**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ROBERT MENENDEZ, *et al.*,

Defendants.

Criminal Action No. 23-490 (SHS)

*Document Electronically Filed*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WAEL HANA'S**
**OMNIBUS PRETRIAL MOTIONS**

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## TABLE OF CONTENTS

<b>Page</b>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................ 3

   I.    COUNTS 1 AND 2 OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO CHARGE AN OFFENSE. ............................................................. 3

      A.    The Indictment Purports To Allege Disparate Official Acts In Exchange For Various Things Of Value. ................................................................. 3

      B.    Legal Standard ........................................................................................ 7

      C.    The Indictment Fails To Charge An Agreement For Senator Menendez To Undertake "Official Acts" Under Either Federal Bribery Or Fraud Law. 11

      D.    The Indictment Does Not Charge an Agreement To Influence A Particular Question Or Matter As Required For Counts 1 And 2. ........................... 20

      E.    IN THE ALTERNATIVE, A BILL OF PARTICULARS IS WARRANTED. ....................................................................................... 30

          1.    The Government Should Be Required To Identify And Provide Particulars Regarding The Official Acts That Senator Menendez Agreed To Take And The Duties That He Agreed To Violate. ..... 34

          2.    The Government Should Be Required To Identify And Provide Particulars Regarding The Specific Matters Or Questions Senator Menendez Promised To Influence At The Time He Accepted Or Agreed To Accept The Purported Bribes. ..................................... 36

   II.    COUNT 4 OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO CHARGE AN OFFENSE. ............................................................... 38

      A.    The Court Should Dismiss Count 4 Because 18 U.S.C. § 219 Does Not Permit Charging Non-Public Officials, And FARA Does Not Permit Charging Non-Agents, With Conspiracy Liability. ................................ 39

          1.    The Affirmative Legislative Policy Exception ............................ 40

          2.    Section 219 And FARA Satisfy The Affirmative Legislative Policy Exception. ................................................................................... 42

      B.    Count 4 Of The Indictment Fails To Properly Charge A Conspiracy To Violate 18 U.S.C. § 219. .......................................................................... 47

      C.    Additionally, As Applied To The Charges In The Indictment, 18 U.S.C. § 219 Is Unconstitutionally Vague. ........................................................... 55

          1.    Vagueness As-Applied. ............................................................... 55

          2.    Section 219 Fails To Provide Fair Notice. ................................... 56

      D.    Paragraph 15 Should Be Stricken As Surplusage. .................................. 59

      E.    If Count 4 Is Not Dismissed, The Court Should Order A Bill of Particulars. ............................................................................................. 61

          1.    The Government Should Be Required To Identify the Foreign Principals. ................................................................................... 61

i

Page

2.   The Government Should Identify The Unnamed "Others" With Whom Mr. Hana Is Alleged To Have Agreed And Conspired. ..... 63

3.   The Government Should Identify Where, Including The "Elsewhere" Alleged In The Indictment, The Alleged Crimes Occurred. ................................................................................ 64

III.   THE INDICTMENT IS DUPLICITOUS OR, IN THE ALTERNATIVE, MULTIPLICITOUS. ........................................................................ 66

A.   Counts 1, 2, and 4 Are Impermissibly Duplicitous And Must Be Dismissed. ........................................................................ 66

1.   Legal Standard ............................................................. 66

2.   The Indictment Improperly Combines Multiple, Distinct Conspiracies Into A Single Count. ................................. 68

3.   Counts 1 and 2 ............................................................. 69

4.   Count 4 ......................................................................... 80

5.   Mr. Hana Will Suffer Irreparable Harm And Prejudice If The Government Is Allowed To Proceed On The Duplicitous Indictment. ................................................................... 81

6.   The Duplicitous Counts Should Be Dismissed, Or At Minimum The Government Should Elect The Single Conspiracy That It Will Present To The Jury. ...................................................... 86

B.   In The Alternative, The Government Must Elect A Conspiracy On Multiplicity Grounds. .......................................................... 89

1.   Legal Standard ............................................................. 90

2.   The Superseding Indictment Fails The *Korfant* Test ................... 93

IV.   THE INDICTMENT DOES NOT ADEQUATELY ALLEGE VENUE. ......... 102

V.   THE COURT SHOULD SUPPRESS EVIDENCE SEIZED FROM MR. HANA'S DEVICES IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS. ................................................................................... 111

A.   Evidence Derived From The Execution Of Certain Search Warrants Should Be Suppressed Because They Lack Particularity And Are Overbroad. ........................................................................... 111

B.   Evidence Derived From Execution Of The Search Warrants Should Be Suppressed Because The Affidavits Submitted In Support Of The Government's Applications Contained False And Misleading Statements Material Or Necessary To Finding Probable Cause, In Violation Of *Franks v. Delaware* ............................................................... 118

CONCLUSION .................................................................................... 131

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arizona v. Gant*,
556 U.S. 332 (2009)............................................................................................................113

*Arriaga v. Mukasey*,
521 F.3d 219 (2d Cir. 2008).................................................................................................56

*Att'y Gen. of United States v. Irish N. Aid Comm.*,
668 F.2d 159 (2d Cir. 1982)............................................................................................48, 49

*Att'y Gen. of United States v. Wynn*,
636 F. Supp. 3d 96 (D.D.C. 2022)........................................................................................47

*Blockburger v. United States*,
284 U.S. 299 (1932)........................................................................................................92, 93

*Blumenthal v. United States*,
332 U.S. 539 (1947)............................................................................................................75

*Coolidge v. New Hampshire*,
403 U.S. 443 (1971)....................................................................................................112, 113

*Dowling v. United States*,
473 U.S. 207 (1985)........................................................................................................9, 59

*Franks v. Delaware*,
438 U.S. 154 (1978)................................................................................................... *passim*

*Gall v. United States*,
552 U.S. 38 (2007)............................................................................................................83

*Gebardi v. United States*,
287 U.S. 112 (1932)............................................................................................40, 41, 42, 43

*Illinois v. Gates*,
462 U.S. 213 (1983)....................................................................................................122, 126

*Johnson v. United States*,
576 U.S. 591 (2015)....................................................................................................55, 56, 104

*Kentucky v. King*,
563 U.S. 452 (2011)............................................................................................................112

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ........................................................................................................56

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ...........................................................................................73, 75, 76

*Mannix v. Phillips*,
    619 F.3d 187 (2d Cir. 2010) ..........................................................................................56

*Martinez v. Wallace*,
    No. 20-cv-00806, 2021 WL 5771876 (W.D. Tex. Dec. 6, 2021) .........................................126

*United States v. McDonnell*,
    579 U.S. 550 (2016) ..................................................................................................*passim*

*McNally v. United States*,
    483 U.S. 350 (1987) ........................................................................................................14

*Ocasio v. United States*,
    578 U.S. 282 (2016) ...............................................................................................11, 14

*Parker v. Levy*,
    417 U.S. 733 (1974) ........................................................................................................57

*Picard v. Magliano*,
    42 F.4th 89 (2d Cir. 2022) .............................................................................................57

*Riley v. California*,
    573 U.S. 373 (2014) ......................................................................................................117

*Rivera v. United States*,
    728 F. Supp. 250 (S.D.N.Y. 1990), *aff'd in part, vacated in part*, 928 F.2d 592
    (2d Cir. 1991) ..............................................................................................................121

*Rubin v. Garvin*,
    544 F.3d 461 (2d Cir. 2008) ..........................................................................................57

*Russell v. United States*,
    369 U.S. 749 (1962) ...........................................................................................8, 85, 86

*Salinas v. United States*,
    522 U.S. 52 (1997) ........................................................................................................40

*Sessions v. Dimaya*,
    584 U.S. ---, 138 S. Ct. 1204 (2018) ...........................................................................56

*Travis v. United States*,
    364 U.S. 631 (1961) ......................................................................................................104

*United State v. Steele*,
    83 F. Supp. 2d 340 (N.D.N.Y. 2000) ................................................................64

*United States v. Abakporo*,
    959 F. Supp. 2d 382 (S.D.N.Y. 2013) ...............................................................77

*United States v. Abbamonte*,
    759 F.2d 1065 (2d Cir. 1985) ............................................................................93

*United States v. Abdallah*,
    528 F. App'x 79 (2d Cir. 2013) .........................................................................10

*United States v. Abdelaziz*,
    68 F.4th 1 (1st Cir. 2023) ..................................................................................70

*United States v. Abrams*,
    539 F. Supp. 378 (S.D.N.Y.1982) .....................................................................86

*United States v. Agnello*,
    367 F. Supp. 444 (E.D.N.Y. 1973) ..............................................................33, 64

*United States v. Aguilar*,
    756 F.2d 1418 (9th Cir. 1985) ...........................................................................87

*United States v. Akhavan*,
    20-cr-188, 2020 WL 2555333 (S.D.N.Y. May 20, 2020) ..................................64

*United States v. Aleskerova*,
    300 F.3d 286 (2d Cir. 2002) ................................................................................5

*United States v. Aleynikov*,
    676 F.3d 71 (2d Cir. 2012) ..................................................................................9

*United States v. Aleynikov*,
    737 F. Supp. 2d 173 (S.D.N.Y. 2010) ..............................................................8, 9

*United States v. Alfisi*,
    308 F.3d 144 (2d Cir. 2002) ..............................................................................21

*United States v. Aliperti*,
    867 F. Supp. 142 (E.D.N.Y. 1994) ...............................................................36, 38

*United States v. Almaleh*,
    No. 17-cr-25, 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) ..............................118

*United States v. Amen*,
    831 F.2d 373 (2d Cir. 1987) .........................................................................41, 42

*United States v. Amiel*,
    95 F.3d 135 (2d Cir. 1996)...........................................................................67

*United States v. Ansaldi*,
    372 F.3d 118 (2d Cir. 2004)..........................................................................92

*United States v. Aracri*,
    968 F.2d 1512 (2d Cir. 1992)...................................................................67, 74

*United States v. Araujo*,
    No. 17-cr-438, 2018 WL 3222527 (S.D.N.Y. July 2, 2018) ...................................92

*United States v. Austin*,
    991 F.3d 51 (1st Cir. 2021).........................................................................126

*United States v. Avenatti*,
    81 F.4th 171 (2d Cir. 2023) ....................................................................21, 37

*United States v. Awadallah*,
    349 F.3d 42 (2d Cir. 2003)..........................................................................121

*United States v. Barnes*,
    158 F.3d 662 (2d Cir. 1998)....................................................................32, 33

*United States v. Baugh*,
    593 F. Supp. 3d 321 (D. Mass. 2022) .............................................................90

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989).........................................................105, 106, 109

*United States v. Bel-Mar Labs., Inc.*,
    284 F. Supp. 875 (E.D.N.Y. 1968) ..................................................................8

*United States v. Belin*,
    99-cr-214, 2000 WL 679138 (S.D.N.Y. May 24, 2000).........................................74

*United States v. Bergstein*,
    16-cr-746 (PKC), 2017 WL 1750392 (S.D.N.Y. May 3, 2017) ...............................67

*United States v. Bezmalinovic*,
    962 F. Supp. 435 (S.D.N.Y. 1997) ................................................................103

*United States v. Bin Laden*,
    92 F. Supp. 2d 225 (S.D.N.Y. 2000), *aff'd sub nom.*, *In re Terrorist Bombings
    of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008)..................................32, 64

*United States v. Birdsall*,
    233 U.S. 223 (1914).................................................................................19

*United States v. Boffa*,
   513 F. Supp. 444 (D. Del. 1980)..................................................................68, 82, 86

*United States v. Bortnovsky*,
   820 F.2d 572 (2d Cir. 1987).....................................................................31, 33, 37

*United States v. Bout*,
   731 F.3d 233 (2d Cir. 2013)................................................................................51

*United States v. Boyland*,
   862 F.3d 279 (2d Cir. 2017)....................................................................... *passim*

*United States v. Broce*,
   488 U.S. 563 (1989)...........................................................................................94

*United States v. Cabrales*,
   524 U.S. 1 (1998)......................................................................103, 104, 105, 110

*United States v. Calderone*,
   982 F.2d 42 (2d Cir. 1992).................................................................................95

*United States v. Cancelmo*,
   64 F.3d 804 (2d Cir. 1995)...............................................................................112

*United States v. Carrano*,
   340 F. Supp. 3d 388 (S.D.N.Y. 2018)...........................................................50, 52

*United States v. Carrozza*,
   728 F. Supp. 266 (S.D.N.Y. 1990), *aff'd*, 956 F.2d 1160 (2d Cir. 1992) ...............74

*United States v. Carter*,
   576 F.2d 1061 (3d Cir. 1978).............................................................................91

*United States v. Castellanos*,
   820 F. Supp. 80 (S.D.N.Y. 1993) .....................................................................120

*United States v. Castle*,
   925 F.2d 831 (5th Cir. 1991) .............................................................................42

*United States v. Chacko*,
   169 F.3d 140 (2d Cir. 2009)...............................................................................90

*United States v. Chalmers*,
   410 F. Supp. 2d 278 (S.D.N.Y. 2006)................................................................32

*United States v. Chandler*,
   388 F.3d 796 (11th Cir. 2004) ...........................................................................76

*United States v. Chen*,
   378 F.3d 151 (2d Cir. 2004)..............................................................31

*United States v. Chow*,
   993 F.3d 125 (2d Cir. 2021)............................................................105

*United States v. Cioffi*,
   668 F. Supp. 2d 385 (E.D.N.Y. 2009) .....................................113, 114, 117, 118

*United States v. Cole*,
   717 F. Supp. 309 (E.D. Pa. 1989) ....................................................34

*United States v. Conesa*,
   899 F. Supp. 172 (S.D.N.Y. 1995) ....................................................74

*United States v. Conley*,
   826 F. Supp. 1536 (W.D. Pa. 1993) ..............................................87, 88

*United States v. Conrad*,
   760 F. App'x 199 (4th Cir. 2019) (per curiam) ..................................12, 13

*United States v. Cooper*,
   886 F.3d 146 (D.C. Cir. 2018)........................................................92

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012)...........................................................103

*United States v. Cornelson*,
   609 F. Supp. 3d 258 (S.D.N.Y. 2022)............................................31, 50

*United States v. Corrado*,
   307 F. Supp. 513 (S.D.N.Y. 1969) ...................................................38

*United States v. Craigue*,
   565 F. Supp. 3d 267 (D.N.H. 2021)..................................................90

*United States v. Crisci*,
   273 F.3d 235 (2d Cir. 2001)..........................................................82

*United States v. Cruikshank*,
   92 U.S. 542 (1875)....................................................................85

*United States v. Cryan*,
   490 F. Supp. 1234 (D.N.J. 1980), *aff'd sub nom. United States v. John F.*
   *Cryan*, 636 F.2d 1211 (3d Cir. 1980), *abrogated on different grounds by*
   *United States v. Donsky*, 825 F.2d 746 (3d Cir. 1987) ............................86

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1998) ............................................................... 33

*United States v. Davis*,
    588 U.S. ---, 139 S. Ct. 2319 (2019) .................................................... 56

*United States v. Diallo*,
    507 F. App'x 89 (2d Cir. 2013) ............................................................ 92

*United States v. Dirr*,
    No. 08-cr-42, 2009 WL 2169871 (E.D. Tenn. July 21, 2009) ............... 65

*United States v. Dixon*,
    509 U.S. 688 (1993) ............................................................................. 90

*United States v. Droms*,
    566 F.2d 361 (2d Cir. 1977) ................................................................ 77

*United States v. Duffey*,
    456 F. App'x. 434 (5th Cir. 2012) ....................................................... 73

*United States v. Dupree*,
    870 F.3d 62 (2d Cir. 2017) ................................................................ 8, 9

*United States v. Dupress*,
    781 F. Supp. 2d 115 (E.D.N.Y. 2011) ............................................... 113

*United States v. Durades*,
    607 F.2d 818 (9th Cir. 1979) .............................................................. 76

*United States v. Espy*,
    989 F. Supp. 17 (D.D.C. 1997), *aff'd in part, rev'd in part*, 145 F.3d 1369
    (D.C. Cir. 1998) ............................................................................ 35, 38

*United States v. Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997),
    *overruled on other grounds* ............................................................. 70

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013) ..................................................... *passim*

*United States v. Ganias*,
    755 F.3d 125 (2d Cir. 2014*) rev'd en banc on other grounds*, 824 F. 3d 199
    (2d Cir. 2016) .................................................................................. 118

*United States v. Ganim*,
    225 F. Supp. 2d 145 (D. Conn. 2002) ................................................ 35

*United States v. Ganim*,
510 F.3d 134 (2d Cir. 2007) .......................................................................29

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) ..........................................................92, 94, 95

*United States v. Geibel*,
369 F.3d 682 (2d Cir. 2004) .............................................73, 74, 106, 108

*United States v. Giraldo*,
859 F. Supp. 52 (E.D.N.Y. 1994) .............................................................74

*United States v. Glenn*,
828 F.2d 855 (1st Cir. 1987) .....................................................................84

*United States v. Glover*,
755 F.3d 811 (7th Cir. 2014) ...................................................................128

*United States v. Gonzalez*,
686 F.3d 122 (2d Cir. 2012) ......................................................................50

*United States v. Gordon*,
No. 17-cr-354, 2018 WL 4495526 (N.D. Ga. May 15, 2018) .................35

*United States v. Grasso*,
585 F. Supp. 3d 484 (S.D.N.Y. 2022) .......................................................38

*United States v. Greenberg*,
No. 21-cr-92, 2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) ......................75

*United States v. Halloran*,
664 F. App'x 23 (2d Cir. 2016) ....................................................12, 15, 16

*United States v. Hammond*,
125 F.3d 845, 1997 WL 592838 (2d Cir. 1997) (unpublished) ...............82

*United States v. Hardy*,
762 F. Supp. 1403 (D. Haw. 1991) ....................................79, 86, 88, 89

*United States v. Hawit*,
No. 15-cr-252, 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ...................36

*United States v. Hearod*,
499 F.2d 1003 (5th Cir. 1974) ...................................................................91

*United States v. Heicklen*,
858 F. Supp. 2d 256 (S.D.N.Y. 2012) ................................................7, 8, 9

*United States v. Hernandez,*
   No. 09-cr-625, 2009 WL 3169226 (S.D.N.Y. Oct. 1, 2009) ...................................................94

*United States v. Hickey,*
   16 F. Supp. 2d 223 (E.D.N.Y. 1998) ...................................................................................65

*United States v. Higdon,*
   68 F. Supp. 3d 807 (E.D. Tenn. 2014) ...............................................................................62

*United States v. Hinton,*
   127 F. Supp. 2d 548 (D.N.J. 2000) ..............................................................................77, 85

*United States v. Hodge,*
   870 F.3d 184 (3d Cir. 2017) ................................................................................................90

*United States v. Hogan,*
   317 F. Supp. 2d 777 (E.D. Mich. 2004) .............................................................................90

*United States v. Hoskins,*
   902 F.3d 69 (2d Cir. 2018) ..........................................................................40, 41, 42, 44

*United States v. Hughes,*
   505 F.3d 578 (6th Cir. 2007) ............................................................................................73

*United States v. Jefferson,*
   289 F. Supp. 3d 717 (E.D. Va. 2017) ...........................................................................13, 16

*United States v. Ji Chaoqun,*
   No. 18-cr-611, 2020 WL 1689826 (N.D. Ill. Apr. 7, 2020) ...............................................51

*United States v. Johansen,*
   56 F.3d 347 (2d Cir. 1995), *as amended* (May 11, 1995)................................................86, 88

*United States v. Johnson,*
   130 F.3d 1420 (10th Cir. 1997) .......................................................................................102

*United States v. Johnson,*
   225 F. Supp. 2d 982 (N.D. Iowa 2002)..............................................................................63

*United States v. Johnson,*
   256 F. Supp. 3d 755 (M.D. Tenn. 2017)............................................................................61

*United States v. Johnson,*
   323 U.S. 273 (1944).................................................................................................104, 111

*United States v. Jones,*
   207 F. Supp. 3d 576 (E.D.N.C. 2016)................................................................................13

*United States v. Jones,*
   482 F.3d 60 (2d Cir. 2006)..........................................................................90

*United States v. Khalupsky,*
   5 F.4th 279 (2d Cir. 2021) .........................................................................54

*United States v. Killeen,*
   No. 98-cr-143, 1998 WL 760237 (S.D.N.Y. Oct. 29, 1998) ...........................70, 72

*United States v. Kim,*
   246 F.3d 186 (2d Cir. 2001)........................................................................106

*United States v. Korbe,*
   No. 09-cr-0005, 2010 WL 2404384 (W.D. Pa. June 10, 2010) ............................34

*United States v. Korfant,*
   771 F.2d 660 (2d Cir. 1985).................................................................92, 93, 100

*United States v. Lahey,*
   967 F. Supp. 2d 698 (S.D.N.Y. 2013).............................................................127

*United States v. Lampley,*
   573 F.2d 783 (3d Cir. 1978) (Gibbons, J., concurring in part and dissenting in
   part).................................................................................................102

*United States v. Lange,*
   No. 10-cr-968, 2012 WL 511448 (E.D.N.Y. Feb. 15, 2012)................................104

*United States v. LaSpina,*
   299 F.3d 165 (2d Cir. 2002)..........................................................................67

*United States v. Lech,*
   161 F.R.D. 255 (S.D.N.Y. 1995) ....................................................................73

*United States v. Lino,*
   No. 00-cr-632, 2001 WL 8356 (S.D.N.Y. Jan. 2, 2001)......................................64

*United States v. Liotard,*
   817 F.2d 1074 (3d Cir. 1978)........................................................................93

*United States v. Lonzo,*
   793 F. Supp. 57 (N.D.N.Y. 1992) ...................................................................65

*United States v. Lopez,*
   356 F.3d 463 (2d Cir. 2004)..........................................................................93

*United States v. Macchia,*
   35 F.3d 662 (2d Cir. 1994)................................................................92, 93, 94, 100

*United States v. Mackey*,
 652 F. Supp. 3d 309 (E.D.N.Y. 2023) ........................................................................107, 111

*United States v. Mahaffy*,
 693 F.3d 113 (2d Cir. 2012)................................................................................................22

*United States v. Malka*,
 602 F. Supp. 3d 510 (S.D.N.Y. 2022)................................................................................54

*United States v. Malkus*,
 696 F. App'x 251 (9th Cir. 2017) ......................................................................................12

*United States v. Manafort*,
 318 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................48, 58, 63

*United States v. Mandell*,
 710 F. Supp. 2d 368 (S.D.N.Y. 2010)................................................................................31

*United States v. Mandell*,
 752 F.3d 544 (2d Cir. 2014)..............................................................................................120

*United States v. Margiotta*,
 646 F.2d 729 (2d Cir. 1981)................................................................................................82

*United States v. Marlinga*,
 No. 04-cr--80372, 2005 WL 513494 (E.D. Mich. Feb. 28, 2005) ..............................80, 88, 89

*United States v. Marquardt*,
 786 F.2d 771 (7th Cir. 1986) ..............................................................................................91

*United States v. Martin*,
 411 F. Supp. 2d 370 (S.D.N.Y. 2006)..........................................................................49, 51

*United States v. Maslin*,
 356 F.3d 191 (2d Cir. 2004)..............................................................................................100

*United States v. Mathis*,
 216 F.3d 18 (D.C. Cir. 2000) ..............................................................................................76

*United States v. Maxwell*,
 No. 20-cr-330, 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022)..........................................94, 96

*United States v. McDermott*,
 245 F.3d 133 (2d Cir. 2001)..........................................................................................67, 88

*United States v. McDonnell*,
 579 U.S. 550 (2016).................................................................................................... *passim*

*United States v. McGoff,*
  831 F.2d 1071 (D.C. Cir. 1987) ...................................................................59

*United States v. Mennuti,*
  639 F.2d 107 (2d Cir. 1981), *abrogated on other grounds by Jones v. United
  States*, 529 U.S. 848 (2000) ......................................................................9

*United States v. Michel,*
  No. 19-cr-148-1, 2022 WL 4182342 (D.D.C. Sept. 13, 2022) ...............................58

*United States v. Miller,*
  471 U.S. 130 (1985)...................................................................................85

*United States v. Miselis,*
  972 F.3d 518 (4th Cir. 2020) .......................................................................59

*United States v. Mitrow,*
  No. 13-cr-633, 2015 WL 5245281 (S.D.N.Y. Sept. 8, 2015), *aff'd* 657 F.
  App'x 67 (2d Cir. 2016)..............................................................................22

*United States v. Monaco,*
  194 F.3d 381 (2d Cir. 1999).........................................................................49

*United States v. Montilla Ambrosiani,*
  610 F.2d 65 (1st Cir. 1979), *cert. denied*, 445 U.S. 930 (1980) .............................91

*United States v. Montoya-Echeverria,*
  991 F. Supp. 2d 1048 (N.D. Iowa 2013)..........................................................61

*United States v. Morales-Lopez,*
  No. 20-cr-27, 2022 WL 2355920 (D. Utah June 30, 2022) ...................................57

*United States v. Munoz-Franco,*
  986 F. Supp. 70 (D.P.R. 1997)..........................................................68, 73, 80

*United States v. Murgio,*
  209 F. Supp. 3d 698 (S.D.N.Y. 2016)..............................................................36

*United States v. Murray,*
  618 F.2d 892 (2d Cir. 1980)............................................................67, 81, 82

*United States v. Nachamie,*
  91 F. Supp. 2d 565 (S.D.N.Y. 2000)...........................................................36, 64

*United States v. Napolitano,*
  552 F. Supp. 465 (S.D.N.Y. 1982) .................................................................60

*United States v. Napout*,
   332 F. Supp. 3d 533 (E.D.N.Y. 2018), *aff'd*, 963 F.3d 163 (2d Cir. 2020)...........................22

*United States v. Napout*,
   963 F.3d 163 (2d Cir. 2020).........................................................................................57

*United States v. Nejad*,
   436 F. Supp. 3d 707 (S.D.N.Y. 2020).....................................................................113, 121

*United States v. Nestor*,
   No. 09-cr-398, 2010 WL 3191888 (M.D. Pa. Aug. 11, 2010)...............................................62

*United States v. Nettles*,
   570 F.2d 547 (5th Cir. 1978) .........................................................................................74

*United States v. Newell*,
   658 F.3d 1 (1st Cir. 2011) .........................................................................................77, 83

*United States v. Ng Lap Seng*,
   934 F.3d 110 (2d Cir. 2019).....................................................................................21, 37

*United States v. Nouri*,
   711 F.3d 129 (2d Cir. 2013).........................................................................................21

*United States v. Ohle*,
   678 F. Supp. 2d 215 (S.D.N.Y. 2010).............................................................................68

*United States v. Olmeda*,
   461 F.3d 271 (2d Cir. 2006).....................................................................................68, 93

*United States v. Oruche*,
   No. 07-cr-0124, 2008 WL 612694 (S.D.N.Y. March 5, 2008)...............................................64

*United States v. Pacione*,
   738 F.2d 567 (2d Cir. 1984).........................................................................................9

*United States v. Peace Info. Ctr.*,
   97 F. Supp. 255 (D.D.C 1951) .....................................................................................58

*United States v. Perez*,
   247 F. Supp. 2d 459 (S.D.N.Y. 2003)...........................................................................121

*United States v. Perez*,
   280 F.3d 318 (3d Cir. 2002).......................................................................................104

*United States v. Pietrantonio*,
   637 F.3d 865 (8th Cir. 2011) .......................................................................................84

*United States v. Pinson,*
    860 F.3d 152 (4th Cir. 2017) (per curiam)................................................................13

*United States v. Pinto-Thomaz,*
    352 F. Supp. 3d 287 (S.D.N.Y. 2018)...................................................31, 64, 117

*United States v. Pirro,*
    212 F.3d 86 (2d Cir. 2000).........................................................................9, 19, 20

*United States v. Pleasant,*
    125 F. Supp. 2d 173 (E.D. Va. 2000) .................................................................87

*United States v. Polizzi,*
    257 F.R.D. 33 (E.D.N.Y. 2009) ..........................................................................91

*United States v. Portanova,*
    961 F.3d 252 (3d Cir. 2020)................................................................................57

*United States v. Portillo,*
    No. 09-cr-1142, 2014 WL 97322 (S.D.N.Y. Jan. 8, 2014)................................60

*United States v. Praddy,*
    725 F.3d 147 (2d Cir.2013)...........................................................................10, 14

*United States v. Prieto,*
    812 F.3d 6 (1st Cir. 2016) ...................................................................................85

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020)......................................................................105, 106

*United States v. Rajaratnam,*
    718 F.3d 139 (2d Cir. 2013)..............................................................................121

*United States v. Rajaratnam,*
    736 F. Supp. 2d 683 (S.D.N.Y. 2010)............................................................67, 68

*United States v. Rajaratnam,*
    No. 09-cr-1184, 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ....................33, 121

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005)......................................................106, 108, 110

*United States v. Ramirez,*
    609 F.3d 495 (2d Cir. 2010)................................................................................33

*United States v. Ramos-Soto,*
    576 F. Supp. 3d 894 (D. Utah 2021)....................................................................71

*United States v. Raniere*,
    384 F. Supp. 3d 282 (E.D.N.Y. 2019) .................................................................31

*United States v. Ray*,
    541 F. Supp. 3d 355 (S.D.N.Y. 2021)..................................................113, 126

*United States v. Reed*,
    639 F.2d 896 (2d Cir. 1981)..............................................................................91

*United States v. Reichberg*,
    5 F.4th 233 (2d Cir. 2021) ........................................................................24, 26

*United States v. Reid*,
    475 F. App'x 385 (2d Cir. 2012) ...................................................................96

*United States v. Reid*,
    650 F. Supp. 3d 182 (S.D.N.Y. 2023) .........................................................128

*United States v. Requena*,
    980 F.3d 30 (2d Cir. 2020)..............................................................................55

*United States v. Rigas*,
    281 F. Supp. 2d 660 (S.D.N.Y. 2003) ...........................................................67

*United States v. Rigas*,
    605 F.3d 194 (3d Cir. 2010)......................................................................68, 87

*United States v. Rijo*,
    No. 04-cr-6128, 2006 WL 3056526 (W.D.N.Y. July 19, 2006), *report and recommendation adopted sub nom.*, *United States v. Castillo-Martinez*, No. 04-cr-6128, 2006 WL 3056523 (W.D.N.Y. Oct. 26, 2006)....................................31

*United States v. Robinson*,
    855 F.3d 265 (4th Cir. 2017) ..........................................................................90

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999)..............................................................................104, 105

*United States v. Rogas*,
    547 F. Supp. 3d 357 (S.D.N.Y. 2021)............................................................32

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2007)..................................................................109, 110

*United States v. Roque*,
    No. 12-cr-540, 2013 WL 2474686 (D.N.J. June 6, 2013) .......................................34

*United States v. Rosenblatt,*
  554 F.2d 36 (2d Cir. 1977)....................................................................10

*United States v. Rowe,*
  414 F.3d 271 (2d Cir. 2005)................................................................103

*United States v. Roy,*
  783 F.3d 418 (2d Cir. 2015)..................................................................99

*United States v. Royer,*
  549 F.3d 886 (2d Cir. 2008)................................................................106

*United States v. Rutigliano,*
  790 F.3d 389 (2d Cir. 2015)..................................................................84

*United States v. Saavedra,*
  223 F.3d 85 (2d Cir. 2000)..............................................103, 107, 110, 111

*United States v. Salameh,*
  152 F.3d 88 (2d Cir. 1998)....................................................................10

*United States v. Santiago,*
  174 F. Supp. 2d 16 (S.D.N.Y. 2001)......................................................63

*United States v. Sattar,*
  272 F. Supp. 2d 348 (S.D.N.Y. 2003)....................................................57

*United States v. Sattar,*
  314 F. Supp. 2d 279 (S.D.N.Y. 2004)....................................................90

*United States v. Savin,*
  No. 00-cr-45, 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ..............38, 64

*United States v. Schlei,*
  122 F.3d 944 (11th Cir. 1997) ..............................................................84

*United States v. Seeger,*
  303 F.2d 478 (2d Cir. 1962)....................................................................8

*United States v. Shear,*
  962 F.2d 488 (5th Cir. 1992) ................................................................42

*United States v. Siddiqi,*
  No. 06-cr-377, 2007 WL 549420 (S.D.N.Y. Feb. 21, 2007) ................35

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017)........................................................ *passim*

*United States v. Singhal*,
876 F. Supp. 2d 82 (D.D.C. 2012) ........................................................61

*United States v. Skelos*,
707 F. App'x 733 (2d Cir. 2017) .....................................12, 15, 22, 30

*United States v. Skelos*,
988 F.3d 645 (2d Cir. 2021).............................................................23, 29

