**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S2 23-cr-490 (SHS)

<u>**SENATOR ROBERT MENENDEZ'S REPLY MEMORANDUM OF LAW**</u>
<u>**IN SUPPORT OF HIS FIRST MOTION TO DISMISS**</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

**TABLE OF CONTENTS**

<strong>Page</strong>

INTRODUCTION ................................................................................................ 1

ARGUMENT ..................................................................................................... 4

I.    THE BRIBERY COUNTS FAIL BECAUSE THEY DO NOT ALLEGE THAT THE SENATOR
AGREED TO PROVIDE A COGNIZABLE *QUO* .......................................................... 4

    A.    The Government Cannot Avoid Review of Its Legal Theories ............................ 5

    B.    None of the Schemes, Shorn of Speech-or-Debate Immune Activity, Rests
on an Agreement to Provide a Cognizable Official Act ....................................... 8

        1.    *The New Jersey State Scheme* ................................................. 9

        2.    *U.S. Attorney Scheme* ........................................................... 15

        3.    *Qatar Investment Scheme* ...................................................... 22

        4.    *IS EG Halal Scheme* ............................................................. 24

        5.    *Egypt Aid Scheme* ............................................................... 27

II.    THE FARA COUNT FAILS BECAUSE 18 U.S.C. § 219 IS UNCONSTITUTIONAL AS
APPLIED. ...................................................................................................... 31

CONCLUSION ................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Att'y Gen. of U.S. v. Irish N. Aid. Comm.*,
668 F.2d 159 (2d Cir. 1982)............................................................................32

*Avery v. Midland Cnty., Tex.*,
390 U.S. 474 (1968)........................................................................................12

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998)..........................................................................................19

*Chastain v. Sundquist*,
833 F.2d 311 (D.C. Cir. 1987)........................................................................28

*City of Arlington v. FCC*,
569 U.S. 290 (2013)........................................................................................29

*Clinton v. City of New York*,
524 U.S. 417 (1998)........................................................................................37

*Crawford-El v. Britton*,
523 U.S. 574 (1998)........................................................................................34

*Davis v. Passman*,
442 U.S. 228 (1979)........................................................................................38

*Doe v. McMillan*,
412 U.S. 306 (1973)........................................................................................31

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975)..........................................................................................7

*Elec. Inspectors, Inc. v. Vill. of E. Hills*,
320 F.3d 110 (2d Cir. 2003)............................................................................12

*FEC v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007)........................................................................................34

*Fields v. Office of Eddie Bernice Johnson*,
459 F.3d 1 (D.C. Cir. 2006)............................................................................17

*Free Enter. Fund v. PCAOB*,
    561 U.S. 477 (2010) ................................................................................................36

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) ...........................................................................................12

*Gravel v. United States*,
    408 U.S. 606 (1972) .........................................................................................16, 20

*Hamling v. United States*,
    418 U.S. 87 (1974) ...................................................................................................5

*Hein v. Freedom from Religion Found., Inc.*,
    551 U.S. 587 (2007) ...............................................................................................33

*Helstoski v. Meanor*,
    442 U.S. 500 (1979) .................................................................................................7

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979) ...............................................................................................28

*In re Sealed Case*,
    80 F.4th 355 (D.C. Cir. 2023) ....................................................................16, 17, 27

*INS v. Chadha*,
    462 U.S. 919 (1983) ...............................................................................................37

*Jud. Watch, Inc. v. U.S. Secret Serv.*,
    726 F.3d 208 (D.C. Cir. 2013) ...............................................................................37

*Kilbourn v. Thompson*,
    103 U.S. 168 (1880) ...............................................................................................16

*Loving v. United States*,
    517 U.S. 748 (1996) ...............................................................................................33

*McDonnell v. United States*,
    579 U.S. 550 (2016) ..................................................................................... *passim*

*McSurely v. McClellan*,
    553 F.2d 1277 (D.C. Cir. 1976) ................................................................16, 17, 28

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...............................................................................................38

*New York v. United States,*
505 U.S. 144 (1992)............................................................................................3

*NLRB v. Canning,*
573 U.S. 513 (2014)..........................................................................................37

*Salahuddin v. United States,*
2018 WL 5342766 (D.N.J. Oct. 29, 2018)...................................................12, 13

*SEC v. U.S. House Comm. on Ways & Means,*
161 F. Supp. 39 (S.D.N.Y. 2015)...................................................................18, 28

*Seila Law LLC v. CFPB,*
140 S. Ct. 2183 (2020).....................................................................................34

*Trump v. Thompson,*
142 S. Ct. 680 (2022).......................................................................................34

*United States v. Alloco,*
305 F.2d 704 (2d Cir. 1962)..............................................................................18

*United States v. Biaggi,*
853 F.2d 89 (2d Cir. 1988)...........................................................................18, 30

*United States v. Birdsall,*
233 U.S. 223, 234 (1914)..............................................................................10, 28

*United States v. Boyland,*
862 F.3d 279 (2d Cir. 2017)..............................................................................12

*United States v. Brewbaker,*
87 F.4th 563 (4th Cir. 2023) ..............................................................................5

*United States v. Brewster,*
408 U.S. 501 (1972).................................................................................. *passim*

*United States v. Burke,*
2022 WL 1970189 (N.D. Ill. June 6, 2022) ........................................................14

*United States v. Dowdy,*
479 F.2d 213 (4th Cir. 1973) ..........................................................................8, 31

*United States v. Ganim,*
510 F.3d 134 (2d Cir. 2007)...............................................................................21

*United States v. Heicklen*,
   858 F. Supp. 2d 256 (S.D.N.Y. 2012) ....................................................................6, 7

*United States v. Helstoski*,
   442 U.S. 477 (1979) .................................................................................................20

*United States v. Helstoski*,
   635 F.2d 200 (3d Cir. 1980)..........................................................................7, 34, 39

*United States v. Jefferson*,
   289 F. Supp. 3d 717 (E.D. Va. 2017) ....................................................................25

*United States v. Johnson*,
   383 U.S. 169 (1966)............................................................................................20, 27

*United States v. Keleher*,
   505 F. Supp. 3d 41 (D.P.R. 2020)........................................................................6, 12

*United States v. Kimbrew*,
   944 F.3d 810 (9th Cir. 2019) ..................................................................................13

*United States v. Lee*,
   919 F.3d 340 (6th Cir. 2019) ............................................................................10, 12

*United States v. McDade*,
   28 F.3d 283 (3d Cir. 1994)..............................................................................29, 31

*United States v. Menendez*,
   132 F. Supp. 3d 610 (D.N.J. 2015) .......................................................................20

*United States v. Menendez*,
   831 F.3d 155 (3d Cir. 2016)..........................................................................29, 37

*United States v. Myers*,
   635 F.2d 932 (2d Cir. 1980)............................................................................. *passim*

*United States v. Oaks*,
   302 F. Supp. 3d 716 (D. Md. 2018) ........................................................................6

*United States v. Pawlowski*,
   351 F. Supp. 3d 840 (E.D. Pa. 2018) ...............................................................12, 13

*United States v. Percoco*,
   2019 WL 493962 (S.D.N.Y. Sept. 8, 2019)......................................................12, 14

*United States v. Rose,*
  28 F.3d 181 (D.C. Cir. 1994) ......................................................................37

*United States v. Silver,*
  864 F.3d 102 (2d Cir. 2017)...........................................................23, 25, 26

*United States v. Silver,*
  948 F.3d 538 (2d Cir. 2020)...........................................................21, 22, 25

*United States v. Skelos,*
  707 F. App'x 733 (2d Cir. 2017) ...........................................................12, 13

*United States v. Smith,*
  985 F. Supp. 2d 547 (S.D.N.Y. 2014) .............................................................6

*United States v. Swindall,*
  971 F.2d 1531 (11th Cir. 1992) ...................................................................30

*United States v. Taveras,*
  504 F. Supp. 3d 272 (S.D.N.Y. 2020)..............................................................7

*United States v. Urciuoli,*
  513 F.3d 290, 296 (1st Cir. 2008) ..........................................................10, 26

*United States v. Walsh,*
  194 F.3d 37 (2d Cir. 1999)............................................................................5

*United States v. Williams,*
  2017 WL 1030804 (N.D. Ga. Mar. 16, 2017)...................................................6

*United States v. Willis,*
  844 F.3d 155 (3d Cir. 2016)..........................................................................6

*Van Buren v. United States,*
  141 S. Ct. 1648 (2021)................................................................................37

*Walker v. Jones,*
  733 F.2d 923 (D.C. Cir. 1984) ...............................................................17, 31

*Yates v. United States,*
  574 U.S. 528 (2015)...................................................................................37

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  576 U.S. 1 (2015).......................................................................................25

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. Art. I, § 6 .................................................................................. *passim*

U.S. Const. Art. II, § 2, Cl.2 ....................................................................... 15

18 U.S.C. § 219 ........................................................................................... *passim*

22 U.S.C. § 611 ........................................................................................... 32, 36

**OTHER AUTHORITIES**

Cong. Res. Servs., *Arms Sales: Congressional Review Process* (Jan. 4, 2024) ........................... 29

Fed. R. Crim. Proc. 12 ................................................................................ 5

Mychael Schnell, *Greene Moves to Force Vote on Censuring Omar for Somalia Remarks*, The Hill (Feb. 1, 2024) ............................................................. 35

Maegan Vazquez, *Trump Says on Univision He Could Weaponize FBI, DOJ Against His Enemies*, Wash. Post (Nov. 10, 2023) ................................... 35

## INTRODUCTION

The government devotes nearly 200 pages of briefing to justify sending this case, in its present form, to a jury in New York.  But the principal thrust of its submission is to urge the Court to punt on all the legal issues—from whether the Indictment states a viable offense, to whether its counts are duplicitous, to whether Senator Menendez should be tried alongside his wife.  Instead of *rebutting* the Senator's arguments, the government seeks to *defer* them.  Its strategy is transparent: bypass judicial review on the front end by claiming prematurity, tarnish the Senator before a jury with sensationalist stories about gold bars, Egyptian spies, and Qatari princes, then evade judicial review on the back end by claiming the jury resolved all issues against Defendants. That is not how the criminal justice system should operate in *any* case, let alone an unprecedented prosecution calculated to destroy the career of a U.S. Senator after 50 years of public service.

