**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S2 23-cr-490 (SHS)

**UNDER SEAL**

## SENATOR ROBERT MENENDEZ'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTIONS TO DISMISS BASED ON LACK OF VENUE AND DUPLICITY, AND HIS SEVERANCE MOTION

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 4

I.  VENUE IN THIS DISTRICT IS IMPROPER ................................................................. 4

   A.  The Government's Desired Pleading Standard Is No Standard At All ............................ 5

   B.  The Indictment Fails to Allege Legally Sufficient Overt Acts. ....................................... 7

      1.  Bronx Bank Account ................................................................................................ 9

      2.  Restaurant Meetings ................................................................................................ 9

      3.  Text Message ......................................................................................................... 11

      4.  Sale of Gold ........................................................................................................... 13

   C.  At A Minimum, A Bill Of Particulars On Venue Is Required ......................................... 15

   D.  Alternatively, a Rule 21 Transfer to New Jersey is Warranted. ...................................... 16

II.  THE INDICTMENT IS DUPLICITOUS ...................................................................... 16

   A.  The Government Cannot Defend the Indictment As Written. ......................................... 18

      1.  The IS EG Halal and Egyptian Aid Schemes Are Not Mutually Dependent. ............ 20

      2.  The Indictment Does Not Allege Daibes' Knowledge of the IS EG Halal Scheme ... 20

      3.  The Indictment Does Not Allege Daibes' Knowledge of the New Jersey State Scheme. ................................................................................................................... 21

      4.  The Indictment Does Not Allege Nadine's Knowledge of the Qatar Investment Scheme. ................................................................................................................... 21

      5.  The Indictment Does Not Allege That Uribe or Hana Had Knowledge of, or Furthered the, Federal Prosecution Scheme or the Qatar Investment Scheme ............................ 21

      6.  The Government Mixes-and-Matches the Alleged *Quids*. .......................................... 22

   B.  The Government Improperly Attempts to Avoid a Ruling on the Merits of the Duplicity Motion. ................................................................................................................... 23

III. THE SEVERANCE MOTIONS SHOULD BE GRANTED ................................................. 27

A.  The Government Cannot Dispute the Serious Risk of Substantial Prejudice to Senator Menendez Resulting from a Joint Trial with His Wife Nadine. ........................................ 28

1.  Senator Menendez Provided the Attestation Necessary to Establish He Would Suffer Substantial Prejudice from a Joint Trial........................................................................ 28

2.  The Government Cannot Rebut that Nadine's Assertion of Marital Communications Privilege Would Severely Prejudice the Senator's Trial Rights. ................................ 32

3.  Senator Menendez Should Not Be Forced to Choose Between Testifying in His Own Defense and Maintaining the Adverse Testimonial Privilege. ................................... 35

B.  The Government Has Not Rebutted the Serious Risk of Substantial Prejudice to Senator Menendez Resulting From a Joint Trial with the Conspiracy Defendants. ..................... 39

CONCLUSION..................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alderman v. United States*,
  394 U.S. 165 (1969)...................................................................................31

*Berger v. United States*,
  295 U.S. 78 (1935).....................................................................................3

*D.R. by Rodriguez v. Santos Bakery, Inc.*,
  2023 WL 3736441 (S.D.N.Y. May 31, 2023) ..........................................40

*Old Chief v. United States*,
  519 U.S. 172 (1997)...................................................................................41

*Percoco v. United States*,
  598 U.S. 319 (2023)...................................................................................25

*Trammel v. United States*,
  445 U.S. 40 (1980).....................................................................................32

*United States v. Abdelaziz*,
  68 F.4th 1 (1st Cir. 2023)...........................................................................27

*United States v. Abreu*,
  342 F.3d 183 (2d Cir. 2003)......................................................................39

*United States v. Bari*,
  750 F.2d 1169 (2d Cir. 1984).....................................................................30

*United States v. Barnette*,
  644 F.3d 192 (4th Cir. 2011) .....................................................................31

*United States v. Blondet*,
  2019 WL 5690711 (S.D.N.Y. Nov. 4, 2019) ............................................6

*United States v. Blunt*,
  930 F.3d 119 (3d Cir. 2019)...........................................................27, 29, 37, 38

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987).......................................................................15

*United States v. Boruch*,
  550 F. App'x 30 (2d Cir. 2013) ..................................................................12

*United States v. Carnagie*,
    533 F.3d 1231 (10th Cir. 2008) ......................................................................19

*United States v. Chocron*,
    2021 WL 3005086 (S.D.N.Y. July 14, 2021) ..................................................6

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012).......................................................................7, 13

*United States v. Dobson*,
    2003 WL 22427984 (E.D. Pa. Aug. 18, 2003) ........................................37, 38

*United States v. Dupigny*,
    No. S1 18 Cr. 528 (JMF) (S.D.N.Y. Dec. 12, 2018) ......................................6

*United States v. Elcock*,
    2008 WL 123842 (S.D.N.Y. Jan. 10, 2008) ....................................................6

*United States v. Estes*,
    793 F.2d 465 (2d Cir. 1986)...........................................................................35

*United States v. Freeman*,
    694 F. Supp. 190 (E.D. Va. 1988) .................................................................36

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1988).....................................................................23, 24

*United States v. Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996).................................................................24

*United States v. Galvan*,
    2006 WL 1659610 (D. Colo. June 8, 2006)...................................................36

*United States v. Greenberg*,
    2022 WL 827304 (S.D.N.Y. Mar. 9, 2022) ...................................................20

*United States v. Gross*,
    No. 15 Cr. 769, 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) .....................13

*United States v. Hsieh Hui Mei Chen*,
    754 F.2d 817 (9th Cir. 1985) .........................................................................32

*United States v. Johansen*,
    56 F.3d 347 (2d Cir. 1995).............................................................................24

*United States v. Key*,
    2013 WL 12204221 (S.D.N.Y. Aug. 28, 2013).............................................41

*United States v. Kirk Tang Yuk,*
   885 F.3d 57 (2d Cir. 2018)...........................................................................12, 13

*United States v. LaSpina,*
   299 F.3d 165 (2d Cir. 2002)...............................................................................13

*United States v. Lekacos,*
   151 F.2d 170 (2d Cir. 1945)...............................................................................19

*United States v. Margiotta,*
   646 F.2d 729 (2d Cir. 1981)...............................................................................23

*United States v. Mennuti,*
   679 F.2d 1032 (2d Cir. 1982)........................................................................13, 14

*United States v. Murgio,*
   209 F. Supp. 3d 698 (S.D.N.Y. 2016).................................................................6

*United States v. Percoco,*
   2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ..................................................25

*United States v. Peterson,*
   357 F. Supp. 2d 748 (S.D.N.Y. 2005)............................................................5, 6

*United States v. Prevezon Holdings, Ltd.,*
   251 F. Supp. 3d 684 (S.D.N.Y. 2017)...............................................................14

*United States v. Riley,*
   2014 WL 53440 (S.D.N.Y. Jan. 7, 2014) ...........................................................6

*United States v. Rommy,*
   506 F.3d 108 (2d Cir. 2007)...........................................................................7, 12

*United States v. Rosnow,*
   977 F.2d 399 (8th Cir. 1992) .............................................................................19

*United States v. Rozenfeld,*
   2005 WL 1181966 (2d Cir. May 18, 2005) ..................................................24, 25

*United States v. Rutigliano,*
   790 F.3d 389 (2d Cir. 2015)..........................................................................11, 15

*United States v. Sarshar,*
   No. 21 Cr. 202 (GHW) (S.D.N.Y. Aug. 13, 2021) .............................................26

*United States v. Sasso,*
   78 F.R.D. 292 (S.D.N.Y. 1977) .........................................................................36

*United States v. Shepard,*
   500 F. App'x 20 (2d Cir. 2012) ..................................................................12

*United States v. Shkreli,*
   260 F. Supp. 3d 247 (E.D.N.Y. 2017) .......................................................29

*United States v. Sneed,*
   2022 WL 35801 (N.D. Tex. Jan. 4, 2022) .................................................36

*United States v. Sturdivant,*
   244 F.3d 71 (2d Cir. 2001)........................................................................24

*United States v. Swinton,*
   797 Fed. Appx. 589 (2d Cir. 2019) ...........................................................24

*United States v. Taggart,*
   2008 WL 2705109 (E.D. Ark. July 8, 2008) ............................................31

*United States v. Townsend,*
   924 F.2d 1385 (7th Cir. 1991) ..................................................................19

*United States v. Travers,*
   1998 WL 36030672 (S.D. Fla. July 16, 1998)..........................................30

*United States v. Tutino,*
   883 F.2d 1125 (2d Cir. 1989)....................................................................26

*United States v. Tzolov,*
   642 F.3d 314 (2d Cir. 2011)........................................................................8

*United States v. Ulbricht,*
   31 F. Supp. 3d 540 (S.D.N.Y. 2014)..................................................19, 21

*United States v. Van Hise,*
   No. 12 Cr. 847 (PGG) (S.D.N.Y. Sept. 18, 2013) ....................................6

*United States v. Viserto,*
   596 F.2d 531 (2d Cir. 1979)................................................................24, 25

*United States v. Wey,*
   2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ............................................14

*United States v. Zafiro,*
   506 U.S. 534 (1993)....................................................28, 30, 37, 41

**Statutes**

18 U.S.C. § 201............................................................................................12

18 U.S.C. § 371 ...................................................................................................................8

18 U.S.C. § 3237(a) ..........................................................................................................12

**Other Authorities**

*Effect,* Black's Law Dictionary (11th ed. 2019) ...............................................................8

*Effect*, https://www.merriam-webster.com/dictionary/effect; ..........................................8

Fed. R. Crim. P. 12(d) .........................................................................................................7

Fed. R. Crim. P. 29(a) .........................................................................................................7

Fed. R. Evid. 801(c) ..........................................................................................................40

Fed. R. Evid. 801(d)(2)(E) ...............................................................................................39

**INTRODUCTION**

Senator Menendez's motions target insufficiencies in the Indictment. As the government concedes, the outcome of these motions largely turns on the specific nature of the Indictment's allegations. Yet, when it comes time to *defend* the Indictment from Senator Menendez's attacks, the government instead resorts to *embellishing* its allegations. Ironically, the government thus does exactly what it claims Senator Menendez *may not* do: try to influence the outcome of pre-trial motions by raising factual allegations that are nowhere to be found in the Indictment.

