# **Exhibit C**

LATBSARO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              21 Cr. 202 (GHW)

5   SEPEHR SARSHAR,
        a/k/a "Sep,"
6
                 Defendant.
7                                           Oral Argument
    ------------------------------x
8
                                            New York, N.Y.
9                                           October 29, 2021
                                            10:00 a.m.
10

11  Before:

12
                        HON. GREGORY H. WOODS,
13
                                            District Judge
14
                            APPEARANCES
15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  BY:  DANIEL M. TRACER
         NEGAR TEKEEI
18       Assistant United States Attorneys

19
    GIBSON, DUNN & CRUTCHER, LLP
20       Attorneys for Defendant
    BY:  REED M. BRODSKY
21       AVI WEITZMAN
         DEBRA W. YANG
22       DOUGLAS FUCHS

23

24

25

LATBSARO

1             (Case called)

2             MR. TRACER:  Daniel Tracer and Negar Tekeei for the

3    government.  We're joined at counsel special by Special Agent

4    Brandon Racz of the FBI.

5             Good morning, your Honor.

6             MS. TEKEEI:  Good morning, your Honor.

7             MR. BRODSKY:  Good morning, your Honor.

8             Reed Brodsky on behalf of Dr. Sarshar, and Dr. Sarshar

9    is with us this morning.

10            I'll let my partners introduce themselves.

11            THE DEFENDANT:  Good morning, your Honor.

12            MR. WEITZMAN:  Good morning, your Honor.

13            Avi Weitzman, on behalf of Dr. Sarshar.

14            MS. YANG:  Good morning, your Honor.  Debra Yang, on

15   behalf of Dr. Sarshar.

16            MR. FUCHS:  Good morning, your Honor.

17            Douglas Fuchs, on behalf of Dr. Sarshar.

18            THE COURT:  Thank you very much.

19            Good morning.

20            So, first, thank you for your patience as I completed

21   that change of plea hearing.  That was unexpected.  I

22   appreciate your patience.  The trial for that matter was

23   imminent, so we wanted to take that up as promptly as we

24   reasonably could, so we appreciate your patience.

25            So, counsel, I scheduled this matter in order to

1    address the defendant's pending motions.  There are several:

2    Motion to dismiss the indictment, motion to exclude certain

3    evidence, and also a motion to suppress.

4          I've reviewed all of the parties' submissions in

5    connection with each of those applications.  I will invite any

6    additional argument the parties would like to present, but I

7    would ask you to be focused, mindful that I've had the

8    opportunity to review your submissions.

9          I have some small number of targeted questions for the

10   parties with respect to certain of them.  I will turn first to

11   the defendant to permit you to present any argument to

12   supplement the arguments that you've presented in your written

13   submissions.  I'll give the government the opportunity to

14   present anything in response to those comments.

15         At the outset, just a threshold question for the

16   government, which was identified in the defendant's reply.

17         Counsel for the United States, your submissions are

18   not supported by an affidavit.  What I am supposed do with the

19   factual assertions that you presented to the Court in the

20   absence of one?

21         Counsel.

22   MR. TRACER:  So, your Honor, the government's

23   possession is that it would depend what the nature of the

24   factual assertions are.

25         So, for example, there are a couple of cases where the

LATBSARO

1    government explains that it only received a document on a

2    certain date.  That assertion is backed up by the cover letter

3    that accompanied that production, and if the Court needs, we

4    can provide additional such documents.

5            There's no need for a hearing to establish a fact,

6    like when the government received a document or something in

7    that nature.  So explanations along those lines that go to

8    factual matters, that don't go to anybody's intent, but that

9    are important threshold questions here, don't require a

10   hearing.  The Court would not need to draw inferences about

11   those facts.  They can be established by the materials we've

12   provided.  It would give the Court a factual record.

13           Another example of that would be --

14           THE COURT:  Let me pause you on that.

15           How have you established the authenticity of any

16   exhibits presented to the Court in connection with your

17   opposition?

18           MR. TRACER:  Your Honor, the government's briefs, I

19   think, explains what the cover letters are, and I think for

20   those purposes, it would be sufficient to submit that document

21   and create a simple documentary record for the Court.

22           THE COURT:  Just to be clear, everyone else swears to

23   the authenticity of documents that are presented to the Court.

24   Is it the government's position that the government is excused

25   from that obligation?

LATBSARO

1          MR. TRACER:  That's not our position, your Honor.

2          THE COURT:  Thank you.

3          So what's the basis on which I can accept that any of

4     the documents presented by the government are what you tell me

5     they are?

6          MR. TRACER:  So, if the Court wanted, we would be able

7     to submit an affidavit that outlines specifically the exhibits

8     that are connected to our brief, what they were, and have they

9     come in sworn form.  That is something we would be able to

10    provide, and it would be, I think, short of a *Franks* hearing.

11    It would be an additional factual supplementation that we could

12    provide the Court.

13         THE COURT:  Why is that an additional factual

14    supplementation rather than just a matter of course?

15         MR. TRACER:  It would be something that, if the Court

16    wanted, we would be willing and able and ready to provide.

17         THE COURT:  Thank you.  Please proceed.

18         Any other comments, counsel?

19         Let me ask a separate question.  With respect to the

20    government's statements regarding your process with respect to

21    the review of Dr. Sarshar's emails for privilege, you've

22    described what that process was in your opposition, but no one

23    has sworn that your statements are accurate.

24         What facts am I supposed to consider for purposes of

25    this motion, counsel, in the absence of a sworn affidavit from

LATBSARO

1    the government?

2              MR. TRACER:  Again, if your Honor wanted a sworn

3    affidavit for that, that's something that we could provide, and

4    I think that would give your Honor a factual predicate.

5              THE COURT:  Thank you.

6              Do I have a factual predicate without an affidavit?

7              MR. TRACER:  Can I have one moment, your Honor?

8              THE COURT:  Thank you.  Yes.

9              MR. TRACER:  Your Honor, we are able to provide a

10   factual predicate in the form of a sworn affidavit to that if

11   the Court believes it would be necessary to establish the

12   facts.

13             For, I think, the reasons we've described in our

14   opposition, the Court doesn't need to reach those issues, but

15   nevertheless, we think we could provide a factual predicate in

16   the form of a sworn affidavit if the Court required it.

17             THE COURT:  Thank you.

18             I don't think that's responsive.

19             What facts has the government presented to the Court

20   that I can consider in the absence of an affidavit?

21             MR. TRACER:  Right now, the government has only

22   provided a proffer of what those facts would be.  We've done

23   that through our brief, but we would be willing to supplement

24   that with an affidavit.

25             THE COURT:  Thank you.  Good.

LATBSARO

1          Anything from the defendant on this point before I

2    turn to arguments with respect to the motions?

3          Counsel for defendant.

4          MR. WEITZMAN:  Thank you, your Honor.

5          I think your Honor has homed in on an important issue

6    that I was planning to raise in my statements.  There are

7    numerous statements in the government's opposition that simply

8    are neither corroborated by an affidavit that go to Agent

9    Racz's good faith and mental state; whether he believed or

10   disbelieved statements; whether he credited or did not credit

11   statements.  And there are also numerous statements in the

12   opposition about the government's conduct, not just Agent

13   Racz's mental state.

14         For example, the government concedes that the warrant

15   authorized a search of the emails and the iCloud, going back to

16   January 15, 2015.  Our position is that that was based on a

17   misstatement by Agent Racz as to January 15 and should not have

18   been -- that warrant shouldn't have extended back to January

19   15.

20         But they also concede that there's an ambiguity in the

21   warrant, because the January 15 limiter doesn't apply to any of

22   the other categories of documents.  And they make a

23   representation that Agent Racz didn't review anything prior to

24   January 15, 2015.

25         And that, again, is a representation that not only

1   would require an affidavit but, frankly, needs to be tested,

2   because how is it possible?  Did they check the metadata on

3   every photo or check the metadata on every document to make

4   sure it doesn't have a created date prior to January 15 before

5   they opened the document?

6          It is so illogical to think that that type of search

7   and inquiry was done that the representation doesn't really

8   make sense.

9          Similarly, with respect to privilege review.  There's

10  just so much that the government has put out there that,

11  respectfully, we think that in addition to an affidavit, we're

12  entitled to examine Agent Racz on whatever statements he makes

13  in that affidavit and that, at a minimum, this warrants a

14  *Franks* hearing.

15         I have other statements, but I just wanted to limit it

16  to the issue that your Honor was focused on at the moment.

17         THE COURT:  Thank you very much.

18         So, let me put this issue aside just for the time

19  being, although I'll welcome further argument on it to the

20  extent that it's pertinent to other issues that you'd like to

21  present to the Court.  We'll circle back to the question of

22  what the Court can properly decide here in the absence of an

23  affidavit from the United States regarding the facts presented

24  on which their opposition relies.  Hold that issue.  We'll

25  circle back to it.

LATBSARO

1          Let me turn to counsel for defendant.  I think that

2     the most efficient way for us to proceed is for me to hear

3     argument from each side with respect to each of the three

4     separate motions that were presented to the Court in turn.  I

5     will take my guidance from the parties about which of those

6     motions you'd like to begin with.  I'm happy to begin with any

7     of the three.

8          So, counsel for defendant, where would you like to

9     start?

10         MR. BRODSKY:  Yes, your Honor.

11         We'd like to start with the motion *in limine* to

12    exclude the cooperating witness call with Associate-1, and then

13    the Auspex note.  My colleague Avi Weitzman will then address

14    the motion to suppress for search warrants and our request for

15    a *Franks* hearing, and then my colleague Mr. Fuchs will address

16    the remaining motions: the motion to dismiss based on

17    duplicity; the motion to compel the government to produce a

18    bill of particulars; and the motion to strike prejudicial

19    surplusage.

20         THE COURT:  Fine.  Thank you.

21         Please begin.

22         And again, let me just ask, for the sake of time, that

23    the parties keep in mind that I've reviewed your written

24    submissions in full.  I think I have a sense of the -- clear

25    sense of the parties' arguments, so I ask you to be focused in

LATBSARO

your presentation to the Court and to focus on the issues that

you'd like to either add or amplify, rather than recreating the

wheel.

　　　　So let me begin with counsel, what would you like to

tell me regarding the motion to exclude?

　　　　I ask you to either use the podium or the table just

to make sure that you're easily heard.

　　　　MR. BRODSKY:  Thank you, your Honor.

　　　　In the history of insider trading cases in the

Southern District of New York, dating back decades, your Honor,

there has never been a hearsay statement and then a double

hearsay statement like this proffered by the government for

admission and not struck by the courts.

　　　　And this hearsay statement, the cooperating witness

call and then the Auspex note, the government has not met their

burden.  Now, they've proffered a series of unsworn statements

and inferences and inferences upon inferences, but

fundamentally, the law is clear here about what standard they

have the burden to meet, and they've failed to meet it.

　　　　Now, just taking the Auspex note and the call just for

one moment, before we actually apply the law, it is telling

that by the time the cooperating witness takes this stand in

this court in March of next year, it will be over seven

years -- over seven years -- from that conversation occurring.

And the government notably contradicts itself about whether or

LATBSARO

1    not this cooperating witness, under a non-prosecution

2    agreement, who says he didn't engage in any insider trading, he

3    himself will be able to remember this conversation.

4              And then, of course, we have the fact that he had the

5    conversation, took handwritten notes, and then those

6    handwritten notes don't exist, and then converted those

7    handwritten notes, he says, into an electronic format, which is

8    inherently contradictory, ambiguous, and has a lot of problems

9    to it, requires a lot of inferences which the government, again

10   in an unsworn way, postulates to the Court what it should mean.

11             Fundamentally, the government cannot run from some

12   stubborn facts.  When it comes to insider trading in a possible

13   hearsay and double hearsay statement, the courts look to

14   trading, because it was trading that is the basis of an insider

15   trading scheme.  The government, in history, case after case,

16   always points to a call and a trade.

17             And here, the declarant, who is unavailable to us, the

18   declarant, who is associate 1 whose lawyers sent in a statement

19   to the government saying, The declarant is innocent and has

20   never traded on inside information, either being tipped by

21   Dr. Sarshar or passing on inside information to the cooperating

22   witness, the declarant is unavailable.

23             These tests for admissibility are so important

24   because, fundamentally, Dr. Sarshar is prejudiced by his

25   inability through us as counsel to cross-examine the declarant,

LATBSARO

1    to understand exactly, What did Dr. Sarshar tell the declarant?

2    What did the declarant understand?  What did the declarant puff

3    or mislead or misunderstand or convey to the cooperating

4    witness on this date over six years ago?

5         And so the declarant here, what does he do after this

6    alleged call takes place when Dr. Sarshar -- according to the

7    government -- leaves an audit committee meeting?

8         The government -- let's look at the trading of the

9    declarant.  Does the declarant trade on that day?  No.  Does he

10   trade the next day?  No.  Days and days and days, he doesn't do

11   any trading at all, and then the first trade he actually does

12   is nine days later, and he sells.

13        Now, the government throughout their arguments always

14   says, Look, it's incredibly telling if somebody is an insider,

15   talks to somebody and somebody trades weeks later and buys.

16   But here, they completely disregard and discount the fact that

17   the declarant sold.  And so the government has this fundamental

18   problem that the trading is inconsistent with the notion that

19   there was a tip.

20        The government buries in a footnote in their brief --

21   I think it's on page 23 of their opposition.  I think it's

22   footnote six.  I'd have to check, but it's an acknowledgment

23   that the cooperating witness himself had bought -- yes, it's

24   footnote six -- the cooperating witness had bought the day

25   before the cooperating witness spoke to the declarant, and then

LATBSARO

1   bought afterwards.  So the notion that he bought before and

2   then bought afterwards undercuts the government's reliability

3   on this.

4            I would like to highlight a few things in terms of the

5   government's arguments.  The government takes the position, and

6   I was disappointed and sad to see it, that somehow because we

7   are moving to exclude something, it somehow points to evidence

8   of guilt.

9            I mean, the government case after case files motions

10   *in limine* and tries to exclude evidence, and sometimes

11   effectively.  Does that mean that the government is trying to

12   exclude evidence of innocence?

13            I don't want to credit that argument.  I don't think

14   anybody should credit that argument.  I don't think the

15   government actually believes that argument themselves.  But the

16   reality is if we take the first -- the only two real

17   substantive arguments the government makes for the admission of

18   both the hearsay cooperating witness call and then the double

19   hearsay Auspex note is, the first one is, they say, it

20   constitutes co-conspirator statements.

21            And then they try, as much as they can, to argue that

22   somehow the originating tipper, allegedly Dr. Sarshar, is

23   somehow in that same conspiracy with the cooperating witness,

24   but the stubborn facts contradict it.  There are three

25   hypothetical avenues for them to establish some kind of single

LATBSARO

1    conspiracy between the alleged tipper and the remote tippee.

2          And your Honor, I know, knows them well, from the

3    *Carpenter* case, from the *McDermott* case, from the *Geibel* case,

4    the government must prove either, one, the scope of the

5    agreement between the originating tipper and the remote tippee

6    includes trading by or for others.

7          Now, the government acknowledges in their opposition,

8    at page 34, that, "The defendant shared his MNPI with associate

9    1 and not directly with the CW."  So they never allege, nor

10   could they, that Dr. Sarshar ever tips, allegedly, the

11   cooperating witness.

12         The government also concedes that -- or appears to

13   concede that the cooperating witness wrote down some note about

14   a call he had with Dr. Sarshar.  It's on March 5.  And the

15   government also acknowledges that the cooperating witness, or

16   they proffer the cooperating witness told the government that

17   Dr. Sarshar was tight-lipped about Auspex, when it was a public

18   company.

19         The March 5 note taken by the cooperating witness,

20   even if we credit it as accurate, which has a whole bunch of

21   issues with that, but even if we take it for its face value,

22   the government acknowledges there's no tipping in that call.

23   So there is no evidence whatsoever that the scope of the

24   conspiracy charged between Dr. Sarshar and associate 1 would

25   include in any way, shape or form the cooperating witness.

LATBSARO

1          So they fail test number one.  They tried to argue, I

2     think, at one point that, of course, it would help the

3     conspiracy if the cooperating witness is trading based on this

4     information inside.  I have to tell you I've never seen a case,

5     an insider trading and the notion of a conspiracy where the

6     conspiracy is furthered by spreading the word of inside

7     information.

8          The whole concept of a conspiracy is secrecy.  In

9     insider trading in particular, it is often -- contradicts the

10     goal of a conspiracy or the objectives of a conspiracy for

11     remote tippees to be trading on inside information.

12          First, it obviously makes it high risk that there's

13     going to be disclosure and somebody's going to learn about an

14     alleged conspiracy.

15          Second, you have another problem.  If you're going to

16     try to tip somebody with inside information before some

17     positive news event, you certainly don't want to drive the

18     stock price up so that the tippee trades on information while

19     the stock price is rising before the public event.

20          So the notion that you would allow remote tippees to

21     somehow trade on information and drive up the stock price,

22     undermining the whole sense of an insider-trading conspiracy,

23     is simply a contradiction.

24          Now, the second test the government has to meet, but

25     fails to meet, is to try to prove that the tipper, originating

LATBSARO

1    tipper, reasonably foresaw the trading by others as a necessary

2    or natural consequence of the unlawful agreement.

3           And for all the reasons we state in our motion papers,

4    your Honor, that argument makes no sense.  I think the

5    government tries to postulate some kind of theory that would

6    work -- again, through unsworn speculation -- but there's no

7    way that any of their arguments really meet the test of what's

8    reasonably foreseeable.

9           They also have to then, if they fail to show that it's

10   a necessary or natural consequence, they argue that -- the

11   government argues this, there's no evidence of an agreement not

12   to tip third parties.

13          I mean, I don't know what to say to that, your Honor.

14   In response to the argument that it's the government's burden

15   to prove that the originating tipper and the remote tippee are

16   in the same conspiracy, when the government says to us, You

17   can't prove it didn't happen, I think by its own terms it

18   reflects a weakness in their argument.  It also turns the

19   burden on us.

20          The burden is not on us to establish that the

21   originating tipper and the remote tippee are in the same

22   conspiracy, and I've never seen a case stand for the

23   proposition that the defendant has to prove a negative.  It is

24   the burden on the government.

25          The government also says that -- they argue that

LATBSARO

1     tipping after Auspex was a public company was a natural

2     consequence of a longstanding practice of informing Costa Verde

3     investors about Auspex.

4            What's so remarkable about their argument is they

5     quoted themselves.  I think it's sort of like, your Honor, the

6     traditional teaching in the U.S. Attorney's Office, which I

7     certainly respect, in front of juries that you try to embrace

8     some of your worst evidence, and you quote it and you put it in

9     your document.  You put it right up front, because you try to

10    draw the sting, as they say.

11           Well, the government quotes the February 2014 email

12    that Dr. Sarshar sends that expressly says to the Costa Verde

13    investors:  It's going to be a public company; I can't update

14    you anymore -- as if there was somehow evidence of wrongdoing.

15    I mean, that is evidence of innocence, evidence of an intent to

16    tell the Costa Verde investors, Things change when this becomes

17    a public company, and I'm telling you in writing, memorializing

18    it, that things have changed.

19           The government quotes it and then does nothing with

20    it, because you can't do anything with that.  It is the

21    elephant in the room that says this man is innocent.  And it

22    also says, and it makes no sense, that Dr. Sarshar would

23    reasonably expect if he allegedly told information to the

24    cooperating witness in March of 2015 that somehow he would

25    expect that to be conveyed to this cooperating witness.

1          I think I addressed already the government's argument

2     that the value of material nonpublic information increases when

3     it's shared broadly.  That's at the opposition on 37.  There's

4     no citation for that proposition.  There's no reliance on any

5     kind of academic theory.  There's no affidavit.  I've never

6     heard of it before.  It's not cited in any case law, such a

7     theory, and I just think it contradicts actual insider trading

8     cases.

9          The government argues that somehow this case is also

10    different because the cooperating witness was known to

11    Dr. Sarshar.  Let me address that, because I think that's

12    important.  The test does say, if you quote the cases, that

13    awareness of -- there's a factor about awareness of the remote

14    tippee, but awareness alone is not enough.  The *Geibel* case

15    says that.  You can't just simply be aware.

16         To quote the *Geibel* court, and we didn't do it in our

17    papers, so I'm going to say it here.  It said, In this case

18    defendant's awareness of Freeman, the source of the

19    information, is not sufficient evidence to link them in a

20    conspiracy with Freeman.  Because mere awareness does not

21    satisfy the conspiracy requirement that two parties act in

22    concert toward a common goal.

23         Their reliance on the simple fact that Dr. Sarshar

24    knows the cooperating witness is just not enough.  If that were

25    the case, then you wouldn't need any other test.  All you would

LATBSARO

1    have to establish is that they knew each other, and that would

2    be enough to pull them within the reasonable expectation that

3    this remote tippee would be tipped as part of a conspiracy, in

4    furtherance of the conspiracy.

5         It is incredible the notion that they could try to fit

6    it within the co-conspiracy exception.  It's notable that that,

7    I think, is their primary argument.  But then they fall back to

8    a secondary argument; which, when you compare it to the other

9    cases, makes it very clear that they can't meet the test.

10        Why do I say that?

11        Their second argument is that it's a statement against

12   penal interest of the declarant because it's a statement that a

13   reasonable person in the declarant's position would have made

14   if they had believed -- only made if they had believed it to be

15   true, because it tends to expose the declarant to civil or

16   criminal liability; and it's supported by corroborating

17   circumstances that clearly indicate its trustworthiness.

18        Courts rightfully want to make sure that when a

19   declarant is unavailable, that the statements significantly

20   tend to be against penal interest, not that they tend to be,

21   but they significantly tend to be against penal interest, and

22   that's a statement directly out of the *Kostopoulos* case, which

23   I'll talk about in one moment.

24        The fact of the matter here is that we're talking

25   about a declarant who's not going to be on the stand, as I

said, and we can't test what that declarant has to say.  So the

statement must significantly tend to be against associate 1's

penal interest, and it has to be strong corroboration of a

clear trustworthiness.  It doesn't meet the test in this case.

Now, first, does it significantly tend to subject the

declarant to criminal or civil liability?  The problem with

that is there's no evidence that associate 1 knew or believed

or thought that what he was doing and what he received on that

call was illegal.

The government focuses all its attention on the

cooperating witness was concerned about the statements --

again, an unsworn statement, the proposition or proffer that

the government represents, so we don't even know if that's

true.

But hypothetically, if the cooperating witness upon

which the government relies was concerned about the statements,

that's not the test.  The government has the burden to show

that associate 1 believed the statements exposed associate 1 to

liability.

Associate 1 is a dentist, not in the securities

industry.  But what does associate 1 do?  The best proof,

again, is the trading.  Associate 1 does not trade.

Would this be a different case if, after that call

between Dr. Sarshar for a few minutes and associate 1,

associate 1 immediately went to buy out-of-the-money call

LATBSARO

1   options?

2            Yes, it would be a different case, because the

3   government would be able to say, See, that's the proof, the

4   trading.  The tip occurred, and then associate 1 immediately

5   traded on the inside information.  Instead, nine days later,

6   associate 1 sells, completely undermines them.

7            We agree with the government, the *Kostopoulos* case is

8   on point.  I think it's very telling the government has an

9   unusual reading of that case.  The government appealed in that

10  case Judge Johnson's exclusion of the defendant's statements to

11  a cooperating witness, the defendant stockbroker.

