UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                :

UNITED STATES OF AMERICA          :

                                :

        -v.-                    :       S2 23 Cr. 490 (SHS)

                                :

ROBERT MENENDEZ,            :
NADINE MENENDEZ,           :
      a/k/a "Nadine Arslanian,"   :
WAEL HANA,                 :
      a/k/a "Will Hana,"        :
JOSE URIBE, and           :
FRED DAIBES,               :

                                :

               Defendants.   :

                                :

-------------------------------------------------------------x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANTS' MOTIONS TO SUPPRESS

                                     DAMIAN WILLIAMS
                                       United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

BACKGROUND ........................................................................................................... 1

    A.    The Charged Offenses ............................................................................. 1

    B.    The Challenged Search Warrants ........................................................... 3

DISCUSSION .............................................................................................................. 7

I.    THERE WERE NO MATERIAL OMISSIONS FROM THE SEARCH WARRANT
    AFFIDAVITS ........................................................................................................ 7

    A.    Applicable Law ...................................................................................... 8

        1.    Review of a Magistrate Judge's Probable Cause Determination ............... 8

        2.    Alleged Omissions or Misstatements in a Search Warrant Affidavit ........ 8

    B.    Discussion ............................................................................................ 12

        1.    The Challenged Alleged Omissions Were Not Material .......................... 14

            a)    The Omissions Related to the Confidential Source Were Not
                Exculpatory or Material ................................................................ 14

                (1)    The Omitted Information Related to the
                      Confidential Source Was Inculpatory .................. 15

                (2)    The First Challenged Affidavit Set Forth Ample
                      Probable Cause Even Disregarding the Recorded
                      Conversation Entirely ........................................... 22

                (3)    The Additional Confidential Source Statements Are
                      Not Material ......................................................... 27

                (4)    Subsequent Warrants Further Show the
                      Immateriality of the Omitted Information Related to
                      the Confidential Source ........................................ 30

            b)    The Allegedly Omitted Government Official Statements Were
                Immaterial .................................................................................... 34

                (1)    Official-2 .............................................................. 35

                  (2)    The State Department and SFRC Employees ....... 37

            c)    The Alleged Omissions of Failures to Recall or Self-Serving
                Denials Were Immaterial .............................................................. 39

                (1)    The New Jersey Defendant ................................... 40

                (2)    The Hana Associate ............................................. 43

                (3)    Jeweler-1 .............................................................. 44

          d)     The Alleged Omissions Related to Additional Conduct Were Not Material ........................................................................................ 45

                  (1)    The Laboratory Company CEO and the Health Official ............................................................................ 45

                  (2)    Associate-2, Associate-3, and the Insurance Client ................................................................................ 47

          e)     The Statements About Gold Were Not Necessary to Probable Cause ............................................................................................ 48

          f)     The Failure to Update the Affidavit Regarding Automatic Payments Was Immaterial and Plainly Inadvertent ..................... 50

     2.     The Defendants Have Shown No Intent to Mislead or Reckless Disregard for the Truth ...................................................................................... 51

II.     THE SEARCH WARRANTS ARE PARTICULAR AND NOT OVERBROAD............ 58

    A.     Applicable Law ............................................................................................. 58

    B.     Discussion ..................................................................................................... 60

      1.     The Categories Specified in the Warrants Were Supported by Probable Cause ................................................................................................ 61

      2.     No Temporal Limitation Was Required ..................................................... 65

      3.     The Search Warrants Properly Sought Evidence of Consciousness of Guilt ........................................................................................................ 67

      4.     Even if There Were Any Defect in the Warrants, Suppression Would Be Inappropriate ............................................................................................ 68

CONCLUSION ................................................................................................................. 70

## TABLE OF AUTHORITIES

**Cases**

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ................................................... 58

*City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365 (1999) ...................... 39

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................................................ 8, 9

*Gerstein v. Pugh*, 420 U.S. 103 (1975) .......................................................................... 8

*Groh v. Ramirez*, 540 U.S. 551 (2004) ........................................................................ 65

*Illinois v. Gates*, 462 U.S. 213, 238 (1983) ................................................................. 8

*In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386 (S.D.N.Y. Aug. 7, 2014) ................................................................................................ 59

*Nix v. Williams*, 467 U.S. 431 (1984) ......................................................................... 69

*Panetta v. Crowley*, 460 F.3d 388 (2d Cir. 2006) ....................................................... 10

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991) ................................................... 9

*Spinelli v. United States*, 393 U.S. 410 (1969) ............................................................. 8

*Texas v. Brown*, 460 U.S. 730 (1983) ........................................................................... 8

*United States v. Adames*, No. 16 Cr. 167 (LAP) (S.D.N.Y. Apr. 6, 2017) .................... 53

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) ............................... 9, 10, 11, 57

*United States v. Baldeo*, No. 13 Cr. 125 (PAC), 2014 WL 351638 (S.D.N.Y. Jan. 31, 2014) ..... 68

*United States v. Brown*, 744 F. Supp. 558 (S.D.N.Y. 1990) ......................................... 9

*United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 3577903 (S.D.N.Y. Jul. 1, 2020) .. *passim*

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) ................................. 9, 11, 12, 52

*United States v. Cioffi*, 668 F. Supp. 2d 385, 396 (E.D.N.Y. 2009) ............................ 68

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ....................................... 8, 60, 68

*United States v. Cromitie*, No. 09 Cr. 558 (CM), 2010 WL 3025670 (S.D.N.Y. July 28, 2010). 10

*United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) .................................. 59

*United States v. Elkorany*, No. 20 Cr. 437 (NRB), 2021 WL 3668086 (S.D.N.Y. Aug. 17, 2021) ................................................................................................................. 60, 66

*United States v. Eng*, 971 F.2d 854 (2d Cir. 1992) ...................................................... 69

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ............................................... 9, 11

*United States v. Fama*, 758 F.2d 834 (2d Cir. 1985) .............................................. 8, 14

*United States v. Feola*, 875 F.2d 857 (2d Cir. 1989) ................................................... 10

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) ............................................................. 58, 68

*United States v. Gatto*, 313 F. Supp. 3d 551 (S.D.N.Y. 2018) .................................................... 66

*United States v. George*, 975 F.2d 72 (2d Cir. 1992) .................................................... 58

*United States v. Harris*, 741 F. App'x 823 (2d Cir. 2018) ........................................................ 36

*United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010)59, 65

*United States v. Juarez*, No. 12 Cr. 59 (RRM), 2013 WL 357570 (E.D.N.Y. Jan. 29, 2013) 59, 66

*United States v. Klump*, 536 F.3d 113 (2d Cir. 2008)............................................................... 8, 9

*United States v. Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013)............................................. 12, 57

*United States v. Leon*, 468 U.S. 897 (1984)........................................................................... 60

*United States v. Maisonet*, No. 12 Cr. 829 (AKH), 2013 WL 12204909 (S.D.N.Y. Mar. 22, 2013)
................................................................................................................................................. 10, 52

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) ......................................... *passim*

*United States v. Marin-Buitrago*, 734 F.2d 889 (2d Cir. 1984).................................................. 40

*United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556 (S.D.N.Y. July 28, 2016)... 9

*United States v. Norris*, 513 F. App'x 57 (2d Cir. 2013).......................................................... 67

*United States v. One Residential Property Located at 8750 Duncan Road, San Diego, CA*, 312 F.
App'x 8 (9th Cir. 2008) ............................................................................................................... 40

*United States v. Perez*, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) .................................................. 11

*United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018)................................ 59, 65

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ................................................. *passim*

*United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) ................................................................. 11

*United States v. Rivera*, 750 F. Supp. 614 (S.D.N.Y. 1990)............................................... 10, 13

*United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002) .............................................................. 67

*United States v. Sandalo*, 70 F.4th 77 (2d Cir. 2023) ................................................................. 9

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) ................................................................ 34

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) .................................................................. 8

*United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291 (S.D.N.Y. Dec. 22, 2023) ... 9

*United States v. Thomas*, 788 F.3d 345 (2d Cir. 2015)............................................................. 55

*United States v. Ulbricht*, 858 F.3d 71 (2d Cir. 2017).............................................. 58, 61, 62, 63

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................................... 69

*United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) .........
.......................................................................................................................... 10, 13, 54, 57

iv

*United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) ........................................................ 65

*United States v. Yusuf*, 461 F.3d 374 (3d Cir. 2006) .................................................. 59

*United States v. Zemlyansky*, 945 F. Supp. 2d 438 (S.D.N.Y. 2013) ........................ 60, 64, 65, 66

*Werner v. Werner*, 267 F.3d 288 (3d Cir. 2001) ........................................................ 55

**<u>Rules</u>**

Fed. R. Crim. P. 41(e)(2)(B) ........................................................................................... 58

The Government respectfully submits this memorandum of law in opposition to the motions of Robert Menendez and Wael Hana to suppress evidence seized pursuant to a series of search warrants.  These motions do not meet the demanding standard for suppression, and accordingly they should be denied.

## BACKGROUND

### A.    The Charged Offenses

The Indictment charges that from in or about 2018 through in or about 2023, Menendez agreed to and did take hundreds of thousands of dollars in bribes paid to him and his wife Nadine Menendez by Hana, Jose Uribe, and Fred Daibes, three New Jersey businessmen, in exchange for Menendez promising and agreeing to use his power and influence to seek to protect and enrich them, as well as to benefit the governments of Egypt and Qatar.  (Indictment ¶ 1.)[1]  Over the course of their corrupt relationship, Menendez and Nadine Menendez agreed to and did accept bribes from Hana, Uribe, and Daibes in the form of cash, gold, payments toward a home mortgage, compensation for a low-or-no-show job, and a luxury Mercedes-Benz convertible (the "Mercedes-Benz Convertible"), among other things of value.  (Indictment ¶ 1; *see also, e.g.*, *id.* ¶¶ 4, 32-34, 37(c), 37(e), 38, 39, 43(d)-(f), 44(h), 51, 53(a), 53(d), 53(h), 63-66.)

---

[1] "Dkt." refers to docket entries in this case; "Indictment" refers to Superseding Indictment S2 23 Cr. 490 (SHS) (Dkt. 115); "Menendez Supp. Mot." refers to the memorandum of law in support of Menendez's motion (Dkt. 158); "Weitzman Decl." refers to the Declaration of Avi Weitzman, Esq. submitted in support of Menendez's motion (Dkt. 159); "Menendez Decl." refers to the Corrected Declaration of Robert Menendez submitted in support of Menendez's motion (Dkt. 163); "Hana Mot." refers to the memorandum of law in support of Hana's motion (Dkt. 143); "Lustberg Cert." refers to the Certification of Lawrence S. Lustberg, Esq. submitted in support of Hana's motion (Dkt. 141); and "Gov't Dismissal Opp." refers to the Government's memorandum in opposition to the defendants' motions to dismiss and for other relief (Dkt. 180).  For clarity, the Indictment and this memorandum of law refer to Robert Menendez as "Menendez" and to Nadine Menendez by her first and last name.

As set forth in more detail in the Indictment and the Government's previously-filed memorandum of law in opposition to the defendants' pretrial motions, as part of the corrupt scheme, Menendez agreed to take, promised to take, took, and/or received payments knowing he was expected to take one or more actions in exchange. The Indictment alleges that those agreements, promises, and actions included, among other things:

- Promising and agreeing that Menendez would use his official position to facilitate billions of dollars in U.S. military aid to Egypt (*see, e.g.*, Indictment ¶¶ 2, 16-21, 28, 35, 37(g));

- Providing and agreeing to provide the Government of Egypt with sensitive and non-public U.S. government information and other forms of surreptitious assistance (*see, e.g., id.* ¶¶ 2-3, 19(b)-(d), 21, 28, 36, 37);

- Agreeing and attempting to pressure the U.S. Department of Agriculture ("USDA") to acquiesce to a lucrative business monopoly the Government of Egypt granted to Hana during the course of the scheme, and that Hana went on to use to pay bribes to Menendez and Nadine Menendez (*see, e.g., id.* ¶¶ 2, 22-34);

- Agreeing and attempting to disrupt a criminal prosecution and related criminal investigation being supervised by the New Jersey Attorney General's Office (*see, e.g., id.* ¶¶ 2, 39-44);

- Agreeing and attempting to disrupt the federal prosecution of Daibes in the District of New Jersey, both before and after the confirmation of a new U.S. Attorney (*see, e.g., id.* ¶¶ 2, 45-54); and

- Receiving bribes knowing that Daibes expected him in exchange to take actions that would assist Daibes by benefitting the Government of Qatar, including to advance a Senate resolution related to Qatar (*see, e.g., id.* ¶¶ 2, 55-67).

As alleged in the Indictment, these acts were taken, promised, agreed upon, and requested, and payment was solicited, made, and received, beginning in or about 2018 and continuing into 2023.

(*See generally* Gov't Dismissal Opp. 2-12.)

2

**B.      The Challenged Search Warrants**

Over the course of the investigation prior to the Indictment, multiple magistrate judges in three federal districts issued a series of search warrants based upon their findings of probable cause. As relevant here, the following search warrants were issued:

1.    **December 2020 Hana Email Warrant:** On December 23, 2020, the Honorable Barbara C. Moses, United States Magistrate Judge for the Southern District of New York, authorized the execution of search warrants designated No. 20 Mag. 13682 (S.D.N.Y.), including one (the "December 2020 Hana Email Warrant") on an email account used by Hana ("Hana Email Account-1"), based on a finding that there was probable cause that this account would contain evidence of several bribery and foreign influence-related offenses.[2]

2.    **November 2021 Hana iCloud Warrant:** On November 24, 2021, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, authorized the execution of search warrants designated No. 21 Mag. 11317 (S.D.N.Y.), including one (the "November 2021 Hana iCloud Warrant") for an iCloud account used by Hana ("Hana iCloud Account-1"), based on a finding that there was probable cause that this account would contain evidence of several bribery and money laundering-related offenses.[3]

3.    **January 2022 Hana Email Warrant:** On January 10, 2022, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge for the Southern District of New York, authorized the execution of search warrants designated No. 20 Mag. 242 (S.D.N.Y.), including one (the "January 2022 Hana Email Warrant") for a second email account used by Hana ("Hana Email Account-2"), based on a finding that there was probable cause that this account would contain evidence of the same

---

[2] The subject offenses specified in the December 2020 Hana Email Warrant were (i) 18 U.S.C. §§ 951 and 371 (acting and conspiring to act as an agent of a foreign government without prior notification to the Attorney General); (ii) 22 U.S.C. §§ 612 and 618(a)(1) and 18 U.S.C. § 371 (acting and conspiring to act as an agent of a foreign principal without registering with the Attorney General as required by FARA); (iii) 18 U.S.C. §§ 201 and 371 (bribing or offering to bribe or demanding or accepting a bribe, and conspiring to do the same, with respect to a United States Senator); (iv) 18 U.S.C. §§ 1343, 1346 and 1349 (honest services wire fraud and conspiring to commit honest services wire fraud); and (v) 18 U.S.C. § 1951 (extortion under official color of right and conspiring to do the same).

[3] The subject offenses specified in the November 2021 Hana iCloud Warrant were (i) 18 U.S.C. §§ 201 and 371; (ii) 18 U.S.C. §§ 1343, 1346, and 1349; (iii) 18 U.S.C. § 1951; and (iv) 18 U.S.C. §§ 1956 and 1957 (money laundering, engaging in a financial transaction in criminally-derived property, and conspiracy to do one or both of the same).

bribery and money laundering-related offenses specified in the November 2021 Hana iCloud Warrant.

4.  **January 2022 Menendez Email and iCloud Warrants:** On January 24, 2022, the Honorable Ona T. Wang, United States Magistrate Judge for the Southern District of New York, authorized the execution of search warrants designated No. 22 Mag. 748 (S.D.N.Y.) (the "January 2022 Menendez Email and iCloud Warrants") for an email account used by Menendez ("Menendez Email Account-1") and an iCloud account used by Menendez (the "Menendez iCloud Account"), based on a finding that there was probable cause that these accounts would contain evidence of the same bribery and money laundering-related offenses specified in the November 2021 Hana iCloud Warrant and the January 2022 Hana Email Warrant.

