**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

       Defendants.

Case No. S2 23-cr-490 (SHS)

## SENATOR ROBERT MENENDEZ'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION TO SUPPRESS SEARCH WARRANT RETURNS

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 5

I.   THE GOVERNMENT'S OPPOSITION CONTINUES TO MISREPRESENT THE CS
     RECORDING ........................................................................................................... 5

     A.   The Challenged Affidavits Severely Mischaracterized the CS Recording ........................ 5

     B.   The Mischaracterizations of the CS Recording Were Critical to Establish
          Probable Cause for the Search Warrants ......................................................... 10

     C.   The Government Impermissibly Omitted the Exculpatory Statements of the
          New Jersey Defendant, Hana, the Hana Associate and Others ......................... 12

     D.   The Mischaracterizations and Omissions Were Made At Least With Reckless
          Disregard for the Truth, If Not Intentionally ................................................... 15

II.  THE ESI WARRANTS ARE UNCONSTITUTIONALLY OVERBROAD ........................ 20

CONCLUSION ............................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*McCullough v. Bennett*,
    413 F.3d 244 (2d Cir. 2005)...............................................................................18

*Riley v. California*,
    573 U.S. 373 (2014)........................................................................................20

*Southerland v. City of New York*,
    680 F.3d 127 (2d Cir. 2012)...........................................................................17

*Stansbury v. Wertman*,
    721 F.3d 84 (2d Cir. 2013).............................................................................14

*United States v. Adames*,
    No. 16-cr-167 (LAP) (S.D.N.Y. Apr. 6, 2017).............................................18

*United States v. Awadallah*,
    349 F.3d 42 (2d Cir. 2003).............................................................................19

*United States v. Calk*,
    No. 19-cr-366 (LGS), 2020 WL 3577903 (S.D.N.Y. July 1, 2020) ......................15

*United States v. Canfield*,
    212 F.3d 713 (2d Cir. 2000)........................................................................6, 7

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011).............................................................................12

*United States v. Dupree*,
    781 F. Supp. 2d 115 (E.D.N.Y. 2011) ...................................................22

*United States v. Eng*,
    971 F.2d 854 (2d Cir. 1992)...........................................................................23

*United States v. Galpin*,
    720 F.3d 436 (2d Cir. 2013).......................................................................4, 20

*United States v. Hernandez*,
    No. 09-cr-625 (HB), 2010 WL 26544 (S.D.N.Y. Jan. 6, 2010)................21

*United States v. Lahey*,
    967 F. Supp. 2d 698 (S.D.N.Y. 2013)...........................................................18

*United States v. Lustyik,*
   57 F. Supp. 3d 213 (S.D.N.Y. 2014)........................................................................22

*United States v. Mandell,*
   710 F. Supp. 2d 368 (S.D.N.Y. 2010)......................................................................19

*United States v. Marin-Buitrago,*
   734 F.2d 889 (2d Cir. 1984).....................................................................................15

*United States v. One Residential Prop. Located at 8750 Duncan Rd., San Diego, CA,*
   312 F. App'x 8 (9th Cir. 2008) .................................................................................15

*United States v. Pinto-Thomaz,*
   352 F. Supp. 3d 287 (S.D.N.Y. 2018)......................................................................21

*United States v. Reilly,*
   76 F.3d 1271 (2d Cir. 1996).......................................................................................2

*United States v. Silver,*
   948 F.3d 538 (2d Cir. 2020).......................................................................................7

*United States v. Stokes,*
   733 F.3d 438 (2d Cir. 2013).....................................................................................23

*United States v. Thomas,*
   788 F.3d 345 (2d Cir. 2015).....................................................................................16

*United States v. Ulbricht,*
   858 F.3d 71 (2d Cir. 2017).......................................................................................21

*United States v. Vilar,*
   No. 05-cr-621 (KMK), 2007 WL 107504 (S.D.N.Y. Apr. 4, 2007)........................18

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013).......................................................................................23

*United States v. Wey,*
   256 F. Supp. 3d 355 (S.D.N.Y. 2017)............................................................5, 20, 22

*Washington v. Napolitano,*
   29 F.4th 93 (2d Cir. 2022) ....................................................................................3, 14

*Wilson v. Russo,*
   212 F.3d 781 (3d Cir. 2000).....................................................................................14

**Statutes**

18 U.S.C. § 201...............................................................................................................7

18 U.S.C. § 371.................................................................................................................7

## INTRODUCTION

In his motion to suppress, Senator Menendez made a substantial preliminary showing that the challenged warrant affidavits misled the authorizing judge in three ways. *First*, the warrant affidavits mischaracterized a recorded conversation by claiming that the conversation evidenced Senator Menendez's participation in a bribery scheme, when in fact it showed only that Senator Menendez was the victim of a fraud. ECF No. 158 at 8-12. *Second*, the warrant affidavits omitted critical information undermining any connection between Defendant Wael Hana (the alleged "arranger" of the bribery scheme) and Senator Menendez. *Id.* at 12-14. And, *third*, the affidavits failed to inform the magistrate of key exculpatory statements from individuals allegedly involved in the claimed bribery scheme. *Id.* at 16-18.

The government's response to these points is to obfuscate. Hoping that complicating the Senator's straight-forward motion might result in denial of a *Franks* hearing, the government resorts to further mischaracterizations of the confidential source's ("CS") recorded conversations, reciting evidence outside the four corners of the affidavits (in an effort to unfairly tarnish the Senator), minimizing the plainly exculpatory nature of the government's omissions, and offering weak *post-hoc* justifications for the omissions. All of this has a transparent goal: to avoid a hearing and speed ahead to trial without testing the reasons for the government's omissions. Particularly given the unprecedented nature of this criminal action, which for the first time ever charges a sitting Congressman with violating FARA, and the constitutional and statutory implications of this case, as highlighted in the Senator's first motion to dismiss (ECF No. 120), the government should be required to present witnesses at an evidentiary hearing to explain the mischaracterizations and omissions in its search warrant affidavits.

