**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S2 23-cr-490 (SHS)

**UNDER SEAL**

## <u>SENATOR ROBERT MENENDEZ'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTIONS TO DISMISS BASED ON LACK OF VENUE AND DUPLICITY, AND HIS SEVERANCE MOTION</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## <u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 6

ARGUMENT ..................................................................................................................... 6

I.   THIS DISTRICT IS THE WRONG VENUE .......................................................... 6

    A.   Legal Standard ................................................................................................ 8

        1.   Proper venue is a fundamental constitutional guarantee. .......................... 8

        2.   The government bears the burden. .............................................................. 9

    B.   The Indictment does not sufficiently allege a basis for venue in this District. ............... 11

        1.   Restaurant Meetings ................................................................................ 12

        2.   Bank Account ........................................................................................... 12

        3.   Text Message ........................................................................................... 13

        4.   Sale of Gold ............................................................................................. 15

    C.   At a minimum, the government should file a bill of particulars identifying all its alleged bases for venue. ................................................................................... 16

II.   ALTERNATIVELY, THE CASE SHOULD BE TRANSFERRED TO NEW JERSEY.  16

    A.   Legal Standard .............................................................................................. 16

    B.   Transfer is warranted to protect the interests of the people of New Jersey ..................... 17

III.   COUNTS I THROUGH III OF THE INDICTMENT ARE IMPERMISSIBLY DUPLICITOUS, REQUIRING A NEW INDICTMENT OR A SPECIAL JURY VERDICT FORM. ................................................................................................. 17

    A.   Impermissibly duplicitous counts prejudice a defendant's constitutional rights. ........... 18

    B.   Counts I through III of the Indictment are impermissibly duplicitous in violation of Senator Menendez's constitutional right to a fair trial. ................................... 21

IV.   SEVERANCE IS REQUIRED TO PROTECT THE SENATOR FROM UNFAIR PREJUDICE. ......................................................................................................... 26

    A.   Legal Standard .............................................................................................. 26

B.   The Court should sever Senator Menendez's trial from Nadine's. ................................ 27

1.   Senator Menendez and Nadine have spousal privileges that limit each's ability to present a defense and receive a fundamentally fair trial.................................................... 29

C.   The Court should sever Senator Menendez's trial from the trial of co-defendants Hana, Uribe, and Daibes. ........................................................................................................... 33

1.   Defendant Hana's alleged communications with Egyptian officials risk prejudicing the jury against Senator Menendez. ................................................................................. 34

2.   Defendants Uribe's and Daibes' alleged conduct, including prior bad acts, risk prejudicing the jury against Senator Menendez.............................................................. 37

CONCLUSION.................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berger v. United States*,
 295 U.S. 78 (1935)......................................................................................................4

*Blumenthal v. United States*,
 332 U.S. 539 (1947)...................................................................................................19

*D.R. by Rodriguez v. Santos Bakery, Inc.*,
 No. 20-cv-3628 (KHP), 2023 WL 3736441 (S.D.N.Y. May 31, 2023) ...................35

*Grunewald v. United States*,
 353 U.S. 391 (1957)...................................................................................................15

*Kelly v. United States*,
 140 S. Ct. 1565 (2020).................................................................................................3

*Kotteakos v. United States*,
 328 U.S. 750 (1946)...................................................................................................19

*McDonnell v. United States*,
 579 U.S. 550 (2016).....................................................................................................2

*Old Chief v. United States*,
 519 U.S. 172 (1997)...................................................................................................38

*Percoco v. United States*,
 598 U.S. 319 (2023).....................................................................................................3

*Platt v. Minnesota Mining & Manufacturing Co.*,
 376 U.S. 240 (1964)...................................................................................................17

*Rodriguez v. Senkowski*,
 No. 03 Civ. 3314 (LAP), 2004 WL 503451 (S.D.N.Y. Mar. 15, 2004) ...................20

*Smith v. United States*,
 599 U.S. 236 (2023)..................................................................................................8, 9

*Trammel v. United States*,
 445 U.S. 40 (1980)................................................................................................31, 32

*United States v. Abakporo*,
 959 F. Supp. 2d 382 (S.D.N.Y. 2013)........................................................................25

*United States v. Abreu*,
　　342 F.3d 183 (2d Cir. 2003) ........................................................................35

*United States v. Akhavan*,
　　No. 20-CR-188-2 (JSR), 2021 WL 1251893 (S.D.N.Y. Apr. 2, 2021) .................28

*United States v. Aracri*,
　　968 F.2d 1512 (2d Cir. 1992) .................................................................18, 20

*United States v. Benjamin*,
　　No. 21 CR. 706 (JPO), 2022 WL 17417038 (S.D.N.Y. Dec. 5, 2022) .....................3

*United States v. Blunt*,
　　930 F.3d 119 (3d Cir. 2019) ...........................................................29, 32, 33

*United States v. Bortnovsky*,
　　820 F.2d 572 (2d Cir. 1987) ........................................................................16

*United States v. Boykins*,
　　No. 20-1104-CR, 2022 WL 2203977 (2d Cir. June 21, 2022) ...............................38

*United States v. Broce*,
　　488 U.S. 563 (1989) ...................................................................................24

*United States v. Brown*,
　　No. 06-cr-71-1-2 (SJM), 2006 WL 3171038 (D.N.H. Nov. 1, 2006) .....................33

*United States v. Burke*,
　　789 F. Supp. 2d 395 (E.D.N.Y. 2011) .............................................................38

*United States v. Cabrales*,
　　524 U.S. 1 (1998) ........................................................................................8

*United States v. Davis*,
　　689 F.3d 179 (2d Cir. 2012) ..........................................................................9

*United States v. Dawkins*,
　　999 F.3d 767 (2d Cir. 2021) .........................................................................19

*United States v. Dellosantos*,
　　649 F.3d 109 (1st Cir. 2011) ........................................................................19

*United States v. Dobson*,
　　No. CRIM. 02-616-06, 2003 WL 22427984 (E.D. Pa. Aug. 18, 2003) ............29, 33

*United States v. Estes*,
　　793 F.2d 465 (2d Cir.1986) ..........................................................................30

*United States v. Ferrer*,
No. 08-CR-0218-03 (SHR), 2008 WL 4890034 (M.D. Pa. Nov. 12, 2008)...........................33

*United States v. Fortenberry*,
No. 22-50144, 2023 WL 8885105 (9th Cir. Dec. 26, 2023)...................................................7, 8

*United States v. Gabriel*,
920 F. Supp. 498 (S.D.N.Y. 1996)......................................................................................23, 24

*United States v. Gigante*,
166 F.3d 75 (2d Cir. 1999)........................................................................................................36

*United States v. Gupta*,
747 F.3d 111 (2d Cir. 2014)......................................................................................................35

*United States v. Helbrans*,
570 F. Supp. 3d 83 (S.D.N.Y. 2021)....................................................................................28, 30

*United States v. Hennings*,
No. 18-CR-028-A (RJA), 2018 WL 4221575 (W.D.N.Y. Sept. 5, 2018) ...............................25

*United States v. Hinton*,
127 F. Supp. 2d 548 (D.N.J. 2000) .....................................................................................18, 24

*United States v. Huber*,
603 F.2d 387 (2d Cir. 1979).....................................................................................................25

*United States v. Kearney*,
451 F. Supp. 33 (S.D.N.Y. 1978).............................................................................................18

*United States v. Key*,
No. 12-CR-712 (SHS), 2013 WL 12204221 (S.D.N.Y. Aug. 28, 2013)............................27, 38

*United States v. Kirk Tang Yuk*,
885 F.3d 57 (2d Cir. 2018)...............................................................................................10, 13

*United States v. LaSpina*,
299 F.3d 165 (2d Cir. 2002).....................................................................................................15

*United States v. Manarite*,
448 F.2d 583 (2d Cir. 1971).....................................................................................................20

*United States v. Margiotta*,
646 F.2d 729 (2d Cir. 1981).....................................................................................................20

*United States v. Menendez*,
No. 15-cr-00155 (WHW) (D.N.J., May 26, 2015) ...................................................................7

*United States v. Mennuti*,
   679 F.2d 1032 (2d Cir. 1982) ................................................................15

*United States v. Mercado*,
   No. 04-CR-166 (SRU), 2005 WL 2850158 (D. Conn. Oct. 26, 2006) ...................................25

*United States v. Munoz-Franco*,
   986 F. Supp. 70 (D.P.R. 1997) ................................................................18, 23

*United States v. Newland*,
   No. 03:17-cr-00623 (JLS) (S.D. Cal. Sept. 8, 2023) .................................................3

*United States v. Papa*,
   533 F.2d 815 (2d Cir. 1976) ................................................................24

*United States v. Pauling*,
   256 F. Supp. 3d 329 (S.D.N.Y. 2017) ................................................................19

*United States v. Peterson*,
   357 F. Supp. 2d 748 (S.D.N.Y. 2005) ................................................................11

*United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*,
   71 F.3d 1067 (2d Cir. 1995) ................................................................30

*United States v. Ramirez*,
   420 F.3d 134 (2d Cir. 2005) ................................................................9

*United States v. Ramirez-Amaya*,
   812 F.2d 813 (2d Cir. 1987) ................................................................9

*United States v. Rigas*,
   281 F. Supp. 2d 660 (S.D.N.Y. 2003) ................................................................19

*United States v. Rommy*,
   506 F.3d 108 (2d Cir. 2007) ................................................................13, 14

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) ................................................................10, 15

*United States v. Russo*,
   302 F.3d 37 (2d Cir. 2002) ................................................................36

*United States v. Saavedra*,
   223 F.3d 85 (2d Cir. 2000) ................................................................10

*United States v. Sarshar*,
   No. 21-cr-202 (GHW) (S.D.N.Y. Nov. 1, 2021) ................................................................24

*United States v. Schlei*,
    122 F.3d 944 (2d Cir. 1997)........................................................................25

*United States v. Seher*,
    562 F.3d 1344 (11th Cir. 2009) .................................................................20

*United States v. Shkreli*,
    260 F. Supp. 3d 247 (E.D.N.Y. 2017) .......................................................27

