O4B8MENC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5   ROBERT MENENDEZ, NADINE
    MENENDEZ, WAEL HANA, and
6   FRED DAIBES,

7              Defendants.                 Decision

8   ------------------------------x
                                           New York, N.Y.
9                                          April 11, 2024
                                           11:00 a.m.
10
    Before:
11
                        HON. SIDNEY H. STEIN,
12
                                           District Judge
13
                        APPEARANCES
14
    DAMIAN WILLIAMS
15       United States Attorney for the
         Southern District of New York
16   BY: DANIEL C. RICHENTHAL
         ELI J. MARK
17       PAUL M. MONTELEONI
         LARA E. POMERANTZ
18       Assistant United States Attorneys

19   PAUL HASTINGS LLP
         Attorneys for Defendant Robert Menendez
20   BY: ADAM FEE
         AVI WEITZMAN
21

22

23

24

25

O4B8MENC

1                          APPEARANCES (Cont'd)

2   SCHERTLER ONORATO MEAD & SEARS, LLP
         Attorneys for Defendant Nadine Menendez
3   BY:  DAVID SCHERTLER

4   GIBBONS, PC
         Attorneys for Defendant Hana
5   BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
6        RICARDO SOLANO, JR.

7   THE LAW FIRM OF CESAR DE CASTRO, P.C.
         Attorneys for Defendant Daibes
8   BY:  CESAR DE CASTRO
         SETH H. AGATA
9        SHANNON M. McMANUS

10  VALERIE A. GOTLIB (via telephone)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O4B8MENC

```
 1              (In open court; case called)
 2              THE DEPUTY CLERK:  Counsel, please state your names
 3    for the record.
 4              MR. RICHENTHAL:  Good morning, your Honor.  Daniel
 5    Richenthal for the government.  With me is Eli Mark, Paul
 6    Monteleoni, and Lara Pomerantz.
 7              THE COURT:  Good morning.
 8              MR. FEE:  Good morning, your Honor.  For Senator
 9    Menendez, Adam Fee and Avi Weitzman.  Your Honor, our client
10    has waived his appearance today.
11              THE COURT:  You have spoken with him about this and he
12    waives his appearance?
13              MR. FEE:  Correct, your Honor.
14              THE COURT:  I accept that.
15              MR. LUSTBERG:  Good morning, your Honor.  Lawrence S.
16    Lustberg, from Gibbons PC, on behalf of Defendant Wael Hana.
17    With me are my partners Anne Collart and Ricardo Solano.
18    Mr. Hana has also, after full consultation with us, waived his
19    appearance for purposes of today's proceeding.
20              THE COURT:  That's fine.  We are only going to be
21    dealing with legal matters and trial scheduling, nothing
22    factual.
23              MR. LUSTBERG:  Thank you.
24              MR. DE CASTRO:  Good morning.  Cesar de Castro.  I am
25    joined by Seth Agata and Shannon McManue for Fred Daibes.  He
```

O4B8MENC

| | |
|---|---|
| 1 | has also waived his appearance today, and we have spoken to him |
| 2 | about it. |
| 3 | THE COURT:  Please be seated. |
| 4 | MR. SCHERTLER:  Your Honor, David Schertler on behalf |
| 5 | of Nadine Menendez.  And Ms. Menendez also waives her |
| 6 | appearance for this proceeding. |
| 7 | THE COURT:  And you have spoken with her about it? |
| 8 | MR. SCHERTLER:  Yes. |
| 9 | THE COURT:  Welcome.  Please be seated. |
| 10 | I have decisions on the pending motions.  I am going |
| 11 | to deliver them orally rather than in written form.  It will |
| 12 | save me a lot of time, and I think it's to the parties' |
| 13 | advantages to have it early. |
| 14 | What I propose, but I won't do it without the consent |
| 15 | of the parties, is that I read the opinion and give the case |
| 16 | name, but not the actual citation.  And the reporter will put |
| 17 | the citation in from my notes, but I will read the case name. |
| 18 | I won't do that if people disagree. |
| 19 | Government. |
| 20 | MR. RICHENTHAL:  I think that's sensible, your Honor. |
| 21 | MR. FEE:  Please, your Honor. |
| 22 | MR. LUSTBERG:  No objection. |
| 23 | MR. DE CASTRO:  No objection. |
| 24 | MR. SCHERTLER:  No objection. |
| 25 | THE COURT:  It will save everybody time in the |

O4B8MENC

1    courtroom.  That's for sure.

2           A lot has been happening in the last couple of days,

3    and I have requests for adjournment of the trial, which is set

4    for May 6, and severance, and requests to go to trial.  So

5    let's handle that at the beginning.

6           This was sparked by a medical issue with Mrs.

7    Menendez.  And, Mr. Schertler, please pass on the concern of

8    the Court and the hope for a speedy recovery.

9           MR. SCHERTLER:  Yes, I will.

10          THE COURT:  Why don't you start off.  What is your

11   position on the May 6 trial date?

12          MR. SCHERTLER:  For the reasons that we have submitted

13   to the Court in writing, we would ask for an adjournment of the

14   trial date with respect to Nadine Menendez.

15          THE COURT:  Until when?

16          You want it *sine die* because the medical issues are

17   uncertain at this time.

18          MR. SCHERTLER:  That's correct.  We think the most

19   prudent course would be to set a status hearing in two months'

20   time to see what the medical condition is at that time and when

21   Ms. Menendez could sit for trial.

22          THE COURT:  As of now, do you have a view as to when

23   it's likely for her to be able to sit for trial or too early to

24   tell?

25          MR. SCHERTLER:  Your Honor, it's just too early to

O4B8MENC

1    tell, especially for me, without any medical background.  And

2    what we understand is that there needs to be more information

3    that will be garnered from additional tests and additional

4    procedures.  So in two months' time we expect to know a lot

5    more.

6              THE COURT:  Thank you.

7              Mr. Fee.

8              MR. FEE:  Your Honor, our position is clear.  The

9    Court denied the one and only request for an adjournment that

10   Senator Menendez made.

11             THE COURT:  You made a request for an adjournment

12   because you wanted additional time; you said you needed, I

13   think it was two months from May 6 to prepare, if I remember.

14             MR. FEE:  We don't need it anymore, your Honor, and we

15   don't want it.  Since that day, when the Court said May 6 is

16   the trial date, we have directed all of our resources to

17   getting ready.  We are ready.

18             Two points, your Honor.  One, every day that the

19   specter of the unproven allegations are in the air as to our

20   client is a detriment to him, and it could effectively remove

21   his ability to run in the general election; every day of delay

22   is prejudicial to him.  So we want to go on May 6, your Honor.

23             The second point, your Honor, given the issues that

24   have arisen with Mrs. Menendez, we think that a severance is

25   almost inevitable of her, unless the Court is prepared to order

O4B8MENC

1    a very lengthy adjournment of the trial.

2            THE COURT:  Well, that I certainly don't want.  But

3    why do you say that, based on the information we have?  And the

4    details are appropriately sealed, but what can you say?

5            MR. FEE:  The issue that the government omits from its

6    letter is that there is now a pending motion to withdraw by her

7    trial counsel, your Honor.  I don't know how the Court is going

8    to deal with that.  But if there is a new counsel --

9            THE COURT:  The motion to withdraw is based on an

10   actual conflict.

11           MR. FEE:  Correct, your Honor.

12           THE COURT:  I don't have much choice if there is an

13   actual conflict.

14           MR. FEE:  Therefore, she is going to have two issues

15   that are going to require significant time.  One, the medical

16   issue, and two, a brand-new counsel who is entering at the time

17   when she is dealing with these other issues.

18           So, I think it's hollow to suggest that a trial date

19   for all the defendants is remotely plausible in July or August.

20   Senator Menendez wants his May 6 trial, your Honor, and we

21   think it actually speaks to the public and the defendants'

22   rights here, because this is a sitting U.S. senator who has to

23   deal with these allegations.

24           THE COURT:  But, again, you recently asked for an

25   adjournment.

O4B8MENC

1              MR. FEE:  Your Honor, that was not recently.  That was

2       at the beginning of this case.  You said no.  You said May 6 is

3       the date.  We listened.  We are ready, and we are asserting our

4       speedy trial right.  We want to go on May 6, your Honor.  And

5       we think an adjournment to July, unless the Court is going to

6       sever, is really an adjournment beyond July to the fall.

7              THE COURT:  Why?

8              MR. FEE:  Because of the need, the likelihood --

9              THE COURT:  Both counsel and you're saying the

10      likelihood of additional medical requests; is that your point?

11             MR. FEE:  Even putting aside additional medical

12      issues.  New counsel for Mrs. Menendez, plus the medical

13      issues, in my view, makes her going forward in July very

14      unlikely.

15             THE COURT:  Thank you.

16             MR. RICHENTHAL:  Can I respond briefly, your Honor?

17             THE COURT:  Of course.

18             MR. RICHENTHAL:  36 days ago, on March 6 --

19             MR. LUSTBERG:  One second.  Are you going to hear from

20      the other defendants?

21             THE COURT:  Let's hear from the defendants.

22             Mr. Lustberg.

23             MR. LUSTBERG:  If I may, like Mr. Fee, we have in the

24      past questioned going to trial so quickly, in fact, recently.

25      But we, like him, have worked very hard and will be ready on

O4B8MENC

1    May 6, and we too want to go to trial on May 6.

2            Let me raise two issues with your Honor.  The first is

3    that Mr. Hana, as the Court is well aware, his wife and

4    children are in Egypt.  He is unable to travel back and forth

5    to Egypt to see them.

6            THE COURT:  I thought when we first met, I thought the

7    representations were that he was going to bring them here

8    because there were issues about likelihood of appearing in

9    court and so forth.

10           MR. LUSTBERG:  And they are not being permitted to

11   travel here; they are not being permitted to leave Egypt.  I

12   don't know the details of that, but I can tell you that he

13   would love for them to be here and they can't come.  So that's

14   a hardship.  But beyond that hardship, your Honor, he is not a

15   US senator, but the pendency of this matter is devastating to

16   his business, and may in fact destroy it.  He just wants to get

17   this thing going.

18           I want to raise, though, your Honor, another issue

19   that I just want you to be aware of.

20           THE COURT:  Wait.  I assume from the public records

21   his business is importing halal certified meat into Egypt.

22           MR. LUSTBERG:  Right.

23           THE COURT:  Why is this trial devastating to that

24   business?  And he has a monopoly on it, or at least in the

25   record he does.

O4B8MENC

1          MR. LUSTBERG:  Which is being questioned as a result

2     of these charges.

3          THE COURT:  Questioned where, by whom?

4          MR. LUSTBERG:  I think some of this is information

5     that is not public, so I am a little wary, but let me tell you

6     what I can.  It would not be surprising to know that those who

7     would prefer to have this contract are using this indictment

8     against him in an effort to achieve that.

