# Exhibit 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      -against-

ROBERT MENENDEZ et al.,

          Defendants.

Case No. S4 23-cr-490 (SHS)

REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE <u>(LETTER ROGATORY)</u>

FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK TO THE APPROPRIATE AUTHORITY IN THE UNITED KINGDOM, GREETINGS:

The United States District Court for the Southern District of New York presents its compliments to the appropriate Territorial Authority of the United Kingdom and requests international judicial assistance to obtain evidence to be used in a criminal prosecution before this Court in the above-captioned matter (the "Action"). A trial in this matter is scheduled at present for May 13, 2024, in New York, New York, United States of America. On that basis, and for the purposes of § 14(2)(a) of the Crime (International Co-Operation) Act 2003, there are reasonable grounds for suspecting that an offense has been committed.

The District Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate Territorial Authority of the United Kingdom nominates a Court to take the sworn deposition of ████████████████████████ ███, a citizen of ██████ residing in the United Kingdom, of ███████████████, a citizen of ███████ residing in the United Kingdom, and of ████████████████, a citizen of ███ ████████ residing in the United Kingdom, for use as evidence in the Action. The District Court believes that the evidence sought is directly relevant to the issues in dispute in this case.

This request is made pursuant to, and in conformity with, 28 U.S.C. § 1781 and the Mutual Legal Assistance ("MLA") Treaty of January 6, 1994, between the United States and the United Kingdom, which allows a court of the United States to submit a request directly to the United Kingdom Central Authority (the "UKCA") and allows the UKCA to respond in the same manner. The District Court is authorized by 28 U.S.C. §§ 1781 and 1782 to extend similar assistance on request of the judicial authorities of the United Kingdom.

The Action involves a criminal prosecution by the United States Department of Justice (the "DOJ") of Robert Menendez, a citizen of the United States, Nadine Menendez, a citizen of the United States, Fred Daibes, a citizen of the United States, and Wael Hana, a citizen of the United States. *See* Exhibit A (Indictment).

The United States District Court for the Southern District of New York, through the offices of the representatives of Defendants, is prepared to reimburse your court and/or office for all costs incurred in executing the instant Letter Rogatory and the assurance of its highest consideration.

**SENDER:**

The Honorable Sidney H. Stein
United States District Court Judge
United States District Court for the Southern
District of New York
Room 23A
United States Courthouse 500 Pearl Street
New York, New York 10007
United States of America
Laura Blakely, Courtroom Deputy
(212) 805-0087
Laura_Blakely@nysd.uscourts.gov

**CENTRAL AUTHORITY OF THE REQUEST STATE:**

UK Central Authority
Public Safety Group
Home Office
6th Floor, Fry Building
2 Marsham Street
London
SW1P 4DF
UKCA-ILOR@homeoffice.gov.uk

**PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

Stuart Alford
PAUL HASTINGS LLP
100 Bishopsgate
London
EC2n 4AG
+44(0)20 3321 1069
stuartalford-kc@paulhastings.com

*On behalf of:*

The Honorable Sidney H. Stein
United States District Court Judge
United States District Court for the Southern
District of New York
Room 24A
United States Courthouse 500 Pearl Street
New York, New York 10007 United States of
America

**IN CONFORMITY WITH 28 U.S.C. § 1781, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING REQUEST:**

| | |
|---|---|
| **REQUESTING JUDICIAL AUTHORITY:** | The Honorable Sidney H. Stein<br>United States District Court Judge<br>United States District Court for the Southern District of New York<br>Room 23A<br>United States Courthouse 500 Pearl Street<br>New York, New York 10007<br>United States of America<br>Laura Blakely, Courtroom Deputy<br>(212) 805-0087 |
| **TO THE COMPETENT AUTHORITY OF THE UNITED KINGDOM:** | UK Central Authority<br>Public Safety Group<br>Home Office<br>6th Floor, Fry Building<br>2 Marsham Street<br>London<br>SW1P 4DF<br>UKCA-ILOR@homeoffice.gov.uk |
| **NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES:** | U.S. Department of Justice:<br><br>Christina A. Clark<br>National Security Division, United States Department of Justice<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br>USA<br>Christina.clark3@usdoj.gov<br><br>Daniel Charles Richenthal<br>Eli Jacob Mark<br>Paul Monteleoni<br>Lara Pomerantz<br>Catherine Ghosh<br>United States Attorney's Office, SDNY<br>One Saint Andrew's Plaza<br>New York, NY 10007<br>USA<br>daniel.richenthal@usdoj.gov<br>eli.mark@usdoj.gov<br>Paul.Monteleoni@usdoj.gov |

Lara.Pomerantz@usdoj.gov
Catherine.Ghosh@usdoj.gov

Defendants:

*Robert Menendez*

Avi Weitzman
Adam Fee
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
USA
aviweitzman@paulhastings.com
adamfee@paulhastings.com

*Nadine Menendez*

Danny Onorato
David Schertler
SCHERTLER, ONORATO, MEAD &
SEARS LLP
555 – 13th Street, NW Suite 500 West
USA
donorato@schertlerlaw.com
dschertler@schertlerlaw.com

*Fred Daibes*

Cesar de Castro
The Law Firm of Cesar de Castro, P.C.
The District 111 Fulton Street – 602
New York, NY 10038
USA
cdecastro@cdecastrolaw.com

*Wael Hana*

Larry Lustberg
Ricardo Solano, Jr.
Anne Collart
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
USA
llustberg@gibbonslaw.com

amarino@gibbonslaw.com
rsolano@gibbonslaw.com
acollart@gibbonslaw.com

## FACTS

The United States Department of Justice (the "DOJ") has brought charges in the United States against Senator Robert Menendez, a citizen of the United States, Nadine Menendez, a citizen of the United States, Fred Daibes, a citizen of the United States, and Wael Hana, a citizen of the United States (together, "Defendants"). *See* Exhibit A. The DOJ alleges that the Defendants, in whole or part, engaged in a conspiracy to and did commit bribery, honest services wire fraud, and extortion under color of official right, conspired for a public official to act as a foreign agent and acted as a public agent, and conspired to and did obstruct justice.

Among other things, the Indictment alleges that Senator Menendez, in exchange for bribes, introduced Defendant Fred Daibes to an investor associated with "an investment company with ties to the Government of Qatar" (████████████) that later agreed to invest in a real estate development project in Edgewater, New Jersey controlled by Mr. Daibes (the "Edgewater Development Project"). Exhibit A ¶¶ 55–56. Specifically, the Indictment alleges that following a meeting involving Senator Menendez, Mr. Daibes, and representatives of the government of Qatar and ████████████████ ultimately "enter[ed] into a joint venture with a company controlled by FRED DAIBES [i.e., the Edgewater Development Project]" and "invested tens of millions of dollars into the project." *Id.* ¶ 66.

The government further alleges that, in order to incentivize ████████████' to invest in Mr. Daibes' development project, Senator Menendez took certain actions benefiting the government of Qatar, including making public statements supporting the Government of Qatar and using his official authority and influence to act on a pending Senate resolution concerning the Government of Qatar. *Id.* ¶¶ 57, 101, 103, 105, 107.

Put simply, the government is alleging that Senator Menendez played a role in causing ████████ to enter into a joint venture with Mr. Daibes, and that he did so in exchange for bribes. See *id.* ¶ 45 ("when he accepted . . . things of value from DAIBES, MENENDEZ knew that DAIBES also expected MENENDEZ in exchange to take action to benefit the Government of Qatar, and thereby benefit DAIBES, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar."); ¶¶ 100–101 (charging Senator Menendez with a substantive bribery offense for taking "Actions to Benefit Daibes and Qatar.")

From DOJ interviews of counsel for ████████████████████████, as well as a law enforcement interview with ████████, we believe that all three of them would dispute the DOJ's allegations. Most significantly, on December 15, 2023, the DOJ interviewed ████████, and he contradicted the DOJ's allegations, stating:

1.  ████████████ opted to invest in the Edgewater Development Project because it was an attractive investment opportunity, and for no other reason. ████████ said that the Edgewater Development Project was a "trophy project" because it "overlooked

Manhattan" from New Jersey.  According to ████████████████████
████ "always wanted to do a property deal in Manhattan" and so a "New Jersey deal"
overlooking Manhattan, was "the next best thing."

2. The Edgewater Development Project was also an attractive opportunity because its
   owner, Mr. Daibes, was "unbankable" (*i.e.*, his unrelated criminal prosecution made it
   difficult for him to obtain loans from commercial banks) and so ████████████████
   was able to invest on favorable terms.

3. Senator Menendez had no connection to the Edgewater Development Project, ████████
   ████████████., or ████████████████████.  Indeed, ████████████ never discussed
   Senator Menendez with ████████████████ or with Mr. Daibes, either in connection with the
   Project or otherwise.

4. The money managed by ████████████████████. belongs to ████████████████████
   ████ not the government of Qatar; nor does the government of Qatar have any
   connection or control over ████████████████ (making the Indictment's use of the
   label "Qatari Investment Company" a misnomer).  In fact, ████████████ has no knowledge
   that anyone in the government of Qatar even *knows about* the Edgewater Development
   Project.  Put simply, ████████████ rejected the notion that Senator Menendez taking action
   favorable to the *government* of Qatar would somehow influence ████████████████████
   decision to invest in the Edgewater Development Project.

Furthermore, representations from attorneys for ████████████████████████ and ████
████████ in September and November 2023 similarly confirmed that Senator Menendez had no
involvement in the Edgewater Development Project, and that the decision to invest in the
Edgewater Development Project had nothing to do with Senator Menendez or the government of
Qatar.

**EVIDENCE TO BE OBTAINED**

Defendant Senator Menendez seeks to obtain testimonial evidence from ████████████, ████
████████, and ████████████████ in the United Kingdom.  Defendant Senator Menendez
maintains that this testimony is critical to Defendant's case and his ability to exonerate himself.

**EVIDENCE TO BE OBTAINED:**          The taking of testimony for trial of ████
                                      ████████████████████████████████
                                      ████████████████████, third-party witnesses in this
                                      matter.

**IDENTITY AND ADDRESSES OF**
**PERSONS TO BE EXAMINED:**

███████████████████████████████

███████████████████████

**QUESTIONS PROPOSED TO HIS** ████████████████████

Defendant Senator Menendez seeks permission to ask ██████████████████ questions concerning the same subject matter for which ████████████ attorneys have already spoken to the United States DOJ.  Such questions would encompass the time period 2021 through present and would concern, for example:

1. The association, if any, between ████████████. and the Government of Qatar or any instrumentalities or agents thereof.
2. Whether ████████████. invests or manages funds on behalf of the Government of Qatar or any instrumentality thereof.
3. ████████████ s investments and potential investments in the United States, including but not limited to real estate projects in New Jersey associated with Defendant Fred Daibes (the "Edgewater Development Project").
4. Whether the Government of Qatar invested in, solicited, or was even aware of the Edgewater Development Project.
5. ██████████████████ interactions with Defendant Fred Daibes and agents acting on his behalf.
6. ██████████████ interactions with Defendant Senator Menendez and agents acting on his behalf.
7. Whether ██████████████, or anyone acting on his behalf, solicited, requested, prepared, reviewed, or approved public statements issued by Defendant Senator Menendez concerning Qatar.
8. His ██████████████ interactions with individuals working on behalf of the Government of Qatar in the United States to lobby Defendant Senator Menendez.
9. Whether ██████████████, or anyone acting on his behalf, solicited, requested, prepared, reviewed, or approved Senate Resolution 390 in the 117th Congress (2021-2022) – "A Resolution expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refuge."
10. Whether the public statements issued by Defendant Senator Menendez concerning Qatar or the passage of Senate Resolution 390 played any role in ██████████████ decision to invest in the Edgewater Development Project.

**QUESTIONS PROPOSED TO** ██████████████ **AND** ██████████████

Defendant Senator Menendez seeks permission to ask ██████████ and ██████████ questions concerning the same subject matter for which ██████████ already spoke to the United States

Department of Justice and counsel for ██████████ and ██████████ spoke to the United States Department of Justice.  Such questions would encompass the time period 2021 through present and would concern, for example:

1. The association, if any, between ████████████████. and the Government of Qatar or any instrumentalities or agents thereof.
2. Whether ████████████. invests or manages funds on behalf of the Government of Qatar or any instrumentality thereof.
3. ████████████s investments and potential investments in the United States, including but not limited to real estate projects in New Jersey associated with Defendant Fred Daibes (the "Edgewater Development Project").
4. Whether the Government of Qatar invested in, solicited, or was even aware of the Edgewater Development Project.
5. Discussions with and instructions by ████████████ principal, ████████ ████████████, regarding potential investments in real estate projects in New Jersey associated with Defendant Fred Daibes, including but not limited to the Edgewater Development Project.
6. ████████████████████ respective interactions with Defendant Fred Daibes and agents acting on his behalf.
7. ████████████████████ respective interactions with Defendant Senator Menendez and agents acting on his behalf.
8. ████████████████████ respective knowledge regarding public statements made by Defendant Senator Menendez concerning Qatar.
9. ████████████████████ respective knowledge concerning Senate Resolution 390 in the 117th Congress (2021-2022) – "A Resolution expressing appreciation for the State of Qatar's efforts to assist the United States during Operation Allies Refugee."
10. Whether the public statements issued by Defendant Senator Menendez concerning Qatar or the passage of Senate Resolution 390 played any role in ████████████ decision to invest in the Edgewater Development Project.

**RIGHTS OF WITNESSES**

Under §§ 13-15 of the Crime (International Co-operation) Act 2003, the rights of witnesses compelled to give evidence in the United Kingdom are governed, insofar as United Kingdom law is concerned, by paragraph 5 of Schedule 1 to the Act. This would include the witness being entitled to refuse to answer questions on the basis of legal professional privilege or the right against self-incrimination.

The same rights arise under the laws of the United States.  *See* Exhibit B (Federal Rules of Evidence).

**SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED**

The District Court respectfully requests, with respect to the oral testimony being sought:

1. that the appropriate Territorial Authority nominates a Court under § 15(1) to receive any evidence to which the request relates, which appears to that Court to be appropriate for the purpose of giving effect to the request;

2. that, in connection with the taking of testimony from the witness, the parties be permitted to refer the witness to documents previously produced or made available in the United States proceedings.

**REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST**

The Court nominated under § 15 will be asked in due course to liaise with the following parties in order to identify a date for the deposition:

U.S. Department of Justice:

Christina A. Clark
National Security Division, United States Department of Justice
950 Pennsylvania Ave NW
Washington, DC 20530
USA
Christina.clark3@usdoj.gov

Daniel Charles Richenthal
Eli Jacob Mark
Paul Monteleoni
Lara Pomerantz
Catherine Ghosh
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
USA
daniel.richenthal@usdoj.gov
eli.mark@usdoj.gov
Paul.Monteleoni@usdoj.gov
Lara.Pomerantz@usdoj.gov
Catherine.Ghosh@usdoj.gov

<u>Defendants</u>:

*Robert Menendez*

Avi Weitzman
Adam Fee
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
USA
aviweitzman@paulhastings.com
adamfee@paulhastings.com

*Nadine Menendez*

Danny Onorato
David Schertler
SCHERTLER, ONORATO, MEAD & SEARS LLP
555 – 13th Street, NW Suite 500 West
USA
donorato@schertlerlaw.com
dschertler@schertlerlaw.com

*Fred Daibes*

Cesar de Castro
The Law Firm of Cesar de Castro, P.C.
The District 111 Fulton Street – 602
New York, NY 10038
USA
cdecastro@cdecastrolaw.com

*Wael Hana*

Larry Lustberg
Ricardo Solano, Jr.
Anne Collart
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
USA
llustberg@gibbonslaw.com
amarino@gibbonslaw.com
rsolano@gibbonslaw.com
acollart@gibbonslaw.com

## RECIPROCITY

The District Court is authorized by 28 U.S.C. §§ 1781 and 1782 to extend similar assistance on request of the judicial authorities of the United Kingdom.

## MEDIA INTEREST

The MLA Guidelines mandate that any media interest in the case be highlighted in the Letter of Request.  Please note that there has been extensive media coverage in relation to this case, and it is envisaged that this will continue.


**DATE OF REQUEST:**                    _____, 2024


**SIGNATURE AND SEAL OF**          BY:_____
**THE REQUESTING AUTHORITY:**      The Honorable Sidney H. Stein
                                   United States District Court Judge
                                   United States District Court for the Southern
         [Seal]                    District of New York
                                   Room 23A
                                   United States Courthouse 500 Pearl Street
                                   New York, New York 10007
                                   United States of America

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **SUPERSEDING INDICTMENT** |
| v. | S4 23 Cr. 490 (SHS) |
| ROBERT MENENDEZ,<br>NADINE MENENDEZ,<br>     a/k/a "Nadine Arslanian,"<br>WAEL HANA,<br>     a/k/a "Will Hana," and<br>FRED DAIBES, | |
| Defendants. | |

### Overview

1.     ROBERT MENENDEZ, the defendant, is the senior U.S. Senator from the State

of New Jersey.  From at least in or about 2018 up to and including in or about 2023,

MENENDEZ and his wife, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant,

engaged in a corrupt relationship with three New Jersey associates and businessmen—WAEL

HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, and Jose Uribe—in which

MENENDEZ and NADINE MENENDEZ agreed to and did accept hundreds of thousands of

dollars of bribes in exchange for using MENENDEZ's power and influence as a Senator to seek

to protect and enrich HANA, DAIBES, and Uribe, and to benefit the Arab Republic of Egypt and

the State of Qatar.  Those bribes included cash, gold, payments toward a home mortgage,

compensation for a low-or-no-show job, a luxury vehicle, and other things of value.

