UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
                              :

  UNITED STATES OF AMERICA       :

                              :

         - v. -              :           S4 23 Cr. 490 (SHS)

                              :

  ROBERT MENENDEZ,           :
  WAEL HANA                  :
    a/k/a "Will Hana," and      :
  FRED DAIBES,              :
              Defendants.     :

                              :
------------------------------------------------------ x


## THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ROBERT MENENDEZ'S MOTION FOR RULE 15 DEPOSITIONS

              DAMIAN WILLIAMS
              United States Attorney

              MATTHEW G. OLSEN
              Assistant Attorney General
              National Security Division

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

Christina A. Clark
Trial Attorney
Department of Justice
National Security Division

-Of Counsel-

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................................ 1

DISCUSSION ................................................................................................................... 2

   I.   Applicable Legal Standards Under Rule 15........................................................... 2

ARGUMENT .................................................................................................................... 5

   I.   Menendez Fails to Meet His Burden .................................................................... 5

      A.   The Anticipated Testimony Does Not Satisfy Rule 15 ................................... 6

         1.  Even if Menendez Were to Elicit the Desired Testimony, Any Such Testimony Would be Immaterial and Would Not Meet the Rule 15 Standard...................................... 7

         2.  Even if Menendez Were to Elicit the Desired Testimony, Because the Defendants Lacked Contemporaneous Knowledge of that Information, Any Such Testimony Would be Immaterial ......................................................................... 11

      B.   A Rule 15 Deposition Would Not be in the Interest of Justice ................................. 15

         1.  Remote Testimony of the Deponents Would be Unreliable........................................ 15

         2.  Remote Testimony and Cross-Examination are Not Guaranteed.............................. 16

         3.  Remote Testimony Would Cause Substantial Delay................................................. 18

      CONCLUSION....................................................................................................... 21

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion of defendant Robert Menendez to take pretrial depositions of three foreign witnesses connected with the Qatari Investment Company pursuant to Rule 15 of the Federal Rules of Criminal Procedure.  For the reasons set forth below, Menendez's motion should be denied in its entirety.

Rule 15 depositions sought by a defendant without the Government's consent are only permitted in "exceptional circumstances" where the proposed testimony is not merely relevant, but would exculpate the defendant.  Here, with respect to each of the three witnesses whom Menendez seeks to depose—the Qatari Investor, the Chief Operating Officer of the Qatari Investment Company, and the General Counsel of the Qatari Investment Company—Menendez has fallen far short of establishing that the testimony he expects to elicit would be exculpatory, or even admissible.[1]  The principal testimony Menendez seeks from these witnesses pertains to whether the Qatari Investment Company decided to invest with defendant Fred Daibes because of any actions Menendez took or promised to take related to Qatar.  That testimony is completely unconnected from any contemporaneous knowledge of either defendant.  It therefore has minimal, if any, relevance to the Government's pertinent allegations: namely, that Menendez promised and accepted bribes from Daibes to take actions related to Qatar knowing that Daibes expected those actions to assist Daibes in obtaining business from the Qatari Investment Company.  Accordingly, the testimony does not meet the high bar required for a Rule 15 deposition.

Moreover, the proposed depositions do not serve the interest of justice, as is also required, in that, *inter alia*: (i) the witnesses would be unlikely to face any sanction for untruthful testimony

---

[1] The Qatari Investor and the Qatari Investment Company are each described in the Indictment, and the descriptions of the Qatari Investor and the Qatari Investment Company are incorporated herein.  (*See* Indictment ¶¶ 55, 56.)

(and, in the case of the Qatari Investor, may not even be available within the United Kingdom ("UK"), in the first instance); (ii) the depositions are unlikely to result in admissible evidence that could be used at trial; and (iii) the depositions would likely cause substantial delay both because of the time it will take the letters rogatory to work through the legal process in the UK and due to the subsequent litigation over what, if any, of the testimony is admissible.  For these reasons, and those discussed in greater detail below, the defendant's Rule 15 motion should be denied.

## DISCUSSION

I.      **Applicable Legal Standards Under Rule 15**

Federal Rule of Criminal Procedure 15 allows for pretrial depositions in criminal cases in "exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  The Rule requires that such a "deposition must be taken and filed in the same manner as a deposition in a civil action" and that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial."  Fed. R. Crim. P. 15(e).  With respect to depositions proposed to be taken outside the United States, "more than one court has observed that 'foreign depositions are suspect and, consequently, not favored.'"  *United States v. Oudovenko*, No. 00 Cr. 1014 (JG), 2001 WL 253027, at *3 (E.D.N.Y. Mar. 7, 2001) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993)).  Among other reasons, this is "because the factfinder does not have an opportunity to observe the witness' demeanor," *United States v. Milian-Rodriguez*, 828 F.2d 679, 686 (11th Cir. 1987), and because such depositions taken abroad "lack[] the sanction of perjury," *United States v. Feijoo-Tomala*, 751 F. Supp. 40, 43 (E.D.N.Y. 1990).

