UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -against-

ROBERT MENENDEZ et al.,

   Defendants.

Case No. 23-cr-490 (SHS)

## SENATOR ROBERT MENENDEZ'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RULE 15 DEPOSITIONS

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## INTRODUCTION

The government has alleged that Senator Menendez took official acts benefiting *Qatar* so that an alleged bribe-payor (Daibes) could land an investment from a *Qatari Investment Company*. Yet the government's eve-of-trial disclosures suggest that the Investment Company's investor, Chief Operating Office, and General Counsel (the "Deponents") all would testify that Senator Menendez did not influence the Company's decision to invest with Daibes; that Senator Menendez had no involvement with the Company; and that the Company is *independent* from Qatar itself. This testimony would blow major holes in the government's entire theory of the case.

Incredibly, the government insists the jury should not hear any of this. It goes so far as to claim the Deponents' testimony is *irrelevant* because (i) bribery focuses on what the parties agreed to, not whether the agreement was carried out, and (ii) Defendants supposedly have not proved their contemporaneous knowledge of the information the Deponents will testify to. Even accepting both premises, the conclusion does not follow. Indeed, the government's position is hypocritical and absurd, given how its own case is based entirely on circumstantial evidence. The *only* official acts alleged to be taken by Senator Menendez were to benefit Qatar, not the Investment Company. Evidence separating the two thus fundamentally undermines the plausibility of the government's theory. Likewise, if Senator Menendez did not cause the Investment Company to invest in the Daibes project, that makes the government's inference of a corrupt agreement far less believable as a matter of *fact*, even if it does not categorically defeat the charge as a matter of *law*.

If the shoe were on the other foot and the Deponents testified that Qatar told them to invest with Daibes because of his connections to Senator Menendez, they would be the government's star witnesses. The opposite testimony does not become immaterial just because it benefits Defendants. And that is true regardless of what Defendants knew at the time—as Second Circuit case law squarely confirms. *See United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015).

1

In the interests of justice, this Court should thus grant Senator Menendez's motion and at least give him the chance of getting this highly relevant, exculpatory evidence into the record.

## ARGUMENT

### I. THIS COURT SHOULD AUTHORIZE RULE 15 DEPOSITIONS OF THE QATARI WITNESSES.

In determining whether to grant a Rule 15 deposition, courts consider whether: "(1) the prospective witness is unavailable for trial, (2) the witness'[s] testimony is material, and (3) the testimony is necessary to prevent a failure of justice." *United States v Cohen*, 260 F.3d 68, 78 (2d Cir. 2001). The government concedes the Deponents are unavailable. Opp. 5 & 6 n.2. So the only disputed issues are whether their testimony is material and necessary to prevent a failure of justice. Both elements are satisfied here.

#### A. The Deponents' Testimony Is Material.

To establish materiality under Rule 15, a defendant need not show that the proposed testimony would "acquit him," only that it "would challenge central aspects of the government's allegations," *United States v. Grossman*, No. S2 03 CR. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005), or "tend to disprove the Government's assertion[s]," *United States v. Alexandre*, 2022 WL 9843495, at *4 (S.D.N.Y. Oct. 17, 2022). The Deponents' testimony easily satisfies that standard. It is remarkable that the government contends otherwise.

For one, the Deponents' testimony will show that the Qatari Investment Company decided to invest in the Daibes development project because it was an attractive investment opportunity, and for no other reason. That testimony rebuts the government's allegation that Senator Menendez entered a corrupt agreement with Daibes to help him secure the investment.

For another, the Deponents' testimony will show that the Qatari Investment Company is independent of Qatar—the Qatari Investment Company is not controlled by the Government of

2

Qatar and the money it invests does not belong to the Government of Qatar. This is particularly critical evidence because the government's theory is that Senator Menendez agreed to take what it alleges are official acts to benefit *Qatar* (such as issuing a press statement thanking Qatar for assisting the American evacuation of refugees from Afghanistan ), to curry favor for Daibes with the Qatari Investment Company. That already attenuated theory is only plausible, if at all, if there is a tight connection between the two entities. Evidence that "tend[s] to disprove" that connection is therefore highly relevant for the defense. *Alexandre*, 2022 WL 9843495, at *4.

The government offers three attempts to elide these straightforward points, but all fail.

