

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 11, 2024

**By ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Robert Menendez, et al.*,
              S4 23 Cr. 490 (SHS)

Dear Judge Stein:

      The Government respectfully writes in the above-captioned matter to identify for the Court and to seek the resolution of certain objections raised by defendants Robert Menendez and Wael Hana to certain exhibits that the Government intends to present in a summary chart in connection with the testimony of its third and final expected chronological summary witness in its case-in-chief, Special Agent Paul Van Wie of the Federal Bureau of Investigation ("FBI"). None of these objections concerns the Speech or Debate Clause. Menendez's limited objections to certain exhibits on the chart based on the Speech or Debate Clause were addressed in a prior letter motion that is *sub judice* (*see* Dkt. 448). The Government writes now to facilitate the presentation of Special Agent Van Wie's testimony as soon as Thursday or Friday of this week, depending upon the progress of trial.

      I.    **Special Agent Van Wie's Expected Testimony and Summary Charts**

      Special Agent Van Wie is expected to provide summary testimony regarding, principally, a voluminous number of documents setting forth a detailed chronology of the aspects of the scheme related to Menendez's promised, agreed, and/or undertaken acts in connection with an effort to disrupt a prosecution by the United States Attorney's Office for the District of New Jersey of defendant Fred Daibes and to assist Daibes, who was seeking millions of dollars in investments from a fund with ties to the Government of Qatar, by promising, agreeing, and/or undertaking acts to benefit the Government of Qatar. As with certain other summary charts the Government recently presented, *see* Government Exhibits 1302 and 1303, the Government intends to present a large volume of evidence, including information obtained from text messages, emails, phone records, and other documentary evidence, in a chronological manner that will aid juror comprehension and allow for an efficient presentation of evidence. And, as was the case with FBI Special Agents Coughlin and Graves, who recently testified, the Government expects Special Agent Van Wie nearly exclusively to explain the methods by which he verified the summary chart and to read from or summarize portions of the summary chart and certain of the underlying

documents cited in it, as well as certain other documents closely associated with its subject matter but not cited in the chart itself. Special Agent Van Wie is expected to authenticate one chronological summary chart, Government Exhibit 1304, that is approximately one-quarter the length, by line count, of the chronological summary chart (*i.e.*, GX 1303) recently used in connection with Special Agent Graves's testimony.[1]

In an effort to resolve any objections pertaining to the testimony of Special Agent Van Wie sufficiently in advance of his testimony, the Government shared a first draft of Government Exhibit 1304 with the defendants on April 28, 2024. Between on or about May 24, 2024 and May 27, 2024, the Government received objections from counsel for all three defendants regarding Government Exhibit 1304 and the underlying exhibits the Government intends to introduce in connection with Special Agent Van Wie's testimony. The Government subsequently conferred with counsel for Menendez, Hana, and Daibes regarding their objections, and based on those conversations and considering their specific objections, the Government made multiple amendments to the summary chart, including removing or modifying multiple entries in response to the defendants' concerns.[2] In light of these amendments, the Government understands that Daibes does not have any outstanding objections to the current version of Government Exhibit 1304 or its underlying exhibits. However, the Government understands that Menendez and Hana continue to object to several entries on the summary chart and/or the underlying exhibits that the Government intends to offer in connection with Special Agent Van Wie's testimony.

## II. Objections To the Substance of the Chart and Associated Exhibits

Menendez's and Hana's objections, which are discussed in greater detail below and are reflected in the attached version of the summary chart (*see* Exhibit A), almost entirely concern authenticity, hearsay, and/or relevance, and primarily relate to documents that were provided to the Government in response to a subpoena directed to a U.S.-based affiliate of the entity referred to in the Indictment as the Qatari Investment Company. (*See, e.g.*, Indictment ¶ 55.) Only two of the objections pertain to the Speech or Debate Clause, and those two objections were addressed in a separate letter motion. (*See* Dkt. 448.) All of the remaining objections should be overruled.

### A. The Indictment

As alleged in the Indictment, from at least in or about December 2020 to at least in or about 2023, Menendez agreed to and did attempt to influence the federal prosecution of Daibes pending in the District of New Jersey, including by recommending a candidate for U.S Attorney for the District of New Jersey who Menendez believed could be influenced by Menendez with respect to Daibes's case (referred to in the Indictment as the "Candidate" or "Official-3"), and by attempting to influence the U.S. Attorney's Office for the District of New Jersey to act favorably in Daibes's case. Menendez took or promised to take these actions in exchange for cash, furniture, and gold

---

[1] The Government continues to refine aspects of Special Agent Van Wie's testimony in an effort to further streamline its presentation and expects his direct testimony to be approximately 3 to 4 hours in length.

