O5fWmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                v.                           23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7               Defendants.
                                             Trial
8   ------------------------------x

9                                            New York, N.Y.
                                             May 15, 2024
10                                           12:15 p.m.

11

12  Before:

13
                        HON. SIDNEY H. STEIN,
14
                                             District Judge
15                                           -and a Jury-

16                          APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

O5fWmen1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9  GIBBONS, P.C.
         Attorneys for Defendant Hana
10  BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15  CESAR DE CASTRO
    SETH H. AGATA
16  SHANNON M. McMANUS
         Attorneys for Defendant Daibes

17

18

19  Also Present:  Marwan Abdel-Rahman
                   Bachar Alhalabi
                   Interpreters (Arabic)
20

                   Rachel Wechsler
21                 Connor Hamill
                   Braden Florczyk
22                 Paralegal Specialists, U.S. Attorney's Office

23                 Justin Kelly, DOAR

24

25

O5fWmen1

1              (A jury of twelve and six alternates was impaneled and
2      sworn)
3              THE COURT:  Ladies and gentlemen of the jury, now that
4      you've been sworn, I'm going to briefly tell you something
5      about your duty as jurors over the next few weeks and give you
6      certain instructions as to how to comport yourself over the
7      course of the trial.  At the end of the trial, I'll give you
8      more detailed instructions, and those instructions will control
9      your deliberations.
10             At the end of the presentation of the evidence and
11     after I've given you my charge, it will be your duty to decide
12     from the evidence what the facts are and whether the government
13     has proved beyond a reasonable doubt that the defendants have
14     committed the crimes charged.  When I say the defendants, you
15     must look at each defendant separately.  There's no grouping of
16     defendants here.  You have to look at each defendant
17     separately.
18             You have to decide from the evidence and what the
19     facts are whether the government has proved beyond a reasonable
20     doubt that the defendant you are considering has committed the
21     crimes charged against that defendant.  You, ladies and
22     gentlemen of the jury, and you alone, are the judges of the
23     facts here.  You're going to hear the evidence.  You're going
24     to decide what the facts are.  You will apply those facts to
25     the law, and I'll give you what the law is.  That's how you'll

O5fWmen1

1     reach your verdict.

2              In doing so, you must follow what I tell you the law

3     is, whether you agree with it or not.  An important thing to

4     note is you must not take anything I say or do during the trial

5     as indicating what your verdict should be.  I have no view of

6     the facts here.  In fact, I may be taking notes at some point

7     or I may be talking with my deputy or my clerks.  It may very

8     well have to do with another matter, because I have other

9     matters that I have to handle.  Even if it has to do with this

10    case, don't let it influence you in any way.  Almost certainly

11    it will deal with other matters.

12             You are going to decide what the facts are from the

13    evidence that will be presented here in court.  That evidence

14    will consist of three different things: the testimony of

15    witnesses that you'll hear speak from that witness stand;

16    documents and other things that I admit into evidence as

17    exhibits; and any facts that the lawyers have stipulated to --

18    in other words, facts that the lawyers have agreed upon and

19    they've stipulated that the particular facts are true.  You

20    don't have to worry about that.  You'll know when that comes

21    in.  One of the lawyers will stand up and say the parties have

22    stipulated to the following facts, and they'll ask me to admit

23    the stipulation as evidence.  So everyone will have agreed that

24    those facts are agreed upon, and you must accept the

25    agreed-upon facts as true.

O5fWmen1

1          So there are three ways evidence comes in, as I just

2    said: the testimony of witnesses; documents and other things I

3    admit into evidence; and stipulations of the parties.  But

4    there are two types of evidence: direct evidence and

5    circumstantial evidence.

6          Direct evidence is simply testimony by a witness about

7    what that witness personally did or saw or heard.  That person

8    has direct evidence of what he or she is telling you.

9          Circumstantial evidence is simply indirect evidence.

10   It is proof of one or more facts from which you can find

11   another fact.  The example that many judges in this courthouse

12   give is as follows:

13         Assume the blinds are drawn so you can't see outside,

14   which is true.  Assume somebody comes into the back of the

15   courtroom, where that gentleman is standing, and he or she has

16   a wet umbrella.  You have direct evidence of that wet umbrella.

17   You are entitled to infer from the direct evidence of a wet

18   umbrella another fact -- that is, it's raining outside.  So the

19   wet umbrella is circumstantial evidence of the fact it's

20   raining outside.

21         Circumstantial evidence is simply you're inferring

22   from one or more facts to another fact.  That's all it is.

23   There are certain logical inferences that you can draw from the

24   fact that there's a wet umbrella here.  Certainly, logically,

25   one can think that it's raining outside, a perfectly

1    permissible inference for the jury to draw from the fact of a

2    wet umbrella.  But mind you, that may not be the case.  The

3    person may have put the umbrella under a faucet in the men's

4    room or ladies' room, but certainly it's logical to infer from

5    the fact of a wet umbrella that it's raining outside.  That's

6    all there is to circumstantial evidence.  It's inferring from a

7    directly observed fact to another fact.

8           The law does not weight direct evidence more or less

9    than circumstantial evidence.  It's you, the jury, that will

10   put weight on each piece of evidence.  So you, the jury, will

11   decide who to believe, who not to believe, and of those you

12   believe, what parts of their testimony to believe, what parts

13   not to believe.  And of the parts you believe, you'll weigh

14   that part according to how you feel appropriate.  You could put

15   heavy weight on a piece of direct evidence or heavy weight on a

16   piece of circumstantial evidence or little weight.  That's

17   entirely up to you.  And again, you don't have to accept any

18   piece of evidence that you don't credit, that you don't think

19   is appropriate for you to credit.

20          What's important is you're the deciders of the facts

21   here.  You're the sole judges of the facts.  You determine who

22   to believe, who not to believe, and what weight to put on any

23   piece of evidence of those that you do believe.

24          Now, you've all seen these trials on TV, so you have a

25   general sense of how these things work.  A lawyer may ask a

1    question of a witness.  The other lawyer will stand up and say

2    "I object," and when that happens, when the lawyer's objecting

3    to the question, that means he or she thinks the questions is

4    not a permissible question, it's not a proper question, it's

5    not designed to adduce evidence that can be admitted.

6         When that happens, that calls upon me to do my job,

7    and I have to determine whether the question is a proper one or

8    not.  If I believe, under the law, it's not a proper one, I

9    will say "objection sustained."  And if I believe it's a proper

10   one, I'll say "objection overruled" or I'll say "you may

11   answer" to the witness.  You don't have to memorize that.

12   You'll see it play out, but let me give you a for-instance.

13        Assume a lawyer asks a witness a question and the

14   other lawyer says "objection, your Honor."  And assume I

15   sustain that objection.  What can you take away from that

16   interchange?

17        The answer is nothing, because what the lawyers say is

18   not evidence.  What I say is not evidence.  Anything these

19   lawyers say -- whether it's a legal objection or they're

20   talking -- isn't evidence.  Similarly, anything I say is not

21   evidence.

22        So in the example I gave you, you have the lawyer

23   asking a question, the other lawyer objecting, my sustaining

24   it, but the witness has said nothing.  The witness is the only

25   person who can give you testimony in that example.  You can't

O5fWmen1

take anything from an unanswered question.  For that matter,
you can't take anything from a question.  It's only the answers
that matter, not the questions.

        Now, it may be that I will strike an answer; I'll say
the jury is directed to disregard the answer.  If I do that,
you must do that.  Normally, the way that would arise is a
question is asked, another lawyer objects, I sustain it, but in
the interim, the witness, who quite appropriately is focusing
really on what the question is, may have answered the question
even though I sustained an objection.  So I may say then the
jury is directed to disregard the answer.  Again, you don't
have to memorize this.  It will play out in open court.

        Don't draw any inference from an unanswered question.
Again, questions are not evidence.  Don't consider what the
witness would have answered.  It's only what the witness has
answered.

        The law requires that your decision be made solely on
the evidence in front of you.  The law does not require, as I
said, you to accept all of the evidence which I admit.  It's up
to you to decide what to accept and what not to accept.

        Now, there's no magic formula I can give you as to how
to evaluate testimony.  There just isn't.  All I can tell you
is when determining who to believe and who not to believe and
what part of the evidence to believe, the best advice I can
give you is to use your common sense.  Use your life

O5fWmen1

experience.  Use your good judgment.  And by that I mean every

moment of every day you decide who to believe and who not to

believe.  When you're talking with your family members, your

children, when you're engaged in a business transaction, on the

street when you're buying a newspaper or when you're listening

to a podcast or something, you decide who to credit and who not

to credit.  Use your good judgment, your life's experience and

your common sense.

Now, I've told you what is evidence and how evidence

comes in.  I've told you a bit about what's not evidence.  What

the lawyers say is not evidence.  What I say is not evidence.

After lunch -- we'll take a lunch break -- we will go

to the opening statements of the lawyers.  The order of opening

statement is set by law.  The parties have no role to play in

that.  The government will present the first opening statement

and then each of the defendant's attorneys will present their

opening statements.  As I said, the order is set by law.

I want you to listen to their opening statements.  But

remember what the lawyers say is not evidence.  Listen to the

opening statements.  What they're going to say is, they're

going to tell you what they think the evidence is going to

show.  It's sort of a preview of what they think the evidence

is going to be, so listen to it.  Also, I'm sure they'll tell

you what conclusion they want you to draw from the evidence.

So listen to what they have to say and think about it during

O5fWmen1

1    the course of the trial.  But what they say is not evidence.

2            Anything you see or hear when the court is not in

3    session is not evidence, and even if it's said or performed by

4    one of the parties here, by one of the lawyers or one of the

5    defendants, that's not evidence.  The only evidence is evidence

6    that you hear when the court is in session in this courtroom.

7    Nothing else.  Certainly anything you may hear in the news or

8    newspapers, anything like that, isn't evidence, and indeed,

9    I've already instructed you to just turn the channel, turn the

10   page in the newspaper, so that you're not affected by any media

11   or anything else, commentators on this trial.

12           Let me tell you certain protocols that I want you to

13   follow:

14           First, don't talk to each other about this case.

15   Don't talk to anyone else about this case.  If your family asks

16   you about the case, say you're on the jury and the judge has

17   asked you not to talk about it.  The reason is pretty simple.

18   Many people -- about this case and any case -- will have

19   opinions, even though they haven't heard the evidence, and I

20   don't want any of you to be affected by anyone else's opinion

21   that hasn't been reached on the basis of hearing all the

22   evidence and on the basis of hearing my instructions on what

23   the law is.  That's why I don't want you to talk to other

24   people about this case.

25           Why I don't want you to talk to each other is

O5fWmen1

1    basically for the same reason; that is, you would not have

2    heard all of the evidence, and I don't want you to talk to each

3    other about your preliminary thinking until all of the evidence

4    is in and I've instructed you on what the law is.  So don't

5    talk to each other.  Don't talk to others about the case.

6        I told you yesterday that I've instructed these

7    lawyers and the parties not to greet you.  I want to keep you

8    separate, so please don't greet them.  Now, if you nod your

9    head hello because somebody looks vaguely familiar, that I

10   understand.  But try not to do that and try to have no contact.

11       You know we ask you not to eat in the cafeteria

12   because participants in the trial may be eating in the

13   cafeteria.  The cafeteria food is adequate, but you're not

14   missing anything -- it's terrible -- by not eating in the

15   cafeteria.  I eat in the cafeteria most days in order to save

16   time.

17       Don't do any research about this case.  As I said,

18   don't read any newspapers.  Don't do social media.  Don't go on

19   Google, anything.  Just listen to what transpires in court.

20   Each of the parties are entitled to have you personally render

21   a verdict on the basis of your independent evaluations of the

22   evidence presented in this courthouse and nothing else.

23       Now, remember it's a criminal case and the defendants

24   have been charged in an indictment with the commission of

25   federal crimes.  You know the indictment is simply an

O5fWmen1

accusation.  It's not evidence of anything.  Each of the

defendants here -- Mr. Menendez, Mr. Daibes, Mr. Hana -- has

pled not guilty to the charges against them, and each of them

denies committing the charged offenses.  Each defendant is

presumed innocent throughout this trial until such time, if

ever, that you reach the conclusion that the government has met

its burden of proving the defendant you are considering guilty

beyond a reasonable doubt on every element of every charge in

this indictment.  And I'll explain all of that at the end.

        So you basically know the outline of the trial, and

when we come back from lunch, the lawyers will give their

opening statements.  I want you to listen to them.  After

that -- I don't know if we'll have time today; otherwise, we'll

start tomorrow -- the government puts on its witnesses.  The

witness will take the stand, answer questions, and then the

defendants will be able to cross-examine that witness and the

government will be able to put on its witnesses, which will

take a couple of weeks.

        At the end of that, the defendants are entitled to put

on their case and their witnesses and then they'll direct

questions to them and the government will cross-examine them.

But remember the defendants, each defendant, are under no

obligation whatsoever to put on any case at all, because

there's never any burden on the defendant to prove anything.

Each defendant is presumed innocent until such time, if ever,

O5fWmen1

1    that you find that defendant is guilty beyond a reasonable

2    doubt.

3          After that, the attorneys will make their closing

4    arguments in which they'll tell you what they think the

5    evidence showed.  But again, those closing arguments aren't

6    evidence.  You decide what the evidence showed.

7          And after that, I'll give you instructions on the law,

8    and then you'll retire to deliberate on the verdict.

9          Please don't make up your mind what the verdict is

10   until after you have heard all the evidence and I've instructed

11   you on the law.  You must keep an open mind until then.  All of

12   the parties -- the government and the three defendants here --

13   deserve, and the law requires, that you give them the

14   opportunity to be fully heard.

15         Now, when you come in in the morning and after lunch,

16   don't come in here.  Come into the jury deliberation room.

17   Ms. Blakely, my deputy, will take you there, and then you'll go

18   to lunch from there, and when you come back, come into the jury

19   deliberation room.  Don't come here, because I'll be working

20   with the lawyers and the parties, or I may be, but in any

21   event, we'll be here.  So don't come into this courtroom until

22   Ms. Blakely sees that all 18 of you are here, and then you'll

23   come into the courtroom and the trial will continue.

24         You'll have notepads in case you want to take notes.

25   It will just be yours.  Ms. Blakely will hand them out in the

O5fWmen1

1    morning and collect them in the afternoon.  They'll have your

2    numbers or your names on them.  You don't have to take notes.

3    It's entirely up to you.  But if you do take notes, please

4    don't share them with anyone else -- for the same reasons I

5    said before, about talking with people.  Psychological

6    experiments show that people tend to trust something more if

7    it's written down.  So I don't want anyone showing their notes

8    or, for that matter, saying I know this is what was said, it's

9    written down, because psychologically, people will tend to

10   credit that more.  But what you wrote down may be wrong; you

11   may have taken an imperfect note.  So whatever notes you have,

12   just keep them for yourself and use them for your own purposes.

13            I think that covers everything.

14            It's now ten after one.  Please be back here --

15            Ms. Blakely, do the jurors have cards that will enable

16   them to go to the head of the security line?

17            Yes?

18            All right.  You won't have to wait on the security

19   line.  Please be back in the jury deliberation room.  It's ten

20   after.  I'll give you more time today, make it 25 after one.

21   All right?  Enjoy your lunch.  25 after one, we'll see you

22   here -- I'm sorry, after two.  After two.  And when you come

23   out, come out by number.  That will be just more orderly.

24            Thank you.

25            (Jury not present)

O5fWmen1

1           THE COURT:  All right.  Please be seated.

2           Let's talk about the slides that the government -- I

3    don't have the ECF number here.  The government is contesting

4    the use of certain slides.

5           Who is going to be doing the opening for Mr. Menendez?

6           MR. WEITZMAN:  I will be, your Honor.

7           THE COURT:  All right.  Mr. Weitzman, what the slides

8    should be, sir, is what you think the evidence is going to

9    show.  A lot of this looks like, you'll forgive me, as sort of

10   a campaign pamphlet here.  It's just what the evidence is going

11   to be.  Now, these are issues that the government has raised.

12   I take it they're the only issues extant.

13          First of all, I will want Mr. Menendez's attorneys to

14   mark these, however you want to mark them, for ID, for

15   identification.

16          On the slides, the government has marked them No. 1,

17   because Mr. Menendez didn't.  How is No. 1 going to come in,

18   sir?

19          MR. WEITZMAN:  Your Honor, there are people who have

20   worked with the senator.  There are people who are family

21   members of the senator.  We do plan to present a defense case.

22   We plan to present this evidence.

23          THE COURT:  And they're people who can testify to

24   this?

25          MR. WEITZMAN:  The senator's history?

O5fWmen1

1          THE COURT:  Yes.

2          MR. WEITZMAN:  Yes.

3          THE COURT:  All right.  Strike the phrase "with

4    distinction."  Again, this is not a campaign pamphlet.

5          Everything else will be OK.  But you're telling me

6    that you're going to have people testify in an admissible form.

7          MR. WEITZMAN:  Correct, your Honor.

8          THE COURT:  Sir.

9          MR. RICHENTHAL:  This may be moot in light of the

10   Court's remarks, but just to be clear, our concern was less

11   that there's no way for the defendant to present these facts

12   and more that the jury shouldn't hear many of them -- for

13   example, that Mr. Menendez grew up in a tenement.  It's hard to

14   see how that's designed to do anything other than attempt to

15   engender sympathy; or that Mr. Menendez has two particular

16   children, including their names; or that he was the first

17   person in his family to go to college.  It's hard respectfully

18   for us to see how the jury should learn any of those facts

19   whether they're in admissible form or inadmissible form.

20         THE COURT:  That's background.  I'll allow that.

21         Strike the names, that's correct.  Just say raised two

22   children.  Strike everything after that.

23         MR. WEITZMAN:  Yes, your Honor.

24         THE COURT:  That's correct.  No need to bring the

25   children in here.

O5fWmen1

1          As long as there's a good faith representation that

2     these facts will come out, I'll accept it.  And again, I'll

3     accept the background.  I'm a little concerned about the

4     pictures, but the government hasn't raised that issue.

5          MR. RICHENTHAL:  I'm sorry.  We raised the pictures in

6     a particular way, so I just want to be clear.

7          We're not aware of whether these are exhibits.  We

8     didn't receive them in marked form.  We, the government, have

9     marked our own photographs.  The defendants have had those for

10    some time.  We asked last night and shared our concerns that if

11    the defendants wish to mark these as exhibits, that they do so.

12    But I'm not in a position to represent that, in fact, they're

13    exhibits -- never found out -- these particular photographs.  I

14    don't have knowledge one way or the other.

15         THE COURT:  Sir.

16         MR. WEITZMAN:  Your Honor, I think there's any number

17    of FBI agents and anybody else in this case who can identify

18    these photographs and can offer them in evidence.

