O5G3MEN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5    ROBERT MENENDEZ, et al.,

6              Defendants.
                                           Trial
7    ------------------------------x

8                                          New York, N.Y.
                                           May 16, 2024
9                                          9:40 a.m.

10   Before:

11
                         HON. SIDNEY H. STEIN,
12
                                           District Judge
13                                         -and a Jury-

14                         APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  PAUL M. MONTELEONI
17        DANIEL C. RICHENTHAL
          ELI J. MARK
18        LARA E. POMERANTZ
          CATHERINE E. GHOSH
19        Assistant United States Attorneys
          -and-
20        CHRISTINA A. CLARK
          National Security Division
21

22

23

24

25

O5G3MEN1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
     Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     RITA FISHMAN

GIBBONS, P.C.
     Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     RICARDO SOLANO, Jr.
     ANDREW J. MARINO
     ELENA CICOGNANI
     JESSICA L. GUARRACINO

CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
     Attorneys for Defendant Daibes



Marwan Abdel-Raman, Interpreter (Arabic)
Bachar Alhalabi, Interpreter (Arabic)

O5G3MEN1                     Opening - Mr. Lustberg

1                    (Trial resumed; jury not present)

2                    THE COURT:  All the jurors have arrived.  You can be

3       seated in the courtroom.

4                    Mr. Lustberg, you're ready?

5                    MR. LUSTBERG:  I am, your Honor.  Thank you.

6                    THE COURT:  My clerk is going to hand to the parties

7       an opinion in the Rule 15 depositions.  I think it can be

8       publicly filed, I see no reason for sealing any part of it.

9       The parties disagree, let me know.  I propose to file it

10      publicly.  As you know, it is denying the application for the

11      Rule 15 depositions.  It just sets my reasoning out in full

12      measure.

13                   Mr. Lustberg, don't interject yourself into the

14      opening.

15                   Jury entering, please rise.

16                   (Jury present)

17                   THE COURT:  Good morning, ladies and gentlemen.  Thank

18      you for being here.  As you know, we now will proceed with the

19      opening statements.  The next opening statement is by

20      Mr. Lustberg on behalf of Mr. Hana.  Remember that anything he

21      says is not evidence.  It's what he believes the evidence will

22      show.  You decide what the evidence will show.

23                   Mr. Lustberg, sir.

24                   MR. LUSTBERG:  Thank you very much, your Honor.  Good

25      morning, ladies and gentlemen of the jury.

O5G3MEN1                    Opening - Mr. Lustberg

1          It's been a few days since I got to introduce myself

2     so let me reintroduce myself.  My name is Larry Lustberg, I

3     have the privilege of representing Will Hana, along with my

4     colleagues Annie Collart and Ricardo Solano, from whom you will

5     hear during this trial.

6          We all listened to and had the opportunity to think

7     about the government's opening that you heard yesterday.  And

8     what strikes me is really, thinking about it, from Mr. Hana's

9     perspective, what that opening was about was about taking

10    innocent, even good, positive acts, and trying to make them

11    appear sinister and criminal.  It's about criminalizing

12    friendships, it's about criminalizing building a business, it's

13    about criminalizing advocating for your native land, it's about

14    criminalizing trying to do someone a favor, it's about

15    criminalizing that which is not at all illegal.

16          In this opening I am going to explain to you how that

17    is so, based entirely upon evidence that will be introduced,

18    and I'm going to argue to you that the government's theory is

19    just not right.  In part it's not right because, really, as I

20    am going to explain, it amounts to something called guilt by

21    association, which Judge Stein will instruct you cannot, cannot

22    justify a conviction in a criminal case.

23          The government's opening really was all about guilt by

24    association.  If you listened to it carefully, you know the

25    government argued, and I'll discuss this more in just a couple

1    of minutes, that Mr. Hana's long relationships, that is

2    associations, guilt by association with Mr. Daibes and

3    Mr. Uribe, the government's star witness, are fundamental

4    aspects of why they think Mr. Hana is guilty.

5            But even more so for Will, it is about his association

6    with Senator Menendez's wife, which was a 15-year friendship,

7    one that began long before Nadine -- then Arslanian -- even met

8    Senator Menendez, let alone before they got married.  And the

9    fact that friendship continued after she met and began to date

10   and then married Bob Menendez does not, it cannot, make it a

11   crime.

12           As you listen to this case, over the next weeks,

13   consider how much of it is based upon guilt by association.

14   You're going to be able to tell that it really is about guilt

15   by association when you see the government's evidence.  Because

16   that evidence is going to include a lot of pictures, but those

17   will not be pictures of criminal acts.  Those will be pictures

18   of people having dinner together.  Those will be pictures of

19   people meeting.  Those will be pictures of people shopping.

20   People associates.  Again, the stuff of everyday life.

21           As we go together through the journey that will be

22   this trial, I will ask that you look at the government's proofs

23   with respect to Mr. Hana with the concept firmly in mind that

24   the kinds of innocent actions that you will see here simply

25   can't justify a finding of guilt in a criminal case like this

O5G3MEN1                    Opening - Mr. Lustberg

1    one.  If it could, then the enormous power of the government

2    would be even more uncontrolled, and really we would all be in

3    trouble.

4             MS. POMERANTZ:  Objection.

5             THE COURT:  Proceed.

6             MR. LUSTBERG:  Fortunately, as you will see, the law

7    will help you not to allow such an injustice.  So I'll ask you,

8    not only, as the other parties have, to listen to the facts, to

9    look at the exhibits, to watch what unfolds before you in this

10   courtroom, but also to apply the law that Judge Stein will

11   instruct you on, as you must do, in order to well and truly try

12   this case, which was the oath that you all took yesterday.  The

13   Court's instruction also help you to do that job, to

14   distinguish between what is criminal, and what isn't.

15            They will, for example, and Ms. Pomerantz told you

16   yesterday, include a lot about the definition of bribery, which

17   requires, as she told you, a quid pro quo, a this for that.  A

18   benefit provided specifically in exchange for an official act.

19   There will be a lot more you'll hear about that concept as this

20   trial goes along, and in Judge Stein's instructions, but right

21   now I want you as you think about this case, to think about it

22   through the prism of a quid pro quo.

23            Listen to the judge at the end of the case, and apply

24   the law to assure that any verdict that you render is a just

25   one.

1          Here, the acts at issue are innocent.  Because as you

2     will see, there was never, ever, a time when Will Hana provided

3     things of value to Senator Menendez directly, or through his

4     girlfriend and later wife Nadine, in exchange for an official

5     action.  It just didn't happen.

6          Now, let me be clear.  Does that mean that Will never

7     gave anything of value to Nadine?  Absolutely not.  I'm not

8     standing here telling you that did not happen.  They were

9     friends, longtime friends, beginning in 2009 and lasting right

10    up through the indictment in this case.

11         It all started when Will, who came here from Egypt in

12    2006, was introduced to her by Andy Aslanian, a name you will

13    hear.  They became friends.  Initially it was because she spoke

14    Arabic, which is the language which he remains most

15    comfortable.  He speaks English as you'll hear, but you see he

16    is having this translated.

17         As friends, Will and Nadine cared about each other.

18    That's what friends do.  They spent time together.  That's what

19    friends do.  And yes, they gave each other gifts.  That's also

20    what friends do.  On birthdays, holidays, and at other times.

21    They supported each other emotionally, and at times

22    financially.  They were, as they described it themselves, and

23    you will hear evidence to this effect, like brother and sister.

24    Within a social group that included others, like Andy Aslanian,

25    and another government witness who you'll hear, Vasken

1    Khorozian.

2              And again, it is significant, that as the government

3    has acknowledged, very significant, I want you to remember,

4    this relationship long predated Nadine Arslanian's relationship

5    with Senator Menendez, which began in mid 2018, and resulted in

6    their marriage, as you heard, in October 2020.

7              So the evidence will be, as I said, we start with

8    this, that they cared about each other.  As you will see they

9    referred to each as brother and sister.  After Hurricane Sandy

10   destroyed Mr. Hana's trucking business, Nadine tried to help

11   Will start over.  And when Nadine suffered a bad injury in

12   2017, Will visited her in the hospital every single day and

13   continued to provide emotional support during her recuperation.

14   He cared for her.

15             Then later, in 2019, when Nadine found herself behind

16   on her mortgage payments, Will offered assistance.  As Nadine

17   had done to him, when his business failed.  Although, as you

18   will see, and as we'll discuss some more, it was in the form of

19   a loan.  A loan.  Which, though without interest, was always

20   something that Nadine understood she would have to pay back.

21   In fact, you are going to hear evidence that she even told the

22   government's star witness, Jose Uribe, that she would pay Will

23   Hana back.  The loan was conveyed in a check that indicated it

24   was a loan, and it was paid back with a check that indicated it

25   was a loan.

1          So, they cared about each other.  And for sure, for

2     sure, as you'll see, they spent time together, as friends do.

3     From late 2016 through 2017, when Will was not traveling, Will

4     and Nadine -- and he often traveled, as you'll hear, to

5     Egypt -- Will and Nadine would go to lunch or dinner at least

6     monthly, sometimes weekly, sometimes more often.  They

7     frequented venues you will hear about, The Park Cafe, The River

8     Palm, La Mesa, among other restaurants in New Jersey as you'll

9     hear.

10          And you will definitely, definitely hear that they

11     gave gifts to each other.  Nice things, like exercise

12     equipment, cases of wine, jewelry.  Small things that they

13     liked, like key lime pie, phone cases, and tequila.  And

14     sometimes practical things like carpeting or an air purifier.

15          As time went along, Nadine's gifts were more on the

16     thoughtful side, and Will's were somewhat more generous,

17     because she did not have as much money as he did.  For example,

18     you'll hear Nadine would take the time to purchase personal

19     gifts for Will's family back in Egypt.  And no doubt, Will's

20     gifts, as I said, got nicer as his business succeeded.  He

21     provided her, as he provide others from whom you'll hear, with

22     jewelry and watches, for example.

23          Let me just stop here to address one thing that the

24     government said.  Which the government said that something

25     Mr. Hana had were gold bars that could be traced to Mr. Hana in

1    the residence of Mr. Menendez that they searched.  I promise

2    you, when you listen to the evidence and consider it with an

3    open mind, you will hear nothing about $50,000 gold bars

4    traceable to Will Hana that were recovered from the Menendez

5    home.

6          You will hear about a couple of small gold -- I'm

7    going to call them minibars, that are worth about $1800 each.

8    Nice, nice thing to have, and you'll hear about how gold is a

9    gift that people, particularly from the Middle East, give each

10   other, but just gifts.  Not representing anything like the huge

11   amounts of money that the government alleges were paid.  And

12   presumably would have to be paid if you were really going to

13   influence public policy or get yourself some kind of lucrative

14   monopoly contract.  It seems like it would take more than an

15   $1800 mini gold bar.  Although you'll hear about two of them

16   that can be traced to Will.  In any event, just ask you listen

17   hard to the evidence here.

18         You will never hear this.  You will never hear that

19   any of Mr. Hana's gifts, I've listed them for you, to Nadine,

20   whether before or after she met Mr. Menendez, were in exchange

21   for anything.

22         At the end of the day, what the government is trying

23   to do here, as I said upfront, is to criminalize gift giving.

24   Don't let them say that every gift is a bribe.  Don't let them

25   criminalize that which is not only not bad, but was actually a

1    good thing.  It is a good thing that we human beings give each

2    other gifts.  Especially don't let them do that because the

3    proofs will not only fail to be tied to a this for that, a quid

4    pro quo, but also, because full consideration of the facts

5    actually presented will show that Will and Nadine's actions

6    were inconsistent with the idea of a quid pro quo.

7    Inconsistent with the idea of bribery.

8            So, when Nadine wanted more money, and complained to

9    Will and complained to others that he wasn't providing more

10    money, you will see that he didn't turn around and provide more

11    money.  Is that what a briber does?  If he's giving gifts in

12    exchange for official acts?  Consider that as the trial goes

13    along.  Is that what a briber does?  If what he is trying to do

14    is land some sort of lucrative contracts?  Think about that as

15    the trial goes along.

16            For example, just a few examples that will come up in

17    the evidence of this case.  Nadine wanted Will to buy her a

18    car.  But the evidence will show that he simply did not do

19    that.  The government said in its opening that he promised to

20    buy her a car.  I ask you, listen to the evidence as it

21    develops in this case.  There will be no evidence, none, that

22    he ever made such a promise.

23            When she was financially strapped, Nadine wanted Will

24    to pay her mortgage.  You've heard a little bit about that.

25    But instead, what Will did, rather than offering her a bribe,

O5G3MEN1                     Opening - Mr. Lustberg

1    was to give her a loan.  She accepted, begrudgingly, that loan,

2    receiving money in the form of a check, as I said before,

3    marked as a loan and eventually repaying it with a check that

4    also said loan.  And it was paid back.  It was paid back.

5    That's a good thing.  That's not obstruction of justice.  It's

6    good to make payment on your loans.  But, the government has to

7    say that that was a cover up because if it was a loan, then it

8    couldn't have been a bribe.

9            Again, think about this through the lens of was this

10   really criminal or was it the kind of thing that people do.

11           The main thing, though, that you heard yesterday from

12   the government is that Will gave Nadine checks.  That was the

13   word they used.  Checks.  To be exact, there were three checks

14   of $10,000 each for her working at IS EG Halal, which you

15   remember is Will's business.  It is his halal certification

16   business, and which he hired her when he was setting it up.  As

17   you'll hear, she was supposed to set up offices in Brazil, in

18   Uruguay, and India.  But she really wasn't interested in

19   working.  And you are going to hear that.  She didn't want to

20   work.  She really wanted something for nothing.  Will was

21   dissatisfied.  And when she was complaining to him that he was

22   trying to -- complaining about him that he was trying to make

23   her work eight hours a day, he responded by firing her.  It was

24   a three -- he gave her three months to make good on it, $10,000

25   a month, not exactly exorbitant, and when he tried to make her

1    work and accomplish something and she didn't, she neither

2    worked nor got any of these offices set up, he didn't renew the

3    contract.  And he hired somebody else to set up the office in

4    India.

5            Ask yourself, as the trial proceeds, is this what a

6    briber does?  Trying to get favorable action from her, or from

7    her husband?  It just doesn't make sense.

8            Finally, you'll hear about conversations, perhaps

9    taped conversations, when it's clear that while Will does say

10   that the Menendezes never paid for their dinners, he does not

11   say, at any given time, that he needs to do so in order to get

12   favorable action from them.  There is no conversation as you

13   sometimes find in cases like this where somebody -- where there

14   is a discussion, I'm going to pay for dinner, in exchange for

15   this.  I'm going to do this, so that that person does that for

16   me.  The quid pro quo.  There's no direct evidence of the quid

17   pro quo.

18           In any event, I've been talking about the quid.  So

19   the quid is the thing you give.  Let's now talk a little bit

20   about the quo.  In the quo side, the government tries to argue

21   that Will must have gotten a benefit from the senator because

22   he was not worthy of the sole source contract.  They called it

23   a monopoly, but what it really was that Will was the only one

24   who could certify as halal meat going into Egypt.  And so

25   repeatedly in their opening they described Will as a, quote

O5G3MEN1                    Opening - Mr. Lustberg

1    unquote, failed businessman.

2            Just as with the quid side, what the government tries

3    to make friendship and gift giving into bribe, here they try to

4    make business success, especially after business failure, some

5    sort of evidence of criminality.  Their position, you should

6    conclude, we'll see if there is any evidence, is not only not

7    supported, but it is unfair.  Indeed, it is contrary to our

8    American values where we celebrate people who pick themselves

9    up by their bootstraps, as Will did, and achieve success, even

10   when they're coming from difficult circumstances, which is what

11   he did.

12           Let me be clear:  They're right on the facts.  Will

13   had had failures in his past.  In 2008, he had leased a Getty

14   gas station in Bayonne, New Jersey, but after a dispute with

15   the franchise owner, he had to close it.

16           Later he started a trucking company.  I think you may

17   hear about it during this trial called Barruos Logistics.  But

18   in 2012, Mr. Hana's trucks were destroyed by Hurricane Sandy.

19   Insurance as you'll definitely hear, did not cover the damage,

20   and Mr. Hana had to close his trucking company.

21           He tried to create an import export business.  He even

22   registered with the procurement office at the Egyptian embassy

23   in Washington so he could participate in RFQs, requests for

24   quotation, from the Egyptian defense ministry.  Working with

25   Andy Aslanian, a name you heard already, Will attempted a

O5G3MEN1                    Opening - Mr. Lustberg

1    number of unsuccessful export projects, including water and

2    sugar.  In all the years that Will sought those RFQs from the

3    procurement office, he received exactly one.  And that one was

4    a small shipment of military equipment, yielding less than

5    $100,000.

6          As late as 2016, Mr. Hana failed to secure any other

7    export contracts.  Even failed to secure a logistics contract

8    involving street sweepers he tried to do.

9          But, this is what's critical, although he had failed

10   in the past, you will hear he had a background in wholesale

11   food distribution.  That's what his family did in Egypt, and he

12   did, as the government said, have contacts in the Egyptian

13   government, which helped them to overcome these failures.  More

14   importantly, he worked unbelievably hard to learn what he

15   needed to know to start the new halal certification business.

16   You're going to hear about his efforts, toiling day and night

17   in a space he occupied in Andy Aslanian's offices to master the

18   principles of halal and to plan his business venture.

19         Eventually, Will got the contract.  But Senator

20   Menendez had nothing whatsoever to do with how he got it, and

21   you didn't hear the government say that he did.  He got it

22   because of factors that are in fact completely unrelated to

23   Senator Menendez.  Those factors include policy positions of

24   the government in the Egypt, and that's important.  Because you

25   will hear, and actually Mr. Weitzman talked about this a bit

O5G3MEN1                         Opening - Mr. Lustberg

1    yesterday, that it is Egypt and Egypt alone who decides who

2    gets these kind of halal certification contracts.

3           And you will hear that at the same time period, Egypt

4    decided that in many economic areas, it would replace opponents

5    of the regime, many of whom were believed to be affiliated with

6    the Muslim Brotherhood, with others who are not Muslim

7    Brotherhood and who were supporters of the new administration.

8    So Will, a Coptic Christian, got his contract because of who he

9    was, who his contacts with Egypt were, and because he worked

10   hard.  None of that, ladies and gentlemen, is a crime.

11          He also got it because an audit revealed that the

12   existing certifiers here in the United States -- you remember

13   the government said he replaced other halal certifiers who were

14   already here -- failed.  The evidence will show there were

15   problem after problem with those existing halal certifiers.

16   There were concerns about the time between stunning and

17   slaughter which can impact halal status.  There were concerns

18   that the animals were not bleeding as expected if the halal

19   process was correct.  Animals were not slaughtered in the

20   correct way.  You'll hear they are supposed to cut laterally as

21   opposed to cut horizontally.  Kind of all gross, but it is what

22   it is.

23          And the Egypt team that was on the audit was unhappy

24   with those halal certifiers.  There were concerns that sick

25   animals were being slaughtered.  And as a general matter, broad

O5G3MEN1                    Opening - Mr. Lustberg

1    concerns about whether halal certifiers here in the United

2    States were actually assuring that the slaughters were being

3    done consistent with Egyptian standards for halal.

4          So he also got this, not only because he worked hard,

5    not only because of his connections, not only because of who he

6    was, but also because his predecessors were not doing the job.

7    That's what the evidence will show.  He got it because, in

8    contrast, he could do the work and perform well and you will

9    hear that he still performs it well.

10         That all over the globe, IS EG Halal personnel are

11   doing a great, doing great work.  And doing great work under

12   government scrutiny.  If the slaughterhouse is not in

13   compliance, technical teams provide instruction and training on

14   Egypt's requirements.  In Australian and New Zealand IS EG

15   Halal employees audit over 40 slaughterhouses once a year.  In

16   Latin America, supervisors are stationed in slaughterhouses to

17   confirm daily compliance with the requirements of halal.

18   You'll hear this is all what IS EG does.  This is a good

19   company.  And you're going to hear that the result is that

20   Mr. Hana continues to keep these halal contracts, not because

21   of connections with Mr. Menendez, but based on the merits.

22         In this regard, the government really only points to

23   one piece of evidence, at least so far.  You'll hear the

24   evidence as it develops at trial.  That is that Senator

25   Menendez placed a phone call to this United States Department

O5G3MEN1                    Opening - Mr. Lustberg

1    of Agriculture Undersecretary Ted McKinney.  You will hear from

2    Mr. McKinney.  I am going to ask you to keep an open mind and

3    listen to the cross-examination of Mr. McKinney as well.

4    McKinney had published a report regarding whether IS EG's

5    status as the sole certify into Egypt was a good thing.  It was

6    critical of IS EG Halal, a New Jersey-based company with a New

7    Jersey-based owner.

8           So Senator Menendez openly made a call on behalf of

9    his constituent.  It was a constituent call.  It is what our

10   congresspeople are supposed to do.  And he expressed his

11   concern that that report was unfairly impacting a New Jersey

12   business, a business within his state.

13          The undersecretary really, in a lot of ways, as you'll

14   hear, representing the whole U.S. meat export industry, which

15   was aggrieved by this decision, expressed his concerns to the

16   senator about Egypt's decision to concentrate the halal market

17   in one certifier.

18          But McKinney and Menendez never again discussed the

19   issue.  And Will kept his business because, honestly, it was

20   never in jeopardy in the first place.  The decision was

21   Egypt's, it was not an American decision.  The USDA had nothing

22   to say about it.  They didn't like it, but there was nothing

23   they could do about it.  And by the way, you'll hear as well

24   that Mr. McKinney thought all kinds of bad things would happen,

25   the entire halal business would dry up, and there would be no

O5G3MEN1                    Opening - Mr. Lustberg

1    exports.  You'll hear that didn't happen as well.  In part

2    because, of course, Will did a great job.  Made contacts with

3    the industry and kept the exports to Egypt flowing.

4            So since that time, the Egyptian ministry of

5    agriculture has sent correspondence to embassies all around the

6    world confirming that IS EG Halal is the centralized certifier

7    of meat products to be imported into Egypt.  And after having

8    established himself, and shown that his business could and did

9    operate well, in March 2021, Mr. Hana's company entered into a

10   five-year contract for certification with Egypt.

11           So with regard to the creation of IS EG Halal, there

12   was no quo.  There was not only was there no quid, nothing

13   offered to Senator Menendez to do anything, but there was no

14   quo.  No crime at all.

15           And again, just think about this as we go along.

16   Mr. Hana picking himself up by his bootstraps is a good thing.

17   Not a crime.  Nor is it a crime to advocate for another country

18   with your elected representatives.

19           We are a country of immigrants, among them the

20   tight-knit Egyptian community of which Will Hana is a part.

21   And Will, as others do, advocates for his native land through

22   his elected representatives.  This is not an effort to make

23   Senator Menendez an agent of a foreign country, anymore than to

24   use a more current example, any Ukrainian-American who seeks to

25   get --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5G3MEN1                    Opening - Mr. Lustberg

1          MS. POMERANTZ:  Objection.

2          MR. LUSTBERG:  -- assistance going to Ukraine by going

3   to a member of congress, and making that member of congress

4   into an agent of Ukraine.  But the government argues that Will

5   stepped over the line by setting up meetings with his home

6   senator.

7          THE COURT:  Ladies and gentlemen, in that Ukrainian

8   example, whether somebody is an agent or not is not before you.

9   That's not for your consideration.

10         MR. LUSTBERG:  Absolutely.  I was doing it by way of

11  an analogy.  But that's fair enough.  This is not about

12  Ukraine.  I'm just giving an example of the sort of thing one

13  might do.

14         In any event, the government argues that Will stepped

15  over the line by setting up meetings with his home senator with

16  Egyptian officials.  Certainly the evidence will be that

17  Senator Menendez has the right, and really even the

18  responsibility, to educate himself with regard to Egypt as he

19  does with regard to other countries.

20         How can it be a crime for Will Hana to assist with

21  that?  It can't.  And you'll see it isn't, even if a part what

22  Will does during these meetings is for his own personal

23  interest in terms of talking about his halal business.  Nor,

24  although the government argues that Senator Menendez promoted

25  Will's halal business to generate money for bribes, is there

1    any evidence that he ever did so in the course of any of the

2    meetings about which you'll hear, and you'll hear about these

3    meetings and you'll see pictures of those meetings.  And you're

4    never, ever going to hear that during the course of those

5    meetings, he promoted his -- he did anything to promote his

6    business in order to generate money for bribes.  Just remember

7    that's the government's theory, that this whole business was

8    allowed to develop so that he could generate the money to

9    provide bribes.  Listen for the evidence.  Listen to whether

10   there is any proof that anything like that ever happened.

11   You'll see none.

12          You are going to hear about Nadine and Will exchanging

13   publicly available information about Egypt, including about

14   Egypt's efforts to combat terrorism along the Libyan border and

15   to promote broader civil rights.  And with respect to Americans

16   detained in Egypt, you'll hear about that.  Some of which

17   Nadine forwards to Senator Menendez.

18          But this is classic advocacy on behalf of a country,

19   one's native country.  Will is trying to send information about

20   Egypt to his senator in his state.

21          Along those lines, you've already heard from the

22   government about Senator Menendez having ghostwritten a letter

23   for the Egyptian government to his fellow senators.  That

24   letter, which was based -- and you'll hear this -- about

25   information provided by Will, in fact advocates in very broad

O5G3MEN1                    Opening - Mr. Lustberg

1    terms for good U.S. Egyptian bilateral relations and talks up

2    Egypt's efforts to establish stability in the Middle East.  The

3    government makes this sound really evil.  Even using the term

4    ghostwrite.  But all it really is, is a constituent working

5    with a senator to help him to advocate for a foreign nation,

6    his native country, in a way that furthers the global interests

7    of, we believe, both.  Is that a crime?  Listen to the evidence

8    and consider the law.  You will find that it is not.

9            Now, the government makes much of two instances in

10   which Will shared information he heard from Senator Menendez or

11   from Nadine with his Egyptian contact.  You heard this in the

12   government's opening yesterday.  Importantly, in neither case

13   was this information classified as top secret or otherwise.

14   Specifically, you will first hear about a time when Senator

15   Menendez requested and obtained certain very general

16   information regarding the composition of the U.S. embassy staff

17   in Cairo.  Will then forwarded that information to an Egyptian

18   official.  But, that information was neither classified or

19   otherwise secret, and you will hear that it was easy to obtain

20   in just a few hours.  In fact, a simple search on LinkedIn

21   reveals hundreds of Egyptian and American current and former

22   employees of the U.S. embassy in Egypt.  Nor was there anything

23   wrong with Will passing along information provided to him by

24   Senator Menendez to the effect that he was signing off on about

25   $100 million of military and civilian aid to Egypt.  Which you

1    will hear was the second largest recipient of foreign military

2    aid globally for its considerable efforts in maintaining

3    stability in the Middle East and combating terrorism.  There

4    was nothing wrong or corrupt about this funding.  Indeed, as

5    you'll hear, it was recommended by senior Senate Foreign

6    Relations Committee personnel, and it was not confidential.

7         Really, the government doesn't identify any purpose,

8    let alone a bad one, for the sharing of this non-classified

9    information.  Remember, they bear the burden.

10        So, assuming that Will requested and was provided with

11   this information and sent it along to Egypt, does that mean

12   that he was conspiring to make Senator Menendez an agent of

13   Egypt?  That was the argument you heard yesterday.  But as you

14   listen to the trial, think to yourself, is that what happened?

15   When Senator Menendez provided information to Egypt that was

16   public information, was that itself becoming an agent of Egypt?

17   And just so it's clear, there is absolutely no evidence, there

18   will be no evidence, that any of this was a result of a bribe.

19   It may have been that for some of these dinners that you are

20   going to hear about with Egyptian officials, that Will paid.

21   But treating friends to dinner is not a crime, let alone a

22   conspiracy to make a U.S. senator an agent of a foreign

23   country.

24        And you'll also hear that there's no evidence that

25   Senator Menendez changed his position as a result of Will's

O5G3MEN1                    Opening - Mr. Lustberg

1    actions, and no evidence he ever promised to do so.  Though he
2    did brag to his constituent Mr. Hana that he had come through
3    for him.  He still remained tough on Egypt on the one hand, but
4    treated it in a way that was aware of its strategic importance
5    as an ally of the United States on the other.
6          So having tried to criminalize friendship, criminalize
7    gift giving, criminalize commercial success by one who had
8    previously struggled, now the government tries to criminalize
9    advocating for one's native country through one's elected
10   representatives.  But that, ladies and gentlemen, is the very
11   essence of democracy.  It is not a crime.  It is not sinister.
12         Final point.  The government somehow contends that
13   Will was involved in this plot by Jose Uribe to influence the
14   state investigation through Senator Menendez.  You may recall
15   that argument yesterday.  But it does not say what Will did
16   anything.  It only says that Will knew the trucker involved, I
17   heard that yesterday, and that he somehow worked to try to get
18   a car for Nadine.
19         But there will be no evidence, and listen for it,
20   listen for it, that he somehow did anything of this sort.  This
21   part of the case really does turn on guilt by association.
22   Because the government's argument is that Will knew the
23   trucker, and knew Mr. Uribe.  And in fact, let's be clear about
24   some basics about it that you'll hear.  The New Jersey criminal
25   case had absolutely nothing to do with Will Hana.  It was a

O5G3MEN1                    Opening - Mr. Lustberg

state matter.  So really, Robert Menendez had no influence, in
fact did nothing, as the evidence will clearly show.

