O5U3MEN1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5    ROBERT MENENDEZ, *et al.*,

6              Defendants.
                                           Trial
7    ------------------------------x

8                                          New York, N.Y.
                                           May 30, 2024
9                                          9:45 a.m.

10   Before:

11
                    HON. SIDNEY H. STEIN,
12
                                           District Judge
13                                         -and a Jury-

14                      APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  PAUL M. MONTELEONI
17        DANIEL C. RICHENTHAL
          ELI J. MARK
18        LARA E. POMERANTZ
          CATHERINE E. GHOSH
19        Assistant United States Attorneys
          -and-
20        CHRISTINA A. CLARK
          National Security Division

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O5U3MEN1

                              APPEARANCES CONTINUED


PAUL HASTINGS LLP
      Attorneys for Defendant Menendez
BY:  ADAM FEE
      AVI WEITZMAN


GIBBONS, P.C.
      Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
      ANNE M. COLLART
      CHRISTINA LaBRUNO
      RICARDO SOLANO, Jr.
      ANDREW J. MARINO
      ELENA CICOGNANI
      JESSICA L. GUARRACINO


CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
      Attorneys for Defendant Daibes

Also Present:   Rodina Mikhail
                Bachar Alhalabi
                Interpreters (Arabic)

O5U3MEN1

1           (Trial resumed; jury not present)

2           THE COURT:  All jurors are present.  We're going to

3    end at 4 today, a juror has an issue.  I said that was all

4    right.

5           In terms of the pending issue from yesterday, I think

6    it had to do with the permissible inference on, if I'm not

7    mistaken, line 1033 and 1040 or 1041.  I'm not going to redact

8    that series.  They're permissible inferences that the jury can

9    draw.

10           I understand the government needs me.

11           MR. MONTELEONI:  Yes, your Honor.  This is further to

12    the discussion of the anticipated cross-examination of Special

13    Agent Coughlin.  We understand that the defendant -- I'm so

14    sorry.  So we understand the defense counsel, they've

15    represented this might not come up, but it might, and we want

16    to make you aware of this in case it does.

17           So as you know, you've advised the defense counsel

18    that they can inquire if the witness reviewed some documents

19    that are not in the chart.  And we understand that.  But,

20    obviously, the fact that a witness has reviewed something does

21    not make it admissible.  And a very large number of these

22    documents that we understand if -- I don't know if the witness

23    is going to remember anything about them, so there might be

24    nothing there.  But even if the witness does remember having

25    reviewed something, a huge number of them are things that are

1    hearsay of the defendants.  So we might have offered them, but

2    the defense can't offer them.

3        We're very concerned that this idea of asking the

4    witness, well, did you review some other portion of the chat

5    chain not in evidence, did you look at it.  That then becomes a

6    backdoor way of them to introduce their own statements.  We

7    understand that --

8        THE COURT:  Looking at that doesn't do anything.

9        MR. MONTELEONI:  Exactly.

10        THE COURT:  I assume -- I shouldn't assume.  But,

11    based on the direct, I assume he looked at the underlying

12    documents for the purpose, the sole purpose of determining

13    whether the excerpt set forth on the chart was indeed in that

14    document.

15        MR. MONTELEONI:  Principally.  In the very early

16    stages he looked through them to familiarize himself with them

17    so he could more easily find that type of thing.  I don't think

18    he has any real memory of any substance about it.  But even if

19    some part of it caught his mind, and my understanding from

20    talking to the witness isn't, but if he did have some memory of

21    some other part that's not in evidence that he happened to look

22    at and thought about and, oh, I remember this.  That's not a

23    reason to bring in its substance.

24        And we're concerned that defense counsel is trying to

25    do that in a backdoor way through this witness, especially

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    since they haven't disclosed any such portions that they wish

2    to do.  And obviously any such portions would not be for

3    impeachment, so we intend to object to this.  Maybe it won't

4    come up, but we want you to be aware of this.

5              MR. WEITZMAN:  I have a different application.

6              THE COURT:  No.  What's your response to what

7    Mr. Monteleoni said?

8              MR. WEITZMAN:  I've told him that I will explore what

9    he's reviewed, I will not offer evidence necessarily, but I'm

10   sticking to the chart that they presented and the underlying

11   documents in the chart they presented.  That's my goal.  And I

12   want to see what else he reviewed.  But I expect there to be a

13   handful of questions about that, and I don't intend at present

14   to offer any additional documents.

15             MR. MONTELEONI:  One follow up on that.  Obviously, if

16   that's the case, that's great.  But as long as he doesn't build

17   in assumptions of the fact of it into the questions, get in

18   their substance of the questions.

19             THE COURT:  We've been through those objections in

20   terms of cross.  I think Mr. Fee was the subject of those

21   issues.

22             MR. WEITZMAN:  Your Honor, you'll recall that the

23   other day on the cross-examination of Ms. Maali or in

24   connection with the examination of Ms. Maali we objected to the

25   introduction by the government of a document that was titled

O5U3MEN1

1    the Eastern Mediterranean Security --

2         THE COURT:  I said that because Egypt was on the

3    Eastern Mediterranean, that it was reasonable.  I think they've

4    introduced it.

5         MR. WEITZMAN:  They have.  It is at lines 1070 through

6    1072 of their summary chart.

7         We've done some more digging, and last night we

8    learned that this was a statute, I'm sorry, this was a --

9         THE COURT:  It was a resolution I think or maybe it

10   was a bill.

11        MR. WEITZMAN:  It was a bill that was introduced on

12   April 10, 2019, it was placed on the Senate legislative

13   calendar on July 10, 2019, and it was never passed.

14        But here's the important point, your Honor.  It was a

15   bill proposed by Senator Menendez.  We were surprised to learn

16   that.  The statute that -- the exhibit that they provided us

17   didn't give us notice of that so, we had to do our own

18   investigation and alerted the government that we think that's a

19   violation of speech and debate and should be stricken because

20   they're not allowed to put in evidence of legislative acts of

21   our client.  And they just can't hide our client's identity

22   when putting it in and say the jury will never find out.

23        So we're moving to strike that and all testimony

24   relating to those lines.

25        THE COURT:  1070 to 1072, and that was the Eastern

1    Mediterranean document.

2                MR. WEITZMAN:  Correct, as well as the exhibit that

3    was put in through Ms. Maali which is GX 207 -- no, it was a

4    forward I think, I don't know which one she testified to, but

5    there are three exhibits referenced on 1070 to 1072.

6                THE COURT:  Government.

7                MR. RICHENTHAL:  There's lot of case law on the idea

8    that legislators often can and do often, perfectly lawfully

9    mind you, share information with constituents or others.  And

10   that the sharing of information is not itself a legislative

11   act.  In fact, there is lots and lots of case law -- this was

12   covered in our brief back in February -- that a provision of a

13   member of Congress to an outsider "this bill is pending" kind

14   of thing is not a legislative act.  It is the sharing of

15   information.

16               THE COURT:  Is that what was happening here?  I

17   remember the document coming in, but what was happening here.

18   I think you're right.  I do remember cases that say sharing of

19   information is not a legislative act.  That part I think you're

20   right on.

21               MR. RICHENTHAL:  Yes.  And to be clear, what I

22   understand Mr. Weitzman to be saying is that it happens to be

23   that the bill was introduced by Senator Menendez.  Nothing in

24   the exhibit says that, and obviously it wasn't offered for that

25   purpose.  It was offered to show that Mr. Menendez --

1          THE COURT:  You're not going to question anyone about

2     his role in it.

3          MR. RICHENTHAL:  Absolutely not.  It's offered to

4     show, as I believe we covered two days ago, the idea that

5     Mr. Daibes' connection to Egypt.  We highlighted paragraph 8 of

6     the bill and paragraph 8 refers to Eastern Mediterranean and

7     literally talks about Egypt.

8          THE COURT:  What was the Daibes connection to the

9     bill?

10          MR. RICHENTHAL:  Mr. Menendez -- Mr. Monteleoni can

11     explain more in detail, but Mr. Menendez shared this with

12     Mr. Daibes.  And the context and timing matters, which is why

13     it's in the chart.  Mr. Monteleoni can talk about the context

14     and timing.

15          But I wanted to flag this is both covered by case law

16     and there is nothing about the exhibit that introduces the fact

17     or even inference that it in fact hit the Senate floor.  Never

18     mind who caused it to do so.

19          THE COURT:  Or that Menendez was involved in it.

20          MR. RICHENTHAL:  Correct.

21          THE COURT:  Mr. Weitzman said he had to do his own

22     digging.

23          MR. WEITZMAN:  Yes, I don't think the case law that

24     Mr. Richenthal refers to says what it says.  I agree with you

25     that sharing of information by a legislator to a constituent is

1    not itself a legislative act.

2           However, when a legislator forwards a bill he proposed

3    to anybody, it's evidence of a legislative act.  *Helstoski*,

4    your Honor's ruling was quite clear.  *Helstoski* prohibits any

5    reference or mention of legislative act.  This is squarely

6    within your Honor's ruling from last week as well as your

7    Honor's earlier ruling on our motion to dismiss.  Respectfully,

8    I don't think the fact that you forward a legislative act

9    changes the matter.  In fact, you held otherwise when you ruled

10   that certain lines have to be redacted.

11          THE COURT:  How do you square that with the case law

12   that you just agreed exists that the sharing of information is

13   not a legislative act?

14          MR. WEITZMAN:  Because the sharing of information, the

15   e-mail sharing information about other things is not the

16   legislative act.  But the legislative act embedded in the

17   e-mail is itself subject to redaction.

18          THE COURT:  It is a legislative act even though there

19   is nothing in the record, and indeed, you didn't even know that

20   he had any involvement in it.  Is that your point?

21          MR. WEITZMAN:  Yes, your Honor.  It is.

22          THE COURT:  The jury is here.  I want them to hear

23   testimony.  You can brief this issue.  So submit something to

24   me in writing and then the government can respond.

25          MR. WEITZMAN:  That's fine, your Honor.  I wanted to

O5U3MEN1

1    note our objection on speech and debate grounds, but also note

2    the following, which is I may examine the witness on that

3    document because they highlighted one paragraph.  Not the rest

4    of it.  And I don't want that to be interpreted as a waiver.

5              THE COURT:  Fine.  It won't be.

6              Let's get this jury in here.  When can you get that

7    piece to me?  Written piece.

8              MR. WEITZMAN:  On the speech and debate?

9              THE COURT:  Yes.

10             MR. WEITZMAN:  We'll get it to you tomorrow, your

11   Honor.

12             THE COURT:  All right.  The government then should

13   respond Sunday.  Monday.

14             MR. RICHENTHAL:  That's fine.

15             THE COURT:  Okay.  Let's get evidence before this

16   jury.

17             Take the stand again, sir.  How much longer do you

18   think you have, Mr. Monteleoni?

19             MR. RICHENTHAL:  Between one and two hours.  I think

20   try to keep it on the small side.

21             THE COURT:  All right.

22             (Continued on next page)

23

24

25

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.  There

3    has been a slight change in plans, ladies and gentlemen.  We'll

4    end at around 4 o'clock.

5              You may continue your direct examination.

6              And Agent Coughlin, I remind you, sir, that you remain

7    under oath.  You understand that, correct?

8              THE WITNESS:  Of course, your Honor.

9     MICHAEL F. COUGHLIN,

10        called as a witness by the Government,

11        having been previously sworn, testified as follows:

12   DIRECT EXAMINATION CONTINUED

13   BY MR. MONTELEONI:

14   Q.  Good morning, Special Agent Coughlin.

15   A.  Good morning.

16   Q.  So, yesterday we ended by reviewing part of a short text

17   chain.  I want to pick back up and remind the jury how the

18   chain started.

19              MR. MONTELEONI:  Mr. Hamill, can you please put up

20   Government Exhibit D 102-10, take us to page 1.  Now, can you

21   please expand the first -- the bottom blue bubble.

22   Q.  The text you previously testified was sent by Nadine to

23   Fred Daibes.  Can you please read this text to remind the jury.

24   A.  "Good afternoon Fred.  Sorry to bother you with this issue.

25   I have not received any checks from Wael.  Since the check that

O5U3MEN1                    Coughlin - Direct

1    was sent to the mortgage company directly.  The understanding

2    is that he would give me a check the first of every month.

3    Could you please have him leave a check in an envelope --"

4              THE COURT:  Didn't you read that yesterday, sir?

5              MR. MONTELEONI:  Yes.

6              THE COURT:  Move on.

7              MR. MONTELEONI:  The figures in this are about to be

8    referenced in another exhibit.  So I'll ask for a shorter

9    version of this text.

10   Q.  Could you please read the sentence that says "I will pick

11   it up at night" and "including October."

12             THE COURT:  The jury sees that.  The jury can see

13   that, right?  The jury is looking at it.  Next.

14             MR. MONTELEONI:  Okay.

15             So, Mr. Hamill can you please scroll down to the next

16   page.

17   Q.  And directing your attention, Special Agent Coughlin, after

18   Fred Daibes writes "Nadine, I personally gave Bob a check for

19   September.  Please send me a rundown of what you believe you

20   are owed."  I believe you testified that Nadine sends three

21   image files to Fred Daibes.

22       I want to look at those image files.  But one of those is

23   not yet in evidence.

24             MR. MONTELEONI:  We offer Government Exhibit D102-C.

25             THE COURT:  Admitted.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1              (Government's Exhibit D102-C received in evidence)

2    Q.  So, Mr. Hamill, can you please put up Government Exhibit

3    D102-A.

4              Special Agent Coughlin, how much is this cashier's

5    check for?

6    A.  $23,568.54.

7    Q.  And for the record, is this an electronic document or a

8    photograph of a physical document?

9    A.  It is a photograph of a physical document.

10   Q.  Is the cashier's check that's being photographed one of the

11   ones we looked at yesterday?

12   A.  Yes.

13             MR. MONTELEONI:  Now, let's take a look at the next

14   one.  Mr. Hamill, could you please put up Government Exhibit

15   D102-B.

16   Q.  Special Agent Coughlin, is this an electronic document or a

17   photograph of a physical document?

18   A.  This is also a photograph of a physical document.

19             MR. MONTELEONI:  And Mr. Hamill, could you please put

20   back up to the left Government Exhibit 5A-1001-A which we

21   looked at yesterday.

22   Q.  And so Special Agent Coughlin, how does this photograph

23   that Nadine is texting Daibes compare to the image of the check

24   and the bank record accounts that we looked at yesterday?

25   A.  It's the same bank, the same check number, the same bank

O5U3MEN1                        Coughlin - Direct

1    account information.  It appears to be the same check.

2    Q.  Different image quality?

3    A.  Yes.

4           MR. MONTELEONI:  Now, let's look at the last image

5    that Nadine sent after Daibes texted please send me a rundown

6    of what you believe you are owed.  Mr. Hamill, please take

7    those down and put up Government Exhibit D102-C.  Now, all

8    right.  Thank you.

9    Q.  So directing your attention to the top of the page, could

10   you please read the top three lines from "good morning" to

11   "clarifying."

12   A.  "Good morning Fred.  Thank you very much for clarifying."

13   Q.  I believe you testified yesterday that she sent these image

14   files on September 24.  About how long was it that Nadine sent

15   this image after Fred Daibes wrote "Nadine I personally gave

16   Bob a check for September, on September 23"?

17   A.  The next day.

18   Q.  Can you please go down to the bottom third of the page.

19   And read the last number at the end of the list of months.

20   A.  Yes.  It says $26,431.46.

21          MR. MONTELEONI:  Now Mr. Hamill, can you please put up

22   to one side Government Exhibit D102-10, and please show us the

23   bottom text on the first page.

24   Q.  And then directing your attention back to the handwritten

25   figures in Government Exhibit D102-C, how does the $26,431.46

O5U3MEN1                          Coughlin - Direct

1    figure handwritten here compare to the amount that Nadine had

2    said in her text the day before?

3    A.  The number and in the handwritten note is 10,000 less than

4    the check.

5    Q.  Let's look at where this lower number comes from.

6    Directing your attention to the three lines after "clarifying."

7    Can you please read -- you can take down Government Exhibit

8    D102-10, Mr. Hamill.  Thank you.

9        Special Agent Coughlin, can you please read what's written

10   on the left of those three lines after clarifying that's within

11   a bracket.

12   A.  It says May 1st, June 1st, and July 1st.

13   Q.  On the right of the bracket, covering those three months,

14   could you please read what is written.

15   A.  "July 19th cashier's check for $23,568.54 to the mortgage

16   company."

17           MR. MONTELEONI:  Mr. Hamill, can you please put up to

18   one side Government Exhibit D102-A.

19   Q.  What is the date on this cashier's check pictured in

20   D102-A?

21   A.  July 19, 2019.

22   Q.  What is the amount?

23   A.  $23,568.54.

24   Q.  How do those dates and amounts compare to what's

25   handwritten on the right of the bracket covering the months May

O5U3MEN1                        Coughlin - Direct

1  1st, June 1st, and July 1st?

2  A.  It's the same.

3  Q.  Now, on Government Exhibit D102-C, directing your attention

4  one line down the page, can you please read the line after the

5  May 1st, June 1st, July 1st, and then after the handwritten

6  line, please read the line starting July balance.

7  A.  July balance 6,431.46.

8  Q.  What is $30,000 minus $23,568.54?

9  A.  It would be 6,431.46.

10 Q.  If you were billing someone $10,000 a month for three

11 months and they paid you 23,431.46, how much would they still

12 owe you?

13           MR. WEITZMAN:  Objection, your Honor.

14           THE COURT:  I'll allow that.

15 A.  6,431.46.

16 Q.  Let's look at the next three months listed on the document.

17 Can you please read the line under July balance.

18 A.  August 1st, $10,000.

19 Q.  Can you please read the next line.

20 A.  September 1st, check number 1055.

21           MR. MONTELEONI:  Mr. Hamill, can you please take down

22 Government Exhibit D102-A, and put up D102-B to one side.

23 Q.  So, directing your attention to this check in D102-B,

24 what's the check number?

25 A.  1055.

O5U3MEN1                          Coughlin - Direct

1    Q.  What's the amount?

2    A.  $10,000.

3    Q.  And the handwriting lists check 1055 on a line that starts

4    September 1st.  What's the date of this check?

5    A.  8/30/2019.

6    Q.  And by the way, when Daibes texted Nadine that he

7    personally gave Bob a check, what month did he say the check

8    was for?

9    A.  He said it was for August or September.

10   Q.  And what's the notation in front of check 1055 on the

11   handwritten document?

12   A.  It says September 1st.

13   Q.  Now, on this handwritten document, directing your attention

14   to the line right after the line for September.  Can you please

15   read at that next line.

16   A.  October 1st, $10,000.

17   Q.  You already read that the number at the bottom is

18   26,431.46.  What is 6,431.46 plus 10,000 plus 10,000?

19   A.  They would be 26,431.46.

20   Q.  How many first days of the month are listed on these

21   documents, on this handwritten document, how many months are

22   listed with the first day of the month?

23   A.  Six total.

24   Q.  If you were charging someone $10,000 per month for six

25   months, and they paid you 23,568.54, how much would they still

O5U3MEN1                         Coughlin - Direct

1    owe you?

2    A.  36,431.46.

3    Q.  If you then found out they paid you an extra $10,000, how

4    much would they owe you instead?

5    A.  26,431.46.

6    Q.  By the way, does anything in this note indicate the author

7    of the note is going to pay anyone back 23,568.54?

8    A.  No.

9    Q.  Please read the last paragraph.

10   A.  "Once again, I am very sorry to involve you.  I thought he

11   would either mail me or give it to me personally.  Nadine."

12            MR. MONTELEONI:  Mr. Hamill, can you please take down

13   government Exhibit D102-B.  And one more thing.  Mr. Hamill,

14   could you please put back up Government Exhibit 4C-1-O page 2

15   to one side.

16   Q.  And now, directing your attention to the first paragraph

17   under consulting agreement.  What business is defined as the

18   company?

19            MR. WEITZMAN:  Your Honor, this is asked and answered

20   now.

21            MR. MONTELEONI:  This is for comparison.

22            THE COURT:  Just a moment.  I'll allow that.  Let's

23   move.

24            MR. MONTELEONI:  I'll ask a shorter question about

25   this.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  What is the date of this consulting agreement?

2    A.  Oh.  May 1st, 2019.

3    Q.  And what is the first date of the first month listed on

4    this handwritten document on the left?

5    A.  May 1st, 2019.

6    Q.  Let's look at one more thing about that May 1st date.

7             MR. MONTELEONI:  Mr. Hamill, can you please take down

8    Government Exhibit 4C-1-2 and put up to the left Government

9    Exhibit C104-AT.  And directing your attention, Mr. Hamill, can

10   you please expand the paragraph reading "greetings" down to the

11   following.  So, and can you put it down to the bottom of the

12   page, Mr. Hamill.  Thank you.

13   Q.  So, how does the date that's listed in the second-to-last

14   line of this paragraph about the suspension of beef shipments

15   to Egypt compare to the first listed date on this handwritten

16   accounting?

17   A.  It's the same.  They're both May 1st.

18   Q.  Let's look at what happens after Nadine texted Daibes these

19   images.

20            MR. MONTELEONI:  Mr. Hamill, can you please put back

21   up on Government Exhibit 1302 from yesterday.  Take us to

22   page 82.

23   Q.  Special Agent Coughlin, directing your attention to

24   line 1105, on September 27, 2019.  At 8:08 a.m., who does

25   Nadine text?

O5U3MEN1                        Coughlin - Direct

1   A.  She texts Menendez.

2   Q.  Please read what she texts him.

3   A.  "Bonjour mon amour de la vie.  I am very happy the weather

4   is good for your drive.  I am heading to the Alexander to

5   hopefully I pick up I would like that done before we go away to

6   have a clear mind."

7   Q.  Directing your attention to the next line at 9:04 a.m.  How

8   long is that after Nadine texted Menendez that she's heading to

9   the Alexander to hopefully pick up?

10  A.  It's just under an hour.

11  Q.  Please read what she texts him at 9:04 a.m.

12  A.  "I am so upset.  I just pulled over to text you.  I left

13  The Alexander.  There is an envelope from Will Apt 710 for a

14  girl, but it has a key in it and nothing for me.  What a waste

15  of a drive.  I am very very disappointed.  I thought Fred would

16  make sure it's there.  This is the second day in a row there is

17  nothing."

18  Q.  Can you please read, directing your attention to the next

19  line, 1107.  Can you please read the quoted text from Nadine to

20  Menendez at 9:05 a.m.

21  A.  "I thought after everything that happened, especially last

22  Saturday and that week, that at least he would honor his word

23  one time.  I don't know if I should text Fred or wait.  What

24  should I do?"

25  Q.  Do you remember previously testifying about messages about

O5U3MEN1                           Coughlin - Direct

1    a meeting at Lotte Palace Hotel on September 21, 2019?

2    A.  Yes.

3    Q.  And you previously testified that was a Saturday?

4    A.  Yes, that's correct.

5    Q.  On September 27, 2019, what day would have been the

6    immediately preceding Saturday?

7    A.  It would be that September 21.

8    Q.  You just read that Nadine texted Menendez "I don't know if

9    I should text Fred or wait.  What should I do?"

10          Directing your attention to the next line.  What does

11   Menendez write to Nadine?

12   A.  He says "wait."

13   Q.  About how long does he send that after Nadine writes "I

14   don't know if I should text Fred or wait.  What should I do?"

15   A.  Just a minute later.

16   Q.  Directing your attention to the next line, who does Nadine

17   leave a voicemail for at 10:11 a.m.?

18   A.  She leaves a voicemail for Robert Menendez.

19          MR. MONTELEONI:  I'd like to play that voicemail.

20   With the Court's permission, I'd like to ask Mr. Hamill to put

21   up Government Exhibit A109-A-TR as an aid to the jury.

22          THE COURT:  Yes.

23          MR. MONTELEONI:  Mr. Hamill, can you put that up and

24   play Government Exhibit A109-A.

25          THE COURT:  Same instruction as always.

O5U3MEN1                    Coughlin - Direct

1      (Audio playing)

2           MR. MONTELEONI:  Mr. Hamill, can you please take us

3    back to Government Exhibit 1302, page 82.

4    Q.  So, Special Agent Coughlin, directing your attention to

5    line 1110 at 10:19 a.m., on September 27, 2019, who does Nadine

6    text?

7    A.  She texts Menendez.

8    Q.  About how long is that after she left him the voice message

9    we just heard saying "I really want my check before going away

10   tomorrow"?

11   A.  It's eight minutes later.

12   Q.  Please read what Nadine texts to Menendez at 10:19 a.m.

13   A.  "Before going to the Alexander this morning I drove to

14   Balthazar and bought Mike two croissants.  I was going to drop

15   them off in your lobby but then I was so disappointed that I

16   turned and came to do the rest of the errands.  Please let me

17   know if I should text Fred.  I am very very upset and want this

18   resolved before we go away tomorrow."

19   Q.  Directing your attention to the next line.  10:20 a.m.  How

20   long after Nadine's text did Menendez send a text in response?

21   A.  The next minute.

22   Q.  Please read what Menendez texted to Nadine one minute after

23   she texted "Please let me know if I should text Fred.  I'm very

24   very upset and want this resolved before we go away tomorrow."

25   A.  "No, you should not text or e-mail."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Did Menendez's text say that Nadine should not call Daibes?

2              MR. WEITZMAN:  Objection, your Honor.

3              THE COURT:  Sustained.

4    Q.  Directing your attention to the next two lines, who does

5    Nadine call that afternoon?

6    A.  She calls Fred Daibes.

7              MR. MONTELEONI:  And directing your attention, Mr.

8    Hamill, can you please take us to page 83.

9    Q.  Directing your attention to line 1114.  On September 27,

10   2019, at 2:10 p.m., please read just the first word in the

11   detail cell.

12   A.  "Voicemail."

13             MR. MONTELEONI:  Let's play the voicemail.  With the

14   Court's permission I'd like to ask Mr. Hamill to display

15   Government Exhibit D111-A-TR as an aid to the jury.

16             THE COURT:  Same instruction.

17             MR. MONTELEONI:  Mr. Hamill, you can display that and

18   play D111-A.

19             (Audio playing)

20   Q.  So, now, let's look at something that happens the next day.

21             MR. MONTELEONI:  Mr. Hamill, can you please put up

22   Government Exhibit 5A-1001B.

23   Q.  Special Agent Coughlin, who is this check from and who is

24   it to?

25   A.  It's from IS EG Halal Certified Inc., it's to Strategic

O5U3MEN1                    Coughlin - Direct

1   Intl. Business Consultants.

2   Q.  How much is it for?

3   A.  $10,000.

4   Q.  You testified that Nadine left the voicemail for Daibes on

5   September 27, 2019.  What's the date on the check?

6   A.  September 28, 2019.

7   Q.  Directing your attention to the lower-left corner of the

8   check.  Can you please read the memo line.

9   A.  "October payment WH/NA."

10  Q.  Let's go back to the timeline.

11          MR. MONTELEONI:  Mr. Hamill, can you please put back

12  up Government Exhibit 1302, page 84.

13  Q.  Special Agent Coughlin, directing your attention to

14  line 1123.  On November 4, 2019 at 12 p.m., can you please read

15  what Daibes texted to Menendez.

16  A.  "Hey Bob are you in town."

17  Q.  Directing your attention to the next line at 12:04 p.m.

18  Can you please read Menendez's response.

19  A.  "I was but I am headed back to D.C."

20  Q.  Directing your attention to the next line at 12:06 p.m.,

21  can you please read Daibe's reply.

22  A.  "Okay.  When will you be back.  I have the envelope for

23  Nadine."

24  Q.  Please read what Menendez writes to Daibes at 4:47 p.m.?

25  A.  "Anything you need to send her you can send to 41 Jane

O5U3MEN1                          Coughlin - Direct

1    Drive, Englewood Cliffs, New Jersey 07632."

2    Q.  What date were those texts?

3    A.  November 4.

4            MR. MONTELEONI:  Let's go down two lines to line 1128.

5    Then actually, let's just put up, Mr. Hamill, if you would,

6    Government Exhibit 5 A-1001C.

7    Q.  Special Agent Coughlin, who is this check from and who is

8    it to?

9    A.  This check is also from IS EG Halal Certified Inc.  And it

10   is also to Strategic Intl. Business Consultants.

11   Q.  How much is it for?

12   A.  It is for $10,000.

13   Q.  What is the date on the check?

14   A.  11/5/2019 I believe.  It could be a 6 but I think it is

15   11/5/2019.

16   Q.  So, about how long is that after Daibes texted Menendez "I

17   have the envelope for Nadine" which you testified was

18   November 4, 2019?

19   A.  The next day.

20   Q.  I'd like to start moving a bit more quickly.  Let's go back

21   to the timeline.

22           MR. MONTELEONI:  Mr. Hamill, please put back up

23   Government Exhibit 1302, page 85.

24   Q.  Directing your attention to line 1130.  January 2, 2020.

25   Who texts Nadine Arslanian?

O5U3MEN1                        Coughlin - Direct

1   A.   Ahmed Helmy.

2   Q.   Can you please read what Helmy writes.

3   A.   "I have been instructed from my boss in Cairo to start

4   talks with Foad regarding what was discussed in NY about

5   Egyptian investments in U.S.A.  And since I met him through you

6   and Bob, I just want to let you know that I will contact him at

7   the next week."

8   Q.   Where Helmy says he's been instructed to start talks with

9   Foad regarding what was discussed in NY about Egyptian

10  investments in U.S.A., where was the meeting that Hana, Helmy,

11  Menendez, and Daibes texted about on September 21, 2019?

12  A.   That was in New York City.

13             MR. MONTELEONI:  By the way, where it discusses

14  starting talks on Egyptian investments in the U.S.A.,

15  Mr. Hamill, can you please put up to one side Government

16  Exhibit C408.

17  Q.   Now, Special Agent Coughlin, on this July 11, 2018, e-mail

18  that Hana sent to Helmy, can you please read the second

19  numbered item that Hana says Fred Daibes was interested in.

20  A.   "To invest in real estate developments in the United States

21  with an Egyptian company."

22             MR. MONTELEONI:  You can take down Government Exhibit

23  C408, Mr. Hamill.  Thank you.

24  Q.   Special Agent Coughlin, directing your attention to the

25  next line, can you please read Nadine's response on January 2,

O5U3MEN1                    Coughlin - Direct

1   2020 at 4:58 p.m.

2   A.  "Hi.  Thank you for your honesty and loyalty.  I hope 2020

3   will be a fabulous year for all of us.  I wish you a very very

4   happy new year and look forward to seeing you soon and even

5   planning a trip to Egypt."

