O63Wmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    v.                      23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7                    Defendants.
                                             Trial
8   ------------------------------x

9                                            New York, N.Y.
                                             June 3, 2024
10                                           1:40 p.m.

11

12  Before:

13                     HON. SIDNEY H. STEIN,

14                                           District Judge
15                                           -and a Jury-

16                          APPEARANCES

17  DAMIAN WILLIAMS
         United States Attorney for the
18       Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

O63Wmen1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9   GIBBONS, P.C.
         Attorneys for Defendant Hana
10  BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15  CESAR DE CASTRO
    SETH H. AGATA
16  SHANNON M. McMANUS
         Attorneys for Defendant Daibes

17

18

19  Also Present:  Marwan Abdel-Rahman
                   Rodina Mikhail
20                 Interpreters (Arabic)

21                 Rachel Wechsler
                   Connor Hamill
22                 Braden Florczyk
                   Paralegal Specialists, U.S. Attorney's Office

23                 Justin Kelly, DOAR

24

25

1             (Trial resumed)

2             THE COURT:  Good afternoon.

3             Please be seated in the courtroom.

4             Bring the jury in, please.

5             You may be seated, sir, until the jury comes in.

6             Let's try to go right through, with one short break,

7    until five.

8             (Jury present)

9             THE COURT:  You may be seated in the courtroom.

10            Good afternoon, ladies and gentlemen, and welcome.

11            Mr. Fee, you may continue with the cross-examination

12   of Mr. McKinney.

13            Mr. McKinney, I remind you, sir, you remain under

14   oath.  You understand that, correct, sir?

15            THE WITNESS:  Yes, sir, I do.

16            THE COURT:  Proceed.

17            MR. FEE:  Thank you, your Honor.

18    TED McKINNEY, resumed.

19   CROSS-EXAMINATION CONTINUED

20   BY MR. FEE:

21   Q.  Good afternoon, Mr. McKinney.  Hello again.

22   A.  Good afternoon.

23   Q.  Mr. McKinney, on Friday, do you remember testifying with

24   the prosecutor as follows:

25   "Q.  Does the FSIS certify meat as halal?

1    "A.   They do."

2         Do you remember being asked that question and giving that

3    answer?

4    A.   Yes, sir.

5    Q.   And the FSIS is a part, it's a piece of the U.S.D.A.,

6    correct?

7    A.   It's another division.

8    Q.   Yes.

9    A.   That's right.

10   Q.   Sir, are you familiar with federal laws that exempt from

11   FSIS supervision religious certifications?

12   A.   I'm generally aware of those.

13   Q.   And are you aware that the U.S.D.A. has a public website,

14   sir?

15   A.   Oh, yes.

16   Q.   And it's a public website that provides information about

17   the U.S.D.A., the FSIS and other works that the agency's doing,

18   right?

19   A.   Yes, sir.

20   Q.   And have you reviewed the portions of the U.S.D.A. website

21   that says the FSIS does not certify food as halal?

22   A.   Yes.  There's context, though, sir.  They take the

23   certification as requested by a country of any type, and they

24   then are the ones that look after and enforce that rule.  So

25   they would take the certification as established by many

1    countries -- in this case, I think, Egypt -- and then they

2    would certify against that.  That's their role.

3    Q.  So your testimony is that the FSIS actually certifies meat

4    as halal before it's exported to Egypt?

5    A.  No, no, no.  They would make sure that the processing is in

6    compliance with the halal certification.  Another person would

7    be the certifier, but they work very, very closely together.

8    There's not a certifier in every plant every day, no.

9    Q.  Another person actually makes sure that the religious rules

10   are followed, right, not the FSIS?

11   A.  Yes.  They come into a plant periodically and check on

12   that, once every year, year and a half or so, usually.

13   Q.  Understood.

14        And you also testified on Friday that while Egypt has the

15   right to reject a halal certifier as inadequate, you would want

16   to confirm with the FSIS to get their view before you agreed

17   with that decision, correct?  Do you remember giving that

18   testimony, sir?

19   A.  Yes, but I believe that was based on a document that I

20   didn't see, had documentation, had reference, and so they work

21   together.  The FSIS wants absolutely to be in compliance with

22   the request of any country, and so to see documents, to

23   understand who is behind that is very important, because they

24   work so closely together, sir.

25   Q.  All right.  Let's talk about what you actually did here.

1    You never reached out to the FSIS to inquire of them on the

2    capability of Egypt's prior certifiers to actually do the

3    certification work, right?

4    A.  In that context, that's right.  We did ask them to look

5    into what in the world had happened, but I think your question

6    is a different one, sir.

7    Q.  My question is you never checked with the FSIS before

8    telling Egypt -- excuse me.

9        You never checked with the FSIS about the quality of the

10   work the prior certifiers were doing, correct?

11   A.  I wouldn't quite put it that way, sir.  We asked the FSIS

12   to tell us what they had about these halal certifiers and if

13   there was anything going on that we needed to know about, we

14   did.  But I want to be accurate on your specific question.

15       We did ask them to give us what they had.

16   Q.  Did you personally make that request?

17   A.  Yes, I shared that with my counterpart.

18   Q.  You reached out to the FSIS personally to get that

19   information, sir; that's your testimony?

20   A.  My counterpart and I met just about weekly or every other

21   weekly, and so yes, I asked them to give me whatever they had.

22   Q.  And the FSIS gave you the information about the prior

23   certifiers?

24   A.  I think that came more from my team than it did from FSIS.

25   Q.  So your team told you that the prior certifiers were doing

1    a good job; that's your testimony?

2    A.  I don't think it was quite those Words.  I'm trying to be

3    very exact given the nature of this.  They shared with me that

4    there had been no complaints about the four or seven

5    certifiers, hence the lack of understanding of why the decision

6    was made to eliminate them.

7    Q.  Who exactly on your team at the U.S.D.A. told you that

8    there had never been any complaints about the prior certifiers?

9    A.  I don't --

10            MR. MARK:  Objection.

11            THE COURT:  I'll allow the answer.

12   A.  I don't recall.  It's been five years, sir.

13            MR. FEE:  Let's bring up Government Exhibit 8B-20,

14   please.

15   Q.  And this is the letter you sent to Dr. Mehrez in May of

16   2019.  Do you remember, Mr. McKinney?

17   A.  Oh, yes.  Yes, sir.

18   Q.  And just to refresh, Dr. Mehrez is the deputy minister of

19   agriculture in essentially the U.S.D.A. version in Egypt, is

20   that fair to say?

21   A.  That's correct, yes.

22            THE COURT:  I think you said she essentially is your

23   equivalent.  Is that right?

24            THE WITNESS:  That was something else we added --

25   about my equivalent, yes.

1              MR. FEE:  Thank you, your Honor.

2              If we go to page 3 of this letter, the second

3    paragraph.  Thank you.

4    Q.  And you say here the existing U.S.-based halal certifiers

5    meet all applicable Egyptian laws and regulations, and they

6    have certified products for export to Egypt and many other

7    Islamic countries for decades?

8    A.  Yes, sir.

9    Q.  Do you see that?

10   A.  Yes.

11   Q.  Now, the truth is your team actually understood the

12   opposite was true, correct?

13   A.  I wouldn't agree with that.

14             MR. MARK:  Objection.

15             THE COURT:  I'll allow him to answer it.  He

16   apparently does not agree.

17   A.  I would not agree with that.

18   Q.  So you understood your team to be telling you that the

19   prior certifiers were meeting all applicable Egyptian laws and

20   regulations?

21   A.  No, I wouldn't say that.  We had not heard of any

22   complaints about those four or seven -- you've raised two

23   different numbers -- so I felt comfortable in using that

24   sentence, sir.

25   Q.  Got it.  So you did not say in this letter I am unaware of

1    complaints about the prior certifiers, correct; that's not the

2    language you used?

3    A.  No.  It's pretty clear I didn't use those words.

4    Q.  That's right.

5        It's clear that you said something stronger than that,

6    right?

7                MR. MARK:  Objection.

8                THE COURT:  Sustained.

9    BY MR. FEE:

10   Q.  You, in fact, said --

11               THE COURT:  Argumentative.  Just move on.

12   BY MR. FEE:

13   Q.  You, in fact, said that they meet all applicable Egyptian

14   laws and regulation; you would agree with that, right?

15               THE COURT:  That's what the words say.

16               Next.

17               MR. FEE:  Thank you, your Honor.

18               THE COURT:  You're welcome.

19               Next.

20   BY MR. FEE:

21   Q.  You're aware that each country has their own set of halal

22   rules, right?

23   A.  They can vary.  Some are the same.

24   Q.  So there are differences between countries in how they

25   interpret the religious requirements in the Quran, correct?

1    A.  Yes, and I would add that sometimes there are political

2    machinations that go with that.  A country may be for some

3    reason angry at the U.S. and they'll put a half twist on

4    something.  I remember several countries where I spoke with the

5    lead religious leader because they were contemplating changes.

6    So to your point, yes, there are differences, but in many cases

7    they're very similar or the same.

8    Q.  So your view is that Muslim countries distort religious

9    requirements for political purposes?

10           MR. MARK:  Objection.

11           THE COURT:  Sustained.

12   BY MR. FEE:

13   Q.  What did you mean when you said that other countries

14   sometimes use halal for political gain, Mr. McKinney, right

15   now?

16   A.  I meant that because we had been told that, and there were

17   oftentimes changes.

18   Q.  OK.

19   A.  I can give several examples where I visited countries

20   because they have a new religious leader.  Many religious

21   leaders have a different take, a quarter twist on an issue, and

22   they want to impose their own new angle.  And we have heard

23   that, yes, sometimes that might have political backdrop to it.

24   Q.  And you feel comfortable, or felt comfortable as an under

25   secretary in the U.S.D.A., in making the determination where a

1    Muslim country was using halal for political purposes --

2    A.  I didn't --

3    Q.  -- or religious purposes?

4    A.  I didn't say that, sir.

5            MR. MARK:  Objection.

6    A.  I didn't say that.

7    BY MR. FEE:

8    Q.  Why don't you explain to me what you said, Mr. McKinney?

9    A.  I said in some cases that is the case, and we know that to

10   be true because we were told that.  I do not know if that's the

11   case here with Egypt.

12           THE COURT:  Listen carefully to the question and just

13   confine your answer to the specific question that's being

14   asked.

15           Go ahead, sir.

16   BY MR. FEE:

17   Q.  You're aware that Egypt's ministry of agriculture is the

18   agency responsible for Egypt's halal rules, correct?

19   A.  That's correct, yes, sir.

20   Q.  And you're aware that Egypt sent members of that agency,

21   the Egyptian agency, to audit the work of the prior halal

22   certifiers in the United States, correct?

23   A.  That is correct.

24   Q.  And in fact, the head of Egypt's veterinary quarantine and

25   inspection agency was the one who led those audits, right?

1    A.   That's my understanding.

2    Q.   And you would agree, sir, that Egyptian officials in that

3    ministry would know better about whether U.S. halal certifiers

4    are following the rules set by Egypt than you would, right?

5             MR. MARK:   Objection.

6             THE COURT:   Sustained as to form.   Rephrase it, sir.

7    BY MR. FEE:

8    Q.   You would agree that the best authority to enforce Egyptian

9    halal rules are the Egyptian officials who made those rules,

10   correct?

11            MR. MARK:   Objection.

12            THE COURT:   I'll allow it.

13   A.   It depends on the context, sir.   Yes, they are the ones

14   that know what they expect, but without knowing what they

15   observed, what the reports are -- I've not seen any FSIS

16   report, and they are very detailed.   So before I agree, in your

17   words, I'd want to see what's the backdrop there?   Because I

18   don't know that that's true.

19   Q.   You remember viewing on Friday emails where your own team

20   was discussing the shortcomings that the Egyptians identified

21   in that audit?

22            MR. MARK:   Objection.

23   BY MR. FEE:

24   Q.   Do you remember that?

25            THE COURT:   I will allow it, if he remembers it.

O63Wmen1                        McKinney - Cross

1    A.  I do recall that, but I also didn't see any authority on

2    the name of who wrote that, who signed that.  That could have

3    been just discussion like anybody would have.  So no, I'm not

4    at a point where I could agree with that until I see the

5    underlying information behind that, a signed signature of an

6    FSIS person, a signed signature of a halal certifier, that kind

7    of thing.

8    Q.  And you're aware that Ali Abdi -- that's a member of the

9    U.S.D.A. in Cairo, correct?

10   A.  Yes.

11   Q.  You're aware that he also came to understand that the

12   Egyptians found the certifiers were not complying with halal

13   rules, correct?

14             MR. MARK:  Objection.

15             THE COURT:  Sustained as phrased.

16   BY MR. FEE:

17   Q.  Are you aware that Ali Abdi had additional information

18   about this audit?

19             MR. MARK:  Objection.

20             THE COURT:  I'll allow it.

21   A.  All I know is what I read, and that left a lot of

22   uncertainty, sir.

23   Q.  Did you speak to Ali Abdi at the time about this issue,

24   sir?

25   A.  No, I did not.

1  Q.  Do you also remember testifying on Friday that Senator

2  Menendez's -- he led the foreign affairs committee in the

3  Senate; do you remember that?

4  A.  No.  I think he was the deputy, so the ranking member at

5  the time, sir.

6  Q.  Thank you, sir.

7      And you remember testifying on Friday that that committee,

8  the foreign affairs committee, has broad oversight, you said,

9  of agriculture; do you remember testifying to that on Friday,

10  sir?

11  A.  I'm not sure I said it quite that way, sir.  They have

12  broad oversight on just about everything foreign, and I think

13  that could include agriculture.  But I also know that they

14  focus on things well beyond agriculture.

15  Q.  Well, let me just focus you on what you know in this case.

16  A.  Right.

17  Q.  Other than the phone call with Senator Menendez about which

18  you testified, are you able to point to any example where

19  Senator Menendez took any action with respect to the U.S.D.A.

20  or U.S. agriculture?

21            MR. MARK:  Objection.

22            THE COURT:  Just a moment.

23            I'll allow that.

24  A.  I can't recall.  I know from prior days different people

25  worked some ag. issues, but I can't in this case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O63Wmen1                         McKinney - Cross

1              THE COURT:  Ag. issues, I take it, being agriculture

2       issues.

3              THE WITNESS:  Yes, ag. would be -- yes.

4       BY MR. FEE:

5       Q.  So when you testified on Friday that Senator Menendez could

6       have influence over agriculture, were you just trying to leave

7       the impression that he did, Mr. McKinney?

8              THE COURT:  Sustained as to form, sir.

9              MR. MARK:  Objection.

10              THE COURT:  This is not the time for argument.  It's

11      the time for cross-examination.

12      BY MR. FEE:

13      Q.  On Friday, do you remember being asked about your

14      statements to Dr. Mehrez that halal exports had effectively

15      stopped after IS EG took over on May 1, 2013?  Do you remember

16      being asked about that?

17      A.  Yes, I do.

18      Q.  And that, in fact, was the claim you were making to the

19      Egyptian government, that exports stopped after IS EG took

20      over?

21              MR. MARK:  Objection.  Argumentative.

22              THE COURT:  No.  I'll allow that.

23      A.  When I said that, when I used the word "effectively," it

24      meant there's no more certification going on right now.  Now,

25      there may have been some stocks hanging in a frozen food

1    warehouse and so forth, but the act of a halal certifier

2    reviewing beef products -- notably, livers -- that stopped.

3              THE COURT:  Why?

4              MR. FEE:  Answer that.

5              THE COURT:  Why --

6              THE WITNESS:  Sir, because they had --

7              THE COURT:  Why had the act of halal certification

8    reviewing beef products stopped?

9              THE WITNESS:  Because the seven halal certifiers had,

10   by -- on May 1, been delisted.  They were no longer in

11   business, and the one that replaced them had no experience.  So

12   for that period of time, until the new one warmed up, ramped

13   up, they had effectively stopped unless there were some stocks

14   in a frozen warehouse or something like that.

15   BY MR. FEE:

16   Q.  And that's what you told Dr. Mehrez and others in the

17   Egyptian government, correct, that they had stopped?

18   A.  I didn't say it in the words I just used to you.  I used

19   the sentence here to try to get at the point.

20   Q.  So you conveyed, in substance, that after IS EG took over,

21   exports, beef exports from the U.S. to Egypt effectively

22   stopped, correct?

23   A.  Could we see that document again?

24   Q.  No.  Can you answer the question, sir?

25             THE COURT:  Do you know, sir, if -- and the answer

1    would be yes, no or I don't know -- do you know whether after

2    IS EG took over beef exports from the U.S. to Egypt effectively

3    stopped?  Yes, no, I don't know.

4              THE WITNESS:  I think so, because they had not had any

5    training.  They had never done it.  They hadn't had time to go

6    inspect, so I -- that's a reasonable conclusion, sir, that if

7    the seven are no longer at work and the other's brand-new, they

8    had effectively stopped.

9              THE COURT:  Do you recall seeing any statistics in

10   that regard?

11             THE WITNESS:  No, I did not.

12             THE COURT:  OK.

13             THE WITNESS:  No, I did not.

14             MR. FEE:  Let's put up what's in evidence as

15   Government Exhibit 8B-41, please.  And if we can focus in on

16   the top half of the email, sir.

17   Q.  So you see, Mr. McKinney, that this is from Ali Abdi;

18   that's a member of the FAS team of the U.S.D.A. in Cairo?

19   A.  Yes, sir.

20   Q.  And it's dated May 2, 2019, so the day after IS EG took

21   over, correct?  If you know.

22   A.  Let me read it.  Just a moment.

23   Q.  Sure.

24   A.  Without reading the rest of it, I've read that.  Thank you.

25   Q.  OK.  Let me ask you some questions.  Do you see the first

O63Wmen1                    McKinney - Cross

1    reference here Mr. Abdi makes is to Sami Rezk, CEO of Mirasco?

2    A.  Yes.

3    Q.  Are you familiar with Mirasco?

4    A.  I know of them.  I don't know what them personally.

5    Q.  Do you know what they do?

6    A.  They're one of many, many exporters of products around the

7    world.

8    Q.  From the U.S.; they're a U.S.-based --

9    A.  Yes.  U.S. exporter to other parts of the world, correct.

10   Q.  Thank you.

11       And do you know if they export to Egypt, sir?

12   A.  I did not know that.  I know them of as an exporter in many

13   countries.

14   Q.  OK.

15       Oh, I'm sorry.  Right here, do you see Mr. Abdi says one of

16   the -- he calls Mirasco one of the main U.S. exporters to

17   Egypt.  Do you see that?

18   A.  Right.

19   Q.  And then he goes on to say that the CEO of Mirasco has been

20   in close communication with the new certifier.  Do you see

21   that, sir?

22   A.  Yes.

23   Q.  And that's a reference to IS EG, the new certifier?

24   A.  Yes.

25   Q.  Over the past few days Mirasco and IS EG met with

O63Wmen1                          McKinney - Cross

1    representatives from Cargill, Tyson and JBS and others to

2    discuss plans going forward?

3    A.  Yes.

4    Q.  Cargill, Tyson and JBS, those are also U.S. meat producers

5    and exporters, right?

6    A.  They are based in the U.S.  JBS is a Brazilian, but they're

7    all based and have operations in the U.S., if that's your

8    point.

9    Q.  And those are huge companies, fair to say?

10   A.  They are among the largest, yes.

11   Q.  Multi-billion dollar companies?

12   A.  I don't think if they're multi-billion or not, but they're

13   large.

14   Q.  And he reports a few key points of the discussions, Ali

15   Abdi does, and I just want to focus on a few.

16       He says representatives from IS EG informed industry that

17   there will be no market disruption, that companies should

18   continue operations as is.  You see that, correct, sir?

19   A.  I see it, yes.

20   Q.  And that's actually what happened, correct; that there was

21   no interruption in the beef exports after IS EG took over?

22   A.  I don't know that, sir.

23   Q.  And sir, when you told Dr. Mehrez that beef exports had

24   stopped --

25   A.  Had effectively stopped, sir.

1    Q.  -- had effectively stopped, is it now your testimony that

2    you actually had no firsthand knowledge of that fact?

3    A.  I had not been informed of this, but I stand by what I

4    said -- that they had effectively stopped.  This is the day

5    after, that it went live, the cessation of the seven went live.

6    So I don't know if there's a disruption or not.

7              MR. MARK:  Your Honor, this is a document that

8    Mr. McKinney's not on.  Is it fair for him to see the whole

9    document?

10             THE COURT:  You can read the whole thing, sir.

11             MR. FEE:  Can you zoom out, Mr. Kelly.

12             Do you want a paper copy, Mr. McKinney?

13             THE COURT:  Just let him read it on the screen.

14             Next question, sir.

15             Have you read it?

16             THE WITNESS:  Let me just finish the last couple of

17   paragraphs, sir.  Thank you.

18             THE COURT:  Take your time.

19             THE WITNESS:  Thank you for letting me read that.

20             THE COURT:  Do you know, sir, if you saw this at or

21   about the time it was issued?

