O66Wmen1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7                 Defendants.
                                           Trial
8    ------------------------------x

9                                          New York, N.Y.
                                           June 6, 2024
10                                         9:30 a.m.

11

12   Before:

13                        HON. SIDNEY H. STEIN,

14                                         District Judge
15                                         -and a Jury-

16                            APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25
```

O66Wmen1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9   GIBBONS, P.C.
         Attorneys for Defendant Hana
10  BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15  CESAR DE CASTRO
    SETH H. AGATA
16  SHANNON M. McMANUS
         Attorneys for Defendant Daibes

17

18

    Also Present:  Marwan Abdel-Rahman
19                 Rodina Mikhail
                   Interpreters (Arabic)
20
                   Rachel Wechsler
21                 Connor Hamill
                   Braden Florczyk
22                 Paralegal Specialists, U.S. Attorney's Office

23                 Justin Kelly, DOAR

24

25

1              (Trial resumed; jury not present)

2              THE COURT:  Please be seated in the courtroom.

3              The jurors are not all here, but there are two things

4    I wanted to handle.

5              One was the letter of the government last night, in

6    which the government raises the point that they thought the

7    inference from the cross-examination of Dr. Davis that the

8    defense was trying to bring out was that other things should

9    have been tested, and the government is seeking the rather

10   standard instruction that law enforcement techniques are not an

11   issue for the jury and the government's not on trial here.  It

12   seems to me rather straightforward.

13             Defense, did you want to say anything?

14             MR. FEE:  Your Honor, I don't think it's appropriate

15   to give a limiting instruction, your Honor.

16             THE COURT:  OK.  What was the purpose of your saying

17   you didn't test this, right, you didn't test that, and you

18   could have tested this and you could have tested that, anything

19   but clothing given to you, all that entire line?  What was the

20   purpose of that?

21             MR. FEE:  Very simple, your Honor.  The jury has to

22   base its decision on the evidence or lack of evidence.

23             THE COURT:  The question is -- I'm not telling you

24   anything you haven't repeated a thousand times in your prior

25   position.  The only issue is whether the government has proven

O66Wmen1

1    the guilt of the defendant beyond a reasonable doubt, nothing

2    else.

3        MR. FEE:  We are entitled, are obliged, to point out

4    the lack of evidence.  This jury has heard about hundreds and

5    hundreds of items, seen, seized and delivered to the FBI.  That

6    direct did not clarify, in my view, for the jury what was

7    tested and what was not tested.  We are obliged to inquire how

8    they made those decisions and to clarify what was not tested.

9        THE COURT:  OK.  Let me hear from the prosecution.

10        MR. MONTELEONI:  I think that there can be no

11    question, your Honor, that Dr. Davis was quite clear about the

12    nine items that were tested to the level of finding samples

13    that were suitable and then the further testing that was done

14    on six of them.

15        THE COURT:  I think the defense is entitled to

16    question them as to how the items that were tested were chosen

17    to be tested.  That seems to me to be fine.

18        MR. MONTELEONI:  Well, I think among the item set, the

19    specific decisions that Dr. Davis made of what to do is one

20    thing, but talking about a whole number of items in the house,

21    many of which, of course, were not seized, I think that defense

22    counsel suggested that all kinds of clothing from the closet

23    could have been tested when --

24        THE COURT:  He likes the closet.  He'll come back to

25    the closet again.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen1

1          MR. MONTELEONI:  Well, he does, but suggesting that

2     this witness, who actually literally had no physical possession

3     over these items at any point could have made a decision to

4     test them, I think, is inappropriate.  But again, I think that

5     the lack of evidence and the amount of evidence is absolutely

6     in the record, and I don't think you have to go through,

7     right -- the items that were tested is in the record, and going

8     through and enumerating not just that other items are not in

9     that set of nine items that are tested, which at some point, I

10    think, very much does suggest the inference, but also

11    suggesting that it has to do with decision-making by this

12    witness really goes far beyond just pointing out the lack of

13    evidence.  And as you noted, this is a very standard

14    instruction that we're asking for and we expect that the jury

15    will get it eventually, but it's not going to have the effect,

16    if it's not --

17          THE COURT:  No.  I'm going to give it now, in general.

18          But Mr. Fee, did you want to respond?

19          MR. FEE:  Your Honor, just one other point.

20          THE COURT:  There are certain questions that are

21    allowable, but when it gets to the point of an inference that

22    the government should have done this or the government should

23    have done that -- now, Mr. Fee is not going to articulate that,

24    but the question is whether the jury is left with that

25    inference, and I want to make sure that the jury understands

1     that's not its concern.

2             Go ahead, sir.

3             MR. FEE:  Your Honor, two quick points.

4             The first is when the government elicits, I think, two

5     hours of testimony about this works and how she performs her

6     work, we are entitled to clarify what exactly, the things to

7     which her techniques are applied.

8             THE COURT:  Agreed.

9             MR. FEE:  The second point, your Honor -- and you

10    should stop me anytime when the jury gets here -- there is

11    relief we are going to seek relating to the testimony of

12    Dr. Davis.  Specifically, she went far beyond the bounds of

13    work she did to offer speculation that Senator Menendez may not

14    have been in the CODIS database.  I'm sure your Honor's

15    familiar --

16            THE COURT:  She has no idea what's in the CODIS

17    database.

18            MR. FEE:  Your Honor, it was notable to me that when I

19    asked her, she did not just say I don't know, she specifically

20    claimed that he may not be there because there's such a long

21    backlog.

22            Your Honor, here's the point.  Obviously we are all

23    aware there was a prior case against Senator Menendez eight

24    years ago, during which he was processed and swabbed.  There is

25    zero percent chance that Senator Menendez --

1        THE COURT:  I understand your point.  You can write it

2    to me.  I don't know what the chance is.  I just know what her

3    knowledge or lack of knowledge was; I think she testified to

4    it, but you can write me whatever you want.  I'm going to give

5    the jury, when they come in, an instruction limited as to law

6    enforcement techniques are not their concern.  I've read a

7    couple of articles, actually, given the popularity of the show

8    called -- is it CIS criminal --

9        MR. FEE:  CSI.

10        THE COURT:  CSI, that juries now think there should be

11    all of this fingerprints on shell casings, and when it's not

12    there, they think something's missing.  Well, I'm going to tell

13    them that's not their issue.

14        Mr. Lustberg.

15        MR. LUSTBERG:  My only concern, your Honor, is that

16    we're right in the middle of a different witness, and it's

17    important to understand that you're not commenting to this jury

18    about the current witness that's on the stand.

19        THE COURT:  I'll let them know that.

20        MR. LUSTBERG:  Yes.

21        THE COURT:  Thank you.

22        I wanted to deal with staffer No. 1, but we'll do that

23    on a break.  Let's bring this jury in.

24        As a matter of fact, I think the closet is Mr. Fee's

25    favorite room in the house.

O66Wmen1

1           MR. FEE:  I'm not going to pick that one up, your

2    Honor, publicly at least.

3               (Continued on next page)

O66Wmen1

1          (Jury present)

2          THE COURT:  Good morning.

3          Please be seated in the courtroom.

4          Good morning, ladies and gentlemen.  We were dealing

5   with legal matters.  I appreciate your being here on time.

6          I did want to tell you something.

7          You remember yesterday there was a witness, Dr. Davis,

8   and there was some discussion about what was tested, what

9   wasn't tested.  Ladies and gentlemen, the government is not on

10  trial here.  The defendants are on trial.  Law enforcement

11  techniques -- that is, what techniques the government uses,

12  what techniques it doesn't use -- are of no concern to the

13  jury.  The government's choice of investigative techniques is

14  simply not an issue for the jury.  Your job is to determine

15  whether the government has proven the guilt of the defendant

16  you are considering beyond a reasonable doubt.  All right?  Is

17  that clear?

18          The government is not on trial.  Its choice of

19  investigative techniques is not at issue for the jury.

20          Thank you.

21          Let's continue with the cross-examination of our

22  witness.

23  RACHEL GRAVES, resumed.

24          THE COURT:  Agent, you realize you remain under oath,

25  correct?

1    THE WITNESS:  Yes, I do.

2    THE COURT:  Mr. Fee, your witness.

3    MR. FEE:  Thank you.

4    CROSS-EXAMINATION CONTINUED

5    BY MR. FEE:

6    Q.  Good morning, Agent Graves.

7    A.  Good morning.

8    Q.  You testified you were on a public corruption squad with

9    the FBI?

10   A.  Yes.

11   Q.  That's a group of agents that focuses on potential

12   violations of laws related to public corruption?

13   A.  Yes.

14   Q.  Is it the squad that investigated the case that's been

15   charged here?

16   A.  The squad that I am on, currently on?

17   Q.  Yes, the one that you're on.  Sorry.

18   A.  Yes.

19   Q.  There are lead case agents on this case?

20   A.  Yes, there are.

21   Q.  On your squad?

22   A.  Yes.

23   Q.  And you are not one of the lead case agents, right?

24   A.  I'm not part of the case investigation.

25   Q.  Got it.

O66Wmen1                        Graves - Cross

1      You have spoken with those lead case agents before,

2  correct?

3  A.  In life, yes.

4  Q.  In life.  In life.

5      How many are there?

6          MR. MONTELEONI:  Objection.

7          THE COURT:  If she knows.

8  A.  I know of four.  I think it's changed over time.  I'm not

9  sure currently how many.

10 Q.  Have you ever spoken to any of those four about any aspect

11 of this case?

12 A.  No, besides being a summary witness.

13 Q.  Meaning one of them or one or more of them came to you and

14 said can you be a summary witness in this case?

15 A.  I believe my supervisor asked me, and then I was on a call

16 with the prosecutors and one of the case agents.

17 Q.  And have you spoken with those case agents since to get an

18 understanding of the allegations in this case?

19 A.  No, I have not.

20 Q.  Did you ever suggest to them that the case agents would be

21 better suited to be summary witnesses in this case?

22         THE COURT:  Sustained.

23 BY MR. FEE:

24 Q.  Briefly on how you went about doing your work with the

25 prosecutors, the first step, you were given exhibits to review

1    by the prosecutors?

2    A.  I was given exhibits along with a summary chart that -- so

3    I was guided by the summary chart to know what exhibits to look

4    at.

5    Q.  Got it.

6        So you get the chart and a bunch of exhibits at the same

7    time, correct?

8    A.  Yes.

9    Q.  Any idea, or do you remember about how many exhibits you

10   got, let's say in terms of page count?

11   A.  The amount of documents I was given or the amount of --

12   like just government exhibits?

13   Q.  What else were you given besides government exhibits?

14   A.  I guess I'm thinking just -- I guess could you repeat the

15   question so I can understand it?

16   Q.  I'm sorry.

17       What did they give you?

18   A.  They gave me summary charts and then government exhibits to

19   match up the summary chart information.

20   Q.  Were the government exhibits they gave you hundreds of

21   pages, thousands of pages, if you know?

22   A.  Hundreds and thousands of pages, depending on the exhibit.

23   Q.  And these were all electronic or a mix of paper and

24   electronic?

25   A.  Everything was electronic.

O66Wmen1                        Graves - Cross

1    Q.  Did you review every page of those exhibits?

2    A.  No, I did not.

3    Q.  Tell me how you went about reviewing those exhibits.

4    A.  I would look at the chart, I would see the date and time,

5    see the information, look at the exhibit number, bring up the

6    exhibit.  If everything kind of had a date and time, so I would

7    look within that exhibit to narrow down that timeline and look

8    at that date and time to confirm the information.

9    Q.  So fair to say that sometimes you could go to an exhibit

10   and find just the one thing that you needed to look at?

11   A.  Yes.

12   Q.  But perhaps there were other times where you had to scroll

13   around an exhibit to familiarize yourself with it and locate

14   what you needed?

15   A.  Yes.

16   Q.  The summary chart, summary chart you were given first, was

17   that the chart you presented here to the jury?

18   A.  No.  There were a series of edits.  Most of it was the

19   same, but there are changes when I would go through, and maybe

20   there was a date or time difference.

21   Q.  If you remember, is it the case that sometimes a new draft

22   of the chart would cite a different government exhibit?

23   A.  I don't recall.

24   Q.  Do you remember getting a revised chart and having to go

25   look at a new exhibit ever?

O66Wmen1                         Graves - Cross

1    A.  I remember getting a revised chart.  I don't know exactly

2    if it was new information in the chart or new exhibits

3    associated.

4    Q.  It was a lot of work, fair to say?

5    A.  Yes.

6    Q.  Generally, did you spot inaccuracies in the draft summary

7    charts?

8    A.  Generally, no.

9    Q.  Were there any edits that you conveyed during the course of

10   this work?

11   A.  Yes, there were.

12   Q.  And how did you share them with the prosecutors, generally?

13   A.  Generally --

14   Q.  -- phone call?

15   A.  Phone call.  I would highlight the cell, if it was -- if

16   all the information was accurate, I would put a V at the end,

17   stating verified, and if not, it would be left blank.

18   Q.  And just to clarify, when I say inaccuracies, just like

19   sort of minor errors, like a date needed to be changed or a

20   typo or something like that; fair to say?

21   A.  Fair.

22            MR. FEE:  Let's just talk about the phone calls that

23   you reviewed on the chart that has been put into evidence here.

24   To bring up one example, Mr. Kelly, if we could put up line 26

25   on Government Exhibit 1303, please.

O66Wmen1                         Graves - Cross

1    Q.  So Agent Graves, the bottom row, this is one of the many

2    calls you testified about on the chart, and it shows a May 28,

3    3:12 p.m. Eastern call from Nadine Arslanian to Senator

4    Menendez, lasting five minutes, 48 seconds, right?

5    A.  Yes.

6    Q.  And I think Government Exhibit 6A-112, that's the cited

7    exhibit here?

8    A.  Yes.

9    Q.  Do you remember that being, like, the multiple

10   thousand-page call record of Nadine?

11   A.  Yes, that was a lengthy exhibit.

12   Q.  Yes.  For one of her phones, right?

13   A.  Yes.

14   Q.  Not the flip phone, the other phone?

15   A.  This, I believe -- I would need to look at it to say for

16   certain, but I believe 6A-112 was the longer, and that was her

17   regular cell phone.

18   Q.  Got it.

19       Now, obviously, given the length of that exhibit, there

20   were a lot of phone calls between Senator Menendez and Nadine

21   that did not end up on the chart, correct?

22   A.  Yes.

23   Q.  From that particular exhibit.  I'm sorry.  Correct?

24   A.  Yes.

25   Q.  I have no idea if you've ever counted, but does it sound

O66Wmen1                         Graves - Cross

1  fair to estimate that on the chart, 1303, there are about 40

2  phone calls between Nadine and Senator Menendez throughout the

3  entire chart?  Does that sound about right?

4  A.  I don't know.  I didn't count.

5  Q.  Does it seem like less than a hundred to you, if you have

6  any sense?

7          THE COURT:  I don't want the jury to have here a guess

8  from you.  You're certainly entitled to estimate if you feel

9  you can estimate.

10  A.  I wouldn't want to give a number.

11  Q.  Fair enough.

12  A.  I didn't really --

13  Q.  Fair enough.

14  A.  -- count.

15  Q.  Have you ever counted, in GX 6A-112, how many phone calls

16  there are between Nadine and Senator Menendez during the period

17  reflected on this chart?

18  A.  During a period I did do a count.  I don't know if it was

19  the entirety -- entire period of this chart.  There were a lot

20  of dates.

21  Q.  For sure.

22      Do you remember the count, the number you hit?

23  A.  On the 6A-112, approximately 282.

24  Q.  Calls?

25  A.  Calls.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  Between the two of them?

2       And have you ever --

3   A.  And that was just between a specific time frame.  That was

4   not in the entire exhibit.

5   Q.  Got it.

6   A.  I can't recall the specific time frame.

7   Q.  Got it.

8       Are you aware whether or not there are thousands of calls

9   between Bob and Nadine on the entire exhibit?

10  A.  I do not know.

11  Q.  OK.  Let's talk generally about the texts and the emails on

12  this chart, 1303.

13      Fair to say that based on your work on this chart and

14  reviewing the exhibits, you obviously can't say whether the

15  recipient of any email or text actually read that thing; is

16  that fair to say?

17  A.  That's fair to say.

18  Q.  And obviously, given your role here, you can't say whether

19  the person who got a text or an email read it carefully or

20  skimmed it; fair to say?

21  A.  Fair to say.

22  Q.  And then the same is true with voice mails in general.  You

23  can see the voice mail on the chart, you can confirm its

24  accuracy, but there was nothing you reviewed that indicated

25  whether somebody actually listened to the voice mail.  Is that

1    fair to say?

2    A.  I don't know whether they listened to the voice mails.

3           MR. FEE:  If we bring up row 360 on page 22 of 1303.

4    Q.  So also fair to say, Agent Graves, that in your work on

5    this chart and the exhibits, you don't have any idea of the

6    content of deleted items, files, texts, emails, correct?

7    A.  No.  They show up -- I forget if it says deleted file or

8    what the actual verbiage is on GX C115-3.  So it's noted

9    something is sent, but the content, content of what was sent

10   I'm unable to see.

11   Q.  Got it.

12        So on that underlying exhibit, there's, like, a column that

13   says deleted, yes or no, is that your memory?

14   A.  I would need to look at it and know the format.

15   Q.  In any event, you're not one of those FBI folks who

16   extracts the data from the phone and prepares those reports,

17   right, not your area?

18   A.  Not my area.

19   Q.  On this one, it says WhatsApp.  It's Parra to Hannah,

20   WhatsApp, and it says sends file now deleted and then it cites

21   that exhibit.  Do you see that, Agent Graves?

22   A.  Yes, I do.

23        Sorry.

24           MR. FEE:  For the record.

25           Mr. Kelly, can we bring up the cited exhibit, C115-3

O66Wmen1                        Graves - Cross

1    and focus in on the one that has this deleted attachment.

2    Q.  So the chart says sends file, now deleted.  Those words are

3    not on the underlying exhibit, correct?

4    A.  Those exact words are not.

5    Q.  Right.  And that was -- you or the prosecutors who put

6    those words in the summary chart?

7    A.  The prosecutors.

8    Q.  In any event, though, it does reflect something was deleted

9    by the sender in the underlying exhibit, right?

10   A.  Yeah.  It says deleted by the sender.

11   Q.  So perhaps it's obvious, you don't know what was actually

12   attached here before it was deleted, right?

13   A.  No.  There's a title of a file, but underneath it says

14   empty file.

15   Q.  And were you provided with anything in your work on this

16   chart where you were able to determine what that file title

17   described?

18   A.  No, I was not.

19   Q.  So just from your work, you don't have any idea what was

20   sent here, right?

21   A.  I do not.

22   Q.  Was this among the things you noted for the prosecutors may

23   not be accurate because you don't know what was actually sent?

24   A.  Can you repeat the question?

25   Q.  Sure.  When this was included on the chart, did you raise

1    any concern about its inclusion given that you have no idea
2    what was deleted from this message?
3    A.  No, I did not.
4              MR. MONTELEONI:  Objection.
5              THE COURT:  Sustained as phrased.
6              It states deleted, correct?
7              THE WITNESS:  It states deleted.
8              THE COURT:  And you saw that it was deleted.
9              THE WITNESS:  Yes.
10             THE COURT:  All right.
11             MR. FEE:  Let me just, one last one.
12   Q.  Do you have any understanding from your work on this chart
13   about the purpose of including that message if the file is
14   deleted?
15             THE COURT:  I'll allow it.
16   BY MR. FEE:
17   Q.  You can answer.
18   A.  Can you repeat the question?
19   Q.  Sure.  From your work on the chart, do you have any idea as
20   to the purpose of including this message if the file was
21   deleted?
22   A.  I do not know.
23             MR. FEE:  We can put that down.
24   Q.  So we talked yesterday, but let me ask, during your review
25   of this chart and the exhibits, did you identify any text

O66Wmen1                          Graves - Cross

```
 1   messages that were orphans, meaning they were divorced from
 2   other messages to which they were responding?
 3              THE COURT:  Sustained.
 4   BY MR. FEE:
 5   Q.  Did you ever raise, during your review on this chart, a
 6   question about whether there was appropriate or fair context
 7   for messages put on the chart?
 8              MR. MONTELEONI:  Objection.
 9              THE COURT:  I'll allow it.  She's indicated what her
10   job was.
11   A.  I just reviewed the chart for its accuracy.  I didn't ask
12   questions about what was in the chart or why it was in the
13   chart.
14   Q.  And accuracy means, like, within the four corners of each
15   entry, if that makes sense, is that right?
16   A.  I would look at the chart; see what was stated; make sure,
17   if it was a text message, that word for word that's what it
18   said; the time was right; the date was right.  Very factual.
19   Q.  Understood.
20       Factual, but not factual in the sense that you didn't
21   compare messages against one another, correct?
22              THE COURT:  Sustained.  I just don't understand the
23   question.
24              MR. FEE:  Fair enough.
25   Q.  You didn't compare the chart as a whole to see if you
```

1   understood every entry in sequence?

2            MR. MONTELEONI:  Objection.

3            THE COURT:  If she can answer.

4            You may answer if you can.

5   A.  That wasn't part of my assignment.

6            MR. FEE:  Thank you for doing that.

7            Let's just look at rows 426 to '29 starting at page

8   26.  There you go.

9   Q.  This is a part of 1303 that the bottom row and then the

10  top -- the bottom row is 426 on one page and then the top three

11  rows of the next page continues.  Do you see that, Agent

12  Graves?

13  A.  Yes, I do.

14  Q.  Here, we have Fernando Barruos, on March 4, texting Uribe

15  and then there's three more exchanges between them.  Do you see

16  that?

17  A.  Yes, I do.

18  Q.  And Barruos says is everything under control?  Uribe says

19  no.  Barruos says is there anything I can do to help?  Uribe

20  says no, brother, I'm here trying.  Do you see that, Agent

21  Graves?

22  A.  Yes, I do.

23  Q.  And then everything but the "no," based on how you

24  described this chart, has been translated from Spanish?

25  A.  Yes.  The typed text within brackets is the translation.

O66Wmen1                        Graves - Cross

1  Q.  OK.  Let's back up to see what preceded this exchange on

2  March 4.  So here, you see we have a page leading up to message

3  426, or row 426.  Do you see that, Agent Graves?

4  A.  Yes, I do.

5  Q.  And so the preceding exchanges on your chart, or on the

6  chart, excuse me, are between Bienvenido Hernandez and José

7  Uribe in rows 415 through 425.  You see that, right?

8  A.  Yes, I do.

9  Q.  And then it switches to Barruos and Uribe on 426, correct?

10 A.  Yes.

11 Q.  And then if you look at the content of 415 through 425, it

12 says -- first it has Hernandez giving the address of Critchley,

13 Kinum & DeNoia LLC -- and you recall testifying on direct,

14 Agent Graves, that there was an entry indicating that one of

15 the attorneys hired here was Michael Critchley, is that

16 correct, if you recall?

17 A.  I recall Michael Critchley was an attorney that was

18 representing someone in the chart.

19 Q.  Just from your review, you don't know who hired him or why,

20 obviously?

21 A.  I do not.

22 Q.  OK.  So here's a Critchley office address.  Hernandez then

23 says, in 416, on Monday.  Uribe says I'm going alone.  They

24 then continue, and then at 422, Uribe tells Hernandez:  It's

25 just so we can talk about Monday.  I'll let you know after

1    church.  And then when we get to March 4, in row 424, Uribe

2    tells Hernandez I'm already in his office.  Do you see that,

3    Agent Graves?

4    A.  Line 424?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And then Hernandez appears to respond to say this is the

8    address, and it's at 1 p.m.  Do you see that in line 425?

9    A.  Yes.

10   Q.  And in row 415, Hernandez, it's the same time and he uses

11   the word "address" again.  Do you see that, 1 p.m., and here's

12   the address, in 415?

13   A.  Yes.

14   Q.  So then you get to 426, where Barruos tells Uribe, who has

15   just -- Uribe has just said I'm already in his office, and then

16   the chart switches to Barruos asking Uribe about, at 2:28 p.m.,

17   and that's about one hour after Uribe says I'm already in his

18   office.  Do you see that, Agent Graves?

19   A.  Yes, I do.

20              MR. FEE:  Let's put up 426 through '29 again, please.

21   Q.  And so he says is everything under control?  Uribe says no.

22       Agent Graves, just from your review of this portion of the

23   chart, or any other part of the chart, you would agree that the

24   suggestion of these entries is that Barruos is talking to Uribe

25   about his meeting at the office?

1          MR. MONTELEONI:  Objection.

2          THE COURT:  I'll allow it, as to suggestion -- that

3    is, sustained to the objection.  Sorry.

4          MR. FEE:  Oh, sustained.  Got it.

5    Q.  Agent Graves, you see the succession of messages where

6    they're talking about a meeting at Critchley's office, correct?

7    A.  At someone's office.

8    Q.  At someone's office with the address of Critchley Kinum and

9    something?

10   A.  Yes.

11   Q.  And then the immediately succeeding messages in this chart

12   is Barruos asking Uribe is everything under control, right?

13   A.  Yes.

14         MR. FEE:  So let's look at the underlying cited

15   exhibit -- it's GX E207-1T -- please.  We can go to page 10 of

16   this exhibit.  And if you could focus in on, let's say, the

17   first two messages.

18   Q.  So Agent Graves, you see this is a text chain between

19   Fernando Barruos and José Uribe?

20   A.  Yes.

21   Q.  Bienvenido Hernandez, that name on the chart, he is not

22   involved in this chain, correct?

23   A.  I don't see his name.

24   Q.  You reviewed this exhibit in confirming the accuracy of the

25   chart, correct?

O66Wmen1                         Graves - Cross

1   A.  Yes, I did.

2   Q.  Just from looking at this here, these messages do not

3   reflect a group chat, right?

4   A.  No.  I just see two.

5   Q.  Just two?

6   A.  A sender and a receiver.

7   Q.  Got it.

8       And then here, the messages that are on the chart, or some

9   of them, is everything under control, I think that was row 46,

10  correct?

11  A.  I'd need to look at it side by side just to confirm.

12  Q.  I won't do that to you.

13      Do you remember seeing the words "is everything under

14  control" on the chart --

15  Q.  -- 1303?

16  A.  Yes.

17  Q.  And then you have the "no" here, so that's from -- you see

18  there was a "no" response to those words on the chart, correct?

19  A.  Yes, I believe so.

20  Q.  And then if we go to the third message, the very next

21  following message, again, you saw the words "is there anything

22  I can do to help" on the chart, right?

23  A.  Yes.

24          MR. FEE:  So let's pull back out, Mr. Kelly, and look

25  at what precedes the messages on the underlying exhibit, the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen1                          Graves - Cross

1   full text chain.  Let's go back to, say, page 5 of this exhibit

2   and work our way forward.  And if we can just sort of cut out

3   the white space so we can see what they're talking about.

4   Q.  First, we have:  Call me, Bori Bori's vehicle broke down.

5   That's Uribe to Fernando.  Next Barruos says:  Call me.  I'm

6   awake.  Next:  Sammy is going to pay me for this.  I bet the

7   joints/couplings haven't been checked in a long time.

8       Do you see that, Agent Graves?

9   A.  I do.

10  Q.  Did you see anything in connection with your work on the

11  chart that reflected whether Uribe and Barruos were involved in

12  any sort of trucking business together?

13  A.  I don't recall.

14          MR. FEE:  Let's go to the next page.  So there are

15  some attachments.  We don't have to zoom in.  They're too hard

16  to see.

17  Q.  Good morning, you can see there, Agent Graves?

18  A.  Yes.

19          MR. FEE:  Let's go to the next page.  You don't have

20  to zoom in.

21  Q.  Can you see those chains, or is it too small?

22  A.  I can -- I can see them.

23          MR. FEE:  Why don't we cut out the white space,

24  Mr. Kelly, put more of them on the page, just to speed it up.

25  Q.  Do you see those exchanges, Agent Graves?

O66Wmen1                        Graves - Cross

1    A.  I do.

2    Q.  Again, nothing about a meeting at a lawyer's office here,

3    fair to say?

4              MR. MONTELEONI:  Objection.

5              THE COURT:  I'll allow it.  From those words:  "I'm

6    going to finish here so I can make the move with Bori.  I

7    already got an appointment and good morning.  I already woke

8    up."

9    Q.  In those words you don't see any reference to a meeting?

10   A.  They reference an appointment.

11   Q.  Got it.  I already got an appointment for tonight, and

12   that's the date of March 4 of 2019, right?

13   A.  Yes.

14   Q.  Not European dating, American-style dating?

15             MR. MONTELEONI:  Objection.

16   Q.  Do you know?

17             THE COURT:  Yes.  Make it a question.

18             MR. FEE:  Yes.

19   Q.  Do you know if 3/4, 2019 on these records indicates March 4

20   or April 3?

21   A.  I believe it reflects March 4.

22             MR. FEE:  Got it.

23             So let's pull back out, Mr. Kelly.  Continue forward.

24   OK.  We see that.

25   Q.  See those words, Agent Graves?

1    A.  Yes.

2              MR. FEE:  Keep going, Mr. Kelly.

3              Was it solved?  Yes, I already solved it.

4              Keep going.

5    Q.  I took 24, do you see that, Agent Graves?

6    A.  Yes.

7              MR. FEE:  OK.  Keep going.

8    Q.  It says GA or NC with a question mark in sort of the

9    translation.  Do you see that?

10   A.  Yes.

11             MR. FEE:  Continue, please.

12   Q.  NC let.  Again, did you see any records in your work on the

13   chart that reflected business involving Georgia or North

14   Carolina for Barruos and Hernandez?

15   A.  I don't recall.

16             MR. FEE:  All good.

17             Next page.  You don't have to zoom in.  Oh, here we

18   go.

19   Q.  Now we're back at the words we saw on the chart:

20   Everything under control?  No.  Is there anything I can do to

21   help?  Correct?

22   A.  Yes.

23   Q.  In fact, if we zoom in, the dating nomenclature or the

24   dating style still has 3/4, 2019?

25   A.  Yes.

O66Wmen1                          Graves - Cross

