O6bWmen1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7              Defendants.
                                          Trial
8    ------------------------------x

9                                         New York, N.Y.
                                          June 11, 2024
10                                        10:00 a.m.

11

12   Before:

13
                      HON. SIDNEY H. STEIN,
14
                                          District Judge
15                                        -and a Jury-

16                          APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division
23

24

25
```

O6bWmen1

                           APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes



Also Present:  Marwan Abdel-Rahman
               Rodina Mikhail
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office

               Justin Kelly, DOAR

O6bWmen1

```
 1                    (Trial resumed; jury not present)
 2              THE COURT:  Good morning.
 3              Please be seated.
 4              Are the four areas in terms of cross still at issue
 5    between the parties?
 6              MR. LUSTBERG:  Yes, your Honor.
 7              THE COURT:  All right.  Why don't you speak to me
 8    then, sir.
 9              MR. LUSTBERG:  Thank you, your Honor.
10              As the Court is aware, there are exactly four issues.
11    Let me start with the two that I think --
12              THE COURT:  You know what?  I'm sorry.  Let me handle
13    it this way, since the last juror just came.
14              Putting those four issues aside, how long do you think
15    Mr. Solano has on cross?  Because what I'd like to do, if we
16    can, is get evidence before the jury and then handle this
17    motion issue at a break.
18              MR. LUSTBERG:  I think we can do that, your Honor.
19    Mr. Solano, I think our plan is that he'll be done right around
20    lunchtime, maybe a little bit after.  We can certainly do this
21    on the morning break.
22              THE COURT:  OK.  Fine.  Let's bring this jury in.
23    Thank you.  That way we're using their time as efficiently as
24    we can.
25              Put the witness on the stand, please.
```

O6bWmen1

1           THE COURT:  Good morning, sir.

2           THE WITNESS:  Good morning, your Honor.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6bWmen1                      Uribe - Cross

1    JOSÉ DOLORES URIBE, resumed.

2              (Jury present)

3              THE COURT:  Good morning.  Please be seated.

4              Good morning, ladies and gentlemen.  Thank you for

5    being here.

6              Mr. Solano, you may continue with your

7    cross-examination of Mr. Uribe.

8              Mr. Uribe, I remind you, sir, that you remain under

9    oath.  You understand that, correct?

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  All right.  Thank you.

12             Proceed.

13             MR. SOLANO:  Thank you, your Honor.

14   CROSS-EXAMINATION CONTINUED

15   BY MR. SOLANO:

16   Q.  Mr. Uribe, just to recap a bit from yesterday, it's the

17   case, is it not, that in your first conversation with Mr. Hana,

18   the one that occurred outside the law offices of Andy Aslanian,

19   there's no discussion whatsoever of what Will Hana was going to

20   do with what he, to use your words, offered in making the case

21   against Parra, Elvis Parra, go away, correct?

22   A.  Would you mind repeating the question for a minute?

23   Q.  Yes.

24             In that first conversation that you had with Mr. Hana that

25   you believe occurred in April 2019, the one outside of Andy

O6bWmen1                          Uribe - Cross

1    Aslanian's office, there was no discussion whatsoever of what

2    Will was going to do when he offered, your words, to make the

3    case against Mr. Parra go away.  Correct?

4    A.  Best of my recollection, Mr. Hana mentioned the fact that

5    he is to contact Nadine, and at this point he have contact with

6    the senator, and that was his way to proceed in his dealings.

7    Q.  OK.  And there was no discussion about what that was,

8    correct, beyond that?

9    A.  The details of what he was going to do, no, how he was

10   going to do it.

11   Q.  There was no discussion about what the details of what he

12   was going to do or how he was going to do it, correct?

13   A.  You are correct.

14   Q.  You initially described this conversation to the government

15   on December 7 of 2023.  Do you recall?

16           THE COURT:  Do you recall describing this conversation

17   to the government on December 7 of 2023?

18           THE WITNESS:  I don't have a recollection and when I

19   describe the conversation like that to the government, but --

20   by date and time, sir.

21   BY MR. SOLANO:

22   Q.  OK.  Let me ask it this way.  You initially met with the

23   government, and yesterday you testified how you had lied to

24   them about the car to Nadine that you gave, correct?

25           MS. POMERANTZ:  Objection, your Honor.

O6bWmen1                              Uribe - Cross

1            THE COURT:  Yes.  Sustained as to form.

2   BY MR. SOLANO:

3   Q.  Do you recall initially meeting with the government and

4   lying to the prosecutors about the car payments that you made

5   on behalf of Nadine Arslanian?

6            MS. POMERANTZ:  Objection.

7            THE COURT:  Yes.  It will assist if you're more

8   specific, sir.

9            MR. SOLANO:  OK.

10            THE COURT:  Do you remember lying to the prosecutors

11   about the car payments to Nadine?

12            THE WITNESS:  Yes, I do.

13            THE COURT:  Next.

14            MR. SOLANO:  Thank you.

15   Q.  And then you were charged with bribery and other offenses

16   in this case, correct?

17   A.  Yes.

18   Q.  And then you went in to meet with the government to try to

19   tell them that you were willing to cooperate and to show them

20   that you were, correct?

21   A.  Yes.

22   Q.  And one of the things you did during that meeting with the

23   government was to explain to them or discuss this initial

24   conversation that you had with Mr. Hana regarding the money

25   that you said he -- excuse me.  Strike that -- regarding this

O6bWmen1                              Uribe - Cross

1  conversation that you had with Mr. Hana outside of

2  Mr. Aslanian's offices, correct?

3  A.  Yes, that was some of my statements.

4  Q.  And during that conversation -- excuse me.

5      During that meeting with the government, you never said

6  that Will Hana mentioned Senator Menendez in any way during

7  that first conversation, correct?

8  A.  I don't have a recollection of saying that.

9           MR. SOLANO:  OK.  Can we show the witness 3542, just

10  the witness, the judge and the attorneys.  And in particular,

11  page 4.  Sorry.  Dash 28.  Apologies.

12           THE COURT:  Mr. Uribe, if you remember the way this

13  proceeds is, you said you don't remember something, so the

14  questioner is entitled to show you anything at all to see if it

15  refreshes your recollection.  The example I use, and I don't

16  know if I used it with you, is if he wanted, he could show you

17  a banana and it may give you a new recollection.

18           So look at whatever he wants you to see.  Just because

19  it's on a piece of paper doesn't make it true, but see if

20  looking at that gives you a new recollection.  And if it does,

21  then you should tell him, yes, it refreshes my recollection,

22  and then it will be up to him to proceed and to ask other

23  questions.

24           So this question to you is, does looking at whatever

25  he wants you to look at refresh your recollection in regard to,

O6bWmen1                        Uribe - Cross

1   at your first meeting with the government, you never said that

2   Will Hana mentioned Senator Menendez?  So see if looking at

3   this refreshes your recollection in regard to whether or not at

4   your first meeting with Will Hana you mentioned Senator

5   Menendez.  OK?

6                THE WITNESS:  Your Honor?

7                THE COURT:  Yes.

8                THE WITNESS:  By looking at the document, I don't have

9   a full recollection of the statements in that document.

10               THE COURT:  OK.  Thank you.

11               MR. SOLANO:  Thank you.

12  Q.  So isn't it true that you actually never mentioned that

13  Mr. Hana had referenced Senator Menendez until several meetings

14  later with the government?

15               MS. POMERANTZ:  Objection.  Asked and answered.

16               THE COURT:  No.  I'll allow it.  I'll allow it.

17  A.  Would you ask me the question again, please?

18  Q.  Yes.

19      Isn't it true that you never actually mentioned to the

20  government that Mr. Hana referenced Senator Menendez until

21  several meetings later with the government?

22  A.  With the who?  I'm sorry.

23  Q.  Yes.

24      You met with the government a number of times in this case,

25  correct?

O6bWmen1                              Uribe - Cross

1    A.  Yes, I did.

2    Q.  And the first time that you mentioned that Will Hana

3    referenced Senator Menendez during that first conversation

4    outside of Aslanian's office was much later in one of those

5    meetings with the government?

6    A.  I don't have a recollection of making those statements.

7    Q.  In any event, you then testified that there was another

8    meeting at a bar at the Glenpointe Marriott with yourself,

9    Mr. Hana, Mr. Hernandez and Mr. Parra, right?

10   A.  That is correct.

11   Q.  And during that meeting, there was no discussion about

12   Mr. Hana about the specifics of what he was going to do to help

13   you with part, what you referred to as part one and part two,

14   Elvis Parra and the investigation that might lead to your

15   daughter Ana, correct?

16   A.  Yes, you are correct.

17   Q.  No discussion of a car, correct?

18   A.  At this point I don't remember a discussion of the car to

19   Nadine, no.

20   Q.  No discussion of a bribe payment?

21   A.  No discussion --

22            MS. POMERANTZ:  Objection.

23            THE COURT:  I'll allow it.

24            Was there any discussion of a bribe payment?

25            THE WITNESS:  I remember, the best I remember of that

O6bWmen1                          Uribe - Cross

1    conversation, your Honor, be that he's met -- the best way that

2    his way of getting this done is his contact with Mr. -- with

3    Nadine and Mr. Menendez.

4    BY MR. SOLANO:

5    Q.  Right.  So my question is there was no discussion of a

6    bribe, correct?

7    A.  There was no discussion of how he was going to pay

8    somebody, yeah.

9    Q.  And you testified you next see Mr. Menendez, Senator

10   Menendez, at a fund-raiser in July of 2018; no discussion there

11   of a bribe, correct?

12   A.  I did not talk to Mr. Menendez about a bribe.

13   Q.  And then there's the dinner with Mr. Hana, Senator

14   Menendez, at the Il Villaggio, and yourself, the dinner that

15   you called pointless, and there's no discussion of a bribe

16   there either, correct?

17   A.  We did not discuss any exchange of proceeds on that.

18   Q.  You've mentioned a couple of times that Mr. Hana referenced

19   Nadine Arslanian and Senator Menendez, and I think your

20   testimony yesterday, to be clear, was that Mr. Hana was going

21   to get this done, meaning help you with part one, Elvis Parra,

22   and part two, the investigation that could lead to Ana, and he

23   was going to get this done by, quote, his connections with

24   Nadine and the senator.  Do you remember that testimony?

25             MS. POMERANTZ:  Objection.  Vague and hard to follow,

O6bWmen1                        Uribe - Cross

 1  your Honor.

 2              THE COURT:  Yes.

 3  BY MR. SOLANO:

 4  Q.  Did you understand --

 5              THE COURT:  Make it simpler.

 6  BY MR. SOLANO:

 7  Q.  During that first conversation with Will Hana, what he told

 8  you was that he was going to use his connections with Nadine

 9  and the senator, to the best of your recollection of that

10  meeting, correct?

11  A.  You're referring to the meeting outside Andy's office, sir?

12  Q.  Yes.

13  A.  Yes.  That's my best recollection.

14  Q.  And you knew that Nadine Arslanian was an old friend of

15  his, correct?  Of Mr. Hana's, correct?

16              MS. POMERANTZ:  Objection.

17              THE COURT:  I'll allow it.

18              Did you know at that time that Nadine Arslanian was an

19  old friend of Hana's?

20              THE WITNESS:  I don't -- I don't know the amount of

21  time of friendship between the two of them.

22              THE COURT:  All right.

23  BY MR. SOLANO:

24  Q.  Did you know whether they were friends for years?

25  A.  I don't have the testimony, sir.

O6bWmen1                              Uribe - Cross

1    Q.  In any event, yesterday you talked about the fact that Will

2    never told you what he meant in terms of step one, step two,

3    step three, step four, what he was going to do, correct?

4    A.  Meaning that he didn't tell me what was being done step by

5    step to get this, the resolutions of the cases.

6    Q.  Correct.  He never said that to you, right?

7    A.  He did not discuss that to me.

8    Q.  And you assumed that he meant something illegal, but he

9    actually never said any of that, correct?

10               MS. POMERANTZ:  Objection.

11               THE COURT:  Sustained.

12   BY MR. SOLANO:

13   Q.  Did he ever say that any of those steps were going to

14   involve something illegal?

15   A.  Best I can tell you that he said is that his connections

16   with Nadine and the senator were going to be they going to

17   bring about a good results that we were expecting to do.

18   Q.  Right.  And he never said --

19   A.  That how --

20   Q.  I'm sorry.  Go ahead.

21   A.  I'm sorry, sir.

22        That how is the execution of the bore -- or the process of

23   how they were going to do whatever was to be done was not

24   disclosed to me.  So I cannot define what the legality or

25   illegality of that process is.

O6bWmen1                          Uribe - Cross

1    Q.  Right.  So the execution of it, you had no idea whether
2    that meant something illegal or something legal, correct?
3              MS. POMERANTZ:  Objection, your Honor.
4              THE COURT:  I'll allow it.
5              You didn't know what he was going to do, correct?
6              THE WITNESS:  Correct, sir.
7              THE COURT:  Next.
8    BY MR. SOLANO:
9    Q.  Wasn't it the case that Mr. Hana was suggesting helping the
10   case go away against Elvis Parra by hiring him a different
11   lawyer?
12   A.  No.  You're -- no, sir.
13   Q.  You don't recall Mr. Hana -- strike that.
14       Do you know that Mr. Hana, in the spring of 2018, asked
15   Nadine Arslanian for a recommendation for a lawyer for Elvis
16   Parra?
17             MS. POMERANTZ:  Objection.  Assumes a fact.
18             THE COURT:  Sustained.  It has the assumption in it.
19   Correct.
20   BY MR. SOLANO:
21   Q.  Do you know whether Mr. Hana, in the spring of 2018, asked
22   Nadine Arslanian for a recommendation for a lawyer for Elvis
23   Parra?
24   A.  I had no knowledge of that conversation, sir.
25   Q.  Are you aware whether she referred Doug Anton to Mr. Hana

O6bWmen1                          Uribe - Cross

1    as a potential lawyer in this matter?  And in this matter,

2    meaning the Parra matter.

3    A.  I have no recollection of that conversation, sir.

4    Q.  You don't recall Mr. Hana telling you -- strike that.

5         You don't recall whether Mr. Hana told you that he

6    understood that Doug Anton could take the case and help get

7    Mr. Parra probation for 20,000, but if it went to trial, it

8    would be $150,000?

9    A.  I have no recollection of such statements, sir.

10   Q.  In any event, between April of 2018 and at some point in

11   January or spring of 2019, you had concluded that Will Hana

12   could not come through or would not come through on the promise

13   or offer he had made to you, correct?

14   A.  Between this period of time, Mr. Hana had showed me no

15   advance in the progress of the resolution of the cases, despite

16   telling me on several occasions that he had things under

17   control.

18   Q.  And so you took matters into your own hands and you reached

19   out to Nadine Arslanian directly, correct?

20   A.  Yes, I did.

21   Q.  And at some point after you do that, after you reached out

22   to Nadine Arslanian, you testified, your interactions with Will

23   become less and less, correct?

24            MS. POMERANTZ:  Objection.

25            MR. SOLANO:  That was his testimony.

O6bWmen1                    Uribe - Cross

```
 1          THE COURT:  I'll allow you to answer that.
 2          Can you answer that, sir?  At some point after you do
 3   that, you reached out to Nadine and your interactions with Will
 4   became less and less; is that true?
 5          THE WITNESS:  My interactions with Will became less
 6   and less after he started the -- his new business and he was
 7   getting too busy to share time together for drinks and food.
 8   Q.  All right.
 9   A.  And laugh.
10   Q.  Thank you.
11          That was at some point around May 2019 and on, correct?
12   A.  Sometime in 2019.  I can't place it on a date and time.
13          MR. SOLANO:  OK.  I want to switch topics and ask you
14   about the plea agreement, the cooperation agreement you signed
15   in this case.
16   Q.  As you testified, you've committed several federal and
17   state crimes in your past, correct?
18   A.  Yes, I did.
19   Q.  Your crimes often involve lying to others, correct?
20   A.  Yes, they did.
21   Q.  Fair to say that when you're in trouble, you lie if you
22   think you can get away with it?
23   A.  I will say that I have lied in the past.
24   Q.  To try to get away with it, correct?
25   A.  That would be fair to say.
```

O6bWmen1                              Uribe - Cross

1   Q.  And is it also fair to say that when your family's in

2   trouble, there is nothing you wouldn't say to try to help them?

3   A.  I will do the necessary steps to protect my family, sir.

4   Q.  Including lying for them, correct?

5   A.  I will say that I will do the necessary things to protect

6   my family, sir.

7   Q.  And my question is would that also include lying for them?

8   A.  I had lied in the past to protect my family, yes.

9   Q.  One of the counts you pled guilty to in this case was the

10  wire fraud, which I'll refer to as Count Seven, and you gave

11  some testimony about that yesterday, but I just want to make

12  sure it's clear.

13      You've admitted that from 2019 to 2020, you lied to the

14  government in order to get a loan from the small business

15  administration, correct?

16  A.  Rephrase the question for me, please.

17  Q.  Yeah.

18      You have admitted that from 2019 until the year 2020, you

19  lied to the U.S. Small Business Administration, known as the

20  SBA, in order to get a loan from them, correct?

21  A.  I don't recall saying the time where I applied for the loan

22  and I made up the lie about the figures.

23  Q.  OK.  You don't remember what year it was, but you, in fact,

24  lied to the U.S. SBA --

25  A.  I admit.

O6bWmen1                         Uribe - Cross

1    Q.  -- the SBA?

2    A.  I did say yesterday that I lied on an application to obtain

3    an SBA loan.  Yes, I did.

4    Q.  OK.  You applied for that loan on behalf of one of your

5    business, Frank & Sons?

6    A.  That is correct, sir.

7    Q.  And to understand what you did, you used information from a

8    fake tax return on behalf of the business Frank & Sons that was

9    not true, that was not a real tax return, correct?

10   A.  That is correct.

11   Q.  You made up the name José Alonzo as the tax preparer,

12   right?

13   A.  I made that up, yes.

14   Q.  And then you submitted, am I right, fake income information

15   for Frank & Sons so that they otherwise -- strike that.

16       And then you submitted fake information about the income

17   for Frank & Sons so that they qualify for this loan when, in

18   fact, they did not?

19   A.  I used the wrong figures, yes.

20   Q.  You used the wrong figures?  Was it a mistake?

21   A.  No.  I used the wrong figures to -- so I can obtain the

22   loan.

23   Q.  Right.  And by wrong, you mean you used fake numbers?

24   A.  I used fake numbers.  Yes, I did.

25   Q.  And you knew that this SBA loan program was part of the

O6bWmen1                          Uribe - Cross

1    economic injury disaster loan program, correct?

2    A.  Yes.

3    Q.  And that's supposed to be loans to help out in cases of

4    natural disasters or for things like the Covid pandemic,

5    correct?

6    A.  That is correct.

7    Q.  And in fact, you applied for this during the Covid pandemic

8    period?

9    A.  That is correct.

10   Q.  And the company you used, Frank & Sons, on paper, it's

11   owned by your brother, Frank Uribe, correct?

12   A.  Yes.

13   Q.  So you involved him in this crime, correct?

14          MS. POMERANTZ:  Objection.

15          THE COURT:  Sustained.

16   BY MR. SOLANO:

17   Q.  He was listed as the owner of Frank & Sons even though you

18   actually ran it, correct?

19   A.  Correct.

20   Q.  And isn't it also true that you submitted this application

21   through your nephew, Hansel Javier, who worked at the bank that

22   you submitted it at?

23   A.  Yes, that is correct.

24   Q.  And just so that it's clear, when you say your brother

25   Frank Uribe, that's really your brother, not like a friend?

O6bWmen1                      Uribe - Cross

1   A.  My -- he's my brother.

2             THE COURT:  He's your brother by blood.

3             THE WITNESS:  He's my brother by blood, sir.

4             THE COURT:  All right.

5   BY MR. SOLANO:

6   Q.  And your nephew, Hansel Javier, as well is your nephew by

7   blood, correct?

8   A.  Legally, if I have to give you definition, it's a second --

9   it will be a second cousin.

10  Q.  OK.

11  A.  Call me uncle.

12  Q.  Thank you.

13       So that was the SBA piece.  You also take this tax return,

14  the fake tax return, and you submit it to that same bank that

15  Hansel Javier works at in order to get a business loan, right?

16  A.  Yes.  If I correct you, sir, the events happened the other

17  way.  I first obtained the loan for the trailers and then use

18  the fees for the SBA.

19  Q.  OK.  And the loan that you submitted to the bank to get the

20  commercial loan, you actually used your brother Frank Uribe's

21  name to sign it, right?

22  A.  Yes, I asked him to sign it.

23            THE COURT:  Oh.  You asked him to sign it, and he

24  signed the application?

25            THE WITNESS:  My brother signed the application.

```
 1                THE COURT:  OK.
 2    BY MR. SOLANO:
 3    Q.  Got it.
 4        So you asked your brother to sign what was, in fact, a
 5    fraudulent application for a loan?
 6    A.  I asked my brother to sign an application.  He did not
 7    question what he was signing.
 8    Q.  Fair enough.  But it was a fraudulent application
 9    nonetheless, correct?
10    A.  Yes, it was.
11    Q.  Let's move on to Count Six.  Count Six was the tax evasion,
12    right?  And for the tax evasion, what you have admitted to is
13    that from the years 2016 to 2022, you lied to the government by
14    not reporting your real income, right?
15    A.  That is correct.
16    Q.  And specifically, you did that through a number of
17    companies and businesses that you control, correct?
18    A.  That I controlled on my action, yes, sir.
19    Q.  And those included Frank & Sons, Phoenix, Route One,
20    Greenpoint Transport and JDU Realty, correct?
21    A.  That would be incorrect.
22    Q.  What part was incorrect?
23    A.  I'm the owner of JDU.
24    Q.  Those were the companies you used as part of the tax
25    evasion part, correct?
```

O6bWmen1                          Uribe - Cross

1    A.  You are correct.

2    Q.  You own -- sorry.  Strike that.

3        You control all of them; they're all in other people's

4    names, except JDU is in your name?

5    A.  That is correct.

6    Q.  And you did two things that were actually lies to the

7    government: you hid the fact that you were actually controlling

8    those companies, one; and you hid the fact that you were taking

9    out income from those companies, correct?

10   A.  You willing to ask me the question again, please?

11   Q.  All right.

12   A.  I will ask you to please do that.

13   Q.  You hid the fact from the government that you were the one

14   actually controlling those companies, right?

15   A.  Hid the fact from who?  Which institution of the government

16   that we referring to at this point?

17   Q.  The U.S. federal government, the IRS.

18   A.  I lied on the SBA application, but not to the IRS at this

19   point.

20   Q.  OK.  On the tax evasion, by not reporting the income you

21   were getting from those five companies, you were lying to the

22   U.S. government, to the IRS, at this time?

23   A.  Yes.

24   Q.  Let's move on to Counts Four and Five, the obstruction, and

25   those are the counts that relate to your lies to the government

1   in this case, correct?

2   A.  Which ones are you talking about again, sir?  If you

3   repeating to me, if you don't mind.

4   Q.  When you lied to the government about the fact that the car

5   you gave to Nadine Arslanian was not a loan.

6   A.  That is correct.

7   Q.  You were charged in September of 2023, correct?

8   A.  Yes.

9   Q.  And we talked about earlier, after you were charged, you

10  went in for a meeting to try to cooperate with the government,

11  correct?

12  A.  Repeat that question, please, one.

13  Q.  And after you were charged you went in to the government to

14  try to cooperate, correct?

15  A.  Yes.

16  Q.  And we'll get to the number in a minute, but you had more

17  than one meeting; you had several meetings with the government,

18  correct?

19  A.  Yes, I had.

20  Q.  And do you recall having to start several of those meetings

21  with you would like to clarify something that you said in the

22  prior meeting?

23  A.  I have recollections of some meetings that I had

24  classify -- clarify statements that came to better recollection

25  in my head, yes.

O6bWmen1                          Uribe - Cross

1    Q.  Right.  And when you say you had to clarify something in

2    one meeting from a prior meeting, what you're really saying is

3    what I said in that prior meeting is not true, correct?

4              MS. POMERANTZ:  Objection.  Misstates the prior

5    testimony.

6              THE COURT:  What did you mean to say, what did you

7    mean by saying you had to clarify, you wanted to clarify

8    something?

9              THE WITNESS:  There were, maybe, statements that I

10   might forgot to be expressive and complete on the statements or

11   a recollection came in that complete the statements rather than

12   giving a, in a short answer or so.

13   BY MR. SOLANO:

14   Q.  Right.  And some of those mistakes were intentional lies,

15   weren't they?

16             MS. POMERANTZ:  Objection.

17             THE COURT:  I'll allow it.

18             Did you intentionally lie about the issues that you

19   said you needed to clarify?

20             THE WITNESS:  No, sir, I did not.

21   BY MR. SOLANO:

22   Q.  OK.  In your first meeting with the government, you told

23   them that you and Nadine Arslanian never discussed the car

24   payments being a loan, after the subpoena; do you remember

25   that?

O6bWmen1                          Uribe - Cross

1    A.  I don't have a recollection of that statement on the

2    meeting, yes.

3          MR. SOLANO:  Could we show the witness what's been

4    marked as 3542-28.  And the judge and the lawyers.

5    Q.  I'm going to direct your attention, Mr. Uribe, to page 12.

6    If you could take a look at that to yourself and see if that

7    refreshes your recollection that you did not have a discussion

8    with her about the car payments being a loan.  And I could

9    point you to the right section.

10   A.  Do you have a particular section of this page where I

11   should be addressing, sir?

12   Q.  I just circled the paragraph.

13   A.  OK.  I can see the paragraph now.

14         If you don't mind, please ask me the question again.

15   Q.  In that first meeting with the government, you

16   intentionally lied when you said that you and Nadine never

17   discussed the car payments being a loan?

18         MS. POMERANTZ:  Objection.

19         THE COURT:  Well, you have two things going.  You have

20   his recollection and now you have a separate question.

21   Separate them out.

22         MR. SOLANO:  I'll separate them out.

23   Q.  Isn't it true that in that first meeting you lied to the

24   government intentionally?

25   A.  Which meeting are you referring to, sir?  That's when I'm

O6bWmen1                          Uribe - Cross

1    lost.

2    Q.  The first meeting on December 7 with the government.

3            THE COURT:  The question, sir, as I understand it, is

4    in that first meeting with the government, did you

5    intentionally lie to the government?

6            THE WITNESS:  No, I did not.

7            THE COURT:  All right.

8            Next question.

9    BY MR. SOLANO:

10   Q.  Did you tell the government that you and Nadine Arslanian

11   had never discussed that the car payments were a loan after

12   receiving the subpoena in this case?

13   A.  I told the government that the payments for the loan, to

14   the best of my recollection, were not a loan.  The payment for

15   the car were never a loan.

16   Q.  Right.  And that was a lie, correct?

17           MS. POMERANTZ:  Objection.

18   A.  Not a lie.

19           MR. SOLANO:  Sorry.  Strike that.

20   Q.  You had a discussion with Nadine Arslanian that you were

21   going to tell the government that the car payments were a loan,

22   correct?

23   A.  That happened in the summer of 2022, sir, yes.

24   Q.  And later, you told the government that you had never had

25   that discussion with Nadine Arslanian, correct?

O6bWmen1                        Uribe - Cross

 1              MS. POMERANTZ:  Objection.  Misstates what he said.

 2              THE COURT:  Well, let's see.

 3   A.  After my conversations with the government, I never made a

 4   statement about the payments being a loan.

 5              MR. SOLANO:  OK.  Why don't we move on to a different

 6   one.  We can take this down.

 7   Q.  One of the ways that you evaded taxes in this case was

 8   because you got paid in cash from your various businesses,

 9   correct?

10   A.  I received cash payments, yes.

11   Q.  And you didn't report that cash as income on your tax

12   returns, correct?

13   A.  On my personal tax return, yes.

14   Q.  Do you remember telling the government during one of your

15   meetings that you didn't realize -- you didn't know that there

16   was any advantage to getting paid in cash?

17   A.  I don't recall the statement.

18   Q.  You don't recall having to go in there and having to

19   clarify that, actually, you do know that there's an advantage

20   to getting paid in cash, which is that you can evade taxes?

21   A.  I remember I -- conversation to the extent of getting paid

22   in cash from my businesses.

23   Q.  That was something you had to clarify because you hadn't

24   told them that before, correct?

25   A.  I don't understand what you mean, before.

O6bWmen1                              Uribe - Cross

1  Q.  Can we at least agree that your story changed from meeting

2  to meeting with the government?

3          MS. POMERANTZ:  Objection.

4          THE COURT:  Sustained.  Too general, sir.

5          There's no question.

6          MR. SOLANO:  We'll go back to this.  I'll move on

7  to -- I want to focus on your plea agreement again.

8  Q.  Yesterday, you talked about the fact that the maximum

9  sentence you were facing was up to 95 years.  Do you recall

10 that?

11 A.  Yes, I do.

12 Q.  And ultimately, the judge gets to decide your sentence,

13 correct?

14 A.  That is correct.

15 Q.  But your hope here is that the prosecutors ask the judge to

16 give you a much lower sentence than you otherwise would get,

17 correct?

18 A.  That is incorrect, sir.

19 Q.  What's your hope?

20 A.  My goal is to obtain a 5K1 letter, in which the prosecutors

21 will no make a recommendation to the judge according to our

22 agreement.

23 Q.  They won't recommend a particular sentence, but they will

24 ask the judge to sentence you below what you otherwise would

25 get, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  My understanding of recommending and asking will be the

2    same thing, sir.  Your question would be negative, sir.

3    Q.  You don't understand that the government -- strike that.

4         You don't understand that your plea agreement says that if

5    you cooperate and the government files a motion, they're

6    requesting the court to sentence you to a lower sentence than

7    you otherwise would get?

8    A.  I have no knowledge.

9              MS. POMERANTZ:  Objection.

10             MR. SOLANO:  OK.

11             THE COURT:  I'll allow it.

12   BY MR. SOLANO:

13   Q.  You have no knowledge of that?

14   A.  Right, no seeing it a part of my agreement, sir.

15             MR. SOLANO:  Can we pull up Government Exhibit 12D-1,

16   page 4.  Give me one second.

17             THE COURT:  I believe this is in evidence already,

18   correct?

19             MR. SOLANO:  It is, your Honor.

20             THE COURT:  All right.

21             MR. SOLANO:  Sorry, your Honor.  Just give me one

22   second.

23             THE COURT:  Take your time, sir.

24             MR. SOLANO:  If we start at the bottom of page 4,

25   Mr. Uribe, I'll circle it on this page, and then we'll have to

O6bWmen1                          Uribe - Cross

1  move to page 5.  Thank you.

2  Q.  Do you see the last sentence on this page starts, in

3  addition, if this office determines that the defendant has

4  provided substantial assistance in an investigation or

5  prosecution, and if he has fully complied with the

6  understandings specified in this agreement, this office will

7  file a motion, pursuant to Section 5K1.1 of the sentencing

8  guidelines, requesting the court to sentence the defendant in

9  light of the factors set forth in Section 5K1.1?  I'll stop

10 there.

11             THE COURT:  Do you see that, sir?

12             THE WITNESS:  Yes, I do see it, your Honor.

13 BY MR. SOLANO:

14 Q.  You've read this agreement before, right?

15 A.  Yes, I have.

16 Q.  You understand it, correct?

17 A.  I understand what I just read, yeah.

18 Q.  I don't want to know what you discussed, but you discussed

19 this with your lawyer, right?

20 A.  That will be privileged.

21 Q.  I'm not asking what you discussed with your lawyer.  I'm

22 only asking have you, in fact, discussed how this agreement and

23 Section 5K1.1 works?  Just yes or no.

24 A.  Yes.

25             THE COURT:  Once again, sir, I'm going to ask that you

O6bWmen1                         Uribe - Cross

1    put the mic directly in front your mouth.  Again, it's

2    directional.  Lower it.

3              THE WITNESS:  Thank you.

4              Sorry about that, sir.

5              THE COURT:  No problem.

6    BY MR. SOLANO:

7    Q.  And so you understand that there's a guideline range that

8    will be determined under the sentencing guidelines in your

9    case, correct?

10   A.  What I understand by what I read there and what I've been

11   explained to me, that if I complied with my obligations with

12   the agreement, the government will issue a 5K1 letter to the

13   court.

14             THE COURT:  And what is that?  To your knowledge, what

15   is the government asking the court to do or telling the court

16   in that 5K1.1 letter?

17             THE WITNESS:  To consider that, things that I have

18   done right and to consider my crimes and then the court will

19   determine my sentence.

20   BY MR. SOLANO:

21   Q.  You have no understanding that that motion or that 5K

22   letter also asks the judge that in light of your cooperation to

23   give you a sentence below the sentencing guideline range that

24   would normally apply?

25   A.  My understanding is that the -- my understanding of, and

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

O6bWmen1                      Uribe - Cross

1    I'm not an attorney.  My understanding is that the letter will

2    be issued to the court with intention of telling my wrongdoings

3    and my good doings and the court will determine my sentence.

4    The government will make no recommendations to the judge.

5            THE COURT:  By virtue of assisting -- you've assisted

6    the government in its investigation, correct?

7            THE WITNESS:  Yes, I have.

8            THE COURT:  And you've done what they've asked you to

9    in terms of showing up at meetings, correct?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  And you've answered their questions to the

12   best of your ability, correct?

13           THE WITNESS:  That is correct, your Honor.

14           THE COURT:  On more than one occasion, you've met with

15   the government.

16           THE WITNESS:  Yes, I have.

17           THE COURT:  OK.  Why have you -- what do you hope to

18   obtain from the fact that you have admitted to these crimes and

19   have been cooperating with the government in its investigation?

20   What is your goal in doing that?

21           THE WITNESS:  My goal is to do better for myself by

22   getting a better sentencing and also to help my family.

23           THE COURT:  And when you say get a better sentencing,

24   what do you mean by that?

25           THE WITNESS:  That I will get better than 95 years'

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen1                              Uribe - Cross

```
 1   incarceration, my guideline indicates.

