O6pWmen1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7              Defendants.
                                         Trial
8    ------------------------------x

9                                        New York, N.Y.
                                         June 25, 2024
10                                       9:35 a.m.

11

12   Before:

13
                      HON. SIDNEY H. STEIN,
14
                                         District Judge
15                                       -and a Jury-

16                      APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division
23

24

25
```

O6pWmen1

1

2                          APPEARANCES CONTINUED

3

PAUL HASTINGS LLP
4        Attorneys for Defendant Menendez
BY:  ADAM FEE
5        AVI WEITZMAN
         ROBERT D. LUSKIN
6        RITA FISHMAN

7

8

9    GIBBONS, P.C.
         Attorneys for Defendant Hana
10   BY:  LAWRENCE S. LUSTBERG
         ANNE M. COLLART
11       CHRISTINA LaBRUNO
         ANDREW J. MARINO
12       RICARDO SOLANO, Jr.
         ELENA CICOGNANI
13       JESSICA L. GUARRACINO

14

15   CESAR DE CASTRO
     SETH H. AGATA
16   SHANNON M. McMANUS
         Attorneys for Defendant Daibes

17

18

     Also Present:  Marwan Abdel-Rahman
19                   Rodina Mikhail
                     Interpreters (Arabic)
20
                     Rachel Wechsler
21                   Connor Hamill
                     Braden Florczyk
22                   Paralegal Specialists, U.S. Attorney's Office

23                   Justin Kelly, DOAR

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
 1                (Jury not present)

 2                THE COURT:  Good morning.

 3                Please be seated.

 4                I understand the government has an issue, but at the

 5      same time, the jury seems to be quite excited that they're all

 6      here on time, and they've told my deputy they'd like to start

 7      right away.

 8                Can the government issue wait for a break?

 9                MR. RICHENTHAL:  Not unless the defense doesn't use

10      certain exhibits to which we have objections in the early part

11      of the cross.

12                THE COURT:  Mr. Weitzman.

13                MR. WEITZMAN:  I think it may come up early, so I

14      think we need to deal with it.

15                THE COURT:  What are they?

16                MR. RICHENTHAL:  There are several exhibits with

17      respect to --

18                THE COURT:  I have to say that one of the jurors

19      complained to my deputy that even after the jury is here we

20      don't seem to start right away.

21                Let's go.  What is it?

22                MR. RICHENTHAL:  There are several exhibits with

23      respect to Mr. Menendez and one with respect to Mr. Hana.

24                Taking Mr. Menendez's first, if I could ask

25      Ms. Wechsler, our paralegal, to call up the exhibit that we
```

O6pWmen1

1    received this morning.  I think it's 2122.  I'll get the

2    number -- 2127.  Excuse me.

3              THE COURT:  Yes.  Put it up.

4              MR. RICHENTHAL:  And specifically 2127-A.

5              THE COURT:  Put it up.

6              MR. RICHENTHAL:  I think it's coming up, your Honor.

7              THE COURT:  All right.  It's not up.

8              Mr. Weitzman, just hold off on whatever the issues are

9    until after the break.

10             Bring this jury in.

11             And you said two hours.  Talk to each other.  Always

12   talk to each other.

13             Mr. Weitzman, I think you said two hours.  Is that

14   still the estimate?

15             MR. WEITZMAN:  That's the goal, yes, your Honor.

16             THE COURT:  We'll break after about an hour and a

17   half.

18             MR. LUSTBERG:  Just so that you don't mistakenly pass

19   over us, I have (inaudible)

20             All I was saying, Judge, is that sometimes you go

21   right to redirect.  I will have a little bit after

22   Mr. Weitzman.

23             Thank you.

24             THE COURT:  Understood.

25             (Continued on next page)

O6pWmen1                        Arkin - Cross

 1              (Jury present)

 2              THE COURT:  Good morning.

 3              THE WITNESS:  Good morning.

 4              THE COURT:  Please be seated in the courtroom.

 5              Good morning, ladies and gentlemen of the jury.  Thank

 6     you for being here on time.

 7              You may continue with your cross-examination of this

 8     witness.

 9              You remain under oath.  You understand that, correct?

10              THE WITNESS:  Yes.

11              THE COURT:  All right.

12              Proceed, Mr. Weitzman.

13      SARAH ARKIN, resumed.

14     CROSS-EXAMINATION CONTINUED

15     BY MR. WEITZMAN:

16     Q.  Good morning, Ms. Arkin.

17     A.  Good morning.

18     Q.  When we last left off yesterday, we were talking about

19     Senator Menendez's approach with respect to human rights in

20     Egypt.  Do you recall that?

21     A.  Yes.

22     Q.  And one of the documents that you testified about was an

23     April 2019 letter, signed by Senator Menendez and a dozen-plus

24     other senators, correct?

25     A.  Yes.

O6pWmen1                         Arkin - Cross

1   Q.  And in that letter, Senator Menendez and other senators

2   specifically complained about Egypt's human rights record,

3   right?

4   A.  Yes.

5   Q.  And in addition, you testified yesterday about a March 2018

6   press release issued by Senator Menendez about Egypt's human

7   rights record, correct?

8   A.  Yes.

9   Q.  And in that press release, again, Senator Menendez

10  complained about Egypt's human rights record, correct?

11  A.  I wouldn't say complained but criticized, yes.

12          MR. WEITZMAN:  OK.  Criticized Egypt's human rights

13  record.

14          Now, if we could put up that press release, which is

15  marked Defense Exhibit 434.  It is in evidence.  Zoom in on the

16  top.

17  Q.  The press release is dated March 7, 2018, correct?

18  A.  Yes.

19  Q.  And it's a letter that Senator Menendez, Cory Booker and

20  others issued to Secretary of State Rex Tillerson, right?

21  A.  Yes.  It's a press release about the letter.

22  Q.  And Rex Tillerson was the secretary of state under Donald

23  Trump?

24  A.  He was the first secretary of state, yes.

25          MR. WEITZMAN:  Correct.

O6pWmen1                          Arkin - Cross

1   Q.  Now, do you recall anything else that Senator Menendez did

2   on March 7, 2018, with respect to Egypt?

3   A.  I believe that the invitation we looked at yesterday was

4   also written on that same day.

5               MR. WEITZMAN:  Correct.

6               Can we put up Government Exhibit 3A-1.

7               MR. RICHENTHAL:  Objection to defense counsel

8   commenting correct.

9               THE COURT:  Yes.  The jury knows what the lawyers say

10  is not evidence.

11              Proceed.

12              MR. WEITZMAN:  Can we put up Defense Exhibit 3A-1.

13  Q.  This was the handwritten note that you testified about

14  yesterday provided by Senator Menendez to Rob Kelly and then

15  forwarded to you, correct?

16  A.  Yes.

17  Q.  And if we can go to the handwritten note, so, before we

18  talk about this handwritten note, I just want to understand

19  your views of Senator Menendez's approach with respect to

20  Egypt.  OK?

21  A.  OK.

22  Q.  Is it correct to say that Senator Menendez took a

23  carrots-and-sticks approach to diplomacy with Egypt?

24              MR. RICHENTHAL:  Objection.  Time frame.

25              THE COURT:  When do you mean, sir?

O6pWmen1                              Arkin - Cross

1    BY MR. WEITZMAN:

2    Q.  Let's say before -- at around this time, in March 2018, was

3    Senator Menendez taking a carrots-and-sticks approach to

4    diplomacy with Egypt?

5    A.  I would say he had -- yes, a variety of measures and

6    tactics that he was -- that he used to engage with Egypt.  But

7    I would also note at this specific time, I wasn't specifically

8    on the Middle East portfolio.  So I didn't have a hand in

9    crafting that March 7, 2018, statement that went out.  He --

10   Q.  OK.  When you did take over the Middle East portfolio, it

11   was shortly after March 2018, right?

12   A.  November-ish 2018.

13   Q.  OK.  Would you agree that he used a carrots-and-sticks

14   approach to diplomacy with Egypt?

15            MR. RICHENTHAL:  Objection.  Vague.

16            THE COURT:  If you understand it, you can answer or

17   you can put it in your own words, what his approach was.

18   A.  Yeah, I would say you need to be more specific.  He did --

19   he did raise human rights concerns in meetings in which I was

20   present with senior -- Egyptian government officials, he raised

21   human rights and the importance of respecting democratic values

22   and norms for the durability and the viability of the bilateral

23   relationship as well as for the sake of human rights and

24   individual rights in Egypt.  He took -- he was -- he raised

25   those specifically with individuals, individuals with whom he

O6pWmen1                              Arkin - Cross

1   was meeting.

2   Q.  OK.  You recall him raising that -- those human rights

3   concerns -- with Abbas Kamel, correct?

4   A.  Yes.

5   Q.  And you recall him raising it with other officials from

6   Egypt, correct?

7   A.  Yes.

8   Q.  You're aware that he raised it as well with President

9   El-Sisi in a personal meeting in Egypt?

10          MR. RICHENTHAL:  Objection.  Assumes a fact.

11          THE COURT:  Just break it down.

12  BY MR. WEITZMAN:

13  Q.  Are you aware of the -- as part of your responsibilities,

14  for your desk in the Middle East, were you apprised of Senator

15  Menendez's meeting with President El-Sisi in spring of 2021 on

16  the CODEL?

17  A.  The CODEL was fall of 2021.

18  Q.  Fall of 2021.  Thank you.

19  A.  I believe I got a verbal readout from a colleague who was

20  in the meeting who was on the CODEL, and I think the readout

21  said that he largely stuck to the talking points and memo that

22  was prepared which included points on human rights.

23  Q.  And the colleague that gave you that readout was Damian

24  Murphy, right?

25  A.  Yes.

O6pWmen1                         Arkin - Cross

1    Q.  And he told you, did he not, in fall of 2021, that Senator

2    Menendez criticized El-Sisi regarding Egypt's human rights

3    record?

4                MR. RICHENTHAL:  Objection, your Honor.  Hearsay.

5                THE COURT:  I'll allow it simply for whether or not it

6    was said.

7    A.  I -- they -- I don't recall specifically.  The readout I

8    got was that he mostly stuck to the points that were in the

9    memo.  The memo included points, raising points on human

10   rights.

11   Q.  Did Damian Murphy tell you, by any chance, that what

12   Senator Menendez did in his meeting with President El-Sisi on

13   the CODEL was a master class in dealing with a dictator?

14               MR. RICHENTHAL:  Objection.

15               THE COURT:  Sustained.

16               MR. WEITZMAN:  In addition to -- let's put this note

17   down.  I want to ask you one additional question about press

18   releases.  Can we put up Defense Exhibit 435 for identification

19   to the witness only and the Court.

20   Q.  Do you recognize this as a March 6, 2020, press release

21   issued by Senator Menendez?

22   A.  Yes.

23               MR. WEITZMAN:  We offer Defense Exhibit 435, again,

24   not for the truth, just for the fact that it was said.

25               MR. RICHENTHAL:  No objection with the standard

O6pWmen1                          Arkin - Cross

1   limiting instruction.

2              THE COURT:  Admitted.

3              (Defendant's Exhibit 435 received in evidence)

4              THE COURT:  Ladies and gentlemen, you know the

5   instruction.

6   BY MR. WEITZMAN:

7   Q.  Ms. Arkin, this was the March 6, 2020, press release that

8   Senator Menendez issued, correct?

9   A.  Yes.

10  Q.  And it's titled, Menendez marks international women's day

11  elevating plight of 25 women political prisoners, correct?

12  A.  Yes.

13  Q.  Did you have any involvement in drafting this?

14  A.  Yes, I believe my team drafted the Middle East sections of

15  this.

16             MR. WEITZMAN:  And let's just highlight the first two

17  paragraphs.  I'll let the jury read it to themselves.

18             THE COURT:  Yes, sir.

19             MR. WEITZMAN:  If we can go to the second page.  And

20  if we can highlight the paragraph that starts with, in Egypt,

21  I'd like to read that into the record.

22             THE COURT:  There's no need to read it.  It's in

23  evidence.  It's the paragraph that begins, in Egypt.  The jury

24  can read it to itself.

25  BY MR. WEITZMAN:

O6pWmen1                          Arkin - Cross

1    Q.  Is this the paragraph you're referring to that you or your

2    team helped draft, Ms. Arkin?

3    A.  Yes, one of them.

4    Q.  OK.  Let's read that.

5    A.  "In Egypt --"

6    Q.  You don't have to read it out loud.

7              THE COURT:  The jury will read it to itself.

8              Ladies and gentlemen, it's in evidence already, so you

9    can look at it in your deliberations, but look at it now.

10   BY MR. WEITZMAN:

11   Q.  Ms. Arkin, you'd agree with me that this paragraph does not

12   paint President Sisi in a positive light?

13             MR. RICHENTHAL:  Objection.

14             THE COURT:  I'll allow it.

15   A.  No, it does not.

16   Q.  And you would agree with me, in March 2020, Senator

17   Menendez was still criticizing President Sisi for his human

18   rights abuses, right, publicly?

19             MR. RICHENTHAL:  Is he asking beyond this document?

20   BY MR. WEITZMAN:

21   Q.  I'm asking about this document and March 2020, Senator

22   Menendez was criticizing Sisi publicly for his human rights

23   record, right?

24   A.  This statement is critical of -- of President Sisi, yes.

25             MR. WEITZMAN:  OK.  Now, we can take that down.

O6pWmen1                         Arkin - Cross

1   Q.  At the same time that Senator Menendez is criticizing

2   Egypt, it's important for the United States to maintain its

3   strategic allyship with Egypt, correct?

4          MR. RICHENTHAL:  Objection.  First part of the

5   question --

6          THE COURT:  I'll allow that.  The question is, is it

7   important for the United States to maintain its strategic

8   allyship with Egypt in March of 2020?

9          THE WITNESS:  Well, that depends on who you asked, I

10  would suppose.

11         MR. WEITZMAN:  OK.  Let's break that down.

12         THE COURT:  Ma'am, if you move yourself closer, it's a

13  directional mic.

14         OK.

15  BY MR. WEITZMAN:

16  Q.  The executive branch, the State Department, certainly

17  believed in 2020 and 2021, all the way to the present, that

18  it's important to maintain a strategic allyship with Egypt,

19  correct?

20         MR. RICHENTHAL:  Objection.

21         THE COURT:  Did the State Department believe in '20

22  and '21 that it's important to maintain its strategic allyship

23  with Egypt?

24         THE WITNESS:  Yes.

25  BY MR. WEITZMAN:

O6pWmen1                          Arkin - Cross

1    Q.  And you had many conversations with Senator Menendez about

2    the important role that Egypt plays strategically to the United

3    States in the Middle East, right?

4    A.  I don't know that I had many conversations about it, but

5    that has been his historical position.

6    Q.  OK.  You'd present briefings and he would talk to you about

7    your briefing, your brief memos, right?

8    A.  Sometimes.

9    Q.  OK.  And in those conversations, he made clear to you that

10   Egypt plays an important strategic role in the Middle East for

11   the United States, right?

12          MR. RICHENTHAL:  Objection.  Made clear.

13          THE COURT:  I'll allow it.

14   A.  I don't recall a specific conversation we had where that

15   phrase was used, but certainly his public statements indicated

16   that memos that I presented, conversations that he had with

17   other people, who he affirmed.  I don't remember direct --

18   Q.  OK.

19   A.  -- deep, extensive conversations.

20   Q.  Since the 1970s, the signing of the Camp David Accord,

21   Egypt has been the second largest military aid recipient in the

22   world from the United States, right?

23   A.  Correct.

24   Q.  And by the way, the Camp David Accord, that's when Egypt,

25   Israel and the United States signed a treaty, and Israel and

O6pWmen1                        Arkin - Cross

1    Egypt finally recognized each other, is that correct?

2    A.  Israel and Egypt signed a treaty.

3              MR. WEITZMAN:  Correct.  Sorry.  The United States

4    under Jimmy Carter was present, right.

5    Q.  In any event, that military aid that the United States

6    gives to Egypt is in the United States's -- has been deemed to

7    be in the United States's interest, correct, by the State

8    Department?

9              MR. RICHENTHAL:  Objection.  Time frame.  Form.

10   Deemed.

11   BY MR. WEITZMAN:

12   Q.  The state department releases that money, gives that money

13   to Egypt in the United States's interest, right?

14             MR. RICHENTHAL:  Objection.

15             THE COURT:  I'm sorry?

16             MR. RICHENTHAL:  The question seems to be asking

17   literally about the past 50 years.  I think that we should have

18   some time frame here.

19             MR. WEITZMAN:  I think it's appropriate for every year

20   that the money's been released.

21             THE COURT:  Since the Camp David Accords, why don't

22   you make it that way, sir.

23             Go ahead.

24   BY MR. WEITZMAN:

25   Q.  Since the Camp David Accords, the United States releases

O6pWmen1                              Arkin - Cross

1   the money because it's in the United States's interest,

2   correct?

3   A.   That's what the State Department argues when they send up

4   the notification to Congress for the release of funds.

5   Q.   Thank you.

6   A.   And Congress has continued to authorize and appropriate

7   those funds.

8   Q.   One of the reasons why the State Department and Senator

9   Menendez have taken the position that Egypt is an important

10  strategic ally is because Egypt is critical to the fight

11  against terrorism in the Middle East, correct?

12          MR. RICHENTHAL:  Compound.

13          THE COURT:  Yes.  Sustained.

14          In your view, is Egypt critical to the fight against

15  terrorism in the Middle East?

16          THE WITNESS:  That is a complicated question that

17  would require a lot of debate, but Egypt's -- Egypt and the

18  United States, I would say factually continue to work together

19  on efforts to combat counterterrorism.

20          MR. WEITZMAN:  Thank you.

21          THE WITNESS:  Efforts to counterterrorism, not to

22  combat counterterrorism.

23          MR. WEITZMAN:  Right.

24  Q.   And for instance, in the 2018, '19 and '20 time frame, the

25  United States gave weapons to Egypt to combat ISIS, correct?

O6pWmen1                          Arkin - Cross

1    A.  I don't recall the specific systems and weapons and the

2    time frames.  I'm not looking at the notifications, but that

3    sounds -- yes, we -- United States and Egypt have worked

4    together to continue to combat ISIS and other terrorist threats

5    over time.

6            THE COURT:  With Egypt.

7            THE WITNESS:  Yes.

8    BY MR. WEITZMAN:

9    Q.  And more broadly speaking, does the United States, the

10   administration, view Egypt as an important counterweight to the

11   growing influence of Iran in the region?

12           MR. RICHENTHAL:  Objection.  The administration.  How

13   it views things.  Time frame.

14           THE COURT:  I will allow it.

15           Is it the view of the executive branch that Egypt is

16   an important counterweight to the growing influence of Iran in

17   the region?  Yes, no, I don't know, or it's complicated.

18           THE WITNESS:  It's complicated.

19   BY MR. WEITZMAN:

20   Q.  There is an emphasis in the United States, this current

21   administration, that it needs to support regimes that can be a

22   counterweight to Iran in the Middle East, correct?

23           MR. RICHENTHAL:  The current administration is not

24   relevant to this case, your Honor.

25   BY MR. WEITZMAN:

O6pWmen1                          Arkin - Cross

1  Q.  Let's go to 2020 to '22, in that administration; would you

2  agree with that statement?

3  A.  I would say in the years 2020 and 2021, the presidential

4  administration was very focused on countering Iran.  There were

5  a number of ways and efforts it did.  The Trump administration,

6  from my perspective, not serving in the administration,

7  cultivated -- sought to cultivate strong ties with the Sisi,

8  with President El-Sisi in Egypt and other countries.  One of

9  those strategic objectives was to counter Iran.  That was an

10  overarching theme of their foreign policy.

11          MR. WEITZMAN:  OK.  Thank you.

12  Q.  I assume that in the years that you worked with Senator

13  Menendez, you didn't always see eye to eye with his policy

14  preferences?

15  A.  No.  I was generally pretty aligned with his policy

16  preferences.  There were certainly issues where I didn't

17  completely agree.

18  Q.  And that's probably common among staffers and the chairman

19  or ranking member; you're the agent carrying out the

20  principal's policy objectives, correct?

21          THE COURT:  Wait.  Is the question is she an agent,

22  not in the legal sense, but an agent of Senator Menendez in

23  carrying out his policy objectives?

24          MR. WEITZMAN:  Yes.

25  A.  I wouldn't use the word "agent."  I would say it's my job

O6pWmen1                          Arkin - Cross

1   to represent his views.

2           MR. WEITZMAN:  OK.  Fair enough.  Thank you.

3           THE COURT:  You did that to the best of your ability,

4   correct?

5           THE WITNESS:  I'm sorry?

6           THE COURT:  You did that to the best of your ability.

7           THE WITNESS:  Yes.

8           THE COURT:  All right.

9   BY MR. WEITZMAN:

10  Q.  And sometimes you had disagreements with him about how

11  vocal the United States or Senator Menendez should be in taking

12  Egypt on its human rights record, right?

13  A.  I don't recall any -- I mean what do you mean

14  disagreements?

15  Q.  Well, you had a difference of opinion as to how you and

16  Senator Menendez -- or how Senator Menendez, how vocal Senator

17  Menendez should be in publicly criticizing Egypt regarding its

18  human rights record?

19  A.  I don't -- can you be more specific?

20  Q.  Yes.  In March 2019, you testified yesterday that you

21  delivered a letter to him that was more vocal than he wanted to

22  be in criticizing Egypt, right?

23  A.  Yes.  But he didn't want to issue the letter and -- I mean

24  he didn't want to issue the letter.  That's his prerogative.

25  Q.  Correct, but fair to say that you were a strong proponent

O6pWmen1                          Arkin - Cross

1    of publicly criticizing in a more vocal way Egypt regarding its

2    human rights record?

3             THE COURT:  More vocal than Senator Menendez wanted?

4             MR. WEITZMAN:  Correct.

5    A.  In this particular instance, the president of Egypt was

6    coming to the United States.  I saw there was an opportunity

7    for him to continue to take a vocal public stance in this

8    particular instance.

9    Q.  Ms. Arkin, can you answer my question yes or no, if

10   possible?

11            MR. RICHENTHAL:  Your Honor --

12   BY MR. WEITZMAN:

13   Q.  If you can't, just let me know.

14            THE COURT:  Fair enough.

15   A.  No.  I don't think it's a yes-or-no question.

16   Q.  OK.  Let me ask it again.

17        In connection with the March 2019 letter that you drafted,

18   you wanted Senator Menendez to be more vocal and public about

19   criticizing Egypt on its human rights record, right?

20   A.  I wouldn't say wanted.  I recommended he send this letter.

21   Q.  OK.  So recommended, you recommended that he send a more

22   vocal public criticism of Senator Menendez?  Yes or no.

23   A.  Of President Sisi, yes.

24   Q.  OK.

25   A.  Based on his past directions.

O6pWmen1                          Arkin - Cross

1    Q.  And in part, that aligns with your personal perspective

2    regarding Egypt's abuses of human rights and how to deal with

3    Egypt, right?

4              MR. RICHENTHAL:  Objection.

5              THE COURT:  I'll allow it.

6    BY MR. WEITZMAN:

7    Q.  Yes or no.

8    A.  In this particular case, because President Sisi was coming

9    to Washington, D.C., and there was going to be an opportunity

10   for engagement and a lot of press coverage, I saw in this

11   particular moment an opportunity to raise these concerns.

12   Q.  OK.  And he disagreed with you, right?

13   A.  He --

14   Q.  Yes or no --

15             MR. RICHENTHAL:  Objection.

16   Q.  -- Ms. Arkin.

17             THE COURT:  Just a moment.  If you can answer a

18   question yes or no, you should do so.

19             THE WITNESS:  OK.

20             THE COURT:  If you can't, I take it what you should

21   say is that I can't answer that.  If Mr. Weitzman says yes or

22   no, and you can't answer it yes or no, say I can't answer that

23   yes or no.  Then Mr. Weitzman will either ask another question

24   or it will be his decision.

25             THE WITNESS:  OK.

O6pWmen1                          Arkin - Cross

1          THE COURT:  OK.

2   A.  In this particular case, he disagreed with this approach.

3   Q.  OK.

4   A.  Yes.

5   Q.  Fair to say reasonable minds can disagree on how to address

6   human rights in Egypt, right?

7          MR. RICHENTHAL:  Objection.

8   BY MR. WEITZMAN:

9   Q.  Yes or no.

10          THE COURT:  If you can answer that yes or no, do so.

11   If you can't, say I can't answer that yes or no.

12   A.  I would say yes, different people can have different

13   opinions about how to address it.

14   Q.  And he's the elected representative; he's the senator,

15   right?

16   A.  Yes.

17   Q.  You'd agree with me in your conversations with him about

18   Egypt, he was very informed about Egypt policy, right, or the

19   U.S. policy towards Egypt?

20          MR. RICHENTHAL:  Objection.  Vague.

21          THE COURT:  I'll allow it.

22          If you can answer that, you can answer it.

23   A.  Yes.

24   Q.  Very intelligent about these matters of strategy and

25   diplomacy, correct?

O6pWmen1                    Arkin - Cross

1    A.  Yes.

2    Q.  When you'd present a briefing paper, he'd ask you questions

3    sometimes that went beyond the briefing paper to push the

4    analysis even more deeply than your briefing paper had, right?

5    A.  Sometimes.

6    Q.  OK.  Dealing with dictators isn't always easy, right?

7            MR. RICHENTHAL:  Objection.

8            THE COURT:  If you can answer that, you may.

9    A.  No.

10   Q.  President Sisi is a military dictator, right?

11   A.  Some people have called him a military dictator.

12   Q.  Do you agree with that statement?

13           MR. RICHENTHAL:  Objection, your Honor.  Her

14   personal --

15           THE COURT:  Yes.  In this case, yes.  Sustained.

16   BY MR. WEITZMAN:

17   Q.  In dealing with a military dictator, sometimes you have to

18   use powers of persuasion, right?

19   A.  I think you need to be more specific.

20           MR. RICHENTHAL:  Your Honor, we object to the

21   characterization.  If he's talking about Mr. Sisi, he should

22   talk about Mr. Sisi.  The united States has a policy on this.

23           THE COURT:  Proceed.  Next question.

24   BY MR. WEITZMAN:

25   Q.  In any event, would you -- you've sat in meetings with

O6pWmen1                        Arkin - Cross

 1   Senator Menendez addressing foreign leaders, right?

 2   A.  Yes.

 3   Q.  And you've sat -- have you sat in meetings where he's

 4   addressing dictators or authoritarian leaders?

 5   A.  No, I don't actually think I have.

 6   Q.  In any event, would you agree with me that Senator Menendez

 7   is a skilled negotiator with foreign leaders?

 8   A.  Yes.

 9             MR. RICHENTHAL:  Objection.

10             THE COURT:  I'll allow that.

11             He's your employer, correct?

12             THE WITNESS:  Yes.

13             THE COURT:  All right.  Let's proceed.

14             THE WITNESS:  He's not actually my employer at the

15   moment.

16             THE COURT:  Oh.  Because you're employed by the SFRC

17   of which he is the chair.

18             MR. WEITZMAN:  No longer the chair.

19             THE COURT:  Oh, I'm sorry.  Of which he is a member.

20             THE WITNESS:  Yes.

21             THE COURT:  OK.

22             Proceed.

23   BY MR. WEITZMAN:

24   Q.  And we'll get to this, but in fact, you're leaving the SFRC

25   shortly, right?

O6pWmen1                          Arkin - Cross

1   A.  I am.

2   Q.  You got a promotion, a lateral promotion?

3   A.  I'm moving to a different agency.

4   Q.  You're moving to the State Department, right?

5   A.  Yes.

6           MR. WEITZMAN:  OK.  We'll talk about that in a moment.

7   Q.  We talked yesterday a bit about the New Jersey's Coptic

8   Christian community.  Do you recall that?

9   A.  Yes.

10  Q.  And you testified that New Jersey does have a large Coptic

11  Christian community, right?

12  A.  Yes.

13  Q.  And Senator Menendez advised you that this Coptic Christian

14  community is an important constituency of his, right?

15  A.  I mean, it is, yes.

16  Q.  And you know from your own expertise that Coptic Christians

17  are generally supportive of El-Sisi, correct?

18          MR. RICHENTHAL:  This was gone through at some length

19  yesterday, your Honor.

20          MR. WEITZMAN:  I'm addressing a portion of her

21  testimony from yesterday.

22          THE COURT:  Go ahead.  You may answer.

23  A.  There's a faction of the Coptic community in New Jersey

24  that is supportive of President Sisi.

25  Q.  And when I asked you yesterday about this, you said that

O6pWmen1                          Arkin - Cross

1   the -- that it's a complicated issue because of the way the

2   Muslim Brotherhood had treated Coptic Christians after the Arab

3   Spring, right?

4   A.  It's far more complicated than that, but that is one

5   element of what makes the relationship complicated.

6   Q.  And just to break that down, the Muslim Brotherhood, after

7   the Arab Spring, won the democratic elections, correct?

8   A.  It did.

9   Q.  And what they started doing was inciting violence against

10  Coptic Christians, right?

11              MR. RICHENTHAL:  Your Honor, this is 403.

12              THE COURT:  No.  I'll permit it.

13  A.  I would say it's far more complicated to be able to answer

14  than a yes-or-no question like that.

15  Q.  OK.  Were there reports of Muslim Brotherhood murdering or

16  inciting others to murder Coptic Christians?

17              THE COURT:  Sustained.

18  BY MR. WEITZMAN:

19  Q.  Are you aware, in your role, that the Muslim Brotherhood

20  was disbanded by President El-Sisi?

21              MR. RICHENTHAL:  Objection.

22              THE COURT:  I'll allow it.

23  A.  Again, I think it's a much more complicated conversation

24  about it that involves many, many decades of history.

25  Q.  OK.  In fact, the Muslim Brotherhood, in a general sense,

1    was not good to Coptic Christians in Egypt, correct?

2               MR. RICHENTHAL:  Objection.

3               THE COURT:  Sustained.

4    BY MR. WEITZMAN:

5    Q.  Have you seen press saying that the Muslim Brotherhood has

6    a war on Coptic Christians?

7               MR. RICHENTHAL:  Hearsay.  403.

8               THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  You're aware that the Muslim Brotherhood is now outlawed in

11   Egypt?

12   A.  Effectively, yes.

13   Q.  OK.  And they're declared a terrorist organization in

14   Egypt, right?

15              MR. RICHENTHAL:  Objection.

16              THE COURT:  I'll allow it.

17   A.  I'm aware that Egypt, yes, treats them as a terrorist

18   organization.

19   Q.  And so do many other Gulf states, right?

20              MR. RICHENTHAL:  Objection.

21              THE COURT:  Sustained.

22   BY MR. WEITZMAN:

23   Q.  So do other gulf states?

24              THE COURT:  Sustained.

25   BY MR. WEITZMAN:

O6pWmen1                          Arkin - Cross

1   Q.  Does Saudi Arabia?

2            MR. RICHENTHAL:  Objection to other countries.

3            THE COURT:  Yes.

4   BY MR. WEITZMAN:

5   Q.  In any event, as a result of whatever the complicated

6   history is, Coptic Christians in New Jersey generally support,

7   or a faction of them support the El-Sisi regime, right?

8            THE COURT:  You've established that twice.

9            MR. WEITZMAN:  Yes.

10           THE COURT:  Or you did once and on direct once.

11  BY MR. WEITZMAN:

12  Q.  You testified that you're aware that the senator met with

13  Coptic bishops in New Jersey, correct?

14           MR. RICHENTHAL:  She testified to one.

15  BY MR. WEITZMAN:

16  Q.  Met with a Coptic bishop in New Jersey?

17  A.  I'm aware that he's met with leaders of the Coptic

18  community in New Jersey.

19  Q.  And in fact, you're aware that the Coptic church has its

20  own Pope, is that correct?

21  A.  Yes.

22  Q.  And when the pope of the Coptic church came to the United

23  States, he came to Jersey City, New Jersey, right?

24  A.  I believe that sounds right.

25  Q.  You'd agree with me that the senator, Senator Menendez, has

O6pWmen1                        Arkin - Cross

1    to balance various constituents' interests on a daily basis?

2              MR. RICHENTHAL:  Objection.

3              THE COURT:  I'll allow it.

4    A.  Yes.

5    Q.  And you'd also agree with me that his strategy applying

6    quiet engagement with Egypt seems to have some benefit, is that

7    correct?

8              THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  Well, do you remember an incident where a New Jersey

11   resident, a young man, a student, was arrested and imprisoned

12   in Egypt?

13   A.  Yes.

14   Q.  And do you recall that Senator Menendez lobbied with Egypt

15   to have him released and returned to his family in New Jersey?

16             MR. RICHENTHAL:  Objection.

17             THE COURT:  I'll allow it.  I'll allow it.

18   A.  I remember he raised the case with Abbas Kamel when he

19   visited in June.

20   Q.  Right.  That was June 2020, right?

21   A.  2021, I think.

22   Q.  2021.  That's after this conversation where the senator

23   said he wanted a more quiet engagement with Egypt, right?

24   A.  Yes.

25   Q.  And after the senator raised it, this young man was

O6pWmen1                          Arkin - Cross

1    released from Egyptian prison, right?

2    A.  Yes.  I don't remember the exact time frame -- timeline.

3    Q.  Do you recall that the student, the New Jersey student,

4    that his name was Mohamed Amashah?

5           MR. RICHENTHAL:  Objection, your Honor.  I don't think

6    the name is necessary.

7           MR. WEITZMAN:  This is all public information.

8           THE COURT:  I'll allow it.

9           Move forward.

10   A.  No.  I remember a different case.

11   Q.  OK.

12   A.  Different name.  I mean I -- well, I think you might be

13   mixing two different cases, two different names.

14   Q.  OK.  Let's talk about the one that I just referenced.  Was

15   that also another New Jersey resident who had been imprisoned

16   for over a year in Egypt?

17   A.  I don't think there was -- I don't recall anyone named

18   Mohamed Amashah.  I remember there was a case of, I think,

19   Justin Amashah.  I can't remember his first name, but there was

20   a separate case.

21   Q.  And the senator, on both those cases, lobbied on behalf of

22   the release of these students from Egypt, right?

23          MR. RICHENTHAL:  Objection to lobby.

24          THE COURT:  Yes.  I'm not sure what you mean when you

25   say lobby.

O6pWmen1                          Arkin - Cross

1    MR. WEITZMAN:  Fair enough.

2    Q.  In both of those cases, Senator Menendez advocated with his

3    Egyptian counterparts on the release of these students from

4    Egyptian prisons, right?

5    A.  I remember him advocating on behalf of the not Amashah

6    case.

7    Q.  OK.

8    A.  A different one that was referenced yesterday.

9    Q.  And that student was released from an Egyptian prison,

10   right?

11   A.  Ultimately he was, yes.

12   Q.  And he was returned safely to New Jersey?

13   A.  As far as I know.

14   Q.  Fair to say that Senator Menendez's relationship with Egypt

15   was beneficial in that situation?

16        MR. RICHENTHAL:  Objection.

17        THE COURT:  In that situation, I will allow it.

18        Did his relationship with Egypt assist in the release

19   of the young man?

20        THE WITNESS:  I don't -- I know that his -- I think

21   his personal engagement on the issue assisted in the release.

22        MR. WEITZMAN:  Thank you.  That's a better way of

23   putting it.

24   Q.  Now, you talked about -- you testified about a March 2018

25   meeting with General Shawky that you attended, correct?

O6pWmen1                         Arkin - Cross

1    A.  Yes.

2    Q.  Now, a huge part of Senator Menendez's job as either the

3    ranking member or the chairman of SFRC, depending on time

4    frame, was to meet with foreign leaders, right?

5    A.  Yes.

6            MR. RICHENTHAL:  Objection.  Form.

7    BY MR. WEITZMAN:

8    Q.  He did so regularly, right?

9    A.  Yes.

10   Q.  Multiple times a month?

11   A.  Yes.

12   Q.  Sometimes those meetings were in the daytime, right?

13   A.  Yes.

14   Q.  In his office, for example?

15   A.  Yes.

16   Q.  Or some other office in the Senate?

17   A.  Yes.

18   Q.  And sometimes those meetings were in the evenings, right?

19   A.  I'm not aware of any official meetings that were in the

20   evenings.

21   Q.  Are you aware of embassy parties, for example?

22   A.  Yes.

23   Q.  And he would attend embassy parties, right?

24   A.  Yes.  I wouldn't call those meetings.

25   Q.  OK.  Well, those are social events?

O6pWmen1                         Arkin - Cross

1    A.  Yes.

2    Q.  OK.

3    A.  Professional social events, but not official meetings.

4    Q.  Got it.

5          And so he would have social, professional social

6    events in the evenings with foreign leaders, right?

7    A.  Yes.

8    Q.  And that was a fairly common thing for Senator Menendez to

9    do, right?

10   A.  He -- he did them.  I don't know how -- I don't know off

11   the top of my head how often he did them.

12   Q.  Because you don't control his calendar, right?

13   A.  Right.

14   Q.  So you don't know what he was doing on a nightly basis with

15   dinners or embassy parties or the like?

16   A.  As the deputy staff director, I did see his calendar every

17   day.

18   Q.  OK.  So you don't control his calendar, but you had access

19   to his calendar, right?

20   A.  Yes.

21   Q.  And if the event was on his calendar, you saw it, correct?

22   A.  Yes.

23   Q.  But you don't know whether all events are reflected on his

24   calendar, right, all social events?

25   A.  No, I suppose not.

O6pWmen1                          Arkin - Cross

1    Q.  Some of the social events, professional social events he

2    attended were in D.C., right?

3    A.  An embassy party would be in D.C.

4    Q.  Yes.  Some of them, not uncommonly, were in New York and

5    New Jersey, right?

6    A.  I would need more specifics on what kind of events you're

7    talking about.

8    Q.  Well, have you heard of a dinner hosted by Qatari emir in

9    New York?

10   A.  Yes.

11   Q.  And he attended that dinner, right?

12   A.  I believe so.

13   Q.  As did other senators, right?

14   A.  I don't know.

15   Q.  OK.  But not uncommon to have events hosted in New York

16   near the U.N., right?

17   A.  No, not uncommon.

18   Q.  And you didn't attend the New York or New Jersey events,

19   right?

20   A.  No.

21   Q.  You live in D.C., or in the area, right?

22   A.  Yes.

23   Q.  And you wouldn't attend the evening events, typically,

24   right; you would attend the daytime official meetings?

25   A.  Depends on the event.

O6pWmen1                        Arkin - Cross

1   Q.  OK.  But it's because you cannot attend all events and all

2   meetings that you sometimes asked for readouts, right?

