O71Wmen1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                   v.                        23 Cr. 490 (SHS)

5    ROBERT MENENDEZ,
     WAEL HANA, a/k/a "Will Hana,"
6    and FRED DAIBES,

7                   Defendants.
                                             Trial
8    ------------------------------x

9                                            New York, N.Y.
                                             July 1, 2024
10                                           9:35 a.m.

11

12   Before:

13                          HON. SIDNEY H. STEIN,

14                                           District Judge
15                                           -and a Jury-

16                          APPEARANCES

17   DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
     BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

O71Wmen1

```
 1

 2                          APPEARANCES CONTINUED

 3

 4   PAUL HASTINGS LLP
          Attorneys for Defendant Menendez
 5   BY:  ADAM FEE
          AVI WEITZMAN
 6        ROBERT D. LUSKIN
          RITA FISHMAN
 7        PAUL C. GROSS

 8

 9   GIBBONS, P.C.
          Attorneys for Defendant Hana
10   BY:  LAWRENCE S. LUSTBERG
          ANNE M. COLLART
11        CHRISTINA LaBRUNO
          ANDREW J. MARINO
12        RICARDO SOLANO, Jr.
          ELENA CICOGNANI
13        JESSICA L. GUARRACINO

14

15   CESAR DE CASTRO
     SETH H. AGATA
16   SHANNON M. McMANUS
          Attorneys for Defendant Daibes
17

18

19   Also Present:  Marwan Abdel-Rahman
                    Rodina Mikhail
20                  Interpreters (Arabic)

21                  Rachel Wechsler
                    Connor Hamill
22                  Braden Florczyk
                    Paralegal Specialists, U.S. Attorney's Office

23                  Justin Kelly, DOAR

24

25
```

O71Wmen1

```
 1                  (Trial resumed; jury not present)
 2                  THE COURT:  Please be seated.
 3                  What occurred over the weekend was an abuse of the
 4      court process.  It's an abuse of this system.  I'm not
 5      interested in hearing from the parties, oh, you're at fault,
 6      no, you're at fault, yours was too long, the other side's was
 7      too long, that was late, this was late.  It's too late for all
 8      of that.
 9                  At 1:30 on Saturday, I received the government's
10      objections to the summary charts.  The objections were about
11      charts that were 124 pages in length, 100 pages in length, 56
12      pages in length, 22 pages in length.  The government raised 40
13      discrete categories of objections to over 200 lines in these
14      charts across approximately 300 pages of summary charts that
15      would take days or hours for the Court to effectively go
16      through.  This was on Saturday, and the briefing wasn't done.
17                  Counsel for Menendez and Hana filed their responses in
18      opposition to the government's objections on Sunday at noon.
19      Also on Sunday, which is yesterday, at noon -- in other words,
20      less than a day ago -- the Court received the government's
21      objections to the direct testimony of Critchley.  At 10 p.m.
22      last night, the government filed its objections to another
23      summary chart, DX 2500.  The tsunami of submissions ended at
24      midnight, when the government's objections were filed.  And
25      indeed, the government was jammed up by late submissions from
```

1    the defense.

2            In sum, from noon yesterday, the Court received

3    briefing on scores of objections to evidence involving hundreds

4    of pages Of exhibits.  I repeat, it's an abuse of the court's

5    system.  I was here from 10 a.m. until 11 p.m., but that's not

6    the point.  The point is it's far, far too many last-minute

7    submissions here.  There's no additional briefing on anything

8    that's been submitted so far.

9            We're going to get this back on track, and if it

10   requires a day that the jury isn't here, well, that's what will

11   be done.  I'm tempted to tell the jury that it's the parties'

12   fault, but I'm not going to do that.  If we have to take a day

13   off, if the jury has to take a day off, I'll say it's due to

14   scheduling.  They're not going to be happy.  Everybody would

15   like to get this done.

16           I was able to go through approximately half of the

17   objections in the submission from the government on document

18   488.  That's where I was able to go.

19           Let me turn to Mr. Menendez.

20           The government has rested.  Who can you put on today,

21   and how long will it take?

22           MR. WEITZMAN:  Yes, your Honor.

23           Without addressing any of the submissions, your

24   Honor --

25           THE COURT:  I'm not interested in the back-and-forth

O71Wmen1

1    about whose fault it was.  We're getting this case on track and

2    we're moving forward.

3              Who are your witnesses today?

4              MR. WEITZMAN:  My only point, your Honor, is without

5    having to rule on any objections, we have three witnesses to

6    present, your Honor.

7              THE COURT:  Fine.  Who are the three witnesses?

8              MR. WEITZMAN:  Caridad Gonzalez.

9              THE COURT:  And she is?

10             MR. WEITZMAN:  The senator's sister.

11             Katia Tabourian, who is Nadine's sister, and Russell

12   Richardson, who was formerly noticed as an expert, but who we

13   plan to present as a lay witness.

14             THE COURT:  Just a moment.

15             Who was the last person?  You said Gonzalez and

16   Tabourian.  Who else?

17             MR. WEITZMAN:  Russell Richardson.

18             THE COURT:  Yes.

19             MR. WEITZMAN:  He's the accountant.

20             THE COURT:  And there are no outstanding objections to

21   those three.  Is that correct?

22             MR. WEITZMAN:  There are some documentary objections

23   the government has raised with us.  As to the ones involving

24   Caridad Gonzalez, I don't plan to offer the two documents.

25             THE COURT:  The question is what objections are there,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

```
1    and why am I only finding about it now?  What objections are
2    there?  Talk to each other if you have to.
3              MR. FEE:  Your Honor, we have spoken on Katia
4    Tabourian, and I think there are at least two or three
5    unresolved evidentiary objections that we would need the
6    Court's resolution.
7              THE COURT:  Since you knew you had her, since
8    everybody knew she was on, why are these objections being given
9    to me now, on the day of her testimony?
10             All right.  The hesitation is the answer.
11             MS. POMERANTZ:  Your Honor, if I may?
12             THE COURT:  Yes.
13             MS. POMERANTZ:  These were part of our prior letter,
14   and we've also raised these with defense counsel.
15             THE COURT:  I haven't had these specific objections in
16   front of me.
17             MS. POMERANTZ:  I understand, your Honor.  I'm happy
18   to raise them now.
19             THE COURT:  Now.
20             You heard the tone in which I said "now."  Is that
21   Tabourian or is that Gonzalez?
22             MS. POMERANTZ:  Well, as to Ms. Gonzalez, there were
23   two defense exhibits.
24             THE COURT:  All right.  Just wait.
25             MS. POMERANTZ:  Yes, your Honor.
```

O71Wmen1

1          THE COURT:  Are there objections as to both Gonzalez

2     and Tabourian?  Yes or no.

3          MS. POMERANTZ:  Yes.

4          THE COURT:  Are there objections as to Richardson?

5          MS. GHOSH:  No, your Honor.

6          THE COURT:  Silence.  I'll take that as no.

7          How long, defense, is the testimony of Gonzalez,

8     Tabourian and Richardson?

9          MR. WEITZMAN:  I think it will, I think they'll likely

10    conclude this morning, although we can't be sure.

11         THE COURT:  All right.  We'll see where we stand then

12    as to whether or not I'm going to tell the jury they can't come

13    in tomorrow.  There's practically no way I could go through

14    these objections, all of these objections tonight.  Very

15    disturbing.

16         In terms of Gonzalez and Tabourian, I must say, at

17    least based on 1303 and the proposed submissions by Menendez,

18    some of that is in quite bad faith.  There are a number of

19    submissions involving Anton and 1303 that are absolutely beyond

20    the guidelines that I had submitted.  In fact, the defense is

21    construing what I was saying on Friday as to the guidelines

22    much too narrowly.  Some of those submissions about Anton and

23    the abuse you said did not fit into "hospitalization or beating

24    up," citing a phrase that I used in describing the guidelines.

25         Well, counsel, clearly I wasn't limiting what you

O71Wmen1

couldn't put in as to Anton to hospitalizations or beating up.
I was talking about specific examples of abuse, not limited to
hospitalizations or beating up.  To some of the submissions on
Anton, I said don't make this a soap opera.  You're not only
making it a soap opera, you're making it a bad soap opera.

No specific examples of abuse, I told you that when I
was describing the guidelines for the relatives.  Domestic
abuse is too hot a topic, and it's so tangential to the issues
here.  It's out on 403.  And Menendez's counsel had to have
known that.  I'm saying that so that you can question Gonzalez
and Tabourian appropriately, without going into specific
examples of dispute.  My remarks were clearly beyond
hospitalization, taken out of evidence things beyond
hospitalization or beating up.

Who is your first witness?

MR. WEITZMAN:  Ms. Gonzalez.

THE COURT:  All right.  Let's take the objections to
Gonzalez.

And I should say also, obviously I need to allocute
each defendant on whether or not that defendant understands
that it's his determination as to whether or not he wants to
take the stand and, indeed, what his determination is.  It
seems to me the most appropriate time to do that is toward the
end of each defendant's case and to do three allocutions
separately.

O71Wmen1

1          I also think the appropriate time, but if the parties

2     disagree, I'll be amenable, but it seems to me the appropriate

3     time to do that is at some point before each defendant rests;

4     the attorneys should ask for a break for the reasons the Court

5     discussed.  And I then will allocute that defendant.  Obviously

6     I don't want to have a situation where the defendant rests and

7     then I allocute.  I want to allocute before.

8          Is that understood?  Everyone understands that?

9          MR. WEITZMAN:  Yes, your Honor.

10          MR. LUSTBERG:  Yes, your Honor.

11          MR de CASTRO:  Yes.

12          THE COURT:  All right.

13          The frenzy over the weekend has got to stop.  And I

14     can only imagine the hours that the attorneys put in.

15          What are the objections on Gonzalez?  And if it's

16     exhibits, show me the exhibits.

17          MS. POMERANTZ:  Yes, your Honor.

18          The objections are to Defense Exhibits 1590 and 1591.

19     We can pull those up.

20          THE COURT:  I take it this has not been presented to

21     me before.  Correct?

22          The answer is yes.  Is the answer yes?

23          MS. POMERANTZ:  I'm not sure, your Honor, if these

24     were in the letter.  That's my only hesitation.

25          THE COURT:  OK.

O71Wmen1

1          MS. POMERANTZ:  My understanding is they are in the

2     letter.

3          THE COURT:  OK.

4          MS. POMERANTZ:  Your Honor, our objection to these

5     exhibits is --

6          THE COURT:  Wait a minute.  I'll try to handle these

7     as they come in.  What exhibit, what page, where is it?

8          MS. POMERANTZ:  The exhibit is on the screen, your

9     Honor.

10         THE COURT:  No, no.  Where you raised this so that the

11    Court could understand what it was.  Because I don't think I've

12    ever seen that exhibit before.

13         You know what?  It doesn't matter.  Let's deal with

14    this right now.

15         MR. WEITZMAN:  Your Honor, as I mentioned, I don't

16    plan to offer this document.  I'm just going to use this

17    document, and I told Ms. Pomerantz this, to refresh

18    recollection.

19         THE COURT:  All right.  I won't have to let that in,

20    but I don't have to rule on it.  Expected time for surgery.  I

21    don't have to rule on it.  There's no issue.

22         What else?

23         MS. POMERANTZ:  I think that's the issues for Defense

24    Exhibits 1590 and 1591.

25         If we want to move to Ms. Tabourian --

O71Wmen1

1          THE COURT:  Yes.

2          MS. POMERANTZ:  I'm sorry.  That was 1590.

3          1591, my understanding from Mr. Weitzman is he's

4   representing that he doesn't plan to offer these.  We don't

5   believe that he should be permitted to ask about either of

6   these exhibits.

7          THE COURT:  What's 1590?  Mr. Weitzman, what's the

8   issue here?

9          MR. WEITZMAN:  Right.  I'm not going to offer this.  I

10  will use the exhibit if I need to refresh recollection.

11         THE COURT:  All right.  Fine.  It's a banana.

12         MS. POMERANTZ:  But your Honor, our point is that he

13  shouldn't be permitted to ask about pain and hospitalization,

14  that they --

15         THE COURT:  That's correct.  I don't think he is.  I

16  don't know what the lead-up is going to be, but he can refresh

17  anything with anybody.

18         MS. POMERANTZ:  Understood, your Honor.  I just wanted

19  to make sure that we were heard on this.  Our view is that this

20  is meant to engender sympathy and that there shouldn't be

21  details coming out about --

22         THE COURT:  This doesn't have to do with Anton.  I

23  gather it has to do with the senator's surgery and the

24  recliner.

25         MS. POMERANTZ:  Correct, your Honor.

O71Wmen1

| | |
|---|---|
| 1 | THE COURT:  I understand your point. |
| 2 | MS. POMERANTZ:  Thank you. |

3          THE COURT:  Thank you for alerting me to it, but it's
4    not an issue I need to address now.  In abstract, I think the
5    government is right about that, pain and so forth is not at
6    issue.

7          Mr. Weitzman.

8          MR. WEITZMAN:  In the abstract, I agree with that.  I
9    do think there's a question to the extent that they're alleging
10   that the recliner is a bribe, giving the context as to why
11   Senator Menendez received a recliner, the surgery --

12         THE COURT:  That still doesn't change that it could be
13   a bribe, but that's up to the jury.

14         MR. WEITZMAN:  That's right, and so the context --

15         THE COURT:  I understand.  You can put the context in,
16   but just because he had a sore shoulder doesn't mean the
17   recliner wasn't a bribe.  That will be for the jury.

18         MR. WEITZMAN:  Correct.

19         THE COURT:  OK.  What else?

20         MS. POMERANTZ:  Next, on Ms. Tabourian, I understand
21   from Mr. Fee that the defense exhibits that we previously
22   raised for your Honor -- I just want to state it for the
23   record -- Defense Exhibits 1787, 1790 and 1793, that they no
24   longer intend to ask Ms. Tabourian about those exhibits, which
25   we had previewed for the Court as being improper and not within

O71Wmen1

1    the bounds of your Honor's ruling.  They have informed that

2    they do not plan to ask about those exhibits or offer them.

3          And the next defense exhibit that I understand from

4    Mr. Fee that he intends to offer is Defense Exhibit 2194.

5          THE COURT:  Yes.

6          MS. POMERANTZ:  And we object to this exhibit on

7    hearsay grounds.  It's -- if we can pull that up.

8          THE COURT:  You know what?

9          Mr. Fee, is it correct you're not going to ask about

10   1787, 1790 or 1793?

11         MR. FEE:  Correct, your Honor.

12         THE COURT:  Let me see those, just so I get a sense of

13   what the negotiations are here.

14         Put up 1787.  All right.

15         All right.  1790.

16         1793.

17         All right.  I understand there are going to be no

18   questions about it.  That's good.

19         2194.

20         Well, on its face, the objection is hearsay.  Correct?

21         MS. POMERANTZ:  That's correct, your Honor.

22         THE COURT:  On its face, it is hearsay.

23         MR. FEE:  It's not for the truth, your Honor.  It's

24   for the purpose of showing, and the Court has heard this from

25   the defense throughout, that Ms. Arslanian was reaching out

O71Wmen1

1    about her financial issues to her sister, and we will elicit

2    from her sister that there was no discussion of sharing --

3            THE COURT:  Katia is Tabourian?

4            MR. FEE:  Yes, that's her sister.  I'm sorry.

5            THE COURT:  OK.

6            MR. FEE:  There was no discussion of these issues with

7    being shared with Senator Menendez.  There's no proof in the

8    record that at this time she was making these same sorts of

9    statements to Senator Menendez.  It's not for the truth.  It's

10   for the state of mind and the fact that it was said.

11           THE COURT:  It's for Menendez's state of mind?

12           MR. FEE:  It's for Nadine's state of mind and it's for

13   the fact that it was said to Katia and to argue the inference,

14   your Honor, that there is nothing in the record that this was

15   ever said to the senator.

16           The government's, one of the government's arguments

17   that it must resort to inference for is that the senator was

18   aware of the financial issues and the financial assistance

19   Nadine was receiving from others.  We're obviously saying the

20   opposite.  All we would elicit from Katia, from the sister, is

21   that she remembers this outreach.  She doesn't remember it ever

22   coming up that Nadine was also sharing this information with

23   the senator.

24           MS. POMERANTZ:  Your Honor, they can ask those types

25   of questions, but the document is still hearsay.

O71Wmen1

1              THE COURT:  Yes.

2              MS. POMERANTZ:  There's no state of mind.

3              THE COURT:  I think that's right.  You certainly can

4     ask the question, but this does not go to state of mind.  It's

5     hearsay, and I'm excluding it as hearsay.  But you can ask

6     those questions.

7              MR. FEE:  Understood, your Honor.

8              THE COURT:  OK.

9              That's it?

10             MS. POMERANTZ:  Next, your Honor, I believe is 2196.

11             MR. FEE:  But this is one of the ones I did not intend

12    to offer.

13             THE COURT:  All right.  Let me look at it.

14             I'm glad you're not offering that.

15             Next.

16             I'm told the jury is here.  What's the next objection?

17             MS. POMERANTZ:  I understand that Mr. Fee is telling

18    me he's also not offering Defense Exhibits 2197 and 2199, so --

19             THE COURT:  All right.

20             MS. POMERANTZ:  -- that's not an issue.

21             THE COURT:  How many more do you have?

22             MS. POMERANTZ:  I think just one, your Honor.

23             THE COURT:  What is it?

24             MS. POMERANTZ:  2195-R.

25             THE COURT:  What is it?

O71Wmen1

1           MS. POMERANTZ:  Just, your Honor, that the first part

2    of this --

3           THE COURT:  What is it?

4           MS. POMERANTZ:  My understanding is these are text

5    messages between Robert Menendez and Katia.

6           THE COURT:  This is between the defendant and Nadine's

7    sister.

8           MS. POMERANTZ:  Yes, your Honor.

9           THE COURT:  Yes.

10          MS. POMERANTZ:  Your Honor, I believe the second,

11   third and fourth sentences here are hearsay, and if you get rid

12   of those sentences, the remainder of the text is not relevant.

13   And so that's the basis.

14          THE COURT:  All right.  Let me look at it.

15          MS. POMERANTZ:  At a minimum, your Honor, that there

16   shouldn't be the references to, I cannot get over her being

17   with Doug while she was with me.

18          THE COURT:  Mr. Fee.

19          MR. FEE:  Your Honor, this is really a perfect example

20   of state-of-mind proof.  It's not for the truth about what he

21   can or cannot get over.  This is in the heart of the alleged

22   conspiracy, where he's in vain --

23          THE COURT:  You keep talking about the heart.  You're

24   just talking about the time period when you say heart, right?

25          MR. FEE:  Yes, your Honor, but this is when alleged

O71Wmen1

1    bribes and alleged *quo* is happening, and so this is state of

2    mind.  He's talking about --

3        THE COURT:  What's the state of mind you're trying to

4    promote here?

5        MR. FEE:  Your Honor, they're alleging a meeting of

6    the minds among coconspirators, two of them being Nadine and

7    Senator Menendez.  He is expressing to Nadine's sister that he

8    cannot even conceive of being with Nadine, as this is November

9    6 of 2018.  This is pure state of mind.  We do not care about

10   the truth, but the fact that he is saying this to Nadine's

11   sister really does seem to be necessary for us to meet the

12   allegations here, your Honor.

13       And your Honor --

14       THE COURT:  I'm not sure it does it for you.  He's

15   saying that he cares for her.  Oh, I see, but I can't get over

16   her, you're saying -- what's the state of mind you're trying to

17   elicit here?

18       MR. FEE:  That he does not want to be with Nadine at

19   this moment.  Your Honor, the inference that the jury's being

20   asked to draw is that they're coconspirators; that he's working

21   a bribery scheme and a foreign agent scheme with her.  It is

22   relevant and necessary for us to convey to this jury that his

23   state of mind at that time was that he doesn't want to be with

24   Nadine.  That certainly bears on the inference of whether --

25       THE COURT:  Government.

O71Wmen1

1              MS. POMERANTZ:  Your Honor, the text is asserting that

2     he doesn't want to be with her.  It is the truth that they're

3     offering, and the witness -- they can ask the witness questions

4     about her understanding as to whether they were together or not

5     for a period of time in November 2018, but that does not make

6     this text message admissible.

7              MR. FEE:  Your Honor, this is his state of mind.  It

8     reflects what he is thinking about a relevant issue at the

9     time.  If this is not state of mind, I struggle to imagine what

10    is in this case.

11             MS. POMERANTZ:  Your Honor, this gets into the basis

12    for them breaking up.

13             THE COURT:  Yes.

14             MS. POMERANTZ:  It raises 403 issues, and again, they

15    can ask the witness about this.  This is, the sentences I have

16    flagged for your Honor are --

17             THE COURT:  I really don't think it's state of mind.

18    I'm going to exclude it.  You can ask your questions about it.

19             MR. FEE:  Your Honor, if I may?

20             THE COURT:  Yes.

21             MR. FEE:  We cannot ask this witness to opine on

22    Senator Menendez's state of mind.

23             THE COURT:  That's true.

24             MR. FEE:  We have seen dozens of text messages between

25    Nadine and Senator Menendez that have been offered for state of

O71Wmen1

1    mind about them having a conspiracy.  This is in the time

2    period of the conspiracy.  We do not care about the truth of

3    the reason that he doesn't want to be with her.  We are not

4    offering it for that purpose.  We will not argue it for that

5    purpose.  But it is him saying I don't want to be with her

6    right now.  That is an argument we will make, and that is

7    highly relevant and, frankly, necessary for our defense to beat

8    this allegation.  It is truthful.

9              We have redacted it to avoid your Honor's ruling

10   about.  There's a sentence here that certainly goes beyond your

11   Honor's ruling about references to Mr. Anton.  We have tried to

12   limit this to a pure expression of state of mind, which it is:

13   I cannot get over her being with Doug while she was with me.

14   This was on his election night in response, the sister will

15   testify, to a message from her saying, please get back to

16   Nadine, get back with Nadine, she loves you.  We're not

17   offering that message.  We're offering the response, which is

18   the pure state of mind.

19             THE COURT:  All right.  I'm going to allow it, but

20   government, make sure that I tell the jury that it's not for

21   the truth of the matter asserted when it's introduced.  You're

22   verging on the soap opera, but I'm going to allow it.

23             That's it, I take it?

24             MS. POMERANTZ:  Thank you, your Honor.

25             Again, I would note that our view about the reference

O71Wmen1

1    to Doug we do think is for 403 purposes.  I'm not sure if there

2    is a way to redact that.

3              THE COURT:  Put it back up.

4              MR. FEE:  Your Honor, if you're permitting any

5    reference --

6              THE COURT:  Just let me see it.

7              MR. FEE:  Yes, of course.

8              THE COURT:  Line them up, Ms. Blakely.

9              I'm going to allow it.

10             Go ahead.  Bring the jury in.

11             MR. WEITZMAN:  Your Honor, should I put the witness on

12   the stand?

13             THE COURT:  Please.

14             Good morning.

15             THE WITNESS:  Good morning.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

O71Wmen1

1          (Jury present)

2    CARIDAD GONZALEZ,

3         called as a witness by Defendant Menendez,

4         having been duly sworn, testified as follows:

5              THE COURT:  You may be seated in the courtroom.

6              Good morning, ladies and gentlemen.  We had some legal

7    matters to handle.  You saw the government rest on Friday.  Now

8    we'll see if each defendant has a case to put on.

9              You know, because I told you on Friday, that the

10   defense is under no obligation to prove anything.  The burden

11   is always on the government to prove its case beyond a

12   reasonable doubt.

13             Is there going to be presentation of evidence on

14   behalf of Mr. Menendez?

15             MR. WEITZMAN:  Yes, your Honor.

16             THE COURT:  Put your first witness on, sir.

17             MR. WEITZMAN:  The defense calls Caridad Gonzalez.

18             THE COURT:  Good morning, Ms. Gonzalez, and welcome.

19             THE WITNESS:  Thank you.

20             THE COURT:  Your witness.

21             MR. WEITZMAN:  Thank you, your Honor.

22   DIRECT EXAMINATION

23   BY MR. WEITZMAN:

24   Q.  Good morning, Ms. Gonzalez.

25   A.  Good morning.

O71Wmen1

1    Q.   Ms. Gonzalez, how do you know Mr. Menendez?

2    A.   He's my baby brother.

3    Q.   How much older are you than he?

4    A.   11 years older.

5    Q.   So how old are you?

6    A.   80.

7    Q.   Where were you born, Ms. Gonzalez?

8    A.   In Havana, Cuba.

9    Q.   Where do you currently live?

10   A.   In Union City, New Jersey.

11   Q.   Do you live in an apartment or a house?

12   A.   In an apartment, on the first floor.

13   Q.   Who do you live with?

14   A.   With my husband of 60 years.

15   Q.   Who owns the apartment in which you live?

16   A.   My brother.

17   Q.   And is that referring to Senator Menendez?

18   A.   Yes.

19   Q.   Do you have other brothers?

20   A.   I have one other brother, who lives in Puerto Rico.

21   Q.   Ms. Gonzalez, do you have any children?

22   A.   One grown child.  He's 55.

23   Q.   You said you're Senator Menendez's older sister, and I

24   think there's an 11-year age gap.

25        How would you describe, in light of that age gap, your

O71Wmen1

1  relationship to Senator Menendez?

2  A.  Well, when he was born, he wasn't a little baby, like my

3  son.  He was 10-1/2 pounds, and my mother came out a little bit

4  hurt with the delivery, so I helped her.  I used to bathe,

5  change his diapers, give him the milk and, when he started

6  growing up, just teaching him both languages so he didn't have

7  the problem that we had when we came to this country.

8  Q.  As he was growing up, what was your relationship like with

9  Senator Menendez?

10  A.  Very close.  We were very close.  We spoke to each other.

11  Whatever problems he had, he would tell me, and then should I

12  tell mom and dad.  Things like that, but very close, very

13  close.

14  Q.  Did you help raise Bob?

15  A.  Yes.

16  Q.  Where was Bob -- you were born --

17          THE COURT:  Try not to lead, sir.

18          MR. WEITZMAN:  Yes, your Honor.

19  Q.  You were born in Cuba, you said.  Where was Senator

20  Menendez born?

21  A.  In Manhattan, New York.

22  Q.  And where did Bob grow up?

23  A.  Part in Hoboken.  And then we moved to Union City, and

24  that's where he started going to school.

25  Q.  What languages did you speak at home with Bob?

O71Wmen1

1    A.  Spanish.

2    Q.  Is Bob fluent in Spanish today?

3    A.  Yes.

4    Q.  Can you tell me a bit about Bob's educational background?

5    Where did he go to school, middle school, high school?

6    A.  OK.  He went to grammar school in Roosevelt School in Union

7    City.  Then he went to Union Hill High School.  After that, it

8    was St. Peter's, and then law school, Rutgers.

9    Q.  You mentioned Union Hill High School.  Is that a public or

10   private school?

11   A.  Roosevelt School and Union Hill were both public schools.

12   Q.  Then you mentioned a school called St. Peter's.  Was that a

13   high school or a university?

14   A.  That's a university.

15   Q.  And then you mentioned that Bob went to law school.  Which

16   law school?

17           THE COURT:  She said Rutgers.

18   BY MR. WEITZMAN:

19   Q.  OK.  Did Bob practice as a lawyer?

20   A.  Yes.

21   Q.  Do you recall approximately how long he practiced?

22   A.  More or less, ten years.

23   Q.  Were you involved in his legal practice in any way?

24   A.  Yes.

25   Q.  What was your involvement?

O71Wmen1

```
 1    A.  As a legal secretary.

 2    Q.  And were you a legal secretary throughout the time that he

 3    was practicing law?

 4    A.  No.  It was, like, the last three years.

 5    Q.  Are you familiar with any of Bob's cash-storing practices?

 6    A.  Yes.

 7    Q.  How are you familiar with his practice of storing cash?

 8    A.  Well, working with him in the law practice, on a certain

 9    day he asked me to go upstairs of the house, the last floor,

10    and from the closet on the left, pull out a box, similar to a

11    shoe box, but wider, and to bring him 600 -- $500.  It wasn't

12    six.  And I did.

13    Q.  OK.  So let me break that down.

14         Approximately when do you recall, if you can, what years or

15    what part of life were you or Bob in when he had this request

16    of you to get cash?

17    A.  I think it was the second year that I was with him.  Maybe

18    '60 -- 1968 --

19    Q.  Let me ask you this.

20    A.  OK.  I don't remember the year really.

21    Q.  Was Bob a parent at the time yet?

22    A.  He had Alicia.

23    Q.  How old was she at the time?

24    A.  About two or three.

25    Q.  Do you recall when Alicia was born?
```

O71Wmen1

1    A.  1982.

2    Q.  So this was sometime in the '80s, is that correct?

3    A.  Yes.

4    Q.  And you said that you were working for him at his law

5    practice.  What do you recall him asking you to do?

6    A.  Well, I did different things.  I did filing, etc.

7    Q.  I apologize.  Let me rephrase.

8    A.  OK.

9    Q.  What do you recall him asking you to do with respect to

10   this day that he asked you to get cash?

11   A.  That's all he did.  He asked me to get cash and instructed

12   me where it was.

13   Q.  Where did he say the cash was located?

14   A.  In a closet.

15   Q.  Whose bedroom was it in?

16   A.  In Alicia's.

17   Q.  And where in the closet was the cash located?

18   A.  On the top, not to the right, like in the middle, and it

19   was a box, just like he explained.

20   Q.  What kind of box was it?

21   A.  It wasn't a shoe box.  It was wider, so I guess it's a boot

22   box.

23              THE COURT:  Wider?  Wider or whiter?

24              THE WITNESS:  No.  Wide.

25              THE COURT:  Wider.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

```
 1              THE WITNESS:  Wide.

 2              THE COURT:  All right.

 3              THE WITNESS:  Yes, sir.

 4   BY MR. WEITZMAN:

 5   Q.  And when you got the boot box, what did you see inside?

 6   A.  Money.

 7   Q.  How did the money look?  Was it rolled up in rubber bands?

 8   Was it in stacks?  What did you see?

 9   A.  The money was laid flat across, and I just counted 500 --

10   $100 bills -- and brought it down.  Same like my dad used to

11   do.

12   Q.  What do you recall the denominations of the bills?

13   A.  On the left side was 100s and then 20s.

14   Q.  OK.  Do you recall smaller denominations than 20s?

15   A.  No.

16   Q.  Were the bills wrapped or rubber banded, or was it just

17   stacked?

18   A.  Just stacked flat.

19   Q.  And how high up the boot box were the bills stacked?

20   A.  This -- I would say something like, like that.  Maybe --

21   Q.  So a few inches?

22   A.  Maybe an inch or two.  Maybe.

23   Q.  And I think you testified that he asked you to bring down a

24   certain amount of cash.  What did you do?

25   A.  I counted $500 in $100 bills.
```

O71Wmen1

1   Q.  And did you bring them to anybody?

2   A.  To him.  To Bob.

3   Q.  Were you surprised when Bob asked you to go into his closet

4   and get cash?

5           THE COURT:  Sustained.

6   BY MR. WEITZMAN:

7   Q.  Did you know at that time, when he made that request --

8   before he made that request that Bob had cash stored in his

9   house?

10  A.  No.

11  Q.  Did you have any reaction to learning that Bob had cash

12  stored in his house?

13          MS. POMERANTZ:  Objection.

14          THE COURT:  I'll allow that.  You may answer.

15          MR. WEITZMAN:  You may answer.

16          THE WITNESS:  I'm sorry.  I forgot the question.

17          THE COURT:  What was your reaction, if any?  Did you

18  have a reaction?

19          THE WITNESS:  No.  It's normal.  It was normal.  It's

20  a Cuban thing.

21  BY MR. WEITZMAN:

22  Q.  OK.  Why do you say it's a Cuban thing, or it was normal to

23  you?

24  A.  Because --

25          MS. POMERANTZ:  Objection.

O71Wmen1

```
 1              THE COURT:  No.  She said it was normal.
 2              Go ahead.
 3   A.  Because every Cuban that came to the United States in the
 4   early '50 '60s and '70s, you speak to them you find they had
 5   cash in their home.  My father had cash in Cuba in the
 6   grandfather clock.  Mostly anything is that they were afraid of
 7   losing everything they worked so hard for, because, in Cuba,
 8   they took everything away from you, whether you liked it or
 9   not.
10   Q.  Let's return to the topic of Bob's storage of cash a bit
11   later.  I'd like to talk to you about what you just described,
12   which was your experiences in Cuba.
13              How old were you when you and your family left Cuba?
14   A.  I was eight years old.
15   Q.  And approximately when would that have been?
16   A.  1951.
17   Q.  Do you recall who was the leader of Cuba at the time?  Was
18   it Fidel Castro yet?
19   A.  No.  No, no, no.  It was between Carlos Prío Soccarás and
20   Batista, within that two, period.
21   Q.  What was your family's life like in Cuba?
22   A.  Perfect.  I mean we -- we didn't have any problems.  We got
23   everything we ever wanted.  We were the first one in the
24   neighborhood to have a TV.  Mom had somebody to cook, somebody
25   to clean.  We had a chauffeur, so it was a good life.
```

O71Wmen1

1   Q.  I'm going to ask you, Ms. Gonzalez, to slow down a bit --

2   A.  OK.

3   Q.  -- for the court reporter.  OK?

4       What did your parents do for a living in Cuba?

5   A.  My father had his own manufacturing business, and it was

6   ties and bow ties.  And he did specialties for what they call

7   he had the *Mardi Gras* and also for weddings.

