O7aWmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7               Defendants.
                                         Trial
8   ------------------------------x

9                                        New York, N.Y.
                                         July 10, 2024
10                                       10:00 a.m.

11

12  Before:

13
                    HON. SIDNEY H. STEIN,
14
                                         District Judge
15                                       -and a Jury-

16                    APPEARANCES

17  DAMIAN WILLIAMS
        United States Attorney for the
18      Southern District of New York
    BY:  PAUL M. MONTELEONI
19       DANIEL C. RICHENTHAL
         ELI J. MARK
20       LARA E. POMERANTZ
         CATHERINE E. GHOSH
21       Assistant United States Attorneys
         -and-
22       CHRISTINA A. CLARK
         National Security Division

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

O7aWmen1

APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
        AVI WEITZMAN
        ROBERT D. LUSKIN
        RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
        ANNE M. COLLART
        CHRISTINA LaBRUNO
        ANDREW J. MARINO
        RICARDO SOLANO, Jr.
        ELENA CICOGNANI
        JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes


Also Present:  Marwan Abdel-Rahman
                Bachar Alhalabi
                Rodina Mikhail
                Interpreters (Arabic)

                Rachel Wechsler
                Connor Hamill
                Braden Florczyk
                Paralegal Specialists, U.S. Attorney's Office


                Justin Kelly, DOAR


                        SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O7aWmen1

```
 1                    (Trial resumed; jury not present)
 2              THE COURT:  Mr. Fee, what's your estimate, sir?
 3              MR. FEE:  It edged upwards overnight, your Honor --
 4    Mr. Weitzman's fault -- two and half hours.
 5              THE COURT:  Well, I suggest you pick up the pace a
 6    bit.  That's my read of the jurors.  You can have your own
 7    read.
 8              MR. FEE:  Yes, your Honor.
 9              THE COURT:  You're also getting to the point where, in
10    your closing, you criticized the government for the length of
11    its summation, and I think you're over that.  It's really up to
12    you, sir.  Do what you feel you have to.
13              Let's bring this jury in.
14              MR. MONTELEONI:  Your Honor, I have something to raise
15    before the jury comes in.
16              THE COURT:  Yes.
17              You may be seated in the courtroom.
18              MR. MONTELEONI:  After the break, your Honor, Mr. Fee
19    made a number of remarks that were sort of straddling the line
20    between attorney vouching and attorney testifying.  He talked
21    about what Bob wants.  He said Bob doesn't want to be here
22    seeing his texts to his girlfriend in open court.  He doesn't
23    want to be here doing this.
24              Obviously Mr. Menendez chose not to testify.
25              THE COURT:  Yes.  You can stop right there.  I think
```

O7aWmen1                          Summation - Mr. Fee

1    that's right.

2              Your client did not testify, so you really can't put

3    words into his mouth.

4              Do you understand that, sir?

5              MR. FEE:  I do, your Honor.

6              MR. MONTELEONI:  And he also says -- a different

7    subject, but also injecting his credibility and opinions.  He

8    said I assure you if the government had any idea, any proof

9    they could supply a theory about how this money got here, you

10   would have heard it.  You would have heard it; I promise you.

11             He shouldn't be making promises about anything, let

12   alone --

13             THE COURT:  I think it's best not to use that term.  I

14   think that was all right.  Stay away from it, though.  No

15   vouching.  Don't put words in your client's mouth when he

16   hasn't taken the stand.  You know the rules.  Don't get close

17   to the line.

18             Bring the jury in.

19             Oh, something else?

20             MR. MONTELEONI:  I'm sorry.  One last thing.

21             He explained the strategic decisions behind why the

22   defense team, I think, put on the forensic financial analyst's

23   opinions in a certain way.  He said, well, we did it this way

24   because we wanted to be conservative.

25             He shouldn't be talking, he shouldn't be testifying

1    about the defense team's strategic decision-making.  That's

2    just not for the jury.  That's not in evidence.

3                THE COURT:  Stick to what the evidence showed, and you

4    can raise whatever doubts you think are appropriate based on

5    the evidence.

6                Let's bring this jury in.  No more commentary.

7                You understand the rules, Mr. Fee, correct?

8                MR. FEE:  Yes, your Honor.

9                THE COURT:  Thank you.

10               (Jury present)

11               THE COURT:  You may be seated in the courtroom.

12               Good morning, ladies and gentlemen.  Welcome.  I

13   understand sometimes the public transportation system does not

14   work as efficiently as we'd like.  It certainly happens from

15   time to time.

16               Mr. Fee, you may continue and conclude your summation.

17               MR. FEE:  Thank you, your Honor.

18               Good morning, everybody.  Welcome back.

19               Yesterday we spent most of our time talking about

20   where, I would submit, the prosecutor's case really begins and

21   ends -- the cash, the gold seized at 41 Jane.  And the reason

22   is I want you to understand that the inferences they're asking

23   you to adopt about that cash and the gold are not credible, are

24   not reliable.  And I'm going to move on from the cash and gold

25   entirely, but I want to leave you with this thought.

O7aWmen1                        Summation - Mr. Fee

1            Again, this is not a boxing match.  This is not a

2    political debate.  You don't pick story A or story B.  You

3    don't go with what makes more gut sense about a story you're

4    being told.  Your oath requires you to follow the law, and as

5    you know by now, the law says that even if, in your mind, you

6    cannot trace every piece of cash and gold seized at 41 Jane to

7    here or there or from there or from here, you must acquit,

8    because there is not proof beyond a reasonable doubt that Bob

9    took anything in exchange for a particular official action.

10   That is the law.

11           So today, I'm not going to spend my time talking about

12   where they started and ended, the cash and gold.  Today, I want

13   to talk about the actions you have heard evidence about and the

14   absence of evidence you heard, because, remember, the

15   prosecutors have to prove, beyond a reasonable doubt, that Bob

16   took official actions in exchange for bribes.  They have not

17   done that.  That's why they are so focused on the cash and the

18   gold.  That's why the presentation of evidence started and

19   ended with cash and gold.  That's why the summation started and

20   ended with cash and gold, because that is just a piece of the

21   case.

22           This case, it dies here, today.  The government always

23   has the burden, and I'm telling you this case dies here today

24   because they have failed to prove -- they have failed to

25   prove -- to that very high standard that Bob's actions were

O7aWmen1                        Summation - Mr. Fee

1    anything other than exactly what we want our elected officials

2    to do.  He was doing his job, and he was doing it well.

3           So let's first start with the allegation that José

4    Uribe bribed Nadine and Bob to pressure Gurbir Grewal, the

5    former attorney general of New Jersey, to drop the Parra case.

6           First, the prosecutors are have abandoned Uribe.  He's

7    gone.  He's in the witness trash pile with Agent Kougemitros.

8    That's what you heard in the prosecutor's summation.  They

9    first tried really hard to make him sound like a credible

10   witness.  They failed.  And so the first time in that summation

11   the prosecutor mentioned Uribe, he bragged to you.  He said,

12   hey, look how far I made it before mentioning this guy.

13   Folks -- then he said, you don't need him, but also if you do

14   need him, he's super credible.  And you should believe his

15   devastating account -- that's the word he used -- of never

16   having mentioned the bribery scheme or the car to Bob Menendez.

17   This is another Uribe/blue blazer problem:  José Uribe.

18          It is such a malleable, typical, hollow story that

19   yesterday you were told to imagine the case, the story, both

20   with and without José Uribe.  It's another argument.  You were

21   asked to do that yesterday.

22          So what are you supposed to do?  What is the jury

23   supposed to do?  Credit Uribe?  Reject him?  The evidence is

24   different with and without that person, right?  Do they want

25   you to accept that the evidence doesn't change without Uribe?

1    Because that's false.  What is the story they want you to

2    accept?  Does it matter?  Does it matter?  Does it matter as

3    long as you convict?  Is that the ultimate end of the arguments

4    being made to you by the government's attorneys?  Because I

5    submit what that shift you saw in the summation that Uribe,

6    maybe, should be ignored entirely shows you that the core of

7    this case is hollow.  There is no evidence upon which you can

8    reasonably rely to draw the conclusions that they want you to

9    draw.

10            So let's talk about Uribe.

11            Now, I'm not going to rehash all the ways that the

12   evidence showed him to have lied a whole lot in his life and

13   here.  I truly don't think that anyone who saw that testimony

14   believes anything other than Uribe will do what he needs to do

15   to take care of himself.  100 percent.  He told you -- he told

16   you -- that he devoted most of his life to lying, to fraud, to

17   running a fraud scheme.  He told you that he actually devoted

18   most of the lives of the people he claims to love to helping

19   him run those fraud schemes.  He was first convicted of fraud

20   in 2011.  Didn't stop him.  He then brought his own son, or his

21   stepson, Omar, in to help with the fraud.  Omar was the first

22   person he had to get that license to run the business, when in

23   truth, Uribe told you he was running the business.  But then

24   Omar got out of there.  He went to the West Coast, Uribe told

25   you.  And Uribe has a problem:  I need to run this insurance

O7aWmen1                          Summation - Mr. Fee

1    business; I'm not legally allowed to do it.  I need somebody

2    else to do it for me.  And he picks a 19-year-old pregnant

3    teenager, who comes to him for help.  OK?  That's what he told

4    you.

5            And it's hard to imagine someone more vulnerable and

6    who needed to be protected from someone like him, but that's

7    the tragic choice he made.  That's the man that the U.S.

8    government wants you to believe so that you can accept their

9    story.  Or not believe if you don't like him but still accept

10   the story.  That was the takeaway of the summation.

11           And then when they do talk about Uribe, they use the

12   word, which I'm sure you all know, "corroboration."  Right?

13   You don't have to believe him, but you should believe him

14   because he is corroborated.  Right?  Like, there's other

15   evidence that shows him to be a truth teller.  I would submit

16   to you that the corroboration you hear of most of José Uribe's

17   embellishments -- and I'll talk about what I mean by that -- is

18   invented corroboration.  Invented.

19           I think a good example, just one example, is all these

20   photos of the New Jersey restaurants where José Uribe had

21   meetings with, whoever, Will Hana, Nadine, Bob.  They

22   photographed these restaurants.  They've showed them to you.

23   They pointed to it as corroboration for his account.  What I

24   mean when I say this is invented corroboration, the photo of

25   the restaurant doesn't corroborate what he said happened there.

O7aWmen1                       Summation - Mr. Fee

1   Right?  It doesn't corroborate anything about whether a bribe

2   is paid.  It's a restaurant.  It corroborates that the

3   restaurant he said he went to exists.  That is not the sort of

4   corroboration that can save a story that is not credible, I

5   would submit to you.

6          I would call this oak tree corroboration.  Imagine or

7   think of someone arrested and accused of stealing a Honda Civic

8   parked under an oak tree near the Bronx Zoo.  There's no

9   witness.  There's no video.  There's no recovery of a Honda

10  Civic, but a prosecutor can stand up and say:  There's an oak

11  tree; there's the Bronx Zoo; there's the oak tree near the

12  Bronx Zoo -- corroboration.  That's the sort of invented

13  corroboration you have with José Uribe.  I would reject those

14  arguments for corroborating him.

15         But now, listen, I want you to listen to what José

16  Uribe said.  I think there is truth in what he said.  I think

17  he embellished sometimes.  I think even his embellishments,

18  frankly, do not get close to proving a crime, because even José

19  Uribe, when you remove the rhetoric and the argument you hear

20  about him, this core fact is 100 percent true -- José Uribe

21  does not say that anything criminal was discussed with Senator

22  Menendez at any time.  I'm not exaggerating.  Uribe said he

23  never spoke to Senator Menendez about the car payments Uribe

24  was making for Nadine, ever.  We showed you that yesterday.

25  His own testimony -- his own testimony -- was that Uribe only

1    discussed the bribery scheme when Bob wasn't around.

2            You heard all this.  When he met with Bob and Nadine

3    at a restaurant the first time, it was at an engagement party,

4    Uribe says no discussion of the scheme, no discussion about any

5    bribe.  Nothing about Uribe's agreement with Nadine.  Nothing.

6    When he met with Bob, Nadine and Will, Wael Hana, at another

7    restaurant, again, Uribe told you no discussion of any scheme,

8    no implicit discussion, no wink-wink.  No.  When he met Bob at

9    41 Jane, which the prosecutor talked a lot about -- that's the

10   little bell; we'll talk about that -- take every word Uribe

11   said, no discussion of the scheme.  Nothing.  Nothing.  They

12   got Uribe to speculate, helpfully, that he was sure Bob knew

13   about the bribery payments.  Uribe did not say that.  He did

14   not talk about that at 41 Jane.  He did not talk about that

15   ever.  What you heard Uribe say was that he wrote down the

16   names of the people in the cases that Bob was going to call

17   Grewal about.

18           Folks -- that was it, by the way; that's all Uribe

19   said, no discussion of the scheme -- you would 100 percent

20   write down the names of the people in that case if you were

21   telling Bob that it was an unfair, selective prosecution, which

22   is what the evidence shows Uribe actually did.  Nothing about

23   Uribe's account proves any bit of a crime.

24           Now, the prosecutors liked that little bell story.

25   We'll talk about more how they use it and what it means.

1           The last dinner, the last face to face Uribe ever had

2      with Bob was at Segovia Restaurant.  This is the "save your

3      ass" discussion.  Again, take what he says.  There is not one

4      word, according to José Uribe, about a bribe, a bribery scheme,

5      a deal with Nadine, a car, a bribery payment.  Even Uribe tells

6      you really just one thing that was said:  I saved your ass

7      twice.  Uribe does not say I clarified that he meant it was

8      about the Parra case.  Uribe does not say Bob said I saved your

9      ass by calling Grewal.  Uribe does not say, you know, I called

10     Grewal not because you told me it was a selective prosecution,

11     but because it was a bribe.  Uribe does not say any of that.

12     None of it.

13           Uribe does say, when he meets with Will Hana and

14     others, Parra, Bien, then he's discussing a bribery scheme.  I

15     don't think that's true either.  But just looking at Bob, the

16     man himself, does not prove their case.  It's actually the

17     opposite, which is why he's on that, you know, witness trash

18     pile.  His testimony didn't stand up.  He helped disprove the

19     charges.  That is why -- and it's funny that we're doing this,

20     but that is why we're talking about, did he ring a little bell?

21     Did Bob say I saved your ass?  If there was proof of a crime in

22     Uribe's account, we would not be talking about a little bell

23     this much.  We would not be talking about *culito*s at Segovia.

24     We would be talking about the evidence of a crime.  It does not

25     exist.  Do whatever you want with José Uribe.  I don't find him

1    very credible, but take every word he says.  It does not get

2    you proof of a crime.

3            Now, you know, the argument here that the prosecutors

4    make, which I submit to you is only an argument a lawyer could

5    make, you must believe José Uribe because if he was a liar, he

6    would have made up a more incriminating story.  OK?  Think

7    about that.  If José Uribe was a liar, he would have said:  I

8    sat down at Segovia, Bob slapped me across the face and said

9    you'd better pay me a bribe so I can call Grewal, whatever.

10   That's what a liar would do.

11           Folks, you know, I think your common sense gives your

12   reaction to that.  But Uribe's a good liar.  You know?  He is.

13   Like, he's a good liar.  He's been doing it a long time.  He

14   got away with it for a long time.  He got caught.  I think he's

15   lying to help himself avoid the consequences of getting caught.

16   But imagine if you do something for, like, 25 years -- you

17   knit, you play video games, you swim, you play tennis, whatever

18   it is, had you been doing it every day, every single day for 25

19   years, I bet you're good at it.  I bet you know how to do that

20   skill pretty effectively, doing it every day for 25 years.

21   Like any truly excellent liar, I bet you know this -- if you

22   have kids, you know this -- the best lie is one that sticks

23   really close to the truth but is tweaked to get you what you

24   need.  You know what I mean?

25           Like if he said:  I sat down and Bob grabbed me by the

O7aWmen1                           Summation - Mr. Fee

1    lapel and said pay me the money, that's not credible on its

2    face.  So you get these little tweaks that make José Uribe

3    matter, that make him needed so that he gets what he wants,

4    which is that letter from the government to help him avoid the

5    top sentence for all that fraud and stuff that he'd been doing.

6    OK?  That's what a good liar does, is tell a story close to the

7    truth.  I actually think that's what he did here.  I think

8    Uribe knew he couldn't go so far, because he knows Bob is

9    innocent.  I want to talk about the proof that Bob had no

10   involvement in any scheme involving Uribe, but Uribe knew he

11   was innocent, and that's why Uribe's story proves him innocent

12   with a couple little one-on-one -- one-on-one -- Uribe and Bob,

13   it has to be one-on-one, otherwise you don't need José Uribe,

14   right?  He needs the government to need him.  That's why you

15   get these one-on-one embellishments.  I think that's exactly

16   what happened here.

17           So what does the evidence actually show about the

18   story of Uribe?

19           You know all about his background, Ana Peguero, the

20   insurance business he was running in violation of the law.  And

21   in 2018, he has a problem.  He knows this case is out there,

22   and he's worried the New Jersey State case is going to lead to

23   him.  And that's a fair concern, because he, as you heard, is

24   selling insurance products to Parra's company, and it's

25   reasonable to think that if Parra's being investigated for

O7aWmen1                     Summation - Mr. Fee

1   insurance fraud, that it could get back to José.  Because you

2   know, José is running an illegal insurance -- it's not, like, a

3   complicated question if anybody starts to really look.  Right?

4        So that's the problem.  And he comes up with a plan to

5   repackage his problem.  This is proven.  So Uribe targets

6   Nadine.  She was vulnerable.  She needed help financially.  She

7   didn't want to sell all that family gold and jewelry.  She was

8   very receptive to getting help with a car.  Uribe told you he

9   discussed that with her.  And remember he said she complained

10  about all the men in her life -- not Bob, but all the men in

11  her life who had disappointed her and how she needed financial

12  help from them.  Again, according to Uribe, she doesn't mention

13  Bob.  And Uribe said, this is an opportunity.  I promised

14  Nadine I'd get her the car if she'd get me in touch with the

15  senator.  He says this.  We'll show you he says this.  And here

16  it is.

17        This is the bargain.  This is the deal that Uribe had

18  with Nadine.  Again, I think he's sticking pretty close to the

19  truth here.

20        MR. MONTELEONI:  Vouching.

21        THE COURT:  Yes.

22        Ladies and gentlemen, it doesn't matter what Mr. Fee

23  says.  He can't say believe this because I believe this.  All

24  right?  He has to tell you what the evidence showed and the

25  conclusions he wants you to draw from it.

O7aWmen1                    Summation - Mr. Fee

1            Proceed, sir.

2            MR. FEE:  Believe this because the evidence shows you

3    this is the actual deal that was struck.  Uribe says he was

4    thanking Nadine for her commitment of trying to put me in touch

5    with Bob.  He owes her because she's doing her best to get me a

6    communication with the senator.  And his end of the bargain, he

7    agrees, was to help Nadine get the car so he could get to the

8    patio meeting.

9            Now, Uribe actually doesn't say he discussed the crime

10   with Bob.  The government argues that the patio meeting is

11   proof of a crime.  That's wrong.  There's just not evidence to

12   support that story, but let's just unpack what Uribe was

13   actually doing.

14           There was a deception that Uribe was attempting to run

15   on Bob, and you've actually seen evidence of this.  Uribe was

16   showing Bob an entirely false image of Uribe as, like, a good

17   business guy, a civic leader, a stand-up person in the Latino

18   trucking community in New Jersey.  The evidence tells you this

19   is what he was trying to convey to Bob.  And again, Uribe knows

20   how to sell a story.  Right?  What you're seeing here is Uribe

21   texting with Nadine -- if we could go back -- and then texting

22   with Fernando Barruos in the runup to a meeting with Bob.  And

23   again, this is yet another meeting that the government submits

24   is proof of a crime, where they're, like, taking photos of

25   themselves hanging out, having drinks and a cigar.

O7aWmen1                          Summation - Mr. Fee

1           What Uribe is doing in the runup is basically

2     research.  Right?  He's getting from Barruos information about

3     how trucking companies are closing.  He actually sends Fernando

4     here part of the car payment that he wants help to pay for for

5     Nadine.

6           And then if we go to the next slide, more of the same.

7     And then you see proof.  This is black and white proof, not an

8     argument, black and white proof that Nadine and José were

9     keeping information from Bob:

10          Thank you for last night.  It was fun.

11          Yes, dear.  Thank you.  Please help me close all the

12    things.  I didn't want to say anything last night.

13          This is May 4, last night, when they're with Bob.

14          And then José is continuing to talk about payment

15    again.  Nadine and José were keeping their bargain from Bob.

16    It's here in front of you.  There's more of it.  This is the

17    opposite of proof showing a scheme involving Bob.  This is the

18    opposite of proof showing that Bob conspired with José Uribe.

19    This is not proof of a conspiracy.  It is the opposite.  He was

20    not aware of the bargain, and you see Uribe gathering

21    information for this deception that he wanted to convey to Bob.

22          I think the core proof of the false image Uribe was

23    trying to convey to Bob that explains, I think, in part, why

24    Bob made that call to Grewal is the fund-raising.

25          MR. MONTELEONI:  Objection.

1            THE COURT:  I'll allow it.

2            Proceed.

3            MR. FEE:  The fund-raiser shows you the image Uribe

4    was trying to convey.

5            THE COURT:  Well, I understand what the objection is.

6            Again, this lawyer cannot vouch for the testimony.  He

7    cannot tell you I think somebody is telling the truth, I think

8    somebody is not telling the truth.

9            Stay away from that, sir, if you would.

10           MR. FEE:  Yes, your Honor.

11           Uribe testified about this fund-raiser at length in

12   the direct.  You did not hear about it in the summation --

13   again, because the story is still shifting, because the

14   fund-raiser, and they now realize the other evidence here

15   disproves -- disproves -- the conspiracy and the bribery scheme

16   as alleged.  Let me explain what I mean.

17           If Uribe was actually in an agreement with Bob and

18   Nadine to pay them to secretly kill a state criminal case,

19   beginning in 2018 -- that's the allegation we have in this

20   case -- do you think in the midst of that conspiracy, your

21   common sense tells you, José Uribe would organize a public

22   fund-raiser for Bob Menendez?

23           Or just step back.  He has had the deal for, like,

24   seven months, according to the government's allegations, with

25   Bob and Nadine.  He's paying a senator to kill a case, and he

1    says:  You know what?  I'm going to have a public fund-raiser,

2    where I'm associated with this man I'm paying to kill the

3    criminal case.  It is the opposite -- the opposite -- of what

4    would happen if this was an accurate story about what was

5    happening.  Uribe is not dumb.  He is not bad at lying.  That

6    is why we showed you, we walked through the careful things he

7    has done in the past to construct false stories.  Right?

8    That's the reason you hear about the Small Business

9    Administration loan, where he created years of false tax

10   returns.  That's, like, hard work -- hard work -- to get that

11   loan from the federal government.  That's why he did the

12   Santander loan, where he, again, created a false financial

13   history and got a nephew to help him jam through that

14   application.

15          That's why it also matters what he did with Ana

16   Peguero.  Right?  Think about all the work he had to do.  She's

17   a teenager.  He got her an insurance license.  He helped her

18   get from where she was when he found her to, like, a certified

19   insurance broker in the state of New Jersey.  That is a lot of

20   work.  It's a lot of effort.  It's thoughtful.  It's careful.

21   If Uribe is bribing a U.S. senator, ask yourself, is he going

22   to have a public fund-raiser?

23          No.  It's the last thing you would do.

24          The true reason, and I think the evidence shows it,

25   that he would organize that fund-raiser is what the evidence

O7aWmen1                        Summation - Mr. Fee

1   has shown you to be the reality here.  Uribe wanted to deceive

2   Bob into believing that Uribe was an important voice in the

3   Latino community so that when Uribe went to Bob, as he did, and

4   said:  Hey, this is a problem in the community I represent,

5   Bob; this is going to eliminate 100 jobs -- and you heard Mike

6   Critchley, the lawyer for Parra, telling you who held those

7   jobs -- Latinos in New Jersey, truckers, regular folks, Bob's

8   constituents.  That is exactly what Uribe did.  He told you

9   that's what he did.  And the fund-raiser -- again, seven months

10  in to the alleged agreement that had already been struck, the

11  fund-raiser was actually designed to set up this story by

12  Uribe.

13          Remember what Uribe told you about it.  The people

14  invited to that fund-raiser were Uribe's clients and friends in

15  the Latino trucking community.  He told you that.  That's who

16  he brought to that fund-raiser.  And it worked, by the way.

17  Remember what Uribe told you.  He was asked, like, so did you

18  discuss at this fund-raiser, because you're seven months in --

19  according to the government's theory, you're seven months in --

20  to your deal with Bob and Nadine, at your fund-raiser did you

21  discuss this illicit scheme?  No, no, no, no.  The only thing

22  that happened at the fund-raiser between me and Bob was Bob

23  walked up to me and said, What an impressive group of people

24  you've summoned.  It worked.  This is exactly what Uribe wanted

25  to happen, and it happened.  And the evidence shows you that

1    it's the truthful story.

2           Again, it's not the most interesting story to pick.

3    What does the evidence show you?  The evidence -- line it all

4    up here -- that disproves the conspiracy is literally

5    everything you heard about José Uribe.  It's genuine of his

6    testimony, no discussion of bribery scheme.  His fund-raiser,

7    seven months in to what these prosecutors say was already a

8    done deal, public fund-raiser, doesn't discuss the bribery

9    scheme with Bob.  Doesn't discuss it afterwards.  Doesn't say:

10   Hey, Bob, that was a really good cover for our ongoing scheme

11   to have this fund-raiser, it's really going to throw everybody

12   off the trail.

13          He doesn't even say he said that to Nadine.  It's not

14   just there's the text messages or emails.  Uribe doesn't say

15   that.  All of the evidence shows you that the truthful story is

16   Uribe had no agreement with Bob.  None.  None.  This count dies

17   with Uribe.  None.  The evidence shows you what he did want Bob

18   to believe about him and that it did work -- that Uribe was a

19   voice for the Latino trucking community, because, by the way,

20   that's who Uribe insured -- truckers.  He knew a lot of

21   truckers.  He knew a lot of car dealers.  Right?  All of it

22   lines up only on one side.  Put aside the argument and the

23   rhetoric of lawyers, and look at the evidence.

24          And by the way, the ultimate hook that Uribe had for

25   Bob, that was not entirely false.  It actually wasn't false.

O7aWmen1                    Summation - Mr. Fee

1    What I mean by that is when Uribe approaches Bob and says this

2    case, this Parra case, this stinks, it's a bad case.  It's a

3    bad prosecution.  It's not merited.  If it continues, it's

4    going to imprison Elvis Parra and put out of business this

5    company that employs 100 people, Bob, in your community.

6    Right?  These are, like, Dominican immigrants, Latinos in New

7    Jersey.  These are the people Bob represents.  And it was true.

8    It was true.  Michael Critchley -- put aside arguments.

9    Michael Critchley, the guy on video who has, like, unprompted

10   been called the best attorney in New Jersey by a bunch of

11   people in this case -- nobody disputed that that guy knew what

12   he was talking about.  Michael Critchley told you that the

13   Parra case was a bad case.  He called it an abusive

14   prosecution.  That's what he said he and Bob, in that phone

15   call, and he and Bob, he said I understood we both agreed that

16   this was an abusive prosecution.

17           And you heard the prosecutor say, well, Bob said

18   selective prosecution, not abusive prosecution when he called

19   Grewal.  We're going to talk about the call.  My friends, that

20   is not the difference that proves anything about a criminal

21   conspiracy, first of all.

22           Second of all, it is a racially motivated prosecution.

23   If a bad case, a weak case is brought against somebody who

24   doesn't deserve to be prosecuted and it destroys a business

25   that only employs Latinos in New Jersey -- you can say whatever

O7aWmen1                         Summation - Mr. Fee

1   you want, but the impact of that case would, 100 percent, be

2   selective and targeted and hurt one group of people.

3           And then the prosecutor said, well, that's a very

4   serious allegation.  If it was a selective prosecution, the

5   case would have been dismissed.  The case was basically

6   dropped.  Like, Parra did plead to something, but do you

7   remember what Critchley told you?  He was going to be asked to

8   do five years of jail time.  And then after Critchley finished

9   his work, through no involvement of Bob, no evidence that Bob

10  ever had any actual impact or even said the name of the

11  defendant to anyone in New Jersey State government, just

12  Critchley doing his work, that case went from five years in

13  jail to no jail time.  And Parra got to continue running his

14  business.  That case did crumble on its own, on its merits,

15  because it was a bad case.  So this is what I mean.  Uribe is

16  sticking pretty darn close to the truth, is what the evidence

17  showed you.  The evidence goes one way -- one way.

18          So let me do just another piece of this Uribe story.

19          Uribe talked a lot in his testimony about what

20  happened in 2018.  Remember his story?  That in, I think he

21  said February of 2018 is when this deal was struck.  He had

22  this account of being in that lawyer Andy Aslanian's office,

23  and Will Hana approaches him and says, really out of the blue:

24  Hey, man, Nadine and her new boyfriend, Senator Menendez, can

25  help you kill that case.

1          That's what Uribe says.  Now, I think that's total

2   nonsense.

3          MR. MONTELEONI:  Vouching.

4          THE COURT:  Yes.

5          Again, it doesn't matter what Mr. Fee's personal views

6   are of the evidence.

7          Proceed.

8          MR. FEE:  None of these are my personal views.  My

9   personal views do not matter.  When I say I think, what I am

10  saying to you is I think the evidence has shown you, has proven

11  to you, that that account was nonsense.

12         THE COURT:  It's best to use that formulation.

13         MR. FEE:  Yes.  Thank you, your Honor.

14         You know who else has abandoned that account, folks?

15  The prosecutors.  The prosecutor, you may not remember it, did

16  not mention a single thing that happened in 2018 with José

17  Uribe and this alleged scheme.  Not one.  His whole story about

18  Uribe started a year into the account that Uribe actually gave.

19         Now, I think you've seen a pattern when they don't

20  talk about the blazer, when they don't talk about what Katia

21  actually testified about.  Is it good or bad for the

22  government's theory?  Do you think it's good or bad what

23  happened in 2018 for the government's theory given that they

24  did not talk about it?  This is the approach of the

25  government's inferences.  And you have to combat the urge to

O7aWmen1                        Summation - Mr. Fee

1    ignore the gaps.  When the evidence doesn't help their story,

2    it is abandoned.  It is contorted.  It is ignored.

3            So we have another example of that.

4            Uribe says his conversation with Will happened around

5    February 2018.  And what do you know really beyond any question

6    was true in 2018, at the start?

7            Well, I would submit that the evidence shows that

8    Uribe, 100 percent, was not in any sort of criminal agreement

9    with Bob Menendez and Nadine in early 2018.  What the evidence

10   does show is that, in early 2018, Will Hana went to a lawyer

11   named Doug Anton to help on the Parra case, and Uribe knew

12   that.  Uribe knew that.  Uribe didn't mention Doug Anton during

13   his direct testimony, but this is the proof.  This is what the

14   evidence shows you.  Right?

15           Remember, Uribe's story is Will says Bob and Nadine,

16   and the government says that's when the conspiracy started.  Or

17   maybe they don't say it.  I don't know.  But that's what Uribe

18   testified to.

19           Here's the proof.

20           Uribe texts Hana, this phrase you've heard repeated

21   and attributed to Bob -- by the way, there is no evidence -- no

22   evidence, none, zero -- that Bob ever said this outside of

23   Uribe's account, which has now been abandoned by the

24   prosecutors.  Uribe texts Hana the deal is to kill and stop all

25   investigation.

O7aWmen1                              Summation - Mr. Fee

1          What happens that day?  Hana meets with criminal

2    defense attorney Doug Anton.  And then you see what happens

3    next.  Hana, with Uribe's help, starts to give information to

4    this lawyer, Doug Anton, about the Parra case -- again,

5    entirely absent from the government's presentation of evidence,

6    entirely absent from José Uribe's testimony when questioned by

7    prosecutors is all the evidence, the actual evidence you've

8    seen here that was drawn out.

9          So Hana is sending, like, discovery, grand jury

10   transcripts from Parra's case to Hana -- excuse me.  Uribe is

11   sending that to Hana, and Hana's giving it to Anton.  And the

12   reason they're doing that is because Anton is being hired to

13   help Parra.  This is the deal.  This is the deal to kill and

14   stop all investigation.  This is the deal.  And you can see it

15   in the whole runup.

16         Anton emails Hana, Doug Anton, about the case.  He

17   asked for missing documents.  Do you know who supplies those

18   missing documents?  This is the email where Doug Anton, Esq --

19   and this is one of Will Hana's email addresses and this is on

20   that defense chart, 1303:  Hey, I'm missing some of the grand

21   jury stuff.

22         Who does Hana go to to get that?

23         Next slide.

24         José Uribe.  So José Uribe here copies and pastes

25   Anton's text or the text of Anton's email.  José Uribe copies

O7aWmen1                    Summation - Mr. Fee

1    and pastes it into a text message.

2              Can we have the actual text image in the next slide,

3    or the prior slide?

