O7bWmen1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                          23 Cr. 490 (SHS)

5   ROBERT MENENDEZ,
    WAEL HANA, a/k/a "Will Hana,"
6   and FRED DAIBES,

7               Defendants.
                                           Trial
8   ------------------------------x

9                                          New York, N.Y.
                                           July 11, 2024
10                                         10:00 a.m.

11

12  Before:

13                      HON. SIDNEY H. STEIN,

14                                         District Judge
15                                         -and a Jury-

16                      APPEARANCES

17  DAMIAN WILLIAMS
          United States Attorney for the
18        Southern District of New York
    BY:  PAUL M. MONTELEONI
19        DANIEL C. RICHENTHAL
          ELI J. MARK
20        LARA E. POMERANTZ
          CATHERINE E. GHOSH
21        Assistant United States Attorneys
          -and-
22        CHRISTINA A. CLARK
          National Security Division

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O7bWmen1

                           APPEARANCES CONTINUED


PAUL HASTINGS LLP
        Attorneys for Defendant Menendez
BY:  ADAM FEE
     AVI WEITZMAN
     ROBERT D. LUSKIN
     RITA FISHMAN




GIBBONS, P.C.
        Attorneys for Defendant Hana
BY:  LAWRENCE S. LUSTBERG
     ANNE M. COLLART
     CHRISTINA LaBRUNO
     ANDREW J. MARINO
     RICARDO SOLANO, Jr.
     ELENA CICOGNANI
     JESSICA L. GUARRACINO



CESAR DE CASTRO
SETH H. AGATA
SHANNON M. McMANUS
        Attorneys for Defendant Daibes



Also Present:  Marwan Abdel-Rahman
               Bachar Alhalabi
               Rodina Mikhail
               Interpreters (Arabic)

               Rachel Wechsler
               Connor Hamill
               Braden Florczyk
               Paralegal Specialists, U.S. Attorney's Office


               Justin Kelly, DOAR

O7bWmen1

```
 1                    (Trial resumed; jury not present)

 2                    THE COURT:  Good morning.

 3                    Mr. Weitzman, I understand you have something to

 4       raise.

 5                    MR. WEITZMAN:  Yes, your Honor.

 6                    THE COURT:  All right.  Come to sidebar.

 7                    You may be seated in the courtroom.

 8                    (At sidebar)

 9                    THE COURT:  Good morning, everybody.

10                    MR. WEITZMAN:  Good morning, your Honor.

11                    Yesterday during summations, we witnessed some

12       concerning behavior by two jurors.  In particular, jurors No. 8

13       and 9 were passing notes to each other during Mr. Fee's

14       summation, and he was able to see that directly from where he

15       was standing.  I and my client also saw that they were showing

16       notes on their notepad that they were taking to each other.

17                    It raises a concern with us that jurors 8 and 9 are

18       making substantive comments akin to deliberations, contrary to

19       your instructions.  What we're requesting, your Honor -- we're

20       not asking for a curative instruction yet because I don't think

21       we know anything yet.  But we are requesting that there be an

22       inquiry by your Honor with these two jurors.

23                    THE COURT:  OK.  And what would you like that inquiry

24       to be?  That is, I take it, I've been informed that you've been

25       passing notes back and forth, and you'll remember my
```

O7bWmen1

1    instructions that you're not to begin deliberations in any

2    fashion.  Can you tell me what those notes are about?

3                MR. WEITZMAN:  Yes.

4                THE COURT:  Are they just personal asides, or do they

5    deal with the substance of this trial?  I think that would be

6    the line of inquiry.

7                MR. WEITZMAN:  So, the first thing I would say is I

8    think our preference would be that it not be "I was informed,"

9    because that rats out one party or another.

10               THE COURT:  No, no.

11               MR. WEITZMAN:  I think just I've observed or --

12               THE COURT:  But I haven't.

13               MR. FEE:  It has come to my attention?  Mr. Monteleoni

14   told me.

15               MR. MONTELEONI:  How did I get involved in this?  When

16   do I get a chance to be heard?

17               THE COURT:  This will be on the record, so please,

18   gentlemen.

19               MR. WEITZMAN:  It has come to my attention, I think,

20   works.

21               THE COURT:  And what do the parties think is the way I

22   should describe the acceptable notes versus the unacceptable?

23   The unacceptable clearly is commenting on the substance of the

24   trial.

25               MR. WEITZMAN:  I guess the question is whether you

1  should describe it at all in those two fashions or whether you

2  should just leave it open-ended -- would you share with me what

3  notes you were sharing with each other, both in your notepads

4  and passing back and forth?

5        MR. MONTELEONI:  Your Honor, we oppose --

6        THE COURT:  Wait a minute.  On the notepads, they're

7  certainly entitled to take notes.

8        MR. WEITZMAN:  But what they were doing was showing

9  their notepads to each other, showing the notes that they were

10  writing.

11        If I may just say one thing, your Honor?

12        THE COURT:  Yes.

13        MR. WEITZMAN:  The reason we didn't raise this

14  yesterday is because we wanted to research this overnight, and

15  the case is *United States v. Hayne*s, 729 F.3d 178 (2d Cir.

16  2013).  And the court said that there's a duty to inquire upon

17  a credible allegation that jurors may be deliberating in

18  advance of the jury instructions, contrary to the court's

19  permission.

20        THE COURT:  Yes.  Mr. Monteleoni.

21        MR. MONTELEONI:  Yes.

22        So, we oppose an inquiry at this time because, though

23  Mr. -- we didn't understand this until we came into court a few

24  minutes ago so we haven't had the benefit of looking at that

25  case.  We understand that, obviously, any inquiry into the

internal conduct of the jury itself raises significant

questions about the integrity of the jury, and there might be

circumstances where that's appropriate, but those circumstances

are very carefully limited, and we request time to consult with

our appeals unit about the possible implications of this.  We

don't think that any of this would have to happen until, any

inquiry would have to happen before the jury begins

deliberating.

THE COURT:  I think that's right.

MR. MONTELEONI:  Obviously we have no objection if the

Court wishes to give a reminder, not particularly prompted by

anything, that the jurors' notes are intended to be for their

own personal use and that they're not supposed to show notes or

anything like that.  But we want to make sure that we

understand that conducting any sort of inquiry and the form of

the inquiry is not going to cause a problem with the integrity

of the jury, if there is one.

THE COURT:  Yes.  I think that makes sense.  If anyone

has additional cases, let me know, let my deputy know.  We'll

check out that case.  I think we can wait for your appeals unit

to weigh in.

MR. WEITZMAN:  We don't have an objection to that.  We

don't think it needs to be in the middle of anybody's closing.

THE COURT:  But I will tell them, I remind you that

notes are for your own use only, and I may remind them as to

O7bWmen1

1    why I said that, because if it's written, then therefore it's
2    true.  But that's not necessarily true.  And I'll also tell
3    them that their deliberations are not to begin until I tell
4    them.
5        All right.  Well, thank you for bringing that to my
6    attention.  I actually did not see that.
7        MR. WEITZMAN:  Thank you, your Honor.
8        THE COURT:  Assuming it did happen.
9        MR. WEITZMAN:  Yes.
10        THE COURT:  The jury is here.
11        (In open court)
12        THE COURT:  The jury is here.  We'll bring the jury
13    in.
14        What's your estimate, Mr. De Castro?
15        MR de CASTRO:  30 to 40 minutes, probably 30.
16        THE COURT:  Thank you.
17        Is the estimate for the government still about two
18    hours?
19        We'll find out.
20        (Jury present)
21        THE COURT:  Please be seated in the courtroom.
22        Ladies and gentlemen, we're about to have Mr. De
23    Castro continue and conclude with his summation on behalf of
24    Mr. Daibes, but I did want to remind you that for those of you
25    who are taking notes, the notes are for your own use only.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    They are not to be shared with others.  They are not to be

2    passed between yourselves, and you know why I told you that.

3    Because the research -- I don't know whether it's sociological

4    or psychological research, whatever it is -- shows that people

5    tend to put more than trust and faith in something that's

6    written down.  So we don't want a juror going to the rest of

7    the jury and saying, I know this is what that person said

8    during trial; I wrote it down.

9            As one of the lawyers said, you'll have access to and

10   the ability to get any of the transcripts during your

11   deliberations.  So I repeat that the notes are for your use

12   only, and they're not to be shown to others and passed around.

13           In line with that, your deliberations should not

14   begin -- must not begin -- until after these summations are

15   concluded and after I've given you my charge on the law, and

16   then I will tell you to deliberate.  But don't talk amongst

17   yourselves -- in groups of two or everyone; it doesn't matter.

18   Don't talk about what you've heard or seen during this trial,

19   and you know all of that already.

20           Mr. De Castro, you're concluding the remainder of your

21   summation, sir.  Welcome.

22           MR de CASTRO:  Thank you, Judge.

23           Good morning, everybody.

24           Yesterday, we talked about, we finished up talking

25   about Egypt.  I'm going to turn now to the District of New

Jersey part of the case. And like Egypt, everything I said in my opening statement relating to this part of the case, involving the appointment of the United States Attorney for the District of New Jersey, came to pass.

What did the evidence show as it related to this chapter of the case?

Before 2018, Fred was under investigation by the United States Attorney's Office for the District of New Jersey. It was related to a bank in which he was a majority shareholder. In 2018, his lawyer at the time made a presentation to the U.S. Attorney's Office, the line prosecutors -- I think you heard that during the trial -- the people handling the case, as to why they shouldn't bring the case. They were unsuccessful, and in 2018, Mr. Daibes was charged by that office.

Now, around that time, Philip Sellinger, a lawyer in private practice, who at one point wanted to become the U.S. Attorney for New Jersey, was golfing with his long-time friend, Senator Menendez. It was a social meeting. Mr. Sellinger had been a big supporter of Senator Menendez through fund-raisers and working on his campaigns over the years. They were golfing, not working. They were socializing, not working.

Yes, business sometimes gets done on the golf course, but Sellinger doesn't say that that's what this was. They were having a social outing. And Bob Menendez said he was

O7bWmen1

 1    frustrated with how the U.S. Attorney's Office was treating his

 2    friend, Fred Daibes.  Nothing more than a friend venting

 3    frustration about how he perceived his friend was being

 4    treated.  And at the time who was Philip Sellinger?  I said it

 5    before.  He was a person in private practice.  He was a

 6    partner, a managing partner at Greenberg Traurig.

 7            Fast forward to 2020, when Joe Biden is elected.

 8    Years have gone by.  Philip Sellinger knows that there will be

 9    an opening for the U.S. Attorney position in the District of

10    New Jersey.  Mr. Sellinger reaches out to Senator Menendez to

11    express his interest, as do others.  Now, it started with a

12    meeting in December of 2021 at the senator's office in D.C.

13    between Philip Sellinger and Senator Menendez.  It was an

14    interview of sorts, a discussion of Mr. Sellinger's potential

15    nomination to be U.S. Attorney.  They discussed Mr. Sellinger's

16    priorities, his vision, his leadership views, should he become

17    nominated and ultimately get the job.  Nominated, then the

18    White House has to decide and then you get the job, after the

19    Senate acts on your nomination.

20            They discussed all those priorities, and that was the

21    focus of the meeting.  And at the end, Senator Menendez

22    mentioned, according to Mr. Sellinger -- right -- what he had

23    already mentioned years ago about his long-time friend,

24    Mr. Daibes, and how he felt that Fred was being treated

25    unfairly by the U.S. Attorney's Office.  After all, the case,

O7bWmen1

1    two years later, was still open.

2              Mr. Sellinger did not feel like the senator had done

3    anything improper.  He didn't feel pressured in any way.  He

4    didn't feel that he was being told that his nomination was

5    conditioned on looking into Fred's case, and you know that

6    because Mr. Sellinger told you that.  You also know that

7    because if that was the case, Mr. Sellinger would never call

8    Senator Menendez a couple days later and tell him that he

9    realized he might have a potential conflict with Mr. Daibes.

10   He wouldn't have told him that he may be recused from the

11   Daibes matter because he had remembered that he had worked on a

12   civil case that was tangentially related and adverse to Fred.

13             What was Senator Menendez's response?  Nothing.  No

14   reaction.  Nothing big, nothing memorable to Mr. Sellinger.  No

15   further discussion.  He didn't try to ask him to ignore this

16   potential conflict or to look the other way.  He didn't say

17   anything like:  That's too bad, Phil.  Maybe there are other

18   positions in government for you.

19             He didn't try and change his mind whatsoever.

20             After this meeting with Philip Sellinger, Senator

21   Menendez was still determining who to present to President

22   Biden for the position.  All senators received guidance

23   regarding what kind of candidates they were looking for.  The

24   White House was strongly urging senators to take into

25   consideration diversity, the need for diversity in their

O7bWmen1

1    selections.  This is the White House memo.  You see it in

2    Government Exhibit A-114PH.  Paragraph 2 here is zoomed in for

3    you.  You can read the whole thing, but I'll highlight for you

4    what it says:  President Biden is eager to nominate individuals

5    who reflect the best of America and who look like America.

6             And what does the evidence show?

7             Rather than nominate a qualified white male to the

8    position -- same old, same old -- Senator Menendez chose to

9    make a potentially historic nomination, one that was in line

10   with the White House's guidance.  He put forward Esther Suarez

11   for consideration by the White House.

12            Why did he do that?  Not only because of the White

13   House memo but also at the urging of his oldest friend and the

14   best man at his wedding, Donald Scarinci.  Esther Suarez had

15   worked for Mr. Scarinci in the past, and he was a strong

16   supporter of Ms. Suarez.  And Ms. Suarez was a qualified

17   choice.  She was the Hudson County prosecutor.  She led that

18   entire office of prosecutors.  She had previously been a judge.

19   She had already gone through a vigorous vetting process in the

20   New Jersey State Senate.  She was endorsed by the Hudson County

21   Prosecutors Association, and she was Latina.

22            And if Mr. Daibes's case was so important to Senator

23   Menendez and it was driving this entire decision, where is the

24   evidence that Senator Menendez or anyone spoke to Ms. Suarez

25   about the Daibes case?  There is none.  But her nomination ran

O7bWmen1

1    into roadblocks.  The White House was not going to approve her

2    for nomination.

3          So we're back to Mr. Sellinger as the potential

4    nominee, someone that didn't check the diversity box, that's

5    for sure, but he was qualified and he would probably survive

6    vetting.  He was also someone who believed in having a diverse

7    power structure at the U.S. Attorney's Office.  He testified to

8    that.  And that was important.

9          And that brings us to the most important evidence in

10   this chapter of the case, the claim that Mr. Sellinger told

11   Mr. Soliman that he would not have to recuse himself.  You saw

12   a slide that Mr. Fee put up during his summation regarding

13   this, so I'm going to talk to you a little bit about this

14   communication.

15         Without that fact, that testimony from Mr. Soliman,

16   they have no evidence that Mr. Sellinger was recommended on the

17   basis of whether he would be able to look at the Daibes case.

18   This piece of the case completely turns on Mr. Soliman's

19   testimony and his message to the senator.  But keep in mind

20   that it's directly at odds with what Mr. Sellinger told you.

21   But I'm confident that you're going to use your common sense to

22   evaluate this contradictory evidence.

23         And how are you going to evaluate it?

24         It makes no sense that Phil Sellinger told Mr. Soliman

25   that he was not going to be recused.  Therefore, that message

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7bWmen1

1   that we've heard so much about and you saw and its

2   interpretation by the government that you will be comfortable

3   with the answer and the call Soliman claimed to have had with

4   the senator is simply wrong.

5        Why doesn't it make sense and why was Soliman

6   mistaken?  How would Sellinger have checked with the Department

7   of Justice regarding recusal when he wasn't even the nominee

8   yet?  He didn't work at the U.S. Attorney's Office.  He was

9   still in private practice.  And there was no testimony that

10  prior to him being nominated he contacted anyone at the

11  Department of Justice regarding conflicts.  And the senator

12  knew this because Mr. Sellinger told you that he explained, as

13  he testified, he explained the reason and process to the

14  senator on their December call, explained that he may have to

15  recuse if he became part of the Department of Justice.

16       Remember, it's a selection to nominate.  That goes to

17  President Biden.  President Biden decides.  Then it goes -- if

18  he approves it, then it goes to the Senate to be considered.

19  You don't have the job.  It's you have the possibility of a

20  job.  And so he wouldn't have said that to him, and that's --

21  and on this issue, Mr. Soliman was simply not a reliable

22  witness.  Not because he's a bad person or he was intentionally

23  lying to you.  I'm not saying that.  Certain parts of his

24  testimony just didn't make sense, and he seems to have been

25  just mistaken and unclear on timing.  After all, he was

O7bWmen1

1    testifying about things that happened years ago, and he told

2    you that he works seven days a week and spends a great deal of

3    time on the phone.  That's why he doesn't remember much about

4    specifics.  Soliman told you it could be recusal or just about

5    Mr. Sellinger's background.  The timing tells you it was

6    background, so the whole premise on the recusal piece is wrong.

7            So, the senator called Mr. Sellinger to congratulate

8    him.  He was going to recommend him to the president.  Senator

9    Menendez doesn't remind him about Daibes and their prior

10   conversations.  He doesn't say I understand from Soliman that

11   you're not going to recuse yourself.  You didn't hear any

12   testimony like that, because Soliman's testimony about that is

13   simply not believable.  It's irreconcilable with

14   Mr. Sellinger's testimony and recollection.  And that makes

15   sense.  Why would Sellinger bring up that conflict?  He would

16   have only checked if he got the job, he got through the vetting

17   process, he got nominated and then he was approved by the

18   Senate, and the Senator Menendez knows that.  Sellinger, after

19   all, is a sworn member of the Department of Justice.  He has no

20   reason to lie to you.  He would have every reason to remember

21   such an important conversation.

22           You also heard evidence regarding the lunch

23   Mr. Soliman had with Mr. Sellinger in which the senator is

24   alleged to have asked Mr. Soliman to find out why Sellinger had

25   been recused on the Daibes matter.  Remember, Soliman had

O7bWmen1

1   called Mr. Sellinger about a friend prior to that lunch.  He

2   called him about a friend of his who was a victim of identity

3   theft.  He had wanted to talk to him about that.  He testified

4   to that.  They set up lunch to catch up.  Mr. Soliman told

5   Menendez that he was having lunch with Sellinger.  Menendez

6   wasn't asking him to go see Phil Sellinger.  You didn't hear

7   any of that testimony.  He didn't say find an excuse to meet

8   with Paul -- Phil, sorry.  Sellinger would've had no idea what

9   Soliman would want to talk to him about at that point, other

10  than his friend who was the victim of identity theft.  And

11  after all, Mr. Sellinger warned him, as he had warned many

12  others that were connected to public officials, that he was

13  forced to distance himself from them and couldn't talk about

14  any matters pending in his office.  But remember this: that no

15  one -- no one -- testified at all in this trial that they felt

16  Mr. Menendez ever asked them to do anything improper.

17       Now, let me take a minute to say something about the

18  phone-call evidence that you've seen.  You've seen a lot of it

19  on the charts, and I submit to you that the government wants

20  you to speculate and assume as to what Mr. Daibes and Senator

21  Menendez spoke about over the phone.  I know Mr. Lustberg

22  talked to you a little bit about this yesterday.  But in

23  reality, the government doesn't know any more about what was

24  discussed than you do.  They want you to assume, speculate,

25  that when Senator Menendez called Mr. Daibes they musk talking

O7bWmen1

about something illicit.  But where is the proof of that?  It's

certainly not in the evidence.  There was certainly no text

about the substance of their conversations after and certainly

nothing criminal.

The government presented evidence that they were often

communicating over encrypted messaging apps.  Right?  Like

WhatsApp, Signal, and they pointed it out.  It's in the charts.

It's in the charts for a reason.  What's that reason?  It's an

argument.  It's an argument that they're using encrypted apps

to hide.  Remember that one bullet point?  Secrecy.  OK?  These

apps are designed to protect one's privacy, and WhatsApp and

Signal are used widely.  Witnesses have testified to that.  It

doesn't mean anything.

And if they were speaking and texting using encrypted

apps, shouldn't they feel comfortable and open to communicate

everything about a bribery scheme?  Where is the message

saying:  I'm paying you to make my case go away; where are my

results?  Where is that message?

Mr. Monteleoni said, in his summation, pointing to a

record of a phone call between Fred Daibes and Robert Menendez,

this was him telling Daibes that he's trying to influence the

case.  That's the promise of the official act.

Well, is he, is the government referring to a

recording or something?  Where is the testimony about the words

spoken in that call?  There isn't, and that's because they want

O7bWmen1

1    you to assume it.  They want you to fill in the gaps.

2              So what happened with Mr. Daibes's case?

3              It was handled in the ordinary course.  Mr. Sellinger

4    was recused.  Mr. Khanna was in charge, and Mr. Daibes's

5    lawyers worked hard and advocated for a resolution of the case

6    short of trial.

7              Did Mr. Menendez know what was going on in

8    Mr. Daibes's case?  Of course.  He certainly knew what was

9    happening with his friend of 40 years.  But he did not cross

10   any lines.  Mr. Menendez did not speak further to Mr.

11   Sellinger.  Mr. Menendez did not speak to Mr. Khanna about the

12   Daibes case at all.  The matter was handled and resolved on the

13   merits between the U.S. Attorney's Office and Mr. Daibes.  They

14   resolved their matter based on the strengths and weaknesses of

15   that case, just like any other criminal case.  Mr. Daibes

16   agreed to plead guilty with the promise of a sentence of

17   probation.  Menendez had nothing to do with the disposition.

18             If Mr. Daibes had bribed Mr. Menendez to make sure

19   things had gotten done or fixed on his criminal case, why would

20   the senator talk to Mr. Daibes's lawyer and admonish him for

21   not being aggressive enough?  There's a stipulation in evidence

22   that the government pointed to in their summation, and you'll

23   have it.  Why would Senator Menendez want to talk to

24   Mr. Daibes's lawyer at all?  You have to ask yourselves these

25   kinds of questions.  If Mr. Daibes had bribed Senator Menendez,

O7bWmen1

1    wouldn't the call be coming from Fred to Senator Menendez,

2    saying, hey, I paid you to make this go away, it isn't going

3    away?

4              Why would there be any conversations between

5    Mr. Menendez and Mr. Daibes's counsel?  It doesn't make any

6    sense.

7              Now, in my opening statement, I told you to listen to

8    the evidence related to this part of the case and ask

9    yourselves if Mr. Daibes paid the senator, what did he pay for?

10   What benefit did he actually receive?  And were the results

11   consistent with a bribe?  Why would Mr. Daibes, a friend of

12   more than 30 years, have to bribe his friend at all?

13             As I said earlier, everything I said about this part

14   of the case in my opening statement has come to pass.  I told

15   you that there would be no evidence that the senator influenced

16   or pressured prosecutors in New Jersey to treat Mr. Daibes more

17   favorable than anyone else.  There's been no evidence of that.

18             I told you that the evidence would show that

19   Mr. Daibes's New Jersey case was handled and is still being

20   handled like any other case.  And that is what the evidence

21   showed.

22             I told you at most the evidence would show that

23   Senator Menendez was concerned about his friend of over 30

24   years like anyone would be, and that is what the evidence

25   showed.

O7bWmen1

```
 1              I told you that the government would not be able to
 2     show you any corrupt intent by Mr. Daibes or any official
 3     actions tied to any payment to Senator Menendez relating to the
 4     U.S. Attorney's Office part of the case.
 5              And I'll ask again, as I asked earlier yesterday, what
 6     does the government claim Mr. Daibes gave the senator to
 7     intervene in his District of New Jersey case?  Did he give him
 8     gold?  Did he give him cash?  Did he give him something else of
 9     value?  If you don't know, then you are not convinced, and he
10     is not guilty.
11              Now, finally, to the last chapter or part of the case
12     in which Mr. Daibes is charged, and that's the Qatar part of
13     the case.  Like the other parts of the case, everything I said
14     in my opening has also come to pass.  I told you that the
15     evidence would show that the senator made an introduction.
16     That's in the evidence, and you can see it.  Nothing secretive
17     about it, a message in which he provides Mr. Daibes's contact
18     information.  Take a look at the introduction.  It's in
19     evidence.  It's Government Exhibit A112-PH1.  He knows that
20     Mr. Daibes needs financing for a huge project in his state, and
21     he was told that the Qataris were looking for an investment
22     that would bring many jobs and opportunities and tax dollars to
23     New Jersey.  Senator Menendez introduced Mr. Daibes to a member
24     of the Qatari royal family that he learned was interested in
25     making investments in New Jersey, the state that he has
```

O7bWmen1

1    represented in the U.S. Congress for 31 years and as a senator

2    since 2006.  He made an introduction.  That's not a crime.

3              I also told you in my opening that the evidence would

4    show that the sultan then turned it over to the sultan's

5    investment team and Mr. Daibes turned it over to Daibes's

6    investment team.  And that's what the evidence showed.  The

7    sultan was represented by an investment company called Heritage

8    Advisors.  Heritage employees are based in London.  A couple of

9    them are Shaun Doherty and Andrew Longmate.

10             The evidence showed that the sultan's and Daibes's

11   team shared information over eight months, and Heritage made a

12   decision to invest based on nothing but the results of their

13   due diligence.  Nothing more.  There's no evidence that the

14   decision to invest or continue to be in business with

15   Mr. Daibes was the result of any involvement by the senator

16   other than that introduction.  You can see in the evidence the

17   due diligence that went back and forth between them.

18             Now, why would they do any of that if they really just

19   wanted a U.S. senator in their camp?  Invest tens of millions

20   and potentially hundreds of millions of dollars just to have

21   the support of a senator.  The Qataris didn't need any more

22   praise from the U.S. government, and they certainly weren't

23   going to trade it for hundreds of millions in investment in

24   Mr. Daibes's real estate development in New Jersey.  The

25   Qataris already permitted the U.S. to have the largest U.S. Air

O7bWmen1

1    Force base in the Middle East in their country.

2          Take a look at the evidence related to the due

3    diligence and the timeline of the deal.  It shows you that the

4    parties engaged in the normal due diligence you would expect to

5    see in any large real estate transaction.  Nothing criminal.

6    You can certainly look at the government's chart, but look at

7    the documents I put up when I briefly cross-examined Mr. Van

8    Wie on the chart as well as other documents that are in

9    evidence.  You can look at the letter of intent at Government

10   Exhibit 4F-17.  But make sure to also look at the work done

11   leading up to the signing of that letter of intent in May of

12   2022.

13         Look at Government Exhibit 4F-15 and Government

14   Exhibit D312, where the Heritage team communicates with the

15   Daibes team about how they've hired counsel in connection with

16   the deal to go forward; that their team has looked over all the

17   numbers and has decided to go forward.

18         Look at Government Exhibit 4F-31.  At the bottom of

19   that, it has the deck regarding the development.  You can go

20   through all the specifications of this massive development

21   project.  And ask yourselves was this the result of some

22   bribery or the result of aboveboard due diligence?  There's no

23   secrecy here.

24         Take a look at Government Exhibit 4F-7.  These were

25   internal Heritage text messages, exchanges with Al Thawadi,

O7bWmen1

1    where Al Thawadi tells Heritage to meet with Fred to keep the

2    momentum going.  The Qataris were excited about the investment

3    and the progress that's being made.  You don't see any internal

4    emails or texts talking about Senator Menendez or talking about

5    Fred's connections to Senator Menendez, because those have

6    nothing to do with this deal.

7         Take a look at Government Exhibit 4F-33.  This is a

8    memo from the sultan's due diligence, his adviser team to the

9    sultan regarding the deal with Mr. Daibes.  It tells you why

10   they're investing with Mr. Daibes.  It couldn't be clearer.

11   And it also couldn't be clearer that Senator Menendez has

12   nothing to do with it.

13        If you look at paragraph 2, which is, I think, pulled

14   out here for you:

15        The property lies just over the Hudson River from

16   Manhattan, lying adjacent to the lower one-third of Central

17   Park as you look at Manhattan, with exciting opportunities to

18   develop a mixed-use scheme of up a four 60-plus story towers of

19   mixed-use residential, retail and F&B.  With an intended ferry

20   service to Manhattan the development will, if successful, be a

21   landmark first-of-its-kind development in Bergen County, highly

22   visible from Manhattan.

23        And the next page, the last two paragraphs, describes

24   how serious they were.  After making a huge payment in

25   connection with the letter of intent, they engage Greenberg

O7bWmen1

1    Traurig, a leader in New York real estate law, to represent

2    them in the project.  Heritage entering into the deal with

3    Mr. Daibes had nothing to do with bribery and everything to do

4    with the recognition that the investment would be extremely

5    lucrative for them.  And it goes without saying that the

6    development would bring jobs and tremendous tax revenues to

7    Edgewater, New Jersey.

8            There's no evidence of bribery.  In fact, no witnesses

9    with firsthand knowledge of this project could testify and tie

10   this investment to any bribery scheme.  And the official acts

11   the government claims Mr. Daibes paid for had no effect and

12   were not connected in any way to Mr. Daibes's project.

13   Certainly the senator issued press releases regarding the

14   country of Qatar.  It was not about this investment or any

15   investments in New Jersey.  The government pointed to advanced

16   copy that Mr. Daibes received of a press release.  Take a look

17   at how advanced a copy it is.  It's the same day.

18           (Continued on next page)

19

20

21

22

23

24

25

1          MR. DE CASTRO:  This is the same day.  Then there was

2     as resolutions sponsored by two other senators where the entire

3     Senate thanked Qatar for its support getting our troops out of

4     Afghanistan.  This had nothing doing with Mr. Daibes' project.

5     The United States government was thanking the Qataris for

6     helping bring members of our Armed Forces home safe.  And like,

7     Egypt, you will have no way of connecting any gold, cash, or

8     things of value going to the senator for any official actions

9     related to Qatar.

10         I'll show you and ask again.  Did the evidence show

11    when this gold bar was given to Nadine or Bob Menendez?  Did

12    the evidence show whether this gold bar was given to Nadine or

13    Bob Menendez before or after Mr. Daibes was introduced to the

14    Qataris?  Did the evidence show whether this gold bar was given

15    to Nadine or Bob Menendez before or after Mr. Daibes and the

16    Qataris finished their due diligence and signed a letter of

17    intent?  Or isn't it just as likely that it was a gift to

18    cultivate friendship or a gift to build goodwill.

19         If you don't know, then you are not convinced, and he

20    is not guilty.

21         Did the evidence show when the envelope was given to

22    Nadine or Bob Menendez?  Did the evidence show if this envelope

23    was given to Nadine or Bob Menendez before or after Mr. Daibes

24    was introduced to the Qataris?  Did the evidence show whether

25    this envelope was given to Nadine or Bob Menendez before or

after Mr. Daibes and the Qataris finished that due diligence
and signed a letter of intent?  Or is it just as likely that it
was a gift to cultivate friendship or a gift to build goodwill.

You don't know, then you are not convinced, and he's
not guilty.

One second.  Let me grab a water.

