**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

         -against-

ROBERT MENENDEZ, *ET AL.*,

               Defendants.

23 CR. 490 (SHS)

**MEMORANDUM OF LAW IN SUPPORT OF FRED DAIBES'S MOTIONS FOR A
JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL
PROCEDURE 29 OR TO SET ASIDE THE VERDICT AND GRANT A NEW TRIAL
PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33**

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

**PRELIMINARY STATEMENT** ................................................................................ 1

**STATEMENT OF FACTS** ......................................................................................... 4

   A.   The Charges Against Mr. Daibes ..................................................................... 4

   B.   Motions *In Limine* and The Final Pretrial Conference ................................... 5

   C.   Trial Evidence ................................................................................................... 6

       1.   *Government's Opening Statement* ............................................................ 6

       2.   *Mr. Daibes's Opening Statement* ........................................................... 8

       3.   *Special Agent Aristotelis Kougemitros* ................................................ 10

       4.   *Special Agent Anna Frenzilli* ............................................................... 10

       5.   *Doctor Charity Davis* ........................................................................... 11

       6.   *Kira Glass* ............................................................................................. 11

       7.   *Janice Grasty* ........................................................................................ 12

       8.   *Jospeh Cantania* ................................................................................... 12

       9.   *Isabella Fuchs* ...................................................................................... 12

       10.   *John Moldovan* ..................................................................................... 13

       11.   *Mierna Hanna* ...................................................................................... 15

       12.   *Jamela Maali* ........................................................................................ 15

       13.   *Mr. Daibes Trial Motion Regarding Gift Giving Evidence* .................... 21

       14.   *Vaskin Khorozian* ................................................................................. 22

       15.   *Special Agent Michael Coughlin* .......................................................... 24

       16.   *Philip Sellinger* ..................................................................................... 25

       17.   *Michael Soliman* ................................................................................... 29

       18.   *Vikas Khanna* ....................................................................................... 31

       19.   *Special Agent Paul Van Wie* ................................................................. 32

       20.   *Special Agent Elizabeth Wheeler* ......................................................... 34

       21.   *Witnesses Unrelated to Mr. Daibes* ...................................................... 35

   D.   The Jury Charge .............................................................................................. 37

       1.   *Goodwill Gifts Charge* .......................................................................... 37

       2.   *Illegal Gratuities* ................................................................................... 40

   E.   Government's Summation and Rebuttal Summation ....................................... 40

**RELEVANT LEGAL PRINCIPLES** ...................................................................... 42

**ARGUMENT** ......................................................................................................... 46

   **Point I** ............................................................................................................... 46

   **THE COURT MUST ENTER A JUDGEMENT OF ACQUITTAL ON ALL COUNTS
BECAUSE MR. DAIBES'S CONVICTION WAS NOT SUPPORTED BY THE
WEIGHT OF THE EVIDENCE AND WAS BASED ON IMPROPER SPECULATION
AND INFERENCES BY THE JURY** ................................................................ 46

   **Point II** .............................................................................................................. 58

   **RULE 33 MANDATES A NEW TRIAL BECAUSE THE COURT'S PRECLUSION OF
MR. DAIBES'S GIFT GIVING EVIDENCE COMBINED WITH THE
GOVERNMENT'S IMPROPER REFERENCES TO GIFT GIVING IN ITS
SUMMATION RESULTED IN A MANIFEST INJUSTICE** ............................. 58

   **Point III** ............................................................................................................ 63

   **MR DAIBES INCORPORATES THE ARGUMENTS RAISED IN CO-DEFENDANTS'
RULE 29 AND 33 MOTIONS AND MEMORANDA OF LAW** ........................ 63

  **CONCLUSION** ...................................................................................................... 63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Jackson v. Virginia,*
    443 U.S. 307 (1979)............................................................................................43

*Tibbs v. Florida,*
    457 U.S. 31 (1982)........................................................................................45, 46

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)................................................................................43

*United States v. Bonjiovanni,,*
    No. 19 Cr. 227 (LJV), 2024 U.S. Dist. Lexis 128252 (W.D.N.Y. July 19,
    2024) ...................................................................................................44, 45, 49

*United States v. Carpenter,*
    405 F. Supp. 2d 85 (D. Mass. 2005) ..............................................................58, 62

*United States v. Clifford,*
    426 F. Supp. 696 (E.D.N.Y. 1976) ......................................................................43

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994)................................................................................44

*United States v. Dore,*
    No. 12 Cr. 45 (RJS), 2013 WL 3965281 (S.D.N.Y. July 31, 2013) ......................43

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001)..........................................................................44, 45

*United States v. Genao,*
    361 F. Supp. 2d 224 (S.D.N.Y. 2005) ........................................................58, 59, 62

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002)............................................................................44, 47

*United States v. Lincoln,*
    630 F.2d 1313 (8th Cir. 1980) .......................................................................45, 46

*United States v. McCourty,*
    562 F.3d 458 (2d Cir. 2009)................................................................................45

*United States v. Melendez,*
    57 F.3d 238 (2d Cir. 1995)............................................................................58, 59

*United States v. Mulheren,*
  938 F.2d 364 (2d Cir. 1991)...........................................................................44

*United States v. Pauling,*
  924 F.3d 649 (2d Cir. 2019)...........................................................................43

*United States v. Sanchez,*
  969 F.2d 1409 (2d Cir. 1992).........................................................................45

*United States v. Silver,*
  948 F.3d 538 (2d Cir. 2020)......................................................................48, 49

*United States v. Skelos,*
  988 F.3d 645 (2d Cir. 2021)...........................................................................5

*United States v. Taylor,*
  464 F.2d 240 (2d Cir. 1972)......................................................................43, 44

*United States v. Valle,*
  807 F.3d 508 (2d Cir. 2015)......................................................................43, 44

*United States v. White,*
  673 F.2d 299 (10th Cir. 1982) ........................................................................43

*United States v. Guadagna,*
  183 F.3d 122 (2d Cir. 1999)...........................................................................43

*United States v.Vernace,*
  811 F.3d 609 (2d Cir. 2016)...........................................................................44

**Statues**

18 U.S.C. § 201(c)(1)......................................................................................40

**Rules**

Federal Rule of Criminal Procedure 29 ............................................................. *passim*

Federal Rule of Criminal Procedure 33 ............................................................. *passim*

Federal Rule of  Evidence 404......................................................................... *passim*

Federal Rule of  Evidence 405......................................................................... *passim*

Federal Rule of  Evidence 406......................................................................... *passim*

**PRELIMINARY STATEMENT**

Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, this Court should grant Mr. Daibes a new trial. No rational jury could have found Mr. Daibes guilty of all the counts in which he was charged. Moreover, it would be a manifest injustice to permit his conviction to stand because it was tainted by cumulative errors related to the preclusion of evidence of Mr. Daibes's specific acts of gift giving.

First and fundamentally, with respect to all schemes in which Mr. Daibes was charged, no rational juror could have concluded that the evidence sufficiently established the appropriate nexus between the money and gold connected to Mr. Daibes seized from the Menendezes with any official acts of the Senator. At best, the government established that within a two-year period, Mr. Daibes provided the Menendezes with some things of value. While complete precision is not required under the law, the imprecision of the government's evidence required the jury to speculate and engage in guesswork rather than employ appropriate reasoned inferences. A verdict of guilt based on speculation not reasonable inferences is improper, therefore, this Court must vacate it.

Furthermore, the Court did not permit Mr. Daibes to sufficiently demonstrate to the jury that cash and gold in the amounts connected to Mr. Daibes would not have been out of the ordinary for Mr. Daibes to gift a friend of more than thirty years. Indeed, the government could not and did not sufficiently demonstrate how, when, why, or under what circumstances Mr. Daibes provided items of value to Nadine or Senator Menendez. The evidence showed that it was just as likely that the gold or cash from Mr. Daibes was a gift, legitimate payment, gratuity, or something else wholly unrelated to any charged scheme, as opposed to a bribe. At best, the government proved that Mr. Daibes provided, in a two-year period, Senator Menendez with

1

goodwill gifts, as defined by the Court in the final instructions to the jury, or a gratuity, but not bribes.

Second, no rational juror could have concluded that Mr. Daibes bribed Senator Menendez to take official actions to assist IS EG Halal or Egypt. The government's evidence did not offer any evidence or otherwise prove that Mr. Daibes was involved in the operations of IS EG Halal, or had any ownership in the business. At most, the government may have proved that Mr. Daibes gave a gratuity, because the sign off on the tank ammunition to Egypt as well as the call to Undersecretary Ted McKinney both took place before Mr. Daibes attempted to purchase Nadine Arslanian's mortgage or dropped off checks to her from IS EG Halal.

 Indeed, the only potential official act that Senator Menendez could have promised was some kind of action on the Grand Ethiopian Renaissance Dam. Senator Menendez sent Mr. Daibes a copy of the bill, S.1102, 116th Congress (2019) in September 2019. However, there was no evidence that Mr. Daibes had any interest in the bill passing or asked for any vote. Evidence regarding the alleged payments to Nadine Arslanian (who become Senator Menendez's wife), was devoid of anything that established Mr. Daibes's awareness of any payments being improper, an essential element of the charged crimes. In fact, the evidence affirmatively showed that he was *unaware* of the specifics of the payments; the payments to Ms. Arslanian occurred long after any official acts took place, which even if made with any corrupt intent, would be proof only of an illegal gratuity, not bribery. No rational jury could have concluded that Mr. Daibes was guilty of the bribery or honest services charges involving IS EG Halal and Egypt.

Third, no rational juror could have concluded that Mr. Daibes engaged in a scheme to bribe Senator Menendez to assist him with his business dealings with individuals and an entity that was connected to the government of Qatar. Neither was there sufficient evidence to permit a

rational juror to conclude that Mr. Daibes bribed Senator Menendez to engage in official acts that were beneficial to the government of Qatar.  The government proved nothing more than Senator Menendez introduced two parties to what ultimately evolved into a successful business partnership.  Senator Menendez introduced Mr. Daibes, his longtime friend and constituent, to a member of the Qatari royal family that he learned was interested in making investments in New Jersey.  Nothing more.

And fourth, with respect to the criminal action pending in the District of New Jersey, no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.  The government presented no evidence that Senator Menendez agreed to or tried to improperly influence or pressure prosecutors in New Jersey to treat Mr. Daibes more favorably than anyone else.  Mr. Daibes's New Jersey case was being handled, and is still being treated, like any other criminal case.  His counsel worked very hard for him to get him the best resolution.  In the end, he accepted a resolution that the prosecutors and he agreed on, all without any improper influence.  At most, the evidence showed that Senator Menendez was concerned about his friend of over thirty years.  Any other conclusion would be improper speculation, assumption, or guesswork.

Furthermore, the interests of justice require that the Court grant Mr. Daibes a new trial pursuant to Rule 33 because it would be a manifest injustice to permit his conviction to stand. His conviction was tainted by cumulative errors related to the preclusion of evidence of specific acts of gift giving by Mr. Daibes.  By precluding evidence of his specific acts of gift giving, the Court erroneously prevented Mr. Daibes from introducing evidence essential to his defense.  The unduly prejudicial effect of this error to Mr. Daibes was compounded by the government's repeated use of the lack of specific instances of gift giving in the record in its closing arguments

and was exacerbated by the goodwill gifts charge the Court gave to the jury. The interests of justice require that Mr. Daibes be granted a new trial.

## STATEMENT OF FACTS

A.     The Charges Against Mr. Daibes

A Southern District of New York ("SDNY") grand jury first returned an indictment against Mr. Daibes and other defendants on or about September 21, 2023. ECF No. 1. It subsequently superseded that indictment three times until it returned and filed a fourth superseding indictment on March 5, 2024, against Senator Robert Menendez, Nadine Menendez (who was known as Nadine Arslanian before marrying Senator Menendez and was often referred to by that name during trial),[1] Wael Hana, and Fred Daibes. ECF No. 238. It was the fourth superseding indictment that was the subject of the instant trial. The fourth superseding indictment named Mr. Daibes in 7 of its 18 counts.

The fourth superseding indictment charged Mr. Daibes with: (1) conspiring to commit bribery in violation of 18 U.S.C. §§ 371 and 3147(1) (Count One); (2) conspiring to commit honest services fraud in violation of 18 U.S.C. §§ 1349 and 3147(1) (Count Two); (3) conspiring to commit obstruction of justice in violation of 18 U.S.C. § 371 (Count Four); (4) bribery regarding actions benefiting Wael Hana and himself in violation of 18 U.S.C. §§ 201(b)(1)(A) and (C), 2 and 3147(1) (Count Six); (5) honest services wire fraud regarding actions benefiting Wael Hana and Egypt in violation of 18 U.S.C. §§ 1343, 1346, 2 and 3147(1) (Count Seven); (6) bribery regarding actions benefiting the Government of Qatar and himself in violation of 18 U.S.C. §§ 201(b)(1)(A), (2) and 3147(1) (Count Twelve); and (7) honest services wire fraud

---

[1] On April 11, 2024, the Court ordered Nadine Menendez's trial be severed from the other three defendants. *See* ECF No. 308.

regarding actions to benefit the Government of Qatar and himself in violation of 18 U.S.C. §§ 1343, 1346, 2, and 3147(1) (Count Thirteen).

