**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

       Defendants.

Case No. S4 23-cr-490 (SHS)

## <u>SENATOR ROBERT MENENDEZ'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF HIS RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD............................................................................................. 3

ARGUMENT ......................................................................................................... 6

   I.   THE COURT SHOULD VACATE THE BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO PROVE ANY OF THE ELEMENTS OF THE ALLEGED QUID PRO QUO ....................................................................... 6

      A.  The Government Failed To Prove That Senator Menendez Agreed To Take Any Official Acts................................................................................3

      B.  The Government Also Failed To Prove That Senator Menendez's Actions Were *In Exchange* for Things of Value.............................................3

   II.  THE GOVERNMENT'S PERVASIVE SPEECH OR DEBATE VIOLATIONS NECESSITATE VACATUR ........................................................................ 17

   III.  THE GOVERNMENT FAILED TO PROVE VENUE AS TO SIXTEEN COUNTS OF CONVICTION ............................................................................................ 26

      A.  Proper Venue Is A Fundamental Constitutional Guarantee..............................3

      B.  The Evidence at Trial Confirmed Venue Was Improper in the Southern District of New York as to Counts 1–16.......................................................3

   IV.  THE EVIDENCE WAS INSUFFICIENT TO CONVICT ON THE FOREIGN AGENT COUNTS, WHICH ARE UNCONSTITUTIONAL AS APPLIED TO SENATOR MENENDEZ (COUNTS 15–16) ................................................................... 35

   V.  THE EVIDENCE WAS INSUFFICIENT TO CONVICT SENATOR MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS (COUNTS 4, 17–18)........................ 38

   VI.  SENATOR MENENDEZ INCORPORATES THE ARGUMENTS RAISED IN CO-DEFENDANTS' RULE 29 & 33 BRIEFS ................................................... 44

CONCLUSION.................................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Swindall,*
971 F.2d 1531 (11th Cir. 1992) ...........................................................................25

*Doe v. McMillan,*
412 U.S. 306 (1973) ...........................................................................................18

*Eastland v. U.S. Servicemen's Fund,*
421 U.S. 491 (1975) ...........................................................................................18

*Fields v. Office of Eddie Bernice Johnson,*
459 F.3d 1 (D.C. Cir. 2006) ...............................................................................18

*Fischer v. United States,*
144 S. Ct. 2176 (2024) ......................................................................................43

*Gravel v. United States,*
408 U.S. 606 (1972) ............................................................................18, 21, 22

*Jackson v. Virginia,*
443 U.S. 307 (1979) ..............................................................................................3

*Jewish War Veterans v. Gates,*
506 F. Supp. 2d 30 (D.D.C. 2007) .....................................................................22

*McDonnell v. United States,*
579 U.S. 550 (2016) .................................................................................. *passim*

*McSurely v. McClellan,*
553 F.2d 1277 (D.C. Cir. 1976) ....................................................................19, 37

*Northern Securities Co. v. United States,*
193 U.S. 197 (1904) ..............................................................................................1

*Printz v. United States,*
521 U.S. 898 (1997) ............................................................................................10

*In re Sealed Case,*
80 F.4th 355 (D.C. Cir. 2023) ............................................................................21

*Smith v. United States,*
599 U.S. 236 (2023) ............................................................................................27

*Snyder v. United States,*
    144 S. Ct. 1947 (2024)...................................................................................................14

*Tenney v. Brandhove,*
    341 U.S. 367 (1951).......................................................................................................18

*United Bhd. of Carpenters & Joiners of Am. v. United States,*
    330 U.S. 395 (1947) ........................................................................................................3

*United States v. Aguilar,*
    515 U.S. 593 (1995).......................................................................................................43

*United States v. Alfisi,*
    308 F.3d 144 (2d Cir. 2002)...........................................................................................15

*United States v. Beech-Nut Nutrition Corp.,*
    871 F.2d 1181 (2d Cir. 1989).........................................................................................29

*United States v. Biaggi,*
    853 F.2d 89 (2d Cir 1988).........................................................................18, 19, 21, 23

*United States v. Birdsall,*
    233 U.S. 223 (1914) ........................................................................................................7

*United States v. Bongiovanni,*
    2024 WL 3487914 (W.D.N.Y. July 19, 2024)........................................................15, 16, 17

*United States v. Brewster,*
    408 U.S. 501 (1972).........................................................................17, 18, 19, 37

*United States v. Cabrales,*
    524 U.S. 1, 6–7 (1998) ..................................................................................................28

*United States v. Cassese,*
    428 F.3d 92 (2d Cir. 2005).............................................................................................4

*United States v. Coplan,*
    703 F.3d 46 (2d Cir. 2012).............................................................................................5

*United States v. Davis,*
    689 F.3d 179 (2d Cir. 2012)...........................................................................................27

*United States v. Desposito,*
    704 F.3d 221 (2d Cir. 2013)...........................................................................................42

*United States v. Dowdy,*
    479 F.2d 213 (4th Cir. 1973) .........................................................................................17

*United States v. Ferguson,*
    246 F.3d 129 (2d Cir. 2001) ........................................................................5

*United States v. Ferguson,*
    49 F. Supp. 2d 321 (S.D.N.Y. 1999) ............................................................5

*United States v. Fortenberry,*
    89 F.4th 702 (9th Cir. 2023) ......................................................................26

*United States v. Helstoski,*
    442 U.S. 447 (1979) ....................................................................................17

*United States v. Jefferson,*
    289 F. Supp. 3d 717 (E.D. Va. 2017) .....................................................8, 10

*United States v. Johnson,*
    383 U.S. 169 (1966) ..............................................................................17, 19

*United States v. Jones,*
    393 F.3d 107 (2d Cir. 2004) ........................................................................3

*United States v. Kapelioujnyj,*
    547 F.3d 149 (2d Cir. 2008) ........................................................................5

*United States v. Kirk Tang Yuk,*
    885 F.3d 57 (2d Cir. 2018) ...................................................................28, 29

*United States v. Mennuti,*
    679 F.2d 1032 (2d Cir. 1982) .....................................................................31

*United States v. Murphy,*
    642 F.2d 699 (2d Cir 1980) ........................................................................17

*United States v. Myers,*
    635 F.2d 932 (2d Cir. 1980) ..................................................................19, 37

*United States v. Nersesian,*
    824 F.2d 1294 (2d Cir. 1987) ......................................................................3

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) .....................................................................4, 5

*United States v. Quattrone,*
    441 F.3d 153 (2d Cir. 2006) .......................................................................42

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005) .......................................................................27

iv

*United States v. Ramirez-Amaya*,
    812 F.2d 813 (2d Cir. 1987)..................................................................27

*United States v. Reed*,
    773 F.2d 477 (2d Cir. 1985) ..............................................................29

*United States v. Robinson*,
    303 F. Supp. 2d 231 (N.D.N.Y. 2004)...................................................5

*United States v. Rodriguez-Moreno*,
    526 U.S. 275 (1999)..........................................................................28

*United States v. Rommy*,
    506 F.3d 108 (2d Cir. 2007)...............................................................33

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008)...............................................................29

*United States v. Saavedra*,
    223 F.3d 85 (2d Cir. 2000)................................................................29

*United States v. Sanchez*,
    969 F.2d 1409 (2d Cir. 1992) ..............................................................5

*United States v. Schulte*,
    2023 WL 5561141 (S.D.N.Y. Aug. 29, 2023) ....................................40

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002).................................................................40

*United States v. Silver*,
    864 F.3d 101 (2d Cir. 2017)..............................................7, 8, 11, 13

*United States v. Stewart*,
    305 F. Supp. 2d 368 (S.D.N.Y. 2004)...................................................4

*United States v. Tarango*,
    396 F.3d 666 (5th Cir. 2005) ...............................................................5

*United States v. Taylor*,
    464 F.2d 240 (2d Cir. 1972)..........................................................3, 4

*United States v. Triumph Capital Group, Inc.*,
    544 F.3d 149 (2d Cir. 2008)...............................................................42

*United States v. Tzolov*,
    642 F.3d 314 (2d Cir. 2011)...............................................27, 28, 30

*United States v. Urciuoli,*
    513 F.3d 290 (1st Cir. 2008) ..................................................................11

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015) ....................................................................4

*United States v. Zhou,*
    428 F.3d 361 (2d Cir. 2005) ....................................................................5

*U.S. Football League v. Nat'l Football League,*
    842 F.2d 1335 (2d Cir. 1988) ................................................................24

*U.S. v Giovanelli,*
    464 F.3d 346 (2d Cir. 2006) ..................................................................42

**Statutes**

18 U.S.C. § 201(a)(3) ......................................................................................6

18 U.S.C § 219 ...............................................................................2, 35, 37

22 U.S.C. § 611 ...........................................................................35, 37

**Other Authorities**

David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation
    Process*, 101 Yale L.J. 1491, 1495 (1992) ..............................................22

Fed. R. Crim. P. 18 ......................................................................................27

Fed. R. Crim. P. 29 .......................................................................1, 3, 4, 27, 44

Fed. R. Crim. P. 33 ..........................................................................1, 5, 44

U.S. Const. Amendment VI ....................................................................26, 27

U.S. Const. Art. I, § 6, cl. 1 ..............................................................*passim*

U.S. Const., Art. III, § 2, cl. 3 ...............................................................27

Pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, Senator Robert Menendez respectfully renews his motion for judgment of acquittal on all counts for failure to introduce sufficient evidence to satisfy each of the elements of each offense, or, in the alternative, for a new trial.

## **INTRODUCTION**

If hard cases make bad law, *Northern Securities Co. v. United States*, 193 U.S. 197, 400 (1904) (Holmes, J., dissenting), then high-profile, unprecedented cases make even worse. And this prosecution of Senator Menendez was nothing if not unprecedented and high profile. If sustained on such a surprisingly thin reed of evidence, these convictions will make terrible, dangerous law. All of Senator Menendez's convictions must be reversed.

