**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| ROBERT MENENDEZ, *et al.*, |
| Defendants. |

Criminal Action No. 23-490 (SHS)

*Document Electronically Filed*

---

**REPLY BRIEF IN FURTHER SUPPORT OF**
**DEFENDANT WAEL HANA'S OMNIBUS POST-TRIAL MOTIONS**

---

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ............................................................................................................. 2

I.     THE GOVERNMENT IMPROPERLY USED SUMMARY CHARTS AND
RELATED WITNESS TESTIMONY TO PROVE ITS CASE. ........................ 2

     A.     Mr. Hana's Request For A New Trial Is Appropriate Under Rule 33. ................. 2

     B.     The Government's Summary Evidence, Which Was Improperly Admitted
Under Rule 1006, Was Used In A Manner That Allowed The Jury To
Impermissibly Pile Inference Upon Inference To Prove Mr. Hana's Guilt. ........... 4

     C.     Mr. Hana Was Deprived Of The Ability To Adequately Cross-Examine
The Summary Witnesses On Their Testimony. ...................................................... 9

     D.     Mr. Hana Was Significantly Harmed By The Manner In Which The
Government Presented Its Case. .......................................................................... 12

II.     NO REASONABLE JURY COULD FIND THAT SENATOR MENENDEZ
UNDERTOOK OR PROMISED TO UNDERTAKE AN "OFFICIAL ACT" OR
ENGAGED IN A QUID PRO QUO SCHEME UNDER EITHER FEDERAL
BRIBERY OR FRAUD LAW. ........................................................................ 14

     A.     Legal Standard ..................................................................................................... 14

     B.     Actions to Benefit Egypt and Mr. Hana.............................................................. 15

          1.     Military Sales ............................................................................................. 15

          2.     Outreach to USDA..................................................................................... 18

          3.     Quid Pro Quo ............................................................................................. 23

     C.     Actions to Disrupt State Criminal Matters............................................................ 32

          1.     Contacting Attorney General Grewal ....................................................... 32

          2.     Quid Pro Quo ............................................................................................. 34

III.     THE GOVERNMENT'S OPPOSITION FAILS TO ADDRESS THE
INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR COUNT 15:
CONSPIRACY TO HAVE SENATOR MENENDEZ ACT AS AN AGENT OF
A FOREIGN PRINCIPAL. .............................................................................. 40

IV.     MR. HANA WAS ENTITLED TO A SPECIAL VERDICT FORM. ............... 48

V.     THE GOVERNMENT MISCONSTRUES FEDERAL RULE OF EVIDENCE
404(B). ........................................................................................................... 49

VI.     THE GOVERNMENT FAILS TO REBUT THE PRESUMPTION THAT
COUNTS 1 AND 15 ARE MULTIPLICITOUS........................................... 52

CONCLUSION...................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Att'y Gen. of United States v. Irish N. Aid Comm.*,
530 F. Supp. 241 (S.D.N.Y. 1981) .......................................................................44

*California v. Green*,
399 U.S. 149 (1970)..........................................................................................11

*Fagiola v. Nat'l Gypsum Co. ACS., Inc.*,
906 F.2d 53 (2d Cir. 1990)...................................................................................2

*Gordon v. United States*,
438 F.2d 858 (5th Cir. 1971) ................................................................................5

*Langston v. Smith*,
630 F.3d 310 (2d Cir. 2011)..................................................................................8

*McDonnell v. United States*,
579 U.S. 550 (2016)................................................................................. *passim*

*Phillips v. Bowen*,
278 F.3d 103 (2d Cir. 2002)..................................................................................3

*Rosemond v. United States*,
572 U.S. 65 (2014)..............................................................................................37

*Smith v. Lightning Bolt Prods., Inc.*,
861 F.2d 363 (2d Cir. 1988)..................................................................................4

*Thompson v. Spota*,
14-cv-02473, 2022 WL 17253464 (E.D.N.Y. Nov. 28, 2022) .................................5

*United State v. Marlinga*,
457 F. Supp. 2d 769 (E.D. Mich. 2006)................................................................50

*United States v. Alfisi*,
308 F.3d 144 (2d Cir. 2002)...........................................................................35, 36

*United States v. Araujo*,
17-cr-438, 2018 WL 3222527 (S.D.N.Y. July 2, 2018) ........................................54

*United States v. Arguedas*,
20-cr-135, 2021 WL 5567749 (S.D.N.Y. Nov. 29, 2021)......................................49

*United States v. Arras*,
373 F.3d 1071 (10th Cir. 2004) ...................................................................7

*United States v. Badalamenti*,
663 F. Supp. 1542 (S.D.N.Y. 1987)............................................................48

*United States v. Bell*,
584 F.3d 478 (2d Cir. 2009)...................................................................3, 48

*United States v. Birdsall*,
233 U.S. 223 (1914)......................................................................................22

*United States v. Blackwood*,
366 F. App'x 207 (2d Cir. 2010) ...........................................................2, 5

*United States v. Boyland*,
862 F.3d 279 (2d Cir. 2017)...............................................................21, 33

*United States v. Bray*,
139 F.3d 1104 (6th Cir. 1998) ..................................................................7

*United States v. Bruno*,
661 F.3d 733 (2d Cir. 2011)....................................................................30

*United States v. Calk*,
2022 WL 101908 (S.D.N.Y. Jan. 11, 2022) ...................................24, 39

*United States v. Cedeno*,
644 F.3d 79 (2d Cir. 2011)........................................................................12

*United States v. Conlin*,
551 F.2d 534 (2d Cir. 1977)..............................................................2, 5, 6

*United States v. Conrad*,
760 F. App'x 199 (4th Cir. 2019) ............................................................21

*United States v. Drougas*,
748 F.2d 8 (1st Cir. 1984)...........................................................................6

*United States v. Ellison*,
557 F.2d 128 (7th Cir. 1977) .............................................................11, 12

*United States v. Estrada*,
320 F.3d 173 (2d Cir. 2003)......................................................................54

*United States v. Fattah*,
914 F.3d 112 (3d Cir. 2019)...............................................................22, 33

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001)........................................................................4

*United States v. Ganim*,
    510 F.3d 134 (2d Cir. 2007)......................................................................36

*United States v. Gaskin*,
    364 F.3d 438 (2d Cir. 2004)......................................................................52

*United States v. Ghavami*,
    10-cr-1217, 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ......................56

*United States v. Graziano*,
    616 F. Supp. 2d 350 (E.D.N.Y. 2008) .......................................................6

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)......................................................................49

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004)........................................................................6

*United States v. Halloran*,
    664 F. App'x 23 (2d Cir. 2016) ................................................................21

*United States v. Hernandez*,
    09-cr-625, 2009 WL 3169226 (S.D.N.Y. Oct. 1, 2009) ..........................53

*United States v. Hills*,
    27 F.4th 1155 (6th Cir. 2022) .............................................................30, 31

*United States v. Hoskins*,
    902 F.3d 69 (2d Cir. 2018)........................................................................40

*United States v. Jefferson*,
    289 F. Supp. 3d 717 (E.D. Va. 2017) ........................................15, 22, 33

*United States v. Jones*,
    291 F. Supp. 2d 78 (D. Conn. 2003)...........................................................9

*United States v. Josephberg*,
    459 F.3d 350 (2d Cir. 2006)......................................................................55

*United States v. Kimbrew*,
    944 F.3d 810 (9th Cir. 2019) ....................................................................19

*United States v. Lambert*,
    580 F.2d 740 (5th Cir. 1978) ....................................................................11

*United States v. Landesman*,
   17 F.4th 298 (2d Cir. 2021) ...................................................17, 40

*United States v. Lemire*,
   720 F.2d 1327 (D.C. Cir. 1983) ..............................................6, 10

*United States v. Lopez*,
   356 F.3d 463 (2d Cir. 2004)...................................................52, 53

*United States v. Macchia*,
   35 F.3d 662 (2d Cir. 1994).........................................................53

*United States v. Malkus*,
   696 F. App'x 251 (9th Cir. 2017) ...............................................21

*United States v. Marrero*,
   904 F.2d 251 (5th Cir. 1990) .....................................................51

*United States v. Martinez*,
   921 F.3d 452 (5th Cir. 2019) .......................................................9

*United States v. Maslin*,
   356 F.3d 191 (2d Cir. 2004)........................................................52

*United States v. Maxwell*,
   20-cr-330, 2022 WL 1294433 (S.D.N.Y. Apr. 29, 2022)................53, 54

*United States v. McMahan*,
   394 F. App'x 453 (10th Cir. 2020) .............................................51

*United States v. Mohamed*,
   18-cr-00603, 2020 WL 4932227 (E.D.N.Y. Aug. 24, 2020)................37

*United States v. Mohel*,
   604 F.2d 748 (2d Cir. 1979).........................................................6

*United States v. Mustafa*,
   753 F. App'x 22 (2d Cir. 2018) ..................................................35

*United States v. Napout*,
   332 F. Supp. 3d 533 (E.D.N.Y. 2018) ....................................35, 36

*United States v. Nektalov*,
   2004 WL 1637010 (S.D.N.Y. July 21, 2004) ..............................51

*United States v. Neumann*,
   21-cr-439, 2023 WL 8700974 (S.D.N.Y. Dec. 14, 2023).....................2

*United States v. Ogando*,
968 F.2d 146 (2d Cir. 1992)..................................................................48

*United States v. Pauling*,
924 F.3d 329 (S.D.N.Y. 2017)...............................................................40

*United States v. Polouizzi*,
564 F.3d 142 (2d Cir. 2009)....................................................................3

*United States v. Quality Formulation Labs, Inc.*,
512 F. App'x 237 (3d Cir. 2013) ...........................................................52

*United States v. Reichberg*,
5 F.4th 233 (2d Cir. 2021) ...............................................21, 24, 25, 39

*United States v. Repak*,
852 F.3d 230 (3d Cir. 2017)...................................................................20

*United States v. Rinaldi*,
301 F.2d 576 (2d Cir. 1962).....................................................................3

*United States v. Rosenblatt*,
554 F.2d 36 (2d Cir. 1977)......................................................................37

*United States v. Sanchez*,
969 F.2d 1409 (2d Cir. 1992)............................................................3, 4, 5

*United States v. Sattar*,
314 F. Supp. 2d 279 (S.D.N.Y. 2004).....................................................55

*United States v. Silver*,
864 F.3d 102 (2d Cir. 2017)............................................................22, 34

*United States v. Silver*,
948 F.3d 538 (2d Cir. 2020)...................................................... *passim*

*United States v. Skelos*,
707 F. App'x 733 (2d Cir. 2017) ....................................21, 33, 54

*United States v. Skelos*,
988 F.3d 645 (2d Cir. 2021)............................................................23, 54

*United States v. Spalding*,
894 F.3d 173 (5th Cir. 2018) ...................................................................7

*United States v. Stadtmauer*,
620 F.3d 238 (3d Cir. 2010)....................................................................11

*United States v. Stavroulakis*,
    952 F.2d 686 (2d Cir. 1992)......................................................................37

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006)......................................................................49

*United States v. Suhl*,
    885 F.3d 1106 (8th Cir. 2018) ..................................................................21

*United States v. Waguespack*,
    935 F.3d 322 (5th Cir. 2019) ......................................................................9

*United States v. White*,
    737 F.3d 1121 (7th Cir. 2013) ..................................................................51

*United States v. Wilson*,
    879 F.3d 795 (7th Cir. 2018) ......................................................................9

*United States v. Zodhiates*,
    235 F. Supp. 3d 439 (W.D.N.Y. 2017) ....................................................51

*UPS Store, Inc. v. Hagan*,
    14-cv-1210, 2017 WL 3309721 (S.D.N.Y. Aug. 2, 2017) ....................2, 5

*Upstate Jobs Party v. Kosinski*,
    106 F.4th 232 (2d Cir. 2024) ...............................................................16, 31

*Valdez v. United States*,
    475 F.3d 1319 (D.C. Cir. 2008) (en banc) ................................................20

**Statutes**

18 U.S.C. § 201.................................................................................13, 19, 53

18 U.S.C. § 219.................................................................................40, 43, 53

18 U.S.C. § 371.........................................................................................54

18 U.S.C. § 1343.......................................................................................13

18 U.S.C. § 1349.......................................................................................54

18 U.S.C. § 1951.......................................................................................54

22 U.S.C. § 611 ........................................................................................40

**Rules**

Federal Rule of Criminal Procedure 29 .......................................... *passim*

Federal Rule of Criminal Procedure 33 ................................................................. *passim*

Federal Rule of Evidence 611 ................................................................................10

Federal Rule of Evidence 403 ..................................................................................6

Federal Rule of Evidence 404 ....................................................................49, 50, 51

Federal Rule of Evidence 405 ..........................................................................50, 51

Federal Rule of Evidence 1006 .......................................................................... *passim*

**Regulations**

28 C.F.R. § 5.100(b) .............................................................................................41

<u>**PRELIMINARY STATEMENT**</u>

Defendant Wael Hana respectfully submits this Reply Brief in further support of his motions for post-trial relief under Federal Rules of Criminal Procedure 29 and 33. Mr. Hana's moving brief, ECF No. 600 ("Hana Br."), detailed the lack of specific evidence supporting each count of the Superseding Indictment and the legal, including constitutional, concerns with the way in which evidence was presented in this case. That presentation amounted to an abuse of the summary exhibit rule but, more profoundly, expressly invited the jury to rely upon inappropriate speculation and the layering of inference upon inference to reach unwarranted and unfair conclusions and ultimately, an unjust guilty verdict. Mr. Hana's motions raised significant legal issues and important concerns about the result of this case and the way in which it was tried, but the Government's response, ECF No. 611 ("Opp."), treats the arguments lightly, either failing to address large swaths of Mr. Hana's argument, or providing superficial analysis which often seems to miss the point. Most fundamentally, however, it never offers any kind of meaningful rejoinder to Mr. Hana's main point: that the evidence against him, based as it was on guesswork rather than evidence—and inference upon inference—instead of testimony or meaningful proof, was insufficient as a matter of law and does not and cannot support a verdict if ours is a system meant to be one that metes out criminal *justice*. For the reasons set forth previously, and for the reasons set forth below and in the oral argument in this matter which Mr. Hana has requested and very much hopes the Court allows, his post-trial motions should be granted and a judgment of acquittal entered or, at the very least, a new trial ordered.

