**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

          Defendants.

Case No. S4 23-cr-490 (SHS)

## <u>SENATOR ROBERT MENENDEZ'S REPLY IN SUPPORT OF HIS RULE 29 AND RULE 33 MOTIONS</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.   THE GOVERNMENT FAILED TO PROVE VENUE AS TO SIXTEEN COUNTS OF CONVICTION .................................................................................................... 2

    A.  The Government Has Not Supported Venue For the Various Counts Related To The Hana-Egypt Charges (Counts 5, 7, 8) ................................................................. 4

    B.  The Government Has Not Shown Any Foreseeable Essential Conduct Occurred In This District Related To The Uribe Bribery Charges (Counts 9 and 10) ........................... 8

    C.  The Government Has Not Shown Any Essential Conduct Occurred In This District Related To The Daibes Bribery Scheme (Counts 11, 13, 14) .......................................... 10

    D.  Venue Was Not Established For The Bribery Conspiracy Charges (Counts 1–3) ..... 12

    E.  Venue Is Improper In This District For The Foreign Agent Charges (Counts 15 and 16) .................................................................................................... 13

    F.   The Government Did Not Even Attempt to Justify Venue Over the Count 4 Obstruction Charge ......................................................................................... 13

II.  THE COURT SHOULD VACATE THE BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO SHOW A PROMISE BY SENATOR MENENDEZ TO USE OFFICIAL POWERS IN EXCHANGE FOR A BRIBE ...................................... 15

III. THE CONVICTIONS MUST BE VACATED BECAUSE THEY DEPEND ON EVIDENCE THAT VIOLATED SPEECH OR DEBATE CLAUSE PROTECTIONS 21

IV. THE EVIDENCE INTRODUCED WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT SENATOR MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS (COUNTS 4, 17, AND 18) ....................................................................... 25

CONCLUSION ..................................................................................................................... 28

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Government of Virgin Islands v. Lee*,
    775 F.2d 514 (3d Cir. 1985) ..........................................................................23

*Gravel v. United States*,
    408 U.S. 606 (1972) ......................................................................................21

*In re Sealed Case*,
    80 F.4th 355 (D.C. Cir. 2023) ...........................................................21, 22, 24

*McDonnell v. United States*,
    579 U.S. 550 (2016) ......................................................................................15

*U.S.A. v. Greenhut*,
    No. 2:15-CR-00477-CAS-1, 2016 WL 6652681 (C.D. Cal. Nov. 8, 2016) ...........................3

*United States v. Aguilar*,
    515 U.S. 593 (1995) ................................................................25, 26, 27, 28

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ..................................................................3, 5, 6

*United States v. Biaggi*,
    853 F.2d 89 (2d Cir. 1988) ...........................................................................23

*United States v. Boruch*,
    550 F. App'x 30 (2d Cir. 2013) ..................................................................8, 9

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012) ..............................................................3, 4, 8, 9

*United States v. Fassnacht*,
    332 F.3d 440 (7th Cir. 2003) ........................................................................26

*United States v. Fortenberry*,
    89 F.4th 702 (9th Cir. 2023) .........................................................................15

*United States v. Gross*,
    No. 15 Cr. 769 (AJN), 2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) ......................6

*United States v. Helstoski*,
    442 U.S. 477 (1979) ...............................................................................21, 24

*United States v. Jefferson*,
    674 F.3d 332 (4th Cir. 2012) .........................................................................5

*United States v. Jones,*
    393 F.3d 107 (2d Cir. 2004).........................................................................20

*United States v. Lee,*
    919 F.3d 340 (6th Cir. 2019) ...............................................................16, 17

*United States v. Mangano,*
    No. 16 Cr. 540 (JMA), 2022 WL 2872670 (E.D.N.Y. July 20, 2022) ..................26

*United States v. Mennuti,*
    679 F.2d 1032 (2d Cir. 1982)........................................................................7

*United States v. Pace,*
    314 F.3d 344 (9th Cir. 2002) .......................................................................4

*United States v. Palma-Ruedas,*
    121 F.3d 841 (3d Cir. 1997).......................................................................15

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019)......................................................................1, 2

*United States v. Purcell,*
    967 F.3d 159 (2d Cir. 2020)......................................................................8, 9

*United States v. Quattrone,*
    441 F.3d 153 (2006).............................................................................25, 26

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005)...................................................................3, 4, 5

*United States v. Rodriguez-Moreno,*
    526 U.S. 275 (1999)...............................................................................3, 4

*United States v. Rommy,*
    506 F.3d 108 (2d Cir. 2007).......................................................................10

*United States v. Royer,*
    549 F.3d 886 (2d Cir. 2008).......................................................................14

*United States v. Schwarz,*
    283 F.3d 76 (2d Cir. 2002)....................................................................25, 26

*United States v. Shepard,*
    500 F. App'x 20 (2d Cir. 2012) .................................................................8, 9

*United States v. Stephenson,*
    895 F.2d 867 (2d Cir. 1990).........................................................................6

*United States v. Sutherland,*
   921 F.3d 421 (4th Cir. 2019) .................................................................26

*United States v. Tzolov,*
   642 F.3d 314 ..............................................................................5, 14

*United States v. Wey,*
   No. 15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)........................7

*United States v. White,*
   887 F.2d 267 (D.C. Cir. 1989) ..............................................................7

*Woods v. Centro of Oneida, Inc.,*
   103 F.4th 933 (2d Cir. 2024) .............................................................1, 3

## STATUTES

18 U.S.C. § 201 ..............................................................................3

18 U.S.C. § 1512(i) ....................................................................13, 14

18 U.S.C. § 1951 (b)(2) ......................................................................4

22 U.S.C. § 611(c)(1)........................................................................13

## INTRODUCTION

The government's 149-page opposition brief (ECF 611, the "Opposition") manages somehow still to evade the core problems with Senator Menendez's conviction: it is based, in large part, on rank speculation that was urged upon the jury by the prosecutors. The government relied on such speculation to overcome the gaping holes in its proof as to the most fundamental aspects of its case—from venue to whether Senator Menendez agreed to a *quid pro quo* bribe in exchange for official action. Speculation cannot substitute for evidence and fair inference, neither at trial nor in post-trial briefing.

For example, in defending against the Senator's venue challenge, the government repeatedly relies on speculation that certain in-District conduct was foreseeable to Senator Menendez. Such speculation is no more appropriate in deciding venue than it is in deciding whether the substantive elements of each offense have been met. Indeed, the Opposition implores this Court to simply ignore the law on venue. Venue "is not dispensed in gross." *Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 940 (2d Cir. 2024). Try as it might, the government cannot satisfy venue requirements by grouping the counts and finding some connection to the District for each group. Venue requires more: an analysis of the "essential conduct elements" for each charge of bribery, extortion, and honest services wire fraud. The government did not even attempt to conduct such an analysis for each count, as any such analysis shows that venue in this District was improper.

