**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

         Defendants.

Case No. S4 23-cr-490 (SHS)

---

## <u>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF SENATOR ROBERT MENENDEZ'S SUPPLEMENTAL MOTION FOR VACATUR AND NEW TRIAL PURSUANT TO RULE 33</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Paul C. Gross
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................ 4

I.    AS A MATTER OF BOTH LAW AND COMMON SENSE, THERE WAS
NO WAIVER .................................................................................................. 4

II.    SPEECH OR DEBATE ERRORS ARE STRUCTURAL AND REQUIRE
VACATUR OF ALL COUNTS OF CONVICTION ................................................. 8

III.    THE GOVERNMENT CANNOT SHOW THAT THE UNREDACTED
EXHIBITS WERE HARMLESS.......................................................................... 15

IV.    AT MINIMUM, THE GOVERNMENT SHOULD PROVE WHAT
HAPPENED HERE, AND SHOULD NOT BENEFIT FROM ITS OWN
OBFUSCATION .............................................................................................. 26

CONCLUSION......................................................................................................... 29

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barnett v. United States*,
    870 F. Supp. 1197 (S.D.N.Y. 1994)................................................................................6

*Costello v. United States*,
    350 U.S. 359 (1956).............................................................................................................15

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975).....................................................................................................12, 14

*Gravel v. United States*,
    408 U.S. (1972)............................................................................................................12, 14

*In re Sealed Case*,
    80 F.4th 355 (D.C. Cir. 2023)..........................................................................................25

*McKaskle v. Wiggins*,
    465 U.S. 168 (1984)............................................................................................................9

*Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*,
    483 F. Supp. 3d 195 (S.D.N.Y. 2020)...............................................................................5

*Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*,
    464 U.S. 501 (1984)..........................................................................................................20

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002)...............................................................................................28

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)...............................................................................................26

*Smithwick v. Walker*,
    758 F. Supp. 178 (S.D.N.Y. 1991)...................................................................................19

*Strickler v. Greene*,
    527 U.S. 263 (1999)............................................................................................................7

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008).............................................................................................26

*Trump v. United States*,
    603 U.S. 593 (2024)..........................................................................................................13

*United States v. Blaszczak*,
    56 F.4th 230 (2d Cir. 2022) ...................................................................24

*United States v. Brewster*,
    408 U.S. 501 (1972)...........................................................................9, 11, 14

*United States v. Brown*,
    843 F.3d 74 (2d Cir. 2016).......................................................................5

*United States v. Calandra*,
    414 U.S. 338 (1974).................................................................................15

*United States. v. Camporeale*,
    515 F.2d 184 (2d Cir. 1975).....................................................................5

*United States v. Coney*,
    76 F.4th 602 (7th Cir. 2023) ...............................................................19, 20

*United States v. Durenberger*,
    No. 3-93-65, 1993 WL 738477 (D. Minn. Dec. 3, 1993) ........................8

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011).....................................................................16

*United States v. Friedland*,
    660 F.2d 919 (3d Cir. 1981).....................................................................25

*United States v. Gonzales-Lopez*,
    548 U.S. 140 (2006)...................................................................................9

*United States v. Greer*,
    285 F.3d 158 (2d Cir. 2002)......................................................................16

*United States v. Hansen*,
    369 F. App'x 215 (2d Cir. 2010) .............................................................19

*United States v. Helstoski*,
    442 U.S. 477 (1979)......................................................................4, 9, 11, 12

*United States v. Jefferys*,
    No. 20-3630, 2022 WL 9627085 (2d Cir. Oct. 17, 2022)...................6, 19

*United States v. Johnson*,
    383 U.S. 169 (1966)..........................................................9, 10, 11, 12

*United States v. Nejad*,
    487 F. Supp. 3d 206 (S.D.N.Y. 2020).....................................................27

*United States v. Nejad*,
    521 F. Supp. 3d 438 (S.D.N.Y. 2021) ............................................................27, 29

*Untied States v. Nkansah*,
    No. 08 CR. 1234, 2010 WL 1375633 (S.D.N.Y. Apr. 6, 2010), *aff'd,* 699 F.3d
    743 (2d Cir. 2012) .............................................................................................19

*United States v. O'Brien*,
    No. 13-CR-586 (RRM), 2017 WL 2371159 (E.D.N.Y. May 31, 2017) ...................6

*United States v. Olazabal*,
    610 F. App'x 34 (2d Cir. 2015) .........................................................................20

*United States v. Rostenkowski*,
    59 F.3d 1291 (D.C. Cir. 1995) ...........................................................................13

*United States v. Stasiv*,
    No. 19-4286, 2021 WL 4888865 (2d Cir. Oct. 20, 2021) ............................6, 7, 24

*United States v. Stevens*,
    715 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................27

*United States v. Stewart*,
    907 F.3d 677 (2d Cir. 2018) ........................................................................21, 24

*United States v. Strassman*,
    241 F.2d 784 (2d Cir. 1957) ...............................................................................25

*United States v. Walters*,
    16-cr-00338, ECF No. 46 (S.D.N.Y. Nov. 17, 2016) ...........................................28

*United States v. Swindall*,
    971 F.2d 1531 (11th Cir. 1992) .........................................................................14

*United States v. Weiss*,
    579 F. Supp. 1224 (S.D.N.Y. 1983), *aff'd*, 752 F.2d 777 (2d Cir. 1985) ..............25

*United States v. Weiss*,
    752 F.2d 777 (2d Cir. 1985) ...............................................................................16

*United States v. Williams*,
    644 F.2d 950 (2d Cir. 1981) ...............................................................................15

*Weaver v. Massachusetts*,
    582 U.S. 286 (2017) ...........................................................................................13

iv

## PRELIMINARY STATEMENT

The government's opposition brief (ECF 648, "Opp.") includes and reflects so many contradictions that it leaves the reader dizzy. Removing some redactions from the at-issue exhibits was once so "critical" that it warranted a motion for reconsideration, but now (after the government wrongly provided these materials the jury) they are cumulative and even "incomprehensible." Billions of dollars in military aid was supposedly the reason Egypt sought to cozy up to Senator Menendez and the main focus of the government's opening statement, but the government now says the jury likely viewed that as "secondary" to a short phone call about a constituent's halal food business. The "careful and attentive jury would have followed the Court's" instructions (ECF 611, at 140), except apparently for the one telling it to review the actual exhibits underlying the summary charts—even those specifically flagged by the government during its closing. Indeed, the government says the jury could not *possibly* have reviewed the exhibits during just a few days of deliberation, yet defense counsel is also somehow at fault for not catching the government's error during mere hours with the laptop. The Court is told to accept without investigation or even sworn testimony that the government's mistake was purely innocent, yet the fact that defense counsel didn't catch it rises to the level of a *knowing and intentional waiver*. It is hard to avoid the sense that the government, from one page to the next, is just saying whatever it thinks it needs to tell this Court in that moment, to avoid the consequences of its own error of constitutional magnitude.

After a lengthy trial, nobody wants to be forced into a redo based on a careless mistake. But there is just no getting around the fact that (i) the Court twice held this evidence was barred by the Speech or Debate Clause; (ii) the government gave it to the jury anyway; and (iii) whether the jury realized it or not—something we will never know for sure, and cannot psychoanalyze—

this evidence filled a gaping hole in the most significant narrative of the government's case. On those facts, the law and principles of justice alike require a new trial.

