**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S4 23-cr-490 (SHS)

---

## <u>SENATOR ROBERT MENENDEZ'S REPLY TO THE GOVERNMENT'S SENTENCING SUBMISSION</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
Paul C. Gross
200 Park Avenue
New York, N.Y. 10166
(212) 318-6000

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 3

I.     The Government Grossly Mischaracterizes the Egypt-Aid Scheme ..................... 3

II.    The Government, Again, Tramples on Senator Menendez's Speech or Debate
Rights ................................................................................................................. 9

III.   Senator Menendez's Lifetime of Good Works Merits Consideration Under 18
U.S.C. § 3353(a) ................................................................................................11

IV.   The Government's Loss Amount Calculations are Based on Guesswork............. 13

V.    The Court Should Reject the Government's Suggestion that Senator Menendez's
Sentence Should Be Increased Based on Hypothetical Future Credits He May or
May Not Earn..................................................................................................... 14

VI.   The Government's and Probation Department's Requested Sentence Would
Unnecessarily Increase The Risk of Harm to Senator Menendez in Prison. ........ 16

CONCLUSION.................................................................................................................. 19

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.m. C.L. Union Found. of S.C. v. Stirling*,
123 F.4th 170 (4th Cir. 2024) .................................................16

*Farmer v. Brennan*,
511 U.S. 825 (1994) (Blackmun, J., *concurring*) .................................18

*Hammer v. Ashcroft*,
570 F.3d 798 (7th Cir. 2009) .................................................16

*Jones v. Donnelly*,
487 F. Supp. 2d 403 (S.D.N.Y. 2007).................................................4

*United States v. Dean*,
792 F. App'x 842 (2d Cir. 2019) .................................................4

*United States v. Dwyer*,
No. 15-cr-385 (AJN), 2019 U.S. Dist. LEXIS 111519 (S.D.N.Y. July 2, 2019)...................11

*United States v. Fishman*,
631 F. Supp. 2d 399 (S.D.N.Y. 2009).................................................11, 12

*United States v. Fowler*,
948 F.3d 663 (4th Cir. 2020) .................................................14

*United States v. Johnson*,
383 U.S. 169 (1966).................................................10

*United States v. Lenich*,
No. 17-CR-0154 (WFK), 2018 U.S. Dist. LEXIS 19386 (E.D.N.Y. Feb. 2, 2018) .................................................11

*United States v. Prevatte*,
66 F.3d 840 (7th Cir. 1995) (Posner, J., *concurring*).................................................15

**Statutes**

5 U.S.C. § 8332(o) .................................................15

18 U.S.C. § 3353(a) .................................................11

18 U.S.C. § 3553(a)(2).................................................1

U.S.S.G. § 5H1.11 .................................................11

**Other Authorities**

DeGregory, Priscilla and Ben Kochman, *Sen. Bob Menendez's Cluttered Home
Loaded with $150K in Gold Bars, $480K in Cash – Some Stashed In A Boot:
New Photos*, N.Y. POST (May 21, 2024), https://nypost.com/2024/05/21/us-
news/sen-bob-menendezs-cluttered-home-loaded-with-gold-bars-wad-of-cash-
stashed-in-boot-new-photos/ ..................................................................................17

Fed. Bureau of Prisons, *About our Facilities,* (last visited Jan. 21, 2025),
https://www.bop.gov/about/facilities/federal_prisons.jsp ......................................17

Fed. Bureau of Prisons, *Prison Security Levels,* (last visited Jan. 21, 2025),
https://www.bop.gov/about/statistics/statistics_inmate_sec_levels.jsp ..................18

Lewis, Simon, *U.S. Grants Egypt $1.3 Billion in Military Aid, Overriding Rights
Conditions,* REUTERS (Sept. 11, 2024), https://www.reuters.com/world/biden-
administration-grants-egypt-13-billion-military-aid-despite-rights-2024-09-11/ ....6

N.J. Monitor, *Gold Bars In Baggies And Cash Crammed In Boots: Prosecutors
Detail Menendez's Hoarded Riches,* (May 16, 2024)
https://newjerseymonitor.com/2024/05/16/gold-bars-in-baggies-and-cash-
crammed-in-boots-prosecutors-detail-menendezs-hoarded-riches/) ........................17

Office of Inspector Gen., U.S. Dep't of State, *Audit of the Process To Prepare
Residences for New Tenants At U.S. Embassy Cairo, Egypt,* (Mar. 2022)
https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-22-
23_8.pdf ....................................................................................................................7

U.S. Dep't of Just., Bureau of Justice Statistics, *Federal Prisioner Statistics
Collected Under the First Step Act,* (Dec. 2024)*,*
https://bjs.ojp.gov/document/fpscufsa24.pdf .........................................................18

