**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

ROBERT MENENDEZ et al.,

        Defendants.

Case No. S4 23-cr-490 (SHS)

## <u>SENATOR ROBERT MENENDEZ'S MOTION</u>
## <u>FOR RELEASE PENDING APPEAL</u>

**PAUL HASTINGS LLP**

Adam Fee
Avi Weitzman
200 Park Avenue
New York, NY 0166

**JONES DAY**

Yaakov M. Roth (*pro hac vice*)
51 Louisiana Avenue N.W.
Washington, D.C. 20001
(202) 879-3939

*Attorneys for Defendant Robert Menendez*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  SENATOR MENENDEZ'S APPEAL WILL PRESENT "SUBSTANTIAL" QUESTIONS THAT, IF RESOLVED IN HIS FAVOR, WOULD RESULT IN REVERSAL OR A NEW TRIAL. ............................................................................................ 5

    A.  The Speech or Debate Clause Questions Are Substantial. ............................. 5

    B.  The *McDonnell* "Official Action" Questions Are Substantial. ........................ 13

    C.  Section 219's Constitutionality Presents Substantial Questions. ................... 17

    D.  The Government's Venue Choice Raises Substantial Questions. ................... 21

    E.  Prevailing on These Issues Would Likely Lead to a New Trial. ...................... 25

II.  SENATOR MENENDEZ PRESENTS NO FLIGHT RISK OR DANGER TO THE PUBLIC. .......... 28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.L.A. Shechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935).................................................................................20

*Att'y Gen. of U.S. v. Irish N. Aid Comm.,*
   668 F.2d 159 (2d Cir. 1982)................................................................18, 19

*Ciminelli v. United States,*
   598 U.S. 306 (2023)..................................................................................4

*Eastland v. U.S. Servicemen's Fund,*
   421 U.S. 491 (1975)..................................................................................8

*Fletcher v. Peck,*
   6 Cranch 87 (1810) .................................................................................18

*Free Enter. Fund v. PCAOB,*
   561 U.S. 477 (2010)................................................................................20

*Gravel v. United States,*
   408 U.S. 606 (1972)..................................................................................8

*Hein v. Freedom from Religion Found., Inc.,*
   551 U.S. 587 (2007)................................................................................19

*In re Search of the Rayburn House Office Building Room No. 2113,*
   432 F. Supp. 2d 100 (D.D.C. 2006) .......................................................12

*Kelly v. United States,*
   140 S. Ct. 1565 (2020).............................................................................5

*Marshall Field & Co. v. Clark,*
   143 U.S. 649 (1892)................................................................................18

*McDonnell v. United States,*
   579 U.S. 550 (2016) ......................................................................... *passim*

*McSurely v. McClellan,*
   521 F.2d 1024 (D.C. Cir. 1975) ..............................................................11

*Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,*
   501 U.S. 252 (1991)................................................................................19

*New York v. United States,*
   505 U.S. 144 (1992)................................................................................20

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ............................................................................................7

*Percoco v. United States*,
598 U.S. 319 (2023) ............................................................................................4

*Printz v. United States*,
521 U.S. 898 (1997) ..........................................................................................14

*Rangel v. Boehner*,
20 F. Supp. 3d 148 (D.D.C. 2013) ....................................................................13

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ..........................................................................................19

*Trump v. United States*,
144 S. Ct. 2312 (2024) ......................................................................................20

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) ..........................................................................................18

*United States v. Abbey*,
No. 06-cr-20286, Dkt. No. 86 (E.D. Mich. Oct. 29, 2007) ................................4

*United States v. Aiello*,
118 F.4th 291 (2d Cir. 2019) ..............................................................................4

*United States v. Al-Moayad*,
545 F.3d 139 (2d Cir. 2008) ..............................................................................27

*United States v. Allocco*,
305 F.2d 704 (2d Cir. 1962) ............................................................................6, 7

*United States v. Auernheimer*,
748 F.3d 525 (3d Cir. 2014) ........................................................................23, 28

*United States v. Beech-Nut Nutrition Corp.*,
871 F.2d 1181 (2d Cir. 1989) ............................................................................22

*United States v. Berkery*,
889 F.2d 1281 (3d Cir. 1989) ............................................................................27

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) ............................................................................9, 10

*United States v. Brennan*,
183 F.3d 139 (2d Cir. 1999) ..............................................................................28

*United States v. Brewster,*
    408 U.S. 501 (1972)........................................................................9, 10, 21

*United States v. Davis,*
    689 F.3d 179 (2d Cir. 2012)..........................................................22, 23

*United States v. Dowdy,*
    479 F.2d 213 (4th Cir. 1973) .............................................................10

*United States v. Fortenberry,*
    89 F.4th 702 (9th Cir. 2023) ..............................................................24

*United States v. Galanis,*
    695 F. Supp. 1565 (S.D.N.Y. 1988).....................................................27

*United States v. Garcia,*
    291 F.3d 127 (2d Cir. 2002)...............................................................26

*United States v. Geibel,*
    369 F.3d 682 (2d Cir. 2004)..................................................................4

*United States v. Gilbert,*
    355 F. Supp. 3d 1168 (N.D. Ala. 2018) ................................................4

*United States v. Gross,*
    2017 WL 4685111 (S.D.N.Y. Oct. 18, 2017) ......................................22

*United States v. Hamilton,*
    46 F.4th 389 (5th Cir. 2022) .................................................................4

*United States v. Helstoski,*
    442 U.S. 477 489 (1979)........................................................11, 12, 13

*United States v. Jefferson,*
    289 F. Supp. 3d 717 (E.D. Va. 2017) ......................................16, 17, 28

*United States v. Kirk Tang Yuk,*
    885 F.3d 57 (2d Cir. 2018)...........................................................23, 24

*United States v. Kozeny,*
    664 F. Supp. 2d 369 (S.D.N.Y. 2009)....................................................4

*United States v. Levy,*
    2014 WL 1483964 (S.D.N.Y. April 9, 2014) .....................................3, 25

*United States v. Lindberg,*
    39 F.4th 151 (4th Cir. 2022) ...............................................................26

*United States v. McDermott,*
    245 F.3d 133 (2d Cir. 2001) ............................................................................27

*United States v. McDonnell,*
    792 F.3d 478 (4th Cir. 2015) ............................................................................4

*United States v. Porat,*
    76 F.4th 213 (3d Cir. 2023) ..............................................................................4

*United States v. Radley,*
    558 F. Supp. 2d 865 (N.D. Ill. 2008) .............................................................24

*United States v. Ramirez,*
    420 F.3d 134 (2d Cir. 2005) ............................................................................23

*United States v. Randell,*
    761 F.2d 122 (2d Cir. 1985) ..........................................................3, 5, 21, 25

*United States v. Renzi,*
    769 F.3d 731 (9th Cir. 2014) .........................................................................4, 9

*United States v. Ring,*
    47 F. Supp. 3d 38 (D.D.C. 2014) .....................................................................4

*United States v. Rodriguez-Moreno,*
    526 U.S. 275 (1999) .........................................................................................24

*United States v. Rutigliano,*
    790 F.3d 389 (2d Cir. 2015) ............................................................................23

*United States v. Siegelman,*
    561 F.3d 1215 (11th Cir. 2009) ........................................................................4

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2019) ........................................................................4, 16

*United States v. Swindall,*
    971 F.2d 1531 (11th Cir. 1992) ......................................................................12

*United States v. Tzolov,*
    642 F.3d 314 (2d Cir. 2011) ............................................................................24

*United States v. Urciuoli,*
    513 F.3d 290 (1st Cir. 2008) ......................................................................14, 16

*United States v. Williams,*
    2024 WL 4491492 (S.D.N.Y. Oct. 10, 2024) ..................................................3

*United States v. Wilson,*
    No. 19-cr-10080, Dkt. No. 2624 (D. Mass. May 19, 2022)........................................................4

