UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
                                     :

UNITED STATES OF AMERICA           :

                                    :

        -*v.*-                  :      S4 23 Cr. 490 (SHS)

                                    :

NADINE MENENDEZ,             :
    a/k/a "Nadine Arslanian,"      :

                                    :

                     Defendant.     :

                                    :
-------------------------------------------------------------------x

## **MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA**
## **IN OPPOSITION TO THE DEFENDANT'S POST-TRIAL MOTIONS**

                                    JAY CLAYTON
                                      United States Attorney

Eli J. Mark
Daniel C. Richenthal
Paul M. Monteleoni
Lara Pomerantz
Catherine Ghosh
Assistant United States Attorneys

- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

I.     THE EVIDENCE AMPLY SUPPORTED THE DEFENDANT'S CONVICTIONS ........ 1

    A.     Applicable Law ................................................................................ 1

        1.     Sufficiency of the Evidence ................................................. 1

        2.     *McDonnell* and the "Official Act" Requirement ......................... 4

        3.     Obstruction of Justice ................................................................. 9

    B.     Discussion ..................................................................................... 10

        1.     The Evidence Proved a Corrupt Quid Pro Quo Related to Egypt............. 10

            a)     The Evidence Established Official Acts ....................................... 10

            b)     The Evidence Established a Corrupt *Quid Pro Quo* ..................... 15

        2.     The Evidence Proved a Corrupt Quid Pro Quo Related to the New Jersey State Criminal Matters ................................................................. 24

            a)     The Evidence Established Official Acts ....................................... 24

            b)     The Evidence Established a Corrupt *Quid Pro Quo* ..................... 28

        3.     The Evidence Proved a Corrupt Quid Pro Quo Related to Daibes's Federal Prosecution........................................................................... 33

            a)     The Evidence Established Official Acts ....................................... 33

            b)     The Evidence Established a Corrupt *Quid Pro Quo* ..................... 34

        4.     The Evidence Proved a Scheme for Menendez to Act as an Agent of Egypt ................................................................................................ 38

        5.     The Evidence Proved Corrupt Endeavors to Obstruct Justice ................. 46

            a)     The Evidence Established the Defendant Agreed to and Did Endeavor to Obstruct the Southern District of New York's Grand Jury Investigation................................................................. 46

            b)     The Evidence Established the Defendant Participated in a Conspiracy to Obstruct the Daibes Federal Prosecution............... 49

        6.     The Evidence Proved Venue was Proper in this District........................... 52

            a)     Counts Related to Egypt .............................................................. 53

            b)     Counts Related to the New Jersey Attorney General's Office ..... 58

            c)     Counts Related to Daibes's Federal Prosecution .......................... 60

II.    THE DEFENDANT IS NOT ENTITLED TO A NEW TRIAL....................................... 61

    A.    Applicable Law................................................................................................. 62

    B.    Discussion ........................................................................................................ 63

        1.    The Defendant's Right to Counsel Was Not Infringed............................ 63

            a)    Applicable Law........................................................................ 65

            b)    Discussion ................................................................................ 72

                (1)    The Defendant Waived Any Objection to Her Own Decision to Cause Schertler's Withdrawal ......................... 72

                (2)    Schertler Was an Unsworn Witness .................................... 77

                (3)    Schertler Was a Potential Unsworn or Sworn Witness on Additional Subjects Until the Close of the Evidence........... 79

                (4)    The Conflict Caused by the Defendant's Actions Never "Resolved" ........................................................................ 82

        2.    The Government's Presentation of Documentary Evidence Was Proper. 84

            a)    The Government's Summary Charts Were Admissible............... 84

                  (1)    Applicable Law on Admission of Summary Charts............ 85

                (2)    The Government's Summary Charts Adhered to Well-Established Law ................................................................ 89

            b)    The Mode of the Government's Presentation of Documentary Evidence to the Jury was Appropriate ........................................... 92

                (1)    The Court Properly Allowed Government Witnesses to Read Relevant Evidence to the Jury................................ 92

                (2)    The Defendant Had a Full Opportunity to Cross-Examine and Present Responsive Evidence ............................... 96

            c)    Any Alleged Error Would Have Been Harmless......................... 99

III.    COUNTS ONE AND FIFTEEN ARE NOT MULTIPLICITOUS ................................... 99

CONCLUSION................................................................................................. 100

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's post-trial motions (Dkt. 868).[1] Because the evidence overwhelmingly proved each count, and the defendant, who bears the burden, identifies no cogent basis for a new trial, her motions should be denied.

## ARGUMENT

## I.   THE EVIDENCE AMPLY SUPPORTED THE DEFENDANT'S CONVICTIONS

The evidence at trial—which included extensive documentary evidence from numerous independent sources, testimony from many lay witnesses, and detailed and corroborated cooperator testimony—was more than legally sufficient to prove each and every count.

### A.   Applicable Law

#### 1.   *Sufficiency of the Evidence*

"To prevail on an insufficiency of the evidence claim under Rule 29, a defendant bears the heavy burden of showing that no rational trier of fact could have found all of the elements of the crime beyond a reasonable doubt." *United States v. Mensah*, 515 F. App'x 59, 61 (2d Cir. 2013) (internal quotation marks omitted); *see also, e.g.*, *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (a jury's verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original)); *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (noting defendant's "heavy burden" in bringing a Rule 29 motion (internal quotation marks omitted)).  In short, "'[a] judgment of acquittal is warranted only if the

---

[1] Citations to "Dkt." refer to docket entries in this case.  Citations to "Mem." refer to the memorandum of law filed in support of Nadine Menendez's post-trial motions, Dkt. 868. Citations to "Tr." refer to the trial transcript.  Citations to "GX" refer to Government exhibits at trial. Citations to "Ex." refer to exhibits attached hereto.

evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted).

Accordingly, when evaluating a Rule 29 motion, the Court must "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *see also, e.g.*, *Jackson*, 443 U.S. at 319 (the Court must "view[] the evidence in the light most favorable to the prosecution"). Even "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the Court] must let the jury decide the matter." *United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) (internal quotation marks omitted); *see also United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (explaining "courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal" (internal quotation marks omitted)).

"The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable." *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994); *United States v. Plitman*, 194 F.3d 59, 67 (2d Cir. 1999) ("Even if there had been evidence regarding these [defense] theories in the record, the jury was free to reject it."). Accordingly, "the government need not exclude every reasonable hypothesis other than that of guilt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted); *see also, e.g.*, *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("[I]t is the task of the jury, not the court, to choose among competing inferences."). Further, "of critical importance, the evidence must be viewed in its totality, as each fact may gain

color from others." *United States v. Cassese*, 428 F.3d 92, 98-99 (2d Cir. 2005) (internal quotation marks and citation omitted).

Thus, even in the presence of evidence supporting the defendant's preferred set of inferences and where the evidence of guilt was "not overwhelming" and "would certainly have permitted a juror to entertain reasonable doubt," the jury's verdict nevertheless must stand if the evidence in its totality renders the jury's verdict reasonable. *United States v. Facen*, 812 F.3d 280, 288 (2d Cir. 2016) (reversing district court's grant of Rule 29 motion).

The Second Circuit has therefore held that a district court errs in granting a Rule 29 motion based on its conclusion that the evidence gave "nearly equal circumstantial support to competing explanations." *United States v. White*, 7 F.4th 90, 103 (2d Cir. 2021) (internal quotation marks omitted). In reversing a grant of a Rule 29 motion on this ground, the Second Circuit explained that this so-called "equipoise rule," derived from *United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002), is "of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *White*, 7 F.4th at 103 (internal quotation marks omitted). Accordingly, the Second Circuit held that the rule "applies only where evidence is nonexistent or so meager as to preclude the inferences necessary to a finding favorable to the government." *Id.* (internal quotation marks omitted).

In sum, to prevail, a defendant must show not merely that there is insufficient evidence supporting certain inferences urged by the prosecution, but rather that the evidence is legally insufficient to support *any* inference that would establish the pertinent element(s) of the offense. *See, e.g.*, *United States v. Salmonese*, 352 F.3d 608, 625 (2d Cir. 2003) ("no new trial is required" by an alleged "factual insufficiency" in a certain prosecution theory where the jury's general

verdict of guilty was supported by sufficient proof on an alternative theory); *see Griffin v. United States*, 502 U.S. 46, 56-59 (1991).

      2.     McDonnell *and the "Official Act" Requirement*

The Supreme Court, in *McDonnell v. United States*, 579 U.S. 550 (2016), considered, in reviewing a challenge to jury instructions, the definition of "official act" under the general federal bribery statute, 18 U.S.C. § 201, which makes it a crime for, among other things, a public official corruptly "to receive or accept anything of value" in return for being "influenced in the performance of any official act," *id.* § 201(b)(2). The Supreme Court adopted a two-part test for what qualifies as an "official act" under Section 201:

First, the "question" or "matter" must involve a "formal exercise of governmental power that is similar in nature to a 'cause, suit, proceeding or controversy,' but that does not necessarily fall into one of those prescribed categories." *McDonnell*, 579 U.S. at 569. In addition, "the question or matter must be 'pending' or 'may by law be brought' before 'any public official.'" *Id.* at 570.

Second, where the defendant is the alleged bribe recipient, he or she "must make a decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so. That action or decision may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id.* at 574. However, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of 'official act.'" *Id.* "Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is

irrelevant . . . . If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act." *Id.* at 573. Indeed, "[a] jury could conclude, for example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal." *Id.*; *see also, e.g.*, *United States v. Silver*, 864 F.3d 102, 117 (2d Cir. 2017), *cert. denied*, 583 U.S. 1091 (2018).[2]

The Supreme Court also explained that "'official action' could be established by custom rather than 'by statute' or 'a written rule or regulation,' and need not be a formal part of an official's decisionmaking process." *McDonnell*, 579 U.S. at 573 (quoting *United States v. Birdsall*, 233 U.S. 223, 230-31 (1914)).

The Supreme Court further emphasized that "a public official is not required to actually make a decision or take an action . . . . [I]t is enough that the official agree to do so. The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so long as he agrees to do so. A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *McDonnell*, 579 U.S.

---

[2] The Supreme Court's decision rested on Section 201, notwithstanding that that statute was not charged, because the parties in the district court agreed to use Section 201's definition in describing honest services fraud and extortion. *See McDonnell*, 579 U.S. at 562. Without conceding that it was required, the Government treated the definition as applicable to the bribery, honest services fraud, and extortion charges in this case, and the jury was instructed accordingly.

at 572 (citation omitted); *see also United States v. Silver*, 948 F.3d 538, 551 (2d Cir. 2020) (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)), *cert. denied*, 141 S. Ct. 656 (2021).[3]

The Supreme Court and the Second Circuit have repeatedly reaffirmed that no actual performance (or attempted performance) of official acts is necessary to commit bribery. *E.g.*, *Evans v. United States*, 504 U.S. 255, 268 (1992) ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *United States v. Brewster*, 408 U.S. 501, 526 (1972) ("There is no need for the Government to show that [the defendant] fulfilled the alleged illegal bargain; acceptance of the bribe is the violation of the statute, not performance of the illegal promise."); *Silver*, 948 F.3d at 551 (a "promise to perform an official act in exchange for payment" is a corrupt *quid pro quo*, and "it is not necessary that the public official in fact intend to perform the contemplated official act" (internal quotation marks and brackets omitted)); *United States v. Myers*, 692 F.2d 823, 842 (2d Cir. 1982) ("If Myers was 'playacting' and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violated the bribery statute."); *United States v. Avenatti*, 432 F. Supp. 3d 354, 362 (S.D.N.Y 2021) (rejecting motion for dismissal of honest services fraud charge; "[t]he Government is not required to prove that the fraudulent scheme was successful" (citing, *inter alia*, *Pasquantino v. United States*, 544 U.S. 349, 371 (2005))); *see also City of Columbia v. Omni Outdoor Advert.*,

---

[3] Similarly, bribery can involve an agreement by the official "not to perform" an official act. *See McCormick v. United States*, 500 U.S. 257, 273 (1991) (discussing Hobbs Act extortion).

*Inc.*, 499 U.S. 365, 378 (1991) ("A mayor is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid."). It is not even necessary that the public official have the power or ability to perform the promised or agreed official act. *See, e.g.*, *United States v. Hood*, 343 U.S. 148, 151 (1952) ("It is no less corrupt to sell an office one may never be able to deliver than to sell one he can.").

Ultimately, the Supreme Court has explained that whether a corrupt scheme regarding an official act was proven is a question of fact for the jury, which may consider a "broad range of pertinent evidence," including circumstantial evidence such as "the nature of the transaction." *McDonnell*, 579 U.S. at 572-73 ("It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*. The jury may consider a broad range of pertinent evidence, including the nature of the transaction, to answer that question."); *see also, e.g.*, *id.* at 573 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act.").

Consistent with *McDonnell*, courts have uniformly rejected any bright-line rules that would limit a jury's ability to determine whether a scheme involved an official act, including whether there was a promise or attempt to pressure or advise another official to perform an official act. For example, there is no requirement that, to provide the requisite "advice," a bribe recipient must have a "formal or official relationship with" the official receiving the advice. *See, e.g.*, *United States v. Mangano*, 128 F.4th 442, 476 (2d Cir. 2025) (rejecting defense argument that "if one public official has no formal or official relationship with another, he essentially acts as a private party in advising or seeking to 'pressure' the other official"); *United States v. Lee*, 919 F.3d 340, 352 (6th Cir. 2019)

7

("Defendant claims that an official can only 'provide advice' to a second official if the first official is in an advisory role to the second. However, nowhere in *McDonnell* did the Supreme Court state that it was creating such a rule. We do not adopt Defendant's additional constraints on the requirements for an official to 'provide advice.'" (citations omitted)); *see also, e.g.*, *United States v. Roberson*, 998 F.3d 1237, 1254 n.22 (11th Cir. 2021) (rejecting argument that advice "must come from someone in a more formal advisory role"), *cert. denied*, 142 S. Ct. 1109 (2022). Instead, as the Second Circuit has long recognized, a bribe recipient can provide advice, within the meaning of the bribery statutes, in "any situation in which the advice or recommendation of a Government employee would be influential, irrespective of the employee's specific authority (or lack of same) to make a binding decision." *United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972).

Similarly, there is no bright line or magic words requirement limiting the jury's ability to assess whether a public official attempted to apply "pressure," much less promised or agreed to do so. *See, e.g.*, *Mangano*, 128 F.4th at 456-57, 477 (affirming conviction based on "clear evidence" of defendant pressuring other officials despite not having official supervisory authority over them or making overt threats); *United States v. Cui*, No. 19 Cr. 322-3, 2024 WL 3848513, at *9 (N.D. Ill. Aug. 16, 2024) ("The jury need not find that [the defendant] had the power to or did perform the act for which he was given or received something of value" (internal quotation marks omitted)); *see also, e.g.*, *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988) ("[W]e see no basis for ruling that a congressman's official acts—especially those demonstrating Congressional interest—may not include efforts that are directed toward local rather than federal officials." (internal quotation marks omitted)); *United States v. Gilbert*, No. 17 Cr. 419 (AKK) (TMP), 2018 WL 2095853, at

8

*5 (N.D. Ala. May 4, 2018) (holding that state official's contacts with federal agency could be official act under *McDonnell*), *aff'd sub nom. United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021).

### 3.  *Obstruction of Justice*

Section 1503, in relevant part, prohibits a person from "corruptly or by threats or force, or by any threatening letter or communication, influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a). In *United States v. Schwarz*, 283 F 3d 76 (2d Cir. 2002), the Second Circuit explained, with respect to a conspiracy to violate Section 1503:

> In order to convict for conspiracy to obstruct justice under § 1503, the government must establish (1) that the defendant (a) knowingly entered into an agreement with another, (b) with knowledge, or at least anticipation, of a pending judicial proceeding, and (c) with the specific intent to impede that proceeding; and (2) the commission of at least one overt act in furtherance of the conspiracy.

*Id.* at 105-06.  Moreover, "a judicial proceeding need not be pending at the time the conspiracy began so long as the [defendants] had reason to believe one would begin and one in fact did." *Id.* at 107.  The conduct offered as proof of the intent to obstruct a federal proceeding must nevertheless have the "'natural and probable effect of' interfering with that judicial proceeding." *Id*. at 108 (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).

For a substantive violation of Section 1503, the elements are "action taken by the accused . . . with an intent to influence judicial or grand jury proceedings." *Aguilar*, 515 U.S. at 599.  The "action" taken by the defendant "must have a relationship in time, causation, or logic with the judicial [or grand jury] proceedings." *Id*.

9

**B.    Discussion**

The evidence at trial was more than sufficient to permit a reasonable jury to find that the corruption and foreign influence offenses charged in the Indictment were proven beyond a reasonable doubt, that the defendant agreed to obstruct and obstructed justice in an attempt to cover up her crimes, and that venue is proper.

1.    *The Evidence Proved a Corrupt* Quid Pro Quo *Related to Egypt*

The evidence at trial overwhelmingly proved that the defendant, and her boyfriend and later husband, then-Senator Robert Menendez, entered into a corrupt *quid pro quo* agreement with Wael Hana, Fred Daibes, and others to accept things of value in exchange for promising to take, and in some cases taking, official acts related to Egypt.

a)    <u>The Evidence Established Official Acts</u>

Contrary to the defendant's arguments (Mem. 26-28)—which largely, and improperly, rest on viewing the evidence in the light most favorable to her—the evidence overwhelmingly established that the defendant and Menendez agreed and promised, and in some cases Menendez performed, official acts for the benefit of Egypt and Hana during the course of the scheme.  There is no real dispute that actions by Menendez to approve or object to U.S. military aid to Egypt, including through foreign military sales or foreign military financing, amounted to official acts. (*See* Mem. 28 (disputing that Menendez promised to approve tank ammunition sale but not arguing that such approval would not be an official act).)  And while the Government—consistent with the Court's rulings related to the Speech or Debate Clause in the trial of the defendant's co-defendants (the "first trial")—did not introduce evidence of the *performance* of any such acts, the evidence of the *promise* of such acts was sufficient, standing alone, to establish this aspect of the offenses.

10

*See, e.g.*, *Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense.").

Among other evidence, the Government proved that the defendant texted Hana a promise from Menendez to swiftly approve a sale of tank ammunition, a clear promise of an official act. (*See* GX A101-14 ("Tell Will I am going to sign off this sale to Egypt today," listing specifics of tank ammunition to be sold); GX B201-10 (defendant screenshot of Menendez text).) Similarly, even if Menendez's decision to ghostwrite a letter for the Egyptian government in support of U.S. arms sales to Egypt was not itself an official act, the context—Menendez literally writing a response to the basis for holds another U.S. Senator had placed on foreign military financing— supported the strong inference that Menendez had promised that he would not perform the official act of imposing holds on that financing for those same reasons. (GX A403 ("I write to *respond to some of the issues* that have been raised by [Senator-1] and others, which have lead [sic] to *a hold on $300 million dollars* in appropriated aid to Egypt." (emphases added)).) In this context, the jury could also have reasonably interpreted Menendez's offers of information about other arms transfers (*see* GX C206-1 (Hana passing information regarding small arms ban to Egypt following meeting with Menendez)) as evidence of additional promises of official acts. *See also United States v. Menendez*, 759 F. Supp. 3d 460, 479-80 & n.4 (S.D.N.Y. 2024).[4]

---

[4] Contrary to the defendant's claims (Mem. 28), these promises clearly related to the concrete and focused questions or matters of foreign military sales and foreign military financing to Egypt. *See Silver*, 948 F.3d at 570 (a rational jury would have found a *quid pro quo* "to influence a *particular matter*, namely *the relevant tax abatement and rent stabilization programs*" (first emphasis in original)).

The defendant's and Menendez's promises and attempts to influence the official position of the U.S. Department of Agriculture ("USDA") on an important matter of foreign relations, which also affected U.S. businesses, were also promises and attempts to perform an official act. The evidence at trial showed that the USDA, in corresponding with Egypt regarding the halal certification monopoly it granted to Hana, was engaged in "the official diplomatic relations of the United States" with another government. (Tr. 1027; *see also, e.g.*, Tr. 1049-50.) This involved the formulation of an official position of the United States, which was arrived at through an interagency process within the Executive Branch and was adopted by the chargé d'affaires at the U.S. Embassy in Cairo, who was the most senior official at the Embassy and the representative of the President. (Tr. 286-88, 361.)

These formal acts of diplomacy—which are precisely what the defendant and Menendez agreed to and did seek to influence—are clearly official acts of the Executive Branch through the USDA, particularly given the need for "the Nation" to speak "with one voice" on foreign policy matters. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015); *see also id.* (holding unconstitutional Congressional requirement that the Executive make a statement in a passport, even one that "would not itself constitute a formal act of recognition," because it would conflict with the Executive's exclusive authority to recognize foreign governments, and noting that a passport is "addressed to foreign powers" (internal quotation marks omitted)); *Biden v. Texas*, 597 U.S. 785, 805 (2022) ("Article II of the Constitution authorizes the Executive to engage in direct diplomacy with foreign heads of state and their ministers." (internal quotation marks and brackets omitted)). Under Secretary of Agriculture Ted McKinney's articulation and effectuation of the position of the United States in diplomacy was within the "specific duties" conferred on McKinney

12

"by the authority of his office." *McDonnell*, 579 U.S. at 570. (*See, e.g.*, Tr. 1030 ("Q. In the course of your duties as undersecretary, did you ever try to influence a decision made by a foreign government? A. Yes, that was my job."); *see generally, e.g.*, Tr. 1030-32, 1038-40, 1049-50); *see also Menendez*, 759 F. Supp. 3d at 480-81.

