**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    -against-

NADINE MENENDEZ et al.,

        Defendants.

Case No. S4 23-cr-490 (SHS)

## NADINE MENENDEZ'S REPLY MEMORANDUM OF LAW IN SUPPORT OF HER RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL AND RULE 33 MOTION FOR A NEW TRIAL

**COZEN O'CONNOR**

Sarah R. Krissoff, Esq.
Andrew Vazquez, Esq.
3 WTC
175 Greenwich St.
New York, N.Y. 10007
(212) 908-1388 / (212) 453-3886

*Attorneys for Defendant Nadine Menendez*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

I.    THE GOVERNMENT FAILS TO DEFEND ITS VIOLATION OF MRS. MENENDEZ'S
      SIXTH AMENDMENT RIGHTS.................................................................................... 4

      A.    THE GOVERNMENT'S BRIEF IN OPPOSITION EMPHASIZES THE NEED
            FOR AN EVIDENTIARY HEARING ..................................................................... 5

      B.    THE GOVERNMENT'S ATTEMPT TO SHIFT RESPONSBILITY TO MRS.
            MENENDEZ FAILS ........................................................................................... 8

            i.    The Government Violated Its Duty to Update the Record Regarding the
                  Changing Nature of the Conflict........................................................................ 8

            ii.   Mrs. Menendez Was Entitled to Formal Notice from the Government and
                  Instruction from the Court Regarding Facts Impacting Her Right to Counsel 10

      C.    THE GOVERNMENT'S UNSWORN WITNESS ARGUMENT IS A RED
            HERRING ....................................................................................................... 12

      D.    THE GOVERNMENT'S WAIVER ARGUMENT IS UNAVAILING .................. 13

            i.    Mrs. Menendez Raised and Preserved the Issue Regarding Infringement of Her
                  Right to Counsel ............................................................................................ 14

            ii.   Mrs. Menendez Was Not Required to Object Prior to Post-Trial Motions..... 15

II.   THE GOVERNMENT'S USE OF SUMMARY EXHIBITS WAS IMPROPER,
      USURPED THE ROLE OF THE JURY, AND LEGITIMIZED UNWARRANTED
      INFERENCES REGARDING CIRCUMSTANTIAL EVIDENCE ................................ 17

      A.    THE GOVERNMENT'S PROCEDURAL ARGUMENTS AS TO THE
            SUMMARY CHARTS ARE UNAVAILING ....................................................... 17

      B.    THE TESTIMONY OF THE SUMMARY WITNESSES INTRODUCED
            UNSUPPORTED INFERENCES TO THE JURY ................................................. 18

III.  THE GOVERNMENT HAS ONLY REITERATED FLAWED AND UNSUPPORTED
      THEORIES OF BRIBERY ......................................................................................... 21

      A.    THE GOVERNMENT DOUBLE-DOWNED ON ITS ERRONEOUS THEORIES
            OF AN OFFICIAL ACT .................................................................................... 21

      B.    NOT A SINGLE PURPORTED SCHEME CAN SUPPORT THAT A BRIBERY
            ARRANGEMENT WAS MADE ......................................................................... 25

IV.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT MRS. MENENDEZ ON THE
      OBSTRUCTION OF JUSTICE COUNTS.................................................................... 28

      A.    THE GOVERNMENT HAS NOT SUPPORTED THE GRAND JURY
            OBSTRUCTION CHARGES (COUNTS SEVENTEEN AND EIGHTEEN) ...... 29

i

B.  THE GOVERNMENT HAS NOT SUPPORTED THE DAIBES-RELATED OBSTRUCTION CHARGE (COUNT FOUR)...................................................... 30

V.    THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR THE FARA CONSPIRACY ........................................................................ 31

VI.   THE CONTACTS WITH THIS DISTRICT ARE TOO ATTENUATED TO SUPPPORT VENUE ............................................................................................... 31

VII.  COUNTS ONE AND FIFTEEN ARE MULTIPLICITOUS AND CANNOT BOTH STAND................................................................................................... 34

VIII. THE RULE 33 MOTION IS TIMELY ............................................................. 34

CONCLUSION............................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*,
  672 F.3d 113 (2d Cir. 2011)............................................................................35

*Bd. of License Comm'rs of Town of Tiverton v. Pastore*,
  469 U.S. 238 (1985)..........................................................................................9

*Berger v. United States*,
  295 U.S. 78 (1935)............................................................................................9

*Donnelly v. DeChristoforo*,
  416 U.S. 637 (1974)..........................................................................................5

*Puckett v. United States*,
  556 U.S. 129 (2009)........................................................................................16

*United States ex rel. Smith v. McMann*,
  417 F.2d 648 (2d Cir. 1969)............................................................................11

*Snyder v. United States*,
  603 U.S. 1 (2024)............................................................................................27

*Thornley v. Penton Publ'g, Inc.*,
  104 F.3d 26 (2d Cir. 1997)..............................................................................15

*United States v. Aquart*,
  912 F.3d 1 (2d Cir. 2018)..................................................................................5

*United States v. Armedo-Sarmiento*,
  524 F.2d 591 (2d Cir. 1975)............................................................................10

*United States v. Awadallah*,
  436 F.3d 125 (2d Cir. 2006)..............................................................................5

*United States v. Beech-Nut Nutrition Corp.*,
  871 F.2d 1181 (2d Cir. 1989)..........................................................................33

*United States v. Blackwood*,
  366 F. App'x 207 (2d Cir. 2010) .....................................................................19

*United States v. Cain*,
  671 F.3d 271 (2d Cir. 2012)............................................................................16

*United States v. Caruso*,
    684 F. Supp. 84 (S.D.N.Y. 1988) ................................................................6

*United States v. Collis*,
    875 F. Supp. 398 (E.D. Mich. 1995)...........................................................30

*United States v. Curcio*,
    680 F.2d 881 (2d Cir. 1982)...............................................................10, 11

*United States v. Davis*,
    689 F.3d 179 (2d Cir. 2012)......................................................................33

*United States v. Finkelstein*,
    No. 21-CR-217, 2021 WL 2555832 (S.D.N.Y. June 22, 2021) ...............8

*United States v. Gonzalez*,
    105 F. Supp. 2d 220 (S.D.N.Y. 2000).......................................................11

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004).....................................................................17

*United States v. Ho*,
    984 F. 3d 191 (2d Cir. 2020)....................................................................18

*United States v. Jones*,
    381 F.3d 114 (2d Cir. 2004).......................................................................9

*United States v. Kenner*,
    272 F. Supp. 3d 342 (E.D.N.Y. 2017) ................................................35, 36

*United States v. Ketabchi*,
    No. 17-CR-243-3, 2019 WL 1510444 (S.D.N.Y. Mar. 25, 2019).............36

*United States v. Lee*,
    919 F.3d 340 (6th Cir. 2019) ...................................................................23

*United States v. Lemire*,
    720 F.2d 1327 (D.C. Cir. 1983) ...............................................................18

*United States v. Leone*,
    215 F.3d 253 (2d Cir. 2000).......................................................................5

*United States v. Levy*,
    377 F.3d 259 (2d Cir. 2004).......................................................................5

*United States v. Locascio*,
    6 F.3d 924 (2d Cir. 1993)...................................................................12, 13

*United States v. Lustyik*,
    No. 12-CR-645, 2012 WL 6574425 (D. Utah Dec. 17, 2012)................................................11

*United States v. Mazzariello*,
    No. 13-CR-211, 2015 WL 11108936 (W.D.N.Y. Dec. 18, 2015)..........................................11

*United States v. Migliaccio*,
    34 F.3d 1517 (10th Cir. 1994) ..............................................................................................12

*United States v. Odom*,
    No. 23-6105, 2024 WL 2043141 (2d Cir. May 8, 2024).......................................................16

*United States v. Orgad*,
    132 F. Supp. 2d 107 (E.D.N.Y. 2001) ..................................................................................12

*United States v. Owen*,
    559 F.3d 82 (2d Cir. 2009).....................................................................................................35

*United States v. Pauling*,
    256 F. Supp. 3d 329 (S.D.N.Y. 2017)...................................................................................37

*United States v. Quattrone*,
    441 F.3d 153 (2d Cir. 2006)...................................................................................................29

*United States v. Reichberg*,
    5 F.4th 233 (2d Cir. 2021) .......................................................................................................3

*United States v. Rosemond*,
    841 F.3d 95 (2d Cir. 2016)..............................................................................................15, 16

*United States v. Scali*,
    No. 16-CR-466, 2018 WL 3536082 (S.D.N.Y. July 23, 2018) .............................................37

*United States v. Schwarz*,
    283 F.3d 76 (2d Cir. 2002).....................................................................................................29

*United States v. Sprecher*,
    783 F. Supp. 133 (S.D.N.Y. 1992) .......................................................................................30

*United States v. Stein*,
    410 F. Supp. 2d 316 (S.D.N.Y. 2006)......................................................................................8

*United States v. Tarricone*,
    996 F.2d 1414 (2d Cir. 1993)...................................................................................................5

*United States v. Yannotti*,
    358 F. Supp. 2d 289 (S.D.N.Y. 2004)...................................................................................12

*Wheat v. United States*,
   486 U.S. 153 (1988)...................................................................................................4, 5, 10, 11

## INTRODUCTION

The Government has failed to defend its violation of Mrs. Menendez's Sixth Amendment rights.  In a truly extraordinary course of events, the Government trampled over Mrs. Menendez's constitutional right to counsel.  In its defense, the Government throws everything at the wall.  On one hand, it argues that Mrs. Menendez should have intuited what was in the minds of the prosecutors, known that there was a "decreased likelihood" that the Government was going to call Mr. Schertler for substantive testimony, and affirmatively inquired about reinstating Mr. Schertler after he had been knocked out of the case.  On the other hand, the Government maintains that despite the "decreased likelihood" of calling Mr. Schertler, it did not make a final determination about calling Mr. Schertler until the very last minute at trial.  The Government cannot get its story straight.

