UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NADINE MENENDEZ,

Defendant.

(S4) 23-Cr-490 (SHS)

OPINION & ORDER

## TABLE OF CONTENTS


I. Applicable Law ........ 3

A. Rule 29 Motion for a Judgment of Acquittal ........ 3

B. Rule 33 Motion for a New Trial ........ 5

II. The Evidence Supports the Convictions. ........ 6

A. The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as Official Acts Related to the Egypt Scheme; the New Jersey State Criminal Matters; and the Daibes Federal Prosecution Scheme. ........ 6

1. The Egypt Scheme ........ 6

a. Official Acts ........ 6

b. *Quid Pro Quo* ........ 8

2. The New Jersey State Criminal Matters ........ 13

a. Official Acts ........ 13

b. *Quid Pro Quo* ........ 15

3. The Daibes Federal Prosecution Scheme ........ 19

a. Official Act ........ 20

b. *Quid Pro Quo* ........ 20

B. The Evidence Was Sufficient to Prove That Defendant Conspired for Menendez to Act as an Agent of a Foreign Principal. ........ 23

C. The Evidence Was Sufficient to Prove the Obstruction of Justice Charges (Counts 4, 17 & 18) ........ 27

D. The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York. .... 30
1. Substantive Counts Related to Egypt (Counts 5, 7 & 8) .... 31
2. Substantive Counts Related to the Daibes Federal Prosecution Scheme (Counts 11, 13 & 14) .... 35
3. Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10) .... 35
4. The Conspiracy Charges (Counts 1, 2, 3, 4 & 15) .... 37
a. The Bribery Conspiracy Charges (Counts 1, 2 & 3) .... 37
b. The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4) .... 37
c. The FARA Conspiracy Charge (Count 15) .... 38
III. There Was No Manifest Injustice Warranting a New Trial Pursuant to Rule 33. .... 38
A. The Sixth Amendment Does Not Entitle Defendant to a New Trial .... 39
1. Relevant Background .... 39
2. The Sixth Amendment Right to Counsel .... 42
3. Defendant's Sixth Amendment Rights Were Not Violated. .... 44
B. The Use of Summary Charts and Summary Witnesses by the Government Was Proper. .... 46
IV. Counts 1 and 15 Are Multiplicitous and Judgment Shall Enter on Only One of Those Counts. .... 50
V. Conclusion .... 51

SIDNEY H. STEIN, U.S. District Judge.

On September 21, 2023, a federal grand jury in the Southern District of New York indicted defendant Nadine Menendez, along with then-Senator Robert Menendez, as well as Wael Hana, Jose Uribe, and Fred Daibes for their participation in a years-long scheme to bribe Menendez in exchange for things of value, including numerous gold bars, hundreds of thousands of dollars in cash, and a Mercedes-Benz convertible for

defendant and her then-boyfriend and now-husband, Robert Menendez.[1] The trial of this action as to all defendants was originally scheduled to begin in May of 2024.[2] But due to a medical condition, the Court adjourned defendant's trial date and severed her trial from the trial of co-defendants Menendez, Hana, and Daibes. After an approximately nine-week trial in the summer of 2024, Menendez, Hana, and Daibes were each found guilty on all counts with which they had been charged.

Ten months after her original trial date, defendant proceeded to trial in March of 2025. The evidence presented was substantially similar to the evidence presented at her co-defendants' trial. Following a five-week trial, defendant was found guilty on all counts with which she had been charged. Defendant has now moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, contending that the government failed to introduce evidence sufficient to support a conviction on all counts. (ECF No. 868.) Defendant seeks in the alternative a new trial pursuant to Federal Rule of Criminal Procedure 33, contending that her Sixth Amendment right to counsel was violated and that the government's use of summary charts and summary witnesses was improper. (*Id.*) Many of these issues have been unpacked and analyzed in this Court's December 13, 2024 Opinion following the trial of Menendez, Hana, and Daibes, *United States v. Menendez*, 759 F. Supp. 3d 460 (S.D.N.Y. 2024). The reader is directed to that Opinion for necessary background and relevant analysis.

As set forth below, defendant's motion pursuant to Rule 29 and Rule 33 is denied in its entirety. Just as this Court observed in connection with the evidence presented in the trial last year of Menendez, Hana, and Daibes, so too the jury's verdict in this trial of Nadine Menendez was fully supported by the extensive witness testimony and documentary evidence here. In addition, defendant has not identified any injustice—let alone a manifest injustice—requiring a new trial. The Court does, however, find that Counts 1 and 15 are multiplicitous and thus will impose judgment on only one of the two multiplicitous counts.

## I. Applicable Law

### A. Rule 29 Motion for a Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure 29, after the jury has rendered its verdict, "the Court may set aside the verdict and enter an acquittal" of "any offense for

---

[1] For clarity, the Court will refer to Nadine Menendez as "defendant" and Robert Menendez as "Menendez."

[2] Jose Uribe pled guilty on March 1, 2024. (ECF No. 248.)

which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c)(2). "[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden.'" *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). In determining whether the evidence is sufficient such that "a reasonable mind might fairly conclude guilt beyond a reasonable doubt," *id.* (quoting *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000)), courts are to "view the evidence presented in the light most favorable to the government" and draw "all permissible inferences . . . in the government's favor." *Id.* (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). Additionally, "it is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *United States v. Cote*, 544 F.3d 88, 99 (2d Cir. 2008) (quoting *Guadagna,* 183 F.3d at 129).

"When a defendant challenges the sufficiency of the evidence in a conspiracy case, 'deference to the jury's findings is especially important . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). The agreement to join the conspiracy may "be inferred from the facts and circumstances of the case" and "[b]oth the existence of the conspiracy and the defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence." *Landesman*, 17 F.4th at 320 (quoting *United States v. Wexler*, 522 F.3d 194, 207-08 (2d Cir. 2008)). Moreover, "the 'agreement or understanding' element of bribery 'is indistinguishable from a conspiratorial agreement,' and accordingly 'may be proven by circumstantial evidence.'" *United States v. Friedman*, 854 F.2d 535, 553 (2d Cir. 1988) (quoting *United States v. Covino*, 837 F.2d 65, 70 (2d Cir. 1988)).

While courts "must defer to a jury's reasonable inferences," they are to "give no deference to impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Id.* (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)). "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

Additionally, "[w]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible." *Landesman*, 17 F.4th at 320 (quoting *Pauling*, 924 F.3d at 657). Rather, the court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find

that the element, like all elements, is established beyond a reasonable doubt." *Id.* (quoting *Pauling*, 924 F.3d at 657). "[I]f the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 159 (2d Cir. 2008) (quoting *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002)).

Ultimately "[t]he jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Guadagna*, 183 F.3d at 130 (emphasis in original) (quoting *United States v. Resto*, 824 F.2d 210, 212 (2d Cir. 1987)). "'[A] judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (internal quotation marks omitted).

### B. Rule 33 Motion for a New Trial

Pursuant to Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

On a Rule 33 motion, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)). In so doing, "[t]he district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* And, as with a Rule 29 motion, "a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020).

But while "'a trial court has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 . . . , that discretion should be exercised sparingly' and only in the most extraordinary circumstances." *Landesman*, 17 F.4th at 330 (quoting *Sanchez*, 969 F.2d at 1414). "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 188. Under this standard, "a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *Id.* (quoting *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997)). Indeed, courts "must take

care 'not to usurp the role of the jury.'" *Landesman*, 17 F.4th at 330 (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

Thus, "absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.'" *Archer*, 977 F.3d at 188-89 (internal citations omitted). "[T]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice. In other words, [t]here must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (citation and quotation marks omitted).

## II. THE EVIDENCE SUPPORTS THE CONVICTIONS.

### A. The Evidence Was Sufficient to Prove a Corrupt *Quid Pro Quo* as well as Official Acts Related to the Egypt Scheme; the New Jersey State Criminal Matters; and the Daibes Federal Prosecution Scheme.

Defendant contends that the government "failed to prove beyond a reasonable doubt that Senator Menendez engaged in a single official act" and failed to prove that Menendez and defendant "agreed to perform an official act *in exchange for* anything of value with corrupt intent." (ECF No. 868 at 24-25.) That is not so.

This Court has already written extensively on the definition of an official act under *McDonnell v. United States*, 579 U.S. 550 (2016) as well as the *quid pro quo* requirement in its December 13, 2024 Opinion addressing the post-trial motions of the defendant's co-defendants. *See Menendez*, 759 F. Supp. 3d at 476-79. Rather than restate that analysis here, the reader is referred to the standards set forth in that Opinion.

#### 1. *The Egypt Scheme*

Defendant urges that the government failed to prove any official act with respect to the Egypt scheme and that any agreement to perform an official act was made in exchange for anything of value. As explained below, she is incorrect.

##### a. *Official Acts*

The government presented evidence of at least two official acts in connection with the Egypt scheme. First, the government introduced evidence that Menendez promised to sign off on a foreign military sale to Egypt. Specifically, the jury saw a text message from Menendez to defendant—which defendant then immediately transmitted to Hana—in which Menendez wrote "Tell Will I am going to sign off this sale to Egypt today. Egypt: 46,000 120MM Target Practice Rounds and 10,000 Rounds Tank

Ammunition: $99 million." (GX 1352, rows 306-09, GX A101-14, GX B201-10, GX B105-15.) As this Court previously explained, this action plainly meets the definition of an official act under *McDonnell*. *See Menendez*, 759 F. Supp. 3d at 480-81. That alone is sufficient to defeat defendant's challenge with respect to official acts for these counts.[3]

*Second*, even assuming that text message did not exist, the jury could reasonably conclude that Menendez's call to Ted McKinney—at the time, the Undersecretary of Agriculture at the U.S. Department of Agriculture ("USDA")—was evidence of Menendez's promise to perform an official act, and perhaps performance of an official act as well. During the trial, the jury heard evidence that in April of 2019, Egypt rejected or decertified seven American companies that had previously been certified as halal beef exporters to Egypt. (Tr. 1036-38; GX 8B-3.) In place of those seven companies, Egypt substituted a single company, IS EG Halal Certifiers Inc. ("IS EG")—a New Jersey company owned by Hana with absolutely no prior experience in halal certification. (*See* GX 8B-3.)

Upon learning of Egypt's decision to grant a monopoly to a totally untested company, the USDA became "deeply concerned," and McKinney wrote a letter to his Egyptian counterpart—the Egyptian Deputy Minister of Agriculture—expressing the USDA's desire that the Egyptian government reverse course "[e]ffective immediately" "to prevent any disruption" in the U.S. market. (GX 1352, row 575, GX 8B-20.) In the wake of that letter, Menendez called McKinney, a call in which McKinney described Menendez to the jury as "direct" and "serious." (Tr. 1062.) During that call, Menendez twice told McKinney to "[s]top interfering with my constituent," which McKinney understood to be IS EG. (Tr. 1059-60, 1061, 1064.) McKinney testified that "it was an order." (Tr. 1060.) McKinney explained that he felt that Menendez wanted the USDA to "cease and desist all of [its] efforts" to bring back the other halal certifiers. (Tr. 1063.) McKinney also explained how unusual a call like this was (*see* Tr. 1063, 1070); afterward, he felt the need to "reassure [U.S. Embassy employees] in Egypt that we have their back" and that "[t]hey should not worry about this call from the senator." (Tr. 1068-69; *see also* GX 1352, row 666, GX 8B-12.)[4]

---

[3] Defendant protests that this message simply "reflected a communication to a concerned constituent regarding a decision on arms sales the Senator had already made, not an official act that was tied to some corrupt bargain." (ECF No. 876 at 21.) But the jury was entitled to reject that (far-fetched) competing inference, in light of the totality of the government's evidence and Menendez's choice to inform that constituent not through any official channel but though his then-girlfriend.

[4] This evidence dispels defendant's assertion that the government offered "no evidence whatsoever" that Menendez attempted to pressure McKinney on that call. (ECF No. 868 at 26.)

With this evidence, the jury was entitled to determine that Menendez was seeking to pressure McKinney concerning the position the USDA was taking on a question or matter before it—its stance on Egypt's grant of a monopoly and specifically whether the USDA would undertake efforts to oppose such a monopoly, which the jury certainly was entitled to conclude involved a "formal exercise of governmental power." *McDonnell*, 579 U.S. at 574. And while the question or matter did not come before Menendez, it did not have to. As *McDonnell* set forth, the "decision or action" prong of an official act may be satisfied by a public official "using his official position to exert pressure on another official to perform an 'official act.'" *Id.* The jury could conclude that Menendez attempted to exert pressure on McKinney to stop the USDA's efforts to get Egypt to reinstate competition in halal certification of meat exports to Egypt, which would be more than enough to establish the official act requirement of a bribery offense.

***b. Quid Pro Quo***

The jury was similarly presented with ample evidence to conclude that Menendez promised to perform official acts to benefit Egypt and Hana in exchange for things of value, including a $23,568.54 payment towards defendant's mortgage and three $10,000 checks from IS EG to defendant for performing essentially no work for IS EG. Specifically, on July 19, 2019, Hana, with the assistance of his lawyer John Moldovan, paid the outstanding debt on defendant's mortgage to get her house out of foreclosure. And on August 30 and November 6, 2019, IS EG wrote three $10,000 checks to defendant's recently established consulting company, Strategic International Business Consultants. (GX 1352, row 919, GX 5A-1001A; GX 1352, row 989, GX 5A-1001B; GX 1352, row 997, GX 5A-1001C.)

Defendant urges that these cannot be bribe payments because they were received *after* the official acts and are thus, at most, gratuities. But bribes are payments that are either "made *or agreed to* before an official act in order to influence the official with respect to a future act." *See Snyder v. United States*, 603 U.S. 1, 5 (2024) (emphasis added). *See also* 18 U.S.C. § 201(b)(2) (criminalizing public officials for, *inter alia*, "agree[ing] to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act"). The government introduced sufficient evidence for the jury to reasonably conclude the scheme began well before defendant and Menendez received anything of value.

Indeed, months before any official acts, in February 2018, defendant asked Menendez—and Menendez agreed—to meet with her and Major General Khaled Shawky Osman, the military attaché at the Egyptian embassy in Washington (GX B105-A), at the embassy so that the pair could be introduced and, in the future, not require "an explanation to Egypt as to why [General Shawky was] meeting an official not at the embassy." (GX 1352, row 46, GX A105-A.) Approximately a week later, defendant,

Hana, and Menendez met "to discuss the points of the meeting" with General Shawky. (GX 1352, row 65, GX A101-99.) And on March 13, 2018, Menendez and defendant met with General Shawky, Andy Aslanian, and Hana, a meeting that Menendez's staff did not join and otherwise appeared to be unaware of. (GX 1352, rows 77-79, GX C102-2, GX 4I-2.) Shorty after, defendant wrote to Hana that she planned to ask Menendez "about the two deals." (GX 1352, row 85, GX B105-3.)

Just a few months after this meeting, in May 2018, defendant asked Menendez to "fix" a letter for General Shawky so that she could "prove a point to [Shawky]," noting that General Shawky and Hana had just given her "clearance for a project." (GX 1352, row 183, GX B102, GX B102-A.)