*United States v. Small*,
229 F. Supp. 2d 1166 (D. Colo. 2002), *aff'd in part, remanded in part*, 423
F.3d 1164 (10th Cir. 2005), *and aff'd in part, rev'd in part and remanded sub
nom. United States v. Hall*, 473 F.3d 1295 (10th Cir. 2007) .................................126

*United States v. Smith*,
231 F.3d 800 (11th Cir. 2000) ......................................................90, 91

*United States v. Smith*,
65 F.R.D. 464 (N.D. Ga. 1974).............................................................34

*United States v. Starks*,
472 F.3d 466 (7th Cir. 2006) ...............................................................90

*United States v. Stevens*,
559 U.S. 460 (2010)...............................................................................57

*United States v. Sturdivant*,
244 F.3d 71 (2d Cir. 2001)...........................................................68, 87

*United States v. Suhl*,
885 F.3d 1106 (8th Cir. 2018) .............................................................12

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999)...............................................................................21

*United States v. Tabb*,
949 F.3d 81 (2d Cir. 2020)...................................................................50

*United States v. Tanner*,
No. 17-cr-61, 2018 WL 1737235 (S.D.N.Y. Feb. 23, 2018) .................................22

*United States v. Teh*,
535 F.3d 511 (6th Cir. 2008) ...............................................................20

*United States v. Throneburg*,
921 F.2d 654 (6th Cir. 1990) .............................................................102

*United States v. Toliver*,
  972 F. Supp. 1030 (W.D. Va. 1997) ...................................................................90

*United States v. Tomero*,
  496 F. Supp. 2d 253 (S.D.N.Y. 2007) ................................................................60

*United States v. Torres*,
  604 F.3d 58 (2d Cir. 2010) ...............................................................................10

*United States v. Travillion*,
  759 F.3d 281 (3d Cir. 2014) ............................................................................102

*United States v. Trie*,
  21 F. Supp. 2d 7 (D.D.C. 1998) ........................................................................65

*United States v. Tzolov*,
  642 F.3d 314 (2d Cir. 2011) ...........................................................105, 107, 109, 110

*United States v. Ulbricht*,
  31 F. Supp. 3d 540 (S.D.N.Y. 2014) .........................................................4, 5, 10

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017) ..............................................................................117

*United States v. Urso*,
  369 F. Supp. 2d 254 (E.D.N.Y. 2005) ...............................................................65

*United States v. Vasquez-Ruiz*,
  136 F. Supp. 2d 941 (N.D. Ill. 2002) .................................................................33

*United States v. Vilar*,
  No. 05-cr-621, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ...............................121

*United States v. Walsh*,
  194 F.3d 37 (2d Cir 1999) ................................................................................86

*United States v. Wegg*,
  919 F. Supp. 898 (E.D. Va. 1996) .....................................................................42

*United States v. Weigand*,
  482 F. Supp. 3d 224 (S.D.N.Y. 2020) ..............................................................112

*United States v. Williams*,
  205 F.3d 23 (2d Cir. 2000) ...............................................................................74

*United States v. Willis*,
  475 F. Supp. 2d 269 (W.D.N.Y. 2007) ..........................................................77, 87

*United States v. Wilson*,
  No. 01-cr-53, 2001 WL 798018 (S.D.N.Y. July 13, 2001) ....................................................65

*United States v. Yakou*,
  428 F.3d 241 (D.C. Cir. 2005) ...............................................................................................45

*United States v. Zemlyansky*,
  908 F.3d 1 (2d Cir. 2018) ................................................................................................10, 11

*United States v. Zemlyansky*,
  945 F. Supp. 2d 438 (S.D.N.Y. 2013) ..........................................................................113, 114

*Van Buren v. United States*,
  593 U.S. ---, 141 S. Ct. 1648 (2021) ....................................................................................43

*Wilson v. Russo*,
  212 F.3d 781 (3d Cir. 2000) ..................................................................................................121

**Statutes**

15 U.S.C. §§ 78dd-1 ....................................................................................................................42

18 U.S.C. § 2 ...............................................................................................................................40

18 U.S.C.§ 41 ..............................................................................................................................45

18 U.S.C. § 201 .....................................................................................................................*passim*

18 U.S.C. § 219 .....................................................................................................................*passim*

18 U.S.C. § 371 .....................................................................................................................*passim*

18 U.S.C. § 666(e) .......................................................................................................................42

18 U.S.C. § 924(c)(1) .................................................................................................................105

18 U.S.C. § 951 .....................................................................................................................*passim*

18 U.S.C. §§ 1343 .................................................................................................................*passim*

18 U.S.C. § 1346 ...................................................................................................................*passim*

18 U.S.C. § 1349 ............................................................................................................1, 10, 99

18 U.S.C. § 1951 ..................................................................................................1, 114, 115

18 U.S.C. § 1956 ..................................................................................................................115

18 U.S.C. § 1957 ..................................................................................................................115

18 U.S.C. § 3147(1) ...................................................................................................3

21 U.S.C. § 846....................................................................................................92

21 U.S.C. § 848, Section 848(c) .............................................................................41

22 U.S.C. § 611) ........................................................................................... *passim*

22 U.S.C. §§ 612 ......................................................................................48, 59 114

22 U.S.C. § 618..................................................................................................114

22 U.S.C. § 613....................................................................................................46

22 U.S.C. § 617....................................................................................................46

Pub. L. 89-486, § 8(b), 80 Stat. 249 (July 4, 1966) .................................................44

Pub. L. 98-473, Title II, Ch. XI, Part J, § 1116, 98 Stat. 2149 (Oct. 12, 1984)............44

**Other Authorities**

Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64
    (1944).......................................................................................................103

Norman Abrams, *Conspiracy and Multi–Venue in Federal Criminal
    Prosecutions: The Crime Committed Formula*, 9 UCLA L. Rev. 751, 774
    (1962).......................................................................................................107

**Rules**

Federal Rule of Criminal Procedure 7 ............................................................. *passim*

Federal Rule of Criminal Procedure 8 .................................................................67, 68

Federal Rule of Criminal Procedure 12 ...............................................................8, 103

Federal Rule of Criminal Procedure 18 ...................................................................104

**Treatises**

2 Charles Alan Wright, Federal Practice and Procedure § 301 (3d ed. 2000)............103

Restatement (Second) of Agency.............................................................................49

**Regulations**

28 C.F.R. § 5.100(a)(8)..........................................................................................48

28 C.F.R. § 5.100(b) ...................................................................................................49

**Constitutional Provisions**

U.S. Const. amend. IV ....................................................................................... *passim*

U.S. Const. amend. V ........................................................................................ *passim*

U.S. Const. amend. VI ....................................................................................... *passim*

U.S. Const. art. III, § 2, cl. 3 .........................................................................84, 103

## PRELIMINARY STATEMENT

On September 21, 2023, a Grand Jury sitting in the United States District Court for the Southern District of New York returned an Indictment (ECF No. 1) against Robert Menendez, Nadine Menendez, Wael Hana, Jose Uribe, and Fred Daibes, charging all Defendants with Conspiracy to Commit Bribery in violation of 18 U.S.C. § 371 (Count 1) and Conspiracy to Commit Honest Services Fraud in violation of 18 U.S.C. § 1349 (Count 2), and charging only Senator Menendez and Mrs. Menendez with Conspiracy to Commit Extortion Under Color of Official Right in violation of 18 U.S.C. § 1951 (Count 3). A First Superseding Indictment (ECF No. 65) was returned on October 12, 2023, which added a charge against Senator Menendez, Mrs. Menendez, and Mr. Hana for Conspiracy For a Public Official to Act as a Foreign Agent in violation of 18 U.S.C. § 371 (Count 4). On January 2, 2024, the Grand Jury returned a Second Superseding Indictment (ECF No. 115) which added new allegations, but not additional charges, against Senator Menendez, Mrs. Menendez, and Mr. Daibes.[1]

The Indictment charges a conspiracy to commit bribery and honest services fraud whereby Senator Menendez allegedly promised to take a series of actions over a five-year period of time in exchange for purported bribes that benefited him and Mrs. Menendez. Ind. ¶ 2. In so alleging, the Indictment identifies five distinct schemes that involve different actors and different alleged benefactors and beneficiaries, and which occurred at different times: (1) a scheme for Senator Menendez to assist Egyptian officials with various requests, *id.* ¶¶ 16-21, 35-38; (2) a scheme for Senator Menendez to help "protect" Mr. Hana's business, IS EG Halal Certified Inc. ("IS EG Halal"), *id.* ¶¶ 22-34; (3) a scheme for Senator Menendez to "disrupt" two New Jersey State

---

[1] Hereinafter, unless otherwise noted, the Second Superseding Indictment is referred to as the "Indictment," and citations to the same take the form "Ind." Additionally, unless otherwise noted, all internal citations and quotation marks are omitted from parenthetical citations.

criminal matters, *id.* ¶ 39-44; (4) a scheme for Senator Menendez to "disrupt" a Federal criminal prosecution, *id.* ¶¶ 46-54; and (5) a scheme for Senator Menendez to act for the benefit of the Government of Qatar, *id.* ¶¶ 55-66. Relying upon the same factual allegations involving the Senator's interactions with Egyptian officials, the Government also alleges that Mr. Hana, Mrs. Menendez, and Senator Menendez conspired for the Senator to act as an agent of a foreign principal required to register, *id.* ¶¶ 81-83, though the Indictment does not identify the foreign principal or even attempt to allege the existence of an agency relationship.

As is the case with regard to other criminal prosecutions that rest upon factually thin and legally unsupportable allegations, the problems with the Indictment are many, and most are fatal. As set forth below, Counts 1, 2, and 4 of the Indictment fail to state an offense against Mr. Hana as a matter of law and must be dismissed. Thus, for example, the allegations of Counts 1 and 2 fail to rest upon the kind of "official act" that the Supreme Court, in *McDonnell v. United States*, 579 U.S. 550 (2016), requires, even as it also fails to tie any benefit allegedly received by Senator or Mrs. Menendez to any allegedly provided in return to the other three defendants, including Mr. Hana; that is, the required *quid pro quo* is not alleged. Nor, and again, even accepting as true all of the allegations of the Indictment, does Count 4 set forth a violation of 18 U.S.C. § 219, as it does not—and indeed expressly declines to—include the foreign principal for whom Senator Menendez was to act as an agent pursuant to the conspiracy alleged. Indeed, as applied to Mr. Hana in Count 4, 18 U.S.C. § 219 is unconstitutionally vague, for no one, looking at the statute, could have known that the actions he allegedly took were criminalized by that provision.

To a great extent, though it is no excuse, these infirmities flow from the truly unique form of the Indictment in this matter, which charges no substantive counts, but four conspiracies (three as against Mr. Hana), each of which incorporate the five different schemes described above. This

form raises two other severe, alternative infirmities:  Counts 1, 2, and 4 can be construed only as either duplicitous, because they each charge multiple unrelated and distinct schemes in singular counts, or multiplicitous, because if there is a single conspiracy to engage in these various schemes such that the counts of the Indictment are not duplicitous, then the Indictment impermissibly divides that one agreement into multiple (in Mr. Hana's case three) separate charges.  Moreover, this form of Indictment tries, though it fails, to insulate from this Court's judicial review the fact that for many, if not all, of the schemes alleged, the conduct charged in the Indictment occurred exclusively outside the Southern District of New York (in New Jersey and Washington, D.C.), and that venue before this Court is therefore improper and, indeed, unconstitutional.  Likewise, because the Government seized certain evidence from Mr. Hana's electronic devices in violation of his Fourth Amendment rights, based upon the breadth of the searches allowed and the misstatements through which the warrants at issue were obtained, that evidence must be suppressed, should this ill-conceived case not be dismissed, as it should be.

## ARGUMENT

## I.     COUNTS 1 AND 2 OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO CHARGE AN OFFENSE.

### A.     The Indictment Purports To Allege Disparate Official Acts In Exchange For Various Things Of Value.

The Indictment purports to charge, as to all Defendants, a conspiracy to commit bribery in violation of 18 U.S.C. §§ 201(b)(1)(A) and (C) and (b)(2)(A) and (C) (Count 1) and conspiracy to commit honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346 (Count 2).[2]  The alleged

---

[2] Counts 1 and 2 also allege a violation of 18 U.S.C. § 3147(1), which applies to individuals who commit an offense while on release pending judicial proceedings. That section is wholly inapplicable to Mr. Hana, who is not alleged to have been on release during the commission of any of the alleged conspiracies.

conspiracies charged in Counts 1 and 2 of the Indictment incorporate by reference all factual allegations in the first 70 paragraphs of the Indictment in support of these charges. Ind. ¶¶ 71, 76. Hence, according to the Indictment, both Counts are predicated upon the same allegations.

In that regard, the Indictment alleges a number of payments and things of value that were supposedly given, directly or indirectly, to Senator Menendez, and a series of acts he allegedly undertook during the five-plus years of the charged conspiracies. Specifically, the Indictment alleges at least five different schemes in which Senator Menendez is charged with agreeing to take action in exchange for the supposed bribe payments: (1) a scheme for Senator Menendez to help Egyptian officials with various requests they had, including the approval of foreign military sales and foreign military financing to Egypt ("scheme to assist Egyptian officials"), Ind. ¶¶ 16-21, 35-38; (2) a scheme for Senator Menendez to help "protect" Mr. Hana's business, IS EG Halal ("scheme to protect IS EG Halal"), *id.* ¶¶ 22-34; (3) a scheme for Senator Menendez to "disrupt" two New Jersey State criminal matters ("scheme to disrupt New Jersey State criminal matters"), *id.* ¶ 39-44; (4) a scheme for Senator Menendez to "disrupt" a Federal criminal prosecution of defendant Fred Daibes ("scheme to disrupt Mr. Daibes's Federal prosecution"), *id.* ¶¶ 46-54; and (5) a scheme for Senator Menendez to act for the benefit of the Government of Qatar ("scheme to benefit Qatar"), *id.* ¶¶ 55-66.[3]

---

[3] According to the Indictment, Mr. Hana was not involved in the fourth and fifth alleged schemes, regarding Mr. Daibes's criminal prosecution and actions to benefit the Government of Qatar. Ind. ¶¶ 46-66. There is a single, apparently superfluous allegation that Mr. Hana purchased twenty-two one-ounce gold bars and that two of them were later found in the residence of Senator and Mrs. Menendez, *id.* ¶ 37(e), but the Government alleges that Mr. Daibes—not Mr. Hana—gave these bars to Senator and Mrs. Menendez in connection with the purported scheme to disrupt a federal criminal prosecution in Mr. Daibes's favor, *id.* ¶¶ 46, 52(h). As is further explained below, to charge a conspiracy, the Government must allege that "a defendant both know the object of the crime and that he knowingly and intentionally join the conspiracy." *See United States v. Ulbricht*, 31 F. Supp. 3d 540, 552 (S.D.N.Y. 2014). While a defendant's knowledge can be inferred through circumstantial evidence, the proof required to establish knowledge varies:

Regarding the first scheme to assist Egyptian officials in various ways, Senator Menendez allegedly sought non-public information about the demographics of persons serving at the United States Embassy in Cairo and disseminated that information to Mrs. Menendez. *Id.* ¶ 19(b). The Senator allegedly disclosed to Mr. Hana non-public information about United States aid to Egypt; anonymously drafted a letter on behalf of Egyptian officials seeking to convince other Senators to release a hold on aid to Egypt; discussed military financing with Egyptian military and intelligence officials; and instructed Mrs. Menendez to tell Mr. Hana that he would "sign off" on a sale of ammunitions to Egypt. *Id.* ¶¶ 19(a), 19(c), 19(d), 20, 21, 37(d), 37(g). The Senator also allegedly met with Egyptian officials regarding negotiations between Egypt, Ethiopia, and Sudan over the construction of the Grand Ethiopian Renaissance Dam on the Nile River, and wrote letters to the then-Secretaries of State and Treasury asking the Secretaries "to increase the State Department's engagement on negotiations surrounding the [Dam]." *Id.* ¶ 37(a) (alteration in original).

---

> A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, [his] presence at critical stages of the conspiracy that could not be explained by happenstance, . . . a lack of surprise when discussing the conspiracy with others, . . . [or] evidence that the defendant participated in conversations directly related to the substance of the conspiracy; possessed items important to the conspiracy; or received or expected to receive a share of the profits from the conspiracy.

*Id.* (quoting *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002)). The Indictment contains no allegations fitting this description against Mr. Hana with regard to the fourth and fifth schemes. In fact, there is no allegation whatsoever that Mr. Hana was aware of the alleged scheme to disrupt Mr. Daibes's prosecution, that he participated during any stage of that scheme, that he was involved in any conversations about the substance of that scheme, that he possessed any items important to that scheme, or that he expected any benefit whatsoever from a favorable resolution of Mr. Daibes's criminal matter. Similarly, there is no allegation that Mr. Hana participated in or provided anything of value in exchange for the alleged scheme to benefit the Qatari Government. Ind. ¶¶ 55-66.

As to the second alleged scheme to "protect" IS EG Halal, the Indictment alleges that Mr. Hana requested Senator Menendez's "assistance" to counter the USDA's "objections" to Mr. Hana's exclusive contract with Egypt to serve as the sole certifier of halal exports from the United States into Egypt.  *Id.* ¶¶ 27-28.  The Government alleges that the Senator "called a high-level USDA official" and "insisted, in sum and substance, that the USDA stop opposing IS EG Halal's status as sole halal certifier."  *Id.* ¶ 30.

Finally, regarding the third alleged scheme to "disrupt" the criminal matters of two individuals, the "New Jersey Defendant" and the "New Jersey Investigative Subject," the Government alleges that Senator Menendez contacted a senior state prosecutor in the Office of the New Jersey Attorney General ("Official-2") to resolve those matters favorably to those persons. *Id.* ¶ 39.  On January 29, 2019, the Senator allegedly called Official-2 "in an attempt through advice and pressure to cause a resolution of the prosecution in the New Jersey Defendant's favor"; on September 4, 2019, Menendez scheduled an in-person meeting with Official-2; and on September 6, 2019, Menendez met with Official-2 and other senior official from the New Jersey Attorney General's Office at the Senator's office in Newark "in an attempt, through advice and pressure, to cause Official-2 to favorably resolve the investigation involving the New Jersey Investigative Subject." *Id.* ¶¶ 42(b), 44(b), 44(c).  The Indictment does not allege how the Senator purported to advise or exert pressure on Official-2 with regard to these matters.  *Id.*

With respect to Mr. Hana, the Indictment alleges several payments that he allegedly gave to the Senator or, more accurately, to Mrs. Menendez, to influence some of the above schemes: (1) a "low-or-no-show job" at Mr. Hana's company, which supposedly resulted in three monthly payments of $10,000 to Mrs. Menendez, *id*. ¶¶ 19, 34; (2) a payment of $23,000 for Mrs. Menendez's mortgage on her residence, *id.* ¶ 32; and (3) the delivery of two exercise machines

and an air purifier to their residence, *id.* ¶ 37(c).The Indictment also seems to contend that Mr. Hana worked with Mr. Uribe to provide Mrs. Menendez with a new automobile, *id.* ¶ 43, but despite this conclusory statement, the only factual allegations in the Indictment relate to how Mr. Uribe supposedly provided Mrs. Menendez the car, *id.* ¶¶ 43(a)-(f) ("*URIBE Provides NADINE MENENDEZ with a Luxury Car*").

The Indictment uses the above allegedly corrupt payments in different contexts and at different times throughout to allege that they were supposedly made to influence the different alleged acts by Senator Menendez.  For example, in one context, the Indictment alleges that Mr. Hana promised Mrs. Menendez "a low-or-no-show job" as a *quid pro quo* for Mr. Hana's supposed request that Senator Menendez "use his power and authority to facilitate [foreign military] sales and financing to Egypt."  Ind. ¶ 19.  But separately, the Indictment attempts to connect those payments from Mr. Hana to Mrs. Menendez for that very same "low-or-no-show job" to the separate bribery scheme in which Senator Menendez was asked to use his influence to protect IS EG Halal.  *Id.* ¶¶ 26, 27-31, 34.  Similarly, the Indictment alleges that Mr. Hana caused his company to pay approximately $23,000 to bring Mrs. Menendez's mortgage current and asserts that after this mortgage payment was made in July 2019, Senator Menendez "continued taking actions to assist Hana and Egypt," with no specificity or other factual explanation.  *Id.* ¶ 32. Likewise, the Indictment alleges that Mr. Hana provided two exercise machines and an air purifier to the Senator, but does not even attempt to connect these gifts to any particular or specific official action that Senator Menendez supposedly took.

### B.  Legal Standard

Federal Rule of Criminal Procedure 7 "requires the prosecution to present to a grand jury an indictment that is 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"  *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y.

2012).   The indictment also "must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  "The statements of essential facts and statutory citation are separate requirements, and a deficiency in the factual allegations cannot be cured by a statutory citation in the same count." *United States v. Dupree*, 870 F.3d 62, 70 (2d Cir. 2017).  "Indeed, an important corollary purpose of the requirement that an indictment state the elements of an offense is to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had."  *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) (quoting *Russell v. United States*, 369 U.S. 749, 768 (1962)); *see also United States v. Seeger*, 303 F.2d 478, 482 (2d Cir. 1962) ("The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had."); *Heicklen*, 858 F. Supp. 2d at 263 ("The two requirements of an indictment are that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."); *United States v. Bel-Mar Labs., Inc.*, 284 F. Supp. 875, 884 (E.D.N.Y. 1968) ("As a corollary purpose, the charging document must also inform the court of the facts alleged so that the court may decide whether they would be sufficient to support a conviction.").

Accordingly, Federal Rule of Criminal Procedure 12(b)(1) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the issue."  *Heicklen*, 858 F. Supp. 2d at 262.  Because federal crimes are "solely creatures

of statute," "a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."  *Id*. (quoting *Dowling v. United States*, 473 U.S. 207, 213 (1985) & *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012)); *see also Dupree*, 870 F.3d at 70 ("An indictment that does not set out all of the essential elements of the offense charged is defective.").

Thus, "dismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute."  *Aleynikov*, 737 F. Supp. 2d at 176.  For example, in *United States v. Pirro*, the Second Circuit upheld the District Court's holding that the indictment, which alleged that the defendant "willfully and knowingly made and subscribed a false 1992 tax return for [p]roperties in violation of [26 U.S.C. §] 7206(1)," "failed to sufficiently allege the second element of a [§] 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood," as "the indictment fail[ed] to allege the essential facts constituting the offense charged."  212 F.3d 86, 88, 91, 93 (2d Cir. 2000); *see also United States v. Pacione*, 738 F.2d 567, 568-69, 572 (2d Cir. 1984) (affirming district court's dismissal of the indictment charging the defendant "with violations of the extortionate credit transactions statute" where "the totality of facts asserted by the government to be provable against [the defendant did] not establish a violation of the statute," as the defendant was not alleged to have made "threats of any sort to anyone"); *United States v. Mennuti*, 639 F.2d 107, 113 (2d Cir. 1981), *abrogated on other grounds by Jones v. United States*, 529 U.S. 848, 854 & n.6 (2000) (upholding district court's pre-trial dismissal of an indictment on the ground that the government's proposed proof would not establish a crime within the terms of the statute).

Here, Count 1 of the Indictment charges Mr. Hana with conspiracy in violation of 18 U.S.C. § 371, and Count 2 charges him with conspiracy in violation of 18 U.S.C. § 1349.[4]  "The essence of the crime of conspiracy . . . is the *agreement* . . . to commit one or more unlawful acts." *United States v. Praddy*, 725 F.3d 147, 153 (2d Cir. 2013) (emphasis in original).  To establish an agreement, the Government must charge a meeting of the minds; that is, "[t]he conspirators must agree to the object, or unlawful end, of the conspiracy.  While the coconspirators need not agree to every detail, they must agree to the 'essential nature' of the plan." *United States v. Ulbricht*, 31 F. Supp. 3d 540, 551 (S.D.N.Y. 2014); *United States v. Abdallah*, 528 F. App'x 79, 82 (2d Cir. 2013) (applying same standard under 18 U.S.C. § 1349).  As to the required object of the conspiracy, a defendant must know what "kind of criminal conduct was in fact contemplated." *Ulbricht*, 31 F. Supp. 3d at 551).  Importantly, a "general agreement to engage in unspecified criminal conduct is insufficient to identify the essential nature of the conspiratorial plan." *United States v. Rosenblatt,* 554 F.2d 36, 39 (2d Cir. 1977).  Instead, "[t]he government must prove that the defendant . . . agreed to commit a *particular offense* and not merely a vague agreement to do something wrong." *United States v. Salameh,* 152 F.3d 88, 151 (2d Cir. 1998) (emphasis in original).  To charge a conspiracy, the Government must also allege the defendant's participation. In other words, conspiracy requires that a defendant (1) know the object of the crime and (2) knowingly and intentionally join the conspiracy. *United States v. Torres*, 604 F.3d 58, 66 (2d Cir.

---

[4] The essential elements of a conspiracy under § 371 and § 1349 are identical with respect to the agreement that is required to establish a violation of either statute.  They differ only in that § 1349 does not require proof of an overt act and is limited to conspiracies to violate Chapter 63 of 18 U.S.C. (*i.e.*, mail fraud and other fraud offenses).  Most significantly, the requirement that an agreement be alleged and proved is identical in the two statutes.  *See United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018) (noting that there is "no overt act requirement for conspiracy under 18 U.S.C. § 1349," but that the "basic" elements of "(1) an agreement between at least two people to commit an unlawful act, and (2) the defendant's knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed" apply).

2010); *Zemlyansky*, 908 F.3d at 10.  Ultimately, the "fundamental characteristic" of a conspiracy is "a joint commitment to an endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense."  *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (cleaned up).

The Indictment here does not allege the essential facts that constitute the offenses charged against Mr. Hana in either of the conspiracy counts.  Specifically, Count 1, which is predicated on a violation of 18 U.S.C. § 201 (bribery), and Count 2, which is predicated on a violation of 18 U.S.C. §§ 1343 and 1346 (honest-services fraud), both fail to allege any agreement for Senator Menendez to undertake an "official act."  In addition, neither properly charges an agreement to engage in the required *quid pro quo*.  Accordingly, Counts 1 and 2 of the Indictment must be dismissed.

### C.     The Indictment Fails To Charge An Agreement For Senator Menendez To Undertake "Official Acts" Under Either Federal Bribery Or Fraud Law.

In *McDonnell v. United States*, the Supreme Court unanimously held that an "official act" as defined by the federal bribery statute, 18 U.S.C. § 201(a)(3), cannot be construed to encompass every action by a public official in his or her official capacity, lest the statute "raise significant constitutional concerns."  579 U.S. at 574-75; *see also United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017) ("*Silver I*") (noting that the constitutional concerns of an expansive interpretation of "official act" include "the criminalization of virtually all actions taken on behalf of constituents, subjecting public officials to prosecution without fair notice due to the vagueness of the Government's definition, and setting standards of good government for local and state official[s] in contravention of federalism principles").  Instead, to establish an official act for purposes of federal bribery, the Government must satisfy two requirements.

*First*, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. *McDonnell*, 579 U.S. at 567.   In this regard, "[t]he question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 574.  Further, "[i]t must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official."  *Id.*  Following *McDonnell*, courts have stringently construed "question" or "matter" to encompass only activities akin to a lawsuit, hearing, or administrative determination.  *See United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (efforts to pass state legislation); *United States v. Halloran*, 664 F. App'x 23, 28-29 (2d Cir. 2016) (allocating state funds); *see also United States v. Conrad*, 760 F. App'x 199, 208 (4th Cir. 2019) (per curiam) (awarding and maintaining government contracts); *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (increase in Medicaid reimbursements, Medicaid referral policies, and appointment to state review board); *United States v. Malkus*, 696 F. App'x 251, 252 (9th Cir. 2017) (judicial monetary awards).

*Second*, "the Government must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 579 U.S. at 567.  While a decision or action "may include using his official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act,' by another official," it is clear under *McDonnell* that merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act.'"  *Id.* at 567, 574.  Nor do "hosting an event, meeting with other officials, or speaking with

interested parties," standing alone, constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter." *Id.* at 571-72; *accord United States v. Boyland,* 862 F.3d 279, 290 (2d Cir. 2017) (jury instruction that merely "contacting . . . other governmental agencies" qualified as an official act was erroneous under *McDonnell*). Further, "[s]imply expressing support" is not a decision or action "on" a matter. *McDonnell*, 579 U.S. at 573; *accord United States v. Pinson,* 860 F.3d 152, 168-69 (4th Cir. 2017) (per curiam) (noting that under *McDonnell,* "an 'official act' needed to be something more than '[s]etting up a meeting, hosting an event, or calling an official'"). It is not, then, enough for the decision or action to simply relate to or concern a pending question or matter. *See Silver I*, 864 F.3d at 120-121, 122-123 (offering to help navigate city permit process, writing a letter of recommendation on official letterhead, publicly opposing an issue, and attending a meeting with lobbyists do not satisfy *McDonnell's* second requirement); *Boyland*, 862 F.3d at 290 (contacting another government agency does not constitute an official act); *United States v. Jefferson*, 289 F. Supp. 3d 717, 736-37 (E.D. Va. 2017) (meeting with military officials in an effort to gain approval of testing of certain technology was not an official act).

*McDonnell*'s "official act" requirement applies equally to both the bribery offense alleged in Count 1 and the honest services fraud alleged in Count 2. *See McDonnell*, 579 U.S. at 562, 566-577 (interpreting an "official act" under the federal bribery law, 18 U.S.C. § 201, in the context of reviewing a prosecution for honest services fraud under § 1346); *Conrad*, 760 F. App'x at 208 (applying *McDonnell* in evaluating sufficiency of evidence to support conviction under 18 U.S.C. § 201); *United States v. Jones*, 207 F. Supp. 3d 576, 581 (E.D.N.C. 2016) (applying *McDonnell* on motion to dismiss 18 U.S.C. § 201 charge). That the federal bribery law's definition of "official act" applies in honest services fraud prosecutions flows from the Supreme Court's decision in

13

*Skilling v. United States*, which "interpret[ed] [18 U.S.C. § 1346] to encompass only bribery and kickback schemes" "[t]o preserve [the statute] without transgressing constitutional limitations."[5] 561 U.S. 358, 407-09, 411-12 (2010).  Hence, the law is clear:  to properly charge an honest services fraud predicated upon bribery or kickbacks, the Government must satisfy the definition of "official act" found in § 201.

Unfortunately for the Government, the Indictment here fails to charge that Mr. Hana agreed to take actions that would violate either § 201 or § 1346 because it does not properly allege that Senator Menendez agreed to undertake official acts within the meaning of *McDonnell*.  The crime of conspiracy "is the agreement . . . to commit one or more unlawful acts."  *Praddy*, 725 F.3d at 153 (omission in original).  Thus, to charge conspiracy, the Government must allege that the Defendants agreed to engage in conduct that, if completed, would be unlawful.  *See id.*  In other words, an indictment must allege a joint endeavor that, "if completed, would satisfy all of the elements of [the underlying substantive] criminal offense."  *Ocasio*, 578 U.S. at 287 (alteration in original).  Here, the Indictment does not allege an endeavor to commit bribery under 18 U.S.C.

---

[5] In reaching this conclusion, Supreme Court first reviewed "the origin and subsequent application of the honest-services doctrine."  561 U.S. at 399.  The Court noted that, following its rejection of the intangible rights doctrine as a viable theory of prosecution under the federal mail fraud statute, *see McNally v. United States*, 483 U.S. 350, 360 (1987) (limiting mail fraud "in scope to the protection of property rights"), Congress "responded swiftly" by enacting 18 U.S.C. § 1346 "specifically to cover . . . 'the intangible right of honest services'" cases that were prosecuted pre-*McNally*.  *Skilling*, 561 U.S. at 402.  The Court then explained that, although there were some exceptions, the "solid core" of those cases "involved offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes."  *Id.* at 406 ("[T]he honest-services doctrine had its genesis in prosecutions involving bribery allegations.").  "In view of this history," the Court concluded "there is no doubt that Congress intended § 1346 to reach *at least* bribes and kickbacks."  *Id.* at 408 (emphasis in original).  The Court further explained that extending § 1346 beyond "*only* the bribe-and-kickback core of the pre-*McNally* case law" would create unconstitutional vagueness concerns by including an "amorphous category of cases"—*e.g.*, non-disclosure cases.  *Id.* at 409-10 (emphasis on original).  As a result, the Court construed § 1346 to "establish a uniform national standard" that encompasses only bribery and kickback schemes.  *Id.* at 411-12 (internal quotation marks and citation omitted).