This reply focuses on the legal viability of the Indictment.  Now is not the time to evaluate whether the government's *evidence* is factually sufficient, but it is precisely the time to assess whether its *allegations* legally state an offense.  Mouthing the elements of the statute is not enough; not in a civil action, and certainly not in a criminal prosecution.  And indeed, the Indictment goes well further, as the government itself points out in seeking to avoid a bill of particulars.  But in going further, the Indictment exposes the charges' legal deficiencies.  Those deficiencies mean the case should never reach a jury—especially insofar as the government's allegations intrude on federal legislators' constitutional "Speech or Debate" protections, afforded to spare them from the obligation to defend their actions in a criminal (rather than political) context.

Start with the three bribery counts, which are materially identical for present purposes.  As the government recognizes, bribery requires an exchange of something of value for an agreement or promise to take *official action*.  As the government also acknowledges, a bribery charge against a federal legislator must be alleged and proved without reliance on any *legislative action*.  Opp.16-

1

17.   As a consequence of those parallel constraints, Counts I-III must allege—without inferential support from any legislative conduct—that the Senator agreed to trade official action for bribes. Contrary to the government's straw-man, that is far from an impossible task.  But it is not easy, either.  It is not *supposed to be* easy for the government to criminally prosecute a federal legislator, given the inherent risks of political selectivity and prosecutorial bias in this sensitive context.

The Indictment does not stay between these lines—not as to *any* of its five distinct schemes, each of which should truly be its own count and evaluated independently to avoid the prejudice associated with duplicity.  Some allege only that the Senator undertook unofficial conduct, like calling other officials—and even *state* officials—on a constituent's behalf.  In trying to squeeze all of this into "official action," the government misses the basic point of *McDonnell v. United States*, 579 U.S. 550 (2016).  It held that federal bribery laws punish the corruption of *sovereign power*, not mere "influence."  Large parts of the Indictment are completely divorced from any exercise or potential exercise of the Senator's federal authority and are therefore legally inadequate.

Meanwhile, when the Indictment does speak to the Senator's official conduct—such as his authority as SFRC Chairman to sign off on foreign military sales, and his constitutional role in advising the President on nominations for his state—the government runs roughshod over the Speech or Debate Clause.  Pivoting from its insistence on a loose, functionalist definition of "official action" that would sweep in nearly everything an official does, the government urges a restrictive, formalistic account of "legislative acts" that would render the constitutional immunity virtually toothless for the exercise of many legislative duties.  The truth is somewhere in the middle: Official action should track the real-world exercise of sovereign power; legislative action should track the real-world exercise of a legislator's constitutionally assigned functions.  Unable to navigate between these two poles, the Indictment's bribery counts must be dismissed.

That leaves the government's unprecedented, offensive accusation that Senator Menendez took action as a "foreign agent" by supposedly acceding to the "request" or "direction" of Egyptian officials.  The government does not seriously dispute that applying this statute to Members of Congress—something no prosecutor has ever tried before—puts the Executive Branch in the position of superintending the routine activities of the Legislative Branch, with power to prosecute otherwise-lawful acts based solely on allegations about why they were taken.  That dangerous regime uniquely undermines legislative autonomy; it is not at all like the application of ordinary criminal laws or mere disclosure requirements.  It thus violates not only the Speech or Debate Clause, but also separation of powers principles more generally—and, yes, the latter is its own doctrine that the Supreme Court has repeatedly invoked to invalidate statutes that threaten to disrupt our constitutional balance.  The government's principal response is that Congress itself enacted § 219, but "[t]he Constitution's division of power among the three branches is violated where one branch invades the territory of another, *whether or not the encroached-upon branch approves the encroachment*."  *New York v. United States*, 505 U.S. 144, 182 (1992) (emphasis added).  Section 219's application to Members of Congress is an extraordinary encroachment, the lasting adverse effects of which are only too easy to imagine.  The Court should reject it now.

This is, no doubt, a particularly high-profile prosecution that involves serious—albeit false and highly misleading—allegations of misconduct.  And the mere filing of these unproved charges, in itself, has caused immense harm to the Senator and his reputation in the middle of an active election cycle.  Respectfully, however, the political context of this case should warrant heightened judicial scrutiny of the allegations, not the hands-off approach the government seeks.  The Senator already must answer to his constituents for the government's false allegations.  But he should not be forced to answer also to a criminal jury.  The Court should dismiss this ill-considered Indictment.

## ARGUMENT

### I. THE BRIBERY COUNTS FAIL BECAUSE THEY DO NOT ALLEGE THAT THE SENATOR AGREED TO PROVIDE A COGNIZABLE *QUO*.

The government agrees that all three bribery charges require that the Senator entered an agreement to accept something of value (a *quid*) in exchange for (*pro*) an official act (a *quo*). Opp.16-17. The government further agrees that the Supreme Court in *McDonnell* limited what counts as an "official act." Opp.32 n.6. And the government agrees too that the Speech or Debate Clause requires that a bribery agreement be proved without any evidence of—or reference in the indictment to—any "legislative" act. Opp.16-17, 21.

That common ground leaves no room for this Indictment to stand. Under these agreed-on principles, it is facially and fatally deficient. Once the allegations violative of the Speech or Debate Clause are purged, as they must be, the Indictment fails to allege a single valid *quo* to sustain any of its purported bribery schemes. Each rests on plainly *unofficial* acts that fail to satisfy *McDonnell*. And without any allegation that the Senator either agreed to take, or actually took, a valid *quo*, the Indictment fails to state a complete offense and must be dismissed. In defending it, the government at once undersells the scope of legislators' constitutional immunity and overstates what qualifies as official action under *McDonnell*—often contradicting its own positions, in both substance and spirit, from one page to the next.

The government resists, but the Indictment's defects are fatal *now*. Pleading requirements for criminal indictments are not paper barriers; they require, at minimum, that an indictment state a complete offense, with allegations substantiating each element. And where, as here, a critical element (a legally cognizable *quo*) is lacking, dismissal is required. Indeed, *especially* so here, given the very purposes underlying the Speech or Debate Clause, and its protections against *facing* charges like this one—not simply prevailing against them before a jury.

A.    The Government Cannot Avoid Review of Its Legal Theories.

Hoping to put off judicial review and thereby force Senator Menendez to bear the burdens of trial, the government repeatedly urges the Court to overlook the Indictment's defects on the ground that the charges sufficiently parrot the "statutory language" by using terms like "agreement," "official action," and "advised or pressured." *E.g.*, Opps.15-16, 18, 33-34, 55-56, 63, 72-73.

The pleading standard is not that lax.  As the prosecution elsewhere acknowledges, it must "advise the defendant of the specific acts of which he is accused" (Opp.162-63 (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999))), and contain particulars sufficient "to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," *Walsh*, 194 F.3d at 44.  While the "language of the statute may be used in the general description of an offence … it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense … with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974).  Merely mouthing the statutory elements is therefore not, on its own, "sufficient to state an offense" under Federal Rule of Criminal Procedure 12(b)(3)(B)(5).  *See United States v. Brewbaker*, 87 F.4th 563, 572, 583 (4th Cir. 2023) (holding that district court erred by not dismissing indictment where specific allegations were not criminal). Paragraph 2 of the Indictment, for example, which alleges that the Senator "promis[ed] to take and t[ook] a series of official acts and breaches of official duty in exchange for bribes that benefitted him both directly, and indirectly" (SSI ¶ 2), is obviously insufficient to get the government past the pleading stage.  *But see* Opp.36, 45-46, 56, 59-60, 63 (citing this paragraph).

Recognizing as much, the Indictment does not stop after its second paragraph, and neither does the government.  Indeed, in seeking to resist a bill of particulars, the government boasts that it "se[t] forth in great detail not just the charges, but also the contours of the defendants' scheme, *including the acts sought and promised* and the bribes provided in exchange."  Opp.162 (emphasis

added).  That detail, about the supposed *quo* element of the bribery agreements, is thus fair game for a motion to dismiss.  It squarely tees up the question "whether [the Senator's] alleged activities, accepted as true, are prohibited by the statute," which is "an issue of law determinable before trial." *United States v. Heicklen*, 858 F. Supp. 2d 256, 263 (S.D.N.Y. 2012); *see also United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (courts ask whether the "indictment fails to state an offense on the basis that the specific facts alleged … fall beyond the scope of the relevant criminal statute"). The Senator thus simply asks the Court to fulfill its everyday duty to say what the law is, assuming the veracity of the specific factual allegations (however false and absurd).  *See, e.g.*, *United States v. Smith*, 985 F. Supp. 2d 547, 551 n.2, 561-62 (S.D.N.Y. 2014) (testing indictment's bribery allegations for legal sufficiency in a pre-trial motion to dismiss).

The government's cases (Opp.33-34) do not say otherwise.  In *United States v. Keleher*, for example, the district court declined to consider a pre-trial challenge to whether the government "ha[d] *shown* that Keleher committed an official act," but *did* consider on the merits whether the indictment properly "allege[d] a question or matter" that was "pending" before the relevant official, within the meaning of *McDonnell*, taking the "pertinent facts" as true.  505 F. Supp. 3d 41, 48 (D.P.R. 2020); *see also United States v. Williams*, 2017 WL 1030804, at *3 (N.D. Ga. Mar. 16, 2017) ("additional facts alleged in the indictment … warrant an inference" of "official action"); *United States v. Oaks*, 302 F. Supp. 3d 716, 726-28 (D. Md. 2018) (engaging in lengthy analysis of "whether a state legislator's request to a state administrative or legislative agency for a draft bond bill," as alleged in the indictment, "constitutes an 'official act'").  Far from refuting the above, the government's cases *confirm* that a court must examine the sufficiency of an indictment's *allegations*—seeing whether they state a crime, if taken as true—which is distinct from evaluating the merits of the government's actual *evidence*.  This motion concerns purely the former.

Accordingly, if the Indictment alleges legally insufficient *quos* to support a bribery offense, the Court "must" say so now. *United States v. Taveras*, 504 F. Supp. 3d 272, 277-78 (S.D.N.Y. 2020); *see also id.* ("[A] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged."). Indeed, "it would be a waste of judicial resources to conduct a trial, only to rule on a post-trial motion that the government's theory of criminal liability fails." *Heicklen*, 858 F. Supp. 2d at 262 n.5.