For example, in an effort to plead venue in this district, the Indictment alleges that "[o]n or about June 30, 2018, [Senator Menendez, Nadine, and Defendant Wael Hana] met at a restaurant in Manhattan." Indict. ¶ 75(a). However, in responding to Senator Menendez's argument that meeting at a restaurant, without more, is obviously not an overt act in furtherance of a conspiracy, the government simply declares in its opposition that, at the dinner, Senator Menendez, Nadine, and Hana "arranged for the July 2018 meeting between Menendez and Egyptian Official-1" after which Senator Menendez supposedly informed Defendant Hana that he would approve a sale of military equipment to Egypt. Opp. at 137. None of that is in the Indictment – the government presents this *factual claim* for the first time in its briefing. And, indeed, the claim is undermined by documentary evidence that shows the July 2018 meeting was scheduled through official channels before the June 30, 2018 dinner.

Not only does the government's opposition introduce factual claims *absent from* the Indictment—some of them actually *contradict* the Indictment. For example, in attempting to defend the Indictment against Senator Menendez's charge of improper duplicity by straining to connect the various pled schemes, the government posits (for the first time) that Senator Menendez's alleged "pressure on the USDA served to allow IS EG Halal to become a revenue source to fund bribe payments." Opp. at 94. This is the *opposite* of the Indictment's allegation

that the Egyptian government had already granted the monopoly to IS EG Halal, and that the USDA did not accede to the Senator's requests.  Indict. ¶¶ 24, 30.

Furthermore, in opposing severance, the government avers that "a confidential source" obtained a recording of a conversation which revealed the existence of a bribery scheme involving Senator Menendez.  Opp. at 126 n. 40.  But that recorded conversation does not—at any point—show the Senator's knowing participation in a bribery scheme; rather, as the government *admits*, it describes a scenario in which Defendant Wael Hana shortchanged Senator Menendez and his wife, and then tried to cover it up. *See* ECF No. 137 at 36. Worse still, the government's description of the recording in its Opposition creates the misimpression that the recording captured *Senator Menendez* engaged in unlawful conduct, when in fact it captures two uncharged individuals in conversation about *Defendant Hana's* misconduct.

For purposes of these motions, the question is not whether these embellished or brand new allegations are *true* (though they are not).  The question is whether the Indictment, without the government's unsubstantiated buttressing, stands up to scrutiny.  It does not.

Turning to the merits, each of Senator Menendez's motions presented substantial reasons why proceeding to trial on the Indictment as drafted, with five co-defendants to be tried together, would cause him material prejudice and violate his constitutional rights.  Strikingly, the government's primary response, in each case, is *not* to defend the Indictment and planned trial as constitutionally sufficient and fair, but rather to insist that the case should proceed to trial *despite* its myriad problems, with any constitutional issues to be sorted out after the fact.  On venue, for example, the government urges this Court not to worry about the lack of *any* material connection between the charged crimes and this District, because "the Government may adduce additional facts at trial" which support venue here.  Opp. at 136.  On duplicity, the government insists

(without any citation to apposite authority) that the Second Circuit maintains a "clear rule" that duplicity "is a question of fact to be resolved by a properly instructed jury." Opp. at 100.  And on severance, the government maintains that whatever prejudice may emerge from a joint trial, it's just not "sufficiently severe" to inconvenience the government and force it to hold separate (but constitutionally fair) trials of differently situated groups of co-defendants.  Opp. at 111.

The government's approach—"race ahead to trial now, worry about the Constitution and the rights of the accused later"—is wrongheaded and myopic.  Of course, it runs absolutely counter to the government's "duty to refrain from improper methods calculated to produce a wrongful conviction," *Berger v. United States*, 295 U.S. 78, 88 (1935).  Moreover, it is shortsighted from a practical perspective as well.  The government's request that the Court essentially ignore Senator Menendez's motions pretrial and risk the appellate court's later scrutiny and reversal (in the event of conviction) risks precisely the type of inefficiency that the government claims it seeks to prevent, not to mention ruining the lives and reputations of the defendants based on constitutionally suspect allegations and procedures.  This Court should minimize the risk of turning this case into a years-long debacle by addressing the flaws in the Indictment and planned joint-trial *now*, not leave them for another day as the government urges.

To the extent the government does seek to engage with Senator Menendez's substantive arguments, its efforts fail.  It is clear that no "essential conduct" occurred in this District, so the government offers new allegations in an effort to tie the Indictment's trivial "overt acts" in the Southern District of New York—one text message, two dinners, and the resale of a gold bar by a non-conspirator jeweler—to the charged scheme.  But none satisfies the legal test for an "overt act."  On duplicity, the government cannot allege a single conspiracy because it fails to point to sufficient "mutual dependence" between the co-defendants.  And, on severance, the government

3

offers no meaningful response to the showing that a joint trial of Senator Menendez and his co-defendants would be highly prejudicial, and would compromise Senator Menendez's trial rights and his ability to offer exculpatory testimony, given his wife's intended assertion of privilege over confidential, exculpatory communications between spouses.  The government instead rests on the claim that this prejudice just isn't enough to warrant the expense of multiple trials, while ignoring that, if a joint trial is later found to be improper, there will be multiple trials anyway. For all of these reasons, and the reasons set forth in Senator Menendez's moving brief, the motions should be granted.

## ARGUMENT

## I.     VENUE IN THIS DISTRICT IS IMPROPER

The government doubles down on its effort to keep this case in the Southern District of New York, away from a New Jersey jury, despite the fact that all defendants reside in New Jersey, the alleged bribes were allegedly paid in New Jersey, the purported "official acts" were allegedly done to benefit New Jersey individuals and entities, and, perhaps most importantly, Senator Menendez is accused of breaching the trust of the people of New Jersey. In every relevant respect, this case centers on New Jersey. But the government—perhaps still stinging from a New Jersey jury's rebuke of its last case against the Senator—tries to overcome all of that by invoking allegations of contacts with Manhattan that have no connection to the alleged crimes committed here: two insignificant dinners, a cellphone being used in New Jersey or New York (the government never specifies) that happens to ping a cell tower in Manhattan, and a resale of gold by a jeweler (who is not even alleged to be a co-conspirator). None of that suffices to support venue in this District, and the proffers in the government's brief only further weaken its case. So the government ultimately argues that the Court should simply trust that it will bring the goods at trial. That ask is neither legally defensible nor prudent. Nor does it justify depriving a

New Jersey jury of the right to try this case, which should decide the fate of one of their sitting U.S. senators.

**A.      The Government's Desired Pleading Standard Is No Standard At All.**

Likely recognizing that the overt acts charged in the Indictment cannot sustain venue—and, indeed, abandoning one overt act altogether (the Bronx bank account, Indict. ¶ 75(b))—the government leans on the pleading standard. It implores the Court to give it the benefit of the doubt—to allow nothing more than boilerplate assertions that the "conduct occurred 'in the Southern District of New York and elsewhere'" to suffice to get to trial in this venue. Opp. at 131.

The government is mistaken that a boilerplate legal conclusion regarding venue suffices. Rather, as the government later acknowledges, on a pretrial motion challenging venue, it is the government's burden to "allege facts sufficient to support venue." *Id.* (citing *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005)). Contrary to the government's protest (Opp. at 137), that is not to say that it must, at this stage, "*prove* venue by a preponderance of the evidence." Here, the government has failed to allege facts that, *even if accepted as true*, would establish that overt acts in furtherance of the charged schemes occurred in this District.

Rule 18 requires that the government have a factual basis for venue ***before*** instituting a case. It is not too much to ask for it to allege that basis in the indictment—to "allege[] facts sufficient to support venue." *Peterson*, 357 F. Supp. 2d at 751 (citations omitted). Indeed, it would eviscerate the purpose of Rule 12, and the notice function of an indictment, if the government could proceed to trial having alleged no facts whatsoever in support of its choice of venue, resting only on a boilerplate assertion that a defendant violated the statute in this District. If the Court were to permit that, defendants would effectively be deprived of the opportunity to prepare a trial rebuttal to the government's theory of venue (based on, for example, the

5

inaccuracy of the government's venue allegations). To take just one example, had the government not identified the opening of the Bronx Bank Account as an overt act in its Indictment—which the government now has seemingly abandoned—it might have offered the bank documents at trial and waited until summation (or, worse, rebuttal summation) to first raise the opening of the Bank account as an overt act. This type of "trial by ambush" is exactly the prejudice Defendant would face where, as the government urges here, the venue allegations are not fully enumerated and tested pretrial. This risk is particularly dramatic in cases, like this one, that allege sweeping, multi-year conspiracies, and where the government intends to use vanishingly remote connections to the District to prove venue.

The district court cases on which the government relies are inapposite because the vast majority involved allegations of specific conduct in the District, not just conclusory assertions.[1] In other words, in those cases the government *met* its burden to allege in the indictment "facts sufficient to support venue." *Peterson*, 357 F. Supp. 2d at 751. Here the government does not.

---

[1] *See, e.g.*, *United States v. Elcock*, No. 07 Cr. 582 (CM), 2008 WL 123842, at *1 (S.D.N.Y. Jan. 10, 2008) (indictment alleging, in a "to wit" clause, that the defendant "accessed, without authorization, several accounts at a bank where she was employed, and shared information about those accounts with co-conspirators for the purpose of fraudulently obtaining the funds in those accounts, resulting in a loss in excess of $1 million"); *United States v. Chocron*, No. 20 Cr. 400 (JSR), 2021 WL 3005086, at *2 (S.D.N.Y. July 14, 2021) (criminal complaint alleging that the defendant agreed to launder money using a bank account in the District); *United States v. Blondet*, No. 16 Cr. 387 (JMF), 2019 WL 5690711, at *1 (S.D.N.Y. Nov. 4, 2019) (indictment alleging that RICO organization "'traffick[ed] cocaine' into the Bronx and engaged in racketeering activity 'in the Southern District of New York and elsewhere.'"); *United States v. Dupigny*, No. S1 18 Cr. 528 (JMF) (S.D.N.Y. Dec. 12, 2018), ECF No. 50 (indictment alleging a sex-trafficking conspiracy centered on a single residential facility in the District); *United States v. Murgio*, 209 F. Supp. 3d 698, 721 (S.D.N.Y. 2016) (indictment alleging that the defendant "accepted bribes" in the District); *United States v. Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440, at *3 (S.D.N.Y. Jan. 7, 2014) (indictment alleging that the defendants caused shares to be traded fraudulently in the District); *United States v. Van Hise*, No. 12 Cr. 847 (PGG) (S.D.N.Y. Sept. 18, 2013), ECF No. 204, at ¶ 3(a) (indictment alleging that defendants "met and discussed a plan to kidnap women" in the District).

Although the venue allegations are legally insufficient on their face, the Court should at minimum exercise its authority to hold an evidentiary hearing. *See* 1A Wright & Miller, Federal Criminal Practice & Procedure § 195 (5th ed., Apr. 2023 update) ("[A] court in its discretion may conduct a hearing before making its ruling.").[2] Whether on the papers or based on a hearing, a decision on whether the government can sufficiently establish proper venue should not await trial. A pre-trial decision would avoid the burden and expense, to the parties and the Court, of going to trial in the wrong venue only to face a second trial in a proper one.