12           The government says, at page 23 in their brief, that

13  the Second Circuit rightfully excluded the musings of this

14  declarant to the stockbroker.  They were definitely musings.

15  And then the government says somehow they were less reliable

16  than this Auspex note and the cooperating witness call.

17           Well, let's look at what the case actually says about

18  these musings.  The musings proffered by the government at that

19  time was that this cooperating witness was going to testify

20  that, Patent, the defendant, declarant, told him, quote, he had

21  learned that WLRF was going to be bought out within a few days

22  at a particular price, and also that he had obtained the

23  information from someone who worked at one of the two public

24  companies that was merging.

25           And those, the government acknowledges, are musings

LATBSARO

1   that the Second Circuit rightfully excluded.  How can they

2   possibly stand in this courtroom today and argue that those

3   musings are somehow less reliable or less inculpatory than the

4   statements in the Auspex note?  It doesn't make any sense.

5        As the *Kostopoulos* court found in that case, where you

6   have disclosure of an actual statement from the stockbroker,

7   This company is going to be bought out in a few days at a

8   particular price from someone -- and I got this from someone

9   who's working at one of those public companies, that's no where

10  near what's reflected in the Auspex note.  The government's

11  interpretation also of *United States v. Gupta* is just unusual.

12  I say that because I tried that case.  I know.

13       The government omits mention of key elements of how

14  Rajaratnam's wiretapped statements to Ian Horowitz, who was his

15  trader, were strongly corroborated and self-inculpatory.

16       In that case, the government was trying to admit

17  Rajaratnam's statement, the declarant, to Ian Horowitz, his

18  trader, against Rajat Gupta.

19       First of all, it was a wiretap call.  There was no

20  dispute about the tone of the voice or the manner of the voice.

21  It was there for everybody to listen to.  That's the power of a

22  wiretap.  We don't have that in this case.

23       We have somebody's recollection, where he took

24  handwritten notes and then converted them at some point later

25  to an electronic record, and he may or may not remember at the

LATBSARO

1    time of trial what it means.

2        But if you look at that case about *Gupta* -- and the

3    government says, Well, that case applies.  Look at that wiretap

4    call.  Raj Rajaratnam was saying on that wiretap call, he got a

5    call at 3:58, two minutes before the close of trading.  That

6    was corroborated by the phone records showing it was one call

7    to Raj Rajaratnam, and that was from Rajat Gupta, in the

8    minutes before the close of trading that day.

9        It was corroborated by Raj's secretary, who was the

10   first witness to testify, Karen Eisenberg, who took the stand

11   and said:  I remember that day.  Right towards the end of the

12   trading day, somebody called on my most-important-people list.

13       It was a list that Raj had given her to say if any of

14   these people call at the end of the trading day, I need to get

15   that call.

16       Well, Rajat Gupta was on the most-important-people

17   list, and so she ran and got him and said it was urgent.  Gupta

18   had just gotten off a board call of Goldman Sachs voting in

19   favor of Warren Buffett's billion dollar investment.

20       Raj tried to get -- and he explains on the phone call,

21   that wiretap that's admitted into evidence -- he's trying to

22   get trader number one to make the trade.  Trader number one

23   testified that happened, and then he gets trader number two to

24   make the trade.  Trader number two doesn't testify.

25       But what does happen is a witness, Karen Eisenberg,

LATBSARO

1    who says, Yeah, he bought Goldman Sachs stock.  The trading

2    records show they purchased 33 million shares of stock right

3    after the call.  And then on the recording itself -- the court

4    doesn't emphasize this at the circuit level, but at the

5    district court, certainly Judge Rakoff focused on this.

6          Raj Rajartnam said to Ian Horowitz on that wire tape

7    call, "I can't, yell it out in the F-U-C-K-I-N-G calls."

8          Judge Rakoff said, Well, that was inculpatory.  Why

9    can't you yell it out loud?  And then the whole context of the

10   call was when Ian Horowitz kept saying, We'll talk about when

11   you come in, we'll talk about it when you come in, because he

12   was trying to shut him up from making all these

13   self-inculpatory statements.

14         It goes on.  The recording has Raj admitting that he

15   bought 376,000 shares of Goldman Sachs towards the end of the

16   trading day.  I mean, if that is the test for the

17   admissibility, which the government seems to say is analogous

18   to this case, it shows how preposterous it is, how far distant

19   they are between what was admitted in the *Gupta* case, what met

20   the standard and what doesn't, which is this case.

21         The final, your Honor, the most important thing for --

22   well, one of two most important things when it comes to this

23   statement against penal interest is the corroboration.  It has

24   to clearly indicate trustworthiness.  There's nothing about

25   this statement that indicates trustworthiness.

1          I talk about the trading.  The trading is the most

2     important indicator.  Is it trustworthy?  You have that in the

3     *Gupta* case.  You don't have that at all here.

4          You have the problem of the inherent contradictions

5     within the notes themselves.  I won't emphasize it.  We lay it

6     all out in our briefs.  The government addresses some of it,

7     disregards other parts.  They don't have an explanation for,

8     "You need holding power to whether."  They disregard that part

9     of the Auspex note, although they have access to the

10    cooperating witness and can offer a proffered unsworn statement

11    if they wanted to.

12         And then, finally, the government has a few other what

13    I would call fallback arguments, just in the hypothetical case

14    that those two principal arguments are rejected: the residual

15    exception, which I think we can all say is just not going to

16    meet the trustworthy test, if it doesn't fall within the other

17    exceptions; and the business record exception, which is really,

18    if you think about it, this is not a business record.  This is

19    somebody's personal note of trading.  The notion that he has

20    one note back in 2006 and then another note, in the Auspex note

21    of 2015, and somehow that's a pattern and a practice that is

22    subject to systematic, automatic sort of taking of notes is

23    just sort of absurd.

24         And we put in our reply brief, your Honor, at page 25

25    of our reply, some of the other statements.  I don't need to

LATBSARO

1    say it here in open court, but some of the other statements and

2    musings that this cooperating witness has said about a host of

3    subjects, I think that shows those aren't business records.

4    What he was taking down were personal musings; they're not

5    business records.

6            And then the government's last fallback argument is

7    this recorded recollection, and I'm not sure why they do that,

8    but they say that maybe the cooperating witness in some months

9    will not remember.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MR. BRODSKY:  Your Honor, if there's any hesitation to

2     even think about admitting this, we need to hear from

3     Mr. Behfarin, because if the government is postulating that

4     maybe he doesn't remember today, then that is something the

5     Court should know today.  It can't be the case that we don't

6     know until trial whether or not Mr. Behfarin is going to

7     remember and what he's going to remember, especially because

8     the declarant is unavailable.

9            I don't know if your Honor has questions about this.

10    I've been talking a lot.  I'm very passionate about the

11    subject, as you can see.

12           THE COURT:  Thank you.

13           I'll hold any questions until after I've heard from

14    the United States.

15           Thank  you.

16           MR. BRODSKY:  Thank you, your Honor.

17           THE COURT:  Counsel for the United States, is there

18    anything that you'd like to say in response?

19           MS. TEKEEI:  Thank you, your Honor.

20           And we take the Court's direction that the Court has

21    read our extensive briefing on this.  I just want to respond

22    very, very briefly to some of the high-level arguments made by

23    counsel.

24           Your Honor, we'll take them in the order of the

25    government's briefing, which is the government first posits the

LatWsar2

1    argument that these are statements against penal interest made

2    by associate 1.  The Court has seen the statements, and on

3    their face, they are highly incriminating.

4            On March 11, associate 1, after a phone call with the

5    defendant, in the middle of his busy dental practice, takes the

6    time, perhaps between seeing patients, to call the cooperating

7    witness to share the information that's reflected in the note,

8    and the cooperating witness takes care to write down what

9    associate 1 says.

10           "Conversation between the defendant and associate 1:

11           "J.P. Morgan is working on it,

12           "He's getting the impression that it can happen" -- he

13   being the defendant.

14           "They are having their audits done just in case."

15           And then there's pricing:

16           "$105 to 110 per share he," the defendant, "was

17   willing to sell -- and not the whole company.

18           "He said 'absolutely' buy more."

19           The defendant said that.

20           We'll talk about "you need holding power to whether"

21   in a moment, your Honor.

22           And then he writes:  "Something is happening."

23           This middle-of-the-day phone call, the workday phone

24   call, is recorded by the cooperating witness, as is his

25   practice to write down information he obtains regarding his and

LatWsar2

his family businesses, his family incorporated partnerships'
investments.  There can be no question that under the *Dupree*
standard these statements would be probative in a case against
associate 1, and that is the standard.  The standard is not
whether the government can prove here, right now, whether
associate 1 knew beyond a reasonable doubt that what he was
sharing with the cooperating witness was material nonpublic
information.

The standard is are these statements probative in a
criminal case against associate 1?  And that is absolutely
true, especially when you look at the surrounding
circumstances, as *Gupta* and many of the other cases cited by
the defense and by the government say we should.  Sharing with
another securities trader, particularly a coinvestor in Auspex,
through the entities that they share together, confidential
information provided by the founder of Auspex and a sitting
member of Auspex, a public company's board of directors, naming
the defendant as the source of that information, which is what
makes it insider information, is what makes it more valuable
and meaningful than analyst reports or market rumors.  And then
conveying the insider's directive -- it's a directive:
absolutely purchase more stock -- are precisely the kinds of
statements that would expose someone to legal jeopardy.  And we
meet the preponderance standard on all of the factors that are
relevant to the statements against penal interest inquiry.  No

LatWsar2

1   reasonable person would have made these statements unless they

2   were true.

3          The statements are corroborated by other evidence.

4   We've cited in our briefing, your Honor, the board meeting

5   minutes.  There's information about the deck, the slide deck

6   that was shown on March 11.

7          THE COURT:  Can I just pause you, counsel.  I

8   apologize.

9          MS. TEKEEI:  Yes, your Honor.

10          THE COURT:  Just a moment ago you said that the

11   standard is not whether the government can prove right here

12   these things.  I understand that.  That's an argument.  I

13   understand that.  The Court makes its decisions regarding

14   whether a sufficient foundation has been provided for the

15   introduction of evidence when the evidence establishing the

16   foundation has been presented to the Court under Rule 104.

17          Now, counsel, you're making an argument that the

18   information that's been presented to the Court at this point is

19   sufficient for the government to satisfy its burden to show

20   prove the admissibility of this evidence under the rule.  Is

21   the government taking the position that the Court should make a

22   decision regarding the admissibility of this evidence based

23   solely on the information that's been presented to the Court

24   here in connection with this motion?

25          MS. TEKEEI:  Your Honor, we think that the Court has

LatWsar2

 1    enough information to be able to hold that the associate 1

 2    statements that are reflected in the Auspex note are probative

 3    evidence of associate 1's guilt and, therefore, statements that

 4    he made against his penal interest.

 5              THE COURT:  Thank you.

 6              Just to be clear, counsel for the United States, are

 7    you taking -- is the government taking the position that I

 8    should make a decision regarding the defendant's motion to

 9    exclude based solely on the evidence that has been presented to

10    the Court in connection with this motion?  Is that the

11    government's position?

12              And again, just to be very clear that I'm not hiding

13    the ball and being very transparent, my understanding was that

14    the government has some other evidence in addition to what's

15    been presented to me in connection with this motion practice to

16    support your position regarding the admissibility of these

17    pieces of evidence.  And so my question to you is whether

18    you're saying that that is not the case, that I should decide

19    whether or not it is possible for the government -- whether or

20    not the government has met its burden to admit this evidence

21    based solely on the evidence presented to the Court in

22    connection with this hearing, or are you saying that, instead,

23    the government has presented or needs not prove the

24    admissibility of this evidence at this stage but, rather, that

25    the burden is one that you satisfy at trial?

LatWsar2

1          So counsel, I just want to understand the government's

2     position, because it is meaningful in my assessment of the

3     defendant's motion to exclude this evidence.

4          MS. TEKEEI:  Thank you, your Honor.

5          I think I understand what the Court is asking.

6          We are at the pretrial motion stage, although this is

7     a motion *in limine* that was filed early.  Typically, in

8     connection with motions *in limine*, which are typically done

9     closer to the trial phase of a proceeding, the government

10    proffers the evidence that it expects, what it expects the

11    evidence at trial will show, and we have done so in this

12    briefing, because we have proffered to the Court what it

13    expects the evidence at trial will show.  And it is based on

14    our proffer of what we expect the evidence at trial will show

15    that we are arguing that this is a statement against penal

16    interest and, therefore, admissible.

17         We recognize, your Honor, that while we have attached

18    exhibits and we have proffered testimonial statements, those

19    statements are not in evidence.

20         THE COURT:  Thank you.

21         So just to be clear, with respect to the other issues

22    here -- namely -- let me begin with the issue of whether or not

23    the conspiracy included the drafter of our note, have you

24    presented to the Court all of the evidence that you expect to

25    support that contention regarding the scope of the conspiracy

LatWsar2

1   in the evidence presented to the Court in connection with this

2   motion?

3              MS. TEKEEI:  Your Honor --

4              THE COURT:  So, in other words, just to be very clear

5   and transparent --

6              MS. TEKEEI:  Sure.

7              THE COURT:  -- is the government telling me that I can

8   adequately evaluate whether the government's evidence is

9   sufficient to establish that the conspiracy's scope extends to

10  CW-1, again, based on the evidence presented in connection with

11  this hearing?  Is that the universe of evidence that I should

12  use to establish whether or not you have met that burden?

13             MS. TEKEEI:  Your Honor, motions *in limine* and rulings

14  on them are typically preliminary because the testimony has not

15  yet come in, and we understand that the Court -- typically, if

16  this were to come up at trial, the Court would have heard

17  testimony and been able to assess and make that determination

18  based on the testimony.  So we are proffering what we expect

19  the testimony will be, and we are making the legal arguments

20  based on what we expect the evidence will show.  We recognize

21  and respect that the Court may want to reserve ruling until

22  such testimony is in.

23             THE COURT:  Thank you.

24             To be clear, let me just distinguish four parts of

25  your briefing from others.

LatWsar2

1          With respect to --

2          MS. TEKEEI:  I'm sorry.

3          THE COURT:  With respect to the issue related to

4     whether or not this is a business record, the government has

5     proffered specific testimony that it expects the witness to

6     provide to the Court that arguably satisfies the preconditions

7     for admission of that evidence under the rule.

8          I don't see a similar proffer with respect to the

9     scope of the conspiracy, for example.  I see argument, but I

10    don't see evidence.  As a result, again, to be fully

11    transparent, my understanding of the government's argument was

12    that this was what you expected to prove but that you were not

13    presenting to me now all of the evidence that you will provide

14    in order to prove it.

15         So I'm asking you now, to be very clear, is the

16    universe of evidence that's been presented to the Court by the

17    government and the defense in connection with this motion the

18    universe of evidence that you expect to present to the Court at

19    trial to support your position?  If so, I may be able to

20    provide more guidance to the parties.  If not, if instead your

21    position is, in essence, that we think that we can prove this

22    hypothetical alternative set of facts at trial, that's a

23    different scenario.

24         So I just want to explore that distinction, because it

25    appears to me that you've said arguably both things: one, not

LatWsar2

1    the government's burden to show this here at this stage; and

2    then, two, that the government's evidence has shown something.

3    So I just want to make sure that I have a clear sense of the

4    universe in which the government is asking for me to resolve

5    this dispute at this stage.

6        MS. TEKEEI:  Sure.

7        Your Honor, if it's helpful, and it's something that

8    the Court said that spurs this, the parties have briefed this

9    issue before all of the evidence is in and before all of the

10   evidence has been assessed in order to get some preliminary

11   guidance from the Court, the Court's assessment as to whether

12   this sort of -- whether this evidence would be admissible if

13   the government were able to lay the foundation that it's

14   proffered that it will be able to, so I'm not trying to --

15       THE COURT:  I'm sorry.  Let me just pause you, because

16   that's almost meaningless, because the question is whether the

17   government has presented facts that establish the foundation

18   for the introduction of this evidence.  Again, my understanding

19   of your comment was whether or not I would let in the evidence

20   if the government establishes a proper foundation.  The answer

21   to that question is yes.  If you establish a proper foundation,

22   it can come in.

23       The question here is whether or not the papers that

24   you have submitted provide to the Court all of the evidence

25   that you will provide in order to establish a proper foundation

LatWsar2

 1    such that I can make a ruling regarding the issue here, or if

 2    instead this is an issue that I have to defer until the

 3    government has presented the evidence at trial.

 4            MS. TEKEEI:  Your Honor, the evidence that we would

 5    add to what we have proffered here is testimonial evidence as

 6    well as the exhibits and the foundation for the exhibits.  So

 7    if the Court's question is -- and I think I understand -- can I

 8    decide right now based on everything that's here, I think the

 9    answer is we think that the testimony is what would establish

10    some of the elements here and some of the foundation, and that

11    testimony is not in yet.

12            THE COURT:  Thank you.

13            So just to be clear, my understanding of the

14    government's position is that you understand that the

15    government bears the burden of establishing the foundation for

16    the introduction of this evidence and that you expect to

17    provide evidence that will support the foundation that is more

18    extensive than what's been presented to me in connection with

19    this motion.

20            MS. TEKEEI:  Yes, your Honor.

21            THE COURT:  Thank you.

22            Please proceed.

23            MS. TEKEEI:  Your Honor, just going back to one of

24    your Honor's comments, when I said that we don't need to prove

25    that associate 1 knew that it was MNPI, my point was not

LatWsar2

1    whether I need to prove it now or later.  My point was that all

2    that needs to be established is whether these statements are

3    probative in a criminal trial against him.  And I think on

4    their face, the argument that we posit to the Court is on their

5    face they would, in fact, be probative in a criminal case

6    against associate 1, and therefore, they meet all of the

7    factors that courts typically look at when admitting statements

8    like this pursuant to the statements against interest

9    exception.

10            THE COURT:  Thank you.

11            Counsel for defendant has suggested that it's a

12   different standard, not just that it's probative but rather

13   that it's substantially, more than just somewhat probative,

14   that it is substantially so.

15            Do you agree with counsel's description of the

16   standard here, and are you suggesting that I apply a lower bar?

17            MS. TEKEEI:  Your Honor, I was actually looking

18   through the cases to see if "substantially probative" was in

19   the quotations.  I'm relying on *Gupta* and *Dupree*, and we cite

20   those cases in our briefing when I say that it needs to be

21   probative.

22            THE COURT:  Thank you.

23            Please proceed.

24            MS. TEKEEI:  Unless the Court has any more questions

25   on the statement against interest, I think we address all of

LatWsar2

1    counsel's arguments in our briefing, so I don't want to

2    reiterate some of the points that have already been made.  I'll

3    move on to the coconspirator statement exception very briefly.

4         Your Honor, and this is in response to something the

5    Court mentioned earlier and also in response to arguments made

6    by counsel.

7         The *Geibel, McDermott*, and *Carpenter* cases make it

8    clear that there are three hypothetical avenues to allowing

9    statements like this in.  The government doesn't have to pursue

10   all of those hypothetical avenues.  The avenue that we have

11   focused our briefing on is whether this was reasonably

12   foreseeable, whether associate 1's passing this material

13   nonpublic information to the CW was reasonably foreseeable.

14   And *Geibel*, *McDermott*, and *Carpenter* all hold that if the

15   conspirators reasonably foresaw, as a necessary or natural

16   consequence of their unlawful agreement, that the information

17   would be passed to more remote tippees, then that is

18   sufficient.

19        And based on the context of this group's history,

20   their relationships, their prior investments through each

21   other's entities in Auspex, their continued friendships

22   throughout the many years, and all of the factors that are laid

23   out in our briefing, we think that we clearly meet this prong

24   or this avenue of relief for seeking admission of these

25   statements as coconspirator statements.

LatWsar2

1          The cooperating witness was somebody who was, in fact,

2     known to the defendant not just as a friend but as an investor

3     in Auspex, was known to the defendant as somebody who invested

4     with or in conjunction with and after discussing their

5     investment decisions with associate 1.  And so this is, it was

6     reasonably foreseeable to the defendant that when he shared

7     this material nonpublic information with associate 1, that it

8     would be shared, but particularly that it would be shared with

9     the cooperating witness.  We think that's a natural

10    consequence, and that's the hypothetical avenue under

11    *McDermott*, *Geibel*, and *Carpenter* that we briefed and that we

12    wanted to focus the Court's attention on.

13          And then very briefly, your Honor mentioned the

14    business records exception.

15          The rule is very clear that the records do not have to

16    be of a business.  They are records of regularly conducted

17    activity, and we pointed the Court to, in our briefing, records

18    that are of regularly conducted activity of this nature, that

19    when the proper foundation has been laid and as we proffered we

20    think it will be, the actual records themselves and not just

21    the witness's testimony about the statements that were made are

22    admissible.  And so to the extent that the Court -- to the

23    extent that the defense continues to argue that they must be

24    business records, I'll just add, your Honor, that the family

25    partnership in which the cooperating witness invested through

LatWsar2

1    his family business was, in fact, a business.  It was, in fact,

2    incorporated.  There was, in fact, a president.  There were, in

3    fact, documents that were kept in addition to just these notes

4    in connection with those investments, including corporate and

5    trading records.

6           And so if this turns on whether a business is needed,

7    and we don't think it should, because we think the rule is

8    clear that it is records of regularly conducted activity, we're

9    happy to provide more information to the Court regarding the

10   business.

11          THE COURT:  Good.  Thank you very much.

12          MS. TEKEEI:  Unless the Court has any more

13   questions --

14          THE COURT:  Thank you.

15          Counsel for defendant, you can tell from my questions,

16   likely, what the principal, a principal issue that I have with

17   respect to this motion, namely, when it is that the government

18   must establish the requisite foundation for the admission of

19   this evidence.  The government has the burden.  The question is

20   if it has the burden to proffer sufficient evidence now, at the

21   motion *in limine* stage, or if they can, as counsel just

22   proffered, show a "hypothetical avenue" for the introduction of

23   this evidence and await the submission of the evidence at trial

24   for me to establish whether or not they have met that burden.

25          What's your thought, counsel?  How can I make a

LatWsar2

1    determination in the context of a motion *in limine* that the

2    government cannot introduce this evidence?

3         MR. BRODSKY:  Your Honor, the government cannot

4    introduce the evidence at the current stage based on what

5    they've proffered to the Court for a number of reasons:

6         First, they haven't proffered a clear understanding at

7    all of what Mr. Behfarin would say or would not say, the

8    cooperating witness.  What they've told us in their motion

9    papers contradicts itself.  On the one hand, he'll remember; on

10   the other hand, he won't.  On the one hand, the note says

11   absolutely buy more; on the other hand, we don't know whether

12   that was the declarant saying it or somebody else.  There's --

13   something is happening.  Something is happening is very

14   different than an actual tender offer is going to take place at

15   a certain time by a certain party.

16        There are a lot of questions.  The government has

17   asked you to look at the words of the note itself.  They say

18   that's inherently reliable, omitting, again, that there was a

19   handwritten note that no longer exists that was then converted.

20   So these aren't contemporaneous notes.  They can't be.  And the

21   government postulates to you that the declarant, somehow this

22   is important because it was between seeing patients.  But then

23   they put in the word "perhaps," speculating again.