5.  **June 2022 Menendez D.C. Warrants:** On June 14, 2022, the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, authorized the execution of search warrants designated Nos. 22-sw-173 and 22-sw-174 (D.D.C.) (the "June 2022 Menendez D.C. Warrants") for Menendez's residence in the District of Columbia and his cellphone, based on a finding that there was probable cause that this location and this item would contain evidence of several bribery, money laundering, and fraud-related offenses.[4]

6.  **June 2022 First Menendez N.J. Warrant:** On June 15, 2022, the Honorable Michael A. Hammer, United States Magistrate Judge for the District of New Jersey, authorized the execution of search warrant Mag. No. 22-10273 (D.N.J.) for Menendez and Nadine Menendez's residence in Englewood Cliffs, New Jersey (the "June 2022 First Menendez N.J. Warrant"), based on a finding of probable cause that this location would contain evidence of the same bribery, money laundering, and fraud-related offenses specified in the June 2022 Menendez D.C. Warrants.

7.  **June 2022 Second Menendez N.J. Warrant:** On June 16, 2022, Judge Hammer authorized the execution of a second search warrant for Menendez and Nadine Menendez's residence, designated Mag. No. 22-10284 (D.N.J.) (the "June 2022 Second Menendez N.J. Warrant"), based on a finding that this location would contain evidence of the same bribery, money laundering, and fraud-related offenses specified in the June 2022 Menendez D.C. Warrants and the June 2022 First Menendez N.J. Warrant.

8.  **July 2022 Menendez Email and iCloud Warrants:** On July 14, 2022, the Honorable James L. Cott, Chief United States Magistrate Judge for the Southern District of New York, authorized the execution of search warrants designated No. 22 Mag. 5801 (S.D.N.Y.), including warrants (the "July 2022 Menendez Email and

---

[4] The subject offenses specified in the June 2022 Menendez D.C. Warrants are (i) 18 U.S.C. §§ 201 and 371; (ii) 18 U.S.C. §§ 1343, 1346, and 1349 (wire fraud and honest services wire fraud, and conspiring to commit wire fraud and honest services wire fraud); (iii) 18 U.S.C. § 1951; and (iv) 18 U.S.C. §§ 1956 and 1957.

iCloud Warrants") for a second email account used by Menendez ("Menendez Email Account-2") and for the Menendez iCloud Account, based on a finding of probable cause that these accounts would contain evidence of several bribery, money laundering, fraud, false statements, and obstruction of justice-related offenses.[5]

9.    **December 2022 Hana Email Warrants:** On December 20, 2022, Judge Gorenstein authorized the execution of search warrants designated No. 22 Mag. 10186 (S.D.N.Y.), including two (the "December 2022 Hana Email Warrants") for two more email accounts used by Hana ("Hana Email Account-3" and "Hana Email Account-4") based on a finding of probable cause that these accounts would contain evidence of the same bribery, money laundering, fraud, false statements, and obstruction of justice-related offenses specified in the July 2022 Menendez Email and iCloud Warrants.

10.   **January 2023 Hana iCloud Warrant:** On January 17, 2023, Judge Moses authorized the execution of a search warrant designated No. 23 Mag. 370 (S.D.N.Y.) (the "January 2023 Hana iCloud Warrant") for another iCloud account used by Hana ("Hana iCloud Account-2"), based on a finding of probable cause that this account would contain evidence of the same bribery, money laundering, fraud, false statements, and obstruction of justice-related offenses specified in the July 2022 Menendez Email and iCloud Warrants.

11.   **February 2023 Hana Historical Location Warrant:** On February 14, 2023, Judge Aaron authorized the execution of search warrants designated No. 23 Mag. 1206 (S.D.N.Y.), including one (the "February 2023 Hana Historical Location Warrant") seeking historical location information for a phone used by Hana, based on a finding of probable cause that this information would include evidence of the same bribery, money laundering, fraud, false statements, and obstruction of justice-related offenses specified in the July 2022 Menendez Email and iCloud Warrants and the January 2023 Hana iCloud Warrant.

12.   **September 2023 Supplemental Warrant:** On September 20, 2023, the Honorable Jennifer E. Willis, United States Magistrate Judge for the Southern District of New York, authorized the execution of a search warrant designated No. 23 Mag. 6481 (S.D.N.Y.) (the "September 2023 Supplemental Warrant"), authorizing the search of the contents of a number of devices and accounts seized pursuant to previous warrants (including all of the devices and accounts seized pursuant to the December 2020 Hana Email Warrant, the November 2021 Hana iCloud Warrant, the January 2022 Hana Email Warrant, the January 2022 Menendez Email and iCloud

---

[5] The subject offenses specified in the July 2022 Menendez Email and iCloud Warrants are (i) 18 U.S.C. §§ 201 and 371; (ii) 18 U.S.C. §§ 1343, 1346, and 1349; (iii) 18 U.S.C. § 1951; (iv) 18 U.S.C. §§ 1956 and 1957; (v) 18 U.S.C. §§ 1001 and 371 (making false statements and conspiring to do the same); and (vi) 18 U.S.C. §§ 1503, 1512, and 371 (obstruction of justice and conspiring to do the same).

Warrants, the June 2022 Menendez D.C. Warrants, the June 2022 First Menendez N.J. Warrant, the June 2022 Second Menendez N.J. Warrant, the July 2022 Menendez Email and iCloud Warrants, the December 2022 Hana Email Warrants, and the January 2023 Hana iCloud Warrant), based on a finding of probable cause that these devices and accounts would contain evidence of several bribery, money laundering, fraud, false statements, obstruction of justice, foreign influence, and theft of government property-related offenses.[6]

Menendez moves to suppress the evidence obtained pursuant to the January 2022 Menendez Email and iCloud Warrants, the June 2022 First Menendez N.J. Warrant, and the June 2022 Second Menendez N.J. Warrant on the grounds of alleged material misrepresentations and omissions from the warrant affidavits. (Menendez Supp. Mot. 8-24.)[7] Menendez also challenges the January 2022 Menendez Email and iCloud Warrants, the July 2022 Menendez Email and iCloud Warrants, and the September 2023 Supplemental Warrant as allegedly overbroad and insufficiently particularized. (*Id.* 24-33.)

Hana moves to suppress the evidence obtained pursuant to the December 2022 Hana Email Warrants, the January 2023 Hana iCloud Warrant, the February 2023 Hana Historical Location Warrant, and the September 2023 Supplemental Warrant on the basis of alleged material false statements and omissions in the warrant affidavits. (Hana Mot. 118-31.) Hana also challenges the

---

[6] The subject offenses specified in the September 2023 Supplemental Warrant are (i) 18 U.S.C. §§ 201 and 371; (ii) 18 U.S.C. §§ 1343, 1346, and 1349; (iii) 18 U.S.C. § 1951; (iv) 18 U.S.C. §§ 1956 and 1957; (v) 18 U.S.C. §§ 1001 and 371; (vi) 18 U.S.C. §§ 1503, 1512, and 371; (vii) 18 U.S.C. §§ 219 and 371 (public official acting as a foreign agent and conspiring to do the same); (viii) 18 U.S.C. §§ 951 and 371; (ix) 22 U.S.C. §§ 612 and 618(a)(1) and 18 U.S.C. § 371; (x) 18 U.S.C. §§ 1344 and 1349) (bank fraud and conspiring to commit bank fraud); and (xi) 18 U.S.C. §§ 641 and 371 (theft of government property and conspiring to do the same).

[7] Nadine Menendez stated that she joins Menendez's motion as to the June 2022 First Menendez N.J. Warrant and the June 2022 Second Menendez N.J. Warrant, although she did not submit an affidavit to establish standing in support of her request to join. (Dkt. 165.) However, the Court may overlook her failure to do so, given that Menendez's motion is without merit.

December 2020 Hana Email Warrant, the November 2021 Hana iCloud Warrant, and the January 2022 Hana Email Warrant as overbroad.  (*Id.* 111-18.)

**DISCUSSION**

## I.    THERE WERE NO MATERIAL OMISSIONS FROM THE SEARCH WARRANT AFFIDAVITS

As even casual perusal of the warrant affidavits themselves reveal, each of the affidavits in support of the challenged warrants presented overwhelming evidence far exceeding probable cause justifying the court-authorized searches.  Hana and Menendez complain that these lengthy affidavits should have been even further lengthened by the inclusion of certain self-serving denials, failures of recollection, peripheral matters, and, in some cases, actually inculpatory information. These claims come nowhere near establishing a basis for suppression.

Reading the allegedly intentionally omitted information together with the affidavits themselves—not Menendez and Hana's deeply unreliable caricatures of and conclusory assertions about them—shows that none of the complained-of omissions could possibly have been material to any of the decisions to authorize the warrants.

Moreover, even if any of the omissions was material, the care taken to include numerous facts arguably supportive of potential defense theories, as well as to *omit* additional and often devastating inculpatory information, show that the defendants, who bear the burden on their motions, also do not meet or even closely approach the second threshold required for suppression or a hearing, namely that the alleged material omissions were left out of an affidavit intentionally or recklessly by the affiant.

A.      **Applicable Law**

1.      *Review of a Magistrate Judge's Probable Cause Determination*

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983).  Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).  It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975).  Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*, 462 U.S. at 235 (internal quotation marks omitted).  Accordingly, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

2.      *Alleged Omissions or Misstatements in a Search Warrant Affidavit*

A search warrant affidavit is presumed reliable.  *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008).  "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit,

8

and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). Not every statement in a warrant affidavit must be true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64. The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155, 170) (emphasis added). The burden to even obtain a *Franks* hearing is thus itself a heavy one, and such hearings are rare. *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 86 (2d Cir. 2023) ("[T]he substantial preliminary showing standard imposes a 'high' burden on [the defendant]." (quoting *Rivera*, 928 F.2d at 604)); *United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291, at *8 (S.D.N.Y. Dec. 22, 2023) (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86)); *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016) ("The burden to obtain [a *Franks*] hearing is a heavy one, and such hearings are exceedingly rare."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden.").

9

In reviewing a challenge to a warrant, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (internal quotation marks and citations omitted); *see also Awadallah*, 349 F.3d at 67. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010) (quoting *Awadallah*, 349 F.3d at 67-68). Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted). This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks omitted).

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, No. 12 Cr. 829 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 3577903, at *5 (S.D.N.Y. Jul. 1, 2020) (quoting *id.*). Indeed, "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *United States v. Cromitie*, No. 09 Cr. 558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010) (internal quotation marks omitted). Accordingly,

"[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374 (internal quotation marks omitted).

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719 (internal quotation marks omitted).

A search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68 (internal quotation marks omitted).

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (internal quotation marks omitted)).

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (internal quotation marks omitted).

B.     **Discussion**

For all their hyperbolic rhetoric, neither Menendez nor Hana comes close to establishing any material misstatements or omissions in the warrant affidavits, let alone any intentional or reckless ones. Indeed, Menendez does not identify a single alleged misstatement, as opposed to an alleged omission, in a single affidavit. This makes Menendez's choice not merely to challenge the alleged omission of facts but also to level unfounded accusations of "misrepresentations" (Menendez Supp. Mot. 1, 3-4, 6, 8, 14, 16-17, 19-20), "mischaracterizations" (*id.* 15, 17-18, 20), "misstatements" (*id.* 19), and "falsehoods" (*id.*), baffling.[8] Hana, for his part, at least claims that several affidavits include one alleged incorrect factual statement—namely, a failure, after Uribe stopped making automatic payments on the Mercedes-Benz Convertible following his approach

---

[8] Similarly puzzling is Menendez's assertion, in the first sentence of his motion, that the Government is engaging in a vindictive prosecution of him in purported retaliation for the fact that he was ultimately not convicted in a separate trial brought by a different prosecution team, in a different component of the Department of Justice, based on different facts, and involving a different co-defendant, years ago. (Menendez Supp. Mot. 1.) This accusation is patently false, which may be why Menendez does not actually make such a legal claim or attempt to further support this inflammatory contention.

by the Federal Bureau of Investigation ("FBI"), to update in a single sentence previous affidavits' language that those payments were ongoing (Hana Mot. 129-30), while also properly describing that the payments stopped in separate paragraph.  But this minor and immaterial oversight hardly supports Hana's broad and repeated accusations of "[f]alse and [m]isleading [s]tatements" (Hana Mot. 118-19, 128), "misrepresentations" (*id.* 128, 130), and "false statements" (*id.* 130).

Stripped of their incendiary language, the defendants' motions actually focus on several peripheral facts that were allegedly intentionally left out of a series of extraordinarily lengthy and thorough affidavits.  But because "all storytelling involves an element of selectivity," *Vilar*, 2007 WL 1075041, at *27 (internal quotation marks and citations omitted), "[o]missions are not subject to the same high level of scrutiny as misstatements," *Rivera*, 750 F. Supp. at 617, and here the defendants do not remotely approach a showing of materiality.  Their claims of materiality rest on misreading or taking out of context what was omitted, and in any event the affidavits at issue set forth overwhelming probable cause that nothing omitted could have changed.

Not only do the defendants fail to show any material omissions, but they also fail to carry their burden of showing that the affiants had any intent to mislead the issuing magistrate judges or reckless disregard for the truth.  The defendants' only arguments regarding intent are their flawed contention that the allegedly omitted statements were material, which is utterly insufficient to meet the defendant's burden.  *See Rajaratnam*, 719 F.3d at 154 (affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical'").  And the record further affirmatively refutes the accusations that the affiants were in any way reckless or misleading.  Indeed, the affiants not only repeatedly disclosed information arguably supportive of potential defense theories, but they also *did not include* highly inculpatory information that would have, if included, further

13

supported probable cause. In short, the defendants' serious accusation that these affiants intentionally or recklessly misled the issuing magistrate judges is not merely unsubstantiated, but is contradicted by the record.

### 1.   *The Challenged Alleged Omissions Were Not Material*

Even a casual review of the affidavits in support of the challenged warrants shows that they overwhelmingly set forth probable cause with or without any of the allegedly omitted material. Rather than grapple with the devastating evidence actually set forth in the affidavits (and which far exceeds a demonstration of probable cause), the defendants grossly distort the affidavits and, in some cases, the allegedly omitted material itself. In many cases, the allegedly omitted material is actually inculpatory, or else entirely neutral as to probable cause. But even if any of the alleged omissions was susceptible to a reasonable exculpatory interpretation, that would still not make any of them material to probable cause. *See, e.g.*, *Fama*, 758 F.2d at 838 ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."). At base, the defendants offer only the sort of "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376 (internal quotation marks omitted), that courts have uniformly held does not justify a *Franks* hearing, much less suppression.

### a)   The Omissions Related to the Confidential Source Were Not Exculpatory or Material

Menendez's complaints that the warrant affidavits omitted material related to a particular confidential source—the centerpiece of his entire motion—rest on a strained characterization of the affidavits and of the omitted material, which was highly inculpatory.

(1)     The Omitted Information Related to the Confidential
Source Was Inculpatory

The affidavits in support of the search warrants summarized a recorded conversation between an associate of Hana (the "Hana Associate") and a confidential source (the "CS") in a manner that—contrary to Menendez's characterization—was substantially *less* inculpatory than the actual conversation.[9]  Menendez's characterization of the omissions is, in short, backwards, as a comparison of the affidavits and the draft translation makes clear.

The affidavit in support of the January 2022 Menendez Email and iCloud Warrants summarizes the conversation in a way that describes a *quid pro quo* involving Menendez's intervention in a criminal insurance fraud prosecution, but does not directly mention Menendez's knowledge at all:

a.  [The Hana Associate] told the CS, in sum and substance, that Hana arranged for [Nadine] Arslanian to receive a ring and a car in exchange for Menendez's assistance in resolving criminal charges for insurance fraud pending against an American male.

b.  In particular, on the recording of this meeting made by the CS, [the Hana Associate] discussed how the criminal case "needed a push," and "this push saved the male three years."

c.  [The Hana Associate] further told the CS that the American male gave Hana $150,000 and that Hana then purchased the engagement ring for Menendez's girlfriend, along with a car, and kept the remaining money for himself.