As to each of the bases for the Senator's motion to suppress, the government's responses betray fundamental problems with the search warrant applications.

*First*, in responding to Senator Menendez's argument regarding the mischaracterized recorded conversation by the CS, the government argues that the warrant affidavits did not suggest that the Senator was knowingly involved in a bribery scheme.  *See* Opp. at 15-16.  That's simply incorrect.  The warrant affidavits described an "arrangement" in which Senator Menendez was supposedly tasked with intervening in the New Jersey Defendant's criminal case "in exchange" for bribes accruing to his wife.  Given the claim in the warrant affidavits that Senator Menendez was involved in a "Bribe Scheme," the only fair reading of the affidavits is that there is probable cause to believe that the Senator had knowledge of the alleged scheme.

Nor does the government have any real justification for the FBI affiant's decision to "spin" the CS Recordings to incriminate, while ignoring all the evidence in the conversations that show the Senator's innocence.  Given the *ex parte* nature of these search warrant affidavits, the affiant had a heightened duty to provide "all potentially adverse information to the issuing judge."  *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996).  The FBI agent failed in this responsibility by grossly mischaracterizing the CS Recording, which does not actually evidence the Senator's knowing participation in a bribery scheme.  As a result, the government cannot support its claim for probable cause to conduct the challenged searches.

On Senator Menendez's second and third arguments regarding material omissions of exculpatory evidence, the government tries to generate reasons why a magistrate could have found that evidence to be immaterial, or even inculpatory.  *See* Opp. at 21-22; 34-39.  These arguments are unpersuasive on their own terms and had the issuing courts known just how thin the basis for the government's allegations of probable cause truly were (and been aware of corroborated denials of wrongdoing), the courts might well have denied, or at least sharply limited, the government's unfettered access to the home and digital life of a sitting U.S. Senator.

But these arguments also fail for a more fundamental reason.  As explained in Senator Menendez's moving brief, "a police officer cannot make unilateral decisions about the materiality of information" but must, instead, ensure that the magistrate has a "full sense of the evidence."  *Washington v. Napolitano*, 29 F.4th 93, 108, 111 (2d Cir. 2022) (citations omitted); ECF No. 158 at 22-23.  So, while the government was welcome to *argue* to the magistrate that apparently exculpatory statements from the CS, the New Jersey Defendant, and the Hana Associate are immaterial, the government was *not* permitted to do what it did here; *i.e.*, decide for itself that the statements are immaterial and elect not to present them to the magistrate on that basis.

In view of these failings, the government attempts to excuse the affiant's omissions, arguing that she did not act intentionally or with a reckless disregard for the truth.  Opp. at 51.  Yet, if anything, the Opposition confirms that at least one of the challenged omissions was made intentionally.  Significantly, the government now admits that Agent Corkery, the affiant for each of the challenged search warrant affidavits, *was present* for the interview during which the New Jersey Defendant denied the existence of any scheme to pay for assistance with his criminal case (even under threat of prosecution for making false statements).  *See* Opp. at 53 n. 29.  That is, Agent Corkery participated in an interview where the New Jersey Defendant denied the existence of the bribery scheme on the very same day that she swore out a search warrant alleging that the New Jersey Defendant was the bribe payer at the center of that same alleged scheme.  Agent Corkery submitted a sworn affidavit to the Court averring that there was probable cause to believe that the bribery scheme existed, but did not disclose the New Jersey Defendant's critical denial she heard several hours earlier.

This material omission cannot plausibly be explained by negligence or mistake—it goes to the heart of the government's theory of probable cause and *must* have been fresh in Agent Corkery's mind when she submitted her affidavit on the same day.  The only plausible explanation for this omission is that the government did not want the reviewing judge to know about it.  The same is true for the half dozen or so other omissions of exculpatory evidence, which the government does not dispute were known to the FBI at the time that the search warrants were sworn out.

In addition to challenging the disclosures in the search warrant affidavits, Senator Menendez separately challenges the ESI Warrants as overbroad "general warrants" that authorized a near-limitless search of the Senator's digital information.  The government's response has three parts, each of which falls flat.  *First*, although it *admits* that the ESI Warrants permitted search and seizure of "substantially all . . . communications" between Senator Menendez and his wife, the government attempts to justify that massively invasive search given "Nadine Menendez's [alleged] role in the offenses and receipt of many of the bribes."  Opp. at 62.  Of course, the government cites no authority for the proposition that where spouses are suspected of joint criminal activity, seizure of *substantially all* of their private communications is warranted.  And any such rule would run directly counter to the bedrock principle that "invasion of a suspect's privacy and property" should be no more extensive than "absolutely necessary."  ECF No. 158 at 25 (citing *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)).

*Second*, the government also attempts to excuse the absence of a date limitation in certain of the ESI Warrants given the allegation of a "complex and long-running scheme."  Opp. at 66.  That cannot explain why the government was permitted to seize and search ESI from *even further* back in time before the scheme is alleged to have begun.  Nor does it contend with any of

4

the controlling law cited in Senator Menendez's brief requiring a "heightened sensitivity to the particularity requirement in the context of digital searches."  ECF No. 158 at 29 (citing *United States v. Wey*, 256 F. Supp. 3d 355, 383 (S.D.N.Y. 2017).

Third, and finally, the government's appeal to the inevitable discovery doctrine fails.  *See* Opp. at 68-69.  The government does not, and cannot, claim that Senator Menendez's responses to subpoenas issued after the ESI Warrants were executed were anywhere near as expansive as the material the government seized in connection with the ESI Warrants.  Thus, the government fails to satisfy its burden to show that the material seized pursuant to the ESI Warrants would have been inevitably discovered through the subpoena returns.