*United States v. Siddiqui*,
    699 F.3d 690 (2d Cir. 2012), and (ii)........................................................31

*United States v. Stein*,
    429 F. Supp. 2d 633 (S.D.N.Y. 2006)........................................................19

*United States v. Stevens*,
    No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. Apr. 7, 2009) ..............2

*United States v. Sturdivant*,
    244 F.3d 71 (2d Cir. 2001)...........................................................18, 20, 25

*United States v. Taylor*,
    745 F.3d 15 (2d Cir. 2014)..........................................................................37

*United States v. Tutino*,
    883 F.2d 1125 (2d Cir. 1989)......................................................................18

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011)......................................................9, 12, 14, 15

*United States v. Ulbricht*,
    31 F. Supp. 3d 540 (S.D.N.Y. 2014).....................................................19, 20

*United States v. Weissman*,
    No. 01 CR,529(BSJ), 2002 WL 1467845 (S.D.N.Y. July 8, 2002).............28

*Zafiro v. United States*,
    506 U.S. 534 (1993)........................................................... *passim*

**Statutes**

18 U.S.C. § 201 .........................................................................................12, 15

**Other Authorities**

Fed. R. Crim. P. 8(a) .......................................................................................17

Fed. R. Crim. P. 12(b)(3)(A)(i) ........................................................................11

Fed. R. Crim. P. 14(a) ..................................................................................................26

Fed. R. Crim. P. 18 ........................................................................................................9

Fed. R. Crim. P. 21 ......................................................................................................16

Fed. R. Evid. 801(c) .....................................................................................................35

Fed. R. Evid. 801(d)(2)(E) .....................................................................................35, 36

https://www.nytimes.com/2017/11/16/nyregion/senator-robert-menendez-
    corruption.html ..........................................................................................................7

U.S. Const. Amend. VI ..............................................................................................8, 9

U.S. Const., Art. III, § 2, cl. 3 ......................................................................................8

## INTRODUCTION

Senator Robert Menendez is an American patriot, with a quintessential American success story. The son of Cuban emigres, Senator Menendez grew up in a tenement in Union City, New Jersey, was educated in the public school system and graduated from Rutgers law school in 1979. He was always committed to public service, and even before he graduated from College, he was elected to the Union City Board of Education. He followed this up with 50 years of dedicated public service, first in the New Jersey General Assembly, then the New Jersey Senate, followed by the House of Representatives, and since 2006, the United States Senate. Senator Menendez's unbroken record of standing up to powerful interests on behalf of the underrepresented has earned him a well-deserved reputation as a fighter who does not back down in the face of injustice.

And that's precisely what he's doing here. The S2 Indictment ("Indictment") is—to be blunt—a distortion of the truth. Senator Menendez isn't just "not guilty"—***he is innocent*** of these charges. Senator Menendez has never sold out his office or misused his authority or influence for personal financial gain, as alleged in the Indictment.

Over and over again, the Indictment distorts or ignores evidence reflecting the Senator's conduct in favor of American—and only American—interests and his decades of appropriate constituent services. Worse yet, the government knows it. The government has buried evidence proving Senator Menendez's innocence, including evidence that directly undercuts the allegations in the Indictment. And the defense is prohibited from disclosing any of it to the public—necessitating a redacted filing under seal—even as the government has gone on its own media blitz to advance its false narrative.

The government is scared of the unvarnished (unredacted) truth. Sadly, there is a term in politics for what the government is doing here: Swiftboating—taking a record of courage and

devotion to public service, and, through a pattern of half-truths, omissions, and distortions, trying to turn those virtues into a liability. It was a despicable tactic when it was employed against Senator Kerry in 2004, and even more so here, where it has been employed not in the heat of a political campaign, but by prosecutors sworn to put the interests of justice first.

Senator Menendez's circumstances are, unfortunately, not unique. Time and again, the Justice Department has brought overly aggressive, baseless political corruption charges that have ruined lives. Indeed, almost exactly 15 years before the government returned this Indictment against Senator Menendez, it returned another explosive bribery indictment against 84-year-old Alaskan Senator Ted Stevens—then the longest-serving Republican Senator in history. That Indictment ended with a conviction of Senator Stevens, but his conviction was soon vacated by the district court upon discovery, after-the-fact, that the government had withheld substantial exculpatory evidence from the defense. *United States v. Stevens*, No. 08-cr-231 (EGS), 2009 WL 6525926, at *1 (D.D.C. Apr. 7, 2009). By then, the damage was done: Senator Stevens lost his re-election bid before dying one year later in a tragic plane crash.

Things haven't changed since that unfortunate over-reach against Senator Stevens.[1] After DOJ indicted Virginia Governor Bob McDonnell and his wife on political corruption charges in 2014, their trial convictions had to be reversed by the Supreme Court because the alleged bribes were just routine constituent services—not corrupt "official acts." *McDonnell v. United States*, 579 U.S. 550, 659–62 (2016). In 2015, the government indicted Bridget Kelly and Bill Baroni in connection with the highly publicized "Bridgegate" matter, but those convictions too were upended by the Supreme Court because none of the charged conduct **could even constitute** a

---

[1] Of course there have been a number of important, meritorious political corruption cases over the years. This case against Senator Menendez, however, is not one of them.

federal crime. *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020). And after the government indicted Joseph Percoco for alleged political bribes in 2016, the Supreme Court again vacated his conviction because Percoco was a private citizen, not even a public official with a duty of honest services. *Percoco v. United States*, 598 U.S. 319, 331–33 (2023).

The government has not learned its lesson. In 2022, the U.S. Attorney's Office in this District indicted then-New York State Lieutenant Governor Brian Benjamin on federal corruption charges, but following the government's media blitz, the District Court threw out the bribery charges for failure to sufficiently allege a *quid pro quo* agreement. *United States v. Benjamin*, No. 21 CR. 706 (JPO), 2022 WL 17417038, at *1, 12–13 (S.D.N.Y. Dec. 5, 2022). And mere months ago, Judge Sammartino in the Southern District of California excoriated the government in vacating the public corruption convictions of four United States naval officers: "the conduct by the government in this case can only be described as outrageous." *United States v. Newland*, No. 03:17-cr-00623 (JLS), Dkt. 1243 at 19:6–9 (S.D. Cal. Sept. 8, 2023). All of this is to say: Sometimes the government does get it wrong, especially when attempting to second-guess the motives of public officials. And when the government gets it wrong, lives are ruined.

Senator Menendez has learned this the hard way. Indeed, this is not the first time that Senator Menendez has faced false allegations of bribery. Senator Menendez was previously charged by New Jersey federal prosecutors, but those charges were dismissed in late 2017 after a New Jersey jury hung, with at least 10 jurors voting to acquit. Quite obviously, that was deeply embarrassing for DOJ. It is perhaps unsurprising that the DOJ launched this investigation just two years later, in 2019.

But what is surprising is the extreme lengths to which the government has gone here to spin its false narrative. It has falsely accused Senator Menendez of being an Egyptian agent

despite clear evidence that, during the very period that the government alleges that Senator Menendez was acting as Egypt's agent, he repeatedly challenged Egypt and held up substantial military aid packages due to Egypt's dismal record on human rights abuses. And the government has, only weeks ago, doubled down on its "foreign agent" false narrative, by expanding the net to include Qatar as well. That is an even more outlandish accusation. Tellingly, while the government accuses the Senator of using "his influence and power . . . to benefit the Government of Qatar" (Indict. ¶ 45), the only official act that could possibly be alleged as a benefit was a noncontroversial Senate resolution that Senator Menendez did not introduce, sponsor, or revise, and that was approved by a voice vote—facts that are glaringly omitted from the Indictment (*id.* ¶ 60). The government's overcharge in this case makes a mockery of the Supreme Court's admonition nearly 90 years ago that "[t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . is not that it shall win a case, but that justice shall be done. . . . [W]hile he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88 (1935).

Yet, this case is riddled with foul blows that now require the Court's intervention. This motion is addressed to three of them.

*First*, the government has filed this case in the wrong judicial district. Indeed, the Indictment alleges a series of distinctly *New Jersey*-based schemes—*i.e.*, purported corrupt relationships with "New Jersey Businessmen" and interference with a political appointment and criminal prosecutions and investigations centered on New Jersey. Any connection between the schemes alleged and the Southern District of New York, by contrast, is virtually non-existent.

The Indictment's strained recitation of alleged "overt acts" occurring in this District (mostly innocuous meals and a ping on a Manhattan cell tower) reflects an attempt to bring this prosecution in a district where it does not belong, but which the government perceives may be more favorable to its case. But Senator Menendez has a constitutional right to be tried in the district where the alleged crime "shall have been committed." This Court should therefore dismiss the Indictment for improper venue or, in the alternative, transfer this case to the District of New Jersey in the interest of justice.

*Second*, the government prejudicially has joined five separate alleged schemes into single conspiracy counts, violating the rule against duplicity with respect to Counts I, II, and III. Each of the five alleged schemes involves different alleged "official acts" by the Senator to benefit different parties, during different time periods, in exchange for different types of consideration. The resulting prejudice to the Senator is impermissible, requiring either a new indictment containing non-duplicitous counts or a special jury verdict form.

*Third*, Senator Menendez should be severed from his co-defendants. The now-planned joint trial of Senator Menendez and his wife, Nadine Menendez ("Nadine"), threatens the Senator's right to a fair trial by, among other things, forcing him to choose between two fundamental rights: his right to testify in his own defense and his right *not* to testify against his spouse. Moreover, joining the Senator's trial with the remaining defendants risks prejudicially exposing the jury to evidence that, although inadmissible against Senator Menendez, might well be admissible against one of his co-Defendants. By holding the Senator's trial first, with his co-Defendants' trials to follow, the Constitutional right to a fair trial will be preserved for all Defendants.

In sum, both given the serious Constitutional and statutory issues raised in the Senator's First Motion to Dismiss (ECF 120) and the defects in the Indictment raised in this motion, this case must be dismissed.