9          THE COURT:  Okay.

10          MR. LUSTBERG:  But there is another logistical

11     problem, which I alerted the Court to in my very first letter

12     on this way back in the fall.  I had another trial in the

13     federal district court for the District of New Jersey scheduled

14     for May 6, before Michael Farbiarz.  Judge Farbiarz, because

15     this trial date had been set earlier, adjourned that trial

16     until September 9.  And he now has set that trial for September

17     9.  And I am very concerned that if this case were to go up

18     until the summer, that would run into September 9, or to go up

19     to the fall, which I think it very well could in light of the

20     concerns that Mr. Fee has raised, that I am going to run into

21     that conflict.  That was a case that was indicted in February

22     of 2019.  So it's a very old case, and there have been efforts

23     made to move it, and Judge Farbiarz was very kind to adjourn

24     the May 6 trial date in order to accommodate this case and your

25     Honor's schedule.  He also said at the time that the reason he

O4B8MENC

1    did that is because this trial date had been set earlier.  But

2    I do not think that is going to be willing to move it again.

3          THE COURT:  I think he will move it again, but I am

4    not terribly concerned about that.

5          MR. LUSTBERG:  I just want to raise it with the Court

6    because depending on what the Court does, it may raise an

7    issue.  Look, as I said to him, I will be wherever the two of

8    you decide I have to be, but I can only be --

9          THE COURT:  The two of us will decide, don't worry.

10   Thank you.

11          Mr. De Castro.

12          MR. DE CASTRO:  Thank you, Judge.  We submitted a

13   letter last night I think with our position, which is that we

14   could use time, we certainly could use an additional amount of

15   time.  If you're asking me now when, I would say late June,

16   early July would be preferable for Mr. Daibes.

17          THE COURT:  Thank you.

18          Let me hear from the government.

19          MR. RICHENTHAL:  Your Honor, 36 --

20          THE COURT:  I am concerned -- well, more than 30

21   seconds.  I am concerned about Mr. Fee's point on the new

22   counsel coming in for Mrs. Menendez and needing to get up to

23   speed.

24          MR. RICHENTHAL:  I am happy to talk about that.  I

25   wasn't going to say 30 seconds.  I was going to say 36 days.

O4B8MENC

| | |
|---|---|
| 1 | On March 6, 2024, at docket 240, every defendant, including Mr. |
| 2 | Menendez, in a letter written by Mr. Hana's counsel, said that |
| 3 | our position on May 6—and this is a quote—"was divorced from |
| 4 | reality" and that the trial -- |
| 5 | THE COURT:  You're quoting and saying "our position." |
| 6 | The government's position? |
| 7 | MR. RICHENTHAL:  Yes. |
| 8 | THE COURT:  These are the defendants saying the |
| 9 | government's position of going on May 6 is divorced from |
| 10 | reality. |
| 11 | MR. RICHENTHAL:  Yes. |
| 12 | THE COURT:  There's gamesmanship here, but I am trying |
| 13 | try to look through the gamesmanship and figure out what is |
| 14 | best under the law and *Zafiro*, and also the need for new |
| 15 | counsel to come on, and the need for the Court to set, in the |
| 16 | interests of all the parties, and the public, a trial date that |
| 17 | can be adhered to. |
| 18 | So go ahead. |
| 19 | MR. RICHENTHAL:  That's exactly our position.  The |
| 20 | reason I was referring to what happened 36 days ago is that |
| 21 | there is gamesmanship.  Only one thing has happened in the past |
| 22 | 36 days that's relevant, is that Ms. Menendez has an unforeseen |
| 23 | medical condition.  And while a party is entitled to change his |
| 24 | or her position for perceived tactical advantage, that is what |
| 25 | is happening here.  Under *Zafiro* and *Richardson*, and lots of |

O4B8MENC

1    other case law, there is a standard for severance.  It's

2    stringent.  It's exceedingly difficult to meet.  It is not met

3    for any number of reasons, for example, the evidence may be

4    only close to one defendant, or defendants may point their

5    fingers at each other, and it is not met here.

6            To go to the point about Ms. Menendez, I agree there

7    is a possibility—of course there is—that we may have to sever

8    this case.  We said that in our letter.

9            THE COURT:  That's the last thing I want if I adjourn

10   it and then it has to be severed.

11           MR. RICHENTHAL:  We agree, which is why we proposed

12   the dates we proposed.  But just to be clear, we are having

13   this conversation on April 11.  If for the sake of argument

14   your Honor were to set a trial in, say, June or July, that's 8

15   or 12 weeks from now.  Ms. Menendez's new counsel will have 8

16   to 12 weeks to get up to speed, in a case that has been

17   exceedingly well briefed --

18           THE COURT:  They need to be brought on also.

19           MR. RICHENTHAL:  I can't speak to Ms. Menendez's

20   retention of counsel, where she is in that process.  All I know

21   is that, at least in my experience, and in my view of this

22   record, 8 to 12 weeks—and that's just an estimate—should be

23   more than sufficient to be ready for trial.

24           Remember, her current counsel unfortunately does

25   appear to face a conflict, but they are not disappearing.  They

O4B8MENC

1    are ready to try this case in four weeks, indeed, less than

2    four weeks.  Particularly with their assistance, and I am not

3    aware of any reason why they can't assist new counsel, 8 to 12

4    weeks is more than sufficient.  And again, I am estimating 8 to

5    12.  The Court hasn't made any decision.  So I just think

6    that's speculative, and we shouldn't be moving on the

7    assumption of what is going to happen in 8 weeks, or 12 weeks,

8    or 10 weeks, or 16 weeks.

9            The law has a stringent standard.  It is not met.  And

10   again, a defendant is entitled to change his or her position,

11   but the law hasn't changed, and severance is unwarranted on

12   this case; and indeed, severance here would have the

13   particularly serious impacts on efficiency, on resources, and

14   on fairness that the Supreme Court has long cautioned against.

15           THE COURT:  Mr. Fee.

16           MR. FEE:  Your Honor, the other thing that happened

17   since that letter was submitted is that the Court said May 6 is

18   the trial date.  We have gotten ready for May 6.  It is not

19   realistic what the government is proposing.  They are saying we

20   will check in in July and we will see what happens.

21           THE COURT:  No.  I thought they were saying set a July

22   date.  That's what has been in the papers back and forth.

23           What does the government say?

24           MR. RICHENTHAL:  Absolutely.  We want a firm trial

25   date.  We are ready to try this case on any schedule the Court

O4B8MENC

1    submits.  Indeed, just to give an example.  The requests to

2    charge are due tomorrow.  We have already drafted them and sent

3    them to the defense.  We are ready to try this case.  We want

4    to try this case.  What we don't want to do is try this case

5    twice, which we don't think is appropriate under the law and

6    appropriate on the record of this case.  That's what we are

7    resisting.  We want a firm trial date.

8         MR. FEE:  Your Honor, we have a firm trial date.  It's

9    May 6.  The idea that we are just going to kick it for two

10   months, when it's a certainty that Mrs. Menendez will be unable

11   to proceed in July.

12        THE COURT:  How do you say that?

13        MR. FEE:  Your Honor, it's not realistic.  Given the

14   issues in the sealed declaration, and given that she is going

15   to have new counsel, despite Mr. Richenthal's belief that

16   anyone could get up to speed on this case in eight weeks, even

17   with the assistance of another lawyer, is not realistic.

18        THE COURT:  I think that part is.

19        MR. FEE:  I think you're going to have another problem

20   you are going to have to deal with if you think there will be a

21   severence in July.

22        We have a May 6 trial date, your Honor.  The

23   government didn't have to charge this case when it did.  It

24   didn't have to oppose an adjournment at every step of the way.

25        THE COURT:  Again, to say what the government was

O4B8MENC

1    saying, when you were advocating for an adjournment at every

2    step of the way.

3    MR. FEE:  We listened to your rulings, your Honor.

4    You were crystal clear that May 6 is the trial date.  The

5    Senator and his legal team have organized their lives around

6    May 6, and every day that these unproven allegations continue

7    to hang in the air is prejudicial to the defendant.  Mr.

8    Richenthal's argument, the government's argument, is a

9    convenience and efficiency of the government, your Honor.  The

10   defendant has a right to a speedy trial and that is what we are

11   asserting, in line with the Court's absolutely crystal clear

12   direction that May 6 --

13   THE COURT:  Your codefendants are seeking additional

14   time.

15   MR. FEE:  One codefendant, who is newer to the case

16   than the rest of us, your Honor.  Senator Menendez and his team

17   have been here since the day it was charged, and we are ready

18   to proceed, your Honor.

19   MR. SCHERTLER:  Your Honor, may I add a quick point?

20   THE COURT:  Yes.

21   MR. SCHERTLER:  I just think it's unrealistic to

22   expect that new attorneys could be ready within 8 to 12 weeks

23   given the volume of discovery in this case.  We are talking

24   about complex charges that cover a period of time of five

25   years, in which there are tens of thousands of relevant and

O4B8MENC

1    probative text messages, e-mails, voice mails.  I am not sure

2    that an attorney would actually take on Ms. Menendez's case if

3    they had to go to trial within 8 to 12 weeks.  I understand

4    what Mr. Richenthal is saying, but I think everybody on the

5    defense side would agree that that's just unrealistic.  No

6    attorney could do that.

7         MR. LUSTBERG:  Judge, I just want to address one thing

8    your Honor said.  There is absolutely, from our perspective,

9    zero gamesmanship.  Like Mr. Fee, when we asked for more time,

10   the Court denied it and --

11        THE COURT:  I have a different view of gamesmanship,

12   but I don't think it really matters.  Thank you, sir.

13        I think given the medical issues it's quite uncertain

14   as to when we will go to trial.  I can't speak to new counsel.

15   I do think counsel can get up to speed.  I don't know when she

16   is going to hire new counsel.  I am going to stick with the May

17   6 trial date.  The Court will have to try this case twice.  The

18   parties will have to try this case twice.

19        Given the medical issues, I am going to sever Mrs.

20   Menendez.  I am going to set Mrs. Menendez down for a July 8

21   trial date.  We will have a conference in June to see whether

22   that's realistic or not.  Let's set Monday, June 3, at 10 a.m.

23   to understand whether or not we can go to trial on July 8.

24   This trial is going forward without Mrs. Menendez.  It's

25   unfortunate given the public policy concerns behind the *Zafiro*

O4B8MENC

1    case.  But in order to give some stability and, certainty is

2    the word I'm looking for, to all the parties, we are going to

3    trial on May 6.  That's my decision.

4              MR. RICHENTHAL:  Your Honor, two small matters, if I

5    may.