2.     This corrupt relationship resulted in ROBERT MENENDEZ, the defendant,

promising to take and taking a series of official acts and breaches of official duty in exchange for

bribes that benefitted him both directly, and indirectly through NADINE MENENDEZ, a/k/a

"Nadine Arslanian," the defendant.  Among other things, first, MENENDEZ promised to and did

use his influence and power and breach his official duty in ways that benefited the Government of Egypt and WAEL HANA, a/k/a "Will Hana," the defendant, an Egyptian-American businessman, among others. Among other actions, MENENDEZ provided sensitive U.S. Government information and took other steps that secretly aided the Government of Egypt. MENENDEZ also improperly advised and pressured an official at the United States Department of Agriculture for the purpose of protecting a business monopoly granted to HANA by Egypt and used in part to fund the bribes being paid to MENENDEZ through NADINE MENENDEZ. Second, MENENDEZ promised to and did use his influence and power and breach his official duty to seek to disrupt a criminal investigation and prosecution undertaken by the New Jersey Attorney General's Office related to Jose Uribe and his associates. Third, MENENDEZ promised to and did use his influence and power and breach his official duty to recommend that the President nominate an individual as U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to the federal criminal prosecution of FRED DAIBES, the defendant, and to seek to disrupt that same prosecution. Fourth, MENENDEZ agreed to and did accept payment from DAIBES, knowing that DAIBES expected MENENDEZ in exchange to use his influence and power and breach his official duty to assist DAIBES, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar, by performing acts to benefit the Government of Qatar.

3. ROBERT MENENDEZ, the defendant, further promised to take and took a series of acts on behalf of Egypt, including on behalf of Egyptian military and intelligence officials, and conspired to do so with WAEL HANA, a/k/a "Will Hana," and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, who also communicated requests and directives from Egyptian officials to MENENDEZ.

4.      In or about June 2022, federal agents executed court-authorized search warrants on the New Jersey home of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and the safe deposit box of NADINE MENENDEZ.  In conducting these court-authorized searches, agents found certain of the fruits of MENENDEZ's and NADINE MENENDEZ's corrupt bribery agreement with WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, and Jose Uribe, including cash, gold, the luxury vehicle, and home furnishings.  Over $480,000 in cash—much of it stuffed into envelopes and hidden in clothing, closets, and a safe—was discovered in the home, along with over $70,000 in NADINE MENENDEZ's safe deposit box.  Some of the envelopes contained the fingerprints and/or DNA of DAIBES or his driver.  Other of the envelopes were found inside jackets bearing MENENDEZ's name and hanging in his closet, as depicted below.

 

During the same court-authorized search of the home, agents also found home furnishings provided by HANA and DAIBES, the luxury vehicle paid for by Uribe parked in the garage, as well as over one hundred thousand dollars' worth of gold bars in the home, which were provided by either HANA or DAIBES.  Two of the gold bars DAIBES provided are depicted in the photographs below.



**Relevant Individuals**

**_Senator Robert Menendez and his Wife, Nadine Menendez, a/k/a "Nadine Arslanian"_**

5.    ROBERT MENENDEZ, the defendant, is the senior U.S. Senator from the State of New Jersey.  MENENDEZ served as mayor of Union City, New Jersey, and a member of the New Jersey state legislature until 1993, when he was elected to the U.S. House of Representatives representing a New Jersey district.  MENENDEZ was appointed to the U.S. Senate in 2006, subsequently elected in 2006, and reelected in 2012 and 2018.  At all times relevant to this Indictment, MENENDEZ held a leadership position on the Senate Foreign Relations Committee (the "SFRC"), first as the Ranking Member and then the Chairman, and therefore possessed influence over, among other things, the Executive Branch's decisions to provide foreign military sales, foreign military financing, and other aid or support to or for the benefit of the Government of Egypt.  By virtue of his position as the senior U.S. Senator from the State of New Jersey, at all times relevant to this Indictment, MENENDEZ had the ability to recommend to the President that a particular individual be nominated to serve as the U.S. Attorney for the District of New Jersey.  At all times relevant to this Indictment, the official public website for MENENDEZ's Senate office stated that his office could not take certain

4

actions, including actions to influence private business matters, and actions to intervene with judicial issues and criminal trials, as detailed in the below excerpt from the website.

BOB **MENENDEZ**

Q ≡

## OUR OFFICE CANNOT

**COMPEL** an agency to act in your favor or expedite your case.

**OVERTURN** or influence matters involving private businesses.

**INTERVENE** with judicial issues, provide legal advice or recommend an attorney. Our Senate office cannot legally get involved with pending litigation, including questions about criminal trials or imprisonment, child custody issues, and civil lawsuits. My office cannot overturn or in any way influence a court's decision.

6.      NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, began dating ROBERT MENENDEZ, the defendant, in or about early February 2018.  They became engaged in or about early October 2019, and married in or about early October 2020.  Before NADINE MENENDEZ began dating MENENDEZ, she was unemployed.  Beginning in at least in or about 2018, NADINE MENENDEZ had meetings and direct communications with multiple Egyptian officials, at least some of whom she understood were intelligence officials, and received requests from them, and conveyed information and requests from them to MENENDEZ.

### *The Three New Jersey Businessmen*

7.      At all times relevant to this Indictment, WAEL HANA, a/k/a "Will Hana," the defendant, who is originally from Egypt, resided principally in New Jersey, and maintained close connections with Egyptian officials.  HANA and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, were friends for many years before she began dating ROBERT MENENDEZ, the defendant.  A court-authorized search in or about November 2019 of a

cellphone HANA used revealed thousands of text messages between HANA and NADINE MENENDEZ, many of which NADINE MENENDEZ deleted from her own cellphone. That search also revealed thousands of text messages, many via an encrypted application, with Egyptian military and intelligence officials, pertaining to various topics, including MENENDEZ, and including requests and directives for HANA to act upon.

8.    FRED DAIBES, the defendant, is a New Jersey real estate developer, a founder of a New Jersey-based bank, and a business associate of WAEL HANA, a/k/a "Will Hana," the defendant. On or about October 30, 2018, DAIBES was charged by the United States Attorney's Office for the District of New Jersey with obtaining loans under false pretenses from that bank. DAIBES was a longtime fundraiser for ROBERT MENENDEZ, the defendant.

9.    Jose Uribe is a businessman who resides in New Jersey and works in the trucking and insurance business, after having previously been convicted of fraud and having his insurance broker's license revoked. Uribe is a business associate and friend of WAEL HANA, a/k/a "Will Hana," the defendant. Uribe developed a relationship with ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, in or about 2018.

### Relevant Statutory Background on FARA

10.    The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, is a federal registration and disclosure statute that requires any person agreeing to act or acting in the United States as "an agent of a foreign principal" to register with the United States Attorney General if he or she agrees to engage or engages, directly or through another person, in certain types of conduct, such as political activities, political consulting, public relations, or publicity activities, for or in the interest of the foreign principal. Such registrations are made to the National Security Division's Foreign Agents Registration Act Unit within the U.S. Department of Justice.

6

11.     The purpose of FARA is to prevent covert influence by foreign principals.  Proper registration under the statute allows the United States Government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents.  Among other things, a FARA registration, which is publicly available, reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, the source and amount of compensation the registrant receives from the foreign principal, and any political campaign contributions made by the registrant while the registrant was acting as an agent of the foreign principal.

12.     Public officials, including Members of Congress, are prohibited by law from agreeing to be or acting as an agent of a foreign principal required to register under FARA.  At all times relevant to this Indictment, the Senate Ethics Manual, which was publicly available, stated, among other things, "Regardless of compensation, a public official may not act as an agent or attorney for a foreign principal required to register under the Foreign Agents Registration Act of 1938, as amended, that is, generally, those individuals engaged in lobbying, political, or propaganda activities on behalf of foreign governments or political parties," citing Title 18, United States Code, Section 219.

### MENENDEZ's Public Statements about FARA, and NADINE MENENDEZ's and HANA's Failure to Register

13.     Between at least approximately 2020 and 2022, ROBERT MENENDEZ, the defendant, made multiple requests for the U.S. Department of Justice to commence an investigation against another person for allegedly failing to register under FARA.  In particular, on or about May 18, 2020, MENENDEZ sent a letter to the then-head of the National Security Division asking the Department of Justice to investigate another individual who had previously

7

served as a Member of Congress (the "Former Member of Congress") for allegedly failing to register as a foreign agent. In that letter, MENENDEZ stated, "The Act is clear that acting directly or indirectly in any capacity on behalf of a foreign principal triggers the requirement to register under FARA." Moreover, on or about May 4, 2022, MENENDEZ sent a second letter to the U.S. Attorney General reiterating his request that the Former Member of Congress be investigated for allegedly failing to register as a foreign agent. In that second letter, MENENDEZ stated, "If [the Former Member of Congress] carried out work that requires registration under FARA, it is imperative that the Justice Department ensure he is held to account." The first of these letters was posted on the official public website for MENENDEZ's Senate office and the official public website for the SFRC, and the second of these letters was posted on the official public website for the SFRC.

14.     As a public official, ROBERT MENENDEZ, the defendant, was prohibited from serving as a foreign agent.

15.     NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, have never registered as foreign agents or lobbyists.

### MENENDEZ Agrees to Take Actions that Benefit Egypt and HANA in Exchange for Promises of Things of Value

16.     In or about early 2018, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, informed WAEL HANA, a/k/a "Will Hana," the defendant, that she was dating ROBERT MENENDEZ, the defendant. In the following months and years, HANA and NADINE MENENDEZ worked to introduce Egyptian intelligence and military officials to MENENDEZ for the purpose of establishing and solidifying a corrupt agreement in which HANA, with assistance from FRED DAIBES, the defendant, and Jose Uribe, provided hundreds of thousands of dollars of bribes to MENENDEZ and NADINE MENENDEZ, in exchange for

MENENDEZ's acts and breaches of duty to benefit the Government of Egypt, HANA, and others, including with respect to foreign military sales and foreign military financing.

### *Background on Foreign Military Sales and Foreign Military Financing*

17.     At all times relevant to this Indictment, Egypt was among the largest recipients in the world of U.S. military aid.  Between approximately 2018 and approximately 2022, the U.S. Government supplied substantial military aid to Egypt, including in the form of grants of over $1 billion per year ("foreign military financing"), and in the form of direct government-to-government sales of military equipment ("foreign military sales"), which Egypt typically paid for with foreign military financing, and which the Executive Branch was required to notify Congress about under certain circumstances prior to going forward with those sales.  The U.S. Department of State (the "State Department") played a central role in reviewing and approving foreign military sales to Egypt and obligating foreign military financing to Egypt, which was conditioned on certain certifications being made by the State Department.  As a matter of longstanding, voluntary practice, the State Department would typically honor so-called "holds" placed by the Chairman or the Ranking Member of the SFRC on both foreign military financing and foreign military sales.  In other words, the State Department would typically not proceed with a transfer of foreign military financing grant money to Egypt's bank account (located at all relevant times in Manhattan), or with a foreign military sale to Egypt, while the Chairman or the Ranking Member of the SFRC had not signed off on, and was maintaining a "hold" on, such a transfer or sale.  As a result, at all times relevant to the Indictment, ROBERT MENENDEZ, the defendant, as the Chairman or the Ranking Member of the SFRC, possessed substantial influence over foreign military sales and foreign military financing to Egypt.

18.     For at least several years prior to 2018, despite its strategically important relationship with the U.S. and in the Middle East, Egypt had often faced resistance in obtaining

foreign military financing and foreign military sales. For example, in or about August 2017, the State Department announced that it was withholding $195 million in foreign military financing until Egypt could demonstrate improvements on human rights and democracy, and was canceling an additional $65.7 million in foreign military financing to Egypt. By in or about early 2018, multiple U.S. Senators had raised human rights or rule-of-law objections to foreign military financing to Egypt, and no foreign military sales of offensive military equipment to Egypt requiring congressional notification had been concluded since in or about March 2016.

### *HANA and NADINE MENENDEZ Introduce Egyptian Officials to MENENDEZ for Corrupt Purposes*

19.    In or about 2018, shortly after ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, began dating, WAEL HANA, a/k/a "Will Hana," the defendant, and NADINE MENENDEZ arranged a series of meetings and dinners with MENENDEZ—paid for by HANA or his associates—at which Egyptian officials raised, among other things, requests related to foreign military sales and foreign military financing. In exchange for MENENDEZ and NADINE MENENDEZ's promise that MENENDEZ would, among other things, use his power and authority to facilitate such sales and financing to Egypt, HANA promised, among other things, to put NADINE MENENDEZ on the payroll of his company in a low-or-no-show job. For example:

a.    In or about March 2018, MENENDEZ met with an Egyptian military official ("Egyptian Official-1") and other Egyptian military officials at a meeting arranged and attended by his then-girlfriend NADINE MENENDEZ and her friend HANA. MENENDEZ allowed NADINE MENENDEZ and HANA to arrange and participate in this meeting, which took place at MENENDEZ's Senate office in Washington, D.C. and included discussions of

foreign military financing to Egypt, among other topics. A photograph taken during the meeting is depicted below.



b. MENENDEZ and NADINE MENENDEZ again met with HANA on or about May 6, 2018. Later that same day, MENENDEZ sought from the State Department non-public information regarding the number and nationality of persons serving at the U.S. Embassy in Cairo, Egypt. Although this information was not classified, it was deemed highly sensitive because it could pose significant operational security concerns if disclosed to a foreign government or if made public. Without telling his professional staff, SFRC staff, or the State Department that he was doing so, on or about May 7, 2018, MENENDEZ texted that sensitive, non-public embassy information to his then-girlfriend NADINE MENENDEZ, writing:

> Just FYI. [a number] Americans – combination of diplomats,
> commercial service, USAID, other
> [a number] Egyptians, locally employed staff
> This is what's at American embassy. [Summary of ratio] are
> Egyptians working at Embassy.

NADINE MENENDEZ forwarded this message to HANA, who forwarded it to an Egyptian government official ("Egyptian Official-2").

c.    That same month, in or about May 2018, HANA hosted another dinner at a high-end restaurant with MENENDEZ, during which MENENDEZ disclosed to HANA non-public information about the United States's provision of military aid to Egypt. Shortly after the dinner, HANA texted Egyptian Official-1, "The ban on small arms and ammunition to Egypt has been lifted. That means sales can begin. That will include sniper rifles among other articles."

d.    Later that month, in or about May 2018, NADINE MENENDEZ conveyed to MENENDEZ a request from an Egyptian official seeking assistance in editing and drafting a letter lobbying other U.S. Senators to support U.S. aid to Egypt. NADINE MENENDEZ explained that she wanted MENENDEZ to prepare the letter because HANA and an Egyptian official, whom she referred to as the "General" in her communications with MENENDEZ, had gotten NADINE MENENDEZ "clearance for a project." In response, MENENDEZ secretly edited and ghost-wrote the requested letter on behalf of Egypt seeking to convince other U.S. Senators to release a hold on $300 million in aid to Egypt. MENENDEZ sent this ghost-written letter to NADINE MENENDEZ from his personal email account. NADINE MENENDEZ forwarded the ghost-written letter to HANA, facilitating HANA's conveyance of the revised draft back to Egyptian officials. Both MENENDEZ and NADINE MENENDEZ deleted the email in which NADINE MENENDEZ asked MENENDEZ to write this letter.

20.    In or about July 2018, ROBERT MENENDEZ, the defendant, met again with Egyptian Official-1 and multiple other Egyptian military officials to discuss foreign military financing and foreign military sales during a meeting that was arranged, scheduled, and attended by NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants. In advance of that meeting, the Egyptian Government, through HANA and NADINE MENENDEZ, provided to MENENDEZ briefing materials advocating Egyptian foreign policy goals and positions and setting forth Egypt's requests for the approval of foreign

12

military financing and foreign military sales to Egypt. The next day, MENENDEZ texted

NADINE MENENDEZ:

> Tell Will [HANA] I am going to sign off this sale to Egypt today.
> Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds
> Tank Ammunition: $99 million
>
> NOTE: These tank rounds are for tanks they have had for many
> years. They are using these in the Sinai for the counter-terrorism
> campaign.

NADINE MENENDEZ forwarded this text to HANA, who forwarded it to Egyptian Official-1

and Egyptian Official-2. Egyptian Official-1 replied with a "thumbs up" emoji.