The burden is on the party seeking a Rule 15 deposition—here, Menendez—to establish that exceptional circumstances exist, and that injustice will result if the motion is denied. *See United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962); *see also United States v. Kelley*,

2

36 F.3d 1118, 1124 (D.C. Cir. 1994).  Specifically, "[a] movant must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001); *see also United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984).

Rule 15 provides "that the district court retains broad discretion in granting a Rule 15(a) motion and that the court should review these motions on a case-by-case basis, examining whether the particular characteristics of each case constitute 'exceptional circumstances.'" *United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994).  Exceptional circumstances are by definition exceptional, *i.e.*, "occur very, very rarely and would strike someone as remarkable or astounding." *Matter of Grand Jury Proceedings [Redacted]*, 377 F. Supp. 3d 439, 444 n.5 (D. Del. 2018); *see also Dillman*, 15 F.3d at 389 ("The words 'exceptional circumstances' bespeak that only in extraordinary cases will depositions be compelled."); *United States v. Rosen,* No. 05 Cr. 225, 2006 WL 5029996, at *1 (E.D. Va. Apr. 21, 2006) ("Rule 15(a) depositions are appropriately granted only in rare circumstances.").

With respect to witness availability, the movant must establish that he made a "good-faith effort to produce the person to testify at trial." *Johnpoll*, 739 F.2d at 709.  This means that the moving party must establish that the foreign-based witness is truly unable or unwilling to come to the United States to testify.  A defense counsel's representation that a witness would not voluntarily travel to the United States to testify at the trial, without more, is insufficient to satisfy this requirement.  *See Oudovenko*, 2001 WL 253027, at *2; *see also United States v. Chusid*, No. 00 Cr. 0263 (LAK), 2000 WL 1449873, at *1 (S.D.N.Y. Sept. 27, 2000) ("Conclusory statements of unavailability by counsel are insufficient" to meet a movant's burden.); *Whiting*, 308 F.2d at 541 ("Neither the motion nor the supplementary affidavit . . . did more than allege, in conclusory terms,

the availability of the five proposed witnesses."); *United States v. Vilar*, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008) (suggesting that repeated contact and offers to pay all expenses of the witnesses would meet good faith requirement).

Evidence is "material" for purposes of Rule 15 "if it is 'highly relevant to a central issue in the case.'" *United States v. Grossman*, No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005) (quoting *Drogoul*, 1 F.3d at 1556); *see also United States v. Abu Ghayth*, S14 No. 98 Cr. 1023 (LAK), 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014) (proposed Rule 15 testimony "should be more than merely relevant"); *Dillman,* 15 F.3d at 389 ("[I]t is emphatically clear to us that the words 'in the interest of justice' call for the deposition to offer evidence that is material."). This requires "some showing, beyond unsubstantiated speculation," that the testimony sought in the Rule 15 deposition "exculpates the defendant." *Kelley*, 36 F.3d at 1125 (affirming denial of depositions where anticipated testimony, although relevant, was not exculpatory) (internal quotation marks and citation omitted); *see also United States v. Merritt*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *5 (S.D.N.Y. May 7, 1991) (denying Rule 15 deposition request where "the defendants have made no showing that the deponents' testimony would be exculpatory"); *United States v. Esquivel*, 755 F. Supp. 434, 439 (D.D.C. 1990) ("[A] defendant typically demonstrates the 'exceptional circumstances' necessary for success on a Rule 15(a) motion by some preliminary showing that the testimony will exculpate him." (citations omitted)).

In sum, the moving party must do more than merely show that the testimony sought is relevant to the case. *United States v. Ismaili*, 828 F.2d 153, 161 & n.6 (3d Cir. 1987) (holding that a district court cannot abuse its discretion in denying a Rule 15 deposition where the testimony "could not negate the crux of the government's indictment"); *Dillman*, 15 F.3d at 389 (finding no abuse of discretion where the testimony would not have exculpated the defendants).