**1.** The government principally asserts that because the crime of bribery requires only a *corrupt agreement*, it is immaterial that Senator Menendez did not *actually* influence the Qatari Investment Company. Opp. 11-14. That does not follow. Of course, it is not a *legal defense* to a bribery charge that the official did not follow-through on a corrupt agreement or that a corrupt scheme did not work as intended. That is all the government's cited cases say. Opp. 11–12.[1] But that does not mean evidence of what happened after an alleged agreement is *irrelevant* to whether such an agreement ever existed. After all, it is not as if the government has direct evidence of any corrupt agreement here. It is trying to prove one through circumstantial evidence. The defense is therefore entitled to *rebut* whatever inferences the government conjures by introducing similar circumstantial evidence that renders the hypothesized scheme implausible (*e.g.*, because Qatar and the Company are too remote for this to make sense), or less likely (*e.g.*, because the investment

---

[1] *McDonnell v. United States*, 579 U.S. 550, 572 ("[A] public official is not required to actually make a decision or take an action … it is enough that the official agree to do so."); *Evans v. United States*, 504 U.S. 255, 260 (1992) ("[F]ulfillment of the *quid pro quo* is not an element of the offense."); *United States v. Percoco*, 13 F.4th 180, 201 (2d Cir. 2021) ("All that ultimately matters is Percoco's *agreement* to perform official action ….").

3

decision was made independent of Senator Menendez). Lots of evidence is factually relevant even if it does not require granting a directed verdict in a defendant's favor.

Again, consider this from the other vantage point. If the Deponents had testified that they invested with Daibes because of Senator Menendez's official acts, there is no doubt that the government would be putting this testimony front-and-center, as corroborating the existence of a corrupt bargain. *See United States v. Biaggi*, 909 F.2d 662, 684 (2d Cir. 1990) (evidence of "favorable treatment may" be considered as "circumstantial[]" evidence "that the evidence were received for the purpose of being influenced in the future performance of future duties"). Indeed, the government is trying that very tack here, with other material from these Deponents. The government has marked as exhibits *dozens* of documents written by the Deponents in what can only be an attempt to offer circumstantial evidence of a corrupt bargain.[2] But what is good for the goose is good for the gander. Circumstantial evidence suggesting the *absence* of a bargain is just as relevant; it does not become inadmissible simply because it undermines the prosecution.

And the evidence here does just that. The Deponents' testimony will show that Senator Menendez had no connection to the Qatari Investment Company, and that the Company decided to invest in Daibes' development project on its own accord. Weitzman Decl. Ex. 1 at 2, 15. That evidence may not warrant a directed verdict, but it certainly tends to undercut the government's claim that the hypothesized scheme existed. *See, e.g.*, *United States v. Hawkins*, 777 F.3d 880, 884

---

[2] To take but two examples. The government marked a WhatsApp thread involving one of the Deponents discussing, after the fact, that Senator Menendez issued a Chairman's Statement concerning Qatar. And the government also marked correspondence involving two of the Deponents discussing the letter of intent that features prominently in the government's rendition of events in paragraph 64 of the Indictment.

(7th Cir. 2015) (evidence that defendant did not "do[] anything in exchange" is relevant to bribery charge).

Likewise, the government's theory only makes sense if there is some tight link between Qatar and the Qatari Investment Company. Why would benefitting Qatar cause the Investment Company to take any action, unless the former had some ownership or control over the latter? The Deponents' testimony will undercut that link—and thus undercut any inference that a corrupt scheme existed—because it will show that the two entities are separate. *Id.* at 3–4, 6, 8.

In short, the government wants to prove the existence of a corrupt agreement through circumstantial evidence post-dating that alleged agreement, such as text messages between the Deponents months after Senator Menendez's Chairman's Statements regarding Qatar. But that rule runs both ways. Where circumstantial evidence *undermines* any inference of a corrupt bargain, that too is material. The government cannot say this evidence is material when it wishes to use it—including evidence from these very Deponents—but immaterial when the defendant wishes to obtain testimony regarding those and other documents.

**2.** Relatedly, the government asserts that the Deponents' testimony is immaterial unless "there was evidence that Menendez and Daibes had contemporaneous knowledge or understanding of" the facts the Deponents will testify to. Opp. 12–14. That objection fails.