[2] The defendants also suggested factual corrections to the chart, which the Government accepted to the extent it determined they were accurate, as it had done with the other summary charts.

Honorable Sidney H. Stein
June 11, 2024
Page 3

bars that Daibes provided to Menendez and Nadine Menendez. (*See, e.g.*, Indictment ¶¶ 45, 46.) When Menendez accepted at least certain of the items of value from Daibes, Menendez knew that Daibes also expected Menendez, in exchange, to take action to benefit the Government of Qatar, and thereby to benefit Daibes, who was seeking millions of dollars in investment from a fund with ties to the Government of Qatar (referred to in the Indictment as the "Qatari Investment Company").

As further alleged in the Indictment, and as relevant here, in mid-2021, Menendez introduced Daibes to a member of the Qatari royal family and the principal of the Qatari Investment Company (who is referred to in the Indictment as the "Qatari Investor"). (Indictment ¶ 56.) At the time, Daibes was seeking to move forward on a real estate project in New Jersey but was still under federal indictment. (*Id.*) After Menendez introduced Daibes to the Qatari Investor, and while the Qatari Investment Company was considering a multimillion-dollar investment in Daibes's project, Menendez made public statements supportive of the Government of Qatar, sent Daibes advance drafts of those statements so that Daibes could share them with the Qatari Investor and a Qatari government official associated with the Qatari Investment Company (referred to in the Indictment as "Qatari Official-1"), and attended with Daibes a private event in Manhattan hosted by the Qatari government. (*Id.* ¶¶ 57-58.) In the fall of 2021, Daibes also offered Menendez bribes and sought Menendez's assistance with a Senate resolution supportive of Qatar. (*Id.* ¶¶ 58, 59.)

As alleged, Menendez continued to receive bribes from Daibes while the Qatari Investment Company was considering, and was preparing to make, an investment in Daibes's project. (Indictment ¶¶ 61-66.) For example, the delivery causing Nadine Menendez to remark "Christmas in January" was provided days after a meeting between Daibes and the Qatari Investor. (*Id.* ¶ 61.) Similarly, the March 30, 2022 meeting between Nadine Menendez and Daibes and the subsequent sale by Nadine Menendez of two one-kilogram gold bars was the same day that Menendez and Daibes met with Qatari officials for a lengthy dinner. (*Id.* ¶ 62.) And in late May 2022, days after the Qatari Investment Company signed a letter of intent to make a multimillion-dollar investment with Daibes, Daibes met with Menendez, who then—again—performed a Google search for the price of a one-kilogram gold bar. (*Id.* ¶ 64.) Additionally, the Qatari Investment Company twice provided tickets for a relative of Nadine Menendez to attend a Formula One race, most recently in May 2023. (*Id.* ¶¶ 63, 66.)

        **B.**    **Objections Based on Authenticity**

Menendez has indicated that he objects to summary chart entries and the underlying exhibits, including emails and text messages, that pertain to materials produced by a U.S.-based affiliate of the Qatari Investment Company (the "Affiliate") on the basis of authenticity. (*See* Ex. A, lines 93, 94, 97-100, 115, 119, 123-26, 133, 137, 140, 144, 145, 146, 148, 150, 151, 155, 246, 255, 256, 326, 327, 330-32.) These are the sorts of exhibits for which parties routinely stipulate as to authenticity, and for which the parties have done so throughout this trial. Based on the Government's conversations with counsel for Menendez, it does not appear that Menendez disputes that the materials are, in fact, authentic. Rather, Menendez appears to dispute whether the Government's proposed witness—a London-based outside counsel to the Affiliate ("Counsel-

Honorable Sidney H. Stein
June 11, 2024
Page 4

1") who currently plans to travel for the limited purpose of authenticating these materials—has sufficient knowledge of the materials to authenticate them.[3]

As the Government has explained to Menendez, if necessary, the Government intends to call Counsel-1, a partner with a leading international law firm, who personally oversaw the collection and production of the relevant exhibits in response to a grand jury subpoena issued to the Affiliate. Counsel-1 will testify that two leading forensic firms collected, preserved, and processed data obtained from computers from twelve employees of the Affiliate, and data from mobile devices of three employees, a principal of the Affiliate (referred to in the Indictment as the "Qatari Investor"), an attorney who worked for the Affiliate (referred to in previous litigation in this matter as the "GC"), and a senior executive who worked for the Affiliate (referred to in previous litigation in this matter as the "COO"). In addition, Counsel-1 will testify that the forensic firms were not able to collect Signal messages from the mobile devices, and that Counsel-1 received screenshots of three of the exhibits, which were Signal messages, that were directly sent to Counsel-1 from the Affiliate's employees.