19         THE COURT:  I'll allow it.  Again, they're kind of

20    glorifying Mr. and Mr. Menendez.  They're clearly ready for

21    their close-up there, but I will allow it.

22         Slide three, strike "children who are adults."  That's

23    irrelevant.

24         MR. WEITZMAN:  Your Honor, I apologize.  It's not

25    irrelevant.  The point is we need to delve into the

O5fWmen1

1    relationship between Nadine and Bob for reasons that we've made

2    very clear in court.  And whether they are taking care of a

3    family together, sharing those finances or not is exactly the

4    point.  This is a relevant fact.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5f3men2

1          THE COURT:  Strike it from -- I understand we'll deal

2     with it when that testimony comes in.  Strike it from the

3     demonstrative.

4          I don't understand what 4 is.  It seems to be an

5     excerpt from something.  What is that?

6          MR. WEITZMAN:  This is an excerpt from a witness who

7     the government plans to call, a woman named Shannon Kopplin.

8     This is her instruction to Senator Menendez as to how to file

9     certain financial disclosures.  In a prior version of the

10    financial disclosure, it revealed certain gold disclosures of

11    gold bars were a parental gift.  Ms. Kopplin instructs Senator

12    Menendez to delete that word, the parental gift.  This is

13    evidence that is going to come in through the government's own

14    witness.

15         MR. RICHENTHAL:  Here's the problem.  That's true.

16    But when it comes in, it will come in context.  And it will not

17    come in as hearsay.  Ms. Kopplin has no personal knowledge as

18    to whether it is a parental gift.  As presented --

19         THE COURT:  Will it come in?

20         MR. RICHENTHAL:  Ms. Kopplin will testify.  She'll

21    talk about, if she's asked, whether by the government or by the

22    defense, interactions, if any, with Mr. Menendez as to his

23    disclosures.  I expect the disclosures will come in.

24    Ms. Kopplin, if asked, will say she has no knowledge of what is

25    a parental gift or not.  She has no ability to verify that

O5f3men2

1    information.  The jury then will understand what this e-mail

2    means, and importantly, what does it not mean.

3              On this slide, and obviously I have not heard

4    Mr. Weitzman's remarks, it appears they are trying to embrace

5    for the truth of the matter asserted a statement that the

6    witness will deny having any personal knowledge of at all.

7              MR. WEITZMAN:  It is not for the truth of the matter

8    asserted.  It is for Senator Menendez's state of mind.  Exactly

9    a valid non-hearsay purpose.

10             THE COURT:  At this point I am going to strike this

11   slide itself.

12             Martin Luther King in an opening statement, we are not

13   makers of history.  Again, it seems to be a civics lesson,

14   which would be welcome in the abstract.  Or campaign piece.

15   But, focus on the evidence.

16             MR. WEITZMAN:  I am, your Honor.  With all due

17   respect, we offered an expert.  You won't let us put in the

18   expert.  We are still going to argue what the cash is from.  We

19   are going to have witnesses and evidence.

20             THE COURT:  I'm sorry.  I'm talking about slide 5 now.

21             MR. WEITZMAN:  Exactly, your Honor.  This quote

22   contextualizes our argument about generational trauma and the

23   senator's practices.  I've --

24             THE COURT:  How does this quote, "We are not makers of

25   history, we are made by history."  How does that --

O5f3men2

1          MR. WEITZMAN:  What Martin Luther King was saying is

2     that the experiences of our family, parents and grandparents,

3     affect us.  That's what I want to argue to the jury.  I think

4     I'm permitted to argue that as part of my defense.

5          It is no different than countless openings and

6     closings where Maya Angelou is quoted, the Constitution, the

7     Declaration of Independence.  This just a quote.  Whether we

8     say MLK or we say a famous person.

9          THE COURT:  I understand.  Government?

10         MR. RICHENTHAL:  Your Honor, I don't have an objection

11    to Mr. Weitzman making arguments from the evidence.  Dr. King

12    was not speaking about Senator Menendez, or cash, or gold.

13         THE COURT:  But he's saying it is not unusual to have

14    pablum thrown out during an opening or a closing.

15         MR. RICHENTHAL:  In general that's true.  But in my

16    experience of 14 years, I've never had someone try to quote

17    Gandhi, never mind present a slide with a quote out of context

18    plainly not talking about this case.

19         This is an appeal to the jury's emotion.  And while

20    appeals to emotion are proper, they have to be based on

21    evidence or in this case expected evidence.  Dr. King's quotes

22    on this subject --

23         THE COURT:  I think that's right.  It is too general.

24    I need the opening to be -- and of all the parties to be

25    focused on the evidence.

O5f3men2

```
1              Sir, I am going to strike, with my apologies to
2     Dr. King and General Powell, I think that's right.  I'll strike
3     General Powell as well.  Number 6.
4              MR. WEITZMAN:  May I ask a question.  May I express
5     the quote without attribution?
6              THE COURT:  How are you going to do it?
7              MR. WEITZMAN:  I'll say a famous person once said we
8     are not makers of history, we are made by history.
9              THE COURT:  I'll allow that.
10             Now, 6.  Again, I'm not going to go back to the
11    earliest Congress.  Strike the first bullet point there.
12             7.  The government is right, this is an incorrect
13    statement of the law to the extent I can understand it.
14    Official acts do not have to be taken.  It can be a promise of
15    an official act.  But you've checked that box.  I'm striking
16    number 7.
17             I've already dealt with General Powell.
18             All of these, by the way, are 403 grounds or
19    irrelevance grounds.
20             I think number 9 is misleading.  I don't understand
21    it.  You certainly can talk about the three parts of
22    government.  That is, if you wish to include the judiciary.
23    But to the equate the undersecretary of the USDA and Senator
24    Menendez, I think is misleading.  I'm going to strike 9.
25             MR. WEITZMAN:  Your Honor.
```

O5f3men2

1            THE COURT:  You can make the separation of powers

2      argument, of course.

3            MR. WEITZMAN:  Your Honor, I'm not trying to mislead.

4      I was going to say they're members of different branch of

5      government.

6            THE COURT:  Fine.  Then you don't need the slide.

7            MR. WEITZMAN:  These are visuals.  I understand, your

8      Honor.  That's fine.

9            THE COURT:  What is 10?

10           MR. WEITZMAN:  Your Honor.

11           THE COURT:  You have 42 slides I understand.  I've

12     never seen an opening with more than six or seven.  There is no

13     rule against 42, but how does that come about?

14           MR. WEITZMAN:  Number 10 is a letter that the senator

15     signed to Attorney General Holder.  We expect the government

16     will argue that it is impermissible or improper for a senator

17     to reach out to an attorney general, and we want to -- and I

18     think your Honor ruled in connection with the motions in limine

19     that we're entitled to show the senator's consistent practices

20     in the past, and this is such a letter.

21           MR. RICHENTHAL:  We would never argue and will not

22     argue it is improper for a senator to reach out to any member

23     of the executive branch.  Context and facts matter.  This is a

24     letter from 2010 on an unrelated subject.  It is designed, in

25     our judgment, to engender sympathy.  But whatever its purpose,

O5f3men2

1    it is not relevant to in case.

2            THE COURT:  I must say I did not understand its

3    relevance.  The government's not going to argue, so it's not in

4    issue, so 10 is out.

5            Senate Resolution 390, number 11, isn't that a waiver,

6    to the extent you're talking about a particular resolution on

7    the floor of the Senate?  Isn't that a legislative act that's

8    the core of speech and debate?

9            MR. WEITZMAN:  Your Honor, I apologize if I didn't

10    understand your Honor's prior ruling on speech and debate.  It

11    did not address the Qatar evidence.  If your Honor is --

12            THE COURT:  I'm sorry.  But it did say what are

13    legislative acts.  And the core of legislative acts are things

14    on the floor of the Senate and committee hearings and so forth.

15    There's a core to the speech and debate protection, and

16    certainly, a senate resolution is core speech and debate.  You

17    can introduce this.  But it seems to me it is a waiver.

18            MR. WEITZMAN:  It is not a waiver, because we have to

19    rebut the government's allegation, and the rebuttal is he

20    wasn't involved in it.  So it is not the senator's speech or

21    debate here.  We're saying he wasn't involved in this

22    resolution.  He didn't --

23            THE COURT:  What is a voice vote?  Help me.  What is a

24    voice vote?  I assume a voice vote is everybody agrees.  The

25    president of the Senate or however it goes.

O5f3men2

1           MR. WEITZMAN:  When you listen to the voice vote,

2     there is only one voice actually noted.  It is not the

3     senator's.

4           THE COURT:  No.  What does that one voice say?  I

5     presume, but you'll have to tell me, something like unanimous

6     consent.

7           MR. WEITZMAN:  It's just an aye and they ask for nays

8     I believe and no one speaks up.

9           THE COURT:  Isn't that -- well, let me hear.

10          MR. WEITZMAN:  It is the absence of his involvement.

11    We can't --

12          THE COURT:  It seems to me that his vote and again --

13          MR. WEITZMAN:  There is no vote.

14          THE COURT:  His not naying is affirmative

15    participation in a voice vote is a legislative act.  Correct me

16    if I'm wrong.

17          MR. WEITZMAN:  Well, your Honor, they've charged him

18    with somehow passing, expediting, doing something with Senate

19    Resolution 390.  I have to be --

20          THE COURT:  Let's hear what they're going to do.

21          MR. WEITZMAN:  If I can just make one point.  I have

22    to be able to rebut their evidence by saying no, he wasn't

23    involved in Senate Resolution 390, without that being a waiver

24    of speech and debate.  Senate Resolution 390 is a public

25    record.

O5f3men2

```
1              THE COURT:  I hear what you are saying.  Let me hear

2     the other side.  I understand.  You're saying they're going to

3     say he was involved in 390.

4              MR. WEITZMAN:  Correct.

5              THE COURT:  You need to say no, he wasn't.

6     Government?

7              MR. RICHENTHAL:  So let me make two points which are

8     related but distinct.  First, until the defense sought to do

9     this, we were not going to present evidence that Mr. Menendez

10    helped pass this resolution, precisely because we understood

11    that that conduct was protected.

12             THE COURT:  Isn't that the end of this issue?

13    Mr. Weitzman, they're not going to present evidence he was

14    involved in 390.

15             MR. WEITZMAN:  Your Honor, they have two exhibits on

16    their summary chart.

17             THE COURT:  You know, there are so many exhibits that

18    were floating around here, and the parties were telling me

19    there were so many they couldn't respond and so forth.  I tend

20    to think that there are many, many exhibits that aren't going

21    to be used by the government here.  To the extent the

22    government knows there are marked exhibits that are not going

23    to be used, they should tell the defense.

24             But now respond.

25             MR. WEITZMAN:  If I can just say one thing.  If the
```

O5f3men2

```
1    government's position is that they're not going to reference
2    Senate Resolution 390 in their opening, I will happily ignore
3    this.  But I think they will reference Senate Resolution 390,
4    in which case that forces me to respond without a waiver.
5              MR. RICHENTHAL:  We're talking about two different
6    things.
7              THE COURT:  Wait.  Just let me think.
8              All right.  Go ahead, sir.
9              MR. RICHENTHAL:  We're talking about two different
10   things and I want to take a minute if I can to explain our view
11   of the two different things, okay.
12             First is the relevance to the existence which is
13   public, as Mr. Weitzman just said, of the resolution.  Yes.
14   And we did intend and do intend to introduce that evidence.
15   Why?  Because Mr. Daibes, as alleged in the indictment, and
16   explained in the indictment, at the time he offered and
17   provided things of value to Mr. Menendez, expected and
18   understood that Mr. Menendez would take action in return to
19   assist or benefit the government of Qatar and therefore
20   Mr. Daibes.  That's Mr. Daibes' mental state as alleged.
21             We've also alleged that at the time Mr. Menendez
22   accepted those things, or agreed to accept those things, he
23   contemporaneously understood that was Mr. Daibes'
24   understanding.  That is multiple federal crimes.  That requires
25   us to demonstrate, among other things, what the understanding
```

O5f3men2

1    was about, which here included the resolution.

2            It does not require us to demonstrate, and we've

3    stayed far away from this moment from seeking to demonstrate

4    that in fact Mr. Menendez did anything on the resolution.  It

5    existed.  Mr. Daibes knew about it.  We did not intend to

6    demonstrate Mr. Menendez took any action on it, because we

7    understood that to be protected.  The back and forth that

8    Mr. Weitzman --

9            THE COURT:  To the extent he took action on it, that

10   clearly is core speech and debate.

11           MR. RICHENTHAL:  We agree.  The back and forth your

12   Honor was having with Mr. Weitzman proves in our view why this

13   would affect a waiver, and let me explain.  It is correct one

14   could in theory present to the jury the mere fact that the

15   resolution passed in this case, passed by voice vote, but that

16   would be incredibly misleading.  Because it would suggest,

17   indeed Mr. Weitzman appears to want to suggest affirmatively,

18   that Mr. Menendez had no involvement in that.  That's false.  I

19   can't present that to the jury until they waive, but I'm

20   telling you it is false.  Mr. Menendez reported this resolution

21   out of committee.  That is, as we understand it, a legislative

22   act.

23           THE COURT:  That's in the opinion, yes.

24           MR. RICHENTHAL:  Yes.

25           THE COURT:  Let's just get some basics here.

O5f3men2

```
1    Committee actions are core speech and debate.  Go ahead.

2              MR. RICHENTHAL:  Correct.  That's why we did not,

3    until we saw these slides last night, intend in any way for the

4    jury to know what I've just told the Court.  That Mr. Menendez

5    in his official capacity as a senator reported this resolution

6    out of committee.

7              If the defense wants to present the fact that when it

8    passed the Senate as a whole it did so by voice vote, in aid of

9    an affirmative argument that Mr. Menendez purportedly had no

10   involvement in it, we are entitled under the law to present the

11   context for that resolution.  And the context is, he I

12   absolutely had involvement.  The defense can't choose

13   50 percent of the story and present --

14             THE COURT:  Let me see, I understand.  Let me see if I

15   can help the parties here.  You say his vote in committee was

16   to move the bill out of committee.

17             MR. RICHENTHAL:  He reported it out of committee.  I

18   don't recall standing here right now whether that was a vote or

19   simply an action to move it through committee.

20             THE COURT:  Either way, it would be core speech and

21   debate.  Reporting it out of committee.  There is case law on

22   that as speech and debate.  So Mr. Weitzman, as I understand

23   the debate now, if the position of the defense is that

24   Mr. Menendez had nothing to do with Senate Resolution 390,

25   obviously this isn't a game, and if the facts are that indeed
```

1    he did, specifically, he reported it out of committee, which I

2    take it the Senate Foreign Relations was the committee?

3            MR. RICHENTHAL:  Yes, your Honor.

4            THE COURT:  Then clearly he has some involvement with

5    it.  So, let's see what your position is.  And if you are going

6    to say he had nothing do with it, and the truth is -- and this

7    is a search for the truth -- that he did have something to do

8    with it, and it seems to me to the extent I understand the

9    legislative process, reporting it out of committee is an

10   important step.  I certainly know in terms of judges being

11   nominated and confirmed, being reported out of the Senate

12   Judiciary Committee is an important step.  Then I would not let

13   the government -- not let the defense argue he had nothing to

14   do with it and that would constitute a waiver, insofar as

15   Senate Resolution 390 is concerned.  Not insofar as all of

16   Qatar is concerned.

17           Sir.

18           MR. WEITZMAN:  Your Honor, I think the words are clear

19   on the page, and that's what I am going to stick to, which is

20   he did not sponsor or co-sponsor the bill.  It was sponsored by

21   Lindsey Graham.

22           THE COURT:  Let me read it again.  Go ahead.

23           MR. WEITZMAN:  It was passed by a voice vote.  That's

24   the argument.  We're not broadening it.  I think it is the

25   truth.  It is what is reflected in the very exhibits that the

O5f3men2

1   government intents to offer.

2           THE COURT:  The inference you're asking the jury to

3   draw from that is that he had nothing to do with 390, he was

4   not -- he was not a co-sponsor, it was passed by voice vote.

5   The inference, that's clearly what you're asking them to do.

6   As a matter of fact, when you started this a few moments ago,

7   you said he had nothing do with it.

8           MR. WEITZMAN:  Your Honor, the inference that the

9   government leaves is deeply misleading.  They're suggesting

10  that when Fred Daibes sends Senator Menendez a senate

11  resolution --

12          THE COURT:  No, that's separate.  I don't know whether

13  they're going to have decent evidence there.  I don't know what

14  inferences are supportable there.  But that's not what we're

15  talking about now.

16          What we're talking about now is to the extent you're

17  asking the jury to infer that Menendez had nothing to do with

18  390, I can't allow that inference to stand without allowing the

19  government to respond to it.  And that, by virtue of that

20  argument, that would be a waiver, because we're talking about a

21  legislative act.

22          MR. WEITZMAN:  Your Honor I'm not asking the jury to

23  draw that inference.  I'm just --

24          THE COURT:  What inference do you want the jury -- you

25  began, I thought, sir, maybe the hand gesture was mine, I don't

O5f3men2

```
 1    know.  Sort of a washing of hands.  You began by saying -- I
 2    thought you said he had nothing to do with it.
 3               MR. WEITZMAN:  It was reported out of committee.  That
 4    is a ministerial event.  It is not a vote.  I don't know
 5    whether the senator even touched that in order for it to be
 6    reported out of committee.
 7               THE COURT:  I'm saying now, reporting out of committee
 8    is a core speech and debate act.
 9               MR. WEITZMAN:  I agree with that, your Honor.  I just
10    don't know it was the senator's speech and debate.  I don't
11    know the mechanics of how that happens.
12               THE COURT:  I don't know either.  But the
13    representation was that he reported it out of committee.  He is
14    the chair.
15               MR. WEITZMAN:  Yes, your Honor.  And there is a
16    process for reporting and it starts with staff.
17               THE COURT:  You can fill me in on specifics.  I don't
18    know it now.
19               MR. WEITZMAN:  The point is I'm not going to talk
20    about that.  I am going to repeat the very facts that are on
21    the face of the government's evidence, which is the text
22    message that includes the bill.  They want to put in the bill
23    and its resolution and the fact that it's passed into evidence,
24    and hamstring us from even identifying, reading the facts that
25    are on the bill, which is who are the sponsors and who are the
```

O5f3men2

1    co-sponsors.  All of a sudden that leaves a misimpression as to

2    the evidence?  I don't understand how.  It is their evidence.

3              MR. RICHENTHAL:  I'm sorry.  I'll say it again.  Until

4    last night, we had no intention, in any way, of introducing the

5    fact of the passage of the bill in any form.

6              THE COURT:  Stop.  Mr. Weitzman, I think you're

7    operating on a predicate or an assumption that the government

8    isn't following through on.  They say, they're moving away from

9    390.  They weren't going to introduce any -- what, if anything,

10   were you going to introduce about 390?