Finally, with regard to the car that's at the essence
of this.  Listen for the evidence, and you're going to hear
that the evidence will show that Uribe is the one who took all
the steps to purchase the Mercedes-Benz for Nadine.  Uribe
connected Nadine to the Mercedes-Benz dealer, Uribe
communicated with the Mercedes-Benz dealer, Uribe asked
somebody named Bien Hernandez for the down payment for the
Mercedes, Uribe made the payments on the car.  And Nadine
thanked Uribe for the car.  Will had no involvement, and you
didn't hear the government argue that he did yesterday, other
than just conclusory saying he was involved.

So as you hear all the evidence, you'll see that Will
is implicated again as a result of guilt by association.  Here,
his association with a trucker, his association with Mr. Uribe.

Let me finish up by urging you as you go forward to
keep your eye on the ball in this case.  The government's going
to say a lot of bad things about Mr. Hana, though, really, he's
not a bad person.  But as you'll hear a generous one, a
successful businessman, a strong advocate for his native
country, and a good friend to people around him.  They'll say
that he got his contract through contacts of creating monopoly,
they'll say he stiffed Nadine -- you heard that yesterday --
and other negatives about him.

O5G3MEN1                    Opening - Mr. De Castro

1          But that is not what's before you.  That is not what's

2     charged.  What's charged is bribery, and a conspiracy to make a

3     U.S. senator an agent of Egypt.  And he, ladies and gentlemen,

4     did not commit any of those crimes.  And you will not be able

5     to find him guilty unless you criminalize the every day actions

6     in which he actually engaged for the good things he did.

7          At the end of the case, I am going to come back to

8     you, we'll talk about the evidence that you actually heard at

9     that time, and I'll ask you to acquit Mr. Hana of all of the

10    counts on which he's charged.  I look forward to that

11    opportunity, I look forward to presenting this case on behalf

12    of Mr. Hana, and I look forward to hearing your verdict which

13    I'm confident will be that he is not guilty on all counts.

14    Thank you very much.

15          THE COURT:  Thank you, Mr. Lustberg.

16          Ladies and gentlemen, we now will hear the opening

17    statement on behalf of Mr. Daibes by Mr. De Castro.

18          MR. DE CASTRO:  Thank you, your Honor.  May I?

19          THE COURT:  Yes, please.

20          MR. DE CASTRO:  This case is about assumptions,

21    guesses, hunches, presumptions, suspicions, suppositions, and

22    inferences.  The government wants you to assume, presume, and

23    infer the worst.  It needs you to assume the worst in order for

24    its evidence to make any sense.  And that tells you everything

25    you need to know about its case.

1          Assumptions, presumptions and inferences are not

2    proof, and they are certainly not proof beyond a reasonable

3    doubt.

4          There is one thing on which I think we can agree with

5    the government.  This case is largely about relationships.

6    But, it is the assumptions they have made and they want you to

7    make which is why we are here.

8          The government saw that a wealthy real estate

9    developer had a relationship with a United States senator.

10   What did they assume, presume, suspect and infer?  That the

11   relationship must be corrupt.  Not that they've been genuine

12   friends for more than three decades, not that they enjoy a true

13   and lasting friendship, not that they give each other tokens of

14   their friendship.

15         The government learned that Mr. Daibes possesses,

16   collects, and gives gold.  What did they assume, presume,

17   suspect, and infer?  Well, there must be something nefarious or

18   criminal happening.  Not that investing in precious metals like

19   gold is normal and common.  Or that giving gold is also

20   commonplace around the world, including right here in the

21   United States.

22         For thousands of years, humans have used gold to

23   demonstrate their prosperity.  New York City schoolchildren

24   learn just that in their field trips to their abundant museums

25   that have gold in countless displays.  The daily price of gold

O5G3MEN1                          Opening - Mr. De Castro

1    is reported and followed by interest rates, stocks and bonds.

2    When inflation is high, the price of gold rises.  Gold is even

3    sold at Costco.

4           The government learned that people were having dinner.

5    What did they assume, presume, suspect and infer?  With no

6    evidence of what occurred or what was discussed at those

7    dinners, they assumed that they were dinner meetings to discuss

8    crimes.  Not that friendships involved having dinner and

9    socializing together, often with your significant others and

10   friends.  Not that it's normal for a United States senator to

11   be involved in his community, and have dinner with his

12   constituents.

13          At the end of the case, you'll see that the

14   government's case is built on assumptions, presumptions,

15   suspicions, inferences that are simply not supported by the

16   evidence.  What the government will do is they'll juxtapose

17   facts in an unfair and unjust way to give the appearance that

18   something untoward or inappropriate was occurring.  You pay

19   close attention to the way they present the evidence.

20          What a real look at the evidence will show this case

21   is really about friendships.  Deep and long-lasting

22   friendships, not corrupt relationships.  It is about gift

23   giving, not bribes.  It is about investments.  Not illegal

24   investments, but legitimate investments, without any

25   inappropriate or illegal influence.  Investments in projects

1    that would be tremendous for the people of New Jersey.

2                   As you learned from Judge Stein, my name is Cesar De

3    Castro, and along with Shannon McManus, Seth Agata, and our

4    trial preparation assistant Kimberly Taveras, we're honored to

5    represent Fred Daibes.

6                   This is going to be a long trial.  I expect the bulk

7    of the testimony the government will introduce will not involve

8    Mr. Daibes.  There may be many witnesses, and maybe even days

9    of the trial that you won't hear from us at all, because what's

10   being discussed will probably have nothing to do with

11   Mr. Daibes.  In fact, Mr. Daibes is only charged in seven of

12   the 18 counts in the indictment.  And we expect that the only

13   way for you to find him guilty based on the evidence is if you

14   make those improper assumptions, presumptions, and inferences

15   that are not supported by the evidence.

16                   Let's talk about what I expect the evidence will show,

17   and the assumptions and presumptions that the government will

18   want you to make about the gold and the cash found at 41 Jane

19   Drive.

20                   I want to be clear.  Mr. Daibes is not going to deny

21   that the money and gold that the government has connected to

22   him was given by him.  Yes, gold bars were given by him.  Yes,

23   cash was given by him.  But what we do challenge is that gold

24   or money was given to pay Senator Menendez to engage in any

25   official senatorial acts.

O5G3MEN1                      Opening - Mr. De Castro

1           The government is going to go to great lengths first

2    to show you what they found.  That's going to be later today.

3    To try and connect what they found to individuals, including

4    Mr. Daibes.  They'll spend a lot of time showing you that.  I

5    suspect they'll have to bring a table out here because they're

6    going to want to display it to you in the most prejudicial way

7    possible.

8           MS. POMERANTZ:  Objection.

9           THE COURT:  Sustained.  Apparently they will display

10   it.  It is for the jury to draw inferences, not you.  And

11   indeed, inferences are not to be drawn at this point, since you

12   haven't heard any evidence.  Proceed.

13          MR. DE CASTRO:  Thank you, Judge.

14          They will sensationalize the cash and gold.

15          MS. POMERANTZ:  Objection.

16          THE COURT:  I'll allow that.

17          MR. DE CASTRO:  Possessing and using cash and gold is

18   not a crime.  So when they have an expert testifying that

19   Mr. Daibes' fingerprints were found on envelopes, or his DNA,

20   keep in mind that we don't contest those facts.

21          But no matter how they sensationalize it, the

22   testimony and evidence won't change what the government cannot

23   show you.  What you do not see is just important as what you do

24   see and learn.  When you're listening to agents testify about

25   what they found, and other agents testifying about forensic

1    evidence, ask yourselves:  Can they tell you when that money or

2    gold got there?  Can they tell you how that money or gold got

3    there?  Can they tell you why those funds or gold were given?

4    But they'll want you to assume, presume, and infer that

5    Mr. Daibes' money and gold was found in Nadine Menendez's home,

6    therefore, it must have been a bribe for Senator Menendez.

7    That it was paid at some point, some point, to influence

8    Senator Menendez to engage in official acts.

9            But the evidence will show there could be nothing

10    further from the truth.  Mr. Daibes did not give anything to

11    Nadine Menendez or to Senator Menendez to influence or have the

12    senator engage in any official acts on behalf of him or anyone

13    else.

14            You heard today and yesterday a little bit about the

15    quid pro quo.  I know it is a little like sitting in a civics

16    or social study class or a Latin class.  The reason you've

17    heard so much about quid pro quo is because it's so important

18    to this case and the law about this case.  You're also going to

19    hear a lot about it at the end of the case as well.

20            Let me briefly try to tell you why the case comes down

21    to some quids, no pros, and no quos.  As you heard, quid pro

22    quo means something for something.  It's Latin.  It's something

23    given or received for something else.  This for that.  The quid

24    equals the payment.  The pro is the for.  And the quo is

25    something.  Here, official action.  That's what the government

O5G3MEN1                    Opening - Mr. De Castro

1   alleges.

2           Let me talk about the quids.  I expect the evidence

3   will show that the government cannot prove beyond a reasonable

4   doubt that any things of value provided to Nadine or Robert

5   Menendez by Mr. Daibes, their longtime friend, were to

6   influence or for official actions of a United States senator.

7   For Mr. Daibes, they say he made payments to Senator Menendez

8   for official action related to Egypt, for official action

9   related to Qatar, and for causing the president to nominate a

10  particular United States attorney for the District of New

11  Jersey.

12          But the evidence will not show what that gold or cash

13  was for, and they will want you to assume it was for something

14  corrupt or nefarious and not a gift for some other legitimate

15  reason.  But the evidence will not show when the money or gold

16  was paid, where the money or gold was paid, why the money or

17  gold was paid, nothing.  They will ask you again to assume

18  those facts, that the existence of money and gold connected to

19  Mr. Daibes automatically means it's payment for these three

20  areas of their case.

21          Now there's no pros.  Why do I say there will be no

22  evidence of pros?  Why do I not just skip to the quos?  The pro

23  is the connection between the payment and the later action.

24  There will be no reliable evidence to establish that connection

25  between the money or gold or anything else to any quo.  There

O5G3MEN1                    Opening - Mr. De Castro

1    is a difference between gifts and bribes.

2           As you already know, as the government implored you to

3    do, we will do the same, use your common sense.  And you know

4    providing something to another person without expecting

5    anything in return is a gift.  Not a bribe.  If something is a

6    gift, there is no pro, there is no for.  You will see evidence

7    of gift giving at this trial.  The government again will want

8    you to assume Mr. Daibes' gift giving isn't what it appears to

9    be.  He's not generous, but it's something nefarious.  It was

10   for some corrupt purpose.  I expect that Mr. Daibes' generosity

11   will come from the witness stand from the government's

12   witnesses.

13          He's an admirable man.  He's lived the American dream.

14   He's had a lifetime of hard work from immigrant to dishwasher

15   to busboy to real estate ownership, and then to real estate

16   developer.  You will learn that he is wealthy.  He has made his

17   way in America successfully as a developer, he's very well

18   known, he is a very well-known successful developer in

19   Edgewater, New Jersey.  He's developed massive properties and

20   even luxury properties in Edgewater.  Mr. Weitzman showed you

21   some pictures of them yesterday.  As a result, he's earned lots

22   of money.  And like many successful people, he spends his money

23   on his loved ones and his community.

24          I expect you will learn that Mr. Daibes, who is

25   67 years old, is a bit old school as well.  He often deals in

O5G3MEN1                    Opening - Mr. De Castro

1  cash, and he loves gold.  He invests in gold and he tells

2  others to do the same.  He was introduced to gold investing and

3  collecting years ago, and is a firm believer in investing in

4  gold.  That will be clear from the evidence.  He also likes to

5  gift gold.  That will also be clear from the evidence.  He

6  gives expensive luxury items.  He collects watches, there is

7  nothing criminal about that.  There is nothing criminal about

8  being generous.

9          And keep in mind, that because of his wealth, the

10  value of the gifts that he gives to his family and friends

11  would -- they pale in comparison to those that we give.

12          Now, I say there is no quos.  Why do I say that?  That

13  brings me to the quo.  Here the quo must be an official act.

14  The evidence will certainly show that Senator Menendez has

15  performed plenty of official acts.  He is a United States

16  senator.  He's performed lots of official acts.  But none of

17  the quids, none of the things found in Nadine Menendez's home

18  can be connected to any official acts of the senator.  And that

19  is fatal to the government's case.  It is fatal to their case.

20  Like every other part of the case, the government will need you

21  to assume, presume, and infer about the quos that they allege.

22          Let me tell you what I expect the evidence will show

23  about the lack of any official action as it relates to the

24  parts of the case in which Mr. Daibes is charged.  Those three

25  areas.

O5G3MEN1                       Opening - Mr. De Castro

1          No quo for Egypt.  You're not really going to hear

2    much about Mr. Daibes, I expect, as it relates to Egypt.  You

3    are going to hear about the halal business.  Certifications.

4    Slaughters.  Blessings.  Other terminology, some of which

5    Mr. Lustberg told you about.  None of it will have anything to

6    do with Mr. Daibes, or his businesses.  He's not Egyptian.  He

7    is a New Jersey real estate developer and he has nothing to do

8    with the halal business.

9          You will hear about meetings about certifications,

10   meetings about audits, meetings in Washington, D.C., dinners,

11   and other meetings where they claim this conspiracy was

12   hatched.  Pay close attention, because you will hear very

13   little about Mr. Daibes.  You will see that, for the most part,

14   he's not even present for most or all of those meetings.

15         The evidence will show that Mr. Daibes has nothing to

16   do with Egypt or the halal business, and he has nothing to do

17   with allegations the government has made regarding Egypt.

18         When you are listening to the evidence as it relates

19   to Egypt, ask yourselves the following:  What does Mr. Daibes

20   have to gain from Egypt, other than seeing the success of a

21   friend?  What does IS EG Halal, Mr. Hana's business, have to

22   gain, what do they need a real estate developer for?

23         I suspect at the end of the Egypt part of the case,

24   you are going to ask why is he even charged in this part of the

25   case.

 1          Now, there is no quo for Qatar, and why do I say that.

 2   Next to Egypt, the charges related to Qatar are the most

 3   baffling as they relate to Mr. Daibes.  The evidence will show

 4   that the senator made an introduction.  He introduced

 5   Mr. Daibes to a member of the Qatari royal family that he

 6   learned was interested in making investments, investments in

 7   New Jersey, the state that the senator has represented in the

 8   United States Congress for 31 years, and as a senator since

 9   2006.  He made an introduction.  That's not a crime.

10          Then, the Sultan, which you'll hear about, who we'll

11   call the one principal in that business deal, turned it over to

12   his investment team.  And Mr. Daibes, the other principal in

13   that real estate deal, turned it over to his investment and

14   real estate team.  And the Qataris and Mr. Daibes' teams

15   engaged in lengthy due diligence, a year and a half or more of

16   due diligence.  What does that mean?  The Qataris wanted to

17   learn about the real estate investment.  Mr. Daibes' team

18   provided information to them about it, back and forth for a

19   year and a half.  And you'll hear about trips overseas for the

20   principals to meet and discuss.  That resulted in the Qataris

21   concluding that investing with Mr. Daibes was a good idea, and

22   they signed what's called a letter of intent.  They showed

23   their good will by investing some preliminary funds.

24          The deal remains active today, a deal, a development

25   that will bring jobs and tremendous tax revenues to Edgewater,

O5G3MEN1                          Opening - Mr. De Castro

1    New Jersey.

2           There is no evidence of bribery.  And the official

3    acts they do claim had no effect and weren't even connected to

4    the Daibes real estate project.  Certainly the senator issued a

5    press release regarding the country of Qatar, and it was not

6    about this investment or any investment in New Jersey.  There

7    was talk of a senate resolution praising Qatar.  This has

8    nothing to do, no connection with Mr. Daibes' real estate

9    development project.  And like Egypt, you will have no way of

10   connecting any gold, cash, or things of value to the senator or

11   Mrs. Menendez for any official action relating to Qatar.

12          Now that brings me to the third part, which is the

13   District of New Jersey piece of the case.  There will be no quo

14   for that part of the case either.  With respect to the

15   appointment of the New Jersey U.S. attorney, there will be no

16   evidence that the senator influenced or pressured prosecutors

17   in New Jersey to treat Mr. Daibes more favorably than anyone

18   else.  The evidence will show that Mr. Daibes' New Jersey case

19   was handled and is still is being handled like any other case.

20   That he negotiated a resolution with the government, as others

21   who have been charged similarly have done.  The evidence will

22   show that his lawyers worked very hard for him, to get him the

23   best resolution possible.  And in the end, he accepted a

24   resolution that the prosecutors and he agreed on.  All with no

25   improper influence or action by anyone.  That's what I expect

O5G3MEN1                    Opening - Mr. De Castro

1    you're going to hear from the evidence, from the witness stand.

2              At most, at most, the evidence will show that Senator

3    Menendez was concerned about his friend of over 30 years, like

4    any one of you would be.  And the government will not be able

5    to show you any corrupt intent by Mr. Daibes or any official

6    actions tied to any payments to Senator Menendez.

7              When you listen to that evidence, for that part of the

8    case, ask yourselves, if Mr. Daibes paid the senator, what did

9    he pay for?  What benefit did he actually receive?  Were the

10   results consistent with a bribe being paid?  And because they

11   can't tell you the when, the how, the whys of the quids, that

12   gold and cash, they will not be able to prove that anything was

13   connected to the senator's official acts.  And that brings me

14   back to where I started.  Which is assumptions, presumptions,

15   guesses, hunches, suppositions, inferences, suspicions are not

16   evidence.  And they are not sufficient.

17             MS. POMERANTZ:  Objection.

18             THE COURT:  The jury can decide.  Proceed.

19             MR. DE CASTRO:  That's not what we do in this country.

20   The one presumption that matters in this courtroom, the one

21   presumption that matters in this courtroom, is the presumption

22   of innocence.

23             You are the check.  You are the ones that ensure that

24   the government does not bring cases based on assumptions,

25   presumptions, improper and unfair inferences.  I'm confident

O5G3MEN1

1   that if you listen closely to the instructions given to you by

2   Judge Stein, at the end of this case, and you apply them to the

3   facts as you learn them in this courtroom, and you don't just

4   make assumptions, you will find Mr. Daibes not guilty.

5            Thank you for your time.

6            THE COURT:  Thank you.  Government, do you need a few

7   minutes?

8            MS. POMERANTZ:  That will be great, your Honor, so we

9   can set up.

10            THE COURT:  Ladies and gentlemen, let's take our

11   midmorning break.  But we're about to begin the evidence and

12   the government is asking for time to bring its witness in.

13            (Jury excused)

14            THE COURT:  How long is this first witness on direct?

15            MS. POMERANTZ:  Your Honor, I anticipate it will be

16   several hours, I don't have a precise --

17            THE COURT:  When is, I still have that motion still.

18   I just received the motion on Kasowitz Benson, and I assume I'm

19   going to get a reply.  When is Uribe on?

20            MS. POMERANTZ:  Your Honor, it will be not be this

21   week.  We anticipate that it -- I don't have a precise date,

22   but certainly not this week.

23            THE COURT:  Or next week?

24            MS. POMERANTZ:  I don't anticipate next week either.

25            THE COURT:  That's fine.  I assume I'll get a reply

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5G3MEN1

1    and it's not briefed yet.

2              MR. RICHENTHAL:  Your Honor, just briefly.  This may

3    have been obvious.  The reason we were objecting is Mr. De

4    Castro argued point blank inferences are not evidence, which is

5    not the law.  He literally said inferences are not evidence.

6    That's not what we do in this country.

7              We're deeply worried the jury believes they are not

8    permitted to draw an inference, what inference they draw is up

9    to them of course, but they're permitted to draw them.  His

10   entire opening was telling them not to do that.

11             THE COURT:  I think that's valid.  I'll make that

12   clear.

13             (Recess)

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

O5gWmen2

1          THE COURT:  You may be seated in the courtroom.

2          (Jury present)

3          THE COURT:  You may be seated in the courtroom.

4          Ladies and gentlemen of the jury, you'll remember that

5   Mr. de Castro was stating to you that inferences are not

6   evidence.  Ladies and gentlemen, remember on Monday when I

7   described to you different types of evidence and I said there

8   was direct evidence and there was circumstantial evidence.

9   Circumstantial evidence requires you to draw inferences from

10  established facts.  The jury is certainly permitted to draw

11  inferences.  In fact, it's the job of the jury to draw

12  permissible inferences based on what the evidence is.

13          The bottom line for the jury, based on the evidence,

14  is appropriate inferences that you draw from that evidence.

15  The bottom line is for you to determine whether, after having

16  heard all of the evidence and drawing appropriate inferences

17  from that evidence, has the government met its burden of

18  proving the guilt of each of the defendants you are considering

19  beyond a reasonable doubt.  But inferences clearly play a role

20  in your determination here.

21          You have not heard a single word of evidence, ladies

22  and gentlemen.  That is about to change.

23          Government, call your first witness.

24          MS. POMERANTZ:  Thank you, your Honor.  The government

25  calls Aristotelis Kougemitros.

1           THE COURT:  I'm going to need that to be spelled.

2    ARISTOTELIS KOUGEMITROS,

3        called as a witness by the government,

4        having been duly sworn, testified as follows:

5           THE COURT:  Welcome, Mr. Kougemitros.

6           THE WITNESS:  Thank you, your Honor.

7           THE COURT:  Your witness.

8           MS. POMERANTZ:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MS. POMERANTZ:

11   Q.  Good morning, Special Agent Kougemitros.

12   A.  Good morning.

13   Q.  What is your educational background?

14   A.  I have a B.A. from Hunter College, here in the city.

15   Q.  Where do you work?

16   A.  Federal Bureau of Investigation.

17   Q.  What is your title at the FBI?

18   A.  I am a special agent.

19   Q.  How long have you been a special agent with the FBI?

20   A.  13 years.

21   Q.  What did you do before becoming a special agent with the

22   FBI?

23   A.  I was a commissioned officer in the United States Army and

24   New York Army National Guard.

25   Q.  How long were you in the United States Army?

O5gWmen2                          Kougemitros - Direct

1   A.  Ten years, including a combat tour.

2   Q.  What did you do while serving in the United States Army?

3   A.  I was Black Hawk helicopter pilot and a company command --

4   I was assault helicopter company commander.

5   Q.  What are your duties and responsibilities as a special

6   agent with the FBI?

7   A.  I work for, or I'm assigned to, a white collar squad that

8   investigates all types of white collar crimes for Nassau and

9   Suffolk County on Long Island.

10  Q.  As part of your duties and responsibilities as a special

11  agent with the FBI, do you also participate in executing search

12  warrants?

13  A.  Yes.

14  Q.  I'd like to direct your attention to June 16, 2022.  What

15  was your assignment that day?

16  A.  I was assigned as a team leader for the search at 41 Jane

17  Drive, Englewood Cliffs, New Jersey.

18  Q.  What kind of building is 41 Jane Drive, Englewood Cliffs,

19  New Jersey?

20  A.  It's a single-family home, split level.

21      MS. POMERANTZ:  Ms. Wechsler, could we please pull up

22  for just the witness, the parties and the Court what's been

23  marked for identification as Government Exhibit 1F-1325.

24  Q.  Special Agent Kougemitros, do you recognize that?

25  A.  I do.

O5gWmen2                          Kougemitros - Direct

1    Q.  What is it?

2    A.  This is a north-facing front picture of the home at 41 Jane

3    Drive, Englewood Cliffs, New Jersey.

4    Q.  Does this exhibit fairly and accurately depict the front of

5    the home you searched on June 16, 2022?

6    A.  Yes, it does.

7           MS. POMERANTZ:  The government offers Government

8    Exhibit 1F-1325 in evidence.

9           MR. FEE:  No objection.

10          MR. McMANUS:  No objection.

11          THE COURT:  Admitted.

12          MR. LUSTBERG:  No objection.

13          (Government Exhibit 1F-1325 received in evidence)

14          MS. POMERANTZ:  Ms. Wechsler, could we please publish

15   this for the jury.

16   Q.  Special Agent Kougemitros, what authority did the FBI have

17   to search this home?

18   A.  We had two search warrants sworn out by the District of New

19   Jersey.

20   Q.  What were you authorized to look for inside the home?

21   A.  Various items, including exercise equipment, valuables,

22   anything of value, a -- looking for a closed circuit -- I'm

23   sorry, a surveillance camera system, amongst other things.

24   Q.  What, if any, special precautions did your team take when

25   searching this home?

1    A.  We were sensitive to the search, and so upon arriving at

2    the residence, because of the special kind of circumstances

3    that we were dealing with, we came with unmarked vehicles,

4    which we normally have, but we had less of them.  We didn't

5    have a large group, which we normally have for a search.  We

6    wore subdued markings that identify us.  Some people did have

7    larger ones, but they might have had a jacket over it, normally

8    things that we don't do at the FBI.  We're usually more flashy

9    just for agent safety, that if we're clearly identified, but we

10   were sensitive to the conditions here, so we tried to go lower.

11       We also didn't request a marked unit, which we normally do

12   as well.  We have a local police officer join us normally just

13   so that there's no question that we're just not a bunch of

14   people running around with FBI shirts; at least there was a

15   marked unit there as well.

16   Q.  You referred to special conditions.  Why were you taking

17   special precautions this day?

18   A.  We were sensitive that we were searching the home and

19   executing a search warrant of a United States senator.

20           MS. POMERANTZ:  You can take that photograph down, Ms.

21   Wechsler.

22           Would you please pull up just for the witness, the

23   parties and the Court what's been marked for identification as

24   Government Exhibit 1F-1333 and 1F-1334 and Government Exhibit

25   1F-1335.

O5gWmen2                          Kougemitros - Direct

1   Q.  Special Agent Kougemitros, do you recognize those?

2   A.  Yes, I do.

3   Q.  What are they?

4   A.  These are the south side or rear-facing pictures of the

5   residence at 41 Jane Drive, Englewood Cliffs, New Jersey.

6   Q.  Do these exhibits fairly and accurately depict the back of

7   the home you searched on June 16, 2022?

8   A.  Yes, they do.

9            MS. POMERANTZ:  The government offers Government

10  Exhibits 1F-1333, 1334 and 1335.

11           MR. FEE:  No objection.

12           MR. LUSTBERG:  No objection.

13           MR. McMANUS:  No objection.

14           THE COURT:  Hearing no objection, admitted.

15           (Government Exhibits 1F-1333, 1F-1334 and 1F-1335

16  received in evidence)

17           MS. POMERANTZ:  Ms. Wechsler, can you please publish

18  this for the jury.  Let's start by pulling up Government

19  Exhibit 1F-1333.

20  Q.  Special Agent Kougemitros, what are we looking at here?

21  A.  This is the west -- southwest corner of the residence at 41

22  Jane Drive, Englewood Cliffs, New Jersey, and this is a

23  sun-room, or my mother would call it a solarium.

24           MS. POMERANTZ:  Let's now pull up Government Exhibit

25  1F-1334.

O5gWmen2                          Kougemitros - Direct

1   Q.  What are we looking at here?

2   A.  This is the rear entrance to the home at 41 Jane Drive,

3   Englewood Cliffs, New Jersey.

4   Q.  And is the left part of the photograph the part of the

5   solarium that we were just looking at?

6   A.  Yes.

7   Q.  And I want to direct your attention to the stairs in the

8   photograph.  What part of the house did those stairs lead to?

9   A.  They would lead to the eat-in portion of the kitchen for

10  the residence.

11          MS. POMERANTZ:  Let's pull up Government Exhibit

12  1F-1335.

13  Q.  What are we looking at here?

14  A.  And this is just the east side of the rear of the

15  residence.

16  Q.  And are those the same stairs that you were just testifying

17  about that lead to the kitchen?

18  A.  Yes.

19          MS. POMERANTZ:  We can take that down.

20  Q.  What, if any, role did you have in the investigation that

21  led up to the search of 41 Jane Drive?

22  A.  None.

23  Q.  About how many FBI agents participated in the search of 41

24  Jane Drive?

25  A.  Initially, eight agents were -- participated in the initial

O5gWmen2                         Kougemitros - Direct

1   search.

2   Q.  And did that change over time?

3   A.  Yes.

4   Q.  Can you explain to the jury generally how the FBI carried

5   out the search of this residence?

6   A.  Yes.  We arrived at the residence.  Once we exited our

7   vehicles, we set up a perimeter around the home and I went to

8   the door and knocked and announced our presence.  I rang the

9   doorbell, let anybody know if there was any occupants of the

10  home that we were the FBI; we were here to investigate a search

11  warrant.

12       After a reasonable amount of time when no one came to the

13  door, we had already obtained the PIN to the garage and the

14  location of a Hide-A-Key as well as the alarm code.  So at that

15  time, since nobody answered the door, we went into the house

16  through the garage door.  And immediately upon entering the

17  home, we conduct a security sweep to ensure that there are no

18  other residents inside the home -- or occupants, I should say.

19  That's done to ensure the safety of people that could be within

20  the home and also for all the agents or officers, anybody

21  participating in the search.