6   Q.  Directing your attention a few lines down January 30, 2020,

7   at 4:28 p.m. can you please read what Nadine texts Menendez.

8   A.  "P.S. you haven't checked up on me once yet today on the

9   app."

10  Q.  Directing your attention to 9:23 p.m.  Can you please read

11  the quoted language that Nadine texts to Menendez.

12  A.  "You made my night again" three exclamation points.  "I

13  pressed okay.  Having tea now."

14  Q.  Let's look briefly of what she attaches.

15          MR. MONTELEONI:  Mr. Hamill, can you please put up

16  Government Exhibit A101-K.

17  Q.  Special Agent Coughlin, can you please read the text in the

18  dialogue box.

19  A.  "Robert Menendez will be notified the next time you leave

20  29-39 Union Street."

21  Q.  Let's go ahead a couple of months.

22          MR. MONTELEONI:  Mr. Hamill, can you please take us

23  back to Government Exhibit 1302 and go to page 85.

24  Q.  So Special Agent Coughlin, directing your attention to

25  line 1135 on March 14, 2020 at 6:01 p.m.  Can you please read

O5U3MEN1                    Coughlin - Direct

1   the first three sentences of what Nadine texts to Ahmed Helmy

2   up to "check the time."

3   A.  "It was very nice speaking to you.  Bob said he will let me

4   know the schedule once he gets to Washington on Monday

5   afternoon.  Tuesday or Wednesday are both possible, he just has

6   to check the time."

7   Q.  Can you please read the last sentence.

8   A.  "Looking forward to catching up and any time you need

9   anything you have my number and we will make everything

10  happen."

11          MR. MONTELEONI:  Mr. Hamill, can you please take us

12  back to "we're already here."  Sorry.

13  Q.  So directing your attention to line 1136.  Can you please

14  read what Nadine texts to Menendez on March 16, 2020 at

15  9:31 p.m.

16  A.  "I'm not sure if you looked at your schedule but maybe you

17  want to have the meeting with the general over the phone."

18  Q.  Directing your attention to the next line.  What does

19  Nadine text Menendez at 3:13 p.m.?

20  A.  She sends the contact information for General Ahmed which

21  contains Helmy's phone number.

22          MR. MONTELEONI:  And Mr. Hamill, can you please just

23  put up to one side Government Exhibit A101-L.

24  Q.  So, this phone number that's listed under the name General

25  Ahmed, does that correspond to the number associated with Helmy

O5U3MEN1                         Coughlin - Direct

1   in the chart that we've been discussing?

2   A.  It does, yes.

3          MR. MONTELEONI:  You can take down Government Exhibit

4   A101-L, Mr. Hamill.  Thank you.

5   Q.  So directing your attention to line 1138.  Can you please

6   read what Nadine texts to Menendez at 5:05 p.m.

7   A.  "Mon amour any decision with the general?"

8   Q.  Directing your attention to 5:27 p.m.  Can you please read

9   Menendez's response?

10  A.  "Spoke to him.  Will see him tomorrow."

11         MR. MONTELEONI:  Now, Mr. Hamill, can you please take

12  us to page 86.

13  Q.  Directing your attention to line 1141.  Can you please read

14  what Nadine texts Menendez at 7:01 p.m. on March 17 of 2020.

15  A.  "Not sure if this is important.  Enjoy your dinner."

16  Q.  Please read the description of what's attached.

17  A.  "Sends PDF of full text of Egypt, Sudan and Ethiopia

18  declaration of principles regarding dispute over Grand

19  Ethiopian Renaissance Dam."

20  Q.  Directing your attention to April 28, 2020 at 5:19 p.m.

21  What does a person named Sarah Arkin attach to the e-mail that

22  she sends?

23  A.  "Attaching letter from Robert Menendez to Treasury

24  Secretary Steven Mnuchin, Secretary of State Mike Pompeo,

25  beginning I am writing to express my concern about the stalled

1   negotiations between Egypt, Ethiopia, and Sudan over the Grand

2   Ethiopia Renaissance Dam, and stating I therefore urge you to

3   significantly increase the State Department's engagement on

4   negotiations surrounding the GERD."

5   Q.  Is the GERD also listed as abbreviation for Grand Ethiopia

6   Renaissance Dam?

7   A.  It is, sorry.

8   Q.  Directing your attention to June 24, 2020.  Who does Nadine

9   leave a voicemail for?

10  A.  Menendez.

11          MR. MONTELEONI:  Let's play this voicemail.  With the

12  Court's permission I'd like to ask Mr. Hamill to put up

13  Government Exhibit A108-B-TR.

14          THE COURT:  Same instruction.

15          MR. MONTELEONI:  You can play Government Exhibit

16  A108-B when you're ready.

17          (Audio playing)

18          MR. MONTELEONI:  Mr. Hamill, can you please take us

19  back to Government Exhibit 1302 and put up page 86.

20  Q.  Directing your attention to line 1146, Special Agent

21  Coughlin.  Directing your attention to September 28, 2020, at

22  2:47 p.m.  Please read what Helmy texts Nadine.

23  A.  "Hello Nadine.  How are you and how is Bob.  Hope you are

24  both doing great.  Long time since we met.  What about having a

25  dinner any time next at your convenience.  All the best, stay

O5U3MEN1                    Coughlin - Direct

1    safe.  Ahmed."

2    Q.  And directing your attention two lines down at 7:15 p.m. on

3    October 6, 2020, can you please read what now Nadine Menendez

4    texts Helmy.

5    A.  "Hi hope you are well.  Does 7 p.m. at River Palm work for

6    you on Thursday?"

7         MR. MONTELEONI:  Turning to page 87 if you would,

8    Mr. Hamill.  Thank you.

9    Q.  And directing your attention to the next line, October 6,

10   2020, at 9:16 p.m., could you please read Helmy's response.

11   A.  "Hi Nadine.  Congratulations.  Yes, it works great.  My

12   colleague Mai will be with me.  She arrived three weeks ago and

13   likes very much to meet you and Bob."

14   Q.  Directing your attention to October 9, 2020 at 3:45 p.m.

15   Can you please read what Nadine Menendez writes to Helmy.

16   A.  "Good afternoon.  Thank you very much for last night.  I

17   hope you had a safe and easy drive back.  It was very nice

18   meeting Mai.  I realized you must have been in meetings when I

19   called to thank you this morning.  I have had a meeting after

20   meeting today through tonight.  I will call to personally thank

21   you tomorrow.  Have a great evening."

22   Q.  So you just read Helmy and Nadine Menendez referring to a

23   Mai who Helmy described as his colleague.  Were you shown any

24   documents involving communications with anyone named Mai or

25   Mai?

O5U3MEN1                    Coughlin - Direct

1    A.  Yes.

2    Q.  Directing your attention to October 20, 2020 at 11:14 a.m.

3    Who sends a WhatsApp message to Nadine Menendez?

4    A.  Mai Abdelmaguid.

5         MR. MONTELEONI:  Mr. Hamill, can you please put up

6    Government Exhibit 1430, page 3.

7         I'll now read from paragraph 19.  The document marked

8    for identification as Government Exhibit 2A-20 is a true and

9    accurate photograph of Mai Abdelmaguid.

10        Mr. Richenthal, can you please put up Government

11   Exhibit 2A-20 on the board with the name.  And Mr. Hamill, can

12   you please take us back to Government Exhibit 1302, page 86.

13   Directing your attention back to -- hold on.  Page 87.

14   Q.  So directing your attention to line 1154.  At 11:14 a.m. on

15   October 20, 2020, can you please read the WhatsApp message that

16   Mai Abdelmaguid sends to Nadine.

17   A.  "Hi Nadine.  Hope you are doing great.  Need you advice

18   about a trusted hair salon over here.  I've been struggling.

19   Hope to see you soon."

20   Q.  Directing your attention to 11:22 a.m., what does

21   Abdelmaguid text to Nadine Menendez as a text?

22   A.  Yes, she then texts that same message.

23   Q.  Directing your attention to October 20, 2020 at 3 p.m., who

24   does Nadine Menendez text?

25   A.  She texts Robert Menendez.

O5U3MEN1                        Coughlin - Direct

1    Q.  Can you please read just the first sentence of the message

2    up to "Washington, D.C."

3    A.  "The lady who gave me the scarf wants a name of a hair

4    salon in Washington, D.C."

5    Q.  Was this message from Nadine Menendez to Menendez referring

6    to the lady who gave me a scarf before or after Nadine Menendez

7    texted Helmy using Mai's name?

8    A.  It was after.

9            MR. MONTELEONI:  Mr. Hamill can you please put up --

10   well, sorry.

11   Q.  Just directing your attention to the next line, does

12   Menendez send Nadine Menendez some hair salon information?

13   A.  Yes, he does.

14           MR. MONTELEONI:  Can you scroll down briefly

15   Mr. Hamill, please.

16   Q.  Does who does Nadine send that hair salon information to?

17   A.  She then sends it to Mai.

18   Q.  Directing your attention to on page 88, just expand the

19   whole page 88.  Directing your attention to line 1160.  On

20   December 7, 2020 at 5:07 p.m., can you please read what Nadine

21   sends to Menendez.

22   A.  "NordicTrack SMR One Touch Controls.  That is my

23   elliptical.  Cost me with the padded mat under it about $1600."

24   Q.  Can you please read what Nadine sends to Menendez two

25   minutes later.

1  A.  "This is what Ro just sent me hers.  I sent the picture of

2  yours to the guy that orders elliptical to look it up.  I'm

3  going to the office tomorrow at noon to order it.  I will

4  confirm before placing the order with you."

5  Q.  Does Nadine identify who the guy who orders elliptical is?

6  A.  No.

7  Q.  I'm not going to ask you to read the next few lines but do

8  they include several messages between Nadine and Helmy?

9  A.  Yes.

10           MR. MONTELEONI:  So, if we could go down to the next

11  page, Mr. Hamill, to line 1173.  Here on page 89.

12  Q.  Can you please read the first sentence of what Nadine texts

13  to Helmy.

14  A.  "It was so nice seeing you and Mai last night."

15  Q.  Directing your attention two lines down on January 12,

16  2021.  Who sends Wael Hana a WhatsApp message?

17  A.  Rony Daibes.

18  Q.  Please read the quoted text that Rony Daibes writes to

19  Hana.

20  A.  "Okay.  Nadine finally decide to take this one."

21  Q.  About how long was that after Nadine sent Menendez a text

22  saying she sent a picture to the guy who orders elliptical on

23  December 7, 2020?

24  A.  It was a little over a month.

25  Q.  Directing your attention to the next line, 1176.  Let's

O5U3MEN1                    Coughlin - Direct

1    look at the image that the chart reflects that Rony Daibes sent

2    to Hana.

3            MR. MONTELEONI:  Mr. Hamill, can you please put up

4    Government Exhibit C213-A.

5            THE COURT:  The jury sees.  It next question.

6    Q.  Yes.  Directing your attention to the right-hand side of

7    the page.  A few lines under the words BowFlex Max Trainer

8    Series.  Please read the red amount after bundle price.

9    A.  2,358.99.

10           MR. MONTELEONI:  Let's go back to the timeline.  Can

11   you take us back to page 89 of Government Exhibit 1302,

12   Mr. Hamill.

13   Q.  Directing your attention to line 1177.  Can you please read

14   what Hana writes to Rony Daibes at 1:19 p.m. on January 12,

15   2021.

16   A.  He writes "how much."

17           MR. MONTELEONI:  Mr. Hamill, can you please take us to

18   page 90.

19   Q.  Special Agent Coughlin, please read the next six messages

20   from Rony Daibes to Hana at 1:19 p.m. in order.  That's lines

21   1178 to 1183.

22   A.  "Save you $2,000 from the other one because she don't want

23   to wait another four weeks.  2,358.  Other one at Alexander is

24   4,000.  So this is cheaper and residential.  It's very good

25   believe me.  Since can buy on Amazon I am will let Christina

O5U3MEN1                      Coughlin - Direct

1  buy it."

2  Q.  Directing your attention to the last message listed at

3  1:19 p.m.  Can you please read Hana's response online 1184.

4  A.  "Okay.  Use my AmEx."

5  Q.  Directing your attention to lines 1185 and 1186.  Can you

6  please read the two messages that Rony Daibes sends to Hana in

7  order.

8  A.  "I will give Christina address for Nadine."

9  Q.  Directing your attention to row 1190.  Can you please read

10 what Hana writes to Rony Daibes.

11 A.  "Send it to her house."

12 Q.  Directing your attention to 1:28 p.m. on line 1191.  And

13 who does Rony Daibes e-mail?

14 A.  Nick D'Alessio and Christina Sinisi.

15 Q.  Please read the quoted text from the e-mail.

16 A.  "There is an elliptical for Nadine in Amazon cart.  Needs

17 to be ordered and shipped ASAP as per Will's request."

18 Q.  Let's go forward a month.

19            MR. MONTELEONI:  Mr. Hamill, can you please take us

20 to, we're on page 90.  Sorry.

21 Q.  Directing your attention to line 1197.  Can you please read

22 the first word in the details cell of this entry from

23 February 19, 2021, at 5:27 p.m.

24 A.  "E-mail."

25 Q.  Look at the e-mail.

O5U3MEN1                    Coughlin - Direct

1          MR. MONTELEONI:  Mr. Hamill, can you please put up

2     Government Exhibit 3C-11.

3     Q.  So, directing your attention to the top.  Who is the e-mail

4     from?

5     A.  It's from service@PayPal.com.

6     Q.  What is the display name of the user in the "to" line?

7     A.  Wael Hana.

8     Q.  What is the e-mail address of the user in the "to" line?

9     A.  Admin@ISEGHalal.com.

10          MR. MONTELEONI:  Mr. Hamill, can you please scroll

11     down a little bit.

12     Q.  Special Agent Coughlin, can you please read the large

13     letters in the middle of the page starting "you paid."

14     A.  "You paid 2,749 USD to Huntsville Fitness Equipment LLC."

15     Q.  Directing your attention near the bottom of the page in the

16     second column.  Can you please read the two words under the

17     bold payment from text.

18     A.  "Wael Hana."

19     Q.  Directing your attention to the first column.  Near the

20     bottom, can you please read the first line under the bold

21     shipping address.

22     A.  "Nadine Menendez."

23     Q.  Whose street address is listed there?

24     A.  That's her address.

25          MR. MONTELEONI:  Mr. Hamill, can you please take us to

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O5U3MEN1                    Coughlin - Direct

1  the top of page 2.

2  Q.  So, Special Agent Coughlin, directing your attention to the

3  item line, can you please read what is listed after item.

4  A.  "Vision Fitness S7100 HRT Suspension Trainer."

5  Q.  Now, is that the same brand name or a different brand name

6  as the one we saw the picture of the screen image for a few

7  minutes ago?

8  A.  It's different.

9            MR. MONTELEONI:  Mr. Hamill, can you please put up to

10  the left Government Exhibit 1F-1044.  Can you please zoom in in

11  the lower-left corner of that photograph on the gray

12  cylindrical portion of the exercise machine including both of

13  the black ovals.

14  Q.  Special Agent Coughlin, can you read the black oval near

15  the bottom or do you need it to be enhanced more?

16  A.  It says "Vision."

17  Q.  Can you read the top, the smaller black oval up near the

18  upper left curve of the wheel thing.

19  A.  Yes.  Thank you.  It says "S7100 HRT."

20  Q.  How do those compare to the brand name and model number of

21  the item that's listed in the PayPal account?

22  A.  The Vision is the same and the item is the same.

23  Q.  Can you put back up 1392 and take us to page 90.

24            Directing your attention to March 3, 2021, at

25  10:37 p.m., who does Nadine text?

1    A.   Robert Menendez.

2    Q.   Please read what she writes to Menendez.

3    A.   "Your elliptical will be put together at 9 a.m. Monday

4    morning.   And the plumber is coming with Nader tomorrow at

5    5 p.m. to do the bathroom tub."

6              MR. MONTELEONI:  Let's look a few days ahead.  First,

7    Mr. Hamill, can you please put up Government Exhibit 1435, take

8    us to the bottom of page 14, top of page 15.  I'm now going to

9    read paragraph 14.

10             The documents marked for identification as Government

11   Exhibits C201 through C218, including documents marked with

12   numbers within that range with the suffixes WD or EX are true

13   and correct copies of records extracted from data files the FBI

14   lawfully obtained from Apple pursuant to a court-authorized

15   search warrant for the contents of an iCloud account with

16   registration e-mail Getty440@yahoo.com which is associated in

17   Apple records with the phone number of the Hana cell phone.

18   The iCloud account with registration e-mail Getty440@yahoo.com

19   is referred to in this stipulation as the Getty440 iCloud

20   account.

21             The government now offers Government Exhibit C218-1, a

22   subpart of Government Exhibit C218.

23             THE COURT:  Admitted.

24             (Government's Exhibit C218-1 received in evidence)

25             MR. MONTELEONI:  Mr. Hamill, can you please put up

O5U3MEN1                         Coughlin - Direct

1    Government Exhibit C218-1.  Can you please expand the bottom

2    text message.

3    Q.  So first, when does the person identified as Nick IS EG

4    send this message to the user of the Getty 440 iCloud account?

5    A.  March 19, 2021, at 11:56 a.m.

6    Q.  Please read what Nick IS EG the user sends to the Getty 440

7    iCloud account.

8    A.  "Let me know if you'd like to talk when you land.  Nadine

9    asked if we could drop off air purifier at her home.  I was

10   going to do it but wanted to run through you first."

11          MR. MONTELEONI:  Now, the government offers Government

12   Exhibit 7N-1 subject to connection.

13          The government offers Government Exhibit 7N-1 subject

14   to connection.

15          THE COURT:  Admitted subject to connection.

16          (Government's Exhibit 7N-1 received in evidence)

17          MR. MONTELEONI:  Mr. Hamill, can you please put up

18   Government Exhibit 7N-1.  So, currently we're on line 801 of

19   this Excel spreadsheet.  We are going to come back to that line

20   but first can you take us to the top so we can see the section

21   headings.

22   Q.  Directing your attention to the headings, Special Agent

23   Coughlin.  Can you please read the heading for column A.

24   A.  "Site."

25   Q.  Please read the heading for column B.

O5U3MEN1                    Coughlin - Direct

1    A.   "Order date."

2    Q.   Please read the heading for column E.

3    A.   "Customer e-mail."

4    Q.   Please read the heading for column F.

5    A.   "Customer name."

6    Q.   Please read the -- Mr. Hamill can you please take us over

7    and show us column J.

8           Please read the heading for column J.

9    A.   "Item description."

10   Q.   Please take us over to column R, Mr. Hamill.

11          Please read the heading for column R.

12   A.   "Total charged to buyer."

13          MR. MONTELEONI:  Now Mr. Hamill, can you please take

14   us down to row 801 and go over to column A.

15   Q.   So on the row 801, Special Agent Coughlin, can you please

16   read what's listed in column A which you testified is the site

17   column.

18   A.   Amazon.com.

19   Q.   Please read the value in column B which you testified is

20   the order date column.

21   A.   March 16, 2021.

22   Q.   Please read the value in column F which you testified is

23   the customer name column.

24   A.   Wael Hana.

25   Q.   Going back one, please read the value in column E which you

O5U3MEN1                          Coughlin - Direct

1    testified is the customer e-mail column.

2    A.  Iseghalal@Outlook.com.

3           MR. MONTELEONI:  Mr. Hamill, can you please show us

4    column J.

5    Q.  So, you testified, Special Agent Coughlin, this is the item

6    description column.  I'm not going to ask you to read the whole

7    long description.  But can you please read the first three

8    words.

9    A.  "Blueair air purifier."

10          MR. MONTELEONI:  Mr. Hamill, can you please show us

11   column R.

12   Q.  Special Agent Coughlin, can you please read column R which

13   you testified is the total charged to buyer column.

14   A.  USD 541.63.

15   Q.  Let's move forward a few months.

16          MR. MONTELEONI:  Mr. Hamill, can you please put back

17   up Government Exhibit 1302, page 90.

18   Q.  Directing your attention to lines 1199 and 1200.  Can you

19   please read the two texts that Mai Abdelmaguid sends to Nadine

20   in order.

21   A.  "On another note, please let chairman know that I had a

22   meeting with General Abbas yesterday and he is very keen to

23   meet him soon and is renewing his invigorate both of you to

24   visit Egypt at your convenience."  The next line says "renewing

25   his invitation.  Sorry for the typing mistake."

O5U3MEN1                        Coughlin - Direct

1          MR. MONTELEONI:  Your Honor, we also offer Government

2    Exhibit 7N-2 subject to connection.

3          THE COURT:  Admitted.

4          (Government's Exhibit 7N-2 received in evidence)

5    Q.  So, let's jump ahead a month.

6          MR. MONTELEONI:  Mr. Hamill, can you please take us to

7    page 91 of Government Exhibit 1302.

8    Q.  Directing your attention to June 15, 2021.  11:07 a.m.

9    Please read what Mai texts to Nadine.

10   A.  "Hi Nadine.  I really don't want to be nagging and I know

11   how busy he is, but hope to here from the chairman any time

12   today because folks in Egypt are pressuring me for any updates.

13   I am still young to loose my job."

14   Q.  Directing your attention to 11:16 a.m., how long is that

15   after Abdelmaguid texts Nadine?

16   A.  It's nine minutes later.

17   Q.  Who does Nadine leave a voicemail for?

18   A.  For Menendez.

19         MR. MONTELEONI:  Let's listen to the voicemail.

20   Mr. Hamill, with the Court's permission, I'd like to ask you to

21   put up Government Exhibit 8211-A-TR as an aid to the jury.

22         THE COURT:  Proceed.  Same instruction.

23         MR. MONTELEONI:  And Mr. Hamill, if can you play

24   Government Exhibit A211-A.

25         (Audio playing)

O5U3MEN1                    Coughlin - Direct

1          MR. MONTELEONI:  Mr. Hamill, can you please put up

2    page 91 of Government Exhibit 1302.

3    Q.  Directing your attention to 11:18 a.m., can you please read

4    what Nadine texts Abdelmaguid on line 1204.

5    A.  "Never a bother.  I just called him.  He text me he's in a

6    hearing.  He will call you as soon as the hearing is over.  His

7    train got delayed yesterday it stopped on the tracks.  It's

8    never ever a nag or a problem."

9    Q.  Directing your attention to 7:06 p.m., on June 15, 2021.

10   How long is that after Abdelmaguid first texted Nadine that

11   day?

12   A.  It's about eight hours later.

13   Q.  Can you please read what Abdelmaguid texted Nadine later

14   that day at 7:06?

15   A.  "Hi Nadine can you please pass to the chairman that we

16   confirm the members meeting to be to on 22nd at 12 as he

17   proposed.  Thanks."

18   Q.  Directing your attention to line 1206 at 10:38 p.m., on

19   June 16, 2021, can you please read the first three lines of

20   what Abdelmaguid texts to Nadine.

21   A.  "The info.  Abbas Kamel chief of general intelligence

22   service."

23   Q.  Directing your attention to the next line, who does Nadine

24   text three minutes after Abdelmaguid texts her?

25   A.  She texts Robert Menendez.

O5U3MEN1                          Coughlin - Direct

1   Q.   I'm not going to ask you to read it out again.  What does

2   she text him?

3   A.   The same message that Mai had texted her.

4   Q.   Directing your attention to the next day, June 17, 2021, at

5   1:28 p.m.  Please read the description of what Robert Kelly

6   e-mails to multiple Senate staffers.

7   A.   "Inviting six senators to a members only meeting with Abbas

8   Kamel on June 22 at 12 p.m. in room S-116 of the capitol."

9   Q.   So, let's look what happened the day before the meeting.

10  Turning to page 92.  Directing your attention to line 1210, on

11  June 21, 2021 at 4:12 p.m.  Please read the quoted text from

12  Nadine Menendez to Robert Menendez.

13  A.   "Thanks for caring.  I am sure it will go well because you

14  organized it.  Please let us know when the chairman will be on

15  his way so I wait for his excellency at the hotel entrance.

16  Meeting will be in the meeting room connected to the

17  presidential room and dinner will be at a private room called

18  Lincoln."

19        MR. MONTELEONI:  Mr. Hamill, can you please scroll

20  back up halfway up the page for a moment, please.

21  Q.   And sorry, directing your attention to the preceding line,

22  did Mai Abdelmaguid text that same message to Nadine before

23  Nadine texts it to Menendez?

24  A.   Yes.

25  Q.   So, now, going down to line 1211, if can you scroll us down

O5U3MEN1                    Coughlin - Direct

1    there, Mr. Hamill, thank you.

2              Directing your attention to 10:08 p.m. on June 21,

3    2021.  First, about how long after that, how long is that after

4    the 4:12 p.m. message that Nadine sent to Menendez about the

5    waiting for his excellency at the hotel entrance and the

6    meeting in a meeting room connected to the presidential room?

7    A.  It's a little under six hours.

8    Q.  So, directing your attention to that line.  Can you please

9    read the file name of the document that Menendez texts to

10   Nadine.

11   A.  YahoostoryAbbasKamelKhashoggi.docx.

12   Q.  Let's look at this document.  Can you please put up A103-A.

13   Directing your attention to the top of the page.  Can you

14   please read the top two lines.

15   A.  "Egyptian intelligence chief to face questioning over

16   alleged involvement in Khashoggi killing."

17   Q.  On the fifth line, please read the date in gray.

18   A.  Monday, June 21, 2021.

19   Q.  How does that compare to the date of the scheduled June 22

20   meeting that we saw the e-mail invitation about?

21   A.  The day before.

22   Q.  Can you please read the first paragraph under the dateline.

23   A.  "A human rights group is calling on members of Congress to

24   interrogate the chief of Egyptian intelligence on Tuesday about

25   a Yahoo News report that a Saudi plane carrying a team of

O5U3MEN1                    Coughlin - Direct

1    assassins stopped in Cairo in October 2018 to pick up illicit

2    drugs that were used to kill journalist Jamal Khashoggi."

3            MR. MONTELEONI:  Can you please scroll down,

4    Mr. Hamill, to the bottom of this first page of Government

5    Exhibit A103-A.

6    Q.  Now, directing your attention to the paragraph beginning

7    Abbas Kamel.  Can you please read that paragraph.

8    A.  "Abbas Kamel, the chief of Egyptian intelligence, is

9    visiting Washington this week to meet with U.S. intelligence

10   officials as well as members of the Senate Foreign Relations

11   Committee.  Staffers told Yahoo News that a number of senators

12   are preparing to ask Kamel about the Cairo stopover, the

13   subject of a Washington Post editorial on Sunday, and whether

14   Egyptian intelligence officials delivered or helped facilitate

15   the delivery of the drugs."

16   Q.  Let's see what happens next.

17           MR. MONTELEONI:  Mr. Hamill, can you please put up

18   1302, page 92.

19   Q.  Directing your attention to line 1212 on June 21, 2021, the

20   line after Robert Menendez sends her the article, what does

21   Nadine Menendez do?

22   A.  She sends it to Mai Abdelmaguid.

23   Q.  Now, this entry says she sends a file with that file name,

24   with the same file name.  Were you able to actually access the

25   file itself?

O5U3MEN1                        Coughlin - Direct

1    A.  In that case, no.

2    Q.  How did the file name of the document that she texted to

3    Abdelmaguid compare to the file name of the document that

4    Menendez texted to Nadine?

5    A.  Yes, we couldn't see the actual file, but the file name is

6    the same.

7    Q.  Directing your attention to 10:32 p.m., can you please read

8    what Abdelmaguid says in response.

9    A.  "Thanks you so much.  Chairman also raised it today.  We

10   appreciate it."

11   Q.  Please remind the jury what Menendez's position on the SFRC

12   was?

13   A.  He was, he was I believe he was either chairman or the

14   senior Democrat.

15          THE COURT:  That's either chair or ranking member; is

16   that correct?

17          THE WITNESS:  Yes.

18   Q.  So, how long did Abdelmaguid text "Thanks you so much.

19   Chairman also raised it today" after Nadine texted Menendez

20   "Please let us know when the chairman will be on his way so I

21   wait for his excellency at the hotel entrance"?

22   A.  It was about six hours.

23   Q.  Directing your attention to the first 10:34 p.m. line,

24   line 1214, what does Nadine write to Abdelmaguid two minutes

25   after Abdelmaguid says "Thanks you so much chairman also raised

O5U3MEN1                           Coughlin - Direct

1   it today"?

2   A.   "Wanted to give you a heads up so you can prepare your

3   answers."

4   Q.   Directing your attention to the next line, can you please

5   read Abdelmaguid's response.

6   A.   "Great you did."

7            MR. MONTELEONI:   Mr. Hamill, can you please scroll

8   down to show 1219.

9   Q.   So directing your attention to June 22, 2021, 6:42 p.m.,

10  how does that time compare to the 12 p.m. time that the members

11  were invited for?

12  A.   It's almost seven hours later.

13  Q.   What does Abdelmaguid write at 6:42 p.m. to Nadine?

14  A.   She writes "Just wanted to let you know, the meeting went

15  very well today."

16           MR. MONTELEONI:   Turning to page 93, Mr. Hamill, if

17  you would.

18  Q.   Directing your attention to June 22, 2021.  At 9:11 p.m.,

19  can you please read the quoted text from Nadine's response to

20  Abdelmaguid.

21  A.   "I truly hope the information that I sent you last night

22  was helpful.  I just thought it would be better to know ahead

23  of time what is being talked about and this way you can prepare

24  your rebuttals."

25  Q.   Directing your attention to the next line.  Can you please

1    read the details cell.  You can skip the serial numbers.

2    A.  "Check from Wael L. Hana to Awad Jewelry for $40,810.  Memo

3    buy gold 22 shown in IS EG Halal photograph along with

4    10 1-ounce Asahi gold ingots" with serial numbers.

5    Q.  There is also a quick mathematical equation at the very end

6    which I'm not going to ask you about yet but we'll come back

7    to.

8            Let's look at one of these photographs that's

9    referenced on this line.

10           MR. MONTELEONI:  Mr. Hamill, can you please put up

11   Government Exhibit 3C-20.

12   Q.  So Special Agent Coughlin, directing your attention to the

13   check image near the bottom of the page.  You can zoom in on

14   that, Mr. Hamill, thank you.  Can you please read the name in

15   the upper-left corner of the check.

16   A.  Wael L. Hana.

17   Q.  And the handwritten date on the check?

18   A.  6-23-21.

19   Q.  How does that date compare to the June 22, 2021, date of

20   the meeting between Kamel and the other senators?