22             THE WITNESS:  I did not.

23             THE COURT:  OK.  Let's proceed.

24   BY MR. FEE:

25   Q.  So you see there where it says IS EG is ready to provide

O63Wmen1                    McKinney - Cross

1    halal certificates effective May 1?

2    A.  Yes.

3    Q.  See that, Mr. McKinney?

4    A.  I see that.

5    Q.  And again, you were not aware of that at the time, is your

6    testimony, sir?

7            MR. MARK:  Objection.

8    A.  That's correct.

9            THE COURT:  Just a moment.

10           MR. MARK:  Assumes a fact.

11   A.  I must say I find that interesting.

12           THE COURT:  Sir, there's no question pending.  Just a

13   moment.

14           THE WITNESS:  Oh, all right.

15           THE COURT:  I'm sorry.  There was a question pending.

16   Just a moment, sir.

17           There's an assumption in the question, sir.  Make it

18   explicit if you want.

19           MR. FEE:  Sure.

20           THE COURT:  But you're free to ask another question.

21   BY MR. FEE:

22   Q.  Were you aware at the time that Ali Abdi had written in an

23   email that IS EG was ready to provide halal certificates

24   effective May 1?

25   A.  I didn't.

1   Q.  And then the next one says IS EG is committing to resolving

2   market access irritants including the ractopamine issue; we'll

3   get back to that.

4       Let's go to the next one.  The government of Egypt is

5   concerned about compliance with halal requirements and IS EG is

6   committed to working with industry to resolve the issue.

7          MR. FEE:  Scroll down, Mr. Kelly, or resume.

8   Q.  This may require modifications at plant levels, but this

9   can only be done by IS EG in cooperation with industry.  Do you

10  see that, Mr. McKinney?

11  A.  I do.

12  Q.  And again, at the time, were you aware that your team in

13  Cairo was discussing Egypt's concern about compliance with

14  halal requirements?

15        MR. MARK:  Objection.

16        THE COURT:  Sustained as phrased.

17  BY MR. FEE:

18  Q.  Sir, are you aware that Mr. Abdi wrote in the email that

19  the government of Egypt was concerned about compliance with

20  halal requirements as of May 1?

21        MR. MARK:  Objection.

22        THE COURT:  I think the problem here, sir, I don't

23  want to testify, but the problem is -- sidebar.

24        (Continued on next page)

25

1           (At sidebar)

2           THE COURT:  Does somebody have a copy?

3           Look, I certainly don't want to testify, but you may

4    be not meeting each other.  I think, again, nobody should take

5    this as fact, that what this is saying is what IS EG said in

6    that meeting.

7           MR. FEE:  That's right.

8           THE COURT:  But you're asking him questions as if this

9    is Ali Abdi saying these things are true.

10          MR. FEE:  Got it.  I'll fix it.

11          THE COURT:  Do you see what I mean?

12          MR. FEE:  I do now, your Honor.

13          THE COURT:  It's really IS EG.  As I read this, IS

14   EG's point of view.

15          MR. FEE:  Don't perceive the strategy, your Honor.

16   Thank you.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1                   (In open court)

2                   MR. FEE:  May I, your Honor?

3                   I'm so sorry.

4                   THE COURT:  I'm going to ask the witness to slow down

5      when you're speaking, sir.

6                   THE WITNESS:  That's fine.  All right.  Thank you.

7                   THE COURT:  Maybe people from Indiana speak quickly.

8                   THE WITNESS:  We are in New York.

9      BY MR. FEE:

10     Q.  Sir, my question is are you aware -- were you aware when

11     you were engaging with the Egyptian government on the IS EG

12     issue that your team in Cairo was speaking with IS EG?

13     A.  I was unaware.

14     Q.  And did you have any understanding about any of the things

15     IS EG was telling your team or the U.S. exporters at the time?

16                   MR. MARK:  Objection.

17                   THE COURT:  Either yes or no.

18                   THE WITNESS:  Sorry, Judge.  What did you say?

19                   THE COURT:  You may answer.

20     A.  I was unaware of that.

21     Q.  And then the last one on the zoomed-in part here, it reads:

22     "IS EG told Mirasco that the Egyptian government is unwilling

23     to provide explanation or justification for this action."  Then

24     they also say:  "Additionally, the government of Egypt doesn't

25     want to get into technical discussions on halal compliance or

1    lack thereof."  And sir, this is what you were talking about,

2    right?

3              MR. MARK:  Objection.

4    A.  What do you mean?

5    Q.  I'm sorry.  That you were having trouble getting answers

6    from the Egyptian government about this decision, correct?

7    A.  Yes, and had I read that, my antenna would have gone way up

8    quickly.

9    Q.  Understood, sir.

10   A.  My first question would be why?  Why would they not want to

11   get --

12             THE COURT:  Sir, sir, sir, just answer the question.

13   OK?  You've answered it.  It will go more smoothly if you just

14   confine yourself to answering the question.

15             MR. FEE:  We can put that down.  Thank you, Mr. Kelly.

16   Q.  Sir, were you aware whether U.S. beef exports increased in

17   value after IS EG took over as a sole certifier?

18   A.  I was unaware of that.

19             THE COURT:  Well, are you aware of it now?  In other

20   words, do you know one way or the other whether beef imports --

21   exports from the United States went up, down or stayed the same

22   after May 1, 2019?

23             THE WITNESS:  I'm not.  We moved on.

24             THE COURT:  You're not one way or the other.

25             THE WITNESS:  Not aware, sir.

1       THE COURT:  All right.  Next.

2           THE WITNESS:  Not aware, sir.

3   BY MR. FEE:

4   Q.  But you are aware of something called the United States

5   agricultural export yearbook?

6   A.  I am aware of it.

7   Q.  And it tracks exports and the volume of exports to the

8   U.S.'s top trading partners every year?

9   A.  Generally speaking.  I didn't spend much time with that

10  document.

11  Q.  Below your pay grade, so to speak?

12          MR. MARK:  Objection.

13          THE COURT:  Yes.  Sustained.

14          MR. FEE:  If we can show DX761 and 761A just to the

15  witness and the lawyers, please.  Let's start with 761.

16          Actually, let me give you a physical copy, sir.

17          MR. FEE:  May I approach, your Honor?

18          THE COURT:  Yes.

19          MR. FEE:  I'm only going to offer what's marked as

20  761A.  So you can look if you want, sir.

21  Q.  Sir, I'm not going to ask you questions about that,

22  Mr. McKinney, but do you recognize that to be the 2022

23  yearbook, at least in the format you're generally familiar

24  with?

25  A.  Yes, produced by the foreign agricultural service, yes.

O63Wmen1                        McKinney - Cross

1   Q.  And that was the department you oversaw during your tenure?

2   A.  That is correct.

3           MR. FEE:  Your Honor, we would offer 761 and 761A,

4   which is an excerpt, 761A, pursuant to 803(8) -- I'm sorry,

5   803(17).  I apologize.

6           MR. MARK:  Your Honor, objection.  401, 403.  This is

7   a very long document.

8           MR. FEE:  We're only offering 761A.  I'm sorry.  To

9   clarify the record, it is a two-page document.

10          THE COURT:  803(17), market reports and similar

11  commercial publications.

12          MR. FEE:  Yes, sir.

13          MR. MARK:  No objection to 761A.

14          THE COURT:  All right.  Pursuant to 803(17) -- sir, is

15  this report generally relied on by people in your occupation?

16          THE WITNESS:  It's a reference piece.  I think some

17  would look at it and observe it and follow it.

18          THE COURT:  Is it thought to be credible in your

19  industry?

20          THE WITNESS:  I think so.

21          THE COURT:  All right.  Thank you.  I accept it under

22  803(17).  761A, admitted, without objection.

23          (Defendants' Exhibit 761A received in evidence)

24          MR. FEE:  Thank you, your Honor.

25          Can we put up the first page of 761A and publish it to

1    the jury, please.  And then let's go to page 2 and zoom in on

2    the Egypt and then the table.

3    Q.  And so this data comes from the U.S. government,

4    Mr. McKinney, is that your general understanding?

5    A.  Yes, sir.

6    Q.  And it is titled top 10 U.S. agricultural exports to Egypt,

7    and it has as one of the commodities beef and beef products,

8    and in parentheses, after the title, you see it says values in

9    millions of dollars, correct?

10   A.  Yes.

11   Q.  And so reading this chart together, in 2018, there were $66

12   million worth of exports, and then in 2022, after IS EG took

13   over in 2019, there are $94 million worth of beef and beef

14   product exports to Egypt from the U.S.  Do you see that, sir?

15   A.  I do.

16   Q.  And that $28 million increase also came during the Covid

17   pandemic, meaning after that pandemic had ended, essentially?

18   A.  Yes.

19           THE COURT:  You're talking about from 2018 to 2022?

20           MR. FEE:  That's correct, sir, your Honor.

21   A.  Yes.

22           MR. FEE:  All right.  We can put that down.

23   Q.  Do you remember testifying on Friday, Mr. McKinney, about

24   the U.S. MEF?

25   A.  Yes, U.S. Meat Export Federation.

1    Q.  Thank you.

2        And you said that that group was feeding to my staff that

3    they had great concerns about where we might be going if we

4    eliminated seven or four.  Do you remember that testimony on

5    Friday, sir?

6    A.  Yes, I do.

7            MR. FEE:  And let me show you what's been admitted as

8    Government Exhibit 8B-46.  And let's zoom in on this email, the

9    bottom email from Paul Clayton.

10   Q.  And again, sir, you're not on this email.  Have you ever

11   reviewed this before, Mr. McKinney?  You can take a chance to

12   look at it.

13   A.  I have not seen it, but I'd like to read it, if I could.

14   Q.  Of course.

15   A.  OK.

16   Q.  Sir, I just have a couple small questions about this.

17       Paul Clayton sends this email from the U.S. MEF.  Do you

18   know him?

19   A.  I do know Paul.

20   Q.  Who is Paul Clayton?

21   A.  Paul is the senior vice president responsible for the

22   export-import business, but mostly export, for U.S. meats.

23   Meats would be beef, pork and lamb.

24   Q.  And the U.S. MEF is -- would you call it a lobbyist, an

25   advocacy organization?  What is it?

1    A.  No, they are not allowed to lobby.  They receive checkoff

2    funds.  Every ton or pound of beef that's sold, a small portion

3    goes into a fund.  They then use that fund to go do their

4    export activity.

5    Q.  And checkoff funds is a program administered by the

6    U.S.D.A.?

7    A.  Overseen but administered by the checkoff firm.

8    Q.  Do you have any sense of the approximate amount of checkoff

9    funds that the U.S. MEF gets every year?

10   A.  I don't recall.  It's been many years.

11   Q.  Do you have any idea if it's in the millions, hundreds of

12   thousands?

13   A.  I would guess it's in the millions, but that's a guess.

14   Q.  Understood.  Don't guess.

15       But fair to say that the U.S. MEF is an important voice in

16   the U.S. agricultural meat export market?

17   A.  They are the lead voice, sir.

18   Q.  And their job is to be a voice for the interests of the

19   U.S. meat industry, fair to say?

20   A.  Yes, in compliance with laws and regulations, but yes.

21   Q.  Of course.  And in compliance with all those things, the

22   goal of the U.S. MEF, in your experience, in this industry is

23   to try to export as much U.S. meat as possible, right?

24   A.  Yes.

25   Q.  And here, we see Mr. Clayton saying, or he titles, sort of

1   leads into this email with what we are hearing from the

2   exporters, and that's after the phrase "are there any updates

3   to the Egyptian halal situation"?

4   A.  Correct.

5           MR. FEE:  And then, if you can highlight that,

6   Mr. Kelly.

7   Q.  And then he notes we are hearing concerns from a couple

8   issues, and he talks about labels and then exporters

9   complaining about price gouging?

10  A.  Yes.

11  Q.  Do you see that, Mr. McKinney?

12  A.  Which is what we had projected would happen.

13  Q.  Exactly, that the prices would go up, right?  Mr. McKinney,

14  that's what you predicted --

15  A.  Yes.

16  Q.  -- prices went up?

17  A.  Yes.  I see a 10X increase in cost.

18  Q.  I'm sorry for speaking over you.  Do you want to say that

19  again, Mr. McKinney?

20  A.  I see here there is a 10X increase in cost, ten cents per

21  pound up to -- well, from one penny per pound to ten cents per

22  pound.

23  Q.  That's right.  So the U.S. MEF is reporting that exporters

24  are complaining about the increase in the cost of halal

25  certification; that's your understanding of this, Mr. McKinney?

1   A.  That's the general gist here.

2   Q.  Because the goal is to export as much meat for as little

3   cost as possible, right?

4   A.  Yes.

5   Q.  And in your experience, the U.S. MEF does not have a --

6   place a priority focus on halal certification, correct?

7   A.  I wouldn't --

8           MR. MARK:  Objection.

9           THE COURT:  Sustained.

10          MR. FEE:  You don't answer that, Mr. McKinney.  It was

11  sustained.

12  Q.  In any event, fair to say that groups like the U.S. MEF and

13  other groups, like NASDA, for which you work now, are focused

14  on increasing U.S. exports, correct?

15  A.  You keep forgetting.  We look for two-way trade, sir.  So

16  yes, we're interested in export, but we also want to be of good

17  service to those who we export with.  So it's both ways.  Yes,

18  we're interested in exporting and getting good clients, as

19  interested as we are in bringing other products in.  It's a

20  short relationship if you only sell one way all the time.

21  Q.  Got it.

22      So just more trade both ways is the goal?

23  A.  Sure.

24  Q.  And groups like --

25          THE COURT:  Is it fair to say, sir, given the fact

O63Wmen1                        McKinney - Cross

1    that during the time you were under secretary of agriculture

2    and the fact that apparently the MEF represents U.S. exporters,

3    that the emphasis is on increasing exports of U.S. products

4    rather than being a good worldwide citizen?  Is that fair or

5    unfair?

6              THE WITNESS:  The answer is primarily they are, but

7    they also --

8              THE COURT:  Primarily they are what?

9              THE WITNESS:  They are interested in the export.  The

10   export.  But if getting more exports is done by allowing some

11   imports, they are also up for that.

12             THE COURT:  I understand.

13             THE WITNESS:  So it's both ways.

14             THE COURT:  Thank you.

15   BY MR. FEE:

16   Q.  And in fact, groups like NASDA, where you work, and the

17   U.S. MEF sometimes hire former U.S.D.A. officials to help those

18   groups engage with others, correct?

19             MR. MARK:  Objection.

20             THE COURT:  I'll allow that.

21   A.  Sometimes organizations like that do, but I don't know -- I

22   don't remember U.S. MEF doing that or not.

23   Q.  All right.  But you work for NASDA, right?

24   A.  Correct.

25   Q.  And you're paid about $340,000 a year by NASDA?

O63Wmen1                          McKinney - Cross

1          MR. MARK:  Objection.

2          THE COURT:  Sustained.  Irrelevant.

3   BY MR. FEE:

4   Q.  In this particular issue, the IS EG issue, the U.S. MEF was

5   pushing the U.S.D.A. to push back on the Egyptian government,

6   correct?

7   A.  As was I at the time.

8   Q.  As were you.  You were in sync with the U.S. MEF, correct?

9   A.  Yes, even though we'd never talked.

10  Q.  You've never spoken to the U.S. --

11  A.  I didn't speak with U.S. MEF at the time.  Information came

12  to me, but I didn't speak to them.

13  Q.  So in this case, you didn't speak to them specifically

14  about IS EG; that's what you're saying?

15  A.  Right.

16  Q.  But you did, once it was shared with you that the U.S. MEF

17  wanted you to push back, you gave deference to that view as

18  well, correct?

19          MR. MARK:  Objection.

20          THE COURT:  Sustained as phrased.

21  BY MR. FEE:

22  Q.  The views of the U.S. MEF, in this circumstance in May

23  2019, were important to you in your position, correct?

24  A.  But they were -- yes, but they were not pushing me.  I was

25  already all over that issue.  I was happy and proud for trying

O63Wmen1                         McKinney - Cross

1    to keep a reasonable price going to customers in Egypt.

2    Q.  Got you.

3    A.  So they didn't have to push me.  I was already there.

4    Q.  You didn't need to be pushed?

5    A.  That's correct.

6    Q.  Got it.  OK.

7        And in fact, you have a long history with the U.S. MEF,

8    fair to say?

9    A.  I was involved with them when I was in the private sector,

10   yes.

11   Q.  Got it.

12       You were on the board of directors of the U.S. MEF?

13   A.  The board and then the executive committee, yes.

14   Q.  For how many years?

15   A.  Two and a half tops.  The board for two and a half, maybe

16   on a push three, and the executive committee for just a year.

17   Q.  And again, in your view, sir, there's nothing inappropriate

18   about someone who is on the board of the exporters foundation

19   then coming into the U.S.D.A. to regulate trade, correct?

20           MR. MARK:  Objection.

21           THE COURT:  I'll allow that.

22   A.  No.  Actually, it was most instructive when I went into

23   U.S.D.A. to understand just exactly how things can work, and I

24   also remember being on the audit and -- audit committee to see

25   how ethical they are in their work.  So it was very helpful to

1   go from industry to government in this case.

2   Q.  Meaning it was a relationship and an experience that

3   informed what you did in the U.S.D.A., correct?

4   A.  Without any doubt.

5   Q.  And also, once you were in the U.S.D.A., fair to say that

6   the Meat Exporters -- federation or foundation?  I'm sorry.

7   A.  U.S. Meat Export Federation.

8   Q.  Federation, U.S. Meat Exporters Federation, once you were

9   in the U.S.D.A. was effectively your constituent, fair to say?

10  A.  Well, sort of.  The ethics rules that I said yes to and

11  which I obeyed disallowed some interface with the U.S. MEF.

12  They would be in large committee meetings, for example, of the

13  ag. trade advisory committee.  But no, I didn't have very much

14  interface with them because of the prior relationship.  Same

15  with NASDA.  I didn't have very much interface with NASDA at

16  all even though I had been director of ag. in Indiana.  So due

17  to ethical guidelines, there was not much interface.

18  Q.  So the ethical guidelines, as you understood them, required

19  you to avoid direct engagement with the U.S. MEF in your role

20  as trade under secretary?

21  A.  Mirrored, but yes, that's correct.

22  Q.  OK.

23  A.  A lot of interface disallowed, and I obeyed that.

24  Q.  I'm sorry to speak over you.

25      But you are unaware of any ethical guidelines that would

O63Wmen1                         McKinney - Cross

1   have prevented the U.S. MEF from sharing concerns directly with

2   your staff at the U.S.D.A.?

3   A.  No.  That's perfectly natural and expected.

4   Q.  And then your staff relays the U.S. MEF positions to you,

5   correct?

6   A.  Well, sometimes yes, sometimes no.

7   Q.  And when the Meat Export Federation raises a concern that

8   comes to your attention, like here, you generally try to

9   address those concerns?

10  A.  I didn't have to.  I was already ahead of them.

11  Q.  But, say, in other circumstances you give attention to the

12  U.S. MEF's concerns, correct?

13              MR. MARK:  Objection.

14              THE COURT:  Sustained as phrased.

15  BY MR. FEE:

16  Q.  When the U.S. MEF --

17              THE COURT:  They're part your remix, correct?

18              THE WITNESS:  They're part of a very large audience of

19  people that we work to support.  They are responsible for

20  trade.  I was responsible for trade.  So you bet.  But within

21  boundaries.  Very, very critical boundaries, sir.  That's the

22  point I'm making.

23  BY MR. FEE:

24  Q.  Understood.

25              And when you talked about this phone call --

1   A.  Which phone call, sir?

2   Q.  I'm going to tell you.  Your testimony that Senator

3   Menendez brought up one of his constituents.  Do you remember

4   that?

5   A.  Yes.

6   Q.  You would agree that a constituent is within the remix of

7   the United States Senate, correct?

8   A.  Yes.

9           MR. FEE:  Let's just pull up one more time --

10  actually, we don't need to.

11  Q.  You saw the references on that email to Cargill, Tyson and

12  JBS.  Do you remember that?

13  A.  Yes, sir.

14  Q.  And let me just ask.  Your team at the U.S.D.A., in 2019,

15  had issued the GAIN report.  Do you recall testifying about

16  that?

17  A.  Yes.

18  Q.  And this is a report that criticized publicly IS EG, fair

19  to say?

20  A.  Oh, I don't know that it was a criticism.  I think they

21  were laying the facts out as they knew them.

22  Q.  OK.  We'll talk about that.

23  A.  GAIN report's not supposed to get political, any of that.

24  They're supposed to lay out the facts as they know them at the

25  time, and I thought they did.

1    MR. FEE:  OK.  Why don't we put up Government Exhibit

2    8B-32.  Let's go to --

3    Q.  Do you recognize this report now, Mr. McKinney?

4    A.  Yes, I do, May 13, 2019.

5    MR. FEE:  There you go.  Let's put up page 2.  Under

6    changes to halal certification, can we zoom in on that.