```
 1              MR. FEE:  If we pull back out and go back to the
 2    chart, 426 to 429, Mr. Kelly.
 3    Q.  Agent Graves, in the messages you just reviewed it doesn't
 4    refer to any meetings with lawyers, fair to say, the messages
 5    you just reviewed?
 6              MR. MONTELEONI:  Objection.
 7              THE COURT:  Do you know whether or not there was
 8    reflected a meeting with lawyers?
 9              THE WITNESS:  I don't know what they were referring
10    to.
11    BY MR. FEE:
12    Q.  Did you see the word "lawyers" in those messages?
13    A.  I did not see the word "lawyer."
14    Q.  Did you see the name Critchley in those messages?
15    A.  I did not.
16    Q.  When you reviewed this portion of the chart, was this among
17    the things you cited as potentially inaccurate for the
18    prosecutors, these entries, 426 to 429, if you remember?
19    A.  As far as verifying the information and date and time?
20    Q.  Anything.
21    A.  I -- I would have to look at the different versions.  That
22    was the only thing that I would raise, if there was a
23    discrepancy in the date, time or text context.
24              MR. FEE:  I understand.  Let's go to rows --
25              THE COURT:  In other words, if there were a
```

O66Wmen1                    Graves - Cross

1    discrepancy between what was on the chart that the prosecutors

2    provided you with and the document that they cited as the

3    underlying document that supported what was on the chart.

4            THE WITNESS:  Yes.

5            THE COURT:  OK.

6            MR. FEE:  Let's go to last one of these, 484.  Let's

7    go there and highlight through 593 of GX 1303.  I think it

8    starts on page 33.

9    Q.  584 is right at the bottom of this page.  And it's -- so

10   this is Uribe to Hernandez on April 2, in translation, reading:

11   I have a friend whose car is going to be delivered to her.

12   I'll tell you what she...later on.  Do you see that, Agent

13   Graves?

14   A.  Yes, I do.

15           MR. FEE:  Can we just show what is next in the chart?

16   Well, show actually all the way from 584 to '94 first if you

17   can.  Yes, the whole thing.

18   Q.  So '84, and then the next row in sequence is 585, and from

19   585 to row 592, you would agree, Agent Graves, that they're,

20   there are no exchanges between Uribe and Bienvenido Hernandez.

21   A.  As was put on the chart, there are not.

22   Q.  Right.  I'm sorry.  Only on the chart, there's nothing

23   listed between Hernandez and Uribe, right?

24   A.  Between 585 and 592, there are not.

25   Q.  Thank you.

1      But then, so the next exchange between those two men after

2  584 is row 593, right?

3  A.  On the chart, that's the next exchange.

4  Q.  On the chart.  All my questions are on the chart.  I'm

5  sorry.

6      April 3, 2019, 10:24 a.m., Uribe sends a WhatsApp:  Good

7  morning, I did everything on this side.  I need 15K cash this

8  afternoon, right?

9  A.  Yes.

10 Q.  So step one, just on this chart, this portion of the chart

11 only that you see on your screen here, step one is Uribe tells

12 Hernandez:  I have a friend whose car is going to be delivered

13 to her.  I'll tell you what she, later on.  That's step one.

14 And just on this portion of the chart, step two between those

15 two men is an April 3 WhatsApp saying, Uribe again to

16 Hernandez:  Good morning, I did everything on this side, I need

17 15K cash this afternoon.  You agree with that just from this

18 portion of the chart, correct?

19 A.  Just from this portion of the chart, those are the two

20 exchanges between José Uribe and Bienvenido Hernandez.

21     MR. FEE:  Thank you.  And so the cited exhibit is GX

22 E105-1T.  Let's pull that up and go to page 2.

23     OK.  You can zoom in on that one -- well, actually,

24 zoom out again.

25 Q.  Is this what you were referring to; it says deleted by the

O66Wmen1                         Graves - Cross

1    sender, in blue up here, Agent Graves?  I'm sorry.  You see

2    that it says deleted by the sender?

3    A.  I do.

4    Q.  You saw other messages like that across the phone and text

5    message records you had reviewed?

6    A.  Yes, I've seen it.

7    Q.  And there was noplace -- there was no other records shown

8    to you where the deleted messages were recovered, is that fair

9    to say?

10   A.  Not that I recall.

11   Q.  Not that you know of.  OK.

12        So here's the message with the words you saw on the chart.

13   Uribe says to Bien, and that's Bienvenido Hernandez?  In the

14   work you did on the chart, Bien also referred to Bienvenido

15   Hernandez?

16   A.  Yes.

17            MR. FEE:  So Uribe to Hernandez:  I have a friend

18   whose car is going to be delivered to her.  I'll tell you what

19   she...later on, and that's April 2, 2019.  Let's put that down,

20   Mr. Kelly.

21            Let's go to the next page in the exhibit.  And then

22   focus, put both of those green messages up top in zoom,

23   Mr. Kelly, please.

24   Q.  So the next message we saw on 1303 is actually at the

25   bottom of your screen right now, Agent Graves, right?

O66Wmen1                      Graves - Cross

1   A.  Yes.

2   Q.  Good morning.  I did everything on this side.  I need 15K

3   cash this afternoon.  That's on the chart, right?

4   A.  Yes.

5   Q.  What the prosecutors did not put in that chart they

6   presented to you is the preceding message, correct?

7   A.  I don't -- I didn't see that in the chart.

8   Q.  And it states:  Believe me, we're doing well.  Uribe tells

9   Hernandez:  That friend of yours is scamming people.  Do you

10  see that, Agent Graves?

11  A.  Yes.

12  Q.  And based on your review of the chart and the underlying

13  exhibits, did you have any understanding whether or not Uribe

14  was referring to a scam where someone was pretending they could

15  influence Senator Menendez's decisions?

16          MR. MONTELEONI:  Objection.

17          THE COURT:  Sustained.

18  BY MR. FEE:

19  Q.  Do you have any understanding from the chart and the

20  exhibits as to what, just from that work, Agent Graves, what

21  the reference to scamming people is?

22  A.  I do not.

23  Q.  And again, I think it's clear now, you did not raise this

24  with the prosecutors as an omission that might render the chart

25  inaccurate, fair to say?

 1                MR. MONTELEONI:  Objection.

 2                THE COURT:  Sustained.

 3     BY MR. FEE:

 4     Q.  Well, in your review of this exhibit, Agent Graves, did you

 5     at any point bring up with the prosecutors the message we're

 6     looking at right now?

 7     A.  I don't recall.

 8                MR. FEE:  You can put that down, Mr. Kelly.

 9     Q.  So there are, if you recall, Agent Graves, there are a

10     number of entries on 1303 that reference the address 41 Jane

11     Drive, Englewood Cliffs, New Jersey; do you remember that

12     address being in the chart?

13     A.  I do.

14     Q.  Maybe not in that exact form, but 41 Jane Drive comes up in

15     the chart?

16     A.  Yes.

17                MR. FEE:  And then let's bring up, just as an example,

18     row 377 of 1303.

19     Q.  Agent Graves, this is a January 29 message from Nadine to

20     Hana, stating 41 Jane Drive, Englewood Cliffs.  You see that,

21     I'm sure?

22     A.  Yes, I do.

23     Q.  And then, I'm sorry -- actually, in the preceding row --

24                MR. FEE:  Mr. Kelly, if you can bring up both at the

25     same time.

O66Wmen1                        Graves - Cross

1    Q.  -- Nadine gives that address after Hana says don't forget

2    to send your address, correct?

3    A.  Yes.

4    Q.  And in your work on this chart, without telling me what the

5    research was, did you conduct any research to confirm or to

6    learn who actually owned the residence at 41 Jane Drive?

7               MR. MONTELEONI:  Objection.

8               THE COURT:  Sustained.

9    BY MR. FEE:

10   Q.  In your work on this chart and the exhibits, did you ever

11   learn the identity of the owner of 41 Jane Drive?

12              MR. MONTELEONI:  Objection.

13              THE COURT:  I'll allow it.

14   A.  I don't recall.

15   Q.  Just sitting here today, you don't know?  You don't know?

16   A.  I -- I don't.

17   Q.  And you would agree that this chart, just 1303, doesn't

18   contain any entry, as you can recall, that indicates that

19   Nadine Arslanian owned 41 Jane, correct?

20              MR. MONTELEONI:  Objection.

21              THE COURT:  Sustained as phrased.

22   BY MR. FEE:

23   Q.  There is no entry on this chart that identifies the owner

24   of 41 Jane, correct?

25              THE COURT:  I'll allow it, if she knows.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen1                    Graves - Cross

A.  Specific documents that show who owned that property?  I
didn't review anything specific.

Q.  And by specific, you mean you could make an inference or a
guess, which you should not do, based on what you see in the
chart, but there's nothing specific here that says who the
owner is.  Is that what you're saying?

A.  There's nothing specific that says who the owner is.

Q.  In your work confirming the accuracy of this chart and
reviewing exhibits, did you review anything that indicated how
long Nadine Arslanian resided at that address, 41 Jane?

          MR. MONTELEONI:  Objection.

          THE COURT:  Sustained.

          MR. FEE:  Basis, your Honor.

          THE COURT:  Sustained.

BY MR. FEE:

Q.  In confirming the accuracy of these entries --

          THE COURT:  If by the basis, there's an assumption in
the question.

          MR. FEE:  OK.

          THE COURT:  But I don't need to set forth the basis.

          Proceed.

BY MR. FEE:

Q.  Agent Graves, did you review any documents preparing this
chart that reflected how long Nadine Arslanian identified 41
Jane Drive as her address, as she does in rows 376 and 377?

1      MR. MONTELEONI:  Objection.

2      THE COURT:  I'll allow it, if she knows.

3  A.  Could you repeat the question?

4  Q.  Sure.  Did you review any documents or records in your work

5  on this chart that reflected how long Nadine Arslanian

6  identified 41 Jane Drive as her address?

7  A.  No.

8      MR. FEE:  So let's go to rows 694 and 695.

9  Q.  So this is April 6 of 2019.  And I'm sorry.  What was the

10 time, if you know, the scope, the time scope of 1303, this

11 chart?

12 A.  I would need to look at the top of the chart.

13 Q.  Is it roughly from July 2016 through November 2022?

14 A.  It might have been prior to July.

15 Q.  OK.

16 A.  I would have to look at the top of the chart to confirm.

17 Q.  All right.  We'll get to that later.

18     This is April 6, 2019, Nadine tells Uribe:  Bob and I are

19 going ho my house.  If you want come by any dime.  He just

20 finished his meeting.  And then a minute later she says:  If

21 you are dropping him him come by 41 Jane Drive, Englewood

22 Cliffs.  Do you see those messages, Agent Graves?

23 A.  Yes, I do.

24 Q.  And when you confirmed the accuracy of the entry that's row

25 at 694, did you take any steps to confirm whether Arslanian,

O66Wmen1                        Graves - Cross

1   when she referred to my house, what she was referring to?

2                   MR. MONTELEONI:  Objection.

3                   THE COURT:  I'll allow it.

4   A.   In confirming this chart, I just looked at the government

5   exhibits that are referenced in the chart.

6                   MR. FEE:  OK.  Thank you.

7                   Let's go to row 1050 of 1303.

8   Q.   This is later.  You remember testifying about or being

9   asked by the prosecutor to read this row during your testimony,

10  Agent Graves?  Maybe not.

11  A.   Yes, I believe --

12  Q.   And --

13  A.   I believe I read that.

14  Q.   I'm sorry to speak over you.

15       And Uribe says:  He called me to his apartment after

16  meeting with others.  Again, just from your work on this chart,

17  do you have any understanding of who he refers -- is referring

18  to in this message?

19  A.   I do not.

20                  MR. FEE:  You can leave this up, Mr. Kelly.

21  Q.   Do you know from your work on this chart and exhibits

22  whether 41 Jane Drive is a home or an apartment?

23                  MR. MONTELEONI:  Objection.

24                  THE COURT:  I'll allow it, allow her to answer if she

25  can.

O66Wmen1                          Graves - Cross

1   A.  I don't know.

2   Q.  Do you remember looking at photos on direct of a home?

3   A.  The only one I can recall is a car parked in front of a

4   driveway.

5   Q.  Got it.

6       Right.  And did you see a house in that photo, if you can

7   remember?

8   A.  There's a driveway, like, with a garage, possibly attached

9   to a house.

10  Q.  Fair enough.

11      Do you remember being asked questions on direct about José

12  Uribe having a meeting with Senator Menendez?

13  A.  I would need to look back --

14  Q.  No worries.

15  A.  -- just to confirm.

16  Q.  Let me ask this.  Based solely on your work on this chart

17  and the exhibits you reviewed, did you see anything indicating

18  what happened at any meeting, if any, between Uribe and Senator

19  Menendez?

20           MR. MONTELEONI:  Objection.

21           THE COURT:  Are you aware of any meeting between Uribe

22  and Menendez?  Yes or no.

23           MR. FEE:  For you.

24           THE COURT:  Are you aware of any meeting between Uribe

25  and Menendez?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen1                    Graves - Cross

1    A.  I would have to look at the chart again.  Just because

2    there's so many different people, I don't want to say one way

3    or the other.

4    Q.  Understood.

5        Understanding you can't recall that, the answer to that

6    question, maybe a broader question.  Do you recall sitting here

7    today having reviewed on this chart or any of the exhibits you

8    actually reviewed any reference to the substance of any

9    conversation between Uribe and Senator Menendez --

10            MR. MONTELEONI:  Objection.

11   BY MR. FEE:

12   Q.  -- if you remember?

13            THE COURT:  If she remembers.

14   A.  I don't recall.

15            MR. FEE:  You can put that down.

16            Let's look at row 31 of 1303, please.  Actually, you

17   can leave it unzoomed.  Let's go to the very top of the chart,

18   row 1.  Sorry, Mr. Kelly.

19   Q.  So the first entry is December 16, 2016.

20            MR. FEE:  You don't have to zoom in, Mr. Kelly.

21   Q.  Do you see that, Agent Graves?

22   A.  Yes, I do.

23   Q.  I'm just looking for the first thing on this chart that

24   reflects Nadine and Senator Menendez talking.  Not here, right,

25   Agent Graves, on page 2?

O66Wmen1                          Graves - Cross

1    A.   You mean conversations between or some kind of contact

2    between those two individuals?

3    Q.   Yes.

4    A.   OK.

5    Q.   So here, we have a phone call on the bottom row?

6    A.   Yes.

7    Q.   And obviously, you don't know if they actually did that,

8    but it's the two phones assigned to those two users are

9    speaking together, are connecting; that's what's reflected

10   here, right?

11           THE COURT:   What line are you on?

12           MR. FEE:   Row 26, your Honor.

13   A.   Yes.

14   Q.   That's the first one in your chart between Nadine and

15   Senator Menendez, correct?

16   A.   Correct.  I didn't have a good chance to look at the first

17   page.

18   Q.   I'm sorry.

19   A.   Just to confirm.

20           MR. FEE:   Go back.

21           THE COURT:   Take a look at the first page, and the

22   second page.

23   A.   I can go to the second page.

24       Yes.  As reflected on the chart, that is the first --

25   Q.   OK.

O66Wmen1                    Graves - Cross

1    A.  -- communication between those two.

2            MR. FEE:  Let's find the first text message.  If you

3    can go forward, Mr. Kelly.

4    Q.  So Agent Graves, is it correct that row 27 has a voice mail

5    between -- I'm sorry.  That's Hana and Nadine.  It's row 31,

6    has a text?

7    A.  Yes.

8    Q.  So that's the first text?

9    A.  Yes, as reflected in the chart.

10   Q.  And the exhibit cited in row 31 is A101-104, correct, Agent

11   Graves?

12   A.  Yes, it's one of two government exhibits.

13   Q.  Right.  Sorry.  101-104 and A101-N.

14       And A101-104, if you recall, Agent Graves, is an excerpt,

15   is a portion of a longer set of text messages between Nadine

16   and Senator Menendez, correct?

17   A.  I believe so.  I would like to look at it just to confirm.

18   Q.  Sure.  So GX A101 is not cited on this chart.

19       Do you know if it's cited on this chart, just GX A101?

20   A.  I don't know if it's cited.

21   Q.  You testified that you viewed prior versions of the chart,

22   right?

23   A.  Yes.

24           MR. FEE:  All right.  So let's look at row 86 of this

25   chart, GX 1303.

O66Wmen1                         Graves - Cross

1   Q.   Now, this text message between Nadine and Senator Menendez

2   cites something called GX A101 dash -- is that O or zero?

3   A.   I believe it's O.

4   Q.   OK.  Do you recall that a prior version of the chart you

5   reviewed cited in this message GX A101?

6   A.   I don't recall.

7          MR. FEE:  Can we please just show to Agent Graves and

8   the attorneys what's been marked as 3515-009, if you can find

9   that entry.

10  Q.   Agent Graves, you see that entry?

11  A.   I do.

12  Q.   Just take a look at it.  The only question I have is, does

13  seeing this refresh your recollection that a prior version of

14  the chart cited for that picture of a car GX A101?

15  A.   I just don't know where this document is -- where it's

16  from.

17  Q.   Understood.  Fair to say, you still don't recall whether

18  you reviewed GX A101?

19  A.   I recall that it was possibly the longer document with all

20  of the text messages --

21  Q.   Got it.

22  A.   -- and when it has a dash, it was an excerpt from the

23  longer document.

24  Q.   Got it.

25          And whatever the document was called, you remember

1    reviewing a much longer set of text messages between Nadine and

2    Senator Menendez than just what is cited on this chart?

3            MR. MONTELEONI:  Objection.

4            THE COURT:  I'll allow it, if she knows.

5    A.  If anything was cited on the chart, I reviewed it to make

6    sure that the information was accurate.  I don't recall exactly

7    what every document contained.

8    Q.  Fair to say you reviewed more messages, text messages,

9    between Nadine Arslanian and Senator Menendez than just what is

10   cited on 1303?

11   A.  I just looked at the portions that were cited.  I would,

12   you know, find the date and time, so I don't recall if there

13   were, you know, scrolling past other messages.  But I was just

14   focused on what was in the chart and matching it with the

15   government exhibit.

16   Q.  So you don't recall if there were messages between Nadine

17   and Senator Menendez that are not cited on this chart?

18   A.  There were.

19           MR. FEE:  Can we go back to 1303 and put it up for

20   everyone.  Let's go back to the row we looked at, the first

21   text exchange, 31.

22           So let's zoom out.  So this is the first text

23   exchange.  Let's go to the next page, Mr. Kelly.

24           Same question.  We don't have to zoom in.

25   Q.  Agent Graves, do you see any exchanges between Nadine and

O66Wmen1                          Graves - Cross

1    Senator Menendez here on this page?

2    A.  On this page, no.

3    Q.  And so now we are in August through October, right?

4    A.  Yes.

5            MR. FEE:  Let's go to the next page.

6    Q.  Same question.  Anything between Nadine and Senator

7    Menendez on this page of the chart only?

8    A.  No.

9            MR. FEE:  Next, Mr. Kelly.

10   Q.  Same question.

11   A.  There are calls listed on line 81.  There's another call on

12   line 83.

13   Q.  Got it.  You can stop there.  Thank you, Agent Graves.

14       So between, on this chart, 1303, between that first text

15   message in July, in row 31, and this call between Nadine and

16   Senator Menendez on December 12, 2018, there is nothing on this

17   chart that reflects contact between the two, correct?

18   A.  Yes.

19   Q.  Did you ever discuss with the prosecutors, in preparing

20   this chart, why there was this gap in time that reflected

21   communications between Nadine and Senator Menendez?

22           MR. MONTELEONI:  Objection.

23           THE COURT:  Sustained.

24   BY MR. FEE:

25   Q.  In your review of messages between Nadine and Senator

1    Menendez, do you recall seeing anything that changed about

2    their communications in the late summer and fall of 2018?

3              MR. MONTELEONI:  Objection.

4              THE COURT:  I'm not sure what you mean with your

5    question.

6              MR. FEE:  Sure.  Sure.

7    Q.  So, specifically, when you reviewed the chains of text

8    messages between Senator Menendez and Nadine, did you see any

9    messages reflecting whether or not Senator Menendez broke up

10   with Nadine Arslanian because she was still involved with a man

11   named Doug Anton?

12             MR. MONTELEONI:  Objection.

13             THE COURT:  I'll allow it.

14   A.  I don't recall.

15   Q.  Do you recall seeing any messages where Senator Menendez

16   demanded that Nadine give a ring back to him?

17             MR. MONTELEONI:  Objection.

18             THE COURT:  I'll allow it.

19   BY MR. FEE:

20   Q.  Do you recall?

21   A.  I don't recall.

22             MR. FEE:  Let's just show to Agent Graves and the

23   attorneys what's been marked as exhibits 155 and 156.

24   Q.  If you could review those and wait for me to pose a

25   question, but let me know when you're done.

O66Wmen1                    Graves - Cross

1           MR. FEE:  Not the jury, right?

2    Q.  Have you had a chance to review?

3    A.  Yes.

4    Q.  So my only question is, does reviewing the items in front

5    of you refresh your recollection as to whether Senator Menendez

6    and Nadine broke up in the fall of 2018 and that he asked

7    Nadine to give back a ring he had gifted her?

8           MR. MONTELEONI:  Objection.

9           THE COURT:  I'll allow it.

10   BY MR. FEE:

11   Q.  Does it refresh your recollection as to that?

12   A.  I don't recall reviewing these messages prior to this

13   morning.

14   Q.  You don't think you've seen these?

15   A.  I don't recall seeing them.

16          MR. FEE:  Let's go to rows 80 to 85 of GX 1303 in

17   evidence.  You can make it the full screen, Mr. Kelly.

18          Thank you.

19   Q.  Agent Graves, a moment ago, this is what you identified as

20   the first exchange between Senator Menendez and Nadine, on this

21   chart, since July?

22   A.  Yes, the prior --

23   Q.  What you see here.

24   A.  -- message.

25   Q.  Yes.  I'm sorry.

O66Wmen1                        Graves - Cross

1          And again, just on this chart, I'm asking.

2     A.   Just on the chart, yes.

3          MR. FEE:  So let's zoom in on, let's do 79 to the

4     bottom of that page, please.

5     Q.   So you remember testifying about some of these exchanges on

6     direct with the prosecutor, Agent Graves?

7     A.   Yes, I do.

8     Q.   OK.  So the first one is on December 12.  Nadine tells

9     somebody identified as Ro Sorce, I am four miles away due to

10    two detours.  Do you see that?

11    A.   Yes, I do.

12    Q.   And again, just based on your work on this chart and the

13    exhibits, did you have any understanding of the relationship

14    status between Nadine and Senator Menendez as of December 12 of

15    2018?

16         MR. MONTELEONI:  Objection.

17         THE COURT:  I'll allow it.

18    A.   No, I do not.

19    Q.   And you then see that on December 12, Nadine texts Ro

20    Sorce -- I'm sorry.  So at 7:28, that's the message about I'm

21    four miles away, right, Agent Graves?

22    A.   At 7:28, yes, it says, I am four miles away due to two

23    detours.

24    Q.   Six minutes later, roughly, Nadine then texts Ro Sorce:

25    911, call me.  See that?

O66Wmen1                        Graves - Cross

1   A.  Yes.

2   Q.  And you remember being shown exhibits and rows on this

3   chart that reflected Nadine was in a car accident on the

4   evening of December 12, 2018, right?

5   A.  Yes.

6   Q.  And based only on your work on this chart, is it correct

7   that the first person Nadine contacted after her accident was

8   not Senator Menendez but Ro Sorce?

9           MR. MONTELEONI:  Objection.

10          THE COURT:  I'll allow it as limited to the chart, if

11  you can answer.

12  A.  I don't know.

13  Q.  By the way, in your work on this chart and exhibits, did

14  you come to see any exhibits identifying -- excuse me.

15  Withdrawn.

16      Did you see any exhibits reflecting additional

17  communications between Ro Sorce and Nadine Arslanian?

18  A.  I don't recall.

19  Q.  Again, just in your work on this chart, did you see

20  anything that indicated that they were coworkers?

21          MR. MONTELEONI:  Objection.

22          THE COURT:  If you recall.

23          Do you know who Ro Sorce is?

24          THE WITNESS:  I do not.

25          THE COURT:  Next.

O66Wmen1                    Graves - Cross

1          MR. FEE:  And now, you can pull back out.

2     Q.  Fair to say that after the accident, on this chart, the

3     number of interactions between Nadine Arslanian and Senator

4     Menendez increases?  And if you want to see the other pages,

5     I'm happy to scroll through.

6     A.  If you could scroll.

7     Q.  Yeah, sure.

8          MR. FEE:  Next page, Mr. Kelly.

9     A.  And can you repeat the question, again, just so I'm clear?

10    Q.  Yeah, sure.  Just only on this chart, my question is after

11    the accident on December 12 of 2018, the interactions on this

12    chart between Nadine and Senator Menendez increase?

13    A.  Yes.

14         MR. FEE:  And so that's December 12 of 2018.

15         Let's go to row 379, please, Mr. Kelly.  And -- yeah,

16    that's the one.

17    Q.  So you have Senator Menendez contacting Gurbir Grewal.  Do

18    you see that?  It's a phone call.

19    A.  Yes, I do.

20    Q.  And I can't recall.  Did you testify as to the position of

21    Mr. Grewal?

22    A.  Yes, I believe I -- I read his title on a letterhead.

23    Q.  That's right, that he was the attorney general of New

24    Jersey at that time of the call?

25    A.  At the time of the document.

O66Wmen1                         Graves - Cross

1   Q.  Got it.

2       And this phone call between Grewal and Senator Menendez is

3   only about a month and a half after that car accident on

4   December 12, 2018, is that fair to say?

5   A.  That's fair to say.

6   Q.  So only about a month and a half after Nadine and Senator

7   Menendez's communications on this chart began to increase,

8   correct?

9              MR. MONTELEONI:  Objection.

10             THE COURT:  I think you made a leap there.  Why don't

11  you rephrase it.

12             MR. FEE:  I'll walk away from my leap, your Honor.

13  Let's move on.

14  Q.  So you remember --

15             MR. FEE:  You can put that down, Mr. Kelly.

16  Q.  You remember testifying about a man appearing on this chart

17  with the name of Elvis Parra?

18  A.  Yes, I recall that name.

19  Q.  And do you recall entries relating to a New Jersey State

20  criminal case involving that man, Elvis Parra, on this chart?

21  A.  Yes.

22  Q.  Now, in your work on 1303 and the exhibits you reviewed,

23  did you see anything indicating whether or not Senator Menendez

24  contacted Attorney General Grewal about a potential

25  discriminatory prosecution concern?

O66Wmen1                    Graves - Cross

1          MR. MONTELEONI:  Objection.

2          THE COURT:  Sustained as phrased.

3   BY MR. FEE:

4   Q.  Did you see anything in your work on this chart

5   supplying -- reflecting the reason that Senator Menendez made

6   that phone call to Attorney General Grewal on your chart?

7          THE COURT:  I'll allow it.

8   A.  All I saw is that there was a phone call.  I don't know

9   what the content of the phone call --

10  Q.  Understood.

11  A.  -- was.

12         MR. FEE:  I'm sorry.  I keep clipping off the answer.

13  Q.  Based on your work on this chart and the exhibits, did you

14  see any records indicating that Senator Menendez contacted any

15  New Jersey State trial prosecutors?

16         MR. MONTELEONI:  Objection.

17         THE COURT:  Do you have any understanding of, from

18  this chart, who any New Jersey State trial prosecutor is?

19         THE WITNESS:  No, besides the documents, but I

20  wouldn't recall their names in particular.

21  BY MR. FEE:

22  Q.  OK.  And you did have on the chart some documents from a

23  court case.  You remember that, Agent Graves?

24  A.  Yes, I do.

25  Q.  Did you review anything in your work on this chart that

O66Wmen1                          Graves - Cross

1   reflected Senator Menendez contacting any judges?

2              MR. MONTELEONI:  Objection.

3              THE COURT:  I'll allow it, if she knows.

4   A.  I would need to look at, specifically at points on the

5   chart.

6   Q.  Sure.

7   A.  I don't recall.

8   Q.  Sitting here right now, does anything come to mind?

9   A.  That doesn't help.  It doesn't refresh my recollection.  I

10  would need to look at the chart --

11  Q.  Fair enough.

12  A.  -- just to answer fairly.

13             MR. FEE:  Fair enough.  Let's move on.

14  Q.  Do you know offhand how many entries there are on this

15  chart, 1303, showing any sort of contact between José Uribe and

16  Nadine Arslanian?

17  A.  How many?

18  Q.  How many?

19  A.  I don't know.

20  Q.  You never counted?

21  A.  I don't -- I don't think so, no.

22  Q.  Does the estimate of 350 seem high or low to you, between

23  Uribe and Nadine?

24  A.  I don't know.

25  Q.  Dozens?

1    A.  I don't know.

2    Q.  OK.  More than a handful between Nadine and Uribe, you

3    would agree?

4    A.  Probably more than a handful.

5    Q.  And you read all of those entries on 1303 between Uribe and

6    Nadine, obviously?

7    A.  I verified all of the entries on 1303.

8    Q.  To verify, you had to read them?

9    A.  Yes.

10          MR. FEE:  Let's go to row 698.

11   Q.  And here is one of those where Uribe calls Nadine my

12   sister.  Do you see that, Agent Graves?

13   A.  Yes.

14          MR. FEE:  Let's go to 962.

15   Q.  Here, Uribe refers to her as *hermana*, and that means

16   sister, right?

17   A.  Yes.

18   Q.  In Spanish?

19   A.  Yes.

20   Q.  Did you happen to count how many times Uribe referred to

21   Nadine as sister, *hermana* or *amor*?

22   A.  I did not.

23          MR. FEE:  Let's go to row 1072.  So there's *amor*.

24   Q.  If I told you there are 11 times that Uribe called Nadine

25   sister or *hermana*, would that sound high or low to you, just on

O66Wmen1                        Graves - Cross