 2            THE COURT:  In other words, you'll get less than 95

 3   years --

 4            THE WITNESS:  What I hope.

 5            THE COURT:  -- from the judge.

 6            THE WITNESS:  That's what I'm hoping.

 7            THE COURT:  OK.  Sir.

 8   BY MR. SOLANO:

 9   Q.  And so that 5K letter is a big deal to you, correct?

10   A.  It is important to me, yes.

11   Q.  And it was part, it was an important part of the

12   cooperation agreement that you ultimately signed with the

13   government, correct?

14   A.  Yes, it is.

15   Q.  And your hope is that the judge will, in fact, sentence you

16   below the guideline range, correct?

17   A.  That's --

18            THE COURT:  Sir, do you know -- I'm sorry.  I didn't

19   mean to interrupt.  If you can answer that question, go ahead.

20            He said and your hope is that the judge will, in fact,

21   sentence you below the guideline range, correct?

22            THE WITNESS:  That will be my hope, yes.

23            THE COURT:  Do you know what Mr. Solano means when he

24   says the guideline range?

25            THE WITNESS:  I mean the 95 year that states on the
```

O6bWmen1                          Uribe - Cross

1    maximum sentencing.

2                THE COURT:  All right.

3    BY MR. SOLANO:

4    Q.   Did you discuss the sentencing guidelines range -- again,

5    just yes or no.  Did you discuss the sentencing guideline range

6    with your attorney?

7    A.   Yes, I did.

8                MR. SOLANO:  If we could zoom out of this.  And just

9    go to page 5.

10   Q.   And I want to focus your attention, Mr. Uribe, on the

11   second paragraph -- the first full paragraph there.  And that

12   states, it is understood that should this office determine that

13   the defendant has not provided substantial assistance in an

14   investigation or prosecution, or has violated any provision of

15   this agreement, such a determination will release the office

16   from any obligation to file a motion pursuant to Section 5K1.1

17   of the sentencing guidelines but will not entitle the defendant

18   to withdraw his guilty plea once it has been entered.

19        Do you see that?

20   A.   I just read it, sir.

21   Q.   So if the office, meaning these prosecutors, decide that

22   your substantial -- your assistance -- you did not provide

23   substantial assistance in an investigation or prosecution, they

24   won't file that 5K, that was a big deal to you, correct?

25                MS. POMERANTZ:  Objection.  Assumes a fact.

O6bWmen1                          Uribe - Cross

          MR. SOLANO:  I'll repeat the question.  I think there
was an "if" in there.
Q.  If the office, meaning these prosecutors, determine that
you have not provided substantial assistance in the
investigation or prosecution or that you violated any other
provision of this agreement, they will not find a 5K that you
testified a couple minutes ago was a big deal to you, correct?
A.  OK.  Your -- your question is kind of long, and I can see
that it has two part.

          My understanding that this agreement also call upon my
obligations within the agreement, such as telling the truth,
being available for meetings when called for, providing
substantial or providing documentation available to me,
truthfully, and do not commit further crimes.  The fact of what
the government considers substantial or no is not for me to
measure.  I don't have a way to measure the word "substantial"
for the understanding of the government.  I do agree with the
other part of the statement, what it says, if I do not comply
with the agreement -- put my glasses back to read other part of
the question, sir.

          If I violated my obligations with the agreement, then the
government will no issue the 5K1 letter.  That would be a true
statement.
Q.  OK.  So let's focus on some of those obligations.  You
mentioned that one of them is to tell the truth, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen1                      Uribe - Cross

1    A.  Yes, sir.

2    Q.  And if these prosecutors decide or determine that you did

3    not tell the truth, they don't have to file the 5K motion,

4    correct?

5    A.  I like to say it this way, sir.  When I took the stand and

6    took an oath, in my meetings with the prosecutors I was

7    reminding in every one of those meetings that I have to tell

8    the truth but only the truth.  And that's what I believe I have

9    done.  And if I don't tell the truth, then my agreement will be

10   taken apart.

11   Q.  Right.  And ultimately, the government decides whether they

12   believe you have told the truth, correct?

13   A.  Sir, the truth is the truth, is my understanding.

14   Q.  You want them to believe what you are saying, correct?

15   A.  I wanted to tell the truth, sir.

16   Q.  OK.  And if you tell the truth and they don't believe you,

17   you're not going to get that 5K, correct?

18              MS. POMERANTZ:  Objection.

19              THE COURT:  Sustained as phrased.

20              Who decides whether or not you have rendered

21   substantial assistance to the government?

22              THE WITNESS:  Your Honor, with all due respect, my

23   best understanding is I tell the truth, the truth is the truth,

24   and the government will take that and find their way to measure

25   whether that is substantial or not.

O6bWmen1                          Uribe - Cross

1              THE COURT:  All right.

2     BY MR. SOLANO:

3     Q.  Your hope is that ultimately -- your hope is that

4     ultimately all of this leads to no incarceration for you;

5     that's what you said yesterday, correct?

6     A.  That would be a -- my best hope, yes.

7              MR. SOLANO:  If we can go back to page 5 -- excuse me,

8     page 4, on this.  I want to talk about some of the other things

9     that you got as a benefit under this agreement.  If you look at

10    page 4 --

11             MS. POMERANTZ:  Objection to characterization and

12    commentary.

13             THE COURT:  The jury knows to disregard the comments

14    of the lawyers.

15             What's your question, sir?  Direct him to what you

16    want to direct him to.

17             MR. SOLANO:  Sure thing.

18             If we could highlight the first full paragraph,

19    starting with, if the defendant fully complies.

20             THE COURT:  What do you want him to look at?

21             MR. SOLANO:  I'm trying to find the right sentence.

22    Q.  It starts off, if the defendant fully complies with the

23    understandings specified in this agreement, he will not be

24    further prosecuted criminally by this office, and with respect

25    to tax offenses, the tax division, Department of Justice, for

1    crimes related to his participation in, and then it goes (a)

2    through section (j).  Do you see that?  Mr. Uribe?

3    A.  I'm looking at it, sir.

4    Q.  Yes.

5    A.  Just give me a minute, sir.

6    Q.  Sure.  Take your time.

7    A.  OK, sir.

8    Q.  If you comply with your agreement, this paragraph lists a

9    number of crimes that you have committed that you will not be

10   prosecuted for, correct?

11   A.  Yes.

12          MS. POMERANTZ:  Objection.  Misstates.

13          THE COURT:  Sustained.

14   BY MR. SOLANO:

15   Q.  Mr. Uribe, is it your understanding -- does this -- strike

16   that.

17      What's your understanding of this agreement, of this

18   paragraph?

19   A.  That a -- the paragraph indicate a number of activities

20   that I had committed that I have not been charged for, and as

21   long as I comply with my obligations with the agreement, I will

22   not be charged for it.

23   Q.  I want to just break that down.

24      The activities are, in fact, crimes, correct?

25   A.  Yes.

O6bWmen1                           Uribe - Cross

1   Q.  And you're not going to be charged for them if you comply

2   with this agreement, correct?

3             MS. POMERANTZ:  Objection.  Misstates.

4             THE COURT:  Sustained.

5             Are these the crimes, (a) through (j), are those the

6   crimes that you pled guilty to, sir, if you know?

7             THE WITNESS:  I did not pled guilty to those crimes.

8             THE COURT:  All right.

9             MS. POMERANTZ:  Your Honor, may I have a moment to

10  confer with Mr. Solano?

11            THE COURT:  Yes.

12            MR. SOLANO:  Thank you.

13  Q.  Mr. Uribe, some of the activities listed in (a) through (g)

14  are activities that you have pled guilty to, correct?

15  A.  (a) through (g), I will have to read them to be sure that I

16  answer him correctly.

17  Q.  Sure.

18  A.  These are the charges I already pled guilty to.

19  Q.  Right.  Some of those activities are covered by -- I'm

20  sorry.

21      Those activities, (a) through (j) -- (a) through (g) are

22  covered by the activities you already pled guilty to, correct?

23  A.  Correct.

24  Q.  And as to those, (a) through (g), the government won't

25  bring any other charges; whether or not they can, they are

1  promising not to bring any other charges for those activities?

2          MS. POMERANTZ:  Objection.

3          THE COURT:  See if he knows.

4          Do you know, sir?

5          THE WITNESS:  I am reading the agreement one more

6  time, your Honor.  With your permission, sir.

7          THE COURT:  Of course.

8  A.  The statement does state I will not be further prosecuted

9  criminally by this.

10 Q.  OK.  Now let's move on to sections (a) through (j).  Take

11 your time and look at it, and my question is those are crimes

12 for which you will not be prosecuted in any way, correct?

13         MS. POMERANTZ:  Objection.  Assumes a fact and a legal

14 conclusion.

15         THE COURT:  Let's see what his understanding is.

16         All right.  I see what the objection is.  Mr. Solano,

17 why don't you rephrase it with the preamble, further

18 prosecuted, in the question.  I think that will clear it up,

19 perhaps.

20 BY MR. SOLANO:

21 Q.  Is it your understanding that for subsections (h) through

22 (j), you will not be prosecuted for those activities if you

23 comply with the agreement?

24 A.  That is my understanding.

25 Q.  Those -- I want to talk about specifically subsection (i).

O6bWmen1                        Uribe - Cross

1   Those are the companies that we talked about earlier that you

2   controlled, and one of them, JDU, you actually own, but the

3   other ones you control under other people's names?

4   A.  You are correct.

5   Q.  And taking them one at a time, starting with Phoenix Risk,

6   which we've heard a lot about -- right -- Phoenix was the

7   company that you were afraid the Elvis Parra investigation

8   might ultimately lead to, correct?

9   A.  That is correct.

10  Q.  And you pled guilty to some tax evasion in connection with

11  Phoenix, but you actually did not pay taxes going back before

12  2015, correct?

13  A.  Some taxes -- some years were not filed before 26 -- 2015.

14  Q.  Right.  And one of the things you did before 2015 was you

15  took cash for yourself out of Phoenix, correct?

16  A.  Yes, I took cash for my business.

17  Q.  We spoke about Frank & Sons Logistics LLC, correct; that's

18  the company in your brother Frank Uribe's name?  Correct?

19  A.  That is correct.

20  Q.  You also failed to pay taxes on Frank & Sons between 2010

21  and 2015, isn't that correct?

22  A.  That is correct.

23  Q.  And you're not being prosecuted for those crimes?

24  A.  That's what my --

25          MS. POMERANTZ:  Objection, your Honor.

O6bWmen1                          Uribe - Cross

1           THE COURT:  I'll allow it.

2           MS. POMERANTZ:  To the characterization and legal

3     conclusion.

4           MR. SOLANO:  I think your Honor said you could answer

5     that.

6           THE COURT:  Yes.

7     BY MR. SOLANO:

8     Q.  You're not being prosecuted for the nonpayment of taxes

9     between 2010 and 2015 for Frank & Sons, correct?

10    A.  I am not.

11    Q.  And one of the things you did is customers of Phoenix

12    insurance broker had to pay a premium for their insurance to

13    Phoenix, correct?

14    A.  Correct.

15    Q.  And one of the things you told your customers was not to

16    pay Phoenix, to instead pay Frank & Sons, correct?

17    A.  Yes.

18    Q.  And then you used that money, the premiums that they were

19    paying for their insurance, to pay for expenses, like your

20    kids' college expenses, correct?

21    A.  I like to say that in a different way.  Some of the moneys

22    that were paid to Frank & Son were actually consulting fees

23    money, not premium money.

24    Q.  OK.  So some of the money was consulting money and some of

25    the money were, in fact, insurance premium money, correct?

O6bWmen1                          Uribe - Cross

1    A.   The insurance premiums went into insurance premium column,

2    and -- that's my recollection, and my consulting fees went into

3    Frank & Son.

4    Q.   Frank & Sons is a trucking company, correct?

5    A.   Yes.

6    Q.   So what you're saying is that you're taking insurance

7    premiums that were supposed to be paid to the actual insurance

8    broker, Phoenix, and you're putting them in a trucking company?

9    A.   What I'm saying is that the consulting money that I charge

10   for through this trucking company went into Frank & Son, no the

11   insurance premium money.

12   Q.   You just testified that you told your customers of Phoenix

13   to pay their insurance premiums to Frank & Sons --

14   A.   I did --

15   Q.   -- correct?

16   A.   I did not understand your question at the time, sir.

17   Q.   So your testimony is that you did not tell Phoenix

18   customers to pay their insurance premiums to Frank & Sons,

19   correct?

20   A.   Sitting here now I don't have a recollection of saying

21   that.

22   Q.   All right.  It's not that you didn't do it; it's you're

23   saying you don't recall it?

24   A.   I'm saying that, best of my knowledge, my premiums

25   payments -- payments to Frank & Son were consulting fees money

O6bWmen1                          Uribe - Cross

1    and don't have a recollections or premiums going into there,

2    premiums went.

3            MR. SOLANO:  OK.  Let's talk about Route One

4    Transport.

5            Actually, before we do that, could you pull up,

6    Mr. Kelly, 3542-046, to the last page, and show it just to the

7    witness, the Court and the attorneys.

8    Q.  Mr. Uribe, can you read to yourself paragraph 23?

9    A.  I did.

10   Q.  Does that refresh your recollection that you told the

11   government that you told Phoenix customers to write checks to

12   Frank & Sons?

13   A.  For my consulting fee.

14   Q.  You're trying to say -- I'm sorry.  Strike that.

15       What you're saying is that this statement means that your

16   consulting fees -- strike that.

17       Phoenix customers paid Phoenix consulting fees?

18   A.  Phoenix customers pay José Uribe's fee, and I put them

19   under my Frank & Son account.

20   Q.  Do you recall telling the government that Phoenix customers

21   paid checks or wrote checks to Frank & Sons?

22   A.  Yes.

23   Q.  OK.  And the purpose of those checks written by Phoenix

24   customers was to pay the college tuition of your children,

25   correct?

O6bWmen1                          Uribe - Cross

1    A.  Yes.

2            MR. SOLANO:  We could put this down.

3    Q.  Route One Transport was one of the other customers --

4    excuse me, entities listed in your plea agreement, correct?

5    A.  Yes, it is.

6    Q.  And this one was in your sister Raisa's name, correct?

7    A.  Correct.

8    Q.  And again, you did not pay taxes on Route One -- or excuse

9    me, Route One did not pay taxes, correct?

10   A.  Correct.

11   Q.  And your sister was the one who was listed, at least on

12   paper, as the owner of Route One, correct?

13   A.  That is correct.

14   Q.  The last company -- well, the second-to-last company was

15   Green Day transport?

16           THE COURT:  And was this a blood sister, a sister by

17   blood?

18           THE WITNESS:  A sister by blood, yes, your Honor.

19   BY MR. SOLANO:

20   Q.  The next company was Green Day Transport.  Remember that

21   one?

22   A.  Yes.

23   Q.  This is a company that you took over from another person,

24   named Michael Edson, correct?

25   A.  That is correct.

O6bWmen1                          Uribe - Cross

1   Q.  And when the tax issues came up, you initially tried to

2   blame Mr. Edson for the failure to pay taxes on Green Day,

3   correct?

4   A.  I don't have a recollection of blaming Mr. Edson for that

5   activity.

6   Q.  That would have been a lie, correct?

7           MS. POMERANTZ:  Objection.

8           THE COURT:  I'll allow that.

9           MS. POMERANTZ:  Your Honor, I don't know what "that"

10  means.

11          THE COURT:  Fair enough.

12          MR. SOLANO:  Thank you.

13  Q.  Blaming Mr. Edson for the failure of Green Day to pay taxes

14  would have been a lie, correct?

15  A.  I don't have a recollection of blaming Mr. Edson for a

16  taxes of Green Day.

17  Q.  Do you have a recollection of opening up a bank account in

18  his name and forging his signature?

19  A.  I have a recollection of opening the bank account, and my

20  recollection authorized me to sign his signature on the

21  signature card.

22  Q.  So you're testifying now that Michael Edson gave you

23  permission to sign his name on this bank account?

24  A.  That would be my testimony, sir.

25  Q.  Do you know whether he would agree with that?

O6bWmen1                          Uribe - Cross

1              MS. POMERANTZ:  Objection.

2              THE COURT:  Sustained.

3    BY MR. SOLANO:

4    Q.  The last company is JDU Realty & Investment, and for that

5    one you didn't file tax returns either, correct?

6    A.  Correct.

7    Q.  You knew you should; you just didn't file them, correct?

8    A.  Ask me the question again?  I'm sorry.

9    Q.  Yes.  You knew you were supposed to file tax returns, but

10   you didn't do that, correct?

11   A.  Correct.

12   Q.  You also got a pass on your personal tax fraud, correct?

13             MS. POMERANTZ:  Objection.

14             THE COURT:  Sustained.

15   BY MR. SOLANO:

16   Q.  Under the agreement, if you comply, you're not going to get

17   charged with any offenses related to personal tax fraud as a

18   result of claiming that you were married when you were not

19   married, correct?

20             MS. POMERANTZ:  Objection.

21             THE COURT:  I'll allow it.

22             I think you can rephrase it so it's a little clearer.

23             MR. SOLANO:  Let me make it clearer.  Thank you, your

24   Honor.

25   Q.  You filed tax returns saying that you were married, filing

O6bWmen1                         Uribe - Cross

1    jointly, until 2021, correct?

2    A.  Correct.

3    Q.  You, in fact, were divorced in 2009?

4    A.  That's correct.

5    Q.  So you lied by telling the IRS that you were married when,

6    in fact, you were not, correct?

7    A.  That is correct, sir.

8    Q.  You've also lied under oath before about the fact that you

9    were married when, in fact, you weren't married, correct?

10   A.  I don't recall lying under oath saying that I was married,

11   sir.

12   Q.  You testified that as a result of the insurance fraud that

13   you pled guilty to, you lost your license, insurance license,

14   correct?

15   A.  Yes.

16   Q.  And as part of that, there was a hearing in which you

17   testified trying to keep your license, correct?

18   A.  Yes.

19   Q.  And ultimately, the judge, the administrative judge didn't

20   agree with you, but you were a witness in that proceeding,

21   correct?

22   A.  I don't have a full recollection of that hearing, but I

23   know I was in a hearing.

24            THE COURT:  Do you know what type of hearing it was?

25            THE WITNESS:  It was in a state court, sir.  I

O6bWmen1                          Uribe - Cross

1  wouldn't have the right terminology as of what kind of hearing

2  that was.

3          THE COURT:  New Jersey State court?

4          THE WITNESS:  New Jersey State court.

5          THE COURT:  All right.

6  BY MR. SOLANO:

7  Q.  And you were a witness in that hearing, correct?

8  A.  I don't recall my position on that hearing.

9  Q.  OK.  Did you testify in the hearing, Mr. Uribe?

10 A.  I did testify at the hearing.

11 Q.  And before you testified, you took an oath to tell the

12 truth, correct?

13 A.  Correct.

14 Q.  Just like you took an oath here on Friday to tell the

15 truth, correct?

16 A.  Correct.

17 Q.  And after every break, the judge reminds you that even

18 though there was a break you're still under oath, correct?

19 A.  Correct.

20 Q.  In that hearing, one of the things that you were trying to

21 establish was that you needed to support yourself and your

22 family, correct?

23 A.  That is correct.

24 Q.  And one of the things you told that judge is that you were

25 married, correct?

O6bWmen1                          Uribe - Cross

1   A.  I don't recall making that a statement.

2   Q.  That hearing was in 2011, correct?

3   A.  I don't remember the year of the hearing, sir.

4   Q.  OK.  You pled guilty to the insurance fraud in 2011; do you

5   remember that?

6   A.  That is correct.

7   Q.  And this hearing occurred as a result of pleading guilty to

8   insurance fraud, correct?

9   A.  You are correct.

10  Q.  So it would have been after 2011, in 2011 or later,

11  correct?

12  A.  Correct.

13  Q.  And you weren't married in 2011, correct?

14  A.  You are correct.

15  Q.  But you don't recall telling the judge that you were?

16  A.  Sitting here right now, I don't have a recollection telling

17  on the hearing that I was a married person.

18          MR. SOLANO:  We'll go back to that.  Let's talk about

19  that insurance fraud that you pled guilty to in state court.

20  Q.  You previously operated a company called Inter America,

21  correct?

22  A.  That is correct.

23  Q.  And you testified you had to close it in 2011 because you

24  were engaged in insurance fraud, correct?

25  A.  Yes, I did.  I pled guilty to insurance fraud.

O6bWmen1                          Uribe - Cross

1    Q.  Insurance fraud and theft by deception, correct?

2    A.  You are correct on those.

3    Q.  And yesterday when you were asked by the prosecutor, you

4    said you were charged with insurance fraud and theft by

5    deception.  You were asked what led to those charges, and you

6    said that you committed a number of wrongdoings that led to

7    insurance fraud.  One of them was placing policies with an

8    unauthorized agent, and then you clarified, insurance company,

9    in the state of New Jersey without that company being

10   authorized company to issue policies in that state, correct?

11   A.  That is correct.

12   Q.  And then the prosecutor asked you what else did you do, and

13   you said among other charges, I failed to request a renewal for

14   one of my client's policy at a proper time and that led to the

15   insured not having coverage.

16       Do you remember that?

17   A.  I remember that.

18   Q.  And then the prosecutor asked you, is that one or more than

19   one client or more than one client, and you answered at least

20   on that, on that instance at least one client that I remember

21   right now.

22       Do you remember that?

23   A.  That's correct.

24   Q.  All right.  And that was your testimony, correct?

25   A.  That was my testimony, to the best of my knowledge, yes,

O6bWmen1                              Uribe - Cross

1    sir.

2    Q.  That wasn't accurate, correct?

3    A.  Sitting here right now I don't have a recollection, but

4    that one case at this point.

5    Q.  You don't remember that the state of New Jersey, the

6    attorney general's office, charged you with insurance fraud and

7    theft by deception because you took insurance premium from

8    multiple clients and failed to pay their insurance policies?

9    A.  What I remember on those charges is that I placed the

10   policies with an unauthorized client -- insurance carrier which

11   is not authorized.  It was my duty to check upon the validity

12   of that company, and I failed to do so.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    BY MR. SOLANO:   (Continuing)

 2    Q.  So you think that the insurance fraud and the theft by

 3    deception charges were simply because you placed policies with

 4    an unauthorized insurance company?  Is that what you are

 5    saying?

 6              MS. POMERANTZ:  Objection.

 7              THE COURT:  Sustained, as phrased.

 8              Sir, why did you lose your insurance brokerage license

 9    in New Jersey?

10              THE WITNESS:  Your Honor, I pled guilty to insurance

11    fraud and theft by deception.

12    Q.  And that insurance fraud was based on collecting money from

13    insurance premiums from customers of Phoenix -- I'm sorry, at

14    the time from customers of Inter-America, and then not paying

15    the policies and putting the insurance in place; correct?

16              MS. POMERANTZ:  Objection to form.

17              THE COURT:  I will allow that.

18    Q.  You can answer, sir.

19    A.  I'm sorry.  Ask me the question again?

20    Q.  That insurance fraud that you pled guilty to was the result

21    of collecting insurance premiums from the customers of

22    Inter-America and then failing to get them insurance

23    coverage -- excuse me, failing to put in insurance policies;

24    correct?

25    A.  My recollection of my charges is that I pled to insurance
```

O6B5men2                        Uribe - Cross

1  fraud and theft by deception.  I don't have a, laid out, all of
2  the discoveries from the insurance commissioner.
3  Q.  Right.  It wasn't the insurance commissioner, it was
4  actually the Division of Criminal Justice of the Attorney
5  General's office, correct?
6  A.  I don't have a recollection of each one of the activities
7  at this point.
8  Q.  Do you remember that all of this was about because --
9  strike that.
10      The customers at issue were truck drivers, correct?
11  A.  Yes.
12  Q.  Do you remember that this came about because truck drivers
13  were being stopped by police officers -- were getting into
14  accidents, showing fake insurance cards, and then the police
15  finding out that they were in fact fake insurance cards?
16          THE COURT:  Sustained.
17      How did your insurance fraud and theft by deception
18  come to the attention of the authorities, if you know?
19          THE WITNESS:  It led to -- this investigation led to
20  by placing the policies with unauthorized insurance companies
21  in the State of New Jersey.
22  Q.  And it came about, did it not, because truck drivers had
23  gotten into accidents, and when the police arrived they gave
24  them fake insurance certificates, insurance cards?
25          MS. POMERANTZ:  Objection.

1           THE COURT:  Sustained.

2   Q.  Do you know whether in fact the truckers had given fake

3   insurance cards to the police officers?

4           MS. POMERANTZ:  Objection.

5           THE COURT:  Sustained.

6   Q.  You were originally facing jail time for that charge;

7   correct?  Let me be clear.  You were originally facing jail

8   time for that insurance fraud and theft by deception, correct?

9   A.  I don't remember being offered jail time.  I remember being

10  accused and pleading guilty to it.

11          THE COURT:  Do you know if the penalties included the

12  possibility of your going to jail?

13          THE WITNESS:  I don't have a recollection of the

14  penalty.

15  BY MR. SOLANO:

16  Q.  Do you remember that the amount of insurance premiums that

17  you took from your customers and didn't pay the insurance was

18  above $75,000?  More than $75,000?

19  A.  I don't have a recollection of the exact amount, sir.

20  Q.  Do you remember that you were charged with the second

21  degree offense?

22  A.  I will ask you to rephrase that for me, please.

23  Q.  Do you remember that you were originally charged with a

24  second degree theft by deception in insurance fraud?

25  A.  I don't have recollection of the original charges; no, sir.

O6B5men2                          Uribe - Cross

1   Q.  Do you remember facing 5 to 10 years in jail as a result of

2   it?

3           MS. POMERANTZ:  Objection.  Asked and answered.

4           THE COURT:  I will allow it.

5           THE WITNESS:  I don't remember the charges and I don't

6   remember what was the sentencing penalty for those charges

7   sitting here right now.

8   Q.  Do you remember that ultimately your lawyer negotiated a

9   plea and you did not get jail time?

10  A.  I remember pleading guilty and getting probation, sir.

11  Q.  Regardless of the charges, as a result of you pleading

12  guilty the New Jersey Department of Banking and Insurance, took

13  away your license, correct, your insurance license?

14  A.  My license and the license of the agency was taken away;

15  that is correct.

16  Q.  And there was a hearing that we talked about earlier that

17  we mentioned, correct?

18  A.  I remember the hearing, yes.

19  Q.  Do you remember the judge that you testified in front of

20  finding that your explanations that these were innocent

21  mistakes were not true?

22          MS. POMERANTZ:  Objection.

23          THE COURT:  I will allow it.  Let's see what his

24  recollection is.

25  A.  I don't have recollections of what was found by the

1    commissioner or the judge administrator.

2    Q.  Do you remember the finding that it was not an isolated

3    incident but actually continuous conduct?

4    A.  I don't have a recollection, sir.

5    Q.  By that I mean that you have repeatedly, over a prolonged

6    period of time, put your clients of Inter-America at great

7    financial risk by not placing their insurance?  Do you remember

8    that?

9                MS. POMERANTZ:  Objection.

10                THE COURT:  Are you asking does he remember that as a

11   finding?

12                MR. SOLANO:  Yes.

13                THE COURT:  Do you remember that as a finding?

14                THE WITNESS:  I don't remember the findings of the

15   commissioner.

16   Q.  You do remember that you ultimately lost your license for

17   good, correct?  Your insurance license?

18   A.  I lost my license; yes, sir.

19   Q.  And instead of getting out of the insurance business, you

20   opened up Phoenix in your son Omar's name; correct?

21   A.  That is correct.

22   Q.  You got charged with insurance fraud, you worked out a deal

23   for probation, you have a second chance, and you just open up

24   another insurance brokerage; correct?

25                MS. POMERANTZ:  Objection.

O6B5men2                          Uribe - Cross

1        THE COURT:  Sustained as phrased.

2   Q.  That is the Phoenix company that you opened up, correct?

3   A.  Yes.

4   Q.  And obviously you knew that you could not run it which is

5   why you put it in your son Omar's name; right?

6   A.  I put it under my son Omar because I was hoping that my

7   kids -- first of all, I needed to feed my family, and second of

8   all, I was hoping that my kids learned the business and

9   eventually I was going to get my license reinstated.

10  Q.  This was in 2011, correct?

11  A.  That is correct.

12  Q.  And on Friday you said that when you signed the cooperation

13  agreement in this case you closed Phoenix, correct?

14       MS. POMERANTZ:  Objection.  I think that misstates the

15  testimony.

16       THE COURT:  Yes.  There is a switch there.  Go ahead.

17  Q.  When you pled guilty in this case on March 1 of this year

18  you closed Phoenix, correct, around that time?

19  A.  Phoenix is still in operation.  It hasn't been closed.

20  Q.  Phoenix is still in operation?

21  A.  Phoenix is an insurance agency.

22  Q.  So, for the last 13 years you have run an insurance

23  company; correct?

24       MS. POMERANTZ:  Objection.

25       THE COURT:  I will allow it.

O6B5men2                          Uribe - Cross

1   A.  From 2011 to 2020, to February of 2024, I was the

2   consultant and general manager for Phoenix Insurance.

3   Q.  You have testified multiple times that you were running

4   this company even when it was under your son's name and your

5   daughter Ana's name; isn't that the truth?

6   A.  Yes.

7   Q.  And you weren't supposed to do that, correct?

8   A.  Correct.

9   Q.  So it wasn't because you wanted to get your son in the

10  business, your son has been out of the business for a long

11  time; isn't that true?

12          MS. POMERANTZ:  Objection.  Argumentative.

13          THE COURT:  Change the tone, sir.

14  Q.  You testified that you started Phoenix after you pled

15  guilty to insurance fraud and put it in your son's name because

16  you were hoping that your son would continue the business;

17  correct?

18  A.  That is correct.

19  Q.  But the truth is that you ran Phoenix from 2011 until you

20  are saying February of this year, correct?

21  A.  My son was -- didn't have the passion for insurance.  Ana

22  came in, we continued the agency under Ana, I was consultant

23  and director of the agency.

24  Q.  You keep saying consultant, Mr. Uribe, but it has been

25  pretty clear from your testimony that you were running it,

O6B5men2                          Uribe - Cross

1   correct?

2   A.  I was the general manager of the office, that's what I mean

3   by running it, sir.