3   A.  If they're in New York and New Jersey.

4   Q.  OK.  And the readouts you typically wanted were for these

5   official meetings, right?

6   A.  Yes, but if there was something interesting that happened

7   at a party or a dinner, I certainly would want to know about

8   it.

9   Q.  Right.

10  A.  Or if there was an interesting conversation or sidebar or

11  met somebody interesting that he wanted to follow up with.

12  Q.  Right.  And you'd want Senator Menendez to inform you of

13  that, you said, right?

14  A.  Yes.

15  Q.  And that's because you perceived it to be helpful to doing

16  your job, right?

17  A.  Yes.

18  Q.  You're aware that Senator Menendez would take phone calls

19  from foreign leaders on his cell phone?

20  A.  Yes.

21  Q.  This isn't like the White House and the president, where

22  when foreign leaders call, it has to go through a central

23  switchboard, right?

24  A.  Well, usually it would go through our -- it would usually

25  go through our operations director, come through our office.  I

O6pWmen1                         Arkin - Cross

1   don't --

2   Q.  That's not my question, ma'am, Ms. Arkin.

3           MR. RICHENTHAL:  Objection.

4           THE COURT:  Just a moment, gentlemen.

5           Were you done with your answer?

6           THE WITNESS:  I'm sorry.  I lost track.

7           THE COURT:  Next question.

8   BY MR. WEITZMAN:

9   Q.  My question is the President of the United States, when he

10  talks to foreign leaders, he doesn't talk to them on his cell

11  phone, right?

12  A.  I've never staffed the President of the United States.

13  Q.  You're not aware of the fact that someone from intelligence

14  or State Department mans every call that the President of the

15  United States has?

16          THE COURT:  Sustained.  Sustained.

17  BY MR. WEITZMAN:

18  Q.  Are you aware that the President of the United States, that

19  President Trump, for example, had his cell phone taken away

20  from him?  Do you recall that?

21          MR. RICHENTHAL:  Your Honor --

22          THE COURT:  Sustained.

23  BY MR. WEITZMAN:

24  Q.  You'd agree with me that no one took Senator Menendez's

25  phone away from him, right?

O6pWmen1                          Arkin - Cross

```
 1              THE COURT:  Sustained.
 2   BY MR. WEITZMAN:
 3   Q.  Senator Menendez had a phone, a cell phone, a personal cell
 4   phone, right?
 5   A.  Yes.
 6   Q.  And when he gets a phone call from foreign leaders on his
 7   personal cell phone --
 8              THE COURT:  Does he receive, to your knowledge, does
 9   he receive calls from foreign leaders on his cell phone?  Yes,
10   no, I don't know.
11              THE WITNESS:  I don't know.
12   BY MR. WEITZMAN:
13   Q.  OK.  Have you ever -- has he ever told you about
14   conversations he's had with foreign leaders on his cell phone?
15   A.  Define foreign leaders.
16   Q.  Foreign officials.  Excuse me.  Let's put it that way.
17   A.  Define foreign officials.
18       I know, for example, a handful of other -- I don't want
19   to -- let me -- a handful of other members of parliament from
20   other countries have his cell phone number.
21   Q.  OK.
22   A.  They're in touch with him on his cell phone.  I would call
23   that a different characterization than when a foreign leader,
24   an elected or appointed head of government or foreign agency.
25   I don't know.  Usually they would come through our scheduler
```

O6pWmen1                          Arkin - Cross

1    and then get connected to him.  But I don't know all the phone

2    calls that come in to his phone.

3    Q.  Fair enough.

4        You mentioned that members of parliament from other

5    countries had his personal cell phone?

6    A.  Yes.

7    Q.  What countries?

8    A.  Lithuania and probably others.

9    Q.  OK.  Are you aware whether Rob Kelly or someone else on his

10   staff monitors all of his personal cell phone calls?

11   A.  I'm not aware of that.

12   Q.  OK.  As an example, are you aware whether Senator

13   Menendez --

14            THE COURT:  When you say monitor, you mean listen in

15   on?

16            MR. WEITZMAN:  Yes.  I meant listen in.

17   A.  I'm not aware.  Usually when it's an official, formal phone

18   call from a foreign government leader, somebody is on the -- to

19   my experience, somebody is on the phone with him, whether it's

20   an appropriate staff, a relevant policy staffer or Rob, because

21   he'd been connecting the call.

22            THE COURT:  Was it sometimes you?

23            THE WITNESS:  I've been on some calls, yes, with

24   foreign leaders.

25   BY MR. WEITZMAN:

O6pWmen1                          Arkin - Cross

1   Q.  And that's when the call is scheduled and on his official

2   calendar, right?

3   A.  Two different things, but --

4   Q.  That's when the call is scheduled through the SFRC, for

5   example?

6   A.  Right.  Call can be scheduled.  Sometimes it happens so

7   fast it doesn't get on the calendar.

8   Q.  But if a call just comes to his cell phone, you're not on

9   that call, right?

10          MR. RICHENTHAL:  Objection.

11          THE COURT:  I'll allow it.

12  A.  I wouldn't know because I don't monitor his phone calls.

13  Q.  Right.

14      You're aware that Senator Menendez would often have private

15  meetings or would, put aside "often."  You're aware that

16  Senator Menendez had private meetings with officials from

17  Greece, for example, correct?

18  A.  What do you mean private meetings?

19  Q.  Dinners, lunches and the like.

20  A.  Yes, I would call those dinners, lunches and the like.

21  Q.  OK.  And he would have --

22          THE COURT:  Well, it seems that you don't want to call

23  them private meetings.  Why is that?

24          THE WITNESS:  To me a meeting is an official

25  engagement that the senator is having with a foreign government

O6pWmen1                         Arkin - Cross

1    official where there's staff, there's preparation, there's

2    notes, which is different to me than a dinner or a lunch or a

3    more social engagement where the purpose might just be

4    relationship building and chatting.

5    BY MR. WEITZMAN:

6    Q.  And by the way, relationship building is an important part

7    of the senator's job, right, with foreign officials?

8    A.  Yes.  It's part of his job as chair.

9    Q.  And in addition to dinners, lunches and social events with

10   Greek officials, he also had dinners, lunch and social events

11   with officials from Cyprus, right?

12   A.  Yes.

13   Q.  You're aware of that?

14       And those would be private; they wouldn't be attended by

15   staff, right?

16   A.  To my knowledge, someone -- you'll have to be more

17   specific.

18   Q.  OK.  Now, you mentioned that sometimes you would ask for

19   readouts, right?

20   A.  Yes.

21   Q.  I just want to understand how the SFRC works.  The SFRC has

22   a staff that report either to the Democratic chairman or

23   Republican chairman and the Democratic or Republican ranking

24   member, right?

25   A.  Yes.

O6pWmen1                          Arkin - Cross

1    Q.  And approximately how many staff members are in the SFRC?

2    A.  On the Democratic staff right now, I think we have about

3    30.

4    Q.  And those 30 staff members are assigned different

5    geographic units, right?

6    A.  Yes, and there's admin and a communications team and

7    functional units, we would say.

8    Q.  Dozens of countries are being covered by those staff

9    members, right?

10   A.  Yes.

11   Q.  And the SFRC is housed where; what building?

12   A.  Dirksen.

13   Q.  Dirksen.  What's the address on that?

14   A.  423 Dirksen Senate Office Building.

15   Q.  OK.  And that's different than the other Senate office

16   building, right?

17   A.  There are two other Senate office buildings.

18   Q.  528 Hart?

19   A.  Yes.

20   Q.  How close is one to the other?

21   A.  Four-minute walk.

22   Q.  OK.

23   A.  Three-minute walk.

24        THE COURT:  Now, you said the Democratic staff is

25   about 30.  Is there a Republican staff?

O6pWmen1                        Arkin - Cross

1           THE WITNESS:  Yes.

2           THE COURT:  About how many are they?

3           THE WITNESS:  Similar.  Maybe 25 or so.

4           THE COURT:  And you're assigned, you have a geographic

5    region, correct?

6           THE WITNESS:  Yes.

7           THE COURT:  Which is what?

8           THE WITNESS:  I -- well, at the moment, I'm in

9    transition now, but it was most recently the Western

10   Hemisphere.

11          THE COURT:  Now, will there be a Republican staffer

12   assigned to the Western Hemisphere as well?

13          THE WITNESS:  There is, yes.

14          THE COURT:  All right.  Thank you.

15          Go ahead.  I understand it better now.

16   BY MR. WEITZMAN:

17   Q.  Senator Menendez's Senate office is at 528 Hart, right?

18   A.  Yes.

19   Q.  And that's where he spent his time, that's where he had an

20   office while he was the chairman of the Senate Foreign

21   Relations Committee, right?

22   A.  Yes.

23   Q.  You all, the staffers, are working at Dirksen, correct?

24   A.  Yes.  That's where our offices are.

25   Q.  And Senator Menendez didn't have an office, his own

O6pWmen1                    Arkin - Cross

1    dedicated office in the Dirksen building, right?

2    A.  No.

3    Q.  So most of the day he's spending in his Senate office, not

4    the Dirksen office, right?

5    A.  If he's in D.C., his day varied.

6    Q.  OK.  You mentioned that there are 30-plus staff members on

7    the Democratic side.  When the senator, when Senator Menendez

8    was the chairman, he had to deal with all the staffers, right?

9              MR. RICHENTHAL:  Objection.  Deal with.

10   BY MR. WEITZMAN:

11   Q.  All the staffers reported directly or indirectly up to the

12   chairman of the Senate Foreign Relations Committee, right?

13   A.  I wouldn't say -- he was not interacting with all 30

14   staffers.

15   Q.  Correct, but they're reporting in to other staffers who

16   were reporting directly in to Senator Menendez, right?

17   A.  Yes.

18   Q.  And in addition to his responsibilities on the Senate

19   Foreign Relations Committee, Senator Menendez was on other

20   Senate committees, correct?

21   A.  Yes.

22   Q.  He was on, for example, the finance committee, right?

23   A.  Yes.

24   Q.  And he's also dealing with constituent services, right?

25   A.  He has a team to help deal with constituent services.

```
 1              THE COURT:  You mean separate and apart from the SFRC

 2     staff?

 3              THE WITNESS:  Yes.

 4              THE COURT:  All right.

 5     BY MR. WEITZMAN:

 6     Q.  Is it fair to say that Senator Menendez would have very

 7     busy days when you saw him?

 8     A.  Yes.

 9     Q.  A lot going on, right?

10     A.  Yes.

11     Q.  Now, you don't know what all the other staff members, how

12     they interacted with Senator Menendez about their portfolios,

13     right?

14     A.  You mean on the foreign relations committee?

15     Q.  Yes.

16     A.  No.  I have a pretty good sense.

17     Q.  OK.  You have a sense of -- did you attend their meetings

18     with Senator Menendez?

19     A.  Some of them, but not most.

20     Q.  OK.  And when Senator Menendez would attend meetings or

21     attend social engagements, I'd say, for countries outside your

22     region, do you know whether he was giving all of those staff

23     members readouts of those meetings?

24     A.  Yes.  I think the approach is the same.  Any staffer wants

25     a readout of a meeting that he's having with a foreign official
```

O6pWmen1                          Arkin - Cross

1    in their space.

2    Q.  My question is a bit different.

3         Do you have knowledge, personal knowledge, as you sit here,

4    that he was giving readouts to every staff member of every

5    social interaction he had with a foreign official?

6    A.  I don't know of every foreign official and every social

7    interaction, but yes, other staff members got readouts of

8    meetings.

9    Q.  How do you know that every -- that other staff -- let me

10   rephrase it.

11        As you sit here today, you don't know whether the senator

12   had social meetings with leaders in Greece, Cyprus or other

13   countries where he wasn't giving those staff members readouts,

14   right?

15             MR. RICHENTHAL:  Objection.  Vague.  Assumes --

16             THE COURT:  Too many negatives in there.  Try it

17   again.

18   BY MR. WEITZMAN:

19   Q.  You don't know as you sit here whether every interaction he

20   had with a Greek official, social interaction, resulted in a

21   readout, isn't that correct?

22   A.  I don't know.

23   Q.  And you don't know whether every social interaction he had

24   with a Cypriot official resulted in a readout, correct?

25   A.  I don't know.

O6pWmen1                           Arkin - Cross

1   Q.  And you don't know whether every single phone call he had

2   with a Lithuanian parliament member resulted in a readout,

3   correct?

4   A.  I don't know.

5   Q.  And by the way, not every staff member expected a readout

6   from Senator Menendez, isn't that true?

7            THE COURT:  Are you able to say whether other staff

8   members expected readouts?  Yes, no, I don't know.

9            THE WITNESS:  Yes, staff expected readouts.

10  BY MR. WEITZMAN:

11  Q.  Have you interviewed every staff member --

12           MR. RICHENTHAL:  Objection.

13           THE COURT:  Sustained.

14  BY MR. WEITZMAN:

15  Q.  Have you spoken to every staff member to know what their

16  expectations were about readouts, as you just testified?

17  A.  Yes, every staff member would expect to get readouts.

18  Q.  That's not my question.

19      My question is have you spoken to every staff member on the

20  Democratic side of the Senate Foreign Relations Committee to

21  know what their expectations were about readouts?

22           MR. RICHENTHAL:  Objection.

23           THE COURT:  I'll allow it.

24  Q.  Yes or no.

25  A.  No.

O6pWmen1                        Arkin - Cross

1              MR. WEITZMAN:  OK.  Thank you.

2    Q.  Now, typically, you'd agree with me that readouts are

3    important for you to do your job when do-outs are necessary,

4    right?

5    A.  Yes.

6    Q.  And if there's no do-out, the readout isn't as important

7    for you, correct?

8    A.  No.

9              THE COURT:  I'll allow it.

10             No meaning what?

11             THE WITNESS:  Meaning it is still important to get a

12   readout.

13   BY MR. WEITZMAN:

14   Q.  It was important to you because you perceived you needed

15   that information to do your job, correct?

16             MR. RICHENTHAL:  Objection.

17             THE COURT:  I'll allow it.

18   A.  Yes.

19   Q.  Fair to say your job's different than the senator's job,

20   right?

21   A.  Yes.

22   Q.  The senator may not perceive the readout as necessary for

23   him to do his job, right?

24   A.  I can't speak for the senator.

25   Q.  Right.  You testified, or we discussed a few minutes ago a

O6pWmen1                        Arkin - Cross

1    dinner held with a New York Qatar.  Do you recall that?

2    A.  Vaguely.

3          MR. WEITZMAN:  Let's put up Government Exhibit A204-1.

4    This is in evidence.  And if we can turn to the bottom text

5    message.

6    Q.  This is in evidence, and it's a text message from Senator

7    Menendez to Senator Booker, and it talks about two events.

8    One, in the fourth sentence, says the New Qatar is holding a

9    dinner in my honor Sunday, the 19th, at 7:30 p.m. at the Plaza

10   Hotel, would really appreciate you coming either for all or

11   part of it.  The second event is the following day in New York;

12   we are hosting a roundtable for the president of the Dominican

13   Republic at the Blackstone Group.  Do you see that?

14   A.  Yes.

15   Q.  Were you aware of these two events?

16   A.  Like I said, I think -- I remember a dinner with the emir

17   of Qatar.  I don't remember the date and time of that dinner.

18         THE COURT:  Do you remember if it was in New York?

19         THE WITNESS:  Yes.

20   BY MR. WEITZMAN:

21   Q.  And is it fair to say that no one from the SFRC staffed

22   that dinner?

23   A.  I don't think so.

24   Q.  OK.  And there were other senators invited to the dinner,

25   right?

O6pWmen1                          Arkin - Cross

```
 1              MR. RICHENTHAL:  Asked and answered.

 2              THE COURT:  Yes.

 3    BY MR. WEITZMAN:

 4    Q.  Are you aware whether other senators attended the dinner?

 5              MR. RICHENTHAL:  That specific --

 6              THE COURT:  We've got all of this already.

 7              MR. WEITZMAN:  I'm sorry.  I'm having a blank moment.

 8              THE COURT:  OK.  Then ask it.

 9    BY MR. WEITZMAN:

10    Q.  Are you aware whether other senators attended the dinner,

11    Cory Booker, for example?

12    A.  I don't think I was at the time.

13    Q.  OK.  And are you aware now?

14    A.  I don't remember.

15    Q.  Are you aware now?

16              MR. RICHENTHAL:  Your Honor, she's testified.

17              THE COURT:  Sustained.

18              MR. RICHENTHAL:  I don't think I was at the time then,

19    I believe Ms. Arkin's not referring to --

20              THE COURT:  Just a moment.  I'll allow the answer to

21    stand.  Next.

22              MR. WEITZMAN:  Thank you.

23    Q.  And are you aware of this round-table discussion with the

24    president of the Dominican Republic?

25    A.  It doesn't ring a bell.
```

O6pWmen1                              Arkin - Cross

1    Q.  Right.  That's not on your portfolio, right?

2    A.  Right.

3    Q.  So you don't know who attended that one, right?

4    A.  No.

5    Q.  And you don't know why it was held at the Blackstone Group,

6    right?

7    A.  No.

8            THE COURT:  I take it you don't know whether or not,

9    in fact, it was held.

10           THE WITNESS:  I don't.

11           THE COURT:  OK.

12   BY MR. WEITZMAN:

13   Q.  And you know the Blackstone Group is a private financial

14   institution?

15           THE COURT:  We've been through it.

16           MR. WEITZMAN:  Not with this witness, your Honor, but

17   fair enough.  You can put that down.

18   Q.  You actually have your own relationship with Egyptians in

19   the embassy, correct?

20   A.  I did.

21   Q.  And you had your own contacts with those, with the Egyptian

22   human rights activists?

23   A.  Yes.

24   Q.  Is that correct?

25   A.  Yes.

O6pWmen1                                Arkin - Cross

1              THE COURT:  I take it this is within the context of

2    your job at the SFRC.

3              THE WITNESS:  Yes, although I have friends who are

4    Egyptian activists from before the time I worked on SFRC.

5              THE COURT:  All right.

6    BY MR. WEITZMAN:

7    Q.  And you had your own contacts in the State Department too,

8    right?

9    A.  Yes.

10   Q.  On the Egypt desk.

11             Before your outreach to Egyptians, either human rights

12   activists or at the embassy, would you typically ask Senator

13   Menendez for permission to make that outreach?

14   A.  No.

15   Q.  And after you would reach out to Egyptian human rights

16   activists or people at the embassy, would you typically give

17   Senator Menendez a readout of your interaction with those

18   individuals?

19   A.  It depends on the individual and the context.

20   Q.  Sometimes yes, sometimes no, right?

21   A.  You have to be more specific.

22   Q.  So sometimes you would give a readout and sometimes you

23   would not, is that fair to say?

24   A.  Yes, but more often I would use that information and put it

25   into memos or briefing materials for him.

O6pWmen1                      Arkin - Cross

1   Q.   OK.  Is it fair to say that Senator Menendez trusted you;

2   if there was something important you would tell him about it?

3          MR. RICHENTHAL:  Objection.

4          THE COURT:  Wait.  If there was something important,

5   would you tell him about it?

6          MR. WEITZMAN:  Yes.

7   Q.   Fair to say that if there was something important in your

8   communications with the Egyptian embassy or Egyptian human

9   rights advocates, you had the discretion whether to tell him

10  about it, right?

11  A.   Yes.

12  Q.   And he trusted you to use that discretion, correct?

13         MR. RICHENTHAL:  Objection to opining on whether he

14  trusted her.

15  BY MR. WEITZMAN:

16  Q.   In his interactions with you --

17         THE COURT:  Wait.  Let's have a question.

18  BY MR. WEITZMAN:

19  Q.   In his interactions with you, did he make it clear to you

20  that you can exercise your own discretion of what to disclose

21  to him about your interactions with Egyptian embassy officials?

22  A.   I think that's an expectation of the job.

23         MR. WEITZMAN:  Correct.  Thank you.

24         MR. RICHENTHAL:  Objection.  Commentary.

25         THE COURT:  Yes.  The jury knows that.

O6pWmen1                          Arkin - Cross

1              Let's move forward.

2     BY MR. WEITZMAN:

3     Q.  Now, you've testified in March 2018 that you did attend a

4     meeting with General Shawky, right?

5     A.  Yes.

6     Q.  And you understand he's a -- he's the defense *attaché* for

7     Egypt, right, in D.C.?

8     A.  Yes.

9     Q.  And that's what his card said, defense, army, naval and air

10    force *attaché*; do you know that?

11              MR. RICHENTHAL:  There's no testimony about a card.

12              THE COURT:  Just a moment.

13              Do you know that that's what his card said?  Yes, no,

14    I don't know.

15              THE WITNESS:  I don't know.  I don't think I saw his

16    card.

17              MR. WEITZMAN:  Can we put up Government Exhibit

18    A101-BB, which is in evidence.

19    Q.  You see his title is listed as defense, army, naval and air

20    force *attaché*, right?

21    A.  Yes.

22    Q.  And *attaché* is someone who works at an embassy, right?

23    A.  Yes, although as I said yesterday, the Egyptian defense

24    *attaché* has its own separate office.  But in general, yes, a

25    defense *attaché* is stationed at an embassy.

O6pWmen1                          Arkin - Cross

1  Q.  And a defense *attaché* is a typical job that many embassies

2  fill, right, or have?

3  A.  Yes.

4  Q.  And that's because the defense industry in those home

5  countries interact with the United States defense industry and

6  defense officials, right?

7  A.  One of the things that they -- one of the reasons they have

8  them.

9  Q.  So it's not surprising, in your mind, that the head of the

10  SFRC would interact with defense *attachés*, right?

11            MR. RICHENTHAL:  Objection.  Form.

12            THE COURT:  I'll allow it.

13            I'll allow it.  You may answer.

14  A.  It's -- no.  It's a reasonable meaning to have.

15  Q.  And Egypt was -- withdrawn.

16      You testified about a handwriting invitation, which was

17  Government Exhibit 3A-1.

18            MR. WEITZMAN:  Can we just put that up.  And turn to

19  the next page.

20  Q.  This was Senator Menendez's handwriting, right?

21  A.  Yes.

22  Q.  Now, you received this from Rob Kelly, correct?

23  A.  Yes.

24  Q.  And Rob Kelly was Senator Menendez's deputy chief of staff

25  for operations, right?

O6pWmen1                        Arkin - Cross

1    A.  I don't remember his title at this time, but yes.

2    Q.  OK.  But he's the person who manages the senator's

3    schedule, by and large, right?

4    A.  Yes.

5    Q.  He arranges meetings, right?

6    A.  Yes.

7    Q.  Keeps the trains running on time?

8    A.  Yes.

9    Q.  That's in contrast to your role, which was policy-oriented,

10   right?

11   A.  Yes.

12   Q.  Now, as a staff member at the SFRC, in Dirksen, you don't

13   see -- you don't have visibility into all of Senator Menendez's

14   interactions with Rob Kelly, which is in the Hart building?

15          MR. RICHENTHAL:  Objection.

16          THE COURT:  Sustained.

17   BY MR. WEITZMAN:

18   Q.  You don't see Senator Menendez's everyday interactions with

19   Mr. Kelly, right?

20   A.  No.

21   Q.  Or his everyday interactions with his former chief of

22   staff, Jason Tuber, right?

23   A.  No.

24   Q.  Or his other chief of staff prior, Fred Turner, right?

25   A.  No.

O6pWmen1                         Arkin - Cross

1    Q.  You don't know how often Senator Menendez hands Mr. Kelly

2    handwritten notes, do you?

3    A.  No.

4    Q.  Mr. Kelly wouldn't necessarily tell you if he did that,

5    right?

6            MR. RICHENTHAL:  Objection.

7            THE COURT:  Sustained.

8    BY MR. WEITZMAN:

9    Q.  If Senator Menendez writes a note to Mr. Kelly that has

10   nothing to do with SFRC, you wouldn't expect to receive a copy

11   of that note, right?

12   A.  No.

13   Q.  Are you aware, Ms. Arkin, that Senator Menendez sometimes

14   preferred to dictate messages --

15           MR. RICHENTHAL:  Objection.

16   BY MR. WEITZMAN:

17   Q.  -- rather than type them out?

18           THE COURT:  Yes.  Sustained.

19           MR. WEITZMAN:  Well, can --

20           THE COURT:  Did Senator Menendez sometimes dictate

21   messages?  Yes or no or I don't know.

22           THE WITNESS:  Yes.

23           THE COURT:  Who would he dictate them to?

24           THE WITNESS:  I've seen him voice dictate them into

25   his phone and --

O6pWmen1                              Arkin - Cross

1   BY MR. WEITZMAN:

2   Q.  Do you know if he ever dictated to a staff member in his

3   office?

4   A.  I think you need to be more specific.

5   Q.  Did he have an assistant, a secretary or anybody else, that

6   he ever dictated to in his Hart office?

7   A.  Well, sometimes if -- I can think of an example or two

8   where I handed him a draft of a speech, and he would call me

9   and go over what the changes he wanted to make were.

10  Q.  OK.  So you attended this meeting with General Shawky --

11        MR. WEITZMAN:  We can take this down.

12  Q.  -- correct?

13  A.  Yes.

14  Q.  And whenever there was a meeting in the office, in the

15  Senate office, it was typically staffed by either SFRC or some

16  other staffer, right?

17  A.  If it was a foreign policy meeting.

18  Q.  Yes.

19      And did you take notes during this meeting with General

20  Shawky?

21  A.  Yes.

22  Q.  OK.  And you recall that the substance of the meeting was

23  pretty standard for meetings with Egyptian officials, right?

24  A.  Yes.

25  Q.  As you testified, Egypt made the same asks they generally

O6pWmen1                        Arkin - Cross

1    make, right?

2    A.  Yes.

3    Q.  They advocated to Senator Menendez for the U.S. to stop

4    imposing conditions on foreign aid, right?

5    A.  For the Congress to, yes.

6    Q.  For Congress.

7         And that's something they had advocated for many years

8    before 2018, right?

9    A.  Yes.

10   Q.  And they've advocated in years after 2018, right?

11   A.  Yes.

12   Q.  And Senator Menendez didn't say OK, we'll do that, right?

13   A.  No, he didn't.

14   Q.  He didn't back down, right?

15            MR. RICHENTHAL:  Objection.

16            THE COURT:  Sustained.

17   BY MR. WEITZMAN:

18   Q.  To the contrary, he raised -- when Egypt, General Shawky

19   mentioned that, Senator Menendez raised in that meeting human

20   rights concerns with General Shawky, right?

21   A.  In that meeting he did raise human rights concerns.

22   Q.  And he raised concerns about general political and civil

23   rights in Egypt, right?

24   A.  Yes.

25   Q.  And he raised concerns about what you call case 173, right?

O6pWmen1                         Arkin - Cross

1   A.  Yes.

2   Q.  And that's a case brought by Egypt against nongovernmental

3   organizations, right?

4   A.  Yes.

5   Q.  At a certain time did the conversation get somewhat

6   contentious or heated over these issues?

7   A.  I don't think so.

8   Q.  OK.  He raised them in a diplomatic fashion, right?

9           MR. RICHENTHAL:  Vague.

10          THE COURT:  I'll allow it.

11  A.  Yes.

12          THE COURT:  He didn't raise his voice, right?

13          THE WITNESS:  I don't think so.

14          THE COURT:  He seemed calm.

15          THE WITNESS:  Yes.

16          THE COURT:  All right.

17          Move on.

18  BY MR. WEITZMAN:

19  Q.  Do you recall that Egypt, General Shawky also said that if

20  the U.S. doesn't release more aid they might have to go to

21  other sources, like Russia?

22  A.  This is a consistent threat that Egypt makes.

23  Q.  OK.

24  A.  Or --

25  Q.  And you recall that they made that --

O6pWmen1                        Arkin - Cross

1    A.  Not threat.  A -- something a little bit lower than a

2    threat.

3    Q.  And you recall that General Shawky made that statement at

4    the March 2018 meeting as well, right?

5    A.  I think so.

6              THE COURT:  I think you said it was fairly standard,

7    is that it?

8              THE WITNESS:  Yes.

9              THE COURT:  All right.

10   BY MR. WEITZMAN:

11   Q.  You would agree with me that meetings such as these were

12   useful because they permit Senator Menendez and yourself to

13   understand better how the Egyptians are looking at the

14   situation?

15             MR. RICHENTHAL:  Vague.

16             THE COURT:  I'll allow it.

17   A.  Sometimes meetings are useful, sometimes they're not.

18   Q.  OK.  Was this a useful meeting?

19   A.  Doesn't stand out as particularly useful or not.

20   Q.  OK.  Now, there were some private individuals who attended

21   the meeting, right?

22   A.  Yes.

23   Q.  You recall Nadine was there, right?

24   A.  Yes.

25   Q.  And you saw the photo, Government Exhibit C102-A.

O6pWmen1                           Arkin - Cross

```
 1              MR. WEITZMAN:  Can we put that up.
 2    Q.  And the individual all the way on the left here, you recall
 3    he was at the meeting, correct?
 4    A.  I didn't know who the other people were, so they didn't
 5    really stand out.
 6    Q.  That's not my question.
 7    A.  Oh.
 8    Q.  Do you recall that the individual all the way on the left
 9    of this photo was at the meeting?
10    A.  I'm looking at the picture.  Yes, I recall that he was at
11    the meeting.
12              THE COURT:  So you took a picture of the meeting.
13              THE WITNESS:  Yes.
14              THE COURT:  You see him there, so you conclude he was
15    at the meeting.
16              THE WITNESS:  Correct.
17              THE COURT:  All right.
18    BY MR. WEITZMAN:
19    Q.  He didn't do anything that was memorable at the meeting to
20    you, right?
21    A.  No.
22    Q.  And the older gentleman who's the third from the right, do
23    you recall him being present at the meeting?
24    A.  Same.  Same thing.
25    Q.  Nothing memorable about him; you just know he was there
```

O6pWmen1                         Arkin - Cross

1    because you took this photo, right?

2    A.  Yes.

3    Q.  In fact, none of the three private citizens in this

4    photo -- you don't recall them saying anything at the meeting,

5    right?

6              MR. RICHENTHAL:  Objection.  Number --

7              THE COURT:  Yes.  Sustained.

8    BY MR. WEITZMAN:

9    Q.  The three individuals we just talked about -- you know who

10   I'm referring to, right?  Nadine, the person to the left, the

11   older gentleman, do you recall whether any of them said

12   anything at the meeting other than greetings?

13   A.  No.

14             THE COURT:  Wait.  I'm sorry.  Do you recall whether

15   or not they said anything?

16             THE WITNESS:  I don't recall.

17             THE COURT:  OK.

18             THE WITNESS:  And I don't think they did.

19             THE COURT:  Fine.

20   BY MR. WEITZMAN:

21   Q.  And after the meeting, this photo was taken; they all posed

22   for the photo, is that right?

23   A.  Yes.

24   Q.  And you were the photographer, right?

25   A.  I think so.

O6pWmen1                          Arkin - Cross

1   Q.  You said cheese?

2   A.  I don't remember.

3          THE COURT:  Next question.

4   BY MR. WEITZMAN:

5   Q.  Correct to say that there's nothing Senator Menendez said

6   during that March 2018 meeting that revealed anything

7   confidential about U.S. policy?

8          MR. RICHENTHAL:  Objection.

9          THE COURT:  Sustained.

10  BY MR. WEITZMAN:

11  Q.  Did Senator Menendez reveal any classified information

12  during this meeting?

13  A.  No.

14  Q.  Did Senator Menendez say anything at this meeting that he

15  had not said before publicly?

16  A.  I don't think so.

17  Q.  Now, in July 2018, another group of Egyptian officials

18  visited Washington, D.C., and met with Senator Menendez, right?

19  A.  I was not working the portfolio at that time, so I don't

20  remember or know.

21  Q.  Dana Stroul was, right?

22  A.  Yes.

23  Q.  Do you recall from the work you did at SFRC, talking to

24  other staffers and the like, of hearing of a white paper

25  delegation coming through Egypt?

O6pWmen1                        Arkin - Cross

1   A.  No.

2   Q.  What was your desk, by the way, at the time, in July 2018?

3   A.  I was the policy director, and I had the public diplomacy

4   functional portfolio.

5       MR. WEITZMAN:  Can we put up Government Exhibit 4I-6

6   in evidence.

7   Q.  In the top email, Dana Stroul emails an individual named

8   Brett O'Brien on June 26, 2018, and she says:  It's the white

9   paper delegation, right?  I recommended that Menendez take the

10  meeting and believe it will get scheduled.  Just takes some

11  time in his personal office to get stuff on the calendar.

12      First of all, do you know who Brett O'Brien is?

13  A.  No.

14  Q.  You're not aware whether he's a lobbyist for Egypt?

15  A.  No.

16  Q.  You've never interacted with Brett O'Brien?

17  A.  No.

18  Q.  OK.  Does this refresh your recollection about anything

19  regarding the white paper delegation?

20  A.  No.

21      MR. WEITZMAN:  Can we put up just for the witness

22  Defense Exhibit 1010.

23  Q.  Have you seen this document before?

24      MR. WEITZMAN:  And we can scroll to the next page, if

25  there is a next page.

O6pWmen1                              Arkin - Cross

```
 1              There.
 2    Q.  Do you know who Viv Montemayor is?
 3    A.  No.
 4    Q.  Do you recognize this email address,
 5    egyptdefense.vivian@gmail.com?
 6    A.  No.
 7              MR. WEITZMAN:  OK.  You can take that down.
 8    Q.  By the way, do you see her title on this first page?  Does
 9    this refresh your recollection as to who she is?
10              MR. RICHENTHAL:  Your Honor, it's not in evidence.
11              MR. WEITZMAN:  I know.
12              THE COURT:  He asked it correctly.
13              Does looking at that refresh your recollection as to
14    who she is?
15              THE WITNESS:  No.
16              THE COURT:  Take that down.
17              MR. WEITZMAN:  You can take that down.  Thank you.
18    Q.  You just testified about a meeting, the meeting that Nadine
19    attended in March 2018.  You're aware -- are you aware whether
20    she attended other meetings with foreign officials and Senator
21    Menendez?
22    A.  There's one other meeting she attended that I staffed.
23    Q.  And do you recall that that was a meeting with an Armenian
24    official?
25    A.  Yes.
```

O6pWmen1                           Arkin - Cross

1   Q.  And it was either the prime minister or the foreign

2   minister of Armenia?

3   A.  It was the foreign minister.

4   Q.  You have a recollection that it was the foreign minister?

5   A.  Yes.

6   Q.  And where was that meeting held?

7   A.  In the Senate Foreign Relations Committee room at the

8   Capitol.

9   Q.  Are you aware that Nadine -- at the time Nadine

10  Arslanian -- was, is Armenian?

11  A.  Yes.

12  Q.  So she's of the diaspora Armenian community?

13  A.  Yes.

14  Q.  And during that meeting, did Nadine speak, to your

15  recollection?

16  A.  I think before the meeting she exchanged some words in

17  Armenian with the foreign minister.

18          THE COURT:  Pleasantries, as far as you know.

19          THE WITNESS:  As far as I know.

20          THE COURT:  All right.

21  BY MR. WEITZMAN:

22  Q.  And the foreign minister was a senior official in the

23  government, right?

24  A.  Yes.

25  Q.  There's no restriction, to your knowledge, on private

O6pWmen1                        Arkin - Cross

1  citizens meeting with foreign leaders along with senators,

2  right?

3  A.  I --

4  Q.  My question's very specific.  There's no restriction on it?

5  A.  No.

6  Q.  It's up to the official who hosts the meeting to decide

7  whether to invite private citizens, right?

8  A.  In general, yes.

9  Q.  And you're aware, are you not, that Senator Menendez had

10  other private citizens attend meetings with foreign leaders

11  beside Nadine?

12  A.  I'm not aware.

13  Q.  Do you know an individual named Tasos Zambas?

14  A.  Yes.

15  Q.  Tasos is a Greek Cypriot American, right?

16  A.  Yes.

17  Q.  He's a private citizen, not a member of government, right?

18  A.  Yes.

19              (Continued on next page)

20

21

22

23

24

25

1   BY MR. WEITZMAN:   (Continuing)

2   Q.  Do you recall that Senator Menendez and Tasos are close

3   friends?

4   A.  Yes.

5   Q.  And Tasos and Senator Menendez meet or speak not

6   irregularly; right?

7   A.  Yes.

8   Q.  In fact, you have spoken to Tasos; right?

9   A.  I have.

10  Q.  And do you recall that Tasos would sometimes attend

11  meetings when leaders from Cyprus came to Congress or came to

12  the United States?

13  A.  I was never in a meeting with Tasos and the leader of

14  Cyprus so I don't know.

15  Q.  Do you recall, however, that Senator Menendez is one of the

16  foremost champions of Greek relations?

17          THE COURT:  Sustained as phrased.

18          Does he champion relations, friendly relations,

19  between the United States and --

20          MR. WEITZMAN:  Greece.

21          THE COURT:  -- Greece?

22          THE WITNESS:  Yes.

23  Q.  And in part that's been developed through his relationship

24  with Tasos; right?

25          MR. RICHENTHAL:  Objection; vague.

1                THE COURT:  Sustained.

2   Q.  Senator Menendez' relationship with Tasos informs Senator

3   Menendez about Greek Cyprus relations?

4                THE COURT:  I will allow it.

5   A.  It is my understanding yes.

6   Q.  And sometimes individuals like Tasos would reach out to you

7   about Senator Menendez; right?

8   A.  Yes.

9                MR. WEITZMAN:  Can we put up, just for the witness,

10  Defendant's Exhibit 2158?

11  Q.  Do you recognize this as an e-mail from Tasos to Senator

12  Menendez?

13  A.  I don't recognize it but I can identify it as such.

14                MR. WEITZMAN:  We offer Defendant's Exhibit 2158.

15                MR. RICHENTHAL:  Objection.  Scope, hearsay, and

16  notice.

17                MR. WEITZMAN:  Not for the truth, just the fact that

18  it is said.

19                MR. RICHENTHAL:  It is not relevant if it is not for

20  the truth.  In any event, scope and notice.

21                MR. WEITZMAN:  We sent this to them last night, your

22  Honor.

23                THE COURT:  Objection sustained.

24                MR. WEITZMAN:  You can put that down.

25  Q.  Are you aware that sometimes these private citizens like

1    Tasos would contact Senator Menendez to provide them updates on

2    what is going on in Greece and Cyprus and the like?

3    A.  Tasos, yes.

4    Q.  And you are aware that Senator Menendez would then follow

5    up with you or someone else about what he is hearing from these

6    U.S. individuals who are advocating for their country; right?

7              THE COURT:  She can only talk about Tasos.

8              MR. WEITZMAN:  Correct.

9    Q.  You learned that Tasos would reach out to the senator and

10   provide some piece of information and sometimes the senator

11   would ask for follow up on that; right?