8   Q.  Did your mother work in Cuba?

9   A.  No.

10  Q.  Do you recall the circumstances, what led to your family's

11  having to leave Cuba?

12  A.  The way --

13  Q.  Just answer yes or no first.

14  A.  Yes.

15  Q.  OK.

16  A.  Sorry.

17  Q.  If you would describe, just at a high level, what happened

18  that caused your family to have to leave Cuba?

19          MS. POMERANTZ:  Objection.

20          THE COURT:  I'll allow it.  If you know.

21  BY MR. WEITZMAN:

22  Q.  You may answer, yes.

23          THE COURT:  You may answer.

24  A.  We left because a very influential man in Havana, who was a

25  competitor with my father, wanted my father to close his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

1    business and work for him.  And dad refused to do so.  And with

2    that, everything else started getting worse and worse, people

3    coming to the house or talking and so on.

4    Q.  You described that things got worse.  Is there a particular

5    incident you're referring to that you're recalling?

6    A.  It was --

7            MS. POMERANTZ:  Objection, your Honor.

8            THE COURT:  Sustained.

9    BY MR. WEITZMAN:

10   Q.  Was there ever a moment, was there ever a period of time

11   when your family felt in jeopardy?

12           MS. POMERANTZ:  Objection.

13           THE COURT:  Rephrase it.

14   BY MR. WEITZMAN:

15   Q.  Were there any intruders in your --

16           THE COURT:  What caused you to leave, to your

17   knowledge, what caused the family to leave Cuba?

18           THE WITNESS:  It was this particular person who wanted

19   dad to close up his family business, and then one day he --

20   four officers and two people from the government came in and

21   started pulling at, pulling everything that was in the back of

22   the house -- that's where the factory was -- looking under

23   everything, looking in dad's desk, which was a roll-up desk.

24   And they pulled everything out.

25       And then this gentleman, who was dressed in black, came and

O71Wmen1

1    sat by me and said are you drinking coffee, and I said no, I

2    was drinking tea.  And that's when he just stared at me and I

3    was nervous, but I just stared him back.  And then he got up

4    and he said *vamanos*, or let's leave, and everybody left.

5    Q.  And I'm not going to get into a lot of detail about this,

6    but I would like to understand a bit better what just happened.

7    You described a bunch of men who worked for the government or

8    officers who came to the house?

9            THE COURT:  Ask your question, sir.

10           MR. WEITZMAN:  Yes.

11   Q.  Who were the individuals who came to your house?

12   A.  Four officers, police.

13   Q.  And where was the house in relation to the factory or

14   manufacturing plant that your dad ran?

15           THE COURT:  She said it was in the back of the house.

16           Is that correct?

17           THE WITNESS:  Yes.

18           THE COURT:  All right.

19   BY MR. WEITZMAN:

20   Q.  Where did the officers and the police go?

21   A.  To the back of the house.

22   Q.  What did they do in the back of the house?

23           THE COURT:  She's already testified to that.

24   BY MR. WEITZMAN:

25   Q.  You described that you were seated, having tea?

O71Wmen1

```
 1   A.  Yes.
 2              THE COURT:  Sir, sir.
 3              MR. WEITZMAN:  Well, it's actually a relevant fact,
 4   your Honor.
 5   Q.  Where were you seated in relation to the grandfather clock?
 6   A.  In front of it.
 7   Q.  OK.  And what's the significance of the grandfather clock
 8   to this incident?
 9              MS. POMERANTZ:  Objection, your Honor.
10              THE COURT:  I'll allow it.
11              THE WITNESS:  Do I answer?
12              THE COURT:  You may answer, yes.
13   A.  In the grandfather clock, on the bottom, had a false
14   bottom, and that's where dad put his money.
15   Q.  And did the officers find the money at the bottom of the
16   grandfather clock?
17   A.  They never looked in it.
18   Q.  Did you have some involvement in causing the officers not
19   to look in the grandfather clock?
20              MS. POMERANTZ:  Objection.
21              THE COURT:  Sustained.
22   BY MR. WEITZMAN:
23   Q.  Before we go further with the family history, how much of
24   this story, of this history, did you all in the United States
25   discuss with Bob?
```

O71Wmen1

1    A.  Most of it, especially why we came to the United States,

2    because we always told him how nice it was and great life, but

3    then why did you leave.  And this is where daddy would --

4    sorry, my father would pick up and explain to him what

5    happened.

6    Q.  OK.  And when you say what happened, what are you referring

7    to, in particular, without going into the entire story?

8    A.  OK.  With everything that had to be done in order for us to

9    come here.  My father did a lot of trips to the United States

10   to purchase different materials, better -- very colorful

11   materials, and that's where he met Mr. Spleger, who was a

12   businessman here, who did the same manufacturing work as my

13   father.  He's the man that gave him a, I think you call it a

14   labor contract.  And that's how we all came as residents.

15   Q.  Ms. Gonzalez --

16   A.  -- a labor contract.

17   Q.  -- did you describe to Bob or did your family describe to

18   Bob this incident that occurred with the officers coming --

19   A.  Yes.

20   Q.  -- to the manufacturing plant?

21   A.  Oh, yes.

22   Q.  And did you describe -- what, if anything, did you all tell

23   Bob in this, in the family history about the grandfather clock?

24   A.  Why it was there, why it was important, and -- and not only

25   that, daddy always said don't trust the banks.  If you --

O71Wmen1

1        Am I going fast?  OK.

2        If you trust the banks, you never know what can happen, so

3   you must always have money at home.  And this was something, so

4   to speak, that they say to you and say it to you so many times

5   that it's -- it sort of forms a law inside of you.

6   Q.  How often did you guys talk about what happened?

7        MS. POMERANTZ:  Your Honor, we would object and move

8   to strike.

9        THE COURT:  Yes.  I'll strike the reference to, sort

10   of forms a law inside of you.

11   BY MR. WEITZMAN:

12   Q.  How often did you all discuss --

13        THE COURT:  The jury should disregard that.

14   BY MR. WEITZMAN:

15   Q.  How often did you all discuss the family's life in Cuba

16   around Bob as he was growing up?

17   A.  Usually at dinner tables, or dad had brought a history book

18   of Cuba, so my brother and I -- my other brother, Ray, had to

19   read one page, and the next day we skipped, because we

20   discussed what we read with dad, and then we went to another

21   one.  And then he would tell Bob, see, this is the history of

22   people who really wanted Cuba to be a better country.  It's not

23   what we have now, and that's the -- and then he went all over

24   it again and again, got really upset.

25   Q.  You mentioned the cash in the grandfather clock.  Other

O71Wmen1

1  than that cash, did your family have assets with which to flee

2  Cuba?

3  A.  Well, he --

4          MS. POMERANTZ:  Objection.  Hearsay.

5          THE COURT:  I'll allow it.  If she knows.

6          I'll allow it, if you know.

7          THE WITNESS:  Do I answer?

8  BY MR. WEITZMAN:

9  Q.  Yes, you may answer.

10 A.  Basically, he had money in the bank.  Not all of it.

11 Little by little he pulled it out.  The house where we lived

12 was ours.  The factory was dad's.  And all those --

13         THE COURT:  The factory in the back of the house?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  So it was part of the house, is that it?

16         THE WITNESS:  Yes.

17         THE COURT:  OK.

18 BY MR. WEITZMAN:

19 Q.  Was your family able to leave with all of its assets from

20 the bank?

21 A.  No.

22 Q.  Was your family able to seel the house?

23         THE COURT:  You're leading, sir.

24 BY MR. WEITZMAN:

25 Q.  Other than the cash, what assets was your family able to

O71Wmen1

1   liquidate and take with them to the United States?

2   A.  None.

3   Q.  And what was your understanding as to why your family was

4   unable to liquidate assets?

5          THE COURT:  Sustained.

6   BY MR. WEITZMAN:

7   Q.  What did your parents do for a living, at a high level,

8   once they arrived in the United States?

9   A.  Well, my dad worked for Mr. Spleger.  He had a contract.  I

10  believe it was five years.  And my mother, the first four or

11  five years, did not work.  She started working when we moved to

12  Hoboken in a sewing machine, the factory, clothing for ladies.

13  Q.  And other than -- well, what kind of, I think you mentioned

14  Mr. Spleger.  Is that his name?

15  A.  Yes.  That's the way they pronounced it.

16  Q.  What business was Mr. Spleger in?

17  A.  He was in manufacturing, the same thing as dad, ties and

18  bow ties.

19  Q.  And did there come a time when your father changed his

20  jobs?

21  A.  Yes.

22  Q.  What did he do next?

23  A.  He first started carpentry in Hoboken.  He did very well

24  with that, and then, after a while, he actually opened in West

25  New York a manufacturing of ladies' pants, mostly pants, wide

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

1  pants they were using at the time, that they're using now, and

2  some blouses, very simple.

3  Q.  You said that Bob was raised in Hoboken and then Union

4  City.  Did you guys live in apartments or homes?  How would you

5  describe your residences?

6  A.  In Union City, it was an apartment, an apartment building.

7  In Hoboken, it was a two-family building.

8  Q.  How was your life, what was life like in the United States

9  after Bob was born?

10 A.  It was all right.  It wasn't like Cuba.  That's for sure.

11 Q.  OK.  Now, you worked for Bob as his legal secretary for a

12 few years.

13      When did Bob first tell you that he wanted to become a

14 lawyer?

15 A.  When he was --

16          MS. POMERANTZ:  Objection.

17          THE COURT:  Sustained.

18 BY MR. WEITZMAN:

19 Q.  From your relationship with Bob, did he express a desire of

20 what he wanted to do for a living?

21          MS. POMERANTZ:  Objection.

22          THE COURT:  Sustained.  Hearsay.

23 BY MR. WEITZMAN:

24 Q.  Did there come a time when Bob started running for

25 political office?

O71Wmen1

1    A.  Yes.

2    Q.  When was that?

3    A.  He was still in college, I think.  He ran for secretary of

4    the Board of Education of Union City.

5    Q.  Did he subsequently run for any other local or state

6    offices?

7    A.  Yes, he -- I think in 19 -- no.  I don't remember the year,

8    but he ran for mayor of Union City.  Then he ran for New Jersey

9    State Assembly, then New Jersey State Senate, then the House of

10   Representatives.  And when Jon Corzine left office, he had six

11   or seven month left, and he appointed Bob to fill that gap of

12   month, and after that, for the next 18 years, Bob ran for

13   senator of New Jersey and won every election.

14   Q.  OK.  So you had stated that he ran for these various

15   offices --

16   A.  Yes.

17   Q.  -- at the local and state level.

18       Did he win those elections?

19   A.  Yes.

20   Q.  And then you had mentioned that Jon Corzine appointed Bob

21   as a senator for carryover months --

22   A.  Yes.

23   Q.  -- of his?

24       Jon Corzine at the time, before the appointment, what

25   position did he hold?  Do you recall?

O71Wmen1

1    A.  It was senator.

2    Q.  And then what position did he take on that freed up the

3    Senate office?  Do you recall?

4    A.  Jon Corzine?

5    Q.  Yes.

6    A.  No, I don't recall.

7    Q.  Do you recall what year it was that your brother was

8    appointed as senator by Jon Corzine?

9    A.  It could have been 2006, more or less.

10   Q.  OK.  Did he subsequently run for office as a U.S. senator

11   in New Jersey?

12   A.  Yes.

13   Q.  Do you recall how many times?

14   A.  Three times.

15   Q.  And did he win?

16   A.  Yes.

17   Q.  Each time?

18   A.  Yes.

19   Q.  So if I'm doing the math correctly, he's been a senator,

20   United States senator from New Jersey for eight years, is that

21   correct?

22   A.  Yes.

23   Q.  You must be very proud of your little brother?

24           MS. POMERANTZ:  Objection.

25           THE COURT:  Sustained.  The jury will disregard the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

1    comments of the lawyers, however artful they may be.

2    BY MR. WEITZMAN:

3    Q.  Did Bob -- how long has Bob wanted to become a public

4    servant?

5              MS. POMERANTZ:  Objection.

6              THE COURT:  Sustained.

7    BY MR. WEITZMAN:

8    Q.  Other than his salary as a senator, are you aware of any

9    other income that Bob earns?

10   A.  Yes.

11   Q.  What other income are you aware of?

12   A.  $45,425 monthly -- no, $4,425 monthly from the rentals that

13   he has.

14   Q.  And when you say rentals, what are you referring to?

15   A.  Five apartments, which he rents, in Union City.

16   Q.  He owns a building in Union City?

17   A.  Yes.

18   Q.  And is that the building you live in?

19   A.  Yes.

20   Q.  And what do you do in connection with the building that

21   Senator Menendez, Bob, owns?

22   A.  I collect the rents.  I deposit them.  If there's an

23   inspection, let the person in.  Whatever they say I tell him.

24   If something has to be fixed, he gets it fixed.  Like a super.

25   Q.  OK.  From your interactions with Bob over the course of his

O71Wmen1

1   lifetime, have you had discussions with him about what

2   motivates him to be a public servant?

3           MS. POMERANTZ:  Objection.

4           THE COURT:  Sustained.

5   BY MR. WEITZMAN:

6   Q.  To what extent have you had discussions with Bob about

7   money?

8           MS. POMERANTZ:  Objection.

9           THE COURT:  I'll allow it.

10  A.  Basically, last time he ran, I asked him, don't run,

11  because he was offered very good salaries on the -- not on a

12  political basis.  So he said no.  I love what I do and I'm not

13  going to leave it.  And that was it.

14  Q.  OK.  From your own experiences, have you asked Bob to help

15  people in your community?

16  A.  Yes.

17  Q.  Was that once or more than once?

18  A.  More than once.

19  Q.  What sorts of things have you asked Bob to do for people in

20  your community?  Just generally, at a high level.

21  A.  Immigration, problems with that.  He took care of it.

22          MR. WEITZMAN:  OK.  Let me show you what's been marked

23  for identification as Defense Exhibit 1602.

24  Q.  Is this an email between yourself -- I'm sorry.

25      Is this a text message between yourself and Bob Menendez?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen1

```
 1   A.  Uh-huh.  Yes.
 2              THE COURT:  You have to say yes or no.  OK.
 3              MR. WEITZMAN:  We offer Defense Exhibit 1602.
 4              THE COURT:  Admitted, without objection.
 5              (Defendant's Exhibit 1602 received in evidence)
 6              MR. WEITZMAN:  Can we publish that, Mr. Kelly.  If you
 7   would zoom in on the text.
 8   Q.  This is a text message, is that correct, Ms. Gonzalez?
 9   A.  Yes.
10   Q.  It's from you to someone with an address of
11   menendez@att.blackBerry.net?
12   A.  Yes.
13   Q.  Do you know whose address that is?
14   A.  My -- the senator.
15   Q.  You can call him Bob.
16   A.  OK.
17   Q.  It's dated January 4, 2020.  It states:  Hi, I have a
18   friend who niece is an American national born in -- she has a
19   child that was born in Ecuador, watching.  Is there a, to try
20   to bring the child over what she can Charleston, a few months
21   old.  The INS in Ecuador told her that she couldn't bring a
22   baby on a visa.  She has questions and I wonder if anyone in
23   your office could help her.  Let me know.  Thanks.
24        Did I read that correctly?
25   A.  Yes.
```

O71Wmen1

1    Q.    What, if anything, do you recall happened as a result of

2    this text message?

3    A.    I also spoke to Bob about it, and I was -- this young lady,

4    I spoke to her and told her a number she had to call for a

5    particular lady in his office who does immigration; she's very

6    good, and explained to her what she could do about bringing her

7    child.

8                MR. WEITZMAN:  I'd like to also put up for

9    identification Defense Exhibit 1603.  Just to the witness and

10   the Court.  If you can zoom in.

11   Q.    Is this another text message between yourself and Senator

12   Menendez, dated January 17, 2020?

13   A.    Uh-huh, yes.

14               MR. WEITZMAN:  We offer Defense Exhibit 1603.

15               THE COURT:  Admitted, without objection.

16               (Defendant's Exhibit 1603 received in evidence)

17               MR. WEITZMAN:  If you would publish that, Mr. Kelly.

18   Q.    Again, this is from you to Bob?

19   A.    Yes.

20   Q.    And it's dated January 17, 2020?

21   A.    Yes.

22   Q.    It states:  Hi --

23               THE COURT:  No need to read it.  Members of the jury,

24   read it to yourselves.

25               MR. WEITZMAN:  Yes, your Honor.

O71Wmen1

1   Q.  Do you recall what happened after you sent this text
2   message?
3   A.   This particular lady, it's the grandmother that asked me to
4   convey this to Bob.  She lives across the street from me, and
5   if my recollection is correct, the daughter's under the dream
6   act, so he gave me a card, when he came -- he always dropped by
7   the house.  So gave me a card.  I walked over and gave it to
8   her, with his telephone number.  And as far as I know, that --
9   he helped her with this immigration problem.
10  Q.  Has Bob made himself available to other people in your
11  community to assist them?
12          THE COURT:  I'll allow that.
13  A.  Yes.  Helped --
14          THE COURT:  You've answered.  You said yes.
15          Next question.
16          MR. WEITZMAN:  Thank you.
17  Q.  Are you aware -- are you familiar with Bob's current wife?
18  A.  Yes, Nadine.
19  Q.  When did you first meet Nadine?
20          MR. WEITZMAN:  You can take that down, Mr. Kelly.
21  Thank you.
22  A.  We had dinner.  Bob invited us to dinner before they got
23  married so we could meet Nadine.
24  Q.  Was that before they got married or before they got
25  engaged?  Do you recall?

O71Wmen1

1    A.   I think even before he got engaged.  I could be wrong.

2    Q.   And do you recall --

3           THE COURT:  Do you know when he got engaged?

4           THE WITNESS:  No.

5    BY MR. WEITZMAN:

6    Q.   Have you seen a video of his engagement?

7    A.   Yes.

8    Q.   I won't play the video, but what do you recall that video

9    showing?

10          MS. POMERANTZ:  Objection.

11          THE COURT:  I'll allow it.

12   A.   It showed him singing.  Bob loves to sing.  He sings all

13   the time.  So he sang to her one of the songs from the -- what

14   is that, I've never loved -- I can't -- I don't know --

15          THE COURT:  That's all right.

16          THE WITNESS:  I'm not a singer.

17          THE COURT:  That's OK.  We don't need the exact song.

18   He sang to her.

19          Next question.

20   BY MR. WEITZMAN:

21   Q.   Where did he sing to her?

22   A.   At the time --

23          THE COURT:  In the video.

24          Next question.

25   BY MR. WEITZMAN:

O71Wmen1

1    Q.  No, no.  Where physically were they located based on your

2    review of the video?

3            THE COURT:  I'll sustain the objection.

4    BY MR. WEITZMAN:

5    Q.  Were they in the United States?

6    A.  No.

7            MS. POMERANTZ:  Objection, your Honor.

8            THE COURT:  I'll allow it.

9    BY MR. WEITZMAN:

10   Q.  What did you see in the background of the video?

11   A.  Taj Mahal.

12           MS. POMERANTZ:  Your Honor --

13           THE COURT:  I'll allow it.

14   BY MR. WEITZMAN:

15   Q.  Was this a video you saw on YouTube?  Is that right?

16           THE COURT:  Sustained.

17           MS. POMERANTZ:  Objection.

18           THE COURT:  Sustained.

19   BY MR. WEITZMAN:

20   Q.  How did you see this video?

21           THE COURT:  Let's move on.

22   BY MR. WEITZMAN:

23   Q.  Did you attend Bob and Nadine's wedding?

24   A.  No.

25   Q.  Why not?

O71Wmen1

1  A.  I was ill.

2  Q.  Did you receive pictures from Bob and Nadine's wedding?

3  A.  Yes.

4         MR. WEITZMAN:  If we could publish just to the witness

5  and the Court Defense Exhibit 1587.

6  Q.  Is this --

7         MR. WEITZMAN:  And if you can go to the next page so

8  that Ms. Gonzalez can see them.

9         THE WITNESS:  Uh-huh.

10        MR. WEITZMAN:  Is there another image?  Next page

11 after this.

12 Q.  Do you recognize this text message and images?

13 A.  Yes.  It's their wedding photos.  Nadine had a beautiful

14 dress.

15        (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    MR. WEITZMAN:  We offer Defendant's Exhibit 1587.

2    THE COURT:  Admitted without objection.

3    (Defendant's Exhibit 1587 received in evidence)

4    MR. WEITZMAN:  If you can go to page 1, Mr. Kelly, the

5    first page of the document, and publish to the jury.

6    BY MR. WEITZMAN:

7    Q.  Is this a text message from Nadine to you?

8    A.  Yes.

9    Q.  It says Cacha?

10   A.  That's my nickname.

11   Q.  Ms. Gonzalez, that's a diminutive for Caridad?

12   MS. POMERANTZ:  Objection, your Honor; leading.

13   THE COURT:  Sustained.

14   Q.  This is dated October 8, 2020?

15   A.  Right.

16   MR. WEITZMAN:  Can we go to the nest page and publish

17   the photo?

18   THE COURT:  I think they've seen it.

19   MR. WEITZMAN:  I don't think we published it.

20   THE COURT:  Take a look at the photos.

21   MR. WEITZMAN:  And if we can go to the next page after

22   that?

23   THE COURT:  Next.

24   BY MR. WEITZMAN:

25   Q.  Before and after the wedding, did you continue to get to

 1   know Bob and Nadine as a couple?

 2   A.  Yes.  We had dinner at my house.  Usually they liked

 3   Spanish food and I'm the cook in the family, and we also had

 4   dinners at different restaurants together.

 5            MR. WEITZMAN:  If we can publish for the witness and

 6   the Court Defendant's Exhibit 1589, and first and second page.

 7   Q.  Do you recognize this?

 8   A.  That's a photo of Bob and Nadine, my husband and myself, at

 9   this restaurant, I think it is called La Sirene, maybe I am

10   mispronouncing it, but they have great food.

11            MR. WEITZMAN:  We offer Defendant's Exhibit 1589.

12            THE COURT:  Admitted without objection.

13            (Defendant's Exhibit 1589 received in evidence)

14            MR. WEITZMAN:  If we can publish that.

15   Q.  Is this another text message from Nadine to you on May 15,

16   2021?

17   A.  Yes.

18            MR. WEITZMAN:  And we can go to the photo and just

19   zoom in so the jury can see?

20   Q.  How would you describe, from your interactions with them,

21   Bob's relationship with Nadine?

22   A.  I think they were very much in love with one another.

23   Q.  Did there come a time when Bob had a shoulder injury and

24   needed surgery?

25   A.  Yes.  He fell.

1    Q.  Do you know where he fell?

2    A.  He was on --

3            MS. POMERANTZ:  Objection, your Honor.

4            THE COURT:  I will allow it.

5    A.  He was on the train in Washington that takes you from one

6    building to another, he got off the train, he was running

7    because he was late for a vote, and he fell and broke his

8    shoulder.

9    Q.  Did you say a boat or a vote?

10   A.  Vote.  I'm sorry.

11   Q.  OK.  And this is the train between Congress and offices?

12   A.  Yes.

13           MS. POMERANTZ:  Objection, your Honor.

14           THE COURT:  I will allow it.

15   Q.  How did you learn about this injury?

16   A.  Nadine told me about it.

17   Q.  Did Nadine provide you updates about Bob in that time

18   frame?

19           MS. POMERANTZ:  Objection.

20           THE COURT:  Sustained.

21   Q.  When do you recall Bob having surgery, if you recall?

22   A.  I don't remember the year but I know it was in December

23   before his birthday.

24   Q.  Let me see if this refreshes your recollection.

25           MR. WEITZMAN:  Can we put up Defendant's Exhibit 1590

1  just for the witness, and if you would read that to yourself?

2              THE COURT:  Now, just because something is here

3  doesn't mean it's true, but you said you don't recall when the

4  injury occurred.

5  A.  That's correct, sir.

6  Q.  Looking at that may refresh your recollection so the

7  question is simply yes or no, does looking at that refresh your

8  recollection?

9  A.  Yes, sir.

10  Q.  What is your refreshed recollection as to when he had this

11  shoulder injury?

12              MR. WEITZMAN:  Shoulder surgery.

13              THE COURT:  I'm sorry.  Thank you, shoulder surgery.

14              THE WITNESS:  It was December 31, 2021, the day before

15  his birthday.

16  Q.  His birthday is January 1?

17  A.  Yes.

18              THE COURT:  That's the day before.  The day before is

19  December 31.  Next.

20  BY MR. WEITZMAN:

21  Q.  Was Nadine a caring wife to Bob?

22  A.  Yes.

23              MS. POMERANTZ:  Objection.

24              THE COURT:  Sustained.  Jury will disregard.

25  Q.  You earlier described at the beginning of your testimony

1  that you saw Bob store cash in a boot box in his closest.  Do

2  you recall that?

3  A.  Yes.

4  Q.  Have you ever seen your parents store cash in their home?

5  A.  Yes.

6  Q.  Other than what you described in Cuba, in the United

7  States?

8            THE COURT:  I will allow it.

9            THE WITNESS:  Yes.

10  Q.  What do you recall?

11  A.  My mom would, with her paycheck, she would take some of it

12  out, leave some of it in with the stub, and then in the frames

13  of the closet she would put it inside the frame, stick it all

14  in there.  That's what my mom used to do.  My aunt would --

15  Q.  I haven't asked you about your aunt yet.

16      As far as your mom goes, did you and Bob ever discuss the

17  fact that your mother stored cash in the frame of the closet?

18  A.  Basically, he thought that if the house --

19            THE COURT:  No, no, no.  The question is, did you ever

20  discuss with your brother the fact that your mother stored cash

21  in the frame of the closet?  Yes or no.

22            THE WITNESS:  Yes.

23            THE COURT:  All right.

24  Q.  And did your father store cash in the United States?

25  A.  Yes.

O715men2                        Gonzalez - Direct

1    Q.  In his home?

2    A.  Yes.

3    Q.  Where did he store cash?

4    A.  Always in a closet on top, always in a shoe box.

5    Q.  Did other members of your family from Cuba store cash in

6    their homes?

7              MS. POMERANTZ:  Objection.

8              THE COURT:  I will allow it.

9    A.  Yes.  My aunt.  She would store it in the back of her,

10   where she put her television, on the bottom.  Same procedure as

11   mom.  She would take an envelope, part for expenses, the other

12   was to be saved.  And my husband's aunt would do the same

13   thing.  When the house burned down, she ran out with all of her

14   handbags, and then when the firemen said they could go in and

15   see what they could take out, she told her boys go downstairs,

16   the basement, on the left-hand side there is a plastic bag with

17   money.  When the boys came out, it was $60,000 in there.

18   Q.  Is your husband Cuban as well?

19   A.  Yes.

20   Q.  Did you and Bob discuss how other members of your family

21   from Cuba stored cash in their homes in the United States?

22   A.  Yes.

23   Q.  Did you and Bob ever discuss the fact that he stored cash

24   in his home after this request in the 1980s that you get him

25   $500?

 1              MS. POMERANTZ:  Objection.  Hearsay.

 2              MR. WEITZMAN:  I'm not going to elicit anything, any

 3    substance, your Honor.

 4              THE COURT:  I will allow it.  Yes or no.

 5              MS. POMERANTZ:  Your Honor, and leading.

 6              THE COURT:  Yes.  I will allow it.

 7              Just answer yes or no.

 8              THE WITNESS:  Yes.

 9              THE COURT:  Next question.

10    BY MR. WEITZMAN:

11    Q.  What, if any -- well, let me -- after -- let me phrase it

12    differently.

13              After this incident when you got the cash, in the

14    years afterwards, did you and bob have discussions about his

15    storage of cash in his home?

16              THE COURT:  Yes or no.

17              MR. WEITZMAN:  Yes or no.

18    A.  No.

19    Q.  Why not?

20    A.  No reason --

21              MS. POMERANTZ:  Objection.

22              THE COURT:  Sustained.

23    Q.  Why didn't you ever raise Bob's storage of cash in his home

24    with him?

25              THE COURT:  Sustained.

O715men2                      Gonzalez - Cross

1    Q.  As you sit here today, do you have any doubts as to the

2    fact that you saw a stack of cash in his home in the 1980s?

3               MS. POMERANTZ:  Objection.

4               THE COURT:  I will allow it.

5               THE WITNESS:  No.

6               THE COURT:  You saw this --

7               THE WITNESS:  Yes.

8               THE COURT:     -- in the closet.

9               THE WITNESS:  Yes.

10               MR. WEITZMAN:  Nothing further, your Honor.

11               THE COURT:  Do any of the other defendants wish to

12    examine this witness?

13               MR. LUSTBERG:  No, your Honor.

14               MR. DE CASTRO:  No, Judge.

15               THE COURT:  Anything from the government?

16               MS. POMERANTZ:  Yes, your Honor.

17    CROSS-EXAMINATION

18    BY MS. POMERANTZ:

19    Q.  Good morning.

20    A.  Good morning.

21    Q.  You are Robert Menendez' older sister?

22    A.  Yes.

23    Q.  The FBI asked if you would be willing to talk with the

24    prosecutors in this case, right?

25    A.  Yes.

O715men2                          Gonzalez - Cross

1   Q.  And you refused to talk with the prosecutors?

2   A.  Correct.

3   Q.  You met with the defense, though?

4   A.  Yes.

5   Q.  About how many times?

6   A.  Three times.

7   Q.  For about how long?

8   A.  I would say 15, 20 minutes.

9            THE COURT:  Each time, or in total?

10           THE WITNESS:  Yes.

11           THE COURT:  Each time 15, 20 minutes?

12           THE WITNESS:  Yes.

13           THE COURT:  Thank you.

14  BY MS. POMERANTZ:

15  Q.  During your meetings with the defense you discussed your

16  testimony today with them?

17  A.  Yes.

18  Q.  Now, you were not born in the United States?

19  A.  No.

20  Q.  You were born in Cuba?

21  A.  Yes.

22  Q.  And you left Cuba when you were around 8 years old; right?

23  A.  Correct.

24  Q.  Your family left Cuba in 1951?

25  A.  Correct.

O715men2                          Gonzalez - Cross

1    Q.  And that was before Fidel Castro came to power in Cuba,

2    right?

3    A.  Yes.

4    Q.  He came to power in 1959, right?

5    A.  '58, '59.

6    Q.  And you understood your parents wanted to go back to Cuba

7    in 1959; right?

8    A.  They wanted to.

9    Q.  And your brother was born in 1954; right?

10   A.  Yes.

11   Q.  That's three years after your family left Cuba?

12            MR. WEITZMAN:  Objection.  Which brother?

13            THE COURT:  Sustained.

14   Q.  Your brother Robert Menendez was born in 1954; correct?

15   A.  Yes.

16   Q.  And that was three years after your family left Cuba?

17   A.  Yes.

18   Q.  So your brother did not personally leave Cuba, did he?

19   A.  No.

20   Q.  Your brother was born here in the United States; right?

21   A.  Yes.

22   Q.  And he was born here in New York; right?

23   A.  Yes.

24   Q.  Your brother grew up in New Jersey with you and your

25   family; right?

1   A.  Yes.

2   Q.  Your brother, you were asked questions on direct

3   examination about a time when officers came to your home in

4   Cuba.  Do you recall that?

5   A.  Yes.

6   Q.  Your brother Robert Menendez was not present when those

7   officers came to the home in Cuba; right?

8   A.  He wasn't born.

9   Q.  Right.  He wasn't alive.

10  A.  Yes.

11  Q.  He didn't live in Cuba?

12  A.  No.

13  Q.  He has never lived in Cuba?

14  A.  No.

15  Q.  By 2022, your brother had been a member of United States

16  Congress for many years; right?

17  A.  Yes.

18  Q.  He was part of the United States federal government for

19  many years; right?

20  A.  Yes.

21  Q.  And, to your knowledge, before June of 2022, no police

22  officers had ever searched Robert Menendez' home, have they?