4              OK.  Anyway, José takes this and puts it in his text

5    message to one of the guys actually involved in the case.

6    Right?  So José knows all about this.  Right?  Like, he's got

7    the email from Doug Anton.  That's what this proves to you.

8    This is not an inference.  I'm not asking you to speculate.

9    This is black and white.  José Uribe has the email from Doug

10   Anton asking for documents so that Doug Anton can help Elvis

11   Parra -- a lot of names.  The bottom line is this.  Uribe knew

12   and was involved in and wanted this guy Doug Anton to stop and

13   kill the investigation.  That's what actually is proven.  The

14   opposite is all inference.  It's all, I would submit to you,

15   based on the evidence, total fantasy that Bob, after, like, two

16   dates with Nadine just starts to commit, like, bribery schemes

17   with José Uribe?  Does your common sense tell you that's the

18   kind of person -- or excuse me, anyone would do that?  Is there

19   any evidence indicating that Bob was the sort of person who

20   would go on two dates and just start agreeing to do massive,

21   intricate criminal conspiracies?  That's the actual story,

22   based on no evidence, other than José Uribe's account, which

23   has disappeared from the prosecutor's story.  That's how much

24   faith you should put in this.

25             OK.  Doug Anton, you've heard that name.  One of the

O7aWmen1                        Summation - Mr. Fee

1    other reasons the evidence and your common sense tells you

2    there is no criminal agreement in 2018 -- or ever, but let's

3    just focus on 2018 -- between Uribe and Bob Menendez is because

4    Nadine at this point is still involved with Doug Anton.  That's

5    that abusive ex-boyfriend that you have heard about in this

6    case.  That is the reason that Nadine was so concerned about

7    physical safety.  And we'll talk more about this.  But at the

8    time Uribe is engaging Doug Anton to kill the Parra case --

9    that's the evidence, not my argument.  That's the evidence.  At

10   that time Nadine is dating Doug Anton and has been for years.

11   None of that was in the government's case.  They instead want

12   you to accept the story, which has no support beyond a piece of

13   Uribe's testimony, just that, that Bob actually struck that

14   deal in February 2018.  That is not credible.  That is not

15   supported by evidence.

16        That should not take much of your time when you go

17   back to deliberate.  Again, the evidence is on one side of the

18   ledger here.  And they have the burden, so even if the evidence

19   is 50-50, I would submit to you that does not go to the

20   government's theory.  But it is not 50-50.  It is on one side,

21   that Uribe is lying about having a deal with Bob and Nadine,

22   because the truth shows that they got Doug Anton to stop and

23   kill this case.

24        A similar piece of proof to show how unreliable and

25   unproven the story is is what happened during the charged

O7aWmen1                        Summation - Mr. Fee

conspiracy in 2018, another reason the prosecutors really don't want you to focus on this time period and this proof, is Bob and Nadine broke up. OK? They broke up at sometime in the fall of 2018. You have seen so many text messages between these two. None of them show them talking about a crime. It showed this -- Bob breaking up with Nadine, because she was still with Doug Anton, this horrible ex-boyfriend.

Now, remember, by Uribe's account, by the government's story, this is -- right here, right now -- month, like, 10 and 11 of the criminal agreement with José Uribe. True. This is the heart of the alleged conspiracy.

What do you see happening?

They're breaking up. OK? They don't mention a thing in these texts, and this is just what I'm telling you. You can look at all of them. They don't mention a thing in these texts about any sort of plans or agreements. There's not even any implicit suggestion, like, hey, we're breaking up, but let's keep that thing going. All right? Don't take this personally. I still want our bribe scheme to keep going, but I'm totally breaking up with you. Give me my stuff back; I don't ever want to see you again.

You don't see any of that. You see them pouring their hearts out, having a breakup, Bob being sad that whatever was going on with her and Doug was going on and her being upset and trying to get him back. This does not make sense. The

O7aWmen1                        Summation - Mr. Fee

1    government's theory does not make sense.  Step one, go on a

2    handful of dates with Nadine, this very exciting new

3    girlfriend.  Step two, start vast criminal conspiracy.  Step

4    three, break up with Nadine, but don't mention, hey, let's keep

5    that conspiracy going.

6            It's totally disconnected from reality, the story

7    you're being asked to accept.  I genuinely -- it is

8    disconnected from the evidence in this case, the story that

9    there is an ongoing bribery scheme happening right here and

10   right now while they are breaking up.  And by the way, at the

11   bottom you see José Uribe is still working with Doug Anton on

12   the deal he actually struck.  This proves it.  Bob and Nadine

13   are broken up.  Bob reaches out.  Bob tells Katia after -- you

14   heard her testify.  Katia is asked by Nadine to get him back,

15   and this is Bob's response:  I can't get over it.  She's still

16   with Doug.  Maybe time will heal wounds but not today.

17           Like, a week earlier, they're broken up.  A week

18   earlier, Uribe to Hana, you never told me what your friend

19   said.  Don't worry, I don't want anybody to harm Anita.  His

20   friend is Doug Anton.  You saw the evidence that José Uribe

21   wanted Doug Anton to stop and kill the investigation.  He's a

22   lawyer.  You heard that.  It's in evidence.  This is reality.

23   This is the truth.  You did not see this.  You did not even

24   hear a reference to this year when the prosecutors were talking

25   about the Uribe scheme.

O7aWmen1                          Summation - Mr. Fee

1              Why?  This is why.  This is why.

2              Just a little bit more about Uribe.  Another way you

3      know he was running a deception on Bob is exactly what we ran

4      through about Uribe avoiding -- avoiding -- meetings with Bob.

5      Again, don't take my word for it.  Don't take any lawyer's word

6      for anything.  Look at the proof.

7              June 2018, this is Uribe telling Hana:  Cancel

8      tomorrow.  We are not ready.  We need to have a definition of

9      the fund-raiser before we meet.

10             Uribe's not ready for what?  The government's story is

11     that you have entered into an agreement with Bob and Nadine,

12     six months before this, five or six months before this.  What

13     are you not ready for?

14             January 2019, Hana:  Hey, you want to get dinner with

15     Bob?  Hana.  Uribe tells Hana:  Let's do next week, brother.

16     This is, like, the most important person in Uribe's life, like,

17     my Anita.  Right?  I mean he cares about himself, but he's

18     telling you he's really worried about his Anita.  Whatever his

19     motivation was, Bob, if you accept the government's story, is

20     super important, and Bob, if you accept the government's story,

21     already has known about his criminal agreements with Uribe.

22     And Uribe -- he will not go see this guy.

23             April 6:  Bob and I are going to my house if you want

24     to come by.  This is Nadine.

25             Hey, man, you want to get a meeting with Bob, this is

O7aWmen1                    Summation - Mr. Fee

1    the chance.  This why you're giving me that car.  Where

2    nobody's telling Bob about the car -- you have heard tons of

3    evidence about that -- Nadine and José are not telling Bob

4    about the car.  Uribe turns it down:  You know what?  I think

5    he needs the rest.

6             Later that day:  Let me know.  I can meet you.

7             Uribe:  It's a long weekend.  Your friend has to be

8    back next week.  Enjoy it -- meaning I don't want to see him.

9             Come over, August 6, I passed out.  This is the one

10   you may remember he wasn't passed out.  This is when he's still

11   texting and calling, hours.  When Nadine texts him, he's on his

12   phone, and hours later he's still texting and calling.

13             Again, the government can't explain any of this.  They

14   just don't.  They just don't.  They just ignore it.  They move

15   on.  It's not addressed.  I bet you'll hear this called a

16   distraction.  This will be called a distraction because it

17   doesn't help the story.  But this is proof.  It is proof that

18   the inference -- because that's all they have, is an

19   inference -- that this criminal conspiracy existed is not true.

20   The reason -- the reason -- Uribe doesn't want to meet with Bob

21   is because he wants to pick the right moment.  Because this is

22   a deception.  Right?  That's why he's learning about, hey,

23   truckers are being laid off.  That's why he's doing the

24   fund-raiser.

25             Again, the government says the conspiracy is locked

O7aWmen1                         Summation - Mr. Fee

1    and loaded for every one of these events.  That's obviously not

2    true.  Uribe has a plan to hit Bob at the right moment in the

3    right way with what he really needs, which is Bob to credit

4    that this is a bad case, that the Parra case is a bad case,

5    help us.

6            All right.  Let's finish with Uribe by talking about

7    this little bell and the *culito* meetings.  I do think these are

8    part of the things where he's embellishing.  Why do they

9    matter?

10           MR. MONTELEONI:  Vouching.

11           MR. FEE:  I do think the evidence shows you --

12           THE COURT:  All right.  Yes.

13           Go ahead.

14           MR. FEE:  I do think the evidence shows you that this

15   is part of the things he's embellishing, but let's just be very

16   clear.  Why do these two anecdotes, the little bell encounter

17   and the Segovia conversation, why do they matter to the

18   government's case?  Well, I'll tell you this.  The reason they

19   matter is they're not incriminating.  They're not.  Even, as I

20   said, even by Uribe's account, what he says about these two

21   things do not involve Bob doing anything.  They don't even

22   involve Bob talking about any aspect of the criminal scheme.

23   None.  Just on this account.  So that's done.

24           When you cut through the rhetoric, the adjectives, the

25   arguments, it's just not incriminating, these meetings.  100

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  percent.  But I do think they matter in another sense, because

2  the prosecutors are treating these as important.  And again, if

3  these are the linchpin of your arguments and the inferences you

4  want to draw, I genuinely think you need to deeply question the

5  story you're being asked to accept.

6          MR. MONTELEONI:  Vouching again.

7          THE COURT:  No.  I'll allow that.

8          MR. FEE:  Two points.

9          They want you to believe that these little details are

10 a sign of a truth teller.  Right?  Hey, look at the rich detail

11 of his descriptions of the bell.  That is a sign of a truth

12 teller.  That is not a sign of a truth teller.  That's a sign

13 of somebody who knows just what the prosecutor says, that when

14 you want people to believe what you're saying, you add some

15 little details.  I think your common sense tells you that.

16         Two, Uribe's not a truth teller.  Like, he's not.

17 He's not.  I am not saying that you reject everything the guy

18 says.  It's evidence here.  You have to deal with it.  But I

19 don't think you should just -- excuse me.  I don't think the

20 evidence shows that you should just accept every detail,

21 especially when it is being exaggerated as proof of a criminal

22 scheme.  OK?

23         So let's focus here.

24         The way they corroborate this story of the little bell

25 is that text about Nadine buying a bell.  Again, this is that

1    oak tree corroboration.  Right?  If Nadine has a bell in her

2    house and Uribe saw it, does that prove that Bob rang a bell

3    shows you that he controlled Nadine's every action?  Because

4    that's actually the argument the prosecutor made.  He said the

5    little bell shows you that Bob is in charge of the charged

6    crimes.  That's where we're at right now.  That's the level of

7    inference you're being asked to draw.

8            It doesn't.  That is not reasonable inference.  Full

9    stop.

10           It is also not corroboration that she had a bell in

11   the house or ever used the word "bell" in a text message, that

12   what Uribe saw actually happened.  And also, I would say about

13   both Segovia and the bell meeting, Uribe tells both of these

14   stories where Nadine leaves the room.  She leaves the room.

15   And again, I would submit to you that your common sense tells

16   you why he created stories where Nadine leaves the room.

17   Because it makes him necessary.  He is the only one who can

18   tell these little anecdotes.

19           I also would submit to you that the evidence does not

20   suggest that Nadine would leave the room for these discussions.

21   And all the actual evidence we have about any encounter

22   involving Uribe, Nadine and Bob, Nadine is in the room --

23   except at Segovia, which I'm going to talk about.  Nadine and

24   José, as you have seen in the evidence, were keeping

25   information from Bob.  There is no reason Nadine would need to

O7aWmen1                         Summation - Mr. Fee

1  leave the room so far as José and Nadine know, because they

2  have all the information about the conspiracy, not Bob.

3         So let me just respond a little bit to the claim what;

4  the little bell anecdote is being used for.  I think what the

5  prosecutor said, or I believe, my memory tells me what the

6  prosecutor said is that the little bell shows that Bob was in

7  charge; that you can take that moment and just reject the

8  evidence that you have actually seen of Nadine telling Uribe

9  not to tell Bob things, the testimony of Uribe, uniformly, that

10  he did not tell Bob about this scheme and that he never saw

11  Nadine tell Bob about the scheme.  Reject all of that, because

12  he rang a little bell.  That he's in control.

13        And then the prosecutor did say in the summation that,

14  yes, you also saw, showing his control of Nadine, that he would

15  sometimes use Find My iPhone feature -- Bob -- to check in on

16  Nadine.  And then -- here's what I want to talk about -- the

17  prosecutor said the reason Bob was doing that was a

18  "distraction."  That's the word he used.  The reason that Bob

19  is checking in on Nadine is a distraction.  It's not relevant.

20        In what world is this a distraction?  The evidence --

21  the evidence -- has shown you overwhelmingly, to the point

22  where yesterday the prosecutor actually said this wasn't

23  disputed -- the evidence has shown you that Nadine feared for

24  her physical safety during this period, this exact period.

25  This is not the entirety of the case, this period where they're

O7aWmen1                         Summation - Mr. Fee

1  using the Find My iPhone feature.  She was concerned about Doug

2  Anton assaulting her.  That's in the evidence.  Katia told you.

3  Her sister told you.  She hasn't seen any of the evidence in

4  this case.  She was asked, hey, have you ever heard them talk

5  about find my iPhone?  Yeah.  Nadine was scared out of her

6  mind.  You've seen that Nadine took out a temporary restraining

7  order against Doug Anton, right before this was happening.  A

8  distraction.

9                 (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. FEE:  The government is accusing Bob of a bribery

2     scheme.  They are accusing Bob of committing a crime.  They are

3     saying that everything Nadine knows and does and everything the

4     prosecutors imagine Nadine knows and does, actually Bob knows

5     and does.

6          On the face of it I would submit to you is a ludicrous

7     suggestion.  Because you use Find My iPhone, you know the

8     contents of someone's conversation?  Because you use Find My

9     iPhone, you know she's really behind on her mortgage in the

10    absence of any other proof?

11         That's the essence of this argument.  Like, think of

12    the leap, little bell, ignore all that evidence.  That Uribe

13    never said anything about a scheme to Bob.  Not once.  Little

14    bell, Find My iPhone, Bob is the center of the criminal

15    conspiracy.

16         How do we get over here?  Does the evidence get us

17    over here?  It does not.  Does a reasonable inference get us

18    over here?  It does not.  It does not.  Of course it's not a

19    distraction.

20         And remember how this came out.  Remember, this is

21    another example of the shifts in this story.  It is just a blob

22    that rolls over evidence the prosecutors' story.  If it is bad

23    evidence, just keep going.  We'll make it work.  If it is

24    evidence that disproves its theory, just swerve around that.

25         They put on a summary chart witness who talked about

1    like dozens of Find My iPhone entries.  They put that on.  They

2    didn't mention the restraining order.  They didn't mention

3    Nadine's hospitalization.  They didn't mention that she was

4    texting others about how Doug, at that moment, was still

5    stalking her.  It's in the record.  We brought it out on

6    defense.  You would not have heard a single word about the

7    truthful reason that Bob at that time was using Find My iPhone

8    to make sure his new girlfriend wasn't getting assaulted by her

9    crazy ex-boyfriend.

10            The evidence is only on one side on this question.

11   The evidence is only on one side.  We don't have the burden,

12   they do.  But the evidence is on our side.

13            This is not a credible story you are being told.  And

14   you will hear more in the next prosecutor summation.  I assure

15   you.  More theories.  More rolling blob of shifting and

16   evolving inferences that you just know is true because there's

17   devastating evidence.

18            Ask yourself when you hear that, where is it?  Where

19   is it?  Do I trust the story?  Do I trust the story?  What

20   about all the stuff you abandoned in your summation?  What

21   about all the stuff you don't mention?  What about the stuff I

22   can't even remember happened eight weeks ago that the

23   prosecutors have decided does not help.  Does not help get a

24   conviction.

25            Do you trust any aspect of what they're trying to tell

O7A3MEN2                    Summation - Mr. Fee

1    you if you didn't actually see or hear it?  Genuinely see or

2    hear it in this case.  I submit to you the evidence is

3    overwhelmingly clear that this story is shaky and rotten to its

4    core.

5            Same thing with that phone.  The first time you heard

6    about what they now call the flip phone that Nadine used for a

7    period of time, the first time you heard about it, it was on a

8    summary chart by another FBI agent.  By the way, another FBI

9    agent who did not investigate this case and knows literally

10   nothing about this case and just read charts.  That is the

11   overwhelming majority of the proof you heard from the

12   government.

13           The first time you heard about that phone you had a

14   prosecutor ask one of those summary chart people, hey, what's

15   that?  The 007 phone.  That was in a text Nadine wrote.  They

16   called it the 007 phone, and they sat down.

17           They are charging Bob as conspiring with Nadine to act

18   as an agent of Egypt.  The argument in putting that proof to

19   you, devoid of all the other evidence that shows why she had

20   that phone, and I'll show you the argument, is, oh, 007 is a

21   spy.  You know that spies have 007 phones.  That's the quality

22   of the inferences they want you to draw.  That's how this

23   started.

24           Now in the summation, it's now undisputed she got the

25   phone because she was worried about her stalker ex-boyfriend.

1   Who mentioned that boyfriend?  Who mentioned he was stalking

2   her?  Who put in the proof that he was actually -- she called

3   it spoofing.  He was in her iPhone account sending messages.

4   Real crazy ex-boyfriend stuff.  And then the 007 phone,

5   yesterday was the flip phone.  But hey, hey, it doesn't matter.

6   It doesn't matter why she got the phone.  But it does matter

7   they showed you one call on that phone.  One call that nobody

8   recorded, that nobody overheard.  And they say it somehow

9   helped prove one of the conspiracies.  It doesn't.

10          There were 65 calls during that period where Nadine's

11  iPhone was getting hacked by this crazy guy.  And they showed

12  you one and said it's still proof of a conspiracy because

13  Nadine was not the subscriber on the phone.  Right.  They

14  still, like, they still want to shift around and find the

15  evidence that only gets you to one place.

16          By the way, the subscriber, it was Ro and Sandy Sorce.

17  They're friends of Nadine who helped her when she was being

18  tormented by this dude.  That's the real subscriber.

19          Again, this is the proof, these are the building

20  blocks of the story they want you to adopt.  The evidence

21  disproves their case.

22          The next part of this story is the call with Grewal.

23  Listen, Bob reached out to Gurbir Grewal.  Obviously, we had a

24  human being, thank goodness, who testified about that.  And the

25  testimony from Grewal made absolutely clear that everything Bob

 1    said to him was accurate, and was totally the right thing to

 2    do.

 3            This is Grewal.  He didn't say he wanted the case

 4    dismissed.  He didn't even ask you to call the prosecutors on

 5    any particular case.  He didn't ask you to call anybody.  He

 6    raised concerns from constituents.  No case name.

 7            Prosecutors talked about Grewal had to insulate his

 8    team.  There was no team to insulate, because Grewal wasn't

 9    even told the case that was the subject of this call.

10            By the way, they pop up the website for Bob.  Bob's,

11    like, official Senate website a bunch to show you -- this is

12    the quality of proof you are getting -- to show the website

13    says he cannot overturn or influence a criminal prosecution.

14    That's what that website says.

15            Bob never in any of the events in this case, there is

16    no proof that Bob ever tried to overturn a prosecution.  There

17    is not even proof he tried to influence a prosecution.  There

18    isn't.  He didn't mention the name of the case.

19            And by the way, if he had mentioned the name of the

20    case, there would have been nothing wrong with that.  Bob had

21    gotten a complaint, justifiably, about a bad prosecution that

22    would have put out of work a lot of his constituents and he

23    raised it as a bad case.

24            You know who else raised it as a bad case?  A man that

25    the government doesn't allege to be engaged in any sort of

bribery scheme, Michael Critchley.  He said exactly the same thing.

And listen, Grewal said he wasn't going to raise this with the prosecutors because he has this policy you heard that nobody knew about.  There is no proof Bob knew about it or Critchley knew about it.  He wasn't going to raise this with the prosecutors because that was his policy.

He should have raised it.  Because reasonable, smart people when they heard about this case, Critchley, Bob, had exactly the same reaction.  Had exactly the right reaction.  This was a nonsense case and it was going to hurt a lot of hardworking Latino folks in Bob's state.

By the way, that's what happened with the case.  It crumbled.

And I just want to point out, this is very similar to what they say about the call to McKinney.  You have like thousands of rows of summary charts and long stories about what this all means.  Look at what Bob actually did.  What we actually know he did with Grewal, with McKinney.  Grewal there is a call and a meeting and Bob moves on.  He raises the constituent's concern, nobody says he threatens, demands, curses, you know, pounds the table.

It's Grewal, McKinney, and Sellinger, they're all on the same line.  He raises the concern and then he moves on forever.  That's actually the evidence.  After the last meeting

O7A3MEN2                    Summation - Mr. Fee

1   with Grewal, Bob never mentions this case to anyone in the
2   state or federal government ever again.  One meeting.  One
3   meeting that right in front of you Grewal tells you no threats,
4   no case name, no request for dismissal.  Raised a constituent
5   concern about selective prosecution.  And then moved on
6   forever.  This is not a complicated event.

7       And it is the same with McKinney, which we'll talk
8   about.  Two-to-four-minute phone call raises a concern about a
9   constituent.  Never again mentions the word IS EG based on this
10  record to anyone in the state or federal government ever again.
11  That's it.  That's it.  That's it.

12      And the absence of evidence after these events is
13  important.  It is meaningful.  It is.  This is an inference you
14  can draw.  What does your common sense tell you would happen if
15  Bob was on the take?  Right.  Like this is the object of the
16  criminal conspiracy.  He has this meeting with Grewal where
17  Grewal is like, I don't want you to tell me because I'm not
18  going to raise this up.  I hear you, selective prosecution,
19  constituent New Jersey, I hear you.  That's good, Bob.  Have a
20  nice day.

21      In reality, the evidence shows you Bob does nothing.
22  If there was a criminal scheme.  If a guy like Uribe had Bob on
23  the take and had the threat of that hanging over Bob, that's
24  what the bribe payer has, if you don't deliver, Bob, I can ruin
25  your life.  If this was true, and there is a lot of evidence

1    disproving that Bob ever did anything in exchange for a bribe,

2    but let's just take it for a moment.  If this was true,

3    wouldn't Bob have done something more?  Like a followup phone

4    call?  A text?  An e-mail?  Send a staffer over?  Have another

5    meeting?  Try?  Nothing.  Literally nothing ever happens.  The

6    name is not even conveyed.  There is no consequence that Bob is

7    worried about based on this evidence.

8         And I would submit that is why in these interactions

9    you see the prosecutors hyper focused on minutia of these

10   really brief, really discrete meetings.  Right.  This is why

11   you hear them spend quite some time asking Ted McKinney did Bob

12   say please.  Right.  This is why you hear, you heard it again

13   in the summation, Bob seemed a little irked that Grewal brought

14   his deputy.  Or that when the deputy left, a person that nobody

15   has heard from, he said it felt gross.

16        That's why they're hyper focused on those sorts of

17   details because there's nothing else.  There is no evidence

18   that Bob was actually trying to accomplish anything.

19        And yes, of course, the law says they don't have to

20   prove that he succeeded in the object of the bribery scheme.

21   Of course that's the law.  But, it is 100 percent relevant to

22   assess the evidence of what Bob did and did not do because it

23   shows you the truth.

24        It's all inference in the prosecutor's story.  It is

25   all inference.  Of course you should look at what he did.  Of

O7A3MEN2                    Summation - Mr. Fee

1    course you should look at was he actually trying to achieve

2    some goal here, or was he just doing what every elected

3    official should do.  You get a concern, you raise it with the

4    right person, you move on.

5          Because, by the way, part of the reason Bob moves on

6    is he has no authority over Gurbir Grewal.  Yeah, listen, I'm

7    sure Grewal took his call, the evidence shows you that Grewal

8    took his call because he was a U.S. senator.  But you also

9    heard that a senator has zero authority.  He can't make Grewal

10   do anything.  You and I have as much official authority over

11   Grewal as Bob does.  To be clear, he gets that meeting because

12   of who he is.  But there's no way for him to even exert more

13   authority over Grewal.

14         So what they need to prove in a bribery case, and

15   you're going to hear more about this from other counsel as well

16   I'm sure, is a quid pro quo.  This for that.  You are going to

17   hear this in the instructions, you've heard this before.  The

18   "this" here for the bribery scheme with Uribe is, they say, the

19   car.  Right.  The car payments.  That's the "this."  Because

20   we're talking about the "for that" today.  Meaning, like, what

21   was Bob asked to do, and what did he do it in exchange for.

22   Yesterday we talked about the "this."

23         And a lot of times they want to talk about the cash

24   and the gold and say, hey, you just know this a bribe.  But, on

25   this scheme, the prosecutor said that Bob actually knew that

O7A3MEN2                    Summation - Mr. Fee

1    Uribe was making the payments.  Oh, here it is.  And they point

2    to one thing.  One piece of evidence.  One.  Because remember,

3    the other evidence did not help them on this.  Uribe said he

4    never told them.  The many, many text messages and e-mails,

5    nobody ever tells Bob that Uribe's making car payments.

6    Nobody.  So there's nothing else in the record other than this

7    text.  So of course they're going to make an argument about

8    this text.

9              Here's the text.  It is in April.  Nadine tells Bob,

10   Jose called Leon at Ray Catena to make the arrangements for my

11   car.  The inference being argued is that this text alone,

12   nothing else, shows you that Menendez knew full well that Uribe

13   was paying for Nadine's Mercedes.

14             That's not true.

15             Let's look at the other evidence.  Nadine was looking

16   to Bob to help connect her to a car dealer.  And that's exactly

17   what she was telling Bob Uribe was doing.

18             So this is just a few months before, and the takeaway

19   is Nadine reaches out to a friend, that's on the government

20   chart, named Patty Mark.  We don't know anything else about

21   her.  Nadine says I wanted to know if Mark knows anyone at

22   Benzel Busch Prestige Mercedes that I, Nadine, could get a good

23   price on C-300.  Bob and I test drove.  He said I'm sure Mark

24   knows somebody in the business.

25             This what's happening in the Uribe text.  Nadine wants

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   a good car dealer.  Common senses tell you it can go pretty

2   badly if you don't have, like, a trustworthy car dealer.  She's

3   trying to find one.  Because she is telling Bob, I am going to

4   buy this car.  Look, look at what she says.

5           I could get a good price on a C-300.  Bob and I test

6   drove.  But the prices are too high monthly to finance.  To

7   finance.  You're not worried about finance and you're not

8   telling other people you're going to finance it or you're

9   worried about a good price if it's 100 percent paid by a bribe.

10          The point of all this is that Bob doesn't know a good

11  car dealer.  He tells her to go to Patty Mark, whoever that is,

12  and Nadine's asking Patty Mark.  And then let's go back to that

13  other text.  The prior slide, please.  Thank you.

14          This is the text, she's telling him that Leon --

15  excuse me, Jose connected her to somebody else at some other

16  car dealer to make the arrangements for my car.  She's trying

17  to get connected with a dealer.

18          Folks, this text to Bob does not comport with the

19  theory he knew about a bribe scheme.  Ask yourself, using your

20  common sense, why would you need a good car dealer if you knew

21  this was all going to be covered by a bribe?  Why are you

22  worried, why are you telling Bob, hey, can you get Patty Mark

23  to find me a car dealer.  And Bob says, yeah, go to Patty.

24  Patty probably knows a guy.

25          That's not proof that Bob knows anything about an

O7A3MEN2                    Summation - Mr. Fee

1    arrangement between Jose and Nadine.  That text we saw where

2    she says Bob told me to reach out to you to find a dealer,

3    that's a year into the conspiracy.  That's not what you're

4    doing if the government is telling you an accurate story.

5    You're not going to Bob and say how do I find this car.  Right?

6    Because four months later, the government says this is proof

7    that Bob knew Jose was getting her the car.  It doesn't hold

8    up.  It doesn't hold up.  And it is so thin as to rely entirely

9    on this text message.  The proof of Bob's knowledge of that

10   arrangement is entirely on this text message.

11            Okay.  The next thing that happens in this timeline,

12   which I won't go in detail, is Uribe keeps basically annoying

13   Nadine after she gets the car and long after the Grewal meeting

14   to get more updates, and you can see this here.  Nadine just

15   stops responding to him.  And he's, you know, saying things

16   that are increasingly sort of odd.  You don't love me anymore.

17   You got me worried.  You never reply to me.  Uribe is still

18   worried about getting some relief.  Some peace on this.

19   Somebody to tell him that, hey, this prosecution's going to

20   stop.  And now he's bothering Nadine about it because he knows

21   that Grewal meeting happened.  He's not reaching out to Bob.

22   Not calling Bob.  He's reaching out to Nadine.

23            And then you heard about at some point there's a phone

24   call, there is literally one phone call where Bob calls Uribe

25   and says something like don't worry about it, chill out.

1          The reason that happens, and you can see it in those

2    charts, is right before that phone call, Nadine calls Bob.

3    Now, we don't know what was said.  But I think a fair inference

4    is that Nadine said, hey, Uribe is texting me all the time.

5    I'm ignoring him.  Get him to leave me alone.  Tell him you

6    followed up on that case, that racist prosecution.  Tell him

7    you followed up, make him leave me alone.

8          There is nothing criminal about that.  There is no

9    proof that Bob had done anything more about the case.  There is

10   no phone calls with Critchley.  No more contact with Grewal

11   about the case.  Their only proof is Nadine calls Bob after

12   getting all these sort of mildly harassing text messages and

13   says something like Bob, call Jose.  And he does.  A short

14   call.  That's it.  That's the only contact in this case between

15   Bob and Jose, until like 10 months later, the meeting at

16   Segovia.

17         And I think we have shown you the proof about what

18   actually happened in this meeting or this dinner or whatever it

19   was.  Number 1, it's 2 years after Bob and Uribe first met.

20   And it's I think nine months after that phone call between Bob

21   and Uribe.  And it's like a year after Bob did the one thing,

22   raising the prosecution, the selective prosecution concern to

23   Grewal.  So this Segovia is far removed from any other events

24   in this case.

25         And what the prosecution theory is, that the one thing

O7A3MEN2                    Summation - Mr. Fee

1    Uribe tells you about this, this culitos reference, which
2    talked about all the things Uribe doesn't say were said by Bob.
3    But that is a reference to the scheme, where literally nothing
4    has happened for a year, for at least nine months.  And the
5    idea that nine months later, Bob at a dinner just blurts out I
6    saved your ass, while he's also this, like, controlling
7    criminal mastermind who never puts anything in writing, has
8    Nadine have all these meetings, you know, to accept this
9    theory, you have to explain all the evidence you don't see
10   about Bob.

11        But now, the inference is that he blurts out I saved
12   your ass twice.  It's basically something about the scheme.  I
13   think the evidence shows you that that's nonsense.  Let's take
14   it on its face.  Let's just say it.  Bob doesn't say to Uribe,
15   hey, thanks for getting Nadine a Mercedes.  Hey, thanks for
16   taking care of us.  I took care of you.  Hey, you know, it was
17   really nothing.  I was happy to do it.  Nothing about that.
18   Just I saved your ass twice.

19        Think about this.  Think about what's happening here.
20   I don't think the evidence shows this is a credible story.  The
21   prosecutors are not alleging that Uribe still needed something
22   from Bob.  They're not alleging there was any reason they had
23   to discuss Bob's performance in this supposed conspiracy.
24   There is nothing happening.  There is no reason that you would
25   expect this encounter to happen.  In fact, you know from the

1   proof that Uribe and Nadine had texted that Uribe was already

2   at Segovia that night.  He was already there drinking.  Bob had

3   no idea.

4           The proof shows you that Uribe would be there.  What

5   happens that night, Uribe says this -- the evidence shows

6   this -- is Uribe is already drinking with a friend at Segovia,

7   and you know from his own testimony that at this time in his

8   life he was going out to dinner and getting drunk and using

9   Xanax, he said that to you.  This is the time in his life where

10  he would go out three or four times a week to dinner and get

11  drunk.  So take that into account when considering his memory

12  of these events.

13          But his account is he's there drinking, he goes to

14  dinner, he walks over to the table and sits down with Bob,

15  Nadine, and Nadine's, like, young 20s daughter.  That's who is

16  at that table.  And again, Bob came there with Nadine and

17  Sabine, and Jose Uribe effectively invites himself over, having

18  already been drinking there for quite some time.

19          So, Bob has this drunk, maybe high guy at the table

20  that he hasn't talked to in nine months, and only knows really

21  pretty marginally from the fundraiser and that meeting at 41

22  Jane as somebody that Nadine knows.  And that's, I would submit

23  to you, by far the most reasonable inference to draw from the

24  texts that the prosecutors have spent a lot of time on.  Right.

25  It's at this dinner Bob says, hey, Nadine, why don't you go to

1    the bathroom.  And I would submit to you that the inference to

2    be reasonably drawn from that is that Bob wanted Nadine and

3    Sabine to go to the bathroom so he could tell a drunk and high

4    Jose Uribe to go somewhere else.  I'm trying to have a nice

5    dinner with my girlfriend and her daughter.