Now, what was this gold and cash for?  You heard from
John Moldovan that Mr. Daibes is known for his generosity.  You
heard from Jamela Maali that Fred Daibes is known for his
generosity.  You heard from Vasken Khorozian that Mr. Daibes is
known for his generosity.

The government wants you to make unfair inferences.
But how about some fair inferences?  Senator Menendez and
Nadine Arslanian got engaged in 2019.  What was Mr. Daibes'
engagement gift?  They got married in 2020.  It was a small
COVID wedding.  Mr. Daibes attended.  What was Fred's wedding
gift?  Do you think this extremely generous person didn't give
a gift on either occasion?

As I said earlier yesterday, he gave Mr. Moldovan, a
friend of his nephew, $25,000.  How much more would he give a
friend for his wedding?

And remember, Vasken Khorozian testified that people
from the Middle East give gold as gifts at weddings, not cash.

You heard that the senator and Nadine were looking to
move.  They had a bank value the property.  We already know

1    Mr. Daibes wanted the property and Nadine texted Jose Uribe

2    about it.

3         Exhibit B-209-11.  Fred says Fred would love the

4    property.  That's Nadine texting.

5         You remember that Mr. Daibes even tried to buy her

6    mortgage.  He is a developer and knows a good investment.

7         Look again at the envelope, again with Mr. Daibes'

8    company name.  On the screen.  First, you are bribing someone,

9    are you going to put the payment in your own envelope?  Second,

10   look at the handwriting on the back of the Daibes Enterprise

11   envelope.  4 times 1850.  Does that look like the price of an

12   ounce of gold?

13        Look at the slide to the right.  22 times 1855.

14        Nadine had family gold, gold coins.  Were all of those

15   coins on her father's inventory recovered?  You also don't have

16   an up-to-date inventory of what's in Mr. Daibes' safe today.

17        Instead of the cash found in Nadine's safe being given

18   to buy her house or buy her gold, they want you to conclude

19   that Mr. Daibes was bribing Senator Menendez, his friend of 30

20   plus years, through his new wife.  Or maybe through his

21   girlfriend because, remember, the government doesn't know when

22   this cash and gold was given.  If you don't know, then you're

23   not convinced, and he's not guilty.

24        I want to take a moment to discuss with you a part of

25   the case that Mr. Daibes was not charged in.  Was not charged

in.  The chapter relating to the prosecution of Elvis Parra by

the New Jersey Attorney General's office.  Why would I want to

talk about that?  Why I would want to talk about a case that

doesn't affect Mr. Daibes?  The reason is because even though

the government failed to prove its case with respect to that

part of the case for all the reasons Mr. Fee and Mr. Lustberg

argued, that part of the case represents the only part of this

case in which the government presented evidence to you

regarding what an actual payment was for.  In that part of the

case, they presented an alleged insider to you, a cooperating

witness, someone who could try to convince you that he,

Mr. Uribe, gave Nadine Menendez a car for action by the

senator.  Someone who could actually testify about the

circumstances of him providing a car.  Someone who could try

and convince you that he knew others gave money, cash to Nadine

for the senator to take some action.  They also showed you

records of Nadine Menendez depositing money that they say came

from Mr. Uribe.  You saw that in Mr. Monteleoni's summation.

Now contrast that with the other parts of the case.

The parts in which Mr. Daibes is charged.  No insider.  No one

to claim they were present when Mr. Daibes gave Nadine or the

senator things of value.  No one to claim why Mr. Daibes gave

things to Nadine or the senator.  No bank records.  They don't

have anyone like Mr. Uribe to try and make those connections

for you.

1           And that's why in opening and today, I say to you

2      that's why they must rely on assumptions, guesses, hunches,

3      presumptions, suspicions, suppositions, and unfair inferences.

4      They simply cannot give you that information for Egypt, Qatar,

5      or the District of New Jersey parts of their case, because they

6      don't have the evidence.

7           And your job is to hold them to their burden.  Hold

8      them to the burden of proving each and every element of each

9      and every crime with competent evidence.

10          Let's talk a little bit about the law.  As I said

11     earlier and in my opening statement as well, the government can

12     prove some quids as they relate to Mr. Daibes.  I told you from

13     the start you would not see us challenging any of Daibes'

14     fingerprints or DNA found on evidence, and sure enough we

15     didn't.  Those hours and hours of testimony about fingerprints

16     and DNA, not necessary for us.  We weren't challenging it.

17     That's why you saw us only ask a few questions of those

18     witnesses, Dr. Davis and Ms. Glass.  They're up on your screen.

19     They cannot date DNA, they cannot date fingerprints.  They

20     could not tell you the circumstances regarding how the prints

21     or DNA ended up on those items.  Simply that it was present.

22          While the government had evidence of some quids from

23     Mr. Daibes, their case fails for what I mentioned earlier.

24     They cannot establish when they were given and why.  The best

25     Mr. Monteleoni could do in his summation was a range of 2 years

1  at best.

2        A quid pro quo, I expect you'll hear from the Court,

3  must be explicit.  While it need not be expressed or stated, it

4  must be clear and unambiguous.  And an official act must

5  involve a decision or action on a specific question or matter.

6  However, not every action taken by a public official qualifies

7  as an official act.  Setting up meetings or expressing support

8  for an action decision or idea is not an official act without

9  more.

10        Let's talk about gifts.  You know what a gift is.

11  Something given to another without needing or wanting something

12  in return.  But the judge will instruct you about goodwill

13  gifts.  The kinds of gifts that you can give to public

14  officials.  Please pay very, very close attention when the

15  judge gives you that instruction.  I expect you will hear from

16  the judge that not every gift or thing of value given to a

17  public official amounts to a bribe.  Under the law, giving a

18  gift or thing of value to a public official to cultivate

19  friendship or to build goodwill in hopes of ultimately

20  affecting one or more unspecified official acts, now or in the

21  future, is not federal bribery.  Is not federal bribery.

22        For bribery, there must be a quid pro quo -- a

23  specific intent to give or receive something of value in

24  exchange for an official act.  Goodwill gifts made with no more

25  than some generalized hope or expectation of ultimate benefit

1    on the part of the donor are thus not bribes.

2              That brings me to a couple points on reasonable doubt.

3    Of course the judge will instruct you on that as well.  But I

4    want to highlight a couple things.  Couple things that

5    Mr. Lustberg also highlighted.  I expect the judge will tell

6    you that a reasonable doubt is a doubt that a reasonable person

7    has after carefully weighing all of the evidence.  It is a

8    doubt that would cause a reasonable person to hesitate to act

9    in a matter of importance in his or her personal life.  Proof

10   of such a convincing character that a reasonable person would

11   not hesitate to rely and act upon it in the most important of

12   his own affairs.

13             As you prepare to deliberate, after you've heard the

14   government's second summation, think about those words relating

15   to reasonable doubt.  You are to approach your deliberations as

16   you approach your most important affairs.  The most important

17   issues in your life.  What those affairs are, those issues in

18   your life, are different for everyone, but the approach should

19   not be.

20             Approach these deliberations like you would in making

21   the most important decisions in your life.  Decisions like

22   where should you send your kids to school.  Should you stay at

23   your job or move on.  Should you go back to school.  Should you

24   retire early.  Who is going to care for your elderly parents.

25             You have to approach deliberations and the question of

1    whether the government has proven its case beyond a reasonable

2    doubt that seriously.  I don't need to tell you how important

3    this case is to my client and the other parties.

4           Before I wrap up, I want to say one more thing.  This

5    is the last defense summation, but the government still gets to

6    go one more time.  They get to do another summation called the

7    rebuttal summation.  They get the last word.  So I can't, we

8    cannot respond to any arguments that the government makes to

9    counter our closing arguments.

10           I'd ask you all when you deliberate and consider the

11   government's rebuttal arguments to keep in mind that we didn't

12   get a chance to respond.  We didn't get the last word.  But ask

13   yourselves how do you think we would respond to those

14   arguments?  And consider that in your deliberations as well.

15           Now, as I said to you back in May, this case is about

16   assumptions, guesses, hunches, presumptions, suspicions,

17   suppositions, and unfair inferences.  The government wants you

18   to assume, presume, and unfairly infer the worst.  And it needs

19   you to assume the worst in order for its evidence to make

20   sense.

21           But assumptions, presumptions, and unfair inferences

22   are not proof, and they are certainly not proof beyond a

23   reasonable doubt.

24           As it relates to Mr. Daibes, the government has

25   presented evidence that at most would cause you to suspect.

1    However, suspicions and assumptions are simply not enough.

2    You're here to make inferences, reasonable, and fair

3    inferences.  The government wants you to use that, being

4    allowed to make inferences, as a license for you to speculate.

5         How many times in your life have you speculated about

6    things in your everyday life that you were wrong about?  How

7    many times in your life have you assumed things in your life

8    that you were wrong about?  You can't do that in a criminal

9    case.  You can't do that with a man's life.  You can't do that

10    and meet justice.  You can't do that and fulfill your

11    obligations as jurors to determine the facts.

12         They haven't called a single witness, an insider, that

13    can tell you what the gold or money was for connected to

14    Mr. Daibes.  They've shown you no direct evidence and very

15    little circumstantial evidence that any gold or money that was

16    connected to Mr. Daibe was given to Nadine or the senator for

17    any particular official acts.

18         Rather, at best, at best, they have shown that

19    Mr. Daibes provided Nadine and Senator Menendez with gifts or

20    goodwill gifts.  Gifts to cultivate friendship.  Gifts to build

21    goodwill.  Gifts.  Not bribes.

22         And I'll leave you with some of the same questions

23    I've asked you earlier.  Did the evidence show when this gold

24    and money was given to Nadine or Bob Menendez?  Did the

25    evidence show that this gold and money was given to Nadine or

1    Bob Menendez before or after they say Mr. Menendez assisted

2    with Mr. Hana's business?  Did the evidence show that this gold

3    and money was given to Nadine or Bob Menendez before or after

4    Philip Sellinger was appointed U.S. attorney?  Did the evidence

5    show that this gold and money was given to Nadine or Bob

6    Menendez before or after Mr. Daibes was introduced to the

7    Qataris?  Did the evidence show that this gold and money was

8    given to Nadine or Bob Menendez before or after Mr. Daibes and

9    the Qataris finished their due diligence and signed a letter of

10    intent?  Or is it just as likely that they were gifts to

11    cultivate friendship?  Or gifts to build goodwill?

12            I submit to you that you should not know those answers

13    because the government did not give you sufficient and credible

14    evidence to answer them, and that's fatal to its case.  And

15    that's why the only just conclusion based on the lack of

16    evidence is that Mr. Daibes is not guilty.

17            Thank you for your time.

18            THE COURT:  Thank you, Mr. De Castro.

19            Ladies and gentlemen, I'd like to remind you of a few

20    things.  The government is not on trial here.  You know that.

21    What avenues the government took to investigate this case or

22    didn't take are not your concern.  Law enforcement techniques

23    are not your concern, because the government is not on trial.

24            Your job is to determine whether the government has

25    met its burden of proof.  Not to decide whether it should have

O7B3MEN2                    Rebuttal - Mr. Richenthal

1    used different law enforcement techniques than it did.

2            Similarly, there have been references in the various

3    closings to the fact that person X or person Y was not called

4    as a witness during the trial.  I remind you that each party

5    had an equal opportunity or lack of opportunity to call any

6    witness.  The absence of any uncalled witness should not affect

7    your judgment in any way.  But I do wish to remind you that a

8    defendant in a criminal case has no burden to call any witness

9    or produce any evidence.  You know all that.

10           All right.  We now are going to hear the government

11   rebuttal case, then you'll have my charge, and then you'll

12   begin your deliberations.

13           Mr. Richenthal, the government rebuttal case.

14           MR. RICHENTHAL:  Good morning.

15           May I proceed, your Honor?

16           THE COURT:  Yes, I'm sorry.  Please proceed.

17           MR. RICHENTHAL:  Ladies and gentlemen, over the past

18   two days, including this morning, you've heard from a lot of

19   lawyers.  You've heard from defense counsel for hours.  They

20   make their arguments with passion, with emotion, with force.

21   They are committed advocates for their clients, and that's

22   exactly what they should be.

23           But just because a lawyer says something loudly, or

24   softly, with emotion, or none, with passion or not, doesn't

25   make it true.

1          And just because a lawyer says the evidence doesn't

2     exist, or it's confusing, it doesn't mean it doesn't exist and

3     it doesn't mean it's confusing.

4          Lawyers are not magicians.  A trial is not a contest

5     about who speaks the best, who speaks with the most emotion,

6     who speaks the longest or the loudest.  It's not even about who

7     speaks the most persuasively.

8          Because lawyers talk in court.  The past few days,

9     they've talked a lot.  What speaks in court is the evidence.

10    That's the only thing that speaks.  That's the only thing that

11    matters.

12         And so much of what you've heard in the past two days

13    is not based on the evidence.  It's not based in fact, it's not

14    based in common sense.  It isn't what happened.

15         Now, again, that is not a knock on defense counsel.

16    When the evidence of guilt is so clear, they've tried to

17    convince you to look elsewhere, to make you question what

18    you've seen, what you've heard, what you've learned.  To try to

19    get you to believe the unbelievable.

20         This is our opportunity to respond.  Here's what I'm

21    going to do this morning.  First, I'm going to make a pretty

22    basic but important point.  Then I'm going to return to the

23    evidence -- not all of it.  Mr. Monteleoni spent hours walking

24    through the evidence.  And it's all going to be available to

25    you as you deliberate.  But there are some fundamental things

1    in this case that you've heard over the past two days, as I've

2    said, that are not grounded in that evidence.  Not even close.

3    I'm going to take a little time to correct some of those

4    things, to return to what you actually saw, what you actually

5    heard, what you actually learned.  Not what you were told you

6    saw, heard, or learned.

7         Third, I'm going to talk briefly about some legal

8    points.  Now, again, I'm not going to go through all of them,

9    and if anything I say conflicts with what you hear from Judge

10    Stein, you should listen to him.  But also again, there are

11    some fundamental things you were told over the past two days

12    that are very different from what I expect you're going to hear

13    from Judge Stein.

14         Fourth, I'm going to talk about some things that

15    defense counsel argued that are just wrong.  Not because I say

16    they're wrong.  But because the evidence shows you that they're

17    wrong.  Your common sense tells you that they're wrong.  I'm

18    going to talk briefly about the cash, about the gold, and about

19    a number of other things that defense counsel argued should

20    give you pause or concern and shouldn't.  That will probably be

21    the longest section of what I talk about this morning.

22         And finally, I'm going to talk about what this all

23    means.

24         I'm not going to be speaking for many hours.  You've

25    listened to the lawyers for many hours already.  It's going to

1    take some time, but I'm going to do my best to wrap up before

2    lunch.  So to do that, I plan to focus on some things in detail

3    and some things at a higher level.  I plan to focus on what

4    matters.

5              So let's get started.  First, I said I was going to

6    talk about a basic principle.  Multiple counsel, Mr. De Castro

7    among them this morning, talked about inferences versus

8    assumptions.  And they suggested that if you don't have direct

9    evidence, you just can't be convinced of guilt.  Mr. Fee even

10   suggested if you don't have a video, you just don't know what

11   happened.

12             Ladies and gentlemen, you don't need a video of Robert

13   Menendez taking bribes from Wael Hana and Fred Daibes to know

14   what happened here.  Juries have been hearing evidence and

15   rendering verdicts since the founding of our country, long

16   before there were videos.  Long before there was DNA and

17   fingerprints, although you actually have that in this case.

18             Now, before this trial began, Judge Stein told you

19   assume the blinds are drawn, so you can't see outside.  Assume

20   someone walks in the back of the courtroom, he or she has a wet

21   umbrella.  You have direct evidence of the wet umbrella.  You

22   saw it.  You are entitled to infer from the direct evidence of

23   the wet umbrella another fact:  That it's raining outside.

24   That is all an inference is.  You do it every day.

25             And the evidence here is not like seeing one wet

1     umbrella.  It's like seeing a room full of wet umbrellas, and

2     seeing the people with wet shoes and hearing thunder behind

3     you.  The evidence is that clear.  Including witness after

4     witness telling you what you already saw.  That the documents

5     in front of you, they mean what they say.  And telling you what

6     your common sense also told you, that what happened is

7     criminal.

8             So let's return to the evidence.  Not stories of what

9     could have happened.  What did happen.

10            So first I want to talk about a couple of things

11    you've heard over the past few days, including about witnesses,

12    that are just not accurate.

13            Let's start here.  Mr. Fee said -- you can see it --

14    there is not one witness who told you they bribed Senator

15    Menendez.  Now, that's just not true.  Look on the right.

16    That's Jose Uribe's testimony.  He pled guilty to bribing

17    Senator Menendez.

18            What else did you hear?  In fact, you heard it again

19    this morning.  That Michael Soliman wasn't confident, that he

20    didn't tell you what Senator Menendez learned about Philip

21    Sellinger's recusal.  Menendez's summation is on the left.

22    Remember he pointed to the text message.  And he accurately

23    said that Soliman said I'm not exactly sure what that text

24    message meant.

25            He left out what the Soliman also said, which is that

1    text message or no text message, I told Menendez that Sellinger

2    told me he did not have to recuse.  That's on the right side.

3           Now, Mr. De Castro spent some time this morning

4    suggesting that Soliman got that wrong.  Ladies and gentlemen,

5    he might have gotten it wrong in the sense that maybe Phil

6    Sellinger didn't tell him exactly that.  But Michael Soliman is

7    not a lawyer.  You saw him.  He didn't get it wrong in the

8    sense of lying.  He's Senator Menendez's former chief advisor.

9    If he got wrong what Phil Sellinger says, did it matter?  No.

10   Why not?  Because he's the one who spoke to Menendez.  He's the

11   one Menendez trusted.  And he conveyed what he understood,

12   which is that Phil Sellinger did not have the to recuse.

13          And you know that he got that right, meaning what he

14   told Menendez, because of what Menendez did next.  He went back

15   to Phil Sellinger after yanking him.  Clearly Michael Soliman

16   told you honestly what he honestly understood and told

17   Menendez.

18          I want to pause for a moment on this part of the

19   story.  That is Phil Sellinger, Michael Soliman, Fred Daibes.

20   You heard a lot about it this morning.  And I want to respond

21   to a couple of those things.  This seems like a good time to do

22   that.

23          Now, first, Mr. De Castro argued -- I think Mr. Fee

24   may have argued as well -- that the reason that Phil Sellinger

25   was pulled, that is the reason Menendez went to Esther Suarez,

1    was the White House memo.

2          So let's return to the actual evidence.  When was Phil

3    Sellinger pulled?  Not a quiz.  You guys remember?

4    December 17.  You saw the messages.  White House memo didn't

5    exist yet.

6          What else do you know?  After Sellinger was pulled and

7    after the White House memo existed, what did Menendez do?

8    Well, among the things he did is he lied to Phil Sellinger

9    about why he had been pulled and he led his staff to believe

10   they had a falling out.

11         I am going to pause here.  I'm not going to rehash on

12   all this.  Just pause on what that means for a second.  If you

13   were changing from selecting your friend to selecting someone

14   else, because the White House was interested in other types of

15   candidates, how is that a falling out?  And why lie about it?

16   Just tell him, listen, you're a great man, but our country is

17   wonderful in part because it's diverse, and I'm going to go in

18   a different direction.  Why not say that?  They're like really

19   close friends.  Because that was false.  That's why he didn't

20   tell him.

21         And what else did Mr. De Castro argue about this part

22   of the scheme?  Well, he said that Menendez wouldn't have

23   called the lawyer if he was getting bribed.  That makes no

24   sense at all.  Remember when this happens.  He admonishes the

25   lawyer to make certain types of arguments and he calls Vikas

O7B3MEN2                    Rebuttal - Mr. Richenthal

1    Khanna, compliments the same lawyer.  Ladies and gentlemen,

2    those things are tied together.  It's not an accident those two

3    things happened.  They're literally part of the same scheme.

4    Because Menendez wanted to make this case go away.  So he used

5    everything in his power to try to do it.

6            With Vikas Khanna, he had to be more careful, but that

7    doesn't mean he didn't want that to happen.

8            By the way, what else did Menendez do?  Well, after he

9    learns that Phil Sellinger has recused himself, he tries to get

10   a message to him anyway.  There is no explanation by any lawyer

11   for the defense as to why that happened or how it happened.

12   Now Menendez is so careful, he doesn't even try to do it

13   himself.

14           MR. FEE:  Objection.  Burden shifting.

15           MR. RICHENTHAL:  I'm referring to the evidence.

16           THE COURT:  Just a moment.

17           I'll remind you, ladies and gentlemen, the defendants

18   are under no obligation to present any evidence whatsoever.

19   The burden is always on the government to prove its case beyond

20   a reasonable doubt.  Keep that in mind.

21           Proceed.

22           MR. RICHENTHAL:  Damn right it is.  It should be.  And

23   we've met it.

24           When I say you've heard no explanation, I'm talking

25   about the arguments you've heard, because it is a fact that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   that happened.  No one has challenged Michael Soliman on that

2   fundamental fact, that Menendez tried to get a message to

3   Sellinger after he was recused.  That actually happened in the

4   world.  It's not subject to dispute.  So the question's why.

5   This trial has told you why.

6          One more thing on Sellinger.  Multiple defense counsel

7   argued to you that because Philip Sellinger told you, as they

8   put it, that Robert Menendez had never done anything unethical,

9   Robert Menendez must not be guilty.

10         Ladies and gentlemen, Mr. Sellinger didn't know what

11  you know about the gold and the cash.  He didn't even know when

12  he would be yanked.  He knew a tenth of what you knew.  Do you

13  have any doubt that if he knew that Senator Menendez had taken

14  payment from Fred Daibes that his answer about unethical

15  behavior would have changed?  Come on.  Of course he would have

16  given you a different answer.

17         Sellinger didn't even know why he was unyanked.

18  Menendez didn't tell him that either.  Remember, Menendez

19  unyanks him, right, because he thinks he is not going to be

20  recused.  He doesn't even tell him that, because now he's going

21  to get his guy.  Think about that.

22         Let's go to another part of the scheme.  Defense

23  counsel told you Bob, that's Menendez, made one phone call

24  about a case that had been presented to him as an abusive

25  prosecution.  That's the top part of your screen.  Except it

1    didn't happen.  Look at what Michael Critchley actually said.

2    Did Menendez ever say to you there was discrimination?  Excuse

3    me.

4             Did you ever say to Menendez there was discrimination?

5             I did not.

6             Did you ever talk about a selective prosecution on

7    that call?

8             I did not.

9             Did you ever talk about selective prosecution with

10   anyone?

11            No.

12            When Menendez called you about Mr. Parra's case to the

13   best of your recollection, did he ask you about the facts of

14   the case?

15            No.

16            So, when Menendez's counsel asked you to assume that

17   Menendez called Gurbir Grewal because he learned from Michael

18   Critchley that there was an abusive prosecution, that isn't so

19   because Michael Critchley didn't say it was so.  In fact,

20   Michael Critchley told you he didn't think that was true.  He

21   thought the case shouldn't have been brought.  He never said it

22   was discriminatory.  He never talked about Latino truckers, it

23   didn't happen.

24            But, like, assume this is a confusion for a second.

25            Can we go to the next slide.  There is another problem

O7B3MEN2                      Rebuttal - Mr. Richenthal

1    with the idea that the Michael Critchley caused the Gurbir

2    Grewal call.  It's timing.  The Gurbir Grewal call was first.

3    The Michael Critchley call was second.  Obviously Senator

4    Menendez did not call Gurbir Grewal on January 29 because he

5    called Michael Critchley on March 12.  That is literally

6    impossible.  It did not happen.  Now, again, it's not because

7    I'm telling you it did not happen.  It's because undisputed

8    records in evidence show you it did not happen.

9            Now, I want to pause for a moment on the idea that,

10   timing aside, Mr. Menendez made his call to Mr. Grewal because

11   Mr. Menendez was worried about truckers and truckers losing

12   their jobs.  Remember, this call with Critchley hadn't happened

13   yet, so obviously he didn't learn anything about truckers on a

14   call he hadn't had yet.

15           Table that for a second.  Let's assume Senator

16   Menendez was legitimately worried about truckers between say

17   January and March related to the Parra case.  Why did he not

18   call Grewal again until the meeting in September?  That's six

19   months between March and September.  He didn't do anything.

20   Nothing.  If he's so deeply worried that 95 truckers will lose

21   their jobs, if he's so deeply worried about discrimination, why

22   doesn't he do anything?  You know the answer, it's because he

23   didn't care about those things.  He cared about money.

24           So why September?  You know the answers to that, too.

25   It's not a guess.  It's not an assumption.  Because Jose Uribe

O7B3MEN2                        Rebuttal - Mr. Richenthal

learned that Detective Lopez had reached back out to Ana
Peguero and was asking questions.  So Jose Uribe reached back
out.  So Menendez had to do something.  The minimum necessary,
but something to continue the car payments.  Not the maximum
necessary to fight discrimination or save jobs.  Because what
did Menendez do after that meeting again?  Nothing.  Again.
Nothing.  He just lied to Uribe and said it's all good.

        Ladies and gentlemen, if you're legitimately worried
about dozens of jobs, why would you lie to the man who
supposedly told you you should be worried about dozens of jobs?
Because what you're interested in is not the dozens of jobs.
What you're interested in is the Mercedes convertible in the
driveway.

        Now, if that doesn't convince you -- although it
should -- let me remind you of two other facts.  Again, these
aren't assumptions.  You know these things.  He didn't involve
his staff.  Remember he had a very large, very professional
staff.  This is purportedly an important constituent issue.
Right?  Dozens of jobs.  Doesn't involve them.  And doesn't put
the meeting with Grewal on his calendar.  Because this wasn't
about jobs.

        Now, I've said if you have any doubt about that, and
you shouldn't, but I'm going to give you one more thing.  I'm
talking about it for a while because multiple defense counsel
did.  Can we put up Defense Exhibit 962.

1              You may remember this, this is the exhibit the defense

2     put in about all the parts in the New Jersey Attorney General

3     Office.  It is a long exhibit.

4              Now, the theory that Senator Menendez was worried

5     about jobs might lead you to think, well, must have been a

6     unique case, right?  You know there is an entire section about

7     horse racing?  That's page 17 in the exhibit.  There is the

8     another entire section about events like kickboxing.  That's

9     page 18.  There is an entire section about alcoholic beverage

10    sales, page 7.  Or why don't we just go to page 5.  Let's stop

11    there.  See the line towards the end.  This part of the New

12    Jersey Attorney General Office oversees 60,000 New Jersey

13    registered businesses.  60,000.

14             But Menendez called about one case.  Ever.  The case

15    of the person bribing him.

16             Ladies and gentlemen, this wasn't about a constituent.

17    It was about a car.  There is no exception on Senator

18    Menendez's website for worries about truckers in terms of

19    intervening in a criminal case.  Doesn't exist.  But you also

20    know it was not about truckers.  It wasn't the trucker

21    exception that wasn't written down.  It was the Mercedes-Benz

22    exception that couldn't be written down.

23             Now, speaking of the Mercedes, let's go to the next

24    slide if we could.  Slide 6 I think.  With respect to the

25    Mercedes, you heard, despite all the evidence to the contrary,

1   that Jose Uribe was just helping Nadine, like, locate a dealer.

2   That's what was said in summation.

3           Ladies and gentlemen, does that make any sense at all?

4   Remember, she'd already been to the dealer.  That's literally

5   what this photograph is, right?  It's photographs of two cars

6   at the dealer.  She obviously wasn't telling Menendez the

7   following month, that is in April, I need help finding a

8   dealer.  She has literally found a dealer and got it down to

9   two cars and was talking about what color to get.

10          So, when she tells Menendez, Jose is helping me make

11   arrangements for the car, she's not talking about where to buy

12   it.  She's talking about how to pay for it.  And you know that

13   for many, many reasons, one of which is, just to go back for a

14   second, that she met Jose in a parking lot with cash and told

15   Menendez before that, I'm going to meet him for five minutes.

16   You don't meet someone for five minutes in a parking lot if

17   you're talking about what car dealer to go to.  You don't meet

18   them in a parking lot at all if you're talking about what car

19   dealer to go to.

20          Let's go to the next slide.  Now, this is from a

21   different summation, Mr. Hana's summation.  What Mr. Lustberg

22   said is Senator Menendez just made a simple call on behalf of a

23   constituent who felt aggrieved.  That's the left side.  Sounds

24   totally innocent.

25          What did McKinney actually tell you?  I never had a

O7B3MEN2                    Rebuttal - Mr. Richenthal

1    call like that before.  Ever.

2              Go to the next slide.

3              Now, to go back a moment to Mr. Menendez's summation.

4    Remember being told this, that Katia Tabourian didn't remember

5    if she ever saw gold.  Right?  He said that's what the

6    government said, and that's not what she said.

7              Look at what she said.  "I don't remember."  To be

8    clear, earlier in her testimony she seemed to say, yeah, I had

9    seen gold.  She didn't distinguish between gold in one form and

10   gold in another.  Later she was asked did you see a kilo.  She

11   seemed to say in her safe, and the Court said did you actually

12   see it?  I don't recall.  I don't remember.

13             There is nothing wrong with not remembering, but the

14   evidence doesn't show she saw a kilo of gold in that house.

15   The evidence shows she doesn't remember if she ever did.

16             The bottom line is this, ladies and gentlemen, I've

17   only gone through some examples.  When a lawyer, me included,

18   tells you what the evidence shows, look at what the evidence

19   actually shows.  Because I could have given you other examples,

20   when Mr. Fee and Mr. Lustberg both said there was no evidence

21   that Egypt wanted the embassy information -- I'm going to talk

22   about the embassy information -- that's not so.  They left out

23   that after Menendez sent it to Nadine, Nadine sent it to Hana,

24   and Hana sent it to an Egyptian official.  Just wasn't in what

25   you heard.

O7B3MEN2                    Rebuttal - Mr. Richenthal

1            You also heard that Hana's role in the New Jersey

2   Attorney General scheme, that's the Gurbir Grewal piece of

3   this, must have ended when Michael Critchley came on to the

4   case.  But then why was he sending Nadine information about the

5   case after?  So she could brief Menendez about his call to

6   Grewal.  And why was he helping promise Nadine a car, after?

7   Those are all in the timeline.  He's doing it because his role

8   wasn't over.

9            So again, when you've heard something in the past

10  couple of days and it doesn't fit your memory or you're not

11  sure, go back and look.

12           Now, I want to talk briefly about gold.  Now, Mr. Fee

13  argued you just don't know where the gold that Nadine took a

14  photograph of was, or whether it was even sold to Vasken

15  Khorozian at all.  So you don't know in turn whether Fred

16  Daibes gave that gold.

17           You probably remember this.  He suggested Nadine took

18  a photo, the photo must have been when she was at

19  Mr. Khorozian's store, I think he said it was 2:04 p.m.  Since

20  the photo looks like it was on the safe, she must have not been

21  selling gold to Mr. Khorozian.  He must have shown gold that

22  others had given him.