      B.    Motions *In Limine* and The Final Pretrial Conference

On April 5, 2024, the government moved *in limine* to preclude, among other things, Mr. Daibes from introducing evidence of his prior good acts. *See ECF* No. 291. In opposition, Mr. Daibes argued that evidence of his gift giving and generosity were admissible pursuant to both Federal Rules of Evidence 405(b) and 406. *See ECF* No. 317. He argued that should he choose to affirmatively present evidence, the Court must permit him pursuant to Rule 406, to introduce evidence of his habitual gift giving because habitual gift giving was evidence that tended to disprove the essential elements of a *quid pro quo*. He argued, citing *United States v. Skelos*, 988 F.3d 645, 663 (2d Cir. 2021), that evidence of a history of gift giving was clearly relevant and as such, "easily surmount[ed] the low bar for relevancy." *Id.* at 2. Thus, Mr. Daibes's generosity and penchant to give gifts to those with whom he enjoys a lasting and close personal relationship, he argued, was admissible. He argued that his habitual gift giving, whether it be providing a ride to or from an airport or giving something of more tangible and significant value (without expecting anything in return) was relevant and admissible under both Rules 405(b) and 406. *Id.* at 2-3. Evidence of his generosity and gift giving was directly relevant to intent; indeed, it could affirmatively negate the government's allegations that he had any corrupt intent. *Id.* Accordingly, Mr. Daibes argued, should he elect to do so, he should not be precluded from introducing evidence of this character trait to support his defense. *Id.* at 3.

At the final pretrial conference on May 6, 2024, the Court ruled on the government's motions *in limine* and on the gift-giving issue. The Court expressly permitted Mr. Daibes to

introduce character evidence concerning his habitual gift giving through defense witnesses in the form of opinion and reputation testimony.  Pretrial Conf. Tr. at 14.

Specifically, the following colloquy occurred at the conference:

The Court:    In regard to Mr. Daibes, he argues he wants to put in the fact that he's a habitual gift giver.  It seems to me that can come in. However – I mean, if it's admissible, I don't have any objection to that.  I assume the government doesn't either.  That's my ruling there.

Mr. Richenthal:  I agree with everything your Honor just said.  I would just note, I think this is something I keep saying, your Honor used the word "relevant" in describing the prior good acts.  We agree, not all acts would be relevant to these charges.  Acts toward Egypt, for example, probably are.  Acts unrelated to Egypt or Qatar probably are not.  That was exactly our concern.

The Court:    Okay.  401, irrelevant evidence does not come in.

C.    <u>Trial Evidence</u>[2]

On May 13, 2024, trial commenced.  For two days the parties and the Court selected the trial jury and from May 15, 2024, until July 12, 2024, the jury heard opening statements, witness testimony, summations, and the Court's instructions.  On July 16, 2024, the jury returned its verdict finding all defendants guilty on all counts.

*1.    Government's Opening Statement*

On May 15, 2024, the government gave its opening statement.  It argued that the evidence would establish, beyond a reasonable doubt, that Senator Menendez sold his power and influence for gold bars, envelopes stuffed with cash, checks for a non-existent job for Nadine

---

[2] In this motion, we do not summarize the entire trial record.  We know that the Court is very familiar with the lengthy record.  Here we endeavor to summarize the relevant evidence introduced at trial only as it relates to Mr. Daibes.

Arslanian, and a Mercedez Benz car.  Trial Transcript of *United States v. Robert Menendez, et al.,* 23 Cr. 490 (SHS) ("TT") at 48-49.

With respect to Mr. Daibes, it argued that while he was friendly with Nadine Menendez née Arslanian and Senator Menendez, at some point over a two-year period, he gave them gold and cash bribes for official actions by the Senator.  TT at 49.  The government also averred that the evidence would establish that Nadine Menendez acted as the "go-between" by passing messages and collecting some of the bribes.  TT at 51.

With respect to allegations regarding Egypt, it argued that Senator Menendez corruptly assisted Mr. Hana and the government of Egypt by repeatedly selling his influence and power over United States foreign policy to help Egypt and Mr. Hana.  TT at 51.  It argued that it would show that Mr. Hana promised to pay Senator Menendez and Nadine Arslanian in exchange for the Senator's use of his official position to help Egypt.  TT at 52.  As to Mr. Daibes's role in the Egypt scheme, the government stated that it expected the evidence to show that *after* Nadine Arslanian and Senator Menendez had assisted Mr. Hana and the government of Egypt, Mr. Hana was not owning up to his side of the bargain and making agreed upon bribe payments.  So, it argued, Nadine Arslanian went to Mr. Daibes to ask him to intervene and make sure that Mr. Hana paid "bribes," physically handing one of those "bribes to [Senator] Menendez himself.  A check from [Mr.] Hana delivered by [Mr.] Daibes."  TT at 56.  Notably, the government did not say that the evidence would show that Mr. Daibes was informed that Mr. Hana's checks were bribe payments or that he was informed of Mr. Hana's arrangement with Ms. Arslanian.

The government further argued that the evidence would show Mr. Daibes's motive for being involved in the Egypt scheme (by ensuring that Mr. Hana paid Nadine Menendez her agreed-upon salary) was money; that Mr. Hana had invested some of his business profits (not

obtained by bribery) into business deals with Mr. Daibes.  *Id.*  "When [Mr.] Hana made money, [Mr.] Daibes made money, too."  *Id.*

With respect to the alleged scheme regarding Mr. Daibes's New Jersey federal prosecution, the government argued that the evidence would show that Senator Menendez promised to interfere with that prosecution in exchange for cash and gold bars.  TT at 59-60.  It argued that the cash Mr. Daibes paid Senator Menendez was the cash found in the Menendezes' home that contained Mr. Daibes's fingerprints and/or DNA.  TT at 62.

But it also argued that Mr. Daibes provided the very same gold and cash to Senator Menendez for his influence or "power over U.S. policy about Qatar, not just Egypt[.]"  TT at 62.  To that end, the government argued that Mr. Daibes suggested ways Senator Menendez could help Qatar, "like by supporting a senate resolution praising Qatar."  *Id.*

### 2.    Mr. Daibes's Opening Statement

In his opening statement, Mr. Daibes emphasized that the government's evidence would not establish, beyond a reasonable doubt, that any gold or cash connected to Mr. Daibes and found in the home of Nadine and Senator Menendez were bribes.  TT at 159.

At the outset, Mr. Daibes clearly stated to the jury that he would not deny or challenge that he had given the money or gold tied to him.  "Yes, gold bars were given by him.  Yes, cash was given by him.  But what we do challenge is that gold or money was given to pay Senator Menendez to engage in any official senatorial acts."  TT at 160.

Mr. Daibes emphasized that he expected that the government's evidence would fail to show what any payments were for, when any payments were made, where any payments were made, or why any payments were made.  TT at 163.  For it to conclude that the payments were illegal bribes, the jury would have to make improper inferences or assumptions not reasonably

supported by the evidence.  *Id.*  Mr. Daibes argued that the government's evidence would fail to show the existence of the *pro* in the *quid pro quo* requirement, and that the evidence would more reasonably show that any payments were gifts, not bribes.  TT at 163.

Mr. Daibes argued that he expected the evidence to show, especially after and relying upon the Court's ruling at the final pretrial conference regarding Mr. Daibes's habitual gift giving, that Mr. Daibes gave as gifts, expensive luxury items and "because of his wealth, the value of the gifts that he gives to his family and friends would – they pale in comparison to those that we give."  TT at 165.

With respect to the Egypt part of the case, Mr. Daibes argued that the evidence would show that he had nothing to do with any halal businesses and in particular Mr. Hana's halal business.  TT at 166.  Indeed, while there were many alleged meetings between the Senator and Mr. Hana, Mr. Daibes was not present for most of the meetings.  *Id.*

With respect to the Qatar part of the case, Mr. Daibes argued that the evidence would only show that Senator Menendez introduced Mr. Daibes and the Qataris, and nothing more.  TT at 167.  Senator Menendez had no other involvement and there would be no evidence that Mr. Daibes paid the Senator for that introduction.  TT at 167-68.

Last, with respect to the appointment of the United States Attorney in New Jersey, Mr. Daibes expected the evidence to show that the Senator did not influence or pressure prosecutors in New Jersey to treat Mr. Daibes more favorably than anyone else and that his case was handled like any other case.  TT at 168.  Furthermore, Mr. Daibes emphasized there would be no evidence establishing that any of the items of value connected to Mr. Daibes (gold and currency) were provided to anyone to influence his New Jersey case.  *Id.*

### 3.    *Special Agent Aristotelis Kougemitros*

The government's first witness was Federal Bureau of Investigation ("FBI") Special Agent Aristotelis Kougemitros.  TT at 173.  Special Agent Kougemitros testified regarding his role in the search and recovery of items from Nadine Menendez's home at 41 Jane Drive, Englewood Cliffs, New Jersey, on June 16, 2022, as the team leader.  TT at 174.

He testified regarding the cellular telephones, gold, cash, and jewelry the FBI recovered in the search, 52 items in total.  TT at 192-93.  Some of the gold would later be tied to Mr. Daibes by matching the serial numbers of the gold with those on Mr. Daibes inventory of gold that his assistant created and kept at Mr. Daibes's direction.  A small portion of the cash recovered would be tied to Mr. Daibes through his fingerprints that were identified on the envelopes or tape sealing the envelopes containing cash.  Special Agent Kougemitros testified that, in total, the FBI seized $486,461 in cash from that home, eleven 1-ounce bars of gold, and two 1-kilogram bars of gold.  TT at 304-05.

Special Agent Kougemitros could not testify when, how, or why the cash or gold bars were given to Nadine or Senator Menendez.

### 4.    *Special Agent Anna Frenzilli*

On June 4, 2024, FBI Special Agent Anna Frenzilli testified.  TT at 2179.  Special Agent Frenzilli testified regarding her role in the search of Nadine Menendez's safe deposit box located at a Chase Bank branch in Englewood, New Jersey.  TT at 2180-81.  She had no other role in the investigation.  *Id.*  Specifically, she testified regarding all the items she recovered from the safe deposit box, including ten bank envelopes containing cash totaling just under $80,000.  TT. at 2188-91.

She could not testify when, how, or why the cash or gold bars were given to Nadine or Senator Menendez.

     *5.*    *Doctor Charity Davis*

On June 4, 2024, Dr. Charity Davis testified.  TT at 2211.  Dr. Davis was a forensic DNA examiner in the DNA Casework Unit for the FBI.  Dr. Davis testified generally about DNA, and how someone can leave their DNA behind on an item.  TT at 2218.  Based on her analysis, Dr. Davis concluded that two envelopes recovered from the FBI searches contained Mr. Daibes's DNA.  TT at 2252.

Dr. Davis acknowledged that her analysis could not determine how or when the DNA was transferred to the envelopes.  TT at 2254.

     *6.*    *Kira Glass*

On June 7, 2024, Kira Glass testified.  TT at 2809.  Ms. Glass was a physical scientist forensic examiner in the latent fingerprint operations unit at the FBI.  TT at 2810.  Ms. Glass testified about the four testing methods she and her team used to look for latent fingerprints on the envelopes recovered from the FBI searches.  TT at 2825-27.  She also described the methods to look for latent fingerprints on tape and the analysis, comparison, and evaluation for comparing latent fingerprints with known fingerprints.  TT 2828-29, 2835-46.

She testified that she found fingerprints belonging to John Pilot, Mr. Daibes's driver, on one envelope recovered in the FBI searches.  TT at 2862.  Ms. Glass also testified that she found Mr. Daibes's fingerprints on nine items recovered in the searches, one of which also contained the fingerprints of Senator Menendez.  TT at 2853, 2863-64; 2864; 2869, 2873, 2873, 2873, 2875.

However, Dr. Glass could not determine when fingerprints were placed on any of the items, where the items were when the fingerprints were put there, or the circumstance under which the fingerprints were placed on the items.  TT at 2818, 2915-16.

7.     *Janice Grasty*

On June 12, 2024, Janice Grasty testified.   TT at 3546.  Ms. Grasty worked for the Bureau of Engraving and Printing.  TT at 3546.  Ms. Grasty testified about the series codes printed on United States currency.  TT at 3547-48.  Ms. Grasty testified that when a new Secretary of the Treasury or Treasurer of the United States is appointed, the Bureau of Engraving and Printing prints new currency with a series code stamped on the bills indicating the date of appointment.  That date will stay on printed currency until a new Secretary of the Treasury or Treasurer of the United States is appointed.  TT at 3549.

8.     *Jospeh Cantania*

On June 25, 2024, Joseph Catania testified.  TT at 4845.  Mr. Catania worked at the Federal Reserve Bank of New York, which is one of the Federal Reserve Banks that places United States currency into circulation.  *Id*.  Mr. Catania was a director in the financial intelligence and investigations unit which, among other functions, answers government requests for bank note information.  TT at 4846.  Mr. Catania testified that the Federal Reserve currently tracks when $100 bills are released and when currency is in circulation in relation to the date it was printed and the series number contained on the bill.  TT at 4857-58.

9.     *Isabella Fuchs*

On June 26, 2024, Isabella Fuchs testified.  TT at 4921.  Ms. Fuchs was a staff operations specialist for the FBI whose job it was to analyze large volumes of data.  TT at 4922.  *Id*.  In this case, she reviewed serial numbers on United States currency seized by the FBI in its searches of

the Menendezes' home and Mrs. Menendez's safe deposit box. *Id.* The government introduced four summary charts, Government Exhibits 1335EX, 1335A, 1335B and 1335C, through Ms. Fuchs. TT at 4956. These charts listed the inventory number that the FBI used when they seized stacks of money, serial numbers of the seized bills, as well as the payout date (or date entering circulation), which was provided to her by the Federal Reserve. TT at 4929-30.

Government Exhibit 1335C showed the most recent date of circulation of any of the bills contained in each inventoried batch. TT at 4939-44. The dates in Government Exhibit 1335C varied, showing the release of currency seized by the FBI going into circulation between 2018 and March 21, 2022. The cash found in a yellow bag on a shelf of the basement at 41 Jane Drive supplied the latter date. TT at 4945; GX 1335C. There was no evidence presented at trial that the cash in that yellow bag was given by Mr. Daibes.