The government said it would prosecute Senator Menendez for his alleged agreements to sell official acts in exchange for bribes. But despite a 10-week trial, the government offered no actual evidence of an agreement, just speculation masked as inference. Worse, the government walked all over the Senator's constitutionally protected Speech or Debate privilege in an effort to show that he took some official action, when in reality, the evidence showed that he never used the authority of his office to do anything in exchange for a bribe. He never threatened or pressured any other official to do anything, and indeed, no other public official—not Attorney General Gurbir Grewal, nor U.S. Attorney Philip Sellinger, nor First Assistant U.S. Attorney Vikas Khanna, nor Undersecretary Ted McKinney—acted on a single request from Senator Menendez to help New Jersey constituents or claimed to have felt any pressure or intimidation from Senator Menendez. Simply put, the government did not show any use of Senator Menendez's official powers to benefit any of the supposed bribe givers, let alone an agreement to do so in exchange for bribes.

Adding insult to injury, Senator Menendez, a 50-year public servant and committed patriot, was convicted of acting as a foreign agent for Egypt—despite the complete lack of evidence that the Government of Egypt or its officials (the alleged "foreign principals") directed any of his activities or provided him any instructions whatsoever.  There is no email, conversation, or text message reflecting any directions from the Government of Egypt to Senator Menendez.  Indeed, the uniform testimony from every relevant government witness was that Senator Menendez was one of the most vocal critics of Egypt's human rights record.  Indeed, they testified that he took Egyptian President Sisi to task on its human rights violations during a congressional delegation visit to Egypt during the heart of the alleged conspiracy—a fact that greatly undermines the speculation the government asked the jury to rely on for conviction.  The government thus fell far short of satisfying the elements under Section 219.

Equally unsustainable are the convictions for obstruction of justice.  Hoping to turn exculpatory evidence into criminal conduct, the government argued that evidence showing that Senator Menendez lacked knowledge of alleged bribes (*e.g.*, car payments from Jose Uribe and mortgage payments from Wael Hana) were merely a fabrication and that Senator Menendez's former counsel's reference to such evidence during an attorney proffer constituted obstruction of justice.  This theory fails on the facts:  even the government's cooperating witness (Uribe) confirmed that he never discussed any car payments with Menendez, and there was no evidence from which a reasonable jury could conclude otherwise.  In any event, binding precedent establishes that the obstruction of justice convictions cannot stand given the complete lack of evidence that Senator Menendez intended or attempted to interfere with any grand jury or judicial proceeding.

We acknowledge it is no simple task to vacate convictions.  But despite its length, the government presented at trial no evidence of any actual *quid pro quo*—just argument based on improper speculation.  While the legal infirmities identified in this post-trial motion raise difficult issues, we respectfully submit that it presents no occasion for making bad law.  For all the reasons explained in more detail below, the law dictates that the result of the trial cannot stand and the Court should grant Senator Menendez's motion for judgment of acquittal, or alternatively, a new trial.

## LEGAL STANDARD

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion." *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979).  The Constitution prohibits a jury from convicting a defendant if no reasonable jury could have found each element of the charged offense to have been proven beyond a reasonable doubt.  *Id.* at 319.  Although the jury is "permitted to enter an . . . unreasonable verdict of 'not guilty[,]'" it does not have the "power to enter an unreasonable verdict of guilty." *Id.* at 317 n.10 (citing *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. 395, 408 (1947)).

To safeguard that bedrock constitutional guarantee, Rule 29 requires the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  That is, the Court must ensure that a jury's guilty verdict was supported by "substantial evidence," *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987), and that the jury did not draw "specious inferences" or render its conclusion based upon "pure speculation or from passion, prejudice or sympathy." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).  Indeed, "[i]t is not enough that the inferences in the government's favor are permissible.  A court must

also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that each element of the offense is established beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015) (cleaned up).

In drawing inferences, a jury may not rely simply on speculation, and courts give no deference to impermissible speculation. *See United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019); *see also United States v. Stewart*, 305 F. Supp. 2d 368, 376 (S.D.N.Y. 2004). While the jury may draw inferences from the evidence, an inference must be "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Pauling*, 924 F.3d at 656 (internal quotation marks and citation omitted). Moreover, "where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible . . . . [T]he inferences [must be] sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* at 657 (internal quotation marks and citation omitted). If a court finds that "reasonable jur[ors] must necessarily have . . . a [reasonable] doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Taylor*, 464 F.2d at 243.

Especially relevant here, where a jury's finding regarding intent rests only on "modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three," it must be set aside. *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005). This is so where the evidence, at best, gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence[.]" *Id.* (citation omitted); *see also, e.g., Stewart*, 305 F. Supp. 2d at 376–78 (granting Rule 29 motion where the jury could have drawn multiple reasonable inferences as to why the defendant made certain allegedly false statements, some of which were equally

consistent with innocence).  In other words, "the government must do more than introduce evidence at least as consistent with innocence as with guilt."  *Pauling*, 924 F.3d at 656 (2d Cir. 2019) (internal quotation marks and citation omitted); *see also, e.g., United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (if the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt") (internal quotation marks and citation omitted).  Finally, in conducting its inquiry into the sufficiency of the evidence, the Court is "obligated to 'consider the evidence presented at trial in its totality, not in isolation.'"  *United States v. Kapelioujnyj*, 547 F.3d 149, 154 (2d Cir. 2008) (quoting *United States v. Zhou*, 428 F.3d 361, 369–70 (2d Cir. 2005)).

Rule 33 empowers the court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  This rule grants the court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409 (2d Cir. 1992)).  Courts may set aside a verdict in the interests of justice where the evidence at trial, while "tangentially support[ing] a guilty verdict," actually "preponderates sufficiently heavily against the verdict such that a miscarriage of justice may have occurred."  *United States v. Tarango*, 396 F.3d 666 (5th Cir. 2005) (internal quotation marks and citation omitted).  In light of this broad standard, courts have granted new trials for a variety of reasons, including where the court finds that the verdict was against the weight of the evidence or fundamentally unfair.  *See, e.g.*, *United States v. Robinson*, 303 F. Supp. 2d 231, 233 (N.D.N.Y. 2004); *United States v. Ferguson*, 49 F. Supp. 2d 321, 323, 328–29 (S.D.N.Y. 1999).

## ARGUMENT

**I.    THE COURT SHOULD VACATE THE BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO PROVE ANY OF THE ELEMENTS OF THE ALLEGED QUID PRO QUO.**

    **A.    The Government Failed to Prove That Senator Menendez Agreed to Take Any Official Acts.**

To prove its bribery charges—including under an extortion and honest services fraud theory—the government had the burden to prove beyond a reasonable doubt that Senator Menendez engaged in a quid pro quo—that is that Menendez agreed to perform an official act (the *quo*) in exchange (*pro*) for a thing of value (the *quid*).  As previously argued at the close of the government's evidence, the government failed to prove each of these elements, and that argument is renewed here.

The Supreme Court has been clear that, to support a bribery conviction, the official act agreed to be performed must involve a "formal exercise of governmental power" (or such an agreement).  *McDonnell v. United States*, 579 U.S. 550, 578 (2016).  That is what distinguishes criminal bribery from "normal political interaction between public officials and their constituents," and it is what prevents these laws from "cast[ing] a pall of potential prosecution over these relationships."  *Id.* at 575–76.  An "official act" is thus defined by statute to mean "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  18 U.S.C. § 201(a)(3).

*McDonnell* held that the phrase "official act" is limited by two requirements.  *First*, there must be a "formal exercise of governmental power," of a "focused and concrete" nature, that is "pending either before the public official who is performing the official act, or before another public official."  579 U.S. at 569–70.  *Second*, the public official "must make a decision or take

an action *on* that question or matter." *Id.* at 572.  The official can do so through exercising his

own power, or by "using his official position" either "to exert pressure on another official to

perform an 'official act'" or "to advise another official, knowing or intending that such advice

will form the basis for an 'official act' by another official." *Id.* at 574.  For example, if an

official's role is to advise a superior on whether to grant clemency, then selling those

recommendations is a bribe.  *See id.* at 572 (citing *United States v. Birdsall*, 233 U.S. 223, 234

(1914)).  It is not sufficient, however, to merely engage in some procedural action relating to a

pending matter—such as by "[s]etting up a meeting," or "***calling an official***," or "gather[ing]

additional information." *Id.* at 573 (emphasis added).  Nor does "expressing support" for an

action "qualify" on its own as official action.  *Id.*  Rather, the official must take real action,

within the sphere of his official duties, to advance a concrete exercise of sovereign power.  *See*

*generally United States v. Silver*, 864 F.3d 101, 115–17 (2d Cir. 2017).

 In connection with each of the bribery counts of conviction (both substantive counts and

conspiracy counts), the government failed to adduce sufficient evidence that Senator Menendez

entered an agreement to take an official act in exchange for a thing of value.

 ***The Hana-Egypt Bribery Charges (Counts 5, 7, 8)***:  In connection with these counts, the

government claimed that the official act that was taken or agreed upon was a short approximately

two-minute phone call from Senator Menendez to Undersecretary Ted McKinney of the

Department of Agriculture.  *See* Tr. 6395–96 (government argued in summation that "the

McKinney call . . . is all you need to convict on the Egypt bribery counts" based on "what

Menendez said on the call" because it reflected "Menendez following through on that promise").

In his retelling, McKinney said that Senator Menendez told him to "stop interfering with my

constituent"— at times he relayed that story with a "please."  But even the government's lead

witness here—recounting this key piece of the government's case—readily acknowledged that Senator Menendez never *pressured* him to take any action, by threatening to use his office in any way against Under Secretary McKinney or the USDA should he refuse to do so.  *See* Tr. 1979–1908 (McKinney acknowledged that Menendez "made no threats" to interfere with USDA funding, nominees, or use any other official power against the USDA or its nominees); Tr. 1807:14–15 (McKinney recalled Senator Menendez "saying please stop interfering with my constituent").

Indeed, the only exercise of governmental power was by *Egypt* in granting an exclusive halal beef export contract to IS EG.  That does not qualify as an "official act" for federal bribery purposes, because it was not a matter pending before any federal official.  *See, e.g.*, *United States v. Jefferson*, 289 F. Supp. 3d 717, 738 (E.D. Va. 2017).  Nor can the Senator be characterized as having "advised" or "pressured" the USDA to take official action on that contract, *McDonnell*, 579 U.S. at 574—because the USDA's expressions of "opposition" to Egypt's halal export contracts are not official acts.  As McKinney conceded, the USDA had no authority or role in Egyptian's determinations, Tr. 1863:24–1864:1 ("Q. Did the U.S. have any actual ability to force Egypt to reinstate the prior halal certifiers? A. No."), and simply opposing a policy is not official action in its own right. *McDonnell*, 579 U.S. at 573; *see also Silver,* 864 F.3d at 122 ("Taking a public position on an issue, by itself . . . is not an 'official act'").  The only ultimate exercise of governmental power was the one exercised by Egypt.  *Jefferson*, 289 F. Supp. 3d at 738.