<u>**ARGUMENT**</u>

I. **THE GOVERNMENT IMPROPERLY USED SUMMARY CHARTS AND RELATED WITNESS TESTIMONY TO PROVE ITS CASE.**

    A.     **Mr. Hana's Request For A New Trial Is Appropriate Under Rule 33.**

The law is clear: while Rule 1006 allows a party to "use a summary, chart, or calculation to prove the content of voluminous writings, records, or photographs that cannot be conveniently examined in court," Fed. R. Evid. 1006, that summary evidence must "fairly represent competent evidence already before the jury.'" *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (quoting *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977)). Likewise, summary witnesses can summarize the content of voluminous evidence, but cannot argue inferences or conclusions from this evidence. *See UPS Store, Inc. v. Hagan,* 14-cv-1210, 2017 WL 3309721, at *5 (S.D.N.Y. Aug. 2, 2017) ("[G]reat care must be taken to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative."); *United States v. Neumann*, 21-cr-439, 2023 WL 8700974, at *7 (S.D.N.Y. Dec. 14, 2023) ("A summary must of course be based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent evidence already before the Court." (quoting *Fagiola v. Nat'l Gypsum Co. ACS., Inc*., 906 F.2d 53, 57 (2d Cir. 1990)). Here, however, far from merely summarizing "voluminous" documents pursuant to Rule 1006, the Government's summary charts and presentation of those charts through Special Agents of the FBI who had no personal knowledge of the underlying facts, affirmatively invited the jury to draw impermissible conclusions and inferences that were unsupported by the actual evidence presented at trial. The error in allowing this type of "summary" evidence was significantly exacerbated by the Court's limitation on the cross-examination of the Special Agents by defense

counsel, and especially Mr. Hana's counsel with respect to the single most significant summary in the case against him, GX 1302.

Unable to justify its improper, and obviously prejudicial, use of summary charts and related witness testimony, the Government resorts to procedural arguments throughout its brief, including that a Rule 33 motion is not the proper vehicle for Mr. Hana to use, describing his motion as one that seeks to relitigate his previously rejected evidentiary claims. *See* Opp. at 105, 115, 120. Rather, the Government contends, the proper procedure for Mr. Hana to raise his evidentiary concerns is through a direct appeal. *Id.* But Rule 33 is not so limited, and it "'confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Polouizzi*, 564 F.3d 142, 159 (2d Cir. 2009) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)). Specifically, Rule 33(a) allows a defendant to argue that certain errors at trial demand a retrial. *See, e.g., United States v. Bell*, 584 F.3d 478, 486 (2d Cir. 2009) (noting that if "the introduction of inadmissible evidence . . . was so clearly prejudicial to the outcome of the trial that [the court is] convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" a new trial should be granted (quoting *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002)); *United States v. Rinaldi*, 301 F.2d 576 (2d Cir. 1962) (holding that the improper introduction of evidence, there of the defendant's past criminal record, is grounds for a new trial).

Contrary to the Government's claim, Mr. Hana is not merely relitigating claims under the guise of a Rule 33 motion; he is raising concerns about an erroneous evidentiary ruling that resulted in a tragically flawed verdict and a serious miscarriage of justice. As fully set forth in Mr. Hana's moving brief and explained further in brief detail below, the Court's decision to admit the Government's summary charts under Rule 1006, coupled with the limitations that the Court placed

on defense counsels' cross-examination of the Government's summary witnesses—which, as just one example, prohibited the defense from asking the summary agents not only about messages and other correspondence that the Government deliberately chose to omit from its summary charts despite their connection to the communications highlighted on direct-examination, but also to do precisely what the Government did when it highlighted certain entries—violated his fundamental right to a fair trial. And Rule 33 is the appropriate vehicle to remedy this injustice and assure that the jury's verdict is in accordance with the law before it goes to the Second Circuit. *See United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir. 2001) ( "[Rule 33] by its terms gives the trial court 'broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" (quoting *Sanchez*, 969 F.2d at 1413)); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988) (noting that if a court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice" it should grant a new trial). Indeed, given the very "real concern that an innocent person may have been convicted," the law provides that the Court should grant Mr. Hana's Rule 33 motion and order a new trial at which the Government will be have the opportunity to present its documentary evidence in an appropriate fashion. *Ferguson*, 246 F.3d at 134 (noting that if there is "a real concern that an innocent person may have been convicted" the court should exercise its discretion and grant a new trial under Rule 33).

## B. The Government's Summary Evidence, Which Was Improperly Admitted Under Rule 1006, Was Used In A Manner That Allowed The Jury To Impermissibly Pile Inference Upon Inference To Prove Mr. Hana's Guilt.

The Government alternatively argues that if the Court were to consider Mr. Hana's attempt to correct, through Rule 29 and Rule 33, the unfair process and inaccurate, unsupported verdict that resulted from the admission of this evidence (as it is obligated to do under Rule 29 and Rule 33), his arguments go to the charts' weight and not their admissibility. Opp. at 107-112. Claiming

that the summary charts "accurately reflected what they purport to reflect," the Government argues that "they served the salutary purpose of facilitating the efficient presentation of indisputably voluminous evidence" and were properly admitted under Rule 1006. *Id*. at 110-12. But the Government puts the cart before the horse. Before ever getting to the appropriate weight to afford a Government's summary chart—a task that the Government effectively avoided by presenting its charts through agents with no knowledge of the case, and successfully persuading the Court, through countless objections, to significantly constrain the scope of the Defendants' cross-examination, *see Sanchez*, 969 F.2d at 1413 ("In exercising the discretion so conferred [under Rule 33], the court is entitled to weigh the evidence and in so doing evaluate for itself the credibility of the witnesses.")—"the court must ascertain with certainty that [the summary charts] are based upon and fairly represent competent evidence already before the jury.'" *Blackwood*, 366 F. App'x at 212 (quoting *Conlin*, 551 F.2d at 538); *see also Thompson v. Spota*, 14-cv-02473, 2022 WL 17253464, at *12 (E.D.N.Y. Nov. 28, 2022) (holding that the party offering a summary under Rule 1006 "must . . . lay a proper foundation for admissibility of the underlying materials and show that the summary is accurate before the summary can be admitted"). Indeed, "a trial court is charged with grave responsibilities to make certain an accused is not unjustly convicted in a 'trial by charts.'" *Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971). Courts must therefore take great care "to ensure that the proposed summary contains no annotation or suggestion, even inferential, that may be considered argumentative." *UPS Store, Inc.*, 2017 WL 3309721, at *5.

Here, the Government's summary evidence should have never been admitted. As Mr. Hana has shown, and discussed again briefly below, the summary charts failed to fairly represent the content of the underlying exhibits, and the related summary agents' testimony presented an improperly skewed presentation of the prosecution's case, expressly based upon inference piled

upon inference, and all in a manner that unconstitutionally interfered with Mr. Hana's ability to thoroughly cross-examine the witnesses against him, resulting in an unjust trial.

First, there is really no question but that Rule 1006 does not authorize the admission of argumentative summary charts for the purpose of generating a narrative to fuel the prosecution's otherwise unsupported theory of the case. *See United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984) ("Care must be taken to insure that summaries accurately reflect the contents of the underlying document and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved."); *see also* Adv. Comm. Note to the 2024 amendment to Rule 1006 (stating that for a proposed Rule 1006 summary to be admissible it "must also pass the balancing test of Rule 403. For example, if the summary does not accurately reflect the underlying voluminous evidence, or if it is argumentative, its probative value may be substantially outweighed by the risk of unfair prejudice or confusion."). Nor does Rule 1006 allow the Government to use summary charts to present limited portions of conversations and thereby to seek the unreasonable assumptions and inferences upon which its case was based. *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (noting that "[a] summary witness for the Government" cannot tell the jury "what inferences to draw" from the evidence); *United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983) ("A summary chart should not draw controversial inferences or pronounced judgment); *see also Conlin*, 551 F.2d at 539 ("A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error."). Indeed, it is well-settled that a conviction cannot be obtained by "stack[ing] 'inference upon inference.'" *United States v. Graziano*, 616 F. Supp. 2d 350, 371 (E.D.N.Y. 2008); *see also United States v. Mohel*, 604 F.2d 748, 755 (2d Cir. 1979) ("[A] piling of indirect

inference upon indirect inference is improper."); *United States v. Arras,* 373 F.3d 1071, 1073 (10th Cir. 2004) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference."). But that, of course, is exactly what the Government did here: the summary charts were, at their essence, the piles of inferences that were the Government's case.

Partly, the Government did this by using the summary charts not as the accurate, non-prejudicial summary of the evidence for which the Rule was intended, but to display select, favorable communications, often depicted outside their appropriate context, that were (as the Government repeatedly argued whenever the issue was raised) "absolutely critical" to Government's case. *See* Hana Br. at 22-24 (setting forth examples). The Government also deployed these inaccurate charts in an argumentative manner by eliciting testimony from its summary agents that further emphasized and cherry-picked portions of lengthy text message and email chains, and attempted to create links between and among these, and other, various communications, in order to connect certain alleged *quids* to *quos*, in a way that substituted for real evidence of a *quid pro quo*. *See id.* at 25 (setting forth examples). Of course, that is exactly what Rule 1006, and the case law interpreting it are meant to guard against. *See United States v. Spalding*, 894 F.3d 173, 185 (5th Cir. 2018) ("[B]ecause summaries are elevated under Rule 1006 to the position of evidence," we have warned, "care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes."); *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998) ("[I]nformation on the [Rule 1006] summary [must not be] embellished by or annotated with the conclusions of or inferences drawn by the proponent."). To be clear, Mr. Hana is not raising "thinly-disguised factual

arguments . . . that a factfinder should have declined to draw certain inferences against the defendants," and "really arguments that the weight of the evidence is against the verdict." Opp. at 118-120. Rather, Mr. Hana is contending that the Government's mode of prosecution was fundamentally designed to, and did, demand that the jury make unreasonable inferences, even as it undercut the Defendants' right to challenge that evidence in a clear and palpable way, and thus never should have been permitted in the first place.

With regard to those inferences, as Mr. Hana argued at length and will not repeat here, *see* Hana Br. at 33-43, the inferences that the jury was asked to draw include: (1) that Mr. Hana gave Gazmend Lita and Nader Moussa envelopes of cash to give to Nadine Menendez ("Nadine") as part of some sort of bribe, despite the absence of any evidence connecting Mr. Hana to the envelopes in question; (2) that Mr. Hana purchased several one-ounce Asahi gold bars and then gave Nadine some of these bars in exchange for arranging a meeting between Senator Menendez and an Egyptian Official, and having Senator Menendez provide an article to the Egyptian government, despite the fact that Mr. Hana had no direct communications with the Egyptian Official and absolutely no connection with any relevant party prior to his purchase of the gold; and (3) that Mr. Hana paid Nadine's mortgage in exchange for a telephone call from Senator Menendez to Under Secretary McKinney to protect Mr. Hana's halal certification company, IS EG Halal, despite the fact that Senator Menendez did not even know about Nadine's delinquent mortgage until well after a month after his call to Under Secretary McKinney. And these are but a few examples of the kind of inferences that were inappropriate as a matter of law because they invited the jury to chain together speculative inference upon inference to reach a finding of guilt. *See Langston v. Smith*, 630 F.3d 310, 314 (2d Cir. 2011) ("[A] conviction based on speculation and surmise alone cannot stand, and courts cannot credit inferences within the realm of possibility

when those inferences are unreasonable."); *United States v. Martinez*, 921 F.3d 452, 466 (5th Cir. 2019) ("The verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference."); *United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018) ("In a case that hinges on circumstantial evidence, we must not permit a verdict based solely on the piling of inference upon inference."); *United States v. Waguespack*, 935 F.3d 322, 330 (5th Cir. 2019) (A court "will overturn a guilty verdict where the government has done nothing more than pile inference upon inference to prove guilt."); *United States v. Jones*, 291 F. Supp. 2d 78, 90 (D. Conn. 2003) (granting acquittal motion in part because the government put forth an "unreasonable" inference that was itself "piled on top" of another "factually unsupported inference"). Certainly, the lack of credible evidence to support the verdict warrants a judgment of acquittal, under Rule 29, as to the charges against Mr. Hana. *See* Hana Br. at 30, 43-44. But the admission of the summary charts, in inviting precisely this type of speculation and reliance by the jury on unreasonable and often misleading inferences also justifies, in the alternative, a new trial under Rule 33.

### C. Mr. Hana Was Deprived Of The Ability To Adequately Cross-Examine The Summary Witnesses On Their Testimony.

The Government claims that all Defendants, including Mr. Hana, had a fair opportunity to cross-examine the Government's summary witnesses on issues within the scope of their direct testimony. Opp. at 120-127. But that is simply untrue. The Court's rulings, which significantly curtailed the scope of permissible cross-examination, prohibited the defense from highlighting on cross-examination—in a manner that was identical to the process followed by the Government on direct—other exculpatory entries on the Government's charts, let alone material evidence that had been omitted from those exhibits. If the defense had been permitted to engage in this proper cross-examination, it would have allowed jurors to put the cherry-picked communications that the

Government emphasized during direct examination of its summary witnesses into their appropriate context, while the jury was still considering those exhibits, as opposed to weeks later when the defense was finally able to present its case.