The government advances similar erroneous arguments throughout its Opposition, claiming that Senator Menendez's conviction was proper because the jury was permitted to ***infer*** inculpatory facts, despite clear law that a fair inference is not rank speculation. Nor is it *ipse dixit*. In the Second Circuit, a fair inference is "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*,

924 F.3d 649, 656 (2d Cir. 2019).  The "evidence" supporting Senator Menendez's convictions simply does not meet this standard: for example, the government can point to *no* evidence supporting the reasoned inference that Senator Menendez intended to interfere with any grand jury or judicial proceeding, which Second Circuit precedent requires to support a conviction.

Nor does the Opposition offer any cure for the government running roughshod over the Senator's constitutionally protected Speech or Debate privilege.  In reality, even reviewing the record in the government's favor, the evidence simply does not support any reasoned inference that Senator Menendez did—or even promised to—use his official powers in exchange for a bribe.

Vacatur is admittedly a high bar.  But it is met here, as reflected in the government's attempt to substitute 149 pages of hot air for a legally indefensible record.  For the reasons cited in Senator Menendez's opening brief and detailed further below, the law requires that the conviction of Senator Menendez on all counts be vacated, or at a minimum, that a new trial be ordered.

## ARGUMENT[1]

### I.    THE GOVERNMENT FAILED TO PROVE VENUE AS TO SIXTEEN COUNTS OF CONVICTION

The government's Opposition only underscores how insufficient its evidence of venue was at trial.  The government's feeble effort to overcome Senator Menendez's venue challenge is underscored by the fact that it both ignores the more stringent venue standards applicable to substantive counts and engages in rank speculation throughout.  Indeed, the government's

---

[1] Senator Menendez incorporates in full the arguments raised in co-defendants Wael Hana's and Fred Daibes' respective reply memoranda of law in further support of their motions under Federal Rules of Criminal Procedure 29 and 33.

arguments elide that venue must be established as to *every single count* based on the essential conduct elements for each charge.  *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989) ("[V]enue must be proper with respect to each count."); *United States v. Davis*, 689 F.3d 179, 185 (2d Cir. 2012) ("Where, as here, a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge.") (citations omitted).  Like standing, venue "is not dispensed in gross." *Woods*, 103 F.4th at 940.  But that's precisely what the government attempts to do in its Opposition, grouping its venue arguments into three categories—"Counts Related to Egypt," "Counts Related to the New Jersey Attorney General's Office," and "Counts Related to Daibes's Federal Prosecution and Qatar"—without even conducting an analysis of the "essential conduct elements" for the various charges of bribery, extortion, and honest services wire fraud.  Each of those charges has separate essential conduct elements that must guide the Court's analysis for venue:

    *Bribery*: the "essential conduct element" for bribery under 18 U.S.C § 201 requires the Court to determine the location where a bribe was demanded, sought, received, accepted, or agreed to be received or accepted in the district of the prosecution.  *See* 18 U.S.C. § 201 (b)(2)(A), (C); *see also United States v. Ramirez*, 420 F.3d 134, 144 (2d Cir. 2005) (quoting *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)) (determining the essential conduct element of an offense requires identifying where the "physical 'conduct constituting the offense' took place"); *cf. U.S.A. v. Greenhut*, No. 2:15-CR-00477-CAS-1, 2016 WL 6652681, at *7 (C.D. Cal. Nov. 8, 2016) (noting that, for purposes of venue, the "essential conduct element of § 201(c)(1)(A) is the giving, offering, or promising of a thing of value").

    *Extortion*: for Hobbs Act extortion, venue can only lie in the district where interstate commerce is foreseeably affected or where the acts constituting the crime took place.  *Davis*, 689

F.3d at 186. If venue is based upon the district where interstate commerce was affected, the evidence must show that the "defendant knew or reasonably should have foreseen that interstate commerce would have been affected in" that specific district. *See id.* at 187. The act constituting the crime of extortion is to "obtain[] property from another . . . under color of official right." *See* 18 U.S.C. § 1951 (b)(2).

*Honest services wire fraud*: the "essential conduct element" for wire fraud requires the Court to analyze the location where a wire in furtherance of the charged fraud emanated from or ended in. *Cf. Ramirez*, 420 F.3d at 145 (quoting *Rodriguez-Moreno*, 526 U.S. at 280) (finding that the essential conduct element of mail fraud for venue is where defendant "'places,' 'deposits,' 'causes to be deposited,' 'takes,' or 'receives' mail, or 'knowingly causes' mail 'to be delivered,'" and not where the scheme to defraud was devised). The district where the alleged scheme to defraud is devised cannot alone support venue for a wire fraud count in the absence of in-district wires. *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002) (finding that venue for wire fraud was improper in the district where the scheme to defraud was devised because "although a fraudulent scheme may be an element of the crime of wire fraud, it is using wires and causing wires to be used in furtherance of the fraudulent scheme that constitutes the prohibited conduct.").

A.    **The Government Has Not Supported Venue For the Various Counts Related To The Hana-Egypt Charges (Counts 5, 7, 8)**

In attempting to defend venue on its "Counts Related to Egypt," the government ignores the essential conduct element for each of the various substantive charges. For example, the government identified no evidence that Senator Menendez sent or received a wire to or from this District in furtherance of the alleged wire fraud charge (Count 7), or that he caused others to do

so, or that such wires were foreseeable to him.[2]  The only in-district wire the government identified supporting this charge is Hana's WhatsApp message to Shawky during a dinner with Senator Menendez in Manhattan.  But that message was, at most, a preparatory act, not essential conduct, for the offense.  *See Beech-Nut Nutrition Corp.*, 871 F.2d at1190 ("venue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense"); *see also United States v. Tzolov*, 642 F.3d 314, 318 (finding venue improper for securities fraud in the district where the defendant boarded flights to meetings in which he made fraudulent statements because defendant did "not transmit any false or misleading information into or out of the Eastern District.").  The government seemingly concedes as much.  Opp. at 69 (WhatsApp message was used to schedule a later Washington D.C. meeting that "***precipitated*** Menendez's promise to approve sale of tank ammunition.").

As to the extortion and bribery counts relating to Hana and Egypt (Counts 5 and 8), the government relies on the June 30, 2018 dinner at Mr. Chow restaurant in Manhattan.  But the government cannot show any of the essential conduct relating to extortion or bribery occurred at this dinner.  Indeed, the government has not shown any evidence of a discussion of a bribe at the dinner or even discussion of a promise to approve the sale of tank ammunition.  At most, the government has shown that Hana sent a message at this dinner to move the timing of a different, pre-scheduled meeting (in Washington D.C.) that then *precipitated* a supposed promise to approve the sale of tank ammunition.  Perhaps more puzzling about the government's theory is the fact that the Washington D.C. meeting was *already scheduled* prior to the dinner at Mr.