The government leads with its desperate waiver argument, but never even acknowledges the heightened standard for waiver in the Speech or Debate context. It is risible to suggest that the Senator *explicitly and unequivocally* abandoned his constitutional privilege because counsel took the government at its word that exhibits were properly labeled.

Next comes the government's "TL;DR" defense—the jury probably bypassed the actual evidence in reliance on the summary charts, in the face of this Court's clear instructions (and the government's rationale for those charts' legitimacy). But it is one thing to presume that the jury did not look at extrinsic materials smuggled into the room; the analysis is completely different when exhibits are loaded onto the official laptop and labeled as admitted evidence. There is no reason why the jury would *not* look at that—and every reason why this careful jury would do *exactly that* with respect to these exhibits. The government directed the jury to one set during its closing; the other filled conspicuous redactions at the end of the Egypt summary chart. Nobody thinks the jury pored over every exhibit; but these are perhaps the *first ones* it would examine.

No matter, the government says—there was nothing to see here anyway, and indeed the jury would only have been confused had it read the exhibits the government urged this Court to admit. But both appellate precedent and the rationale of the Supreme Court's structural error doctrine teach that no such inquiry is appropriate here. The only way to adequately protect the Speech or Debate Clause's purposes is to vacate any conviction when its absolute immunity is breached, without consideration of trial prejudice. In pushing back, the government relies on a Supreme Court *dissent*, plus two cases that did not remotely address the issue. To stave off vacatur, the government also tries—for a third time—to challenge this Court's ruling that these

2

exhibits reflected legislative acts.  The third time is not the charm.  The "ineluctable" takeaway from Supreme Court precedent remains that the government violated the Clause.

In all events, the government fails to demonstrate harmlessness beyond a reasonable doubt.  Whether or not the text messages were "grammatical," the clear and natural inference from the Unredacted Exhibits, based on what the jury heard at trial, is that Senator Menendez actually signed off on military aid to Egypt.  That is not a sideshow; it deserved the "WOW" response from Nadine.  Maybe the jury could have convicted without such evidence, by inferring mere "promises" to act.  But sufficiency and harmlessness are two very different things.  And it is a lot easier to infer that a promise was *made* if there is concrete evidence that the promise was *kept*.  The government did not have any of this "critical" evidence—until it wrongly slipped the Unredacted Exhibits to the jury.  That is why this material was neither "secondary" nor merely "cumulative."  And this is the key point the government never seriously grapples with.

If this Court is not yet ready to order a new trial, basic principles of justice demand, at the least, some measure of discovery to investigate the government's errors.  It is remarkable that the government has yet to submit *any* sworn statements to explain what happened.  Who loaded the Unredacted Exhibits onto the laptop?  Where did that person draw them from?  What safeguards or quality control measures were in place?  When did the government discover the error, and how?  When and why did the government wipe the laptop, precluding further forensic review?  Is that standard protocol or was it a deviation?  There are many—many—legitimate questions that deserve to be asked and answered about how the government was able to effectively reverse the Court's denial of reconsideration and impair a constitutional privilege by giving the jury the wrong exhibits.  Even if nobody acted with illicit intent, the circumstances leading to this error

could well bear on the appropriate sanction and appropriate relief. If nothing else, a mistake of this magnitude should not be swept under the rug based solely on lawyers' say-so.

This Court should therefore grant the motion, authorize discovery, and order a new trial.

## ARGUMENT

## I.    AS A MATTER OF BOTH LAW AND COMMON SENSE, THERE WAS NO WAIVER

Perhaps the most shocking part of the government's opposition is its continued insistence that the protections of the Constitution's Speech or Debate Clause can be disregarded wherever *defense counsel* does not uncover the *government's* inclusion of violative documents within the evidence provided to the jury. Opp. 16-20. As Senator Menendez explained in his opening brief—but the government ignores—that is not the law, for at least two reasons.

*First*, the government never disputes—nor can it—that, in the context of the Speech or Debate Clause, "the ordinary rules for determining the appropriate standard of waiver *do not apply*." *United States v. Helstoski*, 442 U.S. 477, 491 (1979) (emphasis added). Instead, any waiver of the Speech or Debate privilege requires an "explicit and unequivocal renunciation of the protection"—which even the government does not argue occurred here. *Id.*

In fact, the government's waiver argument is even more directly foreclosed by *Helstoski*. There, the Congressman *voluntarily provided* evidence of legislative acts to the grand jury. The Court held this was likely a waiver of his Fifth Amendment rights, but *not* his Speech or Debate rights—because there was no "explicit and unequivocal" renunciation. *Id.* at 492-494. It follows *a fortiori* that if the *voluntary* provision of documents does not effect a waiver, then *failing to catch* the government's error does not do so.

*Second*, even outside the Speech or Debate context, there can be no waiver of a defendant's objection to the provision of evidence to the jury where the defendant preserves his

objection to the same evidence during trial. *See United States. v. Camporeale*, 515 F.2d 184, 188 (2d Cir. 1975) (no waiver where, during trial, "[defense] counsel had put the court, prosecutor, and clerk on notice that [defendant] did not intend to waive objection to the jury's consideration of [certain evidence]"); *see also United States v. Brown*, 843 F.3d 74, 81 (2d Cir. 2016) ("Waiver is the intentional relinquishment or abandonment of a known right."). Here, as the government acknowledges, Senator Menendez raised objections to the Unredacted Exhibits repeatedly (and successfully!) at trial, eliminating any possible finding of waiver.[1] Opp. 2-3.

The government offers literally *zero* response to either of these arguments; it ignores that the waiver analysis is materially different in the Speech or Debate context and it ignores Senator Menendez's preservation of his objections during trial. Accordingly, and ironically, it is now the *government* that has "waived" any argument in opposition to these dispositive points. *Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived"). And what the government does offer – re-citation to inapposite cases (non-Speech or Debate cases where objections were *not* preserved at trial) and self-contradictory arguments about the feasibility of reviewing 3,000 exhibits for missed redactions – does not prove a waiver either.

More specifically, the authorities that the government cites are the same cases cited in its initial letter disclosing its error, and do not control here because (i) none of them concerned

---

[1] In fact, Senator Menendez was *so* clear about his objection to the jury's consideration of the Unredacted Exhibits (and other evidence violating the Speech or Debate privilege) that both the government and *the Court* urged him to stop raising the objection, because it had already been "preserved." Trial Tr. at 566:11-14 (The Court: "If the defense is going to raise this issue [*i.e.*, objections to Speech or Debate Clause violating evidence] time and time and time again, the trial is going to be completely bogged down"); Trial Tr. at 4480:19-22 (the Government, in the context of a Speech or Debate privilege objection, stated: "They object every time. They only need to do it once to preserve. We should move forward with the trial.").

evidence that violated the Speech or Debate clause; and (ii) none of the cases concerned material that was successfully objected to at trial. *See* ECF 645 ("Mot.") 16 (distinguishing waiver-related authorities cited at pages 14 and 16 of government's opposition). Moreover, the government ignores that each of its authorities includes the express caveat that there is *never* a waiver where, as here, the extra-record evidence "was so prejudicial that [the defendant] was denied a fair trial." *United States v. Jefferys*, No. 20-3630, 2022 WL 9627085, at *3 (2d Cir. Oct. 17, 2022); *United States v. Stasiv*, No. 19-4286, 2021 WL 4888865, at *2 (2d Cir. Oct. 20, 2021) (stating the same caveat); *United States v. O'Brien*, No. 13-CR-586 (RRM), 2017 WL 2371159, at *13 (E.D.N.Y. May 31, 2017) (same); *Barnett v. United States*, 870 F. Supp. 1197, 1205 (S.D.N.Y. 1994) (same).