U.S. Dep't of Just., Fed. Bureau of Prisons, *Inmate Security Designation and
Custody Classification*, *Classification* (P.S. 5100.08, Sept. 4, 2019, Ch. 5, p.
12, Table 5-2), https://www.bop.gov/policy/progstat/5100_008cn.pdf) .................18

## INTRODUCTION

The government's sentencing submission (Dkt. 690) rejects the law's mandate that criminal sentences be "not greater than necessary."[1] 18 U.S.C. § 3553(a)(2). As to Senator Menendez, a life-long public servant, the government instead advocates for a 15-year prison sentence—a life and death sentence for a septuagenarian—which can only be described as vindictive and cruel. In pursuit of that sentence, the government presents a hyperbolic screed filled with overheated rhetoric that is divorced from the actual evidence. At trial, even the targets of the charged bribery schemes (the government officials that Senator Menendez contacted on behalf of friends) acknowledged that no threats were made, and no improper action was ever taken as a result of their very brief conversations with Senator Menendez. This is nothing like the "astounding and unheard of" scheme that the government now presents as the most serious "in the history of the Republic." Dkt. 690 at 38, 40.

To be sure, the crimes of conviction are very serious. The distorted view of the offenses of conviction that the government presents is intended to provoke anger in pursuit of a longer sentence. But the evidence offered at trial is largely divorced from the highly misleading presentation in the government's submission. It presents a fictionalized account of Senator Menendez's conduct, aiming for maximum emotional (and media) impact, rather than justice. For example:

---

[1] Pursuant to the Court's briefing schedule, the government had an opportunity to respond to the defense sentencing submission; the government's repeated distortions of the record, and basic fairness, compel the defense to present this short reply brief addressing the government's submission.

- Is copyediting a draft letter at the request of one's spouse that explains Egypt's efforts to fight terrorism and improve relations with NGOs really an effort to "justify Egypt's human rights abuses," as the government claims?  Dkt. 690 at 8.

- Is forwarding a **public** news article (released on Yahoo.com) that reported public statements from other Congressman of their intention to question an Egyptian official about possible involvement in the Khashoggi assassination really "brief[ing] the head of Egyptian intelligence" on how to excuse a brutal murder? Dkt. 690 at 8.

- Is sending Nadine *unclassified* aggregated information about embassy staffing— information the government of Egypt indisputably already had and that the U.S. State Department releases publicly—really putting U.S. foreign service workers "at risk" of violent retaliation by terrorists?  Dkt. 690 at 1.

Such bombastic accusations—in pursuit of a request that the Court essentially lock up the Senator and throw away the key—are not appropriate advocacy in pursuit of justice.  The rhetoric is good for headlines, but to do justice with this sentence, cooler heads must prevail.

As for the calculation of the advisory Guidelines range, the government does not dispute that the Guidelines range it, and the Probation department urge (292-365 months) is grossly inappropriate and excessive.  Senator Menendez maintains his objections to the Probation Department's Guidelines calculation, and rests on his prior submission and the dozens of letters in support in the record to urge a more reasonable and appropriate sentence.  We will not repeat those reasons here.

This reply will, however, highlight areas of the *government*'s submission that utterly lack support in—and worse, defy—the evidentiary record.  *First*, with respect to aid to Egypt, the

government mischaracterizes the evidence of Senator Menendez's role and tramples over his Speech or Debate Clause rights in the process. *Second*, the government improperly asks the Court to ignore Senator Menendez's lifetime of good works, citing outdated caselaw concerning a Guidelines variance that is not even at issue here. *Third*, regarding the *amounts* of supposed bribes, the government more-or-less admits that its attempts to tie cash found in 41 Jane Drive to Senator Menendez was guesswork, arbitrarily excluding some and including other cash in its calculations. And, *fourth*, the government essentially asks the Court to enhance the appropriate sentence to account for "good time credit" and other incentives that are not remotely guaranteed and may never be granted.

In sum, as serious as the crimes of conviction are, the law requires that the Court evaluate factors beyond just the criminal conduct. The government repeatedly asks this Court essentially to ignore those other factors, focusing instead on a distorted view of the alleged conduct. The Court should not take the bait. Although we acknowledge that a sentence of imprisonment is warranted under the circumstances, we respectfully request that a sentence within the Guidelines range proposed by Senator Menendez (21-27 months) is sufficient, but not greater than necessary, to address the 3553(a) factors.