*United States v. Zimny,*
    857 F.3d 97 (1st Cir. 2017)..........................................................................................................3

*Weaver v. Massachusetts,*
    582 U.S. 286 (2017)....................................................................................................................12

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015)........................................................................................................................19

STATUTES

18 U.S.C. § 219............................................................................................................... *passim*

18 U.S.C. § 3143(b) ........................................................................................................ *passim*

18 U.S.C. § 3143(b)(1)(A)..........................................................................................................3, 29

18 U.S.C. § 3143(b)(1)(B).............................................................................................................3

18 U.S.C. § 3143(b)(1)(B)(iii) ....................................................................................................28

22 U.S.C. §§ 611(c)(1), (b)(1)-(3), (o).......................................................................................18

OTHER AUTHORITIES

Leonard Dupee White, *The Federalists: A Study In Administrative History* 83-85 (1948) ...........7

# INTRODUCTION

As this Court is well aware, the government's prosecution of Senator Menendez raised an array of important, difficult, and novel questions. This Court grappled with those questions across a set of lengthy opinions and orders as it shepherded the case from indictment to verdict. Senator Menendez appreciates the time and effort that the Court devoted to these issues, and respects the decisions the Court reached. But it will surprise nobody that Senator Menendez intends to appeal. And, as legal commentators have observed from the outset, that appeal will present the Second Circuit with a host of weighty questions—including about the application of the Speech or Debate Clause; the parameters of the Supreme Court's definition of "official action" in *McDonnell v. United States*, 579 U.S. 550 (2016); the constitutionality of the first-ever use of 18 U.S.C. § 219 against a Member of Congress; and the outer bounds of criminal venue. This Court surely believes it answered those questions correctly. But it can just as surely recognize that the Second Circuit could answer them the other way. In these circumstances, the Senator's sentence should be stayed pending appellate review. Having gone from operative indictment to sentencing in just ten months, a septuagenarian who devoted half a century to public service should not be rushed to prison before the Court of Appeals has an opportunity to consider the significant legal issues presented.

Instead, Senator Menendez is entitled to release pending appeal under 18 U.S.C. § 3143(b). It provides that a court "shall" grant that relief if a defendant makes two showings: (i) that he does not present a danger to the community or a flight risk; and (ii) that his appeal is not for delay, but rather presents "a substantial question of law or fact" that—if resolved in his favor on appeal—is "likely to result in" acquittal, a new trial, or a materially shorter sentence. Of course, the latter element does not require this Court to confess error; otherwise, release pending appeal would never be granted. Rather, as the Second Circuit has explained, the standard is met as long as the questions are reasonably debatable or *could be* decided the other way.

There is no doubt the first element is satisfied: Senator Menendez is a danger to nobody, has participated in all pre-trial and trial proceedings, intends to participate in his wife's imminent trial, and is committed to vindicating himself on appeal. Nor is there any basis to fear delay. The Court moved this case at a highly efficient clip: The operative indictment was handed down in March 2024, and jury selection for a ten-week trial began just two months later—remarkable speed for a trial of this profile and complexity. Senator Menendez opposed efforts to delay the trial, and intends to proceed expeditiously on appeal. Given how quickly the process has advanced already, there is enough breathing room to allow the Second Circuit to consider the Senator's appeal before his sentence is executed. If the Court of Appeals ultimately affirms, the Senator will still serve the same time, so there is no risk of harm on the other side of the ledger.

That leaves only the substantiality of the appellate issues. Again, this Court can at once be confident in its rulings, while also appreciating that the questions presented are close and difficult. At virtually every turn, the government tested the border of notoriously murky legal lines: the difference between "legislative acts" and political acts under the Speech or Debate Clause; between colloquial "pressure" and official action under *McDonnell*; between preparatory acts and laying-the-groundwork for venue. On nearly every point, courts or scholars have agreed with the Senator's legal positions. That suffices to establish that the questions are substantial.

In truth, it is hard to envision a case more appropriate for release pending appeal. If the Senator prevails on even a subset of these issues, he would be entitled to a new trial on all counts. A man should not be sent to prison when reasonable minds can disagree about the legal viability of his convictions. And a lifelong public servant should not be forced to wait out such an appeal from the walls of a federal facility. Senator Menendez deserves, and is entitled to, the opportunity to receive the full benefit of his appeal. The Court should therefore grant this motion.

**LEGAL STANDARD**

A court "shall order" release on bond of a criminal defendant, pending appeal, if (i) the defendant is "not likely to flee or pose a danger to the safety of any other person"; and (ii) his appeal is "not for the purpose of delay" but rather "raises a substantial question of law or fact" that, if resolved in his favor, will "likely" result in reversal, a new trial, or a sentence shorter than the expected duration of the appeal. 18 U.S.C. § 3143(b)(1)(A), (B). Satisfying this test creates an "entitlement to release." *United States v. Zimny*, 857 F.3d 97, 101 (1st Cir. 2017).

The Second Circuit construed the "substantial question" element of § 3143(b) in *United States v. Randell*, 761 F.2d 122, 123 (2d Cir. 1985). *Randell* observed that other Circuits had defined a "substantial" question to mean one that is "novel" and "has not been decided by controlling precedent," "a 'close' question or one that very well could be decided the other way," or one that is "fairly debatable." *Id.* at 125. *Randell* agreed with those other Circuits, and did not think their formulations "differ[ed] significantly from each other." *Id.* In light of that standard, a district court need not find "that its own judgment is likely to be reversed on appeal" in order to justify release pending appeal. *Id.* at 124. Instead, all a court must conclude is that (i) the issue is a "close" one on which reasonable minds could disagree, and (ii) assuming that the issue is decided in the defendant's favor on appeal, it is more probable than not that reversal or a new trial will occur. *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2014 WL 1483964, at *1 (S.D.N.Y. April 9, 2014) ("This second step does not 'require the district court to predict the probability of reversal' but rather goes to the significance of the substantial issue to the ultimate disposition of the appeal"); *see also, e.g.*, *United States v. Williams*, No. 1:22-cr-00684-JLR, 2024 WL 4491492, at *3 (S.D.N.Y. Oct. 10, 2024). If courts have disagreed about the issues presented, it follows *a fortiori* that the questions "could" be decided that way, *Randell*, 761 F.2d at 125, and therefore those issues are necessarily "close" enough to warrant release pending appeal.

Applying these standards, courts have granted release pending appeal in bribery cases that implicate the Speech or Debate Clause. *See, e.g.*, Order at 1-2, *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014) (No. 13-10588), Dkt. No. 20. They have routinely done so in cases implicating the meaning of "official action" under *McDonnell*. *See, e.g.*, Order, *United States v. Silver*, 948 F.3d 538 (2d Cir. 2019) (No. 18-2380), Dkt. No. 106; Order, *United States v. Gilbert*, 355 F. Supp. 3d 1168 (N.D. Ala. 2018) (No. 17-CR-00419), Dkt. No. 324. Indeed, the Fourth Circuit granted release in *McDonnell* itself. Order, *United States v. McDonnell*, 792 F.3d 478 (4th Cir. 2015) (No. 15-4019), Dkt. No. 39. And courts have also granted release in appeals involving aggressive theories of criminal venue. *See, e.g.*, July 8, 2003 Order, *United States v. Geibel*, 369 F.3d 682 (2d Cir. 2004) (No. 02-1645).