Indeed, although it would be sufficient if the evidence showed only that the defendant and Menendez *agreed or promised* to attempt to influence the official position of the Executive Branch regarding the halal certification monopoly through advice or pressure, but did not actually try to do so, Menendez in fact took actions that are precisely the sort of pressure or advice contemplated by the Supreme Court in *McDonnell*. The fact that Menendez was not an executive branch official did not prevent him from being able to attempt (much less promise or agree) to advise or exert pressure over McKinney. *See, e.g.*, *Mangano*, 128 F.4th at 476 (rejecting defense argument that "if one public official has no formal or official relationship with another, he essentially acts as a private party in advising or seeking to 'pressure' the other official"); *Carson*, 464 F.2d at 433; *Lee*, 919 F.3d at 352.

Although the defendant now attempts to recharacterize Menendez's call to McKinney—a call the defendant helped to arrange and prepare Menendez for (*see, e.g.*, GX 1352 rows 624-47)—as a routine matter that did not involve any pressure or the use of Menendez's official position (Mem. 26-27), the jury was entitled to disagree. *See, e.g.*, *United States v. Burke*, No. 19 Cr. 322 (VMK), 2024 WL 3090277, at *16 (N.D. Ill. June 21, 2024) ("[The defendant's] attempt to characterize his conduct as a 'permissible constituent referral,' is a thinly veiled challenge to the jury's findings of his corrupt intent."). The jury could easily infer that the nature, circumstances, and context of Menendez's call showed an attempt to use his official position to apply pressure,

13

or, at the very least, that he had promised those paying him and the defendant that he would seek to apply such pressure, of which the call was the start. *See, e.g.*, *id.* ("[W]hen the longest-serving alderman and Chairman of the Committee on Finance asks a city official to 'look into' a pending permit, the request is not taken lightly. The trial evidence supports the reasonable inference that [the defendant] knew or intended his call to sway the permit evaluation in his favor."); *Gilbert*, 2018 WL 2095853, at *5 (rejecting argument that a state legislator did not commit an official act because he "did not 'threaten to hold an oversight hearing or withhold agency funding unless the state agencies did what he wanted'" (internal quotation marks omitted)). Indeed, McKinney understood that, because of Menendez's committee leadership position, "for him to call and give that order, or that directive, meant something." (Tr. 1063; *see also id.* ("Even though the Senate agriculture committee had primacy over all ag issues, the Senate foreign affairs committee has broad scope on anything going on [] in the foreign affairs world, and that would include Egypt. So for him to call and give that order, or that directive, meant something."); *see also Menendez*, 759 F. Supp. 3d at 480-81.)

The evidence showed that Menendez's call attempting to pressure McKinney to reverse the federal government's stance was not only striking and memorable to McKinney, but also in fact unique in his experience. (*See, e.g.*, Tr. 1116 (McKinney testifying this was the "first and only" time a Member of Congress had told him to change his position without listening to his explanation for his position).) Indeed, in a reflection of the pressure Menendez was attempting to apply, McKinney felt the need to reassure his professional staff that he supported them, the only time he had *ever* needed to do so after a call from a Member of Congress. (GX 8B-12; Tr. 1069-70.) While there is no requirement that an official act be unusual, *see, e.g.*, *Omni Outdoor Advert.*,

499 U.S. at 378, exactly this sort of evidence about the unusual nature of a politician's contact with an executive official has been held to support an inference of an attempt to exert pressure. *See, e.g.*, *Lee*, 919 F.3d at 357 (holding evidence supported an official act through an attempt to pressure a prosecutor where the prosecutor testified that city council member "had never contacted her in such a way regarding other cases" (internal quotation marks omitted)); *see also United States v. Reichberg*, 5 F.4th 233, 249 n.70 (2d Cir. 2021) (citing *id.* as example of official act).

> b)    The Evidence Established a Corrupt *Quid Pro Quo*

The evidence also overwhelming proved a corrupt *quid pro quo*, making out bribery offenses under multiple statutes, arising out of the defendant's and Menendez's agreement, promises, and attempts to take official acts related to Egypt.

The jury heard extensive evidence of a timeline that showed a corrupt *quid pro quo* exchange involving bribery. Contrary to the defendant's claim of a mere after-the-fact gratuity (Mem. 34-35)—a factual argument that she barely advanced at trial, and did not raise in those terms—the evidence amply showed that the payments Hana would eventually cause his halal company to make to the defendant were in fulfillment of promises he had made to her far earlier, and well in advance of the official acts by Menendez (although there is no legal requirement that payment precede action, *see, e.g.*, *United States v. Snyder*, 603 U.S. 1, 19 (2024) ("the timing of the agreement is the key, not the timing of the payment")).

The evidence showed that Menendez was aware, far in advance of any of the promised or performed official acts, that the defendant was expecting and/or promised payment. (*See, e.g.*, GX B105-3 (April 6, 2018 message from the defendant to Hana claiming she would ask Menendez about "the two deals"); GX B102-A (May 28, 2018 email from the defendant asking Menendez to

15

edit ghostwritten letter because Hana and an Egyptian general had gotten her "clearance for a project"); GX A101-19 (January 30, 2019 text from Menendez advising the defendant before meeting at Egyptian embassy related to the defendant and Hana doing business with Egyptian government).)  Indeed, these messages made clear that Hana had been promising a paycheck for the defendant for a year, dating back to March 2018—*i.e.*, the time of the first meeting the defendant arranged between Menendez and the Egyptian defense attaché, Major General Khalid Shawky.  (*See, e.g.*, GX B221-1 (March 26, 2019 text from the defendant to Howard Dorian complaining about "a year of broken promises by Will to me," claiming she had "kept every promise to Will," and stating, "I am willing to give 100% and make sure this goes skyhigh on condition that I start getting my $ 2500/week"); GX F102 (April 2, 2019 text from Dorian telling Nader Moussa, "[I]t's really important that we make sure Nadine stays happy because if she's not she's going to cancel the meetings that Wael has set up with Senator Menendez").)  The text and voice messages between the defendant and Menendez make clear that Menendez was aware, at the time, that Hana had promised the defendant a job through the halal company and had not made the promised payments.  (*See, e.g.*, GX A101-27 (April 8, 2019 text from the defendant to Menendez stating, "Seems like halal went through.   It might be a fantastic 2019 all the way around"); GX A105-D (March 27, 2019 voicemail from the defendant telling Menendez, during period of Hana nonpayment, that she was not arranging a dinner for Hana).)  *See also Menendez*, 759 F. Supp. 3d at 481-84.

Menendez was also deeply involved in the defendant's efforts to receive bribe payments in the form of a supposed paycheck to the defendant's supposed consulting company.  His efforts included getting her a lawyer to set up her company (*see, e.g.*, GX A101-36 (Menendez: "No he

is the lawyer setting up your company")), advising her on how to get a form consulting contract (*see, e.g.*, GX A101-50 (Menendez: "Look under Legal Zoom for contract")), and corresponding with her about anticipated checks either from Hana or Daibes (*see, e.g.*, GX A101-40 (defendant: "[Daibes's romantic partner] is going away tomorrow through Monday. So I don't know if the check is coming from them or from Will?"); GX A101-48 (Menendez advising the defendant what to say "when you call Fred [Daibes] to give him your company name")).

Underscoring their corrupt agreement, both the defendant and Menendez were aware of the three $10,000 bribe checks, all of which were deposited into the defendant's bank account. (*See* GX 1343.) The evidence showed Menendez personally received the first check from Daibes on August 30, 2019. (*See, e.g.*, GX D207-2 (Daibes to Hana on August 30, 2019: "Meeting went well"); GX D102-10 (Daibes: "Nadine I personally gave Bob a check for September").) Menendez fielded the defendant's complaints about Hana's tardy payment of the second check and advised her not to put anything in writing to Daibes about it. (*See, e.g.*, GX A109-A (defendant: "I really want my check"); GX A101-55 (defendant: "Please let me know if I should text Fred"; Menendez: "No, you should not text or email.").) And Menendez received an offer from Daibes to hand deliver the third check. (GX D101-2 ("When will you be back. I have the envelope for Nadine").)

Though Menendez may initially not have been aware of the foreclosure on the defendant's house, the foregoing evidence more than adequately demonstrates that he was aware that she was expecting payment from Hana—particularly when all inferences are drawn in the Government's favor, as they must be in evaluating the defendant's motion. Moreover, in the message in which the defendant explained to Daibes that she had not told Menendez of the foreclosure as of June 2019, she explained that she had not done so because Menendez would be angry that Hana had not

17

paid her—*i.e.*, supporting the inference that Menendez was fully aware of Hana's promises to pay, and simply had not known of the specific need the defendant had for immediate funds. (*See* GX D108-A ("I have not told Bob yet, because he is going to flip out against Will. Um, but, um, my mortgage, I haven't paid it, and I had been counting on the money that Will's giving me to do it, and he hasn't given me anything yet.").) In any event, the defendant shortly thereafter informed Menendez about the pending payment (*see, e.g.*, GX D108-A (defendant to Daibes: "So, um, I will tell Bob on Friday"); GX A101-46 (defendant to Menendez: "I double checked about the payments")), leading him to follow up with her in July 2019 to ensure that she in turn asked Daibes to induce Hana to pay (GX D110-A (defendant to Daibes: "Bob [] called me today to find out if everything's been taken care of . . . Bob insisted on me letting you know. I'm sorry again to bother you. But [] he said that it was important to let you know."), which resulted in Hana paying promptly (GX 5C-200; *see also* GX 1352 rows 885, 893-95). Indeed, the defendant ultimately deducted the payment made to the mortgage company from the halal paychecks she felt were due (GX D102-C), which is clear evidence that the mortgage payment was not some type of after-the-fact gratuity, but was instead made in partial satisfaction of Hana's corrupt promises of a supposed paycheck. Given that, among other things, these promises dated back long before the official acts Menendez promised and took, the evidence was more than sufficient to allow the jury to infer that the payments were bribes. *See also Menendez*, 759 F. Supp. 3d at 484-85.

The timing also strongly demonstrates that Menendez was influenced by Hana's promises of payment to the defendant. At the defendant's request, Menendez ghostwrote a letter for the Egyptian government—responding to human rights concerns his own fellow Senators had raised as grounds for withholding hundreds of millions of dollars of aid to Egypt—the very day that the

defendant said that she had gotten, from Hana and an Egyptian general, so-called "clearance for a project." (GX B102-A; GX A403.) And Menendez's promises to approve a foreign military sale took place during the same period in which Hana was promising supposed employment for the defendant. (*See, e.g.*, GX B221-1 (defendant complaining of "year of broken promises" in March 2019).)

Similarly, Menendez's contacts with McKinney took place not only after a year of such promises, but also just weeks after the defendant informed Menendez that Hana would receive the halal monopoly (GX A101-27 ("Seems like halal went through. It might be a fantastic 2019 all the way around")), and almost immediately after the defendant passed along Hana's requests to him. (*See, e.g.*, GX C102-6 (May 23, 2019: Hana sending defendant link to article), GX C501 (May 23, 2019: Hana sending defendant translation of article); GX A404 (May 23, 2019: defendant sending Menendez link to same article); GX 8B-16 (May 23, 2019: Menendez staffer sending McKinney linked article and translation); GX 8B-10 (May 23, 2019: McKinney reporting to USDA official, "I took a call from Senator Menendez")). Shortly thereafter, Hana listed the defendant as vice president of his halal company with a $120,000 salary (*i.e.*, $10,000 per month), which would render her his second-highest paid employee, despite her lack of relevant experience and the fact that it was a no-show or low-show job with no real role. (GX C104-4; *see also, e.g.*, Tr. 461 (IS EG attorney John Moldovan testifying he was unaware of any work defendant did); Tr. 1148 (IS EG office manager Jamela Maali testifying she was unaware of any work defendant did); Tr. 2737-38 (Hana assistant Meirna Hanna testifying she was unaware of any work defendant did).)

19

Contrary to the defendant's suggestion (Mem. 32-33), evidence of the timing of payments and of actions taken by a public official can—and often does—support a jury's finding of corrupt intent.  *See, e.g.*, *Silver*, 948 F.3d at 571 (relying on timing of events to conclude that properly instructed jury would have found requisite *quid pro quo*); *United States v. Bruno*, 661 F.3d 733, 745 (2d Cir. 2011) ("The government's evidence of the timing of the payments in relation to the actions taken by [the public official] could also be accepted by a rational jury in support of the conclusion that [the official] understood that the consulting payments were made in return for official action."); *see also United States v. Friedman*, 854 F.2d 535, 554 (2d Cir. 1988) ("[E]vidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions. . . . As a result, a jury can in such cases infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt.").

Such evidence of the timing of key actions can *by itself* be sufficient to support a jury's verdict.  *See, e.g.*, *United States v. Calk*, No. 19 Cr. 366 (LGS), 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022) ("The timing and circumstances of each loan was sufficient for the jury to infer [the defendant]'s corrupt intent."); *United States v. Calk*, 87 F.4th 164, 182 (2d Cir. 2023) (affirming sufficiency of the evidence of corrupt intent); *see also, e.g.*, *Silver*, 948 F.3d at 557 n.10 ("[I]n some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient.").  This is logical, as "bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo."  *Silver*, 948 F.3d at 557 n.10; *see also, e.g.*, *United States v. Wright*, 665 F.3d 560, 569 (3d Cir. 2012) ("Parties to a bribery scheme rarely reduce their intent to words, but the law does not require that.").  Indeed, the Second Circuit has

expressly held that the timing of a series of calls and text messages was itself sufficient to sustain a bribery conviction. *See Reichberg*, 5 F.4th at 249 (the defendant's "efforts on behalf of one individual in particular leave us with no doubt that this jury's verdict was reasonable and supported by the evidence," reciting timeline of calls and text messages).

Moreover, although timing alone can be sufficient evidence of a corrupt *quid pro quo*, in this case there was far more. The nature and solicitousness of the favorable treatment that the defendant and Menendez provided and offered was also powerful evidence of the *quid pro quo*. *See, e.g.*, *Burke*, 2024 WL 3090277, at *16 ("Viewed holistically, a reasonable jury could infer that [the defendant's] actions were not taken out of the goodness of his heart. The pole sign was not in [the defendant's] ward nor was [the bribe-payor] his constituent."). And although even promising or taking routine actions in exchange for things of value can constitute a bribery offense, the defendant's and Menendez's promises and actions were not routine. Menendez's promise to approve tank ammunition was a promise to do so unusually swiftly (Tr. 516-17 ("extremely unusual" for foreign military sales to clear in allotted time)), and was immediately recognized as special treatment by Hana and the Egyptian defense attaché, who began discussing who should get credit for it. (*See, e.g.*, GX C206-7 (Shawky receiving forwarded substance of message and responding with three thumbs-up emojis); GX C206-4T (Hana to Shawky: "The people should repay the kindness" and Shawky to Hana: "the contract owner should send their greetings").) As noted above, Menendez's call was unique in McKinney's experience (Tr. 1069-70, 1116)—and was also contrary to what Menendez's Senate website told the world he would and would not do for his constituents (*see* GX 10G-7 (Menendez website publicly stating that his office cannot overturn or influence matters involving private businesses)). This pattern of favorable treatment

21

towards a person who provided things of value can sustain a jury's verdict. *See, e.g.*, *United States v. Hills*, 27 F.4th 1155, 1176-77 (6th Cir. 2022) (listing evidence of favorable treatment including defendant's intervention in a dental residency selection, holding that "[t]he jury could reasonably conclude that [the defendant] was given something of value in return for a promise to intervene when necessary in the resident selection process"); *see also, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury may infer guilt from evidence of benefits received and subsequent favorable treatment[.]" (internal quotation marks omitted)).

Similarly, the nature of the things of value, and particularly the fraudulent nature of the defendant's supposed employment, further support the inference of a corrupt *quid pro quo*. *See, e.g.*, *Hills*, 27 F.4th at 1176 (holding evidence sufficient where defendant was "given envelopes containing thousands of dollars of cash" at expensive dinners with bribe-payors); *see, e.g.*, *id.* at 1175-76 ("Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim."). The defendant made Menendez, Hana, and Daibes all well aware that she was expecting to get paid for her previous acts (*i.e.*, her role in arranging Menendez's actions and promises) and not for any real work. Indeed, the defendant left Daibes a voice message expressing incredulity at Hana's demand, at the time, that she actually be present in IS EG Halal's offices. (*See, e.g.*, GX D108-A (defendant: "[Hana] said that he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day").)[5]

_____

[5] Although even a real full-time job can be a bribe, the jury was easily entitled to infer, from the context, timing, and surrounding circumstances, that Hana was telling the defendant to come into the office because (after having gotten and retained his monopoly with Menendez's assistance) he

The jury also heard ample evidence from which it could infer consciousness of guilt (although no such evidence is legally required). The jury heard evidence that the defendant did not list the three $10,000 checks on her federal tax return for 2019. (Tr. 1804-05 (testimony of Victoria Hernandez, Internal Revenue Service employee); GX 2436). The jury learned that Menendez's public financial disclosure forms falsely reported gold as having been provided by the defendant's family prior to their 2020 marriage, rather than provided by Daibes directly to Menendez in 2021. (*Compare, e.g.*, GX 10E-6 (financial disclosure form) *with* GX A125 (web search for price of kilo of gold) *and* GX 16C-2 at 16 (showing defendant, Menendez, and Daibes together immediately before web search).)

Beyond the direct lies, there was also ample evidence from which the jury could infer that the defendant and her coconspirators referred to each other in code or took other steps to limit the paper trail generated by their actions. (GX A101-55 (Menendez to defendant: "No, you should not text or email."); GX D109-A (defendant to Daibes: "I just got a phone call asking me to give you a call"); GX D207-2 (Daibes to Hana: "Our friend would like to have dinner on Thursday night.").) Such evidence of consciousness of guilt strongly supports the jury's finding of a bribery scheme. *See, e.g.*, *United States v. Zheng*, 113 F.4th 280, 296 n.5 (2d Cir. 2024) ("A jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct.");

---

was looking for an excuse not to follow through on his promises of bribe payments to her, not that he actually expected her to perform office work in an arm's length employment relationship. Further supporting the jury's inference of a corrupt bribe scheme, the defendant also accepted multiple other valuables from Hana, including an approximately $2,700 elliptical purchased through the halal company (GX 3C-11; GX 1F-1015), an almost $500 air purifier also purchased through the halal company (GX 7N-2; GX 1F-1087), and seven one-ounce gold bars worth over $12,000 (GX 1F-1209, GX B201-1A, GX B201-17).

*see also, e.g.*, *Bruno*, 661 F.3d at 744 (jury may "infer guilt from . . . behavior indicating consciousness of guilt" (internal quotation marks omitted)).

> 2.    *The Evidence Proved a Corrupt* Quid Pro Quo *Related to the New Jersey State Criminal Matters*

> > a)    <u>The Evidence Established Official Acts</u>

The evidence also overwhelmingly proved that the defendant and Menendez agreed, promised, and attempted to have Menendez take official acts to influence two New Jersey state criminal matters.  Decisions concerning the disposition of criminal cases and investigations are "the sort of specific, formal exercises of government power that can constitute official acts." *Reichberg*, 5 F.4th at 249; *see also id.* ("making an arrest, and then making a decision about whether to issue a desk appearance ticket to the arrestee" was an official act).

And again, although the defendant's and Menendez's agreement and promise alone would be sufficient, Menendez's actual attempts to pressure then-New Jersey Attorney General Gurbir Grewal to influence these matters are paradigmatic examples of how a public official may "make a decision or take an action on a question, matter, cause, suit, proceeding or controversy by using his official position to exert pressure on *another* official to perform an official act," or by "advis[ing]" the other official to do so.  *McDonnell*, 579 U.S. at 572 (internal quotation marks omitted) (emphasis in original).  Contrary to the apparent arguments of the defendant (*see* Mem. 28-29), there is no requirement that an attempt to exert pressure use any particular wording or, indeed, that any direct evidence be presented regarding a communication during which pressure is exerted or attempted.  For example, the Second Circuit has held that the evidence of an official act was sufficient just based on the timing of calls and text messages, without any direct evidence of the content of the phone call during which the bribe recipient exerted pressure on another police

24

officer. *See Reichberg*, 5 F.4th at 249 ("The first arrest-and-release was on February 16, 2014. [The defendant] texted [the bribe recipient] 'Eddie Sankari' and '78pct,' and one minute later [the bribe recipient] turned around and called the 78th Precinct, where Sankari was being held, setting in motion Sankari's release.").