The Government's arguments are based on the flawed premise that once Schertler Onorato[1] was forced to withdraw, it was appropriate for the Government to proceed with business as usual. In other words, the Government contends that it was permitted to treat Mr. Schertler just like any other witness, and it could choose to call him or not call him at its discretion without any direct notification to the Defendant or the Court.  But this is simply not the case.  Prosecutors had already informed the Court that it had "made clear [to Mr. Schertler] that [they] would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation [regarding the details of the attorney proffer]."  The Government had stated unequivocally that it would be calling Mr. Schertler as a Government witness, forcing Mr. Schertler's withdrawal when the parties were

---

[1] Defined terms have the same meaning as in Mrs. Menendez's Opening Memorandum (the "Memorandum" or "Mem.").  The Government's Opposition brief, dated June 27, 2025 will be referred to herein as "Opposition" or "Opp."

unable to agree on a proposed stipulation. The Government had a legal and ethical duty to update its position as it became clear that it would not be, or would not likely be, calling Mr. Schertler. The Government never did so.

The Government's attempt to put the onus on Mrs. Menendez to check its gamesmanship is unpersuasive. It was not Mrs. Menendez's responsibility to know what was going on in the minds of the prosecutors and infer that there was a "decreased likelihood" that they were calling her former counsel as a witness. This is particularly so when those very same prosecutors have affirmatively represented that they will be calling Mr. Schertler and have identified as trial exhibits documents that could only come in, in the Government's case-in-chief, through Mr. Schertler. This shifting of blame to Mrs. Menendez is not appropriate.

Having unilaterally decided not to call Mr. Schertler, the Government now also argues that, at the very least, Schertler remained an unsworn witness. The Government points to its use at trial of checks that were produced by Mrs. Menendez, through her attorneys, including a handful of exhibits admitted at trial that referenced the Schertler Onorato firm. This argument is just a distraction. The issue is not whether Mr. Schertler was going to be an *unsworn* witness, because the Government affirmatively represented, and never corrected, that he was going to be a *sworn* witness. To the extent that Mr. Schertler was going to be *only* an *unsworn* witness, that would have required an entirely different inquiry by the Court, including an appropriate *Curcio*, and an examination of whether the *unsworn witness* issue could be resolved. For example, it would have taken all of ten minutes to anonymize the relevant exhibits and agree to a simple stipulation relating to the production of the checks by counsel. To the extent the Government was not happy with the outcome of any resolution of the *unsworn* witness issue, it could have then sought disqualification—a motion that was never made here.

The Government's Opposition brief, which is filled with unsworn factual assertions, lays bare the need for a hearing. The Government ignores facts that are unhelpful to it, including the threshold point that, in order to prove the factual allegations in the S4 Indictment regarding the attorney proffer, absent a stipulation, the Government had only two choices: call Mr. Schertler to testify or call an Assistant United States Attorney to testify. The Government's decision not to grapple with this fact in its Opposition—while simultaneously proffering, without a sworn declaration, many other facts that the Government believes are helpful—underscores the need for the Court to conduct a factual inquiry here. There are crucial questions about the course of events and the Government's decision-making here that only an inquiry by the Court can answer.

Mrs. Menendez's right to counsel is enshrined in the Sixth Amendment. The relationship between a defendant and her counsel is sacrosanct, and both the Constitution and hundreds of years of case law protect that relationship. The Government, in its zeal to add additional charges on the eve of trial and its failure to correct course when circumstances changed, violated Mrs. Menendez's fundamental constitutional rights. This was a fundamental structural error that requires a new trial. The potential for abuse should this conduct go unchecked is enormous.

In addition, for all the reasons outlined in her moving brief and below, Mrs. Menendez moves the Court to enter a judgment of acquittal on all counts of conviction. The Government's use of summary exhibits went beyond the bounds of the law and usurped the role of the jury. The Government failed to prove beyond a reasonable doubt that any bribery occurred, or that Mrs. Menendez aided and abetted the same. The evidence was insufficient to support the jury's verdict on the obstruction of justice counts and the alleged Foreign Agents Registration Act conspiracy. Despite the Government's arguments otherwise, the Government failed to prove venue as to

Counts One through Fifteen.  Finally, Counts One and Fifteen are multiplicitous and cannot both stand.

## I.    THE GOVERNMENT FAILS TO DEFEND ITS VIOLATION OF MRS. MENENDEZ'S SIXTH AMENDMENT RIGHTS

The Government's attempt to defend its unconstitutional interference with Mrs. Menendez's fundamental rights—by placing blame on Mrs. Menendez, relying on key facts that are not on the record, and asserting its right to conduct business as usual after knocking out Schertler Onorato— fails.  The Government cannot have its cake and eat it too.  It was the Government's choice to add allegations to the S4 Indictment that necessarily required testimony by either an Assistant United States Attorney or Mrs. Menendez's counsel.  *See* July 7, 2025 Declaration of David Schertler ("Schertler Declaration" or "Schertler Decl."), ¶¶ 3-4 (identifying only prosecutors and members of Schertler Onorato at the attorney proffer). [2]  It was the Government's choice to elect to call Mr. Schertler, as a sworn witness, to attempt to prove those allegations.  *See Curcio* Hearing Tr. 5.  As a result of those two choices, the Government necessarily infringed upon Mrs. Menendez's constitutional rights, and thus had an obligation to abide by the protections the law affords to defendants in such circumstances.[3]  The Government failed to do so, necessitating, at the very least, a new trial.

---

[2] In response to the unsworn factual assertions included in the Government's Opposition, Mrs. Menendez is submitting, in support of her motion and the need for a hearing, a declaration from Mr. Schertler.

[3] The Supreme Court has explicitly warned that "the Government may seek to manufacture a conflict in order to prevent a defendant from having a particularly able defense counsel at his side; but trial courts . . . must take it into consideration along with all of the other factors which inform this sort of a decision." *Wheat v. United States*, 486 U.S. 153, 163 (1988).  The Supreme Court has never addressed what it means for the Government to "manufacture" a conflict of interest, but if any case meets the criteria of a manufactured conflict of interest, it is this one, where the

### A.    THE GOVERNMENT'S BRIEF IN OPPOSITION EMPHASIZES THE NEED FOR AN EVIDENTIARY HEARING

There is no way around an evidentiary hearing.  "When specific guarantees of the Bill of Rights are involved," courts must "take[ ] special care to assure that prosecutorial conduct in no way impermissibly infringes them." *United States v. Aquart*, 912 F.3d 1, 42 (2d Cir. 2018) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "When a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire."  *United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir. 2006).  Courts have an "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat*, 486 U.S. at 161.[4]

Here, in March 2024, the Court appropriately engaged in an inquiry regarding the conflict, as identified to the Court by the Government.  The problem is that the nature and scope of the conflict changed, unbeknownst to both Mrs. Menendez and the Court, due to strategic decisions made by the Government in preparation for trial.  Now, the Government defends those strategic

---

Government turned a run-of-the-mill attorney proffer and a reasonable factual dispute between parties into, what the Government deemed, an obstructive act.

[4] The Second Circuit will remand appeals to the district court where the trial court is the more appropriate venue to build out the record.  For example, the Second Circuit routinely remands cases back to the district court for post-trial factfinding inquiries into defendants' ineffective assistance of counsel claims.  *See, e.g., United States v. Levy*, 377 F.3d 259, 265–66 (2d Cir. 2004); *United States v. Leone*, 215 F.3d 253, 257 (2d Cir. 2000) ("[W]e choose to exercise our discretion to remand to the district court for further fact-finding rather than to dismiss the appeal and force the appellant to use up his only habeas petition."); *United States v. Tarricone*, 996 F.2d 1414, 1417, 1425 (2d Cir. 1993) (remanding on direct appeal of a conviction in order to hold "an evidentiary hearing to develop a factual record on the issue of ineffective assistance" where the ineffective assistance claim was raised below in a motion for a new trial).

decisions with a host of unsworn and unpersuasive factual assertions, underscoring the need for a

hearing.  For example, the Government asserts:

1. "The Government was considering introducing documents pertaining to a second subject, namely, the attorney proffer at which [Mr. Schertler] unknowingly passed on false statements from the defendant to the U.S. Attorney's Office, up until shortly before the Government rested its case-in-chief, which would have made Schertler an unsworn witness on that issue too."  Opp. at 65.

2. "The Government was considering introducing a portion of one of these exhibits— certain slides Schertler used at the attorney proffer (GX 4B-1)—until April 12, 2025, *i.e.*, the Saturday before the Government rested its case-in-chief on Monday, April 14."  Opp. at 79.