At the end of June, Hana, defendant, and Menendez met for dinner in Manhattan, during which time Hana was simultaneously communicating with General Shawky. (*See* GX 1352, rows 243-48, GX B105-10, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1, GX C206-3, GX C206-3T.) The group again met in Washington D.C. the following month on July 25, 2018. (GX 1352, row 300, GX C410.) The very next day, Menendez told defendant to tell Hana that he will sign off on an arms sale to Egypt. (GX 1352, row 306, GX A101-14.) The defendant did immediately as Menendez instructed (GX 1352, row 308-09, GX B105-15) and then, two minutes after Hana received the text from defendant, Hana forwarded the message to General Shawky and another Egyptian official. (GX 1352, rows 310-11, GX C206-7, GX C112-2.)

This series of events provided the jury with ample evidence to conclude that long before defendant informed Hana of Menendez's promise to sign off on an arms sale—or received any payment—Menendez *agreed* to do so in exchange for things of value. In her motion, defendant faults the government for not introducing evidence of "what was actually said at these meetings." (ECF No. 868 at 33.) But a bribery agreement is, by its very nature, a "secretive operation" and thus "'it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Santos*, 541 F.3d at 70 (quoting *Morgan*, 385 F.3d at 204) (discussing secretive nature of conspiratorial agreement). *See also Friedman*, 854 F.2d at 553 ("[T]he 'agreement or understanding' element of bribery 'is indistinguishable from a conspiratorial agreement . . . .'"). And indeed, "evidence of the timing of the payments in relation to the actions taken" by a public official may "be accepted by a rational jury in support of the conclusion that [the defendant] understood that the [] payments were made in return for official action." *United States v. Silver*, 948 F.3d 538, 567 n.18 (2d Cir. 2020) (quoting *United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011)). *See also id.* at 570-71 ("[T]he evidence presented at trial, including circumstantial evidence of the timing of [certain] financing approvals and [the official's] 'side letter' retainer agreement" was sufficient for a jury to conclude the official had accepted payments "with the belief that he was

expected to influence *a particular matter*"); *United States v. Reichberg*, 5 F.4th 233, 249 (2d Cir. 2021) (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions"); *United States v. Calk*, No. 19-cr-366, 2022 WL 101908, at *2 (S.D.N.Y. Jan. 11, 2022) (concluding that "[t]he timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent"), *aff'd*, 87 F.4th 164 (2d Cir. 2023). In this case, the circumstantial evidence strongly supports the jury's conclusion that there was a corrupt *quid pro quo*.

The same is true for Menendez's call to McKinney. In January of 2019, Ali Abdi of the USDA wrote to Dr. Ahmed Abdel Karim, an Egyptian agricultural official, and approved Karim's request "to audit slaughterhouses and Islamic centers in the United States." (GX 1352, row 420, GX C107-C.) Days later, Karim forwarded this letter to Hana. (*Id*.; GX C107-1T.) Around the same time, defendant wrote to Andy Aslanian that "2019 is going to be a FANTASTIC YEAR for all of us. [Menendez] [k]eeps telling me that and I'm really starting to believe it." (GX 1352, row 402, GX B113.)

On March 26, 2019—almost exactly one year from that first meeting between defendant, Menendez, Andy Aslanian, Hana, and General Shawky—defendant wrote that "[i]t has been a year of broken promises by Will to me and I have given 1000% of my myself [sic], my time and kept every promise to Will . . . . I am willing to give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1352, row 461, GX B221-1.) She went on to say that this week "I will once again prove my loyalty and dedication." (*Id.*) Shortly afterward, on April 8, 2019, defendant messaged Menendez that it "[s]eems like halal went through. It might be a fantastic 2019 all the way around." (GX 1352, row 523, GX A101-27.)

A few weeks later, the USDA learned that Egypt had decertified the seven U.S. companies that had been authorized by Egypt to certify meat as halal for exporting into Egypt and had instead authorized IS EG to be the sole exporter. On May 13, 2019, McKinney wrote to the Egyptian Deputy Minister of Agriculture to express his "deep[] concern[s]" and request that she "immediately . . . reinstate the seven U.S. halal certifiers" that had been suspended or terminated. (GX 1352, row 575, GX 8B-20.) Days later, Hana sent an article about the United States' response to the change to defendant (GX 1352, row 644, GX C102-6), who then immediately forwarded it to Menendez. (GX 1352, row 642, GX A404.) Within minutes, Menendez called McKinney and sent this same article to him. (GX 1352, row 647, GX 8B-16.) Five days after Menendez made that call to McKinney, Hana listed defendant as the vice president of IS EG with an annual salary of $120,000 (GX 1352, row 675, GX C104-4)—i.e., $10,000 per month or $2,500 per week, which matched the salary identified in defendant's March 2019 text message.

Following Menendez's call to McKinney, the evidence shows that defendant was paid. In July 2019, Hana, with Moldovan's assistance, paid the outstanding debt on defendant's mortgage, thus stopping the bank from foreclosing upon her house. (*See* GX 1352, row 894, GX 5C-200; Tr. 414-15.) And then in August and November 2019, defendant received three checks for $10,000 each from IS EG. (GX 1352, row 919, GX 5A-1001A; GX 1352, row 989, GX 5A-1001B; GX 1352, row 997, GX 5A-1001C.)

In sum, this circumstantial evidence provides a more than sufficient foundation for the jury to reasonably infer that Menendez agreed to take official action in exchange for items of value for defendant—including the mortgage payment and the checks from IS EG—before he took or attempted to take any official act. *See Reichberg*, 5 F.4th at 249 ("[C]ircumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions."); *Calk*, 2022 WL 101908, at *2 (finding that the "timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent").

Defendant contends that the mortgage payments "were always understood by Mrs. Menendez to be a loan she had every intention of paying back." (ECF No. 868 at 34.) A rational jury was certainly entitled to conclude otherwise. Moldovan testified that when he first spoke with Hana and defendant about paying off her mortgage debt, there was no mention of a promissory note. (Tr. 441-42.) Only later on, Hana instructed Moldovan to "create a loan for the purposes of providing the funds that are going to be used to pay the mortgage off." (Tr. 442.) Moldovan then drafted a loan agreement per Hana's specifications—a five-year term, no interest, and no payment schedule. (Tr. 443-44.) On June 27, 2019, Moldovan sent this draft agreement to defendant for her execution (GX 1352, row 854, GX 4C1-D), but Moldovan testified that she seemed "very angry" when she received it. (Tr. 446-47.) Moldovan explained that defendant "essentially made it clear that she was sort of offended by the fact that a note was being sent prior to the execution of the funds transferred." (Tr. 447.)

On July 16, 2019, Moldovan attempted to follow up with defendant, as he was still "awaiting [her] response on the money from [Hana]." (GX 1352, row 872, GX B222.) The next morning, defendant responded: "I have no idea what response you are waiting for." (GX 1352, row 873, GX B222.) Moldovan then reminded her of the draft loan agreement he had sent weeks ago for her review. (GX 1352, row 877, GX B222.) Moldovan testified that after he sent that message, Hana came to him and instructed him to "transfer the funds immediately" (Tr. 451), even though the draft loan agreement had not been signed. That day, Hana wired Moldovan the money to send to defendant, and on July 19, 2019, Moldovan issued a check to defendant's mortgage company in the amount outstanding. (GX D207-A at 5.) And while the memo line of the check read "Loan Auth W. Hana / ISEG to N.A" (*id.*), Moldovan testified that a promissory note

had not been executed. (Tr. 460.) Ultimately, Moldovan told the jury that defendant never told him that "she agreed the money would be a loan" and she never told him that it would be repaid. (*Id*.) This evidence provides the jury with more than sufficient support to conclude that this was not a loan.

Tellingly, defendant characterized the mortgage payment as a payment to her, along with the $10,000 monthly checks from IS EG. Specifically, in September, defendant reached out to Daibes because she had not been receiving her payments from Hana as expected. (GX 1352, row 967, GX D102-10.) Daibes asked her to send him a "rundown" of what she was owed. (GX 1352, row 969, GX D102-10.) In response, defendant wrote that the "July 19th cashier's check for the $23,568.54 to the mortgage company" covered most of the payments she was due for May, June, and partially July. (GX D102-C.)

Defendant also challenges the government's characterization of her three-month stint as a consultant for IS EG as a "sham job," contending the evidence to support this characterization was "dubious and thin." (ECF No. 868 at 33.) But there was ample evidence from which the jury could conclude that defendant's "employment" by IS EG was simply a means of funneling bribe payments to her and Menendez. As a few examples, defendant was the second highest paid individual at IS EG, despite having no prior experience in halal certification or the halal business in general; an IS EG employee testified that she was unaware of any work defendant performed for IS EG (*see, e.g.*, Tr. 1148)[5]; the jury heard a voicemail in which defendant stated that Hana told her "he doesn't need me for anything and I haven't done anything to help him, and a whole bunch of other stuff that I need to be in the office eight hours a day" (GX 1352, row 865, GX D108-A); and tellingly, defendant did not include the three $10,000 checks she received for her supposed work on her federal tax returns. (Tr. 1804-05; GX 2436.) Perhaps most incriminating, six months before any payment, defendant—referring to the possibility of IS EG being granted a monopoly by Egypt—wrote to Howard Dorian, one of Hana's associates, that she was willing to "give 100% to make sure this goes skyhigh on condition that I start getting my $ 2500/week and health benefits and Will keeps his promises." (GX 1352, row 461, GX B221-1.) All this provides ample support for the reasoned inference that defendant's purported consulting job was simply a means to receive bribe payments.

---

[5] Defendant asserts that this employee "reasonably may not have participated in any discussions around, or otherwise understood, Mrs. Menendez's work." (ECF No. 868 at 34.) That is, at best, a competing inference the jury was entitled to reject in light of the totality of the government's evidence.

### 2. *The New Jersey State Criminal Matters*

Defendant next contends that the government failed to prove that Menendez agreed to perform any official act to benefit Jose Uribe[6] in exchange for things of value. Here, again, the government has met its burden.

#### *a. Official Acts*

The government offered sufficient evidence for the jury to conclude that Menendez promised—and attempted—to take official acts to influence the outcomes of two matters handled by the New Jersey State Attorney General ("NJAG"). Specifically, Menendez agreed to pressure Gurbir Grewal, the New Jersey Attorney General at the time, to favorably influence both the prosecution of Elvis Parra, an associate and good friend of Uribe, and the investigation into Ana Peguero, a woman Uribe viewed as his daughter.

With respect to Parra, the government introduced evidence that Parra had been indicted for insurance fraud by the NJAG in connection with his trucking company and was being represented by Michael Critchley. (Tr. 1469; GX 1353, row 1, GX 4G-1, GX 10G-9; GX 1353, row 13, GX 4G-2, GX 4G-13.) As to Peguero, Uribe testified that Peguero became the agent of record and eventually the owner of Uribe's retail insurance company, Phoenix Risk Management. (Tr. 1459-60.) The NJAG issued subpoenas to Phoenix as part of its investigation into Parra. (Tr. 1469-70.) In 2018 and 2019, the investigation appeared to intensify, as Phoenix received a subpoena seeking additional documents and detectives repeatedly attempted to speak with Peguero. (Tr. 1475-77.)

The government introduced evidence of two instances in which Menendez spoke with Grewal about those matters. *First*, in early 2019, Menendez called Grewal supposedly to discuss the treatment of Hispanic vs. non-Hispanic defendants in the trucking industry (Tr. 1394-97), but in response to Grewal's questions, Menendez admitted it involved a specific criminal matter and that the defendant in question was represented by Michael Critchley. (Tr. 1397.) Grewal then told Menendez that Critchley was a good lawyer and so if he had concerns, Critchley should "raise them up the chain and address them that way." (*Id.*) Grewal testified that he was not comfortable discussing this matter with Menendez because he was afraid it could have a "chilling effect" on his line prosecutors. (*Id.*) Accordingly, Grewal decided not to tell his

---

[6] Uribe pled guilty to, among other crimes, conspiracy to bribe Menendez and defendant by purchasing a Mercedes for defendant in order to gain the help of Menendez in obtaining favorable treatment in two ongoing New Jersey state criminal investigations. (Tr. 1443-45.)

prosecutors about Menendez's call to make sure they did not feel any "undue outside influence." (Tr. 1398.)

*Second*, towards the end of 2019, Menendez called Grewal once again, this time asking Grewal to meet with him at his Senate office in New Jersey, and Grewal agreed. (Tr. 1399-1400.) The jury heard Grewal explain his impression that Menendez was not expecting Grewal to bring one of his assistant attorneys general with him to the meeting and had instead expected him to come alone. (Tr. 1404.) During the meeting, Menendez reiterated the same concerns he had shared earlier in the year, regarding the treatment of Hispanic vs. non-Hispanic defendants in the trucking industry. (Tr. 1406.) Grewal then asked Menendez if this was "the same matter you had called me about where Mike [Critchley] represents the defendants?" (*Id.*) Menendez indicated it was. (*Id.*) Grewal then told Menendez he could not talk to him further about this issue. (*Id*.) Grewal testified that while Menendez did not explicitly ask him to do anything, he understood from this meeting that Menendez "didn't like how the [matter] was being handled." (Tr. 1408.)[7]

In the first instance, there is sufficient evidence for the jury to conclude that both Menendez's call and his subsequent meeting with NJAG Grewal qualify as official acts. There is no doubt that criminal matters handled by the NJAG are properly deemed questions or matters before then-Attorney General Grewal. The decision of whether to investigate and prosecute is both a "formal exercise of governmental power" and was then clearly "pending" before the prosecuting or investigating office. *See McDonnell*, 579 U.S. at 574. Indeed, the Second Circuit has determined that "making an arrest" or "making a decision about whether to issue a desk appearance ticket to the arrestee" are the "sort of specific, formal exercises of government power that can constitute official acts." *Reichberg*, 5 F.4th at 249. *See also United States v. Lee*, 919 F.3d 340, 357-58 (6th Cir. 2019) ("A prosecutor bringing charges against a defendant is certainly within the meaning of 'official act' regarding a 'question, matter, cause, suit, proceeding, or controversy,' as defined by *McDonnell*." (citation omitted).)

From Grewal's testimony, the jury may reasonably infer that Menendez sought to "us[e] his official position to exert pressure on another official to perform an 'official act.'" *McDonnell*, 579 U.S. at 574.[8] Defendant contends that "the Senator's conduct

---

[7] Defendant emphasizes the fact that Menendez's contacts "did not spur Grewal into any action." (ECF No. 876 at 23.) That is a non sequitur. Indeed, the Supreme Court has explained that bribery does not require a public official to "actually make a decision or take an action"; rather, "it is enough that the official agree to do so." *McDonnell*, 579 U.S. at 572 (citing *Evans v. United States*, 504 U.S. 255, 268 (1992)).