§ 201 or §§ 1343 and 1346 because it does not allege any acts or promises to act by Senator Menendez that amount to official action.

In particular, with regard to the first alleged scheme, for the Senator to assist Egyptian officials, the Government identifies the following "acts":  Senator Menendez allegedly (1) sought non-public information about the demographics of persons serving at the U.S. Embassy in Cairo and forwarded that information to Mrs. Menendez; (2) took action regarding foreign military sales and financing by (a) disclosing to Mr. Hana non-public information regarding the provision of aid to Egypt, (b) anonymously drafting a letter on behalf of Egypt advocating for the release of withheld aid to Egypt, (c) discussing military financing with Egyptian officials, and (d) instructing Mrs. Menendez to inform Mr. Hana that he would "sign off" on a sale of ammunitions to Egypt; and (3) took action regarding the Grand Ethiopian Renaissance Dam by (a) meeting with Egyptian officials regarding the Dam, and (b) writing a letter to the then-Secretaries of Treasury and of State seeking to increase the State Department's engagement on negotiations surrounding the Dam.  Ind. ¶¶ 19 (a)-(d), 20, 21, 37 (a), 37(d), 37(g).  Each of these alleged actions is addressed, in turn, below.

First, the request for demographics of persons serving at the US Embassy in Cairo did not, even as alleged, relate to a question or matter pending before a public official akin to a lawsuit, hearing, or administrative determination.  Indeed, the Indictment alleges nothing at all pending before any official—such as, for example, a bill pending before a legislature, *Skelos*, 707 F. App'x at 740, or state funds pending allocation, *Halloran*, 664 F. App'x at 28-29—regarding persons serving at the embassy.  Therefore, any purported action undertaken with respect to "the number and nationality of persons serving" at the US Embassy fails under *McDonnell's* first prong.

Second, while the State Department's allocation of military funds and approval of military sales is likely a question or matter pending before the Executive Branch akin to an agency

determination, *see Halloran*, 664 F. App'x at 28-29, the Indictment does not allege that the Senator took any action or decision on that matter.  The Government alleges that the State Department "played a central role in reviewing and approving foreign military sales to Egypt and obligating foreign military financing to Egypt, which was conditioned on certain certifications being made by the State Department," and that as a matter of practice, the State Department would typically honor so-called 'holds' placed by the Chairman or the Ranking Member of the [Senate Foreign Relations Committee ("SFRC")] on both foreign military financing and foreign military sales." Ind. ¶ 17.  But the Indictment alleges no interactions between the Senator and the State Department on this topic.  *See generally* Ind.  Indeed, aside from a reference to a text message from the Senator to Mrs. Menendez instructing her to tell Mr. Hana "I am going to sign off this sale to Egypt today . . .," *id.* ¶ 20, the Government does not allege that the Senator had anything to do with this sale, let alone approved it as part of some *quid pro quo*.  More fundamentally, simply discussing military financing with Mrs. Menendez, Mr. Hana, or even with Egyptian officials, which is the most that is alleged, does not constitute a decision or action on the matter.  *See Jefferson*, 289 F. Supp. 3d at 736-37 (meeting with military officials in an effort to gain approval of testing certain technology was not an official act).  As *McDonnell* makes clear, "hosting an event, meeting with other officials, or speaking with interested parties" does not constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter."  579 U.S. at 571-72.  Nor can an allegedly ghost-written letter be characterized as an attempt by Senator Menendez to officially assert his power and influence, particularly when his fellow congresspersons did not know he authored the letter; indeed, such a letter does not even amount to the kind of official expression of support, including in a letter, that courts have held insufficient to constitute official action, as described above and below.  *See, e.g., Silver I*, 864 F.3d at 120-123.

Third, issues relating to the Grand Ethiopian Renaissance Dam, like the demographics of the Embassy in Cairo, are not alleged to have been pending before any public official, which is defined as a "Member of Congress, Delegate, or Resident Commissioner . . . or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, . . ., or a juror."  18 U.S.C. § 201(a)(1).  Indeed, according to the Indictment, the Dam's construction did not concern the United States at all:  it was being built by Ethiopia and negotiations regarding it occurred between Egypt, Ethiopia, and Sudan.  Ind. ¶ 37(a).  Nor does the Government at any point allege that any issue regarding the Dam was pending before any official or agency of the United States.  But even if issues regarding the Dam somehow did constitute such a question or matter under *McDonnell*, Senator Menendez's correspondence to the Secretaries of State and Treasury about the Dam does not constitute an official act, since, as the Supreme Court specifically held, "speaking with interested parties" is not enough.  579 U.S. at 571-72; *see also Boyland*, 862 F.3d at 290 (contacting another government agency does not constitute an official act).  And the act of writing a letter, even on official letterhead, does not itself constitute "a formal exercise of government power on a matter similar to a hearing or lawsuit."  *Silver*, 864 F.3d at 120 (noting that "using government letterhead is not, by itself, a formal exercise of government power" and that the jury could find the defendant's letter to a government agency "did not rise to the level of an 'official act'").  In sum, the essential element of an official act is missing from the first scheme alleged in Counts 1 and 2 of the Indictment.

Regarding the second alleged scheme to "protect" IS EG Halal, the Indictment alleges that Senator Menendez "called a high-level USDA official" and "insisted, in sum and substance, that the USDA stop opposing IS EG Halal's status as sole halal certifier."  Ind. ¶ 30.  But again, IS EG Halal's status was not a matter pending before any public official or United States department or

17

agency.  As the Government concedes, "the Government of Egypt granted IS EG Halal an exclusive monopoly on the certification of U.S. food exports to Egypt as compliant with halal standards."  Ind. ¶ 24.  But Mr. Hana's contract with Egypt did not concern—or require the assistance of—the United States or of any public official.  *See id.*  Indeed, the Indictment does not allege that USDA approval was necessary or that USDA opposition would matter in any way.  *See id.* ¶¶ 27-30.  And even if the IS EG Halal contract could be considered a question or matter under *McDonnell*, which it cannot, merely contacting another government agency does not, as a matter of law, constitute an official act.  *Boyland*, 862 F.3d at 290.  Here too, then, the Indictment fails to allege these essential elements of the offense.

Finally, regarding the alleged scheme to "disrupt" the New Jersey State criminal matters, the Government alleges that Senator Menendez called and met with New Jersey's senior state prosecutor (Official-2) in an effort to resolve the matters in the defendants' favor.  Ind. ¶¶ 42(b), 44(b)-(c).  But the Indictment fails to sufficiently allege that Senator Menendez took an official action or decision on those criminal matters.  Under *McDonnell*, "hosting an event, meeting with other officials, or speaking with interested parties," standing alone, cannot constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter."  579 U.S. at 571-72.  The Indictment alleges that the Senator's contacts with Official-2 constitute "advice and pressure," Ind. ¶ 44(c), but the Government alleges nothing about the substance of the Senator's conversation or how he purportedly advised the state prosecutor or exerted pressure on him.  In other words, the Indictment alleges nothing more than that telephone calls and meetings occurred—allegations clearly insufficient to meet the official act element of the offense under *McDonnell*.  579 U.S. at 567, 574 ("Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act.'").

Indeed, for purposes of establishing whether an official act is alleged under an "advice" theory, the "advice" alleged is understood as occurring between superiors and subordinates, not between members of different governments (*i.e.*, state and federal) or even different departments within the same government. *See id.* at 572. In *McDonnell*, the Court reasoned that advice may constitute an official act, citing to *Birdsall*, which it described as a case "finding official action on the part of subordinates where their superiors would necessarily rely largely upon the reports and advice of subordinates . . . who were more directly acquainted with the facts and circumstances of particular cases." *Id.* at 572 (cleaned up) (citing *United States v. Birdsall*, 233 U.S. 223, 234 (1914)). Here, Official-2, a state prosecutor, and the Senator certainly do not have the same relationship as a superior relying upon the advice of a subordinate. Nor does the Indictment claim that the Senator used his official position to exert any pressure on Official-2, other than merely labeling the call and meeting themselves as an attempt to pressure the state prosecutor. *See Silver*, 864 F.3d 102 at 120-21 (noting that evidence of exerting pressure requires some action, such as threatening to withhold funding).

In sum, the Indictment fails to allege an agreement for Senator Menendez to undertake an official act as to the three schemes involving Mr. Hana. Therefore, Counts 1 and 2 must be dismissed for failing to charge an offense as to Mr. Hana.[6]

---

[6] To the extent that the Government intends to argue that the Senator violated his "lawful duty" under 18 U.S.C. § 201(b)(1)(C) or "official duty" under 18 U.S.C. § (b)(2)(C), as opposed to undertaking an "official act" under 18 U.S.C. § 201(b)(1)(A) and (b)(2)(A), the Indictment fatally fails to identify any "duty" that was breached. *See Pirro*, 212 F.3d at 93 ("[W]here an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense."). Indeed, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Id.* (in prosecution for false declaration on a tax return, indictment failed to allege the element of material falsehood or omission by stating only that defendant omitted something from his tax return "without the crucial background fact that gives rise to the

**D.    The Indictment Does Not Charge An Agreement To Influence A Particular Question Or Matter As Required For Counts 1 And 2.**

In addition to not alleging any official act by Senator Menendez with respect to Count 1, the Indictment is also deficient because it fails to charge that there was an agreement for Senator Menendez to accept the allegedly corrupt payments in exchange for influencing a particular question or matter.  This *quid pro quo* is an essential element of the offenses charged in both Count 1 and Count 2.

Although there is no "uniform definition" of bribery in the federal code, it is "generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions."  *United States v. Ng Lap Seng*, 934 F.3d 110, 131 (2d Cir. 2019).  As the Second Circuit explained in *Ng Lap Seng*, "[i]n generally

---

duty to disclose the fact that was omitted."); *see also United States v. Teh,* 535 F.3d 511, 516 (6th Cir. 2008) ("[T]he words 'contrary to law' . . . do[ ] not fully set forth the 'contrary to law' element.").

Here, the Indictment mentions a violation of a "duty" involving Mr. Hana in only two places. Paragraph 2 alleges that Senator Menendez "promised to and did use his influence and power and breach his official duty in ways that benefited the Government of Egypt and WAEL HANA," and alleges that the Senator "provided sensitive U.S. Government information and took other steps that secretly aided the Government of Egypt," "improperly advised and pressured an official at the United States Department of Agriculture for the purpose of protecting a business monopoly granted to HANA by Egypt and used in part to fund the bribes being paid to MENENDEZ through NADINE MENENDEZ," and "promised to and did use his influence and power and breach his official duty to seek to disrupt a criminal investigation and prosecution undertaken by the New Jersey Attorney General's Office related to JOSE URIBE, the defendant, and his associates."  Ind. ¶ 2.  And Paragraph 16 alleges that Mrs. Menendez "worked to introduce Egyptian intelligence and military officials to" the Senator," and that the Defendants "provided hundreds of thousands of dollars of bribes to" Senator and Mrs. Menendez "in exchange for MENENDEZ's acts and breaches of duty to benefit the Government of Egypt, HANA, and others."  Ind. ¶ 16.

These allegations do not meet the requirement that a specific "duty" be identified.  But beyond this fatal deficiency, the Indictment also, as the Court can see, lumps together "acts" and "breaches of duty" without indicating which actions were "official acts" under 18 U.S.C. § 201(b)(1)(A) and (b)(2)(A), and which violated a "duty" under 18 U.S.C. §§ 201(b)(1)(C) or and 18 U.S.C. § (b)(2)(C).  As a result, the Indictment also fails to provide sufficient notice to Mr. Hana of the crime to which he is to defend.  *See Pirro*, 212 F.3d at 93.

proscribing the bribery of federal officials [under § 201], Congress has prohibited corruptly giving such an official 'anything of value' (the *quid*) 'to influence *any official act*' (the *quo*)." *Id.* (quoting 18 U.S.C. § 201(b)(1)(A)) (emphasis in original)); *see also United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be 'a specific intent to give . . . something of value *in exchange for* an official act.'" (quoting *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999) (emphasis in original))). It is this *quid pro quo* element—"a specific intent [corruptly] to give . . . something of value *in exchange* for action or decision"—that "distinguishes bribery from the related crime of illegal gratuity." *Ng Lap Seng*, 934 F.3d at 132 (quoting *Sun-Diamond Growers of Cal.*, 526 U.S. at 404-05) (emphasis in original) (explaining that gratuity "may constitute merely a reward" for some past or future act)).

The honest services fraud that is the object of the conspiracy charged in Count 2 similarly requires that a *quid pro quo* be alleged and proved. As the Second Circuit has made clear, "following *Skilling* [561 U.S. at 407], . . . for conduct to constitute honest-services fraud [under 18 U.S.C. § 1346], it must involve a *quid pro quo*, *i.e.*, an intent to give or receive something of value in exchange for an . . . act." *United States v. Avenatti*, 81 F.4th 171, 194 (2d Cir. 2023) (omission in original) (quoting *United States v. Nouri*, 711 F.3d 129, 139 (2d Cir. 2013)). As discussed above, this is because the Court in *Skilling* interpreted § 1346 so that it would only encompass bribery and kickback schemes. 561 U.S. at 411-12; *see also supra* n.5. As a result, "[w]here, as here, the prosecution relies on a bribery theory [for an honest services fraud charge], the Government must additionally prove a *quid pro quo*, which [the Second Circuit has] variously defined as 'knowledge' of the payor's expectations, an 'underst[anding] that the . . . payments were made in return for official action,' or a 'promise to perform' an official act in exchange for

payment." *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) ("*Silver II*") (cleaned up). And, for this reason, a *quid pro quo* is an essential element of both underlying substantive offenses charged in Counts 1 and 2.[7]

This requirement applies equally where the indictment alleges a conspiracy to commit bribery or an honest services fraud predicated upon a bribery scheme. *See United States v. Napout*, 332 F. Supp. 3d 533, 565 (E.D.N.Y. 2018), *aff'd*, 963 F.3d 163 (2d Cir. 2020) ("Among other elements, the crime of conspiracy to commit honest services fraud requires a showing that the defendant accepted, or agreed to accept, a secret payment in exchange for an 'official act.'"); *Skelos*, 707 F. App'x at 738 (recognizing that honest services wire fraud conspiracy under 18 U.S.C. §§ 1346 and 1349 "requires proof of a *quid pro quo* agreement," that is, "a government official's receipt of a benefit in exchange for an act he has performed, or promised to perform, in the exercise of his official authority."); *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012) (vacating honest-services fraud convictions under 18 U.S.C. §§ 1346 and 1349 predicated upon bribery scheme where the district court failed to instruct the jury that "honest services fraud required bribery or any sort of *quid pro quo*"). A *quid pro quo*, therefore, is an essential element of Counts 1 and 2.

---

[7] The purported honest services fraud that is the object of the conspiracy charged in Count 2 is obviously predicated upon a bribery theory. *E.g.,* Ind. ¶ 1 (alleging corrupt relationship among the defendants that involved Senator and Mrs. Menendez agreeing to and accepting "hundreds of thousands of dollars of bribes"); *id.* ¶ 16 (accusing certain defendants of "provid[ing] hundreds of thousands of dollars of bribes to MENENDEZ and NADINE MENEDEZ"); *id.* ¶¶ 22-23 (alleging that Hana did not "deliver on promised bribe payments"); *id.* ¶ 26 (alleging Mrs. Menendez formed LLC to receive bribe payments). Regardless, the *quid pro quo* requirement applies equally to a kickback scheme. *See United States v. Tanner*, 17-cr-61, 2018 WL 1737235, at *6 (S.D.N.Y. Feb. 23, 2018) (recognizing "that after *Skilling*, Section 1346 requires a Defendant to act in exchange for a bribe or kickback" and that a *quid pro quo* is required for an honest services fraud predicated upon a kickback scheme); *United States v. Mitrow*, 13-cr-633, 2015 WL 5245281, at *14 (S.D.N.Y. Sept. 8, 2015), *aff'd* 657 F. App'x 67 (2d Cir. 2016) (explaining that an implied *quid pro quo* is sufficient to satisfy this required element for a kickback scheme).

To satisfy the *quid pro quo* requirement, the Government must (1) "identify" the "particular *question* or *matter*" that the official promised to influence and (2) allege that the official agreed to influence that "particular question or matter" at the time the corrupt payment or bribe was accepted or agreed upon. *Silver II*, 948 F.3d at 553, 556 (emphasis in original). Thus, although the *quid pro quo* element does not require that "the particular *act* of influence . . . be identified at the time of the official's promise, the particular question or matter to be influenced must be." *Id.* at 553 ("[T]he public official must, at minimum, promise to influence a 'focused and concrete' 'question or matter' that 'involv[es] a formal exercise of governmental power.'" (quoting *McDonnell*, 579 U.S. at 569-70, 574)) (emphasis in original). And because "the relevant point in time in a *quid pro quo* bribery scheme is the moment at which the public official accepts the payment" or agrees to accept it, the "focused and concrete question or matter" must be identified at the time the payment is accepted or agreed upon. *Id.* at 556 (explaining that under *McDonnell*, "at the time the bribe is made, the promised official act must relate to a properly defined question, matter, cause, suit, proceeding or controversy"); *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (holding that the trial court failed to properly charge the jury "that the specific and focused question or matter on which [the public official] was expected to take official action be identified at the time of the payment").

The need to identify the particular question or matter to be influenced is not excused in circumstances in which the Government proceeds with an "as the opportunities arise" theory of bribery, as it may attempt to do in this case.[8] In light of *McDonnell*, the Second Circuit has

---

[8] To be clear, it is Mr. Hana's position that the "as the opportunities arises" theory is legally invalid in light of *McDonnell*. As discussed above, *McDonnell* requires that the Government's theory of bribery, and in turn honest-services fraud predicated on bribery, must assert that the official agreed to act on a "focused and concrete" "question or matter" that is identified "at the time of the alleged *quid pro quo*." 579 U.S. 569-73. The "as the opportunities arise" theory allows

explained that the "as the opportunities arise" theory requires that "at the time of the payment," the official "understood that [he] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise." *United States v. Reichberg*, 5 F.4th 233, 247 (2d Cir. 2021). Again, although bribery does not require that the specific act to be performed be identified, "to be convicted of bribery under the 'as the opportunities arises' theory" still means that "the public official must, at minimum, promise to influence a 'focused and concrete' 'question or matter' that 'involv[es] a formal exercise of governmental power.'" *Silver II*, 948 F.3d at 553 (quoting *McDonnell*, 579 U.S. at 569-70). That is, the Government still must allege that the public official promised to take official action on a particular question or matter as the opportunity to influence that same particular question or matter arises. Put differently, "[w]hen the government proceeds under the 'as opportunities arise' theory of bribery, it must prove that a public official received a payment to which he was not entitled and that, at the time of the payment, the payor and payee understood that [the payee] was expected as a result of the payment to exercise particular kinds of influence . . . as specific opportunities arise." *Reichberg*, 5 F.4th at 247. Without this necessary limitation on the "as the opportunities arise" theory, "any official who accepts a thing of value and then later acts to the benefit of the donor, in any manner, could be vulnerable to criminal prosecution." *Silver II*, 948 F.3d at 558 ("Otherwise, we risk 'subject[ing] [public officials] to prosecution, without fair notice, for the most prosaic interactions.") (quoting *McDonnell*, 579 U.S. at 576).[9]

---

the "question or matter" to be identified at a later time; this is too broad to survive *McDonnell*. Nevertheless, because the Second Circuit has continued to recognized its validity to a limited extent, as discussed herein, *see Silver II*, 948 F.3d at 553 (quoting *McDonnell*, 579 U.S. 569-70), the theory is addressed here. For the reasons set forth, the Indictment does not set forth an offense under the "as the opportunities arise" theory either.

[9] In *Silver II*, the Second Circuit also noted that the terms "as the opportunities arise," "stream of benefits," and "retainer" have all been used interchangeably by courts to characterize the same

Given the above understanding of bribery and honest-services fraud and, in particular, the *quid pro quo* element that is essential to both underlying offenses, the allegations in the Indictment are insufficient, as a matter of law, to charge the conspiracies alleged in Counts 1 and 2. Specifically, the Indictment is deficient because it does not allege an agreement between Mr. Hana and Senator Menendez that at the time Senator Menendez accepted, or agreed to accept, anything from Mr. Hana, he promised to influence a focused, concrete, and particular question or matter.

Instead of identifying the particular question or matter that was the subject of the alleged bribery schemes, as the law requires, the Indictment intermingles several supposed corrupt payments—*i.e.*, *quids*—that were given at various times over five-plus years in exchange for Senator Menendez's alleged promise to assert his influence over several, different matters—*i.e.*, *quos*. This "kitchen-sink approach" of spreading different alleged payments and different "official acts" over 70 paragraphs of an indictment does not satisfy the requirement that Senator Menendez must have agreed to accept corrupt payments knowing at the time he did so that he was being asked to influence a focused, concrete, and particular question or matter. *See Silver II*, 948 F.3d at 577. Indeed, as discussed above, this element is necessary even if the alleged expectation was that Senator Menendez would exercise his influence "as the opportunities arises," because a prosecution under that theory still requires "that the official understood he was expected as a result

---

prosecution theory of bribery. *Silver II*, 948 F.3d at 553 n.7. But the *Silver II* Court confined its holding to the "as the opportunities arise" theory and recognized that there are retainer-type theories of bribery that would not satisfy the "as the opportunities arise" theory of bribery. *Id.* For example, a retainer may be formed by "the acceptance of a bribe with a promise to perform an official act in the future upon designation of the official act by the bribe payor at that later date." *Id.* Such an agreement could not satisfy the requirements of *McDonnell* because the particular question or matter must be identified "at the time the bribe is made." *See id.* at 556, 578578. Therefore, to the extent the Government intends to rely on a "retainer" or a "stream of benefits" theory of liability distinct from the theory upheld in *Silver*, they run afoul of *McDonnell* and subsequent caselaw.

of the payment to exercise particular kinds of acts or influence" on an "as needed" basis as those specific opportunities arose. *Reichberg*, 5 F.4th at 247-48. And in the context of a conspiracy, which is the offense charged in Counts 1 and 2, the failure to identify which particular matter or question was the subject of the alleged bribes is a failure to properly allege the element of an agreement to commit the offense of bribery that is charged in Counts 1 and honest-services fraud in Count 2.

These deficiencies are underscored by the form of the Indictment, which identifies the same allegedly corrupt payments in different contexts and at different times throughout to allege that they were made in exchange to supposedly influence different questions or matters. As just one example, in one part of the Indictment the "low-or-no-show" job that Mr. Hana supposedly promised Mrs. Menendez seems to be alleged in connection with the scheme to influence Senator Menendez to assist Egyptian officials. Ind. ¶ 19. But that very same alleged benefit is separately alleged in connection with asking Senator Menendez to use his influence for another alleged purpose, *i.e.*, to protect Mr. Hana's business. *Id*. ¶¶ 26, 27-31, 34.

Similarly, although the $23,000 payment to Mrs. Menendez's mortgage company references both an alleged scheme to assist Egyptian officials and to protect IS EG Halal, the Indictment does not allege any facts that show the payment was made in exchange for either—or, more specifically, it does not allege that there was an agreement that at the time this payment was accepted, Senator Menendez understood it was to influence any particular matter or question. *Id.* ¶¶ 32. To the contrary, the only alleged action Senator Menendez took to "assist Hana" and protect IS EG Halal, by calling a USDA official, occurred months before the mortgage payment. *Id.* ¶¶ 27-30. And the supposed efforts by Senator Menendez to "assist" Egypt and Egyptian officials, even if true, occurred either a year before, *id.* ¶¶ 16-21, or months after this alleged mortgage payment,

*id.* ¶¶ 35-36.  In either case, the fatal flaw, yet again, is that there is no allegation that this purported

bribe was given in exchange for Senator's Menendez's influence on a *specific* matter or question

.Indeed, the alleged timing of this payment when compared to the timing of the supposed efforts

to assist actually undermines any suggestion that there was an actual agreement to influence any

specific matter or question.[10]  And the same is true with respect to the two exercise machines and

air purifier that Mr. Hana allegedly gave to the Senator.  *Id.* ¶ 37.  As to these purported "bribes,"

the Indictment makes literally no attempt to identify any particular matter or question that Senator

Menendez supposedly agreed to influence as a result.

　　　　The Indictment's fatal flaws become apparent when these charges are compared to other

bribery schemes prosecuted in this District post-*McDonnell*.  For example, the indictment in *Silver*

identified two separate schemes and connected each thing of value received with an official action

taken.  Superseding Indictment (ECF No. 32) Apr. 23, 2015, *United States v. Silver*, 15-cr-93

(S.D.N.Y.). Specifically, Silver was alleged to have received "[a]pproximately $700,000 in illegal

payments . . . in exchange for using his official position to obtain recurring tax certiorari legal

---

[10] The Government may argue that both the scheme to assist Egyptian officials and the scheme to protect IS EG Halal are actually one and the same and, thus, attempt to conflate the supposed efforts to have Senator Menendez use his influence to assist Egyptian officials into the alleged scheme to bribe Senator Menendez in order to protect Mr. Hana's business.  The problem, though, is that the Indictment does not allege that to be the case and certainly does not provide any notice that this is the offense being charged in Counts 1 and 2.  To the contrary, on its face, the Indictment alleges a scheme to have Senator Menendez use his influence to assist Egyptian officials that is distinct from the purported scheme to have Senator Menendez use his influence to protect Mr. Hana's halal business, and—again, accepting the allegations of the Indictment on their face—each supposedly involved distinct actions.  *Compare* Ind. ¶ 19 (alleging that in exchange for bribes Senator Menendez promised to use his influence to facilitate military sales and financing to Egypt, met with several Egyptian officials, and "secretly edited and ghost-wrote" a letter on behalf of Egypt) *with id.* ¶ 30 (alleging that Senator Menendez "intervened" to help Mr. Hana's business by contacting "a high-level USDA official").  For the Government to now argue that the two schemes are actually one particular matter or question for purposes of satisfying the *quid pro quo* element of Counts 1 and 2 therefore requires that the Court ignore the Indictment's actual allegations.

claims . . . of real estate developer clients with substantial business before the State for the Real Estate Law Firm" (the "Real Estate Payment Scheme") and, separately, "[m]ore than $3 million in illegal payments . . . in exchange for using his official position to obtain the names and identifying information of unrepresented patients with mesothelioma, . . . and the valuable legal claims connected thereto, from a doctor" (the "Mesothelioma Scheme").  *Id.* ¶¶ 8(a)-(b)); *see also id.* ¶¶ 12-13, 22-23.  Instead of glossing over the *quid pro quo* requirement and heaping all conduct into a single count, as the Government did here, the *Silver* indictment included six different counts broken up by scheme, with Counts 1, 2, and 5 relating to the Mesothelioma Scheme and Counts 3, 4, and 6 relating to the Real Estate Payment Scheme.  *Id.* ¶¶ 33-43.

The *Percoco* indictment did the same.  *See* Superseding Indictment (ECF No. 321) Sept. 19, 2017, *United States v. Percoco*, 16-cr-776 (S.D.N.Y.).  It described a "first scheme" where the defendants directed "the payment of hundreds of thousands of dollars" to an individual in exchange for that individual working to "secretly rig the bidding process for State contracts worth hundreds of millions of dollars," and a "second scheme" involving "the payment of hundreds of thousands of dollars in bribes . . . in exchange for [the defendant's] assistance in obtaining official State action[.]"  *Id.* ¶ 1; *see also generally id.* ¶¶ 22-24, 28-32, 33-35.  The *Percoco* indictment included thirteen counts broken up further into sub-parts of each scheme, with Counts 1 through 5 relating to the first scheme and Counts 7 through 14 relating to the second scheme.  *Id.* ¶¶ 37-47, 50-67.

The *Silver* and *Percoco* indictments—just examples—left no doubt as to the *quid pro quo* alleged.  The same cannot be said for the Indictment in this case.  As discussed above, the Indictment here simply references allegedly corrupt payments and supposed "official actions" that Senator Menendez took without further alleging that, or identifying how, there was an agreement

that at the time those payments were made (or promised) they were intended to influence "official action" on a particular matter or question.

Last, to be clear, Mr. Hana is *not* arguing that the Indictment needs to allege that a particular payment was intended to, or did, influence a particular act—*i.e.,* a specific meeting or telephone call.  The law is clear that the "bribery *quid pro quo* does not require a 'link [between] each specific benefit [and] a single official act."  *Silver II*, 948 F.3d at 554 (quoting *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007)).  But the law is equally clear that in cases involving "an ongoing course of conduct [by a public official] . . . the public official must still understand the exchange to be one of payment for specific official[] acts as the opportunities to commit those acts arise." *Id*. at 554-55 (alteration in original)).  And most significantly for purposes of the analysis here, "[e]ven though the particular act of influence need not be identified at the time of the official's promise, the particular question or matter to be influenced must be."  *Id.* at 553, 555 (explaining that the Court in *McDonnell* was concerned that a jury might otherwise convict a defendant "without finding that he agreed [(or promised)] to make a decision or take an action on a *properly defined 'question, matter, cause, suit, proceeding or controversy'*" (quoting *McDonnell*, 579 U.S. at 579-80) (alteration and emphasis in original)); *see also Skelos*, 988 F.3d at 656 (explaining that the *quid pro quo* element mandates that "[the public official] and the bribing party shared a specific enough understanding of the question or matter upon payment").  And, again, in the context of a conspiracy, the Government must allege that there was an agreement on the supposed bribe being made to influence a particular question or matter at the time it is accepted or agreed upon.  *See Skelos*, 707 F. App'x at 738 (requiring proof of a *quid pro quo* agreement.).

Here, the only thing that the Indictment makes clear is that the Government has alleged that Mr. Hana supposedly made payments and gave things of value to Mrs. Menendez during a

five-year period, and that during that same time period Senator Menendez allegedly undertook some actions to assist either Egypt or Mr. Hana's business, or perhaps for some other unidentified purpose. As discussed above, this disconnected approach is, as a matter of law, insufficient to properly allege the *quid pro quo* that is an essential element of both Counts 1 and 2 after *McDonnell* and after the Second Circuit's application of *McDonnell* in *Silver*. And it is certainly insufficient to give Mr. Hana notice of the charges he must defend at a trial.

Given these deficiencies, the Indictment must be dismissed. The Government in response is certain to argue, as it always does, that the 50-page Indictment is long and detailed enough to satisfy Federal Rule of Criminal Procedure 7. But length and wordiness should not be confused with legal sufficiency, and they certainly do not excuse the failure to meet the requirements of the relevant caselaw. The Second Circuit has made clear in *Silver* and the cases that have followed that an essential element of a bribery offense is a *quid pro quo* that, in short, involves a payment made to influence a particular or specific question or matter that is identified at the time it is made (or at the time when the promise to influence was made). The Indictment fails to do that with respect to all of the schemes alleged. And that failure both bespeaks legal insufficiency and deprives Mr. Hana of the necessary description of the charges against him so as to enable him to defend against these allegations. And it denies this Court the opportunity to decide whether the facts as alleged are sufficient in law to support a conviction, should there be one. Counts 1 and 2 should therefore be dismissed.

### E.     IN THE ALTERNATIVE, A BILL OF PARTICULARS IS WARRANTED.

If this Court disagrees, notwithstanding the fundamental pleading failures and constitutional defects identified above, that the Indictment should be dismissed, then the Government should, at the very least, be required to provide a bill of particulars that would satisfy the relevant pleading standards and allow for a fair and orderly trial.

Under Federal Rule of Criminal Procedure 7(f), a defendant may request and the Government must provide a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against [the defendant], thereby enabling [the] defendant to prepare for trial [and] to prevent surprise." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). As discussed above, for an indictment to be considered sufficient, it must "fairly inform[] a defendant of the charges against him." *United States v. Cornelson*, 609 F. Supp. 3d 258, 263 (S.D.N.Y. 2022). "[W]here the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," the court is required to order a bill of particulars. *United States v. Raniere*, 384 F. Supp. 3d 282, 322 (E.D.N.Y. 2019) (quoting *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004)). In particular, where, as here, "the charge against the defendant is broad in scope, a bill of particulars may be more appropriate than where the charged conduct is more narrow." *United States v. Rijo*, 04-cr-6128, 2006 WL 3056526, at *3 (W.D.N.Y. July 19, 2006), *report and recommendation adopted sub nom.*, *United States v. Castillo-Martinez*, No. 04-cr-6128, 2006 WL 3056523 (W.D.N.Y. Oct. 26, 2006).