The need for pre-trial legal review in this case is only heightened by the Speech or Debate Clause issues that are implicated by the government's charges. The very point of that Clause is to protect legislators from being forced to defend their legislative actions at trial. *See Helstoski v. Meanor*, 442 U.S. 500, 508 (1979); *see also, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (the Clause "protect[s]" legislators "not only from the consequences of litigation's results but also from the burden of defending themselves"). Its drafters understood that the very existence of an indictment could be "devastating" to a "political career," and that protections *at the threshold* were necessary to shield legislators from executive "overreaching." *United States v. Helstoski*, 635 F.2d 200, 205 (3d Cir. 1980). Indeed, that is precisely why denial of a motion to dismiss on Speech or Debate grounds is subject to interlocutory appeal. *United States v. Myers*, 635 F.2d 932, 935 (2d Cir. 1980).

Here, large parts of the government's case rest on activity that is immune under the Clause. The Court should resolve those legal claims now, so they can be promptly reviewed by the Second Circuit. Otherwise, the same disputes will need to be adjudicated through later motions to determine what evidence the government may adduce at trial—and whether there is *any* admissible evidence in support of some of the alleged schemes. That could give rise to a disruptive second interlocutory appeal on the eve of trial, which serves nobody's interests.

In short, the government's "easy way out" is a mirage.  This novel prosecution raises a host of important legal and constitutional questions, and those questions must be adjudicated now to test the Indictment's viability and to set the framework of any trial that might follow.

**B.    None of the Schemes, Shorn of Speech-or-Debate Immune Activity, Rests on an Agreement to Provide a Cognizable Official Act.**

The government observes that the Senator's motion "intersperse[d] arguments about the Speech or Debate Clause with arguments about *McDonnell*."  Opp.34.  That is because each of the alleged schemes must comply with *both* requirements: allege an agreement involving official action, without relying on legislative activity protected by the Speech or Debate Clause.  In other words, the Indictment must state a viable offense after material protected by the Clause is struck out.  *See United States v. Dowdy*, 479 F.2d 213, 223-24 (4th Cir. 1973) (explaining that indictment must be dismissed if counts are not "legally sufficient" after any "improper matter" barred by Speech or Debate Clause is "stricken").  Some of the alleged schemes fail as to *McDonnell*; some fail as to Speech or Debate; and some fail only once both requirements are applied.  To be clear, the inquiries are indeed "legally and analytically distinct" (Opp.34), but both must be considered together in evaluating whether the Indictment alleges an offense.

Accordingly, the government's repeated observations that neither element standing alone compels dismissal (*e.g.*, Opp. 34-35, 36, 45-46, 62, 63) misses the point.  Just because neither *McDonnell* nor Speech or Debate *alone* knocks out certain schemes or the entire case, the Senator's point is that the two intertwined challenges warrant relief *together*.  Indeed, the government itself ultimately agrees that the Senator is entitled to dismissal if "the Indictment fails to allege any official act that (a) was promised, agreed upon, or performed as part of a corrupt *quid pro quo* and also (b) is not barred by the Speech or Debate Clause."  Opp.16.  That is precisely the Senator's argument.

In a similar vein, the government repeatedly resorts to arguing that, even if a single act or even an entire scheme is immune or unofficial, the Indictment groups all the schemes and acts into each of its three bribery counts and therefore cannot be dismissed unless the Senator is correct as to all of them. *See, e.g.*, Opp.36, 55, 61, 65. That argument showcases why the duplicitous counts are indeed so prejudicial: The government is leveraging its abusive charging strategy as a way to avoid meaningful pre-trial review of its most legally dubious theories. For reasons explained in the Senator's briefing relating to duplicity, the Court should divide the multiple distinct schemes into distinct counts, consider whether each of them suffices to state an offense, and dismiss those that do not. Regardless, however, the whole is not more than the sum of its parts and, as set forth below, not a single scheme properly states an offense. Counts I-III must therefore all be dismissed. At minimum, the Court should strike from the Indictment any allegations that are constitutionally barred by the Speech or Debate Clause, and any separate scheme that does not allege a cognizable *quo*, so as to set an appropriate framework for any trial.

### 1.   The New Jersey State Scheme.

The Indictment alleges that the Senator agreed to try to "disrupt" a state investigation and a state prosecution in New Jersey, supposedly in exchange for Uribe's financial assistance in buying a new car for Nadine Menendez. SSI ¶¶ 39-42, 44. The Senator allegedly "contacted" a state official and agreed to "call" another one "in an attempt … to resolve these matters favorably." *Id.* ¶¶ 39, 43. The government leaves its defense of this scheme for last (Opp.65)—even though it did not appear last in the Indictment, or in the Senator's motion—because it knows how weak it is. An agreement to interfere in a state proceeding by calling a state official is not an agreement to take "official action" under *McDonnell*, and therefore is not a federal offense, because a U.S. Senator *plays no role and has no power* over state criminal matters.

To recap, *McDonnell* explains that an official can take official action in one of two ways. *First*, the official can undertake "a formal exercise of governmental power" himself. 579 U.S. at 574. *Second*, an official can "us[e] his official position to exert pressure on another official … or to advise another official" to take official action. *Id.* An official "us[es] his official position" to advise when his role encompasses providing advice. For example, in *United States v. Birdsall*, the defendant officials' role was to advise superior officials on clemency requests. *See* 233 U.S. 223, 234 (1914). And an official "us[es] his official position to exert pressure" when he threatens or leverages the powers of his office to induce action by another. For example, in *United States v. Urciuoli*, a state legislator "delivered a barely veiled warning of potential legislative trouble to Blue Cross if it did not settle" a private dispute. 513 F.3d 290, 296 (1st Cir. 2008). That "pressure," the court held, could be official action because it "was closely related to [the defendant's] official functions" and thus represented an effort to "exploit … the legislative process." *Id.*

The New Jersey allegations do not fit into either box. The Senator could not have agreed to undertake "a formal exercise of governmental power" on the state matters, *McDonnell*, 579 U.S. at 574, because he held no authority to make any decisions or take any actions on New Jersey state proceedings. The government does not contend otherwise. Nor does the Indictment support that the Senator agreed to "us[e] his official position" to advise or pressure the state officials. It uses the phrase "advice and pressure," to be sure, but never alleges that the Senator "*us[ed] his official position*" to render any advice or exert any pressure. SSI ¶¶ 42(b), 44(c). That omission is no accident. Unlike in *Birdsall*, a Senator's duties—even as a matter of "custom," *McDonnell*, 579 U.S. at 573—do not include advising state prosecutors on pending matters. Again, the government does not contend otherwise. *See also United States v. Lee*, 919 F.3d 340, 360 (6th Cir. 2019) (Nalbandian, J., concurring) ("The Court's holding in *Birdsall* does not support the much broader

10

proposition that any public official who tries to influence another public official takes an 'official act' herself, regardless of the relationship between the two officials.").  As for exerting "pressure," unlike in *Urcioli*, there is no allegation the Senator agreed to—or actually did—"us[e] his official position" to induce the New Jersey officials to do anything, for instance by threatening to withhold federal grants from the State absent favorable resolution.  No doubt that is why those officials did *not* do anything.  *See* SSI ¶¶ 42c, 44g.  Again, the government does not argue otherwise.

Instead, the government submits that Senator Menendez was able, by virtue of his "senior" position, to "exercise *influence* over state officials."  Opp.69 (emphasis added).  That is not the standard for official action.  In fact, "influence" was the standard that the government *proposed* in *McDonnell*, and which the Supreme Court unanimously *rejected*.  *See* 579 U.S. at 577 (finding error in jury instructions that defined official action to include "steps to exercise influence").  Again, the Court qualified that only an official who "us[es] his official position" to render advice or exert pressure has taken official action.  *Id.* at 574.  That use-of-office requirement means that the advice or pressure must leverage or exploit *official power*, not merely title, reputation, network, or other informal forms of "influence."  That requirement supplies the critical link to "the formal exercise of governmental power" that the bribery statutes are meant to protect from corruption for private gain.  *See id.* at 578.  And it is entirely absent from the Indictment here.

Unable to grapple with that problem, the government collects a bushel of cases as kindling for a line-up of straw-men.  None of these authorities allows the government to skip the crucial step of connecting the alleged *quo* to an abuse of the Senator's *powers of office* (rather than merely his generalized *influence*).  Many of the cases are invoked to rebut the notion that the official must have "formal legal authority" over the ultimate governmental act.  Opp.65-69.  Of course, that is not Senator Menendez's argument; as just noted (and as his motion made clear), an official may

be guilty of bribery if he sells the *advisory function* of his office or *exploits the power* of his office such as by threats.  In any of those circumstances, however, there is a nexus between the official's powers and the action he allegedly agrees to sell.  That is the common denominator of bribery— what *McDonnell* called "using" one's "official position."  In the absence of some link to official powers, though, merely *asking* another official to do something cannot be official action.