### B. The Indictment Fails to Allege Legally Sufficient Overt Acts.

The Indictment's only factual allegations supporting venue are five alleged "overt acts" that the government now claims furthered the alleged conspiracy. *See* Indict. ¶¶ 75, 83.[3] These allegations are legally insufficient on their face to establish venue, even (or especially) in light of

---

[2] Contrary to the government's assertion (Opp. at 146 n.48), the Court has the inherent discretion to hold an evidentiary hearing to test the sufficiency of the government's venue allegations and evidence before trial. Under Federal Rule of Criminal Procedure 12(d), "[t]he Court must decide every pretrial motion before trial unless it finds good cause to defer a ruling." The government relies (Opp. at 19, 146 n.48) on cases holding it inappropriate to test the sufficiency of *merits* evidence before trial—that is, evidence going to an element of the charged offense. But, as the Second Circuit has long held, venue is not a merits question. *See United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007). Nor are the venue allegations in the Indictment here "so entwined with the merits of each count that a decision should not be made prior to trial." Opp. at 146 n.48 (quoting *United States v. Callahan*, 300 F. Supp. 519, 522 (S.D.N.Y. 1969)). Indeed, the Indictment barely mentions the venue allegations, which shows that the court can easily hold a short evidentiary hearing on venue to determine whether this case should even progress to a jury trial in this District—which would be consistent with the Court's important gatekeeper role of ensuring that only meritorious cases (e.g., those supported by sufficient evidence) proceed to the jury. *Cf.* Fed. R. Crim. P. 29(a) ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.").

[3] The Indictment alleges these acts only with respect to Counts One and Four. Counts Two and Three do not allege any overt acts in this District, nor do they incorporate these overt acts by reference. *See* Indict. ¶¶ 76-80. So even if the overt acts alleged in paragraphs 75 and 80 are deemed sufficient, Counts Two and Three would still require dismissal. *See United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012) ("Where, as here, a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge.") (citations omitted).

the proffers in the government's brief, because they would not qualify as overt acts even if proven at trial.

To qualify as an overt act, the act's purpose must be "to effect the object of the conspiracy." 18 U.S.C. § 371; *see also United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) ("An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy."). To "effect" something is "to cause [it] to come into being." *Effect*, https://www.merriam-webster.com/dictionary/effect; *see also Effect,* Black's Law Dictionary (11th ed. 2019) ("To bring about; to make happen"). In other words, an overt act must aim to do something that would be a but-for cause of the conspiracy's criminal objective.

The Second Circuit has applied this standard when assessing challenges to venue. *See Tzolov*, 642 F.3d at 320 (2d Cir. 2011) ("A reasonable jury could have concluded that Butler and Tzolov's travel through the Eastern District was in furtherance of the conspiracy because, had they not done so, the face-to-face meetings with potential investors, which was a regular part of their fraudulent scheme, would not have occurred.").

The government takes issue (Opp. at 138-39) with this common-sense standard, asserting—without citing any authority—that some lesser standard of causation should apply and that *Tzolov* found but-for causation to be sufficient but did not hold that it was necessary. But the government's brief does not suggest what that standard should be. Nor does it offer any basis for its suggestion that the Second Circuit in *Tzolov* had some lesser "necessary" standard in mind that it declined to specify. Whatever the standard is, however, the proffer by the government certainly doesn't pass the "straight-face" test to support the government's claim that the overt act was somehow in furtherance of (or sufficiently advanced) the charged scheme.

Under the proper standards, the government's venue allegations—even if accepted as true, and even in light of the government's proffers—are insufficient.

### 1.    Bronx Bank Account

Although the Indictment alleges venue based on a payment made from a bank account that had originally been opened at a bank branch in the Bronx (Indict. ¶ 75(b)), the government notably abandons that allegation as a basis for venue in its brief. For good reason: as the government well knew (but did not disclose in its Indictment), no part of the alleged payments touched the District at all, and the bank account was opened at a branch in the Bronx two years before the conspiracy was alleged to have begun. (*See* Menendez Second Mot. 12-13.) That the government advanced this allegation as an overt act in furtherance of the conspiracy—and the Grand Jury returned three indictments containing that allegation—only goes to show why the Court should rigorously hold the government to its burden at this stage, including by holding an evidentiary hearing on venue.

### 2.    Restaurant Meetings

The government's unsworn factual proffers in its brief (Opp. at 137-39) make it even clearer that there is no *there* there.

With respect to the alleged meeting on June 30, 2018, the government asserts for the first time that, at that June 30 dinner, the Senator, Nadine Menendez, and Hana "arranged for the July 2018 meeting between Menendez and Egyptian Official-1," which meeting in turn caused the Senator to "notif[y]" Hana of his plan to approve some military aid to Egypt. (Opp. at 137). These claims appear nowhere in the Indictment and appear to be pure speculation.[4] And, as often

---

[4] The government refused Senator Menendez's request to disclose its basis for this and several other assertions made for the first time in its brief. Weitzman Reply Decl. Ex. A (February 12, 2024 Email from Lara Pomerantz).

happens with speculation, it's contradicted by evidence. The July 2018 dinner with Egyptian Official-1 occurred four weeks after the June 30, 2018 dinner and was based on an official invitation from an Egyptian delegation sent to the Senator's staff days before the June 30 dinner. *See* Weitzman Reply Decl. Ex. B (SDNY_R11_00468397). There is no causal nexus between the two.

But even putting that aside, discussing at one dinner another dinner that is scheduled for weeks later is hardly an overt act in furtherance of the charged conspiracy. As mentioned, the July 2018 dinner was being scheduled separately by an Egyptian delegation through official channels. The June 2018 dinner was neither a but-for nor a proximate cause of the July 2018 dinner; it was, rather, completely incidental to it.

Moreover, even if the June 2018 dinner *did* somehow advance or cause the July 2018 dinner, even the latter is not plausibly alleged to have been an overt act. Although the government now claims that the "July 2018 meeting resulted in Menendez's notification of Hana" of his intent to approve a sale of weapons to Egypt, the Indictment notably includes no such allegation, or anything about what occurred at the July 2018 dinner. (*See* Indict. ¶ 20). Indeed, the government's use of the phrase "resulted in" only exposes that the alleged notification of the weapons sale was not made at the July 2018 dinner; indeed, the Indictment alleges it occurred in a text message that was sent on July 26, 2018, not at a dinner that occurred on an unspecified date "[i]n or about July 2018." *Id.*

In short, the government's felt-need to embellish makes clear that the Indictment fails to allege that the June 30 restaurant meeting was intended to effect or accomplish any part of any crime. It therefore cannot support venue.

The same is true of the alleged dinner meeting on September 21, 2019. The government claims in its brief that the Senator and an Egyptian official discussed Egyptian investment in the United States at this meeting, which caused the Egyptian government to begin discussing such investment with Daibes. Even accepting this unsupported allegation as true, Egyptian investment in the United States is not part of any charged scheme. Indeed, there is no allegation in the Indictment regarding a corrupt Egyptian investment with Daibes. The government knows as much, which is why it alleges instead that the September dinner vaguely "furthered the corrupt relationship." Opp. at 139. That is not the relevant standard. To qualify as an overt act, this meeting needed to further the accomplishment of the alleged criminal objective. And neither the Indictment nor the government's proffer alleges facts sufficient to support such a conclusion.

### 3. Text Message

The government defends (Opp. at 139-43) its allegation that a single text message, between two other alleged conspirators, bouncing off a Manhattan cell tower establishes proper venue for this entire case under the Constitution and Rule 18. *See* Indict. ¶ 75(c). Such fleeting contact is legally insufficient here.

The government relies on wire-fraud cases, such as *United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015), for the proposition that venue is proper in any district through which a wire transmission passes. Those holdings concerned a wire fraud charge—where transmission over wires is a central element of the substantive offense—but such fleeting engagement with this District should not support venue for offenses where the incidental use of a cell phone forms no part of the underlying charge.[5] Indeed, although the venue statute permits the prosecution of a

---

[5] While Count Two of the Indictment alleges conspiracy to commit honest-services wire fraud, the Indictment alleges the text message only to support venue with respect to Count One, conspiracy to commit bribery. *See* Indict. ¶¶ 75(b), 76 (incorporating by reference only paragraphs 1 through 70).

11

wire fraud "in any district from, *through*, or into which such commerce, mail matter, or imported object or person moves," other offenses against the United States (such as a bribery charge under 18 U.S.C. § 201) can only be prosecuted "in any district in which such offense was begun, continued, or completed." *See* 18 U.S.C. § 3237(a) (emphasis added). The absence of the word "through" for venue over other offenses is critical. Thus, in non-wire-fraud conspiracy cases, the courts chiefly consider where a communication originated and where it was received, not the districts it passed through. *See, e.g.*, *United States v. Rommy*, 506 F.3d 108, 122-23 (2d Cir. 2007) (emphasis added) (focusing on where a phone call was made or received in a drug-importation conspiracy, reasoning that, "[w]hen a conspirator uses a telephone call—by whomever initiated—to further a criminal scheme, the conspirator effectively propels not only his voice but the scheme itself beyond his own physical location *into that of the person with whom he is speaking*") (emphasis added).

Even if *Rutigliano* controlled for offenses without an interstate commerce jurisdictional hook (such as 18 U.S.C. § 201), it does not eliminate the requirement that an overt act's connection to the venue be "reasonably foreseeable" to each defendant. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018). Here, the government alleges no facts to support that the momentary and incidental ping to a Manhattan cell tower—to relay a text message between two New Jersey residents, in the absence of any allegation that either sender or receiver was in this District—was reasonably foreseeable to the Senator.[6]

---

[6] The government cites cases finding that a co-conspirator's *physical presence* in the Southern District was reasonably foreseeable to the defendant based on some special knowledge of the co-conspirator or on common knowledge about transportation through the New York metropolitan area. *See, e.g.*, *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) (that transportation of cash to Brooklyn and Queens likely touched Manhattan); *United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012) (that transporting drugs from New Jersey to Brooklyn likely

### 4.    Sale of Gold

Finally, the government maintains (Opp. at 143-44) that Nadine's sale of gold in New Jersey to a Jeweler in New Jersey, who in turn sold the gold in Manhattan, was an overt act intended to accomplish bribery. It was not. A bribe is not accomplished by converting into cash a bribe that has already been paid. "Where the object of a conspiracy is economic, the conspiracy generally 'continues until the conspirators receive their anticipated economic benefits.'" *United States v. LaSpina*, 299 F.3d 165, 175 (2d Cir. 2002) (quoting *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir. 1982)). What the conspirator does with those benefits is generally not within the conspiracy's scope. *See Mennuti*, 679 F.2d at 1035 (defendant's economic object in the conspiracy "was not the resale of the property, but its purchase at a bargain price"). The Indictment does not assert, nor does the government claim, that an object of the alleged conspiracy was the conversion of gold into cash. Thus, even Nadine's sale of the gold to the jeweler was beyond the scope of the alleged conspiracy, and the non-conspirator jeweler's *sale* of the gold in Manhattan is one step even further removed. The allegation of a sale of a gold bar in Manhattan is an almost comical hook for venue here.