24        They have no idea where the declarant was, whether he

25   was seeing patients or not seeing patients.  They haven't

LatWsar2

1    offered any evidence of that, and their interpretation of the

2    note is pure speculation.  This is not like the wiretap in the

3    *Gupta* case, where we could all hear it.  This is not like the

4    recording that occurred in the Sean Stewart case, where Judge

5    Rakoff actually excluded the silver platter comment, because

6    despite the government's arguments that it was inculpatory,

7    Judge Rakoff found it was not inculpatory, and he heard the

8    recording.  He was able to hear the context.

9             So your Honor, without hearing from the cooperating

10   witness, it is not a good record for your Honor to rule on it,

11   and this is the classic example of why, because this

12   cooperating witness would not be taking the witness stand at

13   this trial if your Honor excludes this testimony about the

14   Auspex conversation with associate 1.  He will not be walking

15   into this courtroom, because he won't have anything relevant to

16   say.  And so the openings will be by the government, the

17   government will open presumably with this note.  The government

18   will emphasize it, and then, in the middle of trial, your Honor

19   will have to make a determination with the cooperating witness

20   whether he remembers or doesn't remember, whether his statement

21   is reliable or unreliable, and that is simply not appropriate

22   in a trial like this.

23            The government rested on its papers regarding the

24   corroboration.  I understand that, but your Honor, when I said,

25   used the language "significantly tends to inculpate," I was

LatWsar2

1    relying on the *Kostopoulos* case, which uses that language.  I

2    understand there are other cases that use different language,

3    but under any standard, the government hasn't met it, and the

4    government was noticeably silent about corroboration.  There

5    isn't sufficient corroboration here for the government to meet

6    the standard.

7          Then, your Honor, with respect to conspiracy, the

8    government postulates a theory, but again, it lacks -- it

9    relies on speculation, and it needs to be probed and tested by

10   this Court before the cooperating witness took the stand.

11         One thing I do want to emphasize is the government has

12   not addressed how it's possible that a conversation occurred

13   between the cooperating witness and Dr. Sarshar in which the

14   government admits Dr. Sarshar did not provide nonpublic

15   information to the cooperating witness days before this alleged

16   conversation between the cooperating witness and associate 1.

17         And so the notion that somehow, that that doesn't

18   indicate Dr. Sarshar's intent, it's just put aside.  And that,

19   again, is another reason why a hearing would be required.

20         THE COURT:  Good.  Thank you very much.

21         MR. BRODSKY:  Thank you, your Honor.

22         THE COURT:  Counsel, thank you very much.

23         Counsel for the United States, any brief rebuttal to

24   counsel for defendant's response to your remarks?

25         MS. TEKEEI:  Your Honor, I didn't hit the

LatWsar2

1    corroboration point only because we discuss it extensively in

2    our briefing.

3           I will just say, your Honor, they seem to be focused

4    on one particular issue, which is trading and whether that in

5    and of itself is corroboration.  There's absolutely no case law

6    that says that the only corroboration for these sorts of

7    statements can and should come from the actual trading that

8    people were engaged in.  There's no basis to say that, and

9    there's plenty of other corroboration for these statements that

10   the government has pointed to in its briefing.

11          THE COURT:  Good.  Thank you very much.

12          MR. BRODSKY:  Your Honor, I apologize.

13          THE COURT:  That's fine.

14          MR. BRODSKY:  The final point, your Honor, we wanted

15   to make was that we would ask your Honor to hold a hearing or

16   exclude the evidence if this is the government's sole record.

17   And we would ask for a hearing sooner rather than later because

18   it would impact the entire trial.

19          THE COURT:  Thank you.

20          I will comment on that in a moment.

21          Counsel, what I'd like to do is just to take a very

22   short recess to let everyone stretch their legs, no longer than

23   five minutes.  When I return, we'll come back to this and the

24   other issues that we've discussed.

25          Again, this is just a very short rest break.  So it's

LatWsar2

1    11:43 a.m. by my clock.  Counsel, I'll see everyone back at

2    11:50.

3            Thank you.

4            (Recess)

5            THE COURT:  Welcome back.  Thank you, counsel, for

6    your arguments regarding the motion to exclude.  I want to turn

7    to each of the other motions, but I think that I will begin by

8    just providing some feedback with respect to the motion to

9    exclude.

10           I'll now address Sarshar's motion to exclude.  Sarshar

11   is seeking to exclude an iCloud note (the "Auspex note") made

12   by cooperating witness (the "CW") which the government alleges

13   reflects a phone call between the CW and associate 1 on March

14   11, 2015, during which associate 1 allegedly passed MNPI to the

15   CW that Sarshar had passed to associate 1.  Sarshar argues that

16   both the Auspex note and associate 1's alleged statements that

17   the Auspex note purports to record are inadmissible hearsay.

18           Sarshar filed the motion to exclude on July 2, 2021 --

19   I'll refer to that as Def. Mem. -- at Dkt. No. 38.  The

20   government filed its opposition to his motion on August 13,

21   2021, which I will refer to as opposition, at Dkt. No. 57.

22   Sarshar filed a reply on September 10, 2021, which I'll refer

23   to as the reply at Dkt. No. 61.

24           I'm prepared to rule on defendant's motion.  I'm going

25   to do so orally.  The parties are familiar with the underlying

LatWsar2

<table>
<tr><td>1</td><td>facts.  Therefore, I will not recite those in detail.  To the</td></tr>
<tr><td>2</td><td>extent any facts in this case are particularly pertinent to my</td></tr>
<tr><td>3</td><td>decision, those facts are embedded in my analysis.</td></tr>
<tr><td>4</td><td>A.  Legal standards.</td></tr>
<tr><td>5</td><td>"The purpose of an <em>in limine</em> motion is to aid the</td></tr>
<tr><td>6</td><td>trial process by enabling the court to rule in advance of trial</td></tr>
<tr><td>7</td><td>on the relevance of certain forecasted evidence as to issues</td></tr>
<tr><td>8</td><td>that are definitely set for trial, without lengthy argument at,</td></tr>
<tr><td>9</td><td>or interruption of the trial." <em>Hart v. RCI Hosp. Holdings,</em></td></tr>
<tr><td>10</td><td><em>Inc</em>,, 90 F.Supp.3d 250, 257 (S.D.N.Y. 2015) (quoting <em>Highland</em></td></tr>
<tr><td>11</td><td><em>Cap. Mgmt., L.P. v. Schneider</em>, 551 F.Supp.2d 173, 176 (S.D.N.Y.</td></tr>
<tr><td>12</td><td>2008)).  "Evidence should not be excluded on a motion <em>in limine</em></td></tr>
<tr><td>13</td><td>unless such evidence is 'clearly inadmissible on all potential</td></tr>
<tr><td>14</td><td>grounds.'" <em>Id</em>. (quoting <em>Nat'l Union Fire Ins. Co. of</em></td></tr>
<tr><td>15</td><td><em>Pittsburgh, Pa. v. L.E. Myers Co. Grp.,</em> 937 F.Supp. 276. 287</td></tr>
<tr><td>16</td><td>(S.D.N.Y. 1996)).  Courts considering a motion <em>in limine</em> may</td></tr>
<tr><td>17</td><td>reserve judgment until trial, so that the motion is placed in</td></tr>
<tr><td>18</td><td>the "appropriate factual context." <em>See Nat'l Union Fire Ins.</em></td></tr>
<tr><td>19</td><td><em>Co.</em>, 937 F.Supp. at 287.  Further, "[a] ruling [on a motion <em>in</em></td></tr>
<tr><td>20</td><td><em>limine</em>] is subject to change when the case unfolds,</td></tr>
<tr><td>21</td><td>particularly if the actual testimony differs from what was</td></tr>
<tr><td>22</td><td>contained in the [party's] proffer." <em>Luce v. United States</em>,</td></tr>
<tr><td>23</td><td>469 U.S. 38, 41 (1984).</td></tr>
<tr><td>24</td><td>The Court must decide preliminary or predicate</td></tr>
<tr><td>25</td><td>questions of fact regarding the admissibility of evidence.</td></tr>
</table>

LatWsar2

Under Rule 104 of the Federal Rules of Evidence, the court "must decide any preliminary question about a whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).  When preliminary facts related to the admissibility of evidence are disputed, the party offering the evidence must prove its admissibility by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  Rule 104(b) provides that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist.  The court may admit the proposed evidence on the condition that the proof be introduced later." Fed. R. Evid. 104(b).  This rule permits of the introduction of evidence at trial "subject to connection" when other evidence is proffered to be offered later in the trial. Under certain circumstances, a court must conduct a hearing regarding a preliminary question outside of the hearing of the jury, particularly if the defendant in a criminal case is a witness and requests such a hearing or if "justice so requires."  Fed. R. Evid. 104(c).

"Hearsay evidence is any statement made by an out-of-court declarant and introduced to prove the truth of the matter asserted*." United States v. Cardascia,* 951 F.2d 474, 486 (2d Cir. 1991) (citing Fed. R. Evid. 802).  "Of course,

LatWsar2

every out-of-court statement is not hearsay, and all hearsay is
not automatically inadmissible at trial.  Instead, the purpose
for which the statement is being introduced must be examined
and the trial judge must determine -- if that purpose is to
prove the truth of its assertion -- the proffered statement
fits within any of the categories excepted from the rule's
prohibition."  *Id.*

Under Fed. R. Evid. 805, "[h]earsay within hearsay is
not excluded by the rule against hearsay if each part of the
combined statements conforms with an exception to the rule."
Fed. R. Evid. 805.  Where evidence involves two or more
out-of-court statements, a court must "review each statement to
determine whether it is admissible, either because it is not
hearsay or because it is hearsay subject to an enumerated
exception."  *United States v. Cummings*, 858 F.3d 763, 773 (2d
Cir. 2017).

B.  Discussion.

Sarshar challenges the admissibility of the Auspex
note.  The Auspex note is an iCloud note allegedly written by
the CW that purports to reflect associate 1's statements to the
CW during a phone call on March 11, 2015.

The relevant portion of the Auspex note states:

"3/11/15

"Conversation between Sharyar and Sep:

"J.P. Morgan is working on it (no name now)

LatWsar2

1              "He's getting impression it can happen

2              "They are having their audits done just in case

3              "$105 to 110 per share he was willing to sell -- and

4    not whole company!!

5              "He said 'absolutely' buy more to Sharyar

6              "U need holding power to whether

7              "Something is happening"

8          The Auspex note contains three levels of potential

9    hearsay:  (1) Sarshar's statements to associate 1; (2)

10   associate 1's statements to the CW; and (3) the Auspex note's

11   statements regarding what associate 1 said to the CW.  The

12   government does not contest that it is offering these

13   statements for the truth of the matter asserted; namely, that

14   associate 1 told the CW about the MNPI that Sarshar allegedly

15   passed to associate 1.

16        The first level of potential hearsay, Sarshar's

17   statements to associate 1, are admissible as nonhearsay

18   statements of a party opponent under Fed. R. Evid.

19   801(d)(2)(A).  The Court will now consider whether associate

20   1's statements and the Auspex note are admissible.

21            (i).  Associate 1's statements.

22        The government argues that associate 1's statements to

23   the CW are admissible as (1) statements against interest; (2)

24   coconspirator statements; and (3) under the residual exception.

25   Because the Court concludes that Sarshar's not established that

LatWsar2

associate 1's statements are clearly inadmissible on all

potential grounds, the Court denies Sarshar's motion to

exclude.

Just a brief aside.

The government did not move here for the admission of

this evidence.  The defendant moved for its exclusion.

1.  Statement against interest.

Under Fed. R. Evid. 804(b)(3), one type of statement

that is "not excluded by the rule against hearsay if the

declarant is unavailable as a witness" is a statement that:

(A) a reasonable person in the declarant's position

would have made only if the person believed it to be true

because, when made, it was so contrary to the declarant's

proprietary or pecuniary interest or had so great a tendency to

invalidate the declarant's claim against someone else or to

expose the declarant to civil or criminal liability; and.

(B) is supported by corroborating circumstances that

clearly indicate its trustworthiness, if it is offered in a

criminal case as one that tends to expose the declarant to

criminal liability.

Fed. R. Evid. 804(b)(3).  To satisfy Rule 804(b)(3),

the proponent must show by a preponderance of the evidence:

"(1) that the declarant is unavailable as a witness; (2) that

the statement is sufficiently reliable to warrant an inference

that a reasonable man in [the declarant's] position would not

LatWsar2

have made the statement unless he believed it to be true; and

(3) that corroborating circumstances clearly indicate the

trustworthiness of the statement." *United States v. Wexler*,

522 F.3d 194,202 (2d Cir. 2008) (quoting *United States v.*

*Katsougrakis,* 715 F.2d 769, 775 (2d Cir. 1983)).  In assessing

whether a statement is against penal interest within the

meaning of Rule 804(b)(3), the district court must first ask

whether "a reasonable person in the declarant's shoes would

perceive the statement as detrimental to his or her own penal

interest," a question that can be answered only "in light of

all the surrounding circumstances." *United States v. Gupta*,

747 F.3d 111, 127 (2d Cir. 2014).

     Sarshar argues that "associate 1's purported

statements on the CW call are not against his penal interest

because they do not contain MNPI, and even if they did,

associate 1 did not know that they did, such that it can be

assumed he would not have made those statements unless they

were true."  Reply at 12.  In response, the government argues

that associate 1, a securities trader, would know that passing

MNPI to another securities trader would expose him to criminal

liability, and therefore associate 1 would not have made the

statements unless they were true.

     Whether associate 1's statements were against

associate 1's penal interest and whether associate 1 knew he

was potentially exposing himself to liability by making the

LatWsar2

statements are both factual issues that the Court cannot

resolve on the current record.  At this stage, it is possible

for the government to offer evidence sufficient to establish

that associate 1's purported statements are admissible as

statements against interest.  Accordingly, Sarshar has failed

to show that associate 1's statements are clearly inadmissible

on all possible grounds, and therefore, the Court denies his

motion to exclude associate 1's statements.

2.  Coconspirator statement.

Alternatively, the government argues that associate

1's statements are admissible as coconspirator statements

pursuant to Rule 801(d)(2)(E).  "Under Rule 801(d), an

out-of-court statement offered for the truth of its contents is

not hearsay if '[t]he statement is offered against an opposing

party' and it 'was made by the party's coconspirator during and

in furtherance of the conspiracy.'"  *United States v. Brown*,

2017 WL 2493140, at *1 (S.D.N.Y. June 9, 2017) (quoting Fed. R.

Evid. 801(d)(2)(E)).  "In order to admit a statement under this

rule, the court must find: '(a) that there was a conspiracy,

(b) that its members included the declarant and the party

against whom the statement is offered, and (c) that the

statement was made during the course of and in furtherance of

the conspiracy.'"  *Id.* (quoting *Gupta*, 747 F.3d at 123).

"Evidence may be admitted under Rule 801(d)(2)(E) only if a

court finds, by a preponderance of the evidence, that the

LatWsar2

defendant and the declarant joined a conspiracy, and the

challenged out-of-court statements may themselves be considered

in making this determination." *United States v. Lumiere*, 2017

WL 1391126, at *5, (S.D.N.Y. Apr. 18, 2017) citing *Bourjaily*,

483 U.S. at 175-76, 178-79).  There is no requirement that the

person to whom the statement is made must also be a member of

the conspiracy.  *Gupta* 747 F.3d at 125 (citation omitted).  "In

determining the existence and membership of the alleged

conspiracy, the court must consider the circumstances

surrounding the statement as well as the contents of the

alleged coconspirator's statement itself."  *Id.* at 123.

        "The existence of a conspiracy" and the declarant's

involvement in that conspiracy are "preliminary questions of

fact that, under Rule 104, must be resolved by the court" and

should be "established by a preponderance of proof.*"*

*Bourjaily*, 483 U.S. at 175.

        The government makes two alternative arguments in

support of its contention that associate 1's statements are

coconspirator statements: (1) that the statements were made as

part of the conspiracy that included Sarshar, associate 1, and

the CW; and (2) that even if the CW was not part of the

conspiracy with Sarshar and associate 1, that associate 1's

statements were in furtherance of his conspiracy with Sarshar.

        In the context of insider trading, an insider may be

found to be in the same conspiracy with a remote tippee if one

LatWsar2

of the following three scenarios exists: "(1) if the scope of
the trading agreement were broader 'to include trading by or
for persons other than the small group of conspirators'; (2) if
the conspirators reasonably foresaw, as a necessary or natural
consequence of the unlawful agreement, information being passed
to remote tippees; and (3) actual awareness of the remote
tippees." *United States v. Geibel*, 369 F.3d 682, 690 (2d. Cir.
2004) (citing *United States v. McDermott*, 245 F.3d 133, 138 (2d
Cir. 2001)).  Under the *Geibel* framework, the government argues
that Sarshar was part of the same conspiracy as the CW because
it was a necessary and natural consequence of passing MNPI to
associate 1 that associate 1 would pass the information to
other remote tippees.

     The defendant raises significant concerns about the
government's ability to prove at trial that Sarshar reasonably
foresaw that it was a necessary or natural consequence of his
conspiracy with associate 1 that associate 1 would pass the
MNPI along to remote tippees.  The Court expects that the
government must have at least some evidence to support its
contention that this case falls under the *Geibel* framework.  In
order for the statements to be admitted under this theory, the
government bears the ultimate burden to establish that Sarshar,
associate 1, and the CW were part of the same conspiracy by a
preponderance of the evidence.  Argument alone, without
evidence, is insufficient to meet this burden at trial.  Again,

LatWsar2

1   the Court trusts that the government has a factual basis for

2   its argument that it will present at trial.

3           Next, the government argues that even if Sarshar and

4   the CW were not in the same conspiracy, associate 1's

5   statements to the CW were in furtherance of his conspiracy with

6   Sarshar.  "To be in furtherance of the conspiracy, a statement

7   must be more than a merely narrative description by one

8   coconspirator of the acts of another."  *Id.* (internal quotation

9   marks omitted).  However, "statements 'designed to induce the

10  listener's assistance with respect to the conspiracy's

11  goals' -- *i.e.*, statements that prompt the listener to respond

12  in a way that facilitates the carrying out of criminal

13  activity' -- satisfy Rule 801(d)(2)(E)'s in-furtherance

14  requirement."  *Brown*, 2017 WL 2493140, at *1 (quoting *Gupta*,

15  747 F.3d at 125).  Statements "seeking assistance from a

16  coconspirator, or...communicating with a person who is not a

17  member of the conspiracy in a way that is designed to help the

18  coconspirators to achieve the conspiracy's goals" may also be

19  considered to be in furtherance of the conspiracy.  *United*

20  *States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994).  "A finding

21  as to whether or not a proffered statement was made in

22  furtherance of the conspiracy should be supported by a

23  preponderance of the evidence, and such a finding will not be

24  overturned on appeal unless it is clearly erroneous."  *Gupta*,

25  747 F.3d at 124 (internal quotation marks omitted).

LatWsar2

1          The government argues that the goal of the conspiracy

2     was "for the defendant's family and friends, many of whom had

3     supported the defendant by investing in Auspex years earlier,

4     to make profitable trades based on MNPI and otherwise cause the

5     purchase of securities based on that MNPI," and therefore, by

6     passing MNPI to the CW, associate 1's statements were in

7     furtherance of the conspiracy.  I do not know what additional

8     evidence the government is going to present to the Court to

9     support this assertion.  Argument alone does not carry the day.

10    If the government seeks to introduce these statements, the

11    Court expects that it will be presenting evidence to support a

12    finding by the Court by a preponderance of the evidence that

13    the goal of the conspiracy between Sarshar and associate 1 was

14    to pass MNPI to Sarshar's close friends and family.  Again, I

15    trust that the government has evidence that it will present at

16    trial to support the arguments that it has presented in this

17    motion.

18          Nonetheless, or nevertheless, on the current record

19    the Court cannot definitively conclude that there are no

20    possible facts that the government could offer to establish

21    that Sarshar was in the same conspiracy as the CW or that

22    associate 1's statements were made in furtherance of the

23    conspiracy.  If the government seeks to admit these statements

24    during the trial, they will need to lay a sufficient

25    foundation.  Again, rhetoric alone will not suffice for me to

LatWsar2

admit this evidence.  The government may wish to consider all of the relevant factors to be evaluated by the Court.  However, because the Court cannot conclude that the statements are clearly inadmissible on all potential grounds, the Court denies Sarshar's motion to exclude the statements at this time. Because the Court concludes that the Auspex note may potentially be admissible as a statement against interest or a coconspirator statement, the Court need not address the other -- the government's alternative theories of admissibility.

        Ii.  The Auspex note.

        The government argues that the Auspex note is admissible as a business record under the business record hearsay exception:  Under Federal Rule of Evidence 803(6), business records may be admitted as an exception to the rule against hearsay if:

        (A) the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;

        (B) the record was kept in the course of the regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

        (C) making the record was a regular practice of that activity;

        (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a

certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  "The purpose of the rule is to ensure that documents were not created for 'personal purpose[s]...or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'"  *United States v. Kaiser,* 609 F.3d 556, 574 (2d Cir. 2010) (quoting *United States v. Freidin*, 849 F.2d 716, 719 2d Cir. 1988)).  Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all."  *Id.* (quoting *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010).

The government proffers that it "expects the evidence at trial will lay the following foundation for admissibility: (a) the Auspex note, and, at the very least, the portions of it relaying the March 11 phone call, was made at or near the time of the call by someone with knowledge, *i.e.*, the CW; (b) the Auspex note was kept by the CW, including via the iCloud file hosting, storage, and sharing service, in the course of the CW's regularly conducted activities and business of investing on behalf of himself and his family partnership; (c) making notes, including the Auspex note, was a regular practice of the

LatWsar2

1    CW's in conducting the business of investing on behalf of

2    himself and his family partnership; and (d) all these

3    conditions will be shown by the testimony of the CW, a

4    qualified witness [who] created and maintained the Auspex

5    note." Opp'n at 46.

6         On this record, the Court cannot conclude that the

7    Auspex note is clearly inadmissible on all potential grounds.

8    The government proffers that the witness will testify that many

9    preconditions to its introduction are satisfied. Therefore, I

10   cannot conclude here that the government will not be able to

11   satisfy its burden to establish that the Auspex note is

12   admissible as a business record. Accordingly, Sarshar's motion

13   to exclude the Auspex note is denied. *See Hart* 90 F.Supp.3d at

14   257 ("Evidence should not be excluded on a motion *in limine*

15   unless such evidence is clearly inadmissible on all potential

16   grounds." (internal quotation marks omitted)). Because the

17   Court concludes that the Auspex note may be admissible as a

18   business record, the Court need not address the government's

19   alternative theories of admissibility.

20        C.

21        For the foregoing reasons, Sarshar's motion to exclude

22   is denied. Sarshar raises significant issues regarding the

23   government's ability to meet its burden to introduce the

24   potential hearsay statements at trial. However, on the current

25   record, the Court cannot conclude that the government is

LatWsar2

incapable of laying a proper foundation for the admissibility
of this evidence at trial.  The government must present facts
that support its arguments to support the introduction of this
evidence at trial.  I expect that the government has evidence
that does so.

        The government is directed to notify the Court prior
to seeking to introduce the Auspex note or other evidence of
the call between associate 1 and the CW at trial.  I will want
to hear argument at that time outside of the hearing of the
jury regarding whether the evidence presented at trial is
sufficient to permit the admission of the note and
conversation.  If the government fails to sustain its burden at
trial, I will not accept this evidence.