(Weitzman Decl. Ex. B ¶ 19 (SDNY_R_00004206-07).)  This summary is entirely silent on whether Menendez knew of *any* of the bribes, stating, in sum, only that Hana made an arrangement in which Nadine Menendez would be paid with a ring and a car, and Menendez would assist in

_____

[9] Menendez in his motion refers to the Hana Associate as "Associate-1."  (Menendez Supp. Mot. 2.)  The Government uses the term the "Hana Associate" herein to avoid any confusion with the individual referred to in the Indictment as Associate-1, who is not the same person as the Hana Associate.

resolving the criminal case.  As such, the conversation as presented in the warrant affidavit, while powerful evidence of a *quid pro quo*, dovetailed with the theory that Menendez, through counsel, pressed to the Government prior to charges being brought—namely, that any actions Menendez took regarding the New Jersey case were performed without his awareness of the payments to or for the benefit of Nadine Menendez.  (*See* Weitzman Decl. Ex. I ¶ 85 n.126 (SDNY_R03_00000125) (subsequent warrant affidavit recounting Menendez denial of awareness that Uribe was paying for the Mercedes-Benz Convertible).)

What was left out in the summary of the conversation, and not included in the affidavit, was substantial evidence that Menendez did in fact know about the corrupt *quid pro quo*.  Indeed, the central alleged omission, that the Hana Associate and the CS were describing Hana as "swindling" Menendez (Menendez Supp. Mot. 11), is actually damningly inculpatory.  The content of the conversation makes clear that the "swindle" being described was Hana *not delivering the promised amount of the bribe*.  Menendez in his brief provides a confusing account of a "trade involving the ring that Nadine requested" in which Nadine Menendez allegedly provided Hana a ring intending for it to be exchanged for a $35,000 ring, but Hana instead exchanged it for a $12,000 ring and pocketed the difference.  (*Id.*)  This story is contradicted by the transcript itself.

What the transcript reflects, contrary to Menendez's arguments, is the Hana Associate's belief that Hana received money from an individual whose criminal case needed a "push" from Menendez as part of a *quid pro quo*, and "swindled" Menendez by buying Nadine Menendez a less expensive ring than promised in exchange for Menendez's intervention in the criminal case.  First, the Hana Associate raised the topic by telling the CS that he had "informed" on Hana to Menendez.  (*See* Weitzman Decl. Ex. J at 5 ("[Hana Associate]: I have informed on Wail to him[.] CHS: To whom?  [Hana Associate]: Bob[.]").)  The Hana Associate then explained this related to

16

the deal that Hana had made with Menendez about the $35,000 for Nadine Menendez's ring.  (*Id.*
("CHS: How did you inform on him?  [Hana Associate]: The deal that Wail had made with him
about the $35,000 for the girl's ring.").)  The CS asked the Hana Associate about it, and the CS
explained that the CS understood that Menendez ("the man") was "in the issue" but did not "take
anything" directly; instead, Hana promised payment to Nadine Menendez ("the girl who belongs
to the man").  (*Id.* at 6 ("CHS: . . . and then you told me a man is in the issue.  [Hana Associate]: .
. . yeah, the man is in the issue but he promised the girl who belongs to the man.  The man did not
take anything.").)  The Hana Associate then clarified that Nadine Menendez ("Bob's friend") acted
as the broker between Hana and Menendez, and that Menendez was "aware."  (*Id.* ("[Hana
Associate]: The girl who belongs to the man, was promised approximately [UI]  CHS: The girl
who belongs to the man is Bob's friend.  [Hana Associate]: Yeah.  CHS:  Bob's friend is the broker.
[Hana Associate]: Bob is aware.")).)

The Hana Associate then explained Hana's embezzlement in terms that bear no
resemblance to Menendez's current claim that Nadine Menendez provided Hana a ring and he
exchanged it for a less valuable ring.  The Hana Associate describes Hana not as receiving anything
in trade from Nadine Menendez, but rather as giving her only part of a larger promised sum and
taking the rest.  (*Id.* ("[Hana Associate]: Okay.  Wail fucked the girl and gave her $67,000, and
took the remaining amount.").)

The transcript reflects that the Hana Associate explained—fatally to Menendez's argument
in his suppression motion—that this transaction related to Menendez "resolv[ing]" the "story" of
an American ("a person who had a story here"):

> [Hana Associate]: [UI] this is not the story of the items/animals at
> all, or from Egypt.
>
> CHS: Yeah this is something else.

[Hana Associate]: This is about *a person who had a story here and Bob resolved it for him*.

CHS: Hum.

[Hana Associate]: It is something left/wrong and *Bob resolved it for him that is it. That girl is supposed to receive items, okay a car and a ring*, and these items are for $100,000.

CHS: A Mercedes and a ring.

[Hana Associate]: Yeah and a Mercedes and a ring and they are for $100,000.

(Weitzman Decl. Ex. J at 6-7 (emphases added).)  The Hana Associate's explanation that "[t]hat girl is supposed to receive items, okay a car and a ring, and these items are for $100,000," is utterly inconsistent with Menendez's present explanation that this referred to Hana taking a more expensive heirloom ring from Nadine Menendez and exchanging it for another ring.  It is self-evidently a discussion of the use of a sum of cash that is supposed to purchase a ring and a car.  At a minimum, that is—by far—the best reading of the conversation.

The Hana Associate went into additional detail about the source of the funds that further refutes Menendez's self-serving and contrived explanation.  The Hana Associate stated that—contrary to Menendez's suggestion that this was about Nadine Menendez providing Hana with a ring to exchange—Hana took money from the "kid" whose case Menendez resolved. (Weitzman Decl. Ex. J at 7 ("[Hana Associate]: So what Wail did next is he took from the kid $150,000 and got the car for the woman then folded everything [UI].").)  Later in the conversation, the Hana Associate made clear that the person with the "problem" is the source of the funds, describing him as Hana's "friend, for four or five years" (*id.* at 8-9) who needed a favor related to "[f]raudulent car insurance," and that Hana was the one who "informed on him and then told him he will resolved it for him" in exchange for the $150,000:

18

> CHS: What was the favor?
>
> [Hana Associate]: *Insurance and Wail is the one who informed on him* [UI].
>
> CHS: Fraudulent car insurance?
>
> [Hana Associate]: Yeah.
>
> CHS: Wail informed on him?
>
> [Hana Associate]: Yeah, honest to God.
>
> CHS: Hehehe Wail is the one who informed on him.
>
> [Hana Associate]: *Wail informed on him then told him he will resolved it* for him [UI]. He *resolved it and took from him $150,000* and [UI].

(*Id.* at 9 (emphases added).) The Hana Associate also described critical intervention by Menendez, explaining that this individual's case "needed a push, without it he would have gotten three years," and that "the push made the man avoid the three years." (*Id.*)

Thus, the Hana Associate explained to the CS that Hana had taken some of the $150,000 bribe money from the male facing criminal charges and claimed he was using it to buy a $35,000 ring but only bought a cheaper one, getting an invoice for $35,000 from the jeweler instead:

> [Hana Associate]: She asked me, how much did Wail receive from the man?
>
> CHS: The girl, who is his fiancé.
>
> [Hana Associate]: Yes, I told her $150,000.  She called the man on the phone and he told him I want the $35,000 [ph]. Done, then he went and got other items and the ring that looked similar but was for a lot less money, and told the man to give him an invoice for $35,000.

(*Id.* at 7; *see also id.* at 8 ("[Hana Associate]: And he took a Rolex watch and another watch, a bracelet, and a necklace for himself.  The necklace is from the same material that I told you about,

the white.  This whole thing was for $20,000, and put the whole expense for the ring for 35, even though the ring is for $12,000.").)

The Hana Associate also explained that Menendez knew that Hana shortchanged him with respect to the ring, and that Nadine Menendez (the "gander") had taken the ring back to the jeweler and learned that it was worth less money:

> CHS: And Bob knows about the ring and the car?
>
> [Hana Associate]: He knows the ring is for the gander and that is it, and then the gander took the ring back to the diamond jeweler.
>
> CHS: To make sure, and he told her.
>
> [Hana Associate]: He told her $12,000.

(*Id.* at 8.)  The Hana Associate explained that the jeweler did not tell Nadine Menendez everything, but did tell her "about the ring" being worth only $12,000, and Menendez stopped talking to Hana after learning of this:

> CHS: He told her.
>
> [Hana Associate]: He did not the story.
>
> CHS: Huh/what?
>
> [Hana Associate]: He did not tell her the story but he told her about the ring.
>
> CHS: And Bob did not call Wail ever since.
>
> [Hana Associate]: No he said to leave him.

(*Id.*)

It is this account—Hana taking money from an individual who needed a favor for his criminal case and embezzling it by providing Nadine Menendez a less expensive ring than promised despite Menendez giving the case a "push" that avoided prison time—that the CS and the Hana Associate describe as Hana "swindling" Menendez.  Upon hearing this account, the CS

20

discussed disclosing to a third party the fact that Hana swindled Menendez.  (Weitzman Decl. Ex. J at 9.)

In sum, the "swindle" is *the failure to deliver the full value of the promised bribe payment*. Indeed, the fact that the CS and the Hana Associate described Menendez as having been "swindled" by Hana is perhaps the most inculpatory portion of the transcript as to Menendez, because without Menendez's agreement to take action in exchange for payment, there would be no "swindle."

Thus, contrary to Menendez's arguments that the warrant affiant omitted exculpatory facts, the transcript supplies highly *incriminating* details that were absent from the affidavit.  Whereas the affidavit was entirely silent on Menendez's knowledge as to the ring or the car, the transcript shows that the Hana Associate claimed that (a) Menendez was aware that Hana had not delivered the full value of the promised ring (*contra* Menendez Supp. Mot. 11-12), and (b) that Menendez was "swindled" because Nadine Menendez did not receive more in exchange for his intervention in the case (*contra id.* 11).[10]

Menendez's only other argument about omissions from this transcript—that it reflects concern about Hana's actions affecting Menendez's relationship with Egypt (*id.*)—is similarly backwards.  The transcript shows that the CS said the CS could communicate news about the swindle "to Egypt" with the message "Wail [Hana] was about to ruin things with Bob.  Bob who is starting to listen to us, and starting to trust us about the Muslim Brotherhood."  (Weitzman Decl. Ex. J at 10.)  The CS elaborated that exposing this information "to Egypt" would convince them

---

[10]  As discussed in Section I.B.2, *infra*, the fact that the affidavit summarized the recorded conversation without including these inculpatory details also is not consistent with any claim that the affiant intentionally or recklessly misled the magistrate judge.

that Hana "ruined the biggest relationship with one in the senate by swindling him." (*Id.* at 11.) This complaint—that the failure to deliver the full amount of the promised bribe would harm Menendez's relationship with Egypt—obviously does not undermine the conclusion that Menendez was in a corrupt relationship for the benefit of Egypt.  It is instead strong proof that he was.

> (2)   The First Challenged Affidavit Set Forth Ample Probable Cause Even Disregarding the Recorded Conversation Entirely

Even if the omitted portions of the recorded CS conversation had been exculpatory in any way—which they were not—their inclusion would not have been material to any of the challenged warrants given the robust probable cause set forth in the affidavits.  Menendez's claim to the contrary is based on a grossly inaccurate characterization of the affidavits supporting the warrants.

The first of the warrants Menendez challenges, the January 2022 Menendez Email and iCloud Warrants, was supported by ample probable cause independent of the conversation involving the CS.  Menendez's claim that this conversation was "the *only* evidence, in the *entire* [affidavit supporting that warrant], linking Senator Menendez to any allegation of bribery, exchange of an improper quid pro quo, or any other criminal wrongdoing" (Menendez Supp. Mot. 9 (emphases in original)) is both irrelevant and flatly contradicted by the affidavit.

Menendez's claim is irrelevant because to support the warrant, the affidavit would only have to demonstrate probable cause that evidence, fruits, or instrumentalities of a crime would be found in the search of his email and iCloud account, not that he was himself guilty of a crime. Even if—contrary to the evidence—Menendez himself had been completely innocent of any wrongdoing, the warrant would have properly issued based on the evidence of Nadine Menendez, Hana, and Uribe's involvement in a *quid pro quo* agreement regarding, among other things,

Menendez's requested intervention into the criminal prosecution of the New Jersey Defendant. After all, it would be no less illegal for Nadine Menendez, Hana, and Uribe to conspire to bribe Nadine Menendez's then-boyfriend even if, contrary to the evidence, Menendez had been unaware of their corrupt scheme.

Given that the scheme involved numerous representations that Nadine Menendez was in contact with her then-boyfriend Menendez about the scheme, and that Menendez would be performing acts in connection with the scheme, there would certainly still have been probable cause to search Menendez's email and iCloud accounts even if he had in fact been unaware of the promised bribe payments or the *quid pro quo* agreement more generally.  Indeed, the warrant affidavit explained that non-content information obtained from a prior court order under 18 U.S.C. § 2703(d) indicated that a number of electronic communications between Nadine Menendez and Menendez had been deleted from Nadine Menendez's devices (*see, e.g.*, Weitzman Decl. Ex. B ¶ 48.b-c (SDNY _R_00004212-13)), thus rendering the warrant doubly appropriate to allow law enforcement to search for those deleted communications.

Menendez's characterization of the affidavit, in any event, is thoroughly contradicted by the text of the affidavit itself.  As an initial matter, far from resting probable cause solely on the recorded conversation, the affidavit also included a reason to *doubt* the veracity of the Hana Associate's statements in the recording, by noting that he had a financial dispute with Hana—and thus a motive to make derogatory statements about Hana—potentially before the recorded conversation.  (*See* Weitzman Decl. Ex. B. ¶ 19 n.5 (SDNY_R_00004206).)[11]   But more

---

[11] As noted in Section I.B.2, *infra*, the inclusion of this fact is also fatal to Menendez's argument that the affiant had any intent to mislead the magistrate judge or acted with reckless disregard for the truth.

fundamentally, even disregarding the entire recorded conversation, the affidavit more than sufficiently established probable cause supporting a search of Menendez's email and iCloud accounts based on the scheme in which Nadine Menendez, Hana, and Uribe participated, including:

1.  Uribe's text messages with Hana regarding the case of the New Jersey Defendant, including Uribe's April 4, 2018 text to Hana stating that "[t]he deal is to kill and stop all investigation" (Weitzman Decl. Ex. B ¶ 31.c (SDNY_R_00004210)), and Hana's May 2018 text to Uribe seeking pages from the grand jury transcript of the New Jersey Defendant's case (*id.* ¶ 31.j (SDNY_R_00004212)).

2.  Hana's text messages with Nadine Menendez in mid-2018 sending her a picture of the grand jury transcript from the New Jersey Defendant's case and receiving a picture from her of a diamond ring several days later.  (*Id.* ¶ 31.d-e (SDNY_R_00004211).)

3.  Text messages and photographs showing that Menendez, Nadine Menendez, and Hana met for dinner on June 30, 2018 (*id.* ¶ 31.m (SDNY_R_00004213)) and at an event on July 13, 2018 (*id.* ¶ 31.n (SDNY_R_00004214)).

4.  Text messages between Nadine Menendez and Hana regarding her lack of a car, including her November 27, 2018 message to him writing that she was "very embarrassed" to tell Menendez that she did not have a car and stating, "and he was very very surprised that no one Is helping me to get a car". (*Id.* ¶ 34.b (SDNY_R_00004217).)

5.  Nadine Menendez's mid-January 2019 text messages with Hana, sending him pictures of Hana talking to Menendez at a January event and receiving documents from Hana regarding the New Jersey Defendant's criminal case.  (*Id.* ¶ 37.a-d (SDNY_R_00004218).)

6.  Nadine Menendez and Hana's text messages seeking to schedule a dinner with the two of them, Menendez, and Uribe in late January 2019, resulting in a January 27, 2019 dinner Menendez, Nadine Menendez and Hana attended, and after which Hana sent Nadine Menendez a series of text messages with information about the New Jersey Defendant's case.  (*Id.* ¶ 37.g-m (SDNY_R_00004219-21).)

7.  A series of text messages and phone calls on January 29, 2019 in which Hana provided a series of messages about the New Jersey Defendant and his case to Nadine Menendez, who responded, "What about the rest?" and "Thank you now I need what the charges are".  Later that day, and after the New Jersey Defendant's lawyer was in phone contact with his office, Menendez's office phone number

called the personal cellphone of Official-2.[12]  (*Id.* ¶ 37.p-s (SDNY_R_00004222-23).)

8.    A series of text messages showing that on the same day that Menendez called Official-2, Nadine Menendez sent Hana her address and thanked her, after which Hana forwarded Nadine Menendez's address to the Hana Associate, who Hana dispatched over the next several weeks to provide Nadine Menendez with carpeting in her basement.  (*Id.* ¶¶ 37.v-w (SDNY_R_00004224), 42 (SDNY_R_00004234).)