In sum, the government cannot adequately explain the material omissions and mischaracterizations in its warrant affidavits, and so it reverts to the argument that the affidavits are so lengthy and complex that corrected affidavits would have made no difference.  Likewise, the government complains that the Constitution's particularity requirement is *just too burdensome* in a case as complex as this one.  But the Fourth Amendment does not evaporate every time a complex scheme (or a scheme involving a husband and wife) is alleged—the government still must comply with constitutional requirements and, here, it did not do so.

## ARGUMENT

## I.    THE GOVERNMENT'S OPPOSITION CONTINUES TO MISREPRESENT THE CS RECORDING

### A.    The Challenged Affidavits Severely Mischaracterized the CS Recording

With respect to the content of the recorded August 2019 conversation between the CS and the Hana Associate (the "CS Recording"), Senator Menendez and the government seem to agree on at least one point:  the challenged warrant affidavits did *not* fully summarize material aspects of the CS Recording.  According to the government, the affidavits' summary of the

conversation (i) is "entirely silent on whether Menendez knew of *any* of the bribes"; and (ii) otherwise omitted "damningly inculpatory" details of the CS Recording.  Opp. at 15-16 (emphasis in original).  According to Senator Menendez, by contrast, the challenged affidavits misstate the content of CS Recording, *falsely* suggesting that Senator Menendez was involved in a bribery scheme for the benefit of his then-girlfriend, and failing to disclose that the CS Recording reveals Senator Menendez's lack of knowledge and victimization by Wael Hana. ECF No. 158 at 9.  While the parties agree that many aspects of the CS Recording are not captured in the challenged affidavits, Senator Menendez offers the more reliable reading of the affidavits and their mischaracterization of the CS Recording.

Initially, the government's claim that the challenged affidavits' summaries of the CS Recording are "entirely silent" on Senator Menendez's knowledge of the alleged bribery scheme misstates the warrant affidavits.  The challenged affidavits claim that, in the CS Recording, the Hana Associate told the CS "in sum and substance, that Hana arranged for [Nadine] Arslanian to receive a ring and a car ***in exchange for*** [Senator] Menendez's assistance in resolving criminal charges for insurance fraud pending against" the New Jersey Defendant.  Weitzman Decl. Ex. B ¶ 19(a).  Analyzed in the context of the entire affidavit, as the Court must, *see United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000), this summary necessarily seeks to implicate Senator Menendez's knowledge.  Indeed, the CS Recording is described under a heading titled "The Suspected Bribe Scheme"; the affiant then summarizes how Senator Menendez "push[ed]" to have the criminal case resolved in a way that "saved the male three years" in exchange for "Arslanian to receive a ring and a car."  Weitzman Decl. Ex. B ¶¶ 19(a)-(b).  Any fair reading of this description suggests that the Senator allegedly acted so that his then-girlfriend would receive these benefits.

Indeed, other sections of the challenged affidavits clearly assert Senator Menendez's knowledge. For instance, the First Corkery Affidavit contains an entire *section* labelled "Menendez's Involvement in the [New Jersey Defendant's] Criminal Case", and describes a phone call from Senator Menendez to Official-2, purportedly concerning the New Jersey Defendant's case. Weitzman Decl. Ex. B at 28; ¶ 37(s). Similarly, the affiant stated that there is probable cause to believe that Menendez's email and iCloud accounts "contain evidence, fruits, and/or instrumentalities of violations of [among others] 18 U.S.C. §§ 201 and 371 (bribing or offering to bribe or demanding or accepting a bribe, and conspiring to do the same, with respect to a United States Senator)." *Id.* at ¶¶ 2(b), 3. The bribery statutes expressly makes it a crime for a public official to ". . . directly or indirectly, ***corruptly*** demand[], seek[], receive[], accept[], or agree[] to receive or accept" something "of value personally or for any other person or entity, in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A) (emphasis added). The "corrupt" element of the offense requires the public official to act with knowledge. *See United States v. Silver*, 948 F.3d 538, 552 (2d Cir. 2020) (the bribery statute "criminalizes 'corrupt promise[s]'—as evidenced by the official's state of mind"). Thus, the government's contentions that the CS Recording does not suggest any such knowledge offers only a "hypertechnical" reading of the affidavit that this Court should reject. *Canfield*, 212 F.3d at 719.

Indeed, far from being "entirely silent" on Menendez's knowledge of a bribery scheme as the government alleges (Opp. at 15), the government admits elsewhere in its Opposition that the affidavits did in fact impugn the Senator's knowledge. The government claims that the warrant affidavits established probable cause to believe that a bribery offense was committed by laying out "extensive contemporaneous detail" showing a promise to Hana and Uribe "that [Senator]

Menendez had agreed to intervene with Official-2 regarding the New Jersey Defendant's and the New Jersey Investigative Subject's criminal matters" and thus there was "probable cause that a bribery offense was committed based on the promise or agreement of official action."  Opp. at 35-36.  The government thus attempts to straddle both sides of the fence, *i.e.*, to disclaim any allegation about Senator Menendez's knowledge when called out on a significant omission in a warrant affidavit; but, at the same time, to insist that there is sufficient evidence of his knowledge when necessary to sustain probable cause.  The government cannot have it both ways.

Turning to the content of the CS Recording itself, the simplest way to clear through the government's attempt to overcomplicate (*see* Opp. at 16-21) is to focus on what the government *admits*.  *First*, the government admits that the CS Recording involved discussion of Hana "swindling" Senator Menendez by providing his wife, Nadine, "with a less expensive ring" than was expected—a fact that was undisclosed in the challenged affidavits.  *See* Opp. at 16.  *Second*, the government admits that the affiant did not disclose that the Hana Associate informed the CS that Hana obtained a "ring that looked similar but was for a lot less money, and told [Jeweler-1] to give him a [fraudulent] invoice for $35,000."[1]  Opp. at 19.  *Third*, the government admits that—although not stated in the challenged affidavits—the swindling resulted in Senator Menendez cutting off contact with Wael Hana.  Opp. at 20.