## STATEMENT OF FACTS

According to the government, Senator Menendez and his alleged co-conspirators engaged in *a single* sprawling five-year-long conspiracy touching on foreign, federal, and state issues involving different defendants with disparate goals. In reality, the Indictment rests on five distinct schemes, which are described in greater detail at pages 6-11 of the Senator's First Motion to Dismiss (ECF No. 120), incorporated herein.

In essence, the government has taken a series of benign occurrences involving a couple and three loosely connected New Jersey residents and concocted an alleged conspiracy involving sensational headline-worthy allegations like foreign intelligence officials and gold bars. *See, e.g., id.* ¶¶ 16, 53h. The facts paint a vastly different picture: a Senator working tirelessly to support constituents, New Jersey businesses, and the national security and policy goals of the United States.

## ARGUMENT

I.  **THIS DISTRICT IS THE WRONG VENUE.**

In its zeal to prosecute Senator Menendez in this District, the government stretches the Constitution's venue requirements beyond their breaking point. In every respect, the conduct alleged in the Indictment concerns activities occurring **outside this District**, with the overwhelming bulk occurring in New Jersey. Nevertheless, the Indictment relies on fleeting, *de minimis* brushes with the Southern District of New York in the hope of showing a nexus to this District, such as a text message relayed through a Manhattan cell tower (Indict. ¶ 75(c)); a bank account originally opened in the Bronx years before the alleged conspiracy (*id.* ¶ 75(b)); a third-

party jeweler's sale of gold (*id.* ¶ 75(e)); and two restaurant meetings (*id.* ¶¶ 75(a), (d)) that were apparently so insignificant they warrant no description in 50 pages of allegations. These allegations, even if accepted as true, are insufficient to establish venue for any of the charged counts. This case belongs in New Jersey.

But the government ignores the applicable venue standard—not to mention the Senator's constitutional right to be tried by a jury where the alleged crime was committed. Eight years ago, the Department of Justice fought tooth and nail to proceed with its political corruption trial against Senator Menendez in New Jersey, emphasizing that New Jersey was the proper venue for the trial because that's where Senator Menendez resided and he should be tried "by a jury of his peers in the State of New Jersey." *See United States v. Menendez*, No. 15-cr-00155 (WHW), Dkt. 25 at 16 (government's brief opposing motion to transfer venue) (D.N.J., May 26, 2015). The government took that position despite the fact that the co-defendant (and alleged bribe payor) resided in Florida, the solicitations for campaign contributions occurred in Washington, D.C., and the alleged "official acts" were performed in Washington, D.C. *See, e.g.*, *id.* at Dkt. 149 ¶¶ 3, 59, 213 (Superseding Indictment) (D.N.J. Oct. 6, 2016).

The government has now done an about-face, hoping to avoid New Jersey at all costs. Why? Surely, it has nothing to do with the fact that the New Jersey jury empaneled in that case saw through the government's false narrative, with at least 10 jurors voting to acquit the Senator on the government's hyped-up corruption charges. *See* https://www.nytimes.com/2017/11/16/nyregion/senator-robert-menendez-corruption.html.

But prosecutors cannot strategically choose where to file their lawsuit based merely on where the case was investigated, or where prosecutors believe they might find a more favorable judge or jury. *See, e.g.*, *United States v. Fortenberry*, No. 22-50144, 2023 WL 8885105, at \*7, 9

7

(9th Cir. Dec. 26, 2023) (reversing conviction of former congressman prosecuted in Los Angeles for false statements made in Nebraska and the District of Columbia, noting that "[t]he Venue and Vicinage Clauses may not be disregarded simply because it suits the convenience of federal prosecutors."). The charges in this case have no genuine connection to this District. They should be dismissed before the parties and this Court incur the cost of a trial in the wrong venue.

A.   Legal Standard

1.   Proper venue is a fundamental constitutional guarantee.

The Constitution twice guarantees defendants the right to be tried in the place where the alleged crime "shall have been committed." U.S. Const., Art. III, § 2, cl. 3; *id.* Amend. VI. "Proper venue in criminal proceedings was a matter of concern to the Nation's founders." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Indeed, the practice of hauling American colonists to England "to be tried for pretended offenses" was a major grievance against the British crown that helped foment the Revolution. Declaration of Independence ¶ 21 (1776). In overturning the conviction of Congressman Fortenberry on corruption charges, the Ninth Circuit recently explained:

> Questions of venue in criminal cases . . . are not merely matters of formal legal procedure. They present policy concerns deeply rooted in the Constitution. Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers drafted the Venue Clause, which "mandates that the 'Trial of all Crimes . . . shall be held in the State where the . . . Crimes shall have been committed.'" This command is reinforced by the Vicinage Clause of the Sixth Amendment, which "guarantees 'the right to . . . an impartial jury of the State and district wherein the crime shall have been committed.'"

*Fortenberry*, 2023 WL 8885105, at *6 (cleaned up; citations omitted). These constitutional rights to be tried in the district where the crime was committed have their origins in the founding of this Nation, as the Supreme Court recently observed. *See Smith v. United States*, 599 U.S. 236, 246-47 (2023) (cleaned up; citation omitted) ("There is no question that the founding generation

8

enthusiastically embraced the vicinage right and wielded it as a political argument of the Revolution.").

A conviction by a jury from the wrong district—that is, from outside "the State and district wherein the crime shall have been committed"—is thus invalid. *See* U.S. Const. Amend. VI; *Smith*, 599 U.S. at 245 (holding that retrial is the proper post-conviction remedy for improper venue). This right is also codified in Federal Rule of Criminal Procedure 18, which requires the government to "prosecute an offense in a district where the offense was committed."

2.    <u>The government bears the burden.</u>

The government has the burden to prove proper venue for each count in an indictment. *See United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012). For a conspiracy count, the government must establish two factors by a preponderance of the evidence. *See United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011).

*First*, the government must establish that the "essential conduct" constituting the alleged offenses occurred in the district of prosecution. "Venue is proper only where the acts constituting the offense—the crime''s 'essential conduct elements'—took place." *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (quoting *United States v. Rodriguez-Moreno,* 526 U.S. 275, 280 (1999)). On a conspiracy charge, the district where the "essential conduct" took place is the district where either (1) the conspiratorial agreement was formed or (2) an overt act was committed to further the conspiracy's objective. *See United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987). An overt act is one committed by a conspirator "for the purpose of accomplishing the objectives of the conspiracy." *Tzolov*, 642 F.3d at 320. The Second Circuit has applied a but-for causation standard: an act qualifies as an overt act for venue purposes if the conspiracy's criminal objectives would not have been realized without it. *See id.* (finding that defendants' travel through the district of prosecution could qualify as an overt act "because, had

they not done so, the face-to-face meetings," which were "a regular part of their fraudulent scheme, would not have occurred").

*Second*, if the overt act was committed by someone other than the defendant, the government must prove that it was "reasonably foreseeable" to each defendant that the act would take place in the district. *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018). This is because there must be "some sense of venue having been freely chosen by the defendant." *Id.* (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)).

Moreover, in all cases, "a court should ask whether the criminal acts in question bear 'substantial contacts' with any given venue." *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000) (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)). "This test takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding." *Id.* While the application of this test to conspiracy counts has received mixed treatment by the Second Circuit,[2] it nonetheless articulates a fundamental principle that a criminal defendant should not suffer the hardship and prejudice of being hauled into court and tried by a jury in a district that has only a minimal connection to the alleged crime. Applying this test in "every case," including conspiracy cases, "will ensure that venue is only found where there are enough substantial contacts to ensure that prosecution is fair to the defendant." *United States v. Royer*, 549 F.3d 886, 897 (2d Cir. 2008).

---

[2] *Compare United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018) ("When an overt act in furtherance of a criminal conspiracy has been committed in the district, however, this supplemental inquiry has no relevance."), *with United States v. Royer*, 549 F.3d 886, 897 (2d Cir. 2008) (citing *United States v. Saavedra*, 223 F.3d 85, 94 (2d Cir. 2000)) (emphasis added) (noting that applying the substantial-contacts test "*in every case*" will help guard against too many possible venues being available to the government in RICO conspiracy cases).

On a pretrial motion to dismiss for improper venue, the government has the burden to demonstrate "that the indictment alleges facts sufficient to support venue." *United States v. Peterson*, 357 F. Supp. 2d 748, 751 (S.D.N.Y. 2005). If the government fails to make that showing with respect to a particular count, that count should be dismissed. *See id.*; Fed. R. Crim. P. 12(b)(3)(A)(i).

The Court need not—and should not—simply take the government at its word that it will be able to prove proper venue at trial. Rather, the Court should resolve factual disputes at this stage of the case with an evidentiary hearing. *See* 1A Wright & Miller, Federal Criminal Practice & Procedure § 195 (5th ed., Apr. 2023 update) (footnotes omitted) (noting that "a court in its discretion may conduct a hearing before making its ruling" upon a "showing that there are material facts in dispute that require a hearing to resolve, and that the disputed issues are capable of being resolved at that hearing."). Doing so would avoid the trouble and expense of holding a trial in the wrong venue only to require a retrial in a proper district.

B.    The Indictment does not sufficiently allege a basis for venue in this District.

At bottom, the Indictment's alleged essential conduct supporting venue in this District consists of five "Overt Acts." Indict. ¶¶ 75-75(e). Three of those acts were allegedly performed by co-conspirators without the Senator's involvement, and only two alleged acts remotely concern the Senator:

- "On or about June 30, 2018, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a 'Nadine Arslanian,' and WAEL HANA, a/k/a 'Will Hana,' the defendants, met at a restaurant in Manhattan." *Id.* ¶ 75(a).
- "On or about September 21, 2019, ROBERT MENENDEZ, HANA, FRED DAIBES, the defendant, and Egyptian Official-4 met at a restaurant in Manhattan." *Id.* ¶ 75(d).