6              THE COURT:  Yes.

7              MR. RICHENTHAL:  First, can July 8 be a control date?

8    Because there are, for example, disclosures triggered by a

9    trial date that may not come to pass, and I think it would be

10   more appropriate for the parties to confer about them.

11             THE COURT:  Sure.  Absolutely.  July 8 will be, you

12   call it a control date, I call it trial date, but the Court

13   understands it may slide.  Indeed, a significant part of the

14   Court's decision to have us go forward on May 6 is the

15   substantial uncertainty in Mrs. Menendez's medical situation.

16   I will leave it at that.  Everybody, including the government,

17   deserves some certainty here.

18             MR. RICHENTHAL:  Understood.  And the second point

19   related to May 6, and I didn't mention this earlier.

20             THE COURT:  I don't think anybody wants to try this

21   case twice, but the parties are entitled to certainty.

22             MR. RICHENTHAL:  Understood.  And when I said that we

23   don't want to try the case twice, I was referring to lay

24   witnesses and the public as well, not just the government.  We

25   are always ready.

O4B8MENC

1          I want to mention something about May 6 that I didn't

2    mention a few minutes ago.  I think it matters, and I was going

3    to mention it regardless, but it wasn't part of the colloquy

4    with counsel.  We have been working extremely hard to come up

5    with a stipulation that would not require Mr. Lustberg to be

6    disqualified.

7          THE COURT:  Mr. Lustberg?

8          MR. RICHENTHAL:  Mr. Lustberg, correct, your Honor.

9    If the Court remembers, there was a *Curcio* hearing.

10          THE COURT:  I do remember.

11          MR. RICHENTHAL:  We are working on a stipulation to

12    get around the issues that were talked about in that *Curcio*.

13    We have largely reached an agreement, indeed, we essentially

14    have reached an agreement with Mr. Hana's counsel, but I want

15    to flag two points related to that.

16          First, all the other defendants have to agree.

17    Otherwise, it doesn't work, and we can't have a stipulation

18    that only one defendant signs.  Second, while the agreement

19    that I am referring to is indeed an agreement, it's an

20    agreement as to what Mr. Lustberg would testify to; it's not an

21    agreement as to admissibility.  And the parties have very

22    different views, perhaps reasonably, about different portions

23    thereof of the stipulation, which would have to be litigated

24    potentially in advance of trial.  That we can do.  But the

25    first issue, that all defendants have to agree, is quite real.

O4B8MENC

1    We will continue to work to seek that agreement, but I just

2    want to flag it for the Court, because absent it, unless I am

3    grossly misreading the law, Mr. Lustberg would have to be

4    disqualified, which obviously will affect the May trial date.

5            THE COURT:  The Court was working on the assumption

6    that that was fairly easy to work out——that is that

7    stipulation——but apparently not.  Keep me apprised.

8            MR. RICHENTHAL:  It's been harder than anticipated,

9    but not for the fault of Mr. Lustberg, and I hope and assume we

10   will get there, but I wanted the Court to be aware we don't yet

11   have agreement from all defendants.

12           THE COURT:  Thank you.

13           MR. LUSTBERG:  We have worked hard and we have a

14   stipulation, but the other defendants have to agree to it as

15   well.

16           MR. WEITZMAN:  Your Honor, I will just say, we are

17   available to talk to the government at any point about the

18   stipulation; they have not reached out to us.  We are happy to

19   confer with them, and we will do so.  We have been conferring

20   with Mr. Lustberg, but we are happy to talk to the government

21   directly.

22           MR. RICHENTHAL:  We have reached out to all

23   defendants, your Honor, although I don't think we need to get

24   to the back-and-forth that proves the point I just made.

25           THE COURT:  We don't.  And I think I may have been

O4B8MENC

1    saying May 8.  This trial is set for May 6.  I misstated it if

2    I said May 8.

3         Mr. Schertler, I am not relieving your firm.  I will

4    not have Mrs. Menendez be unrepresented.  So you are to

5    continue to represent her.  By the same token, she is to obtain

6    new counsel within 30 days.  All right?

7         MR. SCHERTLER:  Yes, sir.

8         THE COURT:  And I will expect a notice of appearance

9    on behalf of new counsel within 30 days.

10        The motions that I intend to deal with include a

11   motion to dismiss for failure to adequately allege venue, a

12   motion to transfer venue to the District of New Jersey, motions

13   for bills of particular, motions to sever—the motions to sever

14   by Senator Menendez vis-a-vis Mrs. Menendez and by Mrs.

15   Menendez vis-a-vis Senator Menendez are mooted by the fact that

16   I have severed her from this May 6 trial—a motion by Mr. Hana

17   to dismiss a count and strike part of the indictment, motions

18   to dismiss for failure to allege an official act and a *quid pro*

19   *quo*, motions for duplicity, and motions for multiplicity.  So

20   let's start.

21        Each defendant has -- and I am including Mrs. Menendez

22   when I say each defendant.  Each defendant has moved to dismiss

23   the S4 indictment for inadequately alleging venue.

24        At trial, the government "bears the burden of proving

25   venue by a preponderance of the evidence."  *United States v.*

O4B8MENC

*Lange*, 834 F.3d 58, 69 (2d Cir. 2016).  But on a pretrial

motion to dismiss, "the government need only allege that

criminal conduct occurred within the venue, even if phrased

broadly." *United States v. Ohle*, 678 F.Supp.2d 215, 231

(S.D.N.Y. 2010) (quoting *United States v. Bronson*, No.

05-cr-714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007)).

Language in the indictment that offenses were committed "within

the Southern District of New York and elsewhere" is sufficient

to support venue at the pretrial stage, as innumerable courts

in this district have held.  *See United States v. Dupigny*, No.

18-cr-528, 2019 WL 2327697, at *4 (S.D.N.Y. May 30, 2019); *see

also United States v. Elcock*, No. 07-cr-582, 2008 WL 123942, at

*3 (S.D.N.Y. Jan. 10, 2008).

        When a defendant is charged in more than one count,

venue must be proper with respect to each count.  *United States

v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir.

1989); *see also United States v. Rutigliano*, 790 F.3d 389, 396

(2d Cir. 2015).  Thus, at the pretrial stage, venue is

adequately alleged as long as each count alleges, at a minimum,

a statement that the offenses were committed within the

Southern District of New York and elsewhere.  The question of

whether there is sufficient evidence to prove venue by a

preponderance of the evidence is, as all of you know, a

question for the jury at the conclusion of the trial.

        "In reviewing a motion to dismiss an indictment, the

court must take the allegations of the indictment as true."
*United States v. Avenatti*, 432 F.Supp.3d 354, 360-61 (S.D.N.Y.
2020) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337,
343 n.16 (1952)).

For each of the 18 counts in the S4 indictment——and
all of these motions, ladies and gentlemen, deal with the S4
indictment——the government specifically alleges that the
offense relevant to the count was committed "in the Southern
District of New York and elsewhere." As I said, this meets the
standard for sufficiently alleging venue before trial. The
standard merely requires the government include language in the
indictment that the offenses were committed within the Southern
District of New York and elsewhere. *See Dupigny*, 2019 WL
2327697, at *4. The government has done exactly that, and has
properly done so for each count in the S4 indictment.

The government has met the pretrial standard for
alleging that venue lies in the Southern District of New York.
To the extent each defendant's motion seeks to dismiss the
indictment for lack of venue, those motions are denied.

Now there is also a motion to transfer venue to the
District of New Jersey, just across the river. I am not quite
sure why either the motion for failure to allege venue and the
motion to transfer venue were actually made, but the defendants
are entitled to make these motions. I am denying this motion
as well.

O4B8MENC

1      Mr. Menendez has moved to transfer venue and Mr.

2 Daibes, Mr. Hana, and Mrs. Menendez have joined in that motion.

3      Rule 21(b) of the Federal Rules of Criminal Procedure

4 provides that "upon the defendant's motion, the court may

5 transfer the proceeding, or one or more counts, against that

6 defendant to another district for the convenience of the

7 parties, any victim, and the witnesses, and in the interest of

8 justice."  Disposition of Rule 21(b) motions are "vested in the

9 sound discretion of the district court."  *United States v.*

10 *Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990).

11      When deciding a Rule 21 motion, the district court

12 considers the factors set forth in *Platt v. Minnesota Mining &*

13 *Mfg. Co.*, 376 U.S. 240, 243-44 (1964).  These factors are:

14      (1) location of defendants; (2) location of possible

15 witnesses; (3) location of events likely to be in issue; (4)

16 location of documents and records likely to be involved; (5)

17 disruption of defendant's business unless the case is

18 transferred; (6) expense to the parties; (7) location of

19 counsel; (8) relative accessibility of place of trial; (9)

20 docket condition of each district involved; and (10) any other

21 special elements which might affect the transfer.

22      That's from the *Platt v. Minnesota Mining & Mfg. Co.*

23 case, 376 U.S. at 243-44.  In that case, the issue of

24 disruption of defendant's business was really addressed to a

25 corporate business and is not directly relevant to this case.

O4B8MENC

1    "No one of these considerations is dispositive, and it remains

2    for the court to try to strike a balance and determine which

3    factors are of greatest importance." *Maldonado-Rivera*, 922

4    F.2d at 966 (quoting *United States v. Stephenson*, 895 F.2d 867,

5    875 (2d Cir. 1990).

6         As I have said, this Rule 21(b) motion is addressed to

7    the discretion of the trial court, and defendants bear the

8    burden of justifying a Rule 21 transfer. *See United States v.*

9    *Datta*, 797 F.Supp.2d 448, 450 (S.D.N.Y. 2011).  "That burden is

10   not often or easily met.  To warrant a transfer from the

11   district where an indictment was properly returned, it should

12   appear that a trial there would be so unduly burdensome that

13   fairness requires the transfer to another district." *United*

14   *States v. Larsen*, No. 13-cr-688, 2014 WL 177411, at *2

15   (S.D.N.Y. Jan. 16, 2014) (quoting *United States v. United*

16   *States Steel Corp.*, 233 F.Supp. 154, 157 (S.D.N.Y. 1964)).

17   Additionally, "there has been a trend in recent years away from

18   granting transfers pursuant to Rule 21(b)," which is "hardly

19   surprising when one considers the massive expansion of

20   technology and the relative decline in costs for long-distance

21   travel over the past few decades." *United States v. Blondet*,

22   No. 16-cr-387, 2019 WL 5690711, at *2 (S.D.N.Y. Nov. 4, 2019)

23   (quoting *United States v. Quinn*, 401 F.Supp.2d 80, 85-86

24   (D.D.C. 2005).