21.     On or about May 21, 2019, ROBERT MENENDEZ, NADINE MENENDEZ,

a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, met with an

Egyptian intelligence official ("Egyptian Official-3") at MENENDEZ's Senate office in

Washington, D.C. During this meeting, the group discussed a human rights matter pertaining to

the resolution of a claim involving the serious injuries suffered by an American citizen, who was

injured in a 2015 airstrike by the Egyptian military using a U.S.-manufactured Apache

helicopter. The incident leading to the citizen's injuries and the perception of certain Members

of Congress that the Government of Egypt was not willing to provide fair compensation to the

injured citizen for the attack resulted in objections by some Members of Congress to the

awarding of certain military aid to Egypt. Shortly after the meeting with Egyptian Offical-3,

MENENDEZ conducted a web search for the name of that American citizen and visited a

website that contained an article about the citizen's claim. Approximately a week later, using an

encrypted messaging application, Egyptian Official-3 texted HANA in Arabic regarding this

human rights matter, writing, in part, that if MENENDEZ helped resolve the matter, "he will sit

very comfortably," to which HANA replied, "orders, consider it done." Egyptian Official-3 then

texted HANA screenshots of a statement from the American citizen's attorney pertaining to the

claim, which HANA then forwarded a few days later to NADINE MENENDEZ, who in turn forwarded it to MENENDEZ. NADINE MENENDEZ subsequently deleted her text messages with HANA about this matter.

## **MENENDEZ Takes Action to Protect IS EG Halal**

### ***HANA Fails to Deliver on Promised Bribe Payments***

22. WAEL HANA, a/k/a "Will Hana," the defendant, repeatedly promised NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, payments, including through a low-or-no-show job, from IS EG Halal Certified, Inc. ("IS EG Halal"), a New Jersey company that HANA operated with financial support and backing from FRED DAIBES, the defendant, in furtherance of the scheme. However, IS EG Halal had little to no revenue between in or about 2018 and in or about early 2019, and HANA did not deliver on his promises to make those payments during this time period.

23. After several months of nonpayment following the initial March 2018 meeting described in paragraph 19.a, above, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, complained to multiple associates of WAEL HANA, a/k/a "Will Hana," the defendant, about HANA's failure to pay her, and caused at least one of them to believe that ROBERT MENENDEZ, the defendant, would cease acting for HANA's benefit and at his request, including with respect to Egypt, unless HANA came through on his promises and paid her. NADINE MENENDEZ also complained directly to MENENDEZ about HANA's as-yet-unfulfilled promises, writing, "I have been so upset all morning. Will left for Egypt yesterday supposedly and now thinks he's king of the world and has both countries wrapped around his pinky. I really hope they replace him."

### *HANA Obtains a Lucrative Monopoly for IS EG Halal*

24.     In or about the spring of 2019, the Government of Egypt granted IS EG Halal an exclusive monopoly on the certification of U.S. food exports to Egypt as compliant with halal standards, despite the fact that neither WAEL HANA, a/k/a "Will Hana," the defendant, nor his company, had experience with halal certification. Prior to this action, a number of other U.S. companies had been licensed to certify U.S. meat exports to Egypt for halal compliance for years.

25.     The monopoly for IS EG Halal allowed WAEL HANA, a/k/a "Will Hana," the defendant, to provide payments to NADINE MENENDEZ, a/k/a "Nadine Arslanian," and ROBERT MENENDEZ, the defendants. Indeed, on or about April 7, 2019, an Egyptian government official informed HANA that IS EG Halal was likely to become Egypt's sole halal certifier for imports from the U.S. market. The next day, NADINE MENENDEZ texted MENENDEZ, "Seems like halal went through. It might be a fantastic 2019 all the way around."

### *NADINE MENENDEZ Forms an LLC to Receive Bribe Payments*

26.     In or about June 2019, after IS EG Halal obtained its monopoly, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, formed an entity titled Strategic International Business Consultants, LLC ("Strategic International Business Consultants") in New Jersey, with the assistance of ROBERT MENENDEZ, the defendant. The company was used to receive bribe payments in furtherance of the crimes charged herein. When sending a relative information about the formation of her company, NADINE MENENDEZ stated, by text message, "every time I'm in a middle person for a deal I am asking to get paid and this is my consulting company."

15

### *MENENDEZ Intervenes to Protect the Lucrative Monopoly*

27.     The IS EG Halal monopoly advanced the scheme by, among other things, providing a revenue stream from which WAEL HANA, a/k/a "Will Hana," the defendant, could make good on the bribe payments he had promised to ROBERT MENENDEZ, the defendant, through NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant.  The monopoly also resulted in increased costs for various U.S. meat suppliers and others.  As a result, in or about April and May 2019, multiple U.S. Government officials from the U.S. Department of Agriculture ("USDA") contacted the Government of Egypt objecting to and seeking reconsideration of its grant of monopoly rights to IS EG Halal, and the USDA prepared a public report regarding the increased cost for halal certification and the likely disruption to the U.S. market caused by the new monopoly.

28.     During the May 21, 2019 meeting described in paragraph 21 above among ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, and Egyptian Official-3, HANA also requested MENENDEZ's assistance to counter the USDA's objections to IS EG Halal's monopoly.  Later that evening, the same participants, along with an Egyptian-American associate of HANA, met at a steakhouse in Washington, D.C. for dinner, during which dinner there was discussion of various matters of foreign policy, and NADINE MENENDEZ stated, "what else can the love of my life do for you?"  This dinner is depicted below.



29.     Over the next two days, on or about May 22 and 23, 2019, WAEL HANA, a/k/a
"Will Hana," the defendant, provided NADINE MENENDEZ, a/k/a "Nadine Arslanian," the
defendant, with a variety of materials regarding the USDA's objections to IS EG Halal's
monopoly, some of which HANA received from an Egyptian official.  NADINE MENENDEZ
then texted certain of those materials to ROBERT MENENDEZ, the defendant, who later
deleted them.

30.     On or about May 23, 2019, ROBERT MENENDEZ, the defendant, called a high-
level USDA official ("Official-1") and insisted, in sum and substance, that the USDA stop
opposing IS EG Halal's status as sole halal certifier.  When Official-1 attempted to explain why
the monopoly was detrimental to U.S. interests, MENENDEZ reiterated his demand, in sum and
substance, that the USDA stop interfering with IS EG Halal's monopoly.  Official-1 did not
accede to MENENDEZ's demand, but IS EG Halal nevertheless kept its monopoly.

### *IS EG Halal is Used to Fund Bribe Payments*

31.     After financially benefitting from IS EG Halal's monopoly status as the sole halal
certifier, WAEL HANA, a/k/a "Will Hana," the defendant, at times with the assistance of FRED

DAIBES, the defendant, and Jose Uribe, provided payments to ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, in furtherance of the scheme.

32.     For example, in or about July 2019, after the mortgage company for the residence of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, initiated foreclosure proceedings, WAEL HANA, a/k/a "Will Hana," the defendant, caused IS EG Halal to pay $23,568.54 to the company that held NADINE MENENDEZ's mortgage to bring NADINE MENENDEZ's mortgage current. HANA made this payment following a series of discussions with NADINE MENENDEZ, as well FRED DAIBES, the defendant, and Jose Uribe, about various options for bringing the mortgage current. When at one point Uribe responded to NADINE MENENDEZ that HANA might balk at the amount required to bring the mortgage current, NADINE MENENDEZ replied, in part, "When I feel comfortable and plan the trip to Egypt he [*i.e.*, HANA] will be more powerful than the president of Egypt." Thereafter, Uribe and HANA worked to facilitate the payments, and ROBERT MENENDEZ, the defendant, continued taking actions to assist HANA and Egypt, including those discussed below.

33.     A few months later, in or about September 2019, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, texted FRED DAIBES, the defendant, complaining that WAEL HANA, a/k/a "Will Hana," the defendant, had not paid her what he owed her. DAIBES replied to NADINE MENENDEZ, "Nadine I personally gave Bob a check for September."

34.     Several days later, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, texted ROBERT MENENDEZ, the defendant, to complain that WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, had not made payments, writing, "I am sooooooo upset," stating that HANA had not left her an envelope, and remarking, "I thought Fred [DAIBES] would make sure it's there and the second day in a row there is nothing." NADINE MENENDEZ also wrote, "I thought after everything that happened especially last Saturday and

that week [referring to meetings MENENDEZ had with senior Egyptian officials] that at least he would honor his word one time I don't know if I should text Fred [DAIBES] or wait what should I do?" MENENDEZ responded, "No, you should not text or email." Soon thereafter, NADINE MENENDEZ called DAIBES. IS EG Halal issued a $10,000 check to Strategic International Business Consultants the next day, on or about September 28, 2019. In total, IS EG Halal issued three $10,000 checks to Strategic International Business Consultants, dated August 30, September 28, and November 5, 2019, which DAIBES helped provide or facilitate.

### *HANA and DAIBES Continue to Seek Action from MENENDEZ for Egypt*

35.     During the same period when IS EG Halal issued these checks, on or about September 9, 2019, Egyptian Official-3 texted WAEL HANA, a/k/a "Will Hana," the defendant, that "[A State Department employee] told [an Egyptian diplomatic official] today that senator Menendize [sic] put an [sic] hold on a billion $ of usaid to Egypt before the recess !!!!" and "Is this true ?" HANA responded to Egyptian Official-3 that HANA would ask. HANA then attempted to contact NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant. Several minutes later, HANA called FRED DAIBES, the defendant, via an encrypted messaging program, and forwarded Egyptian Official-3's text message to DAIBES. DAIBES promptly called ROBERT MENENDEZ, the defendant, and then DAIBES called HANA back via the same encrypted messaging program. Less than two minutes later, HANA texted Egyptian Official-3, writing that it was not true and "he" (*i.e.*, MENENDEZ) did not know anything about the hold on U.S. aid to Egypt.

36.     Also in or about September 2019, ROBERT MENENDEZ, the defendant, offered to provide his assistance to Egypt and to WAEL HANA, a/k/a "Will Hana," the defendant, during an official trip to India. Following a dinner among HANA, MENENDEZ, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, HANA texted Egyptian Official-3, "our

man [MENENDEZ] is traveling to India after two weeks and he is asking if there any message we need or anything for ISEG?" Later that same month, MENENDEZ, HANA, and FRED DAIBES, the defendant, met in Manhattan with Egyptian Official-3.

37.     The meetings between ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and Egyptian officials, and the receipt of things of value by MENENDEZ and NADINE MENENDEZ in exchange for MENENDEZ's promises to take actions favorable to Egypt and WAEL HANA, a/k/a "Will Hana," the defendant, and others, continued through 2020 and into 2022. For example:

        a.      In or about March 2020, NADINE MENENDEZ texted Egyptian Official-3, "anytime you need anything you have my number and we will make everything happen." A few days later she arranged for MENENDEZ to meet with Egyptian Official-3, whom NADINE MENENDEZ referred to as "the general," regarding negotiations between Egypt, Ethiopia, and Sudan over a dam on the Nile River being built by Ethiopia, known as the Grand Ethiopian Renaissance Dam (the "Dam"), which was generally regarded as one of the most important foreign policy issues for Egypt. Within one month, in or about April 2020, MENENDEZ wrote a letter to the then-Secretary of the Treasury and the then-Secretary of State regarding the Dam, beginning the letter, "I am writing to express my concern about the stalled negotiations between Egypt, Ethiopia, and Sudan over [the Dam]," and stating, "I therefore urge you to significantly increase the State Department's engagement on negotiations surrounding the [Dam]."

        b.      In or about October 2020, MENENDEZ and NADINE MENENDEZ met for dinner with Egyptian Official-3 and another Egyptian official ("Egyptian Official-4") at a restaurant in Edgewater, New Jersey. After this dinner, NADINE MENENDEZ and Egyptian Official-4 began texting with each other on an ongoing basis and had additional in-person

meetings, including a dinner they had in or about December 2020 with MENENDEZ and Egyptian Official-3.

       c.      In or about early 2021, HANA used IS EG Halal funds to cause two exercise machines and an air purifier, among other items, collectively worth thousands of dollars, to be purchased online and delivered to the house of MENENDEZ and NADINE MENENDEZ.

       d.      On or about June 21, 2021, NADINE MENENDEZ and Egyptian Official-4 organized a private meeting between MENENDEZ and a senior Egyptian intelligence official ("Egyptian Official-5") in a hotel in Washington, D.C. prior to a meeting between Egyptian Official-5 and other U.S. Senators the next day. On the day of the private meeting, MENENDEZ provided NADINE MENENDEZ with a copy of a news article reporting on questions that other U.S. Senators intended to ask Egyptian Official-5 regarding a human rights issue. NADINE MENENDEZ then sent that article to Egyptian Official-4, who responded, "Thanks you so much, chairman [*i.e.*, MENENDEZ, the Chairman of the SFRC] also raised it today, we appreciate it." The next day, NADINE MENENDEZ texted Egyptian Official-4 that she hoped the article she had sent was helpful, and stated, "I just thought it would be better to know ahead of time what is being talked about and this way you can prepare your rebuttals."

       e.      On or about June 23, 2021—*i.e.*, two days after the private meeting between MENENDEZ and Egyptian Official-5—HANA purchased 22 one-ounce gold bars, each with a unique serial number. Two of these one-ounce gold bars were subsequently found during the court-authorized search in June 2022 of the residence of MENENDEZ and NADINE MENENDEZ. During the relevant time periods, the spot market price of gold was approximately $1,800 per ounce.

       f.      In or about the fall of 2021, NADINE MENENDEZ communicated directly with Egyptian Official-4 to arrange a trip for MENENDEZ and NADINE MENENDEZ

to Egypt, which they took in or about October 2021. NADINE MENENDEZ and Egyptian Official-4 originally planned the trip as an unofficial visit, and therefore without supervision from the State Department. When an SFRC staffer contacted the U.S. Embassy in Cairo regarding the trip, causing the planned trip to become a formal congressional delegation under the supervision of the State Department, Egyptian Official-4 texted NADINE MENENDEZ "i will probably loose [sic] my job" and "SOS". NADINE MENENDEZ forwarded this text to MENENDEZ. HANA was also in Egypt during MENENDEZ's and NADINE MENENDEZ's trip, and they met for at least one dinner while there. During that trip, MENENDEZ and NADINE MENENDEZ also met with multiple Egyptian officials, including for a private dinner at the home of Egyptian Official-5, a photo of which is below.



g.      In or about January 2022, MENENDEZ sent NADINE MENENDEZ a link to a news article reporting on two pending foreign military sales to Egypt totaling approximately $2.5 billion dollars. NADINE MENENDEZ forwarded this link to HANA, writing, "Bob had to sign off on this."

38.     In exchange for the promises and acts set forth above, WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, provided multiple things of value to ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, including with the assistance of Jose Uribe.  Those things of value included hundreds of thousands of dollars in checks, cash, and gold, some of which was recovered during the June 2022 court-authorized search of the residence of MENENDEZ and NADINE MENENDEZ described above. NADINE MENENDEZ caused some of the gold to be sold in Manhattan prior to the search and deposited the proceeds into bank accounts she controlled.

### MENENDEZ Agrees to Disrupt New Jersey State Criminal Matters in Exchange for a Mercedes-Benz Convertible

39.     In or about 2019, WAEL HANA, a/k/a "Will Hana," the defendant, and Jose Uribe, offered and then helped to buy a new Mercedes-Benz C-300 convertible (the "Mercedes-Benz Convertible") worth more than $60,000 for NADINE MENENDEZ, a/k/a "Nadine Arslanian," and ROBERT MENENDEZ, the defendants.  In exchange, MENENDEZ agreed and sought to interfere in a New Jersey state criminal prosecution of an associate of Uribe (the "New Jersey Defendant") and a state criminal investigation involving an employee of Uribe (the "New Jersey Investigative Subject"), whom Uribe referred to as a relative in communicating with NADINE MENENDEZ.  Specifically, MENENDEZ contacted a senior state prosecutor in the Office of the New Jersey Attorney General who supervised the prosecution of the New Jersey Defendant and the investigation involving the New Jersey Investigative Subject ("Official-2") in an attempt, through advice and pressure, to cause Official-2 to resolve these matters favorably to the New Jersey Defendant and the New Jersey Investigative Subject.  Official-2 considered ROBERT MENENDEZ's actions inappropriate and did not agree to intervene.

23

### *MENENDEZ Agrees to Disrupt the Prosecution of the New Jersey Defendant*

40.    The first matter that ROBERT MENENDEZ, the defendant, agreed to attempt to influence concerned the New Jersey Defendant. The New Jersey Defendant was an associate of Jose Uribe, and was charged with insurance fraud relating to a trucking company ("Trucking Company-1"), the insurance of which was brokered by a company controlled by Uribe (the "Insurance Company"). The New Jersey Investigative Subject, an employee of Uribe who worked at the Insurance Company and whom Uribe referred to as a relative, allegedly was involved in submitting the insurance applications at issue in the New Jersey Defendant's criminal case. Uribe was implicated in the conduct with which the New Jersey Defendant was charged, and Uribe raised concerns about the case to WAEL HANA, a/k/a "Will Hana," the defendant, among others, writing in or about April 2018 about the case that "the deal is to kill and stop all investigation."

41.    NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, was involved in a car accident in or about December 2018 that left her without a car. On multiple occasions up to and including in or about January 2019, NADINE MENENDEZ sent text messages to WAEL HANA, a/k/a "Will Hana," the defendant, about her lack of a car.