4

In addition to requiring showings of both unavailability and materiality, a district court must also consider whether significant "countervailing factors" exist which would render the taking of depositions unjust. *Drogoul*, 1 F.3d at 1552. Such countervailing factors include, among other things, whether: (i) the deposition will "expedite, rather than delay, the administration of criminal justice," *id*. at 1556 (quoting Fed. R. Crim. P. 15, Advisory Committee's Note, 1974 amendment); (ii) "the likelihood that the procured testimony will be admissible at trial," *United States v. Jefferson*, 594 F. Supp. 2d 655, 665 (E.D. Va. 2009); and (iii) the incentives for truthful testimony. *See United States v. Banki*, No. 10 Cr. 08 (JFK), 2010 WL 1063453, at *2 (S.D.N.Y. Mar. 23, 2010); *United* States v. *Buck*, 271 F. Supp. 3d 619, 624 (S.D.N.Y. 2017). Even if the sought-after evidence is material, "a court may properly deny the motion if the proposed testimony would be cumulative or consists of hearsay." *Grossman*, 2005 WL 486735, at *3 (citing *United States v. Dunseath*, No. 98 Cr. 493 (JGK), 1999 WL 165703, at *1 (S.D.N.Y. Mar. 25, 1999) and *United States v. Campbell*, No. 91 Cr. 1219 (RJD), 1998 WL 564376, at *1 (E.D.N.Y. June 30, 1998)). This is because "[t]he court need not, at the cost of time and money, engage in an act of futility by authorizing depositions that clearly will be inadmissible at trial." *Drogoul*, 1 F.3d at 1555.

## **ARGUMENT**

### I.     **Menendez Fails to Meet His Burden**

Menendez has moved to depose three witnesses: (1) the Qatari Investor; (2) the Chief Operating Officer of the Qatari Investment Company (the "COO"); and (3) the General Counsel of the Qatari Investment Company (the "GC"). (Menendez Br. 1.) This motion fails for multiple reasons. First, even assuming all are unavailable for trial, as Menendez asserts (*see* Weitzman Decl. ¶ 6), Menendez's motion fails to identify any admissible and exculpatory evidence that any

of the three witnesses could—or would—reasonably be expected to supply as part of a Rule 15 deposition.[2]   Second, the depositions envisioned by Menendez would effectively allow all three witnesses to testify on his behalf without the assurance of reliability afforded by domestic testimony of a sworn witness subject to cross-examination.   And third, notwithstanding Menendez's assertion that depositions in the UK can be arranged in a matter of weeks, in light of the Government's understanding of the UK's legal process, a Rule 15 deposition requested through letters rogatory is likely to cause substantial delay both in terms of the process to secure testimony—to the extent it is even possible—and in subsequent litigation regarding what, if any, of the testimony is admissible.

### A.  The Anticipated Testimony Does Not Satisfy Rule 15

As a threshold matter, to satisfy the high barrier of Rule 15, a movant "must" proffer sufficient facts "to alert the district court to the substance of the evidence that is at peril of being excluded," *United States v. Ramos*, 45 F.3d 1519, 1523 (11th Cir. 1995), and there must be a showing that "the evidence would enable the defendant to alter the quantum of proof significantly in [his] favor," *United States v. Lafontaine*, No. 98 Cr. 251 (MBM), 2000 WL 890380, at *2 (S.D.N.Y. July 5, 2000).  Moreover, it is not enough for counsel simply to propound a generalized expectation of what testimony a proffered witness might provide.  *See Chusid*, 2000 WL 1449873, at *2 ("[D]efense counsel has given the Court only their expectations as to what these witnesses would say if examined.  They have not submitted affidavits from the witnesses.  Indeed, they have not even suggested that they sought but were unable to obtain affidavits.  Moreover, if the

---

[2] The Government does not dispute, for purposes of this motion, that any of the proposed deponents reside beyond the subpoena power of this Court and will rely in good faith on the assertions in the Weitzman declaration and at the April 29, 2024 hearing that none of the proposed deponents is willing to testify or subject themselves voluntarily to a Rule 15 deposition. (*See* Weitzman Decl. ¶ 6.)

witnesses were unwilling to give affidavits, there is no reason to suppose that they would voluntarily appear . . . to submit depositions.").  However, that is precisely what Menendez has done here, and in so doing, he has failed to demonstrate that the testimony he seeks to elicit is "highly relevant" and "exculpatory," as required by Rule 15.

Menendez's motion is premised entirely on his general expectations of the testimony that the three foreign witnesses would provide, which is based not on his or any other defendant's interactions with the foreign witnesses, but solely on (i) statements the COO made during a video interview with the Government, subject to the protections of a proffer agreement,[3] and (ii) limited attorney proffers that counsel for the Qatari Investment Company and counsel for the COO and GC made to the Government.  (*See* Menendez Br., Exs. 1-3.)  Moreover, it does not appear from Menendez's motion that he even knows whether any of the witnesses would answer questions if subject to a deposition.  *See Chusid*, 2000 WL 1449873, at *2.  However, even if the three foreign witnesses were to satisfy Menendez's general expectations of such testimony, as discussed below, none of the expected statements is relevant to the proper issues for the jury, much less relates to the "crux of the government's indictment."  *Ismaili*, 828 F.2d at 161 & n.6; *Feijoo-Tomala*, 751 F. Supp. at 45.  Thus, there is no reason to believe that depositions of those individuals would elicit testimony that would satisfy the high bar of Rule 15.