To start, the government never points to any evidence that Defendants *lacked* knowledge of the relevant facts. *See id.* Instead, the government says the Defendants have not proved that they did have such knowledge. *See id.* But the only way to prove contemporaneous knowledge here would be for Defendants to waive their Fifth Amendment right against self-incrimination. *See, e.g.*, *United States v. Campbell*, 266 F. Supp. 3d 624, 630 (E.D.N.Y. 2017). The government is thus attempting to unconstitutionally force Defendants to forfeit "one of the most sacred" rights

5

"in our society" simply to present an effective defense. *Id.* That is improper; the government is free to argue to the jury that the exculpatory facts should be disregarded based on evidence adduced that Defendants were unaware of the facts at the time—but this is not a reason to keep those facts from the jury.

More fundamental, the government is wrong that materiality requires contemporaneous knowledge. The Second Circuit squarely held otherwise in *United States v. Litvak*, 808 F.3d 160, 190 (2d Cir. 2015). There, in support of a good-faith defense in a securities fraud case, the defendant sought to introduce evidence that his supervisors "regularly approved of conduct identical to that with which" the defendant was charged. *Id.* at 189 & n.35. Mirroring the government's argument here, the district court excluded that evidence, reasoning that unless the defendant *knew about* those approvals, they could not be relevant to his state of mind. *Id.* But the Second Circuit reversed, holding the district court "exceeded its allowable discretion." *Id.* at 190. Even though the defendant did not know about the supervisors' approvals, they still amounted to "circumstantial" evidence disproving that the defendants had acted unlawfully. *Id.* at 188. The "jury" could have "plausibl[y]" credited this evidence "to introduce a reasonable doubt as" to the government's theory of the case. *Id.* at 190.

So much so here: The Deponents' testimony would "support" the Senator's attempt to show that no corrupt bargain existed, since it is self-evident that a "jury may [find that] more plausible in light of" the fact that *nobody* at the Qatari Investment Company thought there was a bargain, or acted pursuant to one. *Id.* To put a finer point on it, the Deponents' testimony is material whether or not Defendants *knew* of it, because it tends to show that the alleged corrupt agreement *simply did not happen*. To use a hypothetical, evidence that a Board of Directors independently made the decision to acquire a company would be material to a claim that an investor bribed the CEO to

6

acquire the company—regardless of whether the investor knew about the Board's decision at the time. There as here, the materiality of the evidence has nothing to do with whether the defendants knew about it, but everything to do with how plausible the theory is.

**3.** Finally, the government casts doubts on whether the depositions "would elicit testimony" that would satisfy Rule 15 because Defendants have provided only "a generalized expectation of what" the testimony will show, rather than sworn "affidavits." Opp. 6-7.[3] But "there is no requirement that, in order to conduct depositions under Rule 15, the moving party must present affidavits from the proposed deponents, or any other materials concerning prior statements of the deponents." *United States v. Vilar*, 568 F. Supp. 2d 429, 440 (S.D.N.Y. 2008). To the contrary, courts "have overwhelmingly rejected such requirements." *Id.* (citing cases).

Nor do the government's quibbles about what *precisely* the Deponents' testimony will show provide any reason to deny the Rule 15 motion. If Defendants already had the testimony and could describe precisely what it said, there would of course be no need for a deposition. For that reason, the case law recognizes that a party need not *prove beforehand* what the deposition testimony will show; a party's "representations" can be the "sole[]" basis upon which a Rule 15 deposition is offered. *Id.* at 440; *see also, e.g.*, *United States v. Epskamp*, No. 12 Cr. 120, 2013 WL 12175097, at *1-2 (S.D.N.Y. Oct. 3, 2013) ("representations by counsel are sufficient");

---

[3] The government's argument is all the more preposterous because Defendants' expectation about what the testimony will show is based in large part on notes prepared *by the government* of proffers made by the Deponents' counsel and a meeting between the government and one of the Deponents.

7

*United States v. Khan*, 2008 WL 2323375, at *2 (E.D.N.Y. June 2, 2008) (granting Rule 15 motion "based solely on defense counsel's representations").

The government's quibbles over what inferences to draw from the materials that Senator Menendez offered are therefore beside the point. Corroborating evidence is not needed at all. The corroborating material Senator Menendez offered is merely the cherry on top and reasonably suggests that Defendants will get the described testimony. That is more than sufficient at this stage of the proceedings. *See, e.g.*, *Epskamp*, 2013 WL 12175097, at *1 (rejecting challenge to proffer as "too vague" where Defendant made generalized representation regarding what testimony would show); *see also Villar*, 568 F. Supp. 2d. at 440 n.10.