Based on the above proffered testimony of Counsel-1, Counsel-1 is more than qualified to testify to the authenticity of the above-described documents and messages that the Affiliate produced to the Government. *See* Fed R. Evid. 803(6)(d) (admissibility may be "shown by the testimony of the custodian *or* another qualified witness" (emphasis added)); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (the witness "need not have personal knowledge of the actual creation of the document"); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 255 (S.D.N.Y. 2014) (attorney could authenticate bank records); *see also, e.g.*, *Braswell v. United States*, 487 U.S. 99, 118 (1988) ("The jury may draw from the corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena."), Indeed, given how electronic storage is maintained and stored by the Affiliate and its employees, Counsel-1 is in a better position to authenticate these materials than anyone else who has worked for the Affiliate.

### C. Objections Based on Hearsay

Menendez has objected to the majority of the messages relating to the Qatar-focused allegations on both hearsay and relevance grounds, with Hana joining a limited number of these hearsay objections. The Government has categorized these communications below, as well as other materials to which the defendants have lodged objections, in an effort to facilitate the Court's analysis of the materials at issue. The majority of the defendants' hearsay objections are misplaced as, in many circumstances, the relevant statements are not offered for the truth of a matter asserted or do not contain assertions of fact at all. The relevance of the disputed materials, some of which are described in the Indictment itself, is generally straightforward, and is addressed in a later section of this letter.

---

[3] To the extent Menendez is objecting to authenticity of these materials because he intends to cross-examine Counsel-1 about what he knows about the Qatari Investment Company's structure and the roles and affiliations of its principals, the Government believes those topics will be outside the scope of direct examination, and much of what he knows or does not know on those topics, if anything, is based on inadmissible hearsay.

1. *Communications Between Representatives of the Qatari Investment Company and Daibes and Daibes's Agents*

Menendez objects on hearsay grounds to multiple emails and text messages between individuals associated with the Qatari Investment Company and Daibes and his agents that relate to the investment the Qatari Investment Company made into a real estate development project with Daibes and his company. (Ex. A, lines 101-103, 105, 115, 128, 146, 148, 150, 255, 256, 330-32.) These messages primarily pertain to (i) arrangements for meetings between the Qatari Investor and/or Qatari Investment Company employees and Daibes, and the time and location of those meetings; and (ii) the exchange of information about the Daibes real estate deal, including Daibes's biographical information and the final Letter of Intent for the real estate deal.

None of these communications is being offered for its truth. Rather, these emails and text messages are admissible as statements of future intent, for the effect on the listener, and/or to provide context for other communications—including subsequent communications between Menendez and Daibes—about the meetings Daibes and his agents were attempting to set up between Daibes and the Qatari Investor and the status of the real estate deal between Daibes's company and the Qatari Investment Company. *See*, *e.g.*, *United States v. Ho*, 984 F.3d 191, 208 (2d Cir. 2020) ("'When statements by an out of court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed.'" (quoting *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984)); *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000) ("A declarant's out-of-court statement as to his intent to perform a certain act in the future is not excludable on hearsay grounds."); *United States v. Cardascia*, 951 F.2d 474, 486-87 (2d Cir. 1991) ("Statements not considered hearsay are typically verbal acts that give rise to legal consequences."). Accordingly, each of the exhibits in this category is admissible for a non-hearsay purpose.