11             MR. RICHENTHAL:  That Mr. Daibes was aware that it was

12   pending, that Mr. Daibes forwarded to Mr. Menendez information

13   about the resolution, ergo that it was pending, that he did so

14   at a time and in a manner suggesting, in our view, and the jury

15   can disagree, that that was why he was giving Mr. Menendez

16   gifts, alleged gifts.

17             THE COURT:  What are you going to introduce about the

18   substance of 390?

19             MR. RICHENTHAL:  That the resolution was pending, that

20   Mr. Daibes knew it, that Mr. Daibes passed information about it

21   to Mr. Menendez.

22             THE COURT:  Without saying what its substance was?

23             MR. RICHENTHAL:  I believe it has a title, so there is

24   sort of general substance.  We weren't going to introduce the

25   resolution itself, which had not yet been enacted, nor were we

O5f3men2

1    going to introduce the fact it was enacted at all.  The

2    indictment lays out the back and forth and the timing on this.

3    We were going to track the indictment, which does not require

4    us, and we were not going to, put in the actual passage, how it

5    passed, who passed it.

6            THE COURT:  Or the content.

7            MR. RICHENTHAL:  It has a title, so I don't want to

8    suggest there is nothing the jury could infer.

9            THE COURT:  What's the title?

10           MR. RICHENTHAL:  Thanking the government of Qatar.  I

11   don't have it in front of me.

12           THE COURT:  See if you can --

13           MR. RICHENTHAL:  And the text messages themselves

14   with, when I talked about contemporaneous correspondence,

15   references the title.  We'll try to pull the actual title right

16   now.

17           THE COURT:  It's 20 to 2.  I'm going to strike, right

18   now.  The evidence, we'll deal with it -- actually, I'd like

19   some heads up before we have this fight on the evidence.  To

20   the extent I can give you guidance.  It sounds like the

21   government is not going to talk about the substance of 390, nor

22   the fact that Menendez, as chair of the Senate Foreign

23   Relations Committee, reported it out.  But if that comes out,

24   it seems to me that's a waiver of speech and debate protection

25   in terms of 390.  So the defense should tread lightly on it.

O5f3men2

1    MR. RICHENTHAL:  I have the title right now if the

2    Court would like me to read the title.  I'm quoting from

3    Congress.gov.  This is not actually our exhibit, just so the

4    Court is aware of the title.

5         "A resolution expressing appreciation for the state of

6    Qatar's efforts to assist the United States during Operation

7    Allies Refuge."  And that title is what Mr. Daibes texted to

8    Mr. Menendez at the contemporaneous time.

9         THE COURT:  You're not concerned about the actual

10   substance of it.

11        MR. WEITZMAN:  We are, your Honor.  We are concerned,

12   and that's not speech and debate waiver.  It is a fact that the

13   resolution was passed.  It is a fact as to who the sponsors

14   are.  And we can't be hamstrung -- forget the opening -- but at

15   this trial they need to know what this resolution is that the

16   government claims constituted a bribe between Fred Daibes and

17   Senator Menendez.  To just introduce the title and say we're

18   not allowed to talk about it without waiving speech and debate

19   is a bit unfair.

20        THE COURT:  Now you're talking about something else.

21   Because before you were -- I thought you were trying to

22   establish Menendez had nothing to do with this.  Now your point

23   is different.  Now your point is you want the jury to hear what

24   the resolution was.  Is that correct?

25        MR. WEITZMAN:  And who the sponsors were and who the

O5f3men2

1     co-sponsors were, yes.  That's exactly what my slide is.

2              THE COURT:  For what purpose?  If the purpose is to

3     say Menendez had nothing to do with it, that is an inference

4     that the jury should not hear, if that's not the reality.

5              MR. WEITZMAN:  And the misimpression that's left with

6     the jury is that Fred Daibes forwards this to Senator Menendez

7     and something happens as a result.  We need to express he

8     didn't join as a sponsor or a co-sponsor.

9              MR. RICHENTHAL:  Because of the Constitution, we're

10    not going to argue that Mr. Menendez did anything, unless the

11    defense suggests to the jury he did nothing, in which case we

12    have to say, no, he did act.

13             Again, they can't have it both ways.  I think it is

14    page 94, line 16, I know lawyers sometimes say things, but

15    Mr. Weitzman said, I'm quoting, "We're saying he wasn't

16    involved in this resolution."  That's not factually correct.

17             THE COURT:  I'm with you on that.  To the extent the

18    defense is going to argue he had nothing to do with the

19    resolution, in light of the representation that's been made to

20    me, that he as the chair reported it out of committee, I can't

21    allow the jury to be left with that inference.

22             That's as far as I am going to take it right now.

23    Everyone should go to lunch.  I do want a heads up before this

24    comes up as to where the parties are so I can adjudicate it

25    appropriately.

O5f3men2

1              What's the very last thing, Secretary Blinken.

2              MR. RICHENTHAL:  Slide 12, the last slide.

3              THE COURT:  What's the purpose of slide 12?

4              MR. WEITZMAN:  Yes, your Honor the non-speech and

5    debate part of the Qatar allegations involve public statements

6    that the senator made and press releases made.  All I plan to

7    do is say that everybody and their mother was falling all over

8    themselves to thank Qatar, including Secretary Blinken and

9    Secretary Austin.  Which was true.  This would not have been

10   some motive for Qatar or anybody else to provide a bribe to --

11             THE COURT:  Fine.  Say it.  I'm going to strike the

12   slide.  You don't need the slide to say it.  You can say

13   everybody was falling all over themselves.

14             All right.  I did ask the jury to come back, I hate to

15   keep them waiting.  Be here at 20 after.  Can you make lunch in

16   that short period of time?

17             MS. POMERANTZ:  Your Honor, do you anticipate that

18   we'll be proceeding with the first witness?

19             THE COURT:  Well, let's talk about that.  I doubt it.

20   I have my notes from a few days ago.  Things may be different

21   now.  And my notes are Ms. Pomerantz 45 minutes, call that

22   3 p.m.  Mr. Weitzman one hour.  Call that 4 p.m.  Mr. Lustberg.

23             MS. POMERANTZ:  I apologize.  If we're coming back

24   here at 2:20, I think I'll be a little after 3 o'clock.

25             THE COURT:  I don't think we're going to hit the first

O5f3men2

1    witness today.  I really don't, based on these numbers.

2              MS. POMERANTZ:  That's helpful for our planning.

3              THE COURT:  And lawyers never overstate the time that

4    they're going to take.  2:20.  Thank you.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

2:20 p.m.

THE COURT:  We'll see if all of the jurors are here.
Ms. Pomerantz, is your estimate still 45 minutes?

MS. POMERANTZ:  Yes, your Honor.

THE COURT:  Thank you.  My deputy is lining the jurors
up.

(Jury present)

THE COURT:  All right, ladies and gentlemen, the next
stage of the trial is the opening statements of the lawyers.
As I told you, the order of opening statements is set by law.
The government will go first, and then each of the defendants.
And remember, unless I missed my mark, what each of the party's
representative will tell you is what they believe the evidence
shows and the conclusions they believe you should reach on
basis of that evidence, but you decide what the evidence is.
Anything they say, just as anything I say, throughout this
trial, by the way, is not evidence.  Anything the lawyers say,
anything I say is not evidence.

First opening on behalf of the government will be
given by Ms. Pomerantz.  Ms. Pomerantz.

MS. POMERANTZ:  In the United States of America,
leaders are expected to put the country first.  To put the
interests of the people they serve above their own.  Public
servants are expected to serve the public.

1          This case is about a public official who put greed

2     first.  A public official who put his own interests above his

3     duty to the people.  Who put his power up for sale.

4          This is Robert Menendez.  He is a United States

5     senator from New Jersey, and he was entrusted with making big

6     decisions, including decisions that affect this country's

7     national security.  He was powerful.  He was also corrupt.  For

8     years, Robert Menendez betrayed the people he was supposed to

9     serve by taking bribes.

10          And what was his price?  Gold bars.  Envelopes stuffed

11     with cash.  Checks for a bogus job for his wife.  A

12     Mercedes-Benz convertible.

13          And who paid those bribes?  This is Wael Hana.  He is

14     a New Jersey businessman, originally from Egypt.  Hana provided

15     some of those gold bars.  He was also responsible for those

16     checks, and he promised to get Menendez's wife a car.

17          The gold, the money, the car.  They were all bribes.

18          But that's not all of the bribes Menendez took.  Who

19     also paid bribes?  That man, Fred Daibes.  Daibes is a wealthy

20     New Jersey real estate developer and Hana's business associate.

21     He was friendly with Menendez and his wife.  Daibes bribed

22     Menendez and his wife with even more gold bars, and tens of

23     thousands of dollars in cash stuffed in envelopes.

24          And what happened to the gold and the cash?  The FBI

25     found gold bars and over $400,000 in cash in Menendez's home.

1    In a safe.  In jacket pockets.  In shoes.  All over the house.

2            What did Menendez promise to do in exchange for the

3    gold, the cash, the checks, and the car?  He made three types

4    of corrupt promises.  First, Menendez promised to do things to

5    benefit Hana and the government of Egypt.  Menendez promised

6    that he would put some of his decisions on U.S. foreign policy

7    up for sale in exchange for bars of gold and checks to his

8    wife.  He promised to approve billions of dollars in military

9    aid to Egypt.  He also helped give Egyptian officials an inside

10   track in Washington.  He gave them sensitive, non-public U.S.

11   government information.

12           Second, in exchange for a Mercedes convertible,

13   Menendez promised to try to disrupt a state criminal case

14   targeting two people Hana knew.  He promised to corrupt the

15   criminal justice system for a luxury car.

16           And third, Menendez promised to try to influence a

17   federal criminal case against Daibes.  Menendez again promised

18   to corrupt the criminal justice system.  What was his price

19   this time?  Cash and gold bars.

20           This was not politics as usual.  This was politics for

21   profit.  Robert Menendez was a United States senator on the

22   take, motivated by greed, focused on how much money he could

23   put in his own pocket, and in his wife's pocket.

24           That is why we are here today.  That is what this

25   trial is all about.

1          This opening statement is the government's opportunity

2      to give you a roadmap of the evidence that you are going to see

3      and hear in this case, and I'm going to do that in three parts.

4      First, I'm going to tell you what the evidence is going to

5      show.  Second, I'm going to give you a brief description of the

6      charges in this case.  And third, I'm going to talk about the

7      different types of evidence that will prove beyond a reasonable

8      doubt that the defendants are guilty.

9          So what will the evidence show?  The bribery scheme

10     had three main goals.  They all involved Robert Menendez

11     selling his influence and power as a U.S. senator to Wael Hana

12     and Fred Daibes, and they also involved Menendez using his wife

13     as a go-between.  She communicated with the bribe payers, she

14     passed messages to Menendez, and she collected some of the

15     bribes.  All in exchange for Menendez's promises to use his

16     power as a senator.

17         So let's take each part of the scheme one at a time.

18     The scheme started with the plan for Menendez to corruptly

19     assist Hana and the government of Egypt.  This part of the

20     scheme involved all three defendants, and it involved Menendez

21     repeatedly selling his influence and power over U.S. foreign

22     policy in exchange for gold bars and checks.  He did it for the

23     benefit of the government of Egypt, which was hungry for U.S.

24     military aid.  And he did it for Hana's benefit, too.

25         So how did it all begin?  The scheme started in early

O5f3men2                      Opening - Ms. Pomerantz

1    2018 when Robert Menendez was a leader of the Senate Foreign

2    Relations Committee.  That's a committee of senators that has

3    tremendous influence over U.S. foreign policy.  And as one of

4    the leaders of that committee, Menendez was powerful.  He was

5    so powerful that he could hold up billions of dollars of U.S.

6    military aid to Egypt.

7            At the same time that he led that powerful committee,

8    Menendez started dating Nadine Arslanian.  Nadine later married

9    Menendez, and took his last name.  When Menendez and Nadine

10   started dating, Hana and Nadine had already been friends for

11   years.  And when Hana learned Nadine was dating a senator, he

12   saw an opportunity.  You see, Hana was a failed businessman,

13   but he had connections to the government of Egypt.  And Hana

14   believed that if he could get Menendez to help Egypt, then

15   Egypt would reward Hana.  So Hana promised to pay Menendez and

16   Nadine.  In exchange, Menendez promised to use his power to

17   help Egypt.  And that deal, bribes from Menendez's promises to

18   help Egypt, lasted for years.

19           So let's start by talking about what Menendez did.

20   Between 2018 and 2022, Menendez met again and again with

21   Egyptian officials.  But these were not normal meetings

22   arranged and attended by Senate staff.  These were meetings

23   arranged by Nadine and her friend Hana.  At these meetings,

24   over the years, Egyptian officials asked Menendez to use his

25   power to help Egypt in several ways.  Let's talk about just

1    three examples of how Menendez helped Egypt.

2            First, Menendez used sensitive, non-public information

3    about the U.S. embassy in Egypt to Egyptian officials.

4    Sensitive information the Egyptians had no business knowing.

5    How did he do it?  He sent it to Egyptian officials through

6    Nadine and Hana.

7            Second, Menendez secretly wrote a letter from Egypt

8    meant to respond to his fellow senators' concerns about Egypt's

9    human rights record.  Concerns that led senators to freeze

10   $300 million in U.S. aid to Egypt.  That's right.  A United

11   States senator secretly helped a foreign country draft a letter

12   to persuade other U.S. senators who were concerned about human

13   rights abuses.

14           Third, Menendez promised to green light or give the go

15   ahead on U.S. military aid, including weapons and U.S. taxpayer

16   money to Egypt.  For example, the day after meeting with

17   Egyptian military officials, Menendez texted Nadine to tell

18   Hana that he was going to sign off on or approve the sale of

19   almost a hundred million dollars of tank ammunition to Egypt.

20   Menendez used his girlfriend to secretly promise Egypt that he

21   would approve their military aid.

22           These are only some of the ways Menendez promised to

23   help Egypt.

24           What did he get in exchange?  Bribes from Hana.  But

25   Menendez had to find a way to get that money without setting

O5f3men2                          Opening - Ms. Pomerantz

1    off alarm bells.  Hana couldn't just write checks to Menendez.

2    That would be too obvious.  So Hana promised to give Nadine a

3    sham job at his company as a consultant, but she didn't have

4    any relevant business experience, and she wasn't being hired to

5    do any real work.  The promises of a job were just promises of

6    a bribe.

7          But there was a problem.  After months of Menendez

8    promising to help Egypt, Hana wasn't coming through with his

9    promises of payments to Nadine.  He was a failed businessman

10   without a lot of money to be paying the bribes he promised.

11         And then, Hana's business problems were solved.  After

12   months and months of helping the government of Egypt influence

13   Menendez, Hana got a business monopoly.  The government of

14   Egypt dropped a lucrative monopoly into Hana's lap.  Overnight,

15   Hana's brand-new company became the only one that could approve

16   shipments of beef from the United States to Egypt.  Hana didn't

17   actually have any experience in this business.  Zero.  But

18   you'll learn that what he did have were connections in the

19   Egyptian government and a U.S. senator in his pocket promising

20   military aid.

21         The Egyptian government took business away from

22   multiple U.S. companies and gave it all to Hana.  This was

23   great for Hana.  He now could finally deliver on those promises

24   of a bogus paycheck to Nadine.  But while Hana's monopoly was

25   great for him, and was going to be great for Robert Menendez

O5f3men2                       Opening - Ms. Pomerantz

1   and Nadine, some people were not happy about it.

2          Not long after Egypt gave Hana the monopoly, officials

3   from the United States Department of Agriculture, or the USDA,

4   which is the federal agency that oversees the export of beef,

5   contacted the government of Egypt.  And they objected, this was

6   bad for U.S. companies.  Bad for U.S. business.  They tried to

7   get Egypt to reconsider.  Hana learned about the USDA trying to

8   get in his way.  And so, who did Hana run to for help?

9   Menendez.  The evidence will show that Menendez knew the

10  monopoly by putting money in Hana's pocket was going to be a

11  payday for Menendez, too.

12         So Menendez stepped in and told the USDA to stand

13  down.  He called a high-level official at the USDA and told him

14  that the USDA better stop opposing the monopoly.  When that

15  USDA official tried to tell Menendez why the monopoly was

16  hurting American interests, Menendez just told the USDA to

17  stop.  And even though the USDA official did not give in to

18  Menendez's demands, Hana's company kept its monopoly.

19         And in the meantime, Menendez and Nadine got to work

20  making sure they could get the bribes from Hana.  Menendez

21  helped Nadine create a shell company called Strategic

22  International Business Consultants.  But don't let that the

23  name fool you.  It wasn't strategic, it hadn't done any

24  international business, it didn't have any consultants.  Just

25  Nadine, who had nothing but her connection to Menendez.

O5f3men2                          Opening - Ms. Pomerantz

1          You'll learn that this wasn't a consulting company.

2     It was a bribe collection company.

3          But even with that company set up, Hana didn't pay

4     right away.  He stiffed Nadine, and Nadine got mad.  Menendez

5     had done what Hana wanted, and now Hana had to pay up.  So

6     Nadine complained and she demanded to get paid.  She asked for

7     Hana's company to pay off her late mortgage payments on her

8     house.  But even after agreeing that he would, Hana was still

9     dragging his feet.

10         So who did Nadine go to?  Fred Daibes.  Daibes had

11    money.  He was close with Hana, and he was friendly with

12    Menendez.  Nadine told Daibes that Menendez wanted to know if

13    Hana made the mortgage payment.  And what happened?  Hana made

14    the payment right away.  But Daibes didn't stop there.  Again

15    and again, he made sure that Hana paid the bribes.  Daibes even

16    physically handed one of those bribes to Menendez himself.  A

17    check from Hana delivered by Daibes.

18         Why did Daibes get involved?  Money.  Hana invested

19    some of his monopoly profits into business deals with Daibes.

20    So when Hana made money, Daibes made money, too.  They both got

21    paid.  And so did Menendez, through sham paychecks to Nadine,

22    and eventually, gold from Hana.

23         The scheme filled Menendez's pockets, it filled his

24    wife's pockets, and it fed their greed.

25         Robert Menendez was willing to corruptly use his power

1    to help Hana and the government of Egypt in exchange for

2    bribes.  What the law calls quid pro quo.  This for that.  You

3    scratch my back, I'll scratch yours.

4          Sham paychecks and gold from Hana for Menendez's

5    promises of military aid to Egypt and for leaning on those in

6    the U.S. government who might try to stand in Hana's way.

7    That's the first part of the scheme.

8          Now I'm going to talk about the second part of the

9    scheme.  The part involving a state criminal case.  This part

10   involved Menendez and Hana.  At the same time that Hana was

11   bribing Menendez to help Egypt and his company, Hana was also

12   working with a New Jersey insurance broker named Jose Uribe to

13   give a $60,000 Mercedes convertible to Menendez and Nadine.