22  Q.  I want to ask you a few follow-up questions about that.

23  So, you first mentioned securing the perimeter.  What do you

24  mean by securing the perimeter?

25  A.  Agents would surround the home.  That's done in order to

O5gWmen2                          Kougemitros - Direct

1   ensure, you know, potentially that somebody isn't trying to

2   sneak into the residence or sneak out of a residence -- or, I'm

3   saying residence because that's the case here.  It could have

4   been a business or whatever the case is.  It's just standard

5   what we do.

6   Q.  And you mentioned knock and announce.  What do you mean by

7   knock and announce?

8           MR. FEE:  Objection to relevance, your Honor.  We're

9   not challenging --

10          THE COURT:  I'll allow it.

11  A.  We go to the door and physically knock on it and let any

12  occupants of the residence know -- it's required for us to do

13  so, let them know that the FBI's here.  We have a legal

14  authority -- in this case it was a search warrant.  I announced

15  that we had a search warrant and we wanted to enter the

16  residence.

17  Q.  What, if any, surveillance equipment did you notice?

18  A.  Coming up to the home, I noticed that there was a doorbell

19  camera.

20  Q.  What did you do in response?

21  A.  After knocking and announce, I had a piece of tape ready,

22  and I covered the doorbell camera.

23  Q.  And why did you do that?

24  A.  Two reasons.  One is agent safety.  As I said before, it's

25  not -- we don't want people to know exactly where we are in the

O5gWmen2                        Kougemitros - Direct

residence that could -- or business, because, you know, if

somebody did want to do harm to anybody, they would know

exactly where we were.  And also so that our tactics, our

tactics that, how we enter rooms or how we secure a room or a

residence, whatever it may be, is law enforcement-sensitive.

You know, if somebody knows our tactics and what we do, that

could potentially cause harm to an officer or agent in the

future.

Q.  You mentioned that after you secured the perimeter and

knocked and announced, can you remind the jury, what did you do

next?  What did the FBI do next?

A.  Knocked and announce.  Rang the doorbell.  No answer.  We

entered the residence through the garage.

Q.  And are you familiar with doing what is referred to as an

initial sweep?

A.  Yes.

Q.  What is an initial sweep?

A.  Just a reverse --

        MR. FEE:  Asked and answered.  I'm sorry.  Asked and

answered.

        THE COURT:  I'll permit it.

        Go ahead.

A.  Initial sweep, or security sweep I think I called it

before, we enter the residence, we go into every single room,

make sure that there are no other occupants or potentially

1    somebody could be hiding in the house or, you know, whatever

2    the case is.  This is just done for agent, officer safety as

3    well as the officers as well.

4    Q.  And by the way, when you first arrived and did the initial

5    sweep, was anyone the home?

6    A.  No.

7    Q.  What did the FBI do after the initial sweep?

8    A.  We weren't able to actually secure the entire residence on

9    the initial sweep.

10   Q.  What do you mean by that?

11   A.  There were locked doors at the residence.

12   Q.  And so what did the FBI do next?

13   A.  Part of the special circumstances that I was talking about

14   but I didn't mention before, we actually had a locksmith on

15   hand.  We called the locksmith to come.  We didn't want to

16   cause extra damage to the residence, undue or unnecessarily.

17   We had a locksmith unlock one door that we first came upon that

18   was locked, and then we cleared that room.

19   Q.  Now, after the security sweep and the doors were unlocked,

20   what did the FBI do next?

21   A.  There was another two doors that were locked that we had

22   the locksmith also unlock.  And then we continued the --

23   securing the residence.  At that point, we were secured.

24        At some point around the same time, I disabled the internet

25   to the residence.

O5gWmen2                          Kougemitros - Direct

1    Q.   And why did you do that?

2    A.   There were security cameras besides the one that I had

3    taped at the residence, and I did that again for the same

4    reasons that I talked about before.  Agent, officer safety, so

5    nobody would know where we were in the house or weren't in the

6    house if somebody were to come while we were there.

7    Q.   Are you familiar with entry photos?

8    A.   Yes.

9    Q.   What are entry photos?

10   A.   Once the -- it's standard for us when we conduct a search

11   warrant that a photographer will accompany us and will take

12   photos of the place that we're searching, and that will happen

13   before any actual search except the secure -- when we secure

14   the premises.  We'll do that initial security sweep, and then

15   after that, the photographer will come in and take photos of --

16   without us searching, you know, physically searching any of the

17   items.

18   Q.   Why are entry photos taken?

19   A.   To document how the residence or the business looks at the

20   time of entry.  It's very helpful.

21   Q.   Are you familiar with an evidence collection point?

22   A.   Yes.

23   Q.   And what is an evidence collection point?

24   A.   Somewhere at the location of the search we will establish

25   an evidence collection point, where evidence that's found in

O5gWmen2                          Kougemitros - Direct

the premises will be taken after it's been photographed in

place or in close proximity to where it was in place

originally, will be taken there in order to be cataloged,

logged, and eventually be removed from the residence.

Q.  Did the FBI take entry photographs and establish a

collection point on the search of 41 Jane Drive?

         MR. FEE:  I'm sorry.  Your Honor, it would helpful --

the objection is to phrasing questions "did the FBI."  It would

be helpful to know what Agent Kougemitros did versus what other

members of the FBI did.

         THE COURT:  Understood.

BY MS. POMERANTZ:

Q.  Special Agent Kougemitros, you testified earlier that you

were the search leader, is that correct?

A.  Yes.  I was the team leader for the search.

Q.  What does it mean to be a team leader?

A.  I was in charge of all the searchers, and I had -- I was

also the designated seizing authority, so I would take

possession of all the evidence at the end of it.  But I was in

charge of everybody that was there that day as well as handled

any of the communications to -- outside of the home.  If I had

to communicate with the prosecutors or anyone, the like, the

locksmith, that was responsibilities that were on me.

Q.  And as part of your responsibilities as the team leader,

were you involved in a process when the photographer was taking

1    entry photos?

2    A.  Yes.

3    Q.  And were you involved in the establishing of an evidence

4    collection point?

5    A.  Yes.

6    Q.  Special Agent Kougemitros, how -- and where was that

7    evidence collection point?

8    A.  We established it in, at the table of the eat-in kitchen

9    portion of the home.

10   Q.  How was the search documented?

11   A.  Various ways.  We have lots of documentation, or not lots,

12   but there's a few documents that we take -- excuse me.  We

13   have, one of the documents would be sign-in sheet.  Anybody

14   that comes into the residence at, in this case, would have

15   signed in when they arrived.  We also document with the

16   photographs that we had just talked about; the

17   evidence-collected log, which we'll talk about; a sketch.

18       There's something else that I can't recall at this time.

19   Q.  Was the search also documented through photographs?

20   A.  Yes.

21   Q.  And through exit video?

22   A.  Yes.

23   Q.  Did anyone on the team wear a body camera?

24   A.  No.

25   Q.  Why not?

O5gWmen2                          Kougemitros - Direct

1    A.  At the time the FBI hadn't been issued body cameras.  That

2    wasn't our policy at the time of the search.

3    Q.  And you testified that your role in the search was to be

4    the team leader.  Are you familiar with the term "designated

5    seizing official"?

6    A.  Yes.

7    Q.  And who was the designated seizing official?

8    A.  I was.

9    Q.  And what were your responsibilities as the designated

10   seizing official?

11   A.  I took possession of all the evidence when we departed the

12   home.  I took -- it was under my responsibility to ensure that

13   they were entered into evidence and eventually brought to

14   vaults.  The evidence was my responsibility, basically.

15   Q.  Special Agent Kougemitros, just to back up a step, after

16   entry photographs were taken and a collection point was

17   established, what was done next?

18   A.  We began to search the residence.

19   Q.  And as the team leader and the designated seizing official,

20   what was your role?

21   A.  I managed the team.  I oversaw the search.  I searched

22   myself in certain times.  Also, when a member of the search

23   team found a piece of evidence or a potential piece of

24   evidence, they would alert me and I would decide if we were

25   going to seize the item or not.

1    Q.  During the initial sweep of the home, did the FBI notice

2    any cars in the garage?

3    A.  Yes.

4    Q.  What car?

5    A.  There was a black Mercedes-Benz C-300.

6    Q.  There is a folder at the witness stand for you.  It has

7    several photographs.  Do you see that?

8    A.  Yes.

9    Q.  Can you please take a look at that.

10              MS. POMERANTZ:  Oh, I'm sorry.  Actually, apologies,

11   not that folder.

12              Ms. Wechsler, can we pull up for just the witness, the

13   parties and the Court what's been marked for identification as

14   Government Exhibit 1F-1002, 1337 and 1348.

15   Q.  Special Agent Kougemitros, do you recognize those?

16   A.  Yes.

17   Q.  What are they?

18   A.  This is a photograph of the -- or these are photographs of

19   the eastern portion of the house.  The home sat on a corner, so

20   the front of the home would face Jane Drive, but the -- where

21   the driveway sits, and leads to Carol Drive.  But this is the

22   east side of the house, of the home.

23   Q.  Do these exhibits fairly and accurately depict the side of

24   the home you searched on June 16, 2022?

25   A.  Yes.

O5gWmen2                         Kougemitros - Direct

1          MS. POMERANTZ:  The government offers Government

2    Exhibits 1F-1002, 1337 and 1348.

3          MR. FEE:  No objection.

4          THE COURT:  Hearing no objection, admitted.

5          (Government Exhibits 1F-1002, 1F-1337 and 1F-1348

6    received in evidence)

7          MS. POMERANTZ:  Ms. Wechsler, can you please publish

8    Government Exhibit 1F-1002 for the jury.

9    Q.  What are we looking at here, Agent Kougemitros?

10   A.  This is the east side of the home, with the garage open.

11   Q.  Are we looking at the driveway of 41 Jane Drive?

12   A.  Yes.

13   Q.  How many driveways does 41 Jane Drive have?

14   A.  Only one.

15   Q.  What was in the garage?

16   A.  A Mercedes-Benz C-300.

17         MS. POMERANTZ:  Can we please publish Government

18   Exhibit 1F-1337.

19   Q.  What are we looking at here?

20   A.  This is, again, the east side of the home, with the garage

21   door closed, and the driveway.

22   Q.  Where is the front of the house?

23   A.  Can I mark this?

24   Q.  Yes.  Please go ahead.

25   A.  The front would be over here, on the right side of this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen2                          Kougemitros - Direct

1    photograph.

2              MS. POMERANTZ:  Let the record reflect that the

3    witness has indicated the right side of the photograph.

4    Q.  Where is the backyard?

5    A.  Over here, to the left, marked by an X.

6              MS. POMERANTZ:  Let the record reflect that the

7    witness has indicated the left side of the photograph.

8              Ms. Wechsler, we can take that down.

9    Q.  And now, Special Agent Kougemitros, you have a folder up

10   there.  I'd ask you if you can take a look at that.

11             MS. POMERANTZ:  And for the parties, it has what has

12   been marked for identification as Government Exhibit 1F-1004

13   and 1F-1291 through 1303.

14   Q.  Let me know, Special Agent Kougemitros, when you've

15   finished reviewing this.

16             THE COURT:  Proceed.

17   BY MS. POMERANTZ:

18   Q.  Special Agent Kougemitros, do you recognize those exhibits?

19   A.  I do.

20   Q.  What are they?

21   A.  Photographs of that Mercedes-Benz C-300 that was located

22   within the garage of 41 Jane Drive, Englewood Cliffs, New

23   Jersey.

24   Q.  Do those exhibits fairly and accurately depict the

25   Mercedes-Benz convertible C-300 that the FBI found in the

O5gWmen2                         Kougemitros - Direct

1  garage at 41 Jane Drive on June 16, 2022?

2  A.  Yes, they do.

3           MS. POMERANTZ:  The government offers Government

4  Exhibits 1F-1004 and 1F-1291 through 1303.

5           MR. FEE:  No objection.

6           THE COURT:  Admitted.

7           (Government Exhibits 1F-1004 and 1F-1291 through 1303

8  received in evidence)

9           MS. POMERANTZ:  Ms. Wechsler, could we please publish

10 for the jury Government Exhibit 1F-1004.

11 Q.  Special Agent Kougemitros, what are we looking at here?

12 A.  This is a photograph standing at the threshold of the

13 garage door, staring into the garage.  There's the black

14 Mercedes C-300 on the right.

15          MS. POMERANTZ:  Let's publish Government Exhibit

16 1F-1298.

17 Q.  What are we seeing here?

18 A.  This is another photograph.  This is depicting the

19 Mercedes-Benz C-300 that was inside the garage at 41 Jane

20 Drive.

21          MS. POMERANTZ:  And can we pull up Government Exhibit

22 1F-1300.

23 Q.  What are we seeing here?

24 A.  It's a photograph of the interior of that Mercedes-Benz

25 C-300 that was in the garage at 41 Jane Drive.

O5gWmen2                          Kougemitros - Direct

1        MS. POMERANTZ:  Let's publish Government Exhibit

2   1F-1302.

3   Q.  What are we seeing here?

4   A.  This is the rear seats of the Mercedes-Benz C-300 that was

5   found at 41 Jane Drive, in the garage of 41 Jane Drive.

6        MS. POMERANTZ:  We can take that down, Ms. Wechsler.

7   Q.  Turning back to how the FBI handled the search on June 16,

8   2022, what happened when a member of the search team found an

9   item in the home to be seized as evidence?

10  A.  They would alert me to a potential item of evidence.

11  Q.  And after they alerted you to a potential item of evidence,

12  what did you do?

13  A.  I would observe the item, it would be photographed, and I

14  would decide if we were going to seize it or not.

15  Q.  And if you decided to seize it, what, if anything, did you

16  do?

17  A.  After it was photographed, eventually it would make its way

18  to the evidence collection point to be logged and eventually

19  removed from the residence.

20  Q.  When you say logged, what do you mean?

21  A.  We would fill out an evidence collection log, which

22  identified lots of information about the item: What it was,

23  obviously; what room it was found in; who found it; who

24  witnessed it being found; and, I think, what we packaged it in.

25  There might be another column of something else.

O5gWmen2                              Kougemitros - Direct

1        We also assigned an item number to it that day.  You know,

2   Item No. 1 was this.

3   Q.  Generally what types of evidence did the FBI seize that

4   day?

5   A.  Cellular telephones, gold, cash, jewelry.

6   Q.  And you testified about the evidence log that documented

7   where each item was found in the house.  What happened to each

8   piece of evidence the FBI seized during the search of 41 Jane

9   Drive once it was logged?

10  A.  Once it was logged?  Are you talking about right at the end

11  of the search what happened?

12  Q.  Right.  So after it's logged, what did the FBI do?

13  A.  Right.  So, the evidence was removed from the evidence.

14  Like I said, I was the seizing official.  I took it actually

15  back to my office on Long Island.  And the next day I logged it

16  into the FBI's database -- it's called Sentinel -- that we use

17  to track our cases, and I entered the evidence -- actually, I

18  didn't enter; my partner entered it, but I oversaw her enter

19  the evidence into our Sentinel system, which assigns -- even

20  though we assigned a number, an item number that day, on June

21  16, once we enter the evidence into Sentinel, the evidence will

22  get its own 1B number.  That's how the FBI tracks it.

23  Q.  What is a 1B number?

24  A.  A 1B number is -- it's just a number, a unique number

25  assigned to a piece of evidence.

1    Now, while -- on the day of the search we'll write, you

2    know, item No. 1, when I enter item No. 1 from the day of the

3    search into Sentinel, if there was already evidence in that

4    case file, it won't come up as No. 1.  It will come up in the

5    next sequence of whatever the next piece of evidence would be.

6    Q.  About how many items of evidence in total did the FBI seize

7    from 41 Jane Drive on June 16, 2022?

8    A.  52 items.

9    Q.  Were any of those items then split into multiple 1B numbers

10   after the search?

11   A.  Yes.

12   Q.  And why?

13   A.  There was evidentiary leads that could be obtained from

14   some of the evidence, so some of the evidence was split into

15   derivative 1B numbers after -- after it was entered into the

16   Sentinel system.

17   Q.  When you say 1B derivative numbers, what do you mean?

18   A.  So, if -- say, 1B1 had some -- had a piece of evidence that

19   needed to be further processed within it, that piece of

20   evidence within 1B1 would be removed, create a new 1B number

21   and then would be sent for processing, whatever that processing

22   would be.

23   Q.  And at this search, can you explain what types of items

24   were, your understanding of what types of -- withdrawn.

25       So, have some of the items that you seized during the

1    search of 41 Jane Drive been marked as government exhibits for

2    this trial?

3    A.  Yes, they have.

4    Q.  And have photographs of those items from the search also

5    been marked as government exhibits for this trial?

6    A.  Yes, they have.

7    Q.  Now, there should be a binder in front of you.  Before

8    coming to court today, did you review this binder?

9    A.  Yes.

10   Q.  Does that binder contain over 100 photographs?

11   A.  I don't know the exact number of photographs, but I believe

12   so.

13   Q.  Now, to be specific, and please bear with me as I read this

14   list, does the binder contain photographs marked for

15   identification as Government Exhibits 1F-1004, 1012, 1013,

16   1014, 1015, 1016, 1017, 1018, 1019, 1020, 1023, 1038, 1039,

17   1042, 1044, 1045, 1079, 1083, 1084, 1085, 1087, 1092, 1093,

18   1105, 1106, 1107, 1108, 1125, 1126, 1127, 1128, 1129, 1155,

19   1156, 1157, 1158, 1159, 1162, 1164, 1165, 1166, 1167, 1168,

20   1169, 1170, 1171, 1172, 1173, 1174, 1175, 1176, 1177, 1178,

21   1179, 1180, 1182, 1183, 1184, 1186, 1187, 1188, 1191, 1192,

22   1193, 1195, 1196, 1197, 1198, 1199, 1200, 1201, 1202, 1203,

23   1204, 1205, 1207, 1208, 1209, 1224, 1225, 1236, 1237, 1249,

24   1240, 1241, 1243, 1244, 1245, 1246, 1247, 1248, 1249, 1250 --

25   bear with me; still a few more to go -- 1251, 1252, 1253, 1259,

O5gWmen2                        Kougemitros - Direct

1    1260, 1261, 1262, 1263, 1264, 1265, 1266, 1267, 1268, 1269,

2    1270, 1271, 1272, 1273, 1274, 1275, 1276, 1278, 1279, 1280,

3    1304, 1305, 1306, 1307, 1308, 1309, 1311, 1312, 1313, 1314,

4    1315, 1316, 1317, 1318, 1319, 1320 and 1321?

5    A.  Yes.

6    Q.  What are those exhibits?

7    A.  Photographs that were taken on June 16, 2022, at 41

8    Englewood, 41 Jane Drive, Englewood Cliffs, New Jersey.

9    Q.  Do they all fairly and accurately depict what you observed

10   inside of 41 Jane Drive on June 16, 2022?

11   A.  Some of them, yes.

12   Q.  And do they fairly and accurately depict the inside of 41

13   Jane Drive on June 16, 2022?

14   A.  Yes, they do.

15           MS. POMERANTZ:  The government offers those exhibits.

16           MR. FEE:  Your Honor, objection only -- I think the

17   witness said some of them.

18           THE COURT:  Yes.

19           Could you clarify that, sir.  What do you mean?

20           THE WITNESS:  Yes.  This is just a subset of all the

21   photographs that were taken that day.  That's the only thing I

22   meant by that.

23           THE COURT:  You mean those aren't all the exhibits --

24   I'm sorry -- aren't all the photos taken that day, but all of

25   those exhibits are photos that were taken that day of that

O5gWmen2                              Kougemitros - Direct

1    location?

2                    THE WITNESS:  Correct.

3                    THE COURT:  Is that what you mean?

4                    THE WITNESS:  Yes, your Honor.  Thank you.

5                    MR. FEE:  No objection.

6                    THE COURT:  Admitted, without objection.

7                    (Government Exhibits 1F-1004, 1012, 1013, 1014, 1015,

8    1016, 1017, 1018, 1019, 1020, 1023, 1038, 1039, 1042, 1044,

9    1045, 1079, 1083, 1084, 1085, 1087, 1092, 1093, 1105, 1106,

10   1107, 1108, 1125, 1126, 1127, 1128, 1129, 1155, 1156, 1157,

11   1158, 1159, 1162, 1164, 1165, 1166, 1167, 1168, 1169, 1170,

12   1171, 1172, 1173, 1174, 1175, 1176, 1177, 1178, 1179, 1180,

13   1182, 1183, 1184, 1186, 1187, 1188, 1191, 1192, 1193, 1195,

14   1196, 1197, 1198, 1199, 1200, 1201, 1202, 1203, 1204, 1205,

15   1207, 1208, 1209, 1224, 1225, 1236, 1237, 1249, 1240, 1241,

16   1243, 1244, 1245, 1246, 1247, 1248, 1249, 1250, 1251, 1252,

17   1253, 1259, 1260, 1261, 1262, 1263, 1264, 1265, 1266, 1267,

18   1268, 1269, 1270, 1271, 1272, 1273, 1274, 1275, 1276, 1278,

19   1279, 1280, 1304, 1305, 1306, 1307, 1308, 1309, 1311, 1312,

20   1313, 1314, 1315, 1316, 1317, 1318, 1319, 1320 and 1321

21   received in evidence)

22                   MR de CASTRO:  Thank you, your Honor.  And thank you

23   for sparing me from reading that list again.

24   Q.  We'll walk through those in a moment, but first, I believe

25   you have a folder up there that's been marked for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen2                         Kougemitros - Direct

1   identification as Government Exhibit 1301.

2        Do you recognize this?

3   A.  I do.

4   Q.  And what is it, generally?

5   A.  This is an aid listing the evidence -- bunch of the

6   evidence that was seized on that day, but it's an aid that was

7   created to match the item number from that day with the 1B

8   number with potentially the derivative, with the government

9   exhibit number, with all the photographs that correspond to it.

10  Q.  And did you assist in preparing this chart?

11  A.  Yes, I did.

12  Q.  Did you check to confirm that this chart is accurate?

13  A.  I did.

14  Q.  And how did you do that?

15  A.  By physically comparing the description with the number,

16  with the 1B number, with the government exhibit number, with

17  the photographs that correspond to each piece of evidence.

18       MS. POMERANTZ:  Your Honor, the government offers

19  Government Exhibit 1301.

20       MR. FEE:  No objection.

21       THE COURT:  Admitted.

22       (Government Exhibit 1301 received in evidence)

23       MS. POMERANTZ:  Can we pull that up -- sorry.  Can we

24  pull that down.

25       Your Honor, apologies.  We're just loading the correct

O5gWmen2                          Kougemitros - Direct

1    exhibit.

2            Your Honor, while we're --

3            THE COURT:  Can we move this along?

4            MS. POMERANTZ:  Yes, your Honor.

5            THE COURT:  Can you move to another section?  We need

6    to move this along.

7            MS. POMERANTZ:  Sorry, your Honor.  Apologies.

8            THE COURT:  These things happen.

9            MS. POMERANTZ:  Your Honor, I'll move on and return to

10   that in a moment.

11   Q.  Before I ask you about this search in detail, can you tell

12   the jury what the search team did at the end of the search?

13   A.  At the end of the search, exit photographs are taken.  Once

14   the search has been completed, and the evidence is removed from

15   the residence, photographs are taken to depict the home as it

16   was left.  And in this case, also an exit video was done.

17   Q.  And what is the purpose of the exit photos and video?

18   A.  To show the state in which we leave the residence.

19   Q.  And generally, what did the house look like when you left?

20   A.  We tried to put it back as closely as we could to the way

21   that we found it.  It's not always possible, considering we

22   search all aspects of it.

23   Q.  Is it fair to say it looked a little different from when

24   you entered?

25   A.  Yes.

O5gWmen2                          Kougemitros - Direct

1    Q.  Did the FBI also do an entry video?

2    A.  No.  An entry video was not done.

3    Q.  And why not?

4    A.  It's just generally not done.

5    Q.  How did the FBI document the state of the home when the FBI

6    first entered?

7    A.  With entry photographs.

8         MS. POMERANTZ:  And I believe you now have 1302 up, if

9    we could publish that.

10        THE COURT:  Is your testimony that photographs were

11   taken, but there was no video -- is that it -- when you

12   entered?

13        THE WITNESS:  When we entered, correct.

14        THE COURT:  When you exit, there is a video.

15        THE WITNESS:  Yes, your Honor.

16        THE COURT:  OK.

17        MS. POMERANTZ:  I believe we now have Government

18   Exhibit 1301, so if we could publish that for the jury.

19   Q.  And Special Agent Kougemitros, I want to just walk through

20   what is in each column.  So starting with the left column, can

21   you explain what we're looking at?

22   A.  Yes.  That's the government exhibit number over here.

23        THE COURT:  Can the jury see that?  Is that on your

24   screens?

25        All right.

1   BY MS. POMERANTZ:

2   Q.  And the next column, what is that?

3   A.  The next column over is the 1B number, so that was --

4   that's the number that would be assigned in Sentinel, like I

5   was saying earlier.

6   Q.  And the evidence -- the next column, the evidence item log

7   number, what is that?

8   A.  That was a number that was assigned on June 16 while we

9   were at the residence.  When we seized whichever item, we

10  logged it and we would give it a number.

11  Q.  And the next column, what is that?

12  A.  Location would be the location within the home where the

13  item was found.

14  Q.  And the next column, where it says description, what is

15  that?

16  A.  Just a description of whatever the item was.

17  Q.  And in the last column, on the right, what does photograph

18  GX mean?

19  A.  These are all the government exhibit photographs that

20  correspond to this item.  At a minimum, I should say.  There

21  may be additional government exhibits, but -- or -- yeah, there

22  may have been other photographs that were taken, but this is,

23  at a minimum, the photographs that correspond to these items.

24          MS. POMERANTZ:  Thank you, Special Agent Kougemitros.

25          We can take that down now.  I'd like to now walk

1    through the search.

2    Q.  Can you describe for the jury the layout inside the house

3    at 41 Jane Drive?

4    A.  Yes.  It was a split-level home, so several levels for the

5    home.

6    Q.  And how did the FBI search team keep track of which room

7    was which during the search?

8    A.  So, part of the duty of the photographer -- in this case,

9    it was a female.  When she went through the home and when I

10   accompanied her, she assigned a letter to each room when, when,

11   while we were entering, while she was entering and, and

12   photographing the room.

13   Q.  Can you give an example of what you mean?

14   A.  Right.  So, I believe the garage was room A, alpha, was

15   assigned.  That was the first room that she came in.  She put a

16   Post-it on, saying alpha.  You may see a couple of the

17   photographs that we're going to talk about, they may have a

18   letter on it.  That corresponds to the room, and then she took

19   photographs of room alpha.

20   Q.  You said that this residence was a split or multilevel.

21   Can you explain what you mean by that?

22   A.  Yes.  Do you want me to describe the layout of the

23   residence?

24   Q.  Sure.  That would be helpful.

25   A.  OK.  So, those pictures that we are seeing of the garage

O5gWmen2                        Kougemitros - Direct

1    that -- we'll say that's the ground floor.  Off the garage was

2    a office, and then there was a step down or two or a couple of

3    steps down to a basement area.  But right in front of that

4    garage, coming through, as soon as you enter the threshold,

5    enter into the residence, there were steps leading to another

6    level.  So you would go one level up, where there was a

7    kitchen, a living room, a dining room.  Then there was a step

8    down to that sun-room, or solarium.  Just to the right of those

9    steps, as soon as you would come up, there was a few, couple of

10   steps going up to a third level, which was where the bedrooms

11   were located.

12        MS. POMERANTZ:  Now, can we pull up Government Exhibit

13   1F-1004.

14   Q.  Special Agent Kougemitros, can you remind the jury what

15   we're looking at here?

16   A.  Yes.  So, this is standing from the threshold of the garage

17   door that, which is open, and looking into the residence.  So

18   we're looking into the garage.  This is the left side of the

19   garage.  You could see that C-300 Mercedes-Benz.  And then just

20   beyond the vehicle, you could see the threshold which leads to

21   the residence from the garage.

22   Q.  Directing your attention to the stairs, what did those

23   stairs lead to?

24   A.  The stairs would lead to the landing for the entryway into

25   the home and also the eat-in kitchen.

1    Q.  And directing your attention to the left of the stairs,

2    what are we looking at here?

3    A.  There's another doorway, threshold leading into an office

4    area.  And from that office area, you could lead to a few step

5    down into a basement area.

6            MS. POMERANTZ:  Can we publish Government Exhibit

7    1F-1012.

8    Q.  What are we looking at here?

9    A.  So, this is standing from the threshold from the garage

10   into the residence.  So -- and that's -- you could see the

11   stairs leading up to that landing that I just spoke of, which

12   would be the entrance to the residence on the right, the front

13   entrance.  And to the left would be the eat-in kitchen and also

14   the rear exit.  To the left is that office area that you see

15   this open -- I don't know how to do this again, one moment.

16   Q.  Can you indicate -- you said the office.  Can you indicate

17   the office area on this government exhibit?

18   A.  Yes.  So, this circle that I'm doing is the door that leads

19   to the office area.

20           MS. POMERANTZ:  Let the record reflect that the

21   witness has indicated the left part of the photograph where a

22   door is located as leading to the office.