21   A.  It is the next day.

22   Q.  How much is the check for?

23   A.  $40,810.

24   Q.  Who is it to?

25   A.  Awad Jewelry.

O5U3MEN1                        Coughlin - Direct

```
 1   Q.  Please read the memo line of the check.
 2   A.  "Buy gold 22."
 3          MR. MONTELEONI:  Now, Mr. Hamill, can you please
 4   expand the portion of the photo showing the gold ingots
 5   themselves.  And just expand the top half of the photo.
 6   Q.  Special Agent Coughlin, can you please read the refiner
 7   name?
 8   A.  "Asahi Refining."
 9          MR. MONTELEONI:  And if you could expand the top left
10   gold ingot, Mr. Hamill, please.
11   Q.  On the gold ingots below the box reading "Fine gold 9999,"
12   please read the next line on the bars.
13   A.  "1 ounce troy."
14   Q.  Now we have to come back to this arithmetic equation.
15          MR. MONTELEONI:  Mr. Hamill, can you please put up to
16   one side Government Exhibit 1302 page 93.  Directing your
17   attention -- can you please expand the detail cell.
18   Q.  So can you please read the quick math in the end of the
19   detail cell.
20   A.  40,810 divided by 22 equals 1855.
21   Q.  Do you remember roughly what range the market price for an
22   ounce of gold was in June of 2021?
23   A.  Yes.
24   Q.  Roughly what kind of ballpark?
25   A.  It was 17 to 1800.
```

O5U3MEN1                          Coughlin - Direct

1            MR. MONTELEONI:  Mr. Hamill, can you please put up

2    Government Exhibit 1435 and take us to the top of page 10.  So,

3    I am going to read paragraph 8(b).

4            The documents marked for identification as Government

5    Exhibits B201-1 through B201-24 and B233 are true and correct

6    copies of image files and associated metadata extracted from

7    the second Nadine Menendez cell phone.

8            Mr. Hamill, can you please publish to the right

9    Government Exhibit B201-17 and to the left Government

10   Exhibit 3C-20 again.

11   Q.  So, Special Agent Coughlin, what is the manufacturer

12   information stamped on the ingots that are shown in Government

13   Exhibit B201-17, the picture from the second Nadine Menendez

14   cell phone?

15   A.  Asahi Refining.

16   Q.  How do the size packaging marking's that's stamped on the

17   ingots that are in the photograph from the second Nadine

18   Menendez cell phone compare to those of the ingots that were in

19   the photograph from IS EG Halal together with the check with

20   the name Wael Hana?

21   A.  It appears the same.

22           MR. MONTELEONI:  So Mr. Hamill, on Government

23   Exhibit 3C-20, can you please zoom in on the top left gold

24   ingot and keep that image on one side.

25   Q.  And so, directing your attention on that gold ingot under

O5U3MEN1                    Coughlin - Direct

1    the words 1 ounce troy, can you please read the serial number

2    of that was bar on the IS EG Halal photograph with the Hana

3    check.

4    A.  A124809.

5         MR. MONTELEONI:  And Mr. Hamill, on Government Exhibit

6    B201-17, can you please zoom in on the top left ingot there,

7    and keep that image on the right.

8    Q.  And directing your attention to the serial number on the

9    ingot from the photograph on the second Nadine Menendez cell

10   phone.  Please read that serial number.

11        MR. WEITZMAN:  We object to that as beyond the summary

12   chart.  And it's fine if he questions it, but I wanted to note

13   for the scope issues, your Honor.

14        THE COURT:  All right.  Proceed.

15   Q.  Can you please read the serial number.

16   A.  A124806.

17   Q.  How close are those two serial numbers?

18   A.  It would be three off.

19   Q.  So, I'm not going to ask you to go through the other serial

20   numbers in those photos, but I do want to ask you one or two

21   other things.

22        MR. MONTELEONI:  Mr. Hamill, you can please take down

23   Government Exhibit 3C-20 and if can you show us the full photo

24   of Government Exhibit B201-17, Mr. Hamill.

25   Q.  So first, how many gold ingots are shown here?

O5U3MEN1                    Coughlin - Direct

1    A.  Six.

2            MR. MONTELEONI:  And Mr. Hamill, can you please put up

3    to the left Government Exhibit 1F-1016 which the jury has

4    already seen.  Please zoom in on the bedspread in Government

5    Exhibit 1F-1017.

6    Q.  So, how does the appearance of the background next to the

7    gold bars in Government Exhibit B201-17, the photograph from

8    the second Nadine Menendez cell phone, compare to the bedspread

9    shown --

10           MR. WEITZMAN:  Objection, your Honor.

11           THE COURT:  Sustained.

12   Q.  So, let's go forward a few months and turn to a new topic.

13           MR. MONTELEONI:  Mr. Hamill, can you please put back

14   up Government Exhibit 1302, page 94.

15   Q.  Directing your attention to line 1228, Special Agent

16   Coughlin.  On September 21, 2021 at 8:49 a.m., please read what

17   Abdelmaguid texts to Nadine.

18   A.  "So I asked back at Cairo for the dates and the week of the

19   9th works fine.  I still didn't get in contact with chairman."

20   Q.  Directing your attention to the next line, can you please

21   read Nadine's response at 9:45 a.m.

22   A.  "I am so happy that it works out.  I will reach out to him

23   today.  He had meetings with heads of state in New York City

24   and got to Washington late yesterday."

25   Q.  Directing your attention to the next line on September 23,

1    2021, at 9:26 p.m.  Please read what Nadine texts Abdelmaguid.

2    A.  "Is there any chance he can sit on a camel in Egypt?  I'm

3    dying for him to be on a camel.  My first time ever on a camel

4    was at the pyramids."

5    Q.  Directing your attention to the next line.  Please read

6    Abdelmaguid's response.

7    A.  "Of course there's a chance for that.  Leave that to me."

8    Q.  Directing your attention to the next line.  Few days later

9    September 28, 2021, 7:43 a.m., please read Abdelmaguid's

10   message to Nadine.

11   A.  "In our last conversation he told me his chief of staff

12   will get back to me on the specific dates and agenda.  I am

13   waiting." Smiley face.

14   Q.  What happens the next day?  Directing your attention to

15   line 1233, on September 29, 2021, at 11:12 a.m., can you please

16   read what Abdelmaguid texts to Nadine.

17   A.  "Nadine, I will probably loose my job.  Sarah Arkins called

18   the embassy gave specific dates, asked the embassy to arrange

19   specific meetings including my director, and asked them to

20   prepare a visit to Aswan and other things SOS."

21   Q.  Directing your attention to the next line at 12:07 p.m.

22   What does Nadine text to Robert Menendez?

23   A.  She forwards that message, the previous message.

24   Q.  Directing your attention to the next line, what does

25   Menendez text Nadine at 12:09 p.m.?

O5U3MEN1                        Coughlin - Direct

1  A.  He writes "taken care of."

2  Q.  Skipping a few lines down to line 1238.  Who does Nadine

3  text on October 2, 2021?

4  A.  Wael Hana.

5  Q.  Please read what she texts him then.

6  A.  "You must be a very special brother.  You have no idea what

7  your sister is going through and went through to make this trip

8  happen."

9  Q.  Directing your attention to the line for October 8 of 2021.

10  Please read the details for that line.

11  A.  "Robert Menendez and Nadine Menendez travel from J.F.K.

12  International Airport to Doha, Qatar."

13         MR. MONTELEONI:  So at this time I am going to offer

14  Government Exhibit 3A-20.

15         THE COURT:  Admitted without objection.

16         (Government's Exhibit 3A-20 received in evidence)

17         MR. MONTELEONI:  Mr. Hamill, can you please put up

18  Government Exhibit 3A-20.  Expand the top quarter of the page.

19  Q.  So first directing your attention to the very top line,

20  Special Agent Coughlin.  Please read just the bold title at the

21  top line.

22  A.  "Report for Senator Robert Menendez."

23  Q.  Special Agent Coughlin, where does this report reflect that

24  Menendez was going on October 8 and 9, 2021?

25  A.  To Doha, Qatar.

1    Q.  If you can please take us to the middle of the page and

2    expand the entry for October 11, 2021.  Special Agent Coughlin,

3    where does this is reflect that Menendez went on October 11,

4    2021?

5    A.  To Cairo, Egypt.

6              MR. MONTELEONI:  Let's return to the chart.

7    Mr. Hamill, can you please put back up Government Exhibit 1302,

8    page 94.

9    Q.  Directing your attention to the line for October 12, 2021,

10   at 5:15 a.m. Eastern Time, can you please read the middle two

11   lines starting "dinner."

12   A.  "Dinner reservations at 7:30 p.m.  Will will be at the

13   hotel at 715 and drive in front of us."

14   Q.  And by the way, when is the October 12 time that the chart

15   reflects that Nadine sent this message to Menendez in

16   comparison to the October 11 time that the calendar we just

17   looked at reflects that Menendez traveled to Cairo?

18   A.  It's the next day.

19   Q.  Going down to the next page, page 95.  Please read

20   line 1243.

21   A.  "Yes.  But I need to know address of where we are going

22   tonight."

23   Q.  Is that a text from Menendez to Nadine Menendez at

24   6:17 a.m. Eastern Time on October 12, 2021?

25   A.  Yes.

O5U3MEN1                    Coughlin - Direct

1   Q.  Directing your attention to the next line, can you please

2   read the second 6:17 a.m. Eastern Time message which is listed

3   from Nadine to Robert Menendez.

4   A.  Yes.  She replies "After you left I went to the concierge

5   to look for restaurants.  One of the security guards came and

6   asked the guy in Arabic what I was looking for and told him

7   that he's watching me and I cannot leave the hotel without

8   detail."

9   Q.  Directing your attention to the next line.  Can you please

10  read what Nadine texts to Menendez at 6:18 a.m. Eastern Time.

11  A.  "It's 11 minutes away.  It's called Basha or Pasha?  It's

12  on the Nile.  Will picked it.  He said it's one of the best

13  restaurants in Cairo.  I will find out exactly the name and let

14  you know."

15  Q.  Directing your attention a few days later at 3:53 p.m.

16  Eastern Time on October 15, 2021, on line 1246.  Can you please

17  read what Nadine Menendez texts to the user identified as Azza

18  Abbas.

19  A.  "Azza thank you for so much a wonderful evening."

20  Q.  You just read that Nadine said "thank you for such a

21  wonderful evening" at 3:53 Eastern Time.  Is the time in Egypt

22  earlier or later in the day than Eastern Time?

23  A.  It is later.

24  Q.  Directing your attention to the next line at 3:54 p.m.

25  Eastern Time.  What type of document does the user known as

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5U3MEN1                        Coughlin - Direct

1    Azza Abbas send to Nadine Menendez?

2    A.   She sends a photograph.

3    Q.   Please read the description of the photograph.

4    A.   "Sends photograph of Menendez, Nadine Menendez, Abbas

5    Kamel, and a female."

6         MR. MONTELEONI:  Let's look briefly, Mr. Hamill, can

7    you please publish Government Exhibit B224-A.  Let's go back to

8    Government Exhibit 1302.  Page 95.

9    Q.   Directing your attention to October 17, 2021, entry for

10   3:37 p.m. on line 1248.  Can you please read the detail cell.

11   A.   "Menendez and Nadine Menendez travel from Cairo, Egypt to

12   J.F.K. International Airport."

13   Q.   Directing your attention to the next two lines, 1249 and

14   1250.  Who calls Robert Menendez?

15   A.   John Pilot.

16   Q.   How do the times of the calls from John Pilot to Menendez

17   compare to the time of Menendez's return to J.F.K.

18   International Airport?

19   A.   It's the same.

20   Q.   Let's look what happens the next day.  Directing your

21   attention to the last line on this page, line 1253.  On

22   October 18, 2021, at 11:12 a.m., who does the chart indicate

23   conducts internet searches?

24   A.   Robert Menendez.

25         MR. MONTELEONI:  Mr. Hamill, can you please publish

O5U3MEN1                    Coughlin - Direct

1    Government Exhibit A125.

2    Q.  Special Agent Coughlin, directing your attention to the

3    left of the page.  Right above the gray bar with the section

4    headings.  Can you please read the largest words.

5    A.  "Searched items."

6    Q.  Directing your attention to the second row down, please

7    read what's written in the time stamp column.

8    A.  "10/18/2021 at 11:12 a.m."

9    Q.  Two columns over, can you please read what is in the value

10   column.

11   A.  "How much is 1 kilo of gold."

12   Q.  Directing your attention to the first row down, can you

13   please read what is written in the time stamp column.

14   A.  "10/18/2021 also at 11:12:43."

15   Q.  Can you please read what is in the value column for this

16   top row.

17   A.  "How much is 1 kilo of gold worth."

18           MR. MONTELEONI:  Let's return to the timeline.

19   Mr. Hamill, can you please take us back to page 96 of

20   Government Exhibit 1302.

21   Q.  Directing your attention to the entry for October 8th,

22   2021, at 11:37 a.m.  Line 1255.  First, about when is that in

23   relation to the searches for how much is a kilo of gold and how

24   much is a kilo of gold worth?

25   A.  It's about 20 minutes or so later.

O5U3MEN1                          Coughlin - Direct

1    Q.  Who does Nadine Menendez text in this line?

2    A.  She texts Fred Daibes.

3    Q.  Can you please read what she texts Daibes.

4    A.  "The sweater looks great on you.  So does the color.  I ran

5    downstairs to get a glazed doughnut and my perfect husband said

6    he did not keep the box of doughnuts.  Next time I will take a

7    doughnut in the very beginning LOL.  Have a great day."

8    Q.  And I think I may have said October 8th, 2021.  What is the

9    date of that message?

10   A.  The date of this message is October 18.

11   Q.  Can you please read the next line, line 1256, what Daibes

12   texts to Menendez at 11:38 a.m. on October 18, 2021?

13   A.  "LOL he made me take the box with me."

14   Q.  Directing your attention to 11:39 a.m., can you please read

15   what Nadine writes next.

16   A.  "He told me.  He said I would eat them and then be upset

17   with him for letting me eat them.  He is most probably correct.

18   But I would have had just one LOL."

19   Q.  So, now at 3 p.m., on October 18, 2021, line 1258, who does

20   Nadine text?

21   A.  Robert Menendez.

22   Q.  Please read the quoted text.

23   A.  "Last thing.  What should I reply as a thank you and

24   response to her text?"

25              MR. MONTELEONI:  Let's look briefly at what she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5U3MEN1                    Coughlin - Direct

1    attaches.

2              Mr. Hamill, can you please put up Government Exhibit

3    A103-B.

4              (Continued on next page)

O5uWmen2                      Coughlin - Direct

1  BY MR. MONTELEONI:

2  Q.  Special Agent Coughlin, how does this compare to messages

3  in the WhatsApp thread between Nadine and the user that she

4  calls Azza Abbas?

5  A.  They're the same.

6          MR. MONTELEONI:  Let's return to the timeline.

7          Mr. Hamill, please take us back to page 96, Government

8  Exhibit 1302.

9  Q.  Directing your attention to October 18, 2021, at 3:06 p.m.,

10 could you please read what Menendez texts to Nadine Menendez?

11 A.  "Hi, Azza.  The feeling is mutual.  Thank you for the

12 lovely mirror.  It was quite a beautiful surprise.  I look

13 forward to seeing you soon in N.Y. or D.C., wherever the

14 general's travels take you.  Until then, receive from me a warm

15 embrace."

16 Q.  Directing your attention to October 19, 2021, at 9:35 p.m.,

17 could you please read what Nadine Menendez texts the user

18 listed as Azza Abbas?

19 A.  "*Bonjour*, Azza.  The feeling is mutual.  Thank you for the

20 lovely mirror.  It was quite a beautiful surprise.  I have it

21 in my handbag and will remember you and the incredible dinner

22 every time I use it.  I look forward to seeing you soon in N.Y.

23 or D.C., wherever the general's travels take you.  Until then

24 receive from me a warm embrace."

25          MR. MONTELEONI:  I have no further questions.

O5uWmen2                       Coughlin - Cross

1           THE COURT:  Ladies and gentlemen, I think this is an

2    appropriate time for a midmorning break.  Let's take ten

3    minutes.  Maybe there will be glazed doughnuts.

4           (Jury not present)

5           THE COURT:  Ten minutes.

6           (Recess)

7           (Jury present)

8           THE COURT:  You may be seated in the courtroom.

9           Your witness for cross-examination, Mr. Weitzman.

10          MR. WEITZMAN:  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MR. WEITZMAN:

13   Q.  Good morning, Agent Coughlin.

14   A.  Good morning.

15   Q.  You testified on direct you've been with the FBI for about

16   seven years, is that correct?

17   A.  That's correct.

18   Q.  And you're currently assigned to the public corruption

19   squad of the FBI?

20   A.  Yes.

21   Q.  What's the squad number?

22   A.  C-14.

23   Q.  How long have you been on C-14?

24   A.  Not too long.  I've only been here about three months, two

25   to three months, or so.

O5uWmen2                          Coughlin - Cross

1   Q.  OK.  And what squad were you on before C-14?

2   A.  I was on C-8, which is healthcare fraud.

3   Q.  So is this your first public corruption case?

4   A.  What do you mean by that?

5   Q.  Well, let me withdraw that.

6       The squad that investigated this matter, was that C-14?

7   A.  Yes.

8   Q.  How many agents are on C-14?

9   A.  It varies.  I believe about 13.

10  Q.  And how many of those agents have been involved in this

11  investigation or on the team investigating this case?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  I'll allow it.

14          If you know.

15  A.  I don't know for sure.  I think four.

16  Q.  OK.  You see some of those agents in the back of the

17  courtroom, right?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  Sustained.

20  BY MR. WEITZMAN:

21  Q.  You testified on direct that you were, and I quote, not

22  really involved in their investigation.  You added the word

23  "really."  What did you mean by that?

24  A.  Well, beyond my current involvement, so obviously in

25  preparation for today, or the last few days, I prepared for

O5uWmen2                        Coughlin - Cross

1    testimony.

2    Q.  OK.  Other than preparing for your testimony, have you

3    spoken to any of the four or so agents who were involved in

4    this investigation about their investigation?

5    A.  I've spoken to them, but not about the investigation.

6    Q.  None of the substance of the allegations in the case?

7    A.  No.

8    Q.  Or the search or anything else?

9    A.  No.

10   Q.  Did you speak to any of the investigating agents on this

11   case about your summary chart?

12   A.  Did I speak to any investigating -- I did not speak to any

13   of the agents, no.

14   Q.  Did you talk to them about your testifying as a witness

15   here in this case?

16   A.  No.

17   Q.  OK.  You started testifying on Tuesday.  It's now Thursday.

18   So three days on the witness stand, I think you deserve some

19   battle pay for that, but --

20          THE COURT:  The jury will disregard the comments of

21   the lawyers.  You know that, and so does Mr. Weitzman.

22          MR. WEITZMAN:  Yes, your Honor.

23   Q.  Let's discuss briefly the process by which you reviewed the

24   chart.

25          The prosecutors created the chart, is that correct?

O5uWmen2                      Coughlin - Cross

1    A.  That's correct.

2    Q.  And they decided what line entries to include in the chart?

3    A.  I did not decide, so my assumption is they decided, yes.

4    Q.  And they made the physical typewritten edits to the line

5    entries in the chart, is that correct, or the prosecutorial

6    team?

7            THE COURT:  You mean they made -- they put the words

8    on the chart; is that what you mean?

9            MR. WEITZMAN:  Yeah.

10   Q.  They put the words on the chart?

11   A.  Yes.

12   Q.  You didn't ever type into the chart yourself?

13   A.  I did type out some edits that I had, but not directly in

14   the chart.

15   Q.  And where did you type out those edits?

16   A.  In a draft.

17   Q.  In a draft of the chart?

18   A.  Correct.

19   Q.  And you sent them back the draft of the chart with your

20   typewritten edits?

21   A.  Correct.

22   Q.  And were you typing in edits into the columns of the chart

23   that the jury has before it or into a separate column that

24   reflected what edits you proposed?

25   A.  No.  I created a separate column.

O5uWmen2                    Coughlin - Cross

1    Q.  So you didn't actually physically type any of the words

2    that are on the summary chart?

3    A.  I did not.

4    Q.  OK.  And your role, as you testified, was to check the

5    chart for accuracy, is that correct?

6    A.  That is correct.

7    Q.  And what do you mean by accuracy?

8    A.  So, obviously, we've gone over a lot of lines, and I went

9    over each of those lines myself to check the date, the time.

10   Obviously, there were quotations from text messages and emails.

11   I checked to ensure that those were accurate.

12   Q.  OK.  And then as far as the quotations go, you checked to

13   make sure that the words in the line entry matched the words

14   that are in the document, is that correct?

15   A.  That is correct, yes.

16   Q.  And is it fair to say that some of the line entries --

17   maybe many -- leave out some words that it's extracting from

18   the underlying document, that it's a redacted -- it's only a

19   portion of the underlying document, correct?

20           MR. MONTELEONI:  Confusing.

21           THE COURT:  Sir, is it true that the words that are on

22   the chart are not always all of the words in the document from

23   which the words on the chart were taken?

24   A.  Not always.  You said many.  I wouldn't say many, but there

25   were a few examples.

O5uWmen2                          Coughlin - Cross

1   BY MR. WEITZMAN:

2   Q.  OK.  We'll go through that.

3       Did you ever provide any -- let me withdraw that.

4       Did you ever consider, in your own mind, whether the line

5   entries on the chart were a fair summary of the underlying

6   document?

7               MR. MONTELEONI:  Objection.

8               THE COURT:  Was that part of your job, sir?

9               THE WITNESS:  I'm not sure I understand.

10  BY MR. WEITZMAN:

11  Q.  Did you consider whether the portions of the document,

12  email, text chain or anything else, that was not included in

13  the line item of the chart should have been included in the

14  chart in order for it to be a fair representation of the

15  underlying document?

16      I'm not asking whether you did that.  I'm just asking

17  whether you thought those thoughts as you were reviewing them?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  Sustained.

20  BY MR. WEITZMAN:

21  Q.  Did you ever propose to the prosecutors that the portions

22  of the line entries in the summary chart were not a fair

23  summary of what was in the underlying document?

24              MR. MONTELEONI:  Objection.

25              THE COURT:  I'll allow it.

O5uWmen2                          Coughlin - Cross

1   A.  No.

2   Q.  You never made that comment to the prosecutors for any of

3   the line entries?

4   A.  No, I don't believe so.

5   Q.  Did you ever reach a conclusion yourself as to that issue,

6   whether the line entry was a fair summary of the underlying

7   document?

8                MR. MONTELEONI:  Objection.

9                THE COURT:  Sustained.

10  BY MR. WEITZMAN:

11  Q.  So at no point in time did you mention to the prosecutors

12  that you thought some text should be added or deleted from the

13  chart for reasons other than accuracy, is that correct?

14  A.  I don't think so, no.

15  Q.  OK.  By the way, you said you don't have any knowledge of

16  the allegations or underlying investigation of this case,

17  correct?

18  A.  Beyond, obviously, preparing for testimony.  I could

19  obviously understand, reading the text message, some of the

20  things, but I don't really understand the full scope, no.

21  Q.  OK.  And any of the other investigators who were involved

22  in this case could be doing just what you're doing, reviewing

23  the summary, right?

24               MR. MONTELEONI:  Objection.

25               THE COURT:  Sustained.

1 BY MR. WEITZMAN:

2 Q.  You've never testified before as a summary witness, right?

3          THE COURT:  Have you ever testified before in court,

4 sir?

5          THE WITNESS:  No, no.

6 BY MR. WEITZMAN:

7 Q.  In any capacity, as a summary witness or as a fact witness

8 or anything?

9 A.  Only in a grand jury proceeding.

10 Q.  Sir, do you have any specialized skills or training that

11 makes you uniquely qualified to testify in this case, in your

12 opinion?

13          MR. MONTELEONI:  Objection.

14          THE COURT:  Sustained as to form.

15 BY MR. WEITZMAN:

16 Q.  Do you have any specialized skills or training that

17 qualifies you to testify as a summary witness in this case?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  Sustained.

20          You can go into what his training is or what his FBI

21 training is or if he has other skills.

22 BY MR. WEITZMAN:

23 Q.  Did you receive training at -- is it Quantico; is that what

24 it's called?

25 A.  That's correct, yes.

O5uWmen2                          Coughlin - Cross

1   Q.  In Virginia, is it?

2   A.  Yes.

3   Q.  You go there as an FBI agent for how long to get training?

4   A.  Five months.

5   Q.  Did you receive any training at Quantico about how to

6   testify as a witness?

7   A.  We do.  There's some sort of, you know, mock court-type of

8   training, yes.

9   Q.  OK.  And so the training that you received in Quantico to

10  testify in a mock court, that's the same type of training that

11  every FBI agent goes through, is that right?

12  A.  As far as I know.  I mean they vary the training over time,

13  but generally the same.

14  Q.  It's like a uniform curriculum for all FBI agents, right?

15          MR. MONTELEONI:  Objection.

16          THE COURT:  I'll allow it, if he knows.  He may not

17  know.  He may.

18  A.  Again, I know, you know, they do change it over time, but

19  as far as I know, it's generally similar.

20  Q.  In addition, at Quantico, they teach you how to be an

21  investigator, right?

22  A.  Yes.

23  Q.  You didn't use any of your investigative skills in

24  connection with the preparation of this summary chart, correct.

25  A.  No.

1    Q.  It's the same thing that a college student could do, check

2    the accuracy of the chart, right?

3              MR. MONTELEONI:  Objection.

4              THE COURT:  Do you know if a college student could do

5    this, sir?

6    A.  I -- I'm not a Rhodes scholar, but it certainly took a lot

7    of work going through the whole chart.

8    Q.  I'm sure it did.

9         Speaking of, when did you start going through the chart?

10   A.  Maybe three or four weeks ago.

11   Q.  OK.  When did you first start meeting with the government

12   about your testimony as a summary witness in this case?

13   A.  I had a phone -- a few phone calls, and then I think my

14   first meeting was, maybe, roughly three weeks ago.

15   Q.  When was your first phone call?

16   A.  Probably four to, four to five weeks ago.

17   Q.  Does March 26, 2024, ring a bell?

18   A.  You mean for a phone call?

19   Q.  Correct.

20   A.  I don't recall --

21   Q.  OK.

22   A.  -- the first phone call.

23             MR. WEITZMAN:  Can we put up for the judge, the

24   witness and counsel 3507-001.  Not for the jury.

25   Q.  Looking at this document -- just take a look at it -- does

O5uWmen2                    Coughlin - Cross

this refresh your recollection that you first had a phone call

with Mr. Monteleoni on March 26, 2024, to start your

preparation for testimony?

            THE COURT:  Mr. Coughlin, this may have come up before

you in the trial.  The question really, you said you didn't

recall when the first phone call was.  Therefore, Mr. Weitzman

is entitled to try to refresh your recollection, because you

said you didn't recall.  So he can show you anything.  I think

I used an example with this jury, maybe not, that you could

show someone a banana and it may refresh their recollection --

may or it may not.

            So look at this document.  Simply because something is

on a document doesn't make it true.  It's a limited question.

Does looking at this banana or this document give you a new

recollection of when that first phone call was?  Either yes or

no.

            THE WITNESS:  No.

            MR. WEITZMAN:  You can put that down.

Q.  Do you have a general recollection that you started

interacting with the U.S. Attorney's Office about your

testimony about eight weeks ago, late March?

A.  Again, I -- what's today's date, the --

Q.  May 30.

A.  May 30?  Honestly, I wouldn't have thought it was that far

back, but it's somewhere between probably six and eight weeks

O5uWmen2                         Coughlin - Cross

```
 1   or so.
 2   Q.  And the first order of business they had you do was to
 3   review exhibits in the case, is that correct?
 4   A.  Yes.
 5   Q.  And how many exhibits did they give you for you to start
 6   reviewing before you got a copy of the summary chart?
 7   A.  I was provided a, sort of a bucket of documents initially.
 8   The number -- I mean it was a lot.  I don't recall a number.
 9   Q.  Do you mean how many exhibits are on the summary chart?
10   A.  I don't.
11   Q.  Would it surprise you that there are over 500 exhibits on
12   the summary chart?
13               MR. MONTELEONI:  Objection.
14               THE COURT:  Sustained as to form.
15               Can you estimate?  The jury isn't entitled to a guess.
16   Are you able to estimate the number of lines on that chart?
17               I take it that's what you're asking, sir.
18               MR. WEITZMAN:  No.  The number of lines is actually
19   greater.
20               THE COURT:  All right.  The number of exhibits then.
21   Are you able to estimate the number of exhibits on that chart?
22               THE WITNESS:  Beyond saying it was a lot, no, I don't
23   know the number.
24               THE COURT:  There are a lot of exhibits there, sir.
25               Next.
```

O5uWmen2                          Coughlin - Cross

1    BY MR. WEITZMAN:

2    Q.  Hundreds, right?

3    A.  I think hundreds is fair, yes.

4    Q.  And in the first tranche of the documents that you

5    received, before you even received the summary chart, would you

6    say you received hundreds of exhibits in the case?

7    A.  I don't remember the initial amount.

8    Q.  And what did you do once you received government exhibits,

9    without access to the summary chart?

10   A.  So, when I initially received the first -- access to the

11   first group, I sort of took initial review to familiarize

12   myself what type of documents would be, I would be looking at.

13   Q.  Was that just, like, a few minutes' scan?  Tell me the

14   process of that initial review.

15   A.  Well, there were a lot of documents, so it was certainly

16   more than a few minutes.  Per document was probably just -- you

17   know, depending on the size of the document, a few seconds to a

18   few minutes to look at each document.

19   Q.  And you attempted to review each of the documents that they

20   provided you before they provided you the summary chart?

21   A.  I would -- I wouldn't say I attempted to review.  I would

22   say I was sort of looking at, looking at them holistically to

23   get a sense of what types of documents were in there.

24   Q.  Well, you recall that the instruction you received was that

25   you should generally familiarize yourself with the documents?

1      MR. MONTELEONI:  Objection.

2      THE COURT:  Sustained as phrased.

3  BY MR. WEITZMAN:

4  Q.  Do you recall that you received an instruction from

5  Mr. Monteleoni to generally familiarize yourself with the

6  documents that he provided you?

7      MR. MONTELEONI:  Objection.

8      THE COURT:  I'll allow it.

9      Did you receive an instruction from Mr. Monteleoni to

10 generally familiarize yourself with the documents that he

11 provided you with?

12     THE WITNESS:  I don't recall his exact instruction.

13     MR. WEITZMAN:  Let's put up 3507-002.

14     THE COURT:  Same thing, sir.  You said you don't

15 recall.  Now the lawyer is entitled to refresh your

16 recollection.  Take a look at it.  See if looking at whatever

17 this is gives you a new recollection, refreshes your

18 recollection.  So your answer is either yes or no.