7    Q.  So it says IS EG Halal had no prior experience in halal

8    certification.  Do you see that?

9    A.  That's correct.

10   MR. FEE:  And then it said -- can we zoom out?  I'm

11   sorry.  I think it's the next paragraph, Mr. Kelly.

12   Here we go.  Audit outcomes, can we zoom in on that.

13   Q.  And then there's a sentence here that says their

14   correspondence did not include an implementation date for when

15   IS EG would take over, but it says industry contacts believed

16   the changes became effective May 1, 2019?

17   A.  Wait, wait, wait, wait.

18   Q.  Yes.

19   A.  I'm trying to follow the yellow.

20   Q.  Yes, sir.

21   A.  OK.  Am I to focus on the yellow sentence?

22   Q.  Yes.  Do you see that, Mr. McKinney?

23   A.  Thank you.

24   Q.  Do you have any idea who the industry contacts were that

25   were providing information in this GAIN report?

O63Wmen1                    McKinney - Cross

1   A.  I do not, sir.

2           MR. FEE:  All right.  Go out from there, Mr. Kelly.  I

3   think it's on the next page.

4           This one.  Egyptian consumers to pay more.

5   Q.  This has a bolded headline saying Egyptian consumers to pay

6   more for beef.  Do you see that?

7   A.  Yes, I see that.

8   Q.  And you would agree that that is not a positive about the

9   change to IS EG, Mr. McKinney?

10          MR. MARK:  Objection.

11          THE COURT:  Sustained as to form.

12  BY MR. FEE:

13  Q.  Mr. McKinney, do consumers usually want to pay more for

14  their food, in your experience?

15  A.  No.

16  Q.  And then it also says the sudden change could disrupt

17  markets and cause confusion among industry and regulators.  Do

18  you see that, Mr. McKinney?

19  A.  I do.

20  Q.  And it also says, and then it goes into some of the volume.

21      Sir, you would agree that, in effect, the GAIN report was

22  offering negatives about the change to IS EG, correct?

23          MR. MARK:  Objection.

24          THE COURT:  Rephrase it.

25  BY MR. FEE:

O63Wmen1                        McKinney - Cross

1    Q.  It was offering facts that suggested the change or said the

2    change to IS EG would raise the price, disrupt markets and

3    cause confusion, correct?

4    A.  Sir, yeah -- I would never say that a GAIN report is meant

5    to be negative.  It is to project changes, increases or reduces

6    in cropping acreage, increases or reductions in herds of

7    cattle, pigs, poultry.  That's what they're about, is to give

8    their best assessment of changes that are occurring and they've

9    done that.  They try to do that with no ill regard to the

10   politics, the whims, the wind blowing, all of that.  And so

11   this is very common across GAIN reports.

12   Q.  Well, U.S. beef exports were not, in fact, interrupted

13   though, Mr. McKinney, were they?

14   A.  I don't know that.

15   Q.  Well, in fact, according to the U.S.D.A. yearbook, beef

16   exports actually increased under IS EG?

17   A.  Well, I noticed you jumped four years.  They went down

18   markedly 2019 to '20; came back still underneath 2020, 2019.

19   And it wasn't until 2022 that they got up.  So they actually

20   did go down for two periods.

21   Q.  What was going on in the world in 2020, 2021?

22   A.  I don't know.  There was lots of -- Covid was going on, for

23   sure.

24   Q.  OK.

25   A.  But so was a higher price and a new halal certifier.

1    Q.  And when you wrote to Dr. Mehrez --

2              MR. FEE:  You can put this down, Mr. Kelly.

3    Q.  -- and you told her that the change to IS EG was draconian,

4    correct?  Do you remember that?

5    A.  Was -- yes, draconian.

6    Q.  Draconian.

7    A.  Yes, I used that word.

8    Q.  Yes.  You said that's not a word you typically would use,

9    right?

10   A.  That is correct.  I don't.

11   Q.  And draconian means cruel or severe; you're aware of that,

12   right?

13   A.  I never -- I never knew it meant cruel.  Draconian is

14   severe.  Significant is how I interpret it, sir.  Cruel, no,

15   I've never known that to be associated with draconian.

16   Q.  Draconian means significant, sir; is that your testimony?

17   A.  Say it again, sir?

18             THE COURT:  When you said draconian, what did you

19   intend to convey to the listener?

20             THE WITNESS:  I used different words or phrases.  It

21   was surprising.  It was unheard of.  It had never been -- it

22   never happened that way before.  Seven to one in the course of

23   a week, all of that absolutely met my definition of draconian.

24   We had never seen market change, market disruption, I believe,

25   in the history -- in my history of the ag. industry nor in

1    those who could recall it in the foreign ag. service.  Hence,

2    the word "draconian."

3    Q.  Sir, is it true that you and your team at the U.S.D.A.

4    wanted the public to conclude that anyone who authorized that

5    change was incompetent?

6            MR. MARK:  Objection.

7            THE COURT:  Sustained.

8    BY MR. FEE:

9    Q.  Sir, did you ever review during your tenure as an under

10   secretary of the U.S.D.A. a GAIN report that commented on Tyson

11   Foods, JBS or Cargill?

12           MR. MARK:  Objection.  Scope.

13           THE COURT:  I'll allow it.  If he knows.

14   A.  I read many GAIN reports, but I don't recall the one you

15   are referencing.

16   Q.  And I referenced three -- Tyson Foods, JBS and Cargill.

17   A.  Three different GAIN reports, sir?

18   Q.  No, no, no.  Any GAIN reports relating to any of those

19   three companies.

20           MR. MARK:  Objection.  Scope again.

21           THE COURT:  I'll allow it.

22   A.  I don't know what you're referencing.  I don't recall GAIN

23   reports that referenced those, so --

24   Q.  That's the question.

25   A.  -- I don't.

1    Q.  Are you also aware, sir, that each of those three companies

2    was actually found liable by the Department of Justice for

3    foreign corruption?

4              MR. MARK:  Objection.

5              THE COURT:  Sustained.

6              The jury will understand when you have a question with

7    no answer there's no testimony there that you can take from

8    that.

9              Move on, sir.  How much longer do you have?

10             MR. FEE:  About an hour, sir.

11   Q.  IS EG, to your knowledge, is not a multi-billion dollar

12   food producer, correct?

13   A.  I know very little and knew very little about IS EG.

14   Q.  Well, you knew --

15   A.  I knew they were new to this business.

16   Q.  You knew they were new to this business, so fair to assume

17   they were not a multi-billion dollar business, correct?

18             THE COURT:  Sustained.  Objection sustained.  The

19   government was rising to object.

20   BY MR. FEE:

21   Q.  You were aware that IS EG is a New Jersey-based business?

22   A.  I learned that very late in the issue.  Yes, they were in

23   New Jersey.  That's correct.

24   Q.  You knew that during the call with Senator Menendez,

25   correct?

O63Wmen1                    McKinney - Cross

```
 1   A.  Yes.  Yes, I knew the single certifier that had taken over
 2   was based in New Jersey.
 3   Q.  And are you aware of any facts relating to Mr. Hana, who he
 4   is, where he's from?
 5   A.  I did not know that name at the time.
 6   Q.  But now you do?
 7   A.  I have heard of it, but I don't know the man.  I only heard
 8   about the affiliation there.
 9   Q.  And fair to say that during your time at the U.S.D.A., you
10   were not expecting to leave the U.S.D.A. and go to work for IS
11   EG, correct?
12            THE COURT:  Sustained.
13            MR. MARK:  Objection.
14   BY MR. FEE:
15   Q.  Did you have any expectations about ever having any future
16   relationships with IS EG at the time you were making these
17   decisions?
18            THE COURT:  You mean employment.
19            MR. MARK:  Objection.
20            MR. FEE:  Anything, any relationship with IS EG in the
21   future.
22            THE COURT:  I'll allow it.
23   A.  I don't know, and it didn't matter.
24   Q.  Well, it is true, sir, that other large food producers
25   regularly hire former U.S.D.A. officials, correct?
```

O63Wmen1                          McKinney - Cross

1          MR. MARK:  Objection.  Relevance.

2          THE COURT:  I'll allow it.

3   A.  Say it again, sir.  I want to make sure I understand what

4   you're asking.

5   Q.  Other U.S. food producers and exporters regularly hire

6   former U.S.D.A. officials?

7   A.  I know that that occurs.

8   Q.  And you would agree, sir, that this company, IS EG, had no

9   relationships with the U.S. MEF at the time, to your knowledge,

10  correct?

11  A.  I did not know, sir.

12  Q.  Well, you were unaware of any, correct?

13         THE COURT:  I'm sorry.  You don't know one way or the

14  other.

15  A.  I don't know one way or the other.

16  Q.  It was just a small New Jersey company, just starting out,

17  correct?

18         MR. MARK:  Objection.

19         THE COURT:  Sustained.

20         MR. FEE:  Let's look one last time at GX 8B-41 in

21  evidence.  Let's zoom in on the fourth paragraph of this email.

22  Q.  Do you see where it says Mr. Abdi reports that he had

23  learned from others that IS EG is committed to resolving other

24  market access irritants, including the ractopamine issue?  Do

25  you see that, Mr. McKinney?

1   A.  I see it.

2            MR. MARK:  Objection.

3            THE COURT:  I'm sorry.  What is the objection?

4            MR. MARK:  Objection.  Misstates the email.

5            THE COURT:  Do you see the email there; do you see

6   that phrase?

7            THE WITNESS:  I do.

8            THE COURT:  All right.  Go ahead.  What's your

9   question?

10  Q.  The ractopamine issue, sir, at the very same time this IS

11  EG, these IS EG events were happening, you were engaged with

12  Dr. Mehrez about her policy on U.S. ractopamine meat, correct?

13  A.  I don't recall her raising ractopamine when we met, so --

14  Q.  Let's --

15  A.  I would have been happy to.  There was not a case of not,

16  but I don't remember ever talking about ractopamine with

17  Dr. Mehrez.

18           MR. FEE:  Let's show the witness.

19           THE COURT:  What is ractopamine?

20           THE WITNESS:  Ractopamine is a feed additive.  It's

21  called a repartitioning agent.  People like to call it a

22  hormone.  It is not a hormone.  What it does when fed in the

23  last month of a pig's life or a cow's life is to tell the body

24  don't create fat.  Don't create fat.  Create muscle or meat.

25           The other thing it does, which is very helpful to the

O63Wmen1                    McKinney - Cross

 1    U.S. and other industries around the world, is that it adds

 2    incredible feed efficiency, meaning more meat per pound of feed

 3    eaten.  So it fits a lot of things that climate change

 4    activists are seeking these days, but it became controversial

 5    over the years.  So it is a product added to feed that goes for

 6    only -- only -- pork and beef.

 7              THE COURT:  And in some way its use is controversial;

 8    is that what you're saying?

 9              THE WITNESS:  It can be controversial.

10              MR. FEE:  Let's show the witness DX 1008, please, and

11    the lawyers.  Zoom in, cut out the white so Mr. McKinney can

12    review this.

13    Q.  Mr. McKinney, you're welcome to review the whole thing, but

14    I would focus your attention on the last two bullets.

15    A.  Down at the bottom, you mean?

16    Q.  Yes, but please read the top as well.  Don't say anything.

17    I'll ask you a question when you're done.

18    A.  So read the whole thing?

19    Q.  Yes, sir.

20    A.  OK.

21              (Continued on next page)

22

23

24

25

 1   A.  (continuing)  Could you scoot it up?  I have some things on

 2   the screen.

 3   Q.  Yes.

 4            MR. FEE:  Mr. Kelly, can you scoot it up?

 5   A.  That's enough.  Thank you.  Very good.  I have read it.

 6   Q.  Mr. McKinney, does that refresh your recollection that you

 7   met with Dr. Mehrez and discussed ractopamine with her?

 8   A.  Yes.  I haven't seen this since 2019.

 9            MR. FEE:  Your Honor, we would offer Defendant's

10   Exhibit 1008 pursuant to 803(8).

11            MR. MARK:  Your Honor, we have no objection to this

12   page but it appears there is two other pages.  We would like to

13   review those before making a decision on it.

14            THE COURT:  Sir, are you asking just for this page?

15            MR. FEE:  Yes.

16            THE COURT:  Just this page, admitted without

17   objection.  And in terms of completeness, if the government is

18   seeking the other two pages, you will let me know, but right

19   now this is the page being admitted.

20            Proceed.

21            (Defendant's Exhibit 1008 received in evidence)

22            MR. FEE:  Understood.

23            Let's zoom in, and the whole thing, the whole page.

24   Q.  So, Mr. McKinney this is titled:  Follow-up and discussion

25   meeting between undersecretary for Trade and Foreign

1    Agricultural Affairs, ted McKinney, and it gives your title.

2    That is Dr. Mehrez, right?

3    A.   Yes.   These are common for meetings like this to have a

4    write-up.

5    Q.   Sir, if you are able to answer the question I pose it will

6    go faster.

7        This meeting occurred, it says, Friday, March 29, 2019, at

8    10:00 a.m.   Do you see that?

9    A.   Yes, sir.

10   Q.   It occurred in the Whitten Building.   Are those the USDA

11   offices in Washington, D.C.?

12   A.   Yes, and Room 410-A is designated for special guests.

13   Q.   Got it.

14           In fact, sir, do you remember being asked these

15   questions and giving these answers during your testimony on

16   Friday with the prosecutor?   I will give it to you:

17   "Q   Which matters do you remember being personally involved in

18   with respect to trade and Egypt?

19   "A   The first one was with a broad stroke, our travel to

20   Dubai, and while there I would usually go over to the offices

21   of the Gulf Cooperation Council.   Didn't represent Egypt, who

22   was not a member but by approximation.

23   "Q   What was the second matter that you were personally

24   involved in?"

25           And then you talk about IS EG coming up in late April.

1    Do you remember talking about those two personal interactions?

2    A.  That was as I recalled, yes.

3    Q.  That's as you recalled it.  And you omitted or did not

4    recall this meeting in the United States just a week or two

5    earlier with Dr. Mehrez; correct?

6            MR. MARK:  Objection.  I think he testified about

7    this.

8            THE COURT:  Did you testify about this meeting?

9    A.  I thought I said I remember the meeting.  Absolutely I

10   remember the meeting but I didn't recall all of its contents.

11   Q.  Understood.  Understood.  Thank you for clarifying.

12           So, this is a document prepared by the USDA; is that

13   correct?

14   A.  This would have been prepared by one of my team members.

15   They usually take the notes, sir.

16   Q.  And it is a summary of what happened at those meetings?

17   A.  What was covered, yes.

18   Q.  But it is the USDA's notes?

19           THE COURT:  It is a member of your team?

20   A.  Yes.  They would be USDA, so yes.

21           MR. FEE:  If we can go down to Egyptian Standards and

22   Animal Drugs.

23   Q.  Before we get into this, let me make sure I understood your

24   responses to the Judge.  Ractopamine, you said some people call

25   it hormone.  It is not a hormone; that's what you said, right?

O635men2                              McKinney - Cross

1    A.  That is correct.  It is not.

2    Q.  But it is added to food for animals?

3    A.  Just like a lot of things are added to our foods.

4    Q.  It makes them stronger?  Leaner?

5    A.  In this case it makes it leaner and it uses less feed to

6    get per pound of meat, so it is ideal in the sense of reaching

7    efficiency.

8    Q.  And at this time the Egyptians, you can see it here, had a

9    zero tolerance standard for ractopamine?

10   A.  That's correct.

11   Q.  And you were advocating with Dr. Mehrez in late March 2019

12   for her to change that policy?

13   A.  Yes.  As I did with many other countries as well.

14   Q.  And, in fact, it was fair to say a core principle of your

15   tenure as undersecretary of trade to make sure that more

16   countries accepted U.S. beef with ractopamines; correct?

17   A.  I would not agree that it was a core.  I raised it on

18   several occasions but I would not agree that it was a core area

19   of focus.

20   Q.  Well, the truth is that Dr. Mehrez was fired eventually;

21   correct?

22            MR. MARK:  Objection.

23            THE COURT:  Was Dr. Mehrez, to your knowledge, was

24   Dr. Mehrez terminated from her position?  If you know.

25   A.  I do not know and I have never known that.

O635men2                         McKinney - Cross

1   Q.  Well, you do know that Egypt changed its zero tolerance

2   policy on ractopamine eventually; correct?

3   A.  I did not know that, sir.

4   Q.  You are unaware that Egypt dropped the zero tolerance

5   standard?  That is your testimony?

6            MR. MARK:  Objection; asked and answered.

7            THE COURT:  I will allow it.  I don't think that is

8   his testimony.

9            Is that your testimony?

10  A.  I was unaware.  Remember, I moved on.  We were negotiating

11  with China, it was taking 20 hours a day.  I moved on after we

12  learned the FBI had this issue.

13  Q.  Got it.

14           And you got China to also start to accept ractopamine

15  beef?

16  A.  No, they did not accept it.

17  Q.  Did they eventually come to accept pork?

18  A.  Oh yes.

19  Q.  With ractopamine in it?

20  A.  Yes -- no.  No, no.  No sir.  Excuse me.

21  Q.  Yes, sir.

22  A.  We don't know.  There are many suspicions that there is

23  wide use of ractopamine in China, but they disallow any pork

24  from any country that has used ractopamine.

25  Q.  But it is about 160 countries -- not the U.S., but 160

1  countries don't permit beef with ractopamine; correct?

2  A.  I don't know what that number is, sir.

3  Q.  It is many other countries don't?

4  A.  I don't know.  There are many countries that do not allow

5  the use of ractopamine in pork or beef coming to their country.

6  That is true.

7  Q.  And the reason Dr. Mehrez was opposing it was because there

8  is some who believe it can cause heart and cancer problems;

9  correct?

10            MR. MARK:  Objection.

11            THE COURT:  Sustained.

12            Do you have an understanding of the basis of

13  Dr. Mehrez' opposition to use of ractopamine in pork products?

14  A.  I do not know about that.  I know the safety of ractopamine

15  hydrochloride thoroughly and I have never heard of a study that

16  indicates what you just suggested, sir.

17  Q.  What is the basis for the European union prohibiting

18  ractopamine?

19            MR. MARK:  Objection; relevance, scope.

20            THE COURT:  I will allow it.  We are down to

21  ractopamine.

22  A.  In the wake of Mad Cow Disease, the European Union took on

23  a precautionary principle that said we want zero risk.  So they

24  have banned everything in between and this is why they have

25  done that.  They are well noted for being uber, uber

O635men2                          McKinney - Cross

1   conservative in this and it is because they're now an importing

2   country or region.

3   Q.  So here you say, it says that you raised Egypt's zero

4   tolerance standard for ractopamine.  Fair to say "zero

5   tolerance" means Egypt was not accepting any beef with

6   ractopamine; correct?

7   A.  That's their policy, correct, and people complied with

8   that, sir.

9   Q.  Understood.

10          And there was a cost to that compliance for the U.S.

11  beef industry; correct?

12  A.  Yes.

13  Q.  It meant that as of this meeting, in late March of 2019,

14  there were millions of dollars in U.S. beef that was being

15  turned away by Egypt due to the presence of ractopamine;

16  correct?

17          THE COURT:  Sustained.

18          You mean not purchased rather than turned away?

19          MR. FEE:  No.

20  Q.  Tell us what happens when Egypt found a piece of beef with

21  ractopamine in it?  What would they do?

22          MR. MARK:  Objection.

23          THE COURT:  I will allow it.

24  A.  Well, there is still beef that doesn't use ractopamine

25  going to countries around the world.  I don't know what percent

1    of beef, but if it is going to Egypt it is not supposed to use

2    ractopamine so just call it two markets because that's what it

3    is.  It is just that farmers and ranchers around the world, not

4    just the U.S., are being denied a very valuable tool.  But,

5    fine.  If a country says, can't use it, you comply and you ship

6    beef that does not use it, or pork that doesn't use it.

7    Q.  But you didn't say fine.  You advocated that they should

8    change the policy, correct?

9              MR. MARK:  Objection; argumentative.

10             THE COURT:  I will allow it.

11   A.  Yes, because it met the Codex Alimentarius rules.  It had

12   been found by many countries in the world and certainly the

13   science committee as being safe through a seven-step process.

14   Q.  And there were estimates at the time that approximately 20

15   to 25 percent of all U.S. beef was being rejected by Egypt due

16   to ractopamine concerns?

17   A.  I never heard that.  That would surprise me.

18   Q.  Were you aware of any beef being turned away due to this

19   issue?

20   A.  No.  I was not aware of any beef -- it wouldn't surprise me

21   if it happened, but I was unaware of any beef being turned

22   away.

23   Q.  And the reason you were advocating to Dr. Mehrez to drop

24   the zero tolerance standard is it would help U.S. exports

25   increase; correct?

1  A.  No, no, no.  I was doing this on a global scale because we

2  wanted to see the acceptance of ractopamine be in compliance

3  with Codex Alimentarius so that any country, who thought they

4  wanted to get a more efficient cut of pork or beef, would know

5  that it is a safe product and it was produced efficaciously and

6  at a lower cost.  So, I had these discussions with many people

7  around the world, not just with Dr. Mehrez.