```
 1    this chart?
 2              MR. MONTELEONI:  Objection.
 3              THE COURT:  I'll allow it, if she knows.
 4    A.  I don't know.
 5              MR. FEE:  All right.  Let's go -- you can put that
 6    down.
 7    Q.  You are obviously familiar with something called a group
 8    text, right?
 9    A.  Yes.
10    Q.  That's more than two people on the same text chain where
11    everyone can see the messages together, correct?
12    A.  Yes.
13              MR. FEE:  Let's put up rows 659 through 663.
14    Q.  So this is a series of exchanges in April 2019 between
15    Nadine and Uribe.  Do you see that, Agent Graves?  There's one
16    with Hana and then the rest are with Uribe.
17    A.  Yes, 659, 660, 661 and 662, and 663 are between Nadine
18    Arslanian and José Uribe.
19    Q.  And on this chart, where you have one person in the "from"
20    and one person in the "to," that indicates it was not a group
21    chat, fair to say?
22    A.  That's fair to say.
23    Q.  Did you see any messages where both Senator Menendez and
24    Nadine Arslanian were communicating with José Uribe in the same
25    chat?
```

O66Wmen1                    Graves - Cross

1  A.  I don't recall.

2  Q.  Based on the work you did on this chart, how many entries

3  on the chart show a communication of any kind between Senator

4  Menendez and José Uribe?

5  A.  I don't know.

6          MR. FEE:  All right.  Well, let's put up row 1117.

7  Q.  Agent Graves, you would agree that this is the only contact

8  on this chart between Senator Menendez and Uribe?

9  A.  I don't know.

10 Q.  Sitting here right now, can you remember anything beyond

11 this single phone call on October 29 that's reflected in the

12 chart?

13         MR. MONTELEONI:  Objection.

14         THE COURT:  Sustained.

15 BY MR. FEE:

16 Q.  All right.  This is a phone call between Uribe and Senator

17 Menendez lasting two minutes and 41 seconds, right?

18 A.  Yes.

19 Q.  And this chart and the exhibits you reviewed don't give you

20 any sense of the contents of that single phone call, correct?

21         MR. MONTELEONI:  Objection.

22         THE COURT:  I'll allow it.

23 A.  It just lists that there's a phone call between the two

24 phone numbers assigned to the individuals.

25 Q.  Understood.

O66Wmen1                    Graves - Cross

1    And just based on your ability to recall the work you did,

2    you did not identify any texts, any emails between Uribe and

3    Senator Menendez referring to Elvis Parra, fair to say?

4            MR. MONTELEONI:  Objection.

5            THE COURT:  Do you recall any such email?

6            THE WITNESS:  I don't recall.

7            THE COURT:  And when you say you don't recall, what I

8    gather from that is what you're saying is you don't know one

9    way or the other.  Is that right?

10           THE WITNESS:  Yes.

11           THE COURT:  OK.

12   BY MR. FEE:

13   Q.  Same question.  Do you recall in your work on this chart

14   seeing any written communications between Senator Menendez and

15   Uribe, where they discussed Menendez giving attention to any

16   New Jersey State criminal case?

17           MR. MONTELEONI:  Objection.

18           THE COURT:  I'll allow it.

19   A.  I don't recall.

20   Q.  All right.  Nadine Arslanian and Mr. Hana, sitting here

21   today, do you have any idea how many communications are

22   reflected on this chart between Nadine and Mr. Hana?

23   A.  I don't know.

24   Q.  If I told you the number was about 180, would that sound

25   high or low to you?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MR. MONTELEONI:  Objection.

2           THE COURT:  Can you estimate?  Can you estimate the

3    number?

4           THE WITNESS:  I can't estimate.

5           THE COURT:  All right.

6           THE WITNESS:  I don't know numbers.

7           MR. FEE:  Let's look at row 147.

8    Q.  So this is Nadine telling Mr. Hana, in a text, that she

9    just got her phone back and she just rented a car on January

10   22, 2019.  See that, Agent Graves?

11   A.  Yes.

12   Q.  And then she continues:  I haven't been up to much with no

13   car, no phone, no credit card, so I called just to say hi and I

14   thought I just saw your message.  Do you see that?

15   A.  I see so I just called to say hi and I thought I just saw

16   your message.

17   Q.  Right.  And you see no car, no phone, no credit card,

18   correct?

19           THE COURT:  Do you see those --

20   A.  Yes.

21           THE COURT:  -- words no car, no phone, no credit card?

22   Yes or no.

23           THE WITNESS:  Yes, I do.

24           MR. FEE:  Let's go to row 335.

25   Q.  And here is Nadine to Mr. Hana, on January 28, 2019,

O66Wmen1                    Graves - Cross

1    saying:  I'm going to do my nails and call Bob from there.  Are

2    you around at 7:30 to get me from the nail salon in Cresskill.

3    Do you see that, Agent Graves?

4    A.  Yes.

5    Q.  And she concludes with:  And go to the mall.  I have to

6    errands for a Bob but I couldn't or could t rent a car.  It's

7    not going through on my credit card.  Do you see that, Agent

8    Graves?

9    A.  Yes.

10   Q.  Agent Graves, in your chart, did you review any messages

11   where Nadine Arslanian communicated any credit card issues to

12   Senator Menendez --

13              MR. MONTELEONI:  Objection.

14   Q.  -- anything at all?

15              THE COURT:  Sustained as phrased.

16              Did you see any message, to your knowledge, where the

17   words "credit card" were contained in a communication with

18   Mr. Menendez?  Yes or no.

19              THE WITNESS:  I don't remember in particular.

20              MR. FEE:  Fair enough.

21              And just could we focus in on this page, from 335 to

22   340.  We won't do that photo again.

23   Q.  So Nadine, we have that message we just reviewed, and then

24   Hana says:  Send me the address, OK, send me the address.  Do

25   you see that, Agent Graves?

1    A.  Yes.

2    Q.  Two messages down, at 7:21 p.m., in row 338, Hana says:  I

3    have my driver.  He is on the way to pick me up from Park Cafe.

4    Hana says:  You let me know what you want me to do.  Do you see

5    that, Agent Graves?

6    A.  Yes, I do.

7    Q.  And so you would agree, in row 336, Mr. Hana appears, based

8    on these entries in this chart, to be asking Nadine to send him

9    the address for the nail salon in Cresskill?

10           MR. MONTELEONI:  Objection.

11           THE COURT:  Are you able to say one way or the other?

12           THE WITNESS:  I'm not able to say one way or the

13   other.

14   BY MR. FEE:

15   Q.  But you see him say OK, send me the address, right?

16   A.  Yes.

17   Q.  And then you then see, at row 340, Senator Menendez reaches

18   out to Nadine and asks, what's happening in Cresskill?  Do you

19   see that?

20   A.  Yes, I do.

21           MR. FEE:  Let's zoom out, Mr. Kelly, and go a little

22   further down.  Let's go from 342 -- 341 just to 343.  Or just

23   these two.

24   Q.  So Nadine tells him:  I love that you care enough to check

25   up on me.  And then Nadine says to Senator Menendez:  I'm

1   waiting for the Uber to go back home.  Do you see that, Agent

2   Graves?

3   A.  Yes, I do.

4   Q.  And just to be clear, you don't see in this message Nadine

5   mention Will Hana's driver coming to pick her up, do you?

6   A.  No.  She just says she's waiting for the Uber.

7   Q.  So would you agree that at least in this message Nadine

8   seems to be lying to Senator Menendez?

9             MR. MONTELEONI:  Objection.

10            THE COURT:  Sustained.

11            MR. FEE:  You can put that down.

12  Q.  In this chart, in this chart did you review any rows or

13  underlying exhibits that reflected Nadine using the words

14  "financial difficulty" with Senator Menendez?

15            MR. MONTELEONI:  Objection.

16            THE COURT:  Did you see those two words, "financial

17  difficulty"?  As you sit here now, do you remember seeing the

18  words "financial difficulty" in this chart?

19            THE WITNESS:  I don't recall.

20            MR. FEE:  Let's move away from the words.

21  Q.  In your work on this chart and the exhibits you reviewed,

22  did you see anything that reflected Nadine Arslanian asking

23  Senator Menendez for financial assistance?

24            MR. MONTELEONI:  Objection.

25            THE COURT:  Sustained.

O66Wmen1                        Graves - Cross

1   BY MR. FEE:

2   Q.  Does this chart contain any communications, as you can

3   recall having worked on it, that reflect Nadine Arslanian

4   asking Senator Menendez for money?

5           MR. MONTELEONI:  Objection.

6           THE COURT:  I will allow it.

7           Are you able to say?  You may answer if you can.

8   A.  I don't remember specifics.

9   Q.  Understood.

10      Senator Menendez and Mr. Hana, how many communications are

11  there between them on this chart?

12  A.  I don't know.

13  Q.  How about this estimate: zero; does that sound high or low?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  Just a moment.

16          You may answer.

17  A.  I don't know.

18          MR. FEE:  Let's look at row 652 of Government Exhibit

19  1303.  Oh, actually, yes, 649 through 652, please.  Yes.

20  Q.  So you remember being asked a series of questions about the

21  chart and other exhibits, Agent Graves, that focused on Nadine

22  purchasing a Mercedes?

23  A.  Yes, she was looking to buy a Mercedes.

24  Q.  Right.  And you looked at the invoice where she did buy the

25  Mercedes, right?

1    A.  Yes.

2    Q.  So these are some exchanges between Nadine and Senator

3    Menendez and then Nadine and Uribe about signing papers.  Do

4    you see those references?

5    A.  Yes, lines 649 and 650.

6    Q.  And then 652, Nadine tells Senator Menendez:

7    Congratulations.  I'll leave that to you.  We are the proud

8    owners of a 2019 Mercedes, heart emoji.  Do you see that, Agent

9    Graves?

10   A.  Yes, I do.

11   Q.  Do any of the rows or entries in 1303, based on your

12   review, reflect how Nadine paid for that car?

13              MR. MONTELEONI:  Objection.

14              THE COURT:  Sustained as phrased.

15   BY MR. FEE:

16   Q.  Did you see entries in this chart that showed Nadine

17   discussing the payment for the Mercedes?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  I'll allow it.

20   BY MR. FEE:

21   Q.  Do you remember?

22   A.  I recall looking at documents with details of the first

23   payment.  I don't recall if there was communications

24   surrounding that.

25   Q.  OK.

1    A.  Those payments.

2            MR. FEE:  I'm sorry.  Let's look at 592 to 593.

3            I'll stop after this, your Honor, or whenever you tell

4    me to; I'm ready for a break.

5    Q.  592 to 593, do you know just from your work on this chart

6    if Pereldik had anything to do with selling the Mercedes to

7    Nadine?

8    A.  No, I -- I don't know.

9    Q.  OK.  So Nadine, on April 3, says:  Good morning, Leon.  I

10   was with José yesterday and he advised me I'll be coming to

11   pick up the car Friday morning from you.  Could you please let

12   me know who the check will be made out to and what kind of

13   check you need.  Do you see that, Agent Graves?

14   A.  I do.

15           MR. FEE:  Your Honor, do you want to take the break at

16   11 or wait?

17           THE COURT:  No.

18           MR. FEE:  Keep going?

19           THE COURT:  Keep going.

20           About how much longer do you have, sir?

21           MR. FEE:  About an hour.

22           THE COURT:  Keep going.

23           MR. FEE:  The cited exhibit is B115.  Let's bring that

24   up.  We can zoom in on this first one.

25   Q.  So you see, Agent Graves, this is an exchange between

1    Arslanian and somebody with that name Leon Pereldik, and she

2    says:  I'm choosing the black on black C300.  Do you see that?

3    A.  Yes, I do.

4    Q.  And then I was not able to speak to José yesterday, she

5    says.  Do you see that, Agent Graves?

6    A.  Yes.

7              MR. FEE:  And that's on April 1.

8              Let's go down to the next page.  Actually, let's go to

9    pages 10 to 11 of this exhibit.  10, let's start at 10.

10             So -- oh.  It's the prior page.  Sorry.

11   Q.  So this is, the bottom one here is Nadine on April 3,

12   saying:  I will send you a copy of the credit card now.  Do you

13   see that?

14   A.  Yes, at the end of the text.

15             MR. FEE:  And then the next page, Mr. Kelly.

16   Q.  Please give me the exact amount of the bank check.  Do you

17   see Pereldik say that to her?

18   A.  Yes.

19             MR. FEE:  And if we go to the next one, Mr. Kelly.

20   Next page, please.  Next page.

21             And then zoom in on all three.

22   Q.  So they have this back-and-forth.  Nadine says:  The total

23   will be 15,000, but it will be with two different checks.

24   Pereldik says:  No problem.  Both checks are from you.  And

25   Nadine says:  Not sure yet.  One from my dad and one from me or

O66Wmen1                    Graves - Cross

1    from my sister, but we will have it all ready and gotten from

2    the bank tomorrow by 2 o'clock.

3        Do you see those messages, Agent Graves?

4    A.  Yes, I do.

5    Q.  And she says tomorrow.  This is April 3 of 2019, this last

6    message at the bottom of the page, correct?

7    A.  Yes.

8    Q.  And then I think it's on the next page.  Yes.  Again, at

9    the top, the top two messages:  Does it matter if the bank

10   check is from my dad?  Pereldik says:  No, he just needs to

11   sign one piece of paper and include his drivers license copy.

12       You would agree -- Agent Graves, do you see those messages?

13   A.  I do.  There's a portion of the last message --

14   Q.  Yes.

15   A.  -- that wasn't read.

16   Q.  Correct.

17       But you would agree that nothing in these exchanges between

18   Nadine and Pereldik reference Senator Menendez?

19   A.  There's -- he's not named in any of these texts.

20   Q.  And you, sitting here today, didn't include in the chart or

21   see included in the chart any other exhibits that referenced

22   Senator Menendez in connection with that, with paying for that

23   Mercedes?

24           MR. MONTELEONI:  Objection.

25           THE COURT:  I'll allow it, if she can answer.

O66Wmen1                    Graves - Cross

1    A.  I don't recall.

2            MR. FEE:  Let's look at GX 7E-1 in evidence, page 22.

3    Q.  Agent Graves, do you remember reviewing this with the

4    prosecutor on direct?

5    A.  Yes, I do.

6    Q.  And this central portion appears to break down how Nadine

7    paid for the initial deposit on the Mercedes, correct?

8    A.  Yes.

9    Q.  And so there's a thousand cash.

10           MR. FEE:  You can highlight that, Mr. Kelly.

11   Q.  See that, Agent Graves?

12   A.  I do.

13   Q.  And it says 2500 MC, and then it has some other amounts

14   with numbers.  I think you testified account numbers next to

15   it, next to them, correct?

16   A.  Yes.

17   Q.  And the total, you did the math, was 15,000 for all of

18   these?

19   A.  Yes.

20           MR. FEE:  All right.  So let's go to page --

21   Q.  Well, and just to briefly, the 5100, that number, fair to

22   say, ends in 14198?  Can you see that, Agent Graves?

23   A.  Not very clearly.

24   Q.  How about the nine, eight?

25           MR. FEE:  Let's zoom in, Mr. Kelly.

O66Wmen1                        Graves - Cross

1    A.  I could confidently say nine, eight are the last two, but

2    the other digits are difficult to read.

3    Q.  Sure.  Sure.  So it's nine, seven, something, something,

4    something, something, something, nine, eight?

5    A.  Yes.

6            MR. FEE:  Let's go to page 19 of this same exhibit,

7    please.

8    Q.  The top check, do you see on the right-hand side nine,

9    seven, digits ending in nine, eight?

10   A.  Yes, I do.

11   Q.  And then Garbis I. Tabourian is the remitter.  What is the

12   remitter?

13   A.  I believe it's the person that is writing the check.

14   Q.  Do you recognize the name Garbis Tabourian as the dad

15   Nadine was referring to?

16           MR. MONTELEONI:  Objection.

17           THE COURT:  I'll allow it.

18           Do you recognize it one way or the other?

19           THE WITNESS:  I don't recognize it one way or the

20   other.

21   BY MR. FEE:

22   Q.  Did any of your work in preparing the chart reflect

23   Nadine's maiden name, her original birth name?

24   A.  I don't recall.

25   Q.  OK.  So then the next check on this page is from Nadine for

O66Wmen1                    Graves - Cross

1    that 4900 amount out of a PNC Bank account, right, Agent

2    Graves?

3    A.  Yes.

4    Q.  And then the final check is another one from Nadine, and I

5    think you testified it was a TD Bank account, even though it's

6    hard to say?

7    A.  I don't recall.  I'd have to look back at --

8    Q.  OK.  Fair to say this is signed by someone using the name

9    Nadine Arslanian?

10   A.  Yes.

11   Q.  And then the thousand was in cash, right?

12   A.  Yes.

13   Q.  And then I think you testified there was an additional

14   2,500 for the purchase amount done by credit card.  Do you

15   remember that?

16   A.  I would need to look back --

17   Q.  Sure.  Sure.

18   A.  -- for me now --

19          MR. FEE:  Quickly, page 23 of this same set of

20   exhibits.

21   Q.  You see here it's a $2,500, a receipt for a payment of

22   $2,500?

23   A.  Yes.

24   Q.  And then just below --

25          MR. FEE:  We can zoom in, Mr. Kelly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen1                                Graves - Cross

1   Q.  -- it says Chase MasterCard.  Do you see that?

2   A.  Yes.

3        MR. FEE:  And then I think it's -- and if we go, I'm

4   sorry.  This is the last time.  Oh, there it is.

5   Q.  7649 is the last four digits of that credit card, right?

6   A.  Yes.

7   Q.  All right.  So now this credit card was Nadine's.  Are you

8   aware of that from your work on the chart?

9   A.  I don't know.

10        MR. MONTELEONI:  Objection.

11        THE COURT:  She's answered.

12        MR. FEE:  Well, let's go back to 639 to 640 on 1303.

13  Q.  Do you remember testifying about cash payments Nadine made

14  in April at J.P. Morgan Chase?

15  A.  Yes.

16  Q.  And do you know, just from sitting here and your work on

17  this chart, whether Nadine made these cash payments to pay off

18  that same credit card ending in 7619?

19  A.  I don't know.

20  Q.  OK.  The accounts that Nadine used to pay for the Mercedes

21  in exhibits you reviewed, you reviewed the underlying financial

22  documents, some of them?

23  A.  Some of them, the portions that were relevant to the chart.

24  Q.  So my question is based on what you reviewed, did you see

25  anyone else having any authority over those accounts other than

O66Wmen1                        Graves - Cross

1    Nadine?

2           MR. MONTELEONI:  Objection.

3           THE COURT:  I'll allow it, if she knows.

4    A.  I don't know.

5    Q.  Do you know if they were joint accounts or individual

6    accounts?

7    A.  I don't know.

8           MR. FEE:  OK.  Let's look at the stipulation, GX 1405,

9    at page 1.  Focus in on the row -- you can publish it.  It's

10   in.  Thank you, Mr. Kelly.  That first row right there,

11   5A-1001.

12   Q.  So you can see PNC Bank listed as financial institution,

13   then you see Nadine Menendez listed on the right-hand side, and

14   you see the x4619.  Do you remember if that was the check,

15   checking account she used for the Mercedes purchase?

16   A.  I don't recall.

17   Q.  OK.  You don't see any name under account name for 4619

18   other than Nadine Menendez in this exhibit, right?

19   A.  I see Strategic International Business Consultants LLC.

20          MR. FEE:  That's right.

21          THE COURT:  That has 4619, correct?

22          THE WITNESS:  Yes.

23          MR. FEE:  Very careful.  That's right.

24   Q.  So Menendez and SIBC have 4619, right?

25   A.  Yes.

O66Wmen1                    Graves - Cross

1   Q.  And you don't see Senator Menendez listed as a holder of

2   that 4619 account, right?

3   A.  Not as listed on this stipulation.

4           MR. FEE:  That's right.

5           Let's go down to the J.P. Morgan Chase bank entry, and

6   again, you can highlight Nadine Menendez, and it's x7619.  And

7   then you do see Robert Menendez here as having a J.P. Morgan

8   Chase account, but it's ending 6967.

9   Q.  Agent Graves, you would agree that 7619 are different

10  numbers than 6967?

11  A.  Yes.

12  Q.  And for 7619 you only see Nadine Menendez, correct?

13  A.  I'd need to look at the entire list.

14  Q.  I'm sorry.  Just on this chart.  You can look in the J.P.

15  Morgan Chase entry.

16          MR. FEE:  Zoom in.

17  A.  Yes.

18          MR. FEE:  And then last one.  Let's go to the TD Bank

19  entry.

20  Q.  Again, TD Bank, you see Nadine Menendez for the account

21  with the last four 5081; do you see that, Agent Graves?

22  A.  Yes, I do.

23  Q.  And again, you see Robert Menendez, but it's for a

24  different last -- his name is next to a different last four

25  digits, correct?

O66Wmen1                          Graves - Cross

1    A.  Yes.

2    Q.  And so just focusing on your chart, there is no entry

3    indicated that Senator Menendez contributed financially to the

4    purchase of the Mercedes, correct?

5              MR. MONTELEONI:  Objection.

6              THE COURT:  Can you say one way or the other?

7              THE WITNESS:  I can't say one way or the other.

8              MR. FEE:  Very quickly, GX 7E-1 in evidence.  Let's go

9    to page 10.

10   Q.  Do you remember looking at this briefly on your direct?

11   A.  Yes, I do.

12   Q.  This is listed as an applicant for a transaction at Ray

13   Catena Motor Cars-MB.  Do you see that at the top, Agent

14   Graves?

15   A.  Yes, I do.

16   Q.  And there is one applicant listed here as Nadine Arslanian.

17   Do you see that name?

18   A.  I do.

19   Q.  At the residence, at the address of 41 Jane Drive?

20   A.  Yes.

21   Q.  And then she identifies herself as self-employed with a

22   salary of $197,000.  Do you see that?

23   A.  Yes, I do.

24   Q.  Did your work on this chart lead you to understand whether

25   the $197,000 salary was accurate?

 1              MR. MONTELEONI:  Objection.

 2              THE COURT:  Do you have any understanding of the

 3    accuracy of that figure one way or the other?

 4              THE WITNESS:  I do not know one way or the other.

 5              MR. FEE:  And then if we could just pull out.

 6    Q.  I understand you were just shown this, but let me ask,

 7    Agent Graves.  You don't see any information on this page

 8    indicating that Nadine is married, correct?

 9              MR. FEE:  We can zoom in.  Cut out the white,

10    Mr. Kelly.  Make it a little easier.

11    A.  I don't see it as a question on the application.

12    Q.  Got it.

13         And there is only one person who signed, at least the page

14    in front of you, on this application, correct?

15    A.  Yes.  If that's also her signature at the bottom.  I can't

16    see it clearly, but it looks like the same signature.

17    Q.  I'm sorry.

18    A.  Uh-huh.

19    Q.  And just from your work on 1303 and the exhibits you

20    reviewed, did you come to learn when, the date when Senator

21    Menendez and Nadine Arslanian became engaged?

22              MR. MONTELEONI:  Objection.

23              THE COURT:  If she knows.

24    A.  I don't know.

25    Q.  How about the marriage date; did you come to learn that in

1    your work on this chart?

2    A.  I don't know.

3           MR. FEE:  Just very quickly, 699 through 702 on 1303,

4    please, Mr. Kelly.

5    Q.  So you remember looking at the underlying exhibits for

6    these entries with the prosecutor, Agent Graves?

7    A.  Yes, I do.

8    Q.  Did you review records indicating Nadine Arslanian made

9    cash payments on that same credit card all the way back to

10   2017?

11   A.  I don't recall.

12   Q.  OK.  Did you review in those records information indicating

13   that she made payments in roughly the same size almost every

14   month?

15          MR. MONTELEONI:  Objection.

16          THE COURT:  Sustained.

17          Well, no.  I will allow it.  If you can answer that,

18   you may.

19   A.  I was particularly looking at these specific dates, so I

20   didn't really look out of that date range.

21          MR. FEE:  Got it.

22          Row 25.

23   Q.  I think you were asked about these, Agent Graves, is that

24   right, on direct?

25   A.  Yes, I believe so.

O66Wmen1                    Graves - Cross

1   Q.  This is, on May 10 of 2018, Mr. Hana sending to

2   Ms. Arslanian what's described as two images of Parra GJ

3   transcript, correct?

4   A.  Yes.

5   Q.  And GJ, I believe you said was grand jury?

6   A.  I don't know if I said that.

7   Q.  OK.  You might not have said that.

8       If we can just focus in on the second image, do you see the

9   words grand jury?

10  A.  Yes, state grand jury.

11  Q.  Got it.

12      And that was May 10 of 2018 --

13          MR. FEE:  You can go back out.

14  Q.  -- the message, correct, Agent Graves?

15  A.  The message was sent May 10, 2018.

16          MR. FEE:  All right.  Let's look at what's Government

17  Exhibit B105-5 in evidence, please.  So let's go to page 2.

18  Q.  And this is a series of text exchanges between Nadine and

19  Mr. Hana, right?

20  A.  Yes.

21          MR. FEE:  If we can zoom in on the last two on the

22  page, Mr. Kelly.

23  Q.  So here, on May 15, 2018 --

24      Five days after that entry we just reviewed in 1303, Agent

25  Graves?

1    A.   Yes.

2    Q.   -- Nadine states:  Give me an hour to check and get in

3    touch.  With the whole mess that happened Saturday I am on my

4    own now to follow up with the car rental, the car accident, the

5    medical bills and my ex not paying me.  So I am super

6    overwhelmed I promise though I will get on top of it.

7         Do you see that, Agent Graves?

8    A.   I do.

9    Q.   And Mr. Hana replies OK, the same day, correct?

10   A.   Yes.

11   Q.   So I believe you testified that the first phone call

12   between Nadine and Senator Menendez was at some point -- on the

13   chart, on the chart -- was at some point in May 2018, is that

14   correct?

15   A.   I would need to go back --

16   Q.   Sure, sure.

17   A.   -- and confirm.

18            MR. FEE:  Can we flip back up to the first and second

19   page of 1303.

20            Let's do the second page.

21   A.   Yes --

22   Q.   Yes.

23   A.   -- line 26.

24   Q.   It's right there.  OK.

25   A.   Uh-huh.

O66Wmen1                          Graves - Cross

1          MR. FEE:  Can we go back to the checks we were just

2     looking at.

3          THE COURT:  Why don't you finish up this line, sir,

4     and I'll give the jury its break.

5          MR. FEE:  Sure.

6     Q.  Based on your review of the chart and the exhibits, did you

7     see any documents indicating whether or not Nadine was trying

8     to get Elvis Parra to hire her ex-boyfriend, Doug Anton, to be

9     his attorney?

10          MR. MONTELEONI:  Objection.

11          THE COURT:  Yes, no, or I simply can't recall.

12    A.  I can't recall.

13          MR. FEE:  OK.  We can stop there.

14          THE COURT:  All right.

15          Ladies and gentlemen, ten minutes.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

O66Wmen1                        Graves - Cross

1                   (Jury not present)

2                   THE COURT:  You may step down, Agent.

3                   (Witness not present)

4                   THE COURT:  Are you on track, Mr. Fee, for about noon?

5                   MR. FEE:  Yes.

6                   THE COURT:  All right.  Thank you.

7                   Ten minutes.

8                   (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O663MEN2                        Graves - Cross

```
 1              (In open court; jury present)
 2              THE COURT:  You may continue with your
 3    cross-examination, sir.
 4              MR. FEE:  Thank you, your Honor.
 5              Mr. Kelly, can you put up that entry at row 25 again
 6    on 1303.
 7    BY MR. FEE:
 8    Q.  Agent Graves, this references the Parra grand jury
 9    transcript.  Right?  In the text on the chart it says Parra GJ
10    transcript.  Do you see that?
11    A.  Yes.
12    Q.  In your work reviewing this chart and the cited exhibits,
13    did you come across an e-mail between Doug Anton and Nadine
14    Arslanian referencing Elvis Parra?
15    A.  I don't recall.
16    Q.  Let me show you what's been marked for identification as DX
17    1016.  Not for the jury.  I'll circle a few things here to
18    direct your attention.
19              You've had a chance to review it?
20    A.  Yes.
21    Q.  My only question is does the item in front of you refresh
22    your recollection as to whether or not you reviewed a
23    communication in May 2018 between Doug Anton and Nadine
24    Arslanian referencing Elvis Parra?
25    A.  The document that's before me, I don't recall reviewing it
```

1    before this morning.

2    Q.   Thank you, Agent Graves.

3         Let's go to row 87 of 1303, please.  And before we

4    look at that entry, you may just recall from having reviewed

5    the exhibit, the new Mercedes was purchased by Nadine Arslanian

6    around April 5 of 2019.  Do you remember seeing those entries

7    on the chart?

8    A.   Yes, her name was on the purchase certificate around that

9    date.

10   Q.   And not from your own fact finding, but just from the

11   chart, that was around April of 2019; fair to say?

12   A.   Yes, I believe so.

13   Q.   That was a new car based on the documents you rereviewed?

14   A.   Yes.

15   Q.   Let's go to row 87 of 1303.  So this is December of 2018,

16   when this voicemail from someone with the contact name

17   Progressive tells Nadine that she's calling about the accident

18   on December 12.  Do you see all that Agent Graves?

19   A.   Yes, Nariah Progressive.

20   Q.   That cites, let's go to what's in evidence at Government

21   Exhibit 7C-1.  And page -- we can start here.

22        You reviewed this, the Progressive Insurance summary

23   file?

24   A.   Yes.

25   Q.   And this is for Nadine Arslanian at 41 Jane Drive or that's

O663MEN2                      Graves - Cross

1   the text you see there, Nadine Arslanian?

2   A.  Yes, that's the name.

3   Q.  Let's go to page 4 of this exhibit, focus on so at the top

4   it says New Jersey police crash investigation report.

5            You see that, Agent Graves?

6   A.  Yes, I do.

7            (Counsel conferring).

8            MR. FEE:  Put it down.

9   Q.  Can we just focus on 38.  In any event, leave it there.

10  You can put it down.

11           Do you remember seeing in this file and on the chart

12  that the car Nadine Arslanian was using at the time of this

13  accident in December was a Mercedes?

14  A.  I don't recall.

15           MR. FEE:  Can I have Connor put up the same exhibit.

16  I'm so sorry.  Not Connor.  It's page 4 of Government

17  Exhibit 7C-1.

18           I'm sorry.  I had a prior version of the exhibit.

19  Mr. Monteleoni advised me there is an updated version.  I'm

20  going to use that very quickly.

21           I'll come back to it when you can signal that you got

22  it.  You got it.  great.

23  Q.  Box 38 of this crash investigation report.  Just 38.  So,

24  cell 27 down if you see that.

25           And so, you see the owner Nadine T. Arslanian, and

1   it's already highlighted a Mercedes make, you see that in box

2   38 make, Mercede?

3   A.  Yes.

4   Q.  And model CL3?

5   A.  Yes.

6   Q.  2007 year?

7   A.  Yes.

8   Q.  And the date of this report, if you can zoom out, well, the

9   case number is 2018 and the date of crash in box 4 is

10  12/12/2018.

11          Do you see that?

12  A.  Yes, I do.

13  Q.  Just from your review of the exhibits -- you can take that

14  down -- you would agree that Nadine Arslanian was driving a

15  Mercedes at the time of her December 12, 2018, accident

16  reflected in that exhibit?

17  A.  Yes.

18  Q.  And then the new Mercedes that was purchased by Nadine

19  Arslanian in April 2019 was also a Mercedes?

20  A.  Yes.  The Mercedes was a 2019.

21  Q.  In all the items you reviewed on the chart and in the

22  exhibits relating to those vehicles, the name used was Nadine

23  Arslanian, not Nadine Menendez, correct?

24  A.  I believe so, but I would like to look at the documents

25  just to confirm.

1    Q.  Understood.  More broadly, do you remember seeing the name

2    Nadine Menendez in any entry in GX 1303?

3    A.  I don't recall.  That name was in some of the exhibits

4    possibly.  That's why I don't want to say one way or the other.

5    Q.  I appreciate that.  Thank you.  Let's go to row 33 of

6    GX 1303.  I'm not going to make you look at the whole thing.

7    I'm moving on.

8              So 33 you remember talking about this on direct.  It

9    is an e-mail from Uribe to somebody called Samantha Maltzman.

10   Do you remember testifying about this or looking at this on

11   your direct testimony?

12   A.  Yes, line 33.

13   Q.  Yes.

14   A.  Yes.

15   Q.  Why don't we put up GX E302, the cited exhibit here.  And

16   again you looked at this and I believe you were shown that

17   Samantha Maltzman had an email domain Menendez4NJ.com?

18   A.  Yes.

19   Q.  You were directed to look at the list of contributors,

20   correct?

21   A.  Yes.

22   Q.  And it was pointed out to you that Jose, it looks

23   misspelled, Jose Uribe is on this list?

24   A.  Yes.

25   Q.  There is a guy with the same last name we've seen elsewhere

O663MEN2                          Graves - Cross

1    in your chart Parra, correct?

2    A.  Yes, Jose Parra.

3    Q.  But these other names, Pablo Bossi, Gilberto Bernal,

4    Morales, Edson, Xei, Drab, Tineo, Darwin Hernandez, Eduardo

5    Vargas.  Go to the next page.  There is another Bossi, then

6    some of these you've seen before but there is McFarland, Gordon

7    Johnson, Fernando Barruos you've seen, and George Martinez.

8            Other than the names you recognize from the chart, do

9    you know who any of these other people are?

10   A.  No.

11   Q.  But the chart obviously focused on the names the

12   prosecutors associated with this case, correct?

13           MR. MONTELEONI:  Objection.

14           THE COURT:  Objection sustained.  The prosecutors

15   selected the documents.

16   Q.  We can put that down.  Let's go to row 457 of 1303, please.

17   It references a FaceTime call on March 12, 2019, between

18   Senator Menendez and Nadine Arslanian.  You see that, Agent

19   Graves?

20   A.  Yes, I do.

21   Q.  I'm sure you remember there were a number of FaceTime calls

22   between those two people listed in your chart, in the chart,

23   not your chart.  The chart 1303, right?

24   A.  There is more than one.

25   Q.  More than one.  And if you recall, each of them was around

1   30 minutes?

2   A.  I don't recall.

3   Q.  Well, the underlying exhibit cited there is GX B114, right?

4   A.  Yes.

5   Q.  Let's bring that up.  So your testimony of course was that

6   when there was a FaceTime call cited in the chart between

7   Nadine and Senator Menendez, you went to this Exhibit, B114,

8   and found that FaceTime entry, correct?

9   A.  Yes.

10  Q.  And confirmed how long it was, and those were the

11  participants and the date was right.  Is that generally fair?

12  A.  Date and time, yes.

13  Q.  Do you remember seeing a number of other FaceTime calls in

14  this Exhibit B114 that were not included on the chart?

15  A.  I don't remember.

16  Q.  Did you recognize any pattern where Senator Menendez and

17  Nadine would have a nightly 30 minute FaceTime call?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  I'll allow it if she knows.

20  A.  I wasn't observing or looking for patterns as part of my

21  assignment.

22  Q.  Understood.  Let's go on B114, I think it is row 59 through

23  61 as examples, Agent Graves.  Can we zoom in on 59.

24          So, you've spent more time with this than I imagine,

25  these are FaceTime calls reflected here?

O663MEN2                    Graves - Cross

1   A.  Yes.

2   Q.  And these three, March 12, March 4, March 28?

3           THE COURT:  Sir, February 28.

4           MR. FEE:  Thank you, your Honor.  That's because I'm

5   European.

6   Q.  Those are all around 30 minutes, right, give or take?

7   A.  Give or take, yes.

8   Q.  And none of these three are on the chart, correct?

9   A.  I don't know.  I would have to compare.

10          MR. MONTELEONI:  Objection.

11          THE COURT:  I'll allow it.

12  Q.  So you're not sure?

13  A.  I'm not sure.

14  Q.  Why don't we go to GX 1303.  And if you can go to the

15  March 4, wherever March 4 is on there.

16          Do you see any FaceTime calls between Senator Menendez

17  and Nadine Arslanian reflected on March 4?  You can start there

18  and go to the next page, Mr. Kelly.  The next, the succeeding

19  page.

20          Any FaceTime calls on the chart on March 4?

21  A.  I don't see any on the chart.

22  Q.  What about on March 12?  FaceTime calls.  Go to the next

23  page, Mr. Kelly.

24          Any on March 12, Agent Graves?

25  A.  I don't see any.

1  Q.  I think February 28 was there.  Let's go back to

2  February 28.

3      (Counsel conferring)

4  Q.  There is one on March 12.  It's a team effort.  Let's go

5  back to March 12.  Where is it, the next page?  There it is.

6  A.  457.

7  Q.  And then so that's the one, but the other two we don't see?

8  A.  I did not have a chance to look at February 28.

9  Q.  Why don't we go back to February 28 very quickly.  You see

10 any FaceTime calls between those two on February 28?

11 A.  I do not.

12 Q.  Okay.  So fair to say -- I won't go through any more --

13 there was some FaceTime calls that are not reflected on

14 GX 1303?

15 A.  Yes.

16 Q.  Let's put up row 172 and 173 of 1303.  Just quickly, you

17 remember testifying about a search or these entries -- you

18 remember testifying about the entries at 172 and 173, Agent

19 Graves?

20 A.  Yes, I do.

21 Q.  When I say "testify," you were shown them during your

22 direct, right?

23 A.  Yes.

24 Q.  Then so it says "How much does a Lincoln MKZ sell for" and

25 there's a Google search with the words "2018 Lincoln MKZ

O663MEN2                          Graves - Cross

1    price," right?

2    A.  Yes.

3    Q.  And those two things happen on January 23 of 2019?

4    A.  Yes.

5    Q.  Let's go to GX -- the photo you referenced GX 1F-1002.  You

6    zoomed in on this and you said this was a Lincoln MKZ or you

7    saw Lincoln on it?

8    A.  It says Lincoln above the light, and then at the bottom

9    left MKZ.

10   Q.  Do you know when this photo was taken?

11   A.  I do not.

12   Q.  Did anyone advise you whether it happened in connection

13   with a search in 2022?

14            MR. MONTELEONI:  Objection.

15            THE COURT:  Do you know when it was taken?

16            THE WITNESS:  I don't know when the photo was taken.

17   Q.  In your review of the communications involving Senator

18   Menendez for the purposes of preparing the chart, did you see

19   any evidence reflecting prior leases of a Lincoln MKZ by

20   Senator Menendez prior, meaning before 2018?

21   A.  I don't recall seeing anything.

22   Q.  Anything you reviewed for your testimony here, do you have

23   any idea about any cars that were owned or leased by Senator

24   Menendez as of the time he did those searches in 2018?  Any

25   idea?

O663MEN2                          Graves - Cross

1   A.  I don't recall one way or the other.

2   Q.  Do you remember testifying about something that was

3   referred to as a flip phone?

4   A.  Yes.

5   Q.  What is a flip phone, as you understand it?

6   A.  It is an older model phone, and they still make them today.

7   But they are not like an iPhone or a more sophisticated phone.

8   Q.  And you testified that based on the chart and the exhibits,

9   that there was something called a flip phone that Nadine

10  Arslanian used to communicate with Senator Menendez.  Do you

11  remember that testimony?

12  A.  Yes.

13  Q.  And then the prosecutor actually showed you on direct a

14  text message where Nadine describes, she uses the phrase my 007

15  cell number?

16  A.  I remember.

17  Q.  You remember 007?

18  A.  Yes.

19  Q.  007 is like a reference to James Bond, in general

20  colloquial usage?

21  A.  That's how I understand it.

22  Q.  Of course.  Then you testified that the service start date

23  for the flip phone was December 2018.  Do you remember that?

24  A.  Yes, I believe so.

25  Q.  You actually said December 14, 2018, was when the flip

1    phone started to be used.  Do you recall?

2    A.  I think that's when the service date was listed as.

3    Q.  On the records?

4    A.  On the records that I reviewed.

5    Q.  Service date means that's when you start to get service on

6    a particular phone.  Is that how you're using that phrase?

7    A.  Yes.

8    Q.  Then you testified that she used it through around March of

9    2019, you weren't sure, but you said around March of 2019 her

10   use of the flip phone ended; is that fair?

11           MR. MONTELEONI:  Objection.

12           THE COURT:  We'll see.  Do you remember that?

13   A.  The records that I reviewed were from that timeline.

14   Q.  Got it.  So based on your memory of those records, it

15   started use or the service start date was in December 14, 2018,

16   and ending in approximately some time in March 2019?

17           MR. MONTELEONI:  Objection.

18           THE COURT:  Sustained.  That's the records she looked

19   at.

20   Q.  That's my only question.  The records.

21           THE COURT:  The record you looked at was in March of

22   2019.  Is that what you're saying?

23   A.  I would need to go back to that government exhibit to say

24   specific dates.  But that sounds close in time of the timeline

25   that I reviewed.

1    Q.  Then let's put up what's in evidence and was shown to you

2    Government Exhibit B105-40.  Can we zoom in on the bottom

3    message here.

4         Do you remember being shown this during your direct

5    testimony?

6    A.  Yes.

7    Q.  It's from Nadine to Mr. Hana on December 1st of 2018, where

8    she states "I'm getting all these fake text from spoofing."  Do

9    you see that?

10   A.  Yes.

11   Q.  You have worked on squads involving spoofing; is that fair?

12        MR. MONTELEONI:  Objection.

13        THE COURT:  I'll allow it.

14   A.  Not, no.

15   Q.  In your work as an FBI agent, have you ever come across

16   something referred to as spoofing?

17   A.  Yes, I have.

18   Q.  What is that generally?

19   A.  Appearing to be a different number or a fake number.  Can

20   be used in different ways, depending on the context.

21   Q.  So this is December 1, 2018, about two weeks before you

22   testified the service start date for Nadine's flip phone.  Fair

23   to say?

24   A.  Yes.

25   Q.  Let's go to page 2 of this same exhibit.  And then you see

O663MEN2                        Graves - Cross

1    up top Mr. Hana says "why."  You see that, Agent Graves?

2    A.  Yes, I do.

3    Q.  Then the next message, Nadine, on December 1st, 2018, says

4    "Tomorrow I have to go get a new phone and a new phone number."

5    Do you see that?

6    A.  Yes, I do.

7    Q.  Do you remember viewing this on your direct testimony, this

8    particular message?

9    A.  I don't recall.

10   Q.  And this is not reflected in your chart, this message,

11   right?

12   A.  I would have to look at the chart.

13   Q.  Did you review anything reflecting that during the time

14   period of this chart, Nadine had actually been hospitalized

15   after an assault by Doug Anton?

16           MR. MONTELEONI:  Objection.

17           THE COURT:  Sustained as phrased.

18   Q.  Did you review anything indicating whether during the

19   period in which your chart covers Nadine Arslanian was

20   hospitalized?

21           THE COURT:  I'll allow it.  Is there anything that

22   indicates that one way or the other to your recollection?

23           THE WITNESS:  I don't recall seeing that.

24   Q.  You did testify that you had reviewed at least some number

25   of Nadine Arslanian's text messages, correct?

O663MEN2                    Graves - Cross

1    A.  Can you repeat the question?

2    Q.  Sure.  More basic.  You reviewed some of Nadine's text

3    messages, correct?

4    A.  Yes.

5    Q.  In fact, you reviewed records for her main cell phone and

6    for the flip phone, correct?

7    A.  Yes.

8    Q.  Do you recall reviewing messages between Ro Sorce and

9    Nadine in December 2018 about spoofing and cyberstalking by

10   Doug Anton?

11              MR. MONTELEONI:  Objection.

12              THE COURT:  Do you remember reviewing messages between

13   Ro Sorce and Nadine in December of 2018, yes or no?

14              THE WITNESS:  No, I don't recall that.

15              MR. FEE:  Just for the witness and the lawyers,

16   please.  No, not this one.  We can move on while they work on

17   that.

18   Q.  In any event, you don't recall seeing such a message?

19   A.  I don't recall seeing a message.

20   Q.  In your chart, do you remember reviewing a number of

21   entries where Nadine was communicating to Senator Menendez that

22   she had arrived home safely or something to that effect?

23   A.  That sounds familiar.  But I would need to see where that

24   wording is exactly what's in the messages.

25              MR. FEE:  Let's look at 581 through 583, Mr. Kelly, on

```
1    1303, please.

2    Q.  So this is April of 2019 where Senator Menendez says "I

3    haven't been able to reach Mike, sent him a text to call you.

4    Let me know if you hear from him."  You see that?

5    A.  Yes.

6    Q.  And then Nadine responds "Okay, mon amour, I'll get in

7    touch with him and have Nader drive me to Mike."

8              You see that, Agent Graves?

9    A.  Yes.

10   Q.  And then last she says "I got in touch with Mike.  He is

11   starting to use French words.  All good."

12             You see that?

13   A.  Yes.

14   Q.  And you have seen other references in the exchanges between

15   Senator Menendez and Nadine about a person named Mike, correct?

16   A.  Yes.

17   Q.  On this chart.

18   A.  Yes.

19   Q.  Did you ever review anything identifying Mike as a security

20   guard who worked for Senator Menendez?