4   Q.  Thank you.

5       And you said Phoenix is still operating today?

6   A.  It is in business.

7   Q.  Is it still under Ana Peguero's name?

8   A.  Yes, it is.

9   Q.  Who is running it?

10  A.  Ana Peguero.

11  Q.  What is your involvement with it today?

12  A.  None.

13  Q.  Right, because you can't because if you answered "yes" you

14  might violate your cooperation agreement, correct?

15              THE COURT:  Sustained.

16              Why don't we take our mid-morning break.  Is this a

17  logical time, sir?  I didn't mean to cut you off.

18              MR. SOLANO:  I appreciate that, your Honor.  Yes, it

19  is.

20              THE COURT:  Ladies and gentlemen, let's do 15 minutes

21  because I do have some work with the lawyers.  15 minutes.

22  Thank you.

23              (Continued on next page)

24

25

O6B5men2                        Uribe - Cross

 1                (Jury not present)

 2                THE COURT:  You may step down, sir, and if you would

 3     step out as well.

 4                THE WITNESS:  Thank you, sir.

 5                (witness steps down)

 6                THE COURT:  You may be seated in the courtroom.

 7                MR. LUSTBERG:  Your Honor, just so you know, in case

 8     you prefer to do this at the end of or beginning of the lunch

 9     break we can do that.  Mr. Solano can wait to address any of

10     these areas.  We can do it now, too.

11                THE COURT:  Let's do it now.

12                MR. LUSTBERG:  OK.  Sure.

13                THE COURT:  As I understand it, there are four areas

14     the defendants would like to cross-examine this witness on that

15     the government objects, so let me hear whatever the defendants

16     have to say.  The first area is the car accident and the

17     resulting lawsuit.  Sir?

18                MR. LUSTBERG:  Thank you, your Honor.

19                With regard to the car accident, we actually just

20     asked the government for additional information to see whether

21     it would be potentially usable for cross-examination.  The

22     government has not provided any additional information.  You

23     can understand that among the things they say in their letter

24     is that this is an accident that is somehow different or not

25     related to other accidents that we have heard about in this

O6B5men2                          Uribe - Cross

 1    case involving Nadine Arslanian and we just -- we had asked for

 2    additional information about it.  It wasn't -- we were not --

 3              THE COURT:  Do you want to question this man about a

 4    car accident and the resulting lawsuit?

 5              MR. LUSTBERG:  We don't have a good faith basis to ask

 6    him about that right now.

 7              THE COURT:  All right.

 8              MR. LUSTBERG:  So we had asked for additional

 9    information which the government has declined to provide.

10              THE COURT:  Government?

11              MR. RICHENTHAL:  We don't have additional information.

12    What we know is that Mr. Uribe got in a car accident, that he

13    was sued, and that the insurance company denied the claim, i.e.

14    did not find the suit of merit.  We do not understand the

15    relevance of that line of inquiry or what additional

16    information could make it relevant.

17              THE COURT:  Put that aside, Mr. Lustberg, the

18    government has no additional information.

19              MR. LUSTBERG:  Thank you, your Honor.

20              The second one, which is the one that we candidly feel

21    the most strongly about, has to do with Mr. Uribe not paying

22    child support for a period of time.  This has become, if

23    anything, more relevant during the course of his direct

24    testimony and even the beginning of his cross-examination where

25    he has professed to be extraordinarily dedicated to his family.

O6B5men2                          Uribe - Cross

1    More than anything else he will do anything for his family.  He

2    has talked about how on Sunday mornings he goes to church, he

3    visits with his elderly father -- I can't remember, he goes to

4    one grave and then visits with another parent.  If the notion,

5    that under the circumstances, he would cease paying child

6    support is, I think, appropriate fodder for cross-examination

7    given his testimony to date.  Let me say, the government's

8    response is that --

9              THE COURT:  Is your idea -- it doesn't go to -- well,

10   is your argument that it goes to truthfulness?

11             MR. LUSTBERG:  No, no, no.  Well, yes, it goes to his

12   credibility, that is, he is claiming that he is doing all of

13   this because he is such a dedicated family guy and meantime, he

14   is failing to pay child support.  And his excuse is that, well,

15   the woman to whom he owed the child support got in another

16   relationship and --

17             THE COURT:  As I understand it he does pay now.

18             MR. LUSTBERG:  And then he began to pay it but he

19   ceased paying it for a period of time, without going through

20   the appropriate legal process.  I think it absolutely

21   undermines his claims that he is -- everything he does is for

22   the benefit of his family, he is a great family guy.  And I

23   don't think this is a lengthy cross-examination but it goes

24   directly to his specific statements that his, you know, of his

25   dedication to his family.

O6B5men2                              Uribe - Cross

1              THE COURT:  I understand.

2              Government?

3              MR. RICHENTHAL:  Look, I don't want to belabor this

4    and I don't want to put in the public record what we think

5    shouldn't be public, but some of what Mr. Lustberg said in the

6    course of his advocacy is factually false.  I'm not saying

7    intentionally false but I am inaccurate.  There is a very

8    limited period of time, to our knowledge, where Mr. Uribe

9    stopped paying.  He had been paying before.  He stopped paying

10   based on his understanding of a development in a relationship

11   that has no bearing on this trial, it has not come out in his

12   testimony; and then there was a legal process -- that was the

13   beginning of legal process.  That is one of the inaccuracies

14   that Mr. Lustberg has said.  And Mr. Uribe complied with that

15   legal process and has paid ever since and still is.  The

16   limited period of time which he did not do it would require him

17   to explain the nature of a relationship that is deeply personal

18   and has nothing to do with this trial.  Even if one were to

19   assume that there is relevance to this, which we are not

20   conceding --

21             THE COURT:  I am a little concerned about the

22   confusion that may ensue between Ana and the child support

23   issue.  That seems to me to be an issue here, that the jury may

24   confuse those issues.

25             What is the position of the government on that?

O6B5men2                    Uribe - Cross

 1          MR. RICHENTHAL:  I'm not sure I follow your Honor's

 2   question.  I apologize.  I don't think Mr. Uribe has talked

 3   about financial support to other of his children.  I'm not sure

 4   he has even named other of his children.

 5          THE COURT:  Fair enough.

 6          MR. RICHENTHAL:  This is a different relationship.  I

 7   may be misunderstanding the Court's inquiry.

 8          THE COURT:  We are dancing around some things here.

 9          Mr. Lustberg, what did you want to respond?

10          MR. LUSTBERG:  Your Honor, it may very well be that he

11   can answer questions by saying for a brief period of time I

12   didn't pay child support.  But, the law is clear that one

13   cannot, on their own, just determine to stop paying child

14   support.  That might not, in another case, be appropriate

15   fodder for cross-examination, but in a situation in which the

16   witness has specifically, repeatedly, over and over and over

17   said he does what he does out of dedication for his family.  It

18   undercuts that very statement for him to cease paying child

19   support without going through the appropriate legal process.

20          Now -- excuse me one second -- Mr. Richenthal was

21   raising I just wanted to finish my thought -- which is that he

22   can say his understanding of the law was he could do that on

23   his own and we can cross-examine him on that, but this, in a

24   situation where he is making these specific statements

25   repeatedly and fervently, this seems to me to be completely

1    appropriate basis for cross.

2           THE COURT:  Thank you.

3           MR. RICHENTHAL:  I just have two brief responses.

4           One is that the remarks I just heard actually gave us

5    greater concern because it now appears that what Mr. Lustberg

6    wants the jury to infer is that Mr. Uribe broke the law.

7    Mr.:~"Uribe is not a lawyer, there has been no testimony about

8    the incredibly complex area of and divorce and child support

9    law in this trial.  That is well beyond what we thought

10   Mr. Lustberg wanted to do which is simply to elicit he didn't

11   pay for a period of time.  As to the facts, that is, for the

12   nonpayment, this is a different child with a different person.

13   Ana Peguero, as the Court knows, isn't even Mr. Peguero's

14   daughter.

15          This is some complex stuff.  And if it becomes

16   something that comes out in cross, I suspect Ms. Pomerantz will

17   feel the need to then elicit from the witness deeply personal

18   matters.  This is an incredibly extraneous matter, there is

19   plenty of cross fodder for Mr. Uribe.  This is not necessary

20   for the defense to go to.

21          THE COURT:  Thank you.

22          Let me hear argument on the third area, the strip

23   clubs.  Was there something else, Mr. Richenthal?  You are

24   still standing.

25          MR. RICHENTHAL:  I was just going to ask if your

O6B5men2                        Uribe - Cross

 1   Honor, and obviously it is not my division, could be careful in

 2   describing the content of the third issue.

 3          THE COURT:  That's why I said it that way.

 4          MR. LUSTBERG:  And I will be purposefully vague with

 5   regard to this.

 6          Your Honor, this is very simple.  The conduct that is

 7   described in the papers that your Honor has is absolutely

 8   antithetical to the family values that Mr. Uribe has professed

 9   throughout the course of his testimony, including his really,

10   in many ways, unsolicited remarks about how he spends his

11   Sunday mornings which made him sound, frankly, like a choir

12   boy.

13          THE COURT:  Well, with all of the crimes he has pled

14   to I don't think that is really your issue.

15          MR. LUSTBERG:  Fair enough.  But this particular

16   conduct goes directly to that sort of morality.

17          THE COURT:  Yes, but you have got -- I mean, you do

18   have so much to cross him on, and indeed you have indicated

19   that your cross, that is on behalf of Mr. Hana, is going to

20   continue now.  You have got tremendous amounts.  This is, I

21   think, somewhat verging into the personal and irrelevant but

22   let's go to the fourth.

23          MR. LUSTBERG:  I understand, your Honor.  I just want

24   to say one thing.

25          THE COURT:  I think we have got a 403 issue here on

 1    that third area.

 2              MR. LUSTBERG:  Fair enough.

 3              With regard to -- before I get to the fourth area I

 4    want to say that our discussion of his dedication to family is

 5    not limited to his dedication to his, quote unquote, daughter

 6    Ana.  I mean, he said throughout his testimony, we can point

 7    the Court to specific statements, that he wanted to feed his

 8    family.  This sort of thing has come up over and over.  So,

 9    again, that perhaps goes more to the second issue than the

10    third.  I understand the 403 issue with regard to the third.

11              The fourth one has to do with failure to pay credit

12    cards in 2010.  And the facts of that, as set forth in the 3500

13    material that we received from the government, is that, and I

14    will just read this one provision:  Uribe once failed to pay

15    his two credit cards in 2010.  I think that alone would not be

16    enough, but it then says debt collectors once reached out about

17    the debt and Uribe ignored it.  And there is a little bit

18    further but I don't think anything we really need to go into

19    here.  The point is it shows a disregard for his legal

20    obligations in a situation in which he has repeatedly stated

21    that all he wants to do is comply with his obligations.

22              THE COURT:  It is 2010.  It is 2010, sir.

23              MR. LUSTBERG:  I understand.

24              THE COURT:  Government?

25              MR. RICHENTHAL:  I was just going to say, again, the

1    idea that he disregards his legal obligations because he

2    ignored a debt collector I think is not an accurate statement

3    of law or fact, but I was also going to pick up on what your

4    Honor said a minute or two ago.  There is abundant evidence

5    that Mr. Uribe, repeatedly through his life, has disregarded

6    legal obligations.  I don't think the jury doesn't needs to

7    know he didn't pay credit card bills 14 years ago for the jury

8    to know that fact.

9            THE COURT:  I have a fair amount of discretion in the

10   scope of cross-examination here.  The failure to pay the credit

11   card bills I'm going to exclude.  There is no relation to

12   truthfulness here, it is old, he never testified on direct in

13   terms of his personal debts or lack thereof so I am going to

14   exclude that.

15           In terms of the strip clubs, there is no relation to

16   truthfulness, really no relation to the testimony.  I do think

17   it is a 403 issue that is of very limited probative value and

18   the limited probative value is substantially outweighed here by

19   wasting time going into areas that are essentially irrelevant.

20           The car accident is dropped out, it is not an issue.

21           In terms of the child support, under 403 weighing I am

22   going to exclude it.  I understand, Mr. Lustberg, your position

23   here, but it was for a very limited time.  It doesn't go to

24   truthfulness.  I am concerned about there being some confusion

25   between Ana and the relevant person, although the government

1    disagrees with me on that.  You have just got so much material

2    to work with on the cross that I really think this falls under

3    403.  It is prejudicial and there would be confusion of the

4    issues, very limited probative value.  So I am going to bar the

5    defendants from that cross as well.  You have got a lot to work

6    with, sir, and you seem to be doing that.

7              Let's take 10 minutes.

8              MR. RICHENTHAL:  Just briefly, your Honor.  I don't

9    think I disagree with your Honor with respect to confusion, I

10   think I misheard the court or misspoke but it doesn't matter.

11             THE COURT:  You're right.  It doesn't matter.  Take 10

12   minutes.

13             (Recess)

14             THE COURT:  You can be seated until all the lawyers

15   are here.  I came back earlier than projected.

16             (Pause)

17             THE COURT:  Put the witness on the stand, please.

18             Mr. Solano, do you think you can finish by lunch?

19             MR. SOLANO:  Assuming lunch is at 1:00-ish, probably

20   not, but maybe shortly after.

21             THE COURT:  What if we make it 1:15?

22             MR. SOLANO:  That is a fair response.  I think it will

23   be longer than that, your Honor.

24             THE COURT:  I am trying to give you some lee way here.

25             MR. SOLANO:  I appreciate that but I will try to keep

O6B5men2                          Uribe - Cross

```
 1    it as efficient as possible.

 2                 THE COURT:  Thank you.

 3                 I took the bench earlier than I said I would.

 4                 Mr. Uribe, if you would step up again, sir.

 5                 (Witness resumes the stand)

 6                 THE COURT:  Who is the next cross examiner?

 7                 MR. FEE:  Me, your Honor.

 8                 THE COURT:  How long will that be, sir?

 9                 MR. FEE:  Two to three hours.

10                 THE COURT:  Really?

11                 MR. FEE:  Really.

12                 THE COURT:  Well, that may take us through the day,

13    then.

14                 Mr. de Castro, what is your estimate, sir?

15                 MR. DE CASTRO:  Zero.

16                 THE COURT:  Rise for the jury.  Jury entering.

17                 (Continued on next page)

18

19

20

21

22

23

24

25
```

1                (Jury present)

2                THE COURT:  You may be seated in the courtroom.

3                Mr. Solano, you may continue.

4                MR. SOLANO:  Thank you, your Honor.

5                Mr. Kelly, can we show the witness, the Court and the

6      attorneys, Defendant's Exhibit Hana-059?

7      BY MR. SOLANO:

8      Q.  Mr. Uribe, I'm going to focus on this area, although of

9      course you can read the entire page of the document.

10               Have you had a chance to look at it?

11     A.  I did, sir.

12     Q.  My question is before the break we were talking about your

13     pleas of guilty to insurance fraud and theft by deception

14     related to Inter-America, and my question is, does this remind

15     you that you pled guilty to insurance fraud, five acts or more?

16     A.  I don't have --

17               MS. POMERANTZ:  Objection.

18               THE COURT:  Just a moment.  Sustained.  Sustained.

19     Was there a failure of recollection prior to the break, sir?

20               MR. SOLANO:  Yes, I believe there was, your Honor.

21     You know what?  I can ask this question.

22     Q.  The insurance fraud that you pled guilty to, it related to

23     numerous customers of Phoenix, correct?

24     A.  Ask me the question one more time, sir.

25     Q.  Yes.

1          The insurance fraud that you pled guilty to from

2     Inter-America related to multiple customers of Inter-America?

3     A.   You used the word "finished" before.

4     Q.   You are right.  Thank you.

5     A.   My recollection of this is that I pled guilty to insurance

6     fraud.  I don't remember the number of customers that were, but

7     they were Inter-America customers, yes.

8     Q.   Looking at Defendant's Exhibit Hana 59, the area that I

9     highlighted, does that refresh your recollection that there

10    were at least five customers or more?

11    A.   I don't have a recollection of the number of people but

12    that's what the document indicates so I have to accept that.

13              MS. POMERANTZ:  Your Honor, it is not in evidence.

14              THE COURT:  Yes.  Sustained.

15              Sir, the jury doesn't want to -- I don't want the jury

16    to be given a guess so don't guess, but can you estimate the

17    number of customers of Inter-America that were involved in the

18    insurance fraud to which you pled guilty?  Are you able to

19    estimate it?  If you can't, don't.

20              THE WITNESS:  Your Honor, with all due respect, I'm

21    sorry.  I would accept that more than five as the document

22    indicates.

23              THE COURT:  I will accept more than five as the

24    document indicates.  Proceed.

25    BY MR. SOLANO:

O6B5men2                          Uribe - Cross

1    Q.  And before the break I asked you the following, and I just
2    want to make sure I have your testimony right.  The insurance
3    fraud, it related to issuing false insurance cards and
4    certificates of insurance to your customers, correct?
5    A.  Yes.
6    Q.  So it wasn't just that you issued policies with an
7    unauthorized company, you actually issued false policies;
8    correct?
9    A.  I wouldn't say it like that, sir.  The fact --
10   Q.  Can --
11   A.  Can I?
12   Q.  Please.
13   A.  Please.  The fact that I used an unauthorized insurance
14   company to transact business in the State of New Jersey and
15   issue an ID card relating and showing that that is the
16   insurance company on the ID card and on the certificate of
17   insurance, then carries home the fact that the certificates
18   were incorrect, and the ID card as well.
19   Q.  You did that but you also issued policies that were
20   entirely false; isn't that the case?
21   A.  Sitting here right now, I don't have that recollection,
22   sir.
23             MR. SOLANO:  Can we show the witness 3542-64, page 3?
24   Just the witness, the Court, and the lawyers.
25   Q.  If you can take a look at this document, if you want to see

1    other pages, but I am going to focus on this paragraph here,

2    Mr. Uribe.

3    A.  I have read it, sir.

4    Q.  Does that refresh your recollection that you did -- that

5    what you did was sell insurance policies through an

6    unauthorized insurance company in the State of New Jersey,

7    issue false commercial auto insurance ID cards and certificates

8    by one company, and then issue false insurance cards and

9    certificates of insurance by another company?

10             MS. POMERANTZ:  Objection.  Assumes a fact.

11             THE COURT:  Sustained.

12         And sir, again, this is shown to you to refresh your

13   recollection so it is like the banana.  It may gave you new

14   recollection, it may not.  Simply because something is on this

15   page doesn't make it so.  Let me ask you directly, sir --

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:    -- does looking at this refresh your

18   recollection in regard to whether or not you issued

19   certificates of insurance that were entirely false?  Yes or no.

20             THE WITNESS:  Sitting here right now, sir, I don't

21   have a recollection of these acts, but if that is the finding

22   of the administrator then that's what the document states I

23   will have to accept it.

24             MR. SOLANO:  I will move on, your Honor.

25             MS. POMERANTZ:  Objection.  We would move to strike

1    that last part.

2                THE COURT:  No.  Motion denied.

3    BY MR. SOLANO:

4    Q.  You opened up Phoenix after you closed Inter-America and

5    put it under your son's name originally, correct?

6    A.  Yes.

7    Q.  And then your son moved to the west coast and you put it

8    under your daughter Ana's name, correct?

9    A.  That is correct, yes.

10   Q.  And you continued, under Phoenix, to issue false policies

11   to the customers of Phoenix; isn't that the case?

12   A.  Not to my recollection, sir.

13   Q.  Do you recall a company called FlexiVan Leasing?

14   A.  Yes.

15   Q.  FlexiVan Leasing worked with E & K Trucking; correct?

16   A.  I don't have a recollection.  He works for many different

17   companies.

18   Q.  Do you recall whether one of the companies was E & K

19   Trucking?

20   A.  I don't have a recollection sitting here right now.

21   Q.  E & K Trucking was the company owned by Elvis Parra,

22   correct?

23   A.  Correct.  I do not know the relation between -- whether

24   E & K used Flexi or not.  I wouldn't have that recollection,

25   sir.

O6B5men2                           Uribe - Cross

1    Q.  Do you recall issuing a certificate of insurance to

2    FlexiVan Leasing that indicated it was on the insurance policy

3    of E & K?

4    A.  I don't have a recollection sitting here right now.

5    Q.  Do you remember Phoenix getting sued because FlexiVan tried

6    to recover under that fake -- excuse me, under that certificate

7    of insurance?

8              MS. POMERANTZ:  Objection.

9              THE COURT:  I will allow it.

10             THE WITNESS:  Do you want to repeat the question

11   again?

12   Q.  Yes.

13        Do you remember Phoenix suing FlexiVan because it tried to

14   recover under that insurance policy -- I'm sorry, under the

15   certificate of insurance policy that you had issued?

16   A.  I don't have a recollection of that activity, sir.  I deal

17   with a thousand customers or more over my years of experience

18   in insurance.

19   Q.  Have you gotten sued many times for issuing false insurance

20   policies?  When I say -- Phoenix, has Phoenix gotten sued?

21   A.  We have been sued before.

22   Q.  And that had related to people who thought they had

23   insurance coverage that you placed, or that Phoenix placed and

24   that in fact was not placed; correct?

25             MS. POMERANTZ:  Objection.  Assumes a fact.

O6B5men2                          Uribe - Cross

1          THE COURT:  I will allow it.

2     A.  I don't recall the nature of the lawsuits, the few lawsuits

3     that we had, but I know they're under litigation.

4     Q.  Phoenix is also the insurance broker for Mr. Hana's

5     trucking business, correct?

6     A.  Best of my recollection, yes.  Yes.

7     Q.  And I think you testified on Friday that Inter-America was

8     first the company and then it switched over to Phoenix?  Do you

9     recall that?

10    A.  Yes, I did, sir.  Yes, I do remember.

11    Q.  So that means you placed insurance policies to cover

12    Mr. Hana's trucks, correct?

13    A.  Best of my recollection, yes.

14    Q.  Do you remember that Mr. Hana's trucks were damaged

15    following Superstorm Sandy?

16    A.  I don't have a recollection of that.  I'm sorry.

17    Q.  Regardless of when it was, do you remember that his trucks

18    were damaged?

19    A.  I don't have a recollection, sir.

20    Q.  And so you don't remember him trying to collect under those

21    policies and not being able to because they weren't actually in

22    effect for all of his trucks, correct?

23    A.  I don't have a recollection of such claims.

24    Q.  You do recall that his business wasn't performing well, his

25    trucking business, in 2013 and 2014; right?

1    A.  Something to that extent, yes.

2    Q.  But you don't recall that the reason for that is because

3    you had sold him insurance policies but not actually placed

4    insurance in place?

5              MS. POMERANTZ:  Objection.  Assumes a fact.

6              THE COURT:  I will allow it.

7              You may answer, if you can.

8              THE WITNESS:  The reasons for Mr. Hana not doing good

9    on his business, I don't think it relates -- I don't think, no.

10   I almost sure it doesn't relate to his not getting paid on an

11   insurance claim.

12   Q.  OK.  I will move on to the Elvis Parra case that you

13   testified about.  On Friday you testified that you were

14   concerned because the prosecution of Elvis Parra and the

15   investigation to Prestige could also lead into an investigation

16   into your daughter Ana and Phoenix, and that's what you term

17   part 1, the Elvis Parra, and part 2, Ana and your family;

18   correct?

19   A.  Part 2 would be Prestige under subpoena and then that could

20   move to Ana and Phoenix.

21   Q.  And the case against Elvis Parra focused on the fact that

22   he lied to an insurance company to get workers compensation

23   insurance for his employees at E & K; correct?

24   A.  Correct.

25   Q.  And the broker of E & K was Phoenix; correct?

1    A.  For that particular policy was Inter-America.

2    Q.  It was Inter-America.

3        And then Phoenix continued being the broker for E & K;

4    correct?

5    A.  Correct.

6    Q.  And so whether it was Inter-America or Phoenix, ultimately

7    the companies you run helped fill out those insurance forms;

8    correct?

9    A.  Would fill out -- Inter-America filled out the insurance

10   form for the policies, yes.

11   Q.  And when you were concerned that the Parra investigation

12   was going to ultimately potentially lead to Phoenix, you were

13   concerned that that was going to uncover the insurance fraud

14   that Phoenix was committing, correct?

15   A.  I don't agree with that, sir.

16   Q.  What was your concern about the investigation leading to

17   your daughter Ana and Phoenix?

18   A.  E & K is under investigation, we already established that,

19   or I had said that.  Parra is indicted, found guilty of his

20   crimes of insurance fraud.  Prestige is now insured by Phoenix,

21   it is under investigations as it is the successor company of

22   E & K, and I was told that that investigation wouldn't lead to

23   my daughter Ana.  My concern is simply not to let my daughter

24   go through a process of being investigated and being accused of

25   something that she hasn't done.  That's my daughter.

1   Q.  What was she getting investigated for and what were you

2   afraid she would get accused of?

3   A.  I cannot speak to the prosecution.

4   Q.  You were the one that was concerned.  I am asking you, what

5   is the basis of your concern that she was going to be

6   investigated for and maybe prosecuted of?

7   A.  This is how I would like to say it, sir.  I was not

8   concerned about the investigation, I was concerned of the harm,

9   of the pain and uncomfortable anxieties that my daughter was

10  experiencing at that age when she has done nothing wrong.

11  Q.  You have testified a number of times that you were

12  concerned about an unpleasant investigation that your daughter

13  Ana -- Anita -- were going to be subjected to investigation.

14  What did you think she was going to be investigated for?  What

15  crimes?

16          MS. POMERANTZ:  Objection.  Asked and answered.

17          THE COURT:  I will allow it.

18          THE WITNESS:  Do I answer?

19          THE COURT:  Yes, you may answer.

20          THE WITNESS:  My recollections are my anxieties and my

21  concerns is not letting anybody harm Anita in the sense that

22  she is no pleasant with the attitude and the investigation

23  managed of Ms. Lopez.  Not because there was any wrongdoings on

24  the policies issues to Prestige, or in this case for Prestige

25  who was under investigation by Phoenix Risk Management.

1    Q.  How about this.  Was the real concern about yourself in

2    that you would have been found out to have been engaging in

3    criminal conduct at Phoenix?

4    A.  With all due respect to you, sir, I expressed a number of

5    time that my concern was my Ana, a young lady, of a good person

6    that has done nothing wrong.  If the concern would have been me

7    and I would have the opportunity, and Ms. Lopez thought I was a

8    concern, she could have come and interviewed me and I will,

9    like I have expressed before, face Ms. Lopez and the

10   investigation.

11   Q.  You were running an insurance company called Phoenix which

12   you were not, by law, authorized to do.  We have well

13   established that, correct?

14   A.  We established that.

15   Q.  And if this investigator Lopez starts looking at Phoenix,

16   she is going to find out that you are engaging in running an

17   insurance company that you are not authorized to do; correct?

18   A.  If she would have find out that and would have been

19   investigated, I would have to face Ms. Lopez.  I am concerned

20   about my daughter Ana, sir.

21   Q.  Because she was aware that you were engaging in this crime?

22   I am still trying to figure out what you were concerned she

23   would have been investigated for?

24   A.  I am concerned about a young lady being hurt, anxiety,

25   being preoccupied and molest her, so to speak, by an

O6B5men2                              Uribe - Cross

1    investigator with a very rude manner and she was unpleasant,

2    and I care for my daughter.

3    Q.  So, are we to understand that you were willing to pay a

4    quarter of a million dollars as part of some scheme to

5    eventually try to bribe a United States senator because she

6    might find that that investigation was unpleasant?  That's what

7    you are saying?

8                MS. POMERANTZ:  Objection.

9                THE COURT:  I will allow it.

10               THE WITNESS:  I would like to remind of my previous

11   testimony that at no time I agreed to pay the $250,000.  I was

12   not part of any of the agreements that I was the person to pay

13   that proceeds to Mr. Hana.

14   Q.  How about the rest of it, sir?

15   A.  Did you want to remind me what the rest of it is, please?

16               THE COURT:  Sustained.

17   Q.  Your testimony is that there was an agreement to pay

18   Mr. Hana, by whoever, a quarter of a million dollars, as part

19   of some scheme that would eventually involve bribing a United

20   States senator, and that it was because you didn't want your

21   daughter to be unpleasant or bothered?

22               MS. POMERANTZ:  Objection.  Misstates and confusing.

23               THE COURT:  I will allow it.

24               THE WITNESS:  What I testified is that the persons of

25   concern at the time of the agreement are Mr. Parra, his being

O6B5men2                          Uribe - Cross

1    offering jail time, Prestige is under investigation as I was

2    told or learned that that investigation couldn't move into to

3    Ana.  At no time I was concerned about the payment that I was

4    going to make because I did not agree to make any payment.  The

5    persons that were concerned, Elvis and Bien, were the ones that

6    agreed with Mr. Hana about making those payments.

7    Q.  And we have established that Mr. Parra was sentenced in

8    June of 2019.  That is the part 1, correct?

9    A.  Correct.

10   Q.  And you continue on with this scheme of bribery, that's the

11   part 2; correct?

12   A.  That was my promise to Nadine.

13   Q.  That part 2, what you are saying is, because you were

14   concerned that your daughter Ana was going to continue to be

15   bothered by Detective Lopez?

16   A.  An unfair investigation could have been opened about her

17   and my poor lady, my poor girl, is on the decent side and is

18   uncomfortable, and that was my way to protect my daughter.

19   Q.  OK.  Ana took a lot of risks for you, correct?

20   A.  Yes.

21   Q.  By putting her as the owner of Phoenix you put her in a

22   position where she was, as in this instance, potentially going

23   to be investigated; correct?

24              MS. POMERANTZ:  Objection.

25              THE COURT:  I will allow it.

O6B5men2                          Uribe - Cross

1    A.  The risk that I referred, in my way of saying, in my, I

2    will say, sir, to you, that the reason that I put Ana into is

3    the risk of an insurance agency.  The risk of an insurance

4    agency involved the obligation of an individual to being there

5    for their customers in a 24/7 to take care of a number of

6    issues that any mistake, that any absence of time would have

7    put that company into a financial risk.  The fact that no

8    matter if it is a holiday, weekend or not, she had obligations

9    to execute and buy and be sure that the customers' policies are

10   being processed in the time that I require to do so.

11   Q.  OK.  But you're the one running the company, not Ana;

12   right?

13   A.  But Ana is the agent of record, the person that can

14   execute, bind policies.

15   Q.  And that puts her at risk?

16   A.  That is the risk, yes.  Any person that --

17           THE COURT:  Do you believe -- I'm sorry, were you

18   continuing, sir?

19           THE WITNESS:  Yes, I was going to.

20           THE COURT:  Go ahead.

21           THE WITNESS:  Any person that had been involved in the

22   insurance agency retail operation will understand the risks and

23   the responsibilities of having to run and be there when you

24   have to be there not when you want to but when you must be

25   there.  That is the risk.

1    Q.  Insurance brokers collect premiums from their customers;

2    correct?

3    A.  Yes.

4    Q.  And you hold them in escrow, and by that I mean you take

5    them from the customer, you put them in an account, and then

6    you use that money to pay insurance premium, correct?

7    A.  That is correct.

8    Q.  You would often ask Ana to pull money out of those escrow

9    accounts for you to personally put in your pocket, correct?

10   A.  That was my order, so Anita transferred from the other

11   accounts but Ana, knowing the law, and knowing the way it

12   should be, she pulled it from the operation account or from the

13   trust account.

14   Q.  So even though you would say to her, specifically, to bring

15   you the money -- $5,000, $3,000 -- from the trust, you are

16   saying she didn't do that?

17   A.  That's what I am stating right now.

18   Q.  Do you remember having a meeting at Michael Critchley's

19   office?

20   A.  Yes, I went to Mr. Critchley's office once.

21   Q.  He was the lawyer for Elvis Parra, correct?

22   A.  I have that understanding, yes.

23   Q.  And you actually went there and met with him and maybe

24   other attorneys from his office?

25   A.  I remember Mr. Critchley and other people there, yes.

O6B5men2                          Uribe - Cross

1    Q.   And you saw some text messages, I can show them to you but

2    let me see if you remember.  You saw some text messages in

3    which you said you didn't want Ana to be there, to leave her

4    out, and you said she doesn't know anything; correct?

5    A.   I don't have a recollection of those texts.

6    Q.   Let me show you just very quickly Government Exhibit 1303.

7             MR. SOLANO:  If we can go to line 408 and 409 --

8    actually 408 to 413, Mr. Kelly.  And I think it may actually

9    span two pages.