12   A.  Yes.  Sometimes.

13   Q.  That is part of you how these private individuals are

14   advocating for their home country, right?

15             THE COURT:  Sustained.  Show just knows about Tasos.

16   Q.  That's how Tasos is advocating for his home country; right?

17   A.  I also spoke to Tasos frequently.  Not frequently, but I

18   spoke to Tasos.

19   Q.  And would he advocate for his home country with you?

20             MR. RICHENTHAL:  Objection.  Characterization.

21             THE COURT:  I will allow it.

22             THE WITNESS:  He would advocate for U.S.-Cyprus

23   relations.

24   BY MR. WEITZMAN:

25   Q.  And he would do that when he spoke to you, you are saying?

O6P5men2                          Arkin - Cross

1   A.  I don't think he ever said it so formally, but there were

2   issues that he would bring to my attention that he wanted to

3   make sure I was aware of regarding their implications for the

4   U.S.-Cyprus relationship.

5   Q.  Now, other than Tasos, are you aware of others, other

6   private citizens who would meet with senators and foreign

7   leaders?

8           MR. RICHENTHAL:  Objection.

9   Q.  Let me rephrase.  Are you aware -- let me be more concrete

10  about it.  Do you know Richard Gere?  Do you know the name

11  Richard Gere, the actor?

12  A.  Yes.

13  Q.  You are aware that he is very involved what the Dalai Lama?

14  A.  I do.

15  Q.  Is and are you aware whether he has attended private

16  meetings with --

17          MR. RICHENTHAL:  Objection.  Relevance.

18          THE COURT:  I will allow it.

19  Q.  Are you aware whether he has attended private meetings with

20  senators and foreign leaders?

21  A.  I wouldn't call them private because he is attending them.

22  Q.  Are you aware that he has attended meetings with senators

23  and foreign leaders?

24  A.  Yes -- well, no.  Just one.

25  Q.  Do you recall a meeting with Mitt Romney and Richard Gere;

O6P5men2                              Arkin - Cross

1    is that correct?

2    A.   I don't recall a meeting with Mitt Romney and Richard Gere.

3    Q.   Which meeting are you referring to?

4    A.   Rich Gere had a meeting with Senator Menendez and leaders

5    of an advocacy group for Tibet.

6    Q.   Can we also put up --

7    A.   That I was at --

8    Q.   Thank you.

9    A.   -- or knew about.

10   Q.   Can we put up Defendant's Exhibit 401?

11        THE COURT:   There may have been some confusion here.

12   You were asked:   Are you aware whether he has attended private

13   meetings with senators and foreign leaders and you answered:   I

14   wouldn't call them private because he is attending them.   Who

15   is the "he" you are referring to.

16        THE WITNESS:   Richard Gere.

17        MR. WEITZMAN:   Can we put up Defendant's Exhibit 481

18   and can we go to the photo on the next page?

19   Q.   Let me ask whether this refreshes your recollection that

20   Rich Gere also attended a meeting with senator Mitt Romney and

21   a leader in the Tibetan government.

22        MR. RICHENTHAL:   Your Honor; objection to time frame.

23   Look at the bottom.   It is after this case.

24        THE COURT:   It is to refresh the recollection.   In

25   other words, don't worry about what is on there, the question

O6P5men2                         Arkin - Cross

1   is simply whether looking at that, whatever it is, gives you a

2   new recollection of whether you know that Gere attended a

3   meeting what Romney.

4              THE WITNESS:  I mean, I can see this picture which

5   indicates --

6              THE COURT:  No, no, no.  Apart from looking at the

7   picture, do you have a new recollection?

8              THE WITNESS:  No.

9              THE COURT:  All right.

10             MR. WEITZMAN:  You can put that down.

11  BY MR. WEITZMAN:

12  Q.  We talked about Tasos Zambas, he is a Cypriot American?

13             THE COURT:  Asked and answered.  Move on.

14  Q.  Are you aware of an individual named Endy who is a Greek

15  American from Chicago?

16  A.  Yes.

17  Q.  You are aware his last name is Zeminedes?

18  A.  Yes.

19  Q.  He is the head of the Hellenic American Leadership Council?

20  A.  Yes.

21  Q.  Do you recall that he met with Senator Menendez as well?

22  A.  Yes.

23  Q.  And he also would attend meetings with foreign leaders and

24  Senator Menendez.  Do you recall that?

25  A.  Vaguely.

O6P5men2                          Arkin - Cross

1    Q.   What about an individual, a constituent in New Jersey named
2    Ani Tshanuklian.  Do you know that name?
3    A.   No.
4    Q.   Do you recognize her as an Armenian --
5    A.   I can recognize an Armenian last name, yes.
6    Q.   But you don't know this woman Ani?
7    A.   No.
8    Q.   Do you know a man name Raffi Hamparian?
9    A.   Yes.
10   Q.   And he is also an Armenian; right?
11   A.   Yes.
12   Q.   He is an Armenian American; right?
13   A.   I believe so.
14   Q.   Do you recall he is on the Armenian National Committee?
15   A.   Yes.
16   Q.   He is an advocate, for example, for Congress' recognition
17   of the Armenian genocide; correct?
18   A.   Yes.
19   Q.   Do you recall that he attended private meetings -- I should
20   attended meetings not private -- attended meetings with Senator
21   Menendez and Armenian officials when they were in the United
22   States?
23   A.   I don't.
24   Q.   You don't have a recollection one way or another?
25   A.   No.

O6P5men2                          Arkin - Cross

1    Q.  By the way, in your work with Senator Menendez, prior to

2    his relationship with Nadine, he was not going on CODELs with a

3    spouse, right?

4    A.  No.

5    Q.  He was unmarried, right?  So Nadine was the first CODEL

6    spouse you had to deal with; is that true?

7              MR. RICHENTHAL:  Objection.

8              MR. WEITZMAN:  First spouse.

9              THE COURT:  Rephrase it.

10   Q.  Nadine was the first spouse whose arrangements you needed

11   to make to deal -- whose travel you needed to make arrangements

12   for on a CODEL; is that fair?

13   A.  Yes.

14   Q.  And working with a senator's spouse can be a bit

15   challenging; is that correct?

16             THE COURT:  Sustained.

17   Q.  Was working with Nadine challenging?

18             THE COURT:  I will allow it.

19   A.  Yes.

20   Q.  You recall that she had some interests to travel in Egypt

21   that you did not agree with; right?

22   A.  Yes.

23   Q.  She wanted to go on a shopping trip; right?

24   A.  Yes, she --

25   Q.  She wanted to go on to Sharm El-Sheikh?

O6P5men2                          Arkin - Cross

1          MR. RICHENTHAL:  Ms. Arkin, was giving a more expanded

2     answer than just "yes".

3          THE COURT:  Next question.

4     Q.  She wanted to go to al Sharm El-Sheikh?

5     A.  As I understood it, yes.

6     Q.  And you said that those things couldn't be done, right?

7     A.  I said a trip to Sharm El-Sheikh -- I recommended against a

8     trip to Sharm El-Sheikh.

9     Q.  And they didn't go to Sharm El-Sheikh; right?

10    A.  She also wanted to go to Lebanon, which was not possible.

11    Q.  Right.  And so there was a bit of friction as a result of

12    that relationship; right?  Between you and Nadine?

13    A.  I understood from other staff that there was a bit of

14    friction.

15         THE COURT:  You didn't feel friction between yourself

16    and Nadine?

17         THE WITNESS:  Hard to say.

18         THE COURT:  OK.

19    Q.  Did you also have an understanding that when Nadine

20    publicly criticized you, Senator Menendez came to your defense?

21         THE COURT:  I will allow it.

22    A.  I don't think she publicly criticized me.  It was relayed

23    to me that she criticized me to other staff and Senator

24    Menendez came to my defense.

25    Q.  And he told her not to criticize Sarah, right?

O6P5men2                          Arkin - Cross

1    A.   I wasn't there but I understood that he came to my defense.

2    Q.   You testified yesterday about the Eastern Mediterranean

3    Security and Energy Partnership Act.  Do you recall that?

4    A.   Yes.

5    Q.   And this was a piece of legislation that never was passed;

6    right?

7            MR. RICHENTHAL:  Objection, your Honor.  This goes to

8    issues we discussed.

9            THE COURT:  Yes.  Sustained.

10           MR. WEITZMAN:  Thank you, your Honor.

11   Q.   Government Exhibit 3D2, this is the legislation; correct?

12   A.   Yes.

13   Q.   And I think you testified it is a draft piece of

14   legislation?

15   A.   This version looks like a draft piece of legislation.

16   Q.   And the government directed you to a particular paragraph

17   that referenced paragraph 8, natural gas off the Egyptian

18   coast; right?

19   A.   Yes.

20   Q.   Are you aware that this is the only reference in this

21   entire document to the word "Egypt"?

22           MR. RICHENTHAL:  Objection.  Assumes a fact.

23           THE COURT:  I will allow it.

24           Do you know whether the word "Egypt" appears anywhere

25   else in the document that is on the screen?

O6P5men2                          Arkin - Cross

```
 1              THE WITNESS:  I don't.  I didn't draft this
 2   legislation.
 3              MR. WEITZMAN:  Can we go to page 5, section 4, and if
 4   we can pull up sub A from Section 4, the whole section?
 5   Q.  It says:  In general, the Secretary of State, in
 6   coordination with the Secretary of Energy, may enter into
 7   cooperative agreements supporting and enhancing dialogue and
 8   planning involving international partnerships between the
 9   United States and Israel, Greece, and the Republic of Cyprus.
10              Do you see that?
11   A.  Yes.
12   Q.  Doesn't mention Egypt; right?
13   A.  It does not.
14   Q.  Would you agree with me that on the whole, this bill has
15   more to do with partnerships with those three countries --
16   Israel, Greece, and Cyprus -- than this does Egypt?
17              MR. RICHENTHAL:  Objection.
18              THE COURT:  Are you able to say that?  Yes, no, I
19   don't know.
20              THE WITNESS:  Yes.
21   Q.  And those are the three countries -- Israel, Greece, and
22   Cyprus -- that stood most to benefit from this legislation;
23   right?
24   A.  The legislation was mostly focused on Israel, Greece, and
25   the Republic of Cyprus.
```

1          MR. WEITZMAN:  You can take that down.

2    Q.  You testified yesterday about a meeting between Senator

3    Menendez and Mr. Helmy sometime in March 2020?

4    A.  I don't think I testified about it because I wasn't there.

5    Q.  Yes; no, we got that.  You learned of the meeting that was

6    held in March 2020; correct?

7    A.  Yes.

8    Q.  And you learned about it from an e-mail that was sent to

9    you; right?

10   A.  Yes.

11   Q.  And you don't know whether the meeting was a social meeting

12   like a lunch or a dinner; right?

13   A.  I don't.

14   Q.  But you would have liked to have known about it; right?

15   A.  Yes.

16          MR. RICHENTHAL:  Objection.

17          THE COURT:  I will allow it.

18          You thought it was part of your job to have known

19   about it; correct?

20          THE WITNESS:  Yes.

21          MR. WEITZMAN:  If we can put up Government Exhibit

22   8F-24?

23   Q.  This is the e-mail that informed you of the meeting that

24   Mr. Helmy had with Senator Menendez; right?

25   A.  Yes.

1    Q.  And you see at the bottom it says, Ahmed Helmy, counselor?

2    A.  Yes.

3    Q.  And by the way, it provides the specific date of the

4    meeting, March 18, 2020; right?

5    A.  Yes.

6    Q.  And it is an e-mail that is sent to Rob Kelly, the

7    senator's deputy chief of staff; right?

8    A.  Yes.

9    Q.  And then Rob Kelly sends it to you and to Fred Turner, the

10   senator's chief of staff at the time; right?

11   A.  Yes.

12   Q.  Fair to say this wasn't a secret meeting?

13           MR. RICHENTHAL:  Objection.

14           THE COURT:  Other people knew about this meeting;

15   correct?

16           THE WITNESS:  I don't know.

17   Q.  You were informed of the meeting after the fact; right?

18   A.  I found out about the meeting.

19   Q.  Right, because the e-mail was forwarded to you; right?

20   A.  Yes.

21   Q.  OK.  And attached to this e-mail is a memo with information

22   about the GERD dispute; right?

23   A.  Yes.

24   Q.  That's the next page?  And again, that memo is signed by

25   Ahmed Helmy; right?

O6P5men2                        Arkin - Cross

1    A.  Yes.

2    Q.  A foreign country sending position papers and white papers

3    and memos about matters that are relevant to them is not an

4    uncommon thing in your experience; right?

5    A.  No.

6            MR. WEITZMAN:  If we can go up to -- if we can do side

7    by side now of Government Exhibit 8F-26?  Let's stick with the

8    first pages of both documents.

9    Q.  So, you learn of this meeting on March 18, 2020 through an

10   e-mail to you on April 8 at 12:54 p.m.; right?

11   A.  Yes.

12   Q.  And Rob Kelly sent you that e-mail; right?

13   A.  Yes.

14   Q.  Senator Menendez is not on it; right?

15   A.  No.

16   Q.  Senator Menendez does reach out to you that same day at

17   3:00 p.m.; right?

18   A.  Yes.

19   Q.  And he says:  Can we see if we can get the state department

20   engaged in order to avoid a conflict here?  Right?

21   A.  Yes.

22   Q.  And then he forwards you -- if we can go to the page 2 of

23   each of those documents -- he forwards you the exact same memo

24   that was forwarded to you previously by Rob Kelly; right?

25   A.  Yes.

O6P5men2                              Arkin - Cross

1    Q.  And so the forward from Senator Menendez, again, includes

2    the Ahmed Helmy memo; right?

3    A.  I don't know that I would call it the Ahmed Helmy memo.

4    Q.  The memo that Ahmed Helmy forwarded or sent to Senator

5    Menendez?

6    A.  Yes.

7    Q.  Now, you had already been working on the GERD issue by the

8    time Senator Menendez sent this to you on April 8; right?

9    A.  Yes.

10   Q.  And that's because the issues surrounding GERD -- the Great

11   Ethiopian Renaissance Dam -- were potentially explosive in the

12   region; right?

13   A.  It was becoming a high flashpoint.

14   Q.  Just so we can understand exactly what it was, essentially

15   there was a conflict, a dispute between countries in the horn

16   of Africa about access to the Nile and water flow; right?

17   A.  I wouldn't call Egypt in the horn of Africa but, yes, it

18   was essentially a brewing crisis about -- a brewing crisis

19   about water access.

20            THE COURT:  I take it disputes about access to the

21   Nile River water have been around for thousands of years?

22            THE WITNESS:  That's correct.  Yes, that's fair.

23   Q.  And the Nile runs from Ethiopian through Sudan up to Egypt;

24   right?

25   A.  Yes.  Well, part of it starts in Uganda, but yes.

O6P5men2                              Arkin - Cross

1    Q.   And in 2011 Ethiopia planned to build a massive dam, the

2    GERD, along the Nile River for the produce of producing

3    electricity; right?

4    A.   I don't remember the date they started, but yes.   Ethiopia

5    was planning on building a dam for energy generation.

6    Q.   And the dam would also potentially reduce the flow of the

7    Nile River northward up to Egypt; right?

8    A.   Yes.

9    Q.   That was the essence of the dispute; right?

10   A.   Yes.

11   Q.   Now, Egypt, you understand, is heavily dependent on the

12   Nile for agriculture, transportation, economic activity; right?

13   A.   Yes.

14   Q.   This was a very important issue for Egypt; right?

15   A.   Yes.

16   Q.   But Ethiopia was experiencing an energy crisis in that time

17   frame, 2010s; correct?

18   A.   I'm not familiar.

19   Q.   You understood that they wanted a dam, though, to enhance

20   their electricity; right?

21   A.   Yes.

22   Q.   There was a potential, there were discussions in effort

23   over the years to negotiate a resolution to this dispute;

24   right?

25   A.   Yes.

O6P5men2                          Arkin - Cross

1    Q.  And one of the ways that that could be done is, for

2    example, Ethiopia could decrease the size of the dam; right?

3    A.  There were a number of proposals on the table.  I don't

4    remember all specifics and I am not a water management expert.

5    Q.  A very complicated issue?

6    A.  Yes.

7    Q.  And if it didn't get resolved, it could be particularly --

8    it could be very dangerous to the region; is that fair to say?

9    A.  Water access and resource of water is critical for any

10   country's ability to thrive and sustain so, yes, water access

11   has driven conflict for millennia.

12   Q.  And you recall that at one point President Trump even

13   mentioned, commented that Egypt might blow up the dam; right?

14              MR. RICHENTHAL:  Objection.

15              THE COURT:  Sustained.

16   Q.  Do you know whether President Trump said that he was

17   worried that Egypt might blow up the dam?

18              MR. RICHENTHAL:  Objection.

19              THE COURT:  Sustained.

20   Q.  In your discussions with Senator Menendez, he relayed to

21   you that this dam issue -- I'm sorry, D-A-M issue, excuse me --

22   that the issue surrounding the dam was a potentially explosive

23   issue for the region; right?

24   A.  The senator did convey he was very concerned about -- very

25   concerned about the implications of the resolution not being --

O6P5men2                    Arkin - Cross

1   or not finding a resolution to the crisis.

2   Q.  And one of the things that Senator Menendez mentioned to

3   you, that he was concerned that Egypt might take military

4   action if the access to The Nile was restricted; right?

5   A.  He did say that, yes.

6   Q.  Now, this was also an important issue for, or I should say

7   an issue that was being addressed by President Trump's

8   administration; right?

9   A.  They were trying to address it.

10  Q.  Right.  And the way President Trump decided to address it

11  was to have someone named Secretary Mnuchin lead the

12  negotiations on the issue, right?

13  A.  Mnuchin, yes.

14  Q.  Mnuchin, thank you.  And Secretary Mnuchin wasn't in the

15  state department; right?

16  A.  No.

17  Q.  He was the Secretary of Treasury, right?

18  A.  Yes.

19  Q.  So he doesn't have the same experience that, let's say, the

20  secretary of state might have in foreign affairs; right?

21          MR. RICHENTHAL:  Objection.

22          THE COURT:  I will allow it.

23  A.  I would say the treasury department doesn't have the tools

24  and resources to address a diplomatic crisis in the way that

25  the state department has the tools and resources to address the

O6P5men2                          Arkin - Cross

1    crisis.

2    Q.  And you knew that Secretary Mnuchin was also a movie

3    producer; right?

4                MR. RICHENTHAL:  Objection.

5                THE COURT:  I will allow it.

6                THE WITNESS:  I didn't actually didn't know that he

7    was a movie producer.

8                THE COURT:  You still don't, because the question

9    isn't evidence.

10   BY MR. WEITZMAN:

11   Q.  In any event, you agree that Secretary Mnuchin was not

12   best-positioned to resolve this very complicated issue;

13   correct?

14   A.  I would agree.

15   Q.  And Senator Menendez agreed with that issue as well, with

16   that point of view; right?

17   A.  Yes.

18   Q.  And that's why Senator Menendez asked you, in that

19   e-mail -- let me rephrase it.

20               MR. WEITZMAN:  If we can go back to Government Exhibit

21   8F-26?

22   Q.  When Senator Menendez asked:  Can we see if we can get the

23   state department engaged in order to avoid a conflict?  The

24   thing that he was talking about was that this might not get

25   resolved by Secretary of Treasury Mnuchin; right?

O6P5men2                        Arkin - Cross

1          MR. RICHENTHAL:  Objection; vague.

2          THE COURT:  Did he tell you he was concerned that the

3     issue of the GERD may not get resolved by Mnuchin?

4          THE WITNESS:  No.

5     Q.  Did you understand that the request to get the state

6     department engaged was an effort to get more diplomatic

7     resources involved in the matter?

8     A.  It is the logical department you would call on to solve

9     this problem so it's the logical question to ask.

10    Q.  And you would agree with me that as chairman of the Senate

11    Foreign Relations Committee, this was the logical question that

12    he should have asked; right?

13         MR. RICHENTHAL:  Objection.  Speculation.

14         THE COURT:  Sustained.

15    Q.  You would agree with me that the GERD issue was within the

16    jurisdiction of the Senate Foreign Relations Committee?

17    A.  Seeking engagement with the state department to get

18    involved on the GERD issue is within the jurisdiction of the

19    Senate Foreign Relations Committee.

20    Q.  And in fact you were, even before this e-mail, looking at

21    the GERD issue and trying to figure out how do we resolve this;

22    right?

23    A.  Yes.

24    Q.  You understood that the issue of the GERD was a serious

25    issue?

O6P5men2                          Arkin - Cross

```
 1   A.  Yes.

 2             MR. RICHENTHAL:  Asked and answered.

 3   Q.  And it was a topic of discussion on the Hill?

 4             MR. RICHENTHAL:  Asked and answered.

 5             THE COURT:  I will allow it.

 6   A.  Not on the Hill, but certainly among the Foreign Relations

 7   Committee, democrat and republicans.

 8   Q.  And you had a view at the time that the Treasury

 9   Department, Senator Mnuchin, wasn't handling the matter

10   properly?

11             MR. RICHENTHAL:  Asked and answered.

12             THE COURT:  I will allow it.

13   A.  It was -- I, along with many others, felt that the Treasury

14   Department was not the right department to be handling this

15   crisis.

16             THE COURT:  Because it didn't have the tools and

17   experience to deal with it appropriately?

18             THE WITNESS:  Right.

19             THE COURT:  OK.

20   BY MR. WEITZMAN:

21   Q.  I think you testified on direct that Senator Menendez

22   eventually wrote a letter to Secretary Mnuchin and Secretary of

23   State Pompeo regarding the GERD conflict; right?

24   A.  Yes.

25   Q.  Do you recall that that was April 2020?
```

```
 1   A.  Yes.

 2            MR. WEITZMAN:  Can we put up Government Exhibit 8F-5

 3   and go to the next page?

 4   Q.  This is a copy of that letter; right?

 5   A.  Yes.

 6   Q.  And Senator Menendez -- withdrawn.

 7            Did you help write this letter?

 8   A.  Yes.

 9   Q.  And Senator Menendez, in the first sentence, is expressing

10   his concern about the stalled negotiations; correct?

11   A.  Yes.

12   Q.  And you thought it was appropriate for Senator Menendez as

13   chairman of the Senate Foreign Relations Committee, to weigh in

14   on this GERD issue; correct?

15   A.  Yes, and that, just but mostly the Africa team drafted

16   this.

17   Q.  We won't read the letter, it is in evidence.

18   A.  I don't want to take credit for something I didn't

19   ultimately do.

20   Q.  This letter is in evidence, I just have a question.  You,

21   after -- let me go up to the top letter.  The letter is

22   addressed to Secretary of State Mnuchin and Secretary Pompeo;

23   correct?

24   A.  Yes.

25            MR. WEITZMAN:  Can you scroll to the bottom of the
```

O6P5men2                           Arkin - Cross

1   letter?  All the way to the bottom, all the way to the next

2   page?

3   Q.  It is signed by Senator Menendez; right?

4   A.  Yes.

5   Q.  There is no cc carbon copy on this letter; right?

6   A.  No.

7   Q.  Do you know if Senator Menendez issued a press release

8   surrounding this letter?

9   A.  I don't remember.

10  Q.  If you turn to the first page of the e-mail, you forwarded

11  this letter to someone named Karim Saad; correct?

12  A.  Yes.

13  Q.  On April 28, after it was sent to Senators Mnuchin and

14  Pompeo; right?

15  A.  Yes.

16  Q.  And you wrote:  Hi Karim, Hope you and the family are doing

17  well.  Wanted to let you know that the senator sent the

18  following letter today.  Correct?

19  A.  Yes.

20  Q.  Did senator Menendez ask you to send that to Karim?

21  A.  No.  I don't remember.  I mean, he doesn't -- I don't think

22  he knew who Karim was.

23  Q.  Right.  That's part of your job duties and

24  responsibilities, to make the decision whether to keep Egyptian

25  counterparts informed; right?

O6P5men2                          Arkin - Cross

1   A.   In this particular case I decided to let them -- I mean --

2   can you be more specific?

3   Q.   You are just doing your job; right, in letting their

4   Egyptian counterpart know about something that is going on in

5   the United States; right?

6   A.   Related to Egypt.

7   Q.   Related to Egypt; right?

8   A.   Yes.

9   Q.   You are doing your job.  That's my simple question.

10          MR. RICHENTHAL:  Your Honor, is the question about

11   this particular moment or --

12          THE COURT:  Yes.  That's right.  It is about this

13   particular moment.

14          THE WITNESS:  Yes, in this moment I was letting him

15   know that the senator had sent a letter regarding the GERD.

16   Q.   And you exercised your discretion in doing that; right?

17   A.   Yes.

18   Q.   And Senator Menendez didn't ask you to forward it to any

19   Egyptians; correct?

20          MR. RICHENTHAL:  She said she doesn't remember, your

21   Honor.

22   Q.   Well, let me see if this refreshes your recollection.  Did

23   Senator Menendez --

24          THE COURT:  She didn't have a failure of recollection.

25          MR. WEITZMAN:  Well, she said first no, and then she

O6P5men2                          Arkin - Cross

1    said I don't recall.

2                THE COURT:  All right.  Fair.  Ask.

3    BY MR. WEITZMAN:

4    Q.  Do you have a recollection, as you sit here, that Senator

5    Menendez asked you to forward this to anybody in Egypt?

6    A.  I don't remember.

7    Q.  The sharing of information between Egyptian and U.S.

8    employees on the Senate Foreign Relations Committee is a fairly

9    routine event in your experience; correct?

10               MR. RICHENTHAL:  Objection.  Vague.

11   Q.  Can you answer that question?

12               THE COURT:  You can answer it.  Objection overruled.

13   A.  Depends on the time of information.

14   Q.  This type of information, like a press release or a letter,

15   internal letter within government, that's OK to share; right?

16               MR. RICHENTHAL:  Objection to characterization of the

17   letter.

18               THE COURT:  Sustained.

19   Q.  The letter that you shared, you didn't view that as

20   problematic to share with Egyptian counterparts; right?

21   A.  No.

22   Q.  By the way, you testified in your direct examination about

23   the head of what's called EGIS and Abbas Kamel; correct?

24   A.  Yes.

25   Q.  Now, EGIS is the General Intelligence Service of Egypt,

O6P5men2                        Arkin - Cross

1   right?

2   A.   Yes.

3   Q.   And I guess is it the equivalent of the CIA in the United

4   States?

5   A.   No.

6   Q.   No, because EGIS has a much broader mandate than, for

7   instance, the CIA would in the United States; right?

8           MR. RICHENTHAL:   Objection to mandate.

9           THE COURT:   I will allow it.

10          THE WITNESS:   I just wouldn't compare them.

11  Q.   Even though it is titled intelligence service, EGIS plays a

12  key role in Egypt's foreign policy, right?

13  A.   And domestic.

14  Q.   And domestics.

15  A.   Yes.

16  Q.   It is a present in Egypt, right?

17  A.   Right.

18  Q.   And Abbas Kamel is a very important, has a close

19  relationship to your knowledge, with the President Sisi; right?

20          MR. RICHENTHAL:   Objection.

21          THE COURT:   She may know.

22          Does he have a close personal relationship?  Is that

23  what you are asking, sir?

24          MR. WEITZMAN:   Yes.

25          THE COURT:   Does he have a close personal relationship

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6P5men2                              Arkin - Cross

1   with the president of -- did he, with the president of Egypt?

2            THE WITNESS:  I don't have personal knowledge of that.

3   BY MR. WEITZMAN:

4   Q.  From your oversight of the Egypt desk in the Middle East,

5   Near East desk, you get reports about Abbas Kamel?

6   A.  Reports, no.

7   Q.  You are aware of who Abbas Kamel was, though?

8   A.  Yes.

9   Q.  And is it fair to say that Abbas Kamel is viewed as Sisi's

10  right hand in Egypt?

11           MR. RICHENTHAL:  Objection.  Viewed by whom?  When?

12           THE COURT:  Do you know whether or not he is viewed

13  that way?

14           THE WITNESS:  It is my understanding that they have a

15  close relationship given the structure of Egypt's government.

16  Q.  And he is one of President Sisi's most senior advisors?  Do

17  you have an understanding of that?

18           MR. RICHENTHAL:  Objection.

19           THE COURT:  I will allow it.

20  A.  Yes.

21  Q.  It has been reported that he has replaced the Egyptian

22  foreign minister in his role over --

23           THE COURT:  When are we talking?  When are we talking

24  about, sir?

25  Q.  2019 to the present.

1          MR. RICHENTHAL:  Hearsay.

2          THE COURT:  What's the question?

3    Q.  The question is was it the United States' view that Abbas

4    Kamel is more important in foreign relations than Egypt's

5    foreign minister?

6          THE COURT:  Sustained.

7    Q.  Was it your view that Abbas Kamel is a more important

8    player than the foreign minister in Egypt when it comes to

9    foreign relations with the United States?

10   A.  It is my view that he is an important player in foreign

11   relations with the United States.

12   Q.  You testified on direct about a woman named Mai

13   Abdelmaguid; right?

14   A.  Yes.

15   Q.  And you met her in connection with Abbas Kamel's trip to

16   the United States; correct?

17   A.  Yes.

18   Q.  And that was in -- was it in June of 2021?

19   A.  Yes.

20   Q.  And Abbas Kamel came and met with a bunch of senators.  Do

21   you recall that?

22   A.  Yes.

23   Q.  And Ms. Abdelmaguid attended that meeting as well?

24   A.  Yes.

25   Q.  At the time did you know what her position was when she

1    attended the meeting?

2    A.  I think so.

3    Q.  What did you think her position was?

4    A.  She was an intelligence officer.

5    Q.  How did you learn that?

6    A.  I heard it from other staff -- other Congressional staff.

7    Q.  And did you ever talk to Senator Menendez about the fact

8    that she is an intelligence officer?

9    A.  No.

10   Q.  Did he ever tell you that he knew she was an intelligence

11   officer?

12   A.  I don't think so.

13   Q.  Other than having heard it from other staff, do you have

14   any personal knowledge -- did Ms. Abdelmaguid ever tell you

15   that she was an intelligence officer?

16   A.  She was with, there with the delegation, but I don't think

17   she ever said, *Hi, I'm an intelligence officer.*

18           THE COURT:  Did the delegation consist of intelligence

19   officers?

20           THE WITNESS:  Yes, they were with the head of

21   intelligence services.

22           THE COURT:  That was Kamel.

23           THE WITNESS:  I'm sorry?

24           THE COURT:  That was Kamel; correct?

25           THE WITNESS:  Yes.

O6P5men2                         Arkin - Cross

1    BY MR. WEITZMAN:

2    Q.   But were there others who were not intelligence officers

3    who attended that meeting from the Egypt side?

4    A.   Yes.

5    Q.   So the fact that she attended it doesn't indicate, one way

6    or another, whether she's personally an intelligence officer;

7    is that fair to say?

8    A.   Because she was at the meeting?

9    Q.   Yes.

10   A.   No.  I mean no to your question.

11   Q.   Meaning I am correct that the mere attendance at this

12   meeting doesn't indicate that she's an intelligence officer

13   alone; correct?

14   A.   Correct.

15   Q.   In your meetings with the United States Attorney's office,

16   did they tell you that she was an intelligence officer?

17            THE COURT:   Sustained.

18   Q.   In any event, it would not be uncommon for an intelligence

19   officer from a foreign country to work in an embassy in the

20   United States; correct?

21   A.   Correct.

22   Q.   And that's because, I think you testified, intelligence

23   officers from our allied countries will share intelligence with

24   our intelligence agencies here in the United States; right?

25   A.   Yes.  We refer to Egypt as a partner country in this

O6P5men2                          Arkin - Cross

1    context, yes.

2    Q.   Thank you; partner country.

3              So, the United States, for instance, can prohibit or

4    bar intelligence officers from coming into the United States?

5              MR. RICHENTHAL:  Objection.  403.

6              THE COURT:  I will allow it.

7              THE WITNESS:  That's a complicated set of diplomatic

8    protocol that I am not the expert to speak on.

9    Q.   Fair enough.

10             In any event, Mai Abdelmaguid attended this meeting

11   with General Abbas Kamel; right?

12   A.   Yes.

13   Q.   And when you say that she is an intelligence officer I just

14   want to understand, that doesn't mean she is like a covert spy?

15             THE COURT:  Sustained.

16   Q.   In fact, the U.S. has intelligence officer in U.S.

17   embassies abroad, right?

18             MR. RICHENTHAL:  Your Honor, we are going to need a

19   side bar immediately if we go down this direction.

20             THE COURT:  Go to another area.  Finish up a line and

21   then I will give the jury its mid-morning break.

22             MR. WEITZMAN:  Thank you.

23   BY MR. WEITZMAN:

24   Q.   Did you have an understanding that Ms. Abdelmaguid replaced

25   Ahmed Helmy at the Egyptian embassy?

1    A.  No.

2    Q.  You don't know one way or another?

3    A.  No.

4    Q.  You do know, do you recall, that you saw a signature block

5    for Ahmed Helmy and referred to him as counselor at the Embassy

6    of Egypt?

7    A.  Yes.

8    Q.  Do you recall that?

9            MR. WEITZMAN:  And if we can put up Defendant's

10   Exhibit 2128 for identification just to the witness.  This is a

11   e-mail from Ahmed Helmy to Rob Kelly and Mai Abdelmaguid, and

12   we offer Defendant's Exhibit 2128.

13           MR. RICHENTHAL:  Your Honor, this goes to precisely

14   what we discussed this morning.  Lack of notice, scope,

15   hearsay, 401, and 403.

16           THE COURT:  Let's take a break, ladies and gentlemen.

17           Before you do, I just want to point out one thing that

18   we all smiled about but it is worth being aware.  The question

19   was:  *You knew that Senator Mnuchin was also a movie producer?*

20   And the answer was:  *I didn't actually know that.*  And what I

21   wanted to bring to your attention is that the -- and I did

22   then -- the fact that he asked the question that way assumed

23   that Mnuchin was a movie producer but the answer was that this

24   witness assumed it as well.  The questions are never answers.

25   I am making it more confusing now but I am just alerting you to

O6P5men2                          Arkin - Cross

1    that being aware when there are assumptions in the questions

2    that are not in the evidence, in fact that is what a lot of the

3    objections are, sometimes assumptions in the answer, and I try

4    to catch that but sometimes I don't.  So, be aware, unanswered

5    questions have no answers.  I may have made it more confusing.

6    And both sides are, as it were, guilty of this.  Just be aware

7    of it.

8                   Take 15 minutes.  Thank you.

9                   (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6P5men2                          Arkin - Cross

1                  (Jury not present)

2                  THE COURT:  You may step down, Ms. Arkin.

3                  (Witness not present)

4                  THE COURT:  Somebody should get Ms. Arkin some more

5        water.

6                  You may be seated.  Let's take up each issue.

7                  MR. RICHENTHAL:  Can we have a very fast restroom

8        break first, your Honor?

9                  THE COURT:  It will be faster if I don't give you the

10       break.

11                 MR. RICHENTHAL:  That is true.

12                 THE COURT:  Five minutes.

13                 (Recess)

14                 THE COURT:  Everyone, take your places, please.

15                 Let's start with the evidentiary objection and then we

16       will go back to the government apparently had a broader

17       objection.

18                 MR. RICHENTHAL:  I'm sorry --

19                 THE COURT:  Start wherever you would like.  What would

20       you like to raise, sir?

21                 MR. RICHENTHAL:  I will start where it appears we left

22       off.

23                 I don't know if Mr. Weitzman is going to move on, but

24       there was a question about certain individuals who may or may

25       not be posted at U.S. embassies abroad.  If that is a subject

O6P5men2                          Arkin - Cross

1   that the defense intends to inquire upon, we are going to need

2   to go into your Honor's robing room pursuant to --

3          THE COURT:  I take it you are not.  Mr. Weitzman, you

4   are not going to ask about intelligence operatives abroad.

5          MR. WEITZMAN:  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8   XXXXXXXXXXXXXXXX.

9          THE COURT:  We don't need to go into that at all.

10         MR. RICHENTHAL:  I may have misunderstood the

11  question.  I thought he asked about individuals abroad.  It may

12  or may not have been a reference to the United States.  I am

13  just acting in an abundance of caution.

14         There are two exhibits that I think raise similar

15  issues so maybe it makes sense to talk about them first and go

16  to other exhibits, and when I say two exhibits I mean exhibits

17  of which the defense gave us notice of one we got notice of

18  this morning and we got notice of after 11:00 p.m. last night.

19  I think the first one that perhaps make sense, and again,

20  depending on the scope of the conversation we may have to leave

21  open court, is DX 2132.

22         If I can ask Ms. Wechsler to put that up?

23         THE COURT:  Enlarge that a little.

24         MR. RICHENTHAL:  I need to be a little careful, your

25  Honor, but what this appears to be, and we were provided this

O6P5men2                          Arkin - Cross

at roughly 11:23 p.m. last night, is an e-mail exchange between

individuals identified at the Federal Bureau of Investigation,

Mr. Helmy and Ms. Abdelmaguid.  I can speak, including in this

setting, as to what the international operations provision is

but there are things that I might say that I need to be careful

about.  But, needless to say, a back and forth between these

Egyptian individuals and the FBI, particularly the

international operations division, is not something I think the

lay jury can understand.  It has very serious 403 issues even

if we were to assume it is relevant, which we are not

conceding.

          THE COURT:  Did you talk to the government about this?

They may not wish to proceed on it.

          MR. RICHENTHAL:  We got this 11:23 p.m., I responded

within minutes and said we had concerns.  I have not been given

further information since.  When I said this morning there were

a number of exhibits we had concerns about, Mr. Weitzman said

he wasn't going to offer them, at least up until this point.  I

have no further information.

          MR. WEITZMAN:  Your Honor, so we were surprised that

the government elicited from this witness yesterday that

Ms. Abdelmaguid is an intelligence officer.  After we got back

from court and got the transcript and studied it, we located

these documents.  We did not have access to these documents

before --

O6P5men2                         Arkin - Cross

1              THE COURT:  You had access.

2              MR. WEITZMAN:  We had access.  We did not identify

3    them before.  We located them, we identified them, two of them

4    are in the government's production to us, and so we put a stamp

5    on them and we sent it to them promptly.  It is directly in

6    response to testimony that they elicited that she is an

7    intelligence officer.  And the misimpression, the confusion to

8    the jury is that the suggestion left is that it is something

9    improper for Senator Menendez to have met with an intelligence

10   officer, when in reality --

11             THE COURT:  You said that quite directly here.  I

12   mean, you have been establishing that it is not.