23          MR. WEITZMAN:  Objection.  Foundation.

24          THE COURT:  If she knows.

25          THE WITNESS:  I don't know.  The year I don't

O715men2                    Gonzalez - Cross

1    remember, anything, like 2022 something happened.

2    Q.   Before June 2022, to your knowledge no police officers had

3    ever searched your brother's home; correct?

4    A.   I really can't truthfully answer that.  I don't remember

5    the year.

6    Q.   Before the year 2020, had anyone ever searched his home?

7    A.   Not that I know of.

8    Q.   Now, you testified that you, about immigration issues that

9    you contacted your brother about.  Do you recall that?

10   A.   Yes.

11   Q.   And sometimes you asked your brother for help; right?

12   A.   In reference to immigration.

13           THE COURT:  You asked for help for others, not for

14   yourself, right?

15           THE WITNESS:  That's correct, sir.

16   Q.   Your brother is an important person, an important senator,

17   you would agree?

18   A.   That's what I'm told.

19   Q.   He is a busy person?

20   A.   Very busy.

21   Q.   And he directed you to his staff, right?

22   A.   Sometimes.

23           MS. POMERANTZ:  Let's pull up Defendant's Exhibit

24   1602.

25   Q.   And on January 4, you texted your brother about an

O715men2                          Gonzalez - Cross

 1    immigration issue involving a friend's niece; right?

 2    A.  Yes.

 3    Q.  You wrote:  I wonder if anyone in your office could help

 4    her.  Let me know.   Thanks.

 5         Do you see that?

 6    A.  Yes.

 7              MS. POMERANTZ:  Let's turn to the next page.

 8    Q.  Your brother responded:  Yes, Alice Lugo, my chief counsel

 9    and an immigration expert in Washington.

10         Do you see that?

11    A.  Yes.

12              MS. POMERANTZ:  Let's go to the next page.

13    Q.  You wrote:  OK.  Do I call her or should this person call

14    her.  And what's her number.  Also, will you speak to Ms. Lugo

15    first.

16         Do you see that?

17    A.  Yes.

18              MS. POMERANTZ:  Let's go to the next page.

19    Q.  Your brother responded:  Have her call Monday and send me

20    the name so I can tell Alice in advance.

21         Do you see that?

22    A.  Yes.

23    Q.  So, in this instance your brother directed you to a member

24    of his staff; right?

25    A.  In that particular instance, yes.

1  Q.  And you are not aware of your friend's niece paying your

2  brother or Nadine anything for this, are you?

3  A.  No.

4         MS. POMERANTZ:  Let's pull up Government Exhibit A142,

5  just for the witness and let's go to the second page.

6  Q.  These are messages between you and your brother?

7  A.  I can't see it.

8         MS. POMERANTZ:  We can blow those up, Ms. Wechsler.

9  A.  OK.

10  Q.  These are messages between you and your brother from

11  April 2022; right?

12  A.  Right.

13         MS. POMERANTZ:  The government offers Government

14  Exhibit A142.

15         MR. WEITZMAN:  No objection.

16         THE COURT:  Admitted, without objection.

17         (Government's Exhibit A142 received in evidence)

18         MS. POMERANTZ:  If we can publish that for the jury,

19  Ms. Wechsler?

20  BY MS. POMERANTZ:

21  Q.  Now, on April 30th, 2022, you texted your brother about a

22  neighbor's immigration problem; right?

23  A.  Right.

24  Q.  And you wrote:  She told me she has called your Newark

25  office however no one speaks Spanish.  She would like to know

O715men2                      Gonzalez - Cross

1  how to get in touch with you or your office but to be able to

2  speak to a Spanish person.  I told her I would ask you and let

3  her know.

4       Do you see that?

5  A.  Yes.

6  Q.  Let's go down to the response.  Your brother responds to

7  you:  Please only share the office number with her.

8       Do you see that?

9  A.  Yes.

10  Q.  He didn't ask you to share his personal cell phone with

11  her, correct?

12  A.  He gave me a card with a number written on it.  That's all

13  I can tell you.

14  Q.  You see here that he is telling you to share the office

15  number with her?

16  A.  That's what he said, and I'm telling you that he gave me a

17  card with a number on it.  It wasn't printed, it was

18  handwritten.  That's all I can tell you.

19  Q.  It wasn't your brother's number, right?

20  A.  I don't know.

21  Q.  Now, he didn't -- you are not aware of your neighbor paying

22  your brother or Nadine anything for this, are you?

23  A.  No.  He doesn't take cash for anything.  He does it because

24  that's what he does, he serves people.

25  Q.  I would like to focus your attention on the years 2018

O715men2                          Gonzalez - Cross

1    through 2022.  During that period you communicated with your

2    brother by text message; correct?

3    A.  Yes.

4    Q.  And you texted with him pretty frequently; right?

5    A.  Probably.

6              MS. POMERANTZ:  Let's pull up Government Exhibit A141,

7    just for the witness.

8    Q.  These are text messages between you and your brother from

9    October 2021; right?

10   A.  Uh-huh.

11             THE COURT:  You have to say yes or no.

12             THE WITNESS:  I'm sorry.  Yes.

13             MS. POMERANTZ:  The government offers Government

14   Exhibit A141.

15             MR. WEITZMAN:  No objection.

16             THE COURT:  Admitted, without objection.

17             (Government's Exhibit A141 received in evidence)

18             MS. POMERANTZ:  Let's publish this for the jury.

19   BY MS. POMERANTZ:

20   Q.  Line 3 you texted your brother:  Thank you.  But remember I

21   am a mere mortal.  Love you.  Going to buy my favorite perfume.

22   Do you see that?

23   A.  Yes.

24   Q.  Let's look at the next line?

25   A.  That was October 25, right.

O715men2                        Gonzalez - Cross

1    Q.  Yes, October 25, 2021.

2    A.  OK.

3    Q.  And he texted you back:  What is your favorite perfume?

4    Yes, we are all mere mortals but some like you are exceptional

5    mortals.

6         Do you see that?

7    A.  Yes.

8    Q.  And then let's look at the next text, you say:  Thanks.

9    You just made my day.  Bvlgari pour femme?

10        Do you see that.

11   A.  Yes.

12   Q.  You are telling your brother that Bvlgari pour femme,

13   that's your favorite perfume; right?

14   A.  Yes.

15   Q.  And your birthday is October 27?

16   A.  That's correct.

17   Q.  And this text exchange was just two days before your

18   birthday?

19   A.  That's correct.

20   Q.  And in this exchange you understood your brother was asking

21   you about your favorite perfume so he could buy it as a

22   birthday gift for you, right?

23   A.  That's correct.

24             MS. POMERANTZ:  Let's pull up Defendant's Exhibit

25   A301-1, side by side with Government Exhibit A141.

1  Q.  Now I'm going to direct your attention to Defendant's

2  Exhibit A301-1 under the large word Search.

3  A.  Can you blow it up?

4  Q.  Yes.  No problem.

5        MS. POMERANTZ:  Ms. Wechsler, blow up the first half

6  of the page?

7  Q.  Can you see that Ms. Gonzalez?

8  A.  Yes.

9  Q.  Now I'm going to direct your attention to do you see where

10  it says, about a third of the way down, it says "Search" and

11  then it says:  Search for Bvlgari pour femme.

12        Do you see that?

13  A.  Yes.

14  Q.  And that search is dated October 25, 2021?  Do you see

15  that?

16  A.  Yes.

17  Q.  That's the same date as the text that you just read between

18  you and your brother, October 25, 2021; right?

19  A.  Yes.

20  Q.  And Bvlgari pour femme, that's the same perfume that you

21  texted your brother about on that same date; right?

22  A.  Yes.

23  Q.  And you texted him, looking at A141 you texted him at

24  3:47 p.m.; right?

25  A.  Yes.

1          MS. POMERANTZ:  Let's just briefly pull up Government

2     Exhibit 1433 and let's go to paragraph 8.  And that says that

3     the parties stipulate that from local times of 2:00 a.m. on

4     March 14, 2021, through 1:59 a.m. on November 7, 2021, UTC was

5     four hours ahead of Eastern Time.

6          So, Ms. Wechsler, pull back up Government Exhibit A141

7     and Defendant's Exhibit A301-1 side by side?

8     Q.  So you would agree with me that if you subtract four hours

9     from 7:49 p.m. UTC you get 3:49 p.m.; correct?

10    A.  3:49 p.m.

11    Q.  Subtract four hours from 7:49 p.m. you will get 3:49 p.m.;

12    correct?

13    A.  More or less, yes.

14    Q.  And 3:49 p.m. is about two minutes after you texted your

15    brother:  Bvlgari pour femme.  Right?  Do you see on A141 you

16    texted:  Bvlgari pour femme, at 3:47 p.m.?

17    A.  Right, when I thanked him for it.

18    Q.  Right.  And 3:49 p.m. is about two minutes after that;

19    right?

20    A.  Yes.

21    Q.  And the search item:  Bvlgari pour femme, that's the same

22    item you texted your brother on October 25; right?

23    A.  Yes.

24    Q.  And by the way, just looking at -- we can zoom out of the

25    A301-1 -- do you see there are some searches from that day a

1    little bit earlier that say:  Sephora?

2    A.  Yes.

3    Q.  And Sephora, that's a store that sells perfume; right?

4    A.  I don't know.

5    Q.  The searches for Sephora also took place on October 25,

6    2021; right?

7    A.  Right.

8    Q.  Two days before your birthday?

9    A.  Yes.

10            MS. POMERANTZ:  And then let's go back to A141.  We

11   can take down Defendant's Exhibit A301-1.  Let's just have

12   Government Exhibit A141 up and let's look at the next text.

13   Q.  You see the next text your brother texts you:  Which pour

14   femme?  There are different ones.

15            Do you see that?

16   A.  Yes.

17   Q.  And you testified your brother is married to Nadine

18   Menendez; right?

19   A.  Yes.

20   Q.  And fair to say you do not see your brother and Nadine

21   every day; right?

22   A.  Yes.

23   Q.  You don't see them every week; right?

24   A.  Yes.

25   Q.  You were asked questions about your brother asking you to

O715men2                         Gonzalez - Cross

1  get him a few hundred dollars for him back in the '80s.  Do you

2  remember that?

3  A.  Yes.

4  Q.  He didn't ask you to put that cash back in the box; right?

5  A.  To put it back in the box?  No.

6  Q.  Right.

7  A.  He told me --

8  Q.  He took it from you, right?

9  A.  Yes.

10 Q.  In other words, he used that cash from that box in the

11 1980s; right?

12 A.  Yes.

13 Q.  And he didn't ask you to just look at the cash and then

14 leave it there; right?

15         MR. WEITZMAN:  Objection.  Asked and answered.

16 A.  I took the cash, I covered the box, I put it back, and I

17 brought the cash down.

18         MS. POMERANTZ:  One moment?

19         THE COURT:  Yes.

20         (Counsel conferring)

21 Q.  Now, Ms. Gonzalez, you have never lived at 41 Jane Drive,

22 right?

23 A.  No.

24 Q.  You didn't spend much time there either, did you?

25 A.  No.

O715men2                          Gonzalez - Cross

1    Q.   You don't know where the bills or the cash in your

2    brother's home came from; right?

3    A.   I didn't know he had money in his home.

4    Q.   You are not with your brother every time he gets a dollar;

5    right?

6    A.   No.

7    Q.   So you have never inspected serial numbers --

8    A.   No.

9    Q.   -- on dollar bills, right?  Right?

10   A.   Right.  Correct.

11   Q.   And you don't know when the bills were put into

12   circulation; right?

13   A.   No.

14   Q.   It is fair to say you are not physically with your brother

15   all the time; right?

16   A.   Not anymore.

17   Q.   You don't know about conversations he has when you are not

18   around; right?

19   A.   That's impossible to know.

20   Q.   Right.

21   A.   Yes.

22   Q.   And you haven't read his text messages with people other

23   than you; right?

24   A.   Of course.

25   Q.   You have not?

1    A.  No, I have not; yes.

2    Q.  You have never been at meetings with Egyptian officials

3    with your brother, have you?

4            MR. WEITZMAN:  Objection.  Scope.

5    A.  No.

6            THE COURT:  Sustained.

7    Q.  You have not been in the courtroom for this trial, have

8    you?

9    A.  No.

10   Q.  You have not seen the evidence or heard the witnesses

11   presented during this trial, have you?

12           MR. WEITZMAN:  Objection.

13   A.  No.

14           MR. WEITZMAN:  Scope.

15           THE COURT:  I will allow that.  She said she hasn't

16   been in the courtroom.

17           (Counsel conferring)

18   BY MS. POMERANTZ:

19   Q.  Ms. Gonzalez, it is fair to say you love your brother very

20   much; right?

21   A.  Yes.

22   Q.  And you don't want to see your brother in trouble; correct?

23   A.  Yes.

24           MS. POMERANTZ:  No further questions.

25           THE COURT:  Thank you.

O715men2                          Gonzalez - Cross

1              Mr. Weitzman, anything, sir?

2              MR. WEITZMAN:  No redirect.

3              THE COURT:  Ladies and gentlemen, let's take 10

4    minutes before our next witness.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O715men2                    Gonzalez - Cross

1              (Jury not present)

2              MR. WEITZMAN:  Your Honor, may I help her down?

3              THE COURT:  You may step down Ms. Gonzalez.  Thank

4    you.  You are dismissed.

5              (Witness excused)

6              THE COURT:  10 minutes.

7              (Recess)

8              THE COURT:  You can put your next witness on the

9    stand.

10             MR. WEITZMAN:  We are getting her right now, your

11   Honor.

12             THE COURT:  All right.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)

 2              THE COURT:  You may be seated in the courtroom.

 3              Please remain standing and speak to my deputy.

 4              Defense?

 5              MR. FEE:  Defense calls Katia Tabourian.

 6   KATIA TABOURIAN,

 7         called as a witness by the Defendant Menendez,

 8         having been duly sworn, testified as follows:

 9              THE DEPUTY CLERK:  Please state your full name and

10   spell your full name.

11              THE WITNESS:  My name is Katia Tabourian.  K-A-T-I-A,

12   last name is T, as in Tom, A-B-O-U-R-I-A-N.