6            That's the inference to draw, folks.  This culitos

7    things only exists in Uribe's mind.  It doesn't incriminate

8    Bob, but I submit the evidence doesn't support it having any

9    connection, any connection to any sort of scheme.

10           Let's move on.

11           THE COURT:  Moving on to a new area, sir, why don't we

12   take a midmorning break.

13           Ladies and gentlemen, 10 minutes, 15 minutes.

14           (Jury excused)

15           MR. MONTELEONI:  Your Honor, I have an application.

16           THE COURT:  Yes, sir.  You may be seated in the

17   courtroom.

18           MR. MONTELEONI:  So, as you know, the Court precluded

19   any evidence of acts of domestic abuse, including

20   hospitalizations involving Doug Anton, the ex-boyfriend.  And

21   in making a bunch of statements about Doug Anton and what the

22   evidence shows -- that we don't agree with -- defense counsel

23   said you've heard about the hospitalizations in that

24   connection.  It was clearly violating the Court's ruling.

25           Now, I believe that they may be referencing, there is

1    one text message that was introduced before we filed this

2    motion, before we understood that defense counsel was intending

3    to put in this type of prejudicial evidence, and that text

4    refers to Nadine having been in the hospital for a fall.  It

5    does not reference any domestic abuse.

6            This is prejudicial and inflammatory and we would

7    request a curative instruction.

8            THE COURT:  Mr. Fee.

9            MR. FEE:  Your Honor, I stuck to the evidence.  They

10   put in the evidence that she was hospitalized at that time

11   period.

12           THE COURT:  My recollection is you connected the

13   hospitalization to a crazy ex-boyfriend.  And I don't think the

14   evidence supports that.  If I remember correctly.  You can tell

15   me otherwise, but I do remember a text referencing her

16   hospitalization.

17           Now, if somebody can show me that it was connected in

18   some way to what you characterized as a crazy ex-boyfriend,

19   I'll listen to that.

20           MR. MONTELEONI:  The message that's in evidence I

21   think they may be referring to is Government Exhibit A101-1.

22   It doesn't on its face reference the ex-boyfriend.  I think we

23   can speculate that, though she said it was from a fall, it may

24   in fact have had to do with the ex-boyfriend.  I don't

25   personally know.

1          THE COURT:  Go ahead.  What is the point?  If indeed

2    it may have to do with the ex-boyfriend, what's the issue?

3          MR. MONTELEONI:  The issue is 403.  The reason for

4    excluding the allegations of domestic abuse isn't that they

5    were not supported by evidence.  It is they were inflammatory,

6    and this inflammatory connection is totally improper for him to

7    draw.

8          THE COURT:  What's the instruction you're seeking?

9          MR. MONTELEONI:  We would propose an instruction that

10   Mr. Fee referenced certain acts that the defense allegedly

11   brought out pertaining to Nadine's relationship with Doug

12   Anton, her ex-boyfriend, including hospitalization, and

13   stalking.

14         I'm instructing you that there are no allegations of

15   domestic abuse or hospitalizations connected to domestic abuse

16   in the record, and that I already ruled that neither party

17   should introduce such evidence because they are irrelevant to

18   your determination of whether the government has or has not

19   proven its case.

20         THE COURT:  Just a moment.

21         MR. FEE:  Your Honor, can I read to you my reference?

22         THE COURT:  I just want to get this down.

23         No, I remember thinking it was quite artful.  Let me

24   read this.

25         Yes, Mr. Fee.

O7A3MEN2                     Summation - Mr. Fee

1            MR. FEE:  Your Honor, the reference was they didn't
2    mention the restraining order, they didn't mention Nadine's
3    hospitalization, they didn't mention she was texting others
4    about how Doug at that moment was still stalking her.
5            THE COURT:  You make the hospitalization reference
6    there clearly in connection with what you characterize as the
7    crazy ex-boyfriend.  That's the issue.
8            MR. FEE:  Your Honor, they put in the evidence of the
9    hospitalization.  I'm only referencing the fact that there is a
10   hospitalization.
11           THE COURT:  You're connecting it to the crazy
12   ex-boyfriend, are you not?
13           MR. FEE:  I'm not, your Honor.
14           THE COURT:  Read it to me again.  I don't have it.
15           MR. MONTELEONI:  I can read it, your Honor.
16           THE COURT:  You both can read it.  Even I can read it.
17   It's not a contest as to reading.
18           MR. FEE:  I want Mr. Monteleoni to read it.
19           THE COURT:  Gentlemen.  Go ahead, sir.
20           MR. MONTELEONI:  Mr. Fee said they put that on.  They
21   didn't --
22           THE COURT:  What page?
23           MR. MONTELEONI:  It's on the LiveNote.
24           THE COURT:  On the left you'll have the reference.
25           MR. MONTELEONI:  588.  I'm not even familiar enough

1    with LiveNote.  588 of the LiveNote.

2              THE COURT:  Mine don't track with that number.

3              MR. MONTELEONI:  He said -- sorry.  587, line 24 going

4    into 588.

5              He said:  They put that on.  They didn't mention the

6    restraining order.  They didn't mention Nadine's

7    hospitalization.  They didn't mention that she was texting

8    others about how Doug at that moment was still stalking her.

9    It's in the record, we brought it out on defense.  You would

10   not have heard a single word about the truthful reason that Bob

11   at that time was using Find My iPhone to make sure his new

12   girlfriend wasn't getting assaulted by her crazy ex-boyfriend.

13             So not only is there a connection of this

14   hospitalization to the allegations of abuse that were precluded

15   expressly, but it is also done in a way to suggest that this is

16   the government hiding evidence from the jury, which is totally

17   improper when it is a topic that has been excluded.

18             THE COURT:  If you remember my ruling, when I thought

19   the defense was characterizing my ruling too narrowly when it

20   referenced hospitalizations, and I think I said that in the

21   back and forth we had that characterizing it as something -- I

22   forget the word -- in hospitalizations was an unfairly narrow

23   characterization of my preclusion order.

24             Mr. Fee.

25             MR. FEE:  So your Honor, this was designed to comply

1    with that order.  I want to show you.

2                THE COURT:  It couldn't have been, because

3    Mr. Weitzman specifically wrote that what the government was

4    doing was -- I'm sorry -- what the defense was doing complied

5    with my order because it did not include hospitalizations.  And

6    I specifically said that was too narrow a reading of my order.

7                MR. FEE:  Your Honor, I would submit to you, look at

8    the exhibit that the government put in.  What I'm referring to

9    in the section he just read, and it is carefully put.  Is the

10   reason Bob is checking on Nadine.  Look at GX A101-1 that the

11   government put in.

12               THE COURT:  Somebody put it up.

13               MR. FEE:  Mr. Hamill I think has it.  The first one is

14   when she talks about the hospitalization.

15               THE COURT:  Let me read it.

16               MR. FEE:  Then just to preview, it is about the two

17   replies as well.  Bob's understanding of what that means.

18               THE COURT:  You have to slide it --

19               MR. FEE:  Thank you, Mr. Hamill.

20               THE COURT:  Are you asking for an inference that the

21   fall was the result of domestic abuse?

22               MR. FEE:  I'm not asking them to draw any inference

23   about the hospitalization.  Bob knows about all this.  And he's

24   worried about her.  That's the whole point.  I don't say, and I

25   have not said, what caused the hospitalization.  The text

O7A3MEN2                    Summation - Mr. Fee

1    message they put in --

2            THE COURT:  The inference was clear.  I understand

3    your argument.  Let me hear from the government.

4            MR. MONTELEONI:  Yes, your Honor.  It is absolutely

5    irrelevant that she was in the hospital from a fall if it is

6    not connected up with exactly what Mr. Fee connected it up

7    with.  I think it is astonishing --

8            THE COURT:  Gentlemen, just a moment.  Let me frame

9    something here.

10           MR. FEE:  Your Honor, the temporary restraining order

11   is in.  You admitted it.  This is Bob expressing, like, a

12   reluctance to engage with Nadine because of everything that's

13   going on.  It is not about who caused it.  It's that Bob is

14   worried.

15           THE COURT:  I understand that.  But it's the

16   connection that you're drawing to domestic abuse that I ruled

17   out of this case.

18           Just let me frame something.  What you can't talk

19   about is domestic abuse or hospitalizations.  I think you've

20   talked about stalking.  Have you done that, Mr. Fee?

21           MR. FEE:  Yes.

22           THE COURT:  And the spoofing you've talked about.

23           I'm going to tell the jury that you've heard

24   references before the break to domestic abuse and

25   hospitalization.  I instruct you that those issues are

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

 1    irrelevant to whether or not the government has proven its case

 2    beyond a reasonable doubt.  They're not part of this

 3    litigation.

 4            I'm going to leave it at that.

 5            MR. MONTELEONI:  Your Honor, is there a way that you

 6    could indicate that the parties were precluded from putting in

 7    evidence relating to that?  Because he's saying we hid

 8    something from the jury, and I'm not sure that the current

 9    curative instruction really adequately addresses the prejudice

10    from that.

11            THE COURT:  Mr. Fee, you're standing.

12            MR. FEE:  Your Honor, that's way beyond.

13            THE COURT:  I think my instruction does it.  Take the

14    remainder of the time.

15            (Recess)

16            THE COURT:  I've reframed the instruction as follows:

17    You've heard, ladies and gentlemen of the jury, you have heard

18    a reference before the break regarding alleged domestic abuse

19    and hospitalization.

20            I instruct you that there is no evidence in this

21    record that any hospitalization had anything to do with

22    domestic abuse.  Domestic abuse and hospitalizations are not

23    part of this litigation.

24            I'll just, rather than repeat, I'll say those issues.

25            Those issues are not part of this litigation and are

O7A3MEN2                         Summation - Mr. Fee

1    irrelevant to whether or not the government has proved its case

2    beyond a reasonable doubt.

3            Let's bring this jury in.  How much longer, Mr. Fee,

4    do you think?

5            MR. FEE:  Lunch, your Honor.

6            THE COURT:  All right.  Thank you.  Let's try to bring

7    it to a close by lunch if you can.

8            MR. FEE:  Thank you, your Honor.

9            (Jury present)

10           THE COURT:  Ladies and gentlemen of the jury, you

11   heard a reference prior to the break regarding alleged domestic

12   abuse and hospitalization.

13           I instruct you that there is no evidence in this

14   record that any hospitalization had anything to do with a

15   domestic abuse.  Those issues are not part of this litigation,

16   and are irrelevant to whether or not the government has proven

17   its case beyond a reasonable doubt.

18           Mr. Fee, you may continue.

19           MR. FEE:  Thank you, your Honor.

20           Let's talk about the Egypt allegations.  So to

21   understand those, you need to understand the evidence about the

22   work of a senator.  You heard witnesses talk about the role of

23   the Senate in foreign policy and foreign diplomacy, and you

24   were told by each witness who had anything to say about those

25   subjects that senators play an important role in diplomacy.

1    Senators don't take orders from the Executive Branch, from the

2    president, or the State Department on foreign relations.

3    Senators, especially those on the Foreign Relations Committee,

4    have to routinely meet with both civilians and constituents

5    interested in foreign affairs, and foreign officials, to do

6    their jobs well.  That's what the witnesses told you about

7    senators on the Foreign Relations Committee.

8            So, look at what senators do.  They meet with

9    constituents who care about foreign policy issues, including

10   folks from diaspora countries.  And this was Sarah Arkin, a

11   former staffer for Bob.  And she talks about that.  And she

12   even notes there's many diaspora communities in New Jersey, and

13   this shows you that a senator in New Jersey has to care about

14   his constituents who care about foreign countries to which they

15   have some cultural, familial tie.

16           So let's go from here to the meetings that have been

17   the focus of a lot of the government's story about Egypt.

18   These are the meetings Bob had with Egyptian officials.

19           Now, be clear, there was no witness, no evidence

20   showing that even a single second of those meetings involved

21   anyone talking about Egypt or Mr. Hana paying a bribe to Bob to

22   do something for Egypt.  Or an Egyptian official saying, Bob,

23   you have to do this for Egypt.  There was no evidence showing

24   that that happened in any of those meetings.  These were

25   routine meetings.

1        Let's look at one of the pictures the government put

2   in.  This was the meeting in March 2018.  I think we're on

3   slide 73, Mr. Kelly.  Thank you so much.

4        So this was in March 2018.  Remember, at this time Bob

5   had been on a few dates with Nadine.  And the government's

6   theory is he's already engaged in the conspiracy to serve

7   Egypt, not the U.S.

8        But I would submit your common sense tells you if that

9   was the case, you're not having a meeting in your official

10  office where you have Sarah Arkin snapping a pic.  This is not

11  how a spy or somebody taking bribes to help Egypt would act.  I

12  think that's what your common sense tells you.

13       You can also see this is routine from how Bob is

14  treating the interactions with Egyptian officials.  And again,

15  this is just some of the evidence you have seen.  This is Ahmed

16  Helmy sending a request to one of Bob's staffers.  It is then

17  circulated among the staff.  This is part of the government's

18  story that these are actually proof of the conspiracy.  And you

19  see the evidence showing you this is total commonplace.

20       Obviously, the focus of the evidence has been his

21  interactions with Egypt.  But you know, because you have heard,

22  that Bob is interacting with foreign officials, foreign

23  intelligence officials, diplomats from countries all over the

24  world.  This is just part of the work, and it is commonplace,

25  is what the evidence shows you.

1              And by the way, this is another part, a focus of the

2     prosecutor's summation they had that line on their slides, the

3     secrecy.  Again, this is part of the shifting theory.  The

4     secrecy is about absence of evidence.  Right.  That's why they

5     have secrecy.  When they don't have something to support a

6     theory, they say it might be secret.

7              This is not secrecy.  You see the evidence.  Bob is

8     meeting with the Egyptians, he's snapping photos with them.

9     When Egyptian officials reach out to him, he gets staff

10    involved.  Not things you would do if you were in some secret

11    bribery scheme with Egypt or Hana about Egypt.

12             And by the way, that's true about the Morton's

13    surveillance.  They sent a lot of agents to cover a dinner with

14    Egyptian officials and Nadine at like a patio table at a

15    restaurant on a main street in Washington, D.C.  There is

16    nothing secret about that.  There is nothing you heard about

17    that that suggests there was anything nefarious going on.

18    Remember, the only words heard there was Nadine had said at one

19    point, what else can the love of my life do for you.  He could

20    have passed the bread, poured the wine.  You have already

21    probably become familiar with Nadine using the phrase "love of

22    my life" a thousand times in all the things you've seen.

23             So again, commonplace events being distorted as proof

24    of the story they want you to adopt.

25             They talked quite a bit about the IS EG consulting

 1    agreement and about that scheme.  And Mr. Hana's lawyer's going

 2    to talk more about it.  I want to focus on that agreement from

 3    Bob's perspective.  The evidence has shown you exactly what Bob

 4    did.  He helped her get a LegalZoom and get a consultant

 5    agreement, he reviewed it, and she got that job from Will Hana,

 6    and he fired her when she wasn't doing enough work.  That's it.

 7    That's the story.

 8         I would say from Bob's perspective, they want to say

 9    that alone proves he knew that these consulting payments were a

10    bribe scheme.  Again, Mr. Hana's lawyer will talk about this.

11         Ask yourself.  The prosecutors say Nadine and Bob are

12    being showered in cash and gold by Hana.  Why would you write

13    down a consulting agreement where the payments are made by

14    check.  Is that the sophisticated, smart, you know, center of a

15    criminal conspiracy that you've heard described in the story?

16    Why?  There is no explanation for why they do that.

17         You're being showered, they say, in cash and gold.  So

18    let's all write down an agreement and pay by check.  It doesn't

19    hold up.  Everything is trying to be contorted for this story,

20    but the evidence is just not there.

21         So, let's go to what they talk about, the quo, what

22    Bob allegedly did for Egypt.  They told you a story in the

23    summation about what he did.  I just want to quickly talk about

24    how there isn't proof that anything he did was improper, and

25    certainly no proof it was in exchange for a bribe.

1          So the first thing he did was approve these tank

2     rounds, the $99 million.  Part of it you saw was like practice

3     rounds, and part of it was for anti-ISIS activities by Egypt in

4     the Sinai.

5          There is just literally no proof that anyone from

6     Egypt actually asked Bob to do anything about that.  And there

7     is literally no proof that anyone in Washington, D.C. in the

8     federal government had one note of opposition to those rounds

9     being given to Egypt.  This is not controversial.  This is

10    something that is done, as you heard, for the last 40 years in

11    much catastrophically hugely larger amounts giving military aid

12    to Egypt.

13         There is nothing, nothing about Bob doing that because

14    of a bribe or even doing that because of a request from anyone.

15    There is no evidence about it.

16         All they like about it is that Bob happens to approve

17    a sale of arms to Egypt.  You know that has been happening in

18    huge amounts before Bob, and in the U.S. government, and it

19    will continue after Bob.

20         The second thing they talk about is that 280 embassy

21    employees e-mail.  I'm not going to do more on that.  I've said

22    what the evidence shows you about what that meant.  The only

23    thing I'll point out, I referenced this.  When Bob sent that

24    information out, that was publicly available.  He did not send

25    it to an Egyptian official.  He did not send it to Nadine.

O7A3MEN2                        Summation - Mr. Fee

1              If you can put up slide 78, Mr. Kelly, if we're able.

2              He sent it to Nadine.  Okay.  And then Nadine -- so

3     that's him sending it to Nadine.  Just FYI Nadine.  And you've

4     seen this information before.  This was what was available on

5     the date he sent it or shortly before the date he sent it

6     online.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. FEE:  Let's go to the next and see what Nadine

2    does with it.

3              She sends it to Will.  She just copies and pastes it.

4    Nadine doesn't attribute it to Bob.  She doesn't say, hey,

5    here's the things that the Egyptian spymaster wanted.  She

6    doesn't say anything, by the way.  This is the end of the

7    proof.  That's it.  There's nothing else showing that the

8    Egyptians wanted this, needed this, used this; that they said:

9    Wow, this is great, you know, terrorists, whatever.  This is

10   the end of the proof.  OK?  So I'm not going to overstate this,

11   but this is what the evidence shows.  Bob gets a request from

12   Nadine, who he loves.  He gives her public information.  Nadine

13   takes that and sends that to Will, the Will you know all about.

14   He is not an Egyptian spymaster.  He is what you've heard about

15   in this case.  That's the end of the story, from Bob's

16   perspective.  It is not proof of a bribery scheme.  It is not

17   proof that Bob is a foreign agent.

18             The third thing was that letter and they're using the

19   phrase "ghost writing."  Nadine asked him to edit this letter.

20   It was obviously about Egypt's commitment to the United States.

21   Bob edited the letter, and we'll show you some of the edits he

22   made and you can look at it if you want.  And then he sent it

23   back to Nadine.  There is no proof that anyone in the Egyptian

24   government ever received this letter.  There's no proof that

25   they ever sent this letter to anyone.  And of course, the

O7aWmen3                    Summation - Mr. Fee

1    government doesn't have to prove that, but it does inform what

2    you are being asked to accept about Bob's knowledge and his

3    intent.  Right?

4          Think about what the proof has shown.  Nadine says:

5    Hey, look at this letter.  He writes it.  I'm not going to go

6    through this.  I would submit to you that this was the right

7    thing for somebody engaging with Egypt to do.

8          Two points:

9          Egypt is an ally for the United States.  It is not for

10   us to consider whether that's good, bad great, or whatever.

11   Egypt has been an ally -- you heard the evidence -- for 40

12   years.  It's not as though engaging with Egypt on diplomacy is

13   like talking to Darth Vader.  OK?  They are an ally, and Bob

14   here is revising a letter that has Egypt committing to the

15   things he cares about.  Look at it -- joining with the U.S. and

16   our mutual desire to defeat global terrorism; making progress

17   on civil rights issues in Egypt.  There is no proof that Bob

18   thought this was special or useful.  And I would submit to you

19   that the common sense tells you that it was an opportunity for

20   a diplomat to lock in Egypt on these commitments to the United

21   States.  But again, that is the end of the story.  He edits it.

22   The text does not change materially, and it goes back to

23   Nadine.  That is your proof of the bribery scheme and the

24   foreign agent.  That's it.

25          Quick point about the foreign agent charge, and it

O7aWmen3                              Summation - Mr. Fee

1    really travels with this bribery allegation.  One thing.  There

2    is no evidence proving that Bob ever did anything in exchange

3    for a bribe to help Egypt.  They're arguing about the acts that

4    we just walked through.  That's what they're arguing about, but

5    there's no proof.  There is no Egyptian.  There's no witness

6    who saw somebody give Bob money for Egypt.  There's no text.

7    There's no email.  There is an absence of proof, so you have to

8    think about the inferences.

9          Second point.  A foreign agent charge requires proof

10   that the defendant was an agent, a servant of the foreign

11   principal.  The judge will tell you that means acting at the

12   direction and control.  Right?  So this is more than just

13   hearing a request and acting upon it.

14         And I want to be clear on this point.  Every day, you

15   have heard, members of Congress, like Bob, get requests from

16   foreign diplomats, foreign intelligence officials and American

17   citizens who care about what's happening in a foreign country,

18   and congresspeople often do things to make those requests

19   happen.  100 percent normal.  Not illegal.

20         When Russia invaded Ukraine and President Zelenskyy

21   came here and spoke to the Senate and the House and said give

22   us --

23              MR. MONTELEONI:  Objection.

24              THE COURT:  I'll allow it.

25              MR. FEE:  And said give us aid, Congress gave them

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    aid.  OK?  To comply with the request --

2              THE COURT:  At this point, sustained.  That's right.

3              MR. FEE:  When he says that if Congress were to give

4    aid, if congresspeople were to be moved by the request to help

5    us, says the president, if that happened, under the law you

6    will be instructed on by the judge, that is not illegal.  That

7    does not make you a foreign agent.  You can do things that

8    others request.  You can even be moved by the advocacy or their

9    demand and comply with the request, and you are not committing

10   a crime.  What you have to do is actually cede -- cede -- give

11   away direction and control to the principal.

12             They have to prove that happened here beyond a

13   reasonable doubt.  They have come nowhere close with the

14   evidence on the Egypt scheme.  They don't even have Egyptian

15   officials making demands to Bob, let alone proof that Bob was

16   doing something other than what he thought was right for the

17   interests of the United States and as a diplomat.  They have

18   made a big allegation, and it has not been met with proof that

19   meets the standard.  Full stop.

20             OK.  The next thing they talk about with Egypt, the

21   action is this McKinney call.  Let's look at how Ted McKinney

22   described this two to four-minute call right around when it

23   happened.  I'm not going to read these or get into the details.

24   My point about these descriptions is what Ted McKinney is

25   saying is at the time this is not dramatic.  Right?  Like, a

1    call from a senator, it matters, but there is no heat in here.

2    There was no suggestion he was pressured, threatened.  There's

3    no suggestion that this is bad for America.  These are U.S.D.A.

4    documents saying we got a request about a constituent concern,

5    and here's the information we need to respond to it.

6         If you want evidence about what happened on that call,

7    you can listen to Ted McKinney.  He has nothing to say

8    suggesting Bob made a threat, made a demand, said anything

9    other than, hey, stop hassling IS EG, which I would submit you

10   hear sometimes in politics and in New Jersey, your common sense

11   tells you.  But then you have Ted McKinney tell you what he

12   needs to do to get back to the senator.  This is at the time.

13   Take his testimony.  Take these documents.  It tells you all

14   you need to know.  There was nothing inappropriate about what

15   Bob was doing.

16        And by the way, the credibility of Bob's actions, why

17   did he do this, they're suggesting that it was inherently

18   suspicious that he was passing on this complaint about the New

19   Jersey business being criticized to the agency that was

20   criticizing it.  That's the argument.  The evidence has shown

21   that the certifiers IS EG was replacing were not doing their

22   job.

23        Go to the next slide, please.

24        This is part of the evidence.  Mr. Hana's counsel will

25   go through more of this.  The point is Ted McKinney didn't

O7aWmen3                           Summation - Mr. Fee

1   agree with this because it was going to slow down trade.

2   That's his job.  You heard that.  His job is to get as much

3   U.S. product sold abroad as he possibly can.  Understandably,

4   he did not like going from multiple certifiers to one

5   certifier.  You also heard Ted McKinney's focus was narrow.  He

6   did not -- did not -- know, did not care to inquire about the

7   quality of the halal certification.

8        You can hear the evidence about whether IS EG was

9   experienced, whether they were not.  The one thing I think you

10  know beyond any doubt, given the evidence here, is that these

11  prior certifiers were doing a bad job.  And McKinney didn't

12  care, because it does slow down trade to do careful halal

13  certification.  Full stop.  So these are different interests at

14  hand here.  McKinney wants trade.  Bob doesn't want a

15  constituent to get basically criticized out of business.  This

16  is a New Jersey business, and it is his friend.

17       By the way, let's make sure we're clear on that.  You

18  will not hear any instruction on the law that it is illegal for

19  a public official to act on a request from a constituent who is

20  also a friend.  OK?  And I would submit, your common sense

21  tells you, you do not want elected officials who don't have

22  friends in their community.  You do not want, your common sense

23  should tell you, elected officials who only hang out with,

24  like, CEOs and Fox News anchors.  You want people, as you've

25  heard in this case, like Bob, who live in the community, who

O7aWmen3                        Summation - Mr. Fee

1   know people in the community, who know the different

2   communities.  There are Coptic Christians in New Jersey who

3   really care about Egypt.  That is part of his job.  OK?  Don't

4   let that be a part of the story, that it is inherently --

5   inherently -- unlawful to get a request from a friend and act

6   upon it.  That is exactly what, I would submit your common

7   sense tells you, an elected official should be doing.

8           One more piece on that tank ammo scheme, the alleged

9   tank ammo scheme.  The core of what the prosecutors focused on

10  with that -- because remember, there is no proof that Egypt was

11  asking Bob to approve those $99 million in anti-ISIS tank

12  rounds.  There's no proof.  I think common sense tells you

13  Egypt definitely wanted that to be approved.  That's the whole

14  point of foreign military aid.  And that's lawful.  Right?  But

15  what they have focused on, in the absence of other proof, is

16  the suggestion that because Bob was updating Nadine or others

17  about approving or expecting to approve those tank rounds, that

18  he therefore must have been doing it because he was either

19  bribed or was a foreign agent.  But that's the argument.  That

20  actually is the entirety of the argument.  The proof beyond a

21  reasonable doubt is that -- the updates to others proves a

22  bribe and that he had ceded, like, the control of his life or

23  control of his decision on Egypt.

24          I just want to be clear.  You will not hear any

25  instruction that it is illegal to share updates about arms

O7aWmen3                    Summation - Mr. Fee

1    sales.  You heard evidence that it happens frequently.  This is

2    not classified.  This is not even nonpublic.  The point of many

3    of these events in the arms sale process, you heard, is to

4    update the countries or other interested parties about it.  And

5    in fact, you see a lot of other evidence of people other than

6    Bob, his staff, updating Egyptians on other events that the

7    prosecutors have now abandoned but used to say were part of the

8    scheme.

9            Just look at this next slide, please.  Sarah Arkin.

10   Again, quickly, this is just Sarah Arkin sharing the letter you

11   saw in this case, not in the summation, but in this case, where

12   Bob is basically asking the State Department to help avoid a

13   conflict over -- remember the GERD, the dam?  This is that

14   letter.  And you see Sarah Arkin sending it to Karim Assad at

15   the Egypt embassy:  Hope you and your family are doing well.

16   Wanted to let you know that the senator sent the following

17   letter today.

18           Again, there is no proof, and there is no law, and you

19   will not hear the judge tell you that there's anything unlawful

20   about updating folks about arms sales processes or about other

21   things that a senator is doing in U.S. foreign relations.

22           OK.  Egypt.  Done.

23           Let's go to Qatar.

24           There is no reliable proof about any scheme involving

25   Bob with respect to Qatar.  I submit to you that is not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    rhetoric.  It's not hyperbole.  There is just no proof.  You

2    have charts and you have some press releases and you have a

3    story.  But even in those charts and the evidence admitted with

4    those, there's no text message, there's no email, there is

5    nothing showing what this story being told by the prosecutors,

6    whether it is true and reliable.  They don't have anyone

7    saying, Bob, you need to do this, you need to introduce Daibes

8    to them, to Heritage, so that Qatar's happy.  Bob, Qatar says

9    you have to put out this press release, even though you don't

10   want to, Bob, you have to do it because we bribed you.  It is

11   the opposite.  The evidence in the record is only on one side

12   of the ledger.  Again, we don't have the burden, but we've

13   proven our side of the story here.

14        So there's three things related to Qatar in the proof

15   you've seen at trial, and this just lists them.  There's that

16   August 2 statement about Yemen, the August 20 statement about

17   Qatar helping to get folks out of Afghanistan, and then there's

18   a trip in October to Qatar.

19        You have heard not a single piece of evidence about

20   that trip.  Put it aside.  The statement on August 2 Bob made

21   on behalf of the SFRC thanking Qatar for sending $100 million

22   to fend off a famine in Yemen.  Qatar gave money to help people

23   starving during the civil war in Yemen.  That's what this is

24   thanking them for.  And again, in the absence of other proof,

25   it is highly relevant to look at what you do have in the record

1    that reflects why Bob would have done this.  Because remember,

2    they need to prove to you that Bob did it because of a bribe.

3    They need to prove that beyond a reasonable doubt.  But in the

4    absence of any evidence, they're asking you to accept the

5    story.  So let's look at the evidence in the record.

6           Look at everyone who's thanking Qatar for giving aid

7    to Yemen in the runup, preceding Bob's statement -- World Food

8    Program, a bunch of senators.  Chris Murphy, from Connecticut,

9    tweets out that he went to Qatar and discussed the possibility

10   of the donation, and then he went to dinner with Qatari

11   officials to celebrate their donation.  This is another

12   congressperson, Gregory Meeks, thanking Qatar for its

13   contribution.

14          Don't overcomplicate this.  There's no proof in the

15   record.  There's really not even something you could use to

16   suggest that there's anything remotely -- remotely --

17   controversial about Bob thanking Qatar for helping stave off a

18   famine in Yemen and the overwhelming universe of other folks

19   doing it and, like, Senator Chris Murphy claiming credit, in

20   part, for convincing Qatar to do it.  It shows you what a

21   nonevent this was for Bob, as chairman of the SFRC, to thank

22   Qatar, as everybody basically was doing, for a totally good

23   thing.  You don't need to pay a bribe to get that sort of thank

24   you, your common sense tells you.

25          And the same is essentially true about that statement

O7aWmen3                         Summation - Mr. Fee

1    thanking Qatar for evacuating folks from Afghanistan.

2    Remember, you heard evidence about what was happening in

3    Afghanistan.  The U.S. left.  The Taliban was taking over.

4    It's chaos.  People are going to be hurt.  And again,

5    everyone -- before Bob's statement on August 20 and after Bob's

6    statement -- is doing the same thing.  They are singling out

7    Qatar for saving people.  And then there's that story on CBS

8    News where they're, like, thanking -- they're applauding Qatar

9    for getting out the girls' chess team from Afghanistan, because

10   that's the level of concern folks had about the folks left

11   behind, and Qatar stepped up.  And everyone thought it was a

12   good thing.  There's been no evidence -- no evidence -- none,

13   not hyperbole, none -- showing that Bob got a request to do

14   this, that Bob had to be convinced to do this, that Bob had to

15   be persuaded or bribed, or whatever, to do this.  It would be

16   hard to find a less controversial decision.  Certainly in the

17   evidence in this case, you could not find a less controversial

18   decision than Bob issuing a press release thanking Qatar for

19   saving people from death in Afghanistan.  Period.  Full stop.

20   That's the end of the story.

21        You saw the prosecutors flash up very quickly this

22   S390, a resolution thanking Qatar.  The reason that only came

23   up and down quickly is what they said about it.  Bob didn't

24   sponsor that, he didn't write it, he didn't cosponsor it.

25   There is no evidence in the record that Bob did anything about

1    that resolution, a Senate resolution thanking Qatar.  Bob put

2    out a press release.  They also showed you this resolution.  It

3    is, again, disproving the conspiracy.

4         Bob is the chairman of the Senate Foreign Relations

5    Committee.  They flashed up this official resolution that

6    another senator wrote, another senator sponsored, another

7    senator introduced, another senator cosponsored.  Not Bob.

8    That is not proof of the scheme.  It is the opposite of proof

9    of the scheme.  And again, they're saying, I think, Daibes

10   noticed it and talks to Bob about it.  That is the quality of

11   proof you're being asked to convict upon in this scheme.

12        Do not -- do not -- overcomplicate the scheme.  Bob

13   did the right thing.  Bob was in line with the universal sweep

14   of other officials in the federal government, NGOs, whatever.