23           I would note the defense never asked Mr. Khorozian

24  whether Nadine sold him gold, and Mr. Khorozian was many

25  things, one of which was a talker.  You didn't hear anything

1    like that.

2          Put that aside.  What lawyers say doesn't matter.  The

3    questions lawyers ask doesn't matter.  What matters is the

4    evidence.  So let's go to the next slide.

5          This is what I'm talking about.  He asked you to

6    conclude that Vasken just showed Nadine Fred's gold.  That's

7    Nadine's gold.  That's what he says on the left.  She took a

8    photo.  It was like a show-and-tell opportunity.

9          Now, just for a moment, look at the safe on the left

10   which supposedly is where this photo was taken.  So, how in the

11   world would this photo actually be taken against that safe?  I

12   don't mean to be telling a joke.  I mean literally how is that

13   possible?  Did they climb on up on a ladder?  Did they climb up

14   on the desk?  Kilogram bars are like several pounds each.

15         They could have taken a photo on the desk.  The story

16   is he literally put the gold on top and then took a camera and

17   took a photo.  Or, I recognize this is a little silly, or,

18   somehow they got the gold to stick to the safe.

19         This is obviously, like, not a photo taken on the

20   safe.  That didn't happen.

21         By the way, why would Vasken Khorozian randomly show

22   Nadine Menendez gold that happened to be from Fred Daibes and

23   happened to be from Wael Hana, the two men bribing her husband?

24         Mr. Fee said this either yesterday or maybe the day

25   before, that the government's asked you to engage in

O7B3MEN2                    Rebuttal - Mr. Richenthal

1    assumption, speculation, fantasy, and conjecture.  That's a

2    quote.  That is what this argument is.  It's a fantasy.  It

3    didn't happen.

4            But there is actually, like, a more fundamental

5    problem with the argument that this is a photo taken on top or

6    inside of the safe at 2:04 p.m., because she wasn't at the

7    store at 2:04 p.m.

8            Go to the next slide.  This is the argument Mr. Fee

9    made on the right, and he grounded that -- the text is small --

10   on the text message at the top, I'm going to meet him at 2 p.m.

11   But can we go to the next slide.  He left out that she wasn't

12   there at 2 p.m.  That she told him I'd like to meet at 3 p.m.,

13   and he responded okay.

14           So not only was this photo not taken on top of the

15   safe, or on the side of the safe.  She wasn't even in the

16   building with the safe at the time the photo was taken.  It did

17   not happen.

18           Can we go to the next slide.  Mr. Fee also suggested

19   that you don't even know if this gold was sold.  Look at the

20   checks on the right.  Put aside for the moment that

21   Mr. Khorozian told you it was sold.  But literally look at the

22   checks.  Two different checks, for gold, from Avital Gold &

23   Platinum.  Look at the memo line.  You don't have to guess what

24   was being sold.  It says it 1kg each.  That's 2 kilos of gold.

25   Those are the checks with the Manhattan address on it.

O7B3MEN2                          Rebuttal - Mr. Richenthal

 1          Now, I want to pause for a moment on the checks.

 2   Mr. Fee seemed to suggest that even if she did sell the gold,

 3   which clearly she sold the gold -- I'm pausing so one of your

 4   colleagues can put their screen up.  Mr. Fee suggested that

 5   even if she sold the gold, and obviously she sold the gold,

 6   that she clearly did not tell Menendez she was going to do

 7   that.  Or told him some time later.

 8          The story he offered seemed to be that because

 9   Menendez had some money in his own bank account, that Nadine

10   sold the gold, notwithstanding that fact, means they weren't

11   talking about money.  Especially if the money was just for her

12   mortgage.  He argued that, well, Senator Menendez has enough

13   for the mortgage, so Nadine's selling the gold to cover the

14   mortgage, obviously they're not talking about selling the gold.

15   But, again, lawyers' arguments aren't evidence.  So let's look

16   at the evidence.  The next slide, please.

17          You can stop there.  The top of your screen is two

18   days before a conversations with Fred Daibes where he gave her

19   more gold, and three days before she sold the gold.  And what's

20   going on.  Menendez and Nadine are looking at new homes.

21   Expensive homes.  There wasn't enough money in his bank account

22   for that.

23          So in short, when Menendez called Shannon Kopplin

24   about a month before this, right, in February, and reported the

25   gold, that is not evidence of innocence, which is what you

O7B3MEN2                    Rebuttal - Mr. Richenthal

1  heard the defense say.  It is evidence of guilt.  Because you

2  know that by at least October 18, 2021, Menendez knew that Fred

3  Daibes had given him a kilo of gold because it is the first

4  kilogram gold search he has ever performed in his entire life

5  after Fred Daibes comes over with doughnuts.

6          But by spring, they're potentially looking to buy a

7  house.  They're looking for money.  And they're obviously

8  talking about it.

9          So now there is a problem.  You can't sell gold and

10  get hundreds of thousands of dollars in checks without going

11  into the financial system.  So they invent a story.  You've

12  heard about the story.  This story is I, Senator Menendez, just

13  learned of this gold.  You know that's not true.

14          Now, just to be clear, there is some evidence Nadine

15  came from money, right, in the 1970s and 1980s.  But by 2022,

16  it is very clear that's gone.  She literally was on the verge

17  of losing her home.  There is not kilogram bars sitting around

18  the house.  And if they were, that stuff is not sentimental.

19  That's not what you heard from the witnesses.  Jewelry,

20  absolutely, that's sentimental.  A kilogram of gold, no.  Any

21  gold she had like that was long gone by then.

22          When they said -- and they, not just her, because he

23  said it to Kopplin and she said it to Vasken Khorozian, it's

24  from my parents, that's because they concocted a story that

25  it's from her parents.

1          Just to pause on Google because I referenced the

2     October 18, 2021, search.  There was an argument you heard from

3     Mr. Fee that you don't know who was searching because at some

4     other time there are searches for things like how to say tomato

5     in Spanish.

6          Ladies and gentlemen, they are in a relationship.

7     That she may have searched for him on occasion or he may have

8     searched for her on occasion tells you nothing about what

9     happened on October 18, 2021.  But what you know happened on

10    October 18, 2021, is Daibes brought doughnuts and Menendez sent

11    out a recommendation letter from the same account within a

12    minute of Googling kilogram of gold price for the first time in

13    his entire life.

14         That search was his search.  That he may have searched

15    another time for tomato or given his girlfriend or wife his

16    phone and she searched for tomato has literally nothing to do

17    with this case.

18         For the same reason, Mr. De Castro's argument that

19    because you don't know when with precision a particular gold

20    bar was given to Menendez or Nadine, you cannot conclude any of

21    the bars was a bribe, should be rejected.  I'm going to talk a

22    little more about that, but just to pause for a moment.  You

23    absolutely know when, with respect to a least one gold bar,

24    October 18, 2021.  Mr. De Castro may be right that literally

25    the bar he showed you, you don't know.  I don't expect you'll

O7B3MEN2                    Rebuttal - Mr. Richenthal

1  hear from Judge Stein you have to conclude literally that

2  physical piece of metal is the bribe.  You just have to

3  conclude there was a bribe.

4         And you know that however many bars of gold were given

5  previously by Mr. Daibes, although to be clear, there is

6  literally no evidence he ever gave gold earlier, but you know

7  even if he gave gold earlier, he certainly gave at least one on

8  October 18, 2021.  And you know that Nadine and Menendez

9  concocted a story about it to sell it.  Actually, to sell two

10  of them.

11         What else are you asked to accept that just isn't

12  grounded in evidence?  Well, according to Mr. Fee, if a bank

13  sees cash, even one bill from 2006, they take it.

14         Now, that may have come as a surprise to you, if you

15  have bank accounts.  You probably never had the bank snatch

16  cash from you after seeing a serial number.  But it also has no

17  basis in evidence at all.  It is an invention.  Mr. Menendez

18  may wish banks worked like that.  They don't.  And again, it's

19  not because I tell you that, you heard, you heard from

20  Mr. Catania.  What did he tell you?  The opposite.

21         Again, you already knew that from your own everyday

22  lives.  But if you any doubt about that, he told you those fall

23  apart, sure, but banks don't just, like, grab them.  That's

24  just not true.  Because you were shown it's not true.  Not

25  because I say it.

1            Now, I've spent some time talking about evidence.
2   Again, I don't have time to talk about all of it, it's all
3   before you and you should look at as much as you want.  But I
4   want to talk a little bit about the law, and I want to talk
5   about four things about the law.
6            Again, if I say anything that conflicts with what
7   you're going to hear, you need to listen to the judge, not me.
8   But I want to just focus on a few things that you heard from
9   defense counsel that are nothing like what I expect you're
10  going to hear.
11           So let's start with official act or official action.
12  Can we have the next slide.  You were told by both
13  Mr. Menendez's counsel and by Mr. Hana's counsel in short that
14  bribes are not -- you can't find official action because
15  Senator Menendez is a federal official, Gurbir Grewal is a
16  state official.  You were told that.
17           You were also told, I think at least once or twice,
18  Senator Menendez doesn't work for the USDA, so anything he did
19  sort of just can't count.  These are just two examples of what
20  you heard.
21           I expect you're going to hear the opposite.  Look at
22  the bottom of your screen.  I expect you are going to hear two
23  important things, the first is what's on your screen.  An
24  official act does not have to be done by the person who got the
25  bribe.

1    Let me say that again.  It does not have to be done by

2    the person who got the bribe.  It can be done by exerting

3    pressure or providing advice to someone else who doesn't know

4    about the bribe.  Like Ted McKinney.  Or Gurbir Grewal.  That's

5    the first thing.

6    The second thing I expect you're going to hear for

7    certain counts known as the honest services fraud counts, that

8    second person, that is the official who doesn't know about the

9    bribe who is being pressured or sought to do something, does

10   not have to be a federal official.  I expect you're going to

11   hear point blank it can be a state or local official.

12   Now if you do hear that, what that means is, it does

13   not matter, it does not matter that Gurbir Grewal worked for

14   the State of New Jersey and Senator Menendez was in the Senate.

15           MR. FEE:  Misstates the law.

16           THE COURT:  Ladies and gentlemen, I'm going to tell

17   you what the law is.  If any of these attorneys, either from

18   the government or any of the defendants, give a statement of

19   the law that is not the same as what I give you, you are to

20   follow my instructions.

21           MR. RICHENTHAL:  Do that.  Just like I said.

22   Let's go to the next slide.  Quid pro quo.  Fancy

23   Latin means this for that.

24   Now, you heard from Mr. Menendez's counsel, you heard

25   from Mr. De Castro yesterday, I think you heard it again today,

1    that you have to have like a precise alignment, like which bars

2    for which act, which bills for which act.

3         Again, if the judge says something different from what

4    I'm about to say, listen to him.  Do not listen to me.

5         What I expect you're going to hear is that is not the

6    law either.  I expect you're going to hear it doesn't have to

7    be this for that.  It can be these for those, as in multiple

8    things for multiple things.  I expect you're going to hear

9    what's on the bottom of your screen.  And look at the last

10   sentence.

11        And of course that actually makes sense, right.

12   Because if a public official took a bribe for three things, is

13   he not guilty?  He would only be guilty if he took a bribe for

14   one thing?  If a public official took three bribes instead of

15   one bribe, is he less guilty?

16        Now, again, you should listen to what Judge Stein

17   says, but your common sense tells you the argument that, like,

18   it has to be one for one cannot possibly be right.  And it

19   isn't right.

20        Let's go to the next slide.  You heard a lot about

21   conspiracy from multiple defense counsel.  This is an example.

22   Mr. De Castro.  The idea they want you to accept is that all

23   conspirators, they must have a equal role.  It's like a

24   partnership and they're all equal partners.  Well, I expect

25   you're going to hear that's not the law either.

 1           Bottom of your screen is what I expect you are going

 2     to hear.  Some play major roles.  Some play minor roles.  They

 3     don't have to be equal.

 4           Now you also heard a lot about timing.  The argument,

 5     I think Mr. Hana's counsel, you may have heard it from Mr. De

 6     Castro as well, if people join the alleged conspiracy in 2019

 7     instead of 2018, they're not part of it.  I expect you'll hear

 8     that's not the law either.  People can join later.  They don't

 9     have to join at the beginning.  They can join for any purpose

10     within the conspiracy, and they're responsible for the entirety

11     of the conspiracy.  This is exactly what I expect you're going

12     to hear.

13           So whatever you think of those factual arguments, and

14     you should scrutinize them, they don't actually matter.

15           Now finally, Section 219.

16           THE COURT:  If you're going on to a new topic, does it

17     make sense to have the break at this point, sir?

18           MR. RICHENTHAL:  Sure.

19           THE COURT:  Ladies and gentlemen, let's take 15

20     minutes.

21           (Jury excused)

22           MR. FEE:  One issue.

23           THE COURT:  You may be seated in the courtroom.

24           MR. FEE:  Sorry, your Honor, two quick things.

25           There were twice that there was portions of a

O7B3MEN2                    Rebuttal - Mr. Richenthal

1    summation compared to portions of a transcript of testimony

2    that were misstated.

3            THE COURT:  What was misstated?

4            MR. FEE:  There is no way it's intentional.  One --

5    unintentional.

6            Katia, Mr. Richenthal told the jury, there has been a

7    lot of back and forth about this.  He said today, he said Katia

8    did not say she saw a 1 kilo gold bar.  Katia said she saw some

9    gold.  That's what he said today.

10           The transcript that is in evidence, what she said was:

11   "Q.  Have you ever seen a 1-kilo bar at 41 Jane Drive -- 1 kilo

12   gold bar 41 Jane Drive?

13   "A.  I have."

14           It's just a pure misstatement.  And it's a trick you

15   do in rebuttal.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

O7bWmen3

```
 1              THE COURT:  Wait, wait.  No, no, no.  Let's not accuse
 2      anybody of tricks.
 3              My recollection, at least what I saw on the screen,
 4      was a question from me as to whether she had seen a one kilo in
 5      the safe, and she said I don't recall.
 6              MR. FEE:  There's two things here, your Honor.
 7              That was the cross.  Mr. Richenthal, he showed them
 8      the cross where it said, have you seen it in the safe?  She
 9      said, I have not seen it in the safe.
10              Mr. Richenthal then told the jury, in his words,
11      today, Katia never testified that she saw a one-kilo gold bar.
12              Pull it up.
13              THE COURT:  Let me just see it.
14              MR. RICHENTHAL:  Your Honor, I'd like to refer to what
15      I said after that, because I know exactly what I said.
16              THE COURT:  Go ahead.
17              MR. RICHENTHAL:  I literally told the jury her
18      testimony shifted.  I'm telling you what the defense left out.
19              That's true.  She said she saw gold, was never asked
20      where.  The Court asked, well, did you see it in the safe?  She
21      said I don't recall.  What I was doing was placing her
22      testimony in context.  I literally told the jury she had
23      earlier said she saw gold.
24              THE COURT:  All right.
25              MR. FEE:  Your Honor, his focus of the point -- let's
```

O7bWmen3

1  see if we can find it.  His focus of the point, he said to them

2  she has not seen a kilo; she has only saw gold.  He said that.

3  It's just a pure misstatement.  We'll find it for you, your

4  Honor.

5        I can flag the second point, which is similar.

6        MR. RICHENTHAL:  I would note -- and this is, I think,

7  frankly, a little silly -- the very slide that they're

8  objecting to, which is on your Honor's screen, literally

9  includes Mr. Fee's statement that she said she saw gold.  I was

10  hardly hiding it from the jury.

11        THE COURT:  All right.  Just a moment.  Let me look at

12  it.

13        MR. FEE:  He's calling me a liar.  That's the whole

14  point of this.

15        THE COURT:  Gentlemen.

16        MR. FEE:  No, no, no.

17        THE COURT:  Gentlemen.

18        MR. FEE:  Your Honor, not in court here.

19        THE COURT:  Let me look at what's on the screen, sir.

20        MR. FEE:  His contrasting --

21        THE COURT:  Let me look at what's on the screen, sir.

22        MR. FEE:  Yes, yes, yes.  Yes, your Honor.

23        THE COURT:  All right.  In your summation here, you're

24  saying, she was asked if she'd ever seen a one-kilo bar, and

25  she said I have.  And she was asked when did you see it, and

O7bWmen3

1    she said years and years ago.  And Mr. Richenthal is putting up

2    the question to her:

3    "Q.  I said you never saw a kilo in the house, correct?

4    "A.  In the safe."

5    Q.  Then the question was:

6    "Q.  Did you see a one-kilo gold bar in Nadine's safe?

7    "A.  I don't recall."

8         Go ahead.

9         MR. FEE:  The purpose of the slide, and my point, your

10   Honor -- I'm sorry.  I reacted to the word "liar."  He can do

11   that.  What I'm saying is the purpose of this slide is

12   contrasting my argument with what he is saying is the evidence.

13        THE COURT:  That's right.

14        MR. FEE:  Yes, your Honor.

15        THE COURT:  I'm sorry.  It's contrasting your argument

16   to the extent you said the evidence said something.

17        MR. FEE:  Correct, your Honor.

18        THE COURT:  And he's showing another part of the

19   evidence where the evidence is different:  "I don't recall."

20        MR. FEE:  That's right.  And I don't have an issue

21   with that.  My issue is this, his words to the jury, that he

22   said Katia never told the jury that she saw a kilo.  He said,

23   in his words, that she only saw gold.  And that's, on a

24   rebuttal, a very inappropriate thing to do, because it is

25   inconsistent with her testimony.

O7bWmen3

```
 1              I'm not just talking about the slide.
 2              THE COURT:  What's the inconsistency between "I never
 3     saw a kilo" --
 4              MR. FEE:  Yes.
 5              I'm so sorry.
 6              THE COURT:  -- and "I only saw gold"?
 7              MR. FEE:  I'm sorry.  I have it here.  It is on --
 8     there; the Court is better at this than the parties.
 9              I think it's says page 45 to 49, and this is
10     Mr. Richenthal:  To go back a moment to Mr. Menendez's
11     summation, remember being told this, that Katia Tabourian
12     didn't remember if she ever saw gold.
13              THE COURT:  Go slowly, sir.
14              MR. FEE:  Sorry.
15              THE COURT:  Just a moment.
16              MR. FEE:  He said that's what the government said, and
17     that's not what she said.  Look at what she said -- I don't
18     remember.  To be clear -- this is the key part -- earlier in
19     her testimony, she seemed to say yeah, I had seen gold.  She
20     didn't distinguish between gold in one form and gold in
21     another.  Later, she was asked did you see a kilo.  She seemed
22     to say in her safe and the Court said did you actually see it,
23     I don't recall.
24              The sentence that is uncorrectable and inappropriate
25     is she didn't distinguish -- referring to her earlier
```

O7bWmen3

1    testimony, the part that the defense likes, she didn't

2    distinguish between gold in one form and gold in another.

3    Later, she was asked did you see a kilo and she said no.

4              That is false and it is inconsistent.

5              THE COURT:  What exactly is the falsity?

6              MR. FEE:  Can we put up the transcript, the portion of

7    the transcript?

8              Oh, I have it.  I'm sorry.

9              He's saying, to be clear, earlier in the testimony,

10   Katia said yeah, I had seen gold.  He's now referring to the

11   part the defense showed of Katia's testimony.

12             THE COURT:  All right.  Let's just make sure we're on

13   the same wavelength.

14             MR. FEE:  Yes.

15             THE COURT:  You're arguing that she said she saw it

16   years and years ago.

17             MR. FEE:  A kilo.  A kilo, one kilo.

18             THE COURT:  Oh, I'm sorry.  Yes.

19             MR. FEE:  The whole point of Mr. Richenthal's argument

20   here is that she didn't, when she was asked my question about

21   did you see a kilo, Mr. Richenthal has told the jury, in that

22   portion of the testimony, Katia did not distinguish between

23   gold in one form and gold in another.  Only later she was asked

24   did you see a kilo.  That is false.

25             MR. RICHENTHAL:  Your Honor --

O7bWmen3

 1              THE COURT:  Just a moment.  Let me make sure I

 2    understand this.

 3              MR. FEE:  Yes.

 4              THE COURT:  Put that up again.  Put up what you were

 5    just showing me.

 6              MR. FEE:  I wasn't.  It's the government's slide, I

 7    think, he wanted to see.

 8              You wanted to see the blue slide from the government,

 9    your Honor?

10              THE COURT:  Yes.  I wanted to see the summation and

11    the testimony.

12              MR. FEE:  I'm sorry.  Yes.

13              THE COURT:  You're arguing that she said she had seen

14    a kilo bar years and years ago.  Richenthal is then pointing

15    out that her testimony was, later, that she didn't recall

16    whether she saw a one-kilo gold bar in the safe.

17              MR. FEE:  That is what he's doing on the slide.

18              THE COURT:  I don't see any inconsistency there.

19              MR. FEE:  Yes.  Let me do a better job explaining

20    that.  Put aside what's on the slide.

21              What you described is what this slide is doing.

22              THE COURT:  And that's what the argument was.

23              MR. FEE:  No.  There's another argument.  There was an

24    argument about -- the thing that I was referring to, he

25    misstates.  And this is what I mean, on the real time, 45 of

O7bWmen3

1    59.

2            THE COURT:  All right.  Pull it up.

3            MR. FEE:  It's on the real time only, your Honor.

4    This is the argument from the summation.

5            THE COURT:  All right.  Let me get it.

6            MR. RICHENTHAL:  Your Honor, can I try to, maybe --

7            THE COURT:  Yes.

8            MR. RICHENTHAL:  There's lots of case law about

9    arguments of lawyers not being evidence.  The Court has told

10   the lawyers arguments of lawyer are not evidence.  I think I

11   personally told the jury six times arguments of lawyer are not

12   evidence.  I think I told them three times if I get something

13   wrong, they should check the record.  So if I misspoke, it

14   doesn't matter.

15           But let's be clear.  The point of my remarks are not a

16   single sentence.  They're a point, that Ms. Tabourian's

17   testimony is unclear whether she ever saw a kilo of gold.  And

18   that's true.  It's unclear.  Now, I want to be pointed about

19   this.  The defense is entitled to argue it's clear.  They are.

20   I'm entitled to argue it's not.  That's literally why we have

21   lawyers making arguments.  There is, to my knowledge, no basis

22   in case law to point out a single sentence in rebuttal and say

23   that single sentence in rebuttal compared to a single sentence

24   in a witness's testimony arguably is inconsistent and so the

25   government lawyer, or the defense lawyer for that matter, did

1    something wrong.

2           THE COURT:  Fair enough.

3           MR. RICHENTHAL:  That's all that happened.

4           THE COURT:  Fair enough.

5           Let me see the pagination.  I have it up.  40 what?

6           MR. FEE:  It's 45.  I'm sorry, your Honor.  And it's

7    in a paragraph beginning, "Now, to go back a moment to

8    Mr. Menendez's summation," and then it's specifically the

9    sentence beginning "to be clear."

10          THE COURT:  No.  I'm at 45.  Go ahead.

11          MR. FEE:  There you go.

12          First of all, *U.S. v. Murray*, in the Second Circuit,

13   is the case that says you cannot unfairly make an argument.

14          THE COURT:  Sir, what on page 45 do you want me to

15   look at?

16          MR. FEE:  "To be clear, earlier in her testimony she

17   seemed to say yeah, I had seen gold."

18          THE COURT:  Are you reading from 45?

19          MR. FEE:  Yes, yes.  Beginning, "to be clear."

20          THE COURT:  Just a moment.

21          45, what line?

22          MR. FEE:  Line -- I'm sorry -- 11.

23          THE COURT:  No.  My 45:11 says Mr. Fee said this

24   either yesterday or maybe the day before.

25          MR. FEE:  I'm not sure I know how to tell you the

O7bWmen3

1    right page from the real time, your Honor.

2                THE COURT:  Read to me what you're reading.

3                MR. FEE:  The government has it up.  I don't know if

4    they're better at it than I:

5                "To be clear," this is Mr. Richenthal's words on the

6    real time.  "To be clear, earlier in her testimony she seemed

7    to say yeah, I had seen gold.  She didn't distinguish between

8    gold in one form and gold in another.  Later, she was asked did

9    you see a kilo.  She seemed to say in her safe, and the Court

10   said did you actually see it?"

11               So he's referring, in the first part of what I read --

12               THE COURT:  All right.  I'm going to pierce through

13   this.

14               Richenthal is right.  It's arguments of lawyers.  It's

15   a word.  I'm not going to go back and instruct them anything in

16   regard to what the lawyers said or didn't say.  It's arguments.

17   It's acceptable.  The jury knows that these are simply

18   arguments.

19               MR. FEE:  Your Honor, there's one more, and eventually

20   there is relief.  There's a surrebuttal, and there's case law

21   on this.

22               THE COURT:  Not on the basis of the lawyer like this,

23   no, especially when he's saying -- what he's trying to do is

24   say she said she saw it and now she's saying she doesn't

25   recall.  That's perfectly OK.

O7bWmen3

 1             MR. FEE:  I disagree that that's what he was saying

 2      there, your Honor.

 3             THE COURT:  Let me tell you.  If you want a ruling,

 4      the ruling is there's no surrebuttal on the basis of what

 5      you've told me so far.

 6             Next point.

 7             MR. FEE:  Next point.  He said, he made this point

 8      about Michael Critchley.  He pointed out again to the

 9      summation -- I don't know if the government has the slide,

10      slide 4 of the rebuttal slides.

11             Here.  I would read it.  You can see it.  He's making

12      an argument in response to the first sentence there:  "Bob made

13      one phone call about a case that had been presented to him as

14      an abusive prosecution."

15             And then they put up the transcript of a portion of

16      Mr. Critchley's testimony, where Mr. Critchley was being asked

17      if he had ever talked about selective prosecution.  And then

18      the argument Mr. Richenthal is making is that Mr. Fee is

19      telling you something that did not happen, it's not in the

20      evidence.  And why is this particularly unfair in rebuttal is

21      in Mr. Critchley's testimony in this case, he testified twice

22      that he and Bob discussed that this was an abusive prosecution.

23      So it's the literal phrase used in the summation that

24      Mr. Richenthal is arguing was not said by Mr. Critchley.  And I

25      agree.  Lawyers make arguments, but a rebuttal summation poses

O7bWmen3                         Rebuttal - Mr. Richenthal

1    a danger of this sort of tactical misstatement.

2              MR. RICHENTHAL:  But your Honor --

3              THE COURT:  Sir, are you raising the distinction

4    that's been in the testimony between abusive prosecution and

5    selective prosecution?

6              MR. FEE:  I'm raising the unfairness of Mr. Richenthal

7    putting this before the jury, the portion where Critchley

8    doesn't say abusive prosecution, and saying Mr. Critchley never

9    said abusive prosecution.  And this is what Mr. Richenthal

10   argued:

11             "When Menendez's counsel" -- and this is page 41, line

12   2, on ours.  This is Mr. Richenthal's words:

13             So when Menendez's counsel asked you to assume that

14   Menendez called Grewal because he learned from Michael

15   Critchley that there was an abusive prosecution, that isn't so,

16   because Michael Critchley didn't say it was so.

17             MR. RICHENTHAL:  Your Honor, not only is that a fair

18   argument, it is undisputed.  Mr. Critchley's own testimony is

19   he did not tell Senator Menendez what he thought.  It was a

20   two-minute phone call, and views were not exchanged.  This is,

21   again, not even just fair argument, although that's enough to

22   deny this claim.  It's literally in the record.  This is what

23   rebuttals are.  I'm placing in context the argument that

24   Mr. Menendez allegedly called Mr. Grewal because --

25             THE COURT:  Look, I'm going to allow the argument.

1    It's a fair argument based on the text that I see in front of

2    me, and if you're making a motion for a surrebuttal, it's

3    denied.

4            MR. RICHENTHAL:  Can I just also note for the record,

5    page 41 of real time, I said, precisely because I am well aware

6    of the distinction between abusive and selective, I literally

7    said, he, referring to Mr. Critchley, thought the case

8    shouldn't have been brought.  He never said it was

9    discriminatory.  That's correct, and it's precisely my

10   argument.

11           THE COURT:  The argument here is within the bounds of

12   fair argument.

13           Take a few moments.

14           (Recess)

15           THE COURT:  Just so the record is clear, Mr. Fee, you

16   had an objection to the request for a surrebuttal, and it's

17   denied.  But you have the objection.

18           MR. FEE:  Thank you, your Honor.

19           THE COURT:  In the event of conviction, it can be

20   raised.

21           (Jury present)

22           THE COURT:  You may continue, Mr. Richenthal.

23           You may be seated in the courtroom.

24           MR. RICHENTHAL:  Welcome back.

25           I think we left off on a slide about conspiracy, case

O7bWmen3                        Rebuttal - Mr. Richenthal

1    law, and then I said that -- excuse me, instructions.  And I

2    said that I would then move to Section 219.  So that's what's

3    on your screen now.  Section 219 is just lawyer talk for a

4    public official acting as a foreign agent.

5              Now, you heard in summation that -- and I'm quoting

6    now the bold line from Mr. Menendez's summation -- "a foreign

7    agent charge requires proof that the defendant was an agent, a

8    servant of the foreign principal."  Continuing, the judge will

9    tell you that means acting at the direction and control.

10             Again, if I say anything about the law and it's

11   inconsistent in any way with what Judge Stein says, you follow

12   what he says.  But I expect what you will hear is not what you

13   were told.  I expect you'll hear what's at the bottom of your

14   screen.  You don't have to be acting at direction or control.

15   You can be acting at a request.

16             Now, to be clear, as I think Mr. Monteleoni told you,

17   request has a legal meaning.  You're going to hear more about

18   it.  It's not just a mere request.  I don't expect you're going

19   to hear that.  But I also don't expect you're going to hear

20   that literally you have to be acting at the direction.  And of

21   course, that makes sense.  When people are paid to do

22   something, they're not acting at the direction.  They're not,

23   like, a marionette doll.  They're being paid to do it.  It's

24   not a mere request.  And you know that that's what happened

25   here.

O7bWmen3                    Rebuttal - Mr. Richenthal

1          Now, I've talked a bit about what witnesses said.

2     I've talked about some of what you've seen.  I want to talk

3     about some of what you were told; that is, some of the

4     arguments you were asked to accept.  I'm not going to talk

5     about all of them, but I want to spend some time on a few of

6     them.  I'm going to spend more time on some and I'm going to

7     spend less time on others.

8          Now, we've heard a lot about cash in this case.  I am

9     not going to go back and tell you what you heard before.  But I

10    do want to say, first, that even if every single dollar of cash

11    in this case went poof, literally disappeared, didn't happen,

12    the defendants would still be guilty on every count, because

13    there's still the Mercedes.  There's still the fake job for

14    Nadine.  There's still the fake mortgage loan.  And there's

15    still all the small stuff Mr. Monteleoni talked about, but even

16    if you ignored the small stuff and ignored the cash, you still

17    have more than enough to find the defendants guilty.  And let's

18    be clear.  You know that all that other stuff was also

19    obviously bribes.  Mr. Monteleoni told you about the timing,

20    the special treatment, the secrecy.  Mr. Fee kept saying the

21    cash is the whole case.  I think that's literally a quote.  I

22    may have gotten it slightly wrong, but he said, in substance,

23    at least once, the cash is everything.  The cash is the whole

24    case.