          10.   *John Moldovan*

John Moldovan testified on May 20 and 21, 2024. TT at 706, 779. Mr. Moldovan testified that in 2019 he was in-house counsel for IS EG Halal for roughly six months. TT at 708. While employed by IS EG Halal, Mr. Moldovan testified that he worked out of the IS EG Halal office at 125 River Road in Edgewater (TT at 720), an office building owned by Mr. Daibes. TT at 748. Mr. Moldovan testified about IS EG Halal's business of certifying meat as Halal. He also testified that he was personally involved in setting up an IS EG office in Uruguay. TT at 725-729. Mr. Moldovan was not sure of the extent of Mr. Hana and Mr. Daibes's business relationship, but knew that Mr. Hana wanted to partner in real estate investments with Mr. Daibes. TT at 748-49.

At some point while working for IS EG Halal, Mr. Moldovan was introduced to Nadine Arslanian through Mr. Hana. TT at 750. Mr. Moldovan was aware that Ms. Arslanian had a

precarious financial situation and participated in facilitating payments to help Ms. Arslanian avoid foreclosure on her home.  TT at 750 *et seq*.  To that end, he prepared a promissory note on behalf of Mr. Hana, for Ms. Arslanian to sign in exchange for Mr. Hana paying off the mortgage. TT at 754.  Additionally, he testified that Mr. Daibes asked him to ask the mortgage company if East West Funding LLC, a company that Mr. Daibes owned, could purchase the loan.  TT at 798-99.  Mr. Moldovan also drafted a contract for Nadine Arslanian to do consulting work for IS EG Halal at $10,000 a month.  TT at 804.

Mr. Moldovan also testified that he prepared a sale agreement where attorney Andy Aslanian would sell his shares in IS EG Halal back to Mr. Hana.  Both Mr. Hana and Mr. Daibes asked Mr. Moldovan to prepare the contract.  TT at 786.

Mr. Daibes and Mr. Hana also invested money with Mr. Moldovan to set up a law firm. TT at 788.  Mr. Daibes and Mr. Hana wanted to be partners but learned that the attorney rules of professional responsibility prohibited the relationship.  TT at 788-89.  Accordingly, on cross-examination, he testified that he asked Mr. Daibes how he should pay back the $25,000 that Mr. Daibes had invested, and Mr. Daibes told him not to, gifting him the money.  TT at 840-41

Regarding Mr. Hana and Mr. Daibes's personal relationship, Mr. Moldovan testified that Mr. Daibes is much older than Mr. Hana, and Mr. Hana looked up to Mr. Daibes or sought advice from him.  TT at 835.  He also testified that Mr. Daibes "has a mentor type way about him."  TT at 839.  He testified that Mr. Daibes developed many properties in Edgewater, and that "[e]veryone knows [Mr. Daibes] as very generous."  TT at 837, 840.

Regarding Daibes Enterprises and IS EG Halal having two overlapping staffers, Mr. Moldovan testified that even though Jamela Maali worked for both Mr. Daibes and IS EG Halal for a short period, when she did IS EG Halal work, she used her IS EG Halal email address.  TT

14

at 847.  Similarly, Rhony Daibes did IT work for the whole building, not just IS EG Halal and

Mr. Daibes.  *Id.*  Mr. Moldovan testified that he was not aware of Daibes Enterprises and IS EG

Halal sharing any bank accounts or Mr. Daibes having any shares in IS EG Halal.  TT at 847-48.

      *11.    Mierna Hanna*

      Mierna Hanna, Mr. Hana's Executive Assistant and Operational Manager of EG Trade,

testified on May 21, 2024.  TT at 948-49.  Ms. Hanna testified that after receiving a subpoena,

she inventoried Mr. Hana's gold bars and jewelry.  TT at 951.  Ms. Hanna also testified that gold

is a "cultural thing" in the Middle East.  TT at 959-60.  She testified that it was normal to own

gold in Middle Eastern culture, consider it as an investment, or give it as a gift.  *Id.* Ms. Hanna

testified that, as an example, in Middle Eastern Culture when individuals marry, they are

commonly given gold as a gift.  *Id.*

      *12.    Jamela Maali*

      On May 21 and 28, 2024, Jamela Maali was called to testify.  TT at 962.  Ms. Maali

testified that she worked for Mr. Daibes as his executive assistant.  TT. at 962.  She has worked

for Mr. Daibes's company for 15 years, 13 years of which she worked directly for Mr. Daibes.

*Id.*

      On direct examination, the government did not limit its questioning to Ms. Maali's

specific duties at Daibes Enterprises, but also inquired about all her job responsibilities and the

full scope of Mr. Daibes's businesses.  TT at 962-63.  Ms. Maali testified that Mr. Daibes is a

commercial and residential real estate developer, primarily in Edgewater, New Jersey, and she

described different aspects of that business.  TT at 963-64.

      Ms. Malli was also asked on direct examination to testify about Mr. Daibes's *personal*

gold collection.  TT at 966.  She testified that she observed him collect gold bars, coins, and

wafers.  TT at 966.  She also testified that she knew that he kept his gold in his home and had

personally observed the same.  TT at 966.

Ms. Maali testified regarding Mr. Daibes's relationship with Senator Menendez,

including Mr. Daibes's fundraising activities over the years that she has been employed by Mr.

Daibes.  TT at 969-70.  She testified about meeting Mr. Hana for the first time at a fundraiser for

Senator Menendez hosted by Mr. Daibes at a restaurant that he owned at the time, Le Jardin, in

Edgewater, New Jersey.  *Id*.

She testified that she had met Senator Menendez several times and had observed the

relationship between Senator Menendez and Mr. Daibes.  TT at 1001.  When asked to describe

that relationship she replied, "[t]hey're friends, and from what I've heard from the both of them,

they've been friends for well over 30 years."  *Id.*

With respect to Mr. Hana's halal business, Ms. Maali testified that around spring 2019,

when Mr. Hana was starting his business, Mr. Daibes asked her if she would be interested in

working for Mr. Hana on the side for extra money to help him start up his business; he made it

clear that she could do such work only if it did not interfere with her work for Mr. Daibes.  TT at

971-72.  She agreed, discussed the business with Mr. Hana, and started to work with Mr. Hana on

the side.  TT at 972.  Ms. Maali testified, regarding her work for Mr. Hana and IS EG Halal, that

it did not involve Mr. Daibes at all.  TT at 972-99.

She then testified regarding Government Exhibit 3D-2, which consisted of an email that

Mr. Daibes had received from Senator Menendez that Mr. Daibes forwarded to Ms. Maali for her

to print out the email's attachment.  TT at 1002.  The attachment was the Eastern Mediterranean

Security and Energy Partnership Act of 2019.  TT at 1003.  Ms. Maali could provide no other

testimony regarding the Act or circumstances surrounding the emails.

16

On May 28, 2024, before continuing Ms. Maali's direct examination, the government requested that the Court preclude Messrs. Daibes and Hana from eliciting from Ms. Maali specific instances of gift giving by either of them pursuant to Federal Rule of Evidence 404(b) or, at a minimum, rule that those topics were beyond the scope of direct examination.  TT at 1086-87.

In response, Mr. Daibes argued that the government had elicited Ms. Maali's job responsibilities working for Mr. Daibes.  "They talked about what she does on a daily basis, they talked about her writing checks from bank accounts for him, personal accounts, and I suspect they are going to go into a little greater detail as to the gold he collects.  They already brought that out.  The gold he keeps at his home."  The Court responded by stating, "that's a separate issue from gift giving."  TT at 1102-1103.  The following colloquy between the parties and the Court then occurred:

| | |
|---|---|
| Mr. de Castro: | Well, it could be.  But we intend to bring out that he gives gifts of gold.  Your Honor ruled in the pretrial final pretrial conference and stated the following.  "In regard to Mr. Daibes, he argues he wants to put in the fact that he is a habitual gift giver.  It seems to me that can come in.  However, I mean, if it is admissible, I don't have any objection to that.  I assume the government doesn't either.  That's my ruling there."  The government reaffirmed the relevance issue. They brought out her job responsibilities.  A huge part of her job responsibilities is personally involved, she's personally involved with Mr. Daibes' gift giving on all different fronts.  And so, I don't see a scope objection at all.  I think they brought it out already and we should be entitled to go into it. |
| The Court: | I'll look at those pages of the transcript.  Government? |
| Mr. Richenthal: | Very quickly.  I think I was the one who responded at the time.  Yes, habitual gift giving, which is the quote in the transcript, is a character trait.  The defense is allowed to elicit relevant character traits.  I think at the time we said we agree. The distinction we are trying to draw and the law |

draws is between character traits and specific instances in conformity therewith. Our understanding is that the defense does not simply intend to ask Ms. Maali, or for that matter any other witness, is Mr. Daibes a gift giver. But to do this differently, what they intend to do, specifically, as we understand it, is literally ask her specifics. Did he give gifts to this person. Did he give gifts to that person. Were they gold, were they not gold. That is in our judgment crossing the line between, as was said in the pretrial conference, habitual gift giving that is a character trait, to specific instances in conformity therewith.

The Court:            Is that 404(b)(1) evidence of any other act is not admissible to prove a person's character in order to show that on a particular occasion, the person acted in accordance with the character.

Mr. Richenthal:       That's our view, your Honor, yes.

Mr. de Castro:        Well, Judge.

The Court:            That's correct.

Mr. de Castro:        They didn't object to it at pretrial. Second, they are going to bring out on direct that Mr. Daibes bought, for example, Nadine Menendez a purse. And during that exact transaction, he then bought Ms. Maali a purse as well. They're trying to prevent it because they know it's coming and they want – they are concerned about it, even though they are going to bring out gift giving and they are just calling it a bribe.

The Court:            Let's see.

Mr. de Castro:        We're calling it gift giving.

The Court:            Let's see what they are doing.

Mr. Mark:             Your Honor, we don't intend to introduce that in her direct. This is the line that your Honor also drew with Ms. Mierna Hanna, which is we did not object to the question of the character trait of gift giving. We did object to the specific instances. And that's the objection your Hoor sustained with her, and that's the same line your Honor should draw with Ms. Maali. Page 960 of the transcript.

| | |
|---|---|
| The Court: | Thank you. |
| Mr. de Castro: | What they are doing now is we are not going to bring that our now, but we'll bring it in through a summary witness where there's messages about Mr. Daibes buying this purse for Ms. Menendez, when we have a witness who was present. Not only when Ms. Menendez was requesting it, or asked for it, that purchased it with him. And the thought we can't get into that with the actual witness that's present because they're choosing strategically not to do it is unfair and prejudicial. |
| The Court: | I think you can, if need be, make her your witness. But I have trouble with the 404(b)(1) issue. |
| Mr. Richenthal: | If the defense believes specific instances we have elicited is not placed in context, obviously we have no objection to them trying to place the instance in context. |
| | But our understanding of what they intend to do is go well beyond anything we are putting in, and essentially and go beyond Rule 405 which I would direct your Honor to, which talks about limitations on proving character, to try to elicit Mr. Daibes' character through specific instances far afield from this particular purse." |

TT at 1103-1106. The Court did not rule but stated, "all right. If those are the issues." TT at 1106.

Ms. Maali's direct examination resumed. TT at 1114. After further testimony regarding IS EG Halal, Ms. Maali continued to testify about Mr. Daibes's gold collection including the inventory she prepared of that collection as well as items unconnected to this case. TT. at 1118-23. As part of preparing the inventory, she recorded the serial numbers on gold bars that he possessed at the time. TT at 1121.

On cross-examination by Mr. Daibes, Ms. Maali testified that she was involved in almost every aspect of Mr. Daibes's professional life. TT at 1124. She testified that she also handled his personal bank accounts. TT at 1126. In preparation for and during major holidays, she

19

coordinated his holiday shopping and charitable donations. TT at 1126. Mr. Daibes then

attempted to elicit several times the general nature of Mr. Daibes generosity. TT at 1129-34.

While the Court permitted Mr. Daibes to elicit that he is generally generous in one question and

answer, it prohibited counsel from eliciting any details. Specifically, the defense attempted to

elicit the following, which the Court precluded:

| | |
|---|---|
| Q: | And how would you describe his generosity? |
| The Court: | Sustained. |
| Mr. Mark: | Objection. |
| TT. at 1129. | |

| | |
|---|---|
| Q: | In general, is he generous with friends? |
| The Court: | Sustained. |
| Mr. Mark: | Objection. |
| TT at 1129. | |

| | |
|---|---|
| Q: | In terms of his generosity over the years, are you able to say, in total, how much, in general, you've seen him provide? |
| Mr. Mark: | Objection. |
| The Court: | 404(b). Sustained. |
| TT at 1129. | |

| | |
|---|---|
| Q: | And are you aware of a gift that Mr. Daibes gave to Nadine Menendez? |
| Mr. Mark: | Objection. |
| The Court: | Sustained. |
| TT at 1130. | |

| | |
|---|---|
| Q: | Are you aware of an item that Mr. Daibes provided to Nadine Menendez? |
| Mr. Mark: | Objection. |
| The Court: | Same objection. Same ruling. |
| TT at 1130. | |

| | |
|---|---|
| Q: | Now, has Mr. Daibes been generous with you personally? |
| Mr. Mark: | Objection. |
| The Court: | 404, 405. Sustained. |
| TT at 1130. | |

| | |
|---|---|
| Q: | And what about gifting gold; does he gift gold? |
| Mr. Mark: | Objection. |
| The Court: | Sustained. |
| Mr. de Castro: | In general, Judge. |
| The Court: | In general, sustained. |

TT at 1133.

Q:          And Mr. Daibes was also very generous with the use of the jet, right?
Mr. Mark:   Objection.
The Court:  Sustained.
TT. at 1142.

Q:          He would let other people use his planes, right?
The Court:  Sustained.  Relevance.  404.
Mr. de Castro: I think they're going to hear testimony about that later on.
The Court:  They very well may.  Ask your next question.
TT at 1142-43.

In addition, on cross-examination, Ms. Maali testified that Mr. Daibes had no expertise or involvement in the halal business.  TT at 1138.  She testified that from 2019 to the present, IS EG Halal and Daibes Enterprises maintained separate office spaces.  TT at 1135.   Mr. Daibes was in the business of real estate investment, development and construction, not certifying halal meat. TT at 1137-38.  She testified that Mr. Daibes never asked her to complete a single task for IS EG Halal.  TT at 1139.