There is no official act here.  For advice or pressure to constitute an official act, the government must show more than a public official giving advice or, for that matter, applying pressure.  There must be some *use of office* for the act to be official—but here, on the government witness's *own* account, the Senator never even hinted that he was planning to *use his*

*office* in any way, should the USDA deny his request. And absent that, there is simply no official action.

It is true that the government also argued that Senator Menendez's decision not to place a hold on a $99 million sale of tank ammunition to Egypt was official action. Tr. 6402–03. But even assuming the decision not to place a hold constitutes an official act, this evidence was admitted in violation of the Senator's Speech or Debate rights. The evidence should have been purged from the case and cannot be used to sustain these bribery counts of conviction. *See* infra Part II. And even if this constitutes a valid "*quo*," the government failed to submit any evidence at all showing a "*pro*"—where the Senator agreed to make that decision, in exchange for some private benefit. At most, the evidence showed that Senator Menendez agreed to inform an Egyptian-American New Jersey constituent, Hana, of his decision, but that is a far cry from evidence that Senator Menendez made the decision to authorize the aid in exchange for a bribe from Hana or Egypt to Senator Menendez's then new girlfriend Nadine.

As for the other acts that the government claimed Menendez took in exchange for bribes from Egypt and/or Hana—such as the editing of a letter provided to him by Nadine—none of those matters can remotely constitute official action because none involved any exercise of the Senator's office. *See generally* ECF 176 at 29–33.

***The Uribe Bribery Charges (Counts 9 and 10)***: The government's theory of official action with respect to these counts was based on a short call and a meeting that Senator Menendez had with New Jersey Attorney General Gurbir Grewal, during which Senator Menendez relayed concerns about potential selective prosecution by the Office of the Insurance Prosecutors without identifying any case by name. Tr. 6448, 2772. But Attorney General Grewal acknowledged that, in that call and meeting, Senator Menendez did not ask that he

dismiss the case, offer any particular or better plea deal, or even call anybody else in the Attorney General's office about the matter.  Tr. 2772-74.  The Senator did not ask Grewal to do anything or take any action whatsoever, and he certainly never threatened to use any official powers against Grewal.  Tr. 2774-75, 2795-97.  Grewal had no fears of retribution from Senator Menendez.  Tr. 2775-76 (acknowledging that he would have been more concerned of retribution from State Senators than U.S. Senators, who lack authority over the New Jersey Attorney General's office).  All Senator Menendez did was raise a concern that he had heard from a constituent about unfair treatment—a concern that Grewal acknowledged he would not have wanted Senator Menendez to raise with the line prosecutors in the first instance.  Tr. 2785, 2794.

None of this constitutes official action.  Senator Menendez had no official power to direct investigatory or prosecutorial decisions by the State of New Jersey—a separate sovereign in our constitutional structure.  *See Printz v. United States*, 521 U.S. 898, 919 (1997) ("the Framers rejected the concept of a central government that would act upon and through the States").  As the court recognized in *United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017), an attempt to exert influence over a foreign government or separate sovereign does not constitute official action because it lacks any nexus to federal authority.  *See id.* at 737–38.

Nor can a federal official's mere request for action by the State, standing alone, qualify as "advice" or "pressure" under *McDonnell*.[1]  The Court held that an official can take official action for purposes of the federal bribery laws if he "use[s] his official position to exert pressure on another official to perform an 'official act.'"  *McDonnell*, 579 U.S. at 574 (emphasis added).

---

[1] The jury's error in convicting on the government's flawed theory was compounded by the failure to provide the jury sufficient instructions as to what constitutes advice and pressure.  *See* Tr. 6313–16 (Senator Menendez's objections to the proposed jury instructions on advice and pressure).

But, as noted above, the key is the official must "use" his office in some way—whether by exercising an official advisory function or by leveraging official power to impose pressure (*e.g.*, by threatening to cut federal funding).  A naked request for action, by contrast, does not suffice.  *See Silver*, 864 F.3d at 122–23 (refusing to treat Silver's opposition to a methadone clinic as advice, because he never "formally used his power as Speaker . . . to oppose the clinic").  And here, there was not even a request for action, just a provision of information regarding potential selective prosecution.  Even if the Senator was "trad[ing] in part on the reputation, network and influence that comes with [his] political office" to get the meeting and provide information or make a request to Attorney General Grewal, that does not qualify as official action.  *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008).

Nor can the government argue that the Senator agreed to a *quid pro quo* embracing official action beyond what he actually did.  The only evidence of an agreement proffered by the government was the testimony of Uribe.  But Uribe did not testify as to any agreement with Senator Menendez to take any specific official action, beyond the actions that Senator Menendez actually took.  The agreement and the act therefore are merged here, and nothing the Senator did or agreed to do remotely approached official action under *McDonnell*.

**The Daibes Bribery Charges (Counts 11, 13, 14)**:  The government's primary theory of official action regarding these counts was that Senator Menendez recommended Philip Sellinger to be the U.S. Attorney in New Jersey in order to benefit Daibes in his prosecution.  *See* Tr. 6504.  But, as argued below, the evidence regarding the selection of Sellinger as U.S. Attorney was introduced in violation of the Speech or Debate clause.  All of that evidence must be purged from the case, and none of it can be used to sustain this conviction.  In any event, even setting that aside, there was no evidence that Senator Menendez agreed to trade his recommendation for

anything of value.  Nobody testified to any such agreement.  Nor was there any circumstantial

evidence of such an agreement.  It was undisputed that Senator Menendez and Daibes had been

close friends for decades.  So, to the extent that the Senator considered Daibes' interests in

making his choice of recommendation, there was no basis to infer that he did so out of anything

other than genuine concern and friendship.

The government also argued that the phone calls Senator Menendez made to First

Assistant U.S. Attorney Khanna (during which Senator Menendez made no reference to the

Daibes prosecution), and to Daibes' lawyer admonishing the lawyer to push for dismissal of the

Daibes case were official uses of the power of the Senator's office.  Tr. 6505–06.  That is

unsupported by any facts, and in any event flatly inconsistent with *McDonnell*, where the Court

made clear that calling an official about a pending matter is insufficient to qualify as official

action (let alone calling an attorney in private practice to offer thoughts on defense strategy).

579 U.S. at 573–74 (simply "talking to another official" is not official action "without more").

As Khanna made clear, there was no "advice" or "pressure" applied, and Senator Menendez did

not ask Khanna to take any action.  At no point in time did Menendez use his official office to

exert any pressure or provide any advice to Khanna, nor did he ever threaten or suggest that he

would.  Indeed, Senator Menendez made no request for action from Khanna whatsoever.  Rather,

Khanna acknowledged that Menendez mainly engaged in personal chit chat while congratulating

him on his new promotion—exactly the same thing that Senator Booker did.  This call had

nothing to do with official action.  Tr. 5029–33.  Moreover, once again, the government cannot

argue that the *quid pro quo* agreement encompassed action beyond what the Senator actually did,

because there was no independent evidence (testimony or documents) of *any* actual agreement.

*The Qatar Scheme (Counts 11, 13, 14)*:  In connection with this scheme, the government's theory of official action was that Senator Menendez issued various press releases thanking Qatar for its humanitarian aid.  Tr. 4263–64.  None of these press releases, however, constitute official action.  "Simply expressing support" for a country or position is one classic example the Supreme Court highlighted of conduct that does not rise to the level of official action. *McDonnell*, 579 U.S. at 573; *see also, e.g.*, *Silver*, 864 F.3d at 120–22.  The press release was not read on the floor of Congress or introduced into the official Congressional record.  It is no different than issuing a tweet or giving an interview to a newspaper or reporter.  It does not constitute official action.

As for Senate Resolution 390 expressing support for Qatar's humanitarian assistance—which, too, should never have been admitted in light of the Constitution's absolute protection against admission of legislative acts—there was no evidence adduced of any involvement by Senator Menendez in the resolution (or even what happened with the resolution) nor that Daibes asked Senator Menendez to get involved in the resolution in exchange for a bribe.  Indeed, there was no evidence of the reason Daibes forwarded Senator Menendez a copy of the resolution, or that he paid a bribe in exchange for some action related to the resolution.  There is thus no factual basis on which a jury could conclude that Senator Menendez was asked to take, did take, or agreed to take, any official action with respect to that resolution.  The government's suggestion otherwise in summation (Tr. 6504) was pure speculation and cannot support a finding of an agreement to sell official action.

### B.    The Government Also Failed to Prove That Senator Menendez's Actions Were *In Exchange* for Things of Value

Even assuming the government could prove that Senator Menendez was aware of the things of value provided to Nadine—and there's no actual evidence demonstrating such

knowledge—there remains a total lack of evidence regarding the *pro* element in the charged bribery schemes. As the Court correctly instructed the jury: "A quid pro quo must be explicit. It has to be clear and unambiguous. . . . The solicitation or receipt of a thing of value in return for an official act can be implied from words and actions, so long as you find that the defendant you are considering understood at the time that a thing of value was being sought or given or received ***in exchange for*** the promise or agreement of a public official to be influenced in the performance or non-performance of an official act." Tr. 7090 (emphasis added). But the government offered no evidence whatsoever that anything Menendez did or agreed to do was in exchange for a thing of value. For example, with respect to the charged IS EG bribery scheme, there was no evidence that Senator Menendez contacted Undersecretary McKinney in exchange for one ounce gold bars, the mortgage payments, the three months of payments to Nadine, or any other thing of value provided by Hana. Senator Menendez contacted McKinney on May 23, 2019. *See* GX 1302. But the mortgage payment by Hana was made two months later in July 2019, and the consulting payments were made to Nadine in and after August 2019. There is no evidence as to when the gold bars were provided to Nadine. And there is zero evidence that Menendez was aware of any of these things of value in advance of his call to McKinney, or that he agreed to make that call in exchange for after-the-fact payments. The evidence thus points equally to the likelihood that Senator Menendez was doing a favor for his wife's friend Hana, consistent with the constituent services he routinely provided to New Jerseyans. Absent "explicit," "clear," and "unambiguous" evidence of the agreement, it is impossible to conclude

that the *quo* was provided in exchange for a future *quid*.  The evidence at most shows a gift or gratuity, not a bribe.[2]

Similarly, with respect to the Uribe bribery charges, there was no evidence of any corrupt agreement – either an actual agreement between the parties, or an understood one, from the perspective of Senator Menendez. The government's theory to the contrary rested entirely on the assertion that the Senator knew about the car payments being made from Uribe to Nadine: But Uribe *himself* acknowledged that he never discussed these payments with the Senator.  *See* Tr. 3376–80.  There was no communication or other evidence from which the jury could reasonably conclude that Senator Menendez communicated with Attorney General Grewal in exchange for these car payments.