Specifically, as the Court will recall, the Government called three different FBI agents to emphasize communications from its already selective summary charts, GX 1302, GX 1303, and GX 1304 (the first of which was most critical to Mr. Hana), in an attempt to show that Mr. Hana paid bribes to Senator Menendez. Each of the FBI summary agents testified that they reviewed the underlying government exhibits upon which their respective summary charts were based. Tr. 1173:4-6; 2316:10-22; 4113:5-20. Thus, it should have been well within the scope of the summary agent's testimony for the defense to ask, on cross-examination, about relevant messages missing from a string of communications that the agent admittedly reviewed and testified to, and it was further certainly within the scope of cross-examination to question the summary agents on the exact communications and documents that they testified to on direct.[1] *See* Fed. R. Evid. 611(b). Worse, the Court did not just disallow the evidence, but did so in a manner that unfairly chastised and impugned counsel for Mr. Hana in front of the jury, characterizing the defense's effort as "just restat[ing] what's on the chart," *see* Tr. 1728:20-1729:4 and noting that "[t]here is no point in just reading it," *see id.* 1739:15-24, although the Government had been permitted to do that, often

---

[1] The Government relies on *Lemire*, 720 F.2d at 1327, which it claims is "strikingly similar to here," for the proposition that appellate courts frequently affirm "limitations of cross-examination of a summary witness on matters outside the scope of the witness's testimony." Opp. at 123. But in *Lemire*, the court affirmed the district court's "refusal to allow cross-examination about [defendant's] cost of shipping" because "that question was outside the scope of the witness's direct testimony, which dealt only with cash flows, and would have required the witness to refer to statements not in evidence." 720 F.2d at 1349. Here, defense counsel sought to cross-examine the summary agents on the very same communications that they testified to on direct examination, in a manner that was exactly what the Government had just done.

suggesting precisely the inferences it was seeking for day after day. And while the Court ultimately acknowledged "criticiz[ing]" defense counsel, *see id.* 1873:17-1874:9, and, with respect to GX 1303 and GX 1304, afforded "some more leeway to the Defendants to, if they so choose, to highlight exculpatory information in the charts that the summary witness has been questioned about," *id.* 2312:12-15, the injustice had already occurred, and continued afterwards. Mr. Hana was stripped of his ability to meaningfully cross-examine the Government's summary witnesses and unduly prejudiced by the message sent to the jury as a result of the Court's admonishment that the Government was right and the defense was merely being obstructive. Meanwhile, and in any event, Mr. Hana was effectively foreclosed from questioning the summary charts' accuracy and testing the evidence that the summary agents presented through "the greatest legal engine ever invented for the discovery of truth," *i.e.*, cross-examination. *California v. Green*, 399 U.S. 149, 158 (1970).

The Government, however, characterizes the Court's actions as acting within its "broad discretion" to control the scope of cross-examination" and properly deferring the defense's presentation of evidence supporting their positions until it was time for the Defendants' case. Opp. at 121-23. In support, the Government cites three out-of-circuit cases that are wholly inapposite and readily distinguishable from the case here. *Id*. at 121-22 (citing *United States v. Stadtmauer*, 620 F.3d 238, 272 (3d Cir. 2010); *United States v. Lambert*, 580 F.2d 740, 747 (5th Cir. 1978); *United States v. Ellison*, 557 F.2d 128, 135 (7th Cir. 1977)). In each of the three cases, the court upheld the exclusion of documentary evidence that the defendants attempted to introduce during cross-examination during the Government's case-in-chief. *See Stadtmauer*, 620 F.3d at 272 (district court did not abuse its discretion in prohibiting defense counsel from "admitting several categories of exhibits" during cross-examination of Government witnesses, including "hundreds

of advertisements"); *Lambert*, 580 F.2d at 746-47 (district court's decision to exclude "proffers of voluminous documentary evidence" was not an abuse of discretion); *Ellison*, 557 F.2d at 135 (district court did not err in refusing to admit records of irrelevant pharmacies during cross-examination to rebut the Government's proof).  By contrast, the Defendants here were prevented not from introducing new documents or evidence but from cross-examining the Government's summary witnesses on the same evidence elicited during direct—*i.e.*, on exactly the same summary chart.  This was error:  although "a district court may impose reasonable limits on cross-examination to protect against, e.g., harassment, prejudice, confusion, and waste, it must also give wide latitude to a defendant in a criminal case to cross-examine government witnesses." *United States v. Cedeno*, 644 F.3d 79, 82 (2d Cir. 2011).  Here, the Court did not do so.  Accordingly, the Court should remedy this unfair process which blatantly violated Mr. Hana's right to confront the witness against him by entering a judgment of acquittal under Rule 29, or at the very least, ordering a new trial under Rule 33.

> ### D.     Mr. Hana Was Significantly Harmed By The Manner In Which The Government Presented Its Case.

As anticipated, the Government responds that even if the introduction of the Government's summary charts or the Court's restrictions on the cross-examination of the summary agents was wrong, any error was harmless because the Defendants were was able to, and ultimately did, present their own summary charts with evidence that they wished to highlight, the same way that the Government did.  Opp. at 127-30.  While the Government is correct that the defense "put on *the same* summary charts that the Government did, with additional insertions chosen by defense counsel," *id*. at 128 (emphasis in original), it ignores the reality that the defense was left with no other choice but to create their own charts to affirmatively present the communications and other incomplete documents that were unfairly left out of the Government's summary charts.  Nor does

the Government address the fact that far from remedying the undue prejudice that Mr. Hana suffered as a result of the Government's presentation of its misleading charts, forcing the defense to introduce their own accurate charts, nearly one month later, and through their own summary witness—who could not point to their credentials as Special Agents of the FBI, with all of the advantages entailed by that title—actually caused Mr. Hana to suffer additional, unwarranted and completely unnecessary prejudice. That is, beyond the fact that the Government was able to insulate itself from cross at the time of the direct—as trials are supposed to work—had the Government stayed within the confines of Rule 1006 and the Court not unjustly restrained Mr. Hana's ability to cross-examine the Government's summary agents, the Government would not have had the opportunity (which it certainly took advantage of) to discredit Mr. Hana in front of the jury by picking at certain portions of the defenses' summary witness's testimony, and thus further tarnishing defense counsel's credibility, already undercut by the Court's treatment of counsel in front of the jury.

For all of these reasons, as set forth at greater length previously, the Government's improper, yet increasingly common, tactic of trial by summary chart without the opportunity for any meaningful cross-examination should not have been allowed, and the verdict on which it was so obviously based, should not be able to stand. Accordingly, the Court should, most respectfully, grant Mr. Hana's post-trial motion for a judgment of acquittal, or at the least, order a new trial under Rule 33.

## II. NO REASONABLE JURY COULD FIND THAT SENATOR MENENDEZ UNDERTOOK OR PROMISED TO UNDERTAKE AN "OFFICIAL ACT" OR ENGAGED IN A *QUID PRO QUO* SCHEME UNDER EITHER FEDERAL BRIBERY OR FRAUD LAW.

### A. Legal Standard

As explained in prior briefing, ECF Nos. 143, 186, 261, 593, to establish an "official act" for purposes of the federal bribery statute, 18 U.S.C. § 201, and honest services wire fraud, 18 U.S.C. § 1343, the Government must satisfy the standard established by the United States Supreme Court in *McDonnell v. United States*, 579 U.S. 550, 567 (2016). First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" "before a public official" akin to "a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 567, 569. This is referred to below as the "question or matter element." Second, the Government must establish that "the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* at 567. This is referred to as the "decision or action element," which can only be satisfied by something more than "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)." *Id.* at 567, 574; *see also* Hana Br. at 54-56.

Additionally, post-*McDonnell*, the law is clear that the *quid pro quo* element of federal bribery and honest services fraud requires that the Government (1) "identify" the "particular *question* or *matter*" that the official (here, Senator Menendez), allegedly promised to, or did, influence; and (2) prove that the official agreed to influence that "particular question or matter" at the time he accepted, or agreed to accept, the purportedly corrupt payment or bribe. *United States v. Silver*, 948 F.3d 538, 553, 556 (2d Cir. 2020) ("*Silver II*") ("[A]t the time the bribe is made, the

14

promised official act must relate to a properly defined question, matter, cause, suit, proceeding or controversy.") (emphasis in original).

For the reasons discussed in Mr. Hana's moving brief and below, the Government failed to prove beyond a reasonable doubt that Senator Menendez either undertook or promised to undertake an "official act" to benefit either Mr. Hana or Egypt. That alone requires the grant of a judgment of acquittal under *McDonnell* on those counts. In addition, however, the Government also failed to prove the requisite *quid pro quo*. Since the first Indictment, and through its opposition brief, the Government has identified a number of things of value— alleged *quids*—that were given by Mr. Hana over the course of several years, and a number of disparate and varying actions taken by Senator Menendez—alleged *quos*—during that same period, without ever identifying or proving the existence of what was always missing in this case: an agreement between Mr. Hana and Senator Menendez for Senator Menendez to influence particular questions or matters in exchange for things of value. *See Silver II*, 948 F.3d at 557; *Triumph Capital Grp., Inc.*, 544 F.3d at 159 ("[T]he relevant question is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). The Government's brief in opposition to Mr. Hana's post-trial motion for judgment of acquittal instead only confirms that its purported proof of a *quid pro quo* rests entirely on misconstrued text messages and testimony and a manufactured timeline. Accordingly, for the reasons set forth in Mr. Hana's moving brief and this reply, his motion for judgment of acquittal on Counts 1, 2, 6, 7, and 9 should be granted.

### B. Actions to Benefit Egypt and Mr. Hana

#### 1. Military Sales

The Government claims that the evidence of Senator Menendez's promise to approve US military aid to Egypt "was sufficient, standing alone," to establish a promise to perform an official act. Opp. at 11. The Government first points to a text message from the Senator to Nadine: "Tell

Will I am going to sign off this sale to Egypt today," identifying certain tank ammunition. *Id.* at 12; GX A101-14. But, as the Court well knows, merely speaking with Nadine or Mr. Hana about the sales is not an official act. *United States v. Jefferson*, 289 F. Supp. 3d 717, 736-37 (E.D. Va. 2017) (meeting with military officials in an effort to gain approval of testing certain technology was not an official act).

Understanding this, the Government pivots to arguing that the "ghostwritten" letter is evidence of a promise by Senator Menendez to approve military sales: "even if Menendez's decision to ghostwrite a letter for the Egyptian government in support of US arms sales to Egypt was not itself an official act, the context—Menendez literally writing a response to the basis for holds another US Senator had placed on foreign military financing—allowed the strong inference that Menendez had promised that he would not perform the official act of imposing holds on that financing for the same reasons." Opp. at 12. In summation, the Government similarly argued that the letter was "a way of promising official acts," but in the same sentence conceded that Senator Menendez "[o]bviously [was] not saying he is joining in the objections that's writing [*sic*] a response to. But even leaving that aside, it's obvious special treatment." Tr. 6407:12-21. "Special treatment" of a constituent, however, is also not an official act. *See McDonnell*, 579 U.S. at 567*; see also Upstate Jobs Party v. Kosinski*, 106 F.4th 232, 249 (2d Cir. 2024) ("[F]avoritism and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial reason for casting a ballot or making a contribution is that the candidate will respond by producing those political outcomes the supporter favors." (citations omitted)).

Moreover, the evidence at trial established that the relationship between Egypt and the United States is complex, but also critically important. Tr. 4510:24-4511:8 (Sarah Arkin: "A. The United States and Egypt have a very important relationship, given Egypt's geographic location, its

geopolitical role in the Middle East and for U.S. foreign policy its location on the Suez Canal. It's a very important strategic relationship and also one where the senator had been critical of the concerns about Egypt's human rights conditions"). The letter that Senator Menendez edited, GX C301, embodies the complexity of that relationship: on the one hand, Egypt is an important strategic partner, which receives substantial annual military funding,[2] but it also engages in significant human rights abuses. Tr. 939:19-940:2 (Joshua Paul: "[W]e've been in a position of on the one hand trying to press Egypt to take steps to strengthen its human rights, to release political prisoners, of which it has had tens of thousands of people in jail simply for their politics, for their views, while at the same time trying to maintain the relationship in order to strengthen certainly Israel's southern border and our regional influence and our ability in particular to go through the Suez Canal on an expedited basis."). In this context, far from a promise to perform an official act, the letter is just as, if not more, reasonably viewed as a form of quiet diplomacy by a Senator tasked with navigating a complex and dynamic relationship. But where "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021). In other words, the Government claims that the letter is evidence of a promise because the only inference to be drawn from Senator Menendez's act in editing a letter on behalf of the Egyptian Government is corrupt "special treatment." Tr. 6407:12-21. But there is another equally plausible

---

[2] See Tr. 867:12-16 (Joshua Paul: Egypt is the second largest recipient of foreign military financing grant money from the United States); *id.* 867:23-868:3 (Joshua Paul: Egypt receives approximately $1.3 billion from the United States in military funding on an annual basis); *id.* 936:25-937:4 (Joshua Paul: Egypt has received annual funding from the United States since the 1970s).

inference:  Senator Menendez edited the letter in what was described as an act of quiet diplomacy with a complex, but important, foreign ally.  Accordingly, there was insufficient evidence that this letter was an official act, or promise of official act, of the sort that is criminalized by the bribery statute.

### 2.    Outreach to USDA

Regarding Senator Menendez's alleged intervention with the USDA through a brief phone call to Under Secretary McKinney, the Government submits that "Menendez's promises and attempts to influence the official position of the [USDA] on an important matter of foreign relations . . . were also attempts to perform an official act."  Opp. at 12.  According to the Government, the USDA's actions with respect to Egypt "involved the formulation of an official position of the United States, which was arrived at through an interagency process within the Executive Branch and was adopted by the charge d' affaires at the U.S. Embassy in Cairo, who was the representative of the President."  *Id.* at 13.  But the Government does not even address Mr. Hana's argument that the decision to award a sole-source contract to IS EG Halal was not a matter pending before any public official or United States department or agency because the record clearly established that the decision to award the contract belonged solely to Egypt.  Tr. 587:1-16 (Bret Tate:  "Q. I have a question for you. Which is in deciding which company and how many companies will become a halal certifier for Egypt, it's Egypt that decides that, correct?  A. Egypt does make those decisions, yes.  Q. And the United States can have its opinion heard, as it did here, but at the end of the day, it's Egypt that makes that decision; isn't that true? A. The decision must be made in line with Egypt's international commitments under the WTO.  But yes, they make the decision."); 588:1-4 (Bret Tate:  "Q. But again, the choice was Egypt's as to whether it would or would not permit a monopoly in this situation; is that correct? A. The decision to determine which certifiers may or may not certify halal beef belonged to the Egyptian government, yes.").

And Egypt maintained its decision to approve only a single certifier even after receiving numerous objections and concerns from USDA officials, including high ranking officials such as Under Secretary McKinney. Tr. 588:15-18 (Bret Tate: "Q. Now, Egypt made the decision to proceed with a single certifier in this case even though the United States protested; am I right? A. Egypt ultimately did make that decision, yes."). Tr. 588:8-14 (Bret Tate testified that on April 1, 2019, he voiced his concerns to the Egyptian Deputy Minister of Agriculture and Land Reclamation at the Frankfurt (Germany) Airport, but she did not change her position); 589:4-10 (Bret Tate testified that in a meeting on April 11, 2019 the USDA again "advocated that Egypt allow for multiple certifiers" to no avail); 591:5-11 (Bret Tate testified that Under Secretary McKinney also raised the issue with Deputy Minister Mehrez, but "Egypt did not change their position."); 591:12-20 (Bret Tate testified that the U.S. Foreign Agriculture Service raised the issue with the Egyptian organization for import and export control, but that outreach did not lead Egypt to change course); 591:21-592:4 (Bret Tate testified that the charge d'affaires raised the halal issue with the Egyptian Minister of Agriculture but, again, Egypt did not alter its position).