---

[2] Nor can alleged "concealment of the source of the gold" establish venue for wire fraud (Opp. at 72 n.13); while a false statement may be an element of wire fraud, it is not "an essential conduct element for purposes of establishing venue" for wire fraud.  *Ramirez*, 420 F.3d at 145; *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012).

Chow and the message from Hana in Manhattan was simply moving the meeting earlier by one day. *See* GX C407; GX C206-3, GX C206-3T. Nor can the government's self-serving and illogical claim that this meeting was "necessary" to the scheme—which the government does not elaborate on—undermine the obvious conclusion that the Mr. Chow dinner was a classic "preparatory" act that cannot sustain venue. *Beech-Nut Nutrition Corp.*, 871 F.2d at 1190. The fact that the dinner was temporally antecedent to a later dinner does not make it "necessary." Indeed, contrary to *Gross*, nothing about the Mr. Chow dinner or the message from Hana at that dinner were "crucial components of [] the bribery scheme." *See United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *39 (S.D.N.Y. Oct. 18, 2017) (quoting *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990)).

The government also claims that venue for the Hana/Egypt scheme generally is proper because "Menendez, Daibes, and Helmy met at a hotel in Manhattan to discuss rewarding Daibes with business ventures with Egypt." Opp. at 69. But Egyptian real estate investments with Daibes were never part of any charged bribery scheme, or even referenced in the Indictment. It had nothing to do with the charged offense, and the government's effort to link these two events only exposes how weak the government's evidence to support venue truly was.[3] Nor is there any allegation that Menendez did anything improper to further some alleged business venture between Daibes and Helmy—and no such venture ever materialized.

---

[3] The government's reliance on *Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *38, is misplaced. Opp. at 76. There, the evidence supporting venue consisted of emails sent from the Southern District of New York that "la[id] the groundwork for" the bribe by obtaining key information from each board member needed to ensure their nomination and election. Unlike the emails there, where the contents of the communication were known and thus could be deemed essential to the bribery scheme, there is no evidence of what actually was discussed in the hotel meetings that would permit a finding that the meetings were essential to any bribery scheme.

Next, the government alleges that venue is proper for the "Counts Related to Egypt" because "Daibes provided free transportation to Menendez and Nadine Menendez through Manhattan on their way back from a trip to Egypt."  Opp. at 69.  The government suggests that this transportation was a "thing[] of value" that would suffice as essential conduct underlying the Egypt bribery schemes.  The suggestion that a $50 or $100 ride from the airport was a bribe that resulted in official acts is risible, and only exposes how thin the government's venue evidence is. There simply is no evidence apart from the government's rank speculation that anything occurred on this ride in the Southern District of New York that furthered a bribery scheme.

Finally, the government argues that the sale of gold bars through Vasken Khorozian, who later traveled to Manhattan to convert the gold to cash, supported venue in this District.  But the government charged Senator Menendez with extorting gold bars from Daibes and receiving the gold bars as bribes.  Once Nadine obtained the gold bars with the requisite intent, the alleged crimes were completed.  The government does nothing to grapple with *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982), which support that the resale of the property is not an overt act in furtherance of the scheme.  Both bribery and extortion were completed crimes once the object of those alleged schemes (*e.g.*, gold) was obtained.  *See United States v. White*, 887 F.2d 267, 272 (D.C. Cir. 1989) (Ginsburg, J.) (bribery "is completed upon the public officer's receipt or agreement to receive payments for an official act.").[4]  Even if the resale of the bars was part of the scheme, those bars were first sold by Nadine in *New Jersey*.  But in any event, the government doesn't muster evidence of Senator Menendez's involvement in or knowledge of these gold bar sales.  *See* Tr. 5136, 5141, 5147 (Mr. Khorozian acknowledging that he never

---

[4] The government's reliance on *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017), is misplaced because there, unlike here, the liquidation of the stock was part of the scheme to artificially inflate the stock price.

spoke to Senator Menendez about any gold sales whatsoever).  As such, "no reasonable jury

could find, based on a preponderance of the evidence presented at trial, that [Senator Menendez]

committed within the Southern District of New York any conduct essential to the offense."

*United States v. Purcell*, 967 F.3d 159, 190 (2d Cir. 2020).

**B.    The Government Has Not Shown Any Foreseeable Essential Conduct Occurred In This District Related To The Uribe Bribery Charges (Counts 9 and 10)**

The government argues that prosecution in this district was permissible for the "Counts

Related to the New Jersey Attorney General's Office" for three reasons, Opp. at 73, but each

fails to establish any foreseeable essential conduct occurred in this District.

*First*, the government's claim that Uribe's phone call to Barruos in the Bronx and the car

payments Barruos' made from the Bronx were foreseeable to Senator Menendez because of the

"proximity of districts covering the New York metropolitan area" is off-base.  New Jersey is not

"the New York metropolitan area," but an entirely separate state (and judicial district), and none

of the government's cited cases stand for the proposition that a New Jersey resident should

predict New York conduct due to their proximity.  Indeed, any such claim collapses under its

own weight, as it would largely render venue proper for any criminal scheme in the tristate area.

Indeed, unlike the cases the government cites,[5] there was no evidence that Senator Menendez had

---

[5] In each of the government's cited cases, the co-conspirator's New York conduct was foreseeable given the defendant's specialized knowledge of the co-conspirator and/or his transportation through the New York metropolitan area. *See, e.g.*, *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) (transportation of cash to Brooklyn and Queens likely touched Manhattan); *United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012) (transporting drugs from New Jersey to Brooklyn likely involved travel through the District); *Davis*, 689 F.3d at 188-89 (that defendants with experience robbing drug dealers in the Bronx could reasonably infer that a drug dealer who lived near the Bronx likely dealt at least some drugs there).

any knowledge of Barruos' existence at all, let alone where he resided or his involvement in the alleged scheme.

Next, the government posits a new theory (never presented to the jury in summation) that Nadine Menendez must have traveled through the District with alleged bribe payments from Uribe because she deposited them in Long Island. Opp. at 73. But there are four problems with this late-breaking theory. *First*, money is fungible and there is no evidence that the funds deposited in Nadine's account in Munsey Park were bribe payments, as opposed to other cash she had on hand. *Second*, there is no evidence that Senator Menendez was aware of this travel and deposit in Long Island, or that it was foreseeable to him. *Third*, in the absence of actual travel records, the Court cannot presume that she traveled through the Southern District to get to Long Island. *See, e.g.*, *Purcell*, 967 F.3d at 187–90 (stating that an "argument . . . based on speculation rather than evidence" cannot support venue). Indeed, New Jerseyans will often travel through Staten Island to get to Brooklyn or Long Island to avoid traffic in the Southern District.