The government's next argument—handwaving about defense counsel's supposed "decision" to rely on the government's own labelling of its exhibits (Opp. 17-19)—is even less persuasive. On this point, the record is very clear: The fault for this error—whether inadvertent, reckless, or negligent—lies with the government. The government was well aware of Senator Menendez's objection to the Unredacted Exhibits, argued vehemently that Senator Menendez's objection should be overruled, lost that argument (twice), and then loaded the Unredacted Exhibits onto the jury's laptop anyway. Of course, no defendant or defense counsel had *any* role in loading *government exhibits* (including the Unredacted Exhibits) onto the government's laptop provided to the jury; the government does not claim otherwise. It follows that no defendant or defense counsel had any role in causing the error. The notion that Senator Menendez should nevertheless suffer the *consequences* of the government's error (a dispositive "waiver" of his Speech or Debate privilege) is unsupported by any authority, and inconsistent with the salutary

principle that the government's interest in a prosecution "is not that it shall win a case, but that justice shall be done," *Strickler v. Greene*, 527 U.S. 263, 281 (1999).[2]

Nor does it matter that defense counsel, with unlimited time, could theoretically have cross-checked every exhibit and discovered the government's error.[3]  The government cites no authority for the argument that defense counsel relies on the government's labelling of exhibits at its own peril, and such a rule would result in a wasteful and unnecessary procedure at the end of criminal trials that would risk delaying jury deliberations.  No court could function effectively if the rule were that a defendant risks waiver unless he (through counsel) delays jury deliberations by combing through every line of tens of thousands of pages of the government's proffered admitted exhibits to ensure that the government did not (intentionally, recklessly, or negligently) disguise constitutionally barred evidence as competent proof.  It would also cause incentives to game the system: Either side could try to slip extra-record information into the set of evidence provided to the jury—even intentionally—and, as long as no one caught the sleight of hand, there would be nothing the Court could do about it after the fact.  *See* Opp. 58 (arguing that no discovery is necessary, because it would "not shed any light on the degree to which *defense counsel* through their conduct waived … their objections").  That is perverse.

---

[2] The quotation from *Stasiv* and other cases stating that "[d]efense counsel is as responsible as the prosecutor for seeing to it that only proper exhibits are sent to the jury room" (Opp. 14 (collecting authorities)), refers to the defense's obligation to timely register objections to the *admission* of exhibits into evidence, for eventual transmission to the jury.  *See* Mot. 16.  None of the government's authorities holds that where *successfully excluded* exhibits are nevertheless provided to the jury, the defendant is left without any recourse.

[3] The government's claims that the defense actually did have a full 48-hours to review the laptop is wrong (Opp. 11); while it first advised the defense that the laptop was *available* for review about 48 hours prior to its submission to the jury, the defense and prosecution were not able to meet to review the laptop until about 4-5 hours before the deliberations.  Weitzman Decl. ¶ 7.  But this is all beside the point anyway—there is no requirement that, in order to avoid a waiver, the defense must comprehensively audit the government's claim that the exhibits it compiled for the jury are what they purport to be (*i.e.*, the versions of the exhibits as admitted at trial).

Finally, the government's suggestion that defendants could have discovered the error *after* the laptop was provided to the jury, including during post-trial briefing, ignores the fact that, once submitted to the jury, the defense lost access to the laptop and never again had access. Defendants thus conducted their remaining work based on the correctly admitted versions of exhibits gathered during trial.

As with many of the government's arguments, a modicum of "common sense" helps refute them. Opp. 24. If the tables were turned, and *defense counsel* had inadvertently loaded excluded evidence onto the jury's laptop (say, further and clearer evidence of Nadine's ongoing relationship with her ex-boyfriend, Doug Anton, or evidence of other acts of generosity by Wael Hana and Fred Daibes), there is ***no chance*** that the government would concede it had "waived" its objections to the evidence that it fought (successfully) to exclude at trial. For good reason – such a rule would be unworkable, senseless, and unjust. That is why it is not the law.

## II.    SPEECH OR DEBATE ERRORS ARE STRUCTURAL AND REQUIRE VACATUR OF ALL COUNTS OF CONVICTION

The government is rather disdainful at the notion that its serious mistakes might have consequences. But the government cannot cite a single case where a court has excused such errors as harmless. Nor is Senator Menendez aware of one. *See United States v. Durenberger*, No. 3-93-65, 1993 WL 738477, at *3-4 (D. Minn. Dec. 3, 1993) (dismissing case even where there was "no claim … that the government relied on" the violative evidence, because excusing any violation as harmless would undercut the "purpose served by the Clause").

This Court should not be the first. Speech or Debate Clause violations are clear examples of structural errors that defy harmless-error review. The entire point of the Clause is to provide Members of Congress a clear *ex ante* guarantee that their legislative acts will never be used against them in a court of law. That is irreconcilable with harmless-error review. If the Speech

or Debate Clause confers an absolute immunity on legislators—as the Supreme Court has said, time and again—then violations cannot be excused. There is no such thing as an absolute immunity with excusable violations. This is instead the sort of privilege that is "either respected or denied," and whose "deprivation cannot be harmless." *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984); *see also, e.g.*, *United States v. Gonzales-Lopez*, 548 U.S. 140, 149 n.4 (2006).

The government has no answer to this, so it offers the kitchen sink—something, anything, to prevent this court from ordering a new trial. It asserts that courts have "repeatedly" agreed with its position, but it cannot quote a single court saying so. And stripped of this quasi-resort to precedent, it then marshals virtually no substance. It never tries to explain how harmless-error analysis can square with the function of the Speech or Debate Clause. And it does not contest that if the errors here are structural, all of the counts of conviction fall. Its main (really, only) appeal is atmospheric: It cannot be that our laptop mistake requires a new trial. But that is the "ineluctable" result of both precedent and principle. ECF 420.

A.    The government claims the Supreme Court has "repeatedly held" that Speech or Debate Clause violations are subject to harmless-error review. Opp. 47. But that assertion does not survive the government's own brief—let alone a skim of the cited cases. As the government itself stumbles into admitting, the *Johnson* Court never considered prejudice at all, because "the government did not argue before the Supreme Court" that any error was harmless. Opp.48; *see United States v. Johnson*, 383 U.S. 169, 185-86 & n.16 (1966). Nor did the Court address harmless error in *Brewster* or *Helstoski*, both of which "involved appeals from pretrial motions" where there was no "occasion to apply a prejudice analysis." Opp. 50. Usually when the law is "crystal clear" (Opp. 47), the party invoking it can at least muster a quote; but the government never comes close, because it cannot. Its claims otherwise rest on wild misreadings.