## ARGUMENT

### I.    The Government Grossly Mischaracterizes the Egypt-Aid Scheme

On the Egypt-related schemes, the government's sentencing submission represents a striking, whiplash-inducing 180º. Just a few weeks ago, in opposing Senator Menendez's motion for a new trial (Dkt. 645), and desperate to preserve Senator Menendez's convictions, the prosecutors insisted that the case against Senator Menendez was not really about military aid to Egypt at all. In fact, the government argued that "the entire topic of military aid to Egypt was . . . a secondary issue in the case" and that the jury could have convicted Senator Menendez on the

Egypt-related counts based solely on a telephone call to a USDA bureaucrat, without any consideration of military aid. Dkt. 648 at 36. Moreover, other than evidence barred by the Speech or Debate Clause, the government was unable to identify record evidence tying Senator Menendez to any corrupt approval of "billions of dollars" worth of military aid to Egypt. The only *admitted* evidence relevant to this scheme—that did not violate the Constitution— concerned $99M of target practice rounds and tank ammunition rounds destined to help the Egyptian military fight ISIS. *Id.* at 38-39 (setting forth the evidence against Senator Menendez regarding military aid and including none regarding a sale of "billions of dollars" worth of aid to Egypt).

The government now does an about-face. Suddenly, for sentencing, the aid-to-Egypt scheme takes center stage and is central to justifying the excessive sentence the government seeks. Worse, the government contorts the scheme beyond recognition into something far more sinister and nefarious than what the evidence actually showed, much like the classic "fish story" in which an amateur angler's description of his catch becomes more impressive, and more incredible, with each telling. While, of course, this Court has broad discretion to consider a variety of materials in imposing a sentence, the "proper procedure" is to disregard "unproven" allegations. *United States v. Dean*, 792 F. App'x 842, 844-45 (2d Cir. 2019); *see also Jones v. Donnelly*, 487 F. Supp. 2d 403, 416–17 (S.D.N.Y. 2007) (at sentencing a "trial court cannot . . . rely on information that is clearly unreliable or inaccurate."). Several of the government's descriptions of the Egypt-related offenses must be rejected on that basis alone.[2]

---

[2] The below is not intended to be, and is not, an exhaustive list of all of the government's mischaracterizations in its sentencing submission but focuses on illustrative (and particularly egregious) examples of the government's overstatements.

As a first example, the government insists that Senator Menendez helped "ghost-write a letter *seeking to justify Egypt's alleged human rights abuses*." Dkt. 690 at 8 (emphasis added). But there was no evidence whatsoever that this letter was ever sent to any US or Egyptian official or used by the Egyptian government at all. Nor did any evidence even remotely suggest that Senator Menendez intended the letter to be sent to the Egyptian government, as opposed to his wife. Moreover, Senator Menendez only edited the grammar and structure of the letter, without in any way adjusting its substance.

In any event, nothing in the letter—either what Nadine provided to Senator Menendez, or what he sent back to her—remotely attempted to "justify" human rights abuses. Indeed, the letter doesn't mention Egypt's human rights record *at all*, and instead focuses on Egypt's ongoing effort to crack down on terrorist groups and its treatment of *foreign* organizations operating in the country. GX A403. It also invites an American who was inadvertently injured during travel in Egypt to contact the Egyptian government, through counsel, to discuss her claims. *Id*. It is simply false and inflammatory to suggest that the letter excused human rights violations, or that Senator Menendez ever sought to do so in this letter or otherwise. In truth, as the trial record reflected, Senator Menendez repeatedly used his platform to focus attention on Egypt's human rights record—usually to the dismay of the White House, which was looking to provide *unconditional* aid to Egypt—even during the time period that the government claims he was working on Egypt's behalf. Trial Tr. at 4638-40 (testimony of Sarah Arkin); s*ee also* GX 10C-6 (April 8, 2019 press release from Senator Menendez: "Leading Senators Call On Sec. Pompeo To Raise Key Concerns During Bilateral Meeting With Egyptian President Sisi"); DX 435 (March 6, 2020 press release from Senator Menendez criticizing President Sisi's actions "attempt[ing] to quash dissent and consolidate control by wrongfully imprisoning human rights

defenders.").  It was Senator Menendez who took President Sisi to task on his human rights record in a face-to-face meeting with him during an Egypt trip that the government claims was "very weird." Trial Tr. 4635-36 (testimony of Sarah Arkin).  Notably, it was only years after the alleged scheme (and after Senator Menendez resigned) that the Executive Branch overrode Congressional human rights conditions that Senator Menendez placed on military aid to Egypt in order to grant Egypt its full allocation of $1.3 billion in aid.  *See* https://www.reuters.com/world/biden-administration-grants-egypt-13-billion-military-aid-despite-rights-2024-09-11/.  The suggestion that Senator Menendez ever attempted to justify human rights abuses by Egypt defies the factual record.