More generally, courts regularly approve release pending appeal in novel or high-profile federal fraud and corruption cases, even where the Courts of Appeals later rejected the appeals on the merits.[1] That pattern reflects that these cases tend to involve tricky and sensitive line-drawing problems that call for careful appellate consideration, and often warrant Supreme Court review too. *See, e.g.*, *Percoco v. United States*, 598 U.S. 319 (2023); *Ciminelli v. United States*, 598 U.S. 306

---

[1] *See, e.g.*, Order at 2, *United States v. Hamilton*, 46 F.4th 389 (5th Cir. 2022) (No. 21-11157), Dkt. No. 107 (campaign contribution bribery case); Order, *United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) (No. 22-1560), Dkt. No. 17 (wire fraud case against Temple University dean; convictions later upheld); Order, *United States v. Wilson*, No. 19-cr-10080 (D. Mass. May 19, 2022), Dkt. No. 2624 ("Varsity Blues" case); Order, *United States v. Aiello*, 118 F.4th 291 (2d Cir. 2019) (No. 18-2990), Dkt. No. 155 (defendant in *Percoco* bribery case; Second Circuit later upheld the convictions, before Supreme Court reversed); Order at 3, *United States v. Ring*, 47 F. Supp. 3d 38 (D.D.C. 2014) (No. 08-CR-274), Dkt. No. 297 (case arising from Jack Abramoff controversy; convictions later upheld); Mar. 27, 2008 Order at 1-2, 4, *United States v. Siegelman*, 561 F.3d 1215 (11th Cir. 2009) (No. 07-13163) (bribery case against Alabama Governor; convictions later upheld); Order, *United States v. Kozeny*, 664 F. Supp. 2d 369 (S.D.N.Y. 2009) (No. 05-cr-518), Dkt. No. 254 (bribery case involving president of Azerbaijan; convictions later upheld); Order, *United States v. Abbey*, No. 06-cr-20286 (E.D. Mich. Oct. 29, 2007), Dkt. No. 86 (campaign contribution bribery; convictions later upheld).

(2023); *Kelly v. United States*, 140 S. Ct. 1565 (2020); *McDonnell*, 579 U.S. 550.  In cases like this, appellate review should precede the execution of the sentence.

## ARGUMENT

I.    **SENATOR MENENDEZ'S APPEAL WILL PRESENT "SUBSTANTIAL" QUESTIONS THAT, IF RESOLVED IN HIS FAVOR, WOULD RESULT IN REVERSAL OR A NEW TRIAL.**

Senator Menendez satisfies the merits prong of § 3143(b) if his appeal will raise at least one substantial question that is material to the counts of conviction.  As explained below, the appeal will raise a number of such questions.  And, given the way the government structured it case, even partial success on appeal would require a new trial on all counts.

### A.    The Speech or Debate Clause Questions Are Substantial.

The Speech or Debate Clause has played a central role in this prosecution from the start.  The Court addressed it at length in its opinion denying the Senator's motion to dismiss.  Dkt. No. 252 (MTD Op. & Ord.).  It came up countless times at trial.  And the Court confronted it again just last week, after the government confessed to providing the jury with evidence that the Court had excluded under the Clause.  Dkt. No. 710.  It is therefore no surprise that Senator Menendez's appeal will present a series of Speech or Debate Clause questions to the Second Circuit.  And, as this Court's orders to date have implicitly appreciated, these are close questions over which courts and scholars have differed.  That is enough to establish that the Second Circuit could very well agree that this prosecution transgressed the Clause—and that, in turn, means that the Senator has carried his burden to obtain release pending appeal.  *See Randell*, 761 F.2d at 125,

**1.    The Recommendation.**  As this Court has recognized, the central piece of evidence in the Daibes-related scheme was that the Senator supposedly decided to "recommend a candidate to be nominated by the President to be the U.S. Attorney for the District of New Jersey who he believed would be favorable to Daibes."  Dkt. No. 654 (R33 Order), at 25.  The question presented

is whether such a pre-nomination recommendation counts as "Advice" under the Advice and Consent Clause; if so, the Court agreed it would be "squarely a legislative act."  MTD Op. & Ord. at 4.

This Court concluded that pre-nomination recommendations are not "Advice" and thus are not legislative acts protected by the Speech or Debate Clause.  Yet the Court also recognized that authorities *have disagreed* over that question.  Even if it was dicta, the Second Circuit observed in *United States v. Allocco* that, for the advice-and-consent process to work fluidly, the views of the "Senators must be obtained and weighed" *before* any nomination is ultimately rendered.  305 F.2d 704, 711 (2d Cir. 1962).  Prominent constitutional scholars share that view.  MTD Op. & Ord. at 5 (citing David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 Yale L.J. 1491, 1495 (1992)).  Respectfully, it is at least a "close" question and "reasonably debatable" that *Allocco* and the respected professors got this right, and thus that the Second Circuit could disagree with this Court's contrary conclusion on this issue.

To start, the only temporal limitation apparent from the text—which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" senior officials within the Executive Branch—is that a Senator cannot provide "Advice" *after* the official's appointment.  Art. II, Sec. 2, Cl. 2.  By then it is too late; the Advice and Consent function has already terminated.  By contrast, and as was apparent from when these words were written, limiting "Advice" to *post*-nomination input would effectively give the word "no meaning at all," because the Senate's approval or disapproval would be captured entirely through its "Consent" (or lack thereof).  *See* Letter from George Mason to James Monroe (January 30, 1792).

Indeed, pre-nomination advice is far more useful to the ultimate goal of the Appointments Clause: Once a nomination is made, the Senate is limited to an up-or-down vote on that person,

whereas, with pre-nomination advice, the Senate is able to help shape who the nominee should be, and then use confirmation to affirm that person's qualifications.  That is what the Second Circuit appreciated in *Allocco*.  *See* 305 F.2d at 711.

Even assuming the text can be read either way (MTD Op. & Ord. at 4)—which in itself supports treating the question as "close" and debatable—the historical record uniformly cuts one direction.  From the founding generation to present day, the political branches have understood that "Advice" captures pre-nomination recommendations.  *E.g.*, Leonard Dupee White, *The Federalists: A Study In Administrative History* 83-85 (1948) ("By the end of Adams' administration the convention had become well established that Congressmen were normally consulted concerning nominations to federal office."); Laura T. Gorjanc, *The Solution to the Filibuster Problem: Putting the Advice Back in Advice and Consent*, 54 Case W. Res. L. Rev. 1435, 1460-61 (2004) (collecting examples from history); Senator Charles McC. Mathias, Jr., *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process*, 54 U. Chi. L. Rev. 200, 202-03 (1987) (detailing modern process).  That unbroken practice is virtually decisive when it comes to constitutional interpretation.  *See NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014).

Nor is this just dusty history books.  Just this month, the Senate convened hearings to consider the qualifications of individuals who had not yet been formally nominated for any posts— because the President-elect had not yet taken office.  *See* Carl Hulse, *Confirmation Hearings Open in a Test of Trump's Hold on Senate G.O.P.*, N.Y. Times (Jan. 13, 2025).  If the Senate can begin the formal process of providing its "Consent" even before nominations are made, it is hard to see why providing "Advice" would have to wait.  All this is part of the Senators' constitutional duties, and therefore qualifies as legislative action under the Speech or Debate Clause.

Moreover, even if "Advice and Consent" is limited to approving or rejecting nominations already made (MTD Op. & Ord. at 5), pre-nomination recommendations are still an "integral part" of that responsibility, no different from how a legislative subpoena is an integral part of a Senator's lawmaking function. *Gravel v. United States*, 408 U.S. 606, 625 (1972). Just as with legislative subpoenas, pre-nomination recommendations allow Senators to more "effectively" accomplish that ultimate objective (*i.e.*, getting nominees confirmed); and just as with legislative subpoenas, there is a longstanding historical record supporting the practice, affirming that pre-nomination recommendations are in fact integral to Senators being "able to do the task assigned" to them by the Constitution. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504-05 (1975). Indeed, that is why this has all calcified into the official "blue slip" process involving the Senate—where pre-nomination input has become a formal step on the confirmation journey. Trial Tr. 3606-07.