Indeed, it is a question of fact for a jury whether an official who explicitly *disclaims* any intent to apply pressure was nonetheless actually attempting to do so. In *Lee*, the Sixth Circuit considered the case of a city council member who called the city's chief prosecutor to inquire about a case, and who stated, "I'm not trying to influence you, you can't say I'm trying to influence you. I'm trying to make you think. That's all I'm trying to do; just trying to make you think." 919 F.3d at 344. The court in *Lee* upheld the conviction, holding that "a juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor." *Id.* at 357; *see also Reichberg*, 5 F.4th at 249 n.70 (Second Circuit citing *Lee* with approval as example of official act). Other contextual information, including the prosecutor's experience that the defendant "had never contacted her in such a way regarding other cases," *Lee*, 919 F.3d at 357 (internal quotation marks omitted)), further supported the jury's finding of an official act.

The evidence at trial amply proved that Menendez attempted to perform an official act by pressuring or advising Grewal. Grewal testified that Menendez—far from disclaiming any attempt to influence Grewal—claimed that the criminal matters involved selective prosecution, which would, if true, have been a potential basis for dismissal. (*See, e.g.*, Tr. 1396-97, 1405-06, 1412.) Although Grewal did not personally feel pressured, his testimony shows that he understood the nature of this contact as inherently involving attempted pressure, insofar as he shielded his team

25

by refusing to pass on even the mere fact of the inquiry. (Tr. 1398 (Grewal testifying that he did not inform line prosecutors of Menendez's call because "I don't want them to feel like they're being pressured in any way"); Tr. 1415 (Grewal: "I didn't want to go making phone calls to supervisors or anybody else in the insurance fraud prosecutor's office relating that the senator was inquiring about a matter that they were handling and had concerns about it. Because I think that would have had the same effect that I was trying to avoid, any sort of chilling effect on the investigators and attorneys handling the matter."); Tr. 1415-16 (Grewal: "I don't want people to start second-guessing and doing things differently than they would do in the ordinary course because there was scrutiny on a matter from someone who happened to be the senior senator for the state of New Jersey.").)[6] And—just as in *Lee*, and as with McKinney—these were the only such contacts that Menendez had with Grewal. (*Compare* Tr. 1416 (Grewal testifying that these contacts were the only time Menendez raised a concern with a particular criminal case) *with Lee*, 919 F.3d at 357 (relying on prosecutor's testimony that defendant "had never contacted her in such a way regarding other cases").) *See also Menendez*, 759 F. Supp. 3d at 486-87.

The fact that Menendez did not have formal authority over a state prosecutor, similarly, does not, contrary to the defendant's arguments (Mem. 29), prevent Menendez from attempting to commit an official act by pressuring or advising him. Indeed, the law in this area is well-settled. *See, e.g.*, *Mangano*, 128 F.4th at 456-57, 477 (affirming conviction based on "clear evidence" of

---

[6] The fact, stressed by the defendant, that Menendez did not mention the names of the cases in which he wanted Grewal to intervene (Mem. 28-29) is hardly exculpatory, given, among other things, that Grewal actively prevented the conversation from getting to that point. (*See* Tr. 1422 ("Q. . . . [H]e never told you what particular defendant, right? A. Right, because I stopped the conversation or shifted it.").)

defendant pressuring other officials despite not having official supervisory authority over them or making overt threats); *Biaggi*, 853 F.2d at 98-99 (affirming conviction of congressman for attempts to influence city officials); *United States v. Kimbrew*, 944 F.3d 810, 814-15 (9th Cir. 2019) (affirming Section 201 conviction of aide to congresswoman for accepting bribes in exchange for promises to pressure city employees, and explaining, *inter alia*, "[t]he bribe recipient need not be the final decisionmaker"), *cert. denied*, 141 S. Ct. 400 (2020); *Lee*, 919 F.3d at 352 (rejecting argument that "an official can only 'exert pressure' on a second official if the first official has 'leverage or power' over the second official"); *United States v. Skelos*, 707 F. App'x 733, 739 (2d Cir. 2017) ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*."); *United States v. Boyland*, 862 F.3d 279, 292 (2d Cir. 2017) (affirming conviction of state assemblyman for taking bribes in exchange for helping secure permits from city agencies"); *see also, e.g.*, *Menendez*, 759 F. Supp. 3d at 487-88.

Of course, all of the foregoing leaves aside the defendant's and Menendez's promises to Jose Uribe and Hana, which are independent grounds for criminal liability that rendered the defendant and Menendez guilty even *before*—and regardless of whether—Menendez actually made contact with Grewal. *See, e.g.*, *Evans*, 504 U.S. at 268 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform specific official acts; fulfillment of the *quid pro quo* is not an element of the offense."); *Hood*, 343 U.S. at 151. These promises were amply established through the testimony of Uribe as well as the contemporaneous documentary evidence. (*See, e.g.*, Tr. 1620-21 (Uribe testifying that he asked

27

Menendez to "use any power and influence he got to stop this investigation" and Menendez said he would "look into it"); GX B209-22 (defendant: "[Menendez] said it would've been so so easy if we had wrapped both together.").)

b)    The Evidence Established a Corrupt *Quid Pro Quo*

The evidence at trial also provided ample proof of a corrupt *quid pro quo*. The timeline of events surrounding Menendez's contacts with Grewal alone provided overwhelming proof of the defendant's and Menendez's corrupt agreement with Hana, Uribe, and others.

The jury heard evidence that, in January 2019, Menendez promised and attempted to influence Grewal concerning the criminal prosecution of Elvis Parra in exchange for a luxury Mercedes-Benz convertible (the "Mercedes-Benz Convertible"). That month, in quick succession, the defendant complained to Hana about her lack of a car (*see, e.g.*, GX B105-31); Menendez performed web searches to ascertain the cost of a Mercedes C300 (*i.e.*, the make and model of the Mercedes-Benz Convertible) (GX A301-12); and Menendez, through the defendant, invited Hana and Uribe to a planning meeting (*see, e.g.*, GX E102-3 (Hana to Uribe: "bob he want have dinner with us tonight")).

Following these steps, the timeline of communications in the next several days alone establishes the defendant's and Menendez's corrupt intent surrounding Menendez's call to Grewal. After that dinner, on January 29, 2019, Menendez contacted the defendant to request basic identifying details about Parra's case (but, notably, *not* any evidence of discrimination or any other grounds for intervention into that case), which the defendant in turn requested from Hana in an urgent series of calls and text messages. (*See, e.g.*, GX 6A-312-1 (Menendez call to defendant); GX 6A-112 (defendant calls to Hana); GX C115-3 (Hana WhatsApp messages with Parra);

GX B105-32 (defendant texts with Hana).)  After the defendant reported back to Menendez, Menendez called Grewal.  (*See, e.g.*, GX 6A-206-1, GX 6B-2401.)  Just days after Menendez's call to Grewal, Hana asked Daibes to pay for a car for the defendant (*see* GX C209-2 (Hana to Daibes, February 1, 2019: "can you please help naden with car . are Expense ."); GX C209-3 (Hana to Daibes, February 7, 2019: "can you please help naden with car .")), who for her part expected to receive a new car, as she acknowledged to Uribe (*see, e.g.*, GX B105-34 (defendant to Hana, February 3, 2019: "All is GREAT! I'm so excited to get a car next week. !!"); Tr. 1517-18 (Uribe testifying that the defendant told him that Hana had promised her a car); *see also* Tr. 1518 (Uribe testifying that Hana told him that "from the proceeds from the money he was going to get from Bien Hernandez and Elvis when the deal is complete, that he was going to buy Nadine a car.").) This sequence alone provides powerful evidence of the defendant's and Menendez's corrupt intent. *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding timing of communications supported inference of official act); *Silver*, 948 F.3d at 557 n.10 ("[I]n some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient."); *Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan was sufficient for the jury to infer [the defendant]'s corrupt intent."), *aff'd*, 87 F.4th at 182; *see also Menendez*, 759 F. Supp. 3d at 488-90.

Moreover, the defendant's and Menendez's corrupt agreement continued after the January 2019 contact with Grewal.  Although Uribe eventually provided the cash for the down payment and made periodic payments for the Mercedes-Benz Convertible, Hana was deeply involved in Uribe's provision of the car.  Uribe was on the phone with Hana when he first texted the defendant the contact information for the Mercedes dealership.  (GX 6D-102-6; GX B209-13; GX B209-L.) Indeed, the evidence showed that Hana offered to assist with the purchase; the defendant told

Menendez she had doubts that Hana would "step up and do anything" as promised and provide the car (GX A105-D), but she expected him to accompany her to the Mercedes-Benz dealership (GX B215 ("Will was supposed to take me to Edison today")). Indeed, in a telling indication that Hana had promised to provide the car, the defendant told Uribe that she had been waiting on Hana in order to move forward with the purchase, explaining "I didn't want him [*i.e.*, Hana] to think I was *going behind his back*." (GX B209-13 (emphasis added).)

But even beyond Hana's coordination with Uribe on the provision of the Mercedes-Benz Convertible, the evidence showed that Hana actually funded part of the price of this car. The jury heard evidence that Hana received cash from Parra and Parra's business partner Bienvenido Hernandez in exchange for Menendez's and the defendant's promises to influence Parra's case, and that Hana then gave Uribe some of the cash to reimburse Uribe for paying for the Mercedes-Benz Convertible—*i.e.*, to reimburse him for some of the bribe payments Uribe was making. (*See* Tr. 1596-97.)

Moreover, the jury was entitled to rely on the testimony presented regarding Menendez's and Hana's corrupt promises. Contrary to the defendant's claims that the evidence did not show that Menendez knew about the car payment (Mem. 35-36), the jury was entitled to credit, in addition to Menendez's telltale sequence of actions, Uribe's understanding that Menendez was aware of Uribe's payment for the car (*see* Tr. 1624 (Uribe: "I never had in my mind a doubt that the senator knew I was the person making the payments on the car."); *see also id.* (Uribe explaining his observations of defendant's and Menendez's behavior giving rise to this understanding)), as well as his testimony that—despite arranging multiple meetings between Uribe and Menendez

30

where the topic could very naturally have come up—the defendant never told Uribe not to tell Menendez that Uribe was making those payments (Tr. 1625, 1647, 1656).

The extensive evidence of the timing of the defendant's and Menendez's solicitous responses to Uribe's demands for intervention into the investigation involving Ana Peguero also show Menendez's awareness of the payment and participation, with the defendant, in the corrupt *quid pro quo*. On August 1, 2019, the day after the defendant met with Uribe, Uribe texted her about the investigation, stating that he wanted to "make things go away," "move fast," and "stop this," and the defendant assured him she would address it promptly "depending on when he is home," referring to Menendez. (*See* GX B209-22 (defendant texts with Uribe).) After Menendez met with the defendant that night, he then Googled the initials of the agency conducting the investigation. (GX A301-14.) A month later, when no intervention had been forthcoming, Uribe texted the defendant a near-explicit *quid pro quo*, writing on September 3, 2019, "Please don't forget about me. I will never forget about you," and emphasizing, "I need peace." (GX B209-23; *see also* Tr. 1639:12-14 ("Q. What did you mean by 'I need peace'? A. I needed this investigation to be stop and finish so I can get peace for myself and my family.").) Menendez was clearly informed about this *quid pro quo*, as the very next day he called Grewal (the first time Menendez had contacted Grewal since his January 2019 intervention related to Parra's case) to schedule an in-person meeting. (GX 6A-206-2.)

Menendez's statements to Uribe after meeting with Grewal further show his and the defendant's awareness of the corrupt *quid pro quo*. After the meeting, Menendez met with Uribe as arranged by the defendant, and falsely encouraged Uribe, claiming the meeting with Grewal had been positive (Tr. 1652-55; GX E109-2), and several weeks later—upon learning that Uribe

31

was going to keep following up with the defendant until he got "peace"—Menendez called Uribe and falsely claimed that the matter had been resolved (Tr. 1657-58; GX B209-24; GX 6D-102-12).  In fact, Grewal had not said anything encouraging to Menendez, but had instead told Menendez that he could not discuss the case.  (*See, e.g.*, Tr. 1406 (Grewal: "I can't speak to you about this matter.").)  Menendez's willingness to lie to Uribe was powerful proof that he was motivated to keep Uribe happy so Uribe would keep paying for the car—a motivation that necessarily implies Menendez's awareness that Uribe was paying for the car.  *See also Menendez*, 759 F. Supp. 3d at 490.  Without such an awareness, Menendez's actions, and this lie, simply make no sense—and the jury was entitled so to find.

The jury also heard evidence that Menendez's call to Grewal was special treatment, deviating sharply from his claims to the public on his website that he would not (and purportedly could not) involve himself in criminal matters.  (*See* GX 10G-7 ("Our Senate office cannot legally get involved with pending litigation, including questions about criminal trials or imprisonment.").)  Similarly, the jury was presented with evidence of concealment from which it could infer consciousness of guilt, such as the defendant's lies to Mercedes-Benz Financial Services about her job and income to conceal Uribe's payment for the car (GX 2436, GX 7E-1); the defendant's use of coded language when describing to Menendez Uribe's provision of the cash for the down payment (GX A105-E (defendant telling Menendez she would be taken to "meet Jose for five minutes")); Menendez keeping his meeting with Grewal off his calendar (GX 3A-9); Menendez's omission of the car payments from his financial disclosure forms (GXs 10E-5, 10E-6, 10E-7); and the defendant's acting as a deniable go-between to provide Menendez with information about Parra's case from Hana (*see, e.g.*, GX B105-32).  Indeed, the defendant's and Menendez's

participation in a series of repayments intended to characterize the car payments as a loan (GX 3B-1-EM)—a false cover-up story that the defendant and Uribe agreed to after being served with federal grand jury subpoenas (Tr. 1677-78)—further shows her and Menendez's consciousness of guilt regarding this bribe.  All of this evidence is more than sufficient to support the jury's verdict. *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[A] jury can . . . infer guilt from evidence of benefits received and subsequent favorable treatment, as well as from behavior indicating consciousness of guilt." (internal quotation marks omitted)).

> 3.    *The Evidence Proved a Corrupt* Quid Pro Quo *Related to Daibes's Federal Prosecution*

> a)    The Evidence Established Official Acts

The evidence at trial also overwhelmingly proved that Menendez and the defendant accepted cash and gold from Daibes in exchange for promised and attempted official acts to influence Daibes's pending federal prosecution.  The jury could readily conclude that each of these promised, attempted, or requested actions amounted to an official act.  Menendez's attempt to influence who would be appointed as the District of New Jersey's U.S. Attorney was plainly an official act under the law.  *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding that decisions promoting or transferring a police officer are "the sort of specific, formal exercises of government power that can constitute official acts"); *see also Menendez*, 759 F. Supp. 3d at 491-92.

Similarly, promises or attempts by Menendez to influence the New Jersey U.S. Attorney's Office's handling of the Daibes prosecution by contacting the New Jersey U.S. Attorney's Office are also paradigmatic official acts.  *See, e.g.*, *id.* (holding that decisions initiating or regarding specific criminal cases are official acts); *Lee*, 919 F.3d at 344-45 (holding that indictment alleged an official act by state legislator attempting to influence prosecutor regarding specific case).  The

evidence showed that Menendez attempted to do so by asking his outside political advisor Michael Soliman to question Philip Sellinger regarding his recusal and ask him to ensure—despite his recusal—that Daibes receive "all due process." (Tr. 2355-58.)[7]  The evidence also entitled the jury to find that Menendez promised to do so by calling Vikas Khanna, the ultimate supervisor of the case against Daibes, and then immediately calling Daibes to report back after that call. (GX 6A-820-1; GX 6B-1810.)  The timing regarding this sequence of events supported a finding by the jury that the promise was made, notwithstanding that—as in other cases—direct, as opposed to circumstantial, evidence of the content of the phone calls was not presented. *See, e.g.*, *Reichberg*, 5 F.4th at 249 (holding evidence sufficient to prove *quid pro quo* regarding official acts based in part on timing of call to police precinct immediately after relevant text messages).

b)    The Evidence Established a Corrupt *Quid Pro Quo*

As with the conduct regarding Egypt and the New Jersey Attorney General's Office, the jury heard powerful evidence of the timing of Menendez's and the defendant's actions related to the New Jersey U.S. Attorney.  Menendez spoke with Sellinger as the principal candidate for New Jersey U.S. Attorney, brought up Daibes's prosecution (the *only* specific case that Menendez mentioned), and asked Sellinger to personally involve himself in that case if he became U.S. Attorney. (*See* Tr. 2217.)  But when Sellinger informed Menendez he might have to be recused from that prosecution, Menendez *within hours* shifted his support to a different candidate (and one

---

[7] Although every defendant is entitled to due process, Menendez's choice to single out the case of one defendant, which was a case in which Menendez knew Sellinger was forbidden from being involved in any way, entitled the jury to conclude that Menendez was requesting favorable treatment. *See, e.g.*, *Lee*, 919 F.3d at 357 ("[A] juror could easily have heard those words and concluded that they meant the exact opposite—that [the defendant] was, in fact, trying to influence the prosecutor.").

with no federal experience, and who was the subject of negative news stories), Esther Suarez. (*See, e.g.*, GX A119-A; GX A113-PH4; GX 6B-501; GX 1351; Tr. 2306-10.) Then, after Suarez's potential candidacy did not appear likely to be successful, Menendez had Soliman speak to Sellinger, and upon learning that Soliman believed Sellinger would *not* have to be recused from the Daibes prosecution, Menendez promptly reversed himself again and supported Sellinger. (*See, e.g.*, Tr. 2350-51, 2354 (Soliman testifying he told Menendez he believed Sellinger would not have to be recused, and Menendez thereafter recommended Sellinger); *see also* Tr. 2235 (Sellinger testifying that after he spoke to Soliman, Menendez recommended him).) These reversals alone were powerful evidence of Menendez's corrupt agreement with Daibes. *See, e.g.*, *Calk*, 2022 WL 101908, at *2 (relying on defendant's reversals on whether to extend loans in bank bribery case, concluding "[t]he timing and circumstances of each loan was sufficient for the jury to infer [the defendant's] corrupt intent"), *aff'd*, 87 F.4th at 182; *see also Menendez*, 759 F. Supp. 3d at 492-95.

The jury also heard that on or about October 18, 2021, shortly before Sellinger's confirmation, Daibes provided at least one kilogram of gold to Menendez and the defendant at an in-person visit to Menendez's house, as evidenced by multiple contemporaneous electronic records (*see, e.g.*, GX A125 (Menendez search history for "how much is one kilo of gold worth"); D102-1 (text messages showing in-person meeting); GX 16C-2 at 16 (cell site records showing in-person meeting between defendant, Menendez, and Daibes)) together with the serial numbers of the kilogram bars of gold matching Daibes's inventory (*see, e.g.*, GX 1F-1164, GX 1F-1239, GX B201-1A & GX 3D-6). Menendez did not disclose the receipt of this gold in his financial disclosure forms (GX 10E-6), and indeed did not disclose any gold *at all* until February 2022 (*i.e.*,

approximately four months after receiving this gold), at which time he falsely represented to the Senate Ethics Committee counsel that this gold had been given to the defendant prior to his 2020 marriage to her, and that he had only recently learned of it.  (*See, e.g.*, Tr. 2576-77; GX 8K-1.)

In late 2021, after this delivery of gold, the defendant texted Daibes that Menendez was "FIXATED" on Daibes's upcoming trial, and Daibes responded, in part, that Menendez "was amazing in all he did."  (GX D102-2.)  During the next weeks, Menendez and Daibes undertook a series of telling actions, all during a time period in which Menendez repeatedly performed Google searches for the price of a kilogram of gold.  Menendez went on to contact Khanna (the ultimate supervisor of Daibes's prosecution after Sellinger's recusal) and then to immediately thereafter call Daibes.  (GX 6A-820-1; GX 6B-1810.)  On the same day that Menendez made one attempt to call Daibes, Daibes's driver contacted the defendant, prompting her to thank Daibes for "Christmas in January."  (GX D102-11.)  And Menendez also told Soliman to contact Sellinger and ask him to explain why he was recused from the Daibes prosecution—a directive that, for the first time in fifteen years working for Menendez, Soliman declined to follow and falsely told Menendez he had.  (Tr. 2356-57.)  After again seeking unsuccessfully to have Soliman speak to Sellinger about Daibes's case, Menendez eventually retaliated against Sellinger, shunning his investiture ceremony and contacting the other New Jersey Senator, Cory Booker, to try to convince him to do the same.  (*See, e.g.*, Tr. 2248 (Sellinger: "He said, I think I'm going to pass.  The only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship when you don't."); GX A204-2.)

Moreover, although the foregoing was more than sufficient, the jury also heard evidence of the highly suspicious nature and timing of the things of value Daibes provided to the defendant

36

and Menendez. Daibes provided a series of at least ten envelopes of cash to the defendant and Menendez bearing Daibes's fingerprints or return address, containing a total of $82,500. (*See* GX 1338.) Serial number analysis on the cash in these envelopes established that the envelopes all had to have been provided at some point between August 24, 2020 and June 16, 2022—*i.e.*, during the period of the scheme. (*See id.*) In addition to this cash, in total, Daibes provided at least four one-kilogram bars and nine one-ounce gold bars to the defendant and Menendez. (*See, e.g.*, GX 1F-1164, GX 1F-1165, GX 1F-1188, GX 1F-1239, GX B201-1A & GX 3D-6.)