3. "Here, the Government's reconsideration of its likelihood of calling Schertler as a substantive witness in its case-in-chief at the first trial, referenced by the defendant (Mem. 8-9), was based on the Government's continued attempts to streamline and focus trial presentation."  Opp. at 75.

4. "If the defendant had testified, the Government was prepared to cross-examine her both about the statements Schertler made at the attorney proffer (and to use, if needed, portions of the slides from the attorney proffer (GX 4B-1)) and about the false exculpatory statement that the defendant made to him (and to use, if needed, portions of the email from the defendant to Schertler (GX 4B-2))."  Opp. at 80.

5. "Moreover, the Government could not responsibly rule out the possibility that, if the defendant testified, the Government would need to call Schertler as a *live* witness in a rebuttal case, and nor was it required to do so for the defendant's convenience."  Opp. at 80.

6. "Thereafter, the parties exchanged drafts of an anonymized stipulation that pertained to Schertler and his firm."  Opp. at 73.

The law does not allow the Government to proceed this way.  *See United States v. Caruso*,

684 F. Supp. 84, 87 (S.D.N.Y. 1988) ("[W]ithout a supporting affidavit of someone with personal

knowledge of the underlying facts, the court need not resolve factual disputes that may be

presented by the moving papers").  These facts, which are not in the record but are simply the

Government's unsworn excuses for its conduct, go to the heart of the issue—the timing of the

Government's decision not to call Mr. Schertler, the rationale for its decisions, and why it believes

it did not have any duty to re-engage on the issue of the forced withdrawal of Mr. Schertler prior to or during the course of trial.

Indeed, we expect any hearing to show that the Government's unsworn recitation of facts is woefully incomplete. In its Opposition, the Government ignores (certainly strategically) the key fact that, on the eve of trial, it added factual allegations to the S4 Indictment that necessarily required testimony by either an Assistant United States Attorney or Mrs. Menendez's counsel. Schertler Decl. ¶¶ 1–4. And then, after forcing the withdrawal of Mr. Schertler so it could call him as a sworn witness, the Government kept Mr. Schertler in its back pocket. In mid-January 2025, the Government subpoenaed Mr. Schertler for the then-scheduled February 5, 2025 trial. *Id.* ¶ 4. When the trial was adjourned until March 18, 2025, the Government confirmed with Mr. Schertler that he would apply the previously issued subpoena to the new trial date. *Id.* ¶ 6. On March 28, 2025, only after an inquiry by Mr. Schertler, the Government told Mr. Schertler, in sum and substance, that his testimony would likely not be needed but they could not commit to the fact that he would not be called. *Id.* ¶ 8. Mr. Schertler cannot recall any communications with the Assistant United States Attorneys about testifying at the trial of Mrs. Menendez after March 28, 2025. *Id.* ¶ 9.

Mr. Schertler was not formally disqualified, but he was forced to withdraw due to the Government's decision to call him as a sworn witness and the parties' inability to reach an acceptable stipulation under those circumstances. As a result, the factual inquiry which typically accompanies the disqualification process was not conducted, leaving an incomplete record. There are many key questions implicating bedrock constitutional rights, that can only be answered through an evidentiary hearing.

**B.    THE GOVERNMENT'S ATTEMPT TO SHIFT RESPONSBILITY TO MRS. MENENDEZ FAILS**

Again highlighting the need for an evidentiary hearing, the Government argues both that (1) Mrs. Menendez should have known that the prosecution likely was not going to call Mr. Schertler as a witness at trial, s*ee, e.g.*, Opp. at 75–76; and (2) the Government viewed Mr. Schertler as a possible sworn witness up until the close of trial, *id.* at 80. The Government's "should have known" argument fails. The Government identifies certain events that it believes should have led Mrs. Menendez to conclude that there was a "decreased likelihood" that it was going to call Mr. Schertler. Opp. at 75–76, 79–80. In a quintessential blame-the-victim move, the Government puts it on Mrs. Menendez's shoulders to have somehow guessed that the Government was wavering on calling Mr. Schertler.

However, it was not incumbent on Mrs. Menendez to read the prosecutors' minds. Rather, it was the Government's legal and ethical duty and responsibility to disclose to Mrs. Menendez and the Court, in a direct and unambiguous way, that it had changed course and was reconsidering calling Mr. Schertler as a witness.

     i.    The Government Violated Its Duty to Update the Record Regarding the Changing Nature of the Conflict

Indeed, the Government's concession that it knew well before trial that it likely was not going to call Mr. Schertler is fatal to its contention that Mrs. Menendez was not deprived of her Sixth Amendment rights. One of the factors that the Court will consider when evaluating whether disqualification is required is "whether there is a possibility that the attorney could be called as a witness at the defendant's trial." *United States v. Stein*, 410 F. Supp. 2d 316, 328 (S.D.N.Y. 2006). Frequently, the fact that an attorney is going to be called as a witness at trial is the deciding factor for the court in ordering disqualification. *See United States v. Finkelstein*, No. 21-CR-217, 2021

WL 2555832, at *3 (S.D.N.Y. June 22, 2021); *United States v. Jones*, 381 F.3d 114, 121 (2d Cir. 2004).

Courts must rely on the prosecution's candor during the disqualification proceedings. The ethical duty of candor requires lawyers to correct false statements of material fact or law previously made to the tribunal. N.Y. R.P.C. 3.3(a)(1); *see also Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) ("It is appropriate to remind counsel that they have a continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation." (internal citation and quotation marks omitted)). This duty applies with even more force to prosecutors, who have heightened responsibilities due to their role as ministers of justice. *See* N.Y. R.P.C. 3.3(a)(1); *see, e.g.*, *Berger v. United States*, 295 U.S. 78, 88 (1935) (emphasizing the role of the United States Attorney as a representative of a "sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all, and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").

The Government violated that duty. At the *Curcio* hearing, the Government "made [it] clear that we would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation." *Curcio* Hearing Tr. 5. The Government did not couch the intention as a "potential" or even a "likelihood" that Mr. Schertler would be called at trial, but as a confirmed fact. The entire *Curcio* proceeding (and Mr. Schertler's subsequent withdrawal) turned on the fact that the Government said that it would be calling Mr. Schertler as witness.[5] And Mr. Schertler and

---

[5] "MR. SCHERTLER: Your Honor, may I just -- I hate to do this, but could I qualify your final determination or conclusion, that she has waived her right to conflict-free counsel, as the Court said at the beginning, based on the assumption that the parties can reach a stipulation. THE

Mrs. Menendez had every reason to believe the Government's representations: ***because the only way the Government could prove the allegations it had just asked the grand jury to add to the S4 Indictment regarding the attorney proffer was through the testimony of someone from Schertler Onorato***.[6]

> ii.  Mrs. Menendez Was Entitled to Formal Notice from the Government and Instruction from the Court Regarding Facts Impacting Her Right to Counsel

An updated disclosure from the Government—as soon as the Government decided that it was not going to call Mr. Schertler as a sworn witness, or, in its words, that it was unlikely that it was going to do so—was required to allow the Court to fulfill its "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat*, 486 U.S. at 161. *United States v. Curcio* is as much—if not more—motivated by avoiding conflicts of interest as by preserving a defendant's right to *retain* her *chosen* counsel. In deciding *Curcio*, the Second Circuit "observed that a criminal defendant has not only a constitutional right to an attorney who has no conflict of interest but also a right . . . to counsel of his own choosing . . . and that ***the latter right should not be obstructed unnecessarily***." *United States v. Curcio*, 680 F.2d 881, 884 (2d Cir. 1982) (emphasis added); *see also United States v. Armedo-Sarmiento*, 524 F.2d 591, 592 (2d Cir. 1975) (reversing disqualification of attorney where "the district court did not even give [defendants] the opportunity to elect to retain . . . their attorneys.").

---

COURT: Absolutely. Thank you for that qualification. If the parties are unable to reach a stipulation, the great likelihood is that your law firm will be disqualified and you will have to have new attorneys." *Curcio* Hearing Tr. 29.

[6] In contrast, in Senator Menendez's trial, a non-lawyer witness from the U.S. Attorney's Office, the Special Assistant to the United States Attorney, testified about the meeting. First Trial Tr. 4270–77.

The Court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160. With this duty comes a requirement that the court expressly inform a defendant at all times about encroachments on her Sixth Amendment rights—regardless of the nature of the threat. *See, e.g.*, *Curcio*, 680 F.2d at 890–91; Fed. R. Crim. P. 44(c) ("Whenever two or more defendants have been jointly charged [or joined for trial], and are represented by the same retained or assigned counsel . . . , **the court shall promptly inquire** with respect to such joint representation and **shall personally advise each defendant** of his right to the effective assistance of counsel.") (emphasis added); *United States ex rel. Smith v. McMann*, 417 F.2d 648 (2d Cir. 1969) (state has obligation to inform every indigent defendant of his right to court-appointed appellate counsel).