[8] Defendant points out that Menendez did not "mention the case name, the criminal defendant, or any target of investigation by the Attorney General." (ECF No. 868 at 29.) True, but meritless. Menendez

[could not] be determinative of [Grewal's] prosecutorial or investigative functions because the Senator had no power over prosecutorial decisions within the purview of the [NJAG]." (ECF No. 868 at 37.) But the Second Circuit has stated that it sees "no basis for ruling that a congressman's official acts—especially those 'demonstrating Congressional interest'—may not include efforts that are directed toward local rather than federal officials." *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir. 1988). And Grewal testified that he understood Menendez to be "a close political ally of the governor"—the person who appointed Grewal to the position of New Jersey Attorney General. (Tr. 1393.) More broadly, Grewal explained that "[y]ou want to have allies" among New Jersey's federal officials (including Menendez). (Tr. 1389.)

Moreover, assuming *arguendo* that the call or meeting are not official acts themselves, they are strong evidence of *an agreement* to perform an official act. *See McDonnell*, 579 U.S. at 573 ("If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act."). Along with the record evidence discussed below, Menendez's calls and meeting with Grewal "serve as evidence of an agreement to take an official act." *See id.*[9]

***b. Quid Pro Quo***

The government presented ample evidence for the jury to conclude that Uribe, with assistance from Hana, paid for a new Mercedes-Benz for defendant in exchange for Menendez's official acts (or promises to take official acts) to end the NJAG's prosecution of Parra and investigation into Peguero.

The evidence showed that by early 2018, Uribe had become increasingly concerned regarding Parra's case and the activity in the investigations into entities related to him and his family, including Phoenix and Peguero. (*See, e.g.*, Tr. 1475-77.) Around that time, Uribe discussed these matters with Andy Aslanian, an attorney who represented

---

stated that he was referring to (i) a pending criminal matter (ii) involving Hispanic individual(s) (iii) connected to the trucking industry (iv) represented by Michael Critchley, and (v) who were under investigation by the New Jersey Office of the Insurance Prosecutor. (Tr. 1396-97.) Grewal knew exactly which case Menendez was raising: he asked Menendez "is this the same matter that you had called me about where Mike [Critchley] represents the defendants? And [Menendez's] response was yes, to which I responded, I can't speak to you about this matter. Let Mike raise the issues with the appropriate people." (Tr. 1406.)

[9] In her reply, defendant asserts that these calls by Menendez to Grewal cannot be evidence of promises to perform official acts because Menendez first spoke with Uribe in August 2019, months after Menendez's first call to Grewal in January 2019. (ECF No. 876 at 24.) As demonstrated *infra*, the timeline of events gives the lie to that assertion.

Phoenix. (Tr. 1483-84.) Uribe testified that at that meeting, Hana—both a friend of Uribe and an officemate of Aslanian—overheard Uribe discussing his concerns, pulled Uribe into the hallway, and offered him a way to "make all of these investigations go away," mentioning both defendant and Menendez by name. (Tr. 1484.)

Soon after, Uribe organized a meeting between himself, one of his associates, Parra, and Hana. (Tr. 1487.) At that meeting, Uribe testified that Hana reiterated that he knew defendant and Menendez and he "ha[d] a way to get a better outcome for the prosecution of Elvis and to stop the investigation into [Uribe's business and associates] for a sum of 200 to $250,000." (Tr. 1489.) Uribe testified that Hana did not explain exactly what steps he was going to take to make sure all the investigations were stopped. (Tr. 1490.)

As the year progressed, the NJAG continued to investigate Phoenix and Peguero and repeatedly attempted to schedule a meeting with Peguero. In October, Uribe wrote to Hana, asking him to "be sure that your friend knows about this." (GX 1353, row 57, GX E102-1; *see also* Tr. 1503 (Uribe testifying that "your friend" referred to Menendez).) Hana responded that he would make sure. (GX 1353, row 58, GX E102-1.) In the fall, the judge presiding over Parra's case denied his motion to dismiss the indictment and set his trial date for the following April. (GX 1353, row 82, GX 4G-3; GX 1353, row 92, GX4G-4.)

On the evening of January 27, 2019, defendant, Hana, and Menendez met at the Menendez home. (GX 1353, rows 246-54, GX B105-32.) Later that night, Hana invited Parra to "have a drink tomorrow" with him and Uribe and asked Parra to call him. (GX 1353, row 255, GX C115-1.) The next day, Hana sent defendant information about Parra's lawyer, Michael Critchley. (GX 1353, rows 257, 261-64, GX B105-32, GX B105-FF, GX B105-GG.) On that same day, Hana asked Parra to send him "that date in April and the name of the judge." (GX 1353, row 268, GX C115-2.) Less than thirty minutes later, Parra sent Hana a screenshot of an online profile of the judge presiding over his case. (GX 1353, row 270, GX C115-2, GX C115-B.) Hana forwarded this screenshot to defendant within minutes. (GX 1353, row 274, GX C102-12, GX C102-F.) An hour later, defendant and Hana spoke on the phone (GX 1353, row 277, GX 6A-112), and the next morning, Menendez called defendant. (GX 1353, row 279, GX 6A-312-1.) Immediately after hanging up with Menendez, defendant called Hana, who then asked Parra for his home address, which he passed back to defendant. (GX 1353, rows 280-88, GX 6A-112, GX C115-3, GX B105-32.) Defendant responded, "Thank you now I need what the charges are." (GX 1353, row 289, GX B105-32.) Hana then immediately called her and also texted her Parra's case information. (GX 1353, rows 290-94, GX 6A-112, GX B105-32.) Defendant once again called Menendez. (GX 1353, rows 295, 298, GX 6A-206-1.) The

very next day, Menendez made his first call to Attorney General Grewal. (GX 1353, row 303, GX 6B-2401.)

During the same period of time, defendant was in need of a car, since her car had been damaged in an accident. (GX 1353, row 88, GX A109, GX A109-B.) In January, defendant wrote to a friend to ask if she knew anyone that would give her a "good price on a [Mercedes-Benz] C 300." (GX 1353, row 148, GX B110.) She explained that "Bob and I went and test drove on Saturday but the prices are too high monthly to finance." (*Id.*) By March, defendant still did not have a car. Uribe testified that he knew that Hana had promised her a car but had not followed through. (Tr. 1517-18.) As a result, Uribe began to call and text defendant directly and in March, he told her that "if her problem is a car, my problem is saving my family. And I will provide a car as long as she helps me." (Tr. 1518.) Uribe told the jury that defendant had agreed. (Tr. 1520.)

Defendant and Uribe met two weeks later for dinner and again they discussed the deal. (Tr. 1527-29.) Uribe testified that again the defendant agreed to the deal and told him that she would "be in touch with Senator Menendez" about Uribe's concerns. (Tr. 1529.) At that same meeting, defendant told Uribe she wanted a Mercedes-Benz. (*Id.*) At that point, Uribe arranged for a friend at a Mercedes-Benz dealership to help defendant get the specific Mercedes she wanted. (Tr. 1531-32; GX 1353, row 418, GX B209-13; GX 1353, row 454, GX A101-83.) In order to pay the deposit for the car, Uribe testified that he gave defendant an envelope containing $15,000 in cash. (Tr. 1532-33; GX 1353, row 486, GXE105-1, GX E105-1T; GX 1353, rows 503-05, 512-13, 519-20, GX B209-13.) He did so because "[p]roviding the $15,000 in cash is my deal with Nadine, that's my commitment to Nadine." (Tr. 1537.)

On April 5, 2019, defendant picked up the Mercedes and told Uribe, "I will never forget this." (GX 1353, row 548, GX B209-13.) Less than ten days later, defendant informed Uribe that she "spoke to him yesterday and I know everything is going to be perfect. 2019 will be fantastic for all of us. God willing." (GX 1353, row 606, GX B209-13.) By May, Uribe had begun to make monthly payments on defendant's car—paying through an associate, Fernando Barruous, in order that the payments would not be under Uribe's name. (Tr. 1559-60.) Uribe continued to make monthly payments on defendant's car for the next three years—including during the time period when Menendez met with Grewal in September 2019. (*See* Tr. 1624-25.)[10]

---

[10] In fact, the night before Menendez arranged for his meeting with Grewal, Uribe had texted the defendant, writing "[p]lease don't forget about me. I will never forget about you. I need peace." (GX 1353, row 906, GX B209-23.)

On October 29, 2019, Uribe texted defendant that he "just got a call and I am a very happy person" and "GOD bless you and him for ever." (GX 1353, rows 1005-06, GX B209-24.) Shortly after, Uribe told defendant that he would "like to set [the monthly payments on her car] in auto pay." (GX 1353, row 1016, GX E101-2.)

Given the above sequence of events coupled with Uribe's testimony, there is certainly sufficient evidence from which a jury was able to infer a "clear and unambiguous" *quid pro quo*. *See Benjamin*, 95 F.4th at 68; *Reichberg*, 5 F.4th at 249 (incriminating testimony from a coconspirator and "timing of [] circumstantial evidence provide[s] a reasonable basis for the jury to infer that particular benefits were linked to particular official actions"). The timing and circumstances of the car payments coupled with Uribe's testimony that defendant and Menendez had agreed to try to end both the criminal case against Parra and the investigation into Phoenix and Peguero were more than sufficient for the jury to infer a corrupt *quid pro quo*.

Indeed, the government introduced sufficient evidence for a reasonable jury to infer that Menendez knew that when he contacted Grewal, he was doing so in exchange for a benefit to defendant. The government introduced evidence that from as early as January 2019, Menendez participated in defendant's search for a new car, when the pair went together to test drive the Mercedes-Benz convertible she had her eye on. (GX 1353, row 148, GX B110.) Defendant also texted a friend that the monthly payments on this car were too expensive. (*Id.*) The next day, Menendez googled the price of the same model. (GX 1353, rows 171-73, GX A301-12.) Just days after those searches, Hana texted Uribe to inform him that "bob he want have dinner with us tonight." (GX 1353, row 217, GX E102-3.) And when Uribe connected defendant to his friend at the dealership, defendant told Uribe she would "go with Bob and look at the cars." (GX 1353, row 429, GX E115, GX E115-A.)

The government also presented evidence that throughout 2019, Menendez knew that defendant was meeting with Uribe. (*E.g.*, GX 1353, row 454, GX A101-83; GX 1353, row 511, GX A105-E; GX 1353, row 811, GX A101-93.) Moreover, the jury heard evidence that Uribe met with Menendez the night before Menendez's October 2019 meeting with Grewal. (Tr. 1643.) That evening, Menendez explained to Uribe that he wanted to meet "because he was having a meeting with some New Jersey officials at his New Jersey office the next day. And he wanted me to explain again what was my concerns and worries." (Tr. 1643-44.) And while Grewal testified that he told Menendez he could not talk to Menendez further about his office's pending cases, Uribe testified that Menendez nonetheless told him that his meeting with Grewal had been promising and that they were "in good status." (Tr. 1652, 1655.) Menendez's clear mischaracterization of the meeting allowed the jury to reasonably believe Menendez intended to appease Uribe in order to ensure that Uribe would continue to pay for

defendant's car.[11] Uribe further testified that he never mentioned the car payments to Menendez because he had no reason to doubt that Menendez knew about them. (Tr. 1624-25.) Finally, the jury saw evidence that months later Menendez, defendant, and Uribe had dinner together. (GX 1352, rows 1037-38, GX B227, GX B209-26.) At that dinner, Menendez texted defendant "[c]an u go to bathroom." (GX 1352, row 1039, GX A101-103.) Uribe testified that when defendant left the table, Menendez said to him, "I saved your ass twice, not once but twice." (Tr. 1664.) In sum, there is ample evidence for the jury to conclude that Menendez knew of these payments and that he was contacting Grewal to urge him to end the Parra and Peguero matters in exchange for those payments.

Defendant contends that at most "the evidence only ever plausibly supported that an agreement was struck between *Hana* and Uribe." (ECF No. 868 at 36.) Defendant is entitled to her view of the evidence, but the government introduced more than sufficient evidence that defendant was a key piece of this scheme. For one, the jury saw evidence of defendant passing information between Menendez and Hana concerning Para's case. And the jury saw many text messages from defendant to Uribe that demonstrate her involvement in this agreement. As just a few examples, the defendant texted Uribe: "You are a miracle worker who makes dreams come true I will always remember that" (GX 1353, row 499, GX B209-13); "[f]or all of us, 2019 will be a fantastic year" (on the day that defendant picked up her new car) (GX 1353, row 536, GX B209-13); "[y]ou are on my mind. It will be done. I need the info please" (GX 1353, row 712, GX B209-15); and "[y]ou will never be forgotten. That's a promise." (GX 1353, row 908, GX B209-23; Tr. 1639 (Uribe testifying that he understood the defendant meant that "she [was] going to comply with her part of the agreement")).

### *3. The Daibes Federal Prosecution Scheme*

Finally, defendant urges that the government failed to prove that Menendez agreed to perform any official act to benefit Daibes in exchange for things of value. But a review of the record yields sufficient evidence for the jury to conclude otherwise.

---

[11] Defendant contends that the "proper inference" for the jury to draw "from that conversation is that the Senator attempted to prevent Uribe from bothering Mrs. Menendez again." (ECF No. 876 at 26.) Viewing the evidence in the light most favorable to the government and drawing all permissible inferences in its favor, that is not so.

***a. Official Act***

Menendez took an official act by recommending Philip Sellinger to the President for nomination to become the U.S. Attorney for the District of New Jersey to benefit Daibes.

The evidence allowed the jury to find an official act with respect to an ongoing federal criminal prosecution of Daibes. In October of 2018, Daibes had been indicted for fraudulent lending by the United States Attorney's Office for the District of New Jersey. (GX 4D-1.) Menendez committed an official act by using his official position as a U.S. Senator to recommend a candidate to be nominated by the President to be the U.S. Attorney for the District of New Jersey who he believed would be favorable to Daibes. Deciding who to recommend to become the U.S. Attorney is undoubtedly a question or matter that came before Menendez in his role as the senior U.S. Senator from New Jersey. Indeed, the jury heard testimony that "the White House was looking to [Menendez] and Senator [Cory] Booker for names" of individuals to nominate and that it was Menendez, as the senior senator, who would "put forth the name" and that Cory Booker, the junior senator, would "defer." (Tr. 2295, 2298, 2301; *see also id.* 2206, 2213.) Menendez then took a clear "decision or action" on that question or matter by recommending Sellinger—a person who, as explained further below, the jury could have reasonably concluded was expected to favorably resolve Daibes' criminal case—to the President to become the U.S. Attorney for the District of New Jersey.

***b. Quid Pro Quo***

The jury heard sufficient evidence to find that Menendez took or promised to take an official act in exchange for things of value for him and defendant, including cash and gold bars.

After the 2020 presidential election, Menendez began considering who to recommend to then President-elect Biden to become the U.S. Attorney for the District of New Jersey. The jury heard credible evidence that, as of mid-December 2020, Sellinger was Menendez's top choice for the job. (Tr. 2303-05, 2334.) On December 15, 2020, Sellinger traveled to Washington D.C. to meet with Menendez to discuss the position. (GX 1354, row 14, GX 3A-17; Tr. 2214-16.) Just hours before that meeting, Menendez and Daibes spoke by phone. (GX 1354, row 13, GX 6A-615.) During his meeting with Menendez, Sellinger testified that Menendez informed him that "Daibes had a matter before the United States Attorney's office and [Menendez] believed that [Daibes] was not being treated fairly. And Senator Menendez hoped that if I became United States Attorney, I would look into it carefully." (Tr. 2217.) Two days later, on December 17, Sellinger called Menendez to inform him that he had previously represented developers in a civil case adverse to Daibes such that were he to become U.S. Attorney, he might have to be recused, but that the decision was not his to make. (Tr. 2226-27; GX 1354,

rows 16-17, GX A119-A, GX 6B-501.) Four hours later, Menendez asked Michael Soliman, his primary political advisor, to research a different candidate for the position, Esther Suarez. (Tr. 2308, 2334; GX 1354, rows 18-20, GX A113-4, GX A113-PH4.)