"The purpose of a bill of particulars is to supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 301-02 (S.D.N.Y. 2018) (quoting *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010)). "Whether to order the filing of a bill of particulars is a decision that rests within the sound discretion of the district court." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000), *aff'd sub nom.*, *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008). "In deciding whether to grant the motion, the court must examine the totality of the information available to the defendant—through the

indictment, affirmations, and general pre-trial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *United States v. Rogas*, 547 F. Supp. 3d 357, 365 (S.D.N.Y. 2021).  Specifically, courts look to "the complexity of the offense, the clarity of the indictment, and the degree of discovery otherwise available to the defendants."  *United States v. Chalmers*, 410 F. Supp. 2d 278, 283 (S.D.N.Y. 2006).  Although a bill of particulars is not meant to provide a defendant with wholesale discovery of the Government's case, when what is sought is legitimate information that would allow him to prepare his defense and avoid unfair surprise, a request for a bill of particulars may not be denied merely because providing the information would divulge details of the Government's evidence or theory of the prosecution.  *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) ("While a bill of particulars is not intended, as such, as a means of learning the government's evidence and theories, if necessary to give the defendant enough information about the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories." (cleaned up)).  Indeed, Rule 7(f) was specifically amended "to encourage a more liberal attitude by courts toward bills of particulars."  Fed. R. Crim. P. 7(f), Advisory Committee's Note.

The need for a bill of particulars applies with special force when the Government alleges a conspiracy offense.  Courts have noted that:

> In conspiracy cases, if the government is to rely upon proof of specific acts to establish the case, there is no question that the defendants alleged to have participated in such acts should be furnished with sufficient detail to fairly apprise them of the transactions to be proved so that they will have a reasonable opportunity to meet the charges of performing the specific acts.

*United States v. Agnello*, 367 F. Supp. 444, 450 (E.D.N.Y. 1973); *see also Barnes*, 158 F.3d at 666 ("[A] bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge

. . . .").  Moreover, because "the potential for unfair surprise and the difficulty of preparing a defense are amplified" in complex conspiracy cases, the Government cannot avoid the responsibility of identifying with sufficient particularity the nature of the charge pending against a defendant by relying on the sheer quantity of discovery produced.  *United States v. Rajaratnam*, No. 09-cr-1184, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010).  Nor may the Government rely upon voluminous discovery as a substitute for identifying critical allegations in a vague indictment, lest a defendant be left to sift through the discovery and guess at the facts behind those vague allegations.  *See United States v. Vasquez-Ruiz*, 136 F. Supp. 2d 941, 943 (N.D. Ill. 2002) ("The defense should not be left to its own devices and a sifting of the voluminous materials that have been provided in order to divine the particulars of these critical allegations, which have not yet been disclosed.").[11]  Thus, the Second Circuit requires that the Government provide a defendant with a bill of particulars in conspiracy cases, such as this, and district courts routinely do so.  *See United States v. Davidoff*, 845 F.2d 1151, 1152 (2d Cir. 1998) (holding that the district court abused its discretion in denying a bill of particulars in a conspiracy case); *Bortnovsky*, 820 F.2d at 573-74 (reversing the defendants' conspiracy convictions where the district court's denial of a bill of particulars hindered the defendants in preparing their defense); *see also United States v. Roque*, No. 12-cr-540, 2013 WL 2474686, at *7 (D.N.J. June 6, 2013) (ordering the Government to provide a bill of particulars in a Computer Fraud and Abuse Act case requiring that the Government

---

[11] Indeed, the Second Circuit has specifically held that a bill of particulars is especially appropriate where, as here, discovery is so voluminous (in this case, over ten million documents produced within a very short period, including very significant documents that are still being disclosed, even as these motions are due).  *See United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) ("[B]ecause so much discovery was produced to the defendants," a bill of particulars was ordered to "significantly condense[] the voluminous discovery"); *see also Bortnovsky*, 820 F.2d at 574 ("providing mountains of documents to defense counsel …impermissibly shifted" the burden of proof to the defendants, necessitating a bill of particulars).

list "each act of unauthorized access," state "whether the government contends that defendant(s) did it in furtherance" of the Computer Fraud and Abuse Act, and state "whether the government contends that defendant(s) did it in furtherance of state-law 'harassment'"); *United States v. Korbe*, No. 09-cr-0005, 2010 WL 2404384, at *5 (W.D. Pa. June 10, 2010) (granting bill of particulars as to "the general type, manner, means, and time frame of the alleged conspiratorial acts" the Government alleged the defendant participated in); *United States v. Cole*, 717 F. Supp. 309, 316-17 (E.D. Pa. 1989) (directing the government to particularize allegations in indictment by informing defendant of precise unlawful conduct charged against him); *United States v. Smith*, 65 F.R.D. 464, 468 (N.D. Ga. 1974) (holding that, where the indictment charged a variety of fraudulent acts and a conspiracy to commit those acts was vague, "justice require[d] that more information be provided to aid in preparation of the defense" and ordering a bill of particulars).

In any event, Mr. Hana does not here request a bill of particulars to obtain wholesale discovery. Instead, with respect to Counts 1 and 2, and based upon the legal analysis set forth above, if those Counts survive, in order that he be provided with the necessary notice, and so that the Court may meaningfully manage a trial that is actually focused on the offenses purportedly alleged, Mr. Hana respectfully requests that the Government be required to identify: (1) all "official acts" that Senator Menendez allegedly agreed to perform and all duties" the Senator allegedly agreed to breach in connection with the conspiracies; and (2) which alleged bribes paid or agreed to be paid by Mr. Hana correspond to which alleged matters Senator Menendez promised to influence.

### 1. The Government Should Be Required To Identify And Provide Particulars Regarding The Official Acts That Senator Menendez Agreed To Take And The Duties That He Agreed To Violate.

The Government should be required to identify and set forth the particulars of every official act that Senator Menendez was to take and every official or lawful duty he was to breach in

connection with each alleged scheme.  *See supra* Section I.C (outlining "official act" standard under *McDonnell*); *see also United States v. Gordon*, No. 17-cr-354, 2018 WL 4495526, at *4 (N.D. Ga. May 15, 2018), *report and recommendation adopted*, No. 17-cr-354, 2018 WL 3067739 (N.D. Ga. June 21, 2018) ("[T]he Government is required to allege the public official performed or agreed to perform official acts, which consists of a pending question or matter, and an action taken on that particular question or matter.").  That is, the Court should, as other courts routinely do, order the Government to provide a bill of particulars specifying "the conduct, date, place and substance of each official act" forming the basis of each bribery charge.[12]  *United States v. Espy*, 989 F. Supp. 17, 34 (D.D.C. 1997), *aff'd in part, rev'd in part*, 145 F.3d 1369 (D.C. Cir. 1998) (granting the defendant's motion for a bill of particulars seeking "the conduct, date, place and substance of each official act referred in the indictment"); *United States v. Siddiqi*, No. 06-cr-377, 2007 WL 549420, at *3 (S.D.N.Y. Feb. 21, 2007) (requiring the Government to produce a bill of particulars identifying the date, beneficiaries, and substance of the alleged official acts, "so that [the defendant] may focus his defense efforts on those specific instances"); *see also United States v. Aliperti*, 867 F. Supp. 142, 149 (E.D.N.Y. 1994) (government was required to inform the defendant of the particulars of any "*quid pro quo*" allegedly received by defendants in extortion case); *United States v. Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (directing the Government to "identify each and every one of the 'false and misleading' claims which were allegedly submitted and/or filed as part of the conspiracy" and to provide specifics regarding the

---

[12] This request is necessitated by the form of the Indictment, which, rather than identifying each and every act that the Government contends will be actionable, sets forth various "examples" of acts allegedly taken by Senator Menendez in connection with the schemes.  *See* Ind. ¶¶ 2, 19, 32, 37, 42, 44, 53, 57.  This type of incomplete pleading has expressly been deemed to be insufficient. *See, e.g., United States v. Ganim*, 225 F. Supp. 2d 145, 155 (D. Conn. 2002) (granting request for bill of particulars setting forth the benefits the defendant was alleged to have received, where indictment specified some benefits, "among others").

claims it intended to prove were false, including: the identity of the person who prepared the claim and who submitted it; when and where each claim was prepared and submitted; and each item or entry on the claim that is alleged to be false and the manner in which such item or entry is allegedly false); *United States v. Hawit*, No. 15-cr-252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (requiring government to file a bill of particulars specifying the transactions that it "will seek to prove were tainted by an unlawful conspiracy of which [the defendant] was a part"). Only with this information will Mr. Hana and the Court be able to fully understand what the actual charges against him are, adequately prepare his defense, and avoid surprise at trial. This straightforward and focused request for a bill of particulars should therefore be granted.[13]

### 2. The Government Should Be Required To Identify And Provide Particulars Regarding The Specific Matters Or Questions Senator Menendez Promised To Influence At The Time He Accepted Or Agreed To Accept The Purported Bribes.

The Government should also be required to identify and set forth how the supposed bribes and corresponding matters that they were allegedly intended to influence are connected—*i.e.*, the "*pro*" in the *quid pro quo* requirement. As discussed above, in order for the Government to adequately allege and ultimately prove the offenses charged in Counts 1 and 2—bribery and honest-services fraud—the Indictment must set forth the essential element of a *quid pro quo*. *Ng*

---

[13] As explained *supra* at n.6, the Indictment is void of any factual allegation that the Senator violated his "lawful duty" under 18 U.S.C. § 201(b)(1)(C) or "official duty" under 18 U.S.C. § 201(b)(2)(C), as opposed to undertaking an "official act" under 18 U.S.C. § 201(b)(1)(A) and (b)(2)(A). To the extent the Government attempts to pursue action against Mr. Hana under 18 U.S.C. §§ 201(b)(1)(C) or (b)(2)(C), a bill of particulars is required to identify acts allegedly taken by Senator Menendez in violation of an "official" or "lawful" duty as opposed to an "official act." As this Court has explained, "[s]pecifying any such laws or duties [that were allegedly violated] is necessary to enable [the defendant] to prepare for trial [and] to prevent surprise." *United States v. Murgio*, 209 F. Supp. 3d 698, 720 (S.D.N.Y. 2016) (defendant charged with receiving corrupt payments as an officer of a financial institution was entitled to bill of particulars setting forth list of laws or duties he allegedly violated).

*Lap Seng*, 934 F.3d at 131-32; *Avenatti*, 81 F.4th at 194.  Thus, the Government must allege that

Mr. Hana agreed to give something of value (the *quid*) in exchange for an official action (the *quo*).

*See Silver II*, 948 F.3d at 551.  But critically, the Government must also identify the *pro*—the

agreement that ties the *quid* and *quo* together.  Indeed, without such critical information, Mr.

Hana's ability to prepare a defense is unquestionably compromised.  *See Bortnovsky*, 820 F.2d at

574-75 (noting that because of "the district court's failure to compel the Government to reveal

crucial information" the "relevance of key events was shrouded in mystery at the commencement

of and throughout the trial").

Again, this request is necessitated by the extraordinary form the Indictment takes.  It

describes several payments and things of value purportedly given to Senator and Mrs. Menendez

over five-plus years as well as various different matters that the Senator allegedly agreed to or

attempted to influence during that same time, without ever identifying what particular matter or

question the Senator agreed to influence at the time he accepted or agreed to accept the specific

bribe alleged.  As explained, for example, the Indictment alleges that in early 2021, Mr. Hana

caused two exercise machines and an air purifier to be delivered to Senator and Mrs. Menendez's

home, Ind. ¶ 37(c), but never identifies what matter or question Senator Menendez agreed to

allegedly influence at the time he accepted them or agreed to do so.  As a result, Mr. Hana is

impermissibly left guessing at which act the Government might argue that he sought to influence

by providing these items.  *See United States v. Savin*, No. 00-cr-45, 2001 WL 243533, at *3-4

(S.D.N.Y. Mar. 7, 2001) (granting request for particulars where defendant otherwise would have

had to "attempt to guess" which transactions during a six-year period were allegedly improper);

*United States v. Grasso*, 585 F. Supp. 3d 484, 490 (S.D.N.Y. 2022) (granting bill of particulars to

"avoid the need for defendants to guess which of the various potential unnamed government

agencies they are alleged to have intended to defraud or mislead"). But because a criminal defendant cannot be compelled to guess at the criminal conduct with which he has been charged, the Government must provide a bill of particulars identifying which supposed illicit payments are connected to which alleged matters to be influenced. *See Espy*, 989 F. Supp. at 34 (granting motion for bill of particulars "as it relates to the defendant's request for the basis of the government's allegations that the defendant solicited and received things of value 'for and because of official acts performed and to be performed by defendant'"); *United States v. Corrado*, 307 F. Supp. 513, 516 (S.D.N.Y. 1969) (granting defendant's request for a bill of particulars where he was charged with offering kickbacks to influence the actions of an agent of a union pension fund, and ordering the government to provide particulars as to what the defendant offered the agent and what action was intended to be influenced or affected); *Aliperti*, 867 F. Supp. at 149 ("Because the Government will be required to prove at trial that Defendants obtained payments to which they were not entitled, knowing that the payments were made in return for official acts, the Court finds that Defendants are entitled to some particularization in this regard, in order to adequately prepare a defense and to avoid unfair surprise at trial."). This very specific information is necessary in order to allow the defense to prepare for trial, and to assist all counsel and the Court to know what is alleged so that an orderly trial may be had; without it, neither will be possible.

## II.   COUNT 4 OF THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO CHARGE AN OFFENSE.

Count 4 of the Indictment charges Mr. Hana with a conspiracy whereby Senator Menendez would "act as an agent of a foreign principal" in violation of 18 U.S.C. § 219. Ind. ¶ 82. Specifically, the Indictment alleges that, "[f]rom at least in or about January 2018 through at least in or about June 2022," Senator Menendez, Mrs. Menendez, and Mr. Hana "and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and

with each other to have a public official, to wit, ROBERT MENENDEZ, act as an agent of a foreign principal, to wit, the Government of Egypt and Egyptian officials, required to register under FARA, [22 U.S.C. § 611 et seq.]," in violation of § 219.  *Id.*

Count 4 fails for three independent reasons.  *First*, the text and structure of § 219 do not permit the Government to charge persons who are not public officials with conspiracy to violate the statute.  *Second*, the Indictment fails to properly charge a conspiracy to violate § 219 because it does not allege that Mr. Hana conspired to form an agency relationship between Senator Menendez and a foreign principal, as required by governing caselaw.  And *third*, the statute is unconstitutionally vague as applied to the facts alleged in the Indictment.

In addition, Paragraph 15 of the Indictment, which is an entirely gratuitous statement that Mr. Hana has not registered as a foreign agent, has nothing to do with the allegations in the Indictment and serves merely to impugn Mr. Hana; it should be stricken under Federal Rule of Criminal Procedure 7(d).  Finally, if the Court disagrees and determines not to dismiss the Indictment despite these fundamental pleading failures and constitutional defects, the Government should at the very least be required to provide a bill of particulars that will allow Mr. Hana to prepare his defense and receive a fair trial.

A.    **The Court Should Dismiss Count 4 Because 18 U.S.C. § 219 Does Not Permit Charging Non-Public Officials, And FARA Does Not Permit Charging Non-Agents, With Conspiracy Liability.**

Count 4 of the Indictment impermissibly charges Mr. Hana with conspiracy to violate 18 U.S.C. § 219, which creates liability for a public official acting as an agent of a foreign principal, as defined by the Foreign Agents Registration Act ("FARA").  Ind. ¶¶ 81-83.  But Mr. Hana is not a public official and therefore cannot violate § 219.  Further, FARA does not provide for the punishment of non-agents, and Mr. Hana is not alleged to be an agent.  Under binding Second Circuit precedent, then, Count 4 must be dismissed as against Mr. Hana.

### 1.     The Affirmative Legislative Policy Exception

Some statutes do not allow the Government to charge certain classes of persons with secondary criminal liability, whether via aiding-and-abetting liability under 18 U.S.C. § 2 or conspiracy liability under 18 U.S.C. § 371.  While the general rule is that "[a] person . . . may be liable for conspiracy even though he was incapable of committing the substantive offense," *Salinas v. United States*, 522 U.S. 52, 64 (1997), the Second Circuit recognized an exception to this general principle in *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), where the Court explained that "[i]n certain cases it is clear from the structure of a legislative scheme that the lawmaker must have intended that accomplice liability not extend to certain persons whose conduct might otherwise fall within the general common-law or statutory definition of complicity."  *Id.* at 77-78.  The Second Circuit derived this principle from *Gebardi v. United States*, where the Supreme Court held that a man and a woman could not conspire to violate the Mann Act by agreeing to transport the woman across state lines to engage in adultery because it would be contrary to Congress's "affirmative legislative policy" of punishing only the man's role in the crime.  287 U.S. 112, 123 (1932).  While the Mann Act obviously contemplated the participation of a woman in an interstate scheme to engage in adultery, it did not specifically impose any penalty upon her, while on the other hand dealing in detail with the conduct and liability of the man who transported the woman. *Id.* at 119, 121.  The Court thus "perceive[d] in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmatively legislative policy to leave her acquiescence unpunished."  *Id.* at 123.  The Court held that "[i]t would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers."  *Id.*

The Second Circuit applied the *Gebardi* principle to a different statutory scheme in *United States v. Amen*, 831 F.2d 373 (2d Cir. 1987).  There, the defendant Paradiso, a lower-level

employee of the defendant Abbamonte, was convicted of conspiracy and aiding and abetting Abbamonte in his operation of a continuing criminal enterprise under 21 U.S.C. § 848.[14] *Id.* at 375, 381.  Section 848, also referred to as the "kingpin statute," *see Hoskins*, 902 F.3d at 80, was a part of the Comprehensive Drug Abuse Prevention and Control Act of 1970 designed "to target the ringleaders of large-scale narcotics operations" and was a "carefully crafted prohibition" that reached "the 'top brass' in the drug rings, not the lieutenants and foot soldiers," *Amen*, 831 F.3d at 381.  The Court reversed Paradiso's convictions, noting that "[w]hen Congress assigns guilt to only one type of participant in a transaction, it intends to leave the others unpunished for the offense" and that "[h]ere Congress defined the offense as leadership of the [criminal] enterprise, necessarily excluding those who do not lead."  *Id.*  The Court therefore found that effecting Congress's intent in passing the statute meant holding that a lower-level criminal employee of a kingpin could not aid and abet the kingpin's violation of § 848.  *Id.* at 382.

Finally, the Second Circuit in *Hoskins* crystalized the "affirmative legislative policy exception" to secondary liability and held that only persons within the Foreign Corrupt Practices Act's ("FCPA's") "carefully delimited categories [can] be subject to conspiracy or complicity liability."  902 F.3d at 83-84.  The Court started with the statute's text, which solely assigned liability to officers, directors, employees, or agents of United States "domestic concerns" or issuers of securities; U.S. citizens, nationals, or residents; or persons acting in U.S. territory.  *Id.* at 84 (citing 15 U.S.C. §§ 78dd-1; 78dd-2; 78dd-3).  The statute contained "no text that creates any liability whatsoever for" a person falling outside of these narrowly drawn classes.  *Id.*  The Court next looked at the FCPA's structure, which it determined was "created with surgical precision to

---

[14] Section 848(c) defined a person engaged in a continuing criminal enterprise as one "occup[ying] a position of organizer, a supervisory position, or any other position of management . . . from which such person obtains substantial income or resources."

limit its jurisdictional reach." *Id.* The Court also considered the FCPA's legislative history, which it found demonstrated Congressional intent to limit who could be a proper FCPA defendant, holding that "the government may not override that policy using the conspiracy and complicity rules."[15] *Id.* at 95; *see also United States v. Castle*, 925 F.2d 831, 836 (5th Cir. 1991) (applying *Gebardi* and "declin[ing] to extend the reach of the FCPA through the application of the conspiracy statute").

## 2. Section 219 And FARA Satisfy The Affirmative Legislative Policy Exception.

The Government's charge that Mr. Hana conspired to violate 18 U.S.C. § 219 is an end run around the *Gebardi/Hoskins* rule. In drafting § 219 and FARA, Congress carefully delineated the categories of potentially liable persons. Mr. Hana does not fall into any of those categories. The statute's text and structure thus prohibit the Government from evading congressionally imposed requirements and expanding the classes of potentially liable persons through the federal conspiracy statute.

First, beginning with the text of § 219, the statute clearly limits the potentially liable persons within its reach. *See, e.g.*, *Van Buren v. United States*, 593 U.S. ---, 141 S. Ct. 1648, 1654

---

[15] Other circuits have also applied the *Gebardi* rule. For example, *United States v. Shear* held that an employee cannot be convicted of aiding and abetting his employer's violation of 18 U.S.C. § 666(e), which explicitly applies solely to employers who violate OSHA regulations. 962 F.2d 488, 495-96 (5th Cir. 1992). Applying the affirmative legislative policy exception, the Court noted that "Congress clearly demonstrated in OSHA that it was capable of imposing liability thereunder on parties other than employers when it so desired. We refuse to upset the careful balancing that Congress established in section 666(e) by judicially imposing aider and abettor liability on employees. It also strikes us as unseemly and unwise for the courts and the Executive Branch to bring in through the back door a criminal liability so plainly and facially eschewed in the statute creating the offense." *Id.*; *see also United States v. Wegg*, 919 F. Supp. 898, 906-09 (E.D. Va. 1996) (holding that Congress's exemption of licensed firearms dealers from felony liability in connection with straw purchases of firearms cannot be avoided through prosecutors' use of aiding-and-abetting or conspiracy liability).

(2021) (a statute's text is the starting point for interpretation).  The statute provides for a maximum of two years' imprisonment for any "public official" who "is or acts as an agent of a foreign principal."  18 U.S.C. § 219(a).  "Public official" is in turn precisely defined as a "Member of Congress, Delegate, or Resident Commissioner, either before or after he has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency, or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government."  18 U.S.C. § 219(c). And "agent of a foreign principal" is defined by reference to 22 U.S.C. § 611(c) (FARA), which states:

> (1) any person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person— (i) engages within the United States in political activities for or in the interests of such foreign principal; (ii) acts within the United States as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal; (iii) within the United States solicits, collects, disburses, or dispenses contributions, loans, money, or other things of value for or in the interest of such foreign principal; or (iv) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States; and (2) any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal as defined in clause (1) of this subsection.

Apparent from these two definitions is the careful line-drawing in which Congress engaged when drafting § 219.  The statute plainly applies solely to public officials and by its terms is targeted at deterring and punishing members of the federal government who act on behalf of a foreign

principal.[16]  The definition of "agent of a foreign principal" is likewise painstakingly precise and is designed to capture only those who fulfill certain specific functions:  (1) "political activities" on behalf of a foreign principal; (2) public relations or political consulting; (3) soliciting or dispensing money or other things of value; and (4) representing the foreign principal before a Government agency or official.  *See* 22 U.S.C. § 611(c).  Just as in *Hoskins*, the statute contains "no text that creates any liability whatsoever for" a person falling outside of these narrowly drawn classes.  902 F.3d at 84.

The narrow categories of persons who can violate § 219 is a notable departure from Congress's normal practice of drafting criminal statutes to reach all persons engaged in criminal activity over whom the courts may exercise jurisdiction.  Most federal criminal statutes, meaning to capture any and all wrongdoers, are drafted to begin with an all-inclusive or catchall phrase, such as "whoever," "a person who," or "any person."  *See, e.g.*, 18 U.S.C. § 41 (hunting or fishing on wildlife refuges); § 81 (arson); § 229 (chemical weapons); § 471 (counterfeiting); § 641 (embezzlement); § 1344 (bank fraud).  Some statutes even explicitly make clear that they intend to criminalize both sides of an illegal transaction, like the federal bribery statute charged as the object of the conspiracy in Count 1.  *See* 18 U.S.C. § 201(b)(1)-(2) (applying to "[w]hoever . . . corruptly gives, offers or promises anything of value to any public official . . . [or] being a public official . . . corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value . . .").  Indeed, comparing § 219 with § 201 is revealing.  The two statutes use nearly identical

---

[16]The statute originally targeted "officer[s] or employee[s] of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States."  *See* Pub. L. 89-486, § 8(b), 80 Stat. 249 (July 4, 1966).  In 1984, Congress amended the statute by replacing "officer or employee" with "public official" and adding the definition contained in subsection (c), thus making clear that the statute covers members of Congress.  *See* Pub. L. 98-473, Title II, Ch. XI, Part J, § 1116, 98 Stat. 2149 (Oct. 12, 1984).

definitions of "public official" (with the slight exception that § 201 also applies to jurors).  But only one—§ 201—applies by its terms to both public officials and those who bribe public officials, demonstrating that Congress is capable of targeting those who improperly interact with public officials when it so chooses.  Thus, while Congress rarely drafts criminal statutes that explicitly apply only to certain categories of individuals, § 219 does precisely that:  it penalizes only public officials who act as agents of a foreign principal.  Persons who are not public officials are, then, by definition excluded from potential liability.  *Cf. United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005) (describing statutes for which "the evil sought to be averted inherently relates to, and indeed requires, persons in certain categories").

FARA's structure confirms this understanding of Congress's intent.  The provisions of the other statutes that were enacted as FARA all regulate agents, and only agents, of foreign governments.  For example, 18 U.S.C. § 951 provides for a maximum of ten years' imprisonment for anyone who acts as an "agent of a foreign government"—defined as "an individual who agrees to operate within the United States subject to the direction or control of a foreign government or official," while excluding duly accredited diplomatic or consular officers, official or representatives of a foreign government; non-American employees of such officers, officials, or representatives; or "persons engaged in a legal commercial transaction"—without having registered with the Attorney General.  And 22 U.S.C. § 617 creates liability for officers of foreign principals' corporate agents.  Meanwhile, 22 U.S.C. § 613 carefully delineates a series of exceptions for persons who would otherwise be required to register as foreign agents, providing that, for example, diplomats and their staff, foreign officials, solely private actors, persons engaged in religious, scholastic, or scientific pursuits, and persons qualified to practice law need not provide notice to the Attorney General.  Permitting conspiracy (or other accomplice) liability for persons

who fall outside any and all of FARA's classes of potential defendants would eviscerate this meticulous mapping of registration requirements, liability, and immunity, and would markedly expand the Government's prosecutorial authority beyond that for which Congress provided.[17]

A comparison of the potential punishments for § 219 and the federal conspiracy statute is also instructive.  Section 219 provides for a maximum of two years' imprisonment for a public official—and only a public official—who acts as an agent of a foreign principal.  But 18 U.S.C. § 371, the general federal conspiracy statute and the provision under which Mr. Hana is charged in Count 4, provides for imprisonment of no more than five years.  It would be striking for Congress to enact a legislative scheme in which someone who could not possibly violate § 219, but who somehow merely agreed to "have" a public official violate the statute, can be punished with more than double the sentence of a public official who actually committed the substantive offense.  This disparity in potential punishments is further evidence that Congress meant for § 219 to serve as a narrowly targeted means of punishing only public officials, and that the statute cannot be expanded through the federal conspiracy statute.

In sum, the text and structure of both § 219 and FARA more generally make clear that, in enacting the statutes, Congress embodied an affirmative legislative policy of only creating potential criminal liability for public officials (in § 219) and persons who are or act as unregistered foreign agents (in FARA)—a policy that cannot be circumvented through the use of conspiracy (or aiding and abetting) liability.  Because Mr. Hana falls into neither category of permissible defendants, Count 4 must be dismissed against him.

_____

[17] As discussed below, although the Indictment does allege that Mr. Hana has never registered as a foreign agent or lobbyist, Ind. ¶ 15, it carefully avoids alleging that Mr. Hana was required to do so, and it accordingly does not charge him with a violation of § 951.  This paragraph therefore should be stricken from the Indictment.  *See infra*, Section II.D.

**B.      Count 4 Of The Indictment Fails To Properly Charge A Conspiracy To Violate 18 U.S.C. § 219.**

The Indictment alleges that the "object" of the conspiracy in Count 4 is a violation of 18 U.S.C. § 219.  As discussed above, § 219 prohibits, in relevant part, "public official[s]"—and no one else—from being or "act[ing] as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938[.]"  18 U.S.C. § 219(a).  "Public official" includes "Member[s] of Congress."  *Id.* § 219(c).  Though § 219 does not elaborate on the meaning of being or acting as an "agent of a foreign principal," that term is defined under FARA, which § 219 references.

FARA is, at its core, a disclosure statue imposing a registration requirement on "agents" of "foreign principals."  *Att'y Gen. of United States v. Wynn*, 636 F. Supp. 3d 96, 98 (D.D.C. 2022).  Specifically, the statute prohibits a person from "act[ing] as an agent of a foreign principal unless" registered with the Attorney General or unless "exempt from registration under the provisions of this subchapter."  22 U.S.C. § 612(a); *United States v. Manafort*, 318 F. Supp. 3d 1, 4 (D.D.C. 2018).  FARA defines the term "agent of a foreign principal" as:

> [A]ny person who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control, of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal, and who directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal.

22 U.S.C. § 611(c)(1).  Such "political activities" include, for instance, "any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States . . . with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests . . . of a government of a foreign country."  *Id.* § 611(o).  And "foreign principal" is

defined in relevant part as "a government of a foreign country . . . [or] a person outside of the United States, unless it is established that such person is an individual and a citizen of and domiciled within the United States . . . [or] a partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country." *Id.* at § 611(b); *see also* 28 C.F.R. § 5.100(a)(8) ("The term foreign principal includes a person any of whose activities are directed or indirectly supervised, directed, controlled, financed, or subsidized in whole or in major part by a foreign principal as that term is defined in section 1(b) of the Act.").

To avoid an interpretation of "agent of a foreign principal" that would "sweep within the statue's scope many forms of conduct that Congress did not intend to regulate," the Second Circuit has held that an "agency relationship" between an "agent" and "foreign principal" must be established to trigger FARA's registration requirement. *Att'y Gen. of United States v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982). Although that agency relationship "need not . . . meet the standard of the Restatement (Second) of Agency with its focus on 'control' of the agent by the principal," if the alleged relationship is premised on an agent acting at the "request" of a foreign principal, for instance, the relevant "request" must, as a matter of the law of this Circuit:

> [F]all[] somewhere between a command and a plea. . . . For example, it is important to ascertain whether those requested to act were identified with specificity by the principal. . . . Also relevant is the specificity of the action requested. A general plea for political or financial support is less likely to constitute a 'request' under the Act than is a more specific instruction. [18]

---

[18]That interpretation is consistent with the Attorney General's regulations, which state that "[a]s used in [FARA], the term control or any of its variants shall be deemed to include the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, by contract, or otherwise." 28 C.F.R. § 5.100(b).

*Id.* at 161-62.

The Indictment alleges that Senator Menendez "was prohibited from serving as a foreign agent" altogether, Ind. ¶ 14, as the Government interprets § 219 as prohibiting "[p]ublic officials, including Members of Congress . . . from agreeing to be or acting as an agent of a foreign principal required to register under FARA," *id.* ¶ 12.  To properly plead the Count 4 conspiracy charged under 18 U.S.C. § 371, the Indictment "must allege" (1) that Mr. Hana agreed to commit an offense under § 219—namely, to "have" Senator Menendez act as an "agent of a foreign principal" as defined under FARA; (2) that Mr. Hana "knowingly engaged in the conspiracy with the specific intent to commit [an offense under § 219];" and (3) the commission of an "overt act" in furtherance of the conspiracy.  *United States v. Martin*, 411 F. Supp. 2d 370, 372 (S.D.N.Y. 2006) (quoting *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999)).  This it fails to do.

As explained *supra* in Section I.B, "[a]n indictment is impermissibly defective if it fails to 'set out all of the essential elements of the offense charged,'" *United States v. Carrano*, 340 F. Supp. 3d 388, 395 (S.D.N.Y. 2018) (Stein, J.) (quoting *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012)), and is, additionally, only sufficient if it "fairly informs a defendant of the charges against him," *Cornelson*, 609 F. Supp. 3d at 263.  Here, the core of criminality addressed by § 219 is a "public official" (allegedly, Senator Menendez) being or acting as the agent of a foreign principal.  A definite and identifiable "foreign principal" on the other end of an agency relationship, and the agency relationship itself, are thus indispensable components of alleging a conspiracy to violate § 219.  The Indictment's critical deficiency, then, is that it does not allege that Mr. Hana conspired to form an agency relationship between Senator Menendez and a foreign principal.