In that light, it is notable that all but two of the cases that the government cites involved individuals who allegedly agreed to influence the decisions of *the same sovereign* whose authority they exercised.[1]  Such allegations make it relatively easy to draw "an inference" that the official had agreed to "pressure or advise other officials to perform official acts."  *Lee*, 919 F.3d at 354. That some cases involved corrupt agreements by *state* officials to influence *local* matters is neither here nor there—cities, counties, and other local governments are mere arms "of the State."  *Avery v. Midland Cnty., Tex.,* 390 U.S. 474, 480 (1968); *see also Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 118 (2d Cir. 2003).  By contrast, the core principle of federalism is that the federal government and the states are "separate sovereigns," *Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019), with each holding the prerogative to regulate its own affairs, *see McDonnell*, 579 U.S. at 576.  So while it is entirely plausible to infer that a "high ranking state official" could "push

---

[1] *United States v. Skelos*, 707 F. App'x 733, 739-40 (2d Cir. 2017) (state official corruptly "push[ed] through county legislation," "bestow[ed] a county-issued contract," and "pass[ed] state legislation" benefitting the bribee); *United States v. Boyland*, 862 F.3d 279, 282 (2d Cir. 2017) (state official corruptly accepted "bribes in connection with a proposed carnival [on city property] and in connection with a proposed real estate venture for which New York State … grant monies were to be obtained"); *United States v. Percoco*, 2019 WL 493962, at *12 (S.D.N.Y. Sept. 8, 2019) (former state official with alleged *de facto* control over state government corruptly steered state decisions), *aff'd*, 13 F.4th 180 (2d Cir 2021), *rev'd and remanded*, 598 U.S. 319 (2023); *Lee*, 919 F.3d at 357-58 (county council member agreed to influence local prosecution); *Keleher*, 505 F. Supp. 3d at 49 (territory education official pressuring a territory transportation official to transfer school property); *United States v. Pawlowski*, 351 F. Supp. 3d 840, 868-69 (E.D. Pa. 2018) (mayor agreed to influence city contracts and perform other favors); *Salahuddin v. United States*, 2018 WL 5342766, at *12 (D.N.J. Oct. 29, 2018) (mayor agreed to influence city contracts).

through county legislation" or "bestow a county-issued contract," *Skelos*, 707 F. App'x at 739, there is no basis, at least in the absence of further allegations, to infer that Senator Menendez either provided advice or exerted pressure *rooted in the powers of his federal office* when he allegedly agreed to contact state officials about state proceedings.

The two remaining cases cited by the government are inapposite.  Just one involved a federal official convicted for corrupt interference in local affairs—an aide to a Congresswoman who threatened a marijuana dispensary and promised an operating permit in exchange for cash. *United States v. Kimbrew*, 944 F.3d 810, 812-13 (9th Cir. 2019).  But even there, the Ninth Circuit emphasized a connection to *federal* power—the aide threatened that the Congresswoman "could get the FBI involved."  *Id.* at 812.  And even with respect to the aide's promises regarding purely local decisions, *Kimbrew* stands for a distinct proposition: If an official deceives a bribe-payor about the scope of his official authority (*e.g.*, the ability to secure a nonexistent city permit), he can still be guilty of bribery.  After all, he is *purporting* to sell his office and *promising* to secure official action, which is just as much bribery as a promise to sell the Eiffel Tower is fraud.  *See id.* at 814-16; *see also Salahuddin*, 2018 WL 5342766, at *12 (though mayor "lacked the actual authority to award contracts," it was "an ability which he represented he possessed"); *Pawlowski*, 351 F. Supp. 3d at 867 (mayor promised but "had no actual authority" to award contract).  Here, however, there is no allegation that Senator Menendez promised to resolve the state matters favorably, or held himself out as having the power to secure that result.  The allegation is instead that he agreed to contact the state prosecutors, which is simply not official action.  As *Kimbrew* itself flags, the official action element "carries with it a requirement that there be a nexus between the public official's position and the *quo* he promises."  *Id.* at 816.  Here that nexus is absent.

13

The government does no better with *United States v. Burke*, 2022 WL 1970189 (N.D. Ill. June 6, 2022).  There, a city official offered to influence contract negotiations with Amtrak to benefit a developer, in exchange for a bribe from the developer.   But the official agreed to *use his own official authority* to do so—*i.e.*, by offering city approvals to Amtrak in exchange for contract concessions that would benefit the developer.  *Id.* at *61.  That abuse of office established the necessary link to official power.  Nothing like that is alleged here.  As already explained, Senator Menendez had no role—advisory or otherwise—in New Jersey decisions.  And the Indictment does not claim that Menendez either agreed to, or actually did, *use his own office* to pressure the New Jersey officials.  It instead alleges an agreement to "influence" a New Jersey act without any link to federal power.  That is insufficient.  *See supra* at 11.

Finally, the government seems to suggest that because a person may be covered by federal bribery laws even without any "formal" government position at all, there can be no requirement that he exercise his own official power to take official action.  Opp.66-67 & n.19.  That does not follow.  It is true that "individuals not formally employed by a government entity may enter into agreements that make them actual agents of the government," and while acting in that capacity can be liable for their abuse of government power just like formally employed officials.  *Percoco*, 143 S. Ct. at 1137.  But that is because *agents* exercise *power* belonging to their principals.  The bribery laws prohibit them from selling that power.  If the Indictment had alleged that Senator Menendez was an agent of the New Jersey Attorney General and sold power he exercised in that capacity, then that might have stated an offense.  It alleges nothing of the kind.

At bottom, the government's theory is that the Indictment is sufficient because it alleges that Senator Menendez agreed to use his political connections and cachet to influence a state matter.  That is not the crime of federal bribery.  It is akin to paying any prominent person (say, Taylor

Swift) to influence a state proceeding.  She certainly has influence (perhaps more than a Senator!), and paying her to intercede may feel unethical, but since it does not involve the corruption of any official power, it does not amount to bribery.  So too here.

Viewed another way, the government's allegation is akin to paying a Senator to attempt to influence the outcome of the Super Bowl or Academy Awards.  Again, at least absent allegations explaining why the official has power or leverage over the matter, that sort of an agreement might violate ethics rules but is no more a federal bribe than the hypothetical payment to Taylor Swift.

Contrary to the government's accusation, the Senator's objection to the New Jersey scheme is the opposite of "empty formalism" (Opp.65)—it reflects the basic purpose of federal corruption law: to prevent the sale for private gain *of official power*.  If there is no use of official power and no use of public office, there can be no corruption and hence no bribe.

### 2.  U.S. Attorney Scheme.

The next scheme in the Indictment alleges that Senator Menendez corruptly agreed to "influence the pending federal prosecution" of Daibes by recommending a particular candidate to be U.S. Attorney, and then calling federal prosecutors about the prosecution.  SSI ¶ 45.  This scheme fails to state an offense, because all of the allegations about the Senator's recommendations must be stricken under the Speech or Debate Clause, and making calls is not official action.

**a.**       Begin with the recommendation.  The government agrees that when a Senator gives his "Consent" on a nominee, he is performing a legislative act.  Opp.48.  But it argues his "Advice" is somehow a horse of a different color.  That is wrong.  The Constitution assigns to Senators the power and responsibility to provide "Advice *and* Consent," Art. II, § 2, Cl.2 (emphasis added), and the Speech or Debate Clause immunizes the exercise of both of those discrete constitutional functions.  Simply put, when the Constitution assigns a specific duty to a legislator, the direct

discharge of that duty is a legislative act.  The government insists otherwise, but offers no authority and no sound reason for slicing-and-dicing constitutional prerogatives.  Nor could it.[2]

The government's core point is largely semantics—a legislative act must be "essential to legislating."  Opp.47.  And even if such an act "need not always involve actual legislation itself," as the government later concedes, it still must *look like* (be "akin to") legislating.  Opp.47-48.

That is not the law.  The Speech or Debate Clause reaches all activities "integral" to *either* "the consideration and passage or rejection of proposed legislation," *or* "other matters which the Constitution places within the jurisdiction of either House."  *Gravel v. United States*, 408 U.S. 606, 625 (1972).  The latter is by definition a distinct class of action—and a class that garners complete constitutional protection in its own right, shielding whenever a member is officially "executing the duties of his office."  *In re Sealed Case*, 80 F.4th 355, 363 (D.C. Cir. 2023).

The government's position rests on the idea that an act is not *legislative* unless it is "a vote or integral to a vote"—so, because "Consent" involves a vote, it is in; but since "Advice" does not, it is out.  Opp.48.  That distinction is completely made up.  Courts have never defined legislative action by its proximity to voting; what is required is instead an integral link to a legislator's constitutional *duties*.  And while those often involve legislation, they are not limited to legislation.  Put another way, legislation is *sufficient* but not *necessary* to Speech or Debate protection.

The government's own authority underscores the point.  As the D.C. Circuit has stressed, the Clause goes beyond legislation, and includes "within its protective sweep those activities which are generally done in a session of the House by one of its members in relation to the business before it."  *McSurely v. McClellan*, 553 F.2d 1277, 1284 (D.C. Cir. 1976) (quoting *Kilbourn v.*

---

[2] Although the government notes in passing that some historical sources suggest "Advice" does not reach pre-nomination input, it does not actually advance that position.  It instead assumes the word should be given its ordinary meaning.  Opp.47.

*Thompson*, 103 U.S. 168, 204 (1880)).  To be sure, it does not reach actions that are *not* integral to that official business—such as acts "casually or incidentally related to legislative affairs."  *Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984).  So in *Walker*, for instance, the court held that the Speech or Debate Clause did not protect the decision to fire an employee in the House cafeteria, even though "[p]ersonnel who attend to food service, medical care, physical fitness needs, parking, and haircutting for members no doubt contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business."  *Id.* at 931.

As these cases lay bare, lots of things affect a legislator's job and may even be central to a legislator's ability to do that job effectively (*e.g.*, cajoling agencies, talking to constituents, issuing press releases), but are nonetheless distinct from execution of the constitutionally assigned duties of the office.  *See In re Sealed Case*, 80 F.4th at 373-74 (Katsas, J., concurring) (distilling this distinction).  Those sorts of actions are "political" in their nature as opposed to "legislative."  *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 12 (D.C. Cir. 2006).  And even though important to a legislator's reelection, those sorts of political acts fall outside the Speech or Debate Clause's "finite limits."  *McSurely*, 553 F.2d at 1285.  By contrast, where a member is performing the *functions* of his office, those acts fit comfortably within the Clause's "absolute immunity."  *Id.*

The point here is not that everything "connected to" a legislative power is a legislative act; nor is the point that the "giving of advice" writ large is a legislative act.  Opp.47.  Nobody thinks that.  The point is that when a legislator is specifically discharging an enumerated constitutional duty, *that* is a legislative act.  And when a Senator provides "Advice" to the President on nominees, he is doing just that.  The fact that the President has the exclusive power to *nominate* (Opp.48) does not undercut that conclusion.  The Constitution intentionally divides the appointment power, so the President's nominations are shaped by the Senate's input, and conditioned on their approval.

17

*See United States v. Alloco*, 305 F.2d 704, 711 (2d Cir. 1962).  When Senators offer advice to the President, they are directly exercising the half of the constitutional function that has been assigned to the Senate—*i.e.*, they are performing a legislative action.