---

involved travel through the District); *United States v. Davis*, 689 F.3d 179, 188-89 (2d Cir. 2012) (that defendants with experience robbing drug dealers in the Bronx could reasonably infer that a drug dealer who lived near the Bronx likely dealt at least some drugs there); *United States v. Gross*, No. 15 Cr. 769, 2017 WL 4685111, at *40 (S.D.N.Y. Oct. 18, 2017) (that an essential email would likely be sent by a co-conspirator while in Manhattan, based on the defendant's knowledge of the co-conspirator's frequent visits there).

As these cases reflect, there must be "some sense of venue having been freely chosen by the defendant." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)). The government simply makes no reasonable allegation that Senator Menendez freely chose this District based on a single cell-tower ping that did not even involve his phone.

In a futile effort to bring the sales within the scope of the conspiracy, the government offers a question-begging standard: an act qualifies as an "overt act," the government claims, if it takes place during a time period when overt acts are still taking place. *See* Opp. at 143. Unsurprisingly, the government cites no authority to support this tautology. Under the correct standard, the key factor is whether the act accomplishes an objective within the scope of the conspiracy, not whether it takes place at a particular point in time during the life of the conspiracy. *See Mennuti*, 679 F.2d at 1035. A securities-fraud conspirator does not commit an overt act every time he uses ill-gotten gains to buy himself lunch, regardless of whether the conspiracy is still ongoing when he visits the deli.[7]

As a backup theory, the government now intimates (Opp. at 144)—for the first time— that Nadine Menendez sold the gold bars as a way to "conceal[] the source of this income." That still would not reach the jeweler's decision to sell the gold in Manhattan. Regardless, the government alleges no factual basis for this theory. And for good reason. If a bribe-taker wanted to conceal the source of gold bars, she would not sell them to a jeweler, serial numbers intact, receive the proceeds by check, and then deposit that check in the bank. *See* Opp. at 142. This theory is as desperate as it is silly. It certainly fails to satisfy the "substantial contacts" test, which applies here given the prejudice to Senator Menendez resulting from having a non-New

---

[7] The government cites (Opp. at 144) *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017), and *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684 (S.D.N.Y. 2017), for the proposition that laundering money qualifies as an overt act that furthers bribery. But, unlike here, the defendants in both of those cases ***were charged with money laundering***. *Wey*, 2017 WL 237651, at *2; *Prevezon*, 251 F. Supp. 3d at 688. Moreover, contrary to the government's assertion, *Wey* had nothing to do with whether money laundering qualified as an overt act. Rather, the court in *Wey* considered whether a conspiracy charge was impermissibly duplicitous for alleging the manipulation of three different securities. 2017 WL 237651, at *4. Nor did *Prevezon* have anything to do with whether conduct qualifies as overt acts. *See* 251 F. Supp. 3d at 690.

14

Jersey jury adjudicate this case. *See Rutigliano*, 790 F.3d at 393 ("'substantial contacts' inquiry is required where . . . defendants . . . argue that prosecution in the Southern District of New York caused them hardship, prejudice, or otherwise undermined the fairness of their trial.")

### C.     At A Minimum, A Bill Of Particulars On Venue Is Required.

While dismissal for improper venue is required, the Court should at least require that the government file a bill of particulars detailing its asserted bases for venue in this District. The Indictment's venue allegations make clear the government's intent to rely on picayune evidence with vanishingly remote connection to this District—such as a single ping to a cell tower, Indict. ¶ 75(c), or an associate's bank account opened at a branch in the Bronx long ago, *id.* ¶ 75(c). Defendants cannot reasonably be expected to anticipate and defend against every conceivable, as-yet-unstated allegation of this kind at trial. Digging through tens of millions of pages of discovery for *substantive* evidence is challenge enough. But identifying each scintilla of evidence suggesting a brush with this District—in an ocean of paper—is virtually impossible.

The government's referring Defendants to this discovery (*see* Opp. at 172) is inadequate. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (holding that "merely . . . providing mountains of documents to defense counsel" is insufficient). So is referring to the unsworn factual allegations made in its brief. *See* Opp. at 172. The government has refused Senator Menendez's request to describe its basis for the many new factual assertions made in these proffers. Weitzman Reply Decl. Ex. A (February 12, 2024 Email from Lara Pomerantz). And the government's brief makes clear that those proffers are only "example[s]" (Opp. at 136, 138, 139) and that it reserves the right to "adduce additional facts at trial bearing on venue" (Opp. at 136). If those proffers constitute the universe of the government's venue allegations, it should represent as much to the Court and the Defendants. Otherwise, a bill of particulars is more than warranted.

### D.    Alternatively, a Rule 21 Transfer to New Jersey is Warranted.

The government spills considerable ink—almost twelve pages (Opp. at 146-57)—ticking through the *Platt* factors. In doing so, it fails to make a case for venue in this District, asserting merely that its choice of venue should be respected. The government, however, does not dispute that no defendant lives in this District (Opp. at 148), and it does not identify any witnesses located in the Southern District of New York (Opp. at 150-51). Nor does the government dispute that the bulk of the alleged events occurred in New Jersey. *See* Opp. at 152.

More importantly, the government offers no answer to Senator Menendez's core basis for seeking transfer under Rule 21—that an out-of-state jury should not decide the fate of New Jersey's elected representative to the U.S. Senate.

The democratic implications of this case should not be taken lightly. This is not a commonplace prosecution; it is a case that implicates not only the delicate balance of power between the branches, but the democratic interests of New Jerseyans. The government asks this Court to countenance a New York jury's taking New Jerseyans' choice of representative into their hands—based on a couple of dinners, a jeweler's sale of gold, and a ping to a Manhattan cell tower. Especially given the weighty interests at stake, the Court should exercise its discretion to transfer this case to where it belongs—New Jersey.

## II.    THE INDICTMENT IS DUPLICITOUS

The government implores the Court to defer a pretrial ruling on the Indictment's duplicity.  Its motive is plain:  if the government can *just get to trial* it will use this duplicitous Indictment to unfairly prejudice the Senator's defense and (in the event of a conviction) defend its errors on appeal under a more government-friendly standard.

But the law, not strategy, should prevail.  Well-settled precedent plainly requires dismissal on duplicity grounds—here, for the government to produce an indictment that charges

each alleged scheme as an independent count.  That's why the government so heavily relies on the law of multiple conspiracies, rather than the law surrounding duplicity.  Whereas the latter requires a judge to consider solely an indictment's allegations to determine if duplicity exists (*i.e.,* if multiple conspiracies are embedded in a single count), the law of multiple conspiracies requires the jury to review the evidence presented at trial to determine whether multiple conspiracies were proven.  The instant motion does not challenge the evidence, but rather the allegations and counts charged in the Indictment.  Each count in the Indictment charges five separate schemes that are not mutually dependent and interrelated.  The law plainly requires the government to replead the Indictment after dismissal.

Tacitly acknowledging the defects in the Indictment, the government's Opposition includes new allegations not contained in the Indictment, including allegations that *contradict* the Indictment.  The government, however, does not cite any evidence for those new or contradictory allegations, imploring the Court to simply "trust but *do not* verify."  None of the new allegations in any event cure the Indictment's many material holes or undermine the Indictment's duplicity.

As telling is the government's tacit admissions.  The government does not dispute that it can proceed with this case with each of the alleged schemes charged in a separate conspiracy.  Nor does the government dispute that such a more-clearly delineated Indictment would better protect the Senator's rights, including providing notice of which acts are alleged to constitute "official acts" under *McDonnell*, and ensuring that the jury renders its verdict as to each scheme with unanimity.

Why didn't the government proceed in this fashion?  *Because it wants to win*.  If the government can proceed with this Indictment, it can and will invite the jury to convict on a non-unanimous basis based on any one of the alleged schemes.  The government revealed as much by

17

arguing that it is irrelevant whether *each* scheme charges an "official act" so long as *any one* such scheme constitutes an "official act" under *McDonnell*. *See* Opp. at 17. In other words, the government wants an outcome where, for example, three groups of jurors find one—and only one—of the alleged schemes was proven beyond a reasonable doubt, without agreement as to which scheme was proven: 4 jurors for the IS EG Halal Scheme, 4 for the Qatar Investment Scheme, and 4 for the New Jersey State Scheme. That is the sort of conviction the government is trying to obtain, and it is precisely the outcome that the body of case law regarding duplicitous indictments *prohibits*. The arising prejudice raises a very real appellate issue that would jeopardize the entire trial; in the event that the Second Circuit finds this unprecedented indictment prejudicially charged a rimless hub-and-spoke conspiracy, the Second Circuit would likely vacate any conviction and require the government to re-file a non-duplicitous indictment and restart the process anew. Indeed, further demonstrating the prejudice to the Senator is the fact that, by filing a duplicitous indictment, the government evades its burden to prove venue as to each scheme in the Indictment—which the government cannot and does not even attempt to do. This only further heightens the risk of appellate reversal. Proceeding as the government has charged is thus the height of inefficiency, which can be easily resolved, without any prejudice to the government or this Court's trial schedule, through a superseding indictment now.[8]

### A.  The Government Cannot Defend the Indictment As Written.

The government's brief distorts the facts to create a narrative of mutual interdependence where none exists, recreating each alleged scheme through unsworn and unsupported statements in its brief that are at odds with the allegations in the Indictment. Opp. at 90; *see also* ECF 137

---

[8] This motion is not a delay tactic. Senator Menendez does not intend to seek a trial adjournment if the government complies with a Court order requiring a superseding indictment separately charging each scheme, as requested in this motion.

at 18–20; *United States v.* Payne, 591 F.3d 46, 61 (2d Cir. 2010).  The government tellingly does not dispute—or even acknowledge—the "hub and spoke" analysis in Senator Menendez's opening brief, and it is the proper lens through which the Court must analyze the issue.  Thus, to prove a single overarching conspiracy, "the Government must show that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other. . . . The Government must prove that 'each defendant participated in the conspiracy with the common goal or purpose of the other defendants.'"  *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (cleaned up; citations omitted).