        A brief aside on the means by which the government is
going to lay the foundation for the introduction of this
evidence at trial.  Frequently, the Court will permit the
introduction of evidence subject to connection and further
proof.  The Court then relies on a curative instruction to the
jury to disregard a statement in the event that the subsequent
evidence does not lay a sufficient foundation for the
introduction of the statement.  I want to place a marker here
with respect to this issue as it pertains to the note and this
testimony.  Because Dr. Sarshar has raised substantial
questions about the plausibility of the government's theory for
the introduction of this evidence -- such as whether this

LatWsar2

1  remote tippee was really a member of the conspiracy and whether

2  Dr. Sarshar can be found to have wanted to tip people other

3  than the people who he allegedly directly tipped -- and because

4  the evidence itself is highly prejudicial to Dr. Sarshar, the

5  government should not expect that I will permit the

6  introduction of this testimony or evidence subject to

7  connection with later testimony or evidence that will connect

8  the dots.  You should expect that I may instead require that

9  the full foundation for the introduction of the statement be

10  laid in advance.

11       Similarly, as counsel for defendant suggested during

12  his arguments, counsel for the United States should not expect

13  to open on this evidence.  I'll hear further with respect to

14  this issue, but this is a significant statement.  The

15  government bears the burden to prove that it should be admitted

16  under Rule 104.  I expect that the government believes that it

17  has evidence that will support its admissibility at trial, but

18  given the nature of this statement, I will want to see that

19  evidence before permitting its admission, and that may have an

20  impact both on how the evidence is presented to the Court and

21  the jury and also, I expect, will have an impact on the

22  evidence that I will permit the government to open on barring

23  some conclusion by the Court otherwise.

24       Counsel for defendants suggested that I hold a hearing

25  with respect to these issues.  As you can tell, my decision on

LatWsar2

 1   this issue is very much based on, I'll call it the polarity of

 2   this motion.  This is a motion by the defense to exclude this

 3   evidence, and I'm denying it for the reasons that I just

 4   granted.  It is not a motion by the government to admit this

 5   evidence based on the record before me, and as a result, I'm

 6   not taking action as if this was a motion to admit the evidence

 7   on this record.

 8          The government has taken a position that allows them

 9   to defeat this motion *in limine* but may raise other issues down

10   the road in the event that the record does not support the

11   admission of this evidence, and I'm not previewing my view with

12   respect to that issue at this time.

13          So the defendant's motion is denied, but I think that

14   we should, at the end of this hearing, talk about whether and

15   to what extent the defendant's request for a hearing regarding

16   the admissibility of this issue and this evidence in advance of

17   trial rather than having the government present the evidence to

18   the Court at trial would be a potential time-saver with respect

19   to the case.  It's not the usual practice here, and I've

20   described an alternative approach that would prevent the

21   government from presenting this significant piece of evidence

22   to the jury before the foundation is properly laid.  So I'll

23   let the parties think about that issue before we decide how

24   best to proceed.

25          At this point, presented with the motion that was

LatWsar2

1  presented to me, it is denied for the reasons I've just

2  described.

3         So let's turn to the next motion that the defendant

4  has pointed me to.  I think, counsel, that the next issue that

5  you wanted to take up was the motion to suppress.  Is that

6  right, counsel?

7             MR. WEITZMAN:  Correct, your Honor.

8             THE COURT:  Thank you.

9             Please proceed.

10            MR. WEITZMAN:  May I approach the lectern?

11            THE COURT:  Yes, you may.

12            MR. WEITZMAN:  Your Honor, as you know, this motion

13  concerns the defendant's request to schedule a *Franks* hearing,

14  because as demonstrated in our papers, the search warrant

15  applications filed by the government are, unfortunately,

16  riddled with material misstatements that materially deceived

17  the authorizing magistrate judge in multiple ways.

18            We don't make these accusations lightly.  We

19  understand the seriousness of this statement in our request for

20  a *Franks* hearing.

21            When we were prosecutors -- all four of us defense

22  counsel have been federal prosecutors.  We have a distinguished

23  former U.S. Attorney among our counsel.  Mr. Brodsky and I

24  handled the *Rajaratnam* case, and I handled the *Franks* hearing

25  in that case, and so I'm familiar with the law and the

LatWsar2

1    standard, and I know it's unpleasant to be on the receiving end

2    of an allegation of misstatements in a search warrant

3    application.  But having examined the supporting declarations

4    by Agent Racz, there is simply no way to see the misstatements

5    and the multiple omissions as anything other than pervasive and

6    material, warranting a *Franks* hearing.  Add to the fact that

7    those misstatements and omissions were made in the *ex parte*

8    context, when Agent Racz and the government had a heightened

9    duty of candor to the court, there simply is no way to escape

10   the conclusion that a *Franks* hearing is needed because those

11   misstatements and omissions were so pervasive.

12           They were, for example -- we've laid them out in our

13   brief -- repeated omissions of clearly exculpatory evidence.

14   Every single witness that Agent Racz interviewed before those

15   search warrant affidavits exculpated our client.  Not one

16   inculpated our client.  I've counted at least six witnesses who

17   exculpated our client before he swore out the affidavits.  None

18   of that was disclosed, or most of it wasn't disclosed.  There

19   are a couple footnotes that make reference to it but don't

20   provide any of the details.

21           There were distortions of trading activity that's

22   simply beyond the pale and made it seem like these traders, the

23   subject traders, profited when they, in fact, lost on trading.

24           Let me pause there, for example, to give you a

25   hypothetical, your Honor.  Imagine Agent Racz, or any agent for

1      that matter, states target has a phone call with subject trader

2      1 on day 1, and on day 3 subject trader buys stock.  Clearly

3      the inference to be drawn -- let's say he buys call options.

4      The inference to be drawn is that the subject trader learned

5      something on that phone call.  But the agent left out that, on

6      day 2, in between those two events, there was ten times more

7      selling than there was buying.  Under that hypothetical, I

8      think we would all agree pretty important information would

9      happen on day 2 that was never disclosed to the magistrate

10     judge.

11             Respectfully, that's what happened here.  My partner's

12     already identified for you how, on day 9, after a phone call

13     between associate 1 and Dr. Sarshar, associate 1 sold a bunch

14     of Auspex stock before he ever bought ten days later or some

15     number of days later.  And that's not just with associate 1.

16     It's with our client's uncle.  Similar story.  Undisclosed

17     selling of stock in the days of March, when he's emphasizing

18     purchases of stock.  There's undisclosed selling of stock by my

19     client's brother.  The trading activity was so distorted to

20     give the wrong inference of insider trading, and it's not for

21     Agent Racz or any government agent to decide which trading

22     activity in the exact, precise time that he's alleging our

23     client is tipping associate 1 through associate 4, it's not for

24     him to decide which trading activity is relevant for the

25     magistrate judge.

LatWsar2

1           Then there are numerous misstatements regarding the

2   documents that Agent Racz had collected, misstatements that,

3   for example, put inside information about a tender offer from

4   Teva in my client's head on January 15, 2015, before there was

5   ever any discussion of a tender offer by Teva, and my client

6   certainly didn't know about it on January 15, and that was

7   integral to the warrant that was issued.

8           The litany of misstatements and omissions we highlight

9   in this case clearly satisfy the substantial preliminary

10  showing standard that's required, but your Honor, there's more.

11          In just preparing for this hearing, we have found

12  additional omissions and misstatements with the discovery that

13  we've received.  For example, attached to the reply affidavit,

14  the Weitzman supplemental, exhibit B at page 9, there's a

15  statement from FInRA to the government in which they said FInRA

16  concluded that Parviz Sarshar, my client's uncle, that Parviz

17  Sarshar's trading was neither suspicious nor profitable.

18  That's exactly the opposite of what Agent Racz swore to the

19  magistrate judge, and he never disclosed that FInRA concluded

20  that Parviz Sarshar's trading was neither suspicious nor

21  profitable.

22          I suspect, your Honor, if there's a hearing, we're

23  going to learn a lot more than what's already in this record.

24          So I think the only question left to decide really is

25  the one that the government submitted its surreply on, its

LatWsar2

1  two-page surreply on, which is the question of standing, and I

2  think that that's really a clear-cut question and answer.

3          The government doesn't dispute that each of the

4  warrants we're challenging involved a search of an email

5  account, iCloud account, or phone that belonged to Dr. Sarshar.

6  We've clearly established that in the affidavits.  The email

7  search warrant involved seven email accounts, two of which

8  belonged to Dr. Sarshar.  The iCloud search warrant involved

9  eight iCloud accounts, one of which indisputably belonged to

10  Dr. Sarshar and the cell-site location warrant that we're

11  challenging includes cell phones that belonged to Dr. Sarshar.

12          So the government doesn't dispute that Dr. Sarshar's

13  affidavit and the evidence we've submitted establishes his

14  privacy interest in at least one account for each of the

15  warrants; that his accounts were, in fact, seized and, in fact,

16  were searched; and that responsive materials were, in fact,

17  seized in searches of those accounts.  So the government

18  instead rests on an argument that conflates standing with

19  remedy.

20          Standing is a prudential doctrine, as your Honor

21  knows.  It's once the defendant has standing to make a *Franks*

22  challenge to challenge a warrant and an affidavit it's up to

23  the Court to decide the remedy for any such constitutional

24  violation, and that's what I think two SDNY cases that we rely

25  on in our opening brief make very clear, both the *Ray* and the

LatWsar2

1    *Lauria* case on which we rely.  But the government conflates the

2    two and argues that the Court doesn't have the remedy, the

3    power and authority to remedy a *Franks* violation that doesn't

4    apply to our client's accounts.  And that's just flat-out

5    wrong, your Honor.

6         The exclusionary rule is a prophylactic rule to deter

7    unlawful police misconduct.  The scope of the exclusionary rule

8    is particularly important in the context of a *Franks* violation,

9    because we're not just talking about law enforcement that

10   decide to undertake a search lacking in reasonable suspicion or

11   probable cause when a law enforcement officer is acting on his

12   own in the spur of the moment, making a momentary decision that

13   could be a life-and-death decision and oversteps his bounds.  A

14   *Franks* challenge is a challenge that goes to the heart of the

15   judicial process and the justice system.  It's a deliberate or

16   reckless effort by the government to mislead a judicial officer

17   in order to obtain probable cause for a search.

18         It is in a *Franks* challenge where the Court's

19   authority has to be broadest to permit a remedy, because there

20   can be no greater danger to the rule of law than law

21   enforcement misleading authorizing judges.  But the

22   government's rule, your Honor, will permit law enforcement to

23   have a total pass even with intentional misstatements,

24   intentionally deceiving a judge so long as the item that is

25   searched does not belong to the defendant, and even in an

LatWsar2

omnibus warrant, where there's some items that were searched belonging to the defendant due to that deception.

The reason the government sought an omnibus warrant here, your Honor, is because it believed the whole is greater than the sum of its parts.  It knew that an individual warrant for each individual account does not have probable cause, because their entire theory was these coincidences are too good to be true:  Look what's going on here; there are calls; there are emails; there's profitable trading.  That was the extent of the evidence they had for their email warrant, for example, so they aggregate it in an omnibus warrant and now they're trying to use that as a sword against the defense to prevent -- both as a sword at the time that they're seeking the search warrant but now as a shield to prevent a remedy for a constitutional violation in deception of a judicial officer.

Such a rule would only encourage law enforcement to proceed with omnibus warrants based on misrepresentations if it knows that there is no recourse for any counts other than the target defendants.

The *Franks* standard itself requires the broader remedy though, your Honor, and I'm going to quote here from *U.S. v. Galpin*, 720 F.3d 436, where the court says that upon a finding of a material misstatement in a warrant affidavit*, Franks* requires the court to "excise from the warrant those clauses that fail the particularity or probable cause requirements."

SOUTHERN DISTRICT REPORTERS, P.C.

LatWsar2

1          So what is a court supposed to do with a *Franks*

2    hearing under *Galpin* and well-established Second Circuit law?

3    It's supposed to sit in the magistrate judge's position,

4    rewrite the affidavit, take out the incorrect information, and

5    insert the correct information and then make a decision *de*

6    *novo*.  Would this affidavit have satisfied probable cause;

7    would this warrant be granted?  And if the answer to that is

8    no, everything in that warrant and in that affidavit gets

9    suppressed.

10          I cite the *Lauria* case in particular for that because

11   that's what happened, in part, in *Lauria*.  In *Lauria*, I think

12   it was Judge Engelmayer that decided that the scope of an

13   omnibus warrant did not support the probable cause for the

14   crime of aggravated identity theft.  And even though in the

15   omnibus warrant the multiple email and iCloud accounts only

16   involved two that belonged to the defendant, he held that any

17   evidence -- any evidence -- of aggravated identity theft

18   resulting from that omnibus warrant must be suppressed.  So I

19   think the *Franks* standard necessarily requires suppression of

20   all evidence.

21          But there's more, your Honor.  The fruit of the

22   poisonous tree doctrine requires that standard to apply as

23   well, because what's very clear, and the government doesn't

24   dispute, is that under the fruit of the poisonous tree

25   doctrine, any evidence acquired, directly or indirectly, as a

1    product of an illegal search, including a search due to an

2    invalid warrant, must be suppressed.  So it's universally

3    accepted, your Honor, that under the fruit of the poisonous

4    tree doctrine, you don't have to have standing to suppress the

5    fruit of the poisonous tree.  A defendant, for example, can

6    seek to suppress fruit of the poisonous tree of an email search

7    or iCloud search belonging to a codefendant so long as it is

8    the fruit of a poisonous tree that he has standing to suppress.

9    And that's very clear.  *Wong Sun v. United States; United*

10   *States v. Oliveras-Rangel*; *United States v. Elmore*, all those

11   cases involve suppression of evidence of a codefendant or third

12   party where the third party's evidence was the fruit of the

13   poisonous tree.  It goes to show, your Honor, that standing

14   doesn't define the remedy of what gets suppressed.  Your Honor

15   does, not the government.

16          Separately because we're also challenging the iCloud

17   search warrant as the fruit of the poisonous tree, because it's

18   so frequently relies on emails and references to emails in the

19   iCloud search warrant, I think it would be largely undisputed

20   that the fruit of the poisonous tree doctrine would require the

21   iCloud search warrant to be suppressed if the email search

22   warrant is similarly suppressed.  And the government doesn't

23   have any answer to the fact that the iCloud warrant certainly

24   relied on investigative leads that were developed as a result

25   of the email search warrant.

LatWsar2

1          Remember, the CW in this case whose iCloud account was

2     searched in the iCloud search warrant, Mr. Behfarin, there's no

3     references to him before the email search warrant or in the

4     email search warrant.  It's directly as a result of the returns

5     in the email search warrant that we believe the government even

6     had that investigative lead.

7          So now the next question, I think, because I think we

8     clearly have standing to seek suppression of all the returns to

9     both the email and iCloud search warrants, is have we made our

10    substantial preliminary showing?  And on this --

11         THE COURT:  Let me just pause you.

12         MR. WEITZMAN:  Yes, your Honor.

13         THE COURT:  So, the government has said that it is not

14    going to use anything that it collected from Dr. Sarshar in

15    response to the iCloud warrant, so if the government stands up

16    again here now and says we didn't get anything from Dr. Sarshar

17    that we're going to use in this case, so they disclaim any

18    intention of using anything collected from Dr. Sarshar, what's

19    your view regarding his standing to challenge that warrant in

20    that instance, where he, after the government has made its

21    concession, will not be affected at trial by his -- or in the

22    case as a result of the government's seizure?

23         MR. WEITZMAN:  Your Honor, because standing --

24         THE COURT:  Sorry.  Let me just make one caveat,

25    separate from the fruit of the poisonous tree issue.

SOUTHERN DISTRICT REPORTERS, P.C.

1          MR. WEITZMAN:  Yes.

2          Because standing is a gating issue, the government

3     can't moot our standing.  We either have standing or we do not

4     have standing.  What they're talking about is whether we have

5     the remedy -- whether we need a remedy, but once we have

6     standing, I believe we have standing, and so we do have

7     standing.  They indisputably seized the account.  They searched

8     the account.  They didn't like any evidence in the account so

9     now they're going to say, Well, we're not going to introduce

10    anything, so now you don't have standing?  We already got

11    through the gate.  We have standing.

12         Now the question is do we have a remedy, which is,

13    again, your Honor's question, your Honor's issue, not for the

14    government to decide whether they can moot your remedy, which

15    would be suppression.  Our position, and I think it's very well

16    supported under Fourth Amendment, constitutional and statutory

17    doctrine.  Our position is that the remedy has to be

18    suppression of all the evidence that resulted from the warrant,

19    which is all the iCloud accounts.  Unless they're saying, your

20    Honor, we're not going to introduce any evidence from any of

21    the accounts from the iCloud search warrant, then maybe there's

22    no remedy.  There's nothing to dispute.  All that evidence is

23    out.  That's the remedy we're seeking, but they can't moot our

24    entire remedy that we're seeking by only agreeing not to

25    introduce the evidence from Dr. Sarshar's one of, I don't know,

LatWsar2

1    10 or 11 iCloud accounts that they searched.  There's no

2    evidence in that iCloud account because he's innocent.  That's

3    what they're saying, but now they want all this other evidence

4    that we're still seeking our remedy for.

5              THE COURT:  Thank you.

6              MR. WEITZMAN:  So, your Honor, we've, I think, briefed

7    at length the issues that are the factual issues that warrant

8    the *Franks* hearing.  I don't want to go over them in great

9    detail.  I think it's very clear with the number of

10   misstatements and misrepresentations that a substantial

11   preliminary showing has been made.  And in fact, in many of the

12   cases that the government cites, it's notable that the Court

13   first held a *Franks* hearing before issuing a ruling.  The

14   *Rajaratnam* case is a perfect example.  I was there.  And by the

15   way, in that case, the alleged omissions were so much more

16   discrete and immaterial compared to what we have here.

17             In the *Rajaratnam* case, the alleged omission was that

18   the agent didn't disclose that there had been a multiyear SEC

19   investigation in which Mr. Rajaratnam testified and in which

20   the SEC collected millions of pages.  It was just, was a there

21   a sufficient disclosure of the extent and scope of the SEC

22   investigation, that was the issue, and Judge Holwell said I

23   need to hear testimony about that.  The scope and the extent of

24   the misrepresentations, misstatements and omissions here are

25   far more pervasive and far more damaging and material to the

LatWsar2

1    judge's determination, because as I said, there was so little

2    to suggest any insider trading here.  All there was were

3    inferences drawn from very weak evidence.  Phone calls, emails,

4    texts, no substance, and trading.

5            But when you put in all the misstatements and

6    omissions that Agent Racz had, that evidence looks totally

7    different.  There would be no probable cause.  But it's not

8    just the *Rajaratnam* case.  There's a litany of cases where

9    courts in the first instance hold evidentiary hearings in a

10   *Franks* challenge before, in some of those cases, denying the

11   *Franks* challenge.  The *Wei Seng Phua* case that the government

12   relies on in Nevada on standing held a *Franks* hearing.  The

13   *Lustyik* case held a multiday suppression hearing.  In *San*

14   *Martin*, the Second Circuit commended the judge for, quote, very

15   wisely holding a suppression hearing.

16           So I think that is where we're at and what the parties

17   need.  Just as your Honor emphasized at the outset, all we have

18   are speculation, assertions, with no affidavit, no support from

19   the agent.  We have statements about his good faith and his

20   mental state with no sworn testimony.  We have statements about

21   what happened in the investigation with no sworn testimony, and

22   some of those statements are simply implausible, in my opinion,

23   and we're entitled to question them.

24           I can address any of the particulars of the

25   misstatements and omissions.  I know your Honor's reviewed the

LatWsar2

 1    papers so I'm not going to go through it one by one, all the

 2    ways that the trading was distorted or the exculpatory evidence

 3    omitted or even how it was distorted that Dr. Sarshar had

 4    received notice of Teva's nonbinding offer on February 24, when

 5    he had not -- or that he knew that there would be a nonbinding

 6    offer on January 15, when he did not.  But there are some other

 7    bases that I wanted to emphasize to your Honor that we are

 8    moving to suppress on, and they're twofold.

 9          The first is the insufficient particularization and

10    overbreadth of the warrants, and I focus in particular on the

11    fact that the law is clear; the Second Circuit has said that a

12    general warrant is impermissible and not having date

13    restrictions in the warrants renders them suppressible.  And

14    the government has acknowledged that the date restriction of

15    January 15 as a starting date only applied, at least on the

16    face of the warrant, to one of the multiple requests.  It's now

17    saying after the fact, after we challenged the issue, they say

18    oh, but we followed that procedure everywhere.  I think that,

19    again, as I said before, it's inconceivable that they did.  I'd

20    like to understand how they did that.  They've offered no

21    substance to that.  And if they didn't, then I think it's

22    subject to suppression as a general warrant.

23          And then, of course, the government's failure to

24    conduct a privilege review.  If Agent Racz is the individual

25    who is reviewing or someone on the prosecution team is

LatWsar2

1    reviewing emails that are subject to privilege -- and we've

2    asked multiple times, how did you conduct a privilege review,

3    what is your privilege protocol, did you have a taint team.

4    They refused to answer any of those questions, your Honor.

5    They've refused flatly to answer them, so we want to get to the

6    heart of what's going on here.  Who reviewed the documents?

7    What privileged documents did they review?  Because it's deeply

8    prejudicial for us to have the prosecutors and the agent on the

9    other side of this litigation be able to review our client's

10   privileged communications with dozens of different lawyers that

11   he had at the time.

12          Our client may testify, your Honor.  They shouldn't be

13   permitted to know what lawyers and he have spoken about, and

14   the fact that they won't tell us whether there was a taint team

15   and what the procedures were is highly problematic, and it goes

16   to the overbreadth of these warrants and the need for a *Franks*

17   and a suppression hearing on these issues.

18          If your Honor has no further questions, I'll hand it

19   over to the government.

20          THE COURT:  Thank you.

21          Let me just ask a couple of brief questions.  First,

22   you described the circumstances of the worst conduct that the

23   government could engage in.

24          MR. WEITZMAN:  I'm sorry, your Honor.  I'm having a

25   hard time hearing.

LatWsar2

1          THE COURT:  That's fine.

2          You described this as some of the worst conduct that

3     the government could engage in, *i.e.*, arguably lying to the

4     court in order to obtain a warrant.  The government points out

5     that under the case law, the agent could completely illegally

6     access the accounts of these third parties without any judicial

7     imprimatur, the same way that they could kick down some third

8     party's door, seize evidence and still use it against the

9     defendant.  So at the heart of the government's argument is, I

10    think, or one of the points at the heart of the government's

11    argument is that, namely, that the evidence that was collected

12    as a result of the email and iCloud warrant from third parties

13    are not things that the government would be precluded from

14    using under other circumstances even if they had sought them

15    without the imprimatur of a warrant.

16         Why is this different?  In other words, why here

17    should the government be prohibited from using the property of

18    others, things in which Dr. Sarshar had no reasonable

19    expectation of privacy?

20         MR. WEITZMAN:  I disagree with the government's

21    assumption that it can offer evidence that it obtains illegally

22    in that way without any potential remedy.  If we have standing

23    to challenge the offer of the evidence, then we have a

24    potential remedy and the Court can use its inherent authority

25    to remediate that.

LatWsar2

1          The question of standing, again, I think, is being

2     conflated by the government.  So in the hypothetical your Honor

3     posited, I wouldn't have standing to challenge that conduct

4     because it was a one-off event, where let's say a law

5     enforcement officer, you know, stole, went into someone's home

6     and didn't have probable cause to enter the home and there were

7     no exigent circumstances and seized some evidence that had a

8     client's fingerprints on it, under those circumstances there is

9     no standing, and therefore, there is no remedy.  But under the

10    circumstances I'm presenting, there is standing to challenge

11    the affidavit.  There is standing to challenge the warrant.