9.    On February 3, 2019—*i.e.*, days after Menendez called Official-2—Nadine Menendez texted Hana, "All is GREAT! I'm so excited to get a car next week. !!" (*Id.* ¶ 38.a (SDNY_R_00004225).)

10.   On April 1, 2019, Nadine Menendez texted Hana complaining that he had not contacted her, writing, "It's Monday you promised the guy would come for the carpet.  But I'm sure you'll be able to answer the phone about next Monday's meetings and dinner" (referring to planned meetings involving Menendez, Hana, and Egyptian officials).  (*Id.* ¶ 42.d (SDNY_R_00004234).)

11.   On or about April 4, 2019, several weeks after beginning regular phone contact with Uribe, Nadine Menendez purchased the Mercedes-Benz Convertible, with the down payment paid both from her and her father's bank account, both of which received cash deposits around the time of the purchase.  (*Id.* ¶ 38.f (SDNY_R_00004226).)

12.   In late April 2019, on the day that the New Jersey Defendant pled guilty pursuant to a plea agreement that recommended a non-incarceratory sentence, Hana sent a text message to a jeweler with Nadine Menendez's address.  (*Id.* ¶ 38.j-k (SDNY_R_00004227).)  Hana and Nadine Menendez then texted about going to see a jeweler together in late May, and Hana messaged Nadine Menendez a photograph of a diamond grading report.  (*Id.* ¶ 38.n-r (SDNY_R_00004228-29).)

13.   Emails and text messages reflecting that in late May 2019, Hana sent Nadine Menendez the text of an email (not addressed to him) from a USDA attaché expressing suspicion regarding IS EG Halal, and texted her asking for a call.  (*Id.* ¶ 41.a-d (SDNY_R_00004231-32).)

14.   Text messages reflecting that Hana texted Nadine Menendez images of a legal demand letter seeking a $13.5 million settlement in connection with a claim that the plaintiff had been injured by Egypt's armed forces and citing potential legislation from Congress supporting the plaintiff's claim, after which Nadine

---

[12] A number of the affidavits mistakenly reflect that Menendez's call to Official-2 was at 12:01 P.M. when it was in fact at 5:01 P.M.  This inadvertent error (resulting from a mistake in converting time zones on records) is not material to probable cause, and Menendez does not contend otherwise.

Menendez advised Hana that she "forwarded" the demand letter.  (*Id.* ¶ 41.e-f (SDNY_R_00004232-33).)

15.     Text messages and other records showing that in June 2019, Nadine Menendez asked Uribe to have Hana pay her mortgage company, saying "When I feel comfortable and plan the trip to Egypt he will be more powerful than the president of Egypt," following which IS EG Halal paid over $23,000 to the company holding the mortgage on Nadine Menendez's house.  (*Id.* ¶ 43.a-e (SDNY_R_00004235-36).)

16.     A photograph in Nadine Menendez's iCloud account of a $10,000 bank check from IS EG Halal to Strategic International Business Consultants.  (*Id.* ¶ 43.h (SDNY_R_00004237).)

17.     Evidence that Nadine Menendez had selectively and intentionally deleted numerous emails with Hana, as well as emails with Menendez that appeared from non-content information to still be present in Menendez Email Account-1.  (*Id.* ¶ 48.b-c (SDNY_R_00004240-41).)

Not only do these facts easily set forth probable cause irrespective of Menendez's personal knowledge and intent, but they also (contrary to Menendez's characterization in his motion (Menendez Supp. Mot. 9)) give rise to probable cause that Menendez *himself* was knowingly involved in the bribe scheme.  They show Nadine Menendez routinely scheduling meetings for Menendez, arguing that her arrangement of dinners with him was a reason that she should receive carpeting services (Weitzman Decl. Ex. B ¶ 42.d (SDNY_R_00004234)), and her willingness to plan a trip to Egypt with him was a reason Hana should pay her mortgage company (*id.* ¶ 43.a-e (SDNY_R_00004235-36)), as well as receiving materials related to Egypt and claiming that she "forwarded" them, *i.e.*, to Menendez (*id.* ¶ 41.e-f (SDNY_R_00004232-33)).  All of this is in addition to the fact that she arranged face to face meetings for Menendez with Hana and collected information about the New Jersey Defendant's case on the same day that Menendez called Official-2, who was supervising the prosecution of the New Jersey Defendant (*id.* ¶ 37.p-s (SDNY_R_00004222-23)); that she received a car and payments from Hana in the spring and summer of 2019, after Menendez's call to Official-2 (*id.* ¶ 38.a, f (SDNY_R_00004225-26)); and

26

that Hana first dispatched the Hana Associate to provide her with carpeting on the very day that Menendez made that call (*id.* ¶ 37.v-w (SDNY_R_00004224), 42 (SDNY_R_00004233-34)). Based on his close personal relationship with Nadine Menendez and his personal involvement in meetings with Hana and the call to Official-2, there was plainly probable cause—even leaving aside the recorded conversation entirely—that Menendez was aware of the *quid pro quo*, further justifying the warrant.

In short, an affidavit adding the complete transcript of the recorded conversation, even if practicable, would have shown ample probable cause, and the omission of the transcript or the portions about which Menendez complains was not material to the warrant.

### (3)   The Additional Confidential Source Statements Are Not Material

For similar reasons, the omissions of sundry other statements related to the CS that Menendez complains of (Menendez Supp. Mot. 12) are hardly even germane, let alone material, to the warrant.

The first claimed omission—the Hana Associate's statement that Hana had "greatly exaggerated his relationship with Senator Robert Menendez" (*id.* 12)—is immaterial because the affidavit did not rely for probable cause on any representations that Hana made about his relationship with Menendez.[13]  As set forth in Section I.B.1.a.2, *supra*, in addition to the recorded conversation, probable cause was supported by voluminous contemporaneous communications from, among others, Nadine Menendez, Hana, and Uribe, as well as evidence of Menendez's own actions during the scheme.   To the extent Menendez claims that this statement by the Hana

---

[13] The statement could also have strengthened probable cause because it evidences that the Hana Associate had a basis for knowledge regarding Hana and Menendez's relationship, thus lending credibility to the Hana Associate's account of the bribe scheme in the recorded conversation.

Associate would undermine the recorded conversation (by suggesting that Hana had exaggerated the bribe scheme in describing it to the Hana Associate (Menendez Supp. Mot. 12)), this contention ignores that the Hana Associate was *aware* of Hana's tendency to exaggerate when he described the bribe scheme to the CS.  (*Compare* Weitzman Decl. Ex. L at SDNY_00103551 (Hana Associate reporting Hana exaggerates in June 2019), *with id.* Ex. B ¶ 19 (Hana Associate describing bribe scheme in recorded conversation in August 2019).)  In any event, as set forth above, even if this or any other omission had entirely *eliminated* the probative value of the recorded conversation, the affidavit would still have set forth ample probable cause.

The other alleged omissions fare no better.  Menendez complains that the affidavit did not include the CS's report in 2021 that Hana had embezzled bribe money intended for a U.S. Senator. (Menendez Supp. Mot. 12-13).  But this statement is further inculpatory as to Hana (and would thus further support the warrant given the relevance of Menendez's communications to the offense involving Hana), and, even as to Menendez, does nothing to undermine the inculpatory details of the transcript of the recorded conversation.  Indeed, Menendez's entire argument is based on misreading the account of him being "swindled" as exculpatory, instead of, as explained in Section I.B.1.a.1, *supra*, being devastatingly inculpatory evidence that he was expecting a larger bribe amount from Hana.

Finally, Menendez's complaint about alleged omissions of reporting by the CS claiming that certain persons associated with the Egyptian intelligence services—in the 2020-2022 time period—ceased working with Hana or sought to do so (Menendez Supp. Mot. 13), is similarly misguided.  This reporting is inculpatory to the limited extent it may be relevant.  None of the warrant affidavits Menendez challenges on *Franks* grounds even includes foreign influence charges as subject offenses and, in any event, the affidavits set out equal probable cause as to

28

bribery whether Hana was bribing Menendez for Egyptian intelligence or for his own purposes or both.[14]   But even if Menendez were challenging the September 2023 Supplemental Warrant—which did specify foreign influence offenses—these omitted statements are inculpatory.   Put simply, a statement that Egyptian intelligence was "no longer working with" Hana in 2020 (Weitzman Decl. Ex. Q at SDNY_00103606) is a statement that it *was* working with him before. (*See also, e.g.*, Menendez Supp. Mot. 13 (summarizing statements that Egyptian intelligence had been "previously relying on Hana for support" and quoting statements that intelligence leadership had instructed an asset to "cease all contact" with Hana).)   Similarly, the statement that Egyptian intelligence by then "had completely cut him off and was looking for another individual to manage IS EG Halal's international operations" (Weitzman Decl. Ex. Q at SDNY_00103606) is evidence of their involvement, in a substantial and ongoing way, in IS EG Halal.   In any event, whether or not Hana was working directly with anyone in Egyptian intelligence in 2020 or beyond, he could still conspire for *Menendez* to act as an agent of the Government of Egypt, particularly given his conduct in 2018 and 2019.   Finally, even if, contrary to fact and logic, these omissions had reduced *to zero* the evidence supporting foreign influence charges, the September 2023 Supplemental Warrant would still have been properly issued based on the abundant probable cause of the bribery

---

[14] Menendez claims that these statements allegedly undermine several facts about Hana's contact with Egyptian government officials, as well as a statement about Hana's relationship with the Egyptian government that was made in connection with a wholly different warrant that was submitted as an attachment to the affidavits in support of the challenged January 2022 Menendez Email and iCloud Warrants and subsequent warrants.  (*See* Menendez Supp. Mot. 13-14 (citing Weitzman Decl. Ex. B at SDNY_R_0004271-72).)  But while included or incorporated into the challenged affidavits, these additional statements were clearly unnecessary to the finding of probable cause and, as explained below, the omitted statements support, rather than undermine, the evidence in the warrant affidavit.

offenses, which was by this point even more overwhelming than that supporting the June 2022

First and Second Menendez N.J. Warrants, discussed in Section I.B.1.a.4, *infra*.

(4)   <u>Subsequent Warrants Further Show the Immateriality of the<br>Omitted Information Related to the Confidential Source</u>

The subsequent warrants obtained in this investigation further show the immateriality of

the information related to the CS.

As an initial matter, Menendez's complaint that the June 2022 First Menendez N.J. Warrant

was not "replete with *new* allegations of probable cause derived from" the January 2022 Menendez

Email and iCloud Warrants (Menendez Supp. Mot. 14 (emphasis in original)) is an example of

Menendez's scattershot approach in his brief.   The very concept of faulting a search warrant

affidavit for not alleging additional facts learned from previous warrants is shaky enough to begin

with; the fact that warrant affidavits do not include every fact known to the affiant is commonplace,

consistent with settled law, and expressly set forth in each affidavit.[15]   (*See, e.g.*, Weitzman Decl.

Ex. D ¶ 4 (SDNY_R_00005099) ("Because this affidavit is being submitted for the limited purpose

of establishing probable cause, it does not include all the facts that I have learned during the course

of my investigation.").)   But there is a more basic reason why no fruits of the January 2022

Menendez Email and iCloud Warrants were included in the June affidavit—the Government had

been *refraining from reviewing the returns from that warrant* until the investigation became known

to Menendez, so that it could provide them to Menendez's then-counsel first, as a discretionary

measure to avoid any risk of inadvertently reviewing material protected by the Speech or Debate

Privilege.   This plan was set out in the affidavit supporting the January 2022 Menendez Email and

---

[15] Indeed, as set forth in Section I.B.2, *infra*, numerous highly inculpatory facts were left out of the warrant affidavits in this case, and no affidavit needs to or reasonably can include all facts learned in an investigation, much less one of this scope.

30

iCloud Warrants.  (*See* Weitzman Decl. Ex. B ¶ 58 (SDNY_R_00004251) ("[L]aw enforcement personnel *presently intend not to immediately commence review* of the emails and/or other materials within the Subject Accounts, in order to ensure appropriate screening procedures are in place prior to review commencing, including potentially *engaging with Menendez's counsel regarding such procedures once the investigation is overt as to him*." (emphases added)).)  And the Government followed that plan without objection from Menendez's prior counsel.

More broadly, and contrary to Menendez's characterization in his memorandum of law, the affidavit supporting the June 2022 First Menendez N.J. Warrant (which was also incorporated into the affidavit supporting the June 2022 Second Menendez N.J. Warrant) added a wealth of additional evidence making an overwhelming showing of probable cause, including more allegations of Menendez's direct involvement in the scheme.  These allegations included:

1. Messages from Uribe asking Hana, in October 2018, for Menendez's help in disrupting the investigation involving the New Jersey Investigative Subject, including his writing, "Please be sure that your friend knows about this. Just as a last favor."  (Weitzman Decl. Ex. D ¶ 33 (SDNY_R_00005113).)

2. Evidence that on January 29, 2019, prior to calling Official-2, Menendez first called Nadine Menendez on her alternate cellphone (a phone Menendez and Nadine Menendez referred to as her "007" phone, an apparent reference to the fictional character James Bond)[16] before Nadine Menendez requested and received from Hana briefing information about the New Jersey Defendant's case, and then— shortly after Nadine Menendez received this information from Hana and before calling Official-2—received a series of text messages from the 007 phone.  (*Id.* ¶ 36.m-n (SDNY_R_00005118-19).)

3. Extensive text messages between Nadine Menendez and Uribe regarding his purchase of the Mercedes-Benz Convertible for her in the spring of 2019, including messages in which they arranged to meet in a parking lot the day before the car purchase; Nadine Menendez texting Uribe, "I will never forget this" on the day of the purchase; her attempting to arrange a meeting between Uribe and Menendez thereafter; and Nadine Menendez texting Uribe the invoice for her first monthly

---

[16] The alternate cellphone's phone number does not include the digits "007."

automotive payment at his request.  (*Id.* ¶ 38.h-m, o-p, r-u (SDNY_R_00005116-21).)

4.    Extensive text messages between Nadine Menendez and Uribe regarding his request for Menendez to intervene in the investigation involving the New Jersey Investigative Subject in the late summer and fall of 2019, including Uribe's text messages to Nadine Menendez asking to "make things go away"; Nadine Menendez representing that Menendez would intervene; and Nadine Menendez representing that Menendez "said it would've been so so easy if we had wrapped both together", apparently referring to the cases of the New Jersey Defendant and the New Jersey Investigative Subject. (*Id.* ¶ 43.a-h (SDNY_R_00004135-37).)

5.    Text messages and phone records showing that on September 4, 2019, after Uribe texted Nadine Menendez, "Please don't forget about me.  I will never forget about you" and "I need peace," Menendez used his cellphone to call Official-2.  (*Id.* ¶ 43.i-j (SDNY_R_00005137).)

6.    Text messages from Uribe to Nadine Menendez expressing his gratitude to "you and him [*i.e.*, Menendez]" and offering to set up automatic payments on the Mercedes-Benz Convertible after Uribe received a call giving him favorable news. (*Id.* ¶ 43.q-r (SDNY_R_00005138).)

7.    Text messages in which Nadine Menendez, after a July 2018 meeting Hana and Nadine Menendez had scheduled and attended with Menendez and Egyptian officials, passed along Menendez's words about approving a sale of tank ammunition to Egypt.  (*Id.* ¶ 58.c (SDNY_R_00005164).)

8.    A series of communications related to Menendez contacting New Jersey mayors in late 2020 and early 2021 and seeking to get them to authorize a company (the "Laboratory Company")—which was paying Nadine Menendez—to perform COVID-19 testing.  (*Id.* ¶¶ 50-51 (SDNY_R_00005149-57).)