---

[1] Separately, the government accuses Senator Menendez of providing a "confusing account" of the CS Recording, by describing how "Nadine Menendez allegedly provided Hana a ring intending for it to be exchanged for a $35,000 ring, but Hana instead exchanged it for a $12,000 ring and pocketed the difference."  Opp. at 16.  This account is far from "confusing"; the government instead ignores the "important context" cited in Senator Menendez's brief that "Jeweler-1" informed law enforcement agents that Nadine and Hana visited his jewelry store with a ring that they hoped to exchange for one with a diamond of a different shape.  *See* Weitmzan Decl. Ex. K at SDNY_00103716.  And, notably, the warrant affiant was present for this interview of Jeweler-1.  Opp. at 53 n. 29.

At a minimum, then, the parties are in agreement that the transcript reflects conversation about Hana "swindling" Senator Menendez by providing Nadine with a ring of lesser value than expected. The parties' disagreement concerns whether the CS Recording contains any evidence that, if the ring was a bribe, Senator Menendez knew about it. With respect to *that* question, the more appropriate reading of the transcript is that Senator Menendez *did not* know about any bribery scheme. In fact, when the CS asked the Hana Associate if "Bob knows about the ring and the car" the Hana Associate responded "He knows the ring is for [Nadine] and ***that is it***[.]" ECF No. 158 at 10 (citing Weitzman Decl. Ex. J at 8). That is, the Hana Associate *denied* that Senator Menendez had any knowledge about any "bribe scheme" associated with the ring, only that there was a trade-in for a ring that Hana swindled Nadine out of. The government's citation to the Hana Associate's statement that "Bob is aware" does not refer to his awareness of a bribe scheme, as the government implies. Rather, the CS states "Bob is aware ***of them***," meaning that he is aware of the relationship between Nadine and Hana and how Hana "fucked the girl," *i.e.,* cheated her out of the ring, without any reference to a bribe. *See* ECF No. 158 at 6. Given that the Indictment nowhere identifies this ring as one of the supposed bribes allegedly tendered in exchange for Senator Menendez's services, the Court should reject the government's assertion that the ring referenced in the CS Recording was a bribe or that the CS Recording shows the Senator's knowledge of any such bribe.

Adding further credence to Senator Menendez's more reasonable reading of the CS Recording is the fact that the government did not include any of its supposedly "damningly inculpatory" facts in the challenged affidavits. If the government really believed that the CS Recording is "substantial evidence" that Senator Menendez "did in fact know about the corrupt *quid pro quo*," (Opp. at 16) surely it would have included that reading of the CS Recording in its

warrant applications.  The much more plausible story is that the government has invented this interpretation *now*, as a post-hoc response to Senator Menendez's challenges to the warrant affidavits.[2]

       B.     The Mischaracterizations of the CS Recording Were Critical to Establish Probable Cause for the Search Warrants

The Opposition correctly notes that the CS Recording is the "centerpiece" of Senator Menendez's motion, Opp. at 14, and for good reason.  This conversation is the *only* evidence, in the entire First or Second Corkery Affidavits, linking Senator Menendez to any allegation of bribery, exchange of an improper *quid pro quo*, or any other alleged crime.  *See* ECF No. 158 at 9.  A review of the evidence underlying the government's contention to the contrary—*i.e.*, that the First Corkery Affidavit "more than sufficiently established probable cause" even without the CS Recording (*see* Opp. at 23-24) — *supports*, rather than undermines, Senator Menendez's reading of the affidavit.

    The government sets forth a laundry list of 17 allegations from the First Corkery Affidavit that it claims "give rise to probable cause that [Senator] Menendez *himself* was knowingly involved in the bribe scheme," even putting aside references to the CS Recording. Opp. at 24-26 (emphasis in original).  But only *one* of these 17 allegations directly involves Senator Menendez *at all*, and that is only the immaterial allegation that "[Senator] Menendez's office phone called the personal cellphone of Official-2," hardly evidencing the Senator's knowing involvement in a bribery scheme.  *See id*.  The rest of the allegations that the

---

[2] The government's claim that the CS Recording's reference to Senator Menendez "starting to listen to us, and starting to trust us about the Muslim Brotherhood" is somehow evidence of a corrupt relationship with Egypt falls especially flat. Opp. at 21-22.  If Senator Menendez were actually an "agent" of the Egyptian government, as the government incredibly (and falsely) alleges, there would be no need for Egypt to earn the Senator's "trust" and cause him to "listen" to concerns about the Muslim Brotherhood.

government identifies describe the statements and conduct of Nadine, Hana and others, but no statement or act by Senator Menendez.  This is clear even from the government's own summary of the allegations that it claims give rise to probable cause against the Senator.

That summary ultimately reduces to the claim that, based on Senator Menendez's "close personal relationship with Nadine Menendez[,]" coupled with his "personal involvement in meetings with Hana and the call to Official-2[,]" some kind of inference of criminality is available.  *Id*. at 27.  Put another way, without the CS Recording, the First Corkery Affidavit offers nothing but *speculation* regarding Senator Menendez's knowing involvement in a bribery scheme.  The CS Recording—which the government continues to materially mischaracterize—is therefore the *only* evidence cited in the entire First Corkery Affidavit that even allegedly ties the Senator to knowing participation in a bribery scheme, just as Senator Menendez argued in his opening brief.  ECF No. 158 at 9.