The remaining three acts allegedly performed by the Senator's co-conspirators are as follows:

11

- "On or about May 3, 2019, JOSE URIBE, the defendant, caused Associate-2 to make a payment from a corporate bank account that had been opened at a bank branch in the Bronx." *Id.* ¶ 75(b).
- "On or about September 5, 2019, NADINE MENENDEZ sent URIBE a text message that was transmitted through a cell tower in Manhattan." *Id.* ¶ 75(c).
- "On or about March 31, 2022, NADINE MENENDEZ provided to a jeweler two one-kilogram gold bars that had been provided by DAIBES, which gold bars were sold in Manhattan." *Id.* ¶ 75(e).

None of these allegations sufficiently allege that the so-called "overt acts"—what comprises the "essential conduct" that must be shown to have taken place in this District—were intended to, or actually did, further the object of the alleged conspiracy.

### 1.    Restaurant Meetings

The Indictment includes no allegations that these restaurant meetings were organized "for the purpose of accomplishing the objectives of" bribing a public official or having a public official act as a foreign agent. *Tzolov*, 642 F.3d at 320; *see* 18 U.S.C. § 201(b)(1)(A), (C); *id.* § 201(b)(2)(A), (C); *id.* § 219. Nor does the Indictment allege how these meetings may have facilitated these criminal objectives, let alone that they were the but-for cause of the conspiracy's moving forward. *See Tzolov*, 642 F.3d at 320. The Indictment says ***nothing*** about what allegedly took place at these meetings, even in general terms. Nor do the Indictment's 42 pages of factual recitation appear even to mention these particular restaurant meetings, which are separate and distinct from the restaurant meetings the Indictment does describe elsewhere. *See* Indict. ¶¶ 19(c), 37(b). This is a telling omission, indicating that there was nothing incriminating about the restaurant meetings that the government asserts as a basis for venue.

### 2.    Bank Account

As to the corporate bank account referenced in paragraph 75(b), the Indictment alleges only that the account "had been ***opened*** at a bank branch located in the Bronx" (emphasis added), not that the account was opened for the purpose of furthering the alleged conspiracy or

that the alleged payment itself touched the District in any way. In fact, the government's disclosures reveal that this account was opened in June 2015, more than **two years before** the conspiracy was allegedly formed—a fact nowhere disclosed in the Indictment. *See* Fee Decl., Ex. A. Moreover, the government's pre-indictment investigation indicated that the alleged payments from that account "were done over the phone with a debit card," and that "[n]o part" of the allegedly relevant bank transactions were routed through the Bronx branch where the account was opened long ago. *See* Fee Decl., Ex. B at ¶¶ 10(a)-(b) (summarizing an interview conducted in May 2023). In fact, such debit-card transactions "do not typically go through New York" at all. *Id.* at ¶ 10(a). In short, the government knew—well before it filed the original Indictment in September 2023—that the alleged acts precipitating the payments had no actual connection to this District. But even if the alleged connection to the Bronx passed muster, the government cannot seriously allege that the account's opening at a branch in the District was reasonably foreseeable to the Senator. *See Kirk Tang Yuk*, 885 F.3d at 69 (requiring that a connection to the venue district be reasonably foreseeable as to each alleged co-conspirator).

3.   Text Message

As to the text message referenced in Subparagraph 75(c), the incidental relay of a message through a cell tower in this District is, by itself, a legally insufficient basis for venue in this District. To be sure, a conspirator's scheme-furthering electronic communication, such as a telephone call, may establish venue in a district where the caller is not physically present. *See United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007). But this only applies where the communication is sent or received, not where the electronic signal is relayed on its way to the recipient. *See id.* (emphasis added) ("[T]he overt act may properly be understood to have occurred at the site *where the listener receives the conspirator's message*."). This is because "the conspirator effectively propels not only his voice but the scheme itself beyond his own physical

location into that of the person with whom he is speaking." *Id.* The same cannot be said for the location where a cell tower bounces an out-of-district text message to an out-of-district recipient.

But even if a ping to a cell tower were sufficient, the Indictment alleges no facts that indicate the text message in question was sent for the purpose of furthering the bribery of a public official, or that it was a but-for cause of the conspiracy. While the precise message is not evident from the government's disclosures, the government has produced three text messages from Nadine Menendez to Jose Uribe sent on September 5, 2019—all of which apparently were part of an innocuous social invitation:

> <u>Nadine Menendez</u>: Good morning. I can't believe summer is over. Haven't seen you in a while. Would love to catch up. I hope you can take a break tonight
>
> <u>Jose Uribe</u>: Thank you
> <u>Nadine Menendez</u>: He says at my house.
> <u>Jose Uribe</u>: What address?
> <u>Jose Uribe</u>: Are we eating? I am at my office. Let me know what time is good
> <u>Nadine Menendez</u>: No we will have cigars and I have grand mariner but no beer. ████████████████████ . I will text you when we are on our way. Should be by 930 pm. Thank you for making it. .

Fee Decl., Ex. C at SDNY_00065796-97.

None of these texts appear on their face to have been sent "for the purpose of accomplishing the objectives of [a] conspiracy" to bribe a public official. *Tzolov*, 642 F.3d at 320. The Indictment does not allege that any agreement, payment, or official act took place at this gathering or was facilitated by it. Indeed, such an allegation would make little sense in light of the allegations that Senator Menendez had already scheduled the September 6 meeting with the New Jersey Attorney General's Office, Indict. ¶ 44(b), and that Uribe had already been making payments on Nadine Menendez's car, *id.* ¶ 43(f).

In short, the government has not alleged any facts to support that any one of the above text messages was a ***but-for cause*** of the charged bribery conspiracy's moving forward. *See Tzolov*, 642 F.3d at 320. But even if it had, the Indictment alleges no facts to suggest that the text message's alleged connection to the District—its incidental relay through a Manhattan cell tower—was reasonably foreseeable to the Senator.

>    4.    Sale of Gold

Finally, the sale of gold alleged in Subparagraph 75(e) falls outside the scope of the alleged conspiracy and thus does not constitute an overt act designed to further it. Count One alleges a conspiracy to bribe a public official, the aim of which is the transfer of "anything of value" in exchange for influencing an official act or violating an official duty. 18 U.S.C. § 201(b)(1), (2). That aim does not include the subsequent sale of the thing of value by a non-conspirator, nor would such a sale materially further that aim. *See Grunewald v. United States*, 353 U.S. 391, 414 (1957) ("[O]vert acts in a prosecution such as this one are meaningful only if they are within the scope of the conspiratorial agreement."); *United States v. LaSpina*, 299 F.3d 165, 175 (2d Cir. 2002) ("Where the object of a conspiracy is economic, the conspiracy generally 'continues until the conspirators receive their anticipated economic benefits.'") (quoting *United States v. Mennuti,* 679 F.2d 1032, 1035 (2d Cir. 1982)); *Royer*, 549 F.3d at 896 (acts that conspirators cause non-conspirators to take will establish venue only if they "*materially* further[] the ends of the conspiracy") (emphasis added).

The sale of gold alleged in Subparagraph 75(e) thus does not qualify as an overt act in furtherance of the alleged conspiracy. The conspiracy's objective, according to the Indictment, was completed when a thing of value was received, not when each thing of value was converted to cash. *See Mennuti*, 679 F.2d at 1035 (defendant's economic object in the conspiracy "was not the resale of the property, but its purchase at a bargain price," and thus a subsequent resale would

not have qualified as an overt act). Nor is there any evidence or reason to believe that the sale of gold in Manhattan by the jeweler was remotely known or foreseeable to Senator Menendez. Absent such a showing, the alleged overt act by a non-conspirator jeweler cannot sustain venue in this District.

      C.      <u>At a minimum, the government should file a bill of particulars identifying all its alleged bases for venue.</u>

At the very least, the government should be required to file a bill of particulars supporting venue in this District. *See* Fee Decl., Ex. D. If those particulars do not establish a sufficient factual basis, the Indictment against Senator Menendez must be dismissed. Given the vanishingly thin nexus between the Southern District of New York and the allegations against Senator Menendez, the government should not be taken at its word that a sufficient nexus will be proven at trial. Nor should the government be permitted merely to refer Senator Menendez or this Court to the voluminous discovery produced in this case—which so far totals nearly 15 million pages—without specifying precisely which discovery it believes to support venue in this District. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel . . . .").

## II.     **<u>ALTERNATIVELY, THE CASE SHOULD BE TRANSFERRED TO NEW JERSEY.</u>**

In the alternative to dismissal, the case against Senator Menendez should be transferred to the District of New Jersey under Rule 21(b).

      A.      <u>Legal Standard</u>

"Upon the defendant's motion, the court may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21. Courts decide Rule 21(b)

motions based on the factors laid out in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243-44 (1964). Among those factors are "(1) location of [the] defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; . . . and (10) any other special elements which might affect the transfer." *Id.*

     B.     <u>Transfer is warranted to protect the interests of the people of New Jersey.</u>

To start, all defendants are located in New Jersey, and the vast majority of the alleged events took place there. *See id.* (factors (1), (3)). In addition, few if any likely witnesses or items of physical evidence are expected to be located in this District, unless they were already transported here by the government. *See id.* (factors (2), (4)).

Moreover, a New Jersey jury has the right to try this case, and sit in judgment of the prosecution's case and the Senator. Its outcome could directly implicate whether New Jerseyans continue to be represented by the person duly and democratically chosen by them. That outcome—particularly one concerning the alleged violation of New Jerseyans' trust—should not be determined by an out-of-state jury. Especially considering the tentative basis for venue in this district, the interests of justice weigh in favor of transfer to New Jersey.

**III.**     **<u>COUNTS I THROUGH III OF THE INDICTMENT ARE IMPERMISSIBLY DUPLICITOUS, REQUIRING A NEW INDICTMENT OR A SPECIAL JURY VERDICT FORM.</u>**

Counts I, II, and III of the Indictment are impermissibly duplicitous, in violation of Fed. R. Crim. P. 8(a), because each count charges Senator Menendez with multiple separate and distinct schemes. This duplicity unfairly prejudices Senator Menendez, risking a non-unanimous verdict of guilt, improper sentencing, and potential double jeopardy, fundamentally threatening his Constitutional right to a fair trial. As such, the Court should either (1) require the government to file a new indictment containing non-duplicitous counts pertaining to each conspiracy, or (2)

require a special jury verdict form that identifies each scheme covered by each count to ensure a unanimous verdict.