25         Let's do each of the ten factors seriatim.

O4B8MENC

1          One:  Location of defendants.

2          Although all four defendants reside in New Jersey,

3    "the inconvenience of having to stand trial outside of one's

4    home district, without more, is insufficient to warrant a

5    transfer." *United States v. Coriaty*, No. 99-cr-1251, 2000 WL

6    1099920, at *2 (S.D.N.Y. Aug. 7, 2000).  There is no reason to

7    think that the courthouse in Foley Square is particularly

8    inconvenient to the defendants.  Indeed, Mr. and Mrs. Menendez

9    actually reside in Englewood Cliffs -- which, according to the

10   internet, is located 20 miles from Foley Square -- and Daibes

11   and Hana reside in Edgewater -- which is ten miles from Foley

12   Square.  Actually, that comes from the government memorandum,

13   not the internet.  It may, in turn, be from the internet.  It's

14   ECF 180 at 149.  Those distances are trivial, regardless of the

15   fact that there may be heavy traffic into and out of New York.

16   So this factor does not favor transfer.

17          Number Two:  Location of possible witnesses.

18          Defendants -- that is, Mr. Menendez asserts that few

19   witnesses are located here, but I actually don't know who the

20   witnesses are going to be.  The parties haven't told me.  A

21   "naked allegation that witnesses will be inconvenienced by

22   trial here does not suffice for transfer." *United States v.*

23   *Spy Factory, Inc.*, 951 F.Supp. 450, 456 (S.D.N.Y. 1997)

24   (quoting *United States v. Haley*, 504 F.Supp. 1124, 1126

25   (E.D.Pa. 1981)).  It is defendants' burden to "specifically

O4B8MENC

describe how particular witnesses would be entirely prevented

from testifying at trial in the Southern District of New York."

*United States v. Blakstad*, No. 19-cr-486, 2020 WL 5992347, at

*4 (S.D.N.Y. Oct. 9, 2020).  Defendants here have done no such

thing.  As I said, there is no mention at all of inconvenience

to witnesses in their briefing, let alone of any specific

instance of inconvenience to any particular witness.

Defendants thus have failed to meet their burden on factor

number two, and this factor does not favor transfer.

Number Three:  Location of events likely to be in

issue.

As defendants state, indeed, a substantial portion of

the events at issue here occurred in New Jersey.  The

government correctly states that there are also events that

occurred in New York and Washington and Egypt and Qatar that

are relevant.  But it does appear that New Jersey is the state

where many of the events likely to be at issue occurred; and,

therefore, this factor favors transfer to New Jersey, but not

very strongly.

Four:  Location of documents and records likely to be

involved.

This is of limited use to the Court because "modern

developments in electronics and computers render documents

readily available to a defendant wherever he is located."

*United States v. Avenatti*, No. 19-cr-374, 2019 WL 4640232, at

O4B8MENC

*4 (S.D.N.Y. Sept. 24, 2019); *see also United States v.*

*Pastore*, No. 17-cr-343, 2018 WL 395490, at *4 (S.D.N.Y. Jan.

11, 2018). Common sense tells us that as well. This is 2024;

documents are available to the parties wherever they may be due

to liberal employment of computers. This factor does not favor

transfer.

Five: Disruption of defendant's business unless the

action is transferred.

Trial is a substantial disruption for all the parties,

including the government. But there is no discernible

difference in the disruption to these defendants' businesses

between having trial in Newark or having it across the river,

here in Manhattan. This factor does not favor transfer.

Six: Expense to the parties.

Daibes alone, among the defendants, singles out this

factor as being in his favor because it was anticipated by him

that his counsel——at that time, Arleo & Donohue, located in New

Jersey——would need to relocate to a hotel in New York for the

duration of this trial. This not only lacks persuasive force,

but on March 5, that firm withdrew, and Daibes is now

represented by Cesar de Castro, P.C., which is located on

Fulton Street, eight blocks away. Thus, among all counsel,

only Gibbons is located in New Jersey, and that firm's website

says they have 40 lawyers in their New York office. In

addition, the government would almost certainly have increased

O4B8MENC

costs by putting its case on in New Jersey rather than in the
Southern District of New York where the Southern District U.S.
Attorney's Office is located.  Where the "defendant has not
shown that the additional expense is unduly onerous in light of
his circumstances, nor that he would be unable to bear such
expenses," this factor "does not weigh in favor of transfer."
*United States v. Calk*, No. 19-cr-366, 2020 WL 703391, at *4
(S.D.N.Y. Feb. 12, 2020).  In addition, the parties have
lawyers from D.C. and L.A. that fly into New York routinely in
this case.  Perhaps the lawyer from D.C. takes the train, I
don't know, but there is essentially no difference between
landing in Newark or landing in New York City.  This factor
does not favor transfer.  And regardless of where Mrs.
Menendez's successor counsel is going to come from, as far as I
can tell, this factor does not favor transfer.  And the other
factors would not change as well.

Seven:  Location of counsel.

Daibes says that because Hana's counsel is in New
Jersey, the action should be transferred to New Jersey.
However, as I have said, defense counsel are located in New
York, New Jersey, D.C. and L.A., and the prosecution team's
location is also relevant here.  *See Stephenson*, 895 F.2d at
875; *United States v. Kolfage*, No. 20-cr-412, 2020 WL 7342796,
at *5 (S.D.N.Y. Dec. 14, 2020).  This factor does not favor
transfer.

O4B8MENC

1          Eight:  Relative accessibility of trial.

2          In the *Avenatti* trial, the trial judge said "Manhattan

3    is clearly one of the most accessible locations in the United

4    States with three major airports and a variety of other public

5    transportation."  That's true.  This factor does not favor

6    transfer.

7          Nine:  Docket condition of each district.

8          There is no evidence in this record that the

9    defendants would receive an earlier trial in New Jersey than

10   the May 6 trial that we are facing.  This factor does not favor

11   transfer.

12         Ten:  Any other special elements which might affect

13   the transfer.

14         Mr. Menendez contends that there is a special element

15   here that might affect the transfer.  He says transfer is

16   warranted to protect the interests of the people of the state

17   of New Jersey.  He claims that there are weighty democratic

18   implications of this case, as its outcome "could directly

19   implicate whether New Jerseyans continue to be represented by

20   the person duly and democratically chosen by them."  That's

21   from ECF 137 at 17.  He also urges that a case so closely tied

22   to the democratic interests of New Jersey voters should not be

23   determined by a New York jury.

24         The Court has considered these points and finds that

25   these democratic interests are relevant, insofar as the

O4B8MENC

1    Senator's argument appears to go to whether a transfer is in

2    the interest of justice.  But this special element does not

3    overcome the preceding nine which, on balance, on strong

4    balance, militate against transfer.

5         The defendants had the burden on this motion to show

6    that a trial in New York "would be so unduly burdensome that

7    fairness requires the transfer to another district." *Larsen*,

8    2014 WL 177411, at *2 (quoting *United States Steel Corp.*, 233

9    F.Supp. at 157).  Defendants have not shown that holding the

10   trial in the Southern District of New York either burdens the

11   defense or creates undue prejudice against them.  In its

12   essence, this is simply a motion brought because the defendants

13   live in New Jersey and would prefer to be tried there.  That is

14   not a sufficient reason to grant the motion.  The motion to

15   transfer this case to the District of New Jersey because of the

16   convenience of witnesses and the parties and in the interest of

17   justice is denied.

18        The next motion is by Menendez and Hana for bills of

19   particulars.

20        Hana and Mr. Menendez request that the Court order

21   bills of particulars pursuant to Federal Rule of Criminal

22   Procedure 7(f), which "permits a party to seek a bill of

23   particulars in order to identify with sufficient particularity

24   the nature of the charge pending against him, thereby enabling

25   defendant to prepare for trial, to prevent surprise, and to

O4B8MENC

interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).

"A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)). "In deciding a motion for a bill of particulars, the important question is whether the information sought is necessary, not whether it is helpful." *United States v. Mandell*, 710 F.Supp.2d 368, 384 (S.D.N.Y. 2010).

This motion, as the prior motions when I stated it, is addressed to the sound discretion of the trial judge. And "if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. "A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial." *United States v. D'Amico*, 734 F.Supp.2d 321, 335 (S.D.N.Y. 2010) (citing *United States v. Gibson*, 175 F.Supp.2d 532, 537 (S.D.N.Y. 2001)).

There are three categories of information over which a bill of particulars is sought, two of which are sought by Hana

O4B8MENC

and the other by Menendez.  Let's turn to Mr. Hana first.

The S4 indictment charges, "In the Southern District of New York and elsewhere, Robert Menendez, Nadine Menendez, and Wael Hana, and others known and unknown" conspired to have Robert Menendez "act as an agent of a foreign principal, to wit, the government of Egypt and Egyptian officials."  Hana requests that the government be required to identify with specificity the identity of the foreign principals, those with whom Hana is alleged to have conspired, and locations where the alleged crimes occurred.

Hana, and every defendant, has received sufficiently detailed information——in the indictment and from substantial discovery——to put him and all the defendants on notice of the charges against them.  The indictment is 66 pages long and contains 125 detailed, numbered paragraphs.  In addition, substantial and extensive discovery has been provided to Hana, including search warrants and highly detailed and extensive affidavits describing evidence and the alleged schemes; documents related to the seizure of physical evidence; electronic evidence from multiple devices and accounts; evidence from pen registers; documents from individuals and entities; and witness statements.  Indeed, some of the defendants have been saying there's a great deal of information that they have been given -- in fact, they say too much.  The government has also provided the discovery in database

O4B8MENC

load-ready format, with a detailed, searchable index and a
glossary of terms used in the indictment.  This is more than
sufficient to enable defendants to prepare for trial and to
prevent surprise regarding the charges against them.

In particular, regarding the foreign principals, the
indictment includes detailed allegations regarding the
government of Egypt and various Egyptian officials.  Hana also
concedes that the government provided him the names of those
officials in October of 2023. (ECF 186 at n.24.)  Regarding the
"others known and unknown," the inclusion of additional
unindicted co-conspirators is not a basis to order a bill of
particulars unless the conspiracy involves "a large number of
co-conspirators over a long period of time." *United States v.
Block*, No. 16-cr-595 (JPO), 2017 WL 1608905, at *6 (S.D.N.Y.
Apr. 28, 2017).  That is not the case here.  The government has
also provided the parties with a glossary of addresses
referenced in the indictment.  The request for additional
information is essentially an inappropriate demand for
evidentiary detail.  The parties' requests amount to the
"wheres, whens and with whoms" that are "beyond the scope of a
bill of particulars." *Torres*, 901 F.2d at 222-23; *also United
States v. Mitlof*, 165 F.Supp.2d 558, 569 (S.D.N.Y. 2001).

Hana seeks a bill of particulars setting forth "all
official acts that Senator Menendez allegedly agreed to perform
and all duties the Senator allegedly agreed to breach in

O4B8MENC

connection with the conspiracies, and which alleged bribes paid
or agreed to be paid by Mr. Hana correspond to which alleged
matters Senator Menendez promised to influence." (ECF 223 at
34).