42.    Beginning in or about January 2019, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," the defendant, and Jose Uribe agreed that MENENDEZ would attempt to intervene with Official-2 to influence the prosecution of the New Jersey Defendant in exchange for a car. For example:

   a.    On or about January 26, 2019, NADINE MENENDEZ invited HANA and Uribe to a dinner with her and MENENDEZ. MENENDEZ, NADINE MENENDEZ, and HANA had the dinner on or about January 27 without Uribe, who could not attend because of a scheduling conflict. After the dinner, HANA sent NADINE MENENDEZ a series of text

24

messages providing facts about the prosecution of the New Jersey Defendant. NADINE MENENDEZ subsequently deleted these text messages.

        b.     On or about January 29, 2019—*i.e.*, two days after the dinner described in paragraph 42.a, above—MENENDEZ called Official-2 and spoke with him in an attempt, through advice and pressure, to cause a resolution of the prosecution in the New Jersey Defendant's favor. In preparation for this call, MENENDEZ requested and received multiple text messages from NADINE MENENDEZ about the New Jersey Defendant, including the charges he was facing, which NADINE MENENDEZ, in turn, requested and received from HANA. MENENDEZ and NADINE MENENDEZ both subsequently deleted these text messages.

        c.     After being contacted by MENENDEZ, to avoid any potential inappropriate influence in the case, Official-2 did not share with the prosecution team that MENENDEZ had contacted him about the matter, and did not intervene in the matter. Nonetheless, in or about April 2019, the New Jersey Defendant resolved his criminal prosecution with a guilty plea pursuant to a plea agreement that recommended a non-incarceratory sentence. This resolution was more favorable for the New Jersey Defendant than the prosecutors' initial plea offer earlier in the case.

### *Uribe Provides NADINE MENENDEZ with a Luxury Car*

      43.     After ROBERT MENENDEZ, the defendant, agreed to and did call Official-2 about the New Jersey Defendant's case in or about January 2019, WAEL HANA, a/k/a "Will Hana," the defendant, and Jose Uribe worked to provide NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, with the Mercedes-Benz Convertible, as HANA had previously promised. Only a few days after MENENDEZ's first call to Official-2, on or about February 3, 2019, NADINE MENENDEZ texted HANA, "All is GREAT! I'm so excited to get a car next

week. !!" After some delays, Uribe ultimately facilitated NADINE MENENDEZ's purchase of the car through the following events, among others:

a.    On or about March 12, 2019, NADINE MENENDEZ called Uribe and spoke with him for over 21 minutes. After the call, Uribe texted NADINE MENENDEZ, "I am real. I will stand by my word."

b.    On or about March 27, 2019, Uribe texted NADINE MENENDEZ the information for a Mercedes-Benz dealership in Edison, New Jersey. Over the next several days, Uribe worked to put NADINE MENENDEZ in touch with a salesman at the car dealership. Once at the dealership, NADINE MENENDEZ sent MENENDEZ photos of two different cars to seek his input on the color scheme.

c.    On or about April 3, 2019, NADINE MENENDEZ texted a Mercedes-Benz car dealership salesperson that Uribe said she would be going to the dealership on April 5 to pick up the car. Later that day, Uribe texted an associate ("Associate-1"), a message roughly translated from Spanish as, "I did everything on this side. I need 15k cash this afternoon." Later that day, NADINE MENENDEZ texted Uribe, "You are a miracle worker who makes dreams come true I will always remember that."

d.    On or about April 4, 2019, NADINE MENENDEZ left MENENDEZ a voicemail saying that she was going "to meet Jose for five minutes" and then met Uribe in the parking lot of a restaurant where Uribe provided NADINE MENENDEZ with approximately $15,000 in cash.

e.    The next day, NADINE MENENDEZ purchased the Mercedes-Benz Convertible, making a $15,000 down payment with a combination of cash, a credit card, and several checks, and taking out an automotive loan to finance the remainder of the approximately $60,000 purchase price. A number of the statements NADINE MENENDEZ made on the

application in order to secure the loan financing were false, including statements about her employment and income. After the purchase was complete, NADINE MENENDEZ messaged MENENDEZ, "Congratulations mon amour de la vie, we are the proud owners of a 2019 Mercedes. 🖤." Later that day, after Uribe asked her, "are you happy?," NADINE MENENDEZ responded, "I will never forget this." NADINE MENENDEZ later texted MENENDEZ a photo of the Mercedes-Benz Convertible, which is below.



f.      After initially providing cash to NADINE MENENDEZ to purchase the Mercedes Benz Convertible, Uribe subsequently caused monthly financing payments to be paid for the car, which were routed either through one of Uribe's business associates or through a company Uribe controlled. In order to make the initial payments, in or about early May 2019, Uribe asked a business associate of his ("Associate-2") to make a payment for the Mercedes-Benz Convertible from Associate-2's corporate bank account, which had previously been opened at a bank branch in the Bronx. Uribe explained to Associate-2, in making this request, that Uribe

did not want his own name to be associated with the payment. Uribe and Associate-2 manually made each periodic payment from in or about May 2019 through in or about October 2019, either from Associate-2's bank account or from an account owned by a trucking company nominally owned by a relative of Uribe ("Trucking Company-2").

### *MENENDEZ Agrees to Disrupt the New Jersey Investigation*

44.     In or about late July 2019, a New Jersey detective sought to interview the New Jersey Investigative Subject in a criminal investigation related to the prosecution of the New Jersey Defendant. Following that interview request, ROBERT MENENDEZ, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and Jose Uribe, agreed that MENENDEZ would attempt to intervene with Official-2 again. For example:

a.      After learning of this interview request, Uribe contacted NADINE MENENDEZ and met with her on or about the evening of July 31, 2019. The next morning, Uribe sent NADINE MENENDEZ a series of texts saying that he did not want anyone to "bother" the New Jersey Investigative Subject (who as discussed above in paragraph 40 was an insurance broker at the Insurance Company Uribe controlled), and also saying that "[w]e need to make things go away," "[w]e need to move fast," and "[w]e can still stop this." That day, NADINE MENENDEZ wrote to Uribe, among other things, that she would "address it first thing tomorrow morning or tonight depending on when he [*i.e.*, MENENDEZ] is home," and adding, "he will be home first thing tomorrow I will address it first thing tomorrow and have the phone calls go out." Later that day, MENENDEZ performed a Google search for the initials of the state agency employing the insurance fraud investigator who was seeking to interview the New Jersey Investigative Subject. A few days later NADINE MENENDEZ texted Uribe that MENENDEZ had commented about Uribe's two requests related to these criminal matters, that "it would've been so so easy if we had wrapped both [requests] together."

b. On or about September 3, 2019, Uribe—who at this point had been making the periodic payments for the Mercedes-Benz Convertible for several months—texted NADINE MENENDEZ, "Please don't forget about me. I will never forget about you" and "I need peace." The next day, on or about September 4, 2019, MENENDEZ called Official-2 to schedule an in-person meeting with Official-2 for September 6, 2019, at MENENDEZ's Senate office in Newark, New Jersey. The day after that call—*i.e.*, September 5, 2019—Uribe, MENENDEZ, and NADINE MENENDEZ met at NADINE MENENDEZ's house.

c. On or about September 6, 2019, MENENDEZ met with Official-2 and another senior official at the Office of the New Jersey Attorney General at MENENDEZ's Senate office in Newark, New Jersey in an attempt, through advice and pressure, to cause Official-2 to favorably resolve the investigation involving the New Jersey Investigative Subject. After the meeting, MENENDEZ met with Uribe at MENENDEZ's apartment. Uribe thereafter texted another business associate of his ("Associate-3") that the meeting between MENENDEZ and Official-2 had been a "good meeting" and that—while nothing was final, to Uribe's understanding—MENENDEZ had informed Uribe that the meeting with Official-2 was "very positive."

d. Over the next several weeks following the September 6, 2019 meeting between MENENDEZ and Official-2, Uribe repeatedly texted NADINE MENENDEZ asking for updates and stating that he needed "peace."

e. On or about October 29, 2019—the day after Uribe texted NADINE MENENDEZ, "I always text you on Monday in case you have an update. I just need peace."— MENENDEZ called Uribe from his Senate office in Washington, D.C. Within minutes of getting off the phone, Uribe texted NADINE MENENDEZ, writing, "I just got a call and I am a very happy person." and "GOD bless you and him for ever." Several nights later, MENENDEZ,

NADINE MENENDEZ, Uribe, and Associate-3 met for a celebratory dinner and toasted with a bottle of champagne, as depicted below.



   f. On or about November 5, 2019—*i.e.*, several days after receiving the call from MENENDEZ and meeting for the celebratory champagne dinner—Uribe texted NADINE MENENDEZ asking for information that would allow him to set up automatic payments for the Mercedes-Benz Convertible.  Two minutes after saying he intended to set up automatic payments, Uribe texted NADINE MENENDEZ again, writing, "I have so much peace.  Gracias a DIOS and to you guys."

   g. Neither Official-2 nor the other senior official present at the September 6, 2019 meeting with MENENDEZ described in paragraph 44.c intervened in the investigation involving the New Jersey Investigative Subject.  That investigation closed without charges.

   h. On or about November 9, 2019, Uribe set up online payments for the Mercedes-Benz Convertible.  Using the online payment system, Uribe caused a trucking

company associated with him ("Trucking Company-3") to make at least approximately 32 monthly payments on the Mercedes-Benz Convertible. Together with the payments Uribe caused Associate-2 to make for the Mercedes-Benz Convertible, Uribe caused more than $30,000 to be paid for the purchase of the car, not including the cash Uribe had provided in a parking lot to NADINE MENENDEZ to pay towards the down payment.

### MENENDEZ Accepts Things of Value, Including Cash and Gold Bars, Knowing that DAIBES Expected MENENDEZ in Exchange to Disrupt a Federal Criminal Prosecution and to Act for the Benefit of the Government of Qatar and DAIBES

45.     From at least in or about December 2020 to at least in or about 2023, ROBERT MENENDEZ, the defendant, accepted things of value from FRED DAIBES, the defendant, knowing that DAIBES expected MENENDEZ in exchange to influence the pending federal prosecution of DAIBES, and to use his influence and power and breach his official duty to benefit the Government of Qatar and DAIBES. Specifically, MENENDEZ agreed to and did attempt to influence the pending federal prosecution of DAIBES, in exchange for cash, furniture, and gold bars that DAIBES provided to MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant. Moreover, when he accepted at least certain of those things of value from DAIBES, MENENDEZ knew that DAIBES also expected MENENDEZ in exchange to take action to benefit the Government of Qatar, and thereby benefit DAIBES, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar.

### *MENENDEZ Promises and Seeks to Disrupt the Prosecution of DAIBES in Exchange for Cash, Furniture, and Gold Bars*

46.     From at least in or about December 2020 to at least in or about early 2022, ROBERT MENENDEZ, the defendant, agreed to attempt to influence and attempted to influence the pending federal prosecution of FRED DAIBES, the defendant, in exchange for cash, furniture, and gold bars that DAIBES provided to MENENDEZ and NADINE MENENDEZ,

a/k/a "Nadine Arslanian," the defendant, including by recommending that the President nominate a candidate for U.S Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's case, and by attempting to influence the U.S. Attorney's Office for the District of New Jersey to act favorably in DAIBES's case.

47.     In or about December 2020, ROBERT MENENDEZ, the defendant, met with an individual who would later be nominated to be the U.S. Attorney for the District of New Jersey (referred to herein as the "Candidate" or "Official-3," the latter after Official-3's Senate confirmation).  At the time of the meeting, the Candidate was an attorney in private practice, and the purpose of his meeting with MENENDEZ was to consider a potential candidacy for U.S. Attorney in New Jersey.  In that meeting, MENENDEZ criticized the U.S. Attorney's Office for the District of New Jersey's prosecution of FRED DAIBES, the defendant, and said that he hoped that the Candidate would look into DAIBES's case if the Candidate became the U.S. Attorney.  MENENDEZ did not mention any other case in the meeting.  After the meeting, the Candidate informed MENENDEZ that he might have to recuse himself from the DAIBES prosecution as a result of a matter he had handled in private practice involving DAIBES. MENENDEZ subsequently informed the Candidate that MENENDEZ would not put forward the Candidate's name to the White House for a recommendation to be nominated by the President for the position of U.S. Attorney.  MENENDEZ also told the Candidate that MENENDEZ would be recommending a different individual for the position.

48.     Instead of the Candidate, ROBERT MENENDEZ, the defendant, recommended a different individual for U.S. Attorney.  FRED DAIBES, the defendant, believed that different individual would likely be sympathetic to him.  In or about the spring of 2021, a series of news reports critical of the other individual were published.

49.     During that time period, in or about the spring of 2021, an individual (the "Advisor") associated with ROBERT MENENDEZ, the defendant, spoke to the Candidate and discussed, among other things, the possibility of the Candidate recusing from the prosecution of FRED DAIBES, the defendant. Subsequently, the Advisor informed MENENDEZ that the Advisor believed that the Candidate would likely not have to recuse from the prosecution of DAIBES. On or about May 2, 2021, in connection with MENENDEZ's potential recommendation of the Candidate, the Advisor texted MENENDEZ, "I think if you call [the Candidate], you'll be comfortable with what he says."

50.     Following the events set forth in paragraph 49, ROBERT MENENDEZ, the defendant, recommended to the President that the Candidate be nominated for the position of U.S. Attorney for the District of New Jersey.

51.     On or about October 17, 2021, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, returned from a trip in which they traveled to Qatar as well as to Egypt, as described in paragraph 37.f, landing at John F. Kennedy International Airport. Upon their arrival, a driver for FRED DAIBES, the defendant ("DAIBES's Driver"), picked up MENENDEZ and NADINE MENENDEZ from the airport and drove them to their home in New Jersey. The next day, MENENDEZ performed a web search for "how much is one kilo of gold worth."

52.     Following the recommendation by ROBERT MENENDEZ, the defendant, of the Candidate as described in paragraph 50, above, the Candidate was nominated by the President, confirmed by the Senate, and sworn in as U.S. Attorney for the District of New Jersey in or about December 2021 (hereinafter, Official-3).

53.     Shortly after the swearing in, on the basis of information that Official-3 provided to the U.S. Department of Justice to determine whether a recusal was warranted, Official-3 was

33

informed that Official-3 was recused from the prosecution of FRED DAIBES, the defendant. Official-3 and the U.S. Attorney's Office for the District of New Jersey implemented that recusal. After Official-3 became the U.S. Attorney, the following events took place, among others:

      a.    On or about December 23, 2021, the trial of DAIBES, which had previously been scheduled for January 2022, was adjourned for reasons related to the COVID-19 pandemic. Later that day, DAIBES texted NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, and asked how ROBERT MENENDEZ, the defendant, who had recently sustained a shoulder injury, was doing. NADINE MENENDEZ responded that MENENDEZ was doing better having heard that the trial date was adjourned, and that MENENDEZ was "FIXATED on it." DAIBES responded, "Good I don't want him to be upset over it. This is not his fault he was amazing in all he did he's an amazing friend and as loyal as they come. How is the shoulder is he sleeping. Let me know if I can get him a recliner it helped me sleep." DAIBES thereafter provided a recliner to MENENDEZ.

      b.    On or about January 21, 2022, MENENDEZ called Official-3 and asked the identity of Official-3's First Assistant U.S. Attorney ("Official-4"). As a result of Official-3's recusal, Official-4 had supervisory responsibility over the prosecution of DAIBES.

      c.    On or about January 22, 2022, MENENDEZ and DAIBES called DAIBES's lawyer to complain that the lawyer had not been aggressive enough in attempting to get DAIBES's case dismissed.

      d.    On or about January 24, 2022, DAIBES's Driver exchanged two brief calls with NADINE MENENDEZ. NADINE MENENDEZ then texted DAIBES, writing, "Thank you. Christmas in January." DAIBES's Driver's fingerprints were later found on an envelope containing thousands of dollars of cash recovered from the residence of MENENDEZ

34

and NADINE MENENDEZ in New Jersey. This envelope also bore DAIBES's DNA and was marked with DAIBES's return address. In or about the early afternoon of January 24, 2022—*i.e.*, approximately two hours after NADINE MENENDEZ had texted DAIBES thanking him and writing "Christmas in January"—MENENDEZ called Official-4, in a call lasting for approximately 15 seconds. This was MENENDEZ's first phone call to Official-4. On or about January 29, 2022—*i.e.*, several days after NADINE MENENDEZ had texted DAIBES, thanking him and writing "Christmas in January"—MENENDEZ performed a Google search for "kilo of gold price."

      e.      On or about January 31, 2022, MENENDEZ again called Official-4, in a call lasting for approximately one minute and 24 seconds. Within minutes of the end of his call with Official-4, MENENDEZ called DAIBES.

      f.      Between approximately in or about December 2021 and February 2022, MENENDEZ directed the Advisor to ask Official-3, who was at the time the U.S. Attorney for the District of New Jersey, why he had recused himself from the prosecution of DAIBES, when MENENDEZ had previously believed that he would not recuse himself. The Advisor declined to do so.

      g.      Later, in or about late March 2022, the Advisor informed MENENDEZ that he was planning to have lunch with Official-3. MENENDEZ told the Advisor, in sum and substance, that he was frustrated with the way the U.S. Attorney's Office was handling the prosecution of DAIBES, and further told the Advisor to tell Official-3 to give DAIBES "all due process," notwithstanding that, as MENENDEZ knew, Official-3 was recused from the matter. The Advisor had the lunch with Official-3, but did not pass on the message from MENENDEZ.

      h.      On or about March 30, 2022, NADINE MENENDEZ met for lunch with DAIBES. Following the lunch, NADINE MENENDEZ texted DAIBES, "THANK YOU Fred

35

🙏 ✖ ⭕ ❤️." The next day, NADINE MENENDEZ met with a jeweler (the "Jeweler"), who was friends with DAIBES and WAEL HANA, a/k/a "Will Hana," the defendant, and texted with DAIBES about the fact that she was meeting the Jeweler. At that meeting, NADINE MENENDEZ provided the Jeweler two one-kilogram gold bars to be sold. At that time, the spot market price for gold was over $60,000 per kilogram. NADINE MENENDEZ falsely told the Jeweler, in sum and substance, that the gold came from her mother. A court-authorized search of NADINE MENENDEZ's phone later found a photograph, taken the day of NADINE MENENDEZ's meeting with the Jeweler, of two one-kilogram gold bars marked with serial numbers indicating they had previously been possessed by DAIBES. A portion of this photograph is below.