1. *Even if Menendez Were to Elicit the Desired Testimony, Any Such Testimony Would be Immaterial and Would Not Meet the Rule 15 Standard*

Menendez's claims that all three deponents will "say the government's allegations are false" (Menendez Br. 2) is unsupported by either the Federal Bureau of Investigation report of the COO's video proffer or the limited attorney proffers Menendez appends to his motion in support.

---

[3] The COO declined to travel to the United States for the interview and participated in the video interview from the United Kingdom.

Rather, Menendez's arguments are principally based on unsubstantiated conclusions he draws from those materials.  For example, Menendez claims that the witnesses will say that "[the Qatari Investment Company] opted to invest in the [Daibes project] because it was an attractive investment opportunity and for *no other reason*."  (Menendez Br. 2 (emphasis added).)  As an initial matter, even if a deponent were to make such a statement, that would not contradict any allegation in the Indictment.  But putting that aside, the proffer of the COO, who had limited knowledge about the events in question, does not support this broad proposition about why the Qatari Investment Company entered into the business deal.  The COO—who did not even know that the Qatari Investor knew Menendez or that Menendez had introduced the Qatari Investor to Daibes—had no decision-making authority over the investments of the Qatari Investment Company.  (*See* Menendez Br., Ex. 1 at 7.)  Although the COO did state that it was his understanding that the Qatari Investor had always wanted to enter into a property deal in Manhattan and that the Daibes project would be a "trophy project," the COO also said that the Qatari Investor "did not explain how the Daibes investment opportunity came about."  (*Id.* at 3-4.)  Thus, it is at least equally as likely that the Qatari Investor pressed the Daibes investment because of Daibes's ties to Menendez—a fact the COO would not have known because he did not know that Menendez had introduced the Qatari Investor to Daibes.  (*See id.* at 6.)  In light of the COO's limited knowledge, the testimony that Menendez proposes to elicit is based on little more than "unsupported conjecture" that is "insufficient to meet the requirements of Rule 15."  *United States v. Warren*, 713 F. Supp. 2d 1, 6 (D.D.C. 2010); *Kelley*, 36 F.3d at 1125.

Menendez also highlights the COO's statement that the Daibes investment was attractive because the Qatari Investment Company was able to invest on favorable terms, due to Daibes's outstanding criminal charges.  (Menendez Br. 2.)  Even if the COO's assertion is true, that fact

would not make it any less likely that *Daibes*, who was concerned about being "unbankable" (*id.*, Ex. 1, at 8), sought to use Menendez's influence to procure funding from the Qatari Investment Company. Thus, none of the testimony Menendez seeks in this regard is relevant to the material issues to be decided at trial.

Menendez also asserts in his motion that the foreign witnesses will testify that "Menendez had no connection" to the Daibes investment, the Qatari Investment Company, or the Qatari Investor. (Menendez Br. 2.) Menendez appears to base that sweeping conclusion on the COO's statement that the COO "never spoke about Menendez with [the Qatari Investor]" and "*had no sense* of whether the Qatari Investor knew Menendez." (*Id.*, Ex. 1 at 6 (emphasis added).) Notably, Menendez does not base that conclusion on any statements or expectation of testimony from the Qatari Investor himself. Indeed, he could not, as discovery produced in this case indicates that Menendez introduced Daibes to the Qatari Investor, and the attorney proffer of the Qatari Investor states that Menendez showed up at a private club to greet the Qatari Investor and Daibes during a May 2022 meeting to discuss the investment. (Menendez Br., Ex. 3.) Nonetheless, even assuming the COO's statements that he did not speak to the Qatari Investor about Menendez are true, those statements are unhelpful to the defense. That the Qatari Investor did not disclose to the COO the details of his relationship with Menendez and did not inform the COO that Menendez introduced him to Daibes, is consistent with the Government's theory that Menendez kept secret his dealings with Daibes and the Qatari Investor. Moreover, whether Menendez, in fact, was connected with the Qatari Investment Company and the Qatari Investor, or influenced the Qatari Investment Company to make the Daibes investment is irrelevant, as discussed further below. The issue before the jury will be whether Menendez agreed to and did accept bribes in return for promised acts that Daibes believed would help him obtain financing from the Qatari Investment

Company, not whether Menendez, in fact, was connected to the Daibes investment, the Qatari Investment Company, or the Qatari Investor. Thus, at most, even if the COO were to testify to his knowledge (or lack thereof) of the relationship between Menendez, the Qatari Investor, or the Qatari Investment Company, any such testimony would have little, if any, relevance. *See Merritt*, 1991 WL 79235, at *5.