    **B.**    **The Government Has Not Met Its Burden To Show that the Depositions Are Unnecessary to Prevent a Failure of Justice.**

When a witness is unavailable and his testimony appears material, "the Court presumes that the testimony is necessary to prevent a failure of justice," unless the government can prove "substantial countervailing factors militating against the taking of such depositions." *Alexandre*, 2022 WL 9843495, at *4 (quoting *United States v. Fargesen*, No. 21 CR 602 (LAP), 2022 WL 4110303, at *5 (S.D.N.Y. Sept. 8, 2022)). This presumption is so strong that some courts do not even separately analyze the third factor. *Khan*, 2008 WL 2323375, at *4.

Here, the government offers a hodge podge of objections of the sort repeatedly rejected by courts in this Circuit; it offers no reason why this case should be treated any differently.

    **1.**  The government first contends that the Deponents' testimony would be unreliable because they are outside the United States and thus not subject to perjury charges. Opp. 15-16. "Courts have considered and rejected similar concerns" *repeatedly*. *Alexandre*, 2022 WL 9843495, at *5 (citing cases). "[C]ourts *routinely* order the taking of foreign depositions," notwithstanding the government's claims "that foreign depositions are untrustworthy because they lack a realistic

8

perjury sanction." *Grossman*, 2005 WL 486735, at *4 (emphasis added) (citing numerous cases authorizing foreign depositions under Rule 15); *United States v. Hwa*, No. 18-CR-538 (MKB), 2021 WL 11723583, at *45 (E.D.N.Y. Sept. 3, 2021) ("courts routinely grant depositions pursuant to Rule 15 where a witness is not a United States citizen and resides outside the country"); *United States v. Salim*, 855 F.2d 944, 948-52 (2d Cir. 1988) (holding that district court properly authorized deposition conducted in France under Rule 15).

There is no reason to treat these Deponents any differently. There is no evidence suggesting that they would be untruthful. To the contrary, the evidence suggests the Deponents have every incentive to testify truthfully. As the government itself points out, the Deponents are not facing any charges and are not accused of any wrongdoing, so they have nothing to hide. *See* Opp. 7, 14. And as the government also admits, the Deponents will not talk to Senator Menendez's counsel voluntarily, so they are clearly not in his pocket or otherwise biased in his favor. *Id*. Moreover, the Deponents (and their counsel) have already provided factual proffers to the government, and at no point did the government suggest that their statements were false. The government thus has tacitly acknowledged that these Deponents' information that is critically material to the defense is likely the truth.

In any event, the government's concerns can easily be "overcome by holding the depositions at an American embassy or consulate, where they could be conducted in a manner consistent with the American judicial system." *Alexandre*, 2022 WL 9843495, at *5. Courts have directed parties to attempt to hold depositions of foreign witnesses at an American embassy or consulate "so that U.S. officials can swear the witnesses and provide assurances of formality and accuracy." *Fargesen*, 2022 WL 4110303, at *5; *United States v. Mohamed*, 2020 WL 1545522, at

9

*7 (E.D.N.Y. Apr. 1, 2020) (similar). That could easily be done here if the government had genuine concerns.

**2.** The government next asserts that the Deponents' testimony would be unreliable because the U.K. magistrate would ask the parties' questions and may limit cross-examination. Opp. 17–18. Again, however, courts have repeatedly rebuffed arguments that a foreign deposition should not be authorized because a country may "limit[] the Government's ability to conduct cross examination," "mandat[e] that the questioning be conducted entirely by" the foreign government, or have other procedural differences with an American deposition. *Alexandre*, 2022 WL 9843495, at *5 (listing cases); *United States v. Little*, 2014 WL 1744824, at *3 (S.D.N.Y. Apr. 23, 2014) (disagreeing with government's suggestion that "absolutely no deposition could be taken" just because a "traditional American-style deposition" may not be possible).

*Salim*, for example, permitted a Rule 15 deposition even though "the examination" was "to be conducted by the French magistrate." 855 F.2d at 951. "[I]t is not always possible to take a deposition in a foreign country in the manner that we might prefer, or even that we might require for a deposition taken domestically," but "that does not mean that depositions taken according to foreign law are inferior to those taken under United States law." *Id.* Indeed, *Salim* specifically permitted "questioning … performed by a foreign judicial officer at the behest of and using questions submitted by American attorneys." *Id.* at 952. A foreign "judicial system, while different from our own," the Second Circuit emphasized, "is neither less impartial nor less interested in obtaining accurate testimony from witnesses." *Id.*[4]

---

[4] The government tries to distinguish away *Salim* in a footnote (Opp. 20 n.9), but the distinction they point to—that there was a second deposition round after a week's continuance—was entirely immaterial; it was not even mentioned in the court's analysis, or in the cases applying *Salim* (*e.g.*, *Alexandre*, 2022 WL 9843495).