2. *Communications Between Qatari Investor and Qatari Official-1*

Menendez and Hana have objected on hearsay grounds to a small number of communications between the Qatari Investor and Qatari Official-1, including messages in which they shared Menendez's press releases or other articles praising Qatar, and other messages reflecting their reactions to those press releases and articles (Ex. A., lines 123-26, 133, 137). These messages include some of the most relevant communications that pertain to this aspect of the scheme. As an initial matter, the Government is not offering any of these messages for the truth of the underlying articles or press releases, *i.e.*, to prove the truth of the title of the press release or for the truth of any of the articles Qatari Official-1 sent to the Qatari Investor related to Qatar's work in Afghanistan. Rather, these messages are being offered to provide context and background for Menendez's and Daibes's actions and as evidence that they believed Menendez's actions to benefit Qatar would assist in Daibes obtaining a real estate deal with the Qatari Investment Company, with which the Qatari Investor and Qatari Official-1 were affiliated. These messages reflect that the Qatari Investor and Qatari Official-1 were aware of what Menendez was saying and doing related to Qatar (*id.*, lines 123-126, 137) and that they were interested in and monitored how Qatar was being portrayed in the media and in Congress (*id.*, lines 123-26, 133, 137).

Honorable Sidney H. Stein
June 11, 2024
Page 6

For example, just over two weeks after his first press release praising Qatar, Menendez reached out to Daibes and encouraged him to send the Qatari Investor and/or Qatari Official-1 his press release prior to its official publication by Menendez's office. (Ex. A, line 138 (Menendez to Daibes: "You might want to send to them. I am just about to release").) Thus, the message from Qatari Official-1 containing Menendez's press release—and the responses, which indicate the message was received and acknowledged—are admissible to provide context and background for Menendez's and Daibes's prior and subsequent messages. Without the messages between the Qatari Investor and Qatari Official-1, the jury would not have the full context as to *why* Menendez encouraged Daibes to send the Qatari Investor and/or Qatari Official-1 the press release, *i.e.*, because Menendez and Daibes had an understanding that the Qatari Investor and Qatari Official-1 would be interested in such messages. *See, e.g., Ho*, 984 F.3d at 208 ("'When statements by an out of court declarant are admitted as background, they are properly so admitted not as proof of the truth of the matters asserted but rather to show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed.'" (quoting. *Pedroza*, 750 F.2d at 200)).

In addition, to the extent the exhibits reflect the reactions of the Qatari Investor and Qatari Official-1, such as their praise or appreciation for Menendez's press release, they are admissible as either non-hearsay, present sense impressions, or state of mind, or both. *See* Fed. R. Evid. 801(a), 803(1), 803(3); *see also United States v. Salameh*, 152 F.3d 88, 112 (2d. Cir. 1998) ("'Where . . . the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted.'" (quoting *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988))).

Another message between the Qatari Investor and Qatari Official-1 to which Menendez objects is a text message attaching a photograph of Menendez and Qatari Official-1 (*see* Ex. A, line 326). However, the sending of the photograph is offered as an act—*i.e.*, only to show that the photograph was sent—and is therefore neither a statement nor hearsay. Moreover, because the photograph itself similarly does not contain an assertion of fact, it is not hearsay and cannot be excluded on that basis. *Laureano v. City of New York*, 17 Civ. 181 (LAP), 2021 WL 3272002, at *6 (S.D.N.Y. July 30, 2021) ("photographs are not hearsay because they are not 'statements'"); *cf. United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978) (holding that a sketch was not a statement and "therefore can no more be 'hearsay' than a photograph identified by a witness"). The transmission of the photograph is therefore admissible.

3. *Communications Regarding Formula One Tickets that Menendez Solicited*

Menendez and Hana also object to several messages between Menendez and Qatari Official-1 and messages between an associate of the Qatari Investor and a relative of Nadine Menendez (the "Relative"). Several of these messages relate to the efforts of the Qatari Investor and Qatari Official-1 to procure and to provide Formula One Grand Prix racing tickets to the Relative. (Ex. A, lines 309, 312, 320, 321, 322.) Menendez and Hana object to these messages as hearsay; however, none of the messages is being offered for the truth of the matters asserted therein.

On May 6, 2022, as alleged in the Indictment (Indictment ¶ 63), Menendez reached out to Qatari Official-1 to request Formula One tickets for a close relative of Nadine Menendez. The defendants do not object to the admissibility of that message but have objected to Qatari Official-1's responses to Menendez as hearsay. However, Qatari Official-1's messages are admissible not for their truth, but (i) for their effect on and belief of the listener, *i.e.*, that Menendez understood that Qatari Official-1 would take action to procure tickets, *see United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("[A] statement offered to show its effect on the listener is not hearsay"); (ii) as statements of future intent, as Qatari Official-1 promised Menendez to look into getting the tickets, *see Best*, 219 F.3d at 198; and (iii) as context for additional messages Menendez sent to Qatari Official-1 regarding the request for tickets, *see Ho*, 984 F.3d at 208, including those in which Menendez sent the Relative's contact information, (Ex. A, line 318), and responded that "He [*i.e.*, the Relative] is thrilled and so is his mother [*i.e.*, Nadine]." (*Id.*, line 324.) Indeed, without these responses, Menendez's additional messages would make little sense. Menendez is not entitled for the jury to be confused about his own messages. Because the messages are admissible on any one of these grounds, Menendez's objections should be overruled.