14   What was the Mercedes for?  Menendez's promise to disrupt a

15   criminal case that was being handled by the New Jersey Attorney

16   General's Office.

17         So here's what happened.  Uribe was an insurance

18   broker who had been friends with Hana for years.  Both Uribe

19   and Hana knew a trucker who was being prosecuted in New Jersey

20   state court for insurance fraud.  The prosecutors and

21   detectives from that case were also investigating one of

22   Uribe's employees, who Uribe considered to be like a daughter

23   to him.  Hana told the trucker and Uribe that he could make the

24   case go away in exchange for tens of thousands of dollars of

25   cash.  How?  Through Menendez.  And why did Menendez promise to

1    try to disrupt the criminal investigation?  Because Nadine

2    needed a car.  Menendez wanted to keep Nadine happy.  And Hana

3    promised to get Nadine the car she wanted.

4              And you'll learn she didn't want just any old car.

5    She wanted a brand-new Mercedes convertible.  And just like

6    that, once Hana promised the car, Menendez sprang into action.

7    He called the New Jersey Attorney General, the ultimate boss of

8    the prosecutors and detectives handling the case against the

9    trucker.  Menendez complained about the case, and asked the

10   attorney general to get personally involved.  It didn't work.

11   The trucker eventually pled guilty.

12             But the investigation into Uribe's employee kept

13   going, and Uribe wanted that investigation to go away.  So

14   after Hana brought Uribe into this part of the scheme, Uribe

15   met with Nadine directly, and they came to an agreement.  Uribe

16   agreed to buy Nadine a Mercedes convertible, the car she had

17   told Hana she wanted.  What was Uribe getting in return?

18   Menendez would try to make the investigation go away.

19             And so, Uribe made good on his word.  In the spring of

20   2019, he handed Nadine $15,000 in cash in a parking lot.

21   Nadine then used that cash for the down payment on a Mercedes

22   convertible.  She checked in with Menendez about the color

23   scheme, and after the purchase was complete, she texted

24   Menendez.  "Congratulations.  We" and that's the word she used

25   when texting Menendez.  "We are the proud owners of a 2019

O5f3men2                          Opening - Ms. Pomerantz

1    Mercedes."

2           But the $15,000 in cash was just the start.  Uribe

3    kept making the monthly payments for the Mercedes.  Nadine

4    didn't pay a dime.  Neither did Menendez.

5           So what happened to the New Jersey investigation?  In

6    the summer of 2019, a detective reached out to interview

7    Uribe's employee.  Uribe wanted Menendez to make the

8    investigation go away, so he went to Menendez directly.  And

9    Menendez held up his part of the deal.  He stepped in again.

10   He went out of his way to schedule a meeting with the New

11   Jersey Attorney General, the same attorney general he had

12   called before.  And for a second time, he complained and asked

13   the attorney general to get personally involved in the case.

14   It didn't work.  But Menendez told Uribe that the meeting went

15   well.  And so, Uribe kept making those monthly payments on the

16   Mercedes.  And a couple of months later, in the fall of 2019,

17   Menendez told Uribe that he had nothing to worry about.  The

18   investigation was done.  And so, Uribe held up his end of the

19   bargain.  He kept making those car payments for years.  Again,

20   quid pro quo.  This for that.  A Mercedes for Menendez's

21   corrupt promises to disrupt a state criminal case.

22          So that's the second part of the scheme.  Now, let's

23   talk about the third part involving Menendez and Daibes.

24          Not long after Menendez agreed to use his power to try

25   to interfere with the state criminal case I just told you

1    about, Menendez made the same type of promise.  But this time,

2    he promised to use his office to try to interfere with a

3    federal criminal prosecution of Daibes.  What did Menendez get

4    in exchange?  Cash and gold bars.

5          So let's take a step back.  In 2018, the United States

6    Attorney's Office for the District of New Jersey brought

7    criminal charges against Daibes, who was friends with Menendez.

8    The U.S. Attorney's Office for the District of New Jersey is

9    responsible for all of the federal prosecutions in the entire

10   State of New Jersey.  That office is led by the U.S. attorney

11   from that district.

12         U.S. attorneys are nominated by the president of the

13   United States, and senators have a lot of influence over who

14   the president nominates.  So when the previous U.S. attorney

15   for New Jersey announced that he was resigning in late 2020,

16   Menendez tried to use this influence as a senator to get a

17   particular candidate to be the new U.S. attorney.  A candidate

18   who he thought would make Daibes' criminal case go away.

19         When Menendez first interviewed this candidate,

20   Menendez, out of nowhere, brought up one specific case, and

21   only one case.  Fred Daibes' case.  Out of the hundreds of

22   cases the U.S. Attorney's Office was handling, Menendez only

23   brought up Daibes.  Menendez criticized the prosecution of

24   Daibes, and said that he hoped the candidate would look into

25   Daibes' case if the candidate became the U.S. attorney.

1          After that interview, the candidate told Menendez that

2    he might be recused from Daibes' case if he became the U.S.

3    attorney.  And being recused means that he would have no

4    involvement in the case.  How did Menendez respond to this

5    news?  Within hours, Menendez started searching for someone

6    else for the job who would have control over Daibes' case.  And

7    so, Menendez recommended a different person to be the U.S.

8    attorney in New Jersey.  But that person's nomination fell

9    through.

10          What happened next?  Well, one of Menendez's advisors

11   spoke to the original candidate.  After that conversation, the

12   advisor told Menendez that he thought the original candidate

13   could have control over the case after all.  That was exactly

14   what Menendez wanted.  A U.S. attorney who he could try to

15   influence to make the case against Daibes go away.

16          But things didn't go as planned.  After the candidate

17   became the U.S. attorney in December 2021, he was recused from

18   Daibes' case.  Menendez still wanted to disrupt the case,

19   though, and tried several times without success to get the U.S.

20   attorney to become involved.

21          Why was Menendez going out of his way to disrupt the

22   Daibes' prosecution?  You'll learn that it wasn't out of the

23   goodness of his heart.  He was being paid bribes by Daibes to

24   obstruct a criminal prosecution.  During this whole time, when

25   Menendez was trying to disrupt the prosecution, Daibes was

1    giving Menendez and his wife valuable things, like 1 kilogram

2    gold bars.  At that time, each gold bar was worth over $50,000.

3    Did Menendez know how much they were worth?  You bet.  Because

4    when Daibes started giving them the gold, again and again,

5    Menendez Googled the price of a kilogram of gold.

6            But Daibes delivered more than just gold bars.  He

7    also gave Menendez and his wife cash.  Tens of thousands of

8    dollars in cash in envelopes found in Menendez's home, with

9    Daibes' DNA and fingerprints on them.

10           But that's not the only reason why Daibes gave

11   Menendez bribes.  You see, Daibes' criminal case made it hard

12   for him to get investments for his business.  And he was hoping

13   for a multimillion dollar investment from a company connected

14   to another foreign government.  The government of another

15   Middle Eastern country, Qatar.  Menendez had power over U.S.

16   policy about Qatar, not just Egypt.  So Daibes bribed Menendez

17   for that, too.  Daibes suggested ways Menendez could help

18   Qatar, like by supporting a senate resolution praising Qatar.

19   And so Menendez took the gold and he took the cash, knowing

20   Daibes wanted him to take those actions.

21           Another quid pro quo.  This for that.

22           Cash and gold bars for Menendez's promises to try to

23   make a criminal case go away, and use his position as a senator

24   to get a Qatari investment in Daibes' business.  You scratch my

25   back, and I'll scratch yours.

1          So those are the three parts of this scheme.  But

2     that's not all that happened.  When the FBI started asking

3     questions about these bribes, Menendez and Nadine lied.  They

4     tried to cover up their crimes.  They claimed that Uribe's

5     payments on the Mercedes convertible were a loan.  That was a

6     lie.  They claimed that the payment from Hana to Nadine's

7     mortgage company was also a loan.  That was also a lie.  And

8     they tried to create a fake paper trail to make their lies look

9     real.  But those lies and the fake paper trail didn't work.

10    They still got caught.

11         That's what the evidence will show.  That Robert

12    Menendez took bribes in exchange for promises to use his

13    position.  That Wael Hana and Fred Daibes paid bribes for

14    Menendez's power and influence.  Menendez corrupted his office

15    and betrayed the trust placed in him by taking bribes from

16    these two men.

17         Now, helping out New Jersey residents was a part of

18    Menendez's job.  But there were some things he said he could

19    not do.  According to his own Senate website, Menendez couldn't

20    influence matters involving a private business, and he could

21    not get involved in criminal investigations or cases.  Period.

22    That's what he told the public.

23         But behind the scenes, Menendez was doing those things

24    for certain people.  The people who were bribing him and his

25    wife.

1          For their actions, the defendants are charged with

2     federal crimes.  All three defendants are charged with bribery

3     offenses.  Menendez is also charged with acting as an agent of

4     Egypt for doing the kinds of things I talked about earlier,

5     like giving Egypt sensitive information, and secretly

6     ghostwriting a letter for them.  Finally, Menendez and Daibes

7     are both charged with obstruction of justice.  Both of them for

8     conspiring, or agreeing, to disrupt the federal prosecution of

9     Daibes, and Menendez for trying to obstruct the investigation

10    into this bribery scheme by lying about some of the bribe

11    payments.

12         You'll hear more about these charges at the end of the

13    trial, when Judge Stein instructs you on the law, and his

14    instructions control.  But for now, there are just a few points

15    I want to highlight.

16         I expect Judge Stein will instruct you that for

17    bribery-related charges, what matters is whether a thing of

18    value is demanded, given, or received in exchange for a promise

19    to take what is known as official action.  The public official

20    does not have to take any action at all.  The promise alone is

21    enough.  Although, here, as I said, a lot more than that

22    happened.

23         Similarly, I expect that you'll be instructed that for

24    the obstruction charges, it is enough that a defendant try to

25    obstruct justice, not that he succeed.  And finally, on the

O5f3men2                    Opening - Ms. Pomerantz

1   foreign agent charges, I want to be clear that this case is not
2   about spying.  Instead, I expect you'll hear that it is illegal
3   for a public official to agree to take certain kinds of action
4   for a foreign government.  A public official cannot agree to
5   give certain kinds of help to a foreign government because he
6   is taking bribes or otherwise acting at that government's
7   direction.

8          You will learn more about these charges at the end of
9   the case, but these are some basic points to keep in mind as
10  you hear the evidence.

11         Now, how will we prove to you beyond a reasonable
12  doubt that the defendants are guilty of these crimes?  We're
13  going to prove it to you in several different ways, and I'm
14  going to highlight just a few right now.

15         First, you are going to see evidence of the bribes.
16  You're going to learn that FBI agents searched Robert and
17  Nadine Menendez's home after a judge issued a search warrant.
18  And what did they find?  Gold bars and over $400,000 in cash
19  stashed throughout their home, in a safe, envelopes, bags,
20  jacket pockets, and shoes.  You are going to see that gold and
21  cash.

22         But that's not all.  When the FBI found those
23  envelopes of cash, they sent them out to be tested in a lab.
24  And what did those lab tests show?  Multiple envelopes of cash
25  containing tens of thousands of dollars in total had Daibes'

1   fingerprints or DNA on them.  And there's more.  Each gold bar

2   that was found at the Menendez's house has a unique serial

3   number.  And through the serial numbers, you'll learn the FBI

4   was able to trace those gold bars back to Daibes and to Hana.

5         How else are we going to prove our case to you?

6   Through the defendants' and their co-conspirators' own words in

7   text messages and e-mails.  They will take you inside the

8   scheme, day by day, hour by hour, sometimes even minute by

9   minute.  You're going to see Nadine tell Menendez long before

10  it was public that Hana's company was going to get that

11  monopoly.  You're going to see Nadine text Menendez that Uribe

12  made arrangements for her to get that Mercedes.  And you're

13  going to see Daibes text Menendez a picture of a gold bar, just

14  like the ones found in his house.

15        Now, Menendez was careful when he was committing

16  crimes.  He was smart enough not to send too many texts.

17  Instead, he had Nadine do that for him.  And sometimes, as you

18  will see, he told her not to put things in writing.

19        He used Nadine as his go-between to deliver messages

20  to and from the people paying the bribes.  But you will also

21  see that she kept him updated.  For example, you will see

22  Nadine sending Menendez messages about working with Egyptian

23  officials.  You will see Nadine sending Menendez messages about

24  the New Jersey state investigation.  And you will see her

25  sending Menendez messages about the bribes they were getting

O5f3men2                    Opening - Ms. Pomerantz

1    out of this scheme.

2            The text messages will tell you what happened.  As you

3    read those messages, you'll see the scheme unfold.

4            You're also going to hear from a number of witnesses.

5    You're going to hear from the officials Menendez promised to

6    influence.  The USDA official, who Menendez called about the

7    monopoly.  The New Jersey Attorney General who Menendez spoke

8    to about the state criminal case.  And the U.S. Attorney for

9    the District of New Jersey, who Menendez spoke to about Daibes'

10   case.  They will each tell you what Menendez said to them.  And

11   as you listen to their testimony, remember that they didn't

12   know why Menendez was reaching out to them.  But you will.  It

13   was because Menendez was secretly being bribed by Hana and

14   Daibes.

15           You will also hear from Jose Uribe, the person who

16   gave Nadine $15,000 in cash so she could make a down payment on

17   the Mercedes.  The person who made monthly payments on that

18   Mercedes for years.  He will give you an inside look at one

19   part of the bribery scheme.  Uribe will explain how he paid

20   money in exchange for Menendez's promise to try to disrupt the

21   New Jersey investigation.  He will describe for you the

22   conversations he had with Hana, Menendez, and Nadine about

23   this.

24           Now, Uribe has pled guilty to serious crimes.  He pled

25   guilty to bribing Menendez, and he pled guilty to other crimes,

1  too.  You'll learn that he has entered into a cooperation

2  agreement with the government.  He will testify at this trial

3  in the hopes of getting a lower sentence.  But let me be clear.

4  We are not asking you to like Uribe, or approve of what he has

5  done.  But what you should do is pay close attention to his

6  testimony.  If you do that, you will see how his testimony

7  lines up with the other evidence, like the defendant's own text

8  messages, financial records, phone records, and the testimony

9  of other witnesses.

10          Taken together, all of this evidence will prove that,

11  for years, Robert Menendez abused his position to feed his own

12  greed and to keep his wife happy; that Menendez put his power

13  up for sale, and Hana and Daibes were more than happy to buy it

14  from him.

15          You're going to see a lot of evidence and hear from a

16  lot of witnesses in this case.  This evidence will come in

17  piece by piece, and it won't come in perfect chronological

18  order.  But by the end of this trial, when you've seen and

19  heard all of the evidence, you will see how it all fits

20  together.  You will see how it proves that Menendez put a price

21  on his power and then sold it to Hana and Daibes.  At the end

22  of this trial, we will speak to you again to summarize the

23  evidence.

24          But between now and then, we're going to ask you to do

25  three things.  First, pay close attention to the evidence.

O5f3men2                    Opening - Mr. Weitzman

1    Second, follow Judge Stein's instructions on the law.  And

2    third, use your common sense.  The same common sense you use

3    every day to make all sorts of decisions in your own lives.

4              If you do those three things, you will reach the only

5    verdict that is consistent with the evidence, the law, and your

6    common sense.  That Robert Menendez, Wael Hana, and Fred Daibes

7    are guilty.

8              THE COURT:  Thank you, Ms. Pomerantz.  That was the

9    opening statement on behalf of the government by Ms. Pomerantz.

10   You now will hear the opening statement by on behalf of

11   Mr. Menendez by Mr. Weitzman.

12             Mr. Weitzman.

13             MR. WEITZMAN:  Thank you, your Honor.  May I step up?

14             THE COURT:  Of course.

15             MR. WEITZMAN:  May I, your Honor?

16             THE COURT:  Yes, sir.

17             MR. WEITZMAN:  Ladies and gentlemen, our client,

18   Senator Robert Menendez, took no bribes.  He did not accept any

19   cash, or gold, or cars, in exchange for anything he did as a

20   United States senator.

21             He's an American patriot.  He has never, and is not, a

22   foreign agent for the government of Egypt.  He did not violate

23   the law.  Period.  And the United States Attorney's Office

24   allegations otherwise is wrong.  Dead wrong.  Far from a bribe

25   taker, Senator Menendez is a lifelong public servant.

O5f3men2                           Opening - Mr. Weitzman

1           On behalf of my partner Adam Fee and myself, we are

2     honored and privileged to represent him in this case.

3           Let me tell you some things about Senator Menendez

4     that you did not hear from the government.  Bob, as he's known

5     to his friends and family, has been a public servant for over

6     50 years.  He started off, even before he graduated from

7     college, running for office on the Union City Board of

8     Education.  He's held positions on the local, state, and

9     federal level.  After his stint on the Union City Board of

10    Education, he became the mayor of Union City.  He then ran for

11    office on a statewide seat, was seated in the state assembly

12    and the state senate.  And then, in 1993, 30 years ago, he won

13    a seat in the United States House of Representatives.  He was a

14    congressman until 2006, and then in 2006, he became a senator

15    and he has served in the Senate proudly for the past 18 years.

16          His childhood, however, was a different story.  He

17    grew up the son of Cuban refugees who fled a military

18    dictatorship in Cuba in the 1950s for a better life here in the

19    United States.  When they fled Cuba, his family lost

20    everything.  Their entire life savings.  They had to rebuild

21    from nothing.  He grew up just across the river in a tenement

22    in Union City, New Jersey.  His dad was a carpenter, his mother

23    was a seamstress.  He was the first person in his family to go

24    to college.  He went to public school all the way through, and

25    then he eventually made his way through law school.  Graduated

1    from Rutgers University Law School in 1979.

2              Now, after law school, he could have signed up with a

3    law firm, fancy law firm, and made a very nice paycheck.  But

4    he wasn't looking for a payday.  He was committed to doing good

5    for the people of New Jersey and for his community.  And that's

6    what he's been doing for 50 years.

7              Again, this was not the most lucrative path for him to

8    become a public servant, but it was the most rewarding one.

9    One that has led him improve the lives of so many in his

10   community, and in New Jersey.

11             THE COURT:  Mr. Weitzman, I take it what you're

12   telling the jury is what you believe the evidence will prove as

13   opposed to what you yourself believe.

14             MR. WEITZMAN:  Absolutely, your Honor.

15             THE COURT:  I'd like you to make that clear as you go

16   forward.

17             MR. WEITZMAN:  Thank you, I appreciate that.

18             The senator has been committed for the past 40 years

19   to helping the people of New Jersey, and the evidence will show

20   that on issues of health care, equity, anti-discrimination,

21   Senator Menendez has consistently fought for the people of New

22   Jersey, and this will be relevant in this case, because as the

23   prosecutor said, the actions that the senator took were actions

24   he took on behalf of his constituents.