23           OK.  We can take that down.

24   Q.  Special Agent Kougemitros --

25           MS. POMERANTZ:  Ms. Wechsler, can we actually publish

O5gWmen2                              Kougemitros - Direct

1    Government Exhibit 1F-1079.

2    Q.   Special Agent Kougemitros, what are we looking at here?

3    A.   This is the eat-in area of the kitchen of the home at 41

4    Jane Drive.  Just to the left you could see -- right over here

5    is where those stairs lead to the garage.

6           MS. POMERANTZ:   And let the record reflect the witness

7    is indicating the left part of the photograph.

8    Q.   And directing your attention to the right part of the

9    photograph, what are we looking at here?

10   A.   I'll circle it.  This is the rear entrance to the

11   residence.

12   Q.   Are you referring to the doors on the right side of the

13   photograph?

14   A.   Correct.

15          MS. POMERANTZ:   Let's pull up Government Exhibit

16   1F-1334 side by side with Government Exhibit 1F-1079.

17   Q.   You were just describing doors in Government Exhibit

18   1F-1079.  Do you see those doors in Government Exhibit 1F-1334?

19   A.   Yes, the opposite side of those doors.

20   Q.   Can you just indicate that on Government Exhibit 1F-1334?

21   A.   Yes, with an X, on the right matches the circle on the

22   left.

23          MS. POMERANTZ:   Let the record reflect that the

24   witness is indicating that the doors in Government Exhibit

25   1F-1079, towards the right of the photograph, are the doors in

O5gWmen2                          Kougemitros - Direct

1    the middle of the photograph designated with an X in Government

2    Exhibit 1F-1334.

3              THE COURT:  The flip side of the doors.

4              MS. POMERANTZ:  I'm sorry.  Thank you, your Honor.

5              OK.  We can take those down.

6              Ms. Wechsler, can we please publish Government Exhibit

7    1F-1083 for the jury.

8    Q.  Special Agent Kougemitros, what are we looking at here?

9    A.  This is just a zoomed-in photograph of the rear door that

10   we were just looking at.

11   Q.  And what room are we in here?

12   A.  This is the kitchen.

13   Q.  And you mentioned that an evidence collection point was

14   established in the kitchen area.  Is that correct?

15   A.  Yes, it was.

16   Q.  OK.  Directing your attention to the left part of the

17   photograph, do you recognize the man in the photograph on the

18   table?

19   A.  Yes, I do.

20   Q.  And who is that?

21   A.  Senator Robert Menendez.

22             MS. POMERANTZ:  OK.  We can pull that down.

23             I'd like to publish for the jury Government Exhibit

24   1F-1084.

25   Q.  What are we seeing here?

O5gWmen2                        Kougemitros - Direct

1    A.   This is a photograph of the step -- so you see here where

2    there's kind of like a step down, or at least it looks like

3    it's looking down, but this is the sun-room/solarium.

4    Q.   Where in the house is the solarium located?

5    A.   To the rear of the residence.

6    Q.   What is the item to the left of the photograph?

7    A.   The item right here, I believe, you're referring to, is an

8    air purifier.

9    Q.   OK.

10   A.   I marked it with an X.

11            MS. POMERANTZ:   Let the record reflect the witness has

12   indicated the air purifier located to the left of the

13   photograph, the white object.

14            And we can pull that down.

15            Government Exhibit 1F-1085, can we please pull that

16   up.

17   Q.   What are we seeing here?

18   A.   This is just the left side, or the east side-facing of the

19   solarium/sun-room.  And you could see -- this is what I was

20   talking about before.  We actually labeled this room, or the

21   photographer labeled this room, O.  Right.  Room O.

22   Q.   And where is the air purifier we saw in the last

23   photograph?

24   A.   It's just in this location right -- right behind this

25   table.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen2                        Kougemitros - Direct

1          MS. POMERANTZ:  And pull that down and publish

2     Government Exhibit 1F-1087.

3     Q.  What are we seeing here?

4     A.  That's the same air purifier, just another photograph of

5     it.

6          MS. POMERANTZ:  OK.  Let's publish Government Exhibit

7     1F-1013.

8     Q.  What are we seeing here, Special Agent Kougemitros?

9     A.  This is a photograph showing the step-up to go to where the

10    bedrooms were located in the residence.  If you look just to

11    the right, this area over here, where I'm circling, that leads

12    down -- it's the steps leading down to the garage, which led

13    into the residence that we were looking at before.

14    Q.  And you said that this led to some of the bedrooms, is that

15    correct?

16    A.  All of the bedrooms.

17    Q.  All of the bedrooms.  And was -- directing your attention

18    to the right -- withdrawn.

19         You mentioned earlier that there was a bedroom that the --

20    that you weren't able to enter during your initial sweep.  Is

21    that correct?

22    A.  Yes.

23    Q.  And which room could you not enter?

24    A.  The primary bedroom, which would be located -- when coming

25    up this hallway and making an immediate right, you would be,

O5gWmen2                      Kougemitros - Direct

1    you'd be confronted by the door to your right.

2    Q.  What letter did the FBI search team assign the primary

3    bedroom?

4    A.  B, bravo.

5    Q.  And you testified earlier that you were able to get into

6    the primary bedroom, which was assigned room B, after calling

7    the locksmith.  Is that correct?

8    A.  Yes.

9           MS. POMERANTZ:  OK.  Let's pull up Government Exhibit

10   1F-1014.

11   Q.  What are we seeing here?

12   A.  This is a photograph of the -- standing from the threshold

13   of that hallway that we were just looking at, looking into room

14   B, bravo, the primary bedroom.

15          MS. POMERANTZ:  Let's pull up Government Exhibit

16   1F-1015.

17   Q.  Special Agent Kougemitros, what are we seeing here?

18   A.  This is another photograph of room B, the primary bedroom.

19   This is from the perspective of just slightly penetrating that

20   doorway threshold and then looking to the left and taking the

21   photograph.

22   Q.  What is the item on the table to the left of the

23   photograph?

24   A.  This is a black Kyocera flip phone.

25          MS. POMERANTZ:  And let the record reflect the witness

O5gWmen2                          Kougemitros - Direct

1    has marked a circle around or indicated that there's a cell

2    phone towards the left part of the photograph.

3              Let's pull up Government Exhibit 1F-1017.

4    Q.  What are we seeing here?

5    A.  So, when standing at the -- if you remember from that last

6    photograph, there was a piece of exercise equipment.  When

7    standing at the perspective of standing adjacent to that piece

8    of exercise equipment and looking back towards the door, we see

9    the letter B on that door is the actual entryway into this

10   room.

11             THE COURT:  And just above the sticker that says

12   government exhibit, is that the same Kyocera cell phone?

13             THE WITNESS:  Yes, your Honor.

14             MS. POMERANTZ:  Thank you, your Honor.  I was just

15   going there, but I appreciate it.

16             THE COURT:  I'm just trying to speed links along.

17             MS. POMERANTZ:  Thank you, your Honor.

18   Q.  Do you recognize the man in the photographs on the table?

19   A.  Yes.

20   Q.  And who is that?

21   A.  Senator Robert Menendez.

22   Q.  I'm directing your attention to the man in the photograph

23   on the wall.  Do you recognize who that is?

24   A.  Yes, I do.

25   Q.  Who is it?

O5gWmen2                         Kougemitros - Direct

1   A.  Senator Robert Menendez.

2           MS. POMERANTZ:  Let's pull up Government Exhibit

3   1F-1038.

4   Q.  What are we seeing here?

5   A.  This is an up-close photograph of that cell phone that we

6   had previously talked about, the black Kyocera phone that was

7   found in room bravo.

8           MS. POMERANTZ:  Let's pull up Government Exhibit

9   1F-1039.

10  Q.  What are we seeing here?

11  A.  This is, again, that same black Kyocera flip phone opened

12  up to be able to photographed.

13          MS. POMERANTZ:  Let's pull up Government Exhibit

14  1F-1042.

15  Q.  What are we seeing here?

16  A.  This is a close-up shot of that same black Kyocera cell

17  phone, flip phone opened up to reveal the phone number and IMEI

18  number.

19  Q.  Can you read the phone number, please?

20  A.  Yes, it's 1-551-287-1212.

21  Q.  What is the IMEI number?

22  A.  014390004909817.

23  Q.  What happened to that cell phone?

24  A.  It was seized and imaged by the FBI.

25  Q.  I'm going to hand you what's been marked for

O5gWmen2                        Kougemitros - Direct

1    identification --

2              MS. POMERANTZ:  Apologies that I'm stepping away from

3    the microphone, but I have to deal with official evidence.

4    Q.  So I'm handing you what's been marked for identification as

5    Government Exhibit B300.

6         Do you recognize this?

7    A.  I do.

8    Q.  And what is it?

9    A.  This is the same black Kyocera flip phone that was seized

10   on June 16, 2022, from 41 Jane Drive.

11   Q.  And how do you recognize it?

12   A.  I recognize it because of the government exhibit number,

13   which corresponds with the 1B number, which corresponds with

14   the evidence item log number.  I also recognize -- my name's on

15   it because I seized this item.  I found this item when I

16   entered the room.

17             MS. POMERANTZ:  You can set that down.

18             Next can we publish Government Exhibit 1F-1044.

19   Q.  What are we seeing here?

20   A.  This is a piece of exercise equipment that was located in

21   the room bravo.

22             MS. POMERANTZ:  Can we zoom in on the front of the

23   exercise equipment.

24   Q.  What does it say on the machine?

25   A.  It is a Vision Fitness machine.

O5gWmen2                         Kougemitros - Direct

1   Q.  And towards the top part, in the oval --

2   A.  It's the model number.  It's S7100HRT.

3   Q.  Directing your attention to the left of where it says

    Vision Fitness, what are we seeing here?

5   A.  I believe you're referring to this white tag or silver-ish

6   tag; that's manufacturer identifying information for the piece

7   of equipment.

8           MS. POMERANTZ:  And can we zoom in on the bedside

9   table.

10  Q.  What are we seeing here?

11  A.  It's a photograph.

12  Q.  And who's in that photograph?

13  A.  Senator Robert Menendez.

14          MS. POMERANTZ:  Let's pull up Government Exhibit

15  1F-1045.

16  Q.  What are we seeing here?

17  A.  This is that label that I was just talking about, the

18  manufacturer identifying information related to that piece of

19  exercise equipment.

20  Q.  What is model number?

21  A.  It is Sierra 7100HRT.

22          MS. POMERANTZ:  Let's turn back to Government Exhibit

23  1F-1017.

24  Q.  What are the doors we see to the left of this photograph?

25  A.  There are two doors.  They were actually closets.  In your

O5gWmen2                          Kougemitros - Direct

1    blowup picture, I'm going to put an X on the one to the left

2    and a circle on the one to the right.

3    Q.  Were you able to access those closets after entering the

4    primary bedroom that was unlocked?

5    A.  Not initially, no.

6    Q.  And why not?

7    A.  They were locked with dead bolt locks.

8    Q.  And so is that when you testified earlier that you waited

9    for a locksmith to open these as well?

10   A.  Yeah.  The locksmith had, just moments earlier, unlocked

11   the bedroom, room B.  We swept the room and then noticed that

12   the other two doors were locked.  And then we immediately asked

13   them to come back into the room and unlock the other two doors.

14          MS. POMERANTZ:  Pull up Government Exhibit 1F-1017.

15   Q.  What are we seeing here?

16   A.  This is just -- also room bravo, standing, again, from the

17   perspective of that piece of exercise equipment, but just

18   looking further to the left.

19   Q.  And what doorways can we see in this photo?

20   A.  Doorway to the *en suite* bathroom as well as the two closets

21   that we had just talked about.

22   Q.  And is there also a doorway to room B as well?

23   A.  Correct, yes.

24          MS. POMERANTZ:  Let's pull up Government Exhibit

25   1F-1019.

O5gWmen2                          Kougemitros - Direct

1  Q.  What are we seeing here?

2  A.  This is just an image of one of those closets.  That was

3  actually the closet to the right.  After it was opened we

4  labeled this room, room Charlie, C and just a photograph of it.

5  Q.  What clothing items did the FBI find inside this closet?

6  A.  Various clothing items belonging to men and women.

7  Q.  And by the way, you testified earlier that entry

8  photographs are taken.  Is this an entry photograph?

9  A.  Yes.

10  Q.  And how do you know that?

11  A.  By the naming convention.  Basically, the number on the

12  right, I recognize it.  It's a low number, and I know it's one

13  of the entry photographs.

14        MS. POMERANTZ:  Let's look at Government Exhibit

15  1F-1020.

16  Q.  What are we seeing here?

17  A.  This is just a photograph of the floor area of room

18  Charlie, and we were just looking at kind of like a general

19  picture of it.  And now this is depicting the floor.

20  Q.  And I want to direct your attention to the right.  What

21  clothing item is visible?

22  A.  A blue blazer.

23  Q.  OK.  And again, is this an entry photograph?

24  A.  Yes, it is.

25  Q.  How do you know that?

1    A.  Again, from the naming convention of the number of the

2    photograph.

3    Q.  And what other items are visible to just the left of that

4    jacket?

5    A.  Some ties.

6    Q.  What happened to the men's jacket that was found -- excuse

7    me, to the blue jacket that was found in the closet?

8    A.  It was searched.

9    Q.  And where was the jacket searched?

10   A.  The jacket was removed from room Charlie, or from the door

11   of room Charlie, and searched in room bravo, because we were

12   standing right at the threshold there.  And it was searched and

13   the contents were removed and photographed.

14        MS. POMERANTZ:  Let's pull up Government Exhibit

15   1F-1224.

16   Q.  What are we seeing here?

17   A.  This is that same blazer with the contents taken out,

18   placed on the bed, just to be able to be photographed.  So this

19   is a far-out shot of that same blazer that was hanging up in

20   room Charlie photographed.

21        MS. POMERANTZ:  Let's pull up Government Exhibit

22   1F-1225.

23   Q.  What are we seeing here?

24   A.  This is just another picture, a little bit more zoomed in,

25   of the contents of the blazer that was hanging up in room

1    Charlie but laid out in room bravo to be photographed.

2              MS. POMERANTZ:  I want to zoom in on the bottom left

3    paper.

4    Q.  Would you please read the words that are underlined close

5    to the top of this paper?

6    A.  Yes, Senator Menendez.

7              MS. POMERANTZ:  OK.  We can take that down.

8    Q.  I want to direct your attention to --

9              MS. POMERANTZ:  Well, I apologize.  Let's keep up

10   Government Exhibit 1F-1225.

11   Q.  I want to direct your attention to the two papers to the

12   right of this one.  What printed words are at the top of these

13   papers?

14   A.  Democratic Caucus.

15   Q.  And can you remind us where this jacket with these papers

16   in the pockets was located during the initial walk-through of

17   the house?

18   A.  Yes.  It was located in room Charlie.  It was hanging on

19   the door of room Charlie.

20             MS. POMERANTZ:  Let's go to Government Exhibit

21   1F-1020.

22             THE WITNESS:  I should say it was hanging on the

23   interior of the door.  Sorry.  Just to clarify.

24             MS. POMERANTZ:  Thank you.

25             Let's pull up Government Exhibit 1F-1020.

O5gWmen2                          Kougemitros - Direct

1   Q.  OK.  So what is the black rectangular object on the floor

2   towards the bottom of this photograph?

3   A.  This is a safe, I believe you're referring to right here

4   that I'm circling.

5        MS. POMERANTZ:  And let's pull up Government Exhibit

6   1F-1023.

7   Q.  What are we seeing here?

8   A.  This is another photograph of the bottom of room Charlie,

9   just depicting the contents better, be able to give you a

10  better perspective of what was on the floor of room Charlie.

11  Q.  Where is the safe we saw in the last photo?

12  A.  Just to the right you can see a keypad.  That's it.

13       MS. POMERANTZ:  OK.  We can take that blowup down.

14  Q.  Special Agent Kougemitros, is this an entry photograph?

15  A.  Yes, it is.

16  Q.  And how do you know that?

17  A.  Again, by the naming convention of the government exhibit,

18  I know that it is a entry photo.

19  Q.  But before we get to the safe, what, if anything, did the

20  FBI find on the floor of the closet?

21  A.  Gold and jewelry.  And the safe.

22  Q.  What did the search team do after finding gold on the floor

23  of the closet?

24  A.  Well, the item would be removed just to be able to be

25  searched.  They would alert me to the finding.

O5gWmen2                    Kougemitros - Direct

1    Q.  And after they alert you to the finding, what happens next?

2    A.  The item would be photographed, and eventually it would be

3    brought to the evidence collection point, where it would be

4    logged.  It eventually would be, you know, removed from the

5    residence and logged into evidence.

6    Q.  And was it photographed -- were the items that were found

7    in the closet photographed in the closet after they were

8    searched?

9    A.  No.

10   Q.  Why -- where were they -- where were the items removed to?

11   A.  The items were moved to room B, bravo, which is the primary

12   bedroom.  This is the -- one of the closets of the primary

13   bedroom.  It was just moved into B to be photographed.

14   Q.  And why was it moved from room C to room B to be

15   photographed?

16   A.  It just wasn't feasible to be in the closet and taking

17   pictures of every item in there.

18           MS. POMERANTZ:  Now let's pull up Government Exhibit

19   1F-1236.

20   Q.  What are we seeing here?

21   A.  This is some of the contents of room C.  Primarily, this is

22   some of the jewelry that was located on the floor, removed,

23   placed on the bed to be able to be photographed.  Additionally,

24   there's two handbags that were located within room C that were

25   also removed from room C, placed on the bed, and some of the

O5gWmen2                        Kougemitros - Direct

1    contents removed to be able to photographed.

2    Q.  I want to direct your attention to the bag on the right of

3    this exhibit.  What are we seeing here?

4    A.  It is a Prada bag.

5    Q.  And what's on top of the Prada bag?

6    A.  Cellular telephones that were located within the Prada bag

7    that was located within room C.

8    Q.  And what did your search team do after finding the phones

9    on the closet floor?

10   A.  They alerted me to them.

11   Q.  And after they alerted you to them, what happened next?

12   A.  I came and observed the items.  They were photographed.

13   Q.  And this is -- why did the search team remove the phones

14   from the closet to photograph them instead of photographing

15   them inside the closet?

16   A.  It just -- it wasn't feasible.  Space -- space wise, it was

17   just feasible to remove it from room C to photograph in room B.

18          MS. POMERANTZ:  Let's publish Government Exhibit

19   1F-1252.

20   Q.  What are we seeing here?

21   A.  This is just another perspective of that same bag that we

22   saw in the corner of the last photograph.  This is a zoomed-in

23   shot.

24   Q.  Focusing on the phone on the right, what kind of phone is

25   that?

1  A.  An iPhone.

2  Q.  What color iPhone?

3  A.  Rose gold.

4        MS. POMERANTZ:  Let's pull up Government Exhibit

5  1F-1253.

6  Q.  What are we seeing here?

7  A.  This is a zoomed-in photograph of that same rose gold

8  iPhone that was located in that Prada bag that was located in

9  room C Charlie.

10 Q.  What is the model number?

11 A.  Model number alpha 1784.

12 Q.  And what happened to that cell phone, Special Agent

13 Kougemitros?

14 A.  It was seized.

15 Q.  I'm going to hand you what's been marked for

16 identification --

17 A.  Do you want this one back.

18 Q.  Yes.

19     -- as Government Exhibit E100.

20     Do you recognize that?

21 A.  Yes, I do.

22 Q.  How do you recognize it?

23 A.  From the government exhibit number, which corresponded --

24 in the weeks leading up to trial, I was able to review these

25 evidence -- government exhibit numbers, which corresponded to

1    the 1B numbers that were assigned on June 17, which correspond

2    to the item number that was assigned on June 16.  That's how I

3    recognize the phone.

4        So just to give you kind of an example, this is 1B100, you

5    could see here.  You can't see it very well, but it was

6    assigned 1B69, and inside my chart I have the actual item

7    number that was assigned that day.

8            MS. POMERANTZ:  All right.  You can set that aside.

9            Let's publish Government Exhibit 1F-1240.

10   Q.  What are we seeing here?

11   A.  This is the contents of this purse that was located in -- I

12   guess I call it the fur-like purse that was located within room

13   Charlie.  The contents were removed to be able to be

14   photographed.

15   Q.  And how did the FBI search team document the contents of

16   this bag?

17   A.  By photographing it.

18   Q.  All right.  And where was it photographed?

19   A.  In room bravo.  The purse was removed from room Charlie,

20   brought to room bravo to be searched.  The contents were

21   removed, displayed in room bravo and photographed.

22           MS. POMERANTZ:  OK.  Let's publish Government Exhibit

23   10 -- 1F-1019 side by side with this one.

24   Q.  Now, you testified earlier that Government Exhibit 1F-1019

25   is an entry photograph.  Again, can you just remind the jury

O5gWmen2                          Kougemitros - Direct

1    what that means, please?

2    A.  Right.  This would be -- the entry photograph would be a

3    photograph that would be taken before any search would be

4    conducted.

5    Q.  And do you see the white bag from Government Exhibit

6    1F-1240 in Government Exhibit 1F-1019?

7    A.  I do.

8    Q.  Where is that bag?

9    A.  I will circle it.  Just here on the right-hand picture on

10   Government Exhibit 1019.

11   Q.  OK.  And just remind the jury, where is that blue jacket in

12   Government Exhibit 1F-1019?

13   A.  Yes.  I'll mark it with an X.  The blue jacket that we had

14   previously seen that had its contents removed and photographed

15   in room bravo is right here, to the right, marked by an X.

16   Q.  And that's on the inside of the door --

17   A.  Yes.

18   Q.  -- of room C?

19   A.  Yes.

20          MS. POMERANTZ:  All right.  Can we publish Government

21   Exhibit 1F-1240 side by side with 1F-1241.

22   Q.  What are we seeing here?

23   A.  This is a photograph of the -- so, the -- the funds or the

24   currency that you see on the right here on Government Exhibit

25   1241 is just laid-out bills, all the loose bills from

O5gWmen2                          Kougemitros - Direct

1   Government Exhibit 1240.  Anything that's not in an envelope

2   would be -- was just removed, put over here to the -- laid out

3   so that we could photograph the serial numbers to the bills.

4          MS. POMERANTZ:  Let's pull up Government Exhibits

5   1F-1242 and 1243 side by side, please.

6   Q.  What are we seeing here, Special Agent Kougemitros?

7   A.  This is one of the items that was located in that fur-like

8   bag.  This is a Tiffany & Co, company, envelope, and you could

9   see there are some bills that were protruding.  Those bills

10  were removed, laid out in Government Exhibit 1243 and

11  photographed.

12         MS. POMERANTZ:  Let's publish Government Exhibit 1244

13  and Government Exhibit 1F-1245.

14  Q.  What are we seeing here?

15  A.  This is one of the -- this is a bank -- TD Bank envelope

16  that was located within that fur-like bag.  So 1244 is just a

17  picture of that envelope by itself.  1245 is the contents of

18  1244 fanned out just to be able to be photographed.

19  Q.  What kind of envelope are we looking at in Government

20  Exhibit 1F-1244 and 1245?

21  A.  TD Bank envelope.

22         MS. POMERANTZ:  Let's publish Government Exhibit

23  1F-1248 and Government Exhibit 1F-1249 side by side, please.

24  Q.  What are we seeing here?

25  A.  1248 is another envelope that was located in that fur-like

O5gWmen2                              Kougemitros - Direct

1   bag.  1249 is the contents of that PNC bank envelope removed

2   and fanned out just to be able to be photographed.

3            MS. POMERANTZ:  Let's publish Government Exhibit

4   1F-1250.

5            THE COURT:  Go back to 1249.

6            Do you see that yellow sticky?  Is that the way it was

7   found, or is that a number placed on there by the FBI?

8            THE WITNESS:  That was the way it was found, your

9   Honor.

10           THE COURT:  All right.  Thank you.

11           MS. POMERANTZ:  Publish Government Exhibit 1F-1250 and

12   Government Exhibit 1F-1251.

13  Q.  What are we seeing here?

14  A.  In 1250, these are three separate -- these are not the same

15  envelopes, the TD Bank, Toronto-Dominion Bank envelopes.  These

16  are separate ones, and a PNC envelope also, that were located

17  in that fur-like bag.  That's 1250.

18      1251 is the contents of each one of those envelopes laid

19  out on the top of that envelope and just to be able to be

20  photographed.

21  Q.  What did the FBI search team do with all of the cash that

22  was found in the white bag in the closet?

23  A.  It was seized.

24  Q.  I'm going to hand you what's been marked for identification

25  as Government Exhibit 64.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen2                          Kougemitros - Direct

1    Do you recognize this?

2    A.  I do.

3    Q.  What is it?

4    A.  Government Exhibit 64 is the contents of the fur-like bag,

5    the money contents of the fur-like bag.

6    Q.  And how do you recognize it?

7    A.  I recognize it from the 1B number -- I'm sorry; take that

8    back -- from the government exhibit number, which corresponds

9    with the 1B number that was assigned in Sentinel on June 17.

10   And that corresponds on my chart with the item No. 47 that was

11   seized that day.

12          MS. POMERANTZ:  Your Honor, the government offers

13   Government Exhibit 64.

14          THE COURT:  Hearing no objection, admitted.

15          (Government Exhibit 64 received in evidence)

16          MS. POMERANTZ:  Your Honor, I'd ask to publish it to

17   the jury by passing it around the jury box.

18          THE COURT:  Just walk in front of the jury box.  Yes,

19   you may.  I don't want to waste time with them handing it

20   person to person.

21          You'll have access, ladies and gentlemen, during your

22   deliberations, to any of this information, any of the exhibits

23   that you want to see.

24   BY MS. POMERANTZ:

25   Q.  Special Agent Kougemitros, how much cash was found in the

O5gWmen2                        Kougemitros - Direct

1    white bag in the closet?

2    A.   $5,590.

3    Q.   Do you know what happened to the envelopes that some of

4    this cash was found in?

5    A.   Yes.

6    Q.   And what happened?

7    A.   After the items were logged into Sentinel and provided the

8    1B number -- in this case, 64 -- at another point in time, the

9    envelopes were removed from the cash and given their own

10   derivative 1B number, and they were sent to the FBI lab at

11   Quantico, Virginia, for further processing, for further

12   evidence processing.  The remaining cash stayed in 1B64 -- or

13   the cash remained in 1B64, and again, the envelopes became

14   their own 1B number and went to the lab.

15   Q.   I'm going to hand you what's been marked for identification

16   as Government Exhibit 90.

17        Do you recognize this?

18   A.   I do.

19   Q.   And what is it?

20   A.   Government Exhibit 90 is the actual envelopes that were

21   seized and were originally part of Government Exhibit 64, but

22   these envelopes were removed.  This is the -- they were made to

23   their own 1B number, so now they became -- just the envelopes

24   became 1B90.  These envelopes were sent to the FBI lab at

25   Quantico, Virginia, for further evidence processing.

1          MS. POMERANTZ:  Your Honor, at this time I would like

2     to read part of a stipulation into the record.  It's Government

3     Exhibit 1437.

4          The parties have stipulated that:

5          "If called as a witness at trial, evidence and

6     laboratory technicians ('technicians') with the Federal Bureau

7     of Investigation would testify as to the following:

8          "The technicians were not present at the June 16,

9     2022, searches pursuant to search warrants at 41 Jane Drive,

10    Englewood Cliffs, New Jersey," defined as the residence, "and

11    of safe deposit box No. 13, located at the Chase Bank at 50

12    Grand Avenue, Englewood, New Jersey," defined as the safe

13    deposit box, "collectively referred to here as the June 2022

14    searches but were involved in processing some of the evidence

15    seized during the June 2022 searches.  Handwritten lists of

16    items seized by the FBI pursuant to search warrants, including

17    those seized during the June 2022 searches, are reflected in

18    FBI records called collected-item logs.  Data from the

19    collected-item logs for each item retained as evidence is later

20    put into an electronic database called the evidence management

21    system and electronically assigned an identifying number

22    beginning with 1B that is assigned to pieces of evidence within

23    a case file."  And it's defined as the 1B number.

24         "Some of the items seized during the June 2022

25    searches, which were originally assigned a single 1B number in

O5gWmen2                        Kougemitros - Direct

the evidence management system, were later split by technicians

at the FBI field office in New York during evidence processing

into two items, and one of the two items was assigned a new 1B

number.  For example, an envelope containing cash was

originally designated with a single 1B number, but during

evidence processing, the cash was removed from the envelope and

the envelope was assigned a separate 1B number.

           "Additionally, some of the items seized during the

June 2022 searches were sent for processing to the FBI

laboratory in Quantico, Virginia, where they were assigned

laboratory item numbers," referred to as the lab item number.

"Some of these items were later split by technicians at the

laboratory during evidence processing into multiple items, and

the components were given additional lab item numbers

reflecting that they had been part of the original item.  For

example, the envelope identified as 1B78 was designated lab

item No. 25, and two pieces of tape removed from that envelope

were designated lab item Nos. 25-1 and 25-1-1.

           "Pursuant to the above practices the items marked as

the following government exhibits correspond to the following

1B numbers:  The item marked for identification as Government

Exhibit --"

           I'm now reading paragraph J:

           "The item marked for identification as Government

Exhibit 64 consists of the items currently logged in the

1    evidence management system under a 1B number 1B64; that is,

2    $5,590 in cash seized from a bedroom closet in the residence.