19 BY MR. WEITZMAN:

20 Q.  Have you had an opportunity to review that, sir?

21 A.  Yes.

22     MR. WEITZMAN:  Take that down.

23 Q.  Does that refresh your recollection that you were asked to

24 generally familiarize yourself with the documents?

25 A.  Again, I don't remember the exact words, general, you know,

1    familiarize, but that's essentially what I -- what I did.

2    Q.  OK.  Good.

3         And after that first tranche of exhibits, did you receive

4    additional exhibits before you received the summary chart?

5    A.  I don't recall.

6    Q.  OK.  After you received the summary chart, did they give

7    you even more exhibits for you to review?

8    A.  Yes.

9    Q.  OK.  And how did the second or the next bucket of exhibits

10   compare in size to the first bucket that you got?

11        I'm trying to figure out whether you got most of the

12   exhibits after receiving the summary chart or before.

13             THE COURT:  So why don't you ask that.

14   BY MR. WEITZMAN:

15   Q.  Did you receive most of the exhibits after you received the

16   summary chart or before?

17   A.  I think I received most after.

18   Q.  OK.

19   A.  Or after I received the first draft of the summary chart.

20   Q.  And then once you received the first draft of the summary

21   chart, you started reviewing everything to make sure that it's

22   accurate, correct?

23   A.  That's correct, yeah.

24   Q.  OK.  Fair to say it took you many, many hours to

25   double-check the work product, right?

1   A.  It -- yeah, it took me a number of hours.

2   Q.  Was this, like, what you spent the majority of your time on

3   over the past few weeks?

4   A.  You know, I certainly have other cases and other

5   investigations, so I tried to balance the two as best I could.

6   Q.  But this was a large component of your effort, right?

7   A.  It was a significant amount of work, yes.

8   Q.  Were you provided only the exhibits that are referenced in

9   this summary chart that's been admitted in evidence?

10  A.  No.  No.

11  Q.  You received other documents beyond those that are

12  referenced in the summary chart, right?

13  A.  Yes.

14  Q.  And some of those documents, for example, were referenced

15  in earlier versions of the summary chart, drafts, correct?

16  A.  I -- I didn't -- I don't recall exactly everything that was

17  in each draft, but I -- I think that's accurate.

18  Q.  OK.  And then some lines were taken out of the draft and

19  deleted, and so that summary, the exhibit that underscores that

20  line item isn't then incorporated into the final chart,

21  correct?

22  A.  I don't remember.  I know a number of lines were -- you

23  know, various edits were made, which included removing lines.

24  You know, I don't remember which exhibit went with each line

25  that was removed, though.

O5uWmen2                         Coughlin - Cross

1    Q.  Did you make recommendations to remove lines?

2    A.  No.

3    Q.  Those were the prosecutors' decisions to remove lines,

4    correct?

5    A.  That's correct, yes.

6    Q.  But there were more documents than, that you reviewed

7    beyond those exhibits listed in the final chart?

8    A.  I -- I think that's right.  But again, to answer for sure,

9    I would honestly need to do this, do it all again.

10   Q.  OK.  How did you advise the prosecution team of errors that

11   you found in the summary chart?

12   A.  So, as mentioned, in the drafts I created an additional

13   column.  Usually just a very short note I put in that column.

14   Sometimes just an X, which means, which essentially meant I

15   reviewed it and it was accurate.

16       Sometimes it might be a very specific, obvious error that I

17   would note, like the time was off.  Sometimes I put a question

18   mark in there.  That was almost more to remind me, ask, you

19   know, ask them about this.  And in some instances we had

20   follow-up either phone conversations -- typically it was on the

21   phone, phone conversations.

22   Q.  You didn't send them any emails with your edits other than

23   that one Excel, is that correct?

24   A.  As we got further in -- so, the first draft was significant

25   because I had to go through the whole thing and sort of, there

O5uWmen2                        Coughlin - Cross

1    was a number.  As we got further on in the drafts and there

2    were less edits, I may have sent an email referencing maybe

3    just a couple of small edits.

4    Q.  Otherwise, you called the prosecutors to dictate edits?

5              MR. MONTELEONI:  Objection.

6              THE COURT:  Did you call the prosecutors to dictate

7    edited?  Yes or no.

8    A.  Yes.

9    Q.  But you never made a recommendation to delete or add any

10   particular piece of evidence, correct?

11             MR. MONTELEONI:  Asked and answered.

12             THE COURT:  I'll allow it.

13   A.  No, I don't think so.

14   Q.  Now, you mentioned a moment ago that there are some things

15   that you reviewed beyond the exhibits that are referenced in

16   the summary chart, right?

17   A.  Yes.

18   Q.  For example, just today, you were asked if you recall the

19   price of gold, roughly, per ounce in June 2021, correct?

20   A.  Yes.

21   Q.  And that's not something you know from memory, right?

22   A.  That's correct, yes.

23   Q.  You looked it up, right?

24   A.  Yes.

25   Q.  And did you use a Bloomberg terminal to do so?

O5uWmen2                        Coughlin - Cross

1    A.  I did not.

2    Q.  How did you look up the price of gold?

3    A.  On Google.

4    Q.  And you looked it up for June 2021 alone?

5    A.  Yes, that's --

6    Q.  Or did you see a chart for, like, a multi-year price of

7    Google?

8    A.  I believe I looked at a chart but just went to the month of

9    June.

10            THE COURT:  And I think you misspoke.  You said

11   multi-year price of Google, but you meant multi-year price of

12   gold.

13            MR. WEITZMAN:  I wish I was invested in that.  But

14   yes, your Honor, you're correct.

15   Q.  I'd like to now -- now that we have the general framework,

16   I'd like to actually go to a specific entry and let's start

17   with the very first entry --

18   A.  Sure.

19   Q.  -- of GX 1302.

20            MR. WEITZMAN:  Zoom in on the first two entries.

21   December 31, 2017.

22   Q.  These are your very first two entries on the chart, or the

23   very first two entries you checked for accuracy on the chart,

24   correct?

25   A.  That's correct.

O5uWmen2                        Coughlin - Cross

1   Q.  And the first entry cites to an exhibit GX A101-1, correct?

2   A.  Yes.

3   Q.  And so in order to confirm the accuracy of this, you

4   actually went to GX A101-1?

5   A.  Correct, yes.

6           MR. WEITZMAN:  And that's in evidence.

7           Can we put that up as a side by side.

8   Q.  And this is, on the bottom, GX A101, correct?

9   A.  I can't see the exhibit number, but --

10  Q.  Can you tell that this is the same, or -- can you tell that

11  that's GX A101-1?

12  A.  Yes.

13          MR. WEITZMAN:  Let's just focus in first on the time

14  stamp.

15  Q.  It says at the bottom read December 31, 2017, 7:22 p.m.

16      Do you know what UTC minus five means?

17  A.  Yes.  It's taking Universal Time and converting it to

18  Eastern time.

19  Q.  OK.  And so this text message was read at 7:22 p.m.,

20  correct, in the evening?

21  A.  That's what it indicates, yes.

22  Q.  OK.  Your chart says 7:22 a.m., correct?

23  A.  That's correct.

24  Q.  That was a typographic error?

25  A.  Sure, yes.

O5uWmen2                        Coughlin - Cross

1    Q.  Yes.  And you testified yesterday, do you recall you were

2    asked how long after this first text did Robert Menendez

3    respond, and you said about 13 hours, correct?

4    A.  Yes.

5    Q.  And that was an error as well, right?

6    A.  It appears so, yes.

7    Q.  He responded less than an hour, or approximately 59 minutes

8    later, right?

9    A.  Yes.

10          MR. WEITZMAN:  OK.  Now, if we can look at the text

11   message from Nadine Arslanian to Bob Menendez, and I'm going to

12   read the whole thing:

13          "I want to wish you all the very, very best for the

14   new year.  I'm not sure if Peter told you.  I have been in and

15   out of different hospitals with a brain fracture, two

16   contusions, a lesion on my liver besides, that arose from a

17   fall.  My kids will be going back to school next Saturday and

18   Sunday.  I would love to go to dinner with you or to lunch,

19   whatever is easier, the following week.  In four and a half

20   hours, it's going to be your birthday.  I will text you happy

21   birthday, and I hope it's going to be the best year ever for

22   you, and I would like to take you out to lunch for your

23   birthday.  I'm looking forward to catching up.  Nadine.

24          "I have not text or plan on texting anybody merry

25   Christmas or happy new year, but I will definitely wish you a

O5uWmen2                         Coughlin - Cross

1    happy birthday."

2    Q.  So when you -- there are portions of this text message that

3    are not included in the line item of the summary chart,

4    correct?

5    A.  Yes.

6    Q.  There's no reference to any of her injuries or the hospital

7    or her request for a dinner date, correct?

8    A.  In the chart, you mean?  No, there isn't.

9    Q.  Do you have any idea, did you see any documents that

10   indicate to you why she was in the hospital?

11   A.  No.

12            MR. WEITZMAN:  Let's look at the senator's response,

13   which is below, in GX A101 in evidence.  This is the same chain

14   that the summary chart quotes.  He said:  "OMG.  I didn't know.

15   Feel so badly from you.  All from a fall?  Terrible.  I hope

16   you are feeling better."

17   Q.  That response isn't included in your summary chart,

18   correct?

19   A.  That's correct, yes.

20   Q.  Instead, your summary chart quotes from the next text

21   response from Senator Menendez:  "Would love to get together

22   but as I said once before I don't want to interfere with your

23   boyfriend."

24            Do you see that?

25   A.  Yes.

O5uWmen2                         Coughlin - Cross

1    Q.  Have you seen documents that inform you that she, directly

2    before Menendez, she was dating a man named Doug Anton?

3              MR. MONTELEONI:  Objection.

4              THE COURT:  Sustained.

5    BY MR. WEITZMAN:

6    Q.  Do you know the name of her boyfriend that is referenced

7    here in this text message?

8              MR. MONTELEONI:  Objection.

9              THE COURT:  I'll allow it.

10             Do you know who her boyfriend was?

11             THE WITNESS:  I do not.

12   BY MR. WEITZMAN:

13   Q.  You don't recognize the name Doug?

14   A.  No.

15             MR. WEITZMAN:  OK.  If we can scroll down to -- just

16   put up 1302.

17             Now, the chart references a number of telephone calls

18   just in this first, you know, few entries.  Let's go down to

19   February, the first few entries on February 3rd, through 11.

20   Q.  This identifies a five minute and 58-second call between

21   Senator Menendez and Nadine Arslanian, correct?

22   A.  Yes, that's correct.

23   Q.  And in order to identify, to find and locate that call, you

24   needed to go to Nadine Arslanian's phone records, right?

25   A.  I believe that's where this came from, yes.

O5uWmen2                          Coughlin - Cross

```
1    Q.  That was GX 6A-112, right?
2    A.  Correct.
3               THE COURT:  You had to go to GX 6A-112.
4               THE WITNESS:  Correct, yes.  I didn't memorize what
5    each exhibit was, so --
6               MR. WEITZMAN:  I don't expect you to.  I apologize.
7    I'll make that clear.
8               Can we put up GX 6A-112.  Can we just scroll.  It says
9    page 1 on this document.  Can you scroll all the way to the
10   last page of the document, Mr. Kelly.
11              Thank you.
12   Q.  Let me ask you a question, sir, in the meantime.
13       Are you aware that --
14              THE COURT:  Wait.  He just went to the last page.
15              MR. WEITZMAN:  I guess he could not tell from looking
16   at the last page.
17   Q.  Let me ask you the question, in any event.  You're aware
18   that this is about a 7,000-page document?
19   A.  I recall a 7,000-page document.  I don't know for sure that
20   this is it, but --
21   Q.  And you understand this to be a comprehensive list of all
22   phone calls from this phone number assigned to Nadine Arslanian
23   in and out, right?
24              MR. MONTELEONI:  Objection.
25              THE COURT:  Sustained.
```

O5uWmen2                        Coughlin - Cross

1    BY MR. WEITZMAN:

2    Q.  You understand this to be Nadine's cell phone, this

3    document?

4                 MR. MONTELEONI:  Objection.

5                 THE COURT:  Do you understand what this document is,

6    sir?

7                 THE WITNESS:  Yes.

8                 THE COURT:  What is it?

9                 THE WITNESS:  It's phone records for Nadine.

10                THE COURT:  OK.

11   BY MR. WEITZMAN:

12   Q.  OK.  And it's for her cell phone ending in 1745, right?

13   A.  That's correct, yes.

14   Q.  And you had access to the entirety of these telephone

15   records, right?

16                MR. MONTELEONI:  Objection.

17   BY MR. WEITZMAN:

18   Q.  You had the entire document?

19                THE COURT:  Did you have access to this document, GX

20   whatever it is?

21   A.  So, I was -- I believe I was given access to the full

22   document initially, and then really when I was going through,

23   reviewing the summary chart, went through each individual

24   government exhibit.

25   Q.  OK.  Are you aware, sir, that there are thousands of phone

O5uWmen2                    Coughlin - Cross

1  calls between Robert Menendez and Nadine that are reflected on

2  this summary chart?

3  A.  I don't know the number.  I'm sure there's a lot.

4  Q.  OK.  You're aware that your summary chart only reflects 40

5  phone calls between the two of them?

6  A.  I don't -- I don't know the number.

7  Q.  OK.  In any event, your summary chart doesn't purport to be

8  a comprehensive listing of all the phone calls between Robert

9  Menendez and Nadine Arslanian, right?

10 A.  No, I assume not.

11 Q.  OK.  The calls that are reflected here, these just show, on

12 this document they just show the existence of a connection or

13 lack of a connection, a toll record, as it's called, right?

14 A.  That's correct.

15          MR. WEITZMAN:  So if we can go to GX 1302 and go to

16 line 558 and 555.

17 Q.  Here, you see that there's an April 5 call at 1 p.m. from

18 Nadine Arslanian to Robert Menendez and it's zero seconds,

19 right?

20 A.  Yes.

21 Q.  And you're aware, sir, that means there was no connection,

22 right?

23          MR. MONTELEONI:  Objection.

24          THE COURT:  Do you know what it means that there's

25 zero seconds?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen2                        Coughlin - Cross

1    A.   There's a column in the cell phone records that indicates

2    how long the call was.

3    Q.   Correct.  And a zero-second call is one where no one

4    communicated with each other?

5    A.   Right, I would assume.

6    Q.   Then you see, on line 557, it says ten seconds, right?

7    A.   Correct.

8    Q.   And you don't know whether that's a very short

9    conversation, a voice mail picks up; you can't tell, right?

10   A.   No.

11   Q.   To the extent two calls did connect, and unless there's a

12   voice mail, you don't have the substance of the call, right,

13   from these records?

14   A.   You mean the discussion between the two parties?

15   Q.   Correct.

16   A.   No, I don't.

17   Q.   You would have to be guessing, right?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  Sustained.

20              These records don't reflect that, correct?

21              THE WITNESS:  Correct.

22   BY MR. WEITZMAN:

23   Q.   And frankly, when there's a phone call from the phone that

24   ends with 1745, and that's Nadine's phone, you don't even know

25   if it's Nadine using her phone, correct?

O5uWmen2                         Coughlin - Cross

1    A.  No.

2            THE COURT:  It is correct?  In other words, you just

3    know that that phone made that call; you don't know who the

4    phoner was.

5            THE WITNESS:  Yes.

6            THE COURT:  OK.

7    BY MR. WEITZMAN:

8    Q.  You're married, sir?  Your spouse uses your phone

9    sometimes?

10           MR. MONTELEONI:  Objection.

11           THE COURT:  Sustained.

12   BY MR. WEITZMAN:

13   Q.  You are aware, though, are you not, sir, that sometimes

14   third parties used Nadine's phone?

15           MR. MONTELEONI:  Objection.

16           THE COURT:  Sustained.

17           MR. WEITZMAN:  It's on the chart.

18           Let's go to GX 1302, line 26.

19   Q.  You see this entry that you reviewed, sir?

20   A.  Yes.

21   Q.  And it's dated, on line 26, February 3, 2018, at 5 p.m.,

22   and it states that it's a connection from Nadine Arslanian to

23   Robert Menendez.  Do you see that?

24   A.  Yes.

25   Q.  The text, though, says, "Senator, I'm using Nadine's phone,

O5uWmen2                    Coughlin - Cross

1    but I'm Andy Aslanian," correct?

2    A.  Yes.

3    Q.  And so based on this chart, is it fair to say that

4    sometimes other people, third parties, used Nadine's phone?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  I'll allow it.

7            At least once, is that correct?

8    BY MR. WEITZMAN:

9    Q.  At least once?

10   A.  At least -- on one occasion.

11   Q.  OK.  At least one occasion?

12           THE COURT:  I think he said on one occasion.  Go

13   ahead.

14   BY MR. WEITZMAN:

15   Q.  Now, let's talk about this entry on line 26.  This is

16   February 3, 2018, correct?

17   A.  Yes.

18   Q.  This is one day after Bob and Nadine had a dinner date,

19   correct?

20   A.  Yes, that's correct.

21   Q.  OK.  Do you recall on your chart it says that they had a

22   dinner date on February 2, 2018?

23           MR. MONTELEONI:  Objection.

24           THE COURT:  Does your chart say that?  Take a look.

25           THE WITNESS:  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen2                        Coughlin - Cross

1   BY MR. WEITZMAN:

2   Q.   OK.  And so, and do you know whether that was their first

3   date or one of their early dates?  Do you know one way or

4   another?

5   A.   I do not.

6   Q.   But it's the first date reflected on your chart that they

7   had a dinner date, correct, February 2?

8   A.   Yes, I believe so.

9   Q.   And you compared this entry from the text message of Andy

10  Aslanian using Nadine's phone to the actual text message,

11  correct, when you checked for accuracy?

12  A.   I did, yes.

13          MR. WEITZMAN:  Can we put up GX A101-4 side by side.

14  Q.   Now, there's a portion of the actual text message that is

15  not in the summary chart, correct?

16  A.   Yes.

17  Q.   OK.  And that's the last two sentences:  "We can definitely

18  help you with your election campaign.  We should get together

19  and those arrangements can be made through Nadine."  Correct?

20  A.   Yes.

21  Q.   And by the way, you didn't have any decision-making

22  authority as to whether to include that sentence or not, right?

23  A.   No.

24  Q.   And then Bob Menendez responds:  "Hello, Andy.  Based on

25  your last name, I guess you're related?  Would be happy to

1    meet.  Will arrange through Nadine."  Correct?

2    A.  Yes.

3    Q.  And so when Senator Menendez says would be happy to meet,

4    you don't know, sitting here, whether he's saying that because

5    of what's in the first portion of Andy Aslanian's email, when

6    he's talking about being the U.S. Attorney for the government

7    of Egypt, ministry of defense, or whether it's about this

8    second portion talking about fund-raising, correct?

9    A.  I don't see any discussion of fund-raising.

10   Q.  You see "we can definitely help you with your election

11   campaign"?

12   A.  Yes.

13   Q.  OK.  Fair enough.  So it may not be fund raising, but you

14   don't know whether he's saying he'd be happy to meet to talk

15   about assistance with an election campaign or something to do

16   with; you can't tell from this text chain, correct?

17            MR. MONTELEONI:  Objection.

18            THE COURT:  I'll allow it.

19   A.  No.

20   Q.  It would be speculation for you to guess, right?

21            MR. MONTELEONI:  Objection.

22            THE COURT:  Sustained.

23   BY MR. WEITZMAN:

24   Q.  But there's no way to tell from this document why Senator

25   Menendez said he'd be happy to meet, right?

1      MR. MONTELEONI:  Objection.

2      THE COURT:  I'll allow it.

3      Based on just looking at those words in the chart.

4   A.  You're asking why is Menendez saying he would be happy to

5   meet?

6   Q.  I'm saying that the document doesn't reflect which of these

7   paragraphs, if any, he's saying he'd be happy to meet about.

8   Right?

9   A.  No.

10  Q.  He might be happy because he wants to help Nadine's friend,

11  right?

12      MR. MONTELEONI:  Objection.

13      THE COURT:  Sustained.  He just said he doesn't know.

14  He can't tell from this chart.

15      Next.

16  BY MR. WEITZMAN:

17  Q.  There are a couple of instances in this chart that you

18  testified about over the past few days where Nadine asks Bob to

19  pray for her.  Do you recall those?

20  A.  Yes.

21  Q.  And Bob seems not to know what Nadine is talking about,

22  right?

23      THE COURT:  I'm sorry.  The jury, again, will

24  disregard the comments.

25      MR. WEITZMAN:  I'm sorry.

O5uWmen2                    Coughlin - Cross

1              Let's go straight to the entries, GX 1302, lines 633

2     to '34.

3     Q.  Nadine sends Bob a text message on April 26, 2019, at 9:44

4     a.m., and she says:

5          "I'm on hold with Mercedes now, but please say a prayer for

6     you in your head.  I need a priest to bless me and the house.

7     If you know one.  I'll let you know when I'm off the phone.

8     Love you," to which Robert Menendez says, three minutes later,

9     "What's wrong?"

10             Do you see that?

11    A.  Yes.

12    Q.  Now, again, you checked the underlying text messages to

13    make sure that these are accurate, right?

14    A.  Yes.

15    Q.  And there's no response from Nadine as to what's wrong, in

16    response to this, right?

17             MR. WEITZMAN:  You can put that back up.

18             THE COURT:  You mean there's no response on the chart?

19             MR. WEITZMAN:  On the chart.

20             THE COURT:  Is that what you're asking?

21             MR. WEITZMAN:  Can you put that back so that he can

22    look at the chart.

23    Q.  She doesn't respond, on this chart at least, to that text

24    message asking for an explanation of what's wrong?

25    A.  No.

O5uWmen2                          Coughlin - Cross

1  Q.  She doesn't say whether it's something with the house or

2  something else, correct, or what it might be with the house?

3  A.  Not on the chart, no.

4          MR. WEITZMAN:  OK.  And that's not the only time this

5  happens, let's go to lines 853 to 858.  And if you can zoom

6  those out.

7  Q.  On June 13, 2019, at 10:10 a.m., Nadine texts Senator

8  Menendez:

9      "If you take your prayer break, please, please, please put

10 me on the very top of the list," to which he says*:  "Oui, mon*

11 *amour*.  Any special reason?"

12     By the way, *oui, mon amour* is French for yes, my love?

13 A.  I don't know.

14 Q.  OK.  Fair enough.

15     And then he asks any special reason, correct?

16 A.  Yes.

17 Q.  And then he follows up:  "Also, are you staying over

18 tonight?  I have events tomorrow."  Correct?

19 A.  Yes.

20 Q.  And are you aware that in June 2019 they were not living

21 together?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  Sustained.

24 BY MR. WEITZMAN:

25 Q.  He then says, at 10:19 a.m.:  "OK.  Any special reason you

O5uWmen2                         Coughlin - Cross

1   want prayers?"  Do you see that?

2   A.  Yes.

3   Q.  And then she responds: *Oui, mon amour*, but not over

4   texting.  I will tell you tonight.  Nothing to worry about.

5   Please put me on the very top of your list.  Your prayers

6   always get answered."  Do you see that?

7   A.  Yes.

8   Q.  Now, she doesn't answer what's wrong in this text exchange,

9   right?

10          MR. MONTELEONI:  Objection.

11          THE COURT:  I'll allow it.

12  A.  Not in the text message, no.

13  Q.  She says she'll tell him later, right?

14  A.  Yes.

15  Q.  And you've seen no documents, emails, or anything that

16  confirms that she actually told him later, right?

17          MR. MONTELEONI:  Objection.

18  BY MR. WEITZMAN:

19  Q.  Nothing like that on your chart, right?

20          THE COURT:  Is there anything on the chart?

21  A.  No.

22          MR. WEITZMAN:  If we can go to lines 951 and 952.

23  Q.  And here, she says, on June 27, 2019, at 2:56 p.m., in a

24  text message to Robert Menendez, Nadine Arslanian writes:  "No

25  questions, *mon amour*.  No bad test results.  Please when you

O5uWmen2                          Coughlin - Cross

get a break do a prayer for me.  The past hour has been very

hard to deal with.  I wish it was tomorrow already, but please

just to a prayer to get me through today.  I wish I never ever

met Will," to which Senator Menendez responds:  "I try not to

ask questions, but when you ask me to say a prayer, I know

something has happened.  Did you see Will?

     Do you see that?

A.  Yes.

Q.  And you testified about these exchanges in your direct

examination, correct?

A.  Yes.

Q.  And Nadine specifically says no questions, *mon amour*,

right?

A.  Yes.

Q.  OK.  She doesn't want Senator Menendez -- she indicates

that she does not want Senator Menendez to question her about

what's wrong, right?

          THE COURT:  Sustained.  She says, no questions*, mon

amour*.

          MR. WEITZMAN:  Correct.

Q.  She also says no bad test results.  Do you know what that

concerns?

          MR. MONTELEONI:  Objection.

          THE COURT:  Sustained.

          He's just checking the underlying documents and making

O5uWmen2                    Coughlin - Cross

1   sure that they're accurately reflected on the chart.

2   BY MR. WEITZMAN:

3   Q.  Have you seen any documents that concern test results?

4           MR. MONTELEONI:  Objection.

5           THE COURT:  Sustained.

6           MR. WEITZMAN:  I'm not asking about the substance of

7   them.

8           THE COURT:  Sustained.

9   BY MR. WEITZMAN:

10  Q.  Fair to say, sir, that in Menendez's response, he

11  understands something may have happened with Will?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14  BY MR. WEITZMAN:

15  Q.  He responds at the end, did you see Will?

16          THE COURT:  His job is not interpreting what's on

17  those charts.  His job is to accurately reflect the underlying

18  documents.

19          MR. WEITZMAN:  Thank you, your Honor.

20          THE COURT:  I take it that's correct, sir.  I

21  certainly don't mean to testify for you.

22          THE WITNESS:  Yes, that is correct.

23          THE COURT:  OK.

24          THE WITNESS:  Thank you.

25  BY MR. WEITZMAN:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen2                        Coughlin - Cross

1   Q.  You testified today about a Nordic Track.  Do you recall

2   that?

3   A.  Yes.

4           MR. WEITZMAN:  If we can go to lines 1160 and 1161,

5   and if we can zoom those out.

6   Q.  Nadine texts senator Menendez about a Nordic Track, an

7   elliptical machine, correct, on December 7, 2020, at 5:07 p.m.?

8           THE COURT:  Do you know if a Nordic Track is an

9   elliptical machine?

10  A.  It does say in the message this is my elliptical.

11          THE COURT:  OK.

12  BY MR. WEITZMAN:

13  Q.  Then she says:  "Cost me, with a padded mat under it, about

14  $1,600," right?

15  A.  Yes.

16  Q.  She's letting Senator Menendez know that it cost her

17  $1,600, correct?

18          THE COURT:  Sustained.

19          MR. MONTELEONI:  Objection.  And rule of completeness.

20  1161.

21          THE COURT:  I sustained the objection.

22          MR. WEITZMAN:  If you go to lines 1175 to 1176, at the

23  bottom and the next page.

24  Q.  1175 and 1176, these are text messages or WhatsApp messages

25  between Rony Daibes and Will Hana about some sort of Nordic

O5uWmen2                           Coughlin - Cross

1    Track machine or a BowFlex Max exercise machine, right?

2    A.  Yes.

3    Q.  Senator Menendez isn't on these messages, right?

4              THE COURT:  On 1175 and 1176, is that what you're

5    asking?

6              MR. WEITZMAN:  That is what I'm asking.

7    A.  No, he's not.

8              MR. WEITZMAN:  OK.  And then can you put up 1178 and

9    1196.

10   Q.  All these messages, from 1175 all the way down to 1196, all

11   these messages between Rony Daibes and Will Hana about some

12   sort of exercise machine for Nadine, Senator Menendez isn't on

13   any of those messages either, right?

14   A.  No, he's not.

15   Q.  And you didn't see any texts as you were reviewing the

16   accuracy of this summary chart that indicates that anybody told

17   Senator Menendez that IS EG paid for an elliptical machine --

18             MR. MONTELEONI:  Objection.

19   Q.  -- for Nadine?

20             THE COURT:  Sustained.

21   BY MR. WEITZMAN:

22   Q.  Is there any line in the summary chart that indicates that

23   Senator Menendez was told that IS EG was paying for this

24   elliptical machine?

25             MR. MONTELEONI:  Objection.

1           THE COURT:  Sustained.

2           MR. WEITZMAN:  If we can scroll to the bottom.

3   Q.  In the next, 1197 to 1198, do you see that Nadine Menendez

4   texted Senator Menendez on March 3, which is weeks after, about

5   the elliptical machine?  Correct?

6           THE COURT:  I'm sorry.  Is your question do you see

7   that on March 3 Nadine Menendez texted Robert Menendez about

8   the elliptical?  Is that your question?

9           MR. WEITZMAN:  It is, yes.

10          THE COURT:  All right.

11  A.  Yes, I see the text.  Yeah.

12  Q.  She doesn't indicate that IS EG in this text paid for that

13  elliptical, correct?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Sustained.

16          It says what it says.  The jury is able to read it.

17  BY MR. WEITZMAN:

18  Q.  When you reviewed this text in the email chain, was there

19  any portion in the underlying document that referenced, that

20  didn't make it into this document that referenced that Nadine

21  Menendez told Robert Menendez that IS EG was paying for this?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  I'll allow it.

24  A.  Ask it again, please?

25  Q.  Yeah.  You reviewed the underlying document, GX A101-3,

1    correct?

2    A.  Yes.

3    Q.  And was there any other, any portion of that document that

4    did not make it in here that suggested that Nadine Menendez

5    told Robert Menendez that IS EG was paying for this elliptical?

6    A.  I don't recall.  I'd have to look at the --

7             MR. WEITZMAN:  Should we put it up?

8             Put it up, GX A101-3.  Why don't you scroll through.

9             Can we find the elliptical machine.  There it is.

10   Q.  "Elliptical we put together at 9 a.m. Monday morning."  Do

11   you see that?

12   A.  Yes.

13   Q.  And she starts with:  I was just recording CNN for tomorrow

14   morning," right; that didn't make it into your summary chart?

15   A.  That's correct.

16            MR. WEITZMAN:  OK.  And then go to the next entry.

17   Just scroll through it very quickly.  Keep going down.

18            Reverse chronological?  OK.

19   Q.  In any event, is there anything here that indicates to you

20   that Nadine Menendez disclosed to Senator Menendez that this

21   was purchased by IS EG?

22            MR. MONTELEONI:  Objection.

23            THE COURT:  Sustained.

24   BY MR. WEITZMAN:

25   Q.  None of those messages included any other references to the

O5uWmen2                        Coughlin - Cross

1    elliptical, other than that top message, right?