8  Q.  And, in fact, you referred to Codex Alimentarius in this

9  meeting with Dr. Mehrez.  Do you see that?

10 A.  Yes.

11 Q.  The underscore that there is a Codex maximum residue limit

12 for ractopamine, right?

13 A.  That's correct.

14 Q.  And you, in fact, in the private sector, were instrumental

15 in changing the Codex guidelines to permit ractopamine;

16 correct?

17         MR. MARK:  Objection.

18         THE COURT:  If he can answer it, he may.

19         THE WITNESS:  I'm sorry, Judge.  I didn't hear you.

20         THE COURT:  You may answer it if you can, if you are

21 able.

22 A.  I had just joined Elanco Animal Health when this came up

23 after seven years of drawn out discussions and my staff was

24 there.  I was brand-new in the company.

25         MR. FEE:  Let's show the witness Defendant's Exhibit

1    141, please.

2    Q.  Take a look at that, Mr. McKinney.

3              THE COURT:  Put your question, sir.

4              MR. FEE:  Your Honor, we would offer this.

5    Non-hearsay.

6              MR. MARK:  401, 403, scope.

7              MR. FEE:  Goes to bias and impeachment.

8              MR. MARK:  He can ask questions that are different

9    than this document.

10             THE COURT:  I will allow it under impeachment

11   possibility, sir.

12             MR. FEE:  I will be short.

13             THE COURT:  It is not for the truth of the matter

14   asserted.

15             MR. FEE:  Absolutely.  I won't inquire on the

16   substance.

17             MR. MARK:  Your Honor, the document is dated 2012.

18             MR. FEE:  That's right.

19             THE COURT:  I'm sorry.  Just a moment.

20             MR. FEE:  Well, I'm going to get to that, your Honor.

21   It is relevant, actually.

22             THE COURT:  Just a moment.

23             (Pause)

24             THE COURT:  I will allow it.

25             (Defendant's Exhibit 141 received in evidence)

1           MR. FEE:  Mr. Kelly, can you publish it?

2           THE COURT:  It is not for the truth of what is said in

3    it, ladies and gentlemen, but simply the fact that it was said,

4    apparently in 2012.

5    BY MR. FEE:

6    Q.  So Rome, Italy, July 7, 2012 is the dateline here,

7    Mr. McKinney.  Do you see that?

8    A.  Yes, I see.

9    Q.  And the headline for this press release is:  Codex Adopts

10   Global Food Safety Standards for Ractopamine Hydrochloride.

11          That's what we have been referring to in your

12   testimony, is ractopamine?

13   A.  Yes; and narasin and monensine.

14   Q.  Got it.

15          Then at the top this is an Elanco press release;

16   correct?

17   A.  Elanco.  That's correct.

18   Q.  Elanco.  Excuse me.

19   A.  That's all right.

20   Q.  At the time you worked for Elanco; correct?

21   A.  I did.  I was new in the area at that time.

22   Q.  You were new but you were the person listed here as the one

23   to contact if you need more information about this event;

24   correct?

25   A.  Yes.  I was the senior director of global corporate

O635men2                          McKinney - Cross

1    affairs.

2    Q.  At this time Elanco was still a part of the company called

3    Eli Lilly, correct?

4    A.  Eli Lilly and Company.

5    Q.  And Company.

6         And Eli Lilly is a very large pharmaceutical company;

7    correct?

8    A.  It is; with an agricultural division known as Elanco.

9    Q.  So Elanco was the part of Eli Lilly that patented and was

10   selling ractopamine; correct?

11   A.  Originated, patented, and was selling.

12   Q.  They created it and they owned it?

13   A.  They invented it.

14   Q.  They still own it today; correct?

15   A.  It is generic, so others now produce it as well.

16   Q.  But Elanco remains the leading producer and supplier of

17   ractopamine; correct?

18   A.  I don't know that, sir.

19             THE COURT:  Sir, let's move on.

20             MR. FEE:  OK.

21   Q.  This was a big deal in July 2012 because it was the first

22   time the Codex permitted ractopamine in beef; right?

23             THE COURT:  Sustained.

24             Was this the first time the Codex permitted

25   ractopamine in beef?  That is, in 2012?

1   A.  It was, just as every other product that somebody puts

2   forward, celebrates when they get approval.

3   BY MR. FEE:

4   Q.  You were celebrating.  That's what you were saying?

5   A.  We were very pleased.  It had been 10 years or more that we

6   had tried to get the product through so, yes, there was a

7   celebration.

8           MR. FEE:  So we can put that down.

9   Q.  So that's 2012, but then in March and April and May of

10  2019, Dr. Mehrez, in Egypt, is still saying we not going to

11  accept U.S. beef with ractopamine; right?

12  A.  I don't remember that but I know they had a zero tolerance

13  policy so their policy would have been to not accept it.

14  Q.  And until Dr. Mehrez changed that policy, U.S. beef with

15  ractopamine could not enter Egypt.  That's your understanding?

16  A.  Correct.  Or pork.  Although not much pork went there.

17  Q.  Right.

18          THE COURT:  Why don't you finish this line, sir, and

19  then I will give the jury its mid-afternoon break.

20          MR. FEE:  We can stop right here, your Honor.  I am

21  going to move on.

22          THE COURT:  Let's take 10 minutes, ladies and

23  gentlemen.

24              (Continued on next page)

25

O635men2                        McKinney - Cross

1                    (Jury not present)

2                    THE COURT:  You may step down, sir.

3                    (Witness steps down)

4                    THE COURT:  10 minutes.

5                    MR. FEE:  Thank you, your Honor.

6                    (Recess)

7                    THE COURT:  Jury entering.  Put the witness on the

8       witness stand.

9                    THE MARSHAL:  He is getting him.

10                   THE COURT:  Time estimate, Mr. Fee?

11                   MR. FEE:  45 minutes, your Honor.

12                   THE COURT:  Thank you.

13                   (Witness resumes the stand)

14                   MR. FEE:  Jury entering.

15                   (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O635men2                              McKinney - Cross

1                (Jury present)

2                THE COURT:  Please be seated in the courtroom.

3                You may continue, sir.

4                MR. FEE:  Thank you, your Honor.

5     BY MR. FEE:

6     Q.  Mr. McKinney, the ractopamine products that Elanco sold and

7     still sells are called Paylean and Optaflexx?

8     A.  Correct; Paylean for pork, Optaflexx for beef.

9     Q.  In 2019, when you were advocating to Dr. Mehrez, were those

10    products still in broad use within the United States?

11               MR. MARK:  Objection.

12               THE COURT:  Yes.  Sustained.  Scope.

13    BY MR. FEE:

14    Q.  After you left Elanco and came to the USDA, you did not

15    recuse yourself from government discussions with countries that

16    were importing ractopamine meat; correct?

17               THE COURT:  Sustained.

18               MR. FEE:  Can we show the witness what has been

19    marked -- the witness and counsel -- Defendant's Exhibit 779?

20               Your Honor, there is a copy on the bench.  It is the

21    last exhibit we are going to offer in this examination and I

22    will preview that we are going to offer it pursuant to 803(17).

23               MR. MARK:  We only object as to relevance and scope,

24    not under 803.

25               MR. FEE:  Your Honor, if you look on the last page --

O635men2                          McKinney - Cross

1              Can we put it up for the witness?  I don't think he

2      has it.  Just the witness, not the jury.

3              I offer it, your Honor.

4              THE COURT:  You are offering it now?

5              MR. FEE:  Yes.  I am offering it as 803(17).

6              THE COURT:  Question him about it.  Keep it up only

7      for him and question.

8              MR. FEE:  Can you show him the front page, Mr. Kelly?

9      BY MR. FEE:

10     Q.  Without talking about the substance of what you see before

11     you, Mr. McKinney, do you recognize this as a USDA publication?

12     A.  I do recognize it as a GAIN report, so yes.  I don't

13     recognize the exact one, but I certainly do recognize it as a

14     GAIN report.

15     Q.  Understood.

16             And the date is July 28, 2021?  Do you see that?

17     A.  Yes, I see that.

18             MR. FEE:  And then if you can zoom out Mr. Kelly and

19     cycle through?  It is short.

20             THE COURT:  Does it consist of the four pages I have,

21     actually?

22             MR. FEE:  Yes, your Honor.

23             THE COURT:  The three pages?

24             MR. FEE:  The three pages that you have.

25     Q.  You see that it concerns the topic of ractopamine; correct,

1    Mr. McKinney?

2    A.   Yes.  I was reading it, yes.

3    Q.   And --

4    A.   I didn't get to read that.

5    Q.   Let's go to the second page, I will focus in.  Don't read

6    from it, Mr. McKinney while the judge is considering.

7         Can you focus in, Mr. Kelly, on background information?

8    Highlight the second sentence -- second paragraph, second

9    sentence through the end?

10        That's the focus, your Honor.

11             THE COURT:  Mr. McKinney, I think you testified that

12   these GAIN reports are relied on by the public or people in the

13   agricultural industry; is that correct?

14   A.   Yes.

15             THE COURT:  I am admitting it, 779.

16             (Defendant's Exhibit 779 received in evidence)

17             MR. FEE:  Let's publish this, Mr. Kelly.

18   Q.   Mr. McKinney, you saw this was a USDA GAIN report published

19   by the USDA in July in 2021; correct, sir?

20   A.   Yes, and that would have been after I was gone.

21   Q.   That's right, about seven months after you left your

22   position; correct?

23   A.   That's correct.

24   Q.   And this reports that on November 15 --

25             Go back there please, Mr. Kelly?

1    The first sentence of the first paragraph:  On

2  November 15, 2020, Egypt's National Food Safety Authority

3  issued decision which set new maximum residue limits for drugs

4  including ractopamine.

5  A.  Right.

6  Q.  And on November 15, 2020, you were still at the USDA;

7  correct?

8  A.  Yes.  Yes.  It was getting late, but yes.

9  Q.  You had about -- you left on January 1, 2021; correct?

10  A.  No.  It was Inauguration Day, which goes into January just

11  a bit, so not January 1.

12  Q.  Thereabouts.

13     And this, Mr. McKinney, GAIN report, says that as of

14  November 15, 2020, your advocacy with Dr. Mehrez succeeded and

15  Egypt dropped its zero tolerance policy; correct?

16          MR. MARK:  Objection as to --

17          THE COURT:  Sustained.

18          Did Egypt drop its zero tolerance policy in

19  November of 2020, if you know?

20  A.  I didn't know that but I am reading this now, so I didn't

21  know it at the time.

22  Q.  You didn't know at the time when you were undersecretary

23  for trade?

24  A.  No.  Not that I recall.

25  Q.  And then it says in the second paragraph, highlighted, that

1  the zero tolerance level had, "become a major impediment to

2  trade since 2012."

3      Do you see that?

4  A.  Yes.

5  Q.  And 2012 was when Elanco celebrated the change to the Codex

6  rules; right?

7  A.  Yes.

8  Q.  Which means that 2012, there was a new international rule

9  that says ractopamine in beef is OK; right?

10 A.  Yes, that's correct.

11 Q.  And Elanco, I believe you said, was the leading producer

12 and supplier of ractopamine?

13         MR. MARK:  Objection.

14         THE COURT:  Sustained.

15 A.  I did not know that at the time, sir.

16 Q.  In 2012?

17         MR. MARK:  Objection.

18         THE COURT:  Yes.  There is no question.

19 Q.  In any event, let's go to the last page of this exhibit and

20 zoom in on that paragraph at the top, please.  It reads in the

21 GAIN report:  Due to the application of zero tolerance, almost

22 20 percent of the total beef offal imports from the U.S. were

23 rejected.

24     Do you see that, Mr. McKinney?

25 A.  Yes, I see that.

O635men2                        McKinney - Cross

1   Q.   So that's as you understand the words on that page, it

2   means that when Dr. Mehrez had that zero tolerance policy,

3   almost 20 percent of beef offal imports were being rejected by

4   Egypt; correct?

5              MR. MARK:  Objection.  Mischaracterizes the evidence.

6              THE COURT:  Do you know whether or not that was true,

7   sir?

8   A.   I didn't know that but I was glad to see it.  I'm glad to

9   see it here.

10  Q.   Glad to see it now but you didn't know it at the time when

11  you were undersecretary?

12  A.   That's correct, no.

13  Q.   Last one from here, starting with "local."  "Local

14  importers report that trade is now easier due to the relaxed

15  ractopamine MRL."

16             MRL is the new standard where Egypt permitted that; is

17  that correct?

18  A.   Yes.  And the MRL that they selected was still well-below

19  the global accepted level of Codex, and so I'd note that, too,

20  in here.

21  Q.   So more than zero but not as much as you would have liked?

22             MR. MARK:  Objection.

23             THE COURT:  Sustained as to --

24  A.   No, not as much as I would have liked.  What was asked by

25  the company.

Q.  So, Mr. McKinney, with this, you acknowledge that it was a

victory for U.S. trade when zero tolerance policy was dropped

in Egypt; correct?

          MR. MARK:  Objection.

          THE COURT:  Sustained as to form.

Q.  Well, when the zero tolerance policy was lifted --

          THE COURT:  Do you believe when Egypt's zero tolerance

policy for ractopamine was lifted that that was likely to

increase beef offal imports from the United States to Egypt?

A.  Yes, as we felt it would with many countries around the

world.  They were following the EU policy which is itself

draconian.  It is zero tolerance, no risk.  So it was, I think,

a good thing for the world, particularly those that rely on

very little feed grains to feed their livestock.  It was a win

for the whole word.

BY MR. FEE:

Q.  So a win for the world, right?  A win for Elanco, fair so

say, your prior Company?

          MR. MARK:  Objection.

          THE COURT:  I will allow it.

A.  I guess.  But remember, there are many other generic

manufacturers about that time.

Q.  Sir, it would be good for Elanco if more countries accepted

ractopamine beef; correct?

          THE COURT:  If he knows it I will allow it, sir.

O635men2                        McKinney - Cross

1    A.  Yes.

2    Q.  And it was will good for you personally, right?

3    A.  No.

4         MR. MARK:  Objection.

5    Q.  Sir, when you were nominated at your confirmation hearing

6    you filed a financial disclosure form, didn't you?

7    A.  Yes.  Yes, you are required to do so.

8    Q.  And on that form, sir, you had you listed that you held

9    between $50,000 and $100,000 in shares of Eli Lilly; right?

10   A.  Which was all sold before I took office.

11   Q.  You held those shares when you were nominated; right?

12   A.  When I was nominated.

13   Q.  That's my question.  And then you sold them before you took

14   off; right?

15   A.  That's correct.

16   Q.  And Eli Lilly was the company that owned Elanco when you

17   worked for it, right?

18   A.  At that time, yes.

19   Q.  But throughout your time at the USDA you still had a 401K

20   with Lilly; correct?

21         MR. MARK:  Objection.  Relevance.

22   A.  Yes, I was getting my pension from that supplement; the

23   USDA salary.

24   Q.  And you had a defined benefit plan for Lilly too, yes?

25   A.  Yes.

1    Q.  Throughout the time you held this position at the USDA,

2    correct?

3    A.  Yes.

4    Q.  Including the time during which you were advocating for

5    Egypt to drop the zero tolerance ractopamine standard; right?

6    A.  Yes.

7    Q.  And the defined benefit plan at Lilly, it's like a pension

8    effectively; right?  It guarantees you a monthly check after

9    your retirement, right?

10   A.  It was and still is a pension.

11   Q.  And that amount of that check is based on Lilly's stock

12   price; correct?

13   A.  No, it's a flat fee.  It does not go up or down with the

14   stock.  I get a flat amount no matter what.

15   Q.  And it comes from Eli Lilly, correct?

16   A.  Yes.

17       And by the way, this was fully allowed under the rigid

18   ethics laws.

19   Q.  Sir, let me ask the next question, please.

20           THE COURT:  No need to volunteer.  Simply answer the

21   question that is being asked.

22           Why don't you move on, sir.

23           MR. FEE:  Your Honor, I have two more questions on

24   this.

25           THE COURT:  Go ahead.

O635men2                    McKinney - Cross

1    BY MR. FEE:

2    Q.   You did not take positions with the U.S. government that

3    were influenced by the money you were still receiving from

4    Lilly; correct?

5    A.   Not at all.

6    Q.   Those were just relationships and work that informed your

7    views; correct?

8            MR. MARK:   Objection.

9            THE COURT:   Sustained.

10   Q.   But, sir, you do agree that you made it a priority

11   throughout your tenure to advocate for increased acceptance of

12   ractopamine; right?

13           MR. MARK:   Objection.

14           THE COURT:   Asked and answered.

15   Q.   And in fact that was why you criticized Dr. Mehrez so

16   heavily, isn't it?

17           MR. MARK:   Objection.

18           THE COURT:   Sustained.   Argumentative.

19           Move on, please, Mr. Fee.

20   BY MR. FEE:

21   Q.   Do you remember testifying a few minutes ago:

22   "Q   Did you personally make that request to the FSIS?

23   "A   Yes.   I shared that with my counterpart.

24   "Q   You reached out to the FSIS personally to get that

25   information, sir?   That is your testimony?

1    "A   My counterpart and I met just about weekly, or every other

2    week, and so, yes, I asked them to give me what they had."

3        Do you remember hearing those questions and giving those

4    answers?

5    A.  Yes.

6    Q.  And that referred to information that the FSIS had about

7    Egypt's halal certifiers, correct?

8    A.  Yes.  And anything they could provide, I was very

9    interested.

10   Q.  And your testimony is that you actually asked the FSIS for

11   that information, correct?

12   A.  Yes, I asked my counterpart.

13   Q.  Your counterpart at the FSIS?

14   A.  Yes.  Yes.  She was the undersecretary for the Food Safety

15   Inspection Service or FSIS; that's correct.

16   Q.  Sir, do you remember the date of your first interview with

17   the FBI in advance of this testimony?

18   A.  I don't remember the exact date.  I believe it was

19   November of 2022.

20   Q.  Do you remember telling the FBI that you did not recall a

21   conversation with the FSIS about the IS EG Halal issue?

22   A.  I don't.  I remember a lot of questions.  I thought it was

23   about documents but I'm not sure.  That's been a while ago.

24            MR. FEE:  Let's show the witness and counsel, not the

25   jury, page 3 of what has been marked for identification as

O635men2                         McKinney - Cross

1    3527-002, please.  And let's highlight the last partial

2    paragraph in that page.

3    Q.  Mr. McKinney, don't make any comments about this document,

4    just tell me when you have had a chance to review it.

5    A.  I have read the enlarged piece.

6    Q.  Does this refresh your recollection, this banana, that you

7    did not recall a conversation with the Food Safety and

8    Inspection Service about this subject, Mr. McKinney?

9              THE COURT:  In other words, as I told you on Friday,

10   the only issue is whether looking at this now gives you a new

11   recollection.  So your answer is either yes, it does, or no, it

12   doesn't.

13   A.  Yes, it does.

14   Q.  So you remember now telling the FBI that you didn't recall

15   having a conversation with the FSIS?

16   A.  I remembered it as documents, not conversations.  So maybe

17   that is parsing it, but I remembered saying I didn't remember

18   ever seeing documents but I didn't remember saying that I never

19   had a conversation.  That would be the difference, sir.

20             MR. FEE:  We can put this down, Mr. Kelly.

21   Q.  Do you remember the prosecutor asking you on Friday about

22   other calls you had with members of Congress?  Do you remember

23   that, Mr. McKinney?

24   A.  Yes, sir.

25   Q.  You said you received one or two calls per month,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   approximately, from members of Congress during your time at the

2   USDA?

3   A.  Very roughly, yes.

4   Q.  Very roughly?

5   A.  Yes.

6   Q.  And you were undersecretary from October of 2017 until some

7   point in January of 2021; correct?

8   A.  Yes.

9   Q.  And so understanding that is rough, it is about a 40-month

10  tenure for you at the USDA?

11  A.  That's right.

12  Q.  So that, if my math is right, is between 40 to 80 calls

13  from members of Congress during your tenure, based on your

14  testimony on Friday, right?

15  A.  Yes.

16  Q.  And I want to talk a little bit about the substance of

17  those other calls.  Do you remember testifying about that on

18  Friday, how those calls generally occurred, correct?

19  A.  Yes.

20  Q.  You said that the calls usually were about a member of

21  Congress wanting to make sure that a certain commodity for

22  animal protein was included in our discussion with various

23  countries.  Do you remember that?

24  A.  As an example, yes.

25  Q.  As an example.  An example of a typical call from a member

1    of Congress?

2    A.   Yes.

3    Q.   40 to 80 of these.

4        And you said these calls were encouraging, as in:  Are you

5    going to add X or Y in your trade discussions?

6            Do you remember that?

7    A.   As but an example; yes, sir.

8    Q.   As an example of a typical call, correct?

9    A.   Yes.

10   Q.   And so I just want to be clear, the typical call was a

11   member of Congress encouraging you to push a product on a

12   foreign country; correct?