21             MR. MONTELEONI:  Objection.

22             THE COURT:  Sustained.  Do you know who Mike is?

23             THE WITNESS:  No, I do not.

24             THE COURT:  Do you know what his job was?

25             THE WITNESS:  No, I do not.
```

1          THE COURT:  Next.

2   Q.  Let's look at rows 222 to 232, please.  So, here you see

3   exchanges between Senator Menendez and Nadine.  First he says

4   "I lost you."  Then she says "You could never lose me because I

5   will never let go.  I just had a super 40 minute meeting with

6   Will" and then he says "Okay, can't see you on Find My

7   Friends."

8          Do you see that?

9   A.  Yes.

10  Q.  Are you generally familiar with what Find My Friends is?

11  A.  Yes, generally.

12  Q.  What is it?

13  A.  It is an app usually on iPhones where people can share

14  their location with people and friends or family or whoever

15  else they want to share.

16  Q.  And did you recognize, again, any period from your work on

17  this chart where Nadine started to use Find My Friends with

18  Senator Menendez?

19          MR. MONTELEONI:  Objection.

20          THE COURT:  Are you aware from your work on the chart

21  as to when, if ever, Nadine started to use the Find My Friends

22  app, yes or no?

23          THE WITNESS:  No.

24  Q.  Did you see anything in the chart or the exhibits you

25  reviewed indicating that the reason was safety?

1          MR. MONTELEONI:  Objection.

2          THE COURT:  Sustained.

3   Q.  Did you see anything that indicated to you the reason why

4   Nadine started to use Find My Friends with Senator Menendez?

5   A.  No, I did not see any reason.

6   Q.  Let's go to Government Exhibit 10C-1, please.  You remember

7   reviewing this document on direct, right, Agent Graves?

8   A.  Yes, I do.

9   Q.  Agent Graves, how long have you worked for the FBI?

10  A.  Eight years.

11  Q.  Did you draft any portions of the FBI's website?

12  A.  I did not.

13  Q.  Are you sure sitting here today that everything on the

14  website of the FBI is entirely accurate?

15          MR. MONTELEONI:  Objection.

16          THE COURT:  Sustained as phrased.

17  Q.  Have you reviewed all of the FBI's website, every entry?

18          MR. MONTELEONI:  Objection.

19          THE COURT:  Let's hear it.  I will be astonished.

20          MR. FEE:  She's very thorough.

21          THE COURT:  Have you read every entry on the FBI's

22  website?

23          THE WITNESS:  I have not.

24  Q.  Okay.

25          THE COURT:  Glad to hear it.

1    Q.  Yeah.

2          So you reviewed this with the prosecutor.  Were you

3    given anything else that indicated that Senator Menendez

4    actually drafted the language on this document?

5          MR. MONTELEONI:  Objection.

6          THE COURT:  Do you know who drafted the language on

7    the document that's up on the screen?

8          THE WITNESS:  I do not know who drafted the language.

9    Q.  I just briefly want to look at some of the entries where it

10   says "our office cannot," Mr. Kelly.

11         It says, first, I think you remember testifying about

12   this, "compel an agency to act in your favor or expedite your

13   case."  Do you see that?

14   A.  I do.

15   Q.  Do you see the words that the office cannot advocate with

16   an agency on behalf of constituents, Agent Graves?

17         MR. MONTELEONI:  Objection.

18         THE COURT:  Sustained.

19   Q.  Do you see the word "advocate" anywhere on this document or

20   on the zoomed in portion?

21         THE COURT:  Is the word "advocate" there?

22         THE WITNESS:  I'm just checking.

23         THE COURT:  I'm sorry.

24   A.  I do not see the word "advocacy" on the zoomed in portion.

25   Q.  And then you were also asked questions about the portion

1    that says "Our office cannot intervene with judicial issues."

2    Do you remember being asked about that?

3    A.   Yes.

4    Q.   Do you see any language here indicating that the office

5    cannot contact a state official about discrimination in law

6    enforcement?

7              MR. MONTELEONI:  Objection.

8              THE COURT:  Sustained.

9    Q.   Do you see the words "contact" listed in that particular

10   paragraph about intervene with judicial issues?

11             MR. MONTELEONI:  Objection.

12             THE COURT:  I'll allow it.

13   A.   Just the paragraph starting with "intervene"?

14   Q.   Yes.

15   A.   And the word is "contact"?

16   Q.   Yes.

17   A.   I don't see the word "contact" in that particular

18   paragraph.

19   Q.   Thank you, Agent Graves.  Last thing I am going to show you

20   the document to attempt to refresh your recollection just for

21   the witness and the attorneys, DX 617 for identification.

22   Please zoom in on that.

23             Just take your time and let me know when you've had a

24   chance to review it.

25             So my question is, does what you have just reviewed

O663MEN2                     Graves - Cross

1   refresh your recollection as to whether Nadine Arslanian told

2   Ro Sorce in early December 2018 that she was getting spoofed by

3   a person named Doug?

4   A.  I don't recall reviewing this document before this morning.

5   Q.  You recall reviewing the service records for the flip

6   phone, correct?

7   A.  Yes.

8   Q.  You recall they indicated the phone was subscribed to by

9   somebody with the last name Sorce?

10  A.  I believe Sorce was the name of the entity.  It was either

11  a company or something.

12  Q.  Did you see anything indicating whether or not Ro Sorce

13  gave the flip phone to Nadine Arslanian in early December 2018?

14          MR. MONTELEONI:  Objection.

15          THE COURT:  I'll allow it.

16          THE WITNESS:  I don't know.

17          MR. FEE:  Agent Graves, I'm done.

18          THE COURT:  Mr. Solano.

19  CROSS-EXAMINATION

20  BY MR. SOLANO:

21  Q.  Good morning, Agent Graves.  I should say good afternoon.

22          I want to start with looking at 1303, and specifically

23  lines 518, Mr. Kelly.  If you can zoom in at the bottom of

24  lines 518 through the end of this page 522.

25          So on line 518, Agent Graves, you see that you noted

1    in the chart Jose Uribe did the search history for Leo, Ray

2    Catena?

3    A.  Yes.

4    Q.  And then again, on line 522 going down, several lines down,

5    he does a search history for Ray Catena, Edison, New Jersey,

6    correct?

7    A.  Yes.

8    Q.  And in between those, there are some text messages between

9    Mr. Uribe and Mr. Hana, and then a phone call on line 521

10   between Mr. Uribe and Mr. Hana, correct?

11   A.  Yes.

12   Q.  Now, to be clear, you didn't make any decisions on where

13   text messages, calls, and search histories were listed on this

14   chart, correct?

15   A.  No, I didn't put together the chart.

16   Q.  Thank you.  The prosecutors did that, correct?

17   A.  Yes.

18   Q.  And obviously you have no personal knowledge of what this

19   call is about?

20   A.  I do not.

21   Q.  You did review text messages between Mr. Uribe and

22   Mr. Hana, correct?

23   A.  Yes, I did.

24   Q.  And looking for example on line 519, you cite the Exhibit

25   GX E102-7, correct?

O663MEN2                        Graves - Cross

1    A.  I looked at that exhibit.  It was cited on the chart.

2    Q.  And those are text messages, a string of text messages

3    between Mr. Uribe and Mr. Hana, correct?

4    A.  Yes, they should, be according to the chart.

5    Q.  Did you see anything in those text messages that explained

6    what that call was about?

7    A.  I don't recall.

8            MR. SOLANO:  We can pull up, please, E102-7,

9    Mr. Kelly.  And if you could flip through it.

10   Q.  I think it is only a couple of pages.  And tell us if there

11   is anything in there that would tell you, Agent Graves, what

12   this call is about.

13           MR. MONTELEONI:  Objection to that question.

14           THE COURT:  I'll allow it.

15   A.  Is there more than one page?

16   Q.  Yes.

17           MR. SOLANO:  Mr. Kelly, if we can show the agent the

18   following pages.  And the next page.  Sorry, Mr. Kelly.

19   Q.  That's the last page.  Agent, do you see anything in there

20   that indicates what this call is about?

21   A.  Yes.  Can we go back to 1303?  I want to confirm there

22   wasn't another exhibit in that series of exchanges.

23   Q.  Sure.  1303, line 519.

24   A.  There is also Government Exhibit -- no, I see now.  I was

25   confused with the call line.  Yes.  I believe those were the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    exchanges cited here.

2    Q.  Right.  And there is nothing referencing what the call is

3    about, correct?

4    A.  I don't know what the call is about.

5    Q.  Looking at the next line 523 on the next page, Mr. Kelly.

6    Mr. Uribe sends, according to the chart, Nadine a screenshot of

7    the Mercedes-Benz of Edison, correct?

8    A.  Yes.

9    Q.  In the messages we just saw, you didn't see that screenshot

10   being forwarded to Mr. Hana, correct?

11   A.  I would have to go back and look.

12   Q.  We can go back to 13 -- the one we just pulled, E102-7.

13   A.  Specifically on this exchange?

14   Q.  Correct.  The one cited in the line in connection with that

15   text message.

16   A.  Specifically on Government Exhibit E101-7, I don't see that

17   image.

18   Q.  Okay.  It's 102-7.

19   A.  Yes, E102-7.  Thank you.

20   Q.  If we can turn now to line 526, Mr. Kelly.

21        And you reviewed Mercedes-Benz records, correct, Agent

22   Graves?

23   A.  Yes, the sale documents and then some of the payment

24   documents.

25   Q.  And on line 526 on March 27, Mr. Uribe texts Ms. Arslanian

1    "G afternoon.  I gave your number to my friend Leo at MB.  He

2    is calling you."

3              Do you see that?

4    A.  Yes, I do.

5    Q.  And then further down on line 556, if you can go there,

6    Mr. Kelly.  Mr. Uribe texts Ms. Arslanian "Please call MB and

7    go get your car."

8              Do you see that?

9    A.  Yes.

10   Q.  And then further down on 563 on the same page, same day,

11   April 1st, Mr. Uribe texts Ms. Arslanian, "Leo said he was

12   waiting for you," correct?

13   A.  "Leon said he was waiting for you," yes.

14   Q.  Do you recall seeing any text messages where Mr. Hana's

15   contacting a Leon at Ray Catena or Mercedes-Benz?

16   A.  I don't recall.

17   Q.  If we can go to line 650 now.  And we're going to do 650

18   through 57 if we can highlight that section.  Thank you.

19             If you see it starts at 650 with Ms. Arslanian texting

20   Uribe "Signing papers now."  And then there is some back and

21   forth between Mr. Uribe and Ms. Arslanian where he says

22   "great."

23             And then if you go a couple lines down to 653, he asks

24   her "Are you happy."

25             And then if you go down to 653, I'm sorry, 656, she

O663MEN2                         Graves - Cross

1    writes back "I will never forget this."  Then he writes "Thank

2    you."

3                 Do you see those?

4    A.  Yes, I do.

5    Q.  In the text messages that you reviewed of Mr. Hana and

6    Ms. Arslanian, did you ever see any text messages, do you

7    recall, where she thanks him for the Mercedes-Benz car?

8    A.  She thanks who?

9    Q.  Where she thanks Mr. Hana?

10               THE COURT:  To your recollection, does Nadine, have

11   you seen a document where Nadine thanks Hana for the car?

12               THE WITNESS:  I don't recall.

13   Q.  Thank you.  If we can move now to line 75 Mr. Kelly.  And

14   I'm just going to highlight some lines and see if it refreshes

15   your recollection.

16               On 755, Nadine Arslanian texts Mr. Uribe a photograph

17   of the invoice from Mercedes-Benz in the amount of $891.26 and

18   the due date of May 4, 2019.

19               Do you see that?

20   A.  Yes, I do.

21   Q.  If we go down a couple of lines to 758.  You see that

22   Mr. Uribe sends that same screenshot photo to an individual

23   named Fernando Barruos, correct?

24   A.  Yes.

25   Q.  And if we go down to 771, Mr. Uribe that same day texts

1    Nadine Arslanian, says "Please call me.  I need some

2    information to make the payment."

3              Do you see that?

4    A.  Yes, I do.

5    Q.  Then even further down on the next page, 796, he texts

6    Ms. Arslanian again, "I have to process the payment."  Correct?

7    A.  Yes.

8    Q.  And then if we could just highlight a series of text

9    messages from 806 through 816.  I'm not going to read them all,

10   Agent, but is it fair to say these are exchanges between

11   Mr. Barruos and Mr. Uribe regarding a payment on that

12   Mercedes-Benz?

13   A.  I don't know if it's just regarding that.  There's some

14   other things that they speak about.

15   Q.  Fair enough.  There is some other stuff they talk about

16   with the truck having some problems.  But part of that is about

17   the payment of the Mercedes-Benz, correct?

18              MR. MONTELEONI:  Objection.

19              THE COURT:  I'll allow it.

20              Does part of that exchange include payment for the

21   Mercedes-Benz?

22              THE WITNESS:  Line 815 and 816, I believe the

23   confirmation number is associated with the payment.

24   Q.  And in either the bank records or the Mercedes-Benz

25   financial records, or the text messages of Mr. Hana, do you

O663MEN2                    Graves - Cross

1  recall seeing any records indicating that Mr. Hana made any

2  payments in connection with that Mercedes-Benz?

3         MR. MONTELEONI:  Objection.

4         THE COURT:  I'll allow it.

5  A.  I don't recall.

6  Q.  I want to move to page 1 of this chart.  1303.  You see at

7  the top it starts with December 16, 2016, Agent Graves?

8  A.  Yes.

9  Q.  And the first item on this very chart is Elvis Parra being

10 indicted.  Do you see that?

11 A.  Yes.

12 Q.  And then if we can go to line 10, there is a substitution

13 of attorney or a notation that Michael Critchley files an

14 appearance in the Parra case, correct?

15 A.  Yes.

16 Q.  On line 78, if we can go there, there is a notation or an

17 e-mail sent out to the lawyers from the court attaching a

18 decision that denies a motion to dismiss the Elvis Parra

19 indictment.  Do you see that?

20 A.  Yes.

21 Q.  If we can go to line 433, there is a notation of an e-mail

22 that the Elvis Parra trial has been rescheduled to April 29,

23 2019, correct?

24 A.  Yes.

25 Q.  The last line on this area is line 717.

1          THE COURT:  What's your question, sir?

2          MR. SOLANO:  I'm going to another line and I'm going

3    to ask the agent now.

4    Q.  There is an e-mail to an Edmund DeNoia that says "Please

5    find attached the updated plea letter regarding Elvis Parra,"

6    correct?

7    A.  Yes.

8    Q.  We've seen from the chart it starts with the indictment of

9    Elvis Parra.  Do you know when that case concluded?

10   A.  I do not.

11   Q.  Did you see any records that indicated that the sentencing

12   Mr. Parra occurred in June of 2019?

13          MR. MONTELEONI:  Objection.

14          THE COURT:  Do you know when, if ever, do you know

15   when, if at any time, there was a sentencing of Mr. Parra?

16          THE WITNESS:  I don't know.

17   Q.  Can we please take a look at line 841.  You don't need to

18   zoom out just for the date.

19          That's the first entry on June 3 of 2019, correct?

20   A.  The first entry for the month of June?

21   Q.  For the month of June.

22   A.  Yes.  June 3, 2019.

23   Q.  If you can look at those lines between June 3 and June 7.

24   Do you see any entry regarding the Elvis Parra sentencing?

25          THE COURT:  You're asking, I take it, if there is any

1   entry on this chart that references that.

2          MR. SOLANO:   Correct.

3   A.  I don't see the name Elvis Parra in these lines.

4   Q.  If we can go to the next page.  Same question, Agent,

5   whether you see on this page any entry to Elvis Parra?

6   A.  I don't see the name Elvis Parra on this page.

7   Q.  If we can go to the next page.  And the same question,

8   Agent.  Is there any reference to the Elvis Parra sentencing?

9   A.  I don't see the name Elvis Parra on this page either.

10  Q.  I think the next page might be the last one for June.

11  There is only one entry for June.  Do you see any reference to

12  Elvis Parra?

13  A.  No, not on the June 22, 2019 entry.

14  Q.  Thank you, Agent.

15       Switching a little bit if we can go to line 607, Mr. Kelly.

16  You see that that entry reflects a text message from

17  Ms. Arslanian telling Mr. Uribe "You are a miracle worker who

18  makes dreams come true I will always remember that."  Do you

19  see that?

20  A.  Yes.

21  Q.  Then if we can go to line 891.  This is on June 22 of 2019,

22  Ms. Arslanian sends him a text.  I am going to read the first

23  line where she says "You have done some so much for me.  I will

24  never forget it."

25          Do you see that?

O663MEN2                          Graves - Cross

1    A.  Yes.

2    Q.  "I hope you know I will never have to repeat it the stands

3    always it's not part two but for a lifetime I will never ever

4    forget what kind of true person and friend you are."

5            Do you see that?

6    A.  Yes.

7    Q.  And last one is 934.  And then I won't read the whole thing

8    but at the end she ends it with "You are family and I have

9    never said that," correct?

10   A.  Yes.

11   Q.  And it's fair to say, do you recall seeing other examples

12   of text messages where Ms. Arslanian uses similar language or

13   phrases with Mr. Uribe?

14           MR. MONTELEONI:  Objection.

15   A.  There could be.

16           THE COURT:  Sustained.  I'm not sure what you mean,

17   sir.

18   Q.  Fair enough.  Why don't we go to line 549.  We could turn

19   to those text messages.  And that's a text from Ms. Arslanian

20   to Senator Menendez in which she texts him "I will now" and I

21   won't read the French "I have been so upset all morning.  Will

22   left for Egypt yesterday supposedly and now thinks he is the

23   king of the world and has both countries wrapped around his

24   pinky. I really hope they replace him."

25           Do you see that?

O663MEN2                          Graves - Cross

1    A.  Yes.

2    Q.  And if we can scroll down to line 554, Mr. Kelly.  And

3    Ms. Arslanian now texts Mr. Uribe "Good morning.  I hope you

4    had a good weekend.  I just found out Will left for Egypt

5    yesterday.  I am very hurt and disappointed by him once again

6    but I should not be surprised."

7              Do you see that?

8    A.  Yes.  It reads "I am very, very hurt."

9    Q.  Thank you.  "Very, very hurt."

10             And now if we can go to line 840.  And May 25 of 2019

11   Ms. Arslanian sends Jose Uribe a text that starts "Wael never

12   said one word about anything or has not brought you up one time

13   the time we were in D.C."  Do you see that?

14   A.  Yes.

15   Q.  Now I'd like to fast forward to June -- to line 901, which

16   is July 29 of 2019.  I think you read this on direct, but there

17   is an e-mail from Detective Lopez to Andy Aslanian that says

18   "Our office was wondering if we could arrange a time to meet

19   with your client Ana Peguero.  I have cc'd our deputy attorney

20   general if you would like to speak to him directly."

21             Do you see that?

22   A.  Yes.

23   Q.  If we go down to line 941, this is an August 1st text where

24   Mr. Uribe asks Mr. Hana "Call me ASAP."  Do you see that?

25   A.  Yes.

1    Q.  Do you know from the records you reviewed whether they

2    spoke?

3    A.  I don't recall.

4            MR. SOLANO:  If we can go to the next page, Mr. Kelly.

5    Q.  The second entry there is Mr. Hana texted Uribe "okay."  In

6    response -- actually if we could not, I apologize, Mr. Kelly.

7            The first entry is Mr. Uribe to Mr. Hana saying "Call

8    when you can."  Mr. Hana replies back on line 945 "okay."

9            You don't know first hand or from anything you

10   reviewed whether they actually spoke?

11   A.  I don't know.

12   Q.  After that text from Mr. Hana to Mr. Uribe, if you could

13   take a look at the rest of this page.  Are there any other

14   communications between Mr. Hana and Mr. Uribe or Mr. Hana and

15   Ms. Arslanian listed on the chart?

16   A.  Sorry.  Who are the other two individuals?

17   Q.  Either with Mr. Hana and either Ms. Arslanian or Mr. Uribe.

18   A.  Can you just clarify who to who?

19   Q.  Let me make it easier.

20           After that 945 line, where there is a text from

21   Mr. Hana, are there any other communications involving Mr. Hana

22   on this page?

23   A.  No, there are not.

24   Q.  If we can go to the next page.  It goes from August 5, the

25   first line, through August 7.  If you could quickly take a

1  look.  Are there any other communications on this page

2  regarding Mr. Hana?

3  A.  No, there are not.

4  Q.  If we can go to the next page.  This is from August 7

5  through September 3.  Do you see any other communications on

6  this page that involve Mr. Hana?

7  A.  No, I do not.

8  Q.  If we can go to the next page.  I'll tell you that on

9  line 1027 there is a text from Mr. Hana to Ms. Arslanian that

10 says "Call me."  Correct?

11 A.  Yes.

12 Q.  Other than that, do you see any other communication

13 involving Mr. Hana?

14 A.  Other than line --

15 Q.  1027.

16 A.  Other than that, line 1027, no, I do not.

17 Q.  And sitting here today, you don't recall if they had a

18 telephone call following that text do you?

19 A.  I don't.

20        MR. MONTELEONI:  Objection.

21        THE COURT:  I'll allow it.

22 Q.  If we can go to the next page.  This runs the entire day of

23 September 6.  Do you see any communications there involving

24 Mr. Hana?

25 A.  I do not.

1          MR. SOLANO:  Mr. Kelly, if we can go to the next page.

2   Q.  This runs from September 6 through October 6.  So

3   approximately one month.  Do you see any communications there

4   involving Mr. Hana on the chart?

5   A.  I do not.

6          MR. SOLANO:  The next page, Mr. Kelly, please.

7   Q.  October 6 through October 8, do you see any communications

8   on the chart involving Mr. Hana?

9   A.  Just to clarify, when I say "involving," I am just looking

10  at communications between.  I'm not looking at the detail

11  section if he's being named or mentioned.

12         THE COURT:  You are saying you're just looking at the

13  "from" and "to" lines.

14         THE WITNESS:  Yes.

15  Q.  That's what I intended for my questions, so thank you for

16  clarifying.

17         Do you see any communications to or from Mr. Hana?

18  A.  I do not.

19  Q.  If we can go to the next page.  This runs from October 8

20  through October 29 of 2019.  Do you see any communications to

21  or from Mr. Hana?

22  A.  I do not.

23  Q.  Last page.  One more page after this.  This runs from

24  October 29 through November 6.  Do you see any communications

25  on the chart to or from Hana?

1    A.  I do not.

2    Q.  The last page, from November 6 -- I'll stop at line 1142

3    because I think that's the last, or I'm sorry, 1141 is the last

4    one that tracks text messages or calls, correct?

5    A.  Yes, I believe so.

6    Q.  You see any text messages or communications between to or

7    from Mr. Hana?

8    A.  I do not.

9    Q.  I'd like to go back to line 426 through 429.  426 is on the

10   bottom here.  You were asked during Mr. Fee's cross-examination

11   about a series of text messages between Mr. Barruos and

12   Mr. Uribe.  Do you recall?  We can show you this line and the

13   next couple on the next page.

14   A.  Yes, I recall.

15   Q.  I think you testified -- we don't need to go back to the

16   chart unless you want, Agent, that those exchanges between

17   Mr. Barruos and Mr. Uribe related to what appeared to be a

18   broken down vehicle or truck?

19           MR. MONTELEONI:  Objection.

20           THE COURT:  Sustained.

21           MR. SOLANO:  Can we go look, please, Mr. Kelly, at

22   E207-1-T.  If you can scroll.

23   Q.  Do you remember being asked questions about this exhibit

24   cited in those lines, 426, 427, 428 and 429?

25   A.  Yes, I recall.

1    Q.  Do you recall testifying that those exhibits did not appear

2    to relate to the meeting that preceded those text messages on

3    the chart?

4              MR. MONTELEONI:  Objection.

5              THE COURT:  I'll allow it if she can answer.

6    A.  I don't recall.

7    Q.  If you want to flip through those text messages, can you

8    tell us whether or not they appear to relate to an issue with a

9    vehicle?

10             MR. MONTELEONI:  Objection.

11             THE COURT:  When you say "flip through," what do you

12   want her to do here?

13             MR. SOLANO:  If we could just flip through the pages

14   and you can look at the text messages, Agent, and let us know

15   what the topic is that's being discussed.

16             MR. MONTELEONI:  Speaks for itself.

17             THE COURT:  Sustained.

18   Q.  Let me go back to the chart.  We can go back to line 422.

19   We don't need to highlight it because there are going to be a

20   couple of questions.  But do you see there is an exchange, and

21   I think you testified about this earlier, starting from

22   line 415 through 425 between Mr. Uribe and Bienvenido

23   Hernandez?

24   A.  Yes, there is an exchange between those two individuals on

25   the chart.

1  Q.  And if you look at 415, for example, there is an address

2  for the law firm Critchley Kinum & DeNoia.  Do you see that?

3  A.  Yes.

4  Q.  And then if you look down below, on 424 Mr. Uribe says "I'm

5  already in his office."  Do you see that?

6  A.  Yes.

7  Q.  And would it be fair to say, generally, these text messages

8  relate to a meeting Mr. Uribe has at that law firm?

9           MR. MONTELEONI:  Objection.

10           THE COURT:  Do you know?

11           THE WITNESS:  I don't know.

12  Q.  From looking just at the chart, does it appear that this

13  exchange relates to the meeting at the law firm of Critchley

14  Kinum & DeNoia?

15           MR. MONTELEONI:  Speaks for itself.

16           THE COURT:  Do you know?

17           THE WITNESS:  I don't know.

18  Q.  Let's go to the next page.  On line 430 and 431.  On 430,

19  Uribe texts Mr. Hana "Good.  I am worry man.  Can't even

20  sleep."  And the next minute Mr. Hana writes back to Mr. Uribe

21  "All good."  Do you see that?

22  A.  Yes.

23  Q.  And cited in that is Exhibit GX E102-6.  From looking at

24  this chart, is there anything that tells you what that text

25  exchange relates to?

O663MEN2                        Graves - Cross

1   A.  No, I don't know.

2   Q.  If we could pull up GX E102-6.  If you see that, if you can

3   focus on the first text on this string.  If you can look at

4   that text, Agent Graves, and tell me if that's the same text

5   message that appears on line 428.  I'm sorry.  430.

6   A.  It's one of the two exchanges I just reviewed.  I don't

7   remember the line number.

8   Q.  But it's one of the two you just reviewed.

9           If we can pull out, Mr. Kelly.

10          Looking at that underlying exhibit that's cited in

11  those lines, is there anything about this exchange that tells

12  you what it relates to?

13          MR. MONTELEONI:  Speaks for itself.

14          THE COURT:  Can you answer that?

15  A.  Is this the only page in the exhibit?

16  Q.  I believe so.

17          Is that correct, Mr. Kelly?  Oh, if we can scroll

18  through the other pages as well, please.

19  A.  I don't know what the conversation is about.

20  Q.  Thank you.  And just to clarify again, you were not

21  responsible for the placement of any of the lines within the

22  chart, correct?

23  A.  No, I was not.

24  Q.  Last area.  If we can pull up line 16, please, Mr. Kelly.

25  On line 16, there is a text that you were asked about yesterday

1  from Uribe to Mr. Hana in which he texts him "Michael Critchley

2  but he's not officially in court yet."  Do you see that?

3  A.  Yes.

4  Q.  And Michael Critchley is an attorney, correct?

5        THE COURT:  If you know, you can answer.

6  A.  His name is associated with a law firm.  And the documents

7  state he's an attorney.

8  Q.  Thank you.  If we can go to line 22.  And we have Mr. Uribe

9  texting Mr. Hana "The deal is to kill and stop all

10 investigation.  I am talking to Andy and he is falling asleep."

11 Do you see that?

12 A.  Yes.

13 Q.  And do you recall from the records that Andy is Andy

14 Aslanian?

15 A.  I don't know.

16 Q.  Do you recall whether there is an Andy Aslanian who is an

17 attorney?

18 A.  I don't know if he's an attorney.  There is an Andy

19 Aslanian.

20       MR. SOLANO:  If we can go back to the first page,

21 Mr. Kelly.  Do you see in line 3 -- we can zoom in on that.

22 Q.  Mr. Aslanian e-mails Detective Lopez and starts off "This

23 office has been retained by Ana Peguero and her employer

24 regarding your desire to obtain information regarding one of

25 their insureds" and then it continues from there.

1        Does that indicate to you that Mr. Aslanian is an attorney?

2    A.  Yes, I recall him sending or reviewing that e-mail.

3    Q.  Last line is line 125.  If we can zoom in on that.  It is a

4    photo that Mr. Hana sends to Ms. Arslanian with the picture of

5    substitution of attorney for Michael Critchley in the State of

6    New Jersey v. Elvis Parra.  Do you see that?

7    A.  Yes.

8    Q.  If we can quickly just go to GX B105-AA.  And if we can

9    zoom on the signature on the right.  I think you may have been

10   asked about this yesterday.

11       Howard Dorian is also listed as the withdrawing

12   attorney, correct?

13   A.  Yes.

14   Q.  So, you'd agree that the communications that we were

15   looking at just now with Will Hana relate to attorneys,

16   correct?

17       MR. MONTELEONI:  Objection.

18       THE COURT:  Sustained.

19       MR. SOLANO:  I'll move on, your Honor.

20   Q.  And to sum up, Agent, you did not make any decisions in the

21   chart with respect to the summary chart that we've been asking

22   questions about.  You did not make any decisions about what was

23   included in there or left out, correct?

24   A.  Yes, I did not make any decisions.

25   Q.  And the prosecutors did that, correct?

O663MEN2                        Graves - Cross

 1  A.  Yes.

 2  Q.  You did not make any decisions about how text messages or

 3  calls or any of the line items were described in the summary

 4  chart?

 5          MR. MONTELEONI:  Objection.

 6          MR. SOLANO:  I can rephrase that, your Honor.

 7  Q.  In 1303 there is the last column under the heading

 8  "detail," do you recall that?

 9  A.  Yes.

10  Q.  For each of the lines in this chart, there is some level of

11  detail about what the communication or event is, correct?

12  A.  Yes.

13  Q.  You did not draft those details, correct?

14  A.  No, I did not.

15  Q.  The prosecutors did, correct?

16  A.  Yes.

17  Q.  And in terms of where things were placed in the chart, and

18  what was included next to a prior item, again, you did not make

19  those decisions, correct?

20  A.  The order of the chart, I did not make those decisions.

21  Q.  The prosecutors did, correct?

22  A.  Yes.

23  Q.  And before you testified today, you met with the government

24  to prepare for your testimony, correct?

25  A.  Yes, I did.

O663MEN2                        Grewal - Direct

1   Q.  And they selected or they decided what questions or areas

2   of the chart your testimony would focus on, correct?

3   A.  Yes.

4              MR. SOLANO:  No further questions.

5              THE COURT:  Thank you.

6              Mr. De Castro, anything?

7              MR. AGATA:  No, your Honor.  No cross-examination.

8              THE COURT:  Thank you.  Is there any redirect of this

9   witness?

10             MR. MONTELEONI:  No, your Honor.

11             THE COURT:  You are excused.  You may step down,

12  Agent.

13             (Witness excused)

14             THE COURT:  How long is the next witness going to be?

15             MR. RICHENTHAL:  I anticipate direct examination of

16  roughly 45 minutes, your Honor.

17             THE COURT:  Why don't we start.

18             MR. RICHENTHAL:  I think that's perfectly fine.

19             THE COURT:  I'm glad you agree.

20             Good afternoon, Mr. Grewal.  Welcome.

21   GURBIR GREWAL,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24  DIRECT EXAMINATION

25  BY MR. RICHENTHAL:

O663MEN2                          Grewal - Direct

1    Q.   Good afternoon.

2    A.   Good afternoon.

3    Q.   What is your educational background?

4    A.   I got my undergraduate degree from Georgetown, and my law

5    degree from William & Mary.

6    Q.   For approximately how long have you been a lawyer?

7    A.   Since '99, so 25 years.

8    Q.   Have you held any positions in public service?

9    A.   I have.

10   Q.   Which ones and approximately when?

11   A.   So, originally I was an assistant U.S. attorney across the

12   river behind us, in Brooklyn.  That's from 2004 to 2007.  Brief

13   stint back in private practice.  Then I was a federal

14   prosecutor and assistant U.S. attorney in New Jersey, across

15   the other river.  I did that until about 2016, when I became

16   the Bergen County prosecutor, which is the equivalent of a

17   district attorney in New York, but in New Jersey they call it a

18   county prosecutor.  I was Bergen County prosecutor from 2016 to

19   2018, at which point I became the attorney general for the

20   state of New Jersey, a position I held since until the summer

21   of 2021, when I assumed my current role as the director of

22   enforcement at the Securities and Exchange Commission, where I

23   presently serve.

24   Q.   What is the Securities and Exchange Commission or SEC?

25   A.   The SEC is the nation's primary federal securities

O663MEN2                          Grewal - Direct

1    regulator.  We have rule making divisions, that promulgate

2    rules that apply to regulated entities and individuals; we have

3    an examinations division that examines against those rules, so

4    we'll go into a registrant to see if they are abiding by those

5    rules; and then you have the enforcement division, which I run,

6    which is about 1600 public servants across 12 offices that

7    investigate and prosecute civil violations of the federal

8    securities laws.

9    Q.  You mentioned a few different positions in New Jersey.  Are

10   you from New Jersey?

11   A.  Born and raised, yeah.

12   Q.  In your current position that is at the SEC, did you have

13   any role in the investigation or prosecution of this case?

14   A.  I did not.

15   Q.  Apart from being interviewed as a witness --

16            THE COURT:  If you can slow down, sir.  The reporter

17   would appreciate it and the interpreter.

18   Q.  I'll go back.

19            In your current position at the SEC, did you have any

20   role in the investigation or prosecution of this case?

21   A.  I did not.

22   Q.  Apart from being interviewed as a witness, did you have any

23   role in the investigation or prosecution of this case?

24   A.  I did not.

25   Q.  I want to turn to one of the positions you just mentioned a

O663MEN2                       Grewal - Direct

1    minute ago.  The New Jersey attorney general.  In sum, what is

2    the New Jersey attorney general?

3            MR. FEE:  I think some of the jury is trying to get

4    your attention.

5            THE COURT:  I'm sorry.  Do you need a break?

6            Ladies and gentlemen, why don't we take our lunch

7    break.  All right?  Let's take a lunch break.  Be back at

8    1 o'clock.  I'm sorry.  I've done that before.  Let's make it a

9    quarter to 2.  All right.  We'll make sure everything is okay.

10            (Jury excused)

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O663MEN2

| | |
|---|---|
| 1 | THE COURT:  All right, everyone.  A quarter to the 2. |
| 2 | We'll make sure that juror is okay. |
| 3 | MR. RICHENTHAL:  Your Honor can we raise one small |
| 4 | matter? |
| 5 | THE COURT:  Yes. |
| 6 | MR. RICHENTHAL:  It doesn't relate to this witness. |
| 7 | I'd like to wait for him to leave. |
| 8 | THE COURT:  I'd like quiet in the courtroom please. |
| 9 | The prosecutor has a question or an issue. |
| 10 | MR. RICHENTHAL:  It doesn't relate to this witness.  I |
| 11 | am going to wait for him to step out in an abundance of |
| 12 | caution. |
| 13 | THE COURT:  I still would like quiet in the courtroom. |
| 14 | MR. RICHENTHAL:  We wanted to note, your Honor, I'm |
| 15 | sorry this is a repeated issue.  Three exhibits were shown to |
| 16 | Agent Graves that we had no notice of.  These were plainly not |
| 17 | impeachment exhibits.  They were literally entirely different |
| 18 | subject matters having nothing to do with the chart or her |
| 19 | testimony. |
| 20 | We gave notice of Agent Graves and the exhibits last |
| 21 | week.  We received some exhibits for other witnesses, including |
| 22 | this witness, last night, that's also belated, but I'm focused |
| 23 | on Agent Graves right now.  This came up during her testimony. |
| 24 | These are lengthy text exchanges.  We saw them for the very |
| 25 | first time in real time. |

1          THE COURT:  Defense?

2          MR. FEE:  Your Honor, this is impeachment.  They have

3    a chart they're presenting through this witness.  It

4    mischaracterizes and omits meaningful things.  We asked her do

5    you recall seeing these.  She said no.  We refreshed her with

6    impeachment exhibits and didn't offer them.  This is totally

7    conventional.

8          MR. RICHENTHAL:  It is true they didn't offer them.

9    It is not true they're impeachment.  This is a summary chart.

10   Asking whether the person saw things not on the chart and

11   literally --

12         THE COURT:  Just a moment.  Go ahead.  They're asking

13   whether she saw things not on the chart.  Go ahead.

14         MR. RICHENTHAL:  And asking her whether she refreshed

15   her memory about those subject matters, which have nothing to

16   do with the chart.  That's not impeaching what she testified to

17   on direct.  It's trying to introduce other subject matters.  It

18   may or may not be appropriate.

19         THE COURT:  To the extent it's introducing other

20   subject matters, that's correct, it's not impeachment.

21         Let me go on to staffer number 1 since we have a few

22   moments here.  The issue with staffer number 1 has to do with

23   the two exhibits attached to the government's letter of June 3,

24   2024, and as I understand it, the issue is the admissibility of

25   what's in the box.  Is that correct?

O663MEN2

1          MR. MARK:  Yes, your Honor.  We had discussed with

2   defense counsel and narrowed it down to just what's in the box.

3          THE COURT:  All right.  Let me hear what the objection

4   to its admissibility is.

5          MR. WEITZMAN:  Your Honor, I apologize, I actually

6   don't have the exhibits in front of me because I did not know

7   we were doing staffer number 1.

8          But my recollection on at least one of the exhibits is

9   that it concerns speculation from a different staffer, stating

10  that this whole Egypt thing is weird.

11         THE COURT:  Here's the issue.  I understand.  Let me

12  just get it.

13         MR. WEITZMAN:  I can lay out the nature of our

14  objection, your Honor, with respect to that one.

15         THE COURT:  I know what it is.  Let me just reference

16  it for you.  Just a moment.  801(d)(2)(D).  801(d), statement

17  that meets the following conditions is not hearsay.

18  801(d)(2)(D).  The statement is offered against an opposing

19  party, that's met, and (d) was made by the party's agent or

20  employee on a matter within the scope of that relationship and

21  while it existed.

22         What part of that are you questioning?

23         MR. WEITZMAN:  So, there are three objections.

24  There's the hearsay nature of the objection, there is the

25  speculation nature of the objection, and then there's the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O663MEN2

1    speculation and foundation.  And then the third is just a

2    straight up 403 objection, your Honor.

3            So with respect to the hearsay nature of the

4    objection, I know the agent rule.  This is a text message

5    thread between two staffers, and this communication itself is

6    not in furtherance of the agency relationship.  It is the two

7    of them gossiping, not at the senator's direction.  So, I

8    don't believe, whether other portions of the text chain are in

9    further --

10           THE COURT:  Hasn't one of them been tasked or job has

11   to do with the Egyptian embassy here?

12           MR. WEITZMAN:  Yes, your Honor.  The two staffers are

13   members of the SFRC and they are both involved in the

14   coordination of the Egypt CODEL.  But this --

15           THE COURT:  They're trying to figure out, there is a

16   miscommunication here, they thought they were trying to find

17   somebody named Abdel, first name, Majid second name.  They

18   didn't realize that the person they were supposed to contact as

19   requested I think from Senator Menendez is a woman named Mai

20   Abdelmaguid, and they can't find her in the embassy.  And the

21   embassy is a relatively small embassy, at least according to

22   this, so they can't figure it out.

23           Isn't that what this is about?

24           MR. WEITZMAN:  Your Honor, we don't have an objection

25   to any portion of that chain.  The objection is just as to this

1   is one, one communication in the box on page -- I don't know if

2   it's 5 or 6.

3          THE COURT:  I have it.  "All of this Egypt stuff is

4   very weird."

5          MR. WEITZMAN:  It's that line.  It's that line.  It's

6   outside the agency relationship in that he's not actually

7   communicating trying to further his boss's instructions.  He's

8   speculating without foundation and then --

9          THE COURT:  I'm sorry.  The box says "All of this

10  Egypt stuff is very weird.  I've never seen anything like it.

11  Let's see if I can talk to him" I infer that's the senator

12  "about it again over the weekend, and get him to a better

13  place."  Staffer 1 then says "thanks."

14         Isn't that exactly what they've been tasked with

15  doing?  That is, finding, making contact with the person who

16  turns out to be Mai Abdelmaguid in connection with arranging

17  the CODEL?

18         MR. WEITZMAN:  They've already communicated.  This

19  part of the chain doesn't have anything to do with

20  Ms. Abdelmaguid.  The first sentence of this chain I don't

21  think is non-hearsay under that exception.  It is just gossip.

22         THE COURT:  What's the first -- you're talking about

23  the box?

24         MR. WEITZMAN:  The first sentence, yes, in the box.

25         THE COURT:  Not the first sentence in the chain.

O663MEN2

1          MR. WEITZMAN:  Correct.  The second sentence is fine.

2    We don't object to that.  But the first sentence is gossip, for

3    which he lacks foundation, nor is it clear what he means by

4    "weird" because's not going to be a testifier in this case.  So

5    it's absolutely 403 confusing, and they're going to draw some

6    sort of spec -- or ask the jury to draw some speculation that

7    you know what weird means here, which there is just no basis

8    for that.

9          And so, I believe there's three different objections

10   beyond, in addition to the hearsay.  Hearsay, speculation,

11   foundation, and 403.  No one's testifying as to what this man

12   meant when he said "weird."

13         THE COURT:  All right.  Government?

14         MR. MARK:  Well, I think right after he said "All of

15   this Egypt stuff is weird, I've never seen anything like it,"

16   he's talking about the planning of the CODEL and the nature of

17   the plan of the CODEL, and this is very much in line with all

18   of their communications regarding the planning of the CODEL,

19   which continue through the next text chain after that.

20         This is very squarely within the agency relationship.

21   The fact that Mr. Menendez just doesn't like the nature of the

22   statements, but as the cases we cite make clear --

23         THE COURT:  No, it's not Mr. Menendez.  It's

24   Mr. Weitzman.

25         MR. MARK:  Mr. Menendez's counsel.  I apologize if I

1    didn't make that clear.

2            The fact that they might be detrimental or not helpful

3    to him, that's exactly what this exception is here for.  And

4    the cases make clear that the liberal treatment of agency in

5    this situation, this is not speculation, it's tied to

6    particularly what they observed within the context of their

7    employment, and they're both longtime staffers talking about

8    the planning of a CODEL, which is within their duties and

9    responsibilities.  So we think it falls squarely within this

10   exception.

11           THE COURT:  403?

12           MR. MARK:  Well, I'm not sure what unfair prejudice

13   that they've identified here.  To the extent they're arguing

14   this is speculation or there is vagueness, that would go to the

15   weight of the evidence and they can make those arguments, but

16   it's highly relevant here.  I mean, for all of the reasons that

17   it's dealing with the CODEL here, this is something that's

18   directly at the core of the charges, and it's directly at the

19   core of particularly the 219 charge that's at issue here.

20           So it's very probative, it's very relevant, and to the

21   extent they want to argue that it's speculative, that's

22   something they can make the argument and they can argue that to

23   the jury.

24           THE COURT:  Mr. Weitzman?  What about the liberal

25   treatment that the Second Circuit accords 801(d)(2)(D).  I'm

O663MEN2

1    referring specifically to *Pappas v. Middle Earth Condominium*

2    *Association*, 963 F.2d 534.

3              MR. WEITZMAN:  Your Honor, I think agency has limits,

4    and the question is whether someone is saying it within the

5    scope and for the purpose of fulfilling their principal's

6    requests.  I don't think he's saying this for that purpose.

7    This is just pure gossip.  She's upset.  What's happened

8    here --

9              THE COURT:  She's not going on the CODEL because she

10   was --

11             MR. WEITZMAN:  Correct.

12             THE COURT:  She was told that for some reason, she

13   wouldn't arrange a meeting between Menendez and el-Sisi.  She

14   feels that's wrong.  She never did not arrange -- they didn't

15   stand in the way of such a meeting.

16             MR. WEITZMAN:  Correct.

17             THE COURT:  Presumably she wants to continue on it.  I

18   think Damian must be a boss although that's a little unclear.

19   But they're also trying to figure out who Mai Abdelmaguid is I

20   believe.

21             MR. WEITZMAN:  The comment about all of this Egypt

22   stuff is very weird is an effort to reassure -- Damian I

23   believe is her subordinate and he's making her feel better

24   about what just happened.  The fact, I mean, there are other

25   reasons she didn't go on the CODEL that are personal to her.

O663MEN2

But, he's basically saying this is just weird stuff.  Right.
Don't take it to heart.  He's not mad at you.  They actually
talk about whether the senator's mad or not mad.

          This is two colleagues trying to reassure each other.
That sentence is not about planning the CODEL in the sense that
they're furthering the planning of it.  They're not doing that.

          Now, I understand the liberalness, but I don't think
any amount of liberalness, your Honor, justifies putting before
the jury something that is utterly confusing and which the
government will argue I think that weird means he's an agent of
Egypt.  I don't think Damian was going to say that.

          THE COURT:  Wait a minute.  Is the government going to
argue that from this that Menendez is an agent of Egypt?

          MR. MARK:  No.  That's not -- what it goes to, there's
certain points that this goes to.

          First, as a factual point, Damian Murphy at the time,
I think it was September 29 so just a few days before, had
formally been promoted to be the staff director.  So he's
actually Sarah Arkin's boss at the time of this.

          THE COURT:  That's the impression I got from something
here.

          MR. MARK:  They were working on it, then he got
elevated during the course of this text chain.

          This is a classic damaging statement by an employee.
It's directly within what this rule is meant to cover.  And

1    this is particularly relevant, because as your Honor knows, the

2    defense opened on saying that Mr. Menendez's behavior with

3    respect to Egypt was entirely consistent, it was usual, and

4    this directly goes to the question of whether this was like

5    anything they had seen before.

6            THE COURT:  I am going to cut this off.

7            Given the liberal treatment under 801(d)(2)(D), I am

8    going to permit it.  It's clearly made by the party's employee

9    on a matter within the scope of that relationship and while it

10   existed.  They are planning the CODEL, it involves that, so I'm

11   going to allow it.  And in fact there is a District Court case

12   that talks about private musings even being permitted under

13   801(d)(2)(D).  I don't have to go that far.  I don't see it as

14   a 403 issue.  So I'm going to allow it to come in under

15   801(d)(2)(D).

16           MR. WEITZMAN:  That's fine.  I think we got a

17   representation from the government that they will not argue

18   that that text, that the jury can infer from that text that

19   he's an agent or working for Egypt.  So they have to be limited

20   in that regard.

21           MR. RICHENTHAL:  So, I think we need to be precise

22   about our argument here.  What Mr. Mark was referring to is

23   this text alone.

24           THE COURT:  I understand.  You're obviously going to

25   argue that, as understand the pleadings, that Menendez was an

1    agent of Egypt.  We're talking about these words.

2                MR. RICHENTHAL:  Yes.  But part of these words is part

3    of a story.  And that story includes strange things in the

4    planning of a trip to Egypt.  We are obviously entitled to ask

5    the jury to infer things were strange because it was an

6    atypical relationship.  These exact words, no, we're not going

7    to point to these words.

8                THE COURT:  I understand.  Proceed.  We'll proceed.  I

9    have no problem with this being in the mix of things.

10               Now let's turn to the second issue here which is the

11   from Robert Kelly to staffer number 1 e-mail.  I think the

12   issue is whether the attachment to that comes in.  So defense,

13   why don't you talk to me about that.

14               MR. WEITZMAN:  Yes, your Honor.  There are two issues.

15   The first is, to the extent the government is seeking to offer

16   the bios, they are offering them for the truth of the matter

17   asserted.

18               THE COURT:  That they can't do.

19               MR. WEITZMAN:  I agree.

20               The second question is what is the admissible purpose

21   if for something other than the truth.

22               THE COURT:  What about the fact it was said, not for

23   the truth?  That is, not for the truth that -- I may not be

24   getting these names correctly -- but that Al Thani is a member

25   of the ruling family in Qatar, and not for the truth that

O663MEN2

1    al-Thawadi is the CEO of one of the largest business holdings

2    in the country.  But simply for the fact that this was said.

3          MR. WEITZMAN:  For the fact that it was said to whom,

4    your Honor?

5          THE COURT:  That has to be an inference, and I don't

6    know whether that inference can be drawn or not.  But it seems

7    to me that that's the government's hurdle here.  On its face,

8    it's from Kelly to Arkin.  So, there isn't a direct link here

9    to Menendez.  But I don't see why, as long as the jury has an

10   instruction that it's not for the truth of the matter asserted,

11   but simply for the fact that it was said, that the government

12   shouldn't be entitled to have the jury draw that inference,

13   assuming they have some basis for it.

14         MR. WEITZMAN:  I disagree, your Honor.  I think it has

15   to have a relevant purpose.  They have not argued, to me at

16   least, it's relevant that Sarah Arkin or Robert Kelly know.

17   They've argued if Menendez knows.

18         THE COURT:  That I understand.  And that's why I say I

19   think it's up to them to be able to lay a foundation for the

20   inference that they, I think, need to draw here.

21         MR. WEITZMAN:  I've asked for a proffer on that very

22   issue.  Do you have a communication, do you have an e-mail, do

23   you have anything that shows this was ever forwarded or

24   communicated to Senator Menendez.  And they didn't have any

25   proffer to provide.  So until they provide a proffer, I don't

1    think it's admissible.

2                THE COURT:  Fine.

3                MR. MARK:  So, your Honor, just on the face of the

4    e-mail itself, I think it establishes sufficient basis for

5    admissibility.

6                So this is an e-mail to Robert Kelly to schedule the

7    meeting attaching, bios of the two Qatari officials.  Then what

8    the e-mail reflects is about an hour later, Robert Kelly, who

9    it's is already in evidence is the deputy chief of staff for

10   Mr. Menendez for operations, the same person who is forwarding

11   him information on behalf of Senator Menendez to McKinney, for

12   instance.  Replies to Sarah Arkin and Jessica Lewis and says RM

13   agreed to do this meeting on Tuesday at 11.  I'm trying to

14   track down more information, meaning additional information

15   about it.

16               Just on its face, this indicates that Robert Kelly is

17   saying that Menendez has agreed to this meeting, right.  And I

18   think it is a fair basis for the jury to infer that it's based

19   on what's communicated, and now he's looking for more

20   information, because all he has is the bio of these two people

21   and he wants to find out more information about them.

22               I think there is a very fair basis for the Court to

23   reach the threshold this is --

24               THE COURT:  This theory is that Menendez agreed to do

25   this meeting, the meeting being what's set forth from M. Doyle.

 1    And at least had the possibility or it was logical to assume

 2    that he did so on the basis of having seen this?  Is that it?

 3              MR. MARK:  Or I think it is a fair inference that he

 4    agreed to the meeting based on the information that is being

 5    conveyed in this meeting request.  That Senator Menendez agreed

 6    to do the meeting based on the information that is being

 7    conveyed to him from this e-mail.

 8              THE COURT:  I understand.

 9              MR. WEITZMAN:  Your Honor, the leaps here are

10    illogical.  This e-mail, the original e-mail from M. Doyle is

11    sent on Sunday, January 31, at 2:18 p.m.  This is a

12    non-workday.  Rob Kelly --

13              THE COURT:  There are no non-workdays.

14              MR. WEITZMAN:  Not for us lawyers.  Rob Kelly responds

15    within one hour, and he says RM agreed to do this meeting.

16    They're not in the office together on this Sunday.  There is no

17    proof of that.  What Rob Kelly is saying, he's already agreed

18    to this meeting, it's fine.  If Senator Menendez was forwarded

19    this, I would entirely agree with the government's position

20    that, you know, there is a predicate.  But on a Sunday, he is

21    just saying we've agreed to do this meeting, no problem.

22    That's the only inference that can be drawn.

23              MR. MARK:  Your Honor, may I?

24              THE COURT:  Yes.

25              MR. MARK:  Which is I think it's a fair inference that

O663MEN2

1    Mr. Menendez isn't going to take a meeting with just anyone

2    that he doesn't know, particularly on a Sunday.  And that the

3    purpose of the bio and the purpose of the e-mail is

4    particularly to introduce who these people are, and why he

5    should take a meeting.  And if there was so quickly a response

6    on a Sunday, which is a non-workday, further supports that he

7    would have understood who the people are that he's agreeing to

8    do a meeting with, just a couple days later.

9         So I think, if anything, what Mr. Weitzman is pointing

10   out, the context of being a Sunday, further supports the

11   inference that he was informed of who these people were, the

12   nature of these people who he was going to take a meeting with

13   just so shortly after.

14        THE COURT:  I am going to allow it but not for the

15   truth of what's set forth here.  But only for the fact that it

16   was said.  And when it comes up, if the defense seeks a

17   limiting instruction, I certainly will give it.

18        MR. WEITZMAN:  Your Honor, I think at a minimum, I

19   don't know that I've done this.  I don't know if government's

20   done this.  But if their argument is this was communicated in

21   real time over this one hour, let's check the toll records.  If

22   there is no toll record between Rob Kelly and Senator Menendez,

23   I don't think this comes in.  We have all their toll records.

24        THE COURT:  I'm not sure I agree with that, but let me

25   hear the government.

O663MEN2

1              MR. RICHENTHAL:  That just isn't the law.  There is no

2       standard we have to prove it was forwarded in a particular way.

3       It is plainly relevant the jury can infer.

4              THE COURT:  I've made my decision.  It says Menendez

5       agreed to do this meeting.  It doesn't necessarily mean that

6       the only basis that he agreed to do the meeting on was if he

7       saw this attachment.  It's coming in but not for the truth of

8       the matter asserted.

9              I think you told me yesterday, government, but what's

10      the expected length of the direct on General Grewal?

11             MR. RICHENTHAL:  I think Mr. Grewal's direct

12      examination is probably approximately 45 minutes.

13             THE COURT:  Thank you.

14             (Luncheon recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O66Wmen3                    Grewal - Direct

                         AFTERNOON SESSION

1                              1:55 p.m.

2

3          (Jury present)

4          THE COURT:  You may be seated in the courtroom.

5          Mr. Richenthal, you may continue with the direct

6    examination of Mr. Grewal.

7          MR. RICHENTHAL:  Welcome back.

8    Q.  Before the break, I think you testified that one of the

9    positions you've held in public service is as New Jersey

10   attorney general?

11   A.  That's correct.

12   Q.  First, who selects the New Jersey attorney general?

13   A.  I was nominated by the governor.  Governor-elect at that

14   time, Phil Murphy, selected me and then nominated me once he

15   became governor.

16   Q.  That's the governor of the state of New Jersey?

17   A.  That's correct.

18   Q.  Now, I'm going to ask you a series of questions about that

19   position, but let me just start at the highest level.

20         What, in sum, is the office of the New Jersey attorney

21   General?

22   A.  Sure.  It's a cabinet-level position.  The New Jersey

23   attorney general is the chief law enforcement officer for the

24   state of New Jersey and also the chief legal officer for the

25   state of New Jersey and, in that capacity, oversees the

O66Wmen3                          Grewal - Direct

1    department of law and public safety, which is comprised of

2    about 8,000 people across 16 or so divisions, the biggest of

3    which being the division of state police.  And there are a

4    number of other divisions, to include the division of criminal

5    justice, the office of insurance fraud prosecutor, broad

6    responsibilities.

7          I could stop there or continue.

8    Q.  Why don't you give some examples, in general, of the types

9    of things the New Jersey Attorney General's Office gets

10   involved in.

11   A.  Sure.  On the criminal side, in addition to overseeing the

12   New Jersey State Police, which is the state's largest police

13   agency, you also have the division of criminal justice, which

14   is the state-level prosecutor's office.  You have your

15   detectives.  You have your own prosecutors.  You have the

16   insurance fraud prosecutor.

17            THE COURT:  Sir, if you could slow down a bit, because

18   we have interpreters --

19            THE WITNESS:  Oh, I'm sorry.

20            THE COURT:  -- and we have the reporter.

21            THE WITNESS:  Sure.

22   A.  You also have the office of insurance fraud prosecutor,

23   which has its own lawyers, prosecutors, detectives.  Then you

24   have supervisory oversight authority over all law enforcement

25   operations in the state.  So you have the ability to set policy

1    for all 36,000 police officers in the state, and you supervise

2    the 21 county prosecutors' offices in -- meaning that if there

3    are any issues with those offices, you can supersede or take

4    over those offices.

5         So those are generally the law enforcement responsibilities

6    of the A.G.

7         On the civil side, you're the state's lawyer.  No state

8    agency can have their own lawyers, within the agency.  They all

9    are, at the A.G.'s office, within the division of law.  So

10   there are about 500 or so civil lawyers that provide legal

11   advice to the state and its agencies.  You oversee the division

12   of consumer affairs as well, which oversees enforcement of the

13   consumer fraud laws in New Jersey.

14        And then you have a bunch of regulatory agencies that you

15   oversee.  You oversee the casinos, the racetracks, boxing,

16   sports and -- you know, sanctioned sports in New Jersey, the

17   alcoholic beverage commission.  And then you have -- it's a

18   broad responsibility.

19        Then you also have -- you know, you're the conduit for

20   grant funding.  For example, federal grants, like the victim of

21   crime assistance act dollars, flow from the federal government

22   to the A.G.'s office, and we distribute those to local law

23   enforcement.  Byrne justice assistance grant money, which comes

24   from the federal government, comes to our office.  We

25   distribute it to local agencies to hire police officers, things

1    of that nature.  So you have that grant function also.

2         And then you have the juvenile justice commission, so

3    you're responsible for housing and rehabilitating young people

4    who are caught up in the criminal justice system.  And so, you

5    know, broadly speaking, those are some of the responsibilities

6    of the A.G.

7    Q.  And approximately when did you serve as the A.G.?

8    A.  I was nominated on January 16 of 2018.  The official

9    nomination was shortly after the governor was sworn into

10   office, and I was confirmed by the Senate that afternoon.  And

11   I served in that role until June 26, 2021, when I left for my

12   current position.

13   Q.  I want to take you through some of the things you just

14   mentioned about the office, generally.

15        First, you mentioned it does both civil work and criminal

16   work, is that right?

17   A.  That's correct.

18   Q.  Can you give an example of the types of criminal work the

19   office might get involved in?

20   A.  Sure.  All the counties have their own prosecutors, and so

21   we're at the state level and the types of crimes we would look

22   at would be bigger drug distribution operations that cross

23   multiple counties.  If there are opioid pill mills, and things

24   of, like, that nature with more complex investigations, we

25   would handle those.  Carjacking rings that span the county and

O66Wmen3                          Grewal - Direct

1   maybe went up and down the state, those would be matters that

2   we would handle.  We would partner with federal law enforcement

3   on bigger, organized crime-type investigations that crossed

4   multiple counties or into other states.  So those would be some

5   examples of the criminal responsibilities of the A.G.'s office.

6   Q.  You described a broad set of responsibilities.  Roughly

7   speaking, how is the office structured; that is, how is it

8   organized?

9   A.   Sure.  The department of law and public safety, which the

10  A.G. oversees, has, I think, about 15 different divisions which

11  have their own division directors.  Within my office, within

12  the A.G.'s office, I had a core team of folks -- a first

13  assistant attorney general, an executive assistant attorney

14  general, a number of counsels and the chief of staff, and they

15  had their own portfolios.  Some had a criminal portfolio and

16  oversaw the criminal divisions that handle, you know, the law

17  enforcement responsibilities.  Other had civil portfolios.

18      We also had the division on civil rights, for example, and

19  they handle those, and so they would sort of deal with the

20  day-to-day questions that may come up from the various

21  divisions.  And then I would meet, depending on the division,

22  on a different cadence with the division directors.  In some

23  cases -- for example, the state police it was nearly a daily

24  conversation, but in other cases, it was less frequent.  So

25  maybe every other week or maybe monthly, I would have check-ins

O66Wmen3                          Grewal - Direct

1    with the different division directors, where they would

2    highlight important initiatives or matters that they wanted to

3    bring to my attention or, you know, concerns around funding or

4    other issues.

5    Q.  Given the size and breadth of the office, do you have a

6    sense roughly of the number of personnel who worked for the

7    attorney general's office?

8    A.  It was up around 8,000-plus when I was the attorney

9    general.  Again, most of those are the division of state

10   police, which has 2,700 or so sworn law enforcement, and the

11   rest were support staff and other professionals.  And then you

12   know, maybe five or 600 lawyers, you know, the division of law

13   and then, you know, a thousand or so other public servants

14   spread out across the other divisions.

15   Q.  Given the size of office, did all matters reach your desk;

16   that is, were all matters brought to your attention?

17   A.  No.

18   Q.  Were all matters brought to your senior leadership's

19   attention?

20   A.  I would hope they were.  You know, even then it probably

21   wasn't every matter.  Certainly things that were -- required

22   consultation, I would expect the division directors to raise up

23   to the senior staff, and then I would get involved in matters

24   where maybe there was a public announcement or a press

25   conference that I would have to give or if there was a policy

1    announcement to be made, if we were rolling out -- for example,
2    a big priority of mine as attorney general was reforming our
3    state's use of force policy and policies around policing.
4    That's one thing that I wanted everything escalated to me on.
5        The opioid issues that we were dealing with were issues
6    that I wanted to be informed about and have a hand sort of in
7    shaping the state's response.
8        Gun violence was a priority for me, so if anything touched
9    on investigations or actions we were taking in that area, those
10   were things that I paid particular attention to and were
11   priorities of mine.  So I would have been informed about those
12   things on a more regular basis.
13            THE COURT:  Again, sir, if you could slow down.
14            THE WITNESS:  Sorry, Judge.
15   BY MR. RICHENTHAL:
16   Q.  I think you mentioned one of the subagencies or components
17   of the office was the New Jersey division of criminal justice?
18   Is that right?
19   A.  That's correct.
20   Q.  Is that sometimes also known as NJDCJ?
21   A.  Not to me.  We call it DCJ.
22   Q.  I'll call it DCJ then.
23        What, in sum, is DCJ?
24   A.  That's the state's prosecutor's office, for a lack of a
25   better explanation.  So they are the state-level prosecutor's

O66Wmen3                        Grewal - Direct

1    office that I mentioned a moment ago.  We have a grand jury

2    sitting in Trenton.  There were detectives assigned to DCJ.

3    There were prosecutors assigned to DCJ.  So those wide-ranging

4    investigations that crossed the state that I talked about --

5    whether it's drugs, auto theft, things of that nature -- those

6    would be run out of DCJ.

7    Q.  A few minutes ago, I believe you mentioned partnering with

8    federal partners.  Do you recall saying that?

9    A.  I do.

10   Q.  Explain what you meant by that.

11   A.  Many times our investigations crossed multiple counties,

12   may cross into other states.  There may be matters where the

13   FBI's investigating, and rather than working with the federal

14   prosecutor's office, they would work with us.  I recall that

15   happening more around gun-trafficking investigations, things of

16   that nature, where we would partner up with federal

17   authorities.

18   Q.  You mentioned the FBI.  Did the office ever partner with

19   other federal authorities?

20   A.  We did.  We worked matters with the Drug Enforcement

21   Administration, other federal agencies.  I mentioned gun

22   violence.  The ATF was a big partner of ours as well.

23   Q.  What about the U.S. Attorney's Office for the District of

24   New Jersey?

25   A.  They were a big partner of ours as well on the prosecution

O66Wmen3                        Grewal - Direct

1   side.  We frequently would lend out prosecutors who would go

2   there, get sworn in as federal prosecutors and work on matters

3   that may originate from our investigations and would be

4   prosecuted federally.  A good example of that is with firearms.

5   Sometimes the penalties are greater.  The deterrent effect of

6   bringing a federal case against a gun trafficker or someone

7   possessing an illegal firearm has a bigger impact.  So those

8   were frequently cases that we would refer over to the U.S.

9   Attorney's Office.

10  Q.  Now, you also mentioned the office of the insurance fraud

11  prosecutor.  Do you recall mentioning that?

12  A.  I do.

13  Q.  Explain a bit more what that office is.

14  A.  OIFP, office of insurance fraud prosecutor, I think, was

15  set up probably in the '70s with an emphasis on investigating

16  and rooting out fraud, abuse, waste around the insurance

17  industry and business, focusing on folks who were filing

18  fraudulent insurance claims, Medicaid fraud, Medicare fraud,

19  those types of things.  I think they had about 20 prosecutors

20  when I was there and maybe about 40 or 50 detectives working on

21  those types of cases.  And they had some civil authorities as

22  well over regulated entities in the insurance business, so they

23  might have done some civil work as well.

24  Q.  How is the attorney general's office funded generally?

25  A.  We were funded by state appropriations, so I would go and

1    testify in front of state legislators and defend our budget and

2    the amount of moneys we needed.  That was a big portion of our

3    budget, but I think the balance of it was through federal

4    funding, some of those grants that I mentioned.

5        It's been a minute, but I think my budget at around the

6    time I was -- my last year there was probably around a billion

7    dollars, and half of it would have probably been state funding,

8    and the other half would have been other sources of funding, to

9    include federal grant dollars.  I don't remember the exact

10   breakdown.

11   Q.  When you say federal grant dollars, what do you mean by

12   that?

13   A.  Some of which I touched on, Byrne JAG grant money.  Justice

14   assistance grant money is money that the federal government

15   puts out for local law enforcement and for state law

16   enforcement, agencies like mine, to hire law enforcement

17   officers, to support different initiatives.  So we would get

18   grant money from that source.  Victim of Crime Act dollars,

19   federal grant money to help people who have been victimized as

20   the result of violent crime and -- in our state and to

21   distribute that to victims.  That would have been another

22   source of grant money.

23       I neglected to mention that I also had the highway traffic

24   safety administration within the A.G.'s office, so we would get

25   grant money from the federal highway traffic safety

O66Wmen3                         Grewal - Direct

 1  administration for initiatives around drunk driving,

 2  enforcement and other safety, public service-type of

 3  initiatives that we would undertake.

 4  Q.  What was your understanding of how federal funds were

 5  authorized and provided to offices such as the New Jersey

 6  Attorney General's Office?

 7          MR. WEITZMAN:  Objection.  Foundation.  He's talking

 8  about the federal government at this point.

 9  BY MR. RICHENTHAL:

10  Q.  Mr. Grewal, in your experience as the attorney general of

11  New Jersey, did you become generally familiar with the sources

12  of funding?

13  A.  Generally familiar, yes.

14  Q.  Did you become generally familiar with the fact that some

15  of those funds came from the federal government?

16  A.  Yes.  I testified to a couple of those sources.

17  Q.  You became familiar generally with how those funding

18  streams were authorized to be provided to your office and

19  offices like yours around the country?

20  A.  Yes.

21  Q.  How were they authorized to provide generally to offices

22  like yours and other offices around the country?

23  A.  They were appropriated at the federal level pursuant to

24  legislation.  I think the Byrne JAG grant is one example of

25  that.

O66Wmen3                        Grewal - Direct

Q.  Were there any ways in which your office worked with New
Jersey's federal congressional delegation, by which I mean its
representatives and senators?

A.  Yes.

Q.  On what types of issues?

A.  I recall on a number of occasions setting up briefings for
the entire delegation through the governor's office.  We would
set up briefings if we were rolling out new policies around
policing or other initiatives that we wanted to make the entire
delegation available on -- about, and inform them about.  So I
recall holding a number of conference calls where legislators
were on or their staff were on.

        And then around issues, I remember hosting a number of
outreach events with different members of the legislature on
issues that were important both to them and to me and to the
state.  This could include -- there was a moment in, late in my
tenure when we had an uptick in bias crimes and hate crimes in
the state, and we had a lot of vulnerable communities that were
on edge.  And so I remember doing outreach with members of the
delegation around those types of issues.  So those are some
examples of the types of interaction I would have with members
of the delegation.

Q.  What was the purpose, from the attorney general's office
perspective, of having outreach on those issues or engagement
on those issues with the federal congressional delegation?

O66Wmen3                          Grewal - Direct

1    A.  Well, for me it was reaching out to the communities we

2    served and, for example, on bias offenses to let them know that

3    we were taking these issues seriously, that we were working to

4    keep neighborhoods safe.  So that's, you know, that's one

5    benefit.

6         There was a moment where, you know, we were trying to work

7    with our federal delegation -- you asked about grant funding --

8    to secure houses of worship -- synagogues, mosques, other

9    houses of worship -- to make sure they could harden their

10   security, and we worked with the delegation on those types of

11   issues.  So it was helpful in getting the message out to

12   communities across the state that we were there to protect

13   them.

14   Q.  Now, beyond the types of meetings or outreach events you

15   just discussed, did you have occasion to meet with state or

16   federal officials during your tenure as attorney general?

17   A.  I did.

18   Q.  Both state and federal?

19   A.  Both state and federal, yes.

20   Q.  Elected or unelected or both?

21   A.  Both.

22   Q.  And what types of subjects generally were discussed in

23   these types of meetings?

24              MR. WEITZMAN:  Objection, your Honor.

25              THE COURT:  Pardon me?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen3                          Grewal - Direct

1             MR. WEITZMAN:  Objection.

2             THE COURT:  I'll allow it.  It's general.

3   A.  Can you repeat the question?

4   Q.  You said you met with both state and federal officials,

5   both elected and unelected officials.  Generally speaking, what

6   kinds of subjects were discussed at these meetings?

7   A.  Some of the topics that I've already mentioned.  Issues

8   that were important to me as the state's chief law enforcement

9   officer, keeping our vulnerable communities safe, protecting

10  our immigrant communities and state at a time when heightened

11  federal civil immigration enforcement was pushing people in my

12  jurisdiction into the shadows, working to highlight how law

13  enforcement was there to help them.  You know, the opioid

14  epidemic would be another example.  Gun violence.  Racial

15  disparities in our state's prison population was a topic that I

16  recall discussing with a member of our delegation and meeting

17  with them on.

18            THE COURT:  When you say a member of our delegation,

19  what are you referring to?

20            THE WITNESS:  I remember having a meeting with Senator

21  Booker and his staff.

22            THE COURT:  But when you said our delegation, what

23  were you referring --

24            THE WITNESS:  Oh.

25            THE COURT:  Go ahead.

1      THE WITNESS:  Our congressional delegation, the two --

2  the offices of the two state senate -- U.S. senators for New

3  Jersey and the congressional representatives for the state of

4  New Jersey.

5      MR. RICHENTHAL:  I'm sorry.

6      THE COURT:  Proceed.

7  BY MR. RICHENTHAL:

8  Q.  By delegation, you meant the federal congressional

9  officials from the state of New Jersey?

10  A.  That's correct.

11  Q.  So that's the representatives and the two senators?

12  A.  That's correct.

13  Q.  Now, what practices, if any, what policies, if any, did you

14  have regarding the discussion of individual pending criminal

15  investigations or individual pending criminal cases during

16  these kinds of meetings?

17  A.  I've, since probably day one where I've led an office --

18  Bergen County prosecutor's office -- I've had a practice of not

19  speaking about pending criminal matters with anyone outside of

20  the team's presence, meaning the team that was investigating

21  the matter.  As a young federal prosecutor, a line prosecutor,

22  I -- you know, very sensitive to the fact that someone is going

23  above me.  And by above me, I mean a defense attorney reaching

24  out to a supervisor about a case that I'm handling.  I believe

25  that there's no more surefire way to lose the confidence of

1  your staff if you're having conversations about their cases

2  with lawyers on those matters.

3       So from day one, I've had a practice of, if a defense

4  attorney comes to me to talk about a criminal matter, I direct

5  them to talk to the team and work their issues up the chain.

6  And if the teams feel as if they want to get me involved, then

7  I'll get involved.  But I don't speak directly with anybody

8  about pending criminal matters in my office.

9           MR. WEITZMAN:  Your Honor, objection.  I think the

10  question was phrased as what policies he had.

11          THE COURT:  I will allow it.

12          Was this written?

13          THE WITNESS:  That was my personal practice, your

14  Honor, but when I was A.G., we did create a memo internally,

15  which modeled on the DOJ contacts memo with, you know, to

16  govern these types of conversations.  But that was more

17  directed at the governor's office as to what the lines were and

18  things of that nature.

19  Q.  For approximately how long during your tenure as New Jersey

20  attorney general did you have that policy or practice?

21  A.  It's a policy I've had throughout my career.  I mean when I

22  was a county prosecutor, when I was A.G. and to this day I've

23  given speeches on the importance of attorneys raising issues

24  through the teams and not directly with senior leadership.  And

25  if there are issues that are novel or if there are issues where

1    there are factual disputes and the teams think that senior

2    leadership -- myself, my deputy in my current position -- need

3    to get involved, we'll get involved.  But there has to be a

4    process in which those issues are raised up through the right

5    channels.

6    Q.  Let me just pause for a second.  I think you used the term

7    "line prosecutor" or "line prosecutors."  Did I hear you

8    correctly?

9    A.  I may have used that term, yes.

10   Q.  What's a line prosecutor, or line prosecutors, in the

11   context of what you're talking about?

12   A.  The people that actually do the work, the prosecutors who

13   are investigating along with agents of the cases.  They're the

14   ones presenting the case in court, if necessary.  You know, the

15   line folks who do the hard work day to day.

16   Q.  I think you also used the phrase "the team."  Did you mean

17   the same thing or something different when you said the team?

18   A.  The same, the group of individuals investigating the

19   matters.  So I'm not going to have a conversation with a

20   defense attorney about a case being handled in my office,

21   whether when it was as criminal prosecutor or my current role,

22   without it going through the team and up the proper channels,

23   and if they feel it necessary to involve me then to get

24   involved.  I want to have their back and make sure that they

25   make the decisions on a day-to-day basis without any

1    interference.

2            THE COURT:  I'm not sure I understand what you're

3    saying, sir, so if you could help me, and I don't want to put

4    words in your mouth.  Was your practice to not speak to anyone

5    who raised an individual ongoing criminal matter within the New

6    Jersey Attorney General's Office, or was your practice to not

7    speak to anyone raising individual criminal matters within the

8    New Jersey Attorney General's Office without the team present,

9    or something else?

10            THE WITNESS:  It was my practice not to engage with

11    anybody about a pending criminal matter in my office.  If they

12    raised it with me, then I would direct them to raise it with

13    the team.  And if the team felt it necessary to get me

14    involved, only then would I get involved.

15    BY MR. RICHENTHAL:

16    Q.  I think you said in response to the question before the

17    judge's question you were referring to conversations with

18    defense attorneys.  Is that right?

19    A.  That's correct.

20    Q.  Did this practice or policy also apply to conversations

21    with officials?

22    A.  Anyone.  I'm not going to have a conversation about a

23    pending criminal matter in my office unless it's elevated

24    through the process, through the team handling the day to day,

25    and if they see fit to get me involved --

1              THE WITNESS:  To your earlier question, Judge, I would

2     expect them to be part of the conversation if I was going to

3     meet with defense counsel; I would not meet without the team

4     being involved in those meetings.

5     BY MR. RICHENTHAL:

6     Q.  You've just used the phrase "pending criminal matter."  As

7     you define it, did that include investigations, charged cases

8     or both?

9     A.  Both.

10    Q.  Now, during your time as New Jersey attorney general, were

11    you familiar with who Robert Menendez was?

12    A.  I was.

13    Q.  Who was he?

14    A.  Senior senator for our state.

15    Q.  What understanding, if any, did you have about his

16    relationships with state officials in the state of New Jersey?

17             MR. WEITZMAN:  Objection, your Honor.

18             THE COURT:  Sustained.

19    BY MR. RICHENTHAL:

20    Q.  During your time as attorney general, did you come to have

21    an understanding of the relationships between the federal

22    officials representing the state of New Jersey and state

23    officials in the state of New Jersey?

24             MR. WEITZMAN:  Objection.  Relevance.  403.

25             THE COURT:  No.  I'll allow that, under 403.

O66Wmen3                            Grewal - Direct