10   Q.   This is you and Bienvenido Hernandez speaking and --

11   actually 412, 413.  Take a look at it, but you are talking

12   about the meeting in Mr. Critchley's office and on line 14 you

13   say:  Tell him that I am going alone, that girl doesn't know

14   anything.

15        Do you see that?

16   A.   Correct.  I can see row 413.

17   Q.   Right.  You said "that girl doesn't know anything" and that

18   means Ana, correct?

19   A.   Correct.

20   Q.   So you went alone?

21   A.   Yes.

22   Q.   During that meeting you learned -- strike that.

23        From these text messages that meeting occurred in early

24   March of 2019; correct?

25   A.   Correct to that.

O6B5men2                          Uribe - Cross

1    Q.  During that meeting you learned from Elvis Parra's lawyers

2    that his defense at trial was going to be to come clean and

3    blame you for his insurance fraud, didn't you?

4    A.  I don't have a recollection of those statements.

5    Q.  Do you recall that you were maybe going to be called as a

6    witness by the defense because you were going to be accused of

7    committing the insurance fraud that Elvis Parra was being

8    prosecuted for?

9    A.  I don't have a recollection of those statements.

10   Q.  And you don't recall either, I'm sure, that that is

11   actually why you were so concerned in stopping the

12   investigation, right?

13            MS. POMERANTZ:  Objection.

14            THE COURT:  Sustained as phrased.

15   Q.  Is isn't it true that that is the reason that you were so

16   concerned about stopping the investigation?

17   A.  No, sir.  I was not concerned about stopping the

18   investigation because I was going to be called as a witness and

19   be investigated.

20   Q.  Let me ask you this.  If you were called as a witness and

21   had to testify truthfully that you were running an insurance

22   company, that would be a problem for you, right?

23            MS. POMERANTZ:  Objection.

24            THE COURT:  Sustained as phrased.

25   Q.  If you had to admit, under oath, that you were running an

O6B5men2                        Uribe - Cross

 1   insurance company in the Elvis Parra case, would that have been
 2   a problem for you?
 3   A.  I don't know the position of the authorities on my
 4   statement.
 5   Q.  OK.  You knew that you weren't supposed to be running an
 6   insurance company, correct?
 7   A.  Correct.
 8   Q.  That was that whole license loss thing that we talked about
 9   earlier today, correct?
10   A.  I agree with you.
11   Q.  I'm going to shift topics a little bit.
12       We can bring this down, Mr. Kelly.
13       The tax evasion that we talked about this morning and that
14   you spoke about yesterday afternoon --
15            THE COURT:  Speak into the mic.
16   Q.  The tax evasion that you pled guilty to, there was no doubt
17   you did not pay taxes on income you earned; correct?
18   A.  That is correct.
19   Q.  You were charged in September of 2023; correct?
20   A.  Correct.
21   Q.  Those charges related only to bribery; correct?
22   A.  Yes.
23   Q.  And there were no tax evasion charges as part of that
24   charge, correct?
25   A.  Correct.

1   Q.  And you denied being involved in that bribery, correct?

2           MS. POMERANTZ:  Objection.

3           THE COURT:  I will allow it.

4   A.  Ask me the question again, please.

5   Q.  Yes.  In September of 2023 when you were charged with

6   several offenses related to bribery, you denied pleading guilty

7   to bribery, correct?

8   A.  I remember pleading not guilty for those charges.

9   Q.  Sorry.  Sorry.

10      You made it very clear -- and this is now your third day of

11  testimony -- that you really care about your family, right?

12  A.  Yes, I do.

13  Q.  And most chances the text messages we saw with Nadine and

14  others, you talking about part 2, stopping that investigation,

15  and it is because you really care about your family; correct?

16          MS. POMERANTZ:  Your Honor, I didn't understand the

17  question.  I apologize.

18          MR. SOLANO:  Yes.

19          THE COURT:  It is just restating a question that's

20  been asked many times so let's move on.

21          MR. SOLANO:  OK.

22  Q.  Do you remember that after you were charged in October of

23  2023 the government told you, through your lawyer, that you

24  were the target of a tax evasion investigation?

25  A.  Yes.

O6B5men2                          Uribe - Cross

1   Q.   The government told you that you were operating various

2   companies in other people's names to conceal your own income

3   for years; correct?

4   A.   I don't remember the exact statements that you used being

5   told to me.

6   Q.   How about in substance?  Do you remember that those

7   statements were relayed to you?

8   A.   Substance that they were evidence of tax evasions and

9   charges could be brought against me and my family, yes.

10  Q.   It is you and your family, and they told you that it was a

11  fairly straightforward case to prove; correct?

12  A.   I don't remember such a statement.

13  Q.   The tax evasion investigation that you were told about

14  involved those companies that we mentioned earlier today,

15  right?  The Frank & Sons, the Route 1, those companies;

16  correct?

17  A.   I agree with you, sir.

18  Q.   And at least on paper those companies are owned by your

19  sister -- your real sister, your brother -- your real brother,

20  and Ana, your daughter -- like a daughter but not your real

21  daughter; correct?

22  A.   Correct.

23  Q.   And you were told that the investigation could implicate

24  that family, correct?

25  A.   Yes.

1    Q.  You also knew, Mr. Uribe, that although you would not be

2    able to avoid a tax prosecution, speaking to the government

3    might help resolve the case favorably for others, correct?

4    A.  I understood by having the opportunity to sit down with the

5    government and telling my truth, the government would have a

6    chance to understand to my involvement in the operation of all

7    of those companies, was the sole director of the companies and

8    manager of those companies, and that my family had no

9    decision-making in those, they were just following my advice.

10   Q.  And your decision to cooperate had two parts -- part 1,

11   hoping to get a better sentence for yourself, and part 2, to

12   show the prosecutors that your family had no wrongdoings and so

13   they wouldn't be implicated in the tax investigation, correct?

14   A.  So I will hope that my family wouldn't be involved on it.

15   I cannot --

16   Q.  All right --

17   A.  I'm sorry, sir.

18   Q.  No.

19   A.  I appreciate you letting me finish.

20   Q.  Please.

21   A.  And I cannot tell what the prosecutors were going to --

22   what position they were going to take for it.

23   Q.  That's fair.

24       You were hoping that it would both lead to a more lenient

25   sentence for you and no prosecution of your family; correct?

O6B5men2                        Uribe - Cross

1    A.  Because my explanation of the truth will indicate that I

2    was the person directing and operating those companies.

3    Q.  Right, and so your family wouldn't be prosecuted?

4    A.  If the government is willing to do so.

5    Q.  That's what you were hoping they would be willing to do?

6    A.  That is my hope, sir.

7    Q.  Just so it is clear, this tax evasion has nothing to do

8    with the bribery scheme; correct?

9    A.  I agree.

10   Q.  After you are told that you are the target of this tax

11   investigation and you are hoping that your family doesn't get

12   implicated, that's the first time you tell the government that

13   you were part of some bribery scheme to bribe Senator Menendez;

14   correct?

15   A.  After entering with a agreement with the government, then I

16   had to tell the truth and the truth involved stating my

17   involvement in the bribery scheme that you just called.

18   Q.  I'm asking a much more different and much more direct

19   question.

20   A.  Then ask me the question again if you don't mind, please.

21   Q.  After you were told that you were the target of a tax

22   investigation, (1); (2) that that might implicate your family;

23   and (3) you're hoping to avoid that, that is when you first

24   tell the government that you are part of a bribery scheme

25   involving Senator Menendez; correct?

O6B5men2                            Uribe - Cross

1   A.  At this point I am already being charged for bribing -- I

2   already have bribery charges.  I was already indicted at this

3   point, sir.

4   Q.  Right.  And as you testified less than 10 minutes ago, you

5   pled not guilty to both bribery charges, correct?

6           MS. POMERANTZ:  Objection, your Honor.

7           THE COURT:  Did you plead not guilty to the bribery

8   charges brought by the government against you?

9           THE WITNESS:  That is correct, sir.

10  Q.  So after you plead not guilty to the bribery charges

11  brought against you, and after you are told about this tax

12  investigation, you then start to cooperate and admit to the

13  bribery; correct?

14  A.  When I was first charged.  The answer to your question is

15  correct.

16  Q.  That was it.  That was my question.  Thank you.

17      Even if there was no bribery, you would have still been

18  charged with tax evasion; correct?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  Sustained.

21  Q.  Mr. Uribe, do you think you would have gotten a cooperation

22  agreement if you were only guilty of tax evasion?

23          MS. POMERANTZ:  Objection.

24          THE COURT:  Sustained.

25  Q.  After you decided to cooperate you met with the government

O6B5men2                          Uribe - Cross

1    several times, correct?

2    A.  Yes.

3    Q.  You met with them a lot, correct?

4    A.  A number of times.

5    Q.  I think yesterday you thought you estimated that you met

6    with them between 10 and 15 times since your first meeting

7    after the charges in December of 2023; correct?

8    A.  You mean after the charges or after the plea agreement,

9    sir?

10   Q.  Fair enough.

11       Your first meeting with them was in December of 2023?

12   A.  That's after the?

13   Q.  Charges?

14   A.  Charges.

15   Q.  And you estimated that you met with them about 10 to 15

16   times since then; correct?

17   A.  I don't have exact recollection.  I would like to say over

18   10 times before the agreement is accepted.

19   Q.  That was on March 1, correct?

20   A.  That is correct, sir.

21   Q.  And since then you met with them more than 20 times;

22   correct?

23   A.  Don't have an exact amount.  I would like to call it over

24   10 times at this point.

25               THE COURT:  March 1, 2024, sir?

O6B5men2                          Uribe - Cross

 1                 MR. SOLANO:  Yes, your Honor; March 1, 2024.

 2                 THE WITNESS:  Thank you, your Honor.

 3   Q.  Do you recall meeting with them 10 times since this case

 4   started?  Sorry.  Since this trial started?

 5   A.  I won't have an accurate number on that statement, sir, on

 6   that question.

 7   Q.  During those meetings you would get asked questions about

 8   this case; correct?

 9   A.  I was asked a number of questions, yes.

10   Q.  You would give a number of answers, correct?

11                 MS. POMERANTZ:  Objection.

12                 THE COURT:  Sustained.

13   Q.  You went over the questions you were being asked several

14   times, not just once; correct?

15   A.  I was asked the questions many times, yes.

16   Q.  And many of those questions were the same questions that

17   you were being asked here by the prosecutor, correct?

18   A.  I agree.

19   Q.  You were practicing your testimony, correct?

20   A.  I don't like the term "practicing", sir.  I would like to

21   say that I was preparing for the questions and the answers.

22   Q.  And you are preparing for the questions and the answers

23   with these prosecutors, correct?

24   A.  Yes, I like that term.

25   Q.  Let's talk about the cash that you have testified was going

1   to be paid to Mr. Hana at some point.  You are not sure of the

2   exact amount, right, it was either 250, 225 -- I'm sorry,

3   $250,000, $225,000, $125,000, 25,000, so you are not sure of

4   the exact amount; correct?

5              MS. POMERANTZ:  Objection, your Honor.

6              THE COURT:  Yes.  Are you sure of the exact amount

7   that was to be paid to Mr. Hana?  Yes or no.

8              THE WITNESS:  Best of my recollection, sir, it was a

9   fee of between $200,000 and $250,000, sir.

10  Q.  Right.  And ultimately you testified you were told that

11  Mr. Hana was paid $125,000; correct?

12  A.  I testified to that, yes.

13  Q.  And you have no idea why that happened, correct?

14  A.  I was not present, sir.

15             MS. POMERANTZ:  Objection.

16  Q.  And then you told the jury there was another 25,000 that

17  Bien originally gave to Will but that you ultimately just took

18  it, correct?

19  A.  I told Will that I was going to take the money and Will

20  agreed to give it to me.

21  Q.  And between the $125,000 that you say Mr. Hana got and the

22  $25,000 that you say you took, that's $150,000; correct?

23  A.  In good mathematics, yes.

24  Q.  Thank you.

25             In the fall of 2019, of 2019, you were looking to purchase

O6B5men2                          Uribe - Cross

1    a home, weren't you?

2    A.   When again?

3    Q.   In the fall of 2019 you were looking to purchase a home?

4    A.   I don't have a recollection of that.

5    Q.   Do you recall messages with a real estate agent named Toby

6    Nassery in November of 2019 regarding a home for you?

7    A.   I don't have a recollection of that, sir.

8    Q.   Let me show you what's been marked as Defendant's Exhibit

9    Hana 87, just for you, the Court, and the attorneys.

10        Who is Toby Nassery?

11            THE COURT:  Don't worry about what is on the screen,

12   sir.  The question is the question:  Who is Toby --

13            What was the last name, sir?

14            MR. SOLANO:  Nassery, I believe.  I may be

15   mispronouncing it.

16            THE COURT:  Do you know the name Toby Nassery?

17            THE WITNESS:  Yes, your Honor, I do.

18   BY MR. SOLANO:

19   Q.   He is a real estate agent, correct?

20   A.   My understanding of Toby's position will be a like a loan

21   officer or a loan processor or some sort of loan person, not a

22   real estate agent, to my understanding.

23   Q.   Understood.  And you would work with someone like Toby in

24   connection with purchasing a home, correct?

25   A.   I would -- I wouldn't say the word working with but that I

O6B5men2                          Uribe - Cross

1    might have to speak to Toby about if you find a nice home, let

2    me know.  But that's the conversations I have already had.

3    Q.  That was in November of 2019?

4    A.  I don't have a recollection of the day and time, sir.

5    Q.  Do you recall eventually telling Toby that you were looking

6    to put $150,000 as a downpayment on the purchase of a house?

7    A.  I do not have a recollection on the amount I told Toby, nor

8    do I have recollection of any other conversations in regard to

9    give me a home and I put X amount of money, sir.

10            MR. SOLANO:  Could we show, Mr. Kelly, the witness,

11   the Court and the attorneys, DX Hana 85?  Page 5 of this

12   exhibit.

13   Q.  Will you take a look at that, Mr. Uribe?

14   A.  Yes, I am looking at it.

15   Q.  Do you recall telling her that you were looking at a home

16   for $500,000, 150 down?

17   A.  Sir, I do not have a recollection of the text even though I

18   am looking at it right now.

19   Q.  Do you recognize that text as one that you sent to Toby?

20            MS. POMERANTZ:  Your Honor, he just said he doesn't

21   recall.

22            THE COURT:  Do you recognize -- what you are looking

23   at now, do you recognize it, sir?

24            MR. SOLANO:  I'm sorry.  Your Honor I want to correct

25   one thing.  I said text, it is an e-mail.  Do you recognize

O6B5men2                          Uribe - Cross

1   that e-mail?

2   A.  What I am looking at -- and I put my glasses back.

3           THE COURT:  No, it is not in evidence, sir.  The

4   question is do you recognize that.  Do you recognize that?  Yes

5   or no.

6           THE WITNESS:  Your Honor, I don't recall this e-mail.

7           THE COURT:  All right.  Thank you.

8   BY MR. SOLANO:

9   Q.  So your testimony is that you have no recollection of

10  trying to buy a house in the fall or spring -- in the fall of

11  2019 into the spring of 2020?

12  A.  No, sir.  I don't have a recollection of that particular

13  time in my life for buying a home.

14  Q.  OK.  Let's move on to your conversations with Nadine

15  Arslanian regarding her financial problems with the mortgage.

16  Do you recall your testimony about that?

17  A.  Yes, I do.

18  Q.  Just to summarize it, Nadine was having some financial

19  problems paying her mortgage, correct?

20  A.  That's what I understood, yes.

21  Q.  And she was complaining to you that Will had said he was

22  going to help her but he wasn't doing that, according to

23  Nadine; correct?

24  A.  Correct.

25  Q.  And you got involved, correct?

O6B5men2                        Uribe - Cross

1    A.  I got involved, yes.

2    Q.  I think you said you were like in the middle of two

3    children fighting, correct?

4    A.  I will repeat that -- yes, I remember saying that.  You are

5    correct, sir.  I'm sorry.

6    Q.  Do you remember that you were asked:

7    "Q   Mr. Uribe, did Nadine ever tell you that she was paying

8    Will back for the mortgage payments?

9    "A   No.  She never did."

10       Do you remember that testimony that you gave yesterday?

11   A.  Correct.

12           MR. SOLANO:  Could we put up Government Exhibit 1319,

13   line 5?

14   Q.  Take a look at that exhibit, which is in evidence --

15           That is in evidence, you can put it up for everyone.

16   Q.  Do you see in the middle of this text from Nadine to you,

17   José Uribe, on June 15, 2019, where I am circling, where she

18   literally says:  I will pay him back.

19   A.  I'm looking at the text, sir.

20   Q.  Does it literally say from Nadine:  I will pay him back?

21   A.  That's what the text says.

22   Q.  Do you remember meeting with the government and telling

23   them that when Nadine told you I will pay him back, you

24   understood that Nadine was saying that she was going to pay

25   Will back the $18,000 that he let her borrow?

1  A.  I don't recall such a statement, sir.

2  Q.  I'm going to show you this one.

3       MR. SOLANO:  If we could look at 3542-37, page 10 and

4  just for the witness and the Court and the attorneys.

5  Q.  Take a look at that, you can look at the whole page but

6  what I want to show you is the following.  Let me know when you

7  are finished, Mr. Uribe.

8  A.  I just read what you circled, sir.

9  Q.  Does that refresh your recollection that you told the

10  government that the text "I will pay him back" meant that

11  Arslanian was going to pay back the $18,000?

12  A.  If you allow me to read the entire text.  Can I do that,

13  sir?

14  Q.  Yes.  My question is does it refresh your recollection but

15  you can read it.

16  A.  It doesn't refresh my recollection.  I am looking at the

17  text -- the document that you showed me.  I'm sorry.

18       THE COURT:  The question is simply whether or not that

19  refreshes your recollection in regard to whether or not you

20  told the government that the words "I will pay him back" meant

21  that Arslanian was going to pay back $18,000.  Does looking at

22  that refresh your recollection?  Yes or no.

23       THE WITNESS:  Your Honor, it does not --

24       THE COURT:  OK.

25       THE WITNESS:  -- recall.

O6B5men2                       Uribe - Cross

1            MR. SOLANO:  Can we pull this down and show the

2    witness Government Exhibit 209-11, which is in evidence?  And

3    in particular, Mr. Kelly, line 951.  You know what?  I'm sorry

4    I gave you the wrong exhibit, Mr. Kelly.  My fault.  Can we

5    look at Government Exhibit 1302, line 951, which is also in

6    evidence?  Sorry.  You know what?  I gave the wrong number.  It

7    is 949 but I think I have got it right now.

8    Q.  Do you see this text that you sent to Ms. Arslanian on

9    June 27 of 2019 in which you said:  Sister.  You have to go

10   sign the papers and save your home.  Just sign and move on,

11   stop the fighting.  You have to go to Cliffton.

12           Do you see that, Mr. Uribe?

13   A.  Correct.

14   Q.  You are telling Nadine to sign the mortgage loan agreement

15   that Will Hana had given her, correct?

16   A.  I could read you the text out of context, sir, but nowhere

17   in that text I indicating that I'm addressing Nadine to go sign

18   a mortgage agreement with Mr. Hana.  At this point the

19   documents that I know of are related to a possible mortgage

20   modification, as I stated yesterday, or a mortgage loan that

21   Nadine receive from a bank.  I am not aware, sir, of any

22   mortgage or payment agreement between Mr. -- I will say I'm

23   sorry.  Take that back.  I'm not aware of any repayment

24   agreement of the mortgage payment between Mr. Hana and Nadine.

25           (Continued on next page)

O6bWmen3                        Uribe - Cross

1           MR. SOLANO:  OK.  You can put that down.

2   Q.  Yesterday you testified that Mr. Hana at some point and you

3   are at a restaurant, Le Jardin, and Will blurted out that he

4   was an agent of the government of Egypt.  Do you remember that?

5   A.  Yes, I did.

6   Q.  And you don't remember when that occurred, correct?

7   A.  I cannot place it on a date and time, sir, no.

8   Q.  And do you remember what the conversation was that led him

9   to say that, that led Mr. Hana to say that?

10  A.  I don't know what made Mr. Hana said those statements

11  that -- he was facing somebody behind my back.  He was

12  addressing somebody else, not to me.

13  Q.  And so your testimony that you're saying is that Mr. Hana

14  simply blurted out I am an agent of the government of Egypt,

15  right?

16          MS. POMERANTZ:  Objection.

17          THE COURT:  I'll allow it.

18  A.  It's the best of my recollection, sir.

19  Q.  Do you recall that on May 30 of this year, two weeks ago,

20  you met with the government, and that was the first time you

21  ever said that you overheard Mr. Hana say that?

22          THE COURT:  First time he ever said to the government?

23  BY MR. SOLANO:

24  Q.  First time you ever said to the government that Mr. Hana

25  said that.

O6bWmen3                          Uribe - Cross

1    A.  I like to start by saying I don't recall the date and time,

2    that I will take it from you.  I remember that it was sometime

3    ago that I did -- sometime.  I don't know May 30.  Today's --

4    couple weeks ago, ten days ago, if that what May 30 being a

5    accurate date.  And I said it because it's when it came back to

6    my recollection, sir.

7    Q.  You've met with the government, as we established, numerous

8    times, correct?

9    A.  Yes, I did.

10   Q.  They've asked you about Mr. Hana's relationship with Egypt,

11   correct?  I'm sorry.

12       Before this meeting in which you say this, they've asked

13   you about Mr. Hana's relationship with Egypt, correct?

14   A.  I don't recall is that way in which the questions were

15   being formulated in that, in those regard, sir.

16   Q.  How about this; between December of 2023 and May of 2023 --

17            THE COURT:  I think you misspoke.

18            MR. SOLANO:  I'm sorry.  Thank you, your Honor.

19   Q.  Between December of 2023 and May of 2024, during any of

20   your meetings with the government, did they ask you about

21   Mr. Hana's relationship with Egypt?

22   A.  Not recall a conversation to that context in the way you

23   ask me, sir.

24   Q.  So the first time you raised this -- strike that.

25       The first time you tell the government that Mr. Hana, at

1   some bar, blurted out that he was the agent of the government

2   of Egypt was approximately two weeks ago, correct?

3   A.  If May 30 being the correct day, that would be accurate.

4   Q.  If it's not the correct day, it was at least within the

5   last couple of weeks, correct?

6   A.  I will take that.

7   Q.  What did the government say to you that caused you to blurt

8   out that statement to them?

9   A.  I don't have a recollection.

10          MS. POMERANTZ:  Objection.

11  BY MR. SOLANO:

12  Q.  You're aware that Mr. Hana has a contract with the

13  government of Egypt to export meats from the U.S. to Egypt,

14  correct?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Sustained.

17          MS. POMERANTZ:  Assumes a fact.

18          THE COURT:  Sustained.

19          Do you know whether or not Mr. Hana has a contract

20  with the government of Egypt to export meats from the U.S. to

21  Egypt?  Yes or no.

22          THE WITNESS:  Your Honor, with your respect, can I

23  answer that with just more than a yes or no?

24          THE COURT:  Yes.

25          THE WITNESS:  I'm aware that Will does import meat

O6bWmen3                          Uribe - Cross

1    into Egypt.  The terms of his agreement with Egypt, whether

2    it's a contract or any some sort of legal documents or no legal

3    document is not to my knowledge.

4                THE COURT:  All right.  Thank you.

5    BY MR. SOLANO:

6    Q.  Yesterday, you testified that you believe Senator Menendez

7    helped Mr. Hana get that contract?

8                MS. POMERANTZ:  Objection.

9    BY MR. SOLANO:

10   Q.  Do you recall that?

11               MS. POMERANTZ:  Objection.  Misstates the testimony.

12               THE COURT:  Sustained.

13   BY MR. SOLANO:

14   Q.  Do you believe that Senator Menendez --

15               THE COURT:  If you have the testimony, you can --

16               MR. SOLANO:  I want to just ask.  Maybe the witness

17   remembers this.

18   Q.  Yesterday you testified -- I'm sorry.

19       Do you believe that Senator Menendez helped Mr. Hana get

20   the contract from Egypt?

21   A.  I will like to say it this way, sir.  According to Mr. Hana

22   said to me before, he received help from Mr. Menendez to get

23   his contract with Egypt -- and I use the word "contract" -- to

24   get his dealings with Egypt.  Whether it is a contract or what

25   form of documents or what is the legal term of that agreement,

O6bWmen3                          Uribe - Cross

1   I do not have the detail of such, sir.

2   Q.  Do you have any idea what Senator Menendez supposedly did

3   to help Mr. Hana get that contract or that arrangement?

4   A.  Mr. Hana did not discuss that to me.

5   Q.  So it's fair to say you have nothing else to offer about

6   Mr. Hana's relationship to Egypt?

7           THE COURT:  Sustained.

8   BY MR. SOLANO:

9   Q.  Do you know anything else about Mr. Hana's relationship

10  with Egypt?

11          MS. POMERANTZ:  Objection.  Vague.

12          THE COURT:  I'll allow it.

13  A.  I will like to get the question again, please.

14  BY MR. SOLANO:

15  Q.  Do you know anything else about Mr. Hana's relationship and

16  contacts with Egypt?

17          THE COURT:  Hearing it now, I'll sustain the

18  objection.  Be more specific.

19          I take it, do you know whether or not Mr. Hana travels

20  to Egypt?

21          THE WITNESS:  I know that he travels to Egypt.

22          THE COURT:  OK.

23  BY MR. SOLANO:

24  Q.  You know he has family in Egypt, correct?

25  A.  Yes.

O6bWmen3                          Uribe - Cross

1   Q.  You don't know about his business dealings with Egypt; is

2   that what you're saying?

3   A.  Mr. Hana express to me several occasions that his family

4   are farmers.

5            MR. SOLANO:  Your Honor, my next section is going to

6   take longer than, for a while, so I'm happy to --

7            THE COURT:  All right.  Why don't we take our break.

8   Be back at 2 p.m.  I have nothing more to deal with at this

9   time with the lawyers so we'll start at two.

10           Enjoy your lunch.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6bWmen3                              Uribe - Cross

 1                  (Jury not present)

 2                  THE COURT:  You may step down, sir.

 3                  (Witness not present)

 4                  THE COURT:  All right.  I'll see everyone at 2

 5     o'clock.

 6                  How much longer, sir?  Do you have an estimate?

 7                  MR. SOLANO:  Your Honor, I thought the break would be

 8     helpful as well, because given what's happened this morning, I

 9     think I can work on it, and probably no more than 30 minutes.

10                  THE COURT:  Thank you.

11                  (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              2:00 p.m.

3              THE COURT:  Put the witness on the stand, please.

4              (Jury present)

5              THE COURT:  You may be seated in the courtroom.

6              You may continue and conclude your cross-examination,

7    Mr. Solano.

8              MR. SOLANO:  Thank you, your Honor.

9              THE COURT:  Oh, I'm sorry.  Ladies and gentlemen of

10   the jury, my deputy tells me that tomorrow you'd like extra

11   time for lunch.  Of course.  I think you've asked for an hour

12   and 15 minutes.  We'll do that.

13             MR. SOLANO:  Thank you, Judge.

14             THE COURT:  No.  You don't have the hour and 15

15   minutes.  You just have the hour.

16             MR. SOLANO:  Fair enough.  I tried.

17   Q.  Mr. Uribe, over the last two-plus days, we've heard you

18   refer to my client, Mr. Hana, as my brother, your brother,

19   several times, correct?

20   A.  Yes.

21   Q.  And that stopped at some point when he did not come through

22   on the offer to help you with the legal troubles that you were

23   having, correct?

24   A.  I don't recall every stopping calling Will my brother.

25   Q.  Well, whatever you may have called him by name, your

O6bWmen3                          Uribe - Cross

1    interactions with him stopped in May, thereabouts, of 2019,

2    correct?

3    A.   Interactions that you're referring to is no being in

4    contact as often as we used to because he's now busy in his new

5    business.

6    Q.   And for a long time before that, you did, in fact, though,

7    call him your brother, right?

8    A.   If I have to call Will right now, sir, I would call him my

9    brother again.

10   Q.   You treated him like, you viewed him as a member of your

11   family, correct?

12   A.   Would you mind repeating that?

13   Q.   Yes.

14   A.   I missed a word.

15   Q.   You viewed him as a member of your family, correct?

16   A.   I viewed him as a brother, yes.

17   Q.   We've seen that the companies you used to evade taxes, you

18   placed under the names of various family members, like your

19   brother, your sister, your son and your daughter Ana, correct?

20   A.   Correct.

21   Q.   You used them to achieve some of your illegal activities,

22   correct?

23              MS. POMERANTZ:  Objection.

24              THE COURT:  Sustained.

25   BY MR. SOLANO:

O6bWmen3                            Uribe - Cross

1    Q.  You committed illegal activities through those very

2    companies of which they were the owners on paper, correct?

3    A.  I will call that I failed to file my taxes under those

4    companies that I control and manage.

5    Q.  Under your family's names?

6    A.  And they were registered to my family's name.

7    Q.  And in doing that, you put them in harm's way to shield

8    yourself, correct?

9             MS. POMERANTZ:  Objection.

10            THE COURT:  Sustained.

11   BY MR. SOLANO:

12   Q.  Mr. Uribe, didn't you put them at risk of legal problems by

13   making them the owners of companies that were evading taxes?

14            MS. POMERANTZ:  Objection.

15            THE COURT:  I'll allow it.

16            You can answer.  If you can answer it, you may, sir.

17   A.  My family could be at risk, yes.

18   Q.  And you're here now testifying against my client --

19   Mr. Hana, correct?

20            MS. POMERANTZ:  Objection.

21            THE COURT:  I'll allow it.

22   A.  I am here to testify as a witness for the prosecutors, sir.

23   Q.  And one of the defendants is Mr. Hana, correct?

24   A.  That is correct.

25   Q.  And you're doing that in the hopes that you get a sentence

1    of no incarceration, isn't that right?

2    A.  I will hope to get that, yes.

3           MR. SOLANO:  No further questions, your Honor.

4           THE COURT:  All right.  Thank you.

5           Mr. Fee, cross-examination.

6           MR. FEE:  Yes.

7    CROSS-EXAMINATION

8    BY MR. FEE:

9    Q.  Mr. Uribe, you have testified that you have pled guilty to

10   committing fraud, right?

11   A.  Yes.

12   Q.  And you would agree that fraud means telling lies to get

13   money, right?

14          MS. POMERANTZ:  Objection.

15          THE COURT:  Well, let's see.

16   A.  I will just have a definition of fraud as having a

17   wrongdoings, something that is illegal.

18   Q.  When you committed fraud, you told lies to get money,

19   right, Mr. Uribe?

20   A.  When I committed these fraud, I -- yes.

21   Q.  You lied to customers of your insurance companies who

22   thought they were getting policies when they weren't, right?

23   A.  I will say the fact that I use an unauthorized insurance

24   carrier to issue those policies turned into a lie to my

25   customers as me no having my diligence of checking the validity

1    of those companies, sir.

2    Q.  You lied to them, right?

3              MS. POMERANTZ:  Objection.

4              THE COURT:  I'll allow it.

5              Did you lie to them?

6    A.  Yes, I did.

7    Q.  You lied to a bank to get money, right?

8    A.  Yes, I did.

9    Q.  You lied to the federal government in the form of the

10   United States Small Business Administration to get more money,

11   right?

12   A.  Yes, I did.

13   Q.  And then you ran, for over 15 years, insurance companies

14   that you were not allowed to operate under New Jersey law,

15   right?

16   A.  That is incorrect, in your answer -- in your question, sir.

17   Q.  You ran insurance businesses for over 15 years that you

18   were not allowed to run under New Jersey law, correct?

19   A.  It was less than 15 years, sir.

20   Q.  How long did you operate insurance businesses that you were

21   not legally allowed to operate under New Jersey law?

22   A.  Give and take 13 years.

23   Q.  So you would agree that you have been committing frauds and

24   other crimes for at least the last 13 years, correct?

25   A.  Yes.

1   Q.  And all of those crimes, day after day after day, required

2   you to tell lies, right?