13             MR. WEITZMAN:  Unfortunately I have had to do so as a

14   result of what the government did yesterday.  And so, here is

15   an e-mail where Ahmed Helmy introduces Mai to FBI agents.  It

16   doesn't matter --

17             THE COURT:  Just a moment.

18             MR. WEITZMAN:  This is 2132.

19             THE COURT:  Well, I believe it is established that

20   Helmy -- is it established that Helmy is an intelligence

21   officer?

22             MR. WEITZMAN:  No.  I don't think it is, your Honor.

23             MR. RICHENTHAL:  I want to distinguish between facts

24   and what this jury has been informed.

25             This jury has been informed that Ms. Arkin believed

1    that Ms. Abdelmaguid was an intelligence officer and

2    Mr. Weitzman is entitled to and now has explored the basis for

3    that belief.  This conversation -- and I am trying to be very

4    careful here -- appears to be a different conversation.  It

5    appears to be a conversation -- this, meaning the one with the

6    Court -- as to whether in fact she was.  I am not at liberty to

7    answer that question in this forum, your Honor.  This is

8    extraordinarily serious under 403.  The defense does not even

9    have a good faith basis, in our judgment, to be putting this

10   document in for this purpose.  If the Court wants us to explore

11   this further --

12              THE COURT:  The purpose, I take it, is that whoever

13   Abdelmaguid was, she was being introduced to the FBI.  Is that

14   the purpose?

15              MR. WEITZMAN:  Correct.  I'm not disputing --

16              THE COURT:  Yes or no.

17              MR. WEITZMAN:  Yes.  Yes, your Honor.  I'm not trying

18   to take on the fact whether she is or she isn't.  The point is

19   that there is nothing inappropriate about whomever she was.

20   She was being introduced to the FBI.  They've made something,

21   they have opened the door suggesting sinister things.  For

22   example, your Honor, Sarah Arkin tries to locate Abdel Maguid

23   and they introduce a text message --

24              THE COURT:  That was a simple error and I think --

25              MR. WEITZMAN:  Of course.  Why did they even introduce

1  it?

2              THE COURT:  One at a time.

3              MR. WEITZMAN:  Yes, your Honor.

4              THE COURT:  That was a simple error and I think the

5  jury understands that.  She thought it was somebody named,

6  first name Abdel, last name Maguid, and that was straightened

7  out.  Nothing more to it than that.

8              MR. WEITZMAN:  What is the relevant purpose other than

9  to leave an impression that she is not even -- the name

10  Abdelmaguid, whether it is a first and last name or just a full

11  name, is unknown to the Egyptian embassy.

12              THE COURT:  No, no.

13              MR. WEITZMAN:  They've left misimpressions left and

14  right and then they complain when we try to clear it up and say

15  it is deeply confusing.

16              THE COURT:  This is trenching on an area that really

17  is not for the jury as a --

18              MR. WEITZMAN:  Well, what area is that?

19              THE COURT:  One at a time.

20              MR. WEITZMAN:  Yes.

21              THE COURT:  -- especially given the particular group

22  within the FBI that this deals with.

23              MR. WEITZMAN:  But this is a part of OIO, Office of

24  International Operations at FBI headquarters, and it oversees

25  the legal attache program.  That is what I am seeing through

1    the website.

2              Your Honor, there is nothing about this that is

3    confusing or prejudicial to the government.  The government

4    shouldn't have elicited this if it didn't want explanation to

5    the jury as to how this works, and one way it works is that

6    these people get introduced to OIO at the FBI.  And there is

7    nothing --

8              THE COURT:  That doesn't mean she is or isn't

9    intelligence --

10             MR. WEITZMAN:  I agree.

11             THE COURT:  -- is or isn't an intelligence officer.

12             MR. WEITZMAN:  I agree with you.  And I'm not taking

13   that position.  I am taking the position that there is,

14   whatever position she has, it is known to the government, it is

15   known to the FBI.  It is what it is.

16             THE COURT:  Well, why don't you ask that, rather than

17   introduce this and see what she knows?  She is not going to

18   know it.  Presumably, she hasn't seen this anyway.

19             MR. WEITZMAN:  Correct, your Honor, which is why I

20   just want to offer it into evidence.  That's the very reason.

21   I shouldn't have to call this FBI agent.

22             MR. RICHENTHAL:  They do not have a good faith --

23             THE COURT:  -- just a moment.

24             MR. RICHENTHAL:  I literally cannot emphasize enough

25   how incredibly deeply problematic this is and how limited I am

O6P5men2                              Arkin - Cross

1  in what I can say.  This document does not purport to show what

2  Mr. Weitzman says and he knows it, it is totally improper, it

3  will confuse the jury.  The substantial prejudice here to us is

4  extreme because of our inability to explain what I cannot say

5  which I think your Honor understands.  This does not show

6  anything about Ms. Arkin's knowledge.

7        MR. WEITZMAN:  I agree it doesn't show anything about

8  Ms. Arkin's knowledge but, you know, Mr. Richenthal, in yelling

9  that things are dangerous, doesn't actually create an

10 evidentiary --

11       THE COURT:  I agree with that, sir.  Don't worry about

12 that.

13       MR. WEITZMAN:  Thank you, your Honor.

14       THE COURT:  Just as I know your question doesn't make

15 Mnuchin a movie producer.

16       MR. WEITZMAN:  Although he is, your Honor.

17       THE COURT:  I know that.  The only one who didn't was

18 the witness.

19       I'm going to exclude this document on 403.  I am

20 concerned about the area it trenches on.

21       What else?

22       MR. RICHENTHAL:  A similar document, which is why I am

23 grouping them together for purposes of this discussion that we

24 were given notice of this morning, that's Defendant's Exhibit

25 2127 and 2127A, as in apple.  They appear to be the same

1   document, one has a URL and one does not so I think maybe we

2   can look at 2127A, as in Apple.

3            So, this appears to be a State Department Diplomatic

4   List from fall 2020.  There are several problems here.  So,

5   first, it is a 136-page document.  Needless to say, there is a

6   lot that is not relevant but even tabling that for a second --

7            If we can go to the next page, Ms. Wechsler?

8            So what the document starts with is portions of the

9   Vienna Convention on diplomatic relations.  This is a legal

10  matter, it is for your Honor, if relevant at all, it is not for

11  the jury.

12           THE COURT:  What is the purpose of this?  What are you

13  going to do with this document?

14           MR. WEITZMAN:  Your Honor, we don't need this whole

15  part the Vienna Convention.  This is actually quite simple and

16  it is a public document.  If you turn to the next page, we have

17  excerpted it.  This is a roster released by the State

18  Department of Personnel at all embassies and it specifically

19  identifies for Egypt, the fourth name down, Ms. Mai Abdelmaguid

20  and it lists her as a counselor.  There is nothing sensitive

21  about this.  This is a publicly available --

22           THE COURT:  What is the date of this document?

23           MR. WEITZMAN:  Fall 2020.

24           MR. RICHENTHAL:  So, your Honor --

25           MR. WEITZMAN:  So it is right before the CODEL.

O6P5men2                          Arkin - Cross

1            THE COURT:  I got it.

2            MR. RICHENTHAL:  This is the exact same problem.  The

3    inference they need -- literally the only purpose of the

4    defense in putting this in is to suggest, in words or

5    substance, that Ms. Abdelmaguid must have been a diplomat and

6    not an intelligence officer.  I cannot speak further on this

7    except that that is misleading and improper, the defense knows

8    it, they do not have a good faith basis for this.

9            THE COURT:  Just a moment.  Speaking in the abstract,

10   aren't a lot of diplomats intelligence officers?

11           MR. RICHENTHAL:  I think this is getting tricky for me

12   to answer, your Honor.  We may need to go into the robing room.

13           I can just say in general, I am not speaking about her

14   specifically.  My comments are in general, not about her one

15   way or another.  The suggestion, in words or substance, that

16   this list has anything to do with what someone's actual role

17   is, at a minimum, extraordinarily misleading.

18           THE COURT:  We will take it in the robing room.

19           What else do you have?

20           MR. RICHENTHAL:  There are a number of other exhibits

21   that the defense, as I understand it, may seek to offer with

22   Ms. Arkin that we have concerns about.  I gave the defense a

23   list of the concerns last night.  We can go through them one at

24   a time, if necessary.

25           THE COURT:  I want you to talk to each other.  Maybe

1    some of those have been obviated.

2                (Counsel conferring)

3                MR. RICHENTHAL:  Mr. Weitzman, he can speak for

4    himself, your Honor.

5                THE COURT:  You know, this is a perfect example of why

6    those proffers have to be considerably more specific.  And you

7    see the jury asking us this morning to start as soon as they

8    came in.  We can't have these constant debates that are

9    stopping the jury from hearing evidence.  Can you gentlemen

10   talk about whatever exhibits there are right now and see if it

11   can be narrowed down?  If exhibits are given to people at 11:30

12   at night it is unrealistic to think any issues can be resolved

13   before court starts the next day.

14               Yes or no, is it worthwhile for you to talk?

15               MR. WEITZMAN:  Yes, I am happy to talk to

16   Mr. Richenthal.

17               THE COURT:  Anybody can talk about anything.

18               All right.  Go ahead.  What else?

19               MR. WEITZMAN:  On this diplomatic list, I would just

20   like to say, Mr. Richenthal conflates two issues --

21               THE COURT:  Let's take this in the robing room.

22               MR. WEITZMAN:  Yes, your Honor.

23               (Pages 4738-4749 SEALED by order of the Court)

24

25

1        THE COURT:  We are back on the record.  We will bring

2    the jury in.

3        MR. RICHENTHAL:  I was hoping Mr. Weitzman had the

4    opportunity to look at the list we supplied him with objections

5    last night.

6        THE COURT:  Yes.

7        MR. RICHENTHAL:  I understand he states he has not, so

8    we still have outstanding objections on exhibits,

9    unfortunately.

10        MR. WEITZMAN:  I have looked at the list, your Honor.

11    There is three documents that are the ones behind.  I don't

12    have another list from Mr. Richenthal.

13        MR. RICHENTHAL:  I have sent him the e-mail three

14    times.

15        MR. WEITZMAN:  I will pull --

16        THE COURT:  Talk to each other.  Talk to each other.

17        MR. WEITZMAN:  If you identify the exhibit --

18        THE COURT:  Just talk to each other.  Don't involve

19    everybody else.

20        You may be seated in the courtroom.

21        (Counsel conferring)

22        THE COURT:  I am going to step off.  The clerk will

23    let me know what the reduction of issues is.

24        (Recess)

25        THE COURT:  You may be seated in the courtroom.

O6P5men2                        Arkin - Cross

1          Were there remaining evidentiary issues?

2          MR. RICHENTHAL:  I am pleased to report there are not.

3          THE COURT:  Let's bring this jury in.

4          MR. WEITZMAN:  Your Honor, is it OK if I have Mr. Fee,

5   since it is his handwriting, read the stipulation?

6          THE COURT:  Of course.

7          Do you want to start with that, sir?

8          MR. WEITZMAN:  Yes, your Honor.

9          THE COURT:  And now that you have been able to hone

10  your remaining cross in the time we were in the room, how long

11  do you have?

12          MR. WEITZMAN:  28 minutes.

13          THE COURT:  Sounds good.

14          Jury entering.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

O6P5men2                          Arkin - Cross

1          (Jury present)

2          THE COURT:  You may be seated in the courtroom.

3          Thank you, ladies and gentlemen.  We actually were

4     working quite avidly on legal matters while you were on your

5     break.  I appreciate your forbearance.  The parties have

6     reached a stipulation.  Mr. Fee will read that stipulation.

7          MR. FEE:  Thank you, your Honor.

8          The parties have stipulated the following is true and

9     correct:  Mai Abdelmaguid was listed as a counselor with the

10    Embassy of the Arab Republic of Egypt on the diplomatic list

11    supplied by Egypt to the United States State Department and

12    published by the State Department in Fall 2020.

13         THE COURT:  Thank you.  That is a fact that has been

14    stipulated to.

15         You may continue and conclude your cross-examination.

16         MR. WEITZMAN:  Thank you, your Honor.

17    BY MR. WEITZMAN:

18    Q.  Ms. Arkin, in preparing to testify here today you met with

19    the government several times; right?

20    A.  Yes.

21    Q.  Can you estimate for me how many times you met with them?

22    A.  Half a dozen.

23    Q.  And even before meeting to prepare half a dozen times, they

24    interviewed you multiple times; correct?

25    A.  I think only once.

O6P5men2                          Arkin - Cross

1   Q.  And the half dozen times, was that by Zoom or in person?

2   A.  Both.

3   Q.  Sometimes you came up to New York to meet with them,

4   correct?

5   A.  No.

6   Q.  You came up to New York on a prior occasion for potential

7   testimony and you met with them during those days?

8   A.  Yes.  They came down to D.C.

9   Q.  Oh, and they traveled to D.C.  Got it.

10          Sometimes you met with them in person; right?

11  A.  Yes.

12  Q.  Sometimes by video, right?

13  A.  Yes.

14  Q.  And they went over the questions that they were planning to

15  ask you; correct?

16  A.  Yes, some of them.

17  Q.  And you went over some of your answers that you were

18  planning to give; right?

19  A.  Yes.

20  Q.  And did they also do a, like a run through of what a

21  potential cross-examination might look like?

22  A.  Yes.

23  Q.  Did someone stand up and say this is what Mr. Weitzman is

24  going to ask you?

25  A.  No.

O6P5men2                          Arkin - Cross

1    Q.   Not in those words?

2    A.   No.

3    Q.   And they gave you some tips on how to deal with

4    cross-examination; right?

5    A.   They just gave me an example of what it was going to be,

6    what it might be.

7    Q.   Was one of the tips that they gave try not to answer

8    questions yes or no?

9                MR. RICHENTHAL:   Objection.

10               THE COURT:   Sustained.

11               MR. WEITZMAN:   In any event, if we can put up

12   Government Exhibit 8F-34, which is in evidence?

13   Q.   This is a letter that you were shown in your direct

14   examination from Ahmed Helmy to Senator Menendez; correct?

15   A.   Yes.

16   Q.   And it attaches, if we can just do side by side and look at

17   page 2 as well, it attaches some reading materials regarding

18   Egypt; correct?

19   A.   Yes.

20   Q.   This is an undated letter; is that correct?

21   A.   As far as I can see.

22   Q.   Do you know when it was sent?

23   A.   I don't remember.

24   Q.   It references a meeting that Abbas Kamel promised to

25   provide Senator Menendez some materials at?

O6P5men2                           Arkin - Cross

1   A.  Right; March 2020.

2   Q.  How do you know it was a March 2020 meeting?

3   A.  I think it was attached to that chain that we saw earlier.

4   Q.  What chain is that?

5   A.  The chain that Rob Kelly forwarded me.

6   Q.  This is a separate document from that chain?

7   A.  I don't remember that.

8           MR. RICHENTHAL:  Was there a question?

9   Q.  Do we need to look at that chain?  Shall we look at it?

10  A.  Sure.

11  Q.  By the way, do you recall that the e-mail Rob Kelly formed

12  to you was from Mr. Helmy?

13  A.  Yes.

14  Q.  And it attaches different reading material than the reading

15  material attached by Abbas Kamel.  Do you recall that?

16          MR. RICHENTHAL:  Objection to reading material.

17          THE COURT:  I will allow it.

18  Q.  Do you recall?

19  A.  I'm sorry, yes.  This is a different letter, yes.

20  Q.  Right.  Do you want me to put up the Helmy -- the forward

21  from Rob Kelly to you?

22  A.  Sure.

23          MR. WEITZMAN:  We can put up Government Exhibit --

24  sorry, I don't have it in hand yet at the moment -- it was

25  Government Exhibit 8F-24.  If we can put Government Exhibit

1    8F-24 on one side, and then Government Exhibit 8F-34 on the

2    other?  And if we can go to page 2 of each of those documents?

3    Actually page 1 of 8F-34, please.  Can we do side by side,

4    Mr. Kelly?  Thank you, just go to page 1 of 8F-34, the

5    right-hand document.

6    Q.  These are different notes that were sent to Senator

7    Menendez; correct?

8    A.  Yes.

9                MR. RICHENTHAL:  Objection to notes.

10               THE COURT:  They're different documents that were sent

11   to him, correct?

12               THE WITNESS:  Yes.

13   Q.  The one on the left is a document from Mr. Helmy; correct?

14   A.  Yes.

15   Q.  And the one on the right is a document from Mr. Helmy as

16   well; correct?

17   A.  Yes.  They're cover letters.

18   Q.  Cover letters.  Fine.

19               And the one on the right references a meeting with

20   Abbas Kamel, correct?

21   A.  Yes.

22   Q.  But it is undated; right?

23   A.  Yes.

24   Q.  And do you recall, do you have any knowledge as to when

25   that meeting supposedly occurred?

1   A.   No.

2   Q.   You do know that there was a meeting with Abbas Kamel and a

3   broader group from the Senate; correct?

4   A.   In D.C.

5   Q.   Correct.   You do know that; right?

6   A.   Yes.

7           MR. WEITZMAN:   Now can we just put up Government

8   Exhibit 8F-34 and if we would flip to the next page and just

9   flip through all the pages?

10  Q.   I know you haven't read all of this Ms. Arkin.   I'm not

11  going to ask you detailed questions about this, but is it fair

12  to say that this has about 14 pages of information about Egypt?

13  A.   I don't know because I'm not -- I haven't looked through

14  all 14 of these pages or if there are 14 pages.

15  Q.   Have you, at some point, reviewed this document?

16  A.   I believe it came to me and I think I glanced through it.

17  Q.   Was there anything classified or controversial in the sense

18  of like this was not material that is publicly available from

19  Egypt?

20          MR. RICHENTHAL:   Compound and vague.

21  Q.   Was Egypt passing along any classified information, from

22  your knowledge --

23          MR. RICHENTHAL:   Objection.

24  Q.   -- in this document?

25          THE COURT:   She said she wasn't able to read it, she

1   didn't even know how many pages.  It is rather dense.

2              MR. WEITZMAN:  It is rather dense.

3   Q.  Does this appear to be some sort of position paper or

4   informational --

5              THE COURT:  Sustained.

6   Q.  Do you know what this is?

7              THE COURT:  That's fair.

8   A.  Information the government of Egypt wanted the senator to

9   have.

10             MR. WEITZMAN:  Can you go to page 2 of this document?

11  Q.  It appears to be some sort of excerpt from a broader

12  document, does that sound right?

13             MR. RICHENTHAL:  The document speaks for itself.  She

14  said she didn't review it.

15             THE COURT:  Sustained.

16  Q.  If you look at the top, do you see that the first line

17  appears to pick up mid-sentence?

18  A.  Yes.

19  Q.  From that can you infer that there is some other

20  information in earlier pages?

21             MR. RICHENTHAL:  This is not her document, your Honor.

22             THE COURT:  I will allow it.

23  A.  Well, it seems like a continuation of the sentence from the

24  previous page.

25             MR. WEITZMAN:  Now, go to Government Exhibit 8F-33,

1    this is a letter, if you would scroll to the signature page,

2    the next page?

3    Q.   This is a letter from Abbas Kamel, correct?

4    A.   Yes.

5    Q.   And if you would go to the first page and it is dated

6    June 30, 2021; right?

7    A.   Yes.

8    Q.   And again, it refers to a meeting that Abbas Kamel had with

9    Senator Menendez; right?

10    A.   Yes.

11    Q.   In this letter Abbas Kamel provides some information in the

12    middle of the page about an individual who had been arrested in

13    Egypt; correct?

14    A.   Yes.

15    Q.   And is this the individual you were referring to earlier in

16    your testimony when you said that Senator Menendez helped or

17    raised this issue with Mr. Kamel?

18    A.   Yes.

19    Q.   And after Senator Menendez raised the issue, Abbas Kamel --

20    or Egypt, I should say, released this individual from the

21    Egyptian prison; right?

22    A.   I don't remember the date he was released but it must have

23    been afterwards.

24    Q.   And the letter starts with:  Dear Bob.  Do you see that?

25    A.   Yes.

O6P5men2                           Arkin - Cross

1    Q.  It is not unprecedented, in your experience, for people to

2    send letters to Senator Menendez with his first name Bob;

3    right?

4                MR. RICHENTHAL:  Objection.  People.

5                THE COURT:  Sustained.

6    Q.  It is not uncommon, in your experience, for that to happen?

7                MR. RICHENTHAL:  Same objection.

8                THE COURT:  I will allow it.

9                Was it common for people to send letters to Senator

10   Menendez using his first name Bob?

11               MR. WEITZMAN:  It is the reverse, it is not uncommon,

12   your Honor, if it is OK.

13               MR. RICHENTHAL:  Is that a question?

14               THE COURT:  Was it uncommon for people to send letters

15   to Senator Menendez using his first name "Bob"?

16               THE WITNESS:  I guess it would depend on the person.

17   Q.  Correct, depends on the nature of the relationship with

18   Senator Menendez; right?

19   A.  Yes.

20   Q.  And it depends on the culture which they come from; right?

21               MR. RICHENTHAL:  Objection to that language.

22               THE COURT:  I will allow it, if she knows.

23               THE WITNESS:  Yes.  It would depend on many factors.

24   Q.  Some cultures are more informal in addressing people, some

25   cultures are more formal; correct?

1  A.  I wouldn't make a characterization like that I think it

2  would be more based on the relationship and the nature of the

3  relationship.

4          THE COURT:  The relationship between the sender and

5  Senator Menendez?

6          THE WITNESS:  The Senator and the individual.

7  Q.  You have certainly seen other foreign officials refer to

8  Senator Menendez as Bob; right?  Not in writing, just in their

9  interactions?

10  A.  Nothing that comes to mind in particular.

11          THE COURT:  Is it your testimony that the usual form

12  of address of foreign officials to Senator Menendez was

13  "Senator"?

14          THE WITNESS:  Senator, or Mr. Chairman, or Mr. Ranking

15  Member.

16  Q.  You don't recall the Greek prime minister referring to him

17  as Bob?

18  A.  Not to my recollection, no.

19  Q.  The meeting that's being referenced here, that was a

20  June 2021 meeting that Abbas Kamel had with Senator Menendez

21  and other senators; correct?

22  A.  Yes.

23  Q.  It was an official meeting in the Senate; correct?

24  A.  Yes.

25  Q.  And someone from the SFRC attended; right?

O6P5men2                    Arkin - Cross

1   A.   Yes.

2   Q.   In addition to raising this issue about this young man who

3   had been detained in Egypt, Senator Menendez raised other human

4   rights issues at this meeting with Abbas Kamel.  Do you recall

5   that?

6   A.   I believe so, yes.

7   Q.   Do you recall what those human rights issues were that he

8   raised?

9   A.   I don't remember specifically, unfortunately.  There was a

10  time period of my notes got lost.  I remember he raised the

11  importance of human rights, the importance of human rights,

12  respecting human rights and democratic values is important for

13  Egypt, important for Egypt-U.S. relations, as he did in those

14  meetings.

15  Q.   So, by the way, you know who Ben Cardin is, correct?

16  A.   I do.

17  Q.   He was on the Senate Foreign Relations Committee at this

18  time in June 2021; right?

19  A.   Yes.

20  Q.   And now he is the chair of the Senate Foreign Relations

21  Committee; right?

22  A.   Yes.

23        MR. WEITZMAN:  Can we put up, side by side with this

24  document just for the witness -- actually I don't know if you

25  can do that.  Let's first get this offered.  DX 1009 for

O6P5men2                         Arkin - Cross

 1    identification, just for the witness.  And if you would go to

 2    the next page of this document, DX 1009?

 3    Q.   Is this another letter from Abbas Kamel signed and

 4    addressed to Ben Cardin?

 5    A.   Yes.

 6    Q.   Is it also dated June 30, 2021?

 7    A.   Yes.

 8              MR. WEITZMAN:  We offer Defendant's Exhibit 1009, not

 9    for the truth.

10              MR. RICHENTHAL:  No objection, with the standard

11    instruction.

12              THE COURT:  Yes.

13              Ladies and gentlemen, not for the truth.

14              (Defendant's Exhibit 1009 received in evidence)

15              MR. WEITZMAN:  If we may publish Defendant's Exhibit

16    1009 side by side with Government Exhibit 8F-33?

17    BY MR. WEITZMAN:

18    Q.   Ms. Arkin, so the same day that Abbas Kamel sends Senator

19    Menendez a letter, he also has a letter dated to Senator

20    Cardin, correct?

21    A.   Yes.

22    Q.   Fair to say that the first paragraph and the first couple

23    of sentences of the letter kind of start off the same, thanking

24    each of them for, it says:  Express my pleasure and gratitude

25    for our latest fruitful meeting with you.

O6P5men2                              Arkin - Cross

 1              MR. RICHENTHAL:  The two sentences speak for

 2   themselves.  They are not the same.

 3              MR. WEITZMAN:  Your Honor, I think the "speak for

 4   themselves" objection is long past in the government's case.

 5              THE COURT:  What's your question?

 6   Q.  The first sentence in each letter --

 7              THE COURT:  Is the first -- all right.

 8   Q.  They're both thanking each of them for a meeting; right?

 9              THE COURT:  Fine.

10              THE WITNESS:  Well, the sentences are different.

11   Q.  Correct, but they're both thank yous; right?

12   A.  They both include the expressions of gratitude and

13   pleasure.

14   Q.  Do you have an understanding, based on reviewing this, that

15   senator Cardin was at that meeting with Abbas Kamel in

16   June 2021?

17   A.  Yes.

18   Q.  And, in fact, when you look at the letter from Abbas Kamel

19   to -- sorry -- from Abbas Kamel to Senator Cardin, he also

20   provides Senator Cardin information as a follow-up to that

21   meeting; correct?

22   A.  I don't know that he is offering information.  He is

23   expressing his opinion.

24   Q.  So in the second paragraph on Exhibit 1009 he says:  I

25   would stress that the Egyptian state does not harass

O6P5men2                        Arkin - Cross

1  journalists or opponents as promoted by some parties seeking to

2  defame Egypt's image.

3            Do you see that?

4  A.  Yes.

5  Q.  Do you recall that Senator Cardin raised issues regarding

6  harassment of journalists or opponents at the meeting with

7  Abbas Kamel?

8  A.  I don't remember what Senator Cardin raised in the meeting.

9            MR. WEITZMAN:  We can take these down.

10  Q.  You testified yesterday about a CODEL that you helped plan

11  to Egypt.  Do you recall that?

12  A.  Yes.

13  Q.  That CODEL, the Congressional Delegation, was in fall of

14  2021?

15  A.  Yes.

16  Q.  And traveling abroad is an essential part of the chairman's

17  job as chairman of Senate Foreign Relations Committee; right?

18            MR. RICHENTHAL:  Objection.  Vague.

19            THE COURT:  I will allow it.

20  A.  It is one of the parts of the job.

21  Q.  And that is one of the ways that they build relationships

22  with foreign officials; right?

23  A.  Yes.

24  Q.  And it is one of the ways that they establish and maintain

25  the U.S.' relationship with foreign countries; right?

O6P5men2                          Arkin - Cross

1    A.  No, they're not acting on behalf of the United States

2    government.

3    Q.  In any event --

4             THE COURT:  I take it members like to travel abroad;

5    right?

6             THE WITNESS:  Some members do, yes.

7    BY MR. WEITZMAN:

8    Q.  How many CODELs have you been on in your time on the SFRC?

9    A.  Just one, actually.

10   Q.  Which one was that?

11   A.  To Munich in 2020.

12   Q.  Was that with Senator Menendez?

13   A.  Yes.

14   Q.  Other than the Munich CODEL with Senator Menendez, you have

15   not planned, been the lead in planning any other CODELs;

16   correct?

17   A.  Except for this CODEL in fall 2021 and then when I worked

18   in his personal office, took over, was sort of the planning of

19   the trip to Cyprus.

20   Q.  OK.

21   A.  Oh, and subsequently he was in Cyprus in the summer of

22   2023?  Yes.  And ended up having a one-day official CODEL that

23   I planned.

24   Q.  Fair to say that the Munich trip was the first time you

25   took the lead in planning a CODEL?

O6P5men2                        Arkin - Cross

1  A.  I don't -- I don't -- I guess I was working on the CODEL

2  with other people on that trip.

3  Q.  OK.  So is Egypt the first time you actually were the lead

4  in planning the CODEL?

5  A.  No, the Cyprus trip in 2016, I guess I planned that trip.

6  Q.  Was that a lengthy CODEL?

7  A.  I don't remember.

8  Q.  You didn't attend it though, right?

9  A.  No.

10  Q.  You would agree with me that there have been many -- are

11  you aware that there have been many CODELs to Egypt over the

12  past three years?

13            MR. RICHENTHAL:  Objection; time frame and who

14  attended.

15            THE COURT:  I will allow it.

16            How many CODELs, to your knowledge, have there been to

17  Egypt over the last three years?

18  A.  Of all senators and members?

19  Q.  For any that you have been involved in or heard of, that

20  you know of.

21  A.  I don't know.  I'm aware that there have been CODELs in the

22  past year following -- following the October 7 attack on

23  Israel.

24  Q.  And there have been a lot of senators who have been

25  traveling to Egypt; correct?

1              MR. RICHENTHAL:  Your Honor this post-dates the

2     charges.

3              THE COURT:  Sustained.  Sustained.  This time period

4     is not relevant.

5              MR. WEITZMAN:  You can put up Defendant's Exhibit

6     471-A and just for the witness.

7     Q.  Do you recognize the individuals in this photo?

8              MR. RICHENTHAL:  Your Honor, this also post dates the

9     case.

10             THE COURT:  Do you recognize the individuals in this

11    photo?  Yes or no.

12             THE WITNESS:  Some of them.

13    BY MR. WEITZMAN:

14    Q.  Do you recognize any individuals as spouses of senators?

15             MR. RICHENTHAL:  Your Honor, it is not in evidence.

16             THE COURT:  Yes, it is not evidence.

17    Q.  Are any of the senators -- are any of the individuals in

18    this photo, senators?

19    A.  Yes.

20    Q.  And any of the individuals foreign leaders?

21    A.  Yes.

22    Q.  Do you know what this is?

23             MR. RICHENTHAL:  Your Honor, same objection.  This is

24    like from two weeks ago.

25             MR. WEITZMAN:  That's the point, your Honor.

1          THE COURT:  Do you know what this is?

2          THE WITNESS:  I don't know what this is.

3          THE COURT:  OK.

4          THE WITNESS:  I mean it is a photograph of senators

5    and president and --

6          THE COURT:  And I take it you did not take it?

7          THE WITNESS:  I did not take this photo, no.

8          THE COURT:  Next question.

9    BY MR. WEITZMAN:

10   Q.  Are you aware that there was a CODEL of senators and their

11   spouses --

12         THE COURT:  Sustained.  Apparently this is something

13   that is recent, it is not in the time period of this action.

14   Let's move on.

15         MR. WEITZMAN:  Yes.

16         You can take that down.

17   Q.  Is it fair to say that --

18         THE COURT:  There is no evidence from that interaction

19   that you just had, ladies and gentlemen, none whatsoever.

20   Q.  Are you aware that other senators have taken their spouses

21   on CODELs?

22         THE COURT:  I will allow that.

23         MR. RICHENTHAL:  I was going to ask timing.

24         THE COURT:  During 2018 to 2020.

25         MR. WEITZMAN:  During the time frame 2016 to 2022.

1    THE COURT:  Fine.

2    THE WITNESS:  Yes.

3  BY MR. WEITZMAN:

4  Q.  Senator Menendez wasn't the only one; correct?

5  A.  Yes.

6  Q.  Now, the CODEL to Egypt, I think you testified yesterday,

7  you actually have long-recommended that Senator Menendez

8  traveled to Egypt; correct?

9  A.  Yes.

10  Q.  You wanted him to travel to Egypt and to Israel; right?

11  A.  I recommended he travel to Egypt and Israel.

12  Q.  And he traveled to Egypt and Qatar on that CODEL; correct?

13  A.  Yes.

14  Q.  But he traveled to Israel on CODELs before; right?

15  A.  Yes.  Not while I worked for him.

16  Q.  You know that he has met with the Mossad on CODELs in

17  Israel?

18    MR. RICHENTHAL:  Objection.

19    THE COURT:  I will allow it.

20    THE WITNESS:  I don't know that.

21  Q.  Do you know what the Mossad is?

22  A.  Yes.

23    MR. RICHENTHAL:  Objection.

24  Q.  What is the Mossad?

25    THE COURT:  No, sustained.

O6P5men2                        Arkin - Cross

1  Q.  Now, you testified yesterday about some text exchanges
2  between you and Damian Murphy regarding the planning of this
3  CODEL; correct?
4  A.  Yes.
5  Q.  Now, you had said that in your prior experience CODELs do
6  not typically get planned with a foreign embassy.  Do you
7  recall that testimony?
8  A.  A foreign embassy does not plan CODEL.
9         THE COURT:  When you say the foreign embassy in the
10  example we are talking about, the Egyptian embassy, that's what
11  you mean?
12         THE WITNESS:  Right.
13         THE COURT:  But it is planned with the American
14  embassy in the relevant country.
15         THE WITNESS:  Yes; or consulate.
16         THE COURT:  OK.
17  BY MR. WEITZMAN:
18  Q.  As far as -- I want to focus on the word "plan" the CODEL.
19  It is not uncommon, in your experience, to reach out to the
20  foreign embassy to advise them of a CODEL; correct?
21  A.  Correct.
22  Q.  And it wouldn't be uncommon in that regard to also seek
23  recommendations from the foreign embassy about things to do in
24  that foreign country; right?
25  A.  You could.

O6P5men2                              Arkin - Cross

1    Q.  And, for example, it wouldn't be uncommon to see, to

2    identify certain sightseeing venues for a spouse to go to?

3    That is something you might ask a foreign embassy for

4    assistance on; correct?

5    A.  What, like recommendations for the sights?

6    Q.  Yes.

7    A.  Sure.

8         THE COURT:  Well, is that something that normally

9    would occur?

10        THE WITNESS:  Often spouses have separate programs

11   because they're not attending the official meetings.  The U.S.

12   embassy or consulate has a person who is also in charge of

13   developing the spouse program but you could reach out to a

14   foreign government -- I mean a foreign embassy on personal

15   recommendations, but they wouldn't be responsible for setting

16   up the spouse's itinerary.

17        THE COURT:  Well, you said you could.

18        THE WITNESS:  You could.

19        THE COURT:  I take it it is permitted but I think the

20   question is, is that part of what normally happens on CODELs

21   where spouses are accompanying members.

22        THE WITNESS:  I don't know.  I haven't planned that

23   many with spouses.

24        THE COURT:  All right.  Thank you.

25   BY MR. WEITZMAN:

1    Q.   You have received calls in the past about a CODEL, for

2    instance, that the Senator took to Cyprus that was assisted by

3    the Cyprus government.  Do you recall that?

4    A.   No.  Can you rephrase that?

5    Q.   Yes.

6              Do you recall getting a call once from Tasos Zambas?

7    A.   Yes.

8    Q.   And Tasos --

9    A.   Can you just be a little bit more specific about --

10   Q.   Yes.  Tasos Zambas is the senator's friend who is Cypriot

11   American; right?

12   A.   Yes.

13   Q.   And he informed you that the president of Cyprus wanted to

14   offer a car or a driver to Senator Menendez on his CODEL;

15   correct?

16   A.   Well, he wasn't on a CODEL, he was on vacation.

17             (Continued on next page)

18

19

20

21

22

23

24

25

O6pWmen3                        Arkin - Cross

1    BY MR. WEITZMAN:

2    Q.   And the president wanted to assist Senator Menendez with

3    his travel plans, correct?

4             MR. RICHENTHAL:  Objection.  Vague.

5             THE COURT:  I'll allow it.

6    A.   No.  The senator was on vacation, and the foreign

7    government wanted to have meetings with him and, in order to

8    facilitate those meetings, had offered transportation or car or

9    driver services.

10   Q.   And so what you did --

11            MR. RICHENTHAL:  Your Honor, Ms. Arkin was not yet

12   finished her answer.

13            THE COURT:  Were you finished?

14            THE WITNESS:  No.

15   A.   And so Tasos called me to ask if that would be OK.

16   Q.   And what you did as a result of that phone call is you

17   converted part of his trip into a CODEL, correct?

18   A.   Well, I converted part of the trip into a CODEL so that the

19   U.S. embassy could provide those services.

20   Q.   And so that at Tasos and the president of Cyprus's request,

21   Senator Menendez can have official meetings with the president

22   of Cyprus, right?

23            MR. RICHENTHAL:  Objection.

24            THE COURT:  Sustained.

25            MR. RICHENTHAL:  Misstates.

O6pWmen3                          Arkin - Cross

1        THE COURT:  You're merging.

2    BY MR. WEITZMAN:

3    Q.  At the request of Cyprus, it was converted to a CODEL so

4    that Senator Menendez could have official meetings with the

5    president of Cyprus, right?

6        THE COURT:  Did Cyprus convert this to a CODEL or

7    request that it be converted to a CODEL?

8        THE WITNESS:  No.  We, as foreign relations committee

9    staff, set up an official CODEL so that he could have

10    transportation and these official meetings.

11    BY MR. WEITZMAN:

12    Q.  Correct, so that -- and your understanding was that the

13    president of Cyprus wanted to meet with Senator Menendez,

14    right?

15    A.  Yes.

16    Q.  OK.  When Senator Menendez asked Damian Murphy or provided

17    Damian Murphy information for Abdelmaguid, at that time you

18    didn't think that was improper for you to reach out to

19    Abdelmaguid at the Egyptian embassy to discuss the CODEL,

20    correct?

21    A.  Well, I didn't know who it was, and I didn't want to call

22    somebody without understanding who they were and what their

23    role was.

24    Q.  You had -- this was September 2021, that you were planning

25    this CODEL, correct?

```
1   A.  Yes.

2   Q.  And you had met Ms. Abdelmaguid beforehand, right?

3   A.  Yes, but when I saw the name, I didn't recognize it as her,

4   I thought it was -- I didn't know who it was.

5   Q.  Right.  It was a simple misunderstanding about the name,

6   right?

7   A.  Yes.

8   Q.  And that's why the Egyptian contact, your Egyptian contact

9   didn't know who an Abdel -- first name Abdel, last name

10  Maguid -- was, correct?

11          MR. RICHENTHAL:  Asking her to opine on what someone

12  else knew.  It's not proper.

13          MR. WEITZMAN:  Your Honor, I'm following up on their

14  line of questioning, and these speaking objections are not

15  necessary, your Honor.

16          THE COURT:  It goes both ways.

17          MR. WEITZMAN:  I understand.

18          THE COURT:  You've established it was a simple

19  misunderstanding.  What else do you wish to know?

20  BY MR. WEITZMAN:

21  Q.  Do you know how many employees work at the Egyptian

22  embassy?

23  A.  I don't.

24  Q.  Dozens?  Hundreds?  Any idea?

25  A.  I don't know.
```

O6pWmen3                         Arkin - Cross

1          THE COURT:  Do you know how many worked at the

2   separate defense *attaché*'s office?