13              THE COURT:  Welcome, Ms. Tabourian.

14              Your witness, Mr. Fee.

15              MR. FEE:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. FEE:

18   Q.  Good morning, Ms. Tabourian.

19   A.  Good morning.

20   Q.  Do you have a sister?

21   A.  Yes, I do.

22   Q.  What is her name?

23   A.  Nadine.

24   Q.  Who was born first and who was born second?

25   A.  My sister is born first, I am born second.
```

1    Q.  About what is the age gap between you two?

2    A.  We are 14 months apart.

3    Q.  Is Nadine your sister, currently today, married?

4    A.  Yes, she is.

5    Q.  To whom?

6    A.  Senator Menendez.

7    Q.  Prior to Senator Menendez, did Nadine have a first

8    marriage?

9    A.  Yes, she did.

10   Q.  Roughly how long was she married to her first husband

11   before Senator Menendez?

12   A.  Approximately 15 years.

13   Q.  Do you know approximately when that first marriage of

14   Nadine's came to an end?

15   A.  She was 22 when she got married, so 15 years after.

16   Q.  Was the divorce, say, within the last five years?  10 years

17   for the first marriage?  If you remember?

18   A.  Oh, no, it was -- it is probably a good 20 years.

19   Q.  So she was divorced from her first husband for quite some

20   time?

21   A.  Yes.

22   Q.  During the course of Nadine's first marriage, to your

23   knowledge, did Nadine work during that marriage?

24   A.  No, she did not.

25   Q.  Did, in that first marriage -- you don't have to say their

1   names or anything -- did Nadine have any children?

2   A.  Yes, she did.

3   Q.  How many?

4   A.  She had two kids.

5   Q.  Both with her first husband?

6   A.  Yes.

7   Q.  And are those two kids now grown-ups?

8   A.  Yes, they are.

9   Q.  After Nadine's divorce from her first husband, did you have

10  an understanding of how Nadine supported herself financially?

11  A.  Yes.

12  Q.  To your knowledge, how did Nadine support herself

13  financially after the end of her first marriage?

14  A.  So my mother passed away.  She left us money.  She was

15  getting alimony, child support.  Yeah.

16  Q.  And during that same period after the first marriage ended,

17  were you aware of Nadine having any regular employment?

18  A.  No.

19  Q.  Did there come a time in approximately 2018 when you

20  learned that Nadine was dating or otherwise involved with

21  Senator Menendez?

22  A.  Yes.

23  Q.  Can you tell us how you first learned that Nadine was

24  involved with Senator Menendez?

25  A.  She texted me.  She texted me and asked me to reach out to

1    Bob because they had broken up and she wanted me to try to

2    liaise with him and get them back together, help.  Yeah.

3    Q.  Before Nadine reaches out to you and asks for your help, do

4    you remember being aware that she was even dating the senator?

5    A.  No.

6    Q.  Do you remember roughly around what time or what was going

7    on when she reached out to you with this request?

8          THE COURT:  When was this?

9          MR. FEE:  Thank you.

10   A.  In 2018?

11         THE COURT:  Can you be more specific?  Maybe you can,

12   maybe you can't.

13   A.  Yes.  Yes, I can.  Actually it was that evening, it was

14   during the election, the senator's election, and it was the

15   night of the elections.

16   Q.  The vote?

17   A.  Sorry.

18   Q.  The vote?

19   A.  The vote.  The vote, yes.

20         THE COURT:  So, am I correct then that it would be

21   around November of 2018 that she asked you for help?

22         THE WITNESS:  Yes.  Exactly.  November '18.

23         THE COURT:  November 2018; right?  Is that what you

24   meant?

25         THE WITNESS:  Yes.

1        THE COURT:  OK.

2        THE WITNESS:  Sorry.

3   BY MR. FEE:

4   Q.  Did you have any understanding of the reason Nadine had

5   reached out to you to ask you to contact the senator?

6        MS. POMERANTZ:  Objection.  Hearsay.

7        THE COURT:  She may have an understanding.

8        Do you have an understanding as to why your sister

9   chose you to reach out?

10       THE WITNESS:  Yes, because -- well -- yes.  Because my

11  sister was in a previous relationship, in an unhealthy

12  relationship and that was creating a lot of chaos in her

13  relationship with the senator.  I think that he -- well, I know

14  that he, I think, was fed up with the previous relationship

15  constantly coming in between.

16       MS. POMERANTZ:  Objection.  Move to strike.

17       THE COURT:  I will allow it.

18  BY MR. FEE:

19  Q.  So did you end up sending, without telling me what you put

20  in the message, did you end up complying with your sister's

21  request to send a message?

22  A.  Yes, I did.

23       MS. POMERANTZ:  Your Honor, objection.  It is leading.

24       THE COURT:  It is leading.  I will allow it, though.

25  Q.  How did you send that message to Senator Menendez?

1   A.  By text message.

2   Q.  And again, what was roughly the date or the month and year

3   of when you sent that message?

4         THE COURT:  Testified to already.  Next.

5   Q.  It was around when you got the request?  I just want to

6   clarify.  You got the request, you said, in November 2018.

7   When did you send the message?

8   A.  That same day.

9   Q.  Thank you.

10        Did the senator respond?

11   A.  The senator responded the same day to me.

12         MR. FEE:  Let me put up just for the witness and the

13   parties what's been marked as DX 2022.

14   Q.  Ms. Tabourian, it is going to pop up on your screen,

15   hopefully.  Ms. Tabourian, do you recognize this as a text

16   message between Bob Menendez and your phone?

17   A.  Yes.

18   Q.  And it is dated November 6, 2018?

19   A.  Yes.

20         MR. FEE:  Your Honor, we would offer DX  -- I got the

21   number wrong -- 2202.

22        THE COURT:  Admitted, without objection.

23        (Defendant's Exhibit 2202 received in evidence)

24         MR. FEE:  If we can publish this for the jury?

25   BY MR. FEE:

O715men2                          Tabourian - Direct

1    Q.  Ms. Tabourian, what do you recognize this to be?  You don't

2    have to read it out loud but what do you recognize it to be?

3    A.  The response.

4    Q.  The response from Senator Menendez?

5            THE COURT:  Is that a response from Senator Menendez

6    to your text?  Yes or no.

7            THE WITNESS:  Yes, it is.

8    Q.  And I will just read the --

9            THE COURT:  The jury can see it.

10           MR. FEE:  There you go, let them read it.  OK.

11           THE COURT:  It is not for the truth of the matter

12   asserted therein, ladies and gentlemen.

13   BY MR. FEE:

14   Q.  Let's put that down, if folks have had enough I time, and

15   move on.

16           Ms. Tabourian, at the time you sent this message had

17   you yet met the senator in person?

18   A.  No, I had not.

19   Q.  Did there come a time when you did meet the senator face to

20   face?

21   A.  Yes.

22   Q.  Do you remember approximately when you had that first

23   meeting face to face?

24   A.  It was early 2019.

25   Q.  What sort of meeting was this?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O715men2                          Tabourian - Direct

1   A.  We had a lunch close to my home with my dad and my sister

2   and the senator, my two children, my husband, and his son from

3   a former marriage.

4   Q.  Your husband's son or the senator's?

5   A.  No, my husband's son.

6   Q.  At the time of this meeting with the senator, this lunch

7   with the senator in early 2019, did you have any understanding

8   of whether Nadine and the senator were a couple by that point?

9   A.  Yes.

10  Q.  What was your understanding?

11  A.  That they were together and we were all having lunch

12  together on the weekend.

13  Q.  Did there come a time when the senator and Nadine got

14  married?

15  A.  Yes.

16  Q.  Did you attend the wedding?

17  A.  Of course.

18  Q.  Have you had a chance to personally observe Senator

19  Menendez and Nadine interact with one another?

20  A.  Yes, I have.

21  Q.  On, fair to say, dozens of occasions?

22  A.  Of course.

23  Q.  How would you describe how Senator Menendez and Nadine

24  interact with each other?

25  A.  They are an extremely loving couple, caring couple.  He is

1  amazing.  Every time she gets up at a dinner or lunch, he'll

2  stand up.  He is like my dad, my dad is old school.  Very

3  respectful, very kind.

4          THE COURT:  Thank you.

5          Next?

6  Q.  Have you ever seen -- have you visited Senator Menendez and

7  Nadine at 41 Jane Drive?

8  A.  Yes, I have.

9  Q.  Either there or anywhere else, have you ever seen the

10 senator ring a little bell to summon Nadine?

11 A.  A what?

12         THE COURT:  Has the senator ever rung a bell in your

13 presence at 41 Jane Drive?  Yes or no.

14         THE WITNESS:  A bell?

15         THE COURT:  A bell.

16         THE WITNESS:  No.  I have never seen a bell.  I have

17 never seen a bell.

18 BY MR. FEE:

19 Q.  You have never seen a bell at 41 Jane Drive?

20 A.  I have never seen a bell.

21 Q.  Are you familiar with something called -- well, let me ask

22 it a different way.

23     Has it ever come to your attention that Senator Menendez

24 and Nadine sometimes use what is called the Find My iPhone

25 feature?

1              MS. POMERANTZ:  Objection.  Leading.

2              THE COURT:  It is, but I will allow it.

3              THE WITNESS:  Yes.

4    Q.  How did you become aware of that?

5    A.  She told me.

6    Q.  And what, if anything, did she tell you about the use of

7    that feature?

8              THE COURT:  Sustained.

9    Q.  What is your understanding of the reason that Bob -- or

10   Senator Menendez -- and Nadine, had used the Find My iPhone

11   feature?

12             MS. POMERANTZ:  Calls for hearsay.

13             THE COURT:  No.  Her understanding.  I will allow it.

14             Do you have an understanding as to why that Find My

15   iPhone feature was being used?

16             THE WITNESS:  Yes, I do.  She was afraid.  She was

17   afraid of her previous relationship.

18             THE COURT:  Thank you.  Next question.

19             MR. FEE:  Let's put up Government Exhibit 1F-1002.

20   Q.  Do you recognize this home?

21   A.  Yes, I do.  That's my sister's home.

22   Q.  And you have spent time at this location?

23   A.  Sure.

24   Q.  What is the address?

25   A.  41 Jane Drive, Englewood Cliffs, New Jersey.

1  Q.  Thank you.

2  A.  07636.

3  Q.  I was about to say that.

4      Do you have any idea approximately how long Nadine, whether

5  putting aside anyone else with her, approximately how long

6  Nadine has resided at 41 Jane Drive?

7  A.  Yes.  Her and her former husband bought this house when her

8  son turned 1 years old.

9  Q.  Any idea about how long ago that was?

10         THE COURT:  How old is her son now?

11         THE WITNESS:  27; so 26 years ago.

12 Q.  Thank you.

13     Do you know who owns the house now?

14 A.  My sister.

15 Q.  And you said she first lived there with her first husband

16 and one of her children.  Did she stay at 41 Jane Drive

17 throughout that first marriage, if you know?

18 A.  Yes, she did, but she lived there with two children.

19 Q.  Got it.

20 A.  Not one.

21 Q.  Thank you.

22     Did you also visit Nadine at 41 Jane Drive during the

23 period after her divorce from her first husband?

24 A.  Yes, I have.

25 Q.  So any sense of roughly how many times you have been over

1   to that house with Nadine?

2   A.  Multiple times for holidays, for visits.

3   Q.  Have you, during those visits, had a chance to see Nadine's

4   bedroom, the master bedroom?

5   A.  Sure.

6           MR. FEE:  Let's put up what is in evidence Government

7   Exhibit 1F-1014.

8   Q.  Do you recognize this, Ms. Tabourian?

9   A.  Yes.  It is her bedroom.

10          MR. FEE:  Let's put up Government Exhibit 1F-1015.

11  Q.  Do you recognize this as well?

12  A.  Yes.  It is her bedroom.

13  Q.  Now, the exercise equipment here, have you seen exercise

14  equipment in that bedroom when you've been in the home?

15  A.  She's always had an exercise bike.

16  Q.  And do you mean this particular exercise thing or have

17  there been others in the past that you have witnessed?

18  A.  I don't know exactly if it is this one but she's always had

19  something that looks like this.

20  Q.  When you say always, what do you mean?

21  A.  She's had it for years, she's had a thing, a bike, exercise

22  bike for years.

23  Q.  Even before she was dating Senator Menendez?

24  A.  Oh yes.

25          MR. FEE:  Let's put up what is in evidence as

1    Government Exhibit 1F-1017.

2              THE COURT:  The picture that was just up, it was

3    referred to both as the master bedroom and Nadine's bedroom.

4    Do you know if it is used by both Mr. and Mrs. Menendez?

5              THE WITNESS:  Yes, it is.

6              THE COURT:  Thank you.

7    Q.  Meaning that they both sleep in that bedroom?

8    A.  Yes.

9    Q.  Let's look at these closets in Government Exhibit 1F-1017.

10   Let me ask you this.  The doors are open -- there are two doors

11   to closets open in this photo.  Have you ever seen the inside

12   of either of those two closets?

13   A.  Yes, I have.

14   Q.  Which one?  Or both?

15   A.  I have seen both.

16   Q.  Just focusing in on the right, the open closet door on the

17   right, you have seen the inside of that closet before?

18   A.  Yes, I have.

19   Q.  Can you tell me how you have come to see inside that

20   closet?  Did you open the door yourself?

21   A.  No.  Like, for example, if I am at her house and she's

22   getting dressed to go out, she opens it to get dressed, to --

23   she keeps her jewelry in there.  She -- yeah.  I mean, she

24   opens it and gets dressed.  I don't know; shoes, clothes.

25   Q.  When you say she -- I'm sorry.

O715men2                         Tabourian - Direct

1        When you say "she" you mean Nadine?

2   A.   Yes.

3   Q.   How did you observe, if at all, Nadine open this particular

4   closet?

5   A.   What do you mean?

6   Q.   Was it locked or unlocked?

7   A.   Oh, it's always locked.  It's locked.

8   Q.   And when you say it's always locked, how did you see Nadine

9   open it?  Did she use something?

10  A.   With a key.

11  Q.   And this key, do you have any understanding of whether this

12  key was left out somewhere in the house or whether it was on

13  Nadine's person?  Whether Nadine was holding this key?

14  A.   No, she holds on to the key but I can tell you why.

15  Q.   Go ahead.

16        MS. POMERANTZ:  Objection.  Hearsay.

17        THE COURT:  I will allow it.

18        Why does she keep it on herself, on her person?

19        THE WITNESS:  Your Honor, two reasons.  The one, if

20  you look at the door, the handle, it is a very hold handle.  It

21  does not close all the way.  Right?  So one of the old doors

22  that you try to open and it kind of opens by itself, it doesn't

23  close.  But the main reason you will see she has her own lock

24  on there is because previously she had a nanny when her kids

25  were little and the nanny has stolen from her and that's why

1  she put that on there.  And, she stole a good amount.

2  BY MR. FEE:

3  Q.  You said this incident with the nanny occurred when the

4  kids were little?

5  A.  Yes.

6  Q.  So any idea of roughly how many years ago that happened?

7  A.  So she got a nanny when her son was 1 years old and her

8  daughter was probably 3 years old.

9  Q.  So -- sorry.

10  A.  So, 26 years ago.

11  Q.  And since that incident, just based on your observations,

12  Ms. Tabourian, what has been Nadine's practice with respect to

13  keeping that closet locked?

14  A.  It's always locked.

15  Q.  Have you, just in your observations, ever seen Nadine share

16  that key with anyone else?

17  A.  No.

18  Q.  Her first husband?

19  A.  No.

20  Q.  You?

21  A.  It's her closet.  It is nothing but her stuff in there.

22  Q.  Let's talk about that.  How many times, if you can

23  estimate, do you think you have seen inside this particular

24  closet?

25  A.  Several times.

O715men2                              Tabourian - Direct

1    Q.  More than 10?  Less than 10?  If you are able to say.

2    A.  I will say 10.

3    Q.  What have you seen inside that closet?

4    A.  Well, she keeps her nice clothes in there, her bags, her

5    designer bags, designer shoes.  She keeps her jewelry in there,

6    she keeps her valuables in there.  And her nanny, that nanny,

7    she stole money from there.

8    Q.  Just to give us a sense of a time period --

9              THE COURT:  Well, did the nanny steal money or did the

10   Nanny steal designer bags and shoes and jewelry?

11             THE WITNESS:  No, the nanny -- sorry.

12             THE COURT:  Go ahead.

13             THE WITNESS:  The nanny stole money.

14   BY MR. FEE:

15   Q.  Just to give us a sense of time period, do you think you

16   have seen the inside of this closet, say, since the time that

17   Senator Menendez and Nadine got married?

18   A.  Yeah, I would say.

19   Q.  And just so I am clear, when I am asking about your

20   observations of the closet, have you done exhaustive searches

21   of the closet?

22             MS. POMERANTZ:  Objection.

23             THE COURT:  I will allow it.

24   A.  No.

25   Q.  You said valuables.  What sorts of valuables do you recall

O715men2                         Tabourian - Direct

1    seeing inside of that closet on the occasions you had a chance

2    to look inside?

3    A.  Her jewelry, money, cash, silver coins, gold coins.

4    Q.  You said you saw cash.  Do you have any idea how much cash?

5    A.  No.

6           MR. FEE:  If we can pull up what's in evidence as

7    Government Exhibit 1F-1020, please?  And if we can zoom in

8    there is a patch of carpet with gold necklace and to the black

9    box?  Yes.

10   Q.  Do you see this object that I am circling -- you may not

11   see that.  Do you see the gold necklace on the floor?

12   A.  Yes, I do.

13   Q.  If you move to the right there is a rectangular black

14   object?

15   A.  Yes, I do.  I see a safe.

16   Q.  Have you seen that safe in the closet before?

17   A.  I have seen a safe in the closet before.

18   Q.  Meaning you have seen a safe.  You are not a hundred

19   percent sure if it was that safe?

20   A.  No, I can't tell that.

21   Q.  Of course --

22   A.  I have a safe in my home.

23   Q.  Why?

24          MS. POMERANTZ:  Objection.

25          THE COURT:  Sustained.  Sustained.

1  Q.  Have you seen a safe in Nadine's closets -- let me ask it a

2  different way.

3      When, if you can estimate, do you think you first saw a

4  safe in this closet in Nadine's bedroom at 41 Jane Drive?

5  A.  When she first moved into that home.

6  Q.  And based on your observations, has she had a safe in that

7  closet ever since?

8  A.  Yes.

9  Q.  Do you have any understanding of what she keeps in that

10 safe in her closet?

11         MS. POMERANTZ:  Objection.

12         THE COURT:  I will allow it.  She may have an

13 understanding.

14         THE WITNESS:  She keeps money, cash.  She keeps her

15 jewelry.  She keeps gifts that were given to her by family.

16 Q.  And you said you also keep a safe in your own home?

17 A.  Yes, I do.

18         MS. POMERANTZ:  Objection.

19         THE COURT:  Sustained.  The jury will disregard.

20 Q.  So, let me just show you some other pictures that have been

21 admitted, Ms. Tabourian.  Government Exhibit 1F-1125 and 1126,

22 we can put them side by side.  I'm not going to ask you if you

23 recognize this, I just want to direct your attention to 1126,

24 the picture on the right.

25         MR. FEE:  Mr. Kelly, if we can zoom in on some of

1   these objects inside?

2   Q.  Do you see a couple of what looks like boxes here or three

3   boxes here?

4   A.  Yes.

5   Q.  Let's go to another admitted exhibit and there is this

6   glass thing, it is like a --

7   A.  It is a ring holder.

8   Q.  Thank you.  Do you recognize that ring holder?

9   A.  Yes, I do.

10  Q.  How do you recognize it?

11          THE COURT:  I'm sorry.  What are you looking at?

12          MR. FEE:  The ring holder, your Honor.

13          THE COURT:  Ms. Tabourian, what are you looking at?

14          THE WITNESS:  I'm looking at this crystal square with

15  a stick.

16          THE COURT:  Somebody put a red box.

17          THE WITNESS:  Yes, that's it.

18          THE COURT:  OK.  I now see it.  Thank you.

19          MR. FEE:  Let's put up Government Exhibit 1F-1129.

20  And maybe just tighten up on the objects laid out?

21  BY MR. FEE:

22  Q.  You see that same ring holder here, Ms. Tabourian?

23  A.  Yes.

24  Q.  And if we can just focus in on the gold bars in the top?

25  Yes, there you go.  So, one of those gold bars says:  1 kilo.

1    Do you see that where it says:  1 kilo?

2    A.  Uh-huh.

3            THE COURT:  You have to say yes or no.

4            THE WITNESS:  I'm sorry.  Yes.  I'm sorry.

5    Q.  Have you ever seen a 1 kilo bar at 41 Jane Drive -- 1 kilo

6    gold bar at 41 Jane Drive?

7    A.  I have.

8    Q.  Do you know when you have seen it?

9    A.  Years and years ago.

10   Q.  What about these smaller things that appear to be gold.  Do

11   you recognize what those are?

12   A.  Yes.

13   Q.  What are those?

14   A.  Those are tiny gold bars.

15   Q.  Do you have any idea of -- we call the big one a 1 kilo, do

16   you know what the weight?

17   A.  I believe they're one ounce.

18   Q.  Have you ever seen whether or not there are these

19   particular ones, have you ever seen any one-ounce gold bars

20   with Nadine's possessions at 41 Jane Drive?

21   A.  Yes, I have.

22   Q.  Do you have any sense of approximately when you might have

23   seen them?

24   A.  Many years ago.  And I have these tiny gold bars because

25   these are gift --

O715men2                          Tabourian - Direct

1          MS. POMERANTZ:  Objection.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  Yes.  There is no question.

4          THE WITNESS:  Sorry.

5          MS. POMERANTZ:  Move to strike, your Honor.

6          THE COURT:  Yes.  The jury will disregard.

7          MR. FEE:  We can zoom out again, Mr. Kelly.

8   BY MR. FEE:

9   Q.  Ms. Tabourian, do you recognize, focusing on a white plate

10  with jewelry in it?

11  A.  Yes.

12  Q.  Do you recognize any of this jewelry?

13  A.  Yes, I do.

14  Q.  How do you recognize it?

15  A.  A lot of this jewelry -- well, some of this jewelry is my

16  sister's and some is my mom's.

17  Q.  When you say some is your mom's, what do you mean?

18  A.  Some jewelry that my mother gave to her; like some to her,

19  some to me.

20  Q.  Understood.

21  A.  And her husband gave her those earrings with the ruby in

22  it, they had that made in Lebanon.

23  Q.  This thing?  Can you see when I circle it in red?  Or no.

24          THE COURT:  No.

25  A.  I don't see it.

1    Q.  When you say "the ruby" you mean the circle?

2    A.  Yes.  That one.

3    Q.  And when you say her husband?

4    A.  Her ex-husband.

5    Q.  Her first husband.

6        We can zoom out.

7        Do you see this box with one, two, three, four, five -- six

8    sides on the top left?

9    A.  Yes.

10           MR. FEE:  Let's go to Government Exhibit 1F-1204 and

11   1205 side by side?

12   Q.  Other than this photo, have you seen this box in Nadine's

13   home at 41 Jane Drive?

14   A.  Yes, I have.

15           MS. POMERANTZ:  Objection, your Honor; to the

16   characterizations.

17           THE COURT:  I will allow it.

18   Q.  Have you previously, outside of these photos, seen the

19   inside of this box?

20   A.  I don't know, but I know what's inside.

21   Q.  Just focusing on the photo on the right, the jewelry, any

22   of that jewelry from this photo strike you as familiar?

23   A.  Yes.

24   Q.  What?

25   A.  The bracelets are from Lebanon.

1   Q.  How do you know that?

2   A.  Because I was there with her, my whole family was there.

3   People buy jewelry in Lebanon.

4   Q.  Anything else here that you recognize?

5   A.  Yeah.  The ring, I have seen her wear that ring, the cash.

6   Gold bar.

7   Q.  Cash is cash.

8   A.  Yes.

9   Q.  Let's go to Government Exhibit 1F-1206.  How about these?

10  Do any of these items, again just from the visual, strike you

11  as familiar?

12  A.  Yes.

13  Q.  What?

14  A.  Most everything.  The three tri-color bracelets are from

15  Beirut, Lebanon.  They're from a jeweler called Tufenkjian.

16  The purple ring, which I love it, with the beads with the

17  diamonds, is bought from London Jewelers in the Hamptons, in

18  New York.  The two big bangles on the bottom right-hand side,

19  those are from Beirut, Lebanon, as well.  The earrings are --

20  they are also from Lebanon, they had these made, her and her

21  previous ex-husband, they are -- Zolatos is the designer.

22          MR. FEE:  Let's go back very quickly to 1129.

23  Mr. Kelly, if you can highlight with a red circle or box around

24  the blue box with the gold braid peeking out of the front end?

25  Q.  Ms. Tabourian, do you have any idea if you have seen that

1   box in 41 Jane Drive previously?

2   A.  Those boxes are jewelry boxes.  Yes, I have seen them in 41

3   Jane Drive and I have the same boxes.

4         MS. POMERANTZ:  Your Honor, objection.

5         THE COURT:  Yes.  What you have or don't have is not

6   at issue in this trial.

7         THE WITNESS:  Sorry.

8         THE COURT:  Just try to answer the question.

9   BY MR. FEE:

10  Q.  Let me ask this.  Do you have any understanding of how

11  Nadine acquired those boxes?

12  A.  Yes.  They are bought in London.

13  Q.  Were you with her when she bought them?

14  A.  My grandmother, she visited --

15        THE COURT:  Were you with her?  Yes or no.

16        THE WITNESS:  Oh, no.

17        THE COURT:  Next question.

18  Q.  Do you have any understanding of how they were obtained by

19  Nadine?

20        MS. POMERANTZ:  Objection.

21        THE COURT:  Sustained.

22  Q.  Do you have these same boxes?

23        MS. POMERANTZ:  Objection.

24        THE COURT:  Sustained.

25        MR. FEE:  Let's go to 1F-1183-84.  Those two.  I'm

1   sorry.  1183 and 1184 side by side.  If you could, Mr. Kelly,

2   zoom in on the box itself?

3   Q.  Do you see that same gold loop on the bottom left there?

4   A.  Yes, I do.

5   Q.  Just focusing on the right, 1184, if we can zoom in on --

6   that's fine.

7       Do you recognize this blue rectangular piece that says

8   "Greece" on it?

9   A.  Yes, I do.

10  Q.  How do you recognize that?  Have you seen that before?

11  A.  Yes.

12  Q.  Where have you seen that?

13  A.  In her house.

14  Q.  When you say in her house, you mean Nadine's house at 41

15  Jane Drive?

16  A.  Yes.

17          MS. POMERANTZ:  Objection.

18          THE COURT:  I will allow it.

19          MR. FEE:  Just the handwritten note that is right

20  there, you can zoom in on that, Mr. Kelly.

21  A.  Yes.

22  Q.  Ms. Tabourian, do you recognize the handwriting there?

23  A.  Yes.  That's my sister's handwriting.

24  Q.  Have you seen this particular note before?

25  A.  No.

O715men2                          Tabourian - Direct

1  Q.  In your experience does your sister, what, if any practice,

2  does she have making lists of her valuables?

3  A.  My sister makes lists of everything.  When she first got

4  married --

5          THE COURT:  She makes lists of everything.  Thank you.

6          Next?

7          THE WITNESS:  Oh.

8          MR. FEE:  You can put that down.

9  Q.  In your visits to 41 Jane Drive since Nadine and Senator

10 Menendez have married, have you had a chance to observe any of

11 Senator Menendez' clothing inside 41 Jane Drive?

12         MS. POMERANTZ:  Objection.  Foundation.

13         THE COURT:  I will allow it.  I'm sorry.  What was the

14 objection?

15         MS. POMERANTZ:  Foundation.

16         THE COURT:  I will allow it.

17 Q.  Did you hear the question?

18 A.  Can you rephrase it?

19         THE COURT:  Have you seen Mr. Menendez' clothing in 41

20 Jane Drive?

21 A.  Yes, I have.

22 Q.  Have you ever seen any of it inside of that closet we have

23 just discussed with the safe in it?

24 A.  Her closet?

25 Q.  Yes.

O715men2                         Tabourian - Direct

1   A.   No.

2   Q.   Let me put up what is in evidence as Defendant's Exhibit --

3            THE COURT:   Are the only things in her closet her

4   clothes and jewelry?

5            THE WITNESS:   Yes.

6            THE COURT:   No one else's?

7            THE WITNESS:   Nobody.   That's her closet.   Always has

8   been.

9            MR. FEE:   129 in evidence.   Is this zoomed in?   Or

10  that's it?   OK.   You don't have to zoom in Mr. Kelly.   Thank

11  you.   I'm sorry about that.

12  Q.   Ms. Tabourian, do you recognize what is depicted in this

13  photograph?

14  A.   Mens shirts.

15  Q.   Do you recognize where this is, this location?

16  A.   Yes.   This is her daughter's room.

17  Q.   When you say her daughter's room, what do you mean?

18  A.   Her bedroom.

19  Q.   Do you mean Nadine's daughter's room?

20  A.   Yes.

21  Q.   Where?

22  A.   At 41 Jane Drive.

23  Q.   Thank you.

24      Have you actually seen these mens shirts at 41 Jane Drive

25  yourself?

1   A.  Yes, I have.

2   Q.  When you saw these mens shirts, where were they located at

3   41 Jane Drive?

4   A.  In her daughter's bedroom's closet.

5   Q.  Did you have an understanding of why these mens shirts were

6   in the closet for Nadine's daughter?

7           MS. POMERANTZ:  Objection.  Hearsay.  It calls for

8   hearsay.

9           THE COURT:  I will allow it.

10          Do you know why they are there?

11          THE WITNESS:  Because that's Senator Menendez' closet.

12  My sister doesn't have room in her closet for that.

13  Q.  The daughter's whose room that used to be, does she still

14  live there?

15  A.  No, she does not.

16  Q.  Let's put up DX 130.  Have you seen the ties and belts

17  depicted in this image at any time at 41 Jane Drive?

18  A.  Yes, I have.

19  Q.  And where have you come to see them?

20  A.  This is her son's bedroom closet.

21  Q.  When you say her son's --

22          THE COURT:  Nadine's son's closet.

23  Q.  So this is a different bedroom than the bedroom where

24  Nadine's closet safe is located?

25  A.  Yes, and he doesn't live there either.

O715men2                        Tabourian - Direct

1          MS. POMERANTZ:  Your Honor, we object to the

2     characterization and commentary in how Mr. Fee is asking the

3     questions.

4          THE COURT:  Sir, try not to lead.  Go ahead.

5          MR. FEE:  Yes.

6          THE COURT:  And eliminate the comments.  Proceed.

7          MR. FEE:  I want to clarify, your Honor.  I'm not

8     leading.

9     Q.  When you say he doesn't live there anymore, what do you

10    mean?

11    A.  Nadine's son does not live at 41 Jane Drive.

12    Q.  Thank you.

13         Let me ask you first what, if any understanding, do you

14    have of whether the senator has an office at 41 Jane Drive?

15    A.  Yes, he does have an office.

16    Q.  Have you yourself been in the room that you are referring

17    to as the office?

18    A.  Yes, I have.

19         MR. FEE:  Let's put up Government Exhibit 1F-1092.

20    Q.  Ms. Tabourian what is this?

21    A.  That's his office.

22    Q.  And have you ever seen Nadine in this room?

23    A.  When I was there and we go talk to him, yeah, we go down to

24    here.

25    Q.  Have you ever seen Nadine in this room at a time when the

O715men2                          Tabourian - Direct

1   senator was not there?

2   A.  No.  We never went.  No.

3           THE COURT:  You know that you have never been there

4   with her alone?  Is that what you are saying?

5           THE WITNESS:  When I'm there --

6           THE COURT:  No.  Are you saying that you know you have

7   never been there with her alone?  Yes or no.

8           THE WITNESS:  That I've never been there.

9           THE COURT:  I'm sorry.

10          THE WITNESS:  I'm sorry.

11          THE COURT:  That's all right.  No, no.  We will step

12  back.  I believe you said a moment ago that the only times you

13  have been there in that room are when Senator Menendez is

14  there.  Is that your testimony?

15          THE WITNESS:  Yes.

16          THE COURT:  OK.

17  Q.  Let's put up Government Exhibit 1F-1093.  Do you recognize

18  what is depicted in this photo, Ms. Tabourian?

19  A.  So this is, again, Senator Menendez' office that leads to

20  the basement where there is like a washer, dryer.

21  Q.  I'm sorry.

22  A.  No.  You have to go through this place to go do your

23  laundry.

24  Q.  So this is my question.  You said it.  Can you use words to

25  describe how you get from this room to the place where you do

1  laundry?  Like what do you see in this photo that shows the

2  pathway?

3  A.  So the white doors, right in the center there is white

4  doors that are open.  If you go straight there is the laundry

5  machine, dryer, and storage.

6  Q.  And if you know, these stairs that you see on the right

7  side of this photo?

8  A.  Yes.

9  Q.  To where do those lead?

10 A.  They had lead up to the living room and the kitchen.

11          MR. FEE:  Mr. Kelly, if we can zoom in on the chair on

12 the left side?

13 Q.  Just focusing your attention, Ms. Tabourian, on the two, or

14 I don't know if there is one or two black objects on that

15 chair, do you recall ever seeing those before?

16 A.  I have never paid attention.  I don't know.  No, I don't

17 know.  No.

18          MR. FEE:  You can put that down.  I'm going to show

19 you a series of photos that are not yet in, so just for the

20 witness and the parties.  Let's start with 2145 and zoom in.

21 Q.  Do you recognize that person?

22 A.  Yes.

23          (Continued on next page)

24

25

O71Wmen3                         Tabourian - Direct

1    BY MR. FEE:

2    Q.  Who is that?

3    A.  It's my sister's son.

4    Q.  And this is him at roughly what age?  If you know.

5    A.  I don't know.  In his 20s -- well, he's in his 20s.

6    Maybe -- I don't know -- 18, 21, 23.  I don't know.

7    Q.  Got it.  And do you see him wearing a tie in that photo?

8    A.  Yes.

9    Q.  And just focusing you on the belt buckle, can you see it?

10   A.  Yes, it's an Hermés belt buckle.

11           MR. FEE:  We'll offer this, your Honor.

12           THE COURT:  Admitted, without objection.

13           (Defendant's Exhibit 2145 received in evidence)

14           THE COURT:  You can tell that that belt buckle is an

15   Hermés belt buckle?

16           THE WITNESS:  Yeah.

17           THE COURT:  OK.

18           MR. FEE:  2152, 2151.  You can put up two at a time.

19           THE WITNESS:  And that's an Hermés tie if I'm not

20   mistaken.

21   BY MR. FEE:

22   Q.  And you recognize the same person and the same buckle

23   depicted here, to the best of your ability?

24   A.  Yes.

25           MR. FEE:  2144 and 2150.

O71Wmen3                          Tabourian - Direct

1   Q.  Do you recognize the person depicted here?

2   A.  Yes.

3           MR. FEE:  2143 and '42, please.

4   Q.  Same question, Ms. Tabourian.  Do you recognize the person

5   depicted here?

6   A.  Yes.

7           MR. FEE:  Your Honor, we would offer 2142 through '44

8   and 2150 through '53.

9           THE COURT:  Admitted, without objection.

10          MS. POMERANTZ:  Your Honor, I would like brief voir

11  dire.

12          THE COURT:  Yes, sure.

13  VOIR DIRE EXAMINATION

14  BY MS. POMERANTZ:

15  Q.  Ms. Tabourian, you were just shown a series of photographs?

16  A.  Yes.

17  Q.  Do you know when these photographs were taken?

18  A.  No, not exactly.

19  Q.  Do you know if they were taken prior to the charges in this

20  case?

21  A.  I believe so, yes.

22          THE COURT:  Well, why do you say that?

23          THE WITNESS:  Because he's so young.

24          THE COURT:  Well, you can't tell the age.

25          THE WITNESS:  And he's --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    THE COURT:  I just have up before me 2143 and 2142.

2    You can't see the age of the person there, correct?

3    THE WITNESS:  I know his build.

4    THE COURT:  So you know --

5    THE WITNESS:  And he has --

6    THE COURT:  I'm sorry.  Go ahead.

7    THE WITNESS:  And he hasn't been home.  This is home.

8    He doesn't live in New York.

9    MS. POMERANTZ:  Your Honor, we would object to the

10   photographs where there's no face.

11   THE WITNESS:  Well, the previous one had a mole, the

12   face with a mole, and I know his mole on his face.

13   THE COURT:  Yes.  The ones I see up, 2143 and 2142,

14   what is that on the left?

15   MR. FEE:  That one's already in, your Honor, '45.

16   THE COURT:  21 -- the two that I have up --

17   MR. FEE:  OK.

18   THE COURT:  -- are excluded.

19   MR. FEE:  Are what?

20   THE COURT:  Excluded.  There's no face there.  We

21   don't know anything about --

22   MR. FEE:  Well, if we could put up 2143.

23   Q.  Do you recognize the location where that photo was taken,

24   Ms. Tabourian?

25   A.  Yes, that's my sister's home.

1   Q.  How do you know that?

2   A.  Because I know her house.

3   Q.  What's that object hanging down in the back, over his right

4   shoulder in the left of the photo?

5   A.  It's called -- keeps the evil eye away.

6           MR. FEE:  I think that establishes the place, your

7   Honor.

8           MS. POMERANTZ:  Your Honor, it's not the question of

9   place.  It's a question of timing.

10           MR. FEE:  She's testified about timing, your Honor.  I

11   think it's sufficient.

12           THE COURT:  Just a moment.

13           What is your testimony as to when these pictures were

14   taken?

15           THE WITNESS:  A long time ago.

16           THE COURT:  Why do you say that?

17           THE WITNESS:  Because he's home.  I can tell his

18   structure, his body structure.

19           THE COURT:  Do you know that the young man has not --

20   when was the last time he was home?

21           THE WITNESS:  Uh --

22           THE COURT:  Is he still in college?

23           THE WITNESS:  No, he's not.

24           THE COURT:  What does he do?  Where is he located?

25   Where does he live?

1          THE WITNESS:  He lives in Miami.

2          THE COURT:  OK.  I assume he comes home.  I shouldn't

3  assume.  Does he come home periodically or visit his mother?

4          THE WITNESS:  Not very often.  The holidays.

5          THE COURT:  He comes home for the holidays.

6          THE WITNESS:  For Christmas.

7          THE COURT:  OK.  I take it then that he's been at home

8  during Christmas the past couple of years.

9          THE WITNESS:  No, actually not last Christmas.

10         THE COURT:  The year before?

11         THE WITNESS:  Maybe.  He doesn't even dress like this

12  anymore.

13         THE COURT:  He doesn't wear shirts and ties anymore?

14         THE WITNESS:  No.  Not in Miami.

15         THE COURT:  I'll allow them in.  It will be up to the

16  lawyers to argue as to time and place.

17         (Defendant's Exhibits 2142 through 2144 and 2150

18  through 2153 received in evidence)

19         MR. FEE:  Let's put those down.

20  Q.  Ms. Tabourian --

21         MR. FEE:  Oh, I'm sorry.  Can we publish what's been

22  admitted as 2145.  Zoom in.

23  Q.  -- this is Nadine's son?

24         THE COURT:  She's testified to that.

25         MR. FEE:  Yes, your Honor.  And just for the jury -- I

1    won't ask any questions -- 2143 and 2142.

2              Let's go to 2142.  OK.  We can put that down.

3              THE COURT:  I'm sorry.  Is that the entire picture?

4              MR. FEE:  That is, your Honor.

5              THE COURT:  Do you have an understanding as to why

6    somebody would take a picture of a man's shirt and tie but not

7    his face?

8              THE WITNESS:  Me?

9              THE COURT:  Yes.

10             THE WITNESS:  No, I don't know.

11             THE COURT:  All right.

12             MR. FEE:  We can put these down, Mr. Kelly.

13   Q.  Ms. Tabourian, at any point, did there come a time when

14   Nadine discussed with you that she was having trouble paying

15   her bills?

16   A.  Never.

17   Q.  Did she ever raise a concern with you about her checks

18   bouncing?

19   A.  Never.

20   Q.  Well, let me ask you, do you remember in 2018 a time where

21   she raised that concern, about checks?

22             MS. POMERANTZ:  Objection.  Leading.

23             THE COURT:  Yes.  Sustained.

24   BY MR. FEE:

25   Q.  Do you remember any such discussion?

1    A.  No.

2              MR. FEE:  Let me put up just for the witness and the

3    parties Defense Exhibit 2194.  Let's focus in on this.

4              Don't say anything about this, Ms. Tabourian.  Just

5    read it and tell me when you have had a chance to read it.

6    Q.  Have you had a chance to review it?

7    A.  Yes.

8    Q.  My only question, which is a yes-or-no question, is does

9    this refresh your recollection that at some point Nadine raised

10   with you an issue about her checks bouncing?

11             THE COURT:  The issue is not what's on that document.

12             MR. FEE:  Right.

13             THE COURT:  Does it refresh your recollection?

14             THE WITNESS:  Just by reading this --

15             THE COURT:  No, not by --

16   A.  No.

17             THE COURT:  OK.

18             THE WITNESS:  No.

19             MR. FEE:  Got it.

20             Let's put it down.

21   Q.  Did Nadine at any point ask you for help financially?

22   A.  Never.

23   Q.  Did she ever ask for your assistance co-signing a loan?

24   A.  Yes.

25   Q.  Approximately when did she make that request to you, if you

O71Wmen3                          Tabourian - Direct

1   remember?

2   A.  A few years ago.

3   Q.  OK.

4   A.  Two, three, somewheres.

5   Q.  Just try to speak up so the court reporter can hear you.

6   A.  Sorry.  A few years ago, maybe like two, three summers ago,

7   three summers, four summers.

8   Q.  What, if anything, did she ask you to do?

9   A.  She asked me to co-sign so -- on her home, and the reason

10  I -- do you want me to say the reason why?

11          THE COURT:  No, no.

12          THE WITNESS:  OK.

13          THE COURT:  The question was what did she ask you to

14  do, and you just said she asked me to co-sign on her home.  Is

15  that correct?

16          THE WITNESS:  Yes.  That's correct.

17          THE COURT:  OK.  Next question.

18  BY MR. FEE:

19  Q.  What do you mean when you said she asked you to co-sign on

20  her home?

21  A.  So, she -- she was going to -- if she defaulted on

22  payments, then, because she didn't have an income coming in, so

23  you need somebody to be able to make payments.  Right?  Like --

24  OK.  Sorry.

25  Q.  Just your understanding of what she asked you to do.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   That's all I'm asking for, is your understanding, if you have

2   one.

3   A.   Yeah.  She asked me to co-sign because she wanted to take a

4   loan.  I -- I -- I don't -- yeah.

5   Q.   Let me ask this.

6   A.   And she didn't make income so they need a co-signer, and I

7   was a co-signer.

8   Q.   Did you end up actually co-signing on a loan?

9   A.   No.

10  Q.   During your discussions with Nadine about this request,

11  what, if anything, did she say to you about asking Senator

12  Menendez for help with co-signing a loan?

13           MS. POMERANTZ:  Objection.

14           THE COURT:  Sustained.

15  BY MR. FEE:

16  Q.   A yes-or-no question.  During these discussions -- I'm

17  asking.  Sorry.  He sustained.

18       During your discussions with Nadine about the co-signing of

19  a loan that you just testified about --

20  A.   Uh-huh.

21  Q.   -- did Senator Menendez come up at all?

22  A.   No.

23  Q.   Did you ever share with Senator Menendez that Nadine had

24  made this request to you?

25  A.   No.  Why would I?

O71Wmen3                         Tabourian - Direct

1    Q.  What, if anything, caused you to decide not to share that

2    with Senator Menendez?

3            MS. POMERANTZ:  Objection.

4            THE COURT:  Sustained.

5    BY MR. FEE:

6    Q.  In your experience, did Nadine discuss as a regular matter

7    having financial difficulties?

8    A.  No.

9            MS. POMERANTZ:  Objection.

10           THE COURT:  With her?

11           MR. FEE:  With her.

12   Q.  With you.

13           THE COURT:  I'll allow that.

14   A.  No.

15   Q.  And what, if any, understanding did you have as to why she

16   did not discuss those difficulties?

17           THE COURT:  Sustained.

18   BY MR. FEE:

19   Q.  Did Nadine -- what, if anything, has Nadine ever said to

20   you about asking for help to pay for a new car for Nadine?

21   A.  Nothing.

22   Q.  Are you aware whether Nadine ever sought or received help

23   from your father to pay for a car?

24           MS. POMERANTZ:  Objection.  Hearsay.  Calls for

25   hearsay, and the understanding would be based on hearsay.

O71Wmen3                    Tabourian - Direct

1          THE COURT:  Sustained.

2          MR. FEE:  Your Honor, it's not for the truth.

3          THE COURT:  Sustained.

4          MR. FEE:  Let's back up.

5   Q.  Can you tell us where you and Nadine were born?

6   A.  We were born in Beirut, Lebanon.

7   Q.  And with whom did you live in Lebanon in the early years?

8   A.  With my parents.

9   Q.  Were your parents originally from Lebanon?

10  A.  My father, yes.  My mother lived in Cyprus, and her family

11  moved to Lebanon.

12  Q.  OK.

13  A.  But I mean the grand -- their parents are not originally

14  from Lebanon.

15  Q.  All right.  Does any part of your heritage or Nadine's

16  Heritage come from Armenia?

17  A.  Yes.

18  Q.  Tell us about that.

19  A.  So that's where the great grandparents, grandparents came

20  from.

21  Q.  During your early years in Lebanon, where did you live; in

22  an apartment, in a home?

23  A.  Oh.  In an apartment.

24  Q.  In which part of Lebanon?

25  A.  Most of Lebanon is apartments, the city.

1    Q.  And you said the city.  Where in Lebanon did you live?

2    A.  In Beirut.

3    Q.  What was Beirut like at the time you lived there?

4    A.  Beautiful.

5    Q.  Other than your parents, who cared for you two during the

6    early years in Beirut?

7    A.  I had a nanny.  She had a nanny.

8    Q.  OK.  Roughly when -- maybe it would be easier to ask like

9    this.  How old were you approximately when you left Beirut?

10   A.  I would say about 10, 11 years old.

11   Q.  And so how old was Nadine roughly when she and you left

12   Beirut?

13   A.  11, 12 years old.

14   Q.  And you left at the same time?

15   A.  Yes.

16   Q.  So up to 10 or 11 years old, did you ever see jewelry

17   stored in your family apartment in Beirut?

18   A.  Of course.

19   Q.  What sort of things were kept in the home in Beirut?

20   A.  My mother's jewelry.

21   Q.  Could you describe what you remember seeing kept there?

22   A.  Yes.  She has a safe in her bedroom.  Everybody had a safe.

23   Everybody had a safe.

24   Q.  OK.  What about gold, coins, silver; any other items you

25   remember seeing in those apartments?

1    A.  Yes.

2    Q.  In that apartment.  Excuse me.

3    A.  Yes.

4    Q.  Can you tell us about that?

5    A.  So, my mother kept jewelry.  She kept cash.  She kept gold.

6    She kept worry beads, like *misbaha*, in Arabic, they say.  It's

7    the worry beads which are made of, let's say, turquoise or, you

8    know, the valuable ones made of turquoise or ivory or ruby.

9    Q.  You said the phrase is worry beads?

10   A.  Worry beads.

11   Q.  Worry beads.

12   A.  It's a cultural thing.

13   Q.  Did your family -- where did your family go when they left

14   Beirut, when you were 10 or 11?

15   A.  We fled during the civil war.  We escaped on the American

16   Sixth Fleet, which is a warship, and we went to Greece.

17   Q.  And --

18   A.  That's where the ship was going.  That's -- so President

19   Carter was the president at that time, and he said anybody with

20   British or American origin --

21           MS. POMERANTZ:  Your Honor, your Honor --

22           THE COURT:  Sustained.  There's no question.

23           MR. FEE:  Let me ask this question, your Honor.

24   Q.  Based on your memory, Ms. Tabourian, what caused your

25   family to leave Beirut?

1    A.  The civil war.

2              MS. POMERANTZ:  Objection, your Honor.  401 and 403.

3              THE COURT:  I will allow it.  The civil war.

4              THE WITNESS:  The civil war in 1975.

5              MR. FEE:  Thank you.

6    Q.  Where did your family go after leaving Beirut?

7    A.  We went to my grandmother, who lived in London.

8    Q.  Did you stay in London, your family?

9    A.  We stayed there a little bit, and then we went to Palo

10   Alto, California, San Francisco.

11   Q.  And did you stay in Palo Alto?

12   A.  Yes, we did.

13   Q.  For how long?

14   A.  For a little bit.  We went -- we started school there.

15   Q.  When you say a little bit, years?

16   A.  No.

17   Q.  Months?

18   A.  Not even a year.

19   Q.  Where did you go after Palo Alto, California?

20   A.  So, my aunt lived in San Francisco, so we went there -- my

21   father's sister.  And then my mother has an uncle and an aunt

22   in Manhasset, Long Island, and we finally moved there.

23   Q.  Is that where you and Nadine spent your high school years,

24   in Long Island?

25   A.  Correct.

1    Q.  Let me ask this.  When your family left Beirut to London,

2    California and New York, do you have any personal knowledge of

3    what your parents brought with them in terms of valuables?

4    A.  Yes.

5    Q.  What do you remember them bringing with them?

6    A.  My mother brought her jewelry, her cash, the gold.  We

7    couldn't bring anything else.  We couldn't even bring the

8    shirts on our backs.

9            THE COURT:  The question is what you brought.

10           MR. FEE:  Thank you.

11   Q.  Ms. Tabourian, did there come a time when you and Nadine

12   left the family home for college and jobs?

13   A.  Sure.

14   Q.  When that happened --

15           THE COURT:  You left for college, correct?

16           THE WITNESS:  Yes.  My sister left for college and she

17   went to NYU, and she dormed there.

18           THE COURT:  She went to college and you left for

19   college as well, correct?

20           THE WITNESS:  I commuted.  I came back and forth.

21           THE COURT:  All right.  Next question.

22   BY MR. FEE:

23   Q.  Did there come a time when your mother, around that time,

24   divided her valuables between you and Nadine?

25           MS. POMERANTZ:  Your Honor, objection.  Leading.

1            THE COURT:  I'll allow it.  You may answer.

2   A.  Yes, eventually.

3   Q.  OK.  Tell me.  Tell me what, if anything, you know about

4   your mother dividing valuables between you and Nadine.

5   A.  So, my mother divided everything in two.  I got to pick

6   what I wanted.  She got to pick what she wanted.

7   Q.  What sorts of things were divided by your mother between

8   you two?

9   A.  Jewelry, gold.  She gave us money all the time growing --

10           THE COURT:  Jewelry, gold.  What else?

11           THE WITNESS:  Cash.

12           THE COURT:  Cash?

13           THE WITNESS:  Cash.

14           THE COURT:  All right.  Next question.

15   BY MR. FEE:

16   Q.  Did this all happen, this division, did it happen at once

17   or over a longer period of time?

18   A.  No.  Over a longer period of time.

19   Q.  Roughly when, or over what time period did this division

20   take place?

21   A.  Over -- over several years.

22   Q.  OK.  In the course of this division, did you personally

23   receive some gold bars from your mother?

24   A.  I got gold coins.

25   Q.  Gold coins.

1    Do you have any personal knowledge of Nadine receiving gold

2    in any form from your mother?

3    A.  My mother -- my sister got my grandmother's gold bars.  My

4    sister was my grandmother's favorite out of five grandkids.

5         MR. FEE:  Let me show you what's been marked for

6    identification as Defense Exhibits 1117 and 1118, just for the

7    witness and the parties.  It's going to come up on your screen.

8    Do it one at a time -- actually, let's do them both, Mr. Kelly.

9    Thank you.

10   Q.  Ms. Tabourian, just take a moment and look at those.  I'm

11   going to ask you a few questions.

12   A.  Uh-huh.

13   Q.  Ready?

14   A.  Yes.

15   Q.  Do you recognize, let's start with what's on the left side

16   of your screen, Defense Exhibit 1117.  Do you recognize that?

17   Don't tell me what it is.  Just tell me if you recognize it.

18   A.  Yes, I do.

19   Q.  Do you recognize the handwriting?

20   A.  Yes, I do.

21   Q.  Whose handwriting is that?

22   A.  My father.

23   Q.  Have you seen this document before?

24   A.  Yes, I have.

25   Q.  Do you have any understanding of when it was prepared?

1  A.  It's years ago.  It's dated --

2          MR. FEE:  Mr. Kelly, there's a second page of 1117.

3  Q.  Same question.  Same question.  Do you recognize this

4  handwriting?

5  A.  Yes, I do.

6  Q.  And do you see the -- what appears to be a signature on the

7  bottom right of this page?

8  A.  Yes.

9  Q.  Do you recognize that signature?

10 A.  Yes.  It's my father's.

11 Q.  And do you recognize a date?

12 A.  Yes, I do.

13 Q.  Do you happen to know if your father, which style of dating

14 he uses?

15 A.  Yes.

16 Q.  So how would you read the date that's depicted there?

17 A.  8 February 1976.

18 Q.  OK.  Let's -- if we can just look on the right side,

19 please, which is Defense Exhibit 1118.

20     Do you recognize the handwriting here, some or all?

21 A.  The other page?

22 Q.  Sorry.  On the right side of your screen.  Yes, that's

23 right.

24 A.  That's my father.

25 Q.  OK.  And again, have you seen this before?

1    A.  Yes, I have.

2    Q.  Who gave these to you, actually?

3    A.  My father has a file.

4    Q.  And the dates on the right-hand side of Defense Exhibit

5    1118, again, would those be -- would you read -- how would you

6    read that first date?

7    A.  7 March 1967.  And that's when my sister was born.

8              THE COURT:  I'm sorry.  I don't see where you're

9    looking at.  On the right-hand page?

10             MR. FEE:  Yes.  Mr. Kelly.

11             THE COURT:  Oh, I see.  Thank you.

12             MR. FEE:  Actually, Ms. Tabourian -- well, I'll wait

13   until it's in.

14             Your Honor, we would offer these pursuant to 803(16)

15   and also 803(15).

16             THE COURT:  Is there an objection?

17             MS. POMERANTZ:  We object on hearsay grounds.

18             MR. FEE:  Your Honor, we gave them notice of these.

19             THE COURT:  Is there any 901 issue here?

20             MS. POMERANTZ:  I don't believe so, your Honor.

21             THE COURT:  All right.  I think it comes in under

22   803(16).

23             MR. FEE:  Let's publish.

24             (Defendant's Exhibits 1117 and 1118 received in

25   evidence)

1    BY MR. FEE:

2    Q.  Ms. Tabourian, are you able to read your father's

3    handwriting on the title, the top left of what's stamped as

4    1117, if you're able to?

5    A.  Yes.

6    Q.  Could you read that, please?

7    A.  "Safe deposit box No. 1, at the British Bank of the Middle

8    East Beirut.

9    Q.  And underneath that, what does it say, if you're able to

10   read it?

11   A.  Rented by Kalbian Tabourian & Co., Beirut, Lebanon.

12   Q.  What is Kalbian Tabourian & Co.?  I'm sorry for butchering

13   this.

14   A.  So this -- so, the safe deposit box was rented under my

15   father's rug business, which he shared with his uncle, whose

16   last name is Kalbian.

17   Q.  Ms. Tabourian --

18            THE COURT:  Your uncle or his uncle?

19            THE WITNESS:  His uncle.

20   BY MR. FEE:

21   Q.  And then the next line?

22   A.  Content.  Property of Mr. and Mrs. G. Tabourian and the

23   telephone number.

24   Q.  And is G. the first initial of your father's first name?

25   A.  Yes, Garbis.

1    Q.  Thank you.

2        Now, just pulling out on this document, the pieces -- well,

3    excuse me.  Generally, what is described in this list, if you

4    know?

5    A.  These are the contents that were at, in the safe deposit

6    box.

7    Q.  In Beirut?

8    A.  Yes.  At the British Bank.

9    Q.  Have you seen any of the pieces?

10       THE COURT:  Well, I take it you don't know that, but

11   that's what's stated here, correct?

12       THE WITNESS:  Correct.

13       THE COURT:  OK.

14       MR. FEE:  Thank you, your Honor.

15   Q.  Have you seen any of the pieces that you believe to be

16   described in this list?

17       MS. POMERANTZ:  Objection, your Honor.

18       THE COURT:  I'll allow it.

19   A.  Some of them, yes.

20   Q.  OK.  And generally, what is described here, as you

21   understand it?

22   A.  My mother's jewelry and gold pieces from the family.

23   Q.  And these values, or these numbers on the right side, do

24   you recognize the letters that precede each of those numbers?

25   A.  LL.  Lebanese lira is the currency in Beirut, Lebanon.

1        MR. FEE:  And if we can go to the next page.

2   Q.  And at the top, you see it says page 2, Mr. and Mrs. G.

3   Tabourian?  Do you see that?

4   A.  Yes.

5        MR. FEE:  And then, if you can pull out, Mr. Kelly.

6   Q.  In general, what is your understanding of what is described

7   in the list portion of this page?

8   A.  My mother's jewelry and my grandmother's gold bars.

9   Q.  When you say your grandmother's gold bars, are you

10  referring to -- zoom in here on the, where it starts Mrs. --

11  A.  R., Mrs. Rosaline Wosgian.

12  Q.  Can you just read, if you're able, what your father wrote

13  there?

14  A.  "Three kilos of gold bars and her jewelry presently in

15  London, details later."

16       MR. FEE:  Zoom out.

17  Q.  I think you said this before we had published it.  Just for

18  the jury's sake, the signature at the bottom, whose is that?

19  A.  My father.

20       MR. FEE:  Let's go to 1118.  You can zoom in on the

21  whole document, actually, Mr. Kelly.  Thank you.

22  Q.  Are you able to read for us what's listed on the left?

23  A.  Yes.

24  Q.  Can you do so, please?

25  A.  "Children jewelry.  Ida brooch," which is my mother, was my

1    mother.  "Turkish brooch and earrings.  Turkish brooch, eight

2    turquoises.  "Emerald" rings -- "earrings" -- sorry.  "Two

3    chains gold."

4    Q.  Thank you.

5        Now, on the right side, do you recognize -- well, what is

6    the first date listed on the right side, as you would read it?

7    A.  7 March 1967.

8    Q.  And what, if any, significance does that date have in your

9    family?

10   A.  It's my sister's birthday.

11   Q.  Now, as you understand this document, did the second column

12   on the right side, it says TNT.  Do you know what that is?

13   A.  Yes.

14   Q.  What is it?

15   A.  My sister's name, Tanya Nadine Tabourian.

16   Q.  What, if any, understanding do you have of what that first

17   row is indicating, her birth date, TNT and then the rest of the

18   text?

19   A.  And then it's British pounds, two gold by me.

20   Q.  Who is the me, as you understand this document?

21   A.  My father.

22   Q.  OK.  And then there's little apostrophes over the next

23   several rows.  Do you see that?

24   A.  Yes.

25   Q.  What do you understand that to mean?

1    A.   That they belong to TNT, or given to TNT.

2    Q.   And then you said the first one was British pounds.  In the

3    third row, is that also British pounds or something different?

4    A.   No.  I think that's U.S. dollars.

5    Q.   OK.  And this one says -- can you just read that row to me,

6    please?

7    A.   "7-3-67, TNT, $20 gold by Wosgian."

8    Q.   And you were reading TNT where the apostrophe was?

9    A.   Yes.

10   Q.   All right.  Just to go down, there's a K. on -- I think

11   it's next to 27-6-68.  Do you see that K.?

12   A.   Yes.

13   Q.   As you understand this document, to whom or what does the

14   K. refer?

15   A.   K. is me, Katia.

16   Q.   And what is that date?

17   A.   27 June 1968.

18   Q.   What, if any, significance does that have?

19   A.   I was born 14 May 1968.

20   Q.   So shortly after your birth?

21   A.   Yes.

22   Q.   And when it says by -- what does that say in that first

23   line with the K., by -- what is the word there?

24   A.   By Nancy, who is my mother's sister.

25   Q.   And then I think I'll stop after this.

1          You said by Wosgian.  Who is Wosgian?

2    A.  My grandmother.  My mother's mother.

3    Q.  And then again, just to help us read the handwriting, the

4    portion -- actually, let me ask.  Beneath the third K., there

5    is an N.?

6    A.  Yes.

7    Q.  Any idea what the N. refers to?

8    A.  Nadine.

9    Q.  And then beneath this dated portion, can you just read for

10   us what your father wrote, where -- I think it's 48?

11   A.  48, 29 gold, I don't know, gold.

12   Q.  If you can't read it --

13   A.  Pesos.

14   Q.  OK.

15   A.  Gold.

16   Q.  And you can just continue down.  Don't guess at anything.

17   A.  Oh.  Two solitaires, one emerald, one sapphire, one pearl.

18   Q.  What is a solitaire, if you know?

19   A.  A solitaire is just a diamond, just a diamond.

20   Q.  Like a single diamond?

21   A.  Yes, like a, just the diamond.

22   Q.  OK.

23   A.  Not the ring, just the diamond.

24          MR. FEE:  OK.  We can put that down, please.

25   Q.  And just let me ask, if you have personal knowledge, were

O71Wmen3                          Tabourian - Direct

1   any of the items listed in the lists we just saw, if you know,

2   given to Nadine?

3   A.  Yes.

4   Q.  And sitting here today, do you know exactly what was given?

5   A.  I don't know exactly.  But those two lists you're referring

6   to?

7   Q.  Yes.  The ones we just saw.

8   A.  The ones from the British Bank?

9   Q.  Yes.

10  A.  Yes.

11  Q.  What, if anything, was your understanding of the purpose of

12  your mother and father dividing these items between you and

13  Nadine?

14         MS. POMERANTZ:  Objection.

15         THE COURT:  Sustained.

16  BY MR. FEE:

17  Q.  Did you ever learn of a safe deposit box -- turning back to

18  closer to the present day, a safe deposit box that was used by

19  Nadine?

20  A.  Yes.

21         MS. POMERANTZ:  Objection to hearsay.

22         THE COURT:  I'll allow it.

23  BY MR. FEE:

24  Q.  Well, how did you learn of the use of a safe deposit box?

25  A.  I was at the bank with her.

1   Q.  How did you come to the bank with her that day?

2   A.  We were -- I spent the day with her and she needed to go to

3   the bank, and I went with her.

4   Q.  What, if anything, do you remember about the purpose of

5   your visit to the safe deposit box on that day?

6   A.  She wanted to take out a piece of jewelry that she was

7   going to wear that evening.

8   Q.  Do you remember approximately when this happened?

9   A.  I don't want to speculate.  No, I don't know exactly.

10  Q.  Let me ask this.  If you can remember, was this before or

11  after her divorce?

12  A.  After her divorce.

13  Q.  Do you remember if it was before or after she was dating

14  Senator Menendez?

15  A.  Probably before.  I haven't been there in -- no.

16  Q.  Have you ever visited that safe deposit box other than the

17  one occasion you just mentioned?

18  A.  I don't recall.  I don't know.

19  Q.  OK.  OK.  Let me show you what's in -- well, let me ask.

20      On the one time you went, was Senator Menendez there?

21  A.  No.

22          MR. FEE:  Let me show you what's been admitted as

23  Defense Exhibit 132.  Can we put up 133 right next to it,

24  please.

25  Q.  Ms. Tabourian, do you have any idea when or who took these

O71Wmen3                          Tabourian - Direct

1   photos?

2   A.  No, I don't know.

3   Q.  OK.  But just looking at the contents of the photo -- we

4   can zoom in, if you like -- do you recognize any of these

5   pieces?

6   A.  Yes, I do.

7   Q.  Can you tell me at least some of the items you recognize

8   and how you recognize them?

9   A.  Yes.  I'll start from the left photo?

10  Q.  Sure.

11  A.  Oh, they're the same.  OK.  No.

12       OK.  I'll start from the left.  The blue cross is a Lalique

13  cross.  My sister and I went to a Lalique sale, and we bought

14  the Lalique ring and cross and I -- I also have the same.

15       The gold coins are -- those tiny little gold coins were

16  probably given to her, were given -- I mean, she was gifted --

17  her kids were gifted when they were little.

18  Q.  Let me just pause and ask what you mean her kids were

19  gifted gold coins?

20  A.  Well, that's what -- that's what -- you know, when a child

21  is born, when a child is baptized --

22            MS. POMERANTZ:  Your Honor, we object to this.

23            THE COURT:  Sustained.

24            MS. POMERANTZ:  And we move to strike.

25            THE COURT:  The jury will disregard.

O71Wmen3                          Tabourian - Direct

1    BY MR. FEE:

2    Q.  Let me just focus you on this particular occasion.  When

3    Nadine's children were born, did you personally observe any

4    gold coins being given to those kids?

5    A.  Yes, of course.

6            MS. POMERANTZ:  Objection.

7            THE COURT:  I will allow that.

8            And those are the gold -- were two gold coins given to

9    each child when they were born, to your knowledge?

10           THE WITNESS:  The kids were given a lot of gold coins.

11           THE COURT:  OK.

12           THE WITNESS:  That's what leads you --

13           THE COURT:  Thank you.  You don't know what those

14   particular gold coins were.

15           THE WITNESS:  No, not --

16           THE COURT:  All right.  Next question.

17           THE WITNESS:  -- from this.

18   BY MR. FEE:

19   Q.  Anything else outside of those gold coins that you

20   recognize in these photos?

21   A.  Yes, I recognize most everything.

22   Q.  OK.  We don't have to go through everything, but when you

23   say you recognize --

24   A.  My mother's pearls, my mother's ring, in the middle, on the

25   blue velvet, yes.

O71Wmen3                         Tabourian - Direct