15   And there is an absence of proof on the other side.

16        This Heritage piece of the case, again, there's been

17   no witness to describe this to you.  They don't have to call

18   any witnesses.  They can make their decisions.  My point to you

19   is that you don't have an understanding of any of the

20   connective tissue that was reflected in the prosecutor's story

21   about Heritage.  I think the theory is that Heritage somehow

22   was also working for the Qatari government.  But there's no

23   proof, other than that Qatari guy who apparently funded

24   Heritage.  But there's no proof that they ever talked to Bob,

25   that they ever talked to Bob about Heritage's relations with

1    Qatar.  There's just nothing.  There's nothing.

2              And again others will do more on this, but let me just

3    show you briefly, because what it boils down to is this.  The

4    prosecutors are saying it's just a timing argument, that that's

5    the proof beyond a reasonable doubt.  I would say even if the

6    timing argument was persuasive, it should not meet that burden

7    when you go back to that jury room to deliberate, but it's not

8    persuasive.  It actually disproves -- again, disproves -- the

9    allegation that Bob was helping Daibes because of a bribe from

10   Qatar or Heritage, or whatever the theory is.

11             Look at the timeline.  So first of all, Heritage is

12   doing diligence -- like, they're investigating whether this is

13   a good deal -- for 14 months.  Again, common sense.  If this

14   was a bribe, if this was a scheme, would they do that amount of

15   scrutiny of the deal?  Ask yourself.

16             But here's the point that really relates to Bob.  You

17   see this August 2 on the bottom?  August 2, 2021, Senator

18   Menendez's chairman's statements re Qatar.  The argument is

19   that you just know that he did that because of a bribe because,

20   in May of 2022, Heritage sent a letter of intent to Daibes.

21             You heard about this during the evidence.  The letter

22   of intent was not binding.  You know, you actually will walk

23   through the language.  It means nothing in the sense that it

24   doesn't bind Heritage to do the investment.  And by the way,

25   even just the timing argument, the timing is distant.  Period.

O7aWmen3                         Summation - Mr. Fee

1    But the timing's actually really distant when you think about

2    the actual important date in the deal, which the government

3    doesn't want to focus on.  It's at the end of this timeline,

4    January 5, 2023.  Heritage does close the deal.  They sign a

5    binding agreement to fund the deal.  You saw that in evidence.

6    That's in January.  It's -- don't make me do the math.  It's

7    really far from August 2nd and 20th, 2021.  This is what's left

8    of the argument.  Even this disproves the theory on Qatar.

9             OK.  Let's talk about Phil Sellinger.

10             Again, the prosecution theory here is that Daibes

11    bribes Bob to appoint Esther Suarez and then also bribes Bob to

12    appoint Philip Sellinger.  Reject that theory.  Again, let's

13    not overcomplicate this.

14             First, there is no evidence that Daibes paid a single

15    dollar or a single piece of gold to Bob in exchange for this

16    action -- for putting up Suarez or putting up Sellinger.

17    There's no evidence.  There's the cash and the gold.  You're

18    sick of people arguing about that, I would imagine, but they

19    cannot connect that to this.  There's no evidence.  You need to

20    have the evidence, the connective tissue, to support this

21    theory.

22             That's first.

23             Second, what do they focus on as the proof that Daibes

24    had somehow paid Bob?  They show you this email from December

25    23, 2021, and you remember it's that Nadine says to Daibes that

O7aWmen3                           Summation - Mr. Fee

1    Bob is better having heard the date is postponed.  He is

2    fixated on it.  Now, the government says this must -- this

3    must, this must -- be about Daibes's trial date, which was

4    adjourned earlier that day.

5         No. 1, the evidence doesn't show you that Daibes was

6    even informed about that adjournment.  They have the phone

7    records.  They're in evidence.  We've shown you there was no

8    call from his attorney to Daibes.  There was certainly no call

9    from the attorney to Bob or Nadine that they had any idea that

10   this had happened.  There's just no proof that the story they

11   want to tell you with this text message, which would be weak,

12   even if they could do it, there's no proof to support that

13   story.  So they say it must be about the case, and by the way,

14   because she said Bob is fixated on it, that proves the bribe.

15   That is actually the proof of the bribe.  That's the proof of

16   the whole scheme, that Bob was fixated on it.

17        Bob and Fred have been friends for 30 years.  There

18   could be a whole host of things they're talking about here.

19   You heard that Bob was having surgery.  You heard that Kate

20   Daibes had health problems.  Also, Bob is certainly aware that

21   Daibes has this criminal case.  Nobody's going to dispute that.

22   OK?  This text is mundane, and it certainly does not go so far

23   as to establish proof beyond a reasonable doubt that Daibes

24   must have bribed Bob to manipulate the U.S. Attorney process.

25        There are no communications in this record between

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Daibes and Bob about the U.S. Attorney nomination process.

2    There is no proof in this record that Daibes ever expressed a

3    preference for anyone to Bob.  There isn't.  There's a

4    stipulation about what Daibes said to his own lawyer, but there

5    is no proof.  All of this stuff you saw, there is no proof that

6    Daibes ever even hinted at, hey, isn't Esther pretty cool, or

7    hey, Phil Sellinger, good guy, right.  We don't even have that.

8    It's just not there.

9             But let's go a little further.  What really confirms

10   to you that Bob was only doing what he did with this nomination

11   process was because it was the right way to do his job, I would

12   submit, that Phil Sellinger pretty effectively does that.  We

13   showed you already -- to refresh -- how Sellinger described his

14   single discussion with Bob where Daibes's name came up:

15            This is Sellinger telling you:  He didn't pressure

16   you?  He didn't threaten me.  He wasn't asking me to do

17   anything.  And then Sellinger even offered you his belief that

18   Bob wasn't asking Phil Sellinger to do anything unethical or

19   anything improper -- next slide -- at any time, including these

20   conversations or the one conversation that referenced Daibes.

21            And folks, I don't think you can overstate the

22   importance of Sellinger's testimony in disproving the theory,

23   disproving the allegation that Daibes bribed Bob to manipulate

24   Sellinger.  This is the theory.  Right?  Did anything you heard

25   from Phil Sellinger suggest to you that that was the guy you

O7aWmen3                          Summation - Mr. Fee

1    were going to make the U.S. Attorney so you can get him to kill

2    a case?  Did anything you heard about him or from him suggest

3    to you he was anything other than, like, a super ethical lawyer

4    who was really respected by everyone in New Jersey?  The theory

5    is that Bob and Fred picked him to also be corrupt.  That's the

6    theory.  It is not plausible.  It is not supported by evidence.

7           And Phil Sellinger knew these facts, by the way.  Phil

8    Sellinger knows that Bob is friends with Daibes.  Remember he

9    went to the wedding; Sellinger talked to Daibes.  Sellinger

10   knows that he has this conflict with Fred Daibes.  Sellinger

11   knows all the key facts that really you know about this theory.

12   Sellinger knows that he's likely going to be nominated with

13   this conflict.  And Sellinger certainly knows what Bob said to

14   him, and Phil Sellinger is telling you this wasn't unethical.

15   Putting aside illegal, this wasn't unethical.  And Sellinger

16   knows all that.  He has disproven the theory.  The government's

17   witnesses on are on our side of the ledger yet again.

18          This is why the cash and gold starts and finishes

19   everything they do -- because this case dies here.  The actions

20   they allege Bob took and the proof that they do not have to

21   show that he did those things because of a bribe -- do not stop

22   with the cash and gold.  Do not yield your righteously held

23   beliefs about the lack of proof on all these other elements

24   when you go back to deliberate.  Bob should be acquitted given

25   the lack of evidence.

1           OK.  So why?  Why then, if there's all this absence of

2   proof, why then, I'm sure you'll ask yourself, why did Bob even

3   mention Daibes to Sellinger?  The proof showed you.  Sellinger

4   had sued, he had literally sued Fred Daibes because of an

5   investment deal.  He had accused Fred Daibes publicly in a

6   civil suit of doing something wrong.  And I don't just mean

7   Sellinger's law firm did it, his giant law firm.  Phil

8   Sellinger told you he himself reviewed and revised that

9   complaint and told other lawyers to file it.  OK?

10          This is an issue, as you heard, if he's going to get

11  nominated and has a pretty bad conflicts issue about one of the

12  cases in that office, that's why Bob brings it up with Phil

13  Sellinger.  It's not because of the bribe.  It's obviously not

14  because of a bribe, the evidence shows you, because Bob nor

15  anyone who works for him ever brought up Daibes's name to

16  anyone else who was being considered for that spot.  Right?

17  You know at least one of the other people, Esther Suarez.

18  There's no evidence, I don't think there's even an argument

19  that Bob ever brought up the Daibes case to Esther Suarez.

20  None.  None.  The scheme is that Bob was nominating these

21  people -- you heard him, the prosecutor, in his summation go on

22  and on about how entitled he was to think he could manipulate

23  the U.S. Attorney selection process to help kill a case.  To do

24  what?  For who?  When?

25          They didn't even try to prove that Bob mentioned Fred

O7aWmen3                          Summation - Mr. Fee

1    Daibes to Esther Suarez.  Do you have any idea what Esther
2    Suarez thinks about the Fred Daibes case?  You do not, because
3    the record is silent.  The record actually is silent on whether
4    Bob ever mentioned Daibes to Esther Suarez, and he actually
5    nominated her.  He actually put her forward to the president to
6    nominate.  He did, like, he put her forward.  So how does this
7    scheme track?  How does it compute?  How does it make sense
8    that the person he tried to get the president to put in that
9    position -- there is 100 percent blank white space that would
10   prove he was doing this because of Daibes.  100 percent, empty,
11   absent.  Hold the prosecutors responsible for the gaps in the
12   evidence.  You would have to ignore a lot -- a lot -- of
13   exculpatory, innocent evidence to fill in that space and find
14   Bob guilty of this count.

15           And by the way, you know who else agreed with Bob that
16   this was a conflicts issue for Phil Sellinger?  The Department
17   of Justice.  You heard Phil Sellinger say he raised this issue
18   with the Department of Justice through the formal process that
19   they have, and the Department of Justice told Sellinger, hey,
20   man, it's a conflict.  You're recused.  That's what Bob said.
21   So the proof they're left with on this is weak.  It is actually
22   impossible, I would submit, to take the proof the prosecutor
23   cited as proof of this bribery scheme and find that it proves
24   anything beyond a reasonable doubt.  It's truly impossible.
25   I'll show you why.

1          The focus here was on Soliman's testimony.  Remember,

2    he was that adviser who said he talked to Sellinger, and then

3    he says he sent a text to Bob.  And the text to Bob said

4    something like:  Call Phil; I think you'll like what you hear.

5    This is the proof.  This is the proof of the U.S. Attorney

6    bribery scheme.  This is it.  The rest is rhetoric and, like,

7    stuff.

8          Let's look at what actually happened.

9          So this is the timeline of some of the events in

10   evidence.  Menendez first interviews Sellinger in December.  He

11   picks -- there's that memo from the White House saying we want

12   diverse candidates, do your best to find qualified diverse

13   candidates.  Bob goes with Suarez.  He puts her forward to the

14   White House in March.  This is obviously reflecting other

15   evidence you've seen.  She runs into problems with the vetting

16   process that the White House is doing, not Bob.  The White

17   House.

18         April 20, Bob switches to plan B, Phil Sellinger, who

19   is a universally respected lawyer in New Jersey that everybody,

20   including Cory Booker, thinks is qualified.  And on April 20,

21   2021, you heard, in evidence, that Senator Menendez tells Phil

22   Sellinger I'm going to nominate you.  That's when it happened.

23   That's it.  That's the end of the proof.  The government has to

24   go a little further, though, because they don't have anything

25   but this.  On April 29, Soliman and Sellinger call each other a

O7aWmen3                          Summation - Mr. Fee

1    bunch of times, and this is when -- and Sellinger testified

2    that during those conversations I never told Soliman -- this is

3    Phil Sellinger -- I never told Soliman that I wasn't recusing.

4    What I told Soliman -- and we'll show you, actually -- is

5    basically: I had this conflict. I have to go through the

6    process. I don't know what the outcome will be.

7            Now, I would submit that common sense tells you he

8    likely had a good sense of what the outcome would be, and you

9    saw where the DOJ eventually came out -- he could not supervise

10   the case. But Sellinger was crystal clear about what he told

11   Soliman. Crystal clear.

12           Is Soliman crystal clear? Let's just go back one

13   slide. I'm sorry.

14           The last thing on this chart on the right is the text

15   that is proof that they are left with for their theory that

16   Daibes bribed Bob to get Sellinger. Soliman texts Bob: I

17   think if you call Sellinger you'll be comfortable with what he

18   says.

19           Two things:

20           No. 1, Bob had already told Sellinger he got the job.

21   OK? That reveals that the theory cannot be right. On April

22   20, Sellinger's getting nominated. Period. Full stop. Suarez

23   has run into trouble at the White House; it's Sellinger's job.

24   So this May conversation is actually irrelevant. But Sellinger

25   is confident that he did not say he could actually supervise

1    Daibes.  He did not say that.

2          Here's what Soliman says.  He is not confident in his

3    testimony.

4          Let's go to the next slide.

5    "Q.  When you say you will be comfortable with what he says" --

6    that's that text, the prize evidence the government selected --

7    "you don't have a clear recollection of that, right?

8    "A.  I do not have a clear recollection."

9          That text meant one of two things.  It either meant

10   that he didn't have any, like, issues that would come up in

11   vetting, not a subject that is relevant to the government's

12   theory; or it was that I think Sellinger told me he didn't have

13   to recuse.  Right?  So Soliman is 50-50.

14         Folks, the burden is proof beyond a reasonable doubt.

15   50-50 literally cannot satisfy that burden.  Soliman cannot

16   tell you that this is actually what he was conveying to Bob.

17   He cannot tell you.  The prosecutor didn't include these sort

18   of like Shades of Gray, the 50-50.  He said you know -- you

19   know, you know, you know, you know -- from this text that Bob

20   understood Sellinger could oversee the Daibes case, therefore,

21   the scheme was a go.  There's a lot of problems with that.

22   It's too late.  Sellinger already had the job.  There's no

23   bribe.  Just take that on its face.  Soliman actually said I

24   actually don't know which of two things I was conveying.  Phil

25   Sellinger is crystal clear that I did not, and would not, have

O7aWmen3                    Summation - Mr. Fee

1    told Soliman that I could supervise the Daibes case, obviously,

2    because I had to go through the DOJ process.

3          Done.  This count is done.  The rhetoric would make

4    you think this count had some legs in the summation, I would

5    imagine.  They told the story.  The story had a beginning, a

6    middle and an end.  It made sense.  It was kind of interesting,

7    sexy bribes, you know, manipulating the U.S. Attorney process.

8    The evidence that was unremarked upon disproves it.  And when

9    you hear again from the prosecutors, because they go last, we

10   don't get to go again, ask yourself when you hear that story

11   how do I know that they're being credible?  Because they have

12   not, to date, been selling you a reliable story about this.

13         OK.  The last part of this is Vikas Khanna.  Remember?

14   This was actually in the summation yesterday.  I think the

15   suggestion was that Bob was, like, feeling out Vikas -- and I'm

16   not really honestly clear -- that he was trying to see, hey,

17   maybe Vikas Khanna could help me.  I'm just going to mention

18   two lawyers and nothing else.  This is, like, maybe like the

19   psychic projection theory of bribery.  I don't understand how

20   it actually proves the case, my friends.  But let me just tell

21   you something.  This, again, is evidence of innocence.  What

22   did you hear from Vikas Khanna on cross, like, if Bob was

23   crooked, if Bob had been bribed to get a federal prosecutor to

24   kill the Daibes prosecution, this was the guy to do it with?

25         Vikas Khanna tells you, on cross, that he actually

O7aWmen3                    Summation - Mr. Fee

1    hosted a fund-raiser for Bob.  OK?  Like, recently.  Vikas

2    Khanna tells you also, by the way, my brother, Vikas Khanna's

3    brother is a sitting Democratic congressman and a political

4    ally and close friend of Bob.  Like, if Bob is crooked, this is

5    a golden opportunity.  So what does Bob do?  He does literally

6    nothing.  He doesn't mention Daibes.  He doesn't mention the

7    case.  He has an 84-second phone call with Vikas Khanna in

8    which he congratulates him, and he congratulates him again on

9    getting the First Assistant position.  I think the brother came

10   up, and then he says:  Hey, those two lawyers, those are great

11   guys.  You're going to have fun working with those guys.

12           And you heard that those two lawyers -- again,

13   unconnected to any particular case, those two lawyers represent

14   dozens of people who are being prosecuted by that office.  So

15   again, this is not evidence of a scheme.  It does not support

16   the story.  The fact that they referenced Vikas Khanna in the

17   story of bribe fantasy proves to you, I would submit, they

18   don't have it.  They don't have it.  This is evidence of

19   innocence.  Fund-raiser, brother of my political buddy, a young

20   up-and-comer.  Not a single word.  Not a single word.  This is

21   the quality of proof.  This is why this case dies right here.

22           The last thing, and again, they're focusing on the

23   minutia because there's nothing else to do.  This thing about

24   Bob skipping the investiture, again, it proves the opposite of

25   a bribery scheme.  Folks, common sense.  If you were on the

O7aWmen3                        Summation - Mr. Fee

1    take to get somebody to kill the Daibes case, if you had

2    nominated Sellinger for that process, but then he recused

3    himself, what do you do next?  Do you call him up while the

4    Daibes case is still pending and while his No. 2, like, his

5    right-hand man, Vikas Khanna, is still supervising the Daibes

6    case, do you call Phil Sellinger up and basically tell him:

7    Man, we're done.  You didn't deliver.  I'm not going to your

8    investiture?

9            Of course not.  Of course you wouldn't do that.

10   Daibes's case is still pending.  Phil Sellinger is in the

11   office every day with Vikas Khanna.  Even if he's not

12   supervising the case, you wouldn't want to do that.  That's a

13   dumb thing to do.  If your next target, as they say, was Vikas

14   Khanna, you're going to tell his boss that, hey, man, we're

15   done, I'm not coming to your investiture?  Does that help you

16   achieve the goals of the scheme that they need to prove with

17   evidence beyond a reasonable doubt?  It does not.  It obviously

18   does not.  The reason he said that to Phil about, you know, I

19   don't really have the ability to influence anything you do is,

20   we proved to you, remember the White House memo, diverse

21   candidates, Bob nominates Esther Suarez.  She would have been

22   the first Latina to have ever held that position.  It doesn't

23   work out.

24           You heard Sellinger discuss diversity with Bob.  I

25   would submit to you, you also saw -- I don't have to submit to

O7aWmen3                    Summation - Mr. Fee

1     you, you saw that Bob was getting pressure from the Black

2     ministers in Newark and Jersey City to compose a federal

3     prosecutor's office that represented the communities that were

4     under its jurisdiction.  This is in evidence.  Sellinger didn't

5     do that.  He didn't appoint this guy Jamal Semper who you heard

6     is now a federal judge, universally loved and respected.  Bob

7     said:  Hey, promote this guy.  I think that would help address

8     this diversity concern that I care about and that the White

9     House cares about and that's important to the communities that

10    we serve.  These are my constituents, for Bob, also Phil

11    Sellinger, people he's serving in New Jersey.  Didn't happen.

12    Didn't happen.  That's the source of Bob going to Sellinger and

13    saying, I don't really trust your word anymore or I'm not

14    coming to your investiture.  Of course he wasn't going to do

15    that in the midst of the bribery scheme while Daibes's case was

16    still pending.  It would not make sense.  It does not make

17    sense.  We have again proven to you, disproved the government's

18    theory with this sort of evidence.

19         OK.  I'm going to briefly talk about the obstruction

20    count, because I do think -- I genuinely think the case --

21              MR. MONTELEONI:  Objection.

22              THE COURT:  Again, the evidence shows.

23              MR. FEE:  Thank you, your Honor.

24              I genuinely believe that the evidence shows that there

25    is --

O7aWmen3                        Summation - Mr. Fee

1            MR. MONTELEONI:  Objection.

2            MR. FEE:  Judge --

3            THE COURT:  Mr. Fee, don't.  I understand.  Don't put

4    yourself up.

5            MR. FEE:  Got it.

6            THE COURT:  The evidence is what matters here or the

7    lack of evidence --

8            MR. FEE:  Thank you.  I'm sorry.

9            THE COURT:  -- evidence or lack of evidence is what

10   matters, not what you believe.

11           MR. FEE:  What he said.

12           And therefore, you must acquit on these counts.

13   Whatever you think or don't think about that cash and gold, no

14   one is answering the question about cash and gold beyond a

15   reasonable doubt.  Let's be real.  They're not.  They're not.

16   Because it represents the chaos and the years of a life lived

17   in a home.  That's hard to unpack.  That's why it seems hard to

18   really have certainty about any of it, right?  Decades and

19   decades of stuff, gold and cash in bags, in closets, whatever.

20   That's tricky.  This is not tricky.  The evidence has shown you

21   this is not tricky.  Bob did things he should have been doing.

22   Bob did things in the absence of any proof that it was a bribe.

23   Bob did things that were right and good for his constituents

24   and his country, standing behind that 100 percent.

25           This obstruction count, just really quickly, the

O7aWmen3                         Summation - Mr. Fee

1    evidence you've heard about the obstruction count is this.

2    Bob's prior lawyers went to a meeting with the prosecutors.

3    They were trying to convince the prosecutors not to bring a

4    case.  It didn't work out, obviously.  It was an advocacy

5    situation -- a defense lawyer making arguments, don't charge my

6    guy.  That's what that was.  And yes, that lawyer works for

7    Bob, but that lawyer was making arguments to not bring a case.

8    There's no detailed testimony about what was actually said by

9    that lawyer.  You heard a paralegal who couldn't remember most

10   of what was said.  He just said I got an email with a

11   presentation.  The only proof you have on this count is that

12   paralegal, and then it's four pages of, like, an almost 50-page

13   presentation.  OK?

14            Now, you know that there was talking.  There was

15   talking during the presentation, but you don't know what the

16   talking was.  You just have the four pages.  So let's look at

17   those four pages.

18            Oh, I'm sorry.  Actually, the other evidence, which

19   I'm sure you'll see again, was they say that these checks were

20   part of Bob's obstructive activities, that the checks produced

21   about the loans being repaid, neither Bob nor his lawyers

22   presented those.  That is not connected to Bob.  Those are

23   Nadine's lawyers.  She had her own, separate counsel produce

24   those checks.  So any theory that that proves Bob obstructed

25   justice, reject that.

1          But let's look at the slide they put in, what they say

2     actually proves obstruction here.

3          So, this is one on monthly car payments.  This is

4     correct.  It's truthful.  The little asterisk means the senator

5     didn't know about it before the investigation began.  That's

6     what they're saying is a lie.

7          Can we go back, please.  Go back to the prior slide.

8     Thank you.

9          That's truthful.  There's no evidence -- we talked

10    about it; I won't talk about it again -- that Bob knew Uribe

11    was making those payments.  Uribe told you that, the text

12    messages, everything has shown you that.  There's just an

13    absence of evidence showing that Bob knew car payments were

14    being made by Uribe.  So this is true.  This is just rearguing

15    the inference they want you to adopt.  So obviously all that

16    other stuff, all the absence of evidence and the evidence we

17    showed to disprove this theory, it just goes together.  That's

18    one of the slides they showed you.

19         The next one, I think, we need to spend a little time

20    on, just a little bit of time on.  You see that highlighted row

21    on this slide?  Again, we don't know what was said during -- I

22    think it was hours of presentation, even though it's written,

23    to the prosecutors.  We don't know what Bob said to his lawyer

24    either.  There's no evidence of that.  Remember that.  I don't

25    want to sort of adopt any sort of misimpression.  There is no

O7aWmen3                        Summation - Mr. Fee

1    evidence what Bob did or did not say to his lawyers.  The

2    argument is that Bob must have said this to his lawyers.  So I

3    want you to understand you don't even know what Bob said to his

4    lawyers.

5            The argument is that, well, he must have said these

6    things to his lawyers.  How else would they know?  That's

7    fairest version of the government's argument.  I would submit

8    that does not meet the burden.  That's what I would tell you.

9    I don't think you can convict on obstruction based on that,

10   because these are not Bob's word.  Bob wasn't at the meeting.

11   He didn't attend the meeting.  There's no proof of what he did

12   or did not say to his lawyers.  Anyway, let's just look at it.

13   So if you see that highlighted entry, in summation they didn't

14   show that to you.  What they showed you were the next three

15   entries.  They're the same -- $10,000 check from IS EG Halal to

16   SIBC, consulting fee, with an asterisk, which says he wasn't

17   aware.  And they say that's a lie.  They didn't show you -- the

18   presentation says in the just one prior row that Bob did know

19   about the consulting agreement between SIBC and IS EG Halal.

20           So the takeaway from this, and no one will dispute

21   this, is that the lawyers are saying, yes, Bob knew about the

22   agreement.  Bob knew SIBC had been engaged by IS EG Halal.  100

23   percent Bob knew it before the investigation began.  The

24   assertion that is being made here is that Bob didn't know about

25   the details of the checks.  That is true.  Now, they have shown

O7aWmen3                    Summation - Mr. Fee

1    you again and again that message where Fred says he gave a

2    check to Bob.  Folks, there's no other evidence about it.

3    Like, let's say it was the IS EG Halal consulting fee check for

4    Nadine and that Fred did give that to Bob.  There's no evidence

5    Bob opened it up, wrote it down, remembered it, knew what it

6    was, knew it was the second of three payments, whatever --

7    whatever.  There's just nothing there beyond that, and that's

8    the entirety.  I would submit to you that this is a deeply

9    implausible theory of obstruction.

10             First, you say 100 percent I knew about that

11    consulting agreement.  I knew about it.  That's the

12    representation.  I knew about it long ago.  And we know he knew

13    about it.  He helped her revise, right, on LegalZoom?  But then

14    step 2 of the obstruction theory is he said he didn't know

15    about the amounts and dates of the checks that were actually

16    delivered.  Right?  Because, remember, when you say you knew

17    about the consulting agreement, the consulting agreement

18    detailed the payments.  It detailed that she would get $10,000

19    for at least three months.  So Bob in this presentation, even

20    if you accept that this came from Bob, it is saying I knew

21    about that agreement.  I knew about the payment schedule.  I

22    did.  I knew what she was getting, I knew how long.  That's

23    what the agreement tells you.  The only thing this is saying is

24    I, Bob, didn't actually know about the details, and that is

25    consistent with the evidence.

1          So let me close with three quick facts, three facts,

2     not quick, that I think are not in serious dispute, and you

3     know very much about them so I won't repeat, and show you you

4     must acquit Bob.

5          The first is that there is no compelling evidence that

6     Bob ever took a bribe.  And reject, as I have talked about

7     before, the suggestion that somehow the absence of evidence of

8     Bob taking a bribe to do an official act is actually evidence

9     of guilt.  That's not how you, I would suggest, should uphold

10    your oath as jurors.

11         They had all the phones in this case.  They had iCloud

12    histories.  They had email accounts.  They had surveillance.

13    They had GPS.  I think the prosecutor even said how much work

14    they did, how hard it was to do all this work.  They did a lot

15    of work.  They don't have it.  They don't have the proof of a

16    bribe.  They did all that, all that hard work, that they're

17    proud of, and they cannot point you to anything more than a

18    story that is not supported by the proof.  Right?  They're

19    misrepresenting what some of the witnesses said.  I showed you.

20    I showed you.  They're leaving out details that don't help the

21    story.  All that work, and they still don't have it.  That's

22    what you need to take away.

23         And you know, the lawyerly trick, you will hear again,

24    I'm 100 percent sure, or I presume you will hear it, is that

25    they're going to make excuses for not having that.  And the

O7aWmen3                    Summation - Mr. Fee

1    excuses sound like what you've already heard.  It was all

2    implicit.  It was wink-wink.  They didn't need to say it

3    because everybody knew it, and you know they knew it because

4    they're criminals.  It's that kind of circular reasoning.  You

5    don't need to hear it again.  They say of course they didn't

6    write this stuff down.  It's a crime; you don't write stuff

7    down.  But when they did write stuff down, that was also proof

8    of a crime.  You're going to hear that.  And they have all one

9    thing in common -- they are in the imagination of the

10   prosecutors.  They're calling them inferences.  They want you

11   to adopt them, and I would ask you to do your best to do your

12   duty to look at the evidence when those sorts of explanations

13   are urged on you because they are completely invented.

14          Think about the most valuable thing you can imagine

15   someone getting handed down in a family -- a gold watch, a gold

16   coin collection, a grandfather clock, a scarf, whatever.

17   Imagine.  It's not yours.  It's stolen.  It's not yours.  I

18   don't have any written evidence because you're too smart.  You

19   concealed a lot.  That grandfather clock is a bribe.  You're

20   just too smart to write it down.  You're too smart to get

21   caught on surveillance video talking about how you stole that

22   grandfather clock.  You are a good secret keeper.  It's easy to

23   rhetorically flip the lack of evidence into an argument that

24   there is evidence, especially when you sort of wrap it up and,

25   like, these entitled politicians think they're so good that

1    they can do whatever they want, send these corrupt guys --

2    wherever.  They're trying to move you along, over the gaps.  It

3    doesn't make sense.

4            The second fact that's not in reasonable dispute and,

5    I would submit, it shows that you need to acquit the senator is

6    that he never even came close to taking an official act to help

7    anyone on the basis of a bribe.  You're going to hear all about

8    what an official act is.  But what have you heard about Senator

9    Menendez doing that was actually within his authority to help

10   any of the people in this case?

11           Ted McKinney told you Senator Menendez had zero

12   authority of over him.  Ted McKinney worked for the secretary

13   of agriculture and the president.  I'm not even talking about

14   all the other evidence that shows Bob wasn't trying to

15   accomplish any kind of bribery objective.  I'm just talking

16   about official authority.  He has none.  In fact, Ted

17   McKinney's actions prove that to you.  Remember after the phone

18   call Ted McKinney just ignored Bob for a month?  No response.

19   They drafted an email, didn't send it.  No follow-up, and Bob

20   didn't follow up.  Just total silence.  That is not somebody

21   who you genuinely are concerned about exercising their

22   authority over, to just ignore them.  I would submit your

23   common sense tells you that is not how someone acts if there is

24   real concern about authority being exercised.

25           On Daibes, we listened to Phil Sellinger.  What did he

1   have to say about pressure from Bob, about threats from Bob,

2   about any requests from Bob?  Just nothing like that came close

3   to coming out of Phil Sellinger's mouth.  It was evidence of

4   innocence from Phil Sellinger.  No threats.

5          José Uribe told you he literally had no idea what Bob

6   did or didn't do to help on the Parra case, and there's a good

7   reason.  Uribe had no idea whether or not Bob had done anything

8   wrong because all Bob did was have a call and a meeting to

9   raise this concern about a bad case that was, in fact, a bad

10  case.  That's the evidence.  That's what you've heard.  And of

11  course, you heard Attorney General Grewal is a state official.

12  Bob has no authority over him.  None.

13         You heard about Qatar.  I'm not going to talk more

14  about that.  There's no question Bob didn't take an action in

15  exchange for a bribe.

16         The third fact about which there is no reasonable

17  dispute that shows you must acquit Bob is that there's no

18  evidence that Senator Menendez was aware -- reliable evidence

19  that he was aware of Nadine getting help with her mortgage or

20  car payments from anyone else.  This is very important.  The

21  evidence has been crystal clear that he did not have any

22  knowledge of those payments and that Nadine wanted it that way.

23  And the reason she wanted that, you also know, she had lost Bob

24  once because of the chaos and drama of her life, and she was

25  trying hard, understandably, to present the image that would

1    keep Bob with her.  Right?  This was, like, the chance for

2    Nadine to get back to a comfortable life, to get away from some

3    of the chaos and the hard times.  And of course, she was

4    presenting an image to him, as human beings do in

5    relationships, that was a little rosier.  Right?  This is the

6    whole point of the Instagram -- it's a little bit better than

7    reality.  Right?

8           That's what she was doing, and you have evidence that

9    she was doing it.  100 percent.  Look at the timeline.  Slide

10   120.

11          This is the relationship.  It's in evidence.  It's

12   when they begin dating, when they break up.  You see the car

13   payments from Uribe began in April 2019 to July 2019, when

14   still dating, not living together.  No bank accounts joined, no

15   credit cards joined.  Nothing.  He's not even living with her

16   when those payments begin.  And then you see the engagement,

17   then he moves in and then they get married.  And again, this is

18   not shifting blame to anyone.  This is the truthful evidence

19   about what Bob knew and did not know, which we are required to

20   present and, frankly, should, in our system, be welcome to

21   present to get you to the truth of what these allegations

22   actually show.

23          Let's go to the next slide, please.

24          This is one example.  This is the elliptical you've

25   heard so much about.  You have not seen this focused on in the

1    prosecutor's summation, no surprise.  Nadine tells Bob this

2    elliptical that you've seen many times now in her bedroom, she

3    says:  I sent the picture of yours, meaning she's going to get

4    it for him, to the guy that orders elliptical to look it up.  I

5    am going to go to the office tomorrow and order it.  I will

6    confirm before placing the order with you, meaning I will

7    confirm with you before I actually buy it.  There's no

8    ambiguity there.  She tells Bob she's going to buy the

9    elliptical.  That's not what happens.  It's part and parcel of

10   the other stuff you've seen.