25          Now, it's part of the case.  You might even conclude

1    it's an important part of the case; that's up to you.  But it's

2    damn well not the whole case.  Of course, it also didn't go

3    poof.  It does exist.  So let's talk about it briefly.

4            I want to return to some basic fact, not everything

5    you've heard about the cash, just some fundamental facts you've

6    learned over the past few months.

7            Let's go to the next slide.

8            All right.  First, this is Robert Menendez's jacket.

9    Now, it's our burden, ladies and gentlemen.  Everything I say

10   about a basic fact, I'm talking about what the evidence shows.

11   But I don't think this was even reasonably disputed.  This was

12   Robert Menendez's jacket.  There's an envelope in it.  It's

13   sealed.  It says $10,000 on it, under the tape; that is, the

14   writing is under the tape.  And on the tape, on the sticky

15   side -- that is, the part you put down -- are Fred Daibes's

16   fingerprints.  And what's inside this envelope?  $10,000 in

17   cash, just like it says on the outside.

18           Now, what do you know about that cash?

19           You know it could not have been withdrawn any earlier

20   than October 21, 2020, because that's when at least one of the

21   bills in this sealed envelope was first put into circulation.

22   This cash could not have been withdrawn from the bank, never

23   mind given to Menendez, any earlier than October 21, 2020.

24           Why does that matter?

25           Because that's when Daibes learned that Menendez might

O7bWmen3                    Rebuttal - Mr. Richenthal

1    have the opportunity to do what Daibes was desperate for him to

2    do.  That's right before the federal election.  That's right

3    before the change in administration.  This is not money Robert

4    Menendez withdrew from his bank accounts.  It's not money that

5    Nadine Menendez withdrew from her bank accounts.  It's Fred

6    Daibes money, given to Robert Menendez.

7            Now, I could stop there, because that envelope is

8    enough to convict both Menendez and Daibes, because you know

9    the timing.  You know the special treatment.  You know the

10   secrecy.  I'm not going to stop there, but I could, because

11   that envelope is enough.  By itself, you could convict both

12   Daibes and Menendez.  It's an envelope of cash, given from

13   Daibes to Menendez, at the time when Daibes and Menendez

14   learned they might have the opportunity to do what they both

15   wanted done.

16           That is a serious problem for the defense.

17           Now, again, the defense has no burden.  I cannot

18   emphasize that enough.  They have no burden, but when they make

19   arguments, you can look at them.  You can scrutinize them.  You

20   shouldn't just blindly accept them.  So let's talk about what

21   you heard.

22           This is what Mr. Fee told you, right?  He said I think

23   this evidence suggests that Nadine, from wherever she got the

24   cash, put this in the jacket.

25           Now, first, from wherever she got the cash?  That's

1    Fred Daibes cash.

2              But second, this is Nadine's cash in Menendez's

3    jacket?

4              Let's go to the next slide.

5              Let's stop there.

6              Now, you may have remembered that the argument Mr. Fee

7    made -- I think Mr. De Castro actually made a version of this

8    as well -- is that this cash was given to Nadine during lean

9    times.  Well, first, fall 2020 were not lean times for Nadine

10   Menendez and Robert Menendez.  Right?  She had trouble with her

11   mortgage in 2019 -- until Hana paid it off for her.  Maybe

12   those are lean times.  This is not lean times.

13             Now, second, as I've said, the idea that you're being

14   asked to accept here is that Daibes gives an envelope of cash

15   to Nadine, and Nadine decides to store it in Robert Menendez's

16   jacket breast pocket.  Now, we live in reality, and that

17   doesn't make any sense at all.  But if you thought it's

18   possible, look at the right side of the photo.  That's another

19   envelope in the same jacket.  And whose fingerprints are on

20   that one?  It's not Nadine's.  It's Robert Menendez's.  So now,

21   she doesn't just put it in his jacket pocket; it happens to be

22   there's another envelope, also in the jacket, with his own

23   fingerprint on it.

24             By the way, side note.  If this cash was for lean

25   times -- that is, the idea she's going to use it -- why is it

O7bWmen3                    Rebuttal - Mr. Richenthal

1    sealed?  Remember, October 21, 2020.  OK?  Seized June 16,

2    2022.  It's never used.  It's never used.

3            By the way, also, how could Fred Daibes give money to

4    his buddy's wife, secretly?  That's bizarre, but even if that

5    happened, if it's this secret thing, she decides, you know how

6    I'm going to keep the secrecy?  I'm going to stick it in his

7    breast pocket coat.

8            Now, that's the fingerprint, by the way, that I was

9    referring to.  That's Menendez's fingerprint on the other money

10   in the same jacket.

11           So let me just return to something I said a few

12   minutes ago, the suggestion that you need a video to know what

13   happened, you need a recording to know what happened.  Do you

14   have any doubt that this money was given to Robert Menendez by

15   Fred Daibes after October 21, 2020?  Now, the standard is

16   beyond a reasonable doubt.  That's not no doubt, but I'm

17   actually asking a different question.  Do you literally have

18   any doubt?  No.  There's no other way this money ends up in

19   that jacket.  You live in reality.

20           But let's zoom out; that is, let's zoom out from the

21   jacket to where the jacket is.  Where is it?  It's here, bottom

22   of your screen.  Right?  That's the closet bar.  The top is the

23   closet shelf.  You see the yellow bag?  That is the famous

24   Forever 21 bag.  It's quite literally inches from the jacket.

25   Literally.  What's in it?  $95,000 in cash.  Some of that cash

O7bWmen3                    Rebuttal - Mr. Richenthal

1    is banded together in bank wrappers, Chase Bank wrappers.

2              Now, Mr. Fee spent a tremendous amount of time trying

3    to convince you that this yellow bag's cash is Nadine

4    Menendez's cash.  That is truly unbelievable.  Put aside for a

5    second that it's inches from Menendez's jacket, it's also feet

6    from his other clothes, by the way, which, if you recall,

7    contain, like, among other things, boots with more cash in it.

8    It's inches from the envelope with Menendez's own fingerprint

9    on it.

10             Now, remember, there is a reason you're being asked to

11   assume that this is Nadine's cash.  Because even if you

12   accepted Russell Richardson's wildly unfounded assumptions

13   about what happened in the past, just accepted them blindly,

14   unless this cash goes poof, even his assumptions don't account

15   for all the cash.  They just don't.

16             So, should the cash go poof?  What's the basis to

17   assume this is Nadine's cash?  Apparently the basis is it's in

18   a yellow bag printed with the words Forever 21.  Now, yes,

19   Nadine was a joint signatory on a college checking account.

20   And yes, Nadine's adult daughter Sabine apparently shopped at

21   Forever 21.  Does that mean that no one else is allowed to use

22   that plastic bag?  Many people have plastic-bag stashes in

23   their homes.  Are you only allowed to use the ones you got from

24   the store?  Do you really think if Nadine was hiding cash from

25   Robert Menendez she would put it in a yellow Forever 21 bag?

O7bWmen3                    Rebuttal - Mr. Richenthal

1    It's not even filled with clothes.  It's not sealed up.  It's

2    just in his jacket with envelopes of cash with his fingerprints

3    on it.

4           By the way, I mentioned that it's wrapped, in part,

5    with Chase Bank wrappers.  Well, Nadine had a Chase Bank

6    account at some point.  You know that from the evidence, but

7    the records show she never withdrew anything like this, and

8    that the account was closed months before those money bands

9    were stamped, because the money bands, in part, have dates on

10   them.  So the defense seems to be asking you to accept that

11   Nadine Menendez magically got $95,000 in cash from the bank

12   account she never withdrew that much from, and then she decided

13   to put it here.

14          Now, remember, you've heard a lot about the closet;

15   I'm not going to talk about the closet.  You've heard about her

16   safe deposit box.  That's not where this is.  This is the

17   basement, yet the story is she put it there, for no reason at

18   all.  Because there's no other reason for her to put it there.

19   She has plenty of space in the closet.  That's nonsense.  It's

20   not, like, an assumption that you should reject.  It's

21   literally nonsense.  It defies logic.  It defies evidence.  It

22   makes no sense at all.

23          Now, in opening statement, Menendez's counsel actually

24   seemed to suggest all of the cash in the basement was

25   Menendez's.  Go to the next slide.  I'm quoting:  "The cash

O7bWmen3                    Rebuttal - Mr. Richenthal

1    that was found in the basement of Nadine's home was the

2    senator's cash."

3          This is in the basement of the senator's home.  Now,

4    they told you something different at the end of this trial, but

5    the something different is not possible.  We have the burden,

6    but this new argument, it's crazy.

7          By the way, speaking of, like, new arguments versus

8    old arguments, you heard so much in Mr. Fee's summation about

9    how the government allegedly changed statements during the

10   trial, changed arguments.  Well, that's wrong, and you know

11   it's wrong because he spent five-plus hours talking and he

12   didn't find a single statement about the facts or about the

13   evidence in Mr. Monteleoni's summation that was wrong.  Not

14   one.  Or Ms. Pomerantz's opening.  Because the arguments

15   haven't changed because the evidence hasn't changed.  The facts

16   haven't changed.

17         To be clear, it would be OK if the arguments changed.

18   They're just arguments.  What a lawyer says doesn't matter.

19   But they haven't changed because the truth of what happened

20   between 2018 and 2023 is what happened between 2018 and 2023.

21   It's been true since it happened.  You learned over the past

22   two months what happened.

23         Very quickly, Mr. Fee also suggested, well, maybe

24   Nadine had this cash for no reason at all, but, you know, she

25   lived her life outside the banking system.  I think that's

O7bWmen3                          Rebuttal - Mr. Richenthal

1    close to a direct quote.

2            There it is, at the top of the screen:  "Lived her

3    life largely outside of the bank system.  She wasn't using

4    banks very much at all for decades."

5            All right.  Well, look at Menendez's own financial

6    disclosures.  These are just examples.  They're all in

7    evidence.  She has one, two, three, four, five bank accounts in

8    2020.

9            Let's look on the right.  She's got one, two, three,

10    four, five bank accounts in 2022.  By the way, these are

11    Menendez's disclosures, meaning he knows his wife has bank

12    accounts, meaning he can't possibly think it's her cash,

13    because he knows that that's not what she does.  You've heard a

14    lot of evidence about Nadine's family gold.  Did you hear any

15    evidence that Nadine hoards cash?  Any evidence at all?  No.

16    Zero.  It's your job to look at the record.  You won't find it.

17    But even if you want to defy reality and assume the yellow bag

18    is Nadine's cash, that doesn't matter.

19            Let's zoom out more.

20            Stop.

21            What are you looking at?  You're looking at the TD

22    Bank envelopes in the house and the safe deposit box.  What do

23    you see?  They are identical to the one that I showed you a few

24    minutes ago.  Every single envelope on this slide has Fred

25    Daibes's fingerprints on it.

1           By the way, I said in the house and safe deposit box.

2    This actually may be just the house.  In any event, every

3    single envelope in this photograph has Fred Daibes's

4    fingerprints on it.  And one, which was found in the closet,

5    inside the safe that you've heard so much about, also has

6    Menendez's fingerprints on it.  And every one of them, as I

7    told you, had at least one bill withdrawn in fall 2021 or more

8    recently.  Every single one.

9           Now, Mr. Fee seemed to suggest this must merely be

10   gifts.  I've already explained to you why that makes no sense.

11   Nadine wasn't in lean times in fall of 2020.  Her husband's

12   best friend wasn't giving her gifts for no reason at all, and

13   if he was, Menendez sure as heck would have known about it.

14   But also, if they're gifts, which presumably means they're

15   handed to Nadine or at least handed from Robert Menendez to

16   Nadine, wouldn't her fingerprints be on them?  How many of

17   these envelopes have Nadine's fingerprints on them?  Zero.

18   Zero.

19          In short, ladies and gentlemen, although the lawyers

20   have asked you to do math a lot in this case, you don't have to

21   do math.  You don't have to look at bar charts, you don't have

22   to look at summary charts to figure out that this cash came

23   from Fred Daibes, to figure out that this cash was given to

24   Robert Menendez, to figure out when it was given to Robert

25   Menendez.  Fall 2021 -- excuse me, fall 2020 and forward.  And

O7bWmen3                    Rebuttal - Mr. Richenthal

1    there's more than $80,000 in those envelopes.  One of them

2    would be sufficient to convict Menendez and Daibes of bribery.

3    Just one.  You've got a lot more than one.

4            Now, Mr. De Castro pointed to one that's not on this

5    slide.  Right?  He pointed to the one with Fred Daibes's return

6    date on it.  Now, let's just be clear.  That envelope has Fred

7    Daibes's driver's fingerprints on it, Mr. Pilot.  And it has

8    Fred Daibes's DNA on it, so it obviously also came from Fred

9    Daibes, although this one was given by the driver.  And you

10   actually know when -- Mr. Monteleoni talked about that -- that

11   is, that Fred Daibes gave Robert Menendez through his driver.

12           Now, that envelope, if we go to the next slide, is

13   this envelope.  Now, where was this envelope found?  The

14   closet.  In the safe.  Again, this is the safe that you've

15   spent a lot of time trying to be convinced Robert Menendez knew

16   nothing about.

17           So Mr. De Castro seemed to give you a different

18   argument than Mr. Fee.  He seemed to suggest, well, yeah, this

19   was probably given to Menendez, not Nadine.  That seems clear

20   as day, doesn't it?  But he made a different argument.  He said

21   because you cannot be sure when it was given, you cannot

22   conclude it was a bribe.  He said it over and over.  He said it

23   again today too.

24           Now, first, you know it was not given any earlier than

25   June 10, 2021.  You don't know exactly when, but you know it

1      couldn't be earlier than that, because none of the cash is from

2      earlier than fall 2020, and you know what was going on between

3      fall 2020 and summer 2021.  Menendez was repeatedly trying to

4      influence Fred Daibes's criminal case.

5              And by the way, I don't expect you're going to hear in

6      the judge's instructions that you need to figure out precisely

7      when a bribe was given, like, literally the date, time, hour.

8      I don't expect you're going to hear anything like that.  I

9      expect you're going to hear was a bribe given within the time

10     period of the charges?  Every single envelope I have shown you

11     is within the time period of the charges.  Every single one.

12             Now, Mr. De Castro argued that even if these were

13     gifts to Mr. Menendez and even if they were during the time

14     period of the charges -- and they were to Menendez and they

15     were during the time period of the charges -- still could not

16     be bribes.  He called them gifts or get well gifts.

17             OK.  Now, first, these are all between fall 2020 and

18     June 2021.  All of them.  That's a particular time period with

19     particular things that Fred Daibes wants from Robert Menendez.

20     They have been friends for decades.  All of these envelopes are

21     not from decades.  They're from the heart of the case as to

22     Fred Daibes and Robert Menendez.

23             By the way, side note.

24             Can we call up Government Exhibit 10E-4.

25             Remember this financial disclosure form?  There are

O7bWmen3                     Rebuttal - Mr. Richenthal

1    several in evidence.  You know what's not on it?  Any of these

2    alleged gifts.  Zero.

3              You know what else is not on it?

4              Can we scroll, please.  Keep going.  Stop.

5              Remember these, the wedding gifts?  Do you see Fred

6    Daibes's name?  To be clear, they were friends for decades,

7    maybe Mr. Daibes gave him a gift.  It's not here, but put all

8    that aside for a moment.  Every one of these, as I said, was

9    between fall 2020 and 2022, the day of the search.  I may have

10   misspoken and said 2021, but it's the heart of the scheme --

11   2020 and 2022.  Every one.

12             Now, ladies and gentlemen, we have the burden, but

13   that home was searched.  Where are the other gifts if

14   Mr. Daibes was so generous as to give $10,000 cash envelopes?

15   Where are they?  They're definitely not in the home.  They're

16   definitely not in Nadine's safe deposit box.  Where are they?

17   Mr. Daibes may well have given Mr. Menendez gifts.  That's not

18   what you're looking at in the chart of envelopes -- even if you

19   assumed, bizarrely, that the gifts he gives are literally

20   sealed envelopes of cash, and there's no evidence he gives

21   those kinds of gifts to anyone at all.

22             The bottom line on this is you've got hundreds of

23   thousands of dollars -- hundreds of thousands of dollars -- in

24   cash and gold between Daibes and Menendez.  And you know that

25   all of that cash, all of these envelopes, are in a very

O7bWmen3                    Rebuttal - Mr. Richenthal

1    specific time frame.  Very specific.  They start within days of

2    the presidential election.  Is that just a coincidence?  Do

3    they become closer friends in late October 2020?  Or did Daibes

4    want something from Menendez?  Something, by the way, you don't

5    just ask a friend to do, because it's dangerous, because it's

6    criminal, because it's wrong, and you both know it.

7              They were friends.  They may have traded gifts.  These

8    things -- this cash and the gold -- it was not friendship.  It

9    was not gifts.  It wasn't goodwill in the hope that someday

10   Robert Menendez can help Fred Daibes.  It was today.  I need

11   help today.  The presidential election is in a week.  This is

12   the thing I want.  Here's lots of cash.  The dates alone tell

13   you what happened.  And that's not an assumption or inference.

14   The dates are not in dispute.

15             Now, I mentioned the closet and the safe, so let me

16   just pause for one second on the closet and the safe.  You guys

17   have heard a ton about this.  I'm not going to spend too much

18   time on the closet and the safe.  By the way, one reason is you

19   could just ignore it and still have found the defendants

20   guilty.  But just to pause, everything that I've said so far is

21   not reasonably subject to doubt.  Text messages exist, like the

22   ones with Vasken Khorozian.  The photos exist.  The cash and

23   the gold exist.  There's no dispute where they were found, no

24   dispute about the fingerprints, no dispute about the DNA.

25   There's no dispute about the serial number cash tracing or the

1    cash packaging.

2           It's our burden, but those things aren't reasonably

3    subject to dispute.  But Mr. Fee nevertheless argued you should

4    just ignore argue all of that.  Indeed, he argued you should

5    ignore everything in the case because, according to him, two

6    things happened in the first week of trial that you should

7    conclude call into question everything you saw in the next six

8    weeks of trial.

9           Now, that's, with respect, kind of a silly argument,

10   but let's just take it head on.  One of those two things was

11   the embassy information.  I'm sure you remember that.  The

12   argument seems to be that -- and Mr. Lustberg, by the way, made

13   a version of this argument too.  The argument seems to be that

14   the embassy information was public.  It's no big deal.  The

15   fact that we presented evidence about it and then they tried to

16   demonstrate it was public means that everything in the case

17   should be disbelieved.

18          Mr. Fee kept referring to the quality of the evidence.

19   He kept saying the quality of the evidence.  OK.  So let's talk

20   about the embassy information.

21          Now, before I just get to this exact, let's pause for

22   one second, I want to focus you on this.  The embassy

23   information is a truly egregious betrayal of Menendez's trust

24   by the public.  It's not a side note.  It is an egregious

25   abuse.  It wasn't public.  He knew it, and he knew it was going

O7bWmen3                          Rebuttal - Mr. Richenthal

1    to Egyptian officials.  This is what you were told:  You can

2    find it in 2018.  It was public.  Period.

3            And you heard this through trial to too.  You heard

4    this during cross-examination.

5            Let's go to the next slide.

6            This is the basis for it allegedly being public.  Now,

7    let's just pause there.  First, the exhibit doesn't show that.

8    It just doesn't.  Look at it.  OK?  This is a sensitive but

9    unclassified report first issued in April 2020, later

10   released -- that's why those words are crossed out; you've

11   heard about that -- and then available years later.  Right?  In

12   2018.  It's from April 2016.  It's available April 2018.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. RICHENTHAL:  So yes, what's in this document was

2      public in April 2018.  But the information is from April 2016.

3      It ain't the same information Menendez gave out.  And that

4      matters.  Mr. Tate explained why it matters, and your common

5      sense tells you why it matters.

6              That's in part what's on your screen.  He explained to

7      you things start confidential, sensitive, but over time, and

8      you know this from your common sense, the facts on the ground

9      change.  It's no longer sensitive.  It gets released later.

10             This wasn't catching the government in some sort of

11     mistake, although a trial is not a contest.  This was trying to

12     convince you of something that is demonstrably false.  Now,

13     let's go to the next slide.

14             Let me pause there.  You also heard it doesn't matter,

15     the embassy information doesn't matter because Mr. Tate and

16     some other people, they traveled on diplomatic passports.  I'll

17     deal with that in one second.  But also what were you told by

18     Mr. Tate?  What matters is not just the U.S. citizens working

19     at the embassy, it is the Egyptian staff working at the U.S.

20     embassy.  And they take efforts to not tell the Egyptian

21     government.

22             But what Menendez shared wasn't just about the U.S.

23     citizens.  You know that.

24             Let's go to the next slide.  You also know why it

25     matters.  Because as Mr. Monteleoni explained to you while

O7B3MEN4                    Rebuttal - Mr. Richenthal

1    talking about the evidence in this case, like a jigsaw puzzle,

2    one piece may not tell you a lot, 1,000 pieces tells you

3    everything.  This is a piece.  It's not everything.  But it is

4    a piece.  That's why it's sensitive.  That's why it's released

5    years later, not in real time.

6           Let's go to the next slide.  Actually, let's go back,

7    I'm sorry.  Could we go to Government Exhibit A-101-6.  Can we

8    blow up the middle.

9           Let's stop there.  So this is what Menendez sent his

10   girlfriend.  So first, as I said to you, it notes Egyptians,

11   not just U.S. citizens.  It literally says locally employed

12   staff.  Then, if there were any doubt what's going on, it

13   clarifies, most are Egyptians working at the embassy.  This is

14   what he sent.

15          Now, the idea that you are being asked to accept is

16   this was public.  Okay, not true, I've already demonstrated it.

17   But you are being asked to accept something else.  That this

18   was like the same thing that was available on Google.

19          Did Menendez tell his girlfriend to use Google?  By

20   the way, the internet works in Egypt.  There is evidence of

21   that.  You heard about Alborsaa News.  If the Egyptians could

22   use Google, which they could, why are they getting it from

23   Menendez?  Why is he sending it to his girlfriend?  Why isn't

24   his girlfriend saying like, dude, I could use Google.  I don't

25   really need it.  Thanks.

1           Did he get it from Google?  No.  He got it from the

2   State Department, and they were so concerned about it, they

3   literally needed a reason.  Did they say, well, I'm concerned

4   about it, even though I could get it on Google?  No.  Because

5   this is the keys to the kingdom, ladies and gentlemen.  This is

6   the real stuff.  This is the real-time information.  This is

7   what's at the American embassy.  That's what Robert Menendez

8   wrote.  This is what's at American embassy.

9           They got it from him because they couldn't get it

10  another way, and he knew it.  Just absorb what you're looking

11  at for a second.  A sitting U.S. senator is giving sensitive

12  information to a foreign nation through his girlfriend.

13          Let's back out.  Go to the next.

14          Now, there was also a suggestion that it stopped

15  there.  Meaning it went from Menendez to Nadine, that was the

16  end of it.  Now, even if that were true, this is devastating

17  proof that Menendez put the interests of Egypt above those of

18  the United States.

19          But you know it's not true because Mr. Monteleoni

20  showed you what happened next.  Nadine sent it to Will Hana,

21  and Will Hana sent it to an Egyptian official.  Because this

22  request came from Egypt.  And like everything else with Egypt,

23  it was secretly funneled through Hana and through Nadine and

24  through Menendez and back again.

25          I'll talk more about Egypt.  But why did that happen?

1    Put aside the Google idea.  Why didn't Will Hana just say, Bob,

2    listen, can I have some of this information?  You know why.

3    This is really important stuff.  They need to separate his

4    getting it from the Egyptians getting it.  What's the link?

5    Nadine and Hana.  What do they have in common?  Hana promised

6    her money.  Is there any explanation in the world for what

7    happened there other than that?

8            Menendez didn't become a senator last year, ladies and

9    gentlemen.  He's literally a leader of the Senate Foreign

10   Relations Committee.  Do you honestly think he thought this was

11   no big deal?  And if he did, why did he send it to his

12   girlfriend?  Had he forgotten Hana's phone number?  Had he

13   forgotten Hana's e-mail address?  You send it through your

14   girlfriend when you're trying to keep your fingerprints off it.

15           All right.  So, that's the first thing Mr. Fee said

16   should cause you doubt, all the evidence in the case.  First of

17   all, that is devastating proof of guilt, and you shouldn't

18   doubt it, but okay, what's the second thing.  The blue blazer.

19           You heard a lot about the blue blazer.  The argument

20   is here that Agent Kougemitros made a mistake.  Because Agent

21   Kougemitros made a mistake, everything in this case must be a

22   mistake.

23           Agent Kougemitros literally did what he should have

24   done.  He looked at photos overnight, remember?  And he

25   corrected himself.  And he decided that a blue blazer he

1    thought was inside the closet was on the outside of the closet.

2            So the argument is, because Agent Kougemitros was

3    careful, and a blue blazer was on the other side of the door,

4    the next six weeks of trial you should ignore.

5            This is an incredibly serious case for the government

6    and for the defendants.  Incredibly serious.  That is not a

7    serious argument.

8            Now, multiple defense counsel also argued that because

9    the government showed you the cash and the gold first in this

10   case, you should somehow ignore everything else.  That you were

11   being, I don't know, inflamed about the cash and the gold.

12           Let's pause there for a second.  Quid pro quo.  This

13   for that.  What's the this?  That's the bribes.  That's the

14   cash and the gold.  Would it make sense to present it in the

15   middle of the case?  Ladies and gentlemen, you've been here for

16   two months.  Did you stop listening after the first week of the

17   case?

18           Blue blazer is not outside of the closet.  It's on the

19   door.  It is a good example of when lawyers say things, it

20   might not be right.  Doesn't matter what we say.  It matters

21   what the evidence says.

22           But, inside the door, outside the door, heck, on the

23   bed.  Does it call into question anything else you've learned

24   for two months?

25           And by the way, a blue blazer in the bedroom.  Forget

O7B3MEN4                    Rebuttal - Mr. Richenthal

where.  Just in the bedroom.  You heard so much about how this
apparently is a bedroom that he doesn't use.  Putting aside it
is a bedroom.  His blazer is in the bedroom.  That's at least
one item of clothing in the bedroom.

Mr. Monteleoni suggested the same thing, but is the
argument, like, he's going to take his jacket off, but heaven
forbid the closet is closed, she has to run past him and lock
it?  This is nonsense.  No one in a real relationship could
think it is real life.  Putting aside his fingerprints are on
an envelope inside the closet, inside the safe.

Now, this idea that the blue blazer somehow blows up
the case, it's sort of a variation of a longer argument you've
heard a lot about, mainly from Mr. Menendez's team, that
Mr. Menendez isn't just not guilty, he's a victim.  He's a
victim of his own wife, he is a victim of Wael Hana, he is a
victim of Fred Daibes.

The suggestion seems to be Nadine, working with Hana
and Daibes, secretly collected money, secretly collected gold,
hid it from Menendez, Menendez didn't know anything about it,
and so he's a victim.

Well, first of all, if that's true, Nadine Menendez is
definitely guilty.  Now, she's not on trial in this case, you
don't haven't to decide if she is.  But if that's true, she is
definitely guilty.  So are Wael Hana and so are Fred Daibes
absolutely.  That's literally what that argument is, right.

O7B3MEN4                        Rebuttal - Mr. Richenthal

1          But, are you going to accept that there was a secret

2     plan to dupe Senator Menendez, that his wife cooked up a scheme

3     to secretly collect money and gold by invoking his name with

4     two men, one of whom was his close friend, and he never learned

5     about it?  Because let's be clear about what that means.

6          First it means that she duped her husband, her

7     boyfriend and now husband, an experienced public official, one

8     of the most powerful people in the entire U.S. Congress for

9     5 years.  Not a day.  Not like during an off part of their

10    relationship.  For 5 years.  That's how long this scheme would

11    have to exist that he would not know about.  5 years.

12         She would have to do it while they're living together.

13    Literally.  She would have to do it while he's tracking her

14    movements.  Let's be clear, it does not matter why he was.  He

15    might have had good reasons to do it.  That's not the point.

16    He was doing it.  That's undisputed.  So she's also doing it

17    while he knows where she is.

18         She's doing it involving a Mercedes literally in their

19    driveway.  A Mercedes he knows she cannot afford.  I'm not

20    asking you to assume.  You've seen the text messages.  He

21    literally knows she can't afford it.  Appears in the driveway.

22         If you believe the duping scheme, that is the blame my

23    wife defense, that car is magic.

24         And she also does it in a really, really bizarre way.

25    Really bizarre.  She has a safe deposit box, she has a safe,

but she sticks things in other places, including his own jacket

pocket?  And somehow he touches things that go in the safe from

his own friend, Fred Daibes with who, mind you, in this version

of the story, is part of the scheme to dupe him.

Now, look, you've learned a lot about Nadine Menendez

in this case.  A lot.  I'm not making fun of her.  But does she

strike you as a diabolical genius who concocts a plan with

Menendez's friend and Wael Hana to dupe him for 5 years,

including when they're living together?  You think that she

could have even pulled that off if she tried?  You don't have

to answer that question.  Why?  Because you know she didn't try

because there was no effort to hide from him.  Just the

opposite.

By the way, if that's what happened, how in heaven's

name do you explain what Menendez actually did.  Because

remember, in this version of the story, he doesn't know about

anything, but he keeps acting for the people paying.  I'm going

to come back to that.

But, as I said earlier, there are facts in the world,

they are not assumptions or guesses, they're facts in the

world.  Those are facts in the world he did stuff.  Why?  He

wasn't part of some secret conspiracy around him.  He did it

because he was being paid.  And by the way, some of it plainly

he controlled.  He didn't make him do it.  The ghostwritten

letter?  He wrote it and sent it to her.  The tell Will I'm

signing off on a arm sales?  He said tell Will.  He told her what to tell Will.  Does that sound like she's duping him?

Also if there is some scheme swirl around him and dupe him, how do you explain that Fred Daibes sends him images of really expensive watches right before acting him to act on legislation in a chain of communications that Nadine is not on?  How do you explain the New Jersey Attorney General scheme?  Nadine's barely involved in that.  Was she whispering in his ear?

So very clear.  As I've said to you, he knows all about the payments, he's taking actions, he's part of it.

But you nevertheless heard that on one specific piece, you kept hearing he doesn't know about the Mercedes, he doesn't know about the Mercedes.

Now, Fred Daibes and the other defendants desperately need you to believe that Menendez knew nothing.  Right.  They have to convince you of that.  That's their job.

But let's talk briefly about the Mercedes.  First of all, Jose Uribe told you all about the conversations he had with Robert Menendez.  I'm going to talking about Jose Uribe, but, even if you just ignored him, and you shouldn't, do you have any doubt, again, that he knew about the Mercedes in his own driveway?  The Mercedes he knew she couldn't afford, the Mercedes where she said I am going to meet Jose for five minutes and it appears in the driveway?  That's not reality.