### 13. *Mr. Daibes Trial Motion Regarding Gift Giving Evidence*

On June 23, 2024, while the government was still presenting its case in chief, Mr. Daibes moved the Court for permission to not only introduce evidence relating to his habitual gift giving, but also introduce evidence of specific instances of gift giving relevant to the charged offenses.  ECF No. 481 at 1.

Mr. Daibes argued that his evidence of specific acts of Mr. Daibes's generosity and gift giving should be admissible pursuant to Federal Rules of Evidence 405(b) (as an essential element to the charge of bribery, *i.e. intent*, and Mr. Daibes's defense to that charge) and Rule 406 (acts taken by Mr. Daibes at issue in this case were in accordance with his habit or routine practice).  ECF No. 481 at 1.  The government opposed the motion on all grounds proffered by Mr. Daibes.  ECF No. 483.

21

The Court denied the motion and precluded Mr. Daibes from introducing evidence of his specific acts of generosity and gift giving.  TT at 5543-46.  First, the Court found that Rules 405(b) barred evidence of specific acts, because the trait of generosity was not an essential element of the charges (TT at 5543) and "Daibes's generosity [wa]s not an essential element of a defense pursuant to 405(b) because the government [wa]s not required to prove that Daibes lacked generosity in order to prove its case".  TT at 5544.

The Court further found that Rule 403 barred such evidence as "evidence of specific acts of gift giving unrelated to the charged offenses is improper under Rule 403 because it is likely to waste time and mislead and confuse the jury" thereby substantially outweighing the probative value of such evidence.  TT at 5544-45.

Finally, the Court found that specific acts evidence was impermissible pursuant to Rule 406 because "[g]iving gifts of gold bars and other items of value is not the sort of conduct that is 'semi-automatic' in nature" and thus outside the scope of conduct permitted under Rule 406.  TT at 5545.

### 14.    *Vaskin Khorozian*

Mr. Khorozian, a jeweler with a store in Edgewater, New Jersey, testified on June 26, 2024.  TT at 5064.  He testified that he met Mr. Hana through Andy Aslanian in 2018 or 2019.  TT at 5065.  Mr. Aslanian and Mr. Hana were friends, and as result, Mr. Khorozian and Mr. Hana became friends.  TT at 5065-67.  He has also known Mr. Daibes since 1982.  TT at 5075.  He described his relationship with Mr. Daibes as a "special relationship."  TT at 5076.  Mr. Khorozian would also see Mr. Daibes and Mr. Hana out socially and described their relationship as "like father and son".  TT at 5077.  Mr. Khorozian met Nadine Arslanian in 2018, around the same time he met Mr. Hana.  TT at 5077.

22

Mr. Khorozian testified generally that when he heard that someone was looking to sell gold, he would reach out to Mr. Daibes to see if he was interested in buying it and facilitate the exchange for him. TT at 5078. Starting around early 2022, he started doing the same for Mr. Hana. TT at 5078. With Mr. Hana, Mr. Khorozian would charge a commission as the middleman in the exchange. TT at 5079. He never made money as a middleman for Mr. Daibes because "I love him. I want to make him happy. Some deal comes and it's opportunity to see him, and it's more than money for me." TT at 5080. In June 2021, he was the middleman for Mr. Hana to buy 22 1-ounce gold bars for $1,855 each. TT at 5081-86; GX 3L-1.

In March 2022, Nadine Menendez came into Mr. Khorozian's store to sell two 1-kilogram bars of gold. TT at 5088-89, 5098. She told Mr. Khorozian that it was family gold, and she needed to sell it to pay her bills. TT at 5090. Mr. Khorozian explained that if Mrs. Menendez was going to sell the gold, he would be making $10 an ounce from the sale, and the ultimate buyer would be making $20 an ounce, which she was okay with. TT at 5092. Mr. Khorozian traveled to Manhattan the next week to sell the gold to Robert Avital. TT at 5098. Later on, Mrs. Menendez asked Mr. Khorozian to sell four 1-ounce gold coins, which he did, and gave her $7,200 in cash. TT at 5104-06. In May 2022, Mrs. Menendez came back to Mr. Khorozian's store to sell two additional 1-kilogram bars of gold, to which Mr. Khorozian agreed. TT at 5113-14. Mr. Khorozian sold the two bars to Mr. Avital again in Manhattan. TT at 5118. Mr. Khorozian testified that he did not record any serial numbers on any of the gold that he sold for Mrs. Menendez. TT at 5134.

On cross-examination, Mr. Khorozian testified that in some cultures, people routinely give gold as gifts, specifically people from Middle Eastern cultures like Messrs. Daibes and Hana, and individuals from India and China. TT at 5127. Additionally, at weddings, people

from the Middle East give gold instead of money. TT at 5129. Mr. Khorozian testified that gold is a good investment because the price of gold has increased historically, and when there is inflation, the price of gold increases as well. TT at 5161-62. Mr. Khorozian was the one that encouraged Mr. Daibes to start investing in gold. TT at 5162. The reason Mr. Khorozian would not take a commission for gold sales to Mr. Daibes is "because I love Mr. Daibes and it was a good way for me to call him. And I see that he smiles when he buys it, he gets it. It makes me happy. And he is a good guy to me and that makes me happy." TT at 5164. He had been doing this for Mr. Daibes for about 12 or 15 years, and has sold him between 10 and 12 1-kilogram gold bars and "at least over 70 to a hundred" 1-ounce pieces of gold. TT at 5165. And acting as a middleman for people looking to buy gold is a "headache", but "[n]ot for Freddy." TT at 5165.

### 15. *Special Agent Michael Coughlin*

The government called the first of its three summary witnesses to testify regarding its email, text, and telephone evidence regarding the Egypt part of its case. TT at 1171. Special Agent Coughlin of the FBI testified regarding Government Exhibit 1302 with which the Court is very familiar. TT at 1175. Government Exhibit 1302 is a 97-page single spaced chart summarizing the electronic evidence the government introduced in support of its circumstantial case regarding the bribery scheme relating to Egypt. This summary chart, and the other two summary charts corresponding to the other charged schemes in the case, collectively formed the basis for the government's arguments regarding the permissible inferences the jury could make to conclude that it had proven the existence of a bribery scheme and that the defendants engaged in those schemes.

For the better part of three days, Special Agent Coughlin testified regarding the chart created by the prosecution team that he simply verified. TT. at 1172-73; *see also* transcripts of

24

May 29, 30, and 31, 2024.  The Chart (Government Exhibit 1302) had the following properties: (1) it was 97 pages, single spaced, and contained 1,272 line entries; (2) Mr. Daibes appeared in only 17 of 97 pages and 67 of 1,272 lines; and (3) it included evidence of many meetings related to the scheme regarding Senator Menendez, Egypt, and Mr. Hana, with all but three containing no reference to Mr. Daibes.  The only meetings on the chart that referenced Mr. Daibes was July 9, 2018, where messages established that Mr. Daibes was at a completely different table, and dinners in Edgewater, New Jersey on September 9, and 21, 2019.  However, there was no evidence in the chart or presented elsewhere in the case regarding what happened or what was discussed at those dinners.  Government Exhibit 1302 contains several photos of the participants of various meetings and dinners, and Mr. Daibes does not appear in a single one of those photographs.

### 16.    Philip Sellinger

With respect to the part of the case regarding the District of New Jersey and the appointment of its United States Attorney, the government called four witnesses: (1) Philip Sellinger, the United States Attorney for the District of New Jersey; (2) Michael Soliman, Senator Menendez's longtime and top political advisor; (3) Vikas Khanna, the First Assistant United States Attorney for the District of New Jersey; and (4) FBI Special Agent Paul Van Wie to introduce the last of the prosecution-created summary charts.

Mr. Sellinger testified that he became the United States Attorney on December 16, 2021.  TT at 3598.  In 2020, Joseph Biden was elected President of the United States and Mr. Sellinger expressed his interest to Senator Menendez in becoming the United States Attorney for the District of New Jersey.  TT at 3608.  In December 2020, Mr. Sellinger, who was counsel at Greenberg Traurig at the time, met with Senator Menendez in his Washington, D.C. office.  TT at

3609-10.  Mr. Sellinger testified regarding the meeting.  TT at 3611.  He testified that at that meeting, he discussed with Senator Menendez, Mr. Sellinger's vision for the office, his focuses for the various units of the office, civil rights, and other general priorities.  *Id.*  Mr. Sellinger also discussed his approach to selecting leadership in the office and the personality traits and characteristics he was looking for.  *Id.*  He also testified that the Senator at the "tail end of the meeting" mentioned Mr. Daibes and that Mr. Daibes had a case pending in the United States Attorney's Office for the District of New Jersey.  Tr. at 3612.  Mr. Sellinger testified that Senator Menendez said that he believed Mr. Daibes was being treated unfairly and that if Mr. Sellinger was selected, he hoped Mr. Sellinger would look at the case carefully.  *Id.*

On cross-examination, he testified that he "did not believe [Senator Menendez] was asking me to do anything other than my official duty.  In fact, I didn't believe he was asking me to do anything."  TT at 3795.  He did not feel pressured, threatened, or that his recommendation was in any way conditioned on decisions he would make on the Daibes matter.  *Id.*

He testified that he also recalled that "many months earlier" Senator Menendez had commented that Senator Menendez had spoken with the prior United States Attorney because he was unhappy about how Mr. Daibes's matter was "resolved."  TT at 3613.  He also testified that he understood that the Senator and Mr. Daibes were friends.  TT at 3615.  That he saw Fred Daibes once in person at Senator Menendez's wedding.  TT at 3620.  He also knew of Mr. Daibes because Mr. Sellinger was involved in a lawsuit, while Managing Member of Greenberg Traurig, to which Mr. Daibes was adverse to the firm's client.  TT at 3617.

Following Mr. Sellinger's meeting with Senator Menendez in Washington, D.C., he testified that he called the Senator regarding the Daibes matter and told him that: (1) if he became United States Attorney he would look at all cases carefully; (2) he had a prior

26

representation in which he represented clients adverse to Mr. Daibes; (3) the prior lawsuit might

result in a conflict of interest; and (4) his conflict could lead to his recusal or removal from the

case in the district of New Jersey but that the Department of Justice would make that decision.

TT at 3624.  The Senator responded that he understood, and they did not discuss the Daibes

matter further.  TT at 3626-27.

In the latter part of December 2020, Mr. Sellinger testified, he spoke with Senator

Menendez again about his potential nomination at which time the Senator informed him that he

would not be recommended by Senator Menendez to the White House for appointment.  TT at

3629.  On cross-examination, he testified that the Senator had told him that the White House was

interested in diverse candidates and that there was a memo from the incoming administration to

that effect.  TT at 3804-06.

He subsequently learned that the Senator had presented Esther Suarez to the White House

for possible nomination but that her potential nomination was "hitting roadblocks."  TT at 3632.

As a result, thereafter, Mr. Sellinger contacted Senator Menendez to express his continued

interest in the position.  *Id.*  He testified that following that conversation, in the Spring 2021,

Michael Soliman called him on behalf of Senator Menendez to follow up on that conversation.

TT at 3634, 3635.  He spoke with Mr. Soliman about his vision for the office, his approach at

selecting leadership for the office, and that he would disclose his potential conflict and follow

whatever directives he was given regarding his recusal from the Daibes matter.  TT at 3634.  He

testified that he did *not* tell Mr. Soliman that he would not have to be recused from the Daibes

matter because he did not know at that time what that determination would be, since he had not

even disclosed that to the Department of Justice yet.  TT at 3634-35.

27

Later in the Spring, Senator Menendez informed Mr. Sellinger that he would be recommended to the White House and he could begin the nomination process. TT at 3635. The Senator did not bring up the Daibes matter at all in that call. TT at 3815. Mr. Sellinger then testified that he became the United States Attorney in December 2021, and on his first day in office, he advised counsel to the United States Attorney of his potential conflict regarding Mr. Daibes and three other matters. TT at 3637. The following week, he was informed by the Department of Justice that he would be recused on the Daibes matter. TT at 3637.

Subsequently in January 2022, counsel to Mr. Daibes in his New Jersey matter called Mr. Sellinger. TT at 3644. Mr. Daibes's counsel requested a meeting to discuss Mr. Daibes's case. *Id.* Mr. Sellinger informed Mr. Daibes's counsel that he was recused from the case and that the First Assistant United States Attorney would handle the matter. *Id.* He also testified that he had received a call from Senator Menendez after he became United States Attorney in which the Senator asked Mr. Sellinger about who he had selected as his First Assistant United States Attorney. TT at 3646.

Mr. Sellinger also testified about a lunch meeting he had with Mr. Soliman on March 30, 2022. TT at 3648. During the lunch, Mr. Soliman said, "let me ask you a question" at which time Mr. Sellinger stopped him and told him "I want you to know that as U.S. Attorney, I'm not allowed to have any conversations about the official business of the office, and I'm required to report any such conversations to the Department of Justice." TT at 3650. Mr. Soliman indicated that he understood and did not ask him a question. *Id.*

Mr. Sellinger testified that at some point following his lunch with Mr. Soliman, he called Senator Menendez to invite him to speak at his investiture ceremony to which the Senator responded, "I'm going to pass. The only thing worse than not having a relationship with the

United States Attorney is people thinking you have a relationship with the United States Attorney, and you don't."  TT at 3652-53.

Mr. Sellinger also testified that he never believed Senator Menendez "to be asking him to do anything unethical or improper."  TT at 3662.

### 17.    *Michael Soliman*

The government called Michael Soliman who had known Senator Menendez for seventeen years as his top political advisor and friend.  TT at 3861.  Mr. Soliman testified that in 2020, when there was some potential press regarding the nomination for United States Attorney for the District of New Jersey, Senator Menendez messaged Mr. Soliman that he did not intend to nominate a Hispanic for the job.  TT at 3871.  On cross-examination he clarified that he understood the Senator to be indicating that he did not want to be "boxed in" or forced to do something because of press reports.  TT at 3992.