Finally, with respect to the Daibes bribery charges, the government largely relied on evidence of searches for the value of gold on Menendez's Google account to show an alleged *quid pro quo* with respect to the Daibes prosecution.  But that evidence cannot sustain the weight the government gives it.  Beyond the fact that there are equally persuasive reasons for the searches—including that Senator Menendez or his wife were attempting to identify the value of Nadine's family kilograms of gold in order to pay down Nadine's mortgage and Senator Menendez was disclosing that gold on Senate financial disclosure forms—the existence of the

---

[2] "As a general matter, bribes are payments made or agreed to before an official act in order to influence the official with respect to that future official act," whereas "[g]ratuities are typically payments made to an official after an official act as a token of appreciation."  *Snyder v. United States*, 144 S. Ct. 1947, 1951 (2024).  Whereas "bribery involves the giving of value to procure a specific official action from a public official," "[t]he element of a *quid pro quo* or a direct exchange is absent from the offense of paying an unlawful gratuity."  *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002).  Because the government prosecuted Menendez on a theory of bribes, not gratuities, the evidence of after-the-fact payments cannot be used to sustain a bribery conviction absent some evidence that Senator Menendez was expecting these after-the-fact payments.  No such evidence was offered.

searches do not show any *quid pro quo*, as they cannot be tied close in time to any gift provided to Nadine.  The government's claims to the contrary are pure speculation.

Just weeks ago, another United States District Judge in this Circuit vacated the bribery conviction of a DEA official for similar reasons given the lack of evidence tying cash gifts to any official acts.  More specifically, in *United States v. Bongiovanni*, 2024 WL 3487914 (W.D.N.Y. July 19, 2024), the trial record showed that the defendant received cash payments of thousands of dollars during a six-month period in 2015.  Several years earlier, the defendant attempted to help the alleged bribe-giver when he was under scrutiny by law enforcement officials.  But, as the court concluded, the fact that the payments were made after the alleged assistance means the payments were "gratuities" that serve "as a token of appreciation—not bribes" and thus the evidence was insufficient "as a matter of law" to convict the defendant of bribery.  *Id.* at *4 (cleaned up).  The government argued that the later payments in 2015 reflected a "corrupt mindset to continue to intercede on [the bribe-giver's] behalf and protect him from law enforcement scrutiny" in the future, based in part on earlier-in-time admissions from the alleged bribe giver that the defendant can assist if he "got in trouble."

The court was unpersuaded, and vacated the bribery conviction because it relied on "surmise and guesswork" that the money constituted a bribe rather than a gratuity for past actions or a genuine gift.  *Id.* at *5.  Of critical importance to the court's analysis was the fact that "no one testified about the purpose of the cash," the defendant and the alleged bribe-giver had a "longstanding friendship" that presented "plausible benign explanations for the money," and the lack of "temporal connection" between the money and the acts taken.  *Id.*

The same rationale applies with equal if not greater force here.  There is no evidence as to when most of the alleged things of value (*e.g.*, gold and cash) were provided, and no evidence as

to the reason why any of them were provided.  Nor is there any evidence that any of these items were provided in exchange for official acts by Senator Menendez.  And given the long-standing relationship between Senator Menendez or Nadine and each of the alleged bribe-givers, it is more than plausible that the payments were mere gifts or gratuities, not bribes.  "[B]ecause it is at least equally likely that the money [and other items of value] was a gift, a reimbursement, or a gratuity and not a bribe, 'the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [and] a reasonable jury must necessarily entertain a reasonable doubt.'"  *Id.* at *5.  All the bribery counts must therefore be vacated.

## II.  THE GOVERNMENT'S PERVASIVE SPEECH OR DEBATE VIOLATIONS NECESSITATE VACATUR

Throughout trial, and in an effort to satisfy the *McDonnell* official-act test, the government repeatedly trampled upon Article I's Speech or Debate Clause.  That clause "protect[s] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts."  *United States v. Brewster*, 408 U.S. 501, 509 (1972).  "[T]hroughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature."  *United States v. Johnson*, 383 U.S. 169, 178 (1966).  It does so by "protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary."  *Id.* at 179.

To be sure, the Supreme Court held in *Brewster* that a Member of Congress may still be prosecuted for ***agreeing*** to take legislative action in exchange for a bribe, 408 U.S. at 526.  But the constitutional protection provides a privilege that prohibits the government from relying on evidence of legislative acts to *prosecute* such an agreement.  *Id.* at 527.  Thus, as *Brewster* made clear, the Clause "precludes any showing of how [a Member of Congress] acted, voted, or

17

decided"—even if that proof would make for a "more appealing case"—because "evidence of acts protected by the Clause is inadmissible." *Id.* at 527–28. "Evidence of a legislative act" thus may not be "introduced" at trial. *United States v. Helstoski*, 442 U.S. 447, 487 (1979); *see also United States v. Murphy*, 642 F.2d 699, 700 (2d Cir 1980) (per curiam); *United States v. Dowdy*, 479 F.2d 213, 222–24 (4th Cir. 1973).

The Supreme Court has defined a "legislative act" to "broadly" include "anything generally done in a session of the House by one of its members in relation to the business before it." *Doe v. McMillan*, 412 U.S. 306, 311 (1973). A legislative act is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972).

As the Court noted in its ruling on Menendez's motion to dismiss, not everything a legislator does is covered by the Speech or Debate clause. In particular, the Supreme Court has excluded from the immunity many of the same constituent services that *McDonnell* held could not support a bribery charge—*e.g.*, "'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'news letters' to constituents," and the like. *Brewster*, 408 U.S. at 512. The Court conceptualized those activities as "political in nature rather than legislative," meaning they are undertaken to secure support for reelection rather than to advance Article I prerogatives. *Id.*

At the same time, Speech or Debate protection extends beyond floor speeches and votes to cover other conduct within the "sphere of legitimate legislative activity." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951). That includes committee work, *Gravel*, 408 U.S. at 624;

"legislative factfinding" and "information gathering," *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir 1988); and consideration of "matters which the Constitution places within the Jurisdiction" of the House or Senate, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). *See also Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10–11 (D.C. Cir. 2006) (collecting cases and examples).

All told, the test is whether the activity is "related to the due functioning of the legislative process." *Johnson*, 383 U.S. at 172; *see also United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980) ("Conduct that falls within the broad category of legislative action may not be charged as an offense under [any] statute, nor may evidence of a Member's legislative action be offered in evidence against him."). The test is an objective one: Consistent with the Clause's purpose, so long as an "activity is *arguably within* the legitimate legislative sphere, the Speech or Debate Clause bars inquiry even in the face of a claim of unworthy motive." *McSurely v. McClellan*, 553 F.2d 1277, 1295 (D.C. Cir. 1976) (emphasis added). In other words, courts must look to the action alone, for the Clause "forbids not only inquiry into acts that are manifestly legislative, but also inquiry into acts that are purportedly legislative, even to determine if they are legislative in fact." *Biaggi*, 853 F.2d at 103; *see also, e.g.*, *Brewster*, 408 U.S. at 525.

At trial, the government repeatedly crossed the line and offered evidence that violated the Speech or Debate clause. By way of example, the government repeatedly attempted to and did rely on evidence of Senator Menendez's approval of military aid to Egypt. The government offered, and the Court admitted, Senator Menendez's text message to his wife: "Tell Will I am going to sign off this sale to Egypt today. Egypt 46,000 120MM target practice rounds and 10,000 rounds tank ammunition $99 million. Note. These tank rounds are for tanks they have had for many years. They are using these in the Sinai for the counterterrorism campaign." GX

19

A101-14.  Nothing about that text message constituted a "promise" of future action, as the government claimed in summation, let alone a corrupt agreement to trade that action for something of value.  Tr. 6402–03 ("Menendez is promising an official act here.  The approval of a sale of $99 million in tank ammunition.").  Rather, this text message reflects what Senator Menendez was doing *on that exact day*—exercising the core legislative act of approving military aid.  Indeed, this text message was no different than the messages that the Court did exclude concerning a January 2022 article regarding $2.5 billion in arms sales to Egypt.  *See* Tr. 1032–46.  Just as the Court did not accept the government's risible claim that these January 2022 messages were a "promise" of future conduct, neither should the Court have accepted the same claim with respect to the $99 million approval.  Tr. 1045 ("But I must say I don't see how you get around the fact, for example [Senator Menendez] had to sign off on this as being a core – the core of the act itself.  You can say the words again and again.  I just don't see a promise here.").  The text message itself reflected a legislative act in which the Senator was contemporaneously engaged, and should not have been admitted into evidence.

But this was only the beginning of the government's trampling on Senator Menendez's Speech or Debate rights.  For example, the government also introduced testimony from a State Department witness (Joshua Paul) that no military aid to Egypt could be approved without authorization from the Chair and Ranking Member of the SFRC, both positions that Senator Menendez held at all relevant times..[3]  And it then introduced testimony from Sarah Arkin, a staffer on the SFRC, about her discussions with Senator Menendez regarding his positions and

---

[3] *See, e.g.,* Tr. 895 ("Q. As a practical matter, how much say does the chairman or ranking member of the Senate Foreign Relations Committee have over whether a foreign military sales case to Egypt goes through?  A. As a practical matter, the chairman or chair or ranking member of the Senate Foreign Relations Committee has immense influence over whether a sale notified to that committee goes through.")

strategy vis-à-vis Egypt—precisely the type of testimony that the Speech or Debate clause flatly prohibits. *See, e.g.*, Tr. 4509–14.