While Mr. Hana concedes that "[t]he bribe recipient need not be the final decisionmaker," *United States v. Kimbrew*, 944 F.3d 810, 814 (9th Cir. 2019), the recipient must "use[] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official," *id.* (quoting *McDonnell*, 579 U.S. at 573). Here, the "other official" was Under Secretary McKinney, but he was not the final decision maker either; the decision was not even one for the United States but was within the exclusive province of the Egyptian Government. Tr. 1856:7-9; 587:3-6, 13-16. Federal bribery law, however, prohibits the exchange of something of value in return for action, or a promise of action, within the defendant's official power as a federal employee – either direct power, or by means of influence over another

public official.  See Tr. 7087:14-19 ("The question or matter must be something specific and focused that is pending or may by law be brought before any public official.  'May by law be brought' means something within the specific duties of an official's position -- the function conferred by the authority of that official's office."); 18 U.S.C. § 201(a)(1) (defining "public official" as a "Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror"); *see also United States v. Repak*, 852 F.3d 230, 254 (3d Cir. 2017) ("The evidence was sufficient for the jury to conclude that he accepted the roof and excavating services *knowing that he was to use his power, i.e., the ability to provide advice*, to influence the JRA's awarding of contracts."(emphasis added)).  Because neither Senator Menendez nor Under Secretary McKinney possessed decision-making authority with regard to Egypt's selection of a single halal certifier, there was simply no question or matter pending before any United States body regarding the selection of a halal certifier for imports entering Egypt; accordingly, Senator Menendez's call to Under Secretary McKinney fails under *McDonnell*'s first prong.  *See McDonnell*, 579 U.S. at 567 (setting forth question or matter element that must be pending before a public official); *see also Valdez v. United States*, 475 F.3d 1319, 1327-29 (D.C. Cir. 2008) (en banc) (official action element lacking where a detective accepted cash in return for searching police databases and providing confidential information because the queries did not involve an "active or incipient police investigation" before the officer).

Additionally, under *McDonnell*, the "'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective."  579 U.S. at 578.

20

The Government argues that the USDA's "correspond[ence] with Egypt regarding the halal certification monopoly it granted to Hana" was a "formal act of diplomacy." Opp. at 12-13. Even assuming the Executive Branch's policy of opposing monopolies is specific enough to be "put on an agenda, tracked for progress, and then checked off as complete"—the criteria for an official act under the caselaw, *McDonnell*, 579 U.S. at 552—"formal acts of diplomacy," *i.e.*, attempts to influence foreign policy, are not analogous to government action that Courts have found sufficient to satisfy the question or matter element of *McDonnell*.

Instead, the question or matter element is met only by "specific, formal exercises of government power," *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021), akin to a lawsuit, hearing, or administrative determination. *See id.* (listing as examples "(1) approving a gun license application; (2) promoting or transferring a police officer; (3) making an arrest, and then making a decision about whether to issue a desk appearance ticket to the arrestee; (4) authorizing the use of a police helicopter for a particular occasion; (5) authorizing the use of a police boat for a particular occasion; and (6) deploying a police escort for a private citizen or transporting a private citizen in a police car."); *United States v. Skelos*, 707 F. App'x 733, 740 (2d Cir. 2017) (efforts to pass state legislation); *United States v. Halloran*, 664 F. App'x 23, 28-29 (2d Cir. 2016) (allocating state funds); *United States v. Conrad*, 760 F. App'x 199, 208 (4th Cir. 2019) (per curiam) (awarding and maintaining government contracts); *United States v. Suhl*, 885 F.3d 1106, 1113 (8th Cir. 2018) (increase in Medicaid reimbursements, Medicaid referral policies, and appointment to review board); *United States v. Malkus*, 696 F. App'x 251, 252 (9th Cir. 2017) (judicial monetary awards). Thus, the evidence was insufficient to establish the essential question or matter element with respect to Senator Menendez's phone call to Under Secretary McKinney because a

discussion about a foreign policy opposing monopolies is not a specific and formal exercise of government power that is sufficient for this purpose under the caselaw.

In addition to failing to establish the question or matter element, which alone is fatal, as Mr. Hana demonstrated in his moving brief, Hana Br. at 60, merely calling another government official also does not satisfy the decision or action element. *See United States v. Boyland*, 862 F.3d 279, 290 (2d Cir. 2017) (contacting another government agency does not constitute an official act); *United States v. Fattah*, 914 F.3d 112, 153 (3d Cir. 2019) ("Importantly, a typical meeting, telephone call, or event arranged by a public official does not qualify as such a formal exercise of governmental power."); *id.* at 154 (holding that defendant congressman's act in setting up a meeting between his friend, a financial backer, and a U.S. Trade Representative did not constitute an official act). *Jefferson*, 289 F. Supp. 3d at 736-37 (meeting with military officials in an effort to gain approval of testing of certain technology was not an official act).

Notwithstanding this caselaw, the Government posits that the McKinney phone call is "the sort of pressure or advice contemplated by the Supreme Court in *McDonnell*" because the Under Secretary found the call "striking" and "memorable," and because he felt the need to protect his staff from the interaction.[3] Opp. at 13-15. However, Under Secretary McKinney also testified that Senator Menendez "made no threats" whatsoever—not, for example, about USDA funding or,

---

[3] But under the caselaw, "advice" constitutes official action when it describes an interaction between superiors and subordinates, not between members of different governments (*i.e.*, state and federal) or even different departments within the same government. *McDonnell*, 579 U.S. at 567, 574. Thus, in *McDonnell*, the Court held that advice may constitute an official act "on the part of subordinates where their superiors would necessarily rely largely upon the reports and advice of subordinates . . .who were more directly acquainted with the facts and circumstances of particular cases." *Id.* at 572 (cleaned up) (citing *United States v. Birdsall*, 233 U.S. 223, 234 (1914)). And "pressure" requires something more than a phone call or meeting itself; it must entail some threat or action, such as threatening to withhold funding. *United States v. Silver*, 864 F.3d 102, 120-21 (2d Cir. 2017) ("*Silver I*").

for that matter, about any other USDA matter that was within the Senator's power to affect. Tr. 1979:23-1980:10. *United States v. Silver*, 864 F.3d 102, 120-21 (2d Cir. 2017) ("*Silver I*") (noting that evidence of exerting pressure requires some action, such as threatening to withhold funding). Nor was there any evidence that Senator Menendez ever spoke to the Under Secretary's superiors about the halal issue, in an attempt "escalate" the matter "above [McKinney's] head" or otherwise. Tr. 1981:15-19. Indeed, there is no evidence anywhere in the record that after the "fairly short" call, the Senator ever again contacted McKinney or the USDA. Tr. 1890:17-25 (Under Secretary McKinney could not recall any action by Senator Menendez with respect to the USDA or US agriculture other than the phone call). Thus, the evidence was insufficient to establish that the two-to-three minute phone call was an attempt by Senator Menendez to exert pressure over the USDA or Under Secretary McKinney, and in the absence of evidence of such pressure, the decision or action element necessary to show an official act was insufficient as a matter of law.

### 3. Quid Pro Quo

In addition to the failure to prove an "official act," and contrary to the Government's argument that the evidence proved a corrupt *quid pro quo* related to Egypt, under no reasonable interpretation of the evidence could the jury conclude that Senator Menendez agreed to take certain actions in 2018—*i.e.*, the approval of military sales and the anonymously drafted letter—in exchange for Mr. Hana's promise either to make a payment toward Nadine's mortgage in June 2019, or to pay Nadine $30,000 for her work at IS EG Halal in September through November 2019. The same is true with respect to the Government's theory that Mr. Hana promised those same things of value in exchange for Senator Menendez contacting Under Secretary McKinney in May 2019. That is because "the relevant point in time in a *quid pro quo* bribery scheme is the *moment at which the public official accepts the payment*"; in other words, the "focused and concrete question or matter" must be identified at the time the payment is accepted or agreed upon.

*United States v. Silver*, 948 F.3d 538, 556 (2d Cir. 2020) ("*Silver II*") (emphasis in original); *see also United States v. Skelos*, 988 F.3d 645, 656 (2d Cir. 2021) (holding that the trial court failed to properly charge the jury "that the specific and focused question or matter on which [the public official] was expected to take official action be identified at the time of the payment"). And as is explained in Mr. Hana's brief, and as the Government's opposition only confirms, the evidence here shows no connection whatsoever—other than pure speculation and the improper piling of inferences upon inferences—to establish the connection between these payments and the actions for which they were purportedly provided to establish a legally sufficient *quid pro quo*. *See* Hana Br. at 72-88.

The Government answers, though it does not support its argument, that "evidence of the timing of key actions can by itself be sufficient to support a jury's verdict." Opp. at 21. Thus, the Government relies on *United States v. Calk*, where there was "ample evidence" related to the timing of events because—unlike here—Defendant Stephen M. Calk provided multiple loans to Paul Manafort in close proximity to Calk's requests for Manafort's assistance in securing a position in the Trump Administration. 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022), *aff'd*, 87 F.4th 164 (2d Cir. 2023). Specifically, Calk caused a first loan to be approved shortly before sending Manafort a wish list of desired positions in the Trump administration. *Id*. Calk then facilitated a second loan shortly after he discussed the term sheet for the second loan with Manafort and confirmed that he would be willing to serve as Under Secretary of the Army. *Id*. The Government also cites to *United States v. Reichberg*, where on three separate occasions, Defendant Jeremy Reichberg secured the release of a particular individual from NYPD custody on the same day that he was arrested. 5 F.4th 233, 249 (2d Cir. 2021). Each time, on the same day as the release of the individual from NYPD custody, Reichberg discussed the individual's release with

his NYPD contact via text message, and offered particular things of value, such as a wristwatch and carpeting services, during those same conversations. *Id.* at 249-50.

Here, the evidence submitted by the Government does not come close to the evidence presented in *Calk* and *Reichberg*. Instead, as the Government's brief shows, its case depends entirely on a few isolated messages spanning over a year:

- An April 6, 2018 text message from Nadine to Will stating that she would ask Senator Menendez "about the two deals," GX B105-3;

- A May 28, 2018 email from Nadine to Senator Menendez asking him to fix a letter so that Nadine could "prove a point to the General" and stating that the General and Mr. Hana "just got [her] clearance for a project," GX B102;

- A January 30, 2019 text message from Senator Menendez to Nadine stating "don't commit to anything today, just listen" on the same day as a meeting at the Egyptian Embassy, GX A101-19;

- A March 26, 2019 text message from Nadine to Howard Dorian mentioning "a year of broken promises by Will to me" and "I am willing to give 100% and make sure this goes skyhigh on condition that I start getting my $ 2500/week," GX B221-1;

- A March 27, 2019 voicemail from Nadine to Senator Menendez stating that she would not arrange a dinner for Mr. Hana, GX A105-D;

- An April 2, 2019 text message from Dorian to Nader Moussa stating, "[I]t's really important that we make sure Nadine stays happy because if she's not she's going to cancel the meetings that Wael has set up with Senator Menendez," GX F102; and

- An April 8, 2019 text message from Nadine to Senator Menendez stating, "Seems like halal went through. It might be a fantastic 2019 all the way around," GX A101-27.

*See* Opp. at 16-17.

As discussed above, in both *Calk* and *Reichberg*, the thing of value and particular matter to be influenced were identified in the communications upon which the Government's case relied, and both were discussed during a single conversation, or very close in time. By contrast, here, the Government attempts to string together cherry-picked messages that occurred sporadically over a one-year period with no reasonable connection between them. Not only did the messages not

occur as part of a single conversation or series of conversations but they also involved different parties discussing different matters, and—most significantly—they did not at any point or in any way identify a thing of value and a particular matter to be done or influenced in exchange. As discussed at length in Mr. Hana's moving brief, therefore, a jury could only conclude that the above timeline of text messages proves a *quid pro quo* by relying on speculation and multiple improper inferences piled one on another.

The Government also argues that Mr. Hana made a payment toward Nadine's mortgage in exchange for both the military sales and Senator Menendez's call to Under Secretary McKinney. *See* Opp. at 18-19. But critically, even if—though the evidence was to the contrary—the Court concludes that the evidence was sufficient to establish that Mr. Hana's payment was not just a loan,[4] the Government still has not identified the particular question or matter to be influenced by the mortgage payment, suggesting that either the approval of the military sales or the call to Under Secretary McKinney could have been the *quo*, but without pointing to any evidence of the *pro*, *i.e.*, proof that the payment was *in exchange for* either of these actions.

Instead, the Government relies on the specious timeline of messages discussed above and points, in particular, to a handwritten note to purportedly connect the mortgage payment to Senator Menendez's actions in 2018. *See* Opp. at 18-19. The handwritten note, from Nadine to Fred

---

[4] The evidence offered at trial confirmed that Mr. Hana's payment toward Nadine's mortgage was a loan and that Nadine understood it to be as such. Specifically, Mr. Hana's lawyer, John Moldovan, drafted loan documents and communicated with Nadine concerning execution of those documents; Mr. Moldovan, prior to releasing the funds to Nadine's mortgage company, confirmed via text message with Nadine that the payment was a loan; and Mr. Moldovan included the memo "LOAN AUTH W.HANA/ISEG TO N.A." written on the cashier's check to Nadine's mortgage company. *See* Hana Br. at 75-78 (discussing evidence presented at trial concerning the mortgage payment). Moreover, while discussing her mortgage payment with Mr. Uribe, Nadine, referring to Mr. Hana, stated: "I will pay him back." *See id.* at 77-78.

Daibes, provides a calculation of the mortgage payment and the $10,000 checks she had received so far. GX D102-C. But that document relied on, and the corresponding text messages between Nadine and Mr. Daibes, *see* GX D102-10, relate only to Mr. Hana providing money to Nadine. Nothing in the note or the messages suggests that Senator Menendez agreed to take, let alone took, any action—official or otherwise—in return.