In any event, travel through a district *en route* to another district does not establish the essential conduct for any of the substantive offenses of wire fraud and extortion.[6]

Nor can the telephone calls or text messages from Nadine to Uribe or to Senator Menendez possibly sustain venue. The government claims that these communications establish

---

[6] The government's reliance on *Boruch*, 550 F. App'x at 33, and *Shepard*, 500 F. App'x at 23, is misplaced because neither of these cases contain the same essential conduct elements applicable here. *Boruch* analyzed the propriety of venue for *conspiracy* to defraud the United States. *Shepard* concerned venue for a drug *conspiracy*. Moreover, while the Hobbs Act analysis in *United States v. Davis* considered the effect on interstate commerce in a district, the Second Circuit implicitly rejected the theory that venue lies in every district where commerce is affected. *Davis*, 689 F.3d at 188–89 (2d Cir. 2012). Instead, the Court held that the effect on interstate commerce in a particular district must be known or reasonably foreseeable to the defendant to sustain venue. *Id.* The government has failed to make this showing.

venue because they "connected to cell towers in this district." *See* Opp. at 73. Notwithstanding the fact that the government's own expert confirmed that Nadine was "[m]ost likely in New Jersey" around the time the message was sent (Tr. 5436) and presented zero evidence that showed Uribe (a New Jersey resident) was in New York when he received those messages, the fact that a call or text signal merely pings a cell tower in a specific district is insufficient to establish venue. *See United States v. Rommy*, 506 F.3d 108, 122 (2d Cir. 2007) ("[T]he overt act may properly be understood to have occurred at the site *where the listener receives the conspirator's message*."). In any event, there was no evidence that it was reasonably foreseeable to Senator Menendez that a text message from a New Jersey resident to another resident of New Jersey would ping off a cell tower in New York.

### C. The Government Has Not Shown Any Essential Conduct Occurred In This District Related To The Daibes Bribery Scheme (Counts 11, 13, 14)

The government argues that venue is satisfied for "Counts Related to Daibes's Federal Prosecution and Qatar" because of (1) "Daibes's provision of transportation through the district," (2) "the sale of kilogram gold bars that Daibes provided," (3) "an in-person meeting between Menendez, Daibes, and the Emir of Qatar in New York," along with an attempted WhatsApp call from Daibes to Heritage in Manhattan, and (4) "numerous electronic communications by various professionals" to evaluate the investment in Daibes New Jersey real estate project. *See* Opp. at 75. Once again, though, the government conducted no essential conduct analysis with respect to each of the substantive counts. None of these acts can remotely sustain venue.

*First*, as to the wire fraud count (Count 13), only the third and fourth acts concern wires in the District. But none of these communications suffice for venue. The government's claim that these communications furthered the bribery scheme is unsupported and illogical. As the government concedes, the call from Daibes to Heritage while Daibes was in Manhattan was only

an "attempt"—the call was not connected, and there was no evidence as to the anticipated substance of the call. *See* Opp. at 75. Certainly, an *attempted* call in which no communication took place cannot not be an overt act in furtherance of a bribery scheme. Nor are the three communications by "various professionals" in furtherance of the bribery scheme. The three cited communications (none of which involved Senator Menendez or any co-conspirator) are e-mail correspondence between Heritage principals in London and attorneys, valuators, and architects in New York regarding design proposals and valuation of the New Jersey real estate project. *See* GX 4F-8; GX 4F-28; GX 4F-31. The government itself conceded that none of these communications was made in furtherance of any bribery scheme. Indeed, in opposing Rule 15 depositions of Heritage Advisors' principals, the government argued (and the Court accepted) that the Heritage principals' communications with Daibes and reasons for investing with Daibes were "not material to the issues at trial." ECF 369 at 14. The government cannot have it both ways, claiming that those very communications were immaterial to the case when the defense seeks to depose the witnesses, but then after trial claim that the communications were not just in furtherance of the bribery scheme, but "essential conduct" underlying it.

In any event, the government has not pointed to any evidence that this attempted in-District call or email correspondence involving Heritage were known or reasonably foreseeable to Senator Menendez. Because they were not. This was a real estate transaction between an investment firm in *London* and a company in *New Jersey* about an investment in a *New Jersey* property.

The government also claims that venue is proper based on "the provision of transportation through the district," which was allegedly "related to things of value Daibes provided . . . Menendez" after he returned from a trip to Egypt and Qatar. *See* Opp. at 75–76.

This is pure speculation. The government did not cite evidence of a bribe being given during that trip, as there is none. In the absence of any actual evidence of a bribe, the equivalent of an Uber ride through the District falls far short of establishing that any essential conduct constituting bribery or extortion occurred during this ride from JFK airport to New Jersey, let alone that it occurred during the portion of the ride that occurred in the Southern District of New York (as opposed to the Eastern District of New York or District of New Jersey).

As for the "in-person meeting between Menendez, Daibes, and the Emir of Qatar" in Manhattan, again there is no evidence that it involved any bribery scheme. The government intentionally omits that this meeting was far from a private discussion, but in actuality involved a dinner with multiple attendees (including other Senators) for which the government introduced no evidence that any bribe or official act were discussed. Indeed, the only evidence of what was actually discussed was that Senator Corey Booker found the Qatari "insights . . . about Afghanistan . . . really fascinating and illuminating." (GX A204-1). Nor did it present any evidence that there was even a discussion of Menendez's alleged acts for "the benefit of the Government of Qatar," much less that the dinner was an essential conduct element of the charged offense. The fact that Daibes sent Menendez an image of a luxury watch days later—which watch was never provided to Menendez, and Menendez never responded to the message—does not make the government's speculation that the Manhattan meeting between the Qataris and numerous Senators (and others) concerned the bribery scheme any more reasonable.

**D.    Venue Was Not Established For The Bribery Conspiracy Charges (Counts 1–3)**

As explained *supra,* none of the acts cited by the government suffice to sustain venue for the substantive counts, and they fail to prove venue for the conspiracy counts, as well. Indeed, there is no evidence that any of the acts in the Southern District of New York constituted the

formation of the conspiratorial agreement, or that any were overt acts committed in furtherance of the conspiracy's objective.  And even assuming, *arguendo*, that an act in this District was committed in furtherance of the conspiracy, there is certainly no evidence that it was reasonably foreseeable to Senator Menendez that any such act would take place in this District.  Any finding to the contrary would be based on rank speculation.

### E.    Venue Is Improper In This District For The Foreign Agent Charges (Counts 15 and 16)

The government does not even attempt in its Opposition to defend the sufficiency of venue for Counts 15 and 16 based on the essential conduct related to the FARA charge.  To the extent the government claims any of the acts it identified for the Hana-Egypt scheme suffice to demonstrate venue for the FARA charges, this argument fails.  The conduct constituting the offense of acting as a foreign agent is: "engag[ing] . . . in political activities for or in the interests of such foreign principal," "act[ing] as public relations counsel, publicity agent, information-service employee, or political consultant for or in the interests of such foreign principal," or "represent[ing] the interests of such foreign principal before any agency or official of the Government of the United States for or in the interests of such foreign principal."  *See* 22 U.S.C. § 611(c)(1)(i)–(iv).  The government has not shown that any such essential conduct for these counts took place in this district.  And none did.  All of the political and public relations activity at the heart of the government's charges occurred in Washington D.C. or New Jersey.