Start with *Johnson*. The government relies heavily on *Johnson*, mainly for the point that three Justices *in dissent* found the Speech or Debate violation harmless as to *some* counts. And it asserts that because the majority did not squarely *reject* this analysis, it implicitly adopted it. But by its express terms, the *Johnson* Court did not discuss harmlessness, because the government abandoned any argument on that front—and said that the fate of the entire case turned "solely" on how the Court resolved the conspiracy count at issue. 383 U.S. at 185-86. The Court thus said it had "no occasion" to address the subject. *Id.* at 186; *see id.* at 187 (Warren, C.J., concurring and dissenting in part) (recognizing the Court "refuse[d] to decide the validity of the conviction under the seven substantive counts"). Refusal to decide an issue is not precedent.

The government's reliance on *Johnson* is stranger still, because where the Court *did* discuss prejudice, its analysis reflects structural error. For context, that case involved a Congressman who was convicted for one count of conspiracy and seven substantive counts of violating the federal conflict of interest statute. *Id.* at 170-71. The "bulk of the evidence" at trial had nothing to do with the Speech or Debate Clause, and nobody suggested for a moment that without the violative evidence—a speech that the Congressman gave on the floor of the House—there would have been a sufficiency problem. *Id.* at 172; *see id.* at 189 (Warren, C.J., concurring and dissenting in part) ("The speech was a minor part of the prosecution."). Indeed, the government pressed this very point, arguing "the Speech or Debate Clause was not violated because the gravamen of the count was the alleged conspiracy, not the speech, and because the defendant, not the prosecution, introduced the speech itself" (which was only referenced by the government). *Id.* at 184 & n.14.

But that argument lost. It was "undisputed" the government used the speech as evidence, as well as in the indictment, and had invited the jury to ask "questions" about the propriety of

that speech.  *Id.* at 184.  That was enough.  A prosecution "dependent on such inquiries"—in any way—"*necessarily* contravene[d] the Speech or Debate Clause."  *Id.* at 184-85 (emphasis added).  And because the prosecution "dr[ew] in question the legislative acts," the remedy was a "new trial."  *Id.* at 185.  That is the ***opposite*** of harmless-error analysis.  If the government were right here, it is hard to see how *Johnson* would not have come out the other way.

The government then turns to *Brewster*, but it is hard to know what it is reading.  Nothing in *Brewster* concerns harmless-error analysis—in large part because the Court *found no violation*.  408 U.S. 501, 525 (1972).  The pages cited by the government regard a different point entirely: Whether the government has the "power" to prosecute a Member of Congress under a generally applicable criminal law, so long as "all references" to a legislative act are "eliminated."  *Id.* at 511.  On *that* point, the Court was "unanimous" in *Johnson*, because everyone agreed the government had the power to bring the charges in that case—the issue was instead the legitimacy of the *evidence* that the government had used to substantiate them.  *Id.* at 511-12.

The government makes much of the fact that the Court has said that a prosecution cannot "rely on" evidence in violation of the Speech or Debate Clause, reading this as an implicit holding that a new trial is not warranted unless such violations are actually prejudicial.  Opp. 47.  But that gloss does not work in context—as the government's last case, *Helstoski*, makes plain.  There, the Court affirmed that the Clause bars *any* "mention of a legislative act" for *any* purpose.  442 U.S. 477, 490 (1979).  It "precludes any showing of how a legislator acted, voted, or decided."  *Id.* at 489.  And it demands a *categorical* "exclusion of such evidence"—a bright-line rule that will no doubt "make prosecutions more difficult," but that is necessary in order to avoid "undermining the values protected by the Clause."  *Id.* at 488-89; *see id.* at 490 (explaining that revealing any "information as to a legislative act" would "violat[e] the explicit prohibition").

The Supreme Court's cases thus lay down a clear command, even if articulated with a selection of verbs: The government cannot "rely on," "mention," "show," or "use" legislative acts in a criminal trial against a Member of Congress.  The Court has been pellucid on that point.  Never and nowhere has it hinted a violation of this absolute protection can somehow be excused as harmless.

**B.**     For good reason.  As Senator Menendez explained, Speech or Debate Clause violations fit comfortably within the Supreme Court's broader structural error jurisprudence, and do not lend themselves to a harmless-error analysis.  The government barely offers a response.

At most, the government points out that evidentiary errors—even constitutional ones—are typically reviewed for harmlessness.  Opp. 52.  But everyone agrees on that.  Mot. 17.  The point here is that Speech or Debate Clause violations are different in kind, because unlike other constitutional evidentiary protections—like the Fourth Amendment's bar against unreasonable search and seizure, or the Fifth Amendment's privilege against self-incrimination—the Speech or Debate Clause is not designed "to assure fair trials," but instead to advance an interest *wholly outside* the court.  *Helstoski*, 442 U.S. at 491.  The Clause establishes a clear, absolute, and *ex ante* protection for all legislative acts so that Members would be immune from "intimidation" and the "executive and judicial oversight that realistically threatens to control [one's] conduct as a legislator."  *Gravel v. United States*, 408 U.S. 606, 618 (1972); *see Johnson*, 383 U.S. at 180 (explaining "prophylactic purpose").  The Clause's function is to assure legislators that their legislative acts will never see the light of a courtroom, so that Congress has the "freedom" to perform its role as an independent branch.  *Gravel*, 408 U.S. at 416; *see Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975) (explaining "absolute" protection).  And where, as here, "the right at issue is not designed to protect the defendant from erroneous conviction but

12

instead protects some other interest," violations of that right are quintessential structural errors. *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017).

The government has no answer to this, so it relegates *Weaver* to a footnote.  Opp. 51 n.35.  And there, it just emphasizes that under *Weaver*, structural errors go to the "framework" of a trial, rather than specific defects within it.  Opp. 51 & n.35.  That is right, but it dooms the government's argument.  Once again, "harm is irrelevant to the basis underlying the right" granted by the Speech or Debate Clause.  *Weaver*, 582 U.S. at 295.  The Clause is not principally concerned with how a legislative act might prejudice a particular legislator in a given case; it is concerned with what may follow from the general *possibility* of legislative action ever being *used* in any trial, and how that specter would chill the work of Congress as an institution.  A Speech or Debate Clause violation is thus very much one that goes to the "framework" of the trial, because its primary harm inheres in the nature of the proceeding, more than its specific effect on the verdict.

In other words, even if the error is harmless *in a specific trial*, the *institutional* harm still occurs, because Congress had one of its legislative acts questioned within a criminal proceeding. *See United States v. Rostenkowski*, 59 F.3d 1291, 1298 (D.C. Cir. 1995) (affirming it is the "very act of questioning that triggers the protections of the Speech or Debate Clause"). And by this light, the government makes no effort to explain how harmless-error analysis can be reconciled with the Speech or Debate Clause's fundamental purpose, or absolute protections.  Nor could it. As Senator Menendez explained, a prophylactic immunity like the one here—one fashioned to give Congress the freedom to operate outside intimidation, and take legislative action outside the shadow of possible sanction—only works where the protections are *ex ante* and absolute.  Mot. 19; *see Trump v. United States*, 603 U.S. 593, 631-32 (2024).  A Member of Congress needs to

know that his actions are never going to be used as evidence in any form. Harmless-error analysis simply cannot be squared with that sort of protection, because it by definition holds that legislative acts can *sometimes* find their way into trial so long as *other branches* excuse the error. The "conscious choice of the Framers," however, was to eliminate this possibility—even if it made "prosecutions" of Members "more difficult." *Brewster*, 408 U.S. at 516.