Nor is there any evidence that Senator Menendez endangered American foreign service workers.  The government incredibly claims that when Senator Menendez told his wife (who in turn told Wael Hana) the aggregate number of staff employed at a U.S. Embassy in Egypt, he somehow put American foreign service workers "at risk." Dkt. 690 at 1.  This assertion is ridiculous on its face.  This is information that Egypt obviously had already (by virtue of its accrediting everyone who entered Egypt and was to work at the U.S. Embassy) and which the U.S. government publishes regularly.  Indeed, the State Department Inspector General periodically issues publicly available reports that not only identify the number of U.S. and foreign employees at Embassy Cairo, but the locations of the employees' residences:

Embassy Cairo's residential properties are spread out geographically. Some of the residences are in downtown Cairo near the embassy in the districts of Zamalek, Garden City, and Al Duqqi. Residences are also located in a suburb called Maadi, about 6 miles away from the embassy. Additionally, the embassy has two warehouses that store furniture, equipment, and supplies to support the make-ready process and general upkeep of all residential and non-residential properties. One of these, called the Embassy Support Services Annex (ESSA), is in Maadi. The other is located downtown at the embassy. Embassy staff responsible for preparing residences for occupancy draw materials and supplies from these locations. In heavy traffic, trips can often take 45 minutes or longer. Figure 2 shows the locations of the embassy, the residential properties, and the ESSA warehouse.



**Figure 2: Location of the Residential Properties in Relation to Embassy Cairo and Supply**

**Source:** OIG generated from information provided by U.S. Embassy, Cairo.

*See* https://www.stateoig.gov/uploads/report/report_pdf_file/aud-mero-22-23_8.pdf, at p.2.

Seriously, there is no plausible explanation for how the *number of Americans* posted at an embassy in Cairo, without any information about their names, positions, or other identifying details, could have created a risk to anyone.  Other than an agricultural attaché who, seeking a moment in the sun, testified that this information could somehow help terrorists target U.S. employees, Dkt. 677 at 38, there was no competent evidence presented *at all* to substantiate this concern of risk to Americans.  And the terrorism theory makes no sense for many reasons, including  the government's claim that this information was provided to agents of the *government* of Egypt, not any terrorist group.  Dkt. 690 at 9-10. Is the theory then that the Egyptian government was helping terrorists plan attacks on Americans inside Egypt? No such evidence has ever been presented to this Court, but the government's thirst for punishment is

seemingly not slowed by the absence of supporting evidence and the plainly nonsensical nature of its theory.

So why did Senator Menendez send his wife these innocuous numbers?  Defendant Hana's Presentence Investigation Report provides an eminently more plausible and sensible explanation than the government's speculation about some kind of Egyptian-terrorist alliance:

> "The idea that providing this information [about embassy staffing] to me means that I was conspiring to make Senator Menendez an agent of Egypt is, honestly, complete nonsense. Egypt knows who is working in embassies in Cairo – if Egyptian, they pay taxes and have health insurance; if American, they have records of their entry and position in the country. Egypt did not ask me to get this information from the Senator and would have no reason to do so. ***I had previously talked with the Senator, Nadine, and Ahmed Helmy about the number of Egyptians who worked at the US embassy who were also members of the Muslim Brotherhood, and he shared it with me to demonstrate that the number of Egyptians there overall was not as high as I had assumed.*** I shared that with Ahmed Helmy, who was at the meeting where I raised this issue, to let him know the follow up. In any event, the information about U.S. employees is publicly published by the U.S. government on a regular basis and the number of staff, whether Americans or Egyptians, does not change materially over time."

Hana PSR ¶ 139 (emphasis added).

There simply was no violation of any rule or law concerning classified materials nor any nefarious or corrupt purpose in sharing this *public* statistical information.  The government's characterization of this data, by contrast, is an attempt to use "clearly unreliable" information at sentencing.  *Jones*, 487 F. Supp. 2d at 416–17.

The claim that Senator Menendez "briefed the head of Egyptian intelligence on questions other U.S. Senators were preparing to ask [him]" is also just false.  Dkt. 690 at 8.  What the evidence actually showed was that *Nadine* Arslanian sent an Egyptian embassy employee—not the "head of Egyptian intelligence"—a *public* news article about an issue of importance to some members of Congress. GX B213.  That issue of importance had already been publicized by other Congressmen, who made it known that they intended to question an Egyptian official about the

matter.  *See* GX A103-A (The forwarded article stated, "The House Foreign Affairs Committee is trying to arrange its own meeting with Kamel, and one of its members, Rep. Tom Malinowski, D-N.J., . . . said that if the meeting happens, he too intends to question Kamel about the Khashoggi assassination. 'I'd like them to know we know they helped the Saudis murder a U.S.-based journalist,' he told Yahoo News.").  All of the information to this embassy employee was also available with a simple online search or to anyone who walked by a newsstand that day.

The list could go on.  It is no doubt the government's role to highlight and contextualize the offense conduct, but that does not give the government license to wantonly fictionalize the record in an effort to maximize punishment.  The above-listed and other exaggerations are simply beyond the pale.