This Court held otherwise, because pre-nomination recommendations are not "mandated" in any way. MTD Op. & Ord. at 5. But respectfully, the Second Circuit could see it differently; after all, legislative subpoenas are not mandated either, even though they are indisputably legislative acts. Rather, recommendations are a constitutionally *authorized* function of the office, integral (in the sense of "helpful") to a Senator's advice-and-consent responsibilities. At minimum, it is "close" whether this clear *official* act is also a *legislative* one under the Speech or Debate Clause.[2]

    **2.**    **Information Gathering.** Turning to the Egypt-related schemes, a significant part of the government's case was based on the Senator's meetings with Egyptian officials. *See* R33

---

[2] This Court accepted that *if* pre-nomination recommendations are legislative acts, then any vetting activity relating to the recommendation would also be covered. *See* MTD Op. & Ord. at 5. So if there is a "close" question about the recommendation, then there is necessarily also a "close" question regarding the vetting leading up to it—here, the Senator's vetting of Philip Sellinger. *See* R33 Order at 26.

Order at 13-14, 26-27. On the government's own telling, these meetings allowed the Senator to *gather information* to inform what *legislative acts* he should take. *See, e.g.*, Trial Tr. 6537 (Closing: "This was years, years of meeting[s]. … Years of learning what they wanted and taking actions to give them what they wanted."); *see also, e.g.*, Trial Tr. 4494-97, 4505, 4514, 4683-85, 4758; GX G101; GX 8F-9; GX 8F-34.

The Court accepted that these activities would ordinarily fit within the Speech or Debate Clause—as formal or informal "legislative factfinding and information gathering" performed by the Chairman or Ranking Member of the Senate Foreign Relations Committee. MTD Op. & Ord. at 2-3, 8. But the Court held that *these* meetings nonetheless fell outside the Clause, and therefore could be admitted into evidence as part of the government's case-in-chief, because the Clause "does not privilege [a Member] to violate an otherwise valid criminal law in preparing for or implementing legislative acts." *Id.* at 8-9; *see* R33 Order at 68-69 (reiterating this rationale).

Respectfully, that reasoning is at least reasonably debatable. To be sure, *non-legislative acts* that are otherwise criminal are not immune from prosecution, even if they relate to a legislative act. For example, if the Senator broke into someone's house to obtain papers, he could not claim Speech or Debate protections. *Renzi*, 651 F.3d at 1026. But here, the challenged activity is the information-gathering itself—*i.e.*, the gaining of information through meetings—and that squarely *is* a legislative act. *United States v. Biaggi*, 853 F.2d 89, 102-03 (2d Cir. 1988). It thus does not matter *why* that information was acquired; the Clause shields certain objective acts, irrespective of their subjective motives. *See United States v. Brewster*, 408 U.S. 501, 528 (1972). It is therefore no answer to assert that *this* information-gathering was different, because it was really done to "implement[] a corrupt bargain." R33 Order at 69. After all, the Clause would never allow the

government to introduce evidence of how a Senator voted on a bill, even if he was "implementing" his half of a "corrupt bargain" by that vote.

The fact that other courts have analyzed the issue Senator Menendez's way establishes that this is a close question warranting release pending appeal. In *United States v. Dowdy*, the Fourth Circuit rejected a near-identical argument pressed by the government. 479 F.2d 213 (4th Cir. 1973). It held that it did not matter if the Member's "actual motives in communicating with government officials and in obtaining certain documents could have been … for improper non-legislative purposes." *Id.* at 226. So long as the information-gathering could bear on a legislative act—as all agree is true here—"the propriety and motivation for the action taken, as well as the detail of the acts performed, are immune from judicial inquiry." *Id.* The Second Circuit may well agree with its sister Circuit's logic and hold that Senator Menendez's meetings are protected, especially since it has previously cited and quoted this part of *Dowdy* favorably. *See Biaggi*, 853 F.2d at 103.

**3.** **The "Sign Off" Text.** The government's single-most important piece of evidence (other than the excluded evidence that was wrongly provided to the jury anyway, discussed below) was the Senator's text to Nadine: "tell Will I am going to sign off on this." R33 Order at 10-11; *see, e.g.*, Trial Tr. 53, 900-01, 6393, 6403; Dkt. No. 611, at 12; Dkt. No. 648 at 38. This Court allowed that message into evidence, on the ground that it was a mere promise of future legislative action, as opposed to evidence of a legislative act itself. MTD Op. & Ord. at 8.

On this point too, reasonable jurists could disagree about where this Court drew the line. To be sure, the Supreme Court has held that promises made as part of sealing an illicit deal are not legislative acts. *Brewster*, 408 U.S. at 501. But, at the same time, it cannot be the case that the government can circumvent the Clause by introducing evidence of a news article or interview or press release or tweet where a Member—right before going to the floor—indicates how he plans

10

to vote. The Clause is not so wooden; its protections have an "intrinsically functional nature," tethered to reality. *McSurely v. McClellan*, 521 F.2d 1024, 1041 (D.C. Cir. 1975). In light of the Court's pragmatic approach to the Clause, the better way to read its precedents is as distinguishing between promises made to forge a corrupt "compact" (*i.e.*, evidence that *directly* shows a corrupt agreement), versus "showing[s] of [what] a legislator [actually] decided" (*i.e.*, evidence that asks the jury to *infer* a corrupt agreement from a legislative act itself). *United States v. Helstoski*, 442 U.S. 477 489 (1979).

And the text here falls comfortably on the latter side of that line. It is not a conditional statement, made as part of an illicit negotiation (in fact, on the government's *own telling*, the negotiation had ended several months earlier and a deal was struck back in April 2018, Trial Tr. 6390). Nor did the text message say: "tell Will I am going to sign off on this because he came through on his end." Rather, the message referenced only a *quo*, without mention of any *quid* or *pro*. And the *quo* is just the bare legislative act itself. It is thus simply a declaration of a decision already made—no different from a CNN headline: "Senator Menendez says will drop hold on Egyptian tank aid." And the point of that evidence, like the point of this text message, is to show the jury that the Senator took a legislative act—and seek an inference of a corrupt agreement from that act. To allow admission of that evidence would severely undercut the purposes of the Speech or Debate Clause, and collapse the distinction drawn by the Supreme Court's precedents.

In so many words, the government's effort to skirt the constitutional line here is too clever by half, and would open the door to hollowing the Speech or Debate Clause. It is at least a "close" question whether the Second Circuit will tolerate that sort of gambit.

**4.     The Laptop Violations.** On top of all this are the serious Speech or Debate Clause violations the government *admitted* to committing. Dkt. Nos. 655, 630. Prosecutors mistakenly

showed the jury evidence of the Senator actually signing off on sizable aid, despite this Court's ruling that this evidence was constitutionally forbidden. And the government itself described this evidence as "very critical," "highly probative," and "compelling." Trial Tr. 1041-42; Dkt. No. 648, at 34. Revelation of these errors set off a series of supplemental Rule 33 motions that the Court did not resolve until last week. Dkt. No. 711. While this Court found that the Senator had waived his constitutional rights, and also excused these government errors as harmless, it is at least reasonable to think the Second Circuit may see the matter differently.

Foremost, there is a serious and significant argument that Speech or Debate violations are structural errors. *See, e.g.*, *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). At least one other Court of Appeals has already so held. As the Eleventh Circuit put it in *United States v. Swindall*: The "Speech or Debate privilege is not merely an evidentiary or testimonial privilege … [t]herefore, a harmless-error analysis will not excuse a violation." 971 F.2d 1531, 1548 n.21 (11th Cir. 1992); *see also, e.g.*, *In re Search of the Rayburn House Office Building Room No. 2113*, 432 F. Supp. 2d 100, 116 n.9 (D.D.C. 2006) ("[A] harmless-error analysis is not appropriate in the context of the Speech or Debate privilege."), *rev'd on other grounds*, 497 F.3d 654 (D.C. Cir. 2007). The fact that other courts *have* held as much establishes that the Second Circuit very well *could* do so— and that alone suffices for purposes of release pending appeal. Indeed, in rejecting the Senator's argument, this Court's order said only that it was "not clear" whether *Swindall* would require a different result in this case. Dkt. No. 711, at 12. For current purposes, however, such a lack of clarity in the law cuts *in favor* of the relief the Senator seeks.