The evidence of these highly probative things of value amply supported the jury's finding of a bribe scheme. *See, e.g.*, *Hills*, 27 F.4th at 1176 (holding that evidence of *quid pro quo* was sufficient where there was evidence that defendant was "given envelopes containing thousands of dollars of cash" at expensive dinners with bribe-payors); *see, e.g.*, *id.* at 1175-76 ("Defendants argued that those things were simply gifts, but the jury had more than an adequate basis to reject that claim.").

Moreover, as with the other portions of the scheme, while not legally necessary, the jury also heard evidence of concealment showing consciousness of guilt. The jury heard evidence that the defendant, in selling two of the one-kilogram gold bars, falsely told Vasken Khorozian that they came from a family member, when in fact they came from Daibes. (*See, e.g.*, Tr. 2155-56 (Khorozian testifying that defendant told him gold bars came from her family); GX B201-1A (photograph from defendant's cellphone of two one-kilogram bars taken shortly before meeting with Khorozian); GX 3D-6 (Daibes inventory listing serial numbers matching pictured kilogram gold bars).) As noted above, Menendez's financial disclosures did not disclose the receipt of the gold bars from Daibes (*see* GX 10E-6), and did not disclose the receipt of any cash in any of the

calendar years in which it could have been provided (*see* GX 10E-5; GX 10E-6; GX 10E-7). All of this provides further support for the jury's verdict under well-settled law. *See, e.g.*, *Zheng*, 113 F.4th at 296 n.5 ("A jury may infer a defendant's knowledge that conduct is wrongful from his efforts to conceal his conduct."); *see also, e.g.*, *Bruno*, 661 F.3d at 744 ("jury may infer guilt from . . . behavior indicating consciousness of guilt" (internal quotation marks omitted)).

### 4.     *The Evidence Proved a Scheme for Menendez to Act as an Agent of Egypt*

The evidence also more than adequately proved that the defendant conspired with Hana, Menendez, and others for Menendez, while a United States Senator, to act as an agent of Egypt by engaging in political activities, acting as a political consultant, representing the interests of Egypt before the U.S. government, and representing and holding himself out as willing to act as an agent of Egypt. Contrary to the defendant's arguments (Mem. 42-45), the evidence that the defendant agreed for Menendez to act at Egypt's request—a request accompanied by the promise and payment of compensation—or at the very least for him to represent that he was willing to do so, was overwhelming.

As an initial matter, the defendant misstates what the Government was required to and did prove at trial. (*See* Mem. 43.)[8] As the jury was instructed without objection from the defendant, the Government was not required to prove any actual request by Egypt, but instead *either* that the object of the conspiracy was for (1) Menendez to act in any one of several capacities including "at the order, request, or under the direction or control" of the foreign principal or its intermediary, *or*

---

[8] The defendant also incorrectly refers to the Section 219 conspiracy as one of multiple "FARA charges." (Mem. 42.) There were no charges brought under the Foreign Agents Registration Act (commonly known as FARA), and the defendant was charged only with a conspiracy to violate Section 219, not a substantive violation.

(2) Menendez to agree, consent, assume, or purport to act as, or to hold himself out as, the foreign principal's agent.  (Tr. 3142.)  The Court instructed the jury that, in this context, a request must be "something more than an ordinary solicitation," and instead must include "some degree of authority" by the principal, such that "the ultimate question, including based on a request, is whether it is fair to draw the conclusion that an individual is not acting independently, such as by simply stating or following his own views, but is instead acting as an agent of the foreign principal."  (Tr. 3143-44.)  The Court instructed the jury that factors that may support such an agency relationship include whether the principal's instructions or requests are "accompanied by the offer or the provision of compensation, evidence of an ongoing relationship or coordination between the foreign principal and an agent, whether the person seeks or receives feedback on his work from the foreign principal, and if the foreign principal's goals do not align with the alleged agent's own interests or subjective viewpoint."  (Tr. 3144-45.)  Each of these factors strongly supported a finding of the requisite agency relationship (although a mere agreement to enter into such an agency relationship would have been sufficient, since the defendant was charged with conspiracy alone, contrary to the defendant's apparent suggestion (Mem. 43-44)).

The jury heard evidence of the material change in Menendez's public posture towards Egypt during the course of the scheme.  Prior to the commencement of the foreign influence scheme, Menendez was a prominent public critic of Egypt.  (*See, e.g.*, GX C401.)  Beginning in early 2018 and continuing through the course of the scheme, Hana and the defendant arranged meetings between Menendez and Egyptian government officials, both those involving formal delegations (*see, e.g.*, GX C407 (Hana passing Menendez invitation for "white paper" delegation meeting to Egyptian Defense Office)), and more unusual meetings such as office meetings that

were kept off his calendar (*see, e.g.*, GX A101-32 (Menendez and defendant corresponding about meeting with Egyptian official Ahmed Helmy and Hana); GX 3A-14 (calendar not listing meeting)). This pattern of "ongoing relationship" and "coordination" between Menendez and Egyptian officials was itself a factor the jury could rely on supporting an agency relationship (Tr. 3144), but the evidence also showed that these meetings got results for Egypt. During the course of this conduct, Menendez told his senior staffer that he intended to change his public position on Egypt to be less critical, a move that he characterized as a tactical shift but that the jury was entitled to view, in context, as an act in Egypt's favor. (*See* Tr. 1893-94 (Sarah Arkin testifying about Menendez's change in approach with respect to public statements concerning Egypt in spring of 2019); *see also* Tr. 3144-45 (agency relationship supported "if the foreign principal's goals do not align with the alleged agent's own interest or subjective viewpoint")).

By June 2021, Menendez's meetings with Egyptian government officials had become even more irregular and accompanied directly by acts for the benefit of Egypt. On June 21, 2021, Menendez met with the then-head of Egyptian intelligence at a hotel without his staff's awareness. (*See* GX B213-4 (Mai Abdelmaguid to defendant: "Please let us know when the chairman will be on his way so i wait for his excellency at the hotel entrance."); GX A103-21 (defendant to Menendez forwarding Abdelmaguid message); *see also* Tr. 1912, 1935-36 (Arkin testifying she was unaware of such a meeting and would have expected to be informed of meetings with head of Egyptian intelligence).) During this hotel meeting, Menendez shared with the Egyptian intelligence director topics his own fellow U.S. Senators planned to ask about the next day; after the meeting Menendez then sent the Egyptian officials, through the defendant, an article providing details on the anticipated questioning—for the stated purpose, according to the defendant, of letting

the Egyptian side "prepare [its] rebuttals."  (*See* GXs A103-17, A103-A (Menendez sending defendant Jamal Khashoggi article); GX B213-4 (defendant sending Abdelmaguid document with article filename and Abdelmaguid responding: "Thanks you so much, chairman also raised it today"); GX G301-1 (defendant to Abdelmaguid: "Wanted to give you a heads up *so you can prepare your answers*" (emphasis added)); GX B213-4 (defendant to Abdelmaguid the next day: "I truly hope the information that I sent you last night was helpful. , I just thought it would be better to know ahead of time what is being talked about and *this way you can prepare your rebuttals*." (emphasis added)).)

This pattern of taking actions in favor of Egypt in connection with direct meetings with Egyptian officials continued and escalated throughout the course of the scheme.  In fall 2021, Menendez took the highly irregular step of directing his staffer Arkin to plan a trip to Egypt not with the U.S. State Department but with Abdelmaguid, who his staff understood was an Egyptian intelligence officer.  (*See* Tr. 1949-55; *see also* Tr. 1928-29.)  When Arkin followed ordinary procedure and contacted the U.S. State Department instead (initiating the process for planning a congressional delegation, or "CODEL," under the supervision of the State Department), Abdelmaguid responded with panic, texting the defendant that Abdelmaguid would probably lose her job, and writing "SOS" at this development.  (GX B213-6.)  The defendant, in turn, passed this unfiltered and telling reaction along to Menendez, who instead of expressing any surprise simply informed the defendant he had "[t]aken care of" the matter.  (GX A103-6.)  And the defendant did not express any confusion at what Menendez meant.

Several days later, Menendez disinvited Arkin from attending the CODEL (and did so based on a false story), a move that stunned and perplexed his staff.  (*See* Tr. 1957-64.)  This

41

backdrop of direct and unfiltered contact with Egyptian government officials and escalating actions in their favor alone was sufficient to allow a reasonable jury to infer that Menendez's actions favorable to Egypt came at the request of those officials Menendez was meeting with and showed an agency relationship, even without more.  But there was much more.

The jury heard ample additional evidence of Menendez's actions further supporting the inference that his actions came at the request of Egypt pursuant to an agency relationship (although again, no actual actions were required to prove the defendant guilty of entering into the conspiracy).  Shortly after an off-the-calendar meeting and dinner with Hana and Helmy in 2019, Menendez called to pressure McKinney to cease his opposition to Egypt's halal certification monopoly, another act on behalf of or benefiting Egypt.  (*See, e.g.*, GX A101-32; GX 8B-10.)  And as far back as May 2018, immediately after meeting with Hana and the defendant, Menendez sent the defendant—for retransmission to Hana and thereafter to Egypt—two highly telling pieces of information.  One was sensitive real-time information about the number and nationality of staff employed at the U.S Embassy in Cairo.  (*See, e.g.*, GX A101-6 (text message sending information).)  The jury heard that this type of information was highly sensitive because it could allow the identification and location of personnel associated with the Embassy.  (Tr. 267-68 (Bret Tate testifying the total number of staff at Embassy is sensitive and not public).)  Although certain *out-of-date* information became no longer sensitive and could be publicly disseminated (Tr. 270-71 (Tate testifying staffing information becomes inaccurate, and no longer sensitive, over time)), *current* information such as Menendez provided was sensitive and was treated as such by the staff members involved in obtaining it (*see, e.g.*, GX 8A-1 ("Don't ask why I'm asking…"); *id.* ("I would have to ask and then someone is going to ask why.")).  After receiving this sensitive

information from Menendez, the defendant passed it to Hana, who immediately retransmitted it to an Egyptian government official.  (GX B105-4; GX C112-1; GX 8A-12.)  The jury could readily conclude that this sequence of events, ending with the information in Egyptian government hands, was not a coincidence but came about as a result of a request from the Egyptian government, passed on through Hana at the meeting that immediately preceded Menendez's attempts to gather the information.

The second piece of information Menendez provided for Egypt's benefit after meeting with Hana also directly supported the inference that the defendant and Menendez agreed that he would act as Egypt's agent and sought to conceal that he was doing so.  The day after the meeting with Hana that prompted Menendez sending the Embassy information, Menendez also gathered a summary of the holds that another U.S. Senator had imposed on foreign military financing to Egypt, and of the human rights concerns motivating those holds, and transmitted that summary to the defendant, who duly passed it on to Hana.  (*See* GX A402.)  That summary of concerns, in turn, led to one of Menendez's most unusual acts on behalf of Egypt—Menendez, at the request of the defendant, Hana, and an Egyptian general, ghostwrote for Egypt a response to those very concerns Menendez had just summarized.  The defendant herself made explicit that the purpose of this letter was to "prove a point to" an Egyptian general, who the defendant indicated had, with Hana, given her "clearance for a project."  (*See* GX B102-A.)  The jury could obviously infer that this attempt to "prove a point" to the general was not *unsolicited* but rather resulted from the general's request (or, at the very least, was done to ensure that Egypt understood that Menendez was willing act as Egypt's agent, including with respect to his fellow Senators).  But even leaving aside this statement, the jury could easily infer that it was an act at the request of the Egyptian

43

government from the nature and content of this ghostwritten letter, which was written in the voice of the Government of Egypt (*e.g.*, using the terms "we" and "our" to refer to the Government of Egypt (GX A403)), which was patently intended to benefit the Government of Egypt by responding to obstacles that had placed a hold on hundreds of millions of dollars of aid to Egypt (*see, e.g.*, *id.* ("I write to respond to some of the issues that have been raised by [Senator-1] and others, which have lead [sic] to a hold on $300 million dollars in appropriated aid to Egypt.")), and which was in fact transmitted to an Egyptian government official (*see* GXs C207-15, C207-A to C207-E (Helmy circulating to Hana a revision containing some of the language drafted by Menendez)).

      In addition to all of these circumstantial indications of fulfilled, and often furtive and unusual, requests from Egyptian government officials, the jury heard direct evidence of an Egyptian government official requesting, through Hana, that Menendez take action to help Egypt resolve a human rights lawsuit at Egypt's preferred settlement amount of $2 million. (*See* GX C207-7T (Helmy to Hana: "[I]f the guy takes care of this thing through [Senator-1], he'll be settled in," and "Our decision, is that we already gave our final offer… Two million and not a single dollar more…").) Upon receiving this request, Hana indicated he would transmit it to Menendez (*see id.* (Hana to Helmy: "Roger that[.] Consider it done")), and Hana in fact transmitted to Menendez, through the defendant, documents pertaining to this lawsuit and fielded questions regarding them (*see* GXs C207-7, C207-I, C207-J (documents from Helmy to Hana); GX C102-7 (documents texted from Hana to defendant); GX A405 (documents forwarded from defendant to Menendez); GX C102-7 (defendant to Hana: "I have a question regarding the text you sent me I forwarded

it")).  The evidence that Menendez acted at Egypt's request and pursuant to an agency relationship was compelling, and more than sufficient.[9]  *See also Menendez*, 759 F. Supp. 3d at 500-03.

In sum, the Government presented overwhelming evidence that Menendez's actions and promises on behalf of Egypt were made not independently or pursuant to "an ordinary solicitation" (Tr. 3143), but instead at Egypt's request and, in any event, in exchange for the "offer or the provision of compensation" (Tr. 3144).   The extensive evidence of the defendant's and Menendez's acceptance of bribes from Hana and Daibes in exchange for Menendez's actions on behalf of Egypt, discussed in Section I.B.1.b, above, itself easily justified the jury's finding that the defendant agreed with Menendez for him to act as Egypt's agent, even leaving aside any of the other factors supporting that finding.

In addition to these responses to the requests made by Egypt, Menendez and the defendant made a number of pronouncements of their willingness for Menendez to serve as an agent.  (*See, e.g.*, Tr. 1019 (Terrie Williams-Thompson: "She asked 'What else can the love of my life do for you?'"); GX C207-13T (Hana to Helmy, following meeting with defendant: "Our man is going to India after two weeks and is asking if we need any message or anything for ISEG"); GX B220-4 (defendant to Helmy: "[A]nytime you need anything you have my number and we will make everything happen.").)   These evidenced Menendez's willingness (often conveyed through the defendant) to act as an agent by soliciting Egypt's feedback on how he could continue to act for

---

[9] The defendant asserts that she and Hana cannot be foreign principals (Mem. 45), but that is beside the point.  While neither of them was a foreign principal, either could be—as the jury was properly instructed without objection—a person "whose activities are directly or indirectly supervised, directed, controlled, financed or subsidized in whole or in major part by a foreign principal."  (Tr. 3142.)

their benefit (*see* Tr. 3144 (jury charge: agency supported by "whether the person seeks or receives feedback on his work from the foreign principal")), and also supported the jury's finding that the defendant aided and abetted Menendez when he held himself out as an agent of Egypt. Indeed, there is no reasonable explanation otherwise for the actions described above, or for Hana— immediately after meeting with the defendant—to refer to a United States Senator as "Our man" in speaking to an Egyptian official. (GX C207-13T.) Certainly, the jury was entitled to so find.

     5.    *The Evidence Proved Corrupt Endeavors to Obstruct Justice*

     a)    <u>The Evidence Established the Defendant Agreed to and Did Endeavor to Obstruct the Southern District of New York's Grand Jury Investigation</u>

As described in Sections I.B.1 and I.B.2, above, the evidence at trial proved that the defendant and Menendez both knew about the payments Uribe and Hana made towards the defendant's mortgage and luxury car, and both knew the payments were not loans. The evidence was more than sufficient to demonstrate that, after the defendant and Menendez learned about the federal grand jury investigation in June 2022, they agreed to and did seek to obstruct the investigation by falsely claiming that the payments made by Uribe and Hana were loans, and by creating documents that were provided to the grand jury to support that false cover story.

The jury heard evidence that the defendant first learned about the federal grand jury investigation on June 16, 2022. On that date, the defendant's cellphone was seized from her by the Federal Bureau of Investigation ("FBI"), and other electronic devices were seized from her co-conspirators, including Menendez and Uribe, and from the residence she and Menendez shared in New Jersey, all pursuant to court-authorized search warrants. (*See, e.g.*, Tr. 1436-37 (Special Agent Tracee Mergen testifying regarding seizure of cellphones from defendant and Menendez);

Tr. 526-28 (Special Agent Ryan Larkin testifying regarding seizure of cellphone from Uribe); Tr. 109-10 (Special Agent Aristotelis Kougemitros testifying regarding search of defendant's residence).) Beginning on June 16, 2022, and continuing through mid-2023, the defendant, Menendez, his Senate office, and their co-conspirators, including Uribe, were served with multiple subpoenas issued by a grand jury in the Southern District of New York. (GX 2499; GXs 11A-1 to 11A-7, 11A-2-EM, 11A-3-EM, 11A-7-EM, 11B-1 to 11B-3, 11B-3-EM, 11E-1 to 11E-7.)

Approximately one month after the FBI executed the initial seizure of electronic devices and served grand jury subpoenas on the defendant and others, the defendant went to see Uribe at Uribe's office in Union City, New Jersey, and said that they needed to talk, prompting them to arrange to get together later that day at the Glenpointe Marriott. (Tr. 1673-76.) At that meeting, Uribe told the defendant that the FBI had served him grand jury subpoenas and seized his phone, and the defendant explained that she "gets sick" looking at the "documents" the FBI had given her. (Tr. 1677.) The defendant asked Uribe what he would say if law enforcement asked him about the payments he had made for the Mercedes-Benz Convertible, to which Uribe responded that he would say those payments had been a loan for a friend until the friend was able to pay him back, and the defendant said, in substance, "I like that." (Tr. 1677.) Uribe admitted that this cover story was false (Tr. 1677-78), and he suggested it as a way to try to "get away with this" (Tr. 1678).

The jury heard that, thereafter, the defendant and Menendez sought to implement the cover story—*i.e.*, that the money the defendant had received from Uribe was a loan—by returning the money and falsely characterizing the transaction as repayment of a "loan." In particular, in December 2022, the defendant and Menendez sought to return to Uribe bribe money Uribe had paid in connection with the defendant's Mercedes-Benz Convertible. Menendez wrote the

defendant a check for $23,000 with the memo line "for car payment." (GX 3B-1-EM.) The defendant then wrote Uribe a check for $21,000 with the memo line "personal loan." (GX 3B-1-EM; Tr. 1678-79.) In fact, this purported repayment was for less than half of the over $45,000 that Uribe had paid for the Mercedes-Benz Convertible, further refuting any contention that the defendant had ever, before becoming aware of the grand jury investigation, intended to repay Uribe or kept track of how much she would need to repay. (Tr. 1706:11-15.)

The defendant and Menendez took a similar approach with the money she received from Hana. In particular, in December 2022, Menendez wrote the defendant a check for $23,569 (*i.e.*, the sum that Hana paid to the defendant's mortgage servicer to avoid foreclosure in 2019, rounded up to the nearest dollar), bearing the handwritten memo line, "To Liquidate loan." (GX 3B-1-EM.) The defendant then wrote a check for $23,568.54 (*i.e.*, the precise amount of the mortgage payment) to Hana's counsel, in trust for Hana, with the handwritten memo line, "Full payment of Wael Hana loan," along with a handwritten letter that stated, in part, that the check was "in full payment of a personal loan he [*i.e.*, Hana] gave me [*i.e.*, the defendant]." (GX 3B-1-EM.) Thereafter, in response to grand jury subpoenas issued to her, the defendant produced Menendez's checks to her, along with her checks to Uribe and Hana, all of which contained false and misleading memo lines describing the nature of the payments. (GX 3B-1-EM; *see also* GX 11B-3; GX 2499.)

The jury was entitled to conclude from Uribe's testimony and the close coordination of this sequence of checks that the defendant intentionally produced checks containing false and misleading statements in response to a grand jury subpoena, which is itself sufficient to prove obstruction of justice under well-settled law. *See, e.g., Aguilar*, 515 U.S. at 601 ("[O]ne who delivers false documents . . . to the grand jury" commits obstruction of justice). Indeed, the Second

Circuit has affirmed an obstruction of justice conviction where a defendant deleted documents that were likely to be later sought by a grand jury subpoena, even though "at no time did [the defendant in that case] delete a document for which there was an outstanding subpoena." *United States v. Triumph Capital Group, Inc.*, 544 F.3d 149, 168 (2d Cir. 2008). Since the evidence here entitled the jury to find that the defendant, by contrast, was involved in submitting false documents pursuant to "an outstanding subpoena," *id.*, it necessarily sufficed to prove obstruction of justice. *See also Menendez*, 759 F. Supp. 3d at 504-07.

    b)  The Evidence Established the Defendant Participated in a Conspiracy to Obstruct the Daibes Federal Prosecution

As described in Section I.B.3, above, the evidence at trial proved that the defendant and Menendez, in exchange for bribes, promised that Menendez would—and that Menendez attempted to—take official acts by seeking to put in place a prosecutor who would treat Daibes's criminal case more favorably than it had been, and then attempting to get that prosecutor to give Daibes a more favorable disposition than Daibes had previously been offered. The same evidence underlying the bribery charges more than amply supported the jury's finding that she conspired to obstruct justice in connection with the Daibes federal prosecution.