In no other context is safeguarding the defendant's right to counsel left to the vagaries of surmise. Because the changing circumstances in this case unjustifiably interfered with Mrs. Menendez's Sixth Amendment right to counsel of her choice, Mrs. Menendez was entitled to formal notice of the Government's change of heart and a subsequent allocution on the matter to determine "whether the attorney in fact suffers from an actual conflict, a potential conflict, or **no genuine conflict at all**." *United States v. Gonzalez*, 105 F. Supp. 2d 220, 222 (S.D.N.Y. 2000) (emphasis added); *United States v. Mazzariello*, No. 13-CR-211, 2015 WL 11108936, at *11 (W.D.N.Y. Dec. 18, 2015) (change in circumstances arising from co-defendant's plea agreement was "precisely why the Court conducted its own initial inquiry hearing and must make an independent determination as to whether an actual conflict exists"); *see also United States v. Lustyik*, No. 12-CR-645, 2012 WL 6574425, at *13 (D. Utah Dec. 17, 2012) ("Though a defendant may choose to waive his right to conflict-free counsel, the court has a continuing obligation . . . to

guard against conflicts of interest that may worsen as circumstances change during the course of the representation.") (quoting *United States v. Migliaccio*, 34 F.3d 1517, 1528 (10th Cir. 1994)).

## C. THE GOVERNMENT'S UNSWORN WITNESS ARGUMENT IS A RED HERRING

As a fall back argument, the Government asserts that Mr. Schertler's withdrawal was proper because he was, at the very least, a document custodian or an unsworn witness. *See, e.g.*, Opp. at 77. In support of this argument, the Government points to a handful of documents that the Government introduced at trial that contained Mr. Schertler's name. *Id.* This argument is just a distraction. The issue is not whether Mr. Schertler was going to be an *unsworn* witness, because the Government affirmatively represented, and never corrected, that he was going to be a *sworn* witness. Indeed, the Government had a duty to correct its prior statements and permit Mrs. Menendez and the Court to properly re-weigh the conflict of interest against Mrs. Menendez's Sixth Amendment rights. *See* Part I.B., *supra*. The Government never allowed this *very different* conversation to take place, so the Sixth Amendment violation can be evaluated only in the sworn witness context.

To the extent that Mr. Schertler was going to be *only* an *unsworn* witness, that would have required an entirely different inquiry by the Court, including an appropriate *Curcio*, and an examination of whether the *unsworn witness* issue could be resolved without disqualification. *See, e.g.*, *United States v. Yannotti*, 358 F. Supp. 2d 289, 293 (S.D.N.Y. 2004) (finding that when an attorney is an unsworn witness "the attorney's relationship to the events in question may give the defendant an unfair advantage"); *United States v. Orgad*, 132 F. Supp. 2d 107, 124 (E.D.N.Y. 2001) (same); *United States v. Locascio*, 6 F.3d 924, 933 (2d Cir. 1993) (same). But because of the

Government's hidden decisions, Mrs. Menendez never enjoyed her right to consider apparently viable alternatives to the forced withdrawal of Mr. Schertler.

For example, it would have been very easy to anonymize the handful of exhibits containing Mr. Schertler's name by simply redacting them to read "Mrs. Menendez's Counsel" or the like. The Government unpersuasively cites to *United States v. Locascio* for the proposition that redactions would have been inadequate. *See* 6 F.3d at 934; Opp. at 78 n.19. In *Locascio*, the Second Circuit's ruling was premised on the district court's explicit finding that "that redaction of the tapes would have eviscerated the government's case." *Locascio*, 6 F.3d at 934. In contrast, the redactions here would have little to no impact on the Government's case and was unlikely to provide Mrs. Menendez with an "unfair advantage" at trial. To the extent the Government was not happy with the outcome of any resolution of the *unsworn* witness issue, it could have *then* sought disqualification—a motion that was never made here.

## D.   THE GOVERNMENT'S WAIVER ARGUMENT IS UNAVAILING

The Government's additional contention that Mrs. Menendez's Sixth Amendment argument was waived or forfeited is wholly without merit. Opp. at 72–77. First, Mrs. Menendez *did* preserve the argument based on the facts that were available to her at the time. Regardless, the argument is properly and timely brought in this post-trial motion. After Mr. Schertler's withdrawal, there was no way that Mrs. Menendez knew or could have known that the nature of the conflict that had infringed upon her right to counsel had changed. The waiver cases cited by the Government have little application to the facts here. The Government primarily cites cases applying standards for *appellate* review, which are inapposite in this post-trial briefing context but nonetheless reinforce the fact that Mrs. Menendez preserved her Sixth Amendment argument.

   i. <u>Mrs. Menendez Raised and Preserved the Issue Regarding Infringement of Her Right to Counsel</u>

As an initial matter, Mrs. Menendez *did* preserve the issue presently before the Court—namely, that the Government must not infringe her right to counsel without sufficient justification, and that Mrs. Menendez cannot make an informed decision absent candor from the Government. Upon receipt of the S4 Indictment and the Government's request for a *Curcio* hearing, Mrs. Menendez took issue with the Government's strategy of keeping all avenues open to it. *See* Letter dated Mar. 18, 2024, Dkt. 255 at 2. Mrs. Menendez argued that, without the relevant information about how the Government intended to proceed, she "cannot make a knowing and intelligent decision as to whether to waive her constitutional right to conflict-free counsel." *Id.* at 4. At the *Curcio* hearing, the Court agreed that candor from the Government on this specific question was required in order to allow Mrs. Menendez to make an informed decision regarding her right to counsel. *See Curcio* Hearing Tr. 3–4 ("I think the defense is correct here in saying it is about time for the government to fish or cut bait in regard to whether or not they are going to be calling Mr. Schertler or anybody else from his firm.").

Thus, the Court directly considered before trial the question of whether the Government-created conflict sufficiently justified the interference with Mrs. Menendez's right to counsel. That was the main purpose of the *Curcio* hearing (in addition to addressing waiver of the so-called "second bucket" conflict), and that was the reason the Court urged the Government to disclose its intended use of evidence with respect to Mr. Schertler and his firm. The Government *purported* to resolve this question when it disclosed at the hearing that it would use Mr. Schertler as a witness absent a stipulation. The Government gave Mrs. Menendez a binary choice: agree to a stipulation covering Mr. Schertler's testimony, including his participation in the attorney proffer, or he would

be called to testify.  Thus, at the time, Mrs. Menendez and the Court believed that they had done all that was possible to vindicate Mrs. Menendez's Sixth Amendment rights.

Further, Mrs. Menendez was not required to continue inquiring about the status of Mr. Schertler's testimony and the nature of the conflict to preserve this argument.  "Where a defendant has made his position clear, further objections to 'rulings or orders of the court are unnecessary' to preserve a claim of error for appellate review."  *United States v. Rosemond*, 841 F.3d 95, 106 (2d Cir. 2016) (quoting Fed. R. Crim. P. 51(a)).  Absent any direct communication from the Government stating that circumstances had changed, Mrs. Menendez operated under the reasonable impression that further objections would be futile.  *See id.* (defendant did not waive objections made during first trial, but not made during second trial, where circumstances had not changed and objecting would have been futile); *Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 30 (2d Cir. 1997) ("Because [plaintiff] argued its position to the district judge, who rejected it, a further exception after [the ruling] would have been a mere formality, with no reasonable likelihood of convincing the court to change its mind on the issue.").[7]

ii.  <u>Mrs. Menendez Was Not Required to Object Prior to Post-Trial Motions</u>

Regardless, it is sufficient to raise this argument in a post-trial motion, rather than at trial.  Waiver at the trial-court level, as opposed to on appellate or collateral review, applies only to objections that *can* or *must* be raised before the end of trial.  Waiver may occur pursuant to rules of procedure

---

[7] As stated above, even if Mrs. Menendez could have known that the conflict was obviated, the burden was not on Mrs. Menendez to correct the error.  Far from it:  she was entitled to direct and unequivocal notice from the Government, with an accompanying inquiry and allocution by the Court, to safeguard her rights and permit her to make a knowing and intelligent decision regarding her right to counsel.  *See* Part I.B., *supra*.

and prior precedent.[8]  The Government admits that the law is unsettled as to whether deprivation

of the right to counsel can be waived or forfeited through failure to timely object and appeal.  *See*

Opp. at 76; *see also United States v. Cain*, 671 F.3d 271, 292 (2d Cir. 2012) (noting that neither

the Second Circuit nor U.S. Supreme Court has resolved whether a structural error, such as

deprivation of the right to counsel, may be forfeited).  Accordingly, no rule mandates that Mrs.

Menendez was required to raise her Sixth Amendment claim prior to post-trial briefing.

Nor *could* she have.  Even under the most stringent appellate preservation requirements, it

is clear that Mrs. Menendez could not waive or forfeit her Sixth Amendment claim because she

had no opportunity to do so during trial.  "The purpose of the appellate waiver rule is 'to induce

the timely raising of claims and objections, which gives the district court the opportunity to

consider and resolve them.'"  *Rosemond*, 841 F.3d at 106 (quoting *Puckett v. United States*, 556

U.S. 129, 134 (2009)).  Where raising such claims is not possible at an earlier time, the court will

not consider those claims waived.  *See, e.g.*, *United States v. Odom*, No. 23-6105, 2024 WL

2043141, at *2 (2d Cir. May 8, 2024) (reviewing error raised for the first time on appeal *de novo*

because error did not become apparent until after judgment and defendant therefore "had no

available basis for objection when this matter was before the district court"); *see also* Fed. R. Crim.