After Suarez's candidacy stalled, the jury learned that Menendez returned to Sellinger and recommended him to President Biden—but only after Menendez was informed by Soliman that Sellinger wanted Menendez to know that he had "checked with Main Justice and that he does not have to recuse himself" from an issue, which Soliman understood to be the then-pending criminal prosecution of Daibes. (Tr. 2351-52.) Soliman then relayed this message to Menendez, telling him that "I think if you call Sellinger, you'll be comfortable with what he says." (GX 1354, row 61, GX A113-8, GX A113-PH8.) Menendez then put forward Sellinger as his recommendation to the President for nomination to the position of U.S. Attorney for the District of New Jersey.

The government introduced evidence of various items of value received by defendant and Menendez during this period of time. As one example, Daibes arranged for his driver to pick up Menendez and defendant from JFK airport and drive them to their home in New Jersey. (GX 1354, row 83, GX A111-1, GX A111-PH1.) Moreover, the government provided ample evidence from which the jury could conclude that in October 2021, Daibes gave Menendez and defendant one or more gold bars. In particular, the government introduced cell site evidence and testimony that Menendez, defendant, and Daibes were all at the Menendez home on the morning of October 18. (GX 16C-2 at 17.) Later that morning, defendant texted Daibes to say that "[t]he sweater looks great on you" and she regretted not taking a donut in the very beginning, further indicating that she had seen Daibes that morning. (GX 1354, row 93, GX D102-1.) That very day, Menendez, for the first time, Googled "how much is one kilo of gold" and "how much is one kilo of gold worth." (GX 1354, rows 91-92, GX A125.)[12] A week later, Daibes sent Menendez a picture of a one kilo gold bar that shows a price of $59,431.20. (*See* GX 1354, row 96, GX A111-1, GX A111-PH1.)

The serial numbers of the gold bars recovered from the Menendez home match those of gold bars purchased by Daibes and listed in his inventory of gold. (*See* GX 1F-1164; GX 1F-1239; GX B201-1A; GX 3D-6.) From that point forward, Menendez continued periodically to Google the price of gold. (*See, e.g.*, GX 1354, row 102, GX A301-1 (November 20, 2021); GX 1354, row 113, GX A301-2 (December 13, 2021); GX

[12] Defendant contends that it is more likely Menendez looked up the price of gold because he "want[ed] to know the value of his wife's family gold." (ECF No. 868 at 38.) But the jury was entitled to reject that competing inference, especially in light of the fact this was the first time Menendez performed such a search.

1354, row 123, GX A301-5 (December 18, 2021); GX 1354, row 156, GX A301-10 (January 29, 2022); GX 1354, row 164, GX A301-11 (March 6, 2022); GX 1354, row 230, GX A301-18 (May 26, 2022).)

On December 16, 2021, Sellinger was sworn in as the U.S. Attorney and within the week was notified by the Department of Justice that he was recused from the Daibes prosecution. (Tr. 2251; GX 1354, row 130, GX 8M-1.) Nevertheless, in March 2022, even though Menendez knew Sellinger would not be involved in the Daibes prosecution (*see* GX 1354, rows 146-47, GX A301-6, GX A301-7), he asked Soliman to meet with Sellinger to tell him to "give the Daibes case . . . all due process," because Daibes' attorney was "not getting calls back from the U.S. Attorney's Office." (Tr. 2358.) However, at the meeting between Soliman and Sellinger, Sellinger shut down any opening for Soliman to pass along that message from Menendez, telling Soliman that he was not allowed to discuss the business of the U.S. Attorney's Office with representatives of federal elected officials and he would have to disclose any attempts at such communication. (Tr. 2359.) The jury learned that after that meeting, Menendez refused to attend and speak at Sellinger's investiture, telling Sellinger that "[t]he only thing worse than not having a relationship with the United States Attorney is people thinking you have a relationship when you don't." (Tr. 2248.) Around this time, defendant informed Daibes that Menendez was "FIXATED" on Daibes' upcoming trial. (GX 1354, row 133, GX D102-2.) Daibes responded that he "d[idn't] want [Menendez] to be upset over it" and "[t]his is not his fault he was amazing in all he did he's an amazing friend and as loyal as they come." (GX 1354, row 134, GX D102-2.)

On January 21, 2022, Menendez learned that Vikas Khanna was the First Assistant U.S. Attorney and thus would be in charge of Daibes' case in Sellinger's place. (*See* GX 1354, rows 146-47, GX A301-6, A301-7.) That same day, defendant called Daibes. (GX 1354, row 150, GX 6A-615.) The very next day, Daibes' driver, John Pilot, called defendant. (GX 1354, rows 151-53, GX 6A-615.) Less than two hours later, defendant wrote Daibes, "Thank you. Christmas in January." (GX 1354, row 154, GX D102-11.) Within hours, Menendez called Khanna. (GX 1354, row 155, GX 6A-616; *see also* GX 6B-1810.) As soon as the call with Khanna ended, Menendez called Daibes. (GX 1354, row 158, GX 6A-820-1.) Five days after calling Khanna, Menendez again Googled the price of gold. (GX 1354, row 156, GX A301-10.)

This series of events—supported by ample record evidence—supports the jury's finding of a corrupt *quid pro quo*. Indeed, the timing of and context around Menendez's flip-flop on Sellinger allows the jury to infer corrupt intent. *See Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan"—including quick changes of course—"was sufficient for the jury to infer [defendant's] corrupt intent").

### B. The Evidence Was Sufficient to Prove That Defendant Conspired for Menendez to Act as an Agent of a Foreign Principal.

Defendant contends the government failed to introduce sufficient evidence to sustain her conviction relating to the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*. Pursuant to 18 U.S.C. § 219(a), "[w]hoever, being a public official, is or acts as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938 . . . shall be fined under this title or imprisoned for not more than two years, or both."

As the jury heard, Congress defined an agent of a foreign principal in two ways. First, an agent of a foreign principal is anyone "who acts as an agent, representative, employee, or servant, or any person who acts in any other capacity at the order, request, or under the direction or control of a foreign principal or of a person any of whose activities are directly or indirectly supervised, directed, controlled, financed, or subsidized, in whole or in major part, by a foreign principal" and who "(i) engages within the United States in political activities for or in the interests of such foreign official; (ii) acts within the United States as a political consultant for or in the interests of such foreign principal; or (iii) within the United States represents the interests of such foreign principal before any agency or official of the Government of the United States." (Tr. 3142 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(1). Second, an agent of a foreign principal is "any person who agrees, consents, assumes or purports to act as, or who is or holds himself out to be, whether or not pursuant to contractual relationship, an agent of a foreign principal." (Tr. 3142 (Jury Charge)); *see also* 22 U.S.C. § 611(c)(2).

Here, defendant was charged with—and convicted of—conspiring to have Menendez act as an agent of a foreign principle in violation of FARA. Principally, defendant asserts that this conviction must fail because there was no evidence that Menendez "acted on the request of Egypt." (ECF No. 868 at 43.) In the first instance, the record belies that statement. But even were that true, acting at the request of a foreign principal is not the only way one becomes an agent of a foreign principal. As the jury heard, someone may be an agent of a foreign principal if he acts as or holds himself out to be an agent of a foreign principal, 22 U.S.C. § 611(c)(2), a point defendant wholly fails to address in her submissions. Moreover, defendant was charged with *conspiracy*; it is thus of no matter whether or not Menendez actually completed the substantive offense. To find defendant guilty of this charge, the jury must find that (i) the charged conspiracy existed; (ii) defendant knowingly and willfully became a member of the conspiracy, with intent to further its illegal purpose; and (iii) one of the members knowingly committed an overt act. (Tr. 3140 (Jury Charge).) As explained below, there is ample evidence in the record to support the jury's conviction on this count.

*First*, the jury heard evidence that in the spring of 2019, Menendez changed his public position to become decidedly less critical of Egypt than he was previously. (Tr. 1892-95.) Sarah Arkin, the deputy staff director responsible for the Middle East and North Africa policy portfolio at the Senate Committee on Foreign Relations (Tr. 1851, 1854), testified that in the spring of 2019, Menendez informed her that he wanted to "take a different approach" to Egypt, with less public criticism of Egypt's human rights record. (Tr. 1894.) After that point, Menendez made "fewer public statements specifically critical of Egypt" (Tr. 1895) and had meetings with Egyptian officials about which he did not inform Arkin. (Tr. 1895-96.) This change in tactics overlaps with Menendez's introduction to, and meetings with, Egyptian officials through defendant and Hana. In early 2018, Menendez, at defendant's behest, was introduced to General Shawky, the defense attaché from the Egyptian government. (*See* GX 3A-4 at 2; GX C102-2; GX 4I-2; GX A101-BB.) In May of that year, defendant told Menendez that Hana and General Shawky had given her clearance for an unidentified project and asked Menendez to edit a letter that was to be sent from an Egyptian official to the United States government. (*See* GX 1352, row 183, GX B102, GX B102-A.) The jury saw evidence that communications and meetings between defendant, Hana, Menendez, and Egyptian officials increased as time went on. (*See, e.g.*, GX 1352, row 46, GX A105-A; GX 1352, rows 61-65, GX A101-99; GX 1352, row 75, GX C102-2, GX C102-A; GX 1352, rows 212-221, GX C206-2T, GX A101-10, GX A101-EX3; GX 1352, row 289, GX C206-3, GX C206-B.) While the jury did not see explicit evidence of Egyptian officials requesting or ordering this "shift," that is not surprising, considering that the government introduced evidence that the defendants were careful to not put the details of their scheme into writing or to discuss these topics in front of others. (*See* GX 1352, rows 595-96, GX A101-32 (defendant telling Menendez that an Egyptian official "is still yelling at [Hana] for talking about Halal" during a May 2019 meeting); GX 1352, rows 979-80, GX A101-55 (defendant asking Menendez if she "should text [Daibes]" and Menendez responding, "No, you should not text or email").)

*Second*, the jury saw evidence that Menendez shared sensitive, nonpublic information about the number and nationality of staff at the U.S. Embassy in Cairo and that this information was conveyed to Menendez and then, almost immediately, relayed to defendant, then to Hana, and then transmitted to an Egyptian official. Specifically, immediately after a meeting between Menendez, defendant, and Hana on May 6, 2018 (GX 1352, rows 90-97, GX B105-4), a Menendez staffer noted that Menendez was asking "how many Americans [are] posted to the embassy" in Cairo, and the staffer added, "Don't ask why I'm asking." (GX 1352, row 98, GX 8A-1.) Another staffer explained that to find out this information, he would "have to ask and then someone is going to ask why." (GX 1352, row 99, GX 8A-1.) The response was "Menendez is asking." (GX 1352, row 100, GX 8A-1.) This information was highly sensitive, nonpublic information. (Tr.

267-68.) The very next day, Menendez texted defendant, informing her that "[t]his is what's at American embassy," with detailed information on the numbers of both the Americans and Egyptians employed there, along with their roles. (GX 1352, row 104, GX A101-6.) Defendant immediately called Menendez, and as soon as they hung up, defendant texted the same information in its entirety to Hana. (GX 1352, rows 105-07, GX 6A-112, GX B105-4.) Hana confirmed receipt of the information and then immediately forwarded the information on to an Egyptian official. (GX 1352, row 108, GX B105-4; GX 1352, row 128, GX C112-1.)

The jury was entitled to conclude that this information was requested by Egyptian officials, based on the meeting between Hana, defendant, and Menendez and the immediately following flurry of activity. While defendant and Hana are not foreign principals themselves, that is not required under the law. Rather, FARA allows for an intermediary to make the request. *See* 22 U.S.C. § 611(c)(1). The evidence introduced at trial amply supports the conclusion that defendant and Hana were acting under the supervision of Egyptian officials, particularly considering the fact that this nonpublic, sensitive information immediately found its way to the Egyptian government. Both the specificity of the information and the speed of the response support an inference that this information was requested by, and then received by, an agent of Egypt. In any event, these communications certainly constitute overt acts in furtherance of the conspiracy.

*Third*, the jury heard evidence that Menendez helped Egyptian officials prepare for meetings with U.S. Senators. The jury heard evidence that Abbas Kamel, the Chief of Egypt's General Intelligence Service, met publicly with six U.S. Senators on June 22, 2021. (GX 1352, row 1071, GX 8F-13.) The night before that meeting, Menendez privately met with Kamel at his Washington D.C. hotel. (GX 1352, rows 1070, 1072-73, GX A103-16, GX B213-4, GX A103-21.) Following the meeting, Menendez sent defendant an article highlighting a line of questioning Kamel was likely to face from Senators the next day regarding the possible involvement of Egypt in the murder of noted journalist Jamal Khashoggi. (GX 1352, row 1074, GX A103-17, GX A103-A.) Defendant then immediately forwarded this article to Mai Abdelmaguid, an Egyptian intelligence official in the Egyptian embassy in Washington D.C. and friend of defendant. (GX 1352, row 1075, GX B213-4; Tr. 1928.) Immediately, Abdelmaguid responded, telling defendant that Menendez "had also raised it today" in their private meeting. (GX 1352, row 1076, GX B213-4.) Defendant wrote back to this Egyptian intelligence officer: "Wanted to give you a heads up so you can prepare your answers." (GX 1352, row 1077, GX G301-1.) This continues Menendez's pattern of taking actions that favored Egypt and constitutes yet another overt act.

*Fourth*, the jury saw evidence that Menendez edited a letter that was to be sent on behalf of an Egyptian official. In May of 2018, defendant requested that Menendez "fix this letter" so she could "prove a point to the General," presumably General Shawky, noting he and Hana had just given her "clearance for a project." (GX 1352, row 183, GX B102, GX B102-A.) Menendez then spoke with defendant on the phone (GX 1352, row 184, GX 6A-112) and sent her a version of the letter that he had revised. (GX 1352, row 185, GX A403.) While the sender and intended recipient of the letter are not identified, the letter is clearly written from the perspective of the Government of Egypt. (*See id.* (using "we" and "our" in reference to Egypt and its citizens).)[13]

*Fifth*, the jury also saw evidence that an Egyptian official requested—via Hana and defendant—that Menendez help resolve a lawsuit in Egypt's favor. In May of 2019, General Ahmed Essameldin Mohamed Helmy, an Egyptian official stationed at the embassy in Washington (GX 8A-12; GX 1352, row 1002, GX A101-58, GX A101-L), sent Hana a letter about settlement discussions in a lawsuit brought by an American citizen against the Egyptian government. (GX 1352, row 683, GX C207-7, C207-I.) In that letter, the American made clear that she was not accepting Egypt's settlement offer. (*Id.*) Shortly after sending the information, General Helmy wrote to Hana that "if the guy [i.e., Menendez] takes care of this thing through [Senator-1], he'll be settled in." (GX 1352, row 687, GX C207-7T.) Hana confirmed: "Roger that. Consider it done." (GX 1352, row 689, GX C207-7T.) A few days later, Hana sent information that he had received from General Helmy about the lawsuit to defendant. (GX 1352, row 690, GX C102-7.) That same day, defendant spoke to Menendez on the phone and, after they hung up, immediately forwarded him the same information about the lawsuit. (GX 1352, rows 700-01, GX 6A-112, GX A405.)