Specifically, though the Indictment includes a bare recitation of § 219, Ind. ¶ 82, the charging instrument omits elements crucial to pleading the conspiracy charged.  As previously explained, *supra at* Section I.A, the essential element of the conspiracy charge is the defendant's knowing and willful agreement with another to commit an offense against the United States.  *See, e.g., United States v. Tabb*, 949 F.3d 81, 88 (2d Cir. 2020).  But the Indictment here plainly fails to allege an agreement to violate § 219, alleging instead that Mr. Hana and Mrs. Menendez merely made introductions and arranged meetings.  *See* Ind. ¶ 16 ("worked to introduce Egyptian military officials to MENENDEZ"); *id.* ¶ 19 ("arranged a series of meetings and dinners" between these "officials" and Senator Menendez).  The Indictment also alleges that at these meetings, the same Egyptian officials raised "requests related to foreign military sales and foreign military financing," *id.* ¶ 19, and that Mr. Hana and the Egyptian officials exchanged messages pertaining to topics discussed with Senator Menendez, including United States' foreign military financing, an American citizen's personal injury claim against the Egyptian government, and American personnel at the United States Embassy in Cairo, Egypt, characterizing the information shared as "not classified," *id.* ¶¶ 19-21, 35-37.  The two overt acts referenced in the Indictment likewise describe two public social encounters:  (1) a 2018 meal at a restaurant between Mr. Hana, Mrs. Menendez, and Senator Menendez, and (2) a 2019 meal at a restaurant between Senator Menendez, Mr. Hana, and "Egyptian Official-4."  *Id.* ¶ 83.  Leaving aside that all of these actions appear to be entirely consistent with the duties of a Senator (particularly one who sits on the Senate Foreign Relations Committee), an issue raised by Senator Menendez in the context of his Speech Or Debate Clause-related motions, *see* ECF No. 120 at 13-34, Mr. Hana's alleged communications with "Egyptian officials," including meetings he allegedly organized and/or attended, simply do not plead any place or in any way that Mr. Hana conspired to have Senator Menendez act as an "agent"

of the Egyptian government.  *See, e.g.*, *United States v. Ji Chaoqun*, No. 18-cr-611, 2020 WL 1689826, at *1 (N.D. Ill. Apr. 7, 2020) (finding a conspiracy to violate FARA's corollary statute, 18 U.S.C. § 951, sufficiently pled where "the conspiracy count allege[d] that Defendant agreed to assist Intelligence Officer A . . . to violate § 951").

Put differently, the Indictment fails to allege the conspiracy's object offense under § 219 with sufficient clarity to plead that Mr. Hana willfully and knowingly entered into an agreement to commit a violation of it.  Although "an indictment for conspiring to commit an offense—in which the conspiracy is the gist of the crime—[need not] . . . allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy," *United States v. Bout*, 731 F.3d 233, 240 (2d Cir. 2013), a conspiracy pleading that omits allegations essential to the object offense is insufficient as a matter of law, *see Martin*, 411 F. Supp. 2d at 372-75 (addressing the "essential elements" of a substantive wire fraud violation to assess defendant's argument that an indictment's charge of conspiracy to violate wire fraud "fail[ed] to charge him with a crime" under the wire fraud statute); *Carrano*, 340 F. Supp. 3d at 395 (addressing the defendant's post-trial motion that the indictment failed to allege an essential element of the conspiracy charged, this Court stated that "each of the charged objects of the conspiracy required an impact on interstate or foreign commerce" and that "the indictment sufficiently alleged an impact on interstate commerce").

In this regard, it is important that the Indictment does not charge Mr. Hana—or, for that matter, anyone—with a substantive violation of § 219 or FARA.  Of course, there is no requirement that a substantive offense be alleged.  But the lack of a substantive charge highlights the deficiency of the Indictment:  the absence of an allegation that Mr. Hana, or anyone else, was an Egyptian government official, an "agent" of the Egyptian government, or a "foreign principal," as defined

by FARA.  Far from merely eschewing "technical precision" with regard to the alleged object of the Count 4 conspiracy, the Indictment omits allegations of the most elemental components necessary to trigger a registration requirement under FARA, and thus liability under section 219.[19]

Indeed, the Indictment, while generally alleging that Senator Menendez "further promised to take and took a series of acts on behalf of Egypt, including on behalf of Egyptian military and intelligence officials," Ind. ¶ 3, fails to identify through which "Egyptian officials" the Egyptian government purportedly conveyed its requests.  That is, although the Indictment refers to five "Egyptian officials" with whom Mr. Hana and Senator Menendez allegedly interacted, *see id.* ¶ 19(a) ("an Egyptian military official ('Egyptian Official-1')"); *id.* ¶ 19(b) ("an Egyptian government official ('Egyptian Official-2')"); *id.* ¶ 21 ("an Egyptian intelligence official ('Egyptian Official-3')"; *id.* ¶ 37(b) ("another Egyptian official ('Egyptian Official-4')")"; *id.* ¶ 37(d) ("a senior Egyptian intelligence official ('Egyptian Official-5')"), it does not allege at all, let alone with the specificity required in order to provide Mr. Hana with the constitutionally adequate notice for which the law provides, that these officials were the foreign principals required by the statute, as to which there was an agreement that Senator Menendez would become an agent.[20]  *See* 22 U.S.C. § 611(b).

_____

[19] To be more specific, the Indictment first fails, completely, to include allegations identifying any "foreign principal" who sought to direct Senator Menendez's actions.  Thus, although the Indictment mentions "the Arab Republic of Egypt," Ind. ¶ 1, "the Government of Egypt," *id.* ¶¶ 2, 5, 16, "multiple Egyptian officials," *id.* ¶ 6, "Egyptian military and intelligence officials," *id.* ¶¶ 3, 7, 16, "other Egyptian military officials," *id.* ¶¶ 19(a), 20, and "Egyptian officials," *id.* ¶¶ 7, 19, and suggests that Mr. Hana has ties to the Egyptian government, *see id.* ¶ 7, it never actually alleges that Mr. Hana is himself either a "foreign principal" or an "agent" thereof.  Nor, of course, does the Indictment at any point allege which—if any—of these amorphous Egyptian entities are the "foreign principals" relevant to § 219.

[20] Certainly, the Indictment does not allege that Mr. Hana is the foreign principal, or that he was involved in creating the purported agency relationship between Senator Menendez and some foreign principal.  Instead, the Indictment vaguely describes Mr. Hana's connection to the "officials" discussed above, alleging only that he "maintained close connections with Egyptian

But even beyond the fundamental failure to allege the existence and identity of a foreign principal, the Indictment also fails to allege and identify *anyone* who sought to control or direct Senator Menendez's actions, let alone that Mr. Hana willfully and knowingly conspired to facilitate an agency relationship between any foreign principal and Senator Menendez.  To the contrary, the Indictment alleges, in Count 4, that Mr. Hana and Mrs. Menendez "worked to introduce Egyptian intelligence and military officials to MENENDEZ for the purpose of establishing and solidifying a corrupt agreement in which HANA, with assistance from FRED DAIBES and JOSE URIBE, the defendants, provided hundreds of thousands of dollars of bribes to MENENDEZ and NADINE MENENDEZ, in exchange for MENENDEZ's acts and breaches of duty to benefit the Government of Egypt, HANA, and others, including with respect to foreign military sales and foreign military financing."  Ind. ¶ 16.  Thus, the Indictment repeatedly alludes to unspecified "promises" and "acts" that Senator Menendez allegedly took "to benefit the Arab Republic of Egypt," *id.* ¶ 1, "the Government of Egypt," *id.* ¶ 2, and "on behalf of Egyptian military and intelligence officials," *id.* ¶ 3.  It does not, however, provide any allegations, as the law requires, that would allow Mr. Hana to defend against the conclusory charge that he conspired to violate § 219 by agreeing to have Senator Menendez act as an agent for a foreign principal.  *See United States v. Khalupsky*, 5 F.4th 279, 293 (2d Cir. 2021) ("To satisfy the Fifth Amendment's Grand Jury Clause, an indictment must contain the elements of the offense charged and fairly inform the defendant of the charge against which he must defend."); *United States v. Malka*, 602 F. Supp. 3d 510, 557 (S.D.N.Y. 2022) ("[T]he purpose of an indictment is to provide notice to the

---

officials" as demonstrated by text messages between "Egyptian military and intelligence officials, pertaining to various topics, including MENENDEZ, and including requests and directives for HANA to act upon."  Ind. ¶ 7.

defendant of the charges against him which the Government must prove at trial beyond a reasonable doubt before a jury convicts him.").

Nor do the Indictment's references to FARA cure this problem; indeed, they only confuse the allegations before the Court. As has been discussed above, the object of the Count 4 conspiracy is a violation of § 219, which—while referencing terms of art defined under FARA—is an entirely different statute. FARA, as the Indictment points out, requires "an agent of a foreign principal" to register with the Attorney General unless an exception applies. Ind. ¶ 10. Indeed, the Indictment emphasizes that the "purpose of FARA is to prevent covert influence by foreign principals" and "[p]roper registration under the statute allows the United States Government and the American people to evaluate the statements and activities or individuals who are serving as agents of foreign principals in light of their status as foreign agents." *Id.* ¶ 11. But the actual object of the conspiracy, § 219, is not a disclosure statute and does not incorporate any registration requirement. To the contrary, the Indictment states that "[p]ublic officials, including Members of Congress, are prohibited by law from agreeing to be or acting as an agent of a foreign principal required to register under FARA," citing § 219. *Id.* ¶ 12. The Indictment thus alleges that Senator Menendez, "[a]s a public official . . . was prohibited from serving as a foreign agent." *Id.* ¶ 14. The Indictment's emphasis on FARA then, only confuses matters, undermining rather than promoting the notice that indictments are supposed to provide; the allegation that Mr. Hana (and Mrs. Menendez) "have never registered as foreign agents or lobbyists," *id.* ¶ 15, only exacerbates this confusion, further requiring that Count 4, which already fails to allege essential elements of the offense, be dismissed because it denies Mr. Hana constitutionally adequate notice of the charges against him.

54

### C. Additionally, As Applied To The Charges In The Indictment, 18 U.S.C. § 219 Is Unconstitutionally Vague.

Even if the Court concludes that Count 4 of the Indictment adequately states an offense, Mr. Hana respectfully submits that § 219 is unconstitutionally vague as applied in this case, requiring dismissal of Court 4 on this basis as well.

#### 1. Vagueness As-Applied

The Fifth Amendment to the United States Constitution prohibits depriving a person of liberty "without due process of law." U.S. Const. amend. V. That provision gives rise to the constitutional bar on vague criminal statutes, which is the "first essential of due process," and is "consonant alike with ordinary notions of fair play and the settled rules of law." *Johnson v. United States*, 576 U.S. 591, 595 (2015). If a statute is not sufficiently clear, then it is invalid under the "void for vagueness" doctrine.

A "statute is unconstitutionally vague if it fails to define the unlawful conduct with sufficient definiteness that ordinary people can understand what conduct is prohibited, or if its vagueness makes the law unacceptably vulnerable to 'arbitrary enforcement.'" *United States v. Requena*, 980 F.3d 30, 39 (2d Cir. 2020); *see also United States v. Davis*, 588 U.S. ---, 139 S. Ct. 2319, 2325 (2019) ("Vague laws contravene [due process because] statutes must give people 'of common intelligence' fair notice of what the law demands of them."); *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (the "arbitrary enforcement" prong of the vagueness as-applied doctrine "requires that a statute give 'minimal guidelines' to law enforcement authorities, so as not to permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections."). The prohibition on vague statutes is also a "corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 584 U.S. ---, 138 S. Ct. 1204, 1212 (2018);

*see also Davis*, 139 S. Ct. at 2323 (vague laws improperly "hand off the legislature's responsibility"). When a statute is vague, then, courts are not free to rewrite it, but must "treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323.

Over the last decade, the Supreme Court has reinforced the constitutional significance of the void for vagueness doctrine. On three separate occasions, it has struck down statutes, in both the criminal and civil contexts, for failing to satisfy the constitutional requirement of clarity. *See Johnson*, 576 U.S. at 606; *Dimaya*, 138 S. Ct. at 1223; *Davis*, 139 S. Ct. at 2336. Of course, the doctrine bears particular weight in the criminal context, where "the consequences of imprecision" are most severe. *Dimaya*, 138 S. Ct. at 1212. That is, when "a statute imposes criminal penalties, the standard of certainty is higher" and failure to satisfy this stringent standard necessitates that the law be held vague "even when it could conceivably have had some legitimate application." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983); *see also Arriaga v. Mukasey*, 521 F.3d 219, 222-23 (2d Cir. 2008) (noting that criminal laws challenged as vague receive "close scrutiny"). Simply put, "criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." [21] *Parker v. Levy*, 417 U.S. 733, 757 (1974).

### 2.    Section 219 Fails To Provide Fair Notice.

The first step of any vagueness challenge requires that a court "determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Rubin v. Garvin*, 544 F.3d 461, 468 (2d Cir. 2008). "Under the 'fair notice' prong, a

---

[21] An as-applied challenge does not necessarily imply that the statute could never be lawfully applied, as would be the case in the context of a facial vagueness challenge. *See Picard v. Magliano*, 42 F.4th 89, 101 (2d Cir. 2022) ("Generally, '[t]o succeed in a typical facial attack, [a plaintiff] would have to establish that no set of circumstances exists under which [the challenged statute] would be valid, or that the statute lacks any 'plainly legitimate sweep.'" (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)))

court must determine whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *United States v. Napout*, 963 F.3d 163, 181 (2d Cir. 2020); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018). If a statute has been charged in a particular case to encompass conduct that the particular defendant did not have fair notice was criminal, those charges cannot stand. *See, e.g.*, *United States v. Portanova*, 961 F.3d 252, 263 (3d Cir. 2020) ("Because vagueness challenges are evaluated on a case by case basis, we must examine the statute to determine if it is vague as applied to Portanova."); *United States v. Sattar*, 272 F. Supp. 2d 348, 359-61 (S.D.N.Y. 2003) (granting defendant's as-applied vagueness challenge and dismissing counts of Indictment where government application of terms and concepts to statute in charging decisions provided "no notice to persons of ordinary intelligence and [left] the standards of enforcement to be developed by the Government"); *United States v. Morales-Lopez*, No. 20-cr-27, 2022 WL 2355920, at *12 & n.5 (D. Utah June 30, 2022) (granting as-applied vagueness challenge where defendant had demonstrated that the statute was "vague as applied to his particular conduct and that his conduct is not clearly prohibited by a statute").

Here, as described above, the statutory violation at issue is hopelessly muddled, especially for Mr. Hana, who is not alleged to be either a "public official," a "foreign principal," or an "agent of a foreign principal." Section 219 criminalizes conduct that is not defined in that statute, but is defined under FARA, which merely proscribes the failure to disclose that conduct, rather than engaging in it—*i.e.*, FARA criminalizes only a "failure to register in advance of engaging in the delineated political activities." [22]   *United States v. Michel*, No. 19-cr-148, 2022 WL 4182342, at

---

[22] Prior rejections of vagueness arguments leveled at FARA and its "corollary foreign agent statute, 18 U.S.C. § 951," *Michel*, 2022 WL 4182342, at *5, by other courts only further underscore § 219's vagueness as applied to this case. In *Michel*, for example, the United States District Court

*5 (D.D.C. Sept. 13, 2022); *see also Manafort*, 318 F. Supp. 3d at 4 (noting that FARA "expressly prohibit[s] 'acting' as a representative of a foreign entity without submitting the required notification to the Attorney General").   But the underlying offense charged in Count 4—a conspiracy to violate § 219—is predicated on the notion that, as a matter of law, Senator Menendez could *not* register—*i.e.*, the very thing FARA requires.   *See* Ind. ¶ 14 ("As a public official, ROBERT MENENDEZ . . . was prohibited from serving as a foreign agent.").   Taken together, no reasonable person could understand what was being proscribed for Mr. Hana under Count 4 of the Indictment.   Further undermining the ability of an ordinary person to understand its meaning and thus be on notice of its consequences, the plain statutory language prohibits conduct on behalf of a non-existent category of people.   Specifically, § 219(a) creates criminal liability for a public official who "is or acts as an agent of a *foreign principal required to register under the Foreign Agents Registration Act of 1938 [FARA.]*"   But a "foreign principal" is not "required to register under FARA," which only obligates registration by an agent of a foreign principal.   *See* 22 U.S.C. § 612(a) ("No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by subsections (a) and (b) of this section or unless he is exempt from registration under the provisions of this subchapter."); *United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987)

---

for the District of Columbia stated that FARA's registration requirement "is, and has been since its inception, straightforward and 'sufficiently precise.'"   *Id.* (citing *United States v. Peace Info. Ctr.*, 97 F. Supp. 255, 264 (D.D.C 1951)).   Key to the court's finding of FARA's clarity was that the statute "criminalizes, in clear terms, failure to register in advance of engaging in the delineated political activities."   *Id.*   Turning to § 951, the court found that FARA's "corollary" statute "also plainly and concretely identifies the conduct which constitutes its violation, and the statute's language is clear and unambiguous."   *Id.*   The court concluded that both statutes "clearly bar[] acting on behalf of a foreign principal without prior notification to the Attorney General, and applicable regulations define each relevant term."   *Id.* But, of course, that is not the case with regard to § 219, which references FARA but does not—unlike FARA and § 951—"clearly" criminalize a failure to register.

("Under the terms of [§ 612(a)], an agent must, within 10 days of commencing his or her activities, file a registration statement.").

In sum, the impossibility of knowing for certain what § 219's key language proscribes renders the statute unconstitutionally vague, requiring that Count 4—a conspiracy to violate that statute—be dismissed. *See United States v. Miselis*, 972 F.3d 518, 529 (4th Cir. 2020) (holding that the "object of an agreement can't be unlawful if the statute defining [it] is unconstitutional," and that "no prosecution for conspiracy to commit that offense will lie" in that circumstance); *see also Dowling*, 473 U.S. at 228-29 (finding that Congress had "not spoken with the requisite clarity" where the language of a criminal statute did not "plainly and unmistakably cover petitioner['s] . . . conduct . . . and the rationale employed to apply the statute to petitioner's conduct would support its extension to significant bodies of law that Congress gave no indication it intended to touch"). For this reason, too, Count 4 should be dismissed.

### D. Paragraph 15 Should Be Stricken As Surplusage.

In any event, as set forth above, the Court should strike any mention of Mr. Hana from Paragraph 15 of the Indictment, which states, completely gratuitously, and insinuating that there is something wrong with it, that Mr. Hana "ha[s] never registered as [a] foreign agent[] or lobbyist[]." Rule 7(d) permits the Court to "strike surplusage from the indictment or information," Fed. R. Crim. P. 7(d), "where it is clear that the alleged surplusage is not relevant to the crime charged and is inflammatory and prejudicial," *United States v. Tomero*, 496 F. Supp. 2d 253, 255 (S.D.N.Y. 2007). "In a motion to strike surplusage, '[t]he determinative question . . . is not the potential prejudice, but rather the relevance of the allegation to the crime charged in the indictment.'" *United States v. Portillo*, No. 09-cr-1142, 2014 WL 97322, at *8 (S.D.N.Y. Jan. 8, 2014) (quoting *United States v. Napolitano*, 552 F. Supp. 465, 480 (S.D.N.Y. 1982)).

Here, the Government has not charged Mr. Hana with any substantive violation of FARA, nor does the Government allege that Mr. Hana at any point was or acted as an "agent of a foreign principal" required to register under FARA.  Nor, even if the Government had alleged that Mr. Hana violated FARA or any related statute, is there any connection to the conspiracy charged in Count 4, which describes a putative scheme to have Senator Menendez—not Mr. Hana—act as an agent of a foreign principal.  In fact, the Government nowhere states or suggests that Mr. Hana's failure to register—which is not alleged to have violated any statute—bears on any alleged agreement to have Senator Menendez act as an agent of a foreign principal.  And Mr. Hana's registration status has even less relevance to the remaining three counts of the Indictment, which do not concern any alleged activities undertaken on behalf of a foreign principal.

In addition to its irrelevance, Paragraph 15 is also plainly inflammatory and prejudicial. By drawing attention to Mr. Hana "never register[ing] as [a] foreign agent[] or lobbyist[]," the Government suggests that Mr. Hana violated some legal duty under FARA or otherwise, without ever charging such an offense.  Indeed, Paragraphs 10 through 12 of the Indictment, immediately preceding the Government's mention of Mr. Hana's registration status, describe "Relevant Statutory Background on FARA," and provide that the statute "requires any person agreeing to act or acting in the United States as 'an agent of a foreign principal' to register with the United States Attorney General."  Ind. ¶ 10.  The Indictment also states that "[t]he purpose of FARA is to prevent covert influence by foreign principals."  *Id.* ¶ 11.

Taken together, these paragraphs suggest, though they do not allege, wrongdoing by Mr. Hana with which he is not charged.  This is classic surplusage and should accordingly be stricken. *See, e.g.*, *United States v. Singhal*, 876 F. Supp. 2d 82, 102 (D.D.C. 2012) (ordering the Government, upon defendant's motion to strike as surplusage, to remove and reformat language

identifying specific entities as "[a]t trial, the jury will be tasked with understanding the relationships among these entities and their involvement in the schemes alleged in the Indictment. The Indictment's imprecision and failure to properly attribute activity to specific entities adds to this complexity and the burden on the jury. Such confusion is unfairly prejudicial to defendants."); *United States v. Montoya-Echeverria*, 991 F. Supp. 2d 1048, 1051 (N.D. Iowa 2013) (striking as surplusage allegations relevant to sentencing rather than "guilt or innocence" of the crime charged); *United States v. Johnson*, 256 F. Supp. 3d 755, 761-62 (M.D. Tenn. 2017) (striking as surplusage allegations of an uncharged crime that were "obviously . . . not an essential element" of the charge in fact brought, finding it "adds a whole new level of prejudice, which can only serve to inflame the passions and/or prejudices of the jury").

### E. If Count 4 Is Not Dismissed, The Court Should Order A Bill of Particulars.

As discussed above, Count 4, which is plagued with numerous constitutional defects, should be dismissed as against Mr. Hana. If, however, the Court disagrees, then Mr. Hana respectfully requests that, at the very least, the Court order the Government to provide a bill of particulars identifying certain very fundamental facts, described below, that necessarily underlie the allegation that Mr. Hana entered into a conspiracy to violate FARA—facts that, as courts have consistently held, are necessary to provide the notice to which Mr. Hana is constitutionally entitled before facing trial on the charge against him.

#### 1. The Government Should Be Required To Identify the Foreign Principals.

In order for Mr. Hana to adequately defend himself on this charge, he is required to know the identity of the foreign principals as to which he allegedly conspired for Senator Menendez to act as an agent. *See United States v. Higdon,* 68 F. Supp. 3d 807, 816 (E.D. Tenn. 2014) (requiring the Government to "disclose [with Jencks Act materials] the identities of eyewitness participants

who will testify for the Government" who participated in exchanges of contraband with the defendant in light of the "significant importance [of such information] to the Defendant's crafting a defense"). Here, the Indictment broadly alleges that Mr. Hana "willfully and knowingly combined, conspired, confederated, and agreed together" with Senator and Mrs. Menendez "to have a public official, to wit, ROBERT MENENDEZ, act as an agent of a foreign principal, to wit, the Government of Egypt and Egyptian officials, required to register under FARA," without identifying those officials. Ind. ¶ 82. As set forth above, nowhere in the Indictment does the Government identify any named entity as a "foreign principal," nor does it allege that any of the Egyptian Officials—referenced in the Indictment as "Egyptian Official -1 [through] -5"—are the foreign principals alleged under FARA. Obviously, Mr. Hana cannot fully investigate the case, prepare a defense, or avoid surprise at trial unless and until he is apprised of the identity of the "foreign principals" that are at the core of the FARA allegation in Count 4. *See United States v. Nestor*, No. 09-cr-398, 2010 WL 3191888, at *5 (M.D. Pa. Aug. 11, 2010) (granting defendant's request for a bill of particulars identifying unnamed "participants" alleged in the indictment where "these 'participants' appear from the indictment to be more than ordinary witnesses: they are central to the indictment, and they are central to the conspiracy with which Defendant is charged").

In *United States v. Manafort*, another FARA case, where the defendant was alleged to have "caused and aided and abetted Companies A, B, and C, and others, including former senior foreign politicians, to act as agents of a foreign principal, to wit, the Government of Ukraine, the Party of Regions, and Yanukovych, without registering," the court ordered the government to provide a bill of particulars naming "any individuals or entities alleged to be the others, including former senior foreign politicians, whom [the defendant] caused and aided and abetted to act as foreign agents without registering." No. 17-cr-0201, 2018 WL 10394893, at *3 (D.D.C. June 12, 2018). The

court explained that a bill of particulars was particularly appropriate given defendant's "oblig[ation] to prepare for a complex trial with a voluminous record within a relatively short period of time," and the risk that defendant would "be surprised at a later point by the addition of a new name or allegation."  *Id.*  As in *Manafort*, to allow Mr. Hana to prepare a complete defense for his rapidly upcoming trial (as to which significant discovery is still being made, as recently as just a few days ago) and to avoid the unfair surprise that would necessarily result if the Government were to disclose this information for the first time at trial, the Court should, at the very least, order that the Government—quite simply—disclose the identities of the foreign principals referenced in the Indictment.  *See also United States v. Santiago*, 174 F. Supp. 2d 16, 42 (S.D.N.Y. 2001) (granting bill of particulars for the "the identities of any unindicted co-conspirators with whom [defendant] participated in the narcotics conspiracy that the Government intends to reference at trial"); *United States v. Johnson*, 225 F. Supp. 2d 982, 999 (N.D. Iowa 2002) (affirming Magistrate Judge's "conclusion that the government must identify co-conspirators and certain participants in the [continuing criminal enterprise] . . . because such information is necessary or useful in the defendant's preparation for trial").

### 2.   The Government Should Identify The Unnamed "Others" With Whom Mr. Hana Is Alleged To Have Agreed And Conspired.

Count 4 alleges that Senator and Mrs. Menendez, Mr. Hana, "and others known and unknown" agreed together and with each other to have Senator Menendez act as an agent of a foreign principal.  Ind. ¶ 82.  Such vague allegations are insufficient because, as courts in this Circuit routinely recognize, defendants are entitled to know the identity of every known person or entity with whom they are alleged to have conspired.  *See, e.g.*, *Pinto-Thomaz*, 352 F. Supp. 3d at 303 (granting request for identities of unindicted co-conspirators known to the government); *Nachamie*, 91 F. Supp. 2d at 573 (ordering government to provide defendants with names of any

known unindicted co-conspirators); *Savin*, 2001 WL 243533, at *5 (granting defense request for list of known unindicted co-conspirators); *United States v. Oruche*, No. 07-cr-0124, 2008 WL 612694, at *4 (S.D.N.Y. March 5, 2008) (ordering the government to reveal the identity of "any known unindicted co-conspirator with respect to each paragraph in the Indictment in which the word 'others' appears"); *Agnello*, 367 F. Supp. at 450-51 (requiring the government to identify "the names and addresses of all coconspirators" in a bill of particulars); *United States v. Steele*, 83 F. Supp. 2d 340, 343 (N.D.N.Y. 2000) (holding "that the Government must disclose the identities of any alleged co-conspirators"); *United States v. Lino*, 00-cr-632, 2001 WL 8356, at *13 (S.D.N.Y. Jan. 2, 2001) (ordering identification of co-conspirators prior to trial); *Bin Laden*, 92 F. Supp. 2d at 241 ("[T]he Government must disclose to the Defendants the identities, including all aliases and code names, of all unindicted co-conspirators to whom it will refer at trial."); *United States v. Akhavan*, No. 20-cr-188, 2020 WL 2555333, at *2 (S.D.N.Y. May 20, 2020) (granting request for bill of particulars identifying co-conspirators in alleged conspiracy case). This same result is appropriate here.

### 3. The Government Should Identify Where, Including The "Elsewhere" Alleged In The Indictment, The Alleged Crimes Occurred.

Finally, the Government should be required to identify the term "elsewhere" for purposes of the conduct with which Mr. Hana has been charged and which he must therefore defend against. As with Counts 1 and 2, Count 4 alleges that the FARA conspiracy occurred "in the Southern District of New York and elsewhere," but offers no specifics as to where in the world "elsewhere" may be. Ind. ¶ 82. A defendant is entitled to know those other places—denominated as "elsewhere"—where conduct set forth in the indictment is alleged by the Government to have occurred. Indeed, under similar circumstances, courts have not hesitated to direct the government to disclose precisely such information when requested by the defense. *See, e.g., United States v.*

*Hickey*, 16 F. Supp. 2d 223, 245 (E.D.N.Y. 1998) (directing the government to provide a bill of particulars regarding allegation that offense took place within the district and "elsewhere"); *United States v. Lonzo*, 793 F. Supp. 57, 59 (N.D.N.Y. 1992) ("[T]he location of 'elsewhere' shall be provided to [defendant] by the Government."); *United States v. Dirr*, No. 08-cr-42, 2009 WL 2169871, at *2 (E.D. Tenn. July 21, 2009) ("[D]irect[ing] that the government provide a bill of particulars listing all locations that comprise the 'and elsewhere' in which the conspiracy in Count One is alleged to have occurred."); *United States v. Urso*, 369 F. Supp. 2d 254, 272 (E.D.N.Y. 2005) (granting bill of particulars for the locations where the government will claim that the alleged crimes occurred).   This is especially true given the pending motion to dismiss on venue grounds, *see United States v. Trie*, 21 F. Supp. 2d 7, 17 (D.D.C. 1998) (holding, on defendant's motion to dismiss for lack of venue, that venue was not adequately alleged in the indictment and was therefore the proper subject of a bill of particulars); *United States v. Wilson*, No. 01-cr-53, 2001 WL 798018, at *6-9 (S.D.N.Y. July 13, 2001) (denying defendant's motion to dismiss for improper venue "without prejudice and with leave to renew" and ordering the government to provide a "bill of particulars describing facts it intends to establish at trial which it claims are sufficient to establish venue in this district"), which turns directly on where the acts alleged in the Indictment occurred for purposes of determining whether a trial can constitutionally take place in the Southern District of New York.   Accordingly, the Government should be compelled to identify, in a bill of particulars, the locations where the conduct charged against Mr. Hana is alleged to have occurred—locations that are currently hidden behind the term "elsewhere" in Count 4.

### III.   THE INDICTMENT IS DUPLICITOUS OR, IN THE ALTERNATIVE, MULTIPLICITOUS.

#### A.   Counts 1, 2, and 4 Are Impermissibly Duplicitous And Must Be Dismissed.

Counts 1, 2 and 4 are impermissibly duplicitous because they each charge multiple different and completely unrelated schemes in singular counts, leaving Mr. Hana (and the jury) to guess, from among five different possibilities, what purportedly criminal behavior each count covers and exposing him to significant harm at trial.  Specifically, Counts 1, 2 and 4, which all incorporate the same initial factual paragraphs in the Indictment, contain at least five separate and distinct conspiracies:  the first concerning payments to the Senator and Mrs. Menendez to obtain benefits for Egypt and Egyptian officials; the second relating to payments to protect IS EG Halal; the third premised on disrupting New Jersey State criminal matters, the fourth to disrupt the Federal prosecution of Mr. Daibes; and the fifth involving actions favorable to the Government of Qatar. But as described in the Indictment, these five schemes were entirely independent; they involved fundamentally different goals and objectives, different individuals, and occurred episodically and at different points in time.  The only thing connecting these conspiracies is the common prejudicial effect and confusion that lumping together fundamentally unrelated schemes into a single count will cause.  As the law makes clear, where, as here, the Indictment combines multiple separate conspiracies in a single count, it is impermissibly duplicitous and must be dismissed.

##### 1.   Legal Standard

The rule against duplicity is clear:  "[T]wo or more distinct crimes should not be alleged in a single count of an indictment." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980); *see also United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) ("An indictment is duplicitous if it joins two or more distinct crimes in a single count.").  To that end, Federal Rule of Criminal Procedure 8(a), which mandates that two or more offenses alleged in the same indictment be

charged "in a separate count for each offense," prohibits duplicitous pleading. *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 687 (S.D.N.Y. 2010) ("Rule 8(a) requires 'separate counts' for each charged offense."); *see also United States v. Bergstein*, No. 16-cr-746, 2017 WL 1750392, at *2 (S.D.N.Y. May 3, 2017) ("Rule 8(a) requires 'separate counts' for each charged offense.").

More specifically, and pertinent to this case, to avoid the problem of duplicity, it is well-settled that an indictment cannot combine multiple conspiracies in a single conspiracy charge. *United States v. Rigas*, 281 F. Supp. 2d 660, 664 (S.D.N.Y. 2003) ("[A]n indictment may not charge multiple conspiracies in a single count."). Because the essence of the crime of conspiracy is "an agreement by at least two parties to achieve a particular illegal end," *United States v. LaSpina*, 299 F.3d 165, 174 (2d Cir. 2002), to prove a single conspiracy, "the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). In other words, while co-conspirators need not agree on every detail of their venture, the participants must agree on the "essential nature of the plan." *United States v. Amiel*, 95 F.3d 135, 144 (2d Cir. 1996). In the Second Circuit, "a single conspiracy may be found where there is mutual dependence among the participants, a common aim or purpose or a permissible inference from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *Rajaratnam*, 736 F. Supp. 2d at 688.