The government's contrary argument is not just wrong but also internally inconsistent.  It accepts that voting on a nominee is a legislative act, much like voting on a piece of legislation. Opp.48.  It also accepts that the lead-up activities to a vote on legislation—*e.g.*, issuing subpoenas, holding hearings, drafting reports—are legislative acts as well, because they are "essential" parts of the process for deciding on possible bills.  Opp.23.  But that rationale applies with equal force here.  As the government acknowledges, a Senator's advice is part of the process for deciding on nominees.  Opp.48.  And there is no cogent reason why such "Advice" is any less an "essential" part of that process than a single subpoena, hearing, or report is an "essential" part of legislating. So whether on its own or as an act integral to a Senator's later "consent" responsibilities, "Advice" to the President on nominees is a legislative act, covered by the Speech or Debate Clause.

By the same token, so too is deciding *what to advise*, including the process for doing so. The government insists otherwise, reasoning that meetings and communications with a prospective nominee are "at least one level removed" from actually giving any advice to the President.  Opp.49. But that is true for all information-gathering—its *entire purpose* is to learn what to do, before doing it.  And it is black-letter law that such information-gathering, both formal and informal, is a covered legislative act.  *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988); *see also, e.g.*, *SEC v. U.S. House Comm. on Ways & Means*, 161 F. Supp. 39, 199, 236-37 (S.D.N.Y. 2015) (collecting cases).

The government continues that even if these interactions appeared "legitimate," there is no reason to think their purpose was *really* to gather information.  Opp.49-51.  But the Indictment itself says otherwise.  *See, e.g.*, SSI ¶ 47 ("[T]he purpose of his meeting with Menendez was to

18

consider a potential candidacy for U.S. Attorney in New Jersey.").  Indeed, the Indictment's *entire theory* here is that Senator Menendez met with and talked to a prospective nominee so as to glean how the nominee would handle Daibes's case—including to learn the specific piece of information about whether the nominee would have to recuse.  *See, e.g.*, *id.* (describing interaction where the candidate "informed" Senator Menendez "he might have to recuse himself from the Daibes prosecution").  In so many words, what the Indictment describes is a series of communications where the Senator said things to the candidate; the candidate said things back; and armed with that information, the Senator made a decision on his recommendation.  *Id.* ¶¶ 47-50.

That is definitional information-gathering.  To be sure, the government's theory is that the *motive* behind these interactions was illicit, and that the Senator was gathering the wrong kind of information.  But that is the precise sort of maneuver that the Speech or Debate Clause forecloses.  The Clause's protection "turns on the nature of the act, rather than on the motive or intent of the official performing it."  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).  And here, those acts—multiple interactions between Senator Menendez and a candidate for U.S. Attorney for New Jersey, the apparent "purpose" of which was to gain information to "consider" that "potential candidacy" (SSI ¶ 47)—are by their nature, legislative acts.  They are quintessential instances of information-gathering, to shape the advice that a Senator is charged with providing the President.

Last, the government says that, at minimum, the communications between the Senator's "Advisor" and the candidate are not covered, because the Advisor was not formally "employed" by the government.  Opp.52.  But as the government recognizes elsewhere, the doctrine is not so wooden; what matters is "the act," not "the actor."  Opp.38; *see also* Opp.66-67 & n.19 (arguing that "public employment" not required to take official action).  The rationale for why the Speech or Debate Clause covers aides is a functional one: Because a member needs aides to complete his

work, the Clause extends to agents just as the principal.  *Gravel*, 408 U.S. at 616.  None of that turns on who signs the pay check, or whether there is a formal employment relationship—indeed, it is common course for Members to rely on outside lawyers for help vetting nominees.  So long as there is an agency relationship, such that the aide is acting as the member's "alter ego[]," the Clause applies. *Id.* at 616-17; *compare United States v. Menendez*, 132 F. Supp. 3d 610, 624 (D.N.J. 2015) (former staffer not acting as Senator's "alter ego," but instead "on behalf of" a separate entity).  And here, that agency relationship is apparent from the Indictment, which alleges that the Senator used his Advisor as a conduit, to interact with and gather information from the nominee. *See, e.g.*, SSI ¶ 53f (depicting Senator "direct[ing]" Advisor to take an action).

The upshot is that the allegations surrounding the Senator's recommendation of a candidate for U.S. Attorney fall within the heartland of the Speech or Debate Clause.  *See* MTD at 23-36 (collecting cites).  The government's responses all derive from its flawed voting-or-bust view of the Speech or Debate Clause—an interpretation no court has adopted, and which makes no sense on its own terms.  These allegations therefore must be purged wholesale from the Indictment, and cannot support its sufficiency. *See United States v. Johnson*, 383 U.S. 169, 185 (1966).[3]

**b.**      Stripping out the recommendation to the President, the U.S. Attorney Scheme rests on the allegation that Senator Menendez agreed to "seek to disrupt" a federal prosecution of Daibes. SSI ¶ 2.  That cannot save this otherwise-barred scheme, because it does not involve a promise or agreement to take *official action* toward that end.  And, in fact, the only actions that the Senator is alleged to have taken in furtherance of that agreement were decidedly *unofficial*.

---

[3] The Government suggests in passing, but does not actually argue, that Senator Menendez may have waived some Speech or Debate protections.  Opp.40-41 & n.11.  Any such claim would be frivolous.  *See United States v. Helstoski*, 442 U.S. 477, 491 (1979) (waiver must be "explicit and unequivocal").

Rather than rebut this argument, the government tries to avoid it.  It first says the Indictment is sufficient merely because it alleges, in the most general terms, that the Senator promised to take "official acts … in exchange for bribes."  Opp.63 (quoting SSI ¶ 2).  That is obviously insufficient without more.  *See supra* Part I.A.  And the "more" that the Indictment offers does not fill the gap. Indeed, the Indictment never alleges—even in bare, conclusory terms—that the Senator agreed to take "official action" to disrupt the prosecution.  It alleges only that he agreed to "seek to disrupt" it and to "attempt to influence it."  SSI ¶¶ 2, 46.  That alone is not an offense, because the federal bribery laws demand "a promise to perform *official acts* for the giver."  *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007) (emphasis added); *see also United States v. Silver*, 948 F.3d 538, 556 (2d Cir. 2020) (explaining that, under *McDonnell*, the forbidden *quid pro quo* must involve "a promise to perform an *official act*" (emphasis added)).  And exercising "influence" alone does not qualify.  *McDonnell*, 579 U.S. at 553 n.7; *supra* at 11.  Since one could seek to disrupt a prosecution without taking official action (*e.g.*, by writing a strongly worded op-ed condemning the case, or by bringing exculpatory material to the prosecutor's attention), the Indictment does not state an offense in describing what Senator Menendez allegedly *agreed* to do.

Often, the government seeks to fill in the details of an ambiguous agreement by looking to what the official *actually* did.  To be clear, the government is correct that following through is not an element of the offense (Opp.53-54); a corrupt agreement to trade official action is a crime even if the official action is never ultimately taken.  The subsequent actions, however, can shed light on the nature of a vague or implied agreement, which is why the government regularly alleges and proves those actions.  *See McDonnell*, 579 U.S. at 573.  Here, however, the alleged follow-through is not official action either, and thus does not allow an "inference" (Opp.33) that the alleged agreement was a corrupt one.  The Indictment alleges two phone calls, but offers zero facts about

what transpired on those calls.  SSI ¶¶ 53d, 53e.  There is accordingly no allegation that Senator Menendez actually provided any official advice or exerted any official pressure on the First Assistant.

The government does not dispute the absence of any allegations of advice or pressure (or other official action).  It responds that no authority requires an indictment to include "the content of a call alleged to have been part of a criminal scheme."  Opp.64.  Maybe not as a general rule, but sometimes those details are necessary to state an offense.  If an indictment alleged merely that A called B, that would not state an offense for uttering death threats.  Here, the Indictment never alleges that Senator Menendez *promised* to engage in official action to disrupt the prosecution, and it also fails to allege that he *actually did so*.  That is not enough to state a bribery offense.

### 3.  Qatar Investment Scheme.

The government spends only a page defending the Qatar Investment Scheme that it added in the Second Superseding Indictment.  Opp.61-62.  That is remarkable: For a U.S. Attorney's office to levy this sort of shattering accusation at a sitting Senator, one would think it would have at least *some* concrete allegation to point to.  But its response reveals otherwise—this is a charge made for headlines, not courtrooms.  Indeed, its sparse defense rests on *rewriting* the Indictment's allegations.  It fails too.

The government argues that the Indictment is sufficient because it alleges that the Senator accepted gifts from Daibes while knowing he was expected "in exchange to take action to benefit the Government of Qatar."  Opp.61 (quoting SSI ¶ 45).  But that sentence—and the Indictment— is at minimum missing a critical word: "*official*."  As the government's own cases confirm, the official must accept things of value while knowing they were made "in return for a commitment to perform some *official action*."  *Silver*, 948 F.3d at 545 (emphasis added); *see also McDonnell*, 579 U.S. at 572 (explaining that jury could infer agreement if official "received a thing of value

knowing that it was given with the expectation that the official would perform an 'official act' in return").  Nowhere does the Indictment allege that the Senator accepted anything while knowing he was expected to take *official* acts in exchange.  *See* SSI ¶ 2 ("performing acts to benefit [Qatar]"); *id.* ¶ 45 ("use his influence … to benefit [Qatar]"); *id.* ¶ 55 ("action favorable to [Qatar]").  Just as with the alleged scheme to try to disrupt the prosecution, these claims do not state an offense standing alone, because it is entirely possible to benefit Qatar *without* taking official action.

Indeed, the Indictment's only allegations about actions the Senator actually took to benefit Qatar were *unofficial*.  He allegedly "made multiple public statements supporting" Qatar, and issued "a press release … prais[ing]" its government.  SSI ¶ 57.  Those are not official acts.  *See McDonnell*, 579 U.S. at 573 ("[s]imply expressing support" is not official action); *United States v. Silver*, 864 F.3d 102, 120-22 (2d Cir. 2017).  The government does not argue otherwise.  So again, we are left with (i) an alleged agreement that does not entail official action, and (ii) alleged follow-through that does not rise to official action.  This is not enough to support a bribery charge.