The government does not—and cannot—do this.  At bottom, its principal (really, only) argument is that the schemes all centered around Senator Menendez, and that their participants generally all wanted to similarly benefit from their relationship with him.  But that is by definition *not* a single conspiracy under well-settled law.  People are not co-conspirators merely because they pursue "similar or parallel objectives."  *United States v. Carnagie*, 533 F.3d 1231, 1238-39 (10th Cir. 2008) (citation and internal quotations omitted).  Nor does that change, *even when* they are aware that those related schemes revolve around the same hub.  *United States v. Townsend*, 924 F.2d 1385, 1397 (7th Cir. 1991); *see also, e.g.*, *United States v. Rosnow*, 977 F.2d 399, 403-06 & n.13 (8th Cir. 1992) ("[M]ere knowledge of another similarly motivated conspiracy or an overlap in personnel [does] not prove one overall agreement") (cleaned up; citations omitted).  As Judge Learned Hand explained in rejecting a very similar theory of conspiracy, people are only "confederates" when they participate in a single "venture"; it is not enough to participate in parallel schemes, however mutually beneficial.  *United States v. Lekacos*, 151 F.2d 170, 172-73 (2d Cir. 1945), *rev'd on other grounds, Kotteakos v. United States*, 328 U.S. 750 (1946) (affirming this holding, but reversing on prejudice).

Perhaps aware that the Indictment fails to clear this bar, the government tries to rewrite it. Even as the government concedes the Court can only consider the indictment "on its face," *United States v. Greenberg*, No. 21 Cr. 92 (AJN), 2022 WL 827304, at *11 (S.D.N.Y. Mar. 9, 2022), the government distorts its own allegations in an attempt to manufacture mutual dependence and assistance.  To take just a few examples from its brief:

1. **The IS EG Halal and Egyptian Aid Schemes Are Not Mutually Dependent.**

The government attempts to show mutual dependence of these two schemes by arguing (without any support) that Senator Menendez's "pressure on the USDA served to allow IS EG Halal to become a revenue source to fund bribe payments" to support the Egyptian Aid Scheme. Opp. at 94.  This is at war with the allegations of the Indictment, which clearly state that the Egyptian government *had already granted the monopoly* to IS EG Halal, and that the USDA *did not accede* to the Senator's requests.  Indict. ¶¶ 24, 30.  Whatever occurred in the discussion between the Senator and the USDA official, it had no effect on the monopoly to IS EG Halal, based on the government's own Indictment.  The two schemes are not mutually dependent in any way.

2. **The Indictment Does Not Allege Daibes' Knowledge of the IS EG Halal Scheme.**

In its opposition, the government for the first time claims that Daibes was "an underwriter of the IS EG Halal bribe payments."  Opp. at 95.  That allegation appears nowhere in the Indictment. Rather, the Indictment only alleges that Hana operated IS EG Halal "with financial support and backing from" Daibes.  Indict. ¶ 22.  Daibes' role as an early investor in IS EG Halal simply does not support the government's leap that Daibes underwrote bribe payments, or that he had any knowledge of the alleged illegal objectives of the IS EG Halal Scheme.

### 3. The Indictment Does Not Allege Daibes' Knowledge of the New Jersey State Scheme.

The government attempts to link Daibes to the New Jersey State Scheme because "Hana twice asked Daibes" to fund a purchase of a Mercedes-Benz for Nadine, which Daibes ultimately did not fund.  Opp. at 94.  Again, this unsupported allegation appears nowhere in the Indictment.  And if anything, it shows that there was no mutual dependence, since Daibes did *not* fund the purchase of the Mercedes-Benz.  Nor does the government allege any knowing involvement by Daibes in, or his knowledge of, the New Jersey State Scheme.  Indeed, the government elsewhere concedes that "Daibes is not alleged to have been aware of Uribe's actions" (Opp. at 113), meaning he was unaware that Uribe allegedly purchased the car in connection with the New Jersey State Scheme.

### 4. The Indictment Does Not Allege Nadine's Knowledge of the Qatar Investment Scheme.

The government claims Nadine participated in the Qatar Investment Scheme solely by virtue of receiving something of value.  Opp. at 94.  Neither the Indictment nor the government's brief alleges Nadine participated in or took any action related to the Qatar Investment Scheme, that she had knowledge of the Qatar fund's investment in Daibes's project, or was even aware of the Senate resolution that the government alleges is the "official act" justifying its charges.  Absent such knowledge of "the common goal or purpose of the other defendants," *United States v. Ulbricht*, 31 F. Supp. 3d at 554, there was no mutual dependence to sustain a connection between these spokes.

### 5. The Indictment Does Not Allege That Uribe or Hana Had Knowledge of, or Furthered the, Federal Prosecution Scheme or the Qatar Investment Scheme.

The government concedes that "Uribe and Hana [are not] alleged to have been aware of all of Daibes's actions."  Opp. at 113.  This means that, coupled with the omissions in the

Indictment, neither was aware of the Federal Prosecution or Qatar Investment Scheme.  Opp. at 113.  Further, by omission, the government concedes that Uribe had no knowledge of the Egyptian Aid Scheme.  Opp. at 93–95.[9]

### 6.    The Government Mixes-and-Matches the Alleged *Quids*.

The government further distorts its own Indictment by claiming that the various alleged bribes supported multiple supposed schemes.  It now contends that the Egyptian Aid Scheme and the New Jersey State Scheme are linked because "the promises of the Mercedes-Benz Convertible served, in part, to sustain the corrupt relationship during the critical time period before Hana could deliver the promised payments from IS EG Halal."  Opp. at 94.  Undisclosed, however, is that the Indictment says the opposite.  Far from linking the Mercedes-Benz in any way to the Egyptian Aid Scheme, the Indictment clearly alleges—in paragraphs *and in headings*—that Nadine received the Mercedes-Benz Convertible *only* in relation to the New Jersey State Scheme.  *See* Indict. ¶¶ 39, 43.  And the actual timeline of events disproves the government's newfound claim:  Nadine received the Mercedes-Benz on April 5, 2019 (*Id*. ¶ 43(e)), but Menendez is alleged to have "offered to provide his assistance to Egypt" "in or about September 2019."  *Id*. ¶ 36.  By then, however, IS EG Halal was up and running, and allegedly providing payments to Nadine.  *Id*. ¶ 34.  Thus, contrary to the government's claims in its efforts to show inter-dependence, the Mercedes-Benz payments have no connection to the Egyptian Aid Scheme.

---

[9] The government attempts to link Hana to the Federal Prosecution and/or Qatar Investment Schemes based on an unrelated text from Nadine to Hana about "sign[ing] off" on an Egyptian foreign aid bill that took place near in time to an alleged payment by Daibes attributed to the Federal Prosecution and/or Qatar Investment Schemes.  Opp. at 94–95.  Similar to the government's attempt to link Daibes to the Egyptian Aid Scheme, this text does not show mutual dependence amongst schemes, actions in furtherance of the Qatar Investment Scheme by Hana, or even that Hana had knowledge of the Qatar Investment Scheme.

Finally, as a last-gasp effort, the government attempts to fill the holes in its Indictment by alleging that there was "temporal overlap" to the various spokes.  See, e.g., Opp. at 93 n. 31, 95, 98 n. 34. Of course, with a conspiracy that charges a 5-year period ("January 2018 through at least in or about 2023", Indict. ¶ 72), everything has temporal overlap.  But that obscures the lack of actual overlap between the schemes, which involve different official acts, different start dates, different participants, and different objectives.  ECF 137 at 24.

Allowing such unfocused conspiracy counts to advance would trigger the very real concerns of prejudice underlying the duplicity doctrine—concerns the government acknowledges could exist.  Opp. at 88 (citing *United States v. Sturdivant*, 244 F.3d 71, 77–78 (2d Cir. 2001)); *see also United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir. 1981).  The Senator's defenses will risk being lost in the sea of allegations contained in the duplicitous counts, leaving jurors with the impossible task of piecing together unrelated events, or worse yet, convicting on a non-unanimous basis.  To avoid the risk of substantial prejudice, this Court can and should find that Counts I, II, and III of the Indictment are impermissibly duplicitous and require the government to remedy through a superseding indictment that would in no way alter the trial schedule or otherwise unfairly prejudice the government's case.

**B.    The Government Improperly Attempts to Avoid a Ruling on the Merits of the Duplicity Motion.**

In an effort to avoid any ruling on the defense's duplicity motion, the government repeatedly advances the contention that the determination of whether the indictment has charged a single conspiracy or multiple conspiracies "is a question of fact for the jury."  Opp. at 89 (citations omitted).  However, several of the cases on which the government relies concern post-conviction challenges to the evidence, including "that the *evidence* demonstrated multiple conspiracies rather than the single conspiracy charged in the indictment," *United States v. Friedman*, 854 F.2d 535,

541 (2d Cir. 1988) (emphasis added), and that "there was a 'variance' between the indictment, which alleged a single conspiracy, *and the proof at trial*, which, at best, tended to prove several independent conspiracies," *United States v. Johansen*, 56 F.3d 347, 350 (2d Cir. 1995) (emphasis added).  While the government cites both *Friedman* and *Johansen* to support the proposition that a duplicity motion is a question of fact for the jury (Opp. at 89), neither appeal involved a duplicity motion.[10]

And, indeed, no Second Circuit case has ever held, to our knowledge, that *duplicity* is a matter for the jury rather than the Court.  In fact, it is settled law in the Second Circuit that a duplicity claim based on a facial defect in an indictment is *waived* if duplicity is not challenged before trial.  *See Sturdivant*, 244 F.3d at 76 (finding a conspiracy duplicity claim is waived if the "alleged duplicitous character of the counts *appears on the face of the indictment*" but not waived "where the claimed defect in the indictment was not apparent on its face at the institution of the proceeding.") (internal citations omitted) (emphasis in original); *United States v. Swinton*, 797 Fed. Appx. 589, 598 (2d Cir. 2019) (same).[11]  It therefore is incorrect to suggest that this Court cannot rule on duplicity pre-trial, for failure to raise that defense can result in waiver.

---

[10] *Friedman* is inapplicable for the additional reason that it involved a RICO conspiracy claim, which "is by definition broader than an ordinary conspiracy to commit a discrete crime.  Each member of a RICO conspiracy need only conspire to participate in the affairs of the alleged enterprise through two predicate crimes."  854 F.2d at 561.

[11] The District Court's ruling in *United States v. Gabriel*, 920 F. Supp. 498, 503–05 (S.D.N.Y. 1996), does not stand for the broad proposition that the court lacks power to dismiss duplicitous counts.  Opp. at 97.  In that case, the Court in fact denied the duplicity motion because "[o]n its face, [the] Count [] appears open to two readings."  920 F. Supp. 498, 503–05 (S.D.N.Y. 1996).  Yet *Gabriel's* reasoning improperly relied exclusively upon three post-conviction conspiracy cases—including *Johansen*—rather than motion stage duplicity jurisprudence.  *Id* at 504–05 .  Contrary to *Gabriel*, the Second Circuit has held it is proper for the court to find duplicity on the face of an indictment pre-trial, including in the conspiracy context.  *See United States v. Rozenfeld*, No. 02-1769-CR, 2005 WL1181966, at *2 (2d Cir. May 18, 2005); *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir. 1979).