12          Once I have standing, then your Honor gets to choose

13    the remedy.  There are lots of circumstances where defendants

14    can move to suppress property or evidence for which they have

15    no privacy interest, and fruit of the poisonous tree is the

16    perfect example.  The Court gets to decide the remedy for the

17    violation, even though they have no privacy interest in that

18    evidence, as long as they have standing in the first instance,

19    and so if the fruit of the poisonous tree, the defendant has

20    standing to suppress, then he also has standing to suppress its

21    fruit.  That's exactly what we're saying as a theoretical

22    structure.  Once we have standing to move to suppress, it's

23    your Honor that gets to decide what the remedy is.

24          THE COURT:  Good.  Thank you.

25          Let me turn to counsel for the United States.

LatWsar2

1              Counsel, how do you respond?

2              MR. TRACER:  In general, or to this specific question?

3              THE COURT:  Thank you.

4              Let's start with this specific question of standing.

5              MR. TRACER:  Sure.

6              May I use the lectern?

7              THE COURT:  Please do.

8              MR. TRACER:  Thank you.

9              So your Honor, as we've previewed in our papers, we

10   believe that standing is a key threshold issue in this case,

11   and we have seen no case that supports the defendant's argument

12   about this bifurcation of standing versus remedy.  There's no

13   case law on it, your Honor, we submit, because that's not how

14   it works.

15             The way it works is you don't suppress a warrant.  The

16   case law is very clear that what you suppress is what is taken

17   in an illegal search.  So, for example, the case that they

18   cite, *United States v. Ray*, if I can just read from the case

19   briefly, the court explains -- and we're talking about omnibus

20   warrants for multiple accounts.  And the court explains that

21   Ray has satisfied his burden in part.  His declaration is

22   sufficient to satisfy his burden with respect to the 9122

23   telephone number, which was also registered to him, and with

24   respect to the seven email and iCloud accounts.  By contrast,

25   Ray has not established that he had a legitimate expectation of

LatWsar2

1    privacy with respect to the other two cell phones and with

2    respect to any of the iCloud or email accounts other than those

3    identified in his sworn declaration.

4            That statement would make no sense under the way the

5    defendants think that this works.  If they can challenge the

6    affidavit, they can challenge the affidavit, say the

7    defendants, but that's not the case.  It's a privacy interest,

8    and you only have standing to vindicate your own privacy

9    interest.  The fact that the government used an omnibus warrant

10   here is just a function of judicial efficiency.

11           Mr. Weitzman said that the reason we did that was

12   because we have a view that the sum is more than the parts.

13   That's plainly not true, your Honor.  The government could have

14   taken the exact same affidavit and submitted it seven or 15 or

15   25 different times to the magistrate with a different warrant

16   attached to it, and the defendant in that case could only

17   attach the warrant that targeted his account.  It's just more

18   efficient to put in a single document and then issue multiple

19   actual warrants.

20           THE COURT:  Thank you.

21           Let me just take you back to the quotation that you

22   just read.

23           Counsel, does that necessarily support your view that

24   a defendant has no standing to challenge the admission of the

25   evidence as opposed to the framing presented by the defendant;

LatWsar2

1    namely, that that goes to the issue of what the scope of the

2    remedy is once the warrant, once the door is opened to a

3    defendant to challenge a warrant?  So you've pointed to that

4    one quotation.  If you can, can you go back to it and tell me

5    why it is that that supports the government's view that this is

6    an issue of standing as opposed to remedy?

7                MR. TRACER:  Sure, your Honor.

8                And I don't have the printout of the full case in

9    front of me, but that quote is taken from a portion of the

10   opinion that addresses standing.  It's dealing up front in that

11   opinion with whether the defendant has standing or not, and so

12   clearly the court is considering this question on an

13   account-by-account or as -- it could be a house-by-house or

14   storage-container-by-storage-container basis.  You don't just

15   get to suppress a warrant.  You suppress particular items that

16   were seized in violation of your privacy rights.  That's what

17   gives you the standing to vindicate that particular interest,

18   and I think that's the way it's spoken about.  Even

19   pre-electronic warrants, that's the way that the Supreme Court

20   line of cases addresses this issue.  It has always spoken of it

21   as your own privacy interest.

22               And for example, in the *Barone* case that we cite,

23   Judge Buchwald ruled that a defendant can't seek suppression of

24   evidence even if it's been suppressed against his codefendant.

25   So in other words, your Honor, this is an individual interest

LatWsar2

1    in your own privacy accounts.  That's what gives you standing

2    to make this challenge.

3            THE COURT:  Let me just ask, are any of the cases that

4    you're referring to equivalent to this one?  In other words,

5    the defendant here, as you know, is arguing that because part

6    of the things that are covered by the warrant are his things,

7    that gives him standing to challenge the warrant as a whole.

8    So do any of the cases that you are pointing me to address this

9    kind of circumstance?

10           Again, to be transparent, I haven't seen a lot of

11   cases or any real cases apart from *Lauria*, arguably, that

12   address this particular circumstance, and in particular, that

13   think carefully about whether or not this is an issue of

14   standing or remedy, as the defense argues.

15           MR. TRACER:  Your Honor, I think there are not a lot

16   of cases directly on point because I think this question is

17   sort of elementary.  I don't think it get raised a lot that you

18   can suppress other people's things.  Nevertheless, the case

19   that we cite that's on point is *United States v. Wei Seng Phua*.

20   It's a District of Nevada case, so it's another, I would say,

21   persuasive case for the Court to look at, not authoritative or

22   binding on this Court.  But in that case, there was a warrant

23   for multiple -- it wasn't an electronic warrant.  It was for

24   physical locations, and the court clearly held that you can

25   challenge your own -- I think it was hotel or motel rooms that

LatWsar2

1    were being searched, and you could challenge the search of your

2    own room but not the other two rooms that you couldn't show a

3    privacy interest in, and I think that's directly on point.

4                    THE COURT:  Thank you.

5                    Go on.

6                    MR. TRACER:  OK.

7                    So just to finish up this particular issue, I think it

8    also comes out -- it's not, again, directly on point, but it's

9    what emerges from the *Lustyik* case that we cite.

10                   In that case, the defendant tried to assert that he

11   had fruit of the poisonous tree standing because someone else's

12   account had been searched in violation of that other person's

13   Fourth Amendment rights, and the court rejected that.  It makes

14   the same points that I think we're trying to advance in front

15   of your Honor, that you need to have standing for the

16   particular account that you are trying to suppress.

17                   THE COURT:  Thank you.

18                   Let me just interrogate that proposition.

19                   Does the government argue that if I suppress the email

20   warrant, the iCloud warrant is not fruit of the poisonous tree?

21                   MR. TRACER:  So, I think there would then be a

22   different analysis.  We submit that the arguments with respect

23   to the email warrant are particularly weak, and I can get to

24   that in a moment.

25                   If the Court were to find that the email warrant

LatWsar2

1    should be suppressed, the Court would only have to engage in

2    the iCloud warrant in an analysis about the fruit of the

3    poisonous tree, which we outline in our brief why there's

4    actually very limited reliance on it such that attenuation

5    would apply there, but there would be no independent basis for

6    the defendant to have standing to challenge the other iCloud

7    warrants.  And I can reiterate a point that your Honor hinted

8    to before, which is we do not intend to rely on anything in the

9    defendant's iCloud account.  We received a very minimal

10   response from that particular account, and so it's not really

11   at issue and it effectively moots the issue.

12          THE COURT:  Thank you.

13          Please proceed.

14          MR. TRACER:  Just to finish that thought, then,

15   because I think it is apropos, each account is its own search,

16   and in this case the challenges that defendants have made to

17   the email warrant -- I'll address that first, and we'll come

18   back to the other one in a second, but all the statements that

19   Mr. Weitzman referenced about exculpatory statements, those all

20   came after the email warrant, so they're not even at issue.

21          With respect to the email warrant, as your Honor

22   notes, the defendants complained about the supposed date of

23   awareness, although the Court has seen that the government had

24   a document that was submitted to FINRA that said the date of

25   awareness was January 15.  Likewise, the defendant complains

LatWsar2

about the FInRA response, where he says he didn't recall

speaking to people versus what the actual FInRA response said,

which is that there was no response.  Again, those emails came

after the email warrant.

And then the defendant challenges trading of two of

the tipping chains, but of course, the email warrant contains

five tipping chains.  So even if the Court took those two out,

there is no basis to suppress the email warrant.  Their

argument there is particularly weak.

And if I can make a tangential point on that, because

I know your Honor raised the issue of the factual record

before, and I think it's something that now having had the

chance to hear the Court's feedback on it and consult with me

colleague on, with respect to the authenticity of the documents

that were submitted along with the government's opposition, I

can represent to the Court that those are authentic, if that is

the issue.  And perhaps we should have put in a declaration

with that, and I apologize if the Court would have wanted one

and we did not.  If the Court wants additional factual

information, I think we would be prepared, like I said before,

to put in a sworn statement that goes beyond the authenticity.

But the authenticity of the documents is something that I think

the attorneys are competent to represent.

Unless the Court has other questions about standing,

I'm happy to pivot to some other issues.

LatWsar2

1          THE COURT:  Thank you.

2          You may.

3          MR. TRACER:  Again, I'm mindful that the Court has

4     read the lengthy briefing by both parties on this.  The

5     defendant's motion at its heart is essentially an attempt to

6     litigate their case in response to a warrant.  A warrant does

7     not serve that purpose.  As the Court knows from *Illinois v.*

8     *Gates* and numerous other cases since then, a warrant is not

9     intended to lay out all the facts of an investigation.  It

10    comes at a certain time in the investigation, and it's

11    sufficient to lay out what the government knows at that time.

12         Mr. Weitzman made note about -- he tried to imply that

13    courts routinely hold these *Franks* hearings.  That's not true.

14    The case law is very clear that a *Franks* hearing, there's a

15    very high standard for it and it's not routinely granted.  In

16    fact, I didn't try the *Rajaratnam* case, but I went back and

17    read the Second Circuit opinion, and in that case, the court

18    actually, according to the opinion, did not hold a *Franks*

19    hearing based on probable cause.  In fact, it was a wiretap

20    application, and there was a separate need for what's called

21    necessity in the wiretap context, and so the court held a

22    hearing with respect to necessity.  The court found that it did

23    not need to hold a hearing with respect to probable cause,

24    which is the only issue here.  There's no necessity requirement

25    in a search warrant.

LatWsar2

1          Likewise, the *Mandell* case that we cite from Judge

2    Crotty, I submit to your Honor that one is very much on point

3    in this case.  There was a litany of allegations that were made

4    against the government.  I think they're akin to the kind of

5    voluminous allegations that are made here, and Judge Crotty

6    carefully went through it and found no basis, including, I

7    would point out, one of the allegations there was that the

8    defendant had supposedly told one of his associates to be

9    brutally honest with the investigators, kind of like they

10   claim, after the former girlfriend -- he had come over to the

11   former girlfriend and deleted emails.  He then supposedly made

12   efforts to try to get those emails back, and Judge Crotty said

13   the defendant knew he was under investigation and that was not

14   the type of material found that would rise to the level of a

15   *Franks* hearing.

16         Likewise, in the *Pinto-Thomaz* case that we cite, there

17   was a hearing, but it was on a separate issue.  It was not on

18   probable case.  And likewise, the *Davis* case that the

19   defendants cite, where they say there was a need for a factual

20   hearing, that was a case where the government conceded there

21   was no probable cause on the warrant.  So in the cases like

22   this, which are conventional cases, where there is a warrant,

23   it's a valid warrant, the government is not conceding that

24   there was some error with the warrant, there is rarely a need

25   for a *Franks* hearing.  It's actually a unique and unusual

LatWsar2

1    remedy.

2              Next, I want to address the standard that applies

3    here.

4              So, as your Honor knows, the standard that applies

5    here -- and the defendants seem to contest the standard in the

6    reply brief, but I submit to your Honor based on the language

7    in *Rajaratnam* and *Villar*, the defendants would ultimately need

8    to show and therefore, for these purposes, need to make a

9    preliminary showing not just that there's some information

10   missing from the warrant, but rather -- and I'm reading from

11   *Villar* -- that the affiant at least had reason to seriously

12   doubt the truth of the allegations.  In other words, ultimately

13   it can't just be negligence.  It has to come down to bad faith

14   or recklessness on the part of the affiant, and that is a high

15   standard and there is no way it's met here.

16             For example, just to hear a couple of the points at a

17   high level, the defense talks about omissions of exculpatory

18   statements.  First of all, the affidavit does include certain

19   statements, especially when it relies on other statements that

20   people made.  So, for example, the girlfriend, the affidavit

21   gives a balanced portrayal.  It says, it recites the

22   information that the girlfriend provided about deleting emails,

23   and then it provides the information that she had denied

24   engaging in insider trading.

25             Likewise, her associate or her coworker, who is also

LatWsar2

1  an alleged remote tippee in the indictment, the search warrant

2  explains that she had received a grand jury subpoena and had

3  engaged in certain relevant conduct to the deletion but then

4  explains that she denied trading on inside information.

5      The defendant also complains about what he calls

6  misleading trading.  At the end of the day the defendant's

7  argument comes down to it would require the government to put

8  all trading records into an affidavit.  Now, they say in their

9  reply that's not required, but ultimately, the government, on

10  the defense's read, would have to preempt any possible defense.

11  And the only way to preempt any possible defense would be to

12  put in all trading records, and that can't be the law, your

13  Honor.

14      Next, I want to briefly address the fruit of the

15  poisonous tree argument that Mr. Weitzman made.  Mr. Weitzman

16  used that as an example of why you don't need to have standing

17  to challenge a particular account.  But I submit it's the

18  opposite, your Honor.  For example, the *Lustyik* case shows the

19  fruit of the poisonous tree, that's an issue of remedy.  In

20  other words, if you show a primary violation of your account,

21  you can then get suppressed other things that are found as a

22  result of your privacy interest having been violated, but in

23  fact, in *Lustyik*, we see that when it is not your account where

24  the primary violation occurs, there is no further suppression

25  down the line, even if it's your account that is the supposed

LatWsar2

1    fruit of the poisonous tree.  So I think the fruit of the

2    poisonous tree doctrine doesn't help the defendants, and we

3    address why that doctrine doesn't apply in our brief, and I

4    won't go over those points.

5         OK.  I'll be brief, your Honor.  Last two points just

6    to very quickly hit the overbreadth issue and the privilege

7    issue.

8         So, on the overbreadth issue, the cases the defendant

9    cites are ones where there was no date in the warrant.  They're

10   far more -- they go to issues where the warrant is essentially

11   lacking in basic things that a warrant is held to require.

12        Here, there's no dispute that the email account had a

13   date range.  The defendants complain that it's overbroad, but

14   for the reasons we describe in our brief, it was a covert

15   investigation and the government was permitted some latitude in

16   the date range.  And so they're only complaining about the

17   iCloud warrant.  Now, for reasons we've discussed, they don't

18   have standing to directly challenge the iCloud warrant, other

19   than with respect to the defendant's account.  But in any

20   event, there was a date range for the message content, which

21   is, frankly, the bulk of what the government has collected from

22   the iCloud accounts in any event.

23        And finally, on the privilege issue, I dispute

24   respectfully the suggestion from the defense that we wouldn't

25   give answers to questions.  I think the exhibits to

LatWsar2

1   Mr. Weitzman's own affidavit show that we candidly and

2   forthrightly explained how the review was done here.  There was

3   no taint team used because Mr. Sarshar was not known to be

4   represented, and we took personal accounts.  The court, Judge

5   Rakoff, in *Lumiere*, explicitly approved of that and said

6   keeping an eye out for law firm domains is an appropriate way

7   to proceed when you don't know that a party is presented.

8   That's what we've done here.  We've explained it to the

9   defense, and there's not really even any indicia of bad faith

10  let alone proof of bad faith.

11          The government has not seen privileged emails.  For

12  example, that is why we didn't have the March 11 meeting

13  minutes, which is one of the issues they raised, because we had

14  segregated those things out, and we even gave them internal

15  emails and provided to the Court as one of our exhibits the

16  internal emails showing that potentially privileged emails had

17  been segregated and were not available for the team to review.

18          So, unless the Court has any further questions, we'll

19  rest on the submissions in this case.

20          THE COURT:  Thank you.

21          Let me turn back to counsel for defendant.

22          First, any response to the government's arguments?

23          MR. WEITZMAN:  Yes, briefly, your Honor.  I do have

24  some responses.

25          THE COURT:  Thank you.

LatWsar2

1                    Please go ahead.

2                    MR. WEITZMAN:  In response to your Honor's question

3          about any authority supporting the circumstances of the search

4          warrant here, where it's an omnibus warrant, the best counsel

5          could come up with is a case in the District of Nevada, which

6          obviously was not authoritative.  It's not precedential.  It's

7          not even persuasive, your Honor, and there are a number of

8          reasons why.

9                    The first is, and I don't know if I'm saying it

10         correctly, but the *Wei Seng Phua* case.  There's an important

11         distinction.  That case did not involve electronic searches.

12         It involved search of a room, multiple different rooms.  I

13         think it was, like, a motel or something of the sort.

14                   When the judge is parsing searches of different rooms,

15         the probable cause goes to the search of the individual

16         location, and it's very clearly teed up in a warrant affidavit.

17         And so when someone is attacking the search of their room,

18         you're looking at probable cause for that search, and

19         therefore, when you excise, in a *Franks* context, for example,

20         the misleading information, you're still left with the

21         remainder of the warrant that supports probable cause for other

22         searches, because you can delineate what the -- when it's a

23         physical location, you can delineate, were there drugs there?

24         Was there a CI buy there?  Was there something that ties

25         criminality to that room?

LatWsar2

1           It's very different in an electronic search of this

2    sort.  We're not challenging probable cause to search our

3    client Dr. Sarshar's email.  We're challenging whether there

4    was probable cause to even believe a crime was being committed

5    or had been committed, whether there was any probable cause to

6    support the commission of the offenses.  That would knock out

7    all the searches, not just our client's.  And so I think that

8    the distinction with *Phua*, where it's a physical location --

9    and probable cause to search a particular physical location is

10   very different from a digital search of this sort.

11          On top of that, I don't understand the government's

12   reliance on *Lustyik* for the fruit of the poisonous tree

13   doctrine.  *Lustyik* was a totally different case.  The defendant

14   in that case was looking for the benefit of the fruit of the

15   poisonous tree when he didn't have his, when the poisonous tree

16   was not an account he had or a location that he had a privacy

17   interest in.  So he was trying to use, take the fruit of the

18   poisonous tree to give him derivative standing when he had no

19   standing.  We're arguing here the opposite, which is we have

20   the standing.  We get through the door.  We're through the

21   gate, and now it's for your Honor to choose the remedy.

22          In addition, I would emphasize that on the fruit of

23   the poisonous tree doctrine the case law, I think, is very good

24   that when the defense -- when the government is arguing for

25   lack of causation or attenuation, that particularly requires a

LatWsar2

1   *Franks* hearing to determine how, for example, the agent used

2   the email search returns to support the iCloud application.  If

3   you look through the iCloud search warrant, there are numerous

4   instances where the agent says based on my knowledge of this

5   investigation and the emails returned from the email search

6   warrant.  He says it three or four or five different times.  So

7   I don't think that the analysis is so circumscribed to look at

8   whether there's only, whether there's reliance on emails from

9   Dr. Sarshar.  It's more broad, to determine whether there's

10  reliance in the agent's knowledge of the case, investigative

11  leads, witnesses and any of the emails that he relied on from

12  the email search warrant.

13          Finally, the last thing I want to say, your Honor, is

14  I think the conduct here is egregious.  There is no dispute

15  that Agent Racz knew before he swore out the iCloud search

16  warrant, he knew that Dr. Sarshar never denied communicating

17  with the subject traders.  He knew it because he had the email

18  in which Dr. Sarshar said I don't recall, and yet he didn't

19  correct the error in the iCloud search warrant.  Agent Racz had

20  the document and knew, must have known, that January 15 was not

21  the date that Dr. Sarshar learned of any potential tender offer

22  by Teva, because it didn't exist on January 15.  He must have

23  known that.

24          Counsel said, and I quote, a warrant, it is sufficient

25  to lay out what the government knows at the time.  That's what

LatWsar2

1    the purpose of a warrant is, and I agree with that.  That is

2    sufficient to lay out what the government knows at the time,

3    and that is not what happened here.  Because Agent Racz, with

4    all due respect, did not lay out what he knew.  He did not lay

5    out all, every single witness who he interviewed who exculpated

6    my client.  He did not lay out all the trading records that

7    exculpate and prove that there was no insider trading here.  He

8    has no explanation for why he did not include in his search

9    warrant affidavit, including the email search warrant, why he

10   didn't include that FInRA concluded that Parviz Sarshar, who is

11   at the core of the email search warrant, why Parviz Sarshar's

12   trading was not suspicious and not profitable.  There's no

13   explanation for why that wasn't included in the email search

14   warrant.

15            Just the opposite.  He swears that this is very

16   suspicious.  I don't know why.  I don't know what the basis for

17   that was.  There's no the a single phone call or text message

18   or contact that he identified between Dr. Sarshar and Parviz.

19   It's merely the fact that he didn't like that Dr. Sarshar's

20   friends and family had traded in Q1 2015.  That's not

21   sufficient probable cause.

22            Your Honor, I know you have some questions, so let me

23   pause here.

24            THE COURT:  Thank you.  Thank you.  Thank you.

25            Just briefly, counsel, let me ask this.  Assume for

LatWsar2

```
1    purposes of this part of the argument that I accept the

2    defendant's position regarding standing; in other words, that

3    Dr. Sarshar has the right to challenge the iCloud warrant, even

4    insofar as it pertains to the accounts of others.  To what

5    degree does the defense believe that I should take into account

6    in framing the proper remedy for any violation that I would

7    find the law that I think everyone recognizes supporting the

8    conclusion that one does not suppress property of third

9    parties?  So you say that that's an issue that I would consider

10   in the context of deciding whether or not to suppress relevant

11   evidence once I've evaluated the sufficiency of the warrant.

12   How would you propose that I do that?  And in particular,

13   should that basic principle have, I'll call it dispositive

14   weight?

15           Counsel.

16           MR. WEITZMAN:  I've already explained why I think *Phua*

17   is not analogous, and I think it's important to explain why I

18   don't think it guides your Honor's consideration of the remedy.

19   And that's because the *Franks* standard itself requires that you

20   rewrite the affidavit.  You rewrite it.  You excise the

21   information that is mistaken and you insert the omitted

22   information, and then you analyze the affidavit.  And if it

23   doesn't support probable cause for a search, then you suppress

24   the evidence.  That's what the *Franks* standard requires.

25           So in *Phua*, when the judge does that, it only permits
```

1    suppression of the defendant's property, because that was the

2    attack, as I understand it.  I don't have the case in front of

3    me, but I don't think it's a blanket rule, for example, that

4    you can't have a broader remedy where the rewritten affidavit

5    doesn't support probable cause as to any of the searches.  So

6    if, as we suggest and argue, there was a lack of probable cause

7    once you insert the correct information, delete the incorrect

8    information, insert the omissions, if that doesn't give a

9    magistrate judge probable cause for any of the searches, then I

10   think you suppress it all.