These allegations expanded on the probable cause set out in the affidavit supporting the prior warrant, and, among other things, both provided additional detail about Menendez's participation in the *quid pro quo* regarding the prosecution of the New Jersey Defendant, and also identified Menendez's additional corrupt actions regarding the investigation of the New Jersey Investigative

Subject.  In the face of these details and facts, Menendez's claim that this affidavit did not "add[]" any new allegations of criminal wrongdoing" (Menendez Supp. Mot. 15) is simply not correct.[17]

Moreover, further warrants, not even challenged by Menendez on *Franks* grounds, were approved despite including a fact that is far more directly relevant to the claims of the recorded conversation upon which Menendez rests his motion.  Specifically, the affidavit in support of the July 2022 Menendez Email and iCloud Warrants (attached hereto as Exhibit A) noted that the Hana Associate was approached by the FBI on June 16, 2022 and denied awareness of Menendez's attempt to assist the New Jersey Defendant with his criminal case.  (*See* Ex. A ¶ 31.c n.7 (SDNY_R_00005645) (disclosing that the Hana Associate claimed, in June 16, 2022 interview, "not to be aware of Hana having provided a ring or car to [Nadine] Arslanian, and not to be aware of Hana attempting to assist [the New Jersey Defendant] with his criminal case").) This fact was disclosed in the affidavits supporting the December 2022 Hana Email Warrants, the January 2023 Hana iCloud Warrant, the February 2023 Hana Historical Location Warrant, and the September 2023 Supplemental Warrant as well.  (*See* Lustberg Cert. Ex. D ¶ 31.c n.8 (SDNY_R_00006243);  *id.* Ex. E ¶ 33.c n.9 (SDNY_R_00005973);  *id.* Ex. F ¶ 21.c n.10 (SDNY_R_00006482); Weitzman Decl. Ex. I ¶ 27.c n.10 (SDNY_R03_00000024).).  Each of these affidavits included the fact that the Hana Associate did not recall or denied the very substance

---

[17] In support of his motion, Menendez submitted a declaration claiming that FBI agents left his house in "complete disarray" when executing the searches pursuant to the June 2022 First and Second Menendez N.J. Warrants.  (Menendez Decl. ¶ 9.)  It is unclear why he made these statements, as they do not remotely make out, and he does not press, any cognizable claim for relief.  But the time-stamped entry and exit photographs taken by the FBI search team (which the Government can provide to the Court upon request) show that his claim is, at best, hyperbolic.  Although virtually every physical search necessarily entails the movement of some objects, the photographs show that the house was in substantially similar condition at the end of the search as it was in the beginning.

of the bribe scheme that he had related to the CS in the recorded conversation.  Nevertheless, five magistrate judges found probable cause based on the detailed evidence—largely contemporaneous and documentary—of the bribe scheme (which, though it bore some resemblance to the Hana Associate's account, differed in certain respects, a common and understandable circumstance). The fact that the warrants issued despite the magistrate judges knowing of this outright denial establishes, *a fortiori*, that the warrant affidavits would have established probable cause if the additional information related to the CS had been included.[18]

> b)      The Allegedly Omitted Government Official Statements Were Immaterial

Both Menendez and Hana also claim that the affidavits should have included additional statements from various present or former government officials that, they claim, would have undermined the inference that Menendez had actually performed certain official acts.  In fact, these allegedly omitted statements did not show that Menendez did not undertake any such acts.  But in any event, as the Government explained in its opposition to Menendez's motion to dismiss, the bribery offenses under investigation did not require proof that Menendez actually engaged in any official acts at all, only that there was a corrupt *quid pro quo* (including an agreement or even a unilateral promise) to do so.  *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)).  (*See generally* Gov't Dismissal Opp. 32, 53-54.) As none of these government officials was in any position to know whether Menendez or any of

---

[18] As discussed in Section I.B.2, *infra*, the inclusion of this fact also shows the lack of any intent by the affiant to mislead or reckless disregard for the truth.

the other subjects of the investigation had actually agreed to engage in a corrupt *quid pro quo*, they were not in any position to give any statement that might defeat probable cause.  Accordingly, any information they could have provided was at most the sort of "potentially relevant but not dispositive" information that does not justify a *Franks* hearing, much less suppression.  *Mandell*, 710 F. Supp. 2d at 374 (internal quotation marks omitted).

(1)   <u>Official-2</u>

The affidavits supporting the December 20, 2022 Hana Email Warrant, the January 2023 Hana iCloud Warrant, the February 2023 Hana Historical Location Warrant, and the September 2023 Supplemental Warrant described Official-2 as remembering only one contact from Menendez about a specific case, not two.  (Lustberg Cert. Ex. D ¶¶ 52, 60.k.i n.62 (SDNY_R_00006266-89); *id.* Ex. E  ¶¶ 53, 61.k.i  n.63  (SDNY_R_00005996-6019);  *id.* Ex. F  ¶¶ 42, 50.k.i  n.64 (SDNY_R_00006505-27); Weitzman Decl. Ex. I ¶¶ 50, 58.k.i. n.72 (SDNY_R03_00000052-75).) Nevertheless, Hana faults the affidavits for not going on to say that Official-2 believed it would have stuck out in Official-2's mind if Menendez raised a specific case another time with Official-2.  (Hana Mot. 128-29.)  But this claim could not have been dispositive of probable cause.

Nothing that Official-2 said about the content of the meetings could defeat probable cause because bribery does not require any official to *perform* any official act, as opposed to promise or agree to do so, as set forth in in the Government's opposition to Menendez's motion to dismiss. The affidavits laid out extensive contemporaneous detail showing how Nadine Menendez had represented to Hana and Uribe that Menendez had agreed to intervene with Official-2 regarding the New Jersey Defendant's and the New Jersey Investigative Subject's criminal matters.  Even if Menendez had in fact met with Official-2 and talked only about something entirely unrelated, there

35

would have been probable cause that a bribery offense was committed based on the *promise or agreement* of official action.  (*See* Gov't Dismissal Opp. 32, 53-44.)

Nevertheless, Official-2 reported to investigators damning evidence of Menendez's attempts to apply pressure to disrupt a criminal case.  The fact that Official-2 only recalled one such instance was immaterial to probable cause, as the approval of the warrants shows.  The magistrate judges reviewing the four warrants found probable cause arising from affidavits setting forth detailed chronologies of contemporaneous text messages establishing that the January 29, 2019 call involved the New Jersey Defendant's case and the September 6, 2019 meeting involved the investigation concerning the New Jersey Investigative Subject, notwithstanding the fact that Official-2 only remembered one such contact.  It is highly implausible, to say the least, to imagine that they would suddenly reverse that finding of probable cause if they were told that Official-2 believed that such a contact in January 2019 would have stuck out in Official-2's mind if raised, particularly because—as noted above—in order for the offense to be committed, it was not necessary for Menendez to actually advise or pressure Official-2 in that call, or at all.

And, of course, not remembering something also does not necessarily mean that the thing did not happen.  *Cf., e.g.*, *United States v. Harris*, 741 F. App'x 823, 826 (2d Cir. 2018) (The defendant "contends that Vijay denied in her testimony that she identified [the defendant] in a photo array, and argues that Vijay's testimony thus contradicted statements attributed to her in the warrant affidavit.  But Vijay in fact testified that she did not *remember* being shown the photograph, which is not inconsistent with Agent Couch's testimony that, at that time, Vijay identified Harris in a photo array." (emphasis in original)).

(2)     The State Department and SFRC Employees

Similarly, Hana is wrong to claim that the statements of three current or former State Department or Senate Committee on Foreign Relations ("SFRC") witnesses would have been material to the issuance of several warrants as to him. (Hana Mot. 122-23.) These witnesses each provided background and contextual information on military aid and in no way undermined probable cause that Menendez agreed to or did engage in a corrupt *quid pro quo*.

The allegedly omitted statements could not have defeated probable cause because they too went—at most—to the question of whether Menendez *actually took* certain acts, not to the question of whether he promised or agreed to (or whether there was a conspiracy for him to do so). Thus, the fact that one witness had not seen an evolution in Menendez's actual position on foreign aid (Hana Mot. 122-23) goes at most to whether Menendez *actually* took certain positions on foreign aid in the bribe scheme, not to whether he secretly promised or agreed to do so. Similarly, another witness saying he or she believed Menendez had put a hold on foreign military financing ("FMF") to Egypt in 2019, or the third witness saying that it would have been extraordinary for Menendez not to lift the hold on that FMF by the end of the fiscal year in any event (Hana Mot. 122-23), go, at most, only towards Menendez's actual *actions* with respect to FMF. But no such actions are required for probable cause supporting a warrant, even with respect to a bribery scheme involving FMF. Instead, only promises or agreements are needed even for a substantive bribery offense. *Silver*, 948 F.3d at 551-52. Indeed, Menendez was charged with conspiracy to commit bribery and extortion in an Indictment that, as the Government has explained in its motion to dismiss, *does not*

37

*allege any such actual actions*, and instead relies on his promises or representations about such aid.  (Gov't Dismissal Mot. 44-45; *see also* Indictment ¶ 35.)[19]

Even to the extent that whether Menendez took (as opposed to agreed to take) these acts in a corrupt *quid pro quo* was relevant, these statements were not decisive of that fact.  None of them set forth any firsthand basis of knowledge about what Menendez did in exchange for promises of payment, and their statements were at most "potentially relevant but not dispositive." *Mandell*, 710 F. Supp. 2d at 374 (internal quotation marks omitted).

Similarly, the statement by one of these witnesses that there is no absolute prohibition on sharing unclassified information regarding foreign military sales ("FMS") is also immaterial to probable cause.  (Hana Mot. 122-23.)  Nothing in the affidavit suggested that there was any such absolute prohibition.  The affidavit's reference to Menendez sharing (among other nonpublic information) a representation that he would sign off on a pending FMS (Lustberg Cert. Ex. G ¶ 78 (SDNY_R03_00000111-18)) was relevant because it was part of a bribery and foreign influence scheme, not because it was an act that was—standing alone—absolutely prohibited.  Since this witness had no basis of knowledge of what Menendez may have promised or agreed to do in the course of that scheme, or what things of value he may have solicited or received, the statements did not bear directly on the key question before the court in issuing the warrant.

---

[19] As set forth in the Government's opposition to Menendez's first motion to dismiss, many acts related to military aid are not in fact protected under the Speech or Debate Clause (Gov't Dismissal Opp. 36-44), and may be the subject of evidence at trial, but in the *ex parte* setting of a warrant application, the affidavits avoided alleging acts that might even arguably be protected under the Speech or Debate Clause—another fact relevant to the intent of the affiants, *see* Section I.B.2, *infra*—and the Government should not now be punished with suppression for allegedly omitting evidence that bore, at most, on such topics.

Indeed, bribery need not and often does not involve otherwise prohibited actions or changes in the public official's positions; it in many instances consists of an agreement to perform or to continue to perform a facially legitimate action in exchange for payment, and is appropriately forbidden regardless.  *See, e.g.*, *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1999) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same interest, the same action for which the bribe was paid.").

Moreover, the statements of these witnesses all bore on military aid to Egypt, a subject that was itself not necessary to any of the affidavits.  As set forth above, the affidavits made out an overwhelming showing of probable cause based solely on the bribes related to Menendez's attempt to intervene in New Jersey criminal proceedings, justifying denial of the motion on this ground alone.

In sum, the inclusion of any of these challenged pieces of background information would not have defeated probable cause.  Instead, these claims of omission are a classic example of the type of "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit" that courts reject.  *Mandell*, 710 F. Supp. 2d at 376.

> c) The Alleged Omissions of Failures to Recall or Self-Serving Denials Were Immaterial

Menendez and Hana also both seek to fault the Government for not loading the affidavits with self-serving denials of wrongdoing or apparent failures of recollection.  They principally complain about the affiant not including statements made on the same day that the Government sought a supplemental warrant to enable agents to complete the search of the Menendezes' New Jersey residence.  But the allegedly omitted self-serving remarks do not defeat probable cause supported, as here, by contemporaneous electronic communications and other documentary

39

evidence.  *See, e.g.*, *Calk*, 2020 WL 3577903, at *7 ("Even if the hypothetical corrected affidavit paints a more complicated picture of Defendant's actions, statements made months after the events by employees who may have had concerns about their own culpability do not undermine probable cause supported by contemporaneous emails." (internal quotation marks omitted)); *see also, e.g.*, *United States v. Marin-Buitrago*, 734 F.2d 889, 895-96 (2d Cir. 1984) (holding "as a matter of law" that a suspect's denial of identity did not require resubmission of a warrant because of the possibility of aliases and false identification documents, and because the new information "did not affect the veracity of the majority of the statements made in the affidavit"); *United States v. One Residential Property Located at 8750 Duncan Road, San Diego, CA*, 312 F. App'x 8, 10 (9th Cir. 2008) (suspect's "self-serving statement to the searching officers that he no longer had the weapon for which police were searching" did not require resubmission of warrant).  And moreover, these statements were added to later affidavits—*i.e.*, affidavits prepared more than a day after the statements were made—and did not prevent multiple magistrate judges from finding probable cause.[20]

### (1)    The New Jersey Defendant

Both Menendez and Hana claim the warrant affidavits should have recounted the New Jersey Defendant's self-serving denial of Hana having assisted with the New Jersey Defendant's criminal case.  (Menendez Supp. Mot. 17; Hana Mot. 125.)  But Hana is simply mistaken—in the affidavits he challenges, this denial *was* disclosed.  (Lustberg Cert. Ex. D ¶ 55 n.57 (SDNY_R_00006283); *id.* Ex. E ¶ 56 n.58 (SDNY_R_00006013); *id.* Ex. F ¶ 45 n.59

---

[20] In addition to showing their immateriality, the fact that these statements were added to later affidavits powerfully shows the affiant had no intention to mislead the issuing magistrate judge or reckless disregard for the truth.  *See* Section I.B.2, *infra*.

(SDNY_R_00006521); Ex. G ¶ 53 n.67 (SDNY_R03_00000069).)  The only affidavit after the New Jersey Defendant made these statements in which the statements were not disclosed was the June 2022 Second Menendez N.J. Warrant.[21]  That warrant application was drafted the very day the New Jersey Defendant made the statements, while the agents were in Menendez and Nadine Menendez's house, and in support of a warrant to be executed before the agents left, such that any additional time in drafting would prolong the intrusion into the Menendezes' residence.  And in any event, as to that affidavit, the showing of probable cause was absolutely overwhelming and in no way depended on, or could be defeated by, whether a beneficiary of the bribe scheme immediately admitted it when confronted by law enforcement.

The exercise of imagining a "corrected affidavit" for the June 2022 Second Menendez N.J. Warrant makes plain how vanishingly little the inclusion of the New Jersey Defendant's self-serving statement would have affected probable cause.  The affidavit in support of that warrant included, among other things, all of the inculpatory facts supporting the January 2022 Menendez Email and iCloud Warrants, *see, e.g.*, Section I.B.1.a.2, *supra*, all of the additional inculpatory facts supporting the June 2022 First Menendez N.J. Warrant issued the day before, *see, e.g.*, Section I.B.1.a.4, *supra*, and the additional highly suspicious facts that had been learned that morning, including:

1.     In the basement of Menendez and Nadine Menendez's residence, on top of a large rack of clothes hangers, were two bags each containing large amounts of cash,

---

[21] While the New Jersey Defendant initially denied any wrongdoing when approached by the FBI, he ultimately admitted months later, after retaining counsel and meeting with the Government, to paying Hana in exchange for Hana's representation that he used his connections in the U.S. government—referring to Menendez—to influence the case.  (*See* Weitzman Decl. Ex. I ¶ 52.x n.56 (SDNY_R03_00000062).)  While this had not happened yet when the June 2022 Second Menendez N.J. Warrant was being drafted, it underscores the unreliability of the New Jersey Defendant's initial self-serving denial.

potentially approximately $100,000 per bag.   (Weitzman Decl. Ex. F ¶ 11.a (SDNY_R_00005382).)

2.   On the hangers beneath the bags of cash were four jackets containing thousands of dollars of cash in their pockets (packaged in envelopes, and in rubber-banded wads, in some cases in small denominations and marked with notes apparently denoting the total amount of cash per wad), including two jackets marked with Menendez's name and two other men's jackets.  (*Id.* ¶ 11.b (SDNY_R_00005382).)

3.   Under the jackets were four boots, stuffed with cash, including one boot containing in excess of $5,000 in $50 bills, marked with a note stating "5350."  (*Id.* ¶ 11.c (SDNY_R_00005383).)