The government also argues that the Second Corkery Affidavit (submitted to obtain a warrant for the Senator's home) "added a wealth of additional evidence making an overwhelming showing of probable cause" even without the CS Recording.  Opp. at 31-32.  This is an overstatement.  The supposed "wealth of additional evidence"—set forth as a list of 8 categories of allegations (*id.*)—involves reliance on statements and acts of Nadine, Hana and others, but not one shred of evidence that *Senator* Menendez knew of or knowingly participated in any bribery scheme.  Absent evidence to establish probable cause of the Senator's knowing involvement, there simply was no probable cause to search the Senator's email account, iCloud account and personal home.

11

C.      The Government Impermissibly Omitted the Exculpatory Statements of the New Jersey Defendant, Hana, the Hana Associate and Others

In his opening brief, Senator Menendez identified numerous additional exculpatory statements, made by percipient witnesses, that were omitted from warrant affidavits despite the FBI's admitted knowledge of the exculpatory information when the warrant affidavits were submitted.  These include:

- The CS's statement that Hana had greatly exaggerated his relationship with Senator Menendez;

- The New Jersey Defendant's denial that he ever sought or received assistance from Hana and Uribe regarding his criminal case;

- The Hana Associate's denial of any awareness of Hana assisting New Jersey Defendant with his criminal case;

- Jeweler-1's denial of any recollection that Hana, Nadine, or Senator Menendez ever purchased a ring from him;

- The Laboratory Company CEO's statement that Senator Menendez never sought to assist him in obtaining COVID testing contracts; *and*

- The Health Official's statement that he was never pressured to issue COVID testing contracts to the Laboratory Company CEO.

ECF No. 158 at 16-18.

The government attempts to explain away these omissions by arguing that none was independently material and, even if included, would not have altered the magistrate's probable cause determinations.  But the government addresses each omission one by one, rather than considering how the quantum of these omissions would have affected the issuing judge's probable cause determination as a whole.  *See United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (probable cause determinations are made based on the "totality of the circumstances" as set forth in a supporting affidavit).  Viewed through the appropriate lens, these omissions *in combination* would likely have altered the issuing judge's probable cause determination.

12

The probable cause allegations in the challenged affidavits concerned a bribery scheme in which bribes would accrue to Senator Menendez's then-girlfriend in exchange for the Senator's assistance with the New Jersey Defendant's criminal case.  A denial from the New Jersey Defendant *himself* that the bribery scheme ever existed—which was corroborated by the Hana Associate—might well have altered the issuing judge's probable cause determination or at minimum caused the magistrate judge to potentially limit the scope of the warrant.  And even if the New Jersey Defendant's corroborated denial was not sufficient on its own to move the needle, when *combined* with the knowledge that Hana had greatly exaggerated his relationship with Senator Menendez (as well as other omissions which could serve to undermine the government's credibility and the veracity of the affidavit's allegations), all this together could have shifted, in the mind of the magistrate judge, the plausibility of the government's claim that Hana had "arranged" a bribery scheme involving the Senator.  The government's assertions to the contrary are pure *ipse dixit*, *see* Opp. at 42 (claiming that it is "unimaginable that a magistrate judge reviewing an affidavit that was revised to include the New Jersey Defendant's statement . . . would have found no probable cause"), or misstate the affidavits.  *Compare* Opp. at 27 ("the affidavit did not rely for probable cause on any representations that Hana made about his relationship with Menendez") & Opp. at 28 ("None of the warrant affidavits Menendez challenges on *Franks* grounds even includes foreign influence charges") *with* Weitzman Decl. Ex. B at Ex. A ¶ 15 (SDNY_R_00004272) ("Hana told the CS that Hana has a close relationship with Menendez, and that Hana has worked on behalf of the Egyptian Government *to influence Menendez's view* regarding the United States' policy toward Egypt") (emphasis added).

More importantly, the law is very clear that materiality determinations are not left to FBI agents; rather, agents are required to give the magistrate a *full sense* of the evidence, not only the

evidence the government believes is material to its probable cause theory.  *See Stansbury v. Wertman*, 721 F.3d 84, 93 (2d Cir. 2013) ("Review for probable cause should encompass 'plainly exculpatory evidence' alongside inculpatory evidence to ensure the court has a full sense of the evidence that led the officer to believe that there was probable cause."); *see also Washington*, 29 F.4th at 108 ("a police officer cannot make unilateral decisions about the materiality of information") (citing *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)).  The magistrate was thus entitled to review this exculpatory evidence, notwithstanding the government's unpersuasive claim that it was obviously immaterial.

The government is wrong to suggest that it was permitted to exclude exculpatory information because, in the government's view, the statements from the New Jersey Defendant and the Hana Associate were "self-serving."[3]  *See* Opp. at 39-40.  Again, the government was free to argue that such statements should be discounted for that or any other reason, but it was *not* entitled to make the unilateral decision to omit them entirely.[4]  The cases cited in the

---

[3] The descriptor "self-serving" is especially inappropriate when it comes to statements from the Laboratory Company CEO and Health Official denying that Senator Menendez was involved in any way in "pressuring" New Jersey jurisdictions to issue contracts to the Laboratory Company or any other wrongdoing involving the Laboratory Company.  As the government is well-aware, the Indictment includes no mention of the Laboratory Company, supporting a conclusion that the denials from the CEO and Health Official were *not* "self-serving"—they were *accurate*. Nevertheless, the government prejudicially cites this conduct in its Opposition, which has led to inaccurate and misleading public reporting on the subject.  *See NJ Spotlight News*, "New filing alleges Menendez urged NJ mayors to use lab with ties to his wife for COVID testing," available at: https://www.njspotlightnews.org/2024/02/new-filing-alleges-menendez-pressed-nj-mayors-use-lab-covid-testing-pandemic-ties-to-wife/ (last accessed February 18, 2024).