A.   <u>Impermissibly duplicitous counts prejudice a defendant's constitutional rights.</u>

An indictment is duplicitous if it joins two or more distinct crimes into a single count, resulting in unfair prejudice to the defendant. *See United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992); *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). "The prohibition against duplicity has constitutional underpinnings in the Sixth Amendment's guarantee that an accused be 'adequately informed of the nature and cause of the accusation' and the Fifth Amendment's interdiction against double jeopardy."  *United States v. Kearney*, 451 F. Supp. 33, 35 (S.D.N.Y. 1978) (internal citation omitted).

There is no single test to determine if an indictment is duplicitous. To judge duplicity in a fraud or similar case, the Court should ascertain whether the alleged acts supporting a count comprise one unitary scheme or multiple separate schemes. *See, e.g., United States v. Hinton*, 127 F. Supp. 2d 548, 554-56 (D.N.J. 2000) (finding the indictment duplicitous where one count purported to charge a single offense, but encompassed distinct frauds against multiple financial institutions); *United States v. Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (dismissing counts where two distinct crimes involving different factual scenarios were improperly charged together). Specifically, courts consider whether identical evidence will support each of the charged offenses—if different facts must be proven as to each alleged scheme, the count contains multiple offenses and is likely duplicitous. *See Kearney*, 451 F. Supp. at 37.

The fact that a fraud, bribery or other scheme is charged as a conspiracy does not permit the government to group multiple different schemes into a single conspiracy count. While it is true that a single conspiracy count can charge "those acts [that] could be characterized as part of a single continuing scheme," *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989), "a

single count alleging multiple independent conspiracies is [nonetheless] duplicitous." *United States v. Stein*, 429 F. Supp. 2d 633, 637 (S.D.N.Y. 2006); *see also United States v. Rigas*, 281 F. Supp. 2d 660, 664 (S.D.N.Y. 2003).

In conspiracy cases, courts have long relied on a "hub-and-spoke" analysis to determine whether multiple conspiracies exist or whether the government improperly charged multiple separate conspiracies involving one "hub" and multiple spokes as a single conspiracy. *See Kotteakos v. United States*, 328 U.S. 750, 755 (1946) (finding multiple conspiracies where there was a pattern of "separate spokes meeting at a common center . . . without the rim of the wheel to enclose the spokes"). To prove a single conspiracy, "the Government must show that there was a 'rim' around the spokes, such that the 'spokes' became coconspirators with each other. . . . The Government must prove that 'each defendant participated in the conspiracy with the common goal or purpose of the other defendants.'" *United States v. Ulbricht*, 31 F. Supp. 3d 540, 554 (S.D.N.Y. 2014) (cleaned up; citations omitted); *see also United States v. Dawkins*, 999 F.3d 767, 797 (2d Cir. 2021) (a single conspiracy exists when "the evidence shows 'that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'") (citations omitted).

The spokes must also be functionally interrelated, so that the success of one spoke facilitates the success of another. *See, e.g., Blumenthal v. United States*, 332 U.S. 539, 558 (1947) (finding "distinct and disconnected" conspiracies when no alleged spoke "aided in any way, by agreement or otherwise" the advancement of the other spokes); *United States v. Dellosantos*, 649 F.3d 109, 117 (1st Cir. 2011) (courts look to whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme") (citations omitted); *United States v. Pauling,* 256 F. Supp. 3d 329, 335 (S.D.N.Y.

19

2017) ("[A] single conspiracy can be established 'so long as there is sufficient proof of mutual dependence and assistance.'") (citations omitted). Thus, at a minimum, a wheel conspiracy requires that "the spoke participants . . . knew or had reason to know of the existence" of the other participants (spokes) of the conspiracy. *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir. 1971).

Conversely, "where the spokes of a conspiracy have no knowledge of or connection with the other spokes and deal[] independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." *United States v. Seher*, 562 F.3d 1344, 1367 (11th Cir. 2009) (citations and internal quotations omitted); *see also Ulbricht*, 31 F. Supp. 3d at 554 (noting multiple conspiracies exist if the spokes act independently with the hub); *Rodriguez v. Senkowski*, No. 03 Civ. 3314 (LAP), 2004 WL 503451, at *19 (S.D.N.Y. Mar. 15, 2004) ("[M]ultiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.").

Duplicitous pleadings must be addressed by the Court when they invoke the "policy considerations that underlie that doctrine," and therefore risk "unfairness to the defendant." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (internal quotations omitted); *see also Sturdivant*, 244 F.3d at 75. The most common prejudice threatened by duplicity is the risk that the jury could convict on a less-than-unanimous basis, by having some jurors vote to convict based on one scheme while other jurors vote to convict on another different scheme charged in the same count. *Margiotta*, 646 F.2d at 733. Other ways in which a defendant may be prejudiced by a duplicitous count include: (i) inadequate notice of the nature of the crime to be proved at trial; (ii) inadequate basis for appropriate sentencing in the event of a conviction; and (iii) double jeopardy in a subsequent prosecution. *Id.*; *see also Aracri*, 968 F.2d at 1518.

B.     Counts I through III of the Indictment are impermissibly duplicitous in violation
       of Senator Menendez's constitutional right to a fair trial.

Counts I through III are plainly duplicitous, and each count squarely implicates the

concerns about prejudice underlying the rule against duplicitous counts. Counts One, Two, and

Three charge Senator Menendez with a sprawling conspiracy involving five separate and distinct

bribery schemes, each involving a separate individual or individuals, during different time

periods, with different objects. The five spokes alleged in Counts One through Three are

described below:

(1) ***The Egyptian Aid Scheme***: an alleged scheme, between March 2018 and

January 2022, among the Senator, Nadine , Hana and other unnamed co-conspirators to secure

certain benefits for Egypt, including, among others, military aid and unclassified but "sensitive"

information in exchange for, among others, a "low-or-no-show job" for the Senator's then-

girlfriend Nadine Arslanian (Indict. ¶¶ 6, 16, 19-21, 31-32, 35-38);

(2) ***The IS EG Halal Scheme:*** an alleged scheme, in or about May 2019, among

the Senator, Nadine, and Hana to make phone calls to at least one U.S. Department of

Agriculture ("USDA") official in an effort to protect a monopoly granted by the Egyptian

government to IS EG Halal purportedly to facilitate bribe payments from Hana (*Id.* ¶¶ 27-34);

(3) ***The New Jersey State Scheme***: two alleged schemes—one in or about January

2019 and one between July 2019 and November 2019—among the Senator, Nadine, Hana, and

Uribe whereby the Senator purportedly attempted to intervene in a New Jersey state prosecution

of the "New Jersey Defendant" and a New Jersey state criminal investigation of the "New Jersey

Investigative Subject" by contacting a "senior state prosecutor in the Office of the New Jersey

Attorney General" to "pressure" this individual to favorably resolve both matters in exchange for

assistance paying for a Mercedes Benz car for Nadine (*Id.* ¶¶ 39-42, 44-44(h));

(4) *The Federal Prosecution Scheme:* an alleged scheme, between December 2020 and March 2022, among the Senator, Nadine, and Daibes whereby the Senator purportedly attempted to intervene in the New Jersey federal prosecution of Daibes through the nomination of a U.S. Attorney candidate favorable to Daibes in exchange for multiple things of value from Daibes, including cash, gold bars, and home items (*Id.* ¶¶ 45-53(h)); and

(5) *The Qatar Investment Scheme:* an alleged scheme, between June 2021 and May 2023, among the Senator and Daibes, whereby the Senator introduced his constituent Daibes to a Qatari investor to potentially invest in one of Daibes' New Jersey-based development projects in exchange for the Senator having some, yet-unidentified involvement in the passage of a non-controversial Senate resolution related to Qatar that was approved by voice vote, and also issuing a press release praising Qatar (*Id.* ¶¶ 55-64, 66).

Each of these alleged schemes is based on a different set of facts involving different alleged "official acts" by the Senator to help different beneficiaries, during different time periods, allegedly in exchange for different types of consideration. Each scheme has a different set of participants with different aims and objectives. None of the schemes was inter-related and it cannot plausibly be suggested that the success of one scheme depended, in any way, on another.

The *only* thing that unites the spokes of the alleged conspiracy is that the Senator is at the hub of each alleged scheme (and Nadine is at the hub of all schemes except for the Qatar Investment Scheme). But that fact, alone, of course, does not permit the charging of multiple conspiracies in a single count. Indeed, the Indictment does not allege that any of the individuals at the spokes of the conspiracies was aware of the other spokes or objectives sought by all the other participants, or that the members of the conspiracy ever met to discuss the various schemes

or were aware of all of the other members' participation. The Indictment is replete with critical omissions. To name a few, the Indictment does *not* allege that:

- Uribe knew of the Egyptian Aid Scheme, the Federal Prosecution Scheme, or the Qatar Investment Scheme, let alone participated in them;

- Daibes had knowledge of or participated in any scheme related to Egypt;

- Hana had knowledge of or participated in the Federal Prosecution Scheme; or

- Nadine had knowledge of or participated in the Qatar Investment Scheme.

To the contrary, the Indictment's own structure—"neatly divid[ing]" each scheme by separate factual allegations that are elsewhere in the Indictment grouped into the same counts—only confirms that the government is alleging unique schemes improperly lumped together. *See Munoz-Franco*, 986 F. Supp. at 71. In *Munoz-Franco*, the court noted that "despite the government's representations" of a single charged conspiracy, the structure of the indictment, which included subtitles dividing the count into "distinct sets" of actions, demonstrated that multiple crimes were actually being charged. *Id; see also United States v. Gabriel*, 920 F. Supp. 498, 503-04 (S.D.N.Y. 1996) (finding duplicity assessment "reinforced" by the structure of the indictment, which listed acts into two separate schemes). Here, the Indictment uses bolded and underlined subtitles (without italics) to identify and separate each scheme:[3]

- *The Egypt Scheme*: "MENENDEZ Agrees to Take Actions that Benefit Egypt and HANA in Exchange for Promises of Things of Value" (Indict. pg. 8);

- *The IS EG Scheme*: "MENENDEZ Takes Action to Protect IS EG Halal" (*Id.* pg. 14);

---

[3] Subsections—which are bolded, underlined, *and italicized*—are not enumerated in this list. They are found in the Indictment on pages 9, 10, 14, 15, 16, 18, 19, 24, 25, 28, 31, and 37.