Hana asserts that there is a greater need for a bill
of particulars when a conspiracy offense is alleged, citing
*United States v. Agnello*, 367 F.Supp.444, 450 (E.D.N.Y. 1973)
and *United States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998).
Even assuming arguendo there is a greater need for a bill of
particulars when the government alleges a conspiracy offense,
the allegations in this indictment do not trigger a need for a
bill of particulars. Here, the government has put substantial
meat on the bones in response to questions by the government.
The indictment sets forth in detail the charges, including the
acts sought and promised and the bribes provided in exchange
for the acts, and details of the defendants' alleged roles in
the crimes charged. The charges in the S4 indictment are not
"so general that they do not advise the defendants of the
specific acts of which they are accused." *Torres*, 901 F.2d at
234. Rather, the detail in the indictment adequately conveys
to defendants the government's theory of the case and the proof
that will be offered. The Court finds that defendants have
been "furnished with sufficient detail to fairly apprise them
of the transactions to be proved so that they will have a
reasonable opportunity to meet the charges of performing the

O4B8MENC

specific acts." *Agnello*, 367 F.Supp. at 450.

While this Court acknowledges the considerable amount of discovery produced by the government, the government represents that it has been responding to defendants' requests for information throughout the pendency of this case. *See United States v. Brewster*, No. 19-cr-833 (SHS), 2021 WL 3423521, at *2 (S.D.N.Y. Aug. 5, 2021). Including answering questions the defense counsel may have had regarding where to find materials in the discovery. The government is also going to provide 3500 material prior to trial.

Thus, Hana has not shown that a bill of particulars is necessary to enable him to prepare his defense and to avoid unfair surprise at trial. Each of the motions for a bill of particulars is denied.

Now, Menendez also requests a bill of particulars for the government in order to support venue here. I have already talked about that. The bill of particulars is not appropriate. The S4 indictment identifies several alleged overt acts in furtherance of the conspiracy that's alleged. The government has provided defendants with discovery in searchable form with a searchable index and a glossary. The government has met the threshold, and has exceeded it, of providing defendants with sufficient information as to the government's bases for asserting venue here. *See United States v. Murgio*, 209 F.Supp.3d 698, 721 (S.D.N.Y. 2016), and *United States v.*

O4B8MENC

*Griffith*, No. 20-cr-15 (PKC), 2020 WL 4369650, at *3 (S.D.N.Y.
July 20, 2020).  What defendants appear to seek here really
concerns the sufficiency of the evidence at trial, not the
sufficiency of the allegations.  Bills of particulars are to
resolve the latter concern, not the former.  *See United States
v. Samsonov*, No. 07-cr-1198 (CM), 2009 WL 176721, at *3
(S.D.N.Y. Jan. 23, 2009).

Menendez has not shown that a bill of particulars is
necessary to enable him to prepare his defense and to avoid
unfair surprise at trial.  His motion as to venue is denied.
Therefore, the Menendez and Hana motions for bills of
particulars are denied in all respects.

Now let's turn to severance.

Mr. Menendez and Mrs. Menendez have separately moved
for severance of their trials, each from the other.  That's
been handled due to Mrs. Menendez's medical issues.

Menendez has also moved to sever his trial from that
of Hana and Daibes.  And Daibes has moved to sever his trial
from the other defendants.  So I will proceed to deal with
those motions.

Rule 8(b) permits joining multiple defendants in one
indictment "if they are alleged to have participated in the
same act or transaction, or in the same series of acts or
transactions, constituting an offense or offenses."  The
well-settled preference for combined trials "is particularly

O4B8MENC

strong where, as here, the defendants are alleged to have

participated in a common plan or scheme." *United States v.*

*Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).  However, if the

joinder "appears to prejudice a defendant," Rule 14 permits a

court to "order separate trials of counts, sever the

defendants' trials, or provide any other relief that justice

requires."

      "Rules 8(b) and 14 are designed to promote economy and

efficiency and to avoid a multiplicity of trials, so as long as

these objectives can be achieved without substantial prejudice

to the right of the defendants to a fair trial." *Zafiro v.*

*United States*, 506 U.S. 534, 540 (1993).  Severance should be

granted pursuant to Rule 14 "only if there is a serious risk

that a joint trial would compromise a specific trial right of

one of the defendants, or prevent the jury from making a

reliable judgment about guilt or innocence." *Id.* at 539.  The

defendant moving must show that the prejudice from joinder "is

sufficiently severe to outweigh the judicial economy that would

be realized by avoiding lengthy multiple trials." *United*

*States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting

*United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998)).

"Less drastic measures" than severance, "such as limiting

instructions, often will suffice to cure any risk of

severance." *Zafiro*, 506 U.S. at 539.

      Let's turn to the Menendez motion to sever from Hana

O4B8MENC

1    and Daibes.  I am denying that.

2         Menendez urges that his trial should be severed from

3    Hana's because a joint trial would involve the admission of

4    evidence relating to Hana's communications with Egyptian

5    officials that would not be admissible if Menendez were tried

6    alone.  However, even at a separate trial, statements and

7    actions taken in furtherance of a conspiracy by a

8    co-conspirator——here, Hana's communications with Egyptian

9    officials——would be admissible pursuant to Federal Rule of

10   Evidence 801(d)(2)(E).  In addition, even if certain statements

11   were not admissible against Menendez in a separate trial, I am

12   not persuaded that the introduction of the evidence would

13   result in a miscarriage of justice or substantial prejudice to

14   Menendez.  *See United States v. Spinelli*, 352 F.3d 45, 54-56

15   (2d Cir. 2003).

16        Menendez also claims that his trial should be severed

17   from Daibes because the risk of Daibes's criminal history would

18   improperly lead the jury to conclude that Menendez is guilty.

19   However, Daibes's criminal history relating to his New Jersey

20   prosecution would likely be admissible against Menendez even in

21   a separate trial because the indictment alleges that Menendez

22   sought to disrupt that very prosecution.  In addition, Menendez

23   has not explained why Daibes's criminal history relating to a

24   separate prosecution would prejudice him.  As the Second

25   Circuit has explained regarding the admissibility of evidence,

O4B8MENC

the possibility that a jury draws an adverse inference against

a defendant merely "because of their association with a

codefendant shown to have a prior criminal record" is "too

insubstantial in most circumstances to survive forceful

instructions." *United States v. Figueroa*, 618 F.2d 934, 946

(2d Cir. 1980).  Here, any risk of prejudice is not substantial

enough to warrant severance and, in any event, can be remedied

by an appropriate jury instruction.  *See Spinelli*, 352 F.3d at

55.  Accordingly, Menendez has not shown substantial prejudice

and the interests of judicial economy weigh more strongly in

favor of a joint trial.  *See Zafiro*, 506 U.S. at 540.

Menendez's motion to sever his trial from that of Daibes and

Hana is denied.

        Now let me turn to Daibes's motion to sever his trial

from the codefendants.

        Daibes first argues that the claims against him do not

meet the requirements for joinder under Rule 8 because they are

unrelated to the allegations against Uribe and Hana.  He's

wrong.  Rule 8(b) allows joinder of offenses and defendants

where two or more persons' criminal "acts are unified by some

substantial identity of facts or participants or arise out of a

common plan or scheme." *United States v. Feyrer*, 333 F.3d 110,

114 (2d Cir. 2003); *see also United States v. Attanasio*, 870

F.2d 809, 815 (2d Cir. 1989); and *United States v. Nerlinger*,

862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that

O4B8MENC

1  a nonfrivolous conspiracy charge is sufficient to support

2  joinder of defendants under Fed.R.Crim.P. 8(b).")  I am sorry.

3  That is the established rule.

4         Here, joinder is proper because the indictment alleges

5  that the defendants, including Daibes, worked together to

6  achieve common objectives, including Hana's actions to benefit

7  the government of Egypt.  (*See* S4, paragraph 16, 22, 31-36, and

8  38.)  The indictment plainly sets forth a substantial overlap

9  of both participants and acts alleged in furtherance of a

10  common scheme or plan.

11         Daibes also claims that severance pursuant to Rule 14

12  is warranted because each of the following issues creates a

13  substantial risk of prejudice: (a) Daibes is not alleged to

14  have engaged in certain activities that are alleged against the

15  other defendants; (b) certain conduct alleged against Daibes is

16  too similar to unrelated conduct alleged against Uribe; and (c)

17  Daibes's similar ethnic background to that of the other

18  defendants.  These reasons I find do not meet the

19  substantiality requirement for severance and any potential

20  prejudice is adequately remedied by jury instructions.  *See*

21  *Spinelli*, 352 F.3d at 55; *United States v. Ramos*, 346 F.Supp.2d

22  567, 575 (S.D.N.Y. 2004) (quoting *United States v. Santiago*,

23  174 F.Supp.2d 16, 22 (S.D.N.Y. 2001)).

24         The Court has no reason to believe that a properly

25  instructed jury would not be able to distinguish between

O4B8MENC

1    Daibes's conduct and the conduct of other defendants, even

2    those of a similar ethnic background.  Accordingly, Daibes has

3    not shown substantial prejudice and the interests of judicial

4    economy weigh strongly in favor of a joint trial.  As I said

5    earlier, I would be able to try all of the defendants at one

6    time, but I am unable to do so given Mrs. Menendez's medical

7    concerns and the uncertainty of when she would be able to stand

8    trial.  Daibes's motion to sever his trial from the other

9    defendants is denied.

10          This is Hana's motion to dismiss Count Fifteen, which

11   is the conspiracy for Menendez to act as a foreign agent, and

12   to strike paragraph 15 as surplusage.  I have already handled

13   Mr. Hana's motion for a bill of particulars.

14          Hana has moved to dismiss the charge of conspiracy for

15   Robert Menendez to act as a foreign agent, Count Fifteen, and

16   to strike paragraph 15.

17          18 U.S.C., Section 219 prohibits a public official

18   from acting as an agent of a foreign principal who is required

19   to register under the Foreign Agents Registration Act.

20   Pursuant to Section 219(a), "Whoever, being a public official,

21   is or acts as an agent of a foreign principal required to

22   register under the Foreign Agents Registration Act of 1938

23   shall be fined under this title or imprisoned for not more than

24   two years or both."

25          Count Fifteen alleges a conspiracy among Menendez,

O4B8MENC

Mrs. Menendez, and Hana for Menendez to act as a foreign

principal in violation of Section 219.

It should be clear to everybody that when I say

Menendez, I am referring to Mr. Menendez; and when I am

referring to Mrs. Menendez, I will refer to her as Mrs.

Menendez or Nadine Menendez.