54.     Official-3 and Official-4 did not pass on to the prosecution team the fact that ROBERT MENENDEZ, the defendant, had contacted them as described in the above paragraphs, and they did not treat the case differently as a result of the above-described contacts. In or about April 2022, FRED DAIBES, the defendant, pled guilty pursuant to a plea agreement that provided for a probationary sentence.

***MENENDEZ Accepts Cash and Gold Bars Knowing that DAIBES Expected Him in
Exchange to Assist DAIBES by Performing Acts for the Benefit of the Government of Qatar***

55.     From in or about 2021 through in or about 2023, ROBERT MENENDEZ, the

defendant, accepted payment from FRED DAIBES, the defendant, knowing that DAIBES

expected MENENDEZ in exchange to use his influence and power and breach his official duty

to assist DAIBES, who was seeking a multimillion-dollar investment from an investment

company with ties to the Government of Qatar (the "Qatari Investment Company"), by

performing acts to benefit the Government of Qatar.  Specifically, MENENDEZ accepted,

among other things, at least certain of the same cash and gold bars described in paragraphs 46-

54, above, from DAIBES, knowing that DAIBES also expected MENENDEZ in exchange to

seek to induce the Qatari Investment Company to invest with DAIBES, including by taking

action favorable to the Government of Qatar.

56.     During the pendency of his criminal prosecution in the District of New Jersey,

FRED DAIBES, the defendant, sought financing for a real estate project in New Jersey and with

which he was involved.  In or about June 2021, ROBERT MENENDEZ, the defendant,

introduced DAIBES to an investor who was a member of the Qatari royal family and the

principal of the Qatari Investment Company (the "Qatari Investor").  The Qatari Investor

proceeded to consider and negotiate a multimillion-dollar investment into the real estate project.

57.     While the Qatari Investment Company was considering the potential investment

into the real estate development owned by FRED DAIBES, the defendant, ROBERT

MENENDEZ, the defendant, made multiple public statements supporting the Government of

Qatar.  MENENDEZ provided DAIBES with these statements so that DAIBES could share them

with the Qatari Investor and a Qatari government official associated with the Qatari Investment

Company ("Qatari Official-1").  For example, on or about August 20, 2021, MENENDEZ used

an encrypted messaging application to send DAIBES the text of a press release in which MENENDEZ praised the Government of Qatar, and several minutes later used the application to text DAIBES, "You might want to send to them. I am just about to release." Shortly thereafter, the Qatari Investor messaged Qatari Official-1, "I received copy from F."

58.   The next month, in or about September 2021, ROBERT MENENDEZ and FRED DAIBES, the defendants, attended a private event in Manhattan hosted by the Qatari government. Several days later, on or about September 27, 2021, DAIBES sent MENENDEZ, via an encrypted messaging application, photographs of a computer monitor depicting luxury wristwatches with prices ranging from $9,990 to $23,990, and asked MENENDEZ, "How about one of these." The photographs are depicted below:

 

Two days later, on or about September 29, 2021, DAIBES used the same encrypted messaging application to text MENENDEZ a link to a website tracking a Senate resolution supportive of Qatar, which reflected that one day earlier the resolution had been introduced and referred to the SFRC.

59.     As described in paragraph 51, on or about October 17, 2021—*i.e.*, several weeks after the messages from FRED DAIBES, the defendant, to ROBERT MENENDEZ, the defendant, described in paragraph 58, above—following the return of MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, from a trip to Qatar and Egypt—DAIBES's Driver picked up MENENDEZ and NADINE MENENDEZ at the airport, and the next day MENENDEZ performed a web search for "how much is one kilo of gold worth."

60.     In or about November 2021, the Qatari Investment Company was still considering the proposed investment in the real estate project of FRED DAIBES, the defendant. That month, on or about November 4, 2021—*i.e.*, less than three weeks after ROBERT MENENDEZ, the defendant, performed the web search described in paragraph 59—DAIBES used an encrypted messaging application to send MENENDEZ an update on the proposed Senate resolution supportive of Qatar.

61.     On or about January 4, 2022, in advance of a planned trip by FRED DAIBES, the defendant, to meet with the Qatari Investor in London, ROBERT MENENDEZ, the defendant, used an encrypted messaging application to text the Qatari Investor and DAIBES, "Greetings. I understand my friend is going to visit with you on the 15th of the month. I hope that this will result in the favorable and mutually beneficial agreement that you have been both engaged in discussing."

62.     On or about March 31, 2022—*i.e.*, the day of the sale by NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, of gold bars described in paragraph 53.h—ROBERT MENENDEZ and FRED DAIBES, the defendants, met for dinner. That evening, NADINE MENENDEZ texted MENENDEZ, "Is it just you, Fred and the Qataris in the private room this entire time?" and MENENDEZ replied in the affirmative.

63.     In or about early May 2022, Qatari Official-1, at the request of ROBERT MENENDEZ, the defendant, provided a close relative (the "Relative") of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, with tickets to the 2022 Formula One Grand Prix race held in Miami, Florida.

64.     In or about May 2022, following a meeting between ROBERT MENENDEZ and FRED DAIBES, the defendants, and the Qatari Investor and Qatari Official-1 in New Jersey, the Qatari Investment Company signed a letter of intent to enter into a joint venture with a company controlled by DAIBES.  Thereafter, DAIBES provided MENENDEZ with at least one gold bar. Three days after the signing of the letter of intent for the Qatari Investment Company's investment with DAIBES, on or about May 26, 2022, MENENDEZ, DAIBES, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, met for dinner in Edgewater, New Jersey, at approximately 7:30 PM.  Later that evening, at approximately 10:30 PM, MENENDEZ performed a Google search for "one kilo gold price".

65.     As noted above, in or about June 2022, a court-authorized search of the residence of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, revealed, among other things, approximately two one-kilogram gold bars and nine one-ounce gold bars that had serial numbers indicating they had previously been possessed by FRED DAIBES, the defendant.  The search also revealed that the residence contained, among other things, hundreds of thousands of dollars of cash, including approximately ten envelopes of cash, with tens of thousands of dollars, bearing the fingerprints and/or DNA of DAIBES.  One of those envelopes also bore, in addition to the fingerprints of DAIBES, the fingerprints of MENENDEZ.

66.     In or about 2023, the Qatari Investment Company entered into a joint venture with a company controlled by FRED DAIBES, the defendant, and invested tens of millions of dollars

into the project. Thereafter, ROBERT MENENDEZ, the defendant, continued to receive things of value from the Qatari Investment Company. In particular, in or about May 2023, the Qatari Investor caused four tickets for the 2023 Formula One Grand Prix race held in Miami to be provided to the Relative.

67. At all times relevant to this Indictment, ROBERT MENENDEZ, the defendant, was required as a U.S. Senator to file annual financial disclosure forms listing, among other things, income received by him or his spouse in each calendar year. At all times relevant to this Indictment, MENENDEZ did not disclose, among other things, the receipt of any payments towards the Mercedes-Benz Convertible for the benefit of him or of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, the receipt of any cash or gold bars by him or by NADINE MENENDEZ, or the Miami Grand Prix tickets for the Relative, in any relevant calendar year.

**MENENDEZ and NADINE MENENDEZ Seek to Cover Up the Bribery Scheme**

68. In or about June 2022, federal agents executed court-authorized search warrants on the residence of ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, among other places, and served subpoenas issued by a federal grand jury sitting in the Southern District of New York on MENENDEZ, NADINE MENENDEZ, Jose Uribe, and IS EG Halal (the "Subpoenas"). The Subpoenas sought documents pertaining to, among other things, payments by Uribe for the Mercedes-Benz Convertible, and payments WAEL HANA, a/k/a "Will Hana, the defendant, caused IS EG Halal to make to NADINE MENENDEZ's mortgage company. After service of the Subpoenas, Uribe ceased making payments on the Mercedes-Benz Convertible.

69. Following service of the Subpoenas, NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, met with Jose Uribe. At that meeting, in substance and in part,

NADINE MENENDEZ asked Uribe what he would say if law enforcement asked him about the payments he had made for the Mercedes-Benz Convertible, Uribe responded that he would say those payments had been a loan, and NADINE MENENDEZ said that sounded good.

70.     In or about December 2022, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, sought to return the bribe money that WAEL HANA, a/k/a "Will Hana," the defendant, had caused IS EG Halal to pay to the mortgage company in July 2019 to avoid foreclosure on NADINE MENENDEZ's home, as described in paragraph 32 above. When MENENDEZ and NADINE MENENDEZ did so, they falsely characterized the return of the bribe money as repayment for a loan. In particular, in or about December 2022, MENENDEZ wrote NADINE MENENDEZ a check for $23,569, bearing the handwritten memo line "To Liquidate loan", which NADINE MENENDEZ deposited. Also in or about December 2022, NADINE MENENDEZ wrote a check for $23,568.54 to HANA's counsel, in trust for HANA, with the handwritten memo line "Full payment of Wael Hana loan," along with a handwritten letter that stated, in part, that the check was "in full payment of a personal loan he [*i.e.*, HANA] gave me [*i.e.*, NADINE MENENDEZ]." However, in truth and in fact, and as MENENDEZ and NADINE MENENDEZ well knew, the payment of $23,568.54 that HANA caused to be made to NADINE MENENDEZ's mortgage company, as described in paragraph 32, was not a loan, but a bribe payment.

71.     In or about at least December 2022, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, sought to return to Jose Uribe some, but not all, of the bribe money Uribe had paid to obtain the Mercedes-Benz Convertible, as described above in paragraphs 43.d, 43.f, and 44.h. When MENENDEZ and NADINE MENENDEZ did so, they falsely characterized the return of the bribe money as repayment for a loan. In particular, MENENDEZ wrote NADINE MENENDEZ a check for $23,000 with the memo line

"for car payment," which NADINE MENENDEZ deposited. Shortly thereafter, NADINE MENENDEZ wrote Uribe a check for $21,000 with the memo line "personal loan." However, in truth and in fact, and as MENENDEZ and NADINE MENENDEZ well knew, the funds Uribe provided to NADINE MENENDEZ (including the cash Uribe provided to her in the parking lot) were not a loan, but bribe payments.

72.     ROBERT MENENDEZ, the defendant, caused his then-counsel to meet with the United States Attorney's Office for the Southern District of New York in Manhattan in or about June 2023 and again in or about September 2023, and—in reliance on statements made to them by MENENDEZ—to state at both meetings, in substance and in part, that MENENDEZ had been unaware until 2022 of the payment of $23,568.54 that WAEL HANA, a/k/a "Will Hana," the defendant, had caused to be made to the company holding the mortgage on the house of NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, or the money that Jose Uribe had paid towards the Mercedes-Benz Convertible. MENENDEZ also caused his then-counsel to state at the September 2023 meeting, in substance and in part, that in 2022, MENENDEZ had learned that these payments were loans. In truth and in fact, and as MENENDEZ well knew, MENENDEZ had learned of both the mortgage company payment and the car payments prior to 2022, and they were not loans, but bribe payments.

73.     NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, caused her counsel to meet with the United States Attorney's Office for the Southern District of New York in Manhattan in or about August 2023, and—in reliance on statements made by NADINE MENENDEZ—to state, in substance and in part, that the $23,568.54 that WAEL HANA, a/k/a "Will Hana," the defendant, had caused to be made to the company holding the mortgage on NADINE MENENDEZ's house was a loan and that the payments that Jose Uribe had made on the Mercedes-Benz Convertible were a loan. In truth and in fact, and as NADINE MENENDEZ

well knew, both the mortgage company payment and the car payments were not loans, but bribe payments.

## COUNT ONE
### (Conspiracy to Commit Bribery)
### (As to All Defendants)

The Grand Jury charges:

74.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

75.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, bribery of a federal employee, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and (C) and (b)(2)(A) and (C).

76.     It was a part and an object of the conspiracy that ROBERT MENENDEZ, the defendant, being a public official, and others known and unknown, directly and indirectly, would and did corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally and for another person and entity, in return for being influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of his official duty, in violation of Title 18, United States Code, Section 201(b)(2)(A) and (C).

77.     It was further a part and an object of the conspiracy that NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the

defendants, and others known and unknown, directly and indirectly, would and did corruptly give, offer, and promise something of value to a public official, and offer and promise a public official to give something of value to another person and entity, with intent to influence an official act and to induce such public official to do an act and omit to do an act in violation of the lawful duty of such official, in violation of Title 18, United States Code, Section 201(b)(1)(A) and (C).

### Overt Acts

78. In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a. On or about June 30, 2018, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, met at a restaurant in Manhattan.

b. On or about May 3, 2019, Jose Uribe requested that Associate-2, who was in the Bronx at the time, make a financing payment for the Mercedes-Benz Convertible for the benefit of MENENDEZ and NADINE MENENDEZ.

c. On or about May 4, 2019, Uribe caused Associate-2, while Associate-2 was in the Bronx, to make a financing payment for the Mercedes-Benz Convertible for the benefit of MENENDEZ and NADINE MENENDEZ from a corporate bank account that had been opened at a bank branch in the Bronx.

d. On or about September 5, 2019, NADINE MENENDEZ sent Uribe a text message regarding scheduling a meeting between Uribe, MENENDEZ, and NADINE MENENDEZ, which text message was transmitted through a cell tower in Manhattan.

e.      On or about September 21, 2019, MENENDEZ, HANA, FRED DAIBES, the defendant, and Egyptian Official-3 met at a restaurant in Manhattan.

f.      On or about October 17, 2021, DAIBES arranged for MENENDEZ and NADINE MENENDEZ to be picked up at the John F. Kennedy airport and driven through the Southern District of New York to their home in New Jersey.

g.      On or about March 31, 2022, NADINE MENENDEZ provided to a jeweler two one-kilogram gold bars that had been provided by DAIBES, which gold bars were sold in Manhattan.

(Title 18, United States Code, Sections 371 and 3147(1).)

### COUNT TWO
**(Conspiracy to Commit Honest Services Wire Fraud)**
**(As to All Defendants)**

The Grand Jury further charges:

79.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

80.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

81.     It was a part and an object of the conspiracy that ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, and others known and unknown, having devised and intending

46

to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to MENENDEZ's honest services as a U.S. Senator and the Chairman and Ranking Member of the SFRC, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

(Title 18, United States Code, Sections 1349 and 3147(1).)

## COUNT THREE
### (Conspiracy to Commit Extortion Under Color of Official Right)
### (As to ROBERT MENENDEZ and NADINE MENENDEZ)

The Grand Jury further charges:

82.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

83.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit extortion under color of official right, as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby would and did obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3).

(Title 18, United States Code, Section 1951.)

## COUNT FOUR
### (Conspiracy to Commit Obstruction of Justice)
### (As to ROBERT MENENDEZ, NADINE MENENDEZ, and FRED DAIBES)

The Grand Jury further charges:

84.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

85.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and FRED DAIBES, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, obstruction of justice, in violation of Title 18, United States Code, Section 1503(a).

86.     It was a part and an object of the conspiracy that ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian, and FRED DAIBES, the defendants, would and did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice, to wit, the criminal prosecution of DAIBES in the District of New Jersey.

### Overt Acts

87.     In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.      On or about October 17, 2021, FRED DAIBES, the defendant, arranged for ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the

defendants, to be picked up at the John F. Kennedy airport and driven through the Southern

District of New York to their home in New Jersey.

      b.     On or about March 31, 2022, NADINE MENENDEZ provided to a

jeweler two one-kilogram gold bars that had been provided by DAIBES, which gold bars were

sold in Manhattan.

(Title 18, United States Code, Section 371.)