Menendez also argues that the testimony would demonstrate that the Government of Qatar does not have "any connection or control over the Qatari Investment Company." (Menendez Br. 2.) Menendez's assertion is not based on any proffered statements from the Qatari Investor. Instead, it appears to be premised primarily on the COO's statement that the Qatari Investment Company's assets belong to the Qatari Investor and that the Qatari sovereign wealth fund had no investment connection to the Qatari Investment Company.[4] (Menendez Br., Ex. 1 at 2.) But even if the Qatari Investor is the beneficial owner of the assets of the Qatari Investment Company, that does not mean there is no connection between the Qatari government and the Qatari Investment Company or between the Qatari government and the assets that belong to the Qatari Investor.[5] Moreover, as discussed further below, this assertion is also legally irrelevant. Whether or not the Qatari government could in fact control the Qatari Investment Company is not the basis of any allegation in the Indictment and provides no insight into the contemporaneous understanding of

---

[4] The COO was subsequently shown documents that discussed the Qatari sovereign wealth fund serving as a third-party debt funder for the Daibes project (Menendez Br., Ex. 1 at 10, 11, 13), but the COO said he did not speak to the Qatari sovereign wealth fund about funding the Daibes deal (*id.* at 10).

[5] Indeed, the COO also discussed Qatari Official-1's "significant advisory role" on the Daibes project. (*Id.* at 7.) Although the COO claimed he did not know whether Qatari Official-1 had a role with the Qatari government (*id.* at 2), a biography provided to Menendez's office indicated that Qatari Official-1 was a high-level advisor to one of the most senior officials in the Qatari government.

*Menendez or Daibes* about Qatar's role in a company controlled by a member of the Qatari royal family.

Menendez also claims that the "COO rejected the notion that Senator Menendez taking action favorable to the *government* of Qatar would somehow influence the Qatari Investment Company's decision" to invest in Daibes's project.  (Menendez Br. 2.)  However, the COO said no such thing.  But even if he had, an alleged lack of connection between the Qatari government and the Qatari Investment Company would provide no defense to any of the charges. Similarly, even if Menendez's actions were shown to be unsuccessful in influencing the Qatari Investment Company's decision to invest, such a fact would not be exculpatory, much less material.  As discussed below, what matters is whether Menendez *believed* that Daibes expected him to take actions beneficial to Qatar in exchange for bribes and whether Daibes similarly *believed* that such actions would assist Daibes in obtaining an investment.  Whether those beliefs were accurate is not material to the defendants' guilt.  Thus, even assuming the COO testified that Menendez's actions benefiting the Government of Qatar did not in fact influence the Qatari Investment Company's investment decisions, such testimony would provide no insights into the minds of the defendants.  Accordingly, such testimony would neither be material nor exculpatory and thus does not meet the Rule 15 standard.  *See, e.g.*, *Kelley*, 36 F.3d at 1125.

> 2. *Even if Menendez Were to Elicit the Desired Testimony, Because the Defendants Lacked Contemporaneous Knowledge of that Information, Any Such Testimony Would be Immaterial*

To prove the allegations in the Indictment, the Government need not prove that the corrupt scheme had its intended effect, *i.e.*, that Menendez, in fact, influenced the Qatari Investment Company.  Nor need the Government prove whether the Qatari Investment Company was in fact connected with the Government of Qatar.  Rather, the Government need only prove—and intends

only to prove—that Daibes *expected* Menendez to take official action to benefit Qatar and that Menendez *was aware* of that expectation and accepted payment in exchange for doing so, or the promise to do so. *See, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 572 (2016) ("A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return."); *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *United States v. Percoco*, 13 F.4[th] 180, 201 (2d Cir. 2021) ("All that ultimately matters is [the defendant's] *agreement* to perform official action, not his execution of the deal." (emphasis in original)), *rev'd on other grounds*, 598 U.S. 319 (2023). Thus, the deponents' testimony regarding the prior intent or objectives of the Qatari Investor or the Qatari Investment Company—or a third party's understanding of their objectives—is immaterial to the charges. *See id.* ("the mere fact that" the pressured individuals "were inclined to take the steps that [the defendant] pushed them to take is not a defense"). What is relevant, in short, are the contemporaneous beliefs of Daibes and Menendez. Accordingly, there is no merit to Menendez's argument that the proposed testimony "may well 'acquit'" Menendez of the charges associated with part of the scheme related to the Qatari investment. (Menendez Br. 4 (quoting *Grossman*, 2005 WL 486735, at *3).) To the contrary, Menendez has made no showing that the deponents' testimony would be material, let alone exculpatory. *See Merritt*, 1991 WL 79235, at *5; *see also Cohen*, 260 F.3d at 78 (denying Rule 15 motion where the testimony would be irrelevant to the question of the defendant's guilt under the relevant statute).