10

And again, the government is not without redress if it wants cross-examination. It can request this court direct the parties to hold the deposition at an American embassy or consulate so that American procedures will apply (*see Fargesen*, 2022 WL 4110303, at *5) or it could invoke the MLAT (*see Alexandre*, 2022 WL 9843495, at *5), as it concedes (Opp. 17 n.7). The fact that the government has not invoked its own rights because it does not want the jury to hear helpful-to-the-defense testimony from these witnesses is not a reason "in the interest of justice" to preclude Defendants from having an opportunity to develop this critical record.[5]

**3.** Finally, the government worries that the Rule 15 depositions will cause substantial delay, both (i) because it might take many months to secure the testimony, and (ii) because, if secured, the parties may have to litigate its admissibility. Opp. 18-19. These are not serious arguments.

As an initial matter, the government should not be heard to complain of the risk of delay when any such risk is a problem of the government's making. The Deponents' statements were made in late 2023, but the government inexplicably failed to include them in its *Brady* disclosures. In fact, the government did not turn over this critical, exculpatory evidence until April 19, 2024 (and even then, buried the statements in thousands of pages of disclosures). Senator Menendez filed his Rule 15 motion a week later, on April 26, 2024. ECF 360. The government's belated disclosure is the reason Senator Menendez must seek relief on the eve of trial. It is inequitable to allow the government to benefit from its own sandbagging in a civil case, let alone when someone's liberty is on the line. *See, e.g.*, *Reynolds v. American Airlines, Inc.*, 2017 WL 6017355, at *5 (E.D.N.Y. Dec. 4, 2017) (ruling against party to avoid "reward[ing] sandbagging").

---

[5] The government also suggests in passing that the remote testimony is "not guaranteed," but lack of a guaranteed result is not a reason to avoid *trying* to obtain the testimony. *See, e.g.*, *Fargesen*, 2022 WL 4110303, at *5 (authorizing Rule 15 deposition even though "the cooperation of the UAE … is not assured"); *Vilar*, 568 F. Supp. 2d at 440 ("that success is not a foregone conclusion does not" require denying a Rule 15 deposition).

Defendants have not asked for a continuance, so there will be no delay in trial. Defendants simply want the opportunity to try to obtain the depositions in a timely fashion, and "there is no reason that Defendant should not be permitted to *try* to obtain the testimony before the scheduled trial date." *Alexandre*, 2022 WL 9843495, at *5. That is particularly so when "the Government may have tools at its disposal that could help speed up the process" and "increase[] the possibility that the at-issue Rule 15 depositions may be able to occur in time for trial." *Id.* Even if the testimony cannot be obtained by the *commencement* of trial, it may be obtained *during* the course of the more than six-week trial. *Vilar*, 568 F. Supp. 2d at 437; *see also United States v. Al Kassar*, 2008 WL 4735269, at (S.D.N.Y. Oct. 27, 2008) (granting Rule 15 motion so long as "deposition is taken no later than one week before the end of trial").

The government's concern about admissibility is likewise overwrought. If the deposition is conducted at an American embassy or consulate, there will be no admissibility issues. In any event, there will surely be dozens or hundreds of admissibility disputes over the course of the trial, and the Court and the parties are more than capable of timely adjudicating them. There is nothing unique about this evidence in that regard. Indeed, in numerous cases authorizing Rule 15 depositions, the courts have noted that admissibility questions are "an entirely separate matter" that are properly addressed later—not a reason to deny the depositions at the outset. *Alexandre*, 2022 WL 9843495, at *6; *see also Salim*, 855 F.2d at 952 (admissibility may be considered "after the deposition has been taken, when" court "can examine the transcript and the actual circumstances under which the deposition was conducted"); *Fargesen*, 2022 WL 4110303, at *5 (reserving issues of admissibility); *United States v. Wey*, 2017 WL 237651, at *25 (S.D.N.Y. Jan. 18, 2017) (same).

## CONCLUSION

For the reasons stated herein, Senator Menendez respectfully requests that this Court authorize depositions of the Deponents and execute the proposed letter rogatory.

Respectfully submitted,

/s/ *Adam Fee*

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Robert D. Luskin
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*