Menendez and Hana also object to two messages between an associate of the Qatari Investor and the Relative. Again, neither message is offered for the truth of any matters asserted. The first message from the Qatari Investor's associate, which came just three hours after Menendez's request to the Qatari Investor for tickets, offers both context for Menendez's subsequent messages about the tickets and reflects a statement of future intent, *i.e.*, the associate's intent to procure tickets. The second message, which merely shows that a link to tickets was provided to the Relative is an act that is not an assertion, is not hearsay, and is therefore admissible.[4]

For each of these reasons, Menendez's and Hana's objections to the Formula One communications should be overruled.

   4. *Communications Regarding the Daibes Case*

Menendez and Hana also object to multiple communications between employees of the Qatari Investment Company in which they shared a news article and other information as background on Daibes and his pending criminal case in the District of New Jersey. (Ex. A, lines 94, 97, 98, 99, 100, 327.) None of the communications is being offered for its truth. Rather, the communications are admissible for two non-hearsay purposes. *See*, *e.g.*, *Ho*, 984 F.3d at 208; *Salameh*, 152 F.3d at 112. First, the communications themselves indicate that key individuals with the Qatari Investment Company, *i.e.*, the Qatari Investor (with whom Menendez met) and Qatari Official-1, were informed of the criminal case against Daibes. And second, the communications

---

[4] The Government would be amenable to a limiting instruction for the portion of the May 6, 2022 message (*see* Ex. A., line 320), in which the Qatari Investor's agent reaches out to the Relative and states, "Hi [Relative], [Qatari Investor] ask me to contact you regarding F1 tickets." Although the Government believes this both reflects the agent's state of mind as to *why* he is reaching out and provides context for the next sentence, which is admissible as a statement of future intent, the Government would not object to a narrowly tailored limiting instruction that the statement is not offered for its truth.

provide background and context for other actions and statements of the Qatari Investor and his agents. For example, Daibes's background—and the Qatari Investor's knowledge of that background—help explain why the COO of the Qatari Investment Company participated in the initial meeting with Daibes and then suggested that the Qatari Investor meet Daibes at a "discreet" location. (Ex. A, lines 99, 100.) Accordingly, the messages are admissible for these non-hearsay purposes.

       5. *Communications Between Menendez and the Advisor Regarding the U.S. Attorney Recommendation Process*

Menendez has indicated that he objects to summary chart entries and the underlying exhibits that pertain to communications from an outside political advisor (referred to the Indictment as the "Advisor") to Menendez regarding the selection process for the United States Attorney for the District of New Jersey and Menendez's recommendation for the same. (*See* Ex. A, lines 4-10, 23-28, 36-40, 51-54, 70-82, 197, 201, 202-204.) All of these communications are relevant and admissible.

The Government intends to offer several messages obtained from an encrypted messaging application between Menendez and the Advisor in which they discuss the U.S. Attorney selection process for the District of New Jersey. In those communications, the Advisor communicates with and took direction from Menendez about the selection process, the vetting process for candidates, and interactions with the media about Menendez's recommendation for the position. For example, two days after Menendez met with the Candidate (who would later become Official-3 (*see* Indictment ¶ 47) and learned that the Candidate might have to recuse himself from the Daibes case if he were to be nominated as the U.S. Attorney, Menendez requested that the Advisor begin looking into a different candidate for the position.

As an initial matter, all of these messages fall under a hearsay exception or exclusion. The messages from the Advisor to Menendez are admissible under the exception for agent statements. *See*, *e.g.*, *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 538 (2d Cir. 1992) ("liberal treatment [of] proof" of agency "is accorded" under Rule 801(d)(2)(D)); *see also*, *e.g.*, *In re Reserve Fund Secs. & Derivs. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012) ("Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d)(2)(D), and his statements are admissible against that individual defendant." (citing *United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996))).