25             I would be remiss if I didn't mention as well that

O5f3men2                          Opening - Mr. Weitzman

1    he's a proud father of two grown children, who have similar

2    values that he has of doing good.

3           Now, at various points in his life, as the evidence

4    will show, Senator Menendez could have cashed out.  He could

5    have retired as a senator.

6           MS. POMERANTZ:  Objection.

7           THE COURT:  Apparently that's what the evidence will

8    show.

9           MR. WEITZMAN:  He could have retired, became a

10   lobbyist or a consultant, and made a very good paycheck.

11   Raising his children on a public servant salary wasn't always

12   the easiest thing for him to do.  Bob didn't cash out.

13          THE COURT:  Sir, once again, ladies and gentlemen, the

14   credibility of these lawyers is not at issue here.  What this

15   lawyer is telling you, I believe, is what he thinks the

16   evidence will show.  So don't think that what he is saying is

17   he believes it.  Rather, one way or the other, for that

18   matter -- and that goes for all the lawyers.  What's important

19   here is what the evidence shows.

20          Continue to make that clear.

21          MR. WEITZMAN:  Yes, your Honor.  Thank you.

22          THE COURT:  And obviously, Mr. Weitzman is saying he's

23   making representations to you that he believes this is what the

24   evidence will show.  Go ahead.

25          MR. WEITZMAN:  Yes.  Thank you, your Honor.

O5f3men2                    Opening - Mr. Weitzman

1              You will see by the end of the case, after you

2     evaluate all of the evidence, that the government's allegations

3     that Senator Menendez sold his office and his loyalty to this

4     country are outrageously false.  The government will be unable

5     to meet its burden, a burden that is the highest in the land,

6     the burden of proof beyond a reasonable doubt that Senator

7     Menendez did anything in exchange for a bribe.  He did not ask

8     for bribes, he did not get any bribes.  Not from Mr. Hana, not

9     from Mr. Daibes, not from Jose Uribe who the government

10    referenced.  Not from anyone.

11             Mark my words:  There will be no witness who steps

12    into this courtroom and says that they ever discussed a bribe

13    with Senator Menendez, or that they ever gave a bribe to

14    Senator Menendez.  Not one witness.  There will be no document

15    you will see, not one e-mail, not one text message, in which

16    Senator Menendez discusses a bribe, accepts a bribe, or asks

17    for a bribe.  Not one message.

18             The evidence will show that the government has been

19    investigating this case for years.  They obtained search

20    warrant after search warrant on every phone, iCloud account,

21    home, business.

22             MS. POMERANTZ:  Objection, your Honor.

23             THE COURT:  Sustained.  The actions of the government

24    are not at issue here.  Proceed.

25             MR. WEITZMAN:  And yet despite those search warrants,

1    there won't be a single piece of tangible evidence that shows

2    that the senator accepted, requested a bribe.  Not one piece.

3           Instead by the end of this case, you will see that

4    each and every action he took was consistent with his duties as

5    a senator.

6           In short, the evidence will show Bob was doing his job

7    and he was doing it right.  When he met with Egyptians and

8    Qataris, he was fulfilling his important role engaging in

9    diplomacy on behalf of the United States.  When he called

10   federal and state officials to raise complaints of

11   discrimination or unfair treatment, he was fulfilling his

12   important role of advocating on behalf of constituents.  You'd

13   want your representative to act in the exact same way, and he

14   did these things, not for bribes, but because that's what

15   dedicated public servants do.  When they learn of possible

16   discrimination or government overreach, or government abuse,

17   dedicated public servants reach out to those who are committing

18   those abuses or accused of them.

19          By the end of this case, ladies and gentlemen, you

20   will see that the prosecutor's entire case rests on little more

21   than speculation and guesswork.  Not actual evidence of bribes

22   to Senator Menendez.

23          Now of course there is an elephant in the room.  A

24   green and gold elephant.  The prosecutor referenced cash and

25   gold and cars over 50 times by my count.  Why?  Because I

1    submit the prosecutors want you to jump to the conclusion that

2    those are the bribes.

3           MS. POMERANTZ:  Objection.

4           THE COURT:  I'll allow that, proceed.

5           MR. WEITZMAN:  And to convict based on that evidence.

6    Who has gold bars in their home?  Who has so much cash in their

7    home?  Smells a bit fishy, you might be thinking to yourself.

8    I'll acknowledge, I'll acknowledge it's reasonable when you

9    just hear those words to think it smells a bit weird.  Resist

10   that urge, ladies and gentlemen.  Listen to the evidence.

11          They want you to be blinded by the gold and the cash,

12   but look at all the evidence and you will see there are

13   innocent explanations for the gold and the cash.  And the Court

14   will instruct you at the end of the case that you should

15   evaluate all of the evidence when reaching your determination.

16   Not just one piece.

17          Each of you in this jury was chosen by Senator

18   Menendez, by Mr. Hana, by Mr. Daibes, by the government, and by

19   the Court, because we have confidence that you will fulfill

20   your solemn oath and fulfill your duties responsibly,

21   honorably, impartially, without passion or prejudice, and

22   consistent with the oath you took to evaluate all the evidence,

23   and that's all we'll be asking you to do.  When you do that, we

24   submit you will conclude that the government has not met its

25   burden to prove beyond a reasonable doubt that Senator Menendez

O5f3men2                    Opening - Mr. Weitzman

1    took any bribes.

2            Let's start, though, with the cash and the gold.

3    First, the gold bars.  Where are the gold bars found?  Well,

4    let me tell you.  It will be undisputed the gold bars were

5    found in a closet that was a locked closet.  This is the closet

6    on your screen.  It is Nadine's closet.  In fact, when you look

7    inside the closet, you will see that it is filled with all of

8    Nadine's clothing.  Women's clothing.  At no point in time, the

9    evidence will show, did the senator have a key to her locked

10   closet, and he did not know of the gold bars that existed in

11   that closet, one in a safe locked behind that closet, and then

12   another behind -- underneath clothing under the bottom of the

13   closet.  He did not know that she had any gold bars provided by

14   Fred Daibes.

15           Now, he knew that she had gold.  He knew it.  But he

16   didn't know it was provided by Fred Daibes.  What he knew, and

17   what the evidence will show, ladies and gentlemen, is that he

18   knew she had family gold.  How could he not know of the gold

19   that's in the closet you might be asking.  They live in the

20   same house.  They're married, the government said.

21           Before I answer that, let me tell you a short personal

22   story about my own life because I think it's relevant and might

23   help you answer this question.  You see, I'm an identical twin.

24   I grew up about 15 miles away from here, and even though we

25   lived together, we look exactly alike, my twin brother and I --

1          MS. POMERANTZ:  Objection, your Honor.

2          THE COURT:  Sustained.  Stick to the evidence.

3          MR. WEITZMAN:  The point, ladies and gentlemen --

4          THE COURT:  I never knew you were a twin.

5          MR. WEITZMAN:  The point, ladies and gentlemen, is

6    that you can't judge what one person does solely because of who

7    they associate with or who they live with or who their friends

8    are or who their relatives are.

9          Justice, our system of justice, requires that you look

10   at the evidence and judge what evidence makes them culpable or

11   innocent.  That's the point.

12         So let me bring you back to Bob and Nadine.  Bob was

13   married for 29 years before he got divorced, and then he was

14   single for many years, about 15 years, and then he met Nadine.

15   Nadine was a bit younger than Bob, approximately 13 years, and

16   she was dazzling to Bob, as the evidence will show.  She is a

17   beautiful and tall international woman who grew up part of her

18   life in Lebanon.  She speaks four languages.  She's highly

19   educated, having received both a bachelor's and master's degree

20   from NYU.

21         Bob fell for her.  She calls him *mon amour de la vie*,

22   which is French for the love of my life.  They met in early

23   2018 and then they got engaged in October 2019, less than

24   2 years after meeting.  They got engaged on a trip to India.

25   As the evidence will show Bob, serenaded Nadine at the Taj

1    Majal in India, sang the love ballad from the Greatest Showman

2    "Never Enough."  It was very romantic.  I won't do it justice.

3    Bob can sing.  I can't.  Bob and Nadine then got married in

4    October 2020.  It was a small and intimate wedding, nothing

5    fancy.

6            From the time that they started dating in early 2018,

7    until about April 2020, Bob and Nadine lived apart.  Let me say

8    that again.  From the time that they got married in early --

9    from the time they start they started dating in early 2018

10   until about April 2020, after the start of COVID, Bob and

11   Nadine lived apart.  Different residences.  Bob lived in an

12   apartment in a townhouse on the first floor in D.C., paid about

13   $1600 for that townhouse.  And he also had an apartment in New

14   Jersey, a small one bedroom -- both of these were small one

15   bedroom apartments here.

16           Bob moved into Nadine's home in April 2020.  She has a

17   home in Englewood Cliffs, New Jersey.  She had been living in

18   that home for approximately 20 years.  This was her home, in

19   her name.  This was her mortgage, in her name.  Bob moved into

20   her home.  But even after he moved in, they largely continued

21   to live separate lives.

22           Here is a picture of their home where he moved into.

23           When they got married, Bob was 66 years old and Nadine

24   was 53.  Their children were already adults and moved out of

25   the home.  So unlike a young couple who might be starting a

O5f3men2                        Opening - Mr. Weitzman

1    family, open bank accounts together, share credit cards, start

2    a life together, Bob and Nadine came to this marriage late in

3    their lives.  They didn't share, as the evidence will show,

4    they did not share any bank accounts, any credit cards, or any

5    other financial obligations.  They had separate finances.  The

6    house that Nadine owned was in her name, not Bob's, and she had

7    a mortgage on it that Bob did not pay, and didn't receive the

8    statements for.

9          Bob spent most of the workweek in D.C., and Nadine

10   spent most of the week in New Jersey, although she occasionally

11   did visit him in D.C.  They even had a separate cell phone

12   plan.  They didn't sign up for a family cell phone plan like

13   the rest of us.

14         Bob and Nadine's separate lives really help answer how

15   it is that he did not know about the gold bars from Fred

16   Daibes.  Given their relationship, their separate lives, and

17   the fact that Nadine kept those gold bars in a locked closet,

18   is it really surprising that Bob might not know that these gold

19   bars were from Nadine?

20         Indeed, the evidence you'll see in this case will

21   paint a very different picture of the relationship between Bob

22   and Nadine than the one the government just depicted.

23         Let me say this about Nadine.  Nadine had financial

24   concerns that she kept from Bob.  She was often supported by

25   others, by a former husband or by her wealthy family.  But

O5f3men2                          Opening - Mr. Weitzman

1    you'll understand, I suspect, why she kept that from Bob.  When

2    someone starts dating someone else that they may be interested

3    in marrying, the first thing you say is not, hey --

4                MS. POMERANTZ:  Objection.

5                THE COURT:  Yes.  Sustained.

6                MR. WEITZMAN:  The evidence will show that Nadine was

7    hiding her financial challenges from Bob, and I suspect you can

8    understand why.

9                She kept things from him.  She kept him in the dark on

10   what she was asking others to give her.  She was outgoing; she

11   was fun loving.  But she wasn't going to let Bob know that she

12   had financial problems.

13               So what did Nadine do?  She tried to get cash and

14   assets any which way she could.  As the evidence will show, she

15   asked family, she asked friends, she asked Fred Daibes, she

16   asked Will Hana, she asked for Jose Uribe.  But she kept Bob

17   sidelined from those conversations.  And you'll see that in

18   black and white.  Nadine made sure Bob was kept out of the

19   discussions regarding money.  And the evidence will show that

20   Nadine had these relationships with Will Hana, Fred Daibes,

21   Jose Uribe, long before she met Bob.

22               So whether or not she got money or gold from her

23   friends to help support her is not the issue you need to

24   consider in this case.  I submit the real question for you is

25   what did Bob know.  And the evidence will show that Nadine did

O5f3men2                     Opening - Mr. Weitzman

1   not let Bob know what she was doing to get more money, either

2   before they got married or after.

3          Remember that game when some of you were kids or

4   younger adults called Where's Waldo?

5          MS. POMERANTZ:  Objection.

6          MR. WEITZMAN:  I gave them this slide, your Honor.

7   There was no objection.

8          THE COURT:  Continue.

9          MR. WEITZMAN:  In this case, we need to figure out

10  Where's Bob?  You won't see Bob anywhere on the page when

11  Nadine is talking to friends and family about getting money,

12  because he wasn't there.  He wasn't in those conversations.  He

13  didn't know about the dealings that Nadine had with those

14  folks.

15         The government will show you hundreds of

16  communications involving Nadine, Will Hana, Fred Daibes, and

17  others.  When you see those, you can't just assume that Bob

18  knows about them or is involved in them.  He was not.  He was

19  in D.C. running the business of running this nation's business.

20  Every time the government shows you some piece of evidence

21  involving Nadine, just ask yourself, Where's Bob?  I'll tell

22  you where.  He was doing his job in D.C., in the United States

23  Senate.

24         Now, in the government prosecutor's opening, you can

25  take that down.  Thank you.  In the --

1        THE COURT:  Yes, thank you.

2        MR. WEITZMAN:  She mentioned a few Google searches

3   that were done on Bob's phone for the price of a kilogram of

4   gold.  The government will claim that the timing of those

5   searches must indicate that he knew about Fred Daibes' gold

6   bars to Nadine.

7        This doesn't prove what the government is asking you

8   to reach for.  In fact, the evidence will show that the senator

9   searched for the price of gold on many other occasions and

10  other precious items, too.  Why did he do that?  It wasn't

11  because he just got a bribe from Fred Daibes as the government

12  submits.  Rather, the evidence will show that the searches were

13  being conducted because Nadine's family has long owned a lot of

14  gold for decades and decades.  The evidence will show that.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. WEITZMAN:  The evidence will show that.  Much of

2     that gold was left to Nadine.  The evidence will show that.

3          You see, Nadine and her family are originally from

4     Lebanon, and in many parts of the Middle East, including in

5     Lebanon, they collect gold and other precious items, silver and

6     jewels.  And they do that for two reasons:

7          One, because local currencies in the Middle East can

8     be unstable, historically; and two, because it's cultural.

9     They like to give gold and silver and other precious items as

10    gifts for baby namings or showers or weddings or engagements.

11    And the evidence will show -- the evidence will show -- that

12    Nadine's family had a lot of gold, including kilogram gold

13    bars, several of them, and that they had them for many, many,

14    many years.  And they were left for Nadine many, many, many

15    years ago.  And these family assets are some of the ways that

16    Nadine helped subsist herself.  They helped Nadine out, because

17    when she needed money she could sell those items.  And you'll

18    learn that she did sell those items.

19         Now, you all know some people are not great at saving.

20    They get a buck, they spend a buck, or two.  Eventually, Nadine

21    needed to sell those kilograms of gold bars that she had from

22    her family, and she did that for a perfectly legitimate reason.

23    That's why there were searches on Bob's phone for the price of

24    gold.

25         So why search for the gold multiple times?

O5fWmen3                         Opening - Mr. Weitzman

1              Well, one of the things you'll see evidence of is the
2      price of gold actually fluctuates.  It's not stable like the
3      United States dollar.  It goes up and down.  You probably all
4      know this about commodities.  They go up and down, up and down,
5      up and down, and so sometimes you want to check what the price
6      is.  That's why there were multiple searches on Bob's phone.
7      The price of gold started off five years ago at 1,300, and now
8      it's $2,300 an ounce.  And you'll learn the reason why Nadine
9      needed to sell gold at that precise time that those searches
10     were being done is because she was looking to pay off her
11     mortgage.  You'll see documents that show that.  So there's
12     nothing surprising about the searches of gold on the senator's
13     phone at the exact same time that Nadine is looking to sell
14     gold to pay off her mortgage.

15             Indeed, you'll see evidence that proves that Bob
16     thought that the gold Nadine had was from her family, not from
17     Fred Daibes.  You see, when you're a sitting senator, you have
18     a financial disclosure obligation.  You need to make those
19     disclosures every year, and they include some of your and your
20     spouse's assets, incomes, loans and the like.

21             After Bob and Nadine got married, the evidence will
22     show, on May 10, 2021, Bob tried to fill out those forms in
23     good faith, and he asked Nadine for a bunch of information --
24     gifts from the wedding, the value of the house, mortgages and
25     home equity lines and any income Nadine earned.  He didn't know

1    this information.  He needed it from Nadine.  And then Senator

2    Menendez reported what he got on his financial disclosure

3    forms.  But he wasn't told everything at the time by Nadine.

4    Remember, this was their second marriage.  In early 2022,

5    several months after this, he learned that Nadine had gold bars

6    that she had not told him about from her family.  It was

7    Nadine's family gold that he learned about.

8              So what did he do?

9              You'll learn that he quickly contacted Senate

10   officials, including a woman that works at the Senate ethics

11   office to disclose the gold he learned of.

12             Next slide.

13             And this is the disclosure he learned of.  On March

14   16, 2022, he disclosed to the world that he has gold bars worth

15   between $100,000 and $250,000 and that the owner was his

16   spouse, Nadine.  And he understood those gold bars were

17   Nadine's family's gold, not any gold from Fred Daibes.

18             Remember, he discloses this -- I'll tell you right now

19   he discloses this before he ever learned of an FBI

20   investigation.  Before there ever was a raid on his house, he

21   discloses this.  He's not trying to hide his assets and not

22   disclose them.  In fact, the fact that Senator Menendez

23   disclosed these gold bars is proof that he didn't receive

24   bribes knowingly.  If the senator's getting gold bars as bribes

25   and the FBI has no idea, you'd agree with me it would be the

O5fWmen3                        Opening - Mr. Weitzman

1    dumbest thing in the world to add those gold bars to your

2    Senate financial disclosures.

3            Now let's discuss the cash that was found in Nadine's

4    home.  As I mentioned, the senator moved into Nadine's home in

5    mid-2020, during the height of Covid.  She owned the home for

6    over 20 years when Bob moved in.  This was her home, not his.

7    And when the senator moved into Nadine's home, he came with all

8    of his things.  He came with a lot of cash too, bags of cash,

9    which he stored in the basement of Nadine's home.  He stored

10   them in envelopes.  He stored them with rubberbands and with

11   Post-its.  He stored them in his jacket and in his boots and

12   other articles of clothing.

13           The cash that was found in the basement of Nadine's

14   home was the senator's cash, which he withdrew over 30 years.

15   He withdrew, multiple times a month, between 400 to $500 each

16   time for the past 30 years.  And you'll see bank records that

17   confirm such withdrawals.  I know that sounds odd.  Let me

18   explain what the evidence will show about that practice.

19           This all relates to what I told you about earlier with

20   Bob's upbringing.  You know, a famous man once said:  We are

21   not makers of history; we are made by history.

22           The past and the present are interconnected, and we,

23   as humans, are shaped by the experiences, the narratives, and

24   the events that have unfolded in our parents', our

25   grandparents' lives.  I'm the grandson of Holocaust survivors.