3         "The item marked for identification as Government

4    Exhibit 90 consists of the items currently logged in the

5    evidence management system under 1B No. 1B90; that is, a

6    business card, four TD Bank envelopes, two PNC bank envelopes,

7    two money bands, a TD Bank receipt, a sticky note and an

8    envelope containing two two-piece receipts found with the cash

9    marked as Government Exhibit 64.

10        "The items contained in Government Exhibits 64 and 90

11   were initially logged in the evidence management system

12   together under 1B No. 1B64."

13        And to conclude, as relevant here it's further

14   stipulated and agreed that the party will raise the objection

15   under federal Rule 11, the exhibit referenced above.  And it's

16   further stipulated and agreed that the stipulation marked as

17   Government Exhibit 1437 is admissible in evidence at trial

18   conditioned upon the admission of any of the documents

19   referenced herein.

20        So at this point, your Honor, I would offer Government

21   Exhibit 90 and Government Exhibit 1437.

22        THE COURT:  Admitted.

23        (Government Exhibits 90 and 1437 received in evidence)

24        MS. POMERANTZ:  And I plan to read more paragraphs of

25   the stipulation as they become relevant throughout Special

1    Agent Kougemitros's testimony.

2              THE COURT:  All right.

3              Ladies and gentlemen, you now have heard all three of

4    the ways evidence has come in.  You've heard the witness

5    testify.  That's evidence.  You've heard me admit photographs

6    and cash and so forth.  That's exhibits, documents and other

7    things.  Those are in evidence.  And now you've heard a

8    stipulation of the parties; that is, an agreement of the

9    parties that certain things are true.  And what the attorney

10   was reading you must accept as true.  So now you've seen all

11   three methods of evidence coming in.

12             Proceed.

13             MS. POMERANTZ:  Thank you, your Honor.

14   Q.  Was this cash from the white bag in the walk-in closet the

15   only cash the FBI found inside 41 Jane Drive, or was there

16   more?

17             MR. FEE:  Objection, your Honor.  Just, again, to help

18   us on cross here, if he could specify the things he did versus

19   what others on the team did.

20             THE COURT:  Fair enough.

21   BY MS. POMERANTZ:

22   Q.  Special Agent Kougemitros, as the team leader and

23   designated seizing official of the search, are you aware of

24   whether there was just this cash from the white bag being found

25   in the walk-in -- in the closet, or was there more cash that

O5gWmen2                          Kougemitros - Direct

1    was found?

2    A.   In the home?

3    Q.   In the home.

4    A.   There was more cash that was found in the home.

5    Q.   Before we get to that, can you remind us what the FBI found

6    on the floor of the closet?

7    A.   Gold and jewelry.

8            MS. POMERANTZ:   I want to pull up Government Exhibit

9    1F-1237.

10   Q.   What are we seeing here?

11   A.   This is some of the jewelry that was located on the floor,

12   removed from room C, brought into room B to be photographed,

13   and also gold, not only jewelry but a gold bar that's visible.

14   Q.   Can you identify the gold bar in this government exhibit?

15   A.   Yes, I'll circle it in red.  It's a one-kilo gold bar.

16           MS. POMERANTZ:   Let the record reflect that the

17   witness has identified the gold bar towards the right of

18   Government Exhibit 1237.

19           Can we now publish Government Exhibit 1023 side by

20   side with 1237.

21   Q.   Special Agent Kougemitros, you testified earlier that

22   Government Exhibit 1F-1023 is an entry photograph.  Is that

23   correct?

24   A.   Yes.

25   Q.   And where in the closet was the gold bar in 1F-1237

1    located?

2    A.  On the floor.  Would you like me to point out?

3    Q.  Yes.

4    A.  Where exactly it is on the floor?

5    Q.  Yes, please.

6    A.  You can't actually see the gold bar itself, but what you

7    can see is the packaging that concealed the gold bar.  So I'm

8    going to point it out right here.  You can see the Ziploc bag

9    and the paper towel.  So this is the Ziploc bag to the right,

10   and you also see the Ziploc bag all the way to the left.  You

11   can see the paper towel more clear on the left.  So this gold

12   bar was located within a Ziploc bag which was wrapped in a

13   paper towel, which was located under these boxes in room C on

14   the floor.

15   Q.  And leaving up Government Exhibit 1F-1237, where we're

16   currently zoomed in, directing your attention to the area to

17   the left of the gold bar, what do you see there?

18   A.  There's a name card.

19   Q.  And what do you -- can you circle that name card, please.

20       And what do you see on that name card?

21   A.  Printed on top of it, it says the president and presumably

22   written in pencil is Senator Menendez.

23   Q.  When you said presumably, can you explain what you mean?

24   A.  The full letters are not viewable, so I -- I'm presuming it

25   says Senator Menendez, but if you want me just to read what it

O5gWmen2                                    Kougemitros - Direct

1    says, it says "ator Menendez."

2              MS. POMERANTZ:  Let's pull up Government Exhibit

3    1F-1239.

4    Q.  What are we seeing here?

5    A.  This is a zoom-in of that same gold bar that we -- that my

6    team found in room C.

7    Q.  OK.  I'm going to now hand you what's been marked for

8    identification as Government Exhibit 56.

9         Do you recognize this?

10   A.  Yes, I do.

11   Q.  And what is it?

12   A.  This is the same gold bar that -- this is the same gold bar

13   that was located on the floor of room Charlie.  Yeah.

14             MS. POMERANTZ:  Your Honor, the government offers this

15   exhibit.

16             MR. FEE:  No objection.

17             THE COURT:  Hearing no objection, admitted.

18             (Government Exhibit 56 received in evidence)

19             MS. POMERANTZ:  Your Honor, may I please pass this

20   around just so that --

21             THE COURT:  Yes.

22             MS. POMERANTZ:  Thank you.

23             THE COURT:  Next question, please.

24             MS. POMERANTZ:  Yes, your Honor.

25   Q.  During the course of the search at 41 Jane Drive, where you

1  were the team leader, was Government Exhibit 56 the only gold

2  that the FBI found, or was there more?

3  A.  No.  There was more.

4  Q.  Where did the FBI find more gold?

5  A.  Located within the safe, which was in room C, on the floor

6  of room C.

7  Q.  How did the FBI search the safe found on the floor of the

8  closet identified as room C?

9  A.  As part of the warrant that we had, that was signed by

10 Judge Hammer in the District of New Jersey, it authorized us to

11 open the safes or any lockboxes.  The safe was removed from

12 room C, was actually brought into room A, which is the garage,

13 and forced open.

14        MS. POMERANTZ:  Pull up Government Exhibit 1F-1125.

15 Q.  What are we seeing here?

16 A.  This is the safe that was previously located in room

17 Charlie that was brought to the garage to be able to be pried

18 open.

19    You'll notice there's, like, a white material on it,

20 substance, almost looks like a white dust.  Fire-retardant

21 safes have a -- what makes them fire retardant, for at least

22 for a period of time, is they may contain concrete or gypsum,

23 the same thing that's in the walls of Gyprock, just to give it

24 a little bit of fire-retardant time of fire retardant.  Because

25 the safe was forced open, some of the contents of that, you

1    know, gypsum or concrete were exposed to the rest of the

2    contents of the safe.  So that's why it looks that way.

3            MS. POMERANTZ:  Let's next publish Government Exhibit

4    1F-1126.

5    Q.  What are we seeing here?

6    A.  This is, again, that same safe that was located in room

7    Charlie.  Just the mechanical portion of the door was removed

8    just to show the contents, so you could see it right there.

9    Q.  And what are we seeing inside the safe in Government

10   Exhibit 1F-1126?

11   A.  There's various boxes, envelopes, jewelry.

12           MS. POMERANTZ:  Next pull up Government Exhibit

13   1F-1127.

14   Q.  What are we seeing here?

15   A.  Same safe.  Just the contents of those boxes that we saw

16   and jewelry that were located at the bottom were removed, and

17   now you could just see there's a shelf in there and see some of

18   the contents of the shelf.

19   Q.  What did the FBI search team do with the items that were

20   found in the safe?

21   A.  They were laid out to be photographed.

22           MS. POMERANTZ:  Let's pull up Government Exhibit

23   1F-1129.

24   Q.  What are we seeing here?

25   A.  This is the content of the safe laid out and photographed.

1    Q.  What kinds of items did the FBI find inside the safe?

2    A.  Cash, loose cash; gold; envelopes of cash; jewelry; gold

3    coins; one-ounce gold bars; one-kilogram gold bar.

4            MS. POMERANTZ:  Let's next publish Government Exhibit

5    1F-1162.

6    Q.  What are we seeing here?

7    A.  These are some of the items that were located within the

8    safe that were laid out to be photographed.

9            MS. POMERANTZ:  I want to zoom in on the second paper

10   from the left.

11   Q.  What is this?

12   A.  United Airlines boarding pass.

13   Q.  Would you please read the passenger name out loud?

14   A.  Menendez, Robert.

15           MS. POMERANTZ:  Let's go back to Government Exhibit

16   1F-1129.

17   Q.  And can you just remind the jury what we're seeing here?

18   A.  This is the contents of the safe removed, placed on a

19   cardboard box, just like the -- a box folded up to be able to

20   be photographed.  It's laid out just so you could see it, since

21   it wasn't clearly visible from the photograph taken within the

22   garage when it was taken.

23   Q.  Are some of the gold bars that the FBI found in the safe

24   visible in this photograph?

25   A.  Some of them.

O5gWmen2                          Kougemitros - Direct

1    Q.  And where are they?

2    A.  I'm going to circle them, over here.

3         So where I circled, you could see the top portion is a

4    one-kilogram gold bar, and then just under it are two one-ounce

5    gold bars.

6              MS. POMERANTZ:  Let's next publish Government Exhibit

7    1F-1164.

8    Q.  What are we seeing here?

9    A.  This is just a zoomed-in photograph of the gold that was

10   located in the safe that was visible in that last picture, just

11   a zoomed-in portion of -- picture of them.

12             MS. POMERANTZ:  Let's next publish Government Exhibit

13   1F-1165.

14   Q.  What are we seeing here?

15   A.  An even closer zoomed-in photograph of that same gold that

16   we were just looking at that was located in the safe that was

17   located in room Charlie.

18   Q.  I'm going to hand you what's been marked for identification

19   as Government Exhibit 42.

20        Do you recognize this?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  These are the same gold bars that are depicted here in

24   Government Exhibit 1165.

25             MS. POMERANTZ:  Your Honor, the government offers this

O5gWmen2                          Kougemitros - Direct

1    exhibit.

2              THE COURT:  Admitted, without objection.

3              (Government Exhibit 42 received in evidence)

4              MS. POMERANTZ:  Your Honor, may I publish to the jury?

5              THE COURT:  Yes.

6    BY MS. POMERANTZ:

7    Q.  Special Agent Kougemitros, was that the only gold that the

8    FBI search team found inside the safe, or was there more?

9    A.  There was more.

10             MS. POMERANTZ:  Let's pull up Government Exhibit

11   1F-1182.

12   Q.  What are we seeing here?

13   A.  This is one of the boxes that was located in the safe of --

14   that was in room Charlie.

15             MS. POMERANTZ:  Let's pull up Government Exhibit

16   1F-1183.

17   Q.  What are we seeing here?

18   A.  This is that same box, just with the flap opened to be able

19   to reveal the contents to be able to be photographed.

20             MS. POMERANTZ:  Let's next turn to Government Exhibit

21   1F-1184.

22   Q.  What are we seeing here?

23   A.  This is the content of that same box we were just viewing

24   in 1183, the contents removed just to be able to be

25   photographed, laid out to be able to be photographed.

1  Q.  What was inside the box?

2  A.  Cash; gold; bank envelope, TD Bank envelope; another blank

3  envelope with cash; a small, little wallet also with cash.

4  Q.  And can you identify in Government Exhibit 1F-1184 where

5  the gold is?

6  A.  Yes.  I'm going to circle it.  These are seven one-ounce

7  gold bars.

8          MS. POMERANTZ:  Let the record reflect that the

9  witness has circled the area at the middle of Government

10  Exhibit 1F-1184.

11          Let's next publish Government Exhibit 1F-1188.

12  Q.  What are we seeing here?

13  A.  These are those same seven gold bars that were -- that we

14  just previously saw in Government Exhibit -- I believe that was

15  1184.  These are just the gold bars by themselves, laid out to

16  be photographed.

17  Q.  I'm going to hand you what's been marked for identification

18  as Government Exhibit 39.

19      Do you recognize this?

20  A.  I do.

21  Q.  What is it?

22  A.  This is Government Exhibit 39, which is the seven one-ounce

23  gold bars that was located in that box that was located in the

24  safe which was found in room Charlie.

25          MS. POMERANTZ:  Your Honor, the government offers this

O5gWmen2                          Kougemitros - Direct

1    exhibit.

2              THE COURT:  Admitted without objection.

3              (Government Exhibit 39 received in evidence)

4              MS. POMERANTZ:  Your Honor, may I publish it to the

5    jury?

6              THE COURT:  No.  Just walk in front of it.  The jury

7    has gotten a feel for the weight of gold, and they're looking

8    forward to the lunch break.

9              MS. POMERANTZ:  Understood, your Honor.

10             MR. RICHENTHAL:  Your Honor, on that subject, could we

11   take up one thing with the Court before the jury's released for

12   lunch?  It will be brief.

13             THE COURT:  Yes.

14             MS. POMERANTZ:  Not in the jury's presence, your

15   Honor.

16             THE COURT:  Do you have more?

17             MS. POMERANTZ:  Yes, your Honor.

18             THE COURT:  Go ahead.

19             Oh, it's 1 o'clock.  I should say, rather, is this a

20   logical time for the jury to take its lunch break?

21             MS. POMERANTZ:  I think that this is a fine time.

22             THE COURT:  OK.

23             Sidebar.  You want a sidebar, is that it?

24             MR. RICHENTHAL:  Wherever the Court would like it,

25   that's fine, your Honor.  Sidebar's fine.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen2                          Kougemitros - Direct

1                  (At sidebar)

2                  THE COURT:  Sir.

3                  MR. RICHENTHAL:  Your Honor, while we've been in

4      court, Mr. Menendez released publicly a statement regarding his

5      wife's diagnosis in some detail.  Needless to say, that is

6      extremely concerning, given the timing that the jury's about to

7      go on lunch and presumably have access to their phones.

8      Without prejudice for potentially asking the Court for

9      additional relief, we would ask that the jury be reminded not

10     to check the news in particular on this lunch break.  It is

11     literally all over the news.  It was released while we were in

12     court.

13                 MR. FEE:  Your Honor, there's no need for further

14     instruction.  Senator Menendez's wife --

15                 And I'd appreciate it if you would refrain from

16     laughing.

17                 MR. RICHENTHAL:  I was not laughing.

18                 THE COURT:  Let's cut that out.

19                 MR. FEE:  She released it because she has people

20     camping outside her doctor's office, and there are rumors

21     circulating all over D.C. and New York about what's actually

22     happening.  There's no further instruction necessary, your

23     Honor.  It's highlighting.

24                 THE COURT:  No, no.  I'll simply remind them not to be

25     listening to news in this case.  That's perfectly all right.

O5gWmen2                          Kougemitros - Direct

1              Over lunch I plan to file that Rule 50 opinion.  I

2      assume there's no objection.

3              MR. FEE:  No objection, your Honor.

4              MR. RICHENTHAL:  No objection from the government

5      either.

6              (Continued on next page)

O5gWmen2                          Kougemitros - Direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen of the jury, we'll

3    take a lunch break now.  Make it an hour and ten minutes.  I

4    think you should go find your way to local area restaurants and

5    so forth.  Of course, you're always free and welcome to have

6    lunch in the jury room.

7              Let's make it 1:10, and I'll remind you again, as I

8    will throughout this case, to avoid any news of this case.

9              Enjoy your lunch.  1:10.

10             MR. MARK:  Your Honor, I think you mean 2:10.

11             THE COURT:  I did that again.

12             2:10.

13             (Jury not present)

14             THE COURT:  You may step down, sir.

15             (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                           2:10 p.m.

3              (In open court; jury present)

4              THE COURT:  Ms. Pomerantz, you may continue with the

5     direct examination of this witness.

6              MS. POMERANTZ:  Thank you, your Honor.

7     BY MS. POMERANTZ:

8     Q.  Picking up with the box from the safe that you were

9     testifying about before the lunch break, I want to publish for

10    the jury Government Exhibit 1F-1184.

11             What did you and your search team do to document the

12    cash found in this box?

13    A.  The cash was counted, it was laid out -- initially in the

14    search we laid out all the bills so that they would be able to,

15    we would be able to see the serial numbers, and we took

16    photographs of them.

17    Q.  Let's pull up Government Exhibit 1F-1187.

18             What are we seeing here?

19    A.  These are some of the bills that were from the previous

20    photograph, laid out and photographed.  These were -- I

21    believe -- can we go back to the previous picture?

22             MS. POMERANTZ:  Let's pull up 1184 side by side with

23    1187.

24    A.  Those were those loose bills, those 20s you can see in the

25    center of the page.  Just laid out to be able to be

O5G3MEN3                          Kougemitros - Direct

1    photographed.

2    Q.   Focusing on Government Exhibit 1F-1184.  What was inside

3    the wallet found inside this box?

4    A.   Cash.

5    Q.   What did you and your team do to document the cash found in

6    the wallet?

7    A.   It was removed and photographed.

8    Q.   Let's look at Government Exhibit 1F-1186.  What are we

9    seeing here?

10   A.   This is the wallet and the contents removed, not fanned

11   out, individually placed so the serial numbers were present or

12   viewable and photographed.

13   Q.   Let's go back to Government Exhibit 1F-1184.

14            Directing your attention to the TD Bank envelope.  Do

15   you see that?

16   A.   Yes.

17   Q.   What was inside the TD Bank envelope found inside this box?

18   A.   Cash.

19   Q.   What did you and your search team do to document the

20   contents of the cash found in the TD Bank envelope?

21   A.   It was removed and photographed, I believe this one might

22   actually have a -- like a deposit slip or a withdrawal slip or

23   something within it as well.

24   Q.   Let's pull up Government Exhibit 1F-1191.

25            What are we seeing here?

1    A.   This is the contents of that TD Bank envelope, including

2    the withdrawal slip or deposit slip.  And the bills were laid

3    out with the serial numbers visible and photographed.

4    Q.   Let's go back to the same box we were discussing,

5    Government Exhibit 1F-1184.

6              Directing your attention to the black envelope on the

7    left side of this Exhibit.  What was inside the black envelope

8    found inside this box?

9    A.   Cash.

10   Q.   What did you and your search team do to document the cash

11   found in this envelope?

12   A.   It was removed, laid out, photographed.

13   Q.   Let's publish Government Exhibit 1F-1192.

14             What are we seeing here?

15   A.   That same black envelope, just isolated and photographed.

16   Q.   Let's go to Government Exhibit 1F-1193.

17             What are we seeing here?

18   A.   This is the content of that black envelope, laid out and

19   photographed.

20   Q.   Let's go back to Government Exhibit 1F-1184, the same box

21   we've been discussing.

22             Directing your attention to right above the black

23   envelope.  What do we see there?

24   A.   A stack of bills wrapped in two rubber bands.

25   Q.   What did you and your search team do to document the cash

O5G3MEN3                          Kougemitros - Direct

1    in the rubber banded stack with the 100 dollar bill on top?

2    A.  The rubber bands were removed, the bills were laid out, and

3    they were photographed.

4    Q.  Let's look at Government Exhibit 1F-1195.

5            What are we seeing here?

6    A.  These are those bills that were in that stack with the

7    rubber bands removed, bills laid out, photographed.

8    Q.  I am going to hand you what's been marked for

9    identification as Government Exhibit 20.

10            Do you recognize this?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is the contents of that stack of bills that we saw

14   with the rubber bands around it, the same one that is, all

15   these bills that are laid out in Government Exhibit 1195.

16            MS. POMERANTZ:  The government offers this exhibit.

17            THE COURT:  Admitted.

18            (Government's Exhibit 1195 received in evidence)

19            MS. POMERANTZ:  May I display it by walking it in

20   front of the jury?

21            THE COURT:  Yes.

22   Q.  How much money in total was inside that stack of hundred

23   dollar bills within this box from the safe?

24   A.  The hundred dollar bills with the rubber bands, it was

25   $10,000.

1    Q.  Was the cash from within this box the only cash you seized

2    from inside the safe or was there more cash inside the safe?

3    A.  There was more cash inside the safe.

4    Q.  Let's pull up Government Exhibit 1F-1196.

5            What are we seeing here?

6    A.  So if you remember from the shots of the safe, I think it

7    was Government Exhibit 1128 or 29, where the full contents were

8    laid out.  There were two of these boxes, blue boxes.  The FBI,

9    the photographer placed this number 2 here on this piece of

10   paper just to differentiate the contents of one and two when

11   she was taking the photographs.  So this is the second blue

12   box.

13   Q.  Can we pull up Government Exhibit 1F-1129 side by side with

14   that.

15           Special Agent Kougemitros, were those the two boxes

16   you were referring to?

17   A.  Yes.  This one is actually number 2 box I believe is the

18   one on the left.  And I know that only because the strings

19   hanging out was hanging out on box number 1 when we reviewed

20   those photographs.

21           MS. POMERANTZ:  We can take down 1129.

22           Let's pull up and take down 1196.  Let's pull up

23   Government Exhibit 1F-1197.

24   Q.  What are we seeing here?

25   A.  So this is box number 2, just with the lid opened to expose

1    the contents to be able to photograph it.

2    Q.  Let's look at Government Exhibit 1F-1198.

3           What are we seeing here?

4    A.  This is the contents of box number 2 with the content

5    removed, spaced out a little bit, just to be able to be

6    photographed.

7    Q.  What items were inside this box?

8    A.  Cash and jewelry.

9    Q.  What did you and your search team do to document the cash

10   seized from this box?

11   A.  The cash was laid out, and photographed.

12   Q.  Let's pull up Government Exhibit 1F-1199.  What are we

13   seeing here?

14   A.  This is the cash that is not -- if you saw in the previous

15   photo, there was a bank envelope.  This is all the cash that

16   was not in the bank envelope, just laid out and photographed.

17   Q.  Let's pull up Government Exhibits 1F-1200 and 1201 side by

18   side, please.

19           What are we seeing here?

20   A.  Again this, is all the cash that was not in the envelope,

21   laid out, to expose the serial numbers and photographed.

22   Q.  I am going to hand you what's been marked for

23   identification as Government Exhibit 41.

24           Do you recognize this?

25   A.  I do.

O5G3MEN3                              Kougemitros - Direct

1    Q.  What is it?

2    A.  This is Government Exhibit 41, which corresponds with FBI

3    1B number 41, which was these bills laid out, that we're

4    viewing in Government Exhibit 1200 and 1201, from box number 2

5    from within the safe that was found in room C photographed.  So

6    this is the actual, this is all the money you see in these two

7    photos.

8              MS. POMERANTZ:  We offer this exhibit.

9              THE COURT:  Hearing no objection, admitted.

10             (Government's Exhibit 41 received in evidence)

11             MS. POMERANTZ:  May I display it briefly, your Honor?

12             THE COURT:  Yes.

13   Q.  How much loose cash was found inside this box?

14   A.  So again, that was inside Government Exhibit 41, was

15   $5,110, and that is again excluding the envelope.

16   Q.  Was that the only cash you seized from inside the same box

17   or was there more?

18   A.  No, there was an envelope with cash in box number 2.

19   Q.  Let's go back to Government Exhibit 1F-1197.

20             Directing your attention to the envelope on the top of

21   the box.  What was inside this TD Bank envelope found in the

22   box?

23   A.  Cash.

24   Q.  How did you and your search team document the cash in that

25   envelope?

1   A.  It was removed, laid out, and photographed.

2   Q.  Let's go to Government Exhibit 1F-1202.

3          What are we seeing here?

4   A.  This is just another shot, but this is isolating that

5   envelope that was inside box number 2.

6   Q.  What was written across the envelope flap?

7   A.  10,000.

8   Q.  Let's next move to Government Exhibit 1F-1203.

9          What are we seeing here?

10  A.  This is the contents of that envelope that we just saw,

11  laid out, photographed.

12  Q.  Let's pull up 1202 side by side with 1203.

13          I am going to hand you what's been marked for

14  identification as Government Exhibit 44.

15          Do you recognize this?

16  A.  I do.

17  Q.  What is it?

18  A.  Government Exhibit 44 corresponds with FBI 1B number 44.

19  And it is the contents of that TD Bank, just the cash without

20  the envelope.

21          MS. POMERANTZ:  We offer Government Exhibit 44.

22          THE COURT:  Admitted without objection.

23          (Government's Exhibit 44 received in evidence)

24  Q.  How much cash was found inside this TD Bank envelope?

25  A.  $9,500.

O5G3MEN3                        Kougemitros - Direct

1              MS. POMERANTZ:  Your Honor, at this time I would like

2    to read paragraph 2(g) of the stipulation in evidence as

3    Government Exhibit 1437.

4              THE COURT:  Proceed.

5              MS. POMERANTZ:  And this provides that one of the

6    envelopes marked for identification -- pardon me.  Sorry.

7              The item marked for identification as Government

8    Exhibit 44 consists of the items currently logged in the

9    Evidence Management System under 1B number 1B44, that is $9500

10   in cash seized from a box in a safe in the residence.  The item

11   marked for identification as Government Exhibit 86 consists of

12   the items currently logged in the Evidence Management System

13   under 1B number 1B86, that is a TD Bank envelope found with the

14   cash marked as Government Exhibit 44.  The items contained in

15   Government Exhibits 44 and 86 were initially logged in the

16   Evidence Management System together under 1B number 1B44.

17   Q.  Other than the cash inside the two smaller boxes, we've

18   looked at, did you and the FBI search team find any more cash

19   inside this safe?

20   A.  Yes.

21   Q.  I am going to go back to Government Exhibit 1F-1129.

22             Can you remind the jury what this is again?

23   A.  Again, this is the contents of the safe that was found on

24   the floor of room C laid out to be photographed.

25   Q.  Can you remind us which two boxes had cash that we've

1    talked about already?

2    A.   The two blue boxes in the center.

3    Q.   Directing your attention to the bottom right, what are we

4    looking at here?

5    A.   This is some loose paper and cash that was located within

6    the safe.

7    Q.   What did you and your search team do to document the loose

8    cash found within the safe?

9    A.   Same thing, laid out and photographed.

10   Q.   Let's pull up Government Exhibits 1F-1158 and 1159 side by

11   side.

12          What are we seeing here?

13   A.   This is the loose cash that was -- that you previously saw

14   in Government Exhibit 1128, just laid out and photographed.

15   Q.   I believe you referred to 11 -- did you mean 1129?

16   A.   I'm sorry.  1129.

17   Q.   Let's go back to Government Exhibit 1F-1129.

18          I want to direct your attention to the envelopes below

19   the two boxes in the center.  What are we seeing here?

20   A.   These are two PNC Bank envelopes.

21   Q.   What was inside those PNC Bank envelopes?

22   A.   I believe one of them had change, one of them had cash.

23          MS. POMERANTZ:  Let's look at Government Exhibits

24   1F-1155, 1156 and 1157.  You can pull them up side by side.

25   Thank you.

1    Q.   What are we seeing here?

2    A.   These are the contents of those PNC envelopes that we saw

3    that were located in the safe that was located in room C on the

4    floor.

5            MS. POMERANTZ:  And your Honor, I believe I may

6    have -- I had read the stipulation regarding Government

7    Exhibit 86.  I'd like to offer Government Exhibit 86.

8            THE COURT:  Have you already read it?

9            MS. POMERANTZ:  Yes, I had, your Honor.

10           THE COURT:  Admitted without objection.

11           (Government's Exhibit 86 received in evidence)

12   Q.   Let's go back to Government Exhibit 1F-1129.

13           What do we see in the top-right corner of this

14   exhibit?

15   A.   Several envelopes.

16   Q.   What was --

17   A.   Bank envelopes, excuse me.

18   Q.   What was inside those bank envelopes?

19   A.   Cash.

20   Q.   How did you and your search team document the cash inside

21   those envelopes?

22   A.   Same way.  I directed the photographer to lay out all the

23   bills and photograph them.

24           MS. POMERANTZ:  Next pull up Government Exhibits

25   1F-1166 and 1167 side by side.

O5G3MEN3                          Kougemitros - Direct

1    Q.  What are we seeing here?

2    A.  This one of those envelopes that was in that stack, and I

3    know I previously said they were bank envelopes.  Several of

4    them were bank envelopes, this just happens to be a not bank

5    envelope.  Another envelope.

6         MS. POMERANTZ:  Let's look at Government Exhibits

7    1F-1168 and 1169 side by side.

8    Q.  What are we seeing here?

9    A.  This is the contents of that last envelope that we saw that

10   was not a bank envelope spread out and photographed.

11   Q.  We're going to hand you what's been marked for

12   identification as Government Exhibit 35.