2    A.  That's correct.

3            MR. WEITZMAN:  OK.  Now, line 1198 of GX 1203.

4    Q.  1198, that's March 3, 2021.

5        You reviewed calendars in your direct testimony.  Are you

6    aware that March 3, 2021, is a Wednesday?

7            MR. MONTELEONI:  Objection.

8            THE COURT:  I'm sorry.  Was there an objection?

9            MR. MONTELEONI:  Yes.  Phrasing.

10           MR. WEITZMAN:  I think counsel asked him many times

11   what day of the week --

12           THE COURT:  As you sit here today, are you aware that

13   March 3, 2021, was a Wednesday?  Yes or no.

14   A.  I would need to review the calendar.

15   Q.  OK.  Do you know where the senator is during the workweek?

16           MR. MONTELEONI:  Objection.

17           THE COURT:  Sustained.

18   BY MR. WEITZMAN:

19   Q.  You know he's a senator of the United States?

20           THE COURT:  I'll allow that.

21   A.  Yes.

22   Q.  You know that the Senate office is in Washington, D.C.,

23   sir?

24           THE COURT:  I'll allow that.

25   A.  Yes.

O5uWmen2                       Coughlin - Cross

1  Q.  Now, the elliptical machine that's referenced in these

2  March 2021 entries, are you aware that that -- those gifts or

3  those, that elliptical was given more than two years after IS

4  EG was formed?

5           MR. MONTELEONI:  Objection.

6           THE COURT:  Sustained.

7  BY MR. WEITZMAN:

8  Q.  Are you aware, sir, as to when IS EG was formed?

9           THE COURT:  Are you aware from your review of the

10 documents when IS EG Halal was formed?

11 A.  There may have been a reference in some documents I

12 reviewed, but I don't recall at the moment.

13 Q.  Are you aware that this elliptical gift was given more than

14 two years after Nadine --

15           MR. MONTELEONI:  Objection.

16           THE COURT:  Sustained.

17 BY MR. WEITZMAN:

18 Q.  -- was terminated --

19           THE COURT:  Sustained.

20           MR. WEITZMAN:  Well, let's go to line 724.

21 Q.  This is March 3, 2021, right?

22 A.  Yes.

23           MR. WEITZMAN:  Let's go to line 724.

24 Q.  Do you recall testifying about this email from Robert Kelly

25 to Ted McKinney at the U.S.D.A. about an article that Senator

O5uWmen2                    Coughlin - Cross

1    Menendez asked to send to Ted McKinney?

2    A.  Yes.

3    Q.  OK.  We're just going to compare the dates here.  March 3,

4    2021, is approximately two years after this email was sent,

5    correct?

6    A.  Yes.

7    Q.  OK.  And the same thing with the air purifier you testified

8    about today; do you recall testifying about those air

9    purifiers, the Amazon purchase?

10   A.  Yes.

11   Q.  And do you recall that that was in about March of 2021?

12   A.  I don't recall the exact date.

13   Q.  OK.  Same question.  That's about two years after this

14   article is forwarded from Senator Menendez's office to Ted

15   McKinney, correct?

16   A.  I don't recall the date of the air purifier, but March 2021

17   is two years after March 2019, yes.

18   Q.  OK.

19   A.  Or May.  I'm sorry.  In this case it says May.

20          MR. WEITZMAN:  I want to talk to you about some other

21   things that Nadine said that's reflected in your chart.  Let's

22   look at line 525.

23   Q.  On March 26, 2019, Nadine texts Andy Aslanian at 8:30 p.m.

24   By the way, do you know that Andy Aslanian is a lawyer?

25          MR. MONTELEONI:  Objection.

O5uWmen2                    Coughlin - Cross

1      THE COURT:  Sustained.

2   BY MR. WEITZMAN:

3   Q.  Do you know what Andy Aslanian does as a profession from

4   your review of the documents?

5   A.  I recall his letterhead, but frankly, I don't -- I don't

6   recall exactly what the business was.

7   Q.  OK.  Some sort of professional, of some sort?

8   A.  Yes.

9   Q.  OK.  And she writes to him:  "I got a letter from my

10  mortgage company."  Correct?

11  A.  Yes.

12  Q.  And do you recall testifying about mortgage issues that she

13  had; she was in foreclosure, right?

14      MR. MONTELEONI:  Objection.

15      THE COURT:  Do you recall testifying about mortgage

16  issues that Nadine Menendez had?

17  A.  I -- we -- I testified about the documents, the mortgage

18  document, documents.

19  Q.  You understood from the documents you reviewed Nadine was

20  in arrears; she was behind in paying her mortgage, right?

21      MR. MONTELEONI:  Objection.

22      THE COURT:  I'll allow it.

23  A.  That's what I understood the foreclosure document to

24  indicate.

25  Q.  OK.  Nothing in this, in your summary chart reflects that

O5uWmen2                      Coughlin - Cross

1    Nadine communicated with Bob about that, right?

2              MR. MONTELEONI:  Objection.

3              THE COURT:  Sustained.

4              MR. WEITZMAN:  Let's go to the next entries, 526

5    through 527.  Next page.  Sorry.

6              527, she leaves a voice mail for Bob Menendez and she

7    says -- hold on a second.

8              She says to him:  "I have been getting nonstop phone

9    calls and text messages which I didn't even open from Will.  So

10   I think he wants me to set up dinner, which I'm not going to

11   do.  So I believe that he's trying to go to the meeting you're

12   attending today and wants me to arrange a dinner, and I'm not

13   arranging a dinner."

14   Q.  I don't need to review the rest of it, but this is a phone

15   call the very next day after she had emailed Andy Aslanian

16   about getting a mortgage letter, right?

17             MR. MONTELEONI:  Objection.

18             THE COURT:  If you know.

19             MR. WEITZMAN:  We can put up 525 at the same time.

20   Q.  So you see -- let's just break down the chronology.

21        On March 26, 2019, she texts Andy Aslanian she got a letter

22   from the mortgage company, correct?

23   A.  Yes.

24   Q.  The very next communication reflected on your chart between

25   Nadine and Bob Menendez is on March 27, 2019, at 11:56 a.m.,

O5uWmen2                         Coughlin - Cross

1   the following morning, correct?

2   A.  Yes.

3   Q.  And she says nothing on that voice mail about a mortgage

4   issue, correct?

5   A.  She does not mention mortgage, no.

6   Q.  And then she texts Robert Menendez two days later in the

7   morning, correct?  Line 529.

8   A.  Yes.

9   Q.  And she says*: "Mon amour de la vie*, merci for my résumé.

10  I just read the text.  I owe it to you."  And then she says:

11  "I will make you very proud of me before the end of the year --

12  in many ways.  I love you."

13          Do you see that?

14  A.  Yes.

15  Q.  Did you see any communication between March 26 and March

16  29 -- that's on this chart or not on this chart -- where she

17  tells Robert Menendez about her mortgage issues between these

18  dates?

19              THE COURT:  Sustained.

20              MR. WEITZMAN:  Well, let's look at line 958.

21              This is a June 28 entry.  I'm sorry.  Yeah, this is a

22  June -- it's 956.  Excuse me.

23  Q.  This is a June 28 entry, at 10:33 a.m., and this is a voice

24  mail Nadine leaves for Fred, correct?

25  A.  Yes.

O5uWmen2                        Coughlin - Cross

1  Q.  This is three months after that March entry on March 29 --

2  I'm sorry, the March 26 entry where she receives the mortgage

3  letter, right?

4  A.  Yes.

5  Q.  And in this voice mail, she states:  "I have not told Bob

6  yet because he's going to flip out against Will."  Do you see

7  that?

8            THE COURT:  Do you see those words, sir?

9  A.  I do see those words, yes.

10  Q.  And she says:  "Um, but my mortgage I haven't paid it and I

11  have been counting on the money Will's giving me to do it and

12  he hasn't given me anything yet."  Correct?

13  A.  Yes.

14  Q.  And then several lines beneath that, she says:  "So, um, I

15  will tell Bob on Friday, after we get back, because I'm not

16  telling him on the trip."  Correct?

17  A.  Correct.

18  Q.  You haven't seen any communication after this date, sir,

19  that's summarized on this chart, where she told Bob about the

20  mortgage issue?

21            THE COURT:  Sustained.

22  BY MR. WEITZMAN:

23  Q.  Is there any line entry on your chart that reflects a

24  communication from Nadine to Bob about the mortgage?

25            MR. MONTELEONI:  Objection.

O5uWmen2                    Coughlin - Cross

1  BY MR. WEITZMAN:

2  Q.  You can have the whole chart.  Is there any line entry that

3  reflects that?

4          THE COURT:  Do you have any idea whether there is or

5  not, sir?

6  A.  There's a lot of entries on the chart.  I would need to

7  review the chart again.

8  Q.  You don't have a recollection as you sit here now, right?

9  A.  Not at the moment, no.

10  Q.  Now, fair to say that you do have line entries where Nadine

11  is invoking Bob's name?  Do you recall that?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14          MR. WEITZMAN:  Let's go to line 631.

15          THE COURT:  The entries are what the entries are.  Go

16  ahead.

17          MR. WEITZMAN:  Let's go to line 631.  And if we could

18  do a split screen with the line entries on the prior page too,

19  above it.  Go from 629 and 630 and then 631.

20  Q.  On April 26, at 12:06 a.m. -- that's right after midnight,

21  is that correct?

22  A.  Yes.

23  Q.  OK.  So it's the nighttime of April 25, overnight, correct?

24  A.  Yes.

25  Q.  OK.  Nadine Arslanian, in the middle of the night, texts

O5uWmen2                    Coughlin - Cross

1    Will Hana:  "I got off the phone with him about an hour ago.

2    I'm sorry to text you late, but he left all of tomorrow free so

3    he can help me in the house because he thought the carpet would

4    already done, down, I text Nader twice today, no answer, once

5    yesterday, no answer.  He keeps telling me he will get back to

6    me and never does.  I asked him if he could at least drop the

7    carpet off.  Could you please let me know tomorrow what is

8    going on with it because now he is really, really pissed that

9    he left the whole day free to help me move things from the

10   garage and nothing can be done."

11       Do you see that?

12   A.  Yes.

13   Q.  Your chart doesn't reflect any phone call from Senator

14   Menendez to Nadine, or vice versa, an hour before April 26,

15   correct?

16           MR. MONTELEONI:  Objection.

17           THE COURT:  You can answer.

18   A.  Again, my role is to check the accuracy of the chart.  I

19   didn't memorize the chart.

20   Q.  No.  I --

21   A.  I don't remember where everything is in the chart.

22   Q.  Fair enough.  I have all the line entries directly before

23   this April 26 line entry.  I have 629 and 630 on April 24 and

24   April 25.  I'm not leaving anything out.

25       There's nothing in the day prior that reflects a call

O5uWmen2                              Coughlin - Cross

1  between Nadine Arslanian and Bob Menendez, correct?

2  A.  The chart does not reflect a call, correct.

3  Q.  Now, again, in April 2019, are you aware that Senator

4  Menendez and Nadine are not engaged?

5          MR. MONTELEONI:  Objection.

6          THE COURT:  Sustained.

7  BY MR. WEITZMAN:

8  Q.  You see her last name --

9          THE COURT:  You see what his job is, sir.  It's to

10  take the documents that the government, the lines that the

11  government has given him and to make sure that the underlying

12  documents accurately reflect what the government has given him.

13  He's not testifying here on where senators have offices or who

14  is engaged when or who is friends with somebody else.  It's a

15  limited role.

16  BY MR. WEITZMAN:

17  Q.  Sir, there are some entries on your chart that refer to

18  Nadine as Nadine Arslanian, correct?

19  A.  Yes.

20  Q.  And there are some entries that refer to her as Nadine

21  Menendez, correct?

22  A.  Yes.

23  Q.  And do you know why it was switched from Arslanian to

24  Menendez?

25  A.  Yes, because they got married.

O5uWmen2                        Coughlin - Cross

```
 1   Q.  OK.  And so at this point in time, in April 2019, they're
 2   not married, right?
 3   A.  I -- I believe they were married in October of 2020.
 4   Q.  OK.  And what's that based on, by the way?
 5   A.  I googled it.
 6           THE COURT:  Is it based on anywhere in your chart?
 7           THE WITNESS:  It's not based on the chart, no.
 8   BY MR. WEITZMAN:
 9   Q.  You googled it?
10   A.  I did.
11   Q.  So you did some other -- again, just a public source
12   review, right?
13   A.  That's correct.
14   Q.  And did you google as well when they got engaged?
15   A.  Yes.
16   Q.  OK.  And when did they get engaged?
17   A.  I believe it was October 2019.
18   Q.  What did you see on Google that indicated that?
19   A.  As far as the engagement?
20   Q.  Yes.
21   A.  I believe it was a New York Times article.
22   Q.  What do you recall from that article?
23           MR. MONTELEONI:  Objection.
24           THE COURT:  Sustained.
25   BY MR. WEITZMAN:
```

O5uWmen2                         Coughlin - Cross

1    Q.   OK.   October 2019, though, right, for the engagement?

2    A.   Yes, I believe so.

3              MR. WEITZMAN:   I want to turn to line 928.

4    Q.   Now, you testified about this line entry on June 22, 2019,

5    at 2:44 p.m.   Do you recall that?

6    A.   Yes.

7    Q.   OK.   You read the first part of the line entry, but you

8    didn't read the bottom half.   Do you recall that?

9    A.   I -- I don't recall that exactly.

10   Q.   In the middle of the page -- I'll read it -- she writes to

11   José Uribe:   "I will give you a call after 4 o'clock, but I do

12   not want to bother you.   If he did not do it, that means he is

13   looking for me to lose my house the same way he lost his

14   because he had been asking me quite a few times that he and

15   Fred would love the property."

16        Do you see that?

17   A.   Yes.

18   Q.   And you understood the property referred to Nadine's home?

19             MR. MONTELEONI:   Objection.

20             THE COURT:   Sustained.

21   BY MR. WEITZMAN:

22   Q.   Do you have any idea what she's referring to here?

23             MR. MONTELEONI:   Objection.

24             THE COURT:   Sustained.

25   BY MR. WEITZMAN:

O5uWmen2                          Coughlin - Cross

1    Q.  You didn't -- do you recall now that you didn't testify

2    about that portion of the line item?

3    A.  Yes.

4    Q.  OK.  You'd agree with me that your testimony did include

5    many, many entries where Nadine is complaining about Will Hana,

6    right?

7                MR. MONTELEONI:  Objection.

8                THE COURT:  I'll allow that.

9    A.  I wouldn't say there's many.  There was a few.

10   Q.  OK.  Do you recall one entry where, excuse me French, she

11   calls him a lying asshole?

12   A.  Yes.

13   Q.  Do you recall another entry where she said she hopes the

14   pyramids fall on his head?

15               MR. MONTELEONI:  Objection.

16               THE COURT:  Let's see what the answer is.

17   A.  I believe in the exact text -- I'm not sure she said Will,

18   but I think contextually, you -- you could understand that's

19   who she was likely talking about.

20   Q.  I'd like to discuss some of the line entries on your chart

21   about Nadine looking for a job.  OK?

22   A.  Yes.

23               MR. WEITZMAN:  Let's start with line 30.

24               Your Honor, I can't tell what time it is.

25               THE COURT:  Ten of one.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen2                        Coughlin - Cross

```
1              How much longer do you have?
2              MR. WEITZMAN:  I have a good amount.
3              THE COURT:  Ten minutes or less?
4              MR. WEITZMAN:  No.  Much more than ten minutes.
5              THE COURT:  What's your estimate?
6              MR. WEITZMAN:  A third of the way through to half.
7              THE COURT:  You're a third of the way through already?
8              MR. WEITZMAN:  Yes.
9              THE COURT:  I shouldn't say already.  Now you're a
10   third of the way through.
11             MR. WEITZMAN:  Yes.  I'll try to speed it up.
12             THE COURT:  It's an hour already and you're a third of
13   the way.
14             MR. WEITZMAN:  Well, he testified for three days, your
15   Honor.
16             THE COURT:  All right.  Let's continue.
17             MR. WEITZMAN:  OK.  If we can go to line 30.
18   Q.  This is a February 4, 2018, text message from Andy Aslanian
19   to Nadine Arslanian.  You recall that this is two days after
20   their first date, after they had a date, Bob Menendez and
21   Nadine, correct?
22   A.  Yes.
23   Q.  And Andy tells her that you have to call her up and
24   apologize, referring to Sabine.  Do you recall the exchange, or
25   should we --
```

O5uWmen2                          Coughlin - Cross

1          MR. WEITZMAN:  We can put up the earlier exchange.

2          MR. MONTELEONI:  Objection.

3          THE COURT:  We don't have a question yet.

4          MR. WEITZMAN:  Let's put up the earlier exchange.

5   Q.  Nadine texts Andy and she says, unfortunately, when I got

6   home there was no trace of Sabine, and she says Sabine was

7   hurt, right?

8   A.  Yes.

9   Q.  Do you know who Sabine is, by the way?

10  A.  I don't.

11  Q.  OK.  And then Andy says:  "You have to call her up and

12  apologize.  Tell her about being cochair person of the charity

13  and the fact that you had been talking to Menendez which may

14  result to a good job for you."

15      Do you see that?

16  A.  Yes.

17  Q.  And there are other communications in which Nadine is

18  talking about getting a job, right?

19          MR. WEITZMAN:  Let's go to line 81.

20  Q.  Nadine texts Will Hana on April 6, 2018, at 5:40 p.m.,

21  senator said that you are such a good friend for everything

22  that you did yesterday, and then at the end he says that I will

23  find out when he calls me today what happened and ask him about

24  the two deals.  Do you see that?

25  A.  Yes.

O5uWmen2                          Coughlin - Cross

1   Q.  And you don't know what those two deals are, right?

2   A.  No.

3   Q.  And do you recall the line entries where the senator helped

4   Nadine with a résumé?

5   A.  Yes.

6           MR. WEITZMAN:  Yes.  Let's go to line 488.  Let's do

7   the lines before then too.  484 to 488.

8   Q.  So starting at the bottom, 488, she says, how many women --

9   this is March 14, 2019, at 12:18 p.m.:  "How many women my age

10  do you know that I have worked and have résumés?"

11          Do you see that?

12  A.  Yes.

13  Q.  And Menendez is asking her questions to assist with the

14  résumé, right?

15  A.  Yes.

16  Q.  OK.  And he asks have you ever formally worked for Doug,

17  right?

18  A.  Yes, he asks her that.

19  Q.  And you don't know who Doug is?

20  A.  No.

21  Q.  You don't know whether he's a lawyer, a professional or

22  anything else?

23          MR. MONTELEONI:  Objection.

24          THE COURT:  Sustained.  He said he doesn't know who

25  Doug is.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    BY MR. WEITZMAN:

2    Q.  Nadine states:  "I started Conception Sports Management

3    with him and got him 90 percent of the clients and got him

4    clients for the law practice 100 percent but never got paid for

5    it."

6          Do you see that?

7    A.  Yes.

8    Q.  Senator Menendez doesn't respond that doesn't sound right,

9    right?

10              MR. MONTELEONI:  Objection.

11              THE COURT:  Sustained.

12   BY MR. WEITZMAN:

13   Q.  You don't see any response from Senator Menendez in

14   response to her starting Conception Sports Management --

15              THE COURT:  On your chart, sir, is there a response to

16   this statement from Nadine Arslanian to Mr. Menendez?

17              THE WITNESS:  I'm sorry.  Can you ask that question

18   again?

19              THE COURT:  Sure.  On your chart, is there a response

20   from Menendez to Arslanian.

21              THE WITNESS:  Not on this portion we could see.  I

22   don't think there is in the later portion either.

23              THE COURT:  All right.  Next.

24              MR. WEITZMAN:  Let's go to lines 489 to 492.

25   Q.  His response was:  What name is the sports management

1    company?  How many years have you been doing children's

2    hospital visit?"  Correct?

3              THE COURT:  Do you see those words on your chart.

4              THE WITNESS:  Yes.

5    BY MR. WEITZMAN:

6    Q.  And again, he doesn't say what sports management company,

7    right?

8              THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  And then he forwards, Robert Menendez forwards the email

11   chain with the draft résumé to Robert Kelly, correct?

12   A.  Yes.

13   Q.  And do you understand who Robert Kelly is?

14   A.  From his signature, yes -- signature line on, on a letter,

15   or on the email.

16   Q.  And he's a staff member for Senator Menendez, right?

17   A.  Correct.

18   Q.  Is he one of the senior staff members?  Do you know?

19             MR. MONTELEONI:  Objection.

20             THE COURT:  Sustained.

21   BY MR. WEITZMAN:

22   Q.  Do you know what his signature block was?

23   A.  I don't recall.  Chief of staff?  I don't recall.

24   Q.  OK.  Any idea why he's asking about children's hospital

25   visits in this text message?

O5uWmen2                          Coughlin - Cross

1              MR. MONTELEONI:  Objection.

2              THE COURT:  Sustained.  Is this a logical time to

3     break, sir?

4              MR. WEITZMAN:  This is, yes.

5              THE COURT:  Ladies and gentlemen, one hour.  Keep an

6     open mind.  You haven't heard all the testimony.  Don't discuss

7     this case.

8              Enjoy the lunch.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5uWmen2

1          (Jury not present)

2          THE COURT:  Please be seated in the courtroom.

3          You may step down and out, sir.

4          (Witness not present)

5          THE COURT:  Mr. Weitzman, I've given you a fair amount

6    of leeway here, you'd concede, in light of the length of the

7    government's direct examination, but you can't have him

8    interpreting what's on there or talking about what's not on

9    there.  Just stick with what is on there.  You can't ask him

10   things outside of the four corners of this document.

11         MR. WEITZMAN:  Your Honor, respectfully, the record

12   suggests otherwise, and let me make two points, your Honor.

13         THE COURT:  The record suggests otherwise what?

14         MR. WEITZMAN:  Yes.  I think I am entitled to ask him

15   about that.

16         THE COURT:  Oh, OK.

17         MR. WEITZMAN:  And there are two reasons why.

18         The first is I asked him whether he reviewed documents

19   other than the exhibits that are in this summary chart, and he

20   said he did.

21         THE COURT:  Yes.

22         MR. WEITZMAN:  He also said he reviewed Google and

23   there are stock charts and other things.  So I'm entitled to

24   ask him whether he's seen other documents, because I don't know

25   the universe of what he reviewed.  They never provided that to

O5uWmen2

1   us.  I'm entitled to ask him whether he's seen other documents

2   that provide him a basis to know one way or the other.

3           The second thing is, your Honor, I can find a dozen,

4   two dozen, three dozen instances where Mr. Monteleoni said do

5   you see a response from Senator Menendez, something that isn't

6   on the document; or did Senator Menendez do this or did Nadine

7   say this.  And they've gone over and over again beyond what's

8   on the document and asked him to put his credibility on the

9   line.

10          THE COURT:  I understand that point.

11          MR. WEITZMAN:  And so I think that I'm being a bit

12   unfairly constricted, as much leeway as you're giving me.  I

13   think I should be entitled to ask do you see a response to that

14   from Robert Menendez.

15          THE COURT:  I understand.

16          MR. MONTELEONI:  Your Honor, may I respond to that

17   briefly?

18          THE COURT:  Please.

19          MR. MONTELEONI:  So, the questions that I asked about

20   whether there was a response were whether that response was

21   reflected in the underlying exhibits.  The question whether the

22   response is on the chart is one type of question.  It's not

23   very informative, because the chart, as he's testified on

24   direct and cross-examination, doesn't list everything.  But

25   there's a very big difference between asking whether a specific

O5uWmen2

1    cited underlying source document that he reviewed that is cited

2    on the chart reflects something versus just asking generally

3    did someone say something about something.

4              THE COURT:  In other words, the point here is to tie

5    it in to the chart, what's on the chart.

6              MR. MONTELEONI:  What's on the chart or the specific

7    underlying document, specifically cited in the chart.  And yes,

8    if there's a particular Google search that he performed about

9    the phone number of Morton's Steakhouse and he wants to ask a

10   question about that Google search, then yes, of course; that's

11   part of it.

12             But the whole idea that because he spends a few

13   seconds to a minute per document looking through a number of

14   documents to figure out what type of documents they were, that

15   Mr. Weitzman can then ask about is he aware of documents that

16   show XYZ, with some suggestion that XYZ happened, is in those

17   documents is completely unfair.

18             THE COURT:  Sir.

19             MR. WEITZMAN:  I respectfully disagree.  He said that

20   he was familiarizing himself with documents and he spent

21   several seconds to minutes on each document, that he looked at

22   every document they gave him.  I'm entitled to ask whether

23   there was -- and he may just say I don't recall, and I get

24   that, or not to my recollection.  But they gave him more

25   documents than are on this chart, and so I'm entitled to ask

O5uWmen2

1    him what his memory is or, at a minimum, say there is nothing

2    on the chart or in the underlying documents you reviewed that

3    reflects a response.

4            MR. MONTELEONI:  Your Honor, he's asking about

5    documents --

6            THE COURT:  Wait just a moment.

7            You can ask him what's on the chart but not what's in

8    the underlying documents.  You're asking him as he sits here

9    now to know what all of those GX documents state.  No.

10           MR. WEITZMAN:  Mr. Monteleoni's point was that he was

11   permitted to make those requests about whether Senator Menendez

12   or someone else responds because he was bringing up the

13   underlying document.  If that's the way we're going to proceed,

14   I'll bring out the underlying document, but I think I can do it

15   at least from memory and see if he recalls before I have to

16   refresh his recollection; at least from memory, is there

17   anything in the summary chart that indicates to you that

18   Senator Menendez responded or didn't respond?

19           THE COURT:  Speak to that particular point.

20           MR. MONTELEONI:  Your Honor, yes, but I think that

21   there's a few issues here.

22           First of all, him talking about what is or isn't

23   reflected in a large number of documents not in evidence,

24   however long he reviewed them for -- and here the review was

25   incredibly cursory -- is absolutely classic attempts to get the

O5uWmen2

1    jury to speculate that something should have been there,

2    something wasn't there in some unknown document set that is

3    really totally improper for the jury to be considering whether

4    a document's not -- that aren't actually offered in evidence

5    reflect something.  That's one thing.

6            The second thing is there is a big difference between

7    asking whether there's a response and what the subject matter

8    of the response is and questions -- and that is tied to a

9    specific admitted government exhibit that is specifically cited

10   that is in evidence and asking questions that build in a number

11   of characterizations about people's intentions, people's

12   knowledge.  And those things involve a degree of interpretation

13   that is really improper.

14           THE COURT:  Yes.

15           MR. MONTELEONI:  If he's going to stick to what they

16   say, that's fine.

17           (Continued on next page)

18

19

20

21

22

23

24

25

1    THE COURT:  I think everybody should go to lunch.  I

2    think that's really what the guidelines should be.  Lodge it in

3    the charts, to the extent you can.  Is what's in the chart, and

4    you can ask is the response set forth on the chart, if he

5    knows.  All right.  But, you can't ask for interpretation of

6    what's there.  And you have been.

7    MR. WEITZMAN:  I accept that, your Honor.  But I have

8    been objected to with sustained objections as to did Robert

9    Menendez respond to this or did he say I disbelieve this.  And

10    those are exactly the types of questions they asked.  When the

11    checks came in for Nadine, I think there was a question, well,

12    did Menendez say what's this about?  And it was littered in the

13    direct.

14    THE COURT:  There were some like that, that's correct.

15    For the jury to draw the inference he knew full well what it

16    was about.

17    MR. MONTELEONI:  Yes.  I phrased the questions in a

18    way intentionally with respect to the specific documents in

19    those chats, that are there on that date, that were the

20    underlying documents reviewed, did you see that.  That's really

21    not just talking about did he respond at all.  It was more

22    broad.

23    THE COURT:  I believe you did ask was there a

24    response.

25    MR. MONTELEONI:  But I do, I did take pains to build

O5U3MEN3

1    into my question, maybe I slipped up at one point, but I think
2    it built it in.  And it was the focus in the documents that he
3    reviewed underlying that was there a response, not was there a
4    response at some global matter of fact, which he's not capable
5    of testifying about for me or for Mr. Weitzman.
6            MR. WEITZMAN:  I'll limit it to the document, the
7    underlying documents.  The exhibit underlying that entry.
8            THE COURT:  That's the way to do it.  Have lunch,
9    everyone.  2 o'clock.
10           With that in mind, Mr. Weitzman, what's your estimate
11   now?
12           MR. WEITZMAN:  I'm going to go over my outline.
13           (Recess)
14           (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

O5U3MEN3

AFTERNOON SESSION

2:00

3          (In open court; jury not present)

4          THE COURT:  Put the witness on the stand, please.  The

5    jury is already lined up.  Where's the witness?

6          Sorry.  They're not all there.  they're in the jury

7    room but they need to line up.

8          MR. WEITZMAN:  Your Honor, if we have a minute.  I

9    wanted to address our colloquy before.

10          THE COURT:  Yes, sir.

11          MR. WEITZMAN:  Just a couple Q and As on direct that

12    shed light on my point.

13          MR. MONTELEONI:  I don't think this is appropriate in

14    front of the witness.

15          MR. WEITZMAN:  He heard the direct.

16          THE COURT:  Step down.

17          Andrew, just stand right there.

18          MR. WEITZMAN:  Transcript page 1410:25-1411:6.

19    "Q.  I'm not going to ask you details about them.  But have you

20    seen documents showing that Uribe was texting with Nadine

21    Arslanian about other subjects earlier in the year?

22    "A.  Yes, I have, yes.

23    "Q.  Have you seen documents that Uribe was texting with Hana

24    about other subjects before this as well?

25    "A.  Yes."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1            Then there's questions page 1341.

2   "Q.  By the way, have you seen documents where Menendez and

3   Nadine Menendez were discussing Nader possibly doing other home

4   improvements for them at other times?

5   "A.  Yes.  His name's been mentioned before.  Yes."

6            Page 1406.  Line 16.

7   "Q.  Have you looked at the messages between Menendez and

8   Nadine over the next several hours in that message chain?

9   "A.  Yes.

10  "Q.  In those messages, does Menendez ask her what she's

11  talking about?

12  "A.  No."

13           On top of that, there were questions about

14  interpreting what a tax ID is, there's questions about --

15           THE COURT:  Just a moment.  You're quoting

16  Mr. Monteleoni now.  Is that what you are doing?

17           MR. WEITZMAN:  All of that was Mr. Monteleoni.  I want

18  the record to be clear.  As precise as he attempted to be, he

19  ventured in a leading way well beyond just the underlying

20  document and asked about all the documents he's reviewed.  And

21  so, I understand your Honor will --

22           THE COURT:  Just let me take a look at this.

23           MR. WEITZMAN:  Yes.

24           THE COURT:  I see it.  Go ahead, sir.

25           MR. MONTELEONI:  So --

O5U3MEN3

1          THE COURT:  Let Mr. Weitzman finish.  I want to bring

2     the jury in.