13           MR. MARK:  Objection to phrasing.

14           THE COURT:  Yes.  Sustained as to form.

15   Q.   Sorry.  My Long Island language.

16       To advocate for more trade involving a certain product that

17   was important to a member of Congress?

18   A.   And welcoming other trade coming back.  You keep forgetting

19   the two-way piece there.

20   Q.   Just answer the first question first, please.

21           MR. MARK:  Objection.

22   A.   Yes, yes.

23           THE COURT:  Yes.  Let's not argue with the witness.

24   Q.   And the typical call about which you testified involved a

25   member of Congress calling about some product that was

O635men2                        McKinney - Cross

1   important to their constituents; right?

2   A.  Yes.

3   Q.  So like Iowa Congresspeople would call about corn for

4   example; right?  Indiana Congresspeople would call about pork,

5   for example; right?

6   A.  Yes.

7   Q.  And so, in your experience with the USDA, over these dozens

8   and dozens of calls, Congresspeople call you to advocate for

9   the things about which their constituents care; right?

10  A.  Yes.

11              MR. MARK:  Objection.

12              THE COURT:  I will allow it.

13  A.  And that would forward, overall, U.S. agriculture food and

14  ag products.

15  Q.  That was your view?

16  A.  I didn't take it, nor did I think they mean it as selfish

17  for their district.  They were looking out for the entirety of

18  the industry.  If you lifted up the industry, you helped their

19  constituents as well.

20  Q.  Well, let me be clear.  You never got a call from the

21  Indiana Congressperson advocating for a New Jersey halal

22  certification business, right?

23  A.  No, but it was never put that way.

24  Q.  Sir, can you please answer the question I put to you?

25              THE COURT:  Sir, let him answer.  What is your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    question?

2    Q.   You never received a call from an Indiana Congressperson

3    advocating for a New Jersey halal certification company, right?

4    A.   No.

5    Q.   So Congresspeople called about what was important to their

6    constituents; right?

7                MR. MARK:  Objection.

8                THE COURT:  I will allow it.

9    A.   Most Congress persons know that if you lift an entire

10   industry and you use the words "corn", you can put "poultry",

11   you can put "beef", you can lift the entire industry no matter

12   where those crops or critters -- I say that lovingly -- are,

13   then you have lifted their state.  So it is usually talking

14   about lifting the industry up.  Can we get exports of beef?  Or

15   corn?  Or cotton?  Or whatever.  Now, they knew that it was

16   helping their district but rarely was it just saying:  *I want*

17   *you to do things that help my constituency.*  It was lifting up

18   the entirety of the commodity.

19   Q.   So your testimony is that Congresspeople did not call about

20   constituent concerns?  That's your testimony here?

21   A.   I don't think that's a question.

22               MR. MARK:  Argumentative.

23               THE COURT:  He just answered.

24   Q.   All right.  So these calls you described on Friday as

25   encouraging.  Do you remember that?

O635men2                          McKinney - Cross

1   A.  Yes, mostly around the China agreements, the China --

2   Q.  They were encouraging because they were advocating for you

3   to push foreign countries to engage in greater trade with the

4   U.S.; correct?

5   A.  Yes.  At large.

6   Q.  And those are pleasant and polite calls, generally, because

7   the Congresspeople want more trade and you want more trade;

8   right?

9   A.  That's correct.

10  Q.  So it is a win-win for that category of calls; the Iowa

11  Congressperson calling about corn, you want to sell more corn,

12  that's a win-win; right?

13          MR. MARK:  Objection, vague.

14          THE COURT:  I will allow it.

15          You can answer.

16  A.  I think the answer was yes.  If they called advocating for

17  lifting up that industry, it was helping them as it was helping

18  other states, usually.

19  Q.  Did you ever get a call from any other Congress members

20  from New Jersey other than the one that you testified about

21  involving Senator Menendez?

22  A.  I didn't get a call, I met personally with the Congressman

23  from southern New Jersey in his district as we made some

24  rounds.  So I did interface with a member from New Jersey but

25  not a call.

O635men2                         McKinney - Cross

1    Q.  Are you aware, sir, whether or not New Jersey has ever

2    exported a single piece of beef to Egypt?

3    A.  I am unaware, but I know they have beef.  Now part of this

4    may be because it is a cow/calf state.  Cow/calf means mamas

5    produce calves, but they tend to go to another state for their

6    finishing, and so the export might be more from Oklahoma,

7    Nebraska, Iowa.

8    Q.  Got it.

9    A.  But New Jersey certainly has beef cattle.

10   Q.  So under what you just described, the exports of beef to

11   Egypt were coming out of states other than Jersey, not directly

12   from Jersey?

13   A.  The finished product.

14   Q.  The finished product?

15   A.  The finished product but it lifts the entire industry, sir.

16   Q.  Are you aware that the only New Jersey constituent involved

17   in any of the events about which you testified relating to

18   IS EG Halal, was in fact IS EG Halal?

19              THE COURT:  Sustained.

20              MR. FEE:  To your knowledge, sir.

21              MR. MARK:  Objection.  Assumes fact.

22              THE COURT:  That's right, it does.  There is an

23   assumption.  Ask it directly.

24   Q.  Looking back over all your moments testifying with the

25   prosecutor on Friday relating to IS EG Halal, sir, were there

1    any other players, people, or companies of which you are aware

2    came from New Jersey?

3                MR. MARK:  Object to the form.

4                THE COURT:  Yes.  I'm sorry, Mr. Fee.  I am lost in

5    it.

6    Q.  To your knowledge, Mr. McKinney, in 2019 were there any New

7    Jersey companies slaughtering beef that was sent to Egypt?

8    A.  I don't know.  I had heard later that there might be one

9    other halal certifier in New Jersey but I'm not certain of that

10   and I didn't pursue it.  We had moved on.

11   Q.  Was that other one called Amana of New York, sir?

12   A.  I don't remember.

13   Q.  And to your knowledge, again, were any of the beef

14   exporters involved in these discussions, relating to IS EG

15   Halal, New Jersey companies, to your knowledge?

16   A.  I do not know.  There are beef and pork and exporters all

17   along the nation, normally along ports, so I do not know the

18   answer to that question.

19               THE COURT:  Sir, try to be as direct and succinct as

20   you can.  I think the answer, if I understand your testimony,

21   your answer to that last question was simply "I don't know."

22   Is that right?

23   A.  I don't know.

24   Q.  I want to understand the typical call, out of these 40 to

25   80 other Congresspeople calling, Mr. McKinney, OK?  So 40 or 80

O635men2                        McKinney - Cross

1  other times a senator or a Congressperson, a member of the

2  House of Representatives, picks up the phone and dials you;

3  right?

4  A.  Or sees me at an event.

5  Q.  Or sees you, and they say something like: *Hey, Ted.  I*

6  *really think it is important that the USDA advocate for more*

7  *trade in sugar beets*.  Right?  Something like that.  And suing

8  sugar beets is a U.S. product?

9  A.  Oh yes.

10  Q.  And they say: *Listen, Ted.  Please, when you are talking*

11  *to the Chinese trade delegation, make sure you talk about*

12  *American sugar beets*.  Right?

13  A.  Yes.  It was phrased differently but the point was there.

14  Q.  And so you would agree that your call with Senator Menendez

15  also involved a Congressperson advocating for a position that

16  his constituents cared about, right?

17              MR. MARK:  Object to the form.

18              THE COURT:  I will allow it.

19              Did your call, in your view, sir, did the call from

20  Senator Menendez involve a Congressperson advocating for one of

21  his constituents?

22  A.  Yes.

23              THE COURT:  Next question.

24  Q.  But, and we will put aside for a moment, sir, your views

25  about Senator Menendez' tone, putting aside that --

O635men2                        McKinney - Cross

1              MR. MARK:  Objection.

2              THE COURT:  Jury knows to disregard the comments and

3     only be concerned about questions to which there are answers:

4     Nothing so far.

5     Q.  Just to frame my question, Mr. McKinney, other than his

6     tone, the only difference between Senator Menendez' phone call

7     and these 40 to 80 other calls, was that Senator Menendez was

8     advocating for a constituent concern that would have lowered

9     trade; right?

10    A.  Would potentially have hurt the U.S. industry with that

11    request.  That was the only time I ever had an elected

12    representative with that angle that I can recall.

13    Q.  He wasn't saying, *I'm from Iowa, please push corn.*  Right?

14    That was not a part of that phone call with Senator Menendez?

15    A.  That's correct.

16    Q.  He was of saying I care about a New Jersey business because

17    it's good for New Jersey -- and there is nothing wrong with

18    that, right, Mr. McKinney?

19             MR. MARK:  Object to the form.

20             THE COURT:  Sustained.

21    Q.  So let's talk about your testimony about his tone; do you

22    remember that on Friday, with the prosecutor?

23    A.  Yes.

24    Q.  Just briefly, you remember having a back and forth with the

25    prosecutor about Senator Menendez' use of the word "please."

1    Do you remember that?

2    A.   Yes.

3    Q.   And so, I'm going to ask you if you remember that the first

4    thing that happened on Friday was you were asked:  What, in

5    sum, did Mr. Menendez say to you during the call?

6          You answered:  That led then to him saying would you

7    please quit interfering with my constituent.

8        My question only is do you remember that question and

9    giving that answer, Mr. McKinney?  That's all my question is.

10   A.   Yes.

11   Q.   Then the second thing that happened was the prosecutor came

12   back and he asked you:

13   "Q   Did he -- referring to Senator Menendez -- use the word

14   'please' in the phone call?

15   "A   Not that I recall."

16       Again, my question is do you remember that question and

17   giving that answer on Friday?

18   A.   Yes.

19   Q.   And then the third thing that happened:

20   "Q   And how did the call with Mr. Menendez end?

21   "A   Well, when I couldn't explain and he had referenced the

22   article, he closed by saying, please, stop interfering with my

23   constituent."

24       Again, my question is do you remember that question and

25   that answer on Friday, Mr. McKinney?

O635men2                          McKinney - Cross

1   A.  Yes, I do.

2   Q.  And so, the fourth thing that happened on Friday was the

3   prosecutor came back again and he says:

4   "Q   You said that when Mr. Menendez called you, before you

5   said that he didn't use the word 'please.'  But then when you

6   related what he said to you, you made a reference to the word

7   'please.'  Did Mr. Menendez --

8             and then you give the answer:

9   "A   No, if I said that, that was an error, I didn't mean

10   that."

11        Do you remember that question and that answer,

12   Mr. McKinney?

13   A.  Yes, I do that.

14   Q.  Is it fair to say that you are having some trouble sticking

15   to the script, Mr. McKinney?

16             MR. MARK:  Objection.

17             THE COURT:  Sustained.

18             Mr. Fee, please.

19   Q.  Would you agree with me, sir, that not saying "please" is

20   not a violation of any USDA rule of which you are aware?

21             MR. MARK:  Objection.

22             THE COURT:  Sustained.

23   Q.  Is it fair to say, sir, that some people are more polite in

24   their everyday interactions than with others?  Would you agree

25   with that?

O635men2                          McKinney - Cross

1   A.  Yes.  Me included.

2   Q.  Well, you called yourself a polite person.

3   A.  Yes.

4   Q.  And if I called you draconian, would you consider that

5   polite?