```
 1    A.  Yes.
 2    Q.  And did you come to have an understanding about how, if at
 3    all, those relationships could either help or hinder your work
 4    as attorney general?
 5            MR. WEITZMAN:  Objection.
 6            THE COURT:  Sustained.
 7            MR. RICHENTHAL:  I'll ask it differently.
 8    Q.  The relationships you're talking about, did you come to
 9    have an understanding as to how you could rely upon them to do
10    your work as New Jersey attorney general?
11            MR. WEITZMAN:  It's all hearsay, your Honor.
12            MR. RICHENTHAL:  It's his understanding.
13            THE COURT:  Just a moment.
14            MR. WEITZMAN:  It's hearsay.
15            THE COURT:  Just a moment.
16            I'll sustain it as to form.
17    BY MR. RICHENTHAL:
18    Q.  Mr. Grewal, as attorney general of the state of New Jersey,
19    did you interact with state officials?
20    A.  I did.
21    Q.  Did you interact with federal officials?
22    A.  I did.
23    Q.  Did you do that in your official capacity?
24    A.  I did.
25    Q.  Through those meetings and interactions, did you come to
```

O66Wmen3                    Grewal - Direct

1    have an understanding as to whether that was useful or not

2    useful to your work as attorney general?

3            MR. WEITZMAN:  Objection.

4            THE COURT:  I'll allow it.

5    A.  Yes.

6    Q.  Was it useful or not useful?

7    A.  It was useful.

8    Q.  How so?

9    A.  I think it's always good to have the support of the federal

10   delegation supporting the work that we're doing.  A lot of --

11   for example, the funding sources we talked about originate at

12   the federal level.  You want to have their support and you want

13   to deal them in as to some of the work that you're doing.  The

14   same with state officials who would contact me about

15   initiatives and other things that were ongoing in the A.G.'s

16   office.

17   Q.  Now, in light of that, did you also come to understand who

18   different officials were?

19   A.  I did come to get that understanding, yes.

20   Q.  How their relationships were with other officials in the

21   federal congressional delegation?

22   A.  Yes.

23   Q.  How their relationships were with other officials in the

24   state delegation?

25   A.  How the relationships between the federal delegation and

O66Wmen3                        Grewal - Direct