3            MS. POMERANTZ:  Objection.

4            THE COURT:  Sustained as phrased.

5   BY MR. FEE:

6   Q.  You told lies for all of those 13 years, correct?

7            MS. POMERANTZ:  Objection.

8            THE COURT:  Sustained.

9   BY MR. FEE:

10  Q.  Sir, every day you were running your insurance businesses

11  you were breaking the law, right?

12  A.  Yes.

13  Q.  And the way in which you were breaking the law every single

14  day was you were deceiving the New Jersey insurance commission,

15  correct?

16  A.  I wouldn't say that way.  I was acting as the general

17  manager and insurance adviser or on insurance agency.

18  Q.  The lie of those businesses was that you were falsely

19  depicting your son Omar and your daughter Ana as running those

20  businesses when, in fact, you were, correct?

21  A.  Correct.

22  Q.  So every day you were running those businesses you were

23  effectively telling a lie, correct?

24           MS. POMERANTZ:  Objection.

25           THE COURT:  I'll allow it.

1   A.  Yes.

2   Q.  And when you do something for that long, you get good at

3   it, right, Mr. Uribe?

4            MS. POMERANTZ:  Objection.

5            THE COURT:  Sustained.

6   BY MR. FEE:

7   Q.  You're a very good liar, aren't you?

8            MS. POMERANTZ:  Objection.

9            THE COURT:  Sustained.

10  BY MR. FEE:

11  Q.  In fact, you lied in this courtroom on Friday and then

12  again on Monday, wouldn't you agree, Mr. Uribe?

13           MS. POMERANTZ:  Objection.

14           THE COURT:  I'll allow that.

15           Did you lie in this courtroom, sir?

16           THE WITNESS:  No, I did not, sir.

17  BY MR. FEE:

18  Q.  And I'll get to that, but before we do, the frauds you were

19  running for all these years, you involved your actual family,

20  your flesh and blood, right?

21  A.  Yes.

22  Q.  You took your son Omar, and after the state of New Jersey

23  said, Mr. Uribe, you cannot run any insurance business, you

24  made Omar the owner of Phoenix, correct?

25  A.  Correct.

1   Q.  But you were, in fact, running Phoenix and not Omar, right?

2   A.  Correct.

3   Q.  And Omar, your son, at the time he was the owner of

4   Phoenix, in name only, he knew you had already lost your

5   insurance license, didn't he, Mr. Uribe?

6            MS. POMERANTZ:  Objection.

7            THE COURT:  Did he know you had already lost your

8   insurance license?  If you know.

9            THE WITNESS:  Yes.

10  BY MR. FEE:

11  Q.  It was no secret to anyone that you had been convicted of

12  insurance fraud in the state of New Jersey in 2011, correct,

13  Mr. Uribe?

14           MS. POMERANTZ:  Objection.

15           THE COURT:  Sustained.

16  BY MR. FEE:

17  Q.  Well, you would agree that the New Jersey insurance fraud

18  prosecutor released a press release about your conviction for

19  defrauding seven clients, correct?

20  A.  I don't know what the press release was, sir.

21  Q.  Do you remember a press release being issued when you were

22  convicted of defrauding seven insurance clients, Mr. Uribe?

23  A.  I don't have a recollection sitting here right now, sir.

24  Q.  You would agree that in the insurance business in New

25  Jersey, it is important to monitor the public statements of the

O6bWmen3                         Uribe - Cross

1    New Jersey insurance fraud prosecutor, sir?

2            MS. POMERANTZ:  Objection.

3            THE COURT:  Sustained.

4            MR. FEE:  Let's show the witness what's been marked as

5    DX 499, please.  Let's zoom in on the main body of that,

6    please.

7    Q.  Read what I've circled, Mr. Uribe, and let me know when

8    you're done.

9    A.  I just read.

10   Q.  Does that refresh your recollection that the New Jersey

11   insurance fraud prosecutor issued a press release when you were

12   convicted, pled guilty to defrauding seven of your insurance

13   client, Mr. Uribe?

14   A.  Still does not refresh my recollection, sir.

15   Q.  OK.  Well, you did that, though; you defrauded seven of

16   your insurance clients and pled guilty to that offense, sir,

17   correct?

18   A.  If that is what expressed by the insurance commissioners,

19   then I have to believe that's what they found.

20   Q.  Because you committed so much fraud over so many years,

21   sitting here today, you can't remember that you pled guilty to

22   defrauding seven of your insurance clients in 2011, isn't that

23   right, Mr. Uribe?

24           MS. POMERANTZ:  Objection.

25           THE COURT:  Sustained.

O6bWmen3                              Uribe - Cross

1    BY MR. FEE:

2    Q.  You don't remember defrauding seven insurance clients and

3    pleading guilty to it, is that your testimony, sir?

4              MS. POMERANTZ:  Objection.

5              THE COURT:  No.  I'll allow it.

6    A.  I remember pleaing to insurance fraud and theft by

7    deception, sir.

8    Q.  The nature of your fraud was telling your clients they had

9    insurance and then stealing their insurance premiums, isn't

10   that correct, sir?

11   A.  I will not agree with that.  The nature of the fraud became

12   from the fact that I placed the policies with the unauthorized

13   carrier, the nonauthorized carriers to do business in New

14   Jersey.  I collected their premium, that policy being from an

15   unauthorized carrier made me took the premiums, but I did not

16   steal it from them, sir.

17   Q.  So your testimony is that the New Jersey insurance fraud

18   prosecutor mischaracterized in his press release your guilty

19   plea to stealing the premiums from your insurance clients; is

20   that your testimony, sir?

21             MS. POMERANTZ:  Objection.

22             THE COURT:  I'll allow it.

23             MS. POMERANTZ:  It's not in evidence.

24   A.  If that is the characterization the department of insurance

25   has on me, then that's what they found.

1    Q.  So they just got that wrong?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.

4              MR. FEE:  You can put that down.  Thank you,

5    Mr. Kelly.

6    Q.  You also roped in to your daily ongoing insurance fraud

7    scheme --

8              THE COURT:  Why don't you take out the word "roped."

9    It may save an objection or two.

10             MR. FEE:  Thank you, your Honor.

11   Q.  You also got involved your sister Raisa, correct?

12             MS. POMERANTZ:  Objection.  Vague.

13             THE COURT:  Let's have a specific question.

14   BY MR. FEE:

15   Q.  Your sister Raisa also worked for the insurance business

16   that you were not legally permitted to run in the state of New

17   Jersey, correct?

18   A.  Correct.

19   Q.  Your brother Antonio Worked for the insurance business that

20   you were not legally allowed to run in the state of New Jersey,

21   correct?

22   A.  Correct.

23   Q.  And your daughter Ana worked there and eventually was named

24   the fake owner of Phoenix, correct?

25             THE COURT:  Sustained.

1          MS. POMERANTZ:  Objection.

2          THE COURT:  Mr. Fee, you know how to ask questions

3     that don't lead to objections, sir.

4     BY MR. FEE:

5     Q.  Well, sir, is she the fake owner of Phoenix, Ana Peguero,

6     during the time you were actually operating it?

7     A.  She's not the fake owner.  She is the legal owner of the

8     agency.

9     Q.  Who was actually running Phoenix, sir, at the time you were

10    involved, sir?

11    A.  I was.

12    Q.  Now, Ana used to be friends with your actual daughter,

13    correct?

14    A.  With my -- Vanessa, my daughter Vanessa, yes.

15    Q.  Your daughter by birth, Vanessa?

16    A.  Say that again, sir.  I missed it.

17    Q.  Ana used to be friends with Vanessa, correct; that's how

18    you first came to know Ana?

19    A.  How did you refer to my daughter Vanessa before, sir?

20    Q.  Your daughter by birth, your birth daughter Vanessa.

21    A.  Vanessa is not my daughter by birth.

22    Q.  Tell me.

23    A.  Vanessa and my son Omar are my son and daughter from my

24    wife Martha that came into my life at age three and age one.

25    And so today Omar is my older son and Vanessa is my older

O6bWmen3                         Uribe - Cross

1    daughter.

2    Q.  Did you take legal custody of Vanessa?

3    A.  No.

4    Q.  OK.  But you call Vanessa your daughter as well?

5    A.  And I will call it to the rest of my life, sir.

6    Q.  Yes, sir.

7         And that's how you first met Ana, correct, through Vanessa?

8    A.  Yes.

9    Q.  And then when Ana was 19 years old, she reached out to you

10   for help, right?

11   A.  Run that by me again, sir?  Ask me the question again.

12   That would be more proper.

13   Q.  When Ana was 19 years old, she reached out to you for help,

14   correct?

15   A.  Don't remember at what age exactly, but somewhere when she

16   was very young she reach out to me, correct.

17   Q.  And at the time she reached out to you for help, she had

18   actually fallen out, had a fight, with your daughter Vanessa,

19   correct?

20   A.  I am not aware of such fight, sir.

21   Q.  Well, they had stopped being friends by the time Ana

22   reached out to you, correct?

23   A.  I have no knowledge of such acts, my friend, sir.

24   Q.  You say you don't remember that Ana and Vanessa had a

25   falling out at the time Ana reached out to you; is that your

O6bWmen3                         Uribe - Cross

1   testimony?

2   A.   That is my testimony.

3        MR. FEE:   Let's show the witness 3542-28, page 3,

4   paragraph 5.   Just the witness and the lawyers, please.

5   Q.   Read that, Mr. Uribe, and let me know when you have had a

6   chance to do it.

7   A.   OK.

8        I did.

9   Q.   Sir, does that refresh your recollection that at the time

10  Ana reached out to you, she had lost touch with your daughter

11  Vanessa?

12  A.   My understanding of losing touch doesn't mean that they

13  have what I understood you said before, falling out, like a

14  dispute or something like that.   They just lost touch to each

15  other.   They went different directions, to my understanding.

16  Q.   So Ana wasn't in touch with your daughter Vanessa at the

17  time she reached out to you, sir; is that what you're saying?

18  A.   I don't know how much touch they have between they -- to

19  each other, sir.

20  Q.   OK.   So Ana calls you and she says I'm pregnant and I need

21  a job, right?

22  A.   Yes.

23  Q.   And she's in a tough situation and was coming to you, sir,

24  for some security and some protection, fair to say?

25       MS. POMERANTZ:   Objection.

O6bWmen3                          Uribe - Cross

1          THE COURT:  I'll allow it.

2          Was Ana coming to you for security and protection, if

3  you know?

4          THE WITNESS:  Your Honor, my best west -- my best way

5  of saying is that she came to me looking for help.

6          THE COURT:  All right.  Thank you.

7  BY MR. FEE:

8  Q.  So this 19-year-old pregnant woman comes to you looking for

9  help, and you install her as the owner of the insurance company

10  that you are secretly operating, correct?

11          MS. POMERANTZ:  Objection.

12          THE COURT:  Sustained as to form.

13          Mr. Fee, ask the question.

14  BY MR. FEE:

15  Q.  You took Ana and you made her the owner of Phoenix,

16  correct?

17  A.  Yes, I did, sir.

18  Q.  And that was your decision, to put Ana as the owner of

19  Phoenix, correct?

20  A.  Yes, it was.

21          Can I add to your question, please?

22  Q.  No.

23          And that happened only after your son Omar refused to

24  participate any longer in Phoenix, right?

25  A.  That happened when my son left to Seattle.

1   Q.  Because your son wanted to be a lawyer and no longer wanted

2   to be involved in your illicit insurance business?

3            MS. POMERANTZ:  Objection.

4            THE COURT:  Sustained.

5            Did your son no longer wish to be involved with

6   Phoenix?

7            THE WITNESS:  Your Honor, my son didn't like insurance

8   and wants to be a lawyer.

9            THE COURT:  All right.

10  BY MR. FEE:

11  Q.  Sir, you said your son didn't like insurance; is that what

12  you just said?

13  A.  He didn't have the passion for insurance.  He didn't like

14  it.

15  Q.  And your testimony is that your son understood that you

16  were illegally barred from operating an insurance agency,

17  correct?

18  A.  I don't have --

19           MS. POMERANTZ:  Objection.

20           THE COURT:  If you know.

21  A.  I don't remember making any statement of my son going away

22  from me because my operation was illegal, sir.

23  Q.  So you made Ana the actual owner, the -- excuse me.  Let me

24  rephrase.

25       You made Ana the owner on paper of Phoenix, correct?

1   A.  Yes.

2   Q.  But you were controlling the profits of Phoenix, right?

3   A.  Yes.

4   Q.  And then for another 11 years after you made Ana the owner

5   on paper of Phoenix, she was working with you in this business,

6   correct?

7           MS. POMERANTZ:  Objection.  Misstates prior testimony.

8           THE COURT:  Was Ana working with you in the insurance

9   business for 11 years?

10          THE WITNESS:  Ana was working with me for, don't

11  remember exactly the year she came to me, back into the office,

12  but yes, 11 year could be a right number.

13          THE COURT:  OK.

14  BY MR. FEE:

15  Q.  And you decided what happened with the money that Phoenix

16  made during those 11 years, correct; that was your decision?

17  A.  Yes.

18  Q.  What was the nicest car you owned during those 11 years?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  I'll allow it.

21  A.  Mercedes-Benz.

22  Q.  But Ana's name was on the paperwork as owner of Phoenix,

23  right?

24          THE COURT:  You've established that.

25          MS. POMERANTZ:  Objection.

O6bWmen3                          Uribe - Cross

1    BY MR. FEE:

2    Q.  Well, Ana had the license to actually operate an insurance

3    business in New Jersey, right?

4              MS. POMERANTZ:  Objection, your Honor.

5              THE COURT:  You've established that.

6              MR. FEE:  I have not yet covered that, your Honor.

7              THE COURT:  All right.  OK.

8    BY MR. FEE:

9    Q.  Ana obtained an actual license in New Jersey to operate an

10   insurance business, correct?

11   A.  That is correct.

12   Q.  And so Ana's license was on the line if it was discovered

13   that you were actually operating that business, correct?

14             MS. POMERANTZ:  Objection.

15             THE COURT:  I'll allow it.

16   A.  I don't know what the decision of the authorities in New

17   Jersey would be to her license, sir.

18   Q.  Sir, as an experienced insurance industry businessperson,

19   is it your understanding that unlawfully operating an insurance

20   business, without a license, is good or bad?

21             MS. POMERANTZ:  Objection, your Honor.

22             THE COURT:  Sustained as phrased.

23   BY MR. FEE:

24   Q.  Sir, in your opinion, as you understand the insurance

25   business in New Jersey, do you think Ana's still going to have

O6bWmen3                          Uribe - Cross

1   an insurance license after this case is over?

2              MS. POMERANTZ:  Objection.

3              THE COURT:  Sustained.

4   BY MR. FEE:

5   Q.  The point, sir, is you have been lying --

6              THE COURT:  The jury knows that unanswered questions

7   are not evidence, correct?

8   BY MR. FEE:

9   Q.  Sir, my question is you would agree that you have used the

10  people closest to you to help carry out the crimes you have

11  described in this courtroom, correct?

12             THE COURT:  I'll allow it.

13  A.  I will not say like that, sir.  I use my family members and

14  the people that are close to me, that I care for, to have the

15  opportunity to be in business, to share my business, to help me

16  grow the business, and the money that we have earned, to us, we

17  earn to all of us, like all the same.

18  Q.  Did you tell Ana that you had been unlawfully operating

19  Phoenix for 11 years?

20             MS. POMERANTZ:  Objection.

21             THE COURT:  I'll allow it.

22  A.  Ana knew that I didn't have an insurance license.  None of

23  us have an idea of -- that we were breaking a federal law, sir.

24  Q.  Your testimony is that you don't think you were breaking

25  any laws by operating Phoenix, sir?

1    THE COURT:  Sustained.

2    BY MR. FEE:

3    Q.  Did you just say none of us believed we were breaking

4    federal laws?

5    A.  You are correct.  I just said that.

6    Q.  But you were breaking federal laws, Mr. Uribe, correct?

7            MS. POMERANTZ:  Objection.

8            THE COURT:  I'll allow it.

9    A.  We had no idea of the federal statute on that law, sir,

10    your Honor.

11    Q.  Just so I understand, for the 11 years after the state of

12    New Jersey had issued an order saying you cannot operate an

13    insurance business, your testimony is that you had no idea you

14    were breaking New Jersey law?

15            MS. POMERANTZ:  Objection.  Misstates the testimony.

16            THE COURT:  No.  I will allow it.

17            You may answer that if you can, sir.

18            THE WITNESS:  Your Honor, my understanding that I was

19    not able to be the owner of record of an insurance agency, but

20    acting as the consultant of the agency was not breaking any

21    law.  That was my understanding.

22            THE COURT:  All right.

23    BY MR. FEE:

24    Q.  You did not name yourself the owner of Phoenix because you

25    wanted to conceal the fact that you were actually operating

O6bWmen3                          Uribe - Cross

1    that business, right?

2    A.  I couldn't be the owner because I didn't have an insurance

3    license, sir.

4    Q.  You named someone else the owner of Phoenix because you

5    wanted to conceal the fact that you were actually operating the

6    business, correct?

7             THE COURT:  I'll allow it.

8             MS. POMERANTZ:  Already mentioned it.

9             THE COURT:  I'll allow it.

10   A.  I like to say that I didn't have an insurance license,

11   couldn't be the agent of record and I was happy in the

12   consulting.  I was hoping that my kids learn the business and

13   they can move on and have a successful business, sir.

14   Q.  And the way you showed your love for your kids was by

15   making them the paper owners of that business while you

16   controlled the profits, correct, sir?

17            THE COURT:  Sustained.

18   BY MR. FEE:

19   Q.  You are such a sophisticated liar that you know how to use

20   documents to cover up your lies, isn't that correct, sir?

21            THE COURT:  Sustained.

22            MS. POMERANTZ:  Objection.

23            THE COURT:  Sustained.  This is not time for making

24   arguments to the jury, sir.  Just ask questions.

25   BY MR. FEE:

O6bWmen3                          Uribe - Cross

1   Q.  Sir, you used documents to tell lies in the past, correct?

2   A.  Yes, I have.

3   Q.  And in fact, you made up an entirely false tax record to

4   get a loan from Santander, correct?

5   A.  Yes, I did.

6   Q.  And that Santander loan, you testified, you used yet

7   another member of your family, this time to commit a federal

8   crime, correct?

9           MS. POMERANTZ:  Objection.

10           THE COURT:  If he knows, I'll allow it.

11   A.  I did not say at any time that I used my nephew to help me

12   commit another crime that you just said, sir.

13   Q.  You committed the federal crime of wire fraud by telling

14   lies to Santander Bank in order to get money, correct?

15   A.  Yes, I did.

16   Q.  And when you were telling those lies, you reached out to

17   your nephew, who worked at Santander, to process that

18   application, correct?

19           MS. POMERANTZ:  Objection.

20           THE COURT:  Did you ask your nephew to process the

21   loan at Santander Bank?

22           THE WITNESS:  My nephew was not a loan processer.  He

23   was a salesperson at Santander.

24           THE COURT:  All right.

25   BY MR. FEE:

O6bWmen3                          Uribe - Cross

1   Q.  Your nephew filled out that loan application, correct?

2   A.  I don't have a recollection whether I did or he did that

3   right now.

4   Q.  Why don't you tell us how your nephew at Santander Bank

5   helped you complete that loan application.

6           THE COURT:  Did your nephew at Santander Bank help you

7   complete the loan application?

8           THE WITNESS:  Yes, he did.

9           THE COURT:  What did he do?

10          THE WITNESS:  Once I provided the fake income tax, he

11  placed the figures where it's appropriate.  In the application.

12  BY MR. FEE:

13  Q.  And to your understanding, sir, your nephew knew you were

14  lying on that application, correct?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Did you have an understanding as to

17  whether he knew you were lying?

18          THE WITNESS:  He did not know, sir.

19          THE COURT:  All right.

20  BY MR. FEE:

21  Q.  Santander is an international bank, correct, sir?

22  A.  I don't know how many countries he -- Santander's operates.

23  I have a knowledge of operating in the United States.

24  Q.  To your knowledge, sir, Santander is a sophisticated

25  financial institution, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen3                          Uribe - Cross

 1          THE COURT:  Sustained.

 2  BY MR. FEE:

 3  Q.  It's a big bank, you would agree, sir; there's many

 4  branches around the world of Santander?

 5          THE COURT:  I'll allow it if he knows.

 6          MS. POMERANTZ:  He just testified about not knowing

 7  outside of the United States.

 8          THE COURT:  Fair enough.  Rephrase it.

 9  BY MR. FEE:

10  Q.  Sir, what do you know about Santander Bank?

11  A.  It's a bank in, at least in New Jersey that I'm aware of a

12  couple of branches, and they have good service.

13  Q.  So it's a bank with a couple branches in New Jersey is your

14  testimony?

15  A.  To the best of my knowledge, sir.

16  Q.  Got it.

17      And you fooled that bank with false information on an

18  application, correct, sir?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  Sustained.

21          Did you give Santander Bank false information on a

22  loan application?  Yes or no.

23          THE WITNESS:  Yes, your Honor, I did provided the

24  false income tax to the application for the loan.

25  BY MR. FEE:

                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

O6bWmen3                              Uribe - Cross

1   Q.  And then you also used documents to defraud what's called

2   the U.S. Small Business Administration; you testified about

3   that, right?

4           MS. POMERANTZ:  Objection.  Those are two questions, I

5   believe.

6   BY MR. FEE:

7   Q.  Did you also use documents to defraud the United States

8   Small Business Administration, sir?

9   A.  I used a figures of the fake income tax to fill out the

10  Santander -- the SBA online application, sir.

11  Q.  You would agree that that was fraud?

12  A.  Yes.

13  Q.  And you testified that you understood that money from the

14  small business administration was intended for small businesses

15  experiencing economic distress, right?

16          MS. POMERANTZ:  Objection.

17          THE COURT:  I'll allow it.

18          MS. POMERANTZ:  Misstates.

19          THE COURT:  I'll allow it.

20  A.  Yes, I understand what the funds of the small business, SBA

21  loans are to be used for, sir.

22  Q.  And in truth, you were not entitled to that money from the

23  small business administration, correct?

24          MS. POMERANTZ:  Objection.

25          THE COURT:  I'll allow it.

O6bWmen3                              Uribe - Cross

1    A.   In truth, sir, the loan was available during pandemic.  I

2    was running a trucking company.  I could have fall in the

3    financial position like in many other companies did, and that

4    money would help me sustain my operation.

5    Q.   So you wanted the money, for sure, right?

6    A.   I wanted the money if I need it in case the pandemic would

7    continue and I would suffer financial loss to continue with the

8    business.

9    Q.   But you couldn't get the money without telling lies, right?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  Sustained.

12   BY MR. FEE:

13   Q.   You told those lies because you otherwise would not have

14   been able to get the money, as you understood it, right,

15   Mr. Uribe?

16            MS. POMERANTZ:  Objection.

17            THE COURT:  Sustained.

18            Why did you give the bank false information?

19            THE WITNESS:  Your -- I just have produced the fake

20   income tax to obtain the loans for the mortgage -- for the

21   purchasing of the trailers that I needed to run the business,

22   and the SBA loans were being available due to the pandemic, and

23   I just used the same figures that I already had.

24   BY MR. FEE:

25   Q.   False figures, right?

O6bWmen3                          Uribe - Cross

 1    A.  Yes.

 2    Q.  And then you also hid your income of your businesses from

 3    the IRS since 2011, right?

 4    A.  I failed to file some of the income tax, yes.

 5    Q.  And that means you hid from the IRS your actual business

 6    income for all of those years, correct?

 7    A.  I like to say that I file -- I failed to file those income

 8    tax return.

 9    Q.  By failing to file the income tax returns, you achieved

10    your goal of not paying taxes on any of that business income,

11    correct?

12            THE COURT:  I'll allow it.

13    A.  I did not pay my taxes for those years as of yet.

14    Q.  Did you just say as of yet?

15    A.  Correct.

16    Q.  So now that you have been caught, you've decided to start

17    repaying the taxes, right?

18            THE COURT:  Sustained.

19    BY MR. FEE:

20    Q.  Before you were cooperating with the U.S. government --

21    excuse me.

22        Before you were charged in this case, you had not paid your

23    corporate taxes since 2011, correct?

24    A.  My taxes were filed before I was charged.

25    Q.  Sir, you didn't pay a dollar of corporate taxes between

O6bWmen3                          Uribe - Cross

1    2011 and at least 2022, correct?

2    A.  Correct.

3        May I rephrase that?

4    Q.  Go ahead.

5    A.  Some of the -- some of the corporations file taxes here and

6    there, not in a consecutive years.  I don't have a recollection

7    of which one of the companies did that.

8    Q.  The reason you didn't do that was so that you could have

9    extra cash in your pocket, Mr. Uribe, right?

10   A.  The real reason is, sir, that I didn't paid enough

11   attention to file my taxes and pay the necessary attention to

12   go through the process, not because I have extra money to hide,

13   or the word that you just used.

14   Q.  Well, the fact is when you don't pay taxes, the money you

15   don't pay in taxes stays with you, right, Mr. Uribe?

16           MS. POMERANTZ:  Objection.

17           THE COURT:  I'll allow it.

18   A.  That would be in the case that the business are profitable

19   and I have money to pay the IRS.

20   Q.  But you weren't telling the IRS anything about your

21   businesses when you failed to file those taxes, right?

22   A.  That is correct.

23           MS. POMERANTZ:  Objection.

24   BY MR. FEE:

25   Q.  In any event, leading up to this trial, you actually did

1    tell lies in this courtroom already, correct?

2            MS. POMERANTZ:  Objection.

3            THE COURT:  Too argumentative, sir.

4            Have you lied here, sir, under oath?

5            THE WITNESS:  No, your Honor.

6    BY MR. FEE:

7    Q.  Well, you said on direct with this prosecutor, Mr. Uribe,

8    that you failed to request a renewal for one of your client's

9    policy at a proper time and that's what led to your guilty plea

10   in 2011.  Do you remember that testimony, sir?

11   A.  Yes, I did.

12   Q.  That was 100 percent false, correct?

13           MS. POMERANTZ:  Objection.

14           THE COURT:  Was that false?

15           THE WITNESS:  No, your Honor.

16   BY MR. FEE:

17   Q.  Mr. Uribe, do you remember about an hour ago saying that

18   you would accept that you defrauded five of your clients in

19   Inter America?

20           MS. POMERANTZ:  Objection, your Honor.  This misstates

21   and mischaracterizes testimony.

22           THE COURT:  I'll allow that.

23   A.  Not renewing the policy for one of the clients doesn't

24   equal the stemming of the seven fraud charges that the

25   statement that was from to me states.

O6bWmen3                          Uribe - Cross

1    Q.  Well, let's put aside what you were shown.  I want you to

2    tell me what you actually did to defraud your insurance clients

3    of Inter America.

4    A.  I fail -- I place policies with an unauthorized client,

5    insurers, that was not allowed to produce business in the state

6    of New Jersey, and my mistake was not checking the validity of

7    that company to perform business in the state.  That led to a

8    number of policies being illegal for the state of New Jersey.

9    Q.  Let me ask you, sir, you remember an old friend of yours

10   called José Suero, don't you?

11   A.  I don't have a recollection right now.

12   Q.  What about his company, Hoboken First Class Corp.; do you

13   remember that?

14   A.  Yes.  It comes to recollection, yes.

15   Q.  And you collected insurance premiums from José Suero and

16   the company, his company, Hoboken First Class Corp., for about

17   three and a half years, correct?

18   A.  I don't recall the exact number of years, sir.

19   Q.  For some amount of time, you collected insurance premiums,

20   money out of José Suero's pocket, to your company as insurance

21   premiums, correct?

22            MS. POMERANTZ:  Objection.  Assumes a fact.

23            THE COURT:  As I read this, it's not actually a

24   question, so why don't you rephrase it.

25   BY MR. FEE:

O6bWmen3                          Uribe - Cross

1    Q.  You collected insurance premiums from José Suero and his

2    company, Hoboken First Class Corp., for some amount of time,

3    correct?

4    A.  I recall having insure José Suero.

5    Q.  Well, you recall collecting insurance premiums from José

6    Suero, right?

7    A.  Yes.

8    Q.  Because what happened, Mr. Uribe, is that José Suero's limo

9    business, one of his limos got in an accident; do you remember

10   that?

11              MS. POMERANTZ:  Objection.

12              THE COURT:  Do you remember whether or not one of

13   Mr. Suero's limousines got into an accident?

14              THE WITNESS:  I don't have a recollection of that,

15   sir.

16              THE COURT:  OK.

17   BY MR. FEE:

18   Q.  Do you remember Mr. Suero coming to you and saying I went

19   to get coverage for this accident and the company said I had no

20   premium, Mr. Uribe -- excuse me -- I had no policy, Mr. Uribe?

21   A.  I don't have a recollection of that event, sir.

22   Q.  And you don't remember Mr. Suero then closing his business

23   and leaving the country, sir?

24              MS. POMERANTZ:  Objection.

25              THE COURT:  Sustained.

O6bWmen3                         Uribe - Cross

1   BY MR. FEE:

2   Q.  Do you know where Mr. Suero is now, sir?

3          MS. POMERANTZ:  Objection.

4          THE COURT:  I'll allow it.

5   A.  I don't know with -- I know he's in New Jersey.

6   Q.  He used to be your friend, correct?

7          THE COURT:  Sustained.

8          MS. POMERANTZ:  Objection.

9          THE COURT:  Is he your friend?

10          THE WITNESS:  Yes.

11          THE COURT:  Next.

12   BY MR. FEE:

13   Q.  And then, sir, you also testified in this courtroom on

14   Friday that on August 6 of 2019, you did not visit 41 Jane

15   Drive because you ate and fell asleep.  Do you remember that

16   testimony, sir?

17   A.  I fell asleep, yeah.  I remember the testimony.

18   Q.  That was also false, correct?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  Was your statement that you fell asleep on

21   August 6, 2019, false, sir?

22          THE WITNESS:  No, it was not.

23          THE COURT:  All right.  Next question.

24          MR. FEE:  Let's put up Government Exhibit 1322, pages

25   5, bottom of page 5 and top of page 6.

O6bWmen3                      Uribe - Cross

1    Q.  So you see here, Mr. Uribe, that on August 6 of 2019, at

2    8:16 p.m., you text Nadine Arslanian and say, are we good to

3    9:30 p.m.?  Do you see that, sir?

4    A.  Which line are you reading at?

5    Q.  Sure.  I'm reading line 49, August 6 --

6    A.  Yeah.

7    Q.  -- 2019.  You text Nadine, are we good to 9:30 p.m.  Do you

8    see that?

9    A.  I see it, sir.

10   Q.  And then the next line, 50, she responds, he just got out,

11   come over, 42 Jane Drive.  Do you see that?

12   A.  I see that as well.

13   Q.  And you testified "he" was Senator Menendez, right; that

14   was what your understanding was?

15   A.  That was my understanding.

16   Q.  Then line 51, she corrects the address, do you see that, 41

17   Jane?

18   A.  Yes.

19   Q.  Line 52, she says, he is two minutes away and said have

20   José come over.  Do you see that?

21   A.  Yes.

22   Q.  And so, to go back to line 50, at 10:20 p.m., she says come

23   over, correct?

24   A.  OK.

25   Q.  Do you see that, sir?

1    A.  Right.

2    Q.  And then the next time you text Nadine on this chart is the

3    next morning, at 6:45 a.m., correct?

4    A.  Yes.

5    Q.  And you say:  I came home like around noon 9:35 to eat.  My

6    sister send me some food.  I passed out after that.  I am so

7    sorry.  I was tired.  And then you send another text a few

8    hours later, are you mad at me?

9        Do you see those two messages?

10   A.  Yes, I see it.

11   Q.  So if we go back to this text where Nadine says, come over,

12   isn't it true, sir, that just one minute before that text you

13   were on another phone call with another person?

14   A.  I don't recall that, sir.

15   Q.  And isn't it also true that at 10:45 p.m. you took another

16   phone call with another person?

17   A.  I don't recall that.

18   Q.  And you were just avoiding Nadine because you weren't ready

19   to have that meeting with Senator Menendez, sir?

20   A.  I don't have the recollection of that, sir.

21        MR. FEE:  Let's show Government Exhibit 1435,

22   paragraph 23, please, Mr. Kelly.  This is in evidence.