3          THE WITNESS:  I don't.

4          THE COURT:  OK.

5   BY MR. WEITZMAN:

6   Q.  Now, as you testified on direct, you ultimately did not

7   attend the CODEL, correct?

8   A.  Correct.

9   Q.  I'm not going to ask you details about any medical issues,

10  but there was a medical issue that was limiting your travel

11  ability in October 2021, correct?

12  A.  For the Qatar portion of the trip, right.

13  Q.  OK.  But that's not the reason, in your understanding, that

14  you didn't attend the Egypt portion, right?

15  A.  Correct.

16  Q.  You didn't attend because there was a misunderstanding

17  about arrangements for a meeting between Senator Menendez and

18  President Sisi, is that correct?

19          MR. RICHENTHAL:  Objection to misunderstanding.

20          THE COURT:  Rephrase it.

21  BY MR. WEITZMAN:

22  Q.  Did you believe there was a misunderstanding regarding your

23  interactions with the Egyptian embassy and a meeting between

24  President Sisi, a potential meeting between President Sisi and

25  Senator Menendez?

O6pWmen3                              Arkin - Cross

1    A.  There was certainly confusion and a misunderstanding of

2    something.

3              THE COURT:  You testified to that already, correct?

4              THE WITNESS:  Yes.

5              THE COURT:  OK.  Somebody said that you were

6    preventing Senator Menendez from meeting with El-Sisi, and you

7    had never done anything like that and you straightened it out

8    with the senator.

9              THE WITNESS:  Right.

10             THE COURT:  OK.

11             Move on.

12   BY MR. WEITZMAN:

13   Q.  And you would agree with me that if someone at the embassy

14   got the impression that you were discouraging a meeting between

15   El-Sisi and Senator Menendez, that could be a snub towards

16   President Sisi, correct?

17             MR. RICHENTHAL:  Objection.

18             THE COURT:  Sustained.  Hypothetical.

19   BY MR. WEITZMAN:

20   Q.  You would agree with me that a meeting, a request by

21   President Sisi to meet with Senator Menendez, if refused, could

22   impair diplomatic relations or affect diplomatic relations

23   between the United States and Egypt?

24             THE COURT:  I'll allow it.  It's self-evident.

25             You may answer.

O6pWmen3                              Arkin - Cross

1    A.  Yes.  In a hypothetical situation.

2    Q.  So what happened was you learned from Damian Murphy what

3    Senator Menendez had said to him, correct?

4    A.  Yes.

5    Q.  And you had learned that Senator Menendez was frustrated

6    that he found out that, as reported to him, two people from the

7    embassy believed that you said Senator Menendez wasn't going to

8    meet with President Sisi, right?

9              THE COURT:  Sustained.  Too complicated.

10             MR. WEITZMAN:  Yes, it was, your Honor.

11   Q.  It was reported to you that someone in the embassy believed

12   you said that Senator Menendez was not going to meet with

13   President Sisi, correct?

14   A.  No.  It was reported to me that somebody told Senator

15   Menendez that I said that under no circumstances would he meet

16   with Sisi.

17             MR. WEITZMAN:  OK.  Now, if we can put up Government

18   Exhibit 8F-22.

19   Q.  This is the text exchange between you and Damian Murphy,

20   correct?

21   A.  Yes.

22             MR. WEITZMAN:  And if we can turn to page 2.

23   Q.  You wrote at the top:  So my guy at the embassy isn't aware

24   of anyone with that name, referring to Abdelmaguid, but is

25   going to try to run it down.  Also pushed a meeting with Sisi.

O6pWmen3                          Arkin - Cross

1    I punted.

2          Do you see that?

3    A.  Yes.

4    Q.  Fair to say your contact was asking you to schedule a

5    meeting between President Sisi and Senator Menendez, correct?

6    A.  He was pushing for a meeting with Sisi in Egypt.

7    Q.  Right.  He being your contact, correct?

8    A.  Yes.

9    Q.  And you wrote:  I punted, right?

10   A.  Yes.

11   Q.  Now, what that meant was that you said we're not ready to

12   schedule that, or something to that effect?

13   A.  I said we're still developing the schedule or something to

14   that effect.

15   Q.  OK.

16   A.  Or it's on the list of recommend -- it's on the list.

17   We're still working to schedule it.

18   Q.  OK.  And do you recall that this was a communication on

19   September 28?

20   A.  Yes.

21   Q.  And you didn't get back to your contact on September 28

22   about the Sisi meeting, right?

23   A.  I don't think so.

24          THE COURT:  Your contact at the Egyptian embassy, is

25   that what you're speaking of?

1          THE WITNESS:  Yes.

2     BY MR. WEITZMAN:

3     Q.  You didn't get back to your contact on September 29 about a

4     Sisi meeting, right?

5     A.  I don't think so.

6     Q.  You didn't get back to your contact on September 30, right?

7     A.  I don't think so.

8          MR. WEITZMAN:  And so if we scroll to the next page --

9     keep going.  Next page.

10    Q.  This is October 1, if you scroll back one prior page,

11    right?  Friday, October 1 at 7:59 p.m., and that's when you

12    learned that there was an incident involving Senator Menendez

13    being frustrated about communications he received from the

14    embassy, right?

15    A.  Yes.

16    Q.  So three days had passed, and you hadn't gotten back to

17    your contact about a Sisi meeting, right?

18    A.  Yes, but I don't know that I needed to get back to him

19    about the Sisi meeting.

20    Q.  Right.  You said you punted?

21    A.  Right.

22         THE COURT:  Do you happen to know if any of those days

23    were weekends or not?

24         THE WITNESS:  They were not, because Friday, October

25    1, was a Friday.

1            MR. WEITZMAN:  You can take that down, Mr. Kelly.

2    Q.  Now, not to belabor the point, you subsequently met with

3    Senator Menendez to discuss this incident, right?

4    A.  Yes.

5    Q.  It was upsetting to you that he might be frustrated with

6    your performance?

7    A.  There was a number of things that were upsetting to me

8    about it.

9    Q.  And one of the things that was frustrating to you was that

10   you felt like this was either a misunderstanding or a falsehood

11   about what you said, right?

12   A.  It was a falsehood about what I said.

13   Q.  And that upset you then, right?

14   A.  It upset me for a variety of reasons.

15   Q.  It upsets you now still, right?

16   A.  It does.

17   Q.  In any event, you told him that that's not what you said to

18   the Egyptian embassy, right?

19   A.  Correct.

20   Q.  And you explained to him what happened, right?

21   A.  Well, I don't know what happened.

22   Q.  Well, you explained to him what you said to the Egyptian

23   embassy, right?

24   A.  Well, I told him what I didn't say to the Egyptian embassy.

25   Q.  He didn't cross-examine you or question you in the way I'm

1   doing, right?

2           MR. RICHENTHAL:  Objection.

3           THE COURT:  I'll allow it.

4           Were you cross-examined by Senator Menendez in a booth

5   in a courtroom?

6           THE WITNESS:  I was not.

7   BY MR. WEITZMAN:

8   Q.  He was -- he accepted your response, right?

9           MR. RICHENTHAL:  Objection.  Objection.

10          THE COURT:  I'll allow it.

11          How did he respond?

12          THE WITNESS:  He said that two people at the embassy,

13  including the ambassador, had told him otherwise.  I said it

14  wasn't true.  I think he did ultimately accept that.

15  BY MR. WEITZMAN:

16  Q.  But he said that given the sensitivity of the issue, it

17  might be best if you stayed back, correct?

18  A.  Something along those lines.

19  Q.  And it might be better for your superior on the staff,

20  Damian Murphy, to attend in your stead, right?

21  A.  Damian was already planning on attending.

22  Q.  He was -- let me rephrase.

23      Senator Menendez didn't discipline you as a result of that

24  incident, right?

25  A.  No.

O6pWmen3                            Arkin - Cross

1  Q.  There was no negative performance review in connection with

2  that incident, right?

3  A.  Not that I'm aware of.

4  Q.  He didn't fire you or threaten to fire you, right?

5  A.  He did not.

6  Q.  By the way, you were asked yesterday if Senator Menendez

7  had ever expressed concern to you about your job performance

8  before October 1.  Do you recall --

9  A.  Yes.

10  Q.  -- being asked that?

11      Did Senator Menendez express to you concern about your job

12  performance on October 1 in this conversation?

13  A.  He expressed concern to somebody else about my job

14  performance.

15  Q.  Was he expressing concern about your job performance or

16  just what he had heard was said by someone from the embassy?

17  I'd like to make that distinction.

18          MR. RICHENTHAL:  Objection.  Vague.

19          THE COURT:  I'll allow it.

20  A.  I wasn't on the call, so I don't actually exactly know what

21  was said.

22  Q.  OK.  You've never gotten a negative job performance review

23  from Senator Menendez, correct?

24  A.  Nothing serious, no.

25  Q.  Well, nothing at all, really?

1    A.  No.

2    Q.  Negative job performance review?

3    A.  No.

4    Q.  OK.

5    A.  Sometimes I talk too fast.

6    Q.  Many of us have fallen prey.

7            Now, you and Senator Menendez continued working

8    together after this conversation on October 1, correct?

9    A.  Yes.

10   Q.  Your relationship didn't change, your working relationship

11   didn't change, correct?

12   A.  Not really.

13   Q.  In fact, you recently, weeks ago, went to Senator Menendez

14   to advise him that you were taking a new job, right?

15   A.  I did.

16   Q.  And you went to his office to tell him that you were

17   accepting a job with the State Department, right?

18   A.  Yes.

19   Q.  And is that considered a lateral promotion?

20   A.  It's --

21   Q.  Would you consider it --

22   A.  It's a different job.

23   Q.  But you were excited for that job, right?

24   A.  I'm looking forward to the job.

25   Q.  OK.  Before you met Senator Menendez, you were working for,

O6pWmen3                        Arkin - Cross

1    I think, you said Debbie Wasserman Schultz, right?

2    A.  Yes.

3    Q.  She was a congresswoman in the House of Representatives

4    from Florida, right?

5    A.  Yes.

6    Q.  And you then started working for Senator Menendez in his

7    personal -- in his Senate office, right?

8    A.  Yes.

9    Q.  And then he became the ranking member on the SFRC?

10           THE COURT:  There's been testimony about this already,

11   sir.

12           MR. WEITZMAN:  Yes.

13   Q.  And then you have had years of working on the SFRC, right?

14   A.  Yes.

15   Q.  He gave you significant responsibility in that role, right?

16   A.  He did.

17   Q.  He's promoted you up the ranks within the SFRC, is that

18   correct?

19   A.  Yes.

20   Q.  He trusted you, right?

21           MR. RICHENTHAL:  Also asked and answered.

22           THE COURT:  You can answer that.

23   A.  Yes.

24           THE COURT:  You had a good working relationship with

25   him, correct?

1          THE WITNESS:  I did, yes.

2          THE COURT:  And you do.

3    BY THE WITNESS:

4    Q.  And he was consistently professional with you, right?

5    A.  Yes.

6    Q.  And so when you went to his office to thank him, you were

7    thanking him for his years of mentorship, right?

8          MR. RICHENTHAL:  Objection.

9          THE COURT:  Yes.  Sustained.

10   BY MR. WEITZMAN:

11   Q.  Did you tell him you thanked him for his years of

12   mentorship?

13   A.  I went to the senator's office because I -- given the

14   circumstances around my job, which became tenuous following his

15   departure, I didn't know whether I was, in part, going to have

16   a job come January.  An opportunity presented itself that I was

17   going to take.  And barring one incident, which we've discussed

18   extensively now, I worked for Senator Menendez for seven years,

19   and in those seven years he was a very good boss and mentor.

20   And I wanted to thank him for the opportunities that he had

21   provided for me in that time.

22         MR. WEITZMAN:  Thank you.

23         Your Honor, I probably have 10, 15 minutes.  Do you

24   want me to continue?

25         THE COURT:  Yes.  Continue and finish.

```
 1              MR. WEITZMAN:  Thank you.
 2   Q.  You were asked on direct about, some questions regarding
 3   the U.S. relationship with Qatar.  Do you recall that?
 4   A.  Yes.
 5   Q.  And there had been a rift between Qatar and the other Gulf
 6   states in about the 2017 time frame, right?
 7   A.  Yes.
 8   Q.  But the U.S. decided it was important to heal that rift,
 9   right?
10   A.  The United States felt it was in its interest for that rift
11   to be healed.
12   Q.  And eventually the United States became, the United States
13   helped heal that rift, is that correct?
14   A.  Depends who you ask.
15              MR. WEITZMAN:  OK.  It's a complicated question.  No
16   need.
17   Q.  In any event, you were shown on direct a document,
18   Government Exhibit 3A-8.
19              MR. WEITZMAN:  Can we put that up.
20   Q.  Do you recall seeing this document?
21              MR. WEITZMAN:  If you can go to the next page as well,
22   split screen.
23   Q.  Do you recall testifying about this document?
24   A.  Yes.
25   Q.  OK.  Just so we orient, the bottom email attaches this,
```

O6pWmen3                          Arkin - Cross

1   bios for two Qatari officials.  Do you see that?

2   A.  Yes.

3   Q.  It's sent to Rob Kelly on Sunday, January 31, 2021,

4   correct?

5   A.  Yes.

6   Q.  And about, within one hour, Rob Kelly sends it to you and

7   to Jessica Lewis, correct?

8   A.  Yes.

9   Q.  Do you know whether these bios were sent to Senator

10  Menendez within, on this day, January 31?

11  A.  I think they went into a memo for him.

12  Q.  And how do you know that?

13  A.  I think I wrote a memo for the meeting.

14  Q.  Do you recall what you wrote in that memo?

15  A.  No.

16  Q.  Do you know what you said about these two individuals?

17  A.  No.

18          THE COURT:  Do you know whether or not you said

19  anything about those two individuals in your memo?

20          THE WITNESS:  I think I included this bio sheet after

21  cross-checking it.

22          THE COURT:  When you say after cross-checking it, what

23  do you mean?

24          THE WITNESS:  A quick Google search.

25          THE COURT:  All right.

O6pWmen3                          Arkin - Cross

 1   BY MR. WEITZMAN:

 2   Q.  And did you see that Sheikh Al Thani runs a company called

 3   Heritage Advisors; when you searched on Google, that is?

 4   A.  I don't remember.

 5   Q.  OK.  It says here that Sheikh Al Thani is a, quote, adviser

 6   to his highness emir of Qatar on Qatar's investments in the

 7   United States and other matters.  Do you recognize that?

 8   A.  Yes.

 9   Q.  You recognize that's not an official position with the

10   Qatari government, correct?

11            MR. RICHENTHAL:  Objection.

12            THE COURT:  Do you know whether or not it is an

13   official position with the Qatari government?

14            THE WITNESS:  I don't.

15   BY MR. WEITZMAN:

16   Q.  It's not the equivalent of a foreign minister, correct?

17            MR. RICHENTHAL:  Objection.

18            THE COURT:  Do you know whether it's the equivalent of

19   a foreign minister?

20            THE WITNESS:  It's not the equivalent of a foreign

21   minister.

22   BY MR. WEITZMAN:

23   Q.  Or a minister of trade, right?

24            MR. RICHENTHAL:  Objection.

25            THE COURT:  I'll allow it.

O6pWmen3                        Arkin - Cross

1    A.  I don't know in the Qatar hierarchy of the construct of

2    this ultimately where it would fall exactly.

3    Q.  Do you know who the royal family in Qatar is?

4    A.  Yes.

5    Q.  The royal family is, they are the Al Thani family, right?

6    A.  Yes.

7    Q.  Are you aware that there are thousands and thousands of Al

8    Thanis in Qatar?

9            MR. RICHENTHAL:  Objection.

10           THE COURT:  Do you know how many Al Thanis there are

11   in Qatar?

12           THE WITNESS:  A lot.

13           THE COURT:  Do you know, are there thousands or

14   hundreds, or you just don't know?

15           THE WITNESS:  I don't know.

16           THE COURT:  OK.

17   BY MR. WEITZMAN:

18   Q.  Is it fair to say that not every person who is a member of

19   the Al Thani family is a member of the Qatari government?

20           MR. RICHENTHAL:  Objection.  Speculation.

21           THE COURT:  No.

22           Do you know whether -- are certain members of the Al

23   Thani family also members of the Qatari government, if you

24   know?

25           THE WITNESS:  Certain members of the Al Thani family

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   are part of the Qatar government.

 2              THE COURT:  And you know other members are not part --

 3   do you know whether or not there are Al Thani family members

 4   who are not part of the Qatari government?

 5              THE WITNESS:  Sort of a complicated question.

 6              THE COURT:  Yes.  You mean the way I phrased it or the

 7   way it works it's complicated?

 8              THE WITNESS:  The way it works is complicated.

 9              THE COURT:  All right.

10   BY MR. WEITZMAN:

11   Q.  Not every member of the Al Thani family has an official

12   position with the Qatari government, correct?

13              MR. RICHENTHAL:  Objection.

14              THE COURT:  I'll allow it.

15   A.  Yes.

16   Q.  OK.

17   A.  Not every member has an official accredited international

18   diplomatic title within the government.

19   Q.  And not every member has equal persuasive ability with the

20   government either, right?

21              THE COURT:  Sustained.

22   BY MR. WEITZMAN:

23   Q.  Do you know what the term "sheikh" means?

24   A.  Yes.

25   Q.  What is a sheikh?
```

O6pWmen3                         Arkin - Cross

1    A.  A leader, effectively.

2    Q.  It's an elder, right?

3    A.  Yes, a leader, an elder, a respected figure.

4    Q.  Right.

5         It's not an official position in the government, though,

6    right?

7              MR. RICHENTHAL:  Objection.

8              THE COURT:  I'll allow it.

9              Do you know if the title sheikh is an official

10   position in the Qatari government?

11             THE WITNESS:  No, not the way a foreign minister or an

12   investment minister is.

13             THE COURT:  Is sultan a title as well?  Part of that

14   name is sultan.  Is that a title?

15             THE WITNESS:  No -- I don't know in this particular

16   case what this particular title denotes, to be honest.

17             THE COURT:  OK.  I take it you don't know -- are you

18   telling me that you know it's a title, but you don't know what

19   it connotes, or are you telling me you don't know whether it's

20   a title or simply a name?

21             THE WITNESS:  Both.

22             THE COURT:  All of those.

23             THE WITNESS:  Yes.

24             THE COURT:  OK.

25             THE WITNESS:  I'm not familiar with this individual

O6pWmen3                            Arkin - Cross

1    off the top of my head.

2    BY MR. WEITZMAN:

3    Q.  Qatar was one of the countries that was within your

4    purview, is that correct?

5    A.  Yes.

6    Q.  So you've met government officials from Qatar?

7    A.  Yes.

8    Q.  But you've never met this individual, Sheikh Al Thani, is

9    that correct?

10   A.  I can't remember.  I don't think so.

11           MR. WEITZMAN:  OK.  Now, if you can put up Government

12   Exhibit 8F-27, which is in evidence.

13   Q.  This is a document that Senator Menendez sent to you, an

14   email, about putting out a statement thanking Qatar for their

15   actions in Afghanistan, correct?

16   A.  Yes.

17   Q.  And you were already working on a statement about what was

18   going on in Afghanistan, correct?

19   A.  I think, based on the emails we saw, the team was working

20   on pulling together information about all the countries who

21   were helping Afghanistan to develop a statement or something.

22   Q.  And is it fair to say that Qatar was the lead country in

23   housing evacuees from Afghanistan?

24   A.  I don't know that it was the lead country.  They took a

25   huge number, a huge percentage of refugees that were trying to

1   make their way to the United States.

2   Q.  Do you know of any country that took more refugees than

3   Qatar?

4   A.  I don't know the numbers off the top of my head.

5   Q.  There were thousands --

6   A.  Many.

7   Q.  -- who went to Qatar?  Many thousands?

8           THE COURT:  Many thousands who were, what, refugees?

9           THE WITNESS:  Yes.

10          THE COURT:  All right.

11  BY MR. WEITZMAN:

12  Q.  And Senator Menendez also includes a man named Juan Pachon

13  on this email?

14  A.  Yes.

15  Q.  He handles press for the Senate Foreign Relations

16  Committee?

17  A.  He did.

18  Q.  And not uncommon for Senator Menendez to ask Juan Pachon to

19  issue a statement or tweet or something else about some matter

20  of foreign affairs, right?

21  A.  Yeah.  He was the communications director for the foreign

22  relations committee.

23  Q.  You had mentioned yesterday and just now that Qatar was

24  helping U.S. citizens escape from Afghanistan, right?

25          MR. RICHENTHAL:  Misstates.

O6pWmen3                         Arkin - Cross

1    BY MR. WEITZMAN:

2    Q.  Was Qatar helping U.S. citizens flee Afghanistan and get

3    out of Afghanistan?

4    A.  I don't know the citizenship details of all the people who,

5    all the Afghans or Afghan Americans or Americans who got out,

6    but Qatar was important for the evacuation effort.

7    Q.  OK.  And it was important to evacuate these people because

8    the Taliban had taken over Afghanistan, right?

9    A.  It's a very simple way of putting it, but Qatar was helping

10   U.S. efforts to evacuate people from Afghanistan.

11   Q.  The United States wanted these Afghanis and others to get

12   out of Afghanistan to protect them from the Taliban, correct?

13             MR. RICHENTHAL:  Objection.  Vague.  Compound.

14             THE COURT:  I'll allow it.

15   A.  There were -- it was a --

16             THE COURT:  I take it your sigh indicates it's

17   complicated.

18             THE WITNESS:  Very complicated, yes.

19   BY MR. WEITZMAN:

20   Q.  Do you recall seeing images of Taliban roaming the streets

21   after the U.S. left Afghanistan?

22             MR. RICHENTHAL:  Objection.

23             THE COURT:  Sustained.

24   BY MR. WEITZMAN:

25   Q.  In any event, there was an effort by the United States to

O6pWmen3                          Arkin - Cross

1   evacuate people from Afghanistan, correct?

2   A.  Yes.

3   Q.  And Qatar helped, right?

4   A.  Yes.

5   Q.  And there were 60,000 people who left Afghanistan and

6   arrived in Qatar as a result of that assistance --

7            MR. RICHENTHAL:  Objection.

8   Q.  -- correct?

9            THE COURT:  Do you know whether or not there were

10  60,000 people who left Afghanistan and arrived in Qatar as a

11  result of assistance leaving Afghanistan?

12           THE WITNESS:  I don't know the numbers, no.

13           MR. WEITZMAN:  OK.  Can we put up Defense Exhibit 411

14  for the witness and parties for identification.

15  Q.  Do you recognize this as an official website of the United

16  States government, remarks of Secretary Blinken in Doha, Qatar

17  on September 7, 2021?

18  A.  Yes.

19           MR. WEITZMAN:  We offer just a limited portion, which

20  we'll redact, of this exhibit, pursuant to your Honor's prior

21  ruling.

22           MR. RICHENTHAL:  No objection pursuant to that ruling

23  of the particular portion.

24           THE COURT:  All right.

25           (Defendant's Exhibit 411 received in evidence)

1          MR. WEITZMAN:  If we can turn to pages 2 and 3.

2    Actually, let's publish this first so everybody can see it.

3          Can you go to the first page, Mr. Kelly.

4          MR. RICHENTHAL:  Your Honor, this is showing a portion

5    that was not subject to your Honor's ruling.

6          MR. WEITZMAN:  Just zoom in on the top, the title.

7    Q.  This is the Secretary Antony J. Blinken and Secretary of

8    Defense Lloyd Austin; this is a joint press conference in Doha,

9    Qatar, dated September 7, 2021, correct?

10   A.  Yes.

11         MR. WEITZMAN:  And if we can go to page 2 of the

12   document and zoom in on pages 2 and 3, Secretary Blinken's

13   comments on the bottom, the last two paragraphs.  The last two

14   paragraphs of Secretary Blinken, Mr. Kelly.

15         And then continue to page 3, split screen.  Can we do

16   a split screen, Mr. Kelly?  Side by side -- OK.

17         It says:  Secretary Austin and I are very pleased and

18   indeed honored to be here to express, first and foremost, our

19   deep gratitude to the Qatari people.

20         Two sentences later:  More than 58,000 people have

21   transited from Doha -- Americans at risk, Afghans at risk,

22   citizens of ally and partner nations.  Qatar was the first stop

23   on a journey to a more peaceful and hopeful future for so many

24   people.

25   Q.  Do you see that?

O6pWmen3                              Arkin - Cross

 1    A.   Yes.

 2            MR. WEITZMAN:  I won't read it into the record, but

 3    just scroll down to the rest of page 3, Mr. Kelly.  Can you

 4    just put up the whole of page 3.

 5            Let's just let people read that.  It's in the record.

 6            And then can we go to the next page, which is

 7    Secretary Austin's comments.  And then Secretary Austin says --

 8    I'll just read the first sentence:  As Secretary Blinken said,

 9    Qatar's support for Operation Allies Refuge was indispensable

10    to the safe transit of Americans and U.S. personnel, allies and

11    partners and Afghans at special risk.

12            THE COURT:  Do you see that?

13            THE WITNESS:  Yes.  Sorry.

14            THE COURT:  Next question.

15    BY MR. WEITZMAN:

16    Q.   You'd agree with me that thanking Qatar in this time frame

17    for their assistance was the right thing for Senator Menendez

18    to request?

19            MR. RICHENTHAL:  Objection, including the time frame

20    of this document.

21    BY MR. WEITZMAN:

22    Q.   In August and September of 2021, was thanking Qatar the

23    right thing to do?

24            MR. RICHENTHAL:  Objection.

25            THE COURT:  Did you recommend to Senator Menendez that

O6pWmen3                          Arkin - Cross

1   he thank Qatar in that time frame?

2           THE WITNESS:  Well, he instructed us to offer -- to

3   offer the statement.  I don't think anybody disagreed with him.

4   BY MR. WEITZMAN:

5   Q.  It was the right thing to do, right?

6           MR. RICHENTHAL:  Objection.

7           THE COURT:  I'll allow it.

8   A.  We thanked Qatar along with a number of other countries who

9   were participating in the evacuation.  Yes, it is important to

10  thank our allies for working with us in crises.

11  Q.  And in fact, the United States, many senators have been

12  thanking Qatar for their humanitarian efforts over the past

13  several years, many countries, right?

14          THE COURT:  During the time period.  Make it the

15  relevant time period, sir.

16          MR. WEITZMAN:  Yes.

17  Q.  In 2021 and 2022, Qatar was taking an increasing role in

18  humanitarian efforts around the world, isn't that correct?

19          MR. RICHENTHAL:  Objection.  Time frame is not the

20  time frame of the press release.

21          MR. WEITZMAN:  I know that.

22          THE COURT:  It is what the question is.

23          Go ahead.

24          MR. WEITZMAN:  2021 and 2022.

25  A.  I think I just need to see more specific examples.  I'm not

O6pWmen3                          Arkin - Cross

 1    sure I can answer that specifically.

 2              MR. WEITZMAN:  Let's put up Government Exhibit 104A,

 3    which is in evidence.

 4    Q.  Do you see this as a tweet or X message from Representative

 5    Gregory Meeks from Congress?  Do you recognize that name?

 6    A.  Yes.

 7    Q.  He's the chair of the House Foreign Affairs Committee,

 8    correct?

 9    A.  Yes.

10    Q.  And he says:  I thank Qatar for its contribution to WFP,

11    which will provide relief to the worst humanitarian crisis in

12    the world.  Do you recognize this as a -- and do you see that

13    he's responding to David Beasley's message?  Do you see that?

14    A.  Yes.

15    Q.  Do you know who David Beasley is?

16    A.  Yes.

17    Q.  Who is he?

18    A.  At the time he was head of the World Food Program.

19    Q.  And he's a former governor or senator from South Carolina,

20    is that right?

21    A.  Something like that.

22    Q.  And Qatar had made a $100 million contribution for

23    humanitarian support in Yemen.  Do you see that?

24              MR. RICHENTHAL:  Objection.  Hearsay.  Relevance.

25              THE COURT:  It's there.  The document is in evidence.

O6pWmen3                          Arkin - Cross

1                  Do you see what's written there?

2                  THE WITNESS:  Yes.

3                  THE COURT:  All right.  She sees what's written there.

4    What's your next question?

5    BY MR. WEITZMAN:

6    Q.  Are you aware that, in addition, Qatar also contributed

7    $100 million to humanitarian aid to Ukraine since then?

8                  MR. RICHENTHAL:  Objection.  Relevance.  Scope.  Time

9    frame.

10                 THE COURT:  Yes.  Time frame.

11   BY MR. WEITZMAN:

12   Q.  In July 2023 are you aware that Qatar contributed $100

13   million?

14                 MR. RICHENTHAL:  2023.  Objection.

15                 THE COURT:  Yes.  Given that time frame, sustained.

16   BY MR. WEITZMAN:

17   Q.  Is it fair to say that Qatar has been increasingly

18   developing goodwill with countries around the world --

19                 MR. RICHENTHAL:  Objection.  401.

20   BY MR. WEITZMAN:

21   Q.  -- humanitarian relations?

22                 THE COURT:  Do you know that one way or the other?

23                 THE WITNESS:  I'm sorry.  Could you say that question?

24   BY MR. WEITZMAN:

25   Q.  Qatar has been making increasing humanitarian donations

O6pWmen3