```
 1        The -- at the very, very bottom, the necklace with the --
 2    it has a sapphire with diamonds on the side, my mother gifted
 3    that to my sister when my sister had thyroid surgery, and she
 4    had a scar.
 5             THE COURT:  The question, ma'am, is simply what you
 6    recognize.
 7             THE WITNESS:  Oh, yes.  Sorry.
 8             THE COURT:  Not the history.
 9             MS. POMERANTZ:  Your Honor, we move to strike.
10             THE WITNESS:  Yes, so, I recognize --
11             THE COURT:  Just a moment.
12             MR. FEE:  Let me cut to the chase.
13             THE COURT:  Just a moment.
14             The way this works is question, answer.  Try just to
15    answer just the question that's asked.
16             THE WITNESS:  OK.
17             THE COURT:  The question was what do you recognize.
18             THE WITNESS:  OK.
19             THE COURT:  So you said the ring, the this, the that.
20    Next question.
21    BY MR. FEE:
22    Q.  My question was too broad.  Let me just ask you this,
23    whatever you recognize in here, to whom did it belong at the
24    time you last saw it?
25    A.  My sister.
```

1             MR. FEE:  One moment, your Honor?

2             Thank you, Ms. Tabourian.

3             No further questions, your Honor.

4             THE COURT:  All right.  Mr. Lustberg, anything?

5             MR. LUSTBERG:  No, your Honor.

6             THE COURT:  Mr. De Castro.

7             MR de CASTRO:  No, your Honor.

8             THE COURT:  Any redirect by the government?

9             MS. POMERANTZ:  Cross, your Honor.

10            THE COURT:  I'm sorry.  Any cross by the government?

11   CROSS-EXAMINATION

12   BY MS. POMERANTZ:

13   Q.  Good afternoon.

14   A.  Hello.

15   Q.  You are Nadine Menendez's sister, right?

16   A.  Yes, I am.

17   Q.  She's your only sister, is that right?

18   A.  Yes, correct.

19   Q.  And the FBI asked if you would be willing to talk with the

20   prosecutors in this case, right?

21   A.  They left me a voice mail.

22   Q.  And you got that voice mail, right?

23   A.  Yes, I did.

24   Q.  You did not speak with the prosecutors, right?

25   A.  No, I did not.

1    Q.  And you didn't return their call, right?

2    A.  No, I did not.

3    Q.  You met with the defense, though?

4    A.  Yes, I did.

5    Q.  About how many times?

6    A.  Three to four times.

7    Q.  And during those meetings, you discussed your testimony

8    today with them, right?

9    A.  Yes.

10   Q.  You were asked questions about the inventories from your

11   family.  Do you remember that?

12   A.  Yes.

13   Q.  And you testified that those inventories list gold your

14   family had, right?

15   A.  Correct.

16         MS. POMERANTZ:  Let's pull up Defense Exhibit 1117.

17   Q.  And you testified that this is from --

18         MS. POMERANTZ:  Let's go to the second page.  If we

19   can rotate that.

20   Q.  You testified that this is from February 8, 1976, right?

21   A.  Yes, I did.

22   Q.  And that's -- try to do some math.  That's about, almost 48

23   years ago, correct?

24   A.  I guess.

25   Q.  And these inventories from decades ago are the most recent

O71Wmen3                          Tabourian - Cross

1    inventories your family has, right?

2    A.   My family or my father?

3    Q.   Well, these are the most recent inventories your father

4    has; yes?

5    A.   Yes.

6    Q.   To your knowledge, there's no written record of the gold

7    possessed by your family in the last few decades, right?

8    A.   I don't recall, no.

9    Q.   No, there isn't one, right?

10   A.   I don't think so.

11   Q.   Right.  And this inventory is an inventory for, you said

12   for valuables in your family, right?

13   A.   Yes.

14   Q.   These inventories do not have serial numbers for the gold,

15   right?

16   A.   I don't know.

17   Q.   You don't see any serial numbers on here, do you,

18   Ms. Tabourian?

19   A.   No, I don't.

20   Q.   And these inventories do not list the brands of any of the

21   gold, do they?

22   A.   No.

23   Q.   Nowhere on this exhibit do you see the brand Swiss bank,

24   right?

25            THE COURT:  Do you see the words "Swiss bank" there?

```
 1              THE WITNESS:  No, I don't.  I'm trying to look.  No, I
 2    don't.
 3    BY MS. POMERANTZ:
 4    Q.  Nowhere on this do you see the brand -- I don't know --
 5    Credit Suisse?
 6    A.  No.
 7    Q.  You don't see Asahi Refining anywhere on this either,
 8    right?
 9    A.  What?
10    Q.  Asahi Refining; you don't see that anywhere on here, right?
11    A.  No.
12    Q.  You don't see Valcambi Suisse, right?
13    A.  No, I don't.
14    Q.  And the inventories only have one reference to this three
15    kilos of gold bars.  Do you see that?
16    A.  Yes.
17    Q.  And it doesn't clarify what form the bars were in, right?
18    A.  No, it doesn't.
19    Q.  It does not, right?
20              THE COURT:  Yes, she agreed it does not.
21              MS. POMERANTZ:  OK.
22    BY MS. POMERANTZ:
23    Q.  It just says that the gold weighed a total of three
24    kilograms, right?
25    A.  Correct.
```

O71Wmen3                      Tabourian - Cross

1  Q.  Now, the rest of the items listed in this document are

2  jewelry and gold coins, right?

3  A.  Yes.

4  Q.  And we've established this, you said, was your father's

5  inventory?

6  A.  Correct.

7  Q.  To be clear, Fred Daibes isn't a member of your family,

8  right?

9  A.  No, he's not.

10  Q.  And Wael Hana isn't a member of your family, right?

11  A.  No, he's not.

12  Q.  And you testified that you'd seen kilogram gold bars and

13  small gold bars at 41 Jane Drive years and years ago, is that

14  right?

15  A.  I said gold, yeah.

16  Q.  You said gold?

17  A.  Yes.

18  Q.  So not a kilo?

19        THE COURT:  Did you see gold bars at 41 Jane Drive

20  years and years ago?

21        THE WITNESS:  Yes.

22  BY MS. POMERANTZ:

23  Q.  Do you have any idea whether the serial numbers on the gold

24  bars in the photos that Mr. Fee showed you on direct

25  examination correspond with the serial numbers of gold owned by

1    Fred Daibes and Wael Hana?

2    A.  I don't know.

3              MR. FEE:  Objection.

4              THE COURT:  Sustained.

5    BY MS. POMERANTZ:

6    Q.  You don't know -- withdrawn.

7              THE COURT:  You're not aware of any serial numbers for

8    any gold bars, right?

9              THE WITNESS:  No, I'm not.

10             THE COURT:  OK.

11   BY MS. POMERANTZ:

12   Q.  And you said that you just saw gold generally, right?

13             THE COURT:  At 41 Jane?

14             MS. POMERANTZ:  At 41 Jane Drive.

15   A.  Yes.

16   Q.  You did not see a kilo?

17   A.  No, I -- the gold bars were given to my sister.

18   Q.  But you don't have --

19             THE COURT:  No, no.  The question -- I'm sorry.  Go

20   ahead.

21             MS. POMERANTZ:  No.  Go ahead, your Honor.

22             OK.  Thank you.

23             One moment.

24   Q.  I understand what you said was given to her.  I said you

25   never saw a kilo in the house, correct?

O71Wmen3                          Tabourian - Cross

 1   A.  In her safe.

 2            THE COURT:  Did you see a one-kilo gold bar in

 3   Nadine's safe?

 4            THE WITNESS:  I don't recall.

 5            THE COURT:  OK.

 6            THE WITNESS:  Sorry.  Sorry.

 7            THE COURT:  Don't be sorry.  If you don't recall, you

 8   don't recall.  Perfectly understandable.

 9   BY MS. POMERANTZ:

10   Q.  You were asked questions, Ms. Tabourian, about the

11   relationship between Bob and Nadine.  Do you recall that?

12   A.  Yes.

13   Q.  You were not present for every conversation between your

14   sister and Robert Menendez during the four-year period between

15   2018 and 2022?

16   A.  No.  I don't live there.

17   Q.  You don't live there?

18   A.  No.

19   Q.  You've spent some time at 41 Jane Drive?

20   A.  Yes.

21   Q.  But you don't live there?

22   A.  No.

23   Q.  You're not there every day, correct?

24   A.  No.

25   Q.  I'm not correct?  You didn't live there; you're not there

1    every day, correct?

2    A.  Correct.

3    Q.  Now, Ms. Tabourian, you have your own family, I believe you

4    testified to?

5    A.  Yes, I do.

6    Q.  You have your own children, correct?

7    A.  Yes.

8    Q.  So you're not spending every day listening to what your

9    sister and your brother-in-law were talking about, right?

10   A.  Right.

11   Q.  And you have not read their text messages, right?

12   A.  Right.

13   Q.  You have not read them?

14   A.  I have not read them.

15   Q.  And you were asked questions about a time when your sister

16   and Robert Menendez were not together for a period of time.  Do

17   you recall that?

18   A.  Yes.

19   Q.  And I believe you said it was in late -- in November of

20   2018?

21   A.  Yes.

22   Q.  But your sister did not give up on her relationship with

23   Robert Menendez, right?

24   A.  Right.

25   Q.  She remained in love with him, right?

1    A.  Right.

2    Q.  She worked hard to get back together with him?

3    A.  Yes.

4    Q.  And they got back together by the end of 2018, right?

5    A.  I don't know exactly when they got back together.

6    Q.  But they got back together; yes?

7    A.  Yes.

8    Q.  And not that far after you sent that message, right?

9    A.  I sent the message on -- in November 2018.

10   Q.  And you said in early 2019, you were at a meal --

11   A.  Yes.

12   Q.  -- with every -- with your father and your children, is

13   that correct?

14   A.  Correct.

15   Q.  And with your sister and Robert Menendez, right?

16   A.  Correct.

17   Q.  And you know that after they got back together, you know

18   they spent time together, right?

19   A.  Yes.

20   Q.  They spent weekends together in New Jersey, right?

21   A.  I would assume so.

22   Q.  And sometimes your sister went to Washington, D.C., to see

23   Robert Menendez, right?

24   A.  Yes.

25   Q.  And then they got engaged, right?

1   A.  They got engaged, yes.

2   Q.  And that was in October 2019?

3   A.  I guess so.

4           THE COURT:  No.  Well, do you know when they were

5   married?

6           THE WITNESS:  They were married in October 2020.

7           THE COURT:  Do you know how long -- let's see if this

8   assists.  Do you know how long they had been engaged for at the

9   time they were married?

10          THE WITNESS:  I know they got engaged overseas, in

11  India, so I don't know when that trip was.  And that's when

12  they got engaged.

13          THE COURT:  Do you know how far in advance of October

14  2020 that trip was?

15          THE WITNESS:  No, I don't.

16          THE COURT:  OK.

17  BY MS. POMERANTZ:

18  Q.  They got engaged, correct?

19  A.  Yes.

20  Q.  And they've been together since that engagement?

21  A.  Yes.

22  Q.  And before that engagement, right?

23  A.  Yes.

24  Q.  And Robert Menendez moved in with Nadine to 41 Jane Drive,

25  right?

O71Wmen3                          Tabourian - Cross

```
 1   A.  Yes.

 2   Q.  That was before they got married, right?

 3   A.  Yes.

 4   Q.  Sometime, say, April 2020?

 5   A.  I don't know.

 6   Q.  During Covid?

 7   A.  Yes.

 8   Q.  During the beginning of Covid?

 9   A.  Yes.

10   Q.  And then they got married?

11   A.  Yes.

12   Q.  Right.  And that's October 2020?

13   A.  Yes.

14   Q.  And you did not live at 41 Jane Drive, right?

15   A.  No.

16   Q.  No, you didn't live there?

17   A.  No, I did not live there.

18   Q.  And you certainly didn't live there with your sister and

19   Robert Menendez, did you?

20   A.  No, I did not.

21   Q.  And so you don't know when you were not in the house how

22   often the closet in the primary bedroom was locked, do you?

23            MR. FEE:  Objection.

24            THE COURT:  Sustained.  She wasn't there.  She

25   couldn't know.
```

1   BY MS. POMERANTZ:

2   Q.  You were not there all the time --

3   A.  No.

4   Q.  -- at 41 Jane Drive?

5       You don't know who went into that closet at every point

6   between 2018 and 2022, do you?

7   A.  No, I don't.

8   Q.  And you testified that you've seen the inside of both

9   closets in that primary bedroom, right?

10  A.  Correct.

11  Q.  So that's the primary bedroom that was shared by your

12  sister and your brother-in-law, right?

13  A.  Correct.

14  Q.  And when you saw the inside of those closets, you said

15  Nadine opened those closets in front of you, right?

16  A.  Yes.

17  Q.  She didn't make you leave the room when she opened the

18  closets, did she?

19  A.  No.

20  Q.  She opened them in front of you?

21  A.  Sure.

22  Q.  When Nadine -- she didn't have a nanny when she lived with

23  Robert Menendez, right?

24  A.  No.

25  Q.  That was many, many years ago?

1   A.  Yes.

2   Q.  Because you said her children are grown?

3   A.  Exactly.

4   Q.  And Nadine never expressed a concern to you that Robert

5   Menendez would steal from her closet, did she?

6   A.  No.

7   Q.  And I believe you said before that you don't know who went

8   into that closet on the right in the primary bedroom shared by

9   your sister and your brother-in-law between 2018 and 2022,

10  right?

11          MR. FEE:  Objection.  Misstates.

12  A.  That's not what I said.

13          THE COURT:  Just a moment.

14  BY MS. POMERANTZ:

15  Q.  You don't know who went into that closet at every point

16  between 2018 and 2022?

17          THE COURT:  I'll allow that.

18          MR. FEE:  Asked and answered.

19          THE COURT:  I'll allow it.

20  A.  Can you repeat the question, please?

21  Q.  You don't know --

22          THE COURT:  Do you know who went into that closet at

23  all times between 2018 and 2022?

24          THE WITNESS:  Only my sister.  She's the one with the

25  key, and it's her closet.

O71Wmen3                      Tabourian - Cross

1          THE COURT:  But the point, I think, that's being made

2    is you didn't live there, right?

3          THE WITNESS:  No.

4          THE COURT:  So you don't really know what was

5    happening on a day-to-day basis, right?

6          THE WITNESS:  No, I wouldn't know that.

7    BY MS. POMERANTZ:

8    Q.  Do you know whose fingerprints were found on envelopes of

9    cash inside that closet?

10         THE COURT:  Sustained.

11   BY MS. POMERANTZ:

12   Q.  Did Nadine ever tell you that when she needed to get

13   dressed at 41 Jane Drive she made Robert Menendez leave their

14   bedroom?

15   A.  No.  I don't know.  No.

16   Q.  You were asked questions about a safe deposit box.  Do you

17   remember that?

18   A.  Yes.

19   Q.  A safe deposit -- and you testified that you went to the

20   bank with Nadine and saw her safe deposit box, right?

21   A.  Yes.

22   Q.  She didn't -- she did not tell you to keep the box a

23   secret, did she?

24   A.  No.

25   Q.  She let you see the box, right?

O71Wmen3                         Tabourian - Cross

1    A.  Yes.

2    Q.  You saw the box when you went that day, right?

3    A.  Yes.

4          THE COURT:  Did you go with her down to the area where

5    the safe deposit boxes are?

6          THE WITNESS:  Yes.

7          THE COURT:  OK.

8    BY MS. POMERANTZ:

9    Q.  Just to be clear, Ms. Tabourian, you're -- between 2018

10   and -- let me rephrase.

11        Between 2019 and 2023, you spent some time with your sister

12   and Robert Menendez?

13   A.  Yes.

14   Q.  But you did not see them every day, did you?

15        MR. FEE:  Objection.  Asked and answered.

16        THE COURT:  Yes.  Sustained.

17   BY MS. POMERANTZ:

18   Q.  It's fair to say that you're not physically with your

19   sister all the time, right?

20        MR. FEE:  Objection.

21        THE COURT:  Sustained.  It's self-evident.

22   BY MS. POMERANTZ:

23   Q.  You don't know conversations your sister has when you're

24   not around, right?

25        MR. FEE:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O71Wmen3                     Tabourian - Cross

1            THE COURT:  Sustained.  Self-evident.

2   BY MS. POMERANTZ:

3   Q.  Did your sister ever tell you to hide the safe from Robert

4   Menendez?

5   A.  No.

6   Q.  Did your sister ever tell you to hide anything from Robert

7   Menendez?

8   A.  Never.

9   Q.  Ms. Tabourian, fair to say that you love your sister very

10  much, right?

11  A.  Of course.

12  Q.  You love Robert Menendez also, right?

13  A.  Absolutely.

14  Q.  He's your brother-in-law, right?

15  A.  Yes.

16  Q.  And you don't want to see your brother-in-law in trouble,

17  do you?

18  A.  No.  Of course not.

19            MS. POMERANTZ:  No further questions.

20            THE COURT:  Anything, Mr. Fee?

21            MR. FEE:  No, your Honor.

22            THE COURT:  All right.  You are excused.  You may step

23  down, Ms. Tabourian.

24            THE WITNESS:  Thank you.

25            THE COURT:  Thank you.

O71Wmen3

1                (Witness excused)

2                THE COURT:  All right.  Ladies and gentlemen, let's

3     take a one-hour lunch break.  See you back at two.

4                How long is the next witness?

5                MR. FEE:  An hour on direct, your Honor.

6                THE COURT:  All right.  Thank you.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O71Wmen3

```
 1                    (Jury not present)

 2                    THE COURT:  2 o'clock.  Thank you.

 3                    MR. RICHENTHAL:  Your Honor, we have one small thing.

 4       We wanted to wait for the jury to not be in the room.

 5                    THE COURT:  Yes.

 6                    MR. RICHENTHAL:  We continue to be deeply concerned

 7       about the photos with the heads cut off.  We didn't want to

 8       make a thing about this in front of the jury.  We would ask the

 9       defense to represent on the record they were not taken for

10       purposes of this litigation.

11                    THE COURT:  They certainly seemed posed.  That's for

12       sure.