11          She doesn't want Bob to know there's financial

12   complications in her life.  100 percent, you can rely on that

13   proof.  This is what she actually does.  This is actually one

14   of Daibes saying:  Nadine wants an elliptical.  It's in the

15   cart.  It needs to be ordered and shipped ASAP.

16          Nadine's not on this email, and Bob certainly is not

17   on this email.  And Bob is never told she had somebody else

18   order it for her.

19          OK.  So, we're going to do it before lunch.

20          The prosecutors are going to continue to tell you, in

21   excited tones, that Senator Menendez is a crook, is corrupt,

22   took a bunch of bribes, all that stuff.  It's going to keep

23   happening.  I hope and I think the evidence has shown you a

24   more accurate picture.  I don't think you've seen anything to

25   suggest that he's a man who cares about ellipticals and

1  Mercedeses and all that.  You heard his sister tell you he

2  could have left the Senate and made a whole bunch of money.  He

3  didn't.  This is what he's done, as you heard, day after day

4  for most of his life.  He's served the public.  He's tried to

5  do the best he could for his constituents.  He cares about

6  things like diversity and human rights and the United States

7  security in the world and whether folks in diaspora communities

8  in New Jersey are getting the attention they deserve in this

9  country, because he himself got a lot in this country.

10        Even Sarah Arkin, the government's own witness, told

11  you that, to this day, Senator Menendez and his staff try to

12  take a meeting with every constituent who needs one.  That's

13  what he's about.  That's what he's always been about.  This is

14  not a case where the prosecutors have met their burden.  It's

15  just not here.  It's a painfully thin case.  Most of the

16  evidence was in summary charts presented by agents who had not

17  interviewed a witness or knew anything about the evidence that

18  you now know about in this case.

19        You will hear theories again from the prosecutors in

20  their next summation, and they are misdirections.  They are

21  theories based on inferences divorced from the evidence, and we

22  have shown you that.  We don't have the obligation to do so,

23  but we have.  We have disproven these allegations.  There's not

24  been one witness who told you they bribed Senator Menendez.

25  There's not been one witness who witnessed Senator Menendez

O7aWmen3                    Summation - Mr. Fee

1   agreeing to do anything that was other than the right thing to

2   do.  It just hasn't happened.

3        You know, the Supreme Court has said, and this will be

4   reflected in the instructions you hear, that the purpose of a

5   jury is to guard against the exercise of arbitrary power, to

6   make available the commonsense judgment of the community as a

7   hedge against the overzealous or mistaken prosecutor -- the

8   overzealous or mistaken prosecutor.

9        Now, listen.  We talked about evidence here.  You've

10  got to go back to that room and you have to uphold your oath.

11  You're the only thing that matters now.  And I want you, I urge

12  you to think about that principle when you do your job.  It's

13  critical to understand the lens through which you must view

14  this case.  This entire prosecution, I think, has been a

15  reflection of how critical, how important it is to have a jury.

16  This is how the system works.  The fact that he is charged,

17  that he is sitting here does not mean that you need to accept

18  this sort of story, half-baked, twisted up, shifting, jumbled,

19  whatever that is, and you will hear more of it.  Resist the

20  temptation to pick the salacious story about a corrupt

21  politician, because it's not there.  It's not there.

22       This is an important case for Senator Menendez.  It's

23  also an important case for these prosecutors, and I think

24  that's been reflected in the stories you've seen and the way

25  they treated the evidence.  That's my view.

O7aWmen3

1          Our system, the American criminal justice system, is

2     designed to reject cases like this one.  It's designed when

3     prosecutors bring charges but do not have evidence beyond a

4     reasonable doubt for the defendants to get acquitted.  I would

5     submit, I would argue you are here for a reason, and the reason

6     is to hold the government to its proof.

7          What you are doing here is a service to your country.

8     It is patriotic to serve on a jury.  I don't know if you've

9     served in the military.  I don't know if you volunteer.  I

10    don't know if you ever have or will work for the U.S.

11    government.  But this patriotic, and when you acquit Senator

12    Menendez, the United States wins.  The United States of America

13    wins when thin cases brought by overzealous prosecutors are

14    rejected because the evidence isn't there.  That will be a win

15    for this country.  So we leave his fate in your hands and leave

16    it for you to decide.

17         Thank you.

18         THE COURT:  All right.  Thank you, Mr. Fee.

19         Ladies and gentlemen, before we go to lunch, I wanted

20    to explain a little bit of what you saw.  There was some byplay

21    back and forth between the lawyers, and it dealt with what's

22    called vouching.  I just want to explain it so you understand

23    what's happening.

24         A lawyer is not permitted to put his or her own

25    credibility at issue.  A lawyer can say I believe the evidence

O7aWmen3

1    showed this or I believe the evidence can show that.  But a

2    lawyer cannot say I believe so-and-so is telling the truth or I

3    believe so-and-so is not telling the truth, because that's

4    putting the personal credibility of that lawyer at issue.  And

5    that's not anything for you.

6           What's for you is the lawyers' arguments.  You listen

7    to the arguments as to what the evidence showed or didn't show.

8    But the lawyer is not permitted to say trust me, believe me,

9    this is what I think.  I think so-and-so is telling the truth.

10    They can't do that.  It's called vouching.

11           Is that clear?  But they can say, and should say, I

12    believe the evidence shows this and I believe the evidence

13    shows that, and you will find at the very end the evidence

14    shows this, you should find the evidence shows that.  You just

15    can't put your credibility at issue.

16           Enjoy the lunch.  We'll see you at five after two.

17           (Jury not present).

18           THE COURT:  Five after two.  Thank you.

19           (Luncheon recess)

20

21

22

23

24

25

```
 1                         AFTERNOON SESSION

 2                           2:05 p.m.

 3            (In open court; jury not present)

 4            THE COURT:  Mr. Lustberg, do I have an estimate from

 5   you, sir?

 6            MR. LUSTBERG:  Your Honor, I said yesterday

 7   two-and-a-half hours.  I think I may be a little less than

 8   that, but that ballpark.

 9            THE COURT:  Fine.  Bring the jury in.

10            (Jury present)

11            THE COURT:  Ladies and gentlemen of the jury, we now

12   will hear the summation by Mr. Lustberg on behalf of Mr. Hana.

13            MR. LUSTBERG:  Thank you very much, your Honor.

14            Quid pro quo.  That's what this entire case is about.

15   This in exchange for that.  Without a quid pro quo, Mr. Hana

16   can't be convicted.

17            But the exact phrase quid pro quo is really important.

18   It's not just about quids, it's not just about the quos, it

19   also has to be the pro.  That connects the two.  Put in plain

20   English, as opposed to Latin, it's not about the this or that.

21   It's not about or that.  It is about this for that.  This in

22   exchange for that.

23            This requirement is necessary, not only just to

24   conform to the bribery statute, but also to implement the

25   requirement that you're going to hear Judge Stein talk about,
```

that the bribery statute requires corrupt intent.  That is, in
order to convict Mr. Hana, or any of the defendants of bribery,
there had to be corrupt intent, which means the intent to act
with an improper motive or purpose.

          And that improper motive or purpose can come about
only if a thing of value was provided in exchange for an
official act.  Without that, there is no improper motive or
purpose which is what the law requires.

          In listening to the government's summation, that quid
pro quo, that this for that, that exchange, often seemed to get
lost.  But it's largely what I want to talk to you about for
the next little while.

          In his summation, Mr. Monteleoni spoke a whole lot
about the quids, the things of value that were given by
Mr. Hana.  With regard to him, those quids were, and I'll list
them all because they're really not disputed.  There was a
payment of Nadine's mortgage, approximately $23,000, we'll talk
about that as a loan.  He gave her a job, paid her $30,000.  He
paid for dinner at Mr. Chow's restaurant, that was one of the
things that Mr. Monteleoni talked about.  That was about $524.
You have the receipt in evidence.  There were seven 1-ounce
gold bars that were worth $12,878.50.  And there was an air
purifier and there was an elliptical.  There were other
unspecified things of value like carpeting maybe some odd jobs
that were done around Nadine's house.  Mr. Monteleoni talked

1    about all of those.  I'm going to address the specifics of most

2    of them a little later in this summation.

3              But, really, whether Will Hana provided those things

4    to Nadine is honestly not disputed.  I would be insulting if I

5    stood here and said he didn't give those things.  Those things

6    happened.

7              Likewise, really with regard to the quos, Mr. Hana

8    does not deny that whether or not there were official acts, as

9    Judge Stein will define them for you, Senator Menendez did do

10   things on Will's behalf or took steps that Will advocated for.

11   Will doesn't deny it.  It's really not deniable that the

12   senator called Undersecretary of Agriculture Ted McKinney.

13   You've heard about that quit a bit.  He didn't deny that

14   Senator Menendez stook steps for which he, Will, advocated

15   regarding issues affecting his native land of Egypt, or that

16   Senator Menendez provided information to Will bearing on the

17   U.S. Egyptian relationship.  He doesn't deny that the senator

18   included him in meetings and dinners with Egyptian officials.

19   These are things as well that Mr. Monteleoni discussed at great

20   length.

21             But, Mr. Monteleoni, as passionate and detailed as he

22   was in describing those quids and those potential quos, if

23   they're official acts, largely ignored the pro.  The pro

24   element of quid pro quo.  Again, it's not enough if there are

25   things of value provided and there are actions taken.  One must

be in exchange for the other.  There must be a quid pro quo.
Without that, there is no corrupt intent.  And with regard to
that, most respectfully, the government has it wrong.  It has
just not proven its case.

So let's talk first, before I get into some of the
specifics about how the government got it wrong, I'm going to
argue to you that the government got it wrong for four reasons.

The first, and you know this very well, the
government's argument that there was a quid, that the quid was
in exchange for a quo, depends almost entirely upon its
timeline.  Mr. Monteleoni spent a lot of time during the trial
and again in his summation reviewing Exhibits 1302, 1303, and
I'm not going to really speak about 1304, I'm sure Mr. De
Castro will.  It's summary charts that seek through timing to
link events one to the other.  More specifically, to link quids
to quos.  That's what the purpose of that was.

You heard when Mr. Monteleoni was doing his
examination of whichever witness was testifying about them,
people who really had not investigated the case, he would say
didn't this happen within a half hour or didn't this happen the
next day.  The government's case is really based upon those
charts and about the closeness in time of various things.

As just one example, Mr. Monteleoni says a quid pro
quo is established with respect to Senator Menendez's call to
Undersecretary McKinney on May 23, '19, because several days

O7A3MEN4                    Summation - Mr. Lustberg

1    later, on May 28, 2019 -- you'll have all these exhibits --
2    Will sent an e-mail listing Nadine as an employee of IS EG
3    Halal at a salary of $120,000.  That's an exhibit that
4    Mr. Monteleoni showed you a couple of times on Monday, maybe
5    Tuesday.
6            Leaving aside that salary, and I'll talk about that
7    just a little later, the government's effort to show a quid pro
8    quo based upon the coincidence of timing fails for several
9    reasons.  One is that, often, the government just gets it
10   wrong.
11           With respect to Nadine's job, for example, while it is
12   true that she was listed on an IS EG document dated May 28, the
13   truth is that she's promised that job with the new halal
14   certification entity as early as March 26.  So there you see
15   line 520 of Government Exhibit 1302 that talks about getting
16   her getting $2500 a week and health benefits and that happens
17   on March 26, 2019.  Why do I point that out to you?  I point
18   that out to you because what the government said was they tried
19   to draw this connection between something that happened on
20   May 23 and something that happened on May 28 and said look how
21   close it was.
22           It wasn't close in time.  In fact, that happened
23   several months earlier.
24           In a similar vein, the government began its opening --
25   actually, its summation, rather, by telling you that the head

O7A3MEN4                   Summation - Mr. Lustberg

1   of Egyptian intelligence Abbas Kamel came to meet with U.S.

2   senators in 2021, and the day before the meeting, Senator

3   Menendez met with him at a hotel for a special meeting that the

4   senator's staff didn't know about.  Shortly after that, Senator

5   Menendez sent the Egyptian government an article through Nadine

6   related to somebody named Jamel Khashoggi, and the argument

7   they made is this was meant to help the government to prepare

8   their answers to U.S. senators.  And then Mr. Monteleoni said

9   this to try to make this part of a quid pro quo.

10          By the way, he says, remember those small Asahi

11  1-ounce bars of gold from Mr. Hana, some of which found their

12  way to Menendez's house?  Hana bought them the day after this

13  meeting with the senators, trying to link those two things by

14  time.  By placing those two events next to each other in time,

15  June 22 and June 23, you can see it there, the government asked

16  you to infer that Mr. Hana gave mini gold bars to Nadine as a

17  bribe in exchange for these meetings and for providing this

18  information.

19          When you look at the chart, you will see that they

20  have this all wrong and that Will had absolutely nothing to do

21  with any of this.  In fact, you have to go back six months to

22  find any communication whatsoever from Will in this chart.  So

23  we are in June, and is nothing leading up to this exchange to

24  these gold bars that links him to any kind of wrongdoing

25  whatsoever.

O7A3MEN4                    Summation - Mr. Lustberg

1            Back in January '21 there is some discussion of

2    helping to send Nadine an elliptical machine.  But there is

3    no -- and then there is no communications after June of 2021 to

4    again goes tie these things together.

5            So, I am going to ask you, when you go back in the

6    jury room, really look carefully at these time lines.  Really

7    think hard.  Are these coincidences of timing?  The

8    government's whole issue is coincidences of timing.  Things

9    that are tied together by timing.  Is that really, really what

10    exists.

11            The bottom line is there is no evidence, none, to

12    suggest that these gold bars which Mr. Monteleoni attempted to

13    tie to that meeting was in any way related one to the other,

14    let alone was a bribe payment for them.

15            The government criticizes us, as I said, for

16    suggesting a bunch of coincidences, but really that's what

17    they're doing.  So sometimes they get it wrong by just missing

18    when the critical things happened.  And again, think about

19    those gold bars for a second.  Mr. Hana buys the gold bars on

20    June 23.  The meeting that's at issue happens on June 22, so

21    the government says ah-ha, we got you.

22            But what you know is that there is no evidence to say

23    when those gold bars go to Nadine.  And in fact, what you know

24    is that back eventually when they search her house in June, and

25    we'll talk about a little more later they find only two of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    them.  But there is no evidence, and we asked the agents, do

2    you have any idea when those gold bars went to Nadine?  And the

3    answer was they had no idea.

4           Anyway, so sometime they just get it wrong.

5           Often, though, they do something else wrong.  This is

6    something that we want you, again, to focus on by looking at

7    all the exhibits, not just theirs.  The government often

8    concludes that the quid is an exchange for the quo, based upon

9    a timeline that actually omits critical facts from those

10   timelines.  So that's why we provided Defendant's Exhibit 1302

11   and 1303, and Hana Exhibit 1300, which I'll talk about a little

12   bit later to fill in those critical gaps.

13          The government criticizes our efforts to interlineate

14   them, to put the yellow lines in between the white and blue

15   lines as a distraction.  They really are critical and you can't

16   deny that.

17          Let me give you just a couple of examples.  In

18   Government Exhibit 1302, lines 56 to 58, the government

19   describes the way in which Nadine gets Senator Menendez to

20   invite Will and General Shawky to a meeting, drafting

21   handwritten notes -- you remember the handwritten notes

22   inviting General Shawky and Will to this meeting, and suggests

23   there is something wrong with that and that it's part of some

24   kind of bribery scheme.

25          But if you look at lines 30-1, these are the ones we

1   added, and 30-2 from February 8, 2018, which we added, you can

2   see that the government didn't tell you in its chronology that

3   four weeks earlier, General Shawky had reached out to Dana

4   Stroul, who is Senate Foreign Relations Committee staff, and

5   she immediately agreed to meet with him.

6          This puts this whole event in a different context and

7   makes it seem so much less sinister and nefarious, so much less

8   a part of the bribery scheme alleged.  This is no mere

9   distraction.  This is telling the whole story with what

10  happened with those meetings.

11         Likewise, let me give you a couple of examples.  Just

12  a couple, I won't go through many of these from Defense

13  Exhibit 1303.  That was our effort to add additional lines to

14  Government Exhibit 1303.  That's the timeline regarding the

15  Uribe-Parra deal.  And it's our view that these lines serve to

16  overstate Will's involvement in the matter all together.

17         So, what Will Hana did was really just about getting a

18  lawyer.  So the government includes line 22 of Government

19  Exhibit 1303, which is a text which you've seen alluded to

20  today, you heard a lot about it during the trial, from Uribe to

21  Will that says the deal is to kill and stop all investigation.

22  I'm talking to Andy and he is falling asleep.

23         But if you see what they left out, you see message

24  after message -- I'm not going to go through all of these, this

25  is Defendant's Exhibit 1303, page 6.  Sorry.  In which Will is

1    attempting to help in the most legitimate possible way, which

2    is by helping Parra to get a new lawyer.

3            Mr. Fee talked to you a little bit about that and I'll

4    talk to you a little more about it later.

5            Later, on 1303 -- you can take that down.  The

6    government seeks to make it seem as if Will Hana is involved in

7    a scheme long after he's cut out of it.

8            So, they in their chart have in line 1027, which is on

9    September 5, 2019, way after Parra's been sentenced, they put

10   in a text from Will to Nadine asking him to call her,

11   insinuating he was somehow involved in part two of the plan.

12   But that's all it is.  There is one line saying call me.

13           But here's what they ignore.  They ignore line 1027-1,

14   where Nadine texts that same day and says I can't talk.  And

15   perhaps more importantly, a couple lines later, lines 1067-2

16   and 1067-3 -- when there's the dashes it means stuff we

17   added -- from September 9, 2019, where it becomes clear Will

18   was trying to get together, not to participate in some new

19   illegality of Uribe's, but to celebrate Egyptian Armed Forces

20   Day.

21           This is a repeated pattern when you look at the

22   chronologies that is such a critical part of the government's

23   case.  It is such a critical part of how they attempt to

24   establish quid, establish a quo, and tie them together.  You

25   will see that there are critical facts missing that we've tried

O7A3MEN4                    Summation - Mr. Lustberg

1    to provide to you.

2              The government yesterday in no uncertain terms asked

3    you to ignore those, saying they will distract you from

4    appreciating their evidence.  But without these

5    interlineations, as we've seen, an inaccurate and an incomplete

6    story will be told.  And that would be tragic.  Because, after

7    all, that may be what the government wants, but it is not what

8    the law requires.  And your oaths as jurors, which you took at

9    the beginning of the case to well and truly try this case,

10   demands that you look at all the evidence.  In deliberating

11   this case, that's all we ask, is that you look at all the

12   evidence.  Theirs and ours.  The charts and the

13   interlineations.  And when you do, you'll have a different view

14   of whether the quids are tried to the quos.  The government's

15   don't because they omit critical information.  That's the first

16   problem with their approach, is that it omits critical

17   information or just gets the chronology wrong.  Their emphasis

18   is on the timeline.  We want you to take those timelines and

19   look at them carefully.

20             Second, here is the second problem with their

21   approach.  The government's effort also fails, it requires you

22   not just to engage in proper inference, Judge Stein will tell

23   you, you can engage in proper inference.  But improper

24   guesswork or speculation, which he'll tell you, you can't do.

25   Indeed, I'm sure you heard many times the judge tell witnesses,

1    don't speculate.

2            But here, the government attempts to tie quids to the

3    quos, and to establish corrupt intent over and over and over by

4    inviting you not to draw inferences from the evidence, but to

5    speculate.

6            So what is said, let me give you a great example of

7    that.  There is all these dinners.  We're going to talk about

8    them some more.  And all these dinners, we know that those

9    dinners took place.  There is pictures of them.  There's

10   entries about them.

11           What we heard about, what did people say at those

12   dinners, what was actually said.  We have no idea.  And the

13   only way you can know is by speculating, other than maybe some

14   of the dinners that were attended by Jose Uribe which he says

15   were pointless.

16           And that's true even in the one case in which we do

17   know something that was said, the May 21, 2019, dinner that

18   Will attended at Morton's Steakhouse in Washington, D.C. with

19   Nadine, Senator Menendez, and Ahmed Helmy, the counselor from

20   the Egyptian embassy.

21           That dinner, you will remember you heard a lot

22   about -- Mr. Fee talked about it a little bit earlier -- was

23   the subject of surveillance inside the restaurant, and outside

24   the restaurant.  And you heard a lot about that surveillance.

25   And what did you hear?  You heard that the parties ate, and

1    drank a good deal of wine, and eventually smoked cigars.  You

2    heard that they laughed, and had a good time.  And at some

3    point, as you can see here, they even left -- it's not

4    surprising after the dinner they would leave.  And even smiled

5    as they left.  I guess that for sure shows a crime had been

6    committed.

7         But what was really criminal about this?  Well, the

8    surveillance inside the restaurant was Agents Ragland and

9    Williams-Thompson who were masquerading as a married couple.

10   Didn't hear much of anything else, though Agent

11   Williams-Thompson did hear she heard Nadine say at some point

12   what else can the love of my life do for you.  I know you heard

13   this a million times.

14        But when she was questioned, she had no idea what this

15   was a response to.  It was what else can the love of my life do

16   for you, and she didn't know what had come before, so she

17   didn't know what the "else" was.  It could have been a response

18   to pouring some wine.  It could have been a response to passing

19   the salt.  Who knew.  The predicate for "else" was not

20   provided.

21        And so, the only way you can make this criminal is by

22   speculating.  That's the point.  It's really the very

23   definition of inappropriate speculation, and that is not

24   allowed.

25        It's also, by the way, taking innocent actions, having

O7A3MEN4                    Summation - Mr. Lustberg

1    a dinner, and making them appear somehow sinister and criminal.

2            That's not the only speculation upon which the

3    government relies.  Take again the seven 1-ounce gold bars that

4    Will bought on June 23, 2021.  Just to remind you, the receipt

5    that was put in evidence showed he bought 22.  The evidence

6    showed he still had 10 in his own inventory.  The government's

7    evidence was that seven at some point were in Nadine's

8    position.  Meaning that, just my arithmetic, that leaves five.

9    Those five were who knows what happened to them.  They could

10   have been gifts, as Vasken Khorozian thought they might.

11   Because he said Will bought a lot of gifts for friends, family

12   and co-workers.  And he also said, you remember, that gold is

13   the kind of thing in this culture that's provided.

14           And in fact Mr. Monteleoni yesterday candidly told you

15   that some people, quote, some people might give those small

16   1-ounce gold bars as gifts.

17           To the extent then that it is unclear that the

18   government says -- the government says they were a bribe, and

19   it's not clear that the government says that they are a bribe.

20   They can't say when, to whom, or for what.  Indeed, they can't

21   even say when Nadine got them between June 23, 2021, when Will

22   bought them, and June 16, 2022, when the FBI seized two of

23   them.  They can only speculate, for example, that they were not

24   a gift.  And speculation is one of the big problems with the

25   government's case.

O7A3MEN4                    Summation - Mr. Lustberg

1          And again, you heard about fingerprints on Monday and
2    again yesterday, even though there was no forensic evidence of
3    Will Hana having fingerprints on anything.  Mr. Monteleoni said
4    that.  And you heard some of the cross-examination of I think
5    it was Agent Glass and Agent Rafferty about the fact that none
6    of Will's fingerprints were on anything.  But Mr. Monteleoni
7    argued that some of that cash might be attributable to Will,
8    because it had the fingerprints of two people, Nader Moussa and
9    Gus Lita, neither of whom was called as a witness, who were,
10   quote unquote, close to Hana.

11         But the notion that this proves that Will Hana had
12   anything to do with any of that cash is true rank horrible
13   speculation, not based on evidence or rationality, only on the
14   thin reed of what the government hoped to, but did not prove.

15         In fact, there is no evidence, none, that Mr. Hana
16   ever provided any cash to Nadine.

17         So third, so I talked about how there were flaws in
18   the timeline.  I talked about the extent to which the
19   government improperly relies on speculation.  The government's
20   argument, and I said this to you in opening, asks of you that
21   you always, always, assume the worst in deciding whether the
22   elements of the offenses have been proven beyond a reasonable
23   doubt.  And especially the question of whether the pro in the
24   quid pro quo, the corrupt intent, has been shown.

25         That is, as we discussed during my opening and as you

1    saw through this case, the government consistently asks you

2    over and over and over that you take innocent actions, which

3    the prosecutors are here spinning into something sinister, in

4    an effort to make up for the lack of real evidence, and to

5    convince you it all amounts to a crime.  There isn't.

6         Sometimes they do this very explicitly.  Sometimes

7    it's so.  So they argue because something is unusual, or weird,

8    that it must be criminal.  We heard Mr. Monteleoni say that

9    several times during his summation when he talked about a

10   senate staffer saying all of this Egypt stuff is very weird.

11   Weird is not criminal.  But that's not it.  As Mr. Monteleoni

12   would say, there is so much more.

13        As I mentioned, you've seen a ton of evidence of

14   friends or friends of friends being introduced to each other,

15   having dinner together.  And the government sought to prove,

16   and did prove actually, not only that these people had dinner,

17   but before dinner, they would text each other and make

18   arrangements to have the dinners.  They would schedule them.

19        And so, as a result, you saw picture after picture of

20   where they had dinner.  It was -- there you go.  A virtual tour

21   of Northern New Jersey restaurants.  We have not only the

22   Glenpointe Marriott -- there it is.  Morton's Steakhouse, The

23   River Palm, Segovia, Villa Amalfi, Il Villaggio.  You heard

24   about all of these.  And you also saw selfies that the people

25   took at each of these restaurants, memorializing their good

1    times together.

2              This, the government says, is evidence of a crime.

3    But, these dinners are not evidence of crimes.  And the

4    government's effort is to take them and in some sense,

5    inferring guilt by association, to take these innocent facts

6    and making them seem wrong or sinister.

7              When one person gives something to another, the

8    government's theory then depends upon you assuming in the same

9    way as you assume these dinners are somehow criminal, and these

10   hotels or restaurants are somehow scenes of crimes.

11             The government's theory depends upon you assuming that

12   what is being given is a bribe and not a gift.  So an air

13   purifier, an exercise machine, and even 1-ounce gold bars which

14   we know, as I've said, are given as gifts in the Egyptian

15   Armenian cultures, are made to be something bad, not good.

16             So generosity which pervades the long friendship

17   between Nadine and Will becomes evil.  At the very least, that

18   generosity, that relationship is ignored, which is why we had

19   to provide Hana Exhibit 1300 to you, another summary chart, but

20   much shorter one, only 14 pages, but this time one that shows

21   Will and Nadine's friendship.  Their gifts, their holiday

22   greetings, their birthday greetings.  They are taking care of

23   each other when they're sick, they are spending time together.

24   We only have a slice of the time because, as Mr. Gannaway

25   testified, the records only went back to 2016.  But even during

1    that time, what you can see is the closeness of their

2    relationship, and more specific to my point, their generosity

3    towards one another.

4            I really would ask you to consider that chart as well

5    as the government's charts in assessing whether the government

6    has shown that the quids really were in exchange for something

7    as opposed to just acts of kindness and friendship.  And that

8    in some ways is what the deliberation you're going to have will

9    be about.  Were these bribes or were they gifts, were they

10   something criminal, or were they something generous.

11           Don't, as the government asks you to do over and over

12   and over, just assume the worst.  Don't think that there is a

13   conspiratorial relationship because a person calls Senator

14   Menendez "Bob" as one person did but calls another senator

15   "Senator."  Don't think a witness should not be believed -- and

16   this was a highlight for us, because he mistakenly put on his

17   chart s0000 as opposed to soooo.  That's part of

18   Mr. Monteleoni's cross-examination of our expert.  Take it

19   down.

20           Don't assume one is trying to hide something, being

21   secretive, when she refers to someone she just recently met as

22   the lady with the scarf.  Mr. Fee talked about that.  Or when

23   Will just forwards along a message referring to Senator

24   Menendez as our friend.  That's not necessarily secrecy.

25   That's not necessarily talking in code.  It's just people

 1    talking.

 2              So really, at every step of the way, the government

 3    asks you to assume the worst.

 4              Why do they do this?  They do this because, lacking

 5    direct evidence, they have to ask you to infer facts from what

 6    they have.  Of course, there is nothing wrong with that.  It's

 7    often the case that circumstantial rather than direct evidence

 8    is used to prove elements.  We agree with that.  But here it's

 9    not only that it's their whole case, it's that their inferences

10    they seek to draw always, always, always go in the same

11    direction.  All pointing to badness, rather than goodness.  All

12    assuming the worst.  And yes, they are assumptions, not

13    inferences based on reason or logic.

14              Let me give you an example derived from a fact that's

15    truly critical to the government's case.

16              And just to sort of talk through the way this happens.

17    The call from Senator Menendez to Undersecretary McKinney.  I'm

18    going to talk about that in a little bit more detail in a

19    minute.  Just for now think about this.  There are several

20    possible answers to why Senator Menendez called Undersecretary

21    McKinney.

22              The government's assumption, their explanation, is

23    that he did it because he and Nadine had received things of

24    value from Will.  But isn't it also possible that he just did

25    it because Will was a friend?  Isn't it possible that he was

O7A3MEN4                    Summation - Mr. Lustberg

 1    just doing it because Will was a constituent?  We know that

 2    senators serve their constituents.  The government simply

 3    excludes those possibilities.

 4            But, and this is important.  Judge Stein is going to

 5    instruct you, you should not exclude those possibilities.  In

 6    fact, he'll specifically instruct you in the context of gift

 7    giving that not every gift or thing of value given to a public

 8    official amounts to a bribe.  Under the law, giving a gift or

 9    thing of value to a public official to build goodwill, even in

10    hopes of ultimately affecting one or more unspecified official

11    acts, now or in the future, is not federal bribery.

12            For bribery there must be a quid pro quo.  Yup, I'm

13    back to quid pro quo, which is where I began today.

14            And I ask you to remember that as you decide whether

15    every essential element of these offenses before is you proven,

16    that you remember that not every action is criminal.  Not every

17    gift is a bribe.  Not everything that somebody does is bad.

18    Not every fact is evil.  That's what the government wants you

19    to believe, and I want you to think about this in a much more

20    holistic way.

21            One last thing about the government's proofs in

22    general.  This is the fourth thing.  In thinking about what

23    they've proven here, just use your common sense.  Think to

24    yourself whether it makes sense that Senator Menendez would

25    take steps to preserve what the government calls a lucrative

O7A3MEN4                     Summation - Mr. Lustberg

1    monopoly contract or change his entire approach to foreign

2    policy with as critical an ally as Egypt for an air purifier.

3    Would he do it for an elliptical?  For carpeting?  Would he do

4    it for a dinner at Mr. Chows?  Or even for $12,000 in gold

5    bars.  It just doesn't make sense.

6           And as we'll discuss further, the mortgage and the job

7    in a few minutes, it's just not proportional.  So for that

8    reason, too, for the fact -- so there's problems with the

9    timeline, there's speculation, there is always thinking the

10   worst, and there is proportionality.

11          Think of all of those things, each of them, as you

12   evaluate this evidence and think to yourself does it really,

13   really make sense.

14          At the end of the day, it undermines the notion of a

15   quid pro quo.  It completely eviscerates the idea of criminal

16   intent.

17          So, let's turn to the schemes in which Will Hana is

18   alleged to be involved.  As you heard, he's not charged with

19   certain of the allegations against others, although the

20   government does try to tie them together.  But, particularly

21   some of the issues with regard to Mr. Daibes that Mr. De Castro

22   will talk about, the government tries to say, well, they knew

23   each other and they invested together, so they must have been

24   in it together.  And Mr. De Castro I'm sure will deal with

25   that.

O7A3MEN4                    Summation - Mr. Lustberg

1          But, as we think about this, as you think about this

2     evidence, and this is super important, you are going to be

3     instructed that you have to think about each defendant

4     individually and each count individually, evaluate them

5     separately.  We're not lumping everybody together, which is

6     sort of what the government did in its summation.

7          In any event, Mr. Hana is charged in three schemes.

8     One to gain and then preserve his sole source -- the government

9     always calls that a monopoly -- contract with Egypt.  One to

10    benefit his native country by attempting to influence U.S.

11    policy in its favor.  And one to get favorable treatment from

12    the New Jersey Attorney General for Elvis Parra.

13         I'll address each of these now.  Before I do, I would

14    like to briefly focus you on a question you should consider

15    carefully as you deliberate this case, which is not only

16    whether Mr. Hana committed a crime, but whether he committed

17    the crimes that are actually alleged in this indictment.

18         In particular, I won't belabor this, but you'll get

19    instructions on it.  The government charges him and his

20    co-defendants in a single, overarching conspiracy.  Big

21    agreement.  Not these various schemes that I'm about to

22    discuss.  And Judge Stein will I believe instruct you that if

23    you find that the specific single conspiracy charged in the

24    count you are considering did not exist, you cannot find any

25    defendant guilty of that conspiracy.

1          Respectfully, they did not prove, let alone prove

2    beyond a reasonable doubt, such a single conspiracy.  And you

3    know that.  Because you saw it in the way they presented the

4    case.  1302 was that big chart about Egypt and IS EG Halal.