1          What else isn't reality is part of this idea that

2     Nadine is duping Robert Menendez.  At least one defense

3     counsel, I think more than one, has asked you to somehow

4     suggest that the plan was not to bribe Robert Menendez, the

5     plan was to hire Doug Anton.  The plan to kill and stop all

6     investigation was to hire Doug Anton.  I think you heard that.

7     They said Doug Anton is a lawyer, they want to hire Doug Anton,

8     it has nothing to doing with Robert Menendez.  That truly makes

9     no sense at all.

10         So, first, to stick with the Mercedes, if the whole

11    plan is just to hire Doug Anton, why are they buying her a

12    Mercedes at all?  You are allowed to hire lawyers.  It doesn't

13    require buying a senator's girlfriend a Mercedes.

14         And second, if the plan is just to hire Anton, why is

15    Nadine connecting Jose Uribe with Menendez repeatedly?  What

16    does he have to do with it?

17         And third, if he's not involved, why is he contacting

18    Gurbir Grewal more than once?  Why is that happening?

19         I've already explained to you it makes no sense he

20    cares about discrimination or truckers and that's why he's

21    calling him.  Why is he calling him?  Anton is supposedly

22    working on this.  What is Menendez doing at all?

23         There are no answers to these questions I've just

24    asked you.  There are no answers to these questions because,

25    yes, the evidence showed that early on, the conspirators talked

1    about hiring Anton, and then the plan fell through.

2    Mr. Lustberg acknowledged it failed.  It did fail.  So then

3    they turned to bribing Menendez.

4            This goes back to the conspiracy instruction I talked

5    to you about.  If you conclude that the scheme to bribe

6    Menendez with respect to the New Jersey Attorney General didn't

7    start in 2018, it started later, and there is plenty of

8    evidence it started in 2018, but if you conclude it started

9    later, that's okay.

10           If you conclude that people schemed to bribe him in

11   2018, which is exactly what the evidence showed, but he wasn't

12   involved until later, that's okay.  You don't have to join at

13   the same time.

14           And also use your common sense.  If you scheme to

15   bribe a senator, the scheme is step one.  The bribing is step

16   two.  They're not going to happen at the same time.  That's

17   what happened here.  That's how conspiracies work.

18           All right.  Jose Uribe.  You heard a lot about Jose

19   Uribe.  Mr. Fee argued the government abandoned him.  He's in a

20   trash pile.  Up to you to decide what to make of that.  It's a

21   very odd thing to say.

22           Mr. Monteleoni explained to you in detail how all the

23   evidence proves the defendants guilty, even if Uribe never

24   testified.  Then explained to you he testified.  He told the

25   truth, and that made even more clear they're guilty.  That's

1    not abandoning him.

2            Mr. Fee literally said this.  Next slide.  Don't

3    believe him, guilty.  Believe him, double guilty.

4            Sort of right, actually.  If you don't believe him,

5    they're still guilty.  If you believe him, they're still

6    guilty.

7            Is the argument we should have presented less

8    evidence?  Is the argument because there is more evidence of

9    guilt, he is less guilty?  This is a serious case.  That's not

10   a serious argument.

11           What else were you asked to accept about Jose Uribe?

12   Let me pause for a minute.  It is a little weird to be talking

13   to you about whether you should believe Jose Uribe, because it

14   doesn't matter what I think.  It just doesn't.  And you saw

15   him.  It's up to you to decide if he is telling the truth.  But

16   did you notice that defense counsel wants to have it both ways?

17   They called him a liar, but then they also embraced lots of

18   stuff he said.  When he said that he pleaded guilty to bribing

19   Senator Menendez, that's a lie.  When he said I didn't actually

20   mention the Mercedes in the backyard, that's the truth.  That

21   was the moment the truth happened.

22           Ladies and gentlemen, if Jose Uribe was lying to frame

23   three men, why would he do it that way?  It's bizarre.  You

24   don't have to approve of Jose Uribe.  You shouldn't.  But does

25   he strike you as insane?  He got on the stand and lied about

1    bribing Senator Menendez?  He got on the stand and lied about

2    Wael Hana's involvement?  And then when asked did you talk to

3    Senator Menendez about the car?  He said no.  It doesn't make

4    any sense at all.

5            Let's just talk about one argument you were asked to

6    accept with Jose Uribe.  You were asked to accept that the

7    reason Jose Uribe said Robert Menendez said I saved your ass

8    not once but twice was not because Robert Menendez said that.

9    But because Jose Uribe was supposedly drunk and high and Robert

10   Menendez wanted to tell him to leave.

11           So, now Jose Uribe is actually double insane.  The

12   story in that version of reality is he is at dinner, drunk and

13   high -- mind you, there's no evidence of that.  If you recall,

14   he was actually invited to the dinner, he wasn't drinking at

15   the dinner.  That's an utter invention.  The story is drunk and

16   high, he's told to leave, and he decides the way I'm going to

17   convict Senator Menendez is not to tell him about the Mercedes.

18   No.  I'm not going to say that.  I'm going to deny that for

19   days.  But I'm going to say he saved my ass.  That is literally

20   what you're being asked to believe.  It is nonsense.  It did

21   not happen.

22           And side note, if it did happen, how did Jose Uribe

23   fake the text message to Nadine Menendez?  Because that exists.

24   It's not disputed.  Also, Sabine is an adult.  But Senator

25   Menendez sends her away so he can turn to a man and say, sir,

1    I'd like to enjoy dinner with my wife and daughter-in-law?

2    Why?

3          There is no answer to these questions because the

4    questions don't make any sense because the assumption baked in

5    doesn't make any sense.  It's not what happened.  Also saved

6    your ass twice.  Not fought discrimination twice.  Not saved

7    truckers twice.  I saved your ass.  That literally tells you

8    everything you need to know.

9          Mr. Lustberg took a different approach.  It is a small

10   thing, but I want to mention it because it's wrong.

11   Mr. Lustberg told you, you should assume Jose Uribe is lying

12   because he said he didn't ask Ana to withdraw money from

13   certain trust accounts, but there are a small number of

14   withdrawals from the same trust accounts.

15         But, just like Uribe told you, there is evidence that

16   he asked Ana Peguero to withdraw money from the trust account,

17   and she instead withdrew it from the operating account.  Yes,

18   there are other small withdrawals from the trust account at

19   other times.  It is a company.  There is no evidence of why

20   they were withdrawn or who did it.  It doesn't prove Uribe's

21   lying.  It doesn't prove anything at all.

22         Mr. Lustberg also asked you to accept that Jose Uribe

23   must be lying because he said "I don't recall" a lot on

24   cross-examination.  Remember there was a comparison of 17 to

25   100 and something.  You probably remember cross-examination.

1    It went on for a really long time, and Jose Uribe was asked a

2    lot of very precise questions, about things that happened years

3    ago, that have nothing to do with this case.  And he said I

4    don't recall.

5           This is just one example.  Transcript page 3354, he

6    was asked:

7    "Q.  And you collected insurance premiums from Jose Suero and

8    his company, his company Hoboken First Class Corp for about

9    three years, correct?

10   "A.  I don't recall the exact number of years, sir."

11          That's in the count, that answer.  You can get any

12   transcript, any testimony you want as you deliberate.  If you

13   have any doubt about what happened in this case, you should.

14   And you will see "I don't recall" was said a lot to bizarre,

15   precise questions about things that happened years ago that do

16   not matter.

17          Because what Jose Uribe did recall and fit literally

18   everything else in the case, was engaging in a scheme to bribe

19   Robert Menendez.

20          Jose Uribe was also attacked by defense counsel for

21   helping arrange a fundraiser during the course of the bribery

22   scheme.  But he told you why he did it.  On the left side is

23   what Mr. Lustberg said about the trust.  On the right side is

24   what happened about the trust.  That's what I talked about a

25   couple minutes ago.

1            Go to the next slide.  Stop there.  You don't need a

2      slide for this.  Why?  Because he was asked repeatedly about

3      the fundraiser.  Direct and cross.  He told you why he had it.

4      He told you he had it because he was trying to get closer to

5      Menendez.  That's what he said.  And that makes total sense.

6      Why is he doing a fundraiser for Menendez, a man he does not

7      know?  Because he wants something from him.  Because he wants

8      to get into his circle of trust.  Because he's about to bribe

9      him.  He's in the course of scheming to bribe him.

10            The suggestion that the fundraiser is evidence of

11     innocence is bizarre.  The fundraiser out of nowhere is

12     evidence of a scheme.  Jose Uribe literally told you why he did

13     it.

14            You're entitled to reject all of his testimony if you

15     want.  That part was credible.  It was all credible.  He did it

16     because he's part of the scheme.  Not because there is no

17     scheme.

18            And finally, Mr. Lustberg suggested that, well, even

19     if Jose Uribe told the truth, he didn't talk about Wael Hana in

20     the scheme.

21            Ladies and gentlemen, you were here.  He talked a lot

22     about Wael Hana in the scheme.  He talked about cash and Wael

23     Hana in the scheme.  He talked about meetings with Wael Hana in

24     the scheme.  Mr. Hana is absolutely within his rights to tell

25     you that those things didn't happen.  But Jose Uribe said they

1    happened, and all the messages you've seen make clear they

2    happened.

3              Your Honor, we're at 1 o'clock.  Would you like me to

4    keep going?

5              THE COURT:  How much longer do you have, sir?

6              MR. RICHENTHAL:  I've got some.

7              THE COURT:  All right.  Let's, ladies and gentlemen,

8    let's take a one-hour lunch break.  Be back at 2.

9              (Jury excused).

10             THE COURT:  2 o'clock.  Thank you.

11             (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O7B3MEN4

                        AFTERNOON SESSION

                             2:00

1            (At the sidebar)

2        THE COURT:  What have the parties found?

3        MR. MONTELEONI:  So, in our research, we don't believe

4   that what has been described by counsel for Mr. Menendez rises

5   to the level that necessitates an inquiry.

6        The Second Circuit has held in several cases that,

7   first of all, how you handle issues of potential premature

8   deliberation with the jury is best left to the discretion of

9   the trial judge.  It is only in unusual circumstances, like in

10  the *Haynes* case, where there is an actual report of a comment

11  on the presumed guilt of a defendant, where here we have

12  nothing.  Nothing of that sort here.  And it involved an

13  alternate who could have been interviewed without at all

14  affecting jury deliberations.  That's the type of circumstances

15  where an inquiry is clearly called for, in many instances of

16  any external influence on the jury, which is much more serious.

17  When it is intra-jury discussions, the Second Circuit has

18  recognized that the very inquiry is intrusive, even if it

19  happens before deliberations, and in many cases a curative

20  instruction is appropriate.

21       We certainly would have no problem with any further

22  curative instructions regarding avoiding any further -- any

23  even preliminary deliberations about the case or anything like

O7B3MEN4

1    that.

2            If the Court wished to conduct an inquiry, it is

3    within the Court's broad discretion.  But we think the factors

4    that the Second Circuit has acknowledged counsel against it in

5    many cases.  Just based on the predicate there was a possible

6    passing of a piece of paper or just a showing of a notebook

7    from one juror to another juror just don't rise to the level

8    where this intrusive inquiry is warranted.

9            And the intrusiveness can also create prejudice

10   because it really magnifies the significance of what may have

11   been insignificant incident.  That's a quote from the Second

12   Circuit in *United States v. Abrams*, a 1998 case.  137 F.3d at

13   704, 708-709.

14           THE COURT:  Mr. Weitzman.

15           MR. WEITZMAN:  I think the record is quite sufficient

16   and frankly requires some form of inquiry.  I don't think it

17   needs to be an intrusive inquiry.  We've seen multiple

18   instances where these two jurors have shown each other their

19   notepads after writing, which I mentioned earlier, and also

20   passed notes, and it is just of concern to us.  I think under

21   *Haynes*, there should be an inquiry, in light of what we've seen

22   by multiple witnesses on the defense side.

23           THE COURT:  You're both right in *Haynes* and under

24   *Acosta, United States v. Acosta*, 833 F. App'x 856 (2020).  But

25   it's clearly within the discretion of the Court.

O7B3MEN4

```
 1              I think I should make some inquiry.  What do the
 2     parties propose that inquiry be?  The issue really is were they
 3     engaged in discussing the case, but I think it's worthwhile
 4     spending a minute or two phrasing what that should be.  And it
 5     seems to me, although I'll be guided by the parties, that I
 6     should do this with each of the two jurors separately, and on
 7     the record, but without counsel there.  It will be available.
 8     It's 8 and 9 that you were talking about.  The woman in the
 9     flower dress and the fellow who wears the knit cap.
10              MR. WEITZMAN:  We agree it should be your Honor
11     without counsel and on the record.
12              THE COURT:  I think the government is probably of the
13     same accord.
14              MR. MONTELEONI:  On that, absolutely.
15              MR. WEITZMAN:  It should be an open-ended inquiry
16     without giving them options.  Just say we understand that
17     people have, and I think the phraseology we gave this morning
18     is I've been informed.
19              THE COURT:  Or it's come to my attention.
20              MR. WEITZMAN:  That there was some notes passed during
21     summations and notes you are taking on in your notepad were
22     also shown to each other.  And I'm sure your Honor will put it
23     best.  But essentially, we're asking about the substance of
24     those communications.
25              MR. MONTELEONI:  I think it's highly intrusive to --
```

O7B3MEN4

        THE COURT:  I don't think I should ask directly about
the substance because that may be intrusive.  But let me just
think for a moment.

        MR. WEITZMAN:  What about to the extent that the
substance concerned summations, the lawyers, the defendants,
then we'd ask that you let us know or advise us.

        THE COURT:  See, the issue with that is if they --
they had a note that said -- certainly not that it would be to
you, Mr. Weitzman -- but this guy's a jerk or something like
that.

        MR. LUSTBERG:  That would have been about me.

        THE COURT:  Not about one of the most famous lawyers
in New Jersey.

        MR. WEITZMAN:  I understand, your Honor.

        THE COURT:  So, that we shouldn't care about.  It
seems to me.  This guy's a jerk.  I don't think it is
discussions.

        MR. WEITZMAN:  Okay.

        THE COURT:  How do I get at that without being
intrusive?  That's the issue.

        MR. MONTELEONI:  The line that the Second Circuit has
drawn is that not every comment a juror may make to another
juror about the case is a discussion about a defendant's guilt
or innocence.  That comes within the common sense definition of
deliberation.

O7B3MEN4

1          The question is did you discuss a defendant's guilt or

2     innocence.  After first establishing whether there was even

3     sharing of notes.  And I would just ask that the predicate for

4     the inquiry, not assume that it necessarily happened.

5          THE COURT:  No, no, I don't want to put them on the

6     spot.  Maybe this is putting them on the spot.  Were you in

7     fact passing notes between yourselves.  I'm going to ask that.

8          MR. WEITZMAN:  I think that the question as phrased is

9     a bit too narrow, because it suggests that unless there is a

10    discussion saying he's guilty or he's not guilty, that nothing

11    else is deliberations and I don't think that's correct.  I

12    think for instance, arguments can be persuasive, contrary to

13    the evidence, and so on, and that constitutes is deliberations.

14    I think that's a bit too narrow a formulation.

15         MR. MONTELEONI:  It's from the Second Circuit.

16         MR. WEITZMAN:  I haven't read that case.  But I think

17    the open-ended question would be did anything in your

18    discussions, are they deliberations, are you discussing the

19    case, the facts of the case.

20         MR. MONTELEONI:  Again, I think just a lot of

21    discussions might be about the case, right.  So saying is there

22    a discussion of the case is going to be much more open-ended

23    than something that actually falls within the does this involve

24    a discussion about the defendant's guilt or innocence.

25         THE COURT:  Were you discussing the evidence in this

O7B3MEN4

1    case.

2              MR. WEITZMAN:  I think that's fair.  The way I see it

3    is it could be a multistage.  If it is just personal, that

4    question is going to get to no, we were only discussing

5    personal matters.  If they were discussing the facts of the

6    case, I suspect you'll have to have a deeper inquiry, your

7    Honor.

8              MR. MONTELEONI:  I think the inquiry that the Second

9    Circuit's cases suggest is first establish whether there even

10   was any showing of passing of notes.

11             THE COURT:  That's done.

12             MR. MONTELEONI:  You can just ask was that about the

13   guilt or innocence of a defendant.

14             I think that something more about this, you know, all

15   kinds of things that happen in front of a jury have to do with

16   the evidence.  Like how long this evidence is taking to come

17   in, any of these types of things.  Just saying does this have

18   to do with the evidence, bringing any sort of legalistic was it

19   about the substance of the evidence or I just -- that's far

20   from the actual inquiry, which is does it involve a discussion

21   of the guilt or innocence of a defendant.  And that's what the

22   cases say, and we think if you even wished to make this

23   inquiry, which is within your discretion, we think that's a

24   more appropriate inquiry to take.

25             THE COURT:  Stay here.  Let me just formulate

O7B3MEN4

1    something.

2              (Pause)

3              THE COURT:  I think first I don't think I should

4    micromanage it without hearing what the answers are, but it

5    seems to me I can say it's come to my attention that notes may

6    have been passed between you and another juror -- I'll question

7    each one separately, by the way -- during the summations of the

8    lawyers.  Did your note involve your views on the evidence or

9    the guilt or innocence of any of the defendants?

10             And depending upon the answer, I'll just have to see

11   where it goes.  But I think I'll conclude with are you able --

12   if I'm comfortable with the answers, are you able to be fair

13   and impartial and decide this case is solely on the evidence or

14   lack of evidence.

15             Agreed all around?

16             MR. WEITZMAN:  Agreed.

17             MR. MONTELEONI:  One or two things.  Our view is that

18   extra level of inquiry is not required, though it is obviously

19   in your discretion.  But I assume you are going to ask a

20   predicate question of whether there actually was any passing of

21   notes.  I think it was did your note involve.  And so I think

22   the first question is there may have been a note, did you in

23   fact pass a note.

24             THE COURT:  What I was proposing was it's come to my

25   attention that notes may have been passed between you and

O7B3MEN4

 1    another juror during summations.  I think I can say in fact did

 2    that happen.

 3                MR. WEITZMAN:  Yes.

 4                I guess the only question is whether there should be

 5    some sort of instruction that they should not discuss the

 6    colloquy with others.

 7                THE COURT:  I think that's fair.  Yes.  Thank you.

 8    Okay.  I'm going to go into the robing room.

 9                Ms. Blakely.

10                (Juror No. 8 present in the robing room)

11                THE COURT:  Come right over.  It's come to my

12    attention that notes may have been passed between you and

13    another juror during the course of summations.  I don't know if

14    that's true or not.  But tell me.

15                JUROR NO. 8:  No.  No.

16                THE COURT:  You didn't exchange a note with anyone?

17                JUROR NO. 8:  No.

18                THE COURT:  Thank you.  That's it.  I appreciate it.

19    Please, there is no need to discuss, I'd rather you not discuss

20    the fact that I've been asking you this with the other jurors.

21                JUROR NO. 8:  Okay.

22                THE COURT:  And I'm going to ask another juror the

23    same question.  So, thank you very much.

24                JUROR NO. 8:  All right.

25                (Juror not present)

1              (Juror No. 9 present)

2              THE COURT:  Doctor, it's come to my attention that

3       notes may have been passed between you and another juror during

4       the course of summations, or you or the other juror were

5       showing your notes to each other.

6              Did that happen?

7              JUROR NO. 9:  Did I show -- honestly I don't remember,

8       and if I did say something, it wasn't anything about the case.

9              THE COURT:  That's really, that's what I'm asking.

10             JUROR NO. 9:  So, so the short answer is I honestly

11      don't remember.  But, if I did, again, it's not anything about

12      the case.

13             I have looked once or twice, they put up an exhibit

14      number and then it came down.  And I tried to understand what

15      was the exhibit, like GX 10 whatever.  So one time I looked

16      over and "did you get that?" and she didn't.  So she had

17      crossed it out because she tried to get it.

18             So, the only time I can remember looking for something

19      is if I tried to write it down.  Because you know they're

20      talking very fast.

21             THE COURT:  Of course.  You know the number of times

22      I've told everybody to slow down.

23             JUROR NO. 9:  Yeah.

24             THE COURT:  I don't want to put words in your mouth.

25      But if I understand you.  You may have looked to see another

O7B3MEN4

1  person -- another juror's notes, but it was for the purpose of

2  getting an exhibit number.

3          JUROR NO. 9:  Today, for instance, I looked, I looked

4  at her paper, and I asked her "Did you get that GX number?"

5          THE COURT:  And the answer?

6          JUROR NO. 9:  She didn't because she had crossed it

7  out.  She started to write GX and she missed the string of

8  numbers.

9          THE COURT:  That's all you saw on her notepad.

10          JUROR NO. 9:  Yeah, yeah.  My notes are extremely

11  detailed.  I don't need anybody's notes.  I have five books

12  full of them.

13          THE COURT:  Thank you, sir.  I appreciate it.

14          JUROR NO. 9:  Nothing, I promise nothing improper.

15          THE COURT:  Thank you.  Please don't discuss the fact

16  that I had this inquiry with the others.

17          JUROR NO. 9:  Sure thing.

18          THE COURT:  And I really appreciate, and I'll tell the

19  jurors this later on, I really appreciate all the time the

20  jurors have spent.  This is a very long case and I know

21  everybody's taking it very seriously.  Thank you, sir.

22          JUROR NO. 9:  Just to add, that's exactly why I did

23  get that number, because we're trying to absorb every piece of

24  information.  We're not suggesting anything --

25          THE COURT:  Thank you.

O7B3MEN4

1          (Juror not present)

2          (At the sidebar)

3          THE COURT:  I'm quite comfortable that there has been

4    no misconduct, and there is no need for further inquiry.  And

5    you'll be able to read the conference in the robing room

6    because it's on the record.

7          I asked Juror No. 8 that it's come to my attention

8    that notes may have been passed between you and another juror

9    during summation.  And is that in fact what happened.  She said

10   no.  No.  She just said no.  Period.  I thanked her, asked her

11   not to discuss the fact I was questioning her, and excused her.

12         When Juror No. 9 came in, I expanded the question

13   because I thought it should be expanded, and I said it's come

14   to my attention that notes may have been passed between you and

15   another juror or you may have been looking at another juror's

16   notes.  And to that he said -- I have every reason to believe

17   he's being completely truthful -- that I didn't pass any notes

18   at all.  But today during summations, he said the lawyers talk

19   very fast, and I don't get all the exhibit numbers.  And you

20   may have seen that this juror has a stack of notepads that he's

21   been filling up.  Every time he fills one up, he asks my deputy

22   for another pad.  He said I take very thorough notes, and I did

23   say to her "did you get that?"  And I saw that on her notes

24   that had been crossed out, the exhibit number.

25         And that was it.  I don't think any further inquiry is

O7B3MEN4                    Rebuttal - Mr. Richenthal

1    needed, I'm quite comfortable.  Government?

2              MR. MONTELEONI:  Yes, your Honor.  We agree with that.

3    But I would also just ask that the record reflect that counsel

4    for Mr. Hana and Mr. Daibes, they didn't verbally object in any

5    way to not also not being present for the inquiry.  And I

6    talked to them off the record and they confirm they agreed.

7              MR. LUSTBERG:  That's correct.

8              MR. DE CASTRO:  That's correct.

9              THE COURT:  I saw everybody nodding affirmatively.

10   That's a more lawyerly approach to it.

11             Government has agreed.

12             No further inquiry?

13             MR. WEITZMAN:  We agree as well.

14             MR. LUSTBERG:  Same.

15             MR. DE CASTRO:  Agreed.

16             THE COURT:  How long is Mr. Richenthal?

17             MR. MONTELEONI:  I'm not an oracle.

18             (In open court)

19             THE COURT:  Bring the jury in.

20             (Jury present)

21             THE COURT:  You may be seated in the courtroom.  And

22   Mr. Richenthal, you may continue and conclude the rebuttal

23   summation on behalf of the government.

24             MR. RICHENTHAL:  Welcome back.

25             Now, before the break, I was talking a bit about how

O7B3MEN4                         Rebuttal - Mr. Richenthal

1    Mr. Menendez's summation, Mr. Fee asked you to believe certain

2    parts of Jose Uribe's testimony, but not other parts.  Parts

3    that were good for Mr. Menendez, believe those.  But parts that

4    paint a different story, that's exaggeration.  That's

5    invention.

6            Now, Mr. Lustberg did much the same thing but in his

7    own way.  I want to talk briefly about that.  He told you that

8    when Uribe said Hana was in his office studying for the future

9    halal company, that was the truth.  He was studying hard,

10   Mr. Lustberg said.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O7bWmen5                         Rebuttal - Mr. Richenthal

1              MR. RICHENTHAL:  He told you when Uribe said that he

2      was frustrated with Hana, that Hana wasn't doing enough, that

3      was also the truth.  However, when Uribe said Bienvenido

4      Hernandez and Elvis Parra paid Hana $150,000 in cash for part

5      1, and part 2 -- that's kill and stop all investigation -- now

6      Uribe's lying.  That -- that -- did not happen.  Now, I expect

7      you're going to hear, you can embrace all the witnesses'

8      testimony or none of it.  It's up to you.  But Uribe, again, is

9      not mentally ill.  He's not a mastermind.  And embracing some

10     of what he says and not the rest doesn't make a lot of sense.

11             Now, why did Mr. Lustberg do that too?  Because the

12     parts that he's asking you not to believe are devastating

13     evidence of Wael Hana's guilt.

14             Could we go to the next slide.

15             You see, in the upper left here, it says, in sum,

16     after Mr. Critchley has filed his notice of appearance, Will's

17     out.  Now, that last line -- that last line -- is the key.

18     What Mr. Lustberg is arguing is that Will Hana was not involved

19     once the Anton piece fell apart.  Now, that matters for the

20     reasons I explained before lunch.  Right?  Because the Anton

21     piece isn't a crime.  So Will is involved in the Anton piece,

22     but he's not involved in the Menendez piece, or at least as to

23     this part of the scheme, the argument goes, Will Hana's not

24     there.

25             Ladies and gentlemen, look at the bottom part of your

O7bWmen5                              Rebuttal - Mr. Richenthal

1     screen.  And this is just a piece of the evidence.  This is not

2     all of it.  Every single message on your screen -- and again,

3     this is just a snippet.  Every single message on your screen is

4     in 2019, and look what they're about.  Look at No. 366, for

5     example.  Will, directly to Nadine, this matter involves only

6     four counts, etc.  What's that about?  It's the Parra case.

7     Why is he texting Nadine information if he was out of the whole

8     thing the year before?  Why is he texting Nadine information at

9     all if his only role was to hire a lawyer, Doug Anton?  The

10    answer, of course, is he wasn't done.  He, Will Hana, was not

11    done in 2018.  His role was not limited to trying to hire Mr.

12    Anton, and he was part of the scheme with Nadine.  It's clear

13    as day.

14            And by the way, not just 366.  I'm not going to

15    belabor this.  Look at 368.  It keeps going and going, because

16    the scheme kept going and going, and Will Hana was part of it.

17    He wanted Menendez to intervene on the Parra case, just like

18    José Uribe, and he collected cash for it, because wanting

19    Menendez to intervene, that's not going to work.  Paying for

20    Menendez to intervene, well, that will work.

21            Now that I'm talking a little about Hana, I want to

22    respond briefly to the argument Mr. Lustberg made that even if

23    Will Hana paid money, they were gifts, not bribes.  I've

24    already talked about that with respect to Mr. De Castro.  That

25    argument falls apart for much of the same reason.  But I want

1    to start with just, like, a basic point.

2              If Hana wanted to give Menendez, or for that matter

3    Nadine, gifts, why didn't he just give them gifts?  I don't

4    mean that as, like, a silly question.  Because you know in this

5    case he didn't just give them gifts.  Right?  There's unsigned

6    contracts.  There's unsigned promissory notes.  Why not just

7    give them a gift?  If literally -- literally -- what you want

8    to do is give them a gift, just give them a gift.  You don't

9    need an unsigned loan agreement.  You don't need an unsigned

10   consulting agreement.  Why cover it up?  Just:  Hi, I like you.

11   Here's a gift.  Merry Christmas, merry Easter, whatever.

12             You don't need a sham mortgage note.  You don't need a

13   sham job.  Just give a gift.  The reason you do a sham job or

14   you do a sham mortgage note is because they ain't gifts, and

15   you want to have a cover story if the payments get found out.

16   It's literally not worth your time otherwise.  Why bother?

17             And let's just be very, very clear.  The mortgage note

18   was a sham.  Don't conclude that because I say it.  That's just

19   a word.  Look at it.  No interest payments.  Have you ever

20   heard of a loan with no interest?  None.  No interest.  No

21   interest.

22             Oh, and, by the way, Nadine may have never made any

23   payments at all.  Have you ever heard of a loan with no

24   interest and no payments?  It ain't a loan.  It's just money

25   and the word "loan."

O7bWmen5                          Rebuttal - Mr. Richenthal

1             Could we go to the next slide.

2             You guys probably remember this.  I'm not a math

3    person.  I'm not going to belabor this, but just look at it for

4    one second.  OK?  So this is the ledger, essentially, of

5    payments.  Two things about this:

6             Now, remember, this is what Nadine told Daibes she was

7    owed by Hana.  Remember?  And Daibes helped.  Now, look at

8    where it starts:  May, not August, like the alleged note and

9    contract say.  Right?  May.  But what happened in May?  Just to

10   be clear, this is May 2019.

11            What happened in May?  In fact, what happened on May

12   1, the date that's highlighted?  That's the IS EG Halal

13   monopoly's beginning.  And she's expecting $10,000 a month.

14   Now, she counted the first of those $10,000 bribe checks.

15   Right?  The one that was handed to Menendez, and she counted

16   the mortgage payments against it too.  $10,000 a month, just

17   like Hana told the Egyptians.

18            Now, look at something else.  This ledger only goes to

19   October.  Right?  Even though you know that Nadine was

20   supposedly fired in November.  And she got a check.  In fact,

21   after she's supposedly fired, in November.  So what's going on

22   here?  You see, ladies and gentlemen, she expected to continue

23   to get paid.

24            Let's go to the next slide.

25            Look at that.  This is Nadine to Daibes:  Hoping not

O7bWmen5                          Rebuttal - Mr. Richenthal

1    to involve you, hoping we'd start November 1 and do it

2    automatically.

3            What's "it"?  Payment.  This is November she's talking

4    about.  Of course, she's allegedly fired in October.  The

5    contract itself allegedly doesn't go past then anyway.  Why, in

6    heaven's name, is she telling Fred Daibes this?  Because it

7    ain't a contract.  It's not signed anyway.  It ain't a job.  It

8    ain't a loan.  Daibes knows it, and she wants her money.

9            Now, to be clear, November ends up being the last

10   check she gets.  You guys know that from the trial.  Well, what

11   happened in November?  Not just Thanksgiving.  What happened in

12   November?

13           Go to the next slide.

14           That -- that; there was a search of Wael Hana's home

15   on November 25, 2019.  Disruption in the plan.  No more checks.