Mr. Soliman testified that initially he understood that Senator Menendez had chosen Mr. Sellinger as the nominee for the job.  TT at 3880-81.  In mid to late December 2020, he testified he understood from Senator Menendez's chief of staff that Senator Menendez was seriously considering a different candidate because the Senator had had a "falling out" with Mr. Sellinger. TT at 3888.  He then understood that the Senator was going in a different direction and choosing Esther Suarez to recommend to the White House.  TT at 3889.  However, on cross-examination Mr. Soliman testified that Senator Menendez changed his view and decided to nominate Ms. Suarez around the time of the White House memo regarding seeking diverse candidates.  TT at 3966.  He knew that "Senator Menendez wanted diversity."  TT at 4055.

Mr. Soliman also acknowledged on cross-examination that Ms. Suarez was a qualified and viable candidate: (1) she served as the top prosecutor in Hudson County (TT at 3969); (2) the

New Jersey State Senate had confirmed her for her position (TT at 3969); (3) she had been a New Jersey state court judge (TT at 3970); and (4) she was endorsed by the Hudson County Prosecutor's Association (TT at 3970).  He also testified on cross-examination that Ms. Suarez was pushed by the Senator's best and childhood friend, lawyer Donald Scarinci.  TT at 3985, 4059-61.

By January 2021, Mr. Soliman testified that he understood Ms. Suarez was the serious candidate for potential recommendation to the White House.  TT at 3898.  In February to March 2021, Senator Menendez recommended Ms. Suarez to the White House.  TT at 3926.  There was no testimony that the Senator or anyone connected to the Senator spoke with Ms. Suarez about the Daibes matter.  However, Ms. Suarez's nomination, based on a series of negative news articles, was not looking favorable.  TT at 3930, 3934.  Accordingly, Senator Menendez turned to "plan B" who Mr. Soliman testified was Mr. Sellinger.  TT at 3934.

Mr. Soliman  testified that in the Spring or Summer of 2021, before President Biden had nominated Mr. Sellinger, he had spoken with Mr. Sellinger about his potential recusal in the Daibes matter.  TT at 3935.  He testified that Mr. Sellinger called him because he had not been able to reach Senator Menendez.  *Id.*  Mr. Soliman claimed that Mr. Sellinger called him to tell him that he had checked with the Department of Justice (even though he had yet to be nominated let alone receive the position) and that he did not have to recuse himself from the Daibes matter. TT at 3935.

Mr. Soliman claimed that he then informed Senator Menendez that "if you call Sellinger, you will be comfortable with what he says."  TT at 3941.  Mr. Soliman could *not* testify that he was referring to the recusal, instead to the best of his recollection, he testified that "I mean, this was on the heels of the Esther Suarez negative news event so either it could have been that the

"[S]enator wanted me to make sure that Mr. Sellinger didn't have anything negative in his history and to have that conversation with him or it was the message Mr. Sellinger relayed to me about the recusal."  TT at 3941.

He testified that after he relayed to the Senator the information regarding his conversation with Mr. Sellinger, the Senator recommended Mr. Sellinger to the White House.  TT at 3942. Mr. Soliman also testified that after Mr. Sellinger had become the United States Attorney, Mr. Menendez informed Mr. Soliman that "the issue that Mr. Sellinger said he did not have to recuse himself from, that in fact he recused himself from it and he wanted to understand why, so he wanted me to call him and ask him why."  TT at 3943.

Lastly, Mr. Soliman testified that in March 2022, after Mr. Sellinger became the United States Attorney, he told  Senator Menendez  that he was going to have lunch with Mr. Sellinger. TT at 3946.  Mr. Soliman testified that Senator Menendez asked him to tell Mr. Sellinger to give Mr. Daibes "all due process."  TT at 3946-47.  Mr. Soliman understood from Senator Menedez that the United States Attorney's Office was not being responsive to Mr. Daibes's counsel.  TT at 3947.

                    *18.     Vikas Khanna*

On June 26, 2024, the government called Vikas Khanna, the First Assistant United States Attorney for the District of New Jersey.  TT at 4990.  Before becoming First Assistant, Mr. Khanna had been an Assistant United States Attorney in that office for eight and a half years then entered private practice.  TT at 4991-92.

Mr. Khanna testified that he first became familiar with Mr. Daibes when he was an Assistant United States Attorney, and he learned that the office was investigating Mr. Daibes.  TT at 4994.  That investigation resulted in Mr. Daibes's indictment.  *Id.*

He  testified that after he returned to the office as First Assistant United States Attorney to Mr. Sellinger, he had a telephone conversation with Mr. Menendez who had called him on Mr. Khanna's personal number.  TT at 4996-97.  He testified that Senator Menendez congratulated him on his new position, made small talk, and said something "to the effect of, I know you're going to be working cases with some really great lawyers.  And then he named one or two of the lawyers, including the lawyer that was representing Mr. Daibes in his pending case in the District of New Jersey."  TT at 4997.  He acknowledged that both lawyers that Senator Menendez mentioned were high profile and well-respected members of the New Jersey bar that he knew well.  TT at 5009-10.  Senator Menendez did not mention Mr. Daibes, nor did he mention any particular cases.  TT at 4999.  Senator Menendez did not ask Mr. Khanna to meet with Mr. Daibes's counsel or otherwise intervene in Mr. Daibes's case.  TT at 5008-09.

Mr. Khanna further testified that at some later point, he spoke with Mr. Daibes's counsel *via* videoconference in which Mr. Daibes's counsel argued for a dismissal of the case against Mr. Daibes.  TT at 5002-03.  Following that videoconference, Mr. Khanna spoke with Mr. Daibes's counsel and informed him that his office would not dismiss the case.  TT at 5004.  Then in February or March 2022, he authorized a felony plea offer to be made to Mr. Daibes with an agreed upon sentence of probation.  *Id.*  He testified that he made the decision to authorize the plea offer, in consultation with the line prosecutors and supervisors, based on the circumstances of the case and what he felt was the appropriate disposition.  TT at 5022.

### 19.    *Special Agent Paul Van Wie*

On June 20, 2024, the government called FBI Special Agent Paul Van Wie.  TT at 4111. Special Agent Van Wie was one of the last of the government's summary witnesses.  In particular, he was the last summary witness to testify to summarize the communications between

parties related to the charged scheme regarding the United States Attorney's Office for the District of New Jersey and the Qatar charged schemes. In fact, Special Agent Van Wie was the only live witness to testify about the alleged Qatar scheme. The government relied solely on admitted documents and the summary chart created by the prosecutors and verified by Special Agent Van Wie, Government Exhibit 1304, as evidence regarding the alleged Qatar scheme.

Like the other summary witnesses, Special Agent Van Wie was asked to review the charge and compare its contents with the cited exhibits. TT at 4112. The shortest of the summary charts summarizing the electronic evidence related to the four charged schemes, Government Exhibit 1304 was still 23 single spaced pages, containing 342 line entries. *See* GX 1304.

Special Agent Van Wie testified regarding the entries in the chart and some of the underlying exhibits referenced in the chart to which the parties directed him. For example, Special Agent Van Wie testified that a picture of two 1-kilogram bars of gold on Mrs. Menendez's phone, with matching serial numbers to bars in Mr. Daibes's gold inventory, was created roughly an hour before she was scheduled to meet with Mr. Khorosian. TT at 4168-70. Special Agent Van Wie also testified regarding Government Exhibit 1401, which was cited for particular entries in Government Exhibit 1304. TT at 4116.

Government Exhibit 1401 was a stipulation between the parties regarding the testimony of Mr. Daibes's counsel in his District of New Jersey matter. TT at 4117. Government Exhibit 1401 provided, in relevant part, that if Mr. Daibes's counsel were to be called to testify as a witness, he would testify that: (1) he requested and obtained judicial authorization in connection with his District of New Jersey Matter for Mr. Daibes to travel to London and Qatar on three separate occasions to secure financing for a development project; (2) when a list of potential

candidates for United States Attorney was circulating in the legal industry press which included Ms. Suarez and Mr. Sellinger, Mr. Daibes expressed to his counsel that "he thought Suarez, whom he said he knew, might be preferable, and more amenable to a favorable resolution of his pending criminal case and that he preferred Ms. Suarez to Mr. Sellinger"; (3) after Mr. Sellinger was sworn in as the United States Attorney, Mr. Daibes's counsel contacted him and was informed that Mr. Sellinger was recused from the Daibes matter; (4) Mr. Daibes's counsel reported the recusal to Mr. Daibes and Mr. Daibes was upset and expressed that he feared it would delay resolution of his matter – he did not express that he cared whether negotiations were with Mr. Sellinger or Mr. Khanna; (5) Senator Menendez spoke with Mr. Daibes's counsel and admonished him for not being aggressive enough and pushing for a dismissal of the Daibes matter; (6) Mr. Daibes's counsel made a presentation to Mr. Khanna seeking a misdemeanor for Mr. Daibes; and (7) in April 2022, Mr. Daibes and the District of New Jersey entered into an agreement to resolve the matter.

20.    *Special Agent Elizabeth Wheeler*

On June 27, 2024, the government called Special Agent Elizabeth Wheeler to testify.  TT at 5391.  Special Agent Wheeler was a member of the Cellular Analysis Survey Team of the FBI, and testified about how the FBI used call detail records to determine a telephone subscriber's approximate location at given times.  TT at 5404-14.  Additionally, she testified about Mr. Daibes's and others' locations at certain times during the charged period in the indictment.  TT at 5417 *et seq.*

Specifically pertaining to Mr. Daibes, Special Agent Wheeler testified that Mr. Daibes, Senator Menendez, and Nadine Menendez were in Manhattan the night of September 19, 2021.  TT at 5439-40.  Special Agent Wheeler also testified about Senator and Mrs. Menendez's

approximate location on the afternoon of October 17, 2021, when they traveled from JFK International Airport in Queens, through the Bronx and Manhattan, to the Menendez residence in New Jersey.  TT at 5441-42.

Special Agent Wheeler also testified that on the morning of October 18, 2021, Mr. Daibes and Senator and Mrs. Menendez were together at the Menendez residence, with Mr. Daibes leaving sometime around 11:03 AM and Senator Menendez searching for the price of gold nine minutes later.  TT at 5443-44.

Special Agent Wheeler testified that midday on March 30, 2022, both Mr. Daibes and Mrs. Menendez were in the vicinity of the River Palm restaurant in New Jersey, and Mrs. Menendez sent a thank you text to Mr. Daibes 45 minutes after they left the restaurant.  TT at 5445-46.

Finally, Special Agent Wheeler testified that on the evening of May 26, 2022, both Mr. Daibes and Senator Menendez were at 41 Jane Drive, and that Senator Menendez searched the price of gold one hour after the two were together.  TT at 5446-48

   21.  *Witnesses Unrelated to Mr. Daibes[3]*

More than a dozen of the government's 30 total witnesses offered no testimony about, nor indeed, ever mentioned, Mr. Daibes.

Such witnesses who testified regarding the Egypt scheme without mentioning Mr. Daibes included James Bret Tate of the United States Department of Agriculture ("USDA") who served during the relevant period as Agricultural Attaché at the United States Embassy in Cairo, Egypt (TT at 374-75) and Ted McKinney, Under Secretary for Trade and Foreign Agricultural Affairs in the USDA (TT at 1764-65) who testified about conversations with Senator Menendez.  Also

---

[3] References to the Trial Transcript (TT) for these witnesses are the pages on which such testimony begins.

related to the subject of Egypt, and failing to mention or implicate Mr. Daibes, specifically to the

process of evaluating military hardware sales, was witness Joshua Paul, Director of

Congressional Public Affairs at the Department of State's Bureau of Political and Military Affairs

(TT at 855-56).  Likewise, Sarah Arkin, Senior Professional Staff on the United States Senate

Foreign Relations Committee (TT at 4455-56) offered no testimony relevant to Mr. Daibes.

Surveillance by the FBI of defendants Mr. Hana, Senator Menendez, and Mrs. Menendez

and others at Morton's Steakhouse in Washington, D.C., that purportedly related to IS EG

Halal/Egypt, did not include any surveillance of Mr. Daibes for the simple reason that he was not

at the meeting that was so heavily watched.  Therefore, the testimony of FBI Investigative

Specialists Chase Hunter-Mills (TT at 2042-43) and Terrie Williams-Thompson (TT at 2103-04)

was void of any mention of Mr. Daibes.

Mr. Daibes was not charged in the counts involving Jose Uribe (TT at 3013-14), so his

testimony, as well as the testimony of then New Jersey Attorney General Gurbir Grewal (TT at

2671-72) and Olivia Sebade (TT at 3535-36), a paralegal employed by the United States

Attorney's Office for the SDNY who testified about text messages between Mr. Uribe and Ms.

Arslanian, did not mention him.  Additionally, FBI Special Agent Rachel Graves (TT at 2314-15)

testified about the summary chart admitted as GX 1303 pertaining to these counts which Mr.

Daibes was again not charged with.

Shannon Kopplin, Chief Counsel and Staff Director of the Senate's Select Committee on

Ethics, testified about Senate disclosure rules and did not mention Mr. Daibes.  TT at 5210-11.

Similarly, there was no mention of Mr. Daibes in the testimony of FBI Forensic Accountant

Megan Rafferty (TT at 5550-51), who testified about Senator Menendez's Senate pay.  Neither

was he mentioned by Geoffrey Mearns, the paralegal assistant to the United States Attorney, who

testified about a pre-indictment presentation made by Senator Menendez's counsel to the government.  TT at 4269-70.

D.    The Jury Charge

The Court's instructions to the jury provide the conceptual and legal framework for the relief sought in this motion.  They establish the substantive legal basis and foundation for the admissibility of the evidence Mr. Daibes sought to introduce and help make even more clear the harm done to Mr. Daibes in this matter by the Court's preclusion of evidence.