The government also offered testimony from Senator Menendez's direct staff reports about Senator Menendez's (and other Senators') meetings with Egyptian officials and his general policy views toward Egypt, including staff's views that Menendez's interactions with Egypt were "weird." *See* Tr. 4511–14 (testimony from Ms. Arkin that Senator Menendez discussed with Ms. Arkin "a change in approach with respect to Egypt."); GX 8F-22 (Ms. Arkin's text message that "I'm [sic] that's weird.  How big is the embassy."). The evidence of his official meetings with Egyptian officials was clearly off limits, as those are precisely the types of information-gathering activities that are safeguarded by the Speech or Debate Clause. *See, e.g.*, *Biaggi,* 853 F.2d at 103 ("[L]egislative factfinding activity conducted by [the Member] during his Florida trips was protected."). As Ms. Arkin confirmed, that March 2018 meeting with General Shawky did not involve any discussion of bribes or other inappropriate requests, but rather was "pretty standard for meetings with Egyptian officials" wherein Egyptian officials provided Senator Menendez with information about Egypt's current policy priorities vis-à-vis the United States.  Tr. 4683–89; *see also* Tr. 4504–09.  Its introduction squarely violated Senator Menendez's Speech or Debate rights.

As did testimony about discussions SFRC staffers had with Senator Menendez or at Senator Menendez's request. "[F]or the purpose of construing the privilege a Member and his aide are to be 'treated as one.'" *Gravel*, 408 U.S. at 616.  The evidence the government offered from the Senator's own staff effectively put Senator Menendez's authorization of military aid, information gathering, and other legislative activities directly at issue.  This evidence included memoranda of committee work, *Gravel*, 408 U.S. at 624, which is precisely the type of

"legislative factfinding" and "information gathering" that the Constitution protects. *Biaggi*, 853 F.2d at 103. In offering this evidence from the Senator's own staff, the government breached the "absolute" protections provided by the Speech or Debate Clause.[4] *See In re Sealed Case*, 80 F.4th 355, 365 (D.C. Cir. 2023) ("If a Member's act qualifies as legislative under *Gravel*, the privilege applies and the Clause confers three 'absolute' protections . . . includ[ing] an evidentiary privilege").

The government similarly violated the Speech or Debate clause when it introduced evidence regarding Senator Menendez's recommendations to President Biden of Esther Suarez and then Philip Sellinger for the position of U.S. Attorney. The government elicited testimony and documents from U.S. Attorney Sellinger and political consultant Michael Soliman about Senator Menendez's decision-making and discussions regarding the U.S. Attorney recommendation. These discussions are part and parcel of Senator Menendez's constitutional "advice and consent" role, and involved "gathering of information . . . in connection with or in aid of an activity . . . that qualifies as 'legislative in nature." *Jewish War Veterans v. Gates*, 506 F. Supp. 2d 30, 57 (D.D.C. 2007). As such, the evidence of Senator Menendez's meetings and discussions with Sellinger, Suarez, or other potential U.S. Attorney candidates, as well as his discussions with his staff regarding those candidates, were within the scope of the Speech or Debate clause prohibition and inadmissible.

To be sure, the Court concluded in its pretrial ruling that a Senator's recommendation of a U.S. Attorney candidate is not within the "Advice and Consent" power granted to Senators by

---

[4] Indeed, the government appears to acknowledge that the staff memoranda are protected because the government agreed to redact certain written correspondence between Ms. Arkin and Senator Menendez. *See, e.g.*, GX 8F-7. Yet the government introduced over Senator Menendez's objections testimony from Ms. Arkin describing her communications with Senator Menendez concerning similar matters squarely relevant to his SFRC work.

the U.S. Constitution.  ECF 252 at 4–5.  Respectfully, the Court's analysis is mistaken, as the

recommendation power is squarely within the "advice" Senators provide regarding nominations.

David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation*

*Process*, 101 Yale L.J. 1491, 1495 (1992) (explaining that the Constitution's text and history

"assign[s]" the Senate a "distinct . . . advisory role before the nomination has occurred").  In any

event, the Court's analysis is beside the point.  The Speech or Debate clause is not limited solely

to powers granted to Congressmen by the Constitution, but extends as well to "other matters [that

are] . . . an integral part of the deliberative and communicative processes by which Members

parties in committee and House proceedings."  *See United States v. Biaggi*, 853 F.2d at 103.  A

Senator's vetting process of potential U.S. Attorney nominees is an integral part of the

deliberative process by which Senators later vote on U.S. Attorney nominees.  The fact that the

President's reliance on Senators in the President's own party for U.S. Attorney vetting and

recommendations is a matter of long-established custom does not undermine the legislative

nature of the U.S. Attorney vetting and recommendation process.  *See* Tr. 3607 (testimony from

U.S. Attorney Sellinger describing the "blue slip" process).  Indeed, it is no less legislative than

the custom of the executive generally deferring to legislative "holds" on military aid.  *See* Tr.

891 (testifying that process of legislative "holds" on military aid is not written into law but rather

an informal process that dates back approximately 50 years); *see also* ECF 252 at 7 ("a Senator's

decision to approve or disapprove of foreign aid is properly characterized as a legislative act"

even though this authority is merely a "matter of longstanding, voluntary practice").

The evidence the government offered regarding Senate Resolution 390 similarly violated

the Speech or Debate clause.  Over objections from Senator Menendez, the government entered

two text messages from Daibes to Senator Menendez concerning legislation pending before the

SFRC, with images from the bill from the Congress.gov website.  *See* GX A104-4, GX 10G-1, GX A104-5, GX A104-E.  Names of the Senators that sponsored or co-sponsored the resolution were redacted, and instructions were given indicating that these unidentified Senators were not Senator Menendez.  *See* Tr. 1018–19.  None of this cured the Speech or Debate violation.  Just as redacting Senator Menendez's name from a legislative document would be legally insufficient to protect his constitutional rights, so too is redacting the names of other Senators.  The resolution itself is a protected legislative act.  And Senator Menendez's decision to sponsor or not sponsor that piece of legislation is precisely what the Speech or Debate clause protects.  Thus, offering evidence of the resolution in this criminal prosecution violated the Speech or Debate Clause, even though the proffered acts purportedly concern Members who are not defendants.  *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1374–75 (2d Cir. 1988) (holding that Senator's testimony in civil antitrust action about conduct by ***other Senators*** was "properly excluded" under Speech or Debates Clause because it invades the "integrity of the legislative process.")

The Speech or Debate violation came full circle in summation when the government argued, based solely on the text messages from Daibes to Senator Menendez forwarding the images of Senate Resolution 390, that Daibes asked Senator Menendez "to use his powers as chair [of the SFRC] to take the official action in advancing the Senator resolution."  Tr. 6504.  There was no such evidence at trial of why Daibes forwarded the Resolution to Senator, and the government's arguments in summation as to the motivations for doing so were pure speculation.  Tr. 6502 ("Why?  Because Daibes wants [Senator] Menendez to keep taking actions that keep Qatar happy and increase Daibes' chances of getting that business deal."); Tr. 6503 ("You know why Daibes is sending [the Resolution], and [Senator] Menendez does too.  He's asking

[Senator] Menendez to take action on the resolution to help Daibes' relationship with the investment company, because he believes it has ties to Qatar."). The Speech or Debate clause prohibits precisely this sort of speculation as to a Member's motive for taking (or not taking) legislative acts. As the government conceded at trial, it could not introduce evidence of any action Senator Menendez took with respect to Senate Resolution 390. But in claiming that the resolution was "pending before [Senator] Menendez, because it's been referred to the [SFRC] . . . . It's now waiting for action by [Senator] Menendez as the chair of that committee," Tr. 6502, the government crossed the line into protected legislative activity. The sole reason for the government to offer Daibes' text messages and argue as it did in summation was to invite the jury to conclude that Senator Menendez took some action on the resolution, and in turn to support an (improper) inference that he must have done so because he had previously entered a corrupt agreement. That is exactly the sort of inference from legislative conduct that the Speech or Debate Clause forbids, because allowing such inferences would obligate the Senator to defend and explain his legislative acts and motivations for taking them, evidence to which the government repeatedly objected. *Accord United States v. Swindall*, 971 F.2d 1531, 1546 (11th Cir. 1992).

Finally, and most directly, the government offered evidence of a bill that Senator Menendez himself proposed (S1102, the "Eastern Mediterranean Security and Energy Partnership Act of 2019"), but attempted to cure the Speech or Debate violation by not identifying the sponsors of the bill. *See, e.g.*, GX 3D-2; *see also* Tr. 1003, 3591–94, 4341, 4539–42. The omission of the sponsors cannot cure the violation for the exact same reasons as above. Just as the government cannot introduce evidence of legislative action directly, it cannot do so indirectly, by using implication to force a defendant's hand. And that's precisely what happened

here.  In offering evidence about S1102, and creating the distinct and inescapable impression for the jury that the Senator proposed the bill (as, in fact, he did), the government put Senator Menendez to the choice of (i) admitting to this legislative act to correct the record for the jury, or (ii) letting the government's inference go unanswered.  That is precisely what the Speech or Debate Clause prohibits.

Here too, the government's tactics were too clever by half.  Of course, as this Court recognized, the government may introduce promises of legislative action.  But here, there is nothing close to that; the government is trying to smuggle in evidence of actual legislative action, on the rationale that Article I's basic safeguards fall away in the face of a few hyper-technical redactions.  But the Speech or Debate Clause is not so wooden; and its protections cover a naked attempt by the government to create the obvious impression of legislative action, just as it prevents the government from directly introducing such evidence.

In short, the government repeatedly ran roughshod over the constitutional protections afforded to Senator Menendez under the Speech or Debate clause, all in an effort to secure an unjust conviction.  The government now must live with the consequences of those decisions, and must bear the burden of vacatur.