Indeed, the Government does not meaningfully respond to the fact that there was no evidence whatsoever introduced to support the inference the Government seeks that Senator Menendez was aware that Nadine even had problems paying her mortgage at the time of his call to Under Secretary McKinney. Indeed, there was no evidence introduced that *any* of the Defendants were even aware of Nadine's mortgage problems at the time of that call, on May 23, 2019, or could be. That is because the foreclosure complaint was not filed until two weeks after the call, on June 5, 2019, GX 5C-100, and the first text message concerning the matter was sent on June 11, 2019 from Mr. Uribe to Nadine, GX B209-10 ("We have to save your home"). Beyond that exculpatory timeline, the Government refers to a single voicemail from Nadine to Mr. Daibes on June 28, 2019—almost two months after the McKinney call— stating, "I have not told Bob yet, because he is going to flip out against Will. Um, but my mortgage, I haven't paid it, and I had been counting on the money Will's giving me to do it, and he hasn't given me anything yet." Opp. at 18; *see* GX D108. According to the Government, Nadine's statement that "I have not told Bob yet," somehow supports the inference that "Menendez was fully aware of Hana's promises to pay" at the time he made the call to Under Secretary McKinney. Opp. at 18. But such an inference is actually contrary to the evidence and is thus entirely unreasonable, making the Government's position no more than rank speculation. In fact, at trial, the Government took exactly the opposite position and acknowledged that this very same message meant that Nadine had kept her mortgage

delinquency from Senator Menendez for some time and did not tell him about it until at least July

5. Tr. 6381:9-17; *see* Hana Br. 79.

With respect to the payments for Nadine's work at IS EG Halal, which the Government

also contends were made in exchange for Senator Menendez's actions in 2018 and the call to Under

Secretary McKinney on May 23, 2019, in addition to the above timeline of text messages, the

Government points to another text message from Mr. Hana to an individual identified only as "HH

HH" stating: "nadine arslan 120 k Vice president." Opp. at 19-20; GX C104-4. Mr. Hana

addressed this message in his moving brief, and relies on those arguments here.[5] *See* Hana Br. at

81-83. But, to be clear, the Government's position that "[a]ll the defendants were well aware that

Nadine Menendez was expecting to get [] paid for her previous acts (*i.e.*, her role in arranging

Menendez's actions and promises) and not for any real work" has no support in the record. *See*

_____

[5] As explained in Mr. Hana's moving brief, the Government asked the jury to infer, based solely on Mr. Hana's exchange with "HH HH," that Mr. Hana provided Nadine with a sham job in exchange for Senator Menendez's call to Under Secretary McKinney. *See* Hana Br. at 82 & n.26. Mr. Hana asserted that the Government's failure to identify "HH HH" or the relevance of the text message with someone with the initials "HH HH" required the jury to draw multiple, specious inferences in order to satisfy its burden of showing that, at the time Nadine accepted employment with IS EG Halal, Senator Menendez promised to influence a particular question or matter. *See id.* at 82-83. Mr. Hana also raised his concern over such messages during trial in connection with the Government's use of summary charts: "The senders and recipients of cited communications similarly range from the defendants and alleged co-conspirators in this case to third parties sending messages with no clear relevance or involvement in the charged conduct; indeed, several such third parties are unidentified on the summary chart." *See* ECF No. 441 at 5. Nevertheless, the Government argues in its opposition that Mr. Hana failed to preserve this issue because he "scarcely made such a claim at trial," and "identifies no rule of law that requires the legal name of every text message recipient to be offered in evidence." Opp. at 20 n.4. The Government misconstrues Mr. Hana's position. Mr. Hana does not challenge the general admissibility of the text messages between Mr. Hana and "HH HH," only the manner in which the Government relied on Mr. Hana's communications with an unidentified individual and the inferences that could be drawn therefrom. This challenge goes directly to the sufficiency of the evidence presented at trial, which is certainly appropriately raised in this Rule 29 motion.

Opp. at 23. Mr. Hana does not dispute that he paid Nadine $30,000 as an independent contractor of IS EG Halal. But, whether or not that $30,000 was paid in exchange for work that was done or supposed to be done—and, the evidence was that it was[6]—there was absolutely no evidence linking this payment to anything that Senator Menendez did or promised to do in exchange. Indeed, the Government fails to address the fact that Nadine was offered a job with Mr. Hana's new halal certification entity months before the call to Under Secretary McKinney. *See* GX B221-1 (March 26, 2019 text message from Nadine to Howard Dorian mentioning "getting [her] $2500/week and health benefits"). Certainly, none of the communications to which the Government points, *see* Opp. at 16-17, establish that connection.

The other things of value advanced by the Government during trial—the elliptical, gold, meals, and air purifier—are the same: not only is there no evidence that they were provided in exchange for any actions by Senator Menendez, but in that regard, they show the complete lack of a *quid pro quo*. *See Silver II*, 948 F.3d at 553, 556 ("[A]t the time the bribe is made, the promised official act must relate to a properly defined question, matter, cause, suit, proceeding or controversy."). That deficiency in the Government's proofs is only confirmed by its opposition,

---

[6] Indeed, the only evidence introduced on this topic is that Mr. Hana hired Nadine at IS EG Halal for a short three-month period pursuant to a consulting agreement, Mr. Hana paid Nadine $30,000 ($10,000 per month) as required under that agreement, Mr. Hana expected Nadine to perform work, and Mr. Hana did not renew Nadine's contract at the end of the three-month term after she failed to perform the work that was expected of her. *See* Hana Br. at 79-81 (discussing evidence presented at trial concerning Nadine's work). Moreover, even if Nadine was underqualified for the position or did not intend to perform the work expected of her—neither of which were proven at trial—Mr. Hana could have provided Nadine with a job for any number of reasons, including because she was his long-time friend. *See generally* Hana-1300 (detailing Mr. Hana's long-standing relationship with Nadine before she met Senator Menendez). Either way, it was not a bribe, though that is the only explanation that the Government will even entertain.

which does not even attempt to connect these things to a particular question or matter in the single footnote mentioning them. *See* Opp. at 23 n.6.

The Government's few additional arguments concerning the sufficiency of the evidence all fail. *First*, the Government claims that "there was far more than mere timing" to support a *quid pro quo* based upon the "favorable treatment" provided by Senator Menendez. Opp. at 21. Specifically, the Government relies on the following so-called "favorable treatment": (1) Senator Menendez's "promise to approve tank ammunition was a promise to do so unusually swiftly" (and, Khaled Shawky's "thumbs up" emoji upon learning of it with the suggestion that "the contract owner should send their greetings"); and (2) Under Secretary McKinney's testimony, with respect to the call from Senator Menendez, that he "never had a call like that before," and that the call, according to the Government, was contrary to the statements on Senator Menendez's website. *See* Opp. at 21-22. But it does not take much analysis to see that neither of these anecdotal snippets (including the emoji) is even evidence of "favorable treatment," let alone the "powerful evidence of the *quid pro quo*" that the Government sees. *See* Opp. at 21. Indeed, the Government's argument flies in the face of established law: although a jury may "infer guilt from evidence of benefits received and subsequent favorable treatment, . . . [t]he key inquiry is whether, in light of all the evidence, an intent to give or receive something of value in exchange for an official act has been proved beyond a reasonable doubt." *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011). The minimal evidence of "favorable treatment" relied on by the Government does not, however, establish the requisite *quid pro quo*.

Nor is the Government's reliance on *United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022), at all persuasive. *See* Opp. at 22. In *Hills*, the Government presented to the jury more than supposed favorable treatment to support the *quid pro quo*—it provided "[a]mple evidence from

multiple witnesses, corroborated by documents and text messages," including testimony from an unindicted coconspirator that he and others provided numerous things of value to the defendant specifically in exchange for the defendant's promise to take those favorable actions. *Id*. at 1175-76. The court held that the evidence was sufficient for a reasonable juror to conclude beyond a reasonable doubt that the defendant corruptly demanded and received "things of value" knowing that they were given in return for being influenced to take certain actions. Of course, there is nothing like that kind of evidence, from a witness, here. Rather, the Government's description of Senator Menendez's actions in 2018 as mere "favorable treatment" effectively concedes that it cannot show that Mr. Hana gave or promised to give something of value to Senator Menendez in exchange for an official act. *See Upstate Jobs Party*, 106 F.4th at 249 ("[F]avoritism and influence, unlike corruption, are unavoidable in representative politics, in which a legitimate and substantial reason for casting a ballot or making a contribution is that the candidate will respond by producing those political outcomes the supporter favors." (citations omitted)).

*Second*, the Government submits that "the jury [] heard ample evidence from which it could infer consciousness of guilt," but cites to evidence that relates solely to Senator Menendez—for example, that Senator Menendez's prior counsel gave a presentation denying his knowledge of the three $10,000 checks to Nadine and the mortgage payment, and that Senator Menendez purportedly falsely reported gold as having been from Nadine's family rather than from Mr. Daibes on his public financial disclosure forms—while pointing to nothing that would show Mr. Hana's consciousness of guilt. That, of course, is because no such evidence was presented at trial. *See* Opp. at 23-24.

*Third*, the Government claims that "there was also ample evidence from which the jury could infer that the conspirators referred to each other elliptically or took other steps to limit the

paper trail generated by their actions." *See* Opp. at 24. But as was discussed in Mr. Hana's moving brief, *see* Hana Br. at 87 & n.28, any contention that Mr. Hana used "code" to refer to his codefendants is without any basis at all in the record, *see* Opp. at 24. As the hundreds of text messages, emails, and other documents in this case make clear, the Defendants often and openly referred to each other by name, and no witness—lay or expert—testified as to the existence of any code. Nor was there any evidence presented at trial that Mr. Hana took unidentified "other steps" to "limit" any "paper trail."

In sum, the Government presented no evidence at trial, and cited none in its opposition brief, establishing beyond a reasonable doubt that the mortgage payment and three $10,000 paychecks, which were offered and accepted in 2019, related back to—or, more specifically, were made in exchange for—Senator Menendez's actions in 2018. The same is true as to the call to Under Secretary McKinney, which occurred before Senator Menendez was aware of Nadine's need for Mr. Hana to pay her mortgage and well after Mr. Hana promised Nadine a job at IS EG Halal. Accordingly, because the Government failed to prove beyond a reasonable doubt the necessary *quid pro quo* element, the Court must enter a judgment of acquittal on Counts 1, 2, 6, and 7.

### C. Actions to Disrupt State Criminal Matters

#### 1. Contacting Attorney General Grewal

With respect to the Government's bribery theory derived from Senator Menendez's phone call to and meeting with AG Grewal in an alleged attempt to interfere with state criminal prosecutions, the Government argues that the evidence "proved that Menendez attempted to perform an official act by pressuring or advising Grewal." Opp. at 27. Specifically, the Government submits that "Grewal's testimony shows that he understood the nature of this contact as inherently involving attempted pressure, from which he shielded his team by refusing to pass

on even the mere fact of the inquiry." *Id.* But (1) this argument ignores the context in which AG Grewal testified about insulating his team from Senator Menendez's outreach and (2) just like the Senator's phone call to Under Secretary McKinney, the Senator's conversations with AG Grewal were not official acts. *See*, *supra*. That is because, contrary to the Government's narrative, neither a mere phone call nor a meeting constitutes an official act, even if during the conversation, the public official at issue discusses pending questions or matters. *McDonnell*, 579 U.S. at 567, 571-72, 574; *Boyland*, 862 F.3d at 290; *see also Fattah*, 914 F.3d at 154 (setting up meeting between businessman and U.S. Trade Representative does not qualify as an official act); *Skelos*, 707 F. App'x at 737 ("arrangement of or participation in certain meetings" are not "official acts"); *Jefferson*, 289 F. Supp. 3d at 737 (Congressman's setting up meeting for businessman to pitch product and services to the Army "explicitly excluded from the meaning of 'official act'" under *McDonnell*).

During a five-to-six minute telephone conversation and ten-to-fifteen minute meeting, Senator Menendez raised concern "about [AG Grewal's] office's handling of matters involving Hispanic defendants as compared to non-Hispanic defendants -- in particular, matters handled by the office of the insurance fraud prosecutor." Tr. 2715:12-20; 2718:1-2.; 2729:13. Although Grewal testified that he did not want his conversations with the Senator to have a "chilling effect" on the prosecutors and team handling the insurance fraud cases because he did not want them to "second-guess[]" their decision making "if they felt that they were under the scrutiny of, of a senior elected official based on the way they were handling the matter," Tr. 2746:4-9, he also testified that the AG Office's does not report to the United States Senate or the federal government at all, Tr. 2747:11-17, 23-25. Further, and significantly, no U.S. Senator could affect the formula by which the United States Department of Justice distributes grant money to state prosecutor offices,

Tr. 2750:22-2751:1, so Senator Menendez had nothing that he could threaten. And indeed, AG Grewal testified that Senator Menendez did not threaten to haul him before Congress, threaten to enact legislation that would discriminate against his office in any way, or threaten any other retaliatory action. Tr. 2774:9-25. In short, the evidence failed to establish any attempt by, or ability of, Senator Menendez to pressure AG Grewal—perhaps an obvious conclusion given that Senator Menendez was a federal official with no authority over AG Grewal (as, for example, a State Legislator would have), Tr. 2747:11-17, 23-25; 2775:23-2776:1. *See Silver I*, 864 F.3d 102 at 120-21 (noting that evidence of exerting pressure requires some action, such as threatening to withhold funding). Without any evidence of pressure, these short meetings and brief conversations between Senator Menendez and AG Grewal did not constitute official acts under *McDonnell*'s second prong. 579 U.S. at 571-74 ("[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit th[e] definition of 'official act,'" nor do "hosting an event, meeting with other officials, or speaking with interested parties," standing alone, constitute a "decision or action," "even if the event, meeting, or speech is related to a pending question or matter.").

### 2. Quid Pro Quo

The evidence at trial was also insufficient, as a matter of law, to support the Counts concerning the scheme to benefit Uribe and Uribe's associates for two reasons: (1) the Government failed to adduce any evidence, let alone proof beyond a reasonable doubt, that there was a mutual understanding or "meeting of the minds" between Mr. Hana and Mr. Uribe to bribe Senator Menendez, *see* Hana Br. at 88-96; and (2) the Government failed to adduce any evidence, let alone proof beyond a reasonable doubt, that Mr. Hana agreed to provide Nadine with a Mercedes Benz in exchange for Senator Menendez disrupting the criminal prosecution of Mr.

Parra or the criminal investigation into Ms. Peguero,[7] *see id.* at 96-101, requiring a judgment of acquittal on Counts 1, 2, and 9. The Government does not meaningfully address Mr. Hana's first argument and relies upon improper inferences to respond to the second.