### F.    The Government Did Not Even Attempt to Justify Venue Over the Count 4 Obstruction Charge

Tellingly, the government's brief does not even address or attempt to justify venue for the Count 4 charge related to obstruction of justice in connection with the Daibes prosecution.  The government does not point to any essential conduct element occurring in this District.  Pursuant to 18 USC § 1512(i), venue for a §1503 charge is found in either the "district in which the

official proceeding . . . was intended to be affected or in the district in which the conduct constituting the alleged offense occurred."  18 USC § 1512(i).  It is undisputed that the allegedly impacted official proceeding was in New Jersey.  Furthermore, the alleged conduct constituting the obstruction of justice offense were the communications with U.S. Attorney Sellinger, Mr. Khanna, Esther Suarez, and Michael Soliman—all of which occurred in New Jersey (or Washington, D.C.).  Accordingly, none of the essential conduct underlying this obstruction charge occurred in this District.

To the extent the government may suggest that one of the acts cited in its "Counts Related to Daibes's Federal Prosecution and Qatar" section provides the basis for venue for Count 4, this argument fails.  None of these acts concern the essential conduct underlying obstruction.  Neither the car ride through Manhattan nor the re-sale of gold bars in Manhattan were acts committed "for the purpose of accomplishing the objectives" of the obstruction charge. *Tzolov*, 642 F.3d at 320.  Bribery is not an element of the obstruction charge, and so any conduct related to alleged bribery cannot constitute essential conduct related to obstruction.

* * *

Finally, separate and apart from the failure to show an essential conduct element for any of the substantive counts occurred in this District, the government fails to show substantial contacts in this District sufficient to "ensure that prosecution is fair to [Senator Menendez]."  *See United States v. Royer*, 549 F.3d 886, 897 (2d Cir. 2008).  The government mistakenly claims that the substantial contacts test is not "relevant" given "the proven overt acts in this district."  Opp. at 77.  But that ignores the need to show substantial contacts supporting each substantive count, not just the conspiracy counts.  Nor does the government's exceedingly weak obstruction claim provide substantial contacts with the District sufficient to charge all the substantive offenses

here.  That analysis would be a classic tail-wagging-the-dog analysis, and would permit any District to justify prosecution for a slew of out-of-district offenses merely because the defendant and his counsel engaged with the grand jury investigation in the prosecuting district.  That cannot be the law.

Moreover, the government is mistaken that Senator Menendez has failed to show that "prosecution in the contested district will result in hardship to him, prejudice him, or undermine the fairness of his trial."  Opp. at 78.  Senator Menendez has detailed the fundamental (and constitutional) unfairness and prejudice of prosecuting this case in this District.  *See* ECF 137 at 7–8, 17.  Indeed, prosecution in the Southern District in New York denied Senator Menendez his right to be tried by a jury of his New Jersey peers and "subjected [him] to the verdict of mere strangers," *United States v. Fortenberry*, 89 F.4th 702, 712 (9th Cir. 2023), "who may [have] fe[lt] no common sympathy, or who may [have] even cherish[ed] animosities, or prejudices against him," *United States v. Palma-Ruedas*, 121 F.3d 841, 861 (3d Cir. 1997) (Alito, J., dissenting), rev'd sub nom.  In the absence of substantial contacts with the District, venue was plainly improper.

## II.    THE COURT SHOULD VACATE THE BRIBERY CONVICTIONS BECAUSE THE GOVERNMENT FAILED TO SHOW A PROMISE BY SENATOR MENENDEZ TO USE OFFICIAL POWERS IN EXCHANGE FOR A BRIBE

For all its length and chest-beating, the government's brief does little to engage with the actual arguments that the evidence was insufficient under *McDonnell v. United States*, 579 U.S. 550, 578 (2016).  Most fundamentally, the government's brief still does not demonstrate how the evidence showed a promise **by Senator Menendez** to use his official powers **in exchange for** a bribe.

For example, with respect to the alleged scheme involving Attorney General Gurbir Grewal, it is undisputed that Senator Menendez's brief call to Grewal only relayed concerns

15

about potential selective prosecution without naming any particular matters, without seeking any particular relief, without making any particular requests or recommendations, without asking that any action be taken, and without using or threatening to use any **official powers** of his office. *See* Senator Menendez's Motion and Memorandum of Law in Support Of His Rule 29 Motion for Judgement of Acquittal and Rule 33 Motion For a New Trial (ECF 592, the "Mot.") at 9–10; Trial Tr. 2772:11–13.  Although the government claims that this call involved the Senator's "use of his official position to exert pressure" or "advise" another public official (Opp. at 25), it fails to explain how.  The fact that Grewal wanted to "shield his team" does not reflect any intended pressure or influence by Menendez (Opp. at 27), since that evidence only concerns Grewal's state of mind, not Senator Menendez's.  Senator Menendez indisputably never attempted to contact anybody on the actual prosecution team or exert any pressure over them.  Nor is there any evidence of a promise that Senator Menendez would attempt to do so, or even that he knew of any bribe that could constitute a *quid pro quo*.  Indeed, the evidence on which the government now relies that shows that Senator Menendez agreed to "look into" the matter involving Uribe's so-called daughter alone cannot support the jury's finding of a *quid pro quo*.

Nor is this remotely akin to the *Lee* case on which the government heavily relies.  There, a city councilor was convicted for agreeing to intervene in a criminal prosecution of a family member of a prominent local businessperson in exchange for a bribe.  *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019).  Specifically, the evidence showed that the city councilor called "the chief prosecutor for the city of Akron (the boss of the prosecutor in charge of [the businessperson's] nephew's case)," demanded to know why another person had not been charged, and made a thinly veiled statement pressuring the prosecutor: "I'm not trying to influence you, you can't say I'm trying to influence you.  I'm trying to make you think.  That's

16

all I'm trying to do; just trying to make you think." 919 F.3d 340 at 357. That is, the defendant called the *direct supervisor* of the prosecutor in charge of the case, named a *specific* case, and made a statement which, in context, supported the inference of pressure on the chief prosecutor. Moreover, the chief prosecutor testified that she *did* feel pressured and worried that "[d]efendant might go over [the prosecutor's] head and contact [her] supervisor." *Id.*

*Lee* is not analogous to the evidence here: Senator Menendez contacted the most senior official (not the direct supervisor of line prosecutors), did *not* identify a specific case, did not ask questions about any particular individual, and did not make any intimidating statement. In addition, unlike the supervisor in *Lee*, Attorney General Grewal did not feel any pressure, as he admitted. *Lee* therefore *supports* Senator Menendez's argument for acquittal: it demonstrates that the government failed to prove any action or promise by Senator Menendez to pressure Grewal.