At its core, the Clause rests on a tradeoff: The risks innate to an "absolute" immunity are smaller than those that would follow from the possibility of inter-branch intimidation. *Eastland*, 405 U.S. at 504. The government's position here rests on the opposite. Either a protection is absolute or it is not; and if it is, as the Court has held, then violations can never be excused.

**C.**    The government cannot cite a case from any court in any jurisdiction that squarely adopts its view, so its last effort is to minimize those that reject it. Opp. 52-54. This fares no better.

Foremost, as for *United States v. Swindall*, the government acknowledges (at it must) that the Eleventh Circuit stated that "harmless error was not the appropriate framework for Speech or Debate Clause violations." *Id*. at 52. The government says *Swindall* somehow has no bearing here, but that counterintuitive assertion is based entirely on its flawed waiver argument above. *Id.* at 53.

The best the government can do is cite lines from cases about Speech or Debate violations in the *grand jury* context. For instance, in *Swindall* itself, the court said that a totally "irrelevant" reference to a legislative act would not ruin an otherwise valid indictment—for instance, where a grand jury "indicted a legislator for bank robbery after a prosecutor presented it with evidence of (1) a gun with the member's fingerprints, (2) a photograph of her robbing the bank, and (3) a copy of a speech she made on the floor of the House in favor of saving the

14

Northern Spotted Owl." 971 F.2d 1531, 1548 & n.21 (11th Cir. 1992). And that is all that the government's other cases suggest too, including *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (excusing violation where "insignificant" violation was "not a factor" in any way "in the issuance of the indictment"). But a grand jury proceeding operates by a different set of rules across the board. Given the grand jury's threshold role, so long as an indictment is "valid on its face," it is "enough to call for trial of the charge on the merits," even where that indictment rests on "incompetent evidence." *Costello v. United States*, 350 U.S. 359, 363 (1956). And that is so even where the evidence involves a violation of a "privilege" protected by the Constitution. *United States v. Calandra*, 414 U.S. 338, 345 (1974). These laxer standards, however, obviously have no application to the criminal trial itself, where actual criminal liability is at issue.

Finally, it bears emphasis that the government makes no effort to argue that if it is wrong about structural error, these Speech or Debate Clause violations do not infect *all counts*. Opp. 55. The opposite, in fact. The government emphasizes throughout its opposition that all counts are intertwined, and were presented to the jury as such. *See, e.g.*, Opp. 39, 42 (arguing exhibits were cumulative because they were all part of "broader scheme" evidence cutting across counts). So *even if* it is possible in a hypothetical case for Speech or Debate Clause violations to require automatic vacatur of some counts without affecting unrelated charges, this is not such a case. The government's Speech or Debate Clause violations—contrary to this Court's order—demand one remedy, and one remedy only: Vacatur of all convictions, and a new trial on all counts.

## III. THE GOVERNMENT CANNOT SHOW THAT THE UNREDACTED EXHIBITS WERE HARMLESS

Even assuming that Speech or Debate errors are subject to some kind of harmless error review or "prejudice analysis" (Opp. 47), the government has utterly failed to rebut the well-established rule "that **any** extra-record information of which a juror becomes aware is presumed

prejudicial." *United States v. Greer*, 285 F.3d 158, 173 (2d Cir. 2002). Indeed, although it called the Unredacted Exhibits "very critical evidence" when it sought their admission at trial (Mot. 4), the government *now* engages in mental gymnastics to argue that this evidence really didn't matter. The Court should take this about-face with a large helping of salt.

The government's arguments fall into two broad categories: *first*, it contends that the jury probably didn't review the Unredacted Exhibits because they weren't emphasized or important at trial; and *second*, that even if the jury *had* seen the Unredacted Exhibits, they would have been incomprehensible and no inferences could possibly be drawn absent discussion in summation. Neither of these arguments finds support in the record or applicable law.

A.     The Court Must Reject the Government's Speculation About What the Jury Saw

This Court has broad discretion to "*review*[] the issue of the prejudicial effect of the infiltration of extra-record evidence." Opp. 15 (citing *United States v. Weiss*, 752 F.2d 777, 783 (2d Cir. 1985) (emphasis added)). But there is no authority for the proposition that a court may engage in the type of unfettered, evidence-free speculation that the government requests here. The government's own cited cases prove as much. *See United States v. Farhane,* 634 F.3d 127, 169 (2d Cir. 2011) (inquiry into effect of extra-record evidence "properly considers the 'entire record' in making an objective assessment of possible prejudice" (emphasis added)); *Weiss*, 752 F.2d at 783 (affirming finding of no prejudice from jury contamination after an "exhaustive evidentiary hearing on the issue," not guesswork). The Court should therefore reject the government's longwinded conjecture about what the jury did, or did not, review. Opp. 21-27.

Even if the Court *were* to consider this jury's likely interaction with the Unredacted Exhibits, the record strongly undercuts the government's narrative. The government certainly did not carry its burden of rebutting the presumption that the Unredacted Exhibits caused actual prejudice. *See Greer*, 285 F.3d at 173. Before explaining why, let us be clear about one thing:

16

No one is suggesting, as the government posits in its strawman, that the jury opened every single one of the exhibits on the jury laptop and reviewed them all.  Opp. 21.  Nonetheless, there is a reasonable likelihood that the jury sought out *these* particular Unredacted Exhibits during its deliberations, and surely no reason to dismiss that possibility as far-fetched.

The problem is that the government urges focus on the *quantity* of exhibits, arguing that among 3,000 exhibits, these would never have been closely reviewed.  But that disregards the *quality* of these exhibits and the context in which they were presented, *i.e.*, that they are the <u>only</u> documents that tie Senator Menendez to a specific, consummated sale of military aid to Egypt, and that they were presented in prominent places in the government's summary charts alongside tantalizing redaction bars, which the government itself exploited in summation.

The government's responses ignore its own case and prior representations.  The government ignores, for example, that the January 2022 Unredacted Exhibits were presented at the very end—*i.e.*, as the grand finale—of the government's Egypt summary chart (as copied again, below), giving the jury all the reason in the world to wonder what Nadine's "WOW" might be in reference to and to investigate further.  And such investigation would have been very easy, had the jury chosen to undertake it.  The summary chart itself listed the precise exhibits underlying each excerpt, and the exhibit provided to the jury as associated with Nadine's exclamation "WOW" (GX A103-10) was *one of the Unredacted Exhibits* containing the Speech or Debate-violating link to the "us-arms-sales-egypt" news article.  *See* Mot. 22-23.

| No. | Date | Time (ET) | From | To | Detail |
|---|---|---|---|---|---|
| 1265 | January 28, 2022 | 12:33 PM | Nadine Menendez | Robert Menendez | Text: "WOW" (GX A103-10) |
| 1266 | January 28, 2022 | 12:35 PM | Nadine Menendez | Wael Hana | Missed WhatsApp voice call (GX C603) |
| 1268 | January 28, 2022 | 12:36 PM | Nadine Menendez | Wael Hana | Missed WhatsApp voice call (GX C603) |
| 1269 | January 28, 2022 | 12:37 PM | Nadine Menendez | Wael Hana | WhatsApp: "I text it to you"(GX B207-1) |
| 1271 | January 28, 2022 | 6:36 PM | Nadine Menendez | Wael Hana | WhatsApp: "Did you get the text?" (GX B207-1) |
| 1272 | January 29, 2022 | 3:52 AM | Wael Hana | Nadine Menendez | WhatsApp: "Yes" (GX B207-1) |

Weitzman Decl. Ex. F.