## II.    The Government, Again, Tramples on Senator Menendez's Speech or Debate Rights

Even if the government accurately described the evidentiary record, its submission advocates for the Court to consider evidence and argument that is clearly barred by the Speech or Debate Clause.  While the government's distaste for the Speech or Debate privilege is self-evident, the Clause's protection against a Senator being "questioned" on his legislative acts in any place other than the halls of Congress apply equally to a sentencing proceeding and remains in full force.

*First*, the government argues at length in its submission that Senator Menendez's positions on Egypt differed from those of some members of the Executive Branch and also from other legislators.  *See* Dkt. 690 at 6-7 ("the foreign military financing and foreign military sales that Menendez promised to approve . . . were far from uncontroversial"); Dkt. 690 at 7 ("others in the Legislative Branch and the Executive Branch [] register[ed] their objections" to such aid); Dkt. 690 at 8 ("Menendez advocated on behalf of the Egyptian government . . . in a manner

directly adverse to his own fellow U.S. Senators"); *id.* ("while a U.S. Senator himself, Menendez literally . . . took the side of . . . a foreign government against his own fellow U.S. Senators").

The Senate is not homogeneous in its views—that's the point, Senators disagree and debate their policy positions.[3]  It is not improper or unlawful for Senator Menendez to disagree with colleagues or even with the Executive Branch of government.  The suggestion that unity is required is something we would expect in a repressive society like Russia or North Korea.  But, more fundamentally, Senator Menendez should not have to defend his policy positions on Egypt in the way that the government now demands, as that is precisely what the Speech or Debate Clause is meant to bar.  *United States v. Johnson*, 383 U.S. 169, 180 (1966) ("the essence of [the] charge in this context is that the Congressman's conduct was improperly motivated . . . *that is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry*") (emphasis added).

To be clear, Senator Menendez does not contest that the Court may consider evidence of the Egypt-aid scheme in imposing a sentence, but the government's attempt to *embellish* that evidence into something damaging to American interests by virtue of its opposition to the policy preferences of others in government crosses the Speech-or-Debate line.

*Second*, the government's references to Senator Menendez's "promise" to approve "billions of dollars" in military aid to Egypt (Dkt. 690 at 40)—a promise that was never proven at trial and for which there is zero supporting evidence—violates this Court's prior orders barring the evidence that is the subject of Senator Menendez's pending motion for vacatur.  Dkt. 420.  In

---

[3] And, although it doesn't affect the Speech or Debate analysis, Senator Menendez's positions were often *less* friendly to Egypt than those held by members of the executive branch who regularly advocated for aid to be provided to Egypt without preconditions (which is what the White House actually did once Senator Menendez resigned).

excluding *all* evidence relating to an approved sale of approximately $2.5 billion of military aid to Egypt in January 2021, the Court rejected the government's arguments that this evidence reflected corrupt *promises* and held that the evidence referenced "past legislative acts." Dkt. 420; Trial Tr. 1045:1-5 (the Court, referencing evidence of the January 2021 military aid sale: "I must say I don't see how you get around the fact, for example, Bob had to sign off on this as being a core--the core of the act itself. You can say the words again and again. I just don't see a promise here."). The government's attempt to revive this excluded, Constitutionallybarred evidence in this sentencing proceeding should be rejected.

## III. Senator Menendez's Lifetime of Good Works Merits Consideration Under 18 U.S.C. § 3353(a)

In urging the Court to disregard Senator Menendez's life's work, all devoted to bettering the lives of his constituents (and all Americans), it relies entirely on caselaw concerning a downward variance under U.S.S.G. § 5H1.11 for good works. *See* Dkt. 690 at 46-52. But a downward variance is not what Senator Menendez is requesting here; to the contrary, he asks that the Court *consider* his decades of devotion to public service as part of its 3553(a) analysis. There is ample support in the law for this type of consideration, and the government's insistence that the Court cannot consider such evidence is simply false. *See United States v. Dwyer*, No. 15-cr-385 (AJN), 2019 U.S. Dist. LEXIS 111519, at *1-2 (S.D.N.Y. July 2, 2019) (finding that a "non-incarceratory sentence was appropriate" for former NYPD officer defendant where "the letters submitted on Dwyer's behalf showed that he was a hard-working individual dedicated to public service"); *United States v. Lenich*, No. 17-CR-0154 (WFK), 2018 U.S. Dist. LEXIS 19386, at *7-8 (E.D.N.Y. Feb. 2, 2018) ("tak[ing] into account" the defendant's "years of public service to the community during her tenure as an ADA . . . [and] the punishment she has already suffered in the form of the loss of her ability to practice her chosen career[.]"); *United States v.*

*Fishman*, 631 F. Supp. 2d 399, 404 (S.D.N.Y. 2009) ("fully" considering "Fishman's charitable activities in connection with its analysis of the § 3553(a) factors").