This court's decision on waiver is likewise subject to reasonable debate. As the Senator pointed out, courts are loathe to find waiver in the Speech and Debate context, where "the ordinary rules … do not apply." *Helstoski*, 442 U.S. at 491. Indeed, until this Court's decision last week,

"[n]o court ha[d] ever held that a Representative or Senator waived their absolute immunity from suit under the Speech or Debate Clause." *Rangel v. Boehner*, 20 F. Supp. 3d 148, 182 (D.D.C. 2013). This Court did not address that argument, but the Second Circuit might hesitate before being the first Circuit ever to hold that a Senator offered an "explicit and unequivocal renunciation of the [Clause's] protection." *Helstoski*, 442 U.S. at 491. And, regardless of the standard, that court could conclude that the Senator's vigorous, repeated, and ultimately *successful* Speech and Debate objections to this evidence are incompatible with a finding of waiver.

*    *    *

The examples above are only the tip of the constitutional iceberg; on appeal, the Senator intends to raise the full range of Speech or Debate Clause claims presented at trial. But these examples are enough to show that the government's case treaded, at minimum, very close to the constitutional line—and, we submit, repeatedly crossed it. There are, at minimum, a host of real and substantial questions with which the Second Circuit will need to grapple.

## B.    The *McDonnell* "Official Action" Questions Are Substantial.

Senator Menendez's appeal will also present substantial questions about the meaning of "official action" under the Supreme Court's decision in *McDonnell*. All of the bribery statutes at issue required the government to prove a *quid pro quo* for official action. The government rested heavily on certain actions by Senator Menendez that were *not* "official," yet characterized them as such to the jury. And this Court's jury instructions contributed to the error by failing to provide the necessary explication of the line that *McDonnell* drew. Once again, while this Court ultimately disagreed with Senator Menendez's interpretation of the Supreme Court precedent, other courts have adopted it. It is therefore at least reasonably debatable that the Second Circuit could view the evidence as insufficient, or the instructions as inadequate, in these respects.

1.     **Grewal Meetings.**  For the government's "New Jersey Scheme," it relied on the Senator's two interactions with then-State Attorney General Gurbir Grewal.  R33 Order at 19-21.  But the Second Circuit could very well agree with Senator Menendez that these were *not* official acts, or at least that the jury was prejudicially misled as to the relevant legal line.

As Senator Menendez has explained, a federal official does not engage in "official action" by asking a state official to do something—at least absent the use of federal power as a threat or for leverage.  *McDonnell* requires some invocation of the power of the official's office; that power is what the bribery laws forbid the official to sell.  *See* Dkt. Nos. 120, at 19-21; 187, at 9-15.  Colloquial "advice" or "pressure" on the part of a public official is therefore not, by itself, official action; as the Court added, there must be some "us[e] [of] his official position" in the provision of the advice or the imposition of the pressure.  *McDonnell*, 579 U.S. at 574.  After all, the essence of bribery is the corruption of *power*—without some link to official power, there can be no bribe.  *See, e.g.*, *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008).

Here, the Senator is not even alleged (let alone proven) to have used any powers of his office vis-à-vis Grewal.  Fundamentally, federal legislators have no authority over state matters, so they lack the power to command organs of state governments to do anything.  *See Printz v. United States*, 521 U.S. 898, 919 (1997).  Accordingly, federal officials generally have no capacity to take official action respecting *state* matters.  The government admits as much.  *See* Dkt. No. 611, at 27-28.  And as Attorney General Grewal himself confirmed on the stand, Senator Menendez never said he would use his federal office in any way (*e.g.*, hold hearings, sponsor legislation); and Grewal affirmed that he never felt threatened in any such manner.  Trial Tr. 2772-74, 2796.

This Court held otherwise.  But respectfully, the Second Circuit could reject its reasoning.  The Court first noted it is not dispositive that Senator Menendez is a federal official.  R33 Order

at 20-21.  But nobody is saying that; the point is that as a federal official, the Senator has no formal power to command state officials to do anything—so he would need to do something more than just make a request or pass along information in order to satisfy *McDonnell* (*i.e.*, he would need to use his office in some way).

Next, the Court said Senator Menendez applied "pressure," because he carried "a lot of influence in the state," and state officials did not "want to upset" him.  *Id.* at 21.  That mistakes the sort of "pressure" that matters under *McDonnell*.  Lots of people—from former officials to popular celebrities—carry "influence" that makes it easier for them to receive a friendly audience.  But if Uribe had paid former President Bill Clinton or Bruce Springsteen to reach out to Grewal on his behalf, that obviously would not be federal bribery.  The analysis should be no different for Senator Menendez.  His generic "advice" was not part of any official advisory role and the alleged "pressure" came only from his prominence, not any use or threatened use of the power of his office.  In short, what is needed for bribery under *McDonnell* is not just an *officeholder*, but the *use of his office*.  And here the government showed only the former, not the latter.

**2.    USDA Call.**  The other supposedly "official act" that the government introduced into evidence was the Senator's call to Ted McKinney, telling him to drop his opposition to the IS EG Halal monopoly.  R33 Order at 11-12.  The government argued that this satisfied *McDonnell*, because he sought to use his "influence" to affect the "position" of the Department of Agriculture on a "matter of foreign relations."  Dkt. No. 611, at 12-13.  This suffers from similar deficiencies, and the Second Circuit could reasonably conclude that this act was not "official" (or that the jury was prejudicially misled to find otherwise by the Court's instructions on the law).

Again, a public official's use of general influence—divorced from any exercise of his powers—is not official action.  As all agree, that is all that happened here.  As McKinney testified,

the Senator never used (or threatened to use) his office (*e.g.*, cutting funding, stalling nominees, holding hearings). Trial Tr. 1979-81. Any colloquial pressure came from the fact the Senator was an "influential person." Trial Tr. 1804. But that cannot be enough. *McDonnell*, 579 U.S. at 574.

More fundamental, the USDA's "position" on Egypt's decision to grant IS EG a monopoly was not itself an official act (and therefore any "advice or pressure" relating to that opposition is not official action either). As the government's own evidence showed, the choice to grant a halal monopoly was Egypt's alone; the United States had no power over that decision. Trial Tr. 588. It had only the "power of persuasion"—*i.e.*, to make its opinion heard, and hopefully adopted. Trial Tr. 1864. But as the Second Circuit has recognized, expressing a view on something—even by someone acting in an official "capacity," R33 Order at 12-13—is not official action. *Silver*, 864 F.3d at 122. In any capacity, voicing an opinion does not itself involve the "formal exercise of governmental *power*." *McDonnell*, 579 U.S. at 574 (emphasis added). And without that, there is no official act—and certainly no official "advice" or "pressure."

*       *       *

On this issue too, disagreements among the lower courts underscore that the question is "close" and could very well be decided the other way. *See United States v. Jefferson*, 289 F. Supp. 3d 717 (E.D. Va. 2017); *Silver*, 864 F.3d at 120-21; *Urciuoli*, 513 F.3d at 296.

The *Jefferson* case is especially instructive. There, Judge Ellis rejected the very arguments that the government pressed here, and adopted Senator Menendez's understanding of "pressure" under *McDonnell*. Across counts, he parsed "expression[s] of support" (unofficial) from true legal "pressure" (official). *Id.* at 739. And he did so based on whether the defendant "used his office" in some way. *Id.* at 743. It was not enough the defendant—a nine-term Member of Congress—had generalized "influence"; *McDonnell*'s inquiry turned on whether any "pressure" derived from

16

him "us[ing] his position as a U.S. Congressman" in a concrete manner. *Id.* at 738. So too here: Senator Menendez was certainly an influential figure in New Jersey (and beyond), but payment for *influence* divorced from *power* is not a federal crime.