The jury heard that since at least well before 2020, Menendez was frustrated by Daibes's federal criminal prosecution by the New Jersey U.S. Attorney's Office. (Tr. 2222-23.) While speaking in December 2020 with Sellinger, who would eventually be nominated to be the U.S. Attorney, Menendez stated that he hoped Sellinger would "look into" the case "carefully" if Sellinger became the U.S. Attorney—the *only* specific case that Menendez mentioned—because Menendez stated Daibes "was not being treated fairly." (Tr. 2218.) After Sellinger indicated that he might be recused from the case (Tr. 2226-27), Menendez pursued an alternate candidate, Suarez,

49

who had no federal experience but was a close ally of Menendez's best friend (Tr. 2308-10). At the same time, Menendez allowed his staff and outside political consultant to have the false impression that he had experienced a "falling out" with Sellinger (Tr. 2306-07), and approved their transmission to Sellinger of a different false account of the reason Menendez was not recommending Sellinger (Tr. 2325 ("We can say something along the lines of blaming it on the White House")).

However, after Suarez's candidacy was not able to advance within the Biden administration, Menendez returned to Sellinger as a candidate only after being informed by Soliman that Sellinger would not need to be recused from the Daibes matter. (Tr. 2350-51, 2354.) Then, after Sellinger became U.S. Attorney and was in fact recused, and despite knowing that Sellinger was recused, Menendez continued to attempt to get Sellinger involved in the case. Menendez even instructed Soliman to question Sellinger about why he was recused—a directive that Soliman, for the first time in his fifteen-year relationship with Menendez, secretly did not follow. (Tr. 2356-57.)

Then, in March 2022, Menendez, who remained frustrated by Sellinger's office's handling of the prosecution, requested that Soliman tell Sellinger that Sellinger should give Daibes "all due process." (Tr. 2358.) And as described in Section I.B.3.b, above, the defendant was fully aware of Menendez's efforts, for example assuring Daibes that Menendez was "FIXATED" on Daibes's case (GX D102-2), shortly thereafter collecting a bribe from Daibes's driver (GX D102-11), and liquidating gold bars provided by Daibes under false pretenses (*see, e.g.*, Tr. 2155-56; GX B201-1A; GX 3D-6).

In sum, the evidence amply demonstrated that, in exchange for bribes, the defendant and Menendez agreed that Menendez would use his position as a U.S. Senator in an effort to influence who would become the New Jersey U.S. Attorney and the resolution of a pending criminal case more favorably to his co-conspirator, Daibes. Such conduct squarely falls within the heartland of conduct covered by Section 1503. In *United States v. Polakoff*, 121 F.2d 333 (2d Cir. 1941), involving the predecessor offense of Section 1503, the Second Circuit rejected the premise that obstruction of justice through an effort to influence a prosecutor could not be based on "otherwise legitimate arguments [to that prosecutor] for concealed or falsified ends." *Id. Polakoff* involved attempts by a bail bondsman, who was being paid bribes, to "influence" a state prosecutor "to recommend a reduced sentence" for a defendant. *Id.* at 334. The Second Circuit held that the defendant's efforts to influence justice for concealed motives (*i.e.*, bribes) constituted a corrupt endeavor within the meaning of the statute. *Id.* at 333-35; *see also id.* at 335 ("It is as 'corrupt' to persuade a public officer by lies as by bribes; indeed, to influence him by fraud is not far afield from influencing him by 'threats or force,' also prohibited by the statute."); *United States v. Freidel*, 124 F.2d 515, 515-516 (2d Cir. 1941) (rejecting argument that an agreement to request a prosecutor not to charge individuals could not be criminal, where defendant government informant agreed to intercede with prosecutors in exchange for bribes); *cf. United States v. Cioffi*, 493 F.2d 1111, 1119 (2d Cir. 1974) (holding that "giving of advice to a witness to plead his constitutional privilege against self-incrimination"—although otherwise lawful—can be a crime when "one []

51

bribes, threatens, coerces a witness to claim it or advises with corrupt motive a witness to take it");

*see also Menendez*, 759 F. Supp. 3d at 507-08.[10]

6. *The Evidence Proved Venue was Proper in this District*

The evidence at trial also amply supported the jury's verdict that venue was proper in this district, as each of the counts was supported by evidence enabling the jury to find by a preponderance that essential conduct elements took place in this district.[11]

"When a federal statute defining an offense does not specify how to determine where the crime was committed, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'" *United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (internal quotation marks and brackets omitted). "Venue is proper only where the acts constituting the offense—the crime's 'essential conduct elements'—took place." *Id.* (citation omitted). "[V]enue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense." *Id.* at 319 (citation omitted). In the context of bribery-related charges, the Second Circuit has held that contacts "laying the groundwork" for the solicitation or receipt of bribes are "part and parcel" of the bribes themselves

---

[10] The Supreme Court's decision in *Fischer v. United States*, 144 S. Ct. 2176 (2024), cited by the defendant (Mem. 42), is not to the contrary. *Fischer* dealt with the statutory interpretation of an entirely different and more recent statute, and does not disturb the Supreme Court's prior holding that "the 'Omnibus Clause' [of Section 1503] serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice," which is appropriately limited by the "nexus requirement." *Aguilar*, 515 U.S. at 598-600. This case, in which the defendant and Menendez, in exchange for bribes, endeavored through an intermediary to ask a recused prosecutor to provide special treatment in a specific pending case, is well within the heartland of obstruction of justice. *See Polakoff*, 121 F.2d at 333.

[11] The defendant does not challenge venue for Counts Seventeen and Eighteen, charging her with conspiring and endeavoring to obstruct a grand jury proceeding in this district. (Mem. 45.)

and are essential conduct for venue purposes.  *See United States v. Davis*, 689 F.3d 179, 190 (2d Cir. 2012) ("[T]elephone calls placed into the Southern District of New York laying the groundwork for bribes were 'part and parcel' of a bribery offense culminating weeks later." (quoting *United States v. Stephenson*, 895 F.2d 867, 875 (2d Cir. 1990)); *see also Stephenson*, 895 F.2d at 875 ("Venue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place."); *Menendez*, 759 F. Supp. 3d at 512 ("For a wire fraud charge, venue is established by showing that the defendant used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." (internal quotation marks omitted)).

### a)    Counts Related to Egypt

The bribery and foreign influence counts related to Egypt are supported by evidence of a number of acts of essential conduct in this district, which were more than sufficient for the jury to find venue proven by a preponderance of the evidence on these counts.  These involved evidence that: (i) Hana, through Andy Aslanian, paid several hundred dollars for a meal for the defendant and Menendez at the Mr. Chow restaurant in midtown Manhattan (GX 7B-2, GX 5E-101A); (ii) while at that dinner in Manhattan with the defendant and Menendez, Hana sent an interstate WhatsApp message to Shawky scheduling a July 2018 meeting and dinner that precipitated Menendez's promise to approve a sale of tank ammunition (GXs C206-3 & C206-3T; GX 7A-3; GX 7B-1); (iii) Menendez, Daibes, and Helmy met at a hotel in Manhattan—in a meeting the defendant was involved in scheduling but chose at the last minute not to attend (GX 1352 rows 956-65)—to discuss rewarding Daibes with business ventures with Egypt (GX D101-1 (Daibes and Menendez texts regarding meeting); GX B220-1 (Helmy and the defendant texts regarding

meeting); GX B220-2 (Helmy informing defendant that he had been instructed to start discussions on business ventures discussed at meeting)); (iv) Daibes provided free transportation to the defendant and Menendez through this district on their way back from a trip to Egypt (*see, e.g.*, GX A111-PH1 (Signal message from Daibes offering Menendez transportation); GX 16C-2 at 16 (cell site analysis showing transportation through district)); and (v) in order to facilitate a real estate purchase which Daibes was offering the defendant and Menendez assistance with, the defendant, in consultation with Menendez and Daibes, sold gold bars through Khorozian (who called a Manhattan gold dealer and traveled to Manhattan for the sale) under the false claim that the gold bars were from a family member (*see, e.g.*, Tr. 2155-60, 2164; GX B201-1A; GX 3D-6).

These acts in this district are essential conduct for the counts related to Egypt and fully sufficient to allow the jury to find venue was proven. The provision of things of value in the district, even things with comparatively modest value such as the meals or transportation, is itself essential conduct for the bribery and foreign influence offenses. *See, e.g.*, *Stephenson*, 895 F.2d at 874. The defendant was free to argue to the jury that these minor things of value were not connected to the offenses charged, but the jury could easily disagree. *See, e.g.*, *Calk*, 87 F.4th at 183 ("In determining whether there is a 'thing of value,' we have observed, what matters is 'the value that the defendants subjectively attached to the items received.'" (quoting *United States v. Williams*, 705 F.2d 603, 623 (2d Cir. 1983))); *see also, e.g.*, *United States v. Ostrander*, 999 F.2d 27, 31 (2d Cir. 1993) ("It is enough if the item received was regarded as a benefit by the recipient, whether or not others might have taken a different view of its value." (brackets omitted)).

Even leaving aside the fact that an actual thing of value was provided in this district, the in-person meetings in Manhattan that laid the groundwork for a further exchange of things of value

for official acts could themselves easily be found by the jury to be essential conduct for these charges. *See, e.g.*, *Davis*, 689 F.3d at 190; *Stephenson*, 895 F.2d at 874-75. Indeed, in strikingly similar circumstances, then-District Judge Alison J. Nathan held venue was sufficient based on messages providing information to facilitate the next steps of a bank bribery scheme. *See United States v. Gross*, No. 15 Cr. 769 (AJN), 2017 WL 4685111, at *38 (S.D.N.Y. Oct. 18, 2017). Those messages were essential conduct "in at least two respects": first, because they were "acts necessary" to carry out the next steps of the scheme; and second, because they provided reassurances to the bribe payors that the bribe recipient was willing to assist them, in order "to lay the groundwork for his ultimate receipt of the largest bribe payment." *Id.* at *39.

The evidence here easily allowed the jury to find that the meetings between Menendez and his bribe-payors in Manhattan were essential conduct under Second Circuit precedent. Just as in *Gross*, the meeting the defendant and Menendez had with Hana at Mr. Chow—along with the interstate wire Hana sent to Shawky during that meeting (GX 1463)—was an act "necessary" to carry out the scheme because Menendez's agreement to the meeting with Shawky precipitated his promise to approve a tank ammunition sale, and it "demonstrated [Menendez's] good faith efforts to demonstrate to [Hana] that he was actively working towards this goal—to lay the groundwork for his ultimate receipt of" the bribe payments Hana had been promising. *Gross*, 2017 WL 4685111, at *39. By the same token, Menendez's meeting with Daibes and Helmy in Manhattan (planned with the defendant) was part of an effort for Menendez to ensure that Daibes received business from the Egyptian government (GX B220-2), as well as a way for Menendez to "demonstrate[]" his "good faith efforts" to reward Daibes and "lay the groundwork for" Menendez's receipt of bribes from Daibes. *Gross*, 2017 WL 4685111, at *39.

Finally, the jury could easily have found that the sales of gold from Daibes in Manhattan by Khorozian, at the direction of the defendant, was a "crucial component[] of" the scheme for Daibes to provide things of value to the defendant and Menendez including gold and assistance in obtaining real estate. *Stephenson*, 895 F.2d at 874. The evidence showed that these sales—which the defendant was aware would take place in Manhattan, and which were brokered by a phone call to the Manhattan-based dealer made in her presence (*see, e.g.*, Tr. 2155-60, 2164-65)—was intended to pay down the defendant's existing home mortgage debts at a time when Daibes was assisting the defendant and Menendez in looking for a new home to purchase. (*See, e.g.*, GX D102-6; GX B234-1 to B234-6; GX 8K-1 (providing reporting advice if defendant "use[d] the proceeds of the sale of the gold bars to repay a mortgage").) The conversion of a gold bar to a liquid form that could be used to pay the mortgage debt—and the use of false statements that the bar was the defendant's family gold instead of from Daibes—was essential to that scheme because it enabled the further real estate transactions contemplated as part of the ongoing scheme. The defendant's argument that the scheme had allegedly ended by that point (Mem. 48) would have been properly directed to the jury (although the defendant made no such argument), which would have been entitled to reject it given, among other things, the evidence of Daibes's involvement in the defendant's and Menendez's real estate search (GX D102-6); Daibes's involvement in the gold sale in Manhattan (GX D102-8); the defendant's coded correspondence with Menendez about picking up the checks resulting from the sale in Manhattan (GX A103-27 (defendant to Menendez: "Is it OK if I ask Mike to swing by Edgewater on our way home. ? This way I can *pick up what I need* instead of making a trip back after Mike drops me at home." (emphasis added)); *see generally* GX 1354 rows 208-10, 212-219); and the defendant's and Menendez's coordinated involvement

56

in the making of false statements to cover up that sale (Tr. 2155-56 (defendant statements to Khorozian); Tr. 2576-77 (Menendez statements to Senate ethics counsel Shannon Kopplin); GXs 10E-4, 10E-6 (Menendez financial disclosure forms)).[12]  *See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at *4 (S.D.N.Y. Jan. 18, 2017) (finding single conspiracy continuing through liquidation of fraudulently inflated stock positions and laundering of the defendant's gains); *cf., e.g.*, *United States v. Prevezon Holdings*, 251 F. Supp. 3d 684, 690 (S.D.N.Y. 2017) ("Acts of perpetration and subsequent acts of concealment in wide ranging, complex frauds are often one and the same." (brackets, internal quotation marks, and citation omitted)).  Indeed, the Second Circuit has acknowledged that a real estate closing could be an essential act in a bank bribery scheme even when it did nothing more than carry out a corrupt agreement previously made.  *See United States v. Kaufman*, No. 21-2589, 2023 WL 1871669, at *2 (2d Cir. Feb. 10, 2023) (summary order) ("That [the defendant] may have *agreed* to the scheme prior to the closing does not mean that the scheme ended then . . . and as explained above, a jury could find that the closing was tantamount to [the defendant's] acceptance of [the payor's] gratuities.").  *See also Menendez*, 759 F. Supp. 3d at 514.

---

[12] Indeed, with respect to the honest services fraud counts, the concealment of the source of the gold sufficed to establish an element of the offense, as the jury was instructed.  (*See, e.g.*, Tr. 3110 ("The third element that the government must prove beyond a reasonable doubt is that the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of fact.").)  But for all the counts, the sale and the concealment of Daibes as the source, by design, furthered the defendant's and Menendez's receipt of Daibes's assistance in their obtaining real estate, and are thus worlds apart from an after-the-fact resale of an ordinary asset received long ago as part of a scheme.

b)    Counts Related to the New Jersey Attorney General's Office

The trial evidence straightforwardly established venue for the counts related to the New Jersey Attorney General's Office.  The jury heard evidence that (i) bribe payments were made from this district, as Uribe, from New Jersey, called an associate in the Bronx and caused him to make payments on the Mercedes-Benz Convertible (Tr. 1555; GX 16C-2 at 8-12); (ii) the defendant caused the cash bribe that Uribe gave her in a parking lot to be deposited in bank accounts both in New Jersey and on Long Island on the same day—which necessarily entailed moving the cash across the waters that are part of this district (GX 1328; GX 1345; GX 5F-202); and (iii) the defendant, both in her texts with Uribe and her calls with Menendez in carrying out the scheme, connected to cell towers in this district, thus utilizing physical structures in this district to transmit core communications carrying out the crime.[13]

The jury could readily have found that all of these acts in this district, which plainly suffice for venue, *see, e.g.*, *Stephenson*, 895 F.2d at 874, were reasonably foreseeable to the defendant. The Second Circuit has recognized that the proximity of districts covering the New York metropolitan area can support a finding of foreseeability where a long-running scheme involves a number of separate financial transactions, and certain of those transactions in fact take place in this district. *See United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("The proximity of Manhattan to Brooklyn and Queens and the conspirators' transfer of hundreds of thousands of

---

[13] Specifically, the defendant sent text messages through this district with instructions for Uribe to meet with Menendez the evening before Menendez met with Grewal, in order for Uribe to specify the persons he wished Menendez to intervene on behalf of (GX 16C-2 at 13), and then for Uribe to meet with Menendez several hours after Menendez had met with Grewal, for Menendez to offer Uribe false assurances in an effort to keep Uribe paying for the car (GX 16C-2 at 14).

dollars in cash admitted *a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money* at issue to Brooklyn and Queens from Manhattan." (emphasis added)); *see also, e.g.*, *United States v. Shepard*, 500 F. App'x 20, 23 (2d Cir. 2012) ("The proximity of the conspiracy's Brooklyn-Queens base of operation to parts of the Southern District of New York, as well as the need to traverse that district in procuring marijuana from New Jersey, permitted a reasonable jury to make a preponderance finding that the aforementioned acts' occurrence in the Southern District was reasonably foreseeable to [the defendant]."); *Davis*, 689 F.3d at 188-89 (proximity of targeted Long Island residence to Southern District of New York, combined with co-conspirators' prior robberies in Bronx, supported venue in Southern District based on foreseeability that robbery target dealt drugs there). *See also Menendez*, 759 F. Supp. 3d at 515-17.

Indeed, in a bribery scheme, venue was held to be proper based on the foreseeability not of any one particular electronic communication, but on the foreseeability that *at least some* communications over the course of a scheme would be made in this district. *See Gross*, 2017 WL 4685111, at *40 ("Even if it was not reasonably foreseeable that any *one* of these emails would be sent from Manhattan, . . . a reasonable jury could have concluded by a preponderance that it was reasonably foreseeable to [the defendant] that, over the course of the bribery scheme and conspiracy, he would receive some essential e-mails from [a co-conspirator] while [the co-conspirator] was in this district." (emphasis in original)). And in any event, the jury was plainly entitled to infer that the defendant was aware of causing some of the bribe money to be deposited into her *own account* by transporting it through this district. (GX 1328; GX 1345; GX 5F-202.)

c)    Counts Related to Daibes's Federal Prosecution

The evidence also showed ample basis for venue for the counts related to Daibes's federal prosecution by the New Jersey U.S. Attorney's Office. That evidence included Daibes's provision of transportation to the defendant and Menendez through this district (*see, e.g.*, GX A111-PH1 (Signal message from Daibes offering transportation); GX 16C-2 at 16), and the defendant causing the sale in Manhattan of kilogram gold bars from Daibes (*see, e.g.*, Tr. 2155-60, 2164; GX B201-1A; GX 3D-6).

The provision of transportation and the sale of kilogram gold bars in this district both provided ample basis for the jury to find venue for the New Jersey U.S. Attorney's Office-related counts just as for the Egypt-related counts. Both of these acts, the evidence showed, were part and parcel of not just the Egypt component of the scheme but the New Jersey U.S. Attorney's Office portion as well.[14]   *See also Menendez*, 759 F. Supp. 3d at 513-15.

---

[14] The defendant briefly references, but does not develop any argument relying on, the need for "substantial contacts" with the district. (Mem. 47.) That reference is too undeveloped to require consideration. Regardless, such an inquiry has no relevance here in light of the proven overt acts committed in this district. *See United States v. Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018) ("When an overt act in furtherance of a criminal conspiracy has been committed in the district . . . , th[e] supplemental [substantial contacts] inquiry has no relevance."); *Tzolov*, 642 F.3d at 321 (finding the substantial contacts test satisfied where the defendant "committed overt acts in furtherance of the conspiracies in the [district of conviction]"). Moreover, the "substantial contacts" test "does not even apply . . . unless the defendant establishes that 'prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *United States v. Chait*, No. 17 Cr. 105 (JMF), 2017 WL 6502228, at *1 (S.D.N.Y. Dec. 18, 2017) (citation omitted). The defendant, who bears the burden, makes no such showing—indeed, she does not even attempt to do so. *See also Menendez*, 759 F. Supp. 3d at 511 n.20. In any event, in addition to each of the bases for venue listed above, the offenses had additional substantial contacts with this district. For example, the evidence showed that the foreign military funding grants that Menendez promised to approve (which were used to finance the foreign military sales that Menendez also promised to approve) were sent to a bank account held in the name of Egypt at the Federal Reserve Bank of New York (Tr. 500), which has its headquarters in Manhattan (Tr. 2069-

## II.    THE DEFENDANT IS NOT ENTITLED TO A NEW TRIAL

The defendant was found guilty by a conscientious jury after a fair and thorough trial, and identifies no valid basis to overturn the jury's considered verdict.

As an initial matter, the defendant's motion for a new trial is untimely.  *See* Fed. R. Crim. P. 33(b)(2) ("Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."); *United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) (under Rule 33, "a defendant must bring a motion for new trial within 14 days of the verdict or finding of guilt, unless the court finds that the late filing was the product of 'excusable neglect'" (quoting Fed. R. Crim. P. 45(b)(2))).  The defendant, in her original request for an extension of time to file post-trial motions, expressly stated that she only intended to renew her motion for acquittal under Rule 29, and did "not plan to move for a new trial" under Rule 33.  (Dkt. 840 at 1.)  The Court ruled accordingly.  (Dkt. 842 (extending the time "in which to file a renewed motion pursuant to Fed. R. [Crim.] P. 29").)  The defendant subsequently sought "a modest continuance of the post-trial briefing deadline by two weeks," making no mention of Rule 33, which request was granted.  (Dkt. 862.)  Accordingly, the defendant's motion for a new trial may be denied as untimely.  However, the motion is also meritless, and, in the alternative, should be rejected on the merits.