P. 51(b) ("If a party does not have an opportunity to object to a ruling or order, the absence of an

objection does not later prejudice that party.").

Here, clearly, the evaporation of the conflict was not clear to Mrs. Menendez until the end

of trial.  The Government concedes this fact by repeatedly insisting that Schertler remained a

---

[8] Such types of objections typically include, for example, evidentiary objections governed by Fed.
R. Evid. 103(a), or objections that must be raised in pleadings or pre-trial motions pursuant Fed.
R. Crim. P. 12.

potential sworn witness for the Government up until the end of trial.[9]  *See* Opp. at 79–81.  In fact, the Government's actions in preparation for trial reinforced the illusion that Mr. Schertler would indeed be called.  The Government included on its exhibit list the PowerPoint presentations from the attorney proffer, which would have required authenticating testimony from Mr. Schertler.  *See* Opp. at 80 (citing GX 4B-1).  And even though Mr. Schertler was not specifically named in a witness list, he fell into the catchall category and received a subpoena.  Schertler Decl. ¶¶ 4, 6. Finally, the Government cannot avoid the fact that it represented to this Court, to Mrs. Menendez, and to her former counsel that it would call Mr. Schertler as a sworn witness.  One would imagine that if the Government *said* that it made a decision that interfered with a defendant's right to counsel, the Government probably *meant it*.  To proceed under that assumption, as Mrs. Menendez did, is entirely reasonable.

## II.    THE GOVERNMENT'S USE OF SUMMARY EXHIBITS WAS IMPROPER, USURPED THE ROLE OF THE JURY, AND LEGITIMIZED UNWARRANTED INFERENCES REGARDING CIRCUMSTANTIAL EVIDENCE

The Government's opposition arguments defending their charts are not persuasive.  The Government still cannot justify the manner in which it utilized the summary exhibits to elicit improper inferences in front of the jury.  Through the relevant witnesses, the Government implied improper causal connections between and among certain events simply based on one event occurring after the other.  But Rule 1006 does not permit the Government to use summary exhibits to present unreasonable and speculative assumptions and inferences to the jury.  *See United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) (stating it is beyond the role of a "[a] summary witness for the Government" to tell the jury "what inferences to draw"); *United States v. Lemire*, 720 F.2d

---

[9] Of course, this is the very inquiry the Court must undertake at the hearing.

1327, 1350 (D.C. Cir. 1983) ("A summary [chart] should not draw controversial inferences or pronounced judgment").  Consequently, Mrs. Menendez's convictions, which relied heavily on the improper use of these summary exhibits, cannot stand.

## A.    THE GOVERNMENT'S PROCEDURAL ARGUMENTS AS TO THE SUMMARY CHARTS ARE UNAVAILING

As a preliminary matter, Mrs. Menendez did not waive her argument as to the use of the summary exhibits.[10]  This argument is preserved.  Defense counsel objected to the use of the summary exhibits multiple times at trial.  *See, e.g.* Trial Tr. 569:2-20 (making a continuing objection to reading of select entries); 591-97 (defense counsel objecting to prosecution's eliciting of testimony as to select entries of the summary exhibit as improper closing argument); 1188 (renewing continuing objection upon Government's move to admit summary exhibits).

## B.    THE TESTIMONY OF THE SUMMARY WITNESSES INTRODUCED UNSUPPORTED INFERENCES TO THE JURY

The Government improperly contends that the summary exhibits were permissible because they were technically accurate summaries of underlying exhibits, and the prosecution may be selective in what it includes in a summary exhibit.  *See* Opp. at 85-87. Relying upon a case from the D.C. Circuit, the Government posits that "[w]here witnesses do not opine or interpret but simply present evidence, courts routinely reject defense motions characterizing the presentation of documentary evidence…as akin to closing argument."  *See* Opp. at 93.  But what the Government did in this case was far beyond simply presenting evidence. [11]

---

[10] The Court need not address whether there was any waiver as to admissibility of the summary exhibits at this time. *See* Opp. at 84-85.

[11] Moreover, the Government's reliance upon *Ho* and other pre-2024 cases is misplaced.  Those cases relied on an older version of Rule 1006, which was amended in December 2024.  The cases do not support the Government's position as they exhibit rulings in which the courts did not permit the use of summary charts as substantive evidence for the jury to consider.  *See, e.g.*, *United States v. Ho*, 984 F. 3d 191, 210 (2d Cir. 2020) ("This court has long approved

First, the summary charts were inherently argumentative because they incorporated exhibits from a host of sources, constituting road maps for the Government's theories of the case. Second, the Government's use of the exhibits at trial, which drew improper innuendo after innuendo from testifying witnesses, was an entirely improper use of the summary exhibits. It was a tactic by which the Government introduced connections between certain events, only because they may have occurred in chronological order, particularly when there was insufficient evidence to infer such connections.

Tellingly, the Government did not attempt to refute the examples of problematic questioning cited by Mrs. Menendez in her opening brief. *See* Mem. at 31-32. An additional illustrative example involved questioning by Government of its summary witness, Paul Van Wie, who provided an unsupported inference that the Senator's online search results were indicative of the receipt of gold bars from Daibes:

> MR. MONTELEONI: All right. And can you please take
>
> us now, Mr. Ahuja, to page 3 of Government Exhibit 1337.
>
> Q. All right. Now, directing your attention near the top of
>
> the page here, these two nonhyperlink searches on October 18th,
>
> 2021, are these the searches that we were just looking at on
>
> the timeline?
>
> A. Yes.

---

the use of charts in complex trials, and has allowed the jury to have the charts in the jury room during its deliberations, *so long as the judge properly instructs the jury, as the judge did here, 'that it is not to consider the charts as evidence.'"*) (emphasis added); *United States v. Blackwood*, 366 F. App'x 207, 212 (2d Cir. 2010) (finding no prejudice because "the District Court's limiting instruction stat[ed] that the charts were not evidence; they were only graphic demonstrations of the underling evidence").

Q. Okay. About how close in time are they to the text between

the defendant and Daibes about donuts and Daibes taking the box

back with him?

A. I believe it was about 15 to 30 minutes before that.

Q. Well, we'll come back to whether -- to that in a moment.

. . .

MR. MONTELEONI: Now, let's return to the timeline.

Mr. Ahuja, could you please put back up page 6 of

Government Exhibit 1354.

Q. All right. So about how close in time are the searches for

one kilo of gold and how much is one kilo of gold worth to the

text between the defendant and Fred Daibes about donuts and he

made me take the box with me?

A. It was about between 15 and 30 minutes later.

Trial Tr. 2417:7-2418:16. Through Van Wie, the Government then impermissibly drew

connections between disparate events, simply based on timing. *See id.* 2418:17-2420:11. The

Government also employed the tactic with witness Rachel Graves. *See* Trial Tr. 1263-64

(questioning impermissibly connected a text by Mrs. Menendez about a trip to Edison with Hana,

to a visit to a car dealership, despite no such reference in evidence as to the location visited). As

these examples show, the Government used summary witnesses to offer inferences that were for

the jurors to make themselves—improperly bolstering the alleged legitimacy of the speculative

inferences by having them stated by law enforcement personnel. Via its cumulatively improper

use of summary exhibits, and related witnesses, the Government unjustly encouraged the jury to convict based solely on speculative and unsupported inferences.

### III.    THE GOVERNMENT HAS ONLY REITERATED FLAWED AND UNSUPPORTED THEORIES OF BRIBERY

The Government makes little meaningful effort to refute the arguments made by Mrs. Menendez as to the bribery counts.  The Government still cannot demonstrate that Mrs. Menendez aided and abetted or participated principally in any bribery scheme involving Senator Menendez.

### A.    THE GOVERNMENT DOUBLE-DOWNED ON ITS ERRONEOUS THEORIES OF AN OFFICIAL ACT

With respect to the alleged Hana/Egypt scheme, the Government is wrong on several fronts. Fundamentally, the Government's Opposition reveals that its theories of official acts relied not on reasonable inferences, but pure speculation.  The fact remains: the text that the Senator sent to Mrs. Menendez, which she allegedly sent to Hana, reflected a communication to a concerned constituent regarding a decision on arms sales the Senator had already made, not an official act that was tied to some corrupt bargain.  Moreover, the Senator's edits to a letter hardly reflected a promise not to impose holds on military financing for Egypt, at some unspecified future date.  Further, the Government improperly contends that Mrs. Menendez did not dispute that the Senator engaged in official acts, only promises of official acts.  *See* Opp. at 10 (wrongfully characterizing the fact that Mrs. Menendez disputed only the promise of an approval of tank ammunition sales "but not arguing such approval would not be an official act.")  Promises of official acts were the manner in which the Government pursued its case at trial.  Notwithstanding, Mrs. Menendez refutes that the Government proved beyond a reasonable doubt *any* official act, in the form of a promise or otherwise.