*Finally*, the jury heard evidence that, at a dinner with Egyptian officials, defendant asked "[w]hat else can the love of my life do for you?" (Tr. 1019.) In sum, the jury saw evidence of a multitude of acts that support the jury's conclusion that defendant participated in a conspiracy for Menendez to act as a foreign agent of Egypt and did so knowingly and willfully.

---

[13] Defendant contends that a "reasonable factfinder could not have concluded that the letter was the result of a request by Egypt, let alone support the inference that Mrs. Menendez agreed to have the Senator act on behalf of the country of Egypt." (ECF No. 868 at 44.) This Court disagrees. In any event, the jury need only conclude that this sequence of events is evidence of defendant conspiring to have Menendez act as an agent of Egypt. The evidence amply supports that conclusion.

### C. The Evidence Was Sufficient to Prove the Obstruction of Justice Charges (Counts 4, 17 & 18)

Defendant urges that the evidence was insufficient to convict her of any of the obstruction of justice counts. These counts include two counts of a conspiracy to commit obstruction of justice (Counts 4 & 17) and one substantive count of obstruction of justice (Count 18).

The Court has recently set forth the law applicable to the obstruction charges at issue in this indictment. *See Menendez*, 759 F. Supp. 3d at 504-06. The Court applies that analysis here and the reader is directed to the Court's prior opinion in this action. *See id.* Defendant principally contends that the government failed to introduce sufficient evidence of her corrupt intent. As explained below, the government has met its burden.

Beginning with the obstruction charges relating to the grand jury proceeding in this District central to both Counts 17 and 18, it is clear that each of the three elements required to prove a violation of section 1503's omnibus clause was satisfied over the course of this trial. The government presented evidence indicating that defendant learned about the federal grand jury investigation on June 16, 2022, when her cellphone was seized pursuant to a search warrant. (Tr. 1436-37.) Defendant was served with a grand jury subpoena that very same day. (*See* GX 11B-1.) Thus, as an initial matter, there can be no question that the first and second elements of a section 1503 omnibus clause conviction were satisfied—a federal grand jury proceeding was ongoing, and defendant knew of it.

Nor is there any question that the third element was satisfied. At trial, the jury heard that Uribe and defendant met approximately one month after that initial grand jury subpoena was served and specifically discussed the grand jury subpoenas they each had received. (Tr. 1673-77.) Uribe testified that defendant told him that "she get[s] scared when she look[s] at [the subpoenas]." (Tr. 1677.) Uribe further testified that at the meeting, he had devised a story in the event that law enforcement ask him about the payments he had made for defendant's Mercedes-Benz. (*Id*.) The cover story Uribe proposed was that he was "helping a friend that was in a financial problem. And when things get better, that friend was going to pay me back." (*Id.*) In response, defendant told Uribe "I like that." (*Id.*) Before that day, Uribe explained, the pair had never discussed that these payments towards the Mercedes-Benz were to be loans and repaid at a later date. (Tr. 1677-78.)

Furthermore, the jury learned that defendant worked with Menendez to substantiate that fabricated cover story that the money defendant had received from Uribe was a loan. To do so, defendant sought to return to Uribe the bribe money he had paid to her to obtain the Mercedes. Specifically, in December 2022, Menendez wrote

defendant a check for $23,000 with the contrived memo line "for car payment." (GX 3B-1 at 6.) And defendant then wrote Uribe a check for $21,000 with the false notation "personal loan." (Tr. 1680-81; GX 3B-1 at 9.)

A similar procedure was followed for the mortgage payments defendant had received from Hana in 2019. There, Menendez wrote defendant a check for $23,569 (i.e., the sum that Hana had paid to defendant's mortgage to avoid foreclosure in 2019), with the memo line "To Liquidate Loan." (GX 3B-1 at 1.) Defendant then wrote a check for $23,568.54—the amount of the mortgage payment—to Hana's lawyer in trust for Hana, with the false memo line "Full Payment of Wael Hana loan." (GX 3B-1 at 4-5.)[14]

Defendant's creation of documents that would be funneled into the response to a grand jury subpoena is a paradigmatic example of transmitting false information to the grand jury in a manner that unquestionably meets *Aguilar*'s nexus requirement of having the "natural and probable effect" of impeding a grand jury proceeding. *United States v. Aguilar*, 515 U.S. 593, 599 (1995). Given that there was an ongoing grand jury investigation of which defendant had both knowledge and notice, she had every reason to believe that payments to key players in the bribery scheme—Uribe and Hana—would be scrutinized by the government and put before the grand jury. Indeed, the Second Circuit has previously affirmed a conviction for obstruction of justice in which a defendant deleted documents *before* they were sought by any grand jury subpoena, even though "at no time did [the defendant] delete a document for which there was an outstanding subpoena." *United States v. Triumph Cap. Grp., Inc.*, 544 F.3d 149, 168-69 (2d Cir. 2008). This is because "[a]s a necessary consequence of its investigatory function, the grand jury paints with a broad brush," *id.* at 168 (quoting *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991)), so "the inference that the grand jury would issue a subpoena for [particularly relevant documents that the defendant deleted] was quite strong, perhaps inescapable." *Id.* at 169.

Thus, defendant's creation of false documents very likely to be sought by a grand jury subpoena is enough by itself to satisfy the third element of a conviction pursuant to section 1503's omnibus clause. But the jury was entitled to infer the even stronger fact that defendant, unlike the defendant in *Triumph*, participated in submitting false documents in direct response to an outstanding subpoena. Defendant produced these checks—each of which had a false and misleading memo line describing the

[14] Defendant urges that this timeline is too attenuated because she discovered the grand jury proceedings in June of 2022 but wrote these checks six months later. But a reasonable jury could conclude that it took months to put this plan into action or gather the required funds. At the end of the day, the jury was not required to accept defendant's view of the evidence.

payments—in response to a later grand jury subpoena issued in 2023. (*See* GX 2499; GX 3B-1-EM.)

Defendant's primary response is there is "nothing 'fake' or 'false'" about the checks. (ECF No. 868 at 40.) Specifically, she urges that the memo lines classifying these checks as loan repayments "simply assist[] the person writing a check in her own record-keeping and do[] not render a check 'true' or 'false.'" (*Id.*) The proper use of a memo line on a check is not an issue before this (or any) Court. Here, the jury heard voluminous evidence from which it was entitled to conclude that defendant and Menendez wrote "personal loan" and "To Liquidate Loan" in the memo lines of the December 2022 checks not for their personal records but to convince a grand jury that the prior payments they had received were loans. As discussed *supra*, there is overwhelming evidence that the payments defendant and Menendez received were actually bribe payments, not loans.

Thus, the Court finds that there was sufficient evidence for a rational trier of fact to find defendant guilty of Count 18, the substantive obstruction count, as well as Count 17, the conspiracy count.

The analysis proceeds similarly for Count 4, which charged defendant with conspiracy to commit obstruction of justice as to the criminal prosecution of Daibes in the District of New Jersey. At trial, the government introduced more than sufficient evidence to conclude that the charged conspiracy existed, that defendant knowingly and willfully joined that conspiracy, and overt acts were taken in furtherance of the conspiracy. As detailed *supra* (*see* Section II.A.3.b), the jury was presented with evidence from which it was able to conclude that Daibes paid things of value to Menendez and defendant in exchange for Menendez's promise that he would take official acts to help favorably resolve Daibes' ongoing federal criminal prosecution in New Jersey. The jury also heard extensive evidence related to Menendez's dissatisfaction with how the New Jersey U.S. Attorney's Office was handling Daibes' criminal case and the apparent emphasis Menendez placed on Daibes' criminal case when deciding who to recommend to the President to be the next U.S. Attorney for the District of New Jersey. (*See* Section II.A.3.b.)

Indeed, the jury was entitled to conclude that Menendez only recommended Sellinger because he thought—incorrectly as it turned out—that Sellinger did not have to be recused from Daibes' case and would be able to participate in a favorable resolution of it, and that Menendez's subsequent chilling reception to Sellinger's request that he attend and speak at Sellinger's investiture was a direct response to realizing that an essential reason for Menendez's recommendation of Sellinger—favorable action by Sellinger on Daibes' pending criminal prosecution—would not come to fruition due to Sellinger's recusal.

Defendant contends that "[t]here was nothing even improper, and certainly not criminal, with regard to Senator Menendez's interactions with [Philip] Sellinger." (ECF No. 868 at 41.) But the Second Circuit has explained that a defendant's endeavor to persuade a prosecutor "to be lenient" with an individual in a criminal matter "was corrupt because it was a fraud" under the rationale that "it is as 'corrupt' to persuade a public officer by lies as by bribes." *United States v. Polakoff*, 121 F.2d 333, 335 (2d Cir. 1941). Menendez's endeavor, with its impetus being bribe payments received by Daibes to favorably affect his criminal case, similarly qualifies as corrupt.

On reply, defendant attempts to extricate herself from this conspiracy, contending she played no role in it. But the jury saw evidence of defendant texting Daibes about Menendez's concern about his case, to which Daibes responded that it "was not his fault[,] he was amazing in all he did[,] he's an amazing friend and as loyal as they come." (*E.g.*, GX 1354, rows 133-34, GX D102-2.) Moreover, the jury saw evidence of defendant reaping the benefits of this scheme. Specifically, the government introduced sufficient evidence for the jury to conclude that defendant was aware of and sold some of the gold bars she and Menendez had received from Daibes. (GX 1354, row 154, GX D102-11 (defendant texting Daibes "Thank you. Christmas in January" after a delivery from Daibes' driver); GX 1354, row 184, GX D102-8 (defendant informing Daibes she was meeting with gold seller); GX 1354, row 192, GX B201-1, GX B201-1A, GX 3D-6 (photo in defendant's phone of gold bar with serial number matching Daibes' gold inventory).) The government also presented evidence that Daibes was assisting defendant and Menendez in purchasing a multimillion-dollar home. (*E.g.*, GX 1354, rows 125-27, GX D102-13; GX 1354, rows 166-68, GX D102-6; GX 1354, row 231, GX D102-16, GX D102-H).) Thus, defendant's effort to extricate herself from this scheme fails.

### D. The Evidence Was Sufficient to Prove That Venue for Each Count Was Proper in the Southern District of New York.

The jury was properly instructed on venue—with the same instruction that was given at the first trial in this action—and, like her co-defendants, defendant does not object to the charge. Specifically, the jury was instructed that if the government failed to prove venue on any count of the indictment, "you must return a verdict of not guilty on that count." (Tr. 3151 (Jury Charge).) Defendant now challenges the sufficiency of the government's venue evidence for Counts 1 to 15.[15] In doing so, defendant "bear[s] a

[15] Defendant was not charged in Counts 6 and 12; as such, the Court need not evaluate those counts. In addition, defendant does not raise any challenge to venue for Counts 17 and 18, which charge defendant

heavy burden," as "the reviewing court is required to draw all permissible inferences in favor of the government." *United States v. Rutigliano*, 790 F.3d 389, 396 (2d Cir. 2015) (quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011)); *see also United States v. Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) ("We review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting every inference that could have been drawn in its favor." (internal quotations omitted)).

This Court has already set forth the applicable law guiding the venue analysis in this case. *See Menendez*, 759 F. Supp. 3d at 509-11. The parties have not identified any intervening change in law. Accordingly, rather than restate that analysis here, the reader is referred to the standards set forth at *Menendez*, 759 F. Supp. 3d at 509-11.[16]

The Court adds, however, that for several of these counts, defendant was charged with aiding and abetting Menendez in committing certain crimes. (Tr. 3090-93 (Jury Charge) (instructing jury that defendant is charged with aiding and abetting in certain counts).) "Where guilt of a substantive offense is premised on aiding and abetting, '[v]enue is proper where the defendant's accessorial acts were committed or where the underlying crime occurred' because '18 U.S.C. § 2 alters the common law rule to provide an *additional* venue where . . . the principal[] acted.'" *United States v. Lange*, 834 F.3d 58, 69 (2d Cir. 2016) (alterations in original) (quoting *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999)).

### *1. Substantive Counts Related to Egypt (Counts 5, 7 & 8)*

Defendant contends that the government failed to introduce evidence from which a reasonable juror would be able to conclude that venue was proper for Counts 5, 7, and 8—the substantive counts of bribery, honest services wire fraud, and extortion under color of official right concerning the Egypt scheme.

Specifically, Count 5 charged defendant with violating 18 U.S.C. § 201, which prohibits a public official from "directly or indirectly, corruptly demand[ing], seek[ing], receiv[ing], accept[ing], or agree[ing] to receive or accept anything of value . . . in return

---

with conspiring to obstruct justice and obstructing justice with respect to a grand jury proceeding in this District.

[16] Defendant makes a passing reference to a "substantial contacts" analysis. (*See* ECF No. 868 at 47.) Menendez similarly asked this Court to conduct this inquiry as part of its venue analysis. *Menendez*, 759 F. Supp. 3d at 511 n.20. This Court explained that such an inquiry is made "only if 'the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial.'" *Rutigliano*, 790 F.3d at 399 (quoting *United States v. Coplan*, 703 F.3d 46, 80 (2d Cir. 2012)). Defendant does not advance such an argument much less make that showing.

for . . . being influenced in the performance of any official act" or "being induced to do or omit to do any act in violation of the official duty of such official person." 18 U.S.C. § 201(b)(2)(A), (C). In this count, the government charged—and the jury convicted defendant of—aiding and abetting Menendez's demanding, receiving, or accepting a bribe in return for certain official actions to benefit the Government of Egypt and Wael Hana.

Bribery is a continuing offense such that venue is proper in any district in which the charged offense was begun, continued, or completed. *United States v. Stephenson*, 895 F.2d 867, 874-75 (2d Cir. 1990) (treating bribery as a continuing offense); 18 U.S.C. § 3237(a). Thus, venue is proper in any district in which Menendez began, continued, or completed demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an official act, as well as in any venue where defendant's accessorial conduct occurred.