Though not always fatal to an indictment, duplicity is certainly impermissible when it causes prejudice to a defendant. *United States v. Ohle*, 678 F. Supp. 2d 215, 221 (S.D.N.Y. 2010) Thus, "[a]n indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a

separate count for each offense,' and 2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). To guide a court's determination of whether a defendant is prejudiced by a duplicitous indictment, the Second Circuit has outlined the important policy considerations underlying the rule against duplicity, including:

> (1) avoiding uncertainty of general guilty verdict by concealing finding of guilty as to one crime and not guilty as to other, (2) avoiding risk that jurors may not have been unanimous as to any one of the crimes charged, (3) assuring defendant adequate notice of charged crimes, (4) providing basis for appropriate sentencing, and (5) providing adequate protection against double jeopardy in subsequent prosecution

*United States v. Olmeda,* 461 F.3d 271, 281 (2d Cir. 2006).

If the Court finds an indictment to be impermissibly duplicitous—as it should here—the duplicitous counts should be dismissed. *United States v. Rigas*, 605 F.3d 194, 210 (3d Cir. 2010) ("An impermissibly duplicitous indictment is subject to dismissal."); *United States v. Boffa*, 513 F. Supp. 444, 472 (D. Del. 1980) ("[W]here a single count of an indictment on its face charges multiple conspiracies, considerations of fairness and prudence require that the count be dismissed."); *see also United States v. Munoz-Franco*, 986 F. Supp. 70, 72 (D.P.R. 1997) (dismissing, as duplicitous, count that impermissibly combined two conspiracies).

## 2.      The Indictment Improperly Combines Multiple, Distinct Conspiracies Into A Single Count.

Counts 1, 2 and 4 should be dismissed as improperly duplicitous because they allege five wholly separate conspiracies in single counts. In the first 42 pages of the 50-page Indictment, the Government sets forth 70 introductory paragraphs that purport to lay out the factual basis for the charges brought against Mr. Hana and his co-defendants. *See* Ind. ¶¶ 1-70. In these initial paragraphs, the Government provides an overview of the charges, *id*. ¶¶ 1-4, a description of the Defendants, *id*. ¶¶ 5-9, statutory and factual background relating to FARA, *id*. ¶¶ 10-15, historical

and factual background on foreign military sales and foreign military financing, *id.* ¶¶ 17-18, and details relating to what is alleged to be a single continuous conspiracy whereby the Senator and Mrs. Menendez allegedly "agreed to and did accept hundreds of thousands of dollars of bribes" in exchange for using Senator Menendez's power and influence to "protect and enrich" Mr. Hana, Mr. Uribe and Mr. Daibes and to benefit Egypt and Qatar, *id.* ¶ 1; ¶¶ 19-67. The Senator and Mrs. Menendez then allegedly sought to cover up these actions. *Id.* ¶¶ 68-70. But apart from these initial references to a single overarching scheme, which itself raises problems of multiplicity, *see infra* at Section III.B, the Indictment explicitly describes, in separately labeled sections, five entirely distinct schemes with different goals, means, members, and periods of operation, *see supra* at Section III. B (describing the schemes to (1) assist Egyptian officials, (2) protect IS EG Halal, (3) disrupt New Jersey State criminal matters, (4) disrupt Mr. Daibes's Federal prosecution, and (5) benefit of Qatar).

Following these factual allegations, the Indictment charges Mr. Hana and his co-defendants with, in his case, three conspiracies, each of which sweep in and incorporate all of the factual conduct alleged previously: to commit bribery (Count 1); honest-services fraud (Count 2); and to have Senator Menendez act as an agent of the Egyptian government (Count 4). As a result, Counts 1, 2 and 4 all charge, in singular counts, five fundamentally different schemes. As explained in further detail below, this type of pleading is, on its face and as a matter of law, duplicitous.

### 3.     Counts 1 and 2

Counts 1 and 2 impermissibly charge, in each of these two counts, five individual conspiracies with different goals, means, members, and periods of operation, without the required unifying nexus. "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990). To be

sure, the Indictment purports to allege a general, overarching scheme with what appears to have had the "common goal" of paying bribes to the Senator and Mrs. Menendez with the intent to influence the Senator to act in a beneficial manner. *See* Ind. ¶ 1 ("MENENDEZ and his wife, NADINE MENENDEZ . . . engaged in a corrupt relationship with three New Jersey associates and businessmen . . . in which MENENDEZ and NADINE MENENDEZ agreed to and did accept hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, URIBE, and DAIBES, and to benefit the Arab Republic of Egypt and the State of Qatar.").  But in order to avoid the problem of duplicity, the Government cannot allege a "common goal" that is so broad. *See United States v. Killeen*, No. 98-cr-143, 1998 WL 760237, at *3 (S.D.N.Y. Oct. 29, 1998) (to allege a common purpose, an indictment must identify a purpose that is not "unreasonably broad" such as that of "generically evading taxes"); *United States v. Gabriel*, 920 F. Supp. 498, 503 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997), *overruled on other grounds* (finding that the indictment's use of "broad, conclusory language" that "posits a unified conspiracy" was insufficient to properly charge a single conspiracy); *see also United States v. Abdelaziz*, 68 F.4th 1, 48 (1st Cir. 2023) ("common goal" of advancing the success of a college admissions conspiracy was impermissibly general to constitute a common purpose shared by all charged participants in analyzing whether evidence at trial created a variance); *United States v. Ramos-Soto*, 576 F. Supp. 3d 894, 900 (D. Utah 2021) (common goal "to possess and distribute heroin, cocaine, and methamphetamine in Utah" was insufficient to show the existence of one single conspiracy).  But this general theory of the case does not contravene that, as written, the Indictment alleges five distinct conspiracies, with varying, unconnected objectives.

Thus, with respect to the scheme to assist Egyptian officials, the Indictment alleges that Mr. Hana and his co-defendants provided the Senator and Mrs. Menendez with "hundreds of thousands of dollars of bribes" in exchange for the Senator's "acts and breaches of duty to benefit the Government of Egypt." Ind. ¶ 16. By contrast, the purpose of the alleged bribes in the second scheme was to protect a "monopoly" granted by Egypt to IS EG Halal, *id*. ¶¶ 27-28, while the goal of the scheme to disrupt New Jersey State criminal matters was to obtain favorable resolutions in the prosecution and investigation of Mr. Uribe's associate and employee, *id*. ¶ 39; the objective of the scheme to disrupt Mr. Daibes's Federal criminal prosecution was to influence the U.S. Attorney's Office in the District of New Jersey to act favorably in Mr. Daibes's criminal prosecution in that district, *id*. ¶ 46; and the purpose of the scheme to benefit Qatar was to obtain a multimillion-dollar real estate investment from a fund with ties to the Government of Qatar, *id*. ¶ 55. Certainly bribing an official to obtain benefits for a foreign country is vastly different from protecting a contract or paying an official to intervene in a criminal investigation or to influence a criminal prosecution in the state of New Jersey. And, although two of the purported schemes share the flow of benefits to foreign countries—albeit, obviously, different ones—the alleged benefits provided to Qatar (unlike the benefits allegedly provided to Egypt) were a purported side benefit of a business transaction, and not the primary objective of the scheme, as is alleged with regard to Egypt. Likewise, with respect to the two alleged schemes to disrupt criminal matters, the schemes sought entirely different relief, at different times, for different defendants in different criminal matters: a state investigation, a state prosecution, and a federal prosecution. Thus, as the Indictment itself makes clear, each individual scheme had its own separate and unique objective; there was no common goal whatsoever.

Moreover, Mr. Hana is not alleged to have known anything about, much less agreed to or approved of an overarching scheme to provide bribes to the Senator and Mrs. Menendez. *See Killeen*, 1998 WL 760237, at \*3 (finding that two conspiracies did not arise out of a common plan or scheme where the Government failed to allege that the defendant was aware of or participated in one of the alleged schemes).  While the Indictment alleges that Mr. Hana had direct involvement in the schemes to assist Egyptian officials and to protect IS EG Halal, it does not even attempt to connect him to the scheme to benefit Qatar or Mr. Daibes's criminal prosecution, and only minimally seeks to connect him to the scheme to disrupt New Jersey State criminal matters.[23] Overall, the Government's theory of a single conspiracy improperly relies upon the purported co-conspirators friendships and relationships with one another, but as the Court is well aware, mere association does not make a conspiracy:   the fact that "all co-defendants and unindicted conspirators knew or should have known that they were involved in a single conspiracy because they were all close friends and had socialized together" failed to show "that there was any sort of agreement amongst all of those named [defendants]" as "it is not sufficient simply to demonstrate that the alleged conspirators knew each other and committed the same or associated crimes." *United States v. Hughes*, 505 F.3d 578, 588 (6th Cir. 2007).  The result is a duplicitous indictment. *See United States v. Geibel*, 369 F.3d 682, 692 (2d Cir. 2004) (finding conspiracy charge involving

---

[23]With respect to the conspiracy to disrupt Mr. Daibes's Federal prosecution, the Indictment merely alleges that Mr. Hana was friends with the jeweler who met with Mrs. Menendez and to whom Mrs. Menendez provided two gold bars, previously possessed by Mr. Daibes, to be sold. Ind. ¶ 53(h).  Nowhere in the Indictment does the Government allege that Mr. Hana knew of or agreed to any of the alleged events involved in the Senator's purported disruption of Mr. Daibes's federal case.  Certainly, as is also the case with regard to the state cases, the Indictment never alleges that Mr. Hana knew of the alleged agreement between Mr. Daibes and the Senator or Mrs. Menendez, or that he approved of any of their purported actions.  Likewise, Mr. Hana is not even mentioned in the newfound allegations concerning the scheme to benefit Qatar, much less alleged to have known anything about or participated in the scheme.

insider trading to be duplicitous, because "defendants' vague awareness of [another's] role in the scheme does not render them co-conspirators"); *United States v. Duffey*, 456 F. App'x. 434, 440 (5th Cir. 2012) (finding multiple conspiracies where eight bank robberies in the same city over the course of six months were carried out by the same three people but there was "no evidence . . . [of] an overarching plan connecting one robbery to another"); *United States v. Lech*, 161 F.R.D. 255, 257 (S.D.N.Y. 1995) (finding indictment to be duplicitous where defendant "had no involvement in the other schemes charged, and at most he had cursory knowledge of the other criminal activities . . . [e]ven if [defendant's alleged fraud] was a springboard for the other two schemes").

In an effort to create the façade of linkage, and thus to allege a single conspiracy that would insulate the Indictment from the infirmity of duplicity (even as it raises the problem of multiplicity discussed below), the Government attempts to intertwine Mr. Hana and his co-defendants into some, although not all, of the different alleged schemes, each of which allegedly involves the Senator and Mrs. Menendez.  But the mere fact that there are some defendants common to the schemes does not transform these otherwise distinct schemes into a single conspiracy, and thus cannot save this pleading deficiency.  As the Supreme Court has explained, the Government cannot "string together . . . eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all." *Kotteakos v. United States*, 328 U.S. 750, 773 (1946); *see also Munoz-Franco*, 986 F. Supp. at 72-73 (the involvement of the same two defendants, even coupled with the same victim and basic goal, did not merge two conspiracies into one); *United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990), *aff'd*, 956 F.2d 1160 (2d Cir. 1992) ("Joinder is not permitted '[w]hen, as here, the connection between different groups is limited to a few individuals common to each but those individuals commit separate acts which involve them in separate offenses with no common aim.'"

(quoting *United States v. Nettles*, 570 F.2d 547, 551 (5th Cir. 1978))); *United States v. Belin*, No. 99-cr-214, 2000 WL 679138, at *2 (S.D.N.Y. May 24, 2000) ("[D]efendants charged with two separate—albeit similar—conspiracies having one common participant are not, without more, properly joined." (quoting *United States v. Giraldo*, 859 F. Supp. 52, 55 (E.D.N.Y. 1994))).

Specifically, in order for the Government to charge a single conspiracy where there are purportedly varied illegal activities it is required to allege "mutual dependence and assistance among the defendants." *Aracri*, 968 F.2d at 1521; *see also United States v. Conesa*, 899 F. Supp. 172, 174 (S.D.N.Y. 1995) (where "defendants engaged in varied illegal activities," there can only be a single conspiracy if "there is . . . mutual dependence and assistance among defendants"); *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000) (in determining whether a single or multiple conspiracies exist, the court may also consider whether there was "mutual dependence among the participants"). Mutual dependence can be found where the co-defendants benefit from each aspect of the putative conspiracy. *See Geibel*, 369 F.3d at 692 (holding that there was a lack of mutual dependence in alleged insider trading scheme where financial benefits were received, but they were trivial). Here, though, on its face, the Indictment does not allege that any one of the conspiracies benefitted from or depended on the success of another or, for example, that Mr. Hana derived any benefit from the scheme to disrupt New Jersey State criminal matters, the scheme to disrupt Mr. Daibes's Federal criminal prosecution, or the scheme to benefit Qatar. Likewise, although the Indictment claims that Mr. Hana and his co-defendants engaged in illicit agreements with the Senator and Mrs. Menendez, the Indictment is entirely devoid of any allegation that Mr. Hana, Mr. Uribe, or Mr. Daibes had any agreement with one another, or that the success of any individual scheme depended on the success, or even the existence of the others. In other words, the combined efforts of the conspiracies were not required to insure the success of the overall

venture.  Rather, each conspiracy acted independently and was an end unto itself.  Simply put, this is not a situation where each scheme was a "necessary step toward the ultimate objective[.]"  *United States v. Greenberg*, No. 21-cr-92, 2022 WL 827304, at \*12 (S.D.N.Y. Mar. 9, 2022).

At most, the Indictment impermissibly alleges a "rimless wheel" conspiracy, which is not a single conspiracy at all and cannot be charged as such.  In *Kotteakos v. United States*, the Supreme Court rejected the practice of charging multiple conspiracies in a single count.  328 U.S. at 755.  There, the government charged, in a single conspiracy count, eight separate conspiracies committed by separate groups of defendants who had no connection to one another except that they each used the services of the same agent to handle fraudulent loan applications.  *Id*. at 754-55.  The court characterized the conspiracy as a "wheel," with the agent at its "hub" and the other defendants as "spokes."  *Id*. at 755.  Finding that the government had "made out a case, not of a single conspiracy, but of several," the court explained that "the pattern was 'that of separate spokes meeting at a common center' . . . without the rim of the wheel to enclose the spokes."  *Id*.

That description is apt here, where the only feature the alleged schemes have in common is the omnipresence of Senator and Mrs. Menendez, purportedly as the "hub" of a conspiracy.  However, as in *Kotteakos*, "[t]he conspiracies . . . were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with [the Senator and Mrs. Menendez]. . . . There was no drawing of all together in a single, over-all, comprehensive plan."  *Blumenthal v. United States*, 332 U.S. 539, 558 (1947).  That is, as previously explained, the Government has not alleged that any of the spokes (*i.e.*, Mr. Hana, Mr. Uribe or Mr. Daibes) knew of the existence of the others' alleged criminal activities, much less agreed to participate in a singular illegal enterprise with them.  *See United States v. Mathis*, 216 F.3d 18, 24 (D.C. Cir. 2000) (in prosecution of "hub" distributors, the distributors were not members of single conspiracy where no

interdependence was established between the competing spoke suppliers); *United States v. Durades*, 607 F.2d 818, 819-20 (9th Cir. 1979) (government proved that the defendant was the hub of two conspiracies, but in the absence of any proof that the success of one conspiracy depended on the activities of the other, had "failed to show that there was some kind of rim binding the spokes"); *Kotteakos*, 328 U.S. at 755 ("Thieves who dispose of their loot to a single receiver— a single 'fence'—do not by that fact alone become confederates:  they may, but it takes more than knowledge that he is a 'fence' to make them such.").  "[W]here [as here] the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." *United States v. Chandler,* 388 F.3d 796, 807 (11th Cir. 2004).

Beyond the lack of a common overall agreement and mutual dependence, the five alleged schemes bear no other indicia of commonality.  For example, the five schemes occurred during different periods of time over the course of five-plus years.  According to the Indictment, the first scheme to assist Egyptian officials commenced in March 2018 and lasted through May 2019.  Ind. ¶¶ 19-21.  The scheme picked up again in September 2019 and lasted until January 2022.  *Id.* ¶¶ 35-37.  The second scheme to protect IS EG Halal allegedly spanned from March 2018 through either September or November 2019,[24] *id.* ¶¶ 22, 28; the third scheme to disrupt New Jersey State criminal matters began in January 2019 and ended June 2022, *id.* ¶¶ 42-44; while the fourth scheme to disrupt Mr. Daibes's Federal prosecution lasted from December 2020 to March 2022, *id.* ¶¶ 46,

---

[24] The Indictment alleges that IS EG Halal issued a $10,000 check, dated November 5, 2019 to Strategic International Business Consultants.  *See* Ind. ¶ 34.  However, as set forth in *supra* Section I.D, the Indictment fails to allege any nexus between the November 5, 2019 payment and any act allegedly taken to protect IS EG Halal.  Rather, the final act alleged in furtherance of this purported scheme occurred "on or about September 28, 2019" when IS EG Halal issued a $10,000 check to Strategic International Business Consultants the day after Mrs. Menendez called Mr. Daibes.  *Id.*

53; and the fifth scheme to benefit Qatar occurred from in or about 2021 through 2023, *id.* ¶ 55. This lengthy and episodic timeline certainly "call[s] into question whether a continuing course of conduct can be shown." *United States v. Willis*, 475 F. Supp. 2d 269, 273 (W.D.N.Y. 2007) (where allegations spanned more than fifteen months, the court found that "the considerable duration of the offenses alleged . . . would certainly seem to call into question whether a continuing course of conduct can be shown."); *United States v. Newell*, 658 F.3d 1, 20 (1st Cir. 2011) (counts which alleged "multiple fraudulent transactions" by describing "multiple instances of the misapplication of funds occurring within discrete one-year windows" were duplicitous); *United States v. Hinton*, 127 F. Supp. 2d 548, 554-56 (D.N.J. 2000) (dismissing a duplicitous indictment charging bank fraud based on 128 transactions where "dates and alleged perpetrator(s) for a particular [set of] transactions do not generally overlap"); *see also* 1 Orfield's Criminal Procedure Under the Federal Rules § 8:39 ("The nexus, as stated in Rule 8, is at least concerned with . . . the lapse of time."). Additionally, given the schemes' varying time frames and distinct objectives, different evidence will obviously be required to prove each of the five diverse schemes. *See United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977) (finding duplicity where different offenses charged in a single count required different proof); *see also United States v. Abakporo*, 959 F. Supp. 2d 382, 390-91 (S.D.N.Y. 2013) (finding indictment duplicitous where it combines two crimes with different elements into one count).

Finally, and perhaps most telling, the Indictment, by its own terms—both implicitly and explicitly—recognizes the existence of multiple distinct schemes. In addressing the Defendants' purportedly corrupt relationships with the Senator and Mrs. Menendez, the Government itself, in

Paragraph 2, neatly divides the alleged conduct into four different schemes.[25]  *See* Ind. ¶ 2 ("[F]irst, MENENDEZ promised to and did use his influence and power and breach of his official duty in ways that benefited the Government of Egypt and WAEL HANA. . . . Second, MENENDEZ promised to and did use his influence and power and breach his official duty to seek to disrupt a criminal investigation and prosecution undertaken by the New Jersey Attorney General's Office related to JOSE URIBE. . . . Third, MENENDEZ promised to and did use his influence and power and breach his official duty to recommend that the President nominate an individual as U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to the federal criminal prosecution of FRED DAIBES. . . .  Fourth, MENENDEZ agreed to and did accept payment from DAIBES, knowing that DAIBES expected MENENDEZ in exchange to use his influence and power and breach his official duty to assist DAIBES, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar, by performing acts to benefit the Government of Qatar.").

Indeed, the way in which the Indictment organizes these factual allegations, compartmentalizing each individual conspiracy in separately labeled sections, belies the existence of a single continuing scheme.  As detailed above, all five schemes occurred at varying times over a five-plus year period; there was no single integrated scheme or plan.  As a result, the Indictment does not, because it simply cannot, set forth a single integrated chronology to support a finding that these five distinct sets of conduct could be joined together in a single conspiracy charge.  *See, e.g*, *United States v. Hardy*, 762 F. Supp. 1403, 1408-10 (D. Haw. 1991) (dismissing conspiracy

---

[25]Although Paragraph 2 separates the conspiracies into four separate schemes, it is clear, based on the distinct conduct alleged and the Indictment's separately-labeled sections, that the Indictment actually sets forth five individual conspiracies. *See* Ind. ¶¶ 16-21, 35-38 (Egyptian officials); ¶¶ 22-34 (IS EG Halal); ¶¶ 39-44 (New Jersey State criminal matters); ¶¶ 46-54 (Mr. Daibes's Federal prosecution); ¶¶ 55-66 (Qatar).

count as duplicitous where "[t]he superseding Indictment fail[ed] to allege any nexus whatsoever, chronological, substantive or otherwise").  Instead, the Government separately pleads each of the schemes in sequential paragraphs in the Indictment, further separating each of the five conspiracies with headings clearly demarcating each alleged scheme.  *See* Ind. ¶ 19 ("HANA and NADINE MENENDEZ Introduce Egyptian Officials to MENENDEZ for Corrupt Purposes"), ¶ 22 ("MENENDEZ Takes Action to Protect IS EG Halal"), ¶ 35 ("HANA and DAIBES Continue to Seek Action from MENENDEZ for Egypt"), ¶ 39 ("MENENDEZ Agrees to Disrupt New Jersey State Criminal Matters in Exchange for a Mercedes-Benz Convertible"), ¶ 46 ("MENENDEZ Promises and Seeks to Disrupt the Prosecution of DAIBES in Exchange for Cash, Furniture, and Gold Bars"), ¶ 55 ("MENENDEZ Accepts Cash and Gold Bars Knowing that DAIBES Expected Him in Exchange to Assist DAIBES by Performing Acts for the Benefit of the Government of Qatar").  For example, in Paragraphs 19 through 21, the Indictment first describes the purported scheme to assist Egyptian officials, focusing on the facilitation of foreign military sales and foreign military financing.  The Indictment then moves to the scheme to protect IS EG Halal in Paragraphs 22 through 34, returning briefly to address the assistance allegedly provided to Egyptian officials in connection with the initial scheme to assist Egyptian officials in Paragraphs 35 to 38.  Following Paragraph 38, the Indictment abruptly shifts to an entirely different set of allegations concerning the Senator's alleged involvement in the scheme to disrupt New Jersey State criminal matters in Paragraphs 39 to 44, and after brief introduction to the schemes solely pertaining to Mr. Daibes, once again changes its focus to the scheme to disrupt Mr. Daibes' Federal criminal prosecution in Paragraphs 46 through 54, and the scheme to benefit Qatar in Paragraphs 55 through 67.  Thus, based on the structure of the Indictment, there is no question that multiple, separate conspiracies are alleged.  *See Munoz-Franco*, 986 F. Supp. at 71-72 (holding that conspiracy charge was

duplicitous, despite the government's representation that the count involved a single conspiracy where the indictment's "description of the overt acts [wa]s neatly divided between two distinct sets of co-conspirators," under different sub-titles in the indictment); *United States v. Marlinga*, No. 04-cr-80372, 2005 WL 513494, at *4 n.2 (E.D. Mich. Feb. 28, 2005) (explaining that separate headings given to each scheme in the indictment evidenced the fact that there were two separate conspiracies).

### 4.      Count 4

Count 4 suffers from many, if not all, of the same problems that are described above with regard to Counts 1 and 2.  In Count 4, the Government alleges that Mr. Hana, along with Senator and Mrs. Menendez "willfully, and knowingly combined, conspired, confederated, and agreed together and with each other" for Senator Menendez to act as an agent of the Government of Egypt and Egyptian officials, required to register under FARA, in violation of 18 U.S.C. § 219.  Ind. ¶ 82.  Like Counts 1 and 2, Count 4—by its terms—incorporates all of the allegations set forth in Paragraphs 1 through 70, purportedly relying on all five schemes to support the § 219 count.  To be sure, based upon the language of the statute and the Government's decision to omit Mr. Uribe and Mr. Daibes from this count,[26] it appears that the charge is limited to actions taken in connection with just two of the five conspiracies, those being:  (1) the scheme to assist Egyptian officials; and (2) the scheme to protect IS EG Halal.  Indeed, in the "Overt Acts" section of Count 4, the

---

[26] There are, of course, no specific allegations that either Mr. Uribe or Mr. Daibes agreed that any of the bribes that they allegedly paid were for the purpose of benefiting Egypt or protecting the "monopoly" afforded to IS EG Halal.  Presumably, that is why they were not named in Count Four.  But this does not explain the Government's conclusory allegations in Paragraphs 16, 22, 31-35, and 38 of the Indictment that Mr. Uribe and Mr. Daibes "assist[ed]" Mr. Hana in providing bribe payments to Senator and Mrs. Menendez in exchange for the Senator's acts to assist Egyptian officials, and that Mr. Daibes provided financial support and backing to IS EG Halal in furtherance of the scheme.

Indictment provides two factual allegations that could only relate to the schemes to assist Egyptian officials and to protect IS EG Halal. *See id.* ¶ 83.  The first act alleged, a meeting that occurred at a restaurant in Manhattan on June 30, 2018, can only, by the nature of the date it allegedly occurred, fall within the scheme to assist Egyptian officials (occurring March 2018-March 2019 and September 2019-January 2022) or the scheme to protect IS EG Halal (occurring March 2018-September or November 2019).  Likewise, the second act listed, a meeting that occurred between the Senator, Mr. Hana, and "Egyptian Official-4," at a restaurant in Manhattan, can only relate to the scheme to assist Egyptian officials, as all of the allegations involving "Egyptian Official-4" are made solely in connection with that scheme.  *See id.* ¶¶ 37(b), 37(d), 37(f).  Thus, Count 4 sweeps in, at a minimum, these two schemes; it is, accordingly, also duplicitous and should be dismissed.

5.      **Mr. Hana Will Suffer Irreparable Harm And Prejudice If The Government Is Allowed To Proceed On The Duplicitous Indictment.**

That the Indictment charges multiple conspiracies as single crimes is prejudicial to Mr. Hana for the very reasons that the Second Circuit has articulated, and warned against.  Much like the requirement that an indictment clearly set forth all of the elements of the offense charged, "the prohibition of duplicity is said to implicate a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution." *Murray*, 618 F.2d at 896.  As currently written, however, the Indictment confuses what Mr. Hana is charged with in each of Counts 1, 2 and 4, creating a substantial risk that a verdict "will not reveal whether the jury found defendant guilty of only one [conspiracy] and not the other[s]" and will not "indicate whether the jury found defendant guilty without having reaching a unanimous verdict on the commission of a particular offense." *Id.*   When such fundamental issues are implicated, a duplicitous indictment cannot stand. *See Boffa*, 513 F. Supp.

at 472 ("[W]here a single count of an indictment on its face charges multiple conspiracies, considerations of fairness and prudence require that the count be dismissed").

Among the principal problems resulting from duplicitous counts is the threat to a defendant's Sixth Amendment right to a unanimous verdict. *See United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) ("[A]voiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another" is a core "policy consideration" underlying the duplicity doctrine.). As the Second Circuit has explained, the overall vice of duplicity is that a verdict on a duplicitous count leaves it "impossible to know the offense of conviction and . . . impossible to determine the validity of a claim that the evidence was insufficient." *United States v. Hammond*, 125 F.3d 845, 1997 WL 592838, at *1 (2d Cir. 1997) (unpublished); *see also United States v. Crisci*, 273 F.3d 235, 238 (2d Cir. 2001) ("[A] general verdict of guilty on a duplicitous count will not reveal whether the jury reached a unanimous verdict on each offense."). Here, for example, if the jury were to return a guilty verdict on any of Counts 1, 2, or 4, neither Mr. Hana, the Government, nor the Court would be able to determine whether the jury was unanimous as to which conspiracy, if any, it found of the five described in the Indictment. *See Murray*, 618 F.2d at 896 ("If an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both.").That is, by combining five distinct events into each count, the Government has created the intolerable danger that three jurors could find guilt as a result of the benefits provided to Egypt and Egyptian officials, three others could find guilt based on acts to protect ISEG Halal, another two could find guilt in connection with disrupting the New Jersey State criminal matters, two others based on disruption in the Federal prosecution of Mr. Daibes, and the final two in connection with the scheme to benefit Qatar, with all 12 jurors essentially

agreeing on nothing, and thus, without any unanimous decision as to what allegedly wrongful conduct occurred.  Similarly, in the event of acquittal, there would be no way to truly know what the jury determined, which is necessary for purposes of Double Jeopardy protection.  In sum, were this case to proceed to trial on the current Indictment, Mr. Hana would be deprived of his right to a unanimous jury verdict, with all of the consequences thereof, including frustrating his ability to challenge any conviction in post-trial motions or on appeal.[27]

Moreover, as currently formulated, Counts 1, 2, and 4 will also visit undue prejudice upon Mr. Hana by forcing him to defend against charges that would otherwise not be properly venued in this district.  As explained in Section *infra* Section IV., the Indictment does not allege any overt act in connection with any of the five conspiracies to sufficiently establish venue in this district. However, should the Court find venue based on overt acts allegedly taken in one conspiracy, but not the others, the effect of such a ruling would be to force Mr. Hana to defend against conduct that, absent the duplicity, would be barred on the basis of venue.  That is, to the extent that the Government is able to establish venue only over those conspiracies in which a sufficient overt act

---

[27] It would also make it impossible for the Court to render a proper sentence, as there would be no way to determine which of the alleged schemes had been proved, and thus, which payments or alleged things of value were involved.  That is, the federal bribery statute, 18 U.S.C. § 201(b), allows the Court to impose a fine of "not more than three times the monetary equivalent of the thing of value, whichever is greater."  Under this statute, a fine imposed based on the $60,000 Mercedes-Benz C-300 convertible would be substantially greater than a fine levied on the three $10,000 checks alleged issued by IS EG Halal to Strategic International Business Consultants. Thus, even aside from the operation of the Sentencing Guidelines, which provide at least the starting point for any sentence, *see Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."); *see also* United States Sentencing Commission, Guidelines Manual, § 2C1.1 (Nov. 2023), this information is therefore also critical for sentencing purposes.  *See Newell*, 658 F.3d at 27 (emphasizing the danger that convictions based on duplicitous indictments "may potentially lead to punishment over and above what the government's proof actually sustains").

is alleged to have occurred in the Southern District of New York, the remaining conspiracies could not be brought in this district. *See United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) ("The government bears the burden of proving that venue is proper as to each count.").  Allowing them to nonetheless do so by proceeding on duplicitous counts would not only be a waste of judicial resources, but also an unconstitutional intrusion on Mr. Hana's constitutional right to be tried where the alleged crime occurred, *see* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."); *see also United States v. Pietrantonio*, 637 F.3d 865, 872 (8th Cir. 2011) (holding that prosecution was not properly venued given duplicity in the indictment); *United States v. Schlei*, 122 F.3d 944, 979-80 (11th Cir. 1997) (reversing conviction where duplicitous count charged two transactions, one outside venue, and trial court failed to strike the improperly venued transaction); *cf. United States v. Glenn*, 828 F.2d 855, 858-60 (1st Cir. 1987) (variance between defendant's conviction for the broad conspiracy charged and the smaller conspiracy proved affected substantial rights where it allowed the government to establish venue that would have otherwise been improper).

Finally, by incorporating all five conspiracies set forth in the initial 70 paragraphs of the Indictment, into every charging count, without any additional detail as to which schemes pertain to which count, the Government has profoundly muddled the charges and thus flouted the constitutional requirement that a defendant be provided with adequate notice of the alleged conduct with which he is being charged.  This requirement—that an indictment sufficiently inform a defendant of the nature of each accusation against him—is one of the oldest and most "elementary principle[s]" of criminal pleading, *United States v. Cruikshank*, 92 U.S. 542, 557-58 (1875); *see*

*also United States v. Miller*, 471 U.S. 130, 135 (1985) (notice related concerns" are "of course . . . among the important concerns underlying the requirement that criminal charges be set out in an indictment[.]"), deriving from the Sixth Amendment guarantee that every defendant "be informed of the nature and cause" of the accusations against him, U.S. Const. amend. VI.