The government therefore falls back to two paragraphs that allude to a Senate resolution about Qatar.  Opp.62; SSI ¶¶ 58, 60.  Even accepting that this non-binding resolution could involve official action, the Indictment does not allege that the Senator ever agreed to act on the resolution or even accepted benefits while knowing that Daibes expected him to act on it.  The government tellingly includes no citation when it claims otherwise.  Opp.62.  And it admits the Indictment "does not allege actual action on the Senate resolution," either, given Speech or Debate immunity.  Opp.62 & n.17.  Again, such action is not legally required for the offense, but (if not otherwise barred by the Speech or Debate Clause) it could theoretically generate an inference that the alleged agreement embraced official action as a way to backfill the otherwise-insufficient allegations about its scope.  The Indictment does not take that path, either, since it cannot.

In the end, as with the alleged scheme to disrupt Daibes' prosecution, the Indictment alleges neither an agreement embracing official action nor actual official action. The only allegations are that the Senator took unofficial action to "benefit" Qatar and received two text messages about the status of a resolution. This late-breaking addition to the Indictment cannot withstand scrutiny.

### 4.  IS EG Halal Scheme.

Whether viewed independently (as it should be) or as part of the Egypt Aid Scheme below, the thrust of the IS EG Halal Scheme is that the Senator corruptly agreed to "counter the USDA's objections" to the monopoly rights granted by Egypt. SSI ¶ 28. More specifically, the Indictment alleges that he "called a high-level USDA official" and "insisted" the agency "stop opposing" the monopoly. *Id.* ¶ 30. This fails to state an offense, because it does not involve any agreement to take official action within the meaning of *McDonnell*.

To start, the government does not meaningfully dispute that Egypt's decisions and actions respecting the monopoly are not "official actions" for purposes of the federal bribery laws. Nor does the government cite a single case under § 201, the honest services statute, or the Hobbs Act involving the alleged corruption of a foreign government's decisions.

Instead, the government offers the following two-step argument: (i) USDA's "position" on the halal monopoly constitutes official action in its own right (Opp.58), and (ii) the Senator engaged in "advice and pressure" relating to that official action by insisting that USDA back down from its opposition (Opp.56-57). Both steps in that argument fail.

*First*, USDA's "position" on Egypt's decision to grant the monopoly was not an official act (and therefore any "advice or pressure" relating to that opposition is not official action either). The agency's support for or opposition to the monopoly is not a "a formal exercise of governmental power," *McDonnell*, 579 U.S. at 574, for the simple reason that USDA plays no governmental role in Egypt's monopoly decision making. The government does not argue otherwise. Given USDA's

bystander capacity, its "position" on the matter amounts to nothing more than "[s]imply expressing support" for, *McDonnell*, 579 U.S. at 573, or "opposition to," *Silver*, 864 F.3d at 122, Egypt's decision. "Taking a public position on an issue, by itself," however, "is not a formal exercise of governmental power, and is therefore not an 'official act' under *McDonnell*." *Id.*

It does not matter that Egypt's decision related to USDA's "mandate" in some generalized way, or that USDA's opposition was expressed in a "formal" letter, or that it had the potential to carry "real-world effects." Opp.58. All of that was equally true in *Silver*, where the Speaker of the Assembly "draft[ed] a letter to be distributed publicly that expressed his strong opposition to" the opening of a "methadone clinic" in his district. *See* 864 F.3d at 110, 122. None of that showed that he "formally used his power … to oppose the clinic." *Id.* Even use of "government letterhead," the Second Circuit warned, "is not, by itself, a formal exercise of government power on a matter similar to a hearing or lawsuit." *Id.* at 120. Like Silver's letters, USDA's "position" on Egypt's monopoly (Opp.58) bears no nexus to any exercise of actual governmental power that federal law is concerned with. *See United States v. Jefferson*, 289 F. Supp. 3d 717, 737 (E.D. Va. 2017).

Contrary to the government's parade of horribles, this does not mean that nothing within the realm of foreign affairs can qualify as official action. The government's cited case, for instance, addresses the "formal act of recognition" by which one sovereign acknowledges the existence and legal rights of another. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015). That is surely "a formal exercise of governmental power," *McDonnell*, 579 U.S. at 574, as would be a declaration of war, or recognition of a foreign ambassador's credentials. But a mere press release or letter or public statement—even if it fairly reflects the "considered and official position of the Executive Branch on an important matter" (Opp.58)—does not meet the *McDonnell* standard.

*Second*, even assuming *arguendo* that USDA's "position" on the monopoly qualifies as an official act, the Indictment does not allege that the Senator "used his office" to advise or pressure USDA in relation to that matter.  Indeed, while the government again insists that the mere use of magic words in an indictment is sufficient to reach a jury (Opp.56), the Indictment never alleges even in conclusory terms that Senator Menendez "us[ed] his office" to render advice or to exert pressure on USDA.  Its conclusory terms are limited to claiming that he "advised and pressured" *simpliciter*.  SSI ¶ 2.  The difference is material.  An official "uses his office" to advise if his role includes advising others.  An official "uses his office" to pressure if he leverages official powers to coerce.  *See supra* at 10.  Yet the Indictment does not allege, and the government does not argue, that the Senator had any official advisory function as to this agency, that he threatened legislative retribution if USDA did not comply, or that he otherwise tried to "exploit … the legislative process." *Urciuoli*, 513 F.3d at 296.  All the Indictment says is that the Senator called and made a demand. SSI ¶ 30.  That is not enough.  *See Silver*, 864 F.3d at 120-21 (rejecting "pressure" argument based on Speaker's letter to private entity, since "there is no evidence in the record that Silver or anyone else threatened to withhold [that entity's] funding").

The government's IS EG Halal scheme reflects its unending quest to subject everything a public official does—no matter how picayune—to the jurisdiction of the federal bribery statutes. *McDonnell* fundamentally rejected that approach, and reiterated the core purpose of the corruption laws, by demanding a tighter nexus to a formal exercise of sovereign power.  As to this scheme, the Indictment alleges nothing remotely close.  The Senator is not alleged to have done anything that Hana or Daibes could not have done.  USDA might have been more likely to answer his calls (or, for that matter, calls from Elon Musk).  But, once again, trading "on the reputation, network and influence that comes with political office" is not official action.  *Urciuoli*, 513 F.3d at 296.

### 5. Egypt Aid Scheme.

As for the Egyptians, the Indictment alleges that Senator Menendez accepted things of value from Hana and others in exchange for facilitating foreign military sales and financing (FMS and FMF) for Egypt—in particular, by agreeing to not place "holds" on that aid. *See* SSI ¶¶ 17, 19. But those allegations all rest on core legislative acts, must be purged, and thus cannot support the sufficiency of the Indictment. *Johnson*, 383 U.S. at 185.

To start, it bears emphasis the government has abandoned all of its other alleged *quos* here. It says the Senator gave Egyptian officials certain non-public material (Opp.36), but it has dropped its argument that this was a breach of duty (Opp.71)—and it does not claim it was an official act either. Likewise, the government appears to concede the Senator's argument that a letter he wrote to urge more "engagement" by U.S. officials regarding a dam in Africa (SSI ¶ 37a) was not official action under *McDonnell*; it responds only that dismissal is inappropriate "regardless" of whether the letter counts, implicitly abandoning any argument that it does. Opp.61 n.16.[4]

The sufficiency of the alleged Egyptian Aid Scheme thus turns entirely on the government's FMS/FMF allegations. But the activities depicted there are *classically* legislative, and fall squarely within the Speech or Debate Clause. As detailed, the Clause protects "acts made" by a Senator "while executing the duties of his office." *In re Sealed Case*, 80 F.4th at 363. And it is a duty of the Chairman (or Ranking Member) of the Foreign Relations Committee to review, sign-off, or hold certain foreign aid; it is an established aspect of their legislative responsibilities—a function assigned to them by feature of their office. The government does not dispute this.

---

[4] The government tries to bundle the IS EG Halal actions with this scheme (Opp.36), but the Senator's alleged actions in connection with that company did not aid Egypt and therefore do not fit here; that is why they are alleged in a distinct section of the Indictment. *See* SSI at 4. In any event, none of those acts satisfies *McDonnell* either, as explained above. *See supra* at 24-26.

The government's main reply is that such acts are the product of "longstanding, voluntary practice," as opposed to some formal constitutional assignment.  Opp.37.  But the government itself eschews that overly formalistic approach elsewhere, arguing that "official action could be established by custom," and need not be a "formal part" of an official's position, Opp. 66; *see also McDonnell*, 579 U.S. at 573-74 (discussing this and *Birdsall*, 233 U.S. at 227-31).  Indeed, this is all precisely why the government thinks "holds" are *official acts* in the first place.  At no point does the government offer any coherent explanation for why the same, pragmatic, real-world approach should not apply to the Speech or Debate inquiry, which in this context asks the parallel, similar question of whether a member is executing the duties of his office.  Nor could it.  The whole thrust of Speech or Debate jurisprudence is to look to function over form—that is precisely why "the Court has given the Clause a practical rather than a strictly literal reading," which focuses on the "essential part[s] of the duties of a Member of Congress."  *Hutchinson v. Proxmire*, 443 U.S. 111, 124 (1979); *see also, e.g.*, *Chastain v. Sundquist*, 833 F.2d 311, 316 (D.C. Cir. 1987) (the Speech or Debate Clause "protect[s] the functional obligations of elected representatives"); *McSurely*, 521 F.2d at 1041 (the Clause's "immunity" has an "intrinsically functional nature"); *SEC*, 161 F. Supp. 3d at 236 (these "protections [do] not hinge on [] formality").

Nor does it matter that a hold is technically non-binding, in the sense that the Executive Branch is free to override it.  Opp.37.  An act need not "bind" anyone else to qualify as legislative in nature.  Consider a vote for legislation that the President then vetoes.  By virtue of the President's action, the legislation does not advance; Congress's action is overriden.  But the vote is surely still "legislative."  For another example, the Senate Resolution on Qatar is just as non-binding as the SFRC Chairman's "holds."  But even the government agrees that advancing that resolution is a legislative act.  Opp.62 & n.17.  There is no reason this is any different.