The government fundamentally misunderstands the procedural posture here.  The defense is not challenging the evidence at trial and whether that evidence will prove a single or multiple conspiracies.  Rather, in raising a duplicity motion now, the defense asserts a facial challenge to the Indictment, irrespective of the evidence later.  Thus, whether the evidence proves a single conspiracy or multiple conspiracies is a question for the finder of fact, but the question of whether the Indictment *on its face* sufficiently alleges a single conspiracy is a question for the Court pre-trial.[12]  *See United States v. Viserto*, 596 F.2d 531, 538 (2d Cir. 1979) (determining in the conspiracy context that "[s]ince the alleged duplicitous character of the counts appears on the face of the indictment, appellants *could have moved before trial to dismiss the indictment*.") (emphasis added); *United States v. Rozenfeld*, 2005 WL1181966, at *2 (2d Cir. May 18, 2005) (finding a duplicity claim in the conspiracy context waived "as the alleged *defect was apparent on the face of the indictment* and [appellant] did not raise an objection before (or even during) trial.") (emphasis added).

Similarly, the government conflates the "objects" of the conspiracy with separate conspiracy "schemes."  Citing *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992), the government claims that the overarching conspiracy charged here is not duplicitous "for the conspiracy is the crime . . . however *diverse its objects*."  Opp. at 89.  But the Indictment here does not charge an overarching conspiracy with multiple objects, which would be different statutorily-defined *substantive offenses*.  Rather, the Indictment charges a single overarching conspiracy with a single object—*e.g.*, Conspiracy to Commit Bribery (Count One), Conspiracy

---

[12] To support its assertion that the "allegations render the Indictment facially sufficient," the government cites *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *12 (S.D.N.Y. Dec. 11, 2017); Opp. at 92, a case recently overturned by the Supreme Court for *overcharging* the defendant.  *Percoco v. United States*, 598 U.S. 319 (2023).

to Commit Honest Services Fraud (Count Two), and Conspiracy to Commit Extortion (Count

Three).  The problem is not that multiple objects render the Indictment duplicitous, but that each

conspiracy count incorporates multiple disparate *schemes*.  Such "aggregation" is permitted only

where the separate schemes "could be characterized as part of a single continuing scheme."

*United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989).  For the reasons stated in our

opening brief and above, there is no single continuing scheme here.  Under these circumstances,

the Court should protect against inevitable prejudice by dismissing and requiring the government

to proceed with each scheme as a separate charge, just as Judge Gregory H. Woods recently did

in *United States v. Sarshar*,  No. 21 Cr. 202 (GHW) (S.D.N.Y. Aug. 13, 2021).[13]  *See* Weitzman

Reply Decl. Ex. C at 126:13–130:14 (*Sarshar* October 29, 2021 Oral Ruling Transcript).

 The government's contention that the appropriate remedy should be a jury instruction is

also incorrect.  Opp. at 96.  The case the government cites for this proposition, *United States v.

Arguedas*, states that, "the Court can resolve any duplicity problem through jury instructions *and

the verdict form*."  No. 20 Cr. 135 (JMF), 2021 WL5567749, at *1 (S.D.N.Y. Nov. 29, 2021)

(emphasis added).  While the government seemingly acknowledges that, at a minimum,

defendants are entitled to a special jury verdict form, even a special jury verdict form is an

inadequate remedy to protect Senator Menendez from the prejudice arising from an indictment

that inextricably intermingles and conflates the five schemes.

---

[13] The government oddly chastises the SDNY prosecutors in *Sarshar*, No. 21 Cr. 202 (GHW),
for having "argued duplicity *on the merits*."  Opp. at 99–100 (emphasis added).  One would think
that the government would applaud arguments that attempt to reach the merits of a dispute.  The
fact that the government prefers that this Court not address the merits of defendants' duplicity
motion speaks volumes.

A final practical consideration points in the same direction.  If this Court does not opt for this simple fix on the front-end—requiring that each scheme proceed as a separate charge—it guarantees an appellate issue on the back-end that would jeopardize any conviction.  Namely, if the Second Circuit agrees the government's professed single conspiracy is really a rimless wheel, that will virtually compel vacatur, because any such variance would undoubtedly be prejudicial in light of the evidentiary spillover it would necessarily entail.  *See, e.g.*, *United States v. Abdelaziz*, 68 F.4th 1, 42 (1st Cir. 2023) (vacating "Varsity Blues" convictions on this basis).  As important, such a defect could not be cured by jury instructions; for these sorts of errors, even the best "limiting instruction" is typically "inadequate to address the risk of evidentiary spillover."  *Id.* at 58.  In so many words, this Court should fix the duplicity problem on the face of the Indictment now, lest it come back to upend everything later.

## III.    THE SEVERANCE MOTIONS SHOULD BE GRANTED

The government's Opposition all but admits that the joinder of the defendants is problematic:  at no point in its Opposition does the government dispute that a joint trial would result in prejudice to Senator Menendez's trial rights, or that severance would cure that prejudice.  To the contrary, the government embraces the risk of "some prejudice," instead offering a weak appeal to "judicial economy" to avoid severance and more than one trial.  *See* Opp. at 110–11.  But seeking a joint trial here is just as, if not more, likely to harm judicial economy and efficiency.  In the event of a conviction in a joint trial, there is a substantial risk of reversal followed by severed retrials, just as the Third Circuit ordered in *United States v. Blunt*, 930 F.3d 119, 129 (3d Cir. 2019).  Severance is required here both for efficiency and other reasons detailed below.

**A.      The Government Cannot Dispute the Serious Risk of Substantial Prejudice to Senator Menendez Resulting from a Joint Trial with His Wife Nadine.**

In responding to Senator Menendez's motion for a severed trial from his wife, Nadine, the government alleges procedural foot faults, hoping to knock out the motion without a merits analysis.  On the actual merits, though, the government mostly minimizes.  Rather than meaningfully dispute the existence of prejudice resulting from a joint trial, the government suggests only that this prejudice is not severe enough to warrant severance.  The government's analysis is misguided.

**1.      Senator Menendez Provided the Attestation Necessary to Establish He Would Suffer Substantial Prejudice from a Joint Trial.**

In his opening brief, Senator Menendez demonstrated how a joint trial with his wife would cause him precisely the type of substantial prejudice that the Supreme Court held, in *Zafiro*, warrants severing trials:  either through Nadine's assertion of marital privilege or through requiring Senator Menendez to choose between trial rights (the right to defend himself and the right *not* to testify against his wife), a joint trial seriously risks depriving Senator Menendez of the ability to offer "essential exculpatory evidence that would be available to [him] [if] tried alone."  *See* ECF No. 137 at 29 (citing *United States v. Zafiro*, 506 U.S. 534, 539 (1993).[14]  The government's primary response to this grave risk is to argue that Senator Menendez has failed to adduce evidence of this prejudice in the *proper form—namely,* he did not make an unequivocal

---

[14] This point also addresses the government's refrain that a defendant must show "*substantial* prejudice" and not just mere "prejudice" to obtain a severed trial.  *E.g.*, Opp. at 114 (emphasis in original).  Even if true, this does not alter the analysis on this motion at all.  In *Zafiro*, the Supreme Court held that a scenario wherein "essential exculpatory evidence that would be available to a defendant tried alone [is] unavailable in a joint trial," *i.e.,* the very prejudice that Senator Menendez argues would obtain in a joint trial with his wife, is sufficiently substantial to warrant severance. *Zafiro*, 506 U.S. at 539.

commitment to waive his Fifth Amendment right, and he relied on an attorney declaration. Opp. at 115–116. These requirements do not exist. The Second Circuit has never held that a defendant seeking a severed trial must commit to testifying in his own defense and must submit his own declaration. In fact, the law is to the contrary.

For instance, in *United States v. Shkreli*, Judge Matsumoto ordered separate trials based on an attorney declaration emphasizing that "a defendant has the right to change his mind [about testifying], including if the government fails to meet its burden . . . ." Weitzman Reply Decl. Ex. D at ¶3; *United States v. Shkreli*, 260 F. Supp. 3d 247, 256 (E.D.N.Y. 2017) ("Severance is granted because of the stated intention of Greebel's ***counsel***, in his declaration . . . [to] argu[e] that Shkreli is guilty and that Greebel is, himself, just another victim of Shkreli's fraud.") (emphasis added). No defendant can responsibly commit to testifying (likely waiving his Fifth Amendment rights) before the government has presented its case.

Similarly, in *Blunt*, the Third Circuit reversed the conviction of married co-defendants on the basis that the district court should have granted their pretrial severance motions. *United States v. Blunt*, 930 F.3d at 129 ("[W]e will reverse the District Court's denial of [both defendants' severance motions]. We will vacate [both defendants'] convictions and sentences, and we will remand the case to the District Court with the instruction that it grant [both motions]"). Notably, when the married couple in *Blunt* moved for severance in the district court, they did not submit a declaration *at all*, and instead relied entirely on attorney argument to explain the basis for severance. Weitzman Reply Decl. Ex. E. Likewise, the co-defendants in *Blunt* did not commit to testifying; rather, one defendant simply argued that she "***wishes*** to provide exculpatory testimony on her own behalf at trial, but her testimony is likely to inculpate her husband, Defendant Hall." Ex. E at ¶6 (emphasis added).

These and other authorities follow from the Supreme Court's ruling in *Zafiro*, which held that to obtain a severed trial a defendant must show, *not* that prejudice resulting from a joint trial is absolutely certain, but rather, only that there is a "*serious risk*" of such prejudice. *See Zafiro*, 506 U.S. at 539 (emphasis added). Attorney declarations describing trial strategy and anticipated testimony plainly suffice to establish such a "serious risk."

The few authorities that the government cites are not to the contrary, and Senator Menendez's request for severance does not suffer from the defects presented in those cases. In *United States v. Travers*, a 25-year-old case from the Southern District of Florida, the court considered a motion for severance unsupported by *any* declaration, from an attorney or otherwise. *United States v. Travers*, No. 96-477-CR (UB), 1998 WL36030672, at *2 (S.D. Fla. July 16, 1998) ("[Defendant] has failed to show specifically how she would be prejudiced by a joint trial with her husband."). The court there thus held only that the defendant must provide *some* support for the claim of potential prejudice, with a declaration from the defendant serving as *one way* to show prejudice. *Id.* A defendant is free to "explain[] how" a joint trial may be prejudicial through other means, such as his moving papers or an attorney declaration. *See id.* Moreover, the court held that a defendant's "motion to sever is *premature* at this point because [the defendant] has failed to show specifically how she would be prejudiced by a joint trial with her husband." *Id.* (emphasis added). By contrast, the attorney declaration supporting Senator Menendez's severance motion provides more than ample basis for this Court to find that a joint trial with Nadine would prejudice Senator Menendez. *See* Weitzman Declaration dated January 15, 2024 ¶¶ 2–5.