11          Now, I will be candid here.  If it does leave a

12   residue of probable cause to a particular search, I don't think

13   we necessarily get the broader remedy.  I understand that

14   that's a corollary to my statement.  I absolutely understand

15   that.  But what we're challenging is there's no probable cause

16   to believe any criminal conduct was afoot, and so all the

17   emails and iCloud accounts get suppressed.

18          THE COURT:  Thank you.  Good.

19          Anything else, counsel for the United States on this

20   issue?

21          MR. TRACER:  Very, very briefly, your Honor.

22          If I can just read to your Honor the pin cite that we

23   quoted from *Phua*?  We are citing from page 1056 of the opinion.

24   The court there says that all three warrants were obtained

25   through a single warrant affidavit does not give *Phua* standing

LatWsar2

1   to challenge searches of villas in which he has no privacy

2   interest.

3          I just want to be clear that our reading of *Phua* is

4   tht it does not go to some secondary inquiry about remedy.

5   Fundamentally, the Court needs to decide, does the defendant

6   have a privacy interest in a particular area, and if so, that

7   would give him standing?  I disagree that there's any

8   difference between a physical location versus an email account.

9   Warrants always need to show both probable cause for the

10  offense and, separately, probable cause for the location to be

11  searched.  So when you take out a location to be searched,

12  that's different.

13         I understand that they're challenging probable cause

14  here in general that a crime was committed, but the standing

15  question is different.  The standing question goes to the

16  particular locations to be searched, and therefore, can you

17  suppress what was taken from particular locations?  It's no a

18  question of excising things out of the warrant.  That is a --

19  you only get there once you get through the standing hurdle.

20         THE COURT:  Thank you.

21         Can you address the defendant's argument here?  Their

22  argument is that their challenge is not as to probable cause

23  for a particular location but, rather, the existence of

24  probable cause for the commission of an offense?

25         MR. TRACER:  Right.  And I think that comes down to

LatWsar2

1   the question of what do they have standing to make that

2   argument with respect to?

3          In other words, the government could have -- instead

4   of doing one omnibus warrant, let's say the government is

5   seeking 15 iCloud warrants.  The government could give the same

6   affidavit, 15 copies to the magistrate and say, Rely on this to

7   issue this warrant, rely on this to issue this warrant.  And it

8   seems like the defendant is taking the view that because we

9   relied on one warrant, they then get to bootstrap and challenge

10   the other accounts that were based on the same warrant.

11          You don't get to do that.  The case law is clear that

12   the whole notion of suppression is to vindicate your privacy

13   interest, and they only have to do that, they can only do that

14   with respect to their accounts.  It's only when you meet that

15   threshold you then get to talk about OK, what comes out of the

16   warrant?  What's left?  What does it look like?  Would they

17   have probable cause to take my account without those

18   misstatements.

19          THE COURT:  Thank you.

20          Let me just focus on the defendant's argument, which

21   is that they're challenging whether or not an offense was

22   committed.  Their argument is, in part, that that is separate

23   and apart from, I'll call it the locations or in this case

24   accounts that are sought to be searched.  Their argument is, in

25   part, that you cannot sever that by account.  So once they say

LatWsar2

1    that you can challenge whether or not the warrant establishes

2    probable cause for the commission of any crime, their argument

3    is that that would mean that I can evaluate that and that that

4    is a proposition that extends across all of the accounts.

5           So counsel for the United States, what's your view on

6    that?  Your arguments are focused, it appears, on standing to

7    challenge aspects of the warrant as to a particular person's

8    property.  They're saying that they are hovering a step above

9    that before you get to the person or the particular property,

10   and they're asking me to evaluate whether or not there's

11   evidence of the commission of a crime at all.

12          How do I sever from that proposition -- namely, was a

13   crime committed -- the separate, subsidiary questions, was a

14   crime committed in this location?  Was a crime committed in

15   that location?

16          So how do you view that issue conceptually, counsel

17   for the government?

18          MR. TRACER:  Your Honor, I think the easiest way to

19   explain that is to come back to the example that your Honor

20   used before.  It just can't be worse.  It just can't be the law

21   that the government is in a worse position when they have a bad

22   warrant than when they have no warrant.  So, in other words, if

23   the government went out with no warrants at all and knocked on

24   15 doors and one of the them was the defendant's, there's no

25   way he could challenge what was taken from the other 14 houses.

LatWsar2

1          So, here, too, even if your Honor concludes that these

2     were effectively -- let's say you buy the defendant's argument

3     that there's no PC in the warrant, so it's as if the government

4     conducted a warrantless search.  But we know that the defendant

5     has no standing to challenge a warrantless search where he has

6     no privacy interest.  So I don't see how the fact that the

7     government used an omnibus warrant could put him in a better

8     place than if the government had no warrant at all, which would

9     obviously be a more flagrant violation.

10          THE COURT:  Thank you.

11          Let me follow up on that line of thinking.

12          Theoretically, if the party doesn't have standing, the

13    court isn't considering anything.  Here, I understand the

14    defense's argument to be, in part, that once the door is

15    opened, then the court can then walk through it and see what

16    happened.  So that is one that thing they would say

17    distinguishes this circumstance from another, where a door was

18    closed and (inaudible) saw the conduct that resulted in the

19    search because they didn't have standing to pursue it.  They're

20    saying that they have standing so I open the door and I look

21    through it and I see that the government did something wrong

22    and, then they say that I should then decide what I should do

23    with that fact.

24          How do you view that, counsel?  Is that a sound

25    analogy, and if so, what's your perspective with respect to it?

LatWsar2

1           MR. TRACER:  So, I don't, your Honor.  I also don't
2     know what the basis for that would be.  In other words, the
3     Court would be saying I can look at this because the defendants
4     have standing with respect to their account, but then step 2
5     becomes, as your Honor said, what the Court does with that, and
6     there is no authority, we submit, that for the Court to make
7     sort of an untethered decision, Well, therefore, I'm not going
8     to let the following evidence that has no relationship to the
9     defendant's privacy interests to be used against him.  We
10    submit that that's contra to all the cases that create the
11    standing doctrine in the first place, and therefore, there's no
12    basis for the Court to keep out that evidence.

13          THE COURT:  Thank you.

14          And again, this is very much a question of where this
15    issue is considered -- as the government suggests, at the
16    standing stage, or as the defense suggests, where the court is
17    crafting a remedy.  I think that that is one of the principle
18    distinctions between the parties' positions here.

19          So, counsel, you've all been very engaged.  It is
20    1:30, though.  I think that we should take a short break, at
21    least -- when I say short, at least half an hour to let you all
22    eat something.  I propose that we do that and that we return at
23    two to take a third of these motions.  And I'll see what I can
24    do to help resolve as much as we can during the course of the
25    day today.  It may be that I'll need to table one or more

LatWsar2

1    issues on that.  I'll let you know more after the break.

2              Counsel, can we take a short break before we return

3    with the discussion of the third motion?

4              Counsel for the government.

5              MS. TEKEEI:  Of course, your Honor.

6              MR. WEITZMAN:  Of course, your Honor.

7              THE COURT:  Thank you.  I'll see you all back here at

8    two.

9              (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LatWsar3

```
 1                        AFTERNOON SESSION

 2                            2:00 p.m.

 3            THE COURT:  Thank you very much, counsel.

 4            Let's begin with the third issue that's before the

 5   Court.  I'm going to ask that we limit argument with respect to

 6   this set of issues to about no more than ten minutes per side.

 7   I think the issues here are relatively discrete.  And so I will

 8   turn to you, counsel for defendant.

 9            Is there anything that you would like to say to add to

10   or supplement your written submissions to the Court with

11   respect to the motion to dismiss?

12            Counsel for defendant.

13            MR. FUCHS:  Yes.  Thank you, your Honor.  And thank

14   you for all of the time and attention you're paying to these

15   matters.  I don't think any of us expected to be here, and we

16   really appreciate it.

17            Your Honor, as you know, I'm going to argue Dr.

18   Sarshar's motions concerning duplicity, bill of particulars,

19   and surplusage.

20            These motions, your Honor, shine a spotlight on the

21   fundamental problems with the indictment.  It is hopelessly

22   vague, speculative, and missing key information, all of which

23   exposes Dr. Sarshar to extreme prejudice and makes it

24   impossible to adequately prepare a defense.  Our motions are

25   designed to remedy that and afford Dr. Sarshar due process and
```

LatWsar3

1    the right to a fair trial.

2          I'd like to start with our request for a bill of

3    particulars.

4          Your Honor, the indictment in this case is built on

5    the following flawed foundation:

6          The government isolated certain corporate events or

7    meetings that took place concerning a possible transaction

8    involving Auspex in Q1 of 2015.  In some cases, but not all,

9    the government then looked for communications between

10   Dr. Sarshar and his friends and family, communications that

11   would have taken place in the ordinary course, around the time

12   of the events and meetings it isolated.  And then the

13   government looked for instances where those friends and family

14   members purchased Auspex stock, again, in some cases, but not

15   all, around the time they communicated with Dr. Sarshar.

16         That's it, your Honor.  The rest is inference and

17   speculation, inference and speculation that, first, Dr. Sarshar

18   was aware of the event or meeting at issue and had learned MNPI

19   at that event or meeting;

20         Second, inference and speculation that Dr. Sarshar

21   passed that MNPI to his friends or family members when he spoke

22   with them; and

23         Third, your Honor, inference and speculation that the

24   friends and family members traded on the MNPI.

25         This information, which is missing from the

LatWsar3

1   indictment, is all fundamental to a prosecution for insider

2   trading.

3            It's missing from the indictment.  It's also missing

4   from the discovery that the government has provided, and it is

5   what Dr. Sarshar is seeking through his request for a bill of

6   particulars, so that he can defend himself against these

7   charges and avoid improper surprise at trial.

8            Your Honor, let me put a finer point on it.

9            Aside from the allegations concerning the Auspex note,

10  which you've heard about today and have their own set of

11  problems, there's not a single allegation in the indictment

12  which specifies the MNPI that Dr. Sarshar allegedly provided to

13  the four associates and that they in turn provided to the four

14  downstream tippees.  And as the Court knows, this information

15  is absolutely critical in an insider trading case.

16           As we wrote in our papers and as the Court in

17  *Rajaratnam* said, a defendant in an insider trading case might

18  argue the information at issue was not material or it was

19  already public, but it can only do that if he knows what was

20  allegedly conveyed and when it was conveyed.  Information might

21  be MNPI one day but not the next.  That information is missing

22  from the indictment.  It's what we're seeking through our

23  request for the bill of particulars.

24           Let me briefly go to the indictment, your Honor, to

25  illuminate this.

LatWsar3

1          Your Honor, I'm not sure if you have the indictment in

2     front of you, but in paragraphs 42 and 43, the indictment

3     discusses the alleged tips that Dr. Sarshar provided to

4     associate 3.  And paragraph 42, at page 18, says that on or

5     about Friday, March 6, 2015, Auspex signed a confidentiality

6     agreement with Pfizer.  It then says that shortly thereafter,

7     Dr. Sarshar spoke with associate 3, and then it says, following

8     that, that associate 3 traded.  That's it: the event, the

9     communication, and the trade.  And nothing more.

10         We have no idea, based on those two paragraphs, what

11    the MNPI is that Dr. Sarshar allegedly provided to associate 3.

12    Is it the fact that Pfizer signed a confidentiality agreement?

13    Or is it that Auspex was exploring a transaction?  Or is it

14    that Auspex had hired an investment banker?  We don't know, but

15    the differences in that information are critical.

16         For instance, your Honor, if what the MNPI is is that

17    Dr. Sarshar allegedly told associate 3 that Pfizer had signed a

18    confidentiality agreement, then the defense might focus on,

19    Well, when was that agreement signed?

20         It doesn't specify that in the indictment.  Obviously

21    if it was signed before Dr. Sarshar spoke with associate 3,

22    then that could not possibly have been MNPI that passed from

23    Dr. Sarshar to associate 3.

24         Similarly, your Honor, if the MNPI is the signing of

25    the Pfizer confidentiality agreement, the defense might focus

LatWsar3

1    on when did Dr. Sarshar learn of that?  There's no information

2    in the indictment that indicates that, and I'll represent to

3    the Court that Dr. Sarshar didn't know that.

4         If, on the other hand, your Honor -- and let me just

5    add.  If the information is that Pfizer signed a

6    confidentiality agreement, that information isn't material.

7    It's far too early in the process of a potential transaction to

8    matter, particularly here, where Pfizer didn't acquire Auspex.

9    But even if the information is different, if it's about the

10   fact that Auspex was exploring a transaction or hired

11   investment bankers, different defenses would apply, your Honor.

12   That's why it's critical that we know the MNPI.

13        The same problem infects all of the other allegations,

14   save the allegations concerning associate 1 and the cooperating

15   witness, which, again, have their own issues.  But I don't have

16   the time to go through them all.  I just want to give you one

17   other example, your Honor.  It's on page 19 of the indictment.

18        That's where the indictment focuses in on

19   Dr. Sarshar's tips or alleged tips to his brother, and in

20   paragraph 44, the indictment provides that on February 9th and

21   10th, 2015, the Auspex CEO and other senior representatives of

22   Auspex participated in in-person meetings in Israel with

23   several of Teva's senior executives.  It then goes on, that

24   same paragraph, to state what occurred at those meetings.

25        Nowhere in that paragraph is there any indication that

LatWsar3

1    Dr. Sarshar was at those meetings, aware of them or aware of

2    what was discussed.  But what follows in the very next

3    paragraph is that on February 10, Dr. Sarshar had a

4    conversation with his brother and then, thereafter, his

5    brother, several days later, traded.  Again, we have no idea

6    what the MNPI is that Dr. Sarshar allegedly told his brother

7    that led to the trading, allegedly, on February 10.  Is it the

8    fact that Auspex senior executives were meeting in Israel?  Or

9    is it that they'd were exploring a transaction generally?  Or

10   was it that they hired an investment banker, or something else?

11   If we have no idea.  But again, it matters because the defense

12   of this matter will depend on what that information is.

13        If it's that Dr. Sarshar told his brother that

14   Auspex's senior executives were meeting in Israel, the defense

15   will focus on the fact that he wasn't there, and he had no idea

16   about those meetings or what was discussed.  If it's that, on

17   the other hand, it has to do with the hiring of an investment

18   banker or a transaction, Dr. Sarshar didn't even learn that

19   information until February 17, at the earliest, based on the

20   indictment.  So it could not possibly have been that he

21   conveyed that information on February 10.

22        Again, your Honor, just two examples of what is

23   replete in the indictment, a lack of the critical information

24   in an insider trading case, and what we would ask the Court

25   order the government to provide.

LatWsar3

1          Now, your Honor, we wrote the government a letter,

2     demanding a bill of particulars.  I have that letter with me,

3     and I would ask the Court, if I might, to review the letter and

4     order the government to provide us with the information in that

5     letter.  And I can hand that letter up to your Honor.

6          THE COURT:  Thank you.

7          You can hand it to the court staff.

8          MR. FUCHS:  Thank you.

9          Your Honor, I just want to briefly address what I

10    anticipate to be the government's arguments.

11         First, they're going to say we're asking for an order

12    of proof.  We're not.  We don't want every witness, every

13    document that they're going to introduce, every piece of

14    evidence.  All we want is the critical information that we're

15    entitled to in an insider trading case, among other things, the

16    MNPI.

17         They're going to argue that the defendant's going to

18    fashion his testimony if they provide that information.

19         Well, first, your Honor, as you know, that's a risk in

20    every case, and they're going to have to disclose the

21    information eventually.  But more importantly, here, we've been

22    transparent with the government all along in our presentations,

23    explaining what our defense is, including the fact that

24    Dr. Sarshar doesn't -- never passed MNPI to anyone and,

25    therefore, doesn't need to fashion his testimony.

LatWsar3

1          They're going to argue this isn't a complex case.

2          Well, first, that's not a requirement.

3          Secondly, in the *Rajaratnam* case, the court

4    distinguished the *Nacchio* and *Contorinis* cases in terms of the

5    level of complexity, claiming that neither of those were as

6    complex, and still in *Contorinis* and *Nacchio*, the court ordered

7    a bill of particulars.

8          And finally, your Honor, this case is plenty

9    complicated, complicated in large part because the way the

10   government has pled it.  There are over 20 trades, eight

11   traders, dozens of communications, and multiple corporate

12   events jammed in to each count in the indictment.

13         And finally, it's not in the discovery, your Honor, in

14   this case.  I'll just leave your Honor with two case

15   references:

16         First, the *Kearney* case, where the court said the

17   indictment must fully, directly, and expressly, without

18   uncertainty or ambiguity, set forth all the elements necessary

19   to constitute an offense.  And the essential facts here, what

20   the MNPI is, is missing.

21         And secondly, from the *Mango* case, in deciding whether

22   to grant a bill of particulars, the court should consider the

23   clarity of the indictment and the way the government has chosen

24   to draft it.

25         Here, your Honor, the way the government has chosen to

LatWsar3

1   draft the indictment leaves it as clear as mud in terms of what

2   Dr. Sarshar is alleged to have passed, when he's alleged to

3   have learned it, whether or not his associates traded on it,

4   and that's all the information we need.

5          I'll pause there, your Honor.  I don't have a lot of

6   time left for my other two issues, but you may want to -- I'll

7   leave it to you, your Honor, if you want me to keep going on to

8   duplicity or surplusage, but we can also hear from the

9   government now, if that makes sense.

10          THE COURT:  Thank you.

11          You can proceed.  I don't think I need to hear

12   anything on surplusage.  I'll hear from you on the duplicity

13   issue.

14          MR. FUCHS:  Thank you, your Honor.

15          I'll be quick on duplicity.

16          In addition to the fact that the indictment is missing

17   the essential facts relating to the offenses charges, the

18   indictment is also duplicitous.  By jamming all of that

19   information I just referenced -- the more than 20 trades, the

20   eight traders, the dozens of text messages and calls and

21   various corporate events and meetings -- into the two counts,

22   the government has charged what, as best as we can tell, is at

23   least four schemes into each of those counts and perhaps more.

24   Indeed, the structure of the indictment, broken down by the

25   four different associates, confirms this.

LatWsar3

1          And we know, of course, why the government is doing

2     it.  The case is weak.  The government's speculating concerning

3     the communications that Dr. Sarshar had with the associates and

4     the trading by those associates, and to mask that weakness,

5     your Honor, the government has tried to put the little they

6     have into each of the two counts to make them appear stronger

7     than they are.

8          The problem with that is that by joining these

9     distinct alleged offenses into a single count, the government

10    has greatly prejudiced Dr. Sarshar.

11         First, this tactic has compromised Dr. Sarshar's Sixth

12    Amendment right to understand the charges against him.

13         Your Honor, it's not even clear from the indictment

14    whether the government is seeking to have Dr. Sarshar found

15    guilty for the trades involving the four associates alone or

16    also the four downstream tippees.  That is a question that

17    needs to be answered.

18         Second, based on the way this case is charged, should

19    the jury return a guilty verdict, there is simply no way anyone

20    will be able to tell whether the verdict was unanimous or

21    whether the jurors based their verdict on different associates.

22         Third, and relatedly, there will be no way to tell

23    whether the jury determined that Dr. Sarshar was not guilty

24    where certain associate trading is concerned.  And this, of

25    course, directly impacts sentencing, by making it completely

LatWsar3

1   unclear what, if any, trading proceeds are attributable to

2   Dr. Sarshar.

3          For all of these reasons, your Honor, we would ask the

4   Court to either dismiss the indictment for duplicity or make

5   the government elect one of the four alleged schemes to proceed

6   on.

7          The government's claim that the indictment charges one

8   continuous scheme, which is their argument, really doesn't pass

9   the straight-face test.  There is no connection between any of

10  the associates, their trading, the communications that

11  allegedly served as the basis of the trading.  And each of the

12  four schemes relies on at least one unique corporate event or

13  meeting.  Indeed, the only thing in common is Dr. Sarshar, but

14  the case law makes clear -- we've cited in our papers -- that

15  that alone is not enough.  If the government had its way, it

16  could always charge multiple offenses in one count, and the

17  exception would swallow the rule.

18         Your Honor, the *Kearney* case said the test is whether

19  identical evidence can support each of the offenses or whether

20  dissimilar facts need to be established.  And of course, here,

21  the same evidence can't prove up that the alleged insider

22  trading by any more than one of the associates.  Different

23  facts are required.  And to accept the government's contention

24  here, your Honor, like the court said in *Kearney*, would be --

25  that there was one continuous scheme would be to obliterate the

LatWsar3

1    distinction between charging separate offenses and one

2    continuous scheme.

3              Finally, your Honor, I'd just ask, at a minimum, if

4    you're not inclined to dismiss the indictment, although we

5    think you should, or at least put the government to its choice

6    of which scheme to proceed on, we would ask that you order that

7    a special verdict form be used in this case to avoid all of the

8    prejudice that Dr. Sarshar will otherwise suffer, as I

9    previously referred to.

10             Thank you very much, your Honor.

11             THE COURT:  Good.  Thank you.

12             Counsel from the United States, let me hear from you.

13             Is there anything that you'd like to say to supplement

14   the arguments presented in your briefing or to respond to the

15   arguments presented by counsel here?

16             MS. TEKEEI:  Thank you, your Honor.  And with the

17   Court's permission, I will change venue to take the lectern.

18             THE COURT:  Thank you.

19             Please proceed.

20             MS. TEKEEI:  Your Honor, with the Court's permission,

21   I'll start sort of in opposite the order that counsel went,

22   only because I think that the very brief arguments we want to

23   make as to their duplicity motion lend themselves to the

24   foundation for our arguments in opposition to their bill of

25   particulars motion.

LatWsar3

1        Your Honor, the indictment charges the defendant in

2   two counts.  As the Court is aware, Count One charges

3   securities fraud for carrying out a scheme to defraud Auspex by

4   misappropriating, in breach of his duties to Auspex, MNPI

5   regarding the tender offer and passing that MNPI to his friends

6   and a family member so that they could make profitable

7   securities trades based on that MNPI and otherwise causing them

8   to purchase securities based on that MNPI.

9        To carry out this scheme, as is set forth in the

10   indictment, the defendant passed MNPI to multiple associates in

11   furtherance of this single, overarching scheme, to defraud

12   Auspex and in breach of his duties to Auspex to enrich his

13   friends and his family.

14        The securities fraud statute clearly contemplates the

15   government's ability to charge this scheme in the way that it

16   has.  There's a single victim, a breach of a single duty,

17   provision of material nonpublic information about a single

18   topic -- the potential acquisition of Auspex -- that occurred

19   within a very limited time frame.  We're talking about three to

20   four months, at most, and involved a limited group of people,

21   those being the defendant's family and friends.

22        Count Two charges fraud in connection with a tender

23   offer for passing MNPI regarding the tender offer to his

24   friends and a family member so that they could make profitable

25   securities trades based on that MNPI and otherwise causing them

LatWsar3

1    to purchase securities based on that MNPI.

2            Now, the tender offer fraud statutes also explicitly

3    allow the government to charge acts taken in furtherance of

4    this scheme, multiple acts taken in furtherance of the scheme,

5    under one count, which is what the government has done here.

6            The point I want to make here, which lends to the bill

7    of particulars argument is also that the tender offer fraud

8    count charges the defendant for being in possession of material

9    nonpublic information during this time period about the tender

10   offer and causing the purchase or sale of securities by his

11   friends and family being in possession of that tender offer.