4.   Agents executing the search also found other cash and gold bars on the premises.  (*Id.* ¶ 12 (SDNY_R_00005383).)

It is unimaginable that a magistrate judge reviewing an affidavit that was revised to include the New Jersey Defendant's statement—*i.e.*, an affidavit laying out these damning facts and then also stating that the New Jersey Defendant had denied wrongdoing when approached by the FBI that same morning—would have found no probable cause.  *See Calk*, 2020 WL 3577903, at *7 (holding self-serving after-the-fact remarks did not defeat probable cause supported by contemporaneous emails).  And indeed, when this statement was disclosed in the affidavits supporting the July 2022 Menendez Email and iCloud Warrants, the December 2022 Hana Email Warrants, the January 2023 Hana iCloud Warrant, the February 2023 Hana Historical Location Warrant, and the September 2023 Supplemental Warrant, the warrants still issued, showing its immateriality.  (*See* Ex. A at 53 n.47 (SDNY_R_00005680); Lustberg Cert. Ex. D ¶ 55 n.57 (SDNY_R_00006283); *id.* Ex. E ¶ 56 n.58 (SDNY_R_00006013); *id.* Ex. F ¶ 45 n.59 (SDNY_R_00006521); Ex. G ¶ 53 n.67 (SDNY_R03_00000069).)[22]

---

[22] As discussed in Section I.B.2, *infra*, the fact that the statement was not included in an affidavit drafted on the same day the statement was made, seeking a warrant to be executed while the agents were still in the Menendezes' residence, but was included in a warrant drafted several weeks later, also strongly shows a lack of recklessness or intent to mislead.

(2)   <u>The Hana Associate</u>

Menendez's complaint that the June 2022 Second Menendez N.J. Warrant affidavit did not mention the statements of the Hana Associate made the same day (Menendez Supp. Mot. 17) is even weaker than his claim as to the New Jersey Defendant.  As noted in Section I.B.1.a.4, *supra*, the Hana Associate, on that day, denied awareness of Menendez's attempt to assist the New Jersey Defendant with his criminal case.  As discussed in that section, this after-the-fact and self-serving statement, which was contradicted by the Hana Associate's own recorded statements, was entirely immaterial in light of the affidavit's robust showing of probable cause.  *See, e.g.*, *Calk*, 2020 WL 3577903, at *7.

Moreover, all of the factors rendering the New Jersey Defendant's statements immaterial applied to the statements of the Hana Associate as well.  *First*, the circumstances were similar, in that the warrant affidavit was being drafted while the agents were still in the Menendezes' residence.  *Second*, as with the New Jersey Defendant, the affidavit supporting the June 2022 Second Menendez N.J. Warrant set forth damning evidence.  *Third*, as set forth above, the Hana Associate's denials of recollection were disclosed in subsequent affidavits and did not prevent further warrants from issuing.  (*See* Ex. A ¶ 31.c n.7 (SDNY_R_00005645) (affidavit supporting July 2022 Menendez Email and iCloud Warrants, disclosing that the Hana Associate claimed, in June 16, 2022 interview, "not to be aware of Hana having provided a ring or car to [Nadine Menendez], and not to be aware of Hana attempting to assist [the New Jersey Defendant] with his criminal case."); Lustberg Cert. Ex. D ¶ 31.c n.8 (SDNY_R_00006243) (similar); *id.* Ex. E ¶ 33.c n.9 (SDNY_R_00005973) (similar); *id.* Ex. F ¶ 21.c n.10 (SDNY_R_00006482) (similar); Weitzman Decl. Ex. I ¶ 27.c n.10 (SDNY_R03_00000024) (similar).).  There is thus no basis to find this information remotely material to probable cause.

43

Hana also challenges the supposed omission of a different statement by the Hana Associate on June 16, 2022, which is that Nadine Menendez attempted to pay him on two occasions for work he performed at Menendez's house.  (Hana Mot. 129.)  But Hana neglects to mention that the challenged affidavits disclose a remark by the Hana Associate conveying substantially the same point—that on one occasion when Menendez learned that the Hana Associate had provided Nadine Menendez a lawnmower, Menendez became angry and told Nadine Menendez that she had to pay the Hana Associate.  (Lustberg Cert. Ex. D ¶ 66.i.ii n.73 (SDNY_R_00006302); *id.* Ex. E ¶ 67.i.ii n.75 (SDNY_R_00006032); *id.* Ex. F ¶ 56.i.ii n.76 (SDNY_R_00006540); *id.* ¶ 64.i.ii n.85 (SDNY_R03_00000089).)  In any event, the probable cause set out in the affidavits in no way depended on the Hana Associate's landscaping services and even to the extent there was any content that was not disclosed, it plainly would not have disturbed probable cause.[23]

### (3)    Jeweler-1

Menendez ventures even further afield to challenge the alleged failure to include in the June 2022 Second Menendez N.J. Warrant affidavit the fact that the jeweler from whom Nadine Menendez obtained her engagement ring ("Jeweler-1"), did not remember providing the ring to her, Hana, or Menendez.  (Menendez Supp. Mot. 17.)  As an initial matter, again, the complained-of omissions are of statements made the same day the warrant was sought.  And again, this denial was disclosed in subsequent warrants (*see, e.g.*, Ex. A ¶ 52.bb.i n.43 (SDNY_R_00005677) (affidavit supporting July 2022 Menendez Email and iCloud Warrants), and did not defeat probable cause.  But, particularly given the detailed allegations in the warrant affidavit about

---

[23] As discussed in Section I.B.2, *infra*, the similarity between what was disclosed and what is now claimed as an omission is another reason precluding any inference of recklessness or intent to mislead.

Nadine Menendez's receipt of a car from Uribe and funds from Hana, Jeweler-1 is a truly peripheral figure, at least in the relevant affidavit.  And even to the extent that the purchase of the ring was deemed significant by this point in the investigation, there is no reason to suspect that Jeweler-1 would immediately remember every engagement ring he or she sold.[24]  The idea that the magistrate judge who found probable cause based on all the other evidence in the warrant would reverse course upon learning that a jeweler did not immediately remember selling a particular ring is simply incredible.

        d)        The Alleged Omissions Related to Additional Conduct Were Not Material

Menendez and Hana also each challenge the failure to include, in various affidavits, matters that related, at most, to additional conduct and could not possibly have negated probable cause based on the central acts that were the focus of the affidavits.  (Menendez Supp. Mot. 18; Hana Mot. 126-27, 129.)  These various complaints come nowhere close to warranting suppression.

        (1)        The Laboratory Company CEO and the Health Official

Menendez complains that the June 2022 Second Menendez N.J. Warrant did not include two other statements that were *also* made on the day of the search and that concerned additional conduct beyond the acts discussed in the earlier warrant affidavits.  (Menendez Supp. Mot. 18.)  These statements related to Menendez's contacts, in late 2020 and early 2021, with certain New Jersey mayors seeking to convince them to authorize the Laboratory Company—a company that was paying Nadine Menendez—to conduct COVID-19 testing.  One of these statements was from the principal of the Laboratory Company (the "Laboratory Company CEO"), and was a self-

---

[24] Indeed, as recounted in later affidavits, in subsequent meetings with the Government, Jeweler-1 did eventually report selling the ring.  (*See, e.g.*, Weitzman Decl. Ex. I ¶ 52.cc.i (SDNY_R03_00000065).)

serving denial that Menendez had ever made calls on behalf of the Laboratory Company. The other was from a health official in one of the cities whose mayor Menendez had called (the "Health Official"), who stated that while the mayor had recommended the Laboratory Company (and only the Laboratory Company) to the Health Official, the Health Official did not feel any pressure to use the Laboratory Company. As with the statements of the New Jersey Defendant, the Hana Associate, and Jeweler-1, these statements were immaterial, and while they were not included in the affidavit issued the day the statements were made, they were included in the next affidavit that was prepared, supporting the July 2022 Menendez Email and iCloud Warrants. (*See* Ex. A ¶¶ 66.bb n.76 (SDNY_R_00005706) (Laboratory Company CEO), 66.z n.74 (SDNY_R_00005706) (Health Official).) For all the reasons applicable to the statements of the New Jersey Defendant, the Hana Associate, and Jeweler-1, these statements were not necessary to probable cause and thus not material to the warrant.

Similarly, Hana challenges the alleged omission of the Laboratory Company CEO's denial, in July 2022, of having asked Nadine Menendez or Menendez to call these mayors. (Hana Mot. 129.) But this statement adds little if anything to the warrant's disclosure that on June 16, 2022 the Laboratory Company CEO "denied that Menendez had made calls on [the Laboratory Company's] behalf." (Lustberg Cert. Ex. D. ¶ 67.bb n.87 (SDNY_R_00006310-11); *id.* Ex. E ¶ 68.bb n.88 (SDNY_R_00006040); *id.* Ex. F ¶ 57.bb n.89 (SDNY_R_00006548); *id.* Ex. G ¶ 65.bb n.98 (SDNY_R03_00000097).) In any event, it could not plausibly have affected the probable cause determination, especially given the wealth of other evidence presented in the affidavit.

(2)     Associate-2, Associate-3, and the Insurance Client

Hana goes far astray in seeking suppression because the affidavits did not disclose that three individuals who did business with Uribe's insurance company—the individuals referred to in the Indictment as Associate-2 and Associate-3, and another individual (the "Insurance Client")—claimed that Uribe was an employee of the company and the nominee owner (*i.e.*, the New Jersey Investigative Subject) was the owner.  (*See* Hana Mot. 126-27.)  That three persons doing business with the company stated that they believed the New Jersey Investigative Subject was the owner is not inherently inconsistent with the affidavit's claim that the New Jersey Investigative Subject ran the company "as a nominee for Uribe" (Lustberg Cert. Ex. G ¶ 46(a) (SDNY_R_00000041)).  In any event, none of the evidence set forth in the affidavit depended in any way on whether the New Jersey Investigative Subject was the true owner of the company or was running it as Uribe's nominee.  The New Jersey Investigative Subject's relationship with Uribe was relevant to Uribe's motive to pay bribes to stop the investigation, and the affidavit sets forth ample probable cause that Uribe had that motive based on his close relationship with the New Jersey Investigative Subject (*see, e.g.*, *id.* ¶ 58.g n.71 (SDNY_R03_00000074)).  Moreover, the evidence set forth above would have supported probable cause even if there were no evidence whatsoever of Uribe's motive (as opposed to his actions, and those of the other suspects).

One of the individuals, Associate-2, not only made the challenged statements about the New Jersey Investigative Subject's role, but also self-servingly denied, on June 16, 2022, helping Uribe make the bribe payments for the Mercedes-Benz Convertible.  Hana claims that this denial was omitted from the affidavits, but he is again mistaken; the affidavits supporting the December 2022 Hana Email Warrants, the January 2023 Hana iCloud Warrant, the February 2023 Hana Historical Location Warrant, and the September 2023 Supplemental Warrant all disclose this

denial (which in any event could not have defeated probable cause).  (Lustberg Cert. Ex. D ¶ 61.h
n.65 (SDNY_R_00006293); *id.* Ex. E ¶ 62.h n.66 (SDNY_R_00006023); *id.* Ex. F ¶ 51.h n.67
(SDNY_R_00006531); *id.* Ex. G ¶ 59.h n.76 (SDNY_R03_00000079).)[25]

        e)      The Statements About Gold Were Not Necessary to Probable
              Cause

Hana also complains about the omission of certain statements concerning the gold bars that
the FBI found in the search of the Menendezes' residence.  (Hana Mot. 130.)  These statements
were immaterial to the warrants, which offered ample evidence unrelated to and separate from the
gold bars to support probable cause.  The warrants prior to June 16, 2022 were supported by
probable cause despite lacking any mention of gold bars.  And even after the gold bars were
discovered, all but one of the affidavits made only brief and general reference to the fact that gold
bars were found in the residence.  Indeed, of the challenged warrants, only the September 2023
Supplemental Warrant even included the fact that any of the gold bars found in the Menendezes'
residence were attributable to Daibes.  This alone makes it impossible to see how any fact
regarding the gold bars could have been material to probable cause, and alone justifies denial of
this portion of the motion.[26]  After all, even if the omitted information had—contrary to fact—
diminished the weight of the evidence that Daibes provided the Menendezes with gold bars *to zero*,

---

[25] Menendez does not challenge the failure to list these June 16, 2022 statements in the June 2022
Second Menendez N.J. Warrant, and any such challenge would be meritless given the peripheral
and self-serving nature of these statements, which (like the similar self-serving statements of the
New Jersey Defendant) were listed in the affidavit in support of the July 2022 Menendez Email
and iCloud Warrants.  (*See* Ex. A ¶ 59.h n.54 (SDNY_R_00005689).)

[26] Similarly, this is another of the alleged omissions that, as discussed in Section I.B.2, *infra*, does
not support any inference of intent to mislead or reckless disregard for the truth, for the same
reasons.

the September 2023 Supplemental Warrant would still have been supported by (among other things) the same probable cause that justified the issuance of each of the other challenged warrants.

But these omissions were also immaterial because they were cumulative, if not duplicative, of other facts that had already been disclosed.  The omitted statements of a Menendez staffer that Menendez told him or her that the gold had come from Nadine Menendez's deceased mother was effectively duplicative of Nadine Menendez's statement to a jeweler ("Jeweler-2"), recounted in the warrant affidavit, claiming that the gold had come from her deceased mother.  (Hana Mot. 130.)  The fact that Menendez, as well, repeated this cover story certainly does not *diminish* probable cause, particularly given how thoroughly that cover story is refuted by the serial numbers on the gold bars themselves.  (Lustberg Cert. Ex. G ¶ 81.g.ii (SDNY_R03_00000122).)  If anything, it is inculpatory, as it shows Menendez caused the cover story to be used in the preparation of his official financial disclosures.  But in no event does it actually negate the overwhelming probable cause set forth in the affidavit.

Similarly, the alleged omission of the statements of an individual arguably corroborating a defense contention that Daibes gave Nadine Menendez seven one-ounce gold wafers not for her own benefit but to deliver to that individual is entirely immaterial.  (Hana Mot. 130.)  Even to the extent the gold bars are relevant to the September 2023 Supplemental Warrant, the more significant ones are clearly the much more valuable one-kilogram gold bars, about which Nadine Menendez provided Jeweler-2 with a false cover story.  (Lustberg Cert. Ex. G ¶ 81.g.ii (SDNY_R03_00000122).)  But in any event, the Government had already disclosed this theory to Judge Willis, noting that Nadine Menendez's counsel had made this very claim regarding those one-ounce gold wafers (*id.* ¶ 85 n.126 (SDNY_R03_00000125) (reflecting claim that Nadine Menendez "received possession of seven one-ounce gold bars from Daibes to show to a mutual

acquaintance to see if that acquaintance wished to purchase them from Daibes.")).   The significance of any additional corroboration of this story—particularly from a close friend of Menendez—was marginal at best.[27]

> f)   The Failure to Update the Affidavit Regarding Automatic Payments Was Immaterial and Plainly Inadvertent

The one actual inaccurate affirmative statement that either defendant identifies in his motions is an obvious—and obviously immaterial—inadvertent failure to fully update a long and complex document.  Hana challenges several affidavits for allegedly claiming that Uribe continued making automatic payments on the Mercedes-Benz Convertible until the present.  (Hana Mot. 129-30.)  But these affidavits (those in support of the December 2022 Hana Email Warrants, the January 2023 Hana iCloud Warrant, and the February 2023 Hana Historical Location Warrant) all in fact correctly indicate that those payments continued until June 2022, when the FBI conducted searches, after which Nadine Menendez changed the contact information on file with Mercedes-Benz Financial Services from a Uribe-created email address to hers, and made a payment.  (*See* Lustberg Cert. Ex. D ¶ 61.i-j (SDNY_00006293-94); *id.* Ex. E ¶ 62.i-j (SDNY_R_00006023-24); *id.* Ex. F ¶ 51.i-j (SDNY_ R_00006531-32).)