[4] The government's claim that some exculpatory statements were later recanted (*see, e.g.*, Opp. at 41 n. 21) is concededly irrelevant to the probable cause determination and appears to have been included for a different audience.  At the *time of the warrant application*, the government had an obligation to be "frank" about the evidence it had obtained – both exculpatory and inculpatory – and provide the magistrate with a "full sense" of that evidence.  ECF No. 158 at 22-23 (citing authorities).

government's brief do not show otherwise.  *See United States v. Calk*, No. 19-cr-366 (LGS), 2020 WL 3577903, at *7 (S.D.N.Y. July 1, 2020) (holding that a warrant affidavit need not be "updated with statements made by Bank employees *after the warrant was signed* by Judge Rowland") (emphasis added); *United States v. Marin-Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984) (finding that, unlike here, "the affidavit still supports a finding of probable cause after the inclusion of [previously omitted] statements;" not commenting on the claimed "self-serving" nature of any statement); *United States v. One Residential Prop. Located at 8750 Duncan Rd., San Diego, CA*, 312 F. App'x 8, 10 (9th Cir. 2008) (considering a post-warrant statement by the suspect "to the searching officers," not exculpatory statements made by uncharged witnesses).

There is no dispute that the government may present argument to a magistrate that certain apparently exculpatory evidence is not actually exculpatory or material, or does not otherwise undermine a finding of probable cause.  The government is not permitted, however, to generate for itself explanations of why evidence should be discredited or discounted and then deprive the magistrate of an opportunity to review that evidence his/herself.

D.    The Mischaracterizations and Omissions Were Made At Least With Reckless Disregard for the Truth, If Not Intentionally

The government's backstop position is to argue that even if the challenged search warrant affidavits did omit exculpatory information and/or mischaracterize the CS Recording, Senator Menendez *still* is not entitled to a *Franks* hearing because he has not shown that these omissions and mischaracterizations were made with reckless disregard for the truth.  Opp. at 51.  The government instead claims that the length of the affidavits, combined with the "haste" in which they were drafted, supports a conclusion that any material omission was the result of a mistake or poor judgment.  *Id*. at 53.  These arguments fail for several reasons, and at minimum do not overcome the evident need to hold a *Franks* hearing to assess intent.

*First*, the government offers no credible explanation for the omission of these exculpatory statements, which it seemingly acknowledges were known to the FBI at the time that the affiant swore out the Second Corkery Affidavit.[5]  For example, the government offers no declaration from Agent Corkery explaining the rationale for the omissions.  Instead, the government incredulously suggests that the omissions were made out of concern for the Menendezes' privacy.  Opp. at 41 ("any additional time in drafting would prolong the intrusion into the Menendezes' residence").  This is nonsense—it would have taken no more than a modest 15 minutes to include these important developments in a revised affidavit.  Moreover, this argument exposes that the government's choice not to include these omissions was indeed deliberate and intentional, although it now claims (incredibly) it was for a selfless purpose.

*Second*, the government's contentions ignore the authority cited in Senator Menendez's brief holding that where an omission is materially exculpatory, the Court can infer that the omission was made intentionally or recklessly.  ECF No. 158 at 20 (citing authorities).  While the government cites *United States v. Thomas*, 788 F.3d 345 (2d Cir. 2015), the defendant in that case "conceded that if the affidavit had contained more detailed [omitted] information it would have strengthened, not weakened, the Government's case for probable cause."  *Id.* at 352.  Here, of course, Senator Menendez's position is very much to the contrary.

*Third*, the government's complaints about the "haste" of a criminal investigation and the burden of including exculpatory evidence in already lengthy affidavits ring especially hollow in

---

[5] Prior to submitting his motion to suppress, Senator Menendez (through counsel) requested that the government confirm that each of the June 16, 2022 interviews was conducted *before* the government applied for the warrant that day to conduct a second search of the Senator's home. The government confirmed as much as to only certain of the interviews and refused to confirm as to others.  *See* Weitzman Decl. Ex. W at 1.  Critically, in its Opposition, the government does not dispute that each of the identified exculpatory statements was known to the government at the time the second application was submitted.  *See* Opp. at 39-40.

light of the government's admission (made for the first time in its Opposition) that Agent Corkery (the author of all the challenged warrants) was actually *present* for the New Jersey Defendant's interview in which he denied that he ever paid anyone for extralegal assistance with his criminal case. Opp. at 53 n. 29. There is thus no excuse for omitting that statement from the affidavit – it would have taken only a few minutes to add the statement to the affidavit (which was presumably being drafted by prosecutors offsite) and would have provided the magistrate with a full sense of the evidence collected. Agent Corkery's failure to undertake the minimal effort to include exculpatory information that she learned in person in a warrant affidavit submitted the very same day further underscores an inference of recklessness (at minimum), and suffices to make a "substantial *preliminary* showing" of such recklessness. *See Southerland v. City of New York*, 680 F.3d 127, 148 (2d Cir. 2012) ("Although these alleged misrepresentations may turn out to be no more than accidental misstatements made in haste, the plaintiffs have nonetheless made a 'substantial preliminary showing' that [the warrant affiant] knowingly or recklessly made false statements.").

*Fourth*, the government puzzlingly argues that the fact that it included certain omitted evidence in later warrants somehow undermines a conclusion that the omission of the *same* evidence in *earlier* warrants was intentional or reckless. Opp. at 53. That defies common sense. There are myriad reasons why an affiant would intentionally or recklessly omit exculpatory information from an earlier affidavit, but include that same information in a later one. Here, one plausible explanation is that after searching the Menendez home and discovering the headline-grabbing gold bars and cash, the government determined that it no longer needed to withhold exculpatory information to obtain a probable cause finding and so included that information to

17

make its later warrants "bulletproof."[6]  Whatever the explanation, it does not follow that the

inclusion of exculpatory information in a later warrant affidavit renders the omission of that

information from an *earlier* affidavit innocent or excusable.[7]  Just the opposite, it's a tacit

acknowledgement that the omission of exculpatory information never should have been made.