- *The New Jersey State Scheme*: "MENENDEZ Agrees to Disrupt New Jersey State Criminal Matters in Exchange for a Mercedes-Benz Convertible" (*Id.* pg. 23); and

- *The Federal Prosecution Scheme and Qatar Scheme*: "MENENDEZ Accepts Things of Value, Including Cash and Gold Bars, Knowing that DAIBES Expected MENENDEZ in Exchange to Disrupt a Federal Criminal Prosecution and to Act for the Benefit of the Government of Qatar and DAIBES" (*Id.* pg. 31).

The Supreme Court's ruling in *United States v. Broce*, 488 U.S. 563, 571 (1989), should control. There, the government alleged that two defendants entered into a bid-rigging scheme whereby they agreed to rig bids on one highway project in April 1978, and subsequently agreed to rig bids on a different highway project in July 1979. *Id.* at 565. The government charged the defendants with one overarching conspiracy to violate the Sherman Act, 15 U.S.C. § 1, based upon the two bids. *Id*. The Court rejected the government's approach, holding that defendants entered into "two distinct agreements . . . constitut[ing] multiple conspiracies" because the bids were temporally distinct—15 months apart—and involved "different project[s]." *Id.* at 570-71.

Similarly here, the government has charged one overarching conspiracy based on some combination of five separate agreements, involving different types of official acts, different start dates, different participants, and different goals or objectives. *See, e.g.,* Order, *United States v. Sarshar*, No. 21-cr-202 (GHW) (S.D.N.Y. Nov. 1, 2021), ECF Nos. 41 & 66 (finding "impermissible duplicity" where securities fraud and tender offer fraud counts each charged defendant with separate schemes providing material, non-public information to four separate individuals); *Hinton*, 127 F. Supp. 2d at 556 (finding duplicity where a single count charged separate frauds against six financial institutions, with different transaction dates and different coconspirators); *United States v. Papa*, 533 F.2d 815, 822 (2d Cir. 1976) (finding that a

24

defendant's involvement in "two unrelated chains distributing narcotics . . . does not transform two separate conspiracies into one.").

The government's decision to group the various alleged schemes into single conspiracy counts unquestionably implicates the policy concerns underpinning the doctrine of duplicity. As currently charged, Senator Menendez could be found guilty by a jury without knowing *which* of the multiple schemes, multiple alleged "official acts," or multiple alleged bribes any conviction is based on. Because the allegations are all included in single conspiracy counts, a jury finding of guilty could also be non-unanimous—based not on any one of the schemes, but on different schemes, depending on the views of individual jurors. *See, e.g., United States v. Schlei*, 122 F.3d 944, 979-80 (2d Cir. 1997) (vacating conviction based on non-unanimous verdict on a duplicitous charge where court lacked venue over one of the charges). Without more specificity, a general verdict of guilty would conceal a finding of guilt as to one conspiracy and a finding of not guilty as to another. *Sturdivant*, 244 F.3d at 75 (citations omitted).

Because the government has not and cannot plausibly point to a single overarching agreement, the Court should require the government to file a new indictment "decoupl[ing] the transactions . . . by separating the [] conspiracies into [] separate counts." *United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013); *see also United States v. Hennings*, No. 18-CR-028-A (RJA), 2018 WL 4221575, at *6 (W.D.N.Y. Sept. 5, 2018) (requiring the government "to elect which of the [schemes] underlying [the] Count [] it will seek to prove at trial"). In the alternative, the Court should require use of a special jury verdict form that requires the jury to reach a unanimous verdict as to any alleged scheme before returning its verdict. *See, e.g., United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) (using a special verdict to ensure jury was unanimous with respect to the theory underlying the conviction); *United States v.*

25

*Mercado*, No. 04-CR-166(SRU), 2005 WL 2850158, at *2 (D. Conn. Oct. 26, 2006) (using a special jury verdict form "in order to address any threat of prejudice to the defendant and avoid impermissible duplicity.").

IV.    **SEVERANCE IS REQUIRED TO PROTECT THE SENATOR FROM UNFAIR PREJUDICE.**

A joint trial of Senator Menendez with his co-defendants will: (i) force Senator Menendez to make an impossible and prejudicial choice between testifying on his own behalf and exercising his spousal privilege to avoid being converted through cross-examination into a witness against his spouse; (ii) expose Senator Menendez's jury to prejudicial statements that would otherwise be admissible only against one or more of Senator Menendez's co-defendants; and (iii) expose that same jury to evidence of co-defendants' alleged prior bad acts which, again, would otherwise be inadmissible against the Senator. Each one of these outcomes would implicate the very prejudices the Supreme Court identified in *Zafiro v. United States* as warranting a severed trial.

By holding Senator Menendez's trial *first*, with the trials of his co-defendants to follow, on the other hand, the Court would completely eliminate the risk of prejudice. Thus, to preserve the rights of both Senator Menendez and his co-defendants to a fair trial, the Court should order the trials to be severed as requested herein.

A.    Legal Standard

Where the joinder of multiple defendants in a single indictment "appears to prejudice a defendant or the government," Federal Rule of Criminal Procedure 14(a) permits the court to "sever the defendants' trials." Fed. R. Crim. P. 14(a). Specifically, district courts are directed to sever trials under Rule 14 where "there is a serious risk that a joint trial would compromise a

specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

In *Zafiro*, the Supreme Court identified a non-exclusive list of scenarios where sufficient prejudice would require severance. 506 U.S. at 539. Those scenarios include where:

- "[E]vidence of a codefendant's wrongdoing . . . erroneously could lead a jury to conclude that a defendant was guilty";

- "[E]vidence that the jury should not consider against a defendant and that *would not be admissible if a defendant were tried alone* is admitted against a codefendant"; and/or

- "[E]ssential exculpatory evidence that would be available to a defendant tried alone [is] unavailable in a joint trial."

*Id.* (emphasis added). The Court also noted that there are other unidentified situations where prejudice would require severance. *See id.*

"[W]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, th[e] risk of prejudice is heightened." *United States v. Key*, No. 12-CR-712 (SHS), 2013 WL 12204221, at *1 (S.D.N.Y. Aug. 28, 2013) (Stein, J.) (quoting *Zafiro*, at 539). In such circumstances, the Court should use its sound discretion to remedy and avoid such prejudice. *United States v. Shkreli*, 260 F. Supp. 3d 247, 253 (E.D.N.Y. 2017) (citing *Zafiro*, 506 U.S. at 541; *United States v. Wilson*, 11 F.3d 346, 353 (2d Cir. 1993)).

B.    The Court should sever Senator Menendez's trial from Nadine's.

Senator Menendez intends to present a defense arguing (in part) that he lacked the requisite knowledge of much of the conduct and statements of his wife, Nadine, and thus lacks scienter and did not agree to join any of the charged conspiracies. By this defense, Senator Menendez's legal team may have to argue, in effect, that any unlawful conduct—and we are aware of none—involved the actions of others (including Nadine), not the Senator. While co-

27

defendants in criminal trials often present defenses that suggest that one was unaware of other co-defendants' statements or conduct, the unusual situation presented here—a married couple slated to be tried together—creates a much more severe risk of unfair prejudice, warranting a severed trial.

As the Court is aware, Senator Menendez and Nadine each have two types of spousal privilege:  (i) "the 'adverse spousal testimony' privilege, which permits an individual to refuse to testify adversely against his or her spouse[;]" and (ii) "the 'marital communications privilege,' [which] protects private and confidential communications between spouses from disclosure." *United States v. Helbrans*, 570 F. Supp. 3d 83, 87 (S.D.N.Y. 2021). The interplay of these spousal privileges with the defense that Senator Menendez intends to offer is the primary source of this prejudice.

If, for instance, Nadine asserts the marital communications privilege in a joint trial to prevent Senator Menendez from testifying to marital communications that *exculpate* Senator Menendez (*e.g.*, if Nadine believes they *inculpate* her), Senator Menendez will be prejudiced by the exclusion of exculpatory evidence that he *would* be able to offer in a separate trial. And if the testimony is nonetheless admitted over Nadine's objection, then she would untenably have her marital communications privilege overridden. This is not a mere hypothetical. As explained in the sealed declaration from defense counsel, we anticipate that, should he testify, Senator Menendez will testify to exculpatory communications with his wife. *See* Weitzman Decl. ¶¶ 2-2(c), 4-5.[4]

---

[4] Because the supporting declaration of Avi Weitzman reveals defense trial strategy, it is submitted to the Court *ex parte* and under seal. *See United States v. Akhavan*, No. 20-CR-188-2 (JSR), 2021 WL 1251893, at *2 (S.D.N.Y. Apr. 2, 2021) (allowing *ex parte* request for subpoenas to "avoid disclosing information that could reveal [defendant's] trial strategy"); *United States v. Weissman*, No. 01 CR,529(BSJ), 2002 WL 1467845, at *1 (S.D.N.Y. July 8,

Even if Nadine does not exercise the spousal communications privilege, Senator

Menendez will find himself in a Catch-22:  He will be forced to choose between his right to

testify in his own defense (and being examined about his own wife's conduct) and his right to

exercise his own testimonial spousal privilege to decline to offer testimony in any case against

Nadine. The law recognizes that where severed trials can avoid this prejudicial dilemma,

severance is required. *See United States v. Blunt*, 930 F.3d 119, 128-29 (3d Cir. 2019) (reversing

convictions of married co-defendants where severance was denied, including because the joint

trial improperly forced the defendants to choose between their rights to testify in their own

defense and to refrain from testifying against their respective spouses); *United States v. Dobson*,

No. CRIM. 02-616-06, 2003 WL 22427984, at *2 (E.D. Pa. Aug. 18, 2003) (severing trials to

allow married co-defendants to exercise both rights:  The right to testify in their own defense and

the right to refuse to testify against one's spouse).