Hana has moved to dismiss this count on three grounds:

(1) individuals who are not public officials may not be charged

with conspiracy to violate Section 219 because of the

affirmative legislative policy exception; (2) the indictment

fails to properly charge a conspiracy to violate 219; and (3)

Section 219 is unconstitutionally vague as applied to the facts

here.  In addition, Hana moves for paragraph 15 of the

indictment to be stricken as surplusage.  Those requests are

denied.

Let's turn first to the affirmative legislative policy

exception.  That exception does not apply.

Hana first urges that Section 219 does not permit

conspiracy liability for individuals who are not public

officials.  While the general rule for conspiracy is that "a

person may be liable for conspiracy even though he was

incapable of committing the substantive offense," the so-called

affirmative legislative policy exception applies where

"Congress demonstrates an affirmative legislative policy to

leave some type of participant in a criminal transaction

O4B8MENC

unpunished." *United States v. Hoskins*, 902 F.3d 69, 77 (2d Cir. 2018).

This policy exception is "narrowly circumscribed." *Id.* As the Second Circuit outlined, "We cannot identify such a policy whenever a statute focuses on certain categories of persons at the exclusion of others." *Id.* at 80. This is a case for Section 219's limited applicability to public officials. There must be "something more" in the "statute's text, structure, or legislative history" to suggest that the "lawmaker must have intended that accomplice liability not extend to certain purposes."

Hana cites no case where the affirmative legislative policy exception was previously applied to Section 219, and his argument that I should apply it here for the first time is not persuasive. As in *Hoskins*, the mere fact that Section 219 applies only to public officials is not sufficient to support a policy exception for conspiracy liability. And Hana has failed to present "something more" to demonstrate congressional intent creating a policy exception. He has presented "no established principle of law or legislative history," and his arguments regarding the text and structure of the statute are not persuasive. Hana has simply not demonstrated that the affirmative legislative policy exception applies to Section 219.

Hana also argues that the Court should dismiss Count

O4B8MENC

Fifteen because it fails to set out the elements of a

conspiracy to violate Section 219. I do not agree with

Mr. Hana's contention, and I am going to deny this motion.

Rule 7(c)(1) states that an indictment must "be a

plain, concise, and definite written statement of the essential

facts constituting the offense charged" and include the

"statute, rule, regulation, or other provision of law that the

defendant is alleged to have violated." "An indictment need do

little more than to track the language of the statute charged

and state the time and place (in approximate terms) of the

alleged crime." *United States v. Alfonso*, 143 F.3d 722, 776

(2d Cir. 1998). An indictment is impermissibly defective if it

fails to "set out all of the essential elements of the offense

charged." *United States v. Gonzalez*, 686 F.3 122, 127 (2d Cir.

2012).

The S4 indictment manifestly meets this standard.

Hana is charged with conspiracy to violate Section 219, which

prohibits a public official from acting as an agent of a

foreign principal who would be required to register under FARA.

FARA, in turn, requires registration by individuals engaging

in, for example, "political activities" "at the order, request,

or under the direction or control" of a "foreign government."

22 U.S.C., Section 611-612. For conspiracy counts, an

indictment needs to charge an agreement to commit an offense,

defendant's knowing participation in the conspiracy with intent

O4B8MENC

1    to commit the offense, and an overt act in furtherance of the

2    conspiracy.  *See United States v. Martin*, 411 F.Supp.2d 370,

3    372 (S.D.N.Y. 2006).

4         The indictment sufficiently alleges the essential

5    elements of such a violation.  In Count Fifteen, the indictment

6    alleges that Menendez, Nadine, and Hana willfully and knowingly

7    agreed to have Menendez act as an agent of the government of

8    Egypt and Egyptian officials.  Other paragraphs of the

9    indictment allege that Menendez is a public official; that

10   Egyptian officials requested that Menendez exercise his

11   authority to grant U.S. military aid to Egypt; that through

12   Nadine and Hana, Menendez conveyed to the Egyptian officials

13   that he planned to approve military aid; that Menendez provided

14   sensitive nonpublic information to the Egyptian government; and

15   that Menendez ghost-wrote a letter on behalf of Egypt to

16   convince other senators to lift a hold on Egyptian aid.  Count

17   Fifteen also alleges two overt acts supporting the conspiracy

18   charge, one of which is a meeting between Menendez, Hana, and

19   an Egyptian official.  In addition, Hana allegedly arranged and

20   paid for meetings and dinners between Menendez and the Egyptian

21   officials where the officials requested military aid; promised

22   to pay Nadine for a low-or-no-show job; relayed the message

23   about aid, the ghost-written letter, and other nonpublic

24   information from Menendez to the foreign officials; and

25   communicated with an Egyptian official who requested that

O4B8MENC

1    Menendez resolve a human rights matter.

2         Detailed factual allegations supporting each element

3    of the offense are present and are sufficient to support a

4    conspiracy to violate Section 219 for the purposes of Rule

5    7(c).  Hana's motion to dismiss Count Fifteen for failure to

6    allege a Section 219 conspiracy is denied.

7         Let's now turn to Mr. Hana's third argument for

8    dismissing Section 219.  He claims it is unconstitutionally

9    vague as applied to the facts alleged here and, once again, I

10   disagree with his argument.

11        In order to survive a void-for-vagueness attack on a

12   statute, a penal statute must define the criminal offense "with

13   sufficient definiteness that ordinary people can understand

14   what conduct is prohibited and in a manner that does not

15   encourage arbitrary and discriminatory enforcement." *United

16   States v. Dawkins*, 999 F.3d 767, 787 (2d Cir. 2021) (quoting

17   *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d

18   242, 265 (2d Cir. 2015)).

19        Hana claims that Section 219 is hopelessly muddled

20   because the statute criminalizes behavior that's defined in

21   another statute, that is, FARA; and, according to his reading

22   of Section 219, it prohibits conduct by a nonexistent category

23   of people, that is, a foreign principal required to register

24   under FARA.  I find that argument particularly ingenious.

25        Hana's vagueness challenge is meritless.

O4B8MENC

1          First, a statute is not unconstitutionally vague

2     simply because it references another statute.  *See United*

3     *States v. Stokes*, 726 F.3d 880, 896 (7th Cir. 2013), *cert.*

4     *denied*, 571 U.S. 1084 (2013).  Section 219 is quite clear about

5     what it proscribes:  public officials are prohibited from

6     engaging in activities that would require them to register

7     under FARA as a foreign agent.  In addition, Hana's reading of

8     the statutory language——that it applies to an agent of a

9     foreign principal who is required to register——is illogical.

10    The more logical interpretation by far is that the statute

11    applies to an "agent of a foreign principal" who is "required

12    to register."  It is the agent who is required to register, not

13    the foreign principal.  It seems to me that is manifest.

14          This ruling is bolstered by the statute's obvious

15    purpose in prohibiting public officials from acting as foreign

16    agents and by FARA's consistent use of the phrase "agent of a

17    foreign principal."  *See* 22 U.S.C., Section 611(c), 613, 615.

18    Finally, it is apparent from Hana's other arguments, including

19    his argument that the indictment fails to properly charge a

20    conspiracy to violate Section 219, that Hana clearly

21    understands the statute's applicability.  (*See* ECF 223 at

22    47-54.)

23          Hana's claim that Section 219 is unconstitutionally

24    vague is denied.

25          Now let's turn to his effort to strike paragraph 15,

O4B8MENC

which alleges that he never registered as a foreign agent or a lobbyist covered by FARA. Hana claims that this allegation is surplusage, inflammatory, and prejudicial because the government has not charged Hana with any substantive violation of FARA and it should be stricken pursuant to Fed.R.Crim.P 7(d).

"Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). Such motions are rarely granted. *See United States v. Murgio*, 209 F.Supp.3d 698, 724 (S.D.N.Y. 2016). Indictments may permissibly describe conduct that is relevant to the charges or provides relevant background information. *United States v. Mostafa*, 209 F.Supp.3d 698, 724 (S.D.N.Y. 2016) (citing *United States v. Mulder*, 273 F.3d 91, 100 (2d Cir. 2001)). As long as the "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa*, 913 F.2d at 1013.

Here, the Court finds the allegation that Hana has failed to register as a foreign agent or lobbyist is indeed relevant to Hana's belief in the wrongfulness of his alleged conduct——conspiring to violate Section 219——and that of his alleged co-conspirators. I am not striking paragraph 15.

O4B8MENC

I wish to move on to defendants' motions to dismiss Counts One, Two, Three, Six, Seven, Nine, Twelve and Thirteen for failure to state an offense -- that is, they claim there is no allegation of an official act pursuant to *McDonnell*, and no allegation of a *quid pro quo*.

Defendants urge that several of the bribery counts in the S4 indictment -- One, Two, Three, Six, Seven, Nine, Twelve and Thirteen -- must be dismissed for failure to charge an offense pursuant to Rule(b)(3)(B)(v) of the Federal Rules of Criminal Procedure.

Rule 7(c)(1) requires that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and that "for each offense, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed.R.Crim.P. 7(c)(1). "The Second Circuit has expanded on the statutory guidance, noting that an indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Gonzalez*, No. 21-cr-288 (VM), 2022 WL 3684796, at *2 (S.D.N.Y. Aug. 24, 2022) (quoting *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013)).

O4B8MENC

1    "In evaluating a motion to dismiss, the Court accepts

2    as true all of the allegations in the indictment." *United*

3    *States v. Pham*, No. 12-cr-423 (AJN), 2022 WL 993119, at *1

4    (S.D.N.Y. Apr. 1, 2022) (quoting *United States v. Goldberg*, 756

5    F.2d 949, 950 (2d Cir. 1985).  A defendant "faces a high

6    standard in seeking to dismiss an indictment."  *Pham*, 2022 WL

7    933119, at *3 (quoting *United States v. Post*, 950 F.Supp.2d

8    510, 527 (S.D.N.Y. 2013).  "The dismissal of an indictment is

9    an extraordinary remedy reserved only for extremely limited

10    circumstances implicating fundamental rights." *United States v.*

11    *Benjamin*, 95 F.4th 60, 66 (2d Cir. 2024) (quoting *United States*

12    *v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)).  While the

13    Sixth Amendment provides that "in all criminal prosecutions,

14    the accused shall enjoy the right to be informed of the nature

15    and cause of the accusation," an indictment "need do little

16    more than to track the language of the statute charged and

17    state the time and place (in approximate terms) of the alleged

18    crime" in order to meet this constitutional requirement.

19    *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975).

20    The Court finds that the government has cleared this

21    constitutional bar.  Each count charged by the government

22    "tracks the language of the statute charged and states the time

23    and place (in approximate terms) of the alleged crime."