**COUNT FIVE**
**(Bribery – Actions to Benefit HANA and Egypt)**
**(As to ROBERT MENENDEZ and NADINE MENENDEZ)**

The Grand Jury further charges:

88.     The allegations contained in paragraphs one through 73 of this Indictment are

repeated, realleged, and incorporated as if fully set forth herein.

89.     From at least in or about 2018 through in or about 2023, in the Southern District

of New York and elsewhere, ROBERT MENENDEZ, the defendant, being a public official, and

NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, directly and indirectly,

corruptly demanded, sought, received, accepted, and agreed to receive and accept something of

value personally and for another person or entity, in return for being influenced in the

performance of an official act and for being induced to do an act and omit to do an act in

violation of MENENDEZ's official duty, to wit, MENENDEZ solicited and obtained things of

value, directly and through NADINE MENENDEZ, including in the form of cash, gold, checks,

personal property, meals, transportation, promises of carpeting services, and promises of the

purchase of an automobile from WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the

defendants, in exchange for MENENDEZ's agreement and promise to use, and/or the actual use

of, his official authority and influence to attempt to cause, through advice and pressure, the

USDA to act favorably toward a business monopoly granted by the Government of Egypt to

49

HANA, and to take other actions that benefited the Government of Egypt, including with respect to U.S. military aid.

(Title 18, United States Code, Sections 201(b)(2)(A) and (C), and 2.)

### COUNT SIX
**(Bribery - Actions to Benefit HANA and Egypt)**
**(As to WAEL HANA and FRED DAIBES)**

The Grand Jury further charges:

90.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

91.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, directly and indirectly, corruptly gave, offered, and promised something of value to a public official, and offered and promised a public official to give something of value to another person and entity, with intent to influence an official act and to induce such public official to do an act and omit to do an act in violation of the lawful duty of such official, to wit, HANA and DAIBES gave, offered, and promised things of value, including cash, gold, checks, personal property, meals, transportation, promises of carpeting services, and promises of the purchase of an automobile to ROBERT MENENDEZ, the defendant, directly and through NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, in exchange for MENENDEZ's agreement and promise to use, and/or the actual use of, his official authority and influence to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA, and to take other actions that benefited the Government of Egypt, including with respect to U.S. military aid.

(Title 18, United States Code, Sections 201(b)(1)(A) and (C), 2, and 3147(1).)

**COUNT SEVEN**
**(Honest Services Wire Fraud - Actions to Benefit HANA and Egypt)**
**(As to All Defendants)**

The Grand Jury further charges:

92.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

93.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to MENENDEZ's honest services as a U.S. Senator and the Chairman and Ranking Member of the SFRC, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, MENENDEZ solicited and obtained things of value, directly and through NADINE MENENDEZ, including in the form of cash, gold, checks, personal property, meals, transportation, promises of carpeting services, and promises of the purchase of an automobile from HANA and DAIBES, in exchange for MENENDEZ's agreement and promise to use, and/or the actual use of, his official authority and influence to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA, and to take other actions that benefited the Government of Egypt, including with respect to U.S. military aid, and MENENDEZ, NADINE MENENDEZ, HANA, and DAIBES transmitted and caused to be transmitted emails, text messages, telephone calls, the wire transfer of funds, and other electronic

communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, 2, and 3147(1).)

## COUNT EIGHT
**(Extortion Under Color of Official Right – Actions to Benefit HANA and Egypt)**
**(As to ROBERT MENENDEZ and NADINE MENENDEZ)**

The Grand Jury further charges:

94.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

95.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, committed extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, to wit, MENENDEZ, while serving as a U.S. Senator and the Chairman and Ranking Member of the SFRC, obtained, directly and through NADINE MENENDEZ, things of value, including cash, gold, checks, personal property, meals, transportation, promises of carpeting services, and promises of the purchase of an automobile, from WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, through extortion under color of official right, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to attempt to cause, through advice and pressure, the USDA to act favorably toward a business monopoly granted by the Government of Egypt to HANA, and to take other actions that benefited the Government of Egypt, including with respect to U.S. military aid.

(Title 18, United States Code, Sections 1951 and 2.)

**COUNT NINE**
**(Honest Services Wire Fraud - Actions to Benefit Uribe and Uribe's Associates)**
**(As to ROBERT MENENDEZ, NADINE MENENDEZ, and WAEL HANA)**

The Grand Jury further charges:

96.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

97.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to MENENDEZ's honest services as a U.S. Senator and the Chairman and Ranking Member of the SFRC, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, MENENDEZ used the power and influence of his official position to obtain things of value, directly and through NADINE MENENDEZ, including in the form of cash, payments toward the Mercedes-Benz Convertible, and meals from HANA and Jose Uribe, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to attempt to cause, through advice and pressure, the Office of the New Jersey Attorney General to resolve the criminal prosecution of the New Jersey Defendant favorably to the New Jersey Defendant and to resolve the criminal investigation involving the New Jersey Investigative Subject favorably to the New Jersey Investigative Subject, and MENENDEZ, NADINE MENENDEZ, and HANA transmitted and caused to be transmitted emails, text messages, telephone calls, electronic transfers of funds, and other electronic

communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346 and 2.)

### COUNT TEN
**(Extortion Under Color of Official Right – Actions to Benefit Uribe and Uribe's Associates)**
**(As to ROBERT MENENDEZ and NADINE MENENDEZ)**

The Grand Jury further charges:

98.     The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

99.     From at least in or about 2018 through in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, committed extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, to wit, MENENDEZ, while serving as a U.S. Senator and the Chairman and Ranking Member of the SFRC, obtained, directly and through NADINE MENENDEZ, things of value, including cash, payments toward the Mercedes-Benz Convertible, and meals from WAEL HANA, a/k/a "Will Hana," the defendant, and Jose Uribe, through extortion under color of official right, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to attempt to cause, through advice and pressure, the Office of the New Jersey Attorney General to resolve the criminal prosecution of the New Jersey Defendant favorably to the New Jersey Defendant and to resolve the criminal investigation involving the New Jersey Investigative Subject favorably to the New Jersey Investigative Subject.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT ELEVEN
### (Bribery – Actions to Benefit DAIBES and Qatar)
### (As to ROBERT MENENDEZ and NADINE MENENDEZ)

The Grand Jury further charges:

100.    The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

101.    From at least in or about 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, the defendant, being a public official, and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept something of value personally and for another person or entity, in return for being influenced in the performance of an official act and for being induced to do an act and omit to do an act in violation of MENENDEZ's official duty, to wit, MENENDEZ solicited and obtained things of value, directly and through NADINE MENENDEZ, including in the form of cash, gold, furniture, and meals from FRED DAIBES, the defendant, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to recommend that the President nominate a candidate for U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's criminal case, and to attempt to cause, through advice and pressure, the U.S. Attorney's Office for the District of New Jersey to act favorably to DAIBES in DAIBES's criminal case, and knowing that DAIBES expected MENENDEZ in exchange to use MENENDEZ's official authority and influence to assist DAIBES by acting for the benefit of the Government of Qatar, including on a pending Senate resolution.

(Title 18, United States Code, Sections 201(b)(2)(A) and (C), and 2.)

55

## COUNT TWELVE
### (Bribery – Actions to Benefit DAIBES and Qatar)
### (As to FRED DAIBES)

The Grand Jury further charges:

102.    The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

103.    From at least in or about 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, FRED DAIBES, the defendant, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, directly and indirectly, corruptly gave, offered, and promised something of value to a public official, and offered and promised a public official to give something of value to another person and entity, with intent to influence an official act and to induce such public official to do an act and omit to do an act in violation of the lawful duty of such official, to wit, DAIBES gave, offered, and promised things of value, including cash, gold, furniture, and meals to ROBERT MENENDEZ, the defendant, directly and through NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to recommend that the President nominate a candidate for U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's criminal case, and to attempt to cause, through advice and pressure, the U.S. Attorney's Office for the District of New Jersey to act favorably to DAIBES in DAIBES's criminal case, and expecting MENENDEZ in exchange to use MENENDEZ's official authority and influence to assist DAIBES by acting for the benefit of the Government of Qatar, including on a pending Senate resolution.

(Title 18, United States Code, Sections 201(b)(1)(A), 2, and 3147(1).)

## COUNT THIRTEEN
### (Honest Services Wire Fraud – Actions to Benefit DAIBES and Qatar)
### (As to ROBERT MENENDEZ, NADINE MENENDEZ, and FRED DAIBES)

The Grand Jury further charges:

104.    The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

105.    From at least in or about 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and FRED DAIBES, the defendants, while DAIBES was released under Chapter 207 of Title 18 of the United States Code, having devised and intending to devise a scheme and artifice to defraud, and to deprive the public of its intangible right to MENENDEZ's honest services as a U.S. Senator and the Chairman and Ranking Member of the SFRC, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, MENENDEZ used the power and influence of his official position to obtain things of value, directly and through NADINE MENENDEZ, including in the form of cash, gold, furniture, and meals from DAIBES, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to recommend that the President nominate a candidate for U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's criminal case, and to attempt to cause, through advice and pressure, the U.S. Attorney's Office for the District of New Jersey to act favorably to DAIBES in DAIBES's criminal case, and knowing that DAIBES expected MENENDEZ in exchange to use MENENDEZ's official authority and influence to assist DAIBES by acting for the benefit of the Government of Qatar, including on a pending Senate

57

resolution, and MENENDEZ, NADINE MENENDEZ, and DAIBES transmitted and caused to be transmitted emails, text messages, encrypted messages, encrypted voice communications, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1346, 2, and 3147(1).)

**COUNT FOURTEEN**
**(Extortion Under Color of Official Right – Actions to Benefit DAIBES and Qatar)**
**(As to ROBERT MENENDEZ and NADINE MENENDEZ)**

The Grand Jury further charges:

106.   The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

107.   From at least in or about 2018 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, committed extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2), and thereby obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, to wit, MENENDEZ, while serving as a U.S. Senator and the Chairman and Ranking Member of the SFRC, obtained, directly and through NADINE MENENDEZ, things of value, including cash, gold, furniture, and meals from FRED DAIBES, the defendant, through extortion under color of official right, in exchange for MENENDEZ's and NADINE MENENDEZ's agreement and promise to use, and/or the actual use of, MENENDEZ's official authority and influence to recommend that the President nominate a candidate for U.S. Attorney for the District of New Jersey who MENENDEZ believed could be influenced by MENENDEZ with respect to DAIBES's criminal case, and to attempt to cause, through advice and pressure, the U.S. Attorney's Office for the District of New Jersey to assist DAIBES by acting favorably to DAIBES in DAIBES's criminal case, and knowing that DAIBES

expected MENENDEZ in exchange to use MENENDEZ's official authority and influence to act

for the benefit of the Government of Qatar, including on a pending Senate resolution.

(Title 18, United States Code, Sections 1951 and 2.)

## COUNT FIFTEEN
### (Conspiracy For a Public Official to Act as a Foreign Agent)
### (As to ROBERT MENENDEZ, NADINE MENENDEZ, and WAEL HANA)

The Grand Jury further charges:

108.  The allegations contained in paragraphs one through 73 of this Indictment are

repeated, realleged, and incorporated as if fully set forth herein.

109.  From at least in or about 2018 through at least in or about 2022, in the Southern

District of New York and elsewhere, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a

"Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, and others known

and unknown, willfully and knowingly combined, conspired, confederated, and agreed together

and with each other to commit an offense against the United States, to wit, to have a public

official, to wit, ROBERT MENENDEZ, act as an agent of a foreign principal, to wit, the

Government of Egypt and Egyptian officials, required to register under FARA, Title 22, United

States Code, Sections 611-621, in violation of Title 18, United States Code, Section 219.

### Overt Acts

110.  In furtherance of the conspiracy and to effect its illegal object, the following overt

acts, among others, were committed and caused to be committed in the Southern District of New

York and elsewhere:

a.  On or about June 30, 2018, ROBERT MENENDEZ, NADINE

MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants,

met at a restaurant in Manhattan.

b.    On or about September 21, 2019, MENENDEZ, HANA, and Egyptian

Official-3 met at a restaurant in Manhattan.

(Title 18, United States Code, Section 371.)

## COUNT SIXTEEN
### (Public Official Acting as Foreign Agent)
### (As to ROBERT MENENDEZ)

The Grand Jury further charges:

111.    The allegations contained in paragraphs one through 73 of this Indictment are

repeated, realleged, and incorporated as if fully set forth herein.

112.    From at least in or about 2018 through at least in or about 2022, in the Southern

District of New York and elsewhere, ROBERT MENENDEZ, the defendant, being a public

official, was and acted as an agent of a foreign principal required to register under FARA, Title

22, United States Code, Sections 611-621, to wit, MENENDEZ secretly agreed to act as, held

himself out as, and acted as an agent of the Government of Egypt and Egyptian officials, within

the United States, through political activities, acting as a political consultant, and representing

the interests of the Government of Egypt and Egyptian officials before agencies and officials of

the Government of the United States.

(Title 18, United States Code, Sections 219 and 2.)

## COUNT SEVENTEEN
### (Conspiracy to Commit Obstruction of Justice)
### (As to ROBERT MENENDEZ and NADINE MENENDEZ)

The Grand Jury further charges:

113.    The allegations contained in paragraphs one through 73 of this Indictment are

repeated, realleged, and incorporated as if fully set forth herein.

114.    From at least in or about June 2022 through at least in or about 2023, in the

Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE

MENENDEZ, a/k/a "Nadine Arslanian," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, to commit obstruction of justice, in violation of Title 18, United States Code, Section 1503(a).

115.    It was a part and an object of the conspiracy that ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian, the defendants, would and did corruptly influence, obstruct, and impede, and endeavor to influence, obstruct, and impede, the due administration of justice, to wit, an investigation in the Southern District of New York.

Overt Acts

116.    In furtherance of the conspiracy and to effect its illegal objects, the following overt acts, among others, were committed and caused to be committed in the Southern District of New York and elsewhere:

a.    In or about December 2022, ROBERT MENENDEZ, the defendant, wrote NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendant, a check for $23,569, bearing the handwritten memo line "To Liquidate loan," which was subsequently produced to the United States Attorney's Office for the Southern District of New York.

b.    In or about December 2022, NADINE MENENDEZ wrote counsel for WAEL HANA, the defendant, a check for $23,568.54 with the handwritten memo line "Full payment of Wael Hana loan," and a handwritten letter, which were subsequently produced to the United States Attorney's Office for the Southern District of New York.

c.    In or about December 2022, MENENDEZ wrote NADINE MENENDEZ a check for $23,000 with the memo line "for car payment," which was subsequently produced to the United States Attorney's Office for the Southern District of New York.

d.      In or about December 2022, NADINE MENENDEZ wrote Jose Uribe a check for $21,000 with the memo line "personal loan," which was subsequently produced to the United States Attorney's Office for the Southern District of New York.

e.      In or about June 2023, MENENDEZ caused his then-counsel to make false and misleading statements to the United States Attorney's Office for the Southern District of New York.

f.      In or about August 2023, NADINE MENENDEZ caused her counsel to make false and misleading statements to the United States Attorney's Office for the Southern District of New York.

g.      In or about September 2023, MENENDEZ caused his then-counsel to make false and misleading statements to the United States Attorney's Office for the Southern District of New York.

(Title 18, United States Code, Section 371.)

## COUNT EIGHTEEN
### (Obstruction of Justice)
### (As to ROBERT MENENDEZ and NADINE MENENDEZ)

The Grand Jury further charges:

117.    The allegations contained in paragraphs one through 73 of this Indictment are repeated, realleged, and incorporated as if fully set forth herein.

118.    From at least in or about June 2022 through at least in or about 2023, in the Southern District of New York and elsewhere, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due administration of justice, to wit, MENENDEZ and NADINE MENENDEZ wrote checks and letters falsely characterizing the return of bribe money to WAEL HANA, a/k/a "Will Hana," the defendant, and Jose Uribe as

repayment for loans, and caused their counsel to make statements regarding the bribe money from HANA and Uribe, and regarding MENENDEZ's awareness of this bribe money, which statements MENENDEZ and NADINE MENENDEZ knew were false, in an effort to interfere with an investigation of MENENDEZ, NADINE MENENDEZ, and others in the Southern District of New York.

(Title 18, United States Code, Sections 1503 and 2.)

## FORFEITURE ALLEGATIONS

119.    As a result of committing one or more of the offenses alleged in Counts One, Two, and Seven of this Indictment, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the following specific property (the "Specific Property"):

a.    The residence of MENENDEZ and NADINE MENENDEZ in Englewood Cliffs, New Jersey (the "Englewood Cliffs Premises").

b.    A 2019 Mercedes-Benz C-Class C300 automobile, vehicle identification number WDDWK8EB7KF873859.

c.    A sum of $486,461 in U.S. currency seized from the Englewood Cliffs Premises on or about June 16, 2022.

d.    A sum of $79,760 in U.S. currency seized from safe deposit box no. 13 at Chase Bank located at 50 Grand Avenue, Englewood, NJ 07631 on or about June 16, 2022.

e.      Two one-kilogram gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

f.      Eleven one-ounce gold bars seized from the Englewood Cliffs Premises on or about June 16, 2022.

g.      Any and all funds on deposit in an account with an account number ending in 8817, held in the name of Strategic International Business Consultants, LLC, at PNC Bank.

h.      One Vision Fitness S7100HRT Suspension Trainer found at the Englewood Premises on or about June 16, 2022.