The questions Menendez proposes to ask the deponents further highlight that the testimony Menendez seeks to elicit through a Rule 15 deposition would not meet the high standard required to warrant such depositions.  (*See* Menendez Br., Ex. 4.)  For example, Menendez seeks testimony that the Qatari Investment Company is not associated with the Government of Qatar—notwithstanding that the Qatari Investor is a member of the Qatari royal family and, according to the COO, sat on the board of the development arm of the Qatar Investment Authority, Qatar's sovereign wealth fund (Menendez Br., Ex. 1 at 2).  But that testimony, even if true, would only be material if there was evidence that *Menendez and Daibes* had contemporaneous knowledge or understanding of that same information.  The Government is not aware of any such evidence, and Menendez, who bears the burden, offers none.  To the contrary, the fact that Daibes preemptively sent Menendez's favorable statements towards the Government of Qatar to the Qatari Investor and a Qatari government official associated with the Qatari Investment company, belies any such argument.  (*See, e.g.*, Indictment ¶ 57.)

The questions that Menendez proposes to ask the COO and the GC fare no better and are even more unlikely to elicit "highly relevant" testimony.  *See Grossman*, 2005 WL 486735, at *3.  For example, among other things, Menendez seeks testimony as to whether the COO and the GC knew whether the Government of Qatar was aware of the Daibes joint venture; whether the COO and the GC were aware of Menendez's public statements concerning Qatar; and whether Menendez's statements regarding Senate Resolution 390 played any role in the Qatari Investment Company's decision to invest in the Daibes project.  (Menendez Br., Ex. 4.) However, for the same reasons discussed above, the testimony of these third parties—who were merely agents of the Qatari Investor—are even further removed from the issues to be decided by the jury and would do little, if anything, to inform the jury about the *defendants' intentions*

in participating in the charged conduct.[6]

In short, neither the Qatari Investor nor the Qatari Investment Company are defendants in this case; neither is accused of bribing a U.S. Senator; and there are no charges that would require the Government to prove Qatari control over the Qatari Investment Company.  Thus, the Qatari Investor's subjective intent, why the Qatari Investment Company entered into a joint venture with Daibes's company, and what two third parties knew about the same are not material to the issues at trial—namely, the intent, knowledge, conduct, and culpability of the defendants themselves. *See United States v. Valle*, 301 F.R.D. 53, 106-07 (S.D.N.Y. 2014) (witness may not testify as to defendant's state of mind), *rev'd in part on other grounds*, 807 F.3d 508 (2d Cir. 2015); *United States v. Avenatti*, S1 19 Cr. 373 (PGG), 2021 WL 2809919, at *32 (S.D.N.Y. July 6, 2021) (upholding the exclusion of evidence about which the defendant was not aware because such evidence could not be relevant to the defendant's state of mind), *aff'd*, 81 F.4th 171 (2d Cir. 2023). Menendez's bare assertion that the deponents' testimony would be exculpatory does not make it so.

In sum, because none of the lines of questioning proposed by Menendez is likely to elicit any "fact that is of consequence in determining the action," Fed. R. Evid. 401, let alone testimony that is "highly relevant to a central issue in the case," *see Grossman*, 2005 WL 486735, at *3, or exculpatory, Menendez has failed to meet Rule 15 standard, and his motion should be denied.  *See Esquivel*, 755 F. Supp. at 439-440; *United States v. Pham*, 12 Cr. 423 (AJN), 2015 WL 7871348, at *3-4 (S.D.N.Y. Dec. 4, 2015) (denying Rule 15 motion where testimony was not "highly relevant to a central issue in the case").

---

[6] Moreover, the proposed deponents' testimony on these topics would also likely serve to confuse the issues such that, even if relevant, such testimony would likely also be inadmissible under Rule 403.  *See* Fed. R. Evid. 403.

14

**B.  A Rule 15 Deposition Would Not be in the Interest of Justice**

Even if Menendez were able to show that the deponents are likely to offer material, exculpatory evidence at trial—which he cannot—Menendez's motion should nevertheless be denied because granting the motion would not further the interest of justice.  *See* Fed. R. Crim. P. 15(a)(1).

1.  *Remote Testimony of the Deponents Would be Unreliable*

Allowing the deponents to testify remotely, whether through a video deposition or in-person questioning, would undermine the truth-seeking function of a jury trial.  If permitted to testify remotely from the UK, the deponents would face no consequences for false testimony offered in a United States proceeding or otherwise refusing to comply with trial procedures (such as refusing to answer questions on cross-examination, assuming cross-examination is even permitted, as discussed in greater detail below).  For example, the Court would not have the ability to hold the deponents in contempt, if necessary, as none would be within the territorial reach of the Court and the U.S. Marshals; and the Government would be highly unlikely to successfully prosecute any of the deponents for perjury, if they were to lie.  This is particularly true, where, as here, one of the proposed deponents is a member of the Qatari royal family who divides his time between Qatar and the UK, according to a public biography posted on the Qatari Investment Company's website.  Even assuming the Qatari Investor could be located in the UK within the necessary timeframe, he would lack any incentive to provide truthful testimony, as he could easily place himself beyond the reach of either the U.S. or the UK government by returning to Qatar, a country from which neither the United States nor the United Kingdom could seek extradition (assuming either country could indict a member of the Qatari royal family in the first instance). *See* 18 U.S.C. § 3181, Historical Notes (listing countries with whom the United States has

extradition treaties); UK Home Office, Mutual Legal Assistance and Extradition: Treaty List, https://www.gov.uk/government/publications/international-mutual-legal-assistance-agreements/mutual-legal-assistance-and-extradition-treaty-list-accessible-version#bilateral-uk-extradition-agreements; *see also Oudovenko*, 2001 WL 253027, at *3 (expressing concern that the Government would have no recourse to prosecute a witness for perjury due to the lack of an extradition treaty).