The Advisor's messages to Menendez are also admissible on several additional non-hearsay grounds. First, they are admissible as context for Menendez's own statements to the Advisor, without which Menendez's statements would not make sense. *See e.g.*, *United States v. Guzman*, 754 F.2d 482, 487 (2d Cir. 1985) ("[The declarant's] questions were introduced, not for the truth of what he asserted, but to render [the defendant's] answers intelligible."); *Ho*, 984 F.3d at 208. Moreover, several of the statements are admissible to show that statements were made, or to explain Menendez's next steps—in other words, for the statements' effect on the listener. *See Dupree*, 706 F.3d at 136; *Davis v. City of New York*, 959 F. Supp. 2d 427, 436 n.37 (S.D.N.Y. 2013). Both purposes are permissible non-hearsay bases for the statements' admissions.

Moreover, many of the messages made to or from the Advisor contain questions (Ex. A, lines 23, 24, 37, 74, 77); requests (*id.*, line 8); demands (*id.*, lines 5, 36); statements of future intent (*id.*, lines 5, 54, 202); or emojis that are not assertions of fact and are therefore not hearsay (*id.*, lines 27, 27, 76, 82.) *See United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) ("as a matter of law, questions are not 'assertions' within the meaning of Rule 801"); *Best*, 219 F.3d at 198; *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." (internal quotation marks omitted)); *United States v. Lubrano*, 529 F.2d 633, 636-37 (2d Cir. 1975) (instructions were admissible as non-hearsay to "aid the jury in understanding the background events leading up to the crimes in question"). Accordingly, all of the exhibits in this category are admissible.

6. *Miscellaneous*

Lastly, Menendez and Hana objected to a few additional exhibits based on hearsay (*see, e.g.*, Ex. A, lines 119, 155, 246.) None of these exhibits includes any statements for the truth of the matter asserted, and fall squarely under the types of materials that courts routine admit for non-hearsay purposes, as described above.

**D.     Objections Based on Relevance or Rule 403**

Finally, Menendez alone has made arguments based on relevance to many of the materials discussed above. These arguments are particularly inapposite to a summary chronology that is intended to provide an integrated picture of a complex scheme. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir. 2006) ("so long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry" (citing *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.))). In any event, many of the exhibits to which Menendez objects were described in the Indictment, and the relevance of each is patently clear from the chart. That said, to facilitate the Court's review, the Government has categorized the majority of these objections below and addressed them in turn.

1. *Communications Regarding the Daibes Real Estate Deal and Menendez*

a. The Internal Qatari Communications Are Relevant

The Government understands Menendez to object to documents that reflect internal communications of the Qatari Investment Company about the deal with Daibes and communications between Qatari Official-1 and the Qatari Investor about Menendez. Menendez principally asserts that the states of mind of the Qatari Investor and Qatari Official-1 are not relevant. However, to prove what Menendez and Daibes *understood* about the interests and motivations of the Qatari Investor and Qatari Official-1—and to explain why Daibes provided Menendez with items of value, and what promises or acts Menendez could and did offer in return—it is necessary to introduce limited communications between the Qatari Investor and Qatari Official-1 that inform and provide context for Menendez's and Daibes's actions during the relevant period.

Indeed, certain actions of Menendez and Daibes during the period in question strongly indicate that Menendez and Daibes knew or at least *believed* that Qatari Official-1 and the Qatari Investor were monitoring and were interested in how Qatar was portrayed in the media and by the U.S. Government more broadly (beliefs that are borne out by the messages themselves). For example, on July 24, 2021, Daibes sent Menendez a screenshot of another Member of Congress's statement praising Qatar for Qatar's work in Yemen. (Ex. A, line 117.) Just over one week later, on August 2, 2024, Menendez sent Daibes his own press release on the same topic. Daibes sent the press release to Qatari Official-1 later that same day. (*Id.*, line 122.) Thereafter, as discussed above, on August 20, 2021—the same date as several of the messages to which Menendez objects—Menendez used an encrypted messaging application to send Daibes the entire text of *another* press release from Menendez's office praising Qatar. Menendez encouraged Daibes to send it to the same Qatari officials before his office officially released it. And finally, Menendez's outreach to the Qatari Investor just over one week before the Qatari Investor met with Daibes in London is highly relevant to proving that Menendez at least thought or believed that his stature—and ultimately, what he could do for the Qataris—could somehow influence the Qatari Investment Company to invest in Daibes's business. (*Id.*, line 220.)