1           MS. POMERANTZ:  Objection.

2           THE COURT:  Sustained.  Sir, this litigation is not

3    about you or any of the lawyers.  Your credibility is not to be

4    put at issue here.  Talk about what you believe the evidence

5    will show.

6           MR. WEITZMAN:  Common sense shows that our experiences

7    and our parents' and our grandparents' experiences can have a

8    deep impact on our behavior.  It's not always rational.  It's

9    not always logical, and we can't always explain it.  And so the

10   same is true for Senator Menendez.  I told you he was the son

11   of Cuban refugees.  You'll learn about that.  His family

12   emigrated to the United States in the early 1950s.  His family

13   lost everything en route, their entire life savings.  The only

14   thing they had left was some cash that was stored away and

15   hidden in a grandfather clock.  They fled with nothing except

16   for that cash.  Those stories he heard as a kid, which you will

17   learn about, and other things that have happened in his life

18   have had a deep impact on him.  From a young age, the senator

19   came to learn the value of having cash on hand in your home.

20           So what did the senator do?

21           For the past 30 years, the senator's withdrawn from

22   his own bank account, and you'll see these records,

23   approximately 400 to $500 in cash multiple times a month, which

24   he then stored in his home.  You'll see evidence that confirms

25   these withdrawals over the course of many decades.  This is a

O5fWmen3                    Opening - Mr. Weitzman

1    picture of just a few bills that were seized, that were found

2    in the senator's home.  Notice the year of the series year on

3    these bills -- 1988, 1985.

4              Next slide.

5              Here's a $100 bill with a series 2006.  You'll learn

6    that the older the series the less likely it is to be in

7    circulation, and so these were not bills given as bribes in the

8    past few years, as the government alleges.  These and many

9    other bills have long been stored by the senator in his home

10   because he's withdrawn them years ago, when these bills were

11   still in circulation.

12             Now, the government mentioned in its opening that

13   there were fingerprints and DNA found on certain envelopes of

14   cash.  Pay close attention to the evidence when it comes in.

15   You will not see any fingerprints and any DNA on the senator's

16   cash, not one bill.  And you will learn that, with one

17   surprising exception that I will explain in a moment, every

18   fingerprint and piece of DNA that was tied to Fred Daibes is

19   found -- where? -- in his wife's closet or in her safe deposit

20   box at a bank.

21             This is where the senator, the master bedroom of the

22   senator's home.  This is a layout, and the fingerprints that

23   I'm pointing to were all found in the closet beside room B.  It

24   was a locked closet, as I noted.  It was Nadine's closet, not

25   the senator's closet.  The senator did have his own closet.

O5fWmen3                          Opening - Mr. Weitzman

1              Next slide.

2              It was in a different room.  This was the senator's

3     closet.  And you know what?  Not one envelope of cash, not one

4     gold bar was found in the senator's closet.

5              Now, as I mentioned, you will learn that there was an

6     envelope that was found in the basement among the senator's

7     belongings that contained a fingerprint from Fred Daibes.

8     That's not surprising, though.  The FBI in this case collected

9     thousands of items and tested hundreds for fingerprints.  Of

10    all the items they collected, they only found one in the

11    senator's belongings with Fred Daibes's fingerprint.  They

12    found more fingerprints from the FBI agent who collected and

13    contaminated the scene than they did from Fred Daibes in his

14    basement.  If anything, if the senator was taking bribes,

15    wouldn't you expect more fingerprints in the senator's

16    belongings?

17             In any event, you will learn that the senator and

18    Daibes have had a 30-year friendship.  They've been friendly

19    for a very long time.  Would you be surprised to find one of

20    your friend's fingerprints among your belongings?  On a book or

21    an envelope?  This isn't a murder weapon, where the fingerprint

22    proves who the culprit is.  This is an envelope, and among

23    friends who have a long relationship, it would not be a

24    surprise to find a single envelope with a fingerprint in his

25    belongings among the hundreds of envelopes that were seized,

1   hundreds of fingerprints that were tested.  Excuse me.

2           As for the fingerprints on envelopes in Nadine's

3   closet and safe deposit box, keep an open mind.  Don't just

4   blindly accept that those envelopes reflect bribes.  There are

5   innocent explanations for Daibes's fingerprints on these

6   envelopes in Nadine's closet and safe deposit box.  The truth

7   is Fred Daibes never bribed Bob, and Bob never took a bribe

8   from Fred Daibes.

9           I want to talk about another important aspect of this

10  case, and that's something called constituent services.

11          Throughout his career, Senator Menendez tried to help

12  various people and companies located in New Jersey, and you

13  will see documents and hear from witnesses that show he was

14  trying to do that in this case, because that was his job.

15  That's what he's there to do.  None of these actions were

16  illegal.  A senator's job in Congress is more than just

17  proposing or voting on legislation.  It also includes what's

18  called constituent services, which is just a fancy term for

19  trying to provide nonlegislative services to people in your

20  state, in your constituency.  Members of Congress have engaged

21  in constituent services for years.  It's an important part of

22  their job.

23          You'll learn that the senator has a large staff of

24  people assigned to help with constituent services.  So do the

25  other 99 senators in the United States.  They do all sorts of

O5fWmen3                              Opening - Mr. Weitzman

1    things on behalf of their constituents.  When someone discovers

2    right before an international trip that their passport is

3    expired, they can call the senator's office and get an

4    expedited appointment.  When a New Jersey resident has a family

5    member who's having a hard time getting a visa to come into the

6    United States, call your senator's office.  They'll help you

7    get an appointment.  When a New Jersey company's having an

8    issue with some bureaucracy or red tape or some bureaucrat in

9    the federal government, you can call your senator's office and

10   try to get assistance.  And when someone sees discrimination or

11   experiences discrimination in their state or selective

12   prosecution, you can contact your senator and ask them for

13   assistance.

14          You will learn that every action the government claims

15   the senator took in this case as a corrupt action, whether it

16   was a phone call or a meeting or an introduction, each time he

17   was acting lawfully, consistent with his duties as a United

18   States Senator.  Each and every time.

19          So the question you'll be asked at the end of this

20   case is not whether the senator tried to help particular New

21   Jersey residents.  He did that, as he should.  That's his job.

22   Nor is the question whether he somehow showed favoritism for

23   New Jersey residents who are his friends or his wife's friends.

24   That's not illegal.  You may not like it, but it's not illegal.

25   He's permitted to provide constituent services for his friends

O5fWmen3                    Opening - Mr. Weitzman

1    and his wife's friends or his girlfriend's friends in the same

2    way that he's permitted to provide constituent services for any

3    New Jersey resident.  You might not like it, but it is not a

4    crime, because listening to a friend is not a crime.

5         The question you'll be asked is whether he took an

6    official act in exchange for some personal benefit or whether

7    he promised to take an official act in exchange for some

8    personal benefit.  The judge will provide you instructions on

9    what an official act is.  Not everything a senator does is an

10   official act.  You'll decide at the end of the case whether the

11   phone calls and the introductions were official acts.

12        I submit, though, that after you review the evidence

13   the government will be unable to prove any agreement or any

14   exchange of an official act for any personal benefit.  As I

15   mentioned, there won't a single witness who walks into court

16   and says that they discussed a bribe or gave a bribe to Senator

17   Menendez -- not one -- not even the government's cooperating

18   witness who you heard about, José Uribe.  We'll have a lot to

19   discuss at the end of the case about him, about his lies and

20   his cheating and his crimes and all the ways he's been

21   incentivized to continue doing all of them.

22        But here's the important thing about him.  It is what

23   even he does not say about this case.  Mark my words.  You will

24   never learn he never discussed a bribe with Bob.  He never

25   mentioned money or a car to Bob.  He never mentioned any of

1    these things to Bob, except he mentions one thing: that he and

2    his friends are the victim of selective prosecution and

3    discrimination; that Latino truckers who are his friends were

4    being targeted unfairly by the New Jersey Attorney General.  Is

5    that what you would expect if Bob was in on a bribery scheme?

6    I think not.

7            So, the prosecutor mentioned three different schemes,

8    as she called them.  I want to talk about those three schemes

9    for a bit, because each of them fits very neatly into this

10   bucket of constituent services that we discussed.

11           First, the government charged Senator Menendez with

12   being an agent of a foreign principal.  Here, Egypt.  And they

13   told you a story about how he took orders from Egyptians in

14   order to do Egypt's bidding.  The evidence, however, will show

15   no such thing actually happened.

16           Let me first say what I think should be obvious to

17   everybody, and the judge already instructed.  The indictment

18   itself is not evidence.  It's words that the prosecutors put on

19   a piece of paper in order to advise the senator and the public

20   of the charges in the case.

21           MS. POMERANTZ:  Objection.

22           THE COURT:  Yes.  Sustained.  The indictment, as a

23   matter of law, is an instrument that is voted on by a grand

24   jury, and it issues from the grand jury.

25           Proceed.

O5fWmen3                          Opening - Mr. Weitzman

1            MR. WEITZMAN:   Thank you.

2            And so let me turn to the government's allegations

3    involving Egypt.

4            As you learned, Senator Menendez was the chair of the

5    Senate Foreign Relations Committee, and in that role he's

6    engaged in diplomacy on behalf of the Senate, just as the

7    President of the United States is engaged in diplomacy on

8    behalf of the executive branch.  And you'll learn that the

9    Senate runs its own foreign policy.  And to that end, the SFRC,

10   the Senate Foreign Relations Committee, can decide how it wants

11   to prioritize foreign AID and foreign affairs.  And you will

12   see that the United States has provided military aid to Egypt

13   for decades, to the tune of billions, tens of billions of

14   dollars.

15           The evidence will show that both before 2018, when the

16   government alleges that the senator was on the take from Egypt,

17   and after 2018, Senator Menendez had a consistent position, and

18   it was a nuanced position.  You will learn that Senator

19   Menendez in public statements said that Egypt is an important

20   strategic partner to the United States in the United States's

21   fight against terrorism, but Egypt needs to do better on human

22   rights.  He said that before 2018, and he said it after 2018.

23   And consistently, even during the time period that the

24   government alleges that he's a foreign agent for Egypt, he is

25   criticizing Egypt.  He is taking them to task, and he's telling

O5fWmen3                           Opening - Mr. Weitzman

1    them they need to do better on human rights.

2                Indeed, in 2019, the evidence will show, while he's

3    allegedly an agent for Egypt, he's writing to the secretary of

4    state, Mike Pompeo, pressing him to press Egypt on human

5    rights.  He says we have serious concerns about the erosion of

6    political and human rights in Egypt.  In fact, you'll learn

7    that at the precise time that the government alleges he has

8    these meetings as a foreign agent, he's having face-to-face

9    meetings in Egypt with President El-Sisi that are monitored by

10   the ambassador and Senate Foreign Relations Committee.

11               And what does he do?

12               He takes President El-Sisi, the military dictator, to

13   task and he tells him you need to do better on human rights.

14               Does that sound like someone who's on the take from

15   Egypt or a foreign agent?  Do you think that if Senator

16   Menendez, if President El-Sisi thought that Senator Menendez

17   was in his pocket, he would stand for Senator Menendez coming

18   into his office and telling him to do better?  Of course not.

19               And let me say this.  You've heard allegations about

20   military aid.  I think she referenced it a bit.  What's

21   important to know is that every arms sale to Egypt, every

22   single one, every one of them is something that the United

23   States president and the State Department wants and has

24   approved and has requested.  The evidence will make that clear.

25   The prosecutor didn't mention it, but that's the truth.

O5fWmen3                       Opening - Mr. Weitzman

1    Senator Menendez didn't hold some magic wand.  The

2    administration proposes it, and multiple members of Congress

3    need to review it.  That's the process.  Senator Menendez was

4    not doing Egypt's bidding.  He was working consistent with the

5    interests and requests of the United States government, and

6    that's it.

7            Now, the prosecutor mentioned a few other things.  She

8    mentioned some letter that the senator helped draft and she

9    mentioned that he released some information that she called

10   sensitive information.  He had legitimate reasons to do those

11   things.  Keep an open mind.  The evidence will come in, and pay

12   attention to it, because you will learn that there is another

13   side to the story.  It is not the story the prosecutor's just

14   told you.  By the end of this trial, the evidence will make

15   clear that at each point Bob was acting on behalf of the United

16   States's interests, not Egypt's.

17           Indeed, there's one word that describes what Bob was

18   doing, and I mentioned it earlier in my opening.  And that's

19   the word "diplomacy."  Diplomacy requires a carrot and a stick.

20   You'll learn that.  You guys know that.  It's common sense.

21   Sometimes you give in to motivate the other side to come to

22   your position.  Sometimes you stand firm and you resist and you

23   fight in order to get them to come to your position.  Senator

24   Menendez was doing a diplomacy dance with a military dictator,

25   and that is a complicated thing to do.  And sometimes you give

O5fWmen3                    Opening - Mr. Weitzman

1    in and sometimes you fight.  But he hasn't changed his

2    position, not one inch, since the military dictatorship started

3    in the early 2010s.

4            Now, the prosecutor's also advanced a story about Bob

5    receiving bribes from Wael Hana and his company IS EG in order

6    to protect IS EG's monopoly, what they called the halal

7    monopoly.  The evidence will not support the government's

8    allegations.  Let's start with Wael Hana's company.  It's

9    called IS EG, and it's a company that does halal

10   certifications.  Halal is basically to Muslim people and

11   majority Muslim nations the same thing as what kosher is to

12   Jewish people.  It's a way to butcher and handle food.

13           The important thing is that the evidence will show

14   that it's Egypt that gets to decide who gets to import halal

15   meats and to certify halal meats into Egypt.  It's not for the

16   United States to decide.  And in early 2019, for whatever

17   reason, Egypt decided that it would give IS EG, Will Hana's

18   company, that authorization.

19           Now, IS EG is located, headquartered across the river

20   in New Jersey, and it has operations all over the world, in

21   multiple countries.  And the crux of the government's

22   allegations with respect to IS EG is that the senator reached

23   out to a particular U.S.D.A., U.S. Department of Agriculture,

24   employee named Ted McKinney.  We don't dispute there was a

25   call.  It lasted a mere two to four minutes.  You'll see all

1    that, but there was no pressure applied on this call, as the

2    government alleged.  The only contact the senator had was this

3    few-minute phone call, and the evidence will show that in that

4    call what Senator Menendez was doing was asking McKinney, this

5    individual, about the accuracy of a press report that had been

6    issued regarding IS EG.  That's what he did.

7          Now, you'll learn about all the meetings and the prep

8    that Mr. McKinney had with the government and how his story has

9    changed.  But the documents you'll see right after the phone

10    call will confirm that all Senator Menendez did was ask about

11    the accuracy of a press report regarding IS EG.

12          And here's another thing that you'll learn about at

13    trial.  You'll learn that the U.S.D.A., the U.S. Department of

14    Agriculture, has absolutely no authority over the halal process

15    and certifications and monopoly granted by Egypt.  Egypt did

16    not need to get the U.S.D.A.'s authorization.  Egypt did not

17    need to consult with the U.S.D.A., and the allegations that

18    were made to Bob was that the U.S.D.A. was overstepping, and so

19    Bob made the phone call to find out what's going on.  This was

20    not out of the ordinary.  As senator, Senator Menendez has

21    previously reached out to federal agencies on multiple

22    occasions in order to help constituents.  That's his job.

23          When Bob reached out to Ted McKinney, he was doing his

24    job and he was doing it the right way.  He did not threaten

25    Mr. McKinney.  He took no official action to pressure

1    Mr. McKinney, and he didn't do anything other than what a

2    senator should do to advocate on behalf of a local constituent

3    business.

4           Let me add this.  Even if Senator Menendez had told

5    Mr. McKinney to shut it down, or whatever it is that the

6    prosecutor said he said, none of that would be illegal either.

7    Let's remember everybody's role here.  Mr. McKinney works at

8    the U.S.D.A.  That's the executive branch of government.

9    Senator Menendez works for the Senate.  That's the legislative

10   branch of the government.  There are separation of powers, and

11   importantly, there are checks and balances.  Senator Menendez

12   can't tell Mr. McKinney what to do.  He has no power or

13   authority over him, but he could ask for information.  And

14   that's precisely what he did.  So even if Bob had a call with

15   Mr. McKinney that got a bit contentious, and there's no

16   evidence to support that, we submit, none of that would be

17   illegal, because the evidence will show that a senator is

18   allowed to complain to a federal agency or a federal agent.

19   He's allowed to advocate to a federal agency on behalf of a

20   company that is a constituent.  And he's even allowed to yell

21   at a federal employee.  None of that is illegal.  It's his

22   constitutionally protected role.

23          Now, in her opening, the prosecutor claimed the

24   senator was bribed to call Ted McKinney, and she mentioned a

25   couple of things, including a mortgage payment and some

1    consulting fees that were paid to a -- I think she called it a

2    sham or a straw company.  It's just a consulting company.  Lots

3    of people have consulting companies.  They incorporate when

4    they become consultants.  Let me spend just a few minutes on

5    this.

6            First, both the mortgage payment and the consulting

7    fees were paid in 2019, in the summer of 2019.  Remember where

8    Bob and Nadine's relationship was at the time.  They were still

9    dating.  They weren't even engaged.  Bob wasn't even in the

10   house.  He didn't move in until April of 2020, and they weren't

11   even close to getting married.  So Nadine's getting her

12   money -- as we said, there are things she's keeping from Bob --

13   and Bob does not necessarily know what's going on with Nadine.

14   They're dating.  And by the way, the consulting payments, those

15   are on-the-books payment.  Those are recorded and recorded.

16   They're paid for three months, a total of three months, $10,000

17   a month to Nadine.  And if the theory of the government is that

18   that's a bribe by IS EG and maybe even Egypt -- it was unclear

19   to me what she was suggesting -- why was it cut off at the

20   three months?

21           MS. POMERANTZ:  Objection, your Honor.

22           THE COURT:  No.  I will allow that.  That's

23   speculation that he wants the jury to engage in, based on the

24   evidence.

25           MR. WEITZMAN:  I submit that after you hear all the

O5fWmen3                          Opening - Mr. Weitzman

1    evidence, you'll conclude that those fees are not bribes to the

2    senator but legitimate payments to IS EG -- from IS EG to

3    Nadine, who was actually doing work for IS EG.  And you'll

4    learn about that, ladies and gentlemen.

5              Now, let me move on to José Uribe, and I appreciate

6    your patience, ladies and gentlemen.  I know it's been a long

7    opening.

8              Due process and fairness, as you will learn, are

9    principles that the senator holds dear.  And he also holds dear

10   the principle of equality under the law.  Over and over again,

11   Bob has advocated for people who are the underserved or are

12   being treated unfairly under law.

13             MS. POMERANTZ:  Objection.

14             MR. WEITZMAN:  I'm talking about this case, your

15   Honor.  In this case he's doing that.

16             THE COURT:  Stick to the evidence, sir, not

17   sermonizing.