13        Do you recognize this?

14   A.  Yes.

15   Q.  What is it?

16   A.  This is Government Exhibit 35, which corresponds with 1B35,

17   but this is the contents of that envelope that we were just

18   seeing in Government Exhibit 1168, 1169, and 1167.

19        MS. POMERANTZ:  We offer Government Exhibit 35.

20        THE COURT:  Admitted without objection.

21        (Government's Exhibit 35 received in evidence)

22        MS. POMERANTZ:  May I briefly display it?

23   Q.  How much cash was found inside of this envelope?

24   A.  $7400.

25        MS. POMERANTZ:  Your Honor, at this time I'd like to

O5G3MEN3                        Kougemitros - Direct

1    read paragraph 2(f) of the stipulation that's in evidence as

2    Government Exhibit 1437.

3                THE COURT:  Go ahead.

4                MS. POMERANTZ:  The item marked for identification as

5    Government Exhibit 35 consists of the items currently logged in

6    the Evidence Management System under 1B number 1B35, that is

7    $7,400 in cash seized from a safe in the residence.  The item

8    marked for identification as Government Exhibit 79 consists of

9    the items currently logged in the Evidence Management System

10   under 1B number 1B79, that is an envelope embossed with Fred A.

11   Daibes 125 River Road, Suite 301, Edgewater, N.J. 07020 found

12   with the cash marked as Government Exhibit 35.

13              The items contained in Government Exhibits 35 and 79

14   were initially logged in the Evidence Management System

15   together under 1B number 1B35.

16              The government offers Government Exhibit 79.

17              THE COURT:  Admitted without objection.

18              (Government's Exhibit 79 received in evidence)

19   Q.  In preparation for your testimony today, did you look at

20   the envelope in Government Exhibit 79 to refresh your

21   recollection of what both sides looked like?

22   A.  Yes.

23              MS. POMERANTZ:  Pull up for the witness what's been

24   marked for identification as Government Exhibit 1F-15001.

25   Q.  Do you recognize this?

O5G3MEN3                        Kougemitros - Direct

1    A.  I do.

2    Q.  What is it?

3    A.  This was the envelope that we saw in the photographs prior,

4    in Government Exhibit 1166 and 1167.  This is just the envelope

5    completely unsealed from the seams, laid out and photographed.

6              MS. POMERANTZ:  We offer Government Exhibit 1F-15001.

7              THE COURT:  Admitted without objection.

8              (Government's Exhibit 1F-15001 received in evidence)

9              MS. POMERANTZ:  Let's publish that for the jury,

10   please.

11   Q.  Would you please read the name and address on the front of

12   this envelope?

13   A.  Fred A. Daibes, 125 River Road Suite 301, Edgewater, New

14   Jersey 07020.

15   Q.  Let's go back to Government Exhibit 1F-1129.

16              Directing your attention to the top right of the

17   photo.  What are we looking at here?  Can you remind the jury.

18   A.  Again, these are more envelopes that were located within

19   the safe, bank envelopes, as well as that Fred A. Daibes

20   envelope that we just reviewed.

21   Q.  Let's move on to Government Exhibit 1F-1170.

22              What are we seeing here?

23   A.  One of those envelopes that we just saw in Government

24   Exhibit 1129.  Just one from that pile laid out to be

25   photographed, isolated to be photographed.

1  Q.  What kind of envelope is this?

2  A.  It is a TD Bank or Toronto Dominion Bank.

3  Q.  What is written across the flap of this envelope?

4  A.  10,000.

5  Q.  What did you and your search team do to document the cash

6  from this envelope?

7  A.  I directed the photographer to remove the cash, lay it out,

8  and photograph it.

9          THE COURT:  I take it that sign 10,000 is not -- I

10  shouldn't take it.  Is that sign that says 10,000 affixed by

11  the FBI?

12          THE WITNESS:  No, the FBI did not write that on there.

13          MS. POMERANTZ:  Let's pull up Government

14  Exhibit 1F-1171.

15  Q.  What are we seeing here?

16  A.  This is the contents of that TD Bank envelope that we were

17  just reviewing laid out and photographed.

18          (Continued on next page)

19

20

21

22

23

24

25

1    Q.  I'm going to hand you what's been marked for identification

2    as Government Exhibit 34.

3         Do you recognize this?

4    A.  I do.

5    Q.  What is it?

6    A.  This is the cash contents of that TD Bank envelope that we

7    were just reviewing in Government Exhibit 1171.

8              MS. POMERANTZ:  We offer this exhibit.

9              THE COURT:  Admitted, without objection.

10             (Government Exhibit 34 received in evidence)

11   BY MS. POMERANTZ:

12   Q.  How much cash was found inside this TD Bank envelope?

13   A.  $9,100.

14             MS. POMERANTZ:  At this time I'd like to read

15   paragraph 2(e) of the stipulation, Government Exhibit 1437:

16             "The item marked for identification as Government

17   Exhibit 34 consists of the items currently logged in the

18   evidence management system under 1B No. 1B34; that is, $9,100

19   in cash seized from a safe in the residence.  The item marked

20   for identification as Government Exhibit 78 consists of the

21   items currently logged in the evidence management system under

22   1B No. 1B78; that is, a TD Bank envelope found with the cash

23   marked as Government Exhibit 34.  The items contained in

24   Government Exhibits 34 and 78 were initially logged in the

25   evidence management system together under 1B No. 1B34."

1        The government offers 78.

2        THE COURT:  Admitted, without objection.

3        (Government Exhibit 78 received in evidence)

4        MS. POMERANTZ:  Let's move on to Government Exhibits

5   1F-1172 and 1173.

6   Q.  What are we seeing here?

7   A.  Another one of those envelopes that was located in the top

8   right corner of Government Exhibit 1129, just isolated in 1172.

9   And in 1173 the bills are laid out, just fanned out, just to be

10  photographed.

11  Q.  And what did you and your search team do to document it?

12  A.  We photographed them.

13       MS. POMERANTZ:  Let's pull up at Government Exhibit

14  1F-1174.

15  Q.  What are we seeing here?

16  A.  Again, this is that same envelope that we just saw in 1173

17  and 1172, this just laid out more clear to reveal the serial

18  numbers.

19       MS. POMERANTZ:  Let's move on to Government Exhibits

20  1F-1175 and 1176, and can we please pull those up side by side.

21  Q.  What are we seeing here?

22  A.  This is another envelope that was in that pile that we saw

23  in Government Exhibit 1129.  This is a separate one from ones

24  that we've reviewed already.  The contents were removed and

25  fanned out just to be able to be photographed.

O5gWmen4                          Kougemitros - Direct

1    Q.  And directing your attention to Government Exhibit 1F-1175,

2    what's written across the flap of the envelope?

3    A.  10,000.

4    Q.  Was that written by the FBI?

5    A.  It was not written by the FBI.

6    Q.  What did you and your search team do to document the cash

7    in this envelope?

8    A.  It was removed, laid out and photographed.

9            MS. POMERANTZ:  Publish Government Exhibit 1F-1177.

10   Q.  What are we seeing here?

11   A.  The cash laid out and photographed.

12   Q.  I'm going to hand you what's been marked for identification

13   as Government Exhibit 58.

14       Do you recognize this?

15   A.  I do.

16   Q.  What is it?

17   A.  This is the contents of that TD envelope that we've just

18   been reviewing, just the cash for that envelope.

19           MS. POMERANTZ:  We offer Government Exhibit 58.

20           THE COURT:  Admitted, without objection.

21           (Government Exhibit 58 received in evidence)

22           THE COURT:  My eyes aren't good enough.  That appears

23   to be Benjamin Franklin.  What's the denomination of the

24   Benjamin Franklin bills?

25           THE WITNESS:  $100, your Honor.

O5gWmen4                          Kougemitros - Direct

1              THE COURT:  OK.  Thank you.

2      BY MS. POMERANTZ:

3      Q.  How much cash was found inside this envelope?

4      A.  $10,000.

5              MS. POMERANTZ:  I'd like to now read paragraph 2(i) of

6      Government Exhibit 1437:

7              "The item marked for identification as Government

8      Exhibit 58 consists of the items currently logged in the

9      evidence management system under 1B No. 1B58; that is, $10,000

10     in cash found in a safe in the residence.  The item marked for

11     identification as Government Exhibit 88 consists of the items

12     currently logged in the evidence management system under 1B No.

13     1B88; that is, a TD Bank envelope found with the cash marked as

14     Government Exhibit 58.  The items contained in Government

15     Exhibits 58 and 88 were initially logged in the evidence

16     management system together under 1B No. 1B58."

17             We offer Government Exhibit 88.

18             THE COURT:  Admitted, without objection.

19             (Government Exhibit 88 received in evidence)

20             MS. POMERANTZ:  Let's move on to Government Exhibits

21     1F-1178 and 1179.  Let's pull those up side by side, please.

22     Q.  What are we seeing here?

23     A.  This is another TD Bank envelope that was located within

24     the safe within room C.  The contents were removed.  It's

25     isolated in 1178, and in 1179 the contents were removed and

1   fanned out just to be photographed.

2   Q.  What is written across the flap of the TD Bank envelope?

3   A.  10,000.

4   Q.  Did the FBI write that?

5   A.  The FBI did not write that.

6   Q.  What did you and your team do to document the cash from

7   this envelope?

8   A.  It was photographed.

9          MS. POMERANTZ:  Let's pull up Government Exhibit

10  1F-1180.

11  Q.  What are we seeing here.

12  A.  Those bills that we were previously reviewing in Government

13  Exhibit 1179, just fully laid out so the serial numbers were

14  visible and photographed.

15  Q.  I'm going to hand you what's been marked for identification

16  as Government Exhibit 49.

17         Do you recognize this?

18  A.  I do.

19  Q.  What is it?

20  A.  This is just the cash from Government Exhibit 49 that --

21  this is the cash that we see in Government Exhibit 1180.  So

22  without the envelope, just the cash.

23         MS. POMERANTZ:  We offer this exhibit.

24         THE COURT:  Admitted.

25         (Government Exhibit 49 received in evidence)

O5gWmen4                              Kougemitros - Direct

 1   BY MS. POMERANTZ:

 2   Q.  How much cash was found inside this envelope?

 3   A.  $5,300.

 4           MS. POMERANTZ:  At this time I'd like to read

 5   paragraph 2(h) of Government Exhibit 1437:

 6           "The item marked for identification as Government

 7   Exhibit 49 consists of the items currently logged in the

 8   evidence management system under 1B No. 1B49; that is, $5,300

 9   in cash seized from a safe in the residence.  The item marked

10   for identification as Government Exhibit 84 consists of the 1B

11   No. 1B84; that is, a TD Bank envelope found with the cash

12   marked as Government Exhibit 49.  The items contained in

13   Government Exhibits 49 and 84 were initially logged in the

14   evidence management system together under 1B No. 1B49."

15           The government offers Government Exhibit 84.

16           THE COURT:  Admitted.

17           (Government Exhibit 84 received in evidence)

18           MS. POMERANTZ:  Let's go back to Government Exhibit

19   1F-1129.

20   Q.  What do we see in the top left corner of this exhibit?

21   A.  It's a hexagon-shaped box.

22   Q.  Can you remind the jury, where was this hexagon-shaped box

23   found?

24   A.  Yes.  This is another one of the contents of the safe that

25   was found in room C.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5gWmen4                          Kougemitros - Direct

1          MS. POMERANTZ:  Let's pull up Government Exhibit

2    1F-1204.

3    Q.  What are we seeing here?

4    A.  This is that hexagon box that was found in the safe, just

5    isolated to be photographed.

6          MS. POMERANTZ:  Pull up Government Exhibit 1F-1205.

7    Q.  What items are we seeing here?

8    A.  This is that same hexagon box just with the lid open to

9    reveal the contents to be able to photograph it.

10   Q.  What items were inside the box?

11   A.  Cash, jewelry and gold.

12         MS. POMERANTZ:  Let's go to Government Exhibit

13   1F-1207.

14   Q.  What are we seeing here?

15   A.  The cash and the gold from the hexagon box, just removed to

16   be able to be photographed.

17         MS. POMERANTZ:  Let's go to Government Exhibit

18   1F-1208.

19   Q.  What are we seeing here?

20   A.  The cash and the gold laid out to reveal the serial numbers

21   to be able to photograph them.

22         MS. POMERANTZ:  Let's go to Government Exhibit 12 --

23   1F-1209.

24   Q.  What are we seeing here?

25   A.  This is just a zoomed-in shot of those two one-ounce bars

1    that were located within the hexagon box that was located

2    within the safe that was found within room C.

3    Q.  I'm going to hand you what's been marked for identification

4    as Government Exhibit 38.

5        Do you recognize this?

6    A.  Yes.

7    Q.  What is it?

8    A.  These are just the two gold bars that were found in that

9    hexagon box that are -- were removed, the two one-ounce bars.

10           MS. POMERANTZ:  We offer this exhibit.

11           THE COURT:  Admitted.

12           (Government Exhibit 38 received in evidence).

13   BY MS. POMERANTZ:

14   Q.  Were the closet and the safe inside that closet the only

15   places where you seized cash inside 41 Jane Drive?

16   A.  No.

17   Q.  Where else did you and your team -- where else did you

18   seize cash?

19   A.  From the basement area, which was later named room U.

20   Q.  I'm sorry.  Just before we go to that, while we still have

21   Government Exhibit 1F-1209 up, can you just read for the jury

22   the brand of the gold bars?

23   A.  Asahi.

24   Q.  You said that --

25           MS. POMERANTZ:  We can pull that down now.

O5gWmen4                          Kougemitros - Direct

1   Q.  You said that you seized cash from other locations besides

2   the closet and the safe.  Where did you and -- where did you

3   seize cash from?

4   A.  The other cash?

5   Q.  Besides the cash in the closet and the safe in the closet,

6   where else did you seize cash?

7   A.  Room U, the basement.

8   Q.  And what about -- was there also, you testified earlier

9   about an office.  Was any cash, did you seize any cash from the

10  office?

11  A.  Yes.

12  Q.  You testified that for the cash found in the safe you

13  described how you directed that the cash be lined, spread, laid

14  out so that each serial number could be photographed.  Do you

15  recall that?

16  A.  Yes.

17  Q.  Did you and your team follow the same process for the cash

18  found in the rest of the home?

19  A.  No.

20  Q.  And why not?

21  A.  When we were given the direction to -- when I was tasked

22  with this search, me and my team, the first direction that we

23  were given was to not necessarily seize cash but to lay it out

24  and photograph it, revealing the serial numbers.

25      There came a time during the search that, based on my

1    training and experience and the totality of the

2    circumstances -- that we were executing a search warrant on an

3    allegation of bribery -- that the amount of cash that we began

4    to discover was so voluminous that I directed the team that we

5    would no longer be photographing any of the cash; we would be

6    seizing the cash, because I believed it was evidence

7    potentially of a crime.

8            MR. FEE:  Objection, your Honor, and ask that

9    observation to be stricken.

10           THE COURT:  Granted.

11   BY MS. POMERANTZ:

12   Q.  Special Agent Kougemitros, you testified that there was a

13   lot of cash.  Was it practical at a certain point to continue

14   to photograph each serial -- lay out each bill?

15           MR. FEE:  Objection.

16           THE COURT:  No.  I'll allow that.

17   A.  No.  It -- in my opinion, it would not be efficient to do

18   so.  If we seized the cash, we had a search warrant signed by

19   the District of New Jersey that granted us permission to seize

20   these items.  If we wanted to photograph them at a different

21   time, we could do that.

22           THE COURT:  When you said signed by the District of

23   New Jersey.  I take it you meant signed by a judge of the

24   District of New Jersey.  Is that correct?

25           THE WITNESS:  Yes, your Honor.  Judge Hammer.

O5gWmen4                        Kougemitros - Direct

1              THE COURT:  All right.

2     BY MS. POMERANTZ:

3     Q.  So how did you and your team count and document all of the

4     cash found in the rest of the house?

5     A.  I had to call in reinforcement from the city.  Two agents

6     came with cash-counting machines.  I was directed that if I

7     seized the cash, that I needed to count it in place.  So I

8     called in reinforcements.  The city brought two cash-counting

9     machines.  I believe it was two cash-counting machines, and we

10    started -- with all the cash that we started finding, we

11    counted it all.

12             THE COURT:  Now, when you say reinforcements from the

13    city, reinforcements from what entity?

14             THE WITNESS:  From the FBI.  Two FBI agents came from

15    our Manhattan office to assist with the search.  These were not

16    agents part of the case squad.  They were just other agents,

17    volunteers that came to -- to help out.

18    BY MS. POMERANTZ:

19    Q.  And how was the cash photographed?

20    A.  Any cash that we found at this point forward, we tried to

21    get a shot of the evidence in place, if you can.  Obviously we

22    removed it, then you find it, and then we would take a shot,

23    place it back where it was to try and take a photograph of it

24    in place, and then we would remove it.  If it was concealed in

25    something, we would remove wherever it was concealed,

O5gWmen4                          Kougemitros - Direct

1    photograph the cash.  Then we would -- relocated the cash to

2    the evidence collection point, which was the kitchen at this

3    point, the eat-in portion of the kitchen, where it was counted,

4    sealed in a heat-sealed envelope and eventually taken to my

5    office, the FBI's Long Island resident agency, to be entered

6    into as evidence.

7    Q.  You mentioned a cash-counting machine.  Can you just

8    explain what you mean by that?

9    A.  Sure.  Like I said, the sheer volume of bills that we

10   were -- that we encountered, that we've seen in some of these

11   photographs, was too much to count by hand.  It would -- it was

12   not efficient whatsoever to count by hand.  So we got

13   cash-counting machines.

14       You've probably seen them in movies.  You know, they have,

15   like, kind of like a Rolodex that just turns quickly.  You

16   enter what denomination of bills that you are counting and the

17   machine tells you how much it is.

18   Q.  Were you involved in processing the money that was seized

19   at 41 Jane Drive?

20   A.  Yes.

21   Q.  What did you do?

22   A.  We counted it.

23   Q.  What, if any, protective gear did you wear when you were

24   processing the money?

25   A.  For the search we wore gloves.  There came a time that, in

O5gWmen4                          Kougemitros - Direct

1    order to efficiently count the bills, I removed my gloves to be

2    able to expedite and streamline the process.

3    Q.  Well, you testified that you and your team found cash in

4    the office and the basement.  I want to start with the office.

5        Could you describe for the jury where the office was

6    located inside the house?

7    A.  Yes.  When we -- when you enter from that threshold of the

8    garage, to the rest of the residence from the garage, the

9    office was immediately to the left.

10           MS. POMERANTZ:  Let's pull back up Government Exhibit

11   1F-1012.

12   Q.  Can you remind the jury what we're seeing here?

13   A.  Yes.  This is standing at the threshold from the garage

14   into the rest of the residence, a photograph from there, that

15   perspective.

16   Q.  And what's to the -- do you see that doorway to the left of

17   the exhibit?

18   A.  I do.

19   Q.  What is that doorway?

20   A.  That is the doorway that leads to the office, which we

21   labeled room Q, like Quebec.

22           THE COURT:  We've done this already, Ms. Pomerantz.

23           MS. POMERANTZ:  Yes, your Honor.  I was just trying to

24   reorient the jury.

25   Q.  Do you recognize the man in the photograph on the left side

1    of this exhibit?

2    A.  I do.

3    Q.  Who is that?

4    A.  That's Senator Robert Menendez.

5            MS. POMERANTZ:  Let's pull up Government Exhibit

6    1F-1092.

7    Q.  What are we seeing here?

8    A.  This is as soon as you walk into that office area, room Q,

9    and you turn to your left, so if you're standing at the doorway

10   and look to your left, this is a perspective of left.  You're

11   centered in the room a little bit.  This is not exactly from

12   the doorway, but it's the left side of the room.

13   Q.  What is the bookshelves to the left?

14   A.  Sports memorabilia.

15           MS. POMERANTZ:  And let's zoom in on the desk.

16   Q.  What do we see here?

17   A.  It's a desk, and there's a small statue of the U.S. Capitol

18   building.

19           MS. POMERANTZ:  Let's zoom in on the photo on the

20   small table to the right.

21   Q.  What do we see here?

22   A.  A photograph.

23   Q.  And who is the man in the photograph?

24   A.  Senator Robert Menendez.

25           MS. POMERANTZ:  Let's go to Government Exhibit

1    1F-1093.

2    Q.   What are we seeing here?

3    A.   This is from the perspective of standing at the table -- or

4    the desk, I'm sorry, in room Q and looking longways, so just

5    the opposite view from the desk.

6    Q.   And focusing on the right wall, what do we see here?

7    A.   Dozens of golf balls.

8              MS. POMERANTZ:  OK.  And let's zoom in on the

9    photograph and the plaid chair on the left side.

10   Q.   What did you and your search team -- excuse me.  What did

11   the FBI find in that chair?

12   A.   Black duffel bag.

13   Q.   And what did you and your team find inside the bag?

14   A.   Within the duffel bag were a smaller duffel bag, a Burberry

15   cloth bag and several file folders.  One was a -- one had the

16   Senate seal on one of the file folders.  One, I believe, was,

17   like, a U.S. Mail, priority mail envelope, and a manila folder.

18             MS. POMERANTZ:  Let's pull up Government Exhibit

19   1F-1304.

20   Q.   What are we seeing here?

21   A.   This is that same duffel bag, removed from the chair and

22   placed onto the floor, so you could see -- there was that small

23   duffel bag that's in front of it -- yup, that one right there;

24   the Davis Sport bag, that was within the larger black duffel

25   bag.  And this was just removed, placed on the floor next to

1    it.

2    Q.   Why are they on the floor instead of in the plaid chair?

3    A.   Just where it was placed to be photographed.

4         MS. POMERANTZ:   Let's go to Government Exhibit

5    1F-1305.

6    Q.   What are we seeing here?

7    A.   This is the flap of the duffel bag opened to reveal more of

8    the contents of the duffel bag.

9         MS. POMERANTZ:   Let's next go to Government Exhibit

10   1F-1306.

11   Q.   What are we seeing here?

12   A.   This is that smaller duffel bag, just zipped open to reveal

13   the contents within.

14        MS. POMERANTZ:   Let's go to Government Exhibit

15   1F-1307.

16   Q.   What are we seeing here?

17   A.   This is all the cash within the smaller duffel bag that was

18   located in the larger duffel bag, located in room Q, just laid

19   out in a manner just to expose the contents to photograph it.

20        MS. POMERANTZ:   Let's go to Government Exhibit

21   1F-1308, and let's pull that up side by side with Government

22   Exhibit 1F-1305.

23   Q.   What are we seeing in Government Exhibit 1F-1308?

24   A.   1308 is the contents of that beige Burberry bag, just

25   removed, laid out in bricks, if you will, to be photographed.

O5gWmen4                          Kougemitros - Direct

1      MS. POMERANTZ:  Let's pull up Government Exhibit

2    1F-1309.

3    Q.  What are we seeing here?

4    A.  This is the same cash that was inside that Burberry, beige

5    Burberry bag, just a different perspective.  The piles of money

6    were turned over just to be able to be photographed.

7    Q.  What happened to all that cash?

8    A.  We counted it.  It was seized, brought to the FBI's office

9    on Long Island, and we entered it into evidence.  It was

10   eventually put in a vault.

11      MS. POMERANTZ:  Can we pull up for just the witness

12   Government Exhibit 1F-17001.

13   Q.  Do you recognize this?

14   A.  I do.

15   Q.  And what is it?

16   A.  It's a photograph that I took from my cell phone on June

17   16, 2022, of the duffel bag, revealing all of the contents

18   within the duffel bag.

19      MS. POMERANTZ:  We offer Government Exhibit 1F-17001.

20      THE COURT:  Admitted.

21      (Government Exhibit 1F-17001 received in evidence)

22      MS. POMERANTZ:  I'm going to hand you -- oh, my

23   apologies.

24      Can we publish Government Exhibit 1F-17001?

25      THE COURT:  Yes.

1    BY MS. POMERANTZ:

2    Q.  Special Agent Kougemitros, can you just remind the jury who

3    took this photograph?

4    A.  I did.

5    Q.  And where did you take this photograph?

6    A.  I removed the contents of the duffel bag from room Q, which

7    was the office, and brought it to the landing, or the evidence

8    control area that was established is just to the left over

9    here.  So it was removed there, and I took it with my cell

10   phone.

11       The reason that I took it with my cell phone and why it's

12   not the photographer taking the picture of it, part of the

13   reason -- again, this was a sensitive search.  Some of the

14   documents could have been potentially sensitive, so I was

15   instructed initially not to take photographs of the documents

16   just in case there was potentially sensitive information to it.

17   But then I was given permission.  I snapped a picture with my

18   cell phone, and --

19   Q.  I'm going to hand you what's been marked for identification

20   as Government Exhibit 67.

21       Do you recognize this?

22   A.  I do.

23   Q.  What is it?

24   A.  This is just the cash, the contents of the small, smaller

25   duffel bag that you see in Government Exhibit 17001.

1          MS. POMERANTZ:  Your Honor, we offer this exhibit.

2          THE COURT:  It's admitted.

3          (Government Exhibit 67 received in evidence)

4          MS. POMERANTZ:  May I publish it?

5          THE COURT:  Yes.

6   BY MS. POMERANTZ:

7   Q.  How much cash was found inside the smaller duffel bag?

8   A.  $33,220.

9   Q.  I'm going to hand you what's been marked for identification

10  as Government Exhibit 66.

11         Do you recognize this?

12  A.  I do.

13  Q.  What is it?

14  A.  This is the Burberry bag, the contents -- the Burberry bag

15  and its contents.

16         MS. POMERANTZ:  We offer Government Exhibit 66.

17         THE COURT:  Come forward, Marshal.

18         THE MARSHAL:  I have the razor to open up the contents

19  of that box.

20         THE COURT:  If that's going to be --

21         MS. POMERANTZ:  Yes, your Honor.  I was going to ask,

22  once it's admitted into evidence, I would ask for permission

23  for the witness to step down from the witness stand to publish

24  the exhibit for the jury by opening up the box.

25         THE COURT:  I just didn't understand what the marshal

O5gWmen4                          Kougemitros - Direct

1    was signaling me for.  Yes.

2              Thank you.

3              You just asked another question.

4              MS. POMERANTZ:  I just asked that we offer Government

5    Exhibit 66 in evidence.

6              THE COURT:  Admitted.

7              (Government Exhibit 66 received in evidence)

8              MS. POMERANTZ:  Thank you, your Honor.

9              Oh.  I think there are also gloves, your Honor.

10             THE COURT:  Thank you, sir.

11             Agent, let me see it as well.

12             Thank you.

13   BY MS. POMERANTZ:

14   Q.  How much cash was found inside the larger duffel bag?

15   A.  $100,000.

16   Q.  Remind us where else the FBI -- excuse me.

17        Remind us where else you seized cash from during the search

18   of 41 Jane Drive.

19   A.  Room U, which is the basement area, or a portion of the

20   basement area.

21   Q.  Could you describe the layout of that, of the basement for

22   the jury?

23   A.  Sure.  Just to reorient you, if we were looking at -- if we

24   were standing from the perspective of the desk in room Q and

25   looking straight down the hall, there was a step -- two steps,

O5gWmen4                          Kougemitros - Direct

1    maybe three steps; I don't remember exactly -- which led down

2    to a laundry area and then another room that we called room U.

3              MS. POMERANTZ:  Let's pull up Government Exhibit

4    1F-1105.

5    Q.  What are we seeing here?

6    A.  This is the entryway into room U.  So one would have walked

7    down those steps already and hooked a quick right, and you

8    would be looking at the entryway to room U.

9              MS. POMERANTZ:  Let's pull up Government Exhibit

10   1F-1106.

11   Q.  What are we seeing here?

12   A.  This is from standing -- if you remember that previous

13   picture, there was a bunch of Home Depot boxes.  This is from

14   standing probably just to the left of those Home Depot boxes

15   and looking longways of room U.

16      Room U was kind of shaped like an L, if you will, and so

17   we're standing almost on the short end of the L, looking

18   towards the long end, if that makes sense.

19             MS. POMERANTZ:  Let's pull up Government Exhibit

20   1F-1107.

21   Q.  What are we seeing here?

22   A.  This is just centering yourself a little bit better on room

23   U and still looking from the short end towards the long end.

24             MS. POMERANTZ:  Let's pull up Government Exhibit

25   1F-1108.

O5gWmen4                    Kougemitros - Direct

1    Q.   What are we seeing here?

2    A.   Again, this is room U.  Now we're looking from the long

3    end, so almost a -- almost the photographer's back's towards

4    the wall and looking back towards, you know, the short end of

5    the L; you could see those Home Depot boxes where the letter

6    was when we originally entered that room.

7    Q.   Where is the entrance of this room in this exhibit?

8    A.   Just to the right of those Home Depot boxes.

9    Q.   Where in this room did the FBI find the cash?

10   A.   Just to the right of where the photographer's standing

11   right now, maybe just a little bit right and back.

12   Q.   And where was the cash found?

13   A.   What type of locations?

14   Q.   Yes.

15   A.   There was on the shelving, on shelving area.  You can kind

16   of see the shelving area.  If you want me to point it, there's

17   like a shelving area here.  The cash is not visible in this

18   picture.  It's behind it.  There were several jackets also

19   behind it just to the right of where the photographer's

20   standing that had cash in it, and there were some shoes that

21   had cash stuffed inside it as well from behind where the

22   photographer's standing.