3          MR. WEITZMAN:  There are also questions about

4     interpreting the résumé.  He says page 1397.

5     "Q.  Apart from those lines that you just read, are there any

6     international business positions listed in the résumé?

7     "A.  No.

8     "Q.  Are there any consulting positions?"

9          THE COURT:  I get the idea.

10          Mr. Monteleoni.

11          MR. MONTELEONI:  Look, I think these are all questions

12     that are within what I was talking about.  Certainly the one

13     about the response and the chat chain was specifically geared

14     in the question itself to the underlying document.  There were

15     a couple of foundational questions just to introduce who Jose

16     Uribe is, as just that he's someone who has texted with them.

17     That level of generality is really neither here nor there.

18          THE COURT:  You seem to be going a little beyond that

19     but I have the guidelines.

20          Let's bring this jury in.  Not greatly beyond that,

21     sir.

22          MR. WEITZMAN:  I understand that, your Honor.

23          THE COURT:  Bring the jury in.  And I'm sorry.  We

24     need the witness up, too.  Bring the jury in.

25          (Jury present)

1          THE COURT:  Ladies and gentlemen, since we're only

2    going to 4, let's try to go straight through until 4 if we can.

3    If somebody needs a break, signal Ms. Blakely.  But otherwise

4    we'll go straight through and you can have the glazed doughnuts

5    at 4.

6          MR. WEITZMAN:  Thank you, your Honor.

7    BY MR. WEITZMAN:

8    Q.  When we left off, we were talking about Nadine's job search

9    and I'd like to put up what is in evidence as GX A420 which was

10   a copy of a résumé you testified about.

11         Do you recall testifying about that?

12   A.  I do, yes.

13   Q.  Can we put up that up.  Let me ask you a question.  Do you

14   recall what it was, why she drafted a résumé from the documents

15   you reviewed?

16         MR. MONTELEONI:  Objection.

17         MR. WEITZMAN:  It's in this document.  Just go to

18   page 6.

19   Q.  Do you see "purpose"?

20   A.  Yes.

21   Q.  Let's read it.

22         "Purpose.  From volunteering at orphanages during the

23   civil war in Lebanon to helping victims of earthquakes in

24   Armenia and helping hurricane victims in Haiti, I've always

25   donated my time to causes helping children and seniors.  This

1   board position will allow me to continue working on my life's

2   passion of helping people in need."

3        You see that?

4   A.  Yes.

5   Q.  Are you aware that she was applying for a job to be a board

6   member on the Hackensack Hospital?

7            MR. MONTELEONI:  Objection.

8            MR. WEITZMAN:  Let me rephrase, your Honor.

9   Q.  Have you seen documents, text messages, or e-mails from

10  your review of the documents for the creation of the summary

11  chart that reflected that she was applying to have a job that's

12  affiliated with Hackensack Hospital?

13           THE COURT:  I'll allow that.

14  A.  Not that I recall.

15  Q.  Let's scroll down on the résumé.  Her work experience

16  includes Conception Sports Management between 2013 and 2018.

17  Correct?

18  A.  Yes.

19           THE COURT:  You mean that's what's listed there.

20           MR. WEITZMAN:  As reported on the résumé, correct.

21  Q.  And then education, if you can scroll down.  On her résumé

22  she lists two degrees from NYU, one with a BA in international

23  politics and one with a master's in French literature and

24  culture.

25           Do you see that?

O5U3MEN3                        Coughlin - Cross

1    A.  Yes.

2    Q.  She lists being fluent in three languages in addition to

3    English:  French, Arabic, and Armenian.  Do you see that?

4    A.  Yes.

5    Q.  If you can turn to lines 428 and 429 of Government

6    Exhibit 1302 and, Agent, I'm happy to give you a copy of 1302

7    so you have it in front of you.  Would you like that?

8    A.  Sure.

9    Q.  Okay.

10           MR. WEITZMAN:  May I approach, your Honor?

11           THE COURT:  Yes.

12   Q.  So you remember testifying about this Google search that

13   Nadine Arslanian's phone did for an export international

14   shipping company in Texas?

15   A.  Yes.

16   Q.  From your review of the documents associated with the

17   summary chart, did you see Nadine ever get a job in export in

18   international shipping?

19           MR. MONTELEONI:  Objection.

20           THE COURT:  Sustained.

21   Q.  Is there any line entry on the summary chart that reflects

22   that Nadine Arslanian had a job in international shipping?

23   A.  I don't believe so.

24   Q.  In the next line, Nadine Arslanian texts a woman named

25   Heather Choi "So sorry I left for Washington, D.C. at

1    4:30 a.m., I'm meeting with head of intelligence for Egypt."

2    Do you see that?

3    A.  Yes.

4    Q.  You testified about who the head of intelligence for Egypt

5    was, right?

6    A.  At the time I testified that, yeah.

7    Q.  And you recall his name?

8    A.  I don't.  I know I testified based on some of the documents

9    that were shown to me.

10   Q.  Does the name Abbas Kamel ring a bell?

11   A.  Yes, I believe that was he.

12   Q.  In your summary chart, you can go to page line 429 if you'd

13   like and the affiliated lines.  Was there any evidence that you

14   saw of an actual meeting between Nadine and Abbas Kamel on or

15   around this date?

16        MR. MONTELEONI:  Objection.

17        THE COURT:  Sustained.

18   Q.  Is there any entry on the chart that reflects the existence

19   of a meeting between Nadine Arslanian and Abbas Kamel on

20   January 30, 2019?

21   A.  I would say this line reflects it.

22   Q.  Other than this line or her statement that there was such a

23   meeting.  Is there any entry that reflects the actual existence

24   of a meeting?

25   A.  No.

1    Q.  Would you agree with me, sir, that the head of intelligence

2    for a foreign state is entering on a visa of some sort?

3            THE COURT:  Sustained.  Sustained.  Remember what this

4    man's job was.  You were asking, I think you asked whether a

5    college student could do it.  Not interpreting intelligence or

6    visa applications.

7    Q.  By the way, from the entries surrounding this date,

8    January 30, can you tell whether Bob attended a meeting with

9    Nadine?

10           MR. MONTELEONI:  Objection.

11           THE COURT:  Sustained.

12   Q.  Is there any entry on this chart that reflects whether Bob

13   attended that meeting?

14           MR. MONTELEONI:  Objection.

15   Q.  Directing your attention to line 425.

16           THE COURT:  I'll allow it.

17   Q.  Do you see the entry on January 30 where he says "Bonjour

18   mon amour de la vie.  Be safe.  Also don't commit to anything

19   just listen.  Je t'aime"?

20   A.  Yes.

21   Q.  Other than this line, do you have any other entries on this

22   chart that will reflect as to whether Bob attended this meeting

23   or not?

24           THE COURT:  Sustained as to the assumption in the

25   question.  He's not interpreting the chart or not interpreting

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    the messages.

2    Q.  Is there any entry on this chart on this page 420 to 435

3    that reflects whether Bob attended this meeting that Nadine

4    Arslanian had?

5             THE COURT:  That reflects whether or not.

6             MR. WEITZMAN:  Whether or not, yes.

7             THE COURT:  You may answer.

8    A.  Did you say whether or not?

9    Q.  He attended the meeting with Nadine Arslanian.

10   A.  I don't see anything that reflects whether or not he

11   attended the meeting.

12   Q.  We can turn to line 908.  And in this text message Nadine

13   is e-mailing Sabine and Andre Arslanian.  They all share the

14   same last name, correct?

15   A.  Yes.

16            MR. MONTELEONI:  Objection.

17   Q.  And she says "My consulting company, every time I'm in a

18   middle person for a deal, I am asking to get paid and this is

19   my consulting company."  You see that?

20   A.  Yes.

21   Q.  Have you heard the term "referral fees"?

22            MR. MONTELEONI:  Objection.

23            THE COURT:  Sustained.  Let's go back to what his job

24   is.

25   Q.  If we can turn to line 991.  And here's a text from Nadine

1   Arslanian to Senator Menendez on July 30, 2019.  And it

2   forwards a screenshot of texts from Damian Kazazian saying "If

3   Daibes is interested in selling his bank, he has someone who

4   may be interested in buying."

5          Do you recall that text message?

6   A.  Yes, I do.

7   Q.  And if you can just bring up the next few lines as well.

8   And you see that Robert Menendez responds, "When you call Fred

9   to give him your company name, you can mention it to him."

10          You see that?

11  A.  Yes.

12  Q.  Is this similar to what Nadine was saying in the text

13  message to Sabine and Andre that we just read about every time

14  I'm in the middle?

15          MR. MONTELEONI:  Objection.

16          THE COURT:  Sustained.  Mr. Weitzman, please.

17          MR. WEITZMAN:  Okay.

18          THE COURT:  These are jury arguments.  Make them at

19  the end of the case.  They're not through this witness.

20  Q.  If we can go to lines 1123 through 1128.  Do you recall

21  testifying today about a check that was given from IS EG Halal

22  to Strategic International Business Consultants in the amount

23  of $10,000?

24  A.  Yes.

25  Q.  Just so I understand.  That check is a document that has to

1    be deposited into a bank, correct?

2    A.   A check has to be deposited into a bank?

3    Q.   Yes.

4    A.   Yes.

5    Q.   There's a record of the payment, correct?

6            MR. MONTELEONI:  Objection.

7            THE COURT:  Well, I don't know what you mean.  I think

8    he answered your question.  He said it had to be deposited in a

9    bank.  Next question.

10           MR. WEITZMAN:  Correct.

11   Q.   And so there is a public record of the payment from IS EG

12   to Nadine Arslanian, correct?

13           MR. MONTELEONI:  Objection.

14           THE COURT:  Sustained.

15   Q.   Let's go to lines 466 through 472.  These are some lines

16   that you were not asked about in direct examination.  So, I

17   think the next page, Mr. Kelly.  There we go.

18           Do you know who Rob Ple is?

19   A.   Do I know who Rob Ple is?  No.

20   Q.   In any event, he's having text messages with Nadine,

21   correct?

22   A.   Yes.

23   Q.   On February 7, 2019, correct?  This is about a year after

24   that first date, correct?

25           MR. MONTELEONI:  Objection.

1  Q.  A year after that dinner date that was in your chart?

2          THE COURT:  I'll allow it.

3  A.  Yes.

4          THE COURT:  About a year after there was a dinner

5  between Nadine and Mr. Menendez, correct?

6          THE WITNESS:  Yes.

7          THE COURT:  Okay.

8  Q.  And on February 6, 2019, at 6:19 p.m., rob Ple says "What

9  are you doing tonight?" Then he says "I'm going out.  Meet me."

10  And then in line 471 at 12:55 p.m. he says, "I thought you

11  broke up with grandpa."

12          You see that?

13  A.  Yes.

14  Q.  Do you know who Rob Ple is referring to when he refers to

15  grandpa?

16          MR. MONTELEONI:  Objection.

17          THE COURT:  Sustained.

18  Q.  You'd agree with me that Nadine doesn't respond in a way

19  that defends grandpa?

20          MR. MONTELEONI:  Objection.

21          THE COURT:  Sustained as phrased.

22  Q.  You would agree Nadine responds with "I was in business

23  meeting with Egypt.  The embassy's in D.C.," correct?

24          THE COURT:  You are asking is that the next text after

25  the one you just read?

1      MR. WEITZMAN:  Yes.

2      THE COURT:  Can you answer that, sir?

3      THE WITNESS:  It's possible there was another text in

4  the exhibit.  I don't know.

5  Q.  Let's go to GX B 219.  If you can scroll down.  Go to the

6  next, thank you.

7      There is the text number 7, "I thought you broke up

8  with grandpa."  Can we go to the next one.  And then here's one

9  response, "I was in a business meeting" and where is the next

10  response, Mr. Kelly?

11      "I'm so in the car driving back with the delegation, I

12  will call you in two hours."

13      She doesn't say anything about Senator Menendez,

14  correct?

15      MR. MONTELEONI:  Objection.

16      THE COURT:  Is there anything in that text that was

17  just read to you that refers, to your knowledge, to

18  Mr. Menendez?

19      THE WITNESS:  No.

20  Q.  If we can go back, I want to talk a bit about a voicemail

21  that Nadine left for Senator Menendez.  It's line 44 on GX

22  1302.  We're going a bit back in time to February 26, 2018,

23  okay?  We listened to this recording.  Can I ask to play it

24  again.  GX A105-8.

25      THE COURT:  GX105-A.

1          MR. WEITZMAN:  A105-A I think.  That's AT.

2          (Audio playing)

3          MR. WEITZMAN:  Put up line 44 which is the -- one

4    time's enough.  If we can put up line 44.

5    Q.  Now the summary that's excerpted in your chart omits the

6    last few sentences from that call; isn't that correct?

7    A.  Yes, that's correct.

8    Q.  And the last few sentences, in those last few sentences she

9    says "I know you said it won't be any more but I hope you can

10   make it so at least I come to see you, because I'm not flying

11   down to Washington, um, just to meet with the general,"

12   correct?

13   A.  Yes.

14   Q.  By the way, you didn't make that decision to excerpt and

15   not include that portion in the summary chart.  That was the

16   prosecutors' decision, correct?

17   A.  That's correct, yes.

18   Q.  If you can zoom out so I can look at the full page.  The

19   next page.

20          Sir, there is nothing in your summary chart that

21   indicates that Senator Menendez went to the embassy as

22   requested in that voicemail, correct?

23          MR. MONTELEONI:  Objection.

24          THE COURT:  Sustained as phrased.

25   Q.  Sir, does your summary chart indicate whether Senator

O5U3MEN3                    Coughlin - Cross

1    Menendez traveled to the embassy as requested by Nadine in that
2    voicemail?
3                THE COURT:  Does it indicate whether or not.
4    Q.  Whether or not.  Thank you, your Honor.
5    A.  I believe there was an indication of a meeting.
6    Q.  At the embassy?  That's my question.  I'm sorry.
7                MR. MONTELEONI:  Objection.
8                THE COURT:  I'll allow it.
9    A.  I mean, obviously I personally don't know who actually
10   attended.  But I believe there was discussion of the senator
11   attending a meeting.
12   Q.  Let's zoom in on lines 54 and lines 55.  Nadine on
13   February 27, which is the following day, both sends a text
14   message and a voicemail to Senator Menendez.
15               On February 27, 2018 at 8:29 she sends a text, "As
16   much as I really wanted to see you today, I could hear in your
17   voice it's going to be tight for you.  And I thank you so much
18   for having said yes, you would do it for half an hour.  I will
19   go to Wael's office and call you at 3:15 p.m. and we can get
20   all the introductions out of the way over the phone."
21               And she leaves a voicemail, "I just sent a text"
22   so-and-so and she reiterates she will call from Will's office
23   at 3:15, correct?
24   A.  Yes.
25   Q.  You checked GX A101-5 for that text exchange, correct?

1    A.  I did, yes.

2    Q.  Can we put up GX A101-5 and go to page 3 of the document.

3    So, the bottom text is the one that you excerpted, that's

4    excerpted in your summary chart, correct?

5    A.  On line 54?

6    Q.  Yeah.

7    A.  Yes.

8    Q.  There are some responses to that text exchange from Senator

9    Menendez that are not excerpted in the chart, correct?

10    A.  If you could scroll down.

11            MR. WEITZMAN:  Mr. Kelly, can you zoom out, and go to

12    the next two messages.

13    A.  So are you asking if those are in the chart?

14    Q.  Correct.

15    A.  No.

16    Q.  Let's read them.  On February 27, 2018, Senator Menendez in

17    response to the last text we just reviewed said, "No, no, I

18    will go and meet for 30 minutes.  It would be too much to think

19    you were in D.C. and I didn't get to see you."  And then he

20    responds, "I called you to clarify.  I'm confused.  Are you

21    coming to D.C. or are you calling from an office in New

22    Jersey?"

23            Do you see that?

24    A.  Yes.

25    Q.  Let's scroll to the next message that Nadine responds to.

1    By the way, that's not in the summary chart either, right?

2    A.  The one you just read?

3    Q.  Those two messages and now this one from Nadine.

4    A.  I don't believe so.

5    Q.  She responds -- I'll read it into the record.  "I was

6    getting my hair blow dried so I would look pretty when I saw

7    you but I am going to call you from New Jersey.  I canceled the

8    meeting with the general.  I'm not flying to D.C. just to see

9    him.  We will arrange for a day, any time that's good for you,

10   and I will fly down and see you both.  I will call you from New

11   Jersey at 3:15 p.m.  I miss you.  I'm not sure if it's

12   appropriate to put that in the text but..."

13           Do you see that?

14   A.  Yes.

15   Q.  That wasn't excerpted in the summary chart when discussing

16   the request to meet with the general at the embassy, correct?

17   A.  That's correct, yes.

18   Q.  Having reviewed these text messages, did the meeting at the

19   embassy happen on February 27 as per her request?

20           MR. MONTELEONI:  Objection.

21           THE COURT:  Sustained.

22   Q.  If you turn to line 63 of Government Exhibit 1203.  I'm

23   sorry.  1302.  This was a business card that was received, a

24   business card of General Khaled Shawky, correct?

25   A.  Correct, yes.

O5U3MEN3                         Coughlin - Cross

1   Q.  He's the, you understand him to be the defense attache for

2   Egypt at the Egyptian embassy, correct?

3   A.  That's correct, yes.

4   Q.  Do you have an understanding as to whether most embassies

5   have a defense attache or not?

6           THE COURT:  Sustained.  Remember what his job is, sir.

7   He's not a diplomat.

8   Q.  And in line 66, there's a handwritten note from Senator

9   Menendez with an invitation.  Do you recall that?

10  A.  Yes.

11  Q.  And in the e-mail Sarah Arkin, you understand who she is.

12  She works at the SFRC?

13          MR. MONTELEONI:  Objection.

14          THE COURT:  Just a moment.  Do you know who Sarah

15  Arkin is, sir?

16          THE WITNESS:  Off of top of my head, I don't recall.

17  Q.  Do you recognize Sarah Arkin, Dana Stroul, and Robert Kelly

18  as people who work for the senator in connection with the -- in

19  the Senate?

20          MR. MONTELEONI:  Objection.

21          THE COURT:  I'll allow that.  As of that time.  Do you

22  recognize them as staff members of Mr. Menendez?

23          THE WITNESS:  I believe they were.  I believe I know

24  Robert Kelly was.  I believe Dana Stroul was.  Again, I didn't

25  memorize all the documents.

1  Q.  And it's your understanding that this is a handwritten

2  invitation that Senator Menendez handwrote?

3          MR. MONTELEONI:  Objection.

4          THE COURT:  Sustained.

5  Q.  Do you have an understanding as to whose handwriting this

6  is?

7          MR. MONTELEONI:  Objection.

8          THE COURT:  I'll allow it if he knows.

9          THE WITNESS:  I don't.

10  Q.  Do you recall in your chart that Senator Menendez sometimes

11  dictated messages?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  Sustained.

14  Q.  Do you see lines -- let's go to line 263.  Do you see

15  Senator Menendez texting Nadine Arslanian on July 7, 2018, "Mon

16  amour, I will dictate it and send it later this evening"?

17  A.  Yes.

18  Q.  Do you know -- well, let me withdraw that.

19      You haven't seen any documents in connection with your work

20  on this chart that explain why this note was handwritten verse

21  dictated, right?

22          MR. MONTELEONI:  Objection.

23          THE COURT:  Sustained.

24  Q.  Fair to say that the handwritten note was sent to the

25  senator's staff, correct?

1    MR. MONTELEONI:  Objection.

2         THE COURT:  I'll allow it.  If he knows.

3    A.  If we could go back to the actual line in the chart.

4    Q.  It's line 66.  You see the subject line is RM.  Do you know

5    who RM is?

6    A.  I don't know who RM is.

7    Q.  Do you know what Robert Menendez's initials are?

8    A.  Yes, they're RM.

9    Q.  It says "then wrote this and hand it to Rob.  Thoughts."

10   You see that?

11   A.  Yes.

12   Q.  So from that, do you understand that Senator Menendez

13   handed this piece of paper to his staff?

14        MR. MONTELEONI:  Objection.

15        THE COURT:  Sustained.

16   Q.  In any event, if you turn to line 73, there is a photo of a

17   meeting that occurs in the senator's -- in the Senate, correct?

18   You testified about this photo?

19        MR. MONTELEONI:  Objection.

20        THE COURT:  Do you know where this photo was taken,

21   sir?

22        THE WITNESS:  I don't know the location.

23        THE COURT:  Next.

24   Q.  Do you know who took this photo?

25   A.  I don't know who took the photo.

O5U3MEN3                    Coughlin - Cross

1   Q.  Would you agree with me that this isn't like an FBI secret

2   photo.  This is just a photo that was somehow in this location.

3   It's not an FBI agent who took this photo, right?

4            THE COURT:  I'll let you withdraw that question, sir.

5            MR. WEITZMAN:  Withdrawn.

6            THE COURT:  Or I can sustain.  All right.

7   Q.  At this date March 14, 2018, sir, this is approximately one

8   month after that date, five weeks after that date referenced in

9   your chart, correct?

10  A.  Yes.

11  Q.  And they're posing for a picture, correct?

12  A.  Yes.

13  Q.  If you go to line 74 and 75.  You didn't testify about

14  these entries in your direct examination, so I'd like to show

15  them to the jury.  In line 74 on March 14 --

16           THE COURT:  Again the jury knows to disregard the

17  comments of the lawyers.  Proceed.

18  Q.  On line 74, March 14 at 6:34 p.m. there is an e-mail from

19  Brett O'Brien to Dana Stroul and it is GX 4I-2.

20  A.  Yes.

21  Q.  Do you know who Brett O'Brien is?

22  A.  A lot of e-mails had signatures, but I don't recall off the

23  top of my head.

24  Q.  Why don't we go to GX 4I-2.  Do you see it says in his

25  e-mail Brett O'Brien at gpg.com?

1  A.  Yes.

2  Q.  Can you scroll down a bit.  He's e-mailing Dana Stroul at

3  foreign.senate.gov, right?

4  A.  Yes.

5  Q.  Do you know what gpg is?

6  A.  I do not.

7  Q.  He writes "Dana, it's been too long since our last catch

8  up.  Hope you are doing well in these crazy times.  I've

9  learned of course after the fact that the Egyptian defense

10  attache met with Senator Menendez yesterday.  I'd welcome your

11  take for my own purposes on how it went, and would be happy to

12  facilitate any follow up that was promised or is needed.

13  Thanks, Brett."

14        Then if we can turn to Dana Stroul's response.  By the

15  way, Dana Stroul, she's listed as senior professional staff on

16  the Senate Foreign Relations Committee, correct?

17  A.  Yes.

18  Q.  She responds, "Hi, Brett, good to hear you from.

19  Apparently that meeting was not policy focused and I did not

20  sit in on the meeting.  If you hear anything about the

21  discussion, please let me know."

22        You see that?

23  A.  Yes.

24  Q.  You don't know what role Brett O'Brien has with respect to

25  Egypt?

1        MR. MONTELEONI:  Objection.

2        THE COURT:  Sustained.

3   Q.  If you turn to lines 338 through 343 in the chart.  You

4   testified about these text messages where Nadine asked Senator

5   Menendez to say certain things in a speech.  Do you recall

6   that?

7   A.  Yes.

8   Q.  And at 4:53 p.m. Robert Menendez responds "Really" question

9   mark, question mark, question mark.  Do you see that?

10  A.  Yes.

11  Q.  And then he does a search about Egypt and the International

12  Monetary Fund, correct?

13  A.  Yes.

14  Q.  This was a speech at an embassy, correct?  Do you recall

15  that?

16        MR. MONTELEONI:  Objection.

17  Q.  Line 336.  Let's bring up a couple lines.  Do you see that

18  you checked this entry for the Egyptian Armed Forces Day

19  invitation?

20  A.  Correct, yes.

21  Q.  And that was a celebration of some sort at the Egyptian

22  embassy.  Do you recall that from the document?

23  A.  I don't recall the location.

24  Q.  In any event, why don't we bring up GX B103 real quick.

25  You see how it say the reception will be held at the embassy of

O5U3MEN3                         Coughlin - Cross

1    Egypt?

2    A.  Yes.

3    Q.  You don't know how well attended that reception was, how

4    many people attended it, right?

5    A.  I do not.

6    Q.  Go back to the chart, those lines, please.  From your

7    review of the documents supporting these entries, in the chart

8    1302, you don't know, sir, do you, whether Senator Menendez --

9    I am going to withdraw that.

10            Your chart doesn't indicate whether or not Senator

11   Menendez even delivered a speech at the Egyptian embassy that

12   day, correct?

13   A.  No, it does not.

14   Q.  It does not indicate if he did deliver a speech, whether he

15   mentioned this part about IMF, correct?

16   A.  No.  The chart does not reflect that.

17   Q.  You just don't know -- based on this summary chart, there

18   is nothing that indicates what happened, correct?

19            THE COURT:  One way or the other.

20   Q.  One way or the other?

21            MR. MONTELEONI:  Objection.

22            THE COURT:  I'll allow it.

23   A.  One way or another whether a speech was given?

24   Q.  And what was in that speech.

25   A.  Correct.  There is nothing in the summary chart that

O5U3MEN3                    Coughlin - Cross

1    indicates one way or another.

2    Q.  There are some forwards that you testified to of

3    information that Senator Menendez sends to Nadine.  I'd like to

4    look at that now.  If you turn to line 83.  This was an article

5    published in Al-Monitor.  You see that?

6    A.  Yes.

7    Q.  Let's look at that, if you can zoom out again.

8              On May 3, 2018, and if you can zoom out if you can,

9    excuse me, go to the Al-Monitor article GX 10A-1.

10             You see that Al-Monitor is listed at the top of this

11   exhibit as an independent, trusted coverage of the Middle East?

12   A.  Yes.

13   Q.  And there is a line, the title says "Congress Withholds

14   Egypt Aid Over Injured American."  Correct?

15   A.  Correct, yes.

16   Q.  You understand this to be a publicly reported article,

17   correct?

18   A.  That's correct, yes.

19   Q.  You understood this article to be publicly available

20   whether Google or elsewhere?

21             MR. MONTELEONI:  Objection.

22             THE COURT:  He said he knows it's publicly reported.

23   Next question.

24   Q.  Do you know whether Al-Monitor has a website?

25   A.  I may have checked it.  I don't recall.

1    Q.  On line 107, Senator Menendez forwards this article or at

2    least the two paragraphs of the article which have been printed

3    four days before, correct?

4    A.  Yes.

5    Q.  So it was printed, it was publicly available as of May 3,

6    2018, correct?

7                MR. MONTELEONI:  Objection.

8                THE COURT:  Do you know when it was publicly

9    available, sir?

10                THE WITNESS:  I don't know.  The message was, the

11    prior message was sent on May 3, 2018.

12    Q.  You see that in this very entry, it says consists of two

13    paragraphs of text from the 5/3/2018 Al-Monitor article?

14    A.  Yes.

15    Q.  Do you understand that to mean it was a May 3, 2018

16    article?

17    A.  I don't know.

18    Q.  You don't know what 5/3/2018 means?

19    A.  I do.

20    Q.  That means May 3, 2018, right?

21    A.  Correct, yes.

22    Q.  We saw a moment ago the actual article on your chart which

23    is listed as May 3, 2018, right?

24    A.  Can you go back to the article?

25    Q.  Absolutely.  Line 83.  There's the article.  You see there

O5U3MEN3                        Coughlin - Cross

1    in the article it says May 3, 2018?

2    A.  Yes, that's correct.

3    Q.  So can we agree that everything you reviewed shows this as

4    a May 3, 2018 article?

5             THE COURT:  I'll allow it.

6    A.  Yes.

7    Q.  And then if you turn back to line 107, Senator Menendez

8    forwards this article publicly available article to Nadine on

9    May 7, 2018, right?

10            MR. MONTELEONI:  Objection.

11            THE COURT:  Does line 107 reflect that Mr. Menendez

12   forwarded to Nadine Menendez on May 7 a May 3, 2018 Al-Monitor

13   article?

14            THE WITNESS:  Yes.

15   Q.  So it's four days after the article's already published?

16            THE COURT:  Next question.

17   Q.  On the May 7 forward, he says FYI, correct, at the top?

18   A.  In the subject line, yes.

19   Q.  And you know what FYI stands for?

20   A.  Yes.

21   Q.  For your information, right?

22   A.  Correct, yes.

23   Q.  He doesn't indicate in this e-mail that she should forward

24   it to anybody else, does he?

25            MR. MONTELEONI:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5U3MEN3                          Coughlin - Cross

1      THE COURT:  Is there anything in that e-mail that says
2  forward this?
3  A.  If you can bring up the e-mail.
4  Q.  Absolutely.  GX 8402.
5  A.  Okay.
6  Q.  Anything in this e-mail indicates from Senator Menendez
7  that this is intended for anybody other than Nadine Arslanian?
8      THE COURT:  Sustained as phrased.
9  Q.  Is there --
10      THE COURT:  You are asking whether he asked that it be
11  forwarded to somebody else.  Correct?
12      MR. WEITZMAN:  Yes, your Honor.
13      THE COURT:  All right.
14  Q.  Anything in the e-mail indicate that?
15      MR. MONTELEONI:  Objection.
16  A.  No.
17      THE COURT:  I'll allow it.
18  A.  Just to clear up our discussion previously.  As you can
19  see, this is sort of -- it's not the actual article.  So I
20  think that was, I apologize, a little of the confusion.
21  Q.  I was imprecise.  It is a cut and paste of two paragraphs
22  from the article?
23  A.  Correct, yes.
24  Q.  Fair.  We're on the same page.  And you are aware in
25  line 108 that Nadine subsequently forwards this to Will Hana,

O5U3MEN3                        Coughlin - Cross

1    correct?

2              THE COURT:  What is "this"?

3              MR. WEITZMAN:  I'm sorry.  You're correct, your Honor.

4    Q.  She sends three texts of screenshots of the e-mail that she

5    received from Senator Menendez, correct?

6    A.  Yes.

7    Q.  And she doesn't include Senator Menendez on that text

8    exchange, correct?

9    A.  Correct, yes.

10   Q.  And again, what she sends to Will Hana was publicly

11   available text from that article, correct?

12             THE COURT:  Sustained.

13   Q.  If you go to the full page, was there any text message you

14   saw around this time when you were reviewing the summary chart

15   or is there any line in the summary chart that indicates that

16   Nadine was informing Senator Menendez that she would forward

17   that e-mail to others?