6              MR. MARK:  Argumentative.

7              THE COURT:  Sustained.

8   Q.  You were born and raised in Indiana, right?

9   A.  Yes, sir.

10  Q.  Do you still live in Indiana?

11  A.  No.

12  Q.  Have you spent much time in New Jersey, sir?

13             MR. MARK:  Objection.

14             THE COURT:  Relevance.  Move on.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1    BY MR. FEE:
 2    Q.  Are you generally aware --
 3              THE COURT:  Let's move forward, Mr. Fee.
 4              MR. FEE:  Yes, your Honor.
 5              THE COURT:  I repeat, please.
 6    BY MR. FEE:
 7    Q.  I want to talk about your testimony about -- Friday about
 8    the prosecutor asking you to discuss how you tried to influence
 9    a foreign government's decision that affected trade.  Do you
10    remember testifying about that on Friday with the prosecutor?
11    A.  I remember some general discussion on that, but I'd need
12    more specifics.
13    Q.  General discussion --
14    A.  But that's what I was trying to do in the job, for sure.
15    Q.  Got it.  So the general discussion on Friday was how you go
16    about advocating for U.S. food producers and exporters on
17    behalf of the U.S.D.A. abroad.  Do you remember that, sir?
18    A.  I remember elements of that.  I don't know which part
19    you're talking about.  You mean the escalation of letters and
20    communications or just --
21    Q.  Yes.
22    A.  -- generally speaking advocating for export and food?
23    Q.  Let's talk about what you testified about on Friday.  Do
24    you remember testifying that among the things you do to
25    advocate were you pick up the phone and call the agricultural
```

O63Wmen3                    McKinney - Cross

1    *attaché* in D.C.?

2    A.  Yes.

3    Q.  Remember that?

4    A.  Yes.

5    Q.  And then you said sometimes you elevate to the ambassador

6    of the foreign country, right?

7    A.  Yes, sir.

8    Q.  This is when you, an issue you care about, these are the

9    steps you take on behalf of the U.S.D.A., correct?

10   A.  What the U.S.D.A. cares about, not just me, sir.

11   Q.  Right.  Not your personal interest, the U.S.D.A.'s --

12   A.  Yes.

13   Q.  And the people on whose behalf the U.S.D.A. speaks, right?

14   A.  Yes.

15   Q.  Farmers, ranchers, exporters?

16   A.  Processors, exporters, all of them.

17   Q.  And then you said you also send emails and formal letters

18   to the agency's leadership in that other country, right?

19   A.  At times, yes.

20   Q.  And that's what you did with Dr. Mehrez, correct?

21   A.  That is correct.

22   Q.  And you would also meet with those folks at the agencies in

23   other countries, sometimes, right?

24   A.  At times, yes.

25   Q.  And you do that because that is the effective way to

1  advocate for the folks and the companies who are relying on the

2  U.S.D.A., right?

3  A.  The combination of all those makes that up, yes.

4  Q.  Right.  So you would agree that your constituents are

5  relying on you to do that sort of advocacy abroad, right?

6        MR. MARK:  Objection to form.

7        THE COURT:  I'll allow it.

8  A.  Yes.

9  Q.  And this is exactly what you did with Egypt on the IS EG

10 Halal issue, correct?

11 A.  Yes.

12 Q.  And on the ractopamine issue, right?  You had meetings,

13 right?

14 A.  I had a meeting.

15 Q.  Got it.

16     So on IS EG you sent emails, you sent letters and you made

17 calls and had a meeting with Dr. Mehrez, right?

18 A.  Yes, sir.

19 Q.  But again, while you were doing all this, the U.S.

20 government didn't actually have authority to tell the Egyptian

21 government what to do, right?

22        MR. MARK:  Objection to form.

23        THE COURT:  Sustained as to form.  I mean you've been

24 over the authority a number of times.  Ask it directly.

25 BY MR. FEE:

O63Wmen3                    McKinney - Cross

1    Q.  Sir, you're not able to tell Dr. Mehrez to change her

2    decision or Egypt's decision about IS EG Halal, right?

3    A.  That's correct.  You use influence as best you can.

4    Q.  Persuasion?

5    A.  Yes.

6    Q.  Whatever the final decision was, it was theirs; you were

7    just trying to influence their decision, right?

8    A.  Yes, as they do to me, and did to me.

9    Q.  Got it.

10        And if you are aware, sir, do you have any idea

11   approximately how many times you personally and your team at

12   the U.S.D.A. reached out to the Egyptian government on the IS

13   EG issue?  How many times, if you know?

14   A.  Well, five or six.  Let's see.  There was phone call to ag.

15   *attaché*, phone call to the ambassador.

16            THE COURT:  Sir, think to yourself.

17   A.  Five or six, sir.

18   Q.  Five or six for you personally; is that what you're saying?

19   A.  No.

20   Q.  OK.  At least --

21   A.  Five or six out of the D.C. office, and then there were

22   some in the embassy in Egypt that I was not as close to.  So

23   five to ten, probably.

24   Q.  Got it.

25   A.  But I'm not sure.

1   Q.  And then in connection with that advocacy, as we've seen,

2   you told Dr. Mehrez to immediately reverse that policy, right?

3   A.  At the end of the escalation, I did.

4   Q.  That's right.  And then your team published that GAIN

5   report --

6          THE COURT:  Well, I tell take it you didn't tell her

7   anything.  I take it you asked.  Is that correct?

8          THE WITNESS:  I asked.  I mean it was in firm tones,

9   but I was direct, respectful, I thought.  So yes, I was asking

10  her to please, you know, stop -- you know, make those four

11  points, I believe it was.  One was allow a transition time for

12  the seven.  One sentence was please reinstate, I believe, the

13  seven.

14  Q.  OK.  And then there were also, I imagine, emails among you,

15  among your staff, which you might not have been on, but many

16  emails about the IS EG Halal issue.  Fair to say?

17  A.  I don't remember that many emails.  There were some.  Most

18  of them were coming to me with updates, so there were some of

19  those, yes.

20  Q.  OK.  But this phone call with Senator Menendez, to your

21  knowledge, it was literally the only thing that he did on IS

22  EG, to your knowledge?

23          MR. MARK:  Objection.

24          THE COURT:  If he knows, I will allow it.

25          If you know one way or the other.

1   A.   It's the only thing I was involved with.

2   Q.   And the one email from his staffer forwarding the article,

3   right?

4   A.   Thank you.

5          MR. FEE:   And before we proceed, just quickly put up

6   Government Exhibit 8B-20.

7          Let's go to the letter to Dr. Mehrez, please.   And

8   let's focus in on the second-to-last paragraph.

9   Q.   And again, you used the word "respectfully" there, sir, but

10  that's not phrased as a question, you would agree?

11  A.   That was not what, sir?

12         MR. MARK:   Objection.

13  BY MR. FEE:

14  Q.   The first sentence there is not phrased as a question; it's

15  phrased as a request, right?

16         MR. MARK:   Objection.   Argument.

17         THE COURT:   I will allow it.   It's self-evident.

18         You can answer that question, sir.   When you say you

19  respectfully request, is that a request?

20         THE WITNESS:   It's a request.

21         THE COURT:   Thank you.

22         Next.

23  BY MR. FEE:

24  Q.   OK.   Let's talk about the phone call.

25         MR. FEE:   We can put this down, Mr. Kelly.

1  A.  Which phone call, sir?

2  Q.  The phone call with Senator Menendez, the one.  You said

3  you had a heads-up that Senator Menendez was going to call you,

4  right?

5  A.  Yes.

6  Q.  And then your chief of staff told you in advance of the

7  call it would be related to the halal issue, correct?

8  A.  I don't remember that.

9  Q.  You don't remember that?

10  A.  No.  All I knew I was getting a call from Senator Menendez.

11       MR. FEE:  Let's put up for the witness what's been

12  marked as 3527-002 page 3 of 7, please.  Not the jury.

13  Q.  Let's look at the last sentence of the first paragraph

14  again, I'm going to ask you one question after you have had a

15  chance to review.

16  A.  OK.

17  Q.  Does this refresh your recollection that your chief of

18  staff communicated to you that the Menendez call would be

19  related to halal issues?

20       MR. MARK:  Objection to form.

21       THE COURT:  I'll allow it.

22       THE WITNESS:  Say again, Judge?

23       THE COURT:  Does this refresh your recollection --

24  A.  It must -- yeah.  If this, it must, that she must have said

25  that, but I'd forgotten that.

1          MR. FEE:  Let's put that down.

2          MR. MARK:  Objection.

3          THE COURT:  The question isn't what's written there,

4     sir.  The question is whether looking at that gives you a new

5     recollection, because a moment ago, you said you don't recall

6     whether or not your chief of staff told you in advance of the

7     call from Senator Menendez that that call would be related to

8     the halal issue.  You said you don't remember.

9          THE WITNESS:  Sir, I didn't remember --

10         THE COURT:  Take a look at this.  Don't assume what's

11    written there is true.  Don't assume it's false.

12         THE WITNESS:  I stand by what I said.  I did not

13    remember that she said it would be about the halal issue.  And

14    I think that's affirmed here by saying Willbrand may have

15    communicated, meaning staff did not know if she did that.  I

16    don't recall her saying halal.

17    BY MR. FEE:

18    Q.  OK.  Senator Menendez's tone during the phone call with

19    you, Mr. McKinney, you characterized it as short and curt,

20    correct?

21    A.  I believe I said serious, and then there were parts that

22    were curt.

23    Q.  Curt.  But you also believed that his tone was respectable

24    throughout, correct?

25         THE COURT:  Respectable, sir?  Is that what you said?

| | |
|---|---|
| 1 | MR. FEE:  Yes, your Honor. |
| 2 | THE COURT:  All right. |
| 3 | A.  Did I say respectable? |
| 4 | Q.  That's my question to you. |
| 5 | A.  I don't remember saying respectable. |
| 6 | MR. FEE:  Let's put up again 3527-002, page 3 of 7, |
| 7 | the first full paragraph.  The first full paragraph. |
| 8 | THE COURT:  Now, again, you just said -- |
| 9 | MR. FEE:  Highlight the second sentence, please. |
| 10 | THE COURT:  You just said you don't recall.  So this |
| 11 | is the proverbial banana.  It doesn't matter whether whatever |
| 12 | is here is true or not.  The issue is only whether, looking at |
| 13 | that, you now have a new recollection as to whether or not you |
| 14 | believed he was respectable throughout. |
| 15 | THE WITNESS:  I don't know what to say.  What is this |
| 16 | document?  Where -- oh, this is the discussion with the FBI. |
| 17 | THE COURT:  Sustained. |
| 18 | Put that down, Mr. Fee. |
| 19 | MR. FEE:  Please take it down. |
| 20 | THE COURT:  Sir -- |
| 21 | THE WITNESS:  Yes. |
| 22 | THE COURT:  -- do you now remember saying that you |
| 23 | believed the senator's tone was respectable throughout?  Yes or |
| 24 | no or I don't know. |
| 25 | THE WITNESS:  I don't know. |

1           THE COURT:  OK.  Next.

2     BY MR. FEE:

3     Q.  Senator Menendez told you during that call that IS EG Halal

4     was frustrated because your team at the U.S.D.A. was

5     criticizing IS EG Halal publicly, right?

6     A.  Say that again, sir.

7     Q.  Sure.  During the call Senator Menendez said that he was

8     frustrated because your team at the U.S.D.A. was criticizing IS

9     EG Halal publicly, correct?

10    A.  That was my interpretation, yes.

11    Q.  And then you explained to him that there were issues with

12    having just one certifier, but he told you that he didn't like

13    the U.S.D.A.'s public criticism of his constituent, correct?

14    A.  Well, you missed a big part.  I started to and I was cut

15    off.  I barely got into the explanation before I was cut off.

16    Q.  So you don't remember saying that you explained to him that

17    having just one certifier was an issue, sir?

18    A.  I remember starting to try to explain that and other points

19    and was disallowed, sir.

20    Q.  And sir, on Friday, you testified that this call was short,

21    right?  Do you remember that?

22    A.  Yes.

23    Q.  Do you remember previously characterizing that the call

24    lasted roughly two to four minutes?

25    A.  I don't remember what I said in November.  I just remember

1    it was very short and there were three elements, as I

2    described.  The first was a rather brief reference to the

3    article, which did come.  The statement to stop interfering.

4    My attempt to explain, and then the restatement at least once,

5    maybe twice more.  And so I don't remember how long that was,

6    but it was very short.  Two, three minutes, something like

7    that.

8             THE COURT:  What restatement?  Restatement of what?

9             THE WITNESS:  Excuse me, sir?

10            THE COURT:  You said, "My attempt to explain, and then

11   the restatement at least once, maybe twice more."  Restatement

12   of what?

13            THE WITNESS:  Oh.  Restatement of stop interfering

14   with my constituent.  Now, I was trying to explain basically

15   the four points.

16            THE COURT:  You answered my question.

17            THE WITNESS:  Oh, OK.

18            THE COURT:  Thank you.

19            THE WITNESS:  All right.

20            MR. FEE:  Can we bring up 3527-002, please, again,

21   page 3, the first sentence of the second paragraph, just for

22   the witness and the lawyers.  And highlight that first

23   sentence, please.

24   Q.  Mr. McKinney, my question to you is this and only this.

25   Does this refresh your recollection that you previously

1    characterized the call with Senator Menendez as lasting two to

2    four minutes?

3    A.  I may have said that, yes.

4         MR. FEE:  All right.  You can put that down,

5    Mr. Kelly.

6    Q.  On Friday, you said you would never --

7         THE COURT:  In your opinion, sir, is two to four

8    minutes a short call?

9         THE WITNESS:  It was more on the shorter side, but

10   yes, that's a short call.

11        THE COURT:  Thank you.

12   BY MR. FEE:

13   Q.  On Friday, sir, do you remember testifying that you would

14   never forget Senator Menendez's words, "stop interfering with

15   my constituent"?  Do you remember that testimony, sir?

16   A.  Yes, I do.

17   Q.  You did not take any notes of the call, correct?

18   A.  That is correct.

19   Q.  But around the time of that call, you did send emails to

20   your staff about the call, correct?

21   A.  Yes, sir.

22        MR. FEE:  So let's look at what's in evidence as

23   Government Exhibit 8B-13.

24   Q.  And sir, you're on this email chain with your staff

25   discussing, as it says in the subject line, an article from

O63Wmen3                    McKinney - Cross

1   Senator Menendez, right?

2   A.  Yes.

3   Q.  And the facts relating to the call about Senator Menendez,

4   right?

5   A.  Yes.

6   Q.  And sir --

7           MR. FEE:  Zoom out, Mr. Kelly.

8   Q.  -- you don't write anywhere in this email that Senator

9   Menendez told you to stop interfering with my constituent, do

10  you?

11  A.  Not in writing, but I verbalized it.

12          MR. FEE:  Let's go to that second page, Mr. Kelly, so

13  folks can see.

14  Q.  And then you drafted or you had a draft response email to

15  Senator Menendez, correct?

16  A.  That's correct.  I did.

17          MR. FEE:  Let's put that up, Government Exhibit 8B-49.

18  Q.  And again, the top email is Zhulieta Willbrand --

19      That was your chief of staff at the time?

20  A.  That is correct.

21  Q.  -- forwarding to you the draft message in revised form,

22  correct?

23  A.  No.  She sent it in original form, and my edits were in

24  yellow.  I'm not sure that's what you said.

25  Q.  All I mean to say is the top email is from Ms. Willbrand to

1  you, correct?  The very top email, if you can see it.

2  A.  Yes.

3  Q.  And the date when it was sent is June 19 --

4  A.  Yes.

5  Q.  -- 2019?

6  A.  Yes, yes.

7  Q.  Do you see --

8  A.  I see where you're referencing, yes.

9        MR. FEE:  Got it.  If we could zoom out.

10  Q.  You say thank you for your recent phone call, and it

11  continues, concluding that first paragraph with notably as it

12  concerns one of your constituents.

13  A.  Yes.

14  Q.  Do you see that?

15  A.  I do.

16  Q.  And this is the email drafted by your chief of staff but

17  with your edits layered on top, correct?

18  A.  My edits -- yes, that's correct.  My edits are in yellow.

19  Q.  And again, you don't put it --

20        THE COURT:  Just a moment.

21        In yellow, that's what you're looking at, are those

22  your edits?

23        THE WITNESS:  Those are my edits, sir.  That's the way

24  I would do editing.

25        MR. FEE:  I'm sorry, your Honor.

1          THE COURT:  I thought it was, Mr. Fee.

2          MR. FEE:  That was a good point.  Thank you.

3    Q.  But again, nowhere in this draft email to Senator Menendez

4    does it reference him saying the words stop interfering with my

5    constituent, correct?

6    A.  That's correct.

7          MR. FEE:  All right.  Let's look at Government Exhibit

8    8B-10, and just -- you can cut out the white and zoom in on

9    both emails.

10   Q.  This is the email about which you testified where one of

11   Senator Menendez's staffers forwarded the article about the

12   GAIN report, correct?

13   A.  Yes, that's right.  They were connected.  That's correct.

14   Q.  And as you recall, sir, this was within hours of that two-

15   to four-minute call with Senator Menendez, right?

16   A.  I believe I said it was either same day or the next day.  I

17   can't recall which, sir.

18   Q.  So close in time?

19   A.  Yes, very close in time.

20   Q.  And you forwarded this on to a bunch of folks, including

21   Ken Isley, in the U.S.D.A., is that right?

22   A.  That is correct.

23   Q.  And again, you don't say --

24   A.  Well, a bunch.  Three, three people.

25   Q.  Thank you.

1     You don't say in here that, you would agree, that the

2     senator said anything about stop interfering with my

3     constituent, right?

4     A.  I did not put that in here.  I verbalized it.

5     Q.  Not in this email, correct?

6     A.  That is correct.

7          MR. FEE:  Let's go back to the draft response for a

8     moment, Government Exhibit 8B-49, and let's go to page 14.

9     Q.  Now, Mr. McKinney, you reviewed these on Friday.  Do you

10    recall?

11    A.  Let me just understand this one.

12         MR. FEE:  Yes.  Can you cut out the white, Mr. Kelly,

13    so it's easier to read.

14    A.  OK.  Go ahead.

15    Q.  And you testified on Friday that these had been prepared in

16    preparation for a second meeting or interaction with Senator

17    Menendez, right?

18    A.  Yeah, that's correct.

19    Q.  All right.

20    A.  I believe that's correct.

21    Q.  And it didn't actually happen, but at the time you and your

22    staff worked on these briefing points, fair to say?

23    A.  That's right.

24    Q.  And the purpose is to respond to Senator Menendez's inquiry

25    regarding the Egyptian news article regarding halal certifiers

1    of U.S. beef.  Do you see that, Mr. McKinney?

2    A.   That's correct.

3    Q.   And then if you zoom back out, it touches on a number of

4    the points you've covered here, Mr. McKinney; is that fair to

5    say?

6    A.   Do you mean on the guidance points, sir?

7    Q.   Yes, sir.  I'm sorry.

8    A.   Yes, sir, that's correct.

9    Q.   All right.

10   A.   Well, and there's a continuation.  The last bullet point

11   talks about the go forward, which was not GAIN-related, but

12   yes.

13   Q.   Understood, understood.

14        And again, nowhere in here do you reference or describe

15   Senator Menendez as having said that he wanted you to stop

16   interfering with his constituent, correct?

17   A.   That's correct.

18            MR. FEE:  We can put that down briefly.

19   Q.   On Friday, you said, you used the words "curt" and

20   "serious" to "very serious" to talk about Senator Menendez's

21   tone on this call, right?

22   A.   Correct.

23   Q.   But so we're absolutely clear, you are not testifying that

24   Senator Menendez actually made any threats to, say, interfere

25   with U.S.D.A. funding on that call, right?

1   A.  That's correct.  He made no threats.

2   Q.  No threats to stop passing U.S.D.A. nominees, right?

3   A.  That's correct.

4   Q.  Nothing like that?

5       He didn't say he was going to haul you before Congress for

6   testimony?

7   A.  That's correct.  He did not.

8   Q.  And he could do that, right?  That's what a senator could

9   do, right?

10  A.  Yes, and they do.

11  Q.  And to your knowledge, senator -- well, they do, but not in

12  this instance, right, Mr. McKinney?

13  A.  No.  That's correct, not in this instance.  He did not say

14  that.

15  Q.  And to your knowledge, Senator Menendez never contacted

16  your boss, the agriculture secretary, Sonny Perdue, right?

17          THE COURT:  Do you know whether or not he ever

18  contacted the secretary of agriculture?

19          THE WITNESS:  I don't believe he did, but I don't

20  know.  Maybe they did, maybe they didn't.  I don't -- I didn't

21  ever know that he did.

22  BY MR. FEE:

23  Q.  And you would agree that it would have been more aggressive

24  to jump over your head and contact your boss, right?

25          MR. MARK:  Objection.

1        THE COURT:  Sustained.

2   BY MR. FEE:

3   Q.  Well, when you wanted to escalate the IS EG Halal issue,

4   you went from the agricultural *attaché* at the Egyptian embassy

5   in the United States and you went to their boss, the

6   ambassador, right?

7   A.  In a sequence following traditional diplomatic protocol, I

8   did do those steps.

9   Q.  Right.  So first the under secretary or the lower level

10  person and then escalation from there if you don't get the

11  results you want, right?

12  A.  No.  Starting with the ag. *attaché* to the ambassador and

13  then to the deputy minister, if you're referencing Egypt.

14  Q.  Got it.

15      But Senator Menendez, to your knowledge, did not escalate

16  above your head, right?

17        MR. MARK:  Objection.

18        THE COURT:  I'll allow it.

19  A.  That's -- to my knowledge, that's correct.

20  Q.  And if you wanted information about the IS EG Halal issue,

21  it was better to contact you rather than Secretary Perdue,

22  correct?

23        MR. MARK:  Objection.

24        THE COURT:  Sustained.

25  BY MR. FEE:

1  Q.  To your knowledge, did Secretary Perdue know anything about

2  IS EG Halal?

3           MR. MARK:  Objection.

4           THE COURT:  I'll allow that.

5  A.  We informed him at the very end to keep him informed.

6  Q.  At the very end after you learned about the FBI

7  investigation?

8  A.  I don't remember if it was before that or after that, but

9  we informed him about that time about where this was going.

10          MR. FEE:  OK.  Let's pull back up those briefing

11  point, 8B-49, and if you can focus on the guidance points.

12 Q.  So I just want to be clear.  These were being prepared

13 after the call with Senator Menendez to get ready for another

14 call, right?

15 A.  That is correct.

16 Q.  And what you are proposing here, if we just start at the

17 bottom, you're going to confirm that FAS is working with USTR

18 to continue pressure on the government of Egypt to provide a

19 detailed audit report, ensuring transparency, right?

20 A.  Yes, sir.

21 Q.  And USTR is U.S. trade representative?

22 A.  Yes.

23 Q.  And the rest of these points reflect that the U.S.D.A.,

24 after the call with Senator Menendez, was not going to change

25 its position on IS EG one bit, right?

O63Wmen3                        McKinney - Cross

1    A.  I would not say that.

2    Q.  After the call, the U.S.D.A. was still advocating for the

3    Egyptian government to reinstate the prior certifiers, correct?

4    A.  Yes, but you never know where that will lead.

5    Q.  The U.S.D.A., after the call with Senator Menendez, was

6    still pushing Egypt to reinstate the prior certifiers?  Yes or

7    no.

8    A.  No.  The letters and the communications were in place.  We

9    were hoping for results from them, but we did not keep pushing,

10   to my knowledge, sir.  And there's a distinction.

11   Q.  Well, let me be clear about this.  You were going to tell

12   Senator Menendez that you were going to continue to pressure

13   the government of Egypt, right?

14   A.  Well, hold on.  This is a draft.  This does not say this is

15   exactly what we were doing.  This is a draft proposed by the

16   team on something we might follow.  We did not end up doing

17   this, sir.

18   Q.  My question to you, sir, after the call with Senator

19   Menendez, you did not call Dr. Mehrez or anyone else in the

20   Egyptian government and change your position on IS EG Halal,

21   correct?

22   A.  That is correct.  We did not.

23   Q.  After the call with Senator Menendez, you did not direct

24   any of your team in Cairo to withdraw the objections to IS EG

25   Halal that had previously been communicated, correct?

1    A.  We did not.  We were hoping there were results from that

2    still.

3    Q.  After the call with Senator Menendez, you did not

4    communicate to anyone within the U.S.D.A. that you were

5    reconsidering your position and the U.S.D.A.'s position on IS

6    EG Halal, correct?

7    A.  That is not true.

8    Q.  Sir, after the call, you did not communicate a change in

9    position to anyone?

10   A.  Oh, we did talk verbally about what the next steps were,

11   sir.  Happy to get into that.

12   Q.  In any event, you were gathering information after the call

13   from Senator Menendez to get back to him, right?

14   A.  Yes, sir.

15   Q.  That's what you were doing?

16   A.  Yes, sir.

17   Q.  Because you wanted to share with Senator Menendez what you

18   and your team had learned about IS EG Halal, right?

19   A.  I wanted to share what I tried to share on the call and

20   crystallize that.

21   Q.  But you never told Senator Menendez that you couldn't get

22   back to him, right?

23   A.  No, I didn't end up calling him, nor had I promised that I

24   would call him either.

25   Q.  Well, you did believe that he deserved a further dialogue

O63Wmen3                         McKinney - Cross

1     about IS EG Halal, right?

2              THE COURT:  Sustained.  Sustained.

3     BY MR. FEE:

4     Q.  You wanted to talk to him further, but you were

5     interrupted, right?

6     A.  You're equating two things together.  I wanted to explain

7     during the call, and I thought it might be best to memorialize

8     all that we had talked about, including points we didn't get

9     across, and if there were any corrections to the record, I

10    wanted to give him an accurate assessment of where things

11    stood.

12             MR. FEE:  All right.  Let's go to this email draft you

13    prepared.  The first page of Government Exhibit 8B-49.

14    Q.  So this is your draft email with your comments to Senator

15    Menendez, correct?

16    A.  This was drafted by my chief of staff, and the yellow were

17    my edits, if that's what you mean.

18    Q.  You reviewed this email, sir?

19    A.  I did.

20    Q.  And you made comments on it, sir?

21    A.  And I edited in yellow, yes.

22    Q.  And those were the only comments you had, right?

23    A.  Those were the edits I had.

24    Q.  You had no further comments, correct?

25    A.  That's correct.

1    Q.  And you say thank you for your recent phone call and

2    interest on the current issue as it concerns one of your

3    constituents, right?

4    A.  Uh-huh.

5            THE COURT:  You have to say yes or no.

6            THE WITNESS:  I'm sorry.

7    A.  Yes.

8    Q.  And then in the third paragraph of this page, you explain

9    how the GAIN report was issued and then you say you did what he

10   asked you to do, right; you compared our report with the

11   article and found that the information accredited to U.S.D.A.

12   and our foreign service officer was fairly accurate?  Right?

13   That's what you say here?

14   A.  That's correct.

15   Q.  You actually caught an error, you and your staff.  It says

16   the certificates were issued from eight centers in the United

17   States, seven without explanation, and this draft response says

18   this may be a translation error.  There were four centers

19   certifying.  Do you see that?

20   A.  Yes, I do see that.

21           MR. MARK:  Objection.  Form.  Makes an assumption.

22           THE COURT:  The question is whether he -- oh, I see.

23           I'll allow it.

24           How much longer do you have?

25           MR. FEE:  15 minutes, your Honor.

1        THE COURT:  All right.

2        MR. FEE:  All right.  And let's go to page 2, the

3  beginning of the second paragraph.

4  Q.  And then you note I should add that we have heard a

5  significant amount of feedback from many in the beef industry

6  expressing a deep concern with having a single halal

7  certification entity.  You were sharing here, you would agree,

8  beef industry feedback on IS EG Halal, correct?

9  A.  Yes.  Yes, sir.

10 Q.  And the beef industry are the voices you listen to as your

11 constituents, right, Mr. McKinney?

12        MR. MARK:  Objection.

13        THE COURT:  Sustained as to form.

14 BY MR. FEE:

15 Q.  Well, you were hearing --

16        THE COURT:  Are they part of your constituency, sir,

17 as viewed by you?

18        THE WITNESS:  Sir, I listen to everybody.  They were

19 an important source.  They're the closest to the exports, so I

20 listened to them.  But I listened to everybody.

21 BY MR. FEE:

22 Q.  You see the words here:  You have heard a significant

23 amount of feedback from many in the beef industry.  Do you see

24 those words, Mr. McKinney?

25 A.  Yes.

1    Q.  And you do not see anywhere in this paragraph or elsewhere

2    in the response anything about the government of Egypt's

3    concerns about feeding nonhalal meat to religiously observant

4    citizens, right?

5              MR. MARK:  Objection.

6              THE COURT:  Sustained.

7    BY MR. FEE:

8    Q.  You don't see anything in here about Egypt's stance on

9    ractopamine, do you, Mr. McKinney?

10             MR. MARK:  Objection.

11             THE COURT:  I'll allow it.

12   A.  No.  I didn't know ractopamine was part of this issue.

13   Q.  Sir, you met with Dr. Mehrez on March 29 and discussed

14   ractopamine, correct?

15   A.  Yes.  We were focused on the halal issue, not the

16   ractopamine issue, although it was a sidebar.  But yes, we were

17   focused on the halal issue here exclusively.

18   Q.  Exclusively focused on the beef industry's concerns about

19   the halal issue, correct?

20             MR. MARK:  Objection.

21             THE COURT:  I'll allow that.  It's cross.

22   A.  I was giving feedback on what I'd heard, and it was from

23   the industry.  And so I shared that.  I wanted them to know

24   that the provider of a lot of their beef products were very,

25   very concerned.  I thought they'd want to know that.

1          THE COURT:  Who is they?

2          THE WITNESS:  I thought the government of Egypt from

3   top to bottom would want to know about the concerns from the

4   U.S. beef industry writ large.

5   BY MR. FEE:

6   Q.  You never sent this response to Senator Menendez, correct?

7   A.  Correct.

8   Q.  You testified because you learned about an FBI

9   investigation, right?

10  A.  Correct.  A few days later, that's correct.

11  Q.  A few days after this letter was drafted in June '19?

12  A.  Yes.

13  Q.  Got it.

14       So to your knowledge, no one else in the U.S.D.A.

15  communicated the information in this letter to Senator

16  Menendez, correct?

17  A.  That's correct.  To my knowledge, no one communicated that.

18  Q.  And so notwithstanding anything else we've talked about

19  here, to your knowledge, the only information that Senator

20  Menendez received from the U.S.D.A. about IS EG Halal was

21  whatever you said during that short phone call, correct?

22          MR. MARK:  Objection.

23          THE COURT:  Sustained.

24  BY MR. FEE:

25  Q.  Well, sir, other than that phone call, you never

1    communicated anything to Senator Menendez about this issue,

2    correct?

3    A.  That's correct.

4    Q.  You --

5    A.  I tried to, though.

6    Q.  Understood, sir.

7         To your knowledge, no one else on the staff, your staff,

8    communicated anything else to Senator Menendez about the IS EG

9    Halal issue, correct?

10   A.  That is correct, sir.