```
1    the state delegation were?
2              MR. RICHENTHAL:  It's a bad question.  Let me ask it
3    another way.
4    Q.   Through these meetings, did you come to an understanding of
5    which officials had relationships with which officials?
6    A.   That's a really broad question.
7    Q.   With respect to federal congressional delegation, with
8    respect to Senator Menendez, did you have an understanding at
9    the time you were attorney general of the nature of his
10   relationships with state officials in the state of New Jersey?
11             MR. WEITZMAN:  Objection.
12             THE COURT:  Sustained.
13             I don't understand the question.
14   BY MR. RICHENTHAL:
15   Q.   What relationship, if any, did you understand Senator
16   Menendez had with executive branch officials in the state of
17   New Jersey, such as the governor who selected you?
18             MR. WEITZMAN:  Objection.
19             THE COURT:  I'll allow that.
20             MR. WEITZMAN:  It's also hearsay.
21             THE COURT:  No.
22             Proceed.
23   A.   My understanding was that the senator was a close political
24   ally of Governor Murphy at the time.
25   Q.   And what relationship, if any, did you understand Senator
```

O66Wmen3                          Grewal - Direct

1    Menendez had with state legislators in the state of New Jersey?

2    A.   There are a lot of state legislators.

3    Q.   With the state legislators relevant to the work of the

4    office of the state attorney general.

5    A.   That's a difficult question for me to answer.

6    Q.   Did you understand Senator Menendez, generally speaking, to

7    have influence in the state of New Jersey?

8            MR. WEITZMAN:   Objection.   Leading.

9            THE COURT:   Sustained.

10   BY MR. RICHENTHAL:

11   Q.   Did you have a personal relationship with Senator Menendez?

12   A.   I did not.

13   Q.   Did you ever?

14   A.   No.

15   Q.   Did anyone in your family?

16   A.   Yes.

17   Q.   Who?

18   A.   My cousin and her husband were friendly with the senator.

19   Q.   Had you ever met Mr. Menendez prior to 2019?

20   A.   In -- perhaps at events and in passing at a public --

21   public events, but never, you know, sit down or anything like

22   that.

23   Q.   Now turning to early 2019, did there come a time when you

24   spoke with him on the phone?

25   A.   In early 2019?

O66Wmen3                          Grewal - Direct

1    Q.  Yes.

2    A.  Yes.

3    Q.  To the best of your memory, how did that come about?

4    A.  My recollection is that at some point prior to the phone

5    call, my cousin, who's friendly with the senator, had asked if

6    she could pass along my number, that he had requested it.  And

7    some point after that conversation -- I said yes.  But at some

8    point after that conversation, I received a phone call.

9            THE COURT:  Now, I would imagine, sir -- tell me if

10   I'm wrong -- that the telephone number of the New Jersey

11   attorney general is a publicly available number.  Is it not?

12           THE WITNESS:  The A.G.'s office number, yes, your

13   Honor.

14           THE COURT:  All right.

15           THE WITNESS:  My cousin was asking to pass along my

16   cell phone.

17           THE COURT:  Go ahead.

18   BY MR. RICHENTHAL:

19   Q.  Your personal cell phone or your government cell phone?

20   A.  I believe my cousin would only have my personal number.

21   Q.  Without giving us the full number, what were the last four

22   digits of the number you had at that time?

23   A.  6162.

24   Q.  Did you end up on a phone call with Senator Menendez?

25   A.  I did.

O66Wmen3                          Grewal - Direct

1    Q.  Did he call you or did you call him?

2    A.  I believe he called me.

3    Q.  Do you recall the precise date of the conversation?

4    A.  I do not.

5    Q.  What occurred in the conversation, in sum?

6    A.  I recall that the conversation happened -- I don't recall

7    the date, but I recall the time.  It happened during my evening

8    wrap-up meeting with my staff.  Every day I would meet with the

9    key leadership team in my office to see what happened during

10   the day and what was the plan for the following day.  And so it

11   must have been around five, 5:30 in the evening.

12       I recall getting the call, stepping out of the meeting, and

13   my office had a bunch of different rooms off of it, and I

14   walked into a side room.  And the senator made small talk with

15   me.  I believe it was pretty early on in my tenure, and so I

16   don't recall the exact substance of the small talk.  And then

17   he raised a concern about my office's handling of matters

18   involving Hispanic defendants as compared to non-Hispanic

19   defendants -- in particular, matters handled by the office of

20   the insurance fraud prosecutor.

21   Q.  Let me just pause for one second.  Where were you when this

22   happened?  I just mean where in the state of New Jersey.

23   A.  Sorry.  Sorry to cut you off.

24   Q.  Where were you when this happened?  I just mean where in

25   the state.

1    A.   I was in the Hughes Justice Complex in Trenton, where my

2    main office is.

3    Q.   And do you recall what area code came up on your screen

4    when Senator Menendez called you?

5    A.   I recall it to be a 202 number.

6    Q.   Now let me go back.  I think you said that he mentioned

7    your office's handling of matters involving certain Hispanic

8    individuals?

9    A.   I believe what he said to me was that he had a concern

10   about how my office -- the office of insurance fraud

11   prosecutor, in particular -- was treating Hispanic defendants

12   versus non-Hispanic defendants in the same industry.  And I

13   recall that that industry related to trucking.

14   Q.   Did you understand him to be talking about a particular

15   case or set of cases, or more broadly?

16   A.   That -- that was my reaction to when he raised the concern.

17   I said is this about a pending criminal matter, to which he

18   responded yes.  And I said are they represented?  And he said

19   yes.  And I believe I inquired by whom?

20        My recollection is that he said -- again, I don't know if

21   it was one defendant or multiple defendants, but rather -- the

22   defendant or defendants were represented by Michael Critchley,

23   and to which I responded, well, Michael is a fine lawyer, and

24   he could raise whatever concerns he has with the staff.

25   Q.   First, when you said Michael's a fine lawyer, what did you

1    mean by that?

2    A.  Michael Critchley is probably one of the finest criminal

3    defense attorneys in the state of New Jersey.

4    Q.  And then I believe you said that he could raise concerns,

5    if any, with someone else, or other people, with whom?

6    A.  With the team handling the matter.

7    Q.  That is the line prosecutors?

8    A.  That's correct.

9    Q.  What relationship, if any, did that have to do with the

10   policy or practice you testified about a few minutes ago?

11   A.  It was entirely consistent with how I handled outreach like

12   that, whether it was from a defense attorney or, in this case,

13   the senior senator.

14   Q.  And by the senior senator, you mean Senator Menendez?

15   A.  That's correct.

16   Q.  Did Senator Menendez appear to be confused by what you were

17   saying to him?

18           MR. WEITZMAN:  Objection.

19           THE COURT:  Sustained.

20   BY MR. RICHENTHAL:

21   Q.  Did he ask you any questions about what you said?

22   A.  I don't recall any follow-up questions.  The conversation

23   just shifted back to more small talk and ended shortly

24   thereafter.

25   Q.  Approximately how long was the conversation?

1    A.  Say five, five minutes, six minutes.  Not a long

2    conversation.

3    Q.  Did you pass on to the line prosecutors or team that you'd

4    received this conversation -- excuse me, received this message

5    from Senator Menendez?

6    A.  I did not.  I did not get into what the case was about or

7    who the defendants were.  And I view my job as insulating the

8    team from any type of pressure or interference from the

9    outside, and so I wasn't going to relate to anyone in the

10   office that there was this inquiry.  And I left it to the fact

11   that Michael could raise it with the team if there was an

12   issue.

13   Q.  What concern, if any, did you have if the team learned of

14   this phone call?

15              MR. WEITZMAN:  Objection.

16              THE COURT:  No.  Given the answer, I will allow it.

17   A.  I don't want my teams to feel pressured or intimidated

18   or -- you know, in any way.  I want them to make the calls in

19   their cases based on the facts of their cases before them, free

20   from any influence from the outside.

21   Q.  I think you said this call occurred in early 2019.  Is that

22   right?

23   A.  I don't recall the exact month, but it was early 2019,

24   fairly early in my tenure, I guess.

25              THE COURT:  Well, you said that before, but if I

O66Wmen3                          Grewal - Direct

1    understand your testimony, sir, it was January of 2018 when you

2    were confirmed as attorney general.  Is that right?

3              THE WITNESS:  That's right.

4              THE COURT:  So this would be about a year after you

5    were confirmed.

6              THE WITNESS:  Probably a year, yeah.  I would still

7    consider that fairly early, but yeah, you're right, about a

8    year after.

9    BY MR. RICHENTHAL:

10   Q.  Did there come a time another time when you spoke with

11   Senator Menendez?

12   A.  I did have another conversation with him, yes.

13   Q.  How did that come about?

14   A.  I just received a phone call from him asking for a meeting

15   with me in his Newark office.

16   Q.  And you said you received a phone call from him.  Do you

17   recall on what phone you received that call?

18   A.  Probably the 6162 number.

19   Q.  Approximately how long after the first phone call did the

20   second phone call come?

21   A.  I'd venture to say that the second phone call probably

22   happened in the fall of 2019.

23   Q.  Do you recall the precise words he used when he invited you

24   to a meeting?

25   A.  Something to the effect of, general, would love to sit down

O66Wmen3                    Grewal - Direct

1   with you or would like to sit down with you in person in my

2   Newark office.

3        I said I'll have my office set it up.

4            THE COURT:  You say he referred to you as general?

5            THE WITNESS:  I think -- I have a recollection of

6   that.  People often did that, would call me general at the

7   time.

8            THE COURT:  Because you were an attorney general, is

9   that correct?

10           THE WITNESS:  That's correct, yeah.

11           THE COURT:  All right.

12  BY MR. RICHENTHAL:

13  Q.  What did you understand him to mean by my Newark office?

14  A.  His in-state official office in Newark, New Jersey.

15  Q.  That is his Senate office?

16  A.  Yeah.  That's my understanding, that it's a Senate office

17  in the state.

18  Q.  Now, did he say what he wanted to meet with you about?

19  A.  He did not.

20  Q.  Did you agree to meet?

21  A.  I did.

22  Q.  What did you think the meeting would be about?

23  A.  I expected it to be on a policy issue or, you know,

24  something that our office was working on.  At the time I recall

25  we were doing a lot of work around issues with our immigrant

1    communities.  I was thinking that might be a topic, but I

2    didn't inquire about the subject matter of the meeting.  I just

3    had my secretary call his office to set it up.

4    Q.  If you had known the meeting would be about a particular

5    pending matter, would you have agreed to meet?

6    A.  A pending criminal matter?

7    Q.  Yes.

8              MR. WEITZMAN:  Objection, your Honor.

9              THE COURT:  Sustained.

10    A.  No.

11              THE COURT:  Sustained.  The jury will disregard the

12    answer.

13    BY MR. RICHENTHAL:

14    Q.  Did you think the meeting was about an individual pending

15    matter?

16    A.  I did not think that was the subject matter of the meeting.

17              THE COURT:  In the normal course, sir, would you ask a

18    staff member to determine in advance what the subject of a

19    meeting with a federal officeholder was going to be about?

20              THE WITNESS:  I think I -- I've started to do that,

21    and I probably --

22              THE COURT:  No.  In this instance.

23              THE WITNESS:  I don't recall if I asked Diane to ask

24    what the meeting was about.

25              THE COURT:  This is a staff member of yours, Diane?

O66Wmen3                        Grewal - Direct

1        THE WITNESS:  That's correct.

2        Sometimes I have, but in this case I don't think I

3   asked her to inquire about the subject matter of the meeting.

4   In particular, Judge, just -- it was because of who was

5   requesting the meeting, I was -- you know, I just was going to

6   have a meeting with the senior senator.

7   BY MR. RICHENTHAL:

8   Q.  Who, if anyone, did you bring to the meeting?

9   A.  I brought my, I think, then executive attorney general,

10  Andrew Bruck, who later became the first assistant and

11  succeeded me when I left the A.G.'s office.  He was my No. 2 or

12  3 person at the time.

13       MR. RICHENTHAL:  Mr. Florczyk, can you put up on the

14  screen for everyone what's in evidence as Government Exhibit

15  8C-1.

16  Q.  Is that on your screen, Mr. Grewal?

17  A.  Yes.

18  Q.  Do you recognize this?

19  A.  I do.

20  Q.  What is this?

21  A.  I recognize it to be a printout of my Outlook calendar for

22  September 6, 2019.

23       MR. RICHENTHAL:  Mr. Florczyk, can you zoom in on the

24  middle, please.

25  Q.  What is that entry?

O66Wmen3                        Grewal - Direct

1    A.   It says meeting with Senator Menendez.  This would have

2    been the meeting I had with him at his Newark office.

3    Q.   You see it says 1 Gateway Center.  What is that?

4    A.   That's the location of his New York -- his Newark office.

5    It's the big office building across from the train station in

6    Newark.

7              MR. RICHENTHAL:  Mr. Florczyk, can you scroll to the

8    second page, please.

9    Q.   Do you see that, Mr. Grewal?

10        Do you recognize what's on this page?

11   A.   I do.  This is -- when you click on the outlook entry that

12   we just looked at, this would have been the details for the

13   meeting that took place on September 6, 2019, that my secretary

14   put in.

15   Q.   Now, do you see where it says start and end?

16   A.   I do.

17   Q.   Does that indicate the meeting necessarily was 45 minutes;

18   that is, from 12 to 12:45?

19   A.   No, that would have been just the time period my secretary

20   blocked off on my calendar for the meeting.

21   Q.   If you could look a few lines below that, it says

22   organizer?

23   A.   That's right.

24   Q.   That's you?

25   A.   Right.  That's my calendar, so I'm the organizer.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen3                       Grewal - Direct

1   Q.  And then on the next line, it says required attendees and

2   says Andrew Bruck.  Is that the Andrew Bruck you mentioned a

3   minute or two ago?

4   A.  It is.

5            MR. RICHENTHAL:  We can take that down.

6   Q.  So did the meeting, in fact, take place?

7   A.  It did.

8   Q.  Approximately when did it take place?

9   A.  On the date reflected in the calendar.  I have no reason to

10  believe it didn't happen on that same date.

11  Q.  Where did it take place?

12  A.  At the senator's office in Newark, New Jersey, in the

13  Gateway building.

14  Q.  Can you describe what the office looked like when you

15  arrived there?

16  A.  I have a recollection.  This jumped out at me.  Maybe it's

17  only a Jersey thing.  When we got off the elevator, if I'm

18  correct, it was on the same floor as the office of the New

19  Jersey Star-Ledger, which is the biggest paper in the state, or

20  was at one time, and I had been there for an editorial board

21  meeting not too long ago.  And I believe --

22           THE COURT:  You mean not too long before that meeting?

23           THE WITNESS:  That's correct, Judge.

24  A.  And I believe the senator's office was on the other end of

25  the same floor.  I could be wrong, but that -- that was a

1    specific recollection I have, and I thought, wow, that's

2    interesting.

3    Q.   For anyone who may not know, what's an editorial board

4    meeting?

5    A.   An editorial board meeting is when, you know, members of

6    the editorial staff at a newspaper bring you around a

7    conference table and grill you about your policies and your

8    priorities and then, you know, maybe sometimes write about the

9    work you're doing in the form of an editorial.

10   Q.   Now, can you describe what the office looks like once you

11   enter it; that is, once you got to Senator Menendez's office or

12   multiple offices, can you describe the entry area?

13   A.   I just remember it being, you know, sort of a small entry

14   area, with a reception area.  I recall there being a young

15   staff person there, who was very new, is my recollection.  And

16   I made some small talk with him, as we let him know that we

17   were there to meet with the senator.  And then a few minutes

18   later, it wasn't long, we -- the senator came out and brought

19   us back to his office, in that suite.

20   Q.   Just to pause for a second.  I think you said we and us.

21   Who is we and us?

22   A.   Oh, I'm sorry.  Andrew Bruck, my then executive assistant

23   attorney general and me.

24   Q.   And I think you said the senator brought you into his

25   office?

1    A.  That's correct, from the reception area.  I don't know if

2    the intern or the young person brought us in or if the senator

3    came out and we all went in.  But we were led back to another

4    office in that suite, which was the senator's office.

5    Q.  What did his office look like?

6    A.  I just remember it being a long office.  I recall there

7    being a long ledge under the window, like a big window with a

8    ledge with lots of shields and awards and things of that

9    nature, with his desk in the back.  And I recall a circular

10   smaller sort of conference-type desk for about four people, not

11   a huge one, in the front of the room.  That's where we sat down

12   for the meeting, Andrew, myself and the senator.

13   Q.  Besides Andrew -- that is, Mr. Bruck -- you and the

14   senator, was anyone else present?

15   A.  No one else was there.

16   Q.  Now, did you and Mr. Bruck enter that room together?

17   A.  We did.

18   Q.  How, if at all, did Senator Menendez appear to react to the

19   fact that you were not alone?

20          MR. WEITZMAN:  Objection, your Honor.

21          THE COURT:  Ask it in a different way.  Sustained as

22   to form.

23   BY MR. RICHENTHAL:

24   Q.  Did you have a chance to observe Senator Menendez as you

25   and Mr. Bruck walked into his office?

O66Wmen3                          Grewal - Direct

1   A.  I did.

2   Q.  From that observation, did you come to an understanding as

3   to whether he was surprised or unsurprised that you were not

4   alone?

5            MR. WEITZMAN:  Objection.

6            THE COURT:  Sustained.

7   BY MR. RICHENTHAL:

8   Q.  Based on Senator Menendez's reaction to your arrival --

9            THE COURT:  What was his reaction to your arrival, to

10  the extent you could observe it?

11           THE WITNESS:  My observation, or based on my

12  observation, I don't think he was expecting me to have somebody

13  with me.

14           THE COURT:  What leads you to conclude that?

15           THE WITNESS:  Just, it was almost like, oh, when

16  Andrew walked in with me.  He himself did not have a staffer in

17  the meeting.

18           THE COURT:  He himself meaning Senator Menendez.

19           THE WITNESS:  That's correct.

20           MR. WEITZMAN:  Your Honor, I move to strike.  I don't

21  think --

22           THE COURT:  No.  I'll allow it.  You can inquire.

23  BY MR. RICHENTHAL:

24  Q.  Had you had other meetings --

25           THE COURT:  I guess let me ask at this point, I'm not

O66Wmen3                        Grewal - Direct

1    quite sure what you mean when you said it was just like, oh.

2            THE WITNESS:  I think it was just a look of surprise,

3    your Honor, that somebody was with me.  That's what I took it

4    to mean, that he wasn't expecting, based on his facial

5    expression, somebody to walk in with me.

6            THE COURT:  So is it fair -- and again, I don't want

7    to put words in your mouth -- to say what you saw was a look of

8    surprise, and you inferred that was the reason for the

9    surprise?

10           THE WITNESS:  Correct.

11           THE COURT:  OK.  Thank you.

12   BY MR. RICHENTHAL:

13   Q.  Had you had other meetings with elected officials during

14   your tenure as attorney general?

15   A.  Yes.

16   Q.  Generally speaking, did you meet with them just you and

17   them, or were others around?

18   A.  I would always bring somebody with to the meetings.  And

19   generally the meetings that I had with members of the federal

20   delegation, there were staffers will.

21   Q.  And just to be clear, sir, when you say staffers, are you

22   referring to your own, or are you referring to someone on the

23   delegation?

24   A.  Both.  I would have somebody with me, and the meetings that

25   I've had with Congresspeople, the other senator from New

O66Wmen3                         Grewal - Direct

1    Jersey, they generally had other members of their staff there

2    for follow-up, do-outs, things of that nature.

3              THE COURT:  What's a do-out?

4              THE WITNESS:  Any follow-up action item, your Honor,

5    from the meeting, say they were going to send us something or

6    we were going to send them something.  Those sorts of things I

7    refer to as do-outs.

8              THE COURT:  Thank you.

9    BY MR. RICHENTHAL:

10   Q.  Approximately how long did the meeting last?

11   A.  Not long.  I would say maybe 10 to 15 minutes at most.

12   Q.  What happened at the meeting, in sum?

13   A.  In sum, it was the same as the phone call.  Some initial

14   small talk and conversation.  I recall when we sat down, the

15   senator was on my left.  I was sort of in front of him on the

16   circular table.  And Andrew was to my right.

17       I have a recollection that the senator had a folder in

18   front of him that he opened up.  And then he again raised the

19   same issue that he raised on the phone call with me earlier in

20   the year.  And that was his concern about how our office of

21   insurance fraud prosecutor was treating Hispanic defendants

22   versus non-Hispanic defendants.  At that point, my reaction

23   was, is this the same matter that you called me about when Mike

24   Critchley's representing the individual or individuals?  He

25   said yes.  And my response was, well, then Mike, again, can

1  raise those issues with the prosecutors who are handling the

2  case.  I can't talk to you about this.

3  Q.  Could you see what was in the folder?

4  A.  I have a vague recollection that it looked like a press

5  release, but it -- that's all -- from the format of a press

6  release that our office would put out, because I remember

7  seeing, I thought, like the logo for the A.G.'s office on the

8  top of the document.  But I couldn't see any details.

9          THE COURT:  You think it was one of your office's

10  press releases.

11          THE WITNESS:  Correct.

12          THE COURT:  OK.

13  BY MR. RICHENTHAL:

14  Q.  In expressing this concern, did he provide anything to you;

15  that is, physically give you anything?

16  A.  No, he didn't.  As soon as I responded in the same way I

17  responded on the phone, I believe he just closed the folder,

18  and we just made more small talk and Andrew and I left shortly

19  thereafter.

20  Q.  What, if anything, did you understand him to be asking you

21  to do with respect to this alleged discrimination?

22  A.  There wasn't an explicit ask.  What I understood the upshot

23  of this conversation to be was that he didn't like how this

24  matter was being handled by our office and wanted it handled

25  differently.

O66Wmen3                        Grewal - Direct

1          MR. WEITZMAN:  Objection, your Honor.  The first

2    sentence answers the question.

3          THE COURT:  Just a moment.

4          MR. WEITZMAN:  The rest is speculation, your Honor.

5          THE COURT:  Yes.  Sustained.  The jury will disregard

6    the second sentence.

7          Proceed.

8    BY MR. RICHENTHAL:

9    Q.  What, if anything, did you understand Senator Menendez to

10   want you to do about what he was raising to you?

11         MR. WEITZMAN:  It's the same question, your Honor.

12   It's already been asked and answered.

13         THE COURT:  Just a moment.

14         Did you have an understanding as to what, if anything,

15   Senator Menendez wanted you to do?  I will allow that.

16         MR. WEITZMAN:  Your Honor, I think he can ask what the

17   senator said, but understanding reads into speculation about

18   scienter.

19         THE COURT:  Thank you.

20         You can answer the question, sir, if you can.

21   A.  Can you repeat the question?

22   BY MR. RICHENTHAL:

23   Q.  What, if anything, did you understand Senator Menendez to

24   be indicating you should do about the alleged concern he was

25   raising?

O66Wmen3                          Grewal - Direct

1   A.   The impression I got is that he did not like how the matter

2   was being handled, but I didn't get an impression or he didn't

3   say anything about how it should be handled.

4            THE COURT:  Did he say anything to you -- what, if

5   anything, did he say about how that matter was being handled?

6            THE WITNESS:  Judge, the conversation never got there.

7            THE COURT:  In other words, nothing.

8            THE WITNESS:  Nothing.

9            THE COURT:  Is that right?

10           THE WITNESS:  That's correct.

11           THE COURT:  OK.

12  BY MR. RICHENTHAL:

13  Q.   What was his demeanor when he expressed this alleged

14  concern to you?

15  A.   Very calm.

16  Q.   Based on how he raised this concern, did he appear happy,

17  unhappy, or something else about how the matter was currently

18  being handled?

19           MR. WEITZMAN:  Objection.

20           THE COURT:  Yes.  Sustained as phrased.

21  BY MR. RICHENTHAL:

22  Q.   Based on how he conveyed this alleged concern to you, did

23  you understand him to be happy or unhappy or something else

24  about how the matter was being handled?

25           MR. WEITZMAN:  It's the same question, your Honor.

1           THE COURT:  Did you have an understanding, sir?

2           No.  I'll just allow Mr. Richenthal to rephrase it if

3    he chooses.

4           Let me ask this.  You said there was, he raised a

5    concern about the office of insurance fraud, how they treated

6    Hispanic defendants versus non-Hispanic defendants.  Is that

7    correct?

8           THE WITNESS:  Correct.

9           THE COURT:  Do you remember what, if anything, he said

10   about that?

11          THE WITNESS:  Other than what, just raising the fact

12   that he had a concern, Judge, about how certain defendants were

13   being treated differently than other defendants, we never got

14   into what case or any other facts related to his concerns,

15   because I asked the question, did this relate to a pending

16   criminal matter?  And once he responded yes, I said I can't

17   speak to you about pending criminal matters.  The lawyer who he

18   indicated was Mike Critchley, I said he should raise those

19   concerns to the team handling the matter or to the court.

20          THE COURT:  Was there any discussion between you and

21   Senator Menendez about how the office of insurance fraud was

22   treating Hispanic defendants vis-à-vis non-Hispanic defendants?

23          THE WITNESS:  Based on the way in which he framed the

24   initial concern, what I took from that, Judge, was that --

25          THE COURT:  No.  No, sir.

O66Wmen3                          Grewal - Direct

1              THE WITNESS:  Oh.

2              THE COURT:  The question was, was there any discussion

3     between you and Senator Menendez about how the office of

4     insurance fraud was treating Hispanic defendants vis-à-vis

5     non-Hispanic defendants?  Yes, there was; no, there wasn't; I

6     don't remember.

7              THE WITNESS:  Yes.

8              THE COURT:  All right.  What was that discussion?

9              THE WITNESS:  That he said they were being treated

10    differently than non-Hispanic defendants.

11             THE COURT:  Did he say he believed they were being

12    treated more poorly or simply differently?

13             THE WITNESS:  I recall it to be differently.  Again, I

14    could tell you what I understood that to mean, which was --

15             THE COURT:  No.  I just want to know what he said.

16             And what did you say in response to that?

17             THE WITNESS:  I said, I asked if this dealt with a

18    pending matter in the office of insurance fraud prosecutor.

19             THE COURT:  It's what you had testified to just a

20    moment ago.

21             THE WITNESS:  Right.

22             THE COURT:  OK.  I now understand.

23    BY MR. RICHENTHAL:

24    Q.  Did you understand differently to be better, worse or

25    something else?

O66Wmen3                    Grewal - Direct

1          MR. WEITZMAN:  Objection, your Honor.

2          THE COURT:  No.  If he had an understanding.

3   A.  Worse.

4   Q.  Did you understand him, in short, to be complimenting your

5   office's work or complaining about your office's work?

6   A.  Complaining.

7   Q.  When you told him you couldn't talk about it, how, if at

8   all, did he react?

9   A.  Very calm.  No reaction.  We just moved on to small talk,

10  and we left the meeting.

11  Q.  Did you respond further about the alleged concern he had

12  raised during the meeting?

13  A.  Respond to him?

14  Q.  Yes.

15  A.  Other than to say, again, if this relates to a pending

16  criminal matter, the attorney on the case should raise it to

17  the court or to the team handling the matter.  I didn't respond

18  beyond that.

19  Q.  Why didn't you respond beyond that?

20  A.  Again, I would rather those conversations happen through

21  the more appropriate channels, with the team.  I didn't know

22  the case.  I didn't want to know the case.  I just wanted to

23  move on from the conversation.  It's not something I was

24  comfortable speaking to him about.

25  Q.  Are you familiar with the term "selective prosecution"?

O66Wmen3                         Grewal - Direct

1    A.  I am.

2    Q.  What is that?

3    A.  My understanding of selective prosecution is when you're

4    treating similarly situated people differently.  For example,

5    if you have two groups of people who may have committed the

6    same crime, you're treating a particular group more harshly

7    because of inappropriate factors, like race, background,

8    ethnicity, than to other similarly situated defendants.  That's

9    what I would consider selective prosecution.

10   Q.  What relationship, if any, did that have to what you

11   understood Senator Menendez to be complaining about?

12   A.  I mean he said that he was concerned about them being

13   treated differently.  I suppose that could also mean selective

14   prosecution, you know, a similar concern.

15   Q.  Let me ask it a different way.  If a prosecution were based

16   on race or ethnicity -- in this case, Hispanic origin --

17   A.  Yes.

18   Q.  -- what, if anything, would result to the case if it turned

19   out that's, in fact, why it was being prosecuted?

20            MR. WEITZMAN:  Objection, your Honor.

21            THE COURT:  Sustained as to form.

22   BY MR. RICHENTHAL:

23   Q.  In your time as New Jersey attorney general, did you come

24   to have an understanding as to how a case would be handled if

25   it turned out there was a credible allegation it was

1    discriminatory?

2              THE COURT:  How are credible allegations of

3    discrimination treated in your office?

4              THE WITNESS:  Judge, if somebody brought credible

5    allegations to me that there were, there was selective

6    prosecution handling of the matter, I think I would -- I would

7    sit down with the team and the people handling the matter, dive

8    into the record.  Or I would have people look at it in depth

9    and if it was supported, I think I would counsel on the

10   charging instrument to be dismissed.

11   BY MR. RICHENTHAL:

12   Q.  Why in that circumstance would you counsel that the

13   charging instrument be dismissed?

14   A.  I mean selective prosecution is -- is inappropriate.  It's

15   not what we do.  And it's -- I mean it's just odious.

16   Q.  Now, in the same circumstance -- that is, if you learned

17   credibly a case had been brought for discriminatory reason --

18   what, if anything, would you with respect to the team; that is,

19   the prosecutors?

20   A.  I'd probably refer them, you know, for investigation or to

21   be looked at by folks within our office or elsewhere.

22             THE COURT:  I take it for your team to investigate.

23             THE WITNESS:  Excuse me?

24             THE COURT:  I take it when you said refer for

25   investigation, I gathered what you meant was for your office to

O66Wmen3                          Grewal - Direct

1    investigate.

2              THE WITNESS:  I think, Judge, he had asked what if

3    there was a -- if they were found to have engaged in selective

4    prosecution, what would I do to the team?  I would have

5    referred them for further investigation, the team handling the

6    matter, if they were found to have engaged in that type of

7    prosecution.

8              THE COURT:  Who was supposed to do the investigation

9    in this?

10             THE WITNESS:  We had an internal IG-type function,

11   sort of -- I'm blanking on the acronym, but sort of a

12   professional standards group that would look at allegations of

13   misconduct by people within the A.G.'s office or within the

14   department of law and public safety.  I would have had them

15   look at it and investigate the matter to see if these were

16   credible.  And, you know, based on that, there would be

17   consequences, whether it's referrals to professional boards or

18   perhaps even criminal sanctions, I imagine.

19   BY MR. RICHENTHAL:

20   Q.  Now, based on your conversation with Senator Menendez, did

21   you do either of those things; that is, either counsel the case

22   be dismissed or investigate the prosecutors?

23   A.  I didn't have that information.

24   Q.  I'm sorry?

25   A.  I didn't have any information to suggest that was the case

O66Wmen3                         Grewal - Direct

1    or not.

2    Q.   What do you mean by that?

3    A.   I -- I didn't know the case.  I didn't have any evidence of

4    selective prosecution.  I didn't have any data before me or --

5    or, you know, hey, this is, you know, 20 prosecutions brought

6    by your office, or this office, and 19 of them, you know, deal

7    with a particular group of defendants and only one deals with

8    another group.  I mean I didn't have that type of information

9    relayed to me.

10   Q.   Did Senator Menendez offer that type of information to you?

11   A.   No, I didn't get anything at that meeting.

12   Q.   What, if anything, did you do following the meeting

13   regarding what he had conveyed to you?

14   A.   Nothing.  Just like the phone call, we -- I ended the

15   conversation and recommended that the attorney on the case, if

16   there were claims to raise, raise them with the court or the

17   team handling the matter.  But I didn't take from him any

18   information about the case.  We never talked about the case,

19   and so I left it as the end of the conversation.

20   Q.   Did you pass on to the team that you'd had this

21   conversation?

22   A.   I did not.

23   Q.   Did you pass on to the team supervisors that you'd had this

24   conversation?

25   A.   I did not.  I don't know what Andrew did after the meeting.

O66Wmen3                           Grewal - Direct

1    Q.  Did you and Mr. Bruck discuss the meeting after the

2    meeting?

3    A.  I recall the meeting was a short meeting.  We rode the

4    elevator down, and I remember standing in front of the car

5    that -- at the time we had a state trooper detail with us.  I

6    remember before walking into the car, looking at each other and

7    I believe Andrew said to me, whoa, that was gross.

8         That was the last conversation I had with Mr. Bruck about

9    it.

10   Q.  That was gross?

11   A.  Gross.

12   Q.  What concern, if any, did you have about conveying to the

13   team or its supervisors that you had this meeting?

14   A.  I didn't have the information about what case it was, but

15   even if I did, I wouldn't convey it to the team.  Again, I want

16   them to be able to do their work without any concern about any

17   outside influence or concern that the senior senator for New

18   Jersey was concerned about the way they were handling the

19   matter.  I'm trying to insulate my team so they could look at

20   the facts of their case, make their decisions based on those

21   facts, not anything outside of -- outside of those facts.

22   Q.  Now, prior to this meeting, had Senator Menendez ever

23   raised a concern to you about the treatment by your office of

24   Hispanic defendants?

25   A.  Just on that first phone call.

O66Wmen3                          Grewal - Direct

1    Q.   Yes.  Other than the meeting and the phone call, did he

2    ever raise such a concern with you before?

3    A.   No.

4    Q.   Did he ever raise such a concern with you again?

5    A.   Some concern or that type of concern?

6    Q.   That concern, the concern of alleged mistreatment of the

7    Hispanic individuals.

8    A.   He did not.

9    Q.   Did he ever raise this particular case or cases with you

10   again; that is, subsequent to the meeting you just testified

11   about?

12   A.   He did not.

13   Q.   Now, you testified a few minutes ago about the team or the

14   line prosecutors.  Do you recall ever speaking with the team or

15   the line prosecutors about this particular case at all?

16   A.   I did not.

17   Q.   Do you recall ever taking action on this particular case at

18   all?

19   A.   I don't know what the case is.  I did not take any actions.

20   Q.   To this day, do you know what case specifically Senator

21   Menendez was talking about?

22   A.   I do not.

23   Q.   Now, I think I had asked you whether you conveyed the

24   meeting to the prosecutors.  Did you convey the meeting to

25   their supervisors?

O66Wmen3                        Grewal - Direct

1    A.  I did not.  I don't know what Andrew did after that

2    meeting, but I certainly didn't.

3    Q.  Based on your meeting with Mr. Bruck, did you expect that

4    he would?

5    A.  I -- Andrew was there.  If there were any follow-ups

6    necessary, my -- again, my expectation was a policy meeting.

7    This meeting was very different from a policy meeting, so I

8    don't know what Andrew did or didn't do.

9    Q.  You said your expectation was that it would be a policy

10   meeting?

11   A.  That's correct.

12   Q.  What did you mean by that?

13   A.  As we talked about earlier, I thought it would be about,

14   you know, the work of our office, maybe some of the initiatives

15   we had underway, maybe along the lines of how we were

16   interacting with our immigrant communities.  I had issued a law

17   enforcement directive on that topic not too long before the

18   meeting, I imagine.  I don't recall the exact dates.  We were

19   doing a lot of work around policing, a lot of work to address

20   the disparities in the prison population.  I thought it would

21   be any number of those types of things.

22   Q.  If you had known that the meeting was what it actually was,

23   would you have gone?

24            MR. WEITZMAN:  Objection, your Honor.

25            THE COURT:  Sustained.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O66Wmen3                          Grewal - Direct

1              Ladies and gentlemen, why don't we take a five-minute

2    stretch break.  All right?  We've never done that.  Let's

3    stretch for a moment.

4              No, no.  Stay.  Literally, stretch.  It's too early

5    for your midafternoon break.  Just a little exercise, I think,

6    would be worthwhile.

7              MR. WEITZMAN:  Do we have to stretch, your Honor?

8              THE COURT:  All right.  I think everybody is

9    revivified.  You can have your seats.

10             You may continue, sir.

11   BY MR. RICHENTHAL:

12   Q.  Mr. Grewal, you testified that you didn't share that this

13   meeting occurred with the line prosecutors or the supervisors.

14   Why not share that it occurred but tell them don't worry about

15   it?

16   A.  I don't know if I had -- I didn't know who they were.  I

17   didn't have information about the case, and I wasn't about to

18   go start having somebody canvass, you know, what cases a

19   certain defense attorney was handling in OIFP and go on that

20   chase.  I didn't want to -- I wanted them to be insulated from

21   all of this.

22   Q.  You've used that phrase a few times, "insulated" or

23   "insulated from all of this," as you just said.  What do you

24   mean by that?

25   A.  The reason I have that policy or that practice that I

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    talked about, I want to have the backs of the people who do the

2    work, and I want them to be able to do the work, you know,

3    based on what the facts of their investigation reveals, how

4    they apply the law to those facts and make those decisions

5    based on their reasoned judgment in consultation with their

6    supervisors.  I don't want to interfere in that process, and

7    you know, if there are concerns that attorneys raise and that

8    percolate up the chain, I'm more than happy to have the

9    meeting, but there's got to be a good process around this and

10   people need to be able to do their work, you know, free from

11   these types of questions.

12   Q.  Free from these types of questions meaning what?

13          MR. WEITZMAN:  Objection, your Honor.  This is the

14   third time.

15          THE COURT:  Sustained as phrased.

16   BY MR. RICHENTHAL:

17   Q.  You said you wanted people to be able to do their work free

18   from these types of questions.  What concern, if any, did you

19   have about what would happen if they learned about the

20   questions?

21          MR. WEITZMAN:  Objection, your Honor.

22          THE COURT:  What did you mean when you said these

23   questions?

24          THE WITNESS:  Your Honor, I was referring -- you know,

25   if I went -- the questioning dealt with why I didn't go to the

O66Wmen3                        Grewal - Direct

1    team or figure out or inform their supervisors that these

2    questions were coming about disparate treatment of certain

3    defendants and they were coming from the senator.  I -- I

4    didn't want to raise those questions, to somehow chill them in

5    the work they were doing or them being chilled in their

6    decision-making or second-guessing themselves.

7               THE COURT:  Who is them?

8               THE WITNESS:  The trial team, the investigative staff.

9               THE COURT:  Thank you.

10              THE WITNESS:  I just wanted them to be able to do

11   their work, and if there are concerns about that work, I wanted

12   the attorney on the other side to raise those with the team up

13   the chain, and if it required me to be involved, that's how I

14   ordinarily get involved.

15   BY MR. RICHENTHAL:

16   Q.  To what degree, if at all, did it impact your thinking on

17   that, that it was the senior senator who had raised the

18   questions?

19   A.  It didn't.  It's my policy.  I'm not going to, you know,

20   circumvent the normal chain and have a conversation about a

21   criminal case with somebody, you know, who's not involved in

22   the case.  And certainly if it was a defense attorney who

23   raised it, I would have directed them to do the same thing, to

24   raise it up the chain.

25   Q.  What concern, if any, did you have if people learned that

1   the senior senator had raised a particular case with you?

2              MR. WEITZMAN:  Objection, your Honor.

3              THE COURT:  I'll allow it.

4   A.  I just didn't want it to have a chilling effect on them,

5   that they begin second-guessing their reasoned decision-making

6   or second-guessing the steps that they're taking, if they felt

7   that they were under the scrutiny of, of a senior elected

8   official based on the way they were handling the matter.

9   That's what I wanted to insulate them from.

10             THE COURT:  Move on, sir.  You've covered this area.

11             MR. RICHENTHAL:  No further questions.

12             THE COURT:  Mr. Weitzman.

13             MR. WEITZMAN:  Thank you, your Honor.

14  CROSS-EXAMINATION

15  BY MR. WEITZMAN:

16  Q.  Good afternoon, Mr. Grewal.

17  A.  Good afternoon.

18  Q.  My name is Avi Weitzman.  I represent Senator Menendez.

19      You served as the attorney general for the state of New

20  Jersey from 2018 to 2021, correct?

21  A.  That's correct.

22  Q.  And in that capacity, you were the state's chief law

23  enforcement officer, as we heard, right?

24  A.  That's correct.

25  Q.  And just to be perfectly clear, the office of the New

1   Jersey attorney general is not part of the federal government,

2   right?

3   A.  It is not.

4   Q.  It's a state position, right?

5   A.  That's correct.

6   Q.  Right now you work at what's called the SEC, the Securities

7   and Exchange Commission, right?

8   A.  Correct.

9   Q.  That's a federal position, right?

10  A.  It is.

11  Q.  But beforehand, when you were the state A.G., that was a

12  state position?

13  A.  That's right.

14  Q.  And so your activities weren't -- as the state A.G., they

15  weren't supervised or overseen in any way by the federal

16  government, right?

17  A.  No.

18  Q.  You didn't report to the President of the United States,

19  correct?

20  A.  No, I did not.

21  Q.  He couldn't fire you, correct?

22  A.  I would hope not.

23  Q.  And you didn't report to the United States Senate either,

24  right?

25  A.  I did not report to them, no.

1   Q.  The Senate couldn't fire you or make hiring decisions in

2   your office either, right?

3   A.  I don't believe so, no.

4   Q.  And your position as a state attorney general wasn't

5   subject to confirmation by the United States Senate either,

6   right?

7   A.  No.  Just New Jersey State Senate.

8   Q.  Correct.  You were nominated by the governor and then

9   confirmed by the state Senate of New Jersey, right?

10  A.  That's correct.

11  Q.  The budget of the New Jersey Attorney General's Office is

12  set by the New Jersey State legislature, is that correct?

13  A.  A part of it, yes.

14  Q.  OK.  And it has to be approved; the part that is set by the

15  New Jersey State legislature has to be approved by both the New

16  Jersey House, both houses of the state legislature, correct?

17  A.  That's right.  There are hearings in both houses, and you

18  defend your budget and then they're voted on.

19  Q.  Now, when Congress passes a budget, there's no line item

20  that says New Jersey State Attorney General's Office, right?

21  A.  I don't believe so, no.

22  Q.  And you did testify that there's a program, which I think

23  you called JAG program, right?

24  A.  Yes.  That was just --

25  Q.  For grants?

1    A.  One example of grant money that we received.

2    Q.  OK.  Now, that grant money that the New Jersey Attorney

3    General's Office receives, that's provided by the Department of

4    Justice, correct?

5    A.  Through the office of justice programs, yes.

6    Q.  OK.  It's not provided directly by the Senate or the House,

7    the United States House, right?

8    A.  Not directly, no.

9    Q.  And in fact, there is a formula in the Department of

10   Justice as to how to allocate those grants to each state

11   attorney general's office, right?

12   A.  I think there is a formula, and then there's an application

13   process too, I think, of sorts.  For some reason I think the

14   U.S. Attorney's Office also gets involved in the

15   decision-making at the local level of the New Jersey U.S.

16   Attorney's Office.  But I believe it to be a formula of sorts.

17   Q.  OK.  And you understand that that formula is implemented by

18   the Department of Justice, the office that you just discussed,

19   right?

20   A.  I don't know who implements it.

21   Q.  It's not Senator Menendez, though, right, who implements

22   that formula?  Right?

23   A.  I don't know how the formula's implemented.

24          MR. WEITZMAN:  Well, we can put up and try to refresh

25   your recollection with Defense Exhibit 821.

O66Wmen3                        Grewal - Cross

1          MR. RICHENTHAL:  Your Honor, he didn't testify --

2          THE COURT:  Sustained.  I don't believe there's a

3  failure of recollection on the record, sir.

4          MR. WEITZMAN:  We can put that down for a second.

5  Q.  Sir, at any point in time when you were the New Jersey

6  attorney general, did you look into how the formula for these

7  grants get allocated by the Department of Justice to the New

8  Jersey State Attorney General's Office?

9  A.  I did not.

10  Q.  As you sit here today, you never had any understanding of

11  how the Department of Justice allocates grant funding to the

12  New Jersey State Attorney General's Office, right?

13  A.  Again, my understanding is that there's a formula.  I don't

14  know how that formula operates.  I know there's consultation.

15  For some reason I seem to recall there being consultation or

16  involvement of the U.S. Attorney's Office in New Jersey and

17  having some conversations with the then U.S. Attorney about JAG

18  funding.  But I don't know, like, the exact inner workings of

19  how that formula works.

20      I was more giving it as an example of one of the types of

21  grants that we got.

22  Q.  At no point in time was it your understanding that Senator

23  Menendez, or any senator for that matter, can affect or has

24  affected the formula by which Department of Justice distributes

25  that grant money, is that correct?

O66Wmen3                       Grewal - Cross

1   A.   That's correct.

2   Q.   Now, you referenced there are other grants, but those are

3   pass-through grants, is that correct?

4   A.   I thought the Byrne JAG grant, in part, is also a

5   pass-through grant.  So we get some funding through Byrne JAG,

6   and then we also pass through to local police departments and

7   other law enforcement agencies.

8            THE COURT:  Could you spell Byrne JAG?  I'm not quite

9   sure of the word.

10           THE WITNESS:  Sure.  It's Byrne, B-Y-R-N-E, and I

11  forget the full name of the individual after whom the grant is

12  named.  And it's the justice assistance grant.  J-A-G is

13  justice assistance grant, JAG.

14           THE COURT:  Thank you.

15  BY MR. WEITZMAN:

16  Q.   Now, I understand from your testimony that there were times

17  when you would meet with federal officials to apprise them of

18  what you did, correct?

19  A.   Correct.

20  Q.   And would you also meet with them to hear complaints or

21  concerns that they had?  Would it be like a round-table

22  discussion?

23  A.   I don't recall having a round table about complaints.  I

24  remember conference calls, where there was more us apprising

25  the delegation of policy rollouts that were happening in the

O66Wmen3                        Grewal - Cross

1   state that affected their districts or affected the state.  I

2   recall those types of broader meetings, but I don't recall ever

3   having a round table to hear complaints from elected officials.

4   Q.  Fair to say that the federal officials were not people who

5   controlled your day-to-day activities in any way?

6   A.  No.

7   Q.  No, as in they do not control your day-to-day activities,

8   right?

9   A.  No, they didn't control my day-to-day activities.

10  Q.  They didn't supervise what you did on a day-to-day basis?

11  A.  They did not.

12  Q.  And frankly, if they were unhappy about what you were

13  doing, they couldn't fire you, right?

14  A.  They --

15  Q.  They didn't have the authority to terminate your

16  employment, right?

17  A.  They couldn't fire me, but they carry a lot of influence in

18  the state, and so you don't want to upset the entire

19  delegation.  That's, in part, why you have the type of

20  conference calls that I talked about, so you're telling them

21  about things, you're explaining to them why you're taking some

22  policy steps so there's not, you know, sort of a back-and-forth

23  of why didn't you alert me, it affects my district.  So you

24  want to maintain good relationships.

25            THE COURT:  And when you said delegation, what were

1  you referring to?

2          THE WITNESS:  The entire congressional delegation, all

3  the Congresspeople representing the state and the two senators

4  for the state, the federal level, the federal delegation.

5          THE COURT:  Thank you.

6  BY MR. WEITZMAN:

7  Q.  You generally wanted to be on good terms with the federal

8  officials in your state, right?

9  A.  That's correct.

10 Q.  And that's true for all of them, right?

11 A.  That's correct.

12 Q.  Now, I think we've talked about the various, the structure

13 of the New Jersey Attorney General's Office.

14         MR. WEITZMAN:  Can we put up Defense Exhibit 962, just

15 for the witness and for counsel.

16 Q.  Sir, do you recognize this?

17         MR. WEITZMAN:  And if we can scroll through the pages.

18 Keep going all the way through so that the witness can see it.

19 Q.  Do you recognize this, sir?

20 A.  I don't think I've ever seen it in this format, but I

21 recognize what it -- what it is.

22 Q.  And what is it?

23 A.  It seems to be a printout of one of the tabs of, from the

24 attorney general's web page.  And judging by the name of the

25 people on it, it's probably from late 2018, early 2019.

1   Q.  OK.  But it's a printout from the attorney general's

2   website during the time that you were attorney general for New

3   Jersey, right?

4   A.  That's correct.

5   Q.  And is this a true and accurate copy of that, of your

6   website, from at least that tab?

7   A.  I have no reason to believe it's not.

8           MR. WEITZMAN:  We offer Defense Exhibit 962.

9           MR. RICHENTHAL:  Brief voir dire, your Honor.

10          THE COURT:  Yes.

11          MR. RICHENTHAL:  Can we look at the banner at the

12  bottom of the page.  Can you blow that up.

13  VOIR DIRE EXAMINATION

14  BY MR. RICHENTHAL:

15  Q.  Mr. Grewal, based on this banner, does this appear to be a

16  website from the time of your meeting with Senator Menendez?

17  A.  I think it -- I don't -- I can't tell when the website is

18  current as of.  It says copyright 2021 on one of the pages, so

19  that would suggest to me that it postdates the meeting.

20      I don't know how to decipher this thing that you're showing

21  me.

22  Q.  Were there changes in personnel or structure generally

23  between 2019 and 2021?

24  A.  There probably were.  I don't remember what they were.

25          MR. RICHENTHAL:  Objection, your Honor.

1           MR. WEITZMAN:  Your Honor, this is his website in
2     2021.  We provided it to government's counsel, and they didn't
3     alert us to any objection.  They showed it to the witness.
4           THE COURT:  Can you tell, sir, whether the information
5     on this printout is accurate as of the time you were attorney
6     general in terms of the makeup of the office?
7           THE WITNESS:  It is, your Honor.
8           THE COURT:  All right.  But some of the individuals
9     are different?
10          THE WITNESS:  It could be, because it's from 2021, and
11    I know some of the directors changed.  And so where it lists a
12    director, these were probably the directors at the time in '21.
13    I just don't remember if they were also the same directors in
14    '18 and '19.
15          THE COURT:  All right.  I will allow it in as long as
16    the jury understands that the individuals may not be the same
17    individuals as when Mr. Grewal was there.
18          But the way the office was set up was the same as
19    reflected on this document, sir; is that your testimony?
20          THE WITNESS:  That's correct, Judge.
21          THE COURT:  All right.
22          THE WITNESS:  Those are the divisions.
23          THE COURT:  I'll allow it.
24          MR. WEITZMAN:  Thank you, your Honor.
25          If we could publish that, put that up.

O66Wmen3                      Grewal - Cross

1              (Defendants' Exhibit 962 received in evidence)

2       BY MR. WEITZMAN:

3       Q.  This is your name at the top, correct, and it says attorney

4       general for the state of New Jersey?  Correct?

5       A.  That's right.

6       Q.  And it says the department of law and public safety.  Is

7       that the entirety of the office of the attorney general?

8       A.  That's correct.

9       Q.  And it's organized into 16 different entities that cover a

10      broad range of responsibilities; each of these 16 programs

11      operate under the supervision of the attorney general, correct?

12      A.  That's correct.

13      Q.  You're the highest law enforcement officer in the land in

14      New Jersey, right?

15      A.  I was, yes.

16      Q.  The buck stops with you?

17      A.  That's correct.

18              MR. WEITZMAN:  OK.  Let's go through some of the

19      divisions.  If you can cycle to page 4.

20      Q.  This is the division of criminal justice, which I think you

21      discussed?

22      A.  That's right.

23      Q.  Putting aside the directors' names -- that's not the

24      issue -- 150 detectives, 100 prosecutors, and it investigates a

25      range of criminal activity across the state, right?

1    A.  That's correct.

2    Q.  Page 5, then there was the division of consumer affairs,

3    which you mentioned, right?

4    A.  I did.

5    Q.  And again, that attempts to protect the public from fraud,

6    deceit, misrepresentations and professional misconduct, right?

7    A.  That's correct.  And it also has the bureau of securities,

8    legalized games of chance, which are the boardwalk games,

9    believe it or not.

10           MR. WEITZMAN:  Can we go to page 6.

11   Q.  There's the division of civil rights, correct?

12   A.  That's right.

13   Q.  And again, that's under your remit; you're responsible for

14   enforcing New Jersey's laws against discrimination, correct?

15   A.  That's correct.  I was.

16           MR. WEITZMAN:  And then can we do page 12.

17   Q.  This is the office of public integrity and accountability,

18   again, within the New Jersey Attorney General's Office, right?

19   A.  That's correct.

20   Q.  And its mission is to investigate violations of public

21   trust and to develop policies that rebuild faith in government

22   institutions and the criminal justice system, right?

23   A.  That's correct.

24   Q.  Again, they reported to you, right?

25   A.  They did.

O66Wmen3                        Grewal - Cross

1          MR. WEITZMAN:  And then can we do page 13.

2   Q.  This is the office of the insurance fraud prosecutor; we

3   discussed this at length in your testimony on direct.  But

4   again, the OIFP is responsible for investigating and

5   prosecuting and deterring insurance fraud, right?

6   A.  That's correct.

7          MR. WEITZMAN:  OK.  Thank you, sir.

8   Q.  Now, as the New Jersey --

9          MR. WEITZMAN:  You can put that down, Mr. Kelly.

10  Q.  As the New Jersey attorney general, you prioritized a

11  number of initiatives, right?

12  A.  I did.

13  Q.  And one of them was protecting New Jersey residents in

14  court.  Do you recall that?

15  A.  That's correct.

16  Q.  And another was strengthening community trust, right?

17  A.  Police-community relations, community trust, yes.

18  Q.  And by strengthening community trust, it was important to

19  you as the New Jersey attorney general to strengthen the trust

20  between the law enforcement and immigrant communities in

21  particular, right?

22  A.  That was one of our initiatives, correct.

23  Q.  And that would include the Hispanic and Latino communities,

24  right?

25  A.  That's correct.

O66Wmen3                          Grewal - Cross

1    Q.  As attorney general of New Jersey, you were flatly opposed

2    to racially influenced policing, right?

3    A.  I was.

4    Q.  And you believe that racially influenced policing must be

5    prohibited, right?

6    A.  It's illegal in New Jersey.  It must be prohibited, yes.

7    Q.  It's important to you -- I should say it was important to

8    you, and I'm sure it still is, but I'm emphasizing your time as

9    the New Jersey attorney general.

10       It was important to you that the law be applied fairly and

11   equitably, without regard to race or ethnicity, isn't that

12   correct?

13   A.  Absolutely, yes.

14   Q.  It was important to you as the New Jersey attorney general

15   that the law be applied in a fair-handed way, not in a

16   discriminatory manner, right?

17   A.  Correct.

18   Q.  In fact, one of your core missions as New Jersey attorney

19   general was to prevent discrimination, right?

20   A.  I had an entire division focused on that, yes.

21   Q.  Because you agreed, and still agree, I assume, that

22   discrimination threatens the very foundation of our democracy,

23   right?

24   A.  I agree with that.

25   Q.  So you actually enacted a number of policies, reforms and

O66Wmen3                        Grewal - Cross

1   initiatives to further strengthen New Jersey's

2   antidiscrimination laws, right?

3   A.  We did.

4   Q.  And some of them, there was the affirmative civil rights

5   and labor enforcement section, which you created, right, within

6   the attorney general's office?

7   A.  We created that, yes.

8   Q.  And as the attorney general of New Jersey, you worked hard

9   to implement and enforce equal protection under the law, right?

10  A.  I did.

11  Q.  And are you aware that when Senator Menendez was a state

12  senator in New Jersey, he was the one who proposed New Jersey's

13  hate crime law?

14          MR. RICHENTHAL:  Objection.

15          THE COURT:  Sustained.

16  BY MR. WEITZMAN:

17  Q.  If there was a problem, generally speaking, with

18  discriminatory policing or prosecutions in New Jersey, as the

19  attorney general for the state of New Jersey, you'd want to

20  know about it, wouldn't you?

21  A.  I would.

22  Q.  In fact, you served as a point of contact in New Jersey

23  with federal or state officials to discuss concerns with

24  respect to state policy or criminal justice, right?

25  A.  Can you repeat the question?

O66Wmen3                        Grewal - Cross

1   Q.  You served as a point of contact in New Jersey for federal

2   and state officials to discuss any concerns they may have with

3   state policy or criminal justice?

4   A.  I would have those types of interactions with federal and

5   state officials, yes.

6   Q.  And that would include U.S. senators sometimes, right?

7   A.  That's correct.

8   Q.  For instance, there were times when you spoke to Senator

9   Booker, Cory Booker, about policy issues and criminal justice

10  policies, correct?

11  A.  I did.

12  Q.  Now, we talked about the types of policy issues that you

13  were concerned with; they included unfair policing, right?

14  Community relations, is that correct?

15  A.  Yes.

16  Q.  And they included -- what were your words -- interactions

17  with immigrant communities, right?

18  A.  Correct.

19  Q.  That was a policy issue, those interactions between law

20  enforcement and immigrant communities, right?

21  A.  It was.  I issued a directive on it.

22  Q.  OK.  Now, Senator Menendez reached out to you, you said, in

23  early 2019.  Do you recall that?

24  A.  I do.

25  Q.  And that was about five and a half years ago, right?

O66Wmen3                           Grewal - Cross

1    A.  That's right.

2    Q.  And your recollection today is that Senator Menendez raised

3    an issue just generally of select -- let's call it selective

4    prosecution.  Is that what he -- let me withdraw that.

5        Did he raise the term, raise the phrase, did he --

6            THE COURT:  Did he use the phrase?

7    BY MR. WEITZMAN:

8    Q.  Did he use the phrase "selective prosecution"?

9    A.  I don't recall that phrase being used.

10   Q.  What phrase do you recall him using?

11   A.  My recollection of the conversation was that, during the

12   call, he said I'm concerned by how your office of insurance

13   fraud prosecutor is treating Hispanic defendants versus

14   non-Hispanic defendants in the trucking industry.

15   Q.  OK.  And that's your testimony of what you recall now,

16   right?

17   A.  That's correct.

18   Q.  Now, that's not what you told the FBI and the prosecutors

19   when they first started talking to you, right?

20   A.  I don't recall what I told them.

21   Q.  Well, do you recall meeting with them on September 1, 2023?

22   A.  I don't recall the date in September.

23   Q.  OK.

24   A.  But I did meet with them in 2023.

25   Q.  And it was about nine months ago, in September 2023, do you

1    recall that?

2    A.   Correct.

3    Q.   And you recall that you met with a number of prosecutors

4    who are seated right here at the government table, right?

5    A.   I met with, with a number of prosecutors.  I don't recall

6    who exactly who was at that meeting.

7    Q.   You're a federal former prosecutor yourself?

8    A.   I am.

9    Q.   In two districts, correct?

10   A.   That's right.

11   Q.   So you know that you have to do your best when you meet

12   with them to tell the truth and recall all relevant facts,

13   right?

14   A.   I do.

15   Q.   Do you recall telling the prosecutors in or about September

16   2023 that you did not remember a phone call with Senator

17   Menendez in January of 2019?

18   A.   I don't know if I said that to them at the time.

19   Q.   Do you recall telling the prosecutors that the only time

20   Senator Menendez raised the criminal investigation with you was

21   in the later, September 2019 meeting you had with him?

22   A.   I know that it was raised in September of 2019.  And I

23   know, as I look back and reflect on both meetings, the phone

24   call and the meeting, I remember distinctly now that at that

25   second meeting, I asked did this relate to the case you told me

O66Wmen3                          Grewal - Cross

1  Mike Critchley was handling?  That's the recollection I have.

2  Q.  OK.  But you told --

3  A.  Which would, to me, suggest that the phone call happened

4  prior, earlier in '19.

5  Q.  OK.  But you told the government when you met with them in

6  September of 2023 that you did not have a recollection of

7  Senator Menendez raising any of these issues in that January

8  2019 call.  Do you recall that?

9  A.  That's possible.

10 Q.  OK.  And you told them that -- in fact, they showed you

11 phone records from your own phone, right?  Do you recall that?

12 A.  I remember seeing phone records, yeah.

13 Q.  And they told you to assume that a particular number came

14 from Senator Menendez and asked you if that refreshed your

15 recollection?

16         MR. RICHENTHAL:  Objection.

17 Q.  Do you recall that?

18         THE COURT:  I'll allow it.

19 A.  I don't recall if that's how they phrased it, but -- but I

20 was shown phone records, yes.

21 Q.  And that did not refresh your recollection at that time

22 that there was a call from Senator Menendez to you discussing

23 the same matter that you all discussed in the September 2019

24 meeting, do you recall that?

25 A.  Say the question one more time.    (Continued on next page)

O663MEN4                          Grewal - Cross

Q.  Even after seeing the phone records, it did not refresh
your recollection, sir, that Senator Menendez in this
January 2019 call mentioned anything about the investigation or
matter that he raised in September of 2019.  Do you recall
that?

A.  It's possible.  I had two meetings with the prosecutors.  I
know one was on June 23, 2022, thereabouts, I remember because
it was my birthday.

Q.  Happy birthday.

A.  It's coming up.  But, I remember not knowing what the
conversation was going to be about.  Just in broad strokes they
wanted to talk to me.  That was the first time.

          I revisited these issues and then I probably put it
out of my mind until the second time I met with them in
September.

          And now months later, here I am in the intervening
period, this my memory of the timeline of events I'm giving
you.

Q.  In neither of the first two meetings did you recall that
Senator Menendez raised any issue regarding the treatment of
Hispanic truckers.  Do you recall that with respect to the
January 2019 call?

A.  It's possible.  I don't have the notes in front of me.

Q.  Let me show you what's been marked for identification
3516-003 for the witness and counsel.

1          THE COURT:  Mr. Weitzman, why don't you finish this

2     particular line, then I'll give the jury its break.

3          MR. WEITZMAN:  Yes, thank you.

4          THE COURT:  Do finish the line.

5     Q.  Why don't you just orient yourself, Mr. Grewal.

6     A.  Do you want to focus me?

7     Q.  The front page.  And you see the date on the bottom?

8     A.  September, yes.

9     Q.  If you can turn to page 2.

10    A.  Okay.

11         MR. WEITZMAN:  And if you can zoom in, Mr. Kelly, on

12    the third paragraph.

13    A.  Okay, I see that.

14    Q.  Do you recall, does this refresh your recollection that you

15    told the prosecutors and the FBI that you did not recall what

16    was being discussed with Senator Menendez in that January 2019

17    phone call?

18    A.  It does.

19    Q.  Do you recall telling the FBI and these prosecutors that if

20    Senator Menendez had brought up something like he did during

21    that later meeting, in September, that would have stuck out in

22    your mind?

23    A.  That's right.  I did say that.

24    Q.  And at this point in time, in September 2023, you had no

25    recollection of that call, correct?

O663MEN4                    Grewal - Cross

1    A.  I didn't recall it at the time, no.

2    Q.  You can put that down.

3            MR. WEITZMAN:  This is a fine moment, your Honor.

4            THE COURT:  Ladies and gentlemen, let's take our

5    midafternoon break.  We're going to end today at around 4:30.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury excused)

2          THE COURT:  You may step down, sir.  One of the jurors

3    had an issue at 4:30, and they've been so good, I thought I

4    could accommodate them, so we'll end at 4:30.  10 minutes.

5          (Recess)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (In open court; jury present)
 2                THE COURT:  You may continue with your
 3      cross-examination Mr. Weitzman.
 4                MR. WEITZMAN:  Thank you, your Honor.
 5                Mr. Kelly, can we put back up 3516-003.
 6      BY MR. WEITZMAN:
 7      Q.  Mr. Grewal, we were looking at this document before the
 8      break.  If you can turn to page 2.  I had shown you the third
 9      paragraph.  Can we now zoom in on the second paragraph.  If you
10      can review that to yourself.
11      A.  I've reviewed it.
12      Q.  Does this refresh your recollection that with respect to
13      the January 29, 2019, phone call, you told the government the
14      only time that Senator Menendez raised the criminal
15      investigation with you was during the September 2019 meeting?
16                MR. RICHENTHAL:  Your Honor, he didn't testify to not
17      having a recollection.  He wasn't asked about this before he
18      was shown something.
19                MR. WEITZMAN:  I thought he was, but I'm happy to do
20      it again.  We can take that down, Mr. Kelly.
21      Q.  Mr. Grewal, do you recall telling the U.S. Attorney's
22      Office and the FBI during your September 2023 meeting with them
23      that the only time Senator Menendez raised the criminal
24      investigation with you was during the September 2019 meeting?
25      A.  I don't have a recollection of telling them that at that
```