23        Just the first paragraph is fine.

24   Q.  You see here, Mr. Uribe, it says the call number

25   201-681-3520 is assigned to a phone that was taken from you; do

O6bWmen3                    Uribe - Cross

1  you see that, Mr. Uribe?

2  A.  Yes, I see it, sir.

3  Q.  And that phone is your phone number?

4  A.  Yes, it is.

5          MR. FEE:  Let's just show the witness and the

6  government what's been marked as Defense Exhibit 829, page 7.

7  And let's focus on the rows on the late evening of April 6.

8  Q.  Mr. Uribe, do you see your phone number indicated there?

9  A.  I see it.

10         MR. FEE:  And then Mr. Kelly, if you can go out.

11 Q.  Next to where it says call records, is that your number,

12 Mr. Uribe?

13 A.  Yes, it is.

14         MR. FEE:  Your Honor, we would offer what's been

15 marked as DX 829, which has already been authenticated pursuant

16 to stipulation marked as Government Exhibit 1434.

17         MS. POMERANTZ:  Your Honor, may I have a moment?

18         THE COURT:  Yes.

19         Don't talk into the mic.

20         MS. POMERANTZ:  Your Honor, brief voir dire.

21         THE COURT:  Yes.

22 VOIR DIRE EXAMINATION

23 BY MS. POMERANTZ:

24 Q.  Mr. Uribe, do you know if this is Eastern time or a

25 different time zone?

O6bWmen3                          Uribe - Cross

1    A.  That would be Eastern time.

2              MS. POMERANTZ:  No objection.

3              THE COURT:  All right.  Admitted.

4              (Defendants' Exhibit 829 received in evidence)

5              THE COURT:  Is this thousands of phone records?

6              MR. FEE:  No.  It's just eight pages over the dates of

7    interest, your Honor, and I'm only going to ask him about a few

8    entries.

9              THE COURT:  Admitted, without objection.

10             MR. FEE:  Let's focus in on the late evening of August

11   6, 2019, Mr. Kelly, and publish for the jury.

12   Q.  And so, Mr. Uribe, on the left --

13             MR. FEE:  Mr. Kelly, are you able to do that where you

14   have the column headings blown up as well?

15             Thank you.

16   Q.  So, Mr. Uribe, do you see under calling-NBR your phone

17   number ending in -3520 in the first highlighted row?

18   A.  I see it.

19   Q.  OK.  And then it says under dialed digits a different phone

20   number.  Do you see that number ending in 5904?

21   A.  I see it.

22   Q.  Do you know whose number that is, Mr. Uribe?

23   A.  Probably, it could be George Martinez number.

24   Q.  Your friend Jorge?

25   A.  Jorge.

O6bWmen3                              Uribe - Cross

1   Q.  George Martinez.  OK.

2       And then you see it says start date in Eastern time, August

3   6, 2019, at 2208.  Do you see that?

4   A.  I see it.

5   Q.  And you agree that 2208 in 12-hour time would be 10:08

6   p.m., correct?

7   A.  That's correct.

8   Q.  And the end date column indicates, for that call on August

9   6 of 2019, it ended at 10:19 p.m., converting it, is that

10  correct?

11  A.  Correct.

12  Q.  And the duration of that call was 611, it appears, seconds,

13  right, Mr. Uribe?

14  A.  I don't know what's 611 means.  Seconds, OK.

15  Q.  Fair enough.  I will just point out, you see the column

16  says duration and then in parentheses SEC?

17  A.  Yes.

18  Q.  And then the next highlighted row, Mr. Uribe, do you see

19  it's a different number in the first column ending in -9207?

20  Do you see that number?

21  A.  I'm not locating myself, sir.

22  Q.  Sure.  Sure.  It's the second highlighted row.

23  A.  OK.

24  Q.  I'm circling it.  Do you see the number ending in 9207?

25  A.  OK.

O6bWmen3                        Uribe - Cross

1    Q.  Do you know whose number that is offhand?

2    A.  Don't know.

3    Q.  All right.  But the called number is your cell phone,

4    correct, ending in 3520?

5    A.  Yes.

6    Q.  And the start date of that call indicates August 6, 2019,

7    at 10:45 p.m., right?

8    A.  Correct.

9    Q.  And it ends about 30 seconds later, at 10:45 and 44

10   seconds, correct?

11   A.  Correct.

12   Q.  So you would agree, sir, that your cell phone was taking

13   and receiving calls from 10:08 p.m. on August 6, with a break,

14   and then again at 10:45 p.m. on August 6 of 2019, correct?

15   A.  Correct.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1   BY MR. FEE:  (Continuing)

2   Q.  You can put that down.

3       In fact, even later than that, you were reading text

4   messages on your cell phone including one at 12:59 a.m.

5   Eastern.  Do you remember that, sir?

6   A.  I don't recall that, sir.

7           MR. FEE:  Let's put up, just for the witness and the

8   lawyers, DX 1034 and you can focus in on there.

9   Q.  Sir, in the "to" line you see your cell phone number ending

10  in 3520?

11  A.  Yes.

12  Q.  And the "from" line, is that number ending in 9207.  Do you

13  see that?

14  A.  I see it.

15  Q.  And you also see the date there, sir?

16  A.  August 7 --

17  Q.  You don't have to read it.  I'm sorry to interrupt.  It is

18  not in evidence yet.

19  A.  OK.

20  Q.  Do you see the date there?

21  A.  I see it.

22          MR. FEE:  Your Honor, this has been authenticated

23  pursuant to stipulation.  The stipulation is Government Exhibit

24  1435.  We would offer just this one page as Defendant's Exhibit

25  1034.

1              MS. POMERANTZ:  No objection.

2              THE COURT:  Admitted, 1034.

3              (Defendant's Exhibit 1034 received in evidence)

4              MR. FEE:  If we can publish that and zoom in on the

5      text, please, a little bit more?

6      BY MR. FEE:

7      Q.  So just briefly again, Mr. Uribe, Samy is the "from",

8      right?

9      A.  Correct.

10     Q.  And you are the "to"?

11     A.  Correct.

12     Q.  And it says:  Do you see the words here read August 7, 2019

13     at 00:59?  Do you see that?

14     A.  Correct.

15     Q.  And that converted to 12-hour time is 12:59 a.m. on

16     August 7, sir?

17     A.  OK.

18             MR. FEE:  You can put that down.  Putting back up

19     Government Exhibit 1322, focusing on row 54, please.

20     Q.  Sir, would you now agree that when you testified on Friday

21     that you had in fact fallen asleep at the time Nadine invited

22     you over at 10:20 p.m., that was false?

23             MS. POMERANTZ:  Objection.  Misstates testimony.

24             THE COURT:  Did you testify, sir, that you had fallen

25     asleep when Nadine invited you over at 10:20 p.m.?

O6B5men4                              Uribe - Cross

1             THE WITNESS:  Yes, your Honor.

2             THE COURT:  Is that true or false?

3             THE WITNESS:  Your Honor, I ate.  I fell asleep.  The

4   fact that George could have called me, the fact that Sammy sent

5   me a text doesn't mean that I didn't wake up in between.  My

6   cell phone is sleep by my bed.

7   Q.  Isn't it true, sir, that you were actually avoiding have a

8   face-to-face meeting with Senator Menendez because your story

9   was not yet ready?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  Sustained.

12  Q.  Sir, were you in fact avoiding a face-to-face meeting with

13  Senator Menendez on August 6, 2019?

14            THE COURT:  I will allow that.

15  A.  No, sir.

16            THE COURT:  I'm sorry.  I didn't mean to speak over

17  you, sir.  What did you say?

18            THE WITNESS:  No, sir.

19            THE COURT:  All right.

20  Q.  Let's turn to your testimony about your first phone call

21  with Nadine Arslanian in March of 2019.  Do you remember

22  testifying about that phone call, sir?

23  A.  Yes, I do.

24  Q.  And you testified that Nadine was complaining that the men

25  in her life had promised her things but had never come through.

O6B5men4                          Uribe - Cross

1    Do you remember that testimony?

2    A.  I remember.

3    Q.  One of the things she was complaining about was that Will

4    Hana would not give her a job; correct, sir?

5    A.  Correct.

6    Q.  I'm sorry.  I spoke over you.  What was your answer?

7    A.  Correct, sir.

8    Q.  Another thing she was complaining to you about on this

9    phone call was that Will would not give her the car that she

10   wanted, Nadine; right, sir?

11   A.  I don't know if I testified saying that he will not.  I

12   testified to the fact that Will hasn't provided the car that he

13   promised to her.

14   Q.  Sir, do you remember being asked the question and giving

15   this answer:

16   "Q   What did she complain about with respect to Will?

17   "A   Among other things, that Will did not provide her the car

18   that she wanted."

19       Do you remember giving that answer in response to that

20   question, sir?

21   A.  I don't remember the words by words, but if you want to

22   show me the transcript I will play the transcript.

23   Q.  Is the substance consistent with your recollection,

24   Mr. Uribe?

25   A.  In substance, it is.

1    Q.  So car, job, and you also testified about, or you have

2    spoken in the past about a carpet that Nadine believes Will had

3    promised to repair?

4            MS. POMERANTZ:  Objection; compound, and I'm not sure

5    where we are placing this.

6            THE COURT:  Simplify the question.

7            MR. FEE:  Yes, your Honor.

8    Q.  Were you also aware that Nadine was upset that Mr. Hana had

9    not fixed a carpet in Nadine's home?

10   A.  That's what she relayed to me, yes.

11   Q.  And Mr. Hana also told you that he had promised to repair

12   that carpet for Nadine, right?

13   A.  Yes.

14   Q.  And sir, my question is during this conversation Nadine

15   never mentioned Senator Menendez when she was complaining about

16   her car, the job, or the carpet; right?

17           MS. POMERANTZ:  Objection.

18           THE COURT:  I will allow it.

19           Did she mention Senator Menendez during that

20   conversation?

21           MS. POMERANTZ:  Your Honor, I just wanted to be clear

22   on which conversation.

23           THE COURT:  All right.

24   Q.  Mr. Uribe, in any conversation you ever had with Nadine,

25   isn't it true that she never told you that she -- Nadine -- had

1    asked Senator Menendez for help buying a car, getting a job, or

2    paying her mortgage?

3    A.  I don't have the recollection of Nadine saying that she

4    asked those things from Senator Menendez.

5    Q.  In your memory today not once do you remember Nadine ever

6    saying anything like that to you about Senator Menendez;

7    correct?

8                MS. POMERANTZ:  Objection.  Vague.

9                THE COURT:  Yes.  Please lodge it into the

10   conversation.

11   Q.  Nadine never texted you, Mr. Uribe, to convey to you that

12   she was asking Senator Menendez for help paying for a Mercedes;

13   correct?

14   A.  I would like you to rephrase the question if you don't

15   mind, sir.

16   Q.  Sure.

17       Nadine never texted you to tell you that Nadine had asked

18   Senator Menendez with help buying a Mercedes?

19   A.  I don't have a recollection of receiving such text.

20   Q.  Nadine never called you to convey that she had asked

21   Senator Menendez for help buying a Mercedes, correct?

22   A.  Correct.

23   Q.  Nadine never called or texted or told you face to face that

24   she asked Senator Menendez for help buying a Mercedes, correct?

25   A.  I don't have a recollection of her texting.

O6B5men4                              Uribe - Cross

1    Q.  Nadine never called, texted, or told you face to face that

2    she had ever asked for Senator Menendez for help paying

3    Nadine's mortgage; correct?

4    A.  That is correct.

5    Q.  And sir, in truth you understood why Nadine was not asking

6    Senator Menendez for help with these things; correct?

7              MS. POMERANTZ:  Objection.

8              THE COURT:  Sustained.

9    Q.  Sir, you were aware that Senator Menendez had broken up

10   with Nadine in December 2018 because she was causing too much

11   drama; right?

12             MS. POMERANTZ:  Objection.

13             THE COURT:  Sustained.

14   Q.  Sir, are you aware that Senator Menendez and Nadine

15   actually broke up in December 2018?

16             MS. POMERANTZ:  Objection.

17             THE COURT:  I will allow that.

18   A.  I am not aware of such.

19   Q.  Based on your interactions with Nadine, you have no

20   information indicating that Nadine expressed to Senator

21   Menendez her concerns about her car, her mortgage, or her job;

22   correct?

23             MS. POMERANTZ:  Objection.  Vague.

24             THE COURT:  Did Nadine ever say to you, either orally,

25   by text, by e-mail, written, that she had asked Senator

O6B5men4                          Uribe - Cross

 1   Menendez for help paying for her car or for paying her

 2   mortgage?

 3             THE WITNESS:  I don't have a recollection of that,

 4   sir.

 5             THE COURT:  OK.

 6   Q.  And sir, when you testified that Nadine complained to you

 7   about how men didn't come through in her life with the promises

 8   they had made to her before, you did not understand her to be

 9   referring to Senator Menendez; correct?

10   A.  She did not mention in those statements which men she was

11   referring to, sir.

12   Q.  So she was complaining to you about how these other men,

13   besides Senator Menendez, had broken her promises; right?

14             MS. POMERANTZ:  Objection.

15             THE COURT:  Sustained.

16   Q.  Well, she was complaining to you about how other men, like

17   Will Hana, had broken their promises to her; correct?

18   A.  That I do remember, sir.

19   Q.  And you viewed this as an opportunity; correct, sir?

20             MS. POMERANTZ:  Objection.

21             THE COURT:  I don't understand the question.

22   Q.  Sir, when Nadine expressed to you that other men had broken

23   promises to her, you in fact made a promise to her; isn't that

24   correct?

25   A.  Yes, I did.

O6B5men4                          Uribe - Cross

1   Q.  And you promised her you would stand by your word to get

2   her her dream car; right?

3   A.  At the time of the phone call I promised her that I will

4   provide the car that she needed.  I did not know which kind of

5   car she was talking about.

6   Q.  But there was a condition to your promise to help her get

7   that car; right?

8   A.  To help my family.

9   Q.  You told her you will help her get this car, so long as she

10  promises to help your family; right?

11  A.  In the substance, yes.

12  Q.  And, in fact, Nadine said to you that if you help her get

13  this car, she will do anything she can to help your family;

14  right, sir?

15  A.  We are still referring to the phone call with Nadine,

16  correct?

17  Q.  Correct, sir.

18  A.  Yes, she did.

19  Q.  And you testified that anything, as you understood Nadine

20  to be saying, included Nadine speaking to the senator about

21  your request for help; right?

22           MS. POMERANTZ:  Objection, your Honor; misstates.

23           THE COURT:  I don't understand the question.

24  Q.  Sir, do you remember hearing these questions and giving

25  these answers:

1    "Q   After you told Nadine that you would get her a car if she

2    helped you, what did she say in response?

3    "A   She would speak to the senator and she would do anything

4    that is possible, can do, to help me get this taken care of.

5    "Q   Did she say how Robert Menendez would help you?

6    "A   She did not go into those details."

7        Do you remember hearing those questions and giving those

8    answers during your testimony with this prosecutor?

9    A.   I remember.

10   Q.   My question to you is your understanding of what Nadine

11   meant by "anything" included manipulating Senator Menendez with

12   you; isn't that correct, sir?

13               MS. POMERANTZ:  Objection.

14               THE COURT:  Sustained.

15               Mr. Fee.  No argumentation.  Manipulative?  Please.

16   Q.   I want to ask you your understanding, Mr. Uribe.  Did you

17   understand her to be promising to help you deceive Senator

18   Menendez?

19               MS. POMERANTZ:  Objection.

20               THE COURT:  Sustained.

21   Q.   Let's fast forward.  You helped Nadine get the car, right?

22   A.   Yes, I did.

23   Q.   And after you helped Nadine get the car, she stopped

24   responding to you as quickly; right?

25   A.   Ask me that question again?

O6B5men4                          Uribe - Cross

1   Q.   Sure.  After you helped Nadine get the car, she stopped

2   responding to you as quickly when you reached out?

3   A.   I don't -- I don't understand your question, sir.

4   Q.   After you helped Nadine get her car and you sent her a

5   message, isn't it true that there are sometimes days or weeks

6   where she would not respond to your message?

7   A.   Based on my recollection I remember she picked the car up

8   and we communicated for a couple of days, and then it could be

9   days or weeks that she couldn't or she didn't reply to my text;

10  yes.

11          MR. FEE:  So let's put up Government's Exhibit

12  B209-23, page 170.  This is in evidence and let's focus in on

13  the two messages, please.

14  Q.   So, Mr. Uribe, you will notice the "from" line, that's your

15  cell phone number ending in 3520; right?

16  A.   Yes, I do.

17  Q.   And the "to" line is Nadine -- it indicated it is Menendez

18  but you knew her as Nadine Arslanian, correct?

19  A.   Correct.

20  Q.   And it is you telling her:  Good morning.

21          Do you see that?

22  A.   Yes, I see that.

23  Q.   And then the date of the message on the bottom right says

24  October 3, 2019; do you see that?

25  A.   Yes.

1    Q.  And then the red column indicates that Nadine Menendez read

2    this message about nine days later, October 12.  Do you see

3    that?

4    A.  I see it.

5    Q.  And then there is no response beneath that in this exhibit

6    until the message where you state to Nadine:  You don't love me

7    anymore.

8         Is that correct, sir?

9    A.  I see it.

10   Q.  And then again it is sent on October 8 of 2019, the

11   message:  You don't love me anymore.

12         Do you see that, sir?

13   A.  I see it.

14   Q.  And it is read by Nadine October 12, again several days

15   later.  Do you see that, sir?

16   A.  Yes.

17   Q.  And this was after Nadine had gotten the car with your

18   assistance; correct?

19   A.  It is about seven, eight months later after she got the

20   car -- about six months later after she got the car.

21   Q.  That was April to October, sir?

22   A.  Yes.

23         MR. FEE:  Let's put up Government Exhibit B209-23.  It

24   is the same exhibit.  I'm sorry, let's go to the next, page

25   172.  And we can focus in on the top two.

1   Q.  So Nadine responds on October 12, at the top, Mr. Uribe.

2   Do you see this response?

3   A.  I am looking at it, sir.

4   Q.  Yes, sir.

5   A.  OK, sir.

6   Q.  And then you respond minutes later in blue.  The green

7   message from Nadine is at 11:11 a.m. and then that's on

8   October 12, and then you respond at 11:15 that same day.  Do

9   you see that, on the bottom left of your screen, Mr. Uribe?

10  A.  Yes.

11  Q.  And you state:  Hello Hermana.  You got me worried.  You

12  never reply to me for over two weeks.  Andy is fine, he is on

13  vacation until Monday.  Say hello to Bob for me.

14      My question to you, Mr. Uribe, is when you said to Nadine

15  "you don't love me anymore," were you concerned that Nadine had

16  used you to get the car?

17  A.  Not at all, sir.  That was an expression from me to Nadine

18  in a, actually a friendly question, kind of like a joke, but

19  that she used me never crossed to my mind.

20  Q.  So you were joking in that instance but you were genuinely

21  concerned that she wasn't giving you updates about the case;

22  correct?

23          MS. POMERANTZ:  Objection.

24          THE COURT:  I will allow it.

25          Were you concerned that she was not giving you updates

O6B5men4                          Uribe - Cross

1     about the case?

2             THE WITNESS:  Yes.

3     Q.  Because your end of the bargain with Nadine was to help her

4     get a car; right?

5     A.  Could you repeat your question?  I missed some of the

6     words.

7     Q.  Sure.

8         Your understanding of the agreement you had made with

9     Nadine was that you would help her get a car; right?

10    A.  Correct.

11    Q.  And you did in fact help her get a car; right?

12    A.  Yes, I did.

13    Q.  And your understanding of that agreement with Nadine is

14    that she would help you get access to the senator, correct?

15            MS. POMERANTZ:  Objection.

16            THE COURT:  Sustained.

17    Q.  Sir, wasn't it your hope that getting Nadine the car would

18    enable you to make your request to Senator Menendez to help

19    you?

20            MS. POMERANTZ:  Objection.

21            THE COURT:  I will allow that.

22    A.  Yes.  That was the purpose of it.

23    Q.  And your testimony, sir -- you can put that down,

24    Mr. Kelly -- was that so far as you are aware, you never

25    mentioned to Senator Menendez that you helped Nadine get a car;

O6B5men4                          Uribe - Cross

1    right?

2    A.  In any of the conversations or meetings that we had

3    sustained at this point I discussed with Senator Menendez the

4    car or the payment for the car?  In fact, we did not talk about

5    a car at all.

6    Q.  I just want to make sure I understand.  You never discussed

7    the car with Senator Menendez; right?

8    A.  I sustain that.

9    Q.  Sustain means you agree?

10   A.  I agree with you, sir.

11   Q.  Thank you.

12        And Nadine never told you that she had told Senator

13   Menendez that you helped her get the Mercedes, right?

14   A.  She never told me that.

15   Q.  And I just want to understand to your knowledge who knew

16   about your help getting the Mercedes for Nadine.  Can I ask you

17   some questions about that?

18   A.  You can ask me the question.

19   Q.  Thank you.

20        You told Mr. Hana about helping Nadine get the car, right?

21   A.  Yes, I did.

22   Q.  And based on your testimony, sir, Mr. Hana was in on this

23   deal; right?

24   A.  Yes.

25   Q.  You told Nadine, obviously, that you had helped her get a

O6B5men4                              Uribe - Cross

1   car, right?

2   A.  Yes.

3   Q.  Because that was the whole point of this deal, right?  For

4   Nadine that was the point, sir?

5          MS. POMERANTZ:  Objection.

6          THE COURT:  If he knows.

7   A.  What I understand is that Nadine was promised from Will a

8   car from the proceeds he was going to get from the payment from

9   Mr. Hernandez and Mr. Parra.

10  Q.  I understand.  So to your knowledge, Nadine obviously knew

11  she was getting a car out of this arrangement; right?

12         MS. POMERANTZ:  Objection.

13         THE COURT:  I will allow it.

14  Q.  Did you answer that question?  Do you want to hear it

15  again?

16  A.  Can you rephrase the question for me, please?

17  Q.  Sure, sure.

18         You understood that Nadine got a car out of the arrangement

19  you had made with her, right?

20  A.  Nadine got the car because I promised I was going to get a

21  car that Will had promised to her.

22  Q.  That's right.  You also understand or know that Elvis Parra

23  knew that you had helped Nadine get this Mercedes, correct?

24         MS. POMERANTZ:  Objection.

25         THE COURT:  Did you know whether Elvis Parra knew you

O6B5men4                    Uribe - Cross

1    had helped Nadine to get the Mercedes?

2              THE WITNESS:  I will make an assumption of that.

3              THE COURT:  No.  No assumptions.  No assumptions.

4              THE WITNESS:  Can I answer it, please?

5              THE COURT:  Yes.

6              THE WITNESS:  Your Honor, my conversation about

7    getting the car to Nadine was with Bien Hernandez, Mr. Parra's

8    partner.

9              THE COURT:  All right.

10   BY MR. FEE:

11   Q.  So Bien Hernandez definitely knew about the arrangement to

12   get Nadine a car?

13             MS. POMERANTZ:  Objection.

14   A.  Yes, he did.

15   Q.  Your friend that you mentioned, Jorge Martinez, to your

16   knowledge, did not know about this arrangement to give Nadine a

17   car; correct?

18   A.  At which point, sir?

19   Q.  At any point before you were charged publicly in this case.

20   A.  I shared some of the things with George at a point, yes.

21   Q.  Let's talk about when all of this was happening, in 2019

22   and 2020; did you tell Jorge Martinez that Nadine was getting a

23   car from you?

24   A.  I must have told George at a point in time, yes.  I don't

25   have it -- I can't place it on date and time.

O6B5men4                              Uribe - Cross

1   Q.  And you never had that discussion with Jorge Martinez or

2   George Martinez about Nadine getting a car in front of Senator

3   Menendez; correct?

4   A.  You are correct on that.

5   Q.  You didn't tell Fred Barruos about Nadine getting a car out

6   of this arrangement with you; right?

7            MS. POMERANTZ:  Objection.

8            THE COURT:  Did you tell Barruos that Nadine was

9   getting a car from you?

10           THE WITNESS:  I told Fernando that I was getting a car

11  for Nadine, yes.

12  Q.  But you didn't tell him why, right?

13  A.  That is correct, sir.

14  Q.  Because Mr. Barruos was not a part of this scheme about

15  which you have testified; right?

16           MS. POMERANTZ:  Objection.

17           THE COURT:  Yes, characterization of scheme.

18  Q.  Mr. Barruos was not aware of your arrangements with Nadine

19  Arslanian, correct, beyond the fact that she was getting a car?

20  A.  Correct.

21  Q.  And your testimony is that you did not tell Senator

22  Menendez that Nadine was getting a car; right?

23  A.  Senator Menendez and I never spoke about the car nor the

24  payment to the car, for the car.

25  Q.  Now, you testified that you first met Senator Menendez face

1  to face at a dinner in June of 2018 or thereabouts; is that

2  correct, sir?

3  A.  I don't remember setting a place and time on that first

4  encounter with Senator Menendez.

5  Q.  Do you remember it taking place at Il Villaggio, the

6  restaurant, your first meeting with Senator Menendez?

7  A.  The first time I encounter with the senator, face to face,

8  was at the fund raiser, sir.

9  Q.  When was the first time you had a meal with him?

10 A.  The meal with the senator would be at the Villaggio

11 where -- yes, at the Villaggio.

12 Q.  And, in fact, you actually tried to skip that dinner at the

13 last moment; isn't that right?

14 A.  I don't have a recollection of that, skipping that meal.  I

15 remember being at the meal.

16        MR. FEE:  Let's put up what is in evidence as B105-7

17 at 2:34.  Let's zoom in on the last two messages.

18 Q.  Sir, you are not on this message but you see from Will Hana

19 to Nadine Arslanian there?

20 A.  Yes, I see it, sir.

21 Q.  And then the bottom message on this chain is dated June 1

22 at 7:40 p.m. and it is Will telling Nadine:  Ask him to have

23 dinner at the Italian restaurant on Route 17.

24        Do you see that, Mr. Uribe?

25 A.  Yes, I see it.

1          MR. FEE:  Let's go to the next page, please, and just

2    focus in on the -- all three messages, actually.

3    Q.  And you see it says with José and I?

4    A.  I see the text.

5    Q.  But after this dinner was arranged, you actually told

6    Mr. Hana to cancel it because you said we are not ready.  Do

7    you remember that?

8    A.  I don't have a recollection of such a statement.

9          MR. FEE:  Let's put up, only for the witness, the

10   attorneys what has been marked as DX 832, and focus in on rows

11   679 and 680.

12   Q.  Mr. Uribe, without reading any of the text in the message,

13   do you see your phone number here ending there 3520?

14   A.  Yes, that's my phone number.

15   Q.  And you see the time listed as May 31, 2018?

16   A.  Yes, it is.

17         MR. FEE:  Your Honor, we would offer just -- we would

18   actually offer DX 832 which is a portion of the authenticated

19   exhibit GX C116.

20         MS. POMERANTZ:  Your Honor, we haven't seen this so we

21   need an opportunity to look.

22         THE COURT:  All right.  Go ahead.  What is DX 832,

23   sir?  Is that up?

24         MR. FEE:  It is up.  This is 832.  You can zoom out.

25         THE COURT:  What is in front of me is?

O6B5men4                        Uribe - Cross

1            MR. FEE:  If you can zoom out, Mr. Kelly?

2            THE COURT:  It is that page?

3            MR. FEE:  This page, your Honor.

4            MS. POMERANTZ:  No objection.

5            THE COURT:  Admitted.

6            (Defendant's Exhibit 832 received in evidence)

7            MR. FEE:  If you can publish and focus in on rows 679

8    and 680, please?

9    Q.  Mr. Uribe, do you see that you write here, and it is going

10   in reverse chronological so the earlier message in time is in

11   row 680 and it is from you --

12   A.  I see that.

13   Q.  -- dated May 31, 2018 at 10:54 a.m.  Do you see that?

14   A.  I see it.

15   Q.  And it says:  Cancel tomorrow meeting.  We are not ready.

16   We need to have a definition of the fundraiser before we meet.

17   We have to clear the air with Andy so we do not.

18       Mr. Uribe, do you remember telling Mr. Hana on May 31 that

19   we are not ready?

20   A.  I don't have that recollection, sir.

21   Q.  And then in the next message, three seconds later on that

22   same day you write:  Look stupid.

23       Mr. Uribe, you were concerned about presenting the right

24   image to Senator Menendez when you met him; right?

25   A.  Correct.

1  Q.  You wanted him to think of you as a legitimate businessman;

2  right?

3  A.  Yes.

4  Q.  You wanted him to think of you as a leader in the trucking

5  business -- trucking insurance business, correct?

6  A.  That's not true.

7  Q.  You wanted him to think of you as a person who was

8  successful in your business; right?

9  A.  That's no -- I cannot say that that was what was in my mind

10  when I wanted to meet Senator Menendez.

11  Q.  Well, it was in your mind that you wanted Senator Menendez

12  to understand that you had family values; right?

13  A.  That's important to me, yes.

14  Q.  And that you were a good citizen who cared about his

15  community; correct?

16  A.  That's not what was in my mind.

17  Q.  Let's look at rows --

18          THE COURT:  What did you intend to say -- well, do you

19  remember saying:  Cancel tomorrow meeting.  We are not ready.

20          THE WITNESS:  I don't have a recollection of this

21  text, sir.

22          THE COURT:  OK.

23          MR. FEE:  Let's look slightly later in time on this

24  same exhibit starting at 6:31 p.m. at 45 seconds -- oh, it is

25  on the same page?  I'm sorry.  Put it down from the jury,

1    Mr. Kelly.

2          Your Honor, we would also offer this page.  I thought

3    it was on the same page, it is the only other one we

4          MS. POMERANTZ:  Your Honor, we weren't provided these

5    before.  I haven't had the opportunity to look.

6          MR. FEE:  Oh, it is the same page.  It is the same

7    page.

8          THE COURT:  Let's establish whether it is or it isn't.

9          MR. FEE:  Is it the same page, Mr. Kelly?  Yes, it is

10   already in evidence so we can put it on for the jury.

11         Mr. Uribe, let's look at row 673 at 6:31 p.m. --

12         We can put it on for the jury, Mr. Kelly.

13   Q.  At 6:31 p.m. you write:  I don't like this but I will be

14   there.

15         Do you see that, Mr. Uribe?

16   A.  I see it.

17   Q.  And then there is an outgoing message in row 672 that says:

18   Don't worry.

19         And then an incoming message from you that says:  Do not

20   like this.

21   A.  Correct.

22   Q.  And your memory is that you did in fact go to this dinner

23   at Il Villaggio with Senator Menendez, Nadine, and Will Hana;

24   right?

25   A.  I don't recall going to the Il Villaggio on June of 2018 to

1    the Il Villaggio.  I do remember that there is a dinner at the

2    Villaggio after the fundraiser and I don't recall the date and

3    time.  I just recall it is a couple of weeks later, the

4    fundraiser.  So this 6/1 text do not bring to my recollection

5    any details of Nadine around those days with the Senator, Will,

6    and myself.

7    Q.  Let's put up Government Exhibit B105-7 already in evidence,

8    page 242, please.

9         Sir, do you remember going to a dinner at Il Villaggio with

10   Nadine, Senator Menendez, and Will Hana; right?

11   A.  I have a recollection of that dinner, yes.

12   Q.  Let's focus on the green, the whole message, and it is

13   dated June 12, 2018, 10:56 a.m. and it says to Nadine to Will:

14   I gave up my romantic anniversary dinner for a friend who I

15   would never turn my back on.  Hope you like the pictures.

16        Do you see that, Mr. Uribe?

17   A.  I see the first message.  Yes, I see it.

18             MR. FEE:  And then if we can zoom in on the third

19   photo down that Nadine attaches, I think it is grainy but zoom

20   in for a moment, Mr. Kelly.  And then let's put up what the

21   government admitted as B105-0.

22   Q.  That's you; right, Mr. Uribe?

23   A.  That is me.

24   Q.  Did you know that Senator Menendez had been told that he

25   was attending his two-month anniversary dinner at Il Villaggio

 1  that night?

 2              MS. POMERANTZ:  Objection.

 3              THE COURT:  Sustained.

 4  Q.  Did it come up during the dinner that Senator Menendez was

 5  under the belief that this was an anniversary dinner?