```
 1   around the world?
 2            MR. RICHENTHAL:  Time frame.
 3            THE COURT:  I will allow it.
 4            Go ahead.  Put a time frame on it.
 5   BY MR. WEITZMAN:
 6   Q.  Over the past several years, Qatar's increasingly donating
 7   money around the world for humanitarian purposes, correct?
 8            THE COURT:  I will allow it.
 9   A.  I'm aware that Qatar has been making humanitarian aid
10   throughout the world.
11   Q.  And that buys goodwill with the United States, right?
12            MR. RICHENTHAL:  Objection.
13            THE COURT:  I'll allow it.
14   A.  I think it's in their strategic interests and probably buys
15   goodwill for their foreign policy more broadly.
16            MR. WEITZMAN:  One moment, your Honor?
17            Nothing further.
18            THE COURT:  All right.  Let's go to lunch, ladies and
19   gentlemen.  Be back at 2:30.  Thank you.
20            (Continued on next page)
21
22
23
24
25
```

O6pWmen3

1                    (Jury not present)

2              THE COURT:  You may step down.

3                    (Witness not present)

4              THE COURT:  All right.  One hour for lunch.  Thank

5    you.

6              Mr. Lustberg, how long?

7              MR. LUSTBERG:  (inaudible)

8              THE COURT:  Mr. De Castro.

9              MR de CASTRO:  I have no questions.

10             THE COURT:  Sir, redirect.

11             MR. RICHENTHAL:  I haven't written it yet, but I would

12   say no more than 15 minutes.

13             THE COURT:  All right.  Lunch.  Thank you.

14                   (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

1                A F T E R N O O N   S E S S I O N

2                              2:30 p.m.

3              THE COURT:  Two items.

4              First, I was reviewing ECF 480 and there is a quote

5    from the transcript here, if you will remember, during the

6    cross-examination of Mearns, there was a question:  At no point

7    in time during his presentation regarding these four pages or

8    anything else did the lawyer ask that this presentation be

9    provided to a grand jury.  There was an objection.  I sustained

10   the objection.  There was a side bar and I, during the side

11   bar, I adhered to my earlier ruling citing Rule 403.

12             The government in ECF 480 quotes from that and they

13   very correctly put an "sic" in there because I misspoke.  I

14   just wanted to make sure that the record is clear.  I said:

15   "I'm going to sustain the objection on 403 grounds that it is

16   starting to enter into an area that will be confusing to this

17   jury and that the probative value is not [sic] substantially

18   outweighed by the danger of delaying and confusing this jury

19   and in fact misleading it.  It is also, indeed, beyond the

20   scope."

21             So I just wanted to make it clear that I misspoke, the

22   government is correct, and what I was saying was the probative

23   value is substantially outweighed by the danger of delaying and

24   confusing the jury and misleading it.  I just wanted the record

25   to be clear in that regard.

O6P5men4                          Arkin - Cross

 1            Secondly, ECF 477, objections in regard to the

 2    Rafferty chart.  I have looked at the objections on 1338, 1340,

 3    and 1341, and I do believe it's -- the chart and the documents

 4    are appropriate under Rule 1006.  The materials are clearly

 5    voluminous, the originals have been made available to the

 6    defendants and it's a proper use of 1006.  But I did want to

 7    give the defense an opportunity if they now wanted to state

 8    anything beyond what the government represented their position

 9    was in ECF 477.

10            MR. FEE:  No argument, your Honor.  I think I just

11    want to clarify.  Is it being offered as a summary chart or as

12    a demonstrative?

13            THE COURT:  Actually, in this there is a little mixup

14    in the terminology here.  I was under the assumption that it

15    was being offered as evidence under 1006.

16            MR. MONTELEONI:  Yes, your Honor.

17            As we have set forth in the letter, all but one of

18    them are being offered as evidence under Rule 1006.  I think

19    that there is one that we are not proposing to offer but to use

20    as demonstrative in the witness' testimony.

21            THE COURT:  Which one, because there is a difference.

22    One can go back into the jury room for deliberations that's in

23    evidence and if it is a demonstrative it can't, so which one

24    are you offering as a demonstrative?  So, Mr. Fee is correct to

25    raise that issue.

1              MR. MONTELEONI:  Your Honor, I don't have the number

2    in front of me.  I believe it is the highest exhibit number of

3    those.

4              THE COURT:  Let me just look.

5              MS. GHOSH:  Your Honor, it is the one related to gold

6    I believe it may be 1340.

7              THE COURT:  No.  I can tell you that Exhibit A is 1338

8    and that has to do with cash in the envelopes.  The 1340 has to

9    do with cash put into circulation.  1341 is the bar chart on

10   the Nadine checking account.

11             MS. GHOSH:  Your Honor, it was not one of the ones --

12   it is referenced in the letter, the chart relating to gold, but

13   wasn't attached because after the discussions with counsel for

14   Mr. Daibes, we didn't understand there to be any objections

15   from defense related to that chart and so that is why it wasn't

16   one of the exhibits.

17             THE COURT:  Well, let's be clear as to what you are

18   offering as a demonstrative.  Do you want my copy of 477?  Will

19   that help?

20             MS. GHOSH:  I have been told that it is Government

21   Exhibit 1339.  That's the one that we will offer as

22   demonstrative only.

23             THE COURT:  It is referred to here as summaries and

24   value calculations of gold seized from 41 Jane Drive and found

25   in photographs on Nadine Menendez' cell phone.  That's being

O6P5men4                           Arkin - Cross

1    offered as a demonstrative?

2              MS. GHOSH:  Yes, your Honor.

3              THE COURT:  Defense, then the others are being offered

4    for the truth -- offered as evidence included in the summary

5    chart itself and 1339 is a demonstrative.

6              Mr. Fee?

7              MR. FEE:  Thank you, your Honor.  That's all.

8              THE COURT:  Let's bring this jury in.  And that, I

9    believe, is that demonstrative is pursuant to 611(a).

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6P5men4                          Arkin - Cross

1                (Jury present)

2                THE COURT:  Please be seated in the courtroom.

3           Good afternoon, Ms. Arkin.  You remain under oath.

4     You understand that.

5                Mr. Lustberg, your witness, sir.

6                MR. LUSTBERG:  Thank you very much, your Honor.

7     CROSS-EXAMINATION

8     BY MR. LUSTBERG:

9     Q.  Good afternoon, Ms. Arkin.  I just have a few minutes of

10    questions for you.

11               You testified that as a member and especially as chair

12    and ranking member of the Senate Foreign Relations Committee it

13    was common for Senator Menendez to have meetings with foreign

14    officials; right?

15    A.  Yes.

16    Q.  And, in fact, you would sometimes be involved in setting

17    them up and providing briefings and staffing for them; right?

18    A.  Yes.

19    Q.  And sometimes Senator Menendez set up those meetings

20    himself too; right?

21    A.  Not usually, no.

22    Q.  So I didn't ask usually.  There were times that he would

23    set up meetings without going through the Senate Foreign

24    Relations Committee; is that correct?

25    A.  Without going through the Senate Foreign Relations

1    Committee -- he would not set up a meeting without the Senate

2    Foreign Relations Committee being involved.

3    Q.  Let me show you what is, so you can take a look at it --

4              (Counsel conferring)

5              THE COURT:  Don't whisper.

6              MR. RICHENTHAL:  Sorry.

7              THE COURT:  Don't whisper into the mic.

8              MR. LUSTBERG:  As you can see, we are getting along

9    great, so no problems.

10   BY MR. LUSTBERG:

11   Q.  I would like to show the witness what is -- just the

12   witness and counsel and the Court 3502-001, page 2.

13             I direct your attention, Ms. Arkin, to the second --

14   the first full paragraph on this page and it reads as follows.

15   I am asking you whether this is correct.

16             THE COURT:  Is this in evidence, sir?

17             MR. LUSTBERG:  No, it's not.

18             THE COURT:  You can't read it.

19             MR. LUSTBERG:  OK.

20   BY MR. LUSTBERG:

21   Q.  So let me ask you this.  Take a look at it, take a look at

22   the second sentence on the third line of this, and let me ask

23   you, does this refresh your recollection that sometimes Senator

24   Menendez would set up meetings himself?

25   A.  Sometimes he would say that he wanted to have a meeting

1    with someone and then the team and the staff would set up the

2    meeting.

3    Q.  OK.  I see.  So your testimony is that there were times

4    when he would want to have a meeting and then he would go to

5    the staff and the staff would make it happen; is that right?

6    A.  Yeah.  That's right.

7    Q.  OK.  Fair enough.

8           And some of the meetings he had I think you

9    testified -- you can take that down -- you knew about, and

10   there were other meetings that you didn't know about; right?

11   A.  Can you just be more specific?  Sorry.

12   Q.  Sure.  There are, for example, you testified with regard to

13   some dinner meetings and I think you testified that at times

14   you would know about them and sometimes, for example, if they

15   happened in New Jersey, you wouldn't?

16   A.  I think there is a differentiation of terminology that is

17   perhaps wonky to my particular line of work, but I would

18   consider a meeting an official engagement; a dinner, perhaps it

19   is a working dinner, which would be different from a social

20   dinner, which would be different from a gala dinner.  I don't

21   know.

22   Q.  But there would be interactions then between -- tell me if

23   I am right -- between Senator Menendez and foreign officials

24   there could be interactions between Senator Menendez and

25   foreign officials at things like dinners that you might not

1    know about?

2    A.   Yes.  I think there -- yes.

3    Q.   And you said that -- and among the meetings that he had,

4    some were meetings in which you participated and some were

5    meetings in which you didn't participate and you got a readout;

6    right?

7    A.   Yes.

8    Q.   And for the ones that you were not at, sometimes there

9    would be other staffers there, like Mr. Murphy, or you

10   testified about Ms. Lewis that would attend when you might not

11   have been there; right?

12   A.   No.  I think what I was saying was that Damian or Jessica,

13   because -- it would be, given their role as staff director,

14   were more likely to be with him more of the time so they would

15   get a readout from him more readily than I would if I wasn't

16   seeing him as frequently as they would so they would get a

17   readout and relay to me or the other staff conversations that

18   he had at readouts at other meetings.

19   Q.   I got it.  I am asking something just a little different.

20   Would there be meetings that they would attend that you

21   wouldn't?

22   A.   Yes, in the grand scheme of things, not in my particular

23   policy area portfolio.

24   Q.   Let me make sure I understand.  You are saying that all of

25   the meetings that were in your policy area you attended?

1  A.  In Washington, D.C.

2  Q.  So meetings that were in New Jersey you might not be at;

3  right?

4  A.  Correct.

5  Q.  Or New York, for example?  You have to say yes.

6  A.  Yes.  I'm sorry.  Yes.

7  Q.  Sorry.  I didn't mean to push you, you have to -- she can't

8  get it if you don't say something.

9  A.  Got it.

10  Q.  And among the meetings -- and we talked about this at

11  length and I'm not going to dwell on it -- that Senator

12  Menendez had was with Abbas Kamel who is the director of

13  intelligence services in Egypt; correct?

14  A.  There was a meeting that I staffed in D.C. with Abbas

15  Kamel, yes.

16  Q.  And again, I think you testified that intelligence in Egypt

17  crosses over from just what we might think of as intelligence

18  and goes to other matters of domestic policy and economy, I

19  think you said was omnipresent.  Is that fair?

20  A.  Yes.

21  Q.  So one type of meeting that we have been talking are

22  CODELs, Congressional Delegations; right?

23  A.  Yes.

24  Q.  And Congressional Delegations are good things because they

25  allow something like Senator Menendez to develop relationships

O6P5men4                        Arkin - Cross

1    with foreign officials; right?

2              MR. RICHENTHAL:  Objection.

3              THE COURT:  I will allow it.

4              THE WITNESS:  They can be.  They are not necessarily

5    good.

6    Q.  Some are --

7              THE COURT:  What do you mean?

8              THE WITNESS:  Just completely in the abstract, you

9    could have a senator or member of Congress who is going to

10   another country specifically to undermine a policy of the

11   United States and it would be a subjective assessment whether

12   or not that was good or bad.

13             THE COURT:  All right.  Thank you.

14             MR. LUSTBERG:  Thank you.

15   BY MR. LUSTBERG:

16   Q.  With regard to Egypt you had, yourself, thought that a

17   CODEL to Egypt would be a good idea, right?

18   A.  Yes.

19   Q.  And you pushed -- I don't mean to put words, if you think

20   this is right -- you pushed Senator Menendez to have, to take a

21   CODEL to Egypt; right?

22             MR. RICHENTHAL:  Objection.

23             THE COURT:  If you are willing to adopt the word

24   "push" you can respond.

25   A.  I wouldn't say pushed.  I had been strongly recommending

O6P5men4                          Arkin - Cross

1  that he go to Egypt.

2  Q.  At the time of the CODEL in this case, which was

3  October 2021, he had been the chair of the Senate Foreign

4  Relations Committee for like eight or nine months at that

5  point; right?

6  A.  Yes.

7  Q.  Going to go back to something you said earlier in the cross

8  today, these CODELs would often include tourist-type activities

9  like, for example, visiting the pyramids; is that fair?

10  A.  Some CODELs involved tourism activities, yes.

11  Q.  And do you know whether CODELs to Egypt often would include

12  something like visiting the Pyramids or riding on a camel?

13  A.  Yes.

14  Q.  In any event, you were generally able, yourself, to set up

15  meetings in Egypt because you had contacts yourself I think you

16  testified, in the Egyptian embassy in Washington; right?

17  A.  Set up meetings for him in Egypt?

18  Q.  Yes -- no, no, no.  Not in Egypt.  Let me be clear.

19          You talk about how Senator Menendez would have

20  meetings with Egyptian officials; correct?

21  A.  Yes.

22  Q.  And you would help, at times, to set up those meetings;

23  right?

24  A.  Yes.  He had official meetings and I was -- I don't know

25  that I was involved in setting them up but I was certainly

O6P5men4                          Arkin - Cross

1    involved in preparing for them.

2    Q.  Well, you did have contacts yourself in the Egyptian

3    embassy in Washington; right?

4    A.  Yes.

5    Q.  And among the names I you think you mentioned on direct

6    examination yesterday were Tamin Salaa and Karim Saad; right?

7    A.  No.  Tamim Khallaf and Karim Saad.

8    Q.  Who were they?

9    A.  They were Egyptian diplomats at the embassy whose primary

10   job was to engage with Congress, liaise with Congress.

11   Q.  Is and you also said that you had your own independent --

12   strike independent -- you had your own contacts with, among

13   others, Egyptian activists; right?

14   A.  Yes.

15   Q.  So one of the people that you met through the embassy, I

16   take it, was Mai Abdulmaguid who we have talked about?

17   A.  I met her once, to my recollection.

18   Q.  Is that in June of 2021?

19   A.  Yes.

20   Q.  Initially, we have talked about this, you, when the whole

21   question of setting up the CODEL came up, you didn't recognize

22   her name; is that right?

23   A.  Right.

24   Q.  And that was the whole text chain where -- I'm not going to

25   put it up -- where there was some question about who she was

1  and people were saying they didn't know who she was and it

2  turned out it was just a mistake; right?

3  A.  I don't know what the confusion was or what it was but we

4  could not -- we, on the staff, could not identify who the

5  person was.

6  Q.  Even though it was someone you had met in the last few

7  months or had been with in the last few months; right?

8  A.  Yes.

9  Q.  Senator -- let me come back to that.

10       I want to go back, very quickly, over one thing you

11  have talked about a lot and let me ask you this.  Is Egypt the

12  largest country in the region for which you were responsible?

13  A.  Population-wise?

14  Q.  Whichever wise.

15  A.  Yes; probably population-wise, yes.

16  Q.  And as you testified, there are significant foreign policy

17  challenges with Egypt because on the one hand there are issues

18  of human rights and on the other hand it is an important

19  strategic partner; right?

20  A.  Yes.

21  Q.  And so, dealing with the foreign policy as you have to do,

22  day in and day out, that presents certain challenges for

23  balancing those two sings; is that fair?

24  A.  Balancing those things is part of what my job would

25  involve.

1   Q.  And it is challenging, in particular, when you have that

2   constellation of strategic importance and human rights problems

3   at the same time; right?

4   A.  It can be challenging.

5   Q.  Anyway, back to meetings.  Senator Menendez also had

6   meetings with constituents, didn't he?

7   A.  Yes.

8   Q.  And some of those meetings, the once -- well, let me say it

9   this way.  Some of those meetings were in fact about foreign

10  policy, weren't they?

11  A.  Yes.

12  Q.  And sometimes constituents would urge him to take a

13  position that was what they favored with regard to a country

14  that they cared about.  Fair enough?

15  A.  Yes.

16  Q.  Sometimes they cared about it because it is the country

17  from which they came and sometimes they cared about it because

18  it was a country that they had strong feelings about; right?

19          MR. RICHENTHAL:  Objection to why they cared.

20          THE COURT:  I will allow her to answer.

21          THE WITNESS:  I think you would need to be more

22  specific.

23  BY MR. LUSTBERG:

24  Q.  Sure.  So, Mr. Weitzman, for example, talked to you about

25  some people who would talk to Senator Menendez about Greece or

O6P5men4                          Arkin - Cross

1    Cyprus; right?

2    A.  Yes.

3    Q.  And some of those people were Greeks or Cypriots and were

4    attempting to persuade them of a particular perspective with

5    regard to the country from which they came; right?

6    A.  The constituents were Greek American or Cypriot American.

7    Q.  And how about the other way?  Have you seen situations

8    where people from particular countries, from what we called

9    earlier today the diaspora, attempt to persuade Senator

10   Menendez of some foreign policy issue with regard to their

11   country?

12   A.  Yes.  There are many diaspora communities in New Jersey.

13   Many have policy -- or many have feelings and opinions and

14   positions regarding their countries of origin or parents'

15   countries of origin and advocate for specific United States

16   policies vis-à-vis those countries.

17            THE COURT:  When you say, just so we are clear, there

18   are many diaspora communities in New Jersey, I don't want to

19   put words in your mouth but as I understand what you are saying

20   is there are people in New Jersey who come, originally, from

21   other countries.  That's the diaspora community of X country or

22   why country?  Is that it?

23            THE WITNESS:  Yes, or their parents or grandparents.

24            THE COURT:  Their origin.

25            THE WITNESS:  Yes.

O6P5men4                        Arkin - Cross

1           THE COURT:  Fine.

2           MR. LUSTBERG:  Thank you very much, your Honor, for

3    that clarification.

4    BY MR. LUSTBERG:

5    Q.  Just again, sometimes those are among the constituent

6    groups that Senator Menendez, in his capacity as ranking member

7    or chair or even just member of the Senate Foreign Relations

8    Committee, might talk to about foreign affairs with regards to

9    those nations; is that right?

10          MR. RICHENTHAL:  Objection.  Compound.

11          THE COURT:  Break it down.

12          MR. LUSTBERG:  Sure.

13   Q.  So what Judge Stein just asked you about was whether

14   members of various diaspora communities, what that meant was

15   that they came from other countries and I just was clarifying,

16   and those people will, at times, in your experience, meet with

17   Senator Menendez in order to persuade him of some, with regard

18   to some issue affecting the country from which they came;

19   right?

20   A.  Yes; meet with him or with staff.

21   Q.  Any Egyptian ones that you can recall?

22   A.  Coptic community in Egypt.

23   Q.  Let me show you another one.

24          THE COURT:  No, it would not be the Coptic community

25   in Egypt.

O6P5men4                          Arkin - Cross

1          THE WITNESS:  I'm sorry.  Correct.  The Coptic

2     community in New Jersey.

3     Q.  I want to come to, in just a second, to the Coptic

4     community, but before I do I would like to show you what we

5     have marked as Hana Exhibit 024.  So if we can show it to you

6     and to the Court and to counsel right now?

7          Do you recognize this?

8     A.  Yes.

9     Q.  What is it?

10    A.  It is a letter from Shafik Gabr to the senator, inviting

11    him to a private seated dinner at his home in Cairo on the

12    CODEL which he had learned about.

13    Q.  Who is Mr. Gabr, to your knowledge?

14    A.  He is a well known businessman who runs an established

15    foundation for exchanges I think for youth from the United

16    States and maybe the UK and Egypt and others in the Arab world.

17    He is very invested in the arts and arts diplomacy and he sits

18    on a variety of boards of institutions in the United States.

19    Q.  Is he someone you have met?

20    A.  Yes.

21    Q.  And you have met him in Washington?

22    A.  Yes.

23          MR. LUSTBERG:  First of all, your Honor, move the

24    admission of Hana Exhibit 024.

25          MR. RICHENTHAL:  No objection, with the standard

1    instruction.

2              THE COURT:  Admitted, but it is not for the truth of

3    what is set forth there, simply for the fact that it was said

4    there.

5              MR. LUSTBERG:  Thank you.

6              (Defendant's Exhibit Hana 024 received in evidence)

7    BY MR. LUSTBERG:

8    Q.  I notice that you are copied on this letter?

9    A.  Yes.

10   Q.  And the letter, as you said, invites Senator Menendez to

11   some sort of exchange to talk about U.S.-Egyptian relations;

12   right?

13   A.  I don't think it talks about what it wants to talk about

14   but it invites him to dinner for an open discussion in the

15   environment of culture and friendship.

16   Q.  I notice that he has an address at the bottom in

17   Washington, D.C.  Is that the place where his business is that

18   caused you to meet him in the first place?

19   A.  I don't know.

20   Q.  So now back to, you started to mention the Coptic Christian

21   community and I think you testified that -- you can take that

22   down -- that the Coptic Christians from Egypt are an important

23   constituency in New Jersey; right?

24   A.  Yes.

25   Q.  I think you said it was about 10 percent of the population

O6P5men4                          Arkin - Cross

1   in Egypt but it is also a community to which Senator Menendez,

2   in your experience, paid attention in his role as chair of the

3   Senate Foreign Relations Committee in terms of their interest?

4               MR. RICHENTHAL:  Compound.

5               THE COURT:  I will allow it.

6   A.   Yes, I'm sorry.  What was the question?

7   Q.   Same as I.  I lost track somewhere in the middle.

8           The Coptic Christian community was a constituency of

9   Senator Menendez' from New Jersey; right?

10  A.   Yes.

11  Q.   And members of that community would meet with him in his

12  capacity as member or chair, ranking member, whichever, of the

13  Senate Foreign Relations Committee; right?

14  A.   Yes.  I am aware that he had meetings with them as their

15  representative from New Jersey.

16              THE COURT:  I'm sorry.  You said you are aware he had

17  meetings with them as their representative of New Jersey.  What

18  do you mean?

19              THE WITNESS:  Not just because he was the chair or

20  reining member of the committee, it is a constituent group to

21  who he is responsible.

22              THE COURT:  As he is responsible, I take it, to all

23  citizens of New Jersey.

24              THE WITNESS:  Yes.

25              THE COURT:  All right.

O6P5men4                    Arkin - Cross

1    BY MR. LUSTBERG:

2    Q.  But the Coptic Christian community had particular interest

3    in policy vis-à-vis Egypt; right?

4    A.  Yes.

5    Q.  And in particular, I think as you testified earlier, the

6    Coptic Christian community were supporters of President

7    El Sisi; right?

8              MR. RICHENTHAL:  Objection to characterizing all

9    community.

10             MR. LUSTBERG:  As a general matter.

11             THE COURT:  I will allow it.

12   A.  Some members of the community were supportive of President

13   Sisi.

14   Q.  Would you say that because -- tell me if I am wrong -- but

15   you have written about this, about the phenomenon of President

16   Sisi's support of the Coptic Christian community; right?

17   A.  I have written about it?

18   Q.  Have you?

19             THE COURT:  No, he asked you first.

20             THE WITNESS:  I believe I have included in background

21   memos the Coptic community -- about the Coptic community's --

22   some of the Coptic community support for President Sisi.  I

23   don't think I published anything.

24   BY MR. LUSTBERG:

25   Q.  I'm sorry, I didn't mean publish.  Do you have a

1  recollection of writing a memo to Senator Menendez with regard

2  to the Coptic community leaders?

3  A.  I have a recollection of including the New Jersey Coptic

4  community's perspective in memos about Egypt.

5  Q.  Does this sound like something that you have written:

6  President Sisi is probably the most forward-leaning of any

7  modern Egyptian president in calling for and acting on behalf

8  of religion toleration for Coptic Christians and other

9  religious minorities.

10  A.  Sounds like something I might have put in a memo.

11  Q.  Do you think it is true?

12  A.  Sounds like something I might have put in a memo.

13  Q.  So, if you put it in the memo it is true?

14          MR. RICHENTHAL:  Objection.

15          THE COURT:  Yes.  The question is do you believe that

16  to be true.

17          THE WITNESS:  I have -- yes, I do believe that to be

18  true.  As a single statement of fact.  Is believed to be the

19  most forward-leaning; yes, I believe that statement to be true.

20  BY MR. LUSTBERG:

21  Q.  And is it your experience, in dealing with the Coptic

22  Christian community, or in studying them, that that as a

23  general matter, Coptic Christians support the regime of El Sisi

24  in part because that regime is so opposed to the Muslim

25  Brotherhood?

O6P5men4                          Arkin - Cross

1                    MR. RICHENTHAL:  Objection.  Vague.

2                    THE COURT:  I will allow it.

3               To the extent the Coptic community supports El Sisi,

4     if you know, is it because the El Sisi regime is so opposed to

5     the Muslim Brotherhood?

6                    THE WITNESS:  I think that's a broad characterization

7     of the community and a simplification of policy.

8               I'm not trying to be difficult.

9     BY MR. LUSTBERG:

10    Q.   No, and I am not actually, you know, just respond to it.

11    If I said it wrong, tell me what your view is.

12    A.   I think there are some members of the Coptic community who

13    were very unhappy with the leadership of the Muslim Brotherhood

14    government in Egypt who prefer the leadership style of El Sisi,

15    and as part of that leadership style not being a religiously

16    oriented government, that factors into it.  There are other

17    Coptics who I have heard from, activists, who are still very

18    concerned about the state of Coptic rights in Egypt and don't

19    believe Sisi is doing enough.  So, it is a mixed bag.

20    Q.   I think my question has to do with in the prior regime,

21    Coptics suffered because of oppression by the Muslim

22    Brotherhood -- let me stop there.  Is that correct?  You know

23    much more about the Middle East than I.

24    A.   Yes, some Coptics -- and I think you could -- I have not

25    looked at human right reports on Egypt in quite some time but I

1    think it is fair to say that religious tolerance was a serious

2    concern of many religious minorities and probably religious

3    majorities under the Muslim Brotherhood government.

4    Q.   And by religious majorities you mean a government that was

5    dominated -- if that is not the right world you will tell me --

6    by the Muslim Brotherhood?

7    A.   The Muslim Brotherhood was in charge, they were the

8    government.

9    Q.   Just a couple other quick things.  There was a discussion

10   during your direct examination -- and I can show it to you if

11   you want but I am sure you remember -- of a text chain in which

12   it was said that all of this Egypt stuff is very weird.  And

13   you were asked the question what was weird about what was going

14   on.  And this was in connection with the CODEL; right?

15   A.   It was in connection with the CODEL and beyond.

16   Q.   And you were asked what was weird about it and you said

17   there were a few things that were weird about it.  One thing

18   that was weird was that you didn't know the person who was

19   planning the CODEL, that being Mai Abdelmaguid.

20            Do you remember that?

21   A.   Well, she wasn't planning the CODEL.  It was weird that the

22   senator had asked me to reach out to someone with whom I wasn't

23   familiar at the embassy.  It was weird that he asked to reach

24   out to someone at the embassy at all for the CODEL.  Among

25   other things.

1    Q.  And when you say it was someone that you didn't know, the

2    fact that it was just a mistake, as you said earlier, you did

3    know who she was; right?

4              MR. RICHENTHAL:  Objection.  Misstates.

5              THE COURT:  Sustained.

6              At that time did you know who she was?

7              THE WITNESS:  No, it really didn't register I met her

8    once in passing and it really just had not -- I didn't engage

9    with her regularly, it wasn't somebody who was in my daily

10   operational awareness.

11   BY MR. LUSTBERG:

12   Q.  I think what you just said was that one of the reasons, and

13   you are right, you said it was a number of reasons that it was

14   weird was that it was someone with whom you weren't familiar,

15   but it was actually someone that you knew but didn't remember

16   at the time.  Is that fair?

17             THE COURT:  Sustained.  Somebody you had met in

18   passing.  Is that what you said?  I don't want to put words in

19   your mouth, is that what you said?

20             THE WITNESS:  Yes.

21   Q.  Fair enough.

22             Another reason it was weird at the time was because

23   you were really being blamed for having said something that you

24   never said; right?

25   A.  That was another element of the weirdness.

1   Q.  I think you testified this morning, in fact, I think -- let

2   me go back.  Yesterday you said that was something that you

3   really stewed about, it really bothered you; right?

4   A.  It did.

5   Q.  It bothered you that somebody was making false allegations

6   against you; isn't that true?

7   A.  It did.

8   Q.  Terrible to be blamed for something you didn't do, isn't

9   it?

10  A.  It is.

11  Q.  One last thing.  You were shown a picture and you were

12  asked -- I can show it to you again -- who the person on the

13  far left was and that was Mr. Hana, and you testified --

14          THE COURT:  I'm sorry.  I think she said she didn't

15  know who the person on the left was.

16  Q.  Fair enough.

17          Did you know who Mr. Hana was?

18  A.  I did not.

19  Q.  You took that picture but you didn't know who he was at the

20  time?

21  A.  No.

22  Q.  And I think you testified that you were not introduced to

23  him at that meeting which was in March, I think, of 2018;

24  right?

25  A.  Yes.

1    Q.  And you said it was not uncommon, it was fairly common that

2    you would not be introduced to everybody at these kinds of

3    meetings; right?

4    A.  Right.

5    Q.  And I think you also testified that at least as of that

6    time you had never heard of ISEG Halal; is that correct?

7              MR. RICHENTHAL:  I think she was asked --

8              THE COURT:  I don't know whether or not she did.

9    Let's hear.

10              THE WITNESS:  I don't think I was asked but, no, I was

11    not aware of that company.

12              MR. LUSTBERG:  Thank you.  That's all I have.  Thank

13    you very much.  Thank you Ms. Arkin.

14              THE COURT:  Thank you.

15              Mr. de Castro, anything?

16              MR. DE CASTRO:  No, Judge.  Thank you.

17              THE COURT:  Any redirect?

18              MR. RICHENTHAL:  Yes, your Honor.

19              THE COURT:  How long, sir?

20              MR. RICHENTHAL:  I will try to do it in 15 minutes.

21              THE COURT:  All right.

22    REDIRECT EXAMINATION

23    BY MR. RICHENTHAL:

24    Q.  Good afternoon again, Ms. Arkin.  I'm going to start with a

25    couple questions with respect to what you were just asked by

```
 1   Mr. Lustberg and then I will shift gears.  OK?
 2            So, first you were asked some questions about meetings
 3   with constituents.  Do you recall those questions?
 4   A.  Yes.
 5   Q.  Does every constituent of Senator Menendez get a meeting
 6   with Senator Menendez himself?
 7   A.  No.
 8   Q.  Do some, instead, get meetings with staff?
 9   A.  Yes.
10   Q.  Do some, instead, not get meetings at all?
11   A.  It is the policy to try to make all meetings happen, to try
12   to get a constituent -- try to get every constituent with at
13   least a staffer.
14   Q.  You said at least a staffer.  Which is more common, a
15   meeting with staffer or meeting with the senator?
16            MR. WEITZMAN:  Objection.
17   A.  I should say --
18            THE COURT:  I'm sorry.
19            MR. WEITZMAN:  Objection.  Foundation.  Time frame.
20            THE COURT:  Time frame.
21   BY MR. RICHENTHAL:
22   Q.  Ms. Arkin, for how long did you work for Senator Menendez?
23   A.  Seven years.
24   Q.  In that entire period, was it more common for a constituent
25   to get a meeting with the senator or meeting with staff?
```

1           MR. WEITZMAN:  Objection.

2           THE COURT:  I will allow it.

3  A.  Staff.

4  Q.  Now, Mr. Lustberg also asked you about the sentence

5  "believed to be the most forward-leaning," that's a quote with

6  respect to Mr. El Sisi.  Do you recall that question?

7  A.  I recall the question.  I haven't actually seen the memo or

8  anything that indicates that I did write it but it sounds like

9  something I might have put in a memo.

10  Q.  You said something like that single statement, on its own,

11  is accurate?

12  A.  He is believed to be the most forward-leaning, or some

13  believe him to be the most forward-leaning.

14  Q.  Is that why you said that single statement, on its own, is

15  accurate?

16  A.  Right.

17  Q.  Now I want to switch to questions that you were asked by

18  Mr. Weitzman.

19           First, do you recall Mr. Weitzman asking you about

20  meetings you had with the government?

21  A.  Yes.

22  Q.  Did you also meet with Mr. Menendez' defense team?

23  A.  Yes.

24           MR. RICHENTHAL:  Let me now put on the screen,

25  Ms. Wechsler, Defendant's Exhibit 1009, please.

O6P5men4                         Arkin - Redirect

1   Q.   Do you recall being asked questions about this, Ms. Arkin?

2   A.   Yes.

3   Q.   Does Senator Cardin have a first name?

4   A.   He does.

5   Q.   What is his first name?

6   A.   Ben.

7   Q.   Was this addressed to Dear Ben?

8   A.   No.

9   Q.   Can we put back on the screen the other letter you were

10  shown on or about the same date, Government Exhibit 8F-33?

11  Does Robert Menendez have a first name?

12  A.   He does.

13  Q.   Does he have a nickname?

14  A.   Yes.

15  Q.   What is it?

16  A.   Bob.

17  Q.   How is he addressed here?

18  A.   Bob.

19  Q.   Oh, by the way, do you see the second sentence of the

20  letter to Mr. Menendez:  Practically, I appreciate your

21  aptitude as a sincere friend to Egypt.

22          Do you see that?

23  A.   Yes.

24  Q.   Would you look at the second sentence to the letter of

25  Senator Cardin?  Does it refer to him as a sincere friend?

1   A.  No.

2   Q.  Does it refer to him as a friend at all?

3   A.  No.

4              MR. RICHENTHAL:  You can take that down.  Now, I would

5   like to look at Defendant's Exhibit 411 Ms. Wechsler.  Would

6   you blow up the top, the title, the blue part?

7   Q.  So do you recall being asked questions about this,

8   Ms. Arkin?

9   A.  Yes.

10  Q.  This press conference occurred on September 7, 2021.  Do

11  you see that?

12  A.  Yes.

13  Q.  Do you recall being asked about an August 2021 press

14  release that Mr. Menendez asked be issued with respect to

15  Qatar?

16  A.  Yes.

17  Q.  Is August before September?

18             MR. WEITZMAN:  Objection.

19  A.  It is.

20             THE COURT:  I will allow the question.

21             Is August before September?

22             THE WITNESS:  It is.

23  Q.  Was there anything in the August 2021 press release that

24  referenced a press conference that had not yet happened?

25  A.  No.

1   Q.  I will ask about a different press release for a moment.

2           MR. RICHENTHAL:  Can we go to Government Exhibit 8F-1?

3   Q.  Ms. Arkin, this is the e-mail containing the document that

4   Mr. Menendez declined to sign; is that right?

5   A.  Yes.

6   Q.  Now, I believe you testified that the statement in here

7   would have been a continuation of his past statements?

8   A.  Yes.

9   Q.  What did you mean by that?

10  A.  Senator Menendez had been vocal in press releases and

11  legislative efforts and statements being pretty critical of

12  Egypt.

13  Q.  But he didn't sign this, did he?

14  A.  He did not.

15  Q.  Now, in a conversation you had with him in spring 2019

16  about why he wasn't going to sign, do you recall testifying he

17  talked about a change from being more public to more private?

18  A.  Yes.

19  Q.  Do you recall being asked questions about whether that was

20  a change in "tactics?"

21  A.  Yes.

22  Q.  Now, based on your meetings with Egyptian officials prior

23  to this time, did you have an understanding whether they

24  followed public statements of U.S. officials about Egypt?

25          MR. WEITZMAN:  Objection.

```
 1                THE COURT:  I'm not sure I understand that, sir.

 2    Q.  In your meetings with Egyptian officials, did they

 3    reference public statements from U.S. officials?

 4    A.  Yes.

 5                MR. WEITZMAN:  Objection.  Time frame.

 6    Q.  In any of your meetings, prior to March 2019, did Egyptian

 7    officials mention U.S. public statements about Egypt in your

 8    conversations with them?

 9    A.  Yes.

10    Q.  What did they say about public statements of United States

11    officials regarding Egypt?

12                MR. WEITZMAN:  Objection.

13                THE COURT:  Sustained.  Be specific.

14    Q.  In conversations that you had with Egyptian officials, how

15    did they characterize their views of U.S. statements about

16    Egypt?

17                MR. WEITZMAN:  Objection.  Multiple officials --

18                THE COURT:  Sustained.

19    Q.  What, if anything, did Egyptian officials say to you of

20    whether they followed U.S. public statements?