13                    MR. RICHENTHAL:  And again, we didn't want to use that

14       word in front of the jury.  If the defense cannot so represent,

15       they should be stricken.

16                    MR. FEE:  I can make that representation, your Honor.

17       In fact, the reason you see --

18                    THE COURT:  Wait just a moment.

19                    MR. FEE:  Yes.

20                    THE COURT:  You're making a good faith representation

21       that the headless photos, with the chest and tie, were not

22       taken for purposes of this litigation.

23                    MR. FEE:  100 percent, and that's why the head is cut

24       off.  And that's why you can see -- I'm going to mess up the

25       word -- there's like a floating skull in one of the ones you
```

O71Wmen3

1    admitted.

2              THE COURT:  I thought that was on his shirt.

3              MR. FEE:  On his shirt, but then there's also like a

4    thingy that you do on social media.  These are social media

5    photos that his mom pulled down, and they cropped it on a few

6    of them so the head wasn't there.

7              THE COURT:  Well, what's important is that you've made

8    a representation that they weren't taken for the purposes of --

9              MR. FEE:  Yes, your Honor.

10             THE COURT:  -- of the --

11             MR. FEE:  Litigation.

12             THE COURT:  -- litigation.

13             All right.

14             MR. RICHENTHAL:  And then second, if we could ask the

15   defense to tell us who the next witnesses are.  The parties

16   have an agreement to be given witnesses and exhibits 72 hours

17   in advance.  That meant as of yesterday we were entitled to

18   witnesses and exhibits through Wednesday.  We've asked the

19   question repeatedly and not been told.  We think we know who

20   the next witness is, but we're not sure who, if anyone, comes

21   next and what exhibits, if any, come next.

22             THE COURT:  The next witness is Richardson, correct?

23             MR. RICHENTHAL:  I understand that, your Honor.  I

24   meant beyond Richardson.

25             THE COURT:  And he's the accountant, right?

O71Wmen3

```
 1                MR. FEE:  That's right, your Honor.
 2                THE COURT:  And there are no objections I'm aware of
 3   that to testimony.
 4                MS. GHOSH:  That's correct.
 5                THE COURT:  And that's one hour.
 6                MR. FEE:  That's right, your Honor.
 7                THE COURT:  OK.  Go ahead.
 8                MR. FEE:  And we've given them the whole list.
 9                THE COURT:  Who are your other witnesses for the next
10   72 hours, sir?
11                MR. FEE:  You've got it.
12                It's Gannaway.
13                THE COURT:  Sir, just the names, sir.
14                MR. FEE:  Mr. Gannaway, who is going to put in summary
15   charts, and there are a host of objections.  And then this has
16   also been noticed to the defense.  We are going to call a
17   paralegal --
18                Right.  The defense got notice.  The government got
19   notice too.
20                We're going to call a paralegal to put on two short
21   summary charts of which they've had notice.
22                THE COURT:  And I assume that that's the tsunami of
23   objections and responses Saturday and Sunday.
24                MR. FEE:  Correct.  It's for Gannaway and also to the
25   paralegal we'll put on.
```

O71Wmen3

| | |
|---|---|
| 1 | And then the only other person on our list is still -- |
| 2 | THE COURT:  Is one of those for 2500? |
| 3 | MR. FEE:  Yes. |
| 4 | THE COURT:  The para. |
| 5 | MR. FEE:  It's the paralegal, Mr. Nunez. |
| 6 | THE COURT:  Now, is it 2500 that was just given to the |
| 7 | government at, I think, 9 p.m. on Friday night; is that the |
| 8 | one? |
| 9 | MR. FEE:  I believe so, your Honor. |
| 10 | MR. RICHENTHAL:  Yes, your Honor. |
| 11 | MR. FEE:  And your Honor, just to note that it is |
| 12 | adding two columns to the existing government chart. |
| 13 | THE COURT:  And apart from the 9 p.m., what's the |
| 14 | basis of the objection on 2500?  Because I'm quite concerned |
| 15 | about the timing on that.  It seems to be abusive. |
| 16 | MR. RICHENTHAL:  It's covered in our letter. |
| 17 | THE COURT:  You can be seated in the courtroom. |
| 18 | MR. RICHENTHAL:  It's covered in our letter. |
| 19 | Ms. Ghosh is the drafter of the letter, but we can go |
| 20 | through it with your Honor. |
| 21 | THE COURT:  Which ECF number? |
| 22 | MS. GHOSH:  Your Honor, I don't have that at the |
| 23 | moment, but just to be clear, 2500 we did receive a replacement |
| 24 | for, but I believe the one that was produced for the first time |
| 25 | on Friday evening at 9 p.m. was a summary chart, 1305, that was |

O71Wmen3

1    a very -- much more lengthy than 2500.  2500 is the

2    cash-envelope chart with the additional, as we said in our

3    letter, argumentative and inaccurate columns added.  1305 was a

4    different exhibit.  That's the 9 p.m. one that was addressed in

5    the letter we submitted on Saturday afternoon, and that was

6    docket No. 490.

7             THE COURT:  490.

8             MS. GHOSH:  No, your Honor.  I believe that was --

9    letter 493 is the one related to 2500, the envelope and cash

10   chart.

11            MR. FEE:  Your Honor, citing the legal doctrine that

12   what's good for the goose is good for the gander, I don't think

13   the process objections are well noted.  For all of these charts

14   they have had the exhibits for weeks.  The 2500 chart

15   essentially just puts in two columns that reflect the math we

16   did on cross.

17            THE COURT:  I understand.  The math you did.  That's

18   math that you can argue to the jury, if you wish.  I don't know

19   that the two columns are necessary.

20            MR. FEE:  But the defense can make choices about what

21   to put in charts.

22            THE COURT:  All right.  I've heard enough.  I've heard

23   enough.

24            Who after Gannaway and the paralegal?

25            MR. FEE:  It's just our client, which obviously is

O71Wmen3

1    still under consideration, your Honor.

2            THE COURT:  Yes.  So Gannaway, what's the expected

3    length of direct on Gannaway?

4            MR. WEITZMAN:  Your Honor, I'm sorry.  Let me just

5    supplement.  There is the issue of the deposition of

6    Mr. Critchley.

7            THE COURT:  Thank you.  We forgot Critchley, and

8    that's another Sunday special.  All right.

9            MR. RICHENTHAL:  Finally, when I referenced exhibits

10   and witnesses, the parties' agreement includes exhibits moved

11   in through stipulations irrespective of whether a witness is on

12   the stand.  So in accord with that, we asked last night for the

13   defense to give us the list of remaining exhibits in this case;

14   that is, through Wednesday of this week.  We were not given any

15   such list.

16           I'm not trying to complain.  We just would like to see

17   the list so if we can determine if we have objections.

18           MR. WEITZMAN:  Sorry, your Honor.  They know what

19   exhibits.  It's the summary charts with Gannaway and it's the

20   summary charts with Nunez.  There are no other exhibits --

21           THE COURT:  Is Nunez the paralegal?

22           MR. WEITZMAN:  Yes.

23           -- other than the exhibits that are referenced in the

24   summary charts which are the subject of numerous objections.

25           THE COURT:  Numerous Sunday objections through

O71Wmen3

1    midnight.

2               MR. RICHENTHAL:  That was the first we've heard of

3    that.  We accept that representation.

4               THE COURT:  All right.  Fine.

5               Now may I have the answer to my question.

6               MR. WEITZMAN:  What is your question?  I'm so sorry,

7    your Honor.

8               THE COURT:  What's the expected direct on Gannaway,

9    subject, of course, to the objections that are the midnight

10   objections?

11              Go ahead.

12              MR. WEITZMAN:  Your Honor, Mr. Gannaway -- let me take

13   a step back.  The summary charts summarize things that both

14   Senator Menendez wanted to put in and also things that Will

15   Hana wants to put in.

16              THE COURT:  Yes.

17              MR. WEITZMAN:  So what we've discussed is we that will

18   lead the direct of Mr. Gannaway, in the first instance, and

19   then it will be continued by Mr. Hana's counsel rather than

20   re-call him unless you prefer he get re-called in Mr. Hana's

21   case, and it would be not a cross but a direct of him by

22   Mr. Lustberg.

23              THE COURT:  Is there any objection to that by the

24   government?  Doesn't seem that there should be.

25              MR. MARK:  No, your Honor.

O71Wmen3

1          THE COURT:  OK.

2          I'll say for the record that Mr. Hana's attorney was

3     able to work out largely, if not entirely, all of his

4     objections with the government.  Much appreciated.

5          Go ahead.  Gannaway, what's the timing for him?  I

6     still have my question.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O715men4

1          MR. WEITZMAN:  Yes.  I'm just conferring with defense

2     counsel.

3          THE COURT:  Go ahead.

4          MR. WEITZMAN:  I think we are trying to streamline it.

5     It will be, I expect, no more than three hours.  We are not

6     going through every line entry and we are going to let it rest

7     for summation.

8          THE COURT:  And the para?

9          MR. WEITZMAN:  Half an hour.

10         THE COURT:  So that probably will take around a day,

11     three and a half hours.  And with the three hours is including

12     Mr. Lustberg's direct?

13         MR. WEITZMAN:  Yes, your Honor.

14         THE COURT:  That will take about a day.  All right.

15     As long as I have some issue.

16         Who is next?  That's it?  Oh, if Senator Menendez

17     decides to testify.

18         MR. WEITZMAN:  Correct, your Honor.  And

19     Mr. Richardson is the next witness.

20         THE COURT:  You have given me your witnesses?

21         MR. WEITZMAN:  I'm sorry.  Yes.

22         THE COURT:  OK.  Sir?

23         MR. LUSTBERG:  Thank you, your Honor.

24         Obviously our case depends upon a ruling that we are

25     awaiting from the Court because the government has essentially

O715men4

1      moved to preclude most of our case.  But, if there is anybody,

2      if the Court allows the additional witnesses, we provided the

3      Court with an updated list including all the exhibits as we are

4      required to do.  I think the most -- we gave them an updated

5      version last night.

6                 THE COURT:  Of what?

7                 MR. LUSTBERG:  Who our witnesses are and what exhibits

8      will be introduced through them.

9                 THE COURT:  OK.

10                MR. LUSTBERG:  Depending on what the Court rules, even

11     if the Court lets it all in, we are talking about half a day.

12                MR. RICHENTHAL:  And just for clarity, your Honor,

13     Mr. Hana's counsel did give us notice last night in accord with

14     the agreement, which we appreciate.

15                THE COURT:  The Hana-government journey has been a lot

16     smoother than the Menendez-government journey.

17                Mr. de Castro?

18                MR. DE CASTRO:  Your Honor ruled on our motion

19     regarding specific instances of gift giving.

20                THE COURT:  Yes, sir.  I don't have anything pending

21     from you.

22                MR. DE CASTRO:  That's correct.  And we conferred with

23     the government over the weekend regarding witnesses we were

24     considering calling and we advised them yesterday that we are

25     not going to call any witnesses on our case.

O715men4

1              THE COURT:  Subject, of course, to whether Mr. Daibes

2      testifies.

3              MR. DE CASTRO:  That's correct, Judge.

4              THE COURT:  Thank you.  That's all very helpful.

5              2:00.

6              (Luncheon recess)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O715men4

```
1                  A F T E R N O O N   S E S S I O N
2                              2:15 p.m.
3             THE COURT:  Please, be seated.
4             MR. FEE:  Your Honor, should we put the next witness
5    on the stand?
6             THE COURT:  Yes.  I said please be seated simply
7    because my deputy needs to get the jurors together.
8             MR. MARK:  Your Honor, if we can have a moment?
9             I wanted to note for the record, given there are so
10   many evidentiary matters before your Honor, that during the
11   lunch break, the government and Hana's counsel have continued
12   to have productive conversations to try to resolve issues.
13   There is one more that we think we will be able to take off
14   your Honor's plate.
15            THE COURT:  Please.
16            MR. MARK:  That relates to IS EG employee no. 5 who is
17   referenced in two places in the pending motions; one, dealing
18   with the government's motion to preclude certain witness
19   testimony.  And so the government is withdrawing the motion --
20            THE COURT:  What ECF?
21            MR. MARK:  Docket 485, and particularly page five
22   deals with IS EG employee no. 5.
23            THE COURT:  Yes.
24            MR. MARK:  And IS EG employee no. 5 is also dealt with
25   on Docket 488, which is the motion dealing with the summary
```

O715men4

```
1   charts, and the matters concerning IS EG employee no. 5 are

2   page 6 to page 7.  So, I expect that the government and Hana's

3   counsel will be able to resolve all those issues and your Honor

4   doesn't need to worry about them.

5              THE COURT:  All of those issues meaning your

6   discussions that led to withdrawal of a single objection of

7   scores and scores; right?  But progress nonetheless.

8              MR. MARK:  It is one witness and certainly exhibits

9   without witness.

10             THE COURT:  Thank you.

11             Bring this jury in.

12             I encourage continued discussions.

13             MR. FEE:  Your Honor, Mr. Gross will be conducting

14  this examination, just so you know.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

 1           (Jury present)

 2           THE COURT:  Mr. Mark, you heard me that I encourage

 3   those discussions, correct?

 4           Please be seated.  Call your next witness.

 5           MR. GROSS:  Senator Menendez calls Russell Richardson.

 6   RUSSELL RICHARDSON,

 7      called as a witness by the Defendant Menendez,

 8      having been duly sworn, testified as follows:

 9           THE DEPUTY CLERK:  State your name and spell your full

10   name for the record.

11           THE WITNESS:  Russell Richardson.

12           THE COURT:  Welcome, sir, and good afternoon.

13           THE WITNESS:  Good afternoon.

14           THE COURT:  Please speak loudly and clearly into the

15   microphone.  You can move it up toward your face a little bit,

16   it is a directional mic.

17           Your witness, Mr. Gross.

18           MR. GROSS:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MR. GROSS:

21   Q.  Mr. Richardson, what do you do for a living?

22   A.  I'm a forensic accountant.

23   Q.  What is a forensic accountant?

24   A.  A forensic accountant is an individual who applies

25   accounting and investigative techniques in analyzing financial

1    records of businesses and individuals.  In essence, following

2    the money.

3    Q.  What is your educational background, Mr. Richardson?

4    A.  I have a BS in accounting from SUNY Albany.  I am also a

5    certified public accountant and a certified fraud examiner.

6    Q.  Where do you work?

7    A.  I work for Guidepost Solutions.

8    Q.  Prior to working at Guidepost Solutions, where did you

9    work?

10   A.  For approximately 25 years I was a special agent with the

11   United States Treasury, IRS, criminal investigation.

12   Q.  Mr. Richardson, are you being compensated for your time

13   today?

14   A.  I personally am not being compensated for my time but my

15   firm is.

16   Q.  And have you been compensated for your work on this case

17   thus far?

18   A.  Yes.

19   Q.  Have you personally been compensated?

20   A.  No.  I apologize.  No, I have not.

21   Q.  Do you know the hourly rate at which your firm bills you?

22   A.  No, I do not.

23   Q.  Mr. Richardson, did there come a time when you were

24   approached by counsel for Senator Menendez and asked to do some

25   forensic accounting work on this case?

1   A.  Yes.

2   Q.  And what types of accounting work were you asked to

3   perform?

4   A.  I was asked to perform two assignments.  The first was

5   analyzing the bank accounts of the senator, analyzing deposits

6   and disbursements from that account and preparing summary

7   charts; and then the second was analyze the cash withdrawals

8   throughout the bank accounts.

9   Q.  And who provided you with the account statements that you

10  needed to do your work?

11  A.  The defense team.

12  Q.  And who gave you instructions about what to look for in

13  those statements?

14  A.  The defense team.

15  Q.  To perform your work, did you need to consolidate data from

16  underlying bank statements in a central location such as an

17  Excel spreadsheet?

18  A.  Yes.

19  Q.  Did you do that work yourself or were you assisted by

20  others?

21  A.  I was assisted by others in my company.

22  Q.  At a high level, can you explain the process for doing that

23  work, by which I mean consolidating data from bank records into

24  a central location?

25  A.  Yes.  I instructed my team to review the bank statements as

well as the credit card statements that we were requested to

review, and prepare summaries of that data which consisted of

the beginning balance for the bank accounts, that would be the

deposits less any disbursements, and the ending balance, and to

complete that task for each month of the records we had

available.

   Similarly, for the credit card statements, we requested

them to do, beginning balance, charges, any payments and

credits and the ending balance.

Q.  Did your team use any quality control measures to ensure

that you were accurately transposing data?

A.  Yes.  Once the data was sent to me, I compiled it all in a

central location and then I went back and sampled the

statements to ensure that the data that they provided to me was

accurate.  Also, given the nature of the work that we were

doing, specifically with the bank statements and the credit

cards, when you track the beginning balance plus the credit

cards, the purchases less payments and credits, you come up

with the ending balance.  Subsequently, the next month, that

statement, the beginning balance is the ending balance so I

asked the team, as well as upon myself, look at it and make

sure that those items match as you continued.  When it came to

the bank statements, as you are working with them, follow a

similar process.  You have the beginning balance, you have the

deposits, less any disbursements, giving you the ending

1    balance, and make sure they match as you proceeded.

2    Q.  How did those quality control measures compare to those you

3    have taken throughout your career as a forensic accountant?

4    A.  They were very similar given the type of work that was

5    being conducted.

6    Q.  Mr. Richardson, did you prepare a summary chart or a

7    summary exhibit summarizing your analysis in this case?

8    A.  Yes, I did.

9            MR. GROSS:  Mr. Kelly, can we put up for the witness

10   and the lawyers what's been marked for identification as

11   DX 2513?

12   Q.  Mr. Richardson, is the first page of the summary exhibit

13   that you prepared summarizing your findings?

14   A.  Yes, it is.

15           MR. GROSS:  Your Honor, we move to admit Defendant's

16   Exhibit 2513, as well as the underlying exhibits cited therein

17   that are not already in evidence, and those are exhibits

18   DX 2191, DX 2192, DX 2193, and DX 2080.

19           THE COURT:  Admitted, without objection.

20           (Defendant's Exhibits 2513, 2191, 2192, 2193, 2080

21   received in evidence)

22           MR. GROSS:  Can we publish that, please?

23   BY MR. GROSS:

24   Q.  Mr. Richardson, what does this slide reflect?

25   A.  This slide reflects the various financial accounts -- well,

1    the first five represent the financial accounts that I analyzed

2    and summarized the account activity consisting of beginning

3    balances for the bank accounts, deposits, withdrawals, ending

4    balance, and for credit cards beginning balance, charges, less

5    any payments, credits, and ending balance.

6    Q.  I notice you said for the first five.  For the last account

7    marked no. 6, did you analyze any transactions in that account?

8    A.  I did not analyze any transactions in that account.

9    Q.  With respect to the Congressional Federal Credit Union

10   account marked no. 6, what did you analyze?

11   A.  I analyzed the account opening and closing documents.

12   Q.  Thank you.

13       Who instructed you which accounts to review,

14   Mr. Richardson?

15   A.  Defense counsel.

16           MR. GROSS:  Can we go to the second slide of the

17   summary chart, please?

18   Q.  Mr. Richardson, at a high level, what does this page of

19   your summary exhibit reflect?

20   A.  It reflects the banking activity conducted in the U.S.

21   Senate Federal Credit Union for the year 2018.  It compiled the

22   total number of deposits, as well as disbursements, throughout

23   the year.

24   Q.  This may go without saying, but in whose name is this

25   account?

1   A.  The account is in Senator Menendez' name.

2   Q.  At which financial institution?

3   A.  United States Senate Federal Credit Union.

4   Q.  Directing your attention to the chart on the right side of

5   this slide, and in particular the row marked U.S. Senate

6   Salary; do you see that, sir?

7   A.  Yes, I do.

8   Q.  Do you see the number listed in the column Deposits?

9   A.  Yes.

10  Q.  Can you read that number, please?

11  A.  $87,834.

12  Q.  What does that number represent?

13  A.  That represents the total number of deposits into the

14  federal credit union's bank account throughout 2018, and it was

15  demarked with -- it was an item noted as a deposit from the

16  U.S. Senate salary.

17          MR. GROSS:  Mr. Kelly, can we put up, just for the

18  witness and the lawyers, what's been marked for identification

19  as DX 5H-102-1?  Can we zoom in on the top portion?  That's

20  great.  Thank you.

21  Q.  Mr. Richardson, do you recognize this document?

22  A.  Yes.

23  Q.  What is it?

24  A.  It is a bank account statement for the Senate Federal

25  Credit Union for the period February 1 through February 28,

 1    2018.

 2                 MR. GROSS:  Your Honor, we offer DX 5H-102-1.

 3                 MS. GHOSH:  Your Honor, we note for the record that

 4    this is an excerpt of a government exhibit that's already in

 5    evidence 5H-102, but we have no objection to the excerpt marked

 6    as defendant's exhibit.

 7                 THE COURT:  This excerpt is admitted.

 8                 (Defendant's Exhibit 5H-102-1 received in evidence)

 9                 MR. GROSS:  Thank you, your Honor.

10                 Can we publish that please, Mr. Kelly?

11    BY MR. GROSS:

12    Q.  Mr. Richardson, what date range does this bank statement

13    reflect?

14    A.  It reflects a date range of February 1, 2018, through

15    February 28, 2018.

16    Q.  How many accounts are reflected on this statement?

17    A.  There are two accounts.  There is a primary savings and a

18    checking account.

19    Q.  Directing your attention in the section marked checking

20    beginning balance; do you see that, sir?

21    A.  Yes.

22    Q.  To an entry dated February 1, 2018, the first entry, can

23    you read what is written in the detail columns?

24    A.  Yes.  Deposit ACH U.S. Senate.  Type Fed salary CO:  U.S.

25    Senate.

O715men4                          Richardson - Direct

1    Q.   Can you read the amount with that transaction, please?

2    A.   $3,382.60.

3    Q.   What do you understand this transaction to represent?

4    A.   A deposit for Senator Menendez' services as a U.S. senator.

5    Q.   Did you include this deposit on your summary chart within

6    the row marked U.S. Senate Salary for the year 2018?

7    A.   Yes, I did.

8         MR. GROSS:  Mr. Kelly, can you scroll down slightly?

9    Q.   Directing your attention to an entry marked February 16,

10   2008, with the same entry in the detail column.  Do you see

11   that, sir?

12   A.   Yes.

13   Q.   Do you see the associated value of this transaction?

14   A.   Yes.

15   Q.   Did you also include this transaction in the row marked

16   U.S. Senate Salary on the summary chart slide for the year

17   2018?

18   A.   Yes.

19        MR. GROSS:  We can take that down, Mr. Kelly, and we

20   can go back to slide 2 of the summary chart.

21   Q.   Mr. Richardson, in populating the value of deposits for the

22   year 2018 in the row marked U.S. Senate Salary, did you

23   undertake substantially the same work for the remaining months

24   of 2018 that we just went through?

25   A.   Yes.

1    Q.  And so, what does the $87,834 figure on that chart

2    represent?

3    A.  It represents the sum of all items that were deposited into

4    the bank account that were classified or annotated as U.S.

5    Senate salary.

6    Q.  Thank you.

7            THE COURT:  So I take it this represents a portion of

8    Mr. Menendez' Senate salary; is that correct?

9            THE WITNESS:  Yes, your Honor.

10           THE COURT:  All right.  It is the portion that was

11   deposited into this bank account; is that correct?

12           THE WITNESS:  Yes, your Honor.

13           THE COURT:  During that year.

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  OK.

16           MR. GROSS:  Thank you, your Honor.

17   BY MR. GROSS:

18   Q.  Directing your attention, Mr. Richardson, to the second row

19   in the chart on the right side of the screen marked U.S. Senate

20   Expense Reimbursement.  Do you see that, sir?

21   A.  Yes.

22   Q.  What does that row refer to?

23   A.  It refers to deposits into the bank account that were

24   annotated as expense reimbursement from the U.S. Senate.

25           MR. GROSS:  Mr. Kelly, can we put up just for the

1  witness and lawyers what's been marked for identification as

2  DX 5H-102-2?  Thank you.

3         THE COURT:  Mr. Richardson, let me ask you this -- you

4  may not know it -- is a federal credit union a bank?

5         THE WITNESS:  Your Honor, I can't speak to the

6  differences between a bank and a credit union.  I know there

7  are some differences but I am not versed in that.

8         THE COURT:  OK.  Thank you.

9         Can you say what a federal credit union is?  Again, if

10  it is beyond your expertise, you don't have to say anything.

11         THE WITNESS:  My understanding of a credit union, it

12  is usually open to specific types of individuals based on their

13  association, in this instance belonging to the Senate or maybe

14  there is the teachers federal credit union where you would be a

15  teacher.  It usually is open to people that may be in a certain

16  type of work or affiliation with a club and so forth, and some

17  people may be excluded from it.  Other than that basic --

18         THE COURT:  Open for what purposes?  You said it is

19  open to --

20         THE WITNESS:  Open for membership application and

21  conducting banking activity.

22         THE COURT:  Thank you.

23         MR. GROSS:  Thank you, your Honor.

24  BY MR. GROSS:

25  Q.  Mr. Richardson, do you recognize this document?

1    A.   Yes.

2    Q.   What is it?

3    A.   It is a bank statement relating to the Senate Federal

4    Credit Union in Senator Menendez' name.

5              MR. GROSS:   Your Honor, noting that this is an excerpt

6    of a government exhibit already in evidence, we offer

7    DX 5H-102-2.

8              THE COURT:   Admitted, without objection.

9              (Defendant's Exhibit 5H-102-2 received in evidence)

10             MR. GROSS:   Thank you.

11             Mr. Kelly, can you zoom in on the top portion of the

12   statement, please?

13   BY MR. GROSS:

14   Q.   Mr. Richardson, what is the date range of the statement?

15   A.   The date range is April 1, 2018, through April 30, 2018.

16   Q.   A moment ago we talked about the row on your summary chart

17   marked U.S. Senate Reimbursement.  Do you recall that?

18   A.   Yes.

19   Q.   Directing your attention to the row dated April 20, 2018,

20   can you please read what's in the descriptor column?

21   A.   Yes.  Deposit ACH U.S. Senate Type Reimburse CO:  U.S.

22   Senate.

23   Q.   Can you read the amount of this transaction, please?

24   A.   Yes.  $4,617.

25   Q.   What do you understand this transaction to reflect?

1    A.  To be a deposit for a reimbursement of expenses.

2    Q.  Do you know what expenses this deposit is reimbursing?

3    A.  No, I do not.

4    Q.  And did you include this transaction --

5            THE COURT:  I take it -- well, do you know that it is

6    a reimbursement of expenses or simply that it is some

7    reimbursement?

8            THE WITNESS:  I know it to be a reimbursement, your

9    Honor.  My assumption was it was for expenses.

10           THE COURT:  All right.

11   BY MR. GROSS:

12   Q.  Mr. Richardson, did you include this transaction on your

13   summary chart for the year 2018 in the row marked U.S. Senate

14   Reimbursement?

15   A.  Yes.

16           MR. GROSS:  Mr. Kelly, can we scroll down slightly on

17   this row?  Thank you.  That's great.

18   Q.  Mr. Richardson, directing your attention to the entry in

19   the checking account with the date April 3, 2018; do you see

20   that, sir?

21   A.  Yes.

22   Q.  And do you see that it references in the description

23   column:  Type fed salary, U.S. Senate?

24   A.  I do.

25   Q.  And do you see the amount is $3,587.96?

1   A.  Yes.

2   Q.  Did you include this transaction not in the Senate

3   reimbursement portion of your chart but in the Senate salary

4   portion of the chart?

5   A.  Yes.

6   Q.  Mr. Richardson, by the way, do you understand this to

7   reflect Senator Menendez' salary before or after taxes?

8   A.  I would assume it is after the withholding of taxes, that's

9   his net salary deposit.

10  Q.  The amount he was actually paid.  Is that what you

11  understand?

12          MS. GHOSH:  Objection.

13  A.  Yes.

14          THE COURT:  That's your assumption, correct?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  It is your assumption.  All right.  I will

17  allow it.  Well, just a moment.  Do you know that that

18  $3,587.96 is the totality of what he was paid in his salary for

19  that time period?

20          THE WITNESS:  Your Honor, I do not know what the

21  senator's gross salary for that pay period would have been,

22  whether this is the net or gross.

23          THE COURT:  Assume for the purposes of my question

24  that it is a net.  Do you know that that sum, in fact, was the

25  entire net payment to him?

O715men4                          Richardson - Direct

1              THE WITNESS:  I know it's the entire net amount that

2      was deposited in this bank account on that day.

3              THE COURT:  OK.

4              MR. GROSS:  Thank you.

5              Mr. Kelly, can we flip back to slide 2 on the summary

6      chart, please?

7      BY MR. GROSS:

8      Q.  Mr. Richardson, directing your attention to the row marked

9      U.S. Senate Salary on the chart on the right side of the slide.

10     Do you see that?

11     A.  Yes.

12     Q.  And the U.S. Senate salary payment that we just

13     highlighted, did you include that in the corresponding deposits

14     cell?

15     A.  Yes.

16     Q.  And we also highlighted a transaction that you understood

17     to represent an expense reimbursement.  Do you remember that?

18     A.  Yes.

19     Q.  Did you include that transaction in the deposit cell for

20     U.S. Senate expense reimbursements for 2018?

21     A.  Yes.

22     Q.  And for the remaining months of 2018, did you undertake

23     substantially the same work, that is, reviewing bank statements

24     and identifying these transactions to populate the cells marked

25     U.S. Senate salary and U.S. Senate expense reimbursement?

O715men4                          Richardson - Direct

1    A.  Yes.

2    Q.  Mr. Richardson, directing your attention to the row marked

3    Credit Card Payments; do you see that, sir?

4    A.  Yes.

5    Q.  And I notice that the figure this time falls under the

6    column "Disburse" rather than "deposits".  Do you see that?

7    A.  Yes.

8    Q.  What is the significance of that, please?

9    A.  It represents disbursements from the 2018 Senate federal

10   credit union that went to the payment of credit cards.

11   Q.  Just to clarify.  By disbursement, what do you mean by

12   that?

13   A.  That the money was an outlay, the money flowed out of the

14   account versus coming into the account.

15           MR. GROSS:  Mr. Kelly, can we pull back up what's now

16   in evidence as DX 5H-102-2 and can we please zoom in on that?

17   Thank you.  And can you please highlight for the witness the

18   entry in the checking balance dated April 11, 2018?

19   Q.  Mr. Richardson, would you please read the second line of

20   the descriptor column for this transaction?

21   A.  Processed check - American Express.

22   Q.  And the amount, please?

23   A.  $906.87.

24   Q.  And what did you understand this transaction to reflect?

25   A.  I understood it to be a payment to American Express.

1          MR. GROSS:  Can we take that down and put up for the

2   witness what has been marked for identification as DX 2193-1?

3   Q.  Mr. Richardson, do you recognize this document?

4   A.  Yes.

5   Q.  What is it?

6   A.  It is an American Express credit card statement for Robert

7   Menendez.

8          MR. GROSS:  Your Honor, we offer DX 2193-1, and note

9   it is an excerpt of already in evidence, DX 2193?

10         THE COURT:  Admitted, without objection.

11         (Defendant's Exhibit 2193-1 received in evidence)

12         MR. GROSS:  Thank you, can you publish that,

13  Mr. Kelly?

14  BY MR. GROSS:

15  Q.  As we discussed a moment ago, Mr. Richardson, what is this

16  document?

17  A.  It is an American Express credit card statement.

18  Q.  For whom?

19  A.  Robert Menendez.

20         MR. GROSS:  Mr. Kelly, can we please go to the third

21  page of this document?  Can you zoom in on the portion labeled

22  detail and then under it, it reads payments?  Thank you.

23  Q.  Mr. Richardson, do you see the line under the heading

24  Payments, dated April 10, 2018?

25  A.  Yes.

1    Q.   And what does it say in the descriptor column?

2    A.   Payment received ACH.   Thank you.

3    Q.   And what is the amount?

4    A.   $906.87.

5          MR. GROSS:   Mr. Kelly, can we leave this up, please,

6    and then put below it or side by side, whichever is easier, the

7    transaction we were just looking at on DX 5H-102-2 and zoom in

8    on the checking balance, and then if you could highlight the

9    4/11 entry on the checking balance?   Thank you.

10   Q.   Mr. Richardson, I think you testified a moment ago that you

11   understood the transaction on 4/11/2018 reflected on the Senate

12   Federal Credit Union statement to reflect a payment to American

13   Express; is that right?

14   A.   Yes.

15   Q.   How do the amounts of that transaction compare to the

16   amount of the payment reflected on the American Express

17   statement?