5    1303, a completely separate chart, had to do with Elvis Parra

6    and the Uribe scheme.  And 1304 had to do with Mr. Daibes.

7          You also know by the way Mr. Monteleoni summed up the

8    case, the dividing of these things, one after at other.

9          This was not one overarching conspiracy.  It was

10   separate agreements at most.  Obviously we say that they're

11   innocent of all of them, and I'm going to talk about Mr. Hana's

12   particular, quote unquote, schemes in a minute.  We think they

13   didn't prove any crime at all.  But look at that issue as well

14   when you deliberate this case.

15         So, as I said, first set of allegations against

16   Mr. Hana has to do with his having, in the words of the

17   indictment, obtained a lucrative monopoly.  The indictment goes

18   on to allege that Senator Menendez intervened to protect the

19   lucrative monopoly.  What you see in front of you is a part of

20   the indictment.

21         It's important to recognize what the government

22   actually alleges, and therefore what you as the jury have to

23   pass judgment on when you deliberate.  You might be surprised

24   to hear, after listening to the government's presentation in

25   this case, that there is no allegation, not only no facts, but

O7A3MEN4                        Summation - Mr. Lustberg

1     no allegation, no charge, that Will and IS EG Halal obtained

2     their sole source contract, their monopoly contract, from Egypt

3     as a result of something that Robert Menendez did, let alone as

4     a result of a bribe of any kind.  Instead, the allegation is

5     only that Senator Menendez made a single two-to-four-minute

6     call to USDA Undersecretary Ted McKinney in an effort to

7     protect the monopoly, which it was hoped would generate

8     payments to Bob and Nadine.

9             But of course you know, because you heard the

10    evidence, that it would not have made sense that Will would pay

11    a bribe to Senator Menendez through Nadine to either get or

12    keep that contract.  And you know why that is.  It's because

13    you heard this clearly, it was totally Egypt's call.  Not only

14    as to who got the contract, but whether a person or entity,

15    here, IS EG Halal, kept it.  The evidence makes this completely

16    clear.

17            Egypt demonstrated, by rejecting one after another

18    after another of the U.S.'s efforts to talk them out of having

19    a halal monopoly at all and giving that monopoly to Will.  And

20    they did this, both before and after that contract was awarded

21    on May 1st, 2019.  Indeed, it not only occurred during the

22    audit process you heard about in the initial selection process,

23    about what you heard so much from Bret Tate.  But also after

24    and at the highest levels of government.

25            So for example, you remember, and this is the timeline

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    of the post-halal contract.  On April 1st, 2019, on return

2    travel from the U.S., Bret Tate met Deputy Minister of

3    Agriculture Dr. Mona Mehrez in the Frankfurt Airport and

4    learned that Egypt wanted one halal certifier.  He, Mr. Tate,

5    attempted to explain why that would not be in the best

6    interests of Egypt or the United States.  But Ms. Mehrez, who

7    you will recall Mr. Tate saw in Washington having lunch with

8    Will and Dr. Kareem, as you'll hear, and she was upset that he

9    interrupted their lunch.  But she ignored him.  She disagreed.

10           Then, on April 7, Dr. Kareem sent Mr. Hana a Word

11   document giving reasons to reject or suspend certifiers and

12   accept IS EG Halal.

13           On April 11, there is a meeting between Mr. Tate, Ali

14   Abdi, who you might remember was his supervisor at the U.S.

15   embassy in Egypt, and Dr. Kareem, following correspondence from

16   the U.S. expressing concern over delisting all the existing

17   certifiers.

18           But it didn't matter, because shortly after that, on

19   April 23, the U.S. got the word that in fact IS EG Halal had

20   gotten the contract.  Again, Egypt disagreed.

21           But although it was decided, it didn't deter the U.S.

22   government from continuing to advocate against IS EG Halal.

23   So, on April 28, this is actually not on this one, the U.S.

24   chargé d'affaires Thomas Goldberger sent a letter to the

25   Ministry of Agriculture in Egypt expressing U.S. concerns about

1    this change.  Again, it was to no avail.

2           Egypt did not change its position that it wanted a

3    single certifier, and that single certifier would be IS EG

4    Halal.

5           And then on May 1st, 2019, the contract is entered

6    into.  And later, that same day, Undersecretary McKinney places

7    a call to the Egyptian embassador in the U.S. expressing

8    concerns and requesting Egypt to permit the other certifiers to

9    continue.  Much to Undersecretary McKinney's chagrin, as you'll

10   recall, he was quite insulted he received no response.

11          10 days later, Mr. McKinney raised these concerns by

12   letter with Deputy Minister Mona Mehrez.  She also ignored him.

13          Finally, you'll remember even after IS EG Halal had

14   the contract and was up and running, Ali Abdi from the foreign

15   agriculture services at the Egyptian U.S. embassy in Cairo

16   raised concerns with an organization called GOEIC raising the

17   situation again, and GOEIC didn't do anything for him.

18          So, this was, as Mr. Tate conceded, completely Egypt's

19   decision.  It was Egypt's choice to use a certifier that did

20   not have prior experience.  A startup organization, which is

21   what IS EG Halal was, correct.  And Bret Tate said Egypt was

22   able to choose the certifier that they want, and they did.

23          By the way, and we just talk about this for a second.

24   Leaving aside it was entirely Egypt's choice, no matter who

25   raised the issue and at what level, Egypt's decision wasn't

1    without basis.  Having a single certifier could be a good

2    thing.  In terms of having uniformed standards that are

3    implemented and enforced.  Now, obviously, the government in

4    this case and their witnesses all used the term "monopoly" and

5    they tried to, if you remember Mr. McKinney in particular,

6    tried to suggest monopolies are always bad.

7            But in this case, all that it simply meant for Egypt,

8    the decision-maker, was having a single entity making uniform

9    decisions about whether the meat that Egyptian consumers were

10   eating met halal standards.

11           Indeed, you will have IS EG Halal's contracts before

12   you, they're in evidence, both the original one and the current

13   one, and you'll see that under this contract, Egypt assures

14   compliance with Islamic law.  And you heard Dr. Sayed the other

15   day talk about that as well.

16           When you take a look at this for yourself, but just to

17   refer you for your notes, Defense Exhibit 1302, line 1198-1,

18   which is that contract, something we added.  And it was

19   important to Egypt that they do this because you will recall

20   that Dr. Kareem wanted all certifiers to uniformly require

21   transverse cutting, but some were permitting lateral cuts which

22   is not in compliance within Egyptian halal standards.  Indeed,

23   this was the specific complaint from Egypt, although it was

24   apparently unknown to Undersecretary McKinney who complained he

25   had not been told it by his subordinates.  As Mr. Tate

1    acknowledged on cross-examination, the Egyptian officials were

2    not okay with the up and down cut.

3          Auditors were also concerned that stunning practices

4    were causing animals to die before slaughter, which would not

5    be halal.  Again, something that Undersecretary McKinney did

6    not know from his underlings but which you heard from Dr. Sayed

7    and others throughout the course of this matter.

8          No doubt, prices increased after Egypt determined to

9    use a sole source certifier, and the government does repeatedly

10   refer to this as a lucrative monopoly.

11         But let's be clear.  The contracts, which, again,

12   you'll have before you between Mr. Hana's company and the U.S.

13   IS EG Halal Certified Inc. and the Egyptian joint stock company

14   which was described by Dr. Sayed, with which he contracts,

15   provide that Mr. Hana's company only gets 30 percent of the

16   revenue from each certificate issued, whereas Egypt gets

17   70 percent.  That's Egypt's decision and has contracted for

18   very favorable terms, as you might expect it to do.

19         Clearly, in any event, Egypt understood that as both

20   Undersecretary McKinney and Mr. Tate repeatedly acknowledged,

21   their job was to advocate for U.S. business.  Bret Tate said

22   it.  So my job is to advocate for the interests of U.S.

23   businesses.  And Ted McKinney said my primary goal was to

24   increase the market for American agricultural products.

25         Egypt understood it was not their job, as they

1    advocated for what they thought was right to do what was best

2    for Egypt or for Egyptian consumers.  Or even, as we heard with

3    respect to the whole Ractopamine thing, what is best for human

4    health.

5            Even the government agreed that startups were good.

6    The government being Mr. McKinney.  They knew that IS EG was a

7    startup, and it was among the businesses for which Mr. Tate

8    advocated.  Remember there was a list of seven, and he said he

9    was advocating for all of them and one of them was IS EG Halal,

10   a startup business.

11           By the way, IS EG Halal was a very good choice.  Will,

12   as even Jose Uribe testified, worked very hard to get up to

13   speed with regard to halal and did it, eventually running an

14   operation that, as the testimony made clear, did not result in

15   anything like the market disruptions that McKinney and Tate had

16   feared.  Indeed, by May 14, remember they start the contract on

17   May 1st.  By May 14, less than two weeks after the contract

18   went into effect, the system was apparently working well.

19           So, Travis Arp from USMEF, which is the export meat

20   federation, says I've done some outreach to the packers and

21   exporters on this yesterday and today, and none seem too

22   concerned about the letter.  Meaning the letter with regard to

23   protesting IS EG Halal.  They actually appreciated IS EG being

24   proactive on this so as not to interrupt their business.

25           And even Mr. McKinney had to acknowledge that there

1    was a $28 million increase in U.S. beef exports to Egypt from

2    2018, before IS EG, to 2022, and that included during the COVID

3    pandemic which was, as he said, difficult for business.

4            But regardless, again, it was entirely an Egyptian

5    decision, which it could make for this reason or any reason.

6    For example, if Egypt wanted to, and apparently it did, it

7    could make its decision based upon the fact that Will Hana had

8    contacts in the Egyptian government, something that Mr. Tate

9    clearly noted when he met with Will on the Egyptian delegation

10   in Washington.  Tate testified that there was an obvious

11   relationship between Will and Dr. Kareem, and that he suspected

12   the relationship had something to doing with why Will got the

13   contract.  He suspected, I thought he said, that IS EG had

14   built a relationship with Egyptian officials in order to gain

15   the business.

16           So, maybe that's not a good thing.  Maybe, you know,

17   as we all know, you know, contacts make contracts.  Maybe

18   that's not the way the world should work.  But it is the way

19   the world does work.  We all know that.  This is not a perfect

20   Utopian world and it is not illegal.  It's just a practical

21   reality.

22           One thing is for sure.  No crime is or could be

23   charged based upon Will Hana getting his contract through

24   contacts he had in Egypt.  Nor was there anything wrong with

25   Will getting contract because as a Coptic Christian he was

1  favored by the new El-Sisi regime in Egypt, as you heard from

2  Sarah Arkin.  There was no crime in Will getting this contract.

3          Now let's talk about what the government really says

4  the crime was, which is Senator Menendez's call to

5  Mr. McKinney.  Wasn't that, the government says, the result of

6  a bribe?  Well, it wasn't.  There was no bribe or promise, and

7  the government's argument that Nadine's statement on April 8

8  seems like halal went through, it might be a fantastic 2019 all

9  around, doesn't show that there was any bribe or promise.

10  Instead, it falls into that category of her being happy for

11  Will, and she was hoping he would get her a job too, somehow

12  becoming a sinister thing.

13          As she recognized, long before the call to McKinney

14  about halal having gone through, that so, again, she knows by

15  that time, by the time of April 8, that in fact the day before

16  Dr. Kareem had sent his report summarizing the problem with the

17  other certifiers to Will.

18          And all of that, all of it, happened without any

19  action by Senator Menendez.  No bribe or promise at that stage.

20          But the government argues there were two bribes that

21  were paid to get Menendez, Senator Menendez to make the call to

22  Mr. McKinney.  Even though there was no reason to pay a bribe,

23  because it could not and did not matter.

24          First, the government claims that Will paid Nadine's

25  mortgage, and second, they argue that Will gave her a, quote

1    unquote, no show job.  Let's look at each of those and think

2    together about whether it makes sense that these were bribes

3    with the corrupt intent that the law requires.

4         When you look at it, think about it carefully, you

5    will see that the government's theory with regard to each of

6    these alleged bribes, the purported quids in the quid pro quo

7    formulation, just doesn't make sense.

8         So let's take them one at a time.  First, the payment

9    of the mortgage.  No doubt, Nadine was desperate to have her

10   mortgage paid.  She said it repeatedly.  She was panicked about

11   it.

12        But rather than just paying it, as he would have if he

13   were try to curry favor with the senator by bribing him, by

14   giving money to his wife, that is not what Will Hana did.

15   Instead, think of the evidence you heard.  He put Nadine in

16   touch with his lawyer John Moldovan and had him draft

17   appropriate loan documents and follow up to get them signed.

18        So here is the promissory note in front of you, and

19   let's just look at it for a moment, what it says.  It doesn't

20   require monthly payments.  It requires like a balloon payment

21   that gets paid on June 28, 2021, which we'll come back to.  It

22   is a zero interest loan.  Good loan.  And it requires that the

23   entire principal balance be paid in full on or before maturity

24   date.  We'll talk about that a little bit later.

25        Then, as you will see here, John Moldovan, the lawyer,

O7A3MEN4                Summation - Mr. Lustberg

1    follows up repeatedly with Nadine to get her to sign that

2    contract.  Ultimately she doesn't.

3            But, you can see that over and over, there was this

4    evidence of the intent that there be a loan, not just a

5    payment.  Then, he indicated that, that is Will did, that it

6    was a loan on the actual check provided.  This is back in 2019,

7    loan.

8            The government is going to say, well, that's all part

9    of a cover up.  But now this is way before there is any

10   investigation.  It really requires the greatest speculation.

11   They wrote "loan" because they were afraid it was going to look

12   like something bad.

13           The government, by the way, in their summation doesn't

14   mention this check.

15           It was no surprise, of course, to Nadine who had

16   specifically told her then very close friended Jose Uribe at a

17   time when she was particularly frustrated, one of those down

18   times with Will, that she would pay it back.  You remember this

19   text.  I will pay him back, she says.  The intent was that it

20   be a loan.  Government doesn't mention this one either.

21           So, the government says that you know that this was a

22   bribe and not a loan, even though Mr. Monteleoni conceded

23   yesterday that Hana wanted it paid back at first, because it

24   was not paid back when it was due, which was on June 28, 2021.

25   Again, no monthly payments were due, there was no monthly

O7A3MEN4                    Summation - Mr. Lustberg

1    payments that had been missed.  And there is absolutely no

2    correspondence, nothing, in all these e-mails and all these

3    texts and all this documentation demanding that the loan be

4    forgiven.  No point at which Nadine says forgive the loan.  No

5    point indicating that it had been forgiven, and no

6    communications with Will where he says don't worry, I'm not

7    going to collect on the loan.

8           If you were trying to bribe somebody, you would let

9    them know that you were in the process of forgiving their loan.

10   You would make it clear that you had no intention of collecting

11   on it.  There is nothing.  Nothing in this record along those

12   lines.

13          And as you know, she ultimately did pay it back.

14   That's the subject of the obstruction charge.  The government

15   says that when it gets paid back as a, quote unquote, payment

16   of a loan, that that was just a lie.  But they have to say

17   that.  Because otherwise, this part of the case just falls

18   apart.  And if this part of the case falls apart, then their

19   big evidence, which is this is the reason why Mr. McKinney made

20   that two-to-four-minute call to Senator Menendez, also falls

21   apart.

22          So, let's be clear.  This loan could easily have been

23   a gift.  Then we would be arguing was it a gift or was it a

24   bribe.  But it was a loan.  It was a loan that ultimately got

25   repaid.  It was a loan that was labeled a loan.  It was a loan

1    that Nadine said she was going to pay back.  It was a loan that

2    Will Hana tried to get paperwork to show that it was legal

3    paperwork from his lawyer trying to make it a loan.  And that's

4    what it was.

5         Now, should he have leaned on her to pay it back

6    sooner?  I'm sure he wishes he had.  But that was not the

7    nature of their longstanding friendship and relationship.  And

8    it absolutely happened that her failure to pay happens long,

9    long after the call to McKinney.  That happens -- it was due in

10   2021.  The McKinney call that this is the justification for,

11   remember, this is in 2019.

12        So, the idea that that forgiveness of the loan, which

13   demonstrates that it was not a loan but a gift, happens 2 years

14   after the call.  Think to yourself how could that be the bribe.

15        Now let's talk about the other government theory for a

16   bribe in connection with the McKinney call.  It has to do with

17   the idea that Nadine was provided with a no show job by IS EG

18   Halal.

19        Now, she may have wanted a no show job, but that's

20   actually not what happened.  In fact, what really did happen,

21   and by the way, I should note, if there had been just wanted to

22   give her money, Will could have given her money.  If he wanted

23   to give her gold bars, as you know in that time period, he

24   could have given her gold bars.  He did in fact for gifts.  But

25   there is none of that.  Instead, what he does is give her a

1     job.

2              So, what was going on there.  Will has a new business.

3     He has a friend.  And he's going to give his friend the chance

4     to do some work for his company.  He specifically gave her a

5     task to open up a foreign office in India.  But it's more than

6     that.  We'll come back to be the foreign office in India in a

7     moment.

8              There's going to be a contract, and you heard Mr. Fee

9     talk a little bit about the LegalZoom contract that was done

10    and amended and sent over.  But let's look at that contract and

11    then let's look at the contract that ultimately gets entered

12    into.

13             The one on left is the consulting agreement that's

14    proposed by Nadine.  And what you see is that it starts on

15    May 1st, it has an indefinite term length, and it has payments

16    that are supposed to be made at the start of each month.

17             The one that gets entered into, although nothing's

18    ever signed, but the one that ends up being operational starts

19    on September 1st, 2019, and it has three months.  It can be

20    renewed, and the payment is at the end of the month.  It is a

21    much less favorable deal.  And in particular, critically, it

22    lasts three months at $10,000 per month.

23             Now let's talk about that for a minute.  John Moldovan

24    testified that was what he recommended, the one with the term

25    that was on the right.  Why did he do that?  He did that so

O7A3MEN4                    Summation - Mr. Lustberg

1    that -- this was his testimony -- that Nadine's performance

2    could be reviewed.

3            Now, would Will Hana have entered into an agreement

4    for a much shorter term than what she wanted, with her

5    performance to be reviewed, if he was trying to bribe her?

6    Does that bespeak the corrupt intent that the government has to

7    prove?

8            Just ask yourself.  She presents him with a deal.  He

9    doesn't take that deal.  What kind of bribe is that?  Instead,

10   what he does is he proposes a deal that is shorter term, and

11   we'll see what happens with that.  And he then makes her go to

12   work.  And she doesn't want to go to work.  She complains about

13   it.  Okay.

14           This is a voicemail that you heard between Nadine and

15   Fred Daibes.  Good morning, Fred, this is Nadine.  We don't

16   have to read all of this but she kind of goes on and on about

17   the mortgage.  And talks about how Will wants a promissory

18   note, I won't do that before I talk to Bob about it.  I won't

19   do that until Bob comes back from his business trip.  It's

20   obvious that he doesn't trust me.

21           But, and then she complains, and in that

22   second-to-last line, I need to be in the office eight hours a

23   day.  Obviously not something she wants.

24           Is this a bribe?  Is this what you do if you're trying

25   to curry favor with a girlfriend or later wife of a U.S.

1    senator, that you bargain hard and then you make her come to

2    work eight hours a day when she doesn't want to?

3                  (Continued on next page)

1             MR. LUSTBERG:  And then -- you can take that down --

2       he essentially fires her.

3             Mr. Richenthal, cross-examining Ms. Silvarredonda,

4       says that that was kind of harsh, it happened in a very quick

5       period that he suddenly lets her go.  And then he says, you

6       know, he didn't really let her go because he paid her the next

7       month's payment.  But is that what he would have done if he was

8       bribing her?  She doesn't do the job as quickly or well as he

9       wants, and so he lets her go.  And there you see it, Carolina

10      Silvarredonda telling Nadine, thank you, we appreciate your

11      time and search, but we have a person already in charge of the

12      Delhi office.  Again, Mr. Richenthal said, well, that all

13      happened too quickly.  But again, there, is that the kind of

14      conduct you would have if you had the corrupt intent to pay

15      someone a bribe in exchange for getting the senator to make a

16      call to the U.S. undersecretary of agriculture?  It just

17      doesn't make sense.  It doesn't show the corrupt intent.

18            And finally, he doesn't even pay her what she thinks

19      she's owed.  This is a document here I want to spend just a

20      minute on, because it was featured rather extensively in

21      Mr. Monteleoni's summation.

22            So, this is Nadine's understanding of what the deal

23      was.  She was supposed to get paid May 1, June 1 and July 1

24      under the contract that was not the one that Will accepted.  So

25      that would have been $30,000.  But look what she says in

1    there -- July 19 cashier's check for $22,516.54 to the mortgage

2    company.  Well, if she thought she had a job for $30,000, why

3    would she count the $22,000 to the mortgage company as a credit

4    somehow against that $30,000 that she was supposed to get paid?

5          She would only do that if that $22,000 really was a

6    loan, which is what we've been saying.  So this document, even

7    though the government touts it, really stands for the

8    proposition that she understood that that $23,000 had to be

9    paid back.  Otherwise that wouldn't make sense.

10          And then she gets paid the $10,000 per month, and she

11    says that there's more owing to her, that she was owed

12    $26,431.46.  At the time there was $10,000, so essentially

13    $6,000 more.  He doesn't pay her that.  He pays her the

14    $30,000.  And again, the question is should he have?  Was that

15    a good investment of his, to pay her $30,000?  Who knows?  But

16    is that what you do if you're trying to curry favor?  Is that

17    what you do if you're trying to, it's a *quid pro quo*, where

18    you're giving somebody money in exchange for something in

19    return?  It just doesn't work.  It just doesn't make sense.

20          So just back to the McKinney call for a second.

21          There was then really no *quid*, and there was also no

22    *quo*, the *quo* being what Senator Menendez did, because as Under

23    Secretary McKinney testified, and it was in his documents as

24    well, that what Senator Menendez did was that he brought up a

25    constituent.  Of course, this was something that McKinney

O7aWmen5                     Summation - Mr. Lustberg

1    understood.  McKinney understands constituents because he had

2    previously, as he testified, fielded calls from members of

3    Congress advocating for their constituents.  And he himself

4    said that he understood the whole idea of constituency, because

5    he described his constituents as, quote, the entire food value

6    chain, farmers, ranchers all the way to the processer and the

7    exporter.  He knows that public servants, like him and like

8    Senator Menendez, serve constituents.  And here, what Senator

9    Menendez did was a simple call on behalf of a constituent who

10   felt aggrieved by the U.S.D.A.'s actions in denigrating him in

11   one of those GAIN reports and had been picked up in an Alborsaa

12   article, which prompted Senator Menendez's call to

13   Mr. McKinney.

14          But Mr. Fee made this point earlier.  It's worth

15   remembering what happens after that, which is Bob Menendez

16   never follows up again.  He makes this call, and that's it.

17   That is constituent services.  Somebody's having a problem with

18   a government agency, the senator makes a call on his behalf,

19   that is the *quo* of the *quid pro quo* in a situation where the

20   *quid* is a loan, not a payment, and it is a job, not a bribe.

21          Finally, in this regard, just quickly, in order for

22   you to find that there was a bribery offense, the offense is

23   really providing a thing of value in exchange for an official

24   act.  And as Judge Stein will instruct you, I believe, an

25   official act does not cover every single thing a senator does.

O7aWmen5                        Summation - Mr. Lustberg

1    Instead, there has to be -- I believe this is what he'll say --

2    a specific question or matter pending before a public official

3    upon which the public official acts.  Nor, the law is clear, is

4    just talking with another official alone enough.

5             Was there a specific question or matter before the

6    public official here?

7             As we have discussed, whether or not to give IS EG

8    Halal the sole-source contract was not a decision of the U.S.

9    government.  It was a decision of the government of Egypt, and

10   it was its decision alone.  And while Under Secretary McKinney

11   may have had his own views on what Egypt should have done, the

12   U.S. had no role -- none -- in deciding whether or not to give

13   IS EG Halal the contract.  This was, quite simply, Senator

14   Menendez speaking to another official about a report, not

15   something that was within that public official's

16   decision-making powers.  It was not an official act.  It was

17   just advocacy for a constituent.

18            So, in sum, the government is asking you to believe

19   that Will bribed Senator Menendez to influence Mr. McKinney who

20   himself had no influence on the country that awarded Will the

21   contract.  It doesn't make sense.  It can't be supported by the

22   notion, it doesn't support the notion of corrupt intent.  But

23   in any event, it doesn't satisfy what the bribery statutes

24   require -- a pending matter that a public official can actually

25   do something about.

1          Judge, I'm just going to suggest that maybe we could

2   do one of those afternoon stretches.

3          THE COURT:  Sure.

4          Ladies and gentlemen, why don't we all stretch.

5          MR. LUSTBERG:  OK.  I'm good.

6          THE COURT:  All right.  Thank you, ladies and

7   gentlemen.

8          MR. LUSTBERG:  OK.  I said there were three schemes.

9   We talked about one of them, which was the IS EG Halal

10  contract.  There are two more to go.  It's not going to be that

11  long.  The second has to do with the benefits that went to

12  Egypt.

13         The government's theory, if I understand it correctly,

14  seems to be that Egypt gave that contract and, therefore, lots

15  of money to Mr. Hana, in part, because of his relationship with

16  Senator Menendez through Nadine.  Will, in order to get that

17  contract, made that relationship known to the Egyptians by

18  taking steps to introduce Senator Menendez to the Egyptians,

19  and that's why you heard so much evidence about these dinners.

20         Will then, according to this same theory, paid bribes

21  to Senator Menendez, which he could now afford to do because

22  the Egyptians had provided him with this contract.  And then

23  Senator Menendez, in turn, took actions to benefit Egypt that

24  he would not have but for these bribes.  And basically, the way

25  the benefits come out, according to the government's theory, is

O7aWmen5                    Summation - Mr. Lustberg

that they were two kinds.  One was that Senator Menendez,

quote/unquote, softened his position on Egyptian human rights

violations; and second, that he gave Egyptians sensitive,

nonpublic U.S. government information.

        This whole scheme breaks down at each step of the

process, and so I'm going to walk you through those four stages

that I just talked about that is the only way that this could

possibly be a crime.

        So first step, for it to prevail, the government would

have to show that the reason that Will got the contract was

because of his relationship with Senator Menendez.  But this

falls apart because, as you've seen, Will, who is a native

Egyptian, has got contacts of his own among Egyptians.  There

was no evidence, none whatsoever, that those contacts came

about because of his relationship with Nadine or Nadine's

relationship with Senator Menendez.  There is no evidence that

those relationships originated, when those relationships

originated or that they, in fact, came about after Nadine began

to date Senator Menendez in February of 2018.

        Indeed, the government introduced no evidence --

nothing -- to show that Will's longstanding relationship with

Nadine had anything to do with the formation of his

relationships with the Egyptian officials, Egyptian

intelligence officials who were, you remember, in Sarah Arkin's

words, omnipresent, including, she said, with regard to

1  economic matters.  So again, there's lots of evidence of Will

2  having Egyptian contacts, of him traveling to Egypt, of him

3  having other economic dealings with Egypt.

4          Nor, as we've discussed, is there any evidence that

5  Will got the contract because of his relationship with Nadine

6  or through her with the senator.  To the contrary, as I said --

7  I'm not going to repeat it -- there were lots of good reasons

8  why Will got the contract even beyond his relationship with

9  Egyptian government officials, including that he's a Coptic

10 Christian, including that he worked incredibly hard.

11         Actually, let me, if we could, pull up the slide where

12 José Uribe describes how hard he worked.

13         José Uribe's testimony:

14 "Q.  In 2018, Will was studying, correct?

15 "A.  I saw it in his office writing notes, and he told me he

16 was doing some studies.

17 "Q.  Related to his meat business?

18 "A.  That's what he -- best of my recollection, that's what he

19 said."

20         Will worked hard to get up to speed -- you can take

21 that down -- on halal, and it worked.  The government says he

22 didn't deserve it because he had past financial failures.

23         Our view is that he got it through his own hard work

24 and, yes, good contacts.  And what we have here really is a

25 success story, which is a wonderful thing.  And there were, as

1    I said, and as you heard, legitimate issues with regard to the

2    halal certifiers in the U.S. during the 2019 audit, something

3    that Dr. Sayed testified, and that you heard during the

4    testimony.

5            So first of all, the idea that Will got this contract

6    because of his relationship with Menendez doesn't make sense.

7            Second, the government's strained theory requires you

8    to find that Will exploited his relationship with Nadine and

9    Bob to get that IS EG Halal contract so that he could then

10   generate money for bribes.  The government's theory seems to be

11   that Will showed Egyptian officials, through these various

12   meetings with them, that he had -- and with Senator Menendez,

13   who accompanied him to a number of these meetings, along with

14   Nadine, that he had these relationships.  According to the

15   government's theory and its indictment, this was all

16   accomplished in a series of meetings and dinners, which you

17   heard about and you've seen selfies from and you've seen

18   pictures from and you know about the restaurants that they were

19   in.

20           But you also heard evidence that it's completely

21   appropriate for a senator, particularly a member of the Senate

22   Foreign Relations Committee and particularly the chair or

23   ranking member of the Senate Foreign Relations Committee, to be

24   meeting with, A, foreign officials, and B, constituents.  And

25   that's what these dinners were.  They were completely normal

O7aWmen5                    Summation - Mr. Lustberg

1    activities for senators and especially for people who had the

2    responsibility to the international community that Senator

3    Menendez did.

4           Nor has the government proven -- and certainly the

5    surveillance didn't prove -- that there was anything out of the

6    ordinary with regard to the meetings that occurred.  For

7    example, you heard about a March 2018 meeting in Senator

8    Menendez's office.  You might remember there was a picture of

9    everybody standing there in the office, and what you heard was

10   that at that meeting Egypt had made the usual asks -- that was

11   the phrase, "usual asks" -- to stop imposing conditions on aid

12   to Egypt and that Egypt had made the usual threats, which is

13   that if the U.S. didn't treat them well, they would go to

14   Russia for military aid.  And there was a meeting of the

15   so-called white paper delegation.  I don't know if you remember

16   that, but you'll have plenty of exhibits on it, about a meeting

17   in July 2018.  That was a meeting that the Senate staff

18   recommended he take.  And you'll see the evidence that the

19   staff pushed him to have that meeting about U.S.-Egyptian

20   relations.  This is in July 2018.

21          So these are formal meetings, but then there's also

22   the dinners, and the question is -- again, the theory is that

23   these dinners show the Egyptians that Will Hana has contacts

24   with Senator Menendez, so the only ones that would really

25   matter are the ones before he got the contract.  And look, I

1    mean they're dinners.  And as we saw, there's not a lot -- you

2    don't know what was said in those dinners, for sure.  But the

3    truth is that there are also only exactly three of them -- on

4    July 9, 2018, February 6, 2019, and April 8, 2019 -- before the

5    contract was awarded.  And there's no evidence to support the

6    theory that Egyptians were providing the contract to Will for

7    the purpose of generating bribes, which is the second piece of

8    this.  Even the government's citation to Will offhandedly

9    describing Senator Menendez to Ahmed Helmy as our man, when

10   Senator Menendez was on his way to India, occurred well after

11   this, in September 2019, during the year when -- I'm sorry.

12   I've got my years mixed up.

13          Anyway, the focus here is on what meetings occurred

14   prior to Will getting the contract, and again, the government's

15   theory is pretty simple: that he got the contract so he could

16   generate bribes, but there's just no evidence that at any of

17   those meetings that was discussed.  There is no text to

18   indicate it.  The whole idea here is one that's just

19   fabricated.  And that's true as well of later meetings.  So it

20   can't be that meetings that happened after he got the contract

21   are ones that were used to get him the contract so that he

22   could generate those bribes.  And that includes the famous

23   CODEL meeting, which you heard a lot about.  And when you think

24   about that CODEL meeting, think about the fact that everybody

25   thought these CODEL meetings are a good thing.  Sarah Arkin

1    testified:  I had suggested that Senator Menendez make a trip

2    to Israel and Egypt, given their respective bilateral

3    relationships, significant bilateral relationships with the

4    United States and the importance of geopolitical and geographic

5    location of both countries.

6          She said that she had been strongly recommending a

7    CODEL to Egypt.  So this whole idea that these meetings were an

8    effort to essentially create a relationship whereby bribes

9    would be generated from Mr. Hana to give to Senator Menendez

10   just falls apart, because either it doesn't make sense in terms

11   of the timing or because we simply don't know that anything

12   close to that is discussed in the meetings.

13         And even if you decide that the loan or the job

14   amounts to some sort of bribe, those don't match up with

15   actions that Senator Menendez took to benefit Egypt.  Let's

16   think about that.  So again, you'll remember that those things

17   happened in 2019.  So there's really two categories of action.