16   But it's not because she was fired.  Remember, of course, she

17   also got a check after she was fired.  And this is teed to the

18   argument that somehow Wael Hana was not involved in 2018.  But

19   does that mean there's no more payments?  No more payments from

20   Wael Hana or IS EG Halal, his company, to Nadine?  No.

21           Go to the next slide.

22           These are envelopes.  Right?  They're found in the

23   Menendez home.  There are three of them that are in red.  Whose

24   prints are on them?  Nader Moussa, Agent Kougemitros and, the

25   bottom one, Gazmend Lita.  Now, who are those people?  You

O7bWmen5                        Rebuttal - Mr. Richenthal

1    might remember the answer.  They're connected to Wael Hana.

2              Go to the next slide.

3              They work for him.  So how did Nadine get paid by Wael

4    Hana after the checks stopped?  The good old-fashioned way --

5    cash.

6              By the way, the chart I just showed you is GX-1334,

7    and you'll see from other evidence in the case that one of

8    those envelopes is also unquestionably after the checks, in

9    recent years, and during the scheme.  Because that's when the

10   money was withdrawn.  It's not that Mr. Hana left the

11   conspiracy.  It's that the conspiracy continued, and he just

12   needed to be a lot more careful.  So he switched to cash and he

13   switched to his employees, and it's sitting in the home like

14   the rest of the bribes.

15             Now, two more things, quickly.

16             First, Daibes's response to that ledger is not, what

17   the heck are you talking about?  It's not, why should I pay?

18   It's not, May?  Don't you have a contract through fall?  It's,

19   like, no problem, I'll pay.  And he helps, because he knows

20   what's going on.  That is a really, really strange ledger,

21   right?  If you don't know what's happening, it's confusing.

22   You guys know what's happening.  You might still think it's

23   confusing.  Daibes doesn't ask a question other than, how much

24   does Will owe you?  Just the amount of money.  Remember, he's

25   Menendez's good friend.  Do you think he thinks that Nadine has

O7bWmen5                    Rebuttal - Mr. Richenthal

become Strategic International Business Consultants, the name
of her company?  Of course not.  It's just money.  Because
Daibes is part of the scheme too.

        By the way, I should also note that even -- even -- if
you think that the promissory note is real, it can still be a
bribe; that is, bribes don't have to be something other than a
loan.  You can give a bribe as a loan, especially a no-interest
loan.  But this wasn't a loan.  And neither was it a job.

        Now, I'm not going to go at length on this, but first
of all, she gets $10,000 after she's fired.  Second of all,
she's fired in an email that literally thanks her for her work
and just says we don't need someone to head the New Delhi
office.  Now, Nadine didn't live in India.  OK?  She wasn't
going to be the head of the New Delhi office, and the work she
did for $10,000, heck, for $30,000 -- you saw it -- was it
worth $30,000?  Was it worth $10,000?  Of course not.  And who
works in an unsigned agreement anyway?  And then when the
agreement terminates allegedly just keeps getting paid, just
switches to cash by the employees of the man who fired you.
It's not a job.  It's a way to cover up bribery.

        Now, I want to talk a little bit more about Wael Hana,
but first, I want to make a basic point.  I've been talking
about cash.  I've been talking about checks.  But even if that
didn't exist, Hana's guilty anyway.  Right?  Because you know
he helped with the Mercedes.  You know he's part of the scheme

O7bWmen5                          Rebuttal - Mr. Richenthal

1    to pay other ways.  So you could actually assume that the

2    promissory note is real.  And it's not.  You could assume that

3    the employment contract is real.  It's not.  It wouldn't

4    matter, but those things aren't real.

5            So let's talk a little more about Wael Hana.

6            Mr. Lustberg's final argument -- it might not have

7    been literally, but the last thing he said, one of the things

8    he said was, ladies and gentlemen, this can't be bribery

9    because the actual payments are in 2019.  But Menendez is doing

10   things in 2018.  So no bribery.  Right?  Menendez acts in 2018.

11   Wael Hana pays in 2019.  So you can't do that.  Well, I don't

12   expect you'll hear from Judge Stein that literally a bribe must

13   be paid before the action gets taken.  I expect you're going to

14   hear an offer of a bribe is just as good as a bribe.  In fact,

15   you don't need to pay at all.

16           So what happened in 2018?  You know the answer.  He

17   promised Nadine he'd pay.  That's the project she got clearance

18   on.  And Menendez sprang into action.  And when Wael Hana got

19   his monopoly, he, in fact, paid.  That's not a lack of bribery.

20   That is literally bribery.

21           Now, I want to be very clear about something.  Yes --

22   I think Mr. Lustberg suggested this -- Mr. Hana didn't pay with

23   enthusiasm.  I think you saw some text messages suggesting he'd

24   rather not pay.  Well, yeah.  He got his monopoly.  He got all

25   the stuff in 2018 and the spring of 2019.  If he already got

it, why pay?  This is not legitimate business, I'm not going to

pay.  Now, to be clear, he, in fact, paid.  But the fact that

he didn't really want to doesn't make him innocent.  In fact,

it's the opposite.  You can only try to stiff someone you

actually otherwise made a promise to.  It reinforces that the

promise in 2018 was an actual promise.  Nadine thought so.

Wael Hana thought so.  And it reinforces because this is all

fake, and he thinks he can try to get out of it because the

contracts aren't real.  The job isn't real.  The promissory

note isn't real.  So if you can get away with it, don't pay.

Again, he did pay.  But don't be deceived by the argument

because he didn't want to they weren't bribes.  He's a

businessman.  Of course he didn't want to.

          So let's go back.  Let's go back to the monopoly.

When did Robert Menendez call Ted McKinney?  Two days after

Morton's dinner.  Two days.  Two days after, what else can the

love of my life do for you, said to Wael Hana and two Egyptian

officials.  Two days.

          By the way, why is Wael Hana even there?  Now,

Mr. Lustberg argued that, you know, Will Hana is just trying to

advocate for his country.  That's why he's there.

          By the way, I think I said two Egyptian officials at

dinner.  I think it was actually one.

          So, the argument is Wael Hana is just advocating for

Egypt.  Remember this argument?  Let's talk a little about

O7bWmen5                     Rebuttal - Mr. Richenthal

1    that.  First, you can definitely advocate for a country if you

2    want, but you can't bribe someone for it.  And he did.  So,

3    like, you can just dispose of that argument right there.  He

4    may have thought that Egypt deserved everything in the world,

5    but if you bribe a U.S. senator for that, he's guilty.  But --

6    but -- is what he did advocacy?  Was the U.S. embassy

7    information advocacy?  Where is the advocacy?  He's just sent

8    them information, to the Egyptian officials, to do with as they

9    will.  He doesn't advocate for a damn thing.

10           Now, that's actually true for virtually everything

11   else as well.  Remember the Jamal Khashoggi heads-up for giving

12   the Egyptians a leg up in conversations with the senators?

13   Advocacy?  It's cheating, sure.  But advocacy?

14           How about the ghostwritten letter?  So Mr. Lustberg

15   literally said that was the work of a diplomat.  Are you

16   kidding me?  A senator -- a senator -- secretly edits a letter

17   to convince other senators to drop objections to military aid

18   to a country.  Doesn't tell anyone he's doing it, and he sends

19   it through his girlfriend.  And Wael Hana's part of this

20   scheme.  Does that look like advocacy to you?  Wael Hana could

21   have had a meeting with Senator Menendez.  Senator Menendez had

22   meetings with all kinds of people.  You heard about a guy named

23   Tasos, Cyprus and Greece.  Tasos has a foundation.

24           You can meet about foreign countries, sure.  A

25   ghostwritten letter secretly, through your girlfriend, to

O7bWmen5                        Rebuttal - Mr. Richenthal

1   convince a foreign country to drop objections by senators, does

2   that seem like such an aboveboard lobbying advocacy activity?

3   And by the way, the woman in the middle that I'm talking about,

4   Nadine, you're secretly promising to pay her from the monopoly

5   you're hoping to get from the same foreign country, does that

6   sound like advocacy?  It sounds like bribery.

7           And let's be very, very crystal clear about something.

8   Senator Menendez has every right and every ability to seek to

9   convince his fellow senators of literally anything he wants.

10  But if he wants to do that, he could walk down the hallway.  He

11  could pick up the phone.  He didn't do that.  He ghost-wrote a

12  letter secretly with his girlfriend who's been promised

13  payments by Will Hana.  That's not the work of a diplomat.  You

14  heard nothing like that in this case.  But even if you heard

15  nothing in this case, you would already know that that's not

16  the work of a diplomat.  That's the work of a corrupt official.

17          And Hana knew it, because, again, if Menendez and Hana

18  just wanted to talk about Egypt, they could talk about Egypt.

19  Why is Nadine in the middle?  It's the same reason she's in the

20  middle of the embassy information.  Senator Menendez and Wael

21  Hana needed to separate themselves from each other because

22  what's going on is dirty, and they both know it.  Nadine knows

23  it too, but at least if she's in the center, there are fewer

24  communications; it's harder to figure it out.  You can call it

25  diplomacy.  You can deny it.

O7bWmen5                    Rebuttal - Mr. Richenthal

1         A ghostwritten letter isn't advocacy.  It's special

2   treatment, and if you have any doubt -- and you shouldn't --

3   that Menendez and Nadine didn't think of Will as some sort of

4   mere advocate or go-between.  Look at how they talked not to

5   him.

6         Could we put up GX-A101-83.  The top.  Nadine Menendez

7   to Bob Menendez, April 1, 2019:  Will left for Egypt yesterday

8   supposedly and now he thinks he's king of the world and has

9   both countries wrapped around his pinky.

10        That's weird enough, but keep reading:  I really hope

11  they replace him.

12        Who is the "they"?  Egypt.  Replace him as in

13  substitute out.  If Will Hana is just like a guy who likes

14  Egypt, how does the foreign government of Egypt get to replace

15  Will Hana in the United States?  They don't.  It's because he's

16  working for Egypt, and Nadine and Menendez know it.  Menendez

17  does not say back, who's they?  I'm sorry.  Will Hana lives in

18  New Jersey.  How do they replace him?  No.  This is, like, a

19  normal thing to say because Will Hana is their intermediary to

20  the government of Egypt, and they know it.

21        And as I said a few minutes ago, why else is Will

22  Hana, the failed trucker, future halal exporter, at Morton's

23  dinner with the senator and the Egyptian official in the first

24  place?  There are lots and lots -- you heard this -- of

25  constituents of Senator Menendez from Egypt or connected to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7bWmen5                          Rebuttal - Mr. Richenthal

1   Egypt in New Jersey.  Lots.  That's great.  Who is at the

2   dinner?  The guy that promised his girlfriend money.  The guy

3   who otherwise has no reason to be at the dinner, except he

4   promised his girlfriend money.

5          And again, I've been talking.  I've been talking about

6   what Nadine and Menendez thought of Will.  What did Will think

7   of Menendez?  Was he part of this, or was he -- I don't know --

8   just sort of an unwitting participant?  Well, how did he refer

9   to Menendez?  You guys know the answer -- our man.  Our man is

10  going to India.  He says that to an Egyptian official.  That's

11  at Government Exhibit 1302, line 79.  I think Mr. Monteleoni

12  showed you this.  Our man.  He's talking to an Egyptian

13  official, and he's saying our man.  So who is "our"?  Egypt's.

14  Who is "man"?  Menendez.  Does Will Hana think of himself as a

15  mere advocate, or does he think he's got Menendez in his

16  pocket?

17         He thinks he has Menendez in his pocket.  Is he wrong?

18  No.  Literally look at all of the stuff Menendez did secretly

19  with Will and Nadine.  He was their man.  It is a horrible

20  thing to say.  This is a senior U.S. senator, and he was their

21  man.

22         Of course, it wasn't just Will Hana who thought that.

23  The head of Egyptian intelligence thought that.  General Abbas

24  Kamel thought that.

25         Could we call up Government Exhibit 8F33 on one side

O7bWmen5                        Rebuttal - Mr. Richenthal

1    of the screen and Defense Exhibit 1009 on the other.

2              You saw these.  Senator Cardin -- these are otherwise

3    identical letters.  If you didn't read them, you probably think

4    they're the same thing.  You should read them.  Senator Cardin

5    is thanked in very formal terms for a meeting.  This is the

6    same meeting Menendez was in, right?  So we're not talking

7    about a different one.  But Senator Menendez is Bob, and he's

8    called a sincere friend.  These are otherwise essentially form

9    letters, but the one on the left isn't a form letter.  It's not

10   even a formal letter.  That's the head of Egyptian

11   intelligence.  Was this an accident?  Was Will wrong?  No.

12   Because Will's not guessing.  Will's talking to an Egyptian

13   official and calling him our man because he was their man.

14             General Abbas Kamel is referring to him as Bob because

15   this isn't a normal relationship.  Senator Cardin is Senator

16   Cardin.  Bob is his sincere friend.  If you had any doubt about

17   that -- and you shouldn't -- look at Menendez's response when

18   his own staffer -- you remember Sarah Arkin, right?  She did

19   the right thing.  She did things by the book, and Mai

20   Abdelmaguid complains about it.

21             By the way, note what she says.  It's not just I'm

22   going to lose my job.  Look what she says in the fourth line,

23   my director, as in director of Egyptian intelligence.

24             Now, Nadine complains to Menendez about this.  He

25   doesn't seem remotely confused.  Quite the opposite.  He just

O7bWmen5                    Rebuttal - Mr. Richenthal

1    says taken care of.  So what did that mean?  I've got Mai's

2    back.  Sarah Arkin, my staffer for years, don't worry about it.

3    You know what he did.  He lied to her.  He kept her away from

4    the CODEL, because it was more important to him to keep Mai

5    happy than his own professional staffer happy.

6            It's been a two-month trial, but if you remember

7    nothing else about Menendez's relationship with Egypt, remember

8    what's in the middle of your screen.  He chose someone who he

9    understood was an Egyptian intelligence officer over a

10   professional staffer of the United States Senate Foreign

11   Relations Committee, who had devoted years to him in service to

12   the United States.  You could use many words to describe that.

13   What the law describes it as is serving as a foreign agent.

14           Now, I'm going to make a few other, small arguments

15   and then I'm going to wrap up, because I've been talking for a

16   long time.

17           On this same point -- by same point I mean Wael Hana

18   paying Robert Menendez -- Mr. Lustberg made the following

19   argument.  He argued whatever else you think, this can't have

20   been corrupt because it wasn't enough money.  Remember he said,

21   like, Nadine only gets tens of thousands and it's a big deal to

22   Egypt so it can't be true.

23           Well, first of all, I don't expect you're going to

24   hear that the law excludes bribes if the briber should have

25   asked for more.  I don't expect you're going to hear anything

1    like that.  Your common sense would tell you the contrary.  But

2    it also doesn't make any sense factually because, yes, Nadine

3    Menendez only got some money in 2019, but it was a lot of

4    money.  In fact, it's the mortgage payments.  It's the fake

5    job.  It's the Mercedes.  It's cash I showed you that

6    Mr. Lustberg didn't talk about.  It's gold.  Hana gave gold

7    too, you know that.  So it's actually a lot.  But there's a

8    more fundamental problem with this argument.  None of the

9    scheme gets disrupted.  There's a search of Menendez's home.

10   You can damn well infer that if it kept going, Robert Menendez

11   expected to get more.  Why would he not?  Hana is raking in

12   money.  So if you stop it and only a certain amount was paid,

13   does that somehow demonstrate it wasn't bribery?  No.  Of

14   course it doesn't.

15          And again, I don't expect you're going to have to

16   decide whether the bribe was big enough, because it literally

17   makes no sense why Robert Menendez does this unless he's

18   getting paid.  There is no other explanation.  This is a man

19   who was known for years -- for years -- for his human rights

20   record.  Why does he do it?  There's literally only one answer

21   to that question.  It's money.

22          Now, from Egypt to Qatar.  I'm not going to talk too

23   long about Qatar.  And one reason I'm not is I just want to

24   note you can find every defendant guilty of every count even if

25   you literally never talk about Qatar.  Period.  There are no

1    counts that rest alone on Qatar.  None.  Zero.  It's part of

2    the counts, but there's no count that rests solely on it.  It's

3    important you remember that.  But you shouldn't forget about

4    Qatar, because it just reinforces everything you've learned for

5    two months.

6            Now, Mr. Fee showed you a bunch of stuff about Qatar.

7    I think there was a tweet in there, a whole bunch of press

8    releases.  The idea was, well, everyone just loves Qatar.

9    Everyone said nice things about Qatar, so if Menendez said nice

10   things about Qatar, he's just one of lots of people.  How many

11   of them had gold in their home from someone trying to do

12   business with Qatar, Fred Daibes's company.  How many of them

13   had bundles of cash in their home from someone trying to do

14   business with a Qatari-tied company?

15           Now, let's be clear.  There's nothing wrong with

16   thanking Qatar.  This case is not about Qatar.  But the

17   question is are you acting because you actually think they

18   deserve thanks, or are you acting because you like the

19   envelopes of cash in your home and your friend is trying to do

20   business with a company called Heritage which has people

21   connected to Qatar?  Don't take your eye off the ball here.

22   They also tried to suggest, well, there's, like, investment

23   people and lawyers, and they're all involved in the deal.  OK.

24   Ladies and gentlemen, the allegation is not, like, the deal was

25   corrupt.  The allegation is that Menendez took things from Fred

O7bWmen5                        Rebuttal - Mr. Richenthal

1    Daibes, knowing Fred Daibes wanted Menendez to do things for

2    Qatar, because that would get Fred Daibes closer to the Qatari

3    officials and closer to the deal.  The deal is fine.  What led

4    to the deal?  Why did Bob Menendez take things from Fred Daibes

5    and do very strange things for Qatar?  Because he was on the

6    take.

7            Now, you may be thinking, well, what strange things?

8    Remember the press release he put out?  Sarah Arkin testified

9    about this.  They were planning to put a press release out

10   thanking a whole bunch of countries.  Qatar is one of them, and

11   then, like a switch, within ten minutes of a communication from

12   Daibes, Menendez says let's thank Qatar.  The problem, as you

13   know, is not that thanking Qatar is wrong.  It's why did he do

14   it?  Why, within ten minutes?  Do you have any doubt as to why?

15   Of course you don't.

16           Now, what else did Daibes suggest Menendez should do?

17   Pass a bill.  Remember the resolution.  He kept updating him on

18   the resolution.  Now, Fred Daibes is a real estate developer.

19   He's not a lawyer.  He doesn't work for Menendez.  There's no

20   evidence that his job was to, like, update Menendez on

21   resolutions in the Senate.  So why is he, like, constantly

22   updating him on a particular resolution?  And why -- that's

23   weird enough, by the way, but why is he doing it after offering

24   a Patek Phillipe watch?  It's because those things are linked.

25   Fred Daibes didn't fall in love with Qatar or decide he wanted

O7bWmen5                    Rebuttal - Mr. Richenthal

1    to be a Menendez staffer unpaid.  It's because Menendez liked

2    Patek Phillipe watches.  You saw the searches.  So he suggests

3    I'll get you a watch.  And by the way, here's the resolution.

4    Do you have any doubt those things are linked?

5            Now, to be clear, it does not matter -- it does not

6    matter -- if Menendez did a damn thing on the resolution.  It

7    does matter.  Why?  Because when he took money from Daibes he

8    knew Daibes wanted him to.  And I expect you're going to hear

9    that it's just as much of a crime to accept money or a thing of

10   value in exchange for action as it is to actually take the

11   action in return for a bribe.  It's a really good reason.  And

12   you can go back to the timeline that Mr. Monteleoni put

13   together about all the back-and-forth with Qatar, Daibes and

14   Menendez.  None of it makes any damn sense unless Menendez is

15   acting for money.

16           A couple other small things.

17           Continuing with Daibes for a moment, Mr. De Castro

18   argued that, well, Daibes didn't have much to do with IS EG

19   Halal, so he can't really be tied to that part of the scheme.

20   Well, first of all, as a legal matter, again, you can be 1

21   percent in.  For conspiracy, the law says you're all in.  But

22   he wasn't 1 percent in.  Daibes backed Hana.  You know that.

23   Daibes got millions of dollars from Hana.  Hana was going to

24   lose his home.  Vasken Khorozian told you that.  He can't spend

25   millions of dollars if he's going to lose his home, millions of

O7bWmen5                          Rebuttal - Mr. Richenthal

1    dollars on the monopoly.  And Daibes gets it, one of Daibes's

2    companies gets it.  You saw the evidence of that.

3            Daibes gives office space to Wael Hana.  Remember?

4    That actually why I said the office is bizarre.  Daibes lends

5    two employees to Hana -- Jamela Maali and Rony Daibes.  He's

6    backing Hana.  He's backing him financially.  He's backing him

7    with people.  He wants him to succeed.  But there's a problem.

8    But there's a problem.

9            What's the problem?  Hana has no business doing halal

10   certification.  That's not making fun of him, but he has no

11   experience there.  There are a whole bunch of companies that do

12   it.  He doesn't have any experience at all.  Remember his own

13   lawyer literally says what is halal?  But Hana has something --

14   connections to the government of Egypt.  And Daibes and Hana

15   have something together -- Robert Menendez.  So they put them

16   together.  That's why, ladies and gentlemen, Fred Daibes is in

17   multiple meetings with Wael Hana and Egyptian officials.  Is he

18   in every one?  No.

19           Mr. De Castro is right.  He's not in every one, but

20   he's in multiple.  What the heck is he doing there?  Why?

21   Because he's part of it.  He wants Wael Hana to succeed.  He

22   wants Wael Hana to get his monopoly.  He wants the monopoly to

23   stay.  You don't get millions of dollars if there's

24   competition, so he's in some of the meetings and he helps with

25   some of the payments.

1              Now, I said some.  That's enough.  To be a

2    conspirator, that is enough.  To be part of a bribery scheme,

3    that is enough.  I do not expect you're going to hear from

4    Judge Stein, even for a substantive count that is not a

5    conspiracy count, everyone must have an equal role.

6    Noncriminal life doesn't work that way.  Neither does criminal

7    life.

8              Let me also note, by the way, that Daibes is also

9    guilty even if he had nothing to do with Egypt at all.  You're

10   going to see there are counts that ain't got nothing to do with

11   Egypt.  So at a minimum, Daibes is guilty of the U.S. Attorney

12   scheme.  We already talked about that, but you should not let

13   him off the hook for the Egypt piece because maybe he got a few

14   million dollars and not $10 million.  Or maybe he gave Hana two

15   employees and not 20 employees.  You're in or you're out.

16   That's the whole point.  You're in a bribery scheme or you're

17   not in a bribery scheme.  He was in a bribery scheme.

18             I want to make one more point about the same scheme;

19   that's Egypt.  I want to talk about obstruction of justice, and

20   then I want to wrap it up.

21             All right.  Egypt.  Ted McKinney.  Now, you've heard

22   from multiple lawyers there's this technical thing called

23   official action.  This doesn't count because Ted McKinney does

24   not work for Egypt.  You're right.  Ted McKinney does not work

25   for Egypt.  Does that mean we're done?  No.

O7bWmen5                    Rebuttal - Mr. Richenthal

1        Why not?  Because Ted McKinney and Bret Tate are

2   executing the foreign policy of the United States.  One of the

3   lawyers -- I think it was Mr. Fee, but forgive me; I can't

4   remember who -- said something like Ted McKinney had, like, a

5   personal view of monopolies, like he just -- I don't know -- he

6   hated them.  Maybe he did, but that's actually not the point

7   here.  Ted McKinney is the undersecretary of the United States

8   Department of Agriculture, and he and Bret Tate are developing,

9   formulating and executing the official foreign policy of the

10  United States through the ambassador -- you heard the *chargé*

11  *d'affaires*, right, the acting ambassador -- in the U.S. embassy

12  in Egypt.  It literally cannot be more serious and more

13  official.  That's what they're doing.  That's what Menendez is

14  trying to interfere with.  He wants to change the official

15  policy of the United States with respect to a partner, Egypt,

16  and on an issue that affects numerous consumers and U.S.

17  businesses, to a high-level official in the U.S. Department of

18  the Agriculture.  That's what he's trying to do.  Damn right

19  that's official action.  Hard to see it as being more official

20  than changing the fundamental foreign policy of the United

21  States, ahead of the president of the United States, through

22  our embassy in Cairo on an issue of importance with a major

23  regional partner and U.S. businesses.  It's not just like a

24  phone call to some guy that doesn't like monopolies.  You know

25  that's not what happened in this case.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7bWmen5                    Rebuttal - Mr. Richenthal

1              All right.  Obstruction.  So I haven't talked much

2      about obstruction of justice.  It's not because it didn't

3      happen.  It's because it's kind of related to everything else

4      that happened; that is, Menendez's lies about the fake loans,

5      his lies about the car.  Those are part of the bribery scheme,

6      and because they were directed to the grand jury, they're also

7      obstruction.  But just to pause for a second on one of the

8      major arguments you heard about obstruction -- two arguments,

9      actually.

10             So one was that Menendez's lawyer, his former lawyers,

11     to be clear, they may have made misstatements, there's no

12     evidence Menendez knew about it.  That's the first argument,

13     right?  You guys heard about that.  The second is, well, so the

14     fake checks, the cover-up checks, the loan checks, they were

15     actually produced by Nadine, so maybe she's guilty of

16     obstruction but Menendez is not.

17             I'm going to take them in order.  The first

18     argument -- you saw that PowerPoint.  It says presentation on

19     behalf of Senator Menendez, who is himself a lawyer, and this

20     is in September of 2023.  This is more than a year after the

21     search of his home by the FBI.  Do you sincerely think his

22     lawyers just, like, made a bunch of stuff up?  They guessed?

23     They just, like, showed up at the U.S. Attorney's Office?  You

24     literally heard the U.S. Attorney himself was in the room.  And

25     they showed up and they're like:  Listen, man -- I don't

O7bWmen5                    Rebuttal - Mr. Richenthal

1    know -- he didn't know about it.

2          Like, do you believe that?  Of course you don't.

3    Obviously they talked to Menendez first, because it aligns with

4    his defense.  This is what he wanted the government to believe,

5    what he needed the government to believe.  They're not, like,

6    random misstatements.  They're lies.

7          Now, to be clear, his lawyers didn't know they were

8    lies.  There's no evidence of that at all.  There's no

9    allegation his lawyers did anything wrong.  They acted as

10   lawyers are supposed to -- zealous advocates for their clients.

11   But the lies came from the client, and the cover-up that

12   they're talking about, the checks written by Menendez's wife,

13   that wasn't just, like, occurring over here.  And then

14   Menendez's lawyers are way over here.  It's a scheme, ladies

15   and gentlemen.  Menendez and his wife concocted it.

16          Remember the checks that funded the checks?  You may

17   be wondering what the heck am I talking about.  The checks that

18   pay back the fake loans -- OK -- the first part of that

19   transaction comes from Robert Menendez to Nadine Menendez.

20   Right?  Because they're in this together.  And she produces

21   them to the grand jury, making it seem real.  And he sends his

22   lawyers in to the government's office and tells the same story.

23   That is a scheme.  That is an agreement.  That is, I think, in

24   the words I expect you're going to hear from the judge, an

25   endeavor to obstruct justice.

O7bWmen5                        Rebuttal - Mr. Richenthal

1          Now, does it matter that it failed?  No.  Because I

2     expect you're going to hear from Judge Stein, an endeavor --

3     that is, an attempt, a try -- is criminal.  She produces fake

4     checks to cover up the bribery scheme they're both in.  He

5     helps her do it by writing the checks, and he sends his lawyers

6     in to make these statements.

7          Side note:  Mr. Fee argued somehow it suggests

8     innocence that the presentation did not deny that he knew about

9     the consulting contract -- that is, the fake consulting

10    contract with IS EG -- but it denied that he knew about the

11    payments.  Now, it might have some superficial appeal, but

12    remember, ladies and gentlemen, what's going on here.  He needs

13    to distance himself from the money, which doesn't show up on

14    his disclosure forms.  He needs to distance himself from Wael

15    Hana, the man paying his girlfriend and then wife.  It is

16    smarter, it is more clever if you're, like, oh, I knew she was

17    a consultant, meaning she has a consulting company, and it's

18    fake, but it exists.  I knew about that, but I deny the

19    payments.  I deny where they're from.  Because then you get to

20    make a very clever argument.

21         Well, as he told Shannon Kopplin:  My wife tries to be

22    a consultant.  She works out of her kitchen.  I'm not really

23    sure what she does.

24         But you don't have to say she got 30 grand from Wael

25    Hana, who helped my girlfriend get a Mercedes and is secretly

O7bWmen5                    Rebuttal - Mr. Richenthal

1  giving information to Egypt.  You don't have to say that.  The

2  fact that the statements were selective, that one of them was

3  the truth and the others were false, is because he wanted it

4  that way.

5       At the end of the day, ladies and gentlemen, Robert

6  Menendez was not a victim of his lawyers, Wael Hana or Nadine

7  Menendez.  He was a victim of a desire for nicer stuff than his

8  Senate salary could afford.  He's not at the center of a

9  bribery scheme without knowing it, never mind a bribery scheme

10  that lasts five years.  He's not at the center of a

11  multi-faceted corrupt endeavor involving one of his friends,

12  Fred Daibes, without knowing it, for years.  If the defense is

13  right and each of Robert Menendez, Wael Hana and Fred Daibes

14  are not guilty, they're each the unluckiest man in the world.

15  And together, they are the most unlucky three people the world

16  has ever seen.

17       Now, let me explain what I mean.  I'm not going to go

18  through all the list of coincidences Mr. Monteleoni went

19  through, but I'm going to tell the story, in part, based on

20  facts that actually happened but with a twist.  And the twist

21  is none of it happened because of bribery and foreign agency.

22  It happened, but it didn't happen because of money, it didn't

23  happen because of gold and it didn't happen because of foreign

24  agency.

25       Ready?

O7bWmen5                        Rebuttal - Mr. Richenthal

1          Robert Menendez, 2018, at the request of Nadine

2     Menendez -- then Nadine Arslanian, his girlfriend -- meets with

3     Wael Hana and Egyptian officials.  Now, she's there too, as I

4     said, but in this alternative telling of the story, it's not

5     because Hana's promising her money.  Remember, there's no money

6     in this part of the story; she's just there.  And it's not that

7     Hana's there because he's promised money, although there's no

8     evidence he has any foreign policy experience of any kind or

9     belongs in that room.  It's not a knock on him, but that's not

10    what he brings to the table.  But they're all there.

11         And by the way, the meeting comes together through a

12    handwritten invitation.  It's utterly bizarre.  His staff has

13    never seen it before.  They have no idea why.  Remember, in

14    this telling of the story, in this alternate reality, that just

15    happened.  That's just, like, a handwritten invitation.

16         Now, this is, like, a very serious matter, but how in

17    heaven's name did that alone happen?  Did the computers in the

18    office break?  I mean that's a joke, but, like, the stuff I'm

19    telling you about actually happened in the world.  They're not

20    assumptions or inferences.  These things actually occurred.  So

21    the question is why?