1.    *Goodwill Gifts Charge*

On April 24, 2024, all defendants made joint requests to charge ("RTC").  *See* ECF No 353.  Among those requests was RTC No. 50 (*id*. at 89) which read:

> 50. BRIBERY – GOODWILL GIFTS.  Not every gift or thing of value given to a public official like Senator Menendez amounts to a bribe.  Under the law, giving a gift or thing of value to a public official because of his office, to cultivate friendship, or to build goodwill in hopes of ultimately affecting one or more unspecified official acts, now or in the future, is not federal bribery.  For bribery, there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act, as I have defined for you a few minutes ago. Payments, sometimes referred to as goodwill gifts, made with no more than some generalized hope or expectation of ultimate benefit on the part of the donor are thus not bribes, since they are made neither with the intent to engage in a relatively specific *quid pro quo* with an official nor for or because of a specified official act.  As to each Defendant, you should consider whether that Defendant intentionally gave or received the gift as part of an intended exchange for an official act by Senator Menendez.  Thus, if you find that any Defendant gave a thing of value to Senator Menendez or his wife as a show of goodwill or, for example, as a token of friendship, but not in exchange for an official act, then you must acquit Defendants on the federal bribery counts.

The weekend before summations commenced, the Court adopted, in sum and substance, the defendants' proposal and charged the jury as follows in Charge No. 39 of its instructions to the jury:

> 39. Bribery – Goodwill Gifts.  Not every gift or thing of value given to a public official amounts to a bribe.  Under the law, giving a gift or thing of value to a

public official to cultivate friendship or to build goodwill in hopes of ultimately affecting one or more unspecified official acts, now or in the future, is not federal bribery.  For bribery, there must be a quid pro quo—a specific intent to give or receive something of value in exchange for an official act, as I have defined for you a few minutes ago.  Payments, sometimes referred to as goodwill gifts, made with no more than some generalized hope or expectation of ultimate benefit on the part of the donor are thus not bribes, since they are made neither with the intent to engage in a relatively specific quid pro quo with an official nor for or because of a specified official act.  As to each defendant, you should consider whether that defendant intentionally gave or received the gift as part of an intended exchange for an official act by Robert Menendez.

TT at 7092-93.

The Court also charged the jury, in Charge No. 38, as part of defining the fundamental

concept of *quid pro quo*, that:

[b]ribery requires an intent to effect an exchange of money or other thing of value for official action, but each payment need not be correlated with a specific official act.  The requirement that there be payment of a thing of value in return for the agreement to perform an official act is satisfied so long as the evidence shows a "course of conduct" of things of value flowing to a public official in exchange for official action—or a pattern of official actions—on a particular question or matter to be influenced.  In other words, the intended exchange in bribery can be "this for these" or "these for these," not just "this for that."  It is not necessary for the Government to prove that the public official intended to perform a set number of official acts, or any, in return for the payments. [Emphasis added].

TT at 7091-92.

The Court, in Charge No. 28 instructed the jury that a "defendant may be found to have

the requisite intent even if he possesses a dual intent – that is, an unlawful intent and also partly a

proper or neutral intent."[4]  TT at 7072.

As part of its crime-specific charges, the Court repeatedly gave an instruction regarding

"corrupt intent" – the element that the Government must prove in each of the various bribery and

bribery related counts.  For example, in Charge No. 40 (relating to Counts Five and Eleven and

Menendez demanding, receiving and accepting a bribe) and throughout its jury instructions,

---

[4] In ECF No. 353, the defendants took exception to Charge No. 28 and its application to the various counts.

where it otherwise deemed appropriate, the Court instructed the jury regarding "corrupt intent"

that:

> "Corrupt intent" means to act with an improper motive or purpose. The defendant
> must have demanded, sought, received, or agreed to receive a thing of value with
> the improper motive or purpose of a public official being corruptly influenced in
> the performance or non-performance of an official act. This involves conscious
> wrongdoing or, as it has sometimes been described, a bad state of mind, although
> the defendant need not be aware of the specific law that he or she is charged with
> violating. The party demanding or receiving a thing of value may have a different
> intent from the party giving it or any other party involved in the alleged offense.
> Therefore, you must decide the intent of the receiver separately from the intent of
> the giver or from the intent of other parties involved in the alleged offense. In
> considering this element, remember that it is the public official's intent to be
> influenced which is important, not the public official's subsequent actions, if any.

TT at 7093-94.

Specifically, with respect to the issue of the intent of the offeror of an alleged bribe and

the offeror's guilt, the Court charged, for example, in Charge No. 44, that "it is the defendant's

intent to influence the public official's actions . . . that is important." TT at 7097-98.

In Charge No. 29 and where it otherwise deemed appropriate, the Court instructed the

jury that "dual-motive" (having both a corrupt and non-corrupt intent for the same gift of proffer

of something of value) is not a defense if there is a "corrupt intent." TT at 7072. But the Court

also instructed the jury that while proof of motive is not a necessary element of any offense, "that

the presence or absence of motive is a circumstance which you may consider as bearing on the

intent of a defendant." TT at 7072.

Thus, the jury instructions, read collectively, recognize the fact that not every gift is a

bribe and that where there is a pattern of gift giving, such pattern is not criminal without the

presence of an actual "exchange" for official action. And the *sine qua non* of evidence that

establishes proof beyond a reasonable doubt of the existence of a bribe is the "corrupt intent" of

the giver of the purported bribe.

Consistent with these jury instructions and the other elements of the offenses for which the defendants stood accused, the Court instructed the jury that they were required "[a]s to each defendant, consider whether that defendant intentionally gave or received the gift as part of an intended exchange for an official act by Mr. Menendez." TT at 7093.

> 2.  *Illegal Gratuities*

The government charged the defendants with multiple bribery related counts in violation of 18 U.S.C. § 201(b)(1), but chose not to charge any of the defendants with any counts related to unlawful gratuities in violation of 18 U.S.C. § 201(c)(1). Accordingly, the Court did not instruct the jury as to the requisite elements of unlawfully accepting or paying gratuities or conspiring to do so in violation of 18 U.S.C. § 201(c)(1). Nor did the Court instruct the jury how those elements are distinguishable from the requisite elements of unlawfully accepting or paying bribes or conspiring to do in violation of 18 U.S.C. § 201(b)(1).

> E.    Government's Summation and Rebuttal Summation

The government's initial and rebuttal summations relied on unsupported conclusions it characterized as established facts, and based on those, it urged the jury to infer guilt by speculating with respect to certain evidence that equally supported a theory of guilt or innocence. Throughout its summation, the government cited innocuous facts they claimed were evidence of a corrupt *quid pro quo*. For example, they claimed that the fact that Mrs. Menendez's failure to refer to her husband by name as the person who told her to call Mr. Daibes, was proof there was a corrupt *quid pro quo*. TT at 6415. Similarly, the government informed the jury that Mr. Hana and Mr. Daibes references to Senator Menendez as "our friend" were also proof that there was a corrupt *quid pro quo*. TT at 6417.

The government took speculation and innuendo a step further in respect to the District of New Jersey scheme when it cited to evidence needed to permit the jury to find Mr. Daibes guilty in connection with those charges when such evidence did not exist. Specifically, the government conclusively told the jury that the Senator informed Mr. Daibes that he was "trying to influence" Mr. Daibes's case and that the Senator clearly conveyed a promise to Mr. Daibes that he would intervene in his case. TT at 6497-99. The evidence that the government cited as proof of the critical element of a corrupt *quid pro quo*, was the fact that there was a phone call between the Senator and Mr. Daibes at a particular time – without any proof as to what discussed or any insight into the substance of that call. But in its summation, it argued to the jury that such proof existed by decisively stating what had been discussed in the call despite there being not a scintilla of evidence of the call's substance.

That was not all. The government claimed to the jury that the fact that there were large amounts of cash found in the Senator's home, cash both from Mr. Daibes and other sources, was, in and of itself, proof that the cash from Mr. Daibes was given to the Senator as a bribe. TT at 6515. Likewise, without citing any evidence, the government informed the jury that both Mr. Hana and Mr. Daibes knew that Mrs. Menendez was not planning on doing any real work for Mr. Hana's company. TT at 6426. Furthermore, in its summation the government made an argument that contradicted facts it relied on when it claimed that Mr. Daibes paid bribes in gold because they were not easy to trace (TT at 6519) while acknowledging that he kept a detailed inventory of the serial numbers of gold from his collection (TT at 6486).

Among the most troubling aspects is that the government's summation and rebuttal improperly referred and directly alluded to the lack of evidence of specific acts of Mr. Daibes's gift giving, evidence that the defense was precluding from introducing at trial. Each of the

following comments made by the government left the jury with the impression that specific evidence of Mr. Daibes's penchant for giving extravagant gifts did not exist, while in truth, it did but the defense was precluded from introducing it.

- "Friends do not give friends envelopes stuffed with $10,000 in cash, just out of friendship. Friends do not give those same friends kilogram bars of gold worth $60,000 each out of the goodness of their hearts." TT at 6507.

- "If bank envelopes neatly labeled with $10,000 markings were just Daibes' love language, why did they only start in or after 2020?" TT at 6507.

- "But gold wasn't gifts either. Some gold may be a gift. People give jewelry made out of gold as gifts. This case isn't about jewelry. Some people may give gold coins as gifts. This case isn't about gold coins. Some people might give those small 1-ounce bars of gold as gifts. Daibes gave at least 4 kilos. There is no evidence in the record of this trial, zero, that there is some kind of habit or practice anywhere in the world of giving kilogram gold bars worth $60,000 each out of friendship." TT at 6515-16.

- "Daibes is a generous man, but he's also a businessman. He's not going to give something that valuable for nothing." TT at 8517.

- "Mr. Daibes may well have given Mr. Menendez gifts. That's not what you're looking at in the chart of envelopes – even if you assumed, bizarrely, that the gifts he gives are literally sealed envelopes of cash, and there's no evidence he gives those kinds of gifts to anyone at all." TT at 6954.

- "Her husband's best friend wasn't giving her gifts for no reason at all[.]" TT at 6951.

F.    <u>The Verdict</u>

On July 16, 2024, the jury returned its verdict finding all defendants guilty on all counts.

## RELEVANT LEGAL PRINCIPLES

Federal Rule of Criminal Procedure 29(a) requires the court to "enter a judgment of acquittal of any offense for which the evidence [was] insufficient to sustain a conviction." While

the defendant challenging a conviction based on the sufficiency of the evidence bears a heavy burden, if any rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could not have found the essential elements of the crime beyond a reasonable doubt, then the court should grant the motion. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Dore*, No. 12 Cr. 45 (RJS), 2013 WL 3965281 at *2 (S.D.N.Y. July 31, 2013).

The court is "obliged to view the evidence with all reasonable inferences drawn in the Government's favor, but [it] may not permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 662 (2d Cir. 2019) (citations omitted) (affirming district court's granting of defendant's Rule 29 motion to vacate a conspiracy count based on finding that the jury's finding of guilt was based on impermissible speculation).

The court does not generally assess witness credibility, resolve inconsistencies in testimony, or otherwise weigh the significance of the evidence under Rule 29, however, the court may enter a judgment of acquittal if the evidence is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Dore*, 2013 WL 3965281 at *2 (citing *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000), *United States v. Guadagna* 183 F.3d 122, 130 (2d Cir. 1999), and *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

The district court cannot allow a jury verdict that is based on "pure speculation." *See United States v. Clifford*, 426 F. Supp. 696, 701 (E.D.N.Y. 1976) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)). "[S]pecious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (affirming the district court's acquittal, pursuant to Rule 29, as to the conspiracy count). Indeed, "[i]f the evidence viewed in the light most

favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Id.*

The issue is not if there is any evidence of guilt.  "[I]n any criminal trial, there is always some evidence of guilt, otherwise there could not have been a prosecution." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  To defeat a Rule 29 motion, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt[.]'" *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).  If "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)*; see also United States v. Bongiovanni,* No. 19 Cr. 227 (LJV), 2024 U.S. Dist. LEXIS 128252, at *22 (W.D.N.Y. July 19, 2024) ("And because the proof presented at trial gave equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence—at least innocence of the crime charged—that proof was insufficient as a matter of law to sustain the government's burden.") (citations and internal quotations omitted). "Where the Government asks the jury to find an element of the crime through inference, '[t]he jury may not be permitted to conjecture . . . or to conclude upon pure speculation or from passion, prejudice or sympathy.'" *United States v. Vernace,* 811 F.3d 609, 615 (2d Cir. 2016) *(quoting United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972)).

Federal Rule of Criminal Procedure 33 provides that a district court may "vacate any judgment and grant a new trial if the interest of justice so requires."  If the district court finds that manifest injustice would result if the guilty verdict were permitted to stand, it should vacate the

judgment and order a new trial. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). As the *Ferguson* court poignantly stated: "No harm and only good can come to our system of justice where we require the government to supply competent, satisfactory and sufficient evidence to prove an element of criminal liability. To let a verdict stand on anything less is indeed a manifest injustice." *ld.* at 129.

While relief under Rule 33 should be exercised sparingly by a district court, the court still enjoys broad discretion to set aside the verdict to undue a miscarriage of justice. *See id.* at 133 (citing *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). "[T]he trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29[.]" *Ferguson* at 134. The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* at 4.