## III.    THE GOVERNMENT FAILED TO PROVE VENUE AS TO SIXTEEN COUNTS OF CONVICTION

In its zeal to prosecute and convict Senator Menendez in this District, the government stretched the Constitution's venue requirements beyond their breaking point.  In every respect, the conduct at issue with respect to almost every count of conviction concerned activities occurring *outside this District*, with the overwhelming bulk occurring in New Jersey or Washington, D.C.  The evidence at trial showed that, at most, Senator Menendez and his co-defendants had fleeting, *de minimis* brushes with the Southern District of New York that cannot

sustain venue.  *United States v. Fortenberry*, 89 F.4th 702,  709–10, 713 (9th Cir. 2023)

(reversing conviction of former congressman prosecuted in Los Angeles for false statements

made in Nebraska and the District of Columbia, noting that "[t]he Venue and Vicinage Clauses

may not be disregarded simply because it suits the convenience of federal prosecutors.").  No

reasonable jury could have concluded that venue was proper on a preponderance of the evidence

standard, and the conviction of Senator Menendez must be vacated under Rule 29.

### A.      Proper Venue Is a Fundamental Constitutional Guarantee.

The Constitution twice guarantees defendants the right to be tried in the place where the

alleged crime "shall have been committed."  U.S. Const., Art. III, § 2, cl. 3; *id.* Amend. VI.  A

conviction by a jury from the wrong district—that is, from outside "the State and district wherein

the crime shall have been committed"—is thus invalid.  *See* U.S. Const. Amend. VI; *Smith v.

United States*, 599 U.S. 236, 244–45 (2023) (holding that retrial is the proper post-conviction

remedy for improper venue).  This right is also codified in Federal Rule of Criminal Procedure

18, which requires the government to "prosecute an offense in a district where the offense was

committed."  *See United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012).

To establish venue for its conspiracy counts (Counts 1–4, 15 and 17), the government

must establish two factors by a preponderance of the evidence.  *See United States v. Tzolov*, 642

F.3d 314, 318 (2d Cir. 2011).  *First*, the government must establish that the "essential conduct"

constituting the alleged offenses occurred in the district of prosecution.  "Venue is proper only

where the acts constituting the offense—the crime's 'essential conduct elements'—took place."

*United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005) (quoting *United States v. Rodriguez-

Moreno,* 526 U.S. 275, 280 (1999)).  On a conspiracy charge, the district where the "essential

conduct" took place is the district where either (1) the conspiratorial agreement was formed or

(2) an overt act was committed to further the conspiracy's objective.  *See United States v.*

*Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987).  An overt act is one committed by a conspirator "for the purpose of accomplishing the objectives of the conspiracy."  *Tzolov*, 642 F.3d at 320.  The Second Circuit has applied a but-for causation standard: an act qualifies as an overt act for venue purposes if the conspiracy's criminal objectives would not have been realized without it.  *See id.* (finding that defendants' travel through the district of prosecution could qualify as an overt act "because, had they not done so, the face-to-face meetings," which were "a regular part of their fraudulent scheme, would not have occurred").

*Second*, if the overt act was committed by someone other than the defendant, the government must prove that it was "reasonably foreseeable" to each defendant that the act would take place in the district.  *United States v. Kirk Tang Yuk*, 885 F.3d 57, 69 (2d Cir. 2018).  This is because there must be "some sense of venue having been freely chosen by the defendant."  *Id.* (quoting *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012)).

As to the substantive counts of conviction (Counts 5–14, 16 and 18), venue is more narrowly construed.  *See, e.g., Tzolov*, 642 F.3d at 318–20 (finding venue improper on a substantive securities-fraud count despite being proper on the associated conspiracy counts).  For substantive offenses, the act constituting the substantive crime itself must take place in the district of prosecution.  *See id.*  That is, absent a statutory venue provision, one of the crime's "essential conduct elements" must have taken place in this District.  *Rodriguez-Moreno*, 526 U.S. at 279–80 (quoting *United States v. Cabrales*, 524 U.S. 1, 6–7 (1998)).  "In performing this inquiry, a court must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts."  *Id.*  This is often done by looking to the key verbs in the statute, which indicate the essential conduct that constitutes the offense.  Under that test, "venue is not proper in a district in which the only acts

performed by the defendant were preparatory to the offense and not part of the offense." *Tzolov*, 642 F.3d at 319 (quoting *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989)).  This is true regardless of whether the alleged crime is a continuing offense or whether the act would suffice for venue on a conspiracy charge.  *Beech-Nut*, 871 F.2d at 1190–91.

Moreover, in all cases, "a court should ask whether the criminal acts in question bear 'substantial contacts' with any given venue."  *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000) (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985)).  "This test takes into account four main factors: (1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs, and (4) suitability of the venue chosen for accurate factfinding."  *Id.*  While the application of this test to conspiracy counts has received mixed treatment by the Second Circuit,[5] it nonetheless articulates a fundamental principle that a criminal defendant should not suffer the hardship and prejudice of being hauled into court and tried by a jury in a district that has only a minimal connection to the alleged crime.  Applying this test in "every case," including conspiracy cases, "will ensure that venue is only found where there are enough substantial contacts to ensure that prosecution is fair to the defendant."  *Royer*, 549 F.3d at 897.

---

[5] *Compare Kirk Tang Yuk*, 885 F.3d at 70 ("When an overt act in furtherance of a criminal conspiracy has been committed in the district, however, this supplemental inquiry has no relevance."), *with United States v. Royer*, 549 F.3d 886, 897 (2d Cir. 2008) (citing *Saavedra*, 223 F.3d at 94 (noting that applying the substantial-contacts test "*in every case*" will help guard against too many possible venues being available to the government in RICO conspiracy cases) (emphasis added).

**B.    The Evidence at Trial Confirmed Venue Was Improper in the Southern District of New York as to Counts 1–16**

*The Hana-Egypt Bribery Substantive Charges (Counts 5, 7, 8):* The government claimed in summation that the June 30, 2018 dinner at the restaurant Mr. Chow in Manhattan sufficed to support venue in this District as to the Hana-Egypt Bribery counts.  Tr. 6424.  According to the government, the evidence showed that Senator Menendez and Nadine had dinner with Hana at Mr. Chow on that date, and that during that dinner Hana confirmed to General Shawky that Menendez would attend the White Paper delegation and a subsequent dinner with General Shawky on July 25, 2018.  *See* GX 1302 (lines 251–55).  But the government introduced no evidence of what was said or discussed at the restaurant.  All the government offered was that the dinner occurred about a month before a *later* July 2018 meeting in Washington D.C. during which the government claimed (with no evidence) that Menendez made a promise with respect to the tank ammunition he approved for Egypt.  Tr. 6424.  Even accepting the government's theory that the June dinner at Mr. Chow was connected to the scheduling of the July meeting in Washington D.C., the meeting at Mr. Chow was *still* precisely the type of "preparatory" act to the bribery charges that cannot sustain venue in New York. *Tzolov*, 642 F.3d at 319.  There's no evidence that any "essential conduct" underlying the Egypt bribery scheme occurred at Mr. Chow or elsewhere in the Southern District of New York.

*The Uribe Bribery Substantive Charges (Counts 9 and 10):* In summation, the government argued that venue was satisfied by evidence of telephone calls to, and car payments made by, Fernando Barruos in the Southern District of New York.  Tr. 6476–77.  The government, however, adduced no evidence that these acts in New York were foreseeable to Senator Menendez.  Indeed, the government asked the jury to speculate as to the foreseeability of these payments and tolls, stating: "it's obviously foreseeable in a big metro area, like the New

York-New Jersey area, where a bunch of payments are being made that some may be made from one side of the Hudson and some from the other. Venue's easy." Tr. 6476. No such inference, however, was called for by the evidence. Indeed, the evidence showed that Menendez was unaware of Barruos, and that Uribe never even mentioned to Menendez that he was making payments on the car. Tr. 3376–80. Given that Uribe was a New Jersey resident, worked in New Jersey, and that the car was purchased and financed in New Jersey, there simply was no reason that any of the New York payments and phone calls were foreseeable to Senator Menendez. The government's "metro area" theory proves too much as it would essentially create universal venue for the Southern District of New York for any financial crime in the tri-state area. Venue is district-specific, not regional.

**_The Daibes Bribery Substantive Charges (Count 11, 13, 14):_** In summation, the government argued that venue was satisfied for these counts by evidence that, in March or April 2022, Vasken Khorozian sold gold in Manhattan and that, in October 2021, John Pilot drove Senator Menendez and Nadine home from JFK airport through Manhattan and the Bronx. Tr. 6521, 6525–26. Not only was there no evidence that those gold bar sales by Nadine were known or foreseeable to Senator Menendez, Mr. Khorozian acknowledged that he never spoke to Senator Menendez about any gold sales whatsoever. Tr. 5136, 5141, 5147. In any event, Nadine's gold sales occurred in New Jersey, and there was no evidence that Senator Menendez was aware or could foresee that Mr. Khorozian would then travel to New York to resell Nadine's gold. In any event, the gold sales in New York cannot sustain venue here because those sales were not part of the essential elements of the charged substantive offenses. For example, even accepting the government's theory, the charged extortion was of **_gold bars_** from Daibes. Once Nadine obtained the gold bars with the requisite intent, the alleged crime was completed, and

31

monetizing those bars into cash was not part of the extortionate scheme. *See United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982) (defendant's economic object in the conspiracy "was not the resale of the property, but its purchase at a bargain price," and thus a subsequent resale would not have qualified as an overt act).

Nor is there any evidence that any essential conduct constituting the Daibes bribery charges occurred while John Pilot gave Senator Menendez a ride from JFK airport to New Jersey.  While the government suggested as much based on sheer speculation, there is no actual evidence (direct or circumstantial) upon which a reasonable jury could conclude that the essential conduct underlying the charged acts of bribery, honest services fraud, and extortion occurred during that ride, let alone that it occurred during the portion of the ride that occurred in the Southern District of New York (versus the Eastern District of New York or District of New Jersey). Driving through a district *en route* to commit a crime may satisfy venue, but a random car ride without any linkage to the substantive offense certainly cannot.

**The Bribery Conspiracy Charges (Counts 1–3):**  The government argued in summation that venue for these conspiracy counts is based on the venue for the substantive bribery counts. Tr. 6528 ("The acts that give venue for the substantive counts are enough for venue on the conspiracy counts, too. So that's all you need."); *see also* Tr. 6529–31.  But, as shown above, none of those acts suffice for venue for the substantive counts, and thus they fail to prove venue for the conspiracy counts as well.