Specifically, in response to Mr. Hana's first argument, the Government submits only that:

> Uribe testified that Menendez told him that Menendez had been asked by Hana and Nadine Menendez to get a better resolution for Parra and E & K Trucking. (Tr. 3104.) This alone was powerful evidence of Hana's corrupt agreement with Menendez, whether or not Uribe was told the details of how Hana and Menendez would carry out their promises. (Compare Hana Mem. 90-96 (arguing lack of *quid pro quo* because Hana did not specify how he would make case go away) *with*, *e.g.*, *McDonnell*, 579 U.S. at 572 ("[T]he public official need not specify the means he will use to perform his end of the bargain[.]").)

Opp. at 32. But the Government's cursory, surface-level response completely misses the mark. As explained more fully in Mr. Hana's moving brief, *see* Hana Br. at 88-96, the evidence was insufficient to prove that Mr. Hana and Mr. Uribe reached a "meeting of the minds," as is necessary to convict Mr. Hana of both the conspiracies alleged in Counts 1 and 2, and flowing from that, the honest services fraud alleged in Count 9, which also requires an agreement as part of the *quid pro quo*. *See, e.g.*, *United States v. Mustafa*, 753 F. App'x 22, 36 (2d Cir. 2018) ("[C]onspiracy requires a meeting of conspirators' minds on a common criminal objective"); *United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) ("The 'corrupt' intent necessary to a bribery conviction is in the nature of a *quid pro quo* requirement; that is, there must be a specific intent to give . . . something of value *in exchange for* an official act.") (emphasis in original); *United States v. Napout*, 332 F. Supp. 3d 533, 565 (E.D.N.Y. 2018), *aff'd*, 963 F.3d 163 (2d Cir. 2020) ("Among other elements, the crime of conspiracy to commit honest services fraud requires

---

[7] The Government does not respond to the complete lack of any evidence whatsoever of Mr. Hana's involvement in or knowledge of Senator Menendez's meeting with Attorney General Grewal in September 2019 at all, but especially insofar as it related to the investigation into Ms. Peguero. *See* Hana Br. at 95.

a showing that the defendant accepted, or agreed to accept, a secret payment in exchange for an 'official act.'"). Put differently, even accepting as true Mr. Uribe's testimony "that Menendez told him that Menendez had been asked by Hana and Nadine Menendez to get a better resolution for Parra and E & K Trucking," that evidence—which is the only evidence the Government references in support of its position—says absolutely nothing about whether Mr. Hana agreed with Mr. Uribe to bribe Senator Menendez. To that end, the Government's reliance on *McDonnell* is actually misleading. The language quoted by the Government—"the public official need not specify the means that he will use to perform his end of the bargain"—is found in this passage of *McDonnell*:

> Under this Court's precedents, a public official is not required to actually make a decision or take an action on a "question, matter, cause, suit, proceeding or controversy"; it is enough that the official agree to do so. The agreement need not be explicit, *and the public official need not specify the means that he will use to perform his end of the bargain*. Nor must the public official in fact intend to perform the "official act," so long as he agrees to do so.

579 U.S. at 572. The passage thus stands for the non-controversial proposition that, where a public official agrees to take an action on a particular question or matter in exchange for a thing of value, a *quid pro quo* is established. It does not matter that, at the time of the promise, the public official did not identify the "official act" to be performed or explain how he would accomplish that action. *See Id*. at 572; *United States v. Ganim*, 510 F.3d 134, 147 (2d Cir. 2007).

In other words, as between Mr. Hana and Senator Menendez, there had to be an agreement to provide a thing of value in exchange for a benefit. *See, e.g.*, Alfisi, 308 F.3d at 149; *Napout*, 332 F. Supp. 3d at 565. That was not shown. But here, the Government misses the point, which had to do with Mr. Hana's argument concerning his purported agreement with Mr. Uribe, not Senator Menendez. That is, the evidence was not sufficient to prove that Mr. Hana ever agreed *with Mr. Uribe* to bribe Senator Menendez in the first place, as the conspiracy counts allege. *See, e.g.*, Ind. ¶¶ 39, 42, 74-78; 79-81. For that purpose, there had to be a "meeting of the minds" of

36

co-conspirators to accomplish a common criminal objective.[8]  And with regard to that inquiry, the law expressly requires that the parties agree to the "essential nature of the plan," *United States v. Stavroulakis*, 952 F.2d 686, 690 (2d Cir. 1992); a "general agreement to engage in unspecified criminal conduct" is not sufficient.  *United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977).  For the reasons stated in Mr. Hana's moving brief, *see* Hana Br. 90-96, the evidence presented at trial failed to show a mutual understanding between Mr. Hana and Mr. Uribe to accomplish an unlawful end, and the convictions on Counts 1 and 2, as well as Count 9, must therefore be set aside.[9]

Beyond the conspiracy with Mr. Uribe, Mr. Hana's second argument addresses the lack of evidence of a *quid pro quo*.  In its opposition, the Government submits that a *quid pro quo* may be inferred because Mr. Hana "funded part of the price" of the Mercedes Benz and reimbursed Mr. Uribe "for some of the bribe payments" that he was making.  Opp. at 31.  But that argument is unfaithful to the actual evidence in the case.  In fact, Mr. Uribe testified that, when Mr. Hernandez

---

[8] Similarly, the standard of intent for aiding and abetting, which is charged in connection with Counts 6, 7, and 9 against Mr. Hana, requires that "the defendant has chosen, with full knowledge, to participate in the illegal scheme."  *United States v. Mohamed*, 18-cr-00603, 2020 WL 4932227, at *5 (E.D.N.Y. Aug. 24, 2020) (quoting *Rosemond v. United States*, 572 U.S. 65, 79 (2014)).  That is, Mr. Hana must have—but did not, for the reasons discussed throughout this matter with respect to those Counts—intended to facilitate the "specific and entire crime charged," here bribery and honest services fraud.  *See id.*

[9] Mr. Uribe confirmed multiple times throughout his testimony that he and Mr. Hana did not reach an agreement.  As discussed in Mr. Hana's moving brief, Mr. Uribe testified that during their conversation outside of Andy Aslanian's office, Mr. Hana "[m]entioned the name of Nadine and Senator Menendez," but did not "say exactly how he was going to make the case go away" and never discussed with Mr. Uribe "the steps that were going to be taken, one, two, three, four, to finish."  *See* Hana Br. 90-91.  Indeed, Mr. Uribe could not say whether Mr. Hana's actions would have been legal or illegal.  *See id.*  Instead, the evidence confirmed that Mr. Hana's true objective was to hire a new lawyer, Doug Anton, for Mr. Parra.  *See id.* at 91-93.  And the evidence confirmed that Mr. Uribe alone purchased the Mercedes Benz for Nadine.  *See id.* at 93-96.

gave Mr. Hana $25,000 in the Ventana's parking lot, Mr. Uribe demanded that Mr. Hana give him the cash: "I'm taking the cash that's there. I, you know, I'm paying for this car, I'm going to take that cash there," to which Mr. Hana responded, "Take it, brother." Tr. 3079:13-20. This conversation also occurred "sometime in the fall . . . of 2019," *id.* at 3077:4-3078:25; 3081:7-12— over a year after the supposed meeting between Mr. Hana and Mr. Uribe in April 2018 and months after Senator Menendez's call to AG Grewal in January 2019. Mr. Uribe's demand for cash long after the events underlying the Government's theory of bribery, in connection with other evidence demonstrating that Mr. Uribe excluded Mr. Hana from his agreement with Nadine and alone took all of the actions toward purchasing the Mercedes Benz, *see* Hana Br. at 96-101 (discussing evidence presented at trial), fails to prove that, at the time Senator Menendez agreed to call AG Grewal to discuss Mr. Parra's case, he did so in exchange for *Mr. Hana* providing Nadine with a Mercedes. *See Silver*, 948 F.3d at 556.

The Government's opposition otherwise confirms how it has tried to piece together unrelated events to construct a timeline that improperly stacked inference upon inference in order to make a case against Mr. Hana with regard to Senator Menendez's alleged actions on behalf of Mr. Uribe and his associates, Mr. Parra, Mr. Hernandez and Ms. Peguero. As an example, in support of its position that "Menendez and Hana's corrupt agreement continued after the January contact with Grewal"—*i.e.*, to the time of Nadine's car purchase—the Government points to the following:

- On March 27, 2019, Mr. Uribe was on the phone with Mr. Hana when Mr. Uribe texted Nadine information for the Mercedes dealership, GX 6D-102-6; GX E303-1; GX B209-13; GX B209-L;

- That same day, Nadine left a voicemail stating, in full: "I have been getting nonstop phone calls and text messages which I didn't even open from Will. So, I think he wants me to set up dinner, which I'm not gonna do. Um. So, I believe that he's trying to go to the meeting you're attending today, and wants me to arrange a dinner and I'm not

arranging a dinner. And, uh, I'm gonna go this weekend, pick a car at that, uh, Edison, at uh, I forgot the name of the dealer, but the Benzel Busch dealer, and I'm gonna see, uh, Monday just sign the papers, get a car, so I'm gonna see if he's gonna um step up and do anything on Monday or not. But I'm definitely gonna get a car Monday," GX A105; GX A105-D;

- Days later, on April 1, 2019, Nadine texted Mr. Uribe: "Will said that he was going to go with me today that's why I didn't follow on anything up I didn't want him to think I was going behind his back," GX B209-13.

Opp. at 31. Of course, none of these messages were sent by or to Mr. Hana. And at the very most, they show that Mr. Hana may have known that Mr. Uribe was purchasing a car for Nadine, GX 6D-102-6; GX E303-1; GX B209-13; GX B209-L, that Mr. Hana wanted Nadine to set up a meeting for him, without any specificity as to what that meeting would be about, GX A105; GX A105-D, and that Nadine wanted Mr. Hana to go with her to pick up a car, as was uncontested (and which he did not do), GX B209-13. But none of these cryptic communications state—or even suggest—that any of this had anything whatsoever to do with Senator Menendez getting a better result in Mr. Parra's or Ms. Peguero's case. *See Calk*, 2022 WL 101908, *2 & *Reichberg*, 5 F.4th at 249-50, *infra.* (discussing ample evidence from which a jury could conclude the existence of a *quid pro quo* based on reasonable inferences derived from conversations between the defendant and the public official discussing the particular question or matter to act upon and the thing of value to be given). Indeed, in a case with numerous text messages and other records confirming that Mr. Uribe facilitated Nadine's purchase of the Mercedes Benz and made monthly payments toward her car for years, all while cutting Mr. Hana out of the process, *see* Hana Br. at 94-101, the Government's current effort invites even more speculation, more piling of inference upon inferences, and more blatantly insufficient evidence. Accordingly, the Court should enter a judgment of acquittal on Counts 1, 2, and 9.

## III. THE GOVERNMENT'S OPPOSITION FAILS TO ADDRESS THE INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR COUNT 15: CONSPIRACY TO HAVE SENATOR MENENDEZ ACT AS AN AGENT OF A FOREIGN PRINCIPAL.

Underlying all of Mr. Hana's post-trial submission is the principle that "the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *United States v. Landesman*, 17 F.4th 298, 320 (2d Cir. 2021); *see also United States v. Pauling*, 924 F.3d 329, 657 (S.D.N.Y. 2017) ("[I]t would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." (emphasis in original)).  As argued in Mr. Hana's moving brief, *see* Hana Br. at 101-31, the Government failed as a matter of law to meet its burden to prove the essential elements of the Count 15 charge:  namely, the existence of a conspiracy to have Senator Menendez act as a foreign agent, as defined by 22 U.S.C. § 611 *et seq.* ("FARA") and the Court's jury instructions; and that Mr. Hana knowingly and willfully joined any such conspiracy.  *See id.* at 102 (quoting the Court's jury instruction with respect to Count 15).[10]  In response, the Government's opposition does not address the fact that the record is devoid of any evidence that the Senator's actions vis-à-vis Egypt in his role as Chair and Ranking Member of the Senate Foreign Relations Committee ("SFRC") were responsive to "orders" or "requests" by the Egyptian government, or that the Senator was in any way eschewing his independently held opinions or policy agendas.[11]  Instead,

---

[10] Mr. Hana does not here reiterate his argument that he cannot be charged with a violation of § 219 under the legislative policy exception recognized by *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018), as he is neither an agent of a foreign principal nor a public official, an argument that was raised in pretrial motions, *see* ECF No. 143 at 39-47, and denied at that time, and does not turn on the evidence at trial.  Obviously, Mr. Hana does not here abandon or otherwise waive those arguments, which were raised and rejected previously.  *See* Hana Br. at 102 n.33.

[11] As described at length in prior briefing, *see* Hana Br. at 102-03 & n.33, the "agency" relationship defined under FARA—and incorporated into § 219—requires, in essence, a lack of independent action on behalf of the putative agent, who is instead complying with , at the very least, a "request"

the Government attempts to address this failing by labeling what is actually unsupported and unjustifiable guesswork an "inference" that the jury was "entitled" to make. Opp. at 50. In doing so, the Government's opposition only accentuates the fact that, unless one resorts to far-flung and wholly unreasonable speculation, there is no evidence in the record to support the existence of a conspiracy to have Senator Menendez act as an agent of a foreign principal; or, alternatively, that Mr. Hana willfully and knowingly agreed to have Senator Menendez act as a foreign agent by transmitting "orders" or "requests" from the Egyptian government. The Government's inapposite arguments fall into four categories:

*First*, the Government argues that the jury was "entitled" to view the Senator's evolving "public posture towards Egypt" as "an act in Egypt's favor" rather than a legitimate "tactical shift." Opp. at 50. To that end, the Government first notes that "[b]eginning in early 2018 and continuing through the course of the scheme, Hana and Nadine Menendez arranged meetings between Menendez and Egyptian government officials," and then associates these meetings—involving "formal delegations" and "office meetings"—with the Senator's "change in approach with respect

---

from a foreign principal in carrying out certain specified political activities for the foreign principal's benefit. *See* Tr. 7127:7-7128:25 (Jury charge). Crucially, the principal must have some degree of control over the agent and, "[a]s used in [FARA], the term control or any of its variants shall be deemed to include the possession or the exercise of the power, directly or indirectly, to determine the policies or the activities of a person, whether through the ownership of voting rights, by contract, or otherwise." 28 C.F.R. § 5.100(b).