The same is, in substance, true of the allegations that Senator Menendez sought to intervene in Daibes' prosecution: while Menendez is alleged to have mentioned the Daibes' case to U.S. Attorney Sellinger, he made no intimidating statements, did not request that any action be taken, and did not otherwise exert any pressure in support of a particular outcome. Mot. at 11–12. U.S. Attorney Sellinger acknowledged as much. Moreover, there was no evidence presented at trial—only pure speculation—showing that Senator Menendez *promised* Daibes that he would attempt to intervene in Daibes' prosecution, let alone an agreement that he would do so in exchange for something of value. To the contrary, the evidence showed that Senator Menendez and Daibes had been friends for years, so that even if Menendez sought to assist Daibes with his criminal case, the inferences are more reasonable that he did so to help his friend, not as part of a corrupt bargain for Nadine to secretly receive gold bars that she hid in a closet to which Senator

Menendez did not have access.  The government did not prove, by any standard, and certainly not beyond a reasonable doubt, that any inference of corruption competes with the straightforward conclusion that Senator Menendez acted only to aid a friend (which is not a crime).

Indeed, in an effort to overcome its evidence deficit, the government continues to rely on sheer speculation to support the convictions that the Senator used or agreed to use his official powers in exchange for a bribe.  The Opposition only further attempts to justify how, time and again, the government encouraged the jury to make speculative leaps in its closing arguments.  The government's assertion that all this speculation is simply permissible inference drawn from the facts does not stand up to scrutiny.  The Court should reject the government's continued reliance on rank speculation.  Just a few examples are identified below.

*First*, the government asserts that "[Senator] Menendez was also deeply involved in Nadine Menendez's efforts to receive **bribe payments**" such as payments to her consulting company from IS EG Halal.  Opp. at 17 (emphasis added).  The government cites no evidence at all showing that Senator Menendez believed that these consulting fees were "bribe payments." *All* the government cites is evidence that Senator Menendez helped Nadine set up a consulting company.  *Id.*  The government does not identify a scintilla of evidence that Senator Menendez knew or understood that any payments Nadine received in connection with her consulting company were made in exchange for **his promise** to perform official acts.

The government's attempt to fill that critical gap piles on further speculation.  The government contends that "all the defendants," presumably including Senator Menendez, "were well aware that Nadine Menendez was expecting to get her paid [by IS EG Halal] for her previous acts (*i.e.*, her role in arranging Menendez's actions and promises) and not for any real

work." Opp. at 23.  The evidence cited in support of this bold proposition, though, is just that

Nadine "expressed incredulity" to Daibes—*not* to Senator Menendez—about a supposed request

from Wael Hana that Nadine come to the IS EG Halal office every day.  *Id.*  As an initial matter,

the evidence at trial showed that Nadine did perform work for IS EG by attempting to set up an

IS EG office in India.  The fact that Hana insisted that Nadine work daily, and that he then

terminated Nadine's employment, only undermines any inference of a bribe.  More

fundamentally, the government's leap that a vague message from Nadine to Daibes supports an

inference that *all* defendants, including Senator Menendez, knew of a bribery scheme reflects

precisely the speculation—not fair inference—that the government asked the jury to make

throughout.  Nothing from that piece of evidence alone or in combination with other evidence

supported a non-speculative, fair inference that Senator Menendez knew payments from IS EG to

Nadine in August 2019 were a *quid pro quo* for Menendez's call to Undersecretary McKinney

months earlier (in May 2019).  No witness or document actually supports that inference.

*Second*, to support the inference that Senator Menendez knew that Uribe was paying for

Nadine's car—despite all the evidence to the contrary—the government relies on its argument

that "[Senator] Menendez's willingness to lie to Uribe" about his meeting with N.J. Attorney

General Grewal "was powerful proof that [Senator Menendez] was simply motivated to keep

Uribe happy so Uribe would keep paying for the car."  Opp. at 33.  The enormity of this

speculative jump is striking, particularly given Uribe's admission that he never spoke to Senator

Menendez about the car payments.  (It is more likely that Senator Menendez was just trying to

avoid Uribe's further harassment of Nadine about the meeting).  The government's argument

regarding Senator Menendez's knowledge of the car payments is not a reasoned, logical

inference from the evidence, just bald speculation.  That is not close to enough to sustain a

conviction beyond a reasonable doubt. *See United States v. Jones,* 393 F.3d 107, 111 (2d Cir. 2004) (a guilty verdict may not rest on "specious inferences" or speculation).

*Third*, turning to the Daibes prosecution, the government asserts that "on or about October 18, 2021, shortly before Sellinger's confirmation, Daibes ***provided at least one kilogram of gold to Menendez*** at an in-person visit to Menendez's house, as evidenced by multiple contemporaneous electronic records." Opp. at 38. Once again, there is *zero* evidence that Daibes provided Senator Menendez with gold at that time, or that the gold bearing serial numbers found on Daibes' inventory had any connection to the criminal case against Daibes pending in New Jersey. Instead, all the government cites is evidence of Daibes's delivery of glazed donuts to the Menendez's' residence—which the government conceded was not a code-word for gold (Trial Tr. at 6385:1–3)—and the fact that later that day, Senator Menendez searched for information about the price of gold. *Id.* The record contains no expression of gratitude, no acknowledgement (contemporaneous or otherwise) that gold was received, and no promise to act in exchange for the alleged provision of gold. In the absence of any other evidence of gold giving—no witness, surveillance, or document showing a delivery of gold—it is just speculation for the government to conclude that Daibes gave Senator Menendez gold on October 18, 2021. But that's exactly what the government asked the jury to do.

The point here is ***not*** that these particular examples, by themselves, tank the government's case. Rather, the problem is that the government's case *in its entirety* is built on impermissible speculation and strained conclusions that are weak, or weaker, than those described above. Nor does the government's excuse—that it *must* rely on speculation because bribery offenses are usually conducted in secret—save the case. *See* Opp. at 21 (arguing that "bribery is rarely conducted in explicit terms; instead, the language of bribery is one of

implication and innuendo").  The fact that crimes are often done secretly does not somehow absolve the government of its obligation to prove, beyond a reasonable doubt, that the crimes actually happened based on reasonable inferences from the evidence.  If anything, by seeking shelter in the claim that Senator Menendez's convictions should upheld, despite the lack of evidence, because it's just too hard to prove bribery offenses without the benefit of jury speculation, the government betrays the weakness of the inferences that it asked the jury to draw.

## III. THE CONVICTIONS MUST BE VACATED BECAUSE THEY DEPEND ON EVIDENCE THAT VIOLATED SPEECH OR DEBATE CLAUSE PROTECTIONS

The government's opposition to the Senator's Speech or Debate clause challenge fail to engage with two key points:  the Speech or Debate Clause inarguably extends to (1) a Senator's *deliberative conduct*, *see Gravel v. United States*, 408 U.S. 606, 616 (1972) ("[t]he Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and *deliberation* without intimidation or threats from the Executive Branch") (emphasis added); and (2) "mentions" of legislative acts, including "signing off" on a sale of arms, or references to proposed or enacted legislation.  *United States v. Helstoski*, 442 U.S. 477, 490 (1979) (the Clause bars any "mention of a legislative act").