The government also ignores that it *specifically encouraged* the jury to speculate about what might be behind the redaction bars on the September 2019 messages between Hana and Helmy, again giving the jury ample reason to pull up *those specific* exhibits and find themselves confronted with Speech or Debate Clause-violating material.  *See* Trial Tr. at 6400:18-24 (urging jury to speculate that behind redaction bars on the Helmy Messages, an Egyptian official was asking Senator Menendez (via Hana) about "things that Egypt always cared about," *e.g.*, unconditional military aid).  Given this prominent presentation of the Unredacted Exhibits in the applicable summary chart and at summation, and given the emphasis on military aid in the government's trial presentation, there is ample reason to conclude that these would be among the exhibits that the jury was *most likely* to review and consider as it deliberated.

Most oddly, the government suggests that it argued to the jury during summation that jurors did not actually "have any need" to review the evidence underlying the government's summary charts and should simply rely on their memories and impressions as presented during trial.  Opp. 26 n.18.  The government seems to contend that it advised the jury to *ignore* the *Court's* instruction that "the underlying evidence and the weight which you attribute to that underlying evidence is what gives value and significance to these [summary] charts."  Trial Tr. 7052:15-17.  If that is really what the government is arguing, that is improper.  And in any event, the argument ignores that the jury specifically asked for technology to make it possible to review the underlying evidence on the jury laptop, strongly suggesting that the jury did undertake to review at least some exhibits presented at trial.  Mot. 27.  It did no go solely on memory.

The authorities the government cites in pressing the Court to presume the jury did not review the Unredacted Exhibits (Opp. 21-22, 24) are inapposite, and only prove why no similar assumption can be made here.  In each of these cases (none involving the Speech or Debate

Clause), there was an evidentiary basis from which to draw that conclusion—not pure speculation, as the government advances here.  For example, in many of those cases, the court *asked* the jury whether it considered the extra-record evidence and credited the jury's response that it had not.  *See Jeffreys*, 2022 WL 9627085, at *3 ("At the Government's request, the district court polled the jurors and asked whether they had read the labels. None of the jurors indicated that they had[.]"); *United States v. Hansen*, 369 F. App'x 215, 216 (2d Cir. 2010) ("The district court explicitly credited the jurors' statements that they had not looked at the extra-record evidence")); *Smithwick v. Walker*, 758 F. Supp. 178, 183 (S.D.N.Y. 1991) ("The post-verdict sworn statements of the jurors indicated that the photographs had little or no impact on the deliberative process"); *see also* Mot. 28 n.10 (distinguishing *Jefferys* and *Hanson*).  No similar inquiry was, or could be, conducted here, as the government concedes.  Opp. 24.

The two other cases on which the government heavily relies—*Nkansah* and *Coney*—again prove the need for an evidentiary record rather than speculation.  In both cases, the court intervened *during deliberations* to remove the extra-record evidence from the jury room, thereby remedying the potential taint.  In *Nkansah*, upon learning that extra-record evidence had been inadvertently provided to the jury, "the Court's courtroom deputy then entered the jury room, after the jury had left the room following its first day of deliberations, and he retrieved all eight [extra-record] exhibits."  *United States v. Nkansah*, No. 08 CR. 1234, 2010 WL 1375633, at *1 (S.D.N.Y. Apr. 6, 2010), *aff'd,* 699 F.3d 743 (2d Cir. 2012).  The court then determined "that seven of the eight exhibits had not been reviewed by the jury at all—based on their location in the jury room and their enclosure in manila folders inside a redweld" and the remaining exhibit "provided no information not in evidence to the jury."  *Id.*  In *Coney*, the court both removed the improper exhibits from the jury room *and* provided a curative instruction *during deliberations*

directing the jury to disregard the prejudicial evidence. *See United States v. Coney,* 76 F.4th 602, 606 (7th Cir. 2023) ("the judge immediately ordered the computer removed from the deliberation room" and "provided the jurors with a curative instruction"). Here, by contrast, there was no intervention during deliberations and no curative instruction. To the contrary, the jury was instructed that it *should* review the evidence underlying the government's summary charts, which would include the Unredacted Exhibits. Mot. 22 (citing Trial Tr. 7052:15-17).

While out of character for the government, some humility is in order here. At the end of the day, while there are compelling reasons to infer that the jury considered the Unredacted Exhibits in reaching its conclusions, nobody knows for certain. (Even the jurors may no longer recall.) Therein lies the rub: As a consequence of the government's error, a pall of uncertainty now hangs over the verdict in one of the highest profile criminal trials in recent memory. That strips the parties, the Court, and the public, of confidence that Senator Menendez's convictions were procured justly, without undue influence or irregularity. That uncertainty is reason enough to grant a new trial. *See United States v. Olazabal*, 610 F. App'x 34, 37 (2d Cir. 2015) (Rule 33 grants courts broad discretion "to set aside a jury verdict and order a new trial to avert [even] a ***perceived*** miscarriage of justice" (emphasis added)). And given that the same basic case is being tried against Nadine Menendez in any event, and that trial will likely consist of the same evidence as a retrial of Senator Menendez, there is no actual loss of judicial resources in ordering a retrial. Absent such a retrial, the "appearance of fairness so essential to public confidence in the [judicial] system" is in jeopardy. *Press-Enter. Co. v. Superior Ct. of California, Riverside Cnty.*, 464 U.S. 501, 508 (1984).

    B.    <u>The Contents of the Unredacted Exhibits Are Highly Prejudicial</u>

The government also contends that, even if reviewed by the jury, the Unredacted Exhibits were not prejudicial because no inferences are apparent from their face. Opp. 32-36. This argument is highly disingenuous. It assumes that the jury ignored its nine-week criminal trial and had to evaluate this evidence in a vacuum—as if the jury would have concluded that the Unredacted Exhibits were random text messages that really *could be about anybody*. Who is kidding whom? There is a reason the government was so adamant about admitting these less-redacted text messages. And it wasn't to confuse the jury. *See United States v. Stewart*, 907 F.3d 677, 690 (2d Cir. 2018) ("the government's apparent recognition regarding 'the impact [the evidence] would have on the jury' . . . confirms our belief that it was, in fact, important to the prosecution's case.").

For instance, the government says that "at most," a text message from Senator Menendez to Nadine attaching a link to a news article containing the text "us-arms-sales-egypt" and Nadine's response "WOW" would have merely led the jury to conclude that "there was *some* news about *something* related to arms sales to Egypt." Opp. 32 (emphasis in original). This is far-fetched. In a lengthy trial in which the government told the jury that Senator Menendez "promised to approve billions of dollars in military aid to Egypt" in exchange for bribes, and then presented evidence of Senator Menendez's unique role in approving or withholding such aid (Mot. 9), the natural (and intended) interpretation of this text message and Nadine's reaction is that it concerned U.S. arms sales to Egypt in which Senator Menendez was involved. The government's suggestion otherwise not only defies common sense, it ignores the very inferences the government asked the jury to make. *See* Trial Tr. at 6401:12-14 (government summation arguing that the evidence reflects "promises made to Egypt" in exchange "for checks . . . right into Menendez's hand").