The government's attempts to dismiss the dozens of letters supporting Senator Menendez as merely reflecting a senator "competently discharging the duties of his office" is mistaken and misses the point.  Dkt. 690 at 46.  The critical fact is that Senator Menendez, despite other, more lucrative options, *chose* to devote his life to serving as an elected representative and, in that role, contributed enormously to the people of New Jersey and the United States.  It is common knowledge that former Senators and other Members of Congress can – and often do – attract significant compensation in the private sector (for example, as a lobbyist or television pundit).  If truly motivated by "naked greed," Dkt. 690 at 1, Senator Menendez could easily have ended his tenure in the Senate early and earned millions at a lobbying firm or elsewhere.  That he did not do so, and instead remained in the Senate in order to make a difference is laudable and merits consideration under the 3553(a) factors.

The truth is that Senator Menendez made a hugely positive difference in the lives of countless people. That's certainly far from typical for a defendant being sentenced in this District.

The government tries to dismiss that history as the everyday, commonplace work of an elected official.  But the record shows a life of service that is far from commonplace, even for an elected official. Senator Menendez was *personally* involved in helping his constituents in a way that went above and beyond the job of a Senator.  The supporting—and undisputed—facts supporting this conclusion were outlined in detail in Senator Menendez's opening submission (Dkt. 677 at 12-14) and reflect extraordinary devotion (well beyond what is expected of an elected official) to victims of Hurricane Sandy, to the homeless, to families managing care of a

disabled loved one, to the family of a tragically murdered judge, and to individuals abroad seeking all manner of humanitarian assistance.  All elected officials, presumably, seek to provide services to their constituents.  It is a select few, though, that demonstrate a true commitment to the wellbeing of *humanity* – and not just prominent constituents or special interests.

The letters submitted on Senator Menendez's behalf conclusively show that he falls squarely in the latter category.  Indeed, when the government on redirect of Senator Menendez's former staffer Sarah Arkin attempted to suggest that constituents often did not get meetings with Senator Menendez and his staff, Ms. Arkin disagreed, stating "[I]t [was] the policy [of Senator Menendez] to try to make all meetings happen, to try . . . to get every constituent [a meeting] with at least a staffer."  Trial Tr. 4831. The suggestion that Senator Menendez's personal involvement on behalf of so many constituents was merely the everyday call of duty of the people's representative ignores the reality depicted in so many of the letters of support submitted on Senator Menendez's behalf.

## IV.    The Government's Loss Amount Calculations are Based on Guesswork

As Senator Menendez argued in his opening submission, the government's method for connecting seized cash to Senator Menendez, thus justifying its enormous proposed "loss amount," is flawed.  Dkt. 677 at 16-20.  There simply is no rhyme or reason behind the government's assertion that most of the cash found in 41 Jane reflects the proceeds of criminal conduct that was reasonably foreseeable to Senator Menendez.  *Id.*  But in opposing this argument, the government's own admission reveals the dearth of evidence actually connecting the Senator (let alone any bribe) to the cash found at 41 Jane.  The government argues that, for unstated reasons, over $100,000 in cash found in a duffel bag in Senator Menendez's office in Nadine's home was excluded from the calculated loss amount.  Dkt. 690 at 30.  Presumably the government recommended exclusion of the duffel bag in Senator Menendez's office given the

13

date of the bills, the method in which they were kept, and the contemporaneous evidence of

Senator Menendez's consistent pattern of withdrawals from his bank account. Senator

Menendez does not object to this *exclusion*, of course—but it does underscore that the

government approached the loss amount calculation in an ad hoc, unprincipled manner, without

tying proper inferences to the evidence. There can be no reason to exclude the cash in the duffel

bag, but include cash found in parts of the house not used by Senator Menendez, or include the

cash and gold bars found in a locked closet that contains not a single article of Senator

Menendez's clothing. The seeming irrationality of these choices betrays the fact that the

government cannot establish by a preponderance of evidence that all the cash was linked and

foreseeable to Senator Menendez. Dkt. 677 at 16-17.

## V.    The Court Should Reject the Government's Suggestion that Senator Menendez's Sentence Should Be Increased Based on Hypothetical Future Credits He May or May Not Earn

Toward the end of its submission, the government offers a primer on various federal

programs that, in some cases, can reduce the portion of an imposed sentence that a defendant

actually serves in custody. Dkt. 690 at 22-27. The seeming implication is that Senator

Menendez may serve only a portion of his imposed sentence in custody, so the Court should

impose an even longer sentence in order to maximize his time behind bars. The government

does not cite any Second Circuit authority that authorizes judicial consideration of hypothetical

future credits when imposing sentence.[4] The Court should reject this argument—and should not

consider the *potential* impact of such sentence reduction programs.