Likewise, Judge Ellis endorsed Senator Menendez's position that when a federal official simply makes a request to a separate sovereign, that alone cannot be official action as a matter of law. There, the Congressman was asking—indeed, pressuring—African officials to enter business dealings with a U.S. company. But that did not satisfy *McDonnell*, because the Congressman did not have any formal authority over that distinct government's actions. *Id.* at 737-38. So much so here: Senator Menendez did not have any formal authority over New Jersey's governmental officials; nor did the USDA have any formal authority over Egypt's. Absent that dynamic, a naked request for action does not—without more—involve any use of one's office. *See id.* at 739-40.

At minimum, Judge Ellis's careful opinion illustrates that the line between colloquial and official "advice" and "pressure" is nuanced. For that reason, the Second Circuit could alternatively conclude that the instructions here failed to give the jury sufficient guidance about how to draw this subtle distinction. The Senator proposed specific instructions that would define each concept and flesh it out; but this Court rejected them. Trial Tr. 6314-16. And then at closing, prosecutors urged the jury to convict, on the ground that the Senator *had in fact* performed certain "official acts"—emphasizing the above conduct. *E.g.*, Trial Tr. 6924-25, 7009. This too presents another "close" call for the Second Circuit, underlying the bulk of the substantive bribery counts.

### C.    Section 219's Constitutionality Presents Substantial Questions.

As the government has boasted, this case marks the "first" time in history that 18 U.S.C. § 219 has been used to prosecute a public official. Dkt. No. 690, at 21. The statute's constitutionality has therefore never been tested. It too presents a novel and weighty issue for appeal.

1.      There are serious reasons to doubt § 219's constitutionality.  For most, FARA is just a routine disclosure obligation.  But for Members of Congress, § 219 makes FARA a criminal prohibition—it bars a Member from taking a large range of actions based on certain proscribed motives.  Section 219's covered actions are written so broadly as to pick up virtually everything an elected official does.  The statute turns those otherwise anodyne acts into federal crimes if they are performed for the "wrong" reasons—*i.e.*, including at the "request" of a foreign principal.  *See* 22 U.S.C. §§ 611(c)(1), (b)(1)-(3), (o); *Att'y Gen. of U.S. v. Irish N. Aid Comm.*, 668 F.2d 159, 161 (2d Cir. 1982) (recognizing statutory breadth).  As applied to Members of Congress, that violates the separation of powers, as a host of interrelated lines of authority make apparent.

*First*, the Supreme Court has held from the start that "[o]ne legislature cannot abridge the powers of a succeeding legislature."  *Fletcher v. Peck*, 6 Cranch 87, 135 (1810).  And the most fundamental power that a Member possesses is the power to exercise his authority for the reasons he deems appropriate.  When it comes to how a legislator chooses to perform his duties, the Constitution assigns a single limit and an exclusive check: "the people."  *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 821 (1995).  Once sent to Washington, a Senator or Representative can act for any reason, or no reason at all, and is answerable for those actions only to his constituents.  *See id.*  But § 219 cabins that prerogative: Its sole function is to carve out impermissible reasons for a legislator's actions.  That is not allowed.  Running on a platform of "I'll do what China tells me" is assuredly bad politics; but the check on that is elections, not prosecution.

*Second*, a long line of precedent holds that the separation of powers forbids courts from probing legislators' motives.  *See, e.g.*, *Marshall Field & Co. v. Clark*, 143 U.S. 649, 673 (1892).  But probing legislators' motives is *precisely* what § 219 tasks courts with doing.  Under the Constitution, "many decisions affecting foreign relations—including decisions that may determine

the course of our relations with recognized countries—require congressional action." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 16 (2015). Under § 219, the only thing that separates such action from criminal conduct is the reason *why* the legislator performed that aspect of his job (there is no need for a separate unlawful agreement, much less a bribe). And the statute dragoons the federal courts into policing that line through criminal trials.

*Third*, the Constitution prohibits one branch of government from "superintend[ing]" the work of another. *Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 611-12 (2007) (plurality). Just as a branch cannot abdicate its responsibilities, nor can it micromanage another branch's business—no matter how "practical" or "innocuous" that may seem. *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 276–77 (1991). That principle too is violated when the Executive and Judiciary sit atop Congress, and determine for itself whether its Members are really doing their work for the right reasons. *Cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 866 (2020). Once again, that is what § 219 asks those branches to do.

The practical threats posed by § 219's application to Members of Congress underscore its offense against the separation of powers. What does § 219 mean for a Member who says he will always stand with Israel, and support whatever Prime Minister Netanyahu needs from the United States? Or one who presses for increased military support to Ukraine, after meeting with President Zelenskyy? Is responding to this "request" of a foreign government okay, or fodder for a felony? Is it for a jury to decide? The contours of § 219's exceedingly broad terms are, putting it generously, "difficult to locate." *Irish N. Aid. Comm.*, 668 F.2d at 161. And the chilling effect of this "pall of potential prosecution"—coupled with the obvious risk of selective enforcement—exacerbates the constitutional issue. *McDonnell*, 579 U.S. at 575.

**2.**    This Court rejected Senator Menendez's constitutional challenge to § 219.  MTD Op. & Ord. 10-16.  But this is literally an unprecedented question, for the statute has never before been invoked to prosecute a Member of Congress.  This is the sort of novel, cutting-edge separation-of-powers question that may well lead to a different result on appeal.  *Cf. Trump v. United States*, 144 S. Ct. 2312 (2024) (finding immunity in case of first impression about criminal prosecution of former President for conduct during presidency).

This Court held that § 219 was constitutional, primarily because "Congress itself" enacted the law.  MTD Op. & Ord. at 11.  But, as explained, one Congress cannot bind another, even by purporting to hand off some of its own legislative power.  *See, e.g.*, *A.L.A. Shechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) ("[A] delegation of legislative power" by Congress to a private entity "is utterly inconsistent with the constitutional prerogatives and duties of Congress.").  Even putting that to the side, a separation-of-powers violation is not avoided if "the encroached-upon branch approves the encroachment."  *New York v. United States*, 505 U.S. 144, 182 (1992).  And, contrary to this Court's reasoning, the latter principle is not limited to encroachment of one branch by another.  *See, e.g.*, *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 572 (2010) (invalidating statutory limit on President's removal power even though a prior President signed it into law and even though the law did not give Congress any role in removal of the officers).

Relatedly, this Court also noted that Congress could always "amend" § 219 if it proved to be an imposition on Members' prerogatives.  But that ignores the hurdles inherent to bicameralism *and* presentment: There is little reason that the Executive would give up this far-reaching ability to oversee Congress, and Congress would in turn need a veto-proof majority to free itself of this superintendence.  *Cf. INS v. Chadha*, 919, 951 (1983).

Finally, the Second Circuit could readily distinguish the other criminal statutes to which this Court analogized—namely, the bribery laws, and the Ethics in Government Act.  The former do not implicate "the role of a legislator" at all, because entering a corrupt bargain is not in any "conceivable" way part of a legislator's day job (unlike almost everything within § 219).  *Brewster*, 408 U.S. at 526.  And the Ethics in Government Act is a *disclosure* law regarding a Member's *personal* finances; it neither regulates nor chills how a Member actually performs his job.

*      *      *

This prosecution involved an unprecedented use of § 219—a law with intuitive constitutional infirmities, and no clear statutory parallel.  It is at least a "close" call whether this "novel" prosecution complies with the separation of powers, *Randell*, 761 F.2d at 125; and there are thus substantial questions as to the viability of the FARA convictions on appeal.