---

70).  *See, e.g.*, *United States v. Rose*, 891 F.3d 82, 86 (2d Cir. 2018) (extortion can be based on *potential* effect on interstate commerce).  Moreover, the defendant committed obstruction of an investigation into these very crimes by a grand jury in this district (*see, e.g.*, GX 3B-1-EM; GX 11B-3), rendering baseless any claim of a lack of substantial contacts.

### A.    Applicable Law

"The defendant bears the burden of proving that [s]he is entitled to a new trial under Rule 33[.]" *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).  Motions for a new trial under Rule 33 "are disfavored in [the Second] Circuit."  *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011).  Accordingly, "[t]he ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013).  This Court—after examining the totality of the evidence and considering objectively all of the facts and circumstances—must exercise its authority under Rule 33 "sparingly" and only in "the most extraordinary circumstances."  *United States v. Padilla*, 511 F. App'x 8, 10 (2d Cir. 2013).  Put another way, a motion pursuant to Rule 33 should only be granted if the Court finds "a real concern that an innocent person may have been convicted."  *Aguiar*, 737 F.3d at 264.  This Court must strike a balance between weighing the evidence and credibility of witnesses and not "wholly usurp[ing]" the role of the jury.  *See United States v. Polouizzi*, 564 F.3d 142, 162 (2d Cir. 2009).  "Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001).

The Second Circuit has twice reaffirmed in the last several years that "a district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand."  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (internal quotation marks omitted); *see also United States v. Landesman*, 17 F.4th 298, 330-31 (2d Cir. 2021).  Under

the "preponderates heavily" standard, "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Landesman*, 17 F.4th at 331 (internal quotation marks omitted). "To the contrary, absent a situation in which, for example, the evidence was patently incredible or defied physical realities, where an evidentiary or instructional error compromised the reliability of the verdict, or where the government's case depends on strained inferences from uncorroborated testimony, a district court must defer to the jury's resolution of conflicting evidence." *Id.* (internal quotation marks and citations omitted). In applying the "preponderates heavily" standard, moreover, a district court "must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* (internal quotation marks omitted).

### B.    Discussion

#### 1.    *The Defendant's Right to Counsel Was Not Infringed*

Contrary to the defendant's rhetoric (*see* Mem. 1, 5, 7, 15, 54), she was not unlawfully deprived of the right to counsel of her choice through some kind of improper tactical effort by the Government to gain an unexplained advantage. To the contrary, long before trial, the Government advised the Court of multiple conflicts involving her then-counsel, David Schertler, Esq., as the Government was supposed to do. The Court then properly and carefully, and over a period of weeks, gave her every opportunity to continue with Schertler as her counsel, despite the conflicts arising out of her choice to lie to him and use him (without his knowledge) in an endeavor to obstruct justice. Having rejected—out of hand—a stipulation that would have allowed Schertler to serve as her trial counsel despite being a witness to some of her obstruction of justice, the

defendant had no Sixth Amendment right to proceed to trial represented by an attorney who would be a sworn or unsworn witness.

The defendant, after consenting to Schertler's withdrawal in writing following consultation with independent counsel, and after proceeding to trial and being convicted, now seeks a new trial on the ground that Schertler should have been permitted to return to represent her, without her ever asking for that to occur. Such a "heads-I-win-tails-you-lose gamble" is not permitted under the law. *United States ex rel. Williams v. McMann*, 436 F.2d 103, 107 (2d Cir. 1970).

Fatally to the entire premise of the defendant's claim—even if that claim were not waived—the conflict the defendant caused was never "resolved" (Mem. 11, 15) in any way that could have permitted Schertler to represent her at trial. At a minimum, Schertler (along with other members of his firm) was, and remains, an unsworn witness to a material and disputed issue at trial—the defendant's production of documents containing false information to the grand jury. That production was proven with evidence that was marked as Government exhibits before trial, and then offered, admitted, shown, and read to the jury without any objection from the defendant, and thus Schertler could never have been permitted to appear as her trial counsel. The defendant does not engage with this evidence—which contained, among other things, Schertler's name and firm affiliation—in her memorandum. Plainly, the Government could not provide "notice to the Court and [the defendant] that the . . . conflict had disappeared" (Mem. 5), because the conflict did not disappear.

In addition, up until the conclusion of the presentation of evidence at trial, there was a significant possibility that Schertler could have been an unsworn or sworn witness to other subject matters as well. The Government was considering introducing documents pertaining to a second

subject, namely, the attorney proffer at which he unknowingly passed on false statements from the defendant to the U.S. Attorney's Office, up until shortly before the Government rested its case-in-chief, which would have made Schertler an unsworn witness on that issue too.

Moreover, and in any event, if the defendant had testified, Schertler likely also would have then become an unsworn witness to both the attorney proffer and to yet another subject, namely, false exculpatory statements the defendant made to him during the investigation, which would be admissible on cross-examination of the defendant. In addition, if the defendant had testified, the Government could have then called Schertler as a witness in the Government's rebuttal case as a sworn live witness, and/or introduced materials of which he had personal knowledge, depending on the defendant's answers in direct testimony and cross-examination. These all presented serious conflicts, preventing him from serving as trial counsel.

### a)    Applicable Law

The New York Rules of Professional Conduct state:

> A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
>
> (1) the testimony relates solely to an uncontested issue;
> (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
> (3) disqualification of the lawyer would work substantial hardship on the client;
> (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
> (5) the testimony is authorized by the tribunal.

N.Y. R.P.C 3.7(a).

Disqualification is generally required where an attorney is in fact, or is in a position to become, either a sworn or unsworn witness at trial.  *See, e.g.*, *United States v. Kliti*, 156 F.3d 150, 156 (2d Cir. 1998) ("When faced with an attorney as a sworn or unsworn witness, the proper recourse is to disqualify the attorney, not to exclude the testimony.").  An attorney who is actually called as a witness at trial should generally be disqualified because, *inter alia*, ethical codes otherwise typically require the attorney to withdraw his representation.  *See id.* at 156, n.8 (citing Model Code of Professional Responsibility DR 5-102(A)); *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993) (same).

The requirement to disqualify counsel who is to testify as a witness in a criminal case is clear and virtually automatic.  The Second Circuit, applying an older version of the professional responsibility rule with relevantly similar language, has held that "[i]f [the attorney] were to be sworn as a witness *it is clear that he should not serve as trial attorney*."  *United States v. Cunningham*, 672 F.2d 1064, 1074 (2d Cir. 1982) (emphasis added); *see also, e.g.*, *United States v. Costanzo*, No. 22 Cr. 281 (JPO) (S.D.N.Y. Oct. 25, 2022) (ECF No. 39 at 6) (citing *id.*); *Kliti*, 156 F.3d at 156 n.8 ("If [the attorney] were to be a sworn witness, he should be disqualified as the trial attorney."); *United States v. Kwang Fu Peng*, 766 F.2d 82, 86 (2d Cir. 1985) ("Of course, if [an attorney] were to take the stand to rebut [a witness]'s testimony explicitly, *he would face certain disqualification* pursuant to [the older version of the rule]." (emphasis added)).

The Second Circuit has held that disqualification of witnesses as trial counsel is justified to prevent "harm to the integrity of the judicial system."  *Murray v. Metropolitan Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).  It held:

66

> We have identified four risks that Rule 3.7(a) is designed to alleviate: (1) the lawyer might appear to vouch for his own credibility; (2) the lawyer's testimony might place opposing counsel in a difficult position when she has to cross-examine her lawyer-adversary and attempt to impeach his credibility; (3) some may fear that the testifying attorney is distorting the truth as a result of bias in favor of his client; and (4) when an individual assumes the role of advocate and witness both, the line between argument and evidence may be blurred, and the jury confused.

*Id.* These concerns, the Second Circuit explained, "matter because, if they materialize, they could undermine the integrity of the judicial process." *Id.*

Consistent with the fact that trials are dynamic and not fully predictable, under settled law, disqualification is appropriate based upon the risk, not necessarily the certainty, that a defense attorney may be a witness at trial. *See Wheat v. United States*, 486 U.S. 153, 162 (1988) ("[A] district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly."); *see also id.* at 164 (presumption in favor of counsel of choice "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict"). Indeed, a district court may properly disqualify an attorney where the Government represents that it is merely reasonably possible that the attorney will be a witness at trial. *See United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004) ("The risk that [the attorney] would become a witness at trial was enough alone to allow the district court to [disqualify the attorney] under an abuse of discretion standard. We could not expect the district court to rule otherwise where it seems more likely than not that a number of conflicts will materialize."). Disqualification is appropriate even when the attorney is not a potential target of the government's investigation and the testimony is not central.

67

*See United States v. Cain*, 671 F.3d 271, 295-96 (2d Cir. 2012) ("Although [the attorney] was not a potential target of the grand jury investigation and his testimony may well have been less central to the prosecution than the testimony that would have been offered by the lawyer in *Jones*, we cannot say that the district court abused its discretion in concluding that the risk that [the attorney] would become a witness against his client was sufficient to justify his disqualification.").

Importantly, even where a lawyer will never be called to testify, he may be disqualified if the lawyer "is in a position to become an unsworn witness." *Locascio*, 6 F.3d at 933. "An attorney acts as an unsworn witness when his relationship to his client results in his having first-hand knowledge of the events presented at trial." *Id.* As the Second Circuit has held, in contrast to a waivable conflict of interest:

> When an attorney is an unsworn witness, however, the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced.

*Id.* at 934.

Although measures short of disqualification may be considered, they are not required where an attorney has personal knowledge of the facts of the case, particularly when they would impair the government's presentation of those facts. An attorney with personal knowledge of facts of the case has a potential conflict of interest, but if the jury is kept entirely unaware of this personal knowledge this conflict may be waivable. *See, e.g.*, *Kliti*, 156 F.3d at 156. But that a waiver is possible does not mean that disqualification is inappropriate. On the contrary, any measures taken to keep the jury from learning of an attorney's role (assuming a defendant is willing to waive the conflict) should not be so intrusive that they impair the government's ability to present a cogent

68

and compelling case. *See Locascio*, 6 F.3d at 934 (rejecting argument that redactions could have avoided unsworn witness issue, holding "the government's case should not be unfairly impaired so that an accused can continue with conflicted counsel.").

In criminal cases, courts will disqualify attorneys if their potential testimony is "not of merely tangential importance to the trial." *Kwang Fu Peng*, 766 F.2d at 87. Applying this settled law, courts in this district routinely disqualify attorneys who may become witnesses. In *United States v. Kerik*, Judge Stephen Robinson disqualified an attorney who had personal knowledge of the charged conduct. 531 F. Supp. 2d 610, 615-16 (S.D.N.Y. 2008). In doing so, Judge Robinson rejected a defense argument that the testimony was cumulative and therefore unnecessary because there were other witnesses to the events. *Id.* at 615. Judge Robinson ordered disqualification because the attorney's testimony was highly relevant to the charges contained in the indictment, and remarked, "even assuming arguendo that [the potential testimony] is in some respects cumulative, it does not follow that the Government should be deprived of this evidence," particularly because it corroborated other evidence the defense was likely to challenge. *Id.* The attorney's role as an unsworn witness was another ground for disqualification, because should the attorney "disagree with any of [another witness's] characterizations of the events surrounding the statements [*i.e.*, the statements of which he had firsthand knowledge], he will either be forced to sit quietly in detriment to his client or (without taking an oath or being cross-examined) to ask questions to which the jury may assign undue weight. In either case, the risk of prejudice to the Defendant or the Government is too great, and places in jeopardy the integrity of the proceeding." *Id.* at 616.

69

Recently, in *United States v. Costanzo*, Judge J. Paul Oetken disqualified counsel as a witness or unsworn witness, rejecting defense arguments that this testimony (whether the attorney was aware of work performed underlying an alleged sham invoice) had little relevance and was not necessary because others would have been better positioned to know about the subject matter. No. 22 Cr. 281 (JPO) (S.D.N.Y. Oct. 25, 2022) (ECF No. 39 at 4). Judge Oetken ordered disqualification even where the testimony would not establish the point with "mathematical certainty," because it was at least "relevant and important." *Id.* at 5-6. Judge Oetken rejected the defendant's arguments of substantial hardship, noting that even though the attorney had represented the defendant for almost three years, only five months had elapsed between charges being brought and the date of the disqualification, as well as the fact that the case was not at an advanced stage. *Id.* at 7.

In *United States v. Finkelstein*, Judge Paul G. Gardephe considered an attorney who—as here—became a potential government witness as a result of criminal acts undertaken by the client during the course of the representation. No. 21 Cr. 217 (PGG), 2021 WL 2555832, at *1 (S.D.N.Y. June 22, 2021). After the parties attempted to but were unable to reach a stipulation as to the attorney's testimony, Judge Gardephe ordered the attorney's disqualification over the defendant's objection, explaining that the attorney's firsthand knowledge made it likely that the attorney "will be a sworn witness at trial, or an unsworn witness in the event that he represents the Defendant at trial." *Id.* at *5.

A decision to disqualify an attorney as a potential sworn or unsworn witness is not erroneous just because the attorney is not ultimately called to testify. In *United States v. Cain*, the Second Circuit affirmed the pretrial disqualification of an attorney, even where "his testimony may

70

well have been less central to the prosecution" than attorney testimony in other cases, based on

"the risk that [the attorney] would become a witness against his client," and—crucially—even

though the judge "ultimately concluded that it was unnecessary" to compel the attorney to testify

and the attorney thus never became a witness at trial.  671 F.3d at 295; *see also id.* at 295-96

("'Viewing the situation as it did before trial,' . . . we cannot say that the district court exceeded

'the broad latitude which must be accorded it in making this decision.'" (quoting *Wheat*, 486 U.S.

at 163-64)).[15]

    "A district court's decision to disqualify an attorney is accorded substantial latitude and is

reviewed only for abuse of discretion."  *United States v. Rivera*, 571 F. App'x 55, 60 (2d Cir. 2014)

(internal quotation marks omitted).

---

[15] As the foregoing and other cases demonstrate, contrary to the defendant's rhetoric, it is not "unprecedented" (Mem. 15) for an attorney to be disqualified (or to withdraw prior to being disqualified) because he or she was unknowingly involved in or has personal knowledge of criminal conduct.  Nor it is unprecedented for that disqualification to rest on the attorney's unknowing involvement in obstruction of justice through statements to a prosecutor's office and/or production of materials to the grand jury.  *See Kerik*, 531 F. Supp. 2d at 615-16 ("Here the Government alleges that the Defendant obstructed the state investigation through his lawyers' unwittingly-made obstructive statements. The direct evidence of those charges is the attorney's statements to investigators.  The fact that Mr. Breen allegedly participated in some of the meetings and allegedly did not stop the statements from being made, contradict or correct them is both relevant and probative.  Even if Mr. Breen were not to become an actual witness, he would be an unsworn witness who could subtly impart to the jury his first-hand knowledge of events without having to swear an oath or be subject to cross-examination."); *United States v. Ash*, 464 F. Supp. 3d 621, 632-33 (S.D.N.Y. 2020) (recognizing defendant's lawyer had an actual or potential conflict because he appeared to have been involved in making an incomplete grand jury subpoena production on her behalf that failed to produce responsive materials and the lawyer was present for false or misleading statements made by defendant at an interview with the government).  In any event, the relevant inquiry is whether an attorney has an actual or potential conflict requiring disqualification (which, as set forth in Section II.B.1.b, Schertler manifestly did), not how often conflicts of this sort come up.

b)      Discussion

(1)      The Defendant Waived Any Objection to Her Own
Decision to Cause Schertler's Withdrawal

In advance of the first trial in 2024, the Government sought in good faith to reach a stipulation that could avoid the disqualification of Schertler, but the defendant did not agree, necessitating his withdrawal. The defendant cannot now be heard, on a post-trial motion, to object to her own decision to necessitate Schertler's withdrawal as her counsel, which she caused by refusing to consider any anonymizing stipulation, and which she never so much as hinted should be revisited following the withdrawal.

Promptly after the S4 Superseding Indictment was filed, adding obstruction of justice charges, at the March 11, 2024 arraignment and conference, the Government raised that the defendant's then-current counsel had personal knowledge of certain facts relevant to this matter.[16] (Dkt. 257 at 13-14; *see also* S4 Indictment ¶¶ 70, 71, 73.) The Government then requested (Dkt. 253), and the Court held, a *Curcio* hearing, because those allegations raised two related, but distinct concerns: first, that the Government at trial might seek to call Schertler and/or enter into evidence materials or elicit testimony from other witnesses regarding events with which Schertler was involved, and second, that Schertler (and his co-counsel) might be limited in their ability to make

---

[16] The defendant and her counsel were already on notice of the potential conflicts as she and her counsel had received grand jury subpoenas pertaining to the obstruction of justice. She retained independent counsel (her now-current counsel), after Schertler's firm was subpoenaed, who provided advice to her at the relevant stage of the grand jury investigation that pertained to Schertler and his law firm, including the Court's denial of the defendant's motion to quash the subpoena to Schertler's firm, the Court's granting of the Government's crime-fraud motion pertaining to certain documents and four topics related to Schertler's potential grand jury testimony, and Schertler's participation in an interview with the Government in lieu of personal appearance before the grand jury. (Sealed Schertler Decl., dated April 5, 2024.)

certain arguments to the Court or the jury at trial, irrespective of whether the defendant wished them to make these arguments. (Dkt. 253 at 1.)

On March 24, 2024, at the *Curcio* hearing, the defendant waived the conflict posed by the second issue described above, and the Court requested the parties seek to reach a stipulation, if they could, by April 4, 2024, to anonymize evidence about Schertler and his firm to avoid their disqualification. (Dkt. 273 at 4-5.) Thereafter, the parties exchanged drafts of an anonymized stipulation that pertained to Schertler and his firm. The defendant then requested a one-day extension on the parties' update on the potential stipulation, which the Court granted. (Dkt. 281.) The next day, after having failed to propose any revision to the Government's revised draft of an anonymized stipulation to avoid disqualification, Schertler and his firm filed a motion to withdraw along with a sealed supporting declaration.[17] (Dkt. 286.)

Subsequently, the defendant informed the Court, in writing, that she consented to Schertler's and his firm's withdrawal. Pursuant to a sealed order of the Court, the defendant filed a sealed declaration that she had reviewed Schertler's motion (and the supporting sealed declaration), that she had discussed the issue with Schertler as well as independent conflict counsel (now her current counsel), and that she consented to the withdrawal of Schertler and his law firm from representing her in this matter.

Following the defendant's consent to Schertler's withdrawal, which the Court granted, the defendant never indicated her alleged desire to re-retain him, asked the Government whether there

---

[17] In contrast to the defendant's rejection of the Government's draft stipulation out of hand, the defendant's co-defendants executed a stipulation that allowed Lawrence Lustberg, Esq., to represent Hana at trial despite the fact that he was a witness to certain conduct of Menendez and Daibes. (*See, e.g.*, Dkt. 318 at 1-4; Dkt. 326; Dkt. 336.)

had been any update in its consideration as to whether to call Schertler as a live witness in its case-in-chief, inquired about why the Government's witness list for its case-in-chief did *not* name Schertler, objected to the inclusion of Schertler's name in a number of Government exhibits, or in any other way sought to re-explore any ability whatsoever for her to re-retain Schertler in connection with this case, much less as a lawyer at the table at trial. The defendant, after causing (and expressly consenting to) Schertler's withdrawal, cannot wait until after trial to revisit the issue and then second-guess her own decision with the "wisdom of hindsight after the trial has taken place," *Wheat*, 486 U.S. at 162; *see generally, e.g.*, *United States v. Robinson*, 399 F. App'x 635, 636 (2d Cir. 2010) ("Where a defendant indicates that the district court's proposed resolution of an issue is satisfactory, he waived his right to appeal that resolution.").

　　This is particularly so because the defendant's choice was plainly strategic. There is no rational explanation for her decisions other than that she preferred to have new counsel, who was free to advocate zealously for her without the constraints of having personal knowledge of the facts. She had the right to make that choice. She does not have the right make that choice, and then, after conviction, to seek a new trial on the ground that the Court—without any contemporaneous objection, or so much as a hint that she had changed her decision—should have overridden her decision or *sua sponte* revisited the withdrawal. *See, e.g.*, *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995) (Where a party "consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver, which will negate even plain error review.").

　　The defendant now appears to suggest that she could not have advised the Court that she wanted Schertler to return because the Government allegedly intentionally kept "secret" that he

would not be called as a substantive witness in its case-in-chief, which decision was a change from the Government's expectation at the *Curcio* hearing (Mem. 2). That is baseless.

As an initial matter, the defendant offers no authority, and the Government is unaware of any, requiring the Government to actually call a lawyer as a witness in its case-in-chief in order for the lawyer to be disqualified. That is, as set forth above, not the law—for good reason. *See, e.g.*, *Cain*, 671 F.3d at 295; *Wheat*, 486 U.S. at 164 (presumption in favor of counsel of choice "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict").