The Government's pained theory on the call to McKinney also suffers from conclusory misgivings.  Simply put, the Government made no effort to rebut that: (1) the call to McKinney lasted only minutes and not once reflected an attempt to pressure or advise McKinney in an official act, and (2) the only official conduct at play was solely within the decision-making power of the country of Egypt.  *See* Mem. at 26-27.[12]  McKinney testified himself that the Senator's tone during their call was "serious," "a little bit abrupt," "not angry," and "direct"—all completely unremarkable descriptions about the call, and certainly characteristics that may typify a formal interaction with a United States Senator.  Trial Tr. 1062:1-3; *see also id.* 1105:4-8 (McKinney testifying that interruptions by senators was a common occurrence in other interactions with senators, for example, at Senate hearings).  Moreover, the Government's musings that the Senator's call to McKinney demonstrated "at the very least, that he had promised those paying him and the defendant that he would seek to apply such pressure, of which the call was the start[,]" should be rejected.  Opp. at 14.  This theory was never argued at trial. Moreover, there was no evidence at trial—not a text, call, or any testimony or other evidence—and the Government has pointed to none—that the Senator intended to apply such pressure via future acts.  McKinney, in fact, testified that the Senator did not engage in any follow-up.  Trial Tr. 1111:20-1112:2.

As to the Uribe scheme, the Government's contentions are again belied by the evidence. The Government improperly argues that the "attempts to pressure" Attorney General Gurbir Grewal were "paradigmatic examples" of pressuring or advising an official act.  Opp. at 24.  But it is undisputed that Grewal never felt pressure.  Even the Government has conceded that.  *See id.*

---

[12] As in other instances of its opposition brief, the Government improperly attempts to distract the Court with irrelevant argument.  For instance, it spent much airtime attempting to explain the powers of the Executive Branch, to improperly try and shoehorn the short call into an alleged official act.  But the contentions are a red herring, which should be ignored.  *See* Opp. at 12-13.

at 25 ("Grewal did not personally feel pressured[.]")  Moreover, the Senator did not even request particular relief or offer advice on any specific outcome.  Starkly, the Senator never identified the particular matters under investigation, any targets of investigation, or the defendants by name. Mem. at 29; Trial Tr. 1407:15; 1422:5-13.

Tellingly, the Government attempts to circumvent this weak evidentiary position by mistakenly arguing that there need not be any direct evidence offered regarding a communication where pressure is exerted.   But even the Government's purported circumstantial support undermines its position because, simply put, there was insufficient evidence of pressure asserted by the Senator in his interactions with Grewal, for reasons already stated.  Moreover, the cases it cites in support of its position betray its contentions.  In *United States v. Reichberg*, 5 F.4th 233 (2d Cir. 2021), there was no direct evidence of pressure utilized on a call.  But, the circumstantial evidence was glaring in that case.  *Id.* at 249.  The relevant call set in motion an individual's release from jail.  *Id.*  By contrast, here, the call to Grewal did not spur Grewal into any action on the criminal case and related investigation at issue.  In fact, Grewal testified there was no follow-up regarding the criminal matters whatsoever.  *See, e.g.*, Trial Tr. 1396-98.  Indeed, the Senator and Grewal never exchanged enough detail about the case for there to be any follow-up.  *Id.* 1408:7-18 (Grewal testifying that the Senator never asked him to do anything and the two never got into the "substance of" the cases).  *United States v.* Lee, 919 F.3d 340 (6th Cir. 2019) bears no similarity to the facts of this case.  .  The Government cites the phrase, "I'm not trying to influence you," and others like it used on a phone call in *Lee* to contend that in *this* case the jury must decide whether any official who disclaims any attempt to apply pressure nonetheless has applied that pressure. Opp. at 25; *Lee*, 919 F.3d at 344.  The argument is entirely misplaced.  Here, the Senator never

made any statements seeking to disclaim an attempt to influence Grewal, when speaking to Grewal.

The Government also briefly asserted that the Senator made promises to Uribe and Hana, even before making contact with Grewal, which were "independent grounds for criminal liability." Opp. at 27-28.  Again, the Government's own citations refute this argument.  The so-called promises, which were not promises at all, were conversations Uribe and the Senator had *subsequent* to the Senator's first call with Grewal in January 2019.  *Compare*  Trial Tr. 1617-1621 (discussion between the Senator and Uribe on August 7, 2019), and GX B209-22 (August 5, 2019), *with* GX 1353 (line 303) (first call from the Senator to Grewal on January 29, 2019).  Thus, instead of demonstrating support for the Government's musings, the citations demonstrate a mischaracterization of the record and a thinly veiled effort to distract the Court from the Government's failure to meet its evidentiary burdens at trial.

The Government does not adequately refute Mrs. Menendez's arguments as to the Daibes scheme either.  Considering nominees for the position of U.S. Attorney fell within the normal scope and the lawful function of the Senator's position.  Moreover, the Senator's efforts on behalf of Daibes were innocuous calls made on behalf of a constituent and long-time friend, with no indication whatsoever of pressure applied or advice provided.  *See, e.g.*, Trial Tr. 2217 (Sellinger testifying that the Senator hoped Sellinger would "look into [the Daibes case] carefully" because he believed "Daibes was not being treated fairly.")  In what seems more like a last ditch effort, the Government also wrongfully contends that a purported call to Vikas Khanna is evidence of the Senator's attempt to influence Daibes's trial.  *See* Opp. at 34.  Incredulously, though, the Government cites only to alleged phone logs of the call and has offered no evidence on the contents of the call to demonstrate any pressure or advice was offered around Daibes's case.  *Id.*  The effort

is a quintessential example of the Government's overall case—which required conclusory jumps and imaginings—that violated the mandates of Rule 29 and 33. The Court should reject these strained efforts.

### B.     NOT A SINGLE PURPORTED SCHEME CAN SUPPORT THAT A BRIBERY ARRANGEMENT WAS MADE

Not only has the Government failed to support any showing of an official act.  The Government again leans on mistaken theories that a *quid pro quo* arrangement was made.  At its core, the Government incorrectly contends that the evidence at trial demonstrated that the Senator agreed to bribes in advance of any official acts, conceding in essence that the Senator did not receive a single benefit before an official act was performed.  *See, e.g.*, Opp. at 15.  But the evidence it cites proves nothing of the sort.

For example, the Government's theories regarding any alleged *quid pro quo* agreement regarding the Hana/Egypt conduct relies on meetings that occurred starting in or around March 2018.  Mrs. Menendez demonstrated the dubiousness of such a theory in her opening brief.  Mem. at 32-33.  The insinuation is that at some meeting, in March 2018, a promise to pay for a future official act was offered.  Opp. at 16.  But, there was, and has been, *no* evidence shown regarding the actual contents of any meeting.  Instead, the Government concludes that an agreement regarding bribes *must have been* struck prior to any official acts, solely on the basis of the fact of the meetings themselves.

The Government's theories on this scheme also fail because the Senator was unaware that Mrs. Menendez was owed any bribe payments prior to the performance of any alleged official acts. For instance, the Government cites no evidence, except speculatory hypotheses, that the Senator believed any consulting payments to Mrs. Menendez were "bribe payments."

25

The Government also fails to address Mrs. Menendez's core contention that any purported bribe payments were paid after any alleged official acts, such that they could not have possibly constituted bribe payments.  In a defective attempt to rebut the contention, the Government instead makes characterizations that certain payments were made close to the performance of official acts.  But under scrutiny, these assertions fail.  As just one glaring example, the Government improperly argues that Menendez edited a letter the very day that the defendant received "clearance for a project," which the Government contends is a message that Mrs. Menendez would get paid for the edits.  Opp. at 18-19.  But the message is anything but clear on that point.  Putting aside the fact that mere edits to a letter do not constitute an official act, as already discussed, the Government hangs its hat on a communication about an ambiguous "project" that is so vague that there can be no reasonable inference stemming from it, in any manner, let alone an inference that the message suggested payment would be provided to Mrs. Menendez.

Regarding the Uribe scheme, despite all of its very lengthy and distracting protestations otherwise, the Government still cannot overcome its evidentiary failure to demonstrate that the Senator had *zero* awareness that any Mercedez Benz payments were bribe payments.  That devastates the Government's case on this scheme, full stop.  For instance, while it cites to Uribe's testimony that he believed the Senator knew Uribe was making payments for the car, that testimony speaks only to Uribe's state of mind, not the Senator's.  *See* Opp. at 30.  The Government's reliance on a conversation wherein Senator Menendez allegedly told Uribe that the criminal matters concerning Uribe had been resolved proved no better.  Rather, the proper inference from that conversation is that the Senator attempted to prevent Uribe from bothering Mrs. Menendez again— not some insidious and unsupported version of the facts that the Senator lied to Uribe so that Uribe would keep paying for the Mercedez Benz.  Opp. at 32.

Moreover, as the Government agrees, the crux of a bribery arrangement is that the participants agreed to a bribe prior to the performance of an official act, or that the bribe recipient received the bribe prior to such an act.  *Snyder v. United States*, 603 U.S. 1, 11 (2024).  Yet, the Government failed to prove this.  For instance, it still cannot cite a single piece of evidence that demonstrated Uribe and Senator Menendez agreed to a bribe prior to his first call to Grewal in January 2019.  *See* Trial Tr. 1618 (Uribe testimony; Regarding August 7, 2019 meeting: "And this is the very first time where I had the chance to talk to the senator directly and express to him what is that that I need in order to get peace and protect my family.")