Count 7 charged defendant with committing honest services wire fraud in violation of 18 U.S.C. §§ 1343, 1346. "The honest services [wire fraud] statute prohibits the use of the mail or the wires to further 'a scheme or artifice to deprive another of the intangible right of honest services.'" *United States v. Benjamin*, 95 F.4th 60, 67 (2d Cir. 2024) (quoting 18 U.S.C. § 1346). Here, the jury convicted defendant of participating in a scheme to defraud the public by paying bribes to Menendez in exchange for Menendez taking or not taking certain actions benefiting Egypt and Hana that deprived the public of Menendez's honest services. Like bribery, wire fraud is a continuing offense. *See Rutigliano*, 790 F.3d at 396; *United States v. Kim*, 246 F.3d 186, 191-92 (2d Cir. 2001). "For a wire fraud charge, venue is established by showing that the defendant used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *United States v. Whitehead*, No. 22-cr-692, 2024 WL 3085019, at *3 (S.D.N.Y. June 21, 2024). And again, because defendant was charged as an aider and abettor here, venue is also proper in any district where defendant's aiding and abetting took place.

Count 8 charged defendant with extortion under the Hobbs Act, 18 U.S.C. § 1951, which prohibits anyone from using one's position as a public official, or the authority of public office, to obtain money for oneself, or for another person, knowing the thing of value was made in return for official acts. In this count, the government charged defendant with aiding and abetting Menendez in obtaining things of value from Hana and Daibes in exchange for certain official acts benefiting the Government of Egypt and Hana. Hobbs Act extortion is also a continuing offense, *Smith*, 198 F.3d at 384, and "[v]enue under the Hobbs Act is proper in any district where interstate commerce is affected or where the alleged acts took place." *Stephenson*, 895 F.2d at 875. Because the

alleged acts here are a bribery scheme, the evidence that satisfies venue as to Count 5 may satisfy venue here as well.

As explained below, for each of these counts, the government introduced several pieces of evidence sufficient for a reasonable jury to conclude by a preponderance of the evidence that venue for these counts was proper in the Southern District of New York.

*First*, the government introduced evidence that on June 30, 2018, defendant, Menendez, and Hana dined at Mr. Chow's, a restaurant located in midtown Manhattan. (GX 1352, row 244, GX 7A-2, GX 7A-3, GX 7A-4, GX 7B-1; GX 1352, row 249, GX B105-10, GX B105-S.) Hana—via Andy Aslanian—paid for this dinner. (*See* GX 1352, row 251, GX 7B-2, GX 5E-101A.) While at that dinner, Hana sent a confidential WhatsApp message to General Shawky, the military attaché at the Egyptian embassy in Washington, scheduling a meeting for July 25th between Menendez and Egyptian officials. (GX 1352, rows 245-46, GX C206-3, GX C206-3T.) On July 26, the day following that meeting, Menendez sent a text message to defendant instructing her to inform Hana that Menendez was "going to sign off" on certain military aid to Egypt. (GX 1352, row 306, GX A101-14.) This evidence provided the jury with an evidentiary foundation from which to conclude that this dinner was part and parcel of Menendez seeking and agreeing to receive a bribe. Indeed, the jury was entitled to infer that this Manhattan meeting "facilitate[ed] a key event" in the bribery scheme "that was to occur only weeks later" and exhibited Menendez's "good faith efforts" to act in Egypt's favor. *See United States v. Gross*, No. 15-cr-769, 2017 WL 4685111, at *38-39 (S.D.N.Y. Oct. 18, 2017), *aff'd sub nom. United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019).

In addition, that Hana sent General Shawky a text from within the Southern District of New York satisfies the venue requirements for wire fraud. It is entirely reasonable for a jury to conclude from the timing and location of this text that defendant "used or caused others to use a wire to communicate with others in the Southern District of New York and did so in furtherance of the scheme." *Whitehead*, 2024 WL 3085019, at *3. While it is true that there is no evidence in this record of what was discussed at the restaurant, Hana's payment for the dinner, his message to General Shawky from the restaurant during his meeting with Menendez, and the ensuing timeline provide a strong foundation from which the jury was entitled to conclude that the June dinner in this District was an essential piece of the charged conduct by laying the groundwork for the July meeting and Menendez's promise to approve the military aid shortly thereafter.

*Second*, the government introduced evidence that Menendez, Daibes, and General Helmy met at the Lotte hotel in midtown Manhattan. (*See* GX 1352, rows 956-60, GX D101-1, GX B220-1.) A few months after, General Helmy informed defendant that he "ha[d] been instructed from my boss in Cairo to start talks with [Daibes] regarding what was discussed in NY about Egyptian investments in USA," stating that he wanted

to inform her because he "met [Daibes] through you and Bob." (GX 1352, rows 998-99, GX B220-2.) Defendant responded, thanking General Helmy for his "honesty and loyalty" and writing "I hope 2020 [w]ill be a fabulous year for all of us." (*Id.*)

*Third*, the government introduced evidence that defendant facilitated the sale in Manhattan of two gold bars Daibes gave her. Specifically, on March 31, 2022, defendant went to Vasken Khorozian, a jeweler in New Jersey, to sell the gold. (Tr. 2120-21, 2155; GX 1354, rows 188-89, GX B216-1.) When meeting with Khorozian, defendant falsely told him that the gold had come from her family (Tr. 2155-56)—essentially the same explanation Menendez gave to Shannon Kopplin, the Chief Counsel and Staff Director on the U.S. Senate Select Committee on Ethics (Tr. 2511), in order to explain why he was newly reporting possessing the gold bars. (*See* Tr. 2577 (Menendez referring to the gold bars as defendant's asset).) When defendant said she wanted to go forward with the sale, Khorozian informed her that he would call a buyer in Manhattan and would go to Manhattan the following week to sell it. (Tr. 2158-60.) He then proceeded to call that Manhattan buyer with defendant present and subsequently sold the gold bars in Manhattan. (Tr. 2158-60, 2164.)[17] Defendant challenges that the sales are not part of the "essential conduct" of the scheme, as her "later efforts to monetize the gold are independent of and unrelated to the alleged scheme to acquire the gold in the first place." (ECF No. 868 at 48.) But the jury was entitled to disagree given the government's evidence that defendant sold the gold as part of the scheme and in consultation with both Menendez and Daibes. (*See* GX D102-8; GX 8K-1 (discussing reporting requirements for Menendez if defendant "use[d] the proceeds of the sale of the gold bars to repay a mortgage").)

*Fourth*, the government introduced evidence that upon return from their trip to Egypt and Qatar on October 17, 2021, Menendez and defendant met Daibes' driver, John Pilot, at JFK airport (*see* GX 1352, rows 1104, 1113-18, GX 8J-1, GX 8J-2, GX A111-1, GX A111-PH1, GX 6A-615) and then were driven back to their home in Englewood Cliffs, New Jersey.[18] The jury was provided with sufficient evidence to conclude that this ride was part and parcel of the substantive offense. For one, nowhere does the statute require a high value item to be given in order to constitute bribery. *See* 18 U.S.C. § 201(2) (the provision of "anything of value" constitutes bribery). Moreover, the jury heard evidence that Pilot's fingerprints were found on an envelope bearing Daibes

---

[17] For the reasons discussed *infra*, this call also satisfies the venue requirements of wire fraud, as defendant caused Khorozian to use a wire to communicate with someone in the Southern District of New York. *See Whitehead*, 2024 WL 3085019, at *3.

[18] The jury was reasonably able to infer that a ride from JFK airport in Queens to Englewood Cliffs involved crossing through the Southern District of New York while en route.

name and containing several thousand dollars in cash discovered in the Menendez home. (*See* Tr. 184-86; GX 1334.) The jury was also entitled to infer that this car ride occurred just one day before Daibes provided defendant and Menendez with gold bars. (*See* GX 1352, row 1122, GX B208-2 (Daibes visiting the Menendez home the morning after this car ride); GX 1352, rows 1120-21, GX A125 (Menendez looking up the price of one kilogram of gold that same morning).) The government also introduced evidence that a few months later, Pilot provided gold on behalf of Daibes to defendant and Menendez—right after Menendez began researching the attorney overseeing Daibes' prosecution. (*See* GX 1354, rows 146-54, GX A301-7, GX A301-8, GX 6A-615, GX D102-11.)

In sum, the government introduced substantial evidence from which a jury was entitled to conclude that venue was satisfied by a preponderance of the evidence for Counts 5, 7, and 8.

### 2. *Substantive Counts Related to the Daibes Federal Prosecution Scheme (Counts 11, 13 & 14)*

Defendant next challenges the sufficiency of the government's venue evidence for Counts 11, 13, and 14. These counts charge defendant with bribery, honest services wire fraud, and extortion under color of right concerning acts in support of Daibes.

Much of the evidence that allowed the jury to find venue for the Egypt charges supports venue for these counts, as well. For example, the evidence of the ride from JFK airport to the Menendez home in Northern New Jersey that Daibes arranged for Menendez and defendant applies to these counts, too. The jury was entitled to infer that this conduct related to these counts, as well. The same is true for defendant's sale in New York of the gold bars that Daibes provided just two days after Menendez and defendant returned from a trip to Egypt and Qatar.

Thus, the government introduced sufficient evidence for the jury to find that venue was proper in this District for these counts.

### 3. *Substantive Counts Related to the New Jersey State Criminal Matters (Counts 9 & 10)*

Defendant next challenges the jury's finding of proper venue for Counts 9 and 10, the substantive counts of bribery and extortion under color of official right—two of the same three crimes discussed above—concerning Jose Uribe and his associates. As explained earlier, venue is proper for the honest service wire fraud count wherever Menendez began, continued, or completed the offense of demanding, seeking, receiving, accepting, or agreeing to receive or accept a thing of value in exchange for an

official act. For the extortion count, because venue is proper wherever the bribery acts took place, the same evidence may suffice. *See Stephenson*, 895 F.2d at 875. And because defendant was charged as an aider and abettor in these counts, venue is additionally proper wherever the accessorial acts occurred.

In support of venue for these counts, the government presented evidence that defendant sent texts and made telephone calls that used cell towers located in this District.[19] Among these communications were defendant's instructions to Uribe to meet with Menendez the evening prior to Menendez's meeting with then-New Jersey Attorney General Gurbir Grewal (*see* GX 1353, row 924, GX B209-23; GX 16C-2 at 13), as well as defendant's calls to Uribe and Menendez just hours after Menendez's meeting with Grewal. (*See* GX 1353, rows 931, 933-34, GX 8C-1, GX 6A-112; GX 16C-2 at 14.) Given this evidence, the jury was more than able to conclude that these communications were "crucial components" of the charged bribery scheme, in which Uribe was making payments on defendant's Mercedes in exchange for Menendez using his influence to squelch the New Jersey state case against Uribe's associates. *See Stephenson*, 895 F.2d at 874-75.

In addition, the government presented evidence that defendant deposited money she had received from Uribe into bank accounts in both New Jersey and on Long Island in the same day. (GX 1328, GX 5F-202.) Specifically, on April 6, 2019—a mere two days after Uribe gave her $15,000 in cash (Tr. 1532-33; GX 1353, row 486, GXE105-1, GX E105-1T; GX 1353, rows 512-13, 519-20, GX B209-13)—she made cash deposits in Englewood, New Jersey and Munsey Park in Long Island. (GX 1328, GX 5F-202.) The jury was entitled to infer that defendant had traveled across this District with the cash to make the deposits.

Travel through this District with a bribery payment to avoid detection is sufficient for venue. *See United States v. Shepard*, 500 F. App'x 20, 22 (2d Cir. 2012) ("[A] foray into Manhattan to avoid detection or conflict—and, thus, to continue the conspiracy—is sufficient to support venue in the Southern District."); *United States v. Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("Even if the theft of the money from ATMs in Manhattan was a distinct conspiracy, its transportation from that borough to Brooklyn and Queens for transfer out of the United States was a necessary step in the challenged conspiracy sufficient to confer venue in the Southern District."); *United States v. Ramirez-Amaya*, 812

---

[19] The evidence the jury heard was that when someone is located along either side of the Hudson river, the cell site used may be on either side of the river, since signals carry farther over water than land. (Tr. 2499.) It is possible that defendant was physically on the New Jersey side of the river when one or more of her calls were made, but the jury was certainly entitled to find by a preponderance of the evidence that she was located in Manhattan when the relevant call was made.

F.2d 813, 816 (2d Cir. 1987) ("[T]he course of the flight [carrying cocaine] carried the airplane over the Narrows, a body of water that lies within the joint jurisdiction of the Southern and Eastern District . . . was sufficient to make venue in the Southern District proper.").

***4. The Conspiracy Charges (Counts 1, 2, 3, 4 & 15)***

For conspiracy charges, "venue is proper in any district in which 'an overt act in furtherance of the conspiracy was committed.'" *Tzolov*, 642 F.3d at 319-20 (quoting *United States v. Royer*, 549 F.3d 886, 896 (2d Cir. 2008)). "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Id.* "The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Id.* "[P]roof of such activity in a district 'by any of the coconspirators' will support venue there as to all of them." *Shepard*, 500 F. App'x at 22 (quoting *Ramirez-Amaya*, 812 F.2d at 816). Ultimately, "venue for a conspiracy may be laid in a district through which conspirators passed in order to commit the underlying offense." *Tzolov*, 642 F.3d at 320 (collecting cases).

***a. The Bribery Conspiracy Charges (Counts 1, 2 & 3)***

Counts 1, 2, and 3 charge defendant with conspiracies to commit the underlying offenses discussed above: bribery, honest services wire fraud, and conspiracy to commit extortion under color of official right.

Defendant simply contends that because the above evidence, in her view, fails to support venue for the substantive charges, it "necessarily fail[s] to support the conspiracy charges as well." (ECF No. 868 at 49.) But as explained above, the evidence was sufficient to support venue for each of the substantive counts. And in any event, venue is more narrowly construed on the substantive counts as compared to the conspiracy counts. *See Tzolov*, 642 F.3d at 318-20. Indeed, the government introduced evidence of overt acts from either defendant or her co-conspirators in the Southern District of New York, including in-person meetings and dinners, telephone calls, and text messages. These suffice to support a finding of venue for these conspiracy charges.

***b. The Conspiracy to Obstruct the Prosecution of Daibes in New Jersey Charge (Count 4)***

The same is true for defendant's challenge to the jury's finding of venue with respect to Count 4, which charged her with conspiring to obstruct justice in relation to Daibes' federal criminal prosecution in the District of New Jersey. The government need only introduce evidence of "*any act*, innocent or illegal, as long as it is done in

furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320 (emphasis added). Defendant and Menendez's car ride from JFK airport to Englewood Cliffs, New Jersey through the Southern District of New York that Daibes provided qualifies as an act that satisfies venue. Similarly, defendant's sale of the gold bars she received from Daibes is any such act. (*See* GX 1354, row 184, GX D102-8 (defendant texting Daibes "Vasken just called me. I'm going to meet him at 2 PM.").) Thus, venue is satisfied for this count.