Here, the Government's blanket incorporation of all five schemes into Counts 1, 2 and 4, without any qualifying language in the charges to apprise Mr. Hana of the specific conduct relevant to each count, violates "the basic principle that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him." *Russell*, 369 U.S. at 766. Instead of making clear which of the alleged schemes relate to the bribery, honest-services fraud and § 219 violations alleged, Counts 1, 2, and 4 merely "repeat[], reallege[], and incorporate[]" the allegations contained in Paragraphs 1 through 70 of the Indictment, Ind. ¶¶ 71, 76, 81, improperly leaving Mr. Hana to guess at exactly what must be defended in order to defeat any given charge. *See Hinton*, 127 F. Supp. 2d at 553 ("A duplicitous indictment compromises a defendant's Sixth Amendment right to know the charges against him."); *United States v. Prieto*, 812 F.3d 6, 11 (1st Cir. 2016) (explaining that the rule against duplicity is borne out of "concern . . . that a criminal defendant facing such an indictment might not know which charge to prepare to defend against."); *see generally Russell*, 369 U.S. at 766 ("A cryptic form of indictment in cases of this kind requires the defendant to go to trial with the chief issues undefined.  It enables his conviction to rest on one point and the affirmance of his conviction to rest on another.  It gives the prosecutor free hand on appeal to fill in the gaps of proof by surmise or conjecture.").[28]

---

[28]Nor are the vices associated with notice concerns stemming from a duplicitous indictment limited to the those emanating from the Sixth Amendment; a single count charging two or more conspiracies gives rise to concerns about the validity of the indictment itself under the Indictment Clause of the Fifth Amendment.  Thus, a duplicitous pleading raises doubts as to whether the grand jury intended to charge multiple conspiracies, whether the grand jury would have charged any

6.     **The Duplicitous Counts Should Be Dismissed, Or At Minimum The Government Should Elect The Single Conspiracy That It Will Present To The Jury.**

The appropriate remedy for duplicity is dismissal. *See Rigas*, 605 F.3d at 210 ("An impermissibly duplicitous indictment is subject to dismissal.").   Alternatively, under certain circumstances, courts in the Second Circuit have held that a duplicitous pleading can be remedied by allowing the Government to elect to proceed on one of the alleged conspiracies for each count, *see Sturdivant*, 244 F.3d at 79 ("[P]rior to a defendant's conviction, prejudice to the defendant can be avoided by having the government elect to proceed based upon only one of the distinct crimes

---

conspiracy had it been aware that the offenses were distinct, and whether the grand jury may have indicted a defendant on the basis of evidence that was admissible only against another defendant. *See Boffa*, 513 F. Supp. at 472 ("[A] count charging two or more conspiracies raises questions about the grand jury proceedings giving rise to the indictment, viz., whether the grand jury intended to charge multiple conspiracies, whether it would have charged any conspiracy at all had it been aware that the offenses were distinct, and whether the grand jury may have indicted a defendant on the basis of evidence admissible only against other defendants."); *United States v. Cryan*, 490 F. Supp. 1234, 1239 (D.N.J. 1980), *aff'd sub nom. United States v. John F. Cryan*, 636 F.2d 1211 (3d Cir. 1980), *abrogated on different grounds by United States v. Donsky*, 825 F.2d 746 (3d Cir. 1987) ("[A] count charging two offenses does not reveal whether the grand jury intended to charge both offenses, or whether it would have charged either had it been aware that the offenses were distinct."). To protect against these dangers "[t]he Indictment Clause of the Fifth Amendment 'requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury.'" *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (quoting *United States v. Abrams*, 539 F. Supp. 378, 384 (S.D.N.Y.1982)). The Court's failure to enforce this requirement "would deprive [Mr. Hana] of a basic protection which the guaranty of the intervention of the grand jury was designed to secure. For [he] could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Russell*, 369 U.S. at 770. To avoid a violation to Mr. Hana's Sixth Amendment right to adequate notice, and Fifth Amendment right to indictment by a grand jury, and to evade any improper variance that may arise as a result of the duplicitous manner in which the Indictment is plead, Counts 1, 2 and 4 should be dismissed. *See Hardy*, 762 F. Supp. at 1410 ("[W]here . . . the preservation of defendants' Fifth and Sixth Amendment rights hands in the balance" is it better to dismiss a duplicitous count than "roll the dice and preserve the confusion of [the duplicitous count]."); *see also United States v. Johansen*, 56 F.3d 347, 351 (2d Cir. 1995), *as amended* (May 11, 1995) (variance between single credit card fraud conspiracy alleged in indictment, involving defendant and all four codefendants, and proof at trial, which showed several credit card fraud conspiracies rather than single conspiracy, prejudiced defendant and denied him fair trial).

included within a duplicitous count."), or through an instruction requiring that all members of the jury unanimously agree on the specific offense proven by the Government, *see Willis*, 475 F. Supp. 2d at 273 ("Prejudice to the defendant can also be avoided at trial by instructing the jurors that they must unanimously agree on the particular conduct underlying the conviction.").  However, where, as here, the harm caused by jumbling together five distinct schemes cannot be remedied by allowing the Government to elect between the conspiracies in the duplicitous counts or by instructing the jury to agree on which schemes the defendant participated in, the duplicitous counts should be dismissed.  *See United States v. Pleasant*, 125 F. Supp. 2d 173, 175-83 (E.D. Va. 2000) (dismissing duplicitous counts pretrial because of potential harm that could result by allowing the government to proceed on the indictment as charged); *United States v. Conley*, 826 F. Supp. 1536, 1544-48 (W.D. Pa. 1993) (dismissing duplicitous count pretrial where "potential prejudice abounds").

In this case, the remedy of election will not suffice:  were the Government allowed to elect one of the conspiracies alleged in Counts 1, 2, and 4, such an election would have the effect of impermissibly amending the Indictment, further denying Mr. Hana his Fifth Amendment right to be tried only on the charges returned by the a grand jury.  *See United States v. Aguilar*, 756 F.2d 1418, 1423 (9th Cir. 1985) ("Substantive amendment of an indictment, particularly if the amendment broadens or alters the offense charged, is reversible error since it violates the defendant's Fifth Amendment right to stand trial only on the charges made by a grand jury in its indictment.").  For this reason too, dismissal, rather than election, is the appropriate remedy for the duplicity that infects Counts 1, 2, and 4.  *See id.* ("[C]hoosing one offense within the count to prosecute and treating the rest of that count as surplusage can be challenged as improper amendment of the indictment."); *Conley,* 826 F. Supp. at 1547 (acknowledging that "[g]enerally,

the appropriate remedy for a duplicitous count is to force the Government to elect to proceed on only one of the charges contained in the count" but finding "this remedy inadequate to protect the Defendants' right to be tried only on an indictment handed down by the grand jury").

Likewise, given the severe risk of prejudice to Mr. Hana's constitutional rights, "roll[ing] the dice and preserv[ing] the confusion" created by the duplicitous conspiracy counts until the end of trial would not only be inherently unfair, but would result in an immense waste of judicial resources by creating the real risk of a mistrial, or, at the very least, creating substantial issues for appeal. *Hardy*, 762 F. Supp. at 1410 ("where . . . the preservation of defendants' Fifth and Sixth Amendment rights hands in the balance" is it better to dismiss a duplicitous count than "roll the dice and preserve the confusion of [the duplicitous count]"); *see also McDermott*, 245 F.3d at 139 (reversing conviction "as a result of the variance between the single conspiracy charged in the indictment and the proof adduced at trial"); *United States v. Johansen*, 56 F.3d 347, 350-52 (2d Cir. 1995) (reversing conspiracy conviction where defendant was prejudiced by the government's proof of multiple conspiracies). Nor could the duplicity argument be adequately addressed by a unanimity charge. To the contrary, in *United States v. Marlinga,* the court, having found the conspiracy count duplicitous, rejected the government's argument that the problem could be corrected through the use of an unanimity charge, explaining:

> Acknowledging that Count One of the Indictment is duplicitous prior to trial, but failing to cure the duplicity until the jury instruction stage, would leave this Defendant open to the very prejudices the Court can prevent. Hoping that a jury instruction will remedy a problem that can clearly be solved now, makes no sense. While there are situations in which a jury instruction of unanimity is an appropriate remedy for a duplicitous indictment (e.g., when the indictment *appropriately alleges* a single conspiracy, but the proofs at trial suggest multiple conspiracies), this is not one of them.

2005 WL 513494,. at *6 (emphasis in original). In line with *Marlinga*, and keeping with "the time-honored adage that 'an ounce of prevention is worth a pound of cure'" the Court should

dismiss the duplicitous conspiracy charges in Counts 1, 2, and 4.  *Hardy*, 762 F. Supp. at 1410 (rejecting the government's insistence that a jury instruction would cure a duplicitous count, reasoning that "'an ounce of prevention is worth a pound of cure' . . .  particularly . . . where, as here, the preservation of defendants' Fifth and Sixth Amendment rights hangs in the balance").

**B.      In The Alternative, The Government Must Elect A Conspiracy On Multiplicity Grounds.**

Should the Court disagree with Mr. Hana's argument above and somehow agree with the Government that the Indictment, in fact, alleges a single conspiracy, that raises a separate pleading problem, although one that is equally serious:  multiplicity.  That is, the Government argues that there is a single conspiracy, but if that is true, it has arbitrarily and impermissibly divided one offense—that is, a single agreement—into three separate charges.  Counts 1, 2, and 4 of the Indictment charge, respectively, conspiracy to commit bribery, conspiracy to commit honest-services fraud, and conspiracy for a public official to act as a foreign agent.  Should the Court rule against Mr. Hana with regard to duplicity, it will, presumably, be because it finds that as alleged, the conspiracies have the same duration, the same overt acts, and—to a large extent—the same conspirators.  And the Government will, it certainly appears, use the same evidence to attempt to prove each of them.  As a matter of both law and common sense, then, it follows that they are the same conspiracy, charged three times.  That being so, Counts 1, 2, and 4 should be dismissed, or at the very least the Government should be required to elect one conspiracy to attempt to prove at trial, and dismiss the rest.[29]

---

[29] It is true, of course, that Mr. Hana has argued that the Indictment is impermissibly duplicitous, but there is no tension between the idea that the Indictment is both duplicitous and multiplicitous. The duplicity argument contends that Counts 1, 2, and 4 each improperly aggregate five distinct conspiracies into singular counts. The Court only needs to reach the multiplicity argument if it concludes that the duplicity argument fails.  That is, if the Court concludes that Counts 1, 2, and 4

### 1.     Legal Standard

Multiplicity is the charging of a single offense in separate counts of an indictment.  *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).  Multiplicitous indictments violate the Double Jeopardy Clause of the Fifth Amendment because they subject a person to punishment for a single crime more than once.  *United States v. Sattar*, 314 F. Supp. 2d 279, 307 (S.D.N.Y. 2004) (citing *United States v. Dixon*, 509 U.S. 688, 696 (1993), and *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 2009)).But the evils inherent in a multiplicitous indictment are several:  first, as noted, a multiplicitous indictment risks subjecting the defendant to multiple sentences for the same offense, a clear violation of the Double Jeopardy Clause's prohibition against cumulative punishment.  *United States v. Hodge*, 870 F.3d 184, 193 (3d Cir. 2017); *United States v. Smith*, 231 F.3d 800, 815 (11th Cir. 2000) (indicating that one of the "vices" of multiplicitous counts is that "the defendant may receive multiple sentences for the same offense").   Second, a multiplicitous indictment risks "prejudic[ing] the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present."  *United States v. Carter*, 576 F.2d 1061, 1064 (3d Cir. 1978); *see also United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981) ("The vice in multiplicity of charges is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant has committed not one but several

---

each properly state only a single, overarching conspiracy, then Mr. Hana contends that that conspiracy is charged three separate times.

This is not an unusual scenario: courts routinely consider simultaneous duplicity and multiplicity challenges, without concern that they are arguments in the alternative.  *See, e.g.*,  *United States v. Robinson*, 855 F.3d 265, 270 (4th Cir. 2017) (noting that duplicity and multiplicity "are a Scylla and Charybdis of sorts" that the Government must navigate when drafting an indictment); *United States v. Baugh*, 593 F. Supp. 3d 321, 326-28 (D. Mass. 2022); *United States v. Craigue*, 565 F. Supp. 3d 267, 270-73 (D.N.H. 2021); *United States v. Starks*, 472 F.3d 466, 468-71 (7th Cir. 2006); *United States v. Hogan*, 317 F. Supp. 2d 777, 781-82 (E.D. Mich. 2004); *United States v. Toliver*, 972 F. Supp. 1030, 1036-37, 1038-40 (W.D. Va. 1997).

crimes."); *Smith*, 231 F.3d at 815 ("[A] multiplicitous indictment may improperly prejudice a jury by suggesting that a defendant has committed several crimes—not one."); *United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) ("Courts have found that when an indictment is multiplicitous, [i]t may prejudice the jury against the defendant by creating the impression of more criminal activity on his part than in fact may have been present."); *United States v. Montilla Ambrosiani*, 610 F.2d 65, 70 (1st Cir. 1979) (criticizing the use of a multiplicitous indictment to unfairly "magnify the defendant's wickedness in the eyes of the jury"), *cert. denied*, 445 U.S. 930 (1980); *see also United States v. Polizzi*, 257 F.R.D. 33, 36 (E.D.N.Y. 2009) (a multiplicitous indictment also runs the risk of creating "an exaggerated impression of a defendant's criminal activity by charging an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed").  Finally, a multiplicitous indictment poses a serious risk of jury confusion and with it, at least the possibility of a fundamentally unfair trial.  *See United States v. Hearod*, 499 F.2d 1003, 1005 (5th Cir. 1974) (noting that one of the hazards of multiplicity is "confus[ing] the jury by suggesting that not one but several crimes have been committed").

If two or more of the offenses at issue in this analysis are, as here, conspiracy offenses, the multiplicity inquiry turns on whether the indictment actually alleges two or more agreements or only one.  *United States v. Araujo*, No. 17-cr-438, 2018 WL 3222527, at *3 (S.D.N.Y. July 2, 2018) (citing *United States v. Ansaldi*, 372 F.3d 118, 124–25 (2d Cir. 2004)); *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004) ("[T]o survive a double jeopardy attack, the government would have to show that the two schemes involved 'distinct' agreements.").  The Court's inquiry is guided by the Second Circuit's so-called *Korfant* factors. *See United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994) (citing *United States v. Korfant*, 771 F.2d 660, 662 (2d Cir. 1985)). Thus,

the Court is required, for purposes of determining whether there is one or several conspiracies, the following factors:

> (1) the criminal offenses charged in [the] indictment[]; (2) the overlap of participants; (3) the overlap of time; (4) similarity of operation; (5) the existence of common overt acts; (6) the geographic scope of the alleged conspiracies or location where overt acts occurred; (7) common objectives; and (8) the degree of interdependence between alleged distinct conspiracies.

*Id.*; *see also United States v. Diallo*, 507 F. App'x 89 (2d Cir. 2013) (applying the *Korfant* factors to determine whether two narcotics conspiracies charged under 21 U.S.C. § 846 in the same indictment were multiplicitous); *United States v. Cooper*, 886 F.3d 146, 154-55 (D.C. Cir. 2018) (applying the *Korfant* factors to determine whether two conspiracies charged under 18 U.S.C. § 371 in the same indictment were multiplicitous).  Courts must apply the *Korfant* factors "with the lively awareness that no dominant factor or single touchstone" is dispositive in determining whether multiple allegedly distinct conspiracies "appear in fact and in law the same." [30]*Macchia*, 35 F.3d at 668.

The Second Circuit has "long recognized 'the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an

---

[30] This test differs from the analysis applied when the allegedly multiplicitous offenses are not conspiracies:  those circumstances call for application of the so-called *Blockburger* test.  *See Blockburger v. United States*, 284 U.S. 299, 304 (1932) (when each offense "requires proof of a fact that the other does not," the two offenses are not the same and the prohibition against Double Jeopardy is not implicated).  Recognizing that this test would not be useful in the conspiracy context, the Courts of Appeals have each devised more flexible totality-of-the-circumstances tests when considering multiplicity challenges to conspiracy offense in light of the fact that the *Blockburger* test "may not adequately protect the defendant's constitutional right against double jeopardy, unless it is tempered with the consideration that a single conspiracy may not be arbitrarily subdivided for the purposes of prosecution."  *United States v. Liotard*, 817 F.2d 1074, 1078 (3d Cir. 1978); *see Korfant*, 771 F.2d at 662 ("By resort to an array of indicia, a court may address the merits of a double jeopardy claim in light of the totality of circumstances presented by a particular conspiracy charge—an apt and well-accepted approach given the nature of the crime of conspiracy, that darling of the modern prosecutor's nursery."

overall conspiracy.'"  *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004) (quoting *United States v. Abbamonte*, 759 F.2d 1065, 1068 (2d Cir. 1985)).  In assessing multiplicity, therefore, the Second Circuit utilizes a burden-shifting framework.  The defendant bears the initial burden of making a "non-frivolous" or "colorable" showing that the multiple counts in fact charge only one conspiracy.  *Id.*; *Olmeda*, 461 F.3d at 282.  If met, the burden then shifts to the Government, to show, "by a preponderance of the evidence, that there are in fact two [or more] distinct conspiracies and that the defendant is not being placed in jeopardy twice for the same crime."  *Lopez*, 356 F.3d at 467.  That the Government bears this burden makes sense, given the fact that "as between the government and the defendant, the government, being the party that drafts indictments, should bear any burden resulting from imprecise language."  *Id.*; *Olmeda*, 461 F.3d at 282.

### 2.      The Superseding Indictment Fails The *Korfant* Test

Here, assuming the Court does not find these counts duplicitous, it necessarily and logically follows that the Government has charged the same agreement three times:  Counts 1 and 2 are the same conspiracy.  Indeed, they do have a complete overlap with regard to time, location, and participants; likewise, the conspiracy charged in Count 4 is a subpart of the conspiracy charged in Counts 1 and 2, with the same start date, three of the five conspirators, and the same location. *See, e.g.*, *Gaskin*, 364 F.3d at 454 ("[W]here a smaller conspiracy is wholly contained within a larger one, they are normally, perhaps always, treated as the same offense for jeopardy purposes." (cleaned up)); *United States v. Maxwell*, No. 20-cr-330, 2022 WL 1294433, at *4, *7 (S.D.N.Y. Apr. 29, 2022) (concluding that one charged conspiracy was a "subset" of and "factually subsumed by" another); *cf. Macchia*, 35 F.3d at 672 (Newman, C.J., concurring) ("Sometimes a pair of . . . conspiracies can be conceptualized as circles that intersect, in which event the issue will be whether the degree of commonality (*i.e.*, the common area within the two intersecting circles) is so extensive and the degree of difference (*i.e.*, the areas of each circle outside the common area) so

slight that under any realistic assessment the smaller of the two conspiracies should be considered part of the larger one for jeopardy purposes."). Applying the *Korfant* factors only confirms this common-sense conclusion. Those *Korfant* factors are discussed below.

<strong>a.      The offenses charged.</strong>

The Indictment alleges that Mr. Hana conspired to commit three separate offenses: bribery under 18 U.S.C. § 201, honest-services fraud under 18 U.S.C. §§ 1343 and 1346; and a public official acting as a foreign agent under 18 U.S.C. § 219. Ind. ¶¶ 71-75, 76-78, 81-83. While these are distinct offenses in the criminal code, charging different offenses as the objects of the conspiracies is not fatal to a multiplicity challenge because, as a matter of law, "[a] single agreement to commit several crimes constitutes one conspiracy." *United States v. Hernandez*, No. 09-cr-625, 2009 WL 3169226, at *8 (S.D.N.Y. Oct. 1, 2009) (quoting *United States v. Broce*, 488 U.S. 563, 570-71 (1989)); *see also Maxwell*, 2022 WL 1294433, at *4 (concluding that different underlying substantive offenses are not "fatal" to a multiplicity claim, and noting that "courts in this district have found two conspiracy counts to be the same offense even when they have different statutory objectives because both counts can arise from the same agreement"). But here, should the Government prevail with regard to the duplicity argument described above, despite the different statutory objectives that are charged, it will be because all three conspiracies have the identical factual objective, as discussed *infra* under the "common objectives" factor.

To an extent, this is obvious: after all, as is discussed above, honest-services fraud under § 1346 is, in essence, an identical offense to bribery under § 201 (apart from the additional requirement of the defendant's use of wires). *See supra* Section I.C. (citing *Skilling*, 561 U.S. at 413 & n.45; *Boyland*, 862 F.3d at 289-90 (treating honest-services fraud and bribery as identical)). Given this near-complete overlap between honest-services fraud and bribery, they are, in essence, identical offenses for purposes of this factor. While 18 U.S.C. § 219, the offense the Defendants

allegedly conspired to commit in Count 4, does not draw its content from bribery under § 201 in the same way that honest-services fraud does, it is a notably similar offense to § 201, criminalizing the alleged actions of a public official acting in the best interests and at the direction of a foreign or private person or entity, and not the public at large.  Sections 201 and 219 are even codified together in the U.S. Code under Chapter 11 of Title 18, titled "Bribery, Graft, and Conflicts of Interest."

### b.        The overlap of participants.

There is complete overlap in the individuals alleged to have committed the conspiracies in Counts 1 and 2: all five Defendants, as well as "others known and unknown."  Ind. ¶¶ 72-74, 77-78.  Consistent with Count 4 being merely a subset of the identical conspiracies alleged in Counts 1 and 2, only Mr. Hana, Senator Menendez, and Mrs. Menendez (as well as "others known or unknown") are alleged to have committed the conspiracy offense set forth in Count 4.  *Id.* ¶ 82; *see, e.g.*, *United States v. Calderone*, 982 F.2d 42, 47-48 (2d Cir. 1992) (finding two alleged conspiracies multiplicitous where, among other things, the time frame and geographic scope of one conspiracy was entirely contained within the other conspiracy and the core participants were the same); *Gaskin*, 364 F.3d at 454 ("[W]here a smaller conspiracy is wholly contained within a larger one, they are normally, perhaps always, treated as the same offense for jeopardy purposes." (cleaned up)); *Maxwell*, 2022 WL 1294433, at *4, *7 (concluding that one charged conspiracy was a "subset" of and "factually subsumed by" another).  And even the slight difference in alleged co-conspirators between Counts 1 and 2 on the one hand, and Count 4 on the other, does not undermine the fact that the conspiracies really are identical.  *See, e.g.*, *United States v. Reid*, 475 F. App'x 385, 387 (2d Cir. 2012) ("[C]hanges in membership do not necessarily convert a single conspiracy into multiple conspiracies, and there is no requirement that the same people be involved throughout the duration of the conspiracy." (cleaned up)).

### c.  The overlap of time.

As discussed above, the temporal overlap between the three conspiracies is substantial. The conspiracies charged in Counts 1 and 2 in the Indictment are alleged to have occurred "[f]rom at least in or about January 2018 through at least in or about 2023," while the conspiracy charged in Count 4 is alleged to have occurred "[f]rom at least in or about January 2018 through at least in or about June 2022."  Ind. ¶¶ 72, 77, 82.[31]

### d.  Similarity of operation.

There is certainly a substantial, if not complete, overlap in the operations alleged for each conspiracy, duplicitous though they are.  Each Count repeats, realleges, and incorporates all of the factual paragraphs of the Indictment, and so, based upon the language of the Indictment itself, result from the exact same factual allegations.  Ind. ¶¶ 71, 76, 81 (stating that "[t]he allegations contained in Paragraphs 1 through 70 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein").  And the Indictment gives no indication that the facts alleged in Paragraphs 1 through 70 can be sorted into some Counts, but not others.  By its terms, the Indictment therefore contends that all of the facts alleged in it were relevant to the operations of each ostensibly distinct conspiracy.

Comparing the two Superseding Indictments to the original Indictment confirms this understanding.  Count 4 was added in the First Superseding Indictment; the original Indictment only charged Mr. Hana in Counts 1 and 2.  *Compare* ECF No. 1 *with* ECF No. 65.  More

---

[31]The First Superseding Indictment (ECF No. 65) alleged absolute temporal overlap: all three conspiracies were alleged to have occurred "[f]rom at least in or about January 2018 through at least in or about June 2022."  ECF No. 65 ¶¶ 57, 62, 67.  The Second Superseding Indictment has extended the bribery and honest-services fraud conspiracies into 2023 through the Qatar-related allegations in Paragraphs 45 and 55-66.  Mr. Hana is not alleged to have had a role in the Qatar-related allegations.

significantly, the First Superseding Indictment added almost no factual material to the original Indictment, inserting only two paragraphs that can be described as substantive (¶¶ 3 and 21[32]), and fleshing out two more (*compare* ECF No. 1 ¶ 5 *with* ECF No. 65 ¶ 6 and ECF No. 1 ¶ 20 *with* ECF No. 65 ¶ 28).  The rest of the paragraphs new to the First Superseding Indictment merely describe FARA's requirements (ECF No. 65 ¶¶ 10-12); allege that Senator Menendez had knowledge of FARA (*id.* ¶ 13); state that the Senator was prohibited from serving as a foreign agent (*id.* ¶ 14); and provide the undisputed fact that Mrs. Menendez and Mr. Hana have never registered as foreign agents or lobbyists (*id.* ¶ 15).[33]

The paucity of new substantive allegations added to the Indictment evidences that the Government intends to rely upon the same facts underpinning Counts 1 and 2 to prove Count 4— and, therefore, that the operations of the conspiracy in Count 4 are identical to those in Counts 1 and 4.  Indeed, the truth is that, far from being a newly discovered conspiracy unveiled in the First Superseding Indictment, the conspiracy charged in Count 4 has been part of Counts 1 and 2 all

---

[32]Paragraph 3 adds almost nothing new to the Indictment that was not already contained in Paragraph 2.  *Compare* ¶ 2 ("MENENDEZ promised to and did use his influence and power and breach his official duty in ways that benefited the Government of Egypt . . . . MENENDEZ provided sensitive U.S. Government information and took other steps that secretly aided the Government of Egypt.") *with* ¶ 3 ("MENENDEZ . . . further promised to take and took a series of acts on behalf of Egypt, including on behalf of Egyptian military and intelligence officials . . . .").  Paragraph 21, meanwhile, cannot support Count 4 on its own.  First, it occurred in Washington, D.C. and therefore cannot support venue in this District.  *See infra* at Section IV.  Second, it does not allege that Menendez agreed to do anything, or took any action, on behalf of Egypt or Egyptian officials.  Third, it does not even allege an agreement between the Senator and Mrs. Menendez and Mr. Hana.  And fourth, the facts referenced in Paragraph 21 do not resurface in the rest of the Indictment and appear unconnected to the bulk of the allegations contained therein.

[33]As discussed *supra* Section II.D., the Indictment does allege that Mr. Hana has never registered as a foreign agent or lobbyist.  Ind. ¶ 15.  But because the Indictment does not allege that Mr. Hana ought to have registered as a foreign agent or lobbyist, and does not charge him with an independent violation of FARA, this allegation is a red herring and should be stricken from the Indictment.

along.  The original Indictment contains paragraph after paragraph alleging that Senator Menendez took accounts on behalf of Egyptian officials—paragraphs that were incorporated by reference into Counts 1 and 2.  *See* ECF No. 1 ¶¶ 2, 9, 10, 11, 12(a), 12(b), 12(c), 12(d), 13, 15, 17, 20, 21, 24, 26, 27, 28, 29(a), 29(b), 29(d), 29(f), 29(g), 48, 52(d), 53.  From the beginning, therefore, the Government has been attempting to use actions Senator Menendez allegedly took on behalf of Egypt as the basis for its bribery and honest-services fraud conspiracies charged in Counts 1 and 2.  The Government's use of those actions as the basis for an additional conspiracy to violate § 219 must therefore mean that the three conspiracies' methods of operation are more than similar—they are identical.

The Second Superseding Indictment, meanwhile adds nothing further to the allegations against Mr. Hana.  The bulk of the new allegations in the Second Superseding Indictment relate to Senator Menendez's interactions with Qatar.  *See* Ind. ¶¶ 45, 55-66.  The Indictment makes no attempt to connect Mr. Hana to the Qatar scheme, and Count 4 of the Second Superseding Indictment only alleges a conspiracy to engages in acts on behalf of Egypt—not Qatar.

### e.    The existence of common overt acts.

Count 1 alleges five overt acts, while Count 4 alleges two.[34]  Ind. ¶¶ 75, 83.  Each of Count 4's alleged overt acts are included in the overt acts supporting Count 1, with the sole difference being that an overt act referencing a September 21, 2019 dinner included in Count 1 references Mr. Daibes, while the same overt act included in Count 4 noticeably omits Mr. Daibes's presence.  *Compare id.* ¶¶ 75(a) ("On or about June 30, 2018, ROBERT MENENDEZ, NADINE MENENDEZ . . ., and WAEL HANA . . ., the defendants, met at a restaurant in Manhattan.") *with*

---

[34]Count 2 is charged under 18 U.S.C. § 1349, which does not require the Government to allege or prove any overt acts, and none have been alleged.  *United States v. Roy*, 783 F.3d 418 (2d Cir. 2015).

83(a) (same) and ¶¶ 75(d) ("On or about September 21, 2019, MENENDEZ, HANA, FRED DAIBES, the defendant, and Egyptian Official-4 met at a restaurant in Manhattan.") *with* 83(b) ("On or about September 21, 2019, MENENDEZ, HANA, and Egyptian Official-4 met at a restaurant in Manhattan.").  Moreover, as discussed above in the "similarity of operation" factor, all factual allegations in the Superseding Indictment are incorporated into each conspiracy Count, indicating that the factual support for each Count is, as alleged, identical.

**f.      The geographic scope of the alleged conspiracies.**

There is complete geographic overlap between the three conspiracies, all of which are alleged to have occurred "in the Southern District of New York and elsewhere"—"elsewhere" here being predominantly, if not entirely, in the State of New Jersey or the District of Columbia, as the Indictment makes clear.[35]  Ind. ¶¶ 75, 77, 83.

**g.      Common objectives.**

Perhaps most significantly, if the Court denies the motion to dismiss on duplicity grounds, it will have to be because the objectives of the charged conspiracies are identical.  While the individual conspiracy counts each charge their objectives by parroting the language of the underlying statutory offenses, Ind. ¶¶ 73-74, 78, 82, the Indictment's prefatory paragraphs make clear that the Government has charged all three supposedly distinct conspiracies as having the same ultimate object:  Senator Menendez's "accept[ance of] hundreds of thousands of dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek to protect and enrich HANA, URIBE, and DAIBES and to benefit the Arab Republic of Egypt and the State of Qatar," *id.* ¶ 1.  Paragraph 2, a summation of the Indictment's allegations, makes clear that the case the Government presented to the grand jury, and the case it will attempt to prove at trial,

---

[35]*See supra* at IV.

revolved around a "corrupt relationship" between all five Defendants that encompassed actions taken on behalf of Mr. Hana, Mr. Uribe, Mr. Daibes, and the Egyptian and Qatari Governments. As discussed above, this theory of the case impermissibly joins five separate conspiracies in individual Counts. *See supra* Section IV. But if the Court rejects Mr. Hana's duplicity argument and finds that the Superseding Indictment properly charges a single conspiracy with a single objective, then it is apparent that Counts 1, 2, and 4 each have that same objective for purposes of multiplicity analysis.

### h. The degree of interdependence between alleged distinct conspiracies.

This factor requires the Court to consider the extent to which the success or failure of one alleged conspiracy is independent of the corresponding success or failure by the other. *Macchia*, 35 F.3d at 671 (*citing Korfant*, 771 F.2d at 663). While not a necessary element, *see, e.g.*, *United States v. Maslin*, 356 F.3d 191, 197 (2d Cir. 2004) ("Finally, as to interdependence, since what was ultimately proven was one common conspiracy, this factor is irrelevant."), in some ways, the interdependence of at least some of the counts here is apparent. For example, the conspiracy alleged in Count 1, if not duplicitous, can be viewed as logically dependent on the success of the conspiracy alleged in Count 2, and vice versa. After all, as discussed above, bribery under § 201 and honest-services fraud under § 1346 have nearly identical elements, and courts consistently draw honest-services fraud's content from the elements of § 201. *See Boyland*, 862 F.3d at 289-90 (treating honest-services fraud and bribery as identical). Given this interrelation, it is difficult to imagine a jury finding that the defendants agreed to commit bribery under § 201, but not honest-services fraud, and the reverse is equally inconceivable: if there was no decision to bribe, there was, as a matter of logic and as dictated by the above caselaw, no decision to deprive the public of its right to Senator Menendez's honest services.