Nor does it matter that FMS/FMF "holds" relate to actions that ultimately the Executive will (or will not) take.  Opp.38.  Many legislative acts relate to what become (or are) executive acts—confirming nominees, approving appropriations, disproving agency actions under the Congressional Review Act, to name a few.   As the government notes later (Opp.81 n.25), the federal branches regularly work together on things; the separation of powers means the branches play different roles, not that they cannot collaborate on the same objectives.  And when they do collaborate, Congress's designated role in that process is "legislative" for purposes of the Speech or Debate Clause.  *Cf. City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (each federal branch is capable of exercising only its form of sovereign power).

Indeed, many "oversight" activities are legislative acts for this reason.  *See United States v. McDade*, 28 F.3d 283, 304 (3d Cir. 1994) (Scirica, J., concurring and dissenting in part).  And holds on FMS/FMF comfortably fit that mold, too.  The government feigns confusion about the oversight process at issue (Opp.39), but that cannot be sincere; the practice of holds on FMS/FMF is *exclusively* about oversight—its only purpose is so that congressional leaders can review how the Executive is allocating foreign aid appropriations.  *See, e.g.*, Cong. Res. Servs., *Arms Sales: Congressional Review Process*, at 1-2 (Jan. 4, 2024).  And even under the government's favorite out-of-circuit case, that sort of determinate, established process for having congressional members review a particularized Executive Branch "policy" falls within the Clause's "constitutional safe harbor."  *United States v. Menendez*, 831 F.3d 155, 169 (3d Cir. 2016).

At bottom, all the government's arguments here rest on its same flawed view of the Speech or Debate Clause, discussed above.  The government asserts that a legislative act must involve legislation—it needs to be "a vote or integral to a vote."  Opp.48; *see also id.* at 22, 38-39.  But as explained, that is simply not the law; and none of the cases cited by the government say that.  *Supra*

at 16-18.  Rather, a legislative act is the *execution of a legislative duty*—or the performance of an act integral to that duty.  This distinction excludes *political* activities, which focus on constituent service and other aspects of elected office, but are too attenuated from a member's constitutionally assigned functions.  *United States v. Brewster*, 408 U.S. 501, 512 (1972).  But *that* is the line the Supreme Court has drawn; and against it, it is clear that holds on military financing and sales fall on the protected side.

As a fallback, the government argues it never actually alleges the Senator "*in fact* placed or declined to place a single hold."  Opp.44.  That is too clever by half.  The Indictment repeatedly refers to actions surrounding such approvals in order to create an inference that Senator Menendez "in fact" took those actions and, in turn, imply that the Senator did so as part of a corrupt bargain that is never *itself* alleged.  *See, e.g.*, SSI ¶¶ 37g (Nadine: "Bob had to sign off on this"); 20 (text describing "sign off" on sale"); 34 (text discussing a meeting with Egyptians).  But that all puts the Senator in the same position as if the Government introduced the acts themselves: Because these texts "virtually compe[l]" the Senator to "justify [the] legislative actions" that they depict, allowing the government to use them (either in an indictment or as evidence at trial) would "frustrate[] … the Speech or Debate privilege" all the same.  *United States v. Swindall*, 971 F.2d 1531, 1546 (11th Cir. 1992).  This fundamental constitutional protection does not lend itself to such an easy workaround.[5]

---

[5] Senator Menendez agrees that this Court need not decide at this time whether his alleged meetings with Egyptian officials were legislative acts, because the government no longer relies on those allegations to support the Indictment.  But if the Court does reach the issue, the government is wrong there too.  The Indictment itself says the meetings were about core legislative business, so there is no request to rely on the Senator's "say-so" (Opp.41).  *See, e.g.*, SSI ¶¶ 19 (meetings about FMS/FMF); 20 (similar); 21 (similar); 37f ("formal congressional delegation").  More, it is not "nuanced" or "unsettled" (Opp.40-41), at least in this Circuit, whether information-gathering, both formal and informal, is a legislative act.  *Biaggi*, 853 F.2d at 103.  And there is also no doubt that gathering information for "committee investigations, proceedings, and reports" is a legislative

*     *     *

Each of the bribery counts is a pieced-together amalgam of unofficial constituent service combined with core legislative activities, bound together by an amorphous "conspiracy" involving a host of unrelated characters, topics, and goals, yet missing any concrete allegation of a corrupt agreement.  The government is clearly very motivated to pursue Senator Menendez (again), and its prosecutors are certainly skilled lawyers capable of marshaling dozens of pages of caselaw for a wide array of propositions, but nothing in this Frankenstein Indictment justifies hauling a senior U.S. Senator before a jury.  The Court should dismiss Counts I-III.

## II.   THE FARA COUNT FAILS BECAUSE 18 U.S.C. § 219 IS UNCONSTITUTIONAL AS APPLIED.

Dismissal is likewise required for Count IV, which charges Senator Menendez with conspiring to "act as an agent" of Egypt in violation of 18 U.S.C. § 219.  SSI ¶ 82.  This allegation is unprecedented, as the government implicitly concedes: Never before has the government used § 219 to prosecute a public official—let alone a sitting Senator, and former Chairman of the Foreign Relations Committee.  For good reason: It is unconstitutional.  Allowing the Executive Branch to police the motivations of a coordinate branch of government performing its constitutionally prescribed functions would upend the separation of powers, and the government's attempts to justify its encroachment on congressional independence are unpersuasive.

---

act.  *Walker*, 733 F.2d at 929.  Last, the government suggests courts need to independently confirm an information-gathering meeting was *really* that.  But the Speech or Debate Clause turns on the *nature* of the act, and thus "forbids inquiry into acts which are purportedly or apparently legislative, even to determine if they are legislative in fact."  *Dowdy*, 479 F.2d at 226.  After all, a "supposed privilege against being held judicially accountable for an act is of virtually no use to the claimant of the privilege if it may only be sustained after elaborate judicial inquiry into the circumstances under which the act was performed."  *Doe v. McMillan*, 412 U.S. 306, 339 (1973) (Rehnquist, J., concurring and dissenting in part).  Even so, to the extent the Court believes it needs more information to determine whether these (or any other acts) qualify as legislative, the proper course is to hold an evidentiary hearing, not to let the allegations stand.  *See McDade*, 28 F.3d at 298.

**A.**  The government does not dispute that § 219 is as broad as it naturally reads.  That statute bars public officials from "act[ing] as an agent of a foreign principal" within the meaning of FARA, which means that they may not (i) engage in "political activities" or certain other acts (ii) if done "at the order, request, or under the direction or control, of a foreign principal."  22 U.S.C. § 611(c)(1).  The term "political activities" encompasses almost anything that a legislator does—reaching all activities that will "in any way influence" the U.S. government or the public with respect to the "domestic or foreign policies of the United States" or "the political or public interests, policies, or relations of a government of a foreign country."  *Id.* § 611(o).  And the term "request" renders the second prong equally broad, such that not even a "common law agency" relationship is required for § 219 to apply.  *Att'y Gen. of U.S. v. Irish N. Aid. Comm.*, 668 F.2d 159, 161 (2d Cir. 1982).  Again, the government accepts all of this; it reads the statute as written.

That is a law with a remarkable sweep—one without parallel in the U.S. Code.  As the government itself emphasizes, § 219 allows it to prosecute Members of Congress for taking otherwise lawful, permissible, and routine actions, solely because they did so at the "request" or "direction" of particular entities—*i.e.*, based on the subjective motivations for those acts.  In other words, § 219 takes almost everything a legislator does—from voting, to giving speeches, to making calls, to everything in between—and makes it the fodder for a possible criminal charge, based *entirely* on what a jury perceives to be the true reason behind that otherwise legitimate action.

That is bad enough as a general matter.  But it is *especially* fraught in the foreign affairs context.  Members of Congress will regularly hear out "requests" from foreign principals as part of their ordinary work; for those on House Foreign Affairs and Senate Foreign Relations, or for those in congressional leadership, it is a weekly (if not sometimes daily) occurrence.  Here, the actions in question concern Senator Menendez's legislative oversight of America's relationship

with Egypt, but it takes no imagination to see how future prosecutions could target all manner of activities.  Be it promoting aid to Ukraine, to supporting a ceasefire in Gaza, to pushing for a free trade agreement, to taking a country's side in a territorial dispute, Members of Congress *frequently* push domestic policies with foreign implications after having met with foreign countries (or those pressing their interests).  Upholding § 219 as applied to Members of Congress places a specter of prosecution over *every single one* of those actions; and inescapably, each one of those cases will turn on whether a lay jury thinks that the politicians' conduct was *really* done in the interest of the United States, or at the vague "request" or "direction" of a foreign principal.

That is unconstitutional.  The Constitution does not permit one branch of government to "superintend" the work of another in this way.  *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 611-12 (2007) (plurality).  And when the Constitution assigns specific "duties" to one branch of government, the "separation-of-powers" bars another from dictating "the performance" of those functions.  *Loving v. United States*, 517 U.S. 748, 757 (1996).  But *that* is precisely what § 219 does, as applied to Members of Congress.  It takes otherwise lawful actions that are part-and-parcel of legislator's Article I duties, and then makes those actions *criminal* based on a defined subset of proscribed motivations; in short, it tells legislators *how* (or more aptly, *how not*) to do their job.  And while criminalizing foreign influence might seem like a good idea in the abstract, § 219 is the application of a constitutionally intolerable principle.  It is no different than a law that eliminates certain bases for judicial decisions (*e.g.*, courts must ignore input of law professors), or commands certain considerations for pardons (*e.g.*, the President must first consult with victims' families).  In all cases, it is a federal statute that takes an action otherwise exclusively assigned to one branch, and then conditions that assignment by having the other branches determine what can and cannot go into its execution.  That cannot square with the separation of powers.