The other cases the government cites are distinguishable for much the same reason – the defendants in those cases provided *no* basis, beyond a conclusory assertion, for their allegations

of prejudice resulting from a joint trial.  *See United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir.

1984) (denying defendants motions for severance where "the affidavit of [a defendant's] attorney

neither describes the nature of their testimony nor offers a plausible explanation of why they

would testify only at a separate trial"); *United States v. Taggart*, No. 4:07CR00142 (JLH), 2008

WL 2705109, at *5 (E.D. Ark. July 8, 2008) ("[Defendant] offers no specific information as to

what testimony might implicate the marital privilege, how the interplay between the testimony

and the marital privilege would prejudice her in a joint trial with [her husband], or how severing

the trials would avoid the prejudice.").  Here, in addition to the arguments made in Senator

Menendez's moving brief, the Weitzman Declaration describes with particularity the prejudice

that Senator Menendez would face.

The government's objection to the *ex parte* submission of the Weitzman Declaration is

disingenuous.  Opp. at 116–18.[15]  For one, the government adopts a double standard.  ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████  The government, however, ignores the legitimate reason to submit the

supporting Weitzman Declaration under seal and *ex parte*:  because it reveals Senator

Menendez's confidential trial strategy.  *See* ECF No. 137 at 28 n.4.  That the authorities

---

[15] The government's authorities concern attempts by the *government* to conduct *ex parte* proceedings and do not materially alter the analysis here, where *ex parte* treatment is essential to protect Senator Menendez's confidential trial strategy from early review by the government.  *See Alderman v. United States*, 394 U.S. 165, 184 (1969) (addressing a *government* request to submit material *ex parte* without addressing whether revelation of a defendant's trial strategy should be filed *ex parte*); *United States v. Barnette*, 644 F.3d 192, 209 (4th Cir. 2011) (holding that district courts should "rarely if ever" exclude a defendant from the government's *voir dire* proceedings, without addressing concerns about the revelation of a defendant's trial strategy).

Menendez cited arose in the context of a Rule 17 subpoena is beside the point; defendants should not be required to choose between disclosing confidential trial strategy and advocating for their constitutional trial rights.

Indeed, contrary to the government's claims, the district court proceedings in the *McDonnell* case *support* crediting the *ex parte* Weitzman Declaration. *See* Opp. at 117. In *McDonnell*, the district court denied a request for *ex parte* treatment of declarations submitted in support of a motion for severance only because "McDonnell ha[d] failed to demonstrate either that the Declarations are privileged *or that they necessarily reveal trial strategy*." Weitzman Reply Decl. Ex. F at 3 n.2 (emphasis added). The Weitzman Declaration, on the other hand, was submitted *ex parte* precisely because it *does* reveal confidential trial strategy—a conclusion the Court reached when it so ordered defendant's sealing letter on January 16, 2024.

In sum, Senator Menendez has properly set forth a substantial basis for the Court to find a "serious risk" of prejudice to Senator Menendez's trial rights. The government's procedural objections to the form of Senator Menendez's submissions are without merit, and should be rejected.

## 2. The Government Cannot Rebut that Nadine's Assertion of Marital Communications Privilege Would Severely Prejudice the Senator's Trial Rights.

The government's objections to severance fare no better on the merits. Crucially, the government *concedes* that if Nadine asserts the marital communications privilege, Senator Menendez will be deprived of the right to offer exculpatory testimony in a joint trial that would otherwise be available to him in a severed trial. *See* ECF No. 137 at 31.[16] In light of that

---

[16] The government's throw-away assertion (Opp. at 119) that there is "at least some question" whether Nadine could prevent Senator Menendez from testifying about marital communications is contradicted by binding Second Circuit authority. The cases that the government cites on this point concern a *different* marital privilege—the "adverse testimonial privilege"—which permits a

concession, the government falls back to its argument that the resulting prejudice to Senator

Menendez just *isn't that big of a deal*. *See* Opp. at 119 ("there is very likely little—if any—

admissible testimony that [Senator Menendez] might potentially offer that would be protected by

the privilege[.]").  The government is mistaken.

The government identifies four reasons why the trial prejudice to Senator Menendez from

Nadine's assertion of the marital communications privilege should not merit the Court's

attention.  Opp. at 119–20.  But none is persuasive, and the first three can be dispensed with

quickly.

*First*, while the government correctly notes that some of the charged conduct in the case

"predates their marriage in October 2020" and is not covered by the privilege (Opp. at 119), the

exculpatory testimony that Senator Menendez has to offer (but cannot in a joint trial) concerns

private, marital communications that post-date his marriage to Nadine.  *See* ECF No. 137 at 30-

31; *see also* Weitzman Decl. at ¶¶ 2–5  This cannot possibly be a surprise to the government.  In

the most recent iteration of the Indictment, for example, the government added extensive

allegations of a plan between Senator Menendez and Nadine to "cover up" their alleged scheme;

all of those allegations concern conduct (and thus, potentially, private communications)

occurring in late 2022, well after the marriage at issue.  *See* Indict. ¶¶ 68–70.

---

witness-spouse to *refuse* to testify *against* his/her spouse on any subject.  *See Trammel v. United States*, 445 U.S. 40, 53 (1980) (discussing adverse testimonial privilege, not marital communications privilege); *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 822–23 (9th Cir. 1985) (same).  That's a distinct issue from whether Nadine can *prevent Senator Menendez* from testifying to *private marital communications*.  Second Circuit authority squarely holds that Nadine does have that right in a joint trial, as the government eventually acknowledges.  *See* Opp. at 119 (citing *United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*, 71 F.3d 1067, 1070 (2d Cir. 1995) (marital communications privilege "can be invoked by either spouse to prevent the revelation [of privileged] communications")).

*Second*, contrary to the government's contention (Opp. at 119–20), Senator Menendez's motion and his attorney declaration show that his communications with his wife were intended to be kept private.  Weitzman Decl. at ¶¶ 2–5; ECF No. 137 at 30–31 (setting forth categories of private communications between Senator Menendez and his wife to which he would be free to testify at a severed trial).

*Third*, the government's effort to characterize the exculpatory communications as "acts," not "utterances," necessarily fails.  Opp. at 120.  As both Senator Menendez's motion and supporting attorney declaration make clear, the prejudice he will face arises from his desire to testify to *statements*, not acts.  *See* Weitzman Decl. at ¶¶ 2–5; ECF No. 137 at 30–31.

*Finally*, the notion that a "crime-fraud" exception to the marital communications privilege would vitiate Nadine's right to prevent Senator Menendez from testifying as to marital communications is wrong on two fronts.  *See* Opp. at 120.  *First*, it puts the cart before the horse: as the government admits, any such crime-fraud exception (called the "joint crime exception" in the context of the marital communications privilege, *see Premises Known at 281 Syosset Woodbury Road*, 731 F.3d at 1073), only applies where the court finds, by a preponderance of evidence, that such private marital communications were "in furtherance of jointly undertaken criminal activity."  Opp. at 120.  Here, the Court has not yet made any such finding, nor will such a finding be supported by the evidence.  Thus, from a practical perspective, holding a joint trial implicates completely unnecessary risk:  in the event that the Court correctly determines that private communications between Senator Menendez and Nadine were *not* made in furtherance of joint criminal activity, Nadine will be able to exercise the marital privilege and, at that point, mid-trial, the Court will find itself needing to sever the cases and order a mistrial as to one or more defendants.  A separate trial from the outset eliminates that risk.

34

*Second*, the government mischaracterizes the scope of the joint-crime exception.  As the government's main authority demonstrates, that exception applies only where one spouse *desires* to describe admittedly criminal conduct, and the other spouse seeks to prevent that from happening.  *See United States v. Estes*, 793 F.2d 465, 466 (2d Cir. 1986) (marital communications privilege does not bar wife from willingly testifying that her husband "told her that he had taken the money from [his employer]").[17]  The government has cited no case considering the privilege in this context, where Senator Menendez would testify to *affirmative* communications he had with his wife that are *exculpatory* and do not concern joint criminal activity, but would be barred from so testifying at a joint trial.  *See* ECF No. 137 at 30–31; *see also* Weitzman Decl. at ¶¶ 2–5.  Because Senator Menendez intends to offer private communications with his wife that exculpate him from any criminal activity—not testimony concerning any "joint" criminal activity—there is no joint-crime exception that would vitiate Nadine's privilege.

### 3.  Senator Menendez Should Not Be Forced to Choose Between Testifying in His Own Defense and Maintaining the Adverse Testimonial Privilege.

Separate and apart from Nadine's potential invocation of the marital communications privilege, a joint trial with Nadine imposes additional prejudice on Senator Menendez, as he would have to choose between his right to testify in his own defense and his right to refuse to testify against his spouse.  ECF No. 137 at 31–32 (citations omitted).

---

[17] *United States v. Levine* is also inapposite.  There, the Court concluded without analysis that testimony from a husband that his wife "did not tell him of her allegedly illegal acts" was outside the privilege.  750 F. Supp. 1433, 1443 (D. Colo. 1990).  Here, Senator Menendez intends to testify to what *he told his wife*, not just what *his wife didn't tell him*.

The government does not deny that a joint trial would subject the Senator to that dilemma.  Instead, the government points to a few out-of-Circuit district court rulings that—unlike the authorities cited by the Senator—declined to sever joint trials of spouses, and thereby forced the spouse to choose between these two rights.[18]  *See* Opp. at 122 (citing authorities).  Those cases are unpersuasive.  They largely focus on the fact that the adverse testimonial privilege is not a constitutional right.  *See United States v. Sneed*, No. 3:19-CR-0580-B (JJB), 2022 WL 35801, at *15 (N.D. Tex. Jan. 4, 2022) (marital privilege "implicates no constitutional right"); *United States v. Artates*, Cr. No. 12-00826-02 SOM, 2012 WL 6597752, at *1 (D. Haw. Dec. 18, 2012) (holding that the privilege "is not a fundamental right"); *United States v. Galvan*, No. 04-CR-00403-LTB, 2006 WL 1659610, at *2 (D. Colo. June 8, 2006) (the privilege is not a "constitutional right"); *United States v. Freeman*, 694 F. Supp. 190, 192 (E.D. Va. 1988) (same).