12           Now, everything that flows from the indictment after

13   making these statutory allegations and in connection with

14   making these statutory allegations are the means and methods by

15   which the defendant carried out this scheme, and those acts can

16   be charged, as we've stated, as a single scheme, the way that

17   the government has charged it.  None of the cases that the

18   defense have provided on the duplicity issue are contrary to

19   the statutory authority that allows the government to charge

20   these as single schemes.

21           Unless the Court has any questions, I'll move on to

22   the bill of particulars argument.

23           THE COURT:  Thank you.

24           Just two.

25           First, could the government have charged Dr. Sarshar

LatWsar3

1   on separate counts for passing MNPI to each alleged tippee?

2          MS. TEKEEI:  I think that in our briefing we argue

3   that that's certainly a possibility.  In this particular case,

4   it's not a requirement, and so the government chose to do as it

5   does often in these sorts of cases, to charge this scheme and

6   then prove what acts the defendant took in furtherance of that

7   scheme.

8          THE COURT:  Thank you.

9          And can the government convict Dr. Sarshar on either

10  count if the jury does not unanimously agree that the

11  government has proven beyond a reasonable doubt that the

12  defendant provided MNPI to at least one specific tippee?  In

13  other words, can you convict if half of the jurors believe that

14  you have proven that Dr. Sarshar provided MNPI to associate 1,

15  but the other half believed that you had proven that

16  Dr. Sarshar provided MNPI to associate 2?

17         MS. TEKEEI:  Yes, because those are the means and

18  methods by which the defendant carried out his scheme.

19         THE COURT:  I'm sorry.  So the government believes

20  that you can prove that he is guilty of passing MNPI to people

21  without proving that he has done so with respect to any one

22  particular person?

23         MS. TEKEEI:  No, your Honor.  I misunderstood the

24  Court's question.

25         THE COURT:  Thank you.

LatWsar3

1          MS. TEKEEI:  The government can show -- in proving

2     that the defendant passed material nonpublic information to his

3     friends and family, the government need only prove that he did

4     so to any single one of those individuals.

5          THE COURT:  Thank you.

6          And so at a minimum, the government must prove beyond

7     a reasonable doubt to a unanimous jury that he passed the MNPI

8     to at least one particular individual.  Is that right?

9          MS. TEKEEI:  Your Honor, I have to think about this a

10    little bit.  The government would need to prove that the

11    defendant passed material nonpublic information to someone.

12    Whether the jury needs to be unanimous as to who that

13    individual is, I don't think that's true.

14         THE COURT:  Why not?  So, to be very clear, have you

15    proven beyond a reasonable doubt that Dr. Sarshar provided MNPI

16    to anyone if you have not proven to the jury that he provided

17    it to one particular person?

18         This is not new for this argument.  This is at the

19    heart of the defendant's motion.  They're saying that

20    Dr. Sarshar will be prejudiced because the jury could return a

21    verdict against him without having unanimously found that he

22    provided MNPI to any one of the associates.  So it's a

23    fundamental issue here.

24         Does the government believe that it can prove its case

25    against Dr. Sarshar without proving to a unanimous jury, beyond

LatWsar3

1    a reasonable doubt, that he provided MNPI to any particular

2    recipient of the MNPI?

3            MS. TEKEEI:  I think the jury can find that he

4    provided MNPI to a person, and some members of the jury may

5    think that that person was associate 1 and associate 2 and

6    associate 3.  Other members of the jury may find that that

7    person or people were just associate 2 and just associate 3,

8    but the point being that he passed MNPI and an individual

9    traded on it.

10           THE COURT:  Thank you.

11           Is there any universe, counsel for the United States,

12   in which the government can prove that Dr. Sarshar committed

13   these offenses if only half of the jurors believe that he

14   tipped associate 1 and half of the jurors believe that he

15   tipped associate 2, and in this hypothetical, none of the

16   jurors believe that he has tipped either associate 3 or

17   associate 4?

18           MS. TEKEEI:  I think the answer to that is yes, your

19   Honor, because the point is the statutes provide, and the point

20   is that he passed MNPI --

21           THE COURT:  I'm sorry.  But under this circumstance,

22   counsel, have you proven that he has passed MNPI to anyone?

23   Because in this hypothetical, only six jurors have agreed that

24   you've proven that he passed it to associate 1 and only six

25   jurors have agreed that he's passed it to associate 2.  So

LatWsar3

1    under that circumstance, has the government proven beyond a

2    reasonable doubt that Dr. Sarshar passed MNPI to anyone?

3            MS. TEKEEI:  I think the answer is still yes, your

4    Honor, because he passed it in furtherance of this scheme to a

5    friend or family member.

6            THE COURT:  But did you prove that he passed it to

7    anyone under this scenario?  Because in my hypothetical, to be

8    clear, only six jurors agree that he passed it to associate 1

9    and only six jurors agree that he passed it to associate 2.  In

10   that scenario, has the government proven that Dr. Sarshar

11   passed MNPI to anyone?

12           MS. TEKEEI:  There's no requirement that the MNPI be

13   passed to a single particular individual that all the jurors

14   agree on.

15           THE COURT:  Thank you.

16           So it's the government's position that you can convict

17   Dr. Sarshar of passing MNPI generally across four potential

18   tippees without proving beyond a reasonable doubt to a

19   unanimous jury that he passed MNPI to any one particular

20   tippee.

21           MS. TEKEEI:  Yes, your Honor.

22           THE COURT:  And what's the legal foundation for that?

23           MS. TEKEEI:  The statutory basis under the securities

24   fraud statutes allows the government to charge this as a

25   scheme, and we define --

LatWsar3

1          THE COURT:  Counsel, would the office's appellate

2     division stand up at the Second Circuit and take the position

3     that the government can convict Dr. Sarshar on this offense

4     under the hypothetical scenario that I've just described?  In

5     other words, the government has failed to prove unanimously, to

6     a unanimous verdict, beyond a reasonable doubt, that he passed

7     MNPI to any one person.  That's the question that I'm asking.

8          If I side with you, will your office stand up in front

9     of the Second Circuit and the Supreme Court and say that you

10    need not prove that he passed MNPI to any one particular

11    individual?

12          MS. TEKEEI:  Your Honor, I've not consulted with

13    our -- to answer the Court's question directly, we've not

14    consulted with the office's appellate unit on this particular

15    question, so I couldn't answer that.  I'd be happy to, but I

16    couldn't answer that standing here today.

17          THE COURT:  Thank you.

18          That's fine.  What else would you like to tell me?

19          MS. TEKEEI:  Your Honor, on the bill of particulars

20    motion, if I could turn to that next?

21          THE COURT:  Please do.

22          MS. TEKEEI:  The defendant -- I just want to go back

23    to first principles, your Honor.

24          One of the reasons often cited for not providing a

25    defendant with a bill of particulars at this point in a

LatWsar3

1    proceeding is because it hampers the government's ability to

2    develop our arguments as we continue to prepare for trial.  And

3    as the Court is aware, we continue to investigate, talk to

4    witnesses, and learn more.  Our theories and the manner in

5    which we prove our case may be refined and in particular, in

6    response to defense arguments, may become more articulated.

7         I say this only because what the defendant is asking

8    for is beyond what the case law allows at this point, which is

9    bill of particulars, the point of it is to provide a defendant

10   with information about the details of the charge against him if

11   it's necessary to the preparation of his defense and to avoid

12   prejudicial surprise at trial.  And it's only required when

13   charges in the indictment are so general that they do not

14   advise the defendant of the specific acts of which he is

15   accused.  And the indictment is viewed in the context of the

16   provision of discovery that happens.

17        In this particular case, the defense has received

18   extensive discovery.  We've outlined that discovery.  We've

19   outlined in our briefing, your Honor, all of the different ways

20   that we've provided chronologies and the sources of the

21   government's proof to the defense in the course of discovery in

22   this case.  And as the Court is aware, in addition to the

23   lengthy search warrant affidavits, the detailed indictment, the

24   detailed complaints, the government has provided early what

25   could be perceived to be Jencks Act material out of an

LatWsar3

1  abundance of caution to address many of the questions the

2  defense has had with respect to potential exculpatory

3  information.  And coming down the pipeline, as we prepare for

4  trial, will be the government's exhibits which will have in

5  them, in addition to all of the documentary evidence that we

6  want to put in, summary charts with toll records, summary

7  charts of brokerage account records, summary charts of

8  communications between the defendant and many of the

9  individuals who are part of the tipping chains.

10       I say this to provide the Court with the information

11  that not only has the government already provided the defendant

12  with extensive, detailed information about the means by which

13  it intends to prove its case in the indictment and the

14  complaint and much of the discovery, there's more information

15  along those lines to come, so that at this point there's no

16  reason for the government to be hampered in its ability to

17  prove its case.  And there's no reason why the bill of

18  particulars that the defense is asking for should be granted.

19       THE COURT:  Good.

20       MS. TEKEEI:  I may have gone on too long, your Honor,

21  and so I want to pause there in case the Court has any

22  questions.

23       THE COURT:  Thank you.

24       No, I don't.  Thank you very much.

25       Good.

LatWsar3

1          So, counsel, let me see if I can rule on this set of

2     issues, and then we'll circle back and try to develop a path

3     forward with respect to the *Franks* issues.  Please bear with

4     me.  I'm going to rule on the defendant's motion to dismiss the

5     indictment.  I'm going to do that orally.  The parties are

6     familiar with the underlying facts.  Therefore, I will not

7     recite those in detail.  To the extent that any facts in the

8     case are particularly pertinent to my decision, the facts are

9     embedded in my analysis.

10          Good.  So let me begin with I, motion to dismiss the

11    indictment.

12          A.  Legal standard.

13          "An indictment is impermissibly duplicitous where: (1)

14    it combines two or more distinct crimes into one count in

15    contravention of Fed. R. Crim. P. 8(a)'s requirement that there

16    be 'a separate count for each offense,' and (2) the defendant

17    is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d

18    71, 75 (2d Cir. 2001).  "The relevant policy considerations

19    guiding a court's determination of whether a defendant was

20    actually prejudiced by a duplicitous indictment include:

21    avoiding the uncertainty of whether a general verdict of guilty

22    conceals a finding of guilty as to one crime and a finding of

23    not guilty as to another, avoiding the risk that the jurors may

24    not have been unanimous as to any one of the crimes charged,

25    assuring the defendant adequate notice, providing the basis for

LatWsar3

appropriate sentencing, and protecting against double jeopardy

in subsequent prosecutions." *Id.*  *United States v. Margiotta*,

646 F.2d 729, 733 (2d Cir. 1981).

        "Duplicitous pleading, however, is not presumptively

invalid." *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir.

2006).  The Second Circuit has long held that "acts that could

be charged as separate counts of an indictment may instead be

charged in a single count if those acts could be characterized

as part of a single continuing scheme." *United States v.*

*Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989).  "As long as the

essence of the alleged crime is carrying out a single

crime...then aggregation is permissible." *Id.*

        B.  Discussion.

        The parties dispute whether Sarshar's alleged acts

were part of a single continuing scheme or four separate

schemes between Sarshar and four alleged tippees.  The

government characterizes Sarshar's actions as "a single

overarching scheme by the defendant to defraud Auspex, and, in

breach of his duties to Auspex, to enrich his family and

friends."  Opp'n at 9.  However, the government acknowledged

that it could have charged Sarshar for separate counts based on

the trading by each of the four alleged tippees.  *See* Opp'n at

9 (arguing that "regardless of whether the government could

break down the activity into distinct crimes, there's nothing

improper under Second Circuit law with charging one continuous

LatWsar3

1    scheme").

2            Both counts charged by the government require the

3    government to prove that Sarshar passed material nonpublic

4    information, which I will refer to as MNPI, to at least one

5    individual and that the individual made securities trades based

6    on that information.  Accordingly, in my view, apparently

7    contrary to the government's view -- in my view -- in order to

8    convict Dr. Sarshar, the jury would have to unanimously decide

9    that Dr. Sarshar passed MNPI to at least one specific person.

10           I don't understand the government's position that they

11   can prove this offense without proving that he passed MNPI to

12   any particular person.  No case law has been presented to me to

13   support it, and counsel's position here seems to be not

14   thoroughly vetted.

15           The indictment creates a significant risk of prejudice

16   to Sarshar because it risks that the jurors might not be

17   unanimous as to whether Sarshar provided MNPI to any individual

18   tippee.  As the defense identifies, "[b]ecause the allegations

19   are all included in a single count, a jury finding of guilty

20   could also be nonunanimous; based not on any one of the

21   schemes, but on different schemes, depending on the views of

22   individual jurors."  Def. Mem. at 21.

23           The government cannot, in my view, convict Dr. Sarshar

24   under either count if, for instance, the jury was split and

25   half believed Sarshar passed MNPI to associate 1 and the other

LatWsar3

1  half believed Dr. Sarshar had passed MNPI to associate 2.

2            In this scenario, the jury might convict Dr. Sarshar

3  for the overarching scheme without the government having

4  proved, beyond a reasonable doubt, that Dr. Sarshar provided

5  MNPI to any one particular individual.  Accordingly, the Court

6  concludes that the indictment creates a threat of impermissible

7  duplicity.

8            C.   Remedy.

9            Having concluded that there is a threat of

10 impermissible duplicity, the Court next considers the

11 appropriate remedy.  A duplicitous indictment "does not

12 necessarily require dismissal."  *Sturdivant*, 244 F.3d at 79.

13           "Courts have utilized other remedies when presented

14 with the threat of impermissible duplicity that vary according

15 to the particular harm or harms to be avoided and the stage of

16 the proceeding at which the threatened harm or harms arise.

17 Thus, courts have held that prior to a defendant's conviction,

18 prejudice to the defendant can be avoided by having the

19 government elect to proceed based upon only one of the distinct

20 crimes included within a duplicitous count, or by a jury

21 instruction that ensures that the jury is unanimous as to the

22 conduct underlying the conviction."

23           *Id.*  (citations omitted).

24           I'm going to pause here and hold this space, because

25 I'm going to come back to the government to hear its views

LatWsar3

1   momentarily about the appropriate remedy.  The government might

2   do any one of several things:  One, ask me to dismiss the

3   indictment and to allow them to recharge Dr. Sarshar if they

4   wish; second, ask me to invite them to elect one of the

5   associates of the appropriate scheme; or three, to establish

6   through the jury instructions as they proposed in their

7   opposition or through a special jury form some other remedy to

8   ensure that the jury is unanimous as to the conduct underlying

9   the conviction, such as through a special verdict form, as

10  counsel for the defendant mentioned as their least favorite of

11  the possible remedies.

12          I'll come back to the government and ask how you would

13  argue that I should best remedy this deficiency of the

14  indictment, so please think about that as I turn to II.

15          Motion to compel the production of a bill of

16  particulars.

17          Next, the Court considers Sarshar's motion to compel

18  the production of a bill of particulars.

19          A.  Legal standard.

20          Federal Rule of Civil Procedure 7(f) "permits a

21  defendant to seek a bill of particulars in order to identify

22  with sufficient particularity the nature of the charge pending

23  against him, thereby enabling defendant to prepare for trial,

24  to prevent surprise, and to interpose a plea of double jeopardy

25  should he be prosecuted a second time for the same offense."

LatWsar3

1   *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

2   The decision to grant or deny a request for a bill of

3   particulars "rests within the sound discretion of the district

4   court."  *Id.*

5          "A bill of particulars is required 'only where the

6   charges of the indictment are so general that they do not

7   advise the defendant of the specific acts of which he is

8   accused.'"  *United States v. Walsh*, 194 F.3d, 37, 47 (2d Cir.

9   1999) (internal citations omitted).  "Furthermore, a bill of

10  particulars is not necessary where the government has made

11  sufficient disclosures concerning its evidence and witnesses by

12  other means."  *Id.*  "Generally, if the information sought by

13  defendant is provided in the indictment or in some acceptable

14  alternate form, no bill of particulars is required."

15  *Bortnovsky*, 820 F.2d at 574.  "In considering whether a bill of

16  particulars is required, the court considers not only the

17  information provided in the indictment but also discovery

18  materials and other information provided to the defendant."

19  *United States v. Pinto-Thomaz*, 352 F.Supp.3d 287, 302 (S.D.N.Y.

20  2018).

21         A bill of particulars is not "a general investigative

22  tool, a discovery device or a means to compel the government to

23  disclose evidence or witnesses to be offered prior to trial."

24  *United States v. Tuzman*, 2017 WL 4785459, at *13 (S.D.N.Y. Oct.

25  19, 2017) (quoting *United States v. Gibson*, 175 F.Supp.2d 532,

LatWsar3

537 (S.D.N.Y. 2001)).  "Instead, its purpose is to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particular last the nature of the charges against them." *Id.* (quoting *United States v. Gotti*, 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004)). In the same vein, "[a]cquisition of evidentiary detail is not the function of the bill of particulars." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36,41 (2d Cir. 2010); *see also United States v. Trippe*, 171 F.Supp.2d 230, 240 (S.D.N.Y. 2001).  It is well established that a defendant is entitled to a bill of particulars only where it is "'necessary to the preparation of his defense, and to avoid prejudicial surprise at the trial.'"  *Torres*, 901 F.2d at 234 (2d Cir. 1990) (*quoting* 1 C. Wright, Federal Practice and Procedure § 129, at 434-35 (2d ed. 1982)).

Although "[t]he line between mere evidentiary detail and information needed to prepare a defense and prevent unfair surprise can be thin indeed," *Rajaratnam*, 2010 WL 2788168, at *1, requests for evidentiary details, such as "whens," "wheres," and "with whoms" are frequently denied. *United States v. Mitlof*, 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001).

"The government's presentation of evidence at trial is limited to the particulars contained in the bill [of particulars], so care must be taken not to overly restrict the

LatWsar3

1   government's proof while still protecting the defendant from

2   unfair surprise." *United States v. Mahabub*, 2014 WL 4243657,

3   at *2 (S.D.N.Y. Aug. 26, 2014) (citing *United States v. Payden*,

4   613 F.Supp. 800, 816 (S.D.N.Y. 1985)); *see also United States*

5   *v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y. 1977) (collecting

6   cases) ("It is beyond cavil that a bill of particulars confines

7   the government's proof to the particulars supplied.").

8       The Court is mindful, however, that insider trading

9   cases are particularly fact- and context-specific. *See*

10  *Rajaratnam*, 2010 WL 2788168, at *2.  Therefore, the amount of

11  detail necessary to prepare a defense depends in part on the

12  scope and complexity of the alleged insider trading scheme.

13  Here, Sarshar seeks additional details from the government

14  regarding:  "(1) the MNPI that Dr. Sarshar allegedly

15  communicated to each of the four associates identified in the

16  indictment; (2) when and how Dr. Sarshar allegedly became aware

17  of this MNPI; (3) when and how Dr. Sarshar allegedly

18  communicated the MNPI to a tippee; and (4) for which trades

19  allegedly based on MNPI the government seeks to hold

20  Dr. Sarshar liable."  Def. Mem. at 23.

21      For the reasons I will describe, to the extent the

22  government intends to rely on trades not included in the

23  indictment at trial, the government is directed to...a bill of

24  particulars that identifies those specific trades.

25      B.  Discussion.

LatWsar3

1          I.  Details related to the MNPI that Sarshar allegedly

2     communicated.

3          Additional details concerning the MNPI that Sarshar

4     allegedly shared are not necessary here because the indictment

5     provides Sarshar with notice of the nature of the MNPI

6     sufficient to enable him to prepare for trial and avoid unfair

7     surprise.

8          Sarshar's correct the courts in this district have

9     ordered the government to disclose details in a bill of

10    particulars in insider trading cases.  *See, e.g.*, *United States*

11    *v. Rajaratnam*, 2010 WL 2788168, at *10 (S.D.N.Y. July 13,

12    2010); *United States v. Contorinis*, No. 09 Cr. 1083, slip op.

13    at 1 (S.D.N.Y. May 5, 2010).  However, the details concerning

14    the MNPI in this case are relatively simple.  *See United States*

15    *v. Blakstad*, 2020 WL 5992347, at *10 (S.D.N.Y. Oct. 9, 2020)

16    ("There is one inside tipster, one company, and four earnings

17    releases that spurred allegedly unlawful transactions.  Given

18    the single source of inside information and the limited number

19    of allegedly unlawful transactions, additional information

20    beyond that provided in discovery and the indictments is not

21    necessary for [the] defense.")  Sarshar retains the burden of

22    showing that a bill of particulars is "necessary" to enable him

23    to prepare his defense and avoid unfair surprise at trial.

24         The indictment, in my view, provides sufficient

25    information regarding the nature of the MNPI allegedly shared

LatWsar3

by Sarshar.  Counsel for defendant has pointed to some
potential alternatives, but his ability to do so shows in part
that the indictment has sufficient information to permit the
defendant to prepare for trial.  The principal piece of MNPI is
the status of the potential tender offer from Teva
Pharmaceutical to purchase Auspex before the deal was made
public on March 30, 2015.  The indictment identifies the dates
of specific board meetings and other key events at which the
government alleges Sarshar obtained MNPI.  *See, e.g.,* Indct.,
Dkt. No. 15, ¶ 16 (On or about February 16 and 17, 2015, a
meeting of the Auspex board of directors was held in La Jolla,
California...[Defendant] was present for both days of this
meeting in his capacity as a member of the Auspex board of
directors.  During the February 2015 board meeting, the Auspex
CEO, among other things, "updated the Auspex board on
significant inbound interest in acquiring Auspex, including
from Teva.").  There are other examples of the nature of the
communications that are identified in the indictment, including
the ones identified by counsel during argument today.  The
indictment also describes in detail the communications between
Sarshar and the alleged tippees around the time of the key
events in which Sarshar allegedly obtained MNPI.  *See, e.g.,*
*id.* ¶ 17 ("On or about February 17, 2015, the second day of the
February 2015 board meeting [defendant] exchanged text messages
with associate 1.  The two exchanged additional text messages

LatWsar3

1   the following day, February 18, 2015.  On or about February 20,

2   2015, associate 1 purchased 500 shares of Auspex.").

3           As a result of these and the other statements in the

4   indictment, which I'm not going to press here, together with

5   the discovery presented by the United States, Sarshar's on

6   notice of the MNPI of which he was allegedly aware at the time

7   of the alleged communications with the tippees, or at least he

8   had sufficient notice of them.  *See United States v. Martoma*,

9   2013 WL 2435082, at *4 (S.D.N.Y. June 5, 2013) ("Rather than

10  vague allegations that unspecified information was obtained

11  about a company's prospects, the government has provided

12  numerous specific details about the inside information the

13  defendant allegedly obtained.")  This information provides

14  enough context to allow Sarshar to prepare for trial.  As a

15  result, the Court finds that Sarshar's not entitled to

16  additional evidentiary detail concerning the MNPI he allegedly

17  passed to tippees.

18          Ii.  Details regarding the trades for which the

19  government will seek to hold Sarshar liable.

20          Next, Sarshar seeks additional information about the

21  trades allegedly executed on the basis of MNPI he shared with

22  tippees.  In particular, Sarshar argues that "[t]he indictment

23  alleges Dr. Sarshar provided unidentified MNPI to four

24  associates who tipped four remote tippees, resulting in eight

25  different individuals who allegedly traded on MNPI," but that

LatWsar3

"the indictment does not specify which of these trades form the
basis of Dr. Sarshar's liability, or whether the government
seeks to hold Dr. Sarshar liable for any of the remote tippees'
trades."  Def. Mem. at 28.