Hana, however, seeks to suppress the warrants because several pages earlier, in a summary paragraph introducing the entire sequence of events leading up to the payments, the affidavits did not update summary statements that the automatic payments "apparently have continued up through in or about the present."  (*See* Lustberg Decl. Ex. D ¶ 59 (SDNY_R_00006286); *id.* Ex. E ¶ 60 (SDNY_R_00006016); *id.* Ex. F ¶ 49 (SDNY_R_00006524).)  Given that this inaccurate

---

[27] As discussed in Section I.B.2, *infra*, it is not plausible to infer an intent to mislead the court or reckless disregard for the truth based on the alleged omission of such a peripheral detail.

statement is contained within a sentence starting "As set forth below," and thus literally refers the reader to the (accurate) account of the payments ceasing, the affidavit as a whole gives—at most—an inconsistent impression.  But more broadly, this obviously inadvertent and immaterial mistake hardly justifies Hana's characterization as a "really flagrant misstatement of the facts" (Hana Mot. 130), and is not a basis for suppression.  Indeed, the payments continuing through the date of the warrants would likely have been *less* incriminating than their abrupt cessation after the FBI approached Hana and Uribe, so this inadvertent failure to update the summary paragraph could hardly have been material.[28]

> 2.   *The Defendants Have Shown No Intent to Mislead or Reckless Disregard for the Truth*

Even if any of the above-described information were material—and it was not—a *Franks* hearing, much less suppression, would still be inappropriate because of the lack of any showing of intent to mislead or reckless disregard for the truth.  As described above, a search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *Rajaratnam*, 719 F.3d at 154.  Instead, the defendant must establish with "credible and probative evidence" that the omission of information "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.*

The defendants have established nothing of the sort, particularly in light of the robust showing of probable cause in each of the warrant affidavits; the marginal—if any—relevance of the allegedly omitted information to probable cause; the care the affiants took to include numerous

---

[28] Nor, for the reasons set forth in Section I.B.2, *infra*, could it have been done with reckless disregard for the truth or intent to mislead.

details qualifying or arguably in tension with theories of guilt; the many pieces of highly inculpatory evidence that the affidavits did not even include; and the fact that in later warrant affidavits much of this information was included.

The defendants' argument that the Court can infer recklessness or intent to mislead is refuted not just by the nature of the alleged omissions but also by the affidavits themselves. Each was a lengthy and detailed document with extensive citation to damning contemporaneous documentary evidence. The robust and carefully marshalled detail alone provides no basis to infer that either "affiant in fact entertained serious doubts as to the truth of his [or her] allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also, e.g.*, *Maisonet*, 2013 WL 12204909, at *1 (an affiant is "not required to include all potentially exculpatory information" in seeking a search warrant).

It is particularly inappropriate for the defendants to claim that the affiant for the June 2022 Second Menendez N.J. Warrant intentionally or recklessly omitted the failures of recollection or self-serving denials made that same day in order to mislead the issuing magistrate judge. That affiant was tasked, while the agents were still in Menendez and Nadine Menendez's house, with obtaining a warrant to be executed before the agents left, so that any additional time in drafting would prolong the intrusion into the Menendezes' residence. *See, e.g.*, *Canfield*, 212 F.3d at 719 (courts are mindful that affidavits often are drafted "in the midst and haste of a criminal investigation" (internal quotation marks omitted)). The affiant was familiar with the overwhelming evidence of probable cause set forth in the June 2022 First Menendez N.J. Warrant, *see* Sections I.B.1.a.2, I.B.1.a.4, *supra*, as well as the highly suspicious facts learned during the search, *see* Section I.B.1.c.1, *supra*. In those circumstances—and even leaving aside the defendants' failure to meet their burden of showing the affiant was even aware of all of the

complained-of statements on that date—there is no reasonable inference that the affiant "entertained serious doubts" about the allegations in the affidavit, *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted), or left any fact out intending to mislead the court or with reckless disregard for the truth.[29]  To the contrary, this is just the sort of circumstance where courts find no "substantial preliminary showing" that any omissions were made with "reckless disregard for the truth."  *Calk*, 2020 WL 3577903, at *8 (finding no intent to mislead where individuals approached by FBI denied wrongdoing shortly prior to the execution of a warrant, and the warrant was not resubmitted in order to include those denials).

Moreover, undermining any suggestions of recklessness, as discussed above, is that in later warrant affidavits, done not in the haste of the same day as the interviews, the affiant included this information.  It defies logic that an affiant would intentionally or recklessly omit supposedly exculpatory facts in a particular warrant affidavit so as to mislead a court, only later, in other search warrant affidavits, to include *those same facts*.  *See, e.g.*, *United States v. Adames*, No. 16 Cr. 167 (LAP) (S.D.N.Y. Apr. 6, 2017) (ECF No. 144 at 13-14) (concluding that omission of fact from "immediately-following" wiretap application was not deliberate, given its inclusion in subsequent applications).  Plainly, the non-inclusion of the complained-of facts in an affidavit drafted and signed the very same day as a search, and while the search was ongoing, was not done with an intent to mislead or with reckless disregard for the truth.  Even if the defendants were able to show that the affiant "exercised poor judgment in not considering to include this information" on the day of the search—and there is no basis whatsoever to find poor judgment—"that would, at best,

---

[29] The affiant attended the June 16, 2022 interviews of the New Jersey Defendant and Jeweler-1, but not the interviews of the Hana Associate, the Laboratory Company CEO, or the Health Official.

support a claim of negligence. But, such a finding, even if the Court were inclined to make it, would not get Defendants over the first *Franks* hurdle." *Vilar*, 2007 WL 1075041, at *29.

Indeed, far from showing any intent to mislead or reckless disregard, the circumstances here show the opposite. Throughout the series of warrants, both affiants included numerous items of information arguably in tension with the theories supporting probable cause. For example, as discussed above, the warrant affidavits included many of the items the defendants claim were omitted or should have been disclosed earlier. *See* Sections I.B.1.c.1-3, I.B.1.d.2, *supra* (noting inclusion of self-serving denials in subsequent warrants). As another example, regarding the recorded conversation involving the CS, the January 2022 Menendez Email and iCloud Warrants affidavit stated that "[the Hana Associate] and Hana had a financial dispute, possibly prior to this conversation," supplying a motive for the Hana Associate to make derogatory statements about Hana. (Weitzman Decl. Ex. B ¶ 19 n.5 (SDNY_R_00004206).) The affirmative inclusion of this fact alone is fatal to Menendez's truly unfounded claim that the affiant "abandoned her duty of candor" with a "reckless disregard for the truth" (Menendez Supp. Mot. 21).

Nor were these the only such disclosures of arguably exculpatory information. (*See, e.g.*, Weitzman Decl. Ex. I (disclosures in footnote 6, 10, 19, 57, 61, 67, 72, 73, 76, 77, 78, 85, 96, 98, 99, 116, 120, 125, 126).) The affiants' inclusion of such materials alone defeats the defendants' attempt to meet their burden to show intent to mislead or reckless disregard for the truth. *See, e.g.*, *Calk*, 2020 WL 3577903, at *6 ("This evidence, which was arguably inconsistent with the

Government's theory of guilt, suggests that any omission from the Affidavit was not designed to mislead.").[30]

Moreover, and equally fatal to any claim of intentional or reckless omissions, the affidavits did not include numerous devastating inculpatory facts. Many, if not most, of the omissions the defendants complain of are in fact inculpatory (and the rest are neutral or irrelevant, as described above), which also deeply undermines the requested finding of recklessness or intent to mislead. *See, e.g.*, *United States v. Thomas*, 788 F.3d 345, 351 (2d Cir. 2015) ("[W]e cannot conclude that any omission here was made deliberately or with reckless disregard for the truth when it is clear that full disclosure of the relevant information would only have strengthened the search warrant application." (internal quotation marks and emphasis omitted)); *Rajaratnam*, 719 F.3d at 155 n.18 ("it is difficult to imagine a situation where the government would intentionally or with reckless disregard omit information that would strengthen its probable cause or necessity showing," referring to wiretap application (internal quotation marks omitted, emphasis in original)). But there were a number of additional inculpatory omissions as well. For example, looking to the face of the original indictment returned in this case (the "Original Indictment")—which was returned

---

[30] Menendez unpersuasively claims in a footnote that these extensive, direct, and logical disclosures were inadequate. (*See* Menendez Supp. Mot. 19 n.5.) Instead of citing a single case in which a disclosure of this form in a warrant affidavit was held inadequate, he relies on a doctrine governing the prominence of securities-related disclosures to the shareholding public, which is entirely inapposite to the context here. (*See id.* (citing *Werner v. Werner*, 267 F.3d 288, 297 (3d Cir. 2001).) Even under the standards applicable to securities, the disclosures in the warrant affidavit are nothing like "situations where the manner of disclosure disguised or seriously distorted important information." *Werner*, 267 F.3d at 297; *see also id.* (citing case where a 200-page document placed an advisor's opinion that the transaction was fair on page 2 in bold-face type, and buried crucial information about the advisor's lack of independence in appendices toward the end of the document).

just a day after the September 2023 Supplemental Warrant was sought—reveals a number of damning inculpatory details that were not included in that warrant's affidavit, such as:

- On or about April 8, 2019, the day after an Egyptian government official informed Hana that IS EG Halal was likely to become Egypt's sole halal certifier for imports from the U.S. market, Nadine Menendez texted Menendez, "Seems like halal went through.  It might be a fantastic 2019 all the way around."  (Original Indictment ¶ 17.)

- Menendez assisted Nadine Menendez in setting up Strategic International Business Consultants, and Nadine Menendez described the purpose of the company to a relative, stating, "every time I'm in a middle person for a deal I am asking to get paid and this is my consulting company."  (*Id.* ¶ 18.)

- In September 2019, Daibes fielded an inquiry from an Egyptian official referred to in the indictment as "Egyptian Official-3," made through Hana, about whether Menendez had put a hold on $1 billion in FMF to Egypt, and after consulting with Menendez, communicated Menendez's response denying any such hold back to Hana, who communicated it to Egyptian Official-3.  (*Id.* ¶ 27.)

- Also in September 2019—after a dinner among Hana, Menendez, and Nadine Menendez—Hana texted Egyptian Official-3 that "our man," referring to Menendez, was traveling to India and was asking "if there any message we need or anything for ISEG?"  (*Id.* ¶ 28.)

- After a meeting with Egyptian Official-3 on the topic of a dam on the Nile River, Menendez wrote to the then-Secretary of the Treasury and then-Secretary of State urging them to change their approach to negotiations over the dam.  (Id. ¶ 29(a).)

- On August 1, 2019, after Uribe texted Nadine Menendez asking her to "stop" an investigation in which an insurance fraud investigator sought to interview the New Jersey Investigative Subject, Menendez performed a Google search for the initials of the state agency employing that investigator. (*Id.* ¶ 36(a).)

- In December 2020, Menendez met with an individual (referred to in the Indictment as the "Candidate") to consider a potential candidacy for U.S. Attorney for the District of New Jersey and in that meeting criticized the prosecution of Daibes, and said that he hoped that the Candidate would look into Daibes's case if the Candidate became the U.S. Attorney; after being told the Candidate may have to recuse himself from the Daibes prosecution, Menendez then informed the Candidate that he would not be put forward for U.S. Attorney; and after being told that his political advisor (referred to in the Indictment as the "Advisor") believed the Candidate would likely not have to recuse from the Daibes prosecution, Menendez recommended the Candidate.  (*Id.* ¶ 39-41.)

- In October 2021, after being picked up from the airport by Daibes's driver, Menendez performed a web search for "how much is one kilo of gold worth."  (*Id.* ¶ 42.)

- On or about January 29, 2022, several days after Nadine Menendez texted Daibes thanking him and writing "Christmas in January," Menendez performed a Google search for "kilo of gold price." (*Id.* ¶ 44(d).)

Taken together, the omission of this wealth of inculpatory information—particularly along with the disclosure of numerous items of arguably exculpatory information, as discussed above— refutes the notion that any alleged omissions were made with a reckless or intentional mental state.

At bottom, instead of making any substantial preliminary showing justifying their very serious accusations of intent to mislead the issuing magistrate judges or reckless disregard for the truth, the defendants simply ask the Court to infer it from the fact that a number of extraordinarily lengthy, detailed, careful, and measured affidavits did not include every fact that the defendants now assert is potentially relevant. This is, for good reason, not a basis for a *Franks* hearing. *See, e.g.*, *Awadallah*, 349 F.3d at 67-68 (it is unreasonable to require an affiant "to include . . . every piece of information gathered in the course of an investigation." (internal quotation marks omitted); *Vilar*, 2007 WL 1075041, at *27 (because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant"); *Mandell*, 710 F. Supp. 2d at 373 ("the mere intent to exclude information is insufficient" to demonstrate recklessness, since "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly"); *Lahey*, 967 F. Supp. 2d at 709 (the omission of information that was "clearly critical" is not itself sufficient; the court must find "'credible and probative evidence that the omission of information in a[n] … application was designed to mislead or was made in reckless disregard of whether [it] would mislead'" (quoting *Rajaratnam*, 719 F.3d at 154))

## II.      THE SEARCH WARRANTS ARE PARTICULAR AND NOT OVERBROAD

Menendez and Hana each bring different misguided challenges to the particularity and breadth of several of the search warrants authorizing searches of electronic media. The challenged warrants were particularized and not overbroad, specifying a number of detailed categories of highly relevant information to be seized that were all amply supported by probable cause.

### A.      Applicable Law

To satisfy the Fourth Amendment's particularity requirement, a warrant must (i) "identify the specific offense for which the police have established probable cause"; (ii) "describe the place to be searched"; and (iii) "specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 138 S. Ct. 2206 (2018). "The Fourth Amendment does not require a perfect description of the data to be searched and seized, however." *Ulbricht*, 858 F.3d at 100. Rather, "the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). "[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100.

The probable cause and particularity requirements intersect in the doctrine of overbreadth. A warrant is overbroad if its "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (internal quotation marks omitted).

It is well settled that a warrant can authorize the search of the full contents of an electronic device or account. *See* Fed. R. Crim. P. 41(e)(2)(B) (authorizing seizure of electronic device and subsequent off-site review); *see also, e.g.*, *Vilar*, 2007 WL 1075041, at *38 (noting it "should not

be surprising that a person who uses a computer, or any electronic device, as an instrumentality of crime might discover that a magistrate judge would find probable cause to search that computer, just as it should not shock the user of a telephone that a judge would approve interceptions of calls over that telephone or the home owner that a judge would approve a search throughout a house believed to contain evidence of a crime"); *United States v. Juarez*, No. 12 Cr. 59 (RRM), 2013 WL 357570, at *6 (E.D.N.Y. Jan. 29, 2013) (concluding that cell phone warrant satisfies the particularity requirement when it constrains agents to search for evidence related to the specific criminal activity being investigated); *cf. In re A Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx@gmail.com Maintained at Premises Controlled By Google, Inc.*, 33 F. Supp. 3d 386, 393 (S.D.N.Y. Aug. 7, 2014) ("[W]e view it as well established that a search warrant can properly permit the Government to obtain access to electronic information for purposes of a search even where the probable cause showing does not apply to the entirety of the electronic information that is disclosed to the Government.").

While a temporal limitation in a warrant may be "one indicium of particularity," *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 306 (S.D.N.Y. 2018), the absence of such a limitation does not render a warrant insufficiently particularized, especially where the conduct being investigated is complex and long-running. *See United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010) ("The complexity and duration of the alleged criminal activities render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates."); *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) ("Where, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents."); *United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006) ("[T]he government is to be given more flexibility regarding the

59

items to be searched when the criminal activity deals with complex financial transactions."). Indeed, "if the criminal scheme at issue is of a complex nature and has been ongoing for a number of years, a lack of a specific time frame in the search warrants is not sufficient in and of itself to render the warrants constitutionally overbroad." *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 464 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also, e.g.*, *United States v. Elkorany*, No. 20 Cr. 437 (NRB), 2021 WL 3668086, at *4 (S.D.N.Y. Aug. 17, 2021) ("Courts in this Circuit have reasoned that the absence of a time frame does not render warrants unconstitutionally general where the crimes under investigation were complex and concerned a long period of time, and not simply one or two dates of criminal activity." (internal quotation marks and brackets omitted)).

Even where a warrant is deficient, there is an "exception to the exclusionary rule for 'evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant.'" *Clark*, 638 F.3d at 99 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). While it is the Government's burden to prove objective reasonableness in such a situation, such reasonableness is presumed for searches performed pursuant to a warrant, except "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Clark*, 638 F.3d at 100 (internal quotation marks omitted).

### B. Discussion

The challenged warrants were meticulously particularized and amply supported by probable cause. Each warrant (i) identified the specific offenses for which probable cause was established; (ii) described the places or objects to be searched; and (iii) specified the items to be

60

seized by their relation to designated crimes. *Ulbricht*, 858 F.3d at 99. Thus, each warrant plainly "satisfies the basic elements of the particularity requirement as traditionally understood." *Id.* at 101. The defendants do not contest this, but raise several meritless objections based on wholly inapposite cases. The challenged warrants here are nothing like any of those found wanting in the cases cited by the defendants.