The government's cited authorities are inapposite and only support the *Franks* hearing

here.  In both *United States v. Vilar* and *United States v Lahey*, the court held a *Franks* hearing,

after which it determined there was no evidence of intent to mislead or reckless disregard for the

truth.  *See Vilar*, No. 05-cr-621 (KMK), 2007 WL 1075041, at *28 (S.D.N.Y. Apr. 4, 2007)

(determining after a *Franks* hearing that "Inspector Fraterrigo . . . harbored no serious doubts

about the accuracy of the claims of misconduct by the Defendants in the Affidavit."); *Lahey*, 967

F. Supp. 2d 698, 704 (S.D.N.Y. 2013) ("the Court accordingly conducted a so-called *Franks*

hearing . . . to resolve the alleged discrepancies between the description of criminal conduct

included in the search warrant affidavits and other evidence of the events described in the

affidavits").  This is consistent with well-established precedent that issues of intent are best

determined with factual hearings.  *See McCullough v. Bennett*, 413 F.3d 244, 249 (2d Cir. 2005)

("Findings which relate to such intangibles as motivation and intent depend especially upon the

credibility assessments made by those who see and hear the witnesses").

---

[6] For the same reason, the later inclusion of the omitted exculpatory information cannot
undermine materiality, as the government suggests.  Opp. at 42.  By the time the exculpatory
information was disclosed, the investigation was in a very different posture.

[7] The only authority that the government cites to support this point is an unpublished bench
order, in which Judge Preska notes, in dicta, that an immaterial omission from a warrant affidavit
was included in a later affidavit.  *See United States v. Adames*, No. 16-cr-167 (LAP) (S.D.N.Y.
Apr. 6, 2017) (ECF No. 144 at 13:23-14:6).  This is a far cry from a holding that inclusion of
omitted information in a later warrant affidavit undermines a finding of intent or recklessness
with respect to earlier warrants.

Particularly given the absence of any declaration from the affiant explaining the actual reasons why the omissions were made, the Court should require live testimony in an evidentiary hearing to determine whether the omissions were intentional or reckless.

The other two cases the government cites concern situations where the Court declined to hold a *Franks* hearing because alleged omissions or misstatements were deemed not to be misleading. *See United States v. Awadallah*, 349 F.3d 42, 67 (2d Cir. 2003) (declining to hold a *Franks* hearing where "[i]t is a stretch to say that any of the four [] statements identified by the district court were in fact misleading"); *United States v. Mandell*, 710 F. Supp. 2d 368, 382 (S.D.N.Y. 2010) (declining to hold a *Franks* hearing where alleged omitted statements "are not really omissions at all; and to the extent they are, they are largely irrelevant"). Senator Menendez, by contrast, has extensively demonstrated the misleading nature of the challenged search warrant affidavits.

In sum, Senator Menendez has effectively demonstrated that the omitted facts and mischaracterizations in the challenged warrant affidavits are material and exculpatory. This suffices to meet his burden to make a *preliminary* showing that the omissions and mischaracterizations were at least made recklessly. This Court, just like the courts in *Vilar* and *Lahey*, should convene a *Franks* hearing to assess the reasons for the omissions and misstatements and to mete out appropriate relief.[8]

---

[8] In its Opposition, the government puzzlingly quotes allegations from the original Indictment in this case, and contends that the fact that these allegations were *not* included in search warrant affidavits undermines an inference of recklessness or intent to deceive. Opp. at 56-57. The fact that Agent Corkery did not include certain indictment allegations says nothing about the veracity of the claims that she *did* swear to. If anything, the fact that the agent did not update the search warrant with what the government now claims is even more inculpatory evidence shows that the affidavits were not drafted with the care and attention the law requires.

## II.       THE ESI WARRANTS ARE UNCONSTITUTIONALLY OVERBROAD

While the government treats Senator Menendez's overbreadth challenge to the ESI Warrants as an afterthought, these Warrants clearly run afoul of the Fourth Amendment's particularity requirement and any evidence obtained pursuant to them must be suppressed.  This is especially so given that the ESI Warrants authorize searches of digital accounts, which the Supreme Court and the Second Circuit have recognized carry an "enormous" potential of causing privacy violations, in light of the massive scope of material stored on a modern cellphone or in an iCloud account.  *See* ECF No. 158 at 28-29 (citing *Riley v. California*, 573 U.S. 373 (2014) and *Galpin*, 720 F.3d at 447).  The government, though, ignores this case law—and the related admonition that "heightened sensitivity to the particularity requirement in the context of digital searches" is necessary, *Wey*, 256 F. Supp. 3d at 383 (citing *Galpin*, 720 F.3d at 447)—and instead argues in the most conclusory terms that the length and complexity of the charged conspiracy merits such expansive searches.  These arguments are meritless.

*First*, the government concedes that the ESI Warrants, among other things, permitted the government to review "substantially all . . . communications" between Senator Menendez and his wife; an unthinkable invasion of the most private aspects and details of the Senator's life.  *See* Opp. at 62.  The government attempts to justify this incredibly broad rummaging by referencing "Nadine Menendez's role in the offenses and receipt of many of the bribes," but never even *tries* to explain why it could not have limited its search and review through common methods such as targeted search terms or date limiters surrounding events of particular interest.  Nor does the sole case the government cites help to justify the scope of the ESI Warrants.