       1.    <u>Senator Menendez and Nadine have spousal privileges that limit each's</u>
<u>ability to present a defense and receive a fundamentally fair trial.</u>

As summarized above, a joint trial of Senator Menendez and Nadine risks depriving

Senator Menendez of the ability to offer "essential exculpatory evidence that would be available

to [him] [if] tried alone"—precisely the type of situation the Supreme Court identified in *Zafiro*

as warranting separate trials. *See Zafiro* at 539. This could happen in at least two ways.

*First*, we are informed that—in an attempt to defang Senator Menendez's defense

regarding lack of knowledge, which threatens to impugn Nadine's conduct and culpability—

Nadine might assert the "marital communications privilege" to prevent Senator Menendez from

_____

2002) ("The Court will allow *ex parte* [submissions] where a party can demonstrate that it would
be required to prematurely disclose its trial strategy, witness list, or other privileged
information[.]")

testifying (at a joint trial) to marital communications with Nadine that serve to exculpate Senator

Menendez. *See United States v. Helbrans*, 570 F. Supp. 3d 83, 88 (S.D.N.Y. 2021)

("[c]ommunications between the spouses, privately made, are generally assumed to have been

intended to be confidential, and hence they are privileged . . . if the marriage is valid . . . then

[one spouse] could assert [her] marital communications privilege and preclude [the other spouse]

from testifying regarding matters within the marriage.").[5]

 For instance, the Indictment alleges significant conduct occurring after Nadine and

Senator Menendez were married (*i.e.*, after October 3, 2020), which conduct necessarily would

include or implicate private communications between Senator Menendez and his wife. *See, e.g.*,

Indict. ¶ 37(b) (alleging that Senator Menendez and Nadine attended dinners with Egyptian

officials in October and December 2020); *Id.* ¶ 37(c) (alleging that Hana caused items of value to

be delivered to Senator Menendez and Nadine's home in "early 2021"); *Id.* ¶ 37(d) (alleging that

Senator Menendez, via his wife, conveyed information about planned questioning from other

Senators to an Egyptian official).

 At trial, as part of his defense, Senator Menendez may elect to testify to communications

with his wife that serve to materially decrease any inference of culpability on Senator

Menendez's part. Senator Menendez will explain, for example, what he and his wife discussed

contemporaneously with their dinners with Egyptian officials (which colored his understanding

---

[5] The "joint crime exception" to spousal privilege is plainly inapplicable here. That exception applies *only* where "the spouse of an accused" will "testify willingly concerning [the spouses'] joint criminal activities." *See United States v. Premises Known as 281 Syosset Woodbury Rd., Woodbury, N.Y.*, 71 F.3d 1067, 1073 (2d Cir. 1995) ("the joint crime exception, recognized by this Court in *United States v. Estes*, 793 F.2d 465 (2d Cir.1986) . . . [is applicable] only when 'the spouse of an accused [would] testify willingly concerning their joint criminal activities.'"). Here, neither Senator Menendez nor Nadine intends to "testify[] willingly" concerning any alleged "joint criminal activity."

of the purpose of such dinners); the explanations that Nadine provided for *why* Hana and Uribe had provided her certain monetary items; the reasons why he sent his wife a series of questions that other Senators purportedly intended to ask an Egyptian official; and many more topics. While these explanations, and the marital communications on which they rely, will tend to exonerate Senator Menendez by demonstrating the absence of any improper intent on *Senator Menendez's* part, they may inculpate Nadine by demonstrating the ways in which she withheld information from Senator Menendez or otherwise led him to believe that nothing unlawful was taking place. *See* Weitzman Decl. ¶¶ 2-2(c), 4.

It is thus possible that Nadine will exercise the marital communications privilege to preclude Senator Menendez from testifying about these and other marital communications. If she does, the *exact* risk identified in *Zafiro* will be made manifest: Exculpatory evidence that *would* be available to Senator Menendez at a separate trial—where Nadine is not there to assert the privilege[6]—would *not* be available to Senator Menendez in a joint trial. That situation would plainly "compromise a specific trial right" available to Senator Menendez in a separate trial. *See Zafiro* at 539. Severance is required under these circumstances.

The *second* way in which a joint trial of the two married defendants in this case could prejudice Senator Menendez is more subtle, but no less important. On top of the risk that Nadine will assert a marital communications privilege to preclude exculpatory testimony from Senator Menendez, a joint trial would force the Senator to choose between two important rights: (i) his right to testify in his own defense, *United States v. Siddiqui*, 699 F.3d 690, 705 (2d Cir. 2012), and (ii) his competing but no less vital right to refuse to testify against his spouse (the "spousal

---

[6] *See Trammel v. United States*, 445 U.S. 40, 53 (1980) ("the witness-spouse <u>alone</u> has a privilege to refuse to testify adversely") (emphasis added).

testimonial privilege"), *see Trammel*, 445 U.S. at 53 (it is fundamental that a member of a married couple "may be neither compelled to testify nor foreclosed from testifying" against his or her spouse).

Were Senator Menendez to be tried alone, there would be no conflict between these two rights. Senator Menendez could freely offer testimony in his own defense with no impact on Nadine's criminal case. And, if called as a witness in Nadine's separate trial, Senator Menendez could decide whether to exercise the spousal testimonial privilege to refuse to testify in his wife's case without compromising his own trial rights. But by combining the couple's trials, an untenable conflict emerges. In a *joint trial*, if Senator Menendez chooses to exercise his right to testify in his own defense, he will necessarily have to *waive* his spousal testimonial privilege *not* to testify against Nadine because the jury deciding Nadine's fate will likewise hear Senator Menendez's testimony. Or, conversely, if Senator Menendez chooses to exercise his right to decline to testify against his wife in a joint trial, that will force him to hold back crucial defense testimony and evidence that would exonerate him were he tried alone.

Though it rarely occurs, courts faced with this situation have found that severance of trials is an appropriate remedy to resolve the conflict. For example, in *United States v. Blunt*, a married couple was charged with conspiring to commit unemployment insurance fraud. Both members of the couple moved to sever for various reasons, with the wife facing the same dilemma Senator Menendez now faces:

> [S]he wishes to provide exculpatory testimony on her own behalf at trial, but her testimony is likely to inculpate her husband, Defendant Hall. As a result, a joint trial will force her to choose between testifying on her own behalf, which testimony is likely to inculpate her husband, or not testifying at all in order to avoid testifying adversely to her husband.

*United States v. Blunt*, 930 F.3d 119, 122 (3d Cir. 2019).

Notably, after the district court declined to sever the married couple's trials, both were convicted. The Third Circuit reversed, holding that "we are compelled to afford the holder of spousal [testimonial] privilege the opportunity to exercise that privilege without being forced to choose between it and the fundamental right to testify on her own behalf," *Blunt*, 930 F.3d at 127, and finding that "Blunt was entitled to exercise both of the rights at issue here" but effectively was denied the opportunity to do so. *Id.*

Likewise, in *United States v. Dobson*, the court ordered severance of two spouses' trials "to protect Larry Dobson's two fundamental rights: the first, to testify on his own behalf and the second, his right not to testify against his wife." *Dobson*, 2003 WL 22427984, at *2 (E.D. Pa. Aug. 18, 2003); *cf. United States v. Brown*, No. 06-cr-71-1-2 (SJM), 2006 WL 3171038, at *1 (D.N.H. Nov. 1, 2006) (finding that severance of a married couple's trials would be appropriate, but declining to separate the trials because "defendants are adamantly opposed to severance").[7] This Court should do the same in order to protect Senator Menendez's important trial rights to testify in his own defense and to refuse to testify against his wife.

C.   The Court should sever Senator Menendez's trial from the trial of co-defendants Hana, Uribe, and Daibes.

Severing the trials of Senator Menendez and Nadine still leaves the Court to grapple with the question of when the *remaining* Defendants—Wael Hana, Jose Uribe and Fred Daibes (the "Conspiracy Defendants")—should be tried. The Supreme Court's guidance in *Zafiro*, and the

---

[7] While some courts have disagreed with *Dobson*'s reasoning and refused to sever trials between married co-defendants where a similar conflict of rights emerges, *see, e.g.*, *United States v. Ferrer*, No. 08-CR-0218-03 (SHR), 2008 WL 4890034 (M.D. Pa. Nov. 12, 2008), the Third Circuit's 2019 decision in *Blunt* (*supra* Section IV.B) makes clear that severance is appropriate in such circumstances and that convictions may be reversed where severance is denied.

specific facts of this case, point to a clear answer to that question:  Senator Menendez should be tried alone first, and then the joint-trial of Nadine and the Conspiracy Defendants should follow.

*First*, a joint trial of Senator Menendez with the Conspiracy Defendants would necessarily involve the admission of evidence against the Conspiracy Defendants that "the jury should not consider against [Senator Menendez] and that would not be admissible if [Senator Menendez] were tried alone."  *Zafiro* at 539. *Second*, a joint trial would likewise create the risk that "evidence of [one or more of the Conspiracy Defendants'] wrongdoing . . . erroneously could lead a jury to conclude that [Senator Menendez] was guilty" as well. *Id.* To eliminate the risk of these prejudices, and to ensure that all Defendants receive a constitutionally fair trial, this Court should sever Senator Menendez's trial from that of the Conspiracy Defendants.