24    *Tramunti*, 513 F.2d at 1113.  The S4 indictment is suffused with

25    facts sufficiently precise "to inform the defendants of the

O4B8MENC

charges they must meet and with enough detail that they may

plead double jeopardy in a future prosecution based on the same

set of events." *Gonzalez*, 2022 WL 3684796, at *2 (quoting

*Vilar*, 729 F.3d at 80).

Defendants contend that various of the actions alleged

by the government in support of its bribery-related counts are

not official acts as that term is defined in *McDonnell v.*

*United States*, 579 U.S. 550 (2016).  However, this issue may

not be decided by the Court now, but is more properly

determined by the jury at the end of the case.  "It is up to

the jury, under the facts of the case, to determine whether the

public official agreed to perform an official act at the time

of the alleged *quid pro quo*." *McDonnell*, 579 U.S. at 572-73.

Defendants also contend that the government in its

indictment failed to identify any official duty that Menendez

breached.  Similarly, I need not weigh in on this matter.  It's

moot.  The government, in its omnibus opposition, has stated,

at least at present, it does not intend to convict the

defendants under Section 201 on the basis of a breach of a

defendant's official duty.  (*See* ECF 180 at 71.)

Defendants urge that the S4 indictment does not allege

the required *quid pro quo*.  But this is not so.  The S4

indictment sufficiently charges explicit *quid pro quos* under

the standard recently articulated in *United States v. Benjamin*,

95 F.4th at 73-74.  In *Benjamin*, the Second Circuit expressed

O4B8MENC

1    its "agreement with the government that the phrase 'in exchange

2    for' satisfied the *quid pro quo* requirement of *McCormick*

3    because it alleged an unambiguous agreement to exchange an

4    official public act by Benjamin for financial contributions

5    from Migdol." *Id.* at 74.  The Second Circuit went on to state,

6    moreover, "the fact that the agreement was never stated

7    expressly is immaterial because the existence of the agreement,

8    and the clarity of its terms to Migdol and Benjamin, could be

9    inferred from their words and actions." *Id.*

10          In the case before this Court, each of the substantive

11   counts in S4 challenged by the defendants consists of the same

12   "in exchange for" language that was sufficient in *Benjamin* and

13   alleges the provision of specific things of value provided by

14   Daibes and Hana for specific alleged official acts to be

15   performed by Menendez.  The facts alleged by the government are

16   sufficient to allow the jury to infer the existence of an

17   agreement between defendants.  It is of no consequence that the

18   government alleges several items of value in exchange for

19   several acts; the Second Circuit has recognized that a bribery

20   scheme can involve such structures as "this for these or these

21   for these, not just this for that." *United States v. Silver*,

22   948 F.3d 538, 554 (2d Cir. 2020) (quoting *United States v.*

23   *Ganim*, 510 F.3d 134, 148 (2d Cir. 2007).

24          To the extent that defendants assert that the

25   government must allege that a public official must have

O4B8MENC

actually taken an act in order to successfully state a bribery offense, this is simply not so.  *See Evans v. United States*, 504 U.S. 255, 268 (1992).  The offense is completed at the time that the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense.  Indeed, the public official need not have even "in fact intended to perform the official act so long as he agrees to do so." *McDonnell*, 579 U.S. at 572.

Defendants raise the point that "the relevant time period in a *quid pro quo* bribery scheme is the moment at which the public official accepts the payment or agrees to accept it."  (ECF 130 at 6 (quoting *Silver*, 948 F.3d at 556).  They note that the S4 indictment fails "because it does not allege that at the time an alleged payment was accepted, or a promise was made, it was in order to influence a particular matter or question."  (ECF 186 at 16.)

However, the government has sufficiently alleged an agreement "to influence a focused, concrete, and particular question or matter."  (ECF 180 at 72-73.)  The case that defendants cite to support their proposition is *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020).  *Silver* does state that "the government must prove that, at the time the bribe was accepted, the defendant promised to take official action on a specific and focused question or matter as the opportunities to

O4B8MENC

1    take such action arose." *Silver*, 948 F.3d at 568.  But like

2    *McDonnell*, *Silver* was a case concerning jury instructions, not

3    the sufficiency of an indictment.  The jury here will determine

4    whether the government has met the standard articulated in

5    *Silver*.

6         Defendants' motions to dismiss Counts One, Two, Three,

7    Six, Seven, Nine, Twelve and Thirteen are denied.  They all

8    have been adequately alleged by the government.

9         I now want to turn to defendants' motions to dismiss

10   the indictment on the basis of duplicity.  They contend that

11   Counts One, Two, Three, Six, Seven, Twelve, Thirteen and

12   Fifteen are impermissibly duplicitous pursuant to Federal Rule

13   of Criminal Procedure 8(a).

14        "An indictment is impermissibly duplicitous where: (1)

15   it combines two or more distinct crimes into one count in

16   contravention of Federal Rule of Criminal Procedure 8(a)'s

17   requirement that there be a separate count for each offense;

18   and (2) the defendant is prejudiced thereby." *United States v.*

19   *Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (quoting *United*

20   *States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)).

21        Policy considerations underlying the prejudice

22   analysis "include avoiding the uncertainty of whether a general

23   verdict of guilty conceals a finding of guilty as to one crime

24   and a finding of not guilty as to another, avoiding the risk

25   that the jurors may not have been unanimous as to any one of

O4B8MENC

the crimes charged, assuring the defendant adequate notice,

providing the basis for appropriate sentencing, and protecting

against double jeopardy in a subsequent prosecution." *United*

*States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981).

       The Second Circuit has found that distinct crimes are

not combined into a single count in contravention of Rule

8(a) -- which is to say, the Second Circuit has not found

impermissible duplicity -- when "acts that could be charged as

separate counts of an indictment are instead charged in a

single count if those acts can be characterized as part of a

continuing single scheme." *United States v. Tutino*, 883 F.2d

1125, 1141 (2d Cir. 1989).

       When it comes to charging a conspiracy "it is well

established that the allegation in a single count of a

conspiracy to commit several crimes is not duplicitous, for the

conspiracy is the crime and that is one, however diverse its

objects." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d

Cir. 1992) (quoting *Murray*, 618 F.2d at 896).  If "the

indictment on its face sufficiently alleges a single

conspiracy, the question of whether a single conspiracy or

multiple conspiracies exists is a question of fact for the

jury." *United States v. Rajaratnam*, 736 F.Supp.2d 683, 688

(S.D.N.Y. 2010) (RJH).  This is so even if the count is

structured as merely a boilerplate allegation of a single

conspiracy.  *See United States v. Gabriel*, 920 F.Supp. 498,

O4B8MENC

504-05 (S.D.N.Y. 1996)(JSR) (noting that "the Court of Appeals
has repeatedly cautioned that the determination of whether a
conspiracy is single or multiple is an issue of fact singularly
well suited to determination by a jury.")

Four of the eight counts challenged by the defendants
on duplicity grounds are conspiracy counts:  Counts one, Two,
Three, and Fifteen.  Each of these counts clearly alleges a
single conspiracy.  For this reason alone, defendants'
duplicity contention fails as to Counts One, Two, Three, and
Fifteen.

Defendants urge that to prove a single conspiracy in a
hub-and-spoke situation, where the charged defendants are the
spokes, "the government must show that there was a 'rim' around
the spokes, such that the 'spokes' became co-conspirators with
each other." *United States v. Ulbricht*, 31 F.Supp.3d 540, 554
(S.D.N.Y. 2014).  This is true, but it does not lead to
dismissal of the charges on the basis of duplicity.  Proving
the existence of the "rim" is a burden for the government at
trial, not at the pleading stage.  None of the cases cited by
defendants on this topic even mention duplicity in this
context.  And while the procedural posture of one case,
*Ulbricht*, is indeed at the motion to dismiss an indictment
stage, the court in *Ulbricht*, 31 F.Supp.3d 540 (S.D.N.Y. 2014),
takes pains to explicitly cabin the applicability of its
discussion on the law of hub-and-spoke conspiracies by writing

O4B8MENC

1    "most conspiracy questions as to size and number are left to

2    trial.  Here, the Court addresses these issues only insofar as

3    they inform whether and how the government might ultimately

4    prove the conspiracies alleged in the indictment." *Ulbricht*, 31

5    F.Supp.3d at 552.

6            Defendants also contend that the common goal alleged

7    by the government is too broad to support a single conspiracy.

8    In one case cited by the defendants, a court in this district

9    noted that the goal of evading taxes was unreasonably broad.

10   *United States v. Killeen*, 1998 WL 760237, at *3 (S.D.N.Y. Oct.

11   29, 1998).  However, the allegations in the S4 indictment

12   depict the common purpose in a far narrower sense than as

13   merely a general design to evade taxes.  The indictment's

14   allegations detail a scheme to utilize a senator's power and

15   influence to assist foreign nations and, in turn, enrich that

16   senator's codefendants.  The only other case in this district

17   that defendants cite to support their point that the counts are

18   impermissibly broad contradicts their assertion.  While the

19   court in the *Gabriel* decision I referred to above does dismiss

20   a count of that indictment, the reason the court did so is

21   explicitly not because the alleged single conspiracy charge was

22   overbroad and conclusory——and indeed, explicitly not on the

23   grounds of duplicity——but, rather, because the count was

24   time-barred.  *See Gabriel*, 920 F.Supp. at 503-06.

25           Finally, defendants contend that the S4 indictment's

O4B8MENC

substantive counts reveal that the conspiracy counts are
duplicitous and must be decoupled.  This is plainly not so.  It
is perfectly appropriate for an indictment to charge multiple
substantive counts that stem from the activity alleged in a
single conspiracy count.  *See United States v. Percoco*, No.
16-cr-776, 2017 WL 6314146, at *12 (S.D.N.Y. Dec. 11, 2017)
(stating that "the fact that this conspiracy led to multiple
separate wire fraud charges is irrelevant to assessing whether
the conspiracy count is duplicitous").  In other words, it is
not inconsistent and duplicitous for a single conspiracy count
to coexist with multiple substantive counts that relate back to
the single overarching scheme alleged in the single conspiracy
count.  *See United States v. Rigas*, 281 F.Supp.2d 660, 665
(S.D.N.Y. 2003).

        Defendants also seek dismissal of four other counts as
duplicitous -- Counts Six, Seven, Twelve, and Thirteen.
However, for the reasons stated above, none of these counts can
be dismissed as duplicitous.  Impermissible duplicity does not
exist when acts that could be charged separately are instead
charged in a single count where those acts "could be
characterized as part of a single continuing scheme."  *Tutino*,
883 F.2d at 1141.