120.    As a result of committing one or more of the offenses alleged in Counts Three, Five, Eight, Ten, Eleven, Fourteen, Seventeen, and Eighteen of this Indictment, ROBERT MENENDEZ and NADINE MENENDEZ, a/k/a "Nadine Arslanian," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the Specific Property.

121.    As a result of committing the offenses alleged in Counts Four and Thirteen of this Indictment, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and FRED DAIBES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses and the Specific Property.

122.     As a result of committing the offense alleged in Count Six of this Indictment, WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

123.     As a result of committing the offense alleged in Count Nine of this Indictment, ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," and WAEL HANA, a/k/a "Will Hana," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the Specific Property.

124.     As a result of committing the offense alleged in Count Twelve of this Indictment, FRED DAIBES, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## SUBSTITUTE ASSETS PROVISION

125.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of ROBERT MENENDEZ, NADINE MENENDEZ, a/k/a "Nadine Arslanian," WAEL HANA, a/k/a "Will Hana," and FRED DAIBES, the defendants:

      a.      cannot be located upon the exercise of due diligence;

      b.      has been transferred or sold to, or deposited with, a third person;

      c.      has been placed beyond the jurisdiction of the Court;

      d.      has been substantially diminished in value; or

      e.      has been commingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney

# EXHIBIT B

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 601, 28 U.S.C.A.

Rule 601. Competency to Testify in General

Currentness

Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1934; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 601, 28 U.S.C.A., FRE Rule 601
Including Amendments Received Through 4-1-24

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 602, 28 U.S.C.A.

Rule 602. Need for Personal Knowledge

Currentness

A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 602, 28 U.S.C.A., FRE Rule 602
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
     Article VI. Witnesses

Federal Rules of Evidence Rule 603, 28 U.S.C.A.

Rule 603. Oath or Affirmation to Testify Truthfully

Currentness

Before testifying, a witness must give an oath or affirmation to testify truthfully. It must be in a form designed to impress that duty on the witness's conscience.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 603, 28 U.S.C.A., FRE Rule 603
Including Amendments Received Through 4-1-24

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 604, 28 U.S.C.A.

Rule 604. Interpreter

Currentness

An interpreter must be qualified and must give an oath or affirmation to make a true translation.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 604, 28 U.S.C.A., FRE Rule 604
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 605, 28 U.S.C.A.

Rule 605. Judge s Competency as a Witness

Currentness

The presiding judge may not testify as a witness at the trial. A party need not object to preserve the issue.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 605, 28 U.S.C.A., FRE Rule 605
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 606, 28 U.S.C.A.

Rule 606. Juror s Competency as a Witness

Currentness

**(a) At the Trial.** A juror may not testify as a witness before the other jurors at the trial. If a juror is called to testify, the court must give a party an opportunity to object outside the jury's presence.

**(b) During an Inquiry Into the Validity of a Verdict or Indictment.**

**(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**(2) Exceptions.** A juror may testify about whether:

**(A)** extraneous prejudicial information was improperly brought to the jury's attention;

**(B)** an outside influence was improperly brought to bear on any juror; or

**(C)** a mistake was made in entering the verdict on the verdict form.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1934; Pub.L. 94-149, § 1(10), Dec. 12, 1975, 89 Stat. 805; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 606, 28 U.S.C.A., FRE Rule 606
Including Amendments Received Through 4-1-24

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 607, 28 U.S.C.A.

Rule 607. Who May Impeach a Witness

Currentness

Any party, including the party that called the witness, may attack the witness's credibility.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1934; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 607, 28 U.S.C.A., FRE Rule 607
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 608, 28 U.S.C.A.

Rule 608. A Witness s Character for Truthfulness or Untruthfulness

Currentness

**(a) Reputation or Opinion Evidence.** A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

**(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:

  **(1)** the witness; or

  **(2)** another witness whose character the witness being cross-examined has testified about.

By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.

  **CREDIT(S)**

  (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1935; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Mar. 27, 2003, eff. Dec. 1, 2003; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 608, 28 U.S.C.A., FRE Rule 608
Including Amendments Received Through 4-1-24

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   1

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 609, 28 U.S.C.A.

Rule 609. Impeachment by Evidence of a Criminal Conviction

Currentness

**(a) In General.** The following rules apply to attacking a witness's character for truthfulness by evidence of a criminal conviction:

**(1)** for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year, the evidence:

**(A)** must be admitted, subject to Rule 403, in a civil case or in a criminal case in which the witness is not a defendant; and

**(B)** must be admitted in a criminal case in which the witness is a defendant, if the probative value of the evidence outweighs its prejudicial effect to that defendant; and

**(2)** for any crime regardless of the punishment, the evidence must be admitted if the court can readily determine that establishing the elements of the crime required proving--or the witness's admitting--a dishonest act or false statement.

**(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

**(1)** its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

**(2)** the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

**(c) Effect of a Pardon, Annulment, or Certificate of Rehabilitation.** Evidence of a conviction is not admissible if:

**(1)** the conviction has been the subject of a pardon, annulment, certificate of rehabilitation, or other equivalent procedure based on a finding that the person has been rehabilitated, and the person has not been convicted of a later crime punishable by death or by imprisonment for more than one year; or

**(2)** the conviction has been the subject of a pardon, annulment, or other equivalent procedure based on a finding of innocence.

**(d) Juvenile Adjudications.** Evidence of a juvenile adjudication is admissible under this rule only if:

**(1)** it is offered in a criminal case;

**(2)** the adjudication was of a witness other than the defendant;

**(3)** an adult's conviction for that offense would be admissible to attack the adult's credibility; and

**(4)** admitting the evidence is necessary to fairly determine guilt or innocence.

**(e) Pendency of an Appeal.** A conviction that satisfies this rule is admissible even if an appeal is pending. Evidence of the pendency is also admissible.

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1935; Mar. 2, 1987, eff. Oct. 1, 1987; Jan. 26, 1990, eff. Dec. 1, 1990; Apr. 12, 2006, eff. Dec. 1, 2006; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 609, 28 U.S.C.A., FRE Rule 609
Including Amendments Received Through 4-1-24

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 610, 28 U.S.C.A.

Rule 610. Religious Beliefs or Opinions

Currentness

Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1936; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 610, 28 U.S.C.A., FRE Rule 610
Including Amendments Received Through 4-1-24

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VI. Witnesses

Federal Rules of Evidence Rule 611, 28 U.S.C.A.

Rule 611. Mode and Order of Examining Witnesses and Presenting Evidence

Currentness

**(a) Control by the Court; Purposes.** The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to:

**(1)** make those procedures effective for determining the truth;

**(2)** avoid wasting time; and

**(3)** protect witnesses from harassment or undue embarrassment.

**(b) Scope of Cross-Examination.** Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility. The court may allow inquiry into additional matters as if on direct examination.

**(c) Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:

**(1)** on cross-examination; and

**(2)** when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1936; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 611, 28 U.S.C.A., FRE Rule 611
Including Amendments Received Through 4-1-24

**End of Document**                                       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.          1

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VI. Witnesses

Federal Rules of Evidence Rule 612, 28 U.S.C.A.

Rule 612. Writing Used to Refresh a Witness s Memory

Currentness

**(a) Scope.** This rule gives an adverse party certain options when a witness uses a writing to refresh memory:

  **(1)** while testifying; or

  **(2)** before testifying, if the court decides that justice requires the party to have those options.

**(b) Adverse Party's Options; Deleting Unrelated Matter.** Unless 18 U.S.C. § 3500 provides otherwise in a criminal case, an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony. If the producing party claims that the writing includes unrelated matter, the court must examine the writing in camera, delete any unrelated portion, and order that the rest be delivered to the adverse party. Any portion deleted over objection must be preserved for the record.

**(c) Failure to Produce or Deliver the Writing.** If a writing is not produced or is not delivered as ordered, the court may issue any appropriate order. But if the prosecution does not comply in a criminal case, the court must strike the witness's testimony or--if justice so requires--declare a mistrial.

  **CREDIT(S)**
  (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1936; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 612, 28 U.S.C.A., FRE Rule 612
Including Amendments Received Through 4-1-24

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 613, 28 U.S.C.A.

Rule 613. Witness s Prior Statement

Currentness

**(a) Showing or Disclosing the Statement During Examination.** When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness. But the party must, on request, show it or disclose its contents to an adverse party's attorney.

<[Text of paragraph (b) effective until December 1, 2024, absent contrary Congressional action.]>

**(b) Extrinsic Evidence of a Prior Inconsistent Statement.** Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

<[Text of paragraph (b) effective December 1, 2024, absent contrary Congressional action.]>

**(b) Extrinsic Evidence of a Prior Inconsistent Statement.** Unless the court orders otherwise, extrinsic evidence of a witness's prior inconsistent statement may not be admitted until after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it. This subdivision (b) does not apply to an opposing party's statement under Rule 801(d)(2).

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1936; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 2, 2024, eff. Dec. 1, 2024, absent contrary Congressional action.)

Fed. Rules Evid. Rule 613, 28 U.S.C.A., FRE Rule 613
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 614, 28 U.S.C.A.

Rule 614. Court s Calling or Examining a Witness

Currentness

**(a) Calling.** The court may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness.

**(b) Examining.** The court may examine a witness regardless of who calls the witness.

**(c) Objections.** A party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1937; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 614, 28 U.S.C.A., FRE Rule 614
Including Amendments Received Through 4-1-24

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VI. Witnesses

Federal Rules of Evidence Rule 615, 28 U.S.C.A.

Rule 615. Excluding Witnesses From the Courtroom; Preventing an Excluded Witness's Access to Trial Testimony

Effective: December 1, 2023

Currentness

**(a) Excluding Witnesses.** At a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:

**(1)** a party who is a natural person;

**(2)** one officer or employee of a party that is not a natural person if that officer or employee has been designated as the party's representative by its attorney;

**(3)** any person whose presence a party shows to be essential to presenting the party's claim or defense; or

**(4)** a person authorized by statute to be present.

**(b) Additional Orders to Prevent Disclosing and Accessing Testimony.** An order under (a) operates only to exclude witnesses from the courtroom. But the court may also, by order:

**(1)** prohibit disclosure of trial testimony to witnesses who are excluded from the courtroom; and

**(2)** prohibit excluded witnesses from accessing trial testimony.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1937; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Pub.L. 100-690, Nov. 18, 1988, Title VII, § 7075(a), 102 Stat. 4405; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 24, 2023, eff. Dec. 1, 2023.)

Fed. Rules Evid. Rule 615, 28 U.S.C.A., FRE Rule 615
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 701, 28 U.S.C.A.

Rule 701. Opinion Testimony by Lay Witnesses

Currentness

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

**(a)** rationally based on the witness's perception;

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1937; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 701, 28 U.S.C.A., FRE Rule 701
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 702, 28 U.S.C.A.

Rule 702. Testimony by Expert Witnesses [Rule Text & Notes of Decisions subdivisions I, II]

Effective: December 1, 2023
Currentness

<Notes of Decisions for 28 USCA Federal Rules of Evidence Rule 702 are displayed in multiple documents.>

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

  **CREDIT(S)**
  (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 24, 2023, eff. Dec. 1, 2023.)

Fed. Rules Evid. Rule 702, 28 U.S.C.A., FRE Rule 702
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 703, 28 U.S.C.A.

Rule 703. Bases of an Expert s Opinion Testimony

Currentness

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1937; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 703, 28 U.S.C.A., FRE Rule 703
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 704, 28 U.S.C.A.

Rule 704. Opinion on an Ultimate Issue

Currentness

**(a) In General--Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

### CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1937; Pub.L. 98-473, Title II, § 406, Oct. 12, 1984, 98 Stat. 2067; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 704, 28 U.S.C.A., FRE Rule 704
Including Amendments Received Through 4-1-24

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 705, 28 U.S.C.A.

Rule 705. Disclosing the Facts or Data Underlying an Expert s Opinion

Currentness

Unless the court orders otherwise, an expert may state an opinion--and give the reasons for it--without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.

**CREDIT(S)**

   (Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1938; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 705, 28 U.S.C.A., FRE Rule 705
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VII. Opinions and Expert Testimony

Federal Rules of Evidence Rule 706, 28 U.S.C.A.

Rule 706. Court-Appointed Expert Witnesses

Currentness

**(a) Appointment Process.** On a party's motion or on its own, the court may order the parties to show cause why expert witnesses should not be appointed and may ask the parties to submit nominations. The court may appoint any expert that the parties agree on and any of its own choosing. But the court may only appoint someone who consents to act.

**(b) Expert's Role.** The court must inform the expert of the expert's duties. The court may do so in writing and have a copy filed with the clerk or may do so orally at a conference in which the parties have an opportunity to participate. The expert:

   **(1)** must advise the parties of any findings the expert makes;

   **(2)** may be deposed by any party;

   **(3)** may be called to testify by the court or any party; and

   **(4)** may be cross-examined by any party, including the party that called the expert.

**(c) Compensation.** The expert is entitled to a reasonable compensation, as set by the court. The compensation is payable as follows:

   **(1)** in a criminal case or in a civil case involving just compensation under the Fifth Amendment, from any funds that are provided by law; and

   **(2)** in any other civil case, by the parties in the proportion and at the time that the court directs--and the compensation is then charged like other costs.

**(d) Disclosing the Appointment to the Jury.** The court may authorize disclosure to the jury that the court appointed the expert.

**(e) Parties' Choice of Their Own Experts.** This rule does not limit a party in calling its own experts.

   **CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1938; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 706, 28 U.S.C.A., FRE Rule 706
Including Amendments Received Through 4-1-24

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 801, 28 U.S.C.A.

Rule 801. Definitions That Apply to This Article; Exclusions From Hearsay

Currentness

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that:

**(1)** the declarant does not make while testifying at the current trial or hearing; and

**(2)** a party offers in evidence to prove the truth of the matter asserted in the statement.

**(d) Statements That Are Not Hearsay.** A statement that meets the following conditions is not hearsay:

**(1) A Declarant-Witness's Prior Statement.** The declarant testifies and is subject to cross-examination about a prior statement, and the statement:

**(A)** is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition;

**(B)** is consistent with the declarant's testimony and is offered:

**(i)** to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or

**(ii)** to rehabilitate the declarant's credibility as a witness when attacked on another ground; or

**(C)** identifies a person as someone the declarant perceived earlier.

<[Text of paragraph (d)(2) effective until December 1, 2024, absent contrary Congressional action.]>

**(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

<[Text of paragraph (d)(2) effective December 1, 2024, absent contrary Congressional action.]>

**(2) An Opposing Party's Statement.** The statement is offered against an opposing party and:

**(A)** was made by the party in an individual or representative capacity;

**(B)** is one the party manifested that it adopted or believed to be true;

**(C)** was made by a person whom the party authorized to make a statement on the subject;

**(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

**(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

If a party's claim, defense, or potential liability is directly derived from a declarant or the declarant's principal, a statement that would be admissible against the declarant or the principal under this rule is also admissible against the party.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1938; Pub.L. 94-113, § 1, Oct. 16, 1975, 89 Stat. 576; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 25, 2014, eff. Dec. 1, 2014; Apr. 2, 2024, eff. Dec. 1, 2024, absent contrary Congressional action.)

Fed. Rules Evid. Rule 801, 28 U.S.C.A., FRE Rule 801
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Federal Rules of Evidence (Refs & Annos)
      Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 802, 28 U.S.C.A.

Rule 802. The Rule Against Hearsay

Currentness

Hearsay is not admissible unless any of the following provides otherwise:

- a federal statute;

- these rules; or

- other rules prescribed by the Supreme Court.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1939; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 802, 28 U.S.C.A., FRE Rule 802
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 803, 28 U.S.C.A.

Rule 803. Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness

Currentness

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

**(1) Present Sense Impression.** A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.

**(2) Excited Utterance.** A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

**(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

**(4) Statement Made for Medical Diagnosis or Treatment.** A statement that:

**(A)** is made for--and is reasonably pertinent to--medical diagnosis or treatment; and

**(B)** describes medical history; past or present symptoms or sensations; their inception; or their general cause.

**(5) Recorded Recollection.** A record that:

**(A)** is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

**(B)** was made or adopted by the witness when the matter was fresh in the witness's memory; and

**(C)** accurately reflects the witness's knowledge.

If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

**(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:

**(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;

**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

**(C)** making the record was a regular practice of that activity;

**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

**(7) Absence of a Record of a Regularly Conducted Activity.** Evidence that a matter is not included in a record described in paragraph (6) if:

**(A)** the evidence is admitted to prove that the matter did not occur or exist;

**(B)** a record was regularly kept for a matter of that kind; and

**(C)** the opponent does not show that the possible source of the information or other circumstances indicate a lack of trustworthiness.

**(8) Public Records.** A record or statement of a public office if:

**(A)** it sets out:

**(i)** the office's activities;

**(ii)** a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

**(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

**(B)** the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

**(9) Public Records of Vital Statistics.** A record of a birth, death, or marriage, if reported to a public office in accordance with a legal duty.