Even for the non-royal deponents, the limitations described above transform what would otherwise be sworn witness testimony before the jury into a one-sided international Zoom call: "Without the teeth of the penalty of perjury, the oath becomes nothing more than an empty recital." *See Buck*, 271 F. Supp. 3d at 624 ("[T]hese [Swiss] witnesses' testimony may essentially be free of any penalty of perjury, calling into doubt the reliability of any of the potential testimony."). This risk is particularly acute in this case, as the Government has only participated in a video interview with one of the witnesses (the COO) and, even then, it was subject to a proffer agreement. Given that none of the witnesses apparently will meet or talk with Menendez's counsel, and a strong incentive for all of the witnesses to distance themselves from the allegations in the Indictment, there is nothing to suggest that they would offer reliable testimony that is material to any issue to be decided at trial. Indeed, safely beyond any meaningful reach of this Court, the deponents would be "essentially free to say anything without reprisal," substantially diminishing the reliability of any testimony they might provide. *See Banki*, 2010 WL 1063453, at *3.

2. *Remote Testimony and Cross-Examination are Not Guaranteed*

In addition to the risk of eliciting unreliable testimony from uncooperative deponents who may not testify truthfully, the testimony Menendez seeks is likely to be even less reliable due to the procedures that would be utilized to procure the deponents' testimony in the UK.

16

Upon receiving Menendez's motion, counsel for the Government consulted with the Office of International Affairs of the United States Department of Justice ("OIA") about the procedures to obtain testimony from a witness located in the UK.  OIA has advised the Government that the execution of letters rogatory would effectively preclude the direct participation of counsel for the defense and the Government in the pertinent proceedings.  In particular, OIA advises that the UK government does not permit foreign counsel—Government or defense—to ask questions directly of the witness or to participate in the proceedings.  Rather, the magistrate in the UK would ask the questions provided by the parties, and there would likely be no meaningful opportunity to modify questions in response to an answer or to conduct any follow-up questioning.[7]  *See* Request for Mutual Legal Assistance in Criminal Matters: Guidelines for Authorities Outside of the UK (Oct 16, 2023) (hereinafter "UK Guidelines"), https://www.gov.uk/government/publications/mla-guidelines-for-authorities-outside-of-the-uk/request-for-mutual-legal-assistance-in-criminal-matters-guidelines-for-authorities-outside-of-the-uk-accessible-version (indicating that the party seeking testimony must "provide a list of questions to be asked" and that the requests for evidence would be "taken on oath by a court").  Instead, the parties would merely be provided with a transcript of the proceeding, which would be of limited utility both in terms of the substantive

---

[7] This is because the Letters Rogatory process differs from that which is contemplated by the Mutual Legal Assistance Treaty ("MLAT") between the United States and the United Kingdom, which affords the *parties* to the MLAT—which Menendez is not—certain privileges "in connection with the investigation or prosecution of criminal offences."  *See* Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters (hereinafter, "MLAT"), Article 19.  However, even under the MLAT, the Government would only be permitted to ask questions "through a legal representative qualified to appear before the courts" of the UK.  *Id.* at Article 8; *see also* U.S. Department of State, Preparation of Letters Rogatory (stating that "many foreign courts do not permit foreign attorneys to participate in their court proceedings"), *available at* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html.

content, the reliability the testimony contained therein, and, as discussed in greater detail below, that content's admissibility at trial. *See Oudovenko*, 2001 WL 253027, at *3 (denying defendant's motion for a foreign deposition, in part, because "the government would not have a full opportunity to cross-examine the witnesses, and might not even be permitted to ask any of the questions"). Where, as here, the depositions are unlikely to elicit testimony that may not be admissible in the first instance, the Court should not, "at the cost of time and money, engage in an act of futility" by authorizing such depositions. *See Drogoul*, 1 F.3d at 1555; *see also United States v. Fargsesen*, 21 Cr. 602 (LAP), 2022 WL 4110303, at *5 (S.D.N.Y. 2022) ("If the Government is unable to cross-examine the witnesses . . . any resulting testimony would almost certainly be deemed inadmissible at trial under Federal Rule of Evidence 403."). Such a result would not be in the interest of justice.