The actions described above would make no sense if Menendez and Daibes did not know or believe that the Qatari Investor and Qatari Official-1 were interested in Menendez's statements praising Qatar or what Menendez could otherwise do for Qatar. Thus, limited evidence that demonstrates that the Qatari Investor and Qatari Official-1 were aware of Menendez's public statements are directly relevant and support the Government's theory of the case, *i.e.*, that Daibes expected Menendez to take official action to benefit Qatar and that Menendez was aware of that expectation and accepted payment in exchange for doing so. *See, e.g.*, *Quattrone*, 441 F.3d at 188.

Moreover, the relevance of these exhibits is heightened because they are responsive to the defendants' opening statements. In their opening statements, both Menendez and Daibes put the actions of the Qatari Investor and Qatari Official-1 at issue when they claimed that the Qatari Investment Company's decision to invest had nothing to do with Menendez's statements or acts. For example, counsel for Menendez stated, "There will be no evidence presented in this case -- zero -- that the senator's statements regarding Qatar influenced Heritage to invest in the development project at all. It was irrelevant to them." (Trial Tr. 112:1-4.) Menendez instead offered alleged alternative reasons for the investment, including the "leverage" the Qatari Investment Company had over Daibes due to his pending criminal charges (*id.* 110:24-111:1), and their desire to "invest in this beautiful waterfront community in Edgewater, New Jersey." (*Id.* 111:4-5.) On the latter point, Menendez even displayed renderings of the proposed waterfront buildings. Similarly, in his opening statement, counsel for Daibes stated that the alleged official acts "had no effect and weren't even connected to the Daibes real estate project. Certainly the senator issued a press release regarding the country of Qatar, and it was not about this investment or any investment in New Jersey. . . . This has nothing to do, no connection with Mr. Daibes' real estate development project." (*Id.* 168:3-9.) Rather, the Qataris simply concluded that "investing with Mr. Daibes was a good idea." (*Id.* 167:21.)

Thus, even if the Qatari Investor and Qatari Official-1's awareness of certain events was not otherwise relevant (which it is), the defendants directly opened the door to these communications through their opening statements. Text messages reflecting *relief* by the Qatari

Honorable Sidney H. Stein
June 11, 2024
Page 11

Investor and Qatari Official-1 that Menendez had issued a press release and *praise* for Menendez's press release create a strong inference that directly contradicts Menendez's assertion that "the senator's statements regarding Qatar" had nothing to do with the decision to invest in the development. In short, because the defendants opened the door to the factors that influenced the investment, the defendants cannot now reasonably be heard to complain about the Government's efforts to introduce evidence that reflects on the same.

            b.  The Government's Position Is Not Inconsistent

Menendez has suggested to the Government that the Government's current position is inconsistent with the Government's opposition to Menendez's motion for a Rule 15 deposition (*see* Dkt. 369). Notwithstanding that the standard for a Rule 15 deposition is much higher than the relevance standard for these exhibits, the Government's current position is not inconsistent with its prior arguments. In its opposition, among other things, the Government argued that "whether Menendez, in fact . . . influenced the Qatari Investment Company to make the Daibes investment is irrelevant" (*id.* 9), because what matters is whether "Menendez *believed* that Daibes expected him to take actions beneficial to Qatar in exchange for bribes and whether Daibes similarly *believed* that such actions would assist Daibes in obtaining an investment" (*id.* 11). That position is no different from the one the Government is taking here.

The Government is not offering the messages in question to prove that the Qatari Investment Company *in fact* invested with Daibes because of Menendez. Rather, the messages between the Qatari Investor and Qatari Official-1 (and their responses to Menendez's actions) are highly probative of the fact that Daibes and Menendez *believed* that they were interested in and were monitoring what Menendez could do for Qatar. This position is also not inconsistent with the Court's ruling. (*See* Dkt. 401 at 3 ("[N]one of what Menendez seeks to elicit from the three Qatari Investment Company individuals bears on the contemporaneous beliefs of Daibes and Menendez. Rather, the statements reflect at most the intentions and objectives of the three individuals themselves and, perhaps, of the Qatari Investment Company. As these intents and objectives say nothing of what Daibes and Menendez's contemporaneous beliefs were, they are immaterial to the charges and come nowhere near 'alter[ing] the quantum of proof significantly' in Menendez's favor.").) Where, as here, the act of sending the press release and the subsequent relief and praise the Qatari Investor and Qatari Official-1 expressed for that press release bear inferentially, if not directly, on the "contemporaneous beliefs of Daibes and Menendez," the messages plainly meet the relevance standard under Rule 401. *See McCoy v. North Carolina*, 494 U.S. 433, 440 (1990) (Evidence need not constitute conclusive proof of a fact in issue, but only must have "any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence.") (internal quotation marks and citation omitted) (emphasis added); *Quattrone*, 441 F.3d at 188. And in any event, as discussed above, because *Menendez* himself put the Qatari Investor's and Qatari Official-1's actions and state of mind at issue during trial, any argument for the exclusion of evidence bearing on those facts is without merit.