18             MR. WEITZMAN:  As the highest ranking Latino senator,

19   Bob has been and is in this case a champion for the Latino

20   community, which is why --

21             MS. POMERANTZ:  Objection, your Honor.

22             THE COURT:  Same point.  Same point.

23             MR. WEITZMAN:  Yes, your Honor.

24             But that is the reason why --

25             THE COURT:  You can go to specific evidence that you

O5fWmen3                              Opening - Mr. Weitzman

1    think will come in, but not overarching generalizations.

2         MR. WEITZMAN:  That is why, ladies and gentlemen, Bob

3    Menendez advocated for those truckers that you heard about.

4    They were Latino truckers, and Bob was told by individuals

5    involved in the investigation, including the lawyers, that

6    these Latino truckers were being selectively prosecuted, that

7    they were being treated differently than other truckers in New

8    Jersey and that the New Jersey Attorney General's Office was

9    abusing its power.  Those are serious accusations, and when one

10   makes those accusations to a sitting senator, and not just any

11   senator, the highest ranking Latino senator in the United

12   States, it is for him to look into them.  And that's exactly

13   what he does.  That's his job.

14        In the government's telling, Senator Menendez exerted

15   pressure and influence on the attorney general of New Jersey.

16   This is a picture of Gurbir Grewal, the then-attorney general.

17   You will learn of any pressure that was engaged in by Senator

18   Menendez.  All he did was tell Attorney General Grewal to look

19   into allegations of selective prosecution.  He did not ask, the

20   evidence will show he did not ask for any particular outcome in

21   the case and that he did not put any pressure on Attorney

22   General Grewal.  He didn't threaten to haul him to Congress.

23   He didn't threaten to withhold any funds.

24        The New Jersey Attorney General will even acknowledge

25   to you that he's not afraid of Senator Menendez and Senator

O5fWmen3                        Opening - Mr. Weitzman

1   Menendez has no power over him.  He's more afraid of state

2   senators than he is federal senators, because the state

3   senators can control the purse, when the United States Congress

4   cannot control the purse of his office.

5          So the government is unfairly twisting, as the

6   evidence will show, a senator doing his job for his

7   constituents into some sort of criminal action when it was not.

8   Nor was it uncommon, ladies and gentlemen, for Senator Menendez

9   to advocate on behalf of his constituents with an attorney

10  general.  You'll learn of other instances when he did just

11  that.

12         Let me tell you one other thing that the government

13  did not mention in its opening.  The senator's call to the New

14  Jersey Attorney General had absolutely no effect on the

15  cases -- zero effect -- whatsoever.  Those cases were resolved

16  on their own merits.  The trucker, Elvis Parra, got a

17  probationary sentence because there were holes and problems in

18  the case.  The evidence will show that.  It had nothing to do

19  with Senator Menendez whatsoever.  Still, the government claims

20  that Bob received a bribe.

21         They emphasized this Mercedes convertible.  How many

22  times did they talk about how expensive and fancy this luxury

23  car was?  The evidence will not show that that was a bribe for

24  Bob.  In fact, here's a fact that you should remember.  Before

25  Nadine started dating Bob, she had a Mercedes.  She got into a

O5fWmen3                          Opening - Mr. Weitzman

1    car accident.  She couldn't drive that Mercedes.  Therefore,

2    she then got a new Mercedes while she's dating Bob.  The new

3    Mercedes she got, which the government alleges José Uribe paid

4    for or helped pay for, was obtained on April 5, 2019, one day

5    after the date that's recorded here on the purchase document.

6    April 5, 2019.  Again, this is just one year into their dating,

7    a year before he even moves in and more than a year and a half

8    before they get married.

9            So when Nadine drives home with a Mercedes, there's

10   nothing surprising in that.  Why?  Because Bob understood that

11   Nadine comes from a family with some money.  The evidence will

12   show that Nadine's family was in the Persian rug business and

13   was able to afford nice homes and nice cars.  Nothing about

14   that would be surprising to Bob for Nadine to come home with a

15   car.  And there's no document, ladies and gentlemen, that shows

16   that Bob understood José Uribe paid for that car.  None.

17           In fact, and I mentioned this earlier, José Uribe will

18   acknowledge to you, I think, that he never discussed paying for

19   a car or that car with Bob.  Indeed, when Bob learned of the

20   car payments from Uribe, he was told that the payments were a

21   loan.  And what did Bob do?  He insisted that Nadine pay Uribe

22   back.  He did the same with respect to the mortgage that he

23   learned about that Will Hana gave as a loan.  He insisted that

24   that get paid back.

25           Why did he do that?  Not because he was looking to

O5fWmen3                          Opening - Mr. Weitzman

1    obstruct justice, as the government alleges.  He insisted on

2    paying back the loans because he didn't want Nadine to be

3    beholden to these individuals after they get married, and he

4    didn't want the hassle of having to amend his Senate disclosure

5    forms to disclose these loans.  So there was nothing, no effort

6    to obstruct justice here.  In fact, you will hear his lawyer

7    told him we're going to have to disclose to the federal

8    government that she repaid those loans and you helped her repay

9    those loans.  And Bob says let's do that.

10            Now, the third part of the scheme is a scheme that

11   involves, as the government alleged, Fred Daibes.  I want to

12   tell you about that story that they told you.

13            They told you a story about how the senator agreed to

14   recommend a particular individual.  They didn't provide his

15   name, but his name is Phil Sellinger.  And the allegation is

16   that the senator agreed to recommend this man Phil Sellinger to

17   President Biden to be the United States Attorney because they

18   thought that he would more favorably dispose of Fred Daibes's

19   other case that was pending in New Jersey.

20            Well, the evidence will show that there was no bribe

21   to nominate U.S. Attorney Sellinger; that Senator Menendez

22   chose Sellinger based on his merits.  He was a highly qualified

23   lawyer in New Jersey for the job and that the nomination had

24   nothing to do with Daibes's case.  In fact, you'll learn that

25   Phil Sellinger wasn't even the senator's first choice to be

O5fWmen3                    Opening - Mr. Weitzman

1    U.S. Attorney.  His first choice was a woman named Esther

2    Suarez, who was, again, a very eminently qualified candidate.

3    She was a former state judge and top county prosecutor in

4    Hudson County.  She was a historic candidate.  She was also the

5    first woman and the first Latino woman to be chosen for U.S.

6    Attorney.  And as you will learn, Esther Suarez was a bit of a

7    lightning rod candidate.  There was bad press about her so the

8    White House pulled her nomination, and thereafter, Senator

9    Menendez recommended Phil Sellinger.

10        And you'll learn that Bob and Phil Sellinger were

11   actually friendly.  He was a well-respected lawyer.  Phil

12   Sellinger was even at Bob's wedding.  He was highly, highly

13   qualified for the job.  And you'll learn about a conversation

14   between Bob and Sellinger regarding Fred Daibes, but it is not

15   the conversation the government told you about.  Rather, the

16   evidence will show that Bob was concerned that Sellinger was

17   biased -- biased -- against Fred Daibes.  Why?  Because

18   Sellinger had a conflict.  Sellinger and his former law firm

19   had sued and were in the process of a lawsuit against Fred

20   Daibes.  Sellinger was actively involved in drafting that

21   lawsuit and filing it against Fred Daibes.  So Bob wanted to

22   make sure that his nominee wouldn't hit a snag based on a

23   conflict in a pending case in that very district.

24        That's not corruption, ladies and gentlemen.  That's

25   what we call the vetting process, when you vet your candidate

O5fWmen3                    Opening - Mr. Weitzman

1    before nominating that candidate to the president.

2           You'll see clear evidence that the senator just wants

3    to make sure that the U.S. Attorney's Office gave Fred Daibes

4    due process, the exact same thing that prosecutors all over the

5    land are required to give their defendants.  Does that sound

6    like someone putting a thumb on the scale of justice?  Not even

7    close, ladies and gentlemen.  It's exactly what you would hope

8    a senator or the United States Attorney or the Attorney General

9    of the United States would demand of the prosecutors, to give

10   defendants due justice, due process, excuse me.

11          Indeed, Bob was right to be concerned about the

12   Sellinger conflict.  He was right.  As you will learn, even the

13   Department of Justice agreed that Sellinger's prior lawsuit

14   against Fred Daibes posed a conflict of interest that required

15   Sellinger to remove himself from the case.  So Bob was right to

16   be concerned, and he raised it with Phil Sellinger in a

17   transparent way.  That's his job.

18          And how do you know that Bob wasn't trying to put his

19   thumb on the scale of justice in favor of Fred Daibes?  Because

20   Bob had a call with the person who took over the supervision of

21   this case --

22          Next slide, please.

23          -- a man named Vikas Khanna.  He was Phil Sellinger's

24   deputy, his No. 2, and when Phil Sellinger was removed from the

25   case, Vikas Khanna took over.  What did Bob say about the

O5fWmen3                          Opening - Mr. Weitzman

1    Daibes case when he spoke to him?  Nothing.  He didn't say

2    anything.  He congratulated Vikas Khanna on his promotion and

3    getting the job.  He also paid a compliment to Khanna's

4    brother, who's a California congressman.  He didn't mention

5    Daibes by name, not even once, in this entire call, and Vikas

6    Khanna never knew that Daibes knew Senator Menendez.  So not

7    surprisingly, when the prosecution of Daibes was resolved, it

8    had absolutely nothing to do with Senator Menendez.  The line

9    prosecutors were not told of any relationship between Senator

10   Menendez and Daibes or any outreach from Menendez or anybody

11   else to either Sellinger or Vikas Khanna.  Plea offers were

12   made to Fred Daibes on the merits of the case.  That's it.

13          Ask yourself, does this sound like a public corruption

14   scheme and obstruction of justice by a U.S. senator?  It's not

15   even close.

16          The government has shifted as well to another theory.

17          MS. POMERANTZ:  Objection.

18          THE COURT:  Sustained.  You can state what you believe

19   the government theory is.

20          MR. WEITZMAN:  Correct, your Honor.

21          The government has another bribery theory involving

22   Daibes, that in exchange for gold bars and cash, Bob introduced

23   Fred Daibes to Qatar as a potential investor in a project that

24   Fred Daibes was developing and that Bob and Fred Daibes

25   discussed some sort of Senate resolution thanking Qatar and

1    then Bob issued some press releases praising Qatar.  The

2    evidence here, again, will show that Bob acted lawfully,

3    appropriately and entirely for the benefit of New Jerseyans,

4    not in exchange for any bribe.  As I mentioned, Bob and Fred

5    have known each other for 30 years.  Bob was the mayor the

6    Union City when Fred was just a young aspiring developer.

7    Daibes eventually became one of the biggest developers in

8    Edgewater, New Jersey.

9           These are some of the buildings that Fred Daibes

10   developed in Edgewater, New Jersey.  There was one real estate

11   project that was in the works, and it was truly going to be

12   groundbreaking in Edgewater, New Jersey.  This is a rendering

13   of the River Road project that Daibes was developing, and this

14   was a big project.  It was a first of its kind development in

15   Bergen County, New Jersey.  And it was going to employ

16   thousands of construction workers in New Jersey.  The project

17   was envisioned to house 2,000 apartments across four towers

18   rising 700 feet into the air.  It would result in the

19   development of these beautiful towers overlooking the Upper

20   West Side of Manhattan, waterfront towers, that was going cost

21   $1 billion and lead to a lot of spending, a lot of

22   construction, a lot of materials, supplies and employees that

23   were good for the city of Edgewater and the state of New

24   Jersey.

25          Fred Daibes was the principal developer of that

O5fWmen3                          Opening - Mr. Weitzman

1    project.  Unfortunately, after he was charged in another case,

2    he lost one of his large investors, and when he asked Bob

3    whether he knows of any potential investors, his timing

4    couldn't be better, because Bob had just been approached by an

5    investment fund called Heritage Advisors and asked whether he

6    was aware of any potential investments in the United States.

7    So Bob made an introduction:  Heritage Advisors, meet Fred

8    Daibes.  Fred Daibes, meet Heritage Advisors.  Nothing wrong

9    with that; that's what senators do day in, day out.  But let me

10   tell you a bit about Heritage Advisors, because this is where

11   the government's story collapses.

12          It's an investment fund in London.  It invests the

13   assets of a particular member of the royal family of Qatar, a

14   man named Sheikh Sultan Al Thani.  It has a portfolio of nearly

15   $1 billion with real estate and other investments in the United

16   States and elsewhere.  Heritage Advisors does not invest or

17   receive any money through the Qatari government, and it is not

18   affiliated with the Qatari government.  The government will not

19   be able to prove otherwise.

20          After Bob introduced Heritage Advisors to Daibes, the

21   evidence will show that Heritage conducted a lot of due

22   diligence on the potential investment.  It hired U.S.-based

23   lawyers and financial advisers and consultants and architects

24   to analyze the project.  Heritage was aware that Daibes had

25   been charged in New Jersey.  They didn't mind.  They actually

O5fWmen3                          Opening - Mr. Weitzman

1   thought it gave them a bit of leverage in the negotiations.

2   But after a year of due diligence, Heritage Advisors decided,

3   based on its own, independent evaluation of the project, that

4   it wanted to invest in this beautiful waterfront community in

5   Edgewater, New Jersey.

6           Nevertheless, the government argues that Daibes bribed

7   Senator Menendez to issue two press statements that are

8   favorable to Qatar.  The evidence will show that these

9   allegations are false.  For example, on the press statements,

10  the government suggests that Menendez issued these public

11  statements thanking Qatar in order to incentivize Heritage to

12  invest with Daibes.  There will be no evidence of that, ladies

13  and gentlemen.  You'll see those public statements.  Again,

14  there will be nothing surprising about any of them.  For

15  example, one of them just thanks Qatar for helping rescue

16  thousands of U.S. citizens and vulnerable Afghans and their

17  families following the Taliban's takeover of Afghanistan.  It

18  didn't recommend any aid or trade or arms or money or anything

19  else for the state of Qatar.  It didn't in any way alter the

20  relationship between the United States and the state of Qatar.

21  In fact, it's the exact same type of public statement that

22  public service politicians in the United States were falling

23  all over themselves to make.  You'll see other statements

24  similar in kind from the secretary of state and the secretary

25  of defense.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5fWmen3                          Opening - Mr. Weitzman

1          But here's the more important part.  There will be no

2     evidence presented in this case -- zero -- that the senator's

3     statements regarding Qatar influenced Heritage to invest in the

4     development project at all.  It was irrelevant to them.  There

5     will be no evidence -- zero -- provided by the government that

6     shows that the Qatari government was even involved in Heritage,

7     knew about the Heritage investment in Daibes's project or cared

8     about it.  Zero.  The fact that there was one member of the

9     royal family who owns Heritage and founded Heritage, that

10    doesn't mean it's owned by the government of Qatar.  The royal

11    family, the Al Thani clan, the family, they're thousands large

12    in Qatar, thousands and thousands.

13          THE COURT:  How much longer do you have, sir?

14          MR. WEITZMAN:  One and a half pages.

15          THE COURT:  Sir.

16          MR. WEITZMAN:  Thank you, your Honor.

17          Ladies and gentlemen, thank you.  On behalf of both

18    Adam fee and myself, I want to thank you.  This is the

19    conclusion of my opening and the beginning of the trial.

20          I want to thank you in advance for your willingness to

21    sit here and pay attention to the evidence.  It's going to be a

22    long trial, and we thank you.  We want to thank you in advance

23    for agreeing to do justice impartially, mutually, fairly,

24    without passion or prejudice and based on your review of all

25    the evidence by both sides.  Thank you.

O5fWmen3                          Opening - Mr. Weitzman

1           And I want to thank you in advance for agreeing to

2    perform the hard task of evaluating each defendant and

3    individual individually.  Whenever you see a document that says

4    Nadine or Hana or Daibes, ask yourself, where's Bob?  We will

5    be spending the next several weeks together, and then you will

6    deliver a verdict.  After you leave this courtroom, this case

7    will be behind you.  You won't forget about it, but you also

8    won't be living with the weight of your judgment day in and day

9    out.

10          MS. POMERANTZ:  Objection.

11          THE COURT:  Sustained.  Sustained, sir.

12          MR. WEITZMAN:  You have a man's lifetime of public

13   service in your hands.  This case has and will affect him for

14   the rest of his life.

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Ladies and gentlemen, your decision here

17   is to be based on the evidence you are going to hear, nothing

18   else, and you are to determine whether the government has met

19   its burden of proof; that is, it has to prove each defendant

20   guilty beyond a reasonable doubt.  The issue of punishment or

21   the result of any finding on your part are up to me.

22   Punishment is for me, not for you, ladies and gentlemen.  Your

23   job is to determine whether the government has met its burden

24   of proof.

25          Sir.

O5fWmen3                          Opening - Mr. Weitzman

1           MR. WEITZMAN:  Yes.

2           So you have a man's lifetime of hard work in your

3     hands.

4           MS. POMERANTZ:  Objection.

5           THE COURT:  Same.

6           Proceed.

7           MR. WEITZMAN:  When you go back to the jury room at

8     the end of the case, all we ask is that you fulfill your solemn

9     oath and that you give the decision you face the weight, the

10    consideration, the deliberation it deserves.

11          Thank you.

12          THE COURT:  All right.  Thank you, Mr. Weitzman.

13          Ladies and gentlemen, it's 4:30.  I want to give you a

14    break -- I always do a break when we can -- so you can refresh

15    yourselves.  Please just do that and come back.

16          Now, we have two more openings that will last until

17    about 5:30.

18          Let Ms. Blakely know whether the jury can stay until

19    5:30.  If it can't, we'll only have one opening and we'll end

20    just around 5 o'clock.  But it's in the interest of everybody

21    to move the case along, and if you can stay for two openings --

22    that is, the remainder of the openings -- so much the better.

23          I don't mean to pressure you.  There shouldn't be any

24    disputation within the jury.  Just let Ms. Blakely know.

25          Thank you.
            (Continued on next page)

O5fWmen3

1          (Jury not present)

2          THE COURT:  Please be seated.

3          Mr. Weitzman, my concern with your opening is you were

4     constantly putting your own credibility at issue.  That's not

5     for this jury.  I mean it's interesting that you're one of a

6     twin.  I didn't know that.  There was something else about

7     Holocaust survivors.  Your personal story is not for this jury.

8     What's for this jury is whether or not the government has met

9     its burden of proof.  So just stick to the evidence.  That's

10    what I was trying to get you to do.

11         MR. WEITZMAN:  I understand, your Honor.

12         THE COURT:  All right.  Thank you.  Take ten minutes,

13    if the jury is ready.

14         (Recess)

15         THE COURT:  All right.  Lawyers take your places.  The

16    jury is ready to come in.

17         There are several members of the jury who have

18    child-care issues, so we'll break at five or as soon after as

19    the closing is finished.  The estimate that Mr. Lustberg gave

20    me was a half hour.