23        MS. POMERANTZ:  Let's pull up Government Exhibit

24   1F-1311.

25   Q.   What are we seeing here?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  So, this is still room U, and this is the top part of the

2    L.  So again, if we're looking at the L, we're located right

3    around here.  We're looking at the corner of it right here, so

4    that's the end of the wall.

5    Q.  And what did the FBI find inside some of these shoes?

6    A.  Cash, envelopes of cash, bags of cash.

7    Q.  And in what shoes was cash found?

8    A.  So, just drawing your attention over here to the left -- I

9    circled it -- there's a pair of brown boots and a pair of

10   reddish boots.  Cash was found in both of these pairs of boots.

11   Q.  Did these appear to be men's boots or women's boots?

12   A.  They appeared to be men's boots.

13            MS. POMERANTZ:  Pull up Government Exhibit 1F-1312.

14            THE COURT:  Are you seeking its admission?

15            MS. POMERANTZ:  I'm sorry, your Honor?

16            THE COURT:  You just asked it to be pulled up; is that

17   what you asked?

18            MS. POMERANTZ:  Yes, your Honor.  These were all

19   admitted earlier.

20            THE COURT:  All right.  Fine.

21   BY MS. POMERANTZ:

22   Q.  What are we seeing here in Government Exhibit 1F-1312?

23   A.  This is just an overhead shot.  The boots were removed from

24   their original portion, which was by that shoe rack shelf, next

25   to it.  This is just an overhead view of them to be able to

O5gWmen4                        Kougemitros - Direct

1     show that there's contents in the, in the bottom of the shoes.

2              MS. POMERANTZ:  Let's pull up Government Exhibit

3     1F-1317.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5G3MEN5                        Kougemitros - Direct

1    Q.   What are we seeing here?

2    A.   This is one of the reddish boots.  You can see there's cash

3    inside of it.

4              MS. POMERANTZ:  Pull up Government Exhibit 1F-1318.

5    Q.   What are we seeing here?

6    A.   The content of that reddish boot, just removed, fanned out,

7    just to be photographed.

8              MS. POMERANTZ:  Let's publish Government

9    Exhibit 1F-1319.

10   Q.   What are we seeing here?

11   A.   This is the matching set of that reddish boot.

12   Q.   What's in the boot?

13   A.   There is a black Armani bag.

14   Q.   Let's go to Government Exhibit --

15   A.   Giorgio Armani.

16   Q.   -- 1F-12320.

17             What are we seeing here?

18   A.   That is that Giorgio Armani bag that was located within

19   that reddish boot in room U, removed and put on the floor.

20   Q.   Let's go to 1F-1321.

21             What are we seeing here?

22   A.   The cash within that Giorgio Armani bag we just saw that

23   was within that reddish boot that was within room U, just

24   removed and photographed.

25   Q.   Directing your attention to the left, what do you see on

1   that stack of cash?

2   A.   There is a money band around it.

3   Q.   Let's pull up Government Exhibit 1F-1312.

4        You were testifying about -- you testified that cash

5   was found in two pairs of boots.  Which boots were you just

6   testifying about?

7   A.   The ones to the right, these reddish ones, I don't know if

8   everyone can fully make out the color.  Exactly.  These are the

9   reddish pigment ones.

10  Q.   The ones on the right, you said?

11  A.   Correct.  Those are the ones we just saw the contents of.

12  Q.   I want to ask you about the other boots now.  Let's publish

13  Government Exhibit 1F-1313.

14       What are we seeing here?

15  A.   This is one of the brownish boots, just with the tongue

16  pulled out a little bit to better display the contents.

17       MS. POMERANTZ:  Ms. Wechsler, let's pull up 1F-1314

18  for the jury.

19  Q.   What are we seeing here?

20  A.   The contents of that envelope that we previously saw

21  removed, it was a PNC Bank envelope.  And the cash just fanned

22  out a little bit to photograph it.

23  Q.   I am going to hand you what's been marked for

24  identification as Government Exhibit 19.

25       Do you recognize this?

1  A.  I do.

2  Q.  What is it?

3  A.  This is just the cash, not the envelope, that was located

4  in that right brown Timberland boot.

5          MS. POMERANTZ:  We offer this exhibit.

6          THE COURT:  Admitted.

7          (Government's Exhibit 19 received in evidence)

8          MS. POMERANTZ:  At this time I'd like to read

9  paragraph 2(b) of the stipulation Government Exhibit 1437.

10         The item marked for identification as Government

11  Exhibit 19 consists of -- apologies. I want to ask one question

12  before I read that stipulation.

13  Q.  How much cash was found inside this boot?

14  A.  $7500.

15         MS. POMERANTZ:  Now, paragraph 2(b) of the

16  stipulation.

17         The item marked for identification as Government

18  Exhibit 19 consists of the items currently logged in the

19  Evidence Management System under 1B number 1B19, that is $7,500

20  in cash seized from a right brown boot in the residence.

21         The item marked for identification as Government

22  Exhibit 70 consists of the items currently logged in the

23  Evidence Management System under 1B number 1B70, that is an

24  envelope found with the cash marked as Government Exhibit 19.

25  The items contained in Government Exhibits 19 and 70 were

1    initially logged in the Evidence Management System together

2    under 1B number 1B19.

3              We offer Government Exhibit 70.

4              THE COURT:  Admitted.

5              (Government's Exhibit 70 received in evidence)

6    Q.  In preparation for your testimony today, did you look at

7    the envelope to refresh your recollection of what it looks

8    like?

9    A.  Yes, I did.

10             MS. POMERANTZ:  Can we pull up just for the witness

11   Government Exhibit 1F-15002.

12   Q.  Do you recognize this?

13   A.  I do.

14   Q.  What is it?

15   A.  This was the PNC Bank envelope that was listed in those

16   photographs that we saw in 1314 and 1313, that were previously

17   part of 1B19 or Government Exhibit 19.

18             MS. POMERANTZ:  We offer Government Exhibit 1F-15002.

19             THE COURT:  Admitted.

20             (Government's Exhibit 1F-15002 received in evidence)

21             MS. POMERANTZ:  Can we publish that for the jury,

22   Ms. Wechsler.

23   Q.  What is notated on the flap of the envelope?

24   A.  7500.

25   Q.  Did the FBI write that on the envelope?

```
 1    A.  No.

 2    Q.  Did the FBI write on any of the envelopes?

 3    A.  No.

 4              MS. POMERANTZ:  Let's publish Government

 5    Exhibit 1F-1502, side by side with Government Exhibit 1F-1314.

 6    A.  Just going to clarify my answer.  On this day, I didn't

 7    write -- me or any of my team did not write anything on any of

 8    the envelopes.

 9    Q.  Thank you.

10        So, what are we looking at here in these two exhibits,

11    Government Exhibit 1F-1502 and 1F-1314?

12    A.  This is just -- 1502 is just the envelope that was in 1314.

13    Just all the seams were removed in order to lay the envelope

14    flat in order to photograph it.

15    Q.  Let's pull up Government Exhibit 1F-1315.

16              What are we seeing here?

17    A.  This is the matching boot, now the next boot to the set of

18    the brownish boots, the Timberlands.

19    Q.  Let's pull up Government Exhibit 1F-1316.

20              What are we seeing here?

21    A.  This is the envelope or the object we previously saw that

22    was inside that boot, removed, it was an envelope, it's not a

23    bank envelope just a regular envelope, legal envelope, with the

24    contents removed which is cash, fanned out a little bit to be

25    able to be photographed.
```

O5G3MEN5                          Kougemitros - Direct

1   Q.  I am going to hand you what's been marked for

2   identification as Government Exhibit 22.

3        Do you recognize this?

4   A.  Yes.

5   Q.  What is it?

6   A.  This is the contents of that boot that we were reviewing

7   here in Government Exhibit 1316.  This is just the cash without

8   the envelope.

9            MS. POMERANTZ:  We offer this exhibit.

10           THE COURT:  Admitted.

11           (Government's Exhibit 22 received in evidence)

12  Q.  How much cash was found inside this shoe?

13  A.  In 1316 and in 1B?

14  Q.  In Government Exhibit 22.

15  A.  $7,000.

16           MS. POMERANTZ:  At this time I'd like to read

17  paragraph 2(c) of Government Exhibit 1437.

18           The item marked for identification as Government

19  Exhibit 22 consists of the items currently logged in the

20  Evidence Management System under 1B number 1B22, that is $7,000

21  in cash seized from a left brown boot in the residence.

22           The item marked for identification as Government

23  Exhibit 72 consists of the items currently logged in the

24  Evidence Management System under 1B number 1B72, that is an

25  envelope found with the cash marked as Government Exhibit 22.

1          The items contained in Government Exhibits 22 and 72

2    were initially logged in the Evidence Management System

3    together under 1B number 1B22.

4          We offer Government Exhibit 72.

5          THE COURT:  Admitted.

6          (Government's Exhibit 72 received in evidence)

7    Q.  In preparation for your testimony today, did you look at

8    the envelope to refresh your recollection of what the envelope

9    looks like?

10   A.  I did.

11         MS. POMERANTZ:  I am going to show just the witness

12   what is marked for identification as Government

13   Exhibit 1F-15003.

14   Q.  Do you recognize this?

15   A.  I do.

16   Q.  What is it?

17   A.  This is the envelope that we were previously -- that

18   previously contained the funds that we just saw in 1B22 or

19   Government Exhibit 22.  Previously held the cash within 1B22.

20   Government Exhibit 22.

21         MS. POMERANTZ:  We offer Government Exhibit 1F-15003.

22         THE COURT:  Admitted.

23         (Government's Exhibit 1F-15003 received in evidence)

24         MS. POMERANTZ:  Can we publish that for the jury,

25   Ms. Wechsler.

1   Q.  Special Agent Kougemitros, what's written on the envelope?

2   A.  7,000.

3   Q.  Was that written by the FBI?

4   A.  It was not.

5   Q.  Let's publish Government Exhibit 1F-1259.

6           What are we seeing here?

7   A.  So to orient you back to room U, and we're looking at

8   the -- the end of the L, so the top part of the L.  When you're

9   standing right at the top part of the L, if you're facing to

10  the left, this is what we're staring at right here.  The boots

11  were previously located on the floor where I marked the X over

12  here.  That's where we were looking before.

13  Q.  Directing your attention to the hangers.  What is on the

14  hangers there?

15  A.  Various jackets and coats.

16  Q.  What is above the jackets?

17  A.  Boxes, bags.

18  Q.  You testified earlier that cash was found inside some of

19  the jacket pockets; is that right?

20  A.  Yes.

21  Q.  What, if anything, did you and your search team do to

22  indicate in which jackets cash had been found?

23  A.  After the cash had been discovered within four of these

24  jackets that are viewable inside this picture, we placed yellow

25  post-its over four of the jackets.

1          Do you want me to point them out?

2    Q.  Can you please point them out for the jury.

3    A.  There is a yellow post-it on this one, on this one, so

4    there it is like a tweed jacket, so tweed to the right.  Next

5    is a leather jacket.  And then there is a blue jacket right

6    here.  And then a black bomber type jacket.

7          So four jackets right there.

8          So yellow post-its are posted by the FBI after the

9    discovery.

10   Q.  Let's publish Government Exhibit 1F-1267.

11         What are we seeing here?

12   A.  This is one of those four jackets that had a post-it on the

13   hanger from before.

14   Q.  What is written on the jacket on the left side of the

15   exhibit?

16   A.  Robert Menendez.

17   Q.  What is written on the jacket on the right side of the

18   exhibit?

19   A.  United States Senate Congressional Hispanic Caucus.

20   Q.  What did the FBI find inside the pockets of this jacket?

21   A.  Cash.

22         MS. POMERANTZ:  Can we pull up Government

23   Exhibit 1F-1259 side by side with 1F-1267.  My apologies.

24   Ms. Wechsler, can we do 1259 instead of 1269.

25   Q.  Can you just remind jury where is the blue Congressional

1  Hispanic Caucus jacket in 1F-1259.

2  A.  Yes.  I'll circle it right here.  And a little bit of that

3  emblem, the U.S. Senate emblem, is apparent right there.

4  Q.  That's the second post-it from the left?

5  A.  Correct, that is the second post-it on the left.

6  Q.  Let's pull up Government Exhibit 1F-1268.

7          What are we seeing here?

8  A.  So this is just exposing the inner pocket to show where the

9  envelope of cash was found.  It was in the inner pocket.

10          MS. POMERANTZ:  Let's publish Government

11  Exhibit 1F-1269.

12  Q.  What are we seeing here?

13  A.  This is the contents of the envelope that you saw in the

14  previous picture.  The cash was wrapped in a white looseleaf

15  paper you see over here on the right.  And here is the envelope

16  on the left.  And that was the cash in the middle is what was

17  wrapped in that.

18  Q.  I am going to hand you what's been marked for

19  identification as Government Exhibit 30.

20          THE COURT:  I take it, once again, the numbers on the

21  cash were not affixed by the FBI; is that right?

22          THE WITNESS:  That's correct, your Honor.  That is not

23  from the FBI.

24  Q.  Do you recognize this?

25  A.  I do.

1    Q.  What is it?

2    A.  This is the cash that is associated with this jacket that

3    was inside the pockets of this jacket.  Just the cash, no

4    envelope, no paper.

5            MS. POMERANTZ:  We offer this exhibit.

6            THE COURT:  Admitted.

7            (Government's Exhibit 30 received in evidence)

8    Q.  How much cash was found inside the pockets of this jacket?

9    A.  $4300.

10   Q.  We've looked at multiple photographs with notes or money

11   bands on them.  Were those placed or written by the FBI or were

12   they there before the search?

13   A.  No, those were there before the search.  I believe the only

14   thing that we saw that was placed there was that number 2 to

15   differentiate box one from two of those blue boxes.

16   Q.  Let's pull up Government Exhibit 1F-1270.

17           What are we seeing here?

18   A.  A black leather jacket.

19   Q.  What did the FBI find in the pockets of this black leather

20   jacket?

21   A.  Cash.

22           MS. POMERANTZ:  Can we pull up Government

23   Exhibit 1F-1259 side by side with this.

24   Q.  Where is the black leather jacket in Government

25   Exhibit 1F-1259?

1   A.  The second from the right.  There we go.

2   Q.  You say second from the right, you mean the post-it.  Is

3   that what you are referring to?

4   A.  Correct.  Where I highlighted in red here, that's the black

5   leather jacket.

6   Q.  Let's pull up Government Exhibit 1F-1271.

7          What are we seeing here?

8   A.  This is the inner breast pocket of that leather jacket with

9   the envelope exposed a little bit to be able to photograph it

10  in place.

11         MS. POMERANTZ:  Can we pull up for the jury Government

12  Exhibit 1F-1272.

13  Q.  What are we seeing here?

14  A.  This is the cash that was located within the envelope that

15  was located within that inner breast pocket removed, just

16  placed on the jacket, and photographed.  And again, this is

17  similar to the last one, it was wrapped in a piece of paper,

18  then placed within that envelope.

19  Q.  Handing you what's been marked for identification as

20  Government Exhibit 29.

21         Do you recognize this?

22  A.  I do.

23  Q.  What is it?

24  A.  This is just the cash that was located within that black

25  leather jacket.

O5G3MEN5                          Kougemitros - Direct

1           MS. POMERANTZ:  We offer this exhibit.

2           THE COURT:  Admitted.

3           (Government's Exhibit 29 received in evidence)

4    Q.  How much cash was found inside the pockets of this jacket?

5    A.  $6,000.

6    Q.  Let's publish Government Exhibit 1F-1273.

7           What are we seeing here?

8    A.  A black tweed jacket, tweed-ish.

9    Q.  What is the item sticking out of the jacket pocket?

10   A.  Yellow Manila folder.

11   Q.  What did the FBI find inside that Manila folder or

12   envelope?

13   A.  Cash.

14          THE COURT:  Sir, when this tweed-ish jacket was found,

15   was that Manila envelope, as it hung on that rack, sticking out

16   the way it is now?

17          THE WITNESS:  No, your Honor, it was concealed.  The

18   envelope was just removed to be able to expose it to be able to

19   be photographed.

20          THE COURT:  Is that the same with the black bomber

21   jacket?

22          THE WITNESS:  That's correct, your Honor.

23          THE COURT:  All right.

24          MS. POMERANTZ:  Can we please pull up Government

25   Exhibit 1F-1259 side by side with Government Exhibit 1F-1273.

O5G3MEN5                           Kougemitros - Direct

1    Q.  Where is the black jacket we see in Government

2    Exhibit 1F-1273 located in Government Exhibit 1F-1259?

3    A.  It is the closest jacket to the wall.  This one right here.

4    Q.  When you say the closest, are you referring to the jacket

5    with the post-it, the first post-it from the right?

6    A.  My apologies, yes.

7    Q.  Let's pull up Government Exhibit 1F-1274.

8             What are we seeing here?

9    A.  This is the contents of that Manila folder that were

10   located within that tweed-like jacket, removed, contents

11   removed, to be able to be photographed.  All those post-its

12   that are on it were found -- were found that way, that was not

13   the FBI that put these little tabs on it.

14   Q.  Let's pull up Government Exhibit 1F-1275.

15             What are we seeing here?

16   A.  Within one of the other pockets was another TD Bank

17   envelope.

18   Q.  What is written across the flap of this envelope?

19   A.  $10,000.

20   Q.  And was this visible when you looked at the coatrack?

21   A.  No.

22   Q.  Let's go to Government Exhibit 1F-1276.

23             What are we seeing here?

24   A.  This is the contents of only the TD envelope removed to be

25   able to be photographed.

1    Q.  I am going to hand you what's been marked for

2    identification as Government Exhibit 28.

3        Do you recognize this?

4    A.  I do.

5    Q.  What is it?

6    A.  This is all the cash that was located in that tweed-like

7    jacket from both envelopes, just no envelopes.

8            MS. POMERANTZ:  We offer this exhibit.

9            THE COURT:  Admitted.

10           (Government's Exhibit 28 received in evidence)

11   Q.  How much cash was found inside the envelopes in the pockets

12   of this coat?

13   A.  $21,000.

14           MS. POMERANTZ:  Your Honor, at this time I'd like to

15   read paragraph 2(d) of the stipulation, Government

16   Exhibit 1437.

17           The item marked for identification as Government

18   Exhibit 28 consists of --

19           I will do a briefer version of this, your Honor.  May

20   I have one moment, your Honor?

21           THE COURT:  Yes.

22           MS. POMERANTZ:  Your Honor, would it be possible to

23   take a brief break right now?

24           THE COURT:  How much longer do you have?

25           MS. POMERANTZ:  I don't have much longer, your Honor.

1    I want --

2              THE COURT:  Let's take a break, ladies and gentlemen.

3    You haven't had one this afternoon.

4              (Jury excused)

5              THE COURT:  10 minutes.  You may step down, sir.

6              THE WITNESS:  Thank you.

7              (Recess)

8              (In open court; jury present)

9              THE COURT:  You may continue, Ms. Pomerantz.

10             MS. POMERANTZ:  Thank you, your Honor.

11             I want to resume by just reading a portion of

12   paragraph 2(d) of stipulation Government Exhibit 1437.

13             The item marked for identification as Government

14   Exhibit 73 consists of the items currently logged in the

15   Evidence Management System under 1B number 1B73, that is two

16   envelopes found with the cash marked as Government Exhibit 28.

17   The items contained in Government Exhibits 28 and 73 were

18   initially logged in the Evidence Management System together

19   under 1B number 1B28.

20         The government offers Government Exhibit 73.

21             THE COURT:  Admitted.

22             (Government's Exhibit 73 received in evidence)

23   Q.  Let's pull up Government Exhibit 1F-1278.

24             What are we seeing here?

25   A.  This is the last of the four jackets that we saw hanging up

1   that we found cash in.

2   Q.  What is written on the jacket on the left side of the

3   exhibit?

4   A.  Senator Menendez.

5   Q.  What's written on the jacket on the right side?

6   A.  Lanzo Plumbing & Sewer.

7   Q.  You testified that the FBI found cash in this pocket.  Is

8   that correct?

9   A.  Yes.

10  Q.  Excuse me.  In the pockets of this -- in the pocket of this

11  jacket?

12  A.  Yes.

13          MS. POMERANTZ:  Let's pull up Government

14  Exhibit 1F-1259 side by side with 1F-1278.

15  Q.  Where is this Lanzo Plumbing & Sewer jacket in Government

16  Exhibit 1F-1259?

17  A.  It is the last jacket with the post-it on the left.  I will

18  circle it for you.

19          MS. POMERANTZ:  We can take that down and let's pull

20  up Government Exhibit 1F-1279.

21  Q.  What are we seeing here?

22  A.  This is the jacket opened to expose to show the inner

23  breast pocket and envelope just exposed a little bit to be able

24  to show it to be photographed.

25  Q.  Let's turn to Government Exhibit 1F-1280.

O5G3MEN5                          Kougemitros - Direct

1              What are we seeing here?

2     A.   This is the contents of the envelope.  Again, the cash was

3     wrapped in white paper, and so the cash is just laid out to be

4     photographed.

5     Q.   I am going to hand you what's been marked for

6     identification as Government Exhibit 32.  Do you recognize

7     this?

8     A.   Yes.

9     Q.   What is it?

10    A.   This is all the cash associated with -- that were located

11    in that envelope in Government Exhibit 1280, that picture.  So

12    just the cash, no envelope.

13              MS. POMERANTZ:  We offer this exhibit.

14              THE COURT:  Admitted.

15              (Government's Exhibit 32 received in evidence)

16    Q.   How much cash was found inside the pockets of this coat?

17    A.   $8,000.

18    Q.   You just testified about four jackets in which the FBI

19    found money.  Did those jackets appear to be men's or women's

20    coats?

21    A.   They -- all those four appeared to be men's coats.

22    Q.   Let's go back to Government Exhibit 1F-1259.

23              Directing your attention to the top-right corner of

24    this photograph.  What are we seeing here?

25    A.   Just a plastic bag, white plastic bag with purple print on

1    it.

2    Q.  Let's go to Government Exhibit 1F-1260.

3         What are we seeing here?

4    A.  Just a zoomed-in shot of that plastic bag in the top-right

5    corner.

6    Q.  What did the FBI find inside that bag?

7    A.  Cash.

8    Q.  Let's pull up Government Exhibit 1F-1261.

9         What are we seeing here?

10   A.  Located within that bag that was in that top-right corner,

11   that plastic bag with the purple print, was a brown paper bag.

12   Q.  Let's pull up Government Exhibit 1F-1262.

13        What are we seeing here?

14   A.  The contents of the brown paper bag that was located within

15   the plastic bag in room U.

16   Q.  Let's pull up Government Exhibit 1F-1263.

17        What are we seeing here?

18   A.  The contents of that brown bag removed, and placed on the

19   floor to be able to be photographed.

20   Q.  I am going to hand you what's been marked for

21   identification as Government Exhibit 37.

22        Do you recognize this?

23   A.  I do.

24   Q.  What is it?

25   A.  This is all the cash that was located within that brown

O5G3MEN5                         Kougemitros - Direct

1    paper bag that was within that plastic bag.

2              MS. POMERANTZ:  We offer this exhibit.

3              THE COURT:  Admitted.

4              (Government's Exhibit 37 received in evidence)

5    Q.  How much cash was found inside this bag?

6    A.  $100,000.

7    Q.  Let's go back to Government Exhibit 1F-1259.

8              You just testified that cash was found in that white

9    plastic bag above the shelf in the top-right corner.

10        Was that the only other cash that you seized inside a bag

11   in this room or was there more?

12   A.  There was more.

13   Q.  Can you indicate on Government Exhibit 1F-1259 where more

14   cash was found?

15   A.  Yes.  In this yellow plastic bag right here.

16   Q.  Let's publish Government Exhibit 1F-1264.

17        What are we seeing here?

18   A.  This is just a zoomed-in shot of that yellow plastic bag.

19   Q.  Is that located on the shelf above the jackets?

20   A.  Yes.

21   Q.  Where was that bag found in relation to the jackets that

22   had cash in them?

23   A.  Just over them.

24   Q.  What did the FBI find inside that yellow plastic bag?

25   A.  Cash.

O5G3MEN5                          Kougemitros - Direct

1    Q.  Let's go to Government Exhibit 1F-1265.

2            What are we seeing here?

3    A.  Just a top view of the contents of the yellow plastic bag.

4    Q.  Go to Government Exhibit 1F-1266.

5            What are we seeing here?

6    A.  This is the contents of the yellow plastic bag, now just

7    laid out to be photographed.

8    Q.  I am going to zoom in on the four stacks of cash on the

9    left in the top row.

10           What are we looking at here?

11   A.  These stacks of cash had money bands on them with stamps

12   from a financial institution.

13   Q.  What is the date on the bands?

14   A.  Starting from the left to the right, April 31, 2022,

15   April 12, 2022, April 12, 2022, and the last one to the right

16   is again April 12, 2022.

17   Q.  Are some of those band markings clearer than others?

18   A.  Definitely, yes.

19   Q.  What, if any, bank do you see on the bands?

20   A.  They are listed as JPMorgan Bank.

21   Q.  Directing your attention on the third money band.  Are you

22   able to see the year?

23   A.  I am able to see it in this shot over here when you blow it

24   up.  I'm able to see the imprint of the numbers.

25   Q.  I am going to hand you what's been marked for

O5G3MEN5                        Kougemitros - Direct

1    identification as Government Exhibit 43.

2        Do you recognize this?

3    A.   I do.

4    Q.   What is it?

5    A.   This is just the cash, no bands, that was -- all the

6    contents of the yellow plastic bag, minus the bag itself, and

7    the bands that were wrapping some of those bills.

8            MS. POMERANTZ:  The government offers this exhibit.

9            THE COURT:  Admitted.

10           (Government's Exhibit 43 received in evidence)

11   Q.   How much cash was found inside this bag?

12   A.   $95,000.

13           MS. POMERANTZ:  You can pull that down, Ms. Wechsler.

14   Q.   Did we walk through every single photograph the FBI took on

15   the day of the search or just a subset?

16   A.   Just a subset.

17   Q.   Did you seize every item that was photographed or just a

18   subset?

19   A.   Just a subset.

20   Q.   Other than acting as the designated seizing official and

21   team leader for this June 16, 2022, search, did you have any

22   other role in this investigation?

23   A.   No.

24   Q.   In total, approximately how much cash did the FBI seize

25   from 41 Jane Drive on June 16, 2022?

1    A.  $486,461.

2    Q.  In total, leaving aside the gold coins you mentioned, how

3    many 1-ounce gold bars did the FBI seize from 41 Jane Drive on

4    June 16, 2022?

5    A.  11 1-ounce bars.

6    Q.  In total, how many 1-kilogram gold bars did the FBI seize

7    from 41 Jane Drive on June 16, 2022?

8    A.  Two.

9              MS. POMERANTZ:  No further questions.

10             THE COURT:  Any cross-examination?

11             MR. FEE:  Yes, your Honor.

12             THE COURT:  Sir, your witness.

13             MR. FEE:  Thank you.

14   CROSS-EXAMINATION

15   BY MR. FEE:

16   Q.  Good afternoon.

17   A.  Good afternoon, sir.

18   Q.  I'm Adam Fee.  I'm one of Senator Menendez's attorneys.  Do

19   you have water?

20   A.  I do not.

21   Q.  Do you want some?

22   A.  I'm okay, thank you.

23   Q.  Okay.  So we won't be much longer today.

24             Can you say your last name for me?

25   A.  Kougemitros.

O5G3MEN5                    Kougemitros - Cross

1   Q.  I'm resisting the urge to call you John because that's not

2   appropriate.

3           So, Agent Kougemitros, your only role here was to do

4   this search on 41 Jane.  That's what you said, right?

5   A.  Yes, sir.

6   Q.  But you are a special agent, so you do lots of different

7   things in your day-to-day job, correct?

8   A.  Yes.

9   Q.  What I mean to say, it's not the case that you're a search

10  specialist, correct?

11  A.  Certainly not.

12  Q.  You have training on how to do searches, obviously.  You're

13  very good at it.  But it is not the only thing you do.

14  A.  That's right.

15  Q.  Can we bring back up very quickly Government

16  Exhibit 1F-1266.  I want to make sure I understood what you

17  said about this one.

18           MR. FEE:  Do we have the monitor for the defense side?

19  Ah, there you go.  So, Mr. Kelly, that's our guy, can you zoom

20  in on the banded bills in the top left, please.  All four of

21  them.

22  Q.  I want to quickly make sure I understand.  You were reading

23  off the dates and you said April 31 of 2022 for this one.

24  A.  Yes, sir.

25  Q.  There's not 31 days in April though, correct?

1            Why don't we zoom in a little closer.

2            Did you answer that question?

3   A.  No.  I'm doing the 30 days has September, April, June, and

4   November in my head.

5            THE COURT:  I do it on my fingers.

6   Q.  Let's pretend I know how to do that.  We'll look a little

7   closer.

8            How about this one.  Are you sure it's April 31, 2022?

9   A.  That's what it looks like to me.

10           MR. FEE:  Okay.  Can we zoom in even closer,

11  Mr. Kelly.  We'll leave it there for now.  Zoom out to the

12  four.