18             MR. MONTELEONI:  Objection.

19             THE COURT:  Sustained.

20   Q.  At this point in time, May 7, 2018, this is about three

21   months after that date in February, correct?

22   A.  Correct, yes.

23   Q.  Now, if you turn to line 102, again, we see Senator

24   Menendez on May 7, 2018, sending a text to Nadine Arslanian,

25   correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yes.

2    Q.  And again, this is about less than three months or about

3    three months after that date, right?  That date in February?

4            THE COURT:  You've established and this jury knows

5    that May is three months after February.  Proceed.

6            MR. WEITZMAN:  Yes, your Honor.

7    Q.  And here he says just FYI -- again FYI, for your

8    information, correct?

9    A.  Correct.

10   Q.  277 Americans and it continues, correct?

11           MR. WEITZMAN:  Can we put up GX A101-6.  Can you put

12   up the entire text chain.  The middle text.

13   Q.  Other than saying just FYI, did Senator Menendez ask that

14   she forward this information to anybody else?

15           MR. MONTELEONI:  Objection.

16           THE COURT:  Sustained as phrased.  FYI is not to

17   forward so.

18           MR. WEITZMAN:  Correct.  It's for your information.

19           MR. MONTELEONI:  Objection, your Honor.

20           MR. WEITZMAN:  He testified that FYI means for your

21   information.

22           THE COURT:  Everyone knows FYI stands for "for your

23   information."  Let's all get on the same page.

24   Q.  Anything in this text when you were reviewing it indicate

25   to you that Senator Menendez was asking her to forward it to

1    anybody else in this text?  Is there any indication?

2                THE COURT:  I'll allow it.  In this text.

3                The text simply says "Just FYI.  277 Americans

4    combination of diplomats, commercial service, USAID, others,

5    1344 Egyptians locally employed staff.  This is what's at

6    American embassy.  Most are Egyptians working at embassy."

7                Is there anything else in that text?

8                THE WITNESS:  No, sir.

9                THE COURT:  Next.

10   Q.  From your review of documents to prepare the summary chart,

11   are you aware whether or not the number of personnel at an

12   embassy is public information?

13               MR. MONTELEONI:  Objection.

14               THE COURT:  I'll allow it.  From your review of the

15   documents.

16               THE WITNESS:  Am I aware if it's public information?

17               THE COURT:  From your review of the documents.

18               THE WITNESS:  I'm not aware one way or the other.

19   Q.  As part of your review of documents in this case, did you

20   review any Office of Inspector General reports about embassies?

21               THE COURT:  Sustained.

22   Q.  Can you turn to line 105 of the chart.  And 105 of the

23   chart to 106.  In line 105, Nadine forwards the senator's text

24   message to Will Hana, correct?

25   A.  Yes, that's correct.

1   Q.  She doesn't include Senator Menendez as a recipient of that

2   text message, correct?

3   A.  Correct.

4   Q.  And you've seen no text message from Nadine to Senator

5   Menendez -- zoom out of the page so he can look at them all --

6   where she indicates to Senator Menendez that she was forwarding

7   his text message to Will Hana, correct?

8           MR. MONTELEONI:  Objection.

9           THE COURT:  I'll allow it.  Is there anything in the

10  text that told Mr. Menendez she was forwarding Menendez's text

11  to Hana?

12          THE WITNESS:  Not on this page, no.

13  Q.  If you turn to line 166 to 181.  There's a -- 166, just do

14  166 through 170.  You testified about this small arms and

15  ammunition ban being lifted.  Do you recall that?

16  A.  Yes.

17  Q.  Just so that we can understand, pull out a bit.  This text

18  message at 10:07 p.m. on May 18, 2018, from Will Hana to Khaled

19  Shawky occurs either at or after some dinner at Il Villaggio;

20  is that correct?

21          MR. MONTELEONI:  Objection.

22          THE COURT:  Just lodge it into the 1302 itself, sir.

23  Q.  Do you recall testifying about the Il Villaggio dinner?

24  A.  Yes.

25          THE COURT:  You didn't testify about the dinner.  You

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  testified about what the text said about a dinner, correct?

2          THE WITNESS:  That's correct.

3  Q.  And at some point, either at or after the dinner, Will Hana

4  texts Khaled Shawky, correct?

5          MR. MONTELEONI:  Objection.

6          THE COURT:  If he knows.

7  Q.  At 10:07 p.m. on May 18, Will Hana texts Khaled Shawky,

8  correct?

9  A.  Correct.

10          THE COURT:  You know that was before, after, or do you

11  know if that related to any dinner at Il Villaggio in time, how

12  that related in time to any dinner at Il Villaggio?

13          THE WITNESS:  That day there was a discussion of a

14  dinner at Il Villaggio at 7 p.m.  I of course don't know the

15  actual, you know, contents of that dinner.

16  Q.  Correct.  So you don't know whether this is information he

17  got at that dinner, correct?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  What?

20  Q.  You don't know whether the ban on small arms being lifted

21  was information Will Hana received at that dinner; is that

22  correct?

23          MR. MONTELEONI:  Objection.

24          THE COURT:  Sustained.

25  Q.  Did you review any documents that indicate what was said at

O5U3MEN3                        Coughlin - Cross

1    the dinner?

2    A.  No.

3    Q.  You don't know from your review of government exhibits what

4    happened at that dinner, correct?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  I'll allow that.  You have no idea what

7    happened at the dinner, correct?

8            THE WITNESS:  No.  Beyond the discussion in the text

9    messages.

10           THE COURT:  Right.  You don't know what they ate.

11           THE WITNESS:  I don't.

12           THE COURT:  You don't know who ordered what.

13           THE WITNESS:  No.

14           THE COURT:  Okay.

15   Q.  If you turn to line 170, though, if you can keep it here.

16   Khaled Shawky e-mails Andrew King and Brett O'Brien.  We saw

17   Brett O'Brien and he's at GPG.  You remember that?

18   A.  Yes.

19   Q.  You don't know whether that's a lobbying firm or something

20   else, right?

21           MR. MONTELEONI:  Objection.

22           THE COURT:  Sustained.  I think you said you don't

23   know what it is; is that right?

24           THE WITNESS:  That's correct.

25   Q.  And Khaled Shawky says, "Dear team, I hope you are having a

great weekend.  I was just told privately now that ban small

arms on Egypt was left today.  Can you help confirm that.

Please keep it private.  Khaled."

          You see that?

A.  Yes.

Q.  And then if we turn to lines 178 and 179, I don't think you

testified about these in your direct, but let's bring them up.

Brett O'Brien e-mails Dana Stroul.  She works at the SFRC,

correct?  We just saw that?

A.  Correct.

Q.  And he says "The Egyptian defense attache informed us last

night that someone in Senator Menendez's office told him last

night that the U.S. ban on the transfer of small arms to Egypt

has been lifted.  And any idea what he might have heard?  And

sorry to bother you on the weekend."

          You see that?

A.  Yes.

Q.  And in response, let's pull this up GX 4I-5.  The first two

e-mails on top.

          Dana Stroul responds, "Hmm, it wasn't me and I'm the

only one who would have known at the staff level.  Do you have

any more specifics?"  Then she says "State did call this week

to let us know that they are lifting the restriction on sale of

small arms and ammunition.  I don't know anything about SASC,

and never did."  She sends that from her iPhone; is that

1    correct?

2    A.  Yes, that's what it indicates, yes.

3    Q.  Is it fair to say that whoever Brett O'Brien is, she's now

4    confirmed to him the lifting of the restriction on sale of

5    small arms and ammunition?

6            MR. MONTELEONI:  Objection.

7            THE COURT:  Sustained as phrased.  It says what it

8    says, sir.  Move on.

9    Q.  In this e-mail on May 20, Dana Stroul confirms to Brett

10   O'Brien that the restriction on the sale of small arms and

11   ammunition had been lifted and she was informed of that by

12   State Department, correct?

13           MR. MONTELEONI:  Objection.

14           THE COURT:  Sustained as phrased.

15   Q.  Sir, Dana Stroul writes they are lifting, as in State

16   Department, is lifting the restriction on sale of small arms

17   and ammunition, correct?

18           MR. MONTELEONI:  Objection.

19           THE COURT:  I'll allow that.

20   A.  Can you repeat the question, please?

21   Q.  Yes.  On May 20, 2018, two days after that dinner, Dana

22   Stroul, who works at the SFRC, writes, "State did call this

23   week to let us know that they are lifting the restriction on

24   sale of small arms and ammunition." That's what she wrote,

25   right, to Brett O'Brien?

O5U3MEN3                        Coughlin - Cross

1   A.  Correct.

2   Q.  And Brett O'Brien in his earlier e-mail specifically says

3   that he received information about this from the Egyptian

4   defense attache, correct?

5   A.  Yes.

6   Q.  The Egyptian defense attache wasn't keeping the information

7   secret, correct?

8               MR. MONTELEONI:  Objection.

9               THE COURT:  Sustained.  Jury argument, sir.  Stick to

10  the documents.

11  Q.  You testified at some detail about a letter, a draft letter

12  that Senator Menendez revised.  Do you recall that or edited?

13  A.  Yes.

14  Q.  Let's go to line 184.  This is the exchange, the e-mail

15  from Nadine Arslanian to Senator Menendez in May of 2018.

16  Three-and-a-half months after their date, correct?

17  A.  Correct.

18  Q.  And she says, "Could you fix this letter and send it back

19  to me.  I want to prove a point to the general."

20              Do you see that?

21  A.  Yes.

22              (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen4                          Coughlin - Cross

1   Q.  And then she says he and Will just got me clearance for a

2   project.  Do you see that?

3   A.  Yes.

4   Q.  No indication in this email or any of the other emails what

5   that project is, correct?

6           MR. MONTELEONI:  Objection.

7           THE COURT:  I'll allow it.

8           Is there any indication in this email, sir, as to what

9   that project was?

10          THE WITNESS:  No, I don't believe so.

11  BY MR. WEITZMAN:

12  Q.  And in response to this email, Bob fixes the letter for

13  Nadine, correct?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Sustained.

16  BY MR. WEITZMAN:

17  Q.  Well, does Bob edit the letter?  Do you recall that?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  Sustained.

20          MR. WEITZMAN:  Let's go to GX A403.

21  Q.  This is an email from Senator Menendez to Nadine Arslanian,

22  correct?

23  A.  Yes.

24  Q.  And this is the letter that Senator Menendez sends back to

25  her following her provision to him of a draft letter, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen4                         Coughlin - Cross

1            MR. MONTELEONI:  Objection.

2            THE COURT:  I'll allow it.

3   A.  You said following her email to him of a draft?

4   Q.  Correct.

5   A.  Yes.

6            MR. WEITZMAN:  Let's do them side by side.  I'd like

7   to look at the two letters.  If you look at the first two

8   paragraphs -- put up GX C406 on the left and GX A403 on the

9   right, if that's OK.

10  Q.  C406 on the left is what Nadine ultimately forwards to

11  Senator Menendez, correct?  This is the original she received

12  from Will Hana.

13  A.  Yes, that's correct.

14  Q.  And then Senator Menendez sends a revised version on, in

15  A403, correct?

16  A.  In A403, yes, correct.

17           MR. WEITZMAN:  And that's several hours later, however

18  much time it was.  I can't do UTC math.

19           If you look at the first two paragraphs on the left,

20  zoom in on those, you can read them to yourself if you don't

21  mind.  And then if you would put the second paragraph that

22  starts "our with antiterrorist operations in the Sinai" and

23  read that to yourself as well.

24  Q.  Sir, both versions -- the draft that Nadine sends and the

25  draft that Senator Menendez sends back -- make three

O5uWmen4                          Coughlin - Cross

1      fundamental points here --

2                  MR. MONTELEONI:  Objection.

3                  THE COURT:  Sustained.  The jury will disregard the

4      comments of the lawyers.

5                  Do you have a question, sir?

6                  MR. WEITZMAN:  Yes, your Honor.

7      Q.  Is the substance of both of these, the one on the left and

8      the one on the right, substantially similar?

9                  MR. MONTELEONI:  Objection.

10                 THE COURT:  Sustained.

11                 MR. WEITZMAN:  Your Honor, these are the same

12     questions he asked.  He asked these very questions on direct as

13     to different paragraphs.

14                 MR. MONTELEONI:  I got a sustained objection on some

15     of that.

16                 THE COURT:  Just a moment.

17                 I do recall what you're referring to, sir.  Let's see

18     if he can answer it.  Ask it.

19     BY MR. WEITZMAN:

20     Q.  Is the substance of these two, the draft and the revised,

21     in these two paragraphs, substantially similar?

22                 THE COURT:  Are you able to answer that?

23     A.  I don't know about substantially, but yes, they're similar.

24                 MR. WEITZMAN:  OK.  Let's go through a couple other

25     paragraphs.

1  Q.  Let's look at side by side paragraph 4 of the draft, "It

2  must be clear to you in Congress," and then the other side, "I

3  hope it is clear to you as well as others in Congress."

4       Read those to yourself, sir.

5  A.  I'm ready if you are.

6  Q.  Would you agree with me that the substance of these

7  paragraphs are substantially similar?

8  A.  Yes.

9  Q.  We won't do this for every paragraph.  You've read both

10  letters, correct?

11  A.  Correct, yes.

12  Q.  Would you agree with me that the substance of Senator

13  Menendez's letter is substantially similar to the substance of

14  the letter that he received as a draft?

15  A.  Yes.

16  Q.  And what he did is he cleaned up the language and edited

17  the grammar and so on, correct?

18            THE COURT:  Sustained.

19  BY MR. WEITZMAN:

20  Q.  There's nothing in the letter that he forwards back --

21            MR. WEITZMAN:  Zoom out.

22  Q.  There's nothing in this letter from Senator Menendez to

23  Nadine that indicates it's for an audience other than Nadine,

24  correct?

25            MR. MONTELEONI:  Objection.  Speaks for itself.

O5uWmen4                         Coughlin - Cross

1           THE COURT:  Sustained.

2    BY MR. WEITZMAN:

3    Q.  Does Senator Menendez tell her to forward this to anybody?

4           MR. MONTELEONI:  Objection.

5           THE COURT:  In what you see.

6           MR. WEITZMAN:  In what you see.

7           THE COURT:  Is there anything in there that says the

8    senator, Mr. Menendez, is telling Nadine to forward it to

9    somebody?

10   A.  He does leave the "dear" blank, so it's not addressed to

11   Nadine.

12   Q.  OK.  No indication of -- no indication of whether Senator

13   Menendez knows who this is going to, correct?

14          THE COURT:  Sustained.

15          MR. WEITZMAN:  In this letter.

16          THE COURT:  Sustained.

17   BY MR. WEITZMAN:

18   Q.  He doesn't fill out a name after "dear," correct, sir?

19   A.  Correct.

20          MR. WEITZMAN:  OK.  And let's look at what Nadine does

21   subsequently to receiving this letter, GX B504 in evidence.

22   Q.  And you understand how email forwarding works, sir?

23   A.  I'm certainly not a tech expert, but sure.

24   Q.  Typically when you forward an email, it has the sender and

25   the recipient and the date of the prior email within the

O5uWmen4                          Coughlin - Cross

1    forward, correct?

2    A.  You -- you could delete that on your own, but if you don't,

3    it would have that, yes.

4    Q.  Can we conclude from this exhibit that Nadine has deleted

5    the forward from the address, who she received this from,

6    Robert Menendez, and the date and time that she received this

7    from him?

8    A.  Is there a way to tell, you know, if anyone actually

9    deleted it?  Is that your question?

10   Q.  No.  She doesn't include the typical forward information

11   which reflects that Robert Menendez sent this to her, correct?

12   A.  Correct.

13   Q.  She's passing this off as her own, right?

14           MR. MONTELEONI:  Objection.

15           THE COURT:  Sustained.

16   BY MR. WEITZMAN:

17   Q.  And nothing in this email from Nadine Arslanian to Will

18   Hana makes reference to the fact that Robert Menendez edited

19   this, correct?

20           THE COURT:  I'll allow it.

21           Is there anything in there that says Robert Menendez

22   edited what I'm sending you?  Are those words there, in words

23   or substance?

24   A.  No.

25           THE COURT:  Where are we on time, sir?

1      MR. WEITZMAN:  I'm going to go the rest of the day.

2              THE COURT:  Are you going to be able to conclude by

3   four?

4              MR. WEITZMAN:  I think so.

5              THE COURT:  All right.  That's the goal.

6              MR. WEITZMAN:  Yes.  I'm cutting, your Honor.  I'm

7   slashing right now.

8              THE COURT:  Take your time.

9              MR. WEITZMAN:  OK.  Fair enough.  *Touche*.

10  Q.  OK.  Let's talk about the white paper.

11      Do you recall testifying about a white paper, sir?

12  A.  I do, yes.

13              MR. WEITZMAN:  Can we put up lines 310 to 314.

14  Q.  This is the white paper that you testified about, correct,

15  or this is an entry summarizing the white paper that you

16  testified about?

17  A.  Yes.

18  Q.  And you understood that there was a delegation that was

19  coming from Egypt to discuss this white paper?

20              MR. MONTELEONI:  Objection.

21              THE COURT:  Yes.  Sustained as phrased.

22              MR. WEITZMAN:  Let's put up GX G101.

23  Q.  Do you see that it says please find the attached white

24  paper read-on for the meeting of the Egyptian delegation with

25  Senator Menendez on Wednesday at 11:30 in the morning?

O5uWmen4                    Coughlin - Cross

1    A.  That's what it says, yes.

2    Q.  So you understood that there was an Egyptian delegation

3    coming to Washington, D.C.?

4              MR. MONTELEONI:  Objection.

5              THE COURT:  Sustained.

6    BY MR. WEITZMAN:

7    Q.  Are you aware from your review of the documents whether

8    this Egyptian delegation met with other senators, other than

9    Senator Menendez?

10             MR. MONTELEONI:  Objection.

11             THE COURT:  I'll allow it.  If he knows.

12   A.  As I mentioned at the beginning, I read a lot of documents.

13   I just don't recall all the documents I reviewed.  So I don't

14   recall anything specific, to answer your question.

15   Q.  Nothing in your chart indicates who the Egyptian delegation

16   met with, correct?

17   A.  I don't believe so.

18   Q.  You don't recall seeing a calendar of their meetings?

19   A.  I -- I did look -- I do recall calendars.  Again, I

20   don't -- I don't remember anything specific.  As I said, there

21   were a lot of documents.

22             MR. WEITZMAN:  Can we go to GX C410.

23             That's not the one.  OK.  We'll skip this.

24             If we can go to lines 1141 and 1142.

25   Q.  There was some testimony about something called the GERD.

O5uWmen4                    Coughlin - Cross

1   Do you recall that?

2   A.  Yes.

3   Q.  That's the Grand Ethiopian Renaissance Dam, is that

4   correct?

5   A.  Yes.  That's what the documents indicated, yes.

6   Q.  And you testified about two particular entries here.  On

7   March 17, 2020, in line 1141, Nadine sends to Robert Menendez a

8   PDF of a text, full text of Egypt, Sudan and Ethiopia

9   declaration of principles regarding this GERD dispute, correct?

10  A.  Correct, yes.

11  Q.  Do you know what the GERD is, other than the acronym it

12  stands for?

13              MR. MONTELEONI:  Objection.

14              THE COURT:  Sustained.

15              Do you know what the Grand Ethiopian Renaissance Dam

16  is?

17              THE WITNESS:  I assume it's a dam, but beyond that,

18  no, I don't know what it is.

19  BY MR. WEITZMAN:

20  Q.  You don't know whether there was an international dispute

21  over that dam, right?

22              THE COURT:  Sustained.  Sustained.

23              Documents, sir.  Documents.

24              MR. WEITZMAN:  Can we look at GX 8 --

25  Q.  Well, in the next entry, you reviewed GX 8F-5, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen4                        Coughlin - Cross

```
 1    A.  Correct, yes.

 2              MR. WEITZMAN:  Let's bring up GX 8F-5.  Let's look at

 3    the entry itself.  There's a letter from Sarah Arkin, who works

 4    for Robert Menendez, to Treasury Secretary Steve Mnuchin and

 5    Secretary of State Mike Pompeo, correct?

 6              MR. MONTELEONI:  Objection.

 7              THE COURT:  Just a moment.

 8              Sustained as phrased.

 9    BY MR. WEITZMAN:

10    Q.  There's a letter from Sarah Arkin --

11              THE COURT:  There's an email.

12              MR. WEITZMAN:  Oh, I'm sorry.  It's attaching a

13    letter.  I apologize.

14    Q.  An email attaching a letter from Robert Menendez to

15    Treasury Secretary -- if we can go to the next page -- to

16    Treasury Secretary Steve Mnuchin and Mike Pompeo, correct?

17    A.  Correct, yes.  If you could just scroll down to the bottom.

18              MR. WEITZMAN:  Scroll down to the letter.

19              And in the letter, among other things, it says:  "As

20    you know, at the request of the countries involved, the

21    Treasury Department has facilitated discussions between

22    Ethiopia, Sudan and Egypt on the GERD but those discussions

23    have failed to yield a final agreement.  Ethiopia has indicated

24    that it plans to begin filling the dam by the end of June or

25    early July, leaving little time to find a diplomatic solution."
```

O5uWmen4                    Coughlin - Cross

1              Push that out and go to the final paragraph on that

2     first page and the next paragraph:

3              "Conflict over the GERD is not inevitable, but its

4     likelihood increases if the U.S. takes a wait and see approach

5     to the current impasse.  Leaders across the Middle East, Africa

6     and the world continue to remind us that U.S. leadership and

7     diplomacy remains a force for stability -- leadership that

8     could be utilized to defuse tensions over the dam and to help

9     Egypt, Ethiopia and Sudan reach an equitable agreement.  At a

10    time when every country in the world is facing unprecedented

11    health and economic uncertainty, we must take every opportunity

12    to facilitate a peaceful, sustainable arrangement for this

13    vital river."

14    Q.  Do you see that?

15    A.  Yes.

16              MR. WEITZMAN:  Push that out.

17    Q.  That letter is signed by Robert Menendez, correct?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  Is that letter signed by Robert Menendez?

20    Yes or no.

21    A.  It appears to be, yes.

22              MR. WEITZMAN:  And this letter is written, if we can

23    go back to lines 1141 and 1142, or at least it's sent, I should

24    say.

25    Q.  It's sent about five weeks, or more than five weeks, after

O5uWmen4                          Coughlin - Cross

1   Nadine Arslanian sent that text to Senator Menendez, correct?

2   A.  Correct, yes.

3   Q.  OK.  And you don't have any -- your summary chart doesn't

4   include any other discussion about this GERD issue other than

5   these entries here?

6   A.  That's correct.

7   Q.  OK.  You also testified about a June 2021 meeting.

8           MR. WEITZMAN:  Let's go to line 1206.

9   Q.  These are meetings with Egyptians, correct?

10          MR. MONTELEONI:  Objection.

11  BY MR. WEITZMAN:

12  Q.  Do you recall whether the meetings that your chart

13  references are meetings with Egyptians?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  I'll allow it.

16          Are you referring to 1206, sir?

17          MR. WEITZMAN:  Yes, your Honor.

18          THE COURT:  I don't see a reference to a specific

19  meeting.

20          MR. WEITZMAN:  OK.  We can push that out, and so let's

21  look at more lines.  But in any event, if we can do 1206 to

22  1209 -- I'm sorry.  1209, all the way down.

23  Q.  Do you see, in line 1208, there's an email that you

24  included in the summary chart, or that was included in the

25  summary chart that you reviewed, saying "inviting six senators

1   to a members-only meeting with Abbas Kamel on June 22 at 12

2   p.m. in the Capitol"?

3   A.  Correct, yes.

4   Q.  And do you see that, in line 1206, Mai Abdelmaguid says to

5   Nadine Menendez, "Please pass to him the director is still keen

6   to meet Chairman Meeks, if possible"?  Do you see that?

7   A.  Yes.

8   Q.  Do you know who Chairman Meeks is?

9   A.  I don't.

10  Q.  Do you know whether he's the chair of the House Foreign

11  Affairs Committee?

12          MR. MONTELEONI:  Objection.

13          THE COURT:  He doesn't know who he is.

14  BY MR. WEITZMAN:

15  Q.  In any event, this is a multiple-senator meeting, per the

16  invite in line 1208, correct?

17  A.  The invite invites six -- the email said six senators,

18  correct.

19          MR. WEITZMAN:  If you go to line 1211.

20  Q.  Nadine -- I'm sorry.

21      On June 21, 2021, the day before the scheduled meeting,

22  Senator Menendez sends to Nadine Menendez a Yahoo story about

23  Abbas Kamel Khashoggi, correct?

24  A.  That's correct.

25  Q.  And that's a Yahoo story that is itself a Washington Post

1    article, is that right?

2    A.  Yes.

3    Q.  OK.  Washington Post editorial, I should say.

4    A.  Correct, yes.

5    Q.  And this is, again, publicly reported information, correct;

6    it's already public?

7    A.  Yes.

8    Q.  It had been published?

9    A.  The -- the article -- had the article already been

10   published?  I believe so, yes.

11   Q.  And do you know whether Senator Menendez brought this issue

12   up in a discussion with Abbas Kamel at that meeting?

13            THE COURT:  Sustained.

14   BY MR. WEITZMAN:

15   Q.  Have you reviewed any documents that indicated what

16   happened at that meeting?

17            MR. MONTELEONI:  Objection.

18            THE COURT:  I'll allow it.  If he knows.

19   A.  There is some discussion in the text message about, I

20   believe, between Nadine and Mai, what happened at the meeting.

21            MR. WEITZMAN:  Go to line 1213.

22   Q.  Is this what you're referring to, text, thank you so much,

23   chairman also raised it today?

24   A.  Yes.

25   Q.  OK.  This is --

O5uWmen4                          Coughlin - Cross

1  A.  And there was additional -- I apologize.  There was

2  additional conversation as well.

3  Q.  Just to be clear, this was before the meeting when she says

4  chairman raised it today?

5          MR. MONTELEONI:  Objection.

6  BY MR. WEITZMAN:

7  Q.  Are you aware of that?

8          THE COURT:  If you know.

9  A.  I would need to look again at the, what we had in the

10 chart.

11         MR. WEITZMAN:  Why don't you turn to it.  Let's go to

12 it.

13 Q.  Do you see the June 22, line 1219, text, "just wanted to

14 let you know the meeting went very well today"?

15 A.  Yes, correct.

16 Q.  So the June 21 text from Mai, in which she says, "chairman

17 also raised it today, we appreciate it," that's before the

18 meeting occurs, correct?

19 A.  It's -- according to the text messages, it's before a

20 meeting --

21 Q.  Correct.

22 A.  -- that occurs on the 22nd.

23 Q.  And you don't know who Mai is referring to when she's

24 referring to the chairman, whether it's the U.S. chairman or

25 the Egyptian chairman?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MR. MONTELEONI:  Objection.

2           THE COURT:  Do you know who the word "chairman" refers

3    to in line 1213 by Mai Abdelmaguid to Nadine Menendez?

4           THE WITNESS:  No.

5    BY MR. WEITZMAN:

6    Q.  OK.  You testified about a document that referred to a

7    CODEL.  Do you recall that?

8           MR. WEITZMAN:  Let's put up GX 3A-20.

9    A.  Was that the agenda?

10   Q.  Correct.

11   A.  Is that what it was?

12   Q.  Yeah, yeah, yeah.

13   A.  I do recall.

14          MR. WEITZMAN:  Your Honor, I'm taking this moment to

15   slash a couple more.

16   Q.  Do you see it says on top CODEL, sir?

17   A.  Yes.

18   Q.  Do you know what a CODEL is?

19   A.  I don't.

20          MR. WEITZMAN:  It's a congressional delegation, for

21   the record.

22          MR. MONTELEONI:  Objection.

23          THE COURT:  Sustained.  It's a comment.  The jury will

24   disregard the comments of the lawyers.

25          He doesn't know what a CODEL is.  Next question.

O5uWmen4                        Coughlin - Cross

```
1    BY MR. WEITZMAN:
2    Q.  Do you know how many people, how many staff members
3    accompanied Senator Menendez on this CODEL?
4              MR. MONTELEONI:  Objection.
5              THE COURT:  Sustained.
6    BY MR. WEITZMAN:
7    Q.  Sir, did you see any documents regarding this CODEL other
8    than this document in front of you?
9    A.  I don't recall.
10   Q.  Did you review any documents about what happened on the
11   CODEL, who Senator Menendez met with, for example, other than
12   what's on this document in front of you?
13             MR. MONTELEONI:  Objection.
14             THE COURT:  I'll allow it.
15             Did you see anything about the substance of the CODEL
16   in the documents you reviewed, to the best of your knowledge?
17             THE WITNESS:  I believe there were some discussions
18   via text message.
19   BY MR. WEITZMAN:
20   Q.  Do you recall what the substance of those discussions were?
21   A.  At the moment, I don't recall, no.
22   Q.  Are you aware that this agenda is prepared by the Senate?
23             THE COURT:  Sustained.
24   BY MR. WEITZMAN:
25   Q.  Do you know where this agenda was from, this document you
```

1    reviewed?

2    A.   No.

3            THE COURT:   Remember, Mr. Weitzman, the focus is the

4    documents.

5    BY MR. WEITZMAN:

6    Q.   Do you know whether the senator met with any foreign

7    leaders on this CODEL, from your review of the documents?

8    A.   Yes.

9    Q.   Who did he meet with?

10   A.   I believe he met with Abbas Kamel.

11   Q.   Other than Abbas Kamel, do you know whether he met with

12   President Sisi?

13   A.   I don't recall that.

14   Q.   OK.  And you don't know whether -- well, withdrawn.

15        You don't know if there were any meetings -- you don't know

16   about his meetings in Qatar either?

17           MR. MONTELEONI:   Objection.

18           THE COURT:   Sustained as to form.

19           To your knowledge, from your review of the documents,

20   did Mr. Menendez have meetings in Qatar?

21           THE WITNESS:   I don't recall.

22   BY MR. WEITZMAN:

23   Q.   Just to table set when this occurs, this is in October of

24   2021, correct?

25   A.   Correct, yes.

O5uWmen4                         Coughlin - Cross

1    Q.  Do you recall we talked about this white paper delegation

2    moments ago?

3    A.  Yes.

4    Q.  Do you recall that that was in July of 2018?

5            MR. MONTELEONI:  Objection.

6            THE COURT:  I'll allow it.  He may recall it.

7    A.  I don't recall.

8            MR. WEITZMAN:  Why don't I refresh your recollection.

9            THE WITNESS:  Thank you.

10           MR. WEITZMAN:  You're welcome.

11           If you'd turn to line 310.

12   Q.  This is white paper we just testified about -- you just

13   testified about; that was in July 2018, correct?