11        THE COURT:  And I take it your question, sir, includes

12   his staff.

13        MR. FEE:  That was my second question.  Yes, sir.

14   Thank you, your Honor.

15        THE COURT:  Did you so understand the question?

16        THE WITNESS:  I do.  I don't know of anyone who

17   communicated to the senator or his staff after our phone call.

18   BY MR. FEE:

19   Q.  OK.  So the call from Senator Menendez, you testified, was

20   on or about May 23 of 2019, is that fair to say?

21   A.  I think that's correct.

22   Q.  And this email, if we can go to the first page of 8B-49,

23   your chief of staff forwards this to you on June 19, 2019?

24   A.  Yes.

25   Q.  Do you see that?

1       So between May 23 and June 19, you are still planning to

2  respond to Senator Menendez, correct?

3  A.  Yes.  Loosely, yes.

4  Q.  Well, it's almost a month, just short of a month, where you

5  had received the call but had not yet responded, correct?

6  A.  That's correct.

7  Q.  And during that month, you told your team in Cairo to stick

8  to their guns, so to speak, on IS EG Halal, correct?

9  A.  I would not characterize it that way, sir.

10        MR. FEE:  Let's put up just for the witness GX -- oh,

11  no.  It's in GX 8B-49.  I'm sorry.  You can put it back up and

12  go through.  Sorry.

13  Q.  Sir, you would agree that the draft response as of June 19

14  reflected that you were still maintaining your opposition on

15  behalf of the U.S.D.A. to IS EG Halal, correct?

16        MR. MARK:  Objection.  Asked and answered.

17        THE COURT:  I'll allow it.

18  A.  We had stopped the outreach, but we were still hoping for

19  information to come back from that which we'd already advanced.

20  Q.  Got it.

21  A.  So we were still standing there, hoping for a response, but

22  we weren't keeping up the outreach, the solicitation.  We were

23  hoping for a response in there.

24  Q.  But when the call from Senator Menendez happened, you

25  reached out to your team in Cairo and you told them you had

O63Wmen3                        McKinney - Cross

1     their back and you'd take the heat, right?

2     A.  If there was retribution, I would take the heat.

3     Q.  That's right.  But there was no retribution, correct, sir?

4     A.  That's correct.

5              MR. MARK:  Objection.

6              THE COURT:  Sustained.

7              MR. MARK:  Move to strike.

8              THE COURT:  The jury will disregard the answer.

9     BY MR. FEE:

10    Q.  So that month, May 23, or roughly a month, to June 19, you

11    didn't hear from Senator Menendez during that month, correct?

12    A.  Correct.

13    Q.  No phone call to you from Senator Menendez, correct?

14    A.  Correct.

15    Q.  Nothing to your staff from his office?

16    A.  Not that I know of, sir.

17    Q.  And the first time the prosecutors in this case asked to

18    speak with you, did you wait a month to get back to them?

19             MR. MARK:  Objection.

20             THE COURT:  I'll allow it.

21             If you know --

22    A.  Say it again, sir?

23    Q.  Sure.  When the U.S. government, the FBI reached out to you

24    and said, hey, we want to talk to you about your phone call

25    with Senator Menendez, did you wait a month to get back to

 1    them?

 2            MR. MARK:  Objection.  Assumes a fact.

 3            THE COURT:  I'll allow it.  If he knows.

 4    A.  I don't know how long it was.  I know they knocked on my

 5    condominium door.

 6            THE COURT:  Sir, if you don't know how long it was --

 7            THE WITNESS:  I don't know how long.

 8            THE COURT:  -- you don't know how long --

 9            THE WITNESS:  I don't know how long.

10            THE COURT:  -- it was.

11            THE WITNESS:  All right.

12            THE COURT:  Do you get the idea that the more you

13    volunteer the longer you'll be here?

14            THE WITNESS:  Sorry.

15    BY MR. FEE:

16    Q.  All right.  Sir, you would agree that given that it took a

17    month for you to even draft the response, this was not your top

18    priority, getting back to Senator Menendez?

19            MR. MARK:  Objection.

20            THE COURT:  Sustained as to form.

21    BY MR. FEE:

22    Q.  Sir, you would agree that as of May 23 getting back to

23    Senator Menendez was not your top priority, correct?

24            MR. MARK:  Objection.

25            THE COURT:  I'll allow that.

1  A.  This is at the height of the negotiations with China, so

2  no, it was not my priority, and I did pay heed.  I didn't want

3  to elevate it any more.

4  Q.  And sir, in fact, during that month -- so that's from the

5  time of the call to when you heard about the FBI, just so we're

6  clear, that's the May 23 to June 19, roughly?

7  A.  Roughly.

8  Q.  And during that month, no one alerted you to Senator

9  Menendez taking any other actions with respect to IS EG Halal,

10 correct?

11         MR. MARK:  Objection.

12         THE COURT:  I'll allow it.

13 A.  That's correct.  I knew of no other information, no other

14 actions.

15 Q.  And the bottom line is that Egypt wanted IS EG, as you

16 understood the situation, to be the single halal certifier,

17 right?

18         THE COURT:  We've been over this and over it and over

19 it.  Move on.

20         MR. FEE:  Yes, your Honor.

21         Just one moment, your Honor?

22         No further questions, your Honor.

23         THE COURT:  Thank you.  Is there any redirect here?

24         MR. FEE:  Oh, no.  We have other people.

25         THE COURT:  Oh, I am sorry.  Of course.

1              I apologize.

2              MR. SOLANO:  Not necessary, your Honor.

3    CROSS-EXAMINATION

4    BY MR. SOLANO:

5    Q.  Good afternoon, Mr. McKinney.

6    A.  Good afternoon.

7    Q.  I want to go back to when you learned that Egypt was going

8    to go to a single halal certifier in the spring of 2019.

9    A.  Yes, sir.

10   Q.  You've testified that you took certain steps to try to get

11   them to change that decision, and in part, your constituents,

12   the U.S.D.A.'s constituents, were asking the U.S.D.A. to do

13   that, correct?

14   A.  Yes, but they were behind me.  I was leading that and they

15   were offering their support and their encouragement.

16   Q.  And you testified, I think you approximated the share of

17   the beef liver market in Egypt to be about 60 percent coming

18   from the U.S., correct?

19   A.  Beef livers to Egypt -- yes, beef livers to Egypt, about 60

20   percent share plus or minus.

21   Q.  And we could pull it up, but it was actually higher, right?

22   In that email that you drafted to Senator Menendez, it's more

23   like 70 percent, correct?

24   A.  Yeah.  I didn't remember exactly, sir.

25   Q.  Understood.  But it was more like 70 percent of the market,

1    correct?

2    A.  OK.

3    Q.  And you've testified that that was a unique position that

4    the U.S. market had in Egypt, correct?

5    A.  Very much so.

6    Q.  And one of the things you testified is that your concern

7    with having a single halal certifier was that it could mean no

8    competition and that might drive up prices for the U.S.

9    companies, correct?

10   A.  That is correct, and it did.

11   Q.  Did you have any concern that U.S. meat exporters having a

12   70 percent control of the market in Egypt meant that

13   effectively there was not that much competition and they could

14   drive up prices for Egyptian consumers?

15            MR. MARK:  Objection.

16            THE COURT:  You may answer.

17   A.  Well, if you have several exporters, they would be

18   competing with each other, and so never mind that it's a high

19   market share, it's many, many people selling it.  So no, I was

20   not concerned about that.

21   Q.  Many, many people from the U.S. beef market is what you

22   mean, correct?

23   A.  Exporters that are part of that system, yes.

24   Q.  OK.

25   A.  They're usually independent, uh-huh.

1   Q.  And in any event, you would say your primary concern was

2   not to have other countries tap into the U.S. market?

3   A.  If I could help it, that's correct.

4   Q.  You testified about a lot of the steps that the U.S.D.A.

5   and you took, on Friday and today, to try to get this decision

6   reversed, and I'm not going to go through all of them, but to

7   summarize, you made phone calls, your staff made phone calls,

8   you had meetings, you wrote letters and you wrote emails,

9   correct?

10  A.  Yes.

11  Q.  And all of that was an effort to try, perhaps ultimately

12  unsuccessful, to get Egypt to change its position, correct?

13  A.  Correct.  Well, we wanted to get an answer on why the

14  decision.  There were many aspects that we wanted to get at,

15  one of which is don't be draconian and move this thing in one

16  week's time from going to seven to one.  So it was many things,

17  but part, yes, sir, was, in fact, we wanted to make sure we

18  retained the market.

19  Q.  And ultimately, as you testified and acknowledged, it was

20  Egypt's decision, and Egypt's decision alone, as to whether to

21  have one halal certifier or multiple, correct?

22  A.  In the end it was their decision, but those are oftentimes

23  discussed amongst parties and we felt it was appropriate,

24  within bounds, because they would do that with us.  So yes,

25  their decision, but we had the flexibility to add influence,

1    add our own points, and we did.

2    Q.  And you tried in this case?

3    A.  We did.  Mightily.

4    Q.  You testified on Friday a couple of times that you were

5    surprised by the lack of response from Egypt, correct?

6    A.  Yes, sir.

7    Q.  But you actually had a call with the Egyptian ambassador,

8    correct?

9    A.  Yes, sir.

10    Q.  He didn't ignore your call?

11    A.  No, not on that case, but we didn't get the answers we were

12    seeking.  He called, but there was no information answering any

13    of our questions, sir.

14    Q.  But you had a conversation with him?

15    A.  Yes.

16    Q.  Were you also aware that Bret Tate, who reported to you --

17    correct?

18    A.  He did not report to me.  He was a part of the foreign ag.

19    system and was in Egypt at the time.

20    Q.  Were you aware that he had a conversation with the Egyptian

21    deputy minister, Dr. Mehrez, when he saw her at the airport in

22    Germany?

23            MR. MARK:  Objection.  Assumes a fact.

24            THE COURT:  I will allow it if he knows.

25    A.  I was unaware either way.

O63Wmen3                        McKinney - Cross

1  Q.  No one from your staff ever reported to you, whether Bret

2  Tate or someone else, that Mr. Tate had tried to argue against

3  Egypt's move to Dr. Mehrez when he met with her?

4  A.  I didn't get it that specific, but I knew they, too, were

5  making efforts to try to get this decision changed, so --

6            THE COURT:  Who is they?  Who is they?

7            THE WITNESS:  Our foreign agricultural service team in

8  the embassy in Egypt, sir.

9            THE COURT:  Thank you.

10           THE WITNESS:  And Bret was one of them.

11           THE COURT:  Thank you.

12  BY MR. SOLANO:

13  Q.  You testified that the letter you wrote to Dr. Mehrez was

14  the last in the escalation of communications with Egyptian

15  officials, correct?

16  A.  It was the last we took.  There were other steps had we

17  chosen to take them.

18  Q.  I can put it up for you if necessary, but to summarize it

19  briefly, you essentially expressed concern about suspending the

20  other halal certifiers, correct, to her?

21  A.  Among many other points, that was one of them, yes.

22  Q.  You expressed the fact that the new organization had no

23  history in the business, correct?

24  A.  Correct.

25  Q.  You said that the U.S. was not given prior notice, correct?

1    A.  Not enough, yes.

2    Q.  And you thought it was doubtful that a single certifier

3    could handle the business of the exporting of beefs to Egypt,

4    or beef to Egypt, correct?

5    A.  Correct.  And don't forget the most important point.  We'd

6    never heard why they did it.

7    Q.  Right.  I was about to get to that.  Thank you.

8        You still had not gotten a full explanation, correct?

9    A.  That's correct.

10   Q.  In your letter to Dr. Mehrez, who is your counterpart, you

11   never asked her why Egypt did not want to continue with the

12   other certifiers, did you?

13   A.  Not in that letter, but we had sure voiced that up in the

14   other meetings.

15   Q.  OK.

16   A.  So I thought it was understood.

17   Q.  Understood.

18       This is your last escalation to your counterpart, correct?

19   A.  The last one we took, among other options, sir.

20   Q.  Understood.

21       So I'm asking you again, in your letter, did you ever ask

22   her why Egypt might want only a single halal certifier?

23   A.  We did not, but we most certainly would have if they'd

24   called, if they had responded.

25   Q.  Well, you had the letter.  You drafted it.  You didn't put

O63Wmen3                          McKinney - Cross

1   that in your letter.  That's a yes-or-no question.  Was it in

2   the letter?  Yes or no.

3   A.   It was not explicitly stated, as I think you're inferring.

4   Q.   Right.  In your letter, you never asked her why Egypt might

5   want this particular certifier, did you?

6   A.   We didn't in that letter.  We did in all the other

7   communications, sir.

8            MR. SOLANO:  This is going to take a lot longer if you

9   do not stick to my questions.

10           THE COURT:  All right.  The jury will disregard the

11  comments of the lawyers.

12           Next question.

13  BY MR. SOLANO:

14  Q.   Did you know whether IS EG was owned by Mr. Hana, who is a

15  Coptic Christian?

16  A.   I did not know that.

17  Q.   Did you know whether that was an important factor to

18  Egyptian officials?

19           MR. MARK:  Objection.  Assumes a fact.

20           THE COURT:  It does indeed.  Why don't you rephrase

21  it.

22  BY MR. SOLANO:

23  Q.   Did you know whether it was an important factor for the

24  Egyptian government that IS EG was owned by a Coptic Christian?

25  A.   No, I never knew that, and it didn't matter to me.

O63Wmen3                    McKinney - Cross

1   Q.  You didn't care what Egypt cared, is what you're saying?

2              MR. MARK:  Objection.

3              THE COURT:  Sustained.

4   A.  Of course not.

5   Q.  In your letter, you never told Dr. Mehrez that the U.S.D.A.

6   constituent, the U.S. meat exporters, had been complaining to

7   the U.S.D.A. about demand, did you?

8              MR. MARK:  Objection to form.  Misstates evidence.

9              MR. SOLANO:  I could rephrase it.

10             THE COURT:  Go ahead.

11  BY MR. SOLANO:

12  Q.  In your letter that you wrote to Dr. Mehrez, does it state

13  that U.S.D.A. constituents -- specifically, the U.S. meat

14  exporters -- had been complaining to the U.S.D.A. about Egypt's

15  decision?

16  A.  I don't remember.  We could pull it up, but I don't think I

17  put that in there.

18  Q.  OK.

19  A.  But again, I'll state it had been communicated many times

20  before in the other methodologies.

21  Q.  It is true, is it not, that countries like Egypt and others

22  often make decisions based on policies even if they might hurt

23  their businesses?  Correct?

24  A.  I don't know why countries make their decisions.

25  Q.  OK.  So during your tenure as under secretary, isn't it

O63Wmen3                          McKinney - Cross

1   true that the Trump administration made trade decisions,

2   particularly with China, that hurt or had the risk of hurting

3   U.S. industries?

4           MR. MARK:  Objection.  Relevance.

5           THE COURT:  I'll allow it.

6   A.  Yes.

7   Q.  And there was nothing wrong with that?

8           MR. MARK:  Objection.

9           THE COURT:  Sustained as to form.

10  BY MR. SOLANO:

11  Q.  Did you feel that there was anything wrong with that?

12          THE COURT:  Sustained.

13  BY MR. SOLANO:

14  Q.  The letter you sent to Dr. Mehrez, you said, would be about

15  as strong a tactic as your office would use, correct?

16  A.  The letter to Dr. Mehrez, yes.  It was straightforward.  I

17  hope respectful and diplomatic, straightforward.

18  Q.  And you were asked on Friday by the prosecutor whether or

19  not you had ever started a letter to a foreign official the way

20  you started this letter expressing your concern with their

21  decision, correct?

22  A.  That's correct, and I don't remember using that in other

23  letters.

24  Q.  Other than Egypt, had you -- you had not done that with any

25  other country, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   A.  Not that I recall.

2   Q.  OK.  Do you recall writing a similar letter, using similar

3   language, to the prime minister of Thailand when Thailand

4   decided to ban the use of glyphosate?

5   A.  Yes, I remember that letter.  I don't remember the

6   language, but it was direct as well.

7           MR. SOLANO:  If we could put up for the witness DX

8   Hana 105, Mr. Kelly, just for the witness, the judge and the

9   lawyers.

10  Q.  Is that the letter that you wrote to Dr. -- excuse me, to

11  the prime minister of Thailand?

12  A.  I'd like to see the signature first.

13          MR. SOLANO:  Sure.  If we could show the witness the

14  second page, Mr. Kelly.

15  A.  Yes.  That's my handwriting too.

16  Q.  And just like the letter you wrote to Dr. Mehrez, you start

17  this letter expressing your concern about Thailand's decision

18  to ban glyphosate?

19  A.  Let me help you.  Glyphosate.

20  Q.  Glyphosate.

21  A.  Glyphosate, uh-huh.

22  Q.  Yes.

23  A.  Yes, I did.

24  Q.  And that's a pesticide, correct?

25  A.  Yes, it is.  It's a herbicide, more specifically.

1  Q.  It's a herbicide that had been listed by the World Health

2  Organization as a possible carcinogen, correct?

3  A.  That's correct, although that is heavily debated, sir.

4  Q.  Understood.

5      But that is correct, correct?

6  A.  That is correct.

7          MR. SOLANO:  And you can zoom out, Mr. Kelly.

8  Q.  Just like the letter you wrote to Egypt, you wrote to the

9  prime minister of Thailand that the ban would severely impact

10 the U.S. export of things such as soybeans and wheat to

11 Thailand, correct?

12 A.  That's correct.

13 Q.  And just like the letter you wrote to Egypt, you wanted to

14 protect the U.S. market in Thailand, correct?

15 A.  Yes, but I was also very interested in making sure they

16 were following sound science, and glyphosate's been approved by

17 most countries in the world.  So they were about to use a large

18 market, including our soy, our wheat, if they implemented that.

19 And I wanted to make sure they knew that.

20 Q.  Right.  Just like you were advocating to Egypt, you were

21 advocating to Thailand --

22         MR. MARK:  Objection.

23 Q.  -- that they should reconsider their ban, correct?

24 A.  Yes, sir.

25         MR. MARK:  Objection to form.

O63Wmen3                         McKinney - Cross

 1              THE COURT:  I'll allow it.

 2    BY MR. SOLANO:

 3    Q.  And just like the letter you wrote to Egypt, you asked the

 4    prime minister of Thailand to delay the ban or implementation

 5    of the ban, correct?

 6              MR. MARK:  Objection to form.

 7              THE COURT:  I'll allow it.

 8    A.  Yes, I did.

 9    Q.  Bayer, the pharmaceutical company, was the manufacturer of

10    this herbicide, correct?

11    A.  I can't recall if it was Bayer that owned them now -- then,

12    at this time, or if it was Monsanto, but Monsanto was purchased

13    by Bayer, so same difference, perhaps.

14    Q.  Do you recall that weeks before you wrote this letter,

15    lobbyists for Bayer were contacting the U.S.D.A. and you to

16    lobby, to intervene with Thailand's ban, for the U.S.D.A. to

17    intervene with Thailand's ban?

18              MR. MARK:  Objection.

19              THE COURT:  Sustained.

20    BY MR. SOLANO:

21    Q.  Did you ever get an email forwarded to you from lobbyists

22    on behalf of Bayer asking to intervene, for the U.S.D.A. to

23    intervene in Thailand's ban?

24              THE COURT:  Relevance.  Sustained.

25    BY MR. SOLANO:

1   Q.  In any event, when you wrote this letter to the prime

2   minister of Thailand, you were advocating for your

3   constituents, correct?

4          MR. MARK:  Objection.

5          THE COURT:  I'll allow it.

6   A.  I was advocating for the world, sir.

7   Q.  Your concern with her -- excuse me, with him, the prime

8   minister of Thailand, was the fact that this would disrupt the

9   U.S. markets of soybeans and wheat in Thailand, correct?

10  A.  And more importantly, set a precedent in all of Asia

11  Pacific about a decision that would be draconian for them.  And

12  I didn't know that he knew that.

13  Q.  Just like Egypt, you thought this was another draconian

14  decision that Thailand was now making, correct?

15         MR. MARK:  Objection.

16         THE COURT:  I'll allow it.  He used the word again.

17  A.  I did.

18         MR. SOLANO:  If we could pull up, Mr. Kelly, GX8B-20.

19  Q.  This is the letter that you wrote to Dr. Mehrez, correct?

20  A.  Yes, we've seen this.

21  Q.  Yes, we've seen this several times, and I just want to

22  focus on one thing, first sentence in the second paragraph.

23      You wrote it is doubtful that a single certifier can handle

24  the magnitude of U.S. halal-certified shipments to Egypt.  do

25  you See that?

O63Wmen3                          McKinney - Cross

1    A.  Yes.

2    Q.  And your letter -- if we can zoom out -- is dated May 10,

3    2019, correct?

4    A.  Say that again, sir?  I'm sorry.

5    Q.  Your letter is dated May 10 of 2019, correct?

6    A.  Yes.  Yes, sir.

7    Q.  And that's just a little over five years ago today,

8    correct?

9    A.  That's correct.

10   Q.  Are you aware that IS EG today is still a single certifier

11   of U.S. exports, beef exports to Egypt?

12            MR. MARK:  Objection.

13            THE COURT:  Sustained.

14   BY MR. SOLANO:

15   Q.  Do you know whether IS EG today is the sole certifier of

16   U.S. beef exports to Egypt?

17            MR. MARK:  Objection.

18            THE COURT:  Sustained.  Relevance.

19   BY MR. SOLANO:

20   Q.  You were shown earlier today, though, that you are aware

21   that today over $90 million of U.S. beef exports continue to

22   Egypt, correct?

23            MR. MARK:  Objection.  Relevance, for today.

24            THE COURT:  I'll allow it, if it's in the record.

25   A.  I saw that in the graph, yes.

 1              MR. SOLANO:  No further questions, your Honor.

 2              THE COURT:  All right.  Thank you, sir.

 3              Mr. De Castro, anything?

 4              MR de CASTRO:  No questions.

 5              THE COURT:  OK.  Now, any redirect?

 6              MR. MARK:  Briefly, your Honor.

 7              THE COURT:  Do you think you'll be able to hit the 5

 8   o'clock mark?

 9              MR. MARK:  I really want to, your Honor.

10              THE COURT:  All right.

11   REDIRECT EXAMINATION

12   BY MR. MARK:

13   Q.  Mr. McKinney, do you recall being asked about whether or

14   not Mr. Menendez used the word "please" when speaking with you

15   in May 2019?

16   A.  I do.

17   Q.  How clear is your memory of the call with Mr. Menendez?

18              MR. FEE:  Objection.  Bolstering.

19              THE COURT:  I'll allow it.

20   A.  Very clear, particularly on the request, the demand he was

21   making.

22   Q.  Why is the call so clear in your mind?

23              MR. FEE:  Objection.

24              THE COURT:  I'll allow it.

25   A.  I've never had a call like that before.

1    Q.   What do you mean you've never --

2    A.   And more critically, it was the first time I'd ever had a

3    call that we thought would clearly harm elements of the U.S.

4    food and ag. industry.  First time.

5    Q.   Was ractopamine on your mind when you spoke with Senator

6    Menendez?

7    A.   No, sir, not at all.

8    Q.   Why not?

9    A.   That was not the focus of the call.  That was -- that

10   was -- our interest was in the decision made to eliminate the

11   many, many halal certifiers, the creation of what proved to be

12   a monopoly and all the things that would go, that might risk

13   depressing the U.S. beef market and the relationship with

14   Egypt.  That's what we were focused on.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O645men4                      McKinney - Redirect

1   BY MR. MARK:

2   Q.  Now, Mr. McKinney, do you remember being asked questions

3   about whether you took notes of this call?

4   A.  I recall those questions.

5   Q.  Did you take any notes during your call with Mr. Menendez?

6   A.  I did not.

7   Q.  Why not?

8          MR. FEE:  Objection as to why.

9          THE COURT:  Sustained.

10         Was it your custom to take notes on calls that

11  Congressmen made to you, sir?

12  A.  Usually I did, sir.

13  Q.  Did you write down what Mr. Menendez said after the call?

14  A.  I did not.

15  Q.  Now, Mr. Hamill, could you just bring up 8B-12?

16  Ms. Wechsler.  Sorry about that.  Could you scroll down to page

17  2 and highlight the message from Mr. McKinney?  The one right

18  above that, Ms. Wechsler.

19  A.  Yes.  I remember this well.

20  Q.  And you wrote that you had a call with Ken Isley, right?

21  A.  That's correct.

22  Q.  And who is Ken Isley again?

23  A.  Ken was the administrator of the Foreign Agricultural

24  Service at the time.

25  Q.  Did you write down the whole call to Mr. Isley in this

O645men4                        McKinney - Redirect

1    e-mail?

2    A.  No.

3    Q.  Why not?

4    A.  I wanted to discuss it privately with him, verbally.

5    Q.  And did you discuss it privately with him?

6    A.  I did.

7    Q.  What did you tell him?

8            MR. FEE:  Objection.  Hearsay.

9            THE COURT:  Sustained.

10   Q.  You said you wanted to discuss this call verbally with him

11   instead of writing it down.  Why was that?

12           MR. FEE:  Objection.

13           THE COURT:  I will allow that.

14           MR. FEE:  Your Honor, side bar.

15           THE COURT:  No need.

16           THE WITNESS:  I'm sorry.  I didn't hear you judge.

17           THE COURT:  You can answer.

18           THE WITNESS:  Ask the question again?

19   BY MR. MARK:

20   Q.  You said before that you didn't write down this whole call

21   with him, you wanted to have a conversation with him?

22   A.  Yes.  And why.

23   Q.  Why was that?

24   A.  First of all, we had suspected, based on the call --

25           MR. FEE:  Your Honor, objection.

O645men4                    McKinney - Redirect

1          THE COURT:  Sustained.  Sustained.

2          MR. MARK:  Your Honor, can we have just a brief side

3    bar then?

4          THE COURT:  Yes.

5          (Continued next page)

O645men4                        McKinney - Redirect

1              (At side bar)

2              THE COURT:  The last time this area was gone into

3    there were objections all around and I didn't let the question

4    proceed, so what are we doing here?

5              MR. MARK:  Your Honor, I understand that your Honor

6    struck certain testimony from Mr. McKinney when he was

7    explaining that on direct.  We actually didn't go there on

8    direct to explain why he didn't take contemporaneous notes and

9    put them into e-mails because we told Mr. Menendez' counsel

10   that we were intentionally not going there.  But when they, if

11   they were going to go on cross to challenge his credibility,

12   which I think they did, the fact that they're arguing that the

13   contemporaneous e-mails that he wrote are what's accurate and

14   that he is not telling the truth as to what happened during the

15   call during his testimony.

16             THE COURT:  Wait, wait.  Just a moment.

17             MR. MARK:  Sure.

18             THE COURT:  You mean suggestion that he never said

19   what he said because any of the contemporaneous e-mails didn't

20   refer to that?

21             MR. MARK:  Right.  Exactly.

22             THE COURT:  That certainly was the suggestion.

23             MR. MARK:  That was the suggestion of

24   cross-examination, that he didn't put "stop interfering" into

25   his e-mails, the contemporaneous documents.  And I think it is

O645men4                          McKinney - Redirect

1    incredibly important to avoid a misleading impression.  The

2    jury has to understand why he didn't do that because otherwise

3    he could believe that the contemporaneous documents are

4    complete and accurate, and that later on he is in some way --

5    is what they're saying is -- coming up with this story.

6              THE COURT:  I understand, but what is the answer you

7    hope to adduce without getting unto the area that was

8    problematic?

9              MR. MARK:  Well, the truthful answer is the one he has

10   to say which is that he was concerned that Senator Menendez was

11   involved in some way with the IS EG Halal and didn't want to

12   put that down in writing because he didn't know whether or not

13   it was true or accurate.  And he thought that was a serious

14   concern and he didn't want to put that into a document at the

15   time.  He is not going to say that he knew what it was, he is

16   going to say that is what his concern was and he was concerned

17   he didn't know the answer to that, he didn't want to

18   memorialize that in a document.

19             THE COURT:  Slow, slow.

20             MR. MARK:  Sorry.

21             MR. FEE:  Whenever you are ready.

22             THE COURT:  Go ahead.

23             MR. FEE:  Your Honor, he has said in the 3500 that he

24   thinks he was a witness to a crime.  You have seen this

25   witness, he takes every opportunity he can --

O645men4                    McKinney - Redirect

 1              THE COURT:  Shhhhh.

 2              MR. FEE:  -- to narrate.  He has testified --

 3              THE COURT:  He volunteers.  As he gets more and more

 4    tired he volunteers more and more.  Go ahead.

 5              MR. FEE:  There is no basis to elicit what they are

 6    trying to elicit here.

 7              THE COURT:  Well, you did, indeed --

 8              MR. FEE:  And let me respond to that.

 9              THE COURT:  No, let me finish.

10              MR. FEE:  Yes, sir.  Of course.

11              THE COURT:  You did, indeed, try to leave the

12    impression that he never said that in the phone call because

13    you kept on saying:  Did you write it down here?  Did you write

14    it down there?  Did you write it down there?  And the answer

15    was no, no, no.  Obviously, because, I mean, I would think you

16    want the inference to be because it was never said?

17              MR. FEE:  That is correct, your Honor.

18              THE COURT:  They're entitled to combat that.

19              MR. FEE:  They have combated that.  The response to

20    that is his testimony, at length, which described the contents

21    of the call and his responses to every one of my questions.

22              THE COURT:  Just a moment.  Go ahead, finish.

23              MR. FEE:  The response to every one of those questions

24    was -- I think he always said, *It is not there but I said it on*

25    *the call.*  It does not open the door for egregiously

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   prejudicial and totally inadmissible speculation.

2           THE COURT:  Just a moment.  I am concerned about that.

3           MR. MARK:  That is why -- he is not going to say that

4   he knew what happened or did not happen.  He is very much a

5   careful person.

6           THE COURT:  He is a very much volunteering person at

7   this stage.  I forget the words he used on Friday.

8           MR. FEE:  I remember, your Honor.

9           THE COURT:  It was a big concern to me.

10          MR. MARK:  He thought that --

11          THE COURT:  It was stronger than shenanigans.

12          MR. MARK:  He thought that there was a connection

13  between that.  He said I thought I had, that there was a

14  connection.  I will also, can ask questions that clarify that

15  he did not know whether that was the connection or not but that

16  was the reason he didn't memorialize it.

17          THE COURT:  Try to think of a leading question that

18  will adduce the answer without getting into his conjecture of

19  suspicion.

20          MR. SOLANO:  Your Honor, may I make a suggestion?

21          THE COURT:  Yes.

22          MR. SOLANO:  It seems they want to get is the fact

23  that he purposely did not memorialize the entire conversation

24  in the e-mails.  If they ask him that question, that will

25  address the fact that it wasn't without getting into --