O663MEN4                    Grewal - Cross

1    point.

2    Q.  If we can put back up 3516-003.

3            THE COURT:  Look at what you were shown before.

4    Page 2.

5    Q.  Page 2.  Let me ask if that refreshes your recollection as

6    to my last question.

7    A.  It does not.  But I have -- I mean, I can tell you what my

8    memory is now, and that's what I'm sharing with you.

9    Q.  I appreciate that.  It doesn't refresh your recollection.

10   That's fine.  You can take that down, Mr. Kelly.

11          Your recollection now is that Senator Menendez did raise in

12   or about January 2019 the issue of treatment of Hispanics,

13   certain Hispanic defendants by your insurance fraud

14   prosecutors, right?

15   A.  That's correct.

16   Q.  And the call was a short call, seven minutes.or so?

17   A.  I know it was a short call.

18   Q.  You recall that at first you guys exchanged pleasantries,

19   right?

20   A.  That's my recollection.

21   Q.  He congratulated you on your job as attorney general?

22   A.  I don't know if it was like congratulations, but I know it

23   was complimentary, you know, complimentary conversation about

24   the work we were doing at the AG's office.

25   Q.  It wasn't a call that surprised you out of the blue, right?

O663MEN4                        Grewal - Cross

1    You got the heads up he was going to call you?

2    A.  I did get the heads up.  But I remember it not being

3    temporally close to when I had that conversation.  So, it was a

4    bit out of the blue.

5    Q.  Your cousin asked if Senator Menendez -- if he can give or

6    she can give Senator Menendez your number to call you, right?

7    A.  That's correct.

8    Q.  And you understand that your cousin and Senator Menendez

9    are quite close friends, right?

10   A.  That's my understanding.

11   Q.  Senator Menendez was polite during that call, right?

12   A.  Always polite, yes.

13   Q.  He was complimentary of the work you were doing, correct?

14   A.  That's correct.

15   Q.  And then he told you that he had some -- he had heard from

16   constituents who were Hispanic that they were being singled out

17   by the office of insurance fraud prosecutors, right?

18   A.  That's not my recollection, him using the word

19   "constituents."

20   Q.  You don't recall him saying "constituents"?

21   A.  My recollection is that he had concerns about how the --

22   how OIFP was treating non-Hispanic defendants -- sorry.

23   Hispanic defendants as compared to non-Hispanic defendants in

24   the trucking industry.

25   Q.  You understand his constituents are statewide in New

O663MEN4                          Grewal - Cross

1    Jersey, right?

2                MR. RICHENTHAL:  Objection.

3                THE COURT:  I'll allow that.

4    A.   That's my understanding, yes.

5    Q.   You prosecute crimes occurring in New Jersey, right?

6    A.   True, but I don't know if the defendants are New Jersey

7    residents.

8    Q.   Fair enough.  In any event, he was hearing -- he had

9    mentioned Hispanic defendants, plural, not just one, right?

10   A.   My recollection is plural, yes.

11   Q.   Other than alerting you to this issue, he didn't ask you to

12   take any corrective action on that call, right?

13   A.   He did not.

14   Q.   He didn't mention any particular case, right?

15   A.   Because I said to him, I asked a question, is this about a

16   pending matter, to which he responded yes.  And I said I cannot

17   speak about that pending matter, and I asked if they were

18   represented.  And my recollection he mentioned they were

19   represented by Mike Critchley.  And I said Mike can raise the

20   issues with the prosecutor or the court.

21               THE COURT:  When you said they, who were you referring

22   to just now?

23               THE WITNESS:  The defendants that he referenced when

24   he made the outreach.

25   Q.   When he first raised the issue, he didn't name a particular

1    case or defendant, right?

2    A.  We didn't get to that.

3    Q.  In the very first sentence, he didn't say this concerns X

4    case?

5    A.  That's correct.

6    Q.  He didn't blurt out the name of any particular defendant or

7    any particular case?

8    A.  He didn't blurt anything.  He was very calm.

9    Q.  He didn't tell you he wants the case dismissed in any way,

10   right?

11   A.  He did not say that.

12   Q.  He didn't mention he wants the defendant or defendants to

13   get a better deal, correct?