 6              MS. POMERANTZ:  Objection.

 7              THE COURT:  Sustained.

 8  Q.  Do you remember at that dinner it being discussed that

 9  Senator Menendez had thought it was an anniversary dinner with

10  Nadine?

11              MS. POMERANTZ:  Objection.

12              THE COURT:  I will allow it.

13  A.  I don't have a recollection of such discussion, sir.

14  Q.  But the fact is you knew that you had a relationship with

15  Nadine, a friendly relationship, going back much farther as of

16  2018 than Senator Menendez did, right?

17              MS. POMERANTZ:  Objection.

18              THE COURT:  Sustained.

19              Do you know when the Senator Menendez' relationship

20  Nadine began, sir?

21              THE WITNESS:  No, your Honor.

22              THE COURT:  OK.

23  BY MR. FEE:

24  Q.  You first started hanging out with Nadine at a bar called

25  Regina's Steak House in Teaneck, New Jersey in around 2007;

O6B5men4                              Uribe - Cross

1    right?

2              THE COURT:  Did you first meet Nadine at a bar in

3    Teaneck in or around 2007?

4              THE WITNESS:  Your Honor, I have no recollection of

5    the year and place where I first met Nadine.

6              THE COURT:  All right.

7    Q.  Well, you had known her, as of 2018, for over 10 years;

8    right?

9    A.  I will say best of my recollection; yes.

10   Q.  I'm sorry.  I didn't hear the answer.

11   A.  I will say, yes, to my recollection.

12   Q.  And this pattern of avoiding meetings with the Senator --

13             THE COURT:  Sustained.

14   Q.  Mr. Uribe, you continued to avoid face-to-face meetings

15   with the senator --

16             THE COURT:  Sustained.

17   Q.  Mr. Uribe, you continued to avoid meeting the senator after

18   this first dinner; correct?

19             THE COURT:  Sustained.

20             MR. FEE:  Basis, your Honor?

21             THE COURT:  Improper assumption in the question.

22             MR. FEE:  Let's put up Government Exhibit 1303, rows

23   956 and --

24             THE COURT:  You have to have support in the record

25   behind the question, sir.  Go ahead.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6B5men4                          Uribe - Cross

1          MR. FEE:  -- 956 to 958.

2     BY MR. FEE:

3     Q.  Mr. Uribe, you see here in row 956 you texted Nadine:  Call

4     me when you have an update.  I don't want to bother you.

5          Do you see that?

6     A.  I am trying.  Which line would that be, sir?

7     Q.  The first line in the zoomed in box that is being

8     highlighted, row 956.

9     A.  956, that would be the second one.

10    Q.  Do you see that, Mr. Uribe:  Call me when you have an

11    update, I don't want to bother you.

12    A.  I see it.

13    Q.  And then Nadine responds:  I will.  If he finishes early

14    tonight let's meet.  He is here all next week so far.

15         Do you see that, Mr. Uribe?

16    A.  Yes, I see it.

17    Q.  And then you say:  Great I will be at office all day.

18    Please do not push him.  I know he is a busy person.

19         Do you see that?

20    A.  Yes, I do.

21    Q.  And then let's go to Government Exhibit -- so you did not

22    see him that day on August 2, 2019; correct?

23    A.  I don't have a recollection of seeing him then.

24         MR. FEE:  Let's put up Government Exhibit 1303, rows

25    967, just the next page, I think.

1    Q.  So we talked about this previously.  Do you see here,

2    Mr. Uribe, again you say to Nadine:  Please work on this.  I

3    don't want these people to hurt my daughter.

4        She asked you to get whatever information Andy has before

5    tonight.

6        And then you say:  Are we good to 9:30 p.m.?

7        Do you see that?

8    A.  I am looking at it sir, yes.

9    Q.  And that Nadine says at 10:20:  Come over.  42 Jane Drive

10   correcting it, 41.

11          This is the instance where you didn't go over that

12   night, correct, Mr. Uribe?

13   A.  I don't have the date and time.  I know it was around that

14   time, but if it was August 6 it was August 6.

15   Q.  Well, let's look at the next message on August 7.  You tell

16   her that you passed out after your sister sent you some food on

17   August 7 at 6:45 a.m.; right?

18   A.  Correct.

19   Q.  But in fact you were on the phone the night prior; isn't

20   that correct, sir?

21          MS. POMERANTZ:  Objection, your Honor; misstates.

22          MR. FEE:  It doesn't.

23          THE COURT:  Counsel.

24          I will allow that question.

25          Were you on the telephone that evening, that is, the

O6B5men4                         Uribe - Cross

1    evening of August 6 at around 10:00 p.m.?

2              THE WITNESS:  Your Honor, I remember this question

3    being asked a few minutes ago and I stated that I -- this is

4    the evening where I passed out.  The phone is sleep by my

5    bedside on my night table.  George Martinez could have called,

6    I could have picked up the phone call because I wake up.  The

7    other phone call that came in was Sammy, my mechanic.  Actually

8    it was a text from him.  I could have saw the text.  I was

9    sleeping, your Honor.

10             THE COURT:  All right.  Thank you.

11             MR. FEE:  You can put that down, Mr. Kelly.

12   BY MR. FEE:

13   Q.  Mr. Uribe, the reason you wanted to portray yourself to

14   Senator Menendez as a legitimate businessman is because you

15   understood him to be an important person, right?

16             MS. POMERANTZ:  Objection.

17             THE COURT:  I will allow it.

18             THE WITNESS:  I understand that Mr. Menendez is first

19   of all, as a human being, an important person, and then as a

20   U.S. senator a very important person; yes.

21   Q.  And you have lived in New Jersey since the 1980s; is that

22   right?

23   A.  1985, to be exact.

24   Q.  So even before you met Senator Menendez, fair to say you

25   knew who he was; right?

O6B5men4                          Uribe - Cross

1    A.  I have recollection of him being somewhere in Union City

2    first and then he moved to the Senate, yes.

3    Q.  And even in 2018, before you met the man face to face, you

4    knew he was a U.S. senator, correct?

5    A.  I had knowledge of that, yes.

6    Q.  And you knew that he was Hispanic as well; right?

7    A.  Yes, sir.

8    Q.  And you knew that he was known to be a vocal advocate for

9    issues impacting the Latino community in New Jersey; right?

10            MS. POMERANTZ:  Objection.

11            THE COURT:  I will allow that.

12            I don't mean to cut off this line.  Finish the line

13   and let me give the jury its mid-afternoon break.

14   Q.  Why don't you answer that, Mr. Uribe.

15   A.  I don't want to be ignorance in the world of politics, but

16   at this point in time I am not a follower of Mr. Menendez and

17   his activities and passions or love for Latinos or no Latinos

18   or what is -- finding it hard to say without being offensive --

19   what is the most that he likes about his job.  I am -- I'm just

20   not a political person, sir.

21            MR. FEE:  Understood.  Thank you, your Honor.

22            THE COURT:  10 minutes, ladies and gentlemen.

23            (Continued on next page)

24

25

O6B5men4                          Uribe - Cross

```
 1                  (Jury not present)

 2                  THE COURT:  You may step down.

 3                  THE WITNESS:  Thank you, sir.

 4                  (Witness not present)

 5                  THE COURT:  10 minutes.

 6                  (Recess)

 7                  THE COURT:  Jury entering.

 8                  (Jury present)

 9                  THE COURT:  Please, be seated.

10            Mr. Fee, you may continue.  Do you think you will be

11    able to finish tonight?

12                  MR. FEE:  No, your Honor.  I'm sorry.

13                  THE COURT:  Proceed.

14                  MR. FEE:  Let's put up Government Exhibit 3E-301-T it

15    is in evidence.

16    BY MR. FEE:

17    Q.  Mr. Uribe, you testified about hosting the fundraiser on

18    July 13 of 2018 for Senator Menendez, right?

19    A.  Yes, I did.

20    Q.  And July 13, that is about a month and a half after June 1,

21    2018, would you agree?

22    A.  Yes.

23    Q.  At this fundraiser Senator Menendez attended; correct?

24    A.  Yes, he did.

25    Q.  And most of the attendees were either small business owners
```

O6B5men4                           Uribe - Cross

1   or employees of those businesses; correct?

2   A.   Correct.

3   Q.   Most of them were in the trucking business; is that right?

4   A.   That is correct, sir.

5   Q.   And almost all of them were Latino, correct?

6   A.   Most of them were Latino.

7   Q.   You said there was one or two non-Latinos?

8   A.   That is correct.

9   Q.   And you recall that at the fundraiser Senator Menendez

10  actually told the folks there to share with him their concerns

11  about their trucking businesses, right?

12  A.   I don't have a recollection of that particular question,

13  sir.

14         MR. FEE:  Let's show the witness and the lawyers

15  3542-0228 marked for identification, page 7, please.  Not the

16  jury.  Let's highlight the first few lines of that page, the

17  first partial paragraph.

18  Q.   Mr. Uribe, just read this and let me know once you have had

19  a chance to read it.

20         THE COURT:  Now, Mr. Uribe, you have said that you did

21  not recall whether or not Mr. Menendez told the folks at the

22  fundraiser to share with him their concerns about their

23  trucking businesses.  Having looked at this, does that refresh

24  your recollection in regard to that?  Yes or no.

25         THE WITNESS:  I was about to finish the reading, your

1    Honor.

2                   THE COURT:  Oh, I am sorry.  I apologize.

3                   THE WITNESS:  Not necessary to apologize.

4                   I have read it.

5                   THE COURT:  Does that refresh your recollection?

6                   THE WITNESS:  Yes, it does, sir.

7                   THE COURT:  What does it refresh your recollection?

8                   THE WITNESS:  Looking at this statement it says --

9                   THE COURT:  No.  No, no, no.  Not what it says.

10                   THE WITNESS:  Sorry.

11                   THE COURT:  The only issue -- it doesn't matter what

12   it says.  The only issue is whether now you have a recollection

13   as to whether or not Mr. Menendez said at that fundraiser that

14   he wanted to hear the concerns of the men and women at the

15   fundraiser about their trucking businesses.

16                   THE WITNESS:  Yes, it does refresh my recollection.

17                   THE COURT:  And what is your refreshed recollection?

18                   THE WITNESS:  So the context that Mr. Menendez asked

19   these truckers to tell him about their worries and concerns

20   about the port in New Jersey.

21   BY MR. FEE:

22   Q.  So this was a group of almost entirely Latino small

23   business owner and truckers that Senator Menendez said please

24   share with me your concerns about things at the port impacting

25   your business; is that fair to say?

1   A.  That's fair to say.

2   Q.  And you viewed the fundraiser as a success because the

3   senator told you that he was very impressed with the fine group

4   of business people that you had assembled that night; right?

5   A.  And in substance that the fundraiser being of liking, that

6   he was pleased with the fundraiser will get us closer to what

7   Will had promised of getting his assistance in taking care of

8   part 1, and supposedly part 2 that he said he didn't know about

9   later.

10  Q.  Let's focus on that night.  Senator Menendez never said the

11  words "part 1" or "part 2" to you at the fundraiser; correct?

12  A.  You are correct, sir.

13  Q.  He told you that you he was very impressed with a fine

14  group of business people that you had assembled; correct?

15  A.  Yes.

16  Q.  And he said that you must be doing something right given

17  the high turnout from the trucking business at that fundraiser,

18  correct?

19  A.  Something to that extent, yes, sir.

20  Q.  And this was successful of achieving your goal of depicting

21  yourself as a legitimate businessman to Senator Menendez;

22  correct?

23          MS. POMERANTZ:  Objection.

24          THE COURT:  I will allow it.

25  A.  That was the success of putting together a fundraiser that

O6B5men4                          Uribe - Cross

1   we were able to meet our goal of $50,000 and that the senator

2   was pleased with the accomplishment of that $50,000; yes.

3   Q.  And his staff, after the fundraiser, also came to share

4   with you updates about Senator Menendez' activities abdicating

5   for Latinos; correct?

6            MS. POMERANTZ:  Objection.

7            THE COURT:  I will allow it.

8            Is that true?

9            THE WITNESS:  I don't have a recollection of the staff

10   coming to me and telling those achievements.

11            MR. FEE:  Let's show the witness and counsel what's

12   been marked for identification as Defendant's Exhibit 1023 at

13   page 51 and 52.

14   Q.  As that is coming up, Mr. Uribe, do you remember testifying

15   on direct about a woman who worked for Senator Menendez' office

16   named Samantha?

17   A.  I did testify to that, yes, sir.

18            MR. FEE:  Let's focus in on these two messages,

19   please.

20   Q.  Do you see your phone number there on both messages?

21   A.  Yes, I do, sir.

22   Q.  And do you see the name Samantha and the phone number next

23   to?

24   A.  Yes, I do, sir.

25            MR. FEE:  Your Honor, we offer this page and the next

1    page which we can show to counsel, just these two pages as

2    Defendant's Exhibit 1023, authenticated via stipulation named

3    Government Exhibit 1435.

4              MS. POMERANTZ:  Your Honor; hearsay and 404(b).

5              MR. FEE:  Not for its truth; and certainly not 404(b).

6              Let's zoom out.

7              MS. POMERANTZ:  Your Honor, I'm sorry.  404(a)(1) and

8    405.

9              MR. FEE:  It's impeachment, your Honor.

10             THE COURT:  Admitted.

11             (Defendant's Exhibit 1023 received in evidence)

12             MR. FEE:  If we can publish it as is, Mr. Kelly, and

13   show the jury.

14   BY MR. FEE:

15   Q.   You see on the top left of your screen, Mr. Uribe, Samantha

16   sends to your phone number a link on December 22 of 2020.  Do

17   you see that?

18   A.   I see it, sir.

19   Q.   So this is over a year after the fundraiser, right?

20   December 2020?

21   A.   A year and a half almost, sir.

22   Q.   And Samantha sends to you an article that says:  NJ.com and

23   you see the text:  Latino museum will be built in D.C. after

24   25-year effort by Menendez.  Do you see that?

25   A.   Yes, I see it.

O6B5men4                           Uribe - Cross

1   Q.  And then she says, Hi José.  FYI, hope you are well.  Sam

2   Maltzman.

3       Do you see that, Mr. Uribe?

4   A.  Yes.

5   Q.  And then on the next page:  Congratulations.  That is

6   great.

7   A.  I see it.

8           THE COURT:  Ladies and gentlemen, these are not

9   offered to you for the truth of what is in them but simply for

10  the fact that they were said.  Nothing more.

11  Q.  So you would agree that you had successfully conveyed to

12  Senator Menendez and his staff that you were a legitimate

13  businessman interested in the issues relevant to the Latino

14  community; correct, sir?

15          MS. POMERANTZ:  Objection.

16          THE COURT:  Sustained.

17          MR. FEE:  You can put it down, Mr. Kelly.

18  Q.  You were getting these updates from Samantha Maltzman for

19  many months; correct?

20  A.  I remember getting e-mails from Samantha periodically.

21  Q.  And she was -- her e-mails focused on the subject of

22  Senator Menendez' activities promoting Latinos and Latino

23  businesses, right?

24          MS. POMERANTZ:  Objection to form.

25          THE COURT:  I will allow it if he knows it.

O6B5men4                          Uribe - Cross

1              I didn't mean to spoke over you, sir.  What did you

2      say?

3              THE WITNESS:  I cannot attest to the context of those

4      e-mails.

5              THE COURT:  OK.

6      Q.  Well, you also wanted to convey to Senator Menendez that

7      the investigations of Phoenix and your Ana were unfair;

8      correct?

9              MS. POMERANTZ:  Objection; time period.

10     Q.  At any point, Mr. Uribe, did you want to convey that to the

11     senator?

12     A.  I had wanted to convey that, yes.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6bWmen5                         Uribe - Cross

1    BY MR. FEE:

2    Q.  And you conveyed that these investigations were unfair by

3    telling Nadine Arslanian that, right?

4    A.  Nadine Arslanian is my point of contact to Mr. -- Senator

5    Menendez and my able -- and my chances of explaining him what I

6    wanted him to do, sir.

7    Q.  I'm sorry, sir.  Finish your answer.  I spoke over you.

8    Were you done?

9    A.  And I said rather than wanting him to do it, that I needed

10   and wanting him to do for me.

11   Q.  And because Nadine, you described, was your point of

12   contact, you understood that when you told her that these

13   investigations were unfair, she was going to convey that to the

14   senator, right?

15           MS. POMERANTZ:  Objection.

16           THE COURT:  I'll allow it.

17           Did you understand that she was going to say that to

18   the senator?

19           THE WITNESS:  My hope is when I'm speaking -- your

20   Honor, my hope is when I am speaking to Nadine about what I'm

21   looking for, she was going to convey to the senator my askings.

22           THE COURT:  All right.

23   BY MR. FEE:

24   Q.  And Mr. Elvis Parra and Bienvenido Hernandez also attended

25   this fund-raiser in July 2018, is that correct, sir?

O6bWmen5                          Uribe - Cross

1    A.  Yes, they did.

2    Q.  And their company was E&K Trucking, right?

3    A.  Correct.

4    Q.  And you also told Nadine that it was unfair that this

5    investigation might cause E&K Trucking to close, right?

6    A.  I don't have that recollection of that statement, sir.

7    Q.  Well, that was one of your concerns, that the investigation

8    could harm the business of E&K Trucking, right?

9    A.  I don't remember conveying that like that.

10   Q.  But did you have that concern, that the investigations

11   would harm E&K Trucking, sir?

12   A.  An investigation was going to put Elvis Parra in prison,

13   sir.

14   Q.  And if Elvis Parra went to prison, E&K Trucking, that

15   business, his business, would be harmed, correct?

16              MS. POMERANTZ:  Objection.

17              THE COURT:  I'll allow it.  If he knows.

18   A.  At this point, sir, a successor's company for E&K Prestige

19   Trucking Express was already formed.

20   Q.  E&K Trucking was Elvis Parra's business?

21   A.  Yes.

22   Q.  And he ran that business, as you understood it, right?

23   A.  In partnership with Bien Hernandez.

24   Q.  So if Elvis Parra went to prison, that would be bad for E&K

25   Trucking, fair to say?

O6bWmen5                          Uribe - Cross

1    A.  It would be bad for him as a person more than anything,

2    sir.

3    Q.  It would also be bad for business, correct?

4    A.  Bien Hernandez could have continue running the business.

5    He was actually the main guy in the business anyway.

6             THE COURT:  Who, Hernandez?

7             THE WITNESS:  Hernandez, sir, your Honor.  My

8    apologies.

9    Q.  Sir, you would agree that if one of two partners in a

10   business goes to prison, that is not a positive development for

11   that business, correct?

12            THE COURT:  I'll allow it.

13   A.  The statement could be true depending on the nature of the

14   business.  In my understanding, I'm more concern that Elvis,

15   person that I also respect and care for a lot, was going to go

16   to prison.  The business could stay alive by Mr. Hernandez

17   running the business.  He was running the business by his self

18   most of the time anyway.

19   Q.  And your business, Phoenix, had issued or had claimed to

20   issue the Workers' Compensation coverage for E&K Trucking,

21   correct?

22   A.  Inter America did.

23   Q.  Inter America, your prior business, had issued that

24   Workers' Compensation coverage?

25   A.  That is correct, sir.

1    Q.  And so you were also concerned that an investigation of

2    Elvis Parra could lead them to ask questions about Phoenix

3    providing that Workers' Compensation insurance, right?

4    A.  It could have provide -- it did provide questions which

5    were the subpoenas in regard to any and all policies that were

6    issued to E&K and to Prestige Trucking Express, sir.

7    Q.  And in any event, E&K Trucking, which attended that

8    fund-raiser, was a large, relatively large business, is that

9    correct?

10   A.  It will be a medium size trucking company, more -- greater

11   than most of the other trucking companies around, yes.

12   Q.  And again, based on your work for E&K on behalf of Phoenix,

13   you came to learn that it had about, E&K Trucking employed more

14   than 80 people in around 2018, right?

15   A.  I don't have exact knowledge of the number of people that

16   they employed at any single point.

17   Q.  Well, you understood that there were dozens of people who

18   worked at E&K Trucking, correct?

19   A.  Couple of dozen of people, at least.

20   Q.  At least a couple of dozen, right?

21   A.  Yes.

22   Q.  And again, some of those folks attended this fund-raiser,

23   right?

24   A.  When you say some of those folks, you're referring to Bien

25   Hernandez and Elvis Parra?

O6bWmen5                        Uribe - Cross

1    Q.    Yes.

2    A.    They were there.

3    Q.    And of those at least two dozen employees of E&K Trucking,

4    about how many were Latino residents of New Jersey, to your

5    knowledge?

6    A.    I will no have a census data on that at this point, sir.

7    Q.    Well, sir, your company issued all the Workers' Comp.

8    insurance for that company, right?

9    A.    We process the application.  We do not issue the policies.

10   Q.    So you came to learn the names of those employees in

11   connection with that work?

12   A.    That would be -- let's say that you can get familiar with a

13   relatively number of them, normally a small of them.  But to

14   know all of their employees' name, that would be a little bit

15   difficult, sir.

16   Q.    And you recall discussing at that fund-raiser that there

17   were concerns in the trucking community in New Jersey about

18   layoffs, correct?

19   A.    I don't have recollection of discussing layoffs.

20   Q.    Well, outside of that fund-raiser, you and Mr. Barruos were

21   discussing, in 2018 and 2019, that there were widespread

22   layoffs in the trucking industry, right?

23   A.    I don't --

24               MS. POMERANTZ:  Objection.  Relevance.

25               THE COURT:  I'll allow it.  If relevance is the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen5                          Uribe - Cross

1    objection.  I'll allow it.

2    A.  I don't have a recollection of a conversation about the

3    number of layoffs or the market set in the trucking industry as

4    far as layoffs in 2018 and 2019, sir.

5              MR. FEE:  Let's put up what's in evidence as

6    Government Exhibit E207-3T, page 1291, Mr. Kelly.  And zoom in

7    on the two messages -- or just the blue one.  I'm sorry.

8    Q.  So you see this message is dated May 3, 2019, Mr. Uribe?

9    A.  I see the date.

10   Q.  And it's between you and Fernando Barruos; it's from

11   Mr. Barruos to you?

12   A.  I see it.

13   Q.  And it shows you read it on May 3 as well.  Do you see

14   that?

15   A.  Yes, it say -- I see it there.

16             MR. FEE:  Mr. Kelly, if you can zoom in on the image

17   that Mr. Barruos sends you on May 3, 2019.

18             Your Honor, we have a blown-up version of this image,

19   which is not yet in, but I can put it for the jury -- excuse

20   me, not for the jury, for the witness and the attorneys.  It's

21   DX 180.

22             Your Honor, I would offer this.  This is just the

23   image from the text that's already in evidence.

24             THE COURT:  You're offering DX 180?

25             MR. FEE:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen5                              Uribe - Cross

1              MS. POMERANTZ:  As long as it's not for the truth.

2              MR. FEE:  Not for the truth, your Honor.

3              THE COURT:  All right.  Admitted.

4              (Defendants' Exhibit 180 received in evidence)

5              MR. FEE:  All right.  Let's put up the attachment that

6    he sent you, Mr. Uribe.

7              You can publish it for the jury now, Mr. Kelly.

8              THE COURT:  You see it.  Ladies and gentlemen, it's

9    not for the truth of what's in that article, but simply for the

10   article.

11   BY MR. FEE:

12   Q.  This headline reads, Drivers Say Trucking Company Has

13   Closed Leaving Them Without a Job, on May 2, 2019.  Do you see

14   that, Mr. Uribe?

15   A.  Yes.

16             MR. FEE:  All right.  Then the next day, on March 4,

17   2019, let's put up Government Exhibit E207-3T, page 1298.

18             Just the second message here.  I'm sorry.  It's May 4,

19   2019.

20   Q.  Mr. Uribe, do you see that date on the bottom?

21   A.  OK.

22             MR. FEE:  And then Mr. Barruos sends to you another

23   attachment, and if we can zoom in on the attachment, Mr. Kelly.

24             And again, we have a screenshot of the attachment.

25   Mr. Kelly, if you can just put up for the witness only DX 177,

O6bWmen5                          Uribe - Cross

1    and counsel.

2                 Actually, let's go to the next, 178.  OK.

3    Q.  Do you see that, Mr. Uribe, without saying anything that's

4    on there?

5    A.  Yes, I do see --

6    Q.  You see it?

7    A.  I saw the one before, and I can see this.

8                 MR. FEE:  Thank you, Mr. Uribe.

9                 Your Honor, we would offer just 178.  It's a

10   screenshot of the attachment that's already in evidence, but

11   just in a form we can show the jury.  We're not going to play

12   anything.

13                MS. POMERANTZ:  Your Honor, we would object on

14   relevance, 403, and this isn't impeachment.

15                MR. FEE:  It's already in evidence, your Honor.  We're

16   just making it easier to view.

17                THE COURT:  It's in evidence.  I'll allow it.

18                Again, not for the truth, ladies and gentlemen.

19                (Defendants' Exhibit 178 received in evidence)

20                MR. FEE:  All right.  Let's put up 178.

21   Q.  Do you see that, Mr. Uribe; that's what Mr. Barruos sent to

22   you, a longer clip containing that image?

23                MS. POMERANTZ:  Objection, your Honor.

24                THE COURT:  Yes.  Sustained.

25                Do you recall receiving an attachment with that at the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6bWmen5                          Uribe - Cross

1    beginning of it?  Yes or no.

2              THE WITNESS:  Your Honor, I had no recollection of

3    either of the two attachment that the gentleman had showed me.

4              THE COURT:  All right.  Fine.

5              MR. FEE:  Put that down.

6    Q.  How about this, Mr. Uribe; after each one of these

7    messages, you responded to Mr. Barruos with information on how

8    to pay for Nadine Arslanian's car.  Do you remember that, sir?

9    A.  I don't have a recollection what this images follow, which

10   messages follow, sir.

11             MR. FEE:  Let's put back up E207A in evidence, for

12   everyone, please.

13             No.  I'm sorry.  The messages, the underlying

14   messages.  This is also in evidence.

15             E207-3T.  There we go.  This is already in evidence.

16   Q.  And so do you see this message we looked at earlier from

17   Mr. Barruos, where he sent you that article, Mr. Uribe?

18   A.  That's what this says.

19             MR. FEE:  Let's go to the next page, Mr. Kelly, and

20   let's zoom in on the response here.

21   Q.  Mr. Uribe, the immediately following messages you send to

22   Mr. Barruos, this attachment, which is shown in Government

23   Exhibit E207-A --

24             MR. FEE:  Let's put that up, please.

25   Q.  -- and you remember testifying about this during direct,

O6bWmen5                          Uribe - Cross

1   this invoice?

2   A.  Yes, I do.

3   Q.  And this is, in fact, an invoice that you were asking

4   Mr. Barruos to pay on the Mercedes, right?

5   A.  That's correct.

6           MR. FEE:  OK.  Let's go back to those messages.

7   Q.  And Mr. Barruos responds with *jeje*, haha, LOL?

8           MR. FEE:  Excuse me.  It's translated as LOL, if you

9   can zoom in on the blue message.

10  Q.  See that, Mr. Barruos -- Mr. Uribe?  Excuse me.

11  A.  Yes, I do, sir.

12          MR. FEE:  Let's go to the next page, very next

13  message.

14  Q.  You remember testifying about this, right, where

15  Mr. Barruos says, that's called power?

16  A.  Yes.

17  Q.  And my question to you, sir, is isn't it true that this

18  exchange reflects information you were trying to convey to the

19  senator?

20          MS. POMERANTZ:  Objection.

21          THE COURT:  I will allow it.  You may answer.

22  A.  Gentleman, I don't see a relation between truckers losing

23  their jobs -- one of the article was truckers in the state of

24  Ohio or a company that was closing -- having a relation with my

25  request to Barruos of make the payment on the car.  I just

1    don't follow.

2    Q.  One of your deals concerned, as you testified, one of your

3    deals concerned E&K Trucking -- excuse me, Elvis Parra,

4    correct?

5    A.  Part one of the deal concern that, yes.

6    Q.  And Elvis Parra's business was a trucking business, right?

7    A.  Agree.

8    Q.  And you testified here today with me that you wanted to

9    portray the image to Senator Menendez that you were a

10   legitimate businessman, right?

11   A.  OK.  I had denied that statement three times.  That was not

12   the purpose of the fund-raiser.  You keep using me trying to

13   portray that I was, again, a -- something about a businessman.

14   I have no remember using such a statement, sir.

15   Q.  Your interactions with Senator Menendez, you wanted him to

16   believe you were a legitimate businessman, right?

17   A.  My interactions with Mr. Menendez in regard to the

18   fund-raiser, sir?

19   Q.  No.  Your interactions with Senator Menendez, all of them,

20   you wanted him to believe you were a legitimate businessman,

21   correct?

22   A.  I was more interested in him to believe that I'm -- was a

23   good person that cares about his family and somebody not

24   hurting his daughter.

25   Q.  When you talked to Senator Menendez, you always talked

O6bWmen5                                Uribe - Cross

1    about family values, right?

2    A.  Agree.

3    Q.  You always talked about how much you loved your daughter

4    Ana, right?

5    A.  And other part of, the other members of my family.

6    Q.  Because you knew Senator Menendez cared about family

7    values; that's why you talked about it, right?

8              THE COURT:  Sustained.

9    A.  I cannot --

10   Q.  Don't answer that question.

11             THE COURT:  Don't answer.

12   BY MR. FEE:

13   Q.  You understood that Senator Menendez, when you spoke about

14   family values, engaged you on that subject in conversation,

15   correct?

16             MS. POMERANTZ:  Objection.  Vague.

17             THE COURT:  I'll allow it.

18             When you told Senator Menendez about your family

19   values, did he respond in some way?

20             THE WITNESS:  Best of my recollection in the same way

21   that I care about my family he cared about his.

22             THE COURT:  All right.  That's what he said, in

23   substance?

24             THE WITNESS:  In substance.

25             THE COURT:  OK.

O6bWmen5                         Uribe - Cross

 1   BY MR. FEE:

 2   Q.  And in fact, you asked Senator Menendez to stop these

 3   investigators from hurting my daughter; you actually said those

 4   words to him, right?

 5   A.  If it was in his power, yes.

 6   Q.  That's right, if it was within his power, that's what

 7   you --

 8   A.  Within his power.

 9   Q.  Within his power, only within his power, correct, sir?

10            MS. POMERANTZ:  Objection.

11            MR. FEE:  His words.

12            THE COURT:  Proceed.  Next question.

13   BY MR. FEE:

14   Q.  And you knew that Senator Menendez cared about his own

15   daughter and his own family very much, right?

16            THE COURT:  Sustained.  He just said what he said.

17   Move on.

18   BY MR. FEE:

19   Q.  And family values is also what you talked to Senator

20   Menendez about at 41 Jane, right?

21            THE COURT:  I'll allow that.

22   A.  That was some of the things we spoke about in the patio, in

23   the -- at Nadine's home, sir.

24   Q.  And you also talked about, in that backyard meeting, family

25   values with Senator Menendez, right?

1          THE COURT:  You just said that.

2          MR. FEE:  No.  That's different, your Honor.  41 Jane,

3    he had one meeting inside and he had one meeting in the

4    backyard.

5          MS. POMERANTZ:  Objection, your Honor.  Commentary

6    and --

7          THE COURT:  Let's establish it.

8          MR. FEE:  Sure.

9          THE COURT:  How many meetings at 41 Jane did you have

10   with the senator?

11         THE WITNESS:  One meeting.

12         THE COURT:  Was it inside or outside?

13         THE WITNESS:  Outside.

14         THE COURT:  All right.  You have your testimony about

15   that outside meeting.

16   BY MR. FEE:

17   Q.  You met him inside the house and then walked outside to the

18   backyard, Mr. Uribe; that was your testimony?

19   A.  We salute each other in the kitchen and we moved to the

20   backyard for the drink and the cigar.

21   Q.  Got it.

22       So you only talked about family values in the backyard with

23   Senator Menendez, is that your testimony?

24   A.  In the backyard, that's when we have the conversation, yes.

25   Q.  And in your interactions with Senator Menendez, you also

O6bWmen5                        Uribe - Cross

1    told him that the prosecution or investigation of Prestige

2    would hurt hardworking Latinos, correct?