21                MR. WEITZMAN:  Objection.

22                THE COURT:  Just a moment, sir.  Too general.

23    Q.  You said you had an understanding as to whether Egyptian

24    officials followed public statements.  You said that I think a

25    minute ago.  Do you recall saying that?
```

1    A.  Yes.

2              THE COURT:  What is that understanding?  What is that

3    understanding?

4              THE WITNESS:  Yes, the Egyptian officials do not like

5    public criticism from U.S. officials about their human rights

6    record.

7    Q.  Is that something they said to you prior to spring 2019?

8    A.  That is something I heard, yes, multiple times.

9    Q.  That was my next question.  They said that once or more

10   than once?

11   A.  Yes, multiple times, in multiple conversations.

12   Q.  You referenced multiple conversations.  Was Senator

13   Menendez in any of those conversations?

14   A.  I -- yes, I think -- I would have to go back and look at

15   the notes again but I do think that in some meetings Egyptian

16   officials communicated publicly airing our differences between

17   partners is not a productive way to do diplomacy.

18   Q.  Let's talk about a press release.

19             MR. RICHENTHAL:  Put up Defendant's Exhibit 435.

20   Q.  Do you recall being asked about this press release in March

21   of 2020?

22   A.  Yes.

23   Q.  Was this only about Egypt?

24   A.  No.

25   Q.  Now, moving from press releases to another subject -- you

1   can take that down Ms. Wechsler -- do you recall being asked

2   about embassy parties?

3   A.   Yes.

4   Q.   These are in Washington, D.C.?

5   A.   Yes.

6   Q.   Are these generally large gatherings or small gatherings?

7   A.   It depends.

8   Q.   For purposes of your job, did you distinguish between large

9   gatherings attended by foreign officials and small gatherings

10  attended by foreign officials?

11  A.   Yes, it would distinguish between the different types of

12  events that the senator was attending.

13  Q.   Can you explain what you mean by that?

14  A.   Sometimes an embassy is hosting a party, just for the sake

15  of having a party.  Sometimes embassies would host dinners in

16  honor of a visiting leader or for the purpose of facilitating

17  conversation or dialogue or an event where the senator might be

18  expected to speak or be up-to-date on a particular topic.  So,

19  for that kind of a meeting I would prepare a memo.  If he was

20  just going to a party to celebrate -- I don't know -- a

21  national day, I probably wouldn't prepare a memo for that kind

22  of event.

23  Q.   What about for readouts, for the purposes of readouts?  Did

24  you distinguish between, say, a party and a different kind of

25  event?

O6P5men4                         Arkin - Redirect

1    A.  Yes.  I mean, my hope would be to get any useful tidbits of

2    information that came out of any event but if it was a formal

3    dinner where there was a purpose or an agenda or a guest of

4    honor and other members, I would hope to get a readout or would

5    expect to get a readout.

6    Q.  Would your expectation of when you get a readout turn on

7    whether the meeting occurred over food or not over food?

8    A.  No.

9    Q.  Why not?

10   A.  The food is ancillary to the substance.

11   Q.  If Senator Menendez had a meeting, say over dinner with

12   General Kamel, would you have expected to get a readout?

13   A.  Yes.

14   Q.  Now, do you recall -- I'm going to go to a different

15   subject.

16          Do you recall being asked about the Hart Senate office

17   building and the Dirksen Senate office building?

18   A.  Yes.

19   Q.  Do you recall being asked how far away they were?

20   A.  Yes.

21          THE COURT:  More slowly, sir.

22   Q.  Do you recall being asked how the committee's offices are

23   in one of the two, I think you said Dirksen, and Mr. Menendez's

24   personal office is in the other one, I believe you said Hart?

25   A.  Yes.

O6P5men4                        Arkin - Redirect

1   Q.   And I think you said they were three or four minutes apart?

2   A.   Yes.

3   Q.   Now, did the fact that they were different buildings

4   prevent you from speaking with people in his personal office?

5   A.   No.

6   Q.   Did it prevent people in his personal office from speaking

7   with you?

8   A.   No.

9   Q.   Did the committee offices have phones?

10  A.   They did.

11  Q.   Did they work?

12  A.   They did.

13  Q.   Do you have computers?

14  A.   We do.

15  Q.   Did they work?

16  A.   Yes.

17  Q.   Did they have e-mail?

18  A.   Yes.

19  Q.   Did they work?

20  A.   Yes.

21  Q.   Now, do you recall being asked about a March 2018 meeting?

22  A.   Yes.

23  Q.   Attended by Nadine Menendez and some other people whom you

24  didn't know?

25  A.   Yes.

O6P5men4                         Arkin - Redirect

1    Q.   Now, do you recall being asked whether what was discussed

2    in the meeting was typical?

3    A.   Yes.

4    Q.   Was the handwritten invitation to the meeting typical?

5    A.   No.

6    Q.   Was the attendance of Nadine typical?

7    A.   No.

8    Q.   Do you know what, if anything, Nadine or others in the

9    meeting said to one another before the meeting?

10   A.   I don't.

11   Q.   Do you know what, if anything, Nadine or others in the

12   meeting said to each other after the meeting?

13   A.   I don't.

14   Q.   Do you know what text messages, if any, they exchanged

15   about the meeting?

16   A.   No.

17   Q.   Or after the meeting?

18   A.   No.

19   Q.   By the way, Mr. Gabr -- am I pronouncing his name

20   correctly?

21   A.   Yes.

22   Q.   Was he in the meeting?

23   A.   No.

24   Q.   Was Mr. Gere, Richard Gere?

25   A.   He was not.

1   Q.  Do you recall being asked about an informal copy of a bill

2   involving a gas form?

3   A.  Yes.

4   Q.  Do you recall being asked how many times the word "Egypt"

5   appeared in the bill?

6   A.  Yes.

7   Q.  In your experience, does the number of times a country is

8   mentioned in a bill necessarily determine who wants the bill

9   passed into law?

10  A.  That's a very broad question.  I would need more specifics

11  on that.

12  Q.  Is that because the mere number of times a word appears in

13  a bill doesn't tell you who wants it passed?

14          MR. WEITZMAN:  Objection.  Leading.

15          THE COURT:  Sustained.

16  Q.  Ms. Arkin, in looking at a bill and counting the words, is

17  that a way to determine who wants the bill passed?

18          MR. WEITZMAN:  Objection.

19          THE COURT:  I will allow it.  The answer is

20  self-evident.

21  A.  It is one way of figuring out the substance of the bill and

22  who might have interest in the bill.

23  Q.  Is it the only way to determine who is interested in the

24  bill?

25          MR. WEITZMAN:  Objection leading.

O6P5men4                          Arkin - Redirect

1    A.   It is not the only way, no.

2    Q.   Does the word count determine who wants the bill passed?

3    A.   No.

4    Q.   Finally, you were asked about text exchange with

5    Mr. Murphy.  Do you recall being asked about that?

6    A.   Yes.

7    Q.   Government Exhibit 8F-22?

8    A.   Yes.

9    Q.   And prior to being asked about that, I believe you were

10   asked some questions about whether the Egyptian embassy in

11   Washington, D.C. could assist with sightseeing.  Do you recall

12   being asked those questions?

13   A.   I recall being asked those questions, yes.

14   Q.   Now, when you were asked to contact someone in the Egyptian

15   embassy, was it your understanding you were being asked to

16   contact them about sightseeing?

17   A.   No.

18   Q.   Do you recall being asked about other countries other than

19   Egypt by Mr. Weitzman?   Lithuania?

20   A.   Yes.

21   Q.   Sudan?

22   A.   What country?  I'm sorry?

23   Q.   Sudan.

24   A.   In the context of the Kurd, yes.

25   Q.   Ethiopia?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6P5men4                          Arkin - Redirect

1    A.   Yes.

2    Q.   Cyprus?

3    A.   Yes.

4    Q.   Greece?

5    A.   Yes.

6    Q.   When Mr. Murphy said that this stuff is weird, was he

7    talking about those countries?

8    A.   No.

9    Q.   What country was he talking about?

10   A.   Egypt.

11             MR. RICHENTHAL:   Thank you, Ms. Arkin.

12             MR. WEITZMAN:   No recross.

13             THE COURT:   Pardon me?

14             MR. WEITZMAN:   No recross, your Honor.

15             THE COURT:   You are excused.   You may step down.

16             THE WITNESS:   Thank you.

17             (Witness excused)

18             THE COURT:   Next witness for the government.

19             MS. GHOSH:   The government calls Joseph Catania.

20   JOSEPH CATANIA,

21        called as a witness by the Government,

22        having been duly sworn, testified as follows:

23             THE DEPUTY CLERK:   Please state your full name and

24   spell your name for the record.

25             THE WITNESS:   Joseph Catania.   J-O-S-E-P-H,

O6P5men4                        Catania - Direct

1    C-A-T-A-N-I-A.

2              THE COURT:  Good afternoon, Mr. Catania.  Welcome.

3    Please speak directly into the microphone loudly and clearly.

4              Your witness, Ms. Gosh.

5              MS. GHOSH:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MS. GHOSH:

8    Q.  Good afternoon.

9    A.  Good afternoon.

10   Q.  Where do you work?

11   A.  Federal Reserve Bank of New York.

12   Q.  Is there a shorter way that you sometimes refer to the

13   Federal Reserve Bank of New York?

14   A.  Yes.  It is known as the New York Fed.

15   Q.  Where is the New York Fed?

16   A.  It is at 33 Liberty Street, in Manhattan.

17   Q.  Is that just a few blocks from here?

18   A.  It is.

19   Q.  We will get into the details shortly, but generally

20   speaking, what role, if any, does the New York Fed have in

21   releasing U.S. currency into circulation?

22   A.  So, the New York Fed, along with the other eleven Federal

23   Reserve Banks, issue new U.S. currency to banks to place into

24   circulation.

25   Q.  Is that sometimes called paying out currency?

1    A.   It is known as paying out currency.

2    Q.   Could you tell us briefly about your educational

3    background?

4    A.   Sure.  I have a bachelor of science degree in aeronautics

5    and management.  I have a master MBA degree in banking and

6    finance.  I have a master of arts degree in economics.  And

7    while at the Federal Reserve Bank, I became a certified fraud

8    examiner several years ago.  And before that and still at the

9    Federal Reserve I became a certified anti-money laundering

10   specialist, also known as a CAMS designation.

11   Q.   How long have you worked at the New York Fed?

12   A.   I have worked at the New York Fed for 10 years and 10

13   months.

14   Q.   What is your current position there?

15   A.   My title is director.

16   Q.   Are you the director of a particular unit?

17   A.   In the financial intelligence and investigations unit.

18   Q.   What does your job entail?

19   A.   I work on enforcement investigations of financial

20   institutions known as banks.  I conduct internal investigations

21   at the New York Fed.  I respond to the members of the public

22   that have been victims of fraud.  And, I also am a liaison to

23   fulfill government requests for bank note information.

24   Q.   You just mentioned bank note information.  What sort of

25   information do you assist with in terms of that aspect of your

1    job duties?

2    A.   Sure.  So, the government may come to us and have a list of

3    serial numbers that they would like us to provide information

4    about and we do have, not in all situations but we have some

5    limited information that we can provide to the government.

6    Q.   How long have you been doing that aspect, these bank note

7    inquiries at the New York Fed?

8    A.   I have been doing this for about five years.

9    Q.   And you have been using the word "notes" a few times.  Are

10   notes and bills generally the same thing?

11   A.   Yes, exactly; known as cash, notes, bills, currency, all

12   referring to the same thing.

13   Q.   Paper money?

14   A.   Paper money; yes.

15   Q.   Approximately how many of these bank note requests have you

16   worked on?

17   A.   Probably 110 to 120 or so.

18   Q.   As part of that work, have you become familiar with how

19   cash is distributed and tracked by the Federal Reserve Banks?

20   A.   Yes, I have.

21   Q.   Does at a high level, what involvement have you had in this

22   case?

23   A.   Sure.  So the government came to me a couple of different

24   times in this case, I believe March of last year was the first

25   time, with a list of bank notes, a list of cash, serial

1    numbers.  They came again in -- later in the year, maybe around

2    November, and then recently in April.  So a couple of -- three

3    different times the government came with a list of notes for us

4    to provide our results to.

5    Q.  Before we talk more about your work on this specific case I

6    would like to take a step back.  Does cash or bank notes have

7    any identifying features?

8    A.  Yes, they do.

9    Q.  What are those identifying features called?

10   A.  It is called a serial number.

11   Q.  Let's look at an example.

12          MS. GHOSH:  Ms. Wechsler or Mr. Hamill, could you

13   please pull up what is already in evidence as Government

14   Exhibit 1F-1266 and would you just rotate and then zoom in on

15   the first two bundles in the right side there?  Thank you.

16   Q.  Mr. Catania what type of bills are shown here?

17   A.  These are $100 bills.

18   Q.  Using the bottom bill as an example first, can you explain

19   where the serial number is found on that bill?

20   A.  Sure.  It is found in the upper left-hand corner of the

21   bill and in the lower right-hand corner of the bill.

22   Q.  What is the serial number for this particular note?

23   A.  Letter P, letter B, 46585823, the letter E.

24   Q.  Do the different numbers and letters in that serial number

25   have any significance?

1    A.  Yes, they do.

2    Q.  Starting with the letters, what does the first letter

3    relate to?

4    A.  The first letter refers to the series year of the note.

5    Q.  Is that letter sometimes called a prefix?

6    A.  It is.

7    Q.  You said series year; what does that refer to?

8    A.  That is the series year that the note, the design was

9    approved for.

10   Q.  What do you mean by that?

11   A.  So in this case it is a series 2017A, that is the series

12   for that note, and the P is the alpha prefix for that year.

13            THE COURT:  Do you see on this note anywhere something

14   that says series 2017A?

15            THE WITNESS:  Yes.  Yes, I do, your Honor.

16            THE COURT:  Where is that?

17            THE WITNESS:  It is in the lower right-hand corner of

18   the note.

19            THE COURT:  I see.  Thank you.

20   BY MS. GHOSH:

21   Q.  Under what circumstances is a new series year created?

22   A.  So, if there is a redesign of the bill where it just

23   changes its appearance, if there is a change in the signature

24   of the secretary of the treasury of the United States, or the

25   treasurer of the United States changes a new series can be

O6P5men4                         Catania - Direct

1  created.

2  Q.  And you just identified that this one is 2017A.  What did

3  the "A" mean in the series?

4  A.  That means that there was a change in the note from the

5  previous series which would have been series 2017.

6  Q.  Now, does the series year 2017A mean that this note was

7  printed in 2017?

8  A.  No, it does not.

9  Q.  If it didn't have an A and it were just 2017, does that

10  mean it was printed in 2017?

11  A.  No.  No, it does not.

12  Q.  You identified the first letter here in the serial number,

13  the prefix P as relating to the series year.  Is P used for the

14  2017A series for all denominations?

15  A.  Yes, it is.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

O6pWmen5                          Catania - Direct

1   BY MS. GHOSH:

2   Q.   Whether a 20, a 50, a 100, any serial number in those

3   starting with P is from series year 2017A?

4   A.   Yeah.  The P indicates it's series 2017A bank note.

5   Q.   What was the series year prefix letter for the 2017 series?

6   A.   It was letter N.

7   Q.   What was the series year prefix letter for 2013 series?

8   A.   That was the letter M.

9            THE COURT:  M, as in --

10           THE WITNESS:  M, as in Mary, your Honor.

11           THE COURT:  All right.

12  BY MS. GHOSH:

13  Q.   Looking back at this bill that we have up on the screen in

14  1F-1266, what does the second letter -- B, as in boy -- relate

15  to?

16  A.   That is the Federal Reserve Bank code that the note was

17  issued by.

18  Q.   And do you know which bank B relates to?

19  A.   Yes, I do.

20  Q.   Which one?

21  A.   The New York Fed.

22  Q.   What does the last letter here, E, at the end of the serial

23  number relate to?

24  A.   Sure.  It is called the suffix, and it is a letter and the

25  suffixes begin with the letter A.  And once all of the eight

O6pWmen5                              Catania - Direct

1    numerical digits of the serial number are used, starting with

2    zero up to 99999999, it will change to B, C, and D.  And it

3    will continue throughout the alphabet.

4    Q.  Can it be any letter?

5    A.  Most letters.  It's never the letter O.  O looks too

6    similar to a zero.  It's not used.

7    Q.  And finally, what did the numbers in between the letters

8    indicate in the serial number?

9    A.  Sure.  That's the numerical portion of the serial number.

10   Q.  The serial number on this note, starting with PB, followed

11   by the numbers and then ending with E, is that serial number

12   unique to this note?

13   A.  It is unique to the note.

14   Q.  I'd now like to direct your attention to the $100 bill

15   above that one in this photo.  What is the serial number on

16   this $100 note?

17   A.  It's the letter A, the letter B, 20010720R.

18   Q.  Does this note have a series year listed?

19   A.  It does.

20   Q.  And what is that series year?

21   A.  In the lower left-hand corner, the series year is 1996.

22   Q.  Now, what is that gold and white band wrapped around this

23   stack of money?

24   A.  That is called a strap.

25   Q.  What does this strap say in white writing on the gold band?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6pWmen5                         Catania - Direct

1    A.  It says Federal Reserve 10,000 hundreds.

2    Q.  Are you generally familiar with Federal Reserve straps?

3    A.  Yes, I am.

4    Q.  What are they used for?

5    A.  They're -- they're a type of packaging for currency.  In

6    this case, a strap contains 100 -- 100 notes.  In this case, it

7    could be 100 $100 bills, which would be 10,000 U.S. dollars.

8    Q.  And you referred to packaging.  Is this packaging when the

9    notes are sent to customer banks?

10   A.  Yes, it could be.  Yes.

11   Q.  Do you see a date or part of a date stamped on this strap

12   in black?

13   A.  There is a date stamp.  It looks like from J.P. Morgan

14   Chase bank and sometime in two -- I can't tell the month but

15   sometime in 2022, looks like.

16   Q.  We'll come back to this in more detail shortly, but did the

17   Federal Reserve Banks pay out only brand-new money?

18   A.  No, they don't.

19        MS. GHOSH:  I'd like to turn now to how cash enters

20   circulation.

21   Q.  First, does the Federal Reserve Bank print its own money?

22   A.  No, it does not.

23   Q.  Where does the Federal Reserve Bank get currency from?

24   A.  The Federal Reserve Banks get their currency from the

25   Bureau of Engraving and Printing.

1   Q.  Is that sometimes called the BEP?

2   A.  Yes, it is.

3            THE COURT:  What's the relationship of the U.S. Mint

4   to the BEP?

5            THE WITNESS:  Your Honor, the U.S. Mint prints --

6   sorry, not prints, but is involved in coin production.

7            THE COURT:  I see.  Thank you.

8            THE WITNESS:  Yes.

9   BY MS. GHOSH:

10  Q.  Is the New York Fed the only Federal Reserve Bank that

11  receives currency from the BEP?

12  A.  No.  All of the Federal Reserve Banks receive currency from

13  the BEP.

14  Q.  And how many Federal Reserve Banks are there?

15  A.  There are 12 Federal Reserve Banks.

16  Q.  What does the New York Fed do with the cash that it

17  receives from the Bureau of Engraving and Printing?

18  A.  The New York Fed uses that cash to fulfill orders for

19  customers.

20  Q.  What do you mean by customers in that context?

21  A.  Sure.  So, customers could be banks, whether they're

22  domestic banks or foreign, international banks.  It could be

23  credit unions.  They could be foreign central banks.

24  Q.  Can a customer of the New York Fed be an individual person?

25  A.  No, it cannot.

1    Q.  Does the New York Fed send the cash to banks immediately,

2    or is the cash that's received from the BEP sometimes stored

3    for some time before it's distributed?

4    A.  It is often sometimes stored before it's distributed.

5    Q.  What is the general process for paying out currency when a

6    bank places an order with the New York Fed?

7    A.  Sure.  So, when a bank places an order with the New York

8    Fed, it will determine how much currency it wants, what

9    denominations it wants.  And the Federal Reserve Banks, whether

10   it's the New York Fed or another Federal Reserve Bank, will

11   prepare that order to have the customer's armored carrier come

12   and pick it up from the Federal Reserve Bank to fulfill that

13   order.

14   Q.  What do the packages sent to banks look like?

15   A.  A typical package is something we call a cash pack, and

16   that is essentially -- if we talked about a strap earlier,

17   which was 100 notes, that is a -- we call it a strap of

18   currency.  If you take ten straps of currency, that is called a

19   bundle.  And if you take 16 bundles, that is a cash pack.  So

20   in the case of $100 denomination bills, that will be $1.6

21   million of $100 bills.  That's a pretty standard package of

22   cash.

23   Q.  During the process of fulfilling a bank's order for cash,

24   are at least some of the specific bills that are put into that

25   order tracked in some way?

O6pWmen5                              Catania - Direct

1    A.  So, yes, we do capture shipping information -- excuse me,

2    shipping information for new issued -- certain new issued

3    bills.

4    Q.  And what does it mean that some are tracked and some

5    aren't?

6    A.  Sure.  So, most of the $100 denomination notes that are,

7    that go out, they are scanned.  The package itself is scanned,

8    and that scan represents the notes in that particular package,

9    and we'll know which Federal Reserve Bank paid which bank that,

10   that particular package of cash on which date.

11   Q.  And you said that most $100 notes are scanned in this way.

12   I want to break that down.  Why do you say most $100 notes and

13   not all $100 notes?

14   A.  Yeah.  There are a number of $100 notes that are not

15   scanned in this way.

16   Q.  Why is that?

17   A.  Years ago the Bureau of Engraving and Printing, in the

18   production process of currency, sometimes the notes are damaged

19   in production.  So, they're printed on sheets.  The sheets can

20   tear, can get a rip.  Many, many years ago that entire batch of

21   currency would have been destroyed.  I don't know exactly when,

22   but starting probably in the eight to ten-year-ago period of

23   time, the Bureau of Engraving and Printing, in order to save

24   money, began to cut away the damaged notes in a sheet that's

25   damaged, reclaiming the notes that are not damaged, packaging

O6pWmen5                              Catania - Direct

1    those notes up for distribution.  And of course, at that point

2    they're no longer in sequential order anymore, so those notes

3    are no longer tracked.

4    Q.   Approximately how often does it happen that this occurs and

5    new notes that came from a damaged sheet are not scanned or

6    tracked?

7    A.   Yeah.  It's about 10 percent of the new $100 notes.

8    Q.   And you've been mentioning $100 notes.  Are all notes or

9    all denominations of notes scanned or tracked in this way?

10   A.   No, they're not.

11   Q.   Are any others besides 100s currently tracked in this way?

12   A.   Other than 100s, currently, no, no other denominations are

13   tracked and scanned in this way.

14   Q.   And just to be clear, I'm speaking about hundreds or lower.

15   I'm not sure --

16   A.   Oh, I'm sorry.  Yeah.

17   Q.   I don't want to get above hundreds.  I'm not sure I was

18   clear.  Let's talk about hundreds or lower.

19       What about 20s and 50s; were those ever scanned and tracked

20   in this way?

21   A.   They used to be tracked and scanned in a similar way to the

22   $100 notes, yes.

23   Q.   Are they still scanned and tracked in this way?

24   A.   No, they're no longer scanned and tracked in this way.  The

25   Federal Reserve Bank stopped scanning 20s and 50s when a new

1    system was rolled out beginning in, sometime in the middle of

2    2016, rolled out the system throughout the country, and by the

3    end of 2017, once all the Reserve Banks were on this system,

4    there was no longer any scanning of $20 and $50 notes.

5    Q.  Now, you said earlier that the Federal Reserve Bank does

6    not release only brand-new money, is that right?

7    A.  That's correct, yes.

8    Q.  In what circumstances does the Federal Reserve Bank release

9    notes that are not brand-new?

10   A.  Sure.  So, the Federal Reserve Banks will receive cash from

11   banks.  We -- it's considered a deposit.  We call that

12   receiving, in Federal Reserve terminology.  So if banks have

13   excess cash on hand, they can make a deposit to Federal Reserve

14   Banks, and now we will have currency that's no longer new

15   anymore.  And if it is deemed to be fit for recirculation, it

16   will be packaged similarly and sent out to another bank that's

17   placing an order for currency.

18   Q.  When the Federal Reserve Banks rerelease these older $100

19   notes that are deemed fit for circulation, do those notes get

20   rescanned when they're put back into circulation?

21   A.  No.  No, there's no further scanning.

22   Q.  Does the Federal Reserve ever remove notes from

23   circulation?

24   A.  It does remove notes from circulation, yes.

25   Q.  Is there a phrase for that?

O6pWmen5                              Catania - Direct

1    A.  No.  I'm not aware of any phrase other than they are taken

2    out of service if they're in just not good shape; they're not

3    fit for recirculation.

4    Q.  What does it mean that something is not fit for

5    recirculation?

6    A.  Sure.  So, a particular bill could be torn.  It could be

7    worn out.  It could have come in contact with some chemical or

8    something that, you know, biological agent.  It will be taken

9    out of service, so it will be destroyed.

10   Q.  If a note is still fit for circulation, even if it's

11   decades old, can it be rereleased by the Federal Reserve?

12   A.  I believe so, yes.

13   Q.  Now, you said earlier that you assisted with some bank note

14   inquiries for the government in this case.  What information

15   did the government send you as part of that request?

16   A.  Sure.  So, the government would have sent us a, what we

17   call a bank note serial request form that asks for some basic

18   information, who the -- which agency is asking for the

19   information, who is the person, and including a list of

20   whatever the serial numbers that the, the person is interested

21   in.

22   Q.  Do you know why the government gave you those particular

23   serial numbers?

24           MR. WEITZMAN:  Objection.

25   A.  No, I don't.

```
1              THE COURT:  I'll allow it.
2     BY MS. GHOSH:
3     Q.  Other than your involvement in assisting with the bank note
4     requests and explaining those results, have you had any other
5     involvement in this investigation?
6     A.  No, I have not.
7     Q.  What was the general process used to obtain information
8     about the serial numbers you were given by the government?
9     A.  Sure.  So, it followed the usual process, where I would
10    take that request and send it over to one of our attorneys in
11    the legal group to review it.  Once I got that approval, I
12    would send that request over to our cash team that actually
13    moves the currency and, and, and queries our system to pull
14    those results.  They would take that information, send it back
15    to me.  I would do some quality control to make sure the
16    information looked correct and provide it to the requester.
17    Q.  In what form would the results of those inquiries and
18    searches have been?
19    A.  They're kept in Excel form.
20    Q.  Is that a spreadsheet?
21    A.  Yeah, yeah.  Sorry.  An Excel spreadsheet.
22    Q.  Were the serial numbers all searched at once, or were there
23    multiple searches?
24    A.  There were multiple searches.
25    Q.  Did you at some point combine all your results into one
```

1   spreadsheet?

2   A.  Yes, and sent it.

3   Q.  Was the data in that spreadsheet taken from records kept by

4   the New York Fed in the ordinary course of business?

5   A.  Yes, definite.

6   Q.  And were those records kept in the course of regularly

7   conducted activity by the New York Fed?

8   A.  Yes.  Yes, it was.

9   Q.  Is maintaining those records a regular practice of the New

10  York Fed?

11  A.  Yes.

12  Q.  You mentioned a moment ago performing certain quality

13  control checks on the data that you received?

14  A.  Yes.

15  Q.  Did you identify any discrepancies or issues during those

16  quality control checks?

17  A.  Yes.

18  Q.  What was one of the discrepancies that you identified

19  during your quality control check?

20  A.  Sure.  So, for one of the results, we received four

21  duplicate entries; so in other words, in one single serial

22  number produced two results, indicating that the same bill was

23  paid to two different banks a couple of days apart.

24      So I went back to the cash team to determine why we would

25  have two results for any note.  And it turns out those four

1  notes were the result of canceled orders.  So a bank placed an

2  order for currency.  Before it was shipped out and left the

3  Federal Reserve, that bank canceled that currency order.  That

4  currency was then reused to fulfill another order and then

5  scanned for that second order.

6  Q.  And how did you resolve that issue once you identified the

7  reason for it?

8  A.  So, we removed those four notes from the spreadsheet,

9  removed the four duplicate that were canceled, not the four

10  that were paid.

11  Q.  Did you identify any other discrepancies during your

12  quality control check?

13  A.  Yes.  There was another discrepancy discovered where any of

14  the serial numbers that began with the letter zero -- so this

15  is, I'm referring to the serial number portion of the serial

16  number.  So if it began with a zero, it -- our system, when it

17  uploaded the number, would drop the first zero.

18      So, as an example, say the government wanted to look for

19  note 00123456, when we pull that in, the two -- the preceding

20  zeroes were dropped, and we provided the results for note

21  123456 and then something-something at the end of that.  So, in

22  essence, we would have provided the government with an

23  incorrect result.  We would have given them a result for a

24  different note that they did not request.

25  Q.  Once you identified this issue with the zeroes at the

1    beginning of the serial number, how did you resolve it?

2    A.   Sure.  We reran that search again, this time retaining the

3    zeroes and pulling the correct result.

4    Q.   Were there any other discrepancies that you identified?

5    A.   There was a discrepancy that impacted a small percentage of

6    notes, maybe 2 percent of the notes, in which case -- in these

7    cases where the series year of the note did not necessarily

8    match the prefix code of the note.

9    Q.   Can you explain what you mean by that?

10   A.   Sure.  So, there were a number of notes that the government

11   asked for that were series, say, 2013 notes.  And our system

12   pulled a 2013A note, but it had the prefix code of an M, which

13   is the prefix code for a 2013 note.

14   Q.   Now, was there a 2013A series year?

15   A.   There was not.

16   Q.   Was there a 2013 series year?

17   A.   There was.

18   Q.   And so for some entries the data that was meant to be for a

19   2013 series year bill was showing up as 2013A in the data

20   pulled?

21   A.   Exactly, which really doesn't make too much sense, so I'm

22   fully confident they were series 2013 notes.

23   Q.   Other than the series year for those notes having the A,

24   are you aware of any other incorrect data in those entries?

25   A.   No.  The data was actually otherwise correct.

1   Q.  And you mentioned 2013 as an example.  Did that affect any

2   other series year as well?

3   A.  Sure.  It also impacted the 2017 series years, where the

4   data was showing -- was purporting to be a 2017 note but with a

5   2017A prefix code.

6   Q.  And other than in that instance, the series year for those

7   notes not having the A in 2017, are you aware of any other

8   incorrect data for those entries?

9   A.  No.  Everything else was correct.

10  Q.  How did you resolve that discrepancy?

11  A.  We ended up removing those notes from the -- from the

12  spreadsheet.

13  Q.  Even though you believed that the rest of the data was

14  correct?

15  A.  Correct, yeah.

16  Q.  Did you find results for all of the serial numbers that the

17  government requested the New York Fed search for?

18  A.  No.  No, we did not.

19  Q.  Why not?

20  A.  There could have been notes that would have been

21  denominations we never tracked -- so, denominations, $1 bills,

22  $5 bills, $10 bills -- to the extent those were in the samples,

23  we would not -- if they were requested we would not have had

24  results for.

25      20s and 50s, if they were paid out after 2018, we would not

1  have results for those, because we were no longer scanning

2  those.

3      And then certain $100 bills, because of the, the

4  single-note inspection process by the BEP, some of those $100

5  bills are not tracked.

6  Q.  What do you mean by the single-note inspection process?

7  A.  So, that's the process where the BEP is cutting away the

8  bad notes that are damaged somehow in production, reclaiming

9  the good notes and using those.  Those notes would not -- we

10  would not have results for those notes.

11  Q.  Is that the process you described earlier?

12  A.  Yes, exactly.

13  Q.  And the information, the serial numbers given by the

14  government, sometimes contained incomplete information?

15  A.  Yeah.  So, if they contained incomplete information -- in

16  other words, not enough characters -- so, the serial number,

17  the serial numbers should have 11 characters.  Some of them

18  they would provide ten, we're not going to have a result.

19  Similarly, if they provided more numbers, if they provided 12

20  or 13 numbers and letters, we wouldn't have results for those,

21  for those data.

22          MS. GHOSH:  Mr. Hamill, could you please put up for

23  the witness Government Exhibit 5G-300.

24          I realize it's quite small; we'll be zooming in.

25  Q.  Mr. Catania, do you recognize this?

1    A.  Yes, I do.

2    Q.  Generally, what is this?

3    A.  This would be the results of our bank note search.

4    Q.  For this case?

5    A.  For this case, yes.

6    Q.  And is this based on the serial numbers that the government

7    asked you to search for?

8    A.  Yes.  Yes, it is.

9    Q.  Were you involved in creating it?

10   A.  Yes, I was.

11   Q.  Have you verified its accuracy?

12   A.  Yes, I have.

13           MS. GHOSH:  The government offers 5G-300 and also

14   5G-300-EX, which is the native Excel version of the same

15   document.

16           THE COURT:  Hearing no objection, both are admitted.

17           (Government Exhibits 5G-300 and 5G-300-EX received in

18   evidence)

19           MS. GHOSH:  Mr. Hamill, could you please publish

20   5G-300 for the jury.  We won't go through all of the rows, but

21   I'd like to go through some of the column headings we discussed

22   with their names, so please start by zooming in a little bit so

23   we can see.

24           Thank you.

25   Q.  Mr. Catania, what does column A in this chart show?

1    A.  Column A is the denomination of the bank note.

2    Q.  How about column B?

3    A.  That is the series year.

4    Q.  What do columns C through G --

5           THE COURT:  Where it says 13, I take it that's 2013.

6           THE WITNESS:  Correct, your Honor.

7           MS. GHOSH:  Mr. Hamill, if we could scroll over a

8    little bit so we can see columns C through G.

9    Q.  What do these columns, C through G, show?

10   A.  Sure.  So, this is the result of the, the government's

11   request for this particular bank note.  So this is showing,

12   column C is a prefix.  The first letter is M.

13       Column D is the Federal Reserve Bank code.  In this case

14   that first line is a B.

15       The beginning serial number, column E, and the ending

16   serial number, column F, was all related.  So in, in this case,

17   notes from 1001 to 2000, so effectively this is a package of

18   1,000 bank notes.  And you presume that there are four -- this

19   is an eight-character field, so there would be four zeroes in

20   front of the number in column A and four zeroes in front of

21   column F.  So it would be 00001001 to 0000002000.

22   Q.  Is that range in columns E and F the range of the serial

23   numbers for a particular package of cash that was paid out by

24   the New York Fed?

25   A.  Yes, correct.  So, each line, including this line, and each

1    line of the spreadsheet is a particular package of cash that

2    was paid out by the Federal Reserve Banks.

3    Q.  And what does it mean if a particular serial number for a

4    note is within that range?

5    A.  So, that means that note is within that package.

6    Q.  Turning to column H, what does that show?

7    A.  Column H shows which Federal Reserve Bank paid out that

8    particular package of cash.

9    Q.  And just to be clear, are the notes in this spreadsheet

10   only notes released by the New York Fed or any Federal Reserve

11   Bank?

12   A.  It's for any Federal Reserve Bank.

13           MS. GHOSH:  If we could scroll over a bit more so we

14   could see column --

15           THE COURT:  I don't understand.  Just a moment.

16           Oh, your question was in regard to the spreadsheet as

17   a whole, not that particular line, is that correct?

18           MS. GHOSH:  Correct, your Honor.

19           THE COURT:  Is that how you understood it?

20           THE WITNESS:  Yes, your Honor.

21           THE COURT:  All right.  Now I understand.

22           Thank you.

23   BY MS. GHOSH:

24   Q.  If we could scroll over to columns J and K now, what do

25   those show?

O6pWmen5                        Catania - Direct

 1   A.   Sure.   That would be the financial institution that the
 2   Federal Reserve Bank in the prior column paid that note to.
 3   Q.   And are notes only sent by the Federal Reserve to banks in
 4   the United States?
 5   A.   No.
 6   Q.   Where could they be sent?
 7   A.   They can be sent to banks around the world and central
 8   banks around the world as well.
 9           MS. GHOSH:   I'd like to move forward now to columns S
10   through V, if we could move forward to those.   Thank you.
11   Q.   What do columns S through V show?
12   A.   Sure.   So, columns S through V are -- is the request from
13   the government for that particular, that particular note.
14   Q.   And is that the serial number although a little bit out of
15   order here?
16   A.   Yeah, it is.   It is out of order, so you would really begin
17   on column U with the prefix, letter M in the first line.
18       Then you would move to column V, which is the FRB code.   In
19   this case for the first line, it's letter B.
20           THE COURT:   That indicates, as I understand it, the
21   regional bank involved.   Is that correct?
22           THE WITNESS:   Yes, your Honor.   That is correct.
23   There could be -- there is movement at times between Federal
24   Reserve Banks for currency before it's shipped out, so it
25   doesn't necessarily mean that the New York Fed will only pay

1    out new currency with a letter B.  There is movement prior to

2    distribution.

3                THE COURT:  All right.

4                THE WITNESS:  But yes, that's correct.

5    A.  And then, so after you go through prefix, column U, and FRB

6    code, column V, going back to the left, column S, that --

7    that's the numerical portion of the serial number.  And that's

8    the number that the government would have requested, note No.

9    1599.

10   Q.  How, if at all, does that serial number in columns S

11   through V relate to the range that we saw earlier in columns E

12   and F?

13   A.  So, the number in -- the note number in column S will be

14   within the range of E and F, indicating that a note is within

15   that package of currency.

16   Q.  I'd like to look now at column Y, called payout date.

17   A.  Yes.

18   Q.  What does that show?

19   A.  That shows the date that the Federal Reserve Bank listed in

20   probably column E or -- no, column G or H, paid out the note.

21   Q.  And was it paid out to the bank listed earlier, in one of

22   the earlier columns?

23   A.  Exactly.  I forget the column letter, but that earlier

24   column.

25   Q.  Is it possible to trace the notes after they're distributed

1  by the Federal Reserve Bank to the particular bank listed

2  there?

3  A.  No.  We only have the one capture when the note is new and

4  going out.

5  Q.  Is it fair to say that the payout date is the earliest date

6  that a note was put into circulation?

7  A.  Yes.

8  Q.  Are you able to determine from the serial number when a

9  note came in to a particular person's possession?

10  A.  No.

11  Q.  Could a note come into someone's possession before the

12  payout date?

13  A.  No.

14         MS. GHOSH:  Now that we've discussed what the columns

15  mean, I'd like to look at just a few examples.  So let's start

16  with that 2017A note we were looking at before.  If we could

17  put back up 1F-1266 on the screen.  Thank you.

18         We can zoom in again on that lower one.  Thank you.

19         And could we please go to page 27 in Government

20  Exhibit 5G-300.  And could we scroll over to column S.  Thank

21  you.

22  Q.  First, Mr. Catania, is the top row that we're looking at

23  now, on page 27 of 5G-300, the entry for the bill that we see

24  above it in 1F-1266?

25  A.  Yes, it is.

1        MS. GHOSH:  Mr. Hamill, could you scroll back to

2   column A and just move over slowly.

3   Q.   And Mr. Catania, could you please explain what Government

4   Exhibit 5G-300 tells us about where and when this particular

5   note was put into circulation?

6   A.   Sure.  So, it is the top line on the spreadsheet, and it

7   indicates that that particular note was in a package of notes

8   with the serial ranges between columns E and F.  It was paid

9   out by the Federal Reserve Bank of Boston to Bank of America

10  in, looks like Dedham, Massachusetts.

11  Q.   Could we go over to column Y after that first row?

12  A.   And it was paid out on September 2, 2020.

13        THE COURT:  Again, it was paid out, if I understand

14  you correctly, from the Federal Reserve Bank of Boston --

15        THE WITNESS:  Yes.

16        THE COURT:  -- to the bank you just mentioned a moment

17  ago --

18        THE WITNESS:  Correct.

19        THE COURT:  -- on September 2, 2020, is that correct?

20        THE WITNESS:  That's correct, your Honor.

21        THE COURT:  So it was not in circulation prior to

22  September 2, 2020, is that correct?

23        THE WITNESS:  That's correct, your Honor.

24  BY MS. GHOSH:

25  Q.   Mr. Catania, can you say when after September 2, 2020, a

1    particular person received this bill?

2    A.  No.

3    Q.  What is the earliest possible date someone could have had

4    this particular $100 note?

5    A.  September 2, 2020.

6    Q.  And now does that payout date mean that if a particular

7    person had this note in their possession they, in fact, got it

8    on September 2, 2020?

9    A.  No.

10   Q.  Where did this note go on September 2, 2020?

11   A.  It went from the Federal Reserve Bank of Boston to Bank of

12   America in Dedham, Massachusetts.

13          MS. GHOSH:  Let's look at another example.

14   Mr. Hamill, could you please pull up what's in evidence as

15   Government Exhibit 1F-1306.  And could you rotate that and zoom

16   in so that we can see the serial number on the note that's

17   visible on top.

18   Q.  Mr. Catania, can you please read that serial number from

19   the $100 bill we can see here?

20   A.  Yes.  It is letter F -- sorry.  Letter L, letter F,

21   62689175H.

22          MS. GHOSH:  Mr. Hamill, could you please go to page 35

23   of 5G-300 and go to column S.

24   Q.  Mr. Catania, is the top row in looking at columns S through

25   V the serial number that we're seeing in the photo above it?

1    A.  Yes, it is.

2    Q.  Looking at column Y, what was the payout date for this

3    bill?

4    A.  The payout date was December 1, 2014.

5    Q.  Does that mean that if a person had this in their

6    possession they necessarily received it in 2014?

7    A.  No, it does not.

8    Q.  Can you say anything about when after 2014 a person

9    received this bill?

10   A.  No, I can't.

11   Q.  If we could scroll over to columns J through M, where did

12   this bill first go when it was released into circulation?

13   A.  It went to the United Overseas Bank in Singapore.

14   Q.  If someone in the United States had this bill, are you able

15   to say anything about when or how this bill traveled from

16   Singapore to the United States?

17   A.  No, I cannot.

18        MS. GHOSH:  I'd like to switch now from 5G-300 to the

19   native Excel version, 5G-300-EX, for just a moment, which is

20   also in evidence.

21   Q.  Mr. Catania, overall, approximately how many serial numbers

22   requested by the government in this case were you able to

23   obtain payout dates for in the New York Fed records?

24   A.  Over 4,800.  It looks like here maybe 4,848 or so.

25        MS. GHOSH:  Mr. Hamill, going to column B, the series

1    year, could we please filter that column for just '09 and '09A.

2    Q.  Mr. Catania, what does the spreadsheet now show?

3    A.  It is -- each line of the spreadsheet is a package of

4    currency with the series years either 2009 or 2009A.

5    Q.  So all of the bills in this spreadsheet as filtered right

6    now are from the 2009 or 2009A series?

7    A.  Yes.

8            MS. GHOSH:  Mr. Hamill, could we go over to column Y,

9    the payout date, please.  And could you click on the filter

10   button.

11   Q.  Mr. Catania, what is the latest the bills in this chart

12   from 2009 and 2009A series were paid out?

13   A.  The latest is December 2019.

14   Q.  Does this mean that some bills with a series year of 2009

15   or 2009A did not enter circulation until ten years later, in

16   December 2019?

17   A.  Yes, correct.

18           MS. GHOSH:  Going back to column E, Mr. Hamill, could

19   you please filter the series year to just '13.

20   Q.  Mr. Catania, what does this spreadsheet now show?

21   A.  Each line of the spreadsheet is a package of currency with

22   a series year 2013.

23           MS. GHOSH:  If we could go back to column Y, the

24   payout date, please.  Mr. Hamill, if you could click on the

25   filter button.

1    Q.  Mr. Catania, what is the latest the bills in this chart

2    from the 2013 series were paid out?

3    A.  Latest is March 2021.

4    Q.  Is it fair to say that some bills with 2013 series years

5    did not enter circulation until 2021?

6    A.  Yes.

7         MS. GHOSH:  And finally, Mr. Hamill, if you could go

8    back to column B and filter for just 2013 -- for just '17A.

9    Q.  Mr. Catania, what does this spreadsheet now show?

10   A.  Each line of the spreadsheet is a package of currency with

11   a series 2017A series.

12   Q.  Going over to column Y, please, and clicking on the filter

13   button, what years were bills in this chart from the 2017A

14   series paid out?

15   A.  They were paid out between 2020 and 2022.

16   Q.  Does this mean that among the 2017A series notes included

17   in this chart, the earliest any of them entered circulation was

18   2020?

19   A.  Yes, it is.

20   Q.  And some of those bills in this chart didn't enter

21   circulation until 2022?

22   A.  Yes, correct.

23        MS. GHOSH:  I'd like to look at one last example.  If

24   we could go back to 5G-300 -- not the native Excel, the

25   regular -- and also pull up -- thank you.  And could we also

O6pWmen5                          Catania - Direct

1    pull up 1F-1126 and 1F-1179 above that.

2              And in 1F-1179, could we please zoom in on the top

3    $100 bill.  Could you zoom in a little bit closer on that $100

4    bill so we can see the serial number.  Thank you.

5    Q.  Mr. Catania, what is the serial number for this bill in

6    1F-1179?

7    A.  It is MJ01512416A.

8    Q.  What is the series year for that bill?

9    A.  It will be a 2013.

10             MS. GHOSH:  Let's look at the payout date.  Could we

11   please go to page 2 of 5G-300 and go to columns S through V.

12   Q.  Mr. Catania, is the top row on page 2 of 5G-300 the entry

13   for the note we were just looking at in 1F-1179?

14   A.  Yes, it is.

15   Q.  And you said this is a 2013 series year?

16   A.  Yes, it is.

17   Q.  If we could look at column Y, what is the payout date for

18   this note?

19   A.  It is December 20, 2018.

20   Q.  So the earliest that this note ever entered circulation was

21   December 2018?

22   A.  Yeah, December 20, 2018, yeah.

23   Q.  And if we could scroll over to column K, please, when the

24   Federal Reserve Bank put this note into circulation on December

25   20, 2018, where did this note first go?

O6pWmen5

1  A.   To the Bank of America in Zurich.

2  Q.   Where is Zurich?

3  A.   Switzerland.

4         MS. GHOSH:  No further questions.

5         THE COURT:  Sir, anything?

6         MR. WEITZMAN:  I will have cross-examination.  I was

7  just wondering if you were planning to take an afternoon break,

8  your Honor.

9         THE COURT:  Let's take a break now, ladies and

10  gentlemen.  Ten minutes.

11         (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O6pWmen5

```
 1                    (Jury not present)
 2                    THE COURT:  You may step down, sir.
 3                    How long do you think you're going to be,
 4      Mr. Weitzman?
 5                    MR. WEITZMAN:  I'm going to tighten it.  It'll
 6      probably half an hour, max.
 7                    THE COURT:  Mr. Lustberg.
 8                    MR. LUSTBERG:  No questions.
 9                    THE COURT:  Yes, sir.
10                    MR de CASTRO:  None.
11                    THE COURT:  All right.  Thank you.  Ten minutes.
12                    (Recess)
13                    THE COURT:  I understand there is an issue.
14                    You can step down, sir, and out, if you would.
15                    (Witness not present)
16                    MS. GHOSH:  There were two exhibits that the
17      government had notified the defense we objected to.  I
18      understand that one of them they don't plan to offer, but it
19      sounds like the second one they still may, and so we wanted to
20      raise that before the jury's --
21                    THE COURT:  You may be seated in the courtroom.
22                    Go ahead.  Mr. Weitzman, do you intend to offer this
23      one?
24                    MR. WEITZMAN:  So, one of them I don't think this
25      witness can provide the foundation for, but the second one is a
```

O6pWmen5