18   A.   They agree.

19   Q.   And what about the dates?   Are those the same?

20   A.   The dates differ.

21   Q.   Do you have an understanding of -- do you understand that

22   sometimes it takes a day or two for a check to clear?

23         MS. GHOSH:   Objection.   Leading.   Foundation.

24         THE COURT:   Sustained.

25   Q.   I will try again.   As a general matter, Mr. Richardson, are

 1    you aware, one way or the other, whether a check payment out of

 2    a bank account appears on a bank statement immediately?

 3              MS. GHOSH:   Objection.

 4              THE COURT:   I will allow it.

 5    A.   There is usually a lag between when a payment is reflected

 6    on a statement such as this, a credit card statement, and when

 7    the payment amount clears in the bank account.

 8    Q.   Based on the dates, descriptors, and amounts of these

 9    payments, do you have an understanding of whether these reflect

10    the same transaction or a different transaction, two

11    payments -- the two transactions reflected on the screen?

12    A.   They reflect the same transaction.

13    Q.   Thank you.

14              THE COURT:   Why do you say that?  Because it is the

15    same amount?

16              THE WITNESS:   The dates are close, your Honor, it is

17    the same amount, and it was a payment for an American Express

18    account.

19              THE COURT:   Thank you.

20              MR. GROSS:   We can take that down.  Thank you,

21    Mr. Kelly.

22    Q.   I should have asked you Mr. Richardson, did you include

23    that transaction in the row marked Credit Card Payments on your

24    summary chart for 2018?

25    A.   Yes, I did.

O715men4                         Richardson - Direct

1    Q.  With respect to all of the credit card payments that you

2    identified for the year 2018, did you undertake substantially

3    the same work we just demonstrated to the jury?

4    A.  Yes.

5    Q.  Can you explain how you went about populating the row

6    marked Credit Card Payments?

7    A.  Yes.  I first analyzed all the bank account statements to

8    identify payments that went to credit cards.  Additionally, I

9    reviewed the credit card statements themselves, found

10   corresponding amounts; and thirdly, I reviewed cancelled checks

11   that were provided and that coincided with the same dollar

12   amounts and dates in the general vicinity and only then, once

13   upon reviewing all three facts, quantified them as a payment to

14   a credit card.

15   Q.  With that description, can you explain then what the

16   $31,278 figure represents?

17   A.  That is the aggregate total for 2018 of all credit card

18   payments.

19   Q.  Mr. Richardson, directing your attention to the row marked

20   Other Disburse.  Do you see that, sir?

21   A.  Yes.

22   Q.  What does that row reflect?

23   A.  That row reflects the sum of disbursements from the 2018

24   U.S. Senate federal credit union that does not fall in the

25   other categories on the disbursement side, specifically credit

1    card payments, New Jersey rental payments, Washington, D.C.

2    rental payments, and cash withdrawals.

3    Q.  Directing your attention to the row marked New Jersey

4    Rental Payments, what is the amount that appears in the

5    Disbursement column?

6    A.  $20,000.

7    Q.  What does that summarize?  What does that $20,000

8    summarize?

9    A.  It summarizes payments for a rental in New Jersey for the

10   year 2018.

11          MR. GROSS:  Mr. Kelly, can we please pull back up what

12   is already in evidence as DX 5H-102-1?  Can we please zoom in

13   on the bottom portion?  Thanks.

14   Q.  Mr. Richardson, what do you understand this portion of the

15   account statement to represent?

16   A.  It represents a summary of checks that cleared in the

17   current month.

18   Q.  And directing your attention to the row marked no. 597,

19   what is the amount of that check?

20   A.  $2,000.

21          MR. GROSS:  Mr. Kelly, can we pull up just for the

22   witness and the lawyers what's been marked for identification

23   as DX 5H-102-4?

24   Q.  Mr. Richardson, do you recognize this document?

25   A.  Yes.

1    Q.   What is it?

2    A.   It's check no. 597 in the amount of $2,000.

3              MR. GROSS:  Your Honor, we offer DX 5H-102-4 again an

4    excerpt of a government exhibit already in evidence?

5              THE COURT:  Admitted, without objection.

6              (Defendant's Exhibit 5H-102-4 received in evidence)

7              MR. GROSS:  Thank you.  And can we put that up for the

8    jury, please?  And Mr. Kelly, if we could leave this check up

9    and then pull back up the portion of the bank statement that we

10   were just looking at, the credit union statement?

11   BY MR. GROSS:

12   Q.   Mr. Richardson, before I ask you any questions -- well, how

13   does the number of this check compare to the number of the

14   check in the row we just discussed on the bank statement?

15   A.   They agree.

16   Q.   And how about the amount of the check?

17   A.   The amount agrees as well.

18   Q.   And Mr. Richardson, directing your attention to the memo

19   line of this check, which I recognize is a little difficult to

20   read so maybe zoom in, I would like to ask you to read what is

21   written in the memo line.

22   A.   Sure.  February 2018, rent for 330 Angelo -- I can't read

23   that -- drive, apartment 326.

24   Q.   Based on the memo line of the check, the date of the check

25   and the amount of the check, what did you understand this check

1   to represent?

2   A.   A payment for rent.

3   Q.   Drawn from what bank account?

4   A.   The Senate Federal Credit Union.

5          MR. GROSS:   Can we please put up -- we will take

6   down-4, please, and put up just for the witness and the lawyers

7   what's been marked for identification as DX 5H-102-5, that will

8   be just for the lawyers.

9   Q.   Mr. Richardson, do you recognize this document?

10  A.   Yes.

11  Q.   What is it?

12  A.   It's check no. 598.

13  Q.   Drawn from what bank account?

14  A.   Drawn from United States Senate Federal Credit Union.

15         MR. GROSS:   Your Honor, we offer DX 5H-102-5, again an

16  excerpt of a Government Exhibit already in evidence.

17         THE COURT:   Admitted, without objection.

18         MR. GROSS:   Thank you.

19         (Government's Exhibit 5H-102-5 received in evidence)

20         MR. GROSS:   Mr. Kelly, can you leave this up and pull

21  up the statement we were just reviewing Summary of Checks?   And

22  this time can you please highlight the entry marked 598?   Thank

23  you.

24  BY MR. GROSS:

25  Q.   Mr. Richardson, how do the number of the check and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    number reflected on the Summary of Checks on Senator Menendez'

2    Senate Federal Credit Union bank statement compare?

3    A.    The date and the amount -- excuse me, the number and the

4    amount agree.

5    Q.    Thank you.

6         And if you could please read -- and I will ask Mr. Kelly to

7    zoom in again -- the memo line on this check?  To the best of

8    your ability.

9    A.    February 2018 rent per 20-8th Street, apartment 2,

10   Northeast, D.C.

11   Q.    Thank you.  Based on the amount of the check, the number of

12   the check, and the memo line, what do you understand this check

13   to reflect?

14   A.    I understand it to be a rental payment for a property in

15   Washington, D.C.

16            MR. GROSS:  Mr. Kelly, we can take that down and we

17   can flip back to summary chart slide no. 2.

18   Q.    Directing your attention, Mr. Richardson, to the rows

19   marked New Jersey Rental Payments and Washington, D.C. Rental

20   Payments.  Do you see those, sir?

21   A.    Yes.

22   Q.    To populate each of those rows, did you actually identify

23   rent checks for each month of 2018?

24   A.    Yes.

25   Q.    Did you undertake the same work we just did in front of the

1  jury, that is, compare the check to a corresponding record of

2  the check being drawn on the senator's Senate Federal Credit

3  Union account?

4  A.  Yes.

5  Q.  Directing your attention to the row marked Cash

6  Withdrawals; do you see that, sir?

7  A.  Yes.

8  Q.  What does that reflect?

9  A.  It reflects withdrawals of cash throughout 2018 from the

10  Senate Federal Credit Union.

11  Q.  Is there any limitation that you place on the value of

12  withdrawals that are reflected in this chart?

13  A.  No.

14  Q.  So I want to make sure I understand.  Any cash withdrawal

15  reflected on a Senate Federal Credit Union bank statement in

16  the year 2018 that you were able to identify would be reflected

17  in this chart?

18  A.  Yes.

19  Q.  Directing your attention now to the totals row, can you

20  explain to the jury what that represents?

21  A.  Yes.  The totals represent the sum of the items identified

22  above in that particular column.  For example, for deposits

23  which total $112,170, that would be the total of the U.S.

24  Senate salary at $87,834, U.S. Senate Expense Reimbursement

25  $23,823, non-cash deposits at $513.  And similarly, for the

O715men4                          Richardson - Direct

1   $109,274, it would be sum of all the disbursements listed

2   above.

3   Q.  Thank you.

4        Finally directing your attention to the row marked Net

5   Increase in Bank Account for 2018; do you see that, sir?

6   A.  Yes.

7   Q.  What does that figure reflect?

8   A.  It represents or reflects the difference between the

9   deposits, which in this case is $112,170, less the

10  disbursements which was $109,274.

11  Q.  With respect to what bank account?

12  A.  United States Senate Federal Credit Union.

13  Q.  Thank you.

14       Let's flip, please, to the next slide of the summary 2019

15  and I am certainly not going to ask you to go through these

16  again, but I do want to ask you with respect to completing the

17  U.S. Senate salary row on the chart on the right side of the

18  slide, can you describe the work you did to populate that

19  entry?

20  A.  Yes.  It would be similar to what we described concerning

21  2018 where I reviewed the bank statements for the United States

22  Senate Federal Credit Union for 2019 and any deposit that had

23  the demarcation of U.S. Senate salary was added together and

24  resulted in the sum that you see $89,960.

25            THE COURT:  Did you go through the same procedures for

1  2019 that you just testified to for 2018?

2          THE WITNESS:  Yes, your Honor.

3  Q.  And is that the case with respect to what the Judge just

4  asked you, did you go through the same procedures.  Is that the

5  case with the row marked U.S. Senate Expense Reimbursement?

6          THE COURT:  Is it true for each and every line there,

7  sir?

8          THE WITNESS:  Yes, your Honor; for every item listed

9  on the chart.

10 Q.  Mr. Richardson, directing your attention to the row marked

11 New Jersey Pension.  Do you see that, sir?

12 A.  Yes.

13 Q.  Was that reflected on the 2018 page of the -- I'm sorry.

14 Was there an entry for New Jersey pension on the 2018 page of

15 the summary chart?

16 A.  No, it was not.

17 Q.  Why not?

18 A.  There was no deposits that I categorized as New Jersey

19 pension.

20         MR. GROSS:  Can we put up, please, what's been marked

21 as DX 5H-102-6, just for the witness and the lawyers?

22 Q.  Mr. Richardson, do you recognize this document?

23 A.  Yes.

24 Q.  What is it?

25 A.  It is a bank statement for the Senate Federal Credit Union.

1  Q.  In whose name?

2  A.  Robert Menendez.

3         MR. GROSS:  Your Honor, we offer DX 5H-102-6, again an

4  excerpt of a government exhibit already in evidence.

5         THE COURT:  Admitted, without objection.

6         (Defendant's Exhibit 5H-102-6 received in evidence)

7         MR. GROSS:  Can we publish that, please?

8  BY MR. GROSS:

9  Q.  Mr. Richardson, what is the date range of this statement?

10  A.  March 1, 2019, through March 31, 2019.

11         MR. GROSS:  And Mr. Kelly, can you scroll down to near

12  the bottom of the page, the portion reflecting the checking

13  balances?  A little further please.  There you go.

14  Q.  Mr. Richardson, directing your attention to the entry dated

15  March 29, 2019; do you see that, sir?

16  A.  Yes.

17  Q.  What did you understand the descriptor column of this

18  transaction to represent?

19  A.  I understood it to mean a deposit from the Department of

20  Pensions from New Jersey.

21  Q.  And what was the amount of this particular deposit?

22  A.  $1,066.66.

23  Q.  Did you include this deposit in the row on your summary

24  chart marked New Jersey Pension for the year 2019?

25  A.  Yes.

1   Q.  Did you review bank statements for the remaining months of

2   2019 and identify similar transactions?

3   A.  Yes.

4   Q.  Did you include those also in the row marked New Jersey

5   Pension for 2019?

6   A.  Yes.

7             MR. GROSS:  We can take that down.

8   Q.  Again, I'm not going to ask you to go through each of these

9   columns but I would like to direct your attention to the Totals

10  row, please.  Mr. Richardson, what does the Totals row reflect

11  on this slide?

12  A.  It represents the sum of the items listed above that are

13  spelled out.  Again, for the sum in deposits total for $134,406

14  would be the sum of the individual items in the deposits

15  column, and the $108,917 would be the sum of the individual

16  items listed in the disbursements column or truncated disburse

17  column.

18  Q.  What was the net increase in bank account for 2019?

19  A.  $25,489.

20  Q.  If you recall, was that higher or lower than the net

21  increase in bank account for 2018?

22  A.  It is higher.

23  Q.  And what, if any sources of income, came into the senator's

24  account in 2019 that did not come in in 2018?

25  A.  The New Jersey pension.

1          MR. GROSS:  Mr. Kelly, let's flip to the next slide.

2   Q.  Mr. Richardson, with respect to this slide, at least with

3   respect to entries that appear on prior slides, did you

4   undertake the same work for the year 2020 as you did for the

5   years 2019 and 2018?

6   A.  Yes.

7   Q.  Directing your attention to the line item marked social

8   security; do you see that, sir?

9   A.  Yes.

10  Q.  Did you include social security payments in 2018 or 2019?

11  A.  No, I did not.

12  Q.  Why not?

13  A.  There were no deposits in the years 2018 and 2019 in the

14  Senate Federal Credit Union bank account.

15         MR. GROSS:  Can we please put up for the witness and

16  the lawyers what's been marked as DX 5H-102-9?

17  Q.  Mr. Richardson, do you recognize this document?

18  A.  Yes.

19  Q.  What is it?

20  A.  It is a bank statement from the Senate Federal Credit Union

21  in the name of Robert Menendez.

22         MR. GROSS:  Your Honor, we offer DX 5H-102-9, again an

23  excerpt of a government exhibit already in evidence.

24         THE COURT:  Admitted.

25         (Defendant's Exhibit 5H-102-9 received in evidence)

1          MR. GROSS:  Zooming in on the upper portion of this

2     document, please, including the address?  Thank you, Mr. Kelly.

3     BY MR. GROSS:

4     Q.  Mr. Richardson, what is the date range of this bank

5     account?

6     A.  March 1, 2020 through March 31, 2020.

7     Q.  This bank account statement, thank you.  Directing your

8     attention please to the entry dated in the savings account

9     balance dated March 7, 2020.  Do you see that, sir?

10    A.  Yes.

11    Q.  What do you understand the descriptor column in that, for

12    that transaction to mean?

13    A.  A deposit -- electronic deposit of social security funds.

14    Q.  And did you include this transaction in your summary chart

15    for 2020 in the row marked Social Security?

16    A.  Yes.

17    Q.  And for the remaining months of 2020, did you undertake

18    substantially the same work to identify social security

19    transactions?

20    A.  Yes.

21    Q.  And did you include those as well in your summary chart?

22    A.  Yes.

23    Q.  Thank you.

24          MR. GROSS:  Mr. Kelly, if we can flip back to the 2020

25    page in the summary chart, slide 4?  Thank you.

O715men4                         Richardson - Direct

1   Q.  Directing your attention, Mr. Richardson, to the row

2   marked -- just give me one moment?

3           MR. GROSS:  Sorry.  Can we flip back for one second to

4   the slide just before this for one 2019?  Thank you.

5   Q.  Mr. Richardson, directing your attention to the row marked

6   Other Disbursements; do you see that?

7   A.  Yes.

8   Q.  What is the value of that row?

9   A.  $12,449.

10          MR. GROSS:  And Mr. Kelly, can we now go ahead to the

11  2020 slide, that is going to be slide 4?  Thank you.

12  Q.  What is the value of other disbursements on this slide,

13  Mr. Richardson?

14  A.  $44,313.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. GROSS:

2    Q.  How does that compare to the value of other disbursements

3    in 2019?

4    A.  It's greater.

5    Q.  By about how much?

6    A.  $32,000.

7            MR. GROSS:  Can we please put up what's been marked

8    as, for identification as 5H-102-11, just for the witness and

9    the lawyers.

10   Q.  Mr. Richardson, do you recognize this document?

11   A.  Yes.

12   Q.  What is it?

13   A.  It is a -- it's check No. 860 from the United States Senate

14   Federal Credit Union.

15           MR. GROSS:  Your Honor, we offer this document, DX

16   5H-102-11, again an excerpt of the government exhibit already

17   in.

18           THE COURT:  Admitted.

19           (Defendant's Exhibit 5H-102-11, received in evidence)

20           MR. GROSS:  Thank you.

21           Can we publish that, please.

22   Q.  Mr. Richardson, does this check reflect one of the payments

23   that was included in the other disbursements row for 2020?

24   A.  Yes.

25   Q.  And who is this check made out to?

1   A.  Hart to Hart Entertainment.

2   Q.  And if you can look in the memo line of the check and read

3   the memo line, to the extent you're able, please.

4   A.  "Menendez-Arslanian wedding classic DJ, etc."

5           MR. GROSS:  Thank you.  We can zoom out, Mr. Kelly.

6   Q.  Based on the memo line of this check, what do you

7   understand this check to be paying for?

8   A.  Payment for --

9           MS. GHOSH:  Objection.

10          THE COURT:  Sustained.

11  BY MR. GROSS:

12  Q.  Do you have an understanding, sir, of what this check is

13  paying for?

14          MS. GHOSH:  Objection.

15          THE COURT:  I take it your understanding is it's

16  Menendez Arslanian wedding classic DJ, etc.  Is that correct?

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  All right.  Next.

19          MR. GROSS:  We can take that down, Mr. Kelly.

20  Q.  Mr. Richardson, in the year 2020, in reviewing --

21          THE COURT:  I should say, let me change my question.

22  I should say I assume all you can say is that that's what's

23  noted in the memo line on that check.  Correct?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  You don't know anything else about what

O71Wmen5                          Richardson - Direct

1   that check to Hart to Hart was about?

2              THE WITNESS:  No, your Honor.

3              THE COURT:  OK.  Thank you.

4              MR. GROSS:  Thank you, your Honor.

5   Q.  Mr. Kelly, in your review of the senator's Senate Federal

6   Credit Union accounts -- account, excuse me, for the year 2020,

7   did you identify other transactions that appeared to you to be

8   wedding-related?

9              MS. GHOSH:  Objection.

10             THE COURT:  Sustained.

11  BY MR. GROSS:

12  Q.  Mr. Kelly, what, if anything, did you notice about the

13  other -- the transactions included in your other disbursements

14  column that was different in 2020 as compared to 2019 or 2021?

15             THE COURT:  Sustained.

16             MR. GROSS:  Let's please put back up the summary

17  chart, slide No. 4, Mr. Kelly.

18  Q.  Mr. Richardson, directing your attention to the totals row,

19  do you see that, sir?

20  A.  Yes.

21  Q.  Can you remind the jury what that row represents, please?

22  A.  The row represents the sum of the individual items listed

23  in the, in the column that it's in, demarcated deposits.

24  152,329 would be sum of all the deposits.  Items listed in the

25  106,335 would be the sum of all the items listed in the

O71Wmen5                      Richardson - Direct

1    disburse column.

2    Q.   What was the net increase in the bank account value for

3    Senator Menendez's Senate Federal Credit Union account in the

4    year 2020?

5    A.   That increase is $45,994.

6    Q.   If you recall is that higher or lower than in 2019?

7    A.   It was higher.

8    Q.   What, if any, sources of income did the senator receive in

9    2020 in this bank account that he did not receive in the same

10   bank account in 2019?

11   A.   Social security.

12           MR. GROSS:   Let's please, Mr. Kelly, flip to the next

13   slide.

14   Q.   And I won't walk you through each category again, but as a

15   general matter, Mr. Richardson, in populating this slide for

16   the year 2021, did you undertake substantially the same work to

17   complete each row as you did for the prior years?

18   A.   Yes.

19   Q.   And what was the net increase for this bank account in

20   2021?

21   A.   $63,922.

22           MR. GROSS:   Let's look to the next slide, please,

23   Mr. Kelly.

24   Q.   And again, did you do substantially the same work to

25   complete this chart for partial year 2022 as you did for the

1    preceding years?

2    A.  Yes.

3    Q.  And what was the net increase in Senator Menendez's Senate

4    Federal Credit Union bank account in partial year 2020 -- 2022,

5    excuse me?

6    A.  $29,152.

7          MR. GROSS:  Thank you.

8          Mr. Kelly, can we go to the next slide, please.

9    Q.  And Mr. Richardson, what does this slide represent?

10   A.  This slide represents a summary of all banking activity in

11   United States Senate Federal Credit Union for the period

12   January 2018 through June 2022.

13   Q.  And in that four-year period, what was the net increase in

14   Senator Menendez's Senate Federal Credit Union account?

15   A.  $167,453.

16         MR. GROSS:  We can go to the next slide, please.

17   Q.  Mr. Richardson, what does this slide represent?

18   A.  This slide represents the banking activity in the M&T Bank

19   account for the period January 10, 2018, through June 9, 2022.

20   Q.  And whose name was this account in?

21   A.  Robert Menendez.

22   Q.  And how did you, at a high level, perform the work to

23   complete the table on the right side of this page?

24   A.  I looked at each individual account statement, and I

25   scheduled out in Excel the beginning balance plus deposits less

1    disbursements and came up with the ending balance and then

2    ensured that the next statement's monthly beginning balance

3    began with the previous ending balance and then summarized for

4    each month the total deposits and disbursements and the ending

5    balance for each year.

6            MR. GROSS:  Thank you.

7    Q.  In the course of reviewing these records for the M&T Bank

8    account, what, if anything, did you notice about the nature of

9    the transactions in that account?

10   A.  They appeared to be for a rental property.

11   Q.  Can you explain that in more detail?

12   A.  Yes.  There was deposits that were made and checks that

13   stated rent, and then the disbursements appeared to be for

14   mortgage and expenses related to repairs and maintenance.

15           MR. GROSS:  Thank you.

16           Let's go to the next slide, please, Mr. Kelly.

17   Q.  Mr. Richardson, what does this slide represent?

18   A.  This slide represents a summary of credit cards that were

19   in Senator Menendez's name -- specifically, an American Express

20   card ending in account 0-32002, and J.P. Morgan Chase Bank

21   accounts ending in 6967 and 5383 for the period 28 -- January

22   2018 through March 2022.

23   Q.  And at a very high level, can you please explain the work

24   you did to populate the chart on the right side of the page?

25   A.  Yes.  As stated earlier, we summarized the charges and

1    payments for each of the individual credit cards for the years

2    2018 through 2022.  With that data we combined them into a

3    single Excel chart, and we added charges to the amounts, the

4    columns and charges together to come up with a total amount of

5    charges for the year and similarly for payments/credits that

6    were stated on the credit card statements.

7    Q.  And over the four-year period reflected on this chart, what

8    was the approximate difference between the charges made on

9    these three credit card accounts and the payments and credits

10   made to these three credit card accounts?

11   A.  Approximately a thousand dollars.

12          MR. GROSS:  Can we put up briefly, Mr. Kelly, what's

13   already in evidence as DX 2193-1.

14   Q.  Mr. Richardson, is this statement from one of the credit

15   card accounts that you reviewed and included on the slide we

16   just observed?

17   A.  Yes.

18   Q.  And directing your attention to the row marked payments,

19   which we looked at a little while ago --

20          MR. GROSS:  I'm sorry.  Mr. Kelly, it's actually the

21   payments below that one, under the word "detail."

22          Thank you.

23   Q.  -- do you see the letters ACH printed there?

24   A.  Yes.

25   Q.  Do you have an understanding of what ACH means?

O71Wmen5                        Richardson - Direct

1  A.  It means -- it was an electronic deposit.

2  Q.  Do you know what those letters stand for?

3  A.  I do not.

4  Q.  You do understand that it was an electronic deposit?

5  A.  Yes.

6          MR. GROSS:  Thank you.

7          Can we also put up briefly --

8          THE COURT:  In other words, a deposit that was made

9  electronically rather than through a piece of paper, a check,

10 is that right?

11         THE WITNESS:  Yes.  Yes, sir.

12         THE COURT:  All right.

13         MR. GROSS:  Thank you, your Honor.

14         Can we put up briefly, please, what's been marked for

15 identification, so just for the witness and the lawyers, DX

16 2192-2.

17 Q.  Mr. Richardson, do you recognize this document?

18 A.  Yes.

19 Q.  What is it?

20 A.  It is a credit card statement from J.P. Morgan Chase Bank

21 in the name of Robert Menendez.

22         MR. GROSS:  Your Honor, we offer DX 2192-2, which is

23 an excerpt of 2192, already in evidence.

24         THE COURT:  Admitted.

25         (Defendant's Exhibit 2192-2 received in evidence)

O71Wmen5                          Richardson - Direct

1    BY MR. GROSS:

2    Q.  Mr. Kelly -- Mr. Richardson, is this statement from one of

3    the credit card accounts that you reviewed and that was

4    reflected on the summary chart slide that we just looked at?

5    A.  Yes.

6              MR. GROSS:  Thank you.

7              And Mr. Kelly, if we could go to the third page of

8    this, please.  There actually is not a third page.  Just the

9    bottom of the page in the portion marked payments and other

10   credits.  Do you see that?

11   Q.  And directing your attention to the row dated 6/21, do you

12   see -- can you please what's read in the descriptor column for

13   that payment?

14   A.  "Payment thank you-check."

15   Q.  As a general matter, in reviewing credit card statements --

16   I'm not asking you every time, but as a general matter -- did

17   the statements generally state what the form of payment for

18   credit cards was, so that is ACH or check or similar?

19   A.  It -- more times than not it did.

20   Q.  And in the course of reviewing the credit card statements

21   that you reviewed to do your work, how many payments in cash

22   did you see reflected on credit card statements?

23   A.  I saw no payments of cash for the credit card statements

24   based on the records I reviewed.

25             MR. GROSS:  You can take that down, Mr. Kelly.

O71Wmen5                        Richardson - Direct

1              THE COURT:  I don't want to put words in your mouth.

2    Is your testimony that for the payments on credit cards that

3    you reviewed, that line either read check or didn't have an

4    entry?

5              THE WITNESS:  Sometimes, your Honor, it would say,

6    payment, thank you; payment, web payment.  It varied.

7              THE COURT:  All right.

8              THE WITNESS:  And other times it would say check or

9    ACH.

10             THE COURT:  But I think you said you can say that it

11   never said payment cash.

12             THE WITNESS:  Based on my review, I did not see

13   anything that said it was a payment by cash.

14             THE COURT:  Thank you.

15             MR. GROSS:  One moment, your Honor?

16             Mr. Kelly, can we put back up the summary chart,

17   please, where we left off.  And go to the next slide, please.

18   Q.  Mr. Richardson, what does this slide reflect?

19   A.  This slide represents cash withdrawals from the United

20   States Senate Federal Credit Union for the period 2008 through

21   June 2022.

22   Q.  Does this chart reflect all of the cash withdrawals that

23   you observed on the credit card statements for that -- I'm

24   sorry, the credit union statements for that 14-year period?

25   A.  No, it did not.

O71Wmen5                        Richardson - Direct

1  Q.  What limitations, if any, were placed on the withdrawals

2  that you included on this table?

3  A.  The limitation was to only include deposits -- cash

4  withdrawals in the amounts of $400 to $403.50.

5           MR. GROSS:  Mr. Kelly, in the --

6  Q.  Mr. Richardson, in the course of reviewing the senator's

7  bank statements from the 14-year period between 2008 and 2022,

8  what, if any, pattern did you observe regarding Senator

9  Menendez's cash-withdrawal behaviors?

10          MS. GHOSH:  Objection.

11          THE COURT:  Sustained.

12 BY MR. GROSS:

13 Q.  Mr. Kelly, did you, in the course of reviewing these

14 documents, notice any regular intervals or amounts at which

15 withdrawals were made?

16          MS. GHOSH:  Objection.

17          THE COURT:  Sustained.

18 BY MR. GROSS:

19 Q.  Turning back to the chart, as an average, over the course

20 of this, over this 14-year period, how many withdrawals in the

21 amount of between 400 and $403 or $403.50 did Senator Menendez

22 make from his Senate Federal Credit Union account?

23 A.  Almost 26 withdrawals a year, 25.9.

24 Q.  And what was the average value of the withdrawals, just in

25 this narrow range, each year of this 14-year period?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  $10,384.38.

2    Q.  And over the course of the 14-year period, what was the

3    total value of withdrawals just in the range between 400 and

4    $403.50 that you observed?

5    A.  $150,573.50.

6    Q.  And I think you said earlier that you -- I'll just ask you.

7         Did you observe cash transactions that, in amounts -- cash

8    withdrawals in amounts less than $400?

9    A.  Yes.

10    Q.  And did you observe cash withdrawals in amounts of more

11    than $400?

12    A.  Yes.

13    Q.  Had you included those withdrawals, the ones greater than

14    $400 or less than $400 on this chart, approximately how much

15    more in withdrawals would this chart have reflected?

16    A.  Approximately 28 to $30,000 more.

17              MR. GROSS:  And, OK.  Let's go, please, to the next

18    slide.

19    Q.  Mr. Richardson, what does this slide reflect?

20    A.  This slide reflects all deposits between January 2008

21    through June '22 that were in the amount of $400 to $403.50.

22    Q.  Mr. Richardson, I think you may have -- does this chart

23    reflect all deposits in cash or all withdrawals in cash?

24    A.  I apologize.  I said deposits.  I meant cash withdrawals.

25         It reflects all cash withdrawals in the amount of $400 to

1    $403.50 between January 2008 and June '22.

2              MR. GROSS:  Thank you.

3              THE COURT:  And if I understand, the total of those

4    withdrawals over a 14-year period is $150,000?

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  All right.  Thank you.

7              MR. GROSS:  Can we please put up what's in evidence as

8    Government Exhibit 5W-1.  Thank you, Mr. Kelly.

9    Q.  Mr. Richardson, what do you understand this document to be?

10   A.  A membership application.

11   Q.  Can you tell for what?

12   A.  An account, an account opening, a bank account opening.

13   Q.  And what is the date of the membership application?

14   A.  September 19, 1995.

15             MR. GROSS:  Thank you.

16             And Mr. Kelly, can we scroll to the next page, please.

17   And can we highlight the portion on the left side of the page,

18   this little entry here, all the way to the bottom, please.

19   Q.  What do you understand this to reflect, Mr. Richardson?

20   A.  The application for membership was approved.

21   Q.  And what's the date of approval?

22   A.  September 22, 1995.

23             MR. GROSS:  Thank you.  And we can take that down.

24             If we can go to the next page, please, Mr. Kelly.

25   Q.  And what is the name of the credit union that's listed on

1    this page?

2    A.  Congressional Federal Credit Union.

3    Q.  And what do you understand this document to be?

4    A.  The account closure.

5    Q.  And what is the date of the account closure?

6    A.  December 9, 2016.

7            MR. GROSS:  At this time, your Honor, I'd like to read

8    a portion of a stipulation into the record.

9            Mr. Kelly, can we please put up the stipulation marked

10   DX 2503.

11           THE COURT:  Proceed.

12           MR. GROSS:  Thank you, sir.  And can we please go to

13   the second page, please.  And zooming in on the second

14   paragraph.  The paragraph marked No. 2, excuse me.

15           This stipulation between the parties reads:

16           "As a matter of general practice, the Congressional

17   Federal Credit Union does not retain account records for a

18   period of longer than seven years and makes efforts to destroy

19   account records older than seven years.  Other than the

20   documents marked for identification as Government Exhibit 5W-1,

21   no additional records relating to the account ending in X83 in

22   the name Robert Menendez have been located by the Congressional

23   Federal Credit Union."

24           We can take that down.

25   Q.  Mr. Richardson, were you asked at any point to perform work

1    extrapolating the value of withdrawals that might have been

2    made in an account belonging to Senator Menendez in the past?

3    A.  Yes.

4    Q.  And what was the account belonging to Senator Menendez in

5    the past that you used to extrapolate the value of those

6    withdrawals?

7    A.  The Congressional Federal Credit Union.

8    Q.  And what was -- what were the dates that you used to

9    extrapolate those amounts?

10    A.  October 1995 through December 2007.

11    Q.  And where do those dates come from?

12    A.  They came from the account opening, which we saw the

13    account opened in October -- excuse me, September 1995.  And

14    then the account closed in 2016.

15    Q.  And what does this chart reflect?

16    A.  It reflects my extrapolation of cash withdrawals for the

17    years 1995 -- specifically, October to December of 1995 --

18    through December 2007.

19    Q.  Did you actually see records of any of these withdrawals?

20    A.  No, I did not.

21    Q.  How did you determine how many -- the value of withdrawals

22    to include in this chart?