18         One category of action is Senator Menendez allegedly

19   acting in Egypt's interests by ghost writing a letter setting

20   forth Egypt's position with respect to certain particular

21   policy issues.  In the context of what you heard from a number

22   of people -- Josh Paul, Sarah Arkin -- it's a very complicated

23   relationship between the U.S. and Egypt.  You learned a lot

24   about that today -- in this trial, rather.  Egypt is a very

25   important strategic partner, on the one hand, but a significant

1   human rights violator, on the other.  And Senator Menendez, as

2   a good senator does, listened to his constituents and got some

3   guidance from Will, who knew a lot about it.  But he didn't, at

4   the end of the day, in this so-called ghostwritten letter or

5   anywhere else set forth any policy positions that are different

6   than what the appropriate U.S. position was, other than there

7   comes a time, as Sarah Arkin testified, that he decides, and

8   we'll come back to this, he decided to pursue a somewhat

9   quieter diplomacy.

10          Let's look at the so-called ghostwritten letter.

11          This is the C301, Government Exhibit C301, which is

12   the version of it that Will sends.  So it says:

13          The Egyptian state alone bears the burden of securing

14   its western border, which extend to about 1,200 kilometers with

15   Libya.  This insurance is supposed to be a joint responsibility

16   between the two sides.  However, we, meaning Egypt, succeeded

17   in monitoring and destroying about 1,300 armed SUVs carrying

18   terrorists during July 2013 until the end of 2017.

19          Will is providing that information to Senator

20   Menendez.  It's not improper.  It's not wrong.  It's not

21   inaccurate.  It's helping him to advocate.

22          And then it goes on to say:

23          It must be clear to you in Congress and also in the

24   other American political circles that Egypt is keen to

25   establish strong strategic alliance relations with the United

O7aWmen5                        Summation - Mr. Lustberg

1   States and to overcome any obstacles that may arise in order to

2   catch up.

3           So these policy positions are well-established policy

4   positions.  There's nothing unusual about either of them.

5   There's nothing improper about either of them.  There's nothing

6   radical about either of them.  There's nothing where Will is

7   asking Senator Menendez to take a position that is not one that

8   is consistent with what he said before.  And sure enough,

9   Senator Menendez helps Egypt to draft something that may be

10  persuasive to his fellow congresspeople.  It may be

11  unconventional to do that, but there's no evidence that that's

12  not something that happens all the time.  The government,

13  however, maintains that Senator Menendez softened his position.

14  In fact, what Sarah Arkin said was that Senator Menendez was

15  committed to human rights improvements in Egypt and continued

16  throughout to raise human rights concerns directly with the

17  Egyptian officials in meetings, all while acknowledging the

18  important role that Egypt plays strategically to the United

19  States in the Middle East.

20          Senator Menendez's positions were wise and

21  justifiable, and although the government talks about this

22  ghostwritten letter, what he's really just doing is helping to

23  advise Egypt about how to deal with the U.S. Congress in a way

24  that is completely justifiable as a matter of American policy.

25          Nor has the government, as I said, shown that this is

O7aWmen5                        Summation - Mr. Lustberg

1    not what congresspeople do.  But whatever the merits of all of

2    that, of the whole taking this position, the point is that this

3    all occurs in May 2018, almost a full year before the IS EG

4    Halal contract.  And for that reason, the government's theory

5    that IS EG Halal generated bribes to get Menendez to take

6    certain official actions simply doesn't work.  But remember,

7    again, their theory, the theory here is that bribes are

8    generated, IS EG Halal's created so that it can generate bribes

9    so that Menendez will take certain actions.  But IS EG Halal

10   starts May 1, 2019, and this ghostwritten letter is in May of

11   2018, a year before.

12          And that is also true -- so let me just say, just to

13   back up, the government's case is based upon timing.  Listen

14   for that timing.  Take that timing into account.  That timing

15   matters for the defense case as well.  And that's true with

16   regard to the nonpublic information that Senator Menendez

17   purportedly provided to Egypt.

18          So there's the embassy figures.  And Mr. Fee spent a

19   good amount of time on that.  The embassy figures, the

20   information about the U.S. embassy was provided also in May

21   2018, and again, a year before IS EG Halal even is in

22   existence.  It's not tied to any bribe.  It just isn't.  Nor is

23   it in response to even any kind of ask from Egyptian officials.

24   There's no emails, texts or anything in what you saw where

25   Egypt says get us this information.  And while Mr. Tate

O7aWmen5                              Summation - Mr. Lustberg

1    described it as somehow putting people in danger -- and leaving

2    aside the public nature of it, as Mr. Fee described -- it's

3    really hard to see how it does that.  The information that was

4    provided was just this: that there are 277 Americans and 1,344

5    Egyptians working at the embassy.  That's it.

6            How that endangers people is really hard to

7    understand, and Mr. Tate should have had to explain it in a

8    little more detail if you're going to take that seriously.  But

9    either way, the whole idea that that was done in exchange for a

10   bribe that was generated by IS EG Halal just doesn't work from

11   a time-frame perspective.

12           Likewise, the information that the ban on small arms

13   and ammunition to Egypt has been lifted, the government says

14   that that information that was passed on to Will and then from

15   Will to the Egyptians, occurs a year -- a year -- before.

16   That's also in May 2018.  It was actually May 18, 2018, so a

17   little less than a year before IS EG Halal was in existence.

18   And that also was public within moments.  So the notion that

19   that was some kind of nonpublic information just doesn't make

20   sense.

21           Finally, there's the text to Nadine from Senator

22   Menendez, saying, tell Will I'm going to sign off on the sale

23   to Egypt today.  This was the $99 million sale primarily of, I

24   think, tanks to fight terrorists in the Sinai.  That occurred

25   on July 26, 2018 -- again, almost a year before IS EG Halal was

1    in business.  So the government theory that IS EG Halal was

2    created to create bribes to influence Senator Menendez just

3    doesn't work with the time frame.

4              Finally, the whole theory turns on Senator Menendez

5    doing that which was in Egypt's but not in the U.S.'s

6    interests, based upon the bribes.  And let's talk about how

7    that all came about.

8              So Sarah Arkin testified that Senator Menendez opted

9    for a more quiet and more specific engagement.  According to

10   her, we've been criticizing Egypt.  We've been going after them

11   for so long on human rights, have been really out there

12   publicly criticizing them, and it hasn't really changed

13   anything on the ground.  Senator Menendez says I also have a

14   lot of Coptic Christians in New Jersey who really like

15   President Sisi and like what he's doing, so I want to do take a

16   different tactic.  I wanted to try to engage privately and

17   engage more specifically and do more quiet engagement and

18   criticism on a lot of these issues.

19   "Q.  But he was still -- he articulated to you he was still

20   committed to human rights improvements in Egypt, right?

21   "A.  I don't think he said it that way, but he did continue to

22   raise human rights concerns directly with Egyptian officials in

23   meetings in which I was present."

24             So Senator Menendez's position doesn't soften much.

25   He continues to criticize Egypt's human rights record.  He

O7aWmen5                    Summation - Mr. Lustberg

1    tries a new form of diplomacy when the old one didn't work, and
2    he does that in a way that's consistent with the interests of
3    his Coptic Christian constituents.  That does not sound
4    anything like a crime, and it certainly doesn't amount to
5    acting as an agent of Egypt within the meaning of Counts
6    Fifteen and Sixteen of the indictment, as Mr. Monteleoni
7    described it to you, or of Will conspiring to make the senator
8    an agent of Egypt.

9         Senator Menendez was never acting at the order,
10   direction or control of Egypt or its officials -- there was no
11   evidence that he was -- or even, in most cases, at the request
12   of Egypt or its officials, as such a request must come from
13   someone who has, as Judge Stein will charge you, some degree of
14   authority over Senator Menendez.  This is a requirement of the
15   law that has not been proven.  In fact, as we said, Senator
16   Menendez's positions didn't change much over time, and so he
17   was never acting other than independently, following his own
18   views.

19        Now, let's talk about that.  The government argued
20   yesterday that he couldn't have been acting independently
21   because he was being bribed.  But listen to what I just said to
22   you.  The bribes that are alleged here happened later.  They
23   happened -- if you believe that they're bribes, and
24   respectfully, you shouldn't.  They happened in 2019.  The
25   positions that we talk about here were in 2018.

1            Finally, it's important to remember that Senator

2   Menendez was certainly not alleged to be acting as Mr. Hana's

3   agent.  He was alleged to be acting as Egypt's.  So if he was

4   simply aligning his views with Will's, who he spoke to about

5   Egyptian policy, that is not being controlled by Egypt.  And it

6   wouldn't be true to say that.  You know, flip statements by

7   Will that he was our man, which the government relies on a

8   great deal, just don't do the trick.  Both Senator Menendez and

9   Will must be acquitted of those charges.

10           Your Honor, I have one section left.  I don't know if

11  you want to take more of a break.

12           THE COURT:  Yes.  Let's take a break now.

13           Ladies and gentlemen, why not make it ten minutes and

14  we'll come back.  My deputy will get you after ten minutes.

15           (Jury not present)

16           THE COURT:  Ten minutes.

17           Thank you.

18           (Recess)

19           THE COURT:  Let's get the government lawyers in here.

20           Ms. Blakely, is the jury there?

21           OK.  You can bring them in.

22           MR de CASTRO:  Before they come in, can I just ask --

23           THE COURT:  Yes, of course.  We're on the record.

24           MR de CASTRO:  My understanding is that Mr. Lustberg

25  will probably wrap around 4:30.

O7aWmen5                          Summation - Mr. Lustberg

1              THE COURT:  Mr. Lustberg, what's your estimation?

2              MR. LUSTBERG:  Just to give you a sense, it was a

3    40-page outline, about 4:30.

4              THE COURT:  If there's even a half hour, I would like

5    you to start, sir, yes.  I want to get as much before this jury

6    as possible.

7              (Jury present)

8              THE COURT:  Please be seated.

9              You may continue, Mr. Lustberg.

10             MR. LUSTBERG:  Thank you, your Honor.

11             The third and final bribery plot in which Mr. Hana is

12   charged is the Parra-Uribe scheme that Mr. Fee talked quite a

13   bit about earlier today, so I'll do my best to not repeat what

14   he said.  And again, you know what that's about.  The idea is

15   that there's this purchase of a car for Nadine, and somehow

16   Will is implicated in that.

17             This is surprising, given the true facts of this case,

18   which, as you'll see, are ones in which Will has really almost

19   nothing to do with it.  And we'll go through that.  But the

20   question here is whether there was a *quid pro quo*.  Again, that

21   is a promise to pay a benefit in exchange for an official act

22   in return.  Here, the *quid* is a car and the *quo* is a purported

23   effort by Senator Menendez to interfere in a pending New Jersey

24   State criminal prosecution.

25             The *pro* comes entirely from José Uribe.  Judge Stein

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    will instruct you on one of the most important things in the

2    criminal justice system later, which is the definition of

3    beyond a reasonable doubt.  And when you think about José

4    Uribe's testimony, I'm going to ask you to really carefully

5    apply the definition of beyond a reasonable doubt.

6         Beyond a reasonable doubt is -- a reasonable doubt is

7    a doubt that is of -- let me try it again.

8         Beyond a reasonable doubt means proof of such a

9    convincing character that you would not hesitate to rely and

10   act upon it in the most important of your affairs -- such a

11   convincing character that you would not hesitate to rely and

12   act upon it in the most important of your affairs.

13        So as you think about the evidence that came from José

14   Uribe, ask yourself if Mr. Uribe was so convincing and

15   trustworthy that you would place your faith in him in the most

16   important affairs in your life.  Ask yourself, would you trust

17   him if he told you where you should live, who you should marry

18   or how to invest your money?  Or maybe closer to home, would

19   you trust him to sell you your life, home or health insurance

20   policies?  But even aside from that, even if you believe José

21   Uribe, neither the *quid* nor the *quo* have been proven with

22   respect to Mr. Hana even if they have with respect to José

23   Uribe or Elvis Parra or Bien Hernandez or Ana Peguero.

24        So let's start with the *quid*, the promise to buy a car

25   for Nadine, something she clearly wanted very badly after her

1    own car was totaled in an accident.  And so here let's talk

2    about four undisputed facts.  I think it's four, hopefully.

3            Fact No. 1, José Uribe, not Will, made arrangements to

4    buy the car from Ray Catena.  So this, Will had nothing to do

5    with the arrangements to buy the car.  Nadine purchased her

6    Mercedes-Benz on April 5, 2019.  You will see, when you look

7    through particularly exhibit 1303, that she purchased, in the

8    days leading up to that purchase, José connected her to a guy

9    named Leon Pereldik at Ray Catena Mercedes-Benz.  Both José and

10   Nadine texted with Leon about Nadine's car purchase, but there

11   are no text messages, not one, no phone calls, not one, no

12   communication of any kind between Will and Leon or between Will

13   and anybody else at Ray Catena.

14           Take a look at 1303.  Look through all of it.  Look

15   through our version.  Look through their version.  You'll see

16   nothing.  So that's undisputed fact No. 1.  José made the

17   arrangements.

18           Undisputed fact No. 2, José -- not Will, José -- paid

19   for the car.  The day before Nadine bought her Mercedes-Benz,

20   José met Nadine -- Mr. Monteleoni talked to you about this --

21   in the parking lot of Villa Amalfi and gave her $15,000 in cash

22   for the down payment on her car purchase.  Thereafter, José

23   made monthly payments on Nadine's Mercedes-Benz from May 2019

24   all the way through June 2022 -- 38 payments.  So take a look

25   at exhibit 1303, lines 751 and 755, and you'll see that José

O7aWmen5                    Summation - Mr. Lustberg

1   asked Nadine to please send him the invoice -- not him and

2   Will; Will's nowhere -- send him the invoice.  And later that

3   day, Nadine sends José a photograph of an invoice from

4   Mercedes-Benz Financial Services in the amount of $891.26,

5   which was due on May 4, 2019.

6            There comes a time -- and this is important, you will

7   recall this evidence from José, and you'll see communications

8   about it -- where José asks his friends Bien Hernandez and

9   Fernando Barruos to help pay, but he never, ever asked Will to

10  help with the purchase of the new Mercedes-Benz.

11           That's undisputed fact No. 2.  So José made the

12  arrangements.  José paid.

13           Undisputed fact No. 3 -- and I said there were four,

14  but there were only three.  Sorry.

15           So undisputed fact No. 3 is that, not surprisingly

16  under those circumstances, who does Nadine thank for the car?

17  Not Will.  She thanks José for getting her the car.  In fact,

18  Nadine tells Leon at Ray Catena, José will be my first

19  passenger.  See that text:  "Great.  Thank you very much.  I'm

20  going to have José be my first passenger."

21           And on April 3, 2019, Nadine texts José and says:  You

22  are a miracle worker who makes dreams come through.  I will

23  always remember that.  She says you have done so much for me.

24  I will never forget it.  For a lifetime, I will never, ever

25  forget what kind of true person and friend you are.

O7aWmen5                        Summation - Mr. Lustberg

1          This is Nadine and José during the time period of the

2     car.

3          By contrast, this is one of those down periods in

4     Nadine and Will's relationship.  At the time she has pretty

5     much nothing good to say about Will; that is, beyond the facts

6     that there are no texts, no emails, no phone calls, nothing

7     connecting Will to providing the car, Nadine complains over and

8     over and over that Will is not helping her, not paying the

9     bribe, from the beginning to the end, when she wanted him to

10    take her to pick up the car.  That's the only thing you'll see,

11    that at some point she says, can you help me pick up the car.

12    And he can't because he's actually in Cairo at the time.

13         So the contrast is stark.  On the left is what Nadine

14    is saying about Will, and on the right is what she's saying

15    about José.  So let's start with José.

16         There are only three people in the last ten years who

17    have affected and changed my life in a way I will never forget.

18    She is one of them -- I'm not sure who she's talking about

19    there -- you are another.  Only three people.

20         Then on the other side, you see Will.  Now *mon amour* I

21    have been so upset all morning.  Will left for Egypt yesterday

22    supposedly and now he thinks he's king of the world and has

23    both countries wrapped around his pinky.  I really hope they

24    replace him.

25         To José -- I said this one before -- you are a miracle

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7aWmen5                        Summation - Mr. Lustberg

worker who makes dreams come true.  I will always remember
that.

About Will, she says, in an email with José:  I'm
very, very hurt and disappointed by him once again, but I
should not be surprised.

To José:  You have done so much for me.  I will never,
ever forget it.  I hope you know I will never have to repeat
this is always not just part two, but for a lifetime I will
never, ever forget what kind of true person and friend you are.

And look at that part two thing, because there's
nothing to Will ever about part two.

To Will, what does she say?

I'm not going to get angry or get any more upset, but
one day I would really love to know one of the pyramids
collapsed and he is trapped forever.

Different approach to these two people by Nadine at
that time.

To be sure -- we can take that down -- José testified
that he met with Will to discuss doing something with regard to
helping out with the Parra prosecution.  So remember, what this
is all about is Parra is facing prosecution, and there's
supposedly a discussion, first outside Andy Aslanian's office
and then in the Glenpointe Marriott.  But nothing with regard
to a car, which is the *quid*, and you need a *quid* for there to
be a bribe.

O7aWmen5                    Summation - Mr. Lustberg

1          So leaving aside José's credibility, which I'll have

2     more to say in a moment, even in his recounting at the initial

3     meeting at which Uribe claims this whole discussion took place,

4     he admitted to you that there was no discussion of getting a

5     car for Nadine.

6          José's testimony:

7     "Q.  You testified that there was another meeting at the bar at

8     the Glenpointe Marriott with yourself, Mr. Hana, Mr. Hernandez

9     and Mr. Parra, right?

10    "A.  That is correct.

11    "Q.  And during that meeting there was no discussion of a car,

12    correct?

13    "A.  At this point I don't remember a discussion of the car to

14    Nadine, no."

15         So the overwhelming evidence is that there really --

16    and we'll come back a little bit more to the discussion of what

17    happens at the outset -- that Will really was not in it.  In

18    fact, he gets kind of cut out of this whole thing.

19         And how does that happen?  From very early on, José

20    Uribe believes that Will either would not or could not do

21    anything to help him.  And this is even true when they actually

22    eventually -- you'll remember this -- go to a dinner, José and

23    Will and Senator Menendez.  And according to José, nothing

24    happened at that dinner because all that Will was doing was,

25    quote, trying to kiss the senator's ass.  So Uribe told you he

O7aWmen5                          Summation - Mr. Lustberg

didn't want to go to another dinner with Will because he

thought it would be, quote/unquote, bullshit.  And pardon my

French, as they say.  In his own words, Uribe says he lost hope

for Will.  So starting as early as October 13, 2018, José texts

Will and says:  I will handle this from now on.  I am going to

face it everyone.  I will no allow anybody to harm my Ana.

That would be Ana Peguero.

           José testified that what he meant by this was that if

Will is not willing to come through with the agreement for the

deal, I was not going to continue hoping that he's able to do

anything.  So José testifies that, in March 2019, he speaks

with Nadine directly.  He takes over, as he said, because,

according to him, time is passing, but nothing is developing in

a way that gave José assurance that this deal is to be

complete.  I lost hope for Will.  I decided to talk to Nadine

directly.

           And on April 2, 2019 -- and you'll see this is on, if

you're taking notes, line 584 of exhibit 1303 -- José texts

Bien Hernandez and refers to Will and says:  That friend of

yours is scamming people.

           He explained that he became upset.  He said:  I'm very

mad at Will.  I'm very upset with Will.  Time and time passed

by and no sign of resolution was given from him to us.  I was

upset and caught him scamming people.

           So the theory seems to be that Will was saying he was

O7aWmen5                    Summation - Mr. Lustberg

1     going to do something and wasn't.

2              So José testifies, and he says it all in this passage

3     from his testimony:  I found Nadine.  Nadine and I entered into

4     an agreement.  I am doing my part of the deal.  She's already

5     picked up her car and willing to continue with the deal until

6     this gets fulfilled.

7              He and Nadine make a deal.  He and Nadine make a deal.

8     Remember, to be guilty of bribery, you don't have to actually

9     pay; you have to have an agreement.  But here, it's clear that

10    the agreement is not with Will.  The agreement is between

11    Nadine -- I'm sorry.  It's not with Will.  It's between Nadine

12    and José.

13             And there's more.

14             Later that same night, as the day that, right around

15    the time of the purchase, Nadine tries to call José while he

16    and Will are in the car together.  But because Will is there,

17    José texts Nadine and says, I cannot talk.

18             Talk about being cut out of it.  This is what happened

19    to Will.  He's cut out of that.  He's cut out of dinners --

20    dinners.  He stops appearing on texts.  You may recall

21    Mr. Solano, in his cross-examination of Agent Graves, showed

22    there were no texts from Will in June 2019, none in July 2019,

23    none in August 2019, no relevant texts in September 2019; I

24    mentioned there's this one about Egyptian Armed Forces Day.

25    None in October.  None in November.  And perhaps most

O7aWmen5                          Summation - Mr. Lustberg

1    significantly, there's a celebratory dinner, and you will not

2    be surprised to know Will Hana is not at that dinner.

3          So José does say that Will was involved at the very

4    beginning.  For you to believe that, you have to believe José,

5    and that means you have to believe someone who, given his

6    history as a fraudster, will lie, cheat and steal -- and for

7    our purposes, mainly lie -- whenever it's in his interests to

8    do so.  That's the person you have to believe.  He admitted to

9    you that when he is in trouble, he lies to try to get away with

10   it.  He told you that from the witness stand.  Then he said

11   when his family's in trouble, he makes it clear that there is

12   nothing he would not do to protect him, including lying.  And

13   here, you know he claims that his family was in trouble --

14   talking about his daughter Ana.

15   "Q.  Fair to say that when you're in trouble, you lie if you

16   think you can get away with it?

17   "A.  I will say that I have lied in the past.

18   "Q.  To try to get away with it, correct?

19   "A.  That would be fair to say.

20   "Q.  And is it also fair to say that when your family's in

21   trouble, there is nothing you wouldn't say to try to help them?

22   "A.  I will do the necessary steps to protect my family, sir.

23   "Q.  Including lying for them, correct?

24   "A.  I will say that I will do the necessary things to protect

25   my family, sir.

"Q.  And my question is that would also include lying for them?

"A.  I had lied in the past to protect my family, yes."

        I mean it's a revealing change because, on the one hand, he admits to lying, and on the other hand, you see he's just, you know, he's trying to help his own case by cooperating with the government.  And he told you from the stand numerous specific times in the past when he had lied to help himself and his family.

        He lied to a bank to get a loan so that he could buy two trailers for his trucking business when he didn't otherwise qualify for the loan.

        He lied by creating a fake tax return and using it for a loan application.

        He lied on his taxes for years and years -- in two ways, both by hiding his income and filing false tax returns that said he made less than he actually did -- this is all stuff that he admitted -- and by lying to the IRS and claiming he was married for about 12 years when the truth was that he was divorced, which, of course, meant that he paid less in income taxes.

        He lied to the Small Business Administration to get a loan, and he used the same false information from the tax returns he gave to the bank to, in that way, get a loan that was intended for people who were actually in need of economic disaster relief during Covid.

1           He lied when he continued to run an insurance agency

2       after he knew he couldn't by using first his son and then his

3       daughter as the straw owners to hide the fact that he was

4       really running it, and he admitted that he did so that he could

5       get cash out of the business for himself.

6           And of course, he lied to the prosecutors in this very

7       case when he falsely told him that the car that he, and he

8       alone, gave to Nadine was really a loan:

9       "Q.  And did you plead guilty to conspiracy to commit

10      obstruction of justice and obstruction of justice?

11      "A.  Yes, I did.

12      "Q.  What made you guilty?

13      "A.  Making up a cover-up story to Nadine to justify the car

14      payment."  No nothing to indicate that Will Hana had anything

15      whatsoever to do with that.

16          And ladies and gentlemen, he also lied to you when he

17      told you that he never withdrew cash from the trust accounts,

18      the escrow accounts of Phoenix.  But as you can see from these

19      sections -- and these are things that we added -- he told you,

20      as I said, he never withdrew cash, but you can see from these

21      examples that he did that a number of times.

22          So having been caught redhanded for evading taxes, now

23      he's in trouble again and he's once again lying to get out of

24      trouble -- now by blaming Will Hana.  You have heard his

25      testimony, and especially his cross, for yourself.

O7aWmen5                          Summation - Mr. Lustberg

1              Yesterday, I thought it was interesting Mr. Monteleoni

2    said he was straightforward, quote, the same person on

3    cross-examination as he was on direct examination.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O7A3MEN6               Summation - Mr. Lustberg

1            MR. LUSTBERG:  I want you to think hard, and you're

2     able to get transcripts if you ask for them.  And think about

3     his cross-examination, we went back through it.  And we counted

4     up, on direct examination, 15 times, he said he didn't recall

5     anything.  On cross-examination, he said it 110 times.  So to

6     say he was the same person on cross as on direct is simply

7     inaccurate.  Don't ignore that.  Don't ignore the cross.  Don't

8     ignore the lying.

9            Even though the government who called him really

10    almost invites you to decide this case without thinking of it.

11    There is a reason why Mr. Monteleoni said to you yesterday you

12    don't have to worry too much about Jose Uribe.  But anyway, as

13    skilled a liar as Jose Uribe was, he really couldn't craft a

14    lie that would truly implicate Will Hana because, as we saw,

15    Will in fact did nothing, even in Uribe's telling, to help

16    Parra.

17           In fact, even in Uribe's telling, all he did was to

18    engage in a conversation, first outside Andy's office, and

19    later at the Glenpointe Marriott -- for old time's sake here

20    you go.  And he made a deal where he would be paid some amount

21    between 200,000 and $250,000, a quarter of a million dollars in

22    order to take completely unspecified acts to help Parra.

23           But think to yourself, does that make sense that there

24    would be an agreement whereby Jose, whereby Will Hana would get

25    paid 200 to $250,000, even though he had no contacts in state

O7A3MEN6                    Summation - Mr. Lustberg

1    government, and more importantly, no plan on what he was going

2    to do?  Because in fact, according to Uribe's testimony, and

3    during that meeting, there was no discussion with Mr. Hana

4    about the specifics of what he was going to do to help with

5    what we referred to as part 1 and part 2.

6            Elvis Parra is the investigation that might lead to

7    your daughter Ana.  The Court you didn't know what Will was

8    going to do, correct?  Correct, sir.

9            Will didn't give him in his words step 1, 2, 3, or 4.

10   He didn't say anything about what he was going to do.  The

11   testimony went this way.

12           Yesterday you talked about the fact that Will never

13   told you what he meant in terms it of step 1, step 2, step 3,

14   step 4, what he was going to do, correct?  Meaning he didn't

15   tell me what was being done step by step to get this.  The

16   resolutions of the cases.  Correct.  He never said that to you,

17   right?  He did not discuss that to me.

18           More specifically, this is important, there was no

19   discussion of a bribe.  So the question to him was right.  So

20   my question is there was no discussion of a bribe.  Correct?

21   There was no discussion of how he was going to pay somebody.

22   Yeah.

23           He didn't even say he would do anything illegal.  So

24   when is the evidence of an agreement of a promise by Will to

25   commit bribery?  There simply isn't one and that's because it

O7A3MEN6                    Summation - Mr. Lustberg

1    doesn't exist.

2              Oh, with regard to the payment itself, you'll recall

3    that Uribe says that at some point $125,000 was supposedly paid

4    some time after Parra's June 24, 2019 sentencing.  Please keep

5    that date in mind.  That's an important date.  June 24, 2019,

6    is when Parra supposedly gets sentenced.  And some time after

7    that, according to Uribe, $125,000, so it's down from the 200

8    to 250, get paid to Will Hana.

9              I want you to think hard about that $150,000.  You

10   have seen a case in which the government repeatedly, over and

11   over, showed where money came from, and where it ended up.  You

12   saw summaries of bank records, there's a wealth of financial

13   information.  Money being taken out of various accounts, and so

14   forth.  But here, there is literally no evidence, none, of

15   money being taken out of various accounts to fund such a

16   payment from Uribe, from Parra, from Bien Hernandez, nothing.

17   And absolutely no evidence that Will received anything like

18   those kinds of moneys, no bank records.  And unlike some other

19   situations here, no cash.  No gold in his apartment.

20             You saw a stipulation where his apartment gets

21   searched a few months afterwards, and only $5,943 in cash was

22   found.

23             In a case in which there have been endless texts and

24   e-mails and huge summary charts, that's Government

25   Exhibit 1303, there are no communications, not one, not one

1    communication, discussing this payment of 250,000 or 200, or

2    125.  Not one.

3           To believe that you have to believe Uribe in part,

4    because the government didn't call Parra or Bien as they

5    certainly could have in order to bear their burden.  Because

6    remember, the reasonable doubt can arise from the evidence or

7    from the lack of evidence.

8           Oh.  One other thing.  When we talk about what

9    evidence there wasn't, with respect to this payment, you heard

10   a witness, I think her name was Agent Wheeler, who talked about

11   tracking people, with how you can track people's locations.

12   So, Uribe's testimony was that they tracked people all over the

13   place, but Uribe's testimony is that this payment is made at

14   Will's apartment.  There is nothing tracking Bien Hernandez,

15   Elvis Parra, anybody else to Will's apartment to make a payment

16   at the end of June.

17          The bottom line is that even though the government

18   says that everything -- this is what Mr. Monteleoni said I

19   think yesterday but maybe the day before -- that Uribe said

20   should be believed because it was, in Mr. Monteleoni's words,

21   overwhelmingly corroborated, there is no proof of this $150,000

22   beyond Uribe saying it.  There's, you may see on rebuttal a

23   text message in which Uribe -- I'm sorry, in which Parra and

24   Bien Hernandez talk about Will's address.  But that you'll see,

25   that's way before when the payment was supposedly made after

1    the June 24 sentencing.

2          But again, even assuming that there was a payment,

3    there is nothing that ties it to the quo.  So, we have the quid

4    and the payment.  Their theory is Will is involved because he

5    had a conversation outside of Andy's office and at the hotel

6    where it is all discussed, although with no specificity.  Just

7    he was going to get paid 200 to $250,000 to do something.  But,

8    beyond that, there is nothing that ties it, anything that

9    happened with Will to the quo.  That Menendez was going to do

10   something because of this car to intervene in Parra's

11   prosecution and in the investigation of Peguero.  Part 1 and

12   part 2.

13          No evidence that whatever Hana promised to do had

14   anything to do with Menendez.  But more specifically, anything

15   to do with Menendez calling and a meeting with the attorney

16   general.

17          In his direct and I think at least once during his

18   cross, Uribe said that Will mentioned Nadine and the senator in

19   Andy's office and maybe at the Marriott as well.  But again,

20   there was no discussion of what he meant by that.  And we know

21   that at the same time other things were happening.  They were

22   organizing a perfectly legal fundraiser for Senator Menendez at

23   the time.  And there was some discussion, as you know, about

24   this dinner in 2018 which Uribe ultimately said was useless

25   because it was only about Will kissing the senator's ass.

O7A3MEN6                    Summation - Mr. Lustberg

1          The truth, the whole truth, as Mr. Fee talked about

2     earlier today, was that all that Will really did was to try to

3     get another attorney, Doug Anton, involved in representing

4     Mr. Parra.

5          If you were trying to curry favor, though, with

6     Senator Menendez, could you have chosen a worse person than

7     Nadine Menendez's former boyfriend?  It seems like an odd

8     choice of lawyers, if what you were trying to do is to curry

9     favor with Mr. Menendez.

10          In fact, you can see that all that Will was trying to

11     do was to get a different lawyer.  Now, that actually fails and

12     Mr. Fee went through all of the texts this morning.  I won't do

13     that now.  That shows what all the interactions with Will

14     around getting Anton involved.  Getting discovery, getting

15     information, so forth, and just generally talking about it.

16     Those texts continue through June of 2018.

17          But at that point it becomes obvious that, in fact,

18     Mr. Parra has gotten another lawyer, the best lawyer in New

19     Jersey, Michael Critchley.  And Critchley has filed his

20     appearance on March 2018.  So at that point, whatever it was

21     that Will's doing was over.  He tried to get Anton involved,

22     and that's it.

23          By the way, I should note, the only person who had got

24     paid $250,000 in this case was Mr. Critchley, who, by the way,

25     worked extensively.  I think he billed, according to the

1    records, a total of 315 hours and he successfully secured for

2    Parra a plea of probation.  That's all a good thing.

3            Even if there was a scheme, it was an absurd one.  For

4    a federal official, a U.S. senator to talk to a state official,

5    an attorney general who had and could have nothing to say about

6    this, the whole thing, it was a ridiculous idea.  Not a real

7    quo for this quid, even if you could tie them together, which

8    you can't, certainly with regard to Will.

9            And again, you'll think about whether it was an

10   official act.  Mr. Fee has talked about that.  Was there

11   anything that was pending before the senator that had to do

12   with his specific duties.  Was his phone call or meeting with

13   Attorney General Grewal an official act?  Seems to contort the

14   law beyond where it can possibly go.

15           So, those are the three schemes.  I've been talking

16   for a while, longer than I like to.  And so I'm going to wrap

17   it up now, but I have a couple of final observations to make

18   for all of you.

19           In the conclusion of its summation yesterday, the

20   government described really aggressively IS EG Halal Will's

21   business which he worked so hard to build into this success

22   story that it is.  This is how they described it.  As a

23   monopoly dropped in the lap of someone unqualified, based on a

24   single decision of the Egyptian government.