22         Now, the story doesn't stop there.  Right?  After the

23    meeting -- this is 2018, the spring of 2018 -- things get even

24    weirder.  Menendez provides sensitive information to Egypt

25    through his girlfriend then back to Hana.  He promises to

O7bWmen5                              Rebuttal - Mr. Richenthal

1    approve a sale of tank ammunition, again, to Hana, the failed

2    trucker, who hopes to export meat to Egypt, nothing to do with

3    tank ammunition.  But somehow he tells them.  And he starts

4    helping other senators secretly change their views on Egypt.

5    He literally -- he literally -- tries to change the mind of his

6    fellow senators, but secretly, not by walking down the hallway.

7    And does his staff know he does this stuff?  Nope.  And he

8    does it all through his girlfriend and through Hana, but

9    certainly not because he's agreed to pay.  Right?

10          In this version of the story, that doesn't exist.  So

11   in this version of the story, he's just doing it.  Now,

12   remember the Senate Ethics Manual literally says you can't be a

13   foreign agent.  Robert Menendez himself literally writes a

14   letter to the attorney general of the United States in the

15   following years saying you can't be a foreign agent.  And he's

16   totally being a foreign agent.  But in this version of the

17   story, he forgot?

18          Now, I already told you what else did he have to

19   forget.  I'm not making fun of it, but you have to answer

20   questions as to why this stuff occurred in the world.  So in

21   this version of the story, he also apparently forgot Hana's

22   phone number, Hana's email address, any ability to contact Wael

23   Hana, except through this girlfriend, who Wael Hana's promising

24   money to.  But he has another problem, right?

25          So in this version of the story, he's just using his

O7bWmen5                    Rebuttal - Mr. Richenthal

1    girlfriend for literally no reason at all.

2           Now, the following year -- that was 2018 -- Wael Hana

3    gets his monopoly.  Nadine Menendez -- again, Nadine Arslanian

4    at the time, his girlfriend -- says to Menendez:  Halal went

5    through, it's going to be a fantastic year all around.  Now, in

6    this version of reality, Menendez has no idea what that means,

7    because remember, in this version of reality, Wael Hana is just

8    a guy who knows Egyptian officials.  He's not trying to get a

9    monopoly he doesn't deserve, certainly not paying his bills.

10   But Menendez doesn't ask a damn question.  He doesn't say,

11   halal went through; what the heck does that mean?  Fantastic

12   year all the around?  Fantastic for whom?  He doesn't ask.

13          And now Nadine starts to get paid -- for nothing,

14   essentially.  Now, again, in this alternate world, Menendez

15   doesn't know that.  But he's still doing stuff for Will.  He's

16   still doing stuff for Nadine.  He's still doing stuff for

17   Egypt.  He goes along.  What else can the love of my life do

18   for you?  It must be about the wine, as the defense told you.

19   Two days later he calls Ted McKinney.  In this version of the

20   story, that's just a coincidence.

21          And it gets even weirder.  Right?  Over time he's

22   doing more and more.  Hana, the man who's promised to pay his

23   girlfriend, now starts helping with her mortgage through a fake

24   note.  He starts helping get a Mercedes for his girlfriend that

25   she cannot afford, and he knows it.  But in this version of the

O7bWmen5                        Rebuttal - Mr. Richenthal

1   story, that's just happening.  Nothing strange about it.

2            The story keeps going.  Things get even weirder, so

3   weird his own staff is told he's changing his position on

4   Egypt.  He starts having meetings with no readout, no staff

5   involved.  They're calling him Bob.  They're calling him

6   sincere friend.  Things are changing, but in this version of

7   reality, there's no reason for that, and certainly it's not

8   because of all the money that's coming in.

9            And at the same time this is happening, he's also

10  doing things for other people paying him.  Right?  It's not

11  just Ted McKinney.  It's Gurbir Grewal.  It's Fred Daibes, the

12  Sellinger piece of the story.  Menendez is, time and again,

13  acting for people that are paying him and his girlfriend.  Time

14  and again, he's lying about it.  He's hiding it.  None of it

15  shows up on his forms.  None of it makes any sense.  He's

16  literally lying to his friends, lying to Philip Sellinger about

17  why he's dropping him.  Drops him like a hot potato the second

18  he learns he's recused.  All of this is happening -- gold,

19  cash, heck, the elliptical machine.

20            (Continued on next page)

21

22

23

24

25

1          MR. RICHENTHAL:  It's all happening.  But Menendez

2     apparently knows none of it, even though it's in his bedroom

3     and the closet off his bedroom.

4          And it's so weird that literally his staff calls it

5     weird.  But in this version of the story, they just must have

6     been mistaken.

7          You have to believe, you have to believe Menendez

8     mentions a single case to Philip Sellinger not because of

9     money.  You have to believe he makes a call to Ted McKinney,

10     not because of money.  He's never called him before.

11          You have to believe he reached out to Gurbir Grewal,

12     not because of money.  The only time he ever reached out on a

13     single case.  You have to believe he reached out again in

14     September, six months later, not because of money.

15          You have to believe and believe and believe.

16          You have to believe that he chose Esther Suarez, who

17     had significant baggage, that is problems with media articles,

18     when there are other plenty of diverse candidates.  But not

19     because Fred Daibes thought she would help him.  Not for any

20     reason at all.  Because his own staff, remember, didn't want

21     him to pick her.  Right.  You heard that.  It's not good for

22     him politically to pick her.  Does it anyway.

23          Mr. Monteleoni calls those coincidences.  He's right.

24          I'll stop in a moment.  What else do you have to

25     believe?  You have to believe that when Robert Menendez says to

1    Philip Sellinger, the only thing worse than not having a

2    relationship with the U.S. attorney is people thinking you have

3    one and you don't.

4          He either didn't say that or he meant something having

5    nothing do with Fred Daibes at all.

6          You have to believe that Menendez's website has no

7    exceptions for any of these things.  And he made exceptions for

8    the people paying him and no one else.  All, all entirely by

9    accident.

10         You have to believe that when he called Gurbir Grewal,

11   he had 95 truckers on his mind, when no one had talked to him

12   about truckers, 95 or otherwise.

13         And you have to believe that everyone around him who

14   he's trying to get to do things and who are resisting, Ted

15   McKinney, Gurbir Grewal, Phil Sellinger, you have to believe

16   they're all mistaken.  Andrew Bruck turned to Grewal and said

17   that was gross.  You have to believe it wasn't.  That they were

18   wrong.

19         Ted McKinney was so horrified, he had to protect his

20   staff.  So did Gurbir Grewal.  You have to believe they were

21   wrong because these were all legitimate calls.  That these

22   senior officials are just all wrong.

23         And it's the same thing, by the way, with Wael Hana

24   and Fred Daibes.  You have to believe that Wael Hana promised

25   the senator's girlfriend money from a monopoly he didn't yet

1    have and got the monopoly, then paid her through a fake

2    contract, paid her mortgage, got her a Mercedes, for no reason

3    at all.

4           You have to believe that was Fred Daibes started to

5    give cash gifts and kilogram bars of gold.  That the cash

6    started approximately a week or later prior to the federal

7    election, when there is no history he did anything like that at

8    all.  Certainly not because, at that point, Menendez for the

9    first time in years could help.  It's all a coincidence.

10          And you have to believe that that all kept going on

11   for 5 years.  Not once.  5 years.

12          That every time Menendez acts, he does it for someone

13   paying him, but they're not connected.  Every time Menendez

14   gets paid from people, he doesn't put it on their Senate form.

15   He has to say it's from my wife's family, when damn well he

16   knows it's not, not because he's hiding it, for some other

17   reason.  You have to believe then believe and believe.

18          And you have to believe that he did these things for

19   Egypt through his girlfriend and Hana, not because Hana was

20   paying her, not because he forgot Wael Hana's phone number, but

21   for some other legitimate reason.  You have to believe he

22   decided to give Egypt sensitive information about an embassy,

23   not because he was on the take, and not because he was Egypt's

24   agent.

25          I could keep going.  You have to believe at the

O7B3MEN6                    Rebuttal - Mr. Richenthal

1    pinnacle of his power, he decided to do all that for no reason

2    at all.

3            Now, as I've said, we have the burden.  But these

4    things happened.  Your job is to figure out why.

5            And in this version of the story, Robert Menendez,

6    Wael Hana, and Fred Daibes are the unluckiest men in the world.

7    And by the way, they're also the luckiest men in the world

8    because Fred Daibes actually has Robert Menendez repeatedly try

9    to get intervene in his case.  Wael Hana gets a monopoly and

10   gets to keep it.  Jose Uribe, who pled guilty, gets Menendez to

11   repeatedly try to interfere in the attorney general's case.

12           All these people are both lucky and unlucky at the

13   same time.  For 5 years.

14           Do you believe that?  Do you believe that they're the

15   unluckiest men in the world and the luckiest men in the world

16   at the same time?  Of course you don't.  They're not the

17   unluckiest men and the luckiest men.

18           Not an accident Robert Menendez kept helping people

19   paying him and his girlfriend.

20           They're not unlucky men or lucky men.  They're just

21   men.  Men in a bribery scheme.  Men in a foreign agent scheme.

22   There is nothing to celebrate in that.  It's tragic.  It's

23   horrible.  But it's true.

24           It is the only way, the only way to make sense of what

25   happened.  It's the only way to make sense of what you've seen

O7B3MEN6

1    for two months.  It is the only way the evidence makes any

2    sense at all.  It is the only thing that fits your common

3    sense.

4            I started this morning by saying to you that lawyers

5    talk in court, but what speaks is the evidence.  What it says

6    here is crystal clear.  They did it.  They're guilty.

7            THE COURT:  Thank you, Mr. Richenthal.

8            Ladies and gentlemen, I think we should take a

9    10-minute break now.  When we come back, I'll have my clerk

10   meet you at the door, and he will hand you each a copy of the

11   charge.  And I then will explain to you what I'm going to do.

12   But essentially, from 10 minutes to now until 5 o'clock, I'll

13   be reading the charge to you.  I'll pick it up again tomorrow

14   morning.  Then the remaining part of this trial is your

15   deliberations.  You will have this case for your deliberations

16   before lunch tomorrow.

17           I'll see you in 10 minutes.

18           (Jury excused)

19           THE COURT:  10 minutes.

20           MR. WEITZMAN:  Your Honor?

21           THE COURT:  Yes, sir.

22           MR. WEITZMAN:  I have an objection to note.

23           THE COURT:  Yes, sir.

24           MR. WEITZMAN:  And I'm considering the relief.  Your

25   Honor may recall that on I believe it was our last day of our

O7B3MEN6

1    defense case on behalf of Mr. Menendez.

2              THE COURT:  You may be seated in the courtroom.

3              MR. WEITZMAN:  We attempted to move in a number of

4    documents, I don't have them in front of me, that showed that

5    Senator Menendez attempted to have meetings or had meetings and

6    calls with Gurbir Grewal about, in one instance a civil case,

7    and another instance a case involving LGBTQ issues and

8    discrimination issues.

9              The government objected on the grounds of 401 and 403.

10   And yet, in their rebuttal summation, in his last salvo about

11   being the unluckiest men in the world, he said that Senator

12   Menendez reached out to Gurbir Grewal not because of money, but

13   the only time he ever reached out on a single case.  This is

14   exactly the issue --

15             THE COURT:  The only time.

16             MR. WEITZMAN:  The only time Senator Menendez ever

17   reached out to the New Jersey Attorney General Gurbir Grewal on

18   a single case.

19             This is the exact issue we were trying to put evidence

20   in.  Government objected on 401 and 403 and they use it in the

21   rebuttal, knowing we couldn't get the evidence in, to argue he

22   must be the unluckiest man in the world and he's guilty.

23             THE COURT:  Just a moment.  Go ahead.

24             MR. WEITZMAN:  This is, I mean, I think there is

25   relief that's necessary.  And one of the things I'm

O7B3MEN6

1  considering, your Honor, is surrebuttal evidence where your

2  Honor admits it and we get to publish it to the jury.

3          THE COURT:  Thank you.

4          MR. RICHENTHAL:  That's frivolous.  It's frivolous for

5  two important reasons.  One, it's plain as day I was talking

6  about a single criminal case.  That was the entire thrust of

7  everything I said and that has nothing to do with the evidence

8  to which Mr. Weitzman is referring.

9          But second, as the Court no doubt recalls, the defense

10  conceded this.  That evidence does not show he ever called

11  Gurbir Grewal.  What the evidence shows --

12          THE COURT:  Let me think about that.

13          MR. RICHENTHAL:  What that evidence shows, if it shows

14  anything at all, and maybe Mr. Weitzman just misspoke, is a

15  staffer of his talked about how he maybe should reach out.

16  There is no evidence, including that evidence, that he ever in

17  fact reached out.  And as the Court also no doubt remembers,

18  Mr. Grewal was cross-examined on this very point.  That is,

19  whether he had ever spoken to be Senator Menendez before about

20  a single case.  His answer was no.  The defense asked had he

21  spoken to Senator Menendez about other --

22          THE COURT:  Just a moment.  You said it was the

23  testimony, the question to Grewal was had he ever spoken to

24  Menendez before about a single case and his answer was no?

25          MR. RICHENTHAL:  I don't remember the verbiage.  But

O7B3MEN6

1    in substance yes, he was asked, and the answer was no.  He then

2    was asked --

3            THE COURT:  Just a minute, sir.  Yes, sir.

4            MR. RICHENTHAL:  He was also asked had you spoken to

5    him before on other matters.  As the Court probably recalls,

6    his answer was yes.  That is policy type matters.  I think

7    there was evidence in the record about voting I think in the

8    Dominican Republic.

9            So, the record is clear and the record is not in any

10   way inconsistent with what Mr. Weitzman is talking about that

11   at no time, ever, did Senator Menendez contact then General

12   Grewal about a single case.  And that's exactly what I said.

13           So even if that evidence had been put in, I still

14   could have said the exact same thing.

15           THE COURT:  All right.  Mr. Weitzman, the

16   representation here is that the question was had Grewal ever

17   spoken to Menendez about a single case before or about a case

18   before.  An individual single, I don't know what the words are,

19   and the answer is no.

20           It seems to me if that indeed is the testimony, then

21   the fact that there's evidence of staffers saying let's talk to

22   him about it or maybe we can talk to him about it or whatever

23   that is, then I don't think your objection is well taken.

24           Do you have those exhibits that you're talking about?

25           MR. WEITZMAN:  I do have the two exhibits.  They are

O7B3MEN6

1  Defense Exhibit 1018 and Defense Exhibit 2165.  And I disagree

2  with Richenthal, although I will check the record regarding

3  what Gurbir Grewal testified to.  Whether it was a no or I do

4  not recall.

5          But, let me tell you about these two defense exhibits.

6  In one of them.

7          THE COURT:  Can you hand them up to me.

8          MR. WEITZMAN:  I can put them on the screen.

9          In defense Exhibit 1018, which is on the screen now,

10 there is a discussion by Senator Menendez's staffer about how

11 the senator's going to -- it's in the first clear bullet point.

12 Second bullet point down.  You said you would contact AG Grewal

13 to pass along concerns particularly on the prosecution of hate

14 crimes against members of the LGBTQ community and the

15 disbursement of VOCA grant money.

16         THE COURT:  I see that.  Go up to the header and the

17 caption so I can see what this is.

18         MR. WEITZMAN:  This is what's titled a weekly report

19 that staffers sent to Senator Menendez.

20         I'll be done in a moment, Mr. Richenthal.

21         THE COURT:  Just a moment.

22         Yes, sir.  What's the second one?

23         MR. RICHENTHAL:  The second document is Defense

24 Exhibit 2165 and this concerns some ongoing litigation

25 regarding antisemitism in the form of discriminatory zoning

O7B3MEN6

```
 1   laws.  And the second bullet point again says you offered to
 2   call Attorney General Grewal to express interest in the matter
 3   and ask for an update.  The point being --
 4            THE COURT:  Just a moment.
 5            MR. WEITZMAN:  It says AG Grewal and DoJ are
 6   investigating this issue.
 7            THE COURT:  Yes, sir.
 8            MR. WEITZMAN:  Now, the statement in the rebuttal
 9   concerns Senator Menendez's state of mind.  It's about whether
10   he's acting criminally in calling Attorney General Grewal for
11   the -- for the first time ever in any case.  Not a criminal
12   case.  In any case.
13            Now when I asked Attorney General Grewal about one of
14   these documents, DX 1018, and we pulled it up, at transcript
15   2791 and 2792:
16   "Q.  Do you recall at some point whether at this meeting or at
17   a prior meeting that you and Senator Menendez did have a
18   conversation about issues with respect to civil rights?
19   "A.  I do not."
20            THE COURT:  Is he talking about the meeting with
21   Menendez?
22            MR. WEITZMAN:  Yes, but it's broadly at this meeting
23   or a prior meeting was the question.
24            THE COURT:  Read it to me again.
25            MR. WEITZMAN:  "Do you recall at some point or at
```

1    prior meeting that you and Senator Menendez did have a

2    conversation about issues with respect to civil rights?

3    "A.  I do not.

4    "Q.  Do you recall Senator Menendez ever raising with you

5    constituent concerns regarding hate crimes against members of

6    the LGBTQ community?

7    "A.  I don't have that recollection.  No."

8        It is, this is why we offered it.  This is why we offered

9    these two documents.  Because they go both to Senator

10    Menendez's state of mind, which would rebut what Mr. Richenthal

11    said in rebuttal, but it also undermines the testimony, because

12    there is a fair inference that the jury can draw that if

13    Senator Menendez was offered and was reminded to call Attorney

14    General Grewal, he likely did do that.  But the more important

15    point --

16        THE COURT:  You're asking for that inference without

17    any proof in the record, including from Grewal, that in fact he

18    had called him, or did call him.

19        MR. WEITZMAN:  It's no different than the proofs that

20    the government is asking about interpreting calls and so on and

21    meetings and whether the meetings occurred, whether the calls

22    occurred.  For example, your Honor, they make a big stink, oh,

23    Daibes must have known about the trial adjournment and he must

24    have communicated it to Senator Menendez because you see here a

25    text message.  There is no evidence of a call.  They're making

O7B3MEN6

1    those arguments for proof beyond a reasonable doubt.  That's

2    not the standard I need to meet.

3            THE COURT:  I agree with that.

4            Do you have the reference that you were talking about

5    to the question, if it exists, had you ever spoken to Menendez

6    about a single case before?  Answer:  No.  You were going to

7    take a look at that.

8            MR. WEITZMAN:  I have not found that.  I will take a

9    look for it, your Honor.

10           But I think the rebuttal argument, which is just one

11   of many that they leaned on, was not a fair argument in light

12   of the fact that they objected to this evidence.  And now we

13   need this evidence in the record as a surrebuttal.

14           THE COURT:  I understand.  Let me just ask this and

15   then I'll hear from Mr. Richenthal.  I take it the best

16   argument you can make from which you want to argue inferences,

17   I understand that the best argument you can make is the staff

18   wrote him two memos of round ups of the week, telling him, that

19   is Menendez, what he had done in the past week or said he was

20   going to do.

21           One of which, 1018, says you said you'd contact

22   Grewal.  The other one, 2165, says essentially the same thing.

23   You offered to call AG Grewal to express interest in this

24   particular matter which was zoning litigation.

25           And you're saying from that, and you were stopped from

O7B3MEN6

1    introducing those, and from that you wish to infer, have the

2    jury infer that he had called?

3            MR. WEITZMAN:  So, your Honor, first of all, I think

4    that it may be a fair inference because the documents don't say

5    we suggest you do so.  It suggests you want to do so.  You

6    offered and you said.  So I think it's relevant in that

7    respect.  It's more probative.  But more importantly, it does

8    go to the state of mind issue, which is whether or not he

9    called, he thought it was okay to call.  That's the important

10   point.  That's why this was never a hearsay problem and that's

11   why it overcame the 401 and 403 issues that the government

12   objected to, because it goes to the state of mind, which is

13   exactly the argument Mr. Richenthal is trying to undermine with

14   his unluckiest man in the world argument that he spent 10

15   minutes riffing on.

16           THE COURT:  Let me hear from Mr. Richenthal.

17           MR. RICHENTHAL:  I can say many things, but the

18   simplest is where I started.  If these were 100 percent in

19   evidence, and I'm going to talk about why they were properly

20   excluded.  But if they were, I could say the exact same words

21   in the exact same paragraph, for the same reason.

22           Neither of these exhibits, which are both hearsay,

23   neither of these exhibits show either that a call in fact

24   occurred, or even if one occurred, that it was about a single

25   case.  The first is demonstrably a policy issue.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7B3MEN6

```
 1            THE COURT:  Just a moment.  Turn to the second one
 2   first.  It looks like it has to do with a doctor involving
 3   antisemitism and zoning changes.
 4            MR. RICHENTHAL:  Again, there is no evidence a call in
 5   fact happened.  But in any event, yes, it refers to litigation.
 6   Not a single case.  In fact, it's fairly apparent it's multiple
 7   cases.  It talks about zoning laws plural.  Litigation the
 8   Department of Justice is involved in.  It refers to an
 9   investigation, that word is literally in the exhibit, an
10   investigation that the DoJ is involved in.
11            My comment was very specific for a very good reason.
12   Did he call about a single case.  That's literally what I said.
13   The answer is no.  The defense is not disputing the factual
14   accuracy of what I said.  What they're doing is trying to
15   relitigate your Honor's evidentiary ruling.
16            Your Honor's evidentiary ruling was right.  These
17   documents remain hearsay.  Even if they're not hearsay, they
18   should be excluded under 403 because they're about unrelated
19   matters.
20            My statement was accurate.  It would remain accurate
21   if these were in the record, and therefore there is no relief
22   to which the defense is entitled.
23            MR. WEITZMAN:  This 2165 concerns a specific
24   litigation.  A specific case.  It is a civil case, involving
25   this man Dr. Richard Roberts.  The plaintiffs are listed below.
```

O7B3MEN6

1    There are a summary of claims.  It is a civil case that AG

2    Grewal and DoJ are investigating for other parallel matters.

3         THE COURT:  It is a little unclear, I don't think I

4    have to decide whether it is a single case or not.  It is a

5    little unclear.  The plaintiffs may be plaintiffs in two

6    separate cases there, but we don't know.  And the subject line

7    is Re Dr. Richard Roberts and antisemitism in Jackson.

8         MR. WEITZMAN:  I agree with Mr. Richenthal that we are

9    trying to relitigate it.  And the reason we're relitigating is

10   because they shouldn't have been permitted to argue on rebuttal

11   a point when evidence that we offered, they got excluded.

12   That's the impropriety of what they did and it needs a remedy,

13   your Honor.

14        MR. RICHENTHAL:  Can I make one final point?

15        THE COURT:  Yes.

16        MR. RICHENTHAL:  This concept that the parties

17   litigated --

18        THE COURT:  I have an idea of what I'm going to do,

19   but go ahead.

20        MR. RICHENTHAL:  I would like to say for the record,

21   the concept that the parties litigate about the Federal Rules

22   of Evidence and argue about the record is not novel.  That is

23   how trials work.  So there is nothing special in this

24   particular circumstance.

25        The defense tried to get this in and the Court

1    properly said no.

2                I stuck to the record and I made an argument in the

3    record.  Even if the defense were correct it was inconsistent,

4    and the defense is not correct, there still would be no proper

5    basis for relief.

6                THE COURT:  I take the application of Mr. Menendez's

7    attorneys to be for a surrebuttal.  I'm denying that request.

8    To the extent that there's evidence that has been presented to

9    me, the record reflects that when asked had he ever spoken, had

10   Grewal ever spoken to Menendez about a single case before, that

11   the answer was no.  That's not contraindicated by 1018 or 2165.

12   They are hearsay.  Each of them don't say that there was a call

13   about a single case.  It's at least one step removed.  You said

14   you'd contact, you said you would contact AG Grewal and you

15   offered to call AG Grewal.

16               The evidentiary ruling was correct.  These are too far

17   afield, they're not directly contradictory of the evidence in

18   regard to what Grewal said.  Certainly in the scheme and the

19   scope of hours of rebuttal, this does not rise to my directing

20   a surrebuttal argument by Menendez attorneys.  That's my

21   ruling.

22               Take a few moments.  I want to bring this jury in.

23               (Recess)

24               (Jury present)

25               THE COURT:  Ladies and gentlemen of the jury, the

O7B3MEN6                         Jury Charge

summations are over.  There are two parts of the trial left.
My charge to you, and your deliberations.

It's already 10 after 4.  So I'll read the charge for
the next 50 minutes.  I'll have to continue it tomorrow.  If
you're here at 9:30, we'll begin at 9:30.  It will take a
couple of hours to read the charge, all together.  And as I
said, my assumption is that you will have this case for your
deliberation before lunch.  When you come in in the morning, my
deputy will take your lunch orders.  From now on, every lunch,
the court system will pay for your lunches.

I've handed out a copy of the charge to each of you.
Don't feel under any obligation to be reading it and following
along with me.  You certainly can, that's why I've given you
the charge.  But people learn in different ways.

I used to never give the charge out, I mean in hard
copy, because I thought what was important was that you should
listen to me, rather than read just like a robot as I'm saying
it.  And then, I changed my view, and would give the charge
out.  And now, although I give the charge out, I explain to
people, you can follow along as I'm reading it or not.  It's
however you think you learn the best, either from listening to
me or reading while I say it aloud.  There are a couple of
things that are important.  So, feel free to do either.  You
can put it down and just listen to me or to follow along.

Couple things that are important.  One is don't single

O7B3MEN6                        Jury Charge

1    out any one word or phrase or sentence or even any one charge

2    in this document.  Consider the charges as a whole.  Okay?

3    When you're going through them.

4            And also, as there are certain themes that you'll see

5    in these charges.  And one of them, or something that

6    overarches the charges, is always use your common sense.  Use

7    your life experience, use your good judgment when thinking

8    about these things.  Follow the instructions, but to me they

9    all make sense.  It is all logical.  So, follow your good

10   judgment, your life's experience, and your common sense.

11           All right.  And each of you will have this with you

12   when you begin your deliberations.  For those of you who do

13   wish to follow along, why don't you turn to the very beginning

14   of the general charges.

15           It says I'm going to instruct you on the laws that you

16   are going to apply to the facts in this case.  You will

17   determine the facts in accordance with these instructions.

18           Now you know that already, I've told you that at the

19   beginning of the case.

20           You know you are vital to the administration of

21   justice.  And I hope you fully appreciate your importance in

22   this process.  It's a tradition and safeguard of our individual

23   liberties that parties involved in criminal matters have a jury

24   chosen from their community to decide questions of fact, and on

25   that basis, render a verdict in the case.

O7B3MEN6                         Jury Charge

1              Now, you know what your role is and you know what my

2      role is.  It's your duty to decide whether or not the guilt of

3      each defendant here has been proved beyond a reasonable doubt.

4      You decide the fact issues here.  I don't decide the facts.

5      Our roles are very different.

6              You are the sole and exclusive judges of the facts.

7      You pass on the weight of the evidence, you determine the

8      credibility of the witnesses, you resolve any conflicts there

9      are in the testimony.  And you know, because you've been

10     sitting here quite conscientiously, that there are conflicts in

11     the testimony.  And you draw whatever reasonable inferences you

12     decide to draw from the facts as you determine those facts to

13     be.

14             You must exercise this responsibility with complete

15     fairness and impartiality.  Your decision is to be based solely

16     on the evidence or lack of evidence.  Your decision cannot be

17     influenced by bias, prejudice, or sympathy for or against any

18     of the parties.

19             I'm going to instruct you on the law, that is, I'll

20     tell you what the rules of law are that govern your

21     deliberations, and tell you what the questions are that you

22     must answer in reaching your verdict.  You must accept the law

23     as I state it to you.  And you apply the law as I state it to

24     you to the facts as you find them.  Do not substitute your idea

25     of what the law should be for what I tell you the law is.  You

1    decide the facts, ladies and gentlemen.  Not I.  But I decide

2    the law.  Not you.  You are duty bound to accept the law as I

3    state it to you.

4            And you know, because I told you this either yesterday

5    or the day before, if any attorney has stated a legal principle

6    during the course of the trial or in the summations that are

7    different from any that I state to you, it's these instructions

8    that you must follow.

9            Remember, a number of the lawyers said I expect Judge

10   Stein will tell you, and then they went on.  Now you're about

11   to see what Judge Stein is going to tell you.  And you apply

12   what Judge Stein tells you to the facts as you find them.

13           As I said before, don't single out any single

14   instruction or word or phrase or paragraph as alone stating the

15   law.  Consider these instructions as a whole.  The result of

16   your work is going to be the verdict.

17           I'm going to tell you some general principles about

18   evidence, I'll explain the burden of proof.  That's going to be

19   one of the themes here, too.  You know what the burden of proof

20   is.  It's on the government to prove the guilt of each

21   defendant beyond a reasonable doubt.  But I'll restate that as

22   we go on.  I'll tell you what the charges are, I'll explain the

23   substantive law that applies, and I'll give you some concluding

24   comments on your deliberations.  And that will take place in

25   midmorning tomorrow.

O7B3MEN6                        Jury Charge

1          You must perform your duty of finding the facts

2    without bias or prejudice or sympathy to any party here.  And

3    you know there are four parties.  The government to the United

4    States is the prosecution, and we have Mr. Hana, Mr. Daibes,

5    and Mr. Menendez.  Each of those parties stand as equals before

6    a jury and the courts of the United States.

7          You must disregard any feelings you may have about any

8    of the defendant's race, religion, national origin, sex or age.

9    It's also improper for you to consider any personal feelings

10   you may have about the race, religion, national origin, sex or

11   age of any witness or any lawyer or anyone involved in this

12   case.

13         It also would be improper for you to allow any

14   feelings you might have about the nature of the crimes charged

15   to interfere with your decision-making process.

16         The fact that the government is a party and the

17   prosecution is brought in the name of the United States does

18   not entitle the government or the government's witnesses to any

19   greater consideration than that given by you to any other

20   party.  By the same token, you have to give it no less

21   consideration.  The government and each defendant stand on

22   equal footing before you.

23         Your verdict must be based solely on the evidence or

24   the lack of evidence.  That's another theme you're going to

25   hear in these instructions.

1              For the same reason, the personalities and the conduct

2      of counsel are not in any way at issue.  If you formed any

3      opinions of any kind as to any of the lawyers in the case -- I

4      assume you have -- whether favorable or unfavorable, whether

5      you approved or disapproved of their behavior, those opinions

6      must not enter into your deliberations.

7              Under your oath as jurors, you must not be swayed by

8      sympathy.  You are to be guided solely by the evidence.  The

9      crucial question you must ask yourselves as you sift through

10     the evidence is, has the government proven the guilt of each

11     defendant beyond a reasonable doubt?  You alone decide whether

12     the government has proven that each defendant is guilty of the

13     crimes charged solely on the basis of the evidence and subject

14     to the laws as I charge you.