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id*. "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real *concern* that an innocent person may have been convicted." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F. 3d. at 134) (emphasis added). After considering the arguments made by the defendant, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Id.* (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). To answer that question, the trial court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.*

Critically, when considering a motion for a new trial, the trial court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing

evaluate for itself the credibility of the witnesses." *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

## ARGUMENT

### Point I

### THE COURT MUST ENTER A JUDGEMENT OF ACQUITTAL ON ALL COUNTS BECAUSE MR. DAIBES'S CONVICTION WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE AND WAS BASED ON IMPROPER SPECULATION AND INFERENCES BY THE JURY

No rational jury could have found Mr. Daibes guilty of all the counts in which he was charged. First and fundamentally, with respect to all schemes in which Mr. Daibes was charged, no rational juror could have concluded that the evidence sufficiently established the appropriate nexus between the money and gold connected to Mr. Daibes seized from the Menendezes' home with any official acts of the Senator. At best, the government established that within a two-year period, Mr. Daibes provided the Menendezes with some things of value. While complete precision is not required under the law, the imprecision of the government's evidence required the jury to speculate and engage in guesswork. Furthermore, the Court did not permit Mr. Daibes to sufficiently demonstrate to the jury that cash and gold in the amounts connected to Mr. Daibes, would not have been out of the ordinary for Mr. Daibes to gift a friend of more than thirty years. The government could not sufficiently demonstrate how, when, why, or under what circumstances Mr. Daibes provided items of value to Nadine or Senator Menendez.

Second, no rational juror could have concluded that Mr. Daibes bribed Senator Menendez for official actions from the Senator to assist a business, IS EG Halal, in which he had no ownership interest or part.

Third, no rational juror could have concluded that Mr. Daibes engaged in a scheme to bribe Senator Menendez to assist him with his business dealings with individuals and an entity

that was connected to the government of Qatar. Nor was there sufficient evidence to permit a rational juror to conclude that Mr. Daibes bribed Senator Menendez to engage in official acts that were beneficial to the government of Qatar.

And fourth, no rational juror could have concluded that there was sufficient evidence to establish that Mr. Daibes provided things of value for Senator Menendez to appoint the United States Attorney for the District of New Jersey to intervene in Mr. Daibes's pending criminal case there. The evidence did not establish that Senator Menendez promised to or agreed to attempt to influence the matter in any way. And the evidence showed that he did nothing improper, and the witnesses with which he spoke all testified that they did not feel that Senator Menendez was asking them or pressuring them to do anything improper as it related to Mr. Daibes. The evidence showed that Mr. Daibes's New Jersey matter was handled and resolved in the ordinary course of business.

Mr. Daibes was charged in three distinct schemes in the Indictment. The first was a scheme related to Egypt. The alleged schemes related to the District of New Jersey and Qatar were combined by the government and it alleged that the cash and gold payments by Mr. Daibes were for both Qatar and the District of New Jersey. However, there was no testimony or evidence introduced about what any gold or cash was given for. The evidence showed that it was just as likely that the gold or cash from Mr. Daibes was a gift, legitimate payment, gratuity, or something else wholly unrelated to any charged scheme, as opposed to a bribe. *See United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) ("the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a reasonable jury must necessarily entertain a reasonable doubt.")

For example, Government Exhibit 1F-1167, which the government recited multiple times in its summation, clearly has handwriting indicating that it was to purchase 4 ounces of gold from Nadine.  The envelope contained handwriting on the outside that says "4 x 1850 = 7400", the same amount that was found in the envelope during the search, and $1,850 was almost the exact price per ounce of gold that the evidence showed Mr. Hana purchased gold in 2021.  *See* GX 3L-1.  That price was also almost identical to the amount that Mrs. Menendez received from her sale of four 1-ounce gold coins to Mr. Khorozian.  TT at 5104-06.  There was no evidence that this cash or gold was given corruptly or in exchange for a promise of the Senator.

As both Ms. Glass and Dr. Davis testified that their DNA and fingerprint analysis, respectively, could not show when Mr. Daibes gave any envelopes of cash.  TT at 2254, 2818.  No other witness testified about when any gold or cash was given by Mr. Daibes either, or what it was given for.  No rational jury could have concluded that the government proved, beyond a reasonable doubt, that any things of value provided to Nadine or Senator Menendez by Mr. Daibes, their longtime friend, were to influence or for official actions of a United States Senator.  At best, the government proved that Mr. Daibes provided, in a two-year period, Senator Menendez with goodwill gifts, as defined by the Court in the final instructions to the jury, or a gratuity, but not bribes.

And even if the government could prove that Mr. Daibes promised Senator Menendez such cash or gold before Senator Menendez promised to take *some* official action, which it failed to prove, it did not establish any nexus between those items of value and any official act.  "[A] public official must do more than promise to take some or any official action beneficial to the payor as the opportunity to do so arises; she must promise to take official action on a particular

question or matter as the opportunity to influence that same question or matter arises." *United States v. Silver*, 948 F.3d 538, 552-53 (2d Cir. 2020).

Notably, during the pendency of this trial, a district court in this Circuit granted a Rule 29 motion in respect to a bribery conviction presenting very similar circumstances to this case. *See United States v. Bongiovanni*, No. 19 Cr. 227, 2024 U.S. Dist. LEXIS 128252, (W.D.N.Y. July 19, 2024) (granting Rule 29 motion in respect to bribery count because "there [wa]s no evidence from which the jury could infer, rather than surmise, that the money was not a generous gift for a milestone birthday and wedding earlier that year."). While *Bongiovanni* does not bind this Court, its decision and reasoning are applicable to the facts in this case.

In *Bongiovanni* the district court highlighted the evidence of the longstanding friendship between the public official and the defendant in granting the defendant's Rule 29 motion. *See id*. at 22. In doing so the court noted that "there simply is no evidence – circumstantial or otherwise – from which a rational juror could infer *beyond a reasonable doubt* that the money was a bribe *in exchange for* Bongiovanni's taking official acts, rather than a gratuity or benign exchange between friends." *Id.* at 14 (emphasis in the original).

The same is true here. Because the government cannot prove when any gold bar was given by Mr. Daibes, and cannot even allege when any envelope of cash was given outside of a multi-year window, the jury could not have rationally concluded that they were given as a promise for any official action, as opposed to a gift, legitimate payment, or unlawful gratuity.

### Egypt

Regarding the allegations related to Egypt, for multiple reasons, no rational juror could have found that Mr. Daibes promised Senator Menendez anything of value in exchange for any official acts. At most the government proved a gratuity, because both the approval of giving the

tank ammunition to Egypt as well as the call to Undersecretary McKinney took place *before* Mr. Daibes attempted to purchase Nadine Arslanian's mortgage or dropped off checks to her from IS EG Halal.  The only potential official act that could have been promised by Senator Menendez was some kind of action on the Grand Ethiopian Renaissance Dam.  Senator Menendez sent Mr. Daibes a copy of the bill, S.1102, 116th Congress (2019) in September 2019.  *See* GX 1302 line 1070.  However, there was no evidence that Mr. Daibes had any interest in the bill passing, or asked for any vote.[5]

Beyond this issue, the government's proof was insufficient because there was no evidence that Mr. Daibes managed or otherwise had any business interest in Mr. Hana's IS EG Halal business; at most, the evidence showed that he mentored Mr. Hana and gave him general business advice.  John Moldovan testified that he was unaware of Mr. Daibes having any ownership interest in IS EG Halal or any shared bank accounts.  There was no evidence regarding Mr. Daibes having an interest in IS EG Halal, especially at the time that the government alleged that bribes were being paid to help the company.  The only meetings between Mr. Daibes and Egyptian officials were related to a potential real estate venture, totally separate from IS EG Halal's business.  *See* Government Exhibit 1302, line 291.  There was no evidence about any promised actions from Senator Menendez related to that real estate venture. Mr. Daibes did not attend any meetings to discuss IS EG Halal getting a monopoly from the Government of Egypt.

---

[5] .  Furthermore, while Mr. Daibes could not introduce the vote history on S.1102 due to Senator Menendez's Speech or Debate protections, by the time he sent the bill to Mr. Daibes it had already been reported through Committee in July 2019 and placed on the full Senate calendar, where no further action was taken. https://www.congress.gov/bill/116th-congress/senate-bill/1102/all-actions

Regarding the alleged bribe payments related to the Egypt scheme, the government's only proof was that Mr. Daibes attempted an arm's length purchase of Mrs. Menendez's mortgage, and that he dropped off three checks from IS EG Halal for Mrs. Menendez. Again, these acts occurred *after* any alleged official acts had already taken place.

There was also no evidence that Mr. Daibes knew of any alleged scheme regarding Egypt. There is nothing in the record that Mr. Daibes had any knowledge of any scheme by Nadine Arslanian or Mr. Hana relating to IS EG Halal's certification monopoly with the country of Egypt, let alone any intent to facilitate alleged bribe payments with illicit intent. In fact, the communications that were introduced demonstrate that Mr. Daibes was unaware of the nature of their business arrangement.

For example, Ms. Arslanian texted Mr. Daibes about being "[s]orry to bother you with this issue" and "I was hoping I would not have to involve you" (GX 1302 line 1098), and Mr. Daibes's response was for her to "[s]end me a rundown of what you believe you are owed." GX 1302 line 1100. This is not emblematic of two co-conspirators speaking with one another.

The government pointed to a joint real estate venture between Mr. Hana and people related to Mr. Daibes as evidence that Mr. Daibes knew about bribes to the Senator related to Egypt. This joint real estate venture was the government's only allegation that Mr. Daibes had any interest in IS EG Halal obtaining or maintaining a monopoly; it fails, as well. In its closing, the government stated that "Menendez[ i]s right to send [Ms. Arslanian] to [Mr. Daibes] because Daibes does in fact help Hana pay Menendez the bribes from that business. And Daibes is getting millions of dollars of investments from that business. Of course he knows what Menendez is doing for that business." TT at 6406.

51

In fact, the real estate venture to which the government referred did not take place until long after payments to Ms. Arslanian stopped. The Kray Plaza operating agreement, a joint venture between Mr. Hana and members of Mr. Daibes's family (not Mr. Daibes), did not occur until May 28, 2021. *See* GX 1302 line 1201; GX 3C-6. The temporal relationship between IS EG Halal's payments to Ms. Arslanian and the real estate venture between Mr. Hana and Mr. Daibes's family is too disconnected for a rational jury to have inferred any connection.

The government's evidence did not prove that Mr. Daibes was involved in the operations of IS EG Halal or had any ownership in the business. Regarding the alleged payments to Ms. Arslanian, the evidence was devoid of anything that established Mr. Daibes's awareness of any payments being improper, an essential element of the charged crimes. In fact, the evidence affirmatively showed that he was *not* aware of the specifics of the payments. And the payments to Ms. Arslanian occurred long after any official acts took place, which even if done with any corrupt intent, would be proof of an illegal gratuity, not bribery. No rational jury could have concluded that Mr. Daibes was guilty of the bribery or honest services charges involving IS EG Halal and Egypt.

### *Qatar*

With respect to the scheme alleged involving Qatar, the government proved that Senator Menendez had introduced two parties to what was ultimately a successful business partnership. Senator Menendez introduced Mr. Daibes, his longtime friend and constituent, to a member of the Qatari royal family whom he learned was interested in making investments in New Jersey, nothing more.

No rational trier of fact could have concluded that bribes were paid in connection with Senator Menendez's official duties or support of United States policy toward Qatar. The Sultan

was represented by an investment company, Heritage Advisors. The evidence showed that the Sultan's and Mr. Daibes's teams shared information over eight months. And Heritage Advisors decided to invest based on nothing but the results of their due diligence. There was no evidence that the decision to invest or continue to be in business with Mr. Daibes was the result of any involvement by the Senator, other than the introduction.

The evidence showed that parties to the real estate venture involving Heritage Advisors engaged in the normal due diligence you would expect to see in any large real estate transaction. The letter of intent, Government Exhibit 4F-17, memorialized and evidenced this and the internal communications of the Qataris further demonstrated that the transaction was above board and had nothing to do with Senator Menendez or the Qataris desire to influence or corrupt a United States Senator. Heritage Advisors entering into the deal with Mr. Daibes had nothing to do with bribery and everything to do with its recognition that the investment would be extremely lucrative for their client.

There was no evidence of bribery involving the Qatar real estate investors. In fact, no witnesses with first-hand knowledge of the project ever testified and tied this investment to any bribery scheme. And the government conceded as much in its rebuttal summation when it argued "I'm not going to talk too long about Qatar. And one reason I'm not is I just want to note you can find every defendant guilty of every count even if you literally never talk about Qatar. Period. There are no counts that rest alone on Qatar." TT at 7003-04. The government went on to say that "the allegation is not, like, the deal was corrupt. The allegation is that Menendez took things from Fred Daibes, knowing Fred Daibes wanted Menendez to do things for Qatar, because that would get Fred Daibes closer to the Qatari officials and closer to the deal. The deal is fine." TT at 7004-05.

*District of New Jersey*

With respect to the District of New Jersey, no rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. The government presented no evidence that Senator Menendez agreed to or tried to improperly influence or pressure prosecutors in New Jersey to treat Mr. Daibes more favorably than anyone else. Mr. Daibes's New Jersey case was handled and is still being handled like any other case. His counsel worked very hard for him to get him the best resolution. And in the end, he accepted a resolution that the prosecutors and he agreed on. All with no improper influence or action by anyone. At most, the evidence showed that Senator Menendez was concerned about his friend of over thirty years. Any other conclusion would be improper speculation, assumption, or guesswork.

The evidence showed that before 2018, Mr. Daibes was under investigation by the United States Attorney's Office for the District of New Jersey. In 2018, his lawyer at the time, made a presentation to the United States Attorney's Office, the line prosecutors, as to why they should not bring a case. They were unsuccessful and in 2018 Mr. Daibes was charged by that office. Around that time, Mr. Sellinger, a lawyer in private practice, who had previously wanted to become the United States Attorney for the District of New Jersey, was golfing with his longtime friend, Senator Menendez. It was a social meeting. Mr. Sellinger had been a big political supporter of Senator Menendez through fundraising and working on his campaigns over the years. Senator Menendez said he was frustrated with how the United States Attorney's Office was treating Mr. Daibes, his friend of thirty years.