The Indictment did charge additional overt acts that were not discussed in the government's summation.  Indict. ¶ 78.  But none of these additional overt acts could possibly sustain venue.  For example, the Indictment references a text message that Nadine sent to Uribe on September 5, 2019, regarding scheduling a meeting between Uribe, Senator Menendez, and

Nadine, "which text message was transmitted through a celltower in Manhattan."  Indict. ¶ 78(d).
But the government's own expert confirmed that upon examining the totality of the records,
Nadine was "[m]ost likely in New Jersey" around the time the message was sent.  Tr. 5436,
5464.  And the government did not present any evidence to show that the recipient of the text,
Uribe, was in New York either.  Moreover, while a scheme-furthering telephone call may
establish venue in a district where the caller is not physically present, *see United States v.
Rommy*, 506 F.3d 108, 122 (2d Cir. 2007), the mere pinging of an electronic signal over the
Hudson River off a celltower in the Southern District of New York while on its way to its
recipient in New Jersey clearly does not suffice to establish venue.  *See id*. ("[T]he overt act may
properly be understood to have occurred at the site *where the listener receives the conspirator's
message*.").  In any event, there was no evidence that this text message pinging off a celltower in
New York was somehow reasonably foreseeable to Senator Menendez, particularly given that
Uribe resided in New Jersey.

The Indictment also references a September 21, 2019, dinner meeting between
Menendez, Hana, Daibes, and Ahmed Helmy (referred to as "Egyptian Official-3") at the Palace
Hotel restaurant in Manhattan.  Indict. ¶ 78(e).  Yet the government introduced no evidence
(direct or circumstantial) upon which a reasonable jury could conclude that the meeting was in
furtherance of the alleged conspiracy.  Instead, the government presented evidence suggesting
that Helmy was involved in discussions regarding real estate and other investments in the United
States, including potentially with the involvement of Fred Daibes. Tr. 1529–30.  But Egyptian
investments in the United States was never part of any charged bribery scheme, and it's unclear
what, if anything, the government even claims Senator Menendez did in connection with such a
bribery scheme.  Indeed, there is not even an allegation in the Indictment regarding a corrupt

Egyptian investment with Daibes.  To the extent the government contends that Senator

Menendez introduced Daibes to Helmy for this purpose, that is clearly lawful activity under

*McDonnell*.  Nothing about the meeting at the Palace Hotel thus constitutes an overt act in

furtherance of the charged scheme.

      ***The Foreign Agent Charges (Counts 15 and 16):*** In summation, the government again

argued that venue was satisfied regarding these counts based on the venue allegations for the

substantive and conspiracy bribery counts.  Tr. 6541 ("And venue for the foreign agent charge

includes any act in furtherance of the agency relationship.  So the meal at Mr. Chow to plan the

meeting with General Shawky, Hana's WhatsApp messages from there, the gold sales in

Manhattan, all of it."); Tr. 6543 ("Venue again, includes everything from the substantive crime

we just talked about for the first count, so you know its satisfied here.").  As shown above, none

of those acts suffice for venue for the substantive bribery counts, and thus they fail to prove

venue for the foreign agent counts as well.

      ***The Daibes Prosecution Obstruction of Justice Charge (Count 4):*** In summation, the

government argued that venue was satisfied regarding Count 4 because the venue for this

conspiracy count is based on the venue for the substantive bribery counts articulated in Counts

11, 13 and 14. Tr. 6551 ("[J]ust like with the bribery offense, the sales of gold in New York,

Khorozian's call into New York to sell the gold, Daibes getting John Pilot to give [Senator]

Menendez and Nadine a free ride from JFK through Manhattan and the Bronx, all grounds for

venue.").  But, as shown above, none of those acts suffice for venue for the substantive counts,

and thus they fail to prove venue for the conspiracy counts as well.  Furthermore, there is no

actual evidence upon which a reasonable jury could conclude that the gold sales in New York

were an essential element of the charged offense or reasonably foreseeable to Senator Menendez.

Likewise, the government failed to provide evidence upon which a reasonable jury could conclude that any essential conduct underlying the charged acts occurred during the ride from JFK, let alone in the Southern District of New York.

## IV. THE EVIDENCE WAS INSUFFICIENT TO CONVICT ON THE FOREIGN AGENT COUNTS, WHICH ARE UNCONSTITUTIONAL AS APPLIED TO SENATOR MENENDEZ (COUNTS 15–16)

The foreign agent charges are unprecedented. We have been unable to identify—and the government has not cited—a single prosecution of any public official for violating this statute since its adoption in 1966. One would expect such extraordinary charges to be supported by extraordinary evidence. Not so. After approximately 10-weeks of trial, the government could point to nothing but supposition and speculation in summation.

Certainly, Senator Menendez engaged in "political activities," "publicity services," or certain other acts defined in 22 U.S.C. § 611(c)(1)(i). That is unsurprising. It is also legally insufficient to support a FARA conviction. If it were otherwise, FARA would effectively criminalize congressional service. Instead, a FARA conviction requires *evidence* that Senator Menendez took certain actions "at the order, request, or under the direction or control, of a foreign principal." 22 U.S.C. § 611(c)(1)(ii). The government offered no such evidence at trial.

Indeed, the government offered no evidence that Senator Menendez was aware of any connection between Hana and Egypt, apart from Hana's contractual relationship as an approved certifier of halal meat exports to Egypt. The fact that Hana had connections with the Egyptian government thus was unsurprising to Senator Menendez, particularly since Hana was not a registered agent or lobbyist for Egypt. In any event, it is undisputed that neither Hana nor Nadine can be foreign principals under the relevant statute. *See* 22 U.S.C. § 611 ("foreign principal" cannot include a person that is a citizen and domiciled within the United States).

Thus, any action that Menendez agreed to take at the request of either Nadine or Hana would be insufficient as a matter of law to prove a violation of 18 U.S.C § 219.

As to each of the actions the government alleges Senator Menendez took on behalf of Egypt, the government fell far short of showing both that the action was commanded by a foreign principal (the Government of Egypt) and that Senator Menendez had knowledge of the foreign principal's directions and control.  For example:

- There is no evidence in the record that Senator Menendez was directed by a foreign principal to send Nadine public information regarding the number of staff at the U.S. Embassy in Cairo or that Senator Menendez knew the information was intended for Egypt.  The evidence at most might suggest that Nadine or Hana made a request for such information, but neither of them can be a foreign principal under the statute.

- As to the letter Menendez edited (GX B102, B102-A, A403), the evidence showed that the request for assistance came from Nadine and that she was trying "to prove a point to the General" in order for Nadine and Will's "clearance for a project."  Nothing about the request shows that anyone in the Egyptian government requested that Senator Menendez edit the letter, or even that the Egyptian government received a copy of the letter edited by Senator Menendez.

- Likewise, there's no evidence admitted at trial that shows that Egypt directed Senator Menendez to call Secretary McKinney regarding IS EG.

- As to the approval of the $99 million sale of ammunition to Egypt, which the State Department asked Senator Menendez to approve (GX 8A-2), the only record evidence is that Senator Menendez asked Nadine to convey the approval to Hana

(GX A101-14).  There is nothing but speculation on which the government could contend that Senator Menendez approved the sale of ammunition at Egypt's direction and control.

Simply put, there is no *factual* basis on which a jury could reasonably conclude that Senator Menendez was aware that he was acting (or did act) at the "order, request, or under the direction or control, of a foreign principal."  22 U.S.C. § 611(c)(1)(ii).  The government's suggestion otherwise during summation (Tr. 6537–41) is pure speculation.

In addition, Senator Menendez renews his as-applied challenge to the constitutionality of 18 U.S.C. § 219 based on the Speech or Debate clause.  Given the breadth of the definition of "agent" under the FARA statute—which includes anyone who (i) engages in "political activities," "publicity" services, or certain other acts, (ii) "at the order, request, or under the direction or control, of a foreign principal," 22 U.S.C. § 611(c)(1)—the government's prosecution under § 219 necessarily required the jury to evaluate legislative acts and motives. Trial only confirmed as much.  Indeed, critical to the charge was the question of whether a foreign hand was at play when Senator Menendez approved the $99 million military aid package to Egypt.  Thus, unlike the bribery counts, which proscribe corrupt *agreements* by public officials, Section 219 targets *actions*, including those that are immunized as Speech or Debate. *See Brewster*, 408 U.S. at 509 (the Speech or Debate clause's core purpose is to "protect[] Members from inquiry into legislative acts or the motivation for actual performance of legislative acts").  The motives for those actions, whether they are noble or "unworthy," are simply beside the point and cannot be prosecuted.  *McSurely*, 553 F.2d at 1295; *see also Myers*, 635 F.2d at 937.  The separation of powers does not permit prosecutors and judges to superintend

37

the basic work of the legislative branch; because extending FARA to sitting members of Congress does just that, as made plain by this trial, it is unconstitutional.

## V.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT SENATOR MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS (COUNTS 4, 17–18)

The government's most obvious failure of proof is the vanishingly thin quantum of evidence presented in support of the obstruction of justice charges against Senator Menendez. Count Four charged him with obstruction in connection with the prosecution of Daibes in the District of New Jersey, while Counts 17 and 18 charged him with obstruction in connection with an attorney proffer made by Senator Menendez's former counsel to the U.S. Attorney's office for the Southern District of New York and certain checks that Senator Menendez wrote to Nadine, which were produced by Nadine's former counsel.  The government utterly failed to adduce sufficient evidence of any of the elements of obstruction of justice, including but not limited to any evidence that Senator Menendez had a corrupt intent to obstruct a judicial or grand jury proceeding.

With respect to Counts 17 and 18, the evidence admitted at trial consisted of the following: (i) grand jury subpoenas proffered to show the existence of a grand jury investigation; (ii) a heavily redacted 4-page excerpt from a 44-page PowerPoint accompanying a presentation by Menendez's former counsel in September 2023 to prosecutors days before the government charged Senator Menendez (GX 4A-3); (iii) testimony from a paralegal at the U.S. Attorney's Office, Geoffrey Mearns, regarding unidentified statements made by Menendez's former counsel to the prosecutors while presenting the PowerPoint; and (iv) two checks purportedly signed by Senator Menendez—one that states "To liquidate loan" in the memo line and a second that states "for car payment" in the memo line—that were produced to the government by *Nadine's* former

counsel, not Senator Menendez.  *See* Tr. 6543–49 (government summation describing the evidence supporting these obstruction charges).