The Government emphasizes that, rather than having to prove "any actual request by Egypt" to have met its burden under Count 15, it was sufficient for the jury to have found "that Menendez agreed, consented, assumed, or purported to act as, or was or held himself out as, the foreign principal's agent." Opp. at 49. This, of course, is consistent with the underlying principle that an agent, by definition, is not acting independently but at the "order, request, or under the direction or control, of a foreign principal." 22 U.S.C. § 611(c)(1); *see also id.* at § 611(c)(2) (further defining "agent as a foreign principal" as "any person who agrees, consents, assumes, or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal *as defined in clause (1) of this subsection.*" (emphasis added)).

to public statements concerning Egypt in spring of 2019." *Id.* The Government further argues that some of these meetings were "unusual" by virtue of not appearing on the Senator's calendar, though they occurred in a public setting, at his Senate office. *Id.* Thus, the Government posits that the jury was entitled to infer, on the basis of the Senator's "ongoing relationship" and meetings with representatives of a vital defense partner to the United States, that his evolving diplomatic stance as a leading member of the SFRC amounted to his having acted as a foreign agent. *Id.*

Leaving aside the dubious propriety of such an inference, it simply ignores the lack of evidence of "orders" or "requests." Crucially, the Government points to no proofs showing that Senator Menendez's "tactical shift" was the result of orders or requests originating from meetings involving Egyptian officials and conveyed by Mr. Hana—nor could it, as there was no evidence of such orders or requests. Indeed, as Mr. Hana's moving brief showed, the Government's position in this respect requires overlooking volumes of credible evidence regarding Egypt and the United States' complex but vitally important diplomatic relationship, the regularity of Egyptian officials' meetings with their U.S. counterparts over the course of many decades, the importance and nature of bilateral discourse and meetings between U.S. officials and their foreign counterparts, and the Senator's routine formal and informal meetings with foreign nationals and officials from all over the world, including Egypt. *See* Hana Br. at 105-06, 109-13, 125-28. Moreover, the Government's position that the Senator's public statement concerning Egypt in the spring of 2019 amounted to "an act in Egypt's favor" is, simply put, nonsensical. The public statement in question—an April 8, 2019 dated letter co-signed by seventeen U.S. Senators addressed to then-Secretary of State Pompeo—urged Secretary Pompeo, in advance of meeting with Egyptian President el-Sisi and then-President Trump, to "stress that our partnerships are stronger and more sustainable when rooted in shared values, including democratic governance, political and economic freedom, and

fundamental human rights for all citizens," among other things.  GX 8F-35; *see* Hana Br. at 112 n.36.  Indeed, had the Senator refused to sign on to such a letter highlighting the Egyptian government's room for improvement in matters of human rights, that would have more readily supported the Government's speculation and assumptions.

*Second*, the Government argues that the jury was entitled to infer that there were orders and requests by Mr. Hana in the form of requests to benefit his company IS EG Halal.  *See* Opp. at 52, 55.  But the evidence cited comes nowhere near meeting the definition of those terms under FARA—that is, directives originating from a foreign principal with some measure of authority over a putative agent.  *See* n.3, *supra*.  To the contrary, in making this argument, the Government overlooks its own acknowledgement that neither Mr. Hana nor IS EG Halal can be a foreign principal as a matter of law.  *See* Hana Br. at 107 n.34.  Specifically, the Government notes that following a meeting with Mr. Hana and Ahmed Helmy in 2019, "Menendez called to pressure McKinney to cease his opposition to Egypt's policy goals regarding halal certification," and that the Senator's call amounted to "another act on behalf of or benefitting Egypt."  Opp. at 52.  Putting aside the Government's outrageously speculative contention that the fact that Senator Menendez, Mr. Hana, and Mr. Helmy had dinner prior to the Senator calling Under Secretary McKinney somehow "support[s] the inference that [Senator Menendez's] actions came at the request of Egypt pursuant to an agency relationship," *id.*, any advocacy in which Mr. Hana engaged with his elected representative as a private citizen on behalf of his then-budding, New Jersey-based business is categorically barred from being considered a violative "request" or "order" by a foreign principal under FARA and § 219 because neither Mr. Hana nor his company IS EG Halal—as, again, the Government acknowledges—are "foreign principals," intermediaries, or agents.  And the same is true of the Government's unreasonable insistence—completely unsupported by actual evidence—

that Mr. Hana asking Mr. Helmy whether they "need any message or anything for ISEG" in advance of the Senator's trip to India amounts to the Senator's "willingness . . . to serve as an agent" of Egypt. *Id.* at 55. While evidence presented at trial certainly supports the notion that the Egyptian government and military play a significant role in the Egyptian economy and industry, that cannot be enough to sustain the Government's statement—despite repeated acknowledgements to the contrary—that *Mr. Hana*, in asking his representative for assistance with respect to his business, was being "directly or indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal," *id*. at 55 n.9, such that Mr. Hana or IS EG Halal could be considered, as a matter of law, foreign principals.[12] Nor did the Government at any point argue that they could, and it should not be permitted to rely on this legally inaccurate characterization of Mr. Hana and his business-related advocacy here. Indeed, as repeatedly raised in pre-trial motions and during trial, Mr. Hana was not charged with failure to register as a foreign agent or lobbyist, and the Court so instructed the jury; the Court also struck testimony of a Government witness who testified that a private company or person who might represent the

---

[12] To the extent the Government asserts that Mr. Hana acted as such an intermediary in the context of discussing the personal injury case of April Corley, *see* Opp. at 54-55, that again requires impermissible speculation. The fact that Mr. Helmy expressed to Mr. Hana, who went on to discuss the case with Nadine Menendez and the Senator, that the Senator would be "settled in," GX C207-7T, if he assisted in achieving an equitable resolution simply does not support the inference that the Egyptian government was "ordering" the Senator to achieve a resolution of that case, that the Senator held himself out as being willing to press for any particular resolution of it, or that Mr. Hana was knowingly and willfully transmitting any information with that intention. Moreover, it bears emphasizing that the U.S. and Egypt both had an interest in seeing the case resolved; a primary indicator of agency under FARA, as repeatedly noted, is "whether it is fair to draw the conclusion that an individual is not acting independently," Opp. at 49, rather than following the course of action they would have with or without a foreign principal benefitting from it. *See Att'y Gen. of United States v. Irish N. Aid Comm.*, 530 F. Supp. 241, 256-57 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 159 (2d Cir. 1982).

interests of a foreign government has an obligation to register with the U.S. government under FARA. *See* Tr. 5205:14-5206:11.

*Third*, the Government's descriptions of certain pieces of evidence presented as essential to the Count 15 charge throughout trial also reveal these purported "requests" and "orders" for what they actually were: unremarkable exchanges of non-confidential information, and follow-up from legitimate meetings between officials or constituents regarding commonly broached subjects of Egyptian-American foreign policy. Opp. at 52-53. As an initial matter, the Government argues that "immediately after meeting with Hana and Nadine Menendez, Menendez sent Nadine Menendez—for retransmission to Hana and thereafter to Egypt . . . sensitive real-time information about the number and nationality of staff employed at the U.S. Embassy in Cairo." *Id*. at 52. Again setting aside the entirely speculative nature of this "inference" in the absence of any perceivable order or request for this information, *see* Hana Br. at 113-15, the Government's characterization of the Embassy staff information is telling. The Government repeatedly characterized the information as "non-public" at trial, stressing that the nature of this information reveals the Senator's willingness to share confidential and potentially exploitable United States government intelligence with a foreign principal, and amounted to the Senator abdicating his duty to the United States in favor of his role as a foreign agent.[13] The Government's opposition now omits from its description of this information as "non-public," instead referring to it as merely "sensitive," *see*

_____

[13] *See* Tr. 53:2-4 (Government opening: "Menendez used sensitive, non-public information about the U.S. embassy in Egypt to Egyptian officials. Sensitive information the Egyptians had no business knowing."); *id*. 573:11-17 (Government direct of Bret Tate: "Q: [] you had testified about certain concerns about making [U.S. Embassy staff numbers] public . . . A: The concerns I mentioned before, we could be targets of terrorist [sic], we could be targets for foreign surveillance, we could be targeted for influence."); *id*. 6408:7-10 (Government summation: "Here [Menendez] is . . . giving out sensitive, non-public information about the number of Americans stationed abroad and the number of foreign nationals working at the U.S. embassy in Egypt").

Opp. at 52-53, a characterization based entirely upon the testimony of Bret Tate, an agricultural attaché, Tr. 371:9-10, as purportedly supported by the Government's speculative interpretation of a very brief exchange between SFRC staffers, *see* Opp. at 53 ("[I]nformation such as Menendez provided was sensitive and was treated as such by the staff members involved in obtaining it" (citing GX 8A-1 ("Don't ask why I'm asking"))).  But while the Government states that the "jury heard that this type of information was highly sensitive because it could allow the identification and location of personnel associated with the Embassy," *id.* at 52—again, per Bret Tate's testimony alone—the Government nowhere in its opposition defines the information as "confidential," "classified," or "non-public"; nor does it explain how such "identifying" information in the form of raw number of staff is more sensitive than full names and employment histories appearing on publicly available Linkedin.com profiles.  *See* Hana Br. at 113 n.37 (noting the accessibility of hundreds of Embassy staffer LinkedIn.com profiles, and quoting publicly available State Department Office of the Inspector General reports disseminating staffing numbers).  In short, the Government has entirely failed to demonstrate how the Senator asking for this non-confidential information from an SFRC staffer was remarkable, let alone problematic or coerced.  Certainly the Government has not demonstrated how discussing U.S. Embassy staff numbers is in any way indicative of the Senator ignoring his duty to the United States government in favor of a foreign principal.

*Finally*, the Government entirely misstates the circumstances surrounding the so-called "ghost-written" letter, creating the misleading and unfounded impression that the Senator took a far more active role in drafting it, and that he did so at the direction of a foreign principal via Mr. Hana.  In the Government's telling, "Menendez . . . gathered a summary of the holds that another U.S. Senator had imposed on foreign military financing to Egypt, and of the human rights concerns

motivating those holds," leading to "Menendez, at the request of Nadine Menendez, Hana, and an Egyptian general, [ghostwriting] for Egypt a response to those very concerns Menendez had just summarized." Opp. at 53. To be clear, the Senator did not "gather" any information at all; he forwarded Nadine Menendez a published al-Monitor article discussing the U.S.'s foreign military financing grants and sales to Egypt in relation to Egypt's civil rights record, adding only "FYI." *See* GX C405. But beyond its fairly blatant mischaracterization of the actual evidence at trial, the Government again fails to contest the fact that, as raised in Mr. Hana's moving brief, *see* Hana Br. at 124-25, the Senator's assistance amounted to no more than polishing high-level and routine bullet points regarding Egypt-U.S. foreign policy, sent to Nadine Menendez by Mr. Hana, as a favor to Mr. Hana's friend and his then-girlfriend after having ignored Mr. Hana's analysis of the policy issues for several weeks. This may not have been conduct that should be admired in a U.S. Senator, but the Government has pointed to absolutely no evidence in the record that Egypt made or even requested (as that term is defined in the statute) that the Senator draft, edit or send any such letter. Its contention that this was a permissible inference, *see* Opp. at 54 ("The jury could obviously infer that this attempt to 'prove a point' to the general was not *unsolicited* but rather resulted from the general's request."), is wrong and unfair: in fact, there was nothing from which anyone could infer that any officer of the Egyptian government or foreign principal played any role in drafting or requesting that any letter be drafted, despite the Government's conclusory speculation to the contrary.[14]

---

[14] Nor does the Government meaningfully respond to Mr. Hana's argument that the Government conflates the elements underlying the bribery and foreign agent charges, *see* Hana Br. at 129-31, instead doubling down on its misleading and inaccurate assessment of payments made by Mr. Hana to Nadine. Specifically, the Government states that "[t]he extensive evidence of Menendez's acceptance of bribes from Hana and Daibes in exchange for his actions on behalf of Egypt . . . itself easily justified the jury's finding that Menendez acted or agreed to act as Egypt's agent, even leaving aside any of the other factors supporting that finding." Opp. at 55. But, even assuming

In sum, rather than meaningfully contesting that the record is devoid of any order or request by a foreign principal, any indication whatsoever that Senator Menendez was not acting independently, or proof that Mr. Hana was willfully and knowingly pursuing a scheme to have the Senator act as a foreign agent, the Government relies entirely on its own speculative interpretation of evidence adduced at trial, shoehorned into an inaccurate reading of FARA. Thus, the Government's opposition demonstrates how it has failed to prove Mr. Hana guilty, and his motion for a judgment of acquittal should, accordingly, be granted.

## IV.    MR. HANA WAS ENTITLED TO A SPECIAL VERDICT FORM.

The Government argues, without citation, that the Court's multiple conspiracies instruction means, *per se*, that "[t]here was thus no need for a special verdict form." Opp. at 140. But that is simply not the law. While the Government states that there is "a traditional distaste for special interrogatories in criminal cases," *id.* (quoting *Bell*, 584 F.3d at 484), it ignores the Second Circuit's "stated preference for special interrogatories in particularly complex criminal cases," *United States v. Ogando*, 968 F.2d 146, 148-49 (2d Cir. 1992). And Defendants' proposed verdict sheet would, of course, have aligned with that stated preference, giving the jury the opportunity to clarify its verdict in a way that allowed a subsequent assessment of whether it was supported by the evidence at trial. *See United States v. Badalamenti*, 663 F. Supp. 1542, 1545 (S.D.N.Y. 1987)

---

anything of value received by Nadine from Mr. Hana can be viewed as "*quids*," nothing of material value flowed from Mr. Hana to Nadine until July 2019, over a year after the "ghost-written" letter, U.S. Embassy figures message, and Senate office meetings highlighted by the Government here, and throughout trial, undermining that there was any *quid pro quo*, even based on the types of timing coincidences upon which the Government otherwise relied throughout this trial. Likewise, the meetings and communications in 2021 surrounding Senator Menendez's CODEL to Egypt, even if somehow probative of a scheme to have the Senator to act as a foreign agent, *id.* at 50-52, do not help the Government's argument against Mr. Hana, because there is no evidence that Mr. Hana had any involvement in them. *See* Hana Br. at 128 n.39.

(a jury's "special findings" can indicate that guilty verdicts were supported by the evidence). Indeed, the jury's across-the-board guilty verdict—far from supporting the Government's contention that it was particularly "careful and attentive," Opp. at 140—causes concern that it did not, in fact, render the kind of "discriminating verdict" that is returned when a jury finds Defendants guilty on some counts but not others, indicated a much fairer and more thorough consideration of the charges and the evidence, *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006); *United States v. Greer*, 285 F.3d 158, 174 (2d Cir. 2002) (same).