*First*, if the protection on deliberation is to mean anything, it ***must*** protect a Senator's communications with his closest aides about how that Senator should approach a particular issue before him in his official capacity.  The D.C. Circuit recently confirmed as much in *In re Sealed Case*, 80 F.4th 355 (D.C. Cir. 2023), where it held that a representative's conversations with others concerning a potential approach to "alleged fraud in the 2020 presidential election" were "within the heartland of 'the deliberative and communicative processes'" protected by the Speech or Debate Clause, even though they did not directly pertain to any particular pending legislative act.  *Id.* at 372–73 ("a Member's deliberation about whether to certify a presidential

election or how to assess information relevant to legislation about federal election procedures are textbook legislative acts").

So, too, is Senator Menendez's deliberation—both in his private conversations with staffers and his meetings with officials—about his approach to issues relating to Egypt. As the government does not contest, Senator Menendez (in his capacity on the Senate Foreign Relations Committee) was constantly faced with decisions on legislative acts concerning Egypt—including whether to place a hold upon, or decline to hold, military aid. The government cannot neatly parse the Senator's meetings with Egyptian officials and discussions about Egypt-related policy with his staff, on the one hand, and deliberation about legislative acts concerning Egypt, on the other hand. Indeed, the testimony regarding Senator Menendez's in-office meetings with Egyptian officials confirmed that these were substantive policy meetings without any discussion of bribes. *See* Mot. at 21 (describing Sarah Arkin's testimony regarding meetings with Egyptian officials for which she was present). This stands in stark contrast to the evidence the government promised it would adduce at trial, which caused the Court to admit evidence of these meetings. *See, e.g.*, ECF 180 at 43 (claiming in Opposition to Motions to Dismiss that meetings referenced in the Indictment "were ones in which Menendez was corrupted by and engaged in corruption with his co-conspirators").

This analysis applies with equal force to Senator Menendez's meetings and discussions with U.S. Attorney Sellinger, Soliman, Suarez and others concerning his forthcoming recommendation to the President for the U.S. Attorney position for the District of New Jersey. This is all classic fact-finding in service of the Senator's Constitutional "advice and consent" role. *See* Mot. at 23.

22

The government's response—that just because a defendant *says* that certain conversations or meetings are legislative in nature, that does not make it so, Opp. at 85–88—misses the point. The government's primary cited authority on this point—*Government of Virgin Islands v. Lee*—demonstrates the flaw in the government's logic. There, a Virgin Islands legislator used public funds to conduct a purported legislative fact-finding trip to New York and Washington D.C., but a "subsequent investigation . . . revealed" that the legislator *did not actually attend* planned legislative fact-finding meetings, and "failed to report the personal nature of much of his trip." 775 F.2d 514, 517 (3d Cir. 1985). In that context, the Third Circuit held that it was not required to accept the legislator's say-so that, notwithstanding the investigation's findings, the trip was subject to legislative immunity. *Id.* at 526. In this case, by contrast, there is no real debate about whether Senator Menendez's meetings with his staffers, Egyptian officials, and candidates for the U.S. Attorney position (i) in fact occurred, and (ii) included elements of legislative activity. The government cannot contend that the at-issue meetings and fact-finding activity were pure shams to disguise secretive corrupt purposes. And the government cites no authority holding that a court may permit an invasion into a Senator's legislative fact-finding activity just because the government *asserts*—without any supporting evidence—that corrupt conduct took place in connection with that activity.

The Second Circuit's decision in *Biaggi* is directly on point. *See* Mot. at 19. There, even though the government alleged that a Congressman took a trip for corrupt purposes, only the fact of his travel was admitted into evidence; nothing about what occurred during his meetings on the trip was admitted, as it was all protected as legislative fact-finding activity. *United States v. Biaggi*, 853 F.2d 89, 103 (2d Cir. 1988) ("legislative fact-finding activity conducted by Biaggi during his Florida trips was protected"). The same conclusion applies here: at most, the

government could have offered only evidence of where meetings occurred, who attended, and how long they lasted; but by penetrating into the *content* and *nature* of indisputably legislative meetings and discussions, as occurred at trial, the government trampled upon the Senator's Constitutional Speech or Debate privilege. A new trial where all such evidence is excluded is therefore warranted.

*Second*, the government introduced evidence of specific pending or passed legislation—Senate Resolution 390 (pertaining to Qatar) and S1102 (a Senate bill bearing an attenuated connection to Egypt)—in blatant violation of the Speech or Debate privilege. The introduction of this evidence violated the Supreme Court's plain, simple, and unyielding directive: there is "no doubt that evidence of a legislative act of a Member may not be introduced by the Government" at trial. *Helstoski*, 442 U.S. at 487. The government does not dispute that Senate Bills (such as S1102) and Senate Resolutions (such as S. Res. 390) are legislative acts. Instead, it sets forth a bevy of arguments stating that this evidence was offered for purposes other than proving Senator Menendez's legislative conduct. But the Supreme Court has been unequivocal that the purpose for which a legislative act is admitted does not matter: "[t]he Speech or Debate Clause does not refer to the prosecutor's purpose in offering evidence . . . the admission of evidence of legislative acts . . . would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause." *Helstoski*, 442 U.S. at 489–90; *see also In re Sealed Case*, 80 F.4th at 365 ("legislative acts may not be introduced into evidence even when the government seeks to punish a Member for non-legislative acts"). The analysis can and should end there. Senate Resolution 390 and S1102 are legislative acts. They should not have been "mentioned" at trial. The fact that they were violated Senator Menendez's constitutional rights, and vacatur is now required.

IV.    **THE EVIDENCE INTRODUCED WAS INSUFFICIENT AS A MATTER OF LAW TO CONVICT SENATOR MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS (COUNTS 4, 17, AND 18)**

Nowhere is the quantum of evidence supporting conviction weaker than with respect to the obstruction of justice counts.  Yet despite spilling 149 pages worth of ink in its Opposition, the government utterly fails to grapple with binding Second Circuit case law fatal to the government's arguments and the gaping holes in its evidentiary record.

For Counts 17 and 18 (obstruction in connection with the SDNY grand jury investigation), the government's opposition sets up a straw man—as if Senator Menendez's arguments were based on his lack of knowledge whether any false information will "literally be successfully transmitted to the grand jury."  Opp. at 62.  This misstates both Senator Menendez's position and binding Second Circuit precedent.

The law in this Circuit is clear: "§ 1503 requires a specific intent to obstruct a federal judicial or grand jury proceeding.  Accordingly, the conduct offered to evince that intent must be conduct that is directed at the court or grand jury and that, in the defendant's mind, has the 'natural and probable effect' of obstructing or interfering with that entity."  *United States v. Schwarz*, 283 F.3d 76, 109 (2d Cir. 2002) (citing *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).  It is not enough in the Second Circuit for a defendant to make false statements after becoming aware of a grand jury proceeding, even if those statements are made directly to agents who may testify before the grand jury.  *Id.* at 109.