21

Indeed, the lengths to which the government now contradicts the arguments it made in summation is striking.  It now claims nothing can be read into Nadine's exclamation "WOW," because that's just her "highly emphatic" personality.  Opp. 33, n.23.  But in summation it claimed that Nadine's hyperbolic statements manifested something nefarious and criminal rather than mundane.  *E.g.*, Trial Tr. 6494:1-25 (arguing that Nadine's exclamation "he is FIXATED on it" must be a reference to Senator Menendez's alleged illegal intervention in Daibes' criminal case and cannot be a reference to Daibes' shoulder surgery); 6539:21-24 (arguing that Nadine's alleged question "what else can the love of my life do for you?" was evidence of Senator Menendez "seek[ing] feedback from [a foreign] principal" and not a tongue-in-cheek reference to pouring wine, paying for dinner, or some other innocent conduct).

The same is true of the government's late-breaking claim that the September 2019 messages between Helmy and Hana (explicitly referencing a "a billion $ of usaid to Egypt") would have "result[ed] only in juror confusion."  Opp. 35.  Again, that flies in the face of the government's *opposite* argument to the jury during summation that—notwithstanding even greater redaction—the jury *knows* "from the evidence and [its] common sense" that behind those redaction bars Helmy was "asking about the things that Egypt always cared about," like military aid.  Trial Tr. 6400:13-22.  Moreover, the flurry of calls involving Senator Menendez that followed these messages on the government's summary chart (*see* Mot. 25) disposes of any claim that the jury would somehow conclude only that there was "some development related to aid in Egypt" unrelated to Senator Menendez.  It just does not pass the smell test.

Perhaps most incredibly, the government now claims "the entire topic of military aid to Egypt was . . . a secondary issue in the case."  Opp. 36.  That is, frankly, jaw-dropping. Without the potential for his greasing the wheels on military aid, Egypt would have had no plausible

reason to allegedly approach or attempt to corrupt Senator Menendez at all.  The Senator's alleged roles in copy-editing a letter, sharing non-classified information, or helping an Egyptian expat with his New Jersey-based business are obviously piddling in comparison to Egypt's understanding that Senator "Menendez . . . was powerful and influential in Washington" as the government claimed. Trial Tr. 6405:5-6.  Without the elephant-in-the-room of the Senator's capacity to provide or withhold valuable military equipment hanging over the trial, it is unlikely the jury would have convicted on the Egypt counts (or even that the Egypt counts would have been charged at all).  The entire case would have made no sense.

These desperate arguments aside, the reality is that these Exhibits filled a critical gap in the record—a gap which the government repeatedly promised the jury that it would fill—as they evidenced an actual, consummated provision of military aid.  Other than the Unredacted Exhibits, there was no evidence of any promise of (let alone follow-through on) a billion dollars in aid—just a $99 million ammunition deal to fight ISIS.  But the government promised the jury in its opening that it would hear evidence that Senator Menendez "promised to approve billions of dollars in military aid to Egypt." Mot. 8 (citing Trial Tr. 50:8-9).  And the government understood that the Unredacted Exhibits were all it had to back up its pledge to the jury—which is why it told this Court it would have sought an interlocutory appeal of its pre-trial ruling, in the event it thought that it reached this evidence.  Mot. 8.

None of this is to say that the Unredacted Exhibits were legally *necessary* to convict—but that is not the test for evaluating the impact of constitutional error.  For example, the government asserts that the Unredacted Exhibits were harmless because the jury *could have* convicted on the Egypt counts based solely on Senator Menendez's 3-minute phone call to a USDA bureaucrat (who himself testified at trial, and affirmed that Senator Menendez never pressured or threatened

him in any form). Opp. 36-37. Even if that were true (it is actually highly dubious, including because the Senator's supposed phone call was not an official act), it does not overcome the dispositive fact that the jury could *just as easily* have convicted based on evidence it never should have seen or considered. What matters here, insofar as harmless error review governs, is whether the jury may have been influenced by the tainted evidence—not whether the jury could have convicted without it. The answer to both questions can be yes. *See Stewart*, 907 F.3d 677, 690 (2d Cir. 2018) (vacating convictions and ordering a new trial where "[w]hile other evidence of [the defendant's] guilt was proffered, the [improperly admitted evidence] was the most suggestive evidence of [the defendant's] intent").

Similarly, the fact that a *promise* is sufficient to convict on bribery counts has no bearing on this motion. Opp. 39. Actually *delivering* military aid (or actually withholding it) in exchange for bribes is much more culpable and unseemly. It also makes it more likely that there really was a promise in the first place. That is why, absent a Speech or Debate Clause problem, evidence of actual aid-signoffs would have been central to the government's case. Meanwhile, there is clear reason to be skeptical that any alleged promise was actually *made* absent evidence of a promise being *kept*. All told, it is more than plausible that the improper evidence of actual, consummated military aid influenced the jury's determination to convict. At minimum, the government cannot bear its burden to prove otherwise. *See United States v. Blaszczak*, 56 F.4th 230, 245 (2d Cir. 2022) ("In harmless-error analysis, the government bears the burden of proof").

The authorities that the government cites on the harmless-error issue are way off-base as a factual matter. Each concerned evidence that was prejudicial (if at all) only on a collateral issue, not on the core of the government's allegations. *See Stasiv*, 2021 WL 4888865, at *2 (extra-record evidence that defendant "had been detained at Rikers Island" in unrelated incident

24

was harmless where evidence of guilt on crimes charged was "overwhelming"); *United States v. Friedland*, 660 F.2d 919, 928 (3d Cir. 1981) (extra-record evidence of "expenditures" deemed "inconsequential" given evidence of guilt); *United States v. Weiss*, 579 F. Supp. 1224, 1227 (S.D.N.Y. 1983), *aff'd*, 752 F.2d 777, 783 (2d Cir. 1985) (finding a "very close question" but determining that the textbook definition of a CPA was harmless in light of ample evidence of actual criminal conduct).[4]

As a true last gasp, the government also argues (again) that the Unredacted Exhibits do not actually violate the Speech or Debate privilege because they do not "mention" a legislative act. Opp. 43-46. That is merely a transparent effort to relitigate (for a third time) an issue the government has repeatedly lost. The Court should not indulge it.