---

[4] The two out-of-Circuit authorities the government cites are inapposite. Both consider irrelevant scenarios where the sentencing court was obligated by statute to avoid a "life sentence," and hold only that consideration of these types of programs is appropriate in assessing whether a "life sentence" will in fact be imposed. *See* Dkt. 690 at 23 (citing *United States v. Fowler*, 948 F.3d 663, 671 (4th Cir. 2020) ("To confirm that a 40-year sentence *was not life equivalent*, the district judge [properly] considered the potential impact of good-time credits on Fowler's age at

The reason is that future reductions of an inmate's sentence are not assured.  These programs are routinely subject to change or even cancellation, and no one can predict whether Senator Menendez will necessarily qualify for each.  For example, there is a broad range of relatively minor prison infractions that can disqualify an inmate from receiving "good conduct" credit, including, for example, the sharing of commissary and phone privileges with other inmates and use of a contraband telephone.  It cannot and should not be taken as a given that any inmate will automatically receive 54 days per year of good conduct credit.  Nor is it a given that any inmate will be able to complete the RDAP program, which even the government acknowledges is the "BOP's most intensive treatment program" that lasts 9 months.

Moreover, the "First Step Act" was passed only seven years ago and could easily be amended or repealed (in whole or in part).  Dkt. 690 at 24.  And while none of the counts of conviction *now* are a "disqualifying offense" that would exclude Senator Menendez from sentence reduction programs (*see* Dkt. 690 at 25, n. 8), Congress may well change that, perhaps as a part of the same zeitgeist that led to the recently enacted "No CORRUPTION Act" (which strips legislators convicted of certain public corruption offences of their federal pensions).  *See* 5 U.S.C. § 8332(o).

And critically, as the government admits, it is the Bureau of Prisons—*not* the Court—that administers each of these programs and determines eligibility for them.  Dkt. 690 at 24, n. 4.  So, if the Court were to lengthen Senator Menendez's sentence based on an assumption that sentence reduction programs will inure to his benefit, and then those programs are modified (or Senator

---

release") (emphasis added); *United States v. Prevatte*, 66 F.3d 840, 848 (7th Cir. 1995) (Posner, J., *concurring*) (similar)).  These cases do not hold that the Court may consider the potential impact of future, hypothetical sentence reduction programs in *all* sentencing proceedings, as the government seemingly urges.

Menendez is deemed ineligible for them), the Court will have imposed a sentence *greater* than necessary, in violation of Section 3553(a), with no recourse to adjust the sentence later if the credits are not granted.

## VI. The Government's and Probation Department's Requested Sentence Would Unnecessarily Increase The Risk of Harm to Senator Menendez in Prison.

As a final matter, in imposing a sentence, the Court should take into consideration the grave risks that uniquely face Senator Menendez should he be imprisoned somewhere other than a minimum-security prison (also known as a "Federal Prison Camp" or "FPC"). As a result of his position in government, the notoriety associated with his criminal investigation and trial, and the public reporting of gold bars and cash seized from his home, Senator Menendez is at a far greater risk than the typical inmate—even the typical well-known inmate—of violence, extortion, and harassment in prison.

While all prisons are sometimes dangerous places, some are more frequently dangerous than others. Under BOP Guidelines, a sentence in excess of 10 years in prison would render Senator Menendez ineligible for placement in a FPC, which would substantially increase the risk of harm to Senator Menendez. For this additional reason, the government and Probation Department's request for a sentence of 15 or 12 years' imprisonment should be rejected.

It is well-recognized that inmates with a degree of celebrity are at increased risk of attention, harassment, and violence from their fellow inmates. *See A.m. C.L. Union Found. of S.C. v. Stirling*, 123 F.4th 170, 175 n.3 (4th Cir. 2024) (inmates who become "virtual 'public figures' within the prison society" attract a "disproportionate degree of notoriety," which can result in "severe disciplinary problems") (internal citation omitted); *Hammer v. Ashcroft*, 570 F.3d 798, 804–05 (7th Cir. 2009) (publicity about an inmate can potentially "result in inmate-on-inmate violence and thus can have dire consequences for inmates, penitentiary staff, and the

16

public at large"). This risk is heightened in Senator Menendez's case, as the reporting surrounding his indictment and trial was (and continues to be) particularly intense and often perceived as describing the Senator as both wealthy as a consequence of his corruption and indifferent to the wellbeing of average Americans.[5] The practical reality is that Senator Menendez's fellow inmates will reach conclusions about him based on his public profile and misleading perceptions that will likely render him a target of violence, extortion, harassment, and intimidation.