### D.    The Government's Venue Choice Raises Substantial Questions.

Besides the substantive deficiencies in the government's case, there are also substantial questions about its choice of forum.  Senator Menendez lived in (and represented constituents in) the District of New Jersey, and virtually all of the conduct at issue occurred there or in the District of Columbia.  Yet the government nonetheless chose to charge him instead in the Southern District of New York (SDNY).  While this Court ultimately determined that a few fleeting contacts were sufficient to satisfy the constitutional and statutory venue demands (without separately considering the essential conduct elements of each offense), that is at least a close and fairly debatable call under Second Circuit precedent.  Each of the four main SDNY contacts that the government raised at trial for venue purposes harbors substantial legal problems.

1.    **Mr. Chow Restaurant.**  The government's primary piece of evidence for venue was a June 30, 2018, dinner with the Senator, Nadine, and Hana at Mr. Chow in midtown.  R33 Order at 50-51.  The government argued (and this Court agreed) that this dinner sufficed, since it

"facilitat[ed] a key event in the bribery scheme," *id.* at 51—namely, Hana sent a text message during the dinner to an Egyptian official, confirming the time for a meeting with the Senator in D.C. (and after *that* meeting, the Senator sent the "sign off" text above). Dkt. No. 611 at 70-71.

It is easy to see, however, how the Second Circuit could instead characterize this dinner as a classic "preparatory acts," insufficient for venue. *See United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190-91 (2d Cir. 1989). Nothing about the dinner itself involved any "part of the offense." *Id.* at 1190. The relevant evidence all concerned what happened *later* in D.C.—both the meeting itself, plus the text that followed. Indeed, even the government acknowledged that the only reason it spent so much time on the dinner was as a hook for venue. Trial Tr. 1275-76. Acts done to "lay the groundwork" for the "ultimate" offense may constitute essential conduct, some courts say. *United States v. Gross*, No. 15-cr-769 (AJN), 2017 WL 4685111, at *39 (S.D.N.Y. Oct. 18, 2017). But even on that view, such actions must be "necessary" toward that end, lest the exception swallow the *Beech-Nut* rule. *Id.* And there is no serious claim that was the case with the Mr. Chow dinner: There was no *need* to eat Chinese food in Manhattan in order to set a later meeting in Washington.

Wherever the line between preparatory acts and laying-the-groundwork, a dinner at which a later meeting is confirmed has to be on the former side of it. And at the least, it is the exact sort of difficult line-drawing question that raises a "close" call under 18 U.S.C. § 3143(b).

**2.    JFK Trip.** The government emphasized that Fred Daibes's driver passed briefly through SDNY when picking up the Senator and Nadine from JFK airport, en route to New Jersey. R33 Order at 53. But even assuming the driver gave *quids* to the Senator *at some point* on this drive through 3 separate districts (EDNY, SDNY, and the District of New Jersey), this *de minimis* brush with SDNY is not a "substantial contact" in any sense. *See United States v. Davis*, 689 F.3d

179, 186 (2d Cir. 2012).  The point of that doctrine is to "operate[] to limit venue" to locations where the defendant *chose* to avail himself.  *United States v. Auernheimer*, 748 F.3d 525, 536 (3d Cir. 2014); *see also United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018).  It is hard to see how that is satisfied here; the Constitution's venue demands cannot possibly turn on the route that Waze happened to choose between Queens and New Jersey.

Prosecuting the Senator in SDNY based on this exceedingly thin reed "prejudiced" him and "undermined the fairness of [his] trial."  *United States v. Ramirez*, 420 F.3d 134, 143 (2d Cir. 2005).  SDNY was not the "site" of any "acts" committed by the Senator in connection with any asserted bribe; nor was any scheme's "elements and nature" substantially connected to SDNY. *Davis*, 689 F.3d at 186.  The Senator should have been tried before his constituents—the supposed victims—or at least in D.C.  Whether it was proper to try the Senator in this forum simply because he once traveled in a car that used its roads *en route* from *A* to *B*, is at least a "close" question.

**3.    Gold Sales.**  The third main venue fact for the government was that the jeweler who resold Nadine's gold did so in Manhattan.  R33 Order at 52-53.  But it is at least a "close" question whether that act matters: The charged bribery offenses were complete upon *receipt* of the gold, and downstream actions like resale are therefore not part of the essential offense conduct. *See United States v. Rutigliano*, 790 F.3d 389, 397-98 (2d Cir. 2015) (for venue, "a scheme to defraud is … complete [when] the proceeds have been received").  Granted, this Court emphasized that the ultimate goal of the scheme was to liquidate the gold.  R33 Order at 52.  Even if so, that is distinct from the essential conduct making up the crime.  It is not hard to imagine the Second Circuit holding that the jeweler's resale of the gold is too far afield to support venue (and that is without even considering whether the resale was reasonably foreseeable by the Senator).

4.    **Nadine's Acts.**  Finally, the government pointed to a couple stray acts by Nadine, but each is at least dubious under Second Circuit precedent.  For instance, Nadine crossed through SDNY on the way to make a cash deposit in EDNY.  R33 Order at 55.  But merely traveling through a district *on the way to committing the crime* is not enough.  *United States v. Tzolov*, 642 F.3d 314, 319 (2d Cir. 2011).  It follows *a fortiori* that merely traveling through a district to do something *wholly collateral to the offense* (like depositing cash) does not suffice either.

Likewise, Nadine sent texts and made calls (likely from New Jersey) that may have bounced off cell towers located in SDNY.  R33 Order at 55.  But while the Second Circuit has held that venue lies in a district where a call is "directed," *Kirk Tang Yuk*, 885 F.3d at 75, it has never held that the happenstance of pinging a cell tower in Manhattan from a different district is sufficient.  And that logic is open to serious challenge, since it would allow SDNY effectively to obtain jurisdiction over the entire tri-state area.  The Second Circuit may be loathe to expand venue so far, in the teeth of both congressional direction and constitutional command.[3]

*        *        *

The government has recently suffered other appellate losses after overreaching on criminal venue in high-profile political cases.  *See, e.g.*, *United States v. Fortenberry*, 89 F.4th 702 (9th Cir. 2023) (reversing conviction of Member of Congress based on improper venue).  The same could

---

[3] The government also raised some late-breaking theories of venue in its post-trial brief—pointing to a September 2019 meeting at a Manhattan hotel, plus an event in Manhattan with the Emir of Qatar.  But it never raised these to the jury, so they cannot suffice.  In all events, neither involved *any* conduct related to the offenses.  The Qatar meeting was a formal meeting involving multiple other Senators.  Trial Tr. 4189-91.  And the government put on zero evidence about what was discussed at the hotel.  *Id.* 1468-75.  Without more, these sorts of general contacts untethered to any offense cannot establish venue.  *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (to prove venue, activity in district must have been "conduct constituting the offense"); *see also United States v. Radley*, 558 F. Supp. 2d 865, 876 (N.D. Ill. 2008) (venue improper when in-district acts "do not provide evidence of the elements of the crime charged").

very realistically happen in this case given the government's obvious overreach. Despite several obvious appropriate venues (including just across the river), the prosecutors took a gamble and forced this case into SDNY. In so doing, it rolled the dice on a series of contacts—none of which pass the straight-face test as meaningful events in the charged offenses, and none of which would likely have reached the jury *absent* the government's need to somehow justify its forum choice. At minimum, it is at least "close" whether these fleeting contacts are truly sufficient.

### E.    Prevailing on These Issues Would Likely Lead to a New Trial.

All of the issues summarized above are "substantial" within the meaning of § 3143(b), because the Second Circuit could well decide them the other way. *Randell*, 761 F.2d at 124-25. And, assuming that these questions are resolved in Senator Menendez's favor on appeal, vacatur and new trial would be warranted across the board. *See Levy*, 2014 WL 1483964, at *1.

**1.**    Start with the Speech or Debate Clause errors. Even standing alone, that bucket of errors (or even just some errors from within the bucket) require a new trial on all counts.