Here, the Government's reconsideration of its likelihood of calling Schertler as a substantive witness in its case-in-chief at the first trial, referenced by the defendant (Mem. 8-9), was based on the Government's continued attempts to streamline and focus trial presentation. These attempts were made in light of, among other things, the Court's rulings, at the first trial (which post-dated the *Curcio* hearing), that an attorney proffer could not be in and of itself an act of obstruction. (*See, e.g.*, First Trial Tr. 4987-88, 7123.) It was also consistent with the approach of the Government's presentation of testimony at the first trial, where the Government elected not to call Menendez's attorney in its case-in-chief either to testify about the attorney proffer.

Contrary to the defendant's suggestion, the decreased likelihood of calling Schertler for substantive testimony (rather than potentially merely as a custodian) in the Government's case-in-chief was anything but a "secret" to her (Mem. 2). Rather, it was communicated to the defendant by the lack of inclusion of Schertler as a witness on the Government's case-in-chief witness list. (*See* Ex. A.) Yet the defendant asked no questions when his name did not appear on that list. Nor did the defendant ask any questions when, consistent with the parties' agreement, as ordered by

the Court (Dkt. 673 at 3), prior to and throughout the trial, the Government provided the names of its case-in-chief witnesses, including custodians, at least two days before calling them (as well as, throughout trial, identifying upcoming witnesses on the record (*e.g.*, Tr. 967, 1576, 1815, 2094-95, 2537)), and Schertler was never so named.[18]  The defendant's suggestion—in a motion in which she bears the burden—that she nevertheless kept expecting him to appear in court as a case-in-chief witness is both unsupported and incredible.  *Cf., e.g.*, *United States v. Westcott*, 159 F.3d 107, 112-13 (2d Cir. 1998) ("But if [the defendant] had been misled by the plea allocution, once he learned [of the information about which he complains] he surely would have asked the district court to permit him to withdraw his plea.  Despite ample opportunity, he did not do so . . . .").  In any event, the defendant obviously had knowledge that the Government did not in fact call Schertler in its case-in-chief.  Yet again, she said nothing and did nothing, despite multiple days remaining in the trial in which she could have sought to "have restored the attorneys of her choosing" (Mem. 11).

To be sure, the Second Circuit has not decided whether a challenge to a disqualification ruling may be forfeited through a failure to timely appeal that ruling.  *See Cain*, 671 F.3d at 291-92.  But here, there was no ruling, and the defendant did not merely fail to object, but affirmatively consented to her attorney's request to withdraw, after consulting with independent counsel (her now-counsel), and never so much as hinted that changed circumstances had let her to reconsider her decision.  Nor is the fact that an improper denial of counsel of choice may be deemed

---

[18] This failure to inquire refutes the defendant's implausible suggestion that she believed the witness list's general reference to unnamed custodians somehow indicated a definite intent by the Government to call Schertler, or that the defendant's decision-making turned on whether he testified as a custodian (Mem. 10 n.4).

"structural error," and thus not subject to harmless error analysis, change the fundamental principle that a defendant must complain that there has been a denial in the first place. *Cf. United States v. Thomas*, 303 F.3d 138, 142 (2d Cir. 2002) (*Batson* challenge, although structural if preserved, waived by lack of timely objection); *United States v. Gomez*, 705 F.3d 68, 76 (2d Cir. 2013) (rejecting unpreserved courtroom closure claim notwithstanding that a violation is structural, because "the fairness and public reputation of the proceeding would be called into serious question if a defendant were allowed to gain a new trial on the basis of the very procedure he had invited").

(2)    Schertler Was an Unsworn Witness

Even if considered on the merits, the defendant's claim proceeds from the faulty premise that she was entitled to be represented at trial by a conflicted attorney who was—due to her own choices—at least an unsworn witness on a material fact at trial.

At the defendant's trial, the Government—without objection from the defendant—offered and introduced a number of exhibits that made Schertler an unsworn witness.  These exhibits included a chart summarizing a number of subpoena responses that Schertler produced, either on behalf of the defendant or his firm (GX 2499); the underlying subpoenas addressed to the defendant care of Schertler, or addressed to Schertler or his firm (GXs 11B-3, 11F-1, 11F-2); emails transmitting to Schertler those subpoenas (GXs 11B-3-EM, 11F-EM); and—one of the key exhibits on the obstruction of justice counts—the subpoena production in which Schertler's firm produced, on behalf of the defendant, the checks and transmittal paperwork falsely characterizing Hana's payment toward the defendant's mortgage and certain payments by Uribe for the Mercedes-Benz as loans (GX 3B-1-EM).  This email was not just sent by an associate at Schertler's

firm (where he is a named partner), but Schertler was copied on the email itself, firmly establishing him as an unsworn witness to the production of these documents.[19]

Not only was Schertler's identity as an unsworn witness cemented—without objection from the defendant—by admitted documentary evidence, but also during the course of presenting this evidence to the jury, the jury's attention was directed to Schertler's name and identity as the defendant's counsel in multiple ways, again without objection by the defendant. A witness was pointed toward Schertler's display name and asked to confirm that his display name was not associated with the U.S. Attorney's Office (Tr. 1832:5-8 (referring to GX 11B-3-EM)); his name was read aloud as counsel for the defendant (Tr. 1833:3-5 ("Q. Looking to the left, could you please read the 'to' line starting with 'to.' A. Nadine Menendez c/o David Schertler, Esq.")); his name was restated in a clarifying question (Tr. 1833:23-25 ("By the way, you read that previously it was—the letter was addressed to Nadine Menendez c/o David Schertler, Esq. What does 'c/o' mean?")); and the name of his firm, which includes his last name, was read aloud to the jury in identifying the sender of the subpoena response (Tr. 1836:18-21 (Q: "Looking at the signature block of the user sending this email, can you please read the first line of the signature block under her name. A. Associate – Schertler Onorato Mead & Sears LLP.")).

Plainly, there was nothing "manufactured" as the defendant baselessly and belatedly states (Mem. 54), about the conflict of interest that would have been presented had Schertler remained

---

[19] The defendant never asked for any of these references to be redacted, and in the absence of an anonymizing stipulation, doing so would have impaired the jury's understanding of the crucial fact that these documents were submitted by the defendant, through counsel, in response to a subpoena that also passed through counsel. *See Locascio*, 6 F.3d at 934 (rejecting argument that redactions could have avoided unsworn witness issue, holding "the government's case should not be unfairly impaired so that an accused can continue with conflicted counsel.").

trial counsel. Indeed, as noted above, the defendant did not even object to the pertinent evidence, and it was self-evidently relevant and admissible.

Equally plainly, the facts on which Schertler was an unsworn witness were far from "of merely tangential importance to the trial." *Kwang Fu Peng*, 766 F.2d at 87. Indeed, the Court has already found that the evidence of this precise conduct presented at the first trial was sufficient to prove obstruction of justice, *see Menendez*, 759 F. Supp. 3d at 507 ("[T]he jury was entitled to infer the even stronger fact that Menendez . . . participated in *submitting false documents in direct response* to an outstanding subpoena. Nadine *produced these checks*—each of which had a false and misleading memo line describing the payments—in response to a later grand jury subpoena issued in 2023." (emphasis added)), and as discussed in Section I.B.5.a, *supra*, the evidence of this conduct presented at this trial—*i.e.*, including the documents and testimony naming Schertler—is similarly powerful evidence on those same charges.

(3)    Schertler Was a Potential Unsworn or Sworn Witness on Additional Subjects Until the Close of the Evidence

In addition to Schertler's cemented status as an unsworn witness to the obstructive document production in exhibits and testimony at trial, the Government also marked several exhibits identifying him as an unsworn witness both to statements he made to the Government at an attorney proffer (GX 4B-1) and to a false exculpatory statement that the defendant made to him (GX 4B-2). The Government was considering introducing a portion of one of these exhibits— certain slides Schertler used at the attorney proffer (GX 4B-1)—until April 12, 2025, *i.e.*, the Saturday before the Government rested its case-in-chief on Monday, April 14. And given that the Government had agreed to disclose which exhibits it intended to offer two days in advance, the

defendant was aware, as of April 12—*i.e.*, the day the Government made the decision—that the Government did not intend to offer the exhibit in its case-in-chief.[20]

Regardless, even after resting its case-in-chief, the Government still could not have advised the defendant that the conflict was conclusively "resolved" (Mem. 11, 15), even leaving aside the fact that Schertler was already an unsworn witness to the document production, which alone created a conflict. If the defendant had testified, the Government was prepared to cross-examine her both about the statements Schertler made at the attorney proffer (and to use, if needed, portions of the slides from the attorney proffer (GX 4B-1)) and about the false exculpatory statement that the defendant made to him (and to use, if needed, portions of the email from the defendant to Schertler (GX 4B-2)). Either of these would have further compounded Schertler's status as an unsworn witness.

Moreover, the Government could not responsibly rule out the possibility that, if the defendant testified, the Government would need to call Schertler as a *live* witness in a rebuttal case, and nor was it required to do so for the defendant's convenience. *See, e.g.*, *Locascio*, 6 F.3d at 933 ("the government's case should not be unfairly impaired so that an accused can continue with conflicted counsel.").[21] And again, far from acting "secretly" (Mem. 2), as soon as the defendant indicated her decision not to testify (Tr. 2667), the Government, in the very same

---

[20] The defendant did not, upon learning that the Government did not seek to introduce that exhibit, indicate any interest in re-retaining Schertler.

[21] The Government of course could not rule out the possibility that the defendant would testify until her decision was final. Indeed, even *after* the Court allocuted the defendant on her decision not to testify—an allocution during which the Government's counsel recall the defendant noticeably pausing before stating that she did not wish to testify (Tr. 2667:18)—counsel for the defendant sought and received the Court's permission for a recess to consult with the defendant prior to resting (Tr. 2743).

conference with the Court, following legal argument on pending motions *in limine*, transparently advised the Court and the defendant that it did not expect a rebuttal case (Tr. 2696 ("[O]bviously we reserve the right to see how the case comes in, but we don't presently expect a rebuttal case.")). Thus, even focusing solely on the Government's decision whether to call Schertler as a live witness (and ignoring entirely the multiple ways in which he was already an unsworn witness), the defendant's claim that the "Government did not make clear, unambiguous, and timely notification to the Court and [the defendant]" (Mem. 2) is demonstrably inaccurate. To the contrary, the Government notified the Court and the defendant of its likely intentions even *before* the defense case had closed and it could definitively rule out a rebuttal case.[22]  In any event, the defendant's conduct—not asking a single question or taking a single action to even hint at any alleged desire to re-engage Schertler at any time either before or after the Government made the numerous witness disclosures described above, or this notification about its rebuttal case—shows that, contrary to her self-serving *post hoc* representations in her post-trial memorandum (*see, e.g., id.*), she did not in fact contemporaneously desire for Schertler to be re-engaged, much less to be re-engaged during trial to present a defense case or to deliver the defense summation for a trial he had not attended. Indeed, three days followed the Government's notification about its rebuttal case before summations, and the defendant *still* said nothing.

---

[22] The Government then also confirmed that it did not intend to present a rebuttal case immediately following the close of the defense case a few hours later. (Tr. 2747.)  In light of the Government's previous notification of its intentions, this confirmation did not come as a surprise to any of the trial participants. (*See* Tr. 2747:14-17 (Court indicating it had assumed the Government was not presenting rebuttal case in light of its earlier notification).)

(4)    The Conflict Caused by the Defendant's Actions Never "Resolved"

In any event, no motion, whenever made, would have had any merit, as the conflict never conclusively "resolved." (Mem. 11, 15.) As described above, Schertler was an unsworn witness to a material and disputed event underlying the charges in Count Seventeen and Count Eighteen, which event was proven with documents conspicuously identifying him. If he had been allowed to advocate for the defendant at trial concerning this event, the defendant would have enjoyed an unfair advantage in being able to assure the jury that the checks that her own counsel was involved in producing could not have been acts of obstruction. *See, e.g., Locascio*, 6 F.3d at 933 ("[An unsworn witness attorney's] role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination."); *id.* at 934 (affirming disqualification, reasoning, "The government was legitimately concerned that, when [the unsworn witness attorney] argued before the jury for a particular interpretation of the tapes, his interpretation would be given added credibility due to his presence in the room when the statements were made."). That would have been entirely improper.

\*\*\*

In sum, the defendant's accusations that the Government improperly and unconstitutionally interfered in her choice of counsel (Mem. 1, 13-16, 54) are factually and legally baseless. The series of cases she cites, which raise the specter of the government's conduct appearing calculated to interfere with a criminal defendant's choice of counsel, has no application here, and she

82

identifies no case remotely resembling the circumstances here in support of her position.[23]  Absent an anonymizing stipulation—which the Government attempted in good faith to reach but the defendant rejected out of hand and never sought to revisit—Schertler was at least an unsworn witness, given his direct (but unwitting) involvement in the defendant's production of documents as part of an effort to obstruct justice.  That alone required disqualification.  And he was also an unsworn witness on multiple other subjects, and a potential *live* witness up until the close of evidence, on multiple subjects.  That too required disqualification.

But the Court need not reach any of this, because Schertler withdrew, with the defendant's express and written consent, and she never objected to his potential disqualification, or sought to have him return.  She is not entitled to the extraordinary remedy of a new trial on the ground that, in the "wisdom of hindsight," *Wheat*, 486 U.S. at 162, she allegedly would have sought to undo the decision she reached after consulting with independent counsel (now her current counsel), and never so much as hinted she wished to reconsider in the many months before trial and multiple weeks of trial.  In short, the defendant appears to have done what she is not permitted to do: "stood mute, gambling on an acquittal while holding this issue in reserve."  *United States v. Gersh*, 328 F.2d 460, 463 (2d Cir. 1964) (Friendly, J.) (referring to a claim of alleged juror prejudice).

---

[23] The defendant's alternative request, made in a footnote and undeveloped, for an "evidentiary hearing" (Mem. 15 n.8) is baseless.  Materials pertaining to the Government's internal decision-making, which is what the defendant seems to seek, are exempted from discovery under "the Federal Rules of Criminal Procedure, as well as the deliberative process privilege," unless, at a minimum, "a defendant provides some evidence tending to show the existence of the essential elements of the defense."  *United States v. Menendez*, 763 F. Supp. 3d 538, 549-50 (S.D.N.Y. 2025) (internal quotation marks omitted).  The defendant has not done so here.

2.       *The Government's Presentation of Documentary Evidence Was Proper*

The defendant also argues that it was purportedly unfair and unconstitutional for the Government to present to the jury, through summary charts or otherwise, voluminous documentary evidence of her guilt. (Mem. 16-24.) None of her complaints, even if preserved, has merit, and even if they did, they are not a basis for a new trial.[24]

a)       The Government's Summary Charts Were Admissible

In order to allow the consideration of large volumes of documentary evidence in a comprehensible and efficient fashion, the Court admitted a series of summary charts that summarized portions of numerous government exhibits and placed them in chronological order. (*See* GXs 1352, 1353, 1354.) The charts summarized highly probative and inculpatory evidence, but—contrary to the defendant's complaints (Mem. 16-24)—that did not somehow render the charts improper. Without the summary charts, the documentary evidence of guilt would have been equally overwhelming, but the trial would have been much longer.

In any event, the portion of the defendant's challenge that is directed at the charts themselves is to an evidentiary ruling she consented to in writing in advance of trial (*see* Dkt. 781 at 2-3), and is therefore fully waived, precluding review. *See United States v. Bodnar*, 37 F.4th 833, 844 (2d Cir. 2022) (a defendant's "considered decision *not* to object" is true waiver foreclosing review). And to the extent the defendant merely re-raises her objections to the summary witnesses *reading* from the charts (*see* Tr. 568-69, 591-97), the Court need not revisit,

---

[24] The defendant's request for a "judgment of acquittal" under Rule 29 on the basis of the Government's use of summary charts (Mem. 17) is a *non sequitur*. Since, as set forth in Section I, the evidence was sufficient on every count, there is no basis for a judgment of acquittal even if the use of summary charts was somehow improper (although it was not).

on a Rule 33 motion, its overruling of those objections. *See, e.g.*, *United States v. Malka*, 623 F. Supp. 3d 306, 328 (S.D.N.Y. 2022) ("Courts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion."); *United States v. Donziger*, No. 11 Civ. 691 (LAP), 2021 WL 3726913, at *4 (S.D.N.Y. Aug. 23, 2021) (denying Rule 33 motion where defendant "essentially seeks reconsideration," which "alone is fatal to his motion, especially because this case presents no concern that an innocent person may have been convicted" (internal quotation marks omitted)); *United States v. Soto*, No. 12 Cr. 566 (RPP), 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions." (collecting cases)), *aff'd sub nom. United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015); *United States v. Delva*, No. 12 Cr. 802 (KBF), 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015) ("A Rule 33 motion is not an appropriate forum to revisit an evidentiary issue that the Court already decided."); *United States v. Smith*, No. 08 Cr. 390 (BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009) (denying Rule 33 motion where defendant "seeks to use Rule 33 as a vehicle to relitigate evidentiary rulings with which he disagrees"); *see also United States v. Fazio*, 770 F.3d 160, 165 (2d Cir. 2014) ("We review a district court's rulings on the admissibility of trial evidence for abuse of discretion."). The Court accordingly need not consider this claim, but if the Court chooses to do so, it should reject it for multiple reasons.

(1)    Applicable Law on Admission of Summary Charts

Summary charts, including chronological summaries of communications, are regularly admitted under the law of the Second Circuit. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 209-10 (2d Cir. 2020) (hundreds of pages of text messages, emails, and other documents "merited the

85

use of summary charts in a complex fraud trial," citing cases); *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020) (affirming admission of summary chart of "hundreds of calls and text messages" and explaining that "this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary"); *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (affirming admission of "government's summary charts [which] set forth detailed information concerning well over 100 telephone calls spanning three days between four individuals"); *see also United States v. Yousef*, 327 F.3d 56, 158 (2d Cir. 2003) (stating the Second Circuit has "regularly affirmed" the use of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records"); *United States v. Lasko*, 146 F. App'x 530, 532 (2d Cir. 2005) ("The use of charts summarizing evidence is a common procedure whose use we have repeatedly approved." (internal quotation marks omitted)); *see also Menendez*, 759 F. Supp. 3d at 520-22.

While summary charts must be based on the evidence they purport to represent, they need not include all evidence the opposing party may wish. *See, e.g.*, *United States v. Gentile*, No. 21 Cr. 54 (RPK) (PK), 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024) (rejecting defense argument that Rule 1006 slides improperly "cherry-pick" certain transactions to highlight, holding "these are the sort of summary slides that Rule 1006 permits"). "A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case." *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 333 (E.D.N.Y. 2013) (internal quotation marks and brackets omitted); *see also, e.g.*, *DL v. District of Columbia*, No. 05 Civ. 1437, 2015 WL 6446087, at *6 (D.D.C. Oct. 23, 2015) (rejecting defense argument that a Rule 1006 chart was "inappropriately argumentative" because it was selective).

86

Because "selection of relevant evidence for presentation to the factfinder is inherent to the nature of litigation," the "non-comprehensive nature of the data underlying a summary goes to evidentiary weight, not the threshold question of admissibility." *United States v. Hofstetter*, No. 13 Cr. 27 (TAV) (DCP), 2019 WL 5057176, at *5 (E.D. Tenn. Oct. 8, 2019) (internal quotation marks omitted). In short, "[a] summary, to be admissible . . . need not give effect to the contentions to the accused," but only "be what it purports to be." *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983) (internal quotation marks omitted).

Accordingly, a summary chart is admissible even when a defendant complains that it takes evidence out of context in order to support prosecution theories. In *United States v. Parnas*, No. 19 Cr. 725 (JPO), 2022 WL 669869 (S.D.N.Y. Mar. 7, 2022), a defendant opposed the admission of chronological summary charts of communications and did "not contend that anything included in the charts was false; he instead assert[ed] that the charts were misleading because they took evidence out of context to support the government's narrative." *Id.* at *7. Judge Oetken rejected that argument, holding that it was "well within the government's right" to present evidence to support its narrative in its case in chief. *Id.*; *see also, e.g.*, *United States v. Bendelstein*, No. 18 Cr. 309 (HG), 2023 WL 2457842, at *10 (E.D.N.Y. Mar. 10, 2023) ("Although Defendant asserts that the charts were improperly argumentative, he notably 'does not contend that anything included in the charts was false.'" (quoting *Parnas*, 2022 WL 669869, at *7-8)). Indeed, the Second Circuit has repeatedly rejected just such arguments. *See Ho*, 984 F.3d at 209-10 (rejecting argument that timeline of selected exhibits could not be introduced under Rule 1006 because it was allegedly "created for the purpose of generating a narrative supporting the prosecution's theory of the case"); *see also, e.g.*, *Miller*, 954 F.3d at 565 (affirming admission of summary chart that listed "highly

selective" set of telephone calls and texts); *see generally Yousef*, 327 F.3d at 158 (noting regular affirmance of summary charts "to draw the jurors' attention to particular evidence culled from a voluminous set of records").