As to the Daibes scheme, the Government again doubles down on conjecture and speculation.  For example, it emphasizes the timing of Sellinger's consideration, then re-consideration for the position of U.S. Attorney as evidence of an alleged *quid pro quo*.  But, critically, the Senator knew that Sellinger could always be recused—up to and after the time Sellinger took office—so any re-consideration of Sellinger was not motivated by the Senator's desire to influence Daibes's prosecution when he ultimately recommended Sellinger for the post.  *See* Trial Tr. 2226:24-2227:7; 2234:12-21.  The Government also improperly claimed that because the Menendezes allegedly possessed cash and gold, they must have received those items from a criminal scheme (assuming incorrectly that there was no other way the Menendezes could be in possession of the items).  But the Government has failed to connect these items with an alleged promise of or actual official act, let alone any corrupt intent.  Opp. at 37.  The Government's fatigued and wholly irrational theory that Daibes must have given a gold bar to the Menendezes on October 18, 2021 because, in part, the Senator googled the price of a kilo of gold is simply ridiculous and not grounded in reality—or fact.  *Id.* at 35.  All that the evidence showed was a visit by Daibes and that he dropped off a box of donuts that day.  To say otherwise would encourage the

Government's cogitations, which while imaginative, are far more appropriate in a fictional novel than in a federal bribery case.

The Government's other arguments are unavailing. Just as one example, neither Mrs. Menendez nor the Senator exhibited a consciousness of guilt or favorable treatment, which the Government incorrectly deemed circumstantial evidence of a bribery scheme. First, their conduct was not evasive and certainly lacked any indicia of consciousness of guilt. Most troubling of the Government's characterizations relates to the December 2022 checks made from the Senator to Mrs. Menendez, and then Mrs. Menendez to Uribe and Hana. The absurd characterization that these checks were somehow false documents is addressed in Section IV. Moreover, they were not made to obfuscate any investigation, or disguise the payments as loans. They provided evidence instead that Mrs. Menendez always intended to pay back the loans she had acquired from Uribe and Hana. Second, as to the alleged favorable treatment the Senator offered, the evidence cited nothing more than proof of the Senator's lawful services as a senator engaged in foreign relations and in service of aiding his constituents and responding to their requests. For all of these reasons, the Government cannot overcome that, at trial, it failed to prove beyond a reasonable doubt that any bribery scheme occurred, and the Court should grant Mrs. Menendez's Rule 29/33 motion as to the bribery and bribery-related counts.

## IV.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT MRS. MENENDEZ ON THE OBSTRUCTION OF JUSTICE COUNTS

The Government cannot save the obstruction counts, which are built on inferences that are unsupported by the evidence. Fundamentally, despite the Government's protestations otherwise, the record is devoid of any evidence that Mrs. Menendez acted with the necessary wrongful intent

to obstruct a judicial or grand jury proceeding. *United States v. Schwarz*, 283 F.3d 76, 105 (2d Cir. 2002).

### A.  THE GOVERNMENT HAS NOT SUPPORTED THE GRAND JURY OBSTRUCTION CHARGES (COUNTS SEVENTEEN AND EIGHTEEN)

Counts Seventeen and Eighteen do not hold up. At trial, the Government presented nothing but optics, innuendo, and an incoherent timeline to support its flimsy obstruction charges, relying on the confusion sown by these tagalong charges to the bribery allegations. Critically, the Government has failed to prove *any* corrupt intent to influence the pending grand jury proceeding. As a result, the Government failed to meet its burden as to the charges under 18 U.S.C. § 1503.

These counts rest on the Government's argument that Mrs. Menendez, when requested to do so, produced checks to the U.S. Attorney's Office that "contained false and misleading memo lines describing the nature of the payments." Opp. at 48. Compounding the absurdity, the Government has held Mrs. Menendez criminally responsible, not just for the memo lines on checks she wrote, but for the memo lines on checks written *to* her by her husband. *Id.* The Government cites no law for its central proposition that a notation on a memo line can transform a valid check into a "false and misleading" document. This is because the memo line on a check simply assists the person writing the check in her own record-keeping and does not render the check "false." There is no dispute that the checks themselves were authentic and valid tender—the Government's only cooperating witness, Jose Uribe, testified that he deposited the check made out to him. Trial Tr. at 1681.

These circumstances are far afield from the case law finding obstruction due to the provision of a false document, or the withholding of a document, in connection with a grand jury subpoena. *See United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir. 2006) ("it is enough if he knows that a subpoena calls for a category of documents, or even one particular document, and

29

then takes steps to place those documents beyond the reach of the grand jury.); *United States v. Collis*, 875 F. Supp. 398, 401 (E.D. Mich. 1995) (finding a violation of 18 USC § 1503 when the defendant attempted to influence a judge toward leniency by submitting a bogus letter from his employer); *United States v. Sprecher*, 783 F. Supp. 133, 164 (S.D.N.Y. 1992) (following bench trial, finding the defendant guilty where he made false representations in an affidavit that misrepresented his relationship with entities involved in an SEC investigation).  Particularly,  as pointed out in Mrs. Menendez's opening brief, the jury heard ample evidence that Mrs. Menendez sincerely believed she was repaying loans.  *See* Mem. at 40–41.[13]

For these reasons, the Court should enter a judgment of acquittal as to Counts Seventeen and Eighteen.

### B.    THE GOVERNMENT HAS NOT SUPPORTED THE DAIBES-RELATED OBSTRUCTION CHARGE (COUNT FOUR)

In its brief defense of Count Four, the Government, remarkably, says almost nothing about the conduct of Mrs. Menendez, focusing entirely on what Senator Menendez allegedly did.  Opp. at 49–52.  The Government then says, summarily, that Mrs. Menendez agreed to participate in the relevant conspiracy.  *Id.* at 49.  As to Mrs. Menendez the Government contends only that she (a) "was fully aware of Menendez's efforts";  (b) described her husband as "FIXATED" on the Daibes case—which, notably, amounts at most to an observation on her part without any suggestion of her or the Senator being engaged in a conspiracy to corruptly influence or steer the Daibes prosecution; and (c) received funds from Daibes.  *See id.* at 50.  Such actions do not support the conclusion that Mrs. Menendez had agreed to participate in a conspiracy to obstruct justice.

---

[13] The Government's argument that Mrs. Menendez never intended to repay Uribe for the Mercedes, because she repaid only half of the money Uribe had paid, is illogical.  Loans are often repaid in installments.

In its Opposition, the Government glosses over Count Four by stating that "[t]he same evidence underlying the bribery charges more than amply supported the jury's finding that she conspired to obstruct justice in connection with the Daibes federal prosecution." Opp. at 49. As set forth above in Section III, the Government has not provided any scintilla of evidence that the Senator's actions were corrupt. The evidence showed that the Senator made innocuous calls on behalf of a constituent and long-time friend, with no indication whatsoever of pressure applied or advice provided. *See, e.g.*, Trial Tr. 2217 (Sellinger testifying that the Senator hoped Sellinger would "look into [the Daibes case] carefully" due to a concern about fairness).

As set forth *supra* and in Mrs. Menendez's Memorandum, Senator Menendez lacked any corrupt intent to justify a conviction for conspiracy to obstruct justice. Without a corrupt purpose (i.e., a bribe), the conduct allegedly performed by Senator Menendez is not a crime and, therefore, there can be no conspiracy. Count Four is premised upon a house of cards, and without evidence of a bribe, all the Government's attempts at inferred misdeeds tumble.

## V. THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION FOR THE FARA CONSPIRACY

The Government's response to Mrs. Menendez's FARA-related arguments is not persuasive. The Government relies on speculative inferences and innuendo as evidence that Mrs. Menendez conspired to have Senator Menendez act as an agent of a foreign principal. The Court should reject the Government's arguments and vacate Count Fifteen.

Initially, the Government does not meaningfully refute Mrs. Menendez's contentions regarding the insufficiency of the Government's proof. As just one example, the Government makes no effort to address the glaring inconsistency in its treatment of the call to Undersecretary McKinney highlighted in Mrs. Menendez's opening brief. *See* Mem. at 44.

31

The Government otherwise points to unconvincing evidence.  It cites, for example, an alleged change in the Senator's approach towards public criticism of Egypt starting in 2018.  *See* Opp. at 40.  But the Senator certainly could alter his approach to foreign diplomacy, deciding as a strategy matter to focus his critical efforts in a more private setting.  To now say that the change somehow illustrated or even suggested a criminal conspiracy is an obvious attempt at Monday-night quarterbacking in its most egregious form.  The Government also absurdly trumpeted plans for a trip to Egypt and meetings with Egyptian officials, contending improperly that these plans and meetings took place furtively with some nefarious intent.  *Id.* at 41.  But nothing can be inferred from this evidence other than (1) an Egyptian trip was planned and (2) that meetings occurred.

The FARA charge was thus an unprecedented endeavor to criminalize congressional behavior—and then to extrapolate the alleged criminal behavior to bring a conspiracy charge against Mrs. Menendez, who was several steps removed from any congressional conduct.  Simply put, there was no agreement—let alone one involving Mrs. Menendez—to have the Senator act as a foreign agent at the request, order, or control of any foreign principal or anyone else directly or indirectly controlled by the government of Egypt.  The Court should vacate Mrs. Menendez's conviction on Count Fifteen.