#### *c. The FARA Conspiracy Charge (Count 15)*

Finally, defendant challenges the sufficiency of the government's venue evidence for Count 15. Count 15 charged defendant with conspiring to have Menendez act as an agent of Egypt. Acting as an agent of a foreign principal is further defined in 22 U.S.C. § 611(c). A plain reading of statute indicates that "the conduct constituting the offense," *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005), for the purpose of venue includes: "engag[ing] within the United States in political activities for or in the interests of such foreign principal," "act[ing] . . . as a public relations counsel, publicity agent, information-service employee or political consultant for or in the interests of such foreign principal," "solicit[ing], collect[ing], disburs[ing], or dispens[ing] contributions, loans, money, or other things of value for or in the interest of such foreign principal," "represent[ing] the interests of such foreign principal before any agency or official of the Government of the United States," and "agree[ing], consent[ing], assum[ing] or purport[ing] to act as . . . an agent of a foreign principal." 22 U.S.C. § 611(c)(1), (2). For a conspiracy charge, the government need only introduce an overt act in furtherance of the conspiracy in this District. Here, the government introduced several such acts. As just one example, the government introduced evidence that while at a dinner in midtown Manhattan, Hana texted General Shawky scheduling a meeting between Menendez and Egyptian officials. Given the other evidence, the jury was more than entitled to conclude that an overt act taken in furtherance of charged conspiracy—that Menendez agree to or consent to act on behalf of Egypt—occurred in this District. This challenge plainly fails.

## III. THERE WAS NO MANIFEST INJUSTICE WARRANTING A NEW TRIAL PURSUANT TO RULE 33.

Defendant contends that she is entitled to a new trial on two bases: first, that she was denied her right to the counsel of her choice under the Sixth Amendment and second, that the government's use of summary charts was improper. The Court notes that following her conviction, she requested an extension of time to file a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 and that she did "not plan to move for a new trial [pursuant to Rule 33]." (ECF No. 840.) The Court

granted this request, extending the time in which defendant was able to file a "renewed motion pursuant to [Rule] 29." (ECF No. 842.) Her counsel specifically represented that she would not move under Rule 33. Despite that representation, the Court has considered the merits of defendant's arguments under Rule 33 and concludes that she has not identified any manifest injustice entitling her to a new trial.

### A. The Sixth Amendment Does Not Entitle Defendant to a New Trial.

#### *1. Relevant Background*

In September of 2023, a grand jury indicted defendant on charges of conspiracy to commit bribery, conspiracy to commit honest services wire fraud, and conspiracy to commit extortion under color of official right. (ECF No. 1.) As the action progressed, superseding indictments were handed down and additional charges were added. (*See* ECF Nos. 65, 115, 230, 238.) On March 5, 2024, a fourth superseding indictment ("the S4 Indictment") was returned, which added charges of obstruction of justice and conspiracy to obstruct justice based on defendant's conduct relating to a grand jury proceeding in this District (Counts 17 and 18, and together "the Obstruction Charges"). (ECF No. 238.)[20]

Specifically, the Obstruction Charges of the S4 Indictment allege that in June of 2022, defendant and Menendez received grand jury subpoenas seeking documents pertaining to, *inter alia*, payments by Uribe for defendant's Mercedes-Benz convertible and Hana's payments towards defendant's mortgage. (*Id.* ¶ 68.) The government alleged that following defendant's receipt of this subpoena, she met with Uribe to discuss what he would tell law enforcement about the payments he had made for her Mercedes-Benz. (*Id.* ¶ 69.) The pair agreed that they would say those payments were a loan. (*Id.*) Defendant then put that plan into action by attempting to return the money by sending checks that purported to be loan repayments. (*Id.* ¶¶ 70-71; *see also* Section II.C. (discussing the checks).)

In addition to these checks, the S4 Indictment also referenced an August 2023 proffer between defendant's then-attorneys—David Schertler and members of his firm, Schertler Onorato Mead & Sears ("Schertler Onorato")—and the U.S. Attorney's Office for the Southern District of New York (the "August 2023 Proffer"). The S4 Indictment alleges that at this proffer, defendant caused her attorneys at Schertler Onorato to state that the payments she had received from Hana and Uribe were loans when she knew

---

[20] The S4 Indictment is the operative indictment and the charging instrument upon which the government proceeded to trial.

they were actually bribe payments. (ECF No. 238 ¶ 73.) Schertler also used a PowerPoint presentation at this proffer to convey his client's position (ECF No. 868 at 6), a document which the government included in its exhibit list for defendant's trial. (*Id.* at 10.)[21]

Following the proffer, in December 2023, the government issued grand jury subpoenas to Schertler and Schertler Onorato. (Decl. of David Schertler dated April 5, 2024 ¶ 3.) At that point, defendant retained independent counsel—her now-current counsel, Sarah Krissoff of the law firm Cozen O'Connor—to provide defendant with "independent legal advice on issues related to the possible conflict of interest created by the fact that her attorneys were the subjects of subpoenas in the case against her." (*Id.* ¶ 4.) After defendant's motion to quash these subpoenas was denied, Schertler and his firm complied with these subpoenas and produced responsive documents. (*Id.* ¶¶ 6-10, 12.) In addition, Schertler was ordered to provide grand jury testimony regarding (i) his communications concerning defendant's payments to Hana and Uribe; (ii) the sources of the factual representations made in the PowerPoint presentation used by Schertler at the August 2023 Proffer; (iii) the content of his communications with the sources that formed the basis of those factual representations; and (iv) whether defendant had reviewed the PowerPoint prior to its use at the August 2023 Proffer. (*Id.* ¶¶ 8, 13; Gov't Mot. to Compel Responses to Grand Jury Subpoenas dated January 23, 2024 at 8-9.)[22] Shortly thereafter, the S4 Indictment was handed down.

One week later, on March 11, 2024, the government advised the Court that "there's a potential *Curcio* issue with respect to one of the lawyers" and that discussions were underway with that attorney. (Mar. 11, 2024 Hr'g Tr. 14.) The next week, the government requested that a hearing be scheduled pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), because "Nadine Menendez's current counsel ha[d] personal knowledge of certain facts relevant to this matter." (ECF No. 253 at 1.) The government explained that this raised two issues: first, the government may seek to call Schertler as a witness at defendant's trial and/or it might introduce evidence or elicit testimony concerning events in which Schertler was personally involved, potentially creating an "unsworn witness" issue; and second, Schertler Onorato attorneys might be limited in their ability to make certain arguments to the Court or to the jury at trial, irrespective of whether defendant wanted them to make those arguments. (*Id.*)

---

[21] There were no non-attorneys present at the August 2023 Proffer. Thus, the only available witnesses to testify concerning the proffer were defense counsel or government attorneys. (ECF No. 868 at 13.)

[22] Schertler ultimately participated in an interview with the government in lieu of providing grand jury testimony. (Schertler Decl. ¶ 13.)

On March 21, 2024, this Court held a *Curcio* hearing, where defendant was represented by both her attorneys at Schertler Onorato as well as her independent counsel at Cozen O'Connor. At that hearing, the government stated that it "would intend to call Mr. Schertler as a witness absent the ability to reach an anonymized stipulation" but informed the Court that the parties were in the progress of negotiating such a stipulation. (Mar. 21, 2024 Hr'g Tr. 5.) All parties agreed that if no stipulation were reached, defendant would need to find a new attorney to represent her at trial. (*E.g.*, *id.* at 5, 8.)

Proceeding on the assumption that the parties would be able to agree on anonymized stipulation, the Court held a *Curcio* hearing on the second issue. (Mar. 21, 2024 Hr'g Tr. 6-7.) Following the *Curcio* inquiry, the Court concluded that defendant had waived her right to conflict-free representation, assuming the parties were able to arrive at a stipulation. (*Id.* at 29.) The Court gave the parties two weeks to attempt to reach such a stipulation.

Ultimately, the parties were unable to agree on a stipulation. Specifically, Schertler explained that, in consultation with independent counsel, defendant "decided that she will not agree to the Government's proposed stipulation, nor will she agree to a stipulation *in lieu* of her attorneys having the opportunity to conduct a full and unhindered cross-examination on the issues related to the testimony of her current attorneys. In so deciding, Ms. Menendez is asserting her Sixth Amendment right to conflict-free counsel." (Schertler Decl. ¶¶ 17-18.) As a result, on April 5, 2024, Schertler and his firm moved to withdraw as defendant's counsel. (ECF No. 286.) Schertler also submitted a declaration from defendant in which she stated that she had discussed the withdrawal decision with independent counsel and that she consented to Schertler's withdrawal. (Decl. of Nadine Menendez dated April 8, 2024 ¶¶ 4-5.)

Around the same time, defendant moved to adjourn her impending trial due to a serious medical condition. (ECF No. 300.) The Court granted that request, severing her trial from that of her co-defendants. (ECF No. 308.) In addition, the Court directed defendant to engage new counsel. (*Id.*) Defendant did so, and on May 29, 2024, Barry Coburn of Coburn Greenbaum & Eisenstein PLLC appeared on her behalf. (ECF No. 427.) At defendant's request, due to her ongoing medical condition, her trial was adjourned for approximately ten months. (*See* ECF Nos. 510, 633, 673, 716.) It ultimately commenced on March 18, 2025. Coburn represented defendant at her trial.

As defendant's trial date neared, the parties exchanged trial materials in compliance with this Court's scheduling orders. (*See* ECF No. 665, 673, 716.) On its pretrial exhibit list, the government included various documents related to Schertler Onorato, including an excerpt of the PowerPoint presentation Schertler used at the August 2023

Proffer. (ECF No. 868 at 10; ECF No. 875 at 77-78.) The government did not list Schertler or any member of his firm on its pretrial list of government witnesses. (ECF No. 875-1.)[23]

As trial commenced, the government continued to provide the defense with information concerning its upcoming witnesses, including by providing the defense with the names of the witnesses it would be calling in its case-in-chief at least two days in advance. (*See* ECF No. 673 at 3.) At no point did the government identify Schertler as a potential government witness, and indeed, he was not called to testify at trial.[24] The government introduced several exhibits concerning Schertler and his firm in the course of presenting its case. These exhibits included a chart listing the subpoenas issued to Schertler and his firm (GX 2499) as well as the subpoenas themselves (GX 11B-3, GX 11F-1, GX 11F-2) and the production made by Schertler Onorato containing the checks and related documentary evidence that were at the heart of the government's obstruction case. (GX 3B-1-EM.) David Schertler and Schertler Onorato were also mentioned by name at least once during the trial. (*See* Tr. 1833.) The government did not, however, introduce the PowerPoint presentation or other evidence concerning the August 2023 Proffer.

Following her conviction on all counts, defendant now contends for the first time that the government violated her Sixth Amendment right to the counsel of her choice.

### 2. *The Sixth Amendment Right to Counsel*

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Within that right is the right of a "defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). The Supreme Court has explained, however, that "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be

---

[23] The government's witness list included two additional categories of witnesses: (i) "[p]ersons as to whom stipulations of testimony or fact have been proposed to you (e.g., as to accuracy of translations from Arabic or Spanish), in the event that no satisfactory stipulation is reached" and (ii) "[d]ocument/records custodians as necessary, in the event that no satisfactory stipulation is reached." (ECF No. 875-1.)

[24] In January 2025, in preparation for trial, government attorneys requested that Schertler meet with them to discuss his possible testimony. (ECF No. 876-1 ¶ 7.) Schertler declined to meet with them but verified the authenticity of certain documents. (*Id.*) On March 28, 2025, government attorneys informed Schertler in substance that it was "likely" his testimony would not be needed but that they "could not commit" that he would not be called as a witness. (*Id.* ¶ 8.)

represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Accordingly, a defendant "does not have the absolute right to counsel of her own choosing." *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993). Of course, a defendant's "[c]hoice of counsel should not be unnecessarily obstructed," *United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982) (citation omitted), and the government may not "'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel." *Wheat*, 486 U.S. at 163.

Also encompassed in the Sixth Amendment right to counsel is a defendant's right to conflict-free representation. *United States v. Rogers*, 209 F.3d 139, 143 (2d Cir. 2000) (citing *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). In some circumstances, however, a defendant may "waive his Sixth Amendment right to a representative free from conflicts of interest in order to retain a particular attorney." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004). But because "a waiver will not necessarily cure every conflict[,] the Sixth Amendment's presumption in favor of counsel of choice may not be interpreted to mean that the right to waive conflicts is absolute." *Id.*

"Rules of professional conduct and case law limit the circumstances in which an attorney acting in a representative capacity may be a witness at trial, whether sworn or unsworn." *United States v. Finkelstein*, No. 21-cr-217, 2021 WL 2555832, at *3 (S.D.N.Y. June 22, 2021). Rule 3.7 of the New York Rules of Professional Conduct provides that:

> A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
>
> (1) the testimony relates solely to an uncontested issue;
>
> (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
>
> (3) disqualification of the lawyer would work substantial hardship on the client;
>
> (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
>
> (5) the testimony is authorized by the tribunal.

N.Y. Rule of Prof. Conduct 3.7(a).

The Second Circuit has explained that "the proper recourse is to disqualify [defendant's] attorney" when the attorney is a sworn or unsworn witness. *United States v. Kliti*, 156 F.3d 150, 156 (2d Cir. 1998); *see also Locascio*, 6 F.3d at 931; *Finkelstein*, 2021 WL 2555832, at *4 (collecting cases). "An attorney acts as an unsworn witness when his

relationship to his client results in his having first-hand knowledge of the events presented at trial." *Locascio*, 6 F.3d at 933. "Where an attorney acts as an unsworn witness, 'his role as advocate may give his client an unfair advantage, because the attorney can subtly impart to the jury his first-hand knowledge of the events without having to swear an oath or be subject to cross examination." *Finkelstein*, 2021 WL 2555832, at *4 (quoting *Locascio*, 6 F.3d at 933). Thus, in this circumstance, "the detriment is to the government, since the defendant gains an unfair advantage, and to the court, since the factfinding process is impaired. Waiver by the defendant is ineffective in curing the impropriety in such situations, since he is not the party prejudiced." *Id.* (quoting *Locascio*, 6 F.3d at 934).

The Supreme Court has acknowledged the reality that a district court generally confronts conflict issues "not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat*, 486 U.S. at 162. As a result, a defendant's attorney may be disqualified when there is simply a risk that the attorney will become a witness or if it seems "more likely than not that a number of conflicts will materialize." *Jones*, 381 F.3d at 121.

### ***3. Defendant's Sixth Amendment Rights Were Not Violated.***

Defendant contends that the government "create[d] an attorney client conflict" by adding the Obstruction Charges in the S4 Indictment and then, once Schertler Onorato withdrew, the government "decline[d] to pursue the allegations that led to the conflict in the first place." (ECF No. 868 at 5.) Defendant asserts that once the prosecutors declined to pursue those allegations, they failed to notify her of that decision. If she had been notified, she urges, she would have re-engaged Schertler, her apparent counsel of choice. This argument fails.

*First*, at no point prior to the present motion—i.e., more than a year after Schertler's withdrawal—had defendant expressed *any* desire whatsoever to re-engage Schertler or his firm. She did not inquire why Schertler's name did not appear on the government's witness list at any point prior to or during her trial nor did she lodge any objection when the case was submitted to the jury and the government had not called Schertler or introduced any exhibits concerning the August 2023 Proffer. Following her trial—where she was ably represented by retained, conflict-free counsel—and her subsequent conviction on all counts, defendant cannot now for the first time assert that she was deprived of the counsel of her choice.

Defendant asserts that she would have had to "read the prosecutors' minds" to have realized that they were unlikely to call Schertler as a witness, contending that the government's decisions were "hidden" and "secret" in light of its representation at the

March 21, 2024 *Curcio* hearing. (ECF No. 876 at 8, 12-13; ECF No. 868 at 2.) That is simply not true. The government alerted defendant to the fact that it was unlikely to call Schertler by omitting him from its witness list.[25] That was more than sufficient to notify defendant of the role her former counsel was to play at her trial.

*Second*, defendant—incorrectly—assumes that Schertler and his firm may have properly served as her trial counsel. But the conflict of interest did not vanish because Schertler was not called as a live witness. First, Schertler likely would have been an unsworn witness to some of the obstructive conduct at issue in this case. Indeed, the jury saw subpoenas Schertler Onorato received, communications surrounding those subpoenas involving Schertler Onorato, and the responsive production which contained the checks with the false memo lines that ultimately became the centerpiece of the government's case on the Obstruction Charges. That the jury did not see all of the evidence involving Schertler or his firm does not alter Schertler's status as an unsworn witness. *See Wheat*, 486 U.S. at 162.[26] Moreover, Schertler may very well have become a sworn witness at defendant's trial. As the government points out, if defendant had chosen to testify, the government may have called Schertler as a witness in its rebuttal case.[27] Again, the fact that this did not come to pass did not remediate the conflict.

*Finally*, there is simply no evidence to support defendant's contention that this conflict was manufactured as a ploy to rid defendant of her chosen counsel. *See Wheat*, 486 U.S. at 163. The two district court cases defendant cites in support bear little, if any, resemblance to the facts of this case. *See, e.g.*, *United States v. Morrell-Corrada*, 343 F. Supp. 2d 80, 90-92 (D.P.R. 2004) (denying motion to disqualify counsel who had formerly served as counsel for a government witness in part due to the "limited nature of the former representation and the waiver of the attorney-client privilege by [the

---

[25] Defendant makes hay of the fact that the government's witness list reserved the right to call as witnesses "[p]ersons as to whom stipulations of testimony or fact have been proposed to you (e.g., as to accuracy of translations from Arabic or Spanish), in the event that no satisfactory stipulation is reached." (ECF No. 875-1.) While it is conceivable that this notation could have encompassed Schertler or other members of Schertler Onorato, it does not support defendant's assertion that she expected Schertler to testify at her trial.

[26] Defendant contends that it does not matter whether Schertler was an unsworn witness because it was the government's representation that Schertler was going to be a sworn witness. But the government did not list Schertler on its witness list; should defendant have wished to explore whether she could re-engage Schertler, she was free to do so at that—or any—time.

[27] The government was entitled to call Schertler as a rebuttal witness if it desired to do so. The government's case "should not be unfairly impaired so that an accused can continue with conflicted counsel." *Locascio*, 6 F.3d at 934.

former client]" and concluding that the motion had been made for tactical purposes); *United States v. Rosato*, No. cr-88-66E, 1989 WL 153790, at *5-6 (W.D.N.Y. Dec. 7, 1989) (denying motion to disqualify counsel when "no competent evidence ha[d] been introduced showing there was ever an attorney-client relationship between" defendant's counsel and government witness and acknowledging that the "assertion that the government has strategically sought to 'manufacture' a conflict of interest so as to avoid these attorneys' tremendous insights and abilities cannot simply be ignored").[28]

At the end of the day, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. The Court has no doubt that defendant was represented by an effective advocate in this case.

### B. The Use of Summary Charts and Summary Witnesses by the Government Was Proper.

Defendant contends that the government's use of several summary charts—primarily GX 1352, GX 1353, and GX 1354—to present voluminous evidence to the jury was improper. Specifically, GX 1352 is an 83-page chart that places various government exhibits concerning the Egypt scheme in chronological order; GX 1353 is a 51-page chart that similarly lists certain government exhibits concerning the New Jersey state criminal matters; and GX 1354 is a 15-page chart that organizes certain government exhibits by date relating to Daibes' federal prosecution.

These three charts are all formatted in the same manner. At the top is a row that sets forth the date range the chart covers. (GX 1352-54; *see also* Tr. 563.) Each chart is comprised of six columns, consisting of (i) a number that identifies the row, (ii) the date of the document or communication, (iii) the time of the communication in Eastern Time, (iv) who sent the communication, (v) who received the communication, and (vi) a column entitled "detail." (*See* GX 1352-54). The detail column is populated with the type of communication (e.g., "text," "email," "WhatsApp," or "call") followed by a direct quotation, photograph, or other reproduction excerpted from the underlying exhibit or

---

[28] The Court declines to hold an evidentiary hearing because the Court has not observed any occurrence that "potentially call[s] into question the fairness of the proceedings or the thoroughness of [the] defense." (ECF No. 876 at 5 (quoting *United States v. Awadallah*, 436 F.3d 125, 136 (2d Cir. 2006)).) *See also United States v. Menendez*, 763 F. Supp. 3d 538, 549-50 (S.D.N.Y. 2025) (declining to allow discovery into alleged government misconduct because defendant failed to provide any "evidence tending to show the existence of the essential elements of the defense" (quoting *United States v. Berrios*, 501 F.2d 1207, 1211-12 (2d Cir. 1974))).

containing the complete exhibit. (*Id.*) The chart then identifies by exhibit number the underlying exhibit from which the quoted language or reproduction came. (*Id.*) Each chart was admitted into evidence pursuant to Federal Rule of Evidence 1006, as well as the exhibits underlying each chart.

To introduce each summary chart, the government called an FBI Special Agent who was not involved in the underlying investigation of the defendant. (Tr. 556, 1186, 2395.) Each agent explained that the government prosecutors had created each chart, including by selecting what documents were listed and what information from them was set forth in the chart. (Tr. 556, 1186-88, 2395-96.) The agent's role was simply to verify that all of the information in each chart was accurate, based on the underlying exhibits. (*See* Tr. 556 (Agent Coughlin: "I went through . . . every line and every column in the summary chart and verified that those lines and the columns were accurate" by "look[ing] at the original source document that the summary chart was derived from."); Tr. 1186, 2395.) Each agent explained to the jury that the decision as to which exhibits to include in the charts had been made by the prosecutors, not the agents. (Tr. 557-58, 564-67, 1186-89, 2396-97.)

Importantly, these three summary charts and the manner in which the government presented them to the jury largely mirror the charts and testimony introduced at the 2024 trial of defendant's co-defendants. (*Compare* GX 1352-54 (summary charts introduced at defendant's March 2025 trial) *with* GX 1302-04 (summary charts introduced at co-defendants' May 2024 trial.) Indeed, the only difference is that the charts introduced at defendant's trial contain slightly fewer underlying exhibits and are therefore shorter. (*Compare, e.g.*, GX 1302 (97-page summary chart for Egypt scheme used at co-defendants' trial) *with* GX 1352 (83-page summary chart for Egypt scheme used at defendant's trial).) Indeed, the very same agents testified. (*See, e.g.*, Trial of Robert Menendez, Wael Hana, and Fred Daibes ("Menendez Tr.") 1172 (Agent Coughlin testifying about Egypt summary chart); Tr. 555 (Agent Coughlin testifying about Egypt summary chart).)

In connection with the first trial, the Court repeatedly held that the format and content of these charts was proper. (*See, e.g.*, Menendez Tr. 1012 (holding that the "format of [GX 1302] seems . . . quite appropriate, and there is nothing unusual about it. The items are certainly voluminous, and it seems to me, under [Rule] 1006, that the chart can be admitted"); *id.* 2312.) *See also Menendez*, 759 F. Supp. 3d at 518-22. In light of those rulings, defendant's trial counsel withdrew her objections to the format of the summary charts. (ECF No. 781 at 2-3 ("Given the Government's proffer that the summary charts it has compiled are materially indistinguishable from summary charts that the Court previously ruled were admissible, and upon review of the Court's prior rulings relating to the application of F.R.E. 1006 to such exhibits, we have withdrawn

such objections."); Tr. 595 (defense counsel: "the government has a right to put that chart together, and did so. And your Honor thought carefully about that and ruled on it in connection with both cases, trial number one and this case. It went in in this case; it's in evidence without objection.").) Defendant offers no reason for the Court to change course now. *See, e.g.*, *United States v. Soto*, No. 12-cr-556, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."), *aff'd sub nom. United States v. Ramos*, 622 F. App'x 29 (2d Cir. 2015).[29]

The Court similarly concluded that the government's method of presenting these summary charts to the jury—through FBI agents who were not involved in the underlying investigation—was proper. *See Menendez*, 759 F. Supp. 3d at 522-25. The Court will reiterate, however, that the use of such witnesses did not deprive defendant of her right under the Sixth Amendment to confront her accusers. *See id.* at 522-24 (rejecting co-defendant's Confrontation Clause challenge to similar summary witness testimony).

Defendant contends these summaries allowed the FBI agents to make "inferences . . . with no personal knowledge." (ECF No. 868 at 23.) To support her argument, defendant highlights an excerpt of the government's questioning of one of its summary witnesses. (*Id.* at 23-24.) In that excerpt, the government asked the agent to read a text message sent by defendant.

> Q: can you please just read "It has been a year of broken promises" to the end of that paragraph, just that line?
>
> A: "It has been a year of broken promises by Will to me, and I have given 1000 percent of my —— myself, my time, and kept every promise to Will."
>
> Q: Where the defendant says it's been a year of broken promises by Will to her, what's the month and year that the defendant writes this?

[29] Defendant takes particular issue with the fact that the charts contained line entries "from a variety of sources . . . compiled together." (ECF No. 868 at 20.) Specifically, she urges that "[b]y compiling a variety of sources of information, the summary exhibits in this trial became improperly argumentative, as they were rife with the Government's judgment determinations and conclusions about the weight of the evidence." (*Id.*) As an initial matter, defendant cites no authority to support her argument. Tellingly, courts in this District have admitted summary charts pursuant to Rule 1006 that compile information from several sources. *See, e.g.*, *United States v. Parnas*, No. 19-cr-725, 2022 WL 669869, at *7 (S.D.N.Y. Mar. 7, 2022), *aff'd sub nom. United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023).

A: March 26, 2019.

(Tr. 677.) The government then pulled up a different (non-summary) exhibit and continued its questioning.

Q: Special Agent Coughlin, what was the month and year of this meeting that we saw the invitation for?

A. March 2018.

Q. About how long was that before the defendant texted a year of broken promises?

A. Little over a year.

(*Id.*)

Nothing about this questioning was improper. While a summary "should not draw controversial inferences or pronounced judgment," "routine computations and culling through of documents to eliminate confusing and extraneous evidence" is acceptable. *United States v. Lemire*, 720 F.2d 1327, 1350 (D.C. Cir. 1983). "[L]ining up and comparing information" does not require impermissible inferences to be drawn. *United States v. Abou-Khatwa*, 40 F.4th 666, 686 (D.C. Cir. 2022). Here, the government simply asked its witness to identify the date a message was sent and then compare that to the date of another document that was already (and properly) admitted into evidence. No interpretation or impermissible inference was called for.[30]

Defendant next contends that because the government presented the jury with a "simplified timeline of certain arguably related conduct all in one place," the jurors became less likely to "analyze evidence that was admitted but not included within the summary exhibit." (ECF No. 868 at 22.) Putting aside the fact that defendant offers absolutely no support for her theory, she was free to create and introduce her own summaries—which her co-defendants did in the 2024 trial. *See Menendez*, 759 F. Supp. 3d at 521-22.

---

[30] Defendant also points to an instance where the government asked Agent Coughlin to identify "the entity that is listed in the first sentence [of the exhibit] as bearing the burden of securing its western border." (Tr. 631.) But the exhibit in question—GX C301—is not a summary chart. Rather, it is an email that Hana, a co-conspirator, sent to himself. It is entirely permissible "for a summary witness to 'also read admissible non-summary evidence into the record.'" *United States v. Gentile*, No. 21-cr-54, 2024 WL 3046193, at *3 (E.D.N.Y. June 18, 2024) (quoting *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 636 F. Supp. 3d 144, 161 (D.D.C. 2022)). Moreover, contrary to defendant's assertions, nothing about this piece of testimony presented a "speculative interpretation[] of the language" in this document to the jury. (ECF No. 868 at 23.)

At its core, defendant takes issue with the government's use of circumstantial evidence. She urges it was impermissible for the government to "dr[aw] connections between disparate events[] simply based on timing." (ECF No. 876 at 20.) The government, however, was well within its rights to present a circumstantial case[31] and to do so in part through the use of summary charts. *See, e.g.*, *United States v. Ho*, 984 F.3d 191, 210 (2d Cir. 2020) (affirming use of visual timeline summary chart); *Parnas*, 2022 WL 669869, at *7 (admitting similar summary chart). *See also Menendez*, 759 F. Supp. 3d at 520-24 (explaining why the format, content, and testimony concerning substantially similar summary charts were proper).

Grasping at straws, defendant asserts it was improper for the government to *not* elicit testimony concerning the "entirety or near entirety" of its summary charts. (ECF No. 868 at 21.) That is meritless. There is no requirement that a witness be examined about everything in an exhibit. Indeed, at trial, in order to expedite the presentation of evidence, the Court urged the government "not to go line by line, but to highlight what it wants to highlight." (Tr. 597.)

In sum, defendant's challenges to the government's use of summary charts and summary witnesses fail.

## IV. COUNTS 1 AND 15 ARE MULTIPLICITOUS AND JUDGMENT SHALL ENTER ON ONLY ONE OF THOSE COUNTS.

Defendant contends that Counts 1 and 15 are multiplicitous and asks this Court to impose judgment on only one of these two counts. This Court has previously concluded that these counts are multiplicitous with respect to Menendez and Hana. *See Menendez*, 759 F. Supp. 3d at 532-34 (applying *Korfant* factors and concluding that Count 15 is "merely a subset of Count 1"). The government presents no reason why the Court should reach a different conclusion here. To the contrary, the government concedes that defendant is "similarly situated to [Menendez and Hana] with respect to this claim."

---

[31] As this Court has previously explained, "evidence of a corrupt agreement in bribery cases is usually circumstantial, because bribes are seldom accompanied by written contracts, receipts or public declarations of intentions." *Menendez*, 759 F. Supp. 3d at 477 (quoting *Friedman*, 854 F.2d at 554). Thus, the Second Circuit has repeatedly emphasized the importance of timing in bribery cases. *See, e.g.*, *Bruno*, 661 F.3d at 744 ("[T]iming of the payments in relation to the actions taken by [an official] could also be accepted by a rational jury in support of the conclusion that [the official] understood that the . . . payments were made in return for official action."); *Silver*, 948 F.3d at 567 n.18 (same); *Calk*, 2022 WL 101908, at *2 ("The timing and circumstances of each loan was sufficient for the jury to infer [defendant's] corrupt intent.").

(ECF No. 875 at 99.) Accordingly, the Court will impose judgment on only one of the two multiplicitous counts.

## V. CONCLUSION

Defendant's motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 is denied on the ground that the evidence at trial was more than sufficient to sustain her conviction on all counts; in addition, defendant's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 is denied on the ground that defendant has failed to identify any injustice—let alone a manifest injustice—requiring a new trial.

Dated: New York, New York
July 31, 2025

SO ORDERED:

Sidney H. Stein

Sidney H. Stein, U.S.D.J.