Moreover, if Count 4 fails a duplicity test, the § 219 conspiracy charged in Count 4 also shares an interdependence with the bribery and honest-services fraud conspiracies.  As discussed in the "similarity of operations" factor above, the original Indictment, which did not contain Count 4 (but does allege the same facts), is nearly identical (particularly with regards to the allegations against Mr. Hana) to the Second Superseding Indictment that does contain Count 4, indicating that the facts underlying the conspiracy charged in Count 4 are completely interwoven with those supporting the conspiracies charged in Counts 1 and 2—and, therefore, that the success or failure of Count 4 is dependent on the success or failure of Counts 1 and 2.  Thus, both depend upon the "corrupt relationship," Ind. ¶ 2, between the Defendants to "protect and enrich Hana, Uribe, and Daibes and to benefit the Arab Republic of Egypt and the State of Qatar," *id.* ¶ 1; though, as set forth above, that is too broad a "common goal" to overcome Mr. Hana's duplicity argument, it certainly links these counts sufficiently to raise a significant multiplicity problem.

As a practical and legal matter, then, should the Court find Counts 1, 2 and 4 not to be duplicitous, the Indictment can certainly be said to state one conspiracy in three offenses.  If any of Counts 1, 2, or 4 are not dismissed for any of the reasons set forth above, including duplicity, the Government should therefore be required to elect the one conspiracy that it intends to prove at trial.  *See United States v. Johnson*, 130 F.3d 1420, 1426 (10th Cir. 1997) (noting that the trial court has discretion to require election between multiplicitous counts); *United States v. Throneburg*, 921 F.2d 654, 657 (6th Cir. 1990) (noting "that the district court has discretion in deciding whether to require the prosecution to elect between multiplicitous counts especially when the mere making of the charges would prejudice the defendant with the jury"); *United States v. Lampley*, 573 F.2d 783, 792 (3d Cir. 1978) (Gibbons, J., concurring in part and dissenting in part) ("If the court finds that the defendant's acts constituted only one illegal course of conduct, the

appropriate remedy is to compel the prosecution to elect among the multiplicitous counts.").  In the alternative, Mr. Hana respectfully requests the required pretrial evidentiary hearing to assess the evidence the Government intends to introduce to prove each alleged conspiracy, in order to determine whether prosecuting him twice for the same acts would violate his rights under the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  *See United States v. Travillion*, 759 F.3d 281, 295 (3d Cir. 2014) ("If the defendant makes the requisite showing, he is entitled to a pretrial evidentiary hearing to adjudicate his double jeopardy claim.").

## IV.    THE INDICTMENT DOES NOT ADEQUATELY ALLEGE VENUE.

The Government has brought this case in the United States District Court for the Southern District of New York against a "senior U.S. Senator from the State of New Jersey," "his wife," and "three New Jersey associates and businessmen." Ind. ¶ 1.  The essential elements of the alleged criminal conduct occurred exclusively outside of the Southern District of New York—either in the State of New Jersey or the District of Columbia—and Mr. Hana accordingly moves to dismiss all counts against him for improper venue.  Fed. R. Cr. P. 12(b)(3)(A)(i).

"[V]enue in federal criminal cases is controlled by a complicated interplay of constitutional provisions, statutes, and rules."  *United States v. Rowe*, 414 F.3d 271, 277 (2d Cir. 2005) (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 301 (3d ed. 2000)); *see also United States v. Bezmalinovic*, 962 F. Supp. 435, 436 (S.D.N.Y. 1997) (recognizing that the question of venue in a criminal case is one of constitutional dimension).  As the Supreme Court has observed:

> Proper venue in criminal proceedings was a matter of concern to the Nation's founders.  Their complaints against the King of Great Britain, listed in the Declaration of Independence, included his transportation of colonists "beyond the Seas to be tried."[36]

---

[36] "The Declaration recited among injuries and usurpations attributed to the King:  'transporting us beyond Seas to be tried for pretended offences.'"  *Cabrales*, 524 U.S. at 6 n.1 (quoting The

*United States v. Cabrales*, 524 U.S. 1, 6 & n.1 (1998); *see also United States v. Saavedra*, 223 F.3d 85, 88 (2d Cir. 2000) (discussing the historical and constitutional underpinnings of the venue requirement).  For this reason, "[t]he Constitution twice safeguards the defendant's venue right." *Cabrales*, 524 U.S. at 6; *see also United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012) (same). Article III requires that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. art. III, § 2, cl. 3.  And the Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." These commands are codified in Federal Rule of Criminal Procedure 18, which provides that "the government must prosecute an offense in a district where the offense was committed."  Fed. R. Crim. P. 18; *see also United States v. Rodriguez-Moreno*, 526 U.S. 275, 278 (1999) ("[P]rosecution shall be had in a district in which the offense was committed.").

The "venue requirement is principally a protection for the [criminal] defendant." *Cabrales*, 524 U.S. at 9; *see also Travis v. United States*, 364 U.S. 631, 634 (1961) (cautioning that "venue provisions in Acts of Congress should not be so freely construed as to give the Government the choice of 'a tribunal favorable' to it."  (quoting *United States v. Johnson*, 323 U.S. 273, 275 (1944))).  And the Supreme Court has repeatedly "underscored the importance of safeguarding the constitutional guarantee of proper venue in criminal trials," *United States v. Perez*, 280 F.3d 318,

---

Declaration of Independence, para. 21 (1776)).  "A complaint of the same tenor appeared earlier, in the 1769 'Virginia Resolves.'"  *Id.* (citing Blume, The Place of Trial of Criminal Cases: Constitutional Vicinage and Venue, 43 Mich. L. Rev. 59, 64 (1944)).  "Parliament had decreed that colonists charged with treason could be tried in England."  *Id.* (citing 16 Parliamentary History of England from Earliest Period to the Year 1803, at 476-510 (T. Hansard ed. 1813)).  "In response, the Virginia House of Burgesses unanimously passed a resolution condemning the practice of sending individuals 'beyond the Sea, to be tried' as 'highly derogatory of the Rights of British subjects.'"  *Id.* (citing Journals of the House of Burgesses of Virginia, 1766-1769, 214 (J. Kennedy ed. 1906)).

328 (3d Cir. 2002), in such seminal cases as *Johnson*, where the Court recognized that a cautious

interpretive approach to venue is "more consonant with the considerations of historic experience

and policy which underlie [the venue] safeguards in the Constitution," 323 U.S. at 275.  The Court

explained:

> These are matters that touch closely the fair administration of
> criminal justice and public confidence in it, on which it ultimately
> rests.  These are important factors in any consideration of the
> effective enforcement of the criminal law. . . .  Questions of venue
> in criminal cases, therefore, are not merely matters of formal legal
> procedure.  They raise deep issues of public policy in the light of
> which legislation must be construed.

*Id.* at 276.

"When a defendant challenges venue by way of a pre-trial motion to dismiss the

indictment" the Government has the burden to "show that the indictment alleges facts sufficient to

support venue."  *United States v. Lange*, No. 10-cr-968, 2012 WL 511448, at *1 (E.D.N.Y. Feb.

15, 2012).  Moreover, "venue must be proper with respect to each count" and each count must be

reviewed separately.  *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United

States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989)); *see also United States

v. Chow*, 993 F.3d 125, 143 (2d Cir. 2021) ("[V]enue must be proper with respect to each count.").

In doing so, and assuming that Congress has not explicitly designated the location in which

it considers a crime to occur, the Court must look to the *locus delicti* of the offense charged in an

indictment; that is, the place where the offense arose "must be determined from the nature of the

crime alleged and the location of the act or acts constituting it."  *Cabrales*, 524 U.S. at 6-7; *see

also Tzolov*, 642 F.3d at 318 ("When a federal statute defining an offense does not specify how to

determine where the crime was committed, [t]he *locus delicti* must be determined from the nature

of the crime alleged and the location of the act or acts constituting it.").  This is because "[v]enue

is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—

took place." *United States v. Purcell*, 967 F.3d 159, 186 (2d Cir. 2020); *see also Tzolov*, 642 F.3d at 318 (same). Courts engaging in this analysis must be careful to separate "essential conduct elements" from "circumstance element[s]," and to ensure that part of the crime charged in the indictment was committed in the district where the case is to be tried. *See Rodriguez–Moreno*, 526 U.S. at 280 & n.4 (distinguishing the underlying crime of violence, an "essential conduct element," proscribed by 18 U.S.C. § 924(c)(1), from a "circumstance element of . . . proscribed conduct [that] occurred 'after the fact' of an offense begun and completed by others."); *see also Cabrales*, 524 U.S. at 7-8 (holding that a money laundering prosecution was improperly venued in Missouri because the defendant was actually charged in the indictment only with money laundering activity that occurred in Florida, but was not charged with having participated in the unlawful conduct in Missouri which generated the laundered funds in question); *Tzolov*, 642 F.3d at 319 ("[G]oing to Kennedy airport and boarding flights to meetings with investors were not a constitutive part of the substantive securities fraud offense with which [defendant] was charged."); *United States v. Ramirez*, 420 F.3d 134, 141-142 (2d Cir. 2005) (venue did not lie in the Southern District for mail fraud when the scheme to defraud originated in the Southern District but the mailing occurred in another district); *Geibel*, 369 F.3d at 697 (finding venue improper where actions in the Southern District of New York were "anterior and remote" to the criminal conduct); *Beech-Nut Nutrition Corp.*, 871 F.2d at 1189-90 (holding, in prosecution for introducing adulterated and misbranded apple juice into interstate commerce, that venue was not proper in the Eastern District of New York because the conduct that occurred in that district was "not part of the offense of introducing the offending juice into commerce but . . . merely prior and preparatory to that offense").

The Second Circuit "has set forth a two-step inquiry for analyzing venue."  *Purcell*, 967 F.3d at 186; *see also United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (recognizing that, to determine whether venue is proper, "the Supreme Court directed courts to first identify the conduct constituting the offense and then determine where that conduct occurred").  First, the Court must "seek to identify the conduct constituting the offense based on the language of the statute." *Purcell*, 967 F.3d at 186.  And second, the Court must "discern the location of the commission of the criminal acts."  *Id.*

With respect to the crime of conspiracy, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed."  *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008).  "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy.  The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320.  The Second Circuit suggested in *Saavedra* that when venue may properly lie in more than one district under a continuing offense theory, we should also ask "whether the criminal acts in question bear 'substantial contacts' with any given venue."  223 F.3d at 92-93. The substantial contacts test "takes into account four main factors:  (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding."[37]  *Id*.  It is "not a 'formal constitutional

---

[37] The Government has chosen not to charge any substantive counts underlying the alleged conspiracies, possibly in an effort to circumvent venue concerns that would otherwise be raised for the same alleged conduct.  *See Saavedra*, 223 F.3d at 89 (where a "defendant is charged with conspiracy as well as substantive offenses, venue must be laid in a district where all the counts may be tried.  Thus, the venue potential in a conspiracy case for the prosecutor to choose from is narrowed by the substantive counts the government wishes to prosecute.") (citing Norman Abrams, *Conspiracy and Multi–Venue in Federal Criminal Prosecutions:  The Crime Committed Formula*, 9 UCLA L. Rev. 751, 774 (1962)).

test,' and, rather, is intended to help courts in determining whether a chosen venue is unfair or prejudicial to a defendant, especially in those cases where the defendant's acts did not take place within the district selected as the venue for the trial." *United States v. Mackey*, 652 F. Supp. 3d 309, 327 (E.D.N.Y. 2023) (quoting *Saavedra*, 223 F.3d at 93).

The Government here alleges that five overt acts were committed in the Southern District of New York, the most recent of which is that Mrs. Menendez purportedly "provided to a jeweler two one-kilogram gold bars that had been provided by Daibes." Ind. ¶ 75(e). Although that jeweler was located in New Jersey, and Mrs. Menendez provided the gold bars to the jeweler in New Jersey, the Government attempts to gain venue by alleging that those same gold bars were later sold by the jeweler in Manhattan. *See id.* ¶¶ 53(h), 75(e). But the subsequent generation of criminally generated proceeds in an alternative district cannot establish venue in that district where all other associated criminal conduct occurred elsewhere. Indeed, were it otherwise, even if all essential conduct occurred in one district, venue would lie where a later sale or transfer of proceeds occurred, no matter how remote. But that is not the law. *See, e.g.*, *Ramirez*, 420 F.3d at 141-42, 145 (venue did not lie in the Southern District for mail fraud when the scheme to defraud originated in the Southern District but the mailing occurred in another district because that would mean that "a defendant who devised a scheme to defraud while driving across the country could be prosecuted in virtually any venue through which he passed"). The problem is particularly acute here, where there is no allegation that the jeweler in question was involved in the conspiracy or that he was directed by Mrs. Menendez or any of her alleged co-conspirators to later sell the gold bars in Manhattan; rather, the jeweler's decision as to where to ultimately sell the gold bars was completely disconnected and remote from the alleged criminal conspiracy. *See Geibel*, 369 F.3d

at 697 (venue improper where actions in the Southern District of New York were "anterior and remote" to the criminal conduct).

The Government next relies on a Mercedes-Benz payment that Jose Uribe allegedly asked a business associate to make from a bank account that had previously been opened for that individual's business at a bank branch in the Bronx.  *See* Ind. ¶¶ 43(f), 75(b).  But again, there is no allegation that the account was set up in connection with the alleged criminal conduct in this case, and not even a fact indicating that the funds were transferred through an account located in New York.  Indeed, the Government could not so allege, ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████  *Beech-Nut Nutrition Corp.*, 871 F.2d at 1189-90 (holding, in prosecution for introducing adulterated and misbranded apple juice into interstate commerce, that venue was not proper in the Eastern District of New York because the conduct that occurred in that district was "not part of the offense of introducing the offending juice into commerce but . . . merely prior and preparatory to that offense").

The Government further seeks to establish venue through a text message that Mrs. Menendez sent to Mr. Uribe on September 5, 2019, which was purportedly transmitted through a

---

[38] It is unclear why this allegation was included in the current and prior indictments, as the Government had this *Brady* information in its possession as early as May 2023.

cell tower in Manhattan.  Ind. ¶ 75(c).  While the Indictment freely quotes from Mrs. Menendez's (and others') text message exchanges from other time periods, *see, e.g.*, *id.* ¶¶ 19(b), 19(c), 20, 21, 26, 35, 36, 43(c), 43(e), 44(b), 57, 61, 62, it does not include the context of the alleged message that was transmitted through a cell tower in Manhattan.  In so omitting the context of that message, the Government has failed to allege that the message was an essential conduct element and made in furtherance of the conspiracy, defeating any claim of venue based on this singular text message pinging a cell tower in Manhattan.[39] *See Tzolov*, 642 F.3d at 320 (overt act is an "act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy"); *United States v. Rommy*, 506 F.3d 108, 125 (2d Cir. 2007) (district correctly charged the jury that a single call in the Southern District of New York could establish venue, provided it was used to further the objectives of the charged conspiracy).

Finally, the Government seeks to establish venue through two dinners that occurred in New York:  one occurring on June 30, 2018, attended by Senator Menendez, Mrs. Menendez, and Mr. Hana, Ind. ¶¶ 75(a), 83(a); and one occurring on September 21, 2019, attended by Senator Menendez, Mr. Hana, Mr. Daibes, and an Egyptian official, *id* ¶¶ 75(d), 83(b).  Other than to state who was present at the restaurant, the Indictment makes no allegations about these dinners.  *Id.* ¶¶ 75(a), 75(d), 83(a)-(b).  Indeed, they are found nowhere in the lengthy factual narrative allegations that comprise Paragraphs 1 through 70 of the Indictment.  For example, there is no allegation that

---

[39] ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

these dinners included discussions during which any agreement to enter into a conspiracy were made, an exchange of bribes occurred, promises were made in exchange for any such bribes, or any other conduct occurred that would be considered an essential conduct element or in furtherance of the conspiracy allegations, as would be required to sustain venue in this case. *See Tzolov*, 642 F.3d at 320; *Rommy*, 506 F.3d at 125. To permit these dinners, as alleged in this third iteration of the indictment, to establish venue in this case would create an untenable rule whereby venue could lie in any district in which alleged co-conspirators were at a restaurant contemporaneously without regard to the location of the essential conduct constituting the crime and the actual efforts allegedly made in furtherance of the criminal conspiracy. *See Ramirez*, 420 F.3d at 141-42, 145 (such a rule would mean that "a defendant who devised a scheme to defraud while driving across the country could be prosecuted in virtually any venue through which he passed"). This would be inconsistent with the concerns of our Nation's founders, enshrined as protections for the criminal defendant in the Constitution, *Cabrales*, 524 U.S. at 6 & n.1; *Saavedra*, 223 F.3d at 88, and with the cautious approach that Courts are required to take with regard to venue challenges in order to avoid giving the Government its choice of tribunal, *Johnson*, 323 U.S. at 275.

It would also be inconsistent with the weight of the factors under the substantial contacts test, the first three of which look to the site of the crime, its elements, and the location where the effect of the criminal conduct occurs. *Saavedra*, 223 F.3d at 93. There can be no doubt but that the core criminal conduct alleged in this case occurred outside of the Southern District, *see* Ind. ¶¶ 1-70, and that its effects were likewise felt elsewhere: by the people of New Jersey, represented by Senator Menendez and reliant upon the public officials and judicial institutions in that State. Given the overwhelming location of these alleged facts, the fourth factor under the substantial contacts test (suitability of the chosen venue for accurate factfinding) also weighs in favor of

prosecution in New Jersey, or perhaps in the District of Columbia, rather than in the Southern

District of New York, a venue particularly inappropriate for which would be both unfair and

prejudicial to Mr. Hana, who engaged in no alleged wrongdoing in New York. *See Mackey*, 652

F. Supp. 3d at 327 (substantial contacts test intended to assist courts in determining "'whether a

chosen venue is unfair or prejudicial' 'where the defendant's acts did not take place within the

district selected as the venue for the trial'" (quoting *Saavedra*, 223 F.3d at 93)).

Because venue is improper in the Southern District of New York, the Indictment must be

dismissed.

## V.   THE COURT SHOULD SUPPRESS EVIDENCE SEIZED FROM MR. HANA'S DEVICES IN VIOLATION OF HIS FOURTH AMENDMENT RIGHTS.

### A.   Evidence Derived From The Execution Of Certain Search Warrants Should Be Suppressed Because They Lack Particularity And Are Overbroad.

To justify an intrusion into an individual's right to privacy in the deeply personal

information stored on his electronic accounts, the Government must establish, at a bare minimum,

that there is probable cause to believe that a specified crime has occurred and that there is probable

cause to believe each item seized is evidence of that specified offense. *See United States v.

Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) ("Under federal law, a search warrant is properly issued

if a neutral magistrate finds that, under the totality of the circumstances, probable cause exists to

believe that a crime has been committed and there is a fair probability that the premises will yield

the objects specified in the search warrant."); *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir.

2013) (a "warrant must specify the items to be seized by their relation to designated crimes").

Moreover, "[a]n otherwise unobjectionable description of the objects to be seized is defective if it

is broader than can be justified by the probable cause upon which the warrant is based." *Galpin*,

720 F.3d at 446.  As set forth below, three search warrants issued in this matter each include two

categories of items to be seized that are beyond the scope of the specified offenses; therefore, the warrants lack particularity and are overbroad.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The purpose of the Fourth Amendment's warrant provision is to ensure that "those searches deemed necessary should be as limited as possible." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also Kentucky v. King*, 563 U.S. 452, 459 (2011) ("[A] warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity."). Accordingly, "[t]o be lawful under the Constitution, a search warrant must . . . set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched." *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020).

The Fourth Amendment's Warrants Clause "was intended as a bulwark against the 'general warrant' abhorred by the colonists and protects against a general, exploratory rummaging in a person's belongings." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009) (quoting *Coolidge*, 403 U.S. at 467). Thus, the United States Supreme Court has recognized "the central concern underlying the Fourth Amendment [is] the concern about giving police officers unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). In order to prevent this kind of abuse, the Fourth Amendment "requires particularity and forbids overbreadth." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013).

To be sufficiently particular under Second Circuit law, a warrant must therefore (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to designated crimes." *Galpin*, 720 F.3d at 445-46. "Courts implement the particularity requirement by insisting that warrants not leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." *Zemlyansky*, 945 F. Supp. 2d at 453; *see also United States v. Ray*, 541 F. Supp. 3d 355, 377 (S.D.N.Y. 2021) ("The key [to particularity] is that the search warrant must enable the executing officer to ascertain and identify with reasonable certainty those items authorized to be searched and seized.").

Finally, a warrant is overbroad, and thus violates these principles, if its description of the items to be searched and seized is "broader than can be justified by the probable cause upon which the warrant is based." *United States v. Nejad*, 436 F. Supp. 3d 707, 725, 730 (S.D.N.Y. 2020) (cleaned up); *United States v. Dupress*, 781 F. Supp. 2d 115, 154 (E.D.N.Y. 2011) ("[T]he overbreadth analysis focuses on whether the magistrate judge authorized search warrants that provided for the seizure of specific items for which there was no probable cause."). To determine whether a warrant is overbroad, courts focus on "whether there exists probable cause to support the breadth of the search that was authorized." *Zemlyansky*, 945 F. Supp. 2d at 464. When a warrant lacks particularity or is overly broad, the search is invalid, and the resulting evidence should be suppressed. *See Cioffi*, 668 F. Supp. 2d at 396 ("The remedy for an overbroad search and seizure is suppression of the resulting evidence.").

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████





---

[40] The January 10 Warrant was amended on February 3, 2022.  Ex. C at SDNY_R_00004166-00004172.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████     As such, the items that relate to ██████████ violate the particularity doctrine and are thus void as overbroad.  *See Galpin* 720 F.3d at 448 (where warrant specified only the offense of failing to register as a sex offender, warrant authorizing search for images of child sexual activity lacked particularity and was overbroad); *Cioffi*, 668 F. Supp. 2d at 396 (warrant for search of defendant's e-mail account, which did not limit items to be seized to e-mails containing evidence of the specified offenses, was unconstitutionally overbroad).

---

[41] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

This blatant lack of particularity and overbreadth is especially alarming "[w]here, as here, the property to be searched" is an electronic account.  *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) ("Where, as here, the property to be searched is a hard drive or other electronic media, 'the particularity requirement assumes even greater importance'").  Ours is a world in which business and personal affairs are largely conducted electronically.  Given the considerable volume of personal, intimate, and private information contained on electronic accounts, the Supreme Court and the Second Circuit have emphasized the particular significance of the Fourth Amendment's privacy protections as they apply to searches of electronic data.  *See Riley v. California*, 573 U.S. 373, 394 (2014) (noting that "a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record," and that "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions").  To that end, "[t]he Second Circuit has instructed courts to apply a heightened sensitivity to the particularity requirement in the context of digital searches given the scope of personal information potentially involved."  *Pinto-Thomaz*, 352 F. Supp. 3d at 304-05 (quoting *Galpin*, 720 F.3d at 447); *United States v. Almaleh*, No. 17-cr-25, 2022 WL 602069, at *11 (S.D.N.Y. Feb. 28, 2022); *see also United States v. Ganias*, 755 F.3d 125, 134-35 (2d Cir. 2014*) rev'd en banc on other grounds*, 824 F. 3d 199 (2d Cir. 2016) ("The . . . Fourth Amendment protections apply to modern computer files.  Like 18th Century 'papers,' computer files may contain intimate details regarding an individual's thoughts, beliefs, and lifestyle, and they should be similarly guarded against unwarranted Government intrusion.  If anything, even greater protection is warranted.").

Particularly viewed through the lens of these doctrinal developments, the Court should

suppress evidence ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ as a result, these

warrants lack the necessary particularity and are unconstitutionally overbroad, requiring that the

fruits of these searches be suppressed.  *See Cioffi*, 668 F. Supp. 2d at 396 ("The remedy for an

overbroad search and seizure is suppression of the resulting evidence.").

> **B.**      **Evidence Derived From Execution Of The Search Warrants Should Be Suppressed Because The Affidavits Submitted In Support Of The Government's Applications Contained False And Misleading Statements Material Or Necessary To Finding Probable Cause, In Violation Of *Franks v. Delaware*.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████     ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    Accordingly, the fruits of these searches, which resulted in the seizure of extensive documentation, some of which has been provided in discovery and may be introduced into evidence by the Government, should be suppressed.[43]

The rule governing misleading search warrant affidavits is well settled.  "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing."  *Id.* 438 U.S. at 164-65.  Indeed, the

---

[42] ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████

[43] ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████

Fourth Amendment "would be 'reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to remain confident that the ploy was worthwhile." *United States v. Castellanos*, 820 F. Supp. 80, 84 (S.D.N.Y. 1993) (quoting *Franks*, 438 U.S. at 168).  As such, the law "permits a defendant to challenge the truthfulness of factual statements made" in an affidavit supporting a search warrant application, "and thereby undermine the validity of the warrant and the resulting search and seizure." *United States v. Mandell*, 752 F.3d 544, 551-52 (2d Cir. 2014) (citing *Franks*, 438 U.S. at 155-56).

The Supreme Court in *Franks v. Delaware* announced the standard and process by which a defendant is entitled to challenge the veracity of a search warrant affiant's statements.  *Franks*, 438 U.S. at 156.  Under *Franks*, when a defendant makes a "substantial preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth'; and (2) those misrepresentations or omissions were material, or 'necessary to the issuing judge's probable cause finding,'" *Nejad*, 436 F. Supp. 3d at 718-19 (emphasis omitted) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)), "the Fourth Amendment requires that a hearing be held at the defendant's request," *Franks*, 438 U.S. at155-56.

To establish both intentional and reckless falsehoods, a defendant must show that "the misstatement or omission [was intended] to mislead the judicial officer into approving the requested warrant." *United States v. Vilar*, No. 05-cr-621, 2007 WL 1075041, at *25 (S.D.N.Y. Apr. 4, 2007).  When an affiant makes statements that ignore or disregard the facts as he knew them, or which he seriously doubted to be true, the "reckless disregard for the truth" standard is

met.  *Rivera v. United States*, 728 F. Supp. 250, 258 (S.D.N.Y. 1990) ("If [the affiant] made statements which failed to take account of the facts as he knew them, or which he seriously doubted were true, that would show reckless disregard for the truth."), *aff'd in part, vacated in part*, 928 F.2d 592 (2d Cir. 1991); *Vilar*, 2007 WL 1075041, at *26 ("[O]ne 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations.").  Similarly, an omission is made with reckless disregard for the truth when "'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003) (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000)).  "[W]here the omitted information was 'clearly critical' to the probable cause determination," recklessness can be inferred.  *Id.*

In assessing materiality, a court must decide whether "putting aside erroneous information . . . there remains a residue of independent and lawful information sufficient to support probable cause," *United States v. Awadallah*, 349 F.3d 42, 65 (2d Cir. 2003), or, in the case of material omissions, whether inclusion of the omitted truths would support probable cause, *Rajaratnam*, 719 F.3d at 146.  When the remaining allegations are "insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  *Franks*, 438 U.S. at 156.  In that regard, probable cause to support a search warrant exists if the totality of circumstances "raise a fair probability that contraband or evidence of a crime will be found."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  If, as is often the case, probable cause is putatively established by information obtained from an informant, courts may consider both the reliability of the informant and the reliability of the information provided by the informant.  *See id.* at 230 (holding that while an

informant's "veracity" is "highly relevant" to the existence of probable cause, it is only one part of the larger common sense determination).

In a blatant attempt to swing the pendulum in favor of a finding of probable cause, the Government, here, recklessly or intentionally omits crucial information from its affidavits, resulting in an entirely one-sided story. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████[45]   Surely had the Magistrate Judges who were determining probable cause been presented with this additional information, painting a complete picture of Senator Menendez's involvement with Egypt, they would have reconsidered their probable cause determination.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[44] ███████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████

[45] ████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████

███████████████████████████████████████████████

█████████████████████████████████

         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         █████████████████████████████████████
         ████████████████████

*Id*. Despite these statements' obvious relevance, the Government conveniently omitted them from its narrative in order to imply criminality that simply does not exist and as a result obtained permission to further search ████████████████████████████████

████████████████████████

      ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

—the

Government was not permitted to simply ignore the evidence as it existed at the time and exclude

and thus account for the "totality of the circumstances" which the magistrates were, under *Gates*,

required to consider.  *See, e.g., Martinez v. Wallace*, No. 20-cv-806, 2021 WL 5771876, at *7

(W.D. Tex. Dec. 6, 2021) ("The information contradicting the CI's identification of the suspect

and the Property known to [officer] at the time he applied for a search warrant cast doubt on the

information in his affidavit, and offers circumstantial evidence that the misleading statements and

omissions in his affidavit were made with a reckless disregard for the truth."); *United States v.*

*Small*, 229 F. Supp. 2d 1166, 1199 (D. Colo. 2002) (The "[court's] inquiry [for purposes of *Franks*]

must focus on what investigators knew at the time they applied for the [warrant], not the knowledge

that is available at the present time."), *aff'd in part, remanded in part*, 423 F.3d 1164 (10th Cir.

2005), *and aff'd in part, rev'd in part and remanded sub nom. United States v. Hall*, 473 F.3d 1295

(10th Cir. 2007); *cf. United States v. Austin*, 991 F.3d 51, 57 (1st Cir. 2021) (defendant not entitled

to *Franks* hearing where "none of the reports [defendant] identifie[d] as containing contradictory

facts omitted from [officer's] affidavit had been prepared by the time the affidavit was prepared

and submitted" as "[i]nformation that did not yet exist could not have been intentionally or

recklessly omitted by [the officer] and does not undermine the presumptive validity of his

affidavit").

███████████████████████████████████████

███████████████████████████████████████

██████████████████ █ █████████████████████

███████████████████████████████████████

███████████████████████████████████████

---

47 ██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████



Thus, the Government simply failed to provide truthful information; its successful attempt to obtain a warrant through this failure should not be rewarded.

Beyond these misstatements and omissions, the affidavits contain numerous other misrepresentations and material omissions that, while not directly related to acts purportedly taken or involving Mr. Hana, were nonetheless necessary for the reviewing magistrates to consider in their probable cause determinations authorizing the searches through █████████████████ ██████ *See, e.g., United States v. Reid,* 650 F. Supp. 3d 182, 192 (S.D.N.Y. 2023) (considering defendant's argument, under *Franks*, "that [affiant] intentionally omitted discussion of an earlier meeting . . . between a CI and certain of [defendant's] co-conspirators and that, had it been included, it would have raised doubts about [defendant's] alleged involvement in the narcotics sale"); *United States v. Glover,* 755 F.3d 811, 816-17 (7th Cir. 2014) (concluding that "the complete omission of known, highly relevant, and damaging information about [an informant's] credibility. . . . impaired the neutral role of the magistrate deciding whether to issue the warrant" to search the defendant's home).  Among these materially false or misleading statements, made with at least a reckless disregard for the truth, are the following:

- ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████





In sum, the affidavits in support of the search warrants contain a number of significant misrepresentations and material omissions to mislead the issuing Magistrate Judge.  If presented correctly and in the appropriate context, the misstated and omitted information would have dramatically established the lack of probable cause to support the issuance of the warrants.  Under these circumstances, a *Franks* hearing is necessary to determine the extent to which these misrepresentations and omissions were included in the affidavits knowingly and intentionally, or with reckless disregard for the truth, and to address, thereafter, whether the false statements and omissions were necessary to the magistrates' findings of probable cause.  *See Franks*, 438 U.S. at

1556 ("In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.").  At the conclusion of that hearing, the evidence seized pursuant to these falsely obtained affidavits should be suppressed.

## **CONCLUSION**

For these reasons, Defendant Wael Hana  respectfully requests that the Court enter an Order dismissing Counts 1, 2, and 4 of the Indictment.  Alternatively, the Court should enter an Order (1) striking Paragraph 15 from the Indictment; (2) granting a bill of particulars; (3) suppressing and excluding from evidence seized pursuant to search warrants ███████████████████ ████████████ and (4) ordering that a *Franks* hearing be held, on a date to be set by the Court, with regard to whether evidence obtained as a result of search warrants ███████████████ ████████████████████ should be suppressed.  Mr. Hana also joins in all applicable motions filed by his co-defendants.

Dated:  January 15, 2024                    Respectfully submitted,

                                            s/ Lawrence S. Lustberg
                                            Lawrence S. Lustberg
                                            Ricardo Solano, Jr.
                                            Anne M. Collart
                                            Andrew J. Marino
                                            Christina M. LaBruno
                                            Jessica L. Guarracino
                                            Elena M. Cicognani
                                            **GIBBONS P.C.**
                                            One Gateway Center
                                            Newark, New Jersey 07102
                                            (973) 596-4500
                                            llustberg@gibbonslaw.com