At minimum, the sheer chill that follows from applying § 219 to Members of Congress is enough to render it unconstitutional.  As explained, by its plain terms, § 219 places virtually every legislative activity involving foreign affairs within the ambit of potential prosecution; all of which would then turn on what a lay jury thinks is behind a member's mind's eye.  But as the Supreme Court has recognized, subjective intent is "easy to allege and hard to disprove."  *Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998).  And for intuitive reasons, where criminal liability turns on such an "intent-based test," the Court has likewise recognized that a deep "chill" will follow, with would-be defendants loath to try their fate at trial.  *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 468 (2007) (opinion of Roberts, C.J.).  That is a serious constitutional problem, because the very prospect of *indictment* hazards serious "damage" to any political career, and thus its possibility alone is often enough to "intimidate the average congressman and jeopardize his independence."  *Helstoski*, 635 F.2d at 205.  In analogous contexts, the Court has not been shy to enforce doctrines designed to ensure the effective functioning of government, by eliminating "chills" like this one.  *See, e.g.*, *Trump v. Thompson*, 142 S. Ct. 680, 681 (2022) (Kavanaugh, J., respecting denial of application) (discussing rationale for executive privilege jurisprudence).  The same should obtain here.

This Court should accordingly hold § 219 unconstitutional as applied to Members of Congress, just as the Supreme Court has done with other statutes that disrupt the separation of powers.  *See, e.g.*, *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2197 (2020).

**B.**  The government offers several reasons to avoid this conclusion, but none holds force.

To start, the government discounts the above as just a "parade of horribles," which have not manifested to date, and will likely not arise in the future.  Opp.82.  That is incredibly rich.  As for the first point, appealing to the past is an empty gesture, because this sort of prosecution is the

*first of its kind*; never before has the government used § 219 like this.  And if American political history teaches anything, once something becomes no longer unprecedented, ready precedents follow.  As for the latter point, the government's "trust us" refrain is a tired one, and one that has never worked.  *See, e.g.*, *McDonnell*, 579 U.S. at 576 ("[W]e cannot construe a criminal statute on the assumption that the Government will use it responsibly.").

More, these arguments ring *particularly* hollow here, given how easy it is to envision how the Executive's new tool can be soon applied in today's polarized political climate.  *See, e.g.*, Maegan Vazquez, *Trump Says on Univision He Could Weaponize FBI, DOJ Against His Enemies*, Wash. Post (Nov. 10, 2023).  It is already mainstream political rhetoric to charge members with acting on behalf of Ukraine, Taiwan, or Israel, while putting this country second; it is far too easy to imagine a future presidential administration putting those allegations into an indictment. The examples are ubiquitous—even limited to the timeframe of these motions being briefed. Recently, Congresswoman Ilhan Omar gave a speech where she had promised (on some accounts) to represent the interests of Somalia in Congress, as opposed to those of the United States.  *See, e.g.*, Mychael Schnell, *Greene Moves to Force Vote on Censuring Omar for Somalia Remarks*, The Hill (Feb. 1, 2024).  If § 219 can be applied to Members of Congress, the *only thing* stopping a future prosecution of Congressman Omar is the *discretion of the Executive Branch* and the *judgment of a lay jury*.  If that does not jeopardize legislative independence, it is impossible to see what does.

Next, the government argues that courts have rejected similar challenges to *bribery* statutes that cover federal legislators.  In particular, the government invokes *United States v. Brewster*, 408 U.S. 501, and *United States v. Myers*, 635 F.2d 932, two cases that upheld bribery charges against Speech or Debate Clause challenges.  Opp. 76-78, 81-82.  But bribery is fundamentally different, because it forbids corrupt *agreements* that are distinct from, and collateral to, the official duties

and work of a Member of Congress.  Prohibiting those agreements therefore neither places the Executive Branch in the position of superintending the legislators' official work nor threatens to chill the proper exercise of their duties.  *Brewster* and *Myers* rested on that rationale: "a corrupt promise to take legislative action" is distinct from "the action itself," *Myers*, 635 F.2d at 937, and "[t]aking a bribe" is not even arguably legislative action, *Brewster*, 408 U.S. at 526.

By contrast, § 219 turns on whether a public official "*acts* as an agent of a foreign principal." 18 U.S.C. § 219(a) (emphasis added).  In criminalizing "any activity that the person engaging in believes will, or that the person intends to," influence government policy if it is done in this agency capacity, 22 U.S.C. § 611, this statute reaches almost anything a Member of Congress does.  Unlike the bribery statutes, then, § 219's reach is not peripheral or collateral to the duties of legislators; it *embraces* those duties and the exercise thereof.  As a result, again, the only thing standing between a Senator on the Foreign Relations Committee and federal prison is a jury finding that he listened to one of the many foreign "requests" or "directions" that he hears out all the time.  Section 219 thus encroaches far into the legislative sphere, and it cannot be held constitutional based on cases about the legality of prosecutions that do *not*.  Conversely, recognizing § 219's unconstitutionality would hardly give Members of Congress the categorical immunity from criminal prosecution that the bribery cases warn against—only protection from a uniquely intrusive law that casts a pall of prosecution over their routine work.  *See Brewster*, 408 U.S. at 520.

Shifting gears, the government contends that there can be no separation of powers violation here because Congress remains free to amend any laws bearing on its Members, and to omit them from the Senate Ethics Manual.  Opp.77-78, 82.  That is plainly wrong.  As even the government eventually concedes, the "separation of powers does not depend on … whether the encroached-upon branch approves the encroachment."  Opp.77-78 & n.23 (quoting *Free Enter. Fund v. PCAOB*,

561 U.S. 477, 497 (2010))).   If anything, Congress's "enthusiasm" for constitutionally questionable provisions must "'sharpen[] rather than blunt[]' [this Court's] review," to ensure that Congress is not "'yield[ing] up its own powers.'"   *NLRB v. Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment) (quoting *INS v. Chadha*, 462 U.S. 919, 944 (1983), and *Clinton v. City of New York*, 524 U.S. 417, 452 (1998) (Kennedy, J., concurring)).   Although the government cites a series of cases in which courts have remarked on how Congress could just amend the statutes being challenged, that truism served as "extra icing on a cake already frosted," rather than a reason why an otherwise unconstitutional statute could be constitutional.   *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (quoting *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting)); *see Brewster*, 408 U.S. at 509-24; *Menendez*, 831 F.3d at 174; *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 222-24 (D.C. Cir. 2013); *United States v. Rose*, 28 F.3d 181, 189-90 (D.C. Cir. 1994); *Myers*, 635 F.2d at 939.   In *Myers*, for example, the Second Circuit noted that "Congress always has the power" to redefine the federal bribery laws to exclude Members of Congress, but only after first concluding that the issues in the case involved purely "choices of public policy, rather than constitutional imperatives."   635 F.2d at 939.

More narrowly, the government argues that Senator Menendez cannot invoke the general protections of the separation of powers, because he is entitled only to the specific protections of the Speech or Debate Clause.   That fails on two independent levels.

For one, even if the Speech or Debate Clause were the only relevant protection here, Count IV would still require invalidation.   The government tries to avoid Senator Menendez's Speech or Debate defense to the *bribery* charges by arguing that its allegations focus on "what [the Senator] *promised* to do, *said* he had done, or *agreed* to seek to have done," not on legislative activities the Senator may "*in fact*" have done.   Opp.44 (emphases added).   But as Senator Menendez explained,

and as the government has not rebutted, the § 219 analysis "turns exclusively on whether the legislator has *acted* as a foreign agent."  MTD at 35-36 (emphasis added).  So even if the bribery charges could circumvent the Speech or Debate Clause by avoiding direct references to legislative activity, the FARA charge cannot.  This count requires the government to prove that decidedly legislative acts, such as the Senator's exercise of his committee prerogatives regarding military aid to Egypt, were in fact undertaken based on a supposedly illicit "request."  That inquiry is flatly forbidden by the Speech or Debate Clause.  *Brewster*, 408 U.S. at 525.

Regardless, the Speech or Debate Clause is not the only relevant constitutional protection for federal legislators.  The separation of powers offers Members of Congress structural protections on top of those of the Speech or Debate Clause.  For example, a statute purporting to bar Members from interfacing with the Executive Branch would clearly be unconstitutional given its conflict with the separation of powers, even though many such interactions would not be "legislative" under the Speech or Debate Clause.  *See Mistretta v. United States*, 488 U.S. 361, 408 (1989) ("Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest.").

Nor, contra the government, does *Davis v. Passman*, 442 U.S. 228 (1979), say otherwise.  That decision held merely that, as to the narrow question whether congressional employment decisions can be judicially reviewable, the separation-of-powers doctrine did not provide any shelter apart from the specific protections of the Speech or Debate Clause.  *Id.* at 235 n.11.  But *Davis* otherwise recognized that the Speech or Debate Clause "*reinforc[es]* the separation of powers" that the Framers separately established, *id.* (emphasis added), so it supports the *Senator*'s position as to the broader question whether the separation of powers offers distinct protection as a general matter.  The Speech or Debate Clause and the separation of powers both serve as "vital

check[s] upon the Executive and Judicial Branches to respect the independence of the Legislative Branch." *Myers*, 635 F.2d at 935-36. And the separation of powers serves as a particularly important check under the government's cramped view of the Speech or Debate Clause, which it asserts does not protect Senator FMS/FMF holds, Senators' recommendations to the President for appointments subject to senatorial "advice and consent," or myriad other activities that legislators appropriately undertake in their official capacities. *See supra* at 16, 18, 28-30. If the government is right on any of that (and it is not), the separation of powers would be the *only* remaining protection for a vast swath of official conduct that Members of Congress engage in every day.

Ultimately, the government is left to object that Senator Menendez's separation-of-powers argument raises "novel" issues. Opp.78. Perhaps, but that again reflects only the unprecedented nature of this prosecution. The government has never before claimed the power to criminally prosecute Members of Congress for undertaking otherwise-lawful official acts based on their subjective motivations for doing so. And its attempt to do so here is an affront to congressional autonomy that cannot be reconciled with our constitutional structure or the principles elucidated in the courts' separation-of-powers jurisprudence.

This Court should not open the door to further prosecutorial oversight of the First Branch— which, if taken to its logical conclusion, would allow for prosecution of the House Speaker for advocating a standalone aid-to-Israel bill at the request of Prime Minister Netanyahu, or of the Senate Majority Leader for supporting Ukraine military aid at the request of President Zelenskyy. To so "jeopardize [congressional] independence" disrupts the constitutional balance of power in an intolerable way, and the § 219 count against Senator Menendez must accordingly be dismissed on constitutional grounds. *Helstoski*, 635 F.2d at 205.

## CONCLUSION

For these reasons and those given in the Senator's opening memorandum, all of the Counts in the Indictment should be dismissed.

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*