This reasoning misses the point entirely.  Whether constitutionally protected or not, the marital privilege is something the Senator would have to forfeit in order to invoke his right to testify in his own defense at a joint trial.  That burdens the latter right, which *is* constitutionally protected.  Imagine, for example, that a trial court ordered trial to commence in three months unless the defendant intends to testify in his own defense, in which case trial would begin in just two weeks.  The defendant has no constitutional right to the later start date, but that scheduling order would obviously burden his Fifth Amendment rights.  So too here.

---

[18] The one in-Circuit case the government cites, *Sasso*, is more than 40 years old, precedes the Supreme Court's ruling in *Zafiro*, and hardly represents the current state of the law on this issue. Moreover, that case *supports* severance here given Nadine's intended invocation of the marital communications privilege to prevent Senator Menendez from testifying about exculpatory communications as to the Senator.  *See United States v. Sasso*, 78 F.R.D. 292, 295 (S.D.N.Y. 1977) ("A separate trial for Mrs. Sasso will, however, be ordered if it is at any time shown to the court's satisfaction that Mr. Sasso intends to exercise a legitimate claim of privilege applicable to testimony to be offered by his wife").

Put another way, the right that is risked when a defendant is forced to make this Hobson's Choice is the *right to a fair trial*.  By forcing this choice upon a defendant in a joint trial—where the same defendant would *not* be forced to make the choice in a separate trial—the defendant is unable to freely exercise his right to testify in his own defense because he may choose to forgo his opportunity to testify in order to avoid examination about his spouse in a joint trial.  *See Blunt*, 930 F.3d at 128 ("Blunt was entitled to exercise both of the rights at issue here [the right to testify in her own defense and the right not to testify against her husband], but she ultimately was unable to exercise either in *a satisfactory manner*.") (emphasis added); *United States v. Dobson*, No. CRIM. 02-616-06, 2003 WL 22427984, at *3 (E.D. Pa. Aug. 18, 2003) (noting the constitutional risks of "[a] choice between two basic rights under threat of criminal conviction").

That is why the more reasoned and persuasive approach is the one adopted by the Third Circuit in *United States v. Blunt*.  There, the Third Circuit reversed conviction because it was "*compelled* to afford the holder of [adverse testimonial] privilege the opportunity to exercise that privilege without being forced to choose between it and the fundamental right to testify on her own behalf."  *Blunt*, 930 F.3d at 127.  Unlike the out-of-circuit district court rulings on which the government relies, the Third Circuit's ruling in *Blunt* more directly comports with the Supreme Court's guidance that severance is appropriate whenever there is a "serious risk" of prejudice to a defendant's "specific trial right."  *Zafiro*, 506 U.S. at 539.  That serious risk is manifest here. Unlike in a severed trial, in a joint trial, Senator Menendez would have to give up his adverse testimonial privilege to testify in his own defense.  It is hard to imagine a clearer example of a "specific trial right" that would be available to a defendant in a separate trial, but denied to him in a joint trial.

The government's attempt to distinguish the *Blunt* case falls flat.[19]  The government claims that severance was necessary in that case because the married couple asserted "mutually antagonistic defenses," resulting from the fact that the wife testified that her husband threatened violence to force her to participate in criminal conduct.  *See* Opp. at 123–24.  But the court's rationale was not that circumscribed.  Rather, the court held that, as a general matter, a defendant "should be given the opportunity to exercise her spousal privilege without being forced to choose between said exercise and testifying in her own defense."  *Blunt*, 930 F.3d at 127.  That is the exact opportunity that Senator Menendez seeks here.  In any event, the differences between the wife's testimony in *Blunt* and Senator Menendez's anticipated testimony here is one of degree, not kind.  His testimony would provide a good faith explanation for his knowledge and conduct, ████████████████████████████████  That is similar in kind to the testimony offered in *Blunt*, and for similar reasons, severance is warranted.  *See also Dobson*, 2003 WL 22427984, at *3 ("A joint trial is unfair to Larry Dobson because it forces him to compromise one of two fundamental trial rights").  The Court should therefore apply the reasoning in *Blunt* and hold that it would be unduly prejudicial to force Senator Menendez to choose, at a joint trial, between testifying in his own defense and waiving his adverse testimonial privilege.

---

[19] The government's distinction of *United States v. Dobson* is similarly unpersuasive.  *See* Opp. at 124.  While it is true the government conceded there that a spouse's proposed testimony would implicate the other spouse, that fact had no apparent bearing on the court's decision, which simply ruled that: "A joint trial is unfair to Larry Dobson because it forces him to compromise" between, his right to testify in his own defense and his right not to testify adversely against his wife. *See Dobson*, 2003 WL 22427984, at *3.

**B.    The Government Has Not Rebutted the Serious Risk of Substantial Prejudice to Senator Menendez Resulting From a Joint Trial with the Conspiracy Defendants.**

Turning to Senator Menendez's request to sever his trial from the trials of Defendants Hana, Uribe, and Daibes (the "Conspiracy Defendants"), as an initial matter, the Opposition incorrectly asserts that this severance request is conditional on the granting of Senator Menendez's request for severance from his wife.  *See* Opp. at 125.  Senator Menendez did not take this position in his opening brief, *see* ECF No. 137 at 34, and he disputes it here.  Rather, he seeks severance from the Conspiracy Defendants, *whether or not* severance from Nadine is granted.

On the merits, the government makes only two arguments, neither of which is availing.  *First*, the government argues that the admittedly prejudicial communications between Defendant Hana and Egyptian officials would be admissible at a separate trial under the co-conspirator hearsay exception of FRE 801(d)(2)(E). Opp. at 125–26.  The government is mistaken, and its prognostication is at minimum far from a certainty.  The government will have the burden to show at trial that the statements are admissible.  If the government cannot carry its burden, severance would likely be required mid-trial.  However, by severing trials now, the Court can eliminate any risk of a midtrial severance.  ECF No. 137 at 36–37.

The government offers no response to this point, nor does it seriously engage with the substantial evidence that Hana was engaged in puffery by overstating his level of political influence in the U.S. for the benefit of his own relationship with Egyptian officials.  *See* ECF No. 137 at 34–35; ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

The government instead claims, without authority, that any claim of puffery goes to the weight, not the admissibility, of the hearsay evidence. Opp. at 125–26 n. 39. That is clearly incorrect. Courts routinely exclude hearsay evidence where it lacks *indicia* of reliability. *See United States v. Abreu*, 342 F.3d 183, 191 (2d Cir. 2003) (declining to admit hearsay statements where the "proffered testimony" was "self-serving and uncorroborated"); *see also* Fed. R. Evid. 801(c); *D.R. by Rodriguez v. Santos Bakery, Inc.*, No. 20-cv-3628 (KHP), 2023 WL 3736441, at *2 (S.D.N.Y. May 31, 2023) ("[T]he rule against hearsay is fundamentally designed to ensure that only reliable evidence goes in front of the jury[.]") (citations and internal quotations omitted).

Even more significantly, the government mischaracterizes the evidence that Senator Menendez submitted in his moving brief to dispute the government's assertion that Senator Menendez and Defendant Hana were co-conspirators, and show that Senator Menendez was a *victim* of Hana's scheme to "swindle" both the Senator and his wife. ECF No. 137 at 35–36. The government's response to this devastating evidence is to (i) *admit* that Defendant Hana did, in fact, swindle the Senator and his wife; and then (ii) blithely repeat the adage that "there [is] no honor among thieves"—*i.e.*, imply, without the slightest evidence, that Hana swindled the Senator and Nadine out of a *bribe*, as opposed to having swindled them by surreptitiously exchanging Nadine's valuable jewelry for much less valuable jewelry, and then lying about it. Opp. at 126 n. 40. Put another way, the government takes a conversation about Hana violating his promise to *exchange* Nadine's heirloom ring for another ring of equivalent value and then helps itself to the invented inference (which is unsupported by any cited evidence) that the ring

40

was somehow a bribe.  Indeed, the government has not charged any bribe in this case based on a ring provided by Defendant Hana.  Nor does the government cite any evidence supporting such a theory.  Clearly, there are substantial reasons to doubt any claims Hana may have made to the Egyptian government (or others) regarding his relationship with Senator Menendez.

*Second*, the government argues that the criminal histories of Defendants Uribe and Daibes would also be admissible against Menendez at a separate trial.  Opp. at 127–28.  But the government ignores Senator Menendez's argument that, to the extent those histories are admissible, the Senator would agree to "enter[] into an appropriate stipulation regarding the existence of the criminal conviction or prosecution, as authorized under *Old Chief v. United States*, 519 U.S. 172, 185–86 (1997), and its progeny."  ECF No. 137 at 38.  By contrast, in a joint trial, the *details* of the Conspiracy Defendants' crimes are far more likely to be admitted, to provide background information, attack credibility, show motive or lack of mistake, or for myriad other reasons.  ECF No. 137 at 37.  As such, the prejudice to Senator Menendez would be greater at a joint trial than at a separate trial.  The government does not dispute this.

While the government claims that any risk of prejudice can be cured by limiting instructions, it does not explain how a jury can reasonably be expected to disregard highly prejudicial evidence concerning Senator Menendez's co-defendants, if offered at a joint trial. *See* ECF No. 137 at 37 (citing *United States v. Taylor*, 745 F.3d 15, 28 (2d Cir. 2014) (limiting instruction insufficient where it would require a jury to engage in "a mental gymnastic which is beyond, not only [the jury's] powers, but anybody's else").  Indeed, recognizing that limiting instructions are often inadequate, in *Zafiro*, the Supreme Court specifically identified as paradigmatic prejudice warranting severance a case where "evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is

admitted against a codefendant." *Zafiro*, 506 U.S. at 539; *cf. United States v. Key*, No. 12 CR. 712 (SHS), 2013 WL12204221, at *2 (S.D.N.Y. Aug. 28, 2013) (Stein, J.) (severing trials and noting that "the marked difference in the character of the allegations against defendants . . . counsels strong in favor of this severance").  That is exactly the risk here.  Senator Menendez's trial should be severed from that of the Conspiracy Defendants.

## CONCLUSION

For the foregoing reasons, and those set forth in his moving brief (ECF No. 137), Senator Menendez respectfully requests that the Court (1) dismiss the Indictment for improper venue or, in the alternative, transfer this case to the District of New Jersey in the interest of justice, (2) require the government to file a new indictment with non-duplicitous counts, and (3) sever Senator Menendez from his codefendants.

Respectfully submitted,

Dated: February 12, 2024

By: */s/  Adam Fee*

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 1(310) 620-5719
Facsimile: 1(310) 620-5819

Avi Weitzman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 725-3620

Robert D. Luskin
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
Telephone: 1(202) 551-1966
Facsimile: 1(202) 551-0466

*Attorneys for Defendant Robert Menendez*