        The indictment provides sufficient detail about the
trades with which the government seeks to hold Sarshar liable.
To the extent they are described in the indictment, I'm not
going to go through all of the paragraphs in which specific
transactions are identified in the indictment.  There are many,
including at paragraphs 17, 26, 29, 35, 37, 39, 43, 45, and
45-50.

        So the indictment identifies trades and with respect
to them, obviously, Dr. Sarshar has sufficient information to
enable him to prepare for trial with respect to those trades
and to avoid unfair surprise.  However, Dr. Sarshar raises
legitimate questions whether the indictment contains
information about all of the trades for which the government
will seek to hold him liable.  For instance, it's unclear
whether the government's theory of liability is premised on a
view that alleged tippees would have sold more shares but for
the MNPI they received.  To the extent that the government
intends to rely on trades beyond those already identified in
the indictment, including sales of stock, those trades must be
provided in the bill of particulars.

        So in sum, I'm going to order the government to

LatWsar3

1    provide a bill of particulars identifying all of the trades at

2    issue in the case.  Those can include both the ones in the

3    indictment and any additional trades.

4              III.  Motion to strike surplusage.

5              Finally, the Court turns to Sarshar's motion to strike

6    surplusage from the indictment.  Fed. R. Civ. P. 7(d) provides

7    that "[u]pon the defendant's motion, the court may strike

8    surplusage from the indictment."  Fed. R. Civ. P. 7(d).

9    Although Rule 7(d) grants the Court authority to strike

10   surplusage, "[i]t has long been the policy of courts within the

11   Southern District to refrain from tampering with indictments."

12   *United States v. Kassir*, 2009 WL 995132, at *2 (S.D.N.Y. Apr.

13   9, 2009) (quoting *United States v. Bin Laden*, 91 F.Supp.2d 600,

14   621 (S.D.N.Y. 2000)); *see also United States v. Block*, 2017 WL

15   1608905, at *5 (S.D.N.Y. Apr. 28, 2017) ("Courts in this

16   circuit are loath to tinker with indictments".).  Motions to

17   strike surplusage from an indictment will be granted only where

18   the challenged allegations are not relevant to the crime

19   charged and are inflammatory and prejudicial." *United States

20   v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001) (quoting *United

21   States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990)).  "If

22   evidence of the allegation is admissible and relevant to the

23   charge, then regardless of how prejudicial the language is, it

24   may not be stricken." *Scarpa*, 913 F.2d, at 1013 (alteration

25   omitted).  This standard "is an 'exacting' one," and "only

LatWsar3

1    rarely is alleged surplusage stricken from an indictment."

2    *United States v. Smith*, 985 F.Supp.2d 547, 610 (S.D.N.Y. 2014)

3    (internal quotation marks and citation omitted).

4           Sarshar argues that three categories of surplusage

5    should be stricken from the indictment:  (1) allegations that

6    Sarshar lied to FINRA about his contacts with certain

7    individuals prior to the Teva acquisition; (2) various "implied

8    allegations, generalizations, and speculation," which Sarshar

9    contends are irrelevant to the charges; and (3) certain

10   "broadening language," which Sarshar contends impermissibly

11   expands the charges brought against him.  *See* Def. Mem. at

12   30-36; Reply 19-24.

13          The defense raises meaningful concerns regarding the

14   government's ability to establish that certain statements in

15   the indictment are accurate, relevant to the charges, and

16   nonprejudicial.  In particular, the Court is troubled that the

17   government's presenting its inference that Sarshar lied to

18   FINRA as a fact.  However, the Court need not address the

19   surplusage issues raised by Sarshar at this time.  "Courts in

20   this district routinely await presentation of the government's

21   evidence at trial before ruling on a motion to strike."  *United*

22   *States v. Mostafa*, 965 F.Supp.2d 451, 467 (S.D.N.Y. 2013)

23   (collecting cases).

24          The Court will be better positioned to decide these

25   issues after the presentation of the government's evidence, as

LatWsar3

1    "[t]here is little or no purpose in attempting to predict in

2    advance of trial what evidence will prove admissible or how

3    specific allegations relate to the overall charges." *United*

4    *States v. Butler*, 351 F.Supp.2d 121, 124 (S.D.N.Y. 2004).

5    Further, Sarshar "will not be prejudiced by this delay because

6    the jury will not see the indictment, if at all, until it

7    begins deliberations." *United States v. Nejad*, 2019 WL

8    6702361, at *18 (S.D.N.Y. Dec. 6, 2019). Accordingly, the

9    Court denies Dr. Sarshar's motion to strike without prejudice

10   to renewal after the government's presentation of evidence at

11   trial.

12         Thank you, counsel, for your patience.

13         So, with apologies, I do have two other matters this

14   afternoon. So what I'd like to do is to turn to a discussion

15   of the other issues and then to work toward a path forward to

16   resolving them.

17         So, you'll not be surprised at this point, counsel, to

18   know that I've similarly considered in detail the arguments

19   presented by the parties in connection with the motion to

20   suppress. I have a lengthy view of my, statement of my view

21   regarding those issues, which I don't have time to read to you

22   now. Instead, I'm going to do what one of my colleagues does

23   and give you a bottom line with respect to the application for

24   a *Franks* hearing here.

25         I'm going to grant the defendant's application for a

LatWsar3

1    *Franks* hearing.  They've made a substantial preliminary showing

2    that permits one.

3            With respect to the email warrant, the thing I want to

4    spend time thinking about, after having heard your arguments,

5    is whether and to what extent a hearing is also warranted with

6    respect to the iCloud warrant, whether one is available at all.

7    It turns very much on this question of standing that was the

8    subject of our interesting colloquy earlier, and so I'm going

9    to reserve on that.  I will let you know what I think.

10           Thanks to the fact that, as we saw earlier, the trial

11   that I'd anticipated taking up a big chunk of my November has

12   been adjourned, I'm going to try to schedule the *Franks* hearing

13   promptly.  I'd like to do it sometime in early November.  If we

14   can, I'd like to do it before Thanksgiving.  I'll leave it to

15   the parties to propose potential dates.

16           You should reach out to Ms. Joseph, my deputy, to find

17   out what my availability is, but I can tell you because this

18   trial is now off of my dance card, I have a substantial amount

19   of availability in the window between the 10th of November and

20   Thanksgiving, which is when that trial was supposed to begin.

21   So I'd like to schedule that hearing for sometime in that

22   window if we can.

23           Again, I need to think carefully about the parties'

24   arguments regarding the standing versus remedy issue regarding

25   the Fourth Amendment concerns raised by the defense, and that

LatWsar3

1    will drive, in part, my decision regarding whether the hearing

2    should focus only on the email warrant or if it should focus on

3    the email and the iCloud warrant.  So I'll have to come back to

4    you on that.  I apologize for not being able to provide you

5    with full clarity with respect to that issue.  Your arguments

6    today were thoughtful, and I need to give them due

7    consideration.

8            So coming out of today, counsel, please confer amongst

9    yourselves; speak with my deputy, so that we can set a hearing

10   date for the *Franks* hearing.

11           I'm not going to rule on the issue of privilege

12   without an affidavit from the United States.  Given the fact

13   that I've concluded that a *Franks* hearing is necessary, at

14   least in part, as to the email warrant, I expect that I will

15   see evidence with respect to the issues raised by the

16   defendant's *Franks* motion, so the gap in the government's

17   submission -- and to be very clear, this is not something that

18   the Court should need to ask for after the fact; it's something

19   that the government should provide at the beginning for all

20   courts when they're filing a motion.  I haven't looked at our

21   criminal rules, but it's very clear that affidavits supporting

22   factual assertions are to be provided to the Court, at least in

23   my experience, and that the government is not excused from that

24   obligation.

25           With respect to the issue related to privilege, my

LatWsar3

1    ability to decide that issue does turn, in part, on whether or

2    not the facts presented by the government regarding the steps

3    taken with respect to the protection of any privileged

4    communications by Dr. Sarshar are true.  I wish that I could

5    just accept the proffer at face value, without an affidavit,

6    but unfortunately, counsel, as you know, there have been recent

7    issues, and so I want to make sure that I have a sworn

8    statement supporting the government's representations regarding

9    the nature of the work done by the government to protect the

10   privileged communications of Dr. Sarshar.  I'm not willing to

11   make a determination with respect to those issues based on the

12   proffer alone.  I apologize that that is the case.

13          So I expect that I will need to see a separate

14   affidavit from the United States with respect to the issues

15   pertaining to its review of Dr. Sarshar's account insofar as it

16   relates to the privilege review.  I cannot rule on that issue

17   on the basis of argument and contentions alone.  So I'll

18   provide the government an opportunity to provide me with an

19   affidavit that at this point I believe can reasonably be

20   limited to that topic alone, since I'll be hearing facts as it

21   pertains to the *Franks* motion by the government.  And I'll ask

22   the government to consider when it would propose to submit that

23   affidavit to me.  It should be substantially in advance of the

24   hearing date so that I can resolve any disputes in advance of

25   then or determine whether a hearing is necessary with respect

LatWsar3

1    to those issues as well.

2           So those are two things that I want the parties to do

3    coming out of here:  (a) discuss hearing dates; (b) discuss the

4    government's affidavit to support its contentions with respect

5    to privilege and the timing of its submission to the Court.

6           I think the only thing that that leaves me with is the

7    issue with respect to the remedy.

8           Counsel, for the duplicitousness finding by the Court,

9    counsel for the government, do you have a sense of what relief

10   you'd like to propose from the Court at this point, or is this

11   something that you'd like to spend a little bit of time

12   thinking about before you take a position?

13          Counsel for the government.

14          MS. TEKEEI:  Thank you, your Honor.

15          I think a little bit of both.  I can preview, I think,

16   the government can certainly prepare and propose to the Court

17   requests to charge that are consistent with the Court's ruling

18   on the unanimity issue and then would like to consider the

19   issue of the special verdict sheet.

20          THE COURT:  Thank you.

21          So your proposal is that the remedy that I prescribe

22   is a special verdict sheet with appropriate charges.  The

23   government is not suggesting that it wants to consider

24   dismissing the indictment and reindicting Dr. Sarshar, focused

25   on individual transmissions of MNPI, and the government is not

LatWsar3

1    suggesting that you would prefer for me to ask you to choose

2    one of the associates.  Is that right?

3            There are three options:  One, dismiss, which would

4    give you the chance to think about the case and reindict it;

5    two is the opportunity to pick an associate's claims, as I

6    understand the options; and three is to address this issue

7    through charges.

8            My request is whether there's any one of those that

9    you want to propose now or if you'd like to consider which of

10   those remedies is appropriate.  I understand at this point that

11   the government is suggesting three.

12           MS. TEKEEI:  Your Honor -- yes, that's right, your

13   Honor, but we will take the Court's suggestion and we will

14   consider all of them.  I wanted to sort of preview for you our

15   initial thinking, but we will certainly take back and consider

16   all of the options that the Court has laid out.

17           THE COURT:  Thank you.  Good.

18           So, let's set a timetable for you to give me all of

19   this information.

20           First, with respect to the remedy issue, counsel for

21   the government, please send me a letter no later than a week

22   from today that tells me what you want to do.  I'll consider

23   that, and I will issue an order with the remedy that I believe

24   is appropriate under the circumstances.

25           With respect to the issue of the affidavit regarding

LatWsar3

1    the steps taken by the government with respect to protection of

2    Dr. Sarshar's privileged information, I think I'm going to ask

3    the government and the defense to meet and confer regarding the

4    timing of its submissions and whether supplemental briefing

5    with respect to it is warranted and to propose a schedule for

6    that to the Court.  I'm also leaving you with the request to

7    meet and confer regarding the appropriate timing for a *Franks*

8    hearing.

9                I think that's all I have.

10                Counsel, any questions for me before we adjourn?

11                Counsel, first, for the government.

12                Counsel for the United States.

13                Counsel for the United States, anything else before we

14    adjourn?

15                MR. TRACER:  Could we have one moment, your Honor?

16                THE COURT:  That's fine.  Please take your time.

17                MR. TRACER:  Just one thing, your Honor?

18                THE COURT:  Please.

19                MR. TRACER:  And this is something I suppose the Court

20    can consider.  We'll obviously confer with the defense on the

21    date for the hearing, as the Court asked us to do.  The

22    defendant's suppression motion, you know, as a general matter,

23    attacks essentially every single paragraph in the warrant, and

24    the government is obviously prepared if the Court would like to

25    address sort of everything in the motion.  The hearing is meant

LatWsar3

1   to be helpful for the Court, obviously, so if there's

2   particular things that the Court would like addressed in the

3   hearing versus other things, the government would welcome that

4   feedback to sort of tailor its presentation accordingly.  But

5   we just want to make it clear that we're willing to do that, or

6   we're willing to provide kind of everything we can think of.

7   But we wanted to flag that the scope of the hearing would

8   depend on what the Court would find helpful.

9               THE COURT:  Good.  Thank you very much.

10              So, I apologize.  Your question is well presented.

11  Let me say that if I had read you the lengthy response to the

12  parties' briefing on this, you would have had more information,

13  and so this issue is a result of my failure to do that.

14              The hearing would focus on the *Franks* challenge.  With

15  respect to the email warrant, it is clear to me that the

16  defendant has made a substantial preliminary statement

17  regarding Agent Racz's statement in the affidavit with respect

18  to when Dr. Sarshar knew specifically of Teva's tender offer.

19  The statement in the affidavit, as you know, is that

20  Dr. Sarshar "first became aware of the potential tender offer

21  by Teva for Auspex common stock on or about January 15, 2015."

22              The defense has met its burden with respect to that

23  statement, which I believe to be material.  I think that having

24  opened the door to a *Franks* hearing with respect to the email

25  warrant, that I will benefit from hearing a presentation of

LatWsar3

1    evidence with respect to each of the challenged issues.  I

2    understand from the defendant's presentation here that they

3    believe that they have found additional issues with the

4    information presented.  It wasn't clear from the comment if

5    that was referring to the email warrant or the iCloud warrant

6    or both, but having concluded that the defendant has made a

7    sufficient showing, I'm opening the door to an examination of

8    each of the statements that were referenced in the defendant's

9    briefing.

10           To the extent that there are other statements that

11   have come to their attention since then that may also show that

12   the agent was either knowingly untruthful or was reckless with

13   respect to his presentation of the facts, I will not exclude

14   those from consideration at the hearing.  I do ask that the

15   parties confer about any such additional statements so that the

16   hearing can be as focused as possible.

17           MR. TRACER:  Thank you, your Honor.

18           THE COURT:  Good.  Thank you.

19           MR. TRACER:  Nothing else from the government.

20           THE COURT:  Thank you.

21           Counsel for the defendant.

22           MR. FUCHS:  Yes.  Thank you, your Honor.

23           The first issue is whether the Court would be willing

24   to set a deadline on the bill of particulars.

25           THE COURT:  Oh, thank you very much.

LatWsar3

1          Counsel for the United States, by when can you provide

2    the bill?

3          MS. TEKEEI:  Your Honor, we can do so within 30 days.

4          THE COURT:  Thank you.

5          MR. FUCHS:  Your Honor, as I understood it, the Court

6    ordered them just to identify the trades both in the indictment

7    and outside of the indictment.  I would be surprised if there's

8    anything outside the indictment.  What's inside the indictment

9    will be very illuminating, and I can't imagine they need 30

10   days to do that, and we're running up against the trial

11   already, your Honor.

12         THE COURT:  Thank you.

13         Counsel for the United States, why does this take so

14   much time?

15         MS. TEKEEI:  Your Honor, given that it will limit the

16   government's presentation of the evidence at trial, the

17   government wants to consider, perhaps, even more carefully five

18   months out from trial than it would, for example, in the one or

19   two months before trial all of the various trades at issue.  We

20   are undergoing an analysis right now, in fact, regarding the

21   trading, and so we ask not because it's not something that we

22   have endeavored to do already, but we're actively undergoing an

23   analysis of all of the trading activity with an individual who

24   will be prepared or someone like this individual who will be

25   prepared to testify about the trading activity at trial, and we

LatWsar3

1    want to make sure that we get the benefit of the full analysis

2    in light of the limitations that the bill of particulars will

3    place on the government's evidence at trial.

4                THE COURT:  That's fine.

5                The bill of particulars must be provided no later than

6    November 29, 2021.

7                Counsel for defendant.

8                MR. FUCHS:  Yes.  Thank you, your Honor.

9                I don't want to belabor that point, but unfortunately,

10   whatever remedy is chosen here for the duplicity is going to

11   bleed into the issue we're just talking about with regard to

12   the trades, because while the defense does not yet know what

13   remedy would be adequate, in its view, at a minimum, a special

14   verdict form's going to be required.  It's not going to be

15   sufficient, from the defendant's point of view, that there just

16   be a jury instruction.  And if it's going to be a special

17   verdict form, then it's going to have to detail every trade and

18   whether MNPI was passed in connection with that trade.

19               So everything hinges on this bill of particulars

20   issue.  And your Honor, I'd also ask that we have an

21   opportunity to weigh in on this letter that they're going to

22   send for all of those reasons.

23               THE COURT:  Thank you.  Good.

24               So, yes.  That's fine.  I'm happy for the letter that

25   will be submitted by a week from today to be a joint letter.

LatWsar3

1          Counsel for the United States, that will require that

2     you provide the defense with your position in about four days

3     so that they have ample time to include their proposed response

4     in the letter.

5          Counsel for defendant, anything else?

6          MR. BRODSKY:  One final point, your Honor.

7          I can appreciate your Honor's statements earlier with

8     respect, because we were the movant, we had a burden to prove

9     by clear and convincing -- I believe it was clear and

10     convincing evidence with respect to the Auspex note and the

11     cooperator witness call.  Respectfully, I'm not --

12          THE COURT:  Thank you.

13          Just to be clear, I didn't actually say that.

14          MR. BRODSKY:  Oh.  Sorry, your Honor.

15          THE COURT:  No.  That's fine.

16          I'll point you to the transcript, but just to

17     summarize it, I didn't place a particular burden on the defense

18     regarding your burden of proof.  I just relied largely on what

19     a motion *in limine* is; in other words, that a motion *in limine*

20     permits the Court to rule on something but that the general

21     rule is that I do not exclude things if they might possibly be

22     capable of being introduced at trial.

23          The government has pointed me to paths in which this

24     might be capable of being introduced.  The burden for its

25     introduction rests with the government, and the burden is a

LatWsar3

1    preponderance of the evidence.

2            MR. BRODSKY:  I think, your Honor, you had indicated

3    earlier today -- and I apologize for misstating what your Honor

4    had said earlier today.

5            I think your Honor might have been thinking of coming

6    back to that issue to suggest a possible proposed approach

7    rather than wait until we're on the eve of trial to resolve

8    that.

9            THE COURT:  Thank you.

10           Thank you for reminding me.

11           So, I will leave it to the parties to talk about.  I

12   will ask you to look at my comments on the record.  You all

13   know that the, I'll call it the custom with respect to issues

14   related to proving the existence and scope of a conspiracy is

15   to permit that evidence to be developed at trial and for the

16   Court to make decisions regarding whether a sufficient

17   foundation had been laid based on the evidence presented at

18   trial.

19           Rule 104 does permit the Court to have a hearing, as

20   counsel for defendant, I think, suggested prior to trial with

21   respect to evidentiary issues.  I did not propose that as a

22   solution with respect to this issue in my comments, in part,

23   because I don't have a clear enough sense of the proof and my

24   concern would be that that hearing would turn into essentially

25   the trial, because I don't know what evidence the government

LatWsar3

1   will need to present in order to prove the scope and --

2   existence and scope of the conspiracy.

3          So, in other words, because this is not a discrete

4   issue, my fear would be that taking that up in a separate

5   hearing prior to trial would be very burdensome, such that we

6   would take an approach other than the customary approach, which

7   is to see whether or not the evidence is sufficient once trial

8   begins.  The risk of that, of course, is that we all take a lot

9   of time and a lot of citizens' time to get to trial if the

10  evidence does not ultimately support the governments' position.

11         So I did not suggest that I would have a hearing with

12  respect to that issue.  Instead, I made the proposal that I

13  did.  The reason why I didn't propose a pretrial hearing was

14  basically what I just articulated to you.  But I don't take it

15  off the table for the parties to talk about whether there's a

16  way for the Court to resolve definitively those issues prior to

17  trial.  I'd be willing to consider any proposals that the

18  parties would like to make.

19         MR. BRODSKY:  Thank you, your Honor.

20         I think with respect to the Auspex note, which is

21  the -- and the cooperator witness discussion with associate 1

22  regarding the topic in March of 2015 that led to handwritten

23  notes and then the Auspex note, we would respectfully submit

24  that we're only talking about -- we're talking about a

25  declarant who's unavailable, and we're talking about one

LatWsar3

1   witness who would be the witness the government says in their

2   papers, in their opposition, they're relying on for the meaning

3   of the note, the basis for business records exception, for

4   every aspect, really.  And so unlike in a lot of cases where

5   there's conspiracy, where you have basically a mini trial,

6   this, from our perspective, we would envision would require the

7   government to put on one witness.

8          Now, I do, your Honor, understand why we were the

9   movant, and therefore, we bore some burden to persuade your

10  Honor at this stage to exclude the evidence.  The only way,

11  having thought about it over our lunch break, the only way we

12  could do that is if we called the cooperating witness, and I

13  don't know if there's any reason why your Honor wouldn't allow

14  us to do that for a hearing.

15         So we believe we would meet the burden if we called

16  the cooperating witness and questioned the cooperating witness.

17  We would be able to establish everything that we believe would

18  be the reasons to exclude the evidence.

19         THE COURT:  Thank you.

20         I'll leave it to the parties to talk about this issue

21  more.  I apologize, because I have another --

22         MR. BRODSKY:  Understood.

23         THE COURT:  Rule 104(d) says that I can have a hearing

24  if -- I think it says something like the interests of justice

25  so require.  It's not something that happens by default, as the

LatWsar3

1   parties here know.

2          The other comment that I'll leave you with as you're

3   thinking about this issue is that I don't know nearly as much

4   as you all do about the case.  I know what you've given to me.

5          I also don't know with certainty that the evidence

6   that the government has regarding the nature and scope of the

7   conspiracy will be limited to the coconspirator's testimony at

8   trial.  They might immunize associate 1 and have that person

9   testify.  I just don't know.

10          So that's part of the reason why, as you've heard,

11   I've had to deny the motion *in limine*.  The universe of

12   evidence that the government might ultimately produce at trial

13   could be more expansive than that of this witness, and I just

14   don't know the answer to that question, which is why I leave it

15   to the parties to talk about and let me know if there is a way

16   that I might consider this issue meaningfully outside of trial.

17   At this point I don't know how.

18          MR. BRODSKY:  One possibility, your Honor, if we

19   cannot -- we'll certainly meet and confer with the government,

20   is for your Honor, if the government does not want to disclose

21   to us, for example, their plans to immunize a witness, one

22   possibility is an *in camera* submission to your Honor regarding

23   how they plan to prove this, because we respectfully submit

24   there's -- we know the case.  They were investigating for a

25   number of years.  We know the discovery, and we know what the

LatWsar3

1    allegations are, although we don't understand them.  So we are

2    confident that your Honor will see that, I believe it will be a

3    hearing with a single witness.

4             THE COURT:  Thank you.  Good.

5             I'm happy for the parties to consider that and make

6    any reasonable proposals to the Court.  I'll take them up when

7    and if as they're made.

8             Thank you all very much for your patience today.

9             This proceeding is adjourned.

10            (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25