1. *The Categories Specified in the Warrants Were Supported by Probable Cause*

Menendez is simply wrong to say that the warrants called for the seizure of more documents than justified by probable cause. (Menendez Supp. Mot. 28.) To the contrary, and particularly given the complexity of the scheme, the warrants were carefully written to tailor the materials to be sought to the probable cause set forth in the accompanying affidavits.

Menendez's objection that the warrants allowed the seizure of too large a number of communications with his wife is based on a misreading of the warrant and a misapprehension of the evidentiary significance of his communications with her. Menendez and Nadine Menendez began dating in early 2018, which is close to the time that many of the initial acts in the scheme under investigation—which would eventually be charged in the Indictment—began. (*See, e.g.*, Indictment ¶¶ 1, 6, 16.) And a number of the things of value provided in the course of the scheme were provided to Nadine Menendez, rendering Menendez's relationship with Nadine Menendez obviously highly relevant to his motive to take or promise official acts in exchange for such things of value being provided to her. The nature of the offense and the timing of his relationship with her thus necessarily will render a large volume of communications between them relevant evidence.

But in addition to misapprehending the evidentiary significance of such communications, Menendez's claim that the "plain terms" of the warrant allowed the seizure of all communications

with Nadine Menendez is simply incorrect.  (Menendez Supp. Mot. 28.)  As Menendez elsewhere acknowledges (Menendez Supp. Mot. 26), the provision authorizing the seizure of communications did not necessarily encompass all communications between all listed persons, but instead was limited to communications "reflecting or concerning interactions between [a set of people (not including Nadine Menendez)] or others acting on their behalf on the one hand, and Menendez or others acting on Menendez's behalf, on the other hand."  (Weitzman Decl. Ex. H ¶ II.a (SDNY_ R03_00000318).)  Menendez is therefore simply wrong to claim that the warrants authorize the seizure of communications "without *any* attempt to restrict that collection to communications actually tending to evidence a crime."  (Menendez Supp. Mot. 31 (emphasis in original).)

Menendez's claim that the warrants did not limit the scope of the search to evidence of crimes is thus based on his mistaken reading of the warrants.  A number of communications between Menendez and Nadine Menendez could indeed be captured in the challenged provision, as well as by a number of categories of the warrant not challenged in his motion.  (*See, e.g.*, Weitzman Decl. Ex. H ¶ II.l, t, u, v (SDNY_ R03_00000321).)  And while collectively this may account for a large number, or even substantially all, nonprivileged communications between the spouses during certain time periods, particularly given Nadine Menendez's role in the offenses and receipt of many of the bribes, that is not because the categories lack tailoring to the offenses. *See Ulbricht*, 858 F.3d at 100 ("[I]n many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast.").

Ultimately, the flaw in Menendez's argument (like that made by another defendant challenging a search of his electronic media and rejected by the Second Circuit) "is that it confuses a warrant's breadth with a lack of particularity."  *Id.* at 102.  Based on the underlying nature of the

conduct, the warrants authorized broad searches, but they were written with great care and attention to particularizing the information to be seized. *See id.* ("A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement.").

Indeed, Menendez acknowledges that the only specific provision he challenges—the collection of communications with or regarding specified persons (Menendez Supp. Mot. 26-27)—is purportedly overbroad only because the list of specified persons is allegedly too long. He expressly notes that a provision authorizing the collection of communications with or regarding specified persons, where those communications related to interactions between specified persons and Menendez or those acting on his behalf—*i.e.*, bearing the *exact same structure* as the challenged ones—was not overbroad. (Menendez Supp. Mot. 32 & n.8.) The only material difference between the challenged and the unchallenged provisions is that the unchallenged one, in Menendez's view, did not specify too many persons. (Menendez Supp. Mot. 32 & n.8; *compare* Weitzman Decl. Ex. A at SDNY_R_00004186 (first bullet listing unchallenged provision) *with id.* Ex. G at SDNY_R_00005891 (first bullet listing challenged provision) *and id.* Ex H at SDNY_R03_00000318 (paragraph II.a).)

Despite claiming that the challenged warrants specify too many people, Menendez does not identify a single person whose inclusion was allegedly unsupported by the probable cause set forth in the applicable affidavit. Nor could he reasonably do so. Even taking the warrant setting forth the largest number of additional individuals—the September 2023 Supplemental Warrant—the applicable affidavit sets forth probable cause justifying each individual's inclusion. Indeed, each such individual is specifically referenced in the accompanying affidavit along with an

explanation of their connection to the conduct under investigation.[31]   And notably, despite challenging different warrants as overbroad (*see infra* Section II.B.3), and moving to suppress the fruits of *this* warrant on the basis of alleged material omissions from the warrant affidavit (*see supra* Section I), Hana does not challenge the September 2023 Supplemental Warrant as overbroad at all.

This case is thus nothing like those cited by Menendez in support of his overbreadth challenge.  Menendez makes the puzzling claim that the warrants here are "especially analogous" to that in *United States v. Zemlyansky* (Menendez Supp. Mot. 32), even though that was a case where the warrant *did not specify the subject offenses under investigation* for most of the categories in the warrant.  *See Zemlyansky*, 945 F. Supp. 2d at 454 ("Nothing on the face of the Tri-State warrant informs the searching officer for which crimes the search is being undertaken.").  And unlike here, where the warrants specify communications with particular persons regarding particular interactions or relationships, the warrant there allowed the seizure of virtually any

---

[31] Some of these are individuals referenced in the Indictment or this memorandum.  (*See, e.g.*, Weitzman Decl. Ex. I ¶¶ 18 (SDNY_ R03_00000019) (the New Jersey Investigative Subject); 20 (SDNY_ R03_00000020) (the Laboratory Company CEO); 23 (SDNY_ R03_00000021) (Fred Daibes); 52.d (SDNY_ R03_00000054-55) (Jeweler-1); 19 (SDNY_ R03_00000020) (Associate-2); 16 (SDNY_ R03_00000019) (Associate-1); 52.z (SDNY_ R03_00000063) (Associate-3); 79.a (SDNY_ R03_00000118) (the individual referred to in the Indictment as the "Qatari Investor"); 79.e (SDNY_ R03_00000118-19) (the individual referred to in the Indictment as "Qatari Official-1").)  Some are not referenced in the Indictment but are still each mentioned at least once in the affidavit.  (*See, e.g.*, *id.* ¶¶ 22 (SDNY_ R03_00000020); 72 (SDNY_ R03_00000107); 52.d (SDNY_ R03_00000054-55); 18 (SDNY_ R03_00000019); 44.c (SDNY_ R03_00000034); 44.c.i n.14 (SDNY_ R03_00000035); 44.k (SDNY_ R03_00000038); 52.gg (SDNY_ R03_00000066-67); 82.b (SDNY_ R03_00000123); 67.k (SDNY_ R03_00000101-02); 81.e (SDNY_ R03_00000121); 83 (SDNY_ R03_00000124).)  As perusal of the affidavit will quickly show, the above-listed paragraphs are far from the only ones listing many of the individuals.  Additionally, the September 2023 Supplemental Warrant also lists Wael Hana, Jose Uribe, the New Jersey Defendant, and the Hana Associate, but Menendez does not challenge their inclusion.  (*See* Menendez Supp. Mot. 32 n.8.)

document whatsoever in a medical clinic. *Id.* at 458.  Similarly, *Groh v. Ramirez*, also cited by

Menendez (Menendez Supp. Mot. 32), concerned the entirely different situation of a warrant that

"did not describe the items to be seized *at all*."  540 U.S. 551, 558 (2004) (emphasis in original);

*see also id.* ("[I]n the space set aside for a description of the items to be seized, the warrant stated

that the items consisted of a 'single dwelling residence . . . blue in color.'").

      In addition, Menendez's citation to *United States v. Voustianiouk* as supposedly relating to

an "overbroad warrant" (Menendez Supp. Mot. 32), is simply in error.  In that case, the Second

Circuit had no occasion to and did not decide whether the warrant was insufficiently particular or

overbroad, because the officers conducted a search of a part of a building not covered by the

warrant at all.  *See United States v. Voustianiouk*, 685 F.3d 206, 211-13 (2d Cir. 2012); *see also

id.* at 213 ("If anything, the warrant was quite clear and specific.").  The case thus does nothing to

support Menendez's argument.

      In sum, Menendez is wrong, factually and legally, to claim that the specific and

particularized warrants sought any materials beyond those justified by the probable cause set forth

in the affidavits.

      2.    *No Temporal Limitation Was Required*

      Menendez's complaint that not all of the warrants included a temporal limitation

(Menendez Supp. Mot. 30-31), attempts to impose a legal requirement where none exists.  While

such a limitation is "one indicium of particularity," *Pinto-Thomaz*, 352 F. Supp. 3d at 306 (internal

quotation marks omitted), there is no requirement of such a limitation, at least in a long-running

and complex scheme, *see Hernandez*, 2010 WL 26544, at \*11.  Indeed, a case that Menendez

himself cites squarely held that "if the criminal scheme at issue is of a complex nature and has

been ongoing for a number of years, a lack of a specific time frame in the search warrants is not

sufficient in and of itself to render the warrants constitutionally overbroad." *Zemlyansky*, 945 F. Supp. 2d at 464; *see also, e.g.*, *Elkorany*, 2021 WL 3668086, at *4 ("[T]he absence of a time frame does not render warrants unconstitutionally general where the crimes under investigation were complex and concerned a long period of time, and not simply one or two dates of criminal activity." (internal quotation marks and brackets omitted)); *United States v. Gatto*, 313 F. Supp. 3d 551, 560 (S.D.N.Y. 2018) (warrants were not overbroad by "virtue of their having authorized searches of the entirety of the cell phones for data responsive to the warrants"). This principle alone is fatal to Menendez's argument, as there can be no serious dispute that the Indictment sets forth a "complex" scheme that "has been ongoing for a number of years," *Zemlyansky*, 945 F. Supp. 2d at 464. (*See, e.g.*, Indictment ¶¶ 1-3 (providing overview of scheme).)

In short, no temporal limitation was necessary. Nor was one wise. As Menendez notes, a number of materials from before the early-2018 commencement of the charged scheme were seized, because they bore on, among other things, Menendez's motive to commit the offenses (*see, e.g.*, Weitzman Decl. Ex. H ¶ II.v (SDNY_R03_00000321)), and the background and nature of his relationship with other key participants (*id.* ¶ II.a (SDNY_R_03_00000318)). In a complex and long-running scheme such as this, it is simply not practicable to mandate an artificial temporal cutoff, and especially not a cutoff tied to the time period charged in a subsequent indictment. Where the facts do not lend themselves to such arbitrary parsing, the law imposes no such requirement. *Zemlyansky*, 945 F. Supp. 2d at 464; *see also, e.g.*, *Juarez*, 2013 WL 357570, at *6

66

(rejecting defense request for temporal limitation where the warrant's reference to the subject offense provided sufficient constraint).[32]

       3.     *The Search Warrants Properly Sought Evidence of Consciousness of Guilt*

Finally, Hana's argument that the warrants were overbroad because they authorized the seizure of evidence pertaining to his awareness of a criminal investigation of him and use of means of communications believed to be less easily accessed by law enforcement (Hana Mot. 114-18) should be swiftly rejected. This subject matter is directly probative of Hana's consciousness of guilt and thus directly relevant to the subject matter of the warrant. Evidence related to an FBI search of Hana's business and electronic devices, and to his use of means of communications less likely to be intercepted by law enforcement, would obviously be relevant to establishing whether Hana took any actions to conceal his activities from law enforcement. Indeed, Hana concedes as much in acknowledging that this subject matter would be relevant if obstruction of justice were one of the offenses specified in the warrant. (*Id.* 116.) But whether or not it formally constitutes obstruction of justice, evidence of attempts to thwart a Government investigation of the bribery scheme or to evade detection is relevant to the defendant's consciousness of guilt as to that scheme. *See, e.g.*, *United States v. Norris*, 513 F. App'x 57, 60 (2d Cir. 2013) (affirming admission of evidence that a defendant sought to engage in a "cover-up of the fraud"); *United States v. Rybicki*, 287 F.3d 257, 264 (2d Cir. 2002) ("appellants' efforts to avoid detection, such as omitting required information on [certain] filings and failing to record the bribes in any of their financial

---

[32] Additionally, Menendez directs his motion specifically to the September 2023 Supplemental Warrant and does not formally challenge the June 2022 Menendez D.C. Warrants, which themselves resulted in the seizure of the Menendez Cellphone and thus supply an independent—and unchallenged—basis for the search of that device. However, even if this Court were to construe his motion as challenging those warrants as well, it would still be without merit for the reasons stated herein.

documentation, are indicative of consciousness of guilt"); *United States v. Baldeo*, No. 13 Cr. 125 (PAC), 2014 WL 351638, at *1 (S.D.N.Y. Jan. 31, 2014) ("Evidence of a party's consciousness of guilt is relevant and admissible.").[33]

The cases cited by Hana concern entirely different circumstances and provide no support for suppressing the warrants at issue here.  In *Galpin*, the Second Circuit found a warrant invalid where it authorized a search for child pornography despite the government conceding that "there was no probable cause" to believe that such materials would be found.  720 F.3d at 448.  And in *United States v. Cioffi*, a warrant was found invalid where it did not limit the items to be seized to documents consisting of evidence of "any crime at all."  668 F. Supp. 2d 385, 396 (E.D.N.Y. 2009).  Neither of these cases speaks to the commonsense proposition that evidence of the reaction to an FBI search, or of attempts to use communication modes more difficult to access by law enforcement, are relevant evidence of consciousness of guilt.

4.   *Even if There Were Any Defect in the Warrants, Suppression Would Be Inappropriate*

Even if there had been any defect in any of the warrants (which, for the reasons set forth in this section, there was not), the executing agents' reliance upon the warrants was clearly objectively reasonable, rendering suppression inappropriate.  *See, e.g.*, *Clark*, 638 F.3d at 100. The defendants do not argue that the magistrate judges issuing each of these warrants "wholly abandoned [their] judicial role[s]," and as set forth in Section I, the magistrate judges were not "knowingly misled" and the warrants were not "so lacking in indicia of probable cause as to render

---

[33] Indeed, despite (meritlessly) seeking to strike a portion of the Indictment as surplusage in his pretrial motions (Hana Mot. 59-61), Hana does *not* seek to strike from the Indictment paragraphs related to the cover-up of the bribe scheme, including through repayments of bribe money to him (*see* Indictment ¶¶ 68-70).

reliance upon [them] unreasonable." *Id.* (internal quotation marks omitted).  For all of the reasons set forth in this section, even if there were some defect in the warrants themselves (which there was not), plainly none of the warrants was "so facially deficient that reliance upon it is unreasonable." *Id.* (internal quotation marks omitted).

Similarly, even if the warrants were defective (which they were not), the "inevitable discovery" rule applies to at least much of that information, such that suppression would not follow.  *See Nix v. Williams*, 467 U.S. 431, 444 (1984) (under the inevitable discovery doctrine, unlawfully obtained evidence can be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.").  Law enforcement issued grand jury subpoenas to both Menendez and IS EG Halal on the same date that the Government executed the search warrant of the Menendezes' home, seeking much of the same information (and subsequent subpoenas were issued seeking more information), and the subpoena recipients complied with these subpoenas through counsel.  "[W]here the government can demonstrate a substantial and convincing basis for believing that the requisite information would have been obtained by subpoena," as is the case here, "there is no reason why the government may not rely upon the subpoena power as one way it might meet the burden of proving inevitable discovery by a preponderance of the evidence." *United States v. Eng*, 971 F.2d 854, 860 (2d Cir. 1992).  Accordingly, this case falls squarely within the inevitable discovery exception to the exclusionary rule.  *See United States v. Vilar*, 729 F.3d 62, 84-85 (2d Cir. 2013) (applying inevitable discovery exception to exclusionary rule where Government independently obtained materials seized during challenged search pursuant to a subpoena issued after the search).

**<u>CONCLUSION</u>**

For the reasons set forth above, the defendants' motions to suppress should be denied.

Dated:  New York, New York
        February 12, 2024

                              Respectfully submitted,

                              DAMIAN WILLIAMS
                              United States Attorney

                    By:    s/ Paul M. Monteleoni
                           Eli J. Mark
                           Daniel C. Richenthal
                           Paul M. Monteleoni
                           Lara Pomerantz
                           Assistant United States Attorneys
                           (212) 637-2431/2109/2219/2343

70