That case, *United States v. Ulbricht*, concerned a warrant targeting Ross Ulbricht's entire laptop (Ross Ulbricht is the person responsible for creating and operating the infamous illegal online marketplace known as Silk Road).  The Second Circuit held that the particular search was

20

justified because "Ulbricht used his laptop to commit the charged offenses by creating and continuing to operate Silk Road" and because Ulbricht was known to store incriminating files under misleading code names, making targeted review essentially impossible. *United States v. Ulbricht*, 858 F.3d 71, 102 (2d Cir. 2017) ("Ulbricht also kept records of certain Tor chats in a file on his laptop that was labeled 'mbsobzvkhwx4hmjt'").  This case is nothing like *Ulbricht*— Senator Menendez is not a highly sophisticated cybercriminal adept at concealing digital information from law enforcement—he is a public servant who uses his phone and email accounts in ways similar to any other citizen.  Nor is there any allegation of code names that would have undermined a targeted review.  The government certainly could have limited the scope of its search to something significantly narrower than "substantially all" communications exchanged between the spouses.

*Second*, the government argues that the lack of a date limitation on certain of the ESI Warrants is excusable because the facts of this case "do not lend themselves to such arbitrary parsing."  Opp. at 66.  This conclusory statement aside, there is an obvious date limitation that should have been applied in this case—the beginning of the alleged conspiracy (*i.e.*, sometime in early 2018).  *See* ECF No. 158 at 31.  In fact, as noted in Senator Menendez's brief, many of the other warrants issued in this case *did* impose date limitations on material collected, which the government has not claimed somehow hampered its investigation.  ECF No. 158 at 30.  While some cases have held that the lack of a date limitation does not *always*, by itself, render a warrant unconstitutional, those cases considered warrants that were significantly limited in other ways. *See United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 307 (S.D.N.Y. 2018) ("subject matter limitations on seizure effectively limited the time frame"); *United States v. Hernandez*, No. 09-cr-625 (HB), 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010) ("the lack of a time frame in itself

does not transform what is otherwise a relatively particularized document into an unconstitutional general warrant"); *United States v. Dupree*, 781 F. Supp. 2d 115, 155 (E.D.N.Y. 2011) ("Each of these categories of documents [authorized to be seized] is reasonably related to the alleged criminal activity and their search and seizure is justified by the affidavit.").[9]  The problem here is that the ESI Warrants *both* authorize the seizure of a near limitless universe of documents and communications *and* (in some cases) lack a temporal limitation as well.

The government's claims that pre-2018 documents bear on Senator "Menendez's motive to commit the offenses" and "the background and nature of his relationship with other key participants" are factually dubious at best, but also miss the core of the issue.  *See* Opp. at 66. The standard for granting the government license to search a person's private digital files and communications is *not* whether such files and communications could possibly provide information that the government might want to know.  The standard is whether the invasion into a target's privacy "can be justified by the probable cause upon which the warrant is based." *Wey*, 256 F. Supp. 3d at 382 (quoting *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014)).  Here, the government has not provided any probable cause to conclude that documents from before the conspiracy is even alleged to have begun (*i.e.*, prior to 2018) could be relevant or show motive.  Indeed, a person's financial circumstances for much of his life might be relevant to the issue of motive, and yet the government does not obtain probable cause as a matter of course to search for financial-related communications for years prior to the alleged criminal conduct in all ESI warrants.

---

[9] *United States v. Elkorany* is distinguishable because, in that case, "defendant ha[d] not directed the Court to any specific piece of evidence from before March of 2012 obtained as a result of the Facebook Warrant, and therefore, there [was] no specific issue before the Court." 2021 WL 3668086, at *4 (S.D.N.Y. Aug. 17, 2021).  Here, the government admits that it has seized pre-2018 documents and Senator Menendez cited an example of such documents in his brief.

*Third*, as its final fallback, the government asserts that because Senator Menendez complied with certain grand jury subpoenas, the discovery of information obtained pursuant to the ESI Warrants was "inevitable" and, on that basis, should not be suppressed.  Opp. at 69.  The government's claim is entirely unsupported.  The government provides no declaration or other evidence comparing evidence produced in connection with subpoenas versus evidence collected pursuant to unlawful searches.  So, at minimum, the inevitable discovery doctrine does not apply to any documents seized not also covered by a grand jury subpoena.  As the government makes no effort to identify which pieces of ESI from the warrants were also produced in response to subpoenas, it has failed to carry its burden of showing inevitable discovery.  *See United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) ("The government bears the burden of proving inevitable discovery").  The single case that the government cites illustrates the point; there, "the government actually obtained [specific] evidence through alternative means that did not depend on any invalidity of the warrant."  *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013).  Here, on the other hand, the government has not actually shown that the materials collected pursuant to the ESI Warrants that it intends to introduce at trial were all also produced pursuant to a grand jury subpoena.  Instead, the government seeks to use the inevitable discovery doctrine as a broad safety net, immunizing it from the consequences of its illegal and overbroad searches.  The Second Circuit has warned against this exact conduct.  *See United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992) ("subpoenas must not serve as an after the fact 'insurance policy' to 'validate' an unlawful search under the inevitable discovery doctrine") (citation omitted).

## CONCLUSION

For the foregoing reasons, and those set forth in his moving brief (ECF No. 158), Senator Menendez respectfully requests that the Court suppress the fruits of each of the five search

warrants involving the Senator, or preliminarily, hold a *Franks* hearing, and grant such other

relief as the Court deems just and proper.

Respectfully submitted,

Dated: February 19, 2024

By: */s/  Adam Fee*

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Adam Fee
PAUL HASTINGS LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: 1(310) 620-5719
Facsimile: 1(310) 620-5819

Avi Weitzman
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: 1(212) 318-6000
Facsimile: 1(212) 725-3620

Robert D. Luskin
PAUL HASTINGS LLP
2050 M Street NW
Washington, D.C. 20036
Telephone: 1(202) 551-1966
Facsimile: 1(202) 551-0466

*Attorneys for Defendant Robert Menendez*