> 1.    <u>Defendant Hana's alleged communications with Egyptian officials risk prejudicing the jury against Senator Menendez.</u>

The Indictment does not allege any unlawful *direct* communications between Senator Menendez and any Egyptian official, but it does allege several communications between *Hana* and Egyptian officials that we expect the government would argue were unlawful or evidence an illegal scheme. In particular, the Indictment alleges that Hana communicated directly with Egyptian officials regarding, among other things: a plan to lift a ban on small arms trading with Egypt (Indict. ¶ 19(c)); Senator Menendez's alleged intent to "sign off" on a specific sale of military equipment to Egypt (*Id.* ¶ 20); an alleged plan for Senator Menendez to "resolve" a "human rights matter" that was purportedly inhibiting the award of military aid to Egypt (*Id.* ¶ 21); Senator Menendez's plans regarding a "hold" on a significant aid package to Egypt (*Id.* ¶ 35); an offer to cause Senator Menendez to work on Egypt's behalf during a trip to India (*Id.* ¶ 36). These statements—if offered at a separate trial where Senator Menendez was the only defendant—would be subject to a significant admissibility hurdle. They are classic out-of-court

statements offered for the truth of the matter asserted—*i.e.*, Senator Menendez's involvement in these alleged unlawful schemes for the benefit of the Egyptian government. Moreover, they lack any indicia of reliability because Hana has significant motivations to engage in puffery, including by overstating his level of political influence in the U.S. for the benefit of his own relationship with Egyptian officials. *See United States v. Abreu*, 342 F.3d 183, 191 (2d Cir. 2003) (declining to admit hearsay statements where the "proffered testimony" was "self-serving and uncorroborated"); *see also* Fed. R. Evid. 801(c); *D.R. by Rodriguez v. Santos Bakery, Inc.*, No. 20-cv-3628 (KHP), 2023 WL 3736441, at *2 (S.D.N.Y. May 31, 2023) ("[T]he rule against hearsay is fundamentally designed to ensure that only reliable evidence goes in front of the jury") (citations and internal quotations omitted).

Senator Menendez acknowledges that—even if tried alone—the government may seek to admit Hana's statements to Egyptian officials against him as *non*-hearsay statements of a co-conspirator under FRE 801(d)(2)(E). Any such claim should fail for several reasons, including because the government will not be able to establish that these statements were made "in furtherance" of any conspiracy ***involving Senator Menendez***. *See United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) ("[i]n order to admit a statement under [FRE 801(d)(2)(E)], the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy") (citations omitted). At most, the government's evidence might show a ***separate*** conspiracy on Hana's part to curry favor with Egyptian officials (including by misrepresenting his ability to influence a sitting U.S. Senator) for his Hana's personal financial benefit. To the extent Egypt was seeking to exploit a years-long friendship between Hana and Nadine, believing that this would somehow lead to an enhancement in

Egypt's influence over U.S. affairs, that was a conspiracy *against* Senator Menendez, not a conspiracy in which he participated.

This is not mere speculation by the defense; contemporaneous evidence produced in discovery by the government shows that Hana was running his own scam, and that Senator Menendez was its victim, not coconspirator. For example, the recording made by a confidential source with Hana's friend ██████████ (which the government credited in its search warrant affidavits), shows that Hana "swindled" Senator Menendez and "fucked [over] Nadine" by taking a ring from Nadine and promising to trade it for one of equivalent value, but instead trading it in for a ring of much lesser value. As a result, Senator Menendez cut off contact with Hana. *See* Fee Decl., Ex. E at 5-10. Accordingly, Hana is *obviously* not part of any conspiracy with Senator Menendez; he was actively scamming him. Hana's statements therefore cannot be admitted against *Senator Menendez* under the exception at FRE 801(d)(2)(E). *See United States v. Russo,* 302 F.3d 37, 45–46 (2d Cir. 2002) ("the conspiratorial objective being furthered by the declarant's statement must in fact be the objective of a conspiracy between the defendant and the declarant. Conspiracies between them that do not so coincide . . . will not be sufficient") (emphasis added); *United States v. Gigante*, 166 F.3d 75, 83 (2d Cir. 1999) ("[i]t is the unity of interests stemming from a specific shared criminal task that justifies Rule 801(d)(2)(E) in the first place") (emphasis added).

We expect the government will argue that this issue is premature and should await factual development at trial. But there is an important reason to resolve this issue now. From an efficiency and judicial economy perspective, deferring this issue until a joint trial risks a *mid-trial* severance, with all the attendant costs. If Senator Menendez's hearsay objections as to Hana's statements carry the day, then the jury deciding his innocence or guilt should not be privy

to the prejudicial statements between Hana and Egyptian officials. The Court will then be caught in an impossible situation, faced with evidence that is *admissible* against one co-defendant (Hana), but *inadmissible* against Menendez. No limiting instruction will be able to cure the prejudice to the Senator by admission of the statements against Hana. *United States v. Taylor*, 745 F.3d 15, 28 (2d Cir. 2014) (limiting instruction insufficient where it would require a jury to engage in "a mental gymnastic which is beyond, not only [the jury's] powers, but anybody's else."). That scenario could leave no choice but to declare a mistrial and set separate trials later, or sever mid-trial. To avoid this wholly undesirable outcome, the Court should sever the trials now.

      2.     <u>Defendants Uribe's and Daibes' alleged conduct, including prior bad acts, risk prejudicing the jury against Senator Menendez.</u>

Last, there can be no doubt that the government will attempt to impugn the credibility and character of Defendants Uribe and Daibes through repeated reference to those Defendants' alleged criminal histories. The Indictment makes this clear:  Although the circumstances of those criminal histories have no apparent or actual relevance to any prosecution of the Senator, the Indictment prominently alleges them. *E.g.*, Indict. ¶ 8 (alleging that Uribe has "previously been convicted of fraud and h[ad] his insurance broker's license revoked"); *Id.* ¶ 9 (alleging that Daibes "was charged by the United States Attorney's Office for the District of New Jersey with obtaining loans under false pretenses from [a] bank" that he founded).

Thus, at trial, in order to provide background information, attack credibility, proffer evidence on motive or lack of mistake, or for myriad other reasons, the government will likely seek to present detailed evidence of Daibes' and Uribe's criminal histories, including their potential sentencing exposure, any harm caused to victims, etc. Of course, all of this has no relation whatsoever to the now-charged conspiracy nor any bearing on Senator Menendez's

innocence or guilt.[8]   Consequently, the admission of all that evidence against Daibes and Uribe,

while Senator Menendez is forced to sit at the same defense table throughout trial, would be

highly prejudicial (and certainly would not be admitted were Menendez to be tried alone). *See*

*Zafiro* at 539 (noting that "evidence of a co-defendants' wrongdoing . . . erroneously could lead a

jury to conclude that defendant was guilty" as well).

On the other hand, to the extent that Uribe's and Daibes' criminal histories are deemed

relevant in the Senator's *separate* trial, Senator Menendez likely will seek to minimize any

unfair prejudice resulting from the admission of such evidence by entering into an appropriate

stipulation regarding the existence of the criminal conviction or prosecution, as authorized under

*Old Chief v. United States,* 519 U.S. 172, 185–86 (1997), and its progeny. *See also United States*

*v. Boykins*, No. 20-1104-CR, 2022 WL 2203977, at *2 n.2 (2d Cir. June 21, 2022) (noting that a

stipulation to prior criminal conduct avoids unfair prejudice).

Indeed, courts have routinely severed trials under comparable circumstances, where the

charges brought against the various defendants in a multi-defendant case differ materially. *See*

*United States v. Burke,* 789 F. Supp. 2d 395, 399 (E.D.N.Y. 2011) (severing trials where

prejudicial "evidence that will be offered in the prosecution of a joint trial with Burke and

D'Arpino will not be admissible against Ruggiero in a severed trial"); *United States v. Key*, No.

12 CR. 712 (SHS), 2013 WL 12204221, at *2 (S.D.N.Y. Aug. 28, 2013) (Stein, J.) (severing

trials and noting that "the marked difference in the character of the allegations against defendants

---

[8] To be sure, the Indictment charges Senator Menendez with seeking to help Daibes evade
punishment for the above-referenced crime (Indict. ¶ 46-54), but there is no claim that Daibes'
alleged *underlying* conduct (obtaining a loan under false pretenses) was done in furtherance of
any conspiracy with Senator Menendez. And Uribe's alleged criminal history (fraud in the
insurance industry) lacks even any *attenuated* link to any conduct attributed to Senator
Menendez or any conspiracy alleged in the Indictment.

Capriata and Key, on the one hand, and the allegations against all other defendants, on the other, counsels strongly in favor of this severance"). Although these cases considered differences in charged offenses, the reasoning underlying them applies with equal force to differences in *evidence* likely to be admitted against different defendants. Thus, if tried alone, Senator Menendez would not be prejudiced by contending with evidence of his co-Defendants' criminal pasts that is irrelevant as to the Senator. The need, in a joint trial, to persuade the jury *not only* of the Senator's own lack of culpability, but also of the difference between himself and his co-Defendants imposes a substantial burden on Senator Menendez that would not be present in a severed trial. This prejudice, as explained in *Zafiro*, warrants severance.

## CONCLUSION

For the foregoing reasons, this Court should (1) dismiss the Indictment for improper venue or, in the alternative, transfer this case to the District of New Jersey in the interest of justice, (2) require the government to file a new indictment with non-duplicitous counts or, in the alternative, provide a special jury verdict form, and (3) sever Senator Menendez from his co-defendants.

Dated: January 15, 2024                                Respectfully submitted,


                                                       By: */s/  Adam Fee*
                                                       _____

Yaakov M. Roth (*pro hac vice* pending)                    Adam Fee
JONES DAY                                                  PAUL HASTINGS LLP
51 Louisiana Avenue N.W.                                   1999 Avenue of the Stars
Washington, D.C. 20001                                     Los Angeles, CA 90067
Telephone: (202) 879-3939                                  Telephone: 1(310) 620-5719
Facsimile: (202) 626-1700                                  Facsimile: 1(310) 620-5819

                                                           Avi Weitzman
                                                           PAUL HASTINGS LLP
                                                           200 Park Avenue
                                                           New York, NY 10166
                                                           Telephone: 1(212) 318-6000
                                                           Facsimile: 1(212) 725-3620

                                                           Robert D. Luskin
                                                           PAUL HASTINGS LLP
                                                           2050 M Street NW
                                                           Washington, D.C. 20036
                                                           Telephone: 1(202) 551-1966
                                                           Facsimile: 1(202) 551-0466


                       *Attorneys for Defendant Robert Menendez*

40