        I find that each of these counts as alleged by the
government can be characterized that way—as part of a single
continuing scheme.  Even assuming that two distinct crimes are

O4B8MENC

impermissibly combined in any of these four counts, the Court finds that defendants would not be "prejudiced thereby." The allegations in S4 are sufficiently detailed to "assure the defendant adequate notice" and "to protect against double jeopardy in a subsequent prosecution." *Margiotta*, 646 F.2d at 733. And jury instructions given at trial can ensure that "the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another" and "the risk that the jurors may not have been unanimous as to any one of the crimes charged" are avoided, while also "providing the basis for appropriate sentencing." *Margiotta*, 646 F.2d at 733.

Counts Six, Seven, Twelve, and Thirteen of the S4 indictment are not impermissibly duplicitous. I deny defendants' motions to dismiss S4 for impermissible duplicity pursuant to Rule 8(a). None of the counts challenged by defendants are impermissibly duplicitous.

The last motion I wish to turn to is multiplicity.

Defendant Hana moves to dismiss the conspiracy counts on multiplicity grounds.

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). "The multiplicity doctrine is based upon the

double jeopardy clause of the Fifth Amendment, which assures
that the court does not exceed its legislative authorization by
imposing multiple punishments for the same offense." *United
States v. Nakashian*, 820 F.2d 549, 552 (2d Cir. 1987).  "The
double jeopardy clause does not protect against simultaneous
prosecutions for the same offense, as long as no more than one
punishment is eventually imposed." *United States v. Josephberg*,
459 F.3d 350, 355 (2d Cir. 2006).

It is well established in the Second Circuit that
courts defer ruling on multiplicity challenges until after the
conclusion of trial.  In *United States v. Josephberg*, 459 F.3d
at 355, the trial court's dismissal of a count as
multiplicitous prior to trial was vacated as premature.  *See
United States v. Constanzo*, No. 22-cr-281, 2023 WL 8451868, at
*5 (S.D.N.Y. Dec. 6, 2023).  "It is a regular practice of
courts in the Second Circuit to deny pretrial motions to
dismiss potentially duplicitous or multiplicitous counts,
reserving decision until after the jury has rendered a
verdict." *United States v. Medina*, 2014 U.S.Dist.LEXIS 91751,
at *8 (S.D.N.Y. July 3, 2014) ("Since *Josephberg*, courts in
this circuit have routinely denied pretrial motions to dismiss
potentially multiplicitous counts as premature.")

Following this well-established precedent, I deny
Hana's motion to dismiss the conspiracy counts on multiplicity
grounds.  Whether any count is multiplicitous depends on what

O4B8MENC

1    the jury does.  In any event, the issue arises, if at all, only

2    after a verdict has been reached and is an issue relative to

3    sentencing.

4            Those are my decisions on all of the pending motions.

5    We have a trial date of May 6.  I intend to hold to it.  The

6    parties are urged to continue talking to each other.  You have

7    a number of issues that you have to talk to each other about --

8    juries, stipulations Mr. Lustberg referred to; you have some

9    CIPA issues to try to work out.  So I urge you to talk to each

10   other.

11           I want to thank our reporter.  I have been going for

12   two hours straight.  The reporters are stretched.  There are a

13   number of trials on.  Ordinarily, we would switch off on the

14   reporters.  But thank you.

15           I have found in my experience, after four or more

16   weeks of trial, the lawyers are staring into the middle

17   distance at me with exhaustion, and I am starting to get that

18   same gaze from the lawyers here.  I am sorry I could not read

19   it more theatrically.

20           Court is adjourned.  Thank you.

21           MR. RICHENTHAL:  Your Honor, one ministerial matter.

22           As to Ms. Menendez, we would ask that time be excluded

23   under the Speedy Trial Act either to the conference date, which

24   I believe your Honor set in June, or, frankly, I think under

25   the circumstances and more appropriately, all the way to the

O4B8MENC

1    control date of July 8.

2              THE COURT:  Sir.

3              MR. SCHERTLER:  No objection.

4              THE COURT:  Any objection to that, sir.

5              MR. FEE:  No, your Honor.

6              MR. LUSTBERG:  No, your Honor.

7              MR. DE CASTRO:  No, your Honor.

8              THE COURT:  I hereby exclude time from calculation

9    under the Speedy Trial Act from today until July 8.  It's on

10   motion of the government, with the consent of all of the

11   defendants.  I find this continuance serves to ensure the

12   effective assistance of counsel and to prevent any miscarriage

13   of justice.  I make the finding that the ends of justice served

14   by this continuance outweigh the best interests of the public

15   and the defendants in a speedy trial.  This is an (h)(7)(A)

16   interest of justice exclusion, occasioned by the need to sever

17   Mrs. Menendez.

18              Yes, sir.

19              MR. FEE:  Trial schedule, if the Court has a plan

20   about how long it's going to sit, how many days off.  I didn't

21   know if, given the length, the Court had any plans.

22              THE COURT:  We have a final pretrial conference

23   scheduled.  So we will handle that at that time, or even

24   earlier.  Some of these things the parties can talk about.  My

25   schedule you can't.

O4B8MENC

1          I normally tend to go 9:30 to 5, with leeway on 5.  In

2     other words, if need be, and if there are no child-care issues

3     with the jury or things of that nature, and a witness is about

4     to conclude, I may go a little after 5.  But, similarly, if the

5     witness ends at 4:30 and the next witness will be a lengthy

6     one, the jury will leave earlier.  I try to be flexible.  But

7     9:30 to 4:30 or 5.  That's the trial day.

8          Yes, Monday to Friday.  If it becomes very long, we

9     may make it four days a week, but I really intend to do five

10    days a week.

11         What is the current estimate, now that we know Mrs.

12    Menendez is not going to be in the trial, of the length of the

13    trial?

14         MR. RICHENTHAL:  I think our case-in-chief is probably

15    four weeks, but obviously it may take time to pick a jury; the

16    defense has indicated multiple times it's likely to have a

17    case.  So between those two things, I would estimate four to

18    six weeks from start to end.

19         THE COURT:  Is there anyone who wants to differ with

20    that?

21         All right.  So we will assume it's four to six weeks.

22         I think we have about 150 people coming in.  I am not

23    inclined to use a questionnaire, but I am looking at the

24    questions the parties have submitted.

25         One of the things the parties should talk to each

O4B8MENC

1    other about is obviously trying to agree on as many as of the

2    charges as you can.  I will expect at some point a list of

3    witnesses and a list of relevant places.

4           How many alternates are the parties suggesting?  I

5    think, from my standpoint, four or five.

6           MR. RICHENTHAL:  I think at least that.

7           Let me also note, when I said four to six weeks,

8    that's assuming we get every stipulation we have requested.

9    The trial is going to be substantially longer without that.

10   Hope springs eternal and hopefully we will get them.

11          I don't just mean lawyers' stipulations.  I mean

12   authenticity, custodians.

13          THE COURT:  Unless there are real issues, I don't want

14   to have the jury deal with, or me deal with authenticity.

15          MR. RICHENTHAL:  We don't either, your Honor.

16          THE COURT:  Authenticity.  What was the other one?

17          MR. RICHENTHAL:  Authenticity, business records.  We

18   couldn't agree more.  It's not yet firmly decided.

19          THE COURT:  It's up to the parties to stipulate.  It

20   just seems to me, unless there is something unusual, the

21   parties ought to be able to stipulate to authenticity and

22   business records, custodians, chain of custody.  Let's try not

23   to waste time on that.

24          MR. RICHENTHAL:  I agree.

25          THE COURT:  The trial is going to go more smoothly for

O4B8MENC

1    everybody, including the government, the defendants, the jury

2    and the Court, if those matters can be dealt with.  To have

3    fights over that sort of thing, when we are asking citizens to

4    sit here for four to six weeks in early summer, it shouldn't

5    be.

6              I assume you wanted to second that comment.

7              MR. RICHENTHAL:  I wanted to second it.  And I wanted

8    to say, as to the alternates, given that it's something of a

9    moving target, given that it's lengthy, and given that we are

10    talking about a trial that is going to go into either literally

11    the summer, or at least what people perceive to be the summer,

12    it may be wise to have as many as six alternates.  But I don't

13    know if the defense has a different view.

14              THE COURT:  I assume the defendants feel the same way

15    as the government has indicated, and the Court has indicated,

16    in regard to whether or not the parties should be able to

17    arrive at stipulations regarding authenticity, business

18    records, chain of custody, etc.

19              MR. FEE:  We agree, your Honor.

20              THE COURT:  And you speak for all of the defendants.

21              MR. FEE:  All my brothers and sisters.  We haven't

22    seen stips yet from the government, but in concept, of course.

23              THE COURT:  Then let's get stips to them.

24              MR. RICHENTHAL:  That, too, is unfortunately a not

25    entirely accurate statement.  We will work with the parties.

O4B8MENC

1          THE COURT:  It's kumbaya time.  Let's not go the other

2     way.

3          MR. FEE:  I think at least five alternates, your

4     Honor.  I don't know if other folks have different views.

5          THE COURT:  Let me think about that.  I will let you

6     know beforehand because your number of peremps will depend upon

7     the number of alternates.

8          I started to look at the proposed questions to the

9     jury.  Are there going to be witnesses here who are going to be

10     testifying in foreign languages, and if so, what?  There was a

11     reference in the proposals to Spanish and Arabic.

12          MR. RICHENTHAL:  Two things.  As to witnesses, I don't

13     anticipate someone testifying in a language other than Arabic.

14     As to --

15          THE COURT:  Except for English.

16          MR. RICHENTHAL:  Yes.  As to documents -- or Spanish,

17     although I think Spanish is potentially less likely.

18          Witnesses:  Arabic, definitely, possibly also Spanish.

19     And I think, at a minimum, we would want a standby interpreter

20     in case a witness decides to switch from English to Spanish, in

21     other words, if a witness has trouble understanding a question

22     or something of that nature.

23          THE COURT:  I take it it's the court that supplies the

24     interpreters; is that right?

25          My deputy tells me the interpreters are supplied by

O4B8MENC

1    the government if it is a government witness.

2                    MR. RICHENTHAL:  We will do that.

3                    As to documents, we anticipate having documents that

4    are translated both from Arabic into English and Spanish into

5    English.

6                    THE COURT:  So I will then question the jurors to make

7    sure that they are going to follow the English and not Arabic

8    or Spanish, if they happen to know Arabic or Spanish.

9                    MR. RICHENTHAL:  And it's a particular fine point with

10   respect to recordings.  The jurors obviously need to follow the

11   official translations, not any interpretation that they may

12   have.

13                   THE COURT:  I take it the government is not going to

14   play a recording in Arabic, but the jury will have the

15   translation of it.

16                   MR. RICHENTHAL:  That's correct.  But if a witness,

17   for example, were to listen to a recording and then talk about

18   it.

19                   THE COURT:  Understood.  We understand.

20                   My current intention is not to use a questionnaire.  I

21   don't really find that they are terribly helpful.

22                   Anything else?

23                   Thank you all.

24                   (Adjourned)

25