**(10) Absence of a Public Record.** Testimony--or a certification under Rule 902--that a diligent search failed to disclose a public record or statement if:

   **(A)** the testimony or certification is admitted to prove that

      **(i)** the record or statement does not exist; or

      **(ii)** a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind; and

   **(B)** in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least 14 days before trial, and the defendant does not object in writing within 7 days of receiving the notice--unless the court sets a different time for the notice or the objection.

**(11) Records of Religious Organizations Concerning Personal or Family History.** A statement of birth, legitimacy, ancestry, marriage, divorce, death, relationship by blood or marriage, or similar facts of personal or family history, contained in a regularly kept record of a religious organization.

**(12) Certificates of Marriage, Baptism, and Similar Ceremonies.** A statement of fact contained in a certificate:

   **(A)** made by a person who is authorized by a religious organization or by law to perform the act certified;

   **(B)** attesting that the person performed a marriage or similar ceremony or administered a sacrament; and

   **(C)** purporting to have been issued at the time of the act or within a reasonable time after it.

**(13) Family Records.** A statement of fact about personal or family history contained in a family record, such as a Bible, genealogy, chart, engraving on a ring, inscription on a portrait, or engraving on an urn or burial marker.

**(14) Records of Documents That Affect an Interest in Property.** The record of a document that purports to establish or affect an interest in property if:

   **(A)** the record is admitted to prove the content of the original recorded document, along with its signing and its delivery by each person who purports to have signed it;

**(B)** the record is kept in a public office; and

**(C)** a statute authorizes recording documents of that kind in that office.

**(15) Statements in Documents That Affect an Interest in Property.** A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose--unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.

**(16) Statements in Ancient Documents.** A statement in a document that was prepared before January 1, 1998, and whose authenticity is established.

**(17) Market Reports and Similar Commercial Publications.** Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations.

**(18) Statements in Learned Treatises, Periodicals, or Pamphlets.** A statement contained in a treatise, periodical, or pamphlet if:

**(A)** the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and

**(B)** the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the statement may be read into evidence but not received as an exhibit.

**(19) Reputation Concerning Personal or Family History.** A reputation among a person's family by blood, adoption, or marriage--or among a person's associates or in the community--concerning the person's birth, adoption, legitimacy, ancestry, marriage, divorce, death, relationship by blood, adoption, or marriage, or similar facts of personal or family history.

**(20) Reputation Concerning Boundaries or General History.** A reputation in a community--arising before the controversy--concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation.

**(21) Reputation Concerning Character.** A reputation among a person's associates or in the community concerning the person's character.

**(22) Judgment of a Previous Conviction.** Evidence of a final judgment of conviction if:

**(A)** the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

**(B)** the conviction was for a crime punishable by death or by imprisonment for more than a year;

**(C)** the evidence is admitted to prove any fact essential to the judgment; and

**(D)** when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

The pendency of an appeal may be shown but does not affect admissibility.

**(23) Judgments Involving Personal, Family, or General History, or a Boundary.** A judgment that is admitted to prove a matter of personal, family, or general history, or boundaries, if the matter:

**(A)** was essential to the judgment; and

**(B)** could be proved by evidence of reputation.

**(24) [Other Exceptions.]** [Transferred to Rule 807.]

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1939; Pub.L. 94-149, § 1(11), Dec. 12, 1975, 89 Stat. 805; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 13, 2013, eff. Dec. 1, 2013; Apr. 25, 2014, eff. Dec. 1, 2014; Apr. 27, 2017, eff. Dec. 1, 2017.)

Fed. Rules Evid. Rule 803, 28 U.S.C.A., FRE Rule 803
Including Amendments Received Through 4-1-24

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

> United States Code Annotated
>   Federal Rules of Evidence (Refs & Annos)
>     Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 804, 28 U.S.C.A.

Rule 804. Exceptions to the Rule Against Hearsay--When the Declarant Is Unavailable as a Witness

Currentness

**(a) Criteria for Being Unavailable.** A declarant is considered to be unavailable as a witness if the declarant:

**(1)** is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies;

**(2)** refuses to testify about the subject matter despite a court order to do so;

**(3)** testifies to not remembering the subject matter;

**(4)** cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness; or

**(5)** is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:

**(A)** the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or

**(B)** the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

But this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying.

**(b) The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

**(1) Former Testimony.** Testimony that:

**(A)** was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and

---

**(B)** is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

**(2) Statement Under the Belief of Imminent Death.** In a prosecution for homicide or in a civil case, a statement that the declarant, while believing the declarant's death to be imminent, made about its cause or circumstances.

**(3) Statement Against Interest.** A statement that:

**(A)** a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

<[Text of paragraph (b)(3)(B) effective until December 1, 2024, absent contrary Congressional action.]>

**(B)** is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

<[Text of paragraph (b)(3)(B) effective December 1, 2024, absent contrary Congressional action.]>

**(B)** if offered in a criminal case as one that tends to expose the declarant to criminal liability, is supported by corroborating circumstances that clearly indicate its trustworthiness after considering the totality of circumstances under which it was made and any evidence that supports or undermines it.

**(4) Statement of Personal or Family History.** A statement about:

**(A)** the declarant's own birth, adoption, legitimacy, ancestry, marriage, divorce, relationship by blood, adoption, or marriage, or similar facts of personal or family history, even though the declarant had no way of acquiring personal knowledge about that fact; or

**(B)** another person concerning any of these facts, as well as death, if the declarant was related to the person by blood, adoption, or marriage or was so intimately associated with the person's family that the declarant's information is likely to be accurate.

**(5) [Other Exceptions.]** [Transferred to Rule 807.]

**(6) Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability.** A statement offered against a party that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1942; Pub.L. 94-149, § 1(12), (13), Dec. 12, 1975, 89 Stat. 806; Mar. 2, 1987, eff. Oct. 1, 1987; Pub.L. 100-690, Title VII, § 7075(b), Nov. 18, 1988, 102 Stat. 4405; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 28, 2010, eff. Dec. 1, 2010; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 2, 2024, eff. Dec. 1, 2024, absent contrary Congressional action.)

Fed. Rules Evid. Rule 804, 28 U.S.C.A., FRE Rule 804

Including Amendments Received Through 4-1-24

**End of Document**                                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 805, 28 U.S.C.A.

Rule 805. Hearsay Within Hearsay

Currentness

Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1943; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 805, 28 U.S.C.A., FRE Rule 805
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 806, 28 U.S.C.A.

Rule 806. Attacking and Supporting the Declarant s Credibility

Currentness

When a hearsay statement--or a statement described in Rule 801(d)(2)(C), (D), or (E)--has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. The court may admit evidence of the declarant's inconsistent statement or conduct, regardless of when it occurred or whether the declarant had an opportunity to explain or deny it. If the party against whom the statement was admitted calls the declarant as a witness, the party may examine the declarant on the statement as if on cross-examination.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1943; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 806, 28 U.S.C.A., FRE Rule 806
Including Amendments Received Through 4-1-24

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article VIII. Hearsay (Refs & Annos)

Federal Rules of Evidence Rule 807, 28 U.S.C.A.

Rule 807. Residual Exception

Currentness

**(a) In General.** Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

**(1)** the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

**(2)** it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

**(b) Notice.** The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement--including its substance and the declarant's name--so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing--or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

**CREDIT(S)**

(Added Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 25, 2019, eff. Dec. 1, 2019.)

Fed. Rules Evid. Rule 807, 28 U.S.C.A., FRE Rule 807
Including Amendments Received Through 4-1-24

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IX. Authentication and Identification

Federal Rules of Evidence Rule 901, 28 U.S.C.A.

Rule 901. Authenticating or Identifying Evidence

Currentness

**(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.

**(b) Examples.** The following are examples only--not a complete list--of evidence that satisfies the requirement:

  **(1) Testimony of a Witness with Knowledge.** Testimony that an item is what it is claimed to be.

  **(2) Nonexpert Opinion About Handwriting.** A nonexpert's opinion that handwriting is genuine, based on a familiarity with it that was not acquired for the current litigation.

  **(3) Comparison by an Expert Witness or the Trier of Fact.** A comparison with an authenticated specimen by an expert witness or the trier of fact.

  **(4) Distinctive Characteristics and the Like.** The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.

  **(5) Opinion About a Voice.** An opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

  **(6) Evidence About a Telephone Conversation.** For a telephone conversation, evidence that a call was made to the number assigned at the time to:

    **(A)** a particular person, if circumstances, including self-identification, show that the person answering was the one called; or

    **(B)** a particular business, if the call was made to a business and the call related to business reasonably transacted over the telephone.

  **(7) Evidence About Public Records.** Evidence that:

**(A)** a document was recorded or filed in a public office as authorized by law; or

**(B)** a purported public record or statement is from the office where items of this kind are kept.

**(8) Evidence About Ancient Documents or Data Compilations.** For a document or data compilation, evidence that it:

**(A)** is in a condition that creates no suspicion about its authenticity;

**(B)** was in a place where, if authentic, it would likely be; and

**(C)** is at least 20 years old when offered.

**(9) Evidence About a Process or System.** Evidence describing a process or system and showing that it produces an accurate result.

**(10) Methods Provided by a Statute or Rule.** Any method of authentication or identification allowed by a federal statute or a rule prescribed by the Supreme Court.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1943; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 901, 28 U.S.C.A., FRE Rule 901
Including Amendments Received Through 4-1-24

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Federal Rules of Evidence (Refs & Annos)
    Article IX. Authentication and Identification

Federal Rules of Evidence Rule 902, 28 U.S.C.A.

Rule 902. Evidence That Is Self-Authenticating

Currentness

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

**(1) Domestic Public Documents That Are Sealed and Signed.** A document that bears:

**(A)** a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and

**(B)** a signature purporting to be an execution or attestation.

**(2) Domestic Public Documents That Are Not Sealed but Are Signed and Certified.** A document that bears no seal if:

**(A)** it bears the signature of an officer or employee of an entity named in Rule 902(1)(A); and

**(B)** another public officer who has a seal and official duties within that same entity certifies under seal--or its equivalent--that the signer has the official capacity and that the signature is genuine.

**(3) Foreign Public Documents.** A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester--or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation. The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States. If all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either:

**(A)** order that it be treated as presumptively authentic without final certification; or

**(B)** allow it to be evidenced by an attested summary with or without final certification.

**(4) Certified Copies of Public Records.** A copy of an official record--or a copy of a document that was recorded or filed in a public office as authorized by law--if the copy is certified as correct by:

**(A)** the custodian or another person authorized to make the certification; or

**(B)** a certificate that complies with Rule 902(1), (2), or (3), a federal statute, or a rule prescribed by the Supreme Court.

**(5) Official Publications.** A book, pamphlet, or other publication purporting to be issued by a public authority.

**(6) Newspapers and Periodicals.** Printed material purporting to be a newspaper or periodical.

**(7) Trade Inscriptions and the Like.** An inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control.

**(8) Acknowledged Documents.** A document accompanied by a certificate of acknowledgment that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments.

**(9) Commercial Paper and Related Documents.** Commercial paper, a signature on it, and related documents, to the extent allowed by general commercial law.

**(10) Presumptions Under a Federal Statute.** A signature, document, or anything else that a federal statute declares to be presumptively or prima facie genuine or authentic.

**(11) Certified Domestic Records of a Regularly Conducted Activity.** The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

**(12) Certified Foreign Records of a Regularly Conducted Activity.** In a civil case, the original or a copy of a foreign record that meets the requirements of Rule 902(11), modified as follows: the certification, rather than complying with a federal statute or Supreme Court rule, must be signed in a manner that, if falsely made, would subject the maker to a criminal penalty in the country where the certification is signed. The proponent must also meet the notice requirements of Rule 902(11).

**(13) Certified Records Generated by an Electronic Process or System.** A record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12). The proponent must also meet the notice requirements of Rule 902(11).

**(14) Certified Data Copied from an Electronic Device, Storage Medium, or File.** Data copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified

person that complies with the certification requirements of Rule 902(11) or (12). The proponent also must meet the notice requirements of Rule 902(11).

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1944; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 25, 1988, eff. Nov. 1, 1988; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 27, 2017, eff. Dec. 1, 2017.)

Fed. Rules Evid. Rule 902, 28 U.S.C.A., FRE Rule 902
Including Amendments Received Through 4-1-24

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Evidence (Refs & Annos)
        Article IX. Authentication and Identification

Federal Rules of Evidence Rule 903, 28 U.S.C.A.

Rule 903. Subscribing Witness s Testimony

Currentness

A subscribing witness's testimony is necessary to authenticate a writing only if required by the law of the jurisdiction that governs its validity.

**CREDIT(S)**

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat.1945; Apr. 26, 2011, eff. Dec. 1, 2011.)

Fed. Rules Evid. Rule 903, 28 U.S.C.A., FRE Rule 903
Including Amendments Received Through 4-1-24

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Federal Rules of Criminal Procedure for the United States District Courts (Refs & Annos)
        Title IV. Arraignment and Preparation for Trial

Federal Rules of Criminal Procedure, Rule 15

Rule 15. Depositions

Currentness

**(a) When Taken.**

**(1) In General.** A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice. If the court orders the deposition to be taken, it may also require the deponent to produce at the deposition any designated material that is not privileged, including any book, paper, document, record, recording, or data.

**(2) Detained Material Witness.** A witness who is detained under 18 U.S.C. § 3144 may request to be deposed by filing a written motion and giving notice to the parties. The court may then order that the deposition be taken and may discharge the witness after the witness has signed under oath the deposition transcript.

**(b) Notice.**

**(1) In General.** A party seeking to take a deposition must give every other party reasonable written notice of the deposition's date and location. The notice must state the name and address of each deponent. If requested by a party receiving the notice, the court may, for good cause, change the deposition's date or location.

**(2) To the Custodial Officer.** A party seeking to take the deposition must also notify the officer who has custody of the defendant of the scheduled date and location.

**(c) Defendant's Presence.**

**(1) Defendant in Custody.** Except as authorized by Rule 15(c)(3), the officer who has custody of the defendant must produce the defendant at the deposition and keep the defendant in the witness's presence during the examination, unless the defendant:

**(A)** waives in writing the right to be present; or

**(B)** persists in disruptive conduct justifying exclusion after being warned by the court that disruptive conduct will result in the defendant's exclusion.

**(2) Defendant Not in Custody.** Except as authorized by Rule 15(c)(3), a defendant who is not in custody has the right upon request to be present at the deposition, subject to any conditions imposed by the court. If the government tenders the defendant's expenses as provided in Rule 15(d) but the defendant still fails to appear, the defendant--absent good cause-- waives both the right to appear and any objection to the taking and use of the deposition based on that right.

**(3) Taking Depositions Outside the United States Without the Defendant's Presence.** The deposition of a witness who is outside the United States may be taken without the defendant's presence if the court makes case-specific findings of all the following:

   **(A)** the witness's testimony could provide substantial proof of a material fact in a felony prosecution;

   **(B)** there is a substantial likelihood that the witness's attendance at trial cannot be obtained;

   **(C)** the witness's presence for a deposition in the United States cannot be obtained;

   **(D)** the defendant cannot be present because:

      **(i)** the country where the witness is located will not permit the defendant to attend the deposition;

      **(ii)** for an in-custody defendant, secure transportation and continuing custody cannot be assured at the witness's location; or

      **(iii)** for an out-of-custody defendant, no reasonable conditions will assure an appearance at the deposition or at trial or sentencing; and

   **(E)** the defendant can meaningfully participate in the deposition through reasonable means.

**(d) Expenses.** If the deposition was requested by the government, the court may--or if the defendant is unable to bear the deposition expenses, the court must--order the government to pay:

   **(1)** any reasonable travel and subsistence expenses of the defendant and the defendant's attorney to attend the deposition; and

   **(2)** the costs of the deposition transcript.

**(e) Manner of Taking.** Unless these rules or a court order provides otherwise, a deposition must be taken and filed in the same manner as a deposition in a civil action, except that:

   **(1)** A defendant may not be deposed without that defendant's consent.

**(2)** The scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial.

**(3)** The government must provide to the defendant or the defendant's attorney, for use at the deposition, any statement of the deponent in the government's possession to which the defendant would be entitled at trial.

**(f) Admissibility and Use as Evidence.** An order authorizing a deposition to be taken under this rule does not determine its admissibility. A party may use all or part of a deposition as provided by the Federal Rules of Evidence.

**(g) Objections.** A party objecting to deposition testimony or evidence must state the grounds for the objection during the deposition.

**(h) Depositions by Agreement Permitted.** The parties may by agreement take and use a deposition with the court's consent.

**CREDIT(S)**

(As amended Apr. 22, 1974, eff. Dec. 1, 1975; July 31, 1975, Pub.L. 94-64, § 3(15)-(19), 89 Stat. 373, 374; Oct. 12, 1984, Pub.L. 98-473, Title II, § 209(b), 98 Stat. 1986; Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 29, 2002, eff. Dec. 1, 2002; Apr. 23, 2012, eff. Dec. 1, 2012.)

Fed. Rules Cr. Proc. Rule 15, 18 U.S.C.A., FRCRP Rule 15
Including Amendments Received Through 4-1-24

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   3