### 3. *Remote Testimony Would Cause Substantial Delay*

The process required to execute the letters rogatory is also likely to cause substantial delay both in terms of the time that will be required to obtain the testimony and in subsequent litigation over the admissibility of any such testimony.

As an initial matter, the Government understands from OIA that, even in the best of circumstances, letters rogatory typically take months to arrange. Indeed, according to the State Department, execution of letters rogatory could take over a year. *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html.

Although Menendez has proposed a letters rogatory package for the Court to transmit to the U.S. State Department, which would send the request to the UK, all parties would nevertheless have to await an answer from the UK Central Authority. *See* 22 C.F.R. 92.54 (defining "letters

rogatory"); 22 C.F.R. 92.66 (describing taking of foreign depositions and process for transmitting letters rogatory); *see also* UK Guidelines.  Even if the Government expressed its support for Menendez's request, there is no guarantee that the lengthy process to secure the deponents' testimony would be—or even could be—meaningfully expedited, and it is not in the interest of justice to adjourn a trial date that Menendez has sought to maintain based on the remote possibility that at some time in the future, the deponents may be available to provide testimony.[8]

Moreover, even if the testimony for one or more of the deponents is ultimately provided, there is no guarantee that any such testimony would be admissible.  *See* Fed. Rule Crim. P. 15(f) ("An order authorizing a deposition to be taken under this rule does not determine its admissibility.").  As an initial matter, depending on the procedures employed by the UK magistrate and the ability of the parties to engage in meaningful direct or cross-examination, it is not clear that the deposition testimony would meet the requirements of Rule 804(b)(1).  *See* Fed. R. Evid. 804(b)(1)(A)-(B) (establishing a hearsay exception for former testimony given at a "lawful deposition" being offered "against a party who had . . . an opportunity . . . to develop it by direct, cross-, or redirect examination"); *see also United States v. Cohen*, No. 08-3282, 2012 WL 289769,

---

[8] In terms of process, the Government understands from OIA that, because the deponents have purportedly indicated that they will not testify voluntarily, the UK would first have to assign a law enforcement agent to locate the deponents.  Once located, an application would be filed for a summons with a magistrate judge.  Prior to issuing a summons, it is not uncommon for the magistrate to request a hearing to assess the materiality of the evidence from the proposed witnesses, a proceeding that would require the parties to enlist the assistance of a barrister because neither the Government nor defense counsel are permitted to participate in the UK proceedings. Assuming the magistrate finds that the testimony would be material, a summons would be issued, and arrangements would be made for the UK authorities to question the deponents, as described above.

at *4 (C.D. Ill. Jan. 31, 2012) (finding that the deposition did not meet the Rule 804(b)(1) standard where there was no opportunity to develop testimony on cross examination).[9]

Finally, even assuming any of the testimony is admissible as former testimony pursuant to Rule 804(b)(1), the Government expects it would object to the introduction of some or all of the proposed deposition testimony under the Federal Rules of Evidence. *See, e.g.*, Fed. R. Evid. 401, 403. Any such litigation would be likely to occur in the middle of trial, needlessly wasting the time of the Court and diverting the attention of the parties from matters that are relevant to the administration of justice.

In sum, because any deposition testimony is likely to: (i) have limited, if any probative value to any material fact at issue; (ii) be unreliable; and (iii) at least potentially be inadmissible in whole or in part at trial, the Court should give substantial weight to the "countervailing factors" presented by the depositions Menendez proposes and should deny his motion in the interest of justice. *See* Fed. R. Crim P. 15, Advisory Committee's Note (emphasizing that a deposition should expedite, rather than delay the administration of justice).

---

[9] In *United States v. Salim* the Second Circuit found that foreign deposition testimony was admissible pursuant to Rule 804(b)(1), even where the parties had to submit their questions in writing. However, in *Salim*, the attorneys for both parties were in France at the time the deposition was taken, and the parties were able to provide follow-up questions to be asked of the witness after a one-week continuance in the deposition, after which the attorneys returned to France, and the deposition resumed. *See Salim*, 855 F.2d 944, 947-948 (2d Cir. 1988).

## **CONCLUSION**

For the foregoing reasons, Menendez's motion should be denied.

Dated:  New York, New York
        May 2, 2024

                          Respectfully submitted,

                          DAMIAN WILLIAMS
                          United States Attorney

            By:     s/ Daniel C. Richenthal
                    Eli J. Mark
                    Daniel C. Richenthal
                    Paul M. Monteleoni
                    Lara Pomerantz
                    Catherine Ghosh
                    Assistant United States Attorneys
                    (212) 637-2431/2109/2219/2343/1114

                    MATTHEW G. OLSEN
                    Assistant Attorney General
                    National Security Division

                    s/ Christina A. Clark
                    Trial Attorney
                    (202) 307-5191