2. *Communications Between Nadine Menendez and a Real Estate Broker Regarding a Multi-Million Dollar Home*

Menendez has indicated that he objects to certain communications between Nadine Menendez and a real estate broker that Daibes introduced to her in early 2022 shortly before the defendants became aware of the instant investigation (*see* Ex. A, lines 260, 263, 264, 295, 296, 297, 298). As reflected in text messages, the real estate broker scheduled multiple appointments for Nadine Menendez to see multimillion-dollar homes. Based on the face of the messages, it does not appear that this was merely window-shopping. Rather, Nadine Menendez conveyed that she and Menendez were interested in these homes, communicated with the broker to schedule viewings, and after visiting at least one of the houses wrote to the broker, for example, "thank you for everything you did this weekend and last . I hope to have an answer for you when we get back in 2 weeks." (Ex. A, lines 298.)

It is highly relevant that, in less than three years, without a job or a steady paycheck, Nadine Menendez went from facing foreclosure to considering houses listed at over four million dollars. Whether or not an offer was placed on any house, these exhibits are directly relevant to show Menendez's and Nadine Menendez's change in financial circumstances as a result of the bribes that were provided by Daibes and Hana, which the Court has already ruled is relevant. (*See* May 6, 2024 Tr. 23 ("Menendez's alleged desire for the car, the gold, and so forth, goes to motive, and the lifestyle that he had before and after is relevant[.]").)

Further, none of these exhibits presents any risk of unfair prejudice, such as by describing conduct that is somehow more inflammatory than the charged conduct. *See*, *e.g.*, *United States v. Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) ("To be sure, all evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him. In that sense, the more pertinent evidence is, the more prejudicial it is. What 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'"). Indeed, as the Court can readily determine from the chart itself, the limited presentation of evidence on this point, whether through the chart or through the documents underlying those challenged lines, will be highly efficient and will enhance the jury's understanding of the facts.

3. *Communications Between Menendez and Daibes Regarding Gold and a Meeting with Qatari Officials*

Menendez also objects to multiple messages between Daibes and Menendez. In the first message, Daibes sends Menendez a picture of a one-kilogram gold bar, displaying a price of $59,431.20. (Ex. A, lines 333-342.) Daibes sent Menendez that message approximately one week after Daibes visited Menendez and Nadine Menendez, and Menendez first Googled the price of a kilo of gold. Daibes's message, which strongly suggests he was conveying to Menendez the value of the bribe he had given Menendez, is clearly relevant.

Menendez also objects to multiple messages between Daibes and Menendez on or around May 26, 2022 about setting up a dinner. Menendez and Daibes exchanged these messages and ultimately had dinner that night—just three days after the Qatari Investment Company sent Daibes the fully signed letter of intent to invest in the real estate deal. (Ex. A, line 332.) Later that same

Honorable Sidney H. Stein
June 11, 2024
Page 13

night, Menendez again Googled the price of one-kilo of gold. The timing of the dinner—just days after Daibes got his real estate deal—and Menendez's Google search strongly suggest that Daibes provided Menendez with gold and/or other items of value at the dinner. These messages are plainly relevant, and Menendez's objection should be overruled.

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

By:    s/ Paul M. Monteleoni
        Eli J. Mark
        Daniel C. Richenthal
        Paul M. Monteleoni
        Lara Pomerantz
        Catherine E. Ghosh
        Assistant United States Attorneys
        (212) 637-2431/2109/2219/2343/1114
        Christina A. Clark
        Special Assistant United States Attorney
        (202) 307-5191

Enclosure

cc:    (by ECF)

       Counsel of Record