21         Is that still what it is, sir?

22         MR. LUSTBERG:  Yes, but your Honor, I'm watching the

23    jury, and I do think that there are some very tired members of

24    the jury.  And I'm concerned with starting my opening at what's

25    going to be quarter till five.  If you're asking me, and I know

O5fWmen3

```
1    you're not, what my preference would be at this point, it would

2    be that rather than start and get to five where they really

3    want to leave and not be done, which I don't think I would be

4    done by five, I would rather just start fresh in the morning.

5            THE COURT:  Let's try and get in as much as we can.

6    We'll end at five.  If you're not finished, you're not

7    finished.

8            All right.

9            Let me see what the position of the parties is.  I

10   shouldn't do that unilaterally.

11           MR. FEE:  Your Honor, for what it's worth, we think we

12   should not break up Mr. Lustberg's opening.

13           THE COURT:  I would assume that.

14           MS. POMERANTZ:  We don't have an objection, your

15   Honor.

16           THE COURT:  All right.  Thank you.

17           Then I'll bring them in and we'll end now.  I always

18   like to get the views of the parties.

19           (Continued on next page)

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5fWmen3

1           (Jury present)

2           THE COURT:  Please be seated in the courtroom.

3           Ladies and gentlemen, my deputy has told me some

4    members of the jury have child-care issues, so we're going to

5    end at five.  Rather than have one of the closings be rushed

6    and keeping you through the process, we're going to break now.

7    All right?

8           So there will be two closings tomorrow, which will

9    start as soon as you come in.  Please be here by 9:30.

10   Remember to leave time for getting through security.  You'll

11   have your cards that will enable you to get to the head of the

12   line.

13          Don't come into this courtroom.  Come into the jury

14   deliberation room, where you were.  That's the jury

15   deliberation room for courtroom 23A.

16          Keep an open mind.  You still haven't heard one word

17   of evidence.  This is just the lawyers' views as to what they

18   think the evidence will show.  Don't listen to any of the media

19   information, if there is any, about this case.  Don't talk to

20   anybody.

21          Keep an open mind.  Enjoy the evening.  This jury is

22   relieved now until 9:30 tomorrow.  And again, we can't begin

23   until all 18 of you are here, so please be courteous.

24          (Continued on next page)

25

```
 1              (Jury not present)
 2              THE COURT:  All right.  9:30 tomorrow.  Thank you.
 3              MR. FEE:  Your Honor, we have one item.
 4              THE COURT:  Yes.
 5              You may be seated in the courtroom.
 6              MR. FEE:  Sorry to keep everyone a bit longer, your
 7  Honor.
 8              The reference relates to Ms. Pomerantz's opening.
 9              THE COURT:  Yes.
10              MR. FEE:  We believe the government violated the
11  speech and debate orders the Court has given in two ways, and
12  I'll read from the transcript, your Honor.
13              First, Ms. Pomerantz stated:  "Menendez texted Nadine
14  to tell Hana he," meaning Menendez, "was going to sign off on
15  or approve the sale of almost $100 million of tank ammunition."
16              Your Honor, that's one, and I don't think that's a
17  close call.  That is describing, as the Court put it, the
18  actions Menendez allegedly took as a senator in deciding
19  whether or not to place a hold on foreign aid to Egypt, and the
20  Court called those legislative acts.
21              That's reading from your opinion, your Honor.
22              THE COURT:  Just a moment.
23              But discussions leading up to a role where a signing
24  off are not legislative acts.
25              MR. FEE:  That's not what it says, your Honor.
```

O5fWmen3

1              THE COURT:  You're right.

2              MR. FEE:  She said he was going to sign off, period.

3    And speech and debate is not like attorney-client.  You don't

4    waive it by telling it to your wife.  In fact, everything you

5    do in the Senate is known to third parties, for the most part.

6              This is directly violative of the Court's order and

7    actually merits a mistrial.

8              THE COURT:  All right.  I'll hear from the other side.

9              MR. FEE:  Your Honor, I have one more point.  I don't

10   know if you want to address them both at the same time.

11             THE COURT:  Yes.

12             MR. FEE:  This is also reading from the transcript.

13             THE COURT:  Just let me read it.

14             MR. FEE:  Of course.

15             THE COURT:  Yes, sir.

16             MR. FEE:  This is Ms. Pomerantz again:  "And he,"

17   meaning Fred Daibes, "was hoping for a multi-million dollar

18   investment from a company connected to another foreign

19   government, a government in another Middle Eastern country,

20   Qatar.  Menendez had power over U.S. policy about Qatar, not

21   just Egypt, so Daibes bribed Menendez for that too.  Daibes

22   suggested ways that Menendez could help Qatar" -- and here's

23   the key sentence, again, her words:  "Like by supporting a

24   Senate resolution praising Qatar.  And so Menendez took the

25   gold and he took the cash, knowing Daibes wanted to take those

O5fWmen3

1    actions."

2          Your Honor, this is exactly what Mr. Richenthal said

3    the government was not going to do minutes before Ms. Pomerantz

4    said that Senator Menendez supported a Senate resolution

5    praising Qatar in exchange for gold and cash.  This is sword

6    and shield that the government is doing, and despite

7    Mr. Richenthal's reaction, this does merit a mistrial.

8          MR. RICHENTHAL:  Would your Honor like me to respond?

9          THE COURT:  Just a moment.

10          I am concerned about praising Qatar when you were

11    saying earlier that the substance of the resolution would not

12    be mentioned.  That is true.  I want to hear briefly about the

13    first one, but let's start with the second one.

14          MR. RICHENTHAL:  This is actually entirely consistent

15    with what I said, which is that Mr. Daibes transmitted

16    information to Mr. Menendez -- I even quoted the exact title of

17    the resolution -- with the hope and expectation that

18    Mr. Menendez would take action thereon.  And what I said was we

19    did not intend to prove any action of any kind was ever

20    undertaken.  This is directly from the indictment, and it's

21    exactly what Ms. Pomerantz said:  "Mr. Daibes suggested ways,"

22    I'm quoting, "Menendez could help Qatar, like supporting a

23    Senate resolution.  In other words, Daibes suggested things

24    Menendez could do."

25          And then Ms. Pomerantz --

O5fWmen3

```
 1                THE COURT:  Just a moment.  Just a moment.

 2                Yes.  Go ahead.

 3                MR. RICHENTHAL:  And then Ms. Pomerantz did exactly

 4      what I said we've always alleged and intended to do -- "shifted

 5      from what Daibes wanted," to use her words, "what he suggested,

 6      to payment and Menendez taking payment, knowing what Daibes

 7      wanted."

 8                Those are the next two lines.  That's exactly what I

 9      said.  It's exactly what's alleged in the indictment.  It does

10      not get into a single thing Menendez ever did, other than

11      accept payment, which is not a legislative action.

12                THE COURT:  No, but it's describing the substance of

13      the Senate resolution; that is, it praised Qatar.

14                MR. RICHENTHAL:  It describes that Daibes suggested

15      things Menendez could do, such as a Senate resolution praising

16      Qatar.  It does not say there was even a resolution, and it

17      certainly does not say what Mr. Menendez did with respect to

18      such resolution.

19                THE COURT:  Give me the quote from Ms. Pomerantz

20      regarding Senator Menendez supporting a Senate resolution

21      praising Qatar.

22                MR. RICHENTHAL:  I'm sorry?

23                THE COURT:  Give me the quote from Ms. Pomerantz's

24      opening in regard to Menendez supporting a Senate resolution

25      praising Qatar.
```

O5fWmen3

```
1          MR. RICHENTHAL:  So, it doesn't say he supported the

2    Senate resolution.  It says, and I'm now going to quote the

3    three sentences in a row, because that's the whole point.

4    Actually, it's two full sentences.  Forgive me.

5          "Menendez had power over U.S. policy about Qatar, not

6    just Egypt, so Daibes bribed Menendez for that too.  Daibes

7    suggested ways Menendez could help Qatar, like supporting a

8    Senate resolution praising Qatar."

9          THE COURT:  Just a moment.

10          Go ahead.

11          MR. RICHENTHAL:  In short, as I said, the allegation

12    is, and has long been -- it's in the indictment -- Daibes

13    suggests to Menendez things Menendez can do, including a

14    resolution with respect to Qatar.

15          THE COURT:  All right.  Fine.

16          MR. RICHENTHAL:  And Menendez takes payment.  That's

17    it.

18          THE COURT:  Thank you.

19          Sir.

20          MR. FEE:  Your Honor, it is forcing us to waive.  The

21    Court was concerned about the inference suggested --

22          THE COURT:  No, but it's consistent with what

23    Mr. Richenthal was saying, that it was Daibes saying that it

24    would help Daibes if Menendez supported Qatar, such as

25    supporting a resolution praising Qatar.
```

O5fWmen3

1           MR. FEE:  This is angels dancing on the head of a pin

2     with this theory, your Honor.  There is zero percent chance

3     that the jury is not going to infer from this that Ms.

4     Pomerantz was arguing to them that Senator Menendez supported

5     Qatar.  I hear the prosecutors repeat it again and again.  They

6     are injecting this case with that inference, No. 1, forcing us

7     to waive.  And No. 2, we think there will be a righteous

8     outcome, but the record in this, for appellate reasons, I think

9     it's impossible to discern the theory the government is now

10    operating on.  To pretend that that inference is not being

11    suggested is naïve.

12          THE COURT:  OK.

13          MR. RICHENTHAL:  I'm sorry.  It's literally the same

14    allegations.  I'm actually going to read the final sentence in

15    the paragraph, because I think it hammers home how precise we

16    have been ever since we brought --

17          THE COURT:  Maybe you're coming too close to the line

18    in terms of the inference that you're seeking, but go ahead.

19          MR. RICHENTHAL:  With respect, your Honor, we're

20    actually not asking the jury to draw any inference at all.

21    We're going to prove literally, not circumstantially --

22    literally -- that Daibes suggested this very thing and Menendez

23    took payment.  We're not asking the jury to infer anything, and

24    the reason I wanted to quote Ms. Pomerantz's final sentence in

25    the paragraph is because we're trying to not even come close to

O5fWmen3

1    the line.  If I may?  The final sentence, before she switches,

2    is, and I'm quoting now:  "And so Menendez took the gold and he

3    took the cash, knowing Daibes wanted him to take those

4    actions."  Period.

5            Nothing else was said about any actions at all.

6            MR. FEE:  Your Honor, only lawyers could come up with

7    this theory.  He took the gold, he took the cash, knowing

8    Daibes wanted him to support a resolution praising Qatar.

9    They're alleging he took the cash to praise Qatar.  It's only a

10   lawyer's mind.

11           THE COURT:  No.  No, sir.  When we're dealing with

12   speech and debate, the difference is what is a legislative act

13   and what isn't.  And there's no legislative act that's in the

14   record here.  The motion for a mistrial is denied on the second

15   basis.

16           Let's turn to the first basis.

17           MR. RICHENTHAL:  So, I don't have the case --

18           THE COURT:  But watch the line, government.  Watch the

19   line that you're dealing with when the evidence comes in on

20   this Qatar resolution.

21           MR. RICHENTHAL:  Understood, your Honor.

22           THE COURT:  What's permissible is Daibes suggesting

23   ways and, if it's the case, then there was the receipt of

24   money.  But, yes, leave it at that.  If there's a promise here,

25   then you're getting into a speech or debate.

1          Go ahead.

2          MR. RICHENTHAL:  I think the devil's in the details,

3   so I don't want to go beyond this colloquy.

4          THE COURT:  No, I'm sorry.  I shouldn't say if there's

5   a promise, then you're getting into speech and debate.  That

6   was a little too far.

7          Go ahead.

8          MR. RICHENTHAL:  And that's why I reacted that way.

9          To go to the other statement, there are numerous

10  Supreme Court cases that have made a very important and

11  granular point, and here's the point.  A promise or statement

12  of an action not yet undertaken, irrespective of the nature of

13  the action, is not a legislative act.

14         THE COURT:  That's true.  I can substantiate that;

15  that is my understanding of the law.

16         Go ahead.

17         MR. RICHENTHAL:  And that is why what Ms. Pomerantz

18  said --

19         THE COURT:  Promises are not legislative acts.

20  They're not within the core of speech or debate protection.

21  Yes.

22         MR. RICHENTHAL:  Yes.

23         THE COURT:  Next.

24         MR. RICHENTHAL:  Which is why what Ms. Pomerantz said

25  wasn't even close to the line.  What she said, which is also in

O5fWmen3

1      the indictment, is that Mr. Menendez told Mr. Hana, through

2      Nadine Menendez, what Mr. Menendez was going to do,

3      future-oriented.  Not a word was said about whether he, in

4      fact, did anything at all ever.  That is not even close to the

5      line under multiple Supreme Court cases and this Court's

6      decision.

7                  THE COURT:  Let's go to No. 1.  You have my denial of

8      the motion for a mistrial on No. 2.

9                  Let's go to No. 1.

10                  MR. RICHENTHAL:  I'm sorry.  I was speaking about No.

11     1, although I think it bears on both.  I can quote Ms.

12     Pomerantz said it's future-oriented, which is why I made those

13     remarks.

14                  I'm now going to quote starting with the words "for

15     example" on line 10:

16                  "For example, the day after the meeting with Egyptian

17     military officials, Menendez texted Nadine to tell Hana he was

18     going to sign off on or approve the sale of almost $100 million

19     of tank ammunition to Egypt."

20                  Now, to be clear, that sentence in and of itself is,

21     as I said, future-oriented.  But as your Honor just said a

22     minute ago in our back-and-forth, and I wholeheartedly agree,

23     it would actually be OK if it weren't.  It would be perfectly

24     fine for him to tell an outside party things he intends to do;

25     for that matter, things he has not done.  Those aren't holds.

O5fWmen3

1  Those are statements to outside parties about actions.  They

2  may be true.  They may be false.  In fact, as the Court knows,

3  there are stings involving public officials in which public

4  officials promised to take action or say they have take action

5  or say they will take action in return for money.

6         The fact that if they did those things the government

7  could not prove the actual action has never been understood to

8  prevent a sting or prevent a prosecution based on the

9  statements.  In fact, your Honor's opinion has a section about

10  this very point.  The reason I was focusing on this sentence

11  being future-oriented is because it's future-oriented it

12  doesn't even really get into those cases because it's not even

13  talk about historical fact at all, although my point is it

14  would be OK if it did.

15         THE COURT:  Mr. Fee.

16         MR. FEE:  It's not future-oriented.  This is how Ms.

17  Pomerantz talked about it:

18         "So let's start by talking about what Menendez did.

19  Between 2018 and 2022, Menendez met again and again with

20  Egyptian officials," a couple other sentences.

21         THE COURT:  That's all OK.

22         MR. FEE:  That's not OK, because she says, let's talk

23  about just three examples of how Menendez helped Egypt.  Let's

24  talk about what he did, how he helped Egypt.

25         First was the sensitive information.  Second was ghost

O5fWmen3

```
1    writing a letter, and then third is, again, the language we are
2    pointing to, that Menendez texted Nadine to tell Hana he was
3    going to sign off on $100 million of tank munitions.  You see
4    what is going on.  This is argument for the jury to understand
5    that he did it and he helped Egypt.  Those are her words.  He
6    did, what he did, and how he helped Egypt.
7          They're going to stand up and say, well, what he did
8    was make a future-looking promise.  The line is untenable.  We
9    have no choice, given the clear implication -- it's not even an
10   implication, because she said he helped Egypt.  The only way to
11   help Egypt is by actually approving that aid.  Making a promise
12   to somebody doesn't help Egypt.  That's what she's arguing to
13   the jury.  We have to waive to meet these allegations.
14         MR. RICHENTHAL:  I confess to sincerely being puzzled.
15   Of course it helps Egypt to give them an inside track in
16   Washington.  Ms. Pomerantz actually said that.
17         And how do you give people an inside track?  You give
18   them information.  You give them advance warning.  You tell
19   them about things.
20         The Court's decision is crystal clear.  None of that
21   is speech or debate.  What would be is if we said you know how
22   he helped Egypt, he actually approved weapons.  She didn't even
23   come close to saying that.  All of these things are
24   conversations with third parties, which the Court ruled crystal
25   clear in a published decision is not speech and debate.
```

O5fWmen3

1          If Mr. Fee, in the event that his client's convicted,

2     wishes to appeal and ask the Second Circuit to dispute the

3     Court's decision, he has that right.  But this Court already

4     ruled on this.  This is not a legislative act.

5          THE COURT:  Sir.

6          MR. FEE:  Your Honor, I don't agree with this

7     characterization of the argument, and if you need that many

8     words to explain why he didn't violate a rule, I don't think

9     it's clear.  They are toeing the line.

10         THE COURT:  The number of words goes back and forth

11    here.

12         MR. FEE:  My words are shorter, your Honor.

13         THE COURT:  Let's not count the words.

14         MR. FEE:  Yes, your Honor.

15         THE COURT:  Because it seems to me that Mr. Richenthal

16    has the better part of the argument.  Clearly the argument is

17    he was helping Egypt, but the sorts of things that you're

18    talking about are not core speech and debate.  Again, core

19    speech and debate is clearly not limited to things that are on

20    the floor of the Senate -- that's true -- and not limited but

21    certainly include Senate resolutions, committee meetings,

22    committee hearings, so forth.  And the cases say you don't

23    interpret speech and debate overly narrowly.  But it seems to

24    me we're far away from core speech and debate because what the

25    government is saying is, yes, he was helping Egypt, but that's

O5fWmen3

1    not core speech and debate.

2              Sir.

3              MR. FEE:  You nailed it, your Honor.  Speech and

4    debate cannot be construed narrowly.  This is so narrow that

5    you can barely see it from the side.  They are saying he did

6    things to help Egypt.  Here's how he helped Egypt.  Three

7    things.

8              THE COURT:  Yes, but so far, everything you've said

9    does not implicate legislative act.

10             MR. FEE:  It does, your Honor.  They are going to

11   suggest in he approved and lifted that hold to help Egypt.

12             THE COURT:  It's evidence of the hold itself that's

13   the legislative act.

14             MR. FEE:  This is evidence of the hold.  They're going

15   to put in a text that he sent to Nadine that she forwarded to

16   an Egyptian officer with a clear implication that he's

17   delivering on the promise.  That is the argument the government

18   is making.  They are making a hypertechnical argument that

19   offends the speech and debate privilege.

20             THE COURT:  All right.

21             Last, government.

22             MR. RICHENTHAL:  I'll try and be short.

23             That's not true under the Court's decision.  The

24   motion should be denied.

25             THE COURT:  I'm denying the motion for a mistrial.

O5fWmen3

1    There's no basis for a mistrial here.  What they're talking

2    about is not core speech and debate.

3            See everyone tomorrow at 9:30.

4            MR. FEE:  Thank you, your Honor.

5            (Adjourned to May 16, 2024, at 9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25