13  Q.  And then on this third one here, I'm circling it in red,

14  the third stack in.  I believe you said this was April 12,

15  2022.

16           MR. FEE:  Can we zoom in on that, Mr. Kelly.

17  Q.  Agent Kougemitros, you can't really see 12th, 2022, can

18  you?

19  A.  So on the zoomed-out shot, when I was viewing it before, I

20  could see the imprint of the 12 and the actual 2022 from the

21  screenshot I was looking at.

22  Q.  Why don't we zoom out.  So what you're telling me is from

23  there you can see the imprint of the stamp that's been rubbed

24  off.  Is that correct?

25  A.  It's what it appears like to me anyways, but from the image

O5G3MEN5                         Kougemitros - Cross

1    I'm looking at right here, I can see what looks like an imprint

2    of April 12, 2022.

3    Q.  Got it.

4              THE COURT:  Sir, going from the left, which pile of

5    cash are you looking at?

6              THE WITNESS:  This one right here.  That's what it

7    appears like to me, staring at this photograph today.

8              THE COURT:  Thank you.

9    Q.  Let's put those down.  Let's put up Government's Exhibit

10   1F-1013.  And I'm going to talk a bit more about where some

11   things were found, and I won't go quite in as much deep detail,

12   but let's start here.

13             So again, your role is to lead the search team?

14   A.  Yes.

15   Q.  And this is a team from the Long Island office of the FBI?

16   A.  No, not necessarily.  There was a canvass that went out to

17   the FBI, New York office, asking for volunteers first for an

18   event -- I didn't know it was a search -- on a certain day in

19   June, so a bunch of agents responded to the canvass.  I was

20   lucky enough to respond as well.  And eventually I was asked to

21   be the team leader for it.  I didn't even know where I was

22   going to search until -- or the target of the search until two

23   days prior.  I wasn't even told the address.  I was just told

24   it was going to be a search in New Jersey, lucky for the Long

25   Island guys.  There were three agents from Long Island, but

1    there were other agents, not part of the case squad, just from

2    different squads here in New York City.

3    Q.  And now you're here with us.

4    A.  Very lucky.  June 16 was also my birthday.

5    Q.  Wow.  I don't know what kind of luck that is.

6    A.  Yeah, the gift that keeps on giving.

7    Q.  Yeah.  Here we are.

8            This is leading up to the master bedroom, what you

9    called room B.  Room bravo.

10   A.  Yes.  This is standing on the landing.  And that would

11   eventually lead up to all the bedrooms.

12   Q.  You testified that when you go into the house, the door to

13   the master bedroom was locked, right?

14   A.  Yes, it was.

15   Q.  And then you had to get the locksmith, you get the

16   locksmith to come open the door to the master bedroom, correct?

17   A.  I didn't have to get the locksmith, but we did get the

18   locksmith.

19   Q.  You didn't have to because FBI, in other circumstances, if

20   there wasn't such a sensitive search, would have just broken

21   down the door, correct?

22   A.  It's possible.

23   Q.  So, locksmith gets into that door, they go into the

24   bedroom, and there's two closets that are locked inside the

25   bedroom, correct?

1  A.   Yeah.  I actually was, I was one of the individuals that

2  went in to clear the room.  So yes, so the locksmith stepped

3  out of the way, me and one, possibly two other agents entered

4  the room.  And then we came upon -- we cleared it and then we

5  came upon there were two other locked closets.

6  Q.   This would be in your interest to just try the answer the

7  question I posed.  It will go quicker for you, so it will be

8  good for you.

9  A.   Okay.

10 Q.   In that bedroom, bravo, there is a closet that is locked or

11 two closets that are locked, correct?

12 A.   Yes.

13 Q.   You get the locksmith to open both of those closets, right?

14 A.   Correct.

15 Q.   And then one of those locked closets, which we looked at

16 quite a bit, has a safe inside of it, correct?

17 A.   Yes, sir.

18 Q.   And that safe is also locked.  It is a safe.

19 A.   Yes, sir.

20 Q.   That's the safe that the agents take to the garage, and you

21 said you forced it open, right?

22 A.   One agent did, yes.

23 Q.   One agent did.  Not you, somebody else?

24 A.   Correct.

25 Q.   What does that mean?  That means a crowbar?  That means

O5G3MEN5                          Kougemitros - Cross

1    just --

2    A.  He brought several tools, Halligan tool, crowbars, to be

3    able to get in.

4    Q.  The Halligan tool is a torch?

5    A.  No.  Firefighters use it to pry open metal doors.

6    Q.  So, between like when you're standing right here to get

7    into that safe, in the master bedroom closet, you got to get

8    through two locked doors and a safe, correct?

9    A.  To get to the safe, you go through two locked doors.

10   Q.  Then into the safe, then?

11   A.  From standing right here, yes.

12   Q.  The safe is important in this case, right?

13           MS. POMERANTZ:  Objection.

14           THE COURT:  Sustained.

15   Q.  The safe had two 1-kilogram -- the safe had one of the

16   1-kilogram gold bars in it, correct?

17   A.  The safe did have a 1-kilogram gold bar in it.

18   Q.  Close to that safe in the same closet, same locked closet,

19   was the second 1-kilogram gold bar, right?

20   A.  In close proximity was the other gold bar, yes.

21   Q.  So the two 1-kilo gold bars that everybody felt today,

22   bizarrely heavy I agree, those are in the closet, what you're

23   calling room Charlie?

24   A.  Yes.

25   Q.  So let's keep walking up.  Let's go to 1F-1014.  GX

1    1F-1014.  You testified this was an entry photo.  Correct,

2    Agent Kougemitros?

3    A.  Yes, sir.

4    Q.  And an entry photo, you do this better than me, it is a

5    photo you take when you're entering a place you are going to

6    search, correct?

7    A.  The entry photos are conducted before anybody searches

8    anything, besides doing the security search.

9    Q.  Got it.  So the idea is you're making a record of what it

10    looked like before?

11    A.  Yes, sir.

12    Q.  Because there is going to be an after, because you have to

13    search?

14    A.  Yes, sir.

15    Q.  This is the before?

16    A.  Before, yeah.

17    Q.  This means you haven't gone into the room yet or you hadn't

18    gone in and searched the master bedroom yet at the time this

19    photo is taken, correct?

20    A.  That's right.

21    Q.  The Charlie, the closet has not been opened yet.  It is

22    closed, correct?

23    A.  No, that is incorrect.

24    Q.  So, Charlie at this point has been unlocked but not opened,

25    correct?

O5G3MEN5                            Kougemitros - Cross

1   A.  No, Charlie has been unlocked and opened.

2   Q.  At the time you took the entry photo?

3   A.  Yes.

4   Q.  You had already opened it but you hadn't searched it?

5   A.  Right.

6   Q.  Got it.

7           THE COURT:  Was that in connection with your clearing

8   the room for security purposes?

9           THE WITNESS:  Yes, your Honor.

10          MR. FEE:  Thank you, your Honor.

11  Q.  So here's our entry photo.  Let's go in real quick to 1017,

12  please.  GX 1017.  And you covered most of it, so there's the

13  door to the bedroom open.  You see that?

14  A.  I do.

15  Q.  I am going to circle that in red.  And then the closet, the

16  locked closet Charlie is now open, correct?

17  A.  Yes, it had been opened.

18  Q.  Okay.  So I'm sorry.

19          MR. FEE:  Well, just very quickly, Mr. Kelly, can you

20  zoom in on the photo, the big photo and the little photo behind

21  it, or beneath it.

22  Q.  So you said that is Senator Menendez.  Who is that next to

23  him in that photo?

24  A.  I believe that's his wife.

25  Q.  You know her name is Nadine, right?

1   A.  Yes, I believe that's her name.

2   Q.  You didn't identify her in any of the other photos about

3   which you testified, correct?

4   A.  I wasn't asked to.

5   Q.  Well, were you told not to identify the other person in

6   those photos?

7   A.  I don't believe so.

8   Q.  So that's Nadine.  And then do you know -- I doubt you

9   do -- know who that little cutie is beneath?

10  A.  I do not.

11  Q.  Are you aware that's Nadine's son from a prior marriage

12  named Andre?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  Sustained.  He doesn't know who that is.

15  Q.  You are not aware that Nadine has a son named Andre?

16          MS. POMERANTZ:  Objection.

17          THE COURT:  Are you aware as to what children, if any,

18  Mrs. Menendez has?

19          THE WITNESS:  I'm not aware.

20  Q.  No one has told you?

21          MS. POMERANTZ:  Objection.

22          THE COURT:  I'll allow that.

23  A.  I didn't even know there was three defendants on trial

24  until last week.  Two weeks ago.

25  Q.  You know now.

1   A.  I know now.  Somebody told me two weeks ago.

2   Q.  Because you were prepping for trial, right?

3   A.  We were going over the facts of the circumstances of

4   June 16.

5   Q.  With these prosecutors?

6   A.  Yes.

7   Q.  Because the search was about two years ago now, correct?

8   A.  Almost two years, yeah.

9   Q.  That's not super fresh in your mind, the details, the

10  minute details of this search, correct?

11  A.  Some of them.

12  Q.  Sure.  And that's how memory works.  Some of the details

13  are fresh in your mind; some of them may not be, right?

14  A.  Yes.

15  Q.  It's totally appropriate to refresh your recollection as

16  you did with these prosecutors and with other case agents to

17  look at photos, to look at evidence collection logs, and other

18  materials to refresh your memory, right?  That's what you did?

19  A.  I wouldn't characterize it as that.  I went over the photos

20  and explained to them what was going on in the photos that were

21  taken, because none of them were there.  I was.

22  Q.  It is still fresh in your mind, and you were able to

23  explain to these prosecutors what was happening in the photos.

24  That's what you're telling me?

25  A.  Yes, sir.

1    Q.  Let's look inside the closet GX 1F-1019.  So, this what you

2    were calling room Charlie, or the closet in the master bedroom,

3    correct?

4    A.  Yes.

5    Q.  And inside -- I'm circling inside the closet, you see a lot

6    of women's clothing and purses, bags and shoes, right?

7    A.  I see a lot of clothing, I do see some bags, I don't see

8    any shoes.

9    Q.  Okay.  You characterized this purse and this dress as

10   women's clothing, correct?

11   A.  Yes.

12   Q.  And then you said there was men and women's clothing in it,

13   and then you described this blue blazer or jacket.  Do you

14   remember that during direct testimony talking about that blue

15   brazer?

16   A.  The blue blazer and the ties.

17   Q.  In fact, you said six times the blue jacket was in the

18   closet.  That was your testimony.  Do you remember that?

19   A.  I believe I said the blue jacket was hanging on the door

20   that was in the closet.

21   Q.  And then the AUSA asked you the blue jacket that was found

22   in the closet, and you said the jacket was removed from room

23   Charlie.  And then you testified that same blazer that was

24   hanging out in room Charlie or hanging up in room Charlie.

25              So, your testimony, and it's clear in your mind, is

1    this blue jacket was hanging in the closet, in this room

2    Charlie closet, correct?

3    A.  My testimony is that the blue blazer was hanging on the

4    closet door which was in room Charlie, which was closed.

5    Q.  So, your testimony is that --

6              THE COURT:  Was it on the inside of the door?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  Okay.

9    Q.  Let's go back to GX 1F-1014, please.  Let's zoom in,

10   well -- to make sure the jury is oriented here.  This is the

11   entry photo where the door to bravo is open, right?

12   A.  Yes.

13             MR. FEE:  Let's zoom in, Mr. Kelly, on like the right

14   third of the photo.

15   Q.  That's the blazer?

16   A.  It may be.

17   Q.  Let's zoom back out.

18             The blazer can be seen, this item of clothing can be

19   seen through the crack in the door to the master bedroom,

20   correct?  This item of clothing?

21   A.  An item of clothing can be seen through that crack.  I

22   don't know what it is, but an item of clothing can be seen.

23   Q.  Let's see.  Let's go to GX 1F-1017, please.  Let's zoom in

24   on this part of the closet.  You see that?

25   A.  Yes.

1    Q.  Okay.  So look at this blue blazer hanging on the back of

2    the door to the master bedroom.  Do you see that?

3    A.  I do see it.

4         MR. FEE:  Can we zoom back out, Mr. Kelly.  Zoom in on

5    the top of the door, the front door to the master bedroom,

6    please.  No, a little -- give me a little more width.  I want

7    to get that the hook there.  Where I'm circling.

8    Q.  I'm circling in red one of those gray hangy things.  Do you

9    see that gray hangy thing, Agent Kougemitros?

10   A.  I do.

11   Q.  You use that typically to hang a garment, correct?

12   A.  Yes, sir.

13   Q.  And in fact, the blazer is hanging on that gray hangy thing

14   off of the exterior bedroom door, correct?

15   A.  I do not know, sir.

16        MR. FEE:  Well, let's look again at GX 1F-1019.  You

17   can zoom out actually.  Try to, Mr. Kelly, see where I'm

18   putting that box.  Zoom in right there.

19   Q.  Agent Kougemitros, you would agree that that blue blazer is

20   not hanging on the closet door for the locked closet in which

21   you found those gold bars, correct?

22   A.  I don't think I can make that determination, sir.

23   Q.  You are a helicopter pilot, right?

24   A.  Yes, sir.

25   Q.  You're much, much, smarter than I at all that math and

1   physics stuff, right?

2           MS. POMERANTZ:  Objection.

3           THE COURT:  Sustained.

4           MR. FEE:  We'll stipulate.

5           MS. POMERANTZ:  Objection.

6           THE COURT:  Yes.

7           Question, answer, question, answer.

8           MR. FEE:  Yes, your Honor.  Yes.

9           THE COURT:  This is not about the lawyers, ladies and

10  gentlemen.  It is about the testimony.

11  Q.  Unless there is some physically impossible extension off of

12  that closet door to what you're calling room Charlie, that blue

13  jacket cannot be hanging on the closet door, right?

14          THE COURT:  Are you able to say yes or no, sir?

15          THE WITNESS:  I'm not able to say that.

16          MR. FEE:  Zoom out a little please, Mr. Kelly.  Let's

17  zoom in on the like the wooden block where everything is

18  hanging.

19  Q.  Mr. Kougemitros, would you agree with me that you do not

20  see any open hooks on that wooden block, do you?  To the best

21  of your ability sitting here today?

22  A.  I do see a couple of open hooks.

23  Q.  You see one where the belt is hanging over it and then

24  there is two next to it?

25  A.  Yeah, there are some.

1    Q.   Yeah.   It does not appear that a suit will fit in there,

2    does it, or a jacket?

3    A.   I don't see a jacket hanging there, if that's what your

4    question is.

5    Q.   Okay.   You also testified to there being -- you had said

6    that the blue jacket was inside the closet.   You'd also said

7    there was men and women's clothing inside the closet.   Do you

8    recall that testimony?

9    A.   I said that the blue jacket was hanging on the closet door,

10   and which was within the closet, and that there was men and

11   women's clothing, yes.

12   Q.   Got it.   So you're referring also to these ties as men's

13   clothing?

14   A.   I am.

15   Q.   Can we zoom in on like this tie first.

16          Did you know if there are any other occupants of the

17   house throughout the time that Nadine Arslanian owned it?

18   A.   No, I have no knowledge of it.

19   Q.   No idea whether there was a teenage boy that lived there?

20   A.   That's correct.   I had no idea.

21   Q.   Okay.

22   A.   I would have no idea.

23   Q.   During your search, and your meetings with these

24   prosecutors, you were never shown a photograph of Senator

25   Menendez wearing a tie with a mouse eating cheese on it, right?

1    A.  I have never seen a photo of Senator Menendez wearing a

2    mouse eating cheese, no.

3                MR. FEE:  Got it.  Let's zoom out and move to the

4    right.  We'll do this quick.

5                Same question for skulls, another mouse eating cheese,

6    and Mr. Kelly, we zoom in on the blue one.  What's the blue

7    one.  I don't know.  Bubbles, fish.  Let's zoom back out.

8    Q.  So you have never seen a photograph of Senator Robert

9    Menendez wearing a tie with a skull, any sort of rodents eating

10   cheese, or any other ties that resemble what you found in room

11   Charlie, the master bedroom closet, right?

12   A.  In fairness, I haven't really studied photos of Senator

13   Menendez wearing ties, but no one showed me a picture of him

14   wearing any of these ties, if that's your question.

15   Q.  That's fair.  Let's back out.

16                Six times, Agent Kougemitros, you had testified that

17   the blue blazer was either inside this closet or hanging on the

18   door, correct?

19   A.  I believe my testimony, like I said before, was hanging on

20   the door.  It appeared to be.

21   Q.  It appeared to be.  And just to be clear, if it was hanging

22   on the door, as Judge Stein just clarified with you, on the

23   inside of the closet door when it was closed, it must have been

24   moved before this photo was taken, correct?

25   A.  I don't think I can make that determination.

O5G3MEN5                        Kougemitros - Cross

1   Q.  Help me understand.  You just told Judge Stein that the

2   blazer was hanging inside Charlie when it was closed.  Correct?

3   A.  Yes.

4   Q.  Do you want to change that testimony looking at this photo?

5          MS. POMERANTZ:  Objection.

6          THE COURT:  Sustained as phrased.

7   Q.  Explain to the jury how this jacket got to its current

8   position in GX 1F-1019 when it was hanging on the inside of the

9   door to Charlie.

10  A.  That's what it appears to me in this photo.  I do not have

11  another photo to be able to make the determination that you're

12  trying to suggest.

13  Q.  I'm not suggesting anything.  I want to ask you very

14  clearly, does this photo indicate to you that the blue jacket

15  was hanging inside the door to Charlie?

16         MS. POMERANTZ:  Objection.  Asked and answered.

17         THE COURT:  I'll allow it.

18  Q.  I'll ask it again.  Does this photo, GX 1F-1019, indicate

19  to you that the blue jacket was hanging on the inside of the

20  door to the master bedroom closet?

21  A.  Yes.

22         MR. FEE:  One moment, your Honor.

23  Q.  Let's go back out to GX 1017.  And we can zoom in again.

24         So your testimony today, Agent Kougemitros, is based

25  on your review of these photos or do you actually remember

1    seeing the jacket hanging inside of that closet?

2    A.  Based on the review of these photos, it appears to me that

3    the jacket was hanging on the inside of the door.

4    Q.  And we're talking about the jacket that I'm now circling in

5    red?

6           THE COURT:  Move on.

7           MR. FEE:  Thank you, your Honor.

8    Q.  Agent Kougemitros, you testified that at one point, you

9    removed the gloves you had been wearing, correct?

10   A.  Yes, sir.

11   Q.  I just want to make sure I understand what you're saying

12   about that.

13       So, you entered the home, you're going around and doing all

14   the things you talked about on direct examination.  And up

15   until the point you're counting bills, you're wearing gloves.

16   That's your testimony?

17   A.  There -- I may not have been wearing it the whole time,

18   only because I may have been on the phone.  But the majority of

19   the time I was wearing gloves until I believe -- so anyways, my

20   recollection at this time is that I was wearing gloves most of

21   the time until we were counting bills.

22   Q.  That's what you said in your direct exam, that you took

23   them off because it was going to be hard to count dollar bills,

24   which makes sense, with gloves on, right?

25   A.  It wasn't the -- from my recollection, it wasn't actually

1    the counting of the bills.  It was removing of the bands that

2    was seeming difficult, because we had to remove the bands to be

3    able to count them.  And there may have been a malfunction or

4    something with the cash counting machine that needed to be

5    cleared.

6            But again, I'm not -- I have a clear memory of the

7    removing of the bands that was causing a problem.

8    Q.  Let's please put up Government Exhibit 1F-1023, please.

9    Agent Kougemitros, this is the interior of that same closet in

10   the master bedroom, correct?

11   A.  Yes, room Charlie.  This is the floor shot of it.

12   Q.  And could you help me figure out where you got that other

13   1-kilogram gold bar.  Is it there?  Am I circling it correctly?

14   A.  That's correct.  It's under the boxes.  You can see the

15   plastic bag, as well as the paper towel that was concealing it.

16   Q.  Got it.  And then if we put up Government Exhibit 1F-1237,

17   please.  Again, circling that Ziploc and the gold bar.  You

18   actually recovered that, didn't you, Agent Kougemitros?

19   A.  No, I did not.

20   Q.  You did not?

21   A.  I did not search room Charlie.

22   Q.  Did you touch the gold bar and the bag that night or that

23   day when you were conducting the search?

24   A.  It's possible.

25   Q.  Are you aware that three of your fingerprints were found by

1    the FBI latent print examiner on the plastic bag from which

2    that gold bar was removed?

3    A.  No.  I was only informed that my prints -- I knew that my

4    prints were on something.  But I was never informed what my

5    prints were actually found on.  But that's what happens when

6    you touch something.  Prints go on them.

7    Q.  When you touch something, your prints get on them, right?

8        You don't actually remember touching that plastic bag, do

9    you?

10   A.  I definitely seized this item.  So I touched it at some

11   point.  But do I recall touching that plastic bag without my

12   gloves on?  No, I do not.

13   Q.  Would you agree that because your prints are found on it,

14   you must have touched it at some point?

15            MS. POMERANTZ:  Objection.

16            THE COURT:  I'll allow that.

17   A.  The bag or the gold bar?

18   Q.  The bag.  Not the gold bar.

19   A.  If my prints are on it, then I touched it.

20   Q.  Again, I don't want to overstate this.  You only touched it

21   probably in the course of processing that day or night for

22   evidence collection purposes, right, Agent Kougemitros?

23   A.  Right.  This item was only in my possession from the time

24   that I was at the house to the time that I brought it to the

25   FBI Long Island resident agency.  And then I believe on the

1    17th the case squad came and picked up all the evidence.  And

2    the only other time I saw it was when we were going over the

3    facts and circumstances of June 16 and 17th in preparation for

4    this.

5    Q.  So, a brief time, but three of your fingerprints were found

6    by the FBI on that bag; fair to say?

7    A.  Yes.

8    Q.  Are you aware that none of Bob Menendez's prints were found

9    on that bag?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  Sustained.

12   Q.  We can put that down.

13       Agent Kougemitros, when you began to talk about this

14   search, you said that you searched 41 Jane, which was the home.

15   Do you know whose home it was?

16   A.  I thought it was the home of Senator Robert Menendez.

17   Q.  Before you searched you did not look for, say, the deed for

18   the home?

19   A.  I was only informed where I was going two days prior, and

20   no.

21   Q.  And as part of your surveillance in the two days leading up

22   to that search, you did not gather information about who

23   actually held the title to the home, correct?

24   A.  My only task was to search the home.

25   Q.  So, fair to say that you are unaware whether Bob Menendez

1   or Nadine Arslanian or Nadine Tabourian holds the title,

2   actually owns the home?

3   A.  That's right.

4           THE COURT:  You have no idea who owns the title to the

5   home, if anyone.

6           THE WITNESS:  That's right, your Honor.

7           MR. FEE:  Your Honor, this might be a good time to

8   break.  I can be efficient in the morning with him.

9           THE COURT:  How much longer do you think you have,

10  sir?

11          MR. FEE:  If --

12          THE COURT:  If you're efficient.

13          MR. FEE:  I would say 30 to 45, your Honor.

14          THE COURT:  Let's break now, ladies and gentlemen.

15  Remember, don't listen or watch any news having to do with this

16  case.  Keep an open mind.  And relax, we'll see you tomorrow.

17          We'll start tomorrow, it's Friday, we'll start at

18  10 a.m.  All right.  10 a.m.  I'm getting a thumbs up from the

19  jury.  And I can return the thumbs up.

20          (Jury excused)

21          (Continued on next page)

22

23

24

25

O5G3MEN5

1          THE COURT:  10 a.m. tomorrow.

2          MR. MONTELEONI:  There is one thing I'd like to

3   address.

4          So, potentially as early as Monday, depending on how

5   the witnesses go, we might be calling our first summary

6   witness, Michael Coughlin, a special agent with the FBI, who we

7   expect to provide very substantial testimony, summarizing a

8   very large number of documents related roughly to the Egypt

9   portion of the scheme.

10          We have a draft summary chart, one of the ones that

11   was mentioned that we wrote to the Court previously about.  We

12   provided the draft to the defense weeks ago.  We have the final

13   and we've asked the defense to give us any objections to that

14   chart or the exhibits by Friday.  But we wanted to --

15          THE COURT:  You mean by tomorrow?

16          MR. MONTELEONI:  Yes, by tomorrow.  We asked them

17   yesterday.

18          We wanted to make you aware that we believe it would

19   be most efficient if there is any disputes between us and

20   defense about this chart or the exhibits, that those get

21   resolved over the weekend, so that if the other witnesses line

22   up, this witness can take the stand.  We mention this because

23   it is a very large volume of documents.

24          THE COURT:  Over the weekend at the latest.  Tomorrow

25   if possible.  Over the weekend at the latest.

O5G3MEN5

1          MR. MONTELEONI:  Yes, that would be ideal.

2          MR. RICHENTHAL:  Just one other administrative matter.

3    We haven't reviewed in full the defense's opposition to our

4    most recent motion in limine yet which was filed under seal.

5    We'd like the opportunity to consider filing a reply.

6          Given all that's going on, we'd like to file that over

7    the weekend.  It may be difficult for us to do it any sooner.

8    We don't anticipate that the witness, who is at least partially

9    the subject matter of that document, will testify for several

10   days.

11         THE COURT:  All right.  Then over the weekend is fine.

12         MR. RICHENTHAL:  Thank you.

13         THE COURT:  Thank you.  10 a.m. tomorrow.

14         (Adjourned to May 17, 2024, at 10 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                        Page
 3   ARISTOTELIS KOUGEMITROS
 4   Direct By Ms. Pomerantz . . . . . . . . . . . 173
 5   Cross By Mr. Fee . . . . . . . . . . . . . . . 305
 6                    GOVERNMENT EXHIBITS
 7   Exhibit No.                            Received
 8    1F-1325  . . . . . . . . . . . . . . . . 175
 9    1F-1333, 1F-1334 and 1F-1335 . . . . . . . 177
10    1F-1002, 1F-1337 and 1F-1348  . . . . . . . 188
11    1F-1004 and 1F-1291 through 1303 . . . . . . 190
12    1F-1004, 1012, 1013, 1014, 1015, 1016,  . . . 196
13             1017, 1018, 1019, 1020, 1023,
14             1038, 1039, 1042, 1044, 1045,
15             1079, 1083, 1084, 1085, 1087,
16             1092, 1093, 1105, 1106, 1107,
17             1108, 1125, 1126, 1127, 1128,
18             1129, 1155, 1156, 1157, 1158,
19             1159, 1162, 1164, 1165, 1166,
20             1167, 1168, 1169, 1170, 1171,
21             1172, 1173, 1174, 1175, 1176,
22             1177, 1178, 1179, 1180, 1182,
23             1183, 1184, 1186, 1187, 1188,
24             1191, 1192, 1193, 1195, 1196,
25             1197, 1198, 1199, 1200, 1201,
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

| | | |
|---|---|---|
| | 1202, 1203, 1204, 1205, 1207, | |
| | 1208, 1209, 1224, 1225, 1236, | |
| | 1237, 1249, 1240, 1241, 1243, | |
| | 1244, 1245, 1246, 1247, 1248, | |
| | 1249, 1250, 1251, 1252, 1253, | |
| | 1259, 1260, 1261, 1262, 1263, | |
| | 1264, 1265, 1266, 1267, 1268, | |
| | 1269, 1270, 1271, 1272, 1273, | |
| | 1274, 1275, 1276, 1278, 1279, | |
| | 1280, 1304, 1305, 1306, 1307, | |
| | 1308, 1309, 1311, 1312, 1313, | |
| | 1314, 1315, 1316, 1317, 1318, | |
| | 1319, 1320 and 1321 | |

1301 . . . . . . . . . . . . . . . . . . . 197
64 . . . . . . . . . . . . . . . . . . . 225
90 and 1437 . . . . . . . . . . . . . . 229
56 . . . . . . . . . . . . . . . . . . . 233
42 . . . . . . . . . . . . . . . . . . . 238
39 . . . . . . . . . . . . . . . . . . . 240
1195 . . . . . . . . . . . . . . . . . . . 247
41 . . . . . . . . . . . . . . . . . . . 250
44 . . . . . . . . . . . . . . . . . . . 251
86 . . . . . . . . . . . . . . . . . . . 254
35 . . . . . . . . . . . . . . . . . . . 255
79 . . . . . . . . . . . . . . . . . . . 256

```
 1    1F-15001    .  .  .  .  .  .  .  .  .  .  .  .  .  257
 2    34    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  259
 3    78    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  260
 4    58    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  261
 5    88    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  262
 6    49    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  263
 7    84    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  264
 8    38    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  266
 9    1F-17001    .  .  .  .  .  .  .  .  .  .  .  .  .  275
10    67    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  277
11    66    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  278
12    19    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  285
13    70    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  286
14    1F-15002    .  .  .  .  .  .  .  .  .  .  .  .  .  286
15    22    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  288
16    72    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  289
17    1F-15003    .  .  .  .  .  .  .  .  .  .  .  .  .  289
18    30    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  293
19    29    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  295
20    28    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  297
21    73    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  298
22    32    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  300
23    37    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  302
24    43    .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  304
25
```