14   A.  Correct, yes.

15   Q.  The communications about the white paper delegation were in

16   July 2018; that's three years before this CODEL you testified

17   about, correct?

18   A.  I don't know what a CODEL is, but it was before the agenda

19   we just looked at.

20           MR. WEITZMAN:  OK.  Got it.

21           OK.  I'd like to go back in time now to stay with July

22   2018, if you can turn, if you can move to line 320.

23   Q.  You spent some time talking about this rounds of ammunition

24   that Senator Menendez told Nadine Arslanian that he's going to

25   sign off on and to tell Will about that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      MR. MONTELEONI:  Objection.

2    BY MR. WEITZMAN:

3    Q.  Do you recall that?

4          THE COURT:  Sustained as phrased.

5    BY MR. WEITZMAN:

6    Q.  Sir, do you recall this entry that you testified about?

7    A.  Yes.

8    Q.  Line 320?

9    A.  Yes.

10    Q.  It's a July 26, 2018, text message?

11    A.  Yes.

12    Q.  Have you seen any documents that indicate whether this

13    information was public or classified or secret at the time?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Sustained.

16    BY MR. WEITZMAN:

17    Q.  In preparing this chart, have you seen any memos about this

18    sale to Egypt?

19          MR. MONTELEONI:  Objection.

20          THE COURT:  I'll allow it.

21    A.  I don't recall.

22          MR. WEITZMAN:  Well, let me show you GX 8A-2.  And if

23    you can flip the page so that the witness can refresh his

24    recollection.

25    Q.  Do you recall seeing this document as part of your review

O5uWmen4                    Coughlin - Cross

1  of the summary chart?

2  A.  Maybe.  Honestly, I don't recall.

3          MR. WEITZMAN:  OK.  I can refresh your recollection,

4  but it isn't in evidence.  Let's refresh your recollection with

5  3507-29, line 238.

6          Next one.  It's an Excel, Mr. Kelly.

7          THE COURT:  This is not in evidence, correct?

8          MR. WEITZMAN:  Right.  It's not.

9          THE COURT:  It's not being shown to the jury, correct?

10          MR. WEITZMAN:  No.

11          THE COURT:  OK.

12          MR. WEITZMAN:  It's OK.

13          THE COURT:  Is this the document you wanted him to

14  look at?

15          MR. WEITZMAN:  No, it's not, your Honor.  It's an

16  Excel, and so I think we're having a bit of a hard time putting

17  it up.

18          Let's go back to GX 8A2.  I'm sorry, Mr. Kelly.  I'm

19  being a bit schizophrenic here with my requests.

20          If you can go to the next page -- sorry.  Prior page.

21  There.  We just passed it.  The one that says the proposed

22  sale, there we go.

23          If you can zoom in on that.  I'll read it into the

24  record.  It says:

25          "Egypt will use the 120 millimeter IMHET cartridges to

O5uWmen4                    Coughlin - Cross

1   maintain a strategic munitions inventory for its M1A1 tank

2   fleet and in support of operations against militants affiliated

3   with Islamic State of Iraq and Syria in the Sinai."

4   Q.  Do you recognize that Islamic State of Iraq and Syria refer

5   to ISIS?

6           MR. MONTELEONI:  Objection, your Honor.  Scope and --

7           THE COURT:  Sustained.  Relevance.

8           MR. WEITZMAN:  Then it says, "Egypt has been producing

9   this type of ammunition under an existing co-production

10  agreement for approximately 15 years.  Egypt intends to use" --

11  I can't read that acronym -- "rounds to replace older model" --

12  various acronyms -- "ammunition to maintain a strategic

13  munitions inventory for its M1A1 tank fleet."

14          MR. MONTELEONI:  Objection.

15  BY MR. WEITZMAN:

16  Q.  Did you review this document?

17          MR. MONTELEONI:  Objection.

18          THE COURT:  Did you review this document; do you

19  remember?

20  A.  I may have, but I don't recall this document specifically.

21          MR. MONTELEONI:  This isn't cross, your Honor.

22          THE COURT:  Yes.

23          MR. WEITZMAN:  If we can go back to line 320 of GX

24  1302.

25  Q.  Do you know whether the rounds that are referenced in this

O5uWmen4                        Coughlin - Cross

1   line are the same rounds that were referenced in the memo we

2   just looked at?

3               THE COURT:  Sustained.

4               Next question.  The time is limited.  Let's use it

5   effectively.

6               MR. WEITZMAN:  If you can turn to lines 588 to 590.

7   Q.  Nadine writes, on April 8, 2019:  "Seems like halal went

8   through.  It might be a fantastic 2019 all the way around."

9       Do you see that?

10  A.  Yes.

11  Q.  She doesn't reference in this text message anything about

12  receiving money from IS EG, correct?

13              THE COURT:  Sustained.

14              Is there anything else on this text other than the

15  words Mr. Weitzman just read to you?

16              THE WITNESS:  Not on the summary chart.

17              THE COURT:  All right.

18              Next.

19              MR. WEITZMAN:  OK.

20  Q.  You've seen other text messages where Nadine references how

21  it's going to be a fantastic year, as part of your review,

22  correct?

23  A.  Yes.

24              MR. WEITZMAN:  Can we go to GX B113.  Top text

25  message.

1  Q.  She writes to André Mon Prince:  "2019 is going to be a

2  fantastic year for all of us.  Bob keeps telling me that and

3  I'm really starting to believe it."

4      Do you see that?

5  A.  Yes.

6  Q.  You're aware, sir, that this months before she writes the

7  text message about halal going through?  The halal going

8  through text message we just read was April 8, 2019.

9  A.  Yes.

10          THE COURT:  Is January before April?

11          MR. WEITZMAN:  Correct.

12          THE COURT:  That's your question.

13          Sir, is January before April?

14          THE WITNESS:  It is, yes.

15          THE COURT:  Is May after February?

16          THE WITNESS:  Yes.

17          THE COURT:  Let's go on.

18  BY MR. WEITZMAN:

19  Q.  Now, in his response, line 590, Robert Menendez, at 2:24

20  p.m., writes:  "7:30 Morton's.  This is the last time I will do

21  this meeting."

22      Do you see that?

23  A.  Yes.

24          MR. WEITZMAN:  Now, going back in time to earlier in

25  the day, lines 583 to 586 -- go up one line, actually, 582 to

O5uWmen4                          Coughlin - Cross

1    590.

2    Q.  Nadine texts Senator Menendez about a plane arriving from

3    Guyana.  Do you see that?

4    A.  Yes.

5    Q.  And Robert Menendez asks who?  And she says Sisi and Abbas

6    Kamel on April 8, 2019, correct?

7    A.  Yes.

8    Q.  Do you know Sisi to be the president of Egypt?

9    A.  Yes.

10   Q.  And Abbas Kamel to be the intelligence chief, or whatever

11   the title is?

12   A.  Correct.

13   Q.  Do you know whether there was a meeting between Senator

14   Menendez and Sisi and Abbas Kamel on this date?

15           MR. MONTELEONI:  Objection.

16           THE COURT:  Do the documents reflect a meeting on that

17   date, to your recollection?

18   A.  As we've seen a lot of Nadine's have -- there were photos

19   afterwards.  I don't recall if this one had any.

20   Q.  Are you aware whether El Sisi met with President Trump that

21   date --

22           MR. MONTELEONI:  Objection.

23           THE COURT:  Sustained.

24   BY MR. WEITZMAN:

25   Q.  -- from your review of the documents?

O5uWmen4                          Coughlin - Cross

1                    THE COURT:  Sustained.

2     BY MR. WEITZMAN:

3     Q.  Based on your review of the documents and all the lines on

4     the summary chart, you're not aware of any actual meeting

5     occurring between Senator Menendez and Sisi on April 8, 2019,

6     correct?

7                    MR. MONTELEONI:  Objection.

8                    THE COURT:  Sustained as phrased.

9     BY MR. WEITZMAN:

10    Q.  Does your summary chart include any line items that reflect

11    a meeting occurring between Senator Menendez and El Sisi and

12    Abbas Kamel on or about April 8, 2019?

13    A.  I -- I don't recall any photos or anything like that with

14    Sisi.

15    Q.  Are you aware that on April 8, 2019, based on your review

16    of documents to create the summary chart, Senator Menendez

17    authored a letter that was highly critical of Egypt?

18                    MR. MONTELEONI:  Objection.

19                    THE COURT:  Sustained as phrased.

20                    MR. MONTELEONI:  Also not cross.

21                    THE COURT:  Yes.

22    BY MR. WEITZMAN:

23    Q.  Are you aware, sir -- does your summary chart indicate any

24    letter that was written on April 8, 2019, by Senator Menendez

25    critical of Egypt?

O5uWmen4                    Coughlin - Cross

1          THE COURT:  Sustained.

2    BY MR. WEITZMAN:

3    Q.  Have you seen letters authored by Senator Menendez critical

4    of Egypt --

5          MR. MONTELEONI:  Objection.

6          THE COURT:  In your review of documents.

7    BY MR. WEITZMAN:

8    Q.  -- in review of documents prepared for summary chart?

9          THE COURT:  To your recollection.

10   A.  Not to my recollection.

11   Q.  OK.  I'd like to direct your attention to line -- to GX

12   B108.  You testified about this document, and in particular,

13   you were asked about this entry on the right, reflecting, under

14   the line deleted, "yes."  Do you see that?

15   A.  Yes.

16   Q.  Do you have any training in forensic retrieval of evidence?

17   A.  We have CART examiners who do it.  I'm certainly not one of

18   those.  I would say we get some very basic training on how the

19   process works, but I wouldn't say I have any specialized

20   training in that, no.

21   Q.  But the CART examiners, they're the ones who are experts in

22   forensic retrieval of evidence, correct?

23   A.  Correct.

24   Q.  And you don't know, sitting here, even though you testified

25   about it, why it says deleted with a "yes," do you?

O5uWmen4                          Coughlin - Cross

1           MR. MONTELEONI:  Objection.

2           THE COURT:  Do you know what the "yes" means under the

3      column deleted?

4           THE WITNESS:  So, we receive these reports from the

5      CART examiners.  I -- I did not -- obviously, I did not create

6      this report.  I don't know exactly how the process works and

7      things like that.

8      BY MR. WEITZMAN:

9      Q.  But you don't know if it's deleted automatically or

10     intentionally or by whom, right?

11     A.  No.

12          MR. WEITZMAN:  OK let's go to lines 1069 to 1071.

13     Q.  On September 16, 2019, at 9:44 p.m., Senator Menendez texts

14     Nadine and he says:

15          "*Mon amour*, I got a late start for dinner with Fred who

16     tells me he has been texting with you.  I'm just about to have

17     a cigar.  Can call you from here or later."

18          And then the next entry is a next-day email from Senator

19     Menendez to Fred Daibes.

20          Do you see that?

21     A.  Yes.

22     Q.  Do you know who the Fred is that he's referencing in line

23     1069?

24     A.  My assumption is Fred Daibes.

25     Q.  Are you aware of a person named Fred Turner?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen4                         Coughlin - Cross

 1              MR. MONTELEONI:  Objection.

 2              THE COURT:  Have you ever heard of anyone named Fred

 3   Turner?

 4              THE WITNESS:  No.

 5              THE COURT:  I take it you know other people who are

 6   named Fred, right?

 7              THE WITNESS:  Not many, actually.

 8              THE COURT:  All right.

 9              MR. WEITZMAN:  Well, one of the documents may clarify

10   that.  If you go to line 526.  This was in your entry.

11   Q.  526, March 26, 2019, there was an email from Sarah Arkin to

12   Robert Kelly and others, correct?

13              MR. WEITZMAN:  Let's put up the email, GX 8F-1.

14   Q.  This is a document you reviewed, correct, sir?

15   A.  Correct.

16              MR. WEITZMAN:  And let's zoom in on the name Fred

17   Turner in the cc.

18              THE COURT:  Do you see that there's a cc to Fred

19   Turner?

20              THE WITNESS:  Yes.

21              THE COURT:  Next question.

22   BY MR. WEITZMAN:

23   Q.  Do you see that this email exchange has a parenthetical for

24   Menendez?

25   A.  Yes.

O5uWmen4                          Coughlin - Cross

1   Q.  Do you know whether Fred Turner was Menendez's then-chief

2   of staff?

3               THE COURT:  Sustained.

4   BY MR. WEITZMAN:

5   Q.  Do you know whether Fred Turner worked for Menendez at any

6   point, sir?

7               MR. MONTELEONI:  Objection, your Honor.  This is far

8   beyond the scope, and it's argumentative.

9               MR. WEITZMAN:  They brought up the email and left a

10  misimpression, your Honor.

11              THE COURT:  Just a moment.

12              I'll allow that question.

13              Do you know whether or not a Fred Turner worked for

14  Menendez at any point?

15              THE WITNESS:  Do not.

16              THE COURT:  From this email.

17              THE WITNESS:  I don't know.

18              THE COURT:  Next.

19  BY MR. WEITZMAN:

20  Q.  You testified about a dinner at Ventana's, line 1081.

21      You recall testifying about this dinner with nine guests,

22  correct?

23  A.  Correct, yes.

24  Q.  You don't know who was at the dinner, right?

25  A.  I do not.

O5uWmen4                      Coughlin - Cross

1    Q.  Your summary chart doesn't indicate who the individuals

2    were who got that expensive meal, 1,795, right?

3    A.  No.

4    Q.  You don't know where Bob was at this dinner, do you?

5          MR. MONTELEONI:  Objection.

6    BY MR. WEITZMAN:

7    Q.  At the time of this dinner?

8          THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  Sir, are you aware that cell phones have GPS devices in

11   them?

12         MR. MONTELEONI:  Objection.

13         THE COURT:  I'll allow it.

14   A.  Yes, of course.

15   Q.  The FBI can figure out where Bob was during the time of

16   this dinner, correct?

17         MR. MONTELEONI:  Objection.

18         THE COURT:  Sustained.

19         Law enforcement techniques are not an issue for this

20   jury.  Law enforcement techniques are completely irrelevant to

21   what the jury is going to be asked to draw inferences from.

22   They have no part to play in your deliberations.

23   BY MR. WEITZMAN:

24   Q.  Sir, do you know that Ventana's is a restaurant in Fort

25   Lee, New Jersey?

O5uWmen4                    Coughlin - Cross

1   A.  Correct, yes.

2   Q.  Based on your review of documents, do you know that Bob was

3   not in New Jersey for this dinner?

4            MR. MONTELEONI:  Objection.

5            THE COURT:  Sustained.

6   BY MR. WEITZMAN:

7   Q.  Is there anything in this summary chart that indicates

8   whether Bob was in New Jersey throughout this dinner?

9            THE COURT:  I'll allow it.

10  A.  Is there anything on the summary chart that indicates if he

11  was there?

12  Q.  If he was even in the state of New Jersey during this

13  dinner.

14  A.  I believe there was discussion of his attendance at this

15  dinner.

16  Q.  OK.  At the Ventana dinner; that's your testimony?

17  A.  If I could take a moment to review.

18           THE COURT:  Go ahead.

19           THE WITNESS:  Thank you.

20           THE COURT:  Hit your mark, sir, at 4 o'clock.

21  BY MR. WEITZMAN:

22  Q.  Sir, are you able to answer that question?

23  A.  If you could just ask the question again?

24  Q.  Sorry.

25      Is there anything in the summary chart that indicates

O5uWmen4                         Coughlin - Cross

1    whether or not Bob was even in New Jersey during this dinner?

2          MR. MONTELEONI:  Objection.

3          THE COURT:  I'll allow it.

4    A.  I'm not sure.

5          THE COURT:  In other words, you have no idea where he

6    was, right, based on that chart?  Here's a better way.  The

7    chart does not reflect where Mr. Menendez was that night,

8    correct?

9          MR. WEITZMAN:  If we could turn to line 974.

10   Q.  The summary chart includes this line, this text message

11   from Nadine Arslanian to Robert Menendez about how she's the

12   luckiest woman on the entire planet.  Do you see that?

13   A.  Yes.

14   Q.  And it cites to GX A101-47, correct?

15   A.  That's correct.

16         MR. WEITZMAN:  Let's put that exhibit up.

17   Q.  Now, you cite to her text message, or the summary chart

18   includes her text message, at the bottom, correct?

19   A.  That's correct, yes.

20         MR. WEITZMAN:  Now, it doesn't include -- the summary

21   chart doesn't include what Senator Menendez said prior to this

22   message.  Let's look at that.  This is in evidence.

23         "The truest success is not obtaining the most material

24   things, climbing to the top ranks or making the most money.

25   True success is following your dreams wholeheartedly, whatever

O5uWmen4                         Coughlin - Cross

1    those dreams may be.  So long as you stay true to your heart,

2    you are certain to obtain true success."

3    Q.  That message wasn't included in the summary chart, was it?

4    A.  That's correct.

5         MR. WEITZMAN:  This is just 90 minutes before the

6    message that was included in the summary chart.

7         Push that back.

8         MR. MONTELEONI:  Objection.

9         THE COURT:  What's the question?

10   BY MR. WEITZMAN:

11   Q.  The message that Senator Menendez sent was just 90 minutes

12   before the message that was included in the summary chart,

13   correct?

14        THE COURT:  I'll allow it.

15   A.  Approximately.

16   Q.  In line 996 of the summary chart, Nadine Arslanian says, on

17   August 1, 2019, to Senator Menendez:  "I wish I could snap my

18   fingers and hear from both Mike and Fred that everything is OK.

19   That will alleviate a lot of anxiety.  But last night's meeting

20   and hopefully the answers on the 9th will make life 85 percent

21   positive and happy every day."

22        Do you see that?

23   A.  Yes.

24   Q.  Do you have any clue what she's referring to?

25        MR. MONTELEONI:  Objection.

1           THE COURT:  Sustained.

2           MR. WEITZMAN:  Let's put up GX A101-49.

3           If you can blow up the bottom text.

4           In the third paragraph, she says:

5           "At a time when 99 percent of the people will be

6    thinking about their hospital visit and their tests, you're

7    thinking of me and sending me a text.  I love you so much.  I

8    don't think you'll ever, ever understand how true that is and

9    how much I love you and I am in love with you.  I can't wait to

10   hug and kiss you and fall asleep in your arms."

11   Q.  Do you see that?

12   A.  Yes.

13   Q.  Do you understand her to be referring to a hospital --

14   well, withdrawn.

15       Do you see that she's referring to a hospital visit in that

16   paragraph?

17   A.  Yes.

18   Q.  She's referring to tests being done at a hospital?

19   A.  Yes.

20   Q.  And she's saying to Senator Menendez that 99 percent of the

21   people would be thinking about their hospital visit and their

22   tests and instead he's texting her.  Do you see that?

23   A.  Yes.

24   Q.  And then she says, at the bottom:  "For right now the most

25   important thing is to hear the doctor give you the reassuring

1    results on both your tests."  Do you see that?

2    A.  Yes.

3    Q.  The reference to the anxiety in the portion that --

4              MR. WEITZMAN:  Go back to 996.

5    Q.  When she references a lot of anxiety, you don't know

6    whether she's referring to tests or something else, do you?

7              MR. MONTELEONI:  Objection.

8              THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  Now, you testified about Find My entries.  Do you recall

11   that?

12   A.  Yes.

13             MR. WEITZMAN:  OK.  Lines 828 and 829.

14   Q.  You're aware that there were multiple, multiple line

15   entries in your summary chart regarding this Find My Friends

16   feature on an iPhone, correct?

17   A.  There was a handful.

18   Q.  Yeah.  OK.  Handful.

19        Have you reviewed any documents that would indicate to you

20   why Bob was asking Nadine to turn on her location finder?

21             MR. MONTELEONI:  Objection.

22             THE COURT:  Sustained.

23   BY MR. WEITZMAN:

24   Q.  In connection with your review to create the summary chart

25   and your review of these Find My feature documents, did any of

O5uWmen4                        Coughlin - Cross

1    them indicate why Bob was asking Nadine to turn on her

2    feature --

3              MR. MONTELEONI:  Objection.

4    BY MR. WEITZMAN:

5    Q.  -- find My Friends?

6              THE COURT:  Just a moment.

7              Sustained.

8    BY MR. WEITZMAN:

9    Q.  Do you know, from your review of documents, whether there

10   were any security concerns for Nadine?

11             MR. MONTELEONI:  Objection.

12             THE COURT:  Sustained.

13   BY MR. WEITZMAN:

14   Q.  You're not aware -- you have no -- the summary chart

15   doesn't indicate why Bob asked her to turn on the Find My

16   feature, correct?

17             MR. MONTELEONI:  Objection.

18             THE COURT:  Sustained.

19             MR. WEITZMAN:  I'm just asking whether the summary

20   chart has any information.

21             THE COURT:  But there's an assumption in your question

22   that I don't think --

23   BY MR. WEITZMAN:

24   Q.  Does the summary chart indicate why Nadine turned on her

25   Find My feature?

O5uWmen4                        Coughlin - Cross

1           MR. MONTELEONI:  Objection.

2           THE COURT:  I'll allow that.

3    A.  No.

4    Q.  OK.  Now, in GX 1203, line 1253, you include a search for

5    how much is one kilo of gold, GX A125.  Do you see that?

6    A.  Yes.

7    Q.  Have you reviewed other Google searches of Senator Menendez

8    besides this one Google search?

9    A.  I believe there were a few others, but not many.

10   Q.  There's a document -- I'm just going to ask you

11   generally -- that contains the entire history of Google

12   searches that the government has.  Did you review that

13   document?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Sustained.

16          MR. WEITZMAN:  Well, I'll ask then if he's familiar

17   with the document.  Can we put up GX A301.  And I'll just ask

18   you -- just for the witness -- ask you if you ever reviewed

19   that document before, GX A301, and if we can scroll just page

20   by page.

21   Q.  Have you seen this document before, sir?

22   A.  I believe I did.

23   Q.  OK.

24   A.  I don't -- I'm not positive, though, honestly.

25   Q.  Are you aware, sir, based on your review of this document

O5uWmen4                        Coughlin - Cross

1  that there are many other searches by Senator Menendez for the

2  price of gold beyond the one line entry you included?

3          MR. MONTELEONI:  Objection.

4          THE COURT:  Based on his response, sustained.

5  BY MR. WEITZMAN:

6  Q.  Are you aware, sir, that there are Google entries in Google

7  searches that Senator Menendez does for the price of gold prior

8  to the date that's referenced in your summary chart?

9          MR. MONTELEONI:  Objection.

10         THE COURT:  Sustained.

11         MR. WEITZMAN:  We can take that down.

12 Q.  Sir, when a Google search is done, you can't tell who is

13 conducting the search, just on which phone it was being done,

14 correct?

15 A.  Either the phone or potentially -- correct, you can get

16 potentially directly from Google through an email account or

17 something like that.

18 Q.  Correct, but you know the device -- you might know the

19 account on which the search was done, but you can't tell who

20 did the search, correct?

21 A.  That's correct.

22 Q.  And if someone else picks up a spouse's phone and does a

23 Google search, you can't tell which spouse is doing it,

24 correct?

25         MR. MONTELEONI:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O5uWmen4                          Coughlin - Cross

1              THE COURT:  Sustained.

2              MR. WEITZMAN:  Your Honor, I hit my mark.

3              THE COURT:  Excellent.  Thank you.

4              Ladies and gentlemen of the jury, we had a full day

5    today.  I appreciate your attention.  We'll have a half day

6    tomorrow, from one to five.  We'll have one short, midafternoon

7    break.  So let's try to get a lot of testimony in tomorrow.

8              Enjoy the evening.  Keep an open mind.  You haven't

9    heard all the testimony.  Don't discuss this case.  Don't read

10   or listen to anything about it.

11             Enjoy the rest of the evening.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O5uWmen4

1              (Jury not present)

2              THE COURT:  Step down, sir.

3              THE WITNESS:  Your Honor, should I leave this here?

4              THE COURT:  No.  Give it to whomever gave it to you.

5              THE WITNESS:  Sure.

6              THE COURT:  All right.  I'll see everybody tomorrow at

7    1 p.m.

8              Thank you.

9              MR. RICHENTHAL:  Your Honor, can we be heard briefly?

10             THE COURT:  Yes.

11             Please be seated in the courtroom.

12             MR. RICHENTHAL:  Can I wait for the witness to leave?

13             THE COURT:  Yes, sir.

14             (Witness not present)

15             MR. RICHENTHAL:  I don't know if this is the

16   appropriate time.  Perhaps as we foreshadowed, it's not

17   surprising, we have a lot of concerns about that cross.

18             THE COURT:  I understand.  I was giving some leeway.

19   I think Mr. Weitzman was pressing it quite a bit.  I assume it

20   will cut down on his jury summation.

21             Go ahead.

22             MR. RICHENTHAL:  Perhaps so.

23             I wanted to flag one concern that I don't think we had

24   foreshadowed, because we didn't anticipate it.  We talked a bit

25   about scope generally and asking the witness to interpret.  I'm

O5uWmen4

1    not going to retread that ground, although we do have concerns

2    that lines were crossed there, but I want to raise one thing

3    in.

4         Particular that I just don't think we aired

5    sufficiently.  Mr. Weitzman kept asking Special Agent Coughlin

6    what Special Agent Coughlin knew.  I don't think Special Agent

7    Coughlin literally testified on direct even one time what he

8    knew.  He testified to what the documents said, what they

9    showed, what they didn't say, what they didn't show, and what I

10   would call, for lack of a better word, metadata -- dates,

11   times, senders, things like that.

12        As the Court put it, or someone else put it, a college

13   student do could it.  Maybe even a robot could do it.  If

14   Mr. Weitzman wants to cross a summary witness on the things I

15   just said -- what the documents say or don't say, when they

16   were sent and when they weren't sent, whether the chart's

17   accurate at all -- I think he indicated one error in a hundred

18   pages -- those are all perfectly proper.

19        THE COURT:  He started off with the error.

20        MR. RICHENTHAL:  Correct.

21        But when you start asking do you know X, in our view,

22   and the Court obviously may disagree, that's beyond the scope

23   of direct.  We never asked him what's in his brain.  We asked

24   him to serve as a conduit for evidence.  Now, to be clear,

25   sometimes questions could have been phrased in the form of

O5uWmen4

1    knowledge.  I recognize that human knowledge is ambiguous.

2                THE COURT:  If he knew another Fred, I thought that

3    was OK.

4                MR. RICHENTHAL:  I think the problem, from our

5    perspective, is they're using him as their witness, do you know

6    something designed to elicit other evidence out there.  I just

7    want to flag for the Court that, in our judgment, is crossing a

8    line.

9                And I want to flag a second thing, and I know the

10   Court's aware of this.  There's been a lot of commentary.  In

11   two respects we think that commentary was really inappropriate.

12   One was he said aloud in front of the jury that we left a

13   misimpression.  Mr. Weitzman is an advocate.  He can say that

14   to the Court.

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O5U3MEN5

1          THE COURT:  I sustained the objection.  That's for

2     summation, correct.

3          MR. RICHENTHAL:  And second, Mr. Weitzman asserted

4     there is a document that we, the government, know exists and

5     have, he said that aloud, that shows all history, suggesting

6     we're hiding things.

7          THE COURT:  I believe I sustained the objection to

8     that as well.

9          MR. RICHENTHAL:  You did, your Honor.  But he keeps

10    saying this stuff in front of the jury.  It is inappropriate

11    and we ask that you direct it to stop.

12         MR. WEITZMAN:  Your Honor --

13         THE COURT:  I think you did cross the line.  In light

14    of the length and the scope I gave Mr. Monteleoni, I was giving

15    you a certain amount of leeway here.  You clearly were not

16    limiting yourself to what was on the texts.  Not even what was

17    on the underlying documents.  You were pushing that envelope,

18    and you did have some assumptions in your questions, à la

19    Mr. Fee.  Reel that in.

20         MR. WEITZMAN:  Yes.

21         THE COURT:  Reel that in.

22         MR. WEITZMAN:  I understand.  This summary chart is

23    deeply, deeply misleading.  It leaves misimpressions left and

24    right.  For example, that dinner with Fred Daibes.

25         THE COURT:  You've done that.  You think it is a

O5U3MEN5

1    different Fred?

2            MR. WEITZMAN:  It is a different Fred.  We know it is

3    a different Fred.  It's Fred Turner and we can prove it.

4            The notion that the government is putting this

5    evidence in and the next line, the next day is a text message

6    involving Fred Daibes leaves a misimpression left and right.

7            So I apologize if I'm being an advocate, but I am

8    being an advocate for truth here because there are some

9    misimpressions left.

10           MR. RICHENTHAL:  I'm not going to respond to the ad

11   hominem attacks.

12           THE COURT:  No.  That's correct.  The fact of the

13   matter is you're permitted to be an advocate, but within a

14   rather narrow aperture, on somebody who has the dotted the i's

15   and just checked whether the i's were dotted on the t's were

16   crossed on a summary chart.  This is not somebody who you

17   really use for adversary purposes.  But it's done.  I gave you

18   the leeway.  Nobody has to explain what they were doing.  I

19   think everybody knows what each of you were doing.

20           MR. WEITZMAN:  I know there was some repetition with

21   how many months was that after that first date.  But I would

22   say Mr. Monteleoni probably went through how many minutes is

23   that after that last text, and it was like one or two minutes,

24   probably 100 times.  I don't think I took any liberties

25   beyond --

O5U3MEN5

1          THE COURT:  You've all put your positions forth.  And
2    you made your cross there.
3          Given the cross, Mr. Lustberg, do you have any
4    questions for this witness?
5          MR. LUSTBERG:  I have a few.  But as I said yesterday,
6    I am going to be brief.  No more than a half hour, your Honor.
7          THE COURT:  Sir, for Mr. Daibes?
8          MR. DE CASTRO:  Very brief, Judge.
9          THE COURT:  See everybody tomorrow at 1 o'clock.
10         You scared me a little, Mr. Weitzman, when you said
11   touché, I thought the lawyers were starting to talk French
12   here.
13         (Adjourned to May 31, 2024, at 1:00 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     MICHAEL F. COUGHLIN

 4    Direct By Mr. Monteleoni . . . . . . . . . .1515

 5    Cross By Mr. Weitzman  . . . . . . . . . . .1568

 6                        GOVERNMENT EXHIBITS

 7    Exhibit No.                              Received

 8     D102-C   . . . . . . . . . . . . . . . . .1517

 9     C218-1   . . . . . . . . . . . . . . . . .1543

10     7N-1   . . . . . . . . . . . . . . . . . .1544

11     7N-2   . . . . . . . . . . . . . . . . . .1547

12     3A-20  . . . . . . . . . . . . . . . . . .1560

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300