```
 1                MR. MARK:  No.

 2                THE COURT:  Ten 10 at a time only.

 3                Sir, what did you say at the end?

 4                MR. SOLANO:  The question they can ask him is:  Did

 5   you purposely intend to memorialize your entire conversation

 6   with Senator Menendez in these e-mails?

 7                THE COURT:  No, they're entitled to more given the

 8   inference that the questioning is begging the jury to draw.

 9                MR. MARK:  We particularly put them on notice of this

10   that we were not going there on direct and that their cross

11   could open it up.

12                THE COURT:  Think of a question or two that will not

13   get into the problematic area.

14                MR. FEE:  Your Honor, on direct, the thing you are

15   remembering is he said, I thought we had found the cause of

16   this entire problem.  He was suggesting directly that Senator

17   Menendez was on the take.  And he is going to do it again.

18                THE COURT:  Just a moment.

19                MR. MARK:  He didn't say that anybody was on the take.

20                THE COURT:  We don't have to debate that.  Talk to

21   each other.

22                MR. MARK:  Let us --

23                MR. RICHENTHAL:  I was going to ask for a minute, if

24   that is OK.  May we have a minute?

25                THE COURT:  Take your minute.
```

1        (Counsel conferring)

2        THE COURT:  What do we have here, guys.

3        MR. RICHENTHAL:  Here is a first quick effort:  Were

4   there things that you wanted to share only over a call and not

5   in the e-mail with Mr. Isley.

6        THE COURT:  That's OK with me.

7        MR. FEE:  Just not a leading question.  It is the same

8   problem, your Honor, but.

9        THE COURT:  No, no, no, no.  Yes or no.

10       MR. MARK:  That is a leading question, but.

11       THE COURT:  I don't care whether it is leading or not.

12   If I allow him to ask it he can ask it.

13       MR. FEE:  OK.

14       THE COURT:  The question is, was there a next

15   question.

16       MR. MARK:  There is, there is three:  Without getting

17   into all of the details --

18       THE COURT:  Talk to each other.

19       MR. MARK:  My handwriting is illegible.

20       MR. RICHENTHAL:  I think something like:  Without

21   getting into all of your thinking, what was the nature of your

22   concern that led you to prefer to speak live?

23       A high-level thought.

24       THE COURT:  I think --

25       MR. FEE:  Sure, sure.

O645men4                     McKinney - Redirect

 1            THE COURT:  OK.  Let's go with that.

 2            MR. RICHENTHAL:  And then I think to make sure that we

 3  are talking about the same thing:  Did that include that

 4  Mr. Menendez stop interfering?  Because that is the key

 5  statement that the parties are disputing.

 6            THE COURT:  Stop interfering.

 7            MR. RICHENTHAL:  Something like that.

 8            THE COURT:  Yes, but I'm going to ask him to listen

 9  carefully to the question and answer only the question asked.

10  Agreed all around?

11            MR. FEE:  Agreed, your Honor.  Thank you.

12            THE COURT:  Let's do it.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  Mr. McKinney, it is late.

3              THE WITNESS:  Yes.

4              THE COURT:  Listen carefully to the questions and

5    simply answer the question.  Don't volunteer, just answer

6    "yes," "no," or if it takes something more than that, but don't

7    volunteer.  All right?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  All right.  It is late.

10             THE WITNESS:  I will try my best.

11             THE COURT:  I understand.

12             MR. MARK:  Your Honor, I may, just so that I am on

13   line, may I ask these questions from right here?

14             THE COURT:  Of course.

15   BY MR. MARK:

16   Q.  Mr. McKinney, were there things that you wanted to share

17   with Mr. Isley over a call and not an e-mail with him?

18   A.  Yes.

19   Q.  Without getting into all of your thinking, what was the

20   nature of your concern of why you wanted to speak live instead

21   of putting in an e-mail what Mr. Menendez said?

22             THE COURT:  Why did you want to speak live rather than

23   putting it in an e-mail?  As succinctly as you can.

24             THE WITNESS:  I will try, and stop me, sir, I'm going

25   to try my best.

1          MR. FEE:  Your Honor, I don't believe that is what we

2     discussed at side bar.

3          MR. MARK:  I am looking at this very carefully.

4          THE WITNESS:  I --

5          THE COURT:  Go ahead.

6          THE WITNESS:  Ask the question again, sir?  I'm sorry.

7          THE COURT:  If you gentlemen think it was something

8     else, talk to each other right now.

9     BY MR. MARK:

10    Q.  Without getting into all of your thinking on this matter,

11    what was the nature of your concern that led you to want to

12    speak live as opposed to putting the call in the e-mail?

13    A.  What I was sharing with my team and did share with the

14    team, I didn't want to go on the record that could then be

15    acquired by Freedom of Information.

16         THE COURT:  Thank you.

17         THE WITNESS:  I did OK?

18         THE COURT:  That is your answer.

19    Q.  Did that include what Mr. Menendez said about stop

20    interfering with my constituent?

21    A.  Yes.  It most certainly did.

22         THE COURT:  All right.  Thank you.

23    Q.  Now, Mr. McKinney, do you remember being asked questions

24    about how members of Congress sometimes reached out to you to

25    help a constituent?

1    A.   Yes, sir.

2    Q.   During your time as undersecretary, when members of

3    Congress reached out for help with a constituent, would the

4    interest of the constituent usually align with the interest of

5    the United States?

6    A.   Yes.  Absolutely.

7    Q.   Was that the case here with Mr. Menendez?

8            MR. FEE:  Objection, your Honor.

9            THE COURT:  I will allow it.

10           To at least your understanding, sir.

11   A.   I didn't think so.

12   Q.   Why not?

13           MR. FEE:  Objection, your Honor, to why not.

14           THE COURT:  Sustained.

15   Q.   When Mr. Menendez called you about the IS EG, did he tell

16   you that the IS EG had promised to pay his then girlfriend

17   Nadine?

18           MR. FEE:  Objection.

19           THE COURT:  Sustained.

20   Q.   Did he tell you that the IS EG had promised to make

21   payments using money from the halal certification business?

22           THE COURT:  Sustained.

23           Have you told us, to the best of your recollection,

24   what Senator Menendez said on that call?

25   A.   Yes.

1           THE COURT:  Is there anything you recall now that

2  Senator Menendez said to you on that call that you have not

3  testified to here?

4  A.  I think we have captured it.

5           THE COURT:  Thank you.

6           MR. MARK:  No further questions.

7           THE COURT:  Thank you.  You are excused, sir.  You may

8  step down.

9           THE WITNESS:  Bless you.

10          THE COURT:  I don't think anyone has ever said that to

11  me before.

12          THE WITNESS:  Thank you very much.

13          THE COURT:  Ladies and gentlemen, we had a full day --

14  no, we had a full half day of testimony.  The schedule for the

15  rest of the week is 9:30 to 5:00.  Let's get testimony in,

16  let's move this case forward.  I appreciate everyone's working

17  with me in that regard.  If everyone is here tomorrow at 9:30,

18  we will start at 9:30 in the a.m.

19          Enjoy your evening.

20          (Continued on next page)

21

22

23

24

25

O645men4                           McKinney - Redirect

1              (Jury not present)

2              THE COURT:  9:30 a.m.  Thank you.

3              MR. MONTELEONI:  Your Honor, I just have one question.

4     There are some pending motions about testimony of Sara Arkin

5     and exhibits to be used with Rachel Graves.  Understanding when

6     your Honor might be in a position to decide them will help us

7     understand our witness order because either of them or

8     potentially both of them might testify tomorrow depending on

9     your rulings as well as JJ Gilday, a third witness that is also

10    coming before your Honor.  So I know there is a lot piling up,

11    but any sense we can have of essentially who we can call in

12    what order would be very helpful.

13             THE COURT:  I don't have that now.  I did receive the

14    motion of the government at 1:30 in the morning between

15    Saturday night and Sunday morning, that I did.  I can't give

16    you order by name at this point.

17             MR. WEITZMAN:  Your Honor, just in case you were

18    waiting, we don't plan to put in a response to those two

19    letters.  We will address it in some sort of argument.  I think

20    it is more efficient.  They are just objections to exhibits.

21             THE COURT:  Yes.  We are talking about the objections

22    to the summary witness; correct?

23             MR. WEITZMAN:  So there are two letters.

24             THE COURT:  Wait.  Is that the reference that you are

25    making here?  Because I thought there were two other people

O645men4                    McKinney - Redirect

1    besides the person who is doing the summary chart.

2         MR. MONTELEONI:  Yes, your Honor; so there are three.

3    One is the letter regarding the summary chart, which I was

4    really trying to get in before midnight on Saturday night.  I

5    missed that, you are absolutely right.

6         THE COURT:  It would have made a difference if it was

7    midnight versus 1:30?  Go ahead.  Move on.

8         MR. MONTELEONI:  Fair enough.

9         I understand defense is saying that they intend to

10   argue that orally, but when the summary witness can go on,

11   based on that, that would be helpful to understand when the

12   Court wishes to have argument on that because we can't put her

13   on, obviously, until we know what the exhibits are.  That's

14   one.

15        Two is that Sara Arkin, a former Senate Foreign

16   Relations Committee staffer, there have been some letters

17   exchanged about certain exhibits that would be used in

18   connection with her testimony.

19        Then three is that JJ Gilday, a Department of Justice

20   witness in the FARA unit, essentially, is also the subject of a

21   pending motion.  Based on rulings we might potentially get to

22   all of those tomorrow and so we would like to understand.  I

23   understand that it sounds like the briefing is now complete if

24   defense is not planning on be filing anything more.

25        THE COURT:  Well, given what I said to the parties at

O645men4                          McKinney - Redirect

1    the end on Friday, I can't respond to you now.  I will deal

2    with it tonight.

3                MR. MONTELEONI:  Thank you, your Honor.

4                (Adjourned to June 4, 2024, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination of:                              Page

3      TED McKINNEY

4     Cross By Mr. Fee . . . . . . . . . . . . . .1879

5     Cross By Mr. Solano  . . . . . . . . . . . .1995

6     Redirect By Mr. Mark . . . . . . . . . . . .2009

7                          DEFENDANT EXHIBITS

8     Exhibit No.                               Received

9      761A    . . . . . . . . . . . . . . . . .1903

10     1008    . . . . . . . . . . . . . . . . .1925

11     141    . . . . . . . . . . . . . . . . . .1934

12     779    . . . . . . . . . . . . . . . . . .1941

13

14

15

16

17

18

19

20

21

22

23

24

25