14   A.  He did not say that, no.

15   Q.  He didn't even ask you to call the prosecutors on any

16   particular case, right?

17   A.  He did not ask me to call anybody.

18   Q.  And it was you who asked who is the defense lawyer on that

19   case, right?

20   A.  I think my first question was, does this concern a pending

21   matter.  When he responded yes, and I said are the defendants

22   represented, and I distinctly remember Mike Critchley coming

23   up.  And I said, well, Mike can raise the issues.

24   Q.  So, he gave you the name of the defense lawyer after you

25   asked whether the individual or individuals are represented?

O663MEN4                           Grewal - Cross

1    A.  That's my recollection, yes.

2    Q.  And he didn't ask you to call the defense lawyer, right?

3    A.  No.

4    Q.  I think you've answered this, but I want to be clear.  At

5    all times in this short conversation, Senator Menendez was

6    polite and respectful, correct?

7    A.  He's always been extremely polite and respectful in all our

8    interactions.

9    Q.  He didn't threaten you in any way, right?

10   A.  No.

11   Q.  He didn't tell you that, you know, you better look into

12   this or I'm going to haul you in front of Congress?

13   A.  No.

14   Q.  He didn't tell you that he would enact any sort of

15   legislation that would discriminate against New Jersey, right?

16   A.  No, he did not.

17   Q.  Or that he would target you in any way or badmouth you or

18   anything else, right?

19            MR. RICHENTHAL:  Objection to "anything else."

20   Q.  Fair enough.  He didn't threaten to badmouth you to state

21   legislators or anything else?

22   A.  He didn't make that threat.

23            THE COURT:  He didn't threaten any retaliatory action,

24   correct?

25            THE WITNESS:  He did not.

O663MEN4                    Grewal - Cross

1    Q.  In fact, you would agree with me that you weren't afraid of

2    any retribution in any way from Senator Menendez, right?

3              MR. RICHENTHAL:  Objection.

4              THE COURT:  Sustained.

5    Q.  You would agree with me you were not afraid of any

6    retribution from Senator Menendez as a result of this call,

7    right?

8              MR. RICHENTHAL:  Objection.

9              THE COURT:  Sustained.

10             Were you concerned that there would be retribution

11   from Senator Menendez as a result of this call?

12             THE WITNESS:  The only thing, Judge, that I was

13   concerned about, was at that point upsetting somebody who was a

14   close political ally of the governor's.  So I didn't, that was

15   my concern, of sort of being on his bad side.

16   Q.  Do you recall being interviewed in June 2022?

17   A.  I think it was on the 23rd.  Am I correct?

18   Q.  You're off by a day, but pretty close.  I'll give it to

19   you.  Do you recall telling the prosecutors and the FBI you

20   were not afraid of retribution from Senator Menendez?

21   A.  I don't recall what I told them, but I wasn't afraid of

22   retribution.

23   Q.  You said retribution is more a concern for you when you

24   deal with state senators, not U.S. senators like Senator

25   Menendez, correct?

O663MEN4                          Grewal - Cross

1    A.  That's something I probably would have said.

2    Q.  So Senator Menendez, in connection with this call in

3    January of 2019, after you told him you can't speak to him

4    about this matter, he didn't get upset with you, right?

5             MR. RICHENTHAL:  Objection.

6    A.  He just moved on.

7    Q.  He didn't threaten you in any way, right?

8             MR. RICHENTHAL:  Asked and answered.

9             THE COURT:  I'll allow it.

10   A.  He did not.

11   Q.  He didn't threaten to use any of his official powers as a

12   senator to retaliate against you, right?

13            MR. RICHENTHAL:  Same objection.

14            THE COURT:  I'll allow it.

15   A.  He didn't threaten to retaliate against me.  Again, my

16   concern was not upsetting somebody who is an ally of the

17   governor's.

18   Q.  You recall that in the first couple of proffers or meetings

19   you had with the federal government, you didn't recall the

20   details of this January 2019 call, right?

21   A.  That's possible, yes.

22   Q.  The first time you mentioned it to the prosecutors was on

23   April 25, 2024, before this trial, right?

24   A.  I had two meetings early on.  That was probably the third

25   time I talked to them, yeah.

1  Q.  That was the first time you mentioned you had a

2  recollection about this call, right?

3  A.  It's possible.

4  Q.  Fair to say your recollection of this call is a bit fuzzy

5  or hazy?

6  A.  It's not, because I think the more I thought about it, and

7  thinking about the sequence of events, I know that when it came

8  up on the September 6, 2019, meeting, it wasn't the first time

9  that he had raised this issue.  And I distinctly remember

10  saying something to the effect, is this the case that you

11  talked about where Mike represents the defendants.  And that's

12  how I recollect that conversation happening in the office.

13  Which to me would suggest that the call happened first.

14  Q.  I understand.  Outreach from state or federal officials is

15  not unprecedented to you, right?

16      Let me rephrase that.  Even outreach about a

17  particular case from a state or federal official isn't unheard

18  of or unprecedented to you, right?

19  A.  About a pending criminal matter?

20  Q.  Yeah.

21  A.  It's pretty unprecedented in my experience.  I'm trying to

22  think if it ever happened.

23  Q.  Let me see if I can refresh you.  Do you recall a state

24  official named Dick Codey?

25  A.  That's right.

O663MEN4                        Grewal - Cross

1   Q.  And Dick Codey was the former governor of New Jersey,

2   right?

3   A.  That's correct.

4           MR. RICHENTHAL:  Objection.

5           THE COURT:  I'll allow it.

6   Q.  He is a former -- he is a current New Jersey state senator?

7   A.  I don't know if he's still in the state senate.

8   Q.  He was the president of the state senate for a while

9   though, right?

10  A.  He's held various leadership positions, and he was senate

11  president, yes.

12  Q.  There was a particular indictment that your office was

13  handling involving an individual named Kevin Bannon; is that

14  correct?

15  A.  I vaguely remember that.  That's the basketball coach?

16  Q.  Correct.  The Rutgers basketball coach, right?

17  A.  I don't think it was Rutgers, but I thought he worked for

18  the Somerset parks.

19  Q.  Do you recall at some point in time Dick Codey called you

20  to complain about that case?

21  A.  He did not call me to complain about the case.

22          So, other than these two instances, I think that would

23  be the only other time where somebody, an elected official,

24  raised a pending criminal matter.  And it was at the tail end

25  of a meeting, probably early in my tenure, where on his way out

O663MEN4                        Grewal - Cross

1  the governor -- I call him the governor because he had been the

2  governor at some point -- said I'm concerned about how the

3  prior administration weaponized this office politically, and

4  I'm particularly concerned about a pending matter.  And before

5  he could raise it, I said to him, I'm not having a conversation

6  with you about a pending matter.

7  Q.  And so, that's one example of another elected official --

8  A.  Probably the only other one.

9  Q.  Just to finish my question.  Another example of another

10 elected official raising a particular case, in that instance,

11 he actually named the case, right?

12         MR. RICHENTHAL:  Objection to form and assumes a fact.

13 A.  I don't know if he named it.

14         THE COURT:  Just a moment, sir.  We have an objection

15 pending.

16         Just restate it more specifically, sir.

17 Q.  Yes.  In that instance, when you spoke to Dick Codey, he

18 made it clear which indictment he was referring to, right?

19 A.  So, I don't know if he raised the specific indictment in

20 that case.  But I know, like, historically he's had a problem

21 with that particular prosecution because I think he's spoken

22 out about it in other venues.  But, this was at the tail end of

23 the meeting and I remember it was at the door of my office when

24 he was walking out, and I said I'm not having a conversation

25 with you about a pending matter.

O663MEN4                        Grewal - Cross

1   Q.  Is it fair to say, as a result of that conversation with

2   Dick Codey, you did experience retaliation from him?

3            MR. RICHENTHAL:  Objection.

4            THE COURT:  I'll allow it.

5   A.  I don't know if it was a result of that particular matter

6   or not.  But, the governor -- I think what you're referring to

7   might be legislation that then Senator Codey introduced to

8   prevent me from running for governor for a period of time until

9   after my term.  Directed at me.

10  Q.  Right.  And he introduced that legislation after you

11  refused to speak to him about this case that he had an issue

12  with, right?

13  A.  I don't know if it was right after that.  But he certainly

14  introduced legislation that was directed at preventing me and

15  my first assistant, and I think he also tried to prevent

16  federal officials from running for governor for a period of

17  time until after their terms.

18  Q.  In addition to this incident with Dick Codey, who was a

19  state official at the time, also the governor's chief of staff,

20  then governor whomever it was chief of staff tried to raise an

21  issue with you about a particular case, too, right?

22  A.  I think that's probably what prompted me to have that memo

23  prepared about informing the governor's office about what they

24  can and can't raise with the AG's office.

25  Q.  We're going to talk about that in a second, but just want

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to understand the predicate to that.  Which is the governor's

2    chief of staff reached out to discuss a particular case pending

3    in your office, right?

4    A.  That's correct.

5    Q.  And again, you said, sorry, that's off limits, you got to

6    raise it up the normal chain, right?

7    A.  I said I can't speak to you about pending matters.  And

8    then I reached out to the governor's counsel, Matt Platkin at

9    the time, to remind folks in his office what the lines were and

10   what they could and could not raise.

11   Q.  So, I understand you had this practice at the time.  But

12   fair to say that not everybody knew about this practice of

13   yours?

14            MR. RICHENTHAL:  Objection to what other people knew.

15            THE COURT:  Sustained.

16   Q.  Fair to say that Dick Codey and the governor's chief of

17   staff were unaware of this practice of yours?

18            MR. RICHENTHAL:  Same objection.

19            THE COURT:  Sustained.

20   Q.  Sir, you didn't communicate, prior to your meeting with

21   Dick Codey or the governor's chief of staff, prior to that

22   meeting, that you had a practice of not communicating about

23   cases other than through the chain of command that you

24   preferred, right?

25   A.  So my practice was largely with defense counsel.  I think

1    the prohibitions on elected officials and members of the

2    governor's staff reaching out about pending criminal matters,

3    these are just norms that people should be aware of.  And I

4    think the DoJ has a policy specifically for the White House on

5    governing their interactions with the DoJ.  So we thought it

6    better for the interactions between the governor's office and

7    our office to also formalize it in a memo.

8            But these are long-held norms that elected folks

9    should not be talking to prosecutors about pending criminal

10   matters or members of the Executive Branch should not be doing

11   that either.

12   Q.  I understand your view as to these norms.  Is it on your

13   website?

14   A.  I don't know if the contacts memo is on the website or not.

15   Q.  Put aside the contacts memo.  Before the contacts memo was

16   written -- we'll talk about when that was written.  Did your

17   website say elected officials shouldn't reach out to me?

18   A.  No, the website didn't say that.

19   Q.  As far as your contacts memo, that was modeled on the White

20   House contacts memo, correct?

21   A.  That's my recollection, yes.

22   Q.  And the White House contacts memo was released by Attorney

23   General Merrick Garland; is that correct?

24   A.  There have been various iterations of that.  It's existed

25   under prior AGs and been updated I think.

1   Q.  Do you recall when you adopted your New Jersey contact, New

2   Jersey governor contacts memo?

3   A.  I don't recall the date.

4   Q.  Do you recall the year?

5   A.  I don't.

6   Q.  Was it early in your tenure or late?

7   A.  I would say probably somewhere early-ish, maybe first year

8   or into the second year.

9   Q.  Some time either the first or the second year?

10  A.  That's my recollection.  Certainly, we did have

11  conversations with the governor's office for them to remind

12  their folks about the types of matters that they could inquire

13  about or not inquire about from the beginning.

14  Q.  That memo was specific to contacts by the governor, because

15  the governor has the power to remove you, is that right?  Or to

16  influence your budget and all sorts of other things, right?

17  A.  I don't think the governor can remove me.  I was one of two

18  cabinet officials that had to go through a process before the

19  state senate for removal, which is unique about the AG and the

20  lieutenant governor position.

21  Q.  But --

22  A.  But the memo was not just for the governor himself.  It was

23  for the entire office for the Executive Branch.

24  Q.  Executive Branch of New Jersey state?

25  A.  That's correct.

O663MEN4                    Grewal - Cross

1    Q.  It didn't specify anything about federal officials?

2    A.  It did not.

3    Q.  After the January 2019 call from Senator Menendez, you

4    didn't do anything to evaluate whether there was selective or

5    discriminatory prosecutions in the case of Latino truckers,

6    right?

7    A.  I did not.

8    Q.  You didn't know which case he was referring to, if any,

9    right?

10   A.  I did not.

11   Q.  What cases -- and you didn't know who the prosecutors were

12   in those cases, right?

13   A.  No.

14   Q.  So you didn't ask for and you didn't get any sort of

15   briefing from the prosecutors, right?

16   A.  I did not.

17          THE COURT:  You were asked, sir, you didn't know which

18   case he was referring to, if any, right?  And you said you did

19   not.

20          Did you know that he was referring to a case and you

21   just didn't know what it was?

22          THE WITNESS:  I'm sorry, Judge.  That's correct.  It

23   was a case within our office of insurance fraud prosecutor,

24   involving the trucking business.  That's what I knew.

25          THE COURT:  You didn't know the name of the case.

O663MEN4                        Grewal - Cross

1           THE WITNESS:  I did not.

2    Q.  Do you know how many cases within the office of insurance

3    fraud prosecutor, how many cases and investigations were

4    related to the trucking industry?

5    A.  I don't.

6    Q.  You didn't know at the time either, right?

7    A.  I did not.

8    Q.  Would you agree with me that as between you, the attorney

9    general, who is the head of the office, or the line attorneys

10   on the trucking case, whichever one it was, you would not have

11   wanted Senator Menendez to reach out to the line attorneys in

12   the first instance, right?

13           THE COURT:  Sustained.

14   Q.  You didn't want Senator Menendez to be reaching out to your

15   line prosecutors, right?

16           THE COURT:  I'll allow it.

17   A.  No.

18   Q.  You would agree --

19           THE COURT:  Why is that?

20           THE WITNESS:  I think I stated on direct, Judge, I

21   don't want there to be a chilling effect, and I don't want

22   folks to feel intimidated in any way by outside folks,

23   especially powerful legislators.

24           THE COURT:  In your view, was there a chilling effect

25   if they had been contacted by Senator Menendez?

```
 1              THE WITNESS:  I would think so.  The power imbalance.
 2              THE COURT:  The power imbalance of what?
 3              THE WITNESS:  You have a line prosecutor, and you have
 4    a senior elected official who is very powerful in our state.
 5    Q.  Now, you mentioned that during the January call, you said
 6    that Michael Critchley can handle this matter, correct?
 7    A.  That's my recollection, yes.
 8    Q.  And there did come a time when Michael Critchley reached
 9    out to you?
10    A.  I recall having a conversation with Michael about this.  I
11    seem to remember speaking to Michael about this, yeah.
12    Q.  And do you recall approximately when he reached out to you?
13    A.  I don't.  It could be, I mean, Michael Critchley's -- let
14    me rephrase that.
15              I remember talking to Michael Critchley.  But I don't
16    remember what it was about.
17    Q.  Do you recall that it concerned the same case or cases the,
18    truckers cases that Senator Menendez was referring to?
19    A.  I don't have a good recollection or specific recollection
20    of that conversation, no.
21    Q.  Do you recall that when he called you, you told him as well
22    that you're not at liberty to discuss his matter?
23    A.  If a defense attorney had called me about a pending
24    criminal case, that's what I would have said to him.
25    Q.  So he didn't have the opportunity to voice his concerns
```

1    about the case with you either on that call?

2    A.  I don't have --

3            MR. RICHENTHAL:  Objection.

4            THE COURT:  I'll allow it.  On that call.

5    A.  I don't have a specific recollection of him raising that on

6    a call.  But had he done that, I would have directed him to

7    raise it with the team first, for all the reasons I've talked

8    about this afternoon.

9    Q.  I think you were fairly complimentary.  You said Michael

10   Critchley is one of the finest criminal defense lawyers in New

11   Jersey; is that right?

12   A.  That's right.  That's my impression.

13   Q.  You've seen him in action?

14   A.  I have, when I was a federal prosecutor, yeah.

15   Q.  Let's turn to the September 2019 meeting that you had with

16   Senator Menendez.  Okay?

17   A.  Sure.

18   Q.  You arrived with Andrew Bruck you said?

19   A.  That's right.

20   Q.  And Senator Menendez -- and you arrived to his office,

21   right?

22   A.  We went to his office in Newark, yes.

23   Q.  He had a young staffer I think you mentioned?

24   A.  I remember speaking to the person working there, and I just

25   remember them being young and new.

1   Q.  It wasn't like an offsite visit, somewhere secret, cafe or

2   anything else.  It was in his office, right?

3                 MR. RICHENTHAL:  Objection.

4                 THE COURT:  Sustained as to phrase.

5                 Was it in the senator's New Jersey office, Senator

6   Menendez's office in New Jersey?

7                 THE WITNESS:  That's right.  It was his official

8   office in the state.

9   Q.  And you said that when he saw you, and he saw Mr. Bruck, he

10  said "oh," with Mr. Bruck?

11  A.  It wasn't -- I mean, I think I said it was more like a "oh"

12  reaction sort of thing where I don't think he was expecting

13  anybody to be with me.  That's my impression.

14  Q.  He didn't seem to know Mr. Bruck, right?

15  A.  I don't think at that point he would have known Mr. Bruck,

16  no.

17  Q.  He introduced himself, shook his hand?

18  A.  I would have introduced him.

19  Q.  And they shook hands?

20  A.  I don't know if they shook hands or not.  But very

21  pleasant.

22  Q.  Now, during the meeting you had with Senator Menendez in

23  his office, you guys discussed a variety of different matters,

24  is that correct?

25  A.  I don't recall discussing a variety of matters.  I think it

O663MEN4                        Grewal - Cross

1    was, again, similarly complimentary words about the work we

2    were doing, and then we turned to this matter that we've been

3    talking about.

4    Q.  Do you recall that you discussed, in addition to this

5    matter, two other matters, including the issue of immigration

6    and the issue of guns?

7    A.  I don't have a specific recollection of discussing

8    immigration or guns with him.

9    Q.  Let me show you what's been marked as 3504-004.  And if we

10   can turn to page 2 of the document.

11            MR. RICHENTHAL:  Your Honor, this is improper.  If you

12   look on the screen.

13            THE COURT:  Pardon me?

14            MR. RICHENTHAL:  I would ask the Court to look at the

15   screen.  I don't think this is appropriate to show this

16   witness.

17            MR. WEITZMAN:  This is the banana we've been talking

18   about.

19            MR. RICHENTHAL:  Your Honor, if we can have a side

20   bar.

21            THE COURT:  Just a moment.

22            MR. WEITZMAN:  The first full paragraph, your Honor.

23            MR. RICHENTHAL:  If I can ask the Court to look at the

24   line at the top regarding what this is.

25            THE COURT:  Somebody show me this document at the

O663MEN4                        Grewal - Cross

1    sidebar.

2              (At the sidebar)

3              THE COURT:  He said he doesn't have a recollection of

4    discussing guns or immigration.

5              MR. RICHENTHAL:  That's true, your Honor.  This is an

6    interview of a different person.  This is an interview of

7    Mr. Bruck.  That's what this report is.

8              I know the banana rule, but I think the witness is

9    under the belief, based on how the questions have come up, this

10   is something he said to the government.  This is something a

11   different person said.

12             THE COURT:  I understand.

13             MR. WEITZMAN:  I'm happy to orient him.

14             THE COURT:  It seems to me he can show him the banana.

15             MR. RICHENTHAL:  I think the banana rule --

16             THE COURT:  Why don't you situate him in the document

17   and then we'll go forward.

18             MR. WEITZMAN:  Thank you, your Honor.

19             THE COURT:  How much longer?  Do you think can you

20   finish by 4:30?

21             MR. WEITZMAN:  That's my goal.

22             (Continued on next page)

23

24

25

1                    (In open court).

2              MR. WEITZMAN:  If we can put up 3504-004, and just

3    page 1 in had the first instance.

4              I'm not going to identify what this is.  I'll let you

5    look at this.  So you can identify what this is, okay, you see

6    the middle.  Maybe highlight just the middle.

7    A.  I do.  That's not me, though.

8    Q.  I understand, sir.  If you can turn to page 2.

9    A.  Okay.

10   Q.  And if you can zoom out the first full paragraph.  I'm

11   going to ask you to read it to yourself and then I'll pose a

12   question.

13   A.  I've read it.

14             MR. WEITZMAN:  You can take that down, Mr. Kelly.

15   Q.  Does that refresh your recollection that there were two

16   other policy issues that were raised at the meeting with

17   Senator Menendez, including immigration and guns?

18   A.  It does not.

19   Q.  Thank you.  Do you recall at some point whether at this

20   meeting or at prior meeting that you and Senator Menendez did

21   have a conversation about issues with respect to civil rights?

22   A.  I do not.

23   Q.  Do you recall Senator Menendez ever raising with you

24   constituent concerns regarding hate crimes against members of

25   the LGBTQ community?

1    A.   I don't have that recollection, no.

2    Q.   Do you recall that Senator Menendez once held a community

3    outreach round table involving hate crimes regarding LGBTQ

4    youth?

5    A.   I don't have a recollection of that.

6    Q.   And to the best of your recollection, as you sit here

7    today, you and Senator Menendez never spoke about hate crimes

8    regarding LGBTQ youth.  Is that your testimony?

9    A.   I don't have a recollection of having that conversation.  I

10   have a recollection of one other issue we discussed, but it

11   wasn't LGBTQ youth.

12   Q.   In any event --

13   A.   Not at that meeting, but in a separate time.

14   Q.   In any event, fair to say that during the September 2019

15   meeting, Senator Menendez was passing along concerns that he

16   had heard from New Jersey constituents?

17              MR. RICHENTHAL:  Objection.

18              THE COURT:  Do you know whether or not he was passing

19   along concerns that he had heard from New Jersey constituents

20   in the September meeting?

21              THE WITNESS:  No.

22              MR. WEITZMAN:  If we can put up 3516.

23   Q.   Let me ask the question first.  Do you recall in a

24   September 1, 2023, interview with law enforcement and the U.S.

25   Attorney's Office that you said that Senator Menendez raised

1    concerns from constituents about how they were being treated by

2    the New Jersey Attorney General's Office of the Insurance Fraud

3    Prosecutor?

4    A.  I don't remember saying "constituents."

5    Q.  If question put up 3516-003.  And if we can turn to page 3.

6    If we can -- there we go.  You can read to yourself the first

7    full sentence.  First two sentences.  Let me know when you've

8    finished.

9            THE COURT:  Can I see the top of this document?

10           MR. WEITZMAN:  Yes, sir.

11           THE COURT:  I see.

12   Q.  You see that, sir?

13   A.  I do.

14   Q.  Does that refresh your recollection that Senator Menendez

15   raised concerns from constituents --

16           MR. RICHENTHAL:  That's not the proper question, your

17   Honor.

18   Q.  Does this --

19           MR. RICHENTHAL:  This is about allegedly prior

20   statements.

21           THE COURT:  Let me hear a question.

22   Q.  Does this refresh your recollection that Senator Menendez

23   raised concerns from constituents about how they were being

24   treated by the New Jersey Attorney General's Office?

25           MR. RICHENTHAL:  Same objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1              THE COURT:  I'll allow it.
 2   A.  I don't know what the question is.
 3   Q.  Apologies.  Does this refresh your recollection that you
 4   advised the FBI and the U.S. Attorney's Office on September 1,
 5   2023, that Senator Menendez raised concerns from constituents
 6   about how they were being treated by the New Jersey Attorney
 7   General's Office of the Office of Insurance Fraud Prosecutors?
 8   A.  Yes.
 9   Q.  In fact he did raise constituent concerns with you, right?
10              MR. RICHENTHAL:  Objection.
11              THE COURT:  I'll allow it.  Let's see what the answer
12   is.
13   A.  It refreshes my recollection that he said that there were
14   individuals being treated differently by the OIFP, in
15   particular, Hispanic defendants versus non-Hispanic defendants.
16   And it refreshes my recollection that those individuals that he
17   was referring to he referenced as constituents.
18   Q.  Thank you.  He didn't mention just one individual or just
19   one -- he didn't mention any particular individual or
20   particular company, correct?
21   A.  No, that didn't come up.
22   Q.  And did he mention that he was concerned that there was
23   selective prosecution here of Hispanic constituents?
24   A.  I don't think he used the word, but it certainly is, having
25   seen that, it refreshes my recollection that I would have --
```

O663MEN4                         Grewal - Cross

1   that's how I would have viewed the complaint as.

2   Q.  You would agree with me that if there were selective

3   prosecution, that would be a very problematic thing in your

4   office?

5   A.  It would.

6   Q.  And it would be a systemic problem, potentially?

7           MR. RICHENTHAL:  Objection to "systemic."

8           THE COURT:  I'll allow it if you know what that means.

9   A.  I don't think necessarily it would indicate it was a

10  systemic problem.  But certainly if there was evidence he

11  brought to me showing that individuals in a different case were

12  being treated differently than other similarly situated

13  defendants, it could lead to a claim of selective prosecution.

14  But that wasn't the conversation we had.

15  Q.  You had said that Senator Menendez came in with a folder of

16  materials?

17  A.  I have a recollection of there being a folder on the table

18  or him having a folder.

19  Q.  And before he can present anything to you in the folder,

20  you advised him that this wasn't the proper forum to raise this

21  issue; is that fair?

22  A.  He raised the concern about the treatment of Hispanic

23  defendants.  And again, I asked, is this related to a pending

24  criminal matter.  And when he said yes, I said is this the one

25  that Mike Critchley is representing the individuals on.  To

1   which he said yes.  And I said, well, then please have Mike

2   raise these issues with the court or with the prosecutors on

3   the case.

4   Q.  At no point in time in connection with that September 2019

5   meeting did Senator Menendez threaten you, correct?

6   A.  He did not.

7   Q.  He didn't apply pressure on you to resolve the case or

8   handle it in a particular manner, right?

9   A.  He did not pressure me, no.

10  Q.  He didn't say I am going to haul you in front of Congress

11  unless you address this, right?

12          MR. RICHENTHAL:  Asked and answered.

13          THE COURT:  Sustained.

14          MR. WEITZMAN:  I asked it with respect to the January

15  call, your Honor.

16          THE COURT:  Fine.  Another call.  Go ahead.  Another

17  meeting.

18  Q.  In the September 2019 meeting, he didn't threaten to put

19  you before Congress and have you testify about this, right?

20  A.  He did not.

21  Q.  He didn't threaten to subpoena you?

22  A.  He did not.

23  Q.  When you said you can't be speaking about this, he didn't

24  react in an upset or frustrated manner, right?

25  A.  He did not.  He just moved on.

O663MEN4                      Grewal - Cross

1   Q.  He was polite at all times, right?

2   A.  He was always polite with me, yes.

3   Q.  And he didn't ask you to put your thumb on the scale of

4   justice with respect to any particular matter either, right?

5   A.  He did not.

6   Q.  Just one -- I think I'm almost done.  The prosecutors who

7   were handling, just so the record is clear, the prosecutors who

8   were handling these trucking cases, they resolved them however

9   they resolved them on their own merits, right?

10           MR. RICHENTHAL:  Objection.

11           THE COURT:  Sustained as to form.

12  Q.  You didn't weigh in on any of those trucking cases, right?

13  A.  I did not weigh in on any trucking cases that I can ever

14  recall being presented to me.

15           MR. WEITZMAN:  Just one moment.

16           THE COURT:  Yes.

17  Q.  One last series of questions and then I'll be done.  After

18  this interaction in September 2019, you continued to have

19  occasional interactions with Senator Menendez, right?

20  A.  I did.

21  Q.  And you guys in fact had text exchanges, right?

22  A.  I did.

23  Q.  And one of the text exchanges that you had with him

24  concerned the SEC position you now have, right?

25  A.  It did.  I don't know if that was a text exchange or a

1  phone call.  But I did speak to him to let him know that I was

2  leaving.

3  Q.  You reached out to him for that purpose, right?

4  A.  I reached out to him and all the members of the

5  Congressional delegation to let them know I was moving on from

6  my position.

7           THE COURT:  Why did you do that if your position was

8  with the New Jersey attorney general?

9           THE WITNESS:  Judge, because --

10          THE COURT:  Why did you contact the New Jersey

11 representatives to federal Congress if your job was with the

12 New Jersey state government?

13          THE WITNESS:  Two reasons, your Honor.  Because I, as

14 chief law enforcement officer and chief legal officer of the

15 state, represented the interests or tried to protect the

16 interests of their constituents, the residents of the state.

17 And also because I would be moving to a federal position, and I

18 would have more occasion to see them when I was in D.C.

19          For those two reasons, A, I had work with a lot of

20 them in New Jersey, and then B, because I would be moving down

21 to D.C. and I would have more occasion to interact with them.

22          MR. WEITZMAN:  Thank you, Mr. Grewal.  No further

23 questions.

24          THE COURT:  Thanks.

25          Mr. Lustberg, anything?

```
 1              MR. LUSTBERG:  No questions, thank you.
 2              THE COURT:  Sir?
 3              MR. DE CASTRO:  No, Judge.
 4              THE COURT:  Any redirect?
 5              MR. RICHENTHAL:  Briefly.
 6   REDIRECT EXAMINATION
 7   BY MR. RICHENTHAL:
 8   Q.  Mr. Weitzman asked you whether Senator Menendez asked you
 9   to put a thumb on scale of justice.  Do you recall being asked
10   that question?
11   A.  I do.
12   Q.  Do you recall saying no, he didn't ask me to do that?
13   A.  I do recall answering that way.
14   Q.  Did you believe if you passed on what he had said to you to
15   the line prosecutors, that would have been a thumb on the scale
16   of justice?
17              MR. WEITZMAN:  Objection, your Honor.
18              THE COURT:  Sustained as hypothetical.
19   Q.  When you responded he didn't ask you to put a thumb on the
20   scale of justice, were you referring to literally what he said?
21   A.  I'm sorry.  Ask the question again?
22   Q.  When you responded he did not ask you to put a thumb on the
23   scale of justice, were you referring to literally what he said
24   to you?
25   A.  I was referring -- I was answering the question, no, he
```

O663MEN4                    Grewal - Redirect

1   didn't ask me to put my thumb on the scales of justice.  And

2   also, reading it to mean, like, he didn't ask me to weigh in on

3   the case specifically.

4          What I did understand him, when he raised these

5   concerns, is he did not like how OIFP was handling the case.

6   Q.  And wanted it handled differently?

7   A.  That was my impression.

8   Q.  By you.

9   A.  Whether by me or by me reaching out to the prosecutors,

10  which is what I would not do.

11  Q.  Again, why would you not do that?

12  A.  For all the reasons we've talked about this afternoon.  I

13  want to insulate my staff and the people who are doing these

14  cases from any sorts of outside influence.  And that's what I

15  did here.

16  Q.  Two more questions.  First, do you recall being asked

17  whether something was on your website?  Certain policies?

18  A.  Yeah, the contacts policy.

19  Q.  Contacts policy.  Can we put up in evidence --

20          MR. WEITZMAN:  That wasn't the question, your Honor.

21          THE COURT:  Just a moment.

22          MR. WEITZMAN:  Misstates.

23          THE COURT:  Do you recall being asked whether

24  something was on your website?

25          And then ask a question directly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  Do you recall being asked anything about your website?

2   A.  I thought there were two questions.  One about the contacts

3   policy and another whether there was a specific proscription on

4   our website about elected officials not reaching out to us

5   about pending criminal matters.

6           MR. RICHENTHAL:  Can you pull up what's in evidence on

7   the screen as 10C-1, please.

8   Q.  Is that on your screen, Mr. Grewal?

9   A.  I can barely see it, but there was something on the screen.

10  I can see it now.

11  Q.  Does that appear to be a website?

12          MR. WEITZMAN:  Scope.  This is not his website.

13          MR. RICHENTHAL:  This is directly responsive to the

14  inference.

15          MR. WEITZMAN:  It is not.

16          THE COURT:  You can ask the question.

17  Q.  Mr. Grewal, do you see what appears to be a website?

18  A.  I do.

19  Q.  One more question.  You were asked about whether an

20  individual named Dick Codey may have said something to you

21  about a case.  Do you recall being asked that?

22  A.  I do.

23  Q.  Do two wrongs make a right?

24          MR. WEITZMAN:  Objection.

25          THE COURT:  Sustained.

O663MEN4

1              MR. RICHENTHAL:  No further questions.

2              THE COURT:  Thank you.  You are excused.  Sir, you may

3    step down.  Thank you.

4              THE WITNESS:  Thank you, your Honor.

5              (Witness excused)

6              THE COURT:  It's 4:30, ladies and gentlemen.  Why

7    don't we break for the evening.  Enjoy the evening.  We'll see

8    you tomorrow 9:30.  We've had a full week.  And let's continue

9    that tomorrow.  9:30 to 5.  Thank you.  Then we will have a

10   full week behind us of testimony.

11             I'm sorry.  Before you go, just for your planning

12   purposes, on Friday, June 21, we are not going to have court.

13   So you can plan that also.  June 21, Friday, we're not going to

14   have court.

15             (Jury excused)

16             THE COURT:  On Friday, June 21, three separate jurors

17   have graduations, family graduations.  So rather than

18   inconvenience them, since there were three of them, separately,

19   I thought again we would reward them.  I think most or many

20   trials here only go four days a week.  I've been going five

21   days a week, so I'm giving that day off.

22             What does tomorrow look like, sir?

23             MR. RICHENTHAL:  I was going to ask one other

24   scheduling question.  I assume that we will not be sitting on

25   June 19, Juneteenth.  That's a federal holiday.

O663MEN4

1          THE COURT:  If it is a federal holiday, yes, I take it

2     if it is a federal holiday, then the courts are not open.

3          MR. FEE:  It is.  It's Juneteenth.

4          MR. RICHENTHAL:  As for tomorrow, we expect to call

5     Kira Glass, that's the latent fingerprint expert from the

6     Federal Bureau of Investigation.

7          THE COURT:  How long is she on direct?

8          MS. GHOSH:  Your Honor, approximately two hours at

9     most.

10          THE COURT:  All right.  Who else?

11          MS. POMERANTZ:  We then expect to call Jose Uribe.

12          THE COURT:  How long?

13          MS. POMERANTZ:  I really can't estimate, your Honor.

14          THE COURT:  All right.  I understand.  That makes

15     sense.

16          MR. RICHENTHAL:  And finally, just for the record, I

17     don't know that I've asked.  We have not received any defense

18     exhibits or objections to ours for our witnesses tomorrow of

19     which we gave notice some time ago.

20          THE COURT:  Gentlemen, let's do it.

21          Are there going to be any?  If there are none, there

22     are none.

23          MR. FEE:  We'll confirm tonight.  There have been a

24     lot of shuffling of the witnesses.

25          THE COURT:  I understand.  It seems to be a constant

O663MEN4

1    here.  9:30 tomorrow.

2             MR. FEE:  One point.  I'm not going to do a tit for

3    tat.  But we raised earlier, they had this 50-page witness

4    list.  We have not received notice of anyone falling off.

5             THE COURT:  That is tit for tat.  Indeed, that's the

6    definition of tit for tat, but I think it's fair.  Cooperation

7    makes it happen.  9:30.

8             MR. RICHENTHAL:  We agree it's fair.

9             THE COURT:  9:30.

10            (Adjourned to June 7, 2024, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   RACHEL GRAVES

 4   Cross By Mr. Fee . . . . . . . . . . . . . .2558

 5   Cross By Mr. Solano  . . . . . . . . . . . .2649

 6    GURBIR GREWAL

 7   Direct By Mr. Richenthal . . . . . . . . . .2671

 8   Cross By Mr. Weitzman  . . . . . . . . . . .2746

 9   Redirect By Mr. Richenthal . . . . . . . . .2799

10                   DEFENDANT EXHIBITS

11   Exhibit No.                          Received

12    962  . . . . . . . . . . . . . . . . . . .2756
```