3    A.  I don't remember using those statements, sir.

4         MR. FEE:  Let's show the witness what's been marked

5    for identification as 3542-118, page 1, please.

6         Zoom in on the text, please.

7    Q.  Just read that to yourself, Mr. Uribe, please, focusing on

8    the last bullet.

9         Have you had a chance to read that, Mr. Uribe?

10   A.  Yes, I do.

11   Q.  Does it refresh your recollection that you told Robert

12   Menendez that you mentioned hardworking Latinos when you talked

13   with him?

14   A.  I don't have a recollection of using the terms to

15   Mr. Menendez "hardworking Latinos."

16   Q.  In substance, did you convey that these matters about which

17   you wanted help impacted hardworking Latinos, even if you

18   didn't use that exact phrase, sir?

19   A.  In substance, I remember saying to Mr. Menendez that it's

20   an investigation against Prestige Trucking Express and Bien

21   Hernandez, that I learned that could lead to an investigation

22   into prosecution -- into an investigation of my daughter Ana

23   and Phoenix Risk Management.  That is the best of my

24   recollection, sir.

25   Q.  Sir, you met with the government to prepare for your

O6bWmen5                        Uribe - Cross

1   testimony on June 3, 2024.  Do you remember that?

2   A.  I don't remember the day and time, sir.

3   Q.  You remember several meetings -- excuse me.  Go ahead.

4   Finish.

5   A.  I remember several meetings, sir.  I don't remember the

6   date of which exact meeting.

7   Q.  Do you remember telling the government during one of your

8   prep meetings this month that when you spoke with Robert

9   Menendez, you mentioned hardworking Latinos to Robert Menendez?

10  A.  I still don't have the recollection of those statements,

11  sir.

12          MR. FEE:  You can put that down.

13  Q.  And you also told Robert Menendez on multiple occasions

14  that the only way you could find peace was to get some help

15  with these investigations, right?

16  A.  Several occasions sounds like too many occasions in this

17  case, sir.

18  Q.  You're right.  It was only two, three?

19  A.  Two.

20  Q.  Two.  But you made that point, right?

21          MS. POMERANTZ:  What's the point?

22          THE COURT:  I'll allow it.

23  BY MR. FEE:

24  Q.  That you couldn't get peace without getting some more

25  information and help from the senator, right?

O6bWmen5                              Uribe - Cross

1    A.  That I couldn't get peace without knowing if my daughter

2    Ana was going to be a target of an investigation, yes.

3    Q.  So in these two interactions with Senator Menendez about

4    your request, you never mentioned that you were running Phoenix

5    without a license from the New Jersey department of insurance,

6    correct?

7    A.  I don't remember making such a statement to Mr. Menendez.

8    Q.  You're sure you didn't mention that, sir, isn't that true?

9    A.  Sitting here right now, based on my recollection, I do not

10   remember saying those things to Mr. Menendez.

11   Q.  And you never -- I'm sorry to speak over you.

12       You never told Senator Menendez during your two

13   interactions about your request for help that you had defrauded

14   a financial institution, right?

15   A.  I never said that to Mr. Menendez.

16   Q.  You never told Senator Menendez that you had defrauded the

17   U.S. government in the form of the U.S. Small Business

18   Administration in your interactions with them, right?

19       MS. POMERANTZ:  Your Honor, timing.  This portrays a

20   record.

21   BY MR. FEE:

22   Q.  Did you ever tell Senator Menendez at any time about fraud

23   that you had committed?

24       THE COURT:  I'll allow it.

25       MS. POMERANTZ:  Objection, your Honor.

```
 1                  THE COURT:  I'll allow it.
 2     A.   No, I don't remember talking to Mr. Menendez about that.
 3     Q.   Did you tell him that you had lost your license because you
 4     had pled guilty to insurance fraud?
 5     A.   Don't have a recollection where, but I remember saying to
 6     Mr. Menendez that I didn't have a license and I don't recall
 7     saying because it's why I lost the license.
 8     Q.   OK.  And you told the government that recollection in the
 9     past?
10                  MS. POMERANTZ:  Your Honor --
11                  THE COURT:  Sustained.
12     BY MR. FEE:
13     Q.   You never told senator in your interactions that you were
14     evading income taxes, right?
15     A.   I never talk about my taxes with Mr. Menendez.
16     Q.   Because if you had told him these things, he would have
17     stood up and walked out of the room --
18                  THE COURT:  Sustained.
19                  MS. POMERANTZ:  Objection.
20     Q.   -- isn't that right, Mr. Uribe?
21                  THE COURT:  Sustained, Mr. Fee.
22     BY MR. FEE:
23     Q.   The reason you didn't tell him these things is because you
24     didn't want him to know, right?
25                  MS. POMERANTZ:  Objection.
```

O6bWmen5                          Uribe - Cross

1          THE COURT:  Why didn't you mention this?  Why didn't

2     you tell Mr. Menendez this?

3          THE WITNESS:  None of those topics came into the

4     conversation, sir.

5          THE COURT:  All right.  Thank you.

6     BY MR. FEE:

7     Q.  You were portraying yourself to him as a legitimate

8     businessman seeking help for injustice, correct?

9          THE COURT:  All right.  Move on.

10    A.  I --

11         THE COURT:  You don't have to answer that.

12         THE WITNESS:  OK, sir.

13         THE COURT:  We've been over it.  611.

14    BY MR. FEE:

15    Q.  All right.  Going back to the beginning of your testimony,

16    do you recall testifying that in early 2018, Mr. Hana

17    approached you while you were in the office of your lawyer,

18    Andy Aslanian?  Do you remember testifying about that?

19    A.  Yes, sir.

20    Q.  And you had testified that you had known Mr. Hana for

21    several years because you had done some work for his prior

22    trucking company, right?

23    A.  I used to insure his prior company with Inter America, and

24    then we became friends.

25    Q.  And your testimony was that Will said to you something, in

1    substance, like he could make the Parra problem, situation,

2    investigation go away for the sum of about 200 to $250,000;

3    that was your testimony, right?

4    A.  Yes, it was.

5    Q.  And you also testified that he actually mentioned Nadine

6    Arslanian and Senator Menendez during this conversation in

7    early 2018, right?

8    A.  Yes, I did.

9    Q.  Now, you had never met Senator Menendez in person at the

10   time of that first conversation with Will Hana, correct?

11   A.  You are correct.

12   Q.  And then the first time you met him in person was at a

13   dinner and a fund-raiser later that year, right?

14   A.  You are correct.  I just kind of confused now what was

15   first, the dinner or the fund-raiser.  But --

16   Q.  Either way.

17   A.  -- your statement -- your statement is correct.

18   Q.  And your belief was that Mr. Hana was somehow leveraging

19   his relationship with Nadine to get access to Senator Menendez,

20   is that fair to say?

21            THE COURT:  Sustained.

22            MS. POMERANTZ:  Objection.

23   BY MR. FEE:

24   Q.  What was your understanding at that time about the

25   reference that you testified Mr. Hana made to Nadine?

1          THE COURT:  I'm not sure I understand the question,

2     sir.

3     BY MR. FEE:

4     Q.  Sir, your understanding from this first conversation with

5     Will Hana, as you testified, was that somehow Nadine and

6     Senator Menendez would help with this problem, right?

7     A.  My understanding with my conversations with Will is that he

8     has contact with both Nadine and Senator Menendez and that he

9     will -- or he has a way to ask him to make this investigation

10    go away.

11    Q.  And then there was a second meeting at the Glenpointe

12    Marriott, where you, Mr. Hana, Elvis Parra and Bien Hernandez

13    all spoke, right?

14    A.  Yes.

15    Q.  During that meeting, again, your testimony is that Mr. Hana

16    said the investigations could be stopped and killed if he

17    received a payment from Elvis and Bien; that's your testimony?

18    A.  That was my testimony, yes, sir.

19    Q.  And now, Mr. Hana did not mention during either of these

20    first two conversations anything about how long Nadine and

21    Senator Menendez had been dating, correct?

22    A.  I don't recall that conversation, no.

23    Q.  Nor do you recall any mention, in your testimony -- excuse

24    me.

25          Nor did you state in your testimony that Mr. Hana ever

1    mentioned, during these first two meetings, a lawyer named Doug

2    Anton, right?

3    A.  I don't have a recollection of Will mentioning a Doug Anton

4    in those two meetings.

5    Q.  But there did come a time when you became aware of this

6    lawyer named Doug Anton, right?

7    A.  Yes.

8    Q.  And in fact, you had at some point spoken to Andy Aslanian,

9    your lawyer, about Doug Anton, right?

10   A.  I remember Andy mentioning Doug Anton, yes.

11   Q.  And Andy told you that Doug Anton was crazy in love with

12   Nadine, right?

13            MS. POMERANTZ:  Objection.  Hearsay.

14            MR. FEE:  Not for the truth.

15            THE COURT:  I understand.  Just a moment.

16            MS. POMERANTZ:  And relevance.

17            THE COURT:  Did Andy tell you that Doug Anton was

18   crazy in love with Nadine?  Yes or no.

19            THE WITNESS:  Yes, he had said that before.

20            THE COURT:  That's not for the truth, ladies and

21   gentlemen.  It's simply for the fact that it was said.

22   BY MR. FEE:

23   Q.  And you also spoke to Mr. Hana about Doug Anton on at least

24   one or more occasions, right?

25   A.  I must to talk about or mention Mr. Doug Anton with Will,

O6bWmen5                          Uribe - Cross

1    yes.

2            MR. FEE:  Let's look at Government Exhibit 1302, line

3    22, to place ourselves in time here.  This is in evidence.

4    Focusing on line 22, please.

5    Q.  Mr. Uribe, your testimony is that this was the first time

6    you referenced the deal with Mr. Hana in writing, is that

7    correct?

8    A.  I don't remember making this testimony of when did I

9    reference a deal in writing with Will.

10   Q.  Got it.

11           This is April 4, 2018, where you write to Will, the deal is

12   to kill and stop all investigation, I am talking to Andy and he

13   is falling asleep.  Do you see that?

14   A.  I recall the text.  I recall the context of the text, yes.

15   Q.  And Andy Aslanian was a reference to the attorney who had

16   been working on Elvis Parra's case?

17   A.  No.  Andy Aslanian was no working on Elvis Parra's

18   representation.  He was the attorney for Phoenix Risk

19   Management and Ana.

20   Q.  Got it.

21           So he was helping you and Phoenix, correct?

22   A.  He was helping our office, yes.

23   Q.  And you testified -- well, let me ask if you remember this

24   question and this answer:

25   "Q.  Why did you send Will this message, referring to this

O6bWmen5                              Uribe - Cross

1   message?

2   "A.  Sitting here right now I don't have the reasoning what

3   triggered me to send this message to Will, but I just

4   reconfirming what the original agreement was."

5        Do you remember getting that question and giving that

6   answer?

7   A.  Yes, I do.

8   Q.  But isn't it correct Mr. Hana -- that you were actually

9   conveying to Mr. Hana, on April 4, 2018, that you were unhappy

10  with the work Andy Aslanian was doing with this investigation?

11  A.  I don't have a recollection of that.

12  Q.  So your testimony is that in April of 2018, when you sent

13  this text, your understanding was that at that time, somehow

14  Nadine Arslanian and Senator Menendez were going to help kill

15  and stop all investigation; that's your testimony?

16            MS. POMERANTZ:  Objection.  Misstates.  Vague.

17            THE COURT:  Just a moment.

18            Was it your belief that in April of 2018 Nadine

19  Arslanian and Senator Menendez were going to help kill and stop

20  all investigations?  Yes or no.

21            THE WITNESS:  Yes, your Honor.

22  BY MR. FEE:

23  Q.  But isn't it the truth, Mr. Uribe, that actually Mr. Hana

24  was going to hire Doug Anton on April 4 to kill the

25  investigation?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                MS. POMERANTZ:  Objection.

2                THE COURT:  Sustained.

3     BY MR. FEE:

4     Q.  Were you aware that on April 4 Mr. Hana met with Doug Anton

5     to try to hire him to kill the investigation?

6                MS. POMERANTZ:  Objection.  Assumes a fact.

7                THE COURT:  Were you aware of that?

8                THE WITNESS:  I was not, sir.

9                THE COURT:  All right.

10               Again, ladies and gentlemen, remember, unanswered

11    questions are not evidence.

12               MR. FEE:  Let's put up for the witness what's been

13    marked as DX 821.  And I'm only going to offer one row.  It's

14    row 165.  And we can redact this if it gets in.

15    Q.  Do you see the names on it, L.e.g.EG, Mr. Uribe?  Do you

16    see that?

17    A.  Yes.

18    Q.  And do you see the second name that I'm circling here?

19    Don't read it aloud.

20    A.  I see it.

21               MR. FEE:  Your Honor, I would offer this, just this

22    row, pursuant to 806, and the proffer, which I'm sure the

23    government will agree that L.e.g.EG is a number used by

24    Mr. Hana.

25               MS. POMERANTZ:  Your Honor, we would object.  There's

1   all sorts of issues:  403, hearsay, not impeachment.  And we're

2   happy to have a brief sidebar to address a larger issue.  It

3   also is not 806, your Honor.

4           THE COURT:  Motion to admit denied.  This has not been

5   accepted.

6           Proceed.

7   BY MR. FEE:

8   Q.  Mr. Uribe, is your testimony that you were never copied on

9   any correspondence about the Elvis Parra investigation with an

10  attorney named Doug Anton?

11  A.  I don't have a recollection of that copy, sir.

12  Q.  Did Mr. Hana forward to you any communications from an

13  attorney Mr. Hana had consulted with about the Elvis Parra

14  case?

15          MS. POMERANTZ:  Objection.  Assumes a fact.

16          THE COURT:  Yes.  Sustained.

17  BY MR. FEE:

18  Q.  Do you recall receiving any correspondence from Mr. Hana --

19          THE COURT:  Do you know if Mr. Hana consulted with any

20  attorneys regarding Elvis Parra?

21          THE WITNESS:  I have no recollection of the response.

22          THE COURT:  Move on.

23  BY MR. FEE:

24  Q.  Fair to say that you did not understand all of Mr. Hana's

25  activities in March and April 2018 relating to the Elvis Parra

1    case?

2            THE COURT:  Sustained.

3    BY MR. FEE:

4    Q.  Were you with Mr. Hana every day in March and April of

5    2018?

6    A.  No.

7    Q.  Were there some things he did without your knowledge?

8            MS. POMERANTZ:  Objection.

9            THE COURT:  Sustained.

10           He was not with him every day, sir.  Move on.

11   BY MR. FEE:

12   Q.  You remember testifying on direct about pleading guilty to

13   federal crimes, right?

14           THE COURT:  We've been over this several times.

15           MR. FEE:  This is new, your Honor.

16           THE COURT:  I don't believe so, but go ahead.

17           MR. FEE:  Let's do it then.

18   Q.  Sir, do you remember testifying in this case, one of the

19   first questions:

20   "Q.  At a general level, what did you do that makes you guilty

21   of bribing Robert Menendez?

22   "A.  I agreed with Nadine Menendez and other people to provide

23   a car for Nadine in order to get the power and influence of

24   Mr. Menendez to help me get a better resolution for one of my

25   associates that was being charged on a criminal matter and to

O6bWmen5                         Uribe - Cross

1    stop ongoing investigations that could lead to my daughter and

2    my family members."

3        Do you remember hearing that question and giving that

4    answer?

5    A.  Yes, I do.

6    Q.  Now, you pled guilty on March 1 of 2024 in this court,

7    correct?

8    A.  Yes, I did.

9    Q.  And you were sworn in at that proceeding to tell the truth,

10   right?

11   A.  Yes, I did.

12   Q.  And before you pled guilty, the judge asked you questions

13   about the crimes you say that you had committed, right?

14   A.  Yes, sir.

15   Q.  And then at one point the judge asked you what you did that

16   made you guilty of certain crimes.  Do you remember being asked

17   that question?

18   A.  Yes, sir.

19   Q.  And you said, in a conversation with the judge at that

20   proceeding, that your attorneys helped to prepare your answer

21   to that question, correct?

22           MS. POMERANTZ:  Objection.

23           THE COURT:  Well, let's see if he did.

24           Did you --

25           THE WITNESS:  Without privilege?

1            MR. FEE:  In open court.

2            THE COURT:  No, no.

3            Did you state in a conversation apparently with me

4    when you pled guilty that your attorneys helped prepare your

5    answer?  Yes or no.  Or I don't remember.

6            THE WITNESS:  Your Honor, I don't have the

7    recollection.

8            THE COURT:  OK.

9            THE WITNESS:  I was pretty nervous that day.

10   BY MR. FEE:

11   Q.  And that day, the day of your guilty plea, do you also

12   remember the prosecutors being asked in open court if they were

13   satisfied with your response?

14   A.  I don't recall such question.

15           MS. POMERANTZ:  Your Honor --

16           THE COURT:  No.

17   BY MR. FEE:

18   Q.  Do you remember stating in open court:

19   "Q.  Tell me what you did that makes you guilty of Count One

20   through Seven.

21   "A.  As to Count One and Three, Count Two, Three, I agreed with

22   several people, including Nadine Menendez, to provide Nadine

23   with Mercedes-Benz in return for Senator Menendez using his

24   power and influence as a United States senator to get a

25   favorable outcome and to stop all investigations related to one

1    of my associates and if necessary to stop the possible

2    investigation into another person who I considered to be a

3    member of my family?"

4          Do you remember giving that answer, Mr. Uribe?

5    A.  Yes, I do.

6    Q.  And so the term "power and influence" that you used in

7    court here, did that come from a script?

8                THE COURT:  Sustained.

9                MS. POMERANTZ:  Objection.

10   BY MR. FEE:

11   Q.  Did you come up with that term, Mr. Uribe?

12               MS. POMERANTZ:  Objection.

13               THE COURT:  Sustained.

14   BY MR. FEE:

15   Q.  Let's talk about your relationship with Nadine in a little

16   more detail.

17         You and Nadine spoke on the phone and texted regularly in

18   2018 and 2019 and 2020, correct?

19               MS. POMERANTZ:  Objection.  Misstates the testimony.

20               MR. FEE:  I'm asking.

21               THE COURT:  Yes.  Let's find out.

22   A.  You repeat the question, please.

23   Q.  Sure.

24         You texted and spoke on the phone with Nadine regularly in

25   '18, '19, and '20 -- excuse me, in '19 and 20?

1    A.  Yes.

2    Q.  And you often met one-on-one where you said she would

3    usually have tea or diet Coke and you would have a beer; that

4    happened regularly?

5    A.  I remember saying tea and water.  Don't remember the diet

6    Coke.

7    Q.  OK.  But you met regularly with her, whatever the beverage

8    is, fair to say?

9    A.  We met -- we met a couple of times, let's say.

10   Q.  Two times?

11   A.  Couple, my understanding would be more than two, but I --

12   regularly is not being the right term.  I will just said a few

13   times.

14   Q.  All right.  And you also had dinners with her outside of

15   the dinners about which you testified where Senator Menendez

16   was also in attendance, right?

17   A.  I don't remember having a dinner with Nadine without the

18   presence of Senator Menendez.

19           MR. FEE:  OK.  Let's put up what's in evidence as

20   E101-6.  And it's the March 25, 2019.

21   Q.  So you see here on the bottom two messages, you said to

22   Nadine, morning, can we meet tomorrow afternoon, and she says

23   yes.  And this is on March 25, 2019.

24           Do you see that, Mr. Uribe?

25   A.  I see that text, yes.

1            MR. FEE:  Then can we go forward to the next page.

2   Q.  She says, in the middle message -- you say hello, when you

3   come back, let's get together, maybe Bob, you and I?

4        Do you see that, Mr. Uribe?

5   A.  I'm looking at it, sir.

6   Q.  Yes, sir.

7   A.  Thank you.

8        Yes, I do see it.

9            MR. FEE:  Then let's go to the next page, Mr. Kelly.

10           Keep going to the next page, please.

11           All right.  Focus in on the last two.

12  Q.  She says, anytime after 3:30 p.m., and then you respond

13  perfect.  Find a place -- perfect.  5 p.m.  We find a place we

14  can talk you and I.

15       Do you see that, Mr. Uribe?

16  A.  Yes, I see it.

17  Q.  And you remember just meeting Nadine on this occasion

18  one-on-one?

19  A.  I don't have the recollection of this meeting.

20           MR. FEE:  OK.  You can put that down, Mr. Kelly.

21  Q.  You testified about calling, referring to Nadine as family,

22  as sister, or *hermana*, correct?

23  A.  Yes, I did.

24  Q.  And you testified that she confided in you about her

25  frustrations with Mr. Hana, right?

1    A.  Yes.

2    Q.  And she also confided in you about her frustrations about

3    possibly losing her home, right?

4    A.  She mention that, yes.

5    Q.  She mentioned that, and she actually asked you to help get

6    others to pay her mortgage, right?

7    A.  I would like to be more specific on the statement by saying

8    that she asked me to please assist her with getting Will to

9    help her pay for -- or bring the mortgage up to current because

10   he had promised that to her.

11   Q.  And sir, was it your understanding that Nadine was

12   embarrassed about having problems paying her mortgage?

13            MS. POMERANTZ:  Objection.

14            THE COURT:  Sustained as phrased.

15   BY MR. FEE:

16   Q.  Did you have any understanding about her feelings about

17   having issues paying her mortgage -- Nadine?

18   A.  Worry and very concerned about losing her home.

19   Q.  And again, in the interactions you had, where Senator

20   Menendez and Nadine were present, you never heard her bring up

21   problems paying her mortgage, correct?

22   A.  You are absolutely correct.

23   Q.  Now, the senator, you had no text messages with Senator

24   Menendez, right?

25   A.  I don't have any text with the senator.

1    Q.  No personal emails with the senator, right?

2    A.  No, sir.

3    Q.  No form of any written communication at any point in time

4    with the senator, correct?

5    A.  No, sir.

6    Q.  And you only spoke once on the phone with Senator Menendez,

7    right?

8    A.  Correct.

9    Q.  This was the call you testified about in October 2019,

10   right?

11   A.  Yes.

12   Q.  And he called you from his Senate office line in D.C.; that

13   was your testimony?

14   A.  Yes, it was.

15   Q.  That phone call lasted less than three minutes; does that

16   sound right to you?

17   A.  It was a short phone call, yes.

18            THE COURT:  Sir, you were asked, and he called you

19   from the Senate office line in D.C. and you said yes, it was.

20            Do you know -- I believe your testimony was that he

21   said he was in his Senate office.  Is that correct?

22            THE WITNESS:  Your Honor, the senator stated that he

23   was calling me from his office in Washington.

24            THE COURT:  But I take it you don't know what line he

25   was calling you on, whether it was an office line or a personal

O6bWmen5                        Uribe - Cross

1    line or someone else's phone or anything of that nature.

2              THE WITNESS:  That's my recollection, he was calling

3    from his office at Washington, in Washington.

4              THE COURT:  All right.

5    BY MR. FEE:

6    Q.  And your testimony about what Senator Menendez said during

7    that call was that thing you asked me about, there's nothing

8    there, I give you your peace.  That was your testimony, right?

9    A.  Yes, it was.

10   Q.  But even with, by your account, during that call, Senator

11   Menendez did not say that he had met with the New Jersey

12   attorney general, right?

13   A.  He did not mention anything about a meeting with nobody in

14   that call, sir.

15   Q.  So he didn't mention talking or meeting with any government

16   officials, the attorney general, prosecutor, a judge; none of

17   that came up on the call, right?

18   A.  You are correct.

19   Q.  He didn't say the case will be dropped, right?

20   A.  I like to remind you what he said.  He said:  That thing

21   that you asked me, there's nothing there.  I give you your

22   peace.  That's the best to my recollection, sir.

23   Q.  Got it.

24        Nor did he ask you to pay a bribe or to give him anything

25   on that phone call, right?

O6bWmen5                              Uribe - Cross

1              MS. POMERANTZ:  Objection.

2              THE COURT:  Did he ask you to give him anything on

3     that phone call?

4              THE WITNESS:  No, he did not, sir.

5              MR. FEE:  I'm going to start a different subject, your

6     Honor.

7              THE COURT:  Let's break.  It's 5 o'clock.

8              Ladies and gentlemen, enjoy the evening.  Remember not

9     to discuss this case amongst yourselves or with anyone else.

10    We'll pick it up at 9:30 tomorrow.

11             And we'll have an hour and a quarter for lunch.

12    Mr. Solano can't go.

13                 (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O6bWmen5

```
1                    (Jury not present)

2                    THE COURT:  You may step down, sir.

3                    (Witness not present)

4                    THE COURT:  Let me see the attorneys briefly at

5         sidebar, please.

6                    (At sidebar)

7                    THE COURT:  All right.  A couple things.

8                    First of all, how much longer do you think you have?

9                    MR. FEE:  About an hour, your Honor.

10                    THE COURT:  All right.  I want to make a couple of

11        points.  I'm trying to give you a fair amount of leeway here.

12        I think I'm doing that.  Nonetheless, you keep on being overly

13        argumentative.  There's a difference between leading questions

14        and argumentative questions, and you're putting into the

15        questions a fair number of things that are not in the evidence.

16        You have to watch that.  You have to rein it back.  I think you

17        know exactly what you're doing, sir.  You're a good lawyer, and

18        in these past ten minutes of questions, those were the correct

19        questions.  They were leading, but they were dry.  They were

20        factual.  They didn't have -- except for the one about bribery.

21        They didn't have questions where you're demanding that he admit

22        to deceiving and so forth.  Just rein it back.  That's one.

23                    Two is I have indicated to the lawyers that I expected

24        you not to be plowing the same ground over and over again, that

25        you would divide as best you could the subject matters.  I
```

O6bWmen5

1    think in certain, especially at the beginning, the first

2    meeting in Andy's office, both Mr. Solano and Mr. Fee went over

3    and over and over it.  So, too, about complaining about men.

4    So, too, about loan applications and some other things.  I'm

5    just urging you to try to divide it up so that we can keep

6    things moving.

7            I think that's it.  Those were the points I wanted to

8    make.

9            MR. FEE:  Thank you, your Honor.  Understood.

10            MR. RICHENTHAL:  Your Honor, may I?

11            THE COURT:  Yes, sure.

12            Oh, I know.  What in the world is the relevance of

13    Anton?

14            MR. FEE:  Oh, yeah.  So we're offering that under 806

15    to impeach the hearsay of Mr. Hana -- excuse me, the statements

16    of Mr. Hana that were admitted through Mr. Uribe.  Namely,

17    Mr. Uribe says Hana told me --

18            THE COURT:  Wait.  Just let me think about it.

19            MR. FEE:  Yes.

20            Avi has to diagram this out for me -- Mr. Weitzman.

21            THE COURT:  Go ahead.

22            MR. FEE:  Mr. Uribe has testified that Hana told him

23    Nadine and the senator were somehow involved in this offer to

24    kill the investigation.

25            THE COURT:  Yes.  And you asked about that.

O6bWmen5

1          MR. FEE:  The 806 value of those emails is Will Hana,

2     on the same day, is talking to Doug Anton about doing that

3     work, and there's a second email.

4          THE COURT:  What does doing that work mean?

5          MR. FEE:  Mr. Anton actually contacts the New Jersey

6     prosecutors on Mr. Parra's case.  He makes a public records --

7          THE COURT:  What was he doing on Parra's case?

8          MR. FEE:  He was representing him.  Mr. Hana actually

9     engaged him for a brief period of time.

10          THE COURT:  But Uribe doesn't know any of that.

11          MR. FEE:  We're impeaching Hana through Uribe, because

12     that's how the hearsay came in.  Mr. Uribe's offering the

13     statements of Hana, that Hana made to him.  And so under 806,

14     if Mr. Hana himself was sitting here and the government was

15     eliciting the statement that Nadine and the senator were going

16     to help me stop and kill, I would impeach Mr. Hana by saying,

17     you met with Doug Anton, who said he could kill the

18     investigation for $20,000, and then he sent you an email a

19     month later saying here's all the things I did to try to kill

20     this investigation.

21          It's directly contradictory of the statements of

22     Mr. Hana being offered through this witness.  So that's the 806

23     value.

24          THE COURT:  I allowed your line on Anton, didn't I?

25          MR. FEE:  You did.

O6bWmen5

1          THE COURT:  OK.

2          MR. FEE:  But I think this is true 806, and we can

3   write a letter and give you the exhibits.  It doesn't have to,

4   obviously, come in here, but these communications truly impeach

5   the statements of Hana that have come in through Mr. Uribe.

6          THE COURT:  And how do you intend to get in whatever

7   you now are seeking to get in?

8          MR. FEE:  They are emails that are authenticated, and

9   we would get them in to impeach Hana's statements.  That would

10  be the purpose.

11          THE COURT:  I need to think about this.

12          MR. FEE:  Of course.

13          THE COURT:  The train.

14          MR. FEE:  Of course.

15          MR. RICHENTHAL:  I'm going to first respond to the

16  alleged 806 proffer.

17          (Continued on next page)

18

19

20

21

22

23

24

25

O6B5men6                           Uribe - Cross

1          (Continuing at sidebar)

2          MR. RICHENTHAL:  Let me know when the Court is ready.

3          THE COURT:  Go ahead.

4          MR. RICHENTHAL:  So I would like to respond first to

5    this alleged 806 argument.  There is a whole bunch of problems

6    here, I will start with the most obvious.

7          What Mr. Fee was demonstrably trying to do was not

8    impeach Mr. Hana.  If the Court recalls and I am sure the Court

9    does, what Mr. Fee was trying to do was impeach Mr. Uribe.  How

10   do we know that?  Because the quote "kill all the

11   investigations" is a statement of Mr. Uribe.  When oh what

12   Mr. Fee was trying to do was impeach Mr. Uribe and his

13   credibility as to his own statement "to kill all the

14   investigations" by showing that a different person in a

15   communication he was never on, made a statement that's

16   allegedly inconsistent.  That is light years from Rule 806, it

17   is totally improper.  We can separately argue 806 if your Honor

18   would like.  That is demonstrably not what was occurring in

19   court.  That's the granular response.

20         Here is the broader response.  As the Court can

21   probably tell, we had no notice of this exhibit.  We had no

22   notice of any exhibit.  It is not impeachment.  In fact,

23   Mr. Fee has acknowledged he wasn't trying to impeach Mr. Uribe.

24   He has premised his entire argument on trying to impeach

25   Mr. Hana.  By definition, it is not impeachment of Mr. Uribe to

O6B5men6                          Uribe - Cross

1    try to impeach Mr. Hana.  Therefore, this is not a

2    non-impeachment exhibit and we should have been given notice of

3    it so this could have been brief and dealt with appropriately

4    and efficiently.  That is my broader comment, we can deal with

5    that separately.  This is a continual issue, we got exactly

6    zero exhibits with respect to Mr. Uribe, but on the granular

7    point before your Honor this isn't even close to 806.

8              THE COURT:  Sir.

9              MR. FEE:  It is exactly 806.

10             They elicited co-conspirator admissions through this

11   witness.  We are impeaching the co-conspirator's statements put

12   in through this witness.  806 is impeachment.  Period.  That's

13   how this works.

14             THE COURT:  I have got to see it in writing so I can

15   consider it.

16             MR. FEE:  Yes.  Absolutely, your Honor.

17             THE COURT:  We are off the record here just for a

18   minute.

19             (Discussion off record)

20             THE COURT:  See you all tomorrow.

21

22

23

24

25

O6B5men6                          Uribe - Cross

1              (In open court)

2              THE COURT:  9:30 tomorrow.

3              (Adjourned to June 12, 2024, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              INDEX OF EXAMINATION

2    Examination of:                        Page

3    JOSÉ DOLORES URIBE

4    Cross By Mr. Solano  . . . . . . . . . . . .3218

5    Cross By Mr. Fee . . . . . . . . . . . . . .3328

6              DEFENDANT EXHIBITS

7    Exhibit No.                        Received

8     829  . . . . . . . . . . . . . . . . . . .3360

9     1034   . . . . . . . . . . . . . . . . . .3364

10    832  . . . . . . . . . . . . . . . . . . .3383

11    1023   . . . . . . . . . . . . . . . . . .3398

12    180  . . . . . . . . . . . . . . . . . . .3407

13    178  . . . . . . . . . . . . . . . . . . .3408

14

15

16

17

18

19

20

21

22

23

24

25