```
1   page from the website of the Federal Reserve.  It's Defense
2   Exhibit 965.  Maybe, Mr. Kelly, you can put it up.  This is
3   from the FAQs on the Federal Reserve website.
4              THE COURT:  Yes.
5              MR. WEITZMAN:  And I was going to show it to the
6   witness and see if he can identify it.
7              THE COURT:  And ask what about it?
8              MR. WEITZMAN:  If he understands that this is the
9   Federal Reserve's publication of the average estimated life
10  span of denominations of bills.
11             THE COURT:  All right.
12             What's the objection?
13             MS. GHOSH:  Your Honor, we object on hearsay,
14  relevance and 403 grounds.
15             First, hearsay, we don't believe there's any
16  exception.  This is not a public record because this does not
17  set out the office's activities under 803(8)(a)(1).
18             THE COURT:  Just a moment.
19             All right.  Indeed, it looks like it does not meet
20  (8)(a)(1).  Correct.  Go ahead.
21             MS. GHOSH:  In addition to that, we have objections to
22  the relevance.  This, obviously, by the face of it, sets out
23  the estimated life span as of December 2018 for certain
24  denominations of bills.  This is irrelevant to this case, which
25  involves actual bills, and so there's a risk both under 401 --
```

O6pWmen5

1            THE COURT:  Just a moment.

2            It talks about the life span when it's in the public.

3     It says it depends on a number of factors, including how the

4     denomination is used by the public.

5            MS. GHOSH:  Yes, your Honor.  It depends.  The life

6     span of a bill, the average life span undoubtedly depends on

7     variety of factors.  The information in Defendant's Exhibit 965

8     is estimates of averages for sort of denominations as a whole,

9     whereas in this case, obviously there are actual bills in

10    evidence, and yet the defense will likely try to apply the

11    information in this document to the actual bills in evidence.

12    Whatever the average life span of a particular denomination was

13    estimated to be in 2018, that doesn't provide any information

14    about the particular bills in evidence here, which were

15    necessarily --

16           THE COURT:  I understand.  I'm sorry.  I didn't mean

17    to cut you off.  Necessarily what?

18           MS. GHOSH:  Still in circulation, given that they had

19    not been destroyed.  And so I think the jury will be confused

20    by this information.

21           I'd also note that, according to the website anyways,

22    the website is for the board of governors of the Federal

23    Reserve system, which is a related but different entity than

24    the one that the witness works for, which is the Federal

25    Reserve Bank of New York.  I don't think he knows anything

O6pWmen5

1    about this, but nonetheless, I still think that there's a risk

2    of wasting time and juror confusion by even bothering to

3    introduce it, which is why we notified the defendants of our

4    objections.

5              THE COURT:  What do you do with the hearsay aspect of

6    it?

7              MR. WEITZMAN:  Your Honor, I think the witness can

8    either lay a foundation that it's nonhearsay or cannot.  I

9    agree.

10             THE COURT:  How do you lay a foundation that it's not

11   hearsay?  In other words, it seems to me it is hearsay.  It's

12   an out-of-court statement for the truth of the matter asserted,

13   and it doesn't appear to apply under 803(8)(a)(1).

14             MR. WEITZMAN:  Well, I'm not sure that's correct.

15   This is the office's, the Federal Reserve's duties and

16   activities, and it is what they do on a day-to-day basis.

17             THE COURT:  No.  It doesn't set out the office's

18   activities.  It asks questions.

19             MR. WEITZMAN:  I think the first sentence does set

20   forth the office's duties.  Not using a formulaic language, I

21   think it does say that when currency's deposited --

22             THE COURT:  I'm going to allow it in.  Certainly there

23   could be cross-examination on it to show that it really depends

24   upon the particular bill itself.

25             All right.  Anything else, government?

O6pWmen5

1          MS. GHOSH:  As long as the other document is not going
2     to be introduced, then no.
3          THE COURT:  I have no idea what the other document is,
4     but is the other document going to be introduced, sir?
5          MR. WEITZMAN:  I don't plan to offer it, no.
6          THE COURT:  All right.  Let's bring this jury in.
7          MS. GHOSH:  Your Honor, it sounds like Mr. Weitzman
8     may nonetheless show it to the witness without offering it.  If
9     he is, then we would continue to raise our objection to it, so
10     I'd like to clarify.
11          THE COURT:  Are you going to do anything with this
12     unidentified exhibit, sir?
13          MR. WEITZMAN:  Your Honor, I'm not sure that there's a
14     basis to object.  If I want to refresh a witness's
15     recollection, it's proper.
16          THE COURT:  That's separate.
17          MR. WEITZMAN:  That would be the only thing I see a
18     basis for.
19          THE COURT:  Remember the banana?  You can show him a
20     banana, if you want.  In other words, you can show him anything
21     you want to refresh his recollection.
22          MR. WEITZMAN:  Correct.  Thank you, your Honor.
23          THE COURT:  Let's put the witness on the stand.
24          How much longer do you have, sir?  Can you finish up
25     today?  I'd like you to.

O6pWmen5

1              MR. WEITZMAN:  Yes.  That's my goal.

2              THE COURT:  All right.

3              Mr. Lustberg, you've already told me.

4              MR. LUSTBERG:  My position remains the same.  No cross

5    for this witness.

6              THE COURT:  All right.

7              MR. LUSTBERG:  Thank you.

8              THE COURT:  All right.  Let's see if we can get this

9    witness on and off.

10             I don't mean to refer to you, sir, as this witness.

11   You're Mr. Catania.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE COURT:  You may be seated.

2      You may cross-examine.

3   CROSS-EXAMINATION

4   BY MR. WEITZMAN:

5   Q.  Good afternoon, Mr. Catania.

6   A.  Good afternoon.

7   Q.  As part of your assignment here, the government asked you

8   to analyze or provided you specific serial numbers for a range

9   of bills, correct?

10      MS. GHOSH:  Objection.

11      THE COURT:  No.  I'll allow that.

12  A.  Can you -- can you repeat the question?

13  Q.  Yes.  As part of your assignment here, the government

14  provided you serial numbers for a range of bills, right?

15  A.  Yeah, they provided specific serial numbers.

16  Q.  Correct.  For several thousands of bills, right?

17  A.  Correct.

18      THE COURT:  Did you say about 4,840?  Is that correct?

19      THE WITNESS:  Your Honor, we had results for about

20  4,840, but the government provided a couple thousand more than

21  that.

22      THE COURT:  OK.

23  BY MR. WEITZMAN:

24  Q.  And they actually provided over 6,000 bills, serial

25  numbers, right?

1   A.  That sounds right.

2   Q.  But you were only able to obtain results for a lesser

3   amount, 4,840 or so, right?

4   A.  Correct.

5   Q.  Now, the serial numbers they provided you have specific

6   series years to them, correct?

7   A.  All -- all currency has specific series years, correct.

8   Q.  Right.  The government provided you serial numbers for

9   series year 2009, right?

10  A.  Correct.

11  Q.  2013, right?

12  A.  Yes.

13  Q.  2017?

14  A.  Yes.

15  Q.  And 2017A, correct?

16  A.  Yes.

17  Q.  They didn't provide you, the government didn't provide you

18  serial numbers for series earlier than 2009, correct?

19  A.  I don't believe so.

20  Q.  And there are series that precede 2009, right?

21  A.  Oh, yes, of course.

22  Q.  There's 1985, 1988, right?

23  A.  I know of 1993, '96, but --

24  Q.  OK.

25  A.  But yes.

O6pWmen5                      Catania - Cross

1   Q.   And there may even be series that precede 1993, right?

2   A.   Presumably been using cash before that, yes.

3   Q.   OK.  Now, you never reviewed any of the actual physical

4   evidence, any of the actual physical bills in this case, right?

5   A.   That's correct.

6   Q.   I'd like to put up Government Exhibit 5G-300-EX, which is

7   that cell that the government used with you.  This is the Excel

8   that was shown and admitted on your direct, correct?

9   A.   It looks like it, yes, correct.

10         MR. WEITZMAN:  And I'd like to do what the government

11  did, which is to filter the series year.  Can we go to the

12  series year 2009 and 2009A.

13  Q.   Now, looking at this, can you tell -- scrolling to the

14  right, can you tell how many bills are 2009 and 2009A bills?

15  A.   Yes, there's a tally on the bottom.  It's about 2,152.

16         MR. WEITZMAN:  OK.  Now, can you go to column Y.

17  Q.   Column Y was the payout date, correct?

18  A.   That's correct.

19         MR. WEITZMAN:  And can you filter the payout date,

20  Mr. Kelly.

21  Q.   And by the way, Mr. Catania, if we're doing this

22  incorrectly, you let me know.  OK?

23  A.   Of course, yes.

24  Q.   If we can just filter and just have the 2019 clicked?

25  A.   Yes.

1    Q.  Of that 2,152 bills that are 2009 and 2009A, is it correct

2    to say that only five of them were paid out in 2019?

3    A.  Yes.

4            MR. WEITZMAN:  OK.  Can we now do a payout date

5    filtered for 2011, if you unclick 2019, and you just do 2011.

6    Q.  If you filter for 2011, there are 180 that were -- or so,

7    that were paid out in 2011, correct?

8    A.  That's correct.

9            MR. WEITZMAN:  And let's just also run 2013, and take

10   out 2011.

11   Q.  2013 had 476, correct?

12   A.  Correct.

13           THE COURT:  I'm sorry.  Where do you see that, sir?

14           MR. WEITZMAN:  If you can zoom in, Mr. Kelly, on the

15   bottom, the count, or maybe move with the arrow.

16           Do you see that, your Honor?

17           THE COURT:  No.

18           THE WITNESS:  It's in the bottom right center of the

19   screen.

20           THE COURT:  Yes.  Thank you.

21           MR. WEITZMAN:  Now, if you would just go back to

22   column A and give me, and column B and give me all the series

23   years.  OK.

24           This is all the bills again?

25           MS. GHOSH:  Objection.

O6pWmen5                          Catania - Cross

```
 1              MR. WEITZMAN:  No, it's not.
 2              Can you give me all the series years for all the bills
 3    and all the payout dates, please.  Thank you.
 4    Q.  Is this now all the bills?
 5    A.  It is 4,864, yes.
 6    Q.  Great.  I'd like to understand -- we can filter this to
 7    identify how many bills for each series what the total amount
 8    is, correct?
 9    A.  Yes.  As far as dollar value?
10    Q.  Yes.
11    A.  Yes.
12    Q.  OK.  Let's figure out how much we have in 2009 bills total.
13    Can you just give me 2009, and when you filter that and you add
14    up the total dollar amount, you get $23,600, is that correct?
15    A.  Yes, that's correct.
16    Q.  OK.  Now let's do the 2009A bills.  When you filter that,
17    you get a total amount of $115,400 on your spreadsheet, is that
18    correct?
19    A.  Yes, correct.
20    Q.  Let's do the 2013 bills.  And that filtered gets you
21    $97,570, correct?
22    A.  Yes, correct.
23    Q.  And are there any 2017 series bills?
24              MR. WEITZMAN:  Let's see.  No.
25    Q.  There are no 2017 series, is that correct?
```

O6pWmen5                         Catania - Cross

1    A.  That's correct.

2    Q.  OK.  So let's just go to the 2017A series.  And that gives

3    you $40,600?

4    A.  Correct.

5            MR. WEITZMAN:  OK.  Can you unfilter and just include

6    all the series together.

7    Q.  The total amount of bills added up, the cash value of all

8    the bills on this spreadsheet is $277,170, correct?

9    A.  Correct.

10   Q.  Do you know how much money was seized, how much cash was

11   seized from the home at 41 Jane Drive?

12   A.  No, I don't.

13   Q.  OK.  You're aware that of the 2017A bills -- we just

14   established there are $40,000 seized there?

15           MS. GHOSH:  Objection.

16   BY MR. WEITZMAN:

17   Q.  $40,600 2017A bills on your spreadsheet, correct?

18           THE COURT:  Wait, wait.  Ask it cleaner.

19   BY MR. WEITZMAN:

20   Q.  Of the 2017A bills on your spreadsheet, there are only

21   $40,600 on your spreadsheet, right?

22   A.  Correct.

23   Q.  And that's less than 10 percent of $485,000, correct?

24   A.  It is less than 10 percent of 480-some-odd thousand, yes.

25           MR. WEITZMAN:  OK.  Now I'd like to understand a bit

1    more what the New York Fed does for a moment.

2    Q.  The New York Fed, you said, sends money -- cash -- to its

3    customers, right?

4    A.  Yes.

5    Q.  OK.  And its customers are banks, by and large, right?

6    A.  Predominantly banks.

7    Q.  OK.  Have you heard the term "correspondent bank"?

8    A.  Yes.

9    Q.  What is a correspondent bank?

10    A.  A correspondent bank is a bank that is used to provide

11    usually U.S. dollar clearing or some currency clearing for a

12    respondent bank.

13    Q.  OK.  So the Fed can send money to customers who are

14    correspondent banks, correct?

15           MR. WEITZMAN:  Let me withdraw that.

16    Q.  The fed will send money to customers like J.P. Morgan Chase

17    or Citi, correct?

18    A.  Correct.  Those banks would have accounts at the Federal

19    Reserve Banks.

20           (Continued on next page)

21

22

23

24

25

O6P5men6                        Catania - Cross

1   BY MR. WEITZMAN:   (Continuing)

2   Q.  Is it fair to say that not all banks in the United States

3   have accounts at the Federal Reserve Bank?

4   A.  That's fair.

5   Q.  And there are some banks that are smaller regional banks,

6   for example, that might not have an account?

7   A.  It's possible they may have an account.  They may not have

8   an account.

9   Q.  And those banks, the smaller regional banks, if they do not

10  have an account with the Fed, they're what you call a

11  respondent bank; correct?

12  A.  Correct.

13  Q.  Those banks, the respondent banks would have to get their

14  cash from what is called a correspondent bank; right?

15            MS. GHOSH:   Objection.

16            THE COURT:   I will allow it.

17  A.  Yes.

18            THE COURT:   Scope objection, I assume?

19            MS. GHOSH:   Yes, your Honor; and what the banks would

20  have to do.

21            THE COURT:   I will allow it.

22  BY MR. WEITZMAN:

23  Q.  I'm sorry.  Did you answer?

24  A.  Can you repeat the question?

25  Q.  If a respondent bank doesn't have an account, a smaller

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    regional bank doesn't have an account with the Fed, they would

2    be obtaining cash --

3            THE COURT:  How do they get cash?

4            THE WITNESS:  They could get cash from another bank

5    that provides cash services.  Certain banks provide -- are

6    global, they provide cash, they do cash distribution on a

7    global basis and you can get cash from those institutions if

8    you don't have or don't want to have an account at the Federal

9    Reserve banks.

10            MR. WEITZMAN:  At this time, your Honor, I have a

11    stipulation --

12            THE COURT:  Yes, sir.

13            MR. WEITZMAN:  -- which has been marked Defendant's

14    Exhibit 2160:  It is hereby stipulated and agreed, by and among

15    the parties, if called as a witness at trial, a member of the

16    defense team for Senator Robert Menendez "the Menendez team"

17    would testify that, in February 2024 the Menendez team

18    inspected search items seized by the Federal Bureau of

19    Investigation during the court-authorized search of the

20    residence of Robert Menendez and Nadine Menendez on June 16,

21    2022.  In connection with that inspection, a member of the

22    Menendez team photographed some of the cash seized during the

23    search.  FBI agents were present throughout the inspection by

24    the Menendez team and facilitated the inspection of the cash by

25    opening the sealed evidence bags containing seized cash to

```
 1   permit the member of the Menendez team to photograph the cash.
 2   After the member of the Menendez team obtained photographs of
 3   cash, FBI agents took possession of the seized cash and placed
 4   it back into evidence bags that were resealed.  The items
 5   marked for identification as Defendant's Exhibit 1625 to 1759
 6   are true and correct photographs taken by the Menendez team of
 7   some of the cash seized from the residence during the
 8   inspection of the evidence in February 2024.  It is further
 9   stipulated and agreed that no party will raise any objection
10   under Federal Rule of Evidence 901 with respect to any exhibit
11   referenced above.
12            We offer Government's Exhibits 1625 to 1759 and a
13   stipulation, Defendant's Exhibit 2160.
14            THE COURT:  Admitted.
15            (Defendant's Exhibits 1625 to 1759 and 2160 received
16   in evidence)
17   BY MR. WEITZMAN:
18   Q.  I would like to show you some bills that were referenced,
19   Mr. Catania.
20            MR. WEITZMAN:  Can we put up Defendant's Exhibit 1677?
21   Q.  This is one of the bills that was photographed that was
22   seized from the home.
23            MR. WEITZMAN:  Can you flip that?  This is in
24   evidence, if you can flip that and can you zoom in on the $50
25   bill on the bottom?
```

1      MS. GHOSH:  Your Honor, I do object to the

2   characterization that he made earlier about where the item was

3   seized.

4      MR. WEITZMAN:  The stipulation described this item,

5   your Honor.

6      MS. GHOSH:  It was seized by the FBI, I don't

7   believe --

8      THE COURT:  I'm not sure what the issue is.

9   Ms. Ghosh, is it taken care of?

10      MS. GHOSH:  We would just ask that this is a bill that

11   is in evidence.  I don't think his characterization is

12   required.

13      THE COURT:  It is a bill that is in evidence.

14      MR. WEITZMAN:  OK.

15   BY MR. WEITZMAN:

16   Q.  Do you see this $50 bill, sir?

17   A.  Yes, I do.

18   Q.  Do you see that it says:  Series 1988?

19   A.  I think so.

20      THE COURT:  Blow that up.

21   Q.  Hard to tell?

22   A.  Hard to tell but it is 19-something.

23   Q.  1980s, right?

24   A.  Yes.

25   Q.  An old bill, right?

O6P5men6                    Catania - Cross

1    A.  Yes.

2              MR. WEITZMAN:  Can we put up Defendant's Exhibit 1640

3    in evidence?  Can you zoom in --

4              THE COURT:  Why do you say it is an old bill?  What

5    makes it an old bill?

6              THE WITNESS:  It is from 1988.

7              THE COURT:  So you just declare something from 1988

8    old?  I mean that quite seriously.  What makes it old?

9              THE WITNESS:  So most of the bills that we have in

10   circulation are much, much newer, from to 2017 or 2013, from

11   2009, sometimes 2003.  So once you go back into the '90s it is

12   very few, and into the '80s even less currently in circulation.

13   As they get older they get worn out.

14             THE COURT:  You mean if they're used in circulation.

15             THE WITNESS:  Yes.

16             THE COURT:  They get worn out, I take it they get worn

17   out if they're being passed from hand to hand and put in

18   wallets and so forth.

19             THE WITNESS:  Exactly.

20   BY MR. WEITZMAN:

21   Q.  Looking at this photograph, sir, looking at the $20 bill,

22   can you tell what series that is?  We will zoom in on the 20.

23   A.  1985.

24   Q.  And if you go to the $100 bill beneath that, can you tell

25   what series that is?

O6P5men6                         Catania - Cross

1   A.  1996.

2   Q.  Again, old bills here; right?

3   A.  Yes, older bills.

4   Q.  By the way, the $100 bill was redesigned with new security

5   features?

6           MR. WEITZMAN:  Can you zoom out from the $100 bill?

7   Q.  It was redesigned with new security features, right?

8   A.  It was at a certain point in time.  I don't exactly

9   remember when, but it did.

10  Q.  And the new security features, they have like a strip on

11  the side; right?

12  A.  I'm not an expert in the security features of the currency.

13  Q.  In any event, this isn't one of the newer -- this isn't a

14  design of the newer bills; right?

15  A.  No, it is not the current, newer bill.

16          MR. WEITZMAN:  Can you go to Defendant's Exhibit 1641?

17  Q.  Again, you see a $50 bill on top?

18  A.  In the center?  Yes.

19  Q.  Yes.  And that's a Series 1988?

20  A.  Yes.

21          MR. WEITZMAN:  By the way, can you zoom out so we have

22  the $50 bill?

23  Q.  Can you tell looking at this whether that bill has a fold

24  in the middle?

25          MS. GHOSH:  Objection.

1      THE COURT:  I will ask if he can tell.

2      THE WITNESS:  I can't tell.

3   Q.  You don't see a fold, correct?

4      MS. GHOSH:  Objection.

5      THE COURT:  No.  He cannot tell.  Go ahead.

6   Q.  Zoom out to the $20 bill.

7      What year is that?

8   A.  Series Year 1985.

9   Q.  Now, in your experience -- you testified on direct -- about

10  bills being taken out of circulation.  Do you recall that?

11  A.  Yes.

12  Q.  Ask and you said that bills are often taken out of

13  circulation due to wear and tear; right?

14  A.  Correct.

15  Q.  Do you know whether Series 1988 $50 bills are in

16  circulation today or have typically experienced more wear and

17  tear such that they are out of circulation?

18     THE COURT:  Sustained as to form.

19     Do you know whether $50 bills of that series remain in

20  circulation?  Yes or no.

21     THE WITNESS:  No, I don't.

22  Q.  Can we go to Defendant's Exhibit 1679?  Looking at these,

23  can you tell what series -- let's go to the second one from the

24  top?

25  A.  We zoomed in on Series 1996.

1   Q.  Can you go to the one below that?

2   A.  That's a Series 2006.

3   Q.  Can we go to Defendant's Exhibit 1709 and let's look at the

4   first top $100 bill.  What series is that?

5   A.  It is 2006 A.

6   Q.  And second and third, if you can zoom in on each of those?

7   The second is what year?

8   A.  Series 2006.

9   Q.  And the third is it?

10  A.  It is series 2006.

11  Q.  Just to be clear, all of these series from the 1980s to

12  2006, these bills that you looked at, you weren't provided the

13  serial numbers for those bills; correct?

14          MS. GHOSH:  Objection.

15          THE COURT:  Sustained.

16  Q.  Did you search for the serial numbers of these bills that

17  we just looked at?

18          MS. GHOSH:  Objection.

19          THE COURT:  I will allow that, if he knows.

20  A.  I'm not sure which serial numbers we ran.

21  Q.  Did you run any serial numbers for series bills preceding

22  2009?

23          MS. GHOSH:  Objection.

24          THE COURT:  If he knows.

25  A.  I don't know.

O6P5men6                              Catania - Cross

1   Q.  They would be on your spreadsheet if you ran them?

2           MS. GHOSH:  Objection.

3           THE COURT:  I will allow it.

4   A.  To the extent we might have a result, yes, but there are

5   those instances that we spoke about where there may not be

6   results, so even if they did provide it we might have had a

7   result but we might not have had a result.

8   Q.  I would like to show you some of the government exhibit

9   photographs from the house.  Government Exhibit 1F- --

10          THE COURT:  The jury will disregard where it is from.

11  These are photographs.

12          Proceed.

13          MR. WEITZMAN:  Government Exhibit 1F-1263.  Can you

14  zoom in on the top left banded stack of bills?

15  Q.  Can you tell what series that is, sir?

16  A.  Yes.  It is a Series 1996.

17  Q.  Is it let's go to the stack next to it on the right, can

18  you tell what series that is, sir?

19  A.  Yes.  Series 2006?

20          THE COURT:  You ended that with a question mark.  Why

21  don't you blow that up so it is clear.

22          Can you tell what series it is?

23          THE WITNESS:  It looks like a 2006.

24          MR. WEITZMAN:  Zoom that out?

25  Q.  You see that on the bottom right there is a updated $100

O6P5men6                         Catania - Cross

1    bill with the new security features?

2    A.   In the lower right?  Yes.

3    Q.   Yes.  We can zoom that out.

4         Of the bills that you see in this image, the only ones

5    that you are seeing with the updated security features is the

6    one on the bottom right and the one above that; right?

7    A.   Yes.  Those are the only two that are visible.

8    Q.   Correct.  There are others in here in this stack but the

9    ones that are visible, it is those two that are the updated

10   security and the others are older; right?

11   A.   Yes.

12   Q.   And the older ones, do you understand those all to be

13   pre-2013?

14   A.   I would have to look at each one.  There is a couple of

15   different years but --

16        THE COURT:  No.  The jury doesn't want a guess.  If

17   you need to look at every one you should look at every one or

18   the questioner can go on.

19        THE WITNESS:  I would have to zoom in a little bit to

20   see the actual series year on these.

21   Q.   We can move on because I do want to wrap you up today.

22        Can we look at Government Exhibit 1F-1307?  Now look

23   at the top $50 bill there.

24   A.   Yes, I see it.

25   Q.   Can you tell what series that is?

O6P5men6                          Catania - Cross

1   A.  It looks like something from 1990s.

2   Q.  Do you see the stack of the $20 bills with the 2K all the

3   way on the right?

4   A.  Yes, I see that.

5   Q.  Can you tell what series years those are?

6            THE COURT:  There are two stacks.  Which one?

7   Q.  The top one.

8   A.  The top one, 2006.

9   Q.  Let me go with one more photo, if you don't mind, which is

10  Government Exhibit 1F-1158.  Again, the new security features

11  involve a multi-colored bill that has some blue and some green.

12  Do you see that?

13  A.  Yes, I do.

14           THE COURT:  Are you asking whether he sees bills with

15  the new security feature.

16           MR. WEITZMAN:  Correct.

17           THE COURT:  On 1158?

18           MR. WEITZMAN:  Right.

19  Q.  One of the ways to distinguish the new bills from the old

20  bills is that the new bills have kind of this gradation of

21  colors from blue to green, whereas the old bills were all

22  green; right?

23  A.  That's correct.  Yes.

24  Q.  You are seeing a lot of the older bills on this page,

25  correct, the majority of the bills are older?

1          MS. GHOSH:  Objection.

2          THE COURT:  Do the majority of the bills that are

3  visible on 1F-1158, do they have the new security features or

4  not?  If you can tell.

5          THE WITNESS:  It looks like the majority don't have

6  the newer security features but I haven't counted.

7  Q.  Now, are you familiar with a concept by the Federal Reserve

8  called a rollover strategy?

9  A.  No, I have never heard that term.

10 Q.  Have you heard of something called natural rollover where

11 the Fed takes --

12         THE COURT:  You just asked if he heard natural

13 rollover.

14 Q.  Have you heard of natural rollover?

15 A.  No, I have not.

16 Q.  Are you familiar with a practice whereby the Fed takes

17 older design notes out of circulation so that they have more of

18 the new design notes in circulation?

19 A.  No, I'm not aware of that.

20 Q.  You are not aware of that.  Is that because it is not

21 within your job responsibility or because it doesn't exist?

22         MS. GHOSH:  Objection.

23         THE COURT:  I don't know how he can answer that.

24 Q.  Is it within your job responsibility to understand how the

25 Fed takes bills out of circulation?

1   A.  No, it is not.

2   Q.  OK.

3   A.  No.

4   Q.  Do you know what the lifespan of paper money is?

5   A.  I don't, no.

6   Q.  Is that something that the Fed studies?

7           MS. GHOSH:  Objection.

8           THE COURT:  If he knows.

9   A.  I don't know if they study the lifespan of currency or not.

10  Q.  Do you know whether the Federal Reserve website provides

11  information on the average estimated lifespan of currency?

12          MS. GHOSH:  Objection.

13          THE COURT:  I will see if he knows.

14  A.  I have never heard of that.

15  Q.  And let me put up Defendant's Exhibit 965 and ask you if

16  this refreshes your recollection?

17          MS. GHOSH:  Your Honor, there is no absence of

18  recollection.

19          THE COURT:  I think that's right.

20          MR. WEITZMAN:  OK.  You can take that down.

21  Q.  Are you aware of a FAQs section of the Federal Reserve

22  website?

23          MS. GHOSH:  Objection.

24          THE COURT:  I will allow it.

25  A.  No I am not, no.

O6P5men6                          Catania - Cross

1    Q.   I would like to turn to Government Exhibit 1F-1266.  Do you

2    see on the top there are four straps around bills?

3    A.   Yes.

4    Q.   Those four straps, each of them have a date on them;

5    correct?

6    A.   Correct.

7    Q.   Do you know whether the date on the strap --

8            THE COURT:  What is the date on the strap?  What does

9    it represent?  What is the actual date, what is the date on the

10   strap represent, if you know?

11           THE WITNESS:  I don't know what the dates on these

12   straps represent.

13   Q.   Let me see if I can ask you two ways.  Do you know if it

14   represents the date of receipt of the cash by the bank or the

15   date of distribution to a bank customer?  Do you know one way

16   or another?

17           MS. GHOSH:  Objection.

18   A.   I don't.

19   Q.   In any event, you see that the cash strap on the left is

20   torn?

21           MS. GHOSH:  Objection.

22   Q.   Zoom in on the left?  Do you see that there is a tear

23   there?

24   A.   I can't tell if it is a tear or not.

25   Q.   Let me just highlight the area.

1    A.  I'm sorry.  I was looking in the middle.

2    Q.  Yes.

3    A.  Yes, there is a slight tear on the left.

4    Q.  Do you know whether these cash straps are made so that you

5    can take money out and put them in and reuse straps?

6              MS. GHOSH:  Objection.

7              THE COURT:  If he knows.

8              THE WITNESS:  I don't know.

9    Q.  Have you ever seen anybody reuse cash straps taken off one

10   series of a stack of bills and put them on another series of

11   stack of bills?

12             MS. GHOSH:  Objection.

13             THE COURT:  Sustained.

14   Q.  Have you ever used cash straps around bills?

15   A.  I have not.

16   Q.  You never put them on or off, right?

17             MS. GHOSH:  Objection.

18             THE COURT:  I will allow it.  He has never used them.

19   A.  I have never used them.

20   Q.  If you can just zoom out of it on that and let's talk about

21   the left series of bills.  The one all the way on the left,

22   that is Series 1996 bills or at the least top bill?

23   A.  Yes, it is.

24   Q.  You can zoom back out.

25             Can you tell from the back of a bill what the series

1    is on the right?

2    A.  I cannot.

3    Q.  But you can tell that that's not with the new security

4    features; right?

5    A.  It doesn't appear to be, no.

6    Q.  Because it is all green, not the blue and green; right?

7    A.  Correct.

8    Q.  Do you know whether the Federal Reserve still distributes

9    the 1996 series older style $100 bills to customers in banks?

10           MS. GHOSH:  Objection.

11           MR. WEITZMAN:  Whether you know.

12           THE COURT:  I will allow it.

13   A.  I don't know.

14   Q.  One of the reasons why bills get taken out of circulation

15   is when they are in use for many years there is wear and tear;

16   correct?

17   A.  There is wear and tear, yes.

18   Q.  And the older the bill you would expect more wear and tear

19   if it is in use; right?

20           MS. GHOSH:  Objection.  I will allow it if it is in

21   use.

22           MR. WEITZMAN:  That is correct.

23           THE WITNESS:  Yes, the more a bill gets turned around

24   it can get worn out; yes.

25   Q.  So is it fair to say that a bill that is an old bill that

O6P5men6                      Catania - Redirect

```
 1   isn't, doesn't have wear and tear, may have been stored?
 2              MS. GHOSH:  Objection.
 3   Q.  Is that a fair inference?
 4              THE COURT:  I will allow that.
 5              Can you say one way or the other?
 6              THE WITNESS:  I wouldn't know.  I have seen new bills
 7   that look in really bad shape, I have seen old bills in good
 8   shape, so.
 9              MR. WEITZMAN:  One moment, your Honor.
10              (Counsel conferring)
11              MR. WEITZMAN:  Nothing further, your Honor.
12              THE COURT:  Mr. Lustberg, anything, sir?
13              MR. LUSTBERG:  No.  No thank you.
14              THE COURT:  Mr. de Castro.
15              MR. DE CASTRO:  No thank you, your Honor.
16              THE COURT:  Any redirect?
17              MS. GHOSH:  Probably one to two minutes' worth, your
18   Honor.
19              THE COURT:  Of course.
20   REDIRECT EXAMINATION
21   BY MS. GHOSH:
22   Q.  Mr. Catania, do you recall being asked questions about cash
23   laid out and whether it appeared to be blue and green or all
24   green?
25   A.  Yes.
```

1           MS. GHOSH:  Mr. Hamill, could you please bring up what

2    is in evidence as Government Exhibit 1F-1177?

3    Q.  What type of bills do you see in this photograph,

4    Mr. Catania?

5    A.  These all look like the newer bills.

6           M.S G:  Mr. Hamill, could you bring up 1F-1171 for a

7    moment?

8    Q.  Mr. Catania, what do you see in this photograph?

9    A.  I see all the newer bills.

10   Q.  Mr. Catania, do you recall being asked questions about

11   certain notes with series years that were earlier than 2009?

12   A.  Yes.

13   Q.  Would someone first receive a note years after it first

14   went into circulation?

15   A.  Yes.

16   Q.  For example, is it possible to receive a 1996 series note

17   from a bank in 2022?

18   A.  Yes.

19          MR. WEITZMAN:  Objection.

20          THE COURT:  I will allow it.

21   Q.  Is it possible to be given a 1996 series note by someone

22   else in 2022?

23          MR. WEITZMAN:  Objection just to form.

24          THE COURT:  Pardon me?

25          MR. WEITZMAN:  Objection to form only; is it possible.

O6P5men6                    Catania - Recross

1           THE COURT:  I will allow it.

2   Q.  Mr. Catania, is it possible to be given a 1996 series note

3   by someone else in 2022?

4   A.  Yes.

5           MS. GHOSH:  No further questions.

6           MR. WEITZMAN:  Just one more question?

7           THE COURT:  Yes.

8   RECROSS EXAMINATION

9   BY MR. WEITZMAN:

10  Q.  If you it looked up serial numbers for the bills preceding

11  2009, would the Federal Reserve have a record of the payout

12  dates of those earlier bills?

13          THE COURT:  Does the Federal Reserve have payout dates

14  listed for bills preceding series 2009?

15          THE WITNESS:  Yes, it should.

16          MR. WEITZMAN:  Thank you.  No further questions.

17          THE COURT:  Anything?

18          MS. GHOSH:  No thank you.

19          THE COURT:  You are excused.  You may step down,

20  Mr. Catania.  Thank you.

21          (Witness excused)

22          THE COURT:  Ladies and gentlemen, it is 10 after 5:00.

23  We have had a full day of testimony.  Testimony is coming in

24  quite apace.  I am glad we are able to start on time today.

25  Let's replicate that tomorrow at 9:30.  See you tomorrow.

O6P5men6                          Catania - Recross

1    Enjoy the evening.  You have not heard all of the testimony,

2    keep an open mind.  Do not discuss this case amongst

3    yourselves, do not do any research.

4              9:30 tomorrow.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            MR. LUSTBERG:  Your Honor, if I can ask about one

3    thing?

4            THE COURT:  Yes, sir.

5            MR. LUSTBERG:  So this apparatus appeared here, you

6    commented on it the other day.

7            THE COURT:  I was told that the lawyers wanted it.  It

8    seems -- actually, I must say, I'm not sure where you are

9    going, but from my standpoint, and I didn't think this would be

10   true, it is a very good thing because it apparently it helps

11   drive the sound into the microphone, and I and the witness and

12   the reporter, I believe, hear it much more clearly.  That's my

13   take.

14           What can I do for you, sir?

15           MR. LUSTBERG:  I think it is incredibly unpleasant and

16   it feels like we are really separating ourselves from the jury.

17   You know, if it is something that the Court thinks -- obviously

18   it is within completely within your discretion, but I think it

19   was supposedly done for health reasons and I don't know if

20   there remains a health reason for it.  I noticed that after

21   jurors saw it, a couple of jurors came out with masks on, so

22   I'm afraid that it has caused more fear than comfort.  So, I

23   just don't like it.  I am an old fashioned guy, I don't like

24   it.

25           THE COURT:  I understand.  I was actually quite

O6P5men6                        Catania - Recross

1   surprised, I didn't like it either just from -- I like the

2   sense of openness but I was quite surprised how much clearer

3   the sound is now.  It's not that it's -- well, I will ask you,

4   is it hotter in some way?

5           MR. LUSTBERG:  No.

6           THE COURT:  For right now we will keep it.

7           My deputy tells me that it took a couple of hours to

8   set it up because it involves wiring so we will leave it up for

9   now.  Thank you.

10          MR. FEE:  Your Honor, two quick things.  I will make a

11  note for summations, I hope we get rid of it; and the second

12  question is just because it matters if the government hits the

13  target and rests -- Friday, will that be a full day?

14          THE COURT:  Yes, the jury is asking for half a day.

15  Are we still able to hit our marks if we give half a day?  They

16  have asked for that half a day.

17          MR. FEE:  Yes.

18          MR. MONTELEONI:  I think that we --

19          THE COURT:  Maybe what we can do is I could go to

20  2:00 p.m. with 15 minutes for them to grab apples or something

21  and get an extra hour out of it, something like that.

22          MR. MONTELEONI:  Yes, your Honor.  I mean, I think

23  that we are still -- I think that Wednesday is now probably is

24  off the table.  I think Thursday we might hit --

25          THE COURT:  If you are telling me you don't think you

1    can rest tomorrow.

2              MR. MONTELEONI:  We don't think we can rest tomorrow

3    but we think that Thursday is definitely a realistic -- is

4    definitely realistic.  Is there a possibility it runs into

5    early Friday?  I think there is a possibility.  I think that

6    the witnesses are going to be largely picking up the pace in

7    terms of the discreteness of the issues that they raise and so

8    I think that it is quite plausible that we will be able to get

9    through it all on Thursday.

10             THE COURT:  Who are the -- and let me turn to the

11   defense -- you may be seated in the courtroom -- does that mean

12   that -- we will have to have the three of you talk -- still hit

13   our mark in terms the July 4 weekend?

14             MR. FEE:  We will have to talk.  I think if we could

15   if we do a 9:00 to 2:00 schedule on Friday.

16             THE COURT:  Let's aim for that.

17             Who are the government witnesses tomorrow?

18             MR. MONTELEONI:  So tomorrow our current order is

19   Isabella Fuchs who did some analysis, the lead into the bank

20   note spreadsheets that you have heard about through

21   Mr. Catania, analyzed essentially where the serial numbers came

22   from, tracked those back.

23             THE COURT:  Yes, I know.  Next?

24             MR. MONTELEONI:  Then Vikas Khanna, who is the first

25   assistant U.S. Attorney for New Jersey; Vasken Khorozian, a

O6P5men6                          Catania - Recross

1   jeweler.

2          THE COURT:  Yes.

3          MR. MONTELEONI:  Shannon Kopplin from the Senate

4   Ethics Committee.  We are putting the finishing touches on the

5   stipulation that might then remove another witness which would

6   then leave us with Elizabeth Wheeler, a cell site expert, and

7   Megan Rafferty, who will be putting in the summary chart that

8   you ruled on, by letter, today.

9          THE COURT:  All right.  See everyone at 9:30 tomorrow.

10         (Adjourned to June 26, 2024, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    SARAH ARKIN

 4   Cross By Mr. Weitzman . . . . . . . . . . .4631

 5   Cross By Mr. Lustberg  . . . . . . . . . . .4809

 6   Redirect By Mr. Richenthal . . . . . . . . .4830

 7   JOSEPH CATANIA

 8   Direct By Ms. Ghosh  . . . . . . . . . . . .4845

 9   Cross By Mr. Weitzman  . . . . . . . . . . .4885

10   Redirect By Ms. Ghosh  . . . . . . . . . . .4908

11   Recross By Mr. Weitzman  . . . . . . . . . .4910

12                       GOVERNMENT EXHIBITS

13   Exhibit No.                             Received

14    5G-300 and 5G-300-EX  . . . . . . . . . . .4866

15                       DEFENDANT EXHIBITS

16   Exhibit No.                             Received

17    435  . . . . . . . . . . . . . . . . . . .4637

18    1009  . . . . . . . . . . . . . . . . . . .4763

19    411  . . . . . . . . . . . . . . . . . . .4797

20    Hana 024  . . . . . . . . . . . . . . . . .4822

21    1625 to 1759 and 2160  . . . . . . . . . .4894

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300