23    A.  I --

24                MS. GHOSH:  Objection.

25                THE COURT:  I'll allow it.

1        How did you choose a value if you didn't see any

2   records?  You can answer.

3        THE WITNESS:  I utilized the information that was

4   gained from the cash withdrawals in the Senate Federal Credit

5   Union for the years 2008 through June '22; specifically, the

6   withdrawals between the dollar range of 400 and 403.50.

7        THE COURT:  What's the basis for -- I take it your

8   conclusion was that the same amount was withdrawn from this

9   account as from that account, correct?

10       THE WITNESS:  Yes, your Honor.

11       THE COURT:  Approximately 400 a month, is that right?

12       THE WITNESS:  400 --

13       THE COURT:  At this time.

14       THE WITNESS:  400 at a time, your Honor.

15       THE COURT:  At a time, each paycheck.

16       THE WITNESS:  From each cash withdrawal from the bank

17  account, whether it be an ATM or a check.

18       THE COURT:  I'm sorry.  That's the right way to say

19  it.

20       What's the basis for your assumption --

21       THE WITNESS:  My -- my --

22       THE COURT:  Just a moment.

23       THE WITNESS:  Sorry.

24       THE COURT:  -- that the withdrawal was the same for

25  one account as the other one if you didn't see any withdrawal

1    documents?

2            You can answer.

3            THE WITNESS:  I based my assumptions on the average

4    number of withdrawals that I identified over a course of a

5    14-1/2-year period and then the total sum of the yearly cash

6    withdrawals.  So I took the averages of the 14-1/2-year data,

7    and I extrapolated it back.

8            THE COURT:  Next question.

9            MR. GROSS:  Thank you, your Honor.

10   Q.  And based on that exercise, what is the extrapolated value

11   of cash withdrawals over the 12-year period between October

12   1995 and the end of 2007?

13   A.  $127,208.66.

14           MR. GROSS:  Just a moment, your Honor?

15           THE COURT:  Having seen no underlying documents

16   supporting that calculation, correct?

17           THE WITNESS:  Correct, your Honor.

18   BY MR. GROSS:

19   Q.  Mr. Richardson, did you see any records of cash withdrawals

20   from the Congressional Federal Credit Union account at all?

21   A.  No, I did not.

22           MR. GROSS:  No further questions at this time, your

23   Honor.

24           THE COURT:  Thank you.

25           Mr. Lustberg, anything at this time, sir?

1          MR. LUSTBERG:  No, your Honor.

2          THE COURT:  Mr. De Castro.

3          MR de CASTRO:  No, your Honor.

4          THE COURT:  Any cross by the government?

5          MS. GHOSH:  Yes, your Honor.

6          THE COURT:  Is the jury OK?  Would the jury like a

7  break?

8          All right.  We'll continue.

9          MS. GHOSH:  Ms. Wechsler, could we please bring up

10 Defense Exhibit 2513.

11 CROSS-EXAMINATION

12 Q.  Good afternoon, Mr. Richardson.

13 A.  Good afternoon.

14 Q.  Looking at slide 1 of your chart, 2513, this slide shows

15 the accounts that you reviewed for these slides, is that right?

16 A.  Yes.

17 Q.  So three credit cards that Menendez used, is that what this

18 says?

19 A.  I'm seeing two on my chart.

20 Q.  Is there an American Express credit card?

21 A.  Yes.  I'm sorry.  I thought you said J.P. Morgan.  I

22 apologize.

23 Q.  So three credit cards that Menendez used?

24 A.  Yes.

25 Q.  And three bank accounts that Menendez used?

1   A.  I analyzed the records in four and five, not the

2   Congressional Federal Credit Union.

3   Q.  OK.  That was an account of Menendez, though, right?

4   A.  Yes.

5   Q.  And those bank accounts included both deposits and

6   disbursements?

7   A.  Yes.

8   Q.  In the set of slides, Defense Exhibit 2513, there are at

9   least two slides related to Menendez's cash withdrawals from

10  the Senate Federal Credit Union account, right?  If you want to

11  go to slides 10 and 11, we can look at those briefly.

12  A.  Yes, please.

13  Q.  This relates to cash withdrawals?

14  A.  Yes.

15  Q.  And if we could go to 11, this also relates to cash

16  withdrawals?

17  A.  Yes.

18          MS. GHOSH:  Could we go to slide 9 for a moment,

19  please, Ms. Wechsler.

20  Q.  This summarizes Menendez's credit card spending from 2018

21  to 2022, correct?

22  A.  Yes.

23  Q.  And the blue bar is the amount spent on the particular

24  credit cards listed at the top of the slide?

25  A.  The blue is the charges.  So it's purchases.

1  Q.  What about cash spending; do any of your charts show how

2  much Menendez spent in cash each year?

3  A.  No.

4  Q.  You said he withdrew about $400 in cash every three weeks,

5  is that right?

6  A.  As evidenced on the charts, yes.

7  Q.  Do you know how much of that cash he then spent?

8  A.  No, I do not.

9  Q.  You would agree he spent some, correct?

10  A.  I have no records to support.

11          MR. GROSS:  Objection, your Honor.

12          THE COURT:  Pardon?

13          MR. GROSS:  Objection to the question.  You would

14  agree he spent some, assumes facts.

15          THE COURT:  Well, let's see.  You can answer, sir.

16  A.  I have no records to support the spending of cash.

17          THE COURT:  So you don't know one way or the other?

18          THE WITNESS:  I do not.

19          THE COURT:  OK.  He could have spent all of it, he

20  could have spent none of it, he could have spent some of it, as

21  far as you know?

22          THE WITNESS:  Correct, your Honor.  I have no records

23  to substantiate any cash expenditures.

24  BY MS. GHOSH:

25  Q.  You reviewed his credit card statements, correct?

1    A.  Yes.

2    Q.  And there aren't any credit card payments for dry cleaning,

3    right?

4    A.  I did not look at every line item charged.  I did skim

5    them, but I didn't analyze every nitty-gritty payment on them.

6    Q.  Sitting here today, do you recall seeing any credit card

7    payments for dry cleaners?

8    A.  I do not.

9    Q.  You've seen Menendez wearing a suit, right?

10            THE COURT:  I'm sorry.

11            Is your testimony that you do not recall seeing any

12   credit card payments for dry cleaners?  Is that correct?

13            THE WITNESS:  Correct, your Honor.

14            THE COURT:  All right.

15   BY MS. GHOSH:

16   Q.  And you've seen Menendez wearing a suit?

17   A.  Yes, I have.

18   Q.  Did anyone provide you with receipts for every cash

19   purchase that Menendez made between 2008 and 2022?

20   A.  I have no records of any cash purchases.

21   Q.  Did you review any records related to purchases made by

22   others for Menendez?

23   A.  I only reviewed records pertaining to Senator Menendez.

24   Q.  So if someone else had paid for dinner, for example, those

25   records weren't part of your review?

1              MR. GROSS:  Objection.

2              THE COURT:  I'll allow it.

3   A.  I reviewed credit card statements that I believe were paid

4   by others, yes.

5   Q.  So if another individual paid for things for Menendez, were

6   those records part of your review?

7   A.  They were not included in my charts.

8   Q.  Did you review --

9              THE COURT:  The testimony says, you said:  I reviewed

10  credit card statements that I believe were paid by others, yes.

11             Is that what you meant to say, sir?

12             THE WITNESS:  I reviewed other credit cards, your

13  Honor, that were not paid directly by Senator Menendez.

14             THE COURT:  OK.  Thank you.

15  BY MS. GHOSH:

16  Q.  Did you review records related to things given to Menendez

17  by other people?

18  A.  I had no records that showed anything was given to Senator

19  Menendez.

20  Q.  Did you review any records related to an elliptical

21  exercise machine?

22  A.  I reviewed no such records.

23  Q.  Did you review any records relating to cash that was given

24  to Menendez by other people?

25  A.  I reviewed no records of that nature.

1    Q.  Is it fair to say that if cash were given to Menendez that

2    wouldn't show up on a bank statement if he didn't deposit it in

3    a bank?

4              MR. GROSS:  Objection.  Asked and answered.

5              THE COURT:  I'll allow it.

6              You may answer if you can.

7    A.  May you please repeat the question?

8    Q.  Certainly.

9         Is it fair to say that if cash were given to Menendez that

10   wouldn't show up on a bank statement if he didn't deposit it in

11   a bank?

12   A.  Correct.

13   Q.  In the records you reviewed, did Menendez ever withdraw

14   $10,000 in cash at once from a bank?

15   A.  Not from my review of the records.

16             MS. GHOSH:  I'd like to go to slide 10 in Defense

17   Exhibit 2513.

18   Q.  This chart indicates that the minimum cash withdrawal for

19   each year from 2008 through June 2022 was $400, correct?

20             MR. GROSS:  Objection.  Misstates.

21             MS. GHOSH:  My question was this chart indicates --

22             THE COURT:  Sustained.

23             I'll allow you to answer that question, sir.  Does

24   that chart indicate that the minimum cash withdrawals for each

25   year from 2008 through June of 2022 was $400?  Yes or no.

1          THE WITNESS:  No, your Honor.  My chart summarizes the

2   withdrawals that I quantified on my chart.  I used a very

3   narrow parameter in preparing this chart.  There were

4   deposits -- there were cash withdrawals less than $400 and

5   there was cash withdrawals greater than $403.50.

6   BY MS. GHOSH:

7   Q.  And so can you point us to where on this chart that

8   limitation is indicated?

9   A.  It is not indicated on the chart.

10          THE COURT:  I'm a little confused.

11          On the chart that's up now, DX 5H-102, the third

12   column says minimum cash withdrawal amount, and that column all

13   has $400 in it as the minimum cash withdrawal amount.

14          THE WITNESS:  Yes, your Honor.  That is what the chart

15   says.  In my review of the bank accounts, there were

16   withdrawals that were less than that amount.  However, I did

17   not capture them on my chart.  I utilized a threshold of $400.

18          THE COURT:  All right.

19   BY MS. GHOSH:

20   Q.  And again, sir, is that threshold of $400 listed on this

21   chart anywhere?

22   A.  No, it is not.

23   Q.  So you would agree that is not actually the minimum cash

24   withdrawal amount?

25   A.  As far as what was through the bank accounts or on my

O71Wmen5                        Richardson - Cross

1    chart?

2    Q.  The bank account listed here, the United States Senate

3    Federal Credit Union account ending in 8151.

4    A.  No.  There were cash withdrawals less than $400.

5    Q.  So is it fair to say that the minimum cash withdrawal

6    amount is $400 when you only take the cash withdrawals of the

7    minimum of $400?

8    A.  Yes.

9           THE COURT:  What led you to choose $400?

10          THE WITNESS:  In discussion with defense counsel, that

11   was the number we decided to use.

12          THE COURT:  Defense counsel gave you those

13   instructions?

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  All right.

16   BY MS. GHOSH:

17   Q.  This chart also lists maximum withdrawal for each of those

18   years as either 400, 403, $403.25 or $403.50.  Maximum means

19   largest, correct?

20   A.  Yes.

21   Q.  Fair to say that those are not the largest cash withdrawals

22   in this account during this time period?

23   A.  That is correct.

24   Q.  The range listed on here of between 400 and $403.50, that's

25   quite a narrow range, isn't it?

O71Wmen5                         Richardson - Cross

1    A.   Yes.

2    Q.   That range would suggest a very consistent pattern of

3    withdrawals, wouldn't it?

4    A.   Yes.

5    Q.   But as you just agreed, that's not actually what the

6    account shows, is it?

7    A.   Yes.

8    Q.   There were cash withdrawals smaller than $400, right?

9    A.   Yes.

10         MS. GHOSH:   Could we put up Government Exhibit 5H-102

11   at page 287.

12   Q.   Do you see at the bottom cash dispense clearing $31?

13   A.   Yes.

14   Q.   You would agree this is a receipt for a $31 cash

15   withdrawal?

16   A.   Yes.

17   Q.   You agree $31 is less than $400?

18   A.   Yes.

19         MS. GHOSH:   Could we put up 5H-102, same document, at

20   page 325.

21   Q.   Do you see a $200 cash withdrawal on May 5, 2022?

22   A.   Yes.

23   Q.   You agree $200 is less than $400?

24   A.   Yes.

25   Q.   And there were also cash withdrawals larger than 403.50,

O71Wmen5                          Richardson - Cross

1    correct?

2    A.  Yes.

3           MS. GHOSH:  Could we put up the same document, 5H-102

4    at page 324.

5    Q.  And do you agree this shows a $500 cash withdrawal on April

6    7, 2022?

7    A.  Yes.

8    Q.  That date is within the time frame on your chart?

9    A.  Yes.

10   Q.  Can you agree $500 is more than $400?

11   A.  I do.

12   Q.  Do you agree your chart is not correct when it says that

13   the maximum cash withdrawal in 2022 was $400?

14          MR. GROSS:  Objection.  Argumentative.

15          THE COURT:  No.  I'll allow it.

16   A.  May you please repeat the question?

17   Q.  Do you agree that your chart is not correct when it says

18   that maximum cash withdrawal in 2022 was $400?

19   A.  If that's the amount I have in that column, then yes, it's

20   incorrect.

21   Q.  And you said you were aware of cash withdrawals that were

22   higher and lower than the amounts listed on the chart?

23   A.  Yes.

24   Q.  And you said it was the defense attorneys' decision not to

25   include those?

1    A.   In discussions with them, this was the chart we decided to

2    proceed with.

3              MS. GHOSH:  I'd like to look at slide 11 of Defense

4    Exhibit 2513.

5              THE COURT:  Go back to the main chart, the

6    withdrawals.

7              MS. GHOSH:  That's slide 10 of Defense Exhibit 2513.

8              THE COURT:  Do you see the third column that says

9    minimum cash withdrawal amount --

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  -- and the fourth column, maximum cash

12   withdrawal amount?

13             Is it your testimony that those columns do not reflect

14   the actual minimum cash withdrawal amount and the actual

15   maximum cash withdrawal amount for those columns?

16             THE WITNESS:  Yes, your Honor.  I can't say without

17   looking at the data for every year which ones that wouldn't be

18   accurate, but there are withdrawals less than 400 in years and

19   there are withdrawals greater than the 403.50 in other years.

20             THE COURT:  And is it your testimony that it was

21   counsel that chose the $400 figure and the $403.50 figure as

22   well?

23             THE WITNESS:  Based on discussion with counsel and

24   analyzing all the data, it was determined that the others were

25   more outliers and so forth, and we decided to go with the

1    range, the narrow range that we have presented here on the

2    screen as it showed a more, you know, consistent withdrawal of

3    cash.  Some were less, some were more, but this was the general

4    pattern indicated by the number of cash withdrawals in each

5    year of those amounts.

6           THE COURT:  But you didn't include those that did not

7    reflect what you've said is a pattern of consistent

8    withdrawals, is that right?

9           THE WITNESS:  Correct, your Honor.

10          THE COURT:  Because they were outliers?

11          THE WITNESS:  Yes.

12          MS. GHOSH:  Can we go to slide 11, please.  If you can

13    read --

14          THE COURT:  But that's not on the chart, right?  That

15    constraint on your calculations is not set forth on the chart,

16    is that correct?

17          THE WITNESS:  That is correct, your Honor.

18          THE COURT:  All right.

19          Go ahead.

20          MS. GHOSH:  Thank you.

21    Q.  We're on slide 11 now of Defense Exhibit 2513.  Can you

22    read at the top the title is cash withdrawals from U.S. SFCU

23    January 2018 -- excuse me, January 2008 to June 2022?  But

24    that's not what this chart shows either, correct?

25          MR. GROSS:  Objection, your Honor.  Misstates.

1          THE COURT:  Well, let's see.

2    A.  The -- the deposits listed on the chart are from January

3    2008 through March of '22.

4    Q.  This is not all of the cash withdrawals from that account

5    during that time frame, right?

6    A.  It would be withdrawals of $400 to 403.50, as annotated on

7    the right side.

8    Q.  So you have to look at that tiny asterisk in the bottom

9    right corner to understand what this chart is showing, is that

10   fair to say?

11          MR. GROSS:  Objection, your Honor.

12          THE COURT:  Yes.  Sustained.

13          What's put on the lower right is necessary to

14   understand, consistent understanding what the chart reflects,

15   is that correct?

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  All right.

18   BY MS. GHOSH:

19   Q.  Would the words "cash withdrawals of $400 to $403.50" have

20   fit in the title at the top?

21          MR. GROSS:  Objection.

22          THE COURT:  Yes.  Sustained.

23          Let me see the title.

24          Next question.

25   BY MS. GHOSH:

```
 1   Q.  Sir, do you agree that the qualification listed in the
 2   bottom right corner next to the asterisk that this chart only
 3   shows withdrawals of $400 to $403.50 is important to accurately
 4   understand what this chart shows?
 5   A.  Yes.
 6              MS. GHOSH:  I'd like to look now --
 7              THE COURT:  I take it that's why you put it in that
 8   footnote, correct?
 9              THE WITNESS:  Yes, your Honor.
10              THE COURT:  Who made the decision to put it in a
11   footnote rather than in the title of that chart.
12              THE WITNESS:  That would have been me, your Honor.
13              THE COURT:  Next question.
14              MS. GHOSH:  I'd like to look at the extrapolated cash
15   chart, which is slide 12.
16              THE COURT:  Is that done by you after consultation
17   with the attorneys?
18              THE WITNESS:  The asterisks, your Honor?
19              THE COURT:  Yes.  Putting it in an asterisk as opposed
20   to in the title.
21              THE WITNESS:  It was just my style, your Honor.  I
22   didn't give any other thought to it other than put it there.
23              THE COURT:  All right.  Thank you.
24              MS. GHOSH:  Go to slide 12, please.
25   Q.  What is the source listed on this slide?
```

1    A.  GX 5W-1.

2    Q.  You agree that that is not where the information in this

3    slide actually comes from?

4    A.  It's where the dates come from, but everything else did not

5    come from there.

6    Q.  Do the records in 5W-1 show any cash withdrawals from the

7    congressional bank account?

8    A.  No, they do not.

9    Q.  And to be clear, you haven't seen any bank records showing

10   the withdrawal amounts listed in this slide, correct?

11   A.  Correct.

12   Q.  This slide is based on assumptions?

13   A.  Yes.

14   Q.  Are those your assumptions or the defense team's

15   assumptions?

16           MR. GROSS:  Objection.

17           THE COURT:  Did the lawyers give you those

18   assumptions?

19           THE WITNESS:  They were my assumptions based on the

20   previous chart that I extrapolated back.

21   BY MS. GHOSH:

22   Q.  So to get to the assumed average cash withdrawal amount of

23   $400.94, you relied on the data in slide 10 that we were

24   looking at a moment ago?

25   A.  Yes.

O71Wmen5                          Richardson - Cross

1    Q.  And that's the slide that omitted certain withdrawals that
2    were higher or lower than approximately $400?
3    A.  Yes.
4    Q.  Is it fair to say that including higher and lower amounts
5    would have affected the average withdrawal?
6    A.  Yes.
7    Q.  The $400.94 assumed average is only the assumed average if
8    you exclude the cash withdrawals higher and lower than roughly
9    $400, correct?
10   A.  Correct.
11   Q.  In any event, this slide makes an assumption about how much
12   cash was withdrawn between October 1995 and the end of 2007,
13   correct?
14   A.  Correct.
15   Q.  Those numbers don't come from the source referenced here?
16   A.  Correct.
17   Q.  Assuming there were cash withdrawals, do you know if
18   Menendez kept all that cash?
19   A.  No, I do not.
20   Q.  If you assume he had kept every single penny of that cash
21   that you assume he withdrew from 1995 through 2007, how much
22   cash are you assuming he withdrew, as reflected in this chart?
23   A.  I'm assuming he withdrew $127,208.66.
24   Q.  Now, to be clear, you don't actually know the amount, if
25   any, of cash withdrawn during that period, do you?

O71Wmen5                       Richardson - Cross

1    A.  No, I do not.

2    Q.  It could be lower than 127,000?

3    A.  Yes.

4    Q.  It could be half of that?

5    A.  Yes.

6    Q.  Could be zero?

7    A.  Yes.

8    Q.  You testified earlier, on direct, the actual amount that

9    you got from 2008 through 2022 was approximately 28 to $30,000

10   more than you list in slide 10, is that right?

11   A.  Yes.

12   Q.  That's roughly $185,000?

13   A.  Yes.

14   Q.  So if you add together the $180,000 of actual cash

15   withdrawals and the $127,000 that you're assuming was

16   withdrawn, fair to say that's about $307,000?

17   A.  Yes.

18   Q.  So if Menendez never spent a penny of that, he would have

19   made about $307,000 in cash withdrawals over that entire time

20   period?

21   A.  Yes.

22   Q.  From bills he withdrew from the bank between 1995 and 2022?

23   A.  Yes.

24        MS. GHOSH:  Could we put up Government Exhibit 1340,

25   please, for a moment.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Fair to say that 307,000 is less than 552,000?

2    A.  Yes.

3    Q.  And 307,000 is less than 402,000?

4    A.  Yes.

5    Q.  Approximately $95,000, right?

6    A.  Yes.

7            MS. GHOSH:  We can take that down.

8            Let's turn to a different topic.

9    Q.  At some point someone reached out to you about hiring you

10   to work on this case, correct?

11   A.  They reached out to my office, yes.

12   Q.  Who reached out?

13   A.  I do not know.

14   Q.  Around when was that?

15   A.  I believe April of this year.

16   Q.  Did members of the defense team interview you before hiring

17   you?

18   A.  They spoke with our firm, yes.

19   Q.  And you were ultimately hired by the defense team, correct?

20   A.  Yes.

21   Q.  Through a consulting firm?

22   A.  Guidepost Solutions, yes.

23   Q.  And Guidepost, that's the brand that you see on the slides

24   on your chart?

25   A.  Yes.

1   Q.  You said on direct that you don't know what your billing

2   rate is in this matter, is that correct?

3   A.  That's correct.

4   Q.  What's your estimate?

5   A.  I have no idea what my, my billing rate would be.

6   Q.  Fair to say it's hundreds of dollars an hour?

7   A.  Yes.

8   Q.  More than $500 an hour?

9   A.  I have no basis for that.

10  Q.  And you've worked about 175 hours on this matter?

11  A.  I would say that would be a fair approximation.

12  Q.  And of those 175 hours, part of that time has involved

13  meeting with the defense?

14  A.  Yes.

15  Q.  Did the defense send you their legal filings or discuss

16  strategy with you?

17  A.  We discussed the financial charts and data that I was asked

18  to analyze.

19  Q.  Including limiting the range to 400 to $403?

20  A.  Yes.

21  Q.  Do you know whether any cash was seized on June 16, 2022,

22  in connection with this case?

23  A.  Just what I've seen in the paper.

24          THE COURT:  No.  Exclude that, sir.

25          THE WITNESS:  Oh.

1           THE COURT:  Excluding that, do you know?

2           THE WITNESS:  No.

3    BY MS. GHOSH:

4    Q.  Do you know whether over half a million dollars in cash was

5    seized on that date?

6    A.  I'm sorry.  Could you repeat that?  I'm hearing something

7    else.

8           THE COURT:  Do you have any knowledge as to how much

9    cash, if any, was seized on June 16, 2022, in connection with

10   this case?  Not having any -- forget what you may have read or

11   seen in the papers.

12   A.  I have no direct knowledge.

13   Q.  You don't know the source of any money seized on June 16,

14   2022, do you?

15          MR. GROSS:  Objection.

16          THE COURT:  Sustained.  He doesn't apparently know

17   that any was seized.

18   BY MS. GHOSH:

19   Q.  You've never been to 41 Jane Drive, have you?

20          MR. GROSS:  Objection.

21          THE COURT:  No.  I'll allow it.

22   A.  No, I have not.

23   Q.  You haven't sat on the back patio with Menendez?

24          THE COURT:  Sustained.  Beyond the scope.

25   BY MS. GHOSH:

1    Q.  You weren't there when envelopes of cash were put into a

2    safe in the house?

3            THE COURT:  Sustained, yes.

4            MS. GHOSH:  Just one moment, your Honor?

5            No further questions.

6            THE COURT:  Mr. Gross, anything?

7            MR. GROSS:  Yes.  Briefly, your Honor.

8            THE COURT:  Yes, sir.

9            MR. GROSS:  Mr. Kelly, can we put up slide 2 of

10   DX-2513.

11   REDIRECT EXAMINATION

12   BY MR. GROSS:

13   Q.  Mr. Richardson, directing your attention to the row marked

14   cash withdrawals on this slide, do you see that, sir?

15   A.  Yes.

16   Q.  Does that figure reflect only a portion of the withdrawals

17   you observed, or does it reflect all of the withdrawals you

18   observed in the year 2018 from Senator Menendez's Senate

19   Federal Credit Union account?

20   A.  It reflects all cash withdrawals in 2018.

21   Q.  Not limited to withdrawals between 400 and $403.50?

22   A.  No.  There was no limitation.

23   Q.  Is that true with respect to the slides for 2019, 2020,

24   2021 and partial year 2022?

25   A.  Yes, that's correct.

1    Q.  All of those slides include all cash withdrawals you

2    observed, not just those within a narrow range, right?

3    A.  That is correct.

4            MR. GROSS:  Can we go to slide 10, please.

5    Q.  Mr. Richardson, do you recall that when I was questioning

6    you about this chart on direct, that I asked you whether you

7    had seen withdrawals less than $400 on Senator Menendez's

8    statements?

9    A.  Yes.

10   Q.  And what did you testify then?

11   A.  That I saw --

12           MS. GHOSH:  Objection.  Asked and answered.

13           THE COURT:  Yes.  If he's testified, he testified.

14           Next.

15   BY MR. GROSS:

16   Q.  And do you recall being asked whether you'd seen

17   withdrawals greater than $403.50?

18           MS. GHOSH:  Objection.  Asked and answered.

19           THE COURT:  Well, do you recall being asked that

20   question?

21           THE WITNESS:  Yes.

22           THE COURT:  All right.  The next question will be

23   objected to as asked and answered.

24           MR. GROSS:  Thank you, your Honor.

25   Q.  Mr. Richardson, in the course of reviewing Senator

1    Menendez's bank records from the Senate Federal Credit Union

2    over this 14-year period, 2008 to 2022, did you notice any

3    commonality in the size of cash transactions?

4              MS. GHOSH:  Objection.

5              THE COURT:  Sustained.

6    BY MR. GROSS:

7    Q.  Are you able to identify one way or another whether there

8    is a most common value of cash withdrawal amounts in this

9    14-year period?

10             MS. GHOSH:  Objection.

11             THE COURT:  Sustained.

12   BY MR. GROSS:

13   Q.  Mr. Richardson, do you recall being asked on

14   cross-examination about the decision to limit the withdrawals

15   reflected on this chart to amounts between 400 and $403.50?

16   A.  Yes.

17   Q.  And do you recall testifying that you observed a pattern of

18   such withdrawals?

19             THE COURT:  Sustained.

20             MR. GROSS:  Can we go to the next slide, please.

21             Can we zoom in, please, on the asterisk in the bottom

22   corner.

23             Can we also zoom in on the asterisk on the top title

24   row.  So compare those two.

25             Thank you.

1    Q.  Mr. Richardson, what does this footnote modify?

2    A.  It modifies the dollar value of the cash withdrawals that

3    are being presented; that is, it only states withdrawals

4    between 400 and $403.50 are being presented.

5    Q.  And how does this chart that we're looking at right now

6    compare to the chart on the slide just before it, slide 10?

7               MS. GHOSH:  Objection.

8               THE COURT:  Sustained as to form.

9               Are you asking about in total, sir?

10              MR. GROSS:  I'll ask it again.

11   Q.  The data reflected in this chart that we're looking at now,

12   is that the same or different than the data reflected in the

13   chart on slide 10?

14              MS. GHOSH:  Objection.

15              THE COURT:  I'll allow it.

16   A.  It is the --

17              THE COURT:  There's different information on each

18   chart, isn't there?

19              THE WITNESS:  Your Honor, the previous.

20              THE COURT:  Doesn't chart 10 -- well, put up chart 10.

21              All right.  Fair enough.

22              What's your question?

23   BY MR. GROSS:

24   Q.  What does this chart summarize, Mr. Richardson, chart 10?

25   A.  Chart 10 summarizes the data on chart 11.

O71Wmen5

1          MR. GROSS:  One moment, your Honor?

2          Nothing further.

3          THE COURT:  Anything?

4          MS. GHOSH:  One question, your Honor.

5          THE COURT:  Yes.

6   RECROSS EXAMINATION

7   BY MS. GHOSH:

8   Q.  Does it say anywhere on slide 10 that is summarizing the

9   data on slide 11?

10  A.  No, it does not.

11         THE COURT:  All right.  Thank you.

12         You're excused, sir.  You may step down.  Thank you.

13         THE WITNESS:  Thank you, your Honor.

14         (Witness excused)

15         THE COURT:  I take it, counsel, there's no additional

16  witness today, is that correct?

17         MR. FEE:  Your Honor, given the discussions amongst

18  the parties and the Court, the next one will have to wait.

19         THE COURT:  All right.

20         Ladies and gentlemen, we are done for the day.

21  Because of scheduling matters, evidentiary issues, there will

22  be no court tomorrow.  All right?  No court tomorrow.  Be here

23  at 9:30 on Wednesday.  We'll have a full day on Wednesday, and

24  I can tell you so far we still are on track of what we told you

25  a couple of weeks ago.  It's not a promise, but so far we're

O71Wmen5

1    still on track.

2              No court tomorrow.  I'll see you Wednesday at 9:30,

3    and then there's no court Thursday and no court Friday.  We'll

4    pick it up again on Monday, but I'll see you on Wednesday at

5    9:30.

6              Enjoy the rest of the day.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O71Wmen5

1          (Jury not present)

2          THE COURT:  All right.  You may be seated.

3          We will not have court tomorrow.  I will set for the

4    lawyers -- the parties don't have to be there if they don't

5    want to -- a conference at 4 p.m.  If I haven't been able to

6    get through all of this material, Ms. Blakely will notify you

7    that we're canceling that 4 p.m. conference.  But as of now, 4

8    p.m. for the lawyers, and certainly if parties or the public

9    want to attend, it's certainly a public proceeding, but we'll

10   handle what I've referred to as the weekend tsunami.  All

11   right?

12          4 p.m. tomorrow unless you hear otherwise.

13          (Adjourned to July 2, 2024, at 4:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3    CARIDAD GONZALEZ

 4   Direct By Mr. Weitzman . . . . . . . . . . .5773

 5   Cross By Ms. Pomerantz . . . . . . . . . . .5808

 6   KATIA TABOURIAN

 7   Direct By Mr. Fee . . . . . . . . . . . . .5826

 8   Cross By Ms. Pomerantz . . . . . . . . . . .5887

 9   RUSSELL RICHARDSON

10   Direct By Mr. Gross . . . . . . . . . . . .5917

11   Cross Q. . . . . . . . . . . . . . . . . . .5966

12   Redirect By Mr. Gross . . . . . . . . . . .5986

13   Recross By Ms. Ghosh . . . . . . . . . . . .5990

14                     GOVERNMENT EXHIBITS

15   Exhibit No.                          Received

16    A142    . . . . . . . . . . . . . . . . .5814

17    A141    . . . . . . . . . . . . . . . . .5816

18    5H-102-5    . . . . . . . . . . . . . . .5939

19

20

21

22

23

24

25
```

```
 1                          DEFENDANT EXHIBITS

 2    Exhibit No.                                    Received

 3    1602     . . . . . . . . . . . . . . . .5795

 4    1603     . . . . . . . . . . . . . . . .5796

 5    1587     . . . . . . . . . . . . . . . .5801

 6    1589     . . . . . . . . . . . . . . . .5802

 7    2202     . . . . . . . . . . . . . . . .5831

 8    2145     . . . . . . . . . . . . . . . .5857

 9    2142 through 2144 and 2150 through 2153   . .5861

10    1117 and 1118   . . . . . . . . . . . . .5875

11    2513, 2191, 2192, 2193, 2080   . . . . . . .5921

12    5H-102-1     . . . . . . . . . . . . . . .5924

13    5H-102-2     . . . . . . . . . . . . . . .5928

14    2193-1     . . . . . . . . . . . . . . . .5933

15    5H-102-4     . . . . . . . . . . . . . . .5938

16    5H-102-6     . . . . . . . . . . . . . . .5944

17    5H-102-9     . . . . . . . . . . . . . . .5946

18    5H-102-11,     . . . . . . . . . . . . . .5949

19    2192-2     . . . . . . . . . . . . . . . .5956

20

21

22

23

24

25
```