25           Consider, if you would, how unbelievably unfair this

1    characterization was.  How it not only ignores the hard work

2    that Will had done to learn the halal business and make it into

3    a real international operation, about which you've heard, but

4    also how it disrespects the Egyptian decision, which it

5    denigrates.

6           Think about how much this prosecution against Mr. Hana

7    is based upon a fundamental misunderstanding of who he is, and

8    where he comes from.

9           It ignores his Egyptian origins when it downplays the

10   contacts he had which yielded him this contract.

11          It fails to appreciate the role of his Coptic

12   Christian faith, which Egypt viewed as critical as the El-Sisi

13   government pushed out the Muslim Brotherhood and promoted

14   Coptic Christians, including Will.

15          It misses the point of Will advocating with the

16   senator from his home state for a better relationship with his

17   native land, advocacy which explains so many of the entries on

18   Exhibit 1302, whether meetings or dinners or texts or e-mails,

19   often supporting the Egyptian point of view.

20          And it even misunderstands the culture from which he

21   came.  A culture that, in practice, is certainly foreign to

22   many of us, in the way it celebrates occasions, large and

23   small, with gifts of gold, which probably most of you don't

24   have.

25          It ignores all of that context, including the Armenian

1  Middle Eastern diaspora which became such an important aspect

2  of who Will Hana was and who he spent time with, including Andy

3  Aslanian, Nadine Arslanian, Fred Daibes, John Moldovan, Vasken

4  Khorozian, among others.

5         But that context, and the closeness of the

6  relationships within that context, some aspect of which we

7  tried to capture in Hana Exhibit 1300, the 14-page chart that

8  talks about the informal contacts between people, is critical

9  to understanding what happened here.  And why the quids were

10  innocent, why Senator Menendez's quos were appropriate, and why

11  none of them, none of them were done with anything like corrupt

12  intent.

13         The government calls all of that a distraction.  But

14  really, it's important.  It's necessary for you to understand

15  the narrative.  A narrative that really can't be ignored

16  without misunderstanding, misunderstanding what happened here,

17  and why far from being a criminal, Mr. Hana is a good man, who

18  committed no crime, but rather sought to build a life in this

19  new country, a business from the ashes of prior financial

20  setbacks, and a social circle surrounded by immigrants, whether

21  first or second generation like him.

22         I ask you to consider, even if the government has

23  refused to, those facts, and not to ignore them or to speculate

24  from them to criminality, when really, they are entirely

25  consistent with innocence or with the stuff of everyday

O7A3MEN6                      Summation - Mr. Lustberg

1    law-abiding life.

2              This will be difficult for you.  And I'll tell you

3    why.  This is -- I'm in a tough situation here.  The government

4    got to go first, and lots of psychologists say you remember

5    what you heard first.  That's called primacy.  And other

6    psychologists say you remember what you heard last, and that's

7    called recency.

8              I am going to ask you to work really hard remember

9    what I said in the middle after 10 hours of summations, so you

10   can factor that into your deliberations.  I have to ask you to

11   try to do as hard as you can do that.  To do so with an

12   understanding that my client, Will Hana, who I'm genuinely

13   honored to represent, is not just a name that appears in

14   hundreds of pages of summary charts, or exhibits contained in

15   those charts.  Not just a name that can be checked off on a

16   computer screen.  But is a real flesh-and-blood person who has

17   a real life, a good and courageous background, and now a

18   business which is a tribute to both.  And which works every day

19   to uphold the traditions of Islam, even thought it's not his

20   faith.

21             If you do all that, and if you think of the evidence

22   and lack of evidence as I've been discussing it, if you talk,

23   and listen to each other, and really deliberate, I'm confident

24   that you will return the only verdict that is consistent with

25   the law -- and the facts and the system of justice of which

1    we're all a part.

2            Mr. Hana is not guilty of the charges against him.

3    Thank you.

4            THE COURT:  Thank you, Mr. Lustberg.

5            Ladies and gentlemen, I'm going to ask Mr. De Castro

6    to begin his summation on behalf of Mr. Daibes.  And if he does

7    not conclude, we'll pick it up tomorrow with the rest of the

8    summation.  Mr. De Castro.

9            MR. DE CASTRO:  Thank you, Judge.

10           Good afternoon.  Summing up last is tough.  Many of my

11   general points will have been covered by other counsel.  And

12   you, the jurors, are tired.  I know that.  You've sat for eight

13   weeks, nine weeks of testimony, and now many hours of closing

14   argument.

15           The good news is that, like opening statements and the

16   questioning of witnesses, I suspect I will be the briefest.

17   But it's not how much you say, how long you present witness

18   testimony, how long you cross-examine witnesses, or how long

19   you speak during closing arguments that determines how

20   effective you are.  Just because we're last doesn't mean that

21   you should consider our arguments any less.  I ask you to

22   listen to my arguments just as attentively as you've listened

23   to everyone else's, and I'm going to do my best to be brief,

24   concise, to the point, and clear how the government was unable

25   to prove that Mr. Daibes committed any crimes.

1          As I said to you in my opening statement, the

2    government wants and needs you to assume, presume, and unfairly

3    infer that Mr. Daibes' money and gold was found at 41 Jane

4    Drive and Nadine Menendez's safe deposit box, and therefore,

5    those items must have been bribes.

6          What you have seen is a case that was reverse

7    engineered and they presented it to you in exactly the same

8    way.  What do I mean by reverse engineered.  I say it was

9    reverse engineered in that it was driven by conclusions.

10         First, it was driven by conclusions first, and then

11   the presentation of circumstantial evidence to try and prove

12   that conclusion.

13         They found money that they linked to Mr. Daibes.  They

14   found gold that they linked to Mr. Daibes.  But they didn't

15   know what it was for.  And they want you to assume, conclude,

16   that they were bribes.  Start with the conclusion, and then

17   look for anything else that helps support that conclusion.  And

18   along the way they ignored any alternate conclusions.

19         And they presented their case to you in exactly the

20   same way.  They didn't present facts to you how they happened

21   historically so you can draw your own conclusions in a logical

22   way.  No.  They started by shocking you.  By sensationalizing

23   the case.  They presented the recovery of money and things from

24   Nadine Menendez's home and safe deposit box.  They wanted you

25   to be blinded by the presence of cash and gold and conclude

1    that something must be nefarious.

2          To be driven by that conclusion while you listen to

3    all the other evidence that came after.  They wanted you to

4    make the same mistakes that they did.  Arrive at the conclusion

5    and then hear the evidence.

6          Then, despite their lengthy summation, that made it

7    seem like they had direct evidence of Mr. Daibes' guilt, they

8    presented to you a case against Mr. Daibes that was largely

9    built on circumstantial evidence, and unfair inferences and

10   assumptions.

11         They presented you with three theories of what the

12   money and gold was for.  They chose Egypt, that Mr. Daibes was

13   somehow involved in paying Senator Menendez to help Mr. Hana's

14   halal business.  Weeks of testimony regarding this chapter of

15   the case, and Mr. Daibes was barely even mentioned.

16         They chose the U.S. attorney for the District of New

17   Jersey.  Well, he must have paid the senator to appoint Philip

18   Sellinger or try to appoint Esther Suarez to get him a good

19   disposition in his pending criminal case.  Again, no direct

20   evidence, and the evidence showed that Mr. Daibes' case was

21   handled like any other case and was resolved on the merits and

22   without any reference to Senator Menendez.

23         They chose Qatar.  He must have paid Senator Menendez

24   to introduce him to the Qataris, an introduction to members of

25   the royal family of a U.S. ally that hosts the largest U.S. Air

1    Force Base in the Middle East, and thank them along with other

2    senators for assisting in the humanitarian evacuation of Afghan

3    refugees.  Nothing remarkable about that.

4            As it relates to Mr. Daibes, the government has

5    presented evidence that, at most, would cause you to suspect.

6    However, suspicions and assumptions are simply not enough.

7    They've shown you no direct evidence and very little

8    circumstantial evidence that any of the gold or money that was

9    connected to Mr. Daibes was given to Nadine or the senator in

10   return for any particular official acts.

11           Rather, at best, at best, they have shown that

12   Mr. Daibes provided Nadine and Senator Menendez with gifts or

13   what are called goodwill gifts.  Gifts to cultivate a

14   friendship.  Gifts to build goodwill.  Gift, not bribes.

15           This gold bar was part of Mr. Daibes' inventory and

16   found in Nadine Menendez's home.  Did the evidence show when

17   this gold bar was given to Nadine or Bob Menendez?  If it was a

18   bribe, wouldn't it have been given before?  But the government

19   has given you absolutely no direct proof as to when any gift

20   was given to Nadine or Bob Menendez.

21           Did the evidence show whether this gold bar was given

22   to Nadine or Bob Menendez before or after they say Mr. Menendez

23   assisted with Mr. Hana's business?  Did the evidence show

24   whether this gold bar was given to Nadine or Bob Menendez

25   before or after Philip Sellinger was appointed U.S. attorney?

1    Did the evidence show whether this gold bar was given to Nadine

2    or Bob Menendez before or after Mr. Daibes was introduced to

3    the Qataris?  Did the evidence show whether this gold bar was

4    given to Nadine or Bob Menendez before or after Mr. Daibes and

5    the Qataris finished their due diligence and signed a letter of

6    intent?

7            Or is it just as likely that it was a gift to

8    cultivate friendship or a gift to build goodwill.

9            If you don't know, then you're not convinced and he's

10   not guilty.

11           This envelope of money was found in Nadine Menendez's

12   safe deposit box.  Did the evidence show when this envelope was

13   given to Nadine or Bob Menendez?  Did the evidence show whether

14   this envelope was given to Nadine or Bob Menendez before or

15   after they say Mr. Menendez assisted with Mr. Hana's business?

16   Did the evidence show whether this envelope was given to aid

17   Nadine or Bob Menendez before or after Phil Sellinger was

18   appointed U.S. attorney?  Did the evidence show whether this

19   envelope was given to Nadine or Bob Menendez before or after

20   Mr. Daibes was introduced to the Qataris?  Did the evidence

21   show whether this envelope was given to Nadine or Bob Menendez

22   before or after Mr. Daibes and the Qataris finished their due

23   diligence?

24           Or did the evidence show it was a gift to cultivate

25   friendship or a gift to build goodwill?  If you don't know,

1    then you're not convinced and he's not guilty.

2             You will not be able to answer those questions,

3    because the government has simply not given you sufficient

4    evidence to know whether the gold or money connected to

5    Mr. Daibes were gifts, goodwill gifts, bribes, or thank yous

6    after the fact.  There was simply no evidence other than the

7    presence of the gold and money.

8             And because the government did not give you enough

9    evidence to answer those questions, to conclude unanimously

10   that those items were given in return for official acts of the

11   senator and not simply gifts, goodwill gifts or gifts after the

12   fact, Mr. Daibes is not guilty.

13            I'm going to go through briefly each chapter or part

14   of this case and I'm going to tell you from Mr. Daibes'

15   perspective what the evidence showed or failed to show, how

16   that evidence failed to establish that Mr. Daibes bribed or

17   conspired to bribe Senator Menendez to perform acts that were

18   beneficial to him.

19            After that, I'm briefly going to talk to you about the

20   law.  You've already heard a lot about law.  I'm not going to

21   go into that in depth.  And then I'll take those legal

22   principles and very briefly argue to you how the government

23   failed to show a quid pro quo.  And then I'll wrap up.

24            As the judge told you, I'm not going to be that long.

25   I'm going to finish today and I will be a short time tomorrow,

1    I promise.

2           Before I get into the different parts or chapters of

3    this case, I want to say a bit about what the evidence showed

4    about Fred Daibes.

5           Freddy, as he is called by many, is Palestinian and

6    born in Lebanon.  He's not Egyptian; he's Christian.  He

7    immigrated to the United States and very much embodies the

8    American dream.  He graduated from high school, and with just a

9    high school diploma, he worked his way up to becoming a major

10   real estate developer.  The real estate developer in Edgewater,

11   New Jersey.  And he's been in real estate development for close

12   to 40 years.

13          You heard from witnesses that know him well.  John

14   Moldovan, his assistant Jamela Maali, and Vasken Khorozian.  He

15   has grown children.  Everyone in Edgewater knows Freddy.  He's

16   like a celebrity there.  His offices are on River Road in

17   Edgewater, New Jersey.

18          You see John Moldovan's testimony on your screen.

19   He's built the majority of what is on River Road.  He built The

20   Alexander, the most beautiful building Moldovan has ever seen.

21   The Metropolitan, the St. Moritz, the Grand Cove, and many

22   other properties.  He's down to earth.  He's approachable.  And

23   he's well known for his generosity.  Everyone knows him as very

24   generous.  He's extremely generous.

25          Moldovan told you, there is the testimony from John

1    about his generosity and Ms. Maali about his generosity.

2    Mr. Moldovan told you that he gave Mr. Moldovan, meaning Freddy

3    gave Mr. Moldovan $25,000 to help start up his law practice.

4    It was a gift.  He didn't ask Mr. Moldovan to pay him back.

5    $25,000.  In fact, Mr. Moldovan asked Mr. Daibes if he could

6    pay him back and Fred said no.

7            And just think, if Fred was willing to give someone he

8    was just acquainted with a $25,000 gift, what would he give a

9    close friend.  A close friend.

10           Freddy pays for things in cash.  Dinner, gifts.  He

11   gives loans in cash.  He has cash in the office.  This is what

12   the testimony showed.  He has cash on him.  He has cash at

13   home.  You also know that he collects gold.  He collects and

14   invests in gold bars, coins, and wafers.  His inventory is kept

15   by Ms. Maali.  He doesn't hide the inventory or keep it secret.

16   He catalogs it.  He has his assistant write down the bar brands

17   and the corresponding serial numbers.

18           There is nothing secretive, as the government was

19   talking about secrecy, there is nothing secretive about it.  He

20   writes it down.

21           His inventory had 24-kilo bars on it when it was last

22   inventoried in 2018.  That is $1.4 million worth of gold.  He

23   checks the price of gold all the time because he's seeing how

24   much it has gone up or down, because it is an investment like

25   stocks, bonds, and commodities.  And the evidence shows that he

1    tells people that it's a great investment.

2            The evidence also showed that he is a longtime friend

3    of Bob Menendez.  Fred has hosted fundraisers for and supports

4    democratic candidates for office.  He's hosted several

5    fundraisers for Senator Menendez.  He's raised money.  He and

6    Senator Menendez have been friends for well over 30 years.

7    They joke, they laugh, they hang out together.  It's a genuine

8    friendship.  This is a real relationship.

9            How many friends have you had for 40 years?  How many

10   friends have you had for 30 years?  20 years? 10 years?

11   Friends look out for each other.  You don't bribe a close

12   friend.

13           Fred was invited to Bob's wedding to Nadine.  It was

14   an intimate wedding, only 65 people during COVID.  Fred was

15   invited and attended.  It shows you how close his friendship is

16   with Senator Menendez.  Mr. Hana, for example, was not invited.

17           Now, with that backdrop of what the evidence showed

18   about who Fred Daibes is, and his character traits, let's look

19   at the different chapters of this case through that lens.  And

20   let me take you through what the evidence showed from our

21   perspective and then how it failed to prove a quid pro quo

22   involving Senator Menendez.

23           So, I'll do Egypt and then probably break if the time

24   is right.

25           Let's start, like I said, by talking about the Egypt

1    part of the case.  Everything I said in my opening statement

2    concerning Egypt, what I expected the evidence would show and

3    what I told you in openings, or not show, has come to pass.  In

4    opening statements I told you that you were not going to hear

5    much about Mr. Daibes as it relates to Egypt.  Mr. Daibes was

6    barely mentioned in this part of the case.  In fact, I think

7    they mentioned him in summation more than they did during the

8    testimony.

9         Several days, maybe even a week of testimony went by

10   without Mr. Daibes even being mentioned.  And you saw that

11   reflected on the lack of questions we had for so many of their

12   Egypt-related witnesses.  Mr. Tate, Mr. Paul, Mr. McKinney,

13   Ms. Graves, Ms. Hunter Mills, Mr. Thompson, we had no questions

14   for these witnesses at all.

15        I told you that would you hear about the halal

16   business, certifications, slaughters, blessings, and other

17   terminology, and that none of it would have anything to do with

18   Mr. Daibes or his businesses.  He's not Egyptian.  I told you

19   that he is a New Jersey real estate developer and has nothing

20   to do with the halal business.

21        The evidence showed that Mr. Hana and Mr. Daibes'

22   businesses are totally separate.  One doesn't depend on the

23   other.  There is absolutely no overlap.  At most, at most, they

24   showed that Rony Daibes worked IT for both businesses, and

25   Jamela Maali worked for Mr. Hana in the very beginning to help

1    him administratively get his business off the ground.  She

2    worked for separate pay, had a separate IS EG e-mail, and

3    reported only to Mr. Hana.  And it was only for a few months

4    anyway.  That's it.  No more.

5           Different entrance, their own receptionists, space is

6    separated and separated by access physically.  You need a fob

7    or a key card to get into each area.  No shared bank accounts.

8           And Mr. Moldovan told you, who was serving as IS EG's

9    counsel, their lawyer, in the early days, that he knew Will and

10   Fred to be friends and was not sure of any business

11   relationship between them.

12          Mr. Daibes is Mr. Hana's landlord in both home and

13   business.  You have that document in evidence.  It's Government

14   Exhibit on your screen C509.  It shows that Fred stands to earn

15   substantial amounts in rent from Mr. Hana.  $624,484.82 over

16   five years in rent to be exact.

17          Mr. Moldovan also told you about Mr. Daibes being

18   involved somehow in Mr. Hana's repurchase or buyback of shares

19   from Andy Aslanian.  The government didn't mention it

20   yesterday.  They may tomorrow.  But, Mr. Moldovan testified

21   that he had no knowledge of Fred having an interest or being

22   involved in IS EG Halal at all.  He told you that he didn't

23   know what Fred's role was.  All he could say about that was

24   that one day in passing Fred said to him, hurry up and get that

25   contract done.  The contract for Will to buy Mr. Aslanian's

1    shares back.  And he told you that Fred did not own any shares

2    in IS EG Halal, that he knew that Fred and Mr. Aslanian were

3    longtime friends.

4         The evidence showed that Mr. Daibes was a mentor and a

5    father figure to Mr. Hana, and he was simply helping resolve a

6    dispute between business partners that happened to both be

7    Mr. Daibes' friends.

8         Fred Daibes is much older than Will Hana.  Fred Daibes

9    is in his 60s and Mr. Hana was in his 30s at the time.  Fred

10   has adult children, and as I said, Fred's been in real estate

11   for 40 years successfully.  For Will, IS EG Halal was his first

12   successful business.  Will would go to Fred for business

13   advice.  Fred was a mentor, someone Will could look up to.  An

14   experienced and successful businessman, and he was also Arab.

15   When Will would go to Fred, it was like a son going to a

16   father.  You heard that testimony from Vasken Khorozian.

17        Fred had no involvement in the halal business, as I

18   told you in openings.

19        With respect to Mr. Aslanian's shares, Fred was in a

20   unique position, where both Mr. Aslanian and Mr. Hana would

21   trust him, so he intervened to help them put aside their

22   differences and resolve a business dispute.  Nothing more.

23        That brings me to the payment to Nadine Menendez from

24   IS EG Halal.  The government argues that one way Mr. Daibes

25   helped in the Egypt part of this scheme, as they say, was he

1   facilitated payments to Nadine Menendez for her alleged sham

2   job at IS EG Halal.

3           First, there is no evidence that Mr. Daibes had any

4   knowledge of the details of the business relationship between

5   Nadine and Will.  If there was something untoward about it --

6   I'm not saying there was -- it was unknown to Fred.  And there

7   is no direct evidence that Will or anyone else told Fred there

8   was anything wrong or criminal or anything about their business

9   relationship.

10          Second, like the Aslanian and Hana dispute, Mr. Daibes

11  was involved in the payment to Nadine for no reason other than

12  to help resolve a dispute between two people that he knew.  The

13  evidence supports that fair and logical inference.

14          Just look at the text from the chart of the voicemails

15  from Nadine Menendez.  This is on lines 1098 through 1104 of

16  Government Exhibit 1302.

17          Good afternoon, Fred.  Sorry to bother you with this

18  issue.  I have not received any checks from Will.  It goes on.

19  The understanding is that he would give me a check the first of

20  every month.

21          Now let me stop there.  If Fred is a co-conspirator,

22  why does Nadine have to tell him what her arrangement is with

23  Will?

24          I was hoping I would not have to involve you.  That's

25  all on 1098.  Then we go to 1099 where you see Nadine, I

1    personally gave Bob a check.

2          Then we go to line 1100.  Fred says, please send me a

3    rundown of what you believe you are owed.

4          He doesn't know because he has nothing to do with the

5    Will and Nadine business relationship.

6          Then you look at line 1104.  Nadine sends him a

7    breakdown.  We've seen this now a couple times.  If Fred was a

8    co-conspirator, why would she have to do this at all?

9          And look at the bottom of the note that I have pulled

10   out there.  Fred, once again, I'm very sorry to involve you.

11         Are those messages two of co-conspirators?  Or are

12   those messages from someone who believes Fred is involved in

13   whatever business dealings she has with Will.  She wouldn't be

14   saying I'm sorry to bother you, I'm sorry to involve you.  She

15   would be saying Fred, we, all of us, have a deal.  You need to

16   make sure Will holds up his side of the bargain.

17         That's not what this is.  There would be no need to

18   educate him on how much she was owed.  There would be no need

19   to give him any details because as a co-conspirator or someone

20   involved in Mr. Hana's business, he would know, right?  So why

21   does she have to do this.

22         But he didn't and Nadine knows that Fred is friends

23   with Will.  That's the fair inference, that he could convince

24   Will to honor whatever deal they had.

25         Now, then there was the evidence of Fred's involvement

1    in paying off Nadine's mortgage.  Look carefully at those

2    messages as well.  Again, there is no evidence of Fred's

3    involvement in anything to do with paying Nadine's mortgage,

4    other than as a potential investment.  He gets involved, like

5    the issue with payment because Nadine has dragged him into an

6    issue with Will.  Fred's much older than Will and Nadine sees

7    him as an elder, someone who can convince Will.

8           So the evidence shows just that.  Fred trying to

9    settle a dispute between friends.  Again, the peacemaker and

10   one way that he could help was simply buy the mortgage.

11   Meaning he would be buying the loan.  And he would be charging

12   Nadine for her mortgage payments.  And you heard that he has a

13   business that does just that.  East-West Funding.  It would

14   save her home in the short term, and Nadine would just make

15   payments to Fred, instead of the bank.  And like the bank does

16   on mortgages, Fred would make a profit.  And if she didn't pay,

17   he could foreclose and take the house.

18          The holder of Nadine's mortgage rejected Fred's offer,

19   nothing more than that, and certainly nothing suggested a quid

20   pro quo involving Fred.  And he had no more involvement in

21   Nadine's mortgage.  And that is not proof beyond a reasonable

22   doubt.

23          Now with respect to this issue with Andy Aslanian and

24   Nadine regarding the shares of IS EG Halal and the payment of

25   Nadine's mortgage, Mr. Daibes was in a unique position both to

1    resolve a dispute between people with which he had

2    relationships, and in Edgewater, New Jersey, Fred is

3    well-known, he is a celebrity like I showed you.  And he has

4    been for decades.  He is an established businessperson that

5    could be objective.  You could think of him as a community

6    elder.  He's charismatic and he's approachable.  He is a

7    problem solver.  That's what developers do.

8        So he got involved at the request of his friends who

9    were having a business dispute.  That is what the evidence

10   showed.

11       I also told you that you would hear about meetings

12   about certifications, meetings about audits, meetings in

13   Washington, D.C. with the senator, dinners and other meetings

14   where they claim this conspiracy was hatched.  And that you

15   would hear very little about Mr. Daibes.  That's what I said in

16   my opening statement.  And I told you that, for the most part,

17   Mr. Daibes was not present for those meetings.

18       Well, the evidence regarding certifications, meetings

19   audits, that came from Mr. Tate, Mr. McKinney and Dr. Sayed the

20   last witness, that had nothing do with Mr. Daibes or his

21   businesses.

22       You heard evidence regarding dinners and meetings with

23   Senator Menendez.  That largely came from surveillance

24   testimony, and the text messages and communications summarized

25   in Government Exhibit 1302.  That was the first and the longest

1   of the charts presented by the government.  The witness that

2   knew nothing about the investigation.

3           So let's look at Government Exhibit 1302.  The Egypt

4   chart.  You're going to have it.  It is single spaced, it's 97

5   pages long.  It's 1,272 lines of chart.  By my count, Fred

6   appears in only 17 of 97 pages.  80 single spaced pages in

7   which he does not appear.  About 80 percent of that document.

8   Fred appears in only 67 of 1,272 lines.

9           And let's talk about the meetings and dinners

10  regarding Egypt about which they presented evidence.  They

11  presented evidence to you regarding Egypt, about these meetings

12  and dinners in which Mr. Daibes for the most part did not

13  participate.

14          If he was such an integral part of this part of the

15  conspiracy as they've argued, wouldn't he have been at these

16  meetings and dinners?

17          Let's take a look at that.  Starts with February 3,

18  2018 at the Ani restaurant.  I won't show pictures of the

19  restaurant.  Trust me.  Who's present?  Nadine, Will Hana,

20  Mr. Aslanian.  No Fred Daibes.

21          Let's look at March 13 of 2018.  That's the meeting

22  down in Senator Menendez's office.  Who is there?  Nadine,

23  Senator Menendez, Mr. Hana, Major Shawky, Mr. Habib, Mr. Atia,

24  and Mr. Aslanian.  No Fred Daibes.

25          Let's look at May 6, 2018 at the Forno restaurant.

1  Nadine, Senator Menendez and Will Hana.  No Fred Daibes.

2        Let's look at May 18, 2018.  Il Villaggio.  Nadine,

3  Senator Menendez, Will Hana, and Major Shawky.  No Fred Daibes.

4        Let's look at June 30, 2018.  This is the Mr. Chow's

5  dinner we've heard so much about.  No Fred Daibes.

6        Let's look at July 9, 2018.  Here's one where Fred is

7  present.  This is the messages you will see he is at a

8  different table, so he's sort of like not even at the main

9  event.  He's only present for the possibility of a real estate

10  deal.  The possibility of a real estate deal.  But you've seen

11  no evidence that Mr. Daibes was involved in any real estate

12  deals with Egyptians.  And it certainly doesn't mean he was

13  involved in Will Hana's halal business.  That would be a very

14  unfair inference to make.

15        Let's go to July 25 of 2018.  In the senator's office,

16  Nadine, Will Hana and Egyptian delegation.  No Fred Daibes.

17        Let's go to October 2nd, 2018.  At the Egyptian

18  embassy and later in Morton's Steakhouse.  Nadine, Senator

19  Menendez, Mr. Hana, Mr. Helmy.  No Fred Daibes.

20        Let's go to January 30 of 2019.  That's at the

21  Egyptian embassy.  Nadine, Will Hana, Mr. Helmy.  Again, no

22  Fred Daibes.

23        May 21, 2019.  At the Hart Senate Office Building.

24  Nadine, Senator Menendez, Mr. Hana, Mr. Helmy.  No Fred Daibes.

25        Look at 9/5 and 9/21/2019.  These are dinners.  Fred

1    is at these dinners.  And as Mr. Lustberg was talking about,

2    what was discussed at these dinners?  You don't know.  There is

3    no evidence of what was discussed or that they involved

4    Mr. Daibes.  And again, no evidence that he was involved in any

5    real estate deals with the Egyptians.  Just that there were

6    talks.  Nothing to do with IS EG Halal.

7            Let's keep going.  October 8, 2020.  River Palm.

8    Nadine Menendez, Mr. Menendez, Mr. Helmy and Mai Abdelmaguid.

9    No Fred Daibes.

10           December 28, 2020.  Il Villaggio.  Nadine, Senator

11   Menendez, Mr. Helmy and Ms. Abdelmaguid again.  No Fred Daibes.

12           June 22 of 2021.  Washington, D.C. Mr. Menendez, other

13   United States senators, and Mr. Kamel.  No Fred Daibes.

14           October 15 of 2021.  This is the trip to Egypt.  Fred

15   didn't go on that trip.  Nadine, Senator Menendez, Mr. Kamel

16   and an unidentified female.  It was a meeting.  No Fred Daibes.

17           I told you that the government would not be able to

18   show you any corrupt intent by Mr. Daibes or any official

19   actions tied to any payments to Senator Menendez related to

20   Egypt.

21           And I'll ask you again, as I did earlier.  What did

22   Mr. Daibes give the senator related to Egypt?  Did he give him

23   gold?  Did he give him money?  Did he give him something else

24   of value?  If you don't know, then you're not convinced.  And

25   he's not guilty.

O7A3MEN6

1          Judge, I think this would be an appropriate time.

2          THE COURT:  Fine.  Thank you, Mr. De Castro.  And

3     we'll pick it up tomorrow.

4          Ladies and gentlemen, what we have left, as you know,

5     is the conclusion of Mr. De Castro's summation on behalf of

6     Mr. Daibes.  We then will have the government rebuttal

7     summation.  We then have my charge.  And then you will commence

8     your deliberations.

9          Enjoy the evening.  Don't discuss this.  Keep an open

10    mind.  See you tomorrow at, again, if you're here at 9:30,

11    we'll start.  Thank you.

12          (Jury excused)

13          THE COURT:  What's the projection of the government,

14    length of time for the government rebuttal?  Sir?

15          MR. RICHENTHAL:  I don't know yet.  But, my goal is

16    less is more.  So I would certainly try to do it in under two

17    hours.

18          THE COURT:  I'll see everybody at 9:30.

19          MR. MONTELEONI:  With apologies, I have an

20    application.

21          THE COURT:  Yes, sir.

22          MR. MONTELEONI:  So Mr. Lustberg referred in his

23    summation to the government not calling Elvis Parra or

24    Bienvenido Hernandez, as they certainly could have.  That is

25    they could have called witnesses from the bank issue with

O7A3MEN6

1    Mr. Fee.

2             We have then Mr. De Castro also again criticized the

3    exact same issue that the Court sustained an objection on about

4    the bringing out of evidence with the first witness in the

5    case.  If you remember his opening statement, he said I think

6    they'll lay out this evidence in the most prejudicial way

7    possible.  We put in our letter that he should not be making

8    statements criticizing our litigation tactics in that fashion.

9    We understood the Court granted that application.  Then he

10   criticized the very decision to present the physical evidence

11   seized by the searches in the beginning of the case saying they

12   started by shocking you, by sensationalizing the case.  They

13   present the recovery of money and things.

14            So, again, this is exactly the same type of improper

15   criticism of our litigation tactics.

16            In addition, obviously, to Mr. Fee choosing to close

17   out his summation by characterizing us as overzealous

18   prosecutors.

19            Ultimately we think that it is appropriate to remind

20   the jury, yet again, that the government is not on trial.  And

21   that uncalled witnesses were equally available to both sides.

22            THE COURT:  Any response?  I think those are rather

23   perfectly acceptable.

24            MR. LUSTBERG:  I'd like to look.  I think what I said,

25   I think focused on evidence or lack of evidence.  And I didn't,

O7A3MEN6

1    I wasn't -- so I think that was an appropriate comment.  But

2    let me take a look at the transcript.  You won't do anything

3    until tomorrow morning anyway.

4                THE COURT:  No.

5                MR. DE CASTRO:  Judge, my initial reaction is

6    number 1, what I mentioned regarding shocking was, first of

7    all, the order in which they presented evidence.  The order in

8    which they presented it.  In order for the jury to make

9    particular inferences and to have particular beliefs in their

10   mind.  I'm allowed to comment on that.  Just the order they

11   presented it, the way they presented it.  They put a chart up.

12   I can't say they put a chart up?

13               THE COURT:  Yes, you can, sir.

14               MR. DE CASTRO:  I don't think I crossed any line.  I

15   knew what the Court's ruling was earlier on and I stuck to it.

16               THE COURT:  All right.  I want the parties to go

17   through the testimony, tell me tomorrow what it is you want me

18   to see.

19               It seems to me that a charge in light of the

20   references to overzealous prosecutors and most prejudicial way

21   possible phrases, that's something on the lines of the

22   government isn't on trial.  And the uncalled witnesses charge

23   again is appropriate.  Rather pro forma.  But you'll send me

24   the transcript references that you want.

25               In fact, if you wish, send the page references to my

O7A3MEN6

1  chambers overnight.  I'll look at them before we take the bench

2  in the morning.

3          MR. DE CASTRO:  Judge, one thing.  I'll look at it as

4  well.  But, the comment regarding overzealous, I didn't make

5  that comment.  I didn't make any comments about missing

6  witnesses.  So if you are going to give an instruction about

7  that, I would ask you not do it in the middle of my summation.

8  It had nothing to do with anything I said.  Maybe do it after.

9          THE COURT:  I hear you.  Send me the pages and I'll

10 take a look at them.  Thank you.  9:30 in the morning.

11          (Adjourned to July 11, 2024, at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25