15             It must be clear to you that once you let fear or

16     prejudice or bias or sympathy interfere with your thinking,

17     there is a risk that you will not arrive at a true and just

18     verdict.  If you have a reasonable doubt as to any of the

19     defendant's guilt, you should not hesitate for any reason to

20     find a verdict of acquittal as to the defendant you are

21     considering.

22             On the other hand, if you should find that the

23     government has in fact met its burden of proving a defendant's

24     guilt beyond a reasonable doubt, you should not hesitate

25     because of sympathy or any other reason to render a verdict of

1    guilty for that defendant.

2            Similarly, you are not to consider the issue of what

3    punishment, if any, will follow if you do find a defendant

4    guilty.  The issue of punishment is entirely for me.

5    Punishment should not enter into your decisions at all.  Again,

6    that's what I have to decide.  You have to decide whether or

7    not the government has proven the guilt of the defendant you

8    are considering beyond a reasonable doubt.

9            You know the defendants have been indicted.  You also

10   know that an indictment is simply an accusation.  It's not

11   evidence.  I told you that on the very first day.  Each

12   defendant here has pled not guilty to the charges against that

13   defendant in the indictment.  As a result of each defendant

14   pleading not guilty, the burden is on the government to prove

15   each defendant's guilt beyond a reasonable doubt.

16           This burden never shifts to the defendants for the

17   simple reason that the law never imposes on a defendant in a

18   criminal case the burden or duty of calling any witness or

19   producing any evidence.

20           Again, these themes, they keep coming up.  They're

21   important.

22           The law presumes each defendant to be innocent of each

23   of the charges against that defendant.

24           I instruct you, ladies and gentlemen, that you are to

25   presume each defendant is innocent throughout your

1   deliberations until such time, if ever, you as a jury are

2   satisfied that the government has proven the defendant you are

3   considering guilty beyond a reasonable doubt.

4           Each of the defendants here, ladies and gentlemen,

5   begins this trial with a clean slate.  The presumption of

6   innocence itself is sufficient to acquit a defendant, unless

7   you as jurors are unanimously convinced beyond a reasonable

8   doubt of that defendant's guilt, after carefully and

9   impartially considering all of the evidence in this case.

10          If the government has failed to sustain its burden as

11  to the defendant you are considering, you must find that

12  defendant not guilty.

13          The presumption of innocence was with each of the

14  three defendants here nine weeks ago when this trial began.  It

15  remains with them even now as I speak to you, and it will

16  continue with each defendant into your deliberations, unless

17  and until you are convinced that the government has proven that

18  defendant's guilt beyond a reasonable doubt.

19          Now, I've used the phrase "reasonable doubt" often in

20  this trial when talking to you.  I've said that the government

21  must prove each defendant's guilt beyond a reasonable doubt.

22  The question arises, what is a reasonable doubt?  The words

23  almost define themselves.  A reasonable doubt is a doubt based

24  upon reason and common sense.  It is a doubt that a reasonable

25  person has after carefully weighing all of the evidence.  It is

a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.

Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.

A reasonable doubt is not a caprice or a whim. It is not speculation or suspicion. And ladies and gentlemen, it is not an excuse to avoid the performance of an unpleasant duty and it's not sympathy.

In a criminal case, as you know, the burden is at all times on the government to prove guilt beyond a reasonable doubt. But the law does not require that the government must prove guilt beyond all possible doubt. That's not required. Proof beyond a reasonable doubt is sufficient to convict.

That burden never shifts to the defendant you are considering, which mean it is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt. And in these instructions, I'll be telling you what the elements of each charge are.

If, after fair and impartial consideration of all of the evidence, you have a reasonable doubt about the guilt of a defendant with respect to a particular charge against that defendant, you must find that defendant not guilty of that charge.

O7B3MEN6                        Jury Charge

 1          On the other hand, if, after fair and impartial

 2   consideration of all of the evidence, you are satisfied of the

 3   defendant's guilt beyond a reasonable doubt, with respect to

 4   the charge you are considering, you should find that defendant

 5   guilty of that charge.

 6          The fact that one party called more witnesses and

 7   introduced more evidence than the other does not mean that you

 8   should necessarily find the facts in favor of the side offering

 9   the most witnesses.

10          By the same token, you do not have to accept the

11   testimony of any witness who has not been contradicted or

12   impeached if you find the witness not to be credible.  You also

13   have to decide which witnesses to believe and which facts are

14   true.  To do this, you must look at all the evidence, drawing

15   upon your own common sense and personal experience.

16          I'm going to discuss the criteria for evaluating

17   credibility in a moment.  Now, I want you to keep in mind that

18   the burden of proof is always on the government, and the

19   defendants are not required to call any witnesses or offer any

20   evidence since they are presumed innocent.

21          All right.  Now what's evidence?  You know what

22   evidence is because I told you what it was on the first day of

23   trial.  Evidence consists of the testimony of the witnesses and

24   the exhibits that have been received into evidence, and they

25   also are stipulations of the parties, which are agreements of

1    the parties, that certain facts are true or agreements of the

2    parties that a witness, if called, would have testified to

3    whatever the stipulation says.

4              Those are the three types of evidence.

5              Now, there are two types of evidence that you can use

6    in deciding the issues here.  Direct evidence and

7    circumstantial evidence.  And I told you about that.  And in

8    fact, there was in at least one of the summations a reference

9    to the difference.

10              Direct testimony is direct evidence of a fact that a

11   witness says he or she personally saw, heard or observed or

12   did.  When a witness testifies of a fact issue which is known

13   because of the witness's own knowledge, again, what he said or

14   what he heard or what he did, that's direct evidence.

15              The other type of evidence is circumstantial evidence.

16   You remember the example I gave you on the first day.  I think

17   there were references to it in the summations.  Assume somebody

18   comes into the back of the courtroom with a wet umbrella and

19   you see it's wet.  So you have direct evidence of a wet

20   umbrella.  You can infer from the fact of the wet umbrella to

21   another fact that's not directly observed by you.  It's raining

22   out.

23              That's all there is to circumstantial evidence.

24   Circumstantial evidence is evidence from which you can infer

25   that something else is true.  And if you remember, I think I

1    pointed out, well, it's certainly logical and permissible to

2    infer from the wet umbrella that it's raining out.  That may

3    not be the case.  Somebody may have put it under a faucet in

4    the restroom.  But it's certainly permissible for you to infer

5    that it's raining outside.  That's all there is to

6    circumstantial evidence.  It's evidence that tends to prove a

7    disputed fact indirectly from proof of other facts.

8            You infer on the basis of reason and experience and

9    common sense from an established fact, the existence or

10   non-existence of some other fact.

11           There you see another one of these themes.

12           Use your experience, use your common sense, use your

13   good judgment when deciding these issues.

14           An inference is a deduction or conclusion that reason

15   and common sense prompt a reasonable mind to draw from facts

16   that have been proven by the evidence.  Not all logically

17   possible conclusions are legitimate or fair inferences.  Only

18   those inferences to which the mind is reasonably led or

19   directed are fair inferences from direct or circumstantial

20   evidence.

21           Whether or not to draw a particular inference is a

22   matter exclusively for you, the jury, as are all determinations

23   of fact.  And you'll remember in the summations, the lawyers

24   were asking you to draw differing inferences from the

25   established facts.  Each lawyer would suggest that the logical

O7B3MEN6                        Jury Charge

inference is X or logical inference was Y.  You decide what the
logical inferences are, and you decide what inferences to draw
and what inferences not to draw.

         Many material facts which are relevant to this case
and are elements of the case, such as state of mind, are rarely
susceptible to proof by direct evidence.  Usually such facts
are established by circumstantial evidence, such as a person's
words, actions, and conduct as of the time of the occurrence of
the events in question as well as any other surrounding facts
and circumstances from that time and the reasonable inferences
you draw.

         Now, ladies and gentlemen, the law does not weight
direct evidence more than circumstantial evidence.  You decide
what weight to be given on any piece of evidence, whether
circumstantial or direct.  You decide what pieces of evidence
to accept, and those that you accept, you decide how much
weight to put on them, whether to weigh something heavily or
very little or not at all.  You decide what pieces of evidence
to reject.  That's all for you to do.

         The law doesn't say circumstantial evidence is better
than direct evidence.  Or for that matter, direct evidence is
better than circumstantial evidence.  That's not in these
instructions.  You decide what evidence to accept and what not
to accept, and how much to weigh any piece of evidence that you
do accept.

O7B3MEN6                    Jury Charge

1              The law simply requires that before convicting a

2       defendant, you must be satisfied of that defendant's guilt

3       beyond a reasonable doubt based on all the evidence in the

4       case.  So I told you what is evidence.  I'm now going to tell

5       you what is not evidence, and you know that too because I've

6       told you all that on day one.

7              The indictment is not evidence.  It's simply an

8       accusation.  You can't use it as evidence.  The statements and

9       the arguments made by the lawyers are not evidence.  Their

10      arguments are intended to convince you of what conclusions they

11      want you to draw from the evidence or lack of evidence.

12             Listen to their arguments, weigh it, weigh their

13      arguments, but don't confuse what they told you with evidence.

14      Anything I've said is not evidence, ladies and gentlemen.  As

15      to what the evidence was, it's your recollection that matters.

16      Not the recollections of the lawyers.

17             And I should tell you that once you start your

18      deliberations, there will be a computer in your deliberation

19      room that's been loaded with all of the evidence in this case.

20      So you can call up any of the evidence at all on that computer.

21             I'm not permitted to let you have the gold bars or the

22      cash or the jewelry.  I'm quite serious.  If you want to see

23      any of that, then you just ask, and I'll explain how you send a

24      note to me, and we'll bring you out and we'll show you those

25      physical things.

 1          THE COURT:  But in terms of the paper exhibits, you'll

 2     have all of the exhibits loaded onto a computer.

 3          What other things aren't evidence?  You know, because

 4     I've told you, questions that lawyers ask are not evidence.

 5     It's the answers that are evidence.  And you also remember,

 6     relatively early on, I said watch for assumptions that are in

 7     the questions when the question is never answered.  The

 8     questions are never evidence.  It's only the answers that are

 9     evidence.

10          From time to time I may have directed you to disregard

11     an answer.  Normally, that would be when a witness sort of

12     over-spoke a lawyer when the lawyer was raising an objection

13     which I sustained, and the witness may have given the answer.

14     If I sustained the objection on some occasions, I would have

15     told you to disregard that answer.  You have to disregard that

16     if I directed you to.

17          Don't draw any inference or conclusion for or against

18     any party by reason of lawyers' objections or my rulings on

19     such objections.  The lawyers here not only have the right to

20     raise objections, but I think they have an obligation to object

21     to a question that they think is not legally permissible.  And

22     that is for me to decide whether it's legally permissible or

23     not.  But don't hold it against any lawyer that that lawyer was

24     raising objections.

25          Nothing I say is evidence.  Don't accept my statement

O7bWmen7                    Charge

1   of what the evidence showed in place of your own recollection.

2   Don't draw any inference from any of my rulings.  My rulings

3   were based on my legal training and were legal issues.  And you

4   know legal issues are not for you.  I have no opinion of the

5   facts of this case.  You decide the facts of this case.  I

6   don't.

7           Don't try to seek that I have an opinion about any of

8   the facts from any of my rulings.  It's just not there.

9           Similarly, you saw a couple of times, although I think

10   I would say the number of sidebar conferences were low, but

11   sometimes we had sidebar conferences.  Always those involved

12   legal matters, so whatever was said at sidebar is not your

13   concern.  And in fact, I had my deputy put on that white noise

14   to help reinforce that it's not your concern what we were

15   saying.  Those involved rulings of law and not matters of fact.

16           I may have questioned a witness myself from time to

17   time.  I did.  Undoubtedly, those questions were intended to

18   help clarify something that I thought may have been unclear.

19   Don't draw any inference of any kind with respect to any

20   question that I may have asked any of the witnesses.  Don't

21   infer that I have any views as to the credibility of any

22   witness -- because that's an issue of fact for you too -- or I

23   have any views as to the weight of the evidence or how you

24   should decide any issue of fact.  That's yours.

25           You'll also remember that I gave limiting instructions

O7bWmen7                    Charge

from time to time.  I think usually in terms of hearsay, I'd

say -- and you don't have to worry about what hearsay is;

again, that's a legal issue for me.  But I may have said this

is being introduced not for the truth of the matter stated but

for some other purpose.  And you must follow those limiting

instructions and consider that evidence only for the limited

purpose for which I admitted it.

        You have heard quite a bit of testimony about evidence

seized in connection with searches that were conducted by law

enforcement officers.  Evidence obtained from those searches

was properly admitted here and may be properly considered by

you.

        Whether you approve or disapprove of how that evidence

was obtained must not enter into your deliberations.  Ladies

and gentlemen, I now instruct you that the government's use of

the seized evidence is entirely lawful.  You must, therefore,

regardless of your own personal opinions about searches, give

this evidence full consideration along with all the other

evidence in the case in deciding whether the government has

proved each defendant's guilt beyond a reasonable doubt.

        I've already told you about stipulations.

        A stipulation of fact is an agreement among the

parties that a certain fact is true.  You have to accept those

as true, but you decide what weight to give those facts.  And

you've heard a stipulation of testimony, which is an agreement

O7bWmen7                    Charge

1   that, if called as a witness, a person would have given certain

2   testimony.  You must accept as true that the witness would have

3   given that testimony.  But again, you decide what weight to

4   give that testimony.

5          Now, you saw a great deal of testimony here in the

6   form of exhibits.  I didn't mean testimony.  You've seen a

7   great deal of evidence that was in the form of exhibits.

8   Certain exhibits were admitted into evidence.  The lawyer

9   propounding the evidence would say I move whatever it is.  If

10  it was a chart, it was a chart.  And then I said whatever I

11  said.  If I said admitted, then that chart and summary is in

12  evidence.

13         I've admitted those charts and summaries in place of

14  or in addition to the underlying documents that they represent

15  in order to save time and avoid unnecessary inconvenience.  And

16  you saw that.  There were a number of charts in which I

17  admitted the charts, and I also admitted the underlying

18  documents, the documents that underlay the charts.

19         You should consider the charts and summaries that I

20  admitted as you would any other evidence.  But there were also

21  charts and exhibits introduced as summaries that were

22  introduced simply as visual aids, and they weren't evidence in

23  and of themselves.  They're graphic demonstrations summarizing

24  some of the underlying evidence.

25         Sometimes it's easier or more convenient to use charts

1    and summaries as opposed to placing all of the underlying

2    documents in front of you.  Again, it's up to you to decide

3    whether the summary exhibits fairly and correctly reflect the

4    underlying testimony and documents they purport to summarize.

5    To the extent that the charts conform to what you determine the

6    underlying facts to be, accept them.  To the extent they differ

7    from what you determine the underlying evidence to be, you can

8    reject them.  But one way or the other, the summary exhibits

9    are not in and of themselves direct evidence -- that is, if I

10   did not admit them as evidence.  If I admitted them as

11   evidence, then they're evidence.

12          That's why you have these two separate charges here.

13   There were charts and summaries I admitted into evidence, and

14   there were charts and summary I did not admit into evidence.

15   In all cases, the underlying evidence and the weight which you

16   attribute to that underlying evidence is what gives value and

17   significance to these charts.

18          Now we turn to witness credibility.  In the past nine

19   weeks -- I think eight of testimony; there were a few days in

20   the beginning when we were choosing a jury and there was no

21   testimony, but eight or nine weeks of testimony -- you have had

22   the opportunity to observe each of the witnesses.  And I want

23   to tell you, as I have said before, you, as a jury, have been,

24   from outward appearances, very attentive to the witnesses and

25   the testimony here.  And I know that's appreciated by the

 1    parties and the lawyers and the Court.

 2            Now you have to consider whether the witnesses were

 3    both truthful and accurate.  A witness could believe that he

 4    was being truthful and still be mistaken and not able to recall

 5    facts accurately.  Similarly, a witness could take the oath and

 6    intentionally testify falsely.

 7            How do you decide who to believe and who not to

 8    believe, and of the evidence you believe, how do you decide

 9    what weight to put on it.  Again, another one of the themes --

10    it's just a matter of using your common sense, your judgment

11    and your life's experience.

12            I don't know whether I told you this story -- again,

13    you may not remember it; I would have told it at the very

14    beginning -- about a seminar I went to sponsored by the Federal

15    Judicial Center.  Does that ring any bell?

16            No.  OK.  Well, you're about to hear it.

17            When I was first a judge, about 30 years ago, the

18    Federal Judicial Center, which is the educational arm of the

19    federal judiciary, sponsored a seminar, and there were a couple

20    hundred judges who went.  I was among them.  And the topic of

21    the seminar was how do you decide the credibility of witnesses,

22    because there are certain trials -- not this -- where I, the

23    judge, decide the credibility of the witnesses.  Those are

24    cases in which there is no jury.  OK?

25            Here, as you know, you decide the credibility of the

1    witnesses, but this was a course that was about three days,

2    three or four days, to help judges determine how they can

3    determine the credibility of witnesses.  And I'm telling you I

4    was very impressed.  They had psychologists.  They had actors

5    who would act out a scenario, and then we had electronic

6    clickers, which were a big deal back then, and we had to click

7    and say who we thought was telling the truth and who we thought

8    wasn't.  And there were other judges who testified, and it was

9    just fabulous.  And at the end of those three days, I learned

10   absolutely nothing.

11        I can't give you any tests.  There are no magic

12   formulas.  Every day you decide who to believe and who not to

13   believe -- when dealing with your family, when dealing with

14   vendors, when going to school, in your job, you decide who to

15   believe, who not to believe.  You consider how well the

16   witness, in such things -- I'm going to give you some things to

17   consider, but again, no tests.  It's good judgment, common

18   sense, life's experience.

19        Among the things you should think about is consider

20   how well the witness was able to observe or hear what he or she

21   testified to.  The witness may be honest but mistaken.  How did

22   the witness's testimony impress you?  Did the witness appear to

23   be testifying honestly and candidly?  Were the witness's

24   answers direct, or were they nonresponsive?  How did the

25   witness act?  How did he testify?  What was the strength or

O7bWmen7                        Charge

1   accuracy of his or her recollection?  Do you think any outside

2   factors affected that witness's credibility?

3           Consider the substance of the testimony.  How does the

4   testimony compare with other proof?  Is it corroborated by

5   other evidence here?  Is it contradicted by other evidence?  If

6   there is a conflict, does any version appear reliable, and if

7   so, which, if any, appears more reliable than others?  Which

8   appear not to be reliable?

9           Do you think a witness had a possible bias or

10  relationship with a party?  Such a bias or relationship does

11  not necessarily make a witness unworthy of belief, but it's a

12  factor you can consider.  If a witness made statements in the

13  past that are inconsistent with his testimony here during the

14  trial, you can consider that when determining how much of the

15  testimony, if any, to believe.  You can consider whether the

16  witness purposely made a false statement.  Or do you think it

17  was an innocent mistake?  You can consider whether the

18  inconsistency concerned an important fact or merely a small

19  detail, as well as whether the witness had an explanation for

20  the inconsistency.  And if that witness did have an

21  explanation, did that explanation make sense to you?

22          It's your decision, after reviewing all the evidence,

23  whether to accept the testimony of any witness.  And of course,

24  you can accept parts and reject parts.  You should give that

25  testimony whatever weight you find it deserved.

1          You also heard questioning of witnesses and evidence

2    during the trial that witnesses have discussed the facts of

3    this case and their testimony with lawyers before they appeared

4    in court.  You can consider that fact when evaluating a

5    witness's credibility.  But I want to tell you, ladies and

6    gentlemen, that there's nothing unusual or improper about a

7    witness meeting with lawyers before testifying in court so that

8    the witness can be aware of what he or she is going to be

9    questioned about, focus on those areas that he or she is going

10   to be questioned about, and have the opportunity to review

11   relevant exhibits that may be given to that witness by the

12   lawyers before being questioned.

13          This type of consultation helps conserve your time and

14   my time and everybody's time.  In fact, I can tell you, in my

15   experience, it would be unusual for a lawyer to call a witness

16   without speaking with that witness in advance.

17          Again, the weight you give the nature or the fact of

18   the witness's preparation and what inferences you draw from

19   that preparation are matters completely within your ken, within

20   your area here.

21          Now, you also heard testimony of law enforcement

22   officers or those who work with law enforcement officers.  The

23   fact that a witness may be employed as a law enforcement

24   official or work with law enforcement officials does not mean

25   that his or her testimony is necessarily deserving of more or

 1    less consideration or greater or lesser weight than that of

 2    ordinary witnesses.

 3            At the same time, it's quite legitimate for a defense

 4    counsel to try to attack the credibility of a law enforcement

 5    witness on the ground that that witness's testimony may be

 6    colored by a personal or professional interest in the outcome

 7    of the case.

 8            It's for you to decide, ladies and gentlemen, after

 9    reviewing all the evidence, whether to accept the testimony of

10    such a witness and to give that testimony whatever weight, if

11    any, you find it deserves.

12            Now, I've admitted into evidence the acts and

13    statements of others because those acts and statements were

14    committed or made by persons who the government alleges were

15    coconspirators of the defendants.  And you heard references to

16    that in the summation.

17            You can consider as evidence against a defendant the

18    reasonably foreseeable acts and statements of those who you

19    find were coconspirators of that defendant if made in

20    furtherance of the conspiracy's common purpose.  The reason for

21    this rule has to do with the nature of the crime of conspiracy.

22    A conspiracy is often referred to as a partnership in crime.

23    Just as in other types of partnerships, when people enter into

24    a conspiracy to accomplish an unlawful end -- that is, an

25    agreement with two or more people to reach a certain result --

1    each member of the conspiracy becomes an agent for the others

2    in carrying out the conspiracy.  Thus, the reasonably

3    foreseeable acts, declarations, statements and omissions of any

4    member of the partnership -- the conspiracy -- in furtherance

5    of the common purpose of the conspiracy, are deemed under the

6    law to be the acts of all of the members.  And each member of

7    the conspiracy is deemed responsible for such acts,

8    declarations, statements and omissions of any other

9    coconspirator made in the course of and in furtherance of the

10   conspiracy.

11         In determining the factual issues before you, you may

12   consider against the defendants any acts or statements made by

13   any of the individuals who you find, under the standards I've

14   already given you, to have been their coconspirators.  This is

15   so even if such acts were done and statements made in a

16   defendant's absence and without that defendant's knowledge.

17   But the burden of proving beyond a reasonable doubt that the

18   conspiracy, in fact, existed and that the defendants were

19   members of that conspiracy remains with the government.

20         Now, you remember another one of the instructions that

21   I gave you many times, and ultimately I just reverted to a

22   shorthand to save everybody's time.  That's when you heard

23   recordings of voice messages and things, telephone calls.

24   Quite frequently, I admitted the telephone call and the

25   recording as evidence, and then the same exhibit had a T number

O7bWmen7                    Charge

1    on it, and that was the transcript.  And I told you the

2    transcript was not evidence; it was just an aid to you to help

3    you in understanding what was on the recording.  And if you

4    heard anything in the recording that was different from what

5    the transcript was, you were to follow what you heard on the

6    recording.

7          Portions of certain communications were in languages

8    other than English.  In respect to those conversations, I have

9    admitted English-language translations of those communications

10   as evidence.  OK?  When they were in a foreign language, it was

11   the English translation that, in fact, was the evidence.  You

12   must accept the translations as evidence even if you understand

13   whatever language was being spoken.

14         The transcripts for the English-language recordings,

15   as I just told you, are not themselves evidence.  You should

16   draw your own conclusions as to what was heard in the

17   recordings admitted into evidence.  And as I just told you, if

18   you think you heard something different from what appears in

19   the transcript of the English-language recording, what you

20   heard controls.

21         Now, among many of the exhibits that were introduced

22   into evidence were redactions.  Redactions are simply parts of

23   the document that are taken out or covered.  They were covered

24   because whatever's under them had no role to play in your

25   deliberations.  Don't concern yourself with what was covered.

O7bWmen7                        Charge

1    Concern yourself only with the part of the item that was

2    admitted into evidence.

3            Now, certain witnesses were also allowed by me to

4    express their opinions about matters that are at issue.  A

5    witness may be permitted to testify to an opinion on those

6    matters about which that witness has special knowledge, skill,

7    experience and training.  The testimony was given to you on the

8    idea that someone who is experienced and knowledgeable in the

9    particular field -- scientific or other specialized areas --

10   should be able to give opinions about the areas in which they

11   are expert to assist you in understanding the evidence or in

12   reaching an independent decision on the facts.  And you'll

13   remember when somebody asked that a witness be qualified as an

14   expert, I turned to you and said, all that means, ladies and

15   gentlemen, is that this witness can answer opinion questions.

16           In weighing the opinions of these experts, you can

17   consider the witness's qualifications, opinions, reason for

18   testifying, and all of the other things that ordinarily apply

19   when deciding whether or not to credit a witness's testimony.

20   Give that opinion testimony whatever weight, if any, you find

21   it deserves in light of all the evidence here, but don't accept

22   opinion testimony merely because I allowed that witness to give

23   his or her opinion.  And again, another one of the themes,

24   don't allow that opinion to substitute for your own common

25   sense, life's experience and good judgment.  Again, another

1     theme.  The determination of facts are solely for you, ladies

2     and gentlemen.

3           You also have heard testimony from one or more

4     government witnesses who have pled guilty to charges arising

5     out of the facts that are related to the issues here.  You

6     remember Mr. Uribe pled guilty.  You are instructed that you

7     are to draw no conclusions or inferences of any kind about the

8     guilt of the defendants on trial from the fact that such a

9     witness pled guilty to a similar charge.  The decision of the

10    witness to plead guilty was a personal decision on the part of

11    that witness, and he or she made it on the basis of his or her

12    own guilt.  You can't use that guilty plea in any way as

13    evidence against the defendants here.  That guilty plea went to

14    the issue of his guilt.

15          Now, the law allows the use of testimony of

16    cooperators or accomplice witnesses.  And you saw Mr. Uribe

17    testify here.  There's nothing improper about the government's

18    use of such a witness; that is, a cooperating witness.  In

19    fact, in federal courts, the law is that the testimony of a

20    cooperating or accomplice witness in itself may be enough for

21    conviction if the jury believes that that testimony proves

22    guilt beyond a reasonable doubt.

23          Accordingly, the testimony of accomplice or

24    cooperating witnesses was properly before you.  The government

25    argues, as it is entitled to do, that if such evidence could

not be used, there would be many cases in which there was real

guilt and convictions could not be obtained.  The testimony of

cooperating or accomplice witnesses should be examined by you

with greater scrutiny because such witnesses may believe it's

in their interests to give testimony favorable to the

government, and the fact that a witness is an accomplice or

cooperating witness can be considered by you in evaluating that

witness's credibility, but it doesn't follow that simply

because someone has admitted to participating in crimes that he

or she is incapable of giving a truthful version of what

happened.

        Like the testimony of other witnesses, accomplice

witness testimony should be given the weight it deserves in

light of the facts and circumstances before you, taking into

account the witness's demeanor, candor, the strength and

accuracy of that witness's recollection, their background and

the extent to which their testimony is or is not corroborated

by other evidence in the case.

        You may consider whether an accomplice witness has any

interest in the outcome of the case and, if so, whether it has

affected that witness's testimony.  For example, you may

consider whether the cooperating witness has received any

benefits or promises of benefits from the government or has

benefitted in any way from his cooperation with the government

that would motivate him to testify falsely in court.

O7bWmen7                        Charge

1           You've also heard testimony of one or more agreements

2    between the government and the accomplice witnesses.  I caution

3    you that it is no concern of yours why the government entered

4    into an agreement with a particular witness.  Your sole concern

5    is whether a witness has given truthful testimony here before

6    you.

7           In evaluating the testimony of these witnesses, ask

8    yourselves whether these witnesses would benefit more by lying

9    or more by telling the truth.  Was there testimony made up in

10   some way because they believed or hoped that they would somehow

11   receive favorable treatment by testifying falsely?  Or did they

12   believe that their interests would be best served telling you

13   the truth?  If you believe that a witness was motivated by

14   hopes of personal gain, was the motivation one that would cause

15   them to lie or one that would cause them to tell you the truth?

16   Did the motivation color that witness's testimony?

17          If you find the testimony by such a witness -- or any

18   witness, for that matter -- is false, reject it.  You know

19   that.

20          If, however, after giving cautious and careful

21   consideration to the testimony and witness's demeanor and

22   everything else I've been talking about, and you're satisfied

23   that that witness told the truth, then accept it and act

24   accordingly.  As with any witness, the issue of credibility

25   isn't usually decided on an all-or-nothing basis, although it

O7bWmen7                    Charge

1    may be.  That's up to you.  If you find a witness testified

2    falsely in one part, you're still entitled to accept that

3    testimony in other respects, or for that matter, you can throw

4    it all out.  It's an issue of fact, so it's up to you.

5         You've also heard testimony that one or more

6    accomplice witnesses or cooperating witnesses pled guilty to

7    certain crimes that are related to the allegations here.  You

8    are to draw no conclusions, as I've told you, or inferences of

9    any kind about the guilt of the defendants on trial here from

10   the fact that a cooperating witness pled guilty to similar

11   charges.  The decision of a witness to plead guilty is a

12   personal decision that that witness made about his own guilt

13   and may not be used by you in any way as evidence against the

14   defendant on trial.

15        Now, it's 5 o'clock, so let me end with this thought,

16   and I've told you this several times.

17        During the trial, you've heard testimony from

18   witnesses that the government did or did not use specific

19   investigative techniques.  You can consider these facts in

20   deciding whether the government has met its burden of proof,

21   because you have to look to all of the evidence, or lack of

22   evidence, when you're deciding whether a defendant is guilty.

23   But I also instruct you that there's no legal requirement that

24   the government use any specific investigative technique to

25   prove its case.

O7bWmen7                    Charge

1              You know the government is not on trial here.  Law

2       enforcement techniques are not your concern.  I've said that

3       several times.  Your concern is to determine whether or not on

4       the evidence, or lack of evidence, each defendant's guilt has

5       been proved beyond a reasonable doubt.  And you know that as

6       well because I've told you that several times.

7              Enjoy the evening.  Don't discuss the evidence.  Keep

8       an open mind.  If you're all here at 9:30, we'll pick up the

9       charge at that point.  And again, our expectation is you'll

10      have this case before lunch.

11             Enjoy the evening.

12             (Jury not present)

13             THE COURT:  All right.  I'll see everyone at 9:30

14      tomorrow.

15             I want to briefly see the lawyers at sidebar.

16             (At sidebar)

17             THE COURT:  I just wanted to let you know that juror

18      No. 9 was concerned, I guess, about why I was questioning him.

19      He told my deputy the following, and it does not change my

20      ruling.  He said he was trying to think about why I could have

21      been asking that question, and he did remember that on one day

22      he'd left his notepad in the jury deliberation room, so he

23      didn't have it.  And he turned to the juror next to him and

24      said, can I have a page out of your notepad, and she gave it to

25      him.  That's the end.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O7bWmen7

1          Thank you.  See you tomorrow.

2          MR. LUSTBERG:  Thank you, Judge.

3          (Adjourned to July 12, 2024, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25