Two years later when Joe Biden was elected, Mr. Sellinger expressed his interest in becoming the United States Attorney. He had an interview with Senator Menendez in the Senator's Washington, D.C. office in which they discussed Mr. Sellinger's priorities, vision, and

54

leadership views should be become nominated and ultimately get the job.  Only at the tail end of

that meeting did Senator Menendez mention what he had already mentioned years ago about his

longtime friend, Mr. Daibes, and how he felt that Mr. Daibes was being treated unfairly by the

United States Attorney's Office in New Jersey.  Mr. Sellinger did not believe or otherwise sense

that the Senator had done anything improper.  He did not feel pressured in any way, nor did he

feel that he was being told that his nomination was conditioned on looking into the Daibes case.

A few days later, Mr. Sellinger, remembering the lawsuit on which he worked where his

private client's interests were adverse to Mr. Daibes, informed Senator Menendez that he might

have a conflict but that should he get the job, the Department of Justice would determine if he

could look into the case.  There was no further discussion.  Senator Menendez did not ask Mr.

Sellinger to ignore this potential conflict or to look the other way.

The evidence showed that after this meeting with Phillip Sellinger, Senator Menendez

was still determining who to present to President Biden for the position.  All Senators received

guidance regarding what kind of candidates they were looking for.  The White House was

strongly urging senators to take into consideration diversity, the need for diversity, in their

selections.  And Mr. Soliman testified that he knew that Senator Menendez shared that desire.

Accordingly, Senator Menendez chose to make a potentially historic nomination.  One that was

in line with the White House's guidance.  He put forward Esther Suarez for consideration by the

White House.  Someone who had been recommended by his best friend, the best man at his

wedding, and a respected New Jersey lawyer.  Esther Suarez had worked for Mr. Scarinci in the

past.  Ms. Suarez was a qualified choice: (1) at the time she was the Hudson County Prosecutor;

(2) she had previously been a judge; (3) she had already gone through a vigorous vetting process

in the New Jersey State Senate; (4) she was endorsed by the Hudson County Prosecutor's Association; and (5) she was a Hispanic woman.

Due to a number of negative press reports, Ms. Suarez's nomination ran into roadblocks. The White House was not going to approve her for nomination. As a result, Senator Menendez returned to Mr. Sellinger as the potential pick.

As Mr. Daibes argued in his summation, the most important evidence in this chapter of the case was the claim that Mr. Sellinger told Mr. Soliman that he would not have to recuse himself. Without that fact, the testimony from Mr. Soliman, the government had no evidence that Mr. Sellinger was recommended on the basis of whether he would be able to look at the Daibes case. And this turned completely on Mr. Soliman's testimony, and his message to the Senator. His recollection was completely at odds with the testimony of Mr. Sellinger on this point.

Mr. Soliman's testimony on this point was simply unbelievable, defied common sense, and no rational jury could have credited it. It does not make sense that Mr. Sellinger told Mr. Soliman that he was not going to be recused, and that he had spoken with the Department of Justice about it. At that point in time, Mr. Sellinger had yet to even been vetted, or even nominated for the position. He had not undergone a background check and he was not a Department of Justice employee. There was no testimony that prior to him being nominated he contacted anyone at the Department of Justice regarding conflicts. He would not have, that is only something that would have been done after he got the job as he explained repeatedly in his testimony. And Senator Menendez was aware of that process because Mr. Sellinger explained it to him.

Mr. Soliman testified that his message to Senator Menendez in which he told Senator Menendez that he would like Mr. Sellinger's answer could have been about the recusal or just about Mr. Sellinger's background.  The timing indicates it was about his background.  Any conclusion otherwise would be improper speculation, assumption, or guesswork.

Mr. Sellinger was an extremely qualified candidate and the evidence showed that he was recommended and nominated on that basis alone.  There was no evidence from which a rational jury could have concluded, beyond a reasonable doubt, that he was recommended by Senator Menendez in order to affect Mr. Daibes's case.  Mr. Daibes's case was handled in the ordinary course.  Mr. Sellinger was recused.  Mr. Khanna took over managing the case and upon the recusal, Mr. Daibes's lawyers worked hard and advocated for a resolution of the case short of trial.  The matter was handled and resolved on the merits based on the strengths and weaknesses of the case as any other criminal case.  Mr. Daibes agreed to plead guilty with a promise of a sentence of probation.  Senator Menendez was not a party nor did have anything to do with the disposition.

The evidence presented at trial was insufficient for any rational jury to have concluded that Mr. Daibes had any knowing involvement in the scheme related to Egypt or that he bribed Senator Menendez for any official actions related to Qatar or for the appointment of the United States Attorney in New Jersey.  Fundamentally and fatal to the government's case was its failure to prove, with any sufficient precision, that any things of value provided to Nadine or Senator Menendez at some point in a two-year period were connected to any official actions or promises of official actions by the Senator.  While it was able to prove the existence of some *quids* as they relate to Mr. Daibes, its evidence failed to establish any *pros*, the essential connection between any payment and the alleged action or promised action.

**Point II**

**RULE 33 MANDATES A NEW TRIAL BECAUSE THE COURT'S PRECLUSION OF MR. DAIBES'S GIFT GIVING EVIDENCE COMBINED WITH THE GOVERNMENT'S IMPROPER REFERENCES TO GIFT GIVING IN ITS SUMMATION RESULTED IN A MANIFEST INJUSTICE**

The interests of justice require that the Court grant Mr. Daibes a new trial pursuant to Rule 33 because it would be a manifest injustice to permit his conviction to stand because it was tainted by cumulative errors related to the preclusion of evidence of specific acts of gift giving by Mr. Daibes. By precluding evidence of his specific acts of gift giving, the Court erroneously prevented Mr. Daibes from introducing evidence essential to his defense. The unduly prejudicial effect of this error to Mr. Daibes was compounded by the government's repeated use, in its closing arguments, of the lack of specific instances of gift giving in the and was further exacerbated by the goodwill gifts charge the Court gave to the jury. The interests of justice require that Mr. Daibes be granted a new trial.

Granting a defendant's Rule 33 motion and ordering a new trial is the proper remedy where it is possible that statements made by the government in closing arguments tainted the verdict. *See United States v. Carpenter*, 405 F. Supp. 2d 85, 102-03 (D. Mass. 2005) (granting defendant's Rule 33 motion and noting that "[be]cause it cannot be said with confidence that the government's improper closing arguments did not taint the verdict, the verdict cannot be allowed to stand."). In determining whether to grant a defendant a new trial pursuant to Rule 33 based on remarks made by the prosecution during closing arguments, at least one court in this District adopted the standard of review used by the Court of Appeals to determine whether reversal of a conviction is warranted based on this misconduct, *i.e.*, (1) examine the severity of the remarks; (2) the measures adopted to cure any harm they caused, and (3) the certainty of conviction absent

58

the improper remarks.  *See United States v. Genao*, 361 F. Supp. 2d 224, 227 (S.D.N.Y. 2005) (citing *United States v. Melendez*, 57 F.3d 238, 241 (2d Cir. 1995)).  "To make this determination, th[e] Court must consider the objectionable remarks within the context of the entire trial."  *Id.*  (citations omitted).

Mr. Daibes argued that the things of value found in the Menendezes' home connected to him were gifts, not bribes, thereby making his generosity a critical element of his defense. Accordingly, Mr. Daibes moved to permit specific acts of gift giving both under Rules 405(b) and 406.  The Court erroneously denied the motion and precluded Mr. Daibes from introducing evidence of his specific acts of generosity and gift giving.  TT at 5543-46.  The Court found that specific acts evidence was impermissible pursuant to Rule 405(b) because the trait of generosity was not an essential element of the charges (5543) and "[Mr.] Daibes' generosity [wa]s not an essential element of a defense pursuant to 405(b) because the government [wa]s not required to prove that [Mr.] Daibes lacked generosity in order to prove its case".  TT at 5544.  This was erroneous, Mr. Daibes's generosity towards others generally and Senator Menendez specifically was his defense, and this ruling prevented him from demonstrating specific instances to the jury to support it.

Furthermore, the Court itself made Mr. Daibes's generosity an essential element to the defense when in its goodwill gifts charge it instructed the jury that "[u]nder the law, giving a gift or thing of value to a public official to cultivate friendship or to build goodwill in hopes of ultimately affecting one or more unspecified official acts now or in the future is not federal bribery."  TT at 7092.  The Court instructed the jury that under the law evidence of specific acts of gift giving outside of the ones introduced by the government and with no purported connection to an official act constituted a defense to bribery but then prevented the defense from

introducing evidence available to it of the same. This undoubtedly left the jury with the impression that no such evidence existed, thereby forcing them to speculate that Mr. Daibes must be guilty of bribery.

In essence, by instructing the jury as it did in the goodwill gifts charge the Court armed Mr. Daibes with a gun, but stripped him of any ammunition, making it meaningless. In its closing arguments the government seized the gun, loaded it with ammunition and turned it on the defense when it repeatedly referenced the lack of evidence in the record of specific acts of Mr. Daibes's gift giving.

First the government stated in its summation that "[f]riends do not give friends envelopes stuffed with $10,000 in cash, just out of friendship. Friends do not give those same friends kilogram bars of gold worth $60,000 each out of the goodness of their hearts". TT at 6507. If permitted the defense could have called witnesses, all of whom were on notice to testify as defense witnesses, who would have testified about specific instances where Mr. Daibes gave thousands of dollars of cash, even more than $10,000, and 1-kilogram gold bars just out of friendship. Furthermore, Mr. Daibes's net worth is in the hundreds of millions. Mr. Daibes giving a $10,000 cash gift would not be unusual for someone with such a high net worth.

The government went on to ask "[i]f bank envelopes neatly labeled with $10,000 markings were just Daibes' love language, why did they only start in or after 2020?" TT at 6507. If permitted, the defense would have called witnesses, all of whom were on notice to testify as defense witnesses, who would have testified about specific instances prior to 2020 where Mr. Daibes gave *gifts* of cash – gifts of cash in quantities greater than $10,000.

The government also asserted in its summation that the "gold wasn't gifts either. Some gold may be a gift. People give jewelry made out of gold as gifts. This case isn't about jewelry.

Some people may give gold coins as gifts.  This case isn't about gold coins. Some people might give those small 1-ounce bars of gold as gifts. Daibes gave at least 4 kilos.  There is no evidence in the record of this trial, zero, that there is some kind of habit or practice anywhere in the world of giving kilogram gold bars worth $60,000 each out of friendship."  TT at 6515-16.  If permitted the defense could have called witnesses, all of whom were on notice to testify as defense witnesses, who would have testified about specific instances where Mr. Daibes gave 1-kilogram gold bars as gifts.

The government went on to describe Mr. Daibes as "a generous man," but claimed he was "also a businessman [who would not] give something that valuable for nothing."  TT at 8517.  If permitted the defense could have called witnesses, all of whom were on notice to testify as defense witnesses, who would have testified about specific instances where Mr. Daibes gave highly valuable gifts for nothing in return.

The government conceded that "Mr. Daibes may well have given Mr. Menendez gifts" but informed the jury "[t]hat's not what you're looking at in the chart of envelopes – even if you assumed, bizarrely, that the gifts he gives are literally sealed envelopes of cash, and there's no evidence he gives those kinds of gifts to anyone at all."  TT at 6954.  If permitted the defense could have called witnesses, all of whom were on notice to testify as defense witnesses, who would have testified about specific instances where Mr. Daibes gave gifts of cash and even gifts exceeding $10,000 in cash.

Towards the end of its summation the government stated that Nadine's Menendez's "husband's best friend wasn't giving her gifts for no reason at all[.]"  TT at 6951.  If permitted the defense could have called witnesses, all of whom were on notice to testify as defense witnesses,

who would have testified about specific instances where Mr. Daibes gave gifts for no reason at all.

These remarks, scrutinized in light of the entire trial, mandate a new trial to prevent a manifest injustice. *See United States v. Genao*, 361 F. Supp. 2d 224, 227 (S.D.N.Y. 2005) (applying standard of review used by Court of Appeals to determine whether a new trial is mandated by Rule 33 based on improper remarks by the government in closing arguments). First, the severity of these remarks could not be greater. Through these remarks the government told the jury that there was no evidence in the record to support a defense to the charges knowingly that the absence of such evidence was because the defense was precluded from introducing it. There were no measures adopted to cure any harm caused by these statements, and the Court's goodwill gifts charge cemented the prejudicial effect. Without these remarks it would have been reasonable for the jury to accept Mr. Daibes's defense and find him innocent.

The government's remarks in closing arguments in respect to the absence of evidence in the record, evidence which was essential to Mr. Daibes's defense, made with the knowledge that the defense was precluded from introducing it combined with the Court's goodwill gifts instruction to the jury, irrevocably tainted the verdict against Mr. Daibes. The interests of justice mandate that this Court grant Mr. Daibes a new untainted trial to prevent a manifest injustice. *See United States v. Carpenter*, 405 F. Supp. 2d 85, 102-03 (D. Mass. 2005) (granting defendant's Rule 33 motion and noting that "[be]cause it cannot be said with confidence that the government's improper closing arguments did not taint the verdict, the verdict cannot be allowed to stand.").

**Point III**

**MR DAIBES INCORPORATES THE ARGUMENTS RAISED IN CO-DEFENDANTS' RULE 29 AND 33 MOTIONS AND MEMORANDA OF LAW**

Mr. Daibes incorporates in full the arguments raised in co-defendants Hana and Robert Menendez's respective memoranda of law in support of their Federal Rules of Criminal Procedure Rules 29 and 33 submissions.

**CONCLUSION**

For the foregoing reasons, this Court should grant Mr. Daibes a new trial pursuant Rules 29 and 33 of the Federal Rules of Criminal Procedure.

Dated: August 19, 2024

_____/s_____
César de Castro
Valerie A. Gotlib
Shannon McManus
Seth Agata
The Law Firm of César de Castro P.C.
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com
smcmanus@cdecastrolaw.com
sagata@cdecastrolaw.com

*Counsel for Fred Daibes*