This paltry showing included zero documents and no testimony at all from which the jury could infer that: (i) Senator Menendez had reviewed the allegedly false statements in the Powerpoint presentation; (ii) Senator Menendez authorized the PowerPoint to be shown to prosecutors, let alone any oral statements by his former counsel to prosecutors during the meeting; (iii) any allegedly false statements in the presentation were based on information provided by Senator Menendez, as opposed to his lawyer's inference, investigation, or misapprehension; or (iv) Senator Menendez's former counsel made statements to the prosecutors consistent with the allegedly false information on the PowerPoint presentation.  Indeed, the fact that the PowerPoint presentation was delivered on behalf of Senator Menendez by his lawyers ignores the common-sense reality that lawyers gather information from many sources— documents, emails, witnesses, etc.—and the lawyers decide what to convey to prosecutors. There is no rule or requirement that a client sign off on each of these statements before they are made to the prosecutors.

More fundamentally, on top of the lack of evidence of any involvement by Senator Menendez in the lawyers' presentation, there was not one iota of evidence that Senator Menendez believed that any statement made to the prosecutors would be repeated to the grand jury.[6]  Indeed, no FBI agent or other witness testifying before the grand jury was present during Menendez's counsel's presentation to a room full of prosecutors.  *See* Tr. 4277–79.  Under

---

[6] At the government's request, the Court sustained objections to any questions about whether Senator Menendez's former counsel had asked that his presentation to the prosecutors be conveyed to the grand jury.  Tr. 4286-–303.  Having deprived the defense of the ability to show that there was no intention to convey information to the grand jury, the government cannot now contend that there was sufficient evidence to reasonably infer Senator Menendez's intent.

binding law, the evidence adduced by the government to support Counts 17 and 18 was simply insufficient to sustain the obstruction charges.

More specifically, the law in this Circuit is clear: even evidence that a defendant **both** knew of a pending grand jury investigation and personally made false statements to federal investigators on subjects pertinent to that investigation is insufficient to sustain an obstruction charge. *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002) (*citing United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("At best, the government proved that [defendant], knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation. The government has therefore **failed** to offer sufficient evidence of [defendant's] intent to obstruct") (emphasis added); *see also United States v. Schulte*, No. 17-CR-548 (JMF), 2023 WL 5561141, at *7 (S.D.N.Y. Aug. 29, 2023) (an obstruction conviction "cannot stand" when based only upon evidence that defendant, "knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation"). Something more is required—such as evidence that the defendant produced false documents directly in response to a grand jury subpoena, or was specifically informed that his false statements would be repeated to a grand jury. Absent such evidence, the government cannot satisfy its obligation to prove, beyond a reasonable doubt, that Senator Menendez had an intent to obstruct a federal grand jury proceeding. *Schwarz*, 283 F.3d at 109.

The government adduced no evidence of Senator Menendez's knowledge that any false statements would be made to prosecutors, or that any such allegedly false statements would be repeated to a grand jury. (And, indeed, there's no evidence that any of counsel's statements or presentation were provided to the grand jury). Nor was there any evidence that Menendez

produced false documents in response to a grand jury subpoena. Indeed, with respect to the

checks from Senator Menendez to his wife that the government claims contains false memo

lines, there is no evidence that Senator Menendez was involved in *any way* in providing these

checks to the government. As the government admits, these checks were produced by *Nadine's*

former counsel. *See* Tr. 6544:14–16 ("Look at these checks . . . These were produced pursuant

to a grand jury subpoena to Nadine"). Nor is there any evidence from which a reasonable jury

could conclude that Senator Menendez was aware that the memo lines on his checks were false

at the time that he wrote them. Particularly given that Uribe acknowledged that he never

discussed any car payments with Senator Menendez, and that he only discussed a supposed

obstruction scheme with Nadine (not the Senator), there was no evidence showing Senator

Menendez's knowledge of any false statements.

The evidence to support the obstruction charge in Count Four was similarly legally

deficient. The government's theory appears to be that Menendez used his power to recommend

the U.S. Attorney in order to appoint his friend Philip Sellinger, who Menendez thought he could

influence in connection with Daibes' case, and Menendez also attempted to have Sellinger weigh

in on Daibes' case. Tr. 6550–51. None of this conduct, even if true, can constitute an

obstruction of justice.

Even assuming that Sellinger was recommended because Senator Menendez thought he

might be favorably disposed to Daibes, that is not an obstruction of justice: it is the fulfillment of

a Senator's constitutionally protected advice and consent role. The following hypothetical

illustrates the point: say a Senator believed that marijuana offenses were over-prosecuted by the

prior U.S. Attorney, and he wanted to recommend a U.S. Attorney who would limit

imprisonment for such offenses. Under these circumstances, asking a potential U.S. Attorney

candidate whether he would recommend against imprisonment in marijuana cases, including in pending cases, would not be an obstruction of justice. It would merely be the Senator pursuing his policy preferences, even if his goal is to influence pending cases. That is, the nomination would not involve any *obstructive action*, regardless of the Senator's motives—*i.e.*, whether he did it also to benefit a friend's medical marijuana business, or did so with the expectation of donations from the marijuana lobby. The allegation of bribes to advance that policy preference does not turn an unobstructive act into an obstructive one, even if it may support a bribery charge.

The omnibus provision of Section 1503 is more limited than the government contends here. Not every effort to influence a prosecution is covered by its ambit. Indeed, Section 1503 does not cover attempts to inquire into the status of a judicial proceeding, nor requests to a prosecutor that a particular proceeding be afforded special attention or scrutiny. *See United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir. 2006). Rather, Section 1503 only applies to conduct having the "natural and probable effect of interfering with a judicial or grand jury proceeding." *Id.* Some examples include attempts to introduce false evidence at trial (*United States v. Desposito*, 704 F.3d 221, 231 (2d Cir. 2013)), destroying documents subject to subpoena (*United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 169 (2d Cir. 2008)) and providing information from grand jury proceedings to targets of an investigation (*U.S. v Giovanelli*, 464 F.3d 346, 350-51 (2d Cir. 2006)). There is no basis at all to support the conclusion that asking a prosecutor to exercise his lawful discretion in a particular way interferes with any proceeding—likewise, lobbying a legislator to vote in a particular way does not somehow "interfere" with the conduct of the vote.

Instead, evidence that Senator Menendez attempted to corruptly interfere with, obstruct, or impede the Daibes prosecution is non-existent. The uniform witness testimony was that Senator Menendez merely asked Sellinger (before he became U.S. Attorney) whether he would look into the Daibes case, because Senator Menendez thought Daibes was being treated "unfairly," and also that Senator Menendez asked Michael Soliman to ask Sellinger after he became U.S. Attorney to give Daibes "all due process." Tr. 3611–12, 3947–48, 4048. Sellinger confirmed that these requests were not inappropriate, did not consist of an effort to interfere with the Daibes prosecution, and were consistent with Sellinger's duties as the U.S. Attorney. Tr. 3795–96, 3804–05. Michael Soliman similarly agreed that Senator Menendez never attempted to interfere with the Daibes case. Tr. 4050–51. Indeed, the uniform testimony was that Senator Menendez never requested that Sellinger weigh in to obtain a particular outcome for Daibes or give him any preferential treatment. Tr. 3795–96, 4049–51. This conduct "falls on the other side of the statutory line from that of one who delivers false documents or testimony to the grand jury itself" and thus "cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Aguilar*, 515 U.S. at 601. Indeed, as the Supreme Court made clear in the middle of this trial, the obstruction statutes must be interpreted narrowly to limit prosecutors' ability to charge obstruction for "prosaic conduct, exposing activists and lobbyists alike to decades in prison." *Fischer v. United States*, 144 S. Ct. 2176, 2189, 603 U. S. ____ (2024). The Supreme Court emphasized that the obstruction statutes must not be expanded to permit prosecution for "any lobbying activity that 'influences' an official proceeding and is undertaken 'corruptly.'" *Id.* But that is precisely what the government is doing here: charging a Senator with obstruction on the theory that his alleged efforts to lobby U.S. Attorney Sellinger and First Assistant Khanna to use their discretion to provide a more favorable disposition in the

Daibes case. As a matter of law, Senator Menendez's actions with respect to the Daibes case cannot constitute an effort to obstruct the criminal proceeding.

In short, the government has not come close to satisfying its burden with respect to any of the obstruction counts. It has not offered any evidence sufficient to prove that Senator Menendez authorized and intended false statements to be communicated to the grand jury, that he intended to present any other false documents or evidence to the grand jury, or that he intended or attempted to interfere with Daibes' prosecution in New Jersey. Accordingly, his obstruction convictions must be vacated.

## VI.    SENATOR MENENDEZ INCORPORATES THE ARGUMENTS RAISED IN CO-DEFENDANTS' RULE 29 & 33 MOTIONS

Senator Menendez incorporates in full the arguments raised in co-defendants Wael Hana's and Fred Daibes' respective memoranda of law in support of their motions under Federal Rules of Criminal Procedure 29 and 33.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant defendant Robert Menendez's motion pursuant to Federal Rules of Criminal Procedure 29(c) and/or 33.

Dated: August 19, 2024                         Respectfully submitted,


Yaakov M. Roth (*pro hac vice*)        By: */s/  Adam Fee*
JONES DAY                                  Adam Fee
51 Louisiana Avenue N.W.                    PAUL HASTINGS LLP
Washington, D.C. 20001                      1999 Avenue of the Stars
Telephone: (202) 879-3939                   Los Angeles, CA 90067
Facsimile: (202) 626-1700                   Telephone: 1(310) 620-5719
                                            Facsimile: 1(310) 620-5819

                                            Avi Weitzman
                                            PAUL HASTINGS LLP
                                            200 Park Avenue
                                            New York, NY 10166
                                            Telephone: 1(212) 318-6000
                                            Facsimile: 1(212) 725-3620

        *Attorneys for Defendant Robert Menendez*