Finally, the Government ignores its own response to Defendants' pretrial duplicity arguments, where it said that the need for a unanimous verdict could be addressed by jury instructions and the verdict form. ECF No. 180 at 96 (citing *United States v. Arguedas*, 20-cr-135, 2021 WL 5567749, at *1 (S.D.N.Y. Nov. 29, 2021) (noting the option of "resolv[ing] any duplicity problem through jury instructions and the verdict form")). The failure to take the Government's own proposed course of action, which could have made clear whether the jury's verdict was in fact unanimous, necessitates a new trial.[15]

## V. THE GOVERNMENT MISCONSTRUES FEDERAL RULE OF EVIDENCE 404(B).

Mr. Hana writes briefly to correct two misimpressions left by the Government's response to his motion for a new trial based on Federal Rule of Evidence 404(b).

*First*, Mr. Hana's moving brief argued that he was improperly prohibited from admitting admit prior-good-acts evidence to prove intent (or lack thereof), innocent mental state, and

---

[15] The Government's argument that Defendants' proposed verdict sheet "also was 9 pages long and confusing," Opp. at 141, almost speaks for itself. Nine pages is not particularly long (the verdict sheet actually used was four pages long), and the proposed verdict sheet really did no more than track the schemes set forth in the Government's own Indictment and presented by the prosecution at trial.

knowledge, among other things. Hana Br. at 154-58. Such evidence is explicitly permitted by the terms of Rule 404(b), which prohibits prior-acts evidence to "prove a person's character" but permits it "for another purpose." The Government, ignoring the extensive caselaw (including that cited in the moving brief) demonstrating that prior gift-giving is properly admissible under Rule 404(b)(2)—again, not to prove character, but for a non-propensity purpose—collapses the two evidentiary purposes, arguing without citation that the proffered evidence was "specific good-act propensity evidence," Opp. at 130, "character evidence," *id.* at 131, and "specific instances of conduct for the purpose of proving character," *id.* at 132, and thus, even if otherwise admissible, could not have been admitted through specific instances of conduct due to Rule 405(b).

Although the Government claims otherwise, *see id.* at 133 (contending that "[Mr.] Hana does not really appear to disagree"), Mr. Hana obviously does disagree. As noted at length in the moving brief, the proffered evidence would have gone not to character, but to intent, mental state, and knowledge, and numerous courts have admitted similar evidence for precisely those purposes in other bribery or bribery-related prosecutions. *See* Hana Br. at 155-56 (citing cases, including *United State v. Marlinga*, 457 F. Supp. 2d 769, 775 (E.D. Mich. 2006) (finding earlier non-bribery conduct to be "indisputably probative" of the defendant's "innocent state of mind and lack of criminal intent")). Given that caselaw, and the plain text of Federal Rule of Evidence 404(b), the Government's blanket statement that "prior good acts (or the lack of bad acts) cannot be proven through specific instances of conduct" is flatly incorrect: per that Rule, prior acts cannot be offered so long as it falls within the "Permitted Uses" of Rule 404(b)(2), rather than the "Prohibited Uses" of 404(b)(1).[16] That is, when introduced for a non-propensity purpose, prior good acts can

---

[16] The Government appears to be confusing Mr. Hana's argument, which bases the admissibility of Mr. Hana's prior gift-giving on Rule 404(b), with Mr. Daibes', which premised the admissibility of Mr. Daibes' prior gift-giving on Rule 405. It references the Court's ruling on Mr. Daibes'

naturally be proven through specific instances of those prior good acts—indeed, it would be difficult to think of another way to introduce them.  The Government's own caselaw endorses this understanding.[17]  *See United States v. Zodhiates*, 235 F. Supp. 3d 439, 452 (W.D.N.Y. 2017) ("A defendant may still introduce other-acts evidence that is relevant to an element of the crime charged (such as intent), provided that the other-acts evidence is not evidence of the defendant's character." (emphasis omitted)).  This legal framing should inform the Court's analysis.

*Second*, the Government contends that any evidentiary errors would have been harmless because "the evidence surrounding Hana's participation in the delivery of bribes that bore no trappings whatsoever of gifts . . . overwhelmingly supported conviction even standing alone." Opp. at 135.  It appears to argue that because some of what Mr. Hana did do not look like gifts (specifically, the consulting job to Nadine), then *none of them* are gifts.  *Id.*  But this both defies plain logic and ignores the Government's own "kitchen sink" approach, in which it argued in summation that *everything* Mr. Hana gave the Senator and Nadine were *quids*, things of value, and bribes:  the air purifier, the carpeting, the elliptical, the cash, the gold, various meals, the mortgage payment, and the job at IS EG Halal.  *See* Tr. at 6374-75; 6383; 6386-87; 6419.  This necessarily meant that Mr. Hana was obligated to rebut the contention that each of these various items were bribes.  Moreover, Mr. Hana was of course not obligated to demonstrate that items like the

---

motion, *see* Opp. at 133 (citing Tr. 5544-45).  But the Court's ruling entirely concerned Rule 405(b), which was the specific basis under which Mr. Daibes moved, and it has no bearing on the proper understanding of non-propensity evidence under Rule 404(b).

[17] The Government also mis-describes *United States v. White*, 737 F.3d 1121 (7th Cir. 2013), as concerning Rule 404(b).  Opp. at 132.  That case does not cite Rule 404(b) and actually concerns Rule 404(a)(2), which deals with evidence of a "pertinent [character] trait."  So do *United States v. Nektalov*, 2004 WL 1637010 (S.D.N.Y. July 21, 2004), *United States v. McMahan*, 394 F. App'x 453 (10th Cir. 2020), and the relevant portion of *United States v. Marrero*, 904 F.2d 251 (5th Cir. 1990).

consulting job were specifically gifts; rather, his defense was, that whatever they were, they were not bribes—that is, not given with corrupt intent.  Evidence of Mr. Hana's prior gift-giving would have supported—and corroborated—his argument that these were not all bribes, thus directly undercutting the Government's case that they *all* were.  Simply put, if other items that Mr. Hana was unable to introduce at trial were gifts to Nadine, it logically supports an argument that at least some of the items on the Government's list, all of which it argued were bribes, were gifts as well, even if others were not.  *See, e.g.*, *United States v. Quality Formulation Labs, Inc.*, 512 F. App'x 237, 240 (3d Cir. 2013) ("Some evidence of earlier good acts may be admissible to show a defendant lacked wrongful intent in later behavior.").  The failure to permit Mr. Hana to fully argue this point to the jury, therefore, necessitates a new trial.

## VI. THE GOVERNMENT FAILS TO REBUT THE PRESUMPTION THAT COUNTS 1 AND 15 ARE MULTIPLICITOUS.

The Government's response to Mr. Hana's multiplicity argument barely addresses the relevant law.  It perfunctorily acknowledges the Second Circuit's holding that a defendant may not be convicted when a smaller conspiracy is "wholly contained" within a larger one, Opp. at 145 (quoting *United States v. Gaskin*, 364 F.3d 438, 454 (2d Cir. 2004)), and briefly alludes to (but does not list) the eight *Korfant* factors, *id.* (citing *United States v. Maslin*, 356 F.3d 191, 196 (2d Cir. 2004)), before only discussing the factors it wants to focus on:  differing statutory objectives and differing participants.  This drive-by application of the *Korfant* factors is simply not sufficient to show by a preponderance of the evidence—which is the Government's burden after Mr. Hana made a "non-frivolous" or "colorable" showing in his moving brief, *see* Hana Br. at 165[18]—that

---

[18] As noted in Mr. Hana's moving brief, the Second Circuit employs this burden-shifting framework because of "the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy."  Hana Br. at 165 (quoting *Lopez*, 356 F.3d at 467).

Counts 1 and 15 in fact allege only one conspiracy, *United States v. Lopez*, 356 F.3d 463, 467 (2d Cir. 2004).

First, the Government argues (without citation) that the fact that the two conspiracies contained different statutory objectives, with Count 1 charging conspiracy to commit bribery under 18 U.S.C. § 201 and Count 15 charging conspiracy to have a public official act as a foreign agent under 18 U.S.C. § 219, is "an overwhelming obstacle to any possible finding of multiplicity." Opp. at 146. But this argument runs directly counter to the *Korfant* factors, which lists such differing statutory objectives as only one factor among eight; the Government's argument that a single factor is an "overwhelming obstacle" to appropriate relief simply ignores the Second Circuit's emphasis on the principle that all eight factors must be applied "with the lively awareness that no dominant factor or single touchstone" is dispositive. *United States v. Macchia*, 35 F.3d 662, 667 (2d Cir. 1994). Indeed, in a comprehensive opinion rejecting the very same argument from the Government, Judge Nathan stressed that this factor alone is not "fatal," as no single *Korfant* factor is "dominant or dispositive." *United States v. Maxwell*, 20-cr-330, 2022 WL 1294433, at *4 (S.D.N.Y. Apr. 29, 2022). And courts in this district have accordingly found two conspiracy counts to be the same offense despite differing statutory objectives. *United States v. Hernandez*, 09-cr-625, 2009 WL 3169226, at *11 (S.D.N.Y. Oct. 1, 2009) (noting that "[i]t is not enough to argue that because the two indictments charge conspiracies to violate different statutes that they charge different conspiracies" and holding that conspiracies to defraud the United States and to commit mail and wire fraud were the same conspiracy as an earlier conspiracy to use or transfer false IDs). The Government's attempt to elevate the statutory-objectives element, uniquely, to a *sine qua non* for relief must therefore be rejected.

The Government takes the same tack with another *Korfant* factor, the overlap in participants between the two charged conspiracies, which it describes as "a truly fatal obstacle to a finding of multiplicity," arguing that the fact that Mr. Daibes was not charged in Count Fifteen "*alone* compels a finding that the two charges are not multiplicitous." Opp. at 147 (emphasis added). Again, the Government seeks to render one of the *Korfant* factors dispositive, ignoring the Second Circuit's repeated admonishment that no single factor is dominant. *United States v. Estrada*, 320 F.3d 173, 181 (2d Cir. 2003). The Government also fails to address that Count 15 is, of course, subsumed in Count 1, so Mr. Daibes's nonparticipation in Count 15 is readily explained: the objective of Count 1 concerned conduct on behalf of Mr. Hana, Mr. Daibes, and Egypt, while the objective of Count 15 concerned only that conduct on behalf of Mr. Hana and Egypt, so Mr. Daibes was a participant in Count 1 but not Count 15. Far from being "difficult to understand," Opp. at 147, a conclusion that one conspiracy is subsumed in another is routine and noncontroversial. *See* Hana Br. at 166-67 (citing cases); *see also Maxwell*, 2022 WL 1294433, at *7 (rejecting Government's argument that one conspiracy's inclusion of a unique conspirator was fatal to multiplicity).

The Government also argues that "the societal interest in avoiding bribery is not the same interest that is protected by the foreign influence statute." Opp. at 148. In so arguing, the Government raises a point wholly untethered from any of the *Korfant* factors; indeed, the one case the Government cites did not, as the Government admits, even include a multiplicity challenge. *See United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021). Rather, *Skelos* concerned two conspiracies, raised under two different statutes—one under 18 U.S.C. § 1951 and the other under 18 U.S.C. § 1349. *Id.*; *United States v. Araujo*, 17-cr-438, 2018 WL 3222527, at *3 (S.D.N.Y. July 2, 2018). By contrast, the conspiracies here are both charged under 18 U.S.C. § 371, meaning

the Government has, in fact, charged Mr. Hana with a violation of the same statute twice—raising the archetypal Double Jeopardy problem. *See United States v. Sattar*, 314 F. Supp. 2d 279, 307 (S.D.N.Y. 2004) (multiplicitous indictments violate the Fifth Amendment's Double Jeopardy Clause because they subject a person to punishment for a single crime more than once).

It is telling which *Korfant* factors go entirely unmentioned in the Government's brief: there is nothing about the supposedly distinct conspiracies' similarity of operations; nothing about their common factual objectives; nothing about their interdependence; nothing about their temporal overlap; nothing about their geographic overlap; and nothing about their common overt acts. *See* Hana Br. at 166-68. The Government fails to mention its explicit collapsing of the two conspiracies into one in its summation. *See id.* at 161-63. And it says nothing about its pretrial argument that the Indictment charged a single "overarching scheme" and a "single conspiracy" with "significant overlap in participants, goals, and conduct" and "close interdependence among portions of the scheme." *See id.* at 160-61. Finally, the Government barely touches on the Indictment itself, which makes no effort to factually distinguish between the two conspiracies. *See id*. at 160.

Instead, the Government argues that because the jury convicted on both counts, it properly found that there were two separate conspiracies. Opp. at 148-49. But this is obviously not the law: every time a multiplicity challenge is raised, it is because the jury convicted on two or more counts, so permitting a jury verdict to preempt a multiplicity challenge would render the entire doctrine a nullity. *See United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006) ("If the jury convicts on more than one multiplicitous count, the defendant's right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts."). Indeed, the Government advised just this course of action in

its opposition to Mr. Hana's motion to dismiss, arguing that the Court should defer any ruling on multiplicity until after a jury verdict. *See* ECF No. 180 at 102-03 (citing cases, including *United States v. Ghavami*, 10-cr-1217, 2012 WL 2878126, at *11 (S.D.N.Y. July 13, 2012) ("Should the jury convict Defendants on what the Court ultimately determines to be multiplicitous counts, the Court will enter judgment on only one of the multiplicitous convictions.")). That jury verdict has now occurred, finding Mr. Hana guilty on two counts alleging the same conspiracy. For the reasons above and in Mr. Hana's moving brief, the Court should only enter judgment on one of either Counts 1 or 15.

**CONCLUSION**

For these reasons, Defendant Wael Hana respectfully requests that the Court enter an Order acquitting Mr. Hana of his convictions under Counts 1, 2, 6, 7, 9, and 15 under Federal Rule of Criminal Procedure 29; or, in the alternative, granting Mr. Hana a new trial under Federal Rule of Criminal Procedure 33. If the Court denies both of these motions for post-trial relief, Mr. Hana alternatively moves the Court to impose judgment on only one of two multiplicitous conspiracies charged under Counts 1 and 15.

Dated:  September 30, 2024

Respectfully submitted,

*s/ Lawrence S. Lustberg*

Lawrence S. Lustberg
Ricardo Solano, Jr.
Anne M. Collart
Kelsey A. Ball
Andrew J. Marino
Christina M. LaBruno
Jessica L. Guarracino
Elena M. Cicognani
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
llustberg@gibbonslaw.com