The government ignores this clear law, relying instead on cases interpreting the nexus requirement for obstruction of justice.[7]  Opp. at 63.  The government distorts *Schwarz* beyond all

---

[7] The government relies on *United States v. Quattrone*, 441 F.3d 153 (2006), for the proposition that "it would be sufficient to show that [the defendant] knew that his actions were likely to affect the proceeding[.]"  *See* Opp. at 63.  *Quattrone* concerned a dispute regarding jury

recognition.  In discussing the Supreme Court's holding in *Aguilar*, *Schwarz* explained that a defendant's "knowledge that there was a pending federal grand jury, and thus his awareness of the possibility that his deceptions might be put before it, was insufficient to establish the required specific intent because there was no indication that the [defendant] knew that the investigating officers interviewing him were going to testify at the grand jury."  *Id.* at 108 (citing *Aguilar*, 515 U.S. at 600–1).[8]  Similarly, the Second Circuit held in *Schwarz* that "[t]he fatal defect in the government's case is that there was no showing that [the defendant] . . . knew that the allegedly false statements he made to the federal investigators . . . would be conveyed to the federal grand jury. . . . He may have hoped that they would be provided to the grand jury, and surely there was that possibility; but there was insufficient evidence to 'enable a rational trier of fact to conclude that [the defendant] knew' that this would happen or that he entertained any expectations on that score that were based on such knowledge."  *Id.* at 109 (citing *Aguilar*, 515 U.S. at 599).

---

instructions.  There, the Second Circuit rejected the defendant's proposed instruction that "the jury had to find he had knowledge of the scope and subject matter of the grand jury investigation, such that he knew what documents or categories of documents had been subpoenaed by the grand jury and that he corruptly endeavored to obstruct by causing the destruction of documents he knew to be sought in the investigation."  441 F.3d at 179 n.25.  The government's quote on page 63 of its Opposition is taken out of context.  The phrase does not reflect a generalized "likely to affect the proceeding" standard.  The complete sentence, from which the government selectively quoted, makes clear that the Second Circuit's holding was far more narrow: the government need not show that the defendant knew precisely which documents the grand jury subpoena sought.  *Id.* ("Under our analysis, it would be sufficient to show that Quattrone knew that his actions were likely to affect the proceeding – i.e. that the subpoenas and requests called for the types of documents he generally knew were in the possession of Tech Group bankers who received the Endorsement Email.")

[8] The government's Opposition further muddies the record with cites to out-of-Circuit decisions at odds with *Schwarz*—*United States v. Sutherland*, 921 F.3d 421 (4th Cir. 2019), and *United States v. Fassnacht*, 332 F.3d 440 (7th Cir. 2003) —and an Eastern District of New York order denying bail pending appeal—*United States v. Mangano*, No. 16 Cr. 540 (JMA), 2022 WL 2872670 (E.D.N.Y. July 20, 2022).  Notably, in *Mangano*, the evidence adduced against the defendant was far more significant than the alleged "lies to agents and prosecutors during the two proffer sessions."  Opp. at 64.

Here, the government introduced no evidence whatsoever that Senator Menendez believed that any statement his prior counsel made or slides they presented to the prosecutors would be provided to the grand jury. Indeed, only prosecutors attended Senator Menendez's prior counsel's presentation. *See* Tr. 4277–79. Nor did the government introduce any evidence that the statements made by counsel were even known to Senator Menendez.

Without evidence from which the jury could reasonably infer that Senator Menendez had a specific intent to interfere with the grand jury, the government attempts to salvage the conviction based on a production of two checks made by **counsel for Nadine Menendez**. While "one who delivers false documents . . . to the grand jury" may be guilty of obstruction of justice, *Aguilar*, 515 U.S. at 601, Senator Menendez and his counsel did not produce these checks to the grand jury and there is no evidence that Menendez knew these checks were being delivered. And there is no **evidence** to support the government's claim that Senator "Menendez and Nadine Menendez had worked together to transmit" the checks to the grand jury—just the government's own *ipse dixit*. Opp. at 64. No wonder the government cited no exhibit or trial transcript to support this rank speculation.

The evidence in support of Count 4—that Senator Menendez attempted to corruptly interfere with, obstruct, or impede the Daibes prosecution—is weaker still. The government suggests that the jury was entitled to infer corrupt intent from (1) Senator Menendez asking U.S. Attorney Sellinger to "look into" Daibes' case, and (2) Senator Menendez enlisting Soliman to request that Sellinger provide "all due process" to Daibes. Opp. at 66. But the government simply does not grapple with the overwhelming *evidence*—detailed in Senator Menendez's Rule 29/33 Motion—that renders any such inference improper. Nor does the government grapple with the utter lack of evidence of obstructive action. Without exception, witnesses testified that Senator Menendez never requested that U.S. Attorney Sellinger weigh in to obtain a particular

27

outcome for Daibes or give him any preferential treatment.  Tr. 3795–96, 4049–51.  Sellinger himself confirmed that Senator Menendez's requests to him were not inappropriate, did not consist of an effort to interfere with the Daibes prosecution, and were consistent with Sellinger's duties as the U.S. Attorney.  Tr. 3795–96, 3804–05.  Soliman agreed that Senator Menendez never attempted to interfere with the Daibes case.  Tr. 4050–51.  In no way, then, could Senator Menendez's conduct "be said to have the 'natural and probable effect' of interfering with the due administration of justice." *Aguilar*, 515 U.S. at 601.

The government's arguments are wrong on the law and rely on rank speculation at odds with overwhelming exculpatory evidence.  Senator Menendez's obstruction convictions must be vacated.

## **CONCLUSION**

For the foregoing reasons, this Court should grant defendant Robert Menendez's motion pursuant to Federal Rules of Criminal Procedure 29(c) and/or 33.

Dated: September 30, 2024                              Respectfully submitted,


Yaakov M. Roth (*pro hac vice*)                   By: */s/  Adam Fee*
JONES DAY                                                       Adam Fee
51 Louisiana Avenue N.W.                                PAUL HASTINGS LLP
Washington, D.C. 20001                                   1999 Avenue of the Stars
Telephone: (202) 879-3939                              Los Angeles, CA 90067
Facsimile: (202) 626-1700                               Telephone: 1(310) 620-5719
                                                                        Facsimile: 1(310) 620-5819

                                                                        Avi Weitzman
                                                                        PAUL HASTINGS LLP
                                                                        200 Park Avenue
                                                                        New York, NY 10166
                                                                        Telephone: 1(212) 318-6000
                                                                        Facsimile: 1(212) 725-3620
                                                                        *Attorneys for Defendant Robert Menendez*