The same goes for the government's hyper-myopic claim that there can be no Speech or Debate violation given that Senator Menendez's name was redacted – this was also raised and rejected in connection with the government's motion for reconsideration. And, anyway, the law is clear that evidence potentially violating the Speech or Debate privilege must be evaluated in "*context*" and not just based on the four corners of an individual piece of evidence. *See In re Sealed Case*, 80 F.4th 355, 372 (D.C. Cir. 2023) (rejecting the conclusion that conversations were "'not integral to' legislative proceedings" where "district court inadequately considered the context of these conversations" which placed them "within the heartland" of the legislative sphere). Here, the context of these exhibits, namely a trial of Senator Menendez focusing on his role in providing military aid to Egypt, makes it perfectly clear that the Unredacted Exhibits

---

[4] In *U.S. v. Strassman*, the Second Circuit did not grant a new trial because it found that the extra-record evidence "was admissible" and so there was no prejudice arising from the jury's review of inadmissible evidence. *United States v. Strassman*, 241 F.2d 784, 785 (2d Cir. 1957) ("we believe the entire log was admissible").

mention the Senator's legislative acts.  Indeed, the government elicited testimony from witnesses

at trial explaining that Senator Menendez's position on the SFRC gave him the unique authority

to "hold foreign military financing grant money."  Mot. 9 (citing Trial Tr. 862:19-863:4; 872:25-

873:6 (Joshua Paul testimony)).  There is thus no good reason for the Court to again revisit its

ruling that the Unredacted Exhibits are barred under the Speech or Debate Clause.

## IV.    AT MINIMUM, THE GOVERNMENT SHOULD PROVE WHAT HAPPENED HERE, AND SHOULD NOT BENEFIT FROM ITS OWN OBFUSCATION

Although the facts are sufficiently clear to order a new trial, if the Court has any doubt,

the necessary first step is to give the defense (and the public) an opportunity to learn the facts of

what happened and why.  Even after multiple opportunities, the government has provided *zero*

competent evidence of how this error happened, how the government learned about it, when and

why the government destroyed the records on the jury laptop, and why the government waited so

long before telling anyone about the error (among other issues).  The government's answer—

"trust us, this was an innocent mistake and, really, it's defense counsel's fault anyway"—is

completely insufficient.

To be sure, Senator Menendez does not expect that the evidence will reveal a nefarious

scheme to sneak the Unredacted Exhibits into the jury room; but that is not the point.  The law

recognizes in many contexts that recklessness is tantamount to scienter.  *See S. Cherry St., LLC

v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (describing "conscious recklessness" as

"state of mind *approximating actual intent*") (emphasis by the court); *Teamsters Loc. 445

Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) ("recklessness

is a sufficiently culpable mental state [to establish scienter]"). Regardless, where the evidence

underlying incredibly seriously criminal convictions has been unconstitutionally polluted, the

Defendants, the Court, and the public are entitled to understand the full story of what happened before everyone (as the government urges) brushes this under the rug and moves on.

This is not solely an academic exercise, or one designed to promote transparency for its own sake (although that is surely enough). Perhaps the record will reveal that the forensic data on the laptop *can* still be recovered, and we can find out if the jury viewed the Unredacted Exhibits. This Court should not merely accept the government's unsworn word. We mean no insult to these particular prosecutors, whom we personally respect, but government prosecutors in this and other Districts have time and again downplayed mistakes and embellished facts in an effort to preserve convictions. *See United States v. Nejad,* 521 F. Supp. 3d 438, 447 (S.D.N.Y. 2021) ("prosecutors persisted in their attempts to downplay the late disclosure and resist any suggestion of culpability"). The same is true in public corruption cases. *E.g.*, *United States v. Stevens*, 715 F. Supp. 2d 1, 8 (D.D.C. 2009) (lamenting "an ongoing series of incidents in which the Court has relied on information provided by the government only to later learn that the government had misled the Court and/or misrepresented the facts") (public corruption prosecution of former Senator Ted Stevens).

The government's refusal to submit a sworn declaration with an explanation of events is perplexing. The government is a litigant no different than any other. No court would simply accept unsworn factual assertions of "trust us" from any civil or criminal defendant, and the government should stand no differently. Indeed courts have, time and again, ordered the government to submit declarations, or appear for an evidentiary hearing, to establish the facts of its own conduct. *See United States v. Nejad*, 487 F. Supp. 3d 206, 224 (S.D.N.Y. 2020) ("the Court therefore orders each AUSA on the trial team, the two Unit Chiefs, and the SAUSA to submit individual declarations, under penalty of perjury, regarding [the failure to timely disclose

*Brady* material]"); *United States v. Walters*, 16-cr-00338, ECF No. 46 (S.D.N.Y. Nov. 17, 2016) (granting motion for "a hearing . . . to address government misconduct during the investigation leading to the indictment in this case"). That the government is not offering to submit evidence of its own conduct at this point is enough to raise an eyebrow (or even two).

Even more so given that the government has admittedly wiped the laptop that was provided to the jury, but fails to explain the circumstances of the deletion. Instead, the government advances the remarkable positions that the Court should speculate that, had it not been wiped, the laptop would have proven that the Unredacted Exhibits were never viewed. Opp. 21-27. Again, no speculation about what deleted evidence might actually have shown is appropriate. *Supra* at III (A). In any event, the fact that spoliation sanctions require a "culpable state of mind" (Opp. 28) ignores that "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or *negligently*." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (emphasis by the Court). Here, there is no dispute that the government destroyed the evidence on the jury laptop "knowingly" (they are not claiming someone clicked the "delete" button by accident), and the limited record we have already suggests negligence. The government should have known of the jury taint that it caused, and it certainly knew that Senator Menendez's convictions were hotly disputed and the subject of lengthy post-trial motions. It was thus foreseeable that the contents of the jury laptop could have been at issue in the case and should have been preserved.[5]

---

[5] The government's argument that Senator Menendez is imposing some kind of unworkable requirement that a new laptop be used at every trial barely merits a response. *See* Opp. 29-30. All Senator Menendez is suggesting (as seems highly reasonable) is that the government should not destroy the records of what the jury was shown in a trial in which post-trial acquittal motions are pending and an appeal is likely. Indeed, the government could place the prior exhibits in a

The government's arguments against an adverse inference miss the point. Again, Senator Menendez's request here is not that the Court enter an inference that the jury did review the Unredacted Exhibits, but just that the Court refrain from giving the government the benefit of its speculative inferences that the jury *did not* review the evidence, which the government uses to battle the presumption of prejudice. At a minimum, the Court should require the government to explain itself—in the form of competent, admissible evidence—and, from there, be guided by the trial record and whatever is exposed in discovery.

It is understandable that the government is embarrassed about its error and wishes it never happened, but that does not give it carte blanche to demand that everyone turn a blind eye based on nothing other than the government's *ipse dixit*. As then-District Judge Nathan put it in *Nejad*, "the public has a right to know how we got here . . . [t]he reasons [for the government's conduct] bear on the accountability of public officials and on public confidence in the administration of justice." *Nejad*, 521 F. Supp. 3d at 454. So too here.

## CONCLUSION

For the reasons set forth in his opening memorandum and herein, Senator Robert Menendez respectfully requests that this Court grant this motion for a new trial. At minimum, as a first step, the Court should authorize discovery into the details and scope of the government error that led to the improper submission of excluded evidence to the jury.

---

password protected folder and reuse the laptop, which would still preserve the forensic evidence of what the jury reviewed while leaving no impact on government resources.

Dated: December 10, 2024

Respectfully submitted,

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

By: */s/  Adam Fee*
_____

    Adam Fee
    PAUL HASTINGS LLP
    1999 Avenue of the Stars
    Los Angeles, CA 90067
    Telephone: 1(310) 620-5719
    Facsimile: 1(310) 620-5819

    Avi Weitzman
    Paul C. Gross
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, NY 10166
    Telephone: 1(212) 318-6000
    Facsimile: 1(212) 725-3620

    *Attorneys for Defendant Robert Menendez*