Although this risk of violence is inherent in any prison setting, it is a matter of degree, and some prisons (like FPCs) have reduced risks of violence as compared to others. Indeed, the Federal Bureau of Prisons operates facilities at a variety of security levels, including "[m]inimum security institutions, also known as Federal Prison Camps (FPCs), [that] have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing."[6] The reasonable intuition that inmates assigned to minimum security facilities would be less prone to violence than those in facilities with higher security levels is borne out in the data. Although inmates in minimum security facilities comprise nearly 15% of the federal prison population, the Bureau of Justice Statistics reports that, in 2023, such inmates are responsible for only *1.9%* of "prohibited acts"—and only 1.3% of prohibited acts with the "greatest severity," such as murder and sexual assault—committed in all federal prisons. By contrast, inmates housed in "low" security facilities, the next gradation up from minimum security, comprise 36.1% of all inmates and, in

---

[5] *See, e.g.*, "Sen. Bob Menendez's clutter home loaded with $150K in gold bars, $480k in cash," *The New York Post*, May 21, 2024, (https://nypost.com/2024/05/21/us-news/sen-bob-menendezs-cluttered-home-loaded-with-gold-bars-wad-of-cash-stashed-in-boot-new-photos/); "Gold bars in baggies and cash crammed in boots:  Prosecutors detail Menendez's hoarded riches," *New Jersey Monitor*, May 16, 2024 (https://newjerseymonitor.com/2024/05/16/gold-bars-in-baggies-and-cash-crammed-in-boots-prosecutors-detail-menendez-hoarded-riches/).
[6] https://www.bop.gov/about/facilities/federal_prisons.jsp.

2023, were responsible for 21.2% of all prohibited acts (including 25.8% of prohibited acts of the greatest severity).[7] That is, proportionate to prison population, inmates in minimum security prisons commit a far lower percentage of prohibited acts (including the most severe prohibited acts) than inmates in low security prisons. Minimum security prisons are thus far safer than low security prisons, and for a high-risk inmate such as Senator Menendez, this is a critically important consideration.

Bureau of Prisons policies, though, automatically disqualify an offender with a sentence of 10 years or more from placement in a minimum-security security facility. *See* Bureau of Prisons, *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4, 2019, Ch. 5, p. 12, Table 5-2 (a sentence of greater than 10 years is a "Public Safety Factor" automatically resulting in at least a "low" (but not a minimum) security level for male inmates) (available at: https://www.bop.gov/policy/progstat/5100_008cn.pdf). Senator Menendez stands firmly by his argument that a sentence within his calculated advisory guidelines range (21-27 months) is more than sufficient to serve the purpose of sentencing and, by preserving his eligibility for placement in a minimum-security prison, would reduce the risks of violence and harm to him in prison. By contrast, the sentences requested by the government and Probation Department would maximize the risk of harm to him, given that a sentence greater than 10 years in prison would render him ineligible for placement in a minimum-security prison. Subjecting a convicted defendant to "violence among prison inmates serves absolutely no penological purpose," *Farmer v. Brennan*, 511 U.S. 825, 852 (1994) (Blackmun, J., *concurring*). Senator

---

[7] Statistics on inmate population by security level are published by the Bureau of Prisons and available at https://www.bop.gov/about/statistics/statistics_inmate_sec_levels.jsp. Statistics on conduct of prohibited acts by security designation are published by the Bureau of Justice Statistics and available at https://bjs.ojp.gov/document/fpscufsa24.pdf.

Menendez therefore should be afforded the opportunity to be placed in a facility where he is most likely to be safe during his term of incarceration.

## CONCLUSION

For the reasons set forth in his initial sentencing submission, and herein, the 3553(a) factors warrant a sentence that considers Senator Menendez's lifetime of good deeds and good character, his zero-percent likelihood of recidivism, and the punishment he has already sustained due to his conviction.  A sentence within the advisory Guidelines range urged by the defense (21-27 months) is more than sufficient to satisfy 3553(a).

Dated: January 21, 2025                     Respectfully submitted,

Yaakov M. Roth (*pro hac vice*)
JONES DAY                                   By: */s/  Adam Fee*
51 Louisiana Avenue N.W.                    _____
Washington, D.C. 20001                          Adam Fee
Telephone: (202) 879-3939                        PAUL HASTINGS LLP
Facsimile: (202) 626-1700                        1999 Avenue of the Stars
                                                 Los Angeles, CA 90067
                                                 Telephone: (310) 620-5719
                                                 Facsimile: (310) 620-5819

                                                 Avi Weitzman
                                                 Paul C. Gross
                                                 PAUL HASTINGS LLP
                                                 200 Park Avenue
                                                 New York, NY 10166
                                                 Telephone: (212) 318-6000
                                                 Facsimile: (212) 725-3620

                                                 *Attorneys for Defendant Robert Menendez*