If the Second Circuit agrees with Senator Menendez that pre-nomination "advice" is a legislative act, that will taint the verdicts on all of the counts toward which that evidence was directed: Counts 11, 13, and 14 (the substantive counts built around the Daibes scheme), Counts 1-3 (the bribery and extortion conspiracy counts, which include the Daibes scheme), and Count 4 (the obstruction conspiracy count relating to the Daibes scheme). If the Court of Appeals agrees with Senator Menendez about the information-gathering meetings, *or* the "had to sign off on this" text, *or* the impact of the admitted laptop errors, that would require a new trial on all of the counts to which that evidence was directed: Counts 5, 7, and 8 (the substantive counts built around the Egypt scheme), Counts 15-16 (the FARA counts, which involved overlapping evidence and were

25

premised on the existence of an illicit agency relationship, *see* Trial Tr. 6538-39), and again Counts 1-3 (the all-encompassing conspiracies).[4]

But the taint of the Speech or Debate Clause errors does not end there. Given how the government structured its case, a flaw in any scheme is a flaw for all of them. Quite deliberately, the government framed its bribery theory as a three-legged stool, with each scheme supporting (and relying upon) the others. It made this express at closing, telling the jury that to convict on one scheme, it should lean on the others. *See, e.g.*, Trial Tr. 6422-23 (urging jury to convict on Egypt based on how that scheme fit into "broader pattern"); Trial Tr. 6461-62 (on New Jersey: "Every new piece of the puzzle you see reinforces the clear pattern of corruption that you see throughout the case. … But now look at it together with the Egypt conduct, because it is all part of the same pattern of corruption."); Trial Tr. 6521-22 (on Fred Daibes: "That brings us to the last reason you know this was a quid pro quo. The big picture.").

The consequence of that framing is that if any of these legs fall out, the whole enterprise must topple. If the jury found the Senator guilty of one scheme, it was more likely to find him guilty on the rest—again, that is exactly how the government told them to think about all this. And where errors as to one set of counts "effortlessly ble[e]d into the jury's consideration" of related ones, the latter are infected too. *United States v. Lindberg*, 39 F.4th 151, 164-65 (4th Cir. 2022). So if the Second Circuit agrees with the Senator on *any* of the Speech or Debate Clause errors (*i.e.*, those affecting the Daibes scheme or those affecting the Egypt scheme), a new trial will be required

---

[4] The government could not seriously contend that any of these constitutional errors was harmless. For one thing, Speech or Debate Clause errors are structural, as discussed above, and thus defy harmless-error review. For another, the violations here bore on the most important evidence proffered by the government for two of its three schemes—the U.S. Attorney recommendation that drove the Daibes-related scheme, plus the meetings and text messages underlying the Egypt-related scheme. Where an error relates to the "principal evidence" in a case, it cannot be excused as harmless. *United States v. Garcia*, 291 F.3d 127, 144 (2d Cir. 2002).

on all of the counts identified above, plus the counts that relate to the New Jersey scheme (Counts 9-10). *See United States v. Al-Moayad*, 545 F.3d 139, 165 (2d Cir. 2008) (reversing when jury could have been "substantially influenced" by improper evidence); *United States v. McDermott*, 245 F.3d 133, 138–39 (2d Cir. 2001) (sufficient evidence for one of two counts, but still reversing due to prejudice from evidence for other count); *United States v. Berkery*, 889 F.2d 1281, 1285 (3d Cir. 1989) (complete reversal required when counts "closely intertwined").

And the same goes for the remaining counts: Counts 17-18, for obstruction and conspiracy relating to concealment of the alleged bribes. As the government put it to the jury, the substantive bribery charges were the "building block[s]" for everything else. Trial Tr. 6373. And of course that is true: A jury could only find that the Senator tried to cover up a bribe if it first found that he took a bribe in the first place. So, a Speech or Debate Clause error tainting the substantive counts would also require a new trial on Counts 17-18.

In short, this is a scenario where the "nature" of the case is such that "all counts" are equally "tainted" by the primary error, and that warrants release pending appeal given the substantiality of that primary error. *See United States v. Galanis*, 695 F. Supp. 1565, 1569 (S.D.N.Y. 1988).

**2.** The *McDonnell* errors present an independent ground for reversal or a new trial on all counts. If the Second Circuit agrees that the Grewal interactions were not "official," that would require reversal on Counts 9-10. Those are the substantive counts built around the New Jersey scheme, which did not involve any other official action. The government has suggested that the counts could nonetheless survive on the theory that Senator Menendez *agreed* to take official action even if he never *actually* did so. But the government did not offer any evidence of a deal for official action, versus for generic help or some lesser *quo*—it instead asked the jury to infer one based on the acts that the Senator *actually* took for Uribe. If that foundation is removed, the

27

charges collapse.  So just as in *Jefferson*, where the government similarly built its bribery case on actions that were in fact unofficial, the convictions must fall.  289 F. Supp. 3d at 740.

As for the call to McKinney, it is impossible to rule out that the jury may have convicted on the Egypt-related counts because the flawed instructions wrongly suggested it was an official act.  A new trial on those counts (Counts 1-3, 5-7, and 15-16) would thus be necessary.

For the reasons already discussed, a new trial on *any* of the three schemes would trigger a new trial on *all* of them, given that the government tied the counts together and urged the jury to treat each as evidence of the rest.  And a new trial on the bribery and extortion counts also requires a new trial on the obstruction counts (Counts 4, 17-18), for the reasons discussed above.

**3.**    The venue errors are an independent ground for vacatur of all counts other than Counts 17-18 (for which venue was proper in SDNY, given the nexus to a "proceeding" in SDNY).  *See United States v. Brennan*, 183 F.3d 139, 149 (2d Cir. 1999) (venue errors cannot be harmless if error was preserved); *Auernheimer*, 748 F.3d at 539 (doubting venue can ever be harmless).  And if only those two counts survived, it is very unlikely that any resulting term of imprisonment would exceed "the expected duration of the appeal."  18 U.S.C. § 3143(b)(1)(B)(iii).

\*       \*       \*

For every count, there are at least two (and, in some cases, three) independent, substantial legal questions upon which the convictions hinge.  Indeed, the Speech or Debate Clause issues are enough on their own to warrant release pending appeal.  Senator Menendez has thus established his entitlement to release pending appeal at least twice over.

**II.    SENATOR MENENDEZ PRESENTS NO FLIGHT RISK OR DANGER TO THE PUBLIC.**

The other prong under § 3143(b) is indisputably satisfied.  Senator Menendez has been free for the duration of these proceedings without incident, is a former United States Senator with no

criminal history, and obviously has no propensity toward violence or crime.  He has participated

fully in pre-trial, trial, and post-trial proceedings.  And he is committed to supporting his wife

during her pre-operative and post-operative care, during which she will need considerable help

and have no other family member available.  As the pre-sentence report reflects, there is no risk

that Senator Menendez will commit further crimes, and he intends to vindicate himself and restore

his reputation on appeal.  He plainly "is not likely to flee or pose a danger to the safety of any other

person or the community if released."  18 U.S.C. § 3143(b)(1)(A).

## CONCLUSION

For these reasons, should this Court sentence Senator Menendez to a custodial sentence, it

should grant him continued release while the Second Circuit considers his appeal, subject to the

same conditions that have been in place since September 2023.


Dated: January 27, 2025

Yaakov M. Roth (*pro hac vice*)
JONES DAY
51 Louisiana Avenue N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

Respectfully submitted,

By:  */s/ Adam Fee*
    Adam Fee
    PAUL HASTINGS LLP
    1999 Avenue of the Stars
    Los Angeles, CA 90067
    Telephone: (310) 620-5719
    Facsimile: (310) 620-5819

    Avi Weitzman
    Paul C. Gross
    PAUL HASTINGS LLP
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 318-6000
    Facsimile: (212) 725-3620

    *Attorneys for Defendant Robert Menendez*