Instead of any supposed requirement to include all documents the opposing party wishes, under the law a summary under Rule 1006 must only be "'based on foundation testimony connecting it with the underlying evidence summarized and must be based upon and fairly represent competent [and admissible] evidence.'" *U.S. Secs. & Exchange Comm'n v. Alpine Secs. Corp.*, 354 F. Supp. 3d 396, 419 (S.D.N.Y. 2018) (quoting *Fagiola v. Nat'l Gypsum Co AC&S*, 906 F.2d 53, 57 (2d Cir. 1990)). "Objections that a summary 'd[oes] not fairly represent the [underlying] documents and [is] excessively confusing and misleading go more to [the summary's] weight than to its admissibility.'" *Alpine Secs.*, 354 F. Supp. 3d at 419 (quoting *U.S. ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 163 (2d Cir. 1996)). So long as a summary chart has a foundation in the evidence, "[t]he inaccuracy of a summary under Rule 1006 . . . goes to the weight, rather than the admissibility, of the evidence." *BD ex rel. Jean Doe v. DeBuono*, 193 F.R.D. 117, 130 (S.D.N.Y. 2000); *see also, e.g.*, *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("Even if the calculations are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it."); *Nat'l Credit Union Admin. Bd. v. Wells Fargo Bank, N.A.*, No. 14 Civ. 10067 (KPF) (SN), 2020 WL 2216560, at *2 (S.D.N.Y. May 7, 2020) (quoting *id.*).

To have a proper foundation in the evidence, a summary chart need not be accompanied by "detailed testimony stating the basis" of each entry, but simply enough explanation to allow the jury to see how the information on the chart was "derived from the underlying evidence." *United*

States v. Citron, 783 F.2d 307, 317 (2d Cir. 1986); *see also id.* ("Our ruling that the chart was inadmissible does not mean that the government must provide detailed testimony stating the basis of each calculation undertaken when a summary chart is prepared. All that is required is enough explanation to allow the jury to see how the numbers on a chart were derived from the underlying evidence put before it.").

The grant of a new trial based on any arguably misleading aspects of a summary chart is an "exceptional" step that is not appropriate when even an "arguably somewhat confusing" chart is accurate and any allegedly misleading aspect is brought to the jury's attention, such as through cross-examination. *Archer*, 977 F.3d at 198 n.4 (reinstating conviction where district court had granted new trial based on allegedly misleading summary chart).

> (2)    The Government's Summary Charts Adhered to Well-Established Law

The Government's summary charts here were admissible under settled law, as the defendant conceded. (*See* Dkt. 781 at 2-3; *see also, e.g.*, Tr. 594 (defense counsel: "The chart is like the *Ho* case. [GX] 1352, which went in without objection, that's what's authorized by the *Ho* case."); *see also Menendez*, 759 F. Supp. 3d at 520-22.) Each of the summary witnesses provided clear foundational testimony to allow the jury to see how the information on the chart was "derived from the underlying evidence," *Citron*, 783 F.2d at 317, and indeed the charts themselves each "already list[ed] the source of the summary material," *Gentile*, 2024 WL 3046193, at *4, amply justifying the charts' foundation in the evidence. (*See* Tr. 556-67 (GXs 1352, 1355); Tr. 741-42 (GX 1356); Tr. 1186-92 (GXs 1307-29, 1353); Tr. 1246-47 (GX 1357); Tr. 2395-97 (GXs 1351,

1354); Tr. 2412-14 (GX 1337).)[25]  As discussed in Section II.B.2.b.2, below, the defendant had a full opportunity to cross-examine the summary witnesses about the connection of the summaries to the underlying evidence, which further undercuts any motion for a new trial.  *See, e.g.*, *Archer*, 977 F.3d at 198 n.4 (reversing grant of new trial because "the threat of prejudice was mitigated by the cross-examination, which highlighted" a payment reversal reflected in the underlying evidence).

The charts used by the Government were each of a form that the Court previously ruled is appropriate.  *See Menendez*, 759 F. Supp. 3d at 520-22.[26]  As collections of selected documents arranged in chronological order, the principal charts challenged—Government Exhibits 1352, 1353, and 1354—are substantively indistinguishable from summary charts approved by the Second Circuit in *United States v. Ho*, 984 F.3d at 209-10, which took the form of visual timelines, and are virtually identical in form to those admitted in a number of other cases in this district. (*Compare, e.g.*, GX 1352 (chronological summary chart related to Egypt) *with, e.g.*, Dkt. 611-1 (summary chart admitted in *Parnas*, 2022 WL 669869, at *7).)[27]

_____

[25] The Government's other summary charts were also properly admitted and supported by ample foundational testimony, and the defendant does not mount any substantial challenge to them.  (*See, e.g.*, Tr. 130-32 (GX 1301); Tr. 909-10 (GX 1334); Tr. 2619-20 (GXs 1338, 1339, 1341, 1343, 1344, and 1345); Tr. 2114-16 (GX 1360).)

[26] There is no dispute that the evidence summarized in the charts is voluminous within the meaning of Rule 1006.  Indeed, the defendant paradoxically complains that the evidence is *too* voluminous (Mem. 22; *see also id.* at 17 (tabulating volume of summary witness testimony)), but this of course simply underscores the applicability of Rule 1006.  *See, e.g.*, *Ho*, 984 F.3d at 210 ("[S]ummary charts are sometimes used to synthesize even larger volumes of documentary evidence than was the case here[.]").

[27] Numerous other summary charts of a nearly indistinguishable format have been admitted in other cases in this district.  *See, e.g.*, *United States v. Skelos*, No. 15 Cr. 317 (KMW) (GX 3303); *United States v. Calk*, No. 19 Cr. 366 (LGS) (GX 2109); *United States v. Shea*, No. 20 Cr. 412

The defendant's complaints with the form of the summary charts all reduce to the complaint that these charts did not include material she would wish to have been included. (Mem. 20-22).[28] But the law is clear that this is not required. *See, e.g.*, *Linde*, 922 F. Supp. 2d at 333 ("A summary may include only evidence favoring one party, so long as the witness does not represent to the jury that he is summarizing all the evidence in the case."); *Parnas*, 2022 WL 669869, at *7; *Gentile*, 2024 WL 3046193, at *3. All that was required, which each chart clearly satisfied as brought out through the witnesses' testimony, is that each chart was "what it purports to be." *Lemire*, 720 F.2d at 1349. The defendant simply identifies no way in which the charts do not accurately reflect what they purport to.

Because the Government's summary charts accurately reflected what they purport to reflect, they served the salutary purpose of facilitating the efficient presentation of indisputably voluminous evidence. *See, e.g.*, *Blackwood*, 366 F. App'x at 212 ("[T]he summaries were helpful to the jury in its evaluation of the evidence because they showed the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy."). If the summary charts were excluded, the Government would have been left to read voluminous documents themselves into the record. As discussed in Section II.B.2.b.1, below, that is a perfectly permissible manner of presenting evidence and was used to a limited extent in this trial. But were

---

(AT) (GX 904); *United States v. Wynder*, No. 20 Cr. 470 (PKC) (GX 2209); *United States v. Milton*, No. 21 Cr. 478 (ER) (GX 1006); *United States v. Rangott*, No. 23 Cr. 4 (JHR) (GX 1306). The Government can provide the Court with copies of such exhibits upon request.

[28] The further complaint that not all portions of the summary charts were read to the jury (Mem. 21-22) is perplexing. Given that a summary chart can itself properly be selective, it would be anomalous to impose a rule that the chart cannot be emphasized selectively. In any event, as explained in Section II.B.2.b.1, below, there is no such rule.

the use of summary charts to have been forbidden for some reason, the Government would have been forced to read a far greater volume of underlying documents into the record. Rule 1006 exists to prevent just this sort of inefficiency.

> b)      The Mode of the Government's Presentation of Documentary Evidence to the Jury was Appropriate

The Government's presentation of documentary evidence—both through summary charts and in the non-summary form of simply reading admitted exhibits to the jury—adhered to well-established law. Contrary to the defendant's contentions (Mem. 20-24), nothing in this presentation served as a closing argument, or indeed any argument at all.

> (1)      The Court Properly Allowed Government Witnesses to Read Relevant Evidence to the Jury

In addition to the presentation of summary charts, "it is permissible for a summary witness to 'also read admissible non-summary evidence into the record.'" *Gentile*, 2024 WL 3046193, at *3 (quoting *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 161 (D.D.C. 2022)); *see also, e.g.*, *United States v. Denton*, 944 F.3d 170, 185 (4th Cir. 2019) (no error in permitting a special agent to read portions of defendant's Facebook records to the jury); *United States v. Tragas*, 727 F.3d 610, 614 (6th Cir. 2013) ("As long as the evidence itself is properly admitted pursuant to the Rules of Evidence and does not run afoul of other safeguards like the Confrontation Clause, [the Court does] not see how a defendant could be prejudiced if the evidence is read aloud to the jury.").

Contrary to the defendant's complaints (Mem. 21), as with the selection of documents for summary charts, there is no requirement that a witness reading admitted exhibits into the record read all the documents, or all the portions of documents, that the adverse party wishes. *See*

92

*Fairholme Funds*, 636 F. Supp. 3d at 161-62 ("[T]o the extent defendants challenge the *selection* of documents [the witness] will read into the record . . . they cite no authority for the proposition that a witness reading documents into the record as part of non-summary testimony must also read documents, or portions thereof, that shed a more favorable light on the opposing party."); *see also, e.g.*, *United States v. Markovich*, 95 F.4th 1367, 1378 (11th Cir. 2024) ("Summary testimony need not summarize *all* the records at issue, but may be based on a mere subset, provided that the testimony does not purport to represent 'all the evidence.'" (citing *Flemister v. United States*, 260 F.2d 513, 517 (5th Cir. 1958)).  Rather, "[i]f defendants think the non-summary portions of [the witness's] testimony omit key documents, they are free to offer those documents into evidence themselves." *Fairholme Funds*, 636 F. Supp. 3d at 162.

Accordingly, the defendant's contentions that the presentation of documentary evidence functioned as a closing argument (Mem. 21-24) are simply wrong as a matter of law.  Where witnesses do not opine or interpret but simply present evidence, courts routinely reject defense motions characterizing the presentation of documentary evidence—whether through summary charts, summary testimony, or the non-summary reading of portions of admitted exhibits—as akin to closing argument.  *See, e.g.*, *Lemire*, 720 F.2d at 1350 ("[A] summary should not draw controversial inferences or pronounced judgment; these functions are best left to the closing argument of counsel.  Here, however, the summary involved only routine computations and culling through of documents to eliminate confusing and extraneous evidence.  Consequently we find no force to the argument that [the summary witness's] testimony provided an unwarranted second closing for the government."); *United States v. Baker*, 923 F.3d 390, 398 (5th Cir. 2019) ("[A]lthough [the summary witness] highlighted some key pieces of evidence, the testimony did

93

not draw inferences for the jury, was not 'wholly argumentative,' and did not serve as a substitute for closing argument.  Rather, the testimony consisted of reading the contents of exhibits and sorting through the evidence to show how the documents related to each other and to the charges in the indictment."); *United States v. Nicholson*, No. 18 Cr. 23 (KS) (MTP), 2019 WL 2146605, at *2 (S.D. Miss. May 16, 2019) (similar, citing *id.*).

The Government's witnesses did not "draw controversial inferences" or "pronounce[] judgment," *Lemire*, 720 F.2d at 1350, but instead involved the entirely proper exercises of "routine computations" such as calculating the time between one communication and another, and the "culling through of documents to eliminate confusing and extraneous evidence," *id.*  This is the type of presentation courts permit.  *See, e.g.*, *Baker*, 923 F.3d at 398 (where summary witness "highlighted some key pieces of evidence" but "did not draw inferences for the jury," it "did not serve as a substitute for closing argument").  A summary witness does not engage in any inferences where his or her testimony consists of "lining up and comparing information already provided in" underlying documents, as here.  *United States v. Abou-Khatwa*, 40 F.4th 666, 686 (D.C. Cir. 2022) ("Cross-referencing invoices to identify the differences between them simply requires lining up and comparing information already provided in the invoices themselves.  No inferences are needed.").[29]  Indeed, a summary witness has even been permitted to use the charges in the indictment as a demonstrative and associate particular pieces of documentary evidence with

---

[29] The defendant's citation of a case stating that a summary exhibit cannot be "embellished by or annotated with" conclusions or inferences (Mem. 21 (internal citation omitted)), is a *non sequitur*, as nothing of the sort was done here.

94

particular counts in the indictment, a procedure that the Government did not use here. *Baker*, 923 F.3d at 397, 398 n.20.

The defendant's list of allegedly objectionable examples of presentation of evidence (Mem. 22-24), consists nearly exclusively of the witnesses computing how much time elapsed between the listed date and time of one document and another.[30]  That is precisely the type of "routine computations" that are squarely permissible. *Lemire*, 720 F.2d at 1350.  Indeed, the Second Circuit recognized that a summary chart showing just this sort of "pattern and timing" of relevant communications was "helpful to the jury" and thus properly admitted.  *See Blackwood*, 366 F. App'x at 212 ("[T]he summaries were helpful to the jury in its evaluation of the evidence because they showed the pattern and timing of telephone calls among the co-conspirators on the three crucial days of the charged conspiracy.").  And even if the Court had for some reason precluded this particular testimony, the computations would remain admissible, proper to be noted in summation, and proper for the jury to consider.

Nor did the Government's reference to the summary exhibits in summation somehow render them improper, contrary to the defendant's unpreserved suggestion (Mem. 21).  The Court properly instructed the jury, pursuant to Rule 1006, that these documents could be considered as any other evidence.  (*See* Tr. 3069; *see also Menendez*, 759 F. Supp. 3d at 525 & n.28.)[31]  That being the case, the Government was permitted to direct the jury's attention, in summation, to the

---

[30] The other example is simply reading a portion of a paragraph consisting of an entity referred to by a pronoun (Mem. 23-24), which, as the Court correctly observed, is "just reading" the document (Tr. 631).

[31] The defendant's reference to the rules for illustrative aids (Mem. 22) is inapplicable, since the summary charts, as set forth above, were properly admitted as evidence under Rule 1006, not as mere illustrative aids.

admitted evidence. *See, e.g.*, *United States v. Okatan*, 728 F.3d 111, 119 n.2 (2d Cir. 2013) ("[I]f evidence is properly admitted as relevant to proving guilt, it cannot be impermissible for the prosecutor to explain the relevance of the evidence to the jury."). But in any event, the Government actually encouraged the jury to look—if it felt it needed to—at the underlying exhibits and not merely the summaries. (*See* Tr. 2841 ("The *exhibits in* this chart are all you need to prove the corrupt quid pro quo. You've heard the evidence; but if you want to see it again, you can write down the number of this chart and look at *every exhibit in it that you want*, Government Exhibit 1352. Just based on *the evidence in* this timeline alone, even if there were nothing more than what we've been through, we would be done with this entire count." (emphasis added)).)

> (2)    The Defendant Had a Full Opportunity to Cross-Examine
> and Present Responsive Evidence

The defendant had a full and fair opportunity to confront and cross-examine each of the Government's summary witnesses on the matters within the scope of their direct testimony, and to present responsive evidence. The defendant's claim that the Government purportedly "significantly curtailed the potential cross-examination" of the summary witnesses (Mem. 23) by not calling witnesses with personal knowledge is frivolous.

District courts have "broad discretion in controlling the scope and extent of cross-examination." *United States v. James*, 712 F.3d 79, 103 (2d Cir. 2010) (internal quotation marks omitted). Rule 611(b) of the Federal Rules of Evidence limits the scope of cross-examination "to the subject matter of the direct examination and matters affecting the credibility of the witness." *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 110 (2d Cir. 2012). Indeed, the Second Circuit has affirmed limiting the cross-examination of law enforcement witnesses who provide summary testimony to the scope of the direct examination. *See United States v. Koskerides*¸ 877 F.2d 1129,

1134, 1136-37 (2d Cir. 1989) (affirming limiting scope of cross-examination of witness who performed net worth calculations, to exclude loans the witness had not testified about); *id.* at 1137 (affirming limiting scope of cross-examination of witness who testified as to gross receipts from a diner, to exclude questioning about the nature of the diner or the circumstances of its sale); *see also Lemire*, 720 F.2d at 1349 (D.C. Circuit affirming preclusion of cross-examination of summary witness on defense theory).

The defendant complains about the presentation of documentary evidence by those who were not involved in the creation of summary charts (Mem. 22-23), but where a summary witness is able to testify about their review and verification of the charts, there is no requirement that the witness have drafted the charts in the first instance. *See, e.g.*, *Lemire*, 720 F.2d at 1349 (holding that where summary witness "had carefully reviewed the charts and ensured that they reflected information contained in documents already in evidence," and where the jury was "well aware" that the witness had not prepared the charts, "the fact that [the summary witness] did not prepare the charts in no way hampered the defendants' ability to cross-examine him, and therefore did not prejudice the defense"). *See also, e.g.*, *Menendez*, 759 F. Supp. 3d at 523-24.

It is in fact routine for attorneys to direct the preparation of, make decisions concerning the content of, or directly draft, summary charts. *See, e.g.*, *United States v. Lebedev*, 932 F.3d 40, 50 (2d Cir. 2019) (affirming admission of summary testimony where the witness testified that "the government had specifically directed" the summary witness to use a particular methodology), *abrogated on other grounds by Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *Alpine Secs.*, 354 F. Supp. 3d at 421 (admitting summary chart, noting: "The SEC may have relied on an expert and consulting group to assist it in assembling the groups of transactions on which the SEC would

focus in this action, but *that task could have been done as well by an SEC attorney* or an SEC paralegal.  It reflects no more than the SEC's contentions." (emphasis added)); *Gentile*, 2024 WL 2046193, at *2 (admitting summary slides based on representation that witness would testify "the government instructed him as to which formulas to use" in slide charts).  Indeed, counsel's "selection of relevant evidence for presentation to the factfinder is inherent to the nature of litigation," *Hofstetter*, 2019 WL 5057176, at *5, and not a subject for cross-examination.  *See also Menendez*, 759 F. Supp. 3d at 524 ("Attorneys routinely choose what evidence to put before a jury.").

The defendant's argument that the Government was obligated to use summary witnesses who were more knowledgeable about the investigation (Mem. 22-23), is utterly baseless.  *See, e.g.*, *Menendez*, 759 F. Supp. 3d at 523 ("[T]he use of witnesses who were not involved in the underlying investigation but had reviewed a summary chart for its accuracy is not extraordinary and has been often sanctioned in the past.").  Even where the witness is a law enforcement agent who has had wide involvement in an investigation of the defendant, that mere fact does not expand the scope of permissible cross-examination.  *See, e.g.*, *Koskerides*, 877 F.2d at 1136 (affirming district court's limitation of cross-examination of case agents to scope of direct testimony); *United States v. McLaughlin*, 957 F.2d 12, 18 (1st Cir. 1992) (affirming limitation of cross-examination of government agents to scope of direct because "a party has no right, unless the court in the exercise of its discretion allows, to cross-examine a witness beyond the subject matter of his direct examination and beyond matters affecting credibility."); *United States v. Adeniyi*, No. 03 Cr. 86 (LTS), 2004 WL 1077963, at *3 (S.D.N.Y. May 12, 2004) ("The Court is also unpersuaded by Defendant's apparent contention that [the case agent's] acknowledgment during direct

examination that he had participated in an investigation of Defendant, coupled with [the case agent's] testimony regarding certain specific aspects of that investigation, combined to give defense counsel carte blanche to inquire into any subject related to the investigation of Defendant.").

c)    <u>Any Alleged Error Would Have Been Harmless</u>

Even if there had been any error in the introduction of the summary charts or the Court's rulings concerning the testimony of the summary witnesses—and there was none—any such alleged error would have been harmless.

The charts merely summarized "properly admitted data," *United States v. Rom*, 528 F. App'x 24, 29 (2d Cir. 2013), which was, as discussed in Section I, truly overwhelming.  *See id.* (holding any possible error in use of summary chart harmless in light of "ample evidence supporting the jury verdict").  Also as in *Rom*, the "government witnesses explained to the jury how the charts were constructed from the underlying data," and there is no indication that the "jury was unable either to grasp the charts' methodology or to differentiate between the utility of the charts and the reliability of the underlying data."  *Rom*, 528 F. App'x at 29; *see also, e.g.*, *Archer*, 977 F.3d at 198 n.4 (any arguable error in summary chart harmless).  As a result, just as the Second Circuit held in *Rom*, any alleged error would be harmless.

**III.    COUNTS ONE AND FIFTEEN ARE NOT MULTIPLICITOUS**

For the reasons set forth in its previous briefing (Dkt. 611 at 144-49), Counts One and Fifteen are not multiplicitous.  The Government acknowledges, and respectfully disagrees with, the Court's contrary ruling as to Menendez and Hana, *see Menendez*, 759 F. Supp. 3d at 532-34, whom the Government considers similarly situated to the defendant with respect to this claim.

## **CONCLUSION**

For the foregoing reasons, the defendant's post-trial motions should be denied.

Dated: New York, New York
June 27, 2025

                                    Respectfully submitted,

                                    JAY CLAYTON
                                    United States Attorney

             By:    s/_____
                                    Eli J. Mark
                                    Daniel C. Richenthal
                                    Paul M. Monteleoni
                                    Lara Pomerantz
                                    Catherine Ghosh
                                    Assistant United States Attorneys
                                    (212) 637-2431/2109/2219/2343/1114