## VI.    THE CONTACTS WITH THIS DISTRICT ARE TOO ATTENUATED TO SUPPPORT VENUE

As to the counts related to the alleged Hana/Egypt scheme, the Government improperly rests its theory on purely preparatory acts, a meeting where, even the Government concedes, Mrs. Menendez was not present, and acts that do not constitute essential conduct.  Opp. at 53.  For instance, the Government cites the Mr. Chow dinner, hypothesizing that the "in-person meeting[ ] laid the groundwork for a further exchange of things of value for official acts."  *Id.* at 54.  But there is no real dispute here: the Government has not offered a single shred of evidence of what was

discussed at the Mr. Chow meeting, nor the reason for the meeting. Even if the meeting was somehow connected to that later alleged promise, the meeting was a preparatory act, at most, which under well-settled law, fails to sufficiently support venue. *See  United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1190 (2d Cir. 1989) ("[V]enue is not proper in a district in which the only acts performed by the defendant were preparatory to the offense and not part of the offense[;]").

As to the Uribe-related counts, the Government relied, in part, on the strained theory that Uribe, in New Jersey, called Barruos who then provided car payments for the Mercedez Benz in this district. The Government skirted the fact that Mrs. Menendez could not have reasonably foreseen this call and the subsequent payments. For instance, it argued that foreseeability is established by the geographic proximity of New Jersey and New York. But then it cited to case law that better suggests that a coconspirator's New York conduct was foreseeable throughout New York. Opp. at 58-59. In other words, the case law belies the notion that an out-of-state resident, from New Jersey, with no other substantive allegations tying her to New York, could have somehow foreseen that Uribe would cause *someone else* to make payments here.

As to the Daibes-related counts, as well as the conspiracy counts, the Government's brief all but concedes the venue argument. As to the former, the Government makes very little effort—to the tune of four sentences—to support its argument that a car ride home from JFK airport and the sale of kilogram gold bars is sufficient evidence of venue in this district. Simply put, neither the car ride nor the sale of bars was essential to any bribery scheme. As to the conspiracy offenses, the Government says absolutely nothing. The Government bears the burden at trial to show sufficient evidence of venue on each count. *See United States v. Davis*, 689 F.3d 179, 185 (2d Cir.

33

2012) ("Where, as here, a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge.") (citations omitted).

## VII. COUNTS ONE AND FIFTEEN ARE MULTIPLICITOUS AND CANNOT BOTH STAND

The Government rightly concedes that Mrs. Menendez is "similarly situated" regarding her multiplicity argument to Senator Menendez and Hana, *see* Opp. at 99, for whom this Court already concluded "Count 15 is merely a subset of Count 1, and the counts are thus multiplicitous." Dkt. 654 at 78. As previously outlined, the *Korfant* factors confirm that the two charges rest upon a single conspiracy as to Mrs. Menendez as well because the participants to Count Fifteen are all included within Count One and the time period overlaps. *See* Mem. at 60. Additionally, the Government continued in Mrs. Menendez's trial with its reliance upon the same overt acts as to both counts. *See* Trial Tr. 2933 (listing overt acts supporting Count One as acts purportedly benefitting Egypt and Hana's monopoly like "Daibes handing over a bar of gold, the defendant selling it."); *id.* at 2947 ("[J]ust like with the bribery conspiracy," the overt acts include "[s]ending the embassy information; asking Menendez to write the ghostwritten letter; the meeting with Hana at Mr. Chow; selling the gold they got from the scheme in Manhattan; so many more."). For these reasons, the Court should treat Mrs. Menendez consistent with Senator Menendez and Hana and find that Counts One and Fifteen are multiplicitous.

## VIII. THE RULE 33 MOTION IS TIMELY

Mrs. Menendez's Rule 33 motion is not untimely, as the Government contends. It was proper for Mrs. Menendez to file a motion for new trial at the same time that she was required to file a Rule 29 motion. Initially, Mrs. Menendez's counsel did not expressly move to extend the time to file a Rule 33 motion, *see* Dkt. 840, and the Court extended the deadline for Mrs. Menendez

to file a Rule 29 motion to May 23, 2025, *see* Dkt. 842.[14]  On May 20, 2025, before the first extension had passed, Mrs. Menendez's current counsel filed a motion seeking an additional extension *immediately after* appearing in the case.  *See* Dkt. 861.  That motion applied to all post-trial briefing, with no distinction between Rule 33 or Rule 29 motions, and the extension was so-ordered by the Court.  *See* Dkt. 862.

Mrs. Menendez's new counsel, who acted as promptly as possible upon joining the case, should not be bound by haphazard statements and non-tactical decisions by Mr. Coburn.  In his letter dated April 28, 2025, requesting additional time to file a Rule 29 motion, Mr. Coburn represented that he was "exhausted after trial" and overextended with other time-sensitive tasks.  *See* Dkt. 840.  He also represented that his colleagues were all unavailable, and that the other attorney on Mrs. Menendez's case was on maternity leave.  *Id*.  The very same strained circumstances that motivated Mr. Coburn's extension request partially underlay Mrs. Menendez's decision to retain additional counsel.

The time limitations of Rule 33 are not jurisdictional, meaning courts have discretion to hear motions outside the fourteen-day period provided in Rule 33(b)(2) upon a finding of excusable neglect.  *See United States v. Owen*, 559 F.3d 82, 83–84 (2d Cir. 2009); *see also* Rule 45(b)(1)(B).  The excusable neglect analysis is guided by the *Pioneer* factors.  *United States v. Kenner*, 272 F. Supp. 3d 342, 419–20 (E.D.N.Y. 2017) (citing *Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 129 (2d Cir. 2011)).  These factors are:  (1) the danger of prejudice to the party opposing the extension; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the

---

[14] He also requested an adjournment of the sentencing date, from June 12, 2025 to September 11, 2025.  The latter date remains as-scheduled.

reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith. *Id.*

Under these factors, it is clear the Court should entertain Mrs. Menendez's Rule 33 motion at this stage. Courts in the Second Circuit have found excusable neglect under similar circumstances where the defendant obtained new counsel post-trial. In *Kenner*, the court found excusable neglect when defendant's Rule 33 motion was not timely filed because defendant's relationship with his trial counsel was irretrievably broken and the new counsel "had to become familiar with the voluminous record" in the case. 272 F. Supp. 3d at 420. Here, similarly, Mr. Coburn's ability to represent Mrs. Menendez in post-trial proceedings was clearly compromised by his staffing limitations and his unmanageable obligations, resulting both in the first extension and in Mrs. Menendez's retention of substitute counsel.[15]

Furthermore, the Government would suffer no prejudice should the Court entertain this motion, which corresponds with the briefing on Mrs. Menendez's Rule 29 motion and to which the Government has already responded. In *Kenner*, the court found that the government suffered no prejudice because, analogous to this case, "[g]iven the overlap in the extended briefing schedule for [co-defendant's] motions and [defendant's] motion, as well as the ongoing forfeiture proceedings, it [was] clear that [defendant's] delayed motion [had] not impacted this judicial proceeding in a negative manner." *Id.* The Government does not and cannot identify any

---

[15] These facts distinguish this situation from a case like *United States v. Ketabchi*, No. 17-CR-243-3, 2019 WL 1510444 (S.D.N.Y. Mar. 25, 2019), where the defendant was merely dissatisfied with trial counsel and remained in contact with him following the verdict. Furthermore, additional factors that motivated the decision in *Ketabchi*, such as the resulting delay in sentencing and the fact that no other post-trial motions were pending, are not present in this case.

"prejudice to its ability to oppose this motion"—which has already been filed and substantively opposed by the Government. *United States v. Pauling*, 256 F. Supp. 3d 329, 340 (S.D.N.Y. 2017).

Further, considering Mrs. Menendez's Rule 33 motion causes no delay and would have no adverse impact on the judicial proceedings in this case. The Rule 33 motion is brought as a single motion alongside Rule 29 arguments, and the September 11, 2025 sentencing date has not shifted. Finally, none of these events suggest bad faith on the part of Mrs. Menendez. As soon as she retained new counsel post-trial, that new counsel acted promptly in seeking an extension, getting up to speed on a 3,000-page record, and filing a motion to vindicate a clear threat to indispensable constitutional rights. *See United States v. Scali*, No. 16-CR-466, 2018 WL 3536082, at *2 (S.D.N.Y. July 23, 2018) (no indication that defendant was "not acting in good faith and simply diligently asserting his rights").

Regardless of the Rule 33 analysis, both judicial economy and the interests of justice necessitate that the Court entertain the *fully briefed* constitutional issues presently before it. Should the Court take the Government's bait and dodge the issues at this stage, Mrs. Menendez's Sixth Amendment argument and her summary chart objection will be ripe for collateral review pursuant to 28 U.S.C. § 2255. Thus, *all* parties and the Court will be best served by the efficient resolution at this stage.

## CONCLUSION

For the foregoing reasons and those stated in the Motion, this Court should grant defendant Nadine Menendez's motion pursuant to Federal Rules of Criminal Procedure 29 and/or 33.

Dated: July 7, 2025                    Respectfully submitted,

By: /s/ Sarah R. Krissoff

Sarah R. Krissoff, Esq.
Andrew J. Vazquez, Esq.
COZEN O'CONNOR
3 WTC
175 Greenwich St.
New York, N.Y. 10